UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-CR-20255-WPD

UNITED STATES OF AMERICA

v.

PATRICK BOYD and
CHARLES BOYD,

          **Defendants**.
_____/

### RESPONSE IN OPPOSITION TO GOVERNMENT MOTION FOR AUTHORIZATION TO RELEASE MATERIAL SUBJECT TO THE CRIME-FRAUD EXCEPTION

Charles Boyd and Patrick Boyd ("Boyds") through undersigned counsel file this Response in Opposition to the June 20, 2025 Government Motion for Authorization to Release Material Subject to Crime-Fraud Exception ("Motion") (D.E. 72). The Boyds further state the following:

### INTRODUCTION

The Government's Motion, filed fifty-two (52) days before commencement of trial (August 11, 2025), seeks authorization for the Government Filter Team to release to the Government Prosecution Team "certain communications pursuant to the crime-fraud exception to privilege" (D.E. 72 at 1). The Government's Filter Team, three (3) days later, on June 23, 2025, filed a one hundred and twenty-four (124) page pleading styled as Filter Team's Ex Parte Supplemental Submission in Support of Motion for Authorization to Release Material Subject to the Crime-Fraud Exception ("Ex Parte Supplement"). The Filter Team's Ex Parte Supplement was filed under seal, served on the Boyds, and properly excluded from the Government Prosecution Team. The Ex Parte Supplement represents that "at least 1,354 records fall within the scope of the Motion – i.e. records, relating to communications Defendants and other Safe Chain personnel had with attorneys relating

to the charged conduct during the alleged conspiracy period of April 2020 to August 2021". (Emphasis Added). The Filter Team identified the bates numbers of the 1,354 records to the Boyds in a June 25, 2025 correspondence. Those 1,354 records total approximately 7,500 pages of documents, not accounting for the attachments to those records. The Filter Team has not indicated whether it seeks use of a portion of or all of the approximately 7,500 pages of documents (excluding attachments) or all of the records. The Boyds are not certain whether the term "at least" indicates additional documents are in play.

The Government's Motion asserts that the Boyds engaged legal counsel for a nefarious purpose:

> Throughout the alleged conspiracy, Patrick Boyd and Charles Boyd engaged counsel <u>to maintain the façade that their HIV business was legitimate and justify continuing to sell the diverted HIV drugs over compliance's objections.</u> As a result, communications between Patrick Boyd, Charles Boyd, Safe Chain personnel, and their lawyers are not protected from disclosure by the attorney-client privilege, the work product doctrine, or any other privilege or doctrine.

(D.E. 72 at 2). (Emphasis Added).

The Boyds' Response will establish that the Government's claim that the Boyds "engaged counsel to maintain the façade that their HIV business was legitimate and justify continuing to sell the diverted HIV drugs over compliance objections" is unsupported by fact and falls measurably short of the legal requirements necessary to establish an exception to recognized legal privileges. Having failed to meet its burden essential to establish the crime-fraud exception, the Government's "eve of trial" Motion should be denied.

## BACKGROUND

Safe Chain is the Boyds' family run business that operates from Cambridge, Maryland and Saint George, Utah in the secondary wholesale pharmaceutical industry. Safe Chain is licensed in

forty-six (46) states and the District of Columbia to operate as a wholesale distributor of pharmaceutical drugs. The legitimacy of secondary pharmaceutical wholesalers is recognized by the Food and Drug Administration ("FDA") as providing assistance in keeping drug prices lower for consumers. See, FDA, The Prescription Drug Marketing Act: Report to Congress, at 15 (June 2001).

Secondary pharmaceutical wholesalers can disrupt the apparatus drug manufacturers construct to maintain elevated prices for their product. Essential components of that apparatus include drug manufacturer's limitation of drug sales to preselected distributors at specifically designated elevated prices. Drug distributors, preselected by the manufacturer are known as "Authorized Distributors" or "AD's". The drug manufacturer's set purchase prices for AD purchase of the manufactured drug is known as the "wholesale acquisition cost" or "WAC." Conceptually, for the manufacturer's preselected drug distributor (AD) to make a profit, it needs to sell the manufactured drug (generally to a pharmacy) at a higher price than the WAC price the distributor purchased the drug from the manufacturer. Obviously, this structure serves the purpose of solidifying higher drug prices and manufacturer profits. It also helps explain the higher prices for the same drugs sold in the United States as opposed to sale in another country.

Secondary pharmaceutical wholesalers are a threat to drug manufacturers since secondary pharmaceutical wholesalers can sell the manufacturer's drugs below the WAC price set by the manufacturer. Drug manufacturers recognize that the competition presented by secondary pharmaceutical wholesalers' lower prices are adverse to drug manufacturers' potential profits. Drug manufactures attempt to combat secondary pharmaceutical wholesalers' competition in a variety of ways, including questioning the legitimacy of the secondary market, questioning the

3

integrity of the product being sold by the secondary pharmaceutical wholesaler, as well as arguing that below WAC prices are "red flags" concerning the integrity of the drug being sold.

In truth, a variety of legitimate factors allow for secondary pharmaceutical wholesalers to purchase and sell drugs at below WAC amounts. The initial factor is the reality that the WAC amount is not the actual cost of the drug being purchased by the AD from the manufacturer. Drug manufacturers provide several financial incentives to their Authorized Distributors, such as early pay discounts, rebate programs, and volume of purchase discounts that effectively reduce the AD's actual cost of purchasing the drug from the manufacturer. Although the AD is supposedly purchasing the drug from the manufacturer at WAC, the truth is that the actual cost of the AD's purchase from the manufacturer is considerably below WAC. The AD can then sell the drug to a secondary wholesale distributor at a below WAC amount and still make a profit. The AD can also sell the manufactured drug at a price lower than WAC as an incentive for pharmacies to buy additional products from the AD.

Another real-world economic reality is that unique circumstances can influence prices for goods. Pharmaceutical goods are not immune to potentially unique circumstances. One of the economic factors that surfaced during the period of the alleged conspiracy (April 2020 through August 2021) was the onset of the Covid crisis that essentially shut down the world economy. Business bankruptcies, shut downs, closings, and limitations on lines of credit involving independent pharmacies were casualties of the financial devastation that Covid created. Given those circumstances, it was not unreasonable to believe that pharmacies would be anxious to liquidate the shelves of expensive HIV medications at fire sale prices.

## HIV DRUGS, SAFE CHAIN AND LEGAL REPRESENTATION

Safe Chain commenced the purchase and sale of HIV medications in April 2020. Safe Chain's involvement in HIV medication purchases and sales was at the urging of Adam Brosius. Prior to April 2020, neither Safe Chain nor the Boyds had experience in the HIV medication market.

In the years leading up to April 2020, Brosius generated revenues for Safe Chain through drug purchases and sales facilitated by Brosius' company Worldwide Pharma Sales Group, Inc. ("Worldwide"). Brosius had originally presented himself to the Boyds as a legitimate and honest businessman with contacts and experience in the pharmaceutical world.  The Boyds took Brosius at his word.

Brosius explained to the Boyds that Brosius had contacts with legitimate licensed wholesale drug distributors who had acquired HIV medications that were available for Safe Chain purchase.  Brosius, also represented to the Boyds that Brosius' Worldwide sales force working in conjunction with Safe Chain could then sell those HIV medications to pharmacies around the country since Safe Chain maintained wholesale pharmaceutical sales licenses in forty-six (46) states and the District of Columbia.  The Boyds relied on Brosius' business acumen and representation that the HIV transactions were legitimate and lucrative.

The Boyds depended upon Brosius' expertise and experience to negotiate Safe Chain's purchase price for the HIV drugs as well as Safe Chain's sales price of the HIV medications to pharmacies. The Boyds had limited communications with the vendors that Brosius brought to Safe Chain. Unknown to the Boyds, until discovery in this case, Brosius conducted extensive communications with HIV vendors utilizing encrypted applications designed to provide secrecy from those communications. Brosius' role in the HIV transactions earned Worldwide a broker's

fee for each HIV purchase and a sales commission fee for each HIV sale to a pharmacy facilitated by Brosius' Worldwide sales force. The Boyds now suspect that Brosius was also receiving a broker fee from the HIV vendor. Safe Chain primarily used Safe Chain funds or monies borrowed by Safe Chain to fund the purchase of HIV drugs from Brosius' wholesale distributor contacts. The HIV medications purchased by Safe Chain were primarily manufactured by Gilead Sciences, Inc. ("Gilead"). Each bottle of Gilead HIV medication cost Safe Chain in the approximate range of $2,500.

In addition to Brosius' representations of legitimacy, the Boyds mandated that Safe Chain compliance procedures be enforced to vet potential vendors or sources of HIV drugs being purchased by Safe Chain. Safe Chain compliance approved each of the wholesale distributors who sold HIV drugs to Safe Chain. In doing so, Safe Chain compliance made a determination that each of the wholesale distributors maintained a state wholesale license in the distributor's home state. The license verification process conducted by Safe Chain compliance included wholesale distributor Boulevard 9229 LLC referenced in the Motion as ("Boulevard"). Not mentioned in the Motion, is the fact that when Safe Chain compliance later determined that Boulevard had presented a false and forged state wholesale distributor license in its Safe Chain vendor application, Safe Chain terminated Boulevard as a vendor of HIV drugs. The Motion also fails to include that Safe Chain likewise terminated its business relationship with at least four additional licensed HIV drug distributors based on discovery of distributor improprieties. Similarly, the Motion does not include Safe Chain's rejection of the application of another HIV distributor based on Safe Chain compliance investigation. The Motion's failure to include actual facts inconsistent with its theory of fraud is a continuing theme in the Government's Motion.

The Indictment alleges that Safe Chain purchased large quantities of diverted HIV drugs from HIV Drug Suppliers that had obtained the HIV drugs primarily through unlawful diversion "buyback" schemes. (D.E. 10 at 6). The Indictment does not allege, nor has any evidence been produced, that the Boyds were aware that the HIV drugs Safe Chain was purchasing and selling were the product of unlawful diversion "buyback" schemes. No disclosure has been made that cooperating witness Brosius represented to the Boyds, or even knew himself, that the HIV drugs Safe Chain was purchasing from Brosius' contacts were the product of "buyback" schemes. To the contrary, Brosius represented to the Boyds that the Boulevard HIV drugs being purchased by Safe Chain had been acquired by Boulevard from pharmacies that had either gone out of business or desired to liquidate their HIV inventory. The Boyds believed Brosius.

When Charles Boyd learned from Safe Chain compliance that Boulevard had failed to provide Safe Chain with required "T3" documentation with HIV deliveries, Charles Boyd insisted that Boulevard T3 obligations be satisfied and that any delinquent T3 obligations be fulfilled. Charles Boyd is documented communicating to Boulevard, Brosius, and others that Safe Chain would not continue conducting any HIV drug related transactions without Boulevard compliance with T3 requirements. Charles Boyd's communications clearly stated that the T3 requirement was the law and compliance with the law was non-negotiable.

Safe Chain was provided various explanations for the initial lack of Boulevard T3s, including that Boulevard had acquired the HIV drugs from pharmacies that were either now out of business or had liquidated their inventory and therefore had not provided Boulevard with T3s that could be updated and provided to Safe Chain. Those explanations were never disputed by Brosius. Safe Chain was informed that Boulevard was attempting to go back and locate documentation in

an attempt to comply with its T3 obligations. Safe Chain refused to continue with Boulevard HIV transactions until Boulevard caught up with the tardy T3s.

Ultimately, Charles Boyd implemented procedures that required Safe Chain compliance to receive and approve T3 documentation prior to Safe Chain accepting any delivery of HIV drugs. The procedure provided Safe Chain compliance with absolute authority to reject any HIV transaction that failed to meet T3 requirements. The Government has failed to identify any circumstance where compliance's authority and decision was overruled.

In instances where Safe Chain compliance could not verify the accuracy of information on T3s relating to HIV purchases, Safe Chain insisted on actual documentation of transactions that confirmed that the HIV drugs had actually been acquired in a legitimate transaction. Without appropriate justifying documentation, HIV transactions were not approved by Safe Chain compliance.

Brosius, who had brought Boulevard as a licensed distributer of HIV drugs to Safe Chain in 2020, also brought a second licensed distributor to Safe Chain during that time period. The second HIV licensed distributor was Gentek. Like he had done with Boulevard, Brosius vouched for the integrity of Gentek as a legitimate source of HIV medication. Brosius represented that Gentek had acquired the HIV medication through a Gilead Authorized Distributor. Again, the Boyds believed Brosius.

In August 2020, Safe Chain was notified by a California pharmacy that a bottle of HIV medication the pharmacy had purchased actually contained generic Excedrin pills. The California pharmacy had also notified the manufacturer of the HIV medication, Gilead, of the Excedrin discovery. At the same time, Safe Chain compliance had contacted Gilead to determine the

authenticity of a different lot number of Gilead HIV medication that was the subject of a customer complaint.

Safe Chain informed Gilead that it was certain that Safe Chain was not responsible for the Excedrin tablets in the Gilead HIV medication bottle. Safe Chain believed that the Excedrin tablets in the HIV bottle was caused either by a manufacturing malfunction or had resulted from some activity after the pharmacy or patient received the Gilead HIV bottle. There is no evidence that Safe Chain bore any responsibility for the Excedrin found in the Gilead HIV bottle.

What followed was a series of communications between Safe Chain and Gilead concerning the Gilead HIV medications and documentation. Safe Chain believed that Gilead was attempting to use the Excedrin pill incident as a pretext to learn the identity of the Gilead Authorized Distributor that had been Gentek's source of the HIV drugs purchased from Gentek by Safe Chain. Safe Chain's concern was business based, in that Safe Chain believed that Gilead would attempt to cut off the Gilead AD from continuing the supply of Gilead product to Gentek and ultimately to Safe Chain. The Government now inaccurately claims that Safe Chain was not providing the name of the Gilead AD to Gilead in an attempt to conceal the scope of the charged conspiracy. Safe Chain was under no legal obligation to provide Gilead, the HIV drug manufacturer, with the identity of the licensed distributor that Safe Chain had purchased the Gilead HIV medication.

During the numerous communications between Gilead and Safe Chain in the fall of 2020, Gilead never informed Safe Chain that Gilead had been conducting a long-term investigation that had identified an unlawful HIV diversion "buyback" scheme. The "buyback" scheme included Gilead HIV drugs that had been overprescribed and consequently, had oversaturated certain markets. Gilead had reason to believe that the HIV drugs that Safe Chain was purchasing from what the Government now describes as the "black market" were counterfeit HIV drugs that were

9

the product of the "buyback" schemes. Although Gilead arguably might have had reasons not to inform Safe Chain of the Gilead investigation of the overprescription and "buyback" schemes during the Gilead investigation, Gilead's basis for silence terminated on November 3, 2020 when Gilead filed a civil lawsuit in the Southern District of Florida that described in detail the way the Gilead manufactured and supplied HIV drugs that became part of the overprescribed and "buyback" schemes. See, Gilead Sciences, Inc. v. AJC Medical Group, Inc. et. al. Case No. 20-cv-24523 (S.D. Fla.).

Interestingly, Gilead did not publicize its Southern District of Florida lawsuit. Gilead did not utilize the filing of the Southern District of Florida lawsuit as an opportunity to inform Safe Chain that the issues Safe Chain was experiencing were consistent with Safe Chain being victimized by the results of the overprescription and "buyback" schemes Gilead had been investigating. Instead, Gilead's in-house legal counsel in November 2020 took an aggressive position towards Safe Chain in addressing a correspondence to Safe Chain's legal counsel.

Safe Chain had retained the national health care law firm of Frier Levit in 2018 to represent Safe Chain. The law firm provided legal advice to Safe Chain, the Boyds and Safe Chain employees on a variety of matters, including health care issues and regulatory related matters. Frier Levitt responded to Gilead's November 2020 correspondence and continued to correspond when Gilead's outside legal counsel became involved in 2021.

In March 2021, Gilead issued a national alert which essentially accused Safe Chain of being the source of counterfeit Gilead HIV drugs throughout the United States. The alert made no mention of Gilead's Southern District of Florida lawsuit and Gilead's role identified in that lawsuit of potentially sourcing the drugs that became part of the overprescription and "buyback" scheme. Brosius expressed the belief that the Gilead's national alert was intended to not only destroy Safe

Chain, but also divert attention and deflect blame away from Gilead's conduct. Brosius also claimed to have "inside" knowledge of Gilead manufacturing issues that had resulted in wrong pills being placed in Gilead produced medication bottles.

While Gilead's conduct was suspicious, Safe Chain did not hesitate to initiate protocols and actions designed to assure Safe Chain compliance. Safe Chain examined the conditions of all HIV bottles received, rejecting any bottles that appeared questionable. Safe Chain opened the cap from bottles it received to conduct a visual inspection to ensure that bottle original foil seals had not been tampered with or altered. Safe Chain implemented a "Receipt of Goods" ("ROG") checklist that was required to be completed when each HIV bottle was received at Safe Chain's warehouse.

Gilead, issued a subpoena to Safe Chain in the spring of 2021 for records relating to the Southern District of Florida November 2020 over prescription and "buyback" scheme lawsuit. Frier Levitt continued its Safe Chain representation, including communications with Gilead legal counsel relating to the subpoena. Safe Chain, which had quarantined Gilead HIV product pursuant to issues raised by Gilead, repeatedly invited Gilead to inspect the quarantined Gilead products located at Safe Chain's Maryland facility. Gilead never took Safe Chain up on its offer.

Gilead in July 2021 filed a lawsuit against Safe Chain and the Boyds in the Eastern District of New York. Gilead's ex parte application in that case resulted in the raid of Safe Chain's Maryland and Utah facilities and the seizure of all Safe Chain and Boyd records, including all communications involving Frier Levitt's legal representation. Unlike the Southern District of Florida lawsuit, Gilead highly publicized the July 2021 Safe Chain lawsuit that expanded the allegations against Safe Chain first set forth in the March 2021 Gilead national alert.

During the pendency of the Eastern District of New York civil law suit, Gilead gained an audience with the FDA and the Department of Justice in which Gilead urged criminal prosecution against the Boyds. Gilead made it known to the Boyds during the civil litigation that a Department of Justice criminal prosecution was on the horizon. Gilead also made an inventory of all items seized in the July 2021 Safe Chain raid that has been readily available to the Government. The Government subsequently issued a subpoena for items Gilead had seized from Safe Chain including privileged communications involving Frier Levitt's legal representation.

As part of the Eastern District of New York civil lawsuit, the Boyds sat for depositions conducted by Gilead's legal counsel. The Boyds were represented by legal counsel during their depositions. References to the Boyds' depositions where the Boyds asserted attorney-client privilege are included in the Government's instant Motion. Gilead did not question or challenge invocation of the privilege during the civil case. Gilead did not seek application of the crime-fraud exception to the Boyds privilege in the civil case that was settled in early 2024.

## THE PRIVILEGED COMMUNICATIONS

The Privileged communications were seized by Gilead as part of their court authorized July 2021 raid at the Safe Chain Maryland facility. The Government Prosecution Team was aware of the privileged documents at an unknown time prior to the June 2024 Boyd Indictment. The Government failed to seek a crime-fraud pre-Indictment order permitting access to the 2021 seized privileged communications. It was not until February 28, 2025, over eight (8) months after Indictment, that the Boyds legal counsel received the 2021 seized privileged communications from the Government Filter Team. That production was made sixty-seven (67) days prior to the scheduled May 5, 2025 trial date and included 850,000 pages of potentially privileged material. Based on the interruption of trial preparation that the late production of potentially privileged

communications created, the Boyds reluctantly agreed to the Government's suggestion to join with the Government in a motion to continue the May 5, 2025 trial date. The Boyds agreed, with the Government, to submit a privilege log relating to the 850,000 potentially privileged documents no later than July 15, 2025.

Since the Indictment alleges conduct from April 2020 until August 2021, the Boyds sought to reduce the privilege document review to documents between January 1, 2020 until the time of the Gilead raid in July 2021. The Government rejected the requested limitation, which would have reduced the quantity of documents Boyds' counsel would need to review. Instead, the Government insisted that the Boyds document review commence with January 1, 2018 documents (two years prior to the alleged April 2020 initial conduct). The Boyds commenced their review of the 850,000 pages of produced documents beginning with 2018 communications moving forward. On June 10, 2025, the Filter Team produced another 850,000 pages of documents that the Government had subpoenaed on May 28, 2025 and received on June 3, 2025. On June 20, 2025 the Government filed the instant Motion with the Filter Team filing its supplement on June 23, 2025. The Boyds have not completed their review of the 850,000 pages of documents to determine 2020 and 2021 privileged documents. Likewise, the Boyds have not completed review of the approximately 7,500 pages of documents referenced in the June 23, 2025 Filter Team supplement and produced to the Boyds on June 25, 2025.

## ARGUMENT

Initially, the Government cannot offer any legitimate excuse for its late production of potentially privileged documents. Production of nearly one million pages of documents sixty-six (66) days before a date certain trial date (May 5, 2025) was unacceptable and forced the Boyds to make a classic Hobson's Choice between a timely speedy trial and being properly prepared for

trial. The Boyds opted for trial preparation and agreed to joining a continuance request with the Government. Fifty-two (52) days prior to the reset trial date, the Government has once again dumped an additional 850,000 pages of documents on the Boyds while raising the issue of crime-fraud exception relating to nearly eight hundred thousand pages of supposedly privileged documents. Faced with the newest Hobson's Choice created by the Government, the Boyds refuse to seek any further trial delays.

But that does not reduce the prejudice inflicted by the Government's unjustified delay. The Government has not offered any argument that would excuse its delay in waiting until the eve of trial to file its crime-fraud exception application. Not only has the Boyds' trial preparation again been disrupted, but disposition of the Government's Motion will unnecessarily require additional disruptions in the Boyds' trial preparation. The Government's revealing on May 12, 2025 that it was contemplating filing a crime-fraud exception motion hardly remedies the prejudice created by the Government's delay. Under the circumstances, the Government's delay in filing the crime-fraud exception motion should be denied as untimely.

In addition to the untimeliness of the Government's Motion, the Government has failed to satisfy its burden necessary for application of the crime-fraud exception. Not that the Government has wrongly identified the applicable case law that this Court should apply in considering the Government's Motion. Judge Altonaga's opinion in United States v. Stein. Case No. 21-20321 (March 21, 2023 S.D.Fla.) (attached) recognizes the societal importance of the attorney-client privilege as set forth by the United States Supreme Court in United States v. Zolin, 491 U.S. 554, 562 (1989) and affirmed by the Eleventh Circuit in Drummond Co. Inc. v. Conrad & Scherer, LLP, 885 F.3d 1324, 1334 (11th Cir. 2018). Judge Altonaga also discusses in Stein the necessity of the crime-fraud exception that denies privilege protections to communications made in furtherance of

a crime or fraud. That need is well established in the Eleventh Circuit. In re Grand Jury Subpoena, 2 F.4th 1339, 1345 (11th Cir. 2021); In re Grand Jury Investigation (Schroeder), 842 F.2d 1223, 1226 (11th Cir. 1987) (Schroeder).

The two-part test to determine whether the crime-fraud exception should apply set forth in Schroeder remains applicable:

1. There must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when seeking the advice of counsel, that the individual was planning such conduct when he sought such advice, or that a crime or fraud was committed after the advice, and

2. There must be a showing that the attorney's advice was obtained in furtherance of the criminal or fraudulent activity or closely related to it.

Schroeder, 842 F.2d at 1226.

The Motion claims satisfaction of the first prong of the test by the fact the Indictment was returned charging the Boyds with fraud. As a second basis to satisfy the first prong, the Motion states that the Boyds "used counsel to maintain the appearance that their HIV business was legitimate, justify repeatedly overruling compliance, and to keep the gravy train of HIV drugs rolling". (Motion at 3). While there is no question that the Boyds were indicted and charged with allegations of fraud, that alone, under the circumstances of this case, does not establish the necessary prima facie showing. The Motion's claim that the Boyds used their counsel to maintain the appearance that their HIV business was legitimate and justify repeatedly overruling compliance is unsupported by actual facts to establish a prima facie showing. The Motion does not offer any specific circumstance when the Boyds used counsel to overrule compliance. The actual facts establish the independence and authority provided to compliance to make decisions. The Boyds invocation of the attorney-client privilege at depositions conducted in a civil case years after the

completion of the alleged conspiracy also does not establish a prima facie case. The Motion's assertion that "Defendants' offensive use of privilege in the civil litigation and defensive invocation in these proceedings reflects the improper use of privilege as both a sword and a shield" (Motion at 18 fn 9) is also unsupported by fact.

The Government has failed Schroeder's second prong to establish that any legal advice was given in furtherance of any fraudulent or criminal activity. As far as the more relaxed "related to" element of Schroeder's second prong, the Government has not established what legal advice was given to the Boyds that would relate to any criminal or fraudulent activity. The filter's team supplemental pleading includes thirteen (13) exhibits that apparently are intended to support the "related to" Schroeder second prong. If that was the purpose of the Filter Team's submission it fails even the most relaxed interpretation of Shroeder's second prong. Should the Court seek any further discussion concerning the Filter Team's submission, the Boyds will, with leave of the Court, file an ex parte in camera pleading.

While the Eleventh Circuit's test to determine the application of the crime-fraud exception is a lower standard than other circuits, the Government's Motion actually would create an even lower standard than the Eleventh Circuit has authorized. In essence, the Motion's logic would allow the crime-fraud exception to apply in any case in which a crime of fraud is charged in an indictment and the indicted defendant had any privileged communications concerning the subject matter of the alleged fraud with an attorney during the time period of the alleged fraud. The Motion's rationale apparently would also allow the crime-fraud exception to apply to any privileged communication that a defendant had with legal counsel in preparation for a civil deposition relating to the alleged fraud. While that might be where the crime-fraud exception ends up, it certainly is not there now.

Whatever reasons that have contributed to the Boyds' prosecution being off a traditional schedule, at this point are not important. What is important is that the Boyds' fundamental due process and sixth amendment rights be protected. The obvious late production of 1.6 million pages of documents and the filing of the Government's Motion so close to trial are now rushing proceedings that should have been commenced and completed at least six months ago, if not prior to indictment over a year ago. As late as they are, the Government's Motion and Supplemental Pleading fail to provide the foundation needed to resolve the crime-fraud issue. The Government after dumping the 1.6 million pages of documents on the Boyds is now dumping another approximately eight thousand pages of documents on the Boyds and the Court.

The Eleventh Circuit requires that the Government establish a "sufficient nexus between the alleged criminal or fraudulent activity and the communications at issue to pierce the attorney-client privilege" In re Grand Jury Subpoena, 2 F4th 1339, 1351 (11th Cir. 2021).  It is unclear whether the Government is advocating that each of the approximately 7,500 pages of documents (not accounting for any attachments) it has now produced to the Court "communications at issue" that need to be reviewed and determined to have a nexus with a still undefined criminal or fraudulent activity. If the Government is claiming the required nexus between each of the approximately 7,500 pages of documents, or certain specific pages of documents, it should notify the Boyds and the Court. The Government should also be required to identify the nexus that is part claiming between each document and the criminal activity.   Requiring the Boyds to prepare to respond to approximately 7,500 pages of documents less than forty (40) days before trial without these disclosures should be unacceptable, especially if the short preparation time has been caused by the Government's unexplained tardiness.

Ordinarily, the Government's late production and Motion would be the basis for a request for continuance. However, as has been clearly stated, the Boyds want to move forward with the current August 11, 2025 trial date. A continuance would only serve to reward the Government for its delays. The Boyds, therefore, request that this Court deny the Government's Motion based on its untimeliness and/or the Government's failure to satisfy both prongs of the Eleventh Circuit's test to allow the crime-fraud exception. Should the Court not be prepared to deny the Government's Motion, the Boyds would request that the Government be required to identify the communications at issue so that the Boyds be given an opportunity to rebut the Government's application at an <u>in-camera</u> hearing.

Dated: July 6, 2025

Respectfully Submitted,

| | |
|---|---|
| **By: s/ William R. Barzee, Esq.** | **By: s/ Bruce A. Zimet, Esq.** |
| Florida Bar No. 158720 | Florida Bar No. 0225053 |
| | |
| **BARZEE FLORES** | **BRUCE A. ZIMET, P.A.** |
| Courthouse Center | 1555 Palm Beach Lakes Blvd. |
| Penthouse One | Suite 1400 |
| 40 N.W. Third Street | West Palm Beach, FL 33401 |
| Miami, FL 33128 | Tel: (561) 508-7741 |
| Tel: (305) 374-3998 | Tel: (954) 764-7081 |
| Email: WilliamBarzee@BarzeeFlores.com | Email: BAZ@BruceAZimetLaw.com |
| | |
| *Counsel for Patrick Boyd* | *Counsel for Charlie Boyd* |

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Florida by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

    Dated: July 6, 2025

Respectfully Submitted,

/s/BRUCE A. ZIMET, ESQ.
Florida Bar No. 0225053
**BRUCE A. ZIMET, P.A.**
1555 Palm Beach Lakes Blvd.
Suite 1400
West Palm Beach, FL 33401
Tel:   (561) 508-7741
Tel:   (954) 764-7081
Fax:   (954) 760-4421
Email: BAZ@BruceAZimetLaw.com