```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                    CASE NO: 1:24-cr-20255-WPD

 3   UNITED STATES OF AMERICA,

 4                 Plaintiff,           DATE OF PROCEEDING:
                                        SEPTEMBER 18, 2025
 5   vs.

 6   PATRICK BOYD and CHARLES BOYD,    Fort Lauderdale, Florida
                                        9:00 a.m. - 5:09 p.m.
 7             Defendants.
     _____

 8
                           TRIAL - DAY 2
 9
            BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
10                   UNITED STATES DISTRICT JUDGE

11

12                    A P P E A R A N C E S

13
     FOR THE PLAINTIFF:        Alexander Thor Pogozelski, Esq.
14                             United States Attorney's Office
                               99 NE 4th Street, Ste. 436
15                             Miami, FL 33132
                               Alexander.pogozelski@usdoj.gov
16
                               Jacqueline Zee DerOvanesian, Esq.
17                             Criminal Division, Fraud Section
                               12020 Miramar Parkway
18                             Miramar, FL 33025
                               Jacqueline.derovanesian@usdoj.gov
19

20   FOR THE DEFENDANT,        William R. Barzee, Esq.
     PATRICK BOYD:             Courthouse Center
21                             40 NW Third Street
                               Penthouse 1
22                             Miami, FL 33128
                               williambarzee@barzeeflores.com
23

24

25   (Cont.)
```

```
 1   FOR THE DEFENDANT,        Bruce Alan Zimet, Esq.
     CHARLES BOYD:             Bruce A. Zimet, P.A.
 2                             1555 Palm Beach Lakes Blvd.
                               Suite 1400
 3                             West Palm Beach, FL 33401
                               BAZ@BruceAZimetLaw.com
 4

 5

 6   STENOGRAPHICALLY          SHAMELLE "SHELLY" KELLEY, CCR, RPR
     REPORTED BY:              Official Court Reporter
 7                             400 N. Miami Avenue
                               9th Floor, South
 8                             Miami, Florida 33128
                               Shamelle_Kelley@flsd.uscourts.gov
 9
                         *** *** *** *** ***
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

OPENING STATEMENT

    BY MR. BARZEE                                        9

    BY MR. ZIMET                                        56


               EXAMINATION INDEX

KATHLEEN EBERSPACHER

    DIRECT BY MS. DEROVANESIAN                         93

    CROSS BY MR. ZIMET                                 145

    REDIRECT BY MS. DEROVANESIAN                       167


JONATHAN NICHOLLS

    DIRECT BY MS. DEROVANESIAN                         178

    CROSS BY MR. BARZEE                                 227

    CROSS BY MR. ZIMET                                 251

    REDIRECT BY MS. DEROVANESIAN                       257

```
 1                         EXHIBIT INDEX

 2                                                     MAR ADM

     GOVERNMENT'S
 3
         No. 101                                           183
 4
         No. 603                                           199
 5
         No. 605                                           105
 6
         No. 604                                           106
 7
         No. 601                                           112
 8
         No. 602                                           117
 9
         No. 600                                           130
10
         No. 107                                           137
11
         No. 101                                           183
12
         No. 603                                           199
13
         No. 431                                           204
14
         No. 517                                           208
15
         No. 182                                           210
16
         No. 183                                           214
17
         No. 439                                           218
18
         No. 600                                           220
19
         No. 601                                           222
20
         No. 249                                           223
21
         No. 118                                           250
22

23

24

25
```

1                  (Call to order of the Court at 9:00 a.m.)

2          THE COURT:  We're back on the record.  Counsel are

3   present, and both defendants are present.  We have a note from

4   a juror indicating that her principal at the school wants to

5   check on her really being on jury duty, so she wanted guidance

6   from me.

7          What I would propose doing is just writing them a

8   note and sending it back.  She can tell them who the Judge is.

9   She can tell them the courtroom name, number, that my

10  courtroom is open to the public and anybody can come into it.

11  But they're not going to be able to go into the jury

12  deliberation room to see if she's there.

13         MR. POGOZELSKI:  That makes sense, Your Honor.

14         MR. ZIMET:  No objection, Judge.

15         MR. BARZEE:  No objection.

16         THE COURT:  I think we're still waiting for some

17  jurors.  Anything to come before the Court while we wait?

18         MR. POGOZELSKI:  Yes, Your Honor.  We have an

19  electronic copy of the government's exhibits for the Court as

20  well as for the court reporter, if you want.

21         THE COURT:  The court reporter might want them.  I

22  don't want them.

23         MR. POGOZELSKI:  Okay.  And we'd just invoke the

24  rule of witness sequestration with exception of the case agent

25  at our table.

1          THE COURT:  Okay.  The rule's invoked.  Counsel are

2   instructed to inform their respective witnesses of the

3   invocation of the rule and the ramification of a violation

4   thereof.

5          MR. ZIMET:  Judge, the only matter that we had was

6   related to Mr. Valentine.  We agreed that the Court would give

7   an instruction to the jury.

8          THE COURT:  Yeah, what do you want me to say?

9   Because I don't have any problem with saying it, but are we

10  ringing the bell twice by my bringing it up again?  It's up to

11  you.

12         MR. ZIMET:  Well, what I really want to say, you

13  can't say.  But --

14         THE COURT:  Well, tell me what you want to say.

15  Maybe I can say it.

16         MR. ZIMET:  Nah.  You'd get in trouble.

17         I think the best thing is there were some comments

18  made by a potential juror yesterday who's not on the jury

19  concerning how the government treats cases -- the seriousness

20  of cases.  We would ask -- or you need to disregard that.

21  That's not applicable to any case, including this case.

22         THE COURT:  Okay.

23         MR. POGOZELSKI:  And, Your Honor, may I approach to

24  provide the exhibits to the court reporter?

25         THE COURT:  Okay.

```
 1                 (Tenders.)

 2         THE COURT:  So what I'm proposing to respond to

 3  Juror Battl's letter is to write on the back of the letter and

 4  send it back to her.  "You can tell them that it shows

 5  Dimitrouleas is in Courtroom 205B, that the courtroom is open

 6  to the public, but the juror deliberation room is not."

 7         MR. ZIMET:  That sounds good, Your Honor.

 8         MR. BARZEE:  No objection, Judge.

 9         MR. POGOZELSKI:  No objection.

10         THE COURT:  Terry, can we give this to the -- I

11  think she's an alternate juror, Jacqueline Battl.

12         Just tell her that if she wants a copy of it, we

13  need to make a copy, but the original we'll have to keep.

14         THE COURT SECURITY OFFICER:  Okay.

15         THE COURT:  I think one of the jurors we're waiting

16  for is Mr. Grey.

17         MR. POGOZELSKI:  Judge, do we hear he's on his way,

18  or just haven't heard anything?

19         THE COURT:  I don't know.  Crystal just told me that

20  he's one of the jurors that we were missing.  So when Crystal

21  comes back in, I'll ask her for an update.

22         We're still missing one.  It's not Mr. Grey.

23  Crystal's trying to get ahold of her.

24         Okay.  Apparently the jurors are here.  Anything

25  further before we bring in the jury?
```

 1           MR. POGOZELSKI:  Not from the government, Your

 2   Honor.

 3           MR. ZIMET:  No, sir.

 4           MR. BARZEE:  No, Your Honor.

 5           THE COURT:  Who's going to do the opening first?

 6           MR. ZIMET:  Mr. Barzee.

 7           THE COURT:  So we're going to go Barzee, unless you

 8   tell me otherwise.

 9           MR. BARZEE:  Yes.

10           (Jury present in open court at 9:16 a.m.)

11           THE COURT:  Counsel concede the presence of the jury

12   and waive its polling?

13           MR. POGOZELSKI:  Yes, Your Honor.

14           MR. BARZEE:  Yes, Your Honor.

15           THE COURT:  And did everyone follow my admonition

16   not to discuss the case or allow it to be discussed in your

17   presence?

18           Yesterday one of the prospective jurors gave some

19   opinions about how criminal cases are handled in the federal

20   system.  Disregard what he said.  It's not applicable to this

21   case, and, quite frankly, it's not applicable to any case.

22           All right.  With that, I think we're ready to resume

23   with opening statements.

24           Mr. Barzee?

25                         **OPENING STATEMENT**

1          MR. BARZEE:  Good morning.  Patrick Boyd and Charlie

2     Boyd both want to express their thanks to each and every one

3     of you for being here today.  For being willing to sit here

4     for two, three weeks, to listen to all the evidence, to

5     consider it all very carefully.

6          This is the most important thing in these two men's

7     lives right now, and they're counting on each and every one of

8     you to fulfill that oath to consider the evidence carefully

9     before reaching a verdict.

10          I want to talk to you about this case, and I know

11     that it's a complicated story.  But I want to begin at the

12     beginning, and that is the humble beginnings of this company

13     called Safe Chain.

14          Safe chain was founded about 16 years ago by these

15     two brothers from Maryland.  And they grew up just typical

16     brothers in Maryland.  Their father was a cameraman for NBC

17     news.  Their mom was a stay-at-home mom.  They went to high

18     school in Maryland and then college.

19          A friend of their's father worked at a hospital.

20     And through that connection, they decided that they were going

21     to try to get into that business, something in the health care

22     field.

23          Now, it's important to know that back then, 16 years

24     ago, Pat Boyd knew nothing about pharmaceuticals, knew nothing

25     about hospitals or health care or insurance or any of those

 1    things, nor did Charlie.  They were both just a couple of guys

 2    trying to open up a company.  And the company that they opened

 3    up was Safe Chain, and it started off as a small shipping

 4    company where they would -- you know, if a hospital needed

 5    some crutches, they would go out and pick the crutches up from

 6    one place, drive them across town, and deliver them to the

 7    hospital.  That was the entire company.

 8            And through a lot of hard, working seven days a

 9    week, 16 hours a day, working weekends, they grew that

10    business from a very small business of just a couple of

11    brothers working together.  And then little by little, it got

12    bigger and bigger and bigger, and it finally started paying

13    off for them.

14            At one point, the company was doing so well they

15    were able to hire close to 50 full-time employees.  So they

16    were beginning to become a force in that community and in that

17    neighborhood with 50 employees, meaning 50 families that were

18    all part of a big Safe Chain family.

19            And I say a big Safe Chain family because that's the

20    kind of company it was.  It was the kind of company that would

21    have regular picnics, that celebrated everybody's birthdays

22    and holidays, that would have Christmas parties.  The Boyds ,

23    from the very beginning, were always very concerned about

24    their employees and about taking care of their employees as

25    well as they could.

1           And before you knew it, instead of just having a
2    couple of hospitals as clients, they were getting so big that
3    they had hundreds and then thousands of pharmacies that they
4    were doing business with on a regular basis.

5           Throughout that process of becoming a small shipping
6    company to becoming a good, strong mid-size company, handling
7    thousands of different pharmacies, required a tremendous
8    amount of help.  They couldn't do it alone.  No one could do
9    it alone.

10          And so in order to get that help, they had to reach
11    out to lawyers, to consultants, to people in compliance
12    departments to understand a byzantine world of rules and
13    regulations surrounding the pharmaceutical industry.

14          And by having that help, by paying for all that
15    help, Patrick and Charlie Boyd were able to get 46 different
16    licenses in 46 different states, and the Federal Drug
17    Administration, to become an independent wholesaler of
18    pharmaceuticals.

19          And what that means is they were able to buy
20    pharmaceuticals from pharmacies, and they would be able to
21    sell pharmaceuticals to pharmacies.

22          And so they developed a model, a business model
23    where they were becoming -- at that point, they were small,
24    but the idea was they would become a Walmart of discount
25    pharmaceuticals.

1            And why do I say discount pharmaceuticals?  Discount

2    pharmaceuticals was the market they were looking for because

3    the healthcare industry in the United States is rigged.  It is

4    absolutely rigged.  And it's rigged by Big Pharma.  It's

5    rigged by the insurance companies, and it's rigged, in many

6    cases, by the hospitals.

7            And these huge Goliath players in this industry, the

8    Big Pharma and the insurance companies, have control over

9    things like the FDA and the regulations that are passed.  And

10   these companies, these Big Pharma companies that you're going

11   to hear about, exercise that control in every way that they

12   can.  And one of those ways is making it almost impossible for

13   independent wholesalers who want to offer discount

14   pharmaceuticals, making it almost impossible for them to

15   operate in this market.

16           Now, let me take a second to explain to you how

17   they've done this -- how they were able to rig the system.

18           The first thing the Big Pharma companies do is they

19   say, "We're not going to sell our pharmaceuticals, our

20   medicines, to wholesalers that are out there offering

21   discounts.  We will only sell our medicine to what we call our

22   authorized distributors."

23           So they pick three or four distribution companies,

24   and they enter into agreements with those companies.  And the

25   biggest and most important agreement is that the companies

1   cannot then sell the pharmaceuticals for anything less than
2   what the manufacturer says.
3           And so what does that mean?  What that means is you
4   get Big Pharma and a company like Gilead, for example, a
5   foreign pharmaceutical multi-billion-dollar corporation from
6   Ireland controlling 80, 90 percent of the HIV medicine market
7   in the United States through these types of agreements, which
8   is just basically stomping out the little guys and preventing
9   consumers from having an opportunity to get the HIV medicine
10  in an affordable way.
11          So what does Gilead do?  They come up with a
12  formula -- and kudos to them for coming up with the medicine,
13  because it's life-saving medicine, right?  So, like, I'm not
14  saying they're all bad.  They did some great things.  But they
15  come up with this life-saving medicine, and then they decide
16  that since this medicine is so imperative, it's so important
17  for people to get this into their hands, they can charge
18  whatever they want for it.
19          And so the materials that are used to create these
20  medicines cost them pennies -- absolute pennies.  But they
21  sell the medicine for about $3,000 a bottle.  $3,000 a bottle.
22  That's for a one-month supply.
23          So for a patient on HIV medicine, they have to come
24  up with $3,000 a month to pay for that HIV medicine.  And
25  Gilead is able to do that because of the monopoly that they've

1  secured with the assistance of the FDA and the insurance

2  companies and the hospitals who have all rigged this

3  healthcare system against the individual consumer and the

4  individual patient.

5         Now, thankfully -- thankfully, there is one way

6  around the monopoly, and that's what I want to talk to you

7  about.  And that's the creation of wholesalers.  And

8  wholesalers, like Pat and Charlie, were able to go to the

9  different states and get licensed by the FDA to become

10 wholesalers to be able to buy and sell pharmaceuticals.

11        And so, for example, if a pharmacy is going out of

12 business, and they have, let's say, a hundred bottles of HIV

13 medicine on one of their shelves, and the pharmacy is going

14 out of business, they are allowed to sell that product to an

15 independent wholesaler.  And the independent wholesaler -- and

16 it's going to be sold at less than what the pharmacy

17 originally paid for it, probably, because they're going out of

18 business.  So people are going to be able to buy the medicine

19 now at maybe 50 cents on the dollar, 25 cents on the dollar,

20 10 cents on the dollar.

21        It would then go to the wholesalers who would then

22 be able to sell it to different pharmacies, and they would be

23 able to sell it to pharmacies at a significantly reduced rate.

24        That's not good for Gilead.  That's not good for Big

25 Pharma.  That's not good for the insurance companies.  Because

1    now, people on the street, the patients, the consumers, the

2    people that need this medicine in order to live, are able to

3    purchase it for a reasonable amount of money.

4            And so when Gilead comes around and says, "We want

5    $3,000 a bottle," there's someone else in the marketplace who

6    is selling the same bottle for significantly less.  And that

7    threatens Gilead.  It threatens their power, it threatens

8    their bottom line, and it threatens their billions and

9    billions and billions of dollars in profit that they are

10   sucking out of the United States from these patients who are

11   having to pay this kind of money for HIV medications.

12           MS. DEROVANESIAN:  Objection.  Argumentative.

13           THE COURT:  Overruled.

14           MR. BARZEE:  So Safe Chain was doing very, very well

15   as a mid-term wholesale distributor.  And in about 2015, so

16   about 10 years ago, they were sold to a different corporation,

17   a corporation called Benchworks.  Benchworks is a bigger

18   pharmaceutical player in the market and Benchworks wanted Pat

19   and Charlie to stay on and continue working.  And so they did

20   that, and they continued working for Benchworks under the name

21   Safe Chain for the next three, four years.

22           At some point, they became -- they got the feeling

23   that they didn't like the way Benchworks was doing business.

24   They wanted to go off on their own.  They wanted the company

25   that they created back and have control over it.  So they went

1   into negotiations with Benchworks, and they talked about

2   buying the company back, bringing it back home to Charlie and

3   Pat.

4           And when they did that, they found that they did not

5   have enough money in order to buy their own company back, and

6   they were going to need some help, and they were going to need

7   some support.

8           And it was at that time that someone came along --

9   someone came along, and they sort of dangled the front keys to

10  Safe Chain.  And they said, "Hey, if you make me a partner of

11  Safe Chain, I'll put up enough money so that you can buy the

12  corporation back."

13          And that person's name was Adam Brosius.  And I want

14  each one of you to remember that name, because Adam Brosius is

15  the key to this entire case.

16          Because if it wasn't for Adam Brosius, none of us --

17  none of us would be sitting in this room right now.  He is the

18  absolute only reason we are here today.

19          So let me tell you a little bit about Adam Brosius.

20  Adam Brosius was a guy who had a lot of knowledge in this area

21  of the pharmaceutical world, of wholesalers, of vendors, of

22  pharmacies.  He had been doing it for many, many years.  He

23  was a consummate salesman, a smooth talker, something of a

24  braggart.  He was also a professional poker player.  You can

25  imagine the type of personality this guy Adam Brosius was.

1          It also turns out that Adam Brosius was a liar.  I'm

2     a lawyer, I have a job here to do for Patrick, for Charlie.  I

3     don't enjoy calling someone a liar.  It doesn't make me feel

4     good.  I don't like it when other people call someone a liar.

5     But I have to be honest with you, and that is really the best

6     way of describing this guy, Adam Brosius.

7          It's not just that he lies once in a while; it's

8     that he lies all the time about everything.  And he lied to

9     Charlie and Pat.  He lied to the compliance department at Safe

10    Chain.  The compliance department are the people that Charlie

11    and Pat hire to make sure that all of those complicated rules

12    that Big Pharma and the FDA put in all their regulations in

13    the tiny, tiny little print that you have to read.  The

14    compliance department are the ones that are in charge of

15    making sure all of those rules are followed.

16          And Adam Brosius dangles the key to Safe Chain, gets

17    in there like a wolf in sheep's clothing, and just starts

18    lying to everybody.  And he lies to Charlie and Pat.  He lies

19    to the compliance department.  He lies to the vendors that are

20    offering the drugs for sale, the pharmaceuticals for sale at

21    the wholesale prices.  He lies to his own sales force.  He

22    lies to his customers, the pharmacies that are purchasing the

23    medications at the end of the day.  And he even lies to the

24    attorneys that Patrick and Charlie hired to advise them on how

25    to handle the operations of Safe Chain.

1          So he's just going around lying to everybody.  And

2   Adam Brosius, if you remember, he's the one that the

3   government mentioned got indicted for fraud.  And I think the

4   government got their facts incorrect.  He wasn't indicted for

5   fraud until after he had already started at Safe Chain.  They

6   didn't hire him after finding out he had been indicted for

7   fraud.

8          So he gets indicted for fraud in a different case,

9   having nothing to do with this.  All right?  A case in New

10  Jersey.  But then he turns around and he lies to Charlie and

11  Pat about that indictment.  And we're going to talk about that

12  indictment in a little bit, because it's important.

13         But the first point and the most important thing to

14  note is that he lied to them about why he was indicted,

15  whether or not he was guilty or innocent of those charges.  He

16  even lied about what those charges were.

17         He lied about money consistently.  He lied about how

18  much money he was making, how much money he was paying his

19  sales force, how much money was involved in all of these

20  deals.

21         He lied about T3s.  T3s, that's the document that

22  the government kept talking about.  By the way, the government

23  referred to T3s as like an authenticity document or something

24  that would verify authenticity of the medicine.  That's not

25  true.  That's not what a T3 is.

 1          A T3 is like a shipping label.  It just shows you
 2   where it's gone from one person to another.  It has nothing at
 3   all to do with authenticating the medicine that is used or
 4   that is sold.  It has nothing to do with saying, "This
 5   authorizes the purchaser of the medicine to know that this is
 6   exactly what the medicine is."  It's not that at all.

 7          In fact, the authenticity, the way that someone in
 8   this marketplace knows that they're buying an authentic
 9   product is the fact that the vendors, the groups of people
10   that are selling the medication, reselling the medication into
11   the secondary market, they all have to be licensed.  They all
12   have to be licensed by the FDA.  So you're going to hear about
13   these companies -- Boulevard, you'll hear about Gentek,
14   Synergy, Rapids.  There's a bunch of them.  They all have
15   licenses.

16          And the licenses, for most of them, allowed them to
17   sell these pharmaceuticals in the wholesale market.  And I say
18   "most of them" because it turns out that Boulevard lied about
19   having that license.  Boulevard, the vendor, pretended that
20   they had the license from the FDA.  And that license from the
21   FDA is what is the authentication.  That's how you know it's
22   real medicine.  And Boulevard lied about that, and we will
23   prove to you that Boulevard lied about that, and that Patrick
24   and Charlie had no knowledge whatsoever that Boulevard was not
25   licensed.

1          Adam Brosius might have known, but Adam Brosius lied

2    to Pat and to Charlie, just like he lied about everything

3    else.

4          He even lied about each of the vendors.  He lied

5    about the sources of the medications, and he lied to Patrick

6    and Charlie in person, when they would meet in person.  He

7    would lie in emails that he wrote to different people in the

8    corporation.  He would lie on text messages.  He lied in

9    depositions under oath.  He even lied to these US attorneys

10   who are going to put him on the stand.

11         He'll be forced to admit that he lied to them when

12   they question him.  Because that's what Adam Brosius does.  He

13   lies.  He's the type of person who lies when they think it's

14   in their best interest.  In that moment.  It's not even a

15   question of thinking about things ahead of time.

16         Is someone going to figure out this lie a year from

17   now, two years from now, five years from now?  I don't think

18   he's a strategic thinker like that.  He just pops out lies in

19   the moment if he thinks it's going to help him in that moment.

20   That's what he does.

21         And, unfortunately, that wolf in sheep's clothing

22   got into Safe Chain, and he absolutely destroyed that company.

23         And he destroyed Patrick Boyd's life, and he has

24   destroyed Charlie Boyd's life with his lies.

25         Now, let me explain to you how those lies destroyed

1    this really beautiful American company that these two guys

2    built from the ground up.  All right?  And it's a combination

3    of a lot of different things that happened, and it's a

4    complicated story, but let me begin at the beginning.

5              I talked about Big Pharma and the health and the

6    FDA.  And the United States government and Big Pharma entered

7    into an agreement where they said, "Oh, the price of HIV

8    medicines are too high.  It's just too expensive.  $3,000 a

9    bottle is too much."  The insurance companies started

10   complaining about it.  And they had to figure out a way --

11             MS. DEROVANESIAN:  Objection.

12             THE COURT:  Overruled.

13             MR. BARZEE:  They had to figure out a way to get the

14   medicine into the hands of the people that needed it.  Gilead

15   insisted that they were going to keep the price at $3,000 a

16   bottle and that they would only sell it to their authorized

17   distributors, keeping it away from the middleman, from the

18   discounters like Charlie and Pat.

19             And so the United States government and Big Pharma

20   and the FDA all get together with all the lawyers, and they

21   come up with this program.  It's called the 340B program,

22   typical government program that's listed by numbers with a

23   subsection of B so that if you even go in to look for it, it

24   takes you a law degree to understand the index of where all of

25   the rules and regulations are.  I mean, they make it so that

 1   no one can understand any of it without hiring law firms to

 2   explain everything.

 3          But the bottom line is this program enabled Gilead

 4   and the HIV manufacturers to flood certain markets with HIV

 5   medicine.  And it allowed people that didn't have insurance,

 6   with just a card or just an authorization, to be able to go in

 7   and get the HIV medicine at a significantly reduced rate.

 8          Now, as a result of that program, which was a great

 9   program in the sense that it got the medicine into the hands

10   of the people that needed it, the problem was it flooded these

11   markets.  And what do you think happens when you flood a

12   market with a very, very, very expensive product?

13          The criminals move in.  I mean, they move in like

14   cockroaches on crumbs left in the kitchen the night before.

15   And that's what happened.  The criminal syndicates moved in,

16   and they realized that they could start getting these bottles

17   of HIV medicine for almost nothing, you know, for $40, $50

18   copays because of the 340B program, and then turn around and

19   sell that bottle for a couple of hundred dollars.

20          And so criminal syndicates in Miami, New York, and

21   different places around the country started operating where

22   they would be selling -- where they would be purchasing,

23   rather, all of the HIV medicine that was going through these

24   pharmacies for poor people.

25          And they would buy these bottles back for 50 bucks,

1   a hundred dollars, and they would have all of these bottles in

2   bags, in boxes, and they would collect them, because each

3   bottle, remember, is $3,000; right?

4          So they would pay a hundred people to go get these

5   prescriptions and then turn the medicines over, and they would

6   pay the people for the medicines.

7          So the criminals now have boxes or bags full of

8   valid, good, authentic Gilead HIV medicine that they've

9   purchased from different people on the street.

10          In order to turn that into cash, in order to turn it

11   into gold, they have to sell it; right?  Because what are they

12   going to do with a mountain of HIV medicines?  Not going to do

13   anything for them.  And they can't go door to door, asking

14   people if they want to buy HIV medicine.  And they can't walk

15   into pharmacies, because a pharmacist isn't allowed to

16   purchase medicine from somebody who just walks in off the

17   street, saying, "Hey, I can sell you HIV medicine."

18          Pharmacies can only purchase from who?  Licensed

19   dealers.

20          Pharmacies can purchase from pharmaceutical giants

21   or their distributors, or pharmacies can purchase from guys

22   like Pat and Charlie who have wholesale licenses from the FDA.

23          And, by the way, even today, Safe Chain and Pat and

24   Boyd [sic] still have those licenses in 46 different states.

25   The FDA has not revoked their licenses.  In fact, Safe Chain

 1    is still operating as a company right now, as a legitimate

 2    company in this space with the blessings of the Department of

 3    Justice and the United States Government.  So putting that --

 4              MS. DEROVANESIAN:  Objection.

 5              THE COURT:  What the lawyers say isn't evidence.  If

 6    it turns out that that's not the evidence, you have to go on

 7    the evidence and not what the lawyers say.

 8              You may proceed.

 9              MR. BARZEE:  Thank you, Your Honor.

10              They are still licensed in all these states.  They

11    are still operating.  They are still doing business.

12              So let me -- I'm sorry, I got distracted.

13              So these guys that have collected all of the

14    medicine, and they have medicine sitting in boxes and in bags.

15    They can't go door to door selling it, and they can't go to

16    pharmacies.

17              So what do they do?

18              They have to sell it to the middlemen.  They have to

19    sell it to wholesale distributors who would then sell it to

20    pharmacies because they're licensed by the FDA; right?

21              The problem for the criminals at that point is

22    Patrick Boyd and Charlie Boyd would absolutely refuse and did

23    refuse and have refused and will continue to refuse to ever

24    purchase any medicine from the black market.  They know better

25    than that.  They're not going to risk their entire company

```
 1    doing that.  They're not going to risk their livelihoods doing
 2    that.  They're not going to risk their liberty and their
 3    freedom and their family's future doing something as stupid as
 4    that.
 5            So what happens?
 6            What happens is the guys that have the medicine, the
 7    criminals, have to figure out a way of tricking Patrick Boyd
 8    and Charlie Boyd.  And the way that they do that is they get a
 9    helper.  And their helper is a guy named Adam Brosius.
10            And these guys, I'm going to call them vendors.  All
11    right?  The criminals who are getting all the pills together
12    and then selling them to Safe Chain.  The vendors have
13    legitimate licenses, with the exception of Boulevard, who lied
14    about having a license.  Patrick and Charlie had no idea that
15    they were lying about it, and we'll prove that to you.
16            The other vendors, Gentek, Synergy, Rapid's, you'll
17    hear these names.  You don't have to remember them now.  But
18    these other vendors all have legitimate licenses.
19            So Adam Brosius makes deals with all of the vendors,
20    and he speaks to all of these vendors.  And he says to the
21    vendors, "Hey, I understand that you have a lot of medicine
22    that you want to move.  We'll buy it.  I got a hook-up.  My
23    hook-up is these guys at Safe Chain, and they have
24    distribution licenses, and they can purchase the medication.
25    But we can't tell them the truth.  We can't tell them where
```

1   this medicine came from.  So we're going to have to lie to

2   Charlie and to Pat."

3          And the vendors who have these boxes of medicine

4   that they've bought for pennies on the dollar and they want to

5   spin them into gold, agree.  And so they all conspire with

6   this guy, Adam Brosius, to sell all of this medicine that they

7   got off the black market to companies like Safe Chain.  And by

8   the way, Safe Chain isn't the only company that got into this

9   kind of trouble.  Pat and Charlie aren't the only two men who

10  got into this trouble.  These bad actors in this system did

11  this to a lot of people, and these two aren't the only victims

12  of this.

13         Adam Brosius was so involved in this, and you'll

14  hear about it, that he now has multiple criminal indictments

15  against him.  Multiple.

16         So what happens?  Adam Brosius comes to Charlie and

17  Pat, and he says, "Listen.  I have a proposal where we can

18  make lots and lots of money."

19         And Charlie and Pat say, "Okay.  Well, tell me about

20  it.  This sounds like a great idea."

21         And he says, "Well, it's in the HIV market."

22         Now, at that time when Adam Brosius brings his plan

23  to Charlie and Pat, Charlie and Pat have never been in the HIV

24  market.  They knew nothing about the HIV market.  They had a

25  limited understanding of some pharmaceuticals, but not an

 1    understanding of the HIV market at all.  So they needed to

 2    become educated.  And Adam Brosius convinces them that he

 3    knows all about this market, and it's not going to be a

 4    problem, and they are going to make tens, maybe hundreds of

 5    millions of dollars by buying this medicine from these

 6    legitimate vendors and then reselling it to legitimate

 7    pharmacies.

 8              And it sounds like a wonderful idea.

 9              And, of course, the first question that Pat and

10    Charlie have -- because they have some knowledge of how the

11    system is rigged is, "Well, how is this going to work?  Gilead

12    and Big Pharma have a monopoly.  They're the ones that decide

13    that the price of the bottles are $3,000 a bottle.  How are we

14    going to be able to buy it for less and sell it for less and

15    still make money?"

16              And Adam Brosius has a few different lies prepared

17    in order to convince Charlie and Pat that this makes sense.

18    And it basically works.  The lies work because of COVID.

19              All of this is happening right around the time that

20    the United States is in crisis.  And, for me, it's like a far

21    away dream, and I can't even sometimes believe that it was

22    really happening to us.  But if you remember COVID, it was

23    bad.  Businesses were closing.  Store fronts were being

24    boarded up.  Everyone's wearing masks.  Everybody was at home.

25    People weren't going into work anymore.

1          And Adam Brosius came to Pat and Charlie, and he

2    said, "Listen, guys, all of these pharmacies all over the

3    United States are going out of business, and there is hundreds

4    of millions of dollars of pharmaceutical products on all of

5    these shelves of all of these pharmacies that are going out of

6    business.  And since the FDA has licensed both of you to be

7    wholesale distributors, we can buy those pharmaceuticals from

8    the pharmacies that are going out of business at pennies on

9    the dollar, and we can resell them to other pharmacies that

10   need the medication, but we don't have to charge them $3,000 a

11   bottle.  We can sell it for $2,000 a bottle.  And we'll make

12   tens of millions, hundreds of millions of dollars."

13          It made sense.  It sounds right, like, it doesn't

14   sound like a lot.

15          There is another reason why Adam Brosius convinces

16   Charlie and Pat that this is legitimate.  And he talks about

17   things like the shelf life and the dates and the expiration

18   dates of the different medicines that are on the shelves of

19   the pharmacies.  And this makes sense also, if you think about

20   it.  All these medicines have expiration dates.

21          Now, as a side note, whether or not those expiration

22   dates are real or not is another question which we don't have

23   to get into, but they're not like milk.  They don't spoil.

24   But they do have expiration dates.  And so, for example, one

25   bottle of the HIV medicine may have an expiration date of

1   October 1st.  So if I'm a pharmacist and I have bottle -- a

2   $3,000 bottle of HIV medicine that's expiring October 1st, and

3   I don't have anybody who's coming in to fill a prescription

4   until November, I'm going to have to throw that in the

5   garbage, and I'm going to lose $3,000; right?  So it has a

6   short shelf life.

7           I mean, today is September 18th -- 19th, something

8   like that; right?  So they only have like 10 or 11 days.

9           So the pharmacist says, "I don't want to throw away

10  $3,000.  I'll sell it to a vendor, a licensed vendor, like

11  Gentek or Synergy or Rapid's or Boulevard " -- we thought they

12  had a license, but it turns out they don't -- but "I'll sell

13  it to one of these vendors for $1,000, and at least I have

14  something."

15          And then the vendor sells it to a place like Safe

16  Chain, and Safe Chain can then go out to pharmacies that need

17  HIV medicine, they need to fill it right away, and they can

18  say, "Hey, we have a short date.  We have a bottle that

19  expires October 1st, but if you get it to the patient now,

20  you'll be okay."

21          And so the pharmacy says, "Yes, I'll buy it."  And

22  they buy it at a discounted rate.

23          So there's two, at least -- at least two different

24  valid reasons why Safe Chain could be buying all of these

25  pharmaceuticals at this significantly reduced rate.  Because

1    of the Adam Brosius story about pharmacies going out of

2    business and because of this idea of short dates.

3            Now, it turns out that Adam Brosius was full of --

4    stuff -- and it was all a lie.  And the truth of the matter

5    was, these guys were reselling these medicines because they

6    had purchased them off the street.

7            But Pat and Charlie had no idea of that.  They

8    didn't know that, and they believed Adam Brosius.  And that's

9    why we're here today, because they believed Adam Brosius.

10           Now, I want to go back and talk about COVID for a

11   minute.  And I talked about how difficult things were in the

12   United States with pharmacies going out of business, people

13   working from home.  COVID was also difficult for Safe Chain.

14           Now, Safe Chain had, you know, at this time 20, 30,

15   40 employees.  They had a compliance department.  They had

16   people working in a warehouse.  I mean, it's a big company.

17   It's a midsize company.

18           COVID hits, and everyone's working from home, and it

19   becomes difficult.  Communications becomes difficult, and

20   attention spans become very, very short.

21           During this time, Patrick and Charlie, this HIV

22   business with Adam Brosius is beginning, but they're not even

23   paying attention to the HIV business.  By the way, the

24   government keeps talking about all this money, and follow the

25   money, and they mention $90 million multiple times.

1          The HIV medicine was probably about 20 percent of

2   Safe Chain's company.  All right?  It wasn't a huge part of

3   their company.  And COVID hits, and they're dealing with

4   things like where can we buy masks, who has masks available?

5   Who has the stuff you rub on your hands?  I mean, those were

6   the things that they were trying to work with.  And everything

7   was kind of a scramble, and everything was happening in the

8   last second, and these guys are doing their best.

9          In the meantime, the vendors are making it very,

10  very difficult for anybody to know what they were doing.

11  You're going to hear about one of the vendors, a company named

12  Gentek, who was dealing with these pharmaceuticals from the

13  street.  And Gentek would collect them all in their bags and

14  in boxes, and then they would take each bottle out, and they

15  would carefully clean it, and they would use alcohol to clean

16  it off to make it look pristine, and they would repackage it

17  so it would look like it just came from the manufacturer.

18          I mean, it was unbelievable the amount of time and

19  effort these vendors put into duping guys like Charlie and

20  Pat.  I say it's unbelievable, but it's not, because if it was

21  apparent, then Charlie and Pat would not have been doing

22  business with them.  It would have been shut down, and the

23  fraud wouldn't have worked.

24          But what they did, they did it with such

25  sophistication, such a level of sophistication that they were

1   able to pull the wool over the eyes of Charlie and Pat.  The

2   sheep in wolf's clothing, Adam Brosius, knew what was going

3   on.  And so Adam was talking out of both sides of his mouth.

4   He would go to Safe Chain and say, "Oh yeah, you know, give

5   the vendors a break.  They're having trouble.  They don't have

6   all of their paperwork together.  It's difficult.  It's

7   COVID."  Blah, blah, blah.  "We're getting you all the

8   paperwork."

9         When I say "paperwork," I'm talking about these T3s,

10  like the shipping paperwork, keeping in mind they have nothing

11  to do with authenticity.  It's just a shipping receipt.  But

12  you're supposed to have it under the regulations.

13        So Adam Brosius is just going to Safe Chain, and

14  he's kind of representing the vendors.  And he's saying,

15  "Don't worry, don't worry.  They're doing their best.  We'll

16  get you all the paperwork."  Right?

17        And then he turns around, and he goes over to the

18  vendors, and he says, "Hey, guys we're in trouble, man.  Safe

19  Chain is going to cut off all of our business because you

20  haven't filled the paperwork out correctly.  You've got to get

21  me this paperwork.  This is what they're asking for."

22        And you'll see that sometimes Adam Brosius warns

23  them, "The compliance department at Safe Chain is going to

24  shut all of this down.  We're not going to be able to keep

25  this going if you guys don't get in line."

1              So it's basically like Safe Chain has a spy inside

2      of their company who is conspiring with the criminals on the

3      street in order to pull the wool over the eyes of Patrick and

4      Charlie.  And the fraud of the vendors was so sophisticated.

5      I mean, they did things -- they would take someone's real name

6      in the pharmaceutical industry, for example, and they would

7      change one letter in the name and create false emails.  They

8      would create false licenses that would be able to trick

9      anybody, unless you were a forensic accountant or an

10     investigator, keeping in mind that this is all happening

11     during COVID.

12             So the licenses are coming in.  The compliance

13     department has to review the license and say, "Okay, this is

14     someone we can do business with," and they make mistakes.

15     They make mistakes.  Boulevard is one of the mistakes they

16     made.  They didn't realize that the application that Boulevard

17     sent in was fraudulent.  They didn't realize that the license

18     that Boulevard said that they had was fake.

19             And so the people at Safe Chain, the people in the

20     compliance department, they make mistakes.  I mean, they're

21     human beings, and they make mistakes.

22             We're also here because of Gilead and the attitude

23     and the approach that Gilead took when they found out that

24     this was happening.  Now, remember, I told you it was that

25     program, the 340B program that Big Pharma induced the United

 1   States Government to get involved with in order to purchase

 2   all of these medications.

 3          Ever since that program went into account, Gilead

 4   knew that this was a problem, that people were buying and

 5   selling these medications for profits in a way that they

 6   should not be doing.

 7          They kept it a secret.  They kept it a secret.

 8   Gilead didn't tell anybody.  Even though we are going to prove

 9   to you that they knew this was happening.  Gilead, the

10   multibillion-dollar foreign pharmaceutical company, safe over

11   in Ireland, knew that their medicines were hitting the black

12   market in the United States.  They knew that people were

13   buying and selling it on the street.

14          They knew that the people buying and selling the

15   medications on the street were selling it to middle dealers,

16   wholesalers like Patrick and Charlie.  Gilead knew that

17   Patrick and Charlie were then reselling it to pharmacies,

18   putting it back into the stream of commerce.

19          Gilead knew all of that.  But they didn't say

20   anything.  They didn't tell anyone.

21          Now, you can ask yourselves why.  What could

22   possibly motivate Big Pharma not informing the public that

23   there was a problem and people were buying and reselling these

24   medications on the street?  What do you think the answer is?

25          It's money.  It's money.  Gilead was making

1    hand-over-fist profits.  They were still getting paid for all

2    these medications.  They didn't want the cash to stop coming

3    from the federal government, and they didn't want to be in a

4    position where they had to say, "Well, now that this

5    medication is out in the stream, we're going to have to do

6    recalls.  We're going to have to recall all of the medicine to

7    make sure that people haven't changed the pills and the

8    bottles and things like that."

9         Gilead didn't want to have to spend any money.  They

10   didn't want to have to lose any money.  They exist for one

11   reason and one reason only, and that's profit.  I'm not saying

12   it's good or bad; I'm just saying it's the truth.

13        And so because of that profit motivation, they never

14   informed Charlie and Pat or the other wholesalers that this

15   distribution scheme -- these cockroaches were buying and

16   selling this stuff off the street.

17        And so what happens?  Gilead allows it to go on for

18   six, nine, ten months, a year, over a year.  And then Gilead

19   finds out that Pat and Charlie are selling this medicine, and

20   what do they do?  They come in, they file lawsuits, they seize

21   products, they contact the Department of Justice, they contact

22   the FDA, and they say to the Department of Justice and the

23   FDA, "Go after these guys.  These are the bad guys."

24        And it's a classic, classic case of David versus

25   Goliath, a multibillion-dollar pharmaceutical company working

 1    hand in hand with the federal government who have rigged the

 2    system against all of us in the first place --

 3             MS. DEROVANESIAN:  Objection.

 4             MR. BARZEE:  -- protecting themselves.

 5             THE COURT:  I allow wide latitude during opening

 6    statements.  So you may continue.

 7             MR. BARZEE:  Doing everything they can to protect

 8    themselves.  And let me tell you how bad it got.  Let me just

 9    give you one example.  You're going to hear about a lot of

10    this during the trial.  Let me give you one example of how

11    disgusting this is.

12             So what happens is when these bottles are being sold

13    on the street, sometimes -- and I don't remember how many

14    times it happened.  Maybe out of -- let's say -- I don't

15    know -- a hundred thousand bottles, maybe like eight or nine

16    of them, there was a different pill inside of the bottle.  A

17    pill that didn't belong there.  All right?

18             In fact, I think the government mentioned in one or

19    two cases there were Excedrin pills in the bottle of HIV

20    medicine.  And in a couple of other cases, there were

21    Seroquel, which is an anti-psychotic pill, in some of the

22    bottles -- all right? -- that Safe Chain unknowingly sold to

23    pharmacies.

24             And to this day, Patrick and Charlie are filled with

25    angst and shame that their company name was at all dragged

1    into this.  The idea that a patient would get a bottle of HIV

2    medicine that they sold that contained another medication is

3    absolutely horrible, tragic, and pains them greatly.

4          But guess what?  Gilead knew that that was a

5    problem.  Gilead knew it was happening.

6          In fact, remember, I told you when Gilead fixed the

7    market -- right? -- when they rigged it and they had their own

8    distributors.  One of Gilead's own distributors is a big

9    multibillion-dollar corporation called McKesson.  And McKesson

10   had a problem.  McKesson was selling HIV medicine, and

11   pharmacies started contacting McKesson and Gilead saying, "Hey

12   there's Seroquel in these bottles of HIV medicine.  What's

13   going on?"

14         What do you think Gilead did?

15         They kept it quiet.

16         Did I say that loud enough for the court reporter?

17         They kept it quiet.  They didn't tell anyone --

18   again.  And Gilead and McKesson agreed.  The lawyers get

19   together, and they say, "Let's not tell anyone that this

20   happened."

21         And Gilead comes up with an answer as to how

22   Seroquel pills can end up in HIV medicine bottles.  And their

23   explanation is that, "Oh, a driver who was picking up the

24   medicine and dropping it off somewhere else must have opened

25   the bottle and inserted Seroquel and take other medicine out

1   so that they could go back to the pharmacy and get their money

2   back."  Some, like, crazy, convoluted story in order to

3   explain this.

4          A more reasonable explanation is that there was a

5   manufacturing problem.  There was a manufacturing problem with

6   Gilead, and somehow pills got into the wrong bottles.

7          And you'll hear throughout the trial that this is

8   something that, although very, very dangerous, it's something

9   that happens with some regularity in the pharmaceutical

10  industry.  Pills do end up in wrong bottles at times, which is

11  one of the reasons why pharmacists in the industry are so

12  careful about having pills all look differently, and it's so

13  -- to help them keep track of things.

14         But you're going to hear in this case that Gilead

15  knows that these problems exist, and they keep it quiet, and

16  they don't tell anybody.  So you can see how this is all sort

17  of coming together.

18         You have the sheep in wolf's clothing, Adam Brosius,

19  lying to Pat and Charlie.  You have the criminals out on the

20  street trying to divert the HIV medicine.  And then you have

21  Gilead and big insurance and Big Pharma fixing the market and

22  not informing anyone that this is happening.

23         Had Gilead told Charlie and Pat at the very

24  beginning that there was a problem and that these medicines

25  were coming from the street, we wouldn't be here today.  If

```
 1    Adam Brosius had never dangled the front keys to Safe Chain in
 2    exchange for an investment in the company, we wouldn't be here
 3    today.
 4            But we are.  And now Patrick and Charlie, these two
 5    business guys from Maryland who didn't know anything about
 6    pharmacies or HIV medicine or anything else, are suddenly
 7    criminal defendants, looking down the Department of Justice
 8    with a huge federal case hanging over them.
 9            And at the end of this trial, it's going to be up to
10    you to decide whether or not they're criminals, criminals who
11    will deserve exactly what they'll get, or are they just honest
12    guys doing their best and acting in good faith whenever they
13    could?
14            And I'm going to suggest to you that at the end of
15    the trial, you're going to become convinced that they were
16    acting in good faith.
17            And right now I'm going to mention ten points --
18    and, by the way, thank you for your patience.  I know this is
19    long.  I know it's difficult to sit here and listen to
20    somebody.  It's so important for me to get this information
21    out to you.  So just give me a couple more minutes, and I
22    promise I'll wrap up.
23            There are ten things that I want you to ask
24    yourselves.  Ten points that I want you to remember.  And it's
25    about the good faith of Patrick and the good faith of Charlie.
```

1          And you've heard the expression "actions speak

2     louder than words."  And I want you to ask yourself the

3     question, "Are these ten acts -- are these ten points the acts

4     of a couple of criminals, or the acts of a couple of guys who

5     were doing their best under extreme, difficult circumstances

6     and trying to deal with all of these rules and all of these

7     regulations while being lied to on the one hand by Adam

8     Brosius, and being smoked out of town by Gilead on the other

9     hand?"

10          And here they are:

11          No. 1, Do criminals have licenses with the FDA, with

12     the DEA, with the United States?  Do they open their books for

13     these inspections on a regular basis?  Are they licensed in 46

14     different states and employ 40, 50 people that support 40 or

15     50 families in a neighborhood in Maryland?

16          What about Adam Brosius's indictment?  The

17     government will love talking about the fact that Charlie and

18     Pat continued doing business with Adam Brosius even after he

19     was indicted for healthcare fraud; right?

20          Now, ask yourselves this question:  What would

21     criminal conspirators do if one of their partners got indicted

22     by the feds?

23          Now, guess what happens?  When you're in a

24     conspiracy with two or three other people, and you get

25     indicted by the feds and the Department of Justice, and these

1    prosecutors come in, and they say, "Hey, you're going to

2    prison for 40 years unless you talk," what do you think the

3    person does?

4           They talk.  They flip.  They cooperate.  They

5    snitch.  Right?  Criminals know this.

6           So Adam Brosius gets indicted in New Jersey.  If Pat

7    and Charlie were co-conspirators of Adam Brosius, if they're

8    involved in a criminal enterprise with Adam Brosius and they

9    know he's been indicted by the feds, criminals would run for

10   the hills.  They would say, "Don't talk to me anymore," and

11   they would hang up.

12          They would say, "Adam who?  I don't know who this

13   is.  Leave us alone."  (Makes noise with mouth.)  Right?

14          But that's not what Charlie and Pat do.  Charlie and

15   Pat take Adam Brosius and they bring Adam Brosius to their

16   lawyers, and they meet with the lawyers, and they have a

17   discussion about whether or not Safe Chain can continue doing

18   business with Adam Brosius.

19          And Adam Brosius, of course, lies to the lawyers,

20   and he lies to Charlie and Pat, and he talks about his

21   innocence.  But the point is would real criminals continue

22   doing business with someone who already got caught?

23          Of course not.  Of course not.  Use your common

24   sense.

25          No. 3 -- so No. 1 was the licenses with the FDA.

1   No. 2 was keeping Adam Brosius.

2           No. 3:  When they received complaints from

3   pharmacies, a pharmacy would contact them and say, "Hey, you

4   know, we got a bottle of HIV medicine, and it looks like a

5   truck ran over it.  What's going on?"  Or they got a call from

6   a pharmacy and the pharmacy says, "A patient found a broken

7   pill in one of the bottles," or "They found Seroquel," or

8   "They found Excedrin."  Would criminals report that?

9           That's what Charlie and Pat did.  They would report

10  it to Gilead.  They would communicate with the manufacturer.

11  They would say, "We have these patient complaints."

12          That's not the action of a criminal.  Were there

13  minor occasions where that slipped through the cracks and

14  Charlie and Pat -- for whatever reason, Gilead wasn't

15  notified?  Yes.  But as a general rule, Gilead would be

16  notified when there were complaints with their medicines.

17          Criminals wouldn't do that.  They would try to keep

18  it a secret.  They would try to hide it.

19          No. 4:  Would a criminal notify the FDA that they've

20  had a problem with this medicine?

21          MS. DEROVANESIAN:  Objection.

22          THE COURT:  It's getting a little argumentative.

23          MR. BARZEE:  The evidence will show that they would

24  notify the FDA with these complaints.  There were forms that

25  Safe Chain would fill out in order to notify the United States

```
 1    government and their regulatory agency, the FDA, and Gilead

 2    that there was a problem.  Not something that criminals would

 3    do.

 4            Would a criminal notify their customer?

 5            MS. DEROVANESIAN:  Objection.

 6            THE COURT:  Let's just talk about what evidence --

 7            MR. BARZEE:  The evidence will show that they

 8    notified their customers.  When one pharmacy said, "We have a

 9    problem with this bottle.  There was the wrong medicine in

10    this bottle," Patrick and Charlie and Safe Chain would then

11    notify all the other pharmacies that had purchased the same

12    medicine from the same lot.  Not something criminals would do.

13    They would try to keep it a secret.

14            Would criminals reimburse their customers --

15            MS. DEROVANESIAN:  Objection.

16            THE COURT:  It's argumentative.  Sustained.

17            MR. BARZEE:  The evidence will show that when there

18    was a problem or there was a complaint, the customers would be

19    reimbursed.  The pharmacies would be reimbursed.

20            The evidence will show that when sketchy vendors

21    approached Safe Chain and said, "Hey, we have HIV medicine

22    that we want to sell to you," but it turned out they didn't

23    have the proper license, Safe Chain would say, "No, we're not

24    doing business with you."

25            And they would reject vendors.  They would reject
```

 1    sales of HIV medicine to them.  Not something criminals would

 2    do.

 3            The evidence will show that Safe Chain spent

 4    millions of dollars -- or maybe almost a million dollars -- on

 5    computer systems to assist their compliance department in

 6    keeping track of all of this, keeping track of all the state

 7    licenses, keeping track of whether or not each vendor had the

 8    appropriate license.  Would criminals be spending that kind of

 9    money to support a compliance department?

10            MS. DEROVANESIAN:  Objection.

11            THE COURT:  Sustained.

12            MR. BARZEE:  The evidence will show that Safe Chain

13    spent almost a million dollars on attorneys during this period

14    of time to advise them on those byzantine rules at the FDA, to

15    advise them on when they had to notify Gilead about a problem

16    and when they shouldn't notify Gilead about a problem.

17            Those ten things alone are things that Safe Chain

18    did, that Patrick and Charlie did that show that they were

19    just acting in good faith.

20            Now, the government mentioned four or five times in

21    their opening statement that there was $90 million in sales.

22    I don't know if you remember that from yesterday.  90 --

23    that's a lot of money.  $90 million that they sold.  And I

24    want to talk to you about the money.

25            And I want to use a cliche that we have all heard.

And, you know, things become cliches because they're true, and
that's why we repeat them all the time.  And when you're
looking into a crime that involves a hundred million dollars,
and you're trying to find out who's guilty and who's not, what
do you do?  You follow the money; right?  You follow the
money.

          And so the government mentioned multiple times $90
million.  $90 million.  And it's true.  Safe Chain ended up
purchasing from these vendors, 90 -- at least $92 million
worth of product that they bought from these various vendors.
All right?  Keep that number in mind for a minute, $92
million.  That's what they purchased it for.

          Then they sold it to pharmacies; right?  That's how
they were going to be making their profit.  So they pay out
93, $92 million and they sell it to pharmacies for about $104
million.

          And so the gross profit to Safe Chain for all of
this business during COVID is about $12 million.  And I say
"gross profit," meaning that's what they took in.  But that's
not what Pat and Charlie made.  Right?  So it's not 90
million.  It's not even 12 million, because we're going to
follow the money.

          So Safe Chain brings in $12 million after selling
all of the products to the various pharmacies.  The $12
million now gets divided up.

1          Who do you think is going to walk away with the

2  lion's share of that $12 million?  Adam Brosius.  Because Adam

3  Brosius lies to everybody about the money and about his

4  agreements.  And it turns out that Adam Brosius was probably

5  making at least 3 percent profit on every single sale of the

6  product.  So every time a bottle was sold, he would be making

7  about 3 percent.  So he was going to make at least 3 percent

8  of all the profits.

9          And so his broker fee on all of those -- I'm sorry,

10 on the purchases from the vendors.  So the vendors like

11 Boulevard, Gentek, Synergy, Rapid's are selling the medication

12 to Safe Chain.  Adam's making money on those deals.  He's

13 making 3 percent on all those deals.

14         So on the 92 million, Adam Brosius is walking away

15 with around $3 million in his pocket on those sales.  So you

16 look at the money that was paid to Safe Chain and the profit,

17 the gross profit of 12 million, Adam Brosius takes around 3

18 million right off the top that -- the different vendors that

19 he was conspiring with, the other criminals, he was making

20 around $3 million on those.

21         After that, Adam turns around, and he charges Safe

22 Chain for commissions, because Adam Brosius is not only the

23 one who was brokering the deals to purchase all the medicine,

24 Adam Brosius is also in charge of selling all of the medicine.

25         And so he's asking for commission sales on all of

1    the medicine that's sold.

2            So he gets $3 million, as a broker, out of the 12,

3    and then he makes an additional $4 million as a sales

4    commission.  So out of the $12 million profit that goes to

5    Safe Chain, Adam Brosius is walking away with over -- over $7

6    million, leaving Safe Chain maybe with around 5 million.

7            Of that 5 million that Safe Chain makes, around a

8    million, 300,000 go out in commissions to their sales force,

9    who are also selling the pharmaceuticals to the pharmacies.

10   And they have to pay about another million or $2 million to

11   what's called group purchasing organizations that represent a

12   bunch of pharmacies that are also licensed by the FDA.

13           And then they spend about $800,000 on legal fees and

14   attorneys' fees because during this process of time, trying to

15   follow all the rules and regulations in a very complicated

16   industry that they don't know a lot about, and their

17   compliance department isn't as strong as it should be.  So as

18   a result of the HIV medicine, they spend $800,000 on lawyers.

19           Well, you do all the math, and you figure out the

20   money that was spent.  That's going to leave Safe Chain with

21   about $400,000 in profit at the end of the day as a result of

22   the $90 million that was paid out for these medications.

23           Now, Adam Brosius, the wolf in sheep's clothing,

24   walks away with around 7 and a half million.

25           Pat Boyd, maybe a hundred thousand.  Charlie Boyd,

1   maybe a $100,000.

2          So at the end of the day, at the end of this trial,

3   I'm going to remind you of this opening statement, and I'm

4   going to say, "Do you remember when I asked you to follow the

5   money?"  And to ask yourselves whether or not this makes any

6   sense whatsoever, that two guys who have never been in trouble

7   before built a company, employ all these people, are great

8   bosses, are important in their community, that they would

9   throw it all away and risk significant prison sentences and

10  the destruction of their lives and their families for

11  $100,000.  It doesn't make any sense at all.  And the reason

12  it doesn't make any sense at all is because they're not

13  guilty.

14         You know, Safe Chain wasn't perfect.  No company is.

15  And Charlie and Pat weren't perfect.  None of us are perfect,

16  and we all make mistakes.  And I'm not going to tell you that

17  mistakes weren't made, because they were.  And things happened

18  that Pat and Charlie are ashamed of.  The question for you is:

19  Were they doing this with intent?  Did they make a decision at

20  some point -- did they wake up and say, "We're going to enter

21  into a criminal enterprise"?

22         Or is this something that happened to them?  Because

23  mistakes aren't the same as fraud.  And they certainly never

24  knew that they were getting the medicine from the black

25  market, and they certainly never dealt with adulterated

 1   medicines, whatever that means.  And they never knowingly

 2   violated federal criminal laws; nor would they.  It doesn't

 3   make any sense when you follow the money.

 4        Were they sloppy?  Yes.  Absolutely.  Did they make

 5   foolish mistakes?  Yes.  Absolutely.

 6        Did they allow Safe Chain, through their negligence,

 7   to purchase and sell medicines without the appropriate

 8   paperwork, the shipping labels?  Yes, they did.

 9        But that doesn't make them criminals.  That just

10   makes them human beings who were in over their heads during a

11   very, very difficult period of life for all of us, and that

12   was COVID.

13        And for that reason and all the reasons that I

14   discussed with you, at the end of this trial, we're going to

15   get back up here, and we're going to ask you to send Patrick

16   and Charlie Boyd back home to their families and find them not

17   guilty.

18        Thank you.

19        THE COURT:  All right.  Now, to the jury, I got

20   three notes from jurors this morning.  One I talked to the

21   lawyers about, and think I answered that.  I wrote back and

22   answered.

23        The other two, I have to talk to the lawyers about,

24   and I'll give you my answer after the break.

25        But before I do that, where's Ms. [sic] Lopez?

1           Mr. Lopez.  I'm sorry.

2           Mr. Lopez, when, on Wednesday, the 1st, do you have

3   to leave?

4           JUROR LOPEZ:  In the morning, sir.

5           THE COURT:  In the morning.  Okay.  All right.

6           We're going to take a 15-minute recess.  Remember my

7   admonition not to discuss the case or allow it to be discussed

8   in your presence, and we'll see you back in the jury room in

9   about 15 minutes.

10           THE COURTROOM SECURITY OFFICER:  All rise.

11           (Jury exits courtroom at 10:26 a.m.)

12           MR. ZIMET:  Judge, can I run to the restroom real

13   quick?  Two seconds.

14           THE COURT:  All right.

15           (Break in the proceedings.)

16           THE COURT:  Back on the record.  The defendants are

17   present.

18           Mr. Lopez's note indicates that he's got travel

19   plans and is asking not to have the Court in session on the

20   1st and the 3rd.  We're already off on the 2nd, I think.  I

21   would propose telling the jury that we're going to be off on

22   October 1st and October 3rd and give them a new calendar with

23   the fact that we're only going to be working a day and a half

24   that week.

25           What's the lawyers' position on that?

```
 1              MR. POGOZELSKI:  Yes, Your Honor.  I'd like -- we
 2    agree.  We don't really see any other option under the
 3    circumstances.
 4              MR. ZIMET:  We agree, Judge.
 5              MR. BARZEE:  Reluctantly agree.
 6              THE COURT:  As to the other juror, Ms. Montana, you
 7    know, I'm sympathetic with her situation, but I think what I
 8    would propose doing is just, "Do the best you can with your
 9    health circumstances, and let us know if you're having
10    difficulties or you need a break."
11              MR. POGOZELSKI:  Agreed, Your Honor.
12              MR. ZIMET:  I don't think we -- well, we do have
13    another option, but I don't think --
14              THE COURT:  I can't hear you.
15              MR. ZIMET:  I'm sorry.  I guess we have an option of
16    excusing her.  I don't think that's appropriate right now, so
17    I agree with the Court's position.
18              MR. BARZEE:  We agree, Your Honor.
19              THE COURT:  All right.  So let me write down the
20    responses, and I'll send back the notes.
21              On Mr. Lopez, I guess we'll need to break earlier on
22    the 10th.  I'll tell him we'll break after lunch on the 10th.
23    Okay?
24              MR. ZIMET:  Yes, sir.
25              THE COURT:  Mr. Barzee?
```

1                  MR. BARZEE:  Yes, Your Honor.

2                  MR. POGOZELSKI:  Same here, Your Honor, for the

3      government.

4                  THE COURT:  All right.  So let's go ahead and make

5      copies of the notes and give the copies to the jurors.  We'll

6      file the notes, and I'll ask Crystal to do a modified calendar

7      indicating that we'll be off on October 1st and October 3rd.

8      And then on October 10th, we'll go from 10:00 to 1:00.  And

9      with that, we'll take a 15-minute recess.

10                 (Court in recess from 10:33 a.m. to 10:49 a.m.)

11                 (In open court, jury NOT present.)

12                 THE COURT:  We're back on the record.  There's

13     another note from Mr. Grey that says he needs to be off the

14     1st, 2nd, and 3rd of October.  We're already going to be off

15     then on those days, so I would propose telling him we will not

16     be in session on those three days.

17                 MR. BARZEE:  Agreed, Your Honor.

18                 MR. ZIMET:  No objection, Your Honor.

19                 MR. POGOZELSKI:  Agreed.

20                 Well, Judge, do you want to just say, "Now that

21     you've told us the information, we've resolved your issue by

22     taking care of this"?

23                 THE COURT:  I've already written on the note.  I'll

24     just send it back.

25                 Make a copy of that.  And then we can give that to

 1    Mr. Grey before he comes out.

 2              While we're waiting, anything to come before the

 3    Court?

 4              MS. DEROVANESIAN:  Your Honor, we have a brief

 5    matter that we'd like to take up at some point before we call

 6    our first witness.  We thought it would be more appropriate

 7    after opening statements, but if the Court doesn't expect -- I

 8    expect it'll take less than five minutes.  It could be a

 9    sidebar.  But whatever the Court's preference.

10              THE COURT:  Let's do it now.

11              MS. DEROVANESIAN:  Okay.  Your Honor, there was a

12    previous ruling about bringing up other issues that the

13    defendants and their companies had, other conduct relating

14    specifically and most importantly to opioids and other shady

15    business dealings of the defendants.  But the opening

16    statement that we just heard completely opens the door to all

17    of that in a number of ways.

18              First, by mentioning and asking the jury:  Would

19    criminals invite the FDA, the DEA to come in and inspect?

20    Both DEA and FDA inspections -- the licensing issues are

21    exactly what that conduct was about.

22              In addition, mentioning that the DOJ and the DEA, I

23    believe, and the FDA have blessed what the defendants are

24    doing, have not revoked their licenses completely opens the

25    door to the fact that there were these other investigations,

1  these other parts of their business.

2          Mentioning that the defendants operated their

3  businesses for years, calling it a beautiful American company

4  they built from the ground up, and that they never got in

5  trouble, again, opens the door to the fact that they actually

6  did have all of these issues with opioids and other issues

7  that were investigated.

8          Mentioning their licenses multiple times, the fact

9  that their licenses have never been revoked, that they invited

10  the DEA to come in and inspect, that 20 percent only of their

11  business was HIV, and that the rest was the defendants trying

12  to help people, again, suggesting that the rest of their

13  business was legitimate, when it wasn't.

14          We initially agreed not to go into those matters,

15  but now that it has been argued before the jury over our

16  objection, it appears the door is wide open, and we have no

17  choice but to address those issues.

18          THE COURT:  All right.  I told the jury that what

19  the lawyers say isn't evidence.  And if it doesn't come out as

20  evidence, they are to disregard the lawyers' comments.  I

21  understand you can open the door in an opening statement.  I

22  don't think Mr. Barzee opened the door.

23          And if he did, I'm going to close it to the point of

24  if their questions during cross-examination, eliciting

25  evidence, or their side of the case, they elicit evidence that

1    the government thinks open the door to those types of bad

2    acts, you can proffer that outside the presence of the jury,

3    and I'll decide whether or not at that point they've opened

4    the door.  But at this point, I think you should stay away

5    from it.

6            Anything further before we bring the jury in?

7            MS. DEROVANESIAN:  No, Your Honor.

8            MR. ZIMET:  No, sir.

9            MR. BARZEE:  No, Your Honor.

10           THE COURT:  All right.  Let's have all the jurors

11   come in.

12           (Jury in open court at 10:54 a.m.)

13           THE COURT:  Counsel concede the presence of the jury

14   and waive its polling?

15           MR. POGOZELSKI:  Yes, sir.

16           MR. ZIMET:  Yes, sir.

17           THE COURT:  Crystal is going to print out a revised

18   calendar.  And I'm looking at this calendar that we've printed

19   up, and it's kind of confusing because the dates are like on

20   the right-hand portion of the date block, and then the hours

21   are closer to yesterday's date than today's date.

22           THE COURTROOM DEPUTY:  I can use a different font.

23           THE COURT:  So just be careful that you're looking

24   at the right date and the right time. But the changes are now

25   we're going to be off on -- not only on October 2nd, but

1    October 1st and October 3rd.  And October 10th, instead of

2    breaking at four o'clock, we're going to break at one o'clock,

3    and we'll give you a new calendar indicating those changes.

4            I think we're ready for the opening statement.

5            Mr. Zimet, you may proceed.

6            MR. ZIMET:  Thank you, Judge.

7                         **OPENING STATEMENT**

8            MR. ZIMET:  May it please the Court.  Still good

9    morning.

10           Good morning, jurors, how are you?  You've had a lot

11   thrown at -- well, discussed with you already, a lot of new

12   terminology, a lot of new information.  It's not easy to

13   digest easily.  At the same time, I don't want to be redundant

14   of things you've heard, so please excuse me if I am.  My goal

15   is to present what we anticipate the facts will be in an

16   orderly manner so that you can be able to evaluate what

17   Charlie Boyd knew, why he acted the way he did, and the fact

18   that we believe he had no criminal intent to defraud anybody

19   in this case.

20           So let me start out with sort of a 30,000-foot view

21   of what this industry was like back in 2020.  You've heard

22   mention of some terminology, but let me try to be a little bit

23   more basic.  There are drug manufacturers that, obviously, by

24   definition, manufacture drugs.  The one you're going to hear

25   the most about in this case is Gilead.  And the type of drugs

 1    that are involved -- there's multiple types -- are known --

 2    categorized as HIV drugs.

 3          What manufacturers, such as Gilead, did and what

 4    Gilead did in this case was set what they called WAC, W-A-C.

 5    WAC stands for wholesale acquisition cost.  Wholesale

 6    acquisition cost.  That's what Gilead labels as what the cost

 7    is of the drug to the Gilead authorized distributors.

 8    Authorized distributors are companies that purchase the drugs

 9    from Gilead.  And to the outside world, it appears that the

10    amount of money that the wholesale distributors -- excuse me,

11    the authorized distributors -- authorized distributors pay to

12    Gilead for that drug is the WAC price.

13          So if Gilead says one of their drugs costs $2,400 a

14    bottle -- and you'll hear testimony like that in this case --

15    they will say that the WAC price is $2,400.  When one of

16    Gilead's authorized distributors purchases that drug,

17    according to the WAC price, they're paying $2,400.  And,

18    obviously, if an authorized distributor is paying that much

19    money, when they then sell the drug to a pharmacy, the

20    authorized distributor needs to make money.

21          So what they're going to be selling the drug for, in

22    theory, is the WAC price, plus whatever percentage.  So they

23    make their profit.

24          What the WAC price is, said to the outside world, is

25    not an accurate price -- or excuse me -- accurate amount of

1    what the authorized distributor has actually paid for that

2    bottle.

3            And so you heard some terminology earlier today, you

4    know, how it's rigged and all that kind of stuff, but this is

5    the practicality of what is happening.

6            The reason for that -- and the evidence will show --

7    is because Gilead wants to keep the price for their drugs at a

8    higher level.  Economics 101; right?  Higher the price is, the

9    more money you're going to make.  The truth is -- is that

10   Gilead and their authorized distributors have other

11   transactions which, in reality, lower the cost, the amount of

12   money they are actually paid, Gilead, for those drugs.

13           So the WAC price might be $2,400, but because of

14   things such as rebates, such as early payment of the money by

15   the authorized distributor, plus other discounts which aren't

16   in the WAC price, the practicality is what's actually paid is

17   significantly less than the WAC price.

18           Now, it does have ramifications what the WAC price

19   is, because insurance companies will pay pharmacies based on

20   that WAC price, not on the actual amount of money that was

21   actually paid when you take into account all of the discounts,

22   all the rebates, all the other financial transactions.  Buy

23   something near the end of the year, you get the discount.

24           You'll hear that authorized distributors want to buy

25   near the end of the year.  Why?  Because January 1st, the WAC

```
 1    price goes up, usually 5 percent.  So if you buy something in
 2    the end of December and buy as much as you can, it's going to
 3    be 5 percent cheaper than if you buy it in January.  At least
 4    the WAC number has that information.
 5            So those are all the things that are happening with
 6    WAC.  The ramification is -- is that, of it, insurance pays
 7    WAC-related costs or price.  The federal government, when they
 8    pay, for instance, any of the programs that are paying for
 9    these drugs, pays the WAC price.  It's not the -- and you
10    heard some discussion earlier.  That's not how much the cost
11    to -- to make the drug, manufacture the drug.  That would be
12    stupid.  I mean, why should the manufacturer have costs and
13    not be able to make a profit?
14            But we do know, obviously, that the cost of the same
15    drug -- and the evidence will establish the cost of the same
16    drug that's $2,400 here, if you buy it in another location
17    outside the United States, it's significantly less.  And
18    that's part of the pricing program and the reason that Gilead,
19    in this instance, wants to keep the prices high and have
20    mechanisms that makes sure the price stays high.
21            Now, obviously, this is the United States.  Free
22    enterprise.  We allow competition.  But some people obviously
23    want to compete and want to win.  And in this instance, Gilead
24    wants to win against any competition.
25                The competition, you'll hear from the evidence in
```

this case, comes from the wholesale distributors, such as Safe

Chain, which desire to be able to purchase the drug that

Gilead is saying has a WAC price of $2,400 at a much cheaper

price because they can sell it to a pharmacy at a much cheaper

price than the authorized distributor could.  And, obviously,

that's a benefit to Safe Chain, and Gilead does not like that,

doesn't want that to happen, and wants to make sure that they

stop it for financial reasons.  Whether we think that's a good

thing or a bad thing, that's what, in reality, is happening.

So Safe Chain enters the HIV market approximately

April 2020.  We heard, obviously, that's prime COVID time.

Newspapers then say -- I think we had maybe 10,000 COVID

deaths as of April 2020.  Several hundred thousand people had

already been infected.  No one really knew what was going to

happen.  Obviously, in retrospect looking back, we realize

what did happen.  But there was a lot of fear, a lot of

concern.

And certainly for Safe Chain, being able to have a

situation where there was a new market, a new drug, a new

ability to make money in uncertain times, that was very

attractive.  It was presented by Adam Brosius.  We heard the

"L" word used consistently about Adam Brosius.  I think it's

important -- instead of just labeling someone as a liar, I

think we should see some of the things that -- and you'll hear

some of the things that he did to try to convince Charlie

1    Boyd, convince Pat Boyd that this was something that was

2    something that was financially advantageous and certainly

3    legal and certainly appropriate.

4         And I'll note part of Adam Brosius's presentation to

5    convince the Boyds, to convince Safe Chain that this was a

6    good thing, aside from the money part of it, was that he

7    had -- Adam Brosius, had the contact with the industry that

8    were able to produce the HIV drugs.  He had the secret.  He

9    had the ability.  He had the contacts.

10        And you'll see and you'll hear that the Boyds

11   trusted Adam Brosius.  And part of the reason he was able to

12   say and get away with the things that he did was because of

13   trust.  He was a person who was very, very adept.

14        You heard the term smooth talker, but you'll see

15   some of the things that he communicated, some of the things

16   that he sent to the Boyds to convince them, in fact, this was

17   real, this was legal, this was profitable.

18        And they believed him.  Now, in retrospect, looking

19   back on it, you can see all sorts of reasons why that was a

20   mistake, why that was stupid on their part.  They're not

21   charged with being stupid.  They're not charged with making a

22   mistake.  What they're charged with is intentionally

23   committing a fraud.

24        And you'll hear that Adam Brosius, whether he knew

25   or didn't know there was a fraud, certainly did not

 1   communicate that to the Boyds.  Either way -- okay -- Adam
 2   Brosius is at the center of it.  Obviously, if he told them it
 3   was legal, and they relied upon it, it was certainly something
 4   that they could rely upon.  If he said it was illegal, then
 5   Adam Brosius would be admitting that he's committing a crime
 6   from the beginning.  We'll see what Adam Brosius really says.
 7           We don't know.  It might depend on what time of the
 8   day he testifies.  Because as you will see, he testifies back
 9   and forth, flip-flops as far as what he says is the truth and
10   what's not the truth.  Even as recently as the past week, he's
11   exhibited that once again.
12           I don't know if it's compulsive.  I don't know what
13   term you should put for it.  Okay?  But that's who Adam
14   Brosius is.
15           What Adam Brosius also is is someone who does not
16   reveal all the information that he knows if that, in any way,
17   would hinder him getting what he wanted.  And what he wanted
18   was money.  He wanted money, and he got money.  And the way he
19   got money was convincing the Boyds that this was legal.
20           Now, you'll hear that there are approximately five
21   different vendors in this case who were the source of these
22   HIV drugs.  You'll also hear that the contact person for each
23   of those five vendors was Adam Brosius.  You'll hear prior to
24   Adam Brosius making the contact and trying to connect Safe
25   Chain with these vendors, Patrick Boyd, Charlie Boyd had never

 1   heard of these people, had never met these people, had never

 2   spoken to these people.

 3          This is all Adam Brosius making the introduction,

 4   and you'll hear that based upon Adam Brosius's contact track

 5   record, the Boyds had every reason to believe that Adam

 6   Brosius was being truthful with them.  They believed in Adam

 7   Brosius.  He had helped save their company.  He had invested

 8   in their company.

 9          To Charlie Boyd and Patrick Boyd, the question of

10   him saying or doing something that was intentionally wrong or

11   intentionally fraudulent was something which was totally

12   inconsistent with everything Adam Brosius was doing.

13          So they relied upon that.  But besides that, it

14   wasn't just his word they were taking.  Safe Chain had its own

15   system in effect in 2020 that needed to be complied with

16   before any new vendor could start working.  So the process

17   is -- is that Brosius says "We have -- I have found a

18   connection.  This is a connection."  Safe Chain had a

19   procedure, "Well, if there's going to be a new vendor, you

20   have to file an application with Safe Chain because we need to

21   vet that new person, that new entity, that new vendor."

22          And you'll see, from the testimony in this case,

23   that that's exactly what happened.  And you'll see that three

24   primary basic things happened with each of the five vendors

25   which gave Charlie Boyd and Patrick Boyd confidence that what

1   Adam Brosius had represented, that these were the real thing,

2   these are legitimate, these are legal, was true.

3          The first is Adam Brosius's word, which they were

4   relying upon.  The second was that there was an actual

5   application that was submitted for each of these five vendors.

6   You'll see part of the application process was reviewing and

7   seeing whether, in fact, there was a state license for that

8   vendor to be in this business.

9          When you say a license, this is not something where

10  you -- you know, you can sign your name on a piece of paper

11  and the state just sends you something two days later.  This

12  is -- and Safe Chain knew that because they had gotten

13  licenses themselves.  They knew what the process was to get a

14  license.  Charlie Boyd had signed off on numerous license

15  applications.  He knew what vetting was done on their company

16  before that licensing was agreed to or issued or authorized.

17         And it's obvious why a state has the responsibility

18  of doing that, for the protection of their citizens.  They

19  don't want unlicensed people out there dealing with drugs, and

20  especially with drugs that are prescription drugs.

21         So Safe Chain had, in its procedures, a vendor

22  files, an application.  A license has to be there.  It has to

23  be validated, it has to be vetted, it has to be reviewed.  No

24  license, no contract.  No work, no money.  No relationship.

25         And you'll see for each of these five -- each of

1    these five vendors, in fact, that process took place.

2           The third aspect then is the process itself was done

3    by the Safe Chain compliance people.  The compliance person,

4    head of compliance, you'll hear as a witness for the

5    government in this case, and you'll hear that she, in fact,

6    approved each of these five vendors, that they could be doing

7    business, they're properly licensed, they could be doing

8    business in these transactions with Safe Chain.

9           So that's what Charlie Boyd knew, that before any

10   business could start, that process had to be done.  Everyone

11   in Safe Chain knew that, and there's no transaction could be

12   had without that being done.  So in Charlie Boyd's mind, with

13   his intent, this was legitimate.  This was real.  Safe Chain

14   reviewed it.  Safe Chain approved it.  Adam Brosius said it

15   was good to go.

16          Adam Brosius, okay, is a person that we rely upon

17   and trust.  He invested money in our company.  There's no way

18   in the world he'd invest money in our company and then get us

19   involved in something that's fraudulent.  So that starts the

20   transactions.

21          Now, you'll see that Adam Brosius is the one who

22   negotiated what the prices should be for the purchase of these

23   drugs from the five vendors.  In fact, you'll see that Adam

24   Brosius was not just a salesman.  Adam Brosius was the primary

25   intermediary who got the companies, with Safe Chain, together,

```
 1    set the price, and basically told the Boyds, "This is what the
 2    price is."
 3              You'll see that Adam Brosius not only spoke to these
 4    vendors, Adam Brosius met with certain of these vendors.
 5    You'll hear zero -- nada -- no evidence whatsoever that
 6    Charlie Boyd met with any of the representatives of these
 7    vendors.
 8              You'll hear that one of the vendors -- one of the
 9    companies is called Boulevard.  The person running that
10    company is a guy named Peter Khaim.  You'll hear that Peter
11    Khaim never ever met with Charlie Boyd.  No contact --
12    personal contact whatsoever.  If Peter Khaim walked in the
13    room, Charlie Boyd would not know who he was.  Peter Khaim
14    would not be able to pick out Charlie Boyd because he's never
15    seen him before because Adam Brosius was the front person.
16              And that was no accident.  The evidence is going to
17    show you that that was no accident.  That was something that
18    the people who were involved in this attempt to basically
19    launder the drugs that they had gotten improperly out to the
20    public realized that Safe Chain was a patsy.  Safe Chain was a
21    patsy because Adam Brosius was such a manipulator who
22    convinced Safe Chain, which was a legitimate company, to sell
23    these products to pharmacies.
24              And the reason that Safe Chain was so attractive was
25    because Safe Chain had all these licenses in all these
```

1   different states.  Because the bad guys had all these drugs

2   that had been manipulated in various ways, but they needed to

3   get rid of them.  They needed to get rid of them so they could

4   get paid.  And the only way to do that was to try to do that

5   through Safe Chain which was a distributor, also a distributor

6   of drugs.

7          But they had to convince Safe Chain it was okay.

8   And that was Adam Brosius's job.  And Adam Brosius started

9   that process, and then Safe Chain had its own internal ways to

10  make sure that transactions were done correctly.  You'll see

11  that the compliance department at Safe Chain was responsible

12  for that.  And you'll see what things they did and what things

13  they didn't do.

14         But you'll also see that, early on with the

15  Boulevard transactions, for instance, these pedigrees worked

16  there.  So you'll be able to see one of the first instances

17  where there's an issue or a problem that comes up with one of

18  these vendors.  And you'll be able to see what Charlie Boyd

19  did in response to that.

20         Did Charlie Boyd say, "Who cares?  We don't need

21  pedigrees.  That's garbage"?

22         No.  Charlie Boyd took steps to ensure that these

23  pedigrees were done.  He communicated with Adam Brosius

24  because Adam Brosius had contact with the vendor -- with his

25  vendor, and said, "We need to have these things done.  These

1    pedigrees need to be done.  The law says they need to be

2    done."

3              You'll see and you'll hear evidence that Boulevard,

4    the company Boulevard, and this Peter Khaim, who was -- last

5    name never disclosed to the Boyds, obviously part of the

6    attempt to conceal who they really were, Charlie and Pat

7    didn't know it at the time -- in retrospect, it's 2020; it's

8    obvious what was going on -- but he didn't know that at the

9    time because all the information was not provided to him.  He

10   did not have all the facts.

11             And you can't look backwards and say, "Oh, he should

12   have known because they didn't have the guy's last name there

13   was something fraudulent."  Garbage.  He knew what he did.  He

14   knew what he knew.  He didn't know other things that would

15   have been significant and game-changing.  You'll see that

16   Boulevard, the company, was very slow in producing the

17   pedigrees.

18             And you'll hear that the compliance officer got more

19   concerned.  The compliance officer spoke with Charlie Boyd.

20   And Charlie Boyd had to start taking more action.  He demanded

21   that these pedigrees be brought up to date, to get them to be

22   brought up to date.

23             Now, you'll hear that there are all sorts of excuses

24   that were given by Boulevard as to why they haven't done it.

25             One of the excuses was, "Well, we're a pharmacy, and

```
 1    we had just gotten into the wholesale business."  Because they
 2    had a wholesale license, supposedly, in New York to sell these
 3    drugs.  "Well, we just got in the wholesale business, and
 4    we're not used to doing pedigrees because we're just a
 5    pharmacy, and we never do pedigrees, and we don't even need
 6    pedigrees because we never want pedigrees."  That was the
 7    excuse.
 8            The other excuse was -- and you'll hear for the
 9    Boulevard drugs -- that they were claiming because of COVID,
10    because of financial circumstances with pharmacies, pharmacies
11    wanted to clear their aisles, clear their shelves of these HIV
12    drugs.  You'll also hear that the relationship that authorized
13    distributors had with pharmacies was essentially if you can't
14    sell the drugs and want to give them back to us, we'll take
15    them back.  We'll give you a credit for those drugs that
16    you've purchased, but we're not going to give you your money
17    back.
18            So having a choice -- and this is what the Boyds
19    knew -- pharmacies having a choice between getting a credit,
20    which means you've got to buy more stuff, and the financial
21    times of COVID, was horrendous, and they didn't want to have
22    to be on the hook to start buying more things.  The fact that
23    they could get money for the drugs was something attractive.
24            So it made sense to the Boyds when Boulevard said
25    "The reason that we don't have the T3s, the pedigrees, is that
```

1    means they're coming from pharmacies.  We are not experienced

2    in wholesaling ourselves.  We are getting these drugs from

3    pharmacies.  They are out of business, some of them.  Some of

4    them just don't want to give them to us; therefore, we don't

5    have them."

6              And so, at that point, that's another issue for

7    Charlie Boyd.  Because Charlie Boyd at that point, again, if

8    you're monitoring and looking at was there an intent to commit

9    a fraud, you've got to look at all the facts.

10             Does Charlie Boyd say, "Screw it.  Forget it.  We

11   don't need it"?  Or does Charlie Boyd say, "Listen, this has

12   to be done."  You'll hear that's exactly what he did.  You'll

13   hear resistance from Boulevard.  You'll hear Boulevard saying,

14   "Forget it.  You owe us money for something that we've already

15   sold to you.  We're not going to give you any T3s until you

16   pay us money."

17             And Charlie Boyd says, "Well, that's okay.  We're

18   just going to stop doing business with you.  This is not

19   negotiable.  You have to update all of these T3s.  You have to

20   make sure that everything that's happened so far is updated.

21   They weren't done when they should have been done.  It's your

22   responsibility to do it.  We'll offer our team to help you out

23   if you don't know how to do it, but we need to get it done."

24             Now, Boulevard rejected that offer from Charlie Boyd

25   to give the Safe Chain team that knows how to prepare T3s,

1   using them.  And you'll see there's a very good reason,

2   because if Boulevard's team that needed to prepare the T3s got

3   involved, then the documents that Boulevard had or should have

4   had, Safe Chain's team would know that they were false and

5   they were fraudulent.

6           So that was another attempt to make sure that this

7   shielding of the bad guys from Safe Chain continued.  We can

8   only tell them so much.  And you'll see how much this "so

9   much" is or what was disclosed.  But you'll also see how much

10  was kept from them, kept from the Boyds.  Because, as the bad

11  guys knew, if they were straight up with Safe Chain, straight

12  up with Charlie Boyd, straight up with Pat Boyd, this thing

13  would just fall apart, and Safe Chain would have no

14  involvement in it, because they needed a good guy to be

15  involved.

16          They couldn't corrupt a good guy, and the government

17  retrospectively goes, "Oh, well, they were corrupted."  No.

18  When you look at all the facts in the case, all the facts when

19  you're presented the case, you'll see that they weren't

20  corrupted.  They didn't know all they should have known to

21  make the decision whether or not this was real or this was, in

22  fact, unreal, because everything they had, they had enough

23  information to believe it was real -- Adam Brosius's

24  application, then approval from the compliance department of

25  Safe Chain.

1        So you'll see the communications that took place

2   were, "Business is stopped unless you start giving us

3   legitimate T3s."

4        So they started providing T3s.  And the T3s are

5   reviewed.  And they found out -- and, listen, Charlie Boyd

6   knew they were going to be reviewed, because he wanted them to

7   be accurate.  When he found out some of them weren't accurate,

8   he stopped again.  He said, "Listen, this is not going to fly.

9   This is not going to work."  And he got more excuses, and he

10  believed the excuses.

11       Now, do you believe him because he was part of a

12  fraud, or is he believing excuses because Adam Brosius was

13  vouching for this company and vouching for the integrity of

14  what was happening and vouching for the excuses?

15       Again, Adam Brosius was something -- he was a

16  mentor.  He was someone that Charlie Boyd relied upon, someone

17  who Charlie Boyd depended upon.

18       Charlie Boyd grew up outside Washington, D.C.

19  You're not going to see Charlie Boyd's name on any academic

20  all-American honor roll list.  Okay?  It took him three years

21  to finish two years of community college.  But Charlie Boyd

22  was a hard worker, and you'll see that Charlie Boyd also knew

23  what his lackings or faults were.  And one of his lackings or

24  faults were that he did not know this industry as well as he

25  probably should have, but he didn't have experience.

1        So he turned to people that did have experience.

2   And you'll see time and time again during the period of this

3   indictment that he turned to people who had experience to get

4   their advice, to get their opinion as to how to proceed.

5        That's not a person who has an intent to defraud.

6   That's a person who wants to do it the right way.  Did it

7   always end up being the right way?  We can second-guess that

8   forever.  But anything he did lacked proof of intent to commit

9   a fraud.

10       So Charlie Boyd realized that there were issues.  In

11   fact, one of the issues, he made sure that contact was made

12   with the manufacturer, Gilead.

13       Yeah, I said that.  Contact was made by Safe Chain

14   to Gilead, the manufacturer, when there's a problem with one

15   of their drugs that they -- that Safe Chain learned about.

16       Now, this was during the period when supposedly

17   there's all this intent to defraud.  So the reason the contact

18   was made to get information to find out what the problem was

19   because Charlie Boyd wanted the problem to be corrected, and

20   he reached out to Gilead himself, personally spoke with Gilead

21   to try to resolve the situation.  The compliance director at

22   Safe Chain reached out to Gilead to get answers to

23   information.

24       And you'll see communications back and forth,

25   documents, and we can figure out -- and we'll get to it in a

```
 1    second, how those documents were retrieved of those
 2    communications.
 3           And you'll see that as early as August of 2020,
 4    Gilead was aware that Safe Chain had some issues with Gilead
 5    products that they were selling.
 6           Why is that date important?  That date is important
 7    because we know -- we know, from evidence, that Gilead was
 8    aware that there was a problem with Gilead drugs getting out
 9    into what they call the black market.  They knew there was an
10    issue with their drugs.  You will see when those
11    communications took place from Safe Chain to Gilead.  Gilead
12    had every opportunity to say, "Listen, we think you're being
13    scammed.  We think that these black market drugs that we know
14    where they came from are going through your company and being
15    used.  And that's a danger to the public, danger to the
16    community.  Let's sit down and let us explain to you what we
17    know, what's going on."
18           Never done.  You won't see one piece of evidence
19    that Gilead comes back and says, "There is this problem that
20    we are aware of.  We have been investigating.  We are about to
21    file a civil lawsuit against all these people that are doing
22    this.  And we want to make sure, okay, that if it's happening,
23    that we cut it off.  And if you're being victimized, we want
24    to tell you what's happening so you can understand and stop."
25           Don't do it at all.  No communication like that
```

1    whatsoever.  Why?  Well, there's a lot of potential

2    explanations for it.  None of them -- none of the explanations

3    are anything that justified Gilead refusing to share the fact

4    that there was stuff on the market that they had reason to

5    believe was going through Safe Chain as early as August 2020.

6         You'll see, from August 2021, there's numerous

7    communications back and forth between Safe Chain -- Safe Chain

8    related individuals and Gilead and Gilead related individuals,

9    including attorneys from Gilead.  And you'll see, at one

10   point, it becomes pretty clear that instead of wanting to say,

11   "Listen, there's a problem.  We want to make sure it's

12   stopped.  We're going to alert you to what we know," you'll

13   see that what turned out was that Gilead said they're

14   starting -- or gave every indication -- they're starting to

15   investigate Safe Chain.

16        Why would they choose, instead of trying to stop

17   what they knew was actually happening, to start investigating

18   Safe Chain, and if they had told Safe Chain what was

19   happening, it could have stopped.

20        Because Gilead -- and the evidence will show --

21   there's one thing Gilead absolutely, absolutely feared; that

22   was the outside world knowing, the market knowing, if you

23   will, that they were aware of where Gilead products that had

24   left the chain of drugs had ended up, because what they would

25   need to do is send out an alert to the pharmacies, "Listen,

1    this is what's happening.  All of these lots of drugs, we know
2    what has happened with them."
3          We know, okay, this is taking place.  All of the
4    340B drugs that were sent to these programs, they know what
5    the bottles say.  They know that all those bottles need to be
6    recalled.  But if you issue a recall on Gilead HIV products,
7    that absolutely devastates -- and evidence will show, it
8    absolutely devastates Gilead in where they cared most, their
9    bottom line.
10         So Gilead, at that point, decided "Well, we're going
11   to investigate Safe Chain because we need somebody to be the
12   bad guy.  Because it's them who are distributing it, so we can
13   sends out to the world that Safe Chain distributing bad Gilead
14   drugs that have been improperly put into the supply chain."
15   And you'll see that's what they did.
16         In fact, leading up to that, we have gotten internal
17   communications of Gilead where Gilead says don't tell Safe
18   Chain certain critical information that Safe Chain needed to
19   know.
20         Why in the world is there any legitimate reason to
21   not tell Safe Chain the truth, to withhold the truth as far as
22   what was really happening?
23         You'll see the document actually did that.
24         Now, you realize -- and we'll tell you in a second
25   how we got that document.  Oh, by the way, you heard millions

1    of dollars for lawyers?  Not me.  Not one of them.  Okay.

2    That Safe Chain's paying all this money for lawyers.  Okay.

3    That's way, way before any of this case happened, and we --

4    you know, Barzee and myself did not represent --

5              MS. DEROVANESIAN:  Objection.

6              THE COURT:  Sustained.

7              MR. ZIMET:  Barzee and I are involved in this case,

8    on the criminal case, not in any prior case that took place --

9    civil case, which you're going to hear about in a second.

10             So what happens is -- is that there's all sorts of

11   threatening kind of communications from Gilead.  Safe Chain

12   hires a law firm or had a law firm that they had retained

13   called Levitt Frier.  They're out of New Jersey, and there's

14   certain individuals that are involved in representing the Safe

15   Chain case.  And you'll see that the lawyer who got involved

16   in the case is going to be a witness for the government,

17   believe it or not.

18             She is advising Safe Chain as far as what to do, and

19   she's telling Safe Chain that -- for instance, the bad pill

20   issue.  She's saying the bad pill issues is a Gilead issue.

21   She says that she knows that Gilead has problems with their

22   manufacturing, which leads the Boyds to believe, "Well, if

23   it's Gilead's issue, then it's not our issue.  We also know

24   that we don't open any bottles that we receive.  We receive

25   the bottles, but we're not putting anything bad into these

1    bottles.  The bottles we get as they come, and then we

2    distribute them."

3           We'll see at some point that because of the bad pill

4    issue, Safe Chain had their warehouse department open the top

5    of the bottle to make sure that the seal is in effect, that

6    nothing has been tampered with, because they cared about that.

7    They didn't want stuff to go out that was improper, and they

8    wanted to see it, if they did, and stop it.  And you'll hear

9    from the evidence that that's not the activity of someone who

10   is intending to defraud.

11          You'll see in the middle of March of 2021, Gilead

12   sent out an alert, an alert to the whole world, all the

13   pharmacies that Safe Chain was dealing with, everyone in the

14   pharmaceutical industry that, "Aha, we have discovered that

15   Safe Chain is involved in distributing drugs outside of the

16   supply chain."

17          For Gilead, they had their perfect remedy for the

18   problem they had about disclosing, okay, what they really knew

19   was happening.  They had a bad guy.  And that starts a chain

20   of activities that ends up in this courtroom in 2025.

21          You'll see what they said.  You'll see what the

22   representations were as far as what they claimed had taken

23   place, and you'll see how Charlie Boyd responded to it.

24   You'll see what activities he took to try to make sure that

25   the Safe Chain business was legal.

1          You'll also hear, even back in the fall of 2020,

2    when there came up these issues with these T3s, and it shows

3    Charlie Boyd's intent.  He changed the protocols.  He said,

4    "Listen, the protocol is that there's a purchase order for

5    drugs that comes from Safe Chain.  It goes to one of the

6    vendors.  The vendor then sends the drugs.  The T3 or pedigree

7    is supposed to be accompanying, or somewhere around, or with

8    the drugs when we get them.  We're not going to do that

9    anymore.  We're not going to put ourselves in this position.

10         The new protocol, the new rule is going to be that

11   before we agree to any purchase whatsoever, we need to see the

12   T3 here, at Safe Chain, and I need my compliance person, Safe

13   Chain's compliance person, to review the T3, review the

14   pedigree, and approve that is a legitimate transaction prior

15   to us engaging in the transaction itself.

16         That's what Charlie Boyd thought was appropriate

17   remedy for the issues that took place.

18         We believe the evidence will show that he did that

19   because he wanted the transactions to be appropriate, wanted

20   to make sure -- this was another check and balance to make

21   sure it happened the right way, and certainly, certainly,

22   absolutely inconsistent with someone with an intent to

23   defraud.

24         You'll also see that when Gilead started, in March,

25   of this claim, this national alert that Safe Chain is a bad

guy, you'll see they also start sending letters threatening

litigation.  You'll see all these things are going back and

forth.  And you'll see that Safe Chain said, "Listen, we'll

start quarantining bottles that are issued.  We're not

fraudsters.  If there's something that has an issue, we'll

quarantine them.  And not only will we quarantine them.  We

invite you, Gilead, to come to our warehouse to look at them

and check them out to see what the real story is."

An attempt to defraud, to quarantine the product?

And you'll also see that Gilead actually never came

to check any of the quarantined items until July 2021.  And

we'll get to that in a second.  But prior to that time, Gilead

had filed a lawsuit in the Southern District of Florida.

The lawsuit was for the drugs that Gilead had

pumped into the system, as part of the 340B program that you

heard about earlier, and the drugs that had gotten into the

black market.  In that lawsuit -- and we intend to produce a

copy of that lawsuit as evidence in this case so you can see

it -- Gilead admits that they had been conducting an

investigation relating to that.

You'll see how long the investigation was.  You'll

see that, by that investigation, Gilead knew for a long time

what was happening, and Gilead had all the information it

needed to tell Safe Chain what was happening so Safe Chain

would no longer be a victim of what was occurring.

 1              And you'll see that what was decided by Gilead that

 2    we'd rather make ourselves a victim and then the bad guy as

 3    opposed to letting them know that they were a victim.  All of

 4    that decision-making, you'll see from the evidence, was a

 5    total, total disregard of the health concerns for patients.

 6              The evidence is going to show that Gilead wraps

 7    itself around protecting the health of the patients, that's

 8    the most important thing.  As they say, actions speak louder

 9    than words.  The decision not to inform Safe Chain of what was

10    really happening, what Gilead knew was happening, to stop it,

11    was purely for financial purposes, purely for that to be done.

12              Now, the 2020 lawsuit in the Southern District of

13    Florida, you'll see that Gilead has an incredible public

14    relations vehicle.  We'll call it that.

15              They have themselves, their lawyers, all sorts of

16    people out there in the public talking about all sorts of

17    things relating to Gilead.  For some reason, when the Southern

18    District of Florida federal lawsuit, November of 2020, where

19    all of this could have been exposed, all of this could have

20    been a press release, news conference, send it to Safe

21    Chain -- what was happening, nothing.  Silence.  Crickets.

22    Why?

23              Well, CYA for Gilead.  It's also to make sure that

24    they could ultimately get the person that they wanted to make

25    the scapegoat for all this.

```
 1              MS. DEROVANESIAN:  Objection.

 2              THE COURT:  Overruled.

 3              MR. ZIMET:  And you'll see from the evidence that

 4  that's exactly what happened here.  You'll see that in July of

 5  2021, Gilead was able to get authorization to raid the Safe

 6  Chain office -- Safe Chain's offices in Maryland, the Safe

 7  Chain warehouse in Maryland.  You'll see that all the

 8  quarantined bottles of HIV drugs that Safe Chain had

 9  represented, "We're keeping, and you can come here to look and

10  find, Gilead," they were there.  An intent to defraud?  We

11  kept all these drugs there so that we'd have records of

12  everything that was there.

13              You'll see that when Gilead came in to do their

14  raid, they were looking for a press, a printer -- basically

15  thinking that somehow Safe Chain was doing all these changes

16  to the bottles, that Safe Chain was involved -- okay? -- and

17  somehow manipulating what was inside the pill -- inside the

18  pill bottles.

19              You'll see that Charlie Boyd -- okay -- never went

20  inside of a bill bottle.  So pill bottles that came into Safe

21  Chain, he didn't look into it.  He didn't have his people look

22  inside of it.  And when it was sent to a pharmacy, no one from

23  Safe Chain was looking in the bottle before it went out.  They

24  believed that the vendors were real.

25              Now, we talked about the steps that were taken to
```

1   conceal identities.  You'll see how sophisticated that was.

2   You'll see that phony, phony email addresses were set up.

3   You'll see that phony telephone numbers were set up.  You'll

4   see that phony websites for corporations were set up only for

5   one reason, because the people at these vendors knew that Safe

6   Chain was no longer -- okay -- going to be such an easy

7   pushover, that they were checking everything out.

8           And they checked things out.  And they called.  They

9   tried to send email.  They tried to send information.  Tried

10  to speak to people.  Turns out the people weren't really the

11  same name as they claimed they were, imposters, all for the

12  same purpose of deceiving Safe Chain, because they knew if

13  Safe Chain knew the truth, their scheme of trying to launder

14  this stuff out and get it into the public would fail and be a

15  disaster.  And that's exactly what took place, and you'll see

16  evidence of all of that.

17          You'll see evidence how detailed the attempt was to

18  try to do this.  You'll also see that we talked about this

19  Boulevard -- this process that Boulevard was applying for its

20  license in April and May of 2020.

21          What happened was that the compliance director at

22  Safe Chain got the application, reviewed the Boulevard

23  license, checked the Boulevard license, and said it was a

24  legal license.

25          Turned out she was wrong.  No suggestion whatsoever

 1   there was any kind of intentional act.  It was just a mistake.

 2   But with that act of approving a license at that point, Safe

 3   Chain, Charlie Boyd, Patrick Boyd, believed that Boulevard was

 4   a legitimately licensed company, when the truth was it really

 5   wasn't.  And that wasn't found out until the spring of 2021

 6   when a review of whether the license was updated took place,

 7   and they found there wasn't a real license to begin with.

 8          So Safe Chain had been defrauded.  Those are the

 9   facts.  Those are -- that is the evidence, in fact, that you

10   will hear in this trial.  Not part of an intent to commit a

11   fraud, but part of persons that were being used to commit a

12   fraud by other people -- all for monetary gain.

13          And you'll see how committed all this happened to be

14   by Safe Chain to these activities and their loyalty to Adam

15   Brosius by how much Adam Brosius made -- you'll have some of

16   the numbers.  You'll see evidence of what it was.  You'll see

17   evidence of how much it was.  You'll also see Adam Brosius as

18   a witness in this case.  He's going to be the star witness for

19   the state -- the government, rather.

20          You'll see that Adam Brosius was indicted, as you

21   heard, in July of 2021 in the District of New Jersey for a

22   scam that took place five years earlier.  You'll also hear

23   that Adam Brosius met with Patrick Boyd and Charlie Boyd a day

24   or so after the indictment, because the Boyds obviously wanted

25   to know what had happened.

1          And you'll hear and you'll see that Adam Brosius

2    gave one of the best performances of his life.  He knew he was

3    guilty, but he had to convince the Boyds that this indictment

4    was wrong.  That it's really, really untrue.  It really,

5    really wasn't the truth.  And he did a hell of a job because

6    they kept him there.  They could have tried to get rid of him.

7    The lawyers, a representative from Frier Levitt, saw the

8    indictment.  No recommendation whatsoever, "You've got to fire

9    this guy.  This is bad news."  They saw what was the basis of

10   the indictment.

11          And the Boyds said, "Listen, we trust you.  We

12   believe you.  We'll move forward with you."  And they did.

13          You'll see even towards the end, in 2021, before the

14   raid, that Adam Brosius was telling -- still telling everybody

15   "That New Jersey indictment is ridiculous.  There's nothing to

16   it."  He kept maintaining that publicly to people that he was

17   meeting.

18          He believed the Boyds would believe it, and he sold

19   them on it.  And he also believed he convinced the lawyers,

20   and the lawyers had every opportunity -- this is a New Jersey

21   law firm, after all.  They didn't come to the Boyds and say,

22   "Listen, get rid of this guy.  He's cancer."

23          None of that whatsoever is going to be any of the

24   evidence in this case.

25          And you're going to see that -- Adam Brosius not

1   only saying he wasn't guilty of that.  Adam Brosius was saying

2   that Gilead has a manufacturing issue.  That's why all of

3   these issues relating to these bad drugs are Gilead's issues,

4   and they're not Safe Chain's issues.  You're going to hear

5   that Adam Brosius was saying, "We did nothing wrong at Safe

6   Chain.  We were victims of the fraud from these vendors."

7          That's what he was saying to the public.  That's

8   what he's saying to the Boyds.  That's what he's saying to the

9   lawyers.  And they believed him.  Charlie Boyd relied upon

10  him.

11         But guess what happens?  Adam Brosius gets arrested

12  in May or June of 2024.  He was out on bond on the New Jersey

13  case when he gets arrested for the Safe Chain case.  His bond

14  is revoked.  He's in jail.  And knowing how Adam Brosius --

15  and I think the evidence is going to be pretty clear, and

16  you're going to see for yourselves that he's a con man.  He

17  recognized that he needed to do something to get out of jail.

18         He needed some kind of currency to get out of jail,

19  is what the evidence is going to show.  And the currency that

20  he presented to the government is that, "I can be a witness

21  for you in the New Jersey case and in the Florida case, and

22  I'll come against the Boyds, even though they haven't even

23  been charged yet."

24         Now, the government bought into it.  Adam Brosius,

25  who's in jail, no bond, nowhere to go other than stay in jail,

1    all of a sudden gets released from jail.

2            He gives a debriefing in Florida.  He goes off to

3    New Jersey to testify --

4            MS. DEROVANESIAN:  Objection.

5            THE COURT:  Overruled.

6            MR. ZIMET:  He comes down to Florida.  He meets with

7    the agents on multiple times.  He suddenly has this

8    recollection of things he never told anything about.  He

9    pleads guilty in a plea agreement here in Florida.  He hasn't

10   showed up to prison for one day yet.

11           The evidence is going to be pretty clear he thinks

12   he can talk his way out of prison.  The currency that he

13   thinks he's going to have is to testify in this case because

14   he thinks the more he pleases the government, you'll see, the

15   better his chances he thinks the government's going to

16   recommend he doesn't go to prison.

17           So he used the Boyds to make money.  He used the

18   Boyds to stay out of jail, and now he's going to use the Boyds

19   to try to get his freedom.

20           You're going to see firsthand, when he testifies,

21   who Adam Brosius really is.  He's going to be smooth.  He's

22   going to turn on all of the skills he has to manipulate and be

23   the master con man that he is.

24           So he hasn't gone to prison.  He has a plea

25   agreement.  He's still out on bond.  And so that's sort of how

1   things were teed up, until last week.

2           Last week, he meets with the agents, and he says,

3   "You know that New Jersey case where I pled guilty?  I'm

4   really not guilty of it.  I did one small part of it, but I'm

5   really not guilty of it."

6           So Adam Brosius gets out of jail by saying he's

7   guilty, and now it's sort of like he hasn't been sentenced yet

8   up in New Jersey -- well, not really.  And the government has

9   a responsibility to tell us that, and they've told us that,

10  that that's what he said.

11          And so we thought, "Okay.  Well, here's a guy that's

12  going to come in and testify that now he believes he's not

13  guilty, even though he pled guilty."

14          And then a couple of days later, we get another

15  message from the government saying, "He now says he's guilty."

16          So not only is the evidence going to show he's a con

17  man, he flip-flops whether he's guilty or not.  I mean, the

18  evidence will show that nobody -- nobody -- would rely upon

19  Adam Brosius as of 2025.

20          Well, there is one entity that would, and that's the

21  government.  With all of that track record of lying, of con

22  man, of making money, of doing all sorts of things that you're

23  going to hear about, being totally untrustworthy --

24          MS. DEROVANESIAN:  Objection.

25          THE COURT:  Overruled.

1          MR. ZIMET:  -- the evidence will show that the

2   government is going to use him as one of their star witnesses

3   to have you believe that the Boyds are guilty beyond a

4   reasonable doubt.

5          And then you're also going to hear that this guy

6   Peter, from Boulevard, supposedly he's going to be another

7   star witness for the government -- at least that's what

8   they've represented.  We'll see whether he testifies or not.

9   But we anticipate he will, based on what we've been told.  And

10  you'll see that he has two cases that he already pled guilty

11  to that had nothing to do with any of the millions and

12  millions of dollars he made relating to Safe Chain.

13         And you'll see that really the source of these drugs

14  has never been charged in this case, never been charged with

15  anything relating to what the government says the Boyds did.

16  You know, he's the source of the drugs.  You'll also see that

17  this guy, who is the source of the drugs, he hopes that

18  because he's going to testify in this case, he's going to get

19  a sentence reduction of the 15 or 16 years he's already been

20  sentenced to.

21         And the evidence will show this guy's a career

22  criminal who the government's going to use as their second

23  star witness in this case.  Because the goal is -- the goal

24  is -- and this is a goal that was started by Gilead, the goal

25  started by Gilead when they refused to answer information,

1   when they refused to tell Safe Chain the truth, when they

2   refused to provide the information critical that Safe Chain

3   needed, was to make sure that the Boyds were destroyed.  And

4   this is the final chapter.  You'll see all of the

5   fingerprints, the DNA of Gilead, on this case.

6          You'll see how they have tried to say that certain

7   facts show an intent to defraud, but the truth is that Gilead

8   got every single document on the servers that Safe Chain had

9   when they did their raid in 2021 -- millions of documents.

10         They were very adept, in the civil case, at pointing

11  out the ones that they wanted too.  But in this case, for a

12  federal criminal jury in the Southern District of Florida in

13  2025, we're going to make sure that you see not what Gilead

14  wants you just to look at, we're going to make sure that you

15  see what -- everything that you should look at, because half

16  the picture is no picture at all.  A distorted picture is not

17  an honest picture.

18         And we believe, based on the evidence that you're

19  going to see, what you're going to hear, what you're going to

20  be able to evaluate, that when you see all of the evidence

21  presented, all of the information that Charlie Boyd and Pat

22  Boyd based their intent on between April of 2020 and August of

23  2021, there is definitely not proof beyond a reasonable doubt

24  that they intended to commit any crime whatsoever,

25  particularly the eight crimes that are charged in this

1   indictment.

2           And when we return, we are going to ask you to

3   return a verdict of not proved, which means not guilty, and

4   that this horror show for these Boyds will come to an end.  We

5   look forward to having the next several weeks to show you

6   exactly what the truth is.

7           THE COURT:  All right.  Members of the jury, we're

8   going to recess for lunch.  Remember my admonition not to

9   discuss the case or allow it to be discussed in your presence,

10  And I'll ask you to be back in the jury room at 1:15.

11          So have a nice lunch.  We'll see you back at 1:15

12          (Jury to lunch break at 11:54 a.m.)

13          THE COURT:  If there's nothing else to come before

14  the Court, we'll be in recess until 1:15.

15          THE COURTROOM SECURITY OFFICER:  Remain standing.

16          (Court in recess from 11:55 a.m - 1:18 p.m.)

17          THE COURT:  Back on the record.  Counsel are present

18  and the defendants are present.

19          Anything to come before the Court before I bring the

20  jury in?

21          MR. POGOZELSKI:  Nothing from the government, Your

22  Honor.

23          MR. ZIMET:  No, sir.

24          MR. BARZEE:  No, Your Honor.

25          THE COURT:  Okay.  If you have all the jurors, let's

 1   bring them in.

 2          (Jury in open court at 1:19 p.m.)

 3          THE COURT:  All right.  We have all the jurors back.

 4   Do counsel concede the presence of the jury and waive its

 5   polling?

 6          MR. BARZEE:  Yes, Your Honor

 7          MR. POGOZELSKI:  Yes, sir.

 8          MR. ZIMET:  Yes, Your Honor.

 9          THE COURT:  And did everyone follow my admonition

10   not to discuss the case or allow it to be discussed in your

11   presence?

12          Okay.  The government may call its first witness.

13          MS. DEROVANESIAN:  Thank you, Your Honor.

14          The government calls Kathleen Eberspacher.

15          (Witness sworn.)

16          THE COURTROOM DEPUTY:  If you could state your name

17   and spell it for the court reporter.

18          THE WITNESS:  My name is Kathleen Eberspacher.

19   K-A-T-H-L-E-E-N.  Eberspacher, E-B-E-R-S-P-A-C-H-E-R.

20          MS. DEROVANESIAN:  May I proceed?

21          THE COURT:  Yes.

22          MS. DEROVANESIAN:  Thank you.

23   THEREUPON,

24                    **KATHLEEN EBERSPACHER**

25   having been first duly sworn to tell the truth, testified as

```
 1   follows:
 2                     DIRECT EXAMINATION
 3   BY MS. DEROVANESIAN:
 4   Q.    Good afternoon, Ms. Eberspacher.
 5   A.    Good afternoon.
 6   Q.    Could you please tell us where you're from?
 7   A.    Dorchester County, Maryland.
 8   Q.    Okay.  And can you tell us what you do for a living?
 9   A.    I am an administrative assistant for the director of
10   student services with Dorchester County Public Schools.
11   Q.    Okay.  And can you tell us how far you went in school?
12   A.    I finished one year of college.
13   Q.    And after you completed that year of college, can you
14   tell us a little bit about your work history right after?
15   A.    I was a waitress, then I was a office clerk in a
16   antithrombrosis clinic, and then I worked in several
17   outpatient and inpatient pharmacies.
18   Q.    Okay.  And I apologize.  I'm going to ask you if you
19   could just slow down just a little bit so that our court
20   reporter can catch everything here.  Thank you.
21   A.    Sorry.
22   Q.    Ms. Eberspacher, are you familiar with a company called
23   Safe Chain Solutions?
24   A.    Yes.
25   Q.    How are you familiar with that company?
```

```
 1    A.    I was employed with them.

 2    Q.    When did you first hear about an open position at Safe

 3    Chain?

 4    A.    Probably in January of 2015.

 5    Q.    And can you tell us what type of business Safe Chain was?

 6    A.    They were a secondary drug wholesaler.

 7    Q.    Could you just give us a little bit of an explanation as

 8    to what a secondary drug wholesaler is?

 9    A.    It's someone who is selling the finished product that, in

10    this case, a prescription drug that is not directly from the

11    manufacturer.

12    Q.    So is that sort of an intermediary between one place and

13    a pharmacy?

14    A.    Yes.

15    Q.    Okay.  And so who are the customers of a company like

16    Safe Chain?

17    A.    They could be hospitals, doctors' offices, clinics,

18    pharmacies.

19    Q.    Okay.  And do you know who -- who were the owners of Safe

20    Chain when you first applied for this job?

21    A.    Pat and Charlie Boyd and Brad Bench.

22    Q.    Okay.  And when you first heard about a job position,

23    what was the title that you applied for?

24    A.    Compliance coordinator.

25    Q.    Okay.  And did you have an interview for this job?
```

```
 1   A.    I did, yes.
 2   Q.    Do you remember who interviewed you?
 3   A.    In the first interview, it was Jess Hickey and Jesse
 4   Hammond.
 5   Q.    Was there a second interview?
 6   A.    Yes.  With Pat and Charlie Boyd.
 7   Q.    Okay.  And do you remember what types of questions you
 8   were asked in that interview?
 9   A.    They just asked a little bit about myself, and then they
10   explained the business and what their goals were.
11   Q.    How old were you at the time you applied to work at Safe
12   Chain?
13   A.    24.
14   Q.    Did you have any experience working in compliance in
15   pharmaceuticals before that point?
16   A.    No.
17   Q.    Okay.  And can you remind me when you first started
18   working at Safe Chain and about what year you left?
19   A.    It was about February of 2015 that I started, and I left
20   in the summer of 2019.
21   Q.    And did your title change over the course of your
22   employment?
23   A.    It did, yes.
24   Q.    Can you tell us what title you started out with and what
25   other titles you held?
```

1  A.    Started with compliance coordinator, compliance manager,

2  and then it ended with DEA, diversion control manager.

3  Q.    Okay.  Ms. Eberspacher, are you familiar with a term

4  called branded medication?

5  A.    Yes.  I am.

6  Q.    Could you tell us, in your own words, what branded

7  medication is?

8  A.    It's a medication that is specifically made by one

9  manufacturer that I don't believe has a generic.

10 Q.    Okay.  And what's a generic?

11 A.    It's kind of the off-brand.  It's not the creator of the

12 drug.  It's just a formulation that the nonmanufacturer sells.

13 Q.    Okay.  And when you first started working at Safe Chain

14 in 2015, was Safe Chain selling branded medication?

15 A.    Not to my knowledge.

16 Q.    Okay.  Are you familiar with a term called a T3 or a

17 pedigree?

18 A.    Yes, I am.

19 Q.    Could you tell us what that means?

20 A.    It is basically the birth certificate of a drug.  It

21 starts with the drug name, an N.D.C. number, and the lot

22 number, and the manufacturer.

23 Q.    Do you know what the purpose of a T3 or a pedigree is?

24 A.    It's to track where the drug has been.

25 Q.    And do you know what the purpose of tracking where a drug

1    has been is?

2    A.    To ensure the patient's safety.

3    Q.    Was it your understanding that T3s or pedigrees were

4    required?

5    A.    Yes.

6    Q.    Okay.  Ms. Eberspacher, do you know if Safe Chain made

7    any representations to its customers about whether T3s or

8    pedigrees were provided?

9              MR. ZIMET:  If we can please get time, Judge, and

10   reference.

11             THE COURT:  Sustained.

12   BY MS. DEROVANESIAN:

13   Q.    Ms. Eberspacher, in 2015, do you know if Safe Chain made

14   representations to its customers about whether it provided

15   pedigrees and T3s?

16   A.    Yes.

17             MR. ZIMET:  Objection.  Relevance at this point.

18             THE COURT:  Overruled.  I'll allow some latitude.

19   You may proceed.

20   BY MS. DEROVANESIAN:

21   Q.    I'm sorry, I didn't catch your answer.

22   A.    Yes.

23   Q.    Yes.  Okay.

24         All right.  I'd like to show you Government's Exhibit

25   101.

1          MS. DEROVANESIAN:  Your Honor, may I approach the

2     witness?

3          THE COURT:  Okay.

4          MS. DEROVANESIAN:  We're going to do this the

5     old-fashioned way.

6     BY MS. DEROVANESIAN:

7     Q.   Do you see the document that I've handed you?

8     A.   Yes.

9     Q.   Okay.  Can you tell me what it is?

10    A.   It's an email.

11    Q.   And is this an email that you are copied on?

12    A.   Yes.

13    Q.   Okay.  And do you recognize it?

14    A.   Yes.

15          MS. DEROVANESIAN:  Your Honor, government moves into

16    evidence Exhibit 101.

17          MR. ZIMET:  Can we see it, Judge?

18          MS. DEROVANESIAN:  Oh, sure.

19          (Tenders.)

20          THE COURT:  Do you want to show it to Mr. Barzee?

21          MR. BARZEE:  That's all right, Your Honor, thank

22    you.

23          THE COURT:  Any objection?

24          MR. ZIMET:  No objection.

25          THE COURT:  101 will be received.

```
 1              (Government's Exhibit 101 admitted.)
 2    BY MS. DEROVANESIAN:
 3    Q.   Okay.  Ms. Eberspacher, do you see the subject line of
 4    that email?
 5    A.   Yes.
 6    Q.   And can you tell us what that is?
 7    A.   It's the acronym for Drug Supply Chain Security Act.
 8    Q.   Okay.
 9         MS. DEROVANESIAN:  I apologize.  I'm going to come
10    take that copy from you, but then I'll show it to you up here
11    so you can look at it on the screen.
12              May I publish Exhibit 101?
13              THE COURT:  Okay.
14    BY MS. DEROVANESIAN:
15    Q.   Okay.  Ms. Eberspacher, do you see the subject line here?
16    A.   Yes.
17    Q.   And can you tell me what that says?
18    A.   DSCSA.
19    Q.   And do you know what that stands for?
20    A.   Yes.  Drug Supply Chain Security Act.
21    Q.   Okay.  And this attachment says T3 update here.  Do you
22    see that?
23    A.   Yes.
24    Q.   Okay.  And then I am going to take you to the attachment
25    here.  Okay.  And do you see here where it says, "Our
```

 1   compliance department will be emailing the T3s to the pharmacy

 2   contact within 24 hours of shipment" --

 3   A.    Yes.

 4   Q.    -- "along with the most recent backup paperwork to show

 5   the product's history"?

 6   A.    Yes.

 7   Q.    And from your understanding, who was this letter directed

 8   to?

 9   A.    The customers.

10   Q.    Okay.  And in your experience working at Safe Chain, was

11   that followed?

12   A.    No.  Not always.

13   Q.    Okay.  Ms. Eberspacher, are you familiar with something

14   called VAWD accreditation?

15   A.    Yes.

16   Q.    Can you tell us what that is?

17   A.    It's an accreditation given to wholesale distributors

18   that shows they've met certain criteria that make them safe by

19   this accreditation.

20   Q.    And is VAWD accreditation something that Safe Chain was

21   looking to obtain during the course of employment?

22   A.    Yes.

23   Q.    Do you know why?

24   A.    It was to --

25            MR. ZIMET:  Objection, Judge, just to foundation.

```
 1              THE COURT:  Sustained.
 2  BY MS. DEROVANESIAN:
 3  Q.   All right.  Ms. Eberspacher, were you involved in
 4  applying for VAWD accreditation?
 5  A.   Yes.  I was.
 6  Q.   And was Safe Chain granted VAWD accreditation while you
 7  were working there?
 8  A.   No.
 9  Q.   Okay.  I'm going to show you --
10           MS. DEROVANESIAN:  If we could please just show just
11  the witness, from the table, Government Exhibit 603.
12  BY MS. DEROVANESIAN:
13  Q.   Ms. Eberspacher, do you see that document on the screen?
14  A.   Yes.
15  Q.   And can you tell me what it is?
16  A.   It's a letter.
17  Q.   Okay.  And can you tell us who the letter is to and from?
18  A.   It's to Dawn Bibbs-Morrisey.
19  Q.   And if you go to -- we'll take you to the third page
20  here.  Can you see who it's from?
21  A.   It's from Charles Boyd.
22  Q.   Okay.
23           MS. DEROVANESIAN:  Your Honor, Government moves into
24  evidence Exhibit 603.
25           MR. ZIMET:  Judge, subject to the pretrial motion,
```

 1   we would reserve.

 2              THE COURT:  Any further objection?  Mr. Barzee?

 3              MR. BARZEE:  No, Your Honor.  Thank you.

 4              THE COURT:  603 will be received.

 5              (Government's Exhibit 603 admitted.)

 6              MS. DEROVANESIAN:  All right.  And could we please

 7   publish this to the jury?

 8              Thank you.

 9   BY MS. DEROVANESIAN:

10   Q.   Ms. Eberspacher, can you just tell us generally what this

11   letter was in reference to?

12   A.   It was reconsidering Safe Chain getting VAWD

13   accreditation.

14   Q.   Okay.  And I'd like to direct your attention to the

15   second page, and then there's a paragraph underneath that top

16   bullet point list, and it says -- at the end of that first

17   sentence, "We were not actively monitoring the transaction

18   history with VAWD criteria."

19              Do you see that?

20   A.   Yes.

21   Q.   And it says, "We will strive to comply moving forward."

22              Do you see that?

23   A.   Yes.

24   Q.   And then I'd like to direct your attention just below

25   that.  There's a bullet point list in the middle of the page.

 1   And it's the top bullet point there that says, "Safe Chain

 2   solutions has implemented a policy where the T3 for every

 3   order will be examined and approved by senior management or

 4   Katie Eberspacher, compliance manager."

 5              Do you see that?

 6   A.    Yes.

 7   Q.    Who was senior manager at the time that this letter was

 8   sent?  And that was June 7th, 2015.

 9   A.    Charles and Pat Boyd.

10   Q.    Okay.  And in your experience working at Safe Chain at

11   this time in 2017, was that followed?

12   A.    No.

13   Q.    Okay.  Ms. Eberspacher, are you familiar with a term

14   called standard operating procedures?

15   A.    Yes.

16   Q.    In your experience, what does that mean?

17   A.    It's basically the rules of how to handle certain

18   situations and do certain tasks within the company.

19   Q.    Okay.  Did Safe Chain have standard operating procedures

20   when you worked there?

21   A.    Yes.

22   Q.    Were you part of implementing those standard operating

23   procedures?

24   A.    Yes.

25   Q.    Were those more or less rules for the company?

```
 1   A.    Yes.

 2   Q.    Okay.  And did anybody have to approve the standard

 3   operating procedures for Safe Chain?

 4   A.    Yes.

 5   Q.    Who had to approve them?

 6   A.    Charlie and Pat Boyd.

 7   Q.    Okay.  And did they review them?

 8   A.    Yes.

 9   Q.    Okay.

10         MS. DEROVANESIAN:  I'd like to show, please, just

11   for the witness, Government Exhibit 605.

12   BY MS. DEROVANESIAN:

13   Q.    All right.  Ms. Eberspacher, do you see that document?

14   A.    Yes.

15   Q.    Can you tell us what it is?

16   A.    It's an SOP.

17   Q.    Okay.  Can you tell us the date?

18   A.    The issue date is 5-2-15.

19   Q.    Are you familiar with this SOP?

20   A.    Yes.

21         MS. DEROVANESIAN:  Your Honor, the Government moves

22   into evidence Exhibit 605.

23         MR. ZIMET:  May I voir dire, Judge?

24         THE COURT:  Okay.

25   BY MR. ZIMET:
```

```
 1  Q.   And was that in effect in April of 2019?
 2  A.   No, it doesn't look like it.
 3           MR. ZIMET:  Object as to relevance, Judge.
 4           THE COURT:  Any other objection, Mr. Barzee?
 5           MR. BARZEE:  No, Your Honor.
 6           THE COURT:  All right.  Overruled.  I'm going to
 7  allow it.
 8           (Government's Exhibit 605 admitted.)
 9           MS. DEROVANESIAN:  Okay.  May I publish to the jury?
10           THE COURT:  Yes.
11  BY MS. DEROVANESIAN:
12  Q.   Ms. Eberspacher, can you just tell us what the title of
13  this SOP is?
14  A.   Standard operating procedures for trading partner
15  validation.
16  Q.   Do you know what "trading partner" means in that context?
17  A.   It's someone they conduct business with that they
18  purchase the drug from.
19  Q.   That's someone they purchase drugs from?
20  A.   Yes.
21  Q.   Okay.  And then down here under "responsibilities," it
22  says "compliance team."  In your experience working at Safe
23  Chain, were Patrick Boyd and Charles Boyd also involved in
24  this process?
25  A.   Yes.
```

```
 1              MS. DEROVANESIAN:  I'd like to show just for the
 2   witness Exhibit 604.
 3   BY MS. DEROVANESIAN:
 4   Q.   Ms. Eberspacher, do you recognize this document?
 5   A.   Yes.
 6   Q.   And can you tell us what it is?
 7   A.   It's a standard operating procedure.
 8   Q.   Okay.  Can you tell us when it was issued?
 9   A.   5-2-15.
10   Q.   Are you familiar with this procedure?
11   A.   Yes.
12              MS. DEROVANESIAN:  Government moves into evidence
13   Exhibit 604.
14              MR. ZIMET:  Same objection as relevance, Judge.
15              THE COURT:  Overruled.  604 will be received.
16              (Government's Exhibit 604 admitted.)
17              MS. DEROVANESIAN:  I'd please like to publish this
18   one to the jury.
19   BY MS. DEROVANESIAN:
20   Q.   Ms. Eberspacher, during this -- in the second paragraph,
21   down here under "Scope," I see a reference to damaged
22   prescription drugs.  Do you know what that means in the
23   context of Safe Chain's business?
24   A.   Something that's received damaged, whether it be a
25   puncture mark, or a crack, or something like a lid missing.
```

1   Q.   Okay.  And I'd like to direct your attention to the

2   second page at the bottom.  And under No. 2 here, do you see

3   where it says, "Damaged, outdated, and counterfeit, or

4   suspected counterfeit products"?

5   A.   Yes.

6   Q.   And can you tell us what it says below that, about what

7   needs to be done with products that fall into those

8   categories?

9   A.   If a product is noticed to be damaged immediately prior

10  to signing for the package, it would be refused and sent back

11  to the sender.

12  Q.   During your time working at Safe Chain, was it your

13  understanding that that was the rule that was in place?

14  A.   Yes.

15  Q.   Okay.  And I'd like to turn your attention to the third

16  page of the same document, Subsection C., and where it says,

17  "If a product is questionable, counterfeit, or suspect, then

18  this will be documented and reported to the Board of Pharmacy

19  and the Food and Drug Administration within three business

20  days."

21       Was it your understanding that that was the rule at Safe

22  Chain?

23  A.   Yes.

24  Q.   Okay.  And it also says, "The drug will be held in

25  quarantine until the drug's disposition is authorized by the

1    Board of Pharmacy or the FDA."

2              Do you see that?

3    A.    Yes.

4    Q.    And was it your understanding that that was the rule at

5    Safe Chain when you worked there?

6    A.    Yes.

7              MS. DEROVANESIAN:  Okay.  Thank you.  We can take

8    that one down, and I would like to please just show the

9    witness Government Exhibit 601.

10   BY MS. DEROVANESIAN:

11   Q.    All right.  Ms. Eberspacher, can you tell us if you

12   recognize this document?

13   A.    Yes.

14   Q.    Can you tell us what it is?

15   A.    An SOP.

16   Q.    And can you tell us the issue date?

17   A.    5-2-15.

18             MS. DEROVANESIAN:  All right.  Government moves into

19   evidence Exhibit 601.

20             MR. ZIMET:  May I voir dire?

21             THE COURT:  Okay.

22   BY MR. ZIMET:

23   Q.    Was this in effect in 2020?

24   A.    The effective date is 5-9-15.

25   Q.    So this was prepared before 2020; is that correct?

```
 1   A.    Yes.

 2   Q.    The date that's on there is the date it was prepared?

 3   A.    Yes.  It looks like it.

 4   Q.    Are you sure?

 5   A.    If that's what the document says.

 6   Q.    Well, it's what your knowledge is.  Was it in effect in

 7   2015?

 8   A.    Yes.

 9   Q.    Do you see at the top there's a Safe Chain Solutions and

10   then its insignia next to it?

11   A.    Yes.

12   Q.    Did that insignia exist in 2015?

13   A.    I don't recall.

14   Q.    Well, it did not exist, did it?

15         MS. DEROVANESIAN:  Your Honor, I'd object.  This

16   goes beyond the scope of voir dire.

17         THE COURT:  Overruled.

18   BY MR. ZIMET:

19   Q.    It did not exist, did it?

20   A.    I don't know.

21   Q.    Well, Safe Chain changed its insignias, did it not?

22   A.    I don't know.

23   Q.    Oh, let's look at -- can we look at 603, I guess?

24         MR. ZIMET:  I'm sorry.  How about 101, please?

25         MR. BARZEE:  I think that's the one on the ELMO.
```

1    BY MR. ZIMET:

2    Q.   So this is Exhibit 101.  There's an insignia on this one,

3    is there not?

4    A.   Yes.

5    Q.   And the insignia on 101 is different than the insignia on

6    the last exhibit you were looking at?

7    A.   Yes.  It's different.

8    Q.   So Safe Chain did change insignias; correct?

9    A.   Yes.

10   Q.   But the date of this is -- 101 is 2015; correct?

11   A.   Yes.

12   Q.   The date of the exhibit you were just looking at is 2015

13   also?

14   A.   Yes.

15   Q.   So in 2015, they had two different insignias?

16          MS. DEROVANESIAN:  Your Honor, this has been asked

17   and answered.

18          THE COURT:  Overruled.

19   BY MR. ZIMET:

20   Q.   They had two different insignias in the same year?

21   A.   No.

22   Q.   Actually, Safe Chain changed its insignias well after

23   2015, did they not?

24   A.   I'm not sure why they changed it.

25   Q.   Well, the insignia on the exhibit that you were looking

1    at was a new insignia that came out after 2015; isn't that

2    correct?

3    A.    Yes.

4    Q.    So an insignia on an exhibit in -- that's dated 2015 is

5    not an exhibit that existed in 2015; isn't that correct?

6    A.    No.

7    Q.    You can't have an insignia that didn't exist in that

8    year, could it?

9    A.    I'm not sure.  I don't -- I'm not sure.

10   Q.    Well, you're a compliance person.  You look at things and

11   figure out things and look at details.  That insignia is not

12   one that existed on that document when supposedly it was

13   created?

14   A.    From what you showed me, it is different.

15   Q.    Which means that that document is not a legitimate

16   document from 2015?

17          MS. DEROVANESIAN:  Objection.

18          THE COURT:  Overruled.

19   BY MR. ZIMET:

20   Q.    Is that correct?

21          MS. DEROVANESIAN:  Objection.  Your Honor, may we

22   approach briefly?

23          THE COURT:  No.  I'm overruling your objection.

24   BY MR. ZIMET:

25   Q.    You can answer.

1    A.    Could you ask your question again, sir?

2    Q.    Sure.  It's is not a legitimate document from 2015,

3    because it has an --

4         MS. DEROVANESIAN:  Your Honor, this document is

5    subject to a stipulation as to its authenticity.

6    BY MR. ZIMET:

7    Q.    It's on a document that did not exist in 2015, so it is

8    not legitimately a 2015 document, is it?

9    A.    I can't answer that.

10   Q.    Well, ma'am, if a document is dated on a date that an

11   insignia had not yet been created, that document cannot be

12   legitimate, can it?

13   A.    I can't speak to what happened after I left the company.

14   I know that the logo has changed, now that you've showed me.

15         MR. ZIMET:  We object, Your Honor, to the

16   introduction of the exhibit.

17         THE COURT:  Overruled.  601 will be received.

18         (Government's Exhibit 601 admitted.)

19         MS. DEROVANESIAN:  Can we please publish 601 to the

20   jury?

21   BY MS. DEROVANESIAN:

22   Q.    Okay.  Ms. Eberspacher, can you tell us the title of this

23   standard operating procedure?

24   A.    Standard operating procedures for product tracing.

25   Q.    Okay.  And can you tell us what product tracing meant in

1  Safe Chain's business?

2  A.   It references back to the T3 and pedigree.  It shows

3  where the drug has been, who sampled it.  And it also

4  references lot numbers, NDCs, expiration dates, things like

5  that.

6  Q.   Okay.  And it says, below instructions, "All SCS

7  personnel will read and understand this standard operating

8  procedure."

9       Was Charles Boyd working at Safe Chain at this time?

10 A.   Yes.

11 Q.   Was Patrick Boyd working at Safe Chain at this time?

12 A.   Yes.

13 Q.   What were each of their roles at this time that this

14 procedure was implemented?

15 A.   Pat was the managing partner, and Charlie was the

16 president.  And they were both listed as co-founders, I

17 believe.

18 Q.   Okay.  And, Ms. Eberspacher, I know you were just asked

19 some questions about the way the logo looked and so forth.  Do

20 you remember this procedure being in place at Safe Chain in

21 2015?

22 A.   Yes.

23 Q.   Okay.  I'd like to draw your attention first below

24 procedures, under Subsection A., where it says, "Safe Chain

25 Solutions will maintain all product tracing information for a

1  minimum of six years."

2          Do you see that?

3  A.   Yes.

4  Q.   And from your experience working at Safe Chain, was that

5  the rule?

6  A.   Yes.

7  Q.   Okay.  And then I'd like to draw your attention to

8  Subsection C.  "The transaction information must have all of

9  the following information to be considered complete:  Name of

10  the product, strength and dosage form, national drug code,"

11  and so forth.

12          Was it your understanding that this information was

13  required to be included in the product tracing at Safe Chain?

14  A.   Yes.

15  Q.   Okay.  And then what about below No. 2, Subsection A,

16  where it says, "Safe Chain Solutions must have the transaction

17  history supplied by the trading partner SCS is purchasing the

18  product from"?

19  A.   Yes.

20  Q.   And can you tell us what the trading partner is referring

21  to in this sentence?

22  A.   The vendor.  The person or company that it was purchased

23  from.

24  Q.   Okay.  So what does this rule say about what has to be

25  received from the person Safe Chain is buying medicine from?

1  A.    A transaction history.

2  Q.    Okay.  And is that the same thing as the pedigree or the

3  T3?

4  A.    Yes.

5  Q.    Okay.  And then just below that, it says, "Information

6  must include every transaction relating to the product,

7  including the manufacturer's information"?

8  A.    Yes.

9  Q.    From your understanding, was that the rule in place at

10  Safe Chain in 2015?

11  A.    Yes.

12  Q.    Okay.  And if you see No. 3 below contains a bullet point

13  list.  Do you see that?

14  A.    Yes.

15  Q.    Okay.  And can you tell us what that list is?

16  A.    It's the information from the product that needs to be on

17  the transaction history.

18  Q.    Okay.  And do you see the second-to-last bullet point

19  there that says, "Did not knowingly ship a suspect or

20  illegitimate product"?

21  A.    Yes.

22  Q.    Did you understand that to be one of the guarantees that

23  needed to be made when selling medicine?

24  A.    Yes.

25  Q.    Okay.  And then this list continues on the second page.

 1   I'd like to show you the two bullet points there where it

 2   says, "Did not knowingly provide false transaction

 3   information."

 4            Do you see that?

 5   A.    Yes.

 6   Q.    And based on your understanding, was this a guarantee

 7   that Safe Chain made to its customers back in 2015?

 8   A.    Yes.

 9   Q.    And what about that second one, "Did not knowingly alter

10   the transaction history"?

11   A.    Yes.

12   Q.    Okay.  And, Ms. Eberspacher, based on your experience

13   working at Safe Chain back in 2015 when this was implemented,

14   were these rules followed?

15   A.    No.  Not always.

16   Q.    Okay.  Ms. Eberspacher, I'd like to show you --

17            MS. DEROVANESIAN:  Please, just for the witness,

18   Exhibit 602.

19   BY MS. DEROVANESIAN:

20   Q.    Ms. Eberspacher, do you recognize this document?

21   A.    Yes.

22   Q.    Can you tell us what it is?

23   A.    It's an SOP.

24   Q.    Okay.  And what's the date of this one?

25   A.    5-2-15.

```
 1              MS. DEROVANESIAN:  Government moves into evidence

 2   Exhibit 602.

 3              MR. ZIMET:  No objection, Judge.

 4              MR. BARZEE:  None.

 5              THE COURT:  602 will be received.

 6              (Government's Exhibit 602 admitted.)

 7   BY MS. DEROVANESIAN:

 8   Q.   And, Ms. Eberspacher, this one says, at the top,

 9   "Standard operating procedure for vendor and transaction

10   history authentication."

11              Do you see that?

12   A.   Yes.

13   Q.   What's a vendor in this context?

14   A.   It's the person that the drug is being purchased from.

15   Q.   Okay.  And then I'd like to draw your attention into the

16   definition section.  No. 5 says, "Authorized distributor of

17   record."

18              Do you know what an authorized distributor is?

19   A.   It's the person -- it's the company that is authorized to

20   sell the medication.

21   Q.   Okay.

22              MR. BARZEE:  Objection.  Vague, Your Honor.

23              THE COURT:  Overruled.

24   BY MS. DEROVANESIAN:

25   Q.   Okay.  And then I'd like to look at a few of these
```

```
 1   guidelines.  Guideline No. 1 says, "All products received at a
 2   SCS distribution center from wholesale distributors shall
 3   include a transaction history."
 4           From what you understood, was that supposed to be
 5   the rule at Safe Chain back in 2015?
 6   A.   Yes.
 7   Q.   Okay.  And then under No. 2, it says, "A cause for
 8   authentication shall be conducted."
 9           Can you tell us what a cause for authentication
10   means in this context?
11   A.   It's similar to the product tracing.  It's investigating
12   a bit more.
13   Q.   Okay.  And it says that happens if there's any reason to
14   believe the drugs purchased from another wholesaler are
15   counterfeit, suspect of counterfeit, misbranded or
16   adulterated.
17           Is it your understanding that that was the procedure
18   that was supposed to be followed in that situation?
19   A.   Yes.
20   Q.   I'm sorry.  I think I spoke over you.  Did you say yes?
21   A.   Yes.
22   Q.   Thank you.
23           And then No. 4 says, "Notify your manager right away
24   if product cannot be verified."
25           Could you tell me what verifying a product would
```

 1   mean in this context?

 2   A.   It would mean the drug that you received in had the same

 3   NDC, drug name and dosage, lot number, and expiration date.

 4   Q.   At this point in time, in 2015, was Charles Boyd working

 5   in management?

 6   A.   Yes.

 7   Q.   Was Patrick Boyd working in management?

 8   A.   Yes.

 9   Q.   Okay.  And then No. 5, "Proper authorities to contact in

10   case of suspected counterfeit products that cannot be verified

11   are the Maryland Board of Pharmacy and the Food and Drug

12   Administration within three days."

13         Did you understand that to be the rule at Safe Chain

14   back in 2015?

15   A.   Yes.

16   Q.   Okay.  And I'd like to take you to the second page at the

17   top where it says, "Transaction histories shall be available

18   for inspection and photocopying by authorized federal, state,

19   or local law enforcement agencies."

20         Do you see that?

21   A.   Yes.

22   Q.   Was it your understanding that it was a rule at Safe

23   Chain to keep the transaction histories and have them

24   available?

25   A.   Yes.

```
 1   Q.   Okay.  And No. 8, transaction history records, do you see
 2   where it says those will be kept at the office and readily
 3   available for authorized inspection?
 4   A.   Yes.
 5   Q.   Was it your understanding that this meant that Safe Chain
 6   had to actually receive pedigrees and T3s in the first
 7   instance?
 8   A.   Yes.
 9   Q.   Okay.  And then I'd like to talk to you about a couple of
10   these procedures.  Under No. 1, it says, "When product is
11   received" -- and then I'm just going to skip you down to this
12   last sentence in the paragraph.  "Verify the product
13   information on the transaction history matches the actual
14   product received."
15        Can you just tell us what that means?  How you would
16   do that?
17   A.   You would use the transaction history and the data on it
18   to compare it to what is on the bottle.
19   Q.   Okay.  And then under No. 2, "If there's any reason to
20   believe the product is counterfeit, suspect of counterfeit,
21   misbranded, or adulterated, conduct a for-cause
22   authentication."
23        And is that the same process you were describing to
24   us earlier when you were saying what to do if you're uncertain
25   about a product?
```

1  A.    Yes.

2  Q.    Okay.  And can you look at that last line and tell me

3  what this procedure requires Safe Chain to do if there is

4  reason to believe that the product is counterfeit, suspect of

5  counterfeit, misbranded, or adulterated?

6  A.    Conduct a for-cause authentication.

7  Q.    Okay.  And do you see here where it says at the end here,

8  "By verifying the following information for all of the owners

9  of the product back to the manufacturer"?

10 A.    Yes.

11 Q.    Okay.  And I just want to kind of break down what that

12 means real quick.  So when it says, "All of the owners of the

13 product back to the manufacturer," where would that

14 information come from?

15 A.    The transaction history.

16 Q.    Is that information supposed to be listed on the

17 transaction history?

18 A.    Yes.

19 Q.    Okay.  And then I'd like to skip down to No. 6.

20       Do you see where it says, "Establishing the legitimacy

21 prescription drugs and/or devices"?

22 A.    Yes.

23 Q.    Do you see Subsection A where it says, "It's the policy

24 of Safe Chain Solutions to only purchase product directly from

25 manufacturers or a distributor that purchases directly from

1  the manufacturer"?

2  A.   Yes.

3  Q.   Was it your experience at Safe Chain that this was

4  supposed to be the rule in 2015?

5  A.   Yes.

6  Q.   Okay.  And in your experience, was that followed?

7  A.   No.

8  Q.   And then Subsection B, I'd like to draw your attention to

9  the bullet-pointed list.  It says, "The T3 must reflect the

10 product came directly from the manufacturer."

11         Is that your understanding of the rule in 2015?

12 A.   Yes.

13 Q.   And then the third one, it says, "Safe Chain Solutions

14 shall make every reasonable effort to verify authenticity of

15 merchandise received and, in conjunction, make every

16 reasonable effort to comply with T3 analysis and supplier

17 licensing."

18         Do you see that?

19 A.   Yes.

20 Q.   And do you see, in the rest of that paragraph, does it

21 say the purpose of that?

22 A.   To verify the authenticity.

23 Q.   Okay.  And did you have an understanding at this point of

24 why it was important to verify the authenticity of a

25 medication?

1    A.    To ensure patient safety.

2    Q.    Okay.  And do you see the bullet point below the last one

3    in that list that says, "If unable to authenticate a T3,

4    notification will be made to the Board of Pharmacy and Food

5    and Drug Administration within three business days"?

6    A.    Yes.

7    Q.    Was it your understanding that that was supposed to be

8    the rule at Safe Chain in 2015?

9    A.    Yes.

10   Q.    Okay.  And if you just bear with me, I'd like to ask you

11   a couple on the next page here, which I think it's numbered --

12   yeah, it's No. 3.

13            All right.  And at the top of this page, do you see

14   where it says, "SCS shall make every reasonable effort to

15   verify authenticity of merchandise received and, in

16   conjunction, make every reasonable effort to comply with T3

17   analysis"?

18   A.    Yes.

19   Q.    Okay.  And was it your understanding that that was the

20   rule that was in place all the way back in 2015?

21   A.    Yes.

22   Q.    And did they all continue throughout the course of when

23   you worked at Safe Chain through 2019?

24   A.    Yes.

25   Q.    And here, again, it repeats, "If you are unable to

1    authenticate a T3, notification will be made to the Board of

2    Pharmacy."

3              Do you see that?

4    A.   Yes.

5    Q.   And it also says the Food and Drug Administration.  Do

6    you see that?

7    A.   Yes.

8    Q.   Do you see how long the rules require Safe Chain to

9    report the fact that it was unable to authenticate a T3?

10   A.   Yes.

11   Q.   Okay.  And how long is that?

12   A.   Three days -- three business days.

13   Q.   Okay.  And then No. 7 underneath that, it says, "FDA

14   guidelines on suspect product."

15             Are you familiar with these guidelines?

16   A.   Yes.

17   Q.   Okay.  And do you know where these guidelines originated?

18   A.   They were on the FDA website.

19   Q.   Okay.  And were these FDA guidelines implemented into

20   Safe Chain's policy here?

21   A.   Yes.

22   Q.   And were these policies approved by Charles Boyd and

23   Patrick Boyd?

24   A.   Yes.

25   Q.   Okay.  Under that first Subsection A, Bullet Point 1, do

1  you see where it says, "Be alert for offers of products for

2  sale that are at a very low price or one that is, quote, too

3  good to be true"?

4  A.   Yes.

5  Q.   Did you have an understanding of how that would apply in

6  the context of buying prescription medication?

7  A.   I'm sorry, could you repeat that?

8  Q.   Sure.  It says, "Be alert for offers of products for sale

9  at a very low price or one that is too good to be true."

10        Working at a company like Safe Chain, were there

11  ways to know what was a normal or expected price for a

12  prescription medication?

13  A.   Yes.

14  Q.   And were there ways to see if there was an offer for a

15  product that was much lower or too good to be true?

16  A.   Yes.

17  Q.   Okay.  And then it says, "Purchasing from a source new to

18  the trading partner."  Do you see that?

19  A.   Yes.

20  Q.   Okay.  And then I'll skip down to the 1, 2, 3, 4 -- 5th

21  bullet point here, "Purchasing from a source that the trading

22  partner knows or has reason to believe, has transacted

23  business involving suspect products."

24        In this context, can you tell us who the trading

25  partner is?

 1   A.    The person that Safe Chain would be buying the drugs

 2   from.

 3   Q.    Well, wait.  It says, "Purchasing from a source that a

 4   trading partner knows."  So would the trading partner be Safe

 5   Chain in this instance?

 6   A.    It could be, yes.

 7   Q.    Okay.  And it's -- underneath of that, in the

 8   bullet-pointed list, it mentions a trading partner that has

 9   been involved in business transactions where they sold or

10   delivered suspect or illegitimate product.

11         Do you see that?

12   A.    Yes.

13   Q.    And did you understand that to be one sign to look out

14   for to see if product was counterfeit, suspect, or

15   illegitimate?

16   A.    Yes.

17   Q.    Okay.  And then down below that, "A trading partner that

18   has a history of problematic or potentially false transaction

19   histories or pedigrees."

20         Do you see that?

21   A.    Yes.

22   Q.    And was it your understanding that this was another sign

23   that would indicate, according to the FDA guidance, suspect

24   product?

25   A.    Yes.

1    Q.   Okay.  And then below that, "A trading partner that is

2    reluctant to provide a transaction history or pedigree

3    associated with the product being purchased."

4              Was it your understanding that this was another sign

5    that was supposed to be looked out for to see if product was

6    suspect?

7    A.   Yes.

8    Q.   Okay.  And under Subpart B here, do you see where it

9    says, "Supply, demand, history, and value of the product"?

10   A.   Yes.

11   Q.   Okay.  And do you see a list of general things to look

12   out for here?

13   A.   Yes.

14   Q.   Okay.  And I'll talk to you about this first one here.  A

15   product that is generally in high demand in the US market.

16             Do you see that?

17   A.   Yes.

18   Q.   Did you understand that to be a sign to look out for in

19   determining if product is suspect?

20   A.   Yes.

21   Q.   Okay.  And then I'd like to draw your attention to the

22   4th bullet point down where it says, "Product that has been

23   previously or is currently being counterfeited or diverted."

24             Do you see that?

25   A.   Yes.

1   Q.   "E.g., HIV, antipsychotic, or cancer drugs."  Do you see

2   that?

3   A.   Yes.

4   Q.   And did you understand, based on this guidance, that HIV

5   [sic] was a product that was currently being counterfeited or

6   diverted, based on this list?

7   A.   Yes.

8   Q.   Okay.  And then bear with me.  I have just a couple more

9   here.

10         Under Subpart C, "Appearance of the product."  Was

11   it your understanding that the appearance of the product was

12   supposed to be examined at Safe Chain to determine if it was

13   suspect product?

14   A.   Yes.

15   Q.   Okay.  And then I'll take you to the last page here.  Do

16   you see in the 1, 2, 3, 4, 5th bullet point where it says,

17   "Closely examine the package"?

18   A.   Yes.

19   Q.   And do you see the first bullet point here where it says,

20   "Look for signs it has been compromised"?

21   A.   Yes.

22   Q.   And it says, "Opened, broken seal, damaged, repaired, or

23   altered"?

24   A.   Yes.

25   Q.   Did you understand that to be a sign that product was

 1  suspect?

 2  A.    Yes.

 3  Q.    Okay.  And then looking at the third bullet point down

 4  where it says, "To see if a product inserts are missing or do

 5  not correspond to the products."

 6            Do you see that?

 7  A.    Yes.

 8  Q.    Can you tell us what a product insert is?

 9  A.    It's a paper document that's usually glued to the back of

10  a drug bottle that has information like storage and, kind of,

11  all of the manufacturer documentation.

12  Q.    Okay.  And based on this list, was it your understanding

13  that if a package or a product insert was missing or didn't

14  correspond to the product, that was a potential sign of

15  suspect product as well?

16  A.    Yes.

17  Q.    Okay.

18            MS. DEROVANESIAN:  Thank you.  I think we can take

19  that one down.

20            And then I'd like to please show the witness only

21  Exhibit 600.

22  BY MS. DEROVANESIAN:

23  Q.    Okay.  Ms. Eberspacher, do you recognize this document?

24  A.    Yes.

25  Q.    Can you tell us what the date of it is?

1  A.   5-2-15.

2  Q.   Okay.  And can you tell us the title of the document?

3  A.   Standard operating procedures for suspect and

4  illegitimate product.

5          MS. DEROVANESIAN:  Government moves into evidence

6  Exhibit 600.

7          MR. ZIMET:  Subject to the Court's earlier ruling,

8  Judge.

9          THE COURT:  Same objection?

10          MR. BARZEE:  Same.

11          THE COURT:  Overruled.  600 will be received.

12          (Government's Exhibit 600 admitted.)

13  BY MS. DEROVANESIAN:

14  Q.   Okay.  Ms. Eberspacher, under "definition" here, do you

15  see a definition for illegitimate product?

16  A.   Yes.

17  Q.   Okay.  And where it says, "A product for which credible

18  evidence shows that the product" -- and then there's a list.

19  The first one says, "Is counterfeit, diverted, or stolen."

20          Did you understand that to be an indication that

21  product is illegitimate?

22  A.   Yes.

23  Q.   Okay.  And what about that third bullet point where it

24  says, "Is the subject of a fraudulent transaction."  Are you

25  familiar with what a fraudulent transaction meant in this

 1   context?

 2   A.   Yes.

 3   Q.   And can you just tell us what a fraudulent transaction

 4   would mean in the world of pharmaceuticals?

 5           MR. ZIMET:   Objection as to foundation, Judge, for

 6   the opinions given.

 7           THE COURT:   I'll allow her to give her understanding

 8   of it.

 9           THE WITNESS:   My understanding is that the

10   fraudulent transaction is when you've received -- received a

11   product that is -- the paperwork with it doesn't match.   It

12   doesn't have the correct information and where it came from.

13   BY MS. DEROVANESIAN:

14   Q.   Okay.   And based on this definition, did you understand

15   that that would render a product to be illegitimate product?

16   A.   Yes.

17   Q.   Okay.   Then under No. 2, where it says, "Suspect products

18   are defined," and it has a few bullet points here.

19           Do you see that?

20   A.   Yes.

21   Q.   And it says, "Potentially counterfeit, diverted, or

22   stolen."   Did you understand that that was something that

23   would make a product considered suspect?

24   A.   Yes.

25   Q.   And then the third bullet point where it says,

1  "Potentially the subject of a fraudulent transaction."  Is

2  that the same type of fraudulent transaction you just

3  explained before?

4  A.   Yes.

5  Q.   Okay.  And where it says, "Appears otherwise unfit for

6  distribution."  Did you understand that to be something that

7  would make a product considered suspect?

8  A.   Yes.

9  Q.   Okay.  And then under procedures, at the bottom of this

10  page, under Roman Numeral IV, do you see where it says,

11  "Purchasing a product from a source that is known or suspected

12  to have been involved in transactions of suspect products"?

13  A.   Yes.

14  Q.   Did you understand that to be part of the process of

15  identifying suspect products, according to these rules?

16  A.   Yes.

17  Q.   Okay.  And then it has another bullet-pointed list.  The

18  first bullet point, do you see where it says, "Trading partner

19  that has been involved in business transactions where they

20  have sold or delivered suspect or illegitimate products"?

21  A.   Yes.

22  Q.   Did you understand that to be one indication that a

23  trading partner should not be purchased from?

24  A.   Yes.

25  Q.   And then what about that second bullet point?  "A trading

 1   partner that has a history of problematic or potentially false

 2   transaction histories or pedigrees."

 3              Do you see that?

 4   A.   Uh-huh.

 5   Q.   And did you understand that to be another indication that

 6   a trading partner should not be someone who Safe Chain

 7   purchases medicine from?

 8   A.   Yes.

 9   Q.   And then I'm going to take you to the second page here.

10   Do you see the part at the top where it says, "A trading

11   partner that is reluctant to provide a transaction history or

12   pedigree associated with the product being purchased or does

13   not do so in a timely manner."

14              Do you see that?

15   A.   Yes.

16   Q.   And did you understand that to be another indication,

17   according to Safe Chain's rules, that indicated that a trading

18   partner is not someone who they should be buying medicine

19   from?

20   A.   Yes.

21   Q.   All right.  Ms. Eberspacher, I don't think I asked you

22   about this one.  But if you'd look at the first page again,

23   was it your understanding that these rules were in place in

24   2015?

25   A.   Yes.

1  Q.   And was it your understanding that these rules continued

2  to exist at Safe Chain throughout the course of your

3  employment there?

4  A.   Yes.

5  Q.   Until 2020?

6  A.   2019.

7  Q.   Oh, I'm sorry.  2019.  You said what month?

8  A.   It was in the summer, like July-ish.

9  Q.   Ms. Eberspacher, I just asked you about a lot of Safe

10 Chain's rules.  And you mentioned with several of them that

11 you had concerns that these rules were not being followed by

12 Charles and Patrick Boyd.  Did you share those concerns with

13 Charles Boyd?

14 A.   Yes.

15 Q.   Did you share those concerns with Patrick Boyd?

16 A.   Yes.

17 Q.   Can you tell us what type of concerns you shared with

18 Charles and Patrick Boyd relating to their own rules?

19 A.   There was a lot of vendors that -- they didn't

20 necessarily follow the direct manufacturer-to-distributor

21 model.  Some of them went from the manufacturer to a

22 distributor to a pharmacy and back.  And that was what wasn't

23 on paper and that we should have been doing.  And that was

24 what part of the VAWD accreditation was, that it wouldn't do

25 that.

1  Q.   Okay.  And is this information that you're talking about,

2  would that come from the pedigree or the T3?

3  A.   Yes.

4  Q.   And, Ms. Eberspacher, when you raised these concerns

5  about the pedigrees or T3s with Charles and Patrick Boyd, did

6  you do that in writing or in person?

7  A.   It was often in person.

8  Q.   Okay.  Did you avoid doing it in writing for any reason?

9  A.   Yes.

10  Q.   What was the reason?

11  A.   A lot of times, we were -- staff was instructed to do

12  things away from in writing.

13  Q.   Who instructed you not to put things in writing?

14  A.   The Boyds.

15  Q.   Both of them?

16  A.   Yes.

17  Q.   Okay.  So when you approached the Boyds in person to tell

18  them about your concerns about complying with these rules,

19  what kind of response did you get?

20  A.   It felt like a brush-off.

21  Q.   Okay.  And do you remember which one of them or both was

22  brushing you off?

23  A.   Both of them.

24  Q.   Okay.  And do you remember anything that either of them

25  said when you raised these concerns?

1   A.   It would be, you know, "To figure it out," you know, just

2   -- it would just be the brush-off type of language.  Like,

3   "Figure it the "F" out, or it doesn't need a pedigree," or

4   things like that.

5   Q.   Okay.  And who would say to you, "Figure it the "F" out"?

6   A.   It would be either of them.

7   Q.   And what did you interpret that to mean?

8   A.   Make it happen.

9   Q.   Okay.  And you said something about you don't need a

10  pedigree.  Who told you that?

11  A.   I heard that from Pat before.

12  Q.   Okay.  And what did you interpret that to mean?

13  A.   That the drug didn't need a pedigree for the sale.

14  Q.   Okay.  And Ms. Eberspacher, I'd like to show you --

15          MS. DEROVANESIAN:  And, please, just for the witness

16  at this time, Government Exhibit 107.

17  BY MS. DEROVANESIAN:

18  Q.   Ms. Eberspacher, do you recognize this document?

19  A.   Yes, I do.

20  Q.   And can you tell us what it is?

21  A.   It's an email.

22  Q.   Okay.  And can you tell me who sent the email?

23  A.   I did.

24  Q.   And can you tell me who you sent the email to?

25  A.   Charlie and Pat Boyd.

1   Q.   Okay.  And the date?

2   A.   July 5th, 2018.

3        MS. DEROVANESIAN:  Okay.  Government moves into

4   evidence Exhibit 107.

5        MR. ZIMET:  Only as to previous matters as discussed

6   with the Court, Judge.

7        THE COURT:  Mr. Barzee?

8        MR. BARZEE:  Same.

9        THE COURT:  Overruled.  107 will be received.

10       (Government's Exhibit 107 admitted.)

11  BY MS. DEROVANESIAN:

12  Q.   Okay.  Ms. Eberspacher, you mentioned that we're looking

13  at an email that you sent to Charles and Patrick Boyd in 2018.

14  And do you see that there is an attachment to this email?

15  A.   Yes.

16  Q.   Can you tell us what that attachment is?

17  A.   It's a -- I think a newsletter article.

18  Q.   Okay.  And I'll show it to you.  It's on the second page

19  here, please.  And can you tell us the title of this article

20  that you sent to Charles and Patrick Boyd?

21  A.   "Wholesale drug distribution, protecting the integrity of

22  the nation's prescription drug supply."

23  Q.   Can you tell us why you sent this article to Charles and

24  Patrick Boyd in 2018?

25  A.   I had been looking more into the things that were needed

 1    to achieve VAWD accreditation, and I had concerns about the

 2    way things were being handled in Safe Chain.

 3    Q.    Okay.  And can you tell us what you mean by that?

 4    A.    About our vendors.

 5    Q.    Okay.  And I'd like to draw your attention to just a

 6    couple of places in this article.  First, on that first page,

 7    second paragraph, it mentions, "An ongoing threat of

 8    counterfeit medication entering the nation's drug supply

 9    chain."

10         Did that concern you to read?

11    A.    Yes.

12    Q.    Okay.  And in that same paragraph a little bit below, it

13    says, "The threat to patient's safety and the realization 25

14    years ago that insufficient safeguards were in place to

15    protect the prescription drug distribution system spurred

16    Congress into action."

17         Do you remember reading that?

18    A.    Yes.

19    Q.    Okay.  And then I'd like to turn your attention to the

20    second page.  Do you see at the top where it says, "The

21    current threat"?

22    A.    Yes.

23    Q.    And can you tell us do you remember reading here about --

24    where it says, "The most prolific counterfeiting incident that

25    occurred over the last 10 years," and then it describes

1    incidents of counterfeiting drugs.

2              Do you remember reading that?

3    A.    Yes.

4    Q.    And did that concern you to read?

5    A.    Yes.

6    Q.    Why did it concern you to see that these problems

7    occurred?

8    A.    Can you say that again?  I'm sorry.

9    Q.    Sure.  Why did it concern you to read about different

10   threats in the marketplace with counterfeit product and so

11   forth?

12   A.    Because it seemed like it could happen, that there were

13   issues that Safe Chain was vulnerable to.

14   Q.    Okay.  And when it says down below, "Fast-forward to

15   2012," do you remember reading this language here about

16   federal criminal charges that were filed against individuals

17   involved in the diversion of drugs?

18   A.    Yes.

19   Q.    Okay.  And down below, do you remember reading here where

20   it talks about defendants who supplied, diverted, sold,

21   originated -- sorry.

22              Where it says, "None of the drugs these diverters

23   sold originated from authorized distributors"?

24   A.    Yes.  I remember reading that.

25   Q.    Okay.  And do you remember reading where it said,

1  "Pharmacies received drugs of unknown quality and origin whose

2  false pedigrees made it practically impossible to trace or

3  determine the true source of the drugs"?

4  A.   Yes, I remember that.

5  Q.   Okay.  And do you remember reading down below, in that

6  next paragraph where it says, "The prescription drug diversion

7  problem has increased"?

8  A.   Yes.

9  Q.   And then in that last paragraph, where it says, in the

10  second -- third to last sentence, "The very real possibility

11  that the Supply chain is riddled with corrupt wholesalers."

12          Do you remember reading that?

13  A.   Yes.

14  Q.   Were you concerned about that?

15  A.   Yes.

16  Q.   Okay.  And then I'd like to turn your attention to the

17  next page.  And then do you see this text down at the bottom

18  that's bolded and sort of larger?

19  A.   Yes.

20  Q.   Where it says, "Even with pedigree requirements in place,

21  suspect wholesale distributors have found ways around the

22  system by falsifying their drug pedigrees."

23          Do you remember reading that?

24  A.   Yes.

25  Q.   Do you remember being concerned about that?

```
 1   A.    Yes.

 2   Q.    Okay.  And then we'll have to blow this up because it's

 3   very little print.  But I'd like to ask you about this

 4   footnote down below, Footnote 2, where it says, "The pedigree

 5   requirement was to require each person engaged in the

 6   wholesale distribution of a prescription drug in interstate

 7   commerce who is not the manufacturer or an authorized

 8   distributor to provide a pedigree to the recipient."

 9         Do you see that?

10   A.    Yes.

11   Q.    And was it your understanding that that was the

12   requirement in place at the time you sent this article in

13   2018?

14   A.    Yes.

15   Q.    At that time, did you have concerns about Safe Chain

16   following that guidance?

17   A.    Yes.

18   Q.    Okay.  And then I'd like to skip to page 7.  Actually, we

19   can skip that, we can go straight to page 8.

20         Okay.  And do you see these two different flow charts

21   pictured on this page?

22   A.    Yes.

23   Q.    Okay.  I'd like to talk to you about this first one.

24   What was your understanding of what this first flowchart is

25   showing?
```

1    A.    That it's showing what a typical, normal drug

2    distribution would look like.

3    Q.    Okay.  And then what about the second figure?

4    A.    That's showing something that is frowned upon, that's not

5    -- not exactly safe.

6    Q.    I'm sorry, did you say "that's not exactly safe"?

7    A.    Yes.

8    Q.    Okay.  And did either of these two flow charts stand out

9    to you when you saw this article?

10   A.    Yes.  The second one.

11   Q.    Why did the second flowchart stand out to you when you

12   saw the article?

13   A.    Because that is very, very often how the drugs were

14   received at Safe Chain.

15   Q.    Okay.  And then do you see down below there's some text

16   sort of explaining what's shown here in these flow charts.

17   And do you see where it says, "Common occurrences include

18   counterfeiting, stolen, or improperly stored drugs, recycling

19   of previously dispensed medications, such as those dispensed

20   through Medicaid."

21            Do you see that?

22   A.    Yes.

23   Q.    And then below that, where it says, "These are some of

24   the most serious forms of diversion that have the greatest

25   risk to patient safety"?

1    A.    Yes.

2    Q.    After you just said this figure reminded you of what was

3    happening at Safe Chain, did that concern you, to see that

4    below?

5    A.    Yes.

6    Q.    Okay.  And after reading this article, did you decide to

7    send it to Charles and Patrick Boyd?

8    A.    Yes.

9    Q.    And after you sent this email to Charles and Patrick

10   Boyd, do you remember if they talked to you about it?

11   A.    Yes.

12   Q.    And do you remember what they said about it?

13   A.    I don't remember exactly what they said, but I remember

14   it not changing anything.

15   Q.    Okay.  Do you remember if Charles Boyd appeared to be

16   concerned?

17   A.    No.

18   Q.    Do you remember if Patrick Boyd appeared to be concerned?

19   A.    No.

20   Q.    Ms. Eberspacher, I'd like to ask you just a couple

21   questions about your experience working at Safe Chain.  Would

22   you describe working at Safe Chain as like being part of a

23   family?

24   A.    With the staff, in some ways, yes.

25   Q.    What about with respect to Charles Boyd and Patrick Boyd?

```
 1   A.    No.

 2   Q.    What was your relationship like with Charles Boyd?

 3   A.    Charles was friendly and more approachable.  I was more

 4   comfortable talking with him.

 5   Q.    Okay.  And what about Patrick Boyd?

 6   A.    I was very intimidated by him.

 7   Q.    Why were you intimidated?

 8   A.    I just -- I just was.  I just felt like he was more

 9   focused on sales.  Getting it done.  Like, I just felt like I

10   didn't have as much of a rapport talking with him.

11   Q.    Okay.  And when you mentioned that you felt like your

12   concerns about compliance were brushed off, did that continue

13   throughout your entire time working at Safe Chain?

14   A.    Yes, it did.

15   Q.    And could you tell us why you stopped working at Safe

16   Chain in 2019?

17   A.    I felt like it was time to move on, that there were also

18   some interpersonal things that were happening, and it was just

19   time to kind of move on.

20   Q.    Okay.  Did your concerns that you raised with the Boyds

21   have anything to do with why you left?

22   A.    It did.

23   Q.    Okay.  Thank you.

24         MS. DEROVANESIAN:  Nothing further at this time,

25   Your Honor.
```

```
 1                 THE COURT:  Are you going to go next, Mr. Zimet?

 2                 MR. ZIMET:  I am, Judge.

 3                 THE COURT:  Okay.  Go ahead.

 4                 MR. ZIMET:  And also, Judge, reserve as to the issue

 5    we talked about previously.

 6                 THE COURT:  Okay.

 7                           CROSS-EXAMINATION

 8    BY MR. ZIMET:

 9    Q.    Good afternoon, ma'am.

10    A.    Good afternoon.

11    Q.    So let's try to go back to a couple of things you've

12    testified about.  And just so we're clear, Charles Boyd -- you

13    referred to him as Charlie, I think, when you worked there?

14    A.    Yes.

15    Q.    That's what all the staff referred to him as -- Charlie?

16    A.    Yes.

17    Q.    And he was somebody that you said did not treat the staff

18    like family?

19    A.    It wasn't necessarily that.  It was the staff, together,

20    was family.

21    Q.    And he was part of that; correct?

22    A.    Sure.  He owned the company.

23    Q.    And he set up events for people in the company?

24    A.    Yes.  He did.

25    Q.    Events inside the company, events outside the company
```

 1   also; correct?

 2   A.   Yes.

 3   Q.   He tried to celebrate successes of the company; correct?

 4   A.   Yes.

 5   Q.   He tried to reward successes of employees?

 6   A.   Yes.

 7   Q.   He recognized employees for their accomplishments?

 8   A.   Yes.

 9   Q.   He recognized employees for doing the right things also,

10   did he not?

11   A.   He did, yes.

12   Q.   And so that was positive from Charles Boyd as far as the

13   company being a family and having success; is that correct?

14   A.   That is correct.

15   Q.   And he did that all during the time period that you were

16   there; is that correct?

17   A.   Yes.

18   Q.   In fact, when you left in 2018, I think --

19   A.   2019.  Oh, I'm sorry.  I left in 2019.

20   Q.   2019.  You had a child in the summer and then took a

21   leave of absence, and then you resigned; is that correct?

22   A.   That is correct.

23   Q.   Did you write a resignation later?

24   A.   I think I did.

25   Q.   And once you resigned, you were free to say anything you

1   wanted to about what was happening at Safe Chain that you felt

2   was inappropriate; is that correct?

3   A.   Yes.

4   Q.   And you wrote a letter to Charles Boyd about that, did

5   you?

6   A.   No.

7   Q.   You wrote a letter to the Maryland Board of Pharmacy at

8   that point?

9   A.   No, I did not.

10   Q.   So all these things that were going wrong, that were bad,

11   that were violative in patient safety, you didn't write any

12   letters about it when you were at Safe Chain because you felt

13   you were intimidated by it; is that right?

14   A.   Write a letter to the Boyds?

15   Q.   To Charlie Boyd, and say, "This is wrong.  We shouldn't

16   be doing this"?

17   A.   I didn't write a letter.  No, I did not.

18   Q.   You claim that you said that to him orally; is that

19   correct?

20   A.   Yes.

21   Q.   And where was that when you said it to him orally?

22   A.   In the office.

23   Q.   Okay.  And was there anyone else present?

24   A.   I'm sure there was at some point.

25   Q.   Well, do you remember actually saying it to him at a

1    particular time?

2    A.   Yes.  Absolutely, I know I said it.

3    Q.   And what year was that?

4    A.   It was throughout.  I know it was definitely toward the

5    end of my time there.

6    Q.   So in 2019, that would have been one of the times you had

7    said it to him; is that correct?

8    A.   Yes.

9    Q.   And you knew during that time period Safe Chain was

10   concerned about a lawsuit that was taking place relating to

11   Big Pharma companies that were trying to do things to belittle

12   the secondary wholesale market; is that correct?

13   A.   Yes.

14   Q.   And you thought that was wrong, did you not?

15   A.   I thought it was a threat to their business.

16   Q.   Well, you also thought it was the wrong thing to be doing

17   to a company like Safe Chain, did you not?

18   A.   At the time, yes.

19   Q.   And that was 2018, during the time that all of these

20   horrible things supposedly were taking place that you claimed

21   on your direct examination; correct?

22   A.   Yes.

23   Q.   And you wanted to have Safe Chain be successful in that

24   lawsuit, did you not?

25   A.   I wanted them to have success the right way.

```
 1   Q.   My question to you:  You wanted them to have success in
 2   that lawsuit, did you not?
 3            MS. DEROVANESIAN:  Objection, asked and answered.
 4            MR. ZIMET:  No, it wasn't answered, Judge.
 5            THE COURT:  Go ahead.
 6   BY MR. ZIMET:
 7   Q.   Go ahead and answer.
 8   A.   I don't remember my opinion.
 9   Q.   You don't remember your opinion about -- well, all these
10   other things you have this vivid memory about, you don't
11   remember your opinion about wanting them to be successful in
12   the lawsuit?  Is that your testimony?
13   A.    I truly -- with the lawsuit, I don't feel like I
14   remember.  I remember VAWD.
15   Q.   You remember VAWD?
16   A.   The VAWD discussion that we had with the letter that was
17   up.
18   Q.   The letter was up, and all those procedures were for VAWD
19   qualification; is that correct?
20   A.   And for the company.
21   Q.   But you needed those for VAWD, did you not?
22   A.   Yes.
23   Q.   And if you didn't get into VAWD, get VAWD certified,
24   those would not need to be the procedures; is that correct?
25   A.   They should still be the procedures.
```

1    Q.    Well, those were VAWD-required procedures, were they not?

2    A.    Yes, but they should -- they are procedures that ensure

3    safety.

4    Q.    You need to have those to get VAWD certification, yes or

5    no?

6    A.    Yes.

7    Q.    And that's why they were put out and published, to submit

8    for the VAWD certification; isn't that correct?

9    A.    Yes.

10   Q.    So whether or not they would be continued after that

11   would have been a decision that was made once the VAWD

12   determination was made; correct?

13   A.    No.  If you say you're going to do it, you should do it.

14   Q.    Well, you say that you want to do those things, and if

15   you get into VAWD, those are going to be the procedures; is

16   that correct?

17   A.    Yes.

18   Q.    And you did not get into VAWD; is that correct?

19   A.    Not while I was there, no.

20   Q.    And then after you left -- or you left in 2019, what the

21   procedures were in 2020 you have no firsthand knowledge; is

22   that correct?

23   A.    No, I don't know.

24   Q.    So if the allegations in this case relate from April 2020

25   to August 2021, you have no firsthand knowledge as to what the

 1   operating procedures were at Safe Chain during that period of

 2   time; is that correct?

 3   A.   That's correct.

 4   Q.   So your testimony today relates to prior to anything

 5   that's alleged in this indictment; is that correct?

 6   A.   Yes.

 7   Q.   So the article that you submitted that the prosecutor was

 8   just going through all those different parts of the article,

 9   you said, I think -- and correct me if I'm wrong -- the reason

10   you sent that to the Boyds was to tell them that these things

11   were happening at Safe Chain, and they needed to make sure

12   they didn't continue; is that right?

13   A.   When you look at the model that I spoke about, it was

14   that that was what our pedigrees looked like, and I sent it

15   out of concern.

16   Q.   And so you sent it out of concern, and this was your way

17   of telling the Boyds that we weren't doing things the right

18   way; correct?

19   A.   Yes.

20   Q.   And that was your motivation and reason for sending that

21   letter; is that correct?

22   A.   Well, I was hoping that they would see it and realize

23   that that is something that should be stopped.

24   Q.   So now you remembered the reason why you sent that

25   article?

1    A.    As we've talked, yes.

2    Q.    Okay.  So you didn't remember five minutes ago, but now

3    you remember it?

4    A.    Yes.

5    Q.    Okay.  Do you remember what the words were in the email

6    that was the cover email to this?

7    A.    That it should be sent to their attorneys because it was

8    using derogatory language about secondary wholesalers, I

9    think, is some of the language that was in it.

10   Q.    Yeah.  Anything else?

11   A.    That's what I remember.

12   Q.    You just had it in front of you a couple minutes ago,

13   didn't you?

14   A.    I've had a lot of things in front of me.  I'm sorry.

15   Q.    I know.  But this one you said -- first, you said you

16   didn't remember.  Now you remember some part of it, but not

17   all of it; correct?

18   A.    I guess I don't.  I'm sorry.

19   Q.    Well, let's look at it together, then, and see what it

20   says.

21          So this is your email; correct?

22   A.    Yes.

23   Q.    So let's read it together.  All right?

24          "Even though this article is from 2013, it's an

25   interesting read to see how the NABP portrays gray wholesale

 1   distributors."  That's what Safe Chain was; correct?

 2   A.    Yes.

 3   Q.    And the NABP is who?

 4   A.    The National Association -- of Boards of Pharmacy.

 5   Q.    They're the VAWD people; right?

 6   A.    They're the VAWD people.

 7   Q.    So they have -- and that's not an official government

 8   agency, is it?

 9   A.    No.

10   Q.    Some private agency that wants to control the use of

11   drugs; isn't that correct?

12   A.    I wouldn't quite agree with it.  I think it's to ensure

13   patient safety.

14   Q.    Well, it emanates -- its origin is from Big Pharma, isn't

15   it?

16   A.    I really don't remember.

17   Q.    Don't remember?

18   A.    Or I don't know.

19   Q.    Which is it?

20   A.    I think I don't know.

21   Q.    Okay.  So you had no idea who the source was of this

22   article that you thought should be sent, should be looked at;

23   is that right?

24   A.    It was from the National Association of Boards of

25   Pharmacy.

1  Q.    Yeah, their newsletter; right?

2  A.    Yes.

3  Q.    And the next sentence is, "If our lawyers and AIPW are

4  not already aware of this article, we may want to pass it

5  along to them since the NABP uses a lot of derogatory terms to

6  describe secondary distributors."  Correct?

7  A.    Yes.  I remember writing that now.

8  Q.    And that's the reason you sent this; isn't it correct?

9  A.    It's part of it, yes.

10 Q.    Well, you don't say anything else that -- you know, it's

11 good to be on the alert for this because we need to clean up

12 our house because we're violating certain things.  You don't

13 say that at all, do you?

14 A.    No.

15 Q.    So you had a secret quiet reason for sending it that's

16 different than the words you actually said?

17 A.    I had hoped that it would show the proper way to get VAWD

18 and that we should not be purchasing from pharmacies.

19 Q.    And where in that paragraph does it say that?

20 A.    It doesn't.

21 Q.    It doesn't at all, does it?

22 A.    No.

23 Q.    So what you're communicating to Charles Boyd -- Charlie

24 Boyd, Patrick Boyd, is that, "We need this for our lawsuit."

25 Isn't that correct?

1   A.   That is what is communicated in the email.

2   Q.   That's what you said; correct?

3   A.   Yes.

4   Q.   And so what you are communicating is that you think it's

5   a good thing that our lawyers who are trying to help us out

6   have this document because we are being bad-mouthed by this

7   organization; isn't that correct?

8   A.   Yes.  That is what I wrote in the email.

9   Q.   So when you're being bad-mouthed, that means that someone

10  is saying something that's false; isn't that correct?

11  A.   I don't think I would necessarily say it's always false.

12  Q.   Well, whether you necessarily say it or not, isn't that

13  what you were saying?

14  A.   Yes.

15  Q.   So you're communicating that they are saying bad things

16  about our type of profession, our type of business, and

17  they're wrong about it; isn't that correct?

18  A.   Yes.

19  Q.   So your testimony today that, "Oh, I sent it to them to

20  give a warning so we stop all these things," is totally false,

21  isn't it?

22  A.   No.

23  Q.   That's correct, that you're sending this because you

24  think that's what's happening?

25          MS. DEROVANESIAN:  Objection.  Argumentative.  Asked

 1   and answered.

 2            THE COURT:  Sustained.

 3   BY MR. ZIMET:

 4   Q.   So you would agree, though, that what you say in this

 5   letter is inconsistent with what you testified that you were

 6   all upset about all these bad things happening at Safe Chain?

 7   A.   Yes.  The email does share something different.

 8   Q.   So what you put in writing is inconsistent with what you

 9   said --

10            MS. DEROVANESIAN:  Objection.  Asked and answered.

11            MR. ZIMET:  Can I --

12            THE COURT:  You can finish your question.

13   BY MR. ZIMET:

14   Q.   So what you said in this email is inconsistent with what

15   supposedly you said to the Boyds from 2015 to 2018; is that

16   correct?

17   A.   I'm sorry, could you say that again?

18   Q.   Sure.  What you're saying in this email on Thursday, July

19   5th, 2018 at seven o'clock and 3 seconds p.m. is inconsistent

20   with what you have testified you were saying to the Boyds for

21   the previous four years; is that correct?

22   A.   What is in the email --

23   Q.   What's in the email?

24   A.   No.

25   Q.   Right in front of you.

1   A.   I'm sorry.  What is in the email is what I told the

2   Boyds, yes.

3   Q.   So you told the Boyds that "Even though this article is

4   from 2013, it's an interesting read to see how NABP portrays

5   gray wholesale distributors."  Right?

6   A.   Yes.

7   Q.   That they're wrong.  Isn't that what you're saying?

8   A.   I can't remember exactly at the time.  And --

9   Q.   So -- I'm sorry, go ahead.

10  A.   I feel like I -- I feel like I answered your question,

11  respectfully, sir.  I just -- I'm agreeing that this is what I

12  wrote.

13  Q.   Just -- and I'll leave this area -- okay? -- because I

14  want to make sure that we're both on the same page as far as

15  what you're answering.  Yes, we know that you wrote this.

16  You've testified to that.

17  A.   Okay.

18  Q.   But are you changing your answer that's what you said in

19  writing because it is inconsistent with what you claim you

20  said to them orally?

21  A.   When?  When is that?  I'm getting confused.

22  Q.   You testified you made all these oral claims that things

23  are being done at Safe Chain.  You were brushed off.

24  A.   Yes.

25  Q.   You were given the cold shoulder.  You would agree that

```
 1   that testimony that you, in fact, said that that is

 2   inconsistent with what you said in writing in this email;

 3   isn't that correct?

 4           MS. DEROVANESIAN:  Objection.  Mischaracterizes her

 5   testimony.

 6           THE COURT:  Overruled.

 7           THE WITNESS:  Yes.

 8   BY MR. ZIMET:

 9   Q.   So the operating procedures that we spent, like, half

10   hour on, you would agree that none of those were in effect in

11   2020, to your knowledge; correct?

12   A.   I don't know what would have or wouldn't have been in

13   effect in 2020.

14   Q.   So you have no knowledge whether it was or was not.  Is

15   that fair to say?

16   A.   Right.  That's fair to say.

17   Q.   And let's just assume they were in effect.  The

18   procedures are procedures that should be followed by the

19   employees at Safe Chain; correct?

20   A.   Yes.

21   Q.   And the person designated to make sure they're followed

22   is the compliance director; isn't that correct?

23   A.   Yes.

24   Q.   And the compliance director is supposed to make certain

25   findings and determinations and so forth?
```

1  A.   Yes.

2  Q.   And you believe that during the time period you were

3  there, that was not done?

4  A.   I believe it was done, but there were times -- I'm sorry.

5  There were times when I don't think it was followed through

6  on.

7  Q.   I'm sorry, the last part of the answer, there were times

8  that you don't think it was followed through on?  Did I get

9  that correct?

10  A.   Yes.  I think we were overruled by management if we

11  brought it up.

12  Q.   So there were times that the procedures were followed; is

13  that correct?

14  A.   Uh-huh.

15  Q.   Is that a yes?

16  A.   Yes.

17  Q.   And there are times they weren't followed; is that

18  correct?

19  A.   Yes.

20  Q.   And do you know the reasons why, when you say they

21  weren't followed, they weren't followed?

22  A.   Because we were -- because the staff was overruled to

23  make a sale or transaction happen.

24  Q.   Okay.  And you mentioned several vendors.  You've been

25  interviewed a whole bunch of times by the prosecutors before

1    you testified; correct?

2    A.    I wouldn't say a whole bunch of times.  Four.

3    Q.    Four times?

4    A.    Uh-huh.

5    Q.    All right.  So four's not a bunch, but four's four.  So

6    you've been interviewed four times, and you made reference to

7    certain companies that you had real questions about their

8    activities; is that correct?

9    A.    Yes.

10   Q.    And one of those companies was -- is it Gentek was one of

11   them?

12   A.    Yes.

13   Q.    And Gentek, you said, had problems or there were issues

14   with Gentek which are consistent with what you claim was being

15   overruled or not looked at; is that correct?

16   A.    I don't remember.

17   Q.    Well, you told the agents in the interview there were

18   problems with Gentek.

19   A.    It's been a while since I've spoken to them.

20   Q.    Well, didn't you just speak with them recently?  You

21   spoke with them today, didn't you?

22   A.    Yes.

23   Q.    And they talked to you about Gentek?

24   A.    No.

25   Q.    So let's look at -- if we can refresh your recollection

1   what you've said about Gentek.

2           MS. DEROVANESIAN:  Objection, Your Honor.

3           THE COURT:  You can show her the document and ask

4   her if it refreshes her recollection.

5           MR. ZIMET:  Sure.

6           One second, Judge, please.

7           May I approach, Judge?

8           THE COURT:  Sure.

9           MS. DEROVANESIAN:  May I ask to see a copy?

10          MR. ZIMET:  Sure.

11          MS. DEROVANESIAN:  Which date?

12          MR. ZIMET:  3-31-2022.

13          MS. DEROVANESIAN:  Thank you.

14          (Tenders.)

15   BY MR. ZIMET:

16   Q.   So here's the rules:  You've got to look at that.  You

17   can't read it out loud.  And see whether it refreshes your

18   recollection about Gentek.

19   A.   The paragraph, or the whole piece?

20   Q.   I can point you -- read anything you want, but I'll point

21   to where I think it should be read.

22          (Reads to self.)

23          THE WITNESS:  Yes, I remember this from a while ago.

24          MR. ZIMET:  Okay.  May I approach?

25          THE COURT:  Okay.

```
 1   BY MR. ZIMET:
 2   Q.   So having read that, it refreshes your recollection that
 3   you told the agents, when you met with them in 2022, which is
 4   shortly after the time you left -- well, three years, I guess,
 5   so -- that you had issues with how things were done with
 6   Gentek; is that correct?
 7   A.   Yes.
 8   Q.   And also Mr. Unlimited; is that correct?
 9   A.   Yes.
10   Q.   And that relates to the issue of pedigrees; is that
11   correct?
12   A.   Uh-huh.
13   Q.   Yes?
14   A.   Yes.  I'm sorry.
15   Q.   So can you explain to us how you had negative information
16   about pedigrees involving Gentek if Gentek had absolutely no
17   business at all with Safe Chain until 2020, after you had
18   left?
19            MS. DEROVANESIAN:  Objection.  Lack of foundation.
20            THE COURT:  It's cross-examination.  Overruled.
21            THE WITNESS:  I remember that name coming up on
22   pedigrees that either were on the transaction histories that
23   were received from other vendors, but I wouldn't speak on --
24   on that any further.
25   BY MR. ZIMET:
```

 1   Q.   Well, you were telling the agents that vendors that were

 2   problematic for you concerning their pedigrees included

 3   Mr. Unlimited and Gentek; correct?

 4   A.   Uh-huh.

 5   Q.   And those companies had no business with Safe Chain

 6   during the time that you were there?

 7            MS. DEROVANESIAN:  Objection.  Asked and answered.

 8            THE COURT:  Overruled.

 9   BY MR. ZIMET:

10   Q.   Go ahead.  You can answer.

11   A.   They would be on the pedigree history, just not

12   necessarily the buyer.

13   Q.   So you're saying that they were -- and those were for HIV

14   drugs; correct?

15   A.   No.

16   Q.   So Gentek had business involving non-HIV drugs that

17   involved Safe Chain while you were still employed?  Is that

18   your testimony, ma'am?

19   A.   Yes.

20   Q.   Are you sure?  Are you really sure that's your answer?

21            MS. DEROVANESIAN:  Objection.  Argumentative.

22            THE COURT:  Sustained.

23   BY MR. ZIMET:

24   Q.   You would agree that if Gentek had no business at all

25   with Safe Chain during the time period you were there, what

1    you told the agents was wrong; isn't that correct?

2    A.    Yes.

3    Q.    In fact, what you're telling them about Gentek is what

4    you heard from somebody else; isn't that correct?

5    A.    No.

6    Q.    You were talking to the compliance person at Safe Chain,

7    were you not?

8    A.    After I left?

9    Q.    Yeah.

10   A.    Is that what you're asking?

11   Q.    Yeah, around the same time period you're talking to the

12   agents and saying, "This is what I saw relating to these

13   vendors with Safe Chain," when, in fact, they weren't vendors

14   with Safe Chain; isn't that correct?

15   A.    I don't recall talking to the other compliance person

16   then.

17   Q.    So do you have an explanation how that could get into a

18   report as coming from you when there was no transactions

19   involving those companies during the time period you worked

20   there?

21           MS. DEROVANESIAN:  Objection.  Calls for

22   speculation.  These aren't her statements.

23           MR. ZIMET:  She's adopted them, Judge.

24           MS. DEROVANESIAN:  She has not adopted the

25   statement.

```
 1              MR. ZIMET:  She sure has.
 2              THE COURT:  You refreshed her recollection from it.
 3    As I indicated earlier, the lawyers' questions are not
 4    evidence.  It's the answers that are evidence overall.
 5    BY MR. ZIMET:
 6    Q.   Do you recall the question?
 7    A.   No, I don't.  Could you repeat it?
 8              MR. ZIMET:  May I -- Judge, I don't want to misstate
 9    it, could we just have her repeat it by the court reporter?
10              THE COURT:  You can just repeat it.
11    BY MR. ZIMET:
12    Q.   You would agree that if there was no transaction
13    involving those two companies, Gentek and Mr. Unlimited, while
14    you were working at Safe Chain, that your representations to
15    these agents in 2022 would be inaccurate?
16    A.   If that was the case, it would be inaccurate, yes.
17    Q.   In fact, if you said it and it had never happened,
18    there's no way it could be anything other than false
19    representations to a government agent?
20              MS. DEROVANESIAN:  Objection.  Argumentative.
21              THE COURT:  Sustained.
22    BY MR. ZIMET:
23    Q.   Have you gone over that statement with the prosecutors
24    before you testified today?
25    A.   No.
```

```
 1  Q.    They didn't ask you about it, didn't question you about
 2  it?
 3  A.    No.
 4  Q.    It wasn't something that came up in any of the various
 5  interviews you had with them?
 6  A.    I remember talking to them about it.
 7  Q.    And you told them that, in fact, it was something that
 8  involved something else that they were involved on a pedigree?
 9  Is that what you told them?
10  A.    I'm sorry, I don't understand.
11  Q.    You told the prosecutors when you spoke to them that the
12  Gentek transaction was not something while you were there
13  involving Gentek being the vendor.  It was something that
14  involved another vendor that they happened to be on the
15  pedigree?
16  A.    I don't remember.
17  Q.    Were they writing down notes when you were talking to
18  them when you told them whatever you think?
19  A.    Yes.
20  Q.    So it would be in their notes what you said about that?
21  A.    Yes.
22  Q.    Okay.  And do you remember who the agents were that you
23  said that to?
24  A.    Cesar Zayas, and I only remember the first name, Carlos.
25  Q.    Okay.  Do you see any of them in court today?
```

```
 1   A.    Yes.

 2   Q.    Which one?

 3   A.    Cesar is right here.

 4   Q.    Just indicate what he's wearing.

 5   A.    A suit with a lapel pin.

 6   Q.    So to sum up your testimony about what took place, you

 7   would agree that you have no knowledge of anything that

 8   happened during the course of this alleged conspiracy;

 9   correct?

10   A.    Correct.

11   Q.    You have no idea why decisions were made by Charles Boyd

12   or Patrick Boyd relating to anything in this case; isn't that

13   correct?

14   A.    Yes, that would be correct.

15   Q.    In fact, all you can say about anything relating to that

16   time period is mere speculation; correct?

17   A.    Yes.

18   Q.    Thank you, ma'am.

19              THE COURT:  Mr. Barzee?

20              MR. BARZEE:  Your Honor, I have no questions for

21   this witness.

22              THE COURT:  Redirect?

23              MS. DEROVANESIAN:  Yes, Your Honor.

24                         REDIRECT EXAMINATION

25   BY MS. DEROVANESIAN:
```

1   Q.   Ms. Eberspacher, I have a couple follow-up questions for

2   you.

3   A.   Okay.

4   Q.   Now, you were asked about VAWD accreditation and Safe

5   Chain applying for VAWD accreditation.  Do you remember that?

6   A.   Yes.

7   Q.   And when you worked at Safe Chain, was it represented to

8   the customers that Safe Chain was in the process of getting

9   VAWD certification?

10               MR. ZIMET:  Objection as to form, Judge.

11               THE COURT:  Overruled.

12               THE WITNESS:  Yes.

13  BY MS. DEROVANESIAN:

14  Q.   And did Safe Chain ever achieve VAWD accreditation?

15  A.   No, not while I was there.

16  Q.   Okay.  And do you remember Mr. Zimet asking you some

17  questions about the various policies, rules, and procedures

18  that were in place at Safe Chain when you worked there?

19  A.   Yes.

20  Q.   And do you remember being asked some questions about the

21  various red flags of suspect and counterfeit product that were

22  included in those rules?

23  A.   Uh-huh.

24  Q.   And do you remember those various red flags and things to

25  look out for in suspect products?

```
 1   A.    Yes, I do.

 2   Q.    And do you remember if any or all of those came from the

 3   FDA?

 4   A.    They did.

 5   Q.    Okay.  And did you know if Charles Boyd and Patrick Boyd

 6   reviewed and approved those procedures?

 7            MR. ZIMET:  Objection as to scope, Judge.

 8            THE COURT:  Overruled.

 9            THE WITNESS:  Yes.

10   BY MS. DEROVANESIAN:

11   Q.    And would that mean that they also had to approve and

12   review those red flags from the FDA of suspect and counterfeit

13   product?

14   A.    Yes.

15   Q.    Okay.  And you were asked some questions,

16   Ms. Eberspacher, about a lawsuit that was filed against Safe

17   Chain while you worked there?

18   A.    Yes.

19   Q.    Okay.  And you were asked --

20            MR. ZIMET:  No, no, no.  Objection.  That's not what

21   was asked about.  It was not against Safe Chain.  Absolutely

22   not.

23   BY MS. DEROVANESIAN:

24   Q.    Ms. Eberspacher, did you remember hearing about a

25   lawsuit?
```

1    A.    Yes.

2    Q.    Okay.  Were you asked some questions about a lawsuit?

3    A.    Yes.

4    Q.    Okay.  And during that time -- I think it was 2018, when

5    there was a lawsuit you were asked about -- where did your

6    paycheck come from?  Were you working at Safe Chain?

7    A.    Yes.

8    Q.    Okay.  And you were asked some questions about what the

9    rules were at Safe Chain in 2020 or beyond.  Do you remember

10   that?

11   A.    Yes.

12   Q.    And did you work at Safe Chain in 2020?

13   A.    No, I didn't.

14   Q.    Okay.  But those rules that you talked about, from 2015,

15   were those in place throughout the entire time you worked at

16   Safe Chain?

17   A.    Yes.

18   Q.    And what about those procedures that we talked about that

19   included the FDA's warning signs and red flags of suspect or

20   counterfeit product?  Were those all, to your knowledge, in

21   place at Safe Chain from 2015 to 2019?

22   A.    Yes.

23   Q.    Do you have any reason to believe that the FDA suddenly

24   decided after that that those were no longer red flags of

25   suspect or counterfeit products?

```
 1  A.    No.
 2  Q.    Okay.  You were asked a few questions about what you
 3  actually put in writing in an email where you sent an article
 4  to Charles and Patrick Boyd.  Do you remember those questions?
 5  A.    Yes.
 6  Q.    Okay.  And on direct examination, you were asked -- you
 7  mentioned that you were told by the Boyds not to put things in
 8  writing?
 9  A.    Correct.
10  Q.    Do you remember why Patrick and Charles Boyd told you not
11  to put things in writing?
12  A.    Because it's there forever.
13  Q.    It's there forever?
14  A.    That was the gist of it, yes.
15  Q.    Okay.  And, Ms. Eberspacher, you were asked some
16  questions about what you told to Charles Boyd and Patrick Boyd
17  about your concerns about these lack of compliance with these
18  rules and regulations.  Do you remember that?
19  A.    Yes.
20  Q.    And specifically about your concerns about pedigrees and
21  T3s.  Do you remember that?
22  A.    Yes.
23  Q.    Ms. Eberspacher, how old were you at the time that you
24  worked at Safe Chain, let's say, 2018?
25  A.    27.
```

```
 1   Q.   Okay.  And how old were you when you started working
 2   there?
 3   A.   24.
 4   Q.   Okay.  And at this point, did you have a lot of
 5   experience in the real world?
 6   A.   Not really.
 7   Q.   Okay.  And did you have any experience working as a
 8   compliance officer?
 9   A.   No.
10   Q.   And did you have very much experience in pharmaceuticals,
11   in this type of a role?
12   A.   No.
13   Q.   Okay.  Was it difficult to approach your bosses and
14   confront them?
15   A.   Yes.
16   Q.   Was it easy to confront Charles Boyd and tell him that
17   you thought he was doing something wrong?
18   A.   No.
19   Q.   Was it easy to confront Patrick Boyd and tell him that
20   you thought he was doing something wrong?
21   A.   No.
22   Q.   And you were asked if it was a secret, what your concerns
23   were.  It was suggested that you were keeping that a secret.
24   Did you keep your concerns a secret, or did you share them?
25   A.   I shared them.
```

```
 1   Q.   Did you share them more than once?

 2   A.   Yes.

 3   Q.   Okay.  And bear with me one moment.  You mentioned that

 4   when you shared these concerns, you were often overruled by

 5   management.  Do you remember being asked that and saying you

 6   were overruled by management?

 7   A.   Yes.

 8   Q.   When you said "management," who would that include?

 9   A.   The Boyds.

10   Q.   Okay.  And then I think you separately said that you felt

11   like you were overruled by management in order to make a sale

12   or transaction happen.  Who were you referring to when you

13   said you were overruled in that regard?

14   A.   Charlie or Pat.

15   Q.   Okay.  Do you remember getting that type of a reaction,

16   being overruled in your compliance concerns, by each of --

17   Charles and Patrick?

18   A.   Yes.

19   Q.   Okay.  And you were asked some questions about a company

20   called Gentek.  Do you remember that?

21   A.   Yes.

22   Q.   Okay.  And Mr. Unlimited?

23   A.   Uh-huh.

24   Q.   Okay.  And were there various companies -- company names

25   that came across your desk when you worked at Safe Chain?
```

1   A.   Yes.

2   Q.   And did you -- I think you mentioned at first that you

3   remembered seeing a name called Gentek on pedigrees.  Is that

4   what you said?

5   A.   Yes.

6   Q.   Okay.  And then you seemed a little confused with some of

7   the questioning.  Were you having a hard time remembering --

8           MR. ZIMET:  Excuse me, that's all leading, Judge.

9           THE COURT:  Sustained.

10  BY MS. DEROVANESIAN:

11  Q.   Ms. Eberspacher, you mentioned that -- you were asked a

12  question about if Safe Chain did business with this Gentek you

13  were referring to.  Do you remember that?

14  A.   Yes.

15  Q.   Okay.  But previously, you mentioned that you remembered

16  seeing Gentek on a pedigree; is that right?

17  A.   Uh-huh.

18  Q.   Okay.  And are you having trouble remembering the exact

19  context of where Gentek appeared on pedigrees?

20          MR. ZIMET:  Objection.  Form, Judge.  Leading.

21          THE COURT:  Overruled.

22          THE WITNESS:  Yes.

23          MS. DEROVANESIAN:  Okay.  I'd like to show a

24  document just to the witness.

25  BY MS. DEROVANESIAN:

```
 1   Q.   Okay.  And, Ms. Eberspacher, I'd like to ask you to just
 2   review the document that's in front of you, specifically that
 3   full sentence in the middle of the email, and just let me know
 4   when you've had a chance to read it, please.
 5   A.   I've seen it.
 6   Q.   Okay.  And does this refresh your memory --
 7   A.   Yes.
 8   Q.   -- about having dealt -- okay.
 9            So was there a company called Gentek that Safe Chain
10   dealt with in 2018?
11   A.   Yes.
12   Q.   Okay.  Thank you.  And Mr. Unlimited?
13   A.   Yes.
14   Q.   Okay.  Thank you.
15            MS. DEROVANESIAN:  Nothing further.
16            THE COURT:  Thank you, ma'am.  You may step down.
17   You're excused.
18            All right.  We're going to take a 15-minute recess.
19   Remember my admonition not to discuss the case or allow it to
20   be discussed in your presence.  We'll see you back in the jury
21   room in about 15 minutes.
22            (Jury exits courtroom at 2:59 p.m.)
23            (In open court, jury NOT present.)
24            THE COURT:  All right.  Mr. Zimet, you had a matter
25   you wanted to raise?
```

1          MR. ZIMET:  Yes, Judge.  I'm recollecting the

2    Court's ruling on the 404(b) motion.  I think you made a

3    ruling and said it always could be subject to renewal.

4          THE COURT:  Sure.  Right.

5          MR. ZIMET:  I would renew the motion based on the

6    testimony of this witness.  This was clearly, from our

7    perspective, propensity evidence.  There's no basis for it for

8    anything that we relate to the indictment other than that, and

9    we move to strike the testimony.

10         THE COURT:  I think it goes to knowledge and intent,

11   so the motion to strike is denied.

12         And we'll be in recess for 15 minutes.

13         THE COURTROOM SECURITY OFFICER:  All rise.

14         (Court in recess from 3:00 p.m. - 3:20 p.m.)

15         (In open court, jury NOT present.)

16         THE COURT:  Back on the record.  Counsel are present

17   and both defendants are present.

18         Anything to come before the Court before we bring

19   the jury in?

20         MR. POGOZELSKI:  Nothing from the government, Your

21   Honor.

22         MR. ZIMET:  No, Your Honor.

23         MR. BARZEE:  No, sir.

24         THE COURT:  All right.  If we have all of the

25   jurors, let's bring them in.

1           (Jury present in open court at 3:23 p.m.)

2           THE COURT:  Counsel concede the presence of the jury

3   and waive its polling?

4           MR. POGOZELSKI:  Yes, Your Honor.

5           MR. BARZEE:  Yes, sir.

6           MR. ZIMET:  Yes, Your Honor.

7           THE COURT:  And did everyone follow my admonition

8   not to discuss the case or allow it to be discussed in your

9   presence?

10          All right.  The government may call its next

11  witness.

12          MS. DEROVANESIAN:  The government calls Jonathan

13  Nicholls.

14          (Witness sworn.)

15          THE COURTROOM DEPUTY:  Please have a seat.  And if

16  you could pull the base of the microphone as close to you as

17  possible.  Please state your name and spell it for the court

18  reporter.

19          THE WITNESS:  Jonathan Nicholls.  J-O-N-A-T-H-A-N.

20  Nicholls, N-I-C-H-O-L-L-S.

21          MS. DEROVANESIAN:  May I proceed?

22          Thank you.

23  THEREUPON,

24                      JONATHAN NICHOLLS

25  having been first duly sworn to tell the truth, testified as

```
 1   follows:
 2                     DIRECT EXAMINATION
 3   BY MS. DEROVANESIAN:
 4   Q.   Good afternoon, Mr. Nicholls.  Could you please tell the
 5   jury where you are from?
 6   A.   Maryland.  Hurlock, Maryland.
 7   Q.   Were you born and raised in Maryland?
 8   A.   Born and raised in Maryland; yes, ma'am.
 9   Q.   Okay.  Can you tell us what you do for a living?
10   A.   I'm a licensed real estate agent for the State of
11   Maryland and Delaware.
12   Q.   Okay.  Are you familiar with a company called Safe Chain
13   Solutions?
14   A.   Yes, ma'am.
15   Q.   And how are you familiar with that company?
16   A.   I was previously employed with Safe Chain for seven-ish
17   years.
18   Q.   For seven -- what did you say?
19   A.   Around seven years.
20   Q.   Around seven years.  Okay.  And are you familiar with
21   Patrick Boyd?
22   A.   Yes, ma'am.
23   Q.   And do you know Charles Boyd?
24   A.   Yes, ma'am.
25   Q.   Can you tell us how you first met Charles and Patrick
```

1    Boyd?

2    A.   Originally I only knew -- can I call him Charlie?

3    Q.   Sure.

4    A.   I originally knew Charles from the gym and going -- like,

5    when he would go out -- I was a bartender for many years, so

6    my breakfast time was his lunch time, and I would see him at

7    the gym in Cambridge.

8    Q.   Okay.  And Patrick?

9    A.   I didn't meet Patrick until I applied for the job.

10   Q.   And how did you first hear about a job opening at Safe

11   Chain?

12   A.   I don't really think there was one.  Like I said, I was

13   bar tending for years.  I found out I was going to be a dad

14   for the first time and just needed something a little bit more

15   stable than tips.  And, like I mentioned, I'd seen Charles a

16   lot at the gym and just figured I'd ask him if the company he

17   worked for was hiring.

18            He told me to send in my résumé via email.  And then

19   when I got the email back, come to find out, he was the CEO

20   and president of the company.

21   Q.   And did you know before that that he was the CEO and

22   president of the company?

23   A.   No, ma'am.

24   Q.   Okay.  And did you learn what Patrick Boyd's role was?

25   A.   Vice president.

```
 1   Q.   Okay.  And after you -- sounds like you sent an email

 2   back and forth.  Did you have any sort of interview for this

 3   job?

 4   A.   Yes, ma'am.

 5   Q.   And can you tell us what types of questions you were

 6   asked during that interview?

 7   A.   Just have I had any other sales experience before,

 8   communication skills, computer skills, and then just kind of

 9   what my job duties would be, considering it would be an office

10   environment rather than up and moving the entire day like

11   bar tending.

12   Q.   And did you eventually receive that job?

13   A.   I did; yes, ma'am.

14   Q.   Can you tell us what your job title was?

15   A.   Started off I was just a national sales representative,

16   and then after a few years, it was senior account executive.

17   Q.   Okay.  And were you selling medication in these roles?

18   A.   Yes, ma'am.

19   Q.   Okay.  And had you ever sold prescription medication

20   before working at Safe Chain?

21   A.   No, ma'am.

22   Q.   Had you ever worked in a pharmacy before?

23   A.   No, ma'am.

24   Q.   Have you ever studied or learned anything about the sale

25   of pharmaceuticals before you worked at Safe Chain?
```

1   A.   No, ma'am.

2   Q.   And when you started working at Safe Chain, did you

3   receive any training about pharmaceuticals?

4   A.   It was kind of figure it out as you go from the manager I

5   had at the time.

6   Q.   Okay.  And is that kind of how it continued while you

7   worked at Safe Chain?

8   A.   Yeah.  It was FITFO.

9   Q.   Can you tell us what you mean by "FITFO"?

10  A.   Figure it the "F" out.

11  Q.   Okay.  And who used that term?

12  A.   It was like sales managers.  It was common with Pat and

13  Charlie.

14  Q.   Okay.  And what did you interpret figure it the "F" out

15  to mean in the context of selling prescription drugs?

16  A.   Ask questions, see if we couldn't figure it out by

17  talking to each first.  And then once we exhausted all

18  options, couldn't figure out the answer for ourselves, then we

19  could move up the chain and ask further questions.

20  Q.   Okay.  Mr. Nicholls, do you know what branded medication

21  is?

22  A.   Yes, ma'am.

23  Q.   Can you tell us your understanding of what that is?

24  A.   It's like the stuff you see on TV, like ask your doctor

25  about this medication, see if it's a fit for you.

1    Q.   Okay.  And when you first started at Safe Chain, were

2    they selling branded medication?

3    A.   No, ma'am.

4    Q.   And did either Patrick or Charles Boyd tell you why they

5    were not selling branded medication at that time?

6    A.   I had a couple clients or potential clients ask why we

7    did not sell branded medications.  And from what I was told is

8    that it was not, I guess, advantageous.  It wouldn't make

9    sense money-wise.

10   Q.   And who told you that it wouldn't make sense money-wise

11   for Safe Chain to sell branded drugs?

12   A.   Patrick Boyd.

13   Q.   Okay.  And did there come a time when Safe Chain

14   eventually did start buying branded drugs?

15   A.   Yes, ma'am.

16   Q.   Okay.

17        MS. DEROVANESIAN:  I'd like to show, please, just to

18   the witness, Government Exhibit 118.

19   BY MS. DEROVANESIAN:

20   Q.   Mr. Nicholls, do you see the document in front of you?

21   A.   Yes, ma'am.

22   Q.   Okay.  And do you see the date?

23   A.   July 9th, 2020.

24   Q.   Okay.  And do you see your name listed under required

25   attendees?

1   A.   Yeah, it looks like all of the sales reps and managers.

2   Q.   Okay.

3            MS. DEROVANESIAN:  Government moves to admit Exhibit

4   118.

5            MR. ZIMET:  No objection, judge.

6            MR. BARZEE:  No objection.

7            THE COURT:  118 will be received.

8            (Government's Exhibit 118 admitted.)

9            MS. DEROVANESIAN:  Okay.  And if we could please

10   publish this to the jury.

11            THE COURT:  I don't think the jury sees it.

12            MS. DEROVANESIAN:  Oh.  Is it up now?

13            THE COURT:  Yeah, I think so.

14            MS. DEROVANESIAN:  Okay.  Thank you.

15   BY MS. DEROVANESIAN:

16   Q.   All right.  Mr. Nicholls, could you please tell us who

17   this email is from?

18   A.   It says Pat Boyd.

19   Q.   Okay.  And down below where it says required attendees,

20   do you see where it says Charles Boyd?  In the second to last

21   line of required attendees.

22   A.   Yes, ma'am.

23   Q.   Okay.  And the subject here says, HIV info meeting.  Was

24   Safe Chain starting to sell HIV medication around this time?

25   A.   I believe it was just starting; yes, ma'am.

1  Q.   Okay.  And is HIV medication that Safe Chain was selling,

2  were those branded medications?

3  A.   Yes, ma'am.

4  Q.   And was it just one type of HIV medication or several

5  different types?

6  A.   We had a variety.

7  Q.   Okay.  And I'd like to direct your attention to the

8  bottom paragraph here where it starts in bold and says, Safe

9  Chain HIV facts, products, and procedures.

10         Do you see that?

11  A.   Is it the stuff in blue, red?

12  Q.   Yeah, so just up here at the top.

13  A.   Oh, at the very top.  Yeah, I see it.

14  Q.   Okay.  And in this email, was Patrick Boyd sharing

15  information with the sales team?

16  A.   It was, I guess, a call that was going to explain like

17  what we were having access to, and I guess like hard intro

18  into branded medication.

19  Q.   Okay.  And was this in interest specifically to HIV

20  medication?

21  A.   I mean, that's what the title says here, but we had like

22  HIV and Hep C.

23  Q.   Okay.  And then in the second line here where it says, We

24  are quickly becoming a major supplier of HIV and specialty

25  products, is this how you learned that Safe Chain was now

1    selling HIV products?

2    A.    Officially.  I mean, we ran inventory reports daily, and

3    I remember seeing some on, like, the inventory report.

4    Q.    Okay.  And down below here -- and we'll show you this

5    part -- where it says, A little bit about the HIV market.

6    Actually, we still have that part up.  It says, The HIV market

7    is mainly controlled by the big three.

8            Do you see that?

9    A.    Yes, ma'am.

10   Q.    And then under that where it says, In the secondary

11   market, Gulf Coast used to control the vast majority of the

12   HIV trade.  They lost many of their suppliers recently.

13           Do you see that?

14   A.    Yes, ma'am.

15   Q.    Did you know what Gulf Coast was?

16   A.    I knew they were another wholesaler.

17   Q.    Okay.  And did this email explain why they had lost the

18   majority of their suppliers recently?

19   A.    No, ma'am.

20   Q.    Okay.  And then down below, it says, Major cities are

21   flooded with HIV patients.  Do you remember reading that?

22   A.    No, I don't remember, but I see it here on the email.

23   Q.    Okay.  And do you remember discussing that fact, either

24   on this call or in general, with Charles or Patrick Boyd?

25   A.    I'm sorry.  What --

1    Q.   That was a loaded question.  Do you remember discussing

2    at Safe Chain the fact that major cities were flooded with HIV

3    patients?

4    A.   I don't remember that, no.

5    Q.   Okay.  And do you see here where it says, In the Bronx,

6    New York, it is estimated that one in five people have HIV?

7    A.    It's cut off, but it says in the Bronx, New York, it is

8    estimated that one --

9    Q.   Okay.  Yeah, it actually carries on to the next page.

10   We'll show you that part too.

11   A.   Okay.  Yeah, I see it.

12   Q.   Okay.  And then it lists Washington D.C., NYC, and

13   Atlanta as three of the largest markets in the country.

14              Do you see that?

15   A.   Yes, ma'am.

16   Q.   And was that relevant to you in selling HIV medicine?

17   A.   It was helpful.

18   Q.   Why was that helpful, to know where the highest HIV

19   populations are?

20   A.   Because that's the medication we had that we were trying

21   to sell.

22   Q.   Okay.  And then down below, it says, We have developed

23   two new sources for HIV meds.  Do you see that in the second

24   paragraph?

25              I'm asking a lot of Ms. Gooles (phonetic) right now,

1    so just bear with us a second.

2    A.   Yeah, I see it.

3    Q.   Okay.  And in this email, do you remember seeing an

4    explanation of where these two sources came from, who found

5    them?

6    A.   Yeah, I see them listed here.

7    Q.   Okay.  So it says, Source 1, Boulevard, and then Source

8    2, Gentek.

9         Do you see that?

10   A.   Yes, ma'am.

11   Q.   Okay.  And do you see where it says, We can offer --

12   excuse me.  In that first sentence of this paragraph where it

13   says, These two new sources give us a distinct advantage over

14   the big three in the marketplace.

15        Do you see that?

16   A.   Yes, ma'am.

17   Q.   Do you remember anyone explaining how Safe Chain now was

18   going to have a distinct advantage over the big three in the

19   marketplace?

20   A.   No, ma'am.

21   Q.   Okay.  And do you see there where it says, We can offer

22   WAC minus 7 percent to WAC minus 8.5 percent?

23   A.   Yes, ma'am.

24   Q.   And did that relate to the pricing of the drugs?

25   A.   Not at the time, no.

1    Q.    So when it says WAC minus 7 percent, does that relate to

2    how much the drug will be sold for?

3    A.    Yeah.  At the time, this is the intro email, I wasn't

4    familiar with all the lingo and stuff yet.

5    Q.    I see.  Okay.  But are you now familiar with what that

6    means?

7    A.    Yeah.  Yes, ma'am.

8    Q.    Okay.  And then next to Source 1 it says, Usually, but

9    not always, has a pharmacy on the pedigree.  We get much

10   better pricing from this source.

11          Do you see that?

12   A.    Yes, ma'am.

13   Q.    And it says 18 to 25 percent off WAC.  Do you see that?

14   A.    Yes, ma'am.

15   Q.    And did you understand that to be a low price to buy this

16   medication for?

17   A.    It was a great price, from what I came to learn, yeah.

18   Q.    Okay.  And then the second source listed here, it says,

19   This is through an AD, authorized distributor.  Do you know

20   what an authorized distributor is?

21   A.    Somebody who's certified and licensed to sell the

22   medication.

23   Q.    Okay.  And in Source 1, do you see where it says,

24   Unlimited inventory available through that source?

25   A.    Yes, ma'am.

 1   Q.   Okay.  And then you mentioned that you came to learn this

 2   was a great price; is that right?

 3   A.   Yes, ma'am.

 4   Q.   Okay.  Down below, do you see where it says, The members

 5   are very happy at WAC minus 7 to WAC minus 8.5?  From what you

 6   understand, was that referring to the price that was being

 7   offered to customers?

 8   A.   Yeah, I see it.

 9   Q.   Okay.  And is that referring to the low price that was

10   being offered to customers?

11   A.   Yes, ma'am.

12   Q.   Okay.  And on page 5 here, we can see the attachment.

13   And in this second column, do you see these names listed?

14   A.   Yes, ma'am.

15   Q.   And can you tell us what those are?

16   A.   Those are the HIV and Hep C meds.

17   Q.   Okay.  And from what you understand, were those

18   manufactured by multiple different companies?

19   A.   It was mainly Gilead.

20   Q.   Okay.  And do you know if there were others?

21   A.   There were others.  I'm just not familiar with them off

22   the top of my head.

23   Q.   Okay.  And then next to that, it says, WAC price.  Do you

24   see that?

25   A.   Yes, ma'am.

 1   Q.   And then there's different numbers next to those.  WAC

 2   minus 6.5, WAC minus 7, WAC minus 7.5.  Are those showing

 3   different prices?

 4   A.   Yes, ma'am.

 5   Q.   Okay.  Now, Mr. Nicholls, you mentioned before that you

 6   came to learn that this was a very good price.  How did you

 7   come to learn that this was such a good price?

 8   A.   Talking to current customers I had at the time as well as

 9   just cold calling.  The industry standard, I guess, from the

10   big three was usually 1 to 3 percent off --

11   Q.   Okay.

12   A.   -- wholesale acquisition calls, WAC.

13   Q.   So you said the normal price that they'd be offered was 1

14   to 3 percent off WAC.  And what was the price that Safe Chain

15   was offering for the same drugs?

16   A.   It could be anywhere up to 9 percent off.

17   Q.   Up to 9 percent?

18   A.   Minus 9, yeah.

19   Q.   Okay.  And how did your customers respond when you told

20   them how big the discount would be from Safe Chain?

21   A.   They were asking if there were any allotments on how many

22   they could buy.

23   Q.   Okay.  And did they seem interested in purchasing those

24   drugs?

25   A.   Very, yeah.

1    Q.    Okay.  And did you know if other sales people at Safe

2    Chain had that same experience?

3    A.    Yeah.  It was relatively easy with the pricing.  I mean,

4    I would say, like the Bronx, Washington D.C.  Myself and a

5    couple of other guys that were in the same office I was, we

6    actually Googled "highest affected HIV cities in the U.S.,"

7    and then just started calling all the local pharmacies around

8    that way.  All we had to do was just tell them the price that

9    we had, and they were eager to sign up.

10   Q.    Okay.  And before you started selling HIV medication, was

11   it that easy to sell other medication, or was it harder?

12   A.    It took more nuance and negotiations, yeah.

13   Q.    Okay.  And you mentioned that once you told the customers

14   the price, they were immediately interested?

15   A.    It basically sold itself at that point.

16   Q.    Okay.  And did you start making a lot of money based on

17   this?

18   A.    The money was nice, yeah.

19   Q.    Okay.  Can you tell us a little bit more about the impact

20   it had on your business when you started selling HIV

21   medication as opposed to when you were only selling generic

22   medication before?

23   A.    I mean, the commission was more regular.  I started

24   getting more clients.  And, I mean, just monthly income grew a

25   decent amount.

1   Q.   And did you know if other salespeople at Safe Chain

2   experienced that as well?

3   A.   Yes, ma'am.

4   Q.   Okay.  And what about Charles and Patrick Boyd?  Did you

5   discuss with them that sales were increasing rapidly with HIV?

6   A.   I mean, not necessarily.  Just checking on inventory and

7   making sure that we had enough for clients that wanted to

8   place orders.

9   Q.   Okay.  Was it tough to keep enough inventory to sell as

10  much as there was demand for?

11  A.   Depending on who we got it from, yeah.

12  Q.   Okay.  And you mentioned earlier that you did some cold

13  calling and Googling, "High HIV infected areas."  Is that how

14  you found your customers?

15  A.   Yes, ma'am.

16  Q.   Okay.  And were you successful at finding customers in

17  those areas?

18  A.   Yes, ma'am.

19  Q.   Okay.  I'd like to talk to you about the actual bottles

20  of medication that Safe Chain sold.  Did you ever receive any

21  complaints about those bottles from customers?

22  A.   Yes, ma'am.

23  Q.   Okay.  Can you tell us about the complaints you had

24  received from your customers about how the bottles worked?

25  A.   It was mainly only one customer, and he was talking

 1   about, like, leaflets missing, damaged bottles, dirty bottles.

 2   Q.   So let's take those one at a time.  You mentioned

 3   leaflets missing?

 4   A.   Yes.

 5   Q.   Okay.  Can you tell us what you mean by leaflets?

 6   A.   So say you open up, like, a box of medication.  It

 7   normally has like a pamphlet of all the side effects, like

 8   drug information, chemical makeup, that kind of stuff.  It's

 9   like an informational pamphlet for the medication.

10   Q.   Okay.  And when you had customers complain about these

11   leaflets missing, did you know why they were missing?

12   A.   No, ma'am.

13   Q.   Okay.  You also mentioned damaged bottles.  What did you

14   mean by damaged bottles?

15   A.   Leaflets missing, because it's supposed to be like an

16   adhesive to the side of the bottle.  And then also just dirty

17   on the outside.  Like, the labels -- like say this bottle was

18   like ripped or something like that.

19   Q.   Okay.  And when you say dirty bottles, what did the dirty

20   bottles look like?

21   A.   I was told it was like scuff marks.

22   Q.   Okay.  And did you know why the bottles were dirty or had

23   scuff marks?

24   A.   No, ma'am.

25   Q.   Did you know why the bottles looked like there had been a

1    label ripped off?

2    A.    No, ma'am.

3    Q.    Okay.  And did you discuss these concerns with your

4    colleagues?

5    A.    Yes, ma'am.

6    Q.    Okay.  And did you discuss your concerns with other

7    salesmen?

8    A.    Yes, ma'am.

9    Q.    Okay.

10         MS. DEROVANESIAN:  I'd like to show, please, just

11   for the witness, Government Exhibit 428.

12   BY MS. DEROVANESIAN:

13   Q.    Mr. Nicholls, can you see what this is?

14   A.    It just looks like a message report between me and Jon

15   Weed.

16   Q.    Okay.  And is Jon Weed another salesman at Safe Chain?

17   A.    Yes, ma'am.

18   Q.    Okay.  And based on this date, did you work at Safe Chain

19   during this time?

20   A.    Yes, ma'am.

21   Q.    Okay.  And then I'd like to just flip you through maybe

22   to this first page.

23         MS. DEROVANESIAN:  Actually, let's go to page 3,

24   just for the witness, please.

25   BY MS. DEROVANESIAN:

 1  Q.   And then maybe the bottom third of this page, without

 2  telling us anything about what it says, do you see yourself

 3  relaying a conversation that you had with Patrick Boyd?

 4  A.   Yes, ma'am.

 5          MS. DEROVANESIAN:  Your Honor, the government moves

 6  to admit Government 428.

 7          MR. ZIMET:  Judge, this is the issue we talked about

 8  previously.  I think the Court has made a ruling.

 9          THE COURT:  I think it's hearsay.  I'll sustain the

10  objection.

11  BY MS. DEROVANESIAN:

12  Q.   Mr. Nicholls, do you remember talking to Patrick Boyd

13  about the complaints you received about the bottles of

14  medication?

15  A.   Yes, ma'am.

16  Q.   Okay.  And do you remember any sort of response you gave

17  him about how you would resolve those complaints?

18  A.   Are you talking about, like, the, I guess, condition of

19  the medication?

20  Q.   Yeah, about the dirty bottles.  How you would resolve the

21  problem of dirty bottles for the customers who complained.

22  A.   I said that if I was allowed, I'd go into the warehouse

23  and pick out the prettiest bottles that we had.

24  Q.   What do you mean "the prettiest bottles that you had"?

25  A.   The ones that had everything that my customer complained

1    about.  So he said missing leaflets, I'd make sure it had

2    leaflets.  I'd make sure whatever he complained about was not

3    on that bottle.

4    Q.    Okay.  And why did you make that offer to go into the

5    warehouse and pick out the pretty bottles?

6    A.    Customer service, one; and then, two, I'm trying to

7    resolve problems and trying to be a good sales rep.

8    Q.    Okay.  I want to talk to you about something called a T3,

9    or a pedigree.  Do you know what that is?

10   A.    Yes, ma'am.

11   Q.    Can you tell us in your own words what that is?

12   A.    T3 or pedigree, it's start to finish of where this

13   product went from manufacturer to the end user.  So it could

14   be -- for, I guess, people's comparison, would be like say you

15   go to the grocery store, you have like a bacteria

16   contamination thing on a thing of food.  They have lot

17   numbers.  They have which farm it came from.  So everything is

18   marked from wherever it started to the very end user.

19           So the medication, it starts, it was made this day,

20   this time, at this plant, at this manufacturer; it was sold

21   this day, this time to this wholesaler; and then down the

22   chain, all the way to the pharmacy.

23   Q.    Okay.  And from what you understood, was a pedigree

24   required to be provided with the sale of medication?

25   A.    I remember it was very important to my customers; yes,

1    ma'am.

2    Q.    Okay.  And when you first started selling HIV medication,

3    was Safe Chain receiving and providing those pedigree

4    documents to customers?

5    A.    It took a few weeks, but yeah.

6    Q.    Okay.  So at the very beginning when you started sending

7    them out, did you receive complaints from customers?

8    A.    Yes.  They were asking for the pedigrees, and we did not

9    have them at that time to give to them.

10   Q.    Okay.  So during that period of time, were they asking

11   for the pedigrees because they hadn't gotten one with their

12   purchase?

13   A.    Correct.

14   Q.    Okay.  And were there certain customers who did not

15   complain about receiving a pedigree?

16   A.    Yes, ma'am.

17   Q.    Okay.  And did you offer different pricing for bottles of

18   medication based on whether or not it had a pedigree?

19   A.    We were told that we could do so; yes, ma'am.

20   Q.    And who told you that?

21   A.    Patrick Boyd.

22   Q.    Okay.  And how did the pricing that you were allowed to

23   offer change depending on whether the bottle had a pedigree or

24   didn't have a pedigree?

25   A.    We were allowed to offer steeper discounts for the

 1  distributor who did not have a pedigree versus the other.

 2  Q.   Okay.  Which distributor was that that you could offer a

 3  steeper discount for because there was no pedigree?

 4  A.   Boulevard.

 5  Q.   Okay.  And, Mr. Nicholls, did you continue to receive

 6  complaints about the lack of pedigree from some customers?

 7  A.   It was one in particular, but yeah.  I had a couple that

 8  I sold to once, and they were able to just kind of take it as

 9  like a one-time mistake.  And then when it occurred again, I

10  had some that actually stopped buying from me.

11  Q.   Okay.

12       MS. DEROVANESIAN:  And I'd like to show, please,

13  just for the witness, Exhibit 420.

14  BY MS. DEROVANESIAN:

15  Q.   And I'd like to turn your attention specifically to page

16  2.  And can you just tell me who is involved in this

17  conversation here in the first message?

18  A.   Who the first message was from?

19  Q.   Yes.  That's a better way to say that.

20  A.   Pat Boyd.

21  Q.   Okay.  And then are you part of this conversation?

22  A.   I'm included on the chain; yes, ma'am.

23       MS. DEROVANESIAN:  Okay.  Government moves to admit

24  Exhibit 420.

25       MR. BARZEE:  Same objection as before, Your Honor.

```
 1  Hearsay.
 2            THE COURT:  Overruled.  420 will be received.
 3            (Government's Exhibit 420 admitted.)
 4            MS. DEROVANESIAN:  All right.  And if we could,
 5  please, publish this one to the jury.
 6            Thank you.
 7  BY MS. DEROVANESIAN:
 8  Q.   All right.  Mr. Nicholls, I'd like to focus you on this
 9  first message from Pat Boyd where it says, We're able to buy
10  from Boulevard again.  Whenever possible, please use their
11  product over Gentek's.  We have much more flexible purchasing
12  options and aren't forced to buy bulk orders.
13            Do you see that?
14  A.   Yes, ma'am.
15  Q.   Okay.  And then a few lines down, do you see two
16  responses from you to that message?
17  A.   Yes, ma'am.
18  Q.   Okay.  And can you tell us what your second response was?
19  A.   I asked Pat, "Are they able to get pedigrees now?"
20  Because that was a big thing with a lot of mine that Boulevard
21  didn't have before.
22  Q.   Okay.  And is that the same issue you were just
23  explaining to us about customers complaining about having no
24  pedigree?
25  A.   Yes, ma'am.
```

1   Q.   Okay.  And then how does Patrick Boyd respond to your

2   question about whether he will be able to get a pedigree now?

3   A.   He says yes.

4   Q.   Okay.  And what's the date of this?

5   A.   August 31st, 2020.

6   Q.   Okay.  And after Patrick Boyd said this, did you continue

7   to have issues with customers complaining about pedigrees?

8   A.   Yes, ma'am.

9   Q.   Okay.

10          MS. DEROVANESIAN:  And I'm going to show, please,

11  just for the witness, Government Exhibit 423.

12          Actually, we'll skip over that for now.

13  BY MS. DEROVANESIAN:

14  Q.   Did you continue to sell the medication even though you

15  were having these issues with the T3s and the pedigrees?

16  A.   Yes, ma'am.

17  Q.   Okay.  And did that continue for months?

18  A.   Yes, ma'am.

19  Q.   Okay.  Give me a moment.

20          Did you talk to Patrick Boyd about the fact that

21  customers were still complaining about not getting pedigrees?

22  A.   Pat was the person I spoke to most about it, yes.

23  Q.   Okay.  And how did he respond when you told him the

24  customers were still complaining that you're selling

25  medications with no pedigree?

```
 1  A.    Try and sell the GMDCs instead.

 2  Q.    And what was that?

 3  A.    Gentek.

 4  Q.    Okay.  And would you still continue to sell the Boulevard

 5  product with no pedigree to customers who didn't complain?

 6  A.    Yes, ma'am.

 7  Q.    Okay.  And was there ever a time where you did start to

 8  receive pedigrees connected to the Boulevard products?

 9  A.    Yes, ma'am.

10  Q.    And at that point, did you still continue to get

11  complaints from customers about them?

12  A.    Yes, ma'am.

13  Q.    What type of complaints did you get from customers after

14  you were able to provide a pedigree?

15  A.    They said they weren't complete.

16  Q.    Okay.  And do you know what type of information was not

17  complete?

18  A.    They said that it was missing dates, locations, certain

19  things like that that were important.

20  Q.    Okay.  And can you tell us, just generally, what

21  information is typically on a pedigree?

22  A.    It's supposed to be, like I said, the person who has it

23  to the person they sold it to.  The day, the time, and then

24  the address of both locations.

25  Q.    Okay.  And were there instances where -- you mentioned
```

 1    date as something that was missing.  Were their times when the

 2    purchaser was missing in some of those instances?

 3    A.    Can you explain it a little bit?

 4    Q.    So you mentioned that sometimes there was information

 5    missing from these pedigrees.  You mentioned -- I think you

 6    said the date was one of those pieces of information.  What

 7    about the purchaser or the people listed as purchasers or

 8    people who had owned the drug?  Was that ever missing?

 9    A.    I did have a couple where it just went from like Gilead

10    to Safe Chain.

11    Q.    Okay.  And why was that problematic?

12    A.    Because we were not an authorized distributor of that

13    medication.

14    Q.    Okay.  So the fact that you weren't an authorized

15    distributor, what did that tell you about the fact that the

16    pedigree said that Gilead sold it straight to Safe Chain?

17    A.    That it was missing some people in between.

18    Q.    Okay.  And when you saw instances like that, what did you

19    do?

20    A.    I would typically forward that to our compliance

21    department to get correct pedigrees.

22    Q.    Okay.  And when you would send those pedigrees that were

23    incorrect to compliance, did you receive them back with new

24    information?

25    A.    We received the complete pedigree; yes, ma'am.

```
 1   Q.   Okay.  And did you know -- at that point, when you

 2   received them back, did they have somebody in between Safe

 3   Chain and the manufacturer?

 4   A.   I mean, I would look at them briefly, but most of time, I

 5   would just forward whatever email I got back, the attachment.

 6   Q.   Okay.  And did you know where that information came from

 7   that appeared on the T3?

 8   A.   No, ma'am.

 9   Q.   Okay.

10        MS. DEROVANESIAN:  All right.  I would -- give me

11   one moment.

12   BY MS. DEROVANESIAN:

13   Q.   Okay.  I'd like to show you another exhibit.

14        MS. DEROVANESIAN:  Just for the witness, please,

15   Government Exhibit 431.

16   BY MS. DEROVANESIAN:

17   Q.   And, Mr. Nicholls, do you see Patrick Boyd's name listed

18   as a recipient -- a participant here?

19   A.   Yes, ma'am.

20   Q.   And do you see your name, Jonathan Nicholls?

21   A.   Yes, ma'am.

22   Q.   Okay.  And then I'll show you just -- well, there's only

23   one other page.  So I'll show you just page 2 and ask you if

24   you recognize this conversation.

25   A.   I remember it now that I'm looking at it; yes, ma'am.
```

 1            MS. DEROVANESIAN:  Okay.  Government moves to admit

 2    Exhibit 431.

 3            MR. BARZEE:  The same as previous objection to the

 4    hearsay.

 5            THE COURT:  Overruled.  431 will be received.

 6            (Government's Exhibit 431 admitted.)

 7    BY MS. DEROVANESIAN:

 8    Q.   All right.  Mr. Nicholls, do you see this first message

 9    here where Patrick Boyd says, Whenever possible, please try to

10    use the --

11            MS. DEROVANESIAN:  Oh, could we please publish to

12    the jury?

13    BY MS. DEROVANESIAN:

14    Q.   All right.  Now, do you see where Patrick Boyd says,

15    "Whenever possible, please try to use the Boulevard HIV

16    products.  We have T3s for them now.  They are less expensive,

17    and the ordering process is much better for us"?

18    A.   Yes, ma'am.

19    Q.   Okay.  And what date is this?

20    A.   September 25th, 2020.

21    Q.   Okay.  And after this date, did customers still raise

22    issues with you about the T3s?

23    A.   Mainly one, but yes.

24    Q.   Okay.  I'd like to show you --

25            MS. DEROVANESIAN:  Just for the witness, please,

1   Government Exhibit 443.

2   BY MS. DEROVANESIAN:

3   Q.   And, Mr. Nicholls, without -- we'll go to page 3 just for

4   you.  And without telling us the content of this, could you

5   please tell us the date?

6   A.   October 21, 2020.

7   Q.   Okay.  And is this a conversation between you and Jon

8   Weed?

9   A.   Yes, ma'am.

10  Q.   And who is Jon Weed?

11  A.   A co-worker of mine.

12  Q.   Were you working for Patrick Boyd and Charlie Boyd at the

13  time?

14  A.   I was with Safe Chain; yes, ma'am.

15  Q.   Okay.  And, again, without telling us what it says, can

16  you tell us if you were talking about a subject related to

17  your job here?

18  A.   We're discussing issues with the --

19  Q.   Sorry.  I'm sorry, Mr. Nicholls.  Without telling us just

20  yet what it says, can you just tell us, are you talking about

21  things related to Safe Chain here?

22  A.   Yes, ma'am.

23         MS. DEROVANESIAN:  Okay, Your Honor.  Government

24  moves to admit Exhibit 443.

25         MR. BARZEE:  Objection.  Hearsay.  Everything --

```
 1              THE COURT:  Sustained.
 2              MS. DEROVANESIAN:  All right.  We can take that
 3    down.
 4    BY MS. DEROVANESIAN:
 5    Q.   Mr. Nicholls, do you remember what types of complaints
 6    you were getting at this point, in October of 2020, from
 7    customers about the T3s?
 8    A.   Just similar ones that I'd been getting the entire time,
 9    just incomplete, missing dates, people, that kind of stuff.
10    Q.   And do you remember how you described your feeling about
11    HIV medicine at this time?
12              MR. BARZEE:  Objection.  Relevance, Your Honor.
13              THE COURT:  Sustained.
14    BY MS. DEROVANESIAN:
15    Q.   Did it concern you that you were still getting these
16    complaints?
17    A.   To an extent; yes, ma'am.
18    Q.   Okay.  Why?
19    A.   I didn't understand why there were just constant issues
20    with the same -- same problems.
21    Q.   Okay.  And did that give you any concern about the
22    business you were doing?
23    A.   Not necessarily the business I was doing.  But, I guess,
24    maybe the people we were getting them from.
25    Q.   Okay.  Mr. Nicholls, did you have a customer named
```

1    Olympia Pharmacy?

2    A.    Yes, ma'am.

3    Q.    And do you remember that customer?

4    A.    Yes, ma'am.

5    Q.    What products did you sell to Olympia Pharmacy?

6    A.    HIV medications.

7    Q.    Okay.  And do you remember if Olympia Pharmacy was sent

8    pedigrees along with the products they received at first?

9    A.    Not at first, because he was the main guy that would

10   always complain.

11   Q.    Who was the main guy who would always complain about not

12   getting pedigrees?

13   A.    Emil.  He was the owner.

14   Q.    Okay.  And did you tell Charles Boyd and Patrick Boyd

15   that Emil, the owner of Olympia Pharmacy, was complaining

16   about not getting pedigrees?

17   A.    Well, Patrick Boyd.  He was the sales manager at the

18   time.

19   Q.    Okay.

20           MS. DEROVANESIAN:  And I would like to show just the

21   witness, please, Government Exhibit 517.

22   BY MS. DEROVANESIAN:

23   Q.    All right.  Mr. Nicholls, do you recognize this

24   conversation?

25   A.    Yes, ma'am.

1   Q.   Okay.  And can you tell me who is involved in the

2   conversation?

3   A.   I sent a screenshot of a text message between me and

4   Emil, which is the owner of Olympia Pharmacy, to Pat Boyd.

5   Q.   Okay.  And do you also see -- well, at the top here, do

6   you see who's involved here, who the participants are at the

7   very top in that box?

8   A.   Charles Boyd, Pat Boyd, and myself.

9   Q.   Okay.  And can you tell us the date of this?

10  A.   September 14th, 2020.

11  Q.   Okay.

12          MS. DEROVANESIAN:  Okay.  Government moves to admit

13  Exhibit 517.

14          MR. ZIMET:  No objection, Judge.

15          MR. BARZEE:  No objection.

16          THE COURT:  517 will be received.

17          (Government's Exhibit 517 admitted.)

18  BY MS. DEROVANESIAN:

19  Q.   Okay.  Mr. Nicholls, just to make it easier, the

20  screenshot there is blown up on page 2, so I'm going to direct

21  your attention there.  And can you tell us what you were

22  sending in this screenshot?  What was the screenshot that you

23  were sending to Patrick and Charles Boyd?

24  A.   A customer of mine who wanted to return the medication he

25  had purchased.

```
 1   Q.   And in this bottom message here, does he say why he
 2   wanted to return the medication he had purchased?
 3   A.   Delayed pedigrees.
 4   Q.   Okay.  And is this a concern that the customer had
 5   already shared with you before?
 6   A.   Yeah.  He had frequent issues with the pedigrees.
 7   Q.   Okay.  And can you tell us about some of the frequent
 8   issues with pedigrees that this customer raised?
 9   A.   Just delayed.  Sometimes they'd have them as soon as he
10   gets the order, and sometimes it would take a week, two weeks.
11   Sometimes it would be incomplete.
12   Q.   Okay.  And then I'd like to take you back to the first
13   page here.  And do you see where you say, "Guy currently has
14   300K worth of this stuff"?
15   A.   Yes, ma'am.
16   Q.   Was that a lot of this medication?
17   A.   That was a good order.
18   Q.   A good order?
19   A.   Yes, ma'am.
20   Q.   Okay.  And do you see Charles Boyd's response?
21   A.   "I will send this over to Boulevard now."
22   Q.   Okay.  And at this point, did Charles Boyd and Patrick
23   Boyd immediately agree to accept this return?
24   A.   No, ma'am.
25   Q.   Okay.  I'd like to show you --
```

 1              MS. DEROVANESIAN:  Just the witness, please,

 2    Government Exhibit 182.

 3    BY MS. DEROVANESIAN:

 4    Q.    All right.  Mr. Nicholls, do you recognize this document?

 5    A.    Yes, ma'am.

 6    Q.    Okay.  And do you see yourself listed as a recipient?

 7    A.    Yes, ma'am.

 8    Q.    Do you see Patrick Boyd listed as a recipient?

 9    A.    Yes, ma'am.

10              MS. DEROVANESIAN:  Okay.  Government moves to admit

11    Exhibit 182.

12              MR. ZIMET:  Your Honor, objection.  Hearsay.  It's

13    from someone else.

14              THE COURT:  Overruled.  182 will be received.

15              (Government's Exhibit 182 admitted.)

16              MS. DEROVANESIAN:  Okay.  And if we could please

17    publish this one for the jury.

18    BY MS. DEROVANESIAN:

19    Q.    Okay.  Mr. Nicholls, can you tell us who sent this email,

20    at the very top?

21    A.    It was Emil, the owner from Olympia Plaza Pharmacy.

22    Q.    And is that the guy we were just talking about in the

23    screenshot we looked at?

24    A.    Yes, ma'am.

25    Q.    Okay.  And during -- I'm actually going to take you to --

 1   well, actually, we'll just start on this first page here.

 2       Do you see the email that is sent by Emil to Pat Boyd?

 3   A.   Currently on this page?  Yes, ma'am.

 4   Q.   Okay.  And then in the middle here, do you see a

 5   reference to a phone call?

 6   A.   Yes, ma'am.

 7   Q.   And were you part of a phone call with the owner of

 8   Olympia and Patrick Boyd?

 9   A.   Yes, ma'am.

10   Q.   I'm sorry, I didn't catch that.  Is it yes?

11   A.   Yes, ma'am.

12   Q.   Okay.  And do you remember what happened during that

13   phone call?

14   A.   It was over Emil's concerns about the pedigree, the

15   condition of the bottles, and the frequency of which this was

16   happening.

17   Q.   Okay.  And, here, where it says, You mentioned -- you

18   being Pat -- mentioned yourself that the vendors supplying the

19   medications are frequently not reliable, inconsistent, and

20   have difficulties for various reasons.

21       Do you remember discussing that on the phone call

22   with Emil and Patrick Boyd?

23   A.   Yes, ma'am.

24   Q.   Okay.  And then after that, he says, After carefully

25   considering all facts and consulting our advisors, we have

1    made a decision to return all medications sourced out from the

2    suppliers in question.  Do you remember discussing that over

3    the phone?

4    A.   It was brought up during the phone call; yes, ma'am.

5    Q.   Okay.  And then the owner of Olympia says, I understand

6    this is a setback, to accept the merchandise back, and I'm

7    truly sorry.  Do you remember him saying that?

8    A.   Yes, ma'am.

9    Q.   Okay.  And then, below, do you see where he says, Our

10   decision was based on the current California State Board of

11   Pharmacy regulations?

12   A.   Yes, ma'am.

13   Q.   Okay.  And do you see where he says, It's based on the

14   DSCSA provisions?

15   A.   Yes, ma'am.

16   Q.   And did you know what that was?

17   A.   He later said it was the Drug Supply Chain Security Act.

18   Q.   Okay.  And he says it was based on his moral obligation

19   to ensure health and safety for his customers.

20           Do you remember him talking about that concern over

21   the phone?

22   A.   It was on this email mainly, but yes.

23   Q.   Okay.  And was Patrick Boyd part of that conversation?

24   A.   Yes.  We were all on the phone call.

25   Q.   Okay.  Who else was on that phone call?

```
 1    A.    Just Pat, Emil, and myself.

 2    Q.    Okay.

 3          MS. DEROVANESIAN:  We can take that one down.

 4    BY MS. DEROVANESIAN:

 5    Q.    And then I would like to show you Government Exhibit 183.

 6          MS. DEROVANESIAN:  Just for the witness, please.

 7    BY MS. DEROVANESIAN:

 8    Q.    All right.  Do you recognize this document?

 9    A.    Yes, ma'am.

10    Q.    And can you tell us what it is?  Is it an email?

11    A.    Yes, ma'am.

12    Q.    We can just start there.  Okay.  And can you tell us who

13    it's from?

14    A.    It's from Emil to myself, along with a couple other

15    people.

16    Q.    Okay.  And is Patrick Boyd one of those people?

17    A.    Well, it's to Patrick Boyd, and I'm copied on the email.

18    Q.    Okay.  And is Charles Boyd also copied on the email?

19    A.    Yes, ma'am.

20          MS. DEROVANESIAN:  Okay.  Government moves to admit

21    Exhibit 183.

22          MR. BARZEE:  Objection, again, Your Honor.  Hearsay.

23    If this Emil is not here and subject to cross-examination,

24    this is hearsay, and it's a Crawford issue.  I'm objecting to

25    the introduction of these documents when these witnesses are
```

1    not present in court.

2              THE COURT:  Okay.  Overruled.  183 will be received.

3    The jury will consider this only as it applies or doesn't

4    apply to Patrick Boyd, not Charles Boyd.

5              MS. DEROVANESIAN:  Your Honor, I'd just like to

6    clarify.  Charles Boyd is also included on this email.

7              THE COURT:  But he didn't send it.  So as far as the

8    sending part, they should only consider as to Patrick Boyd.

9    Allegedly, he received it, so they can consider it in that

10   aspect.

11             MS. DEROVANESIAN:  Understood.  Thank you.

12             (Government's Exhibit 183 admitted.)

13             MS. DEROVANESIAN:  Can we please publish this to the

14   jury?

15   BY MS. DEROVANESIAN:

16   Q.   And if I could take you to page 2, please.

17             And at the bottom here, do you see an email that

18   Patrick Boyd wrote to Emil on Friday October 2nd, 2020.

19   A.   Yes, ma'am.

20   Q.   Okay.  And do you see where he says, The only mention was

21   their packing wasn't as good as the other vendors, and they

22   were slow with their T3?

23   A.   Yes, ma'am.

24   Q.   Do you remember hearing complaints about the packaging of

25   the medication that Emil received at Olympia Pharmacy?

1    A.    Yes, ma'am.

2    Q.    And what do you remember about those complaints?

3    A.    The missing leaflets, the scuffed bottles, the damaged

4    labels.

5    Q.    Okay.  And then I'd like to take you to the attachments

6    which begin -- I'll take you to page 8.

7          Do you see this photo?

8    A.    Yes, ma'am.

9    Q.    Do you remember that photo being attached to the email

10   from the Olympia Pharmacy owner?

11   A.    Yes, ma'am.

12   Q.    Okay.  And in this picture, do you see damaged bottles?

13   A.    I see missing leaflets.

14   Q.    Okay.  And is that what Emil, the owner of Olympia

15   Pharmacy, was complaining about?

16   A.    Yes, ma'am.

17   Q.    Okay.  And then now I'd like to take you to the first

18   page here.  Do you see an email here from Emil, the owner of

19   the pharmacy, to Patrick Boyd?

20   A.    Yes, ma'am.

21   Q.    Okay.  Do you see where he says, The items were

22   quarantined immediately after we discovered suspicious

23   packaging?

24   A.    Yes, ma'am.

25   Q.    Okay.  And do you remember him telling you that, that

```
 1   they quarantined these products because they were in

 2   suspicious packaging?

 3   A.   He said he had them isolated from his inventory.

 4   Q.   Okay.  And then he said he alerted Safe Chain right away,

 5   As soon as our investigation was completed.

 6            Do you see that?

 7   A.   Yes, ma'am.

 8   Q.   And do you remember him alerting Safe Chain when he had

 9   completed his investigation?

10   A.   Well, he had reached out to me, and then I reached out to

11   Pat, but yes.

12   Q.   Okay.  And then in this next paragraph, he says, We

13   deemed it as unsafe to dispense the product received from you.

14            Do you remember reading that?

15   A.   Yes, ma'am.

16   Q.   Was that concerning to you?

17   A.   It was at the time; yes, ma'am.

18   Q.   Why was that concerning?

19   A.   Because I've never had a customer say that before.

20   Q.   Okay.  And what were you concerned about?

21   A.   Just why he wouldn't take it, like, why he wouldn't keep

22   it, I guess.

23   Q.   Okay.  Does he explain why he wouldn't take it and why he

24   wouldn't keep it in that next paragraph?

25   A.   Yeah.  He says he found it to be unsafe.
```

 1   Q.   And do you see in the middle of that 4th paragraph where

 2   he says, The inventory is not usable for us since it is deemed

 3   as not meeting safety standards?

 4   A.   Yeah, I see it.

 5   Q.   Okay.  And is he asking Safe Chain to accept his return

 6   in this email?

 7   A.   Yes, ma'am.

 8   Q.   And do you see in that same paragraph where he says, the

 9   last sentence, or second-to-last, The alternative to the

10   returns is really not that much fun?

11   A.   Yes, ma'am.

12   Q.   Okay.  And do you remember, after receiving this email,

13   if Patrick Boyd and Charles Boyd ever agreed to accept the

14   return?

15   A.   We accepted the return.

16   Q.   And was it after this email was sent?

17   A.   Yes, ma'am.

18   Q.   Okay.

19        MS. DEROVANESIAN:  And I'd like to show you, just

20   for the witness please, Government Exhibit 439.

21   BY MS. DEROVANESIAN:

22   Q.   All right.  Mr. Nicholls, do you see who's part of this

23   Teams chat?

24   A.   Pat Boyd and myself.

25   Q.   Okay.  And do you see the date?

1   A.    October 3rd, 2020.

2           MS. DEROVANESIAN:  Okay.  Government moves to admit

3   Exhibit 439.

4           MR. BARZEE:  No objection.

5           THE COURT:  439 will be received.

6           (Government's Exhibit 439 admitted.)

7   BY MS. DEROVANESIAN:

8   Q.    Okay.  And, Mr. Nicholls, showing you the second page

9   here, which is the first page of the chat.

10          MS. DEROVANESIAN:  Could we publish this for the

11  jury, please?

12  BY MS. DEROVANESIAN:

13  Q.    At the top here, do you see a message from yourself to

14  Patrick Boyd?

15  A.    Yes, ma'am.

16  Q.    And what do you say to Patrick Boyd?

17  A.    "Do you see that email?"

18  Q.    Okay.  And here, are you talking about the email that we

19  were just looking at from Olympia?

20  A.    Yes, ma'am.

21  Q.    Okay.  And do you see Patrick Boyd's response in the next

22  line where he says, "Basically, the pedigree has some hiccups,

23  so if we can replace it with G product, we're good to go"?

24          Do you see that?

25  A.    Yes, ma'am.

1    Q.   Okay.  When he said the pedigree has some hiccups, did he

2    explain in this message what that meant?

3    A.   He didn't explain, but I inferred it was the same stuff

4    that I --

5              MR. ZIMET:  Objection, Judge.

6              THE COURT:  Sustained.

7              MR. ZIMET:  Move to strike that part of the answer.

8              THE COURT:  For the last answer.

9    BY MS. DEROVANESIAN:

10   Q.   Okay.  So just to be clear, in this message, he didn't

11   explain what the hiccups were?

12   A.   No specifics.

13   Q.   Okay.  And what about the problems with the packaging --

14   the suspicious packaging that Emil had referenced in the

15   email?  Did he say anything about that here?

16   A.   No, ma'am.

17   Q.   Okay.  And when he says, "If we can replace with G

18   product, we're good to go," what's G product?

19   A.   Gentek.  The GMDCs.

20   Q.   Okay.  And, Mr. Nicholls, after this point, did Safe

21   Chain continue to sell product that came from Boulevard?

22   A.   Yes, ma'am.

23   Q.   And was that the supplier who provided the product to

24   Emil that he considered to be unsafe?

25   A.   Yes, ma'am.

 1   Q.   Okay.  Mr. Nicholls, are you familiar with the standard

 2   operating procedures at Safe Chain?

 3   A.   Unless they pertained to sales, not in detail.

 4   Q.   Okay.  I'd like to show you Government Exhibit 600, which

 5   is already in evidence.

 6        MS. DEROVANESIAN:  So we can go ahead and publish

 7   that, please.

 8   BY MS. DEROVANESIAN:

 9   Q.   Okay.  Mr. Nicholls, do you see the top of this where it

10   says, Standard Operating Procedures For Suspect and

11   Illegitimate Product?

12   A.   Yes, ma'am.

13   Q.   Do you recognize this standard operating procedure?

14        THE COURT:  Let me interrupt you.  Is 600 in

15   evidence?

16        MS. DEROVANESIAN:  Yes.

17        THE COURT:  Do you guys have it in evidence?  600?

18        MR. ZIMET:  It was introduced over objection, Judge.

19        THE COURT:  Okay.  I didn't mark it down, so 600

20   will be received.

21        MS. DEROVANESIAN:  Thank you.

22        (Government's Exhibit 600 admitted.)

23   BY MS. DEROVANESIAN:

24   Q.   Mr. Nicholls, are you familiar with this standard

25   operating procedure for suspect and illegitimate product?

1   A.   No, ma'am.

2   Q.   Okay.  I'd like to direct your attention to the second

3   page of this exhibit.

4         THE COURT:  He's not familiar with it, so ask

5   another question.

6         MS. DEROVANESIAN:  Okay.

7   BY MS. DEROVANESIAN:

8   Q.   Mr. Nicholls, do you know if after the return from Emil

9   was accepted, if the -- if Safe Chain reported that to the

10  Board of Pharmacy?

11  A.   I'm not sure.

12  Q.   Did Patrick Boyd tell you that he was going to report

13  that there was suspect product?

14  A.   I'm not sure.

15  Q.   Did -- do you remember if Charles Boyd told you that he

16  was going to report the suspect product?

17  A.   If they did, none of it was with me.

18  Q.   Okay.  And did they discuss with you that they were going

19  to look into a potential counterfeit?

20  A.   Not to me, if they did, no.

21  Q.   Okay.  And I'd like to show you Government Exhibit 601,

22  which is also in evidence.

23         MS. DEROVANESIAN:  If we could please publish that

24  one.

25         THE COURT:  I don't have that one either.

1           MS. DEROVANESIAN:  You don't have that one?

2           THE COURT:  That one came in too?

3           MS. DEROVANESIAN:  I believe that one came in too.

4           MR. BARZEE:  Yes.

5           THE COURT:  Okay.  I missed that too.  601 will be

6    received.

7           (Government's Exhibit 601 admitted.)

8           MS. DEROVANESIAN:  Thank you.

9    BY MS. DEROVANESIAN:

10   Q.   All right.  Mr. Nicholls, do you see at the top here

11   where it says, Standard Operating Procedure For Product

12   Tracing?

13   A.   Yes, ma'am.

14   Q.   Okay.  And then I'd like to show you the last page here.

15   And under 5 where it says, "Accepting ownership," and it says,

16   "Under no circumstances should Safe Chain Solutions accept

17   ownership of any product without the transaction history,

18   transaction information, and transaction statement."

19           Were you aware that this was a rule at Safe Chain

20   when you worked there?

21           MR. ZIMET:  Objection, Judge, as to foundation.

22           THE COURT:  Sustained.

23   BY MS. DEROVANESIAN:

24   Q.   Were you familiar with any rule about not accepting

25   products if they didn't have pedigrees at Safe Chain?

```
 1   A.    No, ma'am.

 2   Q.    Okay.

 3            MS. DEROVANESIAN:  We can take that one down.

 4   BY MS. DEROVANESIAN:

 5   Q.   All right.  Mr. Nicholls, I'd like to show you --

 6            MS. DEROVANESIAN:  Just for the witness, please,

 7   Government Exhibit 249.

 8   BY MS. DEROVANESIAN:

 9   Q.   Okay.  Mr. Nicholls, can you tell us who this email is

10   from?

11   A.    Pat Boyd.

12   Q.    And are you one of the recipients?

13   A.    Yes, ma'am.

14   Q.    And can you tell us the date?

15   A.    It says March 17, 2021.

16            MS. DEROVANESIAN:  Okay.  And the government would

17   like to move into evidence Exhibit 249.

18            MR. ZIMET:  No objection.

19            MS. DEROVANESIAN:  And if we could please publish.

20            THE COURT:  249 will be received.

21            (Government's Exhibit 249 admitted.)

22   BY MS. DEROVANESIAN:

23   Q.   All right.  Mr. Nicholls, do you see an email in front of

24   you from Patrick Boyd to yourself?

25   A.    To me and others, yes, ma'am.
```

```
 1   Q.   Okay.  And who are those other people?

 2   A.   Other sales reps.

 3   Q.   At Safe Chain?

 4   A.   Yes, ma'am.

 5   Q.   Okay.  And do you see that there's an attachment here?

 6   A.   Yeah.  It says, "Gilead letter PDF."

 7   Q.   Okay.  And do you see where he's mentioning that there

 8   was an internal release from Gilead here?

 9   A.   Yes, ma'am.

10   Q.   Okay.  And if you're referring to -- when he says,

11   "Mentioning that Gentek was selling Safe Chain lots that they

12   couldn't identify or may have been compromised."  Was Gentek

13   one of the suppliers of HIV medication?

14   A.   Yes, ma'am.

15   Q.   Did you sell Gentek products?

16   A.   Yes, ma'am.

17   Q.   Did you sell those to pharmacies?

18   A.   Yes, ma'am.

19   Q.   Okay.  And then do you see below here -- well, actually,

20   we'll go on to the next page.

21        Do you see this letter here -- and I'll give you a

22   moment to review it -- discussing problems with products that

23   were purchased from Gentek?

24   A.   Can you say that one more time?  I was reading.

25   Q.   Well, I just want to give you a moment to kind of look
```

 1   over this letter and tell me if you remember getting it.

 2   A.   Yes, ma'am.

 3   Q.   Okay.  And do you remember hearing and seeing this letter

 4   talk about issues that were -- issues that were discovered

 5   with Gentek product that was sold by Safe Chain?

 6   A.   Yes, ma'am.

 7   Q.   Okay.  And do you see where, in this third paragraph, it

 8   says, "Safe Chain was made aware of this situation.  It

 9   reported this to Gilead immediately"?

10   A.   Yes, ma'am.

11   Q.   Do you see that?

12        Okay.  Mr. Nicholls, do you remember ever being

13   informed of issues with Gentek products and the bottles that

14   came from Gentek?

15   A.   No, ma'am.

16   Q.   Do you remember if Patrick Boyd ever told you about

17   products that Safe Chain was selling from Gentek having the

18   wrong pills inside the bottles?

19   A.   No, ma'am.

20   Q.   Do you remember if Charles Boyd ever told you that

21   bottles of medication from Gentek that you were selling had

22   the wrong pills in the bottle?

23   A.   No, ma'am.

24   Q.   Would you have wanted to know that information?

25   A.   Yes, ma'am.

```
 1   Q.    Why?

 2   A.    Because I was selling them.

 3   Q.    Okay.  And if you knew that information, what would you

 4   have done differently?

 5   A.    I wouldn't have sold them.

 6   Q.    Okay.  And then I'd like to take you back to the front

 7   page here of the email.  And then if you could just tell me

 8   what date this email was sent on.

 9   A.    March 17th, 2021.

10   Q.    Okay.  And then do you see down below, at the bottom

11   here, where Patrick Boyd says, "Don't send this proactively"?

12   A.    Yes, ma'am.

13   Q.    Is he referring to that letter to customers?

14   A.    Yes, ma'am.

15   Q.    Informing them about the problems that they had with

16   those Gentek products?

17   A.    Yes, ma'am.

18   Q.    And then what does he say down below that, under, "Don't

19   send this proactively"?

20   A.    "If a client mentions it, please forward our response.

21   We're happy to help with any questions."

22   Q.    Okay.  Thank you.

23          And, Mr. Nicholls, just one other point on the

24   second page here in that letter on the 1, 2, 3, 4, 5 -- 6th

25   paragraph down.  Do you see where it says, "All products that
```

```
 1   are distributed by Safe Chain have proper T3 documentation

 2   tracing the products back to the manufacturer or authorized

 3   distributor"?

 4   A.   Yes, ma'am.

 5   Q.   And, as we discussed, was that true at all times when you

 6   were working at Safe Chain.

 7   A.   I mean, we -- I technically got the T3s.  It just wasn't

 8   when it was supposed to.

 9   Q.   Okay.

10   A.   Send them all for a correction or whatever.  I don't know

11   what happened to them or how any of that worked.

12   Q.   And was that the basis of, for example, the Olympia

13   Pharmacy return, that they did not receive T3s timely and they

14   deemed it to be suspect product?

15   A.   I assume so; yes, ma'am.

16   Q.   Okay.  Thank you.

17              MS. DEROVANESIAN:  Can I have just one moment, Your

18   Honor.

19              THE COURT:  Okay.

20              (Counsel confer off the record.)

21              MS. DEROVANESIAN:  Nothing further, Your Honor.

22              THE COURT:  Mr. Barzee.

23                            CROSS-EXAMINATION

24   BY MR. BARZEE:

25   Q.   Good afternoon.
```

```
 1   A.    Good afternoon.

 2   Q.    So you covered a lot of ground there.  I want to go over

 3   a few of the things that were discussed.

 4          And the first thing I'd like to talk about is this

 5   concept that was raised as to what is an authorized

 6   distributor.  Do you remember hearing the prosecutor ask you

 7   about that?

 8   A.    Yes, sir.

 9   Q.    And an authorized distributor means authorized by the

10   manufacturer to distribute; correct?

11   A.    To my knowledge; yes, sir.

12   Q.    Right.  And you know that the big three authorized

13   distributors mean the big three authorized distributors

14   authorized by Gilead; correct?

15   A.    I'm not sure if they're the only ones who are authorized,

16   but those are the main suppliers.

17   Q.    Authorized by Gilead?

18   A.    Yes, sir.

19   Q.    My point is that I want to make a distinction.  When we

20   use the word "authorized," it means that it's authorized by

21   the manufacturer.  We're not saying it's authorized by the

22   United States government; right?

23   A.    Okay.

24   Q.    Okay.  So the big three that -- the Gilead authorized

25   distributors are McKesson, Cardinal Health, and
```

1  AmerisourceBergen; correct?

2  A.    Those are the big three; yes, sir.

3  Q.    And you've heard those big three mentioned over and over

4  and over again; correct?

5  A.    Yes, sir.

6  Q.    All right.  And you talked about something called WAC.

7  A.    Uh-huh.

8  Q.    And that's wholesale acquisition cost; correct?

9  A.    Yes, sir.

10  Q.    And the WAC means the price that Gilead, the

11  manufacturer, has set for their medicine; correct?

12  A.    Yes, sir.

13  Q.    All right.  And so Gilead says, Our WAC, our wholesale

14  acquisition cost, is going to be X -- whatever the number is.

15  Doesn't matter.  Just X; correct?

16  A.    Okay.

17  Q.    And that's a decision that's made by Gilead in order to

18  maximize their profits; correct?

19  A.    Yes, sir.

20  Q.    All right.  And Gilead can decide to sell those products

21  for less than their wholesale acquisition cost if they want

22  to; correct?

23  A.    I'm not sure of their business model.

24  Q.    No, but presumably Gilead can do whatever they want.

25  It's their product.  They can sell it for less if they want;

1  right?

2          MS. DEROVANESIAN:  Objection, calls for speculation.

3  Lack of personal knowledge.

4          THE COURT:  Overruled.

5  BY MR. BARZEE:

6  Q.   You're not aware of any prohibition from Gilead charging

7  whatever they want; right?

8  A.   It's their business.  They can run it how they want.

9  Q.   Of course.  Of course.  And so you said -- you mentioned

10 something about a standard WAC and that the standard in the

11 industry was 1 to 3 percent off of WAC; correct?

12 A.   That's what I was told; yes, sir.

13 Q.   Right.  And told by Adam Brosius?

14 A.   Among others.

15 Q.   Okay.  So everyone would talk about this?  This isn't a

16 secret; right?

17 A.   No.

18 Q.   No.  And it wasn't a secret that Gilead could drop their

19 wholesale acquisition cost when it suits their needs or their

20 desires; correct?

21 A.   It's their -- it's their company.

22 Q.   Right.  And McKesson and Cardinal Health and

23 AmerisourceBergen, the big three authorized distributors,

24 could sell to pharmacies for under WAC.  They could discount

25 it even further, 1 to 3 percent, if they wanted; right?

1    A.    I'm not sure.  I assume.  I'm not sure.

2    Q.    You're not aware of any prohibition telling the big three

3    that they can't do that other than whatever Gilead required;

4    correct?

5    A.    Yes, sir.

6    Q.    Right.  So when you hear that Safe Chain is able to offer

7    something at 9 percent under WAC, that's a discount price, and

8    obviously people would want to buy it at a greater discount;

9    correct?

10    A.    Who wouldn't?

11    Q.    Who wouldn't?  And do you know why Safe Chain was able to

12    offer the medications at 9 percent under WAC?

13    A.    No, sir.

14    Q.    Did you ever hear from Adam Brosius or other people that

15    Safe Chain was able to acquire these medications at a greatly

16    discounted rate?

17    A.    We received an email that we could, but I didn't get

18    specifics outside of, "We have sources."

19    Q.    Right.  But so from that email, you understood that Safe

20    Chain had various sources -- also called vendors; right? --

21    who would offer Safe Chain the medicine for greatly under WAC;

22    correct?

23    A.    That's what we were told.

24    Q.    All right.  And there's absolutely nothing wrong, as far

25    as you know, with Safe Chain purchasing something for 10

1  percent under WAC and selling it for 7 percent under WAC;

2  correct?

3              MS. DEROVANESIAN:  Objection, improper opinion.

4              THE COURT:  Overruled.

5  BY MR. BARZEE:

6  Q.   As far as you know, there would be nothing wrong with

7  Safe Chain buying the medication from one of these sources

8  for, let's say, 10, 15, 20 percent under WAC, under that price

9  controlled by Gilead, and then reselling it for a little bit

10 more; correct?

11 A.   I mean, we were a secondary wholesaler.  That was the

12 whole name of the game.

13 Q.   And let me ask you a question:  Were you committing

14 crimes when you were out there selling to pharmacies?

15 A.   No, sir.

16 Q.   Had the government -- how many times have you met with

17 the government?

18 A.   Two, three maybe.

19 Q.   Did the government ever offer you some kind of immunity

20 and say, "We weren't going to charge you with any crime"?

21 A.   No, sir.

22 Q.   In your heart, do you believe that you were committing

23 crimes by selling these things under WAC?

24 A.   No, sir.

25 Q.   Did they ever tell you you were a criminal because you

```
 1   sold things under WAC?

 2            MS. DEROVANESIAN:  Objection.

 3            THE COURT:  Overruled.

 4            THE WITNESS:  No, sir.

 5   BY MR. BARZEE:

 6   Q.   In fact, as far as you know, there's absolutely nothing

 7   wrong with selling it under WAC; correct?

 8   A.   I believed in the company and what we were doing.  So if

 9   that's what we could do, that's what I did.

10   Q.   Right.  Right.  Because, I mean, who cares?  Gilead wants

11   to keep the price control so that people can't buy these cheap

12   medications, but the secondary market, the wholesalers, they

13   can sell it for less, that's good for the marketplace, isn't

14   it?

15            MS. DEROVANESIAN:  Objection.  Improper opinion.

16            THE COURT:  Sustained.

17   BY MR. BARZEE:

18   Q.   That's something that your customers wanted, isn't it?

19            MS. DEROVANESIAN:  Objection.  Calls for

20   speculation.

21            THE COURT:  Sustained.

22   BY MR. BARZEE:

23   Q.   The pharmacies that you sold to, when you offered them

24   these medications at 7 or 8 percent WAC, they were pleased and

25   they wanted to buy them; correct?
```

```
 1   A.    They were excited about the price.

 2   Q.    Right.  That's all I'm saying.  And so they were happy

 3   with it.  And they weren't breaking the law by buying it under

 4   that price, were they?

 5              MS. DEROVANESIAN:  Objection.  Improper opinion.

 6              THE COURT:  Sustained.

 7   BY MR. BARZEE:

 8   Q.    Now, you had trouble with one of your customers, Olympia;

 9   correct?

10   A.    Yes, sir.

11   Q.    How many different customers did you have?

12   A.    I've had, altogether -- are we just speaking HIV or --

13   Q.    Let's just talk about the HIV for now.

14   A.    20.

15   Q.    All right.  20 different pharmacies?

16   A.    Yes, sir.

17   Q.    All basically purchasing the same amounts, roughly?

18   A.    Same medication, different amounts; yes, sir.

19   Q.    Okay.  And of the 20 different pharmacies that were

20   buying the medications that you were selling on behalf of Safe

21   Chain under WAC, were you receiving complaints from each and

22   every single pharmacy?

23   A.    Not all of them; no, sir.

24   Q.    Okay.  You were receiving complaints from some, from one

25   or two; correct?
```

```
 1   A.    About a handful.  I'd say like 20 percent maybe.

 2   Q.    Okay.  20 percent.  And Olympia was the one that was

 3   complaining about the condition of the bottles?

 4   A.    Yes, sir.

 5   Q.    And the government showed you a picture of some bottles,

 6   and it looked like the leaflets had been torn off the bottles;

 7   correct?

 8   A.    Yes, sir.

 9   Q.    Now, let's just talk about this leaflet for a second.  I

10   think some people in the industry call it an outsert; is that

11   fair?

12   A.    Maybe.  I'm not aware.

13   Q.    It's that paper that's folded up a million times, and

14   they're kind of stuck on the outside of the bottles; correct?

15   A.    Yes, sir.

16   Q.    All right.  And you know from -- you were there at Safe

17   Chain for how many years?  Seven years?

18   A.    Seven, roughly.

19   Q.    You know that those things have a tendency to fall off

20   the bottles when the bottles are being transported place to

21   place; correct?

22   A.    I wasn't in the warehouse, so I'm not sure.

23   Q.    All right.  Does it surprise you that these things would

24   sometimes fall off?

25              MS. DEROVANESIAN:  Objection.
```

```
 1              THE COURT:  Sustained.
 2   BY MR. BARZEE:
 3   Q.    Okay.  Did the other 20 pharmacies that you sold to say,
 4   "Hey, there's a problem here because it looks like a leaflet
 5   fell off of one of these bottles"?
 6   A.    Not that I remember.
 7   Q.    Right.  So this one particular pharmacy was upset that
 8   the leaflets weren't still glued on; correct?
 9   A.    He was the most vocal.
10   Q.    Right.  And you went to Pat, and you said, "Pat, you
11   know, help me out here."  Because Pat was kind of in charge of
12   sales; right?
13   A.    Yeah, he was.
14   Q.    By the way, let's talk about that for a second.  In Safe
15   Chain, there's a CEO, and that's a boss, and that's Charlie;
16   right?
17   A.    Yes, sir.
18   Q.    And there's something called the compliance department;
19   correct?
20   A.    Yes, sir.
21   Q.    And the compliance department, as far as you know, their
22   job is make sure that everything is compliant with the law;
23   correct?
24   A.    Yes, sir.
25   Q.    And then there's sales, and their job is to sell the
```

1    products; correct?

2    A.    Yes, sir.

3    Q.    All right.  And it's fair to say that Pat kind of headed

4    up the sales?

5    A.    He oversaw all of the sales departments; yes, sir.

6    Q.    Okay.  And so you went to the person overseeing sales,

7    and you said, I have a problem with one of my pharmacies,

8    Olympia Pharmacy, they're complaining about the condition of

9    the bottles; correct?

10   A.    Yes, sir.

11   Q.    All right.  And we saw a photo of some of the bottles

12   with some of the leaflets no longer glued onto them; right?

13   A.    Yes, sir.

14   Q.    And Charlie said, "Go down to the warehouse, and pick out

15   the prettiest bottles you can find for them."  Correct?

16   A.    No.  I said if I was allowed, I would.

17   Q.    And Pat said, "Absolutely, go do it"?

18   A.    I don't think he said that, but he understood where I was

19   coming from.

20   Q.    All right.  And was he -- but did you do that?

21   A.    No.  I'm not allowed to touch the medication.

22   Q.    Oh, okay.

23   A.    I don't have clearance.

24   Q.    So I misunderstood your testimony.  So that was just

25   something that you said, "Can I go pick out the prettiest

1   bottle?"

2   A.   Yeah.  Like, if it would make me a better sales rep, calm

3   tensions between the company and him and allow business to

4   continue smoothly, I was willing to do what I had to to

5   appease him.

6   Q.   Got it.  Understood.

7        Now, did the person from Olympia -- I forgot his

8   name.  Emil?

9   A.   Yes, sir.

10  Q.   Did he ever say to you that there was a problem with the

11  medication in the bottles?

12  A.   Not to me; no, sir.

13  Q.   So his complaint was really just about how they appeared,

14  how they looked; correct?

15  A.   And the T3s, the consistent lack of pedigree.

16  Q.   Which we'll talk about.

17        But, first, as far as the bottle and the medication

18  itself, his problem was the appearance; correct?

19  A.   And that situation; yes, sir.

20  Q.   Right.  Like, he wasn't saying, "Hey, I got all these

21  bottles, and the foil caps are missing," or "There's wrong

22  pills, or there's no pills"?  Like, he was just saying, "I

23  don't like the way these look and the T3 issue."  Correct?

24  A.   Yes, sir.

25  Q.   All right.  And there was -- he had, what, like, it was a

```
 1   $300,000 purchase that he wanted a refund on?

 2   A.   For that order.

 3   Q.   All right.  And that's a big order -- right? -- 300,000?

 4   A.   It's a good order.

 5   Q.   Would it surprise you that the person in charge of sales

 6   is trying to push back a little on refunding the money?

 7              MS. DEROVANESIAN:  Objection.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  No.

10   BY MR. BARZEE:

11   Q.   No, it's a business; right?  You're in sales.  If someone

12   asks for a refund, you're going to push back a little bit;

13   right?

14   A.   Yeah.

15   Q.   At the end of the day, did Safe Chain do the right thing

16   and step up to the plate and refund every single penny that he

17   asked for?

18   A.   We took the return.

19   Q.   Of course you did, because that's what a good company

20   would do; right?

21   A.   We took the return, yeah.

22   Q.   Yeah.  Of course.  Now, let's talk about these T3s.  I

23   think you said something that was incorrect, and I want to

24   just check with you to see maybe if we can clarify what your

25   testimony was.
```

1       And your testimony, I think, was that, "Well, I was

2  told that there would be one price if I could sell the

3  medication to a pharmacy that had no T3s, and then a different

4  price for if there was a T3."  Is that what you said, or did I

5  misunderstand?

6  A.   No.  That's what -- we received an email.  Boulevard was

7  not as -- I guess, like, efficient with the T3s or the

8  pedigrees as Gentek, so we could give a little bit of a

9  heavier discount for Boulevard over Gentek for that reason.

10  Q.   And when you say "The email," that's Government Exhibit

11  118 that you referred to?

12  A.   I don't have it.

13  Q.   Let me --

14       MR. BARZEE:  Your Honor, may I approach?

15       THE COURT:  Okay.

16       THE WITNESS:  Yes, sir.  So not necessarily that,

17  but with the pharmacy, on the pedigree, like that, I guess,

18  technically isn't a clean pedigree for reimbursement

19  standards.

20  BY MR. BARZEE:

21  Q.   So let's clear that up, because I think there's a wrong

22  impression out there.

23  A.   Okay.

24  Q.   So you were basing that statement about the two different

25  prices depending on whether or not a pedigree is there or not,

1   and you said, "Well, it's right there in the email."  Correct?

2   A.   That's what I said; yes, sir.

3   Q.   All right.  So I want to read it, and then you tell me if

4   this is what your memory is, and then we'll talk about the

5   meaning of the words in the email.  Okay?

6   A.   Okay.

7   Q.   And it says -- and this is Government 118 that's already

8   been admitted into evidence that I'm reading from.

9            And it says, "We have developed two new sources for

10  HIV meds that give us a distinct advantage over the big three

11  in the marketplace."  Correct?

12  A.   Yes, sir.

13  Q.   All right.  And the big three, again, that would be

14  McKesson, Amerisource, and --

15  A.   Cardinal.

16  Q.   And Cardinal.  And what you want to do, as a salesperson

17  for Safe Chain, for a wholesale distributor, is undercut the

18  big three.  You want to steal business away from the big

19  three; right?

20  A.   Not necessarily.  Most of the time they have contracts

21  already with the pharmacies.  We kind of make up the

22  difference.

23  Q.   It's true; right?  Like, they have a lock on things like

24  the big ones, like Walgreens, CVS, and stuff like that.  But

25  when you can, you want to break into the market and take away

1  business from the big three.  You want to be the one selling

2  it; correct?

3  A.   Well, I'd like to sell when I can.  But, again, they have

4  minimums and stuff, most of the time, baked into their

5  contracts, where even mom-and-pop pharmacies, they have

6  certain obligations they need to meet on that end.

7  Q.   Right.  But aside from that, if they wanted more or they

8  needed more, you would want to be the one that was selling it?

9  A.   Correct.

10  Q.   Okay.  And there's nothing wrong with that.  You were in

11  competition with the big three; right?

12  A.   Other smaller wholesalers.

13  Q.   Yeah.  And smaller wholesalers.

14      So it then says, "We can offer WAC at 7 percent --

15  minus 7 percent to WAC, minus 8.5 percent.  We have two

16  sources for HIV products.  Both offer advantages and

17  disadvantages."  Correct?

18  A.   Yes, sir.

19  Q.   All right.  And the first one is Boulevard usually, but

20  not always, has a pharmacy on the pedigree.  We get much

21  better pricing from this source, usually 18 to 25 percent off;

22  correct?

23  A.   That's what they said.

24  Q.   All right.  And then Source 2 would be Gentek.  Gentek is

25  an authorized distributor?

1    A.    That's what we were told.

2    Q.    Right.  An authorized distributor of Gilead; right?

3    A.    That's what we were told.

4    Q.    Right.  Not one of the big three, but another authorized

5    distributor.  So -- and for them, it would be 15 percent under

6    WAC?

7    A.    That's what we were told, yes.

8    Q.    Right.  So when you talk about these two different prices

9    depending on T3s, it's not that you can sell it for a lot less

10   without a T3.  It's that you can sell it for a lot less if

11   it's from Boulevard because Boulevard has other pharmacies on

12   the T3, and Gentek only has Gilead and Gentek on the T3, no

13   pharmacies in the middle; correct?

14   A.    Just no other pharmacies.

15   Q.    No other pharmacies.  So that's why it's a better -- it's

16   easier to sell to other pharmacies; correct?

17   A.    Yeah, it was -- like I said, it was clean, because it

18   didn't have a pharmacy on the trail, so it helps with

19   reimbursement situations.

20   Q.    Right.  Right.  But it's not as though you're out there

21   offering to sell this medication and saying to these buyers,

22   to these pharmacies, "Hey, I can sell you HIV medicine at a

23   huge discount, but you're not getting a T3 on it."  That's not

24   what was happening; correct?

25   A.    I mean, we didn't have T3s right away when we sold the

1    medication.

2    Q.    I understand that, and we're going to talk about that.

3    But what I'm talking about is this issue of pricing.  It had

4    to do with what was on the T3; it didn't have to do with

5    whether or not a T3 existed.  Correct?

6    A.    That's what we were told on that email, yes.

7    Q.    Okay.  Thank you.

8          Now, in Government's Exhibit 420, which I don't have

9    to show you -- I think you'll remember it -- it mentions that

10   -- it was from Pat Boyd, and it mentions, "We're able to

11   purchase from Boulevard again."

12         Do you remember that?

13   A.    Yes, sir.

14   Q.    All right.  And what that means is, at one time, you

15   stopped purchasing from Boulevard; correct?

16   A.    Yes, sir.

17   Q.    And you know why Safe Chain stopped purchasing from

18   Boulevard, don't you?

19   A.    T3s.

20   Q.    Because Boulevard wasn't coming up with the T3s, and the

21   compliance department at Safe Chain said, "Hey, Boulevard is

22   sending us product, but they're not sending us T3s."  Correct?

23   A.    I just know that we didn't have T3s.  I don't know what

24   compliance did.

25   Q.    Well, but you do know that at some point compliance said,

```
 1    "No more purchasing from Boulevard"?
 2    A.   Well, Pat and Charlie, yeah, said we no longer have
 3    Boulevard as a supplier.
 4    Q.   Right.  Right.  And they did that because they weren't
 5    getting the T3s from Boulevard; right?
 6    A.   Correct.
 7    Q.   All right.  And then at some point, Boulevard finally
 8    started producing the T3s and started sending them with the
 9    product, so you were able to purchase from Boulevard again;
10    correct?
11    A.   They said they would have them that time.
12    Q.   Okay.  Now, did you know Adam Brosius?
13    A.   Yes.  He was a co-owner on Safe Chain.
14    Q.   And did you ever have conversations with Adam Brosius
15    about the issue of why it was so difficult to get these T3s
16    from Boulevard?
17    A.   No, sir.
18    Q.   Did you hear, at Safe Chain, explanations as to why they
19    weren't getting T3s?
20    A.   They were just unorganized.
21    Q.   Your understanding was it was just due to disorganization
22    --
23              MS. DEROVANESIAN:  Objection.  Hearsay.
24              THE COURT:  Sustained.
25              MR. BARZEE:  I'm sorry.  I didn't hear the
```

1    objection, so I'm not sure what --

2              THE COURT:  She said hearsay.  I said sustained.

3              MR. BARZEE:  Yeah, but -- I heard that.  I didn't

4    hear what the objection was, so I don't know what I can and

5    can't ask.

6              THE COURT:  She said hearsay.

7              MR. BARZEE:  Hearsay.  Got it.  Thank you.

8    BY MR. BARZEE:

9    Q.   Did you have -- so your understanding was that the reason

10   Safe Chain was not getting all of these pedigrees from

11   Boulevard was due to disorganization; is that fair?

12             MS. DEROVANESIAN:  Objection.  Hearsay.

13             THE COURT:  Sustained.

14             MR. BARZEE:  Okay.

15   BY MR. BARZEE:

16   Q.   Did it seem to you that Safe Chain wanted to get these

17   T3s in order to produce them to your clients?

18             MS. DEROVANESIAN:  Objection.  Calls for

19   speculation.

20             THE COURT:  I'll allow that.  Overruled.

21             THE WITNESS:  Say that one more time, please.

22   BY MR. BARZEE:

23   Q.   Did it seem to you that Safe Chain wanted to get these

24   T3s, that these were trying to get these T3s from Boulevard so

25   that you would have them for your clients who wanted them?

1  A.   From where I was, yes.

2  Q.   Yeah.

3       And you said, at one point, you had customers saying

4  that the T3s, these pedigrees that they received were

5  incomplete, that they were missing some information on them;

6  correct?

7  A.   Yes, sir.

8  Q.   And you're kind of a go-between between the customer and

9  Safe Chain; right?

10  A.   Yes, sir.

11  Q.   All right.  So the customer says to you, "Hey, Jon, I got

12  these T3s, but, look, they're missing all this information.

13  What's going on?"  Right?

14  A.   Yes, sir.

15  Q.   All right.  And then you take it, and you bring it to

16  someone at Safe Chain?

17  A.   I forwarded it to the compliance department.

18  Q.   To compliance.

19       And then compliance would do whatever compliance

20  does, and then they would send you back a T3 that had the

21  information that was initially missing; correct?

22  A.   Correct.

23  Q.   And then you would supply that to your customer; correct?

24  A.   Correct.

25  Q.   Now, do you know what happened at compliance, who was

1  adding that information or where they were getting that

2  information from?

3  A.    No, sir.

4  Q.    And who in compliance were you receiving those

5  completed -- those corrected T3s; do you recall?

6  A.    It depends who was working them that day.  The two people

7  at the time were Dakota Flowers and Abbie Divilio.

8  Q.    Okay.  And did you ever have a sense from either Abbie or

9  Dakota, from anything that they said to you, that they were

10  committing a crime and fraudulently adding information to T3s?

11         MS. DEROVANESIAN:  Objection.  Calls for a legal

12  conclusion.  Improper opinion.

13         THE COURT:  Sustained.

14  BY MR. BARZEE:

15  Q.    Did Abbie or Dakota ever say to you --

16         MS. DEROVANESIAN:  Objection.  Hearsay.

17         THE COURT:  Sustained.

18  BY MR. BARZEE:

19  Q.    Would they return those completed T3s to you open and

20  notoriously through the email system at Safe Chain, or would

21  they do it in a secret way, under the table, and tell you not

22  to tell anyone?

23  A.    I got it from the compliance email.

24  Q.    Right.  Just from compliance.

25         And you would have the completed T3, and then you

```
1   would provide it to your customer when you were able to;

2   correct?

3   A.   Yes, sir.

4           MR. BARZEE:  Can I have one moment, please?

5           THE COURT:  Okay.

6           (Attorney/client confer off the record.)

7   BY MR. BARZEE:

8   Q.   Sir, I'm going to ask you a question.  I'm not sure if

9   you know the answer, but let me ask it to you.

10          MR. BARZEE:  May I approach, Your Honor?

11          THE COURT:  Okay.

12  BY MR. BARZEE:

13  Q.   So I just showed you Government's Exhibit 118, and that's

14  the email talking about WAC, and we're getting into HIV and

15  everything else; correct?

16  A.   Yes, sir.

17  Q.   And that's from -- you received it from Pat Boyd;

18  correct?

19          THE COURT:  Is 118 in evidence?

20          MR. BARZEE:  Yes, sir.

21          No?

22          THE COURT:  The government agrees?

23          MS. DEROVANESIAN:  It is.  118?  Yes.

24          MR. BARZEE:  Yes.  It was admitted into evidence.

25          THE COURT:  Okay.  I missed that one too.  118 will
```

```
 1   be received.

 2              (Government's Exhibit 118 admitted.)

 3   BY MR. BARZEE:

 4   Q.   So you received this email, Government's Exhibit 118, the

 5   email that we're talking about, that lays out the WAC pricing,

 6   and it's cheaper if we do it with Boulevard because there's

 7   more pharmacies on the T3.  It's more expensive from Gentek

 8   because Gentek is an authorized distributor from Gilead, so

 9   there's no middleman.  Pharmacies like that better.  It looks

10   better.  So that's a little more expensive; correct?

11   A.   Pharmacies prefer people [sic] with no other pharmacy on

12   the pedigree.

13   Q.   Correct.  Agreed.  And that email that was forwarded to

14   everybody from Pat Boyd, that's actually an email that's

15   written by Adam Brosius; correct?

16   A.   I'm not sure.

17   Q.   Okay.  At the very bottom of the email that was sent to

18   you from Pat Boyd, there's a signature line on it.  Did you

19   happen to notice who the signature line was from?

20   A.   No, sir.

21              (Tenders.)

22              THE WITNESS:  Travis Richardson.

23   BY MR. BARZEE:

24   Q.   So just to make sure that we got that, Travis Richardson.

25   And he was in purchasing; right?
```

1  A.    At that time; yes, sir.

2  Q.    All right.  And so this is something that was forwarded

3  to basically the sales group, and it was an introduction for

4  the HIV's meeting for all the salespeople; correct?

5  A.    Yes, sir.

6            MR. BARZEE:  All right.  Thank you, sir.

7            THE COURT:  Mr. Zimet?

8            MR. ZIMET:  I'm going to have the fastest

9  seven-minute cross-examination so I don't have 14 people

10 hating me, Judge.

11           THE COURT:  Take your time.

12                      CROSS-EXAMINATION

13 BY MR. ZIMET:

14 Q.    All right.  So I'm going to try to be quick, but it's

15 obviously important, so I want to make sure that we understand

16 each other.  Okay?

17           This is something that's produced and -- prior to

18 the call with Adam Brosius; correct?

19 A.    This was the intro to our call.

20 Q.    Right.  And Brosius was running the show as far as what

21 was going on with these new HIV medications; correct?

22 A.    Not sure.  I just knew it was everybody on the call.

23 Q.    Well, but you were on the call the next day, were you

24 not?

25 A.    Yes.  But I'm saying it was everybody high up.  I don't

1   know who or what organized it.

2   Q.   Well, Brosius was claiming he knew what was happening

3   with these new vendors; correct?

4   A.   He, I guess, was the most experienced in pharmacy.

5   Q.   And so on this Exhibit 118, this paragraph on -- my pen

6   is pointing to an HIV sentence.  "HIV meds are sold by big

7   three using a pricing method of discount off of WAC.  Usually

8   the discount they offer is minus 2.5 percent to minus 4

9   percent off of WAC."

10          Did you understand what that meant when you read it?

11  A.   Not at that time; no, sir.

12  Q.   Do you understand it now?

13  A.   Yes, sir.

14  Q.   Okay.  So WAC is what -- in this instance, what Gilead is

15  setting the price for the drugs; correct?

16  A.   Yes, sir.

17  Q.   And ordinarily, the authorized distributor, whether it's

18  the big three or -- might have been like ten others that

19  Gilead had that you learned about.

20  A.   Mm-hmm.

21  Q.   That's how much, on paper, supposedly they're buying the

22  drugs from Gilead for; correct?  That's the WAC number?

23  A.   Yes, sir.

24  Q.   And that's not an accurate number as far as what's

25  actually sold; correct?

```
 1   A.    I'm not sure.

 2   Q.    Well, in this instance, if someone is buying something at

 3   WAC, for them to make any money, they have to sell it at a

 4   plus WAC number; correct?

 5   A.    At those -- at certain prices, yeah.

 6   Q.    Well, if you want to make money if you buy something at

 7   WAC, if you sell it to somebody, the price has to be more than

 8   the WAC number; correct?

 9   A.    If you're buying it for WAC; yes, sir.

10   Q.    Okay.  But in this instance, what he's saying is they're

11   selling it for minus WAC, minus percents of WAC, minus 2.5 to

12   minus 4 percent; correct?

13   A.    Yes, sir.

14   Q.    So that means that either they're losing money when

15   they're selling it, or that WAC number ain't real; correct?

16         MS. DEROVANESIAN:  Objection.  Lack of personal

17   knowledge.

18         THE COURT:  Sustained.

19   BY MR. ZIMET:

20   Q.    Do you have an understanding as to how it could have been

21   sold at a minus WAC number if, in fact, it had been purchased

22   at the WAC number itself?

23   A.    No, sir.  I don't have knowledge of that.

24   Q.    I'm sorry?

25   A.    I don't have knowledge of how that works.
```

1    Q.    Okay.  And then we have -- and I'll use this, Exhibit

2    182.  And this is the whole Olympia Pharmacy back-and-forth

3    about what was going to happen with it and so forth; right?

4    A.    Yes, sir.

5    Q.    And we had a whole series of questions.  And since I have

6    three minutes left, there was a discussion as to what to do,

7    and then you were asked some questions.  Well, to your

8    knowledge, okay, was FDA ever told what had happened with this

9    situation concerning this complaint by this client?

10   A.    I'm not aware of anything.

11   Q.    So if there was a complaint that needed to be made or a

12   report made to FDA from Safe Chain, your understanding was

13   that that would be made by compliance; correct?

14   A.    I'm not sure who it would be made by.

15   Q.    Well, let's look at the heading.  Now, this is exhibit

16   182.  This is sent from Olympia to you and Pat Boyd; right?

17   A.    Yes, sir.

18   Q.    And then there's cc'd a couple of people?

19   A.    Yes, sir.

20   Q.    Josh Thornton is a pharmacist?

21   A.    He's a pharmacist at Olympia Plaza.

22   Q.    And the next name is -- who's that?

23   A.    Abbie Divilio.

24   Q.    Who's she?

25   A.    She was the compliance manager at the time.

1   Q.   So she's in this whole loop as far as what's going on

2   with Olympia's complaint; correct?

3   A.   At this time; yes, sir.

4   Q.   And she knows, okay, that there's a complaint concerning

5   drugs, HIV drugs?

6   A.   Yes, sir.

7   Q.   And whether or not that was reported to FDA, it would be

8   your understanding that that'd be a compliance job; right?

9        MS. DEROVANESIAN:  Objection.  Lack of personal

10  knowledge.

11        THE COURT:  I think he already answered it.

12        But if you know the answer, go ahead.

13        THE WITNESS:  No, I'm not aware of who would.

14  BY MR. ZIMET:

15  Q.   Okay.  Did you have any discussions with Abbie Divilio --

16  how does she pronounce her name?

17  A.   Divilio.

18  Q.   About reporting anything to FDA?

19  A.   No, sir.

20  Q.   Did anyone tell you it shouldn't be reported to FDA by --

21        MS. DEROVANESIAN:  Objection.  Hearsay.

22        THE COURT:  I'll allow it for the fact that it was

23  either said or not said.

24        THE WITNESS:  I was never told anything.

25  BY MR. ZIMET:

1    Q.   Okay.  And as far as you know -- and I think you were

2    asked this at the beginning.  This Exhibit 118 talks about a

3    new customer -- a new vendor, a new source of HIV drugs,

4    including Gentek; correct?

5    A.   Boulevard and Gentek, yes, sir.

6    Q.   And so that was in 2020; correct?

7    A.   Yes, sir.

8    Q.   It wasn't in 2019, was it?

9    A.   No, sir.

10   Q.   Do you know someone who was in compliance named

11   Katherine or Katie Eberspacher?

12   A.   Katie -- yes, sir.  She was there when I first started.

13   Q.   But she left before 2020, did she not?

14   A.   I can't remember when she left exactly.

15   Q.   So let's, just for discussion's sake, say that she left

16   in 2019.  That would be before this Exhibit 118 which talks

17   about the new vendor that they've just come across; correct?

18   A.   In that scenario, yes.

19            MR. ZIMET:  Okay.  I have no other questions.

20            THE COURT:  Mr. Nicholls, when are you planning to

21   go back to Maryland?

22            THE WITNESS:  It was supposed to be in an hour.

23            THE COURT:  How long is your redirect going to be?

24            MS. DEROVANESIAN:  Your Honor, I can make it brief,

25   but I expect maybe ten minutes.

```
 1              THE COURT:  All right.  Go ahead.  Ten minutes.

 2              MS. DEROVANESIAN:  Thank you.

 3                       REDIRECT EXAMINATION

 4   BY MS. DEROVANESIAN:

 5   Q.   All right.  Mr. Nicholls, I just have a few things I

 6   wanted to follow up on with you.

 7              First was about something that Mr. Barzee said to

 8   you and asked you about on cross-examination.  Do you remember

 9   when he suggested that you said something incorrect about how

10   you offered medication at one price without a pedigree and at

11   another price with a pedigree?

12   A.   Yes.

13   Q.   Do you remember him asking you about that?

14   A.   Yes, ma'am.

15   Q.   And did you remember making a statement about how

16   medication would be sold at one price with a pedigree and at a

17   cheaper price without a pedigree?  Do you remember making a

18   statement like that?

19   A.   I believe so; yes, ma'am.

20   Q.   Okay.  And do you remember that being the case, that Safe

21   Chain was selling medication at a lower price if it did not

22   have a pedigree?

23   A.   If it came from Boulevard, we had more leeway on pricing.

24   Q.   And those --

25   A.   Yes, ma'am.
```

```
 1  Q.   -- did not come with a pedigree?

 2            MR. BARZEE:  Objection, Your Honor.  Misstating

 3  facts and leading.

 4            THE COURT:  I think he's already answered the

 5  question.  Next question.

 6            MS. DEROVANESIAN:  Okay.

 7  BY MS. DEROVANESIAN:

 8  Q.   Mr. Nicholls, you were asked some questions about the

 9  pricing that Safe Chain offered for HIV medication.  Do you

10  remember those?

11  A.   Yes, ma'am.

12  Q.   Okay.  And you were asked quite a few questions about

13  what would make sense for the big three and how a secondary

14  wholesaler would make money and that sort of thing.  Do you

15  remember being asked questions like that?

16  A.   Yes, ma'am.

17  Q.   Before you worked at Safe Chain, did you have any idea

18  how pricing of pharmaceuticals worked?

19  A.   I mean, from what I learned, just trying to figure it out

20  for myself.

21  Q.   But before you worked at Safe Chain?

22  A.   No, I had zero clue.

23  Q.   And since you've left Safe Chain, did you have any other

24  experiencing working in the pharmaceutical world?

25  A.   No, ma'am.
```

1   Q.   Okay.  So where is all of the information, the only

2   information that you know, about pharmaceutical pricing, what

3   are you basing that on?

4   A.   What I was told.

5   Q.   By who?

6   A.   It was people at Safe Chain and then the emails as far as

7   like the branded medications and things like that.

8   Q.   Okay.  Was one of those people at Safe Chain Patrick

9   Boyd?

10   A.   Yes, ma'am.

11   Q.   And was one of those people at Safe Chain Charles Boyd?

12   A.   Yes, ma'am.

13   Q.   Okay.  You were asked some questions about the emails

14   that you sent to compliance where you would attach the T3s

15   that were missing information.

16        Do you remember those questions?

17   A.   Yes, ma'am.

18   Q.   Okay.  And you were asked who would send you back those

19   T3s with the information filled in.

20        Do you remember that?

21   A.   Yes, ma'am.

22   Q.   Was Dakota Flowers the person who would send you back

23   pedigrees with information filled in?

24   A.   Sometimes; yes, ma'am.

25   Q.   Okay.  Do you remember being asked on cross-examination

 1   some questions about the pedigrees that you eventually

 2   received for Boulevard medications?

 3   A.   Yes, ma'am.

 4   Q.   Okay.  And, Mr. Nicholls, do you remember any particular

 5   feelings -- well, I won't say feelings.

 6          Mr. Nicholls, do you remember what your impressions

 7   were of those pedigrees when you were able to receive them

 8   from Boulevard in late October of 2020?

 9          MR. BARZEE:  Objection.  Relevance.

10          THE COURT:  I don't know if it's not relevant, but I

11   don't think -- well, I guess it is irrelevant.  Sustained.

12          MS. DEROVANESIAN:  Your Honor, may I just briefly

13   respond that he is -- I'm asking a question directly about

14   something that he was asked about on cross.  He was asked

15   about his impressions of these pedigrees on cross.

16          THE COURT:  You should have objected, I guess.

17          MS. DEROVANESIAN:  I'm sorry?

18          THE COURT:  You should have objected.  So --

19          MS. DEROVANESIAN:  Fair enough.

20   BY MS. DEROVANESIAN:

21   Q.   All right.  Mr. Nicholls, you were asked some questions

22   on cross-examination about the issues with Olympia Pharmacy.

23   Do you remember that?

24   A.   Yes, ma'am.

25   Q.   Okay.  And you were asked if Emil complained about the

1    actual drugs inside the bottles.  Do you remember being asked

2    that question?

3    A.   Yes, ma'am.

4    Q.   Okay.  I would like to show you very quickly Government

5    Exhibit 183, which was admitted.  Okay.  And I'd like to turn

6    your attention to the first full paragraph here.

7            Do you see here where Emil is telling you that the

8    items were quarantined immediately?

9    A.   Yes, ma'am.

10   Q.   Okay.  And from your understanding, does "quarantined

11   immediately" mean that the bottles didn't actually get to the

12   patients to see what was inside?

13           MR. BARZEE:  Objection.  Calls for speculation, Your

14   Honor.

15           THE COURT:  Overruled.

16           THE WITNESS:  It means that once they were brought

17   into the pharmacy, they were set aside from the rest of the

18   medications.

19   BY MS. DEROVANESIAN:

20   Q.   Okay.  And down below, do you see where he sees, "We

21   deemed it unsafe to dispense"?

22   A.   Yes, ma'am.

23   Q.   Okay.  All right.  And, Mr. Nicholls, do you remember

24   when Mr. Barzee asked you if you, in your heart, believed you

25   were committing a crime?

1  A.    Yes, ma'am.

2  Q.    Okay.  And I think you said no to that; right?

3  A.    Yes, ma'am.

4  Q.    Okay.  Mr. Nicholls, were you the one who was picking up

5  medication on behalf of Safe Chain?

6  A.    No, ma'am.

7  Q.    Do you know anyone who was sent to pick up medication on

8  behalf of Safe Chain?

9  A.    Yes, ma'am.

10  Q.    Who is that?

11  A.    Kaitlin Murphy.

12  Q.    And do you know where -- well, first of all, what her job

13  was?

14  A.    She started off in sales.  She was actually a rep

15  underneath of me, and then moved to like a purchasing-type

16  role.

17  Q.    Okay.  So was she a lower-level employee or in

18  management?

19  A.    Lower.

20  Q.    Okay.  And do you know where she was sent to pick up this

21  HIV medication from?

22  A.    Jersey.

23  Q.    Okay.  Where in Jersey?  Do you know anything about the

24  circumstances?

25  A.    It was a parking lot to meet Garrett Mellott to pick up

1    medications.

2    Q.    Were those HIV medications?

3    A.    Yes, ma'am.

4    Q.    Okay.  And, Mr. Nicholls, again, you were asked several

5    questions about whether you believed you were committing a

6    crime.  So I just want to follow up on that.

7              Mr. Nicholls, were you the one who was making the

8    decision at Safe Chain to buy from whatever suppliers they

9    were buying from?

10   A.    No, ma'am.

11   Q.    Are you the one who decided that it was okay to buy HIV

12   medication from Boulevard?

13   A.    No, ma'am.

14   Q.    Was it your decision to continue to buy HIV medication

15   that did not have a pedigree accompanying it?

16   A.    No, ma'am.

17   Q.    And, Mr. Nicholls, were you the CEO of Safe Chain?

18   A.    No, ma'am.

19   Q.    Who was?

20   A.    Charles Boyd.

21   Q.    And were you the chief operating officer of Safe Chain?

22   A.    No, ma'am.

23   Q.    Who was?

24   A.    Pat Boyd.

25              MS. DEROVANESIAN:  Thank you.  Nothing further.

1           THE COURT:  Thank you, sir.  You may step down.

2    You're excused.

3           THE WITNESS:  Thank you.

4           (Witness stands aside.)

5           THE COURT:  All right.  Members of the jury, we're

6    going to recess for the evening.  Remember my admonition not

7    to discuss the case or allow it to be discussed in your

8    presence.

9           I've got some hearings at nine o'clock.  I'm going

10   to assume, or hope, that we'll have them done by 10:00.  So

11   I'm going to ask you to be back at 10:00 in the jury

12   deliberation room.  And hopefully, shortly thereafter, we can

13   resume the trial.

14          Have a nice evening.  See you back tomorrow at

15   10:00.

16          THE COURTROOM DEPUTY:  All rise for the jury.

17          (Jury recessed at 5:09 p.m.)

18          THE COURT:  If there's nothing else to come before

19   the Court we'll be in recess until ten o'clock tomorrow on

20   this case and nine o'clock on other matters.

21          (Adjourned at 5:09 p.m.)

22

23

24

25

1                          **C E R T I F I C A T E**

2              I, Shamelle D. Kelley, Registered Professional

3       Reporter, do hereby certify that the foregoing is a true and

4       correct transcript of the stenographically-reported

5       proceedings held in the above-entitled matter and that the

6       transcript page format is in conformance with the regulations

7       of the Judicial Conference of the United States.

8              Dated this 19th day of September, 2025.

9

                              *s/Shamelle D. Kelley*

10

                       Shamelle D. Kelley, CCR, RPR
11                     Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

$1,000                                                                        3rd

## $

**$1,000** (29:13)
**$100,000** (48:1)
(48:11)
**$104** (45:15)
**$12** (45:18) (45:23)
(45:24) (46:2) (47:4)
**$2** (47:10)
**$2,000** (28:11)
**$2,400** (57:13)
(57:15) (57:17)
(58:13) (59:16) (60:3)
**$3** (46:15) (46:20)
(47:2)
**$3,000** (13:21)
(13:24) (15:5) (21:8)
(21:15) (23:3) (27:13)
(28:10) (29:2) (29:5)
(29:10)
**$300,000** (239:1)
**$4** (47:3)
**$40** (22:17)
**$400,000** (47:21)
**$50** (22:17)
**$7** (47:5)
**$800,000** (47:13)
(47:18)
**$90** (30:25) (44:21)
(44:23) (45:7) (45:8)
(47:22)
**$92** (45:9) (45:11)
(45:15)

## *

**\*\*\*** (2:9)

## [

**[sic]** (23:24) (49:25)
(128:5) (250:11)

## 1

**1** (1:21) (40:11)
(41:25) (118:1)
(120:10) (124:25)
(125:20) (128:16)
(187:7) (188:8)
(188:23) (190:10)
(190:13) (226:24)
(230:11) (230:25)
**1:00** (52:8)
**1:15** (91:10) (91:11)
(91:14)
**1:18** (91:16)
**1:19** (92:2)
**1:24-cr-20255-WPD**
**10** (14:20) (15:16)
(29:8) (138:25)
(231:25) (232:8)
**10,000** (60:12)
**10:00** (52:8) (264:10)
(264:11) (264:15)
**10:26** (50:11)
**10:33** (52:10)

**10:49** (52:10)
**10:54** (55:12)
**101** (4:3) (4:11)
(58:8) (97:25) (98:16)
(98:25) (99:1) (99:12)
(109:24) (110:2)
(110:5) (110:10)
**105** (4:5)
**106** (4:6)
**107** (4:10) (136:16)
(137:4) (137:9)
(137:10)
**10th** (51:22) (52:8)
(56:1)
**11** (29:8)
**11:54** (91:12)
**11:55** (91:16)
**112** (4:7)
**117** (4:8)
**118** (4:21) (182:18)
(183:4) (183:7)
(183:8) (240:11)
(241:7) (249:13)
(249:19) (249:23)
(249:25) (250:2)
(250:4) (252:5)
(256:2) (256:16)
**12** (45:21) (46:17)
(47:2)
**12020** (1:17)
**130** (4:9)
**137** (4:10)
**14** (251:9)
**1400** (2:2)
**145** (3:10)
**14th** (208:10)
**15** (50:9) (89:19)
(175:21) (176:12)
(232:8) (243:5)
**1555** (2:2)
**15-minute** (50:6)
(52:9) (175:18)
**16** (9:14) (9:23)
(10:9) (89:19)
**167** (3:11)
**17** (223:15)
**178** (3:14)
**17th** (226:9)
**18** (1:4) (188:13)
(242:21)
**182** (4:15) (210:2)
(210:11) (210:14)
(210:15) (254:2)
(254:16)
**183** (4:3) (4:11)
(4:16) (213:5)
(213:21) (214:2)
(214:12) (261:5)
**18th** (29:7)
**199** (4:4) (4:12)
**19th** (29:7) (265:8)
**1st** (29:1) (29:2)
(29:19) (50:2) (50:20)
(50:22) (52:7) (52:14)

(56:1) (58:25)

## 2

**2** (1:8) (42:1) (107:2)
(114:15) (118:7)
(120:19) (125:20)
(128:16) (131:17)
(141:4) (187:8)
(198:16) (203:23)
(208:20) (214:16)
(226:24) (242:24)
**2.5** (252:8) (253:11)
**2:59** (175:22)
**20** (30:14) (31:1)
(54:10) (232:8)
(234:14) (234:15)
(234:19) (235:1)
(235:2) (236:3)
**2012** (139:15)
**2013** (152:24) (157:4)
**2015** (15:15) (94:4)
(95:19) (96:14)
(97:13) (103:8)
(109:7) (109:12)
(110:10) (110:12)
(110:15) (110:23)
(111:1) (111:4)
(111:5) (111:16)
(112:2) (112:7)
(112:8) (113:21)
(115:10) (116:7)
(116:13) (118:5)
(119:4) (119:14)
(122:4) (122:11)
(123:8) (123:20)
(133:24) (156:15)
(170:14) (170:21)
**2017** (103:11)
**2018** (137:2) (137:13)
(137:24) (141:13)
(146:18) (148:19)
(156:15) (156:19)
(170:4) (171:24)
(175:10)
**2019** (95:20) (105:1)
(123:23) (134:6)
(134:7) (144:16)
(146:19) (146:20)
(148:6) (150:20)
(170:21) (256:8)
(256:16)
**2020** (56:21) (60:11)
(60:13) (63:15) (68:7)
(74:3) (75:5) (79:1)
(81:12) (81:18)
(83:20) (90:22)
(108:23) (108:25)
(134:5) (150:21)
(150:24) (158:11)
(158:13) (162:17)
(170:9) (170:12)
(182:23) (200:5)
(204:20) (205:6)
(206:6) (208:10)

(214:18) (218:1)
(256:6) (256:13)
(260:8)
**2021** (75:6) (78:11)
(80:11) (82:5) (84:5)
(84:21) (85:13) (90:9)
(90:23) (150:25)
(223:15) (226:9)
**2022** (162:3) (165:15)
**2024** (86:12)
**2025** (1:4) (78:20)
(88:19) (90:13) (265:8)
**204** (4:13)
**205B** (7:5)
**208** (4:14)
**21** (205:6)
**210** (4:15)
**214** (4:16)
**218** (4:17)
**220** (4:18)
**222** (4:19)
**223** (4:20)
**227** (3:15)
**24** (95:13) (100:2)
(172:3)
**249** (4:20) (223:7)
(223:17) (223:20)
(223:21)
**25** (14:19) (138:13)
(188:13) (242:21)
**250** (4:21)
**251** (3:16)
**257** (3:17)
**25th** (204:20)
**27** (171:25)
**2nd** (50:20) (52:14)
(55:25) (214:18)

## 3

**3** (41:25) (46:5)
(46:7) (46:13) (46:17)
(115:12) (123:12)
(125:20) (128:16)
(156:19) (190:10)
(190:14) (194:23)
(205:3) (226:24)
(230:11) (230:25)
**3:** (42:2)
**3:00** (176:14)
**3:20** (176:14)
**3:23** (177:1)
**30** (30:14)
**30,000-foot** (56:20)
**300,000** (47:8) (239:3)
**300K** (209:14)
**31st** (200:5)
**33025** (1:18)
**3-31-2022** (161:12)
**33128** (1:22) (2:8)
**33132** (1:15)
**33401** (2:3)
**340B** (21:21) (22:18)
(33:25) (76:4) (80:15)
**3rd** (50:20) (50:22)

4

admitting

(52:7) (52:14) (56:1)
(218:1)

## 4

**4** (118:23) (125:20)
(128:16) (226:24)
(252:8) (253:12)
**4:** (42:19)
**40** (1:21) (30:15)
(40:14) (41:2)
**400** (2:7)
**404** (176:2)
**420** (198:13) (198:24)
(199:2) (199:3) (244:8)
**423** (200:11)
**428** (194:11) (195:6)
**431** (4:13) (203:15)
(204:2) (204:5) (204:6)
**436** (1:14)
**439** (4:17) (217:20)
(218:3) (218:5) (218:6)
**443** (205:1) (205:24)
**46** (11:15) (11:16)
(23:24) (40:13)
**4th** (1:14) (127:22)
(217:1)

## 5

**5** (47:6) (47:7) (59:1)
(59:3) (117:16)
(119:9) (189:12)
(222:15) (226:24)
**5:09** (1:6) (264:17)
(264:21)
**50** (10:15) (10:17)
(14:19) (22:25)
(40:14) (40:15)
**517** (4:14) (207:21)
(208:13) (208:16)
(208:17)
**5-2-15** (104:18)
(106:9) (108:17)
(116:25) (130:1)
**56** (3:5)
**5-9-15** (108:24)
**5th** (125:20) (128:16)
(137:2) (156:19)

## 6

**6** (121:19)
**6.5** (190:2)
**600** (4:9) (4:18)
(129:21) (130:6)
(130:11) (130:12)
(220:4) (220:14)
(220:17) (220:19)
(220:22)
**601** (4:7) (4:19)
(108:9) (108:19)
(112:17) (112:18)
(112:19) (221:21)
(222:5) (222:7)
**602** (4:8) (116:18)
(117:2) (117:5) (117:6)

**603** (4:4) (4:12)
(101:11) (101:24)
(102:4) (102:5)
(109:23)
**604** (4:6) (106:2)
(106:13) (106:15)
(106:16)
**605** (4:5) (104:11)
(104:22) (105:8)
**6th** (226:24)

## 7

**7** (47:24) (124:13)
(141:18) (187:22)
(188:1) (189:5)
(190:2) (232:1)
(233:24) (242:14)
(242:15)
**7.5** (190:2)
**7th** (103:8)

## 8

**8** (120:1) (141:19)
(215:6) (233:24)
**8.5** (187:22) (189:5)
(242:15)
**80** (13:6)

## 9

**9** (3:4) (190:16)
(190:17) (190:18)
(231:7) (231:12)
**9:00** (1:6) (5:1)
**9:16** (8:10)
**90** (13:6) (44:22)
(45:9) (45:20)
**92** (46:14)
**93** (3:9) (45:15)
**99** (1:14)
**9th** (2:7) (182:23)

## A

**Abbie** (248:7) (248:8)
(248:15) (254:23)
(255:15)
**ability** (60:20) (61:9)
**able** (5:11) (10:15)
(11:15) (11:19)
(11:20) (12:17)
(13:25) (14:8) (14:10)
(14:18) (14:22)
(14:23) (15:2) (22:6)
(27:14) (32:1) (32:24)
(33:8) (56:16) (59:13)
(60:2) (60:18) (61:8)
(61:11) (66:14)
(67:16) (67:18) (82:5)
(90:20) (198:8)
(199:9) (199:19)
(200:2) (201:14)
(231:6) (231:11)
(231:15) (244:10)
(245:9) (249:1) (260:7)
**absence** (146:21)

**absolute** (13:20)
(16:18)
**academic** (72:19)
**accept** (209:23)
(212:6) (217:5)
(217:13) (222:16)
**accepted** (217:15)
(221:9)
**Accepting** (222:15)
(222:24)
**access** (184:17)
**accident** (66:16)
(66:17)
**accompanying** (79:7)
(263:15)
**accomplishments**
(57:17)
**according** (57:17)
(126:23) (132:15)
(133:17)
**account** (34:3)
(58:21) (180:16)
**accountant** (33:9)
**accreditation**
**accurate** (57:25)
(72:7) (252:24)
**achieve** (138:1)
(168:14)
**acquire** (231:15)
**acquisition** (57:5)
(57:6) (190:12)
(229:8) (229:14)
(229:21) (230:19)
**acronym** (99:7)
**across** (10:6)
(173:25) (256:17)
**act** (84:1) (84:2)
(99:7) (99:20) (212:17)
**acted** (56:17)
**acting** (39:12)
(39:16) (44:19)
**action** (42:12)
(68:20) (138:16)
**actions** (40:1) (81:8)
**actively** (102:17)
**activities** (78:20)
(78:24) (84:14) (160:8)
**activity** (78:9)
**actors** (26:10)
**acts** (40:3) (40:4)
(55:2)
**actual** (58:20) (64:4)
(120:13) (192:19)
(261:1)
**Adam** (16:13) (16:14)
(16:16) (16:19)
(16:20) (16:25) (17:1)
(17:6) (17:16) (18:2)
(20:1) (20:12) (25:9)
(25:19) (26:6) (26:13)
(26:16) (26:22) (27:2)
(27:16) (28:1) (28:15)
(30:1) (30:3) (30:8)
(30:9) (30:22) (32:2)
(32:3) (32:13) (32:22)

(38:18) (39:1) (40:7)
(40:16) (40:18) (41:6)
(41:7) (41:8) (41:12)
(41:15) (41:18)
(41:19) (42:1) (46:2)
(46:4) (46:14) (46:17)
(46:21) (46:22)
(46:24) (47:5) (47:23)
(60:21) (60:22) (61:4)
(61:7) (61:11) (61:24)
(62:1) (62:5) (62:6)
(62:13) (62:15)
(62:23) (62:24) (63:3)
(63:4) (63:5) (63:6)
(63:12) (64:1) (64:3)
(65:14) (65:16)
(65:21) (65:23)
(65:24) (66:3) (66:4)
(66:15) (66:21) (67:8)
(67:23) (67:24)
(71:23) (72:12)
(72:15) (84:14)
(84:15) (84:17)
(84:20) (84:23) (85:1)
(85:14) (85:25) (86:1)
(86:5) (86:11) (86:14)
(86:24) (87:21) (88:6)
(88:19) (230:13)
(231:14) (245:12)
(245:14) (250:15)
(251:18)
**Adam's** (46:12)
**adding** (248:1)
(248:10)
**addition** (53:22)
**additional** (47:3)
**address** (54:17)
(201:24)
**addresses** (83:2)
**adept** (61:13) (90:10)
**adhesive** (193:16)
**Adjourned** (264:21)
**ADM** (4:2)
**Administration**
**administrative** (93:9)
**admit** (20:11) (183:3)
(195:6) (198:23)
(204:1) (205:24)
(208:12) (210:10)
(213:20) (218:2)
**admits** (80:19)
**admitted** (99:1)
(102:5) (105:8)
(106:16) (112:18)
(117:6) (130:12)
(137:10) (183:8)
(199:3) (204:6)
(208:17) (210:15)
(214:12) (218:6)
(220:22) (222:7)
(223:21) (241:8)
(249:24) (250:2)
(261:5)
**admitting** (62:5)

**admonition**                                                                                    **authentic**

**admonition** (8:15)
(50:7) (91:8) (92:9)
(175:19) (177:7)
(264:6)
**adopted** (164:23)
(164:24)
**adulterated** (48:25)
(118:16) (120:21)
(121:5)
**advantage** (187:13)
(187:18) (241:10)
**advantageous** (61:2)
(182:8)
**advantages** (242:16)
**advice** (73:4)
**advise** (17:24)
(44:14) (44:15)
**advising** (77:18)
**advisors** (211:25)
**affected** (191:6)
**affordable** (13:10)
**afternoon** (93:4)
(93:5) (145:9)
(145:10) (178:4)
(227:25) (228:1)
**agencies** (119:19)
**agency** (43:1) (153:8)
(153:10)
**agent** (5:24) (165:19)
(178:10)
**agents** (87:7) (88:2)
(160:17) (162:3)
(163:1) (164:1)
(164:12) (165:15)
(166:22)
**ago** (9:14) (9:24)
(15:16) (138:14)
(152:2) (152:12)
(161:23)
**agree** (26:5) (51:2)
(51:4) (51:5) (51:17)
(51:18) (79:11)
(153:12) (156:4)
(157:25) (158:10)
(163:24) (165:12)
(167:7) (209:23)
**agreed** (6:6) (37:18)
(51:11) (52:17)
(52:19) (54:14)
(64:16) (217:13)
(250:13)
**agreeing** (157:11)
**agreement** (12:25)
(21:7) (87:9) (87:25)
**agreements** (12:24)
(13:7) (46:4)
**agrees** (249:22)
**Aha** (78:14)
**ahold** (7:23)
**ain't** (253:15)
**AIPW** (154:3)
**aisles** (69:11)
**Alan** (2:1)
**alcohol** (31:15)

**alert** (75:12) (75:25)
(78:12) (79:25)
(125:1) (125:8)
(154:11)
**alerted** (216:4)
**alerting** (216:8)
**Alexander**
(1:15)
**all-American** (72:20)
**allegations** (150:24)
**alleged** (151:5)
(167:8)
**Allegedly** (214:9)
**allotments** (190:21)
**allow** (8:16) (36:5)
(49:6) (50:7) (59:22)
(91:9) (92:10) (97:18)
(105:7) (131:7)
(175:19) (177:8)
(238:3) (246:20)
(255:22) (264:7)
**allowed** (14:14)
(19:16) (22:5) (23:15)
(195:22) (197:22)
(197:25) (237:16)
(237:21)
**allows** (35:17)
**almost** (12:12)
(12:14) (22:17) (44:4)
(44:13)
**alone** (11:8) (11:9)
(41:13) (44:17)
**along** (16:8) (16:9)
(100:4) (154:5)
(207:8) (213:14)
**alter** (116:9)
**altered** (128:23)
**alternate** (7:11)
**alternative** (217:9)
**although** (38:8)
**altogether** (234:12)
**always** (10:23) (73:7)
(100:12) (116:15)
(155:11) (176:3)
(188:9) (207:10)
(207:11) (242:20)
**AMERICA** (1:3)
**American** (21:1) (54:3)
**Amerisource** (241:14)
**AmerisourceBergen**
**Among** (230:14)
**amount** (11:8) (15:3)
(31:18) (57:10)
(57:25) (58:11)
(58:20) (191:25)
**amounts** (234:17)
(234:18)
**analysis** (122:16)
(123:17)
**and then** (130:18)
**And was** (237:20)
**And you** (169:19)
**and/or** (121:21)
**angst** (36:25)

**answering** (157:15)
**anticipate** (56:15)
(89:9)
**antipsychotic** (128:1)
**anti-psychotic**
**antithrombrosis**
**anymore** (27:25)
(41:10) (79:9)
**apart** (71:13)
**apologize** (93:18)
(99:9)
**apparent** (31:21)
**Apparently** (7:24)
**Appearance** (128:10)
(128:11) (238:18)
**appeared** (143:15)
(143:18) (174:19)
(203:7) (238:13)
**appears** (54:16)
(57:9) (132:5)
**appease** (238:5)
**applicable** (6:21)
(8:20) (8:21)
**application** (33:16)
(63:20) (64:5) (64:6)
(64:22) (71:24) (83:22)
**applications** (64:15)
**applied** (94:20)
(94:23) (95:11) (179:9)
**applies** (214:3)
**approach** (6:23)
(33:23) (98:1)
(111:22) (161:7)
(161:24) (172:13)
(240:14) (249:10)
**approachable** (144:3)
**approached** (43:21)
(135:17)
**appropriate** (44:8)
(49:7) (51:16) (53:6)
(61:3) (79:16) (79:19)
**approval** (71:24)
**approve** (79:14)
(104:2) (104:5)
(169:11)
**approved** (65:6)
(65:14) (103:3)
(124:22) (169:6)
**approving** (84:2)
**approximately**
**April** (60:11) (60:13)
(83:20) (90:22)
(105:1) (150:24)
**area** (16:20) (157:13)
**areas** (192:13)
(192:17)
**aren't** (26:9) (26:11)
(48:23) (58:15)
(164:22) (199:12)
**argued** (54:15)
**Argumentative**
**around** (14:6) (15:4)
(18:1) (18:10) (22:18)
(22:21) (27:19)

(32:17) (46:15)
(46:17) (46:20)
(46:21) (47:6) (47:7)
(47:24) (79:7) (81:7)
(140:21) (164:11)
(178:19) (178:20)
(183:24) (191:7)
**arrested** (86:11)
(86:13)
**article** (137:17)
(137:19) (137:23)
(138:6) (141:12)
(142:9) (142:12)
(143:6) (151:7)
(151:8) (151:25)
(152:24) (153:22)
(154:4) (157:3) (171:3)
**ashamed** (48:18)
**aside** (61:6) (242:7)
(261:17) (264:4)
**asks** (239:12)
**aspect** (65:2) (214:10)
**assist** (44:5)
**assistance** (14:1)
**assistant** (93:9)
**associated** (127:3)
(133:12)
**Association** (153:4)
(153:24)
**assume** (158:17)
(227:15) (231:1)
(264:10)
**Atlanta** (186:13)
**attach** (259:14)
**attached** (215:9)
**attachment** (99:21)
(99:24) (137:14)
(137:16) (189:12)
(203:5) (224:5)
**attachments** (215:5)
**attempt** (66:18)
(68:6) (71:6) (80:9)
(83:17)
**attendees** (182:25)
(183:19) (183:21)
**attention** (30:20)
(30:23) (102:14)
(102:24) (107:1)
(107:15) (113:23)
(114:7) (117:15)
(122:8) (127:21)
(138:5) (138:19)
(140:16) (184:7)
(198:15) (208:21)
(221:2) (261:6)
**attitude** (33:22)
**Attorney/client**
**Attorney's** (1:14)
**attractive** (60:21)
(66:24) (69:23)
**August** (74:3) (75:5)
(75:6) (90:22)
(150:25) (200:5)
**authentic** (19:8)

**authenticate**                                                          **bond**

(23:8)

**authenticate** (123:3)
(124:1) (124:9)
**authenticating** (19:3)
**authentication**
**authenticity** (18:23)
(18:24) (19:7) (32:11)
(112:5) (122:14)
(122:22) (122:24)
(123:15)
**authorities** (119:9)
**authorization** (22:6)
(82:5)
**authorized** (12:22)
(21:16) (57:7) (57:8)
(57:11) (57:16)
(57:18) (57:20) (58:1)
(58:10) (58:15)
(58:24) (60:5) (64:16)
(69:12) (107:25)
(117:16) (117:18)
(117:19) (119:18)
(120:3) (139:23)
(141:7) (188:19)
(188:20) (202:12)
(202:14) (227:2)
(228:5) (228:9)
(228:12) (228:13)
(228:14) (228:15)
(228:17) (228:20)
(228:21) (228:24)
(230:23) (242:25)
(243:2) (243:4)
(250:8) (252:17)
**authorizes** (19:5)
**available** (31:4)
(119:17) (119:24)
(120:3) (188:24)
**Avenue** (2:7)
**avoid** (135:8)
**aware** (74:4) (74:8)
(74:20) (75:23)
(154:4) (222:19)
(225:8) (230:6)
(231:2) (235:12)
(254:10) (255:13)
**away** (21:17) (27:21)
(29:9) (29:17) (46:1)
(46:14) (47:5) (47:24)
(48:9) (55:4) (61:12)
(118:23) (135:12)
(216:4) (241:18)
(241:25) (243:25)

## B

**back-and-forth**
**backup** (100:4)
**backwards** (68:11)
**bacteria** (196:15)
**bad-mouthed** (155:6)
(155:9)
**bags** (23:2) (23:7)
(24:14) (31:13)
**baked** (242:4)

**balance** (79:20)
**bar** (179:13) (180:11)
**bartender** (179:5)
**Barzee** (1:20) (3:4)
(3:15) (5:15) (7:8)
(8:4) (8:6) (8:7) (8:9)
(8:14) (8:24) (9:1)
(15:14) (21:13) (24:9)
(36:4) (36:7) (42:23)
(43:7) (43:17) (44:12)
(51:5) (51:18) (51:25)
(52:1) (52:17) (54:22)
(55:9) (77:4) (77:7)
(91:24) (92:6) (98:20)
(98:21) (102:2)
(102:3) (105:4)
(105:5) (109:25)
(117:4) (117:22)
(130:10) (137:7)
(137:8) (167:19)
(167:20) (176:23)
(177:5) (183:6)
(198:25) (204:3)
(205:25) (206:12)
(208:15) (213:22)
(218:4) (222:4)
(227:22) (227:24)
(230:5) (232:5)
(233:5) (233:17)
(233:22) (234:7)
(236:2) (239:10)
(240:14) (240:20)
(245:25) (246:3)
(246:7) (246:8)
(246:14) (246:15)
(246:22) (248:14)
(248:18) (249:4)
(249:7) (249:10)
(249:12) (249:20)
(249:24) (250:3)
(250:23) (251:6)
(257:7) (258:2)
(260:9) (261:13)
(261:24)
**barzeeflores** (1:22)
**base** (177:16)
**based** (58:19) (63:4)
(89:9) (90:18) (90:22)
(116:6) (116:12)
(128:4) (128:6)
(129:12) (131:14)
(176:5) (191:16)
(194:18) (197:18)
(212:10) (212:13)
(212:18)
**basic** (56:23) (63:24)
**basically** (13:8)
(27:18) (33:1) (66:1)
(66:18) (82:14)
(96:20) (103:17)
(191:15) (218:22)
(234:17) (251:3)
**basing** (240:24)
(259:3)

**basis** (11:4) (40:13)
(85:9) (176:7) (227:12)
**Battl** (7:11)
**Battl's** (7:3)
**BAZ** (2:3)
**Beach** (2:2) (2:3)
**bear** (123:10) (128:8)
(173:3) (187:1)
**beautiful** (21:1)
(54:3)
**became** (15:22)
**become** (10:16)
(11:17) (11:24) (14:9)
(27:2) (30:20) (39:15)
(45:1)
**becomes** (30:19)
(75:10)
**becoming** (11:5)
(11:6) (11:23) (184:24)
**beginning** (9:12)
(10:16) (10:23) (21:4)
(30:22) (38:24) (62:6)
(197:6) (256:2)
**beginnings** (9:12)
**behalf** (234:20)
(262:5) (262:8)
**beings** (33:21) (49:10)
**believed** (30:8)
(30:9) (61:18) (63:6)
(72:10) (82:24) (84:3)
(85:18) (85:19) (86:9)
(233:8) (261:24)
(263:5)
**believes** (88:12)
**believing** (72:12)
**belittle** (148:11)
**bell** (6:10)
**belong** (36:17)
**below** (102:24)
(107:6) (113:6)
(113:23) (114:15)
(115:5) (115:12)
(123:2) (126:17)
(127:1) (138:12)
(139:14) (139:19)
(140:5) (141:4)
(142:15) (142:23)
(143:4) (183:19)
(185:4) (185:20)
(186:22) (189:4)
(212:9) (224:19)
(226:10) (226:18)
(261:20)
**Bench** (94:21)
**Benchworks** (15:17)
(15:18) (15:20)
(15:23) (16:1)
**benefit** (60:6)
**besides** (63:13)
**best** (6:17) (17:5)
(20:14) (31:8) (32:15)
(39:12) (40:5) (51:8)
(85:2)
**better** (24:24)

(87:15) (188:10)
(198:19) (204:17)
(238:2) (242:21)
(243:15) (250:9)
(250:10)
**beyond** (89:3) (90:23)
(109:16) (170:9)
**Bibbs-Morrisey**
**big** (10:18) (10:19)
(11:2) (12:4) (12:8)
(12:10) (12:18) (13:4)
(14:24) (17:12) (21:5)
(21:6) (21:19) (27:12)
(30:16) (33:25)
(34:22) (37:8) (38:21)
(148:11) (153:14)
(185:7) (187:14)
(187:18) (190:10)
(190:20) (199:20)
(228:12) (228:13)
(228:24) (229:2)
(229:3) (230:23)
(231:2) (239:3)
(241:10) (241:13)
(241:18) (241:24)
(242:1) (242:11)
(243:4) (252:6)
(252:18) (258:13)
**bigger** (10:12) (15:17)
**biggest** (12:25)
**bill** (82:20)
**billions** (15:8) (15:9)
**birth** (96:20)
**birthdays** (10:21)
**bit** (16:19) (18:12)
(56:22) (93:14)
(93:19) (94:7) (95:9)
(118:12) (138:12)
(179:14) (185:5)
(191:19) (202:3)
(232:9) (239:12)
(240:8)
**black** (24:24) (26:7)
(34:11) (48:24) (74:9)
(74:13) (80:17)
**Blah** (32:7)
**blessed** (53:23)
**blessings** (24:2)
**block** (55:20)
**blow** (141:2)
**blown** (208:20)
**blue** (184:11)
**Blvd** (2:2)
**Board** (107:18)
(108:1) (119:11)
(123:4) (124:1)
(147:7) (212:10)
(221:10)
**boarded** (27:24)
**Boards** (153:4)
(153:24)
**bold** (184:8)
**bolded** (140:18)
**bond** (86:12) (86:13)

**books**                                                   **brush-off**

(86:25) (87:25)
**books** (40:12)
**born** (178:7) (178:8)
**boss** (236:15)
**bosses** (48:8) (172:13)
**bottle** (13:21) (15:5)
(15:6) (21:9) (21:16)
(22:19) (23:3) (27:13)
(28:11) (28:25) (29:1)
(29:2) (29:18) (31:14)
(36:16) (36:19) (37:1)
(37:25) (42:4) (43:9)
(43:10) (46:6) (57:14)
(58:2) (78:5) (82:20)
(82:23) (120:18)
(129:10) (193:16)
(193:17) (196:3)
(197:23) (225:22)
(238:1) (238:17)
**bottles** (14:12)
(22:16) (22:25) (23:1)
(27:13) (35:8) (36:12)
(36:15) (36:22)
(37:12) (37:22) (38:6)
(38:10) (42:7) (76:5)
(77:24) (77:25) (78:1)
(80:4) (82:8) (82:16)
(82:18) (82:20)
(192:19) (192:21)
(192:24) (193:1)
(193:13) (193:16)
(193:19) (193:20)
(193:22) (193:25)
(195:13) (195:20)
(195:21) (195:23)
(195:24) (196:5)
(197:17) (211:15)
(215:3) (215:12)
(225:13) (225:18)
(225:21) (235:3)
(235:5) (235:6)
(235:14) (235:20)
(236:5) (237:9)
(237:11) (237:15)
(238:11) (238:21)
(261:1) (261:11)
**bottom** (15:8) (22:3)
(76:9) (107:2) (132:9)
(140:17) (184:8)
(195:1) (209:1)
(214:17) (226:10)
(250:17)
**bought** (26:4) (45:10)
(86:24)
**Boulevard** (19:13)
(19:18) (19:19)
(19:22) (19:23)
(19:24) (25:13)
(29:11) (33:15)
(33:16) (33:18)
(46:11) (66:9) (67:15)
(68:3) (68:4) (68:16)
(68:24) (69:9) (69:24)
(70:13) (70:24) (71:3)

(83:19) (83:22)
(83:23) (84:3) (89:6)
(187:7) (198:4)
(199:10) (199:20)
(201:4) (201:8)
(204:15) (209:21)
(219:21) (240:6)
(240:9) (242:19)
(243:11) (244:11)
(244:15) (244:18)
(244:20) (244:21)
(245:1) (245:3)
(245:5) (245:7)
(245:9) (245:16)
(246:11) (246:24)
(250:6) (256:5)
(257:23) (260:2)
(260:8) (263:12)
**Boulevard's** (71:2)
**box** (193:6) (208:7)
**boxes** (23:2) (23:7)
(24:14) (26:3) (31:14)
**BOYD** (1:6) (1:20)
(2:1) (9:1) (9:2)
(9:24) (11:15) (23:24)
(24:22) (25:7) (25:8)
(47:25) (49:16)
(56:17) (61:1) (62:25)
(63:9) (63:25) (64:14)
(65:9) (66:6) (66:11)
(66:13) (66:14)
(67:18) (67:20)
(67:22) (68:19)
(68:20) (70:7) (70:10)
(70:11) (70:17)
(70:24) (71:12) (72:5)
(72:16) (72:17)
(72:18) (72:21)
(72:22) (73:10)
(73:19) (78:23)
(79:16) (82:19) (84:3)
(84:23) (86:9) (90:21)
(90:22) (94:21) (95:6)
(101:21) (103:9)
(104:6) (105:23)
(113:9) (113:11)
(119:4) (119:7)
(124:22) (124:23)
(134:12) (134:13)
(134:15) (134:18)
(135:5) (136:25)
(137:13) (137:20)
(137:24) (143:7)
(143:10) (143:15)
(143:18) (143:25)
(144:2) (144:5)
(145:12) (146:12)
(147:4) (147:15)
(154:23) (154:24)
(167:11) (167:12)
(169:5) (171:4)
(171:10) (171:16)
(172:16) (172:19)
(178:21) (178:23)

(179:1) (182:4)
(182:12) (183:18)
(183:20) (184:14)
(185:24) (192:4)
(195:3) (195:12)
(197:21) (198:20)
(199:9) (200:1)
(200:6) (200:20)
(204:9) (204:14)
(205:12) (207:14)
(207:17) (208:4)
(208:8) (208:23)
(209:22) (209:23)
(210:8) (211:2)
(211:8) (211:22)
(212:23) (213:16)
(213:17) (213:18)
(214:4) (214:6)
(214:8) (214:18)
(215:19) (217:13)
(217:24) (218:14)
(218:16) (221:12)
(221:15) (223:11)
(223:24) (225:16)
(225:20) (226:11)
(244:10) (249:17)
(250:14) (250:18)
(254:16) (259:9)
(259:11) (263:20)
(263:24)
**Boyds** (10:22) (61:5)
(61:10) (61:16) (62:1)
(62:19) (63:5) (66:1)
(68:5) (69:18) (69:24)
(71:10) (77:22)
(84:24) (85:3) (85:11)
(85:18) (85:21) (86:8)
(86:22) (87:17)
(87:18) (89:3) (89:15)
(90:3) (91:4) (135:14)
(135:17) (144:20)
(147:14) (151:10)
(151:17) (156:15)
(156:20) (157:2)
(157:3) (171:7) (173:9)
**Boyd's** (20:23)
(20:24) (65:12)
(72:19) (79:3)
(179:24) (203:17)
(209:20) (218:21)
**Brad** (94:21)
**braggart** (16:24)
**branded** (96:4) (96:6)
(96:14) (181:20)
(182:2) (182:5)
(182:7) (182:11)
(182:14) (184:2)
(184:18) (259:7)
**break** (32:5) (49:24)
(50:15) (51:10)
(51:21) (51:22) (56:2)
(91:12) (121:11)
(241:25)
**breakfast** (179:6)

**breaking** (56:2)
(234:3)
**brief** (53:4) (256:24)
**brings** (26:22) (45:23)
**broken** (42:6) (128:22)
**broker** (46:9) (47:2)
**brokering** (46:23)
**Bronx** (186:5) (186:7)
(191:4)
**Brosius** (16:13)
(16:14) (16:16)
(16:19) (16:20)
(16:25) (17:1) (17:6)
(17:16) (18:2) (20:1)
(20:12) (25:9) (25:19)
(26:6) (26:13) (26:16)
(26:22) (27:2) (27:16)
(28:1) (28:15) (30:1)
(30:3) (30:8) (30:9)
(30:22) (32:2) (32:13)
(32:22) (38:18) (39:1)
(40:8) (40:18) (41:6)
(41:7) (41:8) (41:15)
(41:18) (41:19) (42:1)
(46:2) (46:3) (46:4)
(46:14) (46:17)
(46:22) (46:24) (47:5)
(47:23) (60:21)
(60:22) (61:7) (61:11)
(61:24) (62:2) (62:5)
(62:6) (62:14) (62:15)
(62:23) (62:24) (63:3)
(63:6) (63:7) (63:12)
(63:17) (64:1) (65:14)
(65:16) (65:21)
(65:24) (66:3) (66:4)
(66:15) (66:21) (67:8)
(67:23) (67:24)
(72:12) (72:15)
(84:15) (84:17)
(84:20) (84:23) (85:1)
(85:14) (85:25) (86:1)
(86:5) (86:11) (86:14)
(86:24) (87:21) (88:6)
(88:19) (230:13)
(231:14) (245:12)
(245:14) (250:15)
(251:18) (251:20)
(252:2)
**Brosius's** (40:16)
(61:4) (63:4) (64:3)
(67:8) (71:23)
**brothers** (9:15)
(9:16) (10:11)
**brought** (68:21)
(68:22) (159:11)
(212:4) (261:16)
**Bruce** (2:1)
**BruceAZimetLaw** (2:3)
**brushed** (144:12)
(157:23)
**brushing** (135:22)
**brush-off** (135:20)
(136:2)

**bucks**

**Chain**

bucks (22:25)
built (21:2) (48:7)
(54:4)
bulk (199:12)
bullet (102:16)
(102:25) (103:1)
(115:12) (115:18)
(116:1) (123:2)
(124:25) (125:21)
(127:22) (128:16)
(128:19) (129:3)
(130:23) (131:18)
(131:25) (132:18)
(132:25)
bullet-pointed
bunch (19:14) (47:12)
(159:25) (160:2)
(160:5)
business (9:21)
(10:10) (11:4) (11:22)
(14:12) (14:14)
(14:18) (15:23)
(24:11) (28:3) (28:6)
(28:8) (30:2) (30:12)
(30:22) (30:23)
(31:22) (32:19)
(33:14) (39:5) (40:18)
(41:18) (41:22)
(43:24) (45:18)
(53:15) (54:1) (54:11)
(54:13) (64:8) (65:7)
(65:8) (65:10) (69:1)
(69:3) (70:3) (70:18)
(72:2) (78:25) (94:5)
(95:10) (105:17)
(106:23) (107:19)
(113:1) (123:5)
(124:12) (125:23)
(126:9) (132:19)
(148:15) (155:16)
(162:17) (163:5)
(163:16) (163:24)
(174:12) (191:20)
(206:22) (206:23)
(229:23) (230:8)
(238:3) (239:11)
(241:18) (242:1)
Businesses (27:23)
(54:3)
buy (11:19) (14:10)
(14:18) (16:5) (16:11)
(22:25) (23:14)
(25:22) (27:14) (28:7)
(29:21) (29:22) (31:4)
(58:22) (58:24) (59:1)
(59:2) (59:3) (59:16)
(69:20) (188:15)
(190:22) (199:9)
(199:12) (231:8)
(233:11) (233:25)
(253:6) (263:8)
(263:11) (263:14)
buyer (163:12)
buyers (243:21)

buying (16:2) (19:8)
(27:5) (29:24) (34:4)
(34:13) (34:14)
(34:23) (35:15)
(69:22) (114:25)
(125:6) (126:1)
(133:18) (182:14)
(198:10) (232:7)
(234:3) (234:20)
(252:21) (253:2)
(253:9) (263:9)
byzantine (11:12)
(44:14)

## C

calendar (50:22)
(52:6) (55:18) (56:3)
California (212:10)
Call (5:1) (12:21)
(17:4) (25:10) (42:5)
(53:5) (74:9) (81:14)
(92:12) (177:10)
(179:2) (184:16)
(185:24) (211:5)
(211:7) (211:13)
(211:21) (212:4)
(212:24) (212:25)
(235:10) (251:18)
(251:19) (251:22)
(251:23)
called (9:13) (15:17)
(21:21) (37:9) (47:11)
(57:4) (66:9) (77:13)
(83:8) (93:22) (96:4)
(96:16) (100:14)
(103:14) (173:20)
(174:3) (175:9)
(178:12) (196:8)
(229:6) (231:20)
(236:18)
calling (17:3) (54:3)
(190:9) (191:7)
(192:13)
calls (92:14)
(164:21) (177:12)
(190:12) (230:2)
(233:19) (246:18)
(248:11) (261:13)
calm (238:2)
Cambridge (179:7)
came (16:8) (16:9)
(26:1) (28:1) (31:17)
(74:14) (79:2) (80:10)
(82:13) (82:20)
(111:1) (122:10)
(131:12) (166:4)
(169:2) (173:25)
(187:4) (188:17)
(189:1) (190:6)
(196:17) (203:6)
(219:21) (222:2)
(222:3) (225:14)
(257:23)
cameraman (9:16)

cancer (85:22) (128:1)
cannot (13:1)
(112:11) (118:24)
(119:10)
caps (238:21)
card (22:6)
Cardinal (228:25)
(230:22) (241:15)
(241:16)
care (9:21) (9:25)
(10:24) (52:22)
cared (76:8) (78:6)
career (89:21)
careful (38:12)
(55:23)
carefully (9:5) (9:8)
(31:15) (211:24)
cares (67:20) (233:10)
Carlos (166:24)
carries (186:9)
cases (6:19) (6:20)
(8:19) (12:6) (36:19)
(36:20) (89:10)
cash (23:10) (35:2)
catch (93:20) (97:21)
(211:10)
categories (107:8)
categorized (57:2)
caught (41:22)
cc'd (254:18)
CCR (2:6) (265:10)
celebrate (146:3)
celebrated (10:21)
Center (1:20) (62:2)
(118:2)
cents (14:19) (14:20)
CEO (179:19) (179:21)
(236:15) (263:17)
certain (22:4) (66:4)
(76:18) (77:14) (90:6)
(100:18) (103:17)
(103:18) (154:12)
(158:24) (160:7)
(197:14) (201:18)
(242:6) (253:5)
certainly (48:23)
(48:25) (60:18) (61:2)
(61:3) (61:25) (62:3)
(79:21)
certificate (96:20)
certification
certified (149:23)
(188:21)
certify (265:3)
Cesar (166:24) (167:3)
Chain (9:13) (9:14)
(10:3) (10:18) (10:19)
(15:14) (15:21)
(16:10) (16:11)
(17:10) (17:16)
(17:25) (18:5) (20:22)
(23:23) (23:25)
(25:12) (25:23) (26:7)
(26:8) (29:16) (29:24)

(30:13) (30:14) (32:4)
(32:13) (32:19)
(32:23) (33:1) (33:19)
(36:22) (39:1) (41:17)
(42:25) (43:10)
(43:21) (43:23) (44:3)
(44:12) (44:17) (45:8)
(45:17) (45:23)
(46:12) (46:16)
(46:22) (47:5) (47:6)
(47:7) (47:20) (48:14)
(49:6) (60:2) (60:6)
(60:10) (60:18) (61:5)
(62:25) (63:14)
(63:18) (63:20)
(64:12) (64:21) (65:3)
(65:8) (65:11) (65:13)
(65:14) (65:25)
(66:20) (66:22)
(66:24) (66:25) (67:5)
(67:7) (67:9) (67:11)
(70:25) (71:7) (71:11)
(71:13) (71:25)
(73:13) (73:15)
(73:22) (74:4) (74:11)
(75:5) (75:7) (75:15)
(75:18) (75:24)
(76:11) (76:13)
(76:14) (76:18)
(76:21) (77:11)
(77:15) (77:18)
(77:19) (78:4) (78:13)
(78:15) (78:16)
(78:19) (78:25) (79:5)
(79:12) (79:25) (80:3)
(80:24) (81:9) (81:21)
(82:6) (82:7) (82:8)
(82:15) (82:16)
(82:21) (82:23) (83:6)
(83:12) (83:13)
(83:22) (84:3) (84:8)
(84:14) (86:6) (86:13)
(89:12) (90:1) (90:2)
(90:8) (93:23) (94:3)
(94:5) (94:16) (94:20)
(95:12) (95:18)
(96:13) (96:14) (97:6)
(97:13) (99:7) (99:20)
(100:10) (100:20)
(101:6) (102:12)
(103:1) (103:10)
(103:19) (104:3)
(105:23) (107:12)
(107:22) (108:5)
(109:9) (109:21)
(110:8) (110:22)
(113:9) (113:11)
(113:20) (113:24)
(114:4) (114:13)
(114:16) (114:25)
(115:10) (116:7)
(116:13) (118:5)
(119:13) (119:23)
(120:5) (121:3)

Chain's

combination

(121:24) (122:3)
(122:13) (123:8)
(123:23) (124:8)
(125:10) (126:1)
(126:5) (128:12)
(133:6) (134:2)
(138:2) (138:9)
(139:13) (140:11)
(141:15) (142:14)
(143:3) (143:21)
(143:22) (144:13)
(144:16) (147:1)
(147:12) (148:9)
(148:17) (148:23)
(151:1) (151:11)
(153:1) (156:6)
(157:23) (158:19)
(162:17) (163:5)
(163:17) (163:25)
(164:6) (164:13)
(164:14) (165:14)
(168:5) (168:7)
(168:8) (168:14)
(168:18) (169:17)
(169:21) (170:6)
(170:9) (170:12)
(170:16) (170:21)
(171:24) (173:25)
(174:12) (175:9)
(178:12) (178:16)
(179:11) (180:20)
(180:25) (181:2)
(181:7) (181:19)
(182:1) (182:11)
(182:13) (183:24)
(184:1) (184:9)
(184:25) (186:2)
(187:17) (190:14)
(190:20) (191:2)
(192:1) (192:20)
(194:16) (194:18)
(196:22) (197:3)
(198:22) (202:10)
(202:16) (203:3)
(205:14) (205:21)
(212:17) (216:4)
(216:8) (217:5)
(219:21) (220:2)
(221:9) (222:16)
(222:19) (222:25)
(224:3) (224:11)
(225:5) (225:8)
(225:17) (227:1)
(227:6) (231:6)
(231:11) (231:15)
(231:20) (231:21)
(231:25) (232:7)
(234:21) (235:17)
(236:15) (239:15)
(241:17) (244:17)
(244:21) (245:13)
(245:18) (246:10)
(246:16) (246:23)
(247:9) (247:16)

(248:20) (254:12)
(257:21) (258:9)
(258:17) (258:21)
(258:23) (259:6)
(259:8) (259:11)
(262:5) (262:8)
(263:8) (263:17)
(263:21)
**Chain's** (31:2) (71:4)
(77:2) (79:13) (82:6)
(86:4) (106:23)
(113:1) (124:20)
(133:17) (134:10)
**chance** (175:4)
**chances** (87:15)
**change** (33:7) (95:21)
(110:8) (197:23)
**changed** (35:7) (79:3)
(109:21) (110:22)
(110:24) (112:14)
**changes** (55:24)
(56:3) (82:15)
**changing** (143:14)
(157:18)
**chapter** (90:4)
**charge** (13:17)
(17:14) (28:10)
(46:24) (232:20)
(236:11) (239:5)
**charged** (61:21)
(61:22) (86:23)
(89:14) (90:25)
**charges** (18:15)
(18:16) (46:21)
(139:16)
**charging** (230:6)
**CHARLES** (1:6) (2:1)
(101:21) (103:9)
(105:23) (113:9)
(119:4) (124:22)
(134:12) (134:13)
(134:18) (135:5)
(137:13) (137:20)
(137:23) (143:7)
(143:9) (143:15)
(143:25) (144:2)
(144:3) (145:12)
(146:12) (147:4)
(154:23) (167:11)
(169:5) (171:4)
(171:10) (171:16)
(172:16) (173:17)
(178:23) (178:25)
(179:4) (179:15)
(182:4) (183:20)
(185:24) (192:4)
(207:14) (208:8)
(208:23) (209:20)
(209:22) (213:18)
(214:4) (214:6)
(217:13) (221:15)
(225:20) (259:11)
(263:20)
**Charlie** (9:1) (10:1)

(11:15) (14:8) (15:19)
(16:2) (17:2) (17:9)
(17:10) (17:18)
(17:24) (18:10)
(19:24) (20:2) (20:6)
(20:24) (21:18)
(23:22) (24:22) (25:8)
(25:14) (26:2) (26:9)
(26:16) (26:19)
(26:23) (27:10)
(27:17) (28:1) (28:16)
(30:7) (30:21) (31:19)
(31:21) (32:1) (33:4)
(34:16) (34:17)
(35:14) (35:19)
(36:24) (38:19)
(38:23) (39:4) (39:25)
(40:17) (41:7) (41:14)
(41:20) (42:9) (42:14)
(43:10) (44:18)
(45:20) (47:25)
(48:15) (48:18)
(49:16) (56:17)
(60:25) (62:25) (63:9)
(63:25) (64:14) (65:9)
(65:12) (66:6) (66:11)
(66:13) (66:14)
(67:18) (67:20)
(67:22) (68:6) (68:19)
(68:20) (70:7) (70:10)
(70:11) (70:17)
(70:24) (71:12) (72:5)
(72:16) (72:17)
(72:18) (72:19)
(72:21) (72:22)
(73:10) (73:19)
(78:23) (79:3) (79:16)
(82:19) (84:3) (84:23)
(86:9) (90:21) (94:21)
(95:6) (104:6)
(113:15) (136:25)
(145:13) (145:15)
(147:15) (154:23)
(173:14) (179:2)
(181:13) (205:12)
(236:15) (237:14)
(245:2)
**charts** (141:20)
(142:8) (142:16)
**chat** (217:23) (218:9)
**cheap** (233:11)
**cheaper** (59:3) (60:3)
(60:4) (250:6) (257:17)
**check** (5:5) (79:20)
(80:8) (80:11) (239:24)
**checked** (83:8) (83:23)
**checking** (83:7)
(192:6)
**chemical** (193:8)
**chief** (263:21)
**child** (146:20)
**choice** (54:17)
(69:18) (69:19)
**choose** (75:16)

**Christmas** (10:22)
**circumstances** (40:5)
(51:3) (51:9) (69:10)
(222:16) (262:24)
**cities** (185:20)
(186:2) (191:6)
**citizens** (64:18)
**civil** (74:21) (77:9)
(90:10)
**claim** (79:25)
(147:18) (157:19)
(160:14)
**claimed** (78:22)
(83:11) (148:20)
**claiming** (69:9)
(252:2)
**claims** (157:22)
**clarify** (214:6)
(239:24)
**classic** (35:24)
**clean** (31:15)
(154:11) (240:18)
(243:17)
**clear** (69:11) (75:10)
(86:15) (87:11)
(145:12) (219:10)
(240:21)
**clearance** (237:23)
**clearly** (176:6)
**clerk** (93:15)
**cliche** (44:25)
**cliches** (45:1)
**client** (226:20)
(254:9)
**clients** (11:2)
(182:6) (191:24)
(192:7) (246:17)
(246:25)
**clinic** (93:16)
**clinics** (94:17)
**Closely** (128:17)
**closer** (55:21)
**closing** (27:23)
**clothing** (17:17)
(20:21) (32:2) (38:18)
(47:23)
**clue** (258:22)
**Coast** (185:11)
(185:15)
**cockroaches** (22:14)
(35:15)
**co-conspirators**
**code** (114:10)
**co-founders** (113:16)
**cold** (157:25) (190:9)
(192:12)
**colleagues** (194:4)
**collect** (23:2) (31:13)
**collected** (24:13)
**college** (9:18)
(72:21) (93:12) (93:13)
**column** (189:13)
**com** (1:22) (2:3)
**combination** (21:2)

comes                                                                                                    copied

**comes** (7:21) (15:4)
(26:16) (37:21) (53:1)
(60:1) (67:17) (74:19)
(79:5) (87:6)
**comfortable** (144:4)
**coming** (13:12) (29:3)
(33:12) (35:2) (38:17)
(38:25) (70:1)
(162:21) (164:18)
(237:19) (244:20)
**comments** (6:17)
(54:20)
**commerce** (34:18)
(141:7)
**commission** (46:25)
(47:4) (191:23)
**commissions** (46:22)
(47:8)
**commit** (70:8) (73:8)
(84:10) (84:11) (90:24)
**committed** (84:13)
**committing** (61:23)
(62:5) (232:13)
(232:22) (248:10)
(261:25) (263:5)
**common** (41:23)
(142:17) (181:12)
**communicate** (42:10)
(62:1)
**communicated** (61:15)
(67:23) (155:1)
**communicating**
**communication**
**Communications**
**community** (10:16)
(48:8) (72:21) (74:16)
**company name** (36:25)
**compare** (120:18)
**comparison** (196:14)
**compete** (59:23)
**competition** (59:22)
(59:24) (59:25)
(242:11)
**complain** (193:10)
(197:15) (201:5)
(207:10) (207:11)
**complained** (195:21)
(195:25) (196:2)
(260:25)
**complaining** (21:10)
(199:23) (200:7)
(200:21) (200:24)
(207:15) (215:15)
(235:3) (237:8)
**complaint** (43:18)
(238:13) (254:9)
(254:11) (255:2)
(255:4)
**complaints** (42:2)
(42:11) (42:16)
(42:24) (192:21)
(192:23) (195:13)
(195:17) (197:7)
(198:6) (201:11)

(201:13) (206:5)
(206:16) (214:24)
(215:2) (234:21)
(234:24)
**complete** (114:9)
(201:15) (201:17)
(202:25)
**completed** (93:13)
(216:5) (216:9)
(248:5) (248:19)
(248:25)
**completely** (53:16)
(53:24)
**compliance** (11:11)
(17:9) (17:10) (17:14)
(17:19) (30:15)
(32:23) (33:12)
(33:20) (44:5) (44:9)
(47:17) (65:3) (65:4)
(67:11) (68:18)
(68:19) (71:24)
(73:21) (79:12)
(79:13) (83:21)
(94:24) (95:14) (96:1)
(100:1) (103:4)
(105:22) (111:10)
(144:12) (158:22)
(158:24) (164:6)
(164:15) (171:17)
(172:8) (173:16)
(202:20) (202:23)
(236:18) (236:21)
(244:21) (244:24)
(244:25) (247:17)
(247:18) (247:19)
(247:25) (248:4)
(248:23) (248:24)
(254:13) (254:25)
(255:8) (256:10)
(259:14)
**compliant** (236:22)
**complicated** (9:11)
(17:11) (21:4) (47:15)
**complied** (63:15)
**comply** (102:21)
(122:16) (123:16)
**complying** (135:18)
**compromised** (128:20)
(224:12)
**compulsive** (62:12)
**computer** (44:5)
(180:8)
**con** (86:16) (87:23)
(88:16) (88:21)
**conceal** (68:6) (83:1)
**concede** (8:11)
(55:13) (92:4) (177:2)
**concept** (228:5)
**concerned** (10:23)
(68:19) (140:14)
(140:25) (143:16)
(143:18) (148:10)
(216:20)
**concerning** (6:19)

(163:2) (216:16)
(216:18) (254:9)
(255:4)
**concerns** (81:5)
(134:11) (134:12)
(134:15) (134:17)
(135:4) (135:18)
(135:25) (138:1)
(141:15) (144:12)
(144:20) (171:17)
(171:20) (172:22)
(172:24) (173:4)
(173:16) (194:3)
(194:6) (211:14)
**conclusion** (248:12)
**condition** (195:18)
(211:15) (235:3)
(237:8)
**conduct** (53:13)
(53:21) (105:17)
(120:21) (121:6)
**conducted** (118:8)
**conducting** (80:19)
**confer** (227:20)
(249:6)
**conference** (81:20)
(265:7)
**confidence** (63:25)
**conformance** (265:6)
**confront** (172:14)
(172:16) (172:19)
**confused** (157:21)
(174:6)
**confusing** (55:19)
**Congress** (138:16)
**conjunction** (122:15)
(123:16)
**connect** (62:24)
**connected** (201:8)
**connection** (9:20)
(63:18)
**consider** (9:5) (9:8)
(214:3) (214:8) (214:9)
**considered** (114:9)
(131:23) (132:7)
(219:24)
**considering** (180:9)
(211:25)
**consistent** (160:14)
(238:15)
**consistently** (18:17)
(60:22)
**conspiracy** (40:24)
(167:8)
**conspirators** (40:21)
**conspire** (26:5)
**conspiring** (33:2)
(46:19)
**constant** (206:19)
**consultants** (11:11)
**consulting** (211:25)
**consumer** (14:3)
**consumers** (13:9)
(15:1)

**consummate** (16:23)
**Cont** (1:25)
**contact** (35:21)
(42:3) (61:7) (62:22)
(62:24) (63:4) (66:11)
(66:12) (67:24)
(73:11) (73:13)
(73:17) (100:2) (119:9)
**contacting** (37:11)
**contacts** (61:9)
**contained** (37:2)
**contains** (115:12)
**contamination**
**content** (205:4)
**context** (105:16)
(106:23) (117:13)
(118:10) (119:1)
(125:6) (125:24)
(131:1) (174:19)
(181:15)
**continue** (15:19)
(24:23) (36:6) (41:17)
(41:21) (123:22)
(144:12) (151:12)
(198:5) (200:6)
(200:14) (200:17)
(201:4) (201:10)
(219:21) (238:4)
(263:14)
**continued** (15:20)
(40:18) (71:7) (134:1)
(150:10) (181:6)
**continues** (115:25)
**contract** (64:24)
**contracts** (241:20)
(242:5)
**control** (12:8)
(12:11) (15:25) (96:2)
(153:10) (185:11)
(233:11)
**controlled** (185:7)
(232:9)
**controlling** (13:6)
**conversation** (195:3)
(198:17) (198:21)
(203:24) (205:7)
(207:24) (208:2)
(212:23)
**conversations**
**convince** (27:17)
(60:25) (61:1) (61:5)
(61:16) (67:7) (85:3)
**convinced** (39:15)
(66:22) (85:19)
**convinces** (27:2)
(28:15)
**convincing** (62:19)
**convoluted** (38:2)
**cooperate** (41:4)
**coordinator** (94:24)
(96:1)
**co-owner** (245:13)
**copays** (22:18)
**copied** (98:11)

copies

departments

(213:17) (213:18)
**copies** (52:5)
**copy** (5:19) (7:12)
(7:13) (52:25) (80:18)
(99:10) (161:9)
**corporation** (13:5)
(15:16) (15:17)
(16:12) (20:8) (37:9)
**corporations** (83:4)
**corrected** (73:19)
(248:5)
**correction** (227:10)
**correctly** (32:20)
(67:10)
**correspond** (129:5)
(129:14)
**corrupt** (71:16)
(140:11)
**corrupted** (71:17)
(71:20)
**cost** (13:20) (57:5)
(57:6) (58:11) (59:10)
(59:14) (59:15)
(229:8) (229:14)
(229:21) (230:19)
**costs** (57:13) (59:7)
(59:12)
**counterfeit** (107:3)
(107:4) (107:17)
(118:15) (119:10)
(120:20) (121:4)
(121:5) (126:14)
(130:19) (131:21)
(138:8) (139:10)
(168:21) (169:12)
(170:20) (170:25)
(221:19)
**counterfeited**
**counterfeiting**
**counting** (9:7)
**country** (22:21)
(186:13)
**couple** (10:1) (10:10)
(11:2) (22:19) (36:20)
(39:21) (40:4) (88:14)
(120:9) (123:11)
(128:8) (138:6)
(143:20) (145:11)
(152:12) (168:1)
(182:6) (191:5)
(198:7) (202:9)
(213:14) (254:18)
**Court's** (51:17)
(53:9) (130:7) (176:2)
**cover** (152:6)
**covered** (228:2)
**COVID** (27:18) (27:22)
(30:10) (30:13)
(30:18) (31:3) (32:7)
(33:11) (45:18)
(49:12) (60:11)
(60:12) (69:9) (69:21)
**co-worker** (205:11)
**crack** (106:25)

**cracks** (42:13)
**Crawford** (213:24)
**crazy** (38:2)
**create** (13:19) (33:7)
(33:8)
**created** (15:25)
(111:13) (112:11)
**creation** (14:7)
**creator** (96:11)
**credible** (130:17)
**credit** (69:15) (69:19)
**Crickets** (81:21)
**crime** (45:3) (62:5)
(90:24) (232:20)
(248:10) (261:25)
(263:6)
**crimes** (90:25)
(232:14) (232:23)
**criminals** (22:13)
(23:7) (24:21) (25:7)
(25:11) (33:2) (38:19)
(39:10) (40:4) (40:11)
(41:5) (41:9) (41:21)
(42:8) (42:17) (43:2)
(43:12) (43:14) (44:1)
(44:8) (46:19) (49:9)
(53:19)
**crisis** (27:20)
**criteria** (100:18)
(102:18)
**critical** (76:18)
(90:2)
**CROSS** (3:10) (3:15)
(3:16) (260:14)
(260:15)
**cross-examination**
**crumbs** (22:14)
**crutches** (10:5)
**Crystal** (7:19) (7:20)
(52:6) (55:17)
**Crystal's** (7:23)
**currency** (86:18)
(86:19) (87:12)
**current** (138:21)
(190:8) (212:10)
**currently** (127:23)
(128:5) (209:13)
(211:3)
**customer** (43:4)
(192:25) (195:25)
(196:6) (206:25)
(207:3) (208:24)
(209:4) (209:8)
(216:19) (247:8)
(247:11) (247:23)
(249:1) (256:3)
**customers** (17:22)
(43:8) (43:14) (43:18)
(94:15) (97:7) (97:14)
(100:9) (116:7)
(168:8) (189:7)
(189:10) (190:8)
(190:19) (191:13)
(192:14) (192:16)

(192:21) (192:24)
(193:10) (195:21)
(196:25) (197:4)
(197:7) (197:14)
(198:6) (199:23)
(200:7) (200:21)
(200:24) (201:5)
(201:11) (201:13)
(204:21) (206:7)
(212:19) (226:13)
(233:18) (234:8)
(234:11) (247:3)
**cut** (32:19) (74:23)
(186:7)
**CVS** (241:24)
**CYA** (81:23)

## D

**dad** (179:13)
**daily** (185:2)
**Dakota** (248:7)
(248:9) (248:15)
(259:22)
**damaged** (106:21)
(106:24) (107:3)
(107:9) (128:22)
(193:1) (193:13)
(193:14) (215:3)
(215:12)
**danger** (74:15)
**dangerous** (38:8)
**dangled** (16:9) (39:1)
**dangles** (17:16)
**data** (120:17)
**DATE** (1:4) (28:25)
(29:18) (55:20)
(55:21) (55:24)
(68:21) (68:22) (74:6)
(104:17) (104:18)
(108:16) (108:24)
(109:2) (110:10)
(110:12) (112:10)
(116:24) (119:3)
(129:25) (137:1)
(161:11) (182:22)
(194:18) (200:4)
(202:1) (202:6)
(204:19) (204:21)
(205:5) (208:9)
(217:25) (223:14)
(226:8)
**dated** (111:4)
(112:10) (265:8)
**dates** (28:17) (28:18)
(28:20) (28:22)
(28:24) (30:2) (55:19)
(113:4) (201:18)
(206:9)
**David** (35:24)
**Dawn** (101:18)
**DEA** (40:12) (53:19)
(53:20) (53:22)
(54:10) (96:2)
**deal** (40:6)

**dealers** (23:19)
(34:15)
**dealing** (31:3)
(31:12) (64:19) (78:13)
**dealings** (53:15)
**deals** (18:20) (25:19)
(46:12) (46:13) (46:23)
**dealt** (48:25) (175:8)
(175:10)
**deaths** (60:13)
**debriefing** (87:2)
**deceiving** (83:12)
**December** (59:2)
**decent** (191:25)
**decided** (9:20)
(76:10) (81:1)
(170:24) (263:11)
**decision-making**
(167:11)
**decisions** (167:11)
**deemed** (216:13)
(217:2) (227:14)
(261:21)
**Defendants** (1:7)
(5:3) (39:7) (50:16)
(53:13) (53:15)
(53:23) (54:2) (54:11)
(91:18) (139:20)
(176:17)
**defined** (131:18)
**definitely** (90:23)
(148:4)
**definition** (56:24)
(117:16) (130:14)
(130:15) (131:14)
**defraud** (56:18)
(73:5) (73:17) (78:10)
(79:23) (80:9) (82:10)
(90:7)
**defrauded** (84:8)
**degree** (21:24)
**Delaware** (178:11)
**Delayed** (209:3)
(209:9)
**deliberation** (5:12)
(7:6) (264:12)
**deliver** (10:6)
**delivered** (126:10)
(132:20)
**demand** (127:9)
(127:15) (192:10)
**demanded** (68:20)
**denied** (176:11)
**department** (17:9)
(17:10) (17:14)
(17:19) (24:2) (30:15)
(32:23) (33:13)
(33:20) (35:21)
(35:22) (39:7) (40:25)
(44:5) (44:9) (47:17)
(67:11) (71:24) (78:4)
(100:1) (202:21)
(236:18) (236:21)
(244:21) (247:17)
**departments** (11:12)

**depend**                                                              **distribution**

(237:5)

**depend** (62:7)
**depended** (72:17)
**Depending** (192:11)
(197:23)(240:25)
(243:9)
**depends** (248:6)
**depositions** (20:9)
**DEPUTY** (55:22)
(92:16)(177:15)
(264:16)
**derogatory** (152:8)
(154:5)
**DerOvanesian** (1:16)
(1:18)(3:9)(3:11)
(3:14)(3:17)(15:12)
(21:11)(24:4)(36:3)
(42:21)(43:5)(43:15)
(44:10)(53:4)(53:11)
(55:7)(77:5)(82:1)
(87:4)(88:24)(92:13)
(92:20)(92:22)(93:3)
(97:12)(97:20)(98:1)
(98:4)(98:6)(98:15)
(98:18)(99:2)(99:9)
(99:14)(101:2)
(101:10)(101:12)
(101:23)(102:6)
(102:9)(104:10)
(104:12)(104:21)
(105:9)(105:11)
(106:1)(106:3)
(106:12)(106:17)
(106:19)(108:7)
(108:10)(108:18)
(109:15)(110:16)
(111:17)(111:21)
(112:4)(112:19)
(112:21)(116:17)
(116:19)(117:1)
(117:7)(117:24)
(129:18)(129:22)
(130:5)(130:13)
(131:13)(136:15)
(136:17)(137:3)
(137:11)(144:24)
(149:3)(155:25)
(156:10)(158:4)
(161:2)(161:9)
(161:11)(161:13)
(162:19)(163:7)
(163:21)(164:21)
(164:24)(165:20)
(167:23)(167:25)
(168:13)(169:10)
(169:23)(174:10)
(174:23)(174:25)
(175:15)(177:12)
(177:21)(178:3)
(182:17)(182:19)
(183:3)(183:9)
(183:12)(183:14)
(183:15)(194:10)
(194:12)(194:23)

(194:25)(195:5)
(195:11)(198:12)
(198:14)(198:23)
(199:4)(199:7)
(200:10)(200:13)
(203:10)(203:12)
(203:14)(203:16)
(204:1)(204:7)
(204:11)(204:13)
(204:25)(205:2)
(205:23)(206:2)
(206:4)(206:14)
(207:20)(207:22)
(208:12)(208:18)
(210:1)(210:3)
(210:10)(210:16)
(210:18)(213:3)
(213:4)(213:6)
(213:7)(213:20)
(214:5)(214:11)
(214:13)(214:15)
(217:19)(217:21)
(218:2)(218:7)
(218:10)(218:12)
(219:9)(220:6)
(220:8)(220:16)
(220:21)(220:23)
(221:6)(221:7)
(221:23)(222:1)
(222:3)(222:8)
(222:9)(222:23)
(223:3)(223:4)
(223:6)(223:8)
(223:16)(223:19)
(223:22)(227:17)
(227:21)(230:2)
(232:3)(233:2)
(233:15)(233:19)
(234:5)(235:25)
(239:7)(245:23)
(246:12)(246:18)
(248:11)(248:16)
(249:23)(253:16)
(255:9)(255:21)
(256:24)(257:2)
(257:4)(258:6)
(258:7)(260:12)
(260:17)(260:19)
(260:20)(261:19)
(263:25)
**describe** (143:22)
(154:6)
**described** (206:10)
**describes** (138:25)
**describing** (17:6)
(120:23)
**deserve** (39:11)
**designated** (158:21)
**desire** (60:2)
**desires** (230:20)
**desk** (173:25)
**destroyed** (20:22)
(20:23)(20:24)
(20:25)(90:3)

**destruction** (48:10)
**detail** (220:3)
**detailed** (83:17)
**details** (111:11)
**determination**
**determinations**
**determine** (128:12)
(140:3)
**determining** (127:19)
**devastates** (76:7)
(76:8)
**developed** (11:22)
(186:22)(241:9)
**devices** (121:21)
**difference** (241:22)
**different** (11:7)
(11:15)(11:16)(14:9)
(14:22)(15:16)(18:8)
(20:7)(21:3)(22:21)
(23:9)(23:24)(27:16)
(28:18)(29:23)
(36:16)(40:14)
(46:18)(55:22)
(62:21)(67:1)(110:5)
(110:7)(110:15)
(110:20)(111:14)
(139:9)(141:20)
(151:8)(154:16)
(156:7)(184:5)
(189:18)(190:1)
(190:3)(197:17)
(234:11)(234:15)
(234:18)(234:19)
(240:3)(240:24)
(243:8)
**differently** (38:12)
(226:4)
**difficult** (30:11)
(30:13)(30:19)
(31:10)(32:6)(39:19)
(40:5)(49:11)
(172:13)(245:15)
**difficulties** (51:10)
(211:20)
**digest** (56:13)
**DIMITROULEAS** (1:9)
(7:5)
**DIRECT** (3:9)(3:14)
(93:2)(102:14)
(102:24)(107:1)
(134:20)(148:21)
(171:6)(178:2)
(184:7)(208:20)
(221:2)
**directed** (100:7)
**directly** (94:10)
(121:24)(121:25)
(122:10)(260:13)
**director** (73:21)
(83:21)(93:9)
(158:22)(158:24)
**dirty** (193:1)
(193:16)(193:19)
(193:22)(195:20)

(195:21)
**disadvantages**
**disaster** (83:15)
**disclosed** (68:5)
(71:9)
**disclosing** (78:18)
**discount** (11:24)
(12:1)(12:13)(58:23)
(190:20)(198:3)
(230:24)(231:7)
(231:8)(240:9)
(243:23)(252:7)
(252:8)
**discounted** (29:22)
(231:16)
**discounters** (21:18)
**discounts** (12:21)
(58:15)(58:21)
(197:25)
**discovered** (78:14)
(215:22)(225:4)
**discuss** (8:16)(50:7)
(91:9)(92:10)
(175:19)(177:8)
(192:5)(194:3)
(194:6)(221:18)
(264:7)
**discussed** (8:16)
(49:14)(50:7)(56:11)
(91:9)(92:10)(137:5)
(175:20)(177:8)
(227:5)(228:3)(264:7)
**discussing** (185:23)
(186:1)(205:18)
(211:21)(212:2)
(224:22)
**discussion** (41:17)
(59:10)(149:16)
(254:6)
**discussions** (255:15)
**discussion's** (256:15)
**disgusting** (36:11)
**disorganization**
**dispense** (216:13)
(261:21)
**dispensed** (142:19)
**disposition** (107:25)
**disregard** (6:20)
(8:20)(54:20)(81:5)
**distinct** (187:13)
(187:18)(241:10)
**distinction** (228:19)
**distorted** (90:16)
**distracted** (24:12)
**distribute** (78:2)
(228:10)
**distributed** (227:1)
**distributing** (76:12)
(76:13)(78:15)
**distribution** (12:23)
(25:24)(35:15)
(118:2)(132:6)
(137:21)(138:15)
(141:6)(142:2)

**distributor**

**distributor** (15:15)
(57:15) (57:20) (58:1)
(58:15) (60:5) (67:5)
(117:16) (117:18)
(121:25) (134:22)
(141:8) (188:19)
(188:20) (198:1)
(198:2) (202:12)
(202:15) (227:3)
(228:6) (228:9)
(241:17) (242:25)
(243:2) (243:5)
(250:8) (252:17)
**distributors** (12:22)
(21:17) (23:21)
(24:19) (28:7) (37:8)
(57:7) (57:8) (57:10)
(57:11) (57:16)
(58:10) (58:24) (60:1)
(69:13) (100:17)
(118:2) (139:23)
(140:21) (153:1)
(154:6) (157:5)
(228:13) (228:25)
(230:23)
**DISTRICT** (1:1) (1:10)
(80:13) (81:12)
(81:18) (84:21) (90:12)
**diversion** (96:2)
(139:17) (140:6)
(142:24)
**divert** (38:20)
**diverted** (127:23)
(128:6) (130:19)
(131:21) (139:20)
**diverters** (139:22)
**divided** (45:25)
**Divilio** (248:7)
(254:23) (255:15)
(255:17)
**Division** (1:17)
**DNA** (90:5)
**doctor** (181:24)
**doctors** (94:17)
**document** (18:21)
(18:23) (76:23)
(76:25) (90:8) (98:7)
(101:13) (104:13)
(106:4) (107:16)
(108:12) (109:5)
(111:12) (111:15)
(112:2) (112:4)
(112:7) (112:8)
(112:10) (112:11)
(116:20) (129:9)
(129:23) (130:2)
(136:18) (155:6)
(161:3) (174:24)
(175:2) (182:20)
(210:4) (213:8)
**document from**
**documentation**
**documented** (107:18)
**documents** (71:3)

(73:25) (74:1) (90:9)
(197:4) (213:25)
**DOJ** (53:22)
**dollar** (14:19)
(14:20) (26:4) (28:9)
**dollars** (15:9)
(22:19) (23:1) (27:5)
(28:4) (28:12) (44:4)
(44:13) (45:3) (77:1)
(89:12)
**door** (23:13) (24:15)
(53:16) (53:25) (54:5)
(54:16) (54:21)
(54:22) (55:1) (55:4)
**Dorchester** (93:7)
(93:10)
**dosage** (114:10)
(119:3)
**dragged** (36:25)
**draw** (113:23) (114:7)
(117:15) (122:8)
(127:21) (138:5)
**dream** (27:21)
**drive** (10:6)
**driver** (37:23)
**drop** (230:18)
**dropping** (37:24)
**Drug** (11:16) (56:23)
(57:7) (57:12) (57:16)
(57:19) (57:21)
(59:11) (59:15)
(59:16) (60:2) (60:19)
(94:6) (94:8) (94:10)
(96:12) (96:20)
(96:21) (96:24)
(96:25) (99:7) (99:20)
(105:18) (107:19)
(107:24) (113:3)
(114:10) (117:14)
(119:2) (119:3)
(119:11) (123:5)
(124:5) (129:10)
(136:13) (137:21)
(137:22) (138:8)
(138:15) (140:6)
(140:22) (141:6)
(142:1) (188:2)
(193:8) (202:8)
(212:17)
**drugs** (17:20) (56:24)
(56:25) (57:2) (57:8)
(57:13) (58:7) (58:12)
(59:9) (61:8) (62:22)
(64:19) (64:20)
(65:23) (66:19) (67:1)
(67:6) (69:3) (69:9)
(69:12) (69:14)
(69:15) (69:23) (70:2)
(73:15) (74:8) (74:10)
(74:13) (75:24) (76:1)
(76:4) (76:14) (78:15)
(79:5) (79:6) (79:8)
(80:14) (80:16) (82:8)
(82:11) (86:3) (89:13)

(89:16) (89:17)
(105:19) (106:22)
(118:14) (121:21)
(126:1) (128:1)
(139:1) (139:17)
(139:22) (140:1)
(140:3) (142:13)
(142:18) (153:11)
(163:14) (163:16)
(181:15) (182:11)
(182:14) (187:24)
(190:15) (190:24)
(252:15) (252:22)
(255:5) (256:3) (261:1)
**drug's** (107:25)
**DSCSA** (99:18) (212:14)
**due** (245:21) (246:11)
**duly** (92:25) (177:25)
**duping** (31:19)
**During** (30:21)
(33:11) (36:5) (36:10)
(44:13) (45:18)
(47:14) (49:10)
(54:24) (73:2) (73:16)
(100:21) (106:20)
(107:12) (146:15)
(148:9) (148:19)
(151:1) (159:2)
(163:6) (163:25)
(164:19) (167:8)
(170:4) (180:6)
(194:19) (197:10)
(210:25) (211:12)
(212:4)
**duties** (180:9)
**duty** (5:5)

**E**

**each** (9:2) (9:7)
(16:14) (20:4) (23:2)
(31:14) (44:7) (62:22)
(63:24) (64:5) (64:25)
(65:6) (113:13)
(141:5) (173:16)
(181:17) (234:21)
(251:16)
**eager** (191:9)
**earlier** (51:21)
(58:3) (59:10) (80:16)
(84:22) (120:24)
(130:7) (165:3)
(192:12)
**early** (58:14) (67:14)
(74:3) (75:5)
**easier** (208:19)
(243:16)
**easily** (56:13)
**easy** (56:12) (83:6)
(172:16) (172:19)
(191:3) (191:11)
**EBERSPACHER** (3:8)
(92:14) (92:18)
(92:19) (92:24) (93:4)
(93:22) (96:3) (97:6)

(97:13) (99:3) (99:15)
(100:13) (101:3)
(101:13) (102:10)
(103:4) (103:13)
(104:13) (105:12)
(106:4) (106:20)
(108:11) (112:22)
(113:18) (116:12)
(116:16) (116:20)
(117:8) (129:23)
(130:14) (133:21)
(134:9) (135:4)
(136:14) (136:18)
(137:12) (143:20)
(168:1) (169:16)
(169:24) (171:15)
(171:23) (174:11)
(175:1) (256:11)
**E-B-E-R-S-P-A-C-H-E-R**
**Economics** (58:8)
**educated** (27:2)
**effect** (63:15) (78:5)
(105:1) (108:23)
(109:6) (158:10)
(158:13) (158:17)
**effective** (108:24)
**effects** (193:7)
**efficient** (240:7)
**effort** (31:19)
(122:14) (122:16)
(123:14) (123:16)
**eight** (36:15) (90:25)
**electronic** (5:19)
**elicit** (54:25)
**eliciting** (54:24)
**ELMO** (109:25)
**email** (83:2) (83:9)
(98:10) (98:11) (99:4)
(136:21) (136:22)
(136:24) (137:13)
(137:14) (143:9)
(152:5) (152:6)
(152:21) (155:1)
(155:8) (156:7)
(156:14) (156:18)
(156:22) (156:23)
(157:1) (158:2)
(171:3) (175:3)
(179:18) (179:19)
(180:1) (183:17)
(184:14) (185:17)
(185:22) (187:3)
(188:3) (203:5)
(210:19) (211:2)
(212:22) (213:10)
(213:17) (213:18)
(214:6) (214:17)
(215:9) (215:18)
(217:6) (217:12)
(217:16) (218:17)
(218:18) (219:15)
(223:9) (223:23)
(226:7) (226:8)
(231:17) (231:19)

emailing                                                          father

(240:6) (240:10)
(241:1) (241:5)
(244:6) (248:20)
(248:23) (249:14)
(250:4) (250:5)
(250:13) (250:14)
(250:17)
**emailing** (100:1)
**emails** (20:7) (33:7)
(259:6) (259:13)
**emanates** (153:14)
**Emil** (207:13)
(207:15) (208:4)
(210:21) (211:2)
(211:22) (213:1)
(213:14) (213:23)
(214:18) (214:25)
(215:14) (215:18)
(219:14) (219:24)
(221:8) (238:8)
(260:25) (261:7)
**Emil's** (211:14)
**employ** (40:14) (48:7)
**employee** (262:17)
**employees** (10:15)
(10:17) (10:24)
(30:15) (146:5)
(146:7) (146:9)
(158:19)
**employment** (95:22)
(100:21) (134:3)
**enabled** (22:3)
**end** (17:23) (37:22)
(38:10) (39:9) (39:14)
(47:21) (48:2) (49:14)
(58:23) (58:25) (59:2)
(73:7) (85:13) (91:4)
(102:16) (121:7)
(148:5) (196:13)
(196:18) (239:15)
(242:6)
**ended** (45:8) (75:24)
(96:2)
**ends** (78:20)
**enforcement** (119:19)
**engaged** (141:5)
**engaging** (79:15)
**enjoy** (17:3)
**ensure** (67:22) (97:2)
(123:1) (150:2)
(153:12) (212:19)
**enter** (12:24) (48:20)
**entered** (21:6)
**entering** (138:8)
**enterprise** (41:8)
(48:21) (59:22)
**enters** (60:10)
**entire** (10:7) (16:15)
(24:25) (144:13)
(170:15) (180:10)
(206:8)
**entity** (63:21) (88:20)
**environment** (180:10)
**especially** (64:20)

**Esq** (1:13) (1:16)
(1:20) (2:1)
**essentially** (69:13)
**establish** (59:15)
**Establishing** (121:20)
**estate** (178:10)
**estimated** (186:6)
(186:8)
**evaluate** (56:16)
(90:20)
**even** (17:23) (18:16)
(20:4) (20:9) (20:14)
(21:23) (23:23)
(27:21) (30:22) (34:8)
(40:18) (45:21)
(62:10) (69:5) (79:1)
(85:13) (86:22)
(88:13) (140:20)
(152:24) (157:3)
(200:14) (230:25)
(242:5)
**evening** (264:6)
(264:14)
**events** (145:23)
(145:25)
**eventually** (180:12)
(182:14) (260:1)
**everybody's** (10:21)
**Everyone's** (27:24)
(30:18)
**exact** (174:18)
**exactly** (19:6)
(39:11) (53:21)
(63:23) (70:12) (82:4)
(83:15) (91:6) (142:5)
(142:6) (143:13)
(157:8) (256:14)
**EXAMINATION** (3:7)
(93:2) (148:21)
(167:24) (171:6)
(178:2) (257:3)
**examine** (128:17)
**examined** (103:3)
(128:12)
**example** (13:4)
(14:11) (28:24) (33:6)
(36:9) (36:10) (227:12)
**Excedrin** (36:19)
(42:8)
**exception** (5:24)
(25:13)
**exchange** (39:2)
**excited** (234:1)
**excuse** (56:14)
(57:10) (57:25) (69:7)
(69:8) (174:8) (187:12)
**excused** (175:17)
(264:2)
**excuses** (68:23)
(68:25) (72:9) (72:10)
(72:12) (72:14)
**excusing** (51:16)
**executive** (180:16)
**exercise** (12:11)

**exhausted** (181:17)
**EXHIBIT** (4:1) (97:24)
(98:16) (99:1) (99:12)
(101:11) (101:24)
(102:5) (104:11)
(104:22) (105:8)
(106:2) (106:13)
(106:16) (108:9)
(108:19) (110:2)
(110:6) (110:12)
(110:25) (111:4)
(111:5) (112:16)
(112:18) (116:18)
(117:2) (117:6)
(129:21) (130:6)
(130:12) (136:16)
(137:4) (137:10)
(182:18) (183:3)
(183:8) (194:11)
(198:13) (198:24)
(199:3) (200:11)
(203:13) (203:15)
(204:2) (204:6)
(205:1) (205:24)
(207:21) (208:13)
(208:17) (210:2)
(210:11) (210:15)
(213:5) (213:21)
(214:12) (217:20)
(218:3) (218:6)
(220:4) (220:22)
(221:3) (221:21)
(222:7) (223:7)
(223:17) (223:21)
(240:10) (244:8)
(249:13) (250:2)
(250:4) (252:5)
(254:1) (254:15)
(256:2) (256:16)
(261:5)
**exhibited** (62:11)
**exhibits** (5:19) (6:24)
**exist** (35:10) (38:15)
(109:12) (109:14)
(109:19) (111:7)
(112:7) (134:2)
**existed** (111:5)
(111:12) (244:5)
**exits** (50:11) (175:22)
**expect** (53:7) (53:8)
(256:25)
**expected** (125:11)
**expensive** (21:8)
(22:12) (204:16)
(250:7) (250:10)
**experienced** (70:1)
(192:2) (252:4)
**experiencing** (258:24)
**expiration** (28:17)
(28:20) (28:21)
(28:24) (28:25)
(113:4) (119:3)
**expires** (29:19)
**expiring** (29:2)

**explain** (12:16)
(20:25) (22:2) (38:3)
(74:16) (162:15)
(184:16) (185:17)
(202:3) (216:23)
(219:2) (219:3)
(219:11)
**explained** (95:10)
(132:3)
**explaining** (142:16)
(187:17) (199:23)
**explanation** (37:23)
(38:4) (94:7) (164:17)
(187:4)
**explanations** (75:2)
(245:18)
**exposed** (81:19)
**express** (9:2)
**expression** (40:1)
**extreme** (40:5)
**eyes** (32:1) (33:3)

                 **F**
**fail** (83:14)
**faith** (39:12) (39:16)
(39:25) (44:19)
**fake** (33:18)
**fall** (71:13) (79:1)
(107:7) (235:19)
(235:24)
**false** (33:7) (33:8)
(71:4) (116:2)
(126:18) (133:1)
(140:2) (155:10)
(155:11) (155:20)
(165:18)
**falsifying** (140:22)
**familiar** (93:22)
(93:25) (96:3) (96:16)
(100:13) (103:13)
(104:19) (106:10)
(124:15) (130:25)
(178:12) (178:15)
(178:20) (188:4)
(188:5) (189:21)
(220:1) (220:24)
(221:4) (222:24)
**families** (10:17)
(40:15) (48:10) (49:16)
**family's** (25:3)
**far** (27:20) (62:9)
(70:20) (76:21)
(77:18) (78:22)
(93:11) (146:12)
(157:14) (214:7)
(231:24) (232:6)
(233:6) (236:21)
(238:17) (251:20)
(252:24) (255:1)
(256:1) (259:6)
**farm** (196:17)
**fastest** (251:8)
**Fast-forward** (139:14)
**father** (9:16) (9:19)

faults                                                                          Gentek

**faults** (72:23) (72:24)
**FDA** (12:9) (14:1)
(14:9) (17:12) (19:12)
(19:20) (19:21) (21:6)
(21:20) (23:22)
(23:25) (24:20) (28:6)
(35:22) (35:23)
(40:11) (41:25)
(42:19) (42:24) (43:1)
(44:14) (47:12)
(53:19) (53:20)
(53:23) (108:1)
(124:13) (124:18)
(124:19) (126:23)
(169:3) (169:12)
(170:23) (254:8)
(254:12) (255:7)
(255:18) (255:20)
**FDA's** (170:19)
**fear** (60:16)
**feared** (75:21)
**February** (95:19)
**federal** (8:19)
(11:16) (35:3) (36:1)
(39:8) (49:2) (59:7)
(81:18) (90:12)
(119:18) (139:16)
(265:11)
**feds** (40:22) (40:25)
(41:9)
**fee** (46:9)
**feeling** (15:22)
(206:10)
**feelings** (260:5)
**fees** (47:13) (47:14)
**fell** (236:5)
**felt** (135:20) (144:8)
(144:9) (144:11)
(144:17) (147:1)
(147:12) (173:10)
**field** (9:22)
**figure** (20:16)
(21:10) (21:13) (25:7)
(47:19) (73:25)
(111:11) (136:1)
(136:3) (136:5)
(142:3) (143:2)
(181:4) (181:10)
(181:14) (181:16)
(181:18) (258:19)
**figured** (179:16)
**file** (35:20) (52:6)
(63:20) (74:21)
**filed** (80:13)
(139:16) (169:16)
**files** (64:22)
**fill** (29:3) (29:17)
(42:25)
**filled** (32:20)
(36:24) (259:19)
(259:23)
**final** (90:4)
**finally** (10:12)
(245:7)

**financial** (58:22)
(60:8) (69:10) (69:20)
(81:11)
**financially** (61:2)
**find** (45:4) (49:16)
(73:18) (82:10)
(179:19) (237:15)
**finding** (18:6)
(192:16)
**findings** (158:25)
**finds** (35:19)
**fingerprints** (90:5)
**finish** (72:21)
(156:12) (196:12)
**finished** (93:12)
(94:9)
**fire** (85:8)
**firm** (77:12) (85:21)
**firms** (22:1)
**firsthand** (87:20)
(150:21) (150:25)
**fit** (181:25)
**FITFO** (181:8) (181:9)
**five** (20:17) (44:20)
(53:8) (62:20) (62:23)
(63:24) (64:5) (64:25)
(65:1) (65:6) (65:23)
(84:22) (152:2) (186:6)
**fixed** (37:6)
**fixing** (38:21)
**flags** (168:21)
(168:24) (169:12)
(170:19) (170:24)
**flexible** (199:11)
**flip** (41:4) (194:21)
**flip-flops** (62:9)
(88:17)
**flood** (22:4) (22:11)
**flooded** (22:10)
(185:21) (186:2)
**Floor** (2:7)
**FLORIDA** (1:1) (1:6)
(2:8) (80:13) (81:13)
(81:18) (86:21) (87:2)
(87:6) (87:9) (90:12)
**flow** (141:20) (142:8)
(142:16)
**flowchart** (141:24)
(142:11)
**Flowers** (248:7)
(259:22)
**flsd** (2:8)
**fly** (72:8)
**focus** (199:8)
**focused** (144:9)
**foil** (238:21)
**folded** (235:13)
**followed** (17:15)
(100:11) (103:11)
(116:14) (118:18)
(122:6) (134:11)
(158:18) (158:21)
(159:5) (159:8)
(159:12) (159:17)

(159:21)
**following** (114:9)
(121:8) (141:16)
**follows** (93:1) (178:1)
**follow-up** (168:1)
**font** (55:22)
**Food** (107:19)
(119:11) (123:4)
(124:5) (196:16)
**foolish** (49:5)
**footnote** (141:4)
**for-cause** (120:21)
(121:6)
**force** (10:16) (17:21)
(18:19) (47:8)
**forced** (20:11)
(199:12)
**foregoing** (265:3)
**foreign** (13:5) (34:10)
**forensic** (33:9)
**forever** (73:8)
(171:12) (171:13)
**Forget** (70:10) (70:14)
**forgot** (238:7)
**form** (114:10)
(168:10) (174:20)
**format** (265:6)
**forms** (42:24) (142:24)
**formula** (13:12)
**formulation** (96:12)
**Fort** (1:6)
**forth** (62:9) (73:24)
(75:7) (80:3) (113:19)
(114:11) (139:11)
(158:25) (180:2)
(254:3)
**forward** (85:12)
(91:5) (102:21)
(202:20) (203:5)
(226:20)
**forwarded** (247:17)
(250:13) (251:2)
**found** (16:4) (33:23)
(42:6) (42:7) (42:8)
(63:17) (72:5) (72:7)
(84:5) (84:7) (140:21)
(179:13) (187:4)
(192:14) (216:25)
**foundation** (100:25)
(131:5) (162:19)
(222:21)
**founded** (9:14)
**four** (12:23) (15:21)
(44:20) (56:2)
(156:21) (160:2)
(160:3) (160:5) (160:6)
**four's** (160:5)
**frankly** (8:21)
**Fraud** (1:17) (18:3)
(18:5) (18:7) (18:8)
(31:23) (33:4) (40:19)
(48:23) (61:23)
(61:25) (70:9) (72:12)
(73:9) (84:11) (84:12)

(86:6)
**fraudsters** (80:5)
**fraudulent** (33:17)
(63:11) (65:19)
(68:13) (71:5)
(130:24) (130:25)
(131:3) (131:10)
(132:1) (132:2)
**fraudulently** (248:10)
**Free** (59:21) (146:25)
**freedom** (25:3) (87:19)
**frequency** (211:15)
**frequent** (209:6)
(209:7)
**frequently** (211:19)
**Friday** (214:18)
**friend** (9:19)
**friendly** (144:3)
**Frier** (77:13) (85:7)
**front** (16:9) (39:1)
(66:15) (152:12)
(152:14) (156:25)
(175:2) (182:20)
(223:23) (226:6)
**fronts** (27:23)
**frowned** (142:4)
**fulfill** (9:8)
**full** (23:7) (30:3)
(175:3) (261:6)
**full-time** (10:15)
**fun** (217:10)
**future** (25:3)

## G

**gain** (84:12)
**game** (232:12)
**game-changing** (68:15)
**garbage** (29:5)
(67:21) (68:13)
**Garrett** (262:25)
**general** (42:15)
(127:11) (185:24)
**generally** (102:10)
(127:15) (201:20)
**generic** (96:9)
(96:10) (191:21)
**Gentek** (19:13)
(25:16) (29:11)
(31:12) (31:13)
(46:11) (160:10)
(160:13) (160:14)
(160:18) (160:23)
(161:1) (161:18)
(162:6) (162:16)
(163:3) (163:16)
(163:24) (164:3)
(165:13) (166:12)
(166:13) (173:20)
(174:3) (174:12)
(174:16) (174:19)
(175:9) (187:8)
(201:3) (219:19)
(224:11) (224:12)
(224:15) (224:23)

(225:5) (225:13)
(225:14) (225:17)
(225:21) (226:16)
(240:8) (240:9)
(242:24) (243:12)
(250:7) (250:8)
(256:4) (256:5)
**Gentek's** (199:11)
**gets** (17:16) (18:8)
(41:6) (45:25) (47:2)
(86:11) (86:13) (87:1)
(88:6) (209:10)
**getting** (11:2)
(22:16) (25:11) (32:7)
(35:1) (42:22) (48:24)
(62:17) (69:19) (70:2)
(74:8) (102:12)
(144:9) (157:21)
(168:8) (173:15)
(191:24) (200:21)
(206:6) (206:8)
(206:15) (206:24)
(207:12) (207:16)
(225:1) (243:23)
(245:5) (245:19)
(246:10) (248:1)
(249:14)
**giants** (23:20)
**Gilead** (13:4) (13:11)
(13:25) (14:24) (15:4)
(15:7) (21:14) (22:3)
(23:8) (27:11) (33:22)
(33:23) (34:3) (34:8)
(34:9) (34:16) (34:19)
(34:25) (35:9) (35:17)
(35:18) (37:4) (37:5)
(37:6) (37:11) (37:14)
(37:18) (37:21) (38:6)
(38:14) (38:21)
(38:23) (40:8) (42:10)
(42:14) (42:15) (43:1)
(44:15) (44:16)
(56:25) (57:3) (57:4)
(57:6) (57:9) (57:12)
(57:13) (58:7) (58:10)
(58:12) (59:18)
(59:23) (60:3) (60:6)
(73:12) (73:14)
(73:20) (73:22) (74:4)
(74:7) (74:8) (74:11)
(74:19) (75:3) (75:8)
(75:9) (75:13) (75:20)
(75:21) (75:23) (76:6)
(76:8) (76:10) (76:13)
(76:17) (77:11)
(77:20) (77:21)
(78:11) (78:17)
(79:24) (80:7) (80:10)
(80:12) (80:14)
(80:19) (80:22)
(80:23) (81:1) (81:6)
(81:10) (81:13)
(81:17) (81:23) (82:5)
(82:10) (82:13) (86:2)

(89:24) (89:25) (90:5)
(90:7) (90:13)
(189:19) (202:9)
(202:16) (224:6)
(224:8) (225:9)
(228:14) (228:17)
(228:24) (229:10)
(229:13) (229:17)
(229:20) (229:24)
(230:6) (230:18)
(231:3) (232:9)
(233:10) (243:2)
(243:12) (250:8)
(252:14) (252:19)
(252:22)
**Gilead's** (37:8)
(57:16) (77:23) (86:3)
**gist** (171:14)
**gives** (87:2)
**giving** (72:2)
**glued** (129:9) (236:8)
(237:12)
**GMDCs** (201:1) (219:19)
**goal** (56:14) (89:23)
(89:24)
**goals** (95:10)
**go-between** (247:8)
**goes** (32:17) (47:4)
(59:1) (71:17) (79:5)
(87:2) (109:16)
(176:10)
**gold** (23:11) (26:5)
**Goliath** (12:7) (35:25)
**Googled** (191:6)
**Googling** (192:13)
**Gooles** (186:25)
**gotten** (64:12)
(66:19) (69:1) (76:16)
(80:16) (197:11)
**gov** (1:15) (1:18) (2:8)
**government** (6:19)
(8:1) (18:3) (18:4)
(18:22) (21:6) (21:19)
(21:22) (24:3) (30:24)
(34:1) (35:3) (36:1)
(36:18) (40:17) (43:1)
(44:20) (45:7) (52:3)
(55:1) (59:7) (65:5)
(71:16) (77:16)
(84:19) (86:20)
(86:24) (87:14) (88:8)
(88:15) (88:21) (89:2)
(89:7) (89:15) (91:21)
(92:12) (92:14)
(98:15) (101:11)
(101:23) (104:11)
(104:21) (106:12)
(108:9) (108:18)
(117:1) (130:5)
(136:16) (137:3)
(153:7) (165:19)
(176:20) (177:10)
(177:12) (182:18)
(183:3) (194:11)

(195:5) (195:6)
(198:23) (200:11)
(203:15) (204:1)
(205:1) (205:23)
(207:21) (208:12)
(210:2) (210:10)
(213:5) (213:20)
(217:20) (218:2)
(220:4) (221:21)
(223:7) (223:16)
(228:22) (232:16)
(232:17) (232:19)
(235:5) (240:10)
(241:7) (249:22)
(261:4)
**GOVERNMENT'S** (4:2)
(5:19) (87:15) (89:22)
(97:24) (99:1) (102:5)
(105:8) (106:16)
(112:18) (117:6)
(130:12) (137:10)
(183:8) (199:3)
(204:6) (208:17)
(210:15) (214:12)
(218:6) (220:22)
(222:7) (223:21)
(244:8) (249:13)
(250:2) (250:4)
**granted** (101:6)
**gray** (152:25) (157:5)
**great** (13:14) (22:8)
(26:20) (48:7)
(188:17) (189:2)
**greater** (231:8)
**greatest** (142:24)
**greatly** (37:3)
(231:15) (231:21)
**grew** (9:15) (10:9)
(72:18) (191:24)
**Grey** (7:16) (7:22)
(52:13) (53:1)
**grocery** (196:15)
**gross** (45:17) (45:19)
(46:17)
**ground** (21:2) (54:4)
(228:2)
**group** (47:11) (251:3)
**groups** (19:9)
**guarantee** (116:6)
**guarantees** (115:22)
**guess** (37:4) (40:23)
(51:15) (51:21)
(86:11) (109:23)
(152:18) (162:4)
(182:8) (184:16)
(184:17) (190:9)
(195:18) (196:14)
(206:23) (216:22)
(240:7) (240:17)
(252:4) (260:11)
(260:16)
**guidance** (5:5)
(126:23) (128:4)
(141:16)

**Guideline** (118:1)
**guidelines** (118:1)
(124:14) (124:15)
(124:17) (124:19)
**guilty** (18:15) (45:4)
(48:13) (49:17) (85:3)
(86:1) (87:9) (88:3)
(88:4) (88:5) (88:7)
(88:13) (88:15)
(88:17) (89:3) (89:10)
(91:3)
**Gulf** (185:11) (185:15)
**guy** (16:20) (16:25)
(17:6) (25:9) (26:6)
(66:10) (71:14)
(71:16) (76:12)
(78:19) (80:1) (81:2)
(85:9) (85:22) (88:11)
(89:5) (89:17) (207:9)
(207:11) (209:13)
(210:22)
**guys** (10:1) (13:8)
(21:1) (23:21) (24:13)
(25:6) (25:10) (25:23)
(28:2) (30:5) (31:8)
(31:19) (32:18)
(32:25) (35:23) (39:5)
(39:12) (40:4) (48:6)
(67:1) (71:7) (71:11)
(191:5) (220:17)
**guy's** (68:12) (89:21)
**gym** (179:4) (179:7)
(179:16)

## H

**hadn't** (197:11)
**half** (47:24) (50:23)
(90:15) (158:9)
**Hammond** (95:4)
**handed** (98:7)
**handful** (235:1)
**handle** (17:25)
(103:17)
**handled** (8:19) (138:2)
**handling** (11:6)
**hand-over-fist** (35:1)
**hands** (13:17) (21:14)
(22:9) (31:5)
**hang** (41:11)
**hanging** (39:8)
**happen** (60:7) (60:15)
(60:16) (136:8)
(139:12) (159:23)
(173:12) (250:19)
(254:3)
**happened** (21:3)
(22:15) (36:14)
(37:20) (48:17)
(48:22) (63:23)
(63:24) (70:20) (76:2)
(77:3) (79:21) (82:4)
(83:21) (84:13)
(84:25) (112:13)
(165:17) (166:14)

happening

(167:8) (211:12)
(227:11) (247:25)
(254:8)
**happening** (27:19)
(27:22) (31:7) (33:10)
(33:24) (34:9) (37:5)
(38:22) (58:5) (59:5)
(60:9) (72:14) (74:22)
(74:24) (75:17)
(75:19) (76:1) (76:22)
(78:19) (80:23)
(80:24) (81:10)
(81:21) (143:3)
(144:18) (147:1)
(151:11) (155:24)
(156:6) (211:16)
(243:24) (252:2)
**happens** (22:11)
(25:5) (25:6) (26:16)
(35:17) (36:12) (38:9)
(40:23) (77:10)
(86:11) (118:13)
**happy** (189:5)
(226:21) (234:2)
**hard** (10:8) (72:22)
(174:7) (184:17)
**harder** (191:11)
**hasn't** (87:9) (87:24)
(88:7)
**hating** (251:10)
**head** (65:4) (189:22)
**headed** (237:3)
**heading** (254:15)
**heads** (49:10)
**health** (9:21) (9:25)
(21:5) (51:9) (81:5)
(81:7) (212:19)
(228:25) (230:22)
**healthcare** (12:3)
(14:3) (40:19)
**hearing** (169:24)
(214:24) (225:3)
(228:6)
**hearings** (264:9)
**hearsay** (195:9)
(199:1) (204:4)
(205:25) (210:12)
(213:22) (213:24)
(245:23) (246:2)
(246:6) (246:7)
(246:12) (248:16)
(255:21)
**heart** (232:22)
(261:24)
**heavier** (240:9)
**he'd** (65:18)
**held** (95:25) (107:24)
(265:5)
**hell** (85:5)
**He'll** (20:11)
**help** (11:8) (11:10)
(11:14) (11:15) (16:6)
(20:19) (38:13)
(54:12) (70:22)

(155:5) (226:21)
(236:11)
**helped** (63:7)
**helper** (25:9)
**helpful** (186:17)
(186:18)
**helps** (243:18)
**Hep** (184:22) (189:16)
**hereby** (265:3)
**here's** (88:11)
(161:16)
**Hey** (16:10) (23:17)
(25:21) (29:18)
(32:18) (37:11) (41:1)
(42:3) (43:21) (236:4)
(238:20) (243:22)
(244:21) (247:11)
**hiccups** (218:22)
(219:1) (219:11)
**Hickey** (95:3)
**hide** (42:18)
**high** (9:17) (21:8)
(59:19) (59:20)
(127:15) (192:13)
(251:25)
**higher** (58:8)
**highest** (186:18)
(191:6)
**hills** (41:10)
**himself** (73:20)
**hinder** (62:17)
**hire** (10:15) (17:11)
(18:6)
**hired** (17:24)
**hires** (77:12)
**hiring** (22:1) (179:17)
**histories** (119:17)
(119:23) (126:19)
(133:2) (162:22)
**history** (93:14)
(100:5) (102:18)
(114:17) (115:1)
(115:17) (116:10)
(117:10) (118:3)
(120:1) (120:13)
(120:17) (121:15)
(121:17) (126:18)
(127:2) (127:9)
(133:1) (133:11)
(163:11) (222:17)
**hits** (30:18) (31:3)
**hitting** (34:11)
**HIV** (13:6) (13:9)
(13:23) (13:24)
(14:12) (15:11) (21:7)
(22:4) (22:7) (22:17)
(22:23) (23:8) (23:12)
(23:14) (23:17)
(26:21) (26:23)
(26:24) (27:1) (28:25)
(29:2) (29:17) (30:21)
(30:23) (31:1) (36:19)
(37:1) (37:10) (37:12)
(37:22) (38:20) (39:6)

(42:4) (43:21) (44:1)
(47:18) (54:11) (57:2)
(60:10) (61:8) (62:22)
(69:11) (76:6) (82:8)
(128:1) (128:4)
(163:13) (183:23)
(183:24) (184:1)
(184:4) (184:9)
(184:19) (184:22)
(184:24) (185:1)
(185:5) (185:6)
(185:12) (185:21)
(186:2) (186:6)
(186:16) (186:18)
(186:23) (189:16)
(191:6) (191:10)
(191:20) (192:5)
(192:13) (197:2)
(204:15) (206:11)
(207:6) (224:13)
(234:12) (234:13)
(241:10) (242:16)
(243:22) (249:14)
(251:21) (252:6)
(255:5) (256:3)
(258:9) (262:21)
(263:2) (263:11)
(263:14)
**HIV's** (251:4)
**holidays** (10:22)
**home** (16:2) (27:24)
(30:13) (30:18) (49:16)
**honest** (17:5) (39:11)
(90:17)
**hook** (69:22)
**hook-up** (25:22)
(25:23)
**hope** (264:10)
**hoped** (154:17)
**hopefully** (264:12)
**hopes** (89:17)
**hoping** (151:22)
**horrendous** (69:21)
**horrible** (37:3)
(148:20)
**horror** (91:4)
**hospital** (9:19)
(10:4) (10:7)
**hospitals** (9:25)
(11:2) (12:6) (14:2)
(94:17)
**hour** (158:10) (256:22)
**hours** (10:9) (55:20)
(100:2)
**house** (154:12)
**huge** (12:7) (31:2)
(39:8) (243:23)
**human** (33:21) (49:10)
**humble** (9:12)
**hundred** (14:12)
(22:19) (23:1) (23:4)
(36:15) (45:3) (47:25)
(60:13)
**hundreds** (11:3)

impressions

(27:4) (28:3) (28:12)
**Hurlock** (178:6)

**I**

**I'd** (51:1) (97:24)
(102:14) (102:24)
(104:10) (106:1)
(106:17) (107:1)
(107:15) (109:15)
(113:23) (114:7)
(116:1) (116:16)
(117:15) (117:25)
(119:16) (120:9)
(121:19) (122:8)
(123:10) (127:21)
(129:20) (136:14)
(138:5) (138:19)
(140:16) (141:3)
(141:18) (141:23)
(143:20) (174:23)
(175:1) (179:15)
(179:16) (182:17)
(184:7) (192:19)
(194:10) (194:21)
(195:22) (196:1)
(196:2) (198:12)
(198:15) (199:8)
(203:13) (204:24)
(206:8) (209:12)
(209:25) (214:5)
(215:5) (215:17)
(217:19) (220:4)
(221:2) (221:21)
(222:14) (223:5)
(226:6) (228:4)
(235:1) (242:3) (261:5)
**idea** (11:24) (25:14)
(26:20) (27:8) (30:2)
(30:7) (37:1) (153:21)
(167:11) (258:17)
**identify** (224:12)
**identifying** (132:15)
**identities** (83:1)
**illegal** (62:4)
**illegitimate**
**imagine** (16:25)
**immediately** (107:9)
(191:14) (209:23)
(215:22) (225:9)
(261:8) (261:11)
**immunity** (232:19)
**impact** (191:19)
**imperative** (13:16)
**implemented** (103:2)
(113:14) (116:13)
(124:19)
**implementing** (103:22)
**importantly** (53:14)
**impossible** (12:12)
(12:14) (140:2)
**imposters** (83:11)
**impression** (240:22)
**impressions** (260:6)
(260:15)

**improper** (78:7)
(232:3) (233:15)
(234:5) (248:12)
**improperly** (66:19)
(76:14) (142:18)
**inaccurate** (165:15)
(165:16)
**inappropriate** (147:2)
**incident** (138:24)
**incidents** (139:1)
**include** (115:6)
(118:3) (142:17)
(173:8)
**included** (114:13)
(163:2) (168:22)
(170:19) (198:22)
(214:6)
**including** (6:21)
(75:9) (115:7) (256:4)
**income** (191:24)
**incomplete** (206:9)
(209:11) (247:5)
**inconsistent** (63:12)
(79:22) (156:5)
(156:8) (156:14)
(156:19) (157:19)
(158:2) (211:19)
**incorrect** (18:4)
(202:23) (239:23)
(257:9)
**increased** (140:7)
**increasing** (192:5)
**incredible** (81:13)
**independent** (11:17)
(12:13) (14:15)
**INDEX** (3:1) (3:7)
(4:1) (21:24)
**indicated** (133:17)
(165:3)
**indicating** (5:4)
(52:7) (56:3)
**indication** (75:14)
(130:20) (132:22)
(133:5) (133:16)
**indicted** (18:3)
(18:4) (18:6) (18:8)
(18:14) (40:19)
(40:21) (40:25) (41:6)
(41:9) (84:20)
**indictment** (18:11)
(18:12) (40:16) (73:3)
(84:24) (85:3) (85:8)
(85:10) (85:15) (91:1)
(151:5) (176:8)
**indictments** (26:14)
**individuals** (75:8)
(77:14) (139:16)
**induced** (33:25)
**industry** (11:13)
(12:3) (12:7) (33:6)
(38:10) (38:11)
(47:16) (56:21) (61:7)
(72:24) (78:14)
(190:9) (230:11)

(235:10)
**infected** (60:14)
(192:13)
**inferred** (219:3)
**info** (183:23)
**inform** (6:2) (81:9)
**information** (39:20)
(52:21) (56:12) (59:4)
(62:16) (68:9) (71:23)
(73:18) (73:23)
(76:18) (80:23) (83:9)
(89:25) (90:2) (90:21)
(113:25) (114:8)
(114:9) (114:12)
(115:5) (115:7)
(115:16) (116:3)
(120:13) (121:8)
(121:14) (121:16)
(129:10) (131:12)
(135:1) (162:15)
(184:15) (193:8)
(201:16) (201:21)
(202:4) (202:6)
(202:24) (203:6)
(222:18) (225:24)
(226:3) (247:5)
(247:12) (247:21)
(248:1) (248:2)
(248:10) (259:1)
(259:2) (259:15)
(259:19) (259:23)
**informational** (193:9)
**informed** (35:14)
(225:13)
**informing** (34:22)
(38:22) (226:15)
**initially** (54:14)
(247:21)
**innocence** (41:21)
**innocent** (18:15)
**inpatient** (93:17)
**insert** (129:8)
(129:13)
**inserted** (37:25)
**inserts** (129:4)
**inside** (33:1) (36:16)
(82:17) (82:20)
(82:22) (145:25)
(225:18) (261:1)
(261:12)
**insignia** (109:10)
(109:12) (110:2)
(110:5) (110:25)
(111:1) (111:4)
(111:7) (111:11)
(112:11)
**insignias** (109:21)
(110:8) (110:15)
(110:20) (110:22)
**insisted** (21:15)
**inspect** (53:19)
(54:10)
**inspection** (119:18)
(120:3)

**inspections** (40:13)
(53:20)
**instance** (59:8)
(59:19) (59:23)
(67:15) (77:19)
(120:7) (126:5)
(252:14) (253:2)
(253:10)
**instances** (67:16)
(201:25) (202:2)
(202:18)
**instead** (11:1) (56:1)
(60:23) (75:10)
(75:16) (201:1)
**instructed** (6:2)
(135:11) (135:13)
**instruction** (6:7)
**instructions** (113:6)
**insufficient** (138:14)
**insurance** (9:25)
(12:5) (12:8) (14:1)
(14:25) (21:9) (22:5)
(38:21) (58:19) (59:6)
**integrity** (72:13)
(137:21)
**intend** (80:17)
**intended** (90:24)
**intending** (78:10)
**intent** (48:19)
(56:18) (65:13) (70:8)
(73:5) (73:8) (73:17)
(79:3) (79:22) (82:10)
(84:10) (90:7) (90:22)
(176:10)
**intentional** (84:1)
**intentionally**
**interest** (20:14)
(184:19)
**interested** (190:23)
(191:14)
**interesting** (152:25)
(157:4)
**intermediary** (65:25)
(94:12)
**internal** (67:9)
(76:16) (224:8)
**interpersonal**
**interpret** (136:7)
(136:12) (181:14)
**interrupt** (220:14)
**interstate** (141:6)
**interview** (94:25)
(95:3) (95:5) (95:8)
(160:17) (180:2)
(180:6)
**interviewed** (95:2)
(159:25) (160:6)
**interviews** (166:5)
**intimidated** (144:6)
(144:7) (147:13)
**into** (5:10) (5:11)
(9:21) (12:24) (13:17)
(16:1) (19:10) (20:22)
(21:7) (21:14) (22:9)

(23:10) (23:11)
(23:15) (26:5) (26:8)
(26:10) (27:25)
(28:23) (31:19) (34:3)
(34:18) (37:1) (38:6)
(45:3) (48:21) (54:14)
(58:21) (69:1) (74:9)
(76:14) (77:25)
(80:15) (80:16)
(82:20) (82:21)
(83:14) (86:24)
(98:15) (101:23)
(104:22) (106:12)
(107:7) (108:18)
(117:1) (117:15)
(124:19) (130:5)
(137:3) (137:25)
(138:16) (149:23)
(150:15) (150:18)
(164:17) (184:18)
(195:22) (196:4)
(221:19) (223:17)
(241:8) (241:25)
(242:4) (249:14)
(249:24) (261:17)
**intro** (184:17)
(188:3) (251:19)
**introduced** (220:18)
**introduction** (63:3)
(112:16) (213:25)
(251:3)
**inventory** (185:2)
(185:3) (188:24)
(192:6) (192:9)
(216:3) (217:2)
**invest** (65:18)
**invested** (63:7)
(65:17)
**investigate** (75:15)
(76:11)
**investigated** (54:7)
**investigating**
**investigation**
**investigations**
**investigator** (33:10)
**investment** (39:2)
**invite** (53:19) (80:7)
**invited** (54:9)
**invocation** (6:3)
**invoke** (5:23)
**invoked** (6:1)
**involved** (18:19)
(26:13) (34:1) (41:8)
(57:1) (65:19) (66:18)
(71:3) (71:15) (77:7)
(77:14) (77:15)
(78:15) (82:16)
(101:3) (105:23)
(126:9) (132:12)
(132:19) (139:17)
(163:17) (166:8)
(166:14) (198:16)
(208:1) (208:6)
**involvement** (71:14)

**involves**

**involves** (45:3)
**involving** (125:23)
(162:16) (163:16)
(164:19) (165:13)
(166:13)
**Ireland** (13:6) (34:11)
**irrelevant** (260:11)
**isn't** (23:15) (24:5)
(26:8) (47:17) (54:19)
(111:1) (111:5)
(150:8) (153:11)
(153:14) (154:8)
(154:25) (155:7)
(155:10) (155:12)
(155:17) (155:21)
(157:7) (158:3)
(158:22) (164:1)
(164:4) (164:14)
(167:12) (230:15)
(233:13) (233:18)
(240:18)
**isolated** (216:3)
**issued** (64:16) (80:4)
(106:8)
**items** (80:11)
(215:21) (261:8)
**it'll** (53:8)
**its** (8:12) (55:14)
(63:14) (64:21) (67:9)
(83:19) (92:4) (92:12)
(97:7) (97:14)
(109:10) (109:21)
(110:22) (112:5)
(116:7) (153:14)
(177:3) (177:10)
**itself** (65:2) (79:15)
(81:7) (191:15)
(238:18) (253:22)

**J**

**Jacqueline** (1:16)
(1:18) (7:11)
**jail** (86:14) (86:17)
(86:18) (86:25) (87:1)
(87:18) (88:6)
**January** (58:25)
(59:3) (94:4)
**Jersey** (18:10) (41:6)
(77:13) (84:21)
(85:15) (85:20)
(86:12) (86:21) (87:3)
(88:3) (88:8) (262:22)
(262:23)
**Jess** (95:3)
**Jesse** (95:3)
**job** (17:2) (67:8)
(85:5) (94:20) (94:22)
(94:25) (179:9)
(179:10) (180:3)
(180:9) (180:12)
(180:14) (205:17)
(236:22) (236:25)
(255:8) (262:12)
**Jon** (194:14) (194:16)

(205:7) (205:10)
(247:11)
**JONATHAN** (3:13)
(177:12) (177:19)
(177:24) (203:20)
**J-O-N-A-T-H-A-N**
**Josh** (254:20)
**Judicial** (265:7)
**July** (80:11) (82:4)
(84:21) (137:2)
(156:18) (182:23)
**July-ish** (134:8)
**June** (86:12) (103:8)
**Justice** (24:3)
(35:21) (35:22) (39:7)
(40:25)
**justified** (75:3)

**K**

**Kaitlin** (262:11)
**Katherine or** (256:11)
**KATHLEEN** (3:8)
(92:14) (92:18) (92:24)
**K-A-T-H-L-E-E-N**
**Katie** (103:4)
(256:11) (256:12)
**keep** (7:13) (21:15)
(32:24) (38:13)
(38:15) (42:17)
(43:13) (45:11) (58:7)
(59:19) (119:23)
(172:24) (192:9)
(216:21) (216:24)
(233:11)
**keeping** (21:17)
(32:10) (33:10) (42:1)
(44:6) (44:7) (82:9)
(172:23)
**keeps** (30:24)
**KELLEY** (2:6) (2:8)
(265:2) (265:9)
(265:10)
**kept** (18:22) (34:7)
(37:15) (37:17)
(71:10) (82:11) (85:6)
(85:16) (120:2)
**key** (16:15) (17:16)
**keys** (16:9) (39:1)
**Khaim** (66:10) (66:11)
(66:12) (66:13) (68:4)
**kitchen** (22:14)
**knowing** (75:22)
(86:14)
**knowingly** (49:1)
(115:19) (116:2)
(116:9)
**knowledge** (16:20)
(19:24) (27:10)
(96:15) (109:6)
(150:21) (150:25)
(158:11) (158:14)
(167:7) (170:20)
(176:10) (228:11)
(230:3) (253:17)

(253:23) (253:25)
(254:8) (255:10)
**known** (20:1) (57:1)
(68:12) (71:20)
(132:11)
**knows** (19:8) (27:3)
(38:15) (62:16)
(70:25) (77:21)
(125:22) (126:4)
(255:4)
**kudos** (13:12)

**L**

**label** (19:1) (194:1)
**labeling** (60:23)
**labels** (49:8) (57:6)
(193:17) (215:4)
**Lack** (162:19)
(171:17) (198:6)
(230:3) (238:15)
(253:16) (255:9)
**lacked** (73:8)
**lackings** (72:23)
**Lakes** (2:2)
**language** (136:2)
(139:15) (152:8)
(152:9)
**lapel** (167:5)
**larger** (140:18)
**largest** (186:13)
**last** (31:8) (68:4)
(68:12) (88:1) (88:2)
(110:6) (120:12)
(121:2) (123:2)
(128:15) (138:25)
(140:9) (140:10)
(159:7) (183:20)
(217:9) (219:8)
(222:14)
**late** (260:8)
**later** (64:11) (88:14)
(146:23) (212:17)
**latitude** (36:5)
(97:18)
**Lauderdale** (1:6)
**launder** (66:19)
(83:13)
**laws** (49:2)
**lawsuits** (35:20)
**lays** (250:5)
**leading** (76:16)
(174:8) (174:20)
(258:3)
**leads** (77:22)
**leaflet** (235:9)
(236:4)
**leaflets** (193:1)
(193:3) (193:5)
(193:11) (193:15)
(196:1) (196:2)
(215:3) (215:13)
(235:6) (236:8)
(237:12)
**learn** (179:24)

**license**

(188:17) (189:1)
(190:6) (190:7)
**learned** (73:15)
(180:24) (184:25)
(252:19) (258:19)
**least** (29:13) (29:23)
(45:9) (46:5) (46:7)
(59:3) (89:7)
**Leave** (41:13) (47:20)
(50:3) (146:21)
(157:13)
**leaving** (47:6)
**leeway** (257:23)
**left** (22:14) (75:24)
(95:18) (95:19)
(112:13) (144:21)
(146:18) (146:19)
(150:20) (162:4)
(162:18) (164:8)
(254:6) (256:13)
(256:14) (256:15)
(258:23)
**legal** (47:13) (61:3)
(61:17) (62:3) (62:19)
(64:2) (78:25) (83:24)
(248:11)
**legitimacy** (121:20)
**legitimate** (24:1)
(25:13) (25:18) (27:6)
(28:16) (54:13) (64:2)
(65:13) (66:22) (72:3)
(76:20) (79:14)
(111:15) (112:2)
(112:12)
**legitimately** (84:4)
(112:8)
**less** (13:1) (14:16)
(15:6) (27:14) (53:8)
(58:17) (59:17)
(103:25) (204:16)
(229:21) (229:25)
(233:13) (243:9)
(243:10)
**letter** (7:3) (33:7)
(100:7) (101:16)
(101:17) (102:11)
(103:7) (147:4)
(147:7) (147:14)
(147:17) (149:16)
(149:18) (151:21)
(156:5) (224:6)
(224:21) (225:1)
(225:3) (226:13)
(226:24)
**letters** (80:1)
(147:12)
**letting** (81:3)
**level** (31:25) (58:8)
**Levitt** (77:13) (85:7)
**liar** (17:1) (17:3)
(17:4) (60:23)
**liberty** (25:2)
**license** (19:19)
(19:20) (25:14)

**licensed**

(29:12) (33:13)
(33:17) (43:23) (44:8)
(64:7) (64:9) (64:14)
(64:22) (64:24) (69:2)
(83:20) (83:23)
(83:24) (84:2) (84:6)
(84:7)
**licensed** (14:9)
(19:11) (19:12)
(19:25) (23:18)
(24:10) (24:20) (28:6)
(29:10) (40:13)
(47:12) (65:7) (84:4)
(178:10) (188:21)
**licenses** (11:16)
(19:15) (19:16)
(23:22) (23:24)
(23:25) (25:13)
(25:18) (25:24) (33:8)
(33:12) (40:11)
(41:25) (44:7) (53:24)
(54:8) (54:9) (64:13)
(66:25)
**licensing** (53:20)
(64:16) (122:17)
**lid** (106:25)
**lie** (20:7) (20:8)
(20:16) (26:1) (30:4)
**lied** (17:8) (17:9)
(18:14) (18:16)
(18:17) (18:21)
(19:18) (19:22)
(19:23) (20:1) (20:2)
(20:4) (20:5) (20:8)
(20:9) (20:11) (25:13)
(40:7)
**lies** (17:7) (17:8)
(17:18) (17:19)
(17:21) (17:22)
(17:23) (18:10)
(20:13) (20:18)
(20:24) (20:25)
(27:16) (27:18)
(41:19) (41:20) (46:3)
**life** (20:23) (20:24)
(28:17) (29:6) (49:11)
(85:2)
**life-saving** (13:13)
(13:15)
**limited** (26:25)
**line** (15:8) (22:3)
(32:25) (76:9) (99:3)
(99:15) (121:2)
(183:21) (184:23)
(218:22) (250:18)
(250:19)
**lines** (199:15)
**lingo** (188:4)
**lion's** (46:2)
**list** (72:20) (102:16)
(102:25) (115:13)
(115:15) (115:25)
(122:9) (123:3)
(126:8) (127:11)

(128:6) (129:12)
(130:18) (132:17)
**listed** (21:22)
(113:16) (121:16)
(182:24) (187:6)
(188:18) (189:13)
(202:7) (203:17)
(210:6) (210:8)
**lists** (186:12)
**litigation** (80:2)
**little** (10:11) (13:8)
(16:19) (17:13)
(18:12) (42:22)
(56:22) (93:14)
(93:19) (94:7) (95:9)
(138:12) (141:3)
(174:6) (179:14)
(185:5) (191:19)
(202:3) (232:9)
(239:6) (239:12)
(240:8) (250:10)
**live** (15:2)
**livelihoods** (25:1)
**lives** (9:7) (48:10)
**living** (93:8) (178:9)
**loaded** (186:1)
**local** (119:19) (191:7)
**location** (59:16)
**locations** (201:18)
(201:24)
**lock** (241:23)
**logo** (112:14) (113:19)
**longer** (80:25) (83:6)
(170:24) (237:12)
(245:2)
**look** (21:23) (31:16)
(31:17) (38:12)
(46:16) (68:11) (70:9)
(71:18) (80:7) (82:9)
(82:21) (90:14)
(90:15) (91:5) (99:11)
(105:2) (109:23)
(111:10) (111:11)
(117:25) (121:2)
(126:13) (127:11)
(127:18) (128:20)
(133:22) (142:2)
(151:13) (152:19)
(160:25) (161:16)
(168:25) (193:20)
(203:4) (221:19)
(224:25) (238:23)
(247:12) (254:15)
**looked** (113:19)
(127:5) (151:14)
(153:22) (160:15)
(193:25) (210:23)
(235:6) (238:14)
**looking** (12:2) (39:7)
(45:3) (55:18) (55:23)
(60:15) (61:18) (70:8)
(82:14) (82:23)
(100:21) (110:6)
(110:12) (110:25)

(129:3) (137:12)
(137:25) (203:25)
(218:19)
**looks** (42:4) (109:3)
(183:1) (194:14)
(236:4) (250:9)
**loop** (255:1)
**Lopez** (49:25) (50:1)
(50:2) (50:4) (51:21)
**Lopez's** (50:18)
**lose** (29:5) (35:10)
**losing** (253:14)
**lost** (185:12) (185:17)
**lot** (10:8) (16:20)
(21:3) (25:21) (26:11)
(28:14) (36:9) (43:12)
(44:23) (47:16)
(56:10) (56:11)
(56:12) (60:16) (75:1)
(96:21) (113:4)
(119:3) (134:9)
(134:19) (135:11)
(152:14) (154:5)
(172:4) (179:16)
(186:25) (191:16)
(196:16) (199:20)
(209:16) (228:2)
(243:9) (243:10)
(262:25)
**lots** (26:18) (76:1)
(224:11)
**loud** (37:16) (161:17)
**louder** (40:2) (81:8)
**love** (40:17)
**low** (125:2) (125:9)
(188:15) (189:9)
**lower** (58:11)
(125:15) (257:21)
(262:19)
**lower-level** (262:17)
**loyalty** (84:14)
**lunch** (51:22) (91:8)
(91:11) (91:12) (179:6)
**lying** (17:18) (18:1)
(25:15) (38:19) (88:21)

**M**

**ma'am** (112:10)
(145:9) (163:18)
(167:18) (175:16)
(178:8) (178:14)
(178:22) (178:24)
(179:23) (180:4)
(180:13) (180:18)
(180:21) (180:23)
(181:1) (181:22)
(182:3) (182:15)
(182:21) (183:22)
(183:25) (184:3)
(185:9) (185:14)
(185:19) (186:15)
(187:10) (187:16)
(187:20) (187:23)
(188:7) (188:12)

(188:14) (188:25)
(189:3) (189:11)
(189:14) (189:25)
(190:4) (192:3)
(192:15) (192:18)
(192:22) (193:12)
(193:24) (194:2)
(194:5) (194:8)
(194:17) (194:20)
(195:4) (195:15)
(196:10) (197:1)
(197:16) (197:19)
(198:22) (199:14)
(199:17) (199:25)
(200:8) (200:16)
(200:18) (201:6)
(201:9) (201:12)
(202:25) (203:8)
(203:19) (203:21)
(203:25) (204:18)
(205:9) (205:14)
(205:22) (206:17)
(207:2) (207:4)
(207:25) (209:15)
(209:19) (209:24)
(210:5) (210:7)
(210:9) (210:24)
(211:3) (211:6)
(211:9) (211:11)
(211:23) (212:4)
(212:8) (212:12)
(212:15) (213:9)
(213:11) (213:19)
(214:19) (214:23)
(215:1) (215:8)
(215:11) (215:16)
(215:20) (215:24)
(216:7) (216:15)
(216:17) (217:7)
(217:11) (217:17)
(218:15) (218:20)
(218:25) (219:16)
(219:22) (219:25)
(220:12) (221:1)
(222:13) (223:1)
(223:13) (223:25)
(224:4) (224:9)
(224:14) (224:16)
(224:18) (225:2)
(225:6) (225:10)
(225:15) (225:19)
(225:23) (225:25)
(226:12) (226:14)
(226:17) (227:4)
(227:15) (257:14)
(257:19) (257:25)
(258:11) (258:16)
(258:25) (259:10)
(259:12) (259:17)
(259:21) (259:24)
(260:3) (260:24)
(261:3) (261:9)
(261:22) (262:1)
(262:3) (262:6)

main                                                                                    met

(262:9) (263:3)
(263:10) (263:13)
(263:16) (263:18)
(263:22)
**main** (207:9) (207:11)
(228:16)
**mainly** (185:7)
(189:19) (192:25)
(204:23) (212:22)
**maintain** (113:25)
**maintaining** (85:16)
**major** (184:24)
(185:20) (186:2)
**majority** (185:11)
(185:18)
**makeup** (193:8)
**management** (103:3)
(119:5) (119:7)
(159:10) (173:5)
(173:6) (173:8)
(173:11) (262:18)
**manager** (96:1) (96:2)
(103:4) (103:7)
(118:23) (181:4)
(207:17) (254:25)
**managers** (181:12)
(183:1)
**managing** (113:15)
**manipulate** (87:22)
**manipulated** (67:2)
**manipulating** (82:17)
**manipulator** (66:21)
**manner** (56:16)
(133:13)
**manufacture** (56:24)
(59:11)
**manufactured** (189:18)
**manufacturer** (13:2)
(31:17) (42:10)
(59:12) (73:12)
(73:14) (94:11) (96:9)
(96:22) (121:9)
(121:13) (122:1)
(122:10) (129:11)
(134:21) (141:7)
(196:13) (196:20)
(203:3) (227:2)
(228:10) (228:21)
(229:11)
**manufacturers** (22:4)
(56:23) (57:3) (121:25)
**manufacturer's**
**manufacturer-to-distributor**
**manufacturing** (38:5)
(77:22) (86:2)
**MAR** (4:2)
**March** (78:11) (79:24)
(223:15) (226:9)
**mark** (106:25) (220:19)
**marked** (196:18)
**market** (12:2) (12:15)
(13:6) (15:18) (19:11)
(19:17) (22:12)
(24:24) (26:7) (26:21)

(26:24) (27:1) (27:3)
(34:12) (37:7) (38:21)
(48:25) (60:10)
(60:19) (74:9) (74:13)
(75:4) (75:22) (80:17)
(127:15) (148:12)
(185:5) (185:6)
(185:11) (233:12)
(241:25)
**marketplace** (15:5)
(19:8) (139:10)
(187:14) (187:19)
(233:13) (241:11)
**markets** (22:4)
(22:11) (186:13)
**marks** (193:21)
(193:23)
**Maryland** (9:15)
(9:16) (9:18) (39:5)
(40:15) (82:6) (82:7)
(93:7) (119:11)
(147:7) (178:6)
(178:7) (178:8)
(178:11) (256:21)
**masks** (27:24) (31:4)
**master** (87:23)
**match** (131:11)
**matches** (120:13)
**materials** (13:19)
**math** (47:19)
**matters** (54:14)
(137:5) (264:20)
**maximize** (229:18)
**McKesson** (37:9)
(37:10) (37:11)
(37:18) (228:25)
(230:22) (241:14)
**meaning** (10:17)
(45:19) (241:5)
**means** (11:19) (13:3)
(49:1) (69:20) (70:1)
(91:3) (96:19)
(105:16) (106:22)
(111:15) (118:10)
(120:15) (121:12)
(155:9) (188:6)
(228:9) (228:20)
(229:10) (244:14)
(253:14) (261:16)
**meant** (112:25)
(120:5) (130:25)
(219:2) (252:10)
**meantime** (31:9)
**mechanisms** (59:20)
**Medicaid** (142:20)
**medication** (19:10)
(25:24) (28:10) (35:5)
(37:2) (46:11) (96:4)
(96:7) (96:8) (96:14)
(117:20) (122:25)
(125:6) (125:12)
(138:8) (180:17)
(180:19) (181:20)
(181:25) (182:2)

(182:5) (183:24)
(184:1) (184:4)
(184:18) (184:20)
(186:20) (188:16)
(188:22) (191:10)
(191:11) (191:21)
(191:22) (192:20)
(193:6) (193:9)
(195:14) (195:19)
(196:19) (196:24)
(197:2) (197:18)
(200:14) (202:13)
(208:24) (209:2)
(209:16) (214:25)
(224:13) (225:21)
(232:7) (234:18)
(237:21) (238:11)
(238:17) (240:3)
(243:21) (244:1)
(257:10) (257:16)
(257:21) (258:9)
(262:5) (262:7)
(262:21) (263:12)
(263:14)
**medications** (15:11)
(17:23) (20:5) (34:2)
(34:5) (34:15) (34:24)
(35:2) (47:22)
(142:19) (182:7)
(184:2) (200:25)
(207:6) (211:19)
(212:1) (231:12)
(231:15) (233:12)
(233:24) (234:20)
(251:21) (259:7)
(260:2) (261:18)
(263:1) (263:2)
**medicine** (12:21)
(13:6) (13:9) (13:12)
(13:13) (13:15)
(13:16) (13:21)
(13:23) (13:24)
(14:13) (14:18) (15:2)
(18:24) (19:3) (19:5)
(19:6) (19:22) (21:14)
(22:5) (22:7) (22:9)
(22:17) (22:23) (23:8)
(23:14) (23:16)
(23:17) (24:14)
(24:24) (25:6) (25:21)
(26:1) (26:3) (26:6)
(27:5) (28:25) (29:2)
(29:17) (31:1) (35:6)
(35:19) (36:20) (37:2)
(37:10) (37:12)
(37:22) (37:24)
(37:25) (38:20) (39:6)
(42:4) (42:20) (43:9)
(43:12) (43:21) (44:1)
(46:23) (46:24) (47:1)
(47:18) (48:24)
(114:25) (115:23)
(133:7) (133:18)
(186:16) (206:11)

(229:11) (231:21)
(243:22)
**medicines** (12:20)
(13:20) (21:8) (23:5)
(23:6) (23:12) (28:18)
(28:20) (30:5) (34:11)
(38:24) (42:16) (49:1)
(49:7)
**meds** (186:23)
(189:16) (241:10)
(252:6)
**meet** (20:6) (41:16)
(179:9) (242:6)
(262:25)
**meeting** (85:17)
(183:23) (217:3)
(251:4)
**meets** (87:6) (88:2)
**Mellott** (262:25)
**Members** (91:7)
(189:4) (264:5)
**memory** (149:10)
(175:6) (241:4)
**men** (26:9)
**men's** (9:6)
**mention** (30:25)
(39:17) (56:22)
(214:20)
**mentioned** (18:3)
(36:18) (44:20) (45:7)
(134:10) (137:12)
(144:11) (159:24)
(171:7) (173:3)
(174:2) (174:11)
(174:15) (179:15)
(189:1) (190:5)
(191:13) (192:12)
(193:2) (193:13)
(201:25) (202:4)
(202:5) (211:17)
(211:18) (229:3)
(230:9)
**mentioning** (53:18)
(53:22) (54:2) (54:8)
(224:7) (224:11)
**mentions** (126:8)
(138:7) (226:20)
(244:9) (244:10)
**mentor** (72:16)
**merchandise** (122:15)
(123:15) (212:6)
**mere** (167:16)
**message** (88:15)
(194:14) (198:17)
(198:18) (199:9)
(199:16) (204:8)
(208:3) (209:11)
(218:13) (219:2)
(219:10)
**messages** (20:8)
**met** (63:1) (66:4)
(66:6) (66:11) (84:23)
(100:18) (162:3)
(178:25) (232:16)

method                                                    NICHOLLS

**method** (252:7)
**Miami** (1:15) (1:22)
(2:7) (2:8) (22:20)
**microphone** (177:16)
**middle** (34:15)
(78:11) (102:25)
(175:3) (211:4)
(217:1) (243:13)
**middleman** (21:17)
(250:9)
**middlemen** (24:18)
**midsize** (30:17)
**mid-size** (11:6)
**mid-term** (15:15)
**milk** (28:23)
**million** (30:25)
(44:4) (44:13) (44:21)
(44:23) (45:3) (45:8)
(45:9) (45:12) (45:15)
(45:16) (45:18)
(45:21) (45:23)
(45:25) (46:2) (46:14)
(46:15) (46:17)
(46:18) (46:20) (47:2)
(47:3) (47:4) (47:6)
(47:7) (47:8) (47:10)
(47:22) (47:24)
(235:13)
**millions** (27:5)
(28:4) (28:12) (44:4)
(76:25) (89:11)
(89:12) (90:9)
**mind** (32:10) (33:10)
(45:11) (65:12)
**minimum** (114:1)
**minimums** (242:4)
**minor** (42:13)
**minus** (187:22)
(188:1) (189:5)
(190:2) (190:18)
(242:15) (252:8)
(253:11) (253:12)
(253:21)
**minute** (30:11) (45:11)
**minutes** (39:21)
(50:9) (53:8) (152:2)
(152:12) (175:21)
(176:12) (254:6)
(256:25) (257:1)
**Miramar** (1:17) (1:18)
**misbranded** (118:15)
(120:21) (121:5)
**Mischaracterizes**
**missed** (222:5)
(249:25)
**missing** (7:20) (7:22)
(106:25) (129:4)
(129:13) (193:1)
(193:3) (193:11)
(193:15) (196:1)
(201:18) (202:1)
(202:2) (202:5)
(202:8) (202:17)
(206:9) (215:3)

(215:13) (238:21)
(247:5) (247:12)
(247:21) (259:15)
**misstate** (165:8)
**Misstating** (258:2)
**mistake** (61:20)
(61:22) (84:1) (198:9)
**mistakes** (33:14)
(33:15) (33:20)
(33:21) (48:16)
(48:17) (48:23) (49:5)
**misunderstand** (240:5)
**misunderstood**
**Mm-hmm** (252:20)
**model** (11:22)
(134:21) (151:13)
(229:23)
**modified** (52:6)
**mom** (9:17)
**mom-and-pop** (242:5)
**moment** (20:14)
(20:19) (173:3)
(200:19) (203:11)
(224:22) (224:25)
(227:17) (249:4)
**monetary** (84:12)
**money** (15:3) (15:11)
(16:5) (16:11) (18:17)
(18:18) (18:19)
(26:18) (27:15)
(30:24) (30:25)
(34:25) (35:9) (35:10)
(38:1) (44:9) (44:23)
(44:24) (45:5) (45:6)
(45:22) (46:3) (46:12)
(46:16) (47:20) (48:5)
(49:3) (57:10) (57:19)
(57:20) (58:9) (58:12)
(58:14) (58:20)
(60:20) (61:6) (62:18)
(62:19) (64:24)
(65:17) (65:18)
(69:16) (69:23)
(70:14) (70:16) (77:2)
(87:17) (88:22)
(191:16) (191:18)
(239:6) (253:3)
(253:6) (253:14)
(258:14)
**money-wise** (182:9)
(182:10)
**monitoring** (70:8)
(102:17)
**monopoly** (13:25)
(14:6) (27:12)
**Montana** (51:6)
**month** (13:24) (134:7)
**monthly** (191:24)
**months** (35:18)
(200:17)
**moral** (212:18)
**motion** (101:25)
(176:2) (176:5)
(176:11)

**motivate** (34:22)
**motivation** (35:13)
(151:20)
**mountain** (23:12)
**mouth** (32:3) (41:13)
**move** (22:13) (25:22)
(85:12) (144:17)
(144:19) (176:9)
(181:19) (219:7)
(223:17)
**moved** (22:15) (262:15)
**moves** (98:15)
(101:23) (104:21)
(106:12) (108:18)
(117:1) (130:5)
(137:3) (183:3)
(195:5) (198:23)
(204:1) (205:24)
(208:12) (210:10)
(213:20) (218:2)
**moving** (102:21)
(180:10)
**multi-billion-dollar**
**multibillion-dollar**
**multiple** (26:14)
(26:15) (30:25) (45:7)
(54:8) (57:1) (87:7)
(189:18)
**Murphy** (262:11)
**must** (37:24) (114:8)
(114:16) (115:6)
(122:9)
**myself** (77:4) (95:9)
(191:4) (208:8)
(213:1) (213:14)
(217:24) (258:20)

# N

**NABP** (152:25) (153:3)
(154:5) (157:4)
**nada** (66:5)
**Nah** (6:16)
**national** (79:25)
(114:10) (153:4)
(153:24) (180:15)
**nation's** (137:22)
(138:8)
**NBC** (9:16)
**NDC** (119:3)
**NDCs** (113:4)
**near** (58:23) (58:25)
**necessarily** (134:20)
(145:19) (155:11)
(155:12) (163:12)
(192:6) (206:23)
(240:16) (241:20)
**needed** (10:4) (21:14)
(22:10) (27:1) (63:15)
(67:2) (67:3) (71:2)
(71:14) (76:18)
(80:24) (86:17)
(86:18) (90:3)
(115:23) (137:25)
(149:21) (151:11)

(179:14) (242:8)
(254:11)
**needs** (52:13) (57:20)
(107:7) (115:16)
(230:19)
**negative** (162:15)
**negligence** (49:6)
**negotiable** (70:19)
**negotiated** (65:22)
**negotiations** (16:1)
(191:12)
**neighborhood** (10:17)
(40:15)
**never** (26:23) (35:13)
(39:1) (48:6) (48:23)
(48:25) (49:1) (54:4)
(54:9) (62:25) (63:1)
(66:11) (66:14) (68:5)
(69:5) (69:6) (74:18)
(80:10) (82:19) (87:8)
(89:14) (165:17)
(216:19) (255:24)
**New** (18:9) (22:20)
(41:6) (50:22) (56:3)
(56:11) (56:12)
(60:19) (63:16)
(63:19) (63:21) (69:2)
(77:13) (79:10)
(84:21) (85:15)
(85:20) (86:12)
(86:21) (87:3) (88:3)
(88:8) (111:1)
(125:17) (186:6)
(186:7) (186:23)
(187:13) (202:23)
(241:9) (251:21)
(252:3) (256:3)
(256:17)
**news** (9:17) (81:20)
(85:9)
**newsletter** (137:17)
(154:1)
**Newspapers** (60:12)
**nice** (91:11) (191:18)
(264:14)
**NICHOLLS** (3:13)
(177:13) (177:19)
(177:20) (177:24)
(178:4) (181:20)
(182:20) (183:16)
(190:5) (194:13)
(195:12) (198:5)
(199:8) (203:17)
(203:20) (204:8)
(205:3) (205:19)
(206:5) (206:25)
(207:23) (208:19)
(210:4) (210:19)
(217:22) (218:8)
(219:20) (220:1)
(220:9) (220:24)
(221:8) (222:10)
(223:5) (223:9)
(223:23) (225:12)

**N-I-C-H-O-L-L-S**                                                                                          **order**

(226:23) (256:20)
(257:5) (258:8)
(260:4) (260:6)
(260:21) (261:23)
(262:4) (263:4)
(263:7) (263:17)
**N-I-C-H-O-L-L-S**
**night** (22:14)
**nine** (35:18) (36:15)
(264:9) (264:20)
**nobody** (88:18)
**noise** (41:13)
**non-HIV** (163:16)
**nonmanufacturer**
**nor** (10:1) (49:2)
**normal** (125:11)
(142:1) (190:13)
**normally** (193:7)
**not represent** (77:4)
**note** (5:3) (5:8)
(18:14) (28:21)
(50:18) (52:13)
(52:23) (61:4)
**notes** (49:20) (51:20)
(52:5) (52:6) (166:17)
(166:20)
**notice** (250:19)
**noticed** (107:9)
**notification** (123:4)
(124:1)
**notified** (42:15)
(42:16) (43:8)
**notify** (42:19)
(42:24) (42:25) (43:4)
(43:11) (44:15)
(44:16) (118:23)
**notoriously** (248:20)
**November** (29:4)
(81:18)
**nowhere** (86:25)
**nuance** (191:12)
**number** (5:9) (45:11)
(53:17) (59:4) (96:21)
(96:22) (119:3)
(229:14) (252:22)
(252:24) (253:4)
(253:8) (253:15)
(253:21) (253:22)
**numbered** (123:11)
**numbers** (21:22)
(83:3) (84:16) (113:4)
(190:1) (196:17)
**Numeral** (132:10)
**numerous** (64:14)
(75:6)
**NYC** (186:12)

**O**

**Object** (105:3)
(109:15) (112:15)
**objected** (260:16)
(260:18)
**objecting** (213:24)
**objection** (5:14)

(5:15) (7:8) (7:9)
(15:12) (21:11) (24:4)
(36:3) (42:21) (43:5)
(43:15) (44:10)
(52:18) (54:16) (77:5)
(82:1) (87:4) (88:24)
(97:17) (98:23)
(98:24) (100:25)
(102:2) (105:4)
(106:14) (111:17)
(111:21) (111:23)
(117:3) (117:22)
(130:9) (131:5)
(149:3) (155:25)
(156:10) (158:4)
(161:2) (162:19)
(163:7) (163:21)
(164:21) (165:20)
(168:10) (169:7)
(169:20) (174:20)
(183:5) (183:6)
(195:10) (198:25)
(204:3) (205:25)
(206:12) (208:14)
(208:15) (210:12)
(213:22) (218:4)
(219:5) (220:18)
(222:21) (223:18)
(230:2) (232:3)
(233:2) (233:15)
(233:19) (234:5)
(235:25) (239:7)
(245:23) (246:1)
(246:4) (246:12)
(246:18) (248:11)
(248:16) (253:16)
(255:9) (255:21)
(258:2) (260:9)
(261:13)
**obligation** (212:18)
**obligations** (242:6)
**obtain** (100:21)
**obvious** (64:17) (68:8)
**obviously** (56:23)
(57:18) (59:14)
(59:21) (59:22) (60:5)
(60:11) (60:15) (62:2)
(68:5) (84:24) (231:8)
(251:15)
**occasions** (42:13)
**occurred** (138:25)
(139:7) (198:9)
**occurrences** (142:17)
**occurring** (80:25)
**o'clock** (56:2)
(156:19) (264:9)
(264:19) (264:20)
**October** (29:1) (29:2)
(29:19) (50:22) (52:7)
(52:8) (52:14) (55:25)
(56:1) (205:6) (206:6)
(214:18) (218:1)
(260:8)
**off-brand** (96:11)

**offer** (12:13) (70:22)
(70:24) (125:14)
(187:11) (187:21)
(196:4) (197:17)
(197:23) (197:25)
(198:2) (231:6)
(231:12) (231:21)
(232:19) (242:14)
(242:16) (252:8)
**offered** (189:7)
(189:10) (190:13)
(233:23) (257:10)
(258:9)
**offering** (12:20)
(17:20) (190:15)
(243:21)
**offers** (125:1) (125:8)
**Office** (1:14) (82:6)
(93:15) (120:2)
(147:22) (180:9)
(191:5)
**OFFICER** (7:14)
(50:10) (68:18)
(68:19) (91:15)
(172:8) (176:13)
(263:21)
**offices** (82:6) (94:17)
**Official** (2:6)
(153:7) (265:11)
**Officially** (185:2)
**often** (135:7)
(142:13) (173:4)
**old** (95:11) (171:23)
(172:1)
**old-fashioned** (98:5)
**Olympia** (207:1)
(207:5) (207:7)
(207:15) (208:4)
(210:21) (211:8)
(212:5) (214:25)
(215:10) (215:14)
(218:19) (227:12)
(234:8) (235:2)
(237:8) (238:7)
(254:2) (254:16)
(254:21) (260:22)
**Olympia's** (255:2)
**once** (17:7) (62:11)
(146:25) (150:11)
(173:1) (181:17)
(191:13) (198:8)
(261:16)
**one-month** (13:22)
**ones** (17:14) (27:12)
(90:11) (195:25)
(206:8) (228:15)
(241:24)
**one-time** (198:9)
**ongoing** (138:7)
**only** (6:5) (12:21)
(16:18) (21:16)
(23:18) (26:8) (26:9)
(26:11) (29:8) (35:11)
(46:22) (50:23)

(54:10) (55:25) (66:3)
(67:4) (71:8) (80:6)
(83:4) (86:1) (88:16)
(121:24) (129:20)
(137:5) (166:24)
(179:2) (191:21)
(192:25) (203:22)
(214:3) (214:8)
(214:20) (228:15)
(243:12) (259:1)
**onto** (237:12)
**open** (5:10) (7:5)
(8:10) (10:2) (40:12)
(52:11) (54:16)
(54:21) (55:1) (55:12)
(77:24) (78:4) (92:2)
(94:2) (175:23)
(176:15) (177:1)
(193:6) (248:19)
**opened** (10:2) (37:24)
(54:22) (55:3) (128:22)
**OPENING** (3:3) (8:5)
(8:23) (8:25) (36:5)
(44:21) (48:3) (53:7)
(53:15) (54:21) (56:4)
(56:7) (179:10)
**opens** (53:16) (53:24)
(54:5)
**operate** (12:15)
**operated** (54:2)
**operating** (22:21)
(24:1) (24:11)
(103:14) (103:19)
(103:22) (104:3)
(105:14) (106:7)
(112:23) (112:24)
(113:7) (117:9)
(130:3) (151:1)
(158:9) (220:2)
(220:10) (220:13)
(220:25) (222:11)
(263:21)
**operations** (17:25)
**opinion** (73:4)
(149:8) (149:9)
(149:11) (232:3)
(233:15) (234:5)
(248:12)
**opinions** (8:19)
(131:6)
**opioids** (53:14) (54:6)
**opportunity** (13:9)
(74:12) (85:20)
**opposed** (81:3)
(191:21)
**option** (51:2) (51:13)
(51:15)
**options** (181:18)
(199:12)
**oral** (157:22)
**orally** (147:18)
(147:21) (157:20)
**order** (5:1) (11:10)
(15:2) (16:5) (23:10)

ordering

(27:17) (33:3) (34:1)
(38:2) (42:25) (79:4)
(103:3) (173:11)
(209:10) (209:17)
(209:18) (229:17)
(239:2) (239:3)
(239:4) (246:17)
**ordering** (204:17)
**orderly** (56:16)
**orders** (192:8)
(199:12)
**ordinarily** (252:17)
**organization** (155:7)
**organizations** (47:11)
**organized** (252:1)
**origin** (140:1)
(153:14)
**original** (7:13)
**originally** (14:17)
(179:2) (179:4)
**originated** (124:17)
(139:21) (139:23)
**others** (189:20)
(189:21) (223:25)
(230:14) (252:18)
**otherwise** (8:8)
(132:5)
**our** (5:25) (12:19)
(12:21) (32:19) (53:6)
(54:15) (65:17)
(65:18) (70:22)
(77:23) (80:7) (93:19)
(99:25) (138:4)
(151:14) (154:3)
(154:12) (154:24)
(155:5) (155:16)
(176:6) (202:20)
(211:25) (212:9)
(216:5) (226:20)
(229:13) (251:19)
**ourselves** (70:2)
(79:9) (81:2) (181:18)
**outdated** (107:3)
**outpatient** (93:17)
**outsert** (235:10)
**outside** (55:2) (57:9)
(57:24) (59:17)
(72:18) (75:22)
(78:15) (145:25)
(193:17) (231:18)
(235:14)
**overall** (165:4)
**Overruled** (15:13)
(21:12) (82:2) (87:5)
(88:25) (97:18)
(105:6) (106:15)
(109:17) (110:18)
(111:18) (112:17)
(117:23) (130:11)
(137:9) (158:6)
(159:10) (159:22)
(160:15) (162:20)
(163:8) (168:11)
(169:8) (173:4)

(173:6) (173:11)
(173:13) (173:16)
(174:21) (199:2)
(204:5) (210:14)
(214:2) (230:4)
(232:4) (233:3)
(239:8) (246:20)
(261:15)
**overruling** (111:23)
**oversaw** (237:5)
**overseeing** (237:6)
**owe** (70:14)
**own** (15:24) (16:5)
(17:21) (37:7) (37:8)
(63:14) (67:9) (96:6)
(134:18) (196:11)
**owned** (145:22) (202:8)
**owner** (207:13)
(207:15) (208:4)
(210:21) (211:7)
(212:5) (215:10)
(215:14) (215:18)
**owners** (94:19)
(121:8) (121:12)
**ownership** (222:15)
(222:17)

## P

**package** (107:10)
(128:17) (129:13)
**packaging** (214:24)
(215:23) (216:2)
(219:13) (219:14)
**packing** (214:21)
**page** (101:19)
(102:15) (102:25)
(107:2) (107:16)
(115:25) (119:16)
(123:11) (123:13)
(128:15) (132:10)
(133:9) (133:22)
(137:18) (138:6)
(138:20) (140:17)
(141:18) (141:19)
(141:21) (157:14)
(186:9) (189:12)
(194:22) (194:23)
(195:1) (198:15)
(203:23) (205:3)
(208:20) (209:13)
(211:1) (211:3)
(214:16) (215:6)
(215:18) (218:8)
(218:9) (221:3)
(222:14) (224:20)
(226:7) (226:24)
(265:6)
**paid** (14:17) (35:1)
(46:16) (47:22) (58:1)
(58:12) (58:16)
(58:21) (67:4)
**pains** (37:3)
**Palm** (2:2) (2:3)
**pamphlet** (193:7)

(193:9)
**paper** (64:10) (129:9)
(134:23) (235:13)
(252:21)
**paperwork** (32:6)
(32:8) (32:9) (32:10)
(32:16) (32:20)
(32:21) (49:8) (100:4)
(131:11)
**paragraph** (102:15)
(106:20) (120:12)
(122:20) (138:7)
(138:12) (140:6)
(140:9) (154:19)
(161:19) (184:8)
(186:24) (187:12)
(216:12) (216:24)
(217:1) (217:8)
(225:7) (226:25)
(252:5) (261:6)
**parking** (262:25)
**Parkway** (1:17)
**part** (10:18) (31:2)
(59:18) (61:4) (61:6)
(61:11) (61:20) (64:6)
(68:5) (72:11) (80:15)
(84:10) (84:11) (88:4)
(103:22) (132:14)
(133:10) (134:24)
(143:22) (145:21)
(152:16) (154:9)
(159:7) (185:5)
(185:6) (186:10)
(198:21) (211:7)
(212:23) (214:8)
(217:22) (219:7)
**participant** (203:18)
**participants** (208:6)
**particular** (148:1)
(198:7) (236:7) (260:4)
**particularly** (90:25)
**parties** (10:22)
**partner** (16:10)
(105:14) (105:16)
(113:15) (114:17)
(114:20) (125:18)
(125:22) (125:25)
(126:4) (126:8)
(126:17) (127:1)
(132:18) (132:23)
(133:1) (133:6)
(133:11) (133:18)
**partners** (40:21)
**parts** (54:1) (151:8)
**pass** (154:4)
**passed** (12:9)
**past** (62:10)
**Pat** (9:24) (14:8)
(15:18) (16:3) (17:9)
(17:11) (17:13)
(18:11) (20:2) (21:18)
(23:22) (23:23) (26:2)
(26:9) (26:17) (26:19)
(26:23) (27:9) (27:17)

(28:1) (28:16) (30:7)
(31:20) (31:21) (32:1)
(35:14) (35:19)
(38:19) (38:23)
(40:18) (41:6) (41:14)
(41:15) (41:20) (42:9)
(42:14) (45:20)
(47:25) (48:15)
(48:18) (61:1) (68:6)
(71:12) (90:21)
(94:21) (95:6) (103:9)
(104:6) (113:15)
(136:11) (136:25)
(173:14) (181:12)
(183:18) (198:20)
(199:9) (199:19)
(200:22) (208:4)
(208:8) (211:2)
(211:18) (213:1)
(216:11) (217:24)
(223:11) (236:10)
(236:11) (237:3)
(237:17) (244:10)
(245:2) (249:17)
(250:14) (250:18)
(254:16) (263:24)
**patience** (39:18)
**patient** (13:23)
(14:4) (29:19) (37:1)
(42:6) (42:11) (123:1)
(142:25) (147:11)
(153:13)
**patients** (15:1)
(15:10) (81:5) (81:7)
(185:21) (186:3)
(261:12)
**patient's** (97:2)
(138:13)
**PATRICK** (1:6) (1:20)
(9:1) (11:15) (17:2)
(17:24) (19:23) (20:5)
(20:23) (24:22) (25:7)
(25:14) (30:21) (33:3)
(34:16) (34:17)
(36:24) (39:4) (39:25)
(43:10) (44:18)
(49:15) (62:25) (63:9)
(63:25) (84:3) (84:23)
(105:23) (113:11)
(119:7) (124:23)
(134:12) (134:15)
(134:18) (135:5)
(137:13) (137:20)
(137:24) (143:7)
(143:9) (143:18)
(143:25) (144:5)
(154:24) (167:12)
(169:5) (171:4)
(171:10) (171:16)
(172:19) (173:17)
(178:21) (178:25)
(179:8) (179:9)
(179:24) (182:4)
(182:12) (184:14)

**patsy**

**player**

(185:24)(192:4)
(195:3)(195:12)
(197:21)(200:1)
(200:6)(200:20)
(203:17)(204:9)
(204:14)(205:12)
(207:14)(207:17)
(208:23)(209:22)
(210:8)(211:8)
(211:22)(212:23)
(213:16)(213:17)
(214:4)(214:8)
(214:18)(215:19)
(217:13)(218:14)
(218:16)(218:21)
(221:12)(223:24)
(225:16)(226:11)
(259:8)
**patsy** (66:20)(66:21)
**pay** (13:24)(15:11)
(23:4)(23:6)(45:14)
(47:10)(57:11)
(58:19)(59:8)(70:16)
**paycheck** (170:6)
**paying** (10:12)
(11:14)(18:18)
(30:23)(57:17)
(57:18)(59:8)(77:2)
**payment** (58:14)
**pays** (59:6)(59:9)
**PDF** (224:6)
**pedigree** (79:6)
(79:14)(96:17)
(96:23)(113:2)
(115:2)(127:2)
(133:12)(135:2)
(136:3)(136:10)
(136:13)(140:20)
(141:4)(141:8)
(163:11)(166:8)
(166:15)(174:16)
(188:9)(196:9)
(196:12)(196:23)
(197:3)(197:15)
(197:18)(197:23)
(197:24)(198:1)
(198:3)(198:6)
(199:24)(200:2)
(200:25)(201:5)
(201:14)(201:21)
(202:16)(202:25)
(211:14)(218:22)
(219:1)(238:15)
(240:17)(240:18)
(240:25)(242:20)
(250:12)(257:10)
(257:11)(257:16)
(257:17)(257:22)
(258:1)(263:15)
**pedigrees** (67:15)
(67:21)(67:23)(68:1)
(68:17)(68:21)(69:4)
(69:5)(69:6)(69:25)
(97:3)(97:8)(97:15)

(120:6)(126:19)
(133:2)(135:5)
(140:2)(140:22)
(151:14)(162:10)
(162:16)(162:22)
(163:2)(171:20)
(174:3)(174:19)
(197:8)(197:11)
(199:19)(200:7)
(200:15)(200:21)
(201:8)(202:5)
(202:21)(202:22)
(207:8)(207:12)
(207:16)(209:3)
(209:6)(209:8)
(222:25)(240:8)
(246:10)(247:4)
(259:23)(260:1)
(260:7)(260:15)
**pen** (252:5)
**pennies** (13:20)
(26:4)(28:8)
**penny** (239:16)
**Penthouse** (1:21)
**people's** (196:14)
**percent** (13:6)(31:1)
(46:5)(46:7)(46:13)
(54:10)(59:1)(59:3)
(187:22)(188:1)
(188:13)(190:10)
(190:14)(190:16)
(190:17)(230:11)
(230:25)(231:7)
(231:12)(232:1)
(232:8)(233:24)
(235:1)(235:2)
(242:14)(242:15)
(242:21)(243:5)
(252:8)(252:9)
(253:12)
**percentage** (57:22)
**percents** (253:11)
**perfect** (48:14)
(48:15)(78:17)
**performances** (85:2)
**period** (44:13)
(49:11)(73:2)(73:16)
(146:15)(148:9)
(151:1)(159:2)
(163:25)(164:11)
(164:19)(167:16)
(197:10)
**person** (19:2)(20:6)
(20:13)(41:3)(61:13)
(62:22)(63:21)(65:3)
(65:16)(66:9)(66:15)
(73:5)(73:6)(79:12)
(79:13)(81:24)
(111:10)(114:22)
(114:25)(117:14)
(117:19)(126:1)
(135:6)(135:7)
(135:17)(141:5)
(158:21)(164:6)

(164:15)(200:22)
(201:22)(201:23)
(237:6)(238:7)
(239:5)(259:22)
**personal** (66:12)
(230:3)(253:16)
(255:9)
**personality** (16:25)
**personally** (73:20)
**personnel** (113:7)
**persons** (84:11)
**person's** (16:13)
**perspective** (176:7)
**pertained** (220:3)
**Peter** (66:10)(66:12)
(66:13)(68:4)(89:6)
**Pharma** (12:4)(12:8)
(12:10)(12:18)(13:4)
(14:25)(17:12)(21:5)
(21:6)(21:19)(27:12)
(33:25)(34:22)
(38:21)(148:11)
(153:14)
**pharmaceutical**
**pharmaceuticals**
**pharmacies** (11:3)
(11:7)(11:20)(11:21)
(14:22)(14:23)
(16:22)(17:22)
(22:24)(23:15)
(23:18)(23:20)
(23:21)(24:16)
(24:20)(27:7)(28:2)
(28:5)(28:8)(28:9)
(28:19)(29:16)(30:1)
(30:12)(34:17)
(36:23)(37:11)(39:6)
(42:3)(43:11)(43:19)
(45:13)(45:15)
(45:24)(47:9)(47:12)
(58:19)(66:23)
(69:10)(69:13)
(69:19)(70:1)(70:3)
(75:25)(78:13)
(93:17)(94:18)
(140:1)(154:18)
(191:7)(224:17)
(230:24)(232:14)
(233:23)(234:15)
(234:19)(236:3)
(237:7)(241:21)
(242:5)(243:11)
(243:13)(243:14)
(243:15)(243:16)
(243:22)(250:7)
(250:9)(250:11)
**pharmacist** (23:15)
(29:1)(29:9)(254:20)
(254:21)
**pharmacists** (38:11)
**pharmacy** (14:11)
(14:13)(14:16)
(29:21)(38:1)(42:3)
(42:6)(43:8)(57:19)

(60:4)(68:25)(69:5)
(82:22)(94:13)
(100:1)(107:18)
(108:1)(119:11)
(123:4)(124:2)
(134:22)(147:7)
(153:4)(153:25)
(180:22)(188:9)
(196:22)(207:1)
(207:5)(207:7)
(207:15)(208:4)
(210:21)(212:11)
(214:25)(215:10)
(215:15)(215:19)
(221:10)(227:13)
(234:22)(236:7)
(237:8)(240:3)
(240:17)(242:20)
(243:18)(250:11)
(252:4)(254:2)
(260:22)(261:17)
**phone** (211:5)(211:7)
(211:13)(211:21)
(212:3)(212:4)
(212:21)(212:24)
(212:25)
**phonetic** (186:25)
**phony** (83:2)(83:3)
(83:4)
**photo** (215:7)(215:9)
(237:11)
**photocopying** (119:18)
**pick** (10:5)(12:23)
(66:14)(195:23)
(196:5)(237:14)
(237:25)(262:7)
(262:20)(262:25)
**picking** (37:23)
(262:4)
**picnics** (10:21)
**picture** (90:16)
(90:17)(215:12)
(235:5)
**pictured** (141:21)
**piece** (64:10)(74:18)
(161:19)
**pieces** (202:6)
**pill** (36:16)(36:17)
(36:21)(42:7)(77:19)
(77:20)(78:3)(82:17)
(82:18)(82:20)
**pills** (25:11)(35:7)
(36:19)(37:22)(38:6)
(38:10)(38:12)
(225:18)(225:22)
(238:22)
**pin** (167:5)
**places** (22:21)(138:6)
**plan** (26:22)
**planning** (256:20)
**plans** (50:19)
**plant** (196:20)
**plate** (239:16)
**player** (15:18)(16:24)

**players**                                                                 **proceedings**

players (12:7)
Plaza (210:21)
(254:21)
plea (87:9)(87:24)
pleads (87:9)
please (56:8)(56:14)
(93:6)(97:9)(101:10)
(102:6)(104:10)
(106:17)(108:8)
(109:24)(112:19)
(116:17)(129:20)
(136:15)(137:19)
(161:6)(175:4)
(177:15)(177:17)
(178:4)(182:17)
(183:9)(183:16)
(194:10)(194:24)
(198:12)(199:5)
(199:10)(200:10)
(203:14)(204:9)
(204:11)(204:15)
(204:25)(205:5)
(207:21)(210:1)
(210:16)(213:6)
(214:13)(214:16)
(217:20)(218:11)
(220:7)(221:23)
(223:6)(223:19)
(226:20)(246:21)
(249:4)
pleased (233:24)
pleases (87:14)
pled (88:3)(88:13)
(89:10)
plus (57:22)(58:15)
(253:4)
pocket (46:15)
Pogozelski (1:13)
(1:15)(5:13)(5:18)
(5:23)(6:23)(7:9)
(7:17)(8:1)(8:13)
(51:1)(51:11)(52:2)
(52:19)(55:15)
(91:21)(92:7)
(176:20)(177:4)
point (10:14)(11:23)
(15:22)(18:13)
(24:21)(41:21)
(48:20)(53:5)(54:23)
(55:3)(55:4)(70:6)
(70:7)(75:10)(76:10)
(78:3)(84:2)(95:15)
(97:17)(102:16)
(102:25)(103:1)
(115:12)(115:18)
(119:4)(122:23)
(123:2)(124:25)
(125:21)(127:22)
(128:16)(128:19)
(129:3)(130:23)
(131:25)(132:18)
(132:25)(147:8)
(147:24)(161:20)
(172:4)(191:15)

(201:10)(203:1)
(206:6)(209:22)
(219:20)(226:23)
(228:19)(244:25)
(245:7)(247:3)
pointing (90:10)
(252:6)
points (39:17)
(39:24)(40:3)(116:1)
(131:18)
poker (16:24)
policies (124:22)
(168:17)
policy (103:2)
(121:23)(124:20)
polling (8:12)
(55:14)(92:5)(177:3)
poor (22:24)
pops (20:18)
populations (186:19)
portion (55:20)
portrays (152:25)
(157:4)
position (35:4)
(50:25)(51:17)(79:9)
(94:2)(94:22)
positive (146:12)
possibility (140:10)
possible (177:17)
(199:10)(204:9)
(204:15)
possibly (34:22)
potential (6:18)
(75:1)(129:14)
(182:6)(221:19)
potentially (126:18)
(131:21)(132:1)
(133:1)
power (15:7)
practicality (58:5)
(58:16)
practically (140:2)
prefer (250:11)
preference (53:9)
prepare (70:25)(71:2)
prepared (27:16)
(108:25)(109:2)
prescription (29:3)
(64:20)(94:10)
(106:22)(121:21)
(125:6)(125:12)
(137:22)(138:15)
(140:6)(141:6)
(180:19)(181:15)
prescriptions (23:5)
presence (8:11)
(8:17)(50:8)(55:2)
(55:13)(91:9)(92:4)
(92:11)(175:20)
(177:2)(177:9)(264:8)
presentation (61:4)
presented (60:21)
(71:19)(86:20)(90:21)
president (113:16)

(179:20)(179:22)
(179:25)
press (81:20)(82:14)
presumably (229:24)
pretended (19:19)
pretrial (101:25)
prettiest (195:23)
(195:24)(237:15)
(237:25)
pretty (75:10)
(86:15)(87:11)(196:5)
preventing (13:8)
previous (53:12)
(137:5)(156:21)
(204:3)
previously (127:23)
(142:19)(145:5)
(174:15)(178:16)
(195:8)
price (21:7)(21:15)
(27:13)(57:12)
(57:15)(57:17)
(57:22)(57:24)
(57:25)(58:7)(58:8)
(58:13)(58:16)
(58:17)(58:18)
(58:20)(59:1)(59:7)
(59:9)(59:20)(60:3)
(60:4)(60:5)(66:1)
(66:2)(125:2)(125:9)
(125:11)(188:15)
(188:17)(189:2)
(189:6)(189:9)
(189:23)(190:6)
(190:7)(190:13)
(190:14)(191:8)
(191:14)(229:10)
(231:7)(232:8)
(233:11)(234:1)
(234:4)(240:2)
(240:4)(252:15)
(253:7)(257:10)
(257:11)(257:16)
(257:17)(257:21)
prices (17:21)
(59:19)(65:22)
(190:3)(240:25)
(243:8)(253:5)
pricing (59:18)
(187:24)(188:19)
(191:3)(197:17)
(197:22)(242:21)
(244:3)(250:5)
(252:7)(257:23)
(258:9)(258:18)
(259:2)
primary (63:24)
(65:24)
prime (60:11)
principal (5:4)
print (17:13)(55:17)
(141:3)
printed (55:18)
printer (82:14)

prior (62:23)(77:8)
(79:14)(80:12)
(107:9)(151:4)
(251:17)
prison (41:2)(48:9)
(87:10)(87:12)
(87:16)(87:24)
pristine (31:16)
private (153:10)
proactively (226:11)
(226:19)
probably (14:17)
(31:1)(46:4)(72:25)
(94:4)
problem (6:9)(22:10)
(24:21)(27:4)(34:4)
(34:23)(37:5)(37:10)
(38:5)(38:24)(42:20)
(43:2)(43:9)(43:18)
(44:15)(44:16)
(67:17)(73:14)
(73:18)(73:19)(74:8)
(74:19)(75:11)
(78:18)(140:7)
(195:21)(236:4)
(237:7)(238:10)
(238:18)
problematic (126:18)
(133:1)(163:2)
(202:11)
problems (38:15)
(77:21)(139:6)
(160:13)(160:18)
(196:7)(206:20)
(219:13)(224:22)
(226:15)
procedure (63:19)
(106:7)(106:10)
(112:23)(113:8)
(113:14)(113:20)
(117:9)(118:17)
(121:3)(220:13)
(220:25)(222:11)
procedures (64:21)
(103:14)(103:19)
(103:23)(104:3)
(105:14)(112:24)
(113:24)(120:10)
(130:3)(132:9)
(149:18)(149:24)
(149:25)(150:1)
(150:2)(150:15)
(150:21)(151:1)
(158:9)(158:18)
(159:12)(168:17)
(169:6)(170:18)
(184:9)(220:2)
(220:10)
proceed (24:8)(56:5)
(73:4)(92:20)(97:19)
(177:21)
PROCEEDING (1:4)
proceedings (50:15)
(265:5)

**process**

**process** (11:5)
(47:14) (63:16) (64:6)
(64:13) (65:1) (65:2)
(65:10) (67:9) (83:19)
(105:24) (120:23)
(132:14) (168:8)
(204:17)
**produce** (61:8)
(80:17) (246:17)
**produced** (251:17)
**producing** (68:16)
(245:8)
**product** (14:14)
(19:9) (22:12) (45:10)
(46:6) (80:9) (94:9)
(107:9) (107:17)
(112:24) (112:25)
(113:25) (114:10)
(114:13) (114:18)
(115:6) (115:16)
(115:20) (118:11)
(118:24) (118:25)
(120:10) (120:12)
(120:14) (120:20)
(120:25) (121:4)
(121:9) (121:13)
(121:24) (122:10)
(124:14) (125:15)
(126:10) (126:14)
(126:24) (127:3)
(127:5) (127:9)
(127:15) (127:19)
(127:22) (128:5)
(128:10) (128:11)
(128:13) (128:25)
(129:4) (129:8)
(129:13) (129:14)
(129:15) (130:4)
(130:15) (130:17)
(130:18) (130:21)
(131:11) (131:15)
(131:23) (132:7)
(132:11) (133:12)
(139:10) (168:21)
(169:13) (170:20)
(196:13) (199:11)
(201:5) (216:13)
(218:23) (219:18)
(219:21) (219:23)
(220:11) (220:25)
(221:13) (221:16)
(222:11) (222:17)
(225:5) (227:14)
(229:25) (244:22)
(245:9)
**products** (28:4)
(35:21) (45:24)
(66:23) (74:5) (75:23)
(76:6) (107:4) (107:7)
(118:1) (119:10)
(125:1) (125:8)
(125:23) (129:5)
(131:17) (132:12)
(132:15) (132:20)

(168:25) (170:25)
(184:9) (184:25)
(185:1) (201:8)
(204:16) (207:5)
(207:8) (216:1)
(222:25) (224:15)
(224:22) (225:13)
(225:17) (226:16)
(226:25) (227:2)
(229:20) (237:1)
(242:16)
**product's** (100:5)
**profession** (155:16)
**professional** (16:24)
(265:2)
**proffer** (55:2)
**profit** (15:9) (35:11)
(35:13) (45:14)
(45:17) (45:19) (46:5)
(46:16) (46:17) (47:4)
(47:21) (57:23) (59:13)
**profitable** (61:17)
**profits** (34:5) (35:1)
(46:8) (229:18)
**program** (21:21)
(21:22) (22:3) (22:8)
(22:9) (22:18) (33:25)
(34:3) (59:18) (80:15)
**programs** (59:8) (76:4)
**prohibition** (230:6)
(231:2)
**prolific** (138:24)
**promise** (39:22)
**pronounce** (255:16)
**proof** (73:8) (90:23)
**propensity** (176:7)
**proper** (43:23)
(119:9) (154:17)
(227:1)
**properly** (65:7)
**proposal** (26:17)
**propose** (5:7) (50:21)
(51:8) (52:15)
**proposing** (7:2)
**prosecutor** (151:7)
(228:6)
**prosecutors** (41:1)
(159:25) (165:23)
(166:11)
**prospective** (8:18)
**protect** (36:7)
(138:15)
**protecting** (36:4)
(81:7) (137:21)
**protection** (64:18)
**protocol** (79:4)
(79:10)
**protocols** (79:3)
**prove** (19:23) (25:15)
(34:8)
**proved** (91:3)
**provide** (6:24) (90:2)
(116:2) (127:2)
(133:11) (141:8)

(201:14) (249:1)
**provided** (68:9)
(97:8) (97:14)
(196:24) (219:23)
**providing** (72:4)
(197:3)
**provisions** (212:14)
**public** (5:10) (7:6)
(34:22) (66:20)
(74:15) (81:13)
(81:16) (83:14) (86:7)
(93:10)
**publicly** (85:16)
**publish** (99:12)
(102:7) (105:9)
(106:17) (112:19)
(183:10) (199:5)
(204:11) (210:17)
(214:13) (218:10)
(220:6) (221:23)
(223:19)
**published** (150:7)
**pull** (32:1) (33:3)
(177:16)
**pumped** (80:15)
**puncture** (106:25)
**purchase** (15:3)
(23:16) (23:18)
(23:20) (23:21)
(24:24) (25:24) (34:1)
(46:23) (49:7) (57:8)
(60:2) (65:22) (79:4)
(79:11) (105:18)
(105:19) (121:24)
(197:12) (239:1)
(244:11) (245:9)
**purchased** (23:9)
(30:6) (43:11) (45:12)
(69:16) (114:22)
(117:14) (118:14)
(127:3) (132:23)
(133:12) (208:25)
(209:2) (224:23)
(253:21)
**purchaser** (19:5)
(202:2) (202:7)
**purchasers** (202:7)
**purchases** (46:10)
(57:16) (121:25)
(133:7)
**purchasing** (17:22)
(22:22) (45:9) (47:11)
(114:17) (125:17)
(125:21) (126:3)
(132:11) (154:18)
(190:23) (199:11)
(231:25) (234:17)
(244:15) (244:17)
(245:1) (250:25)
**purchasing-type**
**purely** (81:11)
**purpose** (83:12)
(96:23) (96:25)
(122:21)

**purposes** (81:11)
**push** (239:6) (239:12)
**pushover** (83:7)
**put** (16:11) (17:12)
(20:10) (31:19)
(62:13) (76:14) (79:9)
(135:13) (150:7)
(156:8) (171:3)
(171:7) (171:11)
**putting** (24:3)
(34:18) (77:25)

**Q**

**qualification**
**quality** (140:1)
**quarantine** (80:6)
(80:9) (107:25)
**quarantined** (80:11)
(82:8) (215:22)
(216:1) (261:8)
(261:10)
**quarantining** (80:4)
**question** (20:12)
(20:15) (27:9) (28:22)
(40:3) (40:20) (48:18)
(63:9) (112:1) (149:1)
(156:12) (157:10)
(165:6) (166:1)
(174:12) (186:1)
(200:2) (212:2)
(221:5) (232:13)
(249:8) (258:5)
(260:13) (261:2)
**questionable** (107:17)
**questioning** (174:7)
**quick** (50:13)
(121:12) (251:14)
**quickly** (184:24)
(261:4)
**quiet** (37:15) (37:17)
(38:15) (154:15)
**quite** (8:21) (153:12)
(258:12)
**quote** (125:2)

**R**

**raid** (82:5) (82:14)
(85:14) (90:9)
**raise** (175:25)
(204:21)
**raised** (135:4)
(135:25) (144:20)
(178:7) (178:8)
(209:8) (228:5)
**ramification** (6:3)
(59:6)
**ramifications** (58:18)
**ran** (42:5) (185:2)
**rapidly** (192:5)
**Rapids** (19:14)
**Rapid's** (25:16)
(29:11) (46:11)
**rapport** (144:10)
**rate** (14:23) (22:7)

**rather**                                                                    **represented**

(29:22) (29:25)
(231:16)
**rather** (22:23) (81:2)
(84:19) (180:10)
**reach** (11:10)
**reached** (73:20)
(73:22) (216:10)
**reaching** (9:9)
**reaction** (173:15)
**read** (17:13) (113:7)
(138:10) (139:4)
(139:9) (152:23)
(152:25) (157:4)
(161:17) (161:20)
(161:21) (162:2)
(175:4) (241:3)
(252:10)
**readily** (120:2)
**reading** (138:17)
(138:23) (139:2)
(139:15) (139:19)
(139:24) (139:25)
(140:5) (140:12)
(140:23) (143:6)
(185:21) (216:14)
(224:24) (241:8)
**Reads** (161:22)
**ready** (8:22) (56:4)
**real** (19:22) (28:22)
(33:5) (41:21) (50:12)
(61:17) (64:1) (65:13)
(71:21) (71:23) (80:8)
(82:24) (84:7)
(121:12) (140:10)
(160:7) (172:5)
(178:10) (253:15)
**reality** (58:11) (60:9)
**realization** (138:13)
**realize** (33:16)
(33:17) (60:15)
(76:24) (151:22)
**realized** (122:16)
(66:20) (73:10)
**reasonable** (15:3)
(38:4) (89:4) (90:23)
(122:14) (122:16)
(123:14) (123:16)
**reasons** (29:24)
(38:11) (49:13) (60:8)
(61:19) (159:20)
(211:20)
**rebates** (58:14)
(58:22)
**recall** (35:6) (76:6)
(109:13) (164:15)
(165:6) (248:5)
**recalled** (76:6)
**recalls** (35:6)
**receipt** (32:11)
**receive** (77:24)
(120:6) (180:12)
(181:3) (192:20)
(197:7) (198:5)
(201:8) (202:23)

(227:13) (260:7)
**received** (42:2)
(98:25) (102:4)
(106:15) (106:24)
(112:17) (114:25)
(117:5) (118:1)
(119:2) (120:11)
(120:14) (122:15)
(123:15) (130:11)
(131:10) (137:9)
(140:1) (142:14)
(162:23) (183:7)
(192:24) (195:13)
(199:2) (202:25)
(203:2) (204:5)
(207:8) (208:16)
(210:14) (214:2)
(214:9) (214:25)
(216:13) (218:5)
(220:20) (222:6)
(223:20) (231:17)
(240:6) (247:4)
(249:17) (250:1)
(250:4) (260:2)
**receiving** (197:3)
(197:15) (217:12)
(234:21) (234:24)
(248:4)
**recent** (100:4)
**recently** (62:10)
(160:20) (185:12)
(185:18)
**recess** (50:6) (52:9)
(52:10) (91:8) (91:14)
(91:16) (175:18)
(176:12) (176:14)
(264:6) (264:19)
**recessed** (264:17)
**recipient** (141:8)
(203:18) (210:6)
(210:8)
**recipients** (223:12)
**recognize** (98:13)
(106:4) (108:12)
(116:20) (129:23)
(136:18) (203:24)
(207:23) (210:4)
(213:8) (220:13)
**recognized** (86:17)
(146:7) (146:9)
**recollecting** (176:1)
**recollection** (87:8)
(160:25) (161:4)
(161:18) (162:2)
(165:2)
**recommend** (87:16)
**recommendation** (85:8)
**reconsidering**
**records** (82:11)
(120:1)
**recycling** (142:18)
**red** (168:21) (168:24)
(169:12) (170:19)
(170:24) (184:11)

**REDIRECT** (3:11)
(3:17) (167:22)
(167:24) (256:23)
(257:3)
**reduced** (14:23)
(22:7) (29:25)
**reduction** (89:19)
**redundant** (56:13)
**reference** (97:10)
(102:11) (106:21)
(160:6) (211:5)
**referenced** (219:14)
**references** (113:2)
(113:4)
**referred** (18:23)
(145:13) (145:15)
(240:11)
**referring** (114:20)
(173:12) (174:13)
(189:6) (189:9)
(224:10) (226:13)
**reflect** (122:9)
**refresh** (160:25)
(175:6)
**refreshed** (165:2)
**refreshes** (161:4)
(161:17) (162:2)
**refund** (239:1)
(239:12) (239:16)
**refunding** (239:6)
**refuse** (24:22) (24:23)
**refused** (24:24)
(89:25) (90:1) (90:2)
(107:10)
**refusing** (75:3)
**regard** (173:13)
**Registered** (265:2)
**regular** (10:21)
(11:4) (40:13) (191:23)
**regularity** (38:9)
**regulations** (11:13)
(12:9) (17:12) (21:25)
(32:12) (40:7) (47:15)
(171:18) (212:11)
(265:6)
**regulatory** (43:1)
**reimburse** (43:14)
**reimbursed** (43:19)
**reimbursement**
**reject** (43:25)
**rejected** (70:24)
**relate** (150:24)
(176:8) (187:24)
(188:1)
**related** (6:6) (75:8)
(205:16) (205:21)
**relates** (151:4)
(162:10)
**relating** (53:13)
(80:20) (81:17) (86:3)
(89:12) (89:15)
(115:6) (134:18)
(148:10) (164:12)
(167:12) (167:15)

**relations** (81:14)
**relationship** (64:24)
(69:12) (144:2)
**relatively** (191:3)
**relaying** (195:3)
**release** (81:20)
(224:8)
**released** (87:1)
**Relevance** (97:17)
(105:3) (106:14)
(206:12) (260:9)
**relevant** (186:16)
(260:10)
**reliable** (211:19)
**relied** (62:3) (63:13)
(72:16) (86:9)
**reluctant** (127:2)
(133:11)
**Reluctantly** (51:5)
**rely** (62:4) (65:16)
(88:18)
**relying** (64:4)
**Remain** (91:15)
**remedy** (78:17) (79:17)
**remember it** (244:9)
**remembered** (151:24)
(174:3) (174:15)
**remembering** (174:7)
(174:18)
**reminded** (143:2)
**renew** (176:5)
**renewal** (176:3)
**rep** (196:7) (238:2)
(262:14)
**repackage** (31:16)
**repaired** (128:22)
**repeat** (45:2) (125:7)
(165:7) (165:9)
(165:10)
**repeats** (123:25)
**replace** (218:23)
(219:17)
**report** (42:8) (42:9)
(124:9) (164:18)
(185:3) (194:14)
(221:12) (221:16)
(254:12)
**Reporte** (265:11)
**REPORTED** (2:6)
(107:18) (221:9)
(225:9) (255:7)
(255:20)
**Reporter** (2:6) (5:20)
(5:21) (6:24) (37:16)
(92:17) (93:20)
(165:9) (177:18)
(265:3)
**reporting** (255:18)
**reports** (185:2)
**represent** (47:11)
**representations**
**representative**
**representatives**
**represented** (64:1)

**representing**

**representing** (32:14)
(77:14)
**reps** (183:1)(224:2)
**require** (124:8)
(141:5)
**required** (11:7)
(97:4)(114:13)
(182:24)(183:19)
(183:21)(196:24)
(231:3)
**requirement** (141:5)
(141:12)
**requirements** (140:20)
**requires** (121:3)
**resell** (28:9)
**reselling** (19:10)
(27:6)(30:5)(34:17)
(34:23)(232:9)
**reserve** (102:1)
(145:4)
**resignation** (146:23)
**resigned** (146:21)
(146:25)
**resistance** (70:13)
**resolve** (73:21)
(195:17)(195:20)
(196:7)
**resolved** (52:21)
**respect** (143:25)
**respectfully** (157:11)
**respective** (6:2)
**respond** (7:2)
(190:19)(200:1)
(200:23)(260:13)
**responded** (78:23)
**response** (67:19)
(135:19)(195:16)
(199:18)(209:20)
(218:21)(226:20)
**responses** (51:20)
(199:16)
**responsibilities**
**responsibility**
**responsible** (67:11)
**rest** (54:11)(54:12)
(122:20)(261:17)
**restroom** (50:12)
**result** (22:8)(47:18)
(47:21)
**resume** (8:22)(264:13)
**résumé** (179:18)
**retained** (77:12)
**retrieved of** (74:1)
**retrospect** (60:15)
(61:18)(68:7)
**retrospectively**
**return** (91:2)(91:3)
(208:24)(209:2)
(209:23)(212:1)
(217:5)(217:14)
(217:15)(221:8)
(227:13)(239:18)
(239:21)(248:19)

**reveal** (62:16)
**review** (33:13)
(79:13)(84:6)(104:7)
(169:12)(175:2)
(224:22)
**reviewed** (64:23)
(65:14)(72:5)(72:6)
(83:22)(169:6)
**reviewing** (64:6)
**revised** (55:17)
**revoked** (23:25)
(53:24)(54:9)(86:14)
**reward** (146:5)
**Richardson** (250:22)
(250:24)
**rid** (67:3)(85:6)
(85:22)
**riddled** (140:11)
**ridiculous** (85:15)
**rig** (12:17)
**rigged** (12:3)(12:4)
(12:5)(14:2)(27:11)
(36:1)(37:7)(58:4)
**right-hand** (55:20)
**ringing** (6:10)
**ripped** (193:18)
(194:1)
**rise** (50:10)(176:13)
(264:16)
**risk** (24:25)(25:1)
(25:2)(48:9)(142:25)
**role** (172:11)
(179:24)(262:16)
**roles** (113:13)
(180:17)
**roll** (72:20)
**Roman** (132:10)
**room** (5:12)(7:6)
(16:17)(50:8)(66:13)
(91:10)(175:21)
(264:12)
**roughly** (234:17)
(235:18)
**rub** (31:5)
**rule** (5:24)(6:3)
(42:15)(79:10)
(107:13)(107:21)
(108:4)(114:5)
(114:24)(115:9)
(118:5)(119:13)
(119:22)(122:4)
(122:11)(123:8)
(123:20)(222:19)
(222:24)
**rules** (11:12)(17:11)
(17:15)(21:25)(40:6)
(44:14)(47:15)
(103:17)(103:25)
(116:14)(124:8)
(132:15)(133:17)
(133:23)(134:1)
(134:10)(134:11)
(134:18)(135:18)
(161:16)(168:17)

(168:22)(170:9)
(170:14)(171:18)
**rule's** (6:1)
**ruling** (53:12)
(130:7)(176:2)
(176:3)(195:8)
**run** (41:9)(50:12)
(230:8)
**running** (66:9)
(251:20)

## S

**s/Shamelle** (265:9)
**Safe** (9:13)(9:14)
(10:3)(10:18)(10:19)
(15:14)(15:21)
(16:10)(16:11)(17:9)
(17:16)(17:25)(18:5)
(20:22)(23:23)
(23:25)(25:12)
(25:23)(26:7)(26:8)
(29:15)(29:16)
(29:24)(30:13)
(30:14)(31:2)(32:4)
(32:13)(32:18)
(32:23)(33:1)(33:19)
(34:10)(36:22)(39:1)
(41:17)(42:25)
(43:10)(43:21)
(43:23)(44:3)(44:12)
(44:17)(45:8)(45:17)
(45:23)(46:12)
(46:16)(46:21)(47:5)
(47:6)(47:7)(47:20)
(48:14)(49:6)(60:1)
(60:6)(60:10)(60:18)
(61:5)(62:24)(63:14)
(63:18)(63:20)
(64:12)(64:21)(65:3)
(65:8)(65:11)(65:13)
(65:14)(65:25)
(66:20)(66:22)
(66:24)(66:25)(67:5)
(67:7)(67:9)(67:11)
(70:25)(71:4)(71:7)
(71:11)(71:13)
(71:25)(73:13)
(73:15)(73:22)(74:4)
(74:11)(75:5)(75:7)
(75:15)(75:18)
(76:11)(76:13)
(76:17)(76:18)
(76:21)(77:2)(77:11)
(77:14)(77:18)
(77:19)(78:4)(78:13)
(78:15)(78:25)(79:5)
(79:12)(79:25)(80:3)
(80:24)(81:9)(81:20)
(82:5)(82:6)(82:8)
(82:12)(82:16)
(82:20)(82:23)(83:5)
(83:12)(83:13)
(83:22)(84:2)(84:8)
(84:14)(86:4)(86:5)

**Safe**

(86:13)(89:12)(90:1)
(90:2)(90:8)(93:23)
(94:2)(94:5)(94:16)
(94:19)(95:11)
(95:18)(96:13)
(96:14)(97:6)(97:13)
(100:10)(100:18)
(100:20)(101:6)
(102:12)(103:1)
(103:10)(103:19)
(104:3)(105:22)
(106:23)(107:12)
(107:21)(108:5)
(109:9)(109:21)
(110:8)(110:22)
(113:1)(113:9)
(113:11)(113:20)
(113:24)(114:4)
(114:13)(114:16)
(114:25)(115:10)
(116:7)(116:13)
(118:5)(119:13)
(119:22)(120:5)
(121:3)(121:24)
(122:3)(122:13)
(123:8)(123:23)
(124:8)(124:20)
(125:10)(126:1)
(126:4)(128:12)
(133:6)(133:17)
(134:2)(134:9)
(138:2)(139:13)
(141:15)(142:5)
(142:6)(142:14)
(143:3)(143:21)
(143:22)(144:13)
(144:15)(147:1)
(147:12)(148:9)
(148:17)(148:23)
(151:1)(151:11)
(153:1)(156:6)
(157:23)(158:19)
(162:17)(163:5)
(163:17)(163:25)
(164:6)(164:13)
(164:14)(165:14)
(168:4)(168:7)
(168:8)(168:14)
(168:18)(169:16)
(169:21)(170:6)
(170:9)(170:12)
(170:16)(170:21)
(171:24)(173:25)
(174:12)(175:9)
(178:12)(178:16)
(179:10)(180:20)
(180:25)(181:2)
(181:7)(182:1)
(182:11)(182:13)
(183:24)(184:1)
(184:8)(184:25)
(186:2)(187:17)
(190:14)(190:20)
(191:1)(192:1)

**safeguards**                                                                                                    **sell**

(192:20) (194:16)
(194:18) (197:3)
(202:10) (202:16)
(203:2) (205:14)
(205:21) (216:4)
(216:8) (217:5)
(219:20) (220:2)
(221:9) (222:16)
(222:19) (222:25)
(224:3) (224:11)
(225:5) (225:8)
(225:17) (227:1)
(227:6) (231:6)
(231:11) (231:15)
(231:19) (231:21)
(231:25) (232:7)
(234:20) (235:16)
(236:14) (239:15)
(241:17) (244:17)
(244:21) (245:13)
(245:18) (246:10)
(246:16) (246:23)
(247:9) (247:16)
(248:20) (254:12)
(257:20) (258:9)
(258:17) (258:21)
(258:23) (259:6)
(259:8) (259:11)
(262:5) (262:8)
(263:8) (263:17)
(263:21)
**safeguards** (138:14)
**safety** (97:2) (123:1)
(138:13) (142:25)
(147:11) (150:3)
(153:13) (212:19)
(217:3)
**sake** (256:15)
**sale** (17:20) (46:5)
(125:2) (125:8)
(136:13) (159:23)
(173:11) (180:24)
(196:24)
**sales** (17:21) (18:19)
(44:1) (44:21) (46:15)
(46:25) (47:3) (47:8)
(144:9) (180:7)
(180:15) (181:12)
(183:1) (184:15)
(191:1) (192:5)
(196:7) (207:17)
(220:3) (224:2)
(236:12) (236:25)
(237:4) (237:5)
(237:6) (238:2)
(239:5) (239:11)
(251:3) (262:14)
**salesman** (16:23)
(65:24) (194:16)
**salesmen** (194:7)
**salespeople** (192:1)
(251:4)
**salesperson** (241:16)
**sampled** (113:3)

**save** (63:7)
**saw** (85:7) (85:9)
(142:9) (142:12)
(164:12) (202:18)
(237:11)
**saying** (6:9) (13:14)
(19:4) (23:17) (32:14)
(35:11) (35:12)
(37:11) (60:3) (63:10)
(70:13) (77:20) (86:1)
(86:5) (86:7) (86:8)
(88:6) (88:15)
(120:24) (147:25)
(155:10) (155:13)
(155:15) (156:18)
(156:20) (157:7)
(163:13) (164:12)
(173:5) (212:7)
(228:21) (234:2)
(238:20) (238:22)
(243:21) (247:3)
(251:25) (253:10)
**says** (13:2) (15:4)
(25:20) (26:17)
(26:21) (29:9) (29:21)
(32:18) (42:6) (52:13)
(57:13) (62:6) (62:9)
(63:17) (68:1) (70:17)
(74:19) (76:17)
(77:21) (88:2) (88:15)
(89:15) (99:17)
(99:21) (99:25)
(102:16) (102:21)
(103:1) (105:22)
(107:3) (107:6)
(107:16) (107:24)
(109:5) (113:6)
(113:24) (114:16)
(115:5) (115:19)
(116:2) (117:8)
(117:16) (118:1)
(118:7) (118:13)
(118:23) (119:17)
(120:2) (120:10)
(121:7) (121:12)
(121:20) (121:23)
(122:9) (122:13)
(123:3) (123:14)
(124:5) (124:13)
(125:1) (125:8)
(125:17) (126:3)
(127:9) (127:22)
(128:16) (128:19)
(128:22) (129:4)
(130:17) (130:19)
(130:24) (131:17)
(131:21) (131:25)
(132:5) (132:10)
(132:18) (133:10)
(138:13) (138:20)
(138:24) (139:14)
(139:22) (140:6)
(140:9) (140:20)
(141:4) (142:17)

(142:23) (152:20)
(183:18) (183:19)
(183:20) (183:23)
(184:8) (184:21)
(184:23) (185:5)
(185:6) (185:10)
(185:20) (186:5)
(186:7) (186:22)
(187:7) (187:11)
(187:13) (187:21)
(188:1) (188:8)
(188:13) (188:18)
(188:23) (189:4)
(189:23) (195:2)
(199:9) (200:3)
(204:9) (204:14)
(205:15) (205:20)
(211:17) (211:24)
(212:5) (212:9)
(212:13) (212:18)
(214:20) (215:21)
(216:12) (216:25)
(217:2) (217:8)
(218:22) (219:17)
(220:10) (222:11)
(222:15) (223:15)
(224:6) (224:10)
(225:8) (226:11)
(226:25) (229:13)
(241:7) (241:9)
(242:14) (247:11)
**scam** (84:22)
**scammed** (74:13)
**scapegoat** (81:25)
**scenario** (256:18)
**scheme** (35:15) (83:13)
**school** (5:4) (9:18)
(93:11)
**Schools** (93:10)
**Scope** (106:21)
(109:16) (169:7)
**scramble** (31:7)
**screen** (99:11)
(101:13)
**screenshot** (208:3)
(208:20) (208:22)
(210:23)
**Screw** (70:10)
**SCS** (113:6) (114:17)
(118:2) (123:14)
**scuff** (193:21)
(193:23)
**scuffed** (215:3)
**seal** (78:5) (128:22)
**second** (12:16) (31:8)
(64:4) (74:1) (76:24)
(77:9) (80:12) (89:22)
(95:5) (102:15)
(106:20) (107:2)
(115:25) (116:9)
(119:16) (132:25)
(133:9) (137:18)
(138:7) (138:20)
(140:10) (142:3)

(142:10) (142:11)
(161:6) (183:20)
(184:23) (186:23)
(187:1) (188:18)
(189:13) (199:18)
(218:8) (221:2)
(226:24) (235:9)
(236:14)
**secondary** (19:11)
(94:6) (94:8) (148:12)
(152:8) (154:6)
(185:10) (232:11)
(233:12) (258:13)
**second-guess** (73:7)
**seconds** (50:13)
(156:19)
**second-to-last**
**secret** (34:7) (42:18)
(43:13) (61:8)
(154:15) (172:22)
(172:23) (172:24)
(230:16) (230:18)
(248:21)
**Section** (1:17)
(117:16)
**secured** (14:1)
**SECURITY** (7:14)
(50:10) (91:15) (99:7)
(99:20) (176:13)
(212:17)
**seeing** (64:7) (174:3)
(174:16) (185:3)
(187:3) (225:3)
**seem** (190:23)
(246:16) (246:23)
**seemed** (139:12)
(174:6)
**seen** (66:15) (175:5)
(179:15)
**sees** (183:11) (261:20)
**seize** (35:20)
**self** (161:22)
**sell** (11:21) (12:19)
(12:21) (13:1) (13:21)
(14:10) (14:14)
(14:22) (14:23)
(19:17) (21:16)
(22:19) (23:11)
(23:17) (24:18)
(24:19) (26:6) (27:14)
(28:11) (29:10)
(29:12) (43:22)
(45:15) (49:7) (57:19)
(60:4) (66:22) (69:2)
(69:14) (117:20)
(182:7) (182:11)
(183:24) (186:21)
(188:21) (191:11)
(192:9) (200:14)
(201:1) (201:4)
(207:5) (219:21)
(224:15) (224:17)
(229:20) (229:25)
(230:24) (233:13)

**selling**       **Solutions**

(236:25) (240:2)
(242:3) (243:9)
(243:10) (243:16)
(243:21) (243:22)
(253:3) (253:7)
**selling** (15:6)
(19:10) (22:22)
(24:15) (25:12) (34:5)
(34:13) (34:14)
(34:15) (35:16)
(35:19) (37:10)
(45:23) (46:11)
(46:24) (47:9) (57:21)
(74:5) (94:9) (96:14)
(115:23) (180:17)
(181:15) (182:2)
(182:5) (184:1)
(185:1) (186:16)
(191:10) (191:20)
(191:21) (197:2)
(200:24) (224:11)
(225:17) (225:21)
(226:2) (232:1)
(232:14) (232:23)
(233:7) (234:20)
(242:1) (242:8)
(253:11) (253:15)
(257:21)
**sells** (29:15) (96:12)
**send** (7:4) (49:15)
(51:20) (52:24)
(75:25) (81:20) (83:9)
(143:7) (179:18)
(202:22) (209:21)
(214:7) (226:11)
(226:19) (227:10)
(247:20) (259:18)
(259:22)
**sender** (107:11)
**sending** (5:8) (80:1)
(151:20) (154:15)
(155:23) (197:6)
(208:22) (208:23)
(214:8) (244:22)
(245:8)
**sends** (64:11) (76:13)
(79:6)
**senior** (103:3)
(103:7) (180:16)
**sense** (5:13) (22:9)
(27:17) (28:13)
(28:19) (41:24) (48:6)
(48:11) (48:12) (49:3)
(69:24) (182:9)
(182:10) (248:8)
(258:13)
**sent** (33:17) (61:16)
(76:4) (78:12) (82:22)
(103:8) (107:10)
(136:22) (136:24)
(137:13) (137:20)
(137:23) (141:12)
(143:9) (151:10)
(151:14) (151:16)

(151:24) (152:7)
(153:22) (154:8)
(155:19) (171:3)
(180:1) (207:7)
(208:3) (210:19)
(211:2) (217:16)
(226:8) (250:17)
(254:16) (259:14)
(262:7) (262:20)
**sentence** (89:19)
(102:17) (114:21)
(120:12) (140:10)
(154:3) (175:3)
(187:12) (217:9)
(252:6)
**sentenced** (88:7)
(89:20)
**sentences** (48:9)
**separately** (173:10)
**SEPTEMBER** (1:4)
(29:7) (204:20)
(208:10) (265:8)
**sequestration** (5:24)
**series** (254:5)
**serious** (142:24)
**seriousness** (6:19)
Seroquel (36:21)
(37:12) (37:22)
(37:25) (42:7)
**servers** (90:8)
**service** (196:6)
**services** (93:10)
**session** (50:19)
(52:16)
**set** (57:4) (66:1)
(83:2) (83:3) (83:4)
(145:23) (229:11)
(261:17)
**setback** (212:6)
**setting** (252:15)
**seven** (10:8) (156:19)
(178:18) (178:19)
(178:20) (235:17)
(235:18)
**seven-ish** (178:16)
**seven-minute** (251:9)
Several (60:13)
(91:5) (93:16)
(134:10) (159:24)
(184:4) (263:4)
**shady** (53:14)
**shall** (118:2) (118:8)
(119:17) (122:14)
(123:14)
**shame** (36:25)
**SHAMELLE** (2:6) (2:8)
(265:2) (265:10)
**share** (46:2) (75:3)
(134:12) (134:15)
(156:7) (172:24)
(173:1)
**shared** (134:17)
(172:25) (173:4)
(209:5)

**sharing** (184:14)
**sheep** (32:2) (38:18)
**sheep's** (17:17)
(20:21) (47:23)
**shelf** (28:17) (29:6)
**SHELLY** (2:6)
**shelves** (14:13)
(28:5) (28:18) (69:11)
**shielding** (71:7)
**ship** (115:19)
**shipment** (100:2)
**shipping** (10:3)
(11:5) (19:1) (32:10)
(32:11) (49:8)
**short** (29:6) (29:18)
(30:2) (30:20)
**shortly** (162:4)
(264:12)
**shoulder** (157:25)
**shouldn't** (44:16)
(147:15) (255:20)
**show** (42:23) (43:7)
(43:17) (43:20) (44:3)
(44:12) (44:18) (58:6)
(66:17) (75:20) (76:7)
(79:18) (81:6) (86:19)
(88:16) (88:18) (89:1)
(89:21) (90:7) (91:4)
(91:5) (97:24) (98:20)
(99:10) (100:4)
(101:9) (101:10)
(104:10) (106:1)
(108:8) (116:1)
(116:16) (129:20)
(136:14) (137:18)
(154:17) (161:3)
(174:23) (182:17)
(185:4) (186:10)
(194:10) (198:12)
(200:10) (203:13)
(203:22) (203:23)
(204:24) (207:20)
(209:25) (213:5)
(217:19) (220:4)
(221:21) (222:14)
(223:5) (244:9)
(251:20) (261:4)
**showed** (86:10)
(111:14) (112:14)
(235:5) (249:13)
**showing** (141:25)
(142:1) (142:4)
(190:2) (218:8)
**shown** (142:16)
**shows** (7:4) (19:1)
(79:2) (100:18)
(113:2) (130:18)
**shut** (31:22) (32:24)
**side** (28:21) (54:25)
(193:7) (193:16)
**sidebar** (53:9)
**sides** (32:3)
**sign** (64:10) (126:13)
(126:22) (127:4)

(127:18) (128:25)
(129:14) (191:9)
**signature** (250:18)
(250:19)
**signed** (64:14)
**significant** (48:9)
(68:15)
**significantly**
**signing** (107:10)
**signs** (128:20)
(170:19)
Silence (81:21)
**similar** (118:11)
(206:8)
**since** (13:16) (28:6)
(34:3) (154:5)
(160:19) (217:2)
(254:5) (258:23)
**single** (46:5) (90:8)
(234:22) (239:16)
**situation** (51:7)
(60:19) (73:21)
(118:18) (225:8)
(238:19) (254:9)
**situations** (103:18)
(243:19)
**six** (35:18) (114:1)
**sketchy** (43:20)
**skills** (87:22) (180:8)
**skip** (120:11)
(121:19) (125:20)
(141:18) (141:19)
(200:12)
**slipped** (42:13)
**sloppy** (49:4)
**slow** (68:16) (93:19)
(214:22)
**small** (10:3) (10:10)
(11:5) (11:23) (88:4)
**smaller** (242:12)
(242:13)
**smoked** (40:8)
**smooth** (16:23)
(61:14) (87:21)
**smoothly** (238:4)
**snitch** (41:5)
**sold** (14:16) (15:16)
(19:4) (36:12) (36:22)
(37:2) (44:23) (45:13)
(46:6) (47:1) (70:15)
(85:18) (126:9)
(132:20) (139:20)
(139:23) (180:19)
(188:2) (191:15)
(192:20) (196:20)
(198:8) (201:23)
(202:16) (225:5)
(226:5) (233:1)
(233:23) (236:3)
(243:25) (252:6)
(252:25) (253:21)
(257:16)
**Solutions** (93:23)
(103:2) (109:9)

somehow                                                    such

(113:25) (114:16)
(121:24) (122:13)
(178:13) (222:16)
**somehow** (38:6)
(82:15) (82:17)
**someone's** (33:5)
**sometimes** (27:21)
(32:22) (36:13)
(202:4) (209:9)
(209:10) (209:11)
(235:24) (259:24)
**somewhere** (37:24)
(79:7)
**soon** (209:9) (216:5)
**SOP** (104:16) (104:19)
(105:13) (108:15)
(116:23)
**sophisticated** (33:4)
(83:1)
**sophistication**
**sorry** (24:12) (46:9)
(50:1) (51:15) (93:21)
(97:21) (109:24)
(118:20) (125:7)
(134:7) (139:8)
(139:21) (142:6)
(146:19) (152:14)
(152:18) (156:17)
(157:1) (157:9)
(159:4) (159:7)
(162:14) (166:10)
(185:25) (205:19)
(211:10) (212:7)
(245:25) (253:24)
(260:17)
**sort** (16:9) (38:16)
(56:20) (87:25) (88:7)
(94:12) (140:18)
(142:16) (180:2)
(195:16) (258:14)
**sorts** (61:19) (68:23)
(77:10) (81:15)
(81:16) (88:22)
**sound** (28:14)
**sounds** (7:7) (26:20)
(27:8) (28:13) (180:1)
**source** (62:21)
(89:13) (89:16)
(89:17) (125:17)
(125:21) (126:3)
(132:11) (140:3)
(153:21) (187:7)
(188:8) (188:10)
(188:18) (188:23)
(188:24) (242:21)
(242:24) (256:3)
**sourced** (212:1)
**sources** (20:5)
(186:23) (187:4)
(187:13) (231:18)
(231:20) (232:7)
(241:9) (242:16)
**South** (2:7)
**SOUTHERN** (1:1)

(80:13) (81:12)
(81:17) (90:12)
**space** (24:2)
**spans** (30:20)
**speak** (40:1) (81:8)
(83:10) (112:13)
(160:20) (162:23)
**speaking** (234:12)
**speaks** (25:20)
**specialty** (184:24)
**specifically** (53:14)
(96:8) (171:20)
(175:2) (184:19)
(198:15)
**specifics** (219:12)
(231:18)
**speculation** (164:22)
(167:16) (230:2)
(233:20) (246:19)
(261:13)
**spell** (92:17) (177:17)
**spend** (35:9) (47:13)
(47:18)
**spending** (44:8)
**spent** (44:3) (44:13)
(47:20) (158:9)
**spin** (26:5)
**spoil** (28:23)
**spoke** (66:3) (68:19)
(73:20) (118:20)
(151:13) (160:21)
(166:11) (200:22)
**spoken** (63:2) (160:19)
**spring** (84:5)
**spurred** (138:15)
**spy** (33:1)
**stable** (179:15)
**staff** (135:11)
(143:24) (145:15)
(145:17) (145:19)
(159:22)
**stand** (20:10) (142:8)
(142:11)
**standard** (103:14)
(103:19) (103:22)
(104:2) (105:14)
(106:7) (112:23)
(112:24) (113:7)
(117:9) (130:3)
(190:9) (220:1)
(220:10) (220:13)
(220:24) (222:11)
(230:10)
**standards** (217:3)
(240:19)
**standing** (91:15)
**stands** (57:5) (99:19)
(264:4)
**star** (84:18) (89:2)
(89:7) (89:23)
**start** (22:16) (56:20)
(63:16) (65:10)
(68:20) (69:22) (72:2)
(75:17) (80:1) (80:4)

(182:14) (191:16)
(196:12) (201:7)
(211:1) (213:12)
**started** (10:3)
(10:12) (18:5) (21:9)
(22:21) (37:11) (67:8)
(72:4) (79:24) (89:24)
(89:25) (95:17)
(95:19) (95:24) (96:1)
(96:13) (172:1)
(180:15) (181:2)
(182:1) (191:7)
(191:10) (191:20)
(191:23) (196:18)
(197:2) (197:6)
(245:8) (256:12)
(262:14)
**starting** (75:14)
(183:24) (183:25)
**starts** (17:17)
(65:19) (78:19)
(96:21) (184:8)
(196:19)
**state** (44:6) (64:7)
(64:11) (64:17)
(84:19) (92:16)
(119:18) (177:17)
(178:10) (212:10)
**STATEMENT** (3:3)
(8:25) (44:21) (48:3)
(53:16) (54:21) (56:4)
(56:7) (164:25)
(165:23) (222:18)
(240:24) (257:15)
(257:18)
**statements** (8:23)
(36:6) (53:7) (164:22)
**STATES** (1:1) (1:3)
(1:10) (1:14) (11:16)
(12:3) (13:7) (14:9)
(15:10) (21:6) (21:19)
(23:24) (24:3) (24:10)
(27:20) (28:3) (30:12)
(34:1) (34:12) (40:12)
(40:14) (42:25)
(59:17) (59:21) (67:1)
(228:22) (265:7)
**stay** (15:19) (55:4)
(86:25) (87:18)
**stay-at-home** (9:17)
**stays** (59:20)
**Ste** (1:14)
**steal** (241:18)
**steeper** (197:25)
(198:3)
**STENOGRAPHICALLY**
**stenographically-reported**
(124:25)
**step** (175:16)
(239:16) (264:1)
**steps** (67:22) (82:25)
**stipulation** (112:5)
**stolen** (130:19)
(131:22) (142:18)
**stomping** (13:8)

**stop** (35:2) (60:8)
(70:18) (74:24)
(75:16) (78:8) (81:10)
(155:20)
**stopped** (72:2) (72:8)
(75:12) (75:19)
(144:15) (151:23)
(198:10) (244:15)
(244:17)
**storage** (129:10)
**Store** (27:23) (196:15)
**stored** (142:18)
**story** (9:11) (21:4)
(30:1) (38:2) (80:8)
**straight** (71:11)
(71:12) (141:19)
(202:16)
**strategic** (20:18)
**stream** (34:18) (35:5)
**Street** (1:14) (1:21)
(15:1) (23:9) (23:17)
(30:6) (31:13) (33:3)
(34:13) (34:15)
(34:24) (35:16)
(36:13) (38:20) (38:25)
**strength** (114:10)
**strive** (102:21)
**strong** (11:6) (47:17)
**stuck** (235:14)
**student** (93:10)
**studied** (180:24)
**stuff** (30:4) (31:5)
(35:16) (58:4) (69:20)
(75:4) (78:7) (83:14)
(181:24) (184:11)
(188:4) (193:8)
(206:9) (209:14)
(219:3) (241:24)
(242:4)
**stupid** (25:3) (59:12)
(61:20) (61:21)
**subject** (99:3)
(99:15) (101:25)
(112:5) (130:7)
(130:24) (132:1)
(176:3) (183:23)
(205:16) (213:23)
**submit** (150:7)
**submitted** (64:5)
(151:7)
**Subpart** (127:8)
(128:10)
**subsection** (21:23)
(107:16) (113:24)
(114:8) (114:15)
(121:23) (122:8)
(124:25)
**success** (146:13)
(148:25) (149:1)
**successes** (146:3)
(146:5)
**successful** (148:23)
(149:11) (192:16)
**such** (31:24) (31:25)

sucking                                                                    Third

(57:3) (58:14) (60:1)
(66:21) (83:6)
(142:19) (190:7)
**sucking** (15:10)
**sudden** (87:1)
**suddenly** (39:6)
(87:7) (170:23)
**suggest** (39:14)
**suggested** (172:23)
(257:9)
**suggesting** (54:12)
**suggestion** (83:25)
**suit** (167:5)
**Suite** (2:2)
**suits** (230:19)
**sum** (167:6)
**summer** (95:20)
(134:8) (146:20)
**supplied** (114:17)
(139:20)
**supplier** (122:16)
(184:24) (219:23)
(245:3)
**suppliers** (185:12)
(185:18) (212:2)
(224:13) (228:16)
(263:8)
**supply** (13:22)
(76:14) (78:16) (99:7)
(99:20) (127:9)
(137:22) (138:8)
(140:11) (212:17)
(247:23)
**supplying** (211:18)
**support** (16:7)
(40:14) (44:9)
**supposed** (32:12)
(79:7) (118:4)
(118:18) (121:16)
(122:4) (123:7)
(127:5) (128:12)
(158:24) (193:15)
(201:22) (227:8)
(256:22)
**supposedly** (69:2)
(73:16) (89:6)
(111:12) (148:20)
(156:15)
**supposedly they're**
**surprise** (235:23)
(239:5)
**surrounding** (11:13)
**suspect** (107:17)
(115:19) (118:15)
(120:20) (121:4)
(124:14) (125:23)
(126:10) (126:14)
(126:23) (127:6)
(127:19) (128:13)
(129:1) (129:15)
(130:3) (131:17)
(131:23) (132:7)
(132:12) (132:15)
(132:20) (140:21)

(168:21) (168:25)
(169:12) (170:19)
(170:25) (220:10)
(220:25) (221:13)
(221:16) (227:14)
**suspected** (107:4)
(119:10) (132:11)
**suspicious** (215:22)
(216:2) (219:14)
**sustain** (195:9)
**Sustained** (43:16)
(44:11) (77:6) (97:11)
(101:1) (156:2)
(163:22) (165:21)
(174:9) (206:1)
(206:13) (219:6)
(222:22) (233:16)
(233:21) (234:6)
(236:1) (245:24)
(246:2) (246:13)
(248:13) (248:17)
(253:18) (260:11)
**sworn** (92:15) (92:25)
(177:14) (177:25)
**sympathetic** (51:7)
**syndicates** (22:15)
(22:20)
**Synergy** (19:14)
(25:16) (29:11) (46:11)
**system** (8:20) (12:17)
(14:3) (26:10) (27:11)
(36:2) (63:15) (80:15)
(138:15) (140:22)
(248:20)
**systems** (44:5)

# T

**T3** (18:25) (19:1)
(79:6) (79:12) (79:13)
(96:16) (96:23)
(99:21) (103:2)
(113:2) (115:3)
(122:9) (122:16)
(123:3) (123:16)
(124:1) (124:9)
(135:2) (196:8)
(196:12) (203:7)
(214:22) (227:1)
(238:23) (240:4)
(243:10) (243:12)
(243:23) (244:4)
(244:5) (247:20)
(248:25) (250:7)
**T3s** (18:21) (18:23)
(32:9) (69:25) (70:15)
(70:19) (70:25) (71:2)
(72:3) (72:4) (79:2)
(97:3) (97:7) (97:15)
(100:1) (120:6)
(135:5) (171:21)
(200:15) (204:16)
(204:22) (206:7)
(227:7) (227:13)
(238:15) (239:22)

(240:3) (240:7)
(243:9) (243:25)
(244:19) (244:20)
(244:22) (244:23)
(245:5) (245:8)
(245:15) (245:19)
(246:17) (246:24)
(247:4) (247:12)
(248:5) (248:10)
(248:19) (259:14)
(259:19)
**table** (5:25) (101:11)
(248:21)
**taken** (78:22) (82:25)
**takes** (21:24) (46:17)
**taking** (10:24)
(52:22) (63:14)
(68:20) (76:3)
(148:10) (148:20)
**talk** (9:10) (14:6)
(18:11) (30:10) (41:2)
(41:4) (41:10) (43:6)
(44:24) (49:23)
(87:12) (120:9)
(127:14) (141:23)
(192:19) (196:8)
(200:20) (225:4)
(228:4) (230:15)
(234:13) (235:9)
(236:14) (238:16)
(239:22) (241:4)
(243:8) (244:2)
**talked** (16:1) (21:5)
(30:11) (49:20)
(82:25) (83:18)
(143:10) (145:5)
(152:1) (160:23)
(170:14) (170:18)
(195:7) (229:6)
**talker** (16:23) (61:14)
**talking** (18:22)
(30:24) (32:3) (32:9)
(40:17) (81:16)
(135:1) (144:4)
(144:10) (164:6)
(164:11) (164:15)
(166:6) (166:17)
(181:17) (190:8)
(192:25) (195:12)
(195:18) (205:16)
(205:20) (210:22)
(212:20) (218:18)
(244:3) (249:14)
(250:5)
**talks** (28:16) (41:20)
(139:20) (256:2)
(256:16)
**tampered** (78:6)
**tasks** (103:18)
**team** (70:22) (70:25)
(71:2) (71:4) (105:22)
(184:15)
**Teams** (217:23)
**technically** (227:7)

(240:18)
**teed** (88:1)
**telephone** (83:3)
**ten** (35:18) (39:17)
(39:23) (39:24) (40:3)
(44:17) (252:18)
(256:25) (257:1)
(264:19)
**tendency** (235:19)
**Tenders** (7:1) (98:19)
(161:14) (250:21)
**tending** (179:13)
(180:11)
**tens** (27:4) (28:12)
**tensions** (238:3)
**terminology** (56:12)
(56:22) (58:3)
**terms** (154:5)
**Terry** (7:10)
**testified** (92:25)
(145:12) (156:5)
(156:20) (157:16)
(157:22) (160:1)
(165:24) (177:25)
**testifies** (62:8)
(87:20) (89:8)
**testify** (87:3)
(87:13) (88:12) (89:18)
**testimony** (57:14)
(63:22) (149:12)
(151:4) (155:19)
(158:1) (158:5)
(163:18) (167:6)
(176:6) (176:9)
(237:24) (239:25)
(240:1)
**text** (20:8) (140:17)
(142:15) (208:3)
**thankfully** (14:5)
**thanks** (9:2)
**that'd** (255:8)
**the Gilead** (57:7)
**their's** (9:19)
**themselves** (36:4)
(36:8) (64:13) (81:15)
**theory** (57:22)
**thereafter** (264:12)
**therefore** (70:4)
**thereof** (6:4)
**THEREUPON** (92:23)
(177:23)
**they'd** (190:13)
(209:9)
**they'll** (39:11)
**thinker** (20:18)
**thinking** (20:15)
(82:15)
**thinks** (20:19) (55:1)
(87:11) (87:13)
(87:14) (87:15)
**Third** (1:21) (65:2)
(101:19) (107:15)
(122:13) (129:3)
(130:23) (131:25)

Thor                                                                                                    use

(140:10) (195:1)
(225:7)
**Thor** (1:13)
**Thornton** (254:20)
**though** (34:8) (86:22)
(88:13) (152:24)
(156:4) (157:3)
(200:14) (243:20)
**thought** (29:11)
(53:6) (79:16) (88:11)
(148:14) (148:15)
(148:16) (153:22)
(172:17) (172:20)
**thousand** (36:15)
(47:25) (60:13)
**thousands** (11:3)
(11:7)
**threat** (138:7)
(138:13) (138:21)
(148:15)
**threatening** (77:11)
(80:1)
**threatens** (15:7)
(15:8)
**threats** (139:10)
**three** (9:4) (12:23)
(15:21) (40:24)
(49:20) (52:16)
(63:23) (72:20)
(107:19) (119:12)
(123:5) (124:12)
(162:4) (185:7)
(186:13) (187:14)
(187:18) (190:10)
(228:12) (228:13)
(228:24) (229:2)
(229:3) (230:23)
(231:2) (232:18)
(241:10) (241:13)
(241:18) (241:19)
(242:1) (242:11)
(243:4) (252:7)
(252:18) (254:6)
(258:13)
**Throughout** (11:5)
(38:7) (123:22)
(134:2) (144:13)
(148:4) (170:15)
**throw** (29:4) (29:9)
(48:9)
**thrown** (56:11)
**Thursday** (156:18)
**timely** (133:13)
(227:13)
**tiny** (17:13)
**tips** (179:15)
**title** (94:23) (95:21)
(95:24) (105:12)
(112:22) (130:2)
(137:19) (180:14)
(184:21)
**titles** (95:25)
**today's** (55:21)
**together** (10:11)

(21:20) (25:11) (32:6)
(37:19) (38:17)
(65:25) (145:19)
(152:19) (152:23)
**too** (21:8) (21:9)
(90:11) (125:2)
(125:9) (125:15)
(186:10) (222:2)
(222:3) (222:5)
(249:25)
**top** (46:18) (78:4)
(102:15) (103:1)
(109:9) (117:8)
(119:17) (123:13)
(133:10) (138:20)
(184:12) (184:13)
(189:22) (208:5)
(208:7) (210:20)
(218:13) (220:9)
(222:10)
**torn** (235:6)
**total** (81:5)
**totally** (63:11)
(88:23) (155:20)
**touch** (237:21)
**tough** (192:9)
**toward** (148:4)
**towards** (85:13)
**town** (10:6) (40:8)
**trace** (140:2)
**tracing** (112:24)
(112:25) (113:25)
(114:13) (118:11)
(222:12) (227:2)
**track** (38:13) (44:6)
(44:7) (63:4) (88:21)
(96:24)
**tracking** (96:25)
**trade** (185:12)
**trading** (105:14)
(105:16) (114:17)
(114:20) (125:18)
(125:21) (125:24)
(126:4) (126:8)
(126:17) (127:1)
(132:18) (132:23)
(132:25) (133:6)
(133:10) (133:17)
**tragic** (37:3)
**trail** (243:18)
**training** (181:3)
**transacted** (125:22)
**transaction** (65:11)
(79:14) (79:15)
(102:17) (114:8)
(114:16) (115:1)
(115:6) (115:17)
(116:2) (116:10)
(117:9) (118:3)
(119:17) (119:23)
(120:1) (120:13)
(120:17) (121:15)
(121:17) (126:18)
(127:2) (130:24)

(130:25) (131:3)
(131:10) (132:1)
(132:2) (133:2)
(133:11) (159:23)
(162:22) (165:12)
(166:12) (173:12)
(222:17) (222:18)
**transactions** (58:11)
(58:22) (65:8) (65:20)
(67:10) (67:15)
(79:19) (126:9)
(132:12) (132:19)
(164:18)
**transcript** (265:4)
(265:6)
**transported** (235:20)
**travel** (50:18)
**Travis** (250:22)
(250:24)
**treat** (145:17)
**treats** (6:19)
**tremendous** (11:7)
**trick** (33:8)
**tricking** (25:7)
**tried** (83:9) (85:6)
(90:6) (146:3) (146:5)
**trouble** (6:16) (26:9)
(26:10) (32:5) (32:18)
(48:6) (54:5) (174:18)
(234:8)
**truck** (42:5)
**true** (18:25) (45:1)
(45:8) (64:2) (125:3)
(125:9) (125:15)
(140:3) (227:5)
(241:23) (265:3)
**truly** (149:13) (212:7)
**trust** (61:13) (65:17)
(85:11)
**trusted** (61:11)
**truth** (25:25) (30:4)
(35:12) (58:9) (62:9)
(62:10) (76:21)
(83:13) (84:4) (85:5)
(90:1) (90:7) (91:6)
(92:25) (177:25)
**truthful** (63:6)
**turn** (22:18) (23:5)
(23:10) (87:22)
(107:15) (138:19)
(140:16) (198:15)
(261:5)
**turned** (43:22) (73:1)
(73:3) (75:13) (83:25)
**turns** (17:1) (18:10)
(19:18) (24:6) (29:12)
(30:3) (32:17) (46:4)
(46:21) (83:10)
**twice** (6:10)
**types** (13:7) (55:1)
(57:1) (95:7) (180:5)
(184:5) (206:5)
**typical** (9:15)
(21:22) (142:1)

**typically** (201:21)
(202:20)

## U

**ultimately** (81:24)
**unable** (123:3)
(123:25) (124:9)
**unbelievable** (31:18)
(31:20)
**uncertain** (60:20)
(120:24)
**undercut** (241:17)
**underneath** (102:15)
(124:13) (126:7)
(262:15)
**understanding**
(196:23) (214:11)
(231:19) (237:18)
(238:6)
**understood** (118:4)
**unfit** (132:5)
**unfortunately** (20:21)
**UNITED** (1:1) (1:3)
(1:10) (1:14) (12:3)
(13:7) (15:10) (21:6)
(21:19) (24:3) (27:20)
(28:3) (30:12) (33:25)
(34:12) (40:12)
(42:25) (59:17)
(59:21) (228:22)
(265:7)
**unknowingly** (36:22)
**unknown** (140:1)
**unless** (8:7) (33:9)
(41:2) (72:2) (220:3)
**unlicensed** (64:19)
**Unlimited** (162:8)
(163:3) (165:13)
(173:22) (175:12)
(188:24)
**unorganized** (245:20)
**unreal** (71:22)
**unsafe** (216:13)
(216:25) (219:24)
(261:21)
**untrue** (85:4)
**untrustworthy** (88:23)
**update** (7:21) (70:19)
(99:21)
**updated** (70:20) (84:6)
**upon** (62:3) (62:4)
(63:4) (63:13) (64:4)
(65:16) (72:16)
(72:17) (86:9) (88:18)
(142:4)
**upset** (156:6) (236:7)
**usable** (217:2)
**uscourts** (2:8)
**usdoj** (1:15) (1:18)
**use** (31:15) (41:23)
(44:25) (55:22)
(87:18) (89:2) (89:22)
(120:17) (153:10)
(199:10) (204:10)

**user**

(204:15) (228:20)
(254:1)
**user** (196:13) (196:18)
**uses** (154:5)
**using** (71:1) (152:8)
(252:7)
**usually** (59:1)
(129:9) (188:8)
(190:10) (242:19)
(242:21) (252:7)

**V**

**Vague** (117:22)
**Valentine** (6:6)
**valid** (23:8) (29:24)
**validated** (64:23)
**validation** (105:15)
**value** (127:9)
**variety** (184:6)
**various** (45:10)
(45:24) (67:2) (166:4)
(168:17) (168:21)
(168:24) (173:24)
(211:20) (231:20)
**vast** (185:11)
**VAWD** (100:14)
(100:20) (101:4)
(101:6) (102:12)
(102:18) (134:24)
(138:1) (149:14)
(149:15) (149:16)
(149:18) (149:21)
(149:23) (150:4)
(150:8) (150:11)
(150:15) (150:18)
(153:5) (153:6)
(154:17) (168:4)
(168:5) (168:9)
(168:14)
**VAWD-required** (150:1)
**vehicle** (81:14)
**vendor** (19:19)
(29:10) (29:15) (44:7)
(63:16) (63:19)
(63:21) (64:8) (64:21)
(67:24) (67:25) (79:6)
(114:22) (117:9)
(117:13) (166:13)
(166:14) (256:3)
(256:17)
**vendors** (16:21)
(17:19) (19:9) (20:4)
(25:10) (25:12)
(25:16) (25:18)
(25:19) (25:20)
(25:21) (26:3) (27:6)
(29:13) (31:9) (31:11)
(31:19) (32:5) (32:14)
(32:18) (33:4) (43:20)
(43:25) (45:9) (45:10)
(46:10) (46:18)
(62:21) (62:23)
(62:25) (63:24) (64:5)
(65:1) (65:6) (65:23)

(66:4) (66:7) (66:8)
(67:18) (79:6) (82:24)
(83:5) (86:6) (134:19)
(138:4) (159:24)
(162:23) (163:1)
(164:13) (211:18)
(214:21) (231:20)
(252:3)
**verdict** (9:9) (91:3)
**verified** (118:24)
(119:10)
**verify** (18:24)
(120:12) (122:14)
(122:22) (122:24)
(123:15)
**verifying** (118:25)
(121:8)
**versus** (35:24) (198:1)
**vet** (63:21)
**vetted** (64:23)
**vetting** (64:15)
**via** (179:18)
**Vice** (179:25)
**victim** (80:25) (81:2)
(81:3)
**victimized** (74:23)
**victims** (26:11) (86:6)
**view** (56:20)
**violated** (49:2)
**violating** (154:12)
**violation** (6:3)
**violative** (147:11)
**vivid** (149:10)
**vocal** (236:9)
**vouching** (72:13)
(72:14)
**vulnerable** (139:13)

**W**

**WAC** (57:4) (57:5)
(57:12) (57:15)
(57:17) (57:22)
(57:24) (58:13)
(58:16) (58:17)
(58:18) (58:20)
(58:25) (59:4) (59:6)
(59:9) (60:3) (187:22)
(188:1) (188:13)
(189:5) (189:23)
(190:1) (190:2)
(190:12) (190:14)
(229:6) (229:10)
(229:13) (230:10)
(230:11) (230:24)
(231:7) (231:12)
(231:21) (232:1)
(232:8) (232:23)
(233:1) (233:7)
(233:24) (234:21)
(242:14) (242:15)
(243:6) (249:14)
(250:5) (252:7)
(252:9) (252:14)
(252:22) (253:3)

(253:4) (253:7)
(253:8) (253:9)
(253:11) (253:15)
(253:21) (253:22)
**W-A-C** (57:4)
**WAC-related** (59:7)
**wait** (5:17) (126:3)
**waiting** (5:16) (7:15)
(53:2)
**waitress** (93:15)
**waive** (8:12) (55:14)
(92:4) (177:3)
**wake** (48:20)
**Walgreens** (241:24)
**walk** (23:14) (46:1)
**walked** (66:12)
**walking** (46:14) (47:5)
**walks** (23:16) (47:24)
**Walmart** (11:24)
**wanting** (75:10)
(149:11)
**wants** (5:4) (7:12)
(58:7) (59:19) (59:24)
(60:7) (73:6) (90:14)
(153:10) (233:10)
**warehouse** (30:16)
(78:4) (80:7) (82:7)
(195:22) (196:5)
(235:22) (237:14)
**warning** (155:20)
(170:19)
**warns** (32:22)
**Washington** (72:18)
(186:12) (191:4)
**ways** (12:12) (53:17)
(67:2) (67:9) (125:11)
(125:14) (140:21)
(143:24)
**wearing** (27:24)
(167:4)
**website** (124:18)
**websites** (83:4)
**we'd** (5:23) (53:5)
(81:2) (82:11)
**Wednesday** (50:2)
**Weed** (194:15)
(194:16) (205:8)
(205:10)
**weekends** (10:9)
**weeks** (9:4) (91:5)
(197:5) (209:10)
**weren't** (27:25)
(48:15) (48:17)
(70:21) (71:19) (72:7)
(83:10) (151:17)
(159:17) (159:21)
(164:13) (201:15)
(202:14) (232:20)
(234:3) (236:8)
(245:4) (245:19)
**we've** (52:21) (55:18)
(70:14) (89:9) (152:1)
**What's** (37:12) (42:5)
(47:11) (50:25)

(58:16) (62:10)
(74:17) (74:24) (76:1)
(96:10) (116:24)
(117:13) (142:16)
(155:24) (156:23)
(200:4) (219:18)
(247:13) (252:24)
(255:1)
**whatsoever** (19:24)
(48:6) (66:5) (66:12)
(75:1) (79:11) (83:25)
(85:8) (85:23) (90:24)
**whenever** (39:12)
(199:10) (204:9)
(204:15)
**where's** (49:25)
**wherever** (196:18)
**while** (5:17) (17:7)
(40:7) (53:2) (101:6)
(150:19) (160:19)
(161:23) (163:17)
(165:13) (166:12)
(168:15) (169:17)
(181:6)
**whole** (78:12)
(159:25) (160:2)
(161:19) (232:12)
(254:2) (254:5) (255:1)
**wholesale** (15:15)
(17:21) (19:17)
(23:22) (24:19) (28:7)
(57:5) (57:10) (60:1)
(69:1) (69:2) (69:3)
(100:17) (118:2)
(137:21) (140:21)
(141:6) (148:12)
(152:25) (157:5)
(190:12) (229:8)
(229:13) (229:21)
(230:19) (241:17)
**wholesaler** (11:17)
(14:15) (94:6) (94:8)
(118:14) (185:16)
(196:21) (232:11)
(258:14)
**wholesalers** (12:13)
(12:20) (14:7) (14:8)
(14:10) (14:21)
(16:21) (34:16)
(35:14) (140:11)
(152:8) (233:12)
(242:12) (242:13)
**wholesaling** (70:2)
**who's** (6:18) (8:5)
(29:3) (45:4) (86:25)
(188:21) (208:6)
(217:22) (254:22)
(254:24)
**whose** (140:1)
**wide** (36:5) (54:16)
**WILLIAM** (1:9) (1:20)
**williambarzee** (1:22)
**willing** (9:3) (238:4)
**win** (59:23) (59:24)

**withhold**                                                                                      **Zimet**

**withhold** (76:21)
**within** (100:2)
(103:18) (107:19)
(119:12) (123:5)
**without** (22:1) (49:7)
(65:12) (195:1)
(205:3) (205:4)
(205:15) (205:19)
(222:17) (243:10)
(257:10) (257:17)
**witness** (5:24) (53:6)
(65:4) (77:16) (84:18)
(86:20) (89:7) (89:23)
(92:12) (92:15)
(92:18) (98:2)
(101:11) (104:11)
(106:2) (108:9)
(116:17) (129:20)
(131:9) (136:15)
(158:7) (161:23)
(162:21) (167:21)
(168:12) (169:9)
(174:22) (174:24)
(176:6) (177:11)
(177:14) (177:19)
(182:18) (194:11)
(194:24) (198:13)
(200:11) (203:14)
(204:25) (207:21)
(210:1) (213:6)
(217:20) (223:6)
(233:4) (239:9)
(240:16) (246:21)
(250:22) (255:13)
(255:24) (256:22)
(261:16) (264:3)
(264:4)
**witnesses** (6:2)
(89:2) (213:25)
**wolf** (17:17) (20:21)
(47:23)
**wolf's** (32:2) (38:18)
**wonderful** (27:8)
**wool** (32:1) (33:3)
**word** (60:22) (63:14)
(64:3) (228:20)
**words** (40:2) (81:9)
(96:6) (152:5)
(154:16) (196:11)
(241:5)
**worker** (72:22)
**works** (27:18) (253:25)
**world** (11:12) (16:21)
(57:9) (57:24) (65:18)
(75:22) (76:13)
(76:20) (78:12)
(131:4) (172:5)
(258:24)
**worry** (32:15)
**worth** (45:10) (209:14)
**wouldn't** (31:23)
(38:25) (39:2) (42:17)
(134:24) (153:12)
(158:12) (160:2)

(162:23) (182:8)
(182:10) (216:21)
(216:23) (216:24)
(226:5) (231:10)
(231:11)
**wrap** (39:22)
**wraps** (81:6)
**write** (7:3) (51:19)
(146:23) (147:11)
(147:14) (147:17)
**writing** (5:7) (135:6)
(135:8) (135:12)
(135:13) (154:7)
(156:8) (157:19)
(158:2) (166:17)
(171:3) (171:8)
(171:11)
**written** (52:23)
(250:15)
**wrong** (38:6) (38:10)
(43:9) (63:10) (83:25)
(85:4) (86:5) (147:10)
(147:15) (148:14)
(148:16) (151:9)
(155:17) (157:7)
(164:1) (172:17)
(172:20) (225:18)
(225:22) (231:24)
(232:6) (233:7)
(238:21) (240:21)
(242:10)
**wrote** (20:7) (49:21)
(147:4) (147:7)
(155:8) (157:12)
(157:15) (214:18)

## Y

**year** (20:16) (35:18)
(58:23) (58:25)
(93:12) (93:13)
(95:18) (110:20)
(111:8) (148:3)
**yesterday** (6:18)
(8:18) (44:22)
**yesterday's** (55:21)
**yet** (86:23) (87:10)
(88:7) (112:11)
(188:4) (205:20)
**York** (22:20) (69:2)
(186:6) (186:7)
**yourselves** (34:21)
(39:24) (40:20) (48:5)
(86:16)

## Z

**Zayas** (166:24)
**Zee** (1:16)
**zero** (66:5) (258:22)
**Zimet** (2:1) (3:5)
(3:10) (3:16) (5:14)
(6:5) (6:12) (6:16)
(7:7) (8:3) (8:6)
(50:12) (51:4) (51:12)
(51:15) (51:24)

(52:18) (55:8) (55:16)
(56:5) (56:6) (56:8)
(77:7) (82:3) (87:6)
(89:1) (91:23) (92:8)
(97:9) (97:17) (98:17)
(98:24) (100:25)
(101:25) (104:23)
(104:25) (105:3)
(106:14) (108:20)
(108:22) (109:18)
(109:24) (110:1)
(110:19) (111:19)
(111:24) (112:6)
(112:15) (117:3)
(130:7) (131:5)
(137:5) (145:1)
(145:2) (145:4)
(145:8) (149:4)
(149:6) (156:3)
(156:11) (156:13)
(158:8) (161:5)
(161:10) (161:12)
(161:15) (161:24)
(162:1) (162:25)
(163:9) (163:23)
(164:23) (165:1)
(165:5) (165:8)
(165:11) (165:22)
(168:10) (168:16)
(169:7) (169:20)
(174:8) (174:20)
(175:24) (176:1)
(176:5) (176:22)
(177:6) (183:5)
(195:7) (208:14)
(210:12) (219:5)
(219:7) (220:18)
(222:21) (223:18)
(251:7) (251:8)
(251:13) (253:19)
(255:14) (255:25)
(256:19)