UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-20255 Dimitrouleas/Hunt

UNITED STATES OF AMERICA, Fort Lauderdale, Florida

September 17, 2025

vs.

9:00 AM - 5:15 PM

PATRICK BOYD and CHARLES BOYD, Volume I

Defendants. Pages 1 to 355

---

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
Alexander Pogozelski, Esquire
Jacqueline DerOvanesian
Assistant United States Attorneys
99 NE 4th Street
Miami, Florida 33132

FOR DEFENDANT PATRICK BOYD:
William Barzee, Esquire
Ivlis Mantilla, Esquire
Barzee Flores
40 NW 3rd Street Ph 1
Miami, Florida 33128

FOR DEFENDANT CHARLES BOYD:
Bruce Zimet, Esquire
Bruce A. Zimet, P.A.
633 S. Federal Highway Fl 6
Fort Lauderdale, FL 33301

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

(Call to the Order of the Court.)

THE COURT: United States versus Patrick Boyd and Charles Boyd. Would counsel announce their appearances for the record.

MR. POGOZELSKI: Good morning, Your Honor.

Alex Pogozelski, Jacqueline DerOvanesian, Special Agent Cesar Zayas, and Molly Gold, on behalf of the United States.

MR. BARZEE: Good morning, Your Honor.

William Barzee and Ivlis Mantilla, on behalf of Patrick Boyd, who's with us at counsel table.

MR. ZIMET: And good morning, Your Honor.

May it please the Court, Bruce Zimet, on behalf of Charles Boyd, who is present in the court. Also seated with us is our paralegal, Jessica Cadwell.

THE COURT: Mr. Barzee, the other counsel is who? I didn't catch the name?

MR. ZIMET: Ivlis Mantilla, I-V-L-I-S. Ivlis Mantilla.

THE COURT: And Patrick Boyd is present; is that correct?

MR. ZIMET: That is correct, Your Honor.

THE COURT: And Charles Boyd is present; is that correct?

MR. ZIMET: Yes, sir.

THE COURT: We have 67 jurors that are coming in. I think we said that we were going to do the challenges in open

court with the jury excused. Is that what we agreed to, as opposed to doing them at sidebar where the defendants couldn't hear what was going on?

MR. ZIMET: Judge, my recollection is just the opposite.

THE COURT: So we're going to have the jury here. We'll do them at sidebar.

Then before I swear the jury, you will go back and talk to your clients and tell them what happened.

MR. ZIMET: Yes, sir. The clients will not be at sidebar.

THE COURT: Mr. Barzee.

MR. ZIMET: Correct, Your Honor.

THE COURT: We'll do them in open court so you can see who is coming up.

I think there was a waiver of having the jury decide the forfeiture count; is that correct?

MR. ZIMET: It's technically not a waiver because I don't think --

THE COURT: Waiver of the jury deciding it.

MR. ZIMET: I don't think they're entitled to decide that, Judge, forfeiture, because it's a money judgment and forfeiture -- it has to be decided by the Court. We agreed to sever the two. We would have that not part of the trial itself.

THE COURT: Okay.

MR. ZIMET: And the evidence that will be presented will be after the trial if necessary.

THE COURT: All right. So I will redact out the forfeiture part of the indictment that goes back to the jury.

MR. ZIMET: Agreed, Judge.

THE COURT: And normally, when I have the forfeiture not going back to the jury, I have the defendants sign a written waiver of the right to a jury trial, but you're saying there is no rights; so I don't have to do that?

MR. ZIMET: That's my understanding, Judge, and that's our position.

THE COURT: What's the Government's position?

MR. POGOZELSKI: We agree.

I think there was an agreed motion or an agreed filing on behalf of the forfeiture AUSA and the defense. So we agree, Your Honor.

THE COURT: Okay. There's a number of pending motions. There's a motion to exclude summary exhibits. I don't think I have ruled on that, have I?

MR. ZIMET: You have not, Judge.

THE COURT: Your argument on that, Mr. Zimet?

MR. ZIMET: Judge, the argument is to the production of the --

THE COURT: You need to speak into the microphone.

MR. ZIMET: The argument relates to and the motion relates to the production of the summary exhibits. They were not produced until last Wednesday.

We have not had an opportunity to review those exhibits in relationship to the discovery that was presented, which, according to the Government, is the basis of the summary exhibits themselves.

The rule requires they be produced at a reasonable time. "Reasonable time" is not on the eve of trial, and so we had no opportunity to review those, to examine those at this point.

THE COURT: What's the Government's position?

MR. POGOZELSKI: Your Honor, as we stated in our response, the rule requires the underlying documents to be produced at a reasonable time.

The underlying financial records were produced a long time ago. Once we produced the summary exhibits, the financial summary exhibits, we also provided the financial analyst's underlying analysis, which was in a spreadsheet that details all of the transactions. And we, as we stated in our filing, are also willing to delay calling the FBI forensic accountant until later in the trial, but the heart of our argument is that the underlying financial records, which at its core -- at their core are, it's just one bank account. It's Safe Chain's Univest bank account, which was produced at the beginning of

discovery and then a refresh a few months later in November of 2024.

So they've had these underlying records for a long time. They have known that the financials are an important component of the Government's case.

We presented, basically in essence, the same content as in the summary exhibits to the defendants and their counsel in person in May of 2020. So this is certainly no surprise when they have had all of the underlying financial records for so long.

THE COURT: You mean May of 2025?

MR. POGOZELSKI: Sorry. May of 2025. Yes, apologies, Your Honor. So there is no surprise. They've had the records for a long time.

THE COURT: How many summary exhibits are we talking about?

MR. POGOZELSKI: There's two different sets of summary exhibits. One is the financial summary exhibits.

THE COURT: So how many pages is that?

MR. POGOZELSKI: I would estimate that's about 10 to 12 pages.

THE COURT: And how about the second one?

MR. POGOZELSKI: And then the call summary exhibits, I believe, are about four pages, and those are based on Verizon call records that we have received in late August pursuant to a

trial subpoena, and we have produced those underlying call records to the defense the same day that we received them.

THE COURT: Anything further, Mr. Barzee?

MR. BARZEE: No, Your Honor. Thank you.

THE COURT: Anything further, Mr. Zimet?

MR. ZIMET: Yes, Judge. The argument makes no sense from the standpoint of the rule. The reason you provide the underlying documents in a timely manner is to compare them to the exhibit, the summary exhibit.

If you don't have the summary exhibit until the eve of trial, you can't do the comparison. The purpose of the rule is to allow the person or the individual or entity that the exhibit is going to be offered against to be able to conduct that review and that analysis.

It's impossible to review an exhibit that doesn't exist from the standpoint of being produced to the defendant and, therefore, it's untimely and, therefore, we have no ability to review it, determine its accuracy, and also to prepare our own responsive exhibit.

The reason you provide the exhibit early is so you can examine it, see whether you want to have an exhibit that contradicts or refutes what's included in that summary exhibit. When you do it on the eve of trial, you're deprived of that opportunity to do it. You have no ability to do it and, therefore, under these circumstances, I have no idea how long

they have had them.

I think it's important. I would ask the Court to inquire how long they have had them, but this has all the appearance of a dump right before trial and not give us an opportunity to review and compare underlying documents with what's in that exhibit.

THE COURT: How long am I going to tell the jury to expect this case to last?

MR. POGOZELSKI: Your Honor. We are expecting our case in chief to last ten trial days, absent any other delays.

THE COURT: Mr. Zimet, how long should I tell the jury?

MR. ZIMET: Judge, my belief would be three full trial days. I know we have -- excuse me, 15 full trial days. I know we have intervening holidays, but how long that is week-wise?

THE COURT: Mr. Barzee.

MR. BARZEE: Three weeks, Your Honor.

THE COURT: All right. I'm going to deny the motion to exclude summary judgments, given the Government's representation that the witnesses are going to be called until the end of trial is -- there's going to be a couple of weekends, maybe three weekends between now and when that's going to happen.

The next motion is the motion to exclude 404(b) evidence as well as evidence of scientific testing. I think the Government has indicated they're not going to call that or

introduce that type of scientific evidence; is that right?

MR. POGOZELSKI: That is correct, Your Honor.

THE COURT: Mr. Zimet, your argument on the 404(b)?

MR. ZIMET: 404(b), Judge, there's been no notice that they intend to use 404(b) evidence.

They filed a response in which they talked about things that they think is inextricably intertwined. We need to have a hearing to decide whether it's admissible or not.

It's outside the dates of the conspiracy. It's a theory that there's no basis for. It's a theory that there's not even a preponderance of evidence to support that will allow the introduction of it.

Our position is it's not intrinsic evidence. It's evidence of what the Government alleges is another crime. It doesn't survive a 403 test because the other evidence that they're alluding to, if the reports are correct, relate to controlled substances. This is not a controlled substance case.

If the jury hears it's a controlled substance issue, that's absolutely prejudicial to these defendants. This is a noncontrolled substance case. It's HIV medications. That's what the indictment says. And to introduce that aspect to this case is extremely prejudicial and any relevance it has, which we don't think it has any, is certainly outweighed by the prejudice.

THE COURT: What type of evidence are you seeking to introduce that isn't evidence of a crime?

MR. POGOZELSKI: Yes, Your Honor.

We, as we stated in our response yesterday, we do not intend to elicit anything about the defendants' distribution of controlled substances.

The proffered testimony in the response relates to two employees who would testify about Kathleen Eberspacher. She would testify about her role in the compliance department; generally, how she, when she would raise issues, was disregarded, which is directly relevant to another compliance witness and is a theme of the Government's case. And I'm certain that one of the defenses will be to blame compliance.

That witness will also testify to and introduce an article directly relating to prescription drug diversion schemes, not controlled substances, but of HIV drugs that she sent to these two defendants in July of 2018, and which defendant, Patrick Boyd, then forwarded on to Anthony Berger, who was a part-owner of Safe Chain around the same time.

Also, critically, Ms. Eberspacher will testify about the company's policies and procedures that were implemented during her tenure. Those policies and procedures are directly relevant to the defendant's intent because they specifically address T3 pedigrees, how to authenticate them, what you are supposed to do if you can't authenticate them.

They discussed vetting vendors. They discuss all of the steps or actions that we allege the defendants did not take. And the fact that the defendants did not follow their own standard operating procedures that were in place for years and they were implemented during Ms. Eberspacher's tenure is directly relevant and certainly intrinsic to the allegations in this case.

She's also expected to testify, generally, about T3 pedigree issues that occurred during her tenure, that happened both before and during the conspiracy period. This is not 404(b) evidence.

These are not -- she's not going to testify about criminal activity related to controlled substances. So it's not 404(b). Everything that I have described there is intrinsic evidence.

I think that's a general summary of what Ms. Eberspacher would testify to. She is also the Government's first witness, Your Honor.

And then there's a second witness, Ms. Courtney Ruark-Coleman, who is expected to testify, generally, about when the defendants brought on Adam Bosius, around 2017. Generally, how their business practices changed when they brought on Adam Bosius, again, to testify about issues with T3 pedigrees, shipping without T3 pedigrees, which mirror the exact allegations that are in this indictment.

Both of these witnesses' testimony go directly to the allegations of the case and they are necessary to complete the story, particularly as it relates to the T3 pedigree requirements and the way the defendants had disregarded compliance, disregarded compliance's recommendations, otherwise paid them lip service or just did not follow compliance's recommendations or rejected them outright.

Courtney Ruark-Coleman worked in a couple of different positions while she was there, but their testimony will not be long. Their testimony will be limited to these topics. And all of these topics are directly relevant and fairly close in time and they do form and help the jury understand the complete story of why we're here.

THE COURT: Mr. Barzee.

MR. BARZEE: Your Honor, I join Mr. Zimet's arguments.

THE COURT: Anything else, Mr. Zimet?

MR. ZIMET: I do, sir.

Number one, all that is propensity evidence. That's all that is.

The issue is what happened with compliance, what happened with following rules during the time period of the conspiracy. And what they're trying to say is because supposedly it wasn't followed, free conspiracy, that means it wasn't followed during the conspiracy.

There's no evidence whatsoever it wasn't followed at

the direction of the defendants. If for things that were done, that were not done, was not at their direction, was not at them instructing compliance not to do something that should have been done, not to follow standard operating procedures.

All this is is someone who is a disgruntled employee, after the fact, coming in and saying something happened during her tenure and that means it happened under -- at Safe Chain after she left.

That's classic propensity evidence. That's all that is. There's no notice of this whatsoever.

The Government's pleading says that this will be evidence to show this was -- this conspiracy was planned during the time period these other witnesses were present. That they intentionally tried to have poor compliance, so they can carry out the deeds, which they were trying to do, which are alleged in the indictment.

There's no evidence of that whatsoever. And for us to be able to cross-examine the issues that are being presented through this propensity evidence, that is going to bring out all the issues concerning other drugs, controlled substances.

They might say we're not trying to bring that out, but at cross-examination, she's going to blurt it out. She's going to talk about it, and for us to effectively cross-examine, it has to get into that area. There's no reason, there's no basis for that to come in as 404(b) evidence.

MR. POGOZELSKI: Just briefly, Your Honor. This is not propensity evidence.

This is critical knowledge and intent evidence and it is directly related to the allegations in the indictment.

We will instruct the witness not to discuss controlled substances, as well. We're not -- we're not trying to make that an issue. It's not an issue in this case and we're not trying to bring it in any form into this case before the jury. And we will instruct Ms. Eberspacher accordingly.

MR. ZIMET: And, Judge, they haven't --

MR. POGOZELSKI: Sorry. Just one final point on the notice. Because we believe it's intrinsic evidence, we don't think we were required to file a 404(b) notice.

That said, we produced these interview reports of these two witnesses at the outset of discovery, and we also gave the defendants and their counsel a very detailed description of what these witnesses would testify to, including the company's preexisting policies and procedures that directly relate to T3 and vendors and everything that we allege they did not do. And we specifically called out and sent and showed them the article that Ms. Eberspacher sent to the defendants, which Defendant Patrick Boyd forwarded on.

This is no surprise, Your Honor. They have known that we are calling Ms. Eberspacher for a long time, and we made that abundantly clear in May of 2025.

They've had the reports. So even if this were somehow construed to be extrinsic 404(b) evidence, there was certainly sufficient notice for the defendants and their counsel. And this appears to be part and parcel of a flurry of eve-of-trial motions, but this one particularly has no basis, Your Honor.

So we respectfully request that Your Honor deny this motion, particularly because this witness has also flown in. She's now -- she's from out of town. She's here, and she's our first witness, and there's certainly no need for a minitrial on what she is going to testify about.

Should they have objections, they can raise those objections. We will instruct her repeatedly about this controlled substances issue.

The last time we met with her, it did not even come up. This is all about knowledge and intent. This is not about propensity evidence.

THE COURT: Mr. Zimet.

MR. ZIMET: Judge, in a real trial where the evidence of what's indicted is brought in front of the jury, the compliance officer, who is involved with the clients during the time period of the conspiracy, will testify what the standard operating procedures were. That's the witness that does it.

The only reason to try to bring this other witness in is to suggest they weren't being followed. And in this case, they're trying to prove it was intentionally done.

There's absolutely zero evidence whatsoever at all that the compliance officer, who is in charge of this compliance during this time period, was instructed by my client, Charles Boyd, to disregard procedures, not to follow procedures, not to do things that she was supposed to be doing.

And for them to try to bring in somebody from the outside, outside the time period of the conspiracy, all that is is propensity to show that something was done wrong -- and understand, it's not -- just 404(b) is not just crimes. It's wrongdoing or other acts.

They're trying to suggest that there was some kind of long-term practice not to follow compliance.

Well, if compliance doesn't follow compliance, that's on compliance. If they're told not to do it during the time period of the indictment, that's relevant evidence.

There's no evidence at all -- and the Government, I would think, would represent to the Court that there is evidence from the compliance officer on charge that she was directed not to follow compliance.

There's none of that whatsoever. And all this is is a backdoor attempt to get something into evidence that shouldn't come into evidence at all, not charged in the indictment.

If they thought it was part of the indictment, part of the time period of the conspiracy, they could have alleged that in the indictment.

They chose to start the conspiracy on or about April of 2020, a year after these witnesses left the employment of Safe Chain.

Additionally, Judge, the comment concerning a flurry of motions on the eve of trial suggesting, if not saying, that, in fact, there's some wrongful intent, I know they invent intent all the time in this case, such as accusing our clients of intentionally hiring lawyers to masquerade the fact they're doing illegal things, which was a motion that they had originally in this case.

We told the Court we needed more time to complete our preparation. The Court's ruled on that. I understand. I'm not trying to reargue that.

The Court said, "Do the best you can." Well, that's what those motions are -- "the best we can." And that's what they were filed, in good faith.

We also, Judge, as reverse proffers have been referred to time and time and time again, understand we had an agreement; that what happened in that reverse proffer stayed in the room with the reverse proffer.

All of a sudden, when it's to the Government's benefit, they want to start talking about things in the reverse proffer.

The reason for the notice requirement is so the parties can evaluate it, present it to the Court. The Court can hear evidence, have witnesses testify, and make a determination as

to the admissibility of the exhibit -- admissibility of the evidence itself.

That has not been done in this case. The credibility and the accuracy of what's being represented, we do not agree with. We think that the Court should hear from the witnesses, starting with the compliance officer saying, testifying under oath, which he hasn't testified, hasn't been in any report that we've seen, that she was told by Charles Boyd to ignore, disregard, not follow any procedure.

THE COURT: All right. Any of my rulings are subject to being revisited at trial after I've had an opportunity to hear everything and put everything into perspective.

So if I deny a motion, it's without prejudice to the defense re-raising it at the time the evidence is sought to be introduced.

If I grant a motion, it's without prejudice to the Government's proffering outside of the presence of the jury the relevance or the admissibility of the evidence at that time.

I think this is relevant evidence. I think that the defense has timely objected to it, but I don't think that they're prejudiced, and I will deny the motion to exclude 404(b) evidence. I think it's all relevant to the intent.

MR. ZIMET: Judge, I just had a question as far as when this witness testifies, can we have a standing objection to her testimony or -- and have an agreement with the Government that

we have that standing objection as opposed to every question getting up and objecting to her testimony?

THE COURT: Sure. I think you can make the first objection. If I don't change my mind, then it can be a standing objection after that.

MR. ZIMET: And, Judge, just to complete the record, we would ask the Court to instruct the Government not to talk about this in opening statement because if the Court does sustain the objection when you hear more evidence, we will be prejudiced by the mention of this in opening statement. Understanding --

THE COURT: They do that at their own peril.

If they talk about it in opening statement and I change my ruling, then if you make a motion, I'll have to rule on the motion.

MR. ZIMET: Understood. Thank you, Judge.

THE COURT: The next one is the motion to avoid *Bruton* severance. The Government filed a response indicating what excerpts they plan to introduce.

MR. POGOZELSKI: Yes, Your Honor. Just to be clear: We have not filed a response to that motion, yet.

THE COURT: Okay.

MR. POGOZELSKI: The Bruton motion.

THE COURT: So I stand corrected on that.

I guess my question to Mr. Zimet is in the excerpts

that you're aware of, where does one defendant put blame on the other defendant? And if there isn't, why wouldn't a curative instruction that the deposition testimony as to one defendant can be only considered as to that defendant be sufficient?

MR. ZIMET: Well, we think that's mandatory to give that instruction to begin with, with each of these excerpts because it's required. It cannot be used against the other defendant.

In the case of -- and I enumerated them in the motion, at least the ones that we have, and I was able to have time to review before filing the motion, there's a question of Patrick Boyd as to what WAC was. WAC -- and you're going to hear a whole bunch about it in trial -- is a wholesale acquisition cost of drugs that are purchased from a manufacturer by a wholesaler.

And Patrick Boyd said essentially -- testified essentially he really didn't know.

Charles Boyd was asked the same question in his deposition. He gave a lengthy answer as to what it was. We anticipate the Government is going to argue and claim that Patrick Boyd, in fact, did know what WAC was. It was a false exculpatory answer concerning what WAC was and, therefore, since they're brothers, codefendants, impute that as to Charles Boyd. We think that's a *Bruton* issue, but we think it's a *Bruton* issue that's resolvable by after the Patrick Boyd answer

to that question, that the Charles Boyd answer to the same question is played for the jury.

That would resolve any issue involving one defendant's answer, which comes from plaintiff's false, not be attributed or imputed to Charles Boyd.

THE COURT: What's the Government position?

MR. POGOZELSKI: Yes, Your Honor. We believe that this *Bruton* argument is a bit of a stretch.

The standard is where the statement -- or at least the Eleventh Circuit case says, "No *Bruton* problem exists where the statement was not incriminating on its face and became so only when linked with evidence introduced later at trial."

THE COURT: What's your position on the suggestion that you introduce one deposition after the other?

MR. POGOZELSKI: The defendant's suggestion that if we introduce Defendant Patrick Boyd's statement of what WAC represents, that we have to introduce Charles Boyd's deposition video as to what WAC represents as well?

THE COURT: Right.

MR. POGOZELSKI: I suppose if that's what Your Honor --

THE COURT: Well, are you going to be putting in part of Charles Boyd's deposition?

MR. POGOZELSKI: We have excerpts from both defendants.

THE COURT: So if you're going to put in part of the deposition, aren't they going to be able to get in other parts

under the rule of completeness? So what's the difference if it comes in procedurally right after Patrick Boyd's deposition as opposed to later on or before?

MR. POGOZELSKI: Well, I suppose we only intend to use that particular excerpt of Patrick Boyd's deposition as to Patrick Boyd. It's his own statement.

Charles Boyd's deposition is entirely different. That's his -- those are his own statements; so I don't think that the rule of completeness is necessarily implicated there.

THE COURT: You're either missing my point, or I'm not putting it forth clearly.

If you introduce part of Charles Boyd's deposition under the rule of completeness, why wouldn't other parts of his deposition be admissible?

MR. POGOZELSKI: Certainly, if those other parts are necessary to complete the story of a particular subject that's being asked, then the rule of completeness would come into play.

But if it's an excerpt -- his deposition, I think, lasted some time and covered a variety of topics, and these are two separate depositions we're talking about.

One is of one defendant, and the other is of the other defendant, which is why I'm a little confused as to why introducing an excerpt of Patrick Boyd's statement as to what he thought WAC was or didn't know about WAC means that the

codefendant's deposition about that same subject is somehow necessary to complete or for the jury to understand what Patrick Boyd was saying.

Those -- that doesn't seem to square with the rule of completeness when we're talking about two different defendants and two different statements.

There is no *Bruton* here because they did not incriminate themselves or each other in those depositions. They didn't say anything that was like, "We knew these drugs were diverted, and we knew we were doing things wrong."

Particularly, this very limited WAC issue, to say that introducing Patrick Boyd's statement that he didn't know what WAC was and then introducing a document that may contradict that and only on Defendant Patrick Boyd, that says nothing about the separate defendant's intent or thought. It is limited to that one defendant.

And we would be fine with the Court instructing both prior to and after trial, but even after playing that particular deposition excerpt, instructing the jury that this excerpt only relates to Patrick Boyd, not Charles Boyd. We think that is the appropriate way to address this.

THE COURT: I will certainly do that.

Mr. Barzee, anything further?

MR. BARZEE: No, Your Honor.

THE COURT: Anything further, Mr. Zimet?

MR. ZIMET: Yes, sir.

It is appalling, really appalling that the United States Department of Justice does not want the truth to come out in this case.

I mean, the Court is a gatekeeper of evidence. Rule 403, okay, allows the Court to make determinations as to prejudice, to protect against prejudice. Part of the *Bruton* issue is concerning prejudice. It's a vehicle to make sure that the jury is not misled. These gentlemen are charged as coconspirators. They're brothers -- they are brothers. A false exculpatory statement by one coconspirator certainly can be utilized by a jury to think that the other defendant is also part of that statement.

And we have direct evidence that's untrue. The Government knows it. The Government is fighting against the jury being able to hear it.

It is incredible, Judge. Your point was well made. Your point was direct. There's no reason not to allow at the time that the Patrick Boyd's statement answer to that question is finished, that Charles Boyd's answer to question is played to the jury.

THE COURT: I'm not comfortable telling the Government what order to put in witnesses or how to try their case, but I am comfortable saying that when Charles Boyd's deposition is introduced, if that part of it isn't introduced at that point

under the rule of completeness, certainly Mr. Zimet can ask that that be played for the jury.

So with that understanding, I'm going to deny the motion.

The next motion is a motion to strike surplusage or in the alternative, redact the indictment. I'm going to tell the jury the indictment is not evidence. Why is that not good enough, Mr. Zimet?

MR. ZIMET: Because it is the statement of what the law is. That's the job of the Court -- to tell the jury what the law is.

THE COURT: I will tell the jury that, too, then.

MR. ZIMET: Excuse me?

THE COURT: I am going to tell the jury that, too; that I'm the one that's going to tell them what the law is.

MR. ZIMET: So what's the purpose of providing the jury with other statements of the law, which actually contradict what the Court is going to instruct the jury about?

It's misleading to the jury. It's part of the Government's theme in this case -- to present things that are not actually charged to try and convict these gentlemen of something they're not charged with.

That's why it's dangerous. That's why it's something that no defendant should have the situation where an indictment says something that's wrong, the Court reads it to the jury,

and then gives it back to the jury when they're deliberating.

There's absolutely no reason for it at all at this point.

THE COURT: How long is this indictment?

MR. ZIMET: It's eight counts on I don't know how many pages, 15.

THE COURT: I don't think I'm going to read the whole thing. I will summarize it.

MR. ZIMET: We ask if you summarize, not to include the paragraphs relating to the law and the general allegations, Judge.

THE COURT: It seems to me that if the Government got the law wrong, told the grand jury wrong information that the grand jury relied on, that that's something that the defense, if they want to strategy-wise, can argue to the jury in this case. But I'm not going to strike parts of the indictment or redact it.

MR. ZIMET: Judge, just to respond. I'm not allowed to argue what happened in the grand jury. I don't know what happened in the grand jury.

THE COURT: Well, I think that ...

MR. ZIMET: I don't know that we --

THE COURT: I don't think the grand jury drafted this indictment.

And if there's erroneous information in the law in the

indictment and strategy-wise you want to point that out that it is different than what I'm going to tell them at the end of case, I think that's fair comment. So I will deny that motion.

The next one is a motion to exclude 400 --

MR. ZIMET: Judge, we're not done with the deposition issue.

THE COURT: Oh, okay. Go ahead.

MR. ZIMET: So we dealt with paragraph 12 in my motion, if you have -- if the Court has it.

THE COURT: I have got it. Go ahead.

MR. ZIMET: Paragraph 13 -- this is also from Patrick Boyd's deposition, -- it involves a request for Patrick Boyd to speculate why Charles Boyd would have sent a newspaper article to Patrick Boyd.

It's asking one witness to address the mental state of another witness. It's inadmissible. Deposition testimony can be introduced, but it has to be admissible itself.

And this is asking a witness to do something -- if he was on the witness stand and asked to do it, the objection would be sustained. There's no ability of one witness to speculate as to the mental state of another witness.

THE COURT: Well, again, I don't think I can rule in a vacuum on cases.

Why would that be admissible, Mr. Pogozelski?

MR. POGOZELSKI: Yes, Your Honor. And we would be

happy to provide you these deposition excerpts as soon as possible. They're not very lengthy, but it would be admissible given the context because the context was there are Teams messages between the two defendants on September 30th of 2020, which is the same day that they learn that one of these Boulevard pedigree T3s are falsified. And Defendant Charles Boyd, I believe, sends Defendant Patrick Boyd a news article that relates to prescription drug diversion schemes in Queens, where Boulevard is located.

So certainly that context is important. So when Patrick Boyd is asked, you know, "What's the context of sending this article?" or "Why did your brother send you this article?" the Teams messages say something to the effect of "We may need to cut off" or "We need to cut off Boulevard again and look at this," and then he sends the article. And Patrick Boyd, I believe, responds, "Oof."

So the question was asked, "Why was he sending you this article?"

It appears from the document that it was in the context of Boulevard, one of the first HIV suppliers, and it's the defendant's own statement, which is admissible.

THE COURT: So the question was, "Why was which one of the Boyds?"

MR. POGOZELSKI: I believe the question was, "Why was Charles Boyd sending you this Queens evil article about

prescription drug --"

THE COURT: Who is asking that question?

MR. POGOZELSKI: The lawyer -- an attorney for Gilead in the civil deposition.

THE COURT: I thought this was in a Teams.

MR. POGOZELSKI: Oh, sorry. So in the Teams chat, it's between the two defendants.

And Charles Boyd, I believe, is saying, "We may need to cut off Boulevard again and check this out." Sends the article, and Patrick Boyd responds, "Ooff."

And then Patrick Boyd is being asked during the deposition questions about the context and why his brother, Charles Boyd, was sending that article at that specific time because it is a very critical day.

THE COURT: And the response in the depo was?

MR. POGOZELSKI: I believe it was, you know, "I think, you know, he has ADD. He could have been sending it for a variety of reasons, and I think I was looking at this article more from the retail side than from the wholesale side."

THE COURT: I think the probative value is outweighed by the prejudice; so I'll eliminate that part of the deposition.

Next one?

MR. ZIMET: Exhibit 72, again from Patrick Boyd's deposition, this is Gilead's attorney trying to solicit an

inadmissible legal opinion from Patrick Boyd, and then followed by trying to have Patrick Boyd admit that the inadmissible legal opinion as to what the law should or was was not followed.

And basically, it's trying to have this witness say that, in fact, a crime was committed. And that's classic *Bruton.* And there's no reason to have any of that introduced whatsoever, especially since in the context of the civil deposition, this is not an issue as far as criminal law.

So what the law is, what the law isn't -- understand, Judge, if there's no intent to defraud under this statute, it's a misdemeanor.

This crime charged in this indictment is with an intent to defraud. That's a felony. That's what's charged in the indictment.

So what they're asking basically, "Was a misdemeanor committed?" he's not even competent to testify to that. He doesn't know what the law is. He doesn't have a basis or foundation for that.

And then when he says this is what he thinks it is, they try to get him to admission -- an admission that wasn't followed.

Wasn't followed by who? By Safe Chain, which includes Patrick Boyd and Charles Boyd. And it's classic, classic *Bruton* issue.

THE COURT: I don't think it is; so I'm going to allow that.

So next one?

MR. ZIMET: 73, paragraph 73 is on paragraph [sic] 15 of the motion. This is Patrick Boyd's deposition. It involves an attempt to solicit another inadmissible evidence concerning a legal opinion.

THE COURT: Same ruling.

Next one?

MR. ZIMET: We would press, Judge, that the Court review the segments to see exactly what it is and make the prejudice determination, also the 403 determination.

That was the last one that I have seen so far. I haven't seen them all. They still are producing them. Have been producing since calendar call. I'm not ready to be able to challenge them. When I am, I will make the challenge to the other --

THE COURT: And as I --

MR. ZIMET: -- segments if I can.

THE COURT: And as I indicated, my ruling is subject to be revisited at the time the evidence is sought to be introduced.

Are we ready to move on to the motion to exclude 400 Teams exhibits?

MR. ZIMET: Sure.

THE COURT: Okay. Go ahead.

MR. ZIMET: So this is what we raised, Judge, at the calendar call when we talked about the need for a continuance.

And the Court said, "Well, if that's the case, then they'll just have to introduce the individual Teams messages, not the composite exhibit." The motion is to exclude those exhibits.

THE COURT: I'm going to allow the summary; right?

MR. ZIMET: No, it's not the summary.

We're not allowing the manufactured exhibit, which put together multiple messages, because we haven't had an opportunity to compare what they have as the ultimate exhibit which has multiple -- sometimes 50, 60 or more, I think, Teams messages into one Teams exhibit.

That's what we said we haven't had a chance to look at because they dumped it on us at the last minute. They've never told us what the individual Teams messages were that they were using so we could make that analysis.

THE COURT: Let me hear from the Government.

MR. POGOZELSKI: Yes, Your Honor. We did discuss this at calendar call. I think this is only relevant for Teams messages, the combined Teams messages where it involves the defendants because when we are calling witnesses who are on the Teams messages themselves and acting within the scope of their employment at the defendant's company, they are perfectly

capable of authenticating and saying that these are accurate representations of the Teams messages that were sent during this time period.

It would be extraordinarily cumbersome to go message by message by message by message. This is to simplify it for the jury and streamline the Government's presentation of evidence for the jury.

So for witnesses who are on the Teams messages, this is properly addressed at the time that those witnesses are testifying. And then for the Teams messages where there's not a witness but a case agent who is introducing opposing party, the defendant's own statements, this is only relevant to those Teams messages, in my opinion.

And I believe we have provided the defense with the Bates-stamp numbers for all the individual Teams messages that underlie those messages where it's the defendants' own statements or a non-testifying employee acting within the scope of their employment.

We have provided in a spreadsheet the Bates stamps for each individual Teams messages, each one of those.

MR. ZIMET: Tell me when you did it, Alex.

MR. POGOZELSKI: Well, I believe we produced that particular spreadsheet on Saturday.

MR. ZIMET: Saturday night?

MR. POGOZELSKI: And it is Wednesday now, and we don't

expect the case agent to testify until perhaps no earlier than Friday or perhaps Monday, depending on how long cross-examination lasts.

This is not a very complicated exercise with -- how many are there?

MR. ZIMET: Judge, we've been asking for this for a month. They dumped this on Saturday night before Wednesday trial when we've indicated we have all these additional things that we have been doing. That's the problem with the timeliness of it.

THE COURT: I will say the agent can't testify before next week.

Anything further, Mr. Barzee?

MR. BARZEE: No, Your Honor.

THE COURT: So I'm going to deny that motion.

MR. ZIMET: Judge, there's more to that motion.

THE COURT: Okay. Go ahead.

MR. ZIMET: There's prejudicial Teams messages, and those are beginning on paragraph 28.

These are times in which employees of Safe Chain are giving their opinion concerning certain transactions, certain individuals. They use the term "shady, sketchy, spammy-ass looking, complete bogus. Seems sketchy. We are associated with some real scummies."

Those are their opinions. They're not statements made

in furtherance of a conspiracy. They're clearly hearsay. They're clearly prejudicial. And what the intent of the Government is going to be is because an employee of Safe Chain had an opinion that they communicate through office talk, somehow that's admissible to show knowledge and intent of the defendants.

THE COURT: Well, if that wasn't being communicated to either of the Boyds, why would that be admissible, Mr. Pogozelski?

MR. POGOZELSKI: Yes, Your Honor.

Certainly, where the Teams messages involve two compliance employees who are doing their job and trying to do due diligence or look into certain vendors or do a background investigation on Boulevard --

THE COURT: How do I know that one of Boyds saw that message?

MR. POGOZELSKI: Well, it's not hearsay, though, because they're acting within the scope of their employment and they are agents of the defendants.

They're working in compliance, and they're doing their job and making those statements as compliance employees of the defendants.

THE COURT: I don't buy that.

So I'm going to exclude that testimony or that part of the Teams is between employees of the company but there's no

indication that the Boyds were part of the conversation or were aware of it.

Next one?

MR. ZIMET: That's all for the Teams, Judge.

THE COURT: Now, we're over to the motion to compel Brady and Giglio?

MR. ZIMET: Yes, Judge.

We have now two new witnesses. We heard about one sort of and now, we have got some reports about two witnesses. These are people who ran the company, supposedly the sources of the HIV drugs that Safe Chain ultimately purchased.

These two people -- one is Peter Khaim. The other is Rivera. These two gentlemen have two other cases, two other criminal cases totally unrelated to this indictment.

They have, according to the Government, Giglio-Brady disclosure, they have come to the Government or the Government has come to them, and they have signed what sounds like some, kind of "Queen for a Day" letter relating to their conduct in this case, which means they haven't been charged in the case.

THE COURT: That's going to come out in front of the jury. If they don't bring it up, you're going to bring it up.

MR. ZIMET: I will try to bring it up, but I think we should know whether or not there's been discussion concerning whether the target of the investigation, whether or not --

THE COURT: You can ask those questions, and if they

give a false answer, the prosecutor is going to correct it.

MR. ZIMET: But, Judge, it's what's in their mind. And if I know and if we know to cross-examine them to have -- the purpose of getting the Giglio material is to know what it is so you can have effective cross-examination. And if they --

THE COURT: They have given you what they think is Brady and Giglio, and you're saying they are not being honest about it, and I don't have any indication that they're not being honest.

If anything, it seems to me like they're giving you information when it comes in that may be favorable.

MR. ZIMET: But, Judge, any lawyer representing these people is going to ask, "What's the status of my client?" Has to.

So if the status is they're a subject, they're a target, we don't intend to indict -- those communications between lawyers, that is Giglio material.

The witness who is on the witness stand might not know that. In fact, it's probably privileged as to whether he was provided that information.

That's all something that's part of Giglio, part of Brady to have that information because something --

THE COURT: If the witness doesn't know, then why is it relevant?

In other words, if they're saying to the witness's

lawyer, "We'll take this into consideration in your other case," but the lawyer doesn't tell the witness that, why is it relevant?

MR. ZIMET: Because I have no way of finding out whether the witness was told that by his lawyer.

THE COURT: You can ask.

MR. ZIMET: Excuse me?

THE COURT: You can ask. And if there's an objection to attorney-client privilege, then I can address it at that point.

MR. ZIMET: But to be able to ask that question to begin with, I have to know whether it exists or not, and that's part of what the obligation is to tell us that.

THE COURT: I don't think it goes that far.

Anything further on the motion to compel?

MR. ZIMET: Yes. Then we had the Brosius issue, Judge. Brosius is the one in front of you that's going to be one of the Government's star witnesses.

THE COURT: He has been flip-flopping. You can have a field day with his inconsistent remarks.

MR. ZIMET: Well, Judge, I don't know whether he's flip-flopped. All I know is his representation is that now he says something else.

I don't know who it came from. Did it come from the lawyers trying to protect his client? We have no notes of the

actual statement that was made.

We have no quotation of what he said when he said that he wasn't really guilty. We should have all that information to be able to cross-examine him.

How can I impeach him on a report or an email from a prosecutor as to what he said?

THE COURT: If you ask him that and he denies it and it's inconsistent with what the prosecutor told you, the prosecutor is going to correct it.

MR. ZIMET: I don't want him to correct it. I want to be able to impeach him with the statement that he gave, the actual statement.

He's a weasel enough. He'll try to weasel out of it, Judge, on the witness stand.

THE COURT: If he weasels, then we'll address it at that point.

What else?

MR. ZIMET: That's all as to that.

We don't have all the Brady that we should. We don't have all the Giglio that we should.

THE COURT: I think the Government has given you the Brady material that they have; so I will deny that motion. Any other motions that we have pending?

MR. ZIMET: Judge, we would renew our motion for a continuance. I'm not going to reargue it, but we have been

dumped multiple layers of documents and information since the last time we met.

We got stuff last night. I haven't had a chance to review or look at it. And I'm going to be starting picking a jury and do opening statements without having the opportunity to look at all of the discovery in this case.

THE COURT: Well, I don't think we're going to get a jury picked before lunch so you can look at stuff over lunch.

We've got days that we're going to be off, and I need to go over that with you.

On Rosh Hashanah -- which days are we off?

MR. ZIMET: It begins Monday night. So Monday, we have court, so on Tuesday and Wednesday.

THE COURT: Tuesday and Wednesday we are off.

MR. ZIMET: Yes.

THE COURT: So Monday we have court. Okay.

MR. ZIMET: And then the next Thursday, we have off. It begins Wednesday night, Yom Kippur.

THE COURT: Yom Kippur.

Anything further, Mr. Barzee, on the motion to continue?

MR. BARZEE: Joining the motion, Your Honor.

THE COURT: Yeah. I think both defendants have exquisite lawyers in this case and are going to do the best job they can, and I think they'll do fine; so the motion to

continue is denied.

Let's take a five-minute recess for the court reporter while the clerk lines up the people outside.

MR. POGOZELSKI: Your Honor, we have one issue that we wanted to raise before any opening statements.

MS. DEROVANESIAN: Yes, Your Honor. We raised this at calendar call as well. I just wanted to make sure that nobody's position had changed after receiving exhibit lists and so forth.

We addressed the issue of using family photos and information about children in families in an effort to, you know, paint the defendants as family people and so forth.

We were told at that point that they did not intend to use those materials, but we wanted to confirm now, now that we received the exhibit list that contained those materials, we wanted to make sure so we don't run into that issue made in opening statements.

THE COURT: Mr. Zimet?

MR. ZIMET: For the third time, the answer is no, we are not going to use it in opening.

THE COURT: Mr. Barzee.

MR. BARZEE: Same answer.

THE COURT: Let's take a five-minute recess, and Crystal can just keep the jurors out, and then we will bring them in after the recess.

COURTROOM SECURITY OFFICER: All rise.

(Off the record.)

THE COURT: We're back on the record.

Counsel are present. Both defendants are present.

Anything to come before the Court before we bring in the jury?

MR. POGOZELSKI: No, Your Honor.

MR. ZIMET: No, sir.

MR. BARZEE: I'm sorry. I didn't hear what you said, Your Honor.

THE COURT: Anything to come before the Court before we bring in the jury?

MR. BARZEE: No, Your Honor. Thank you.

THE COURT: Jury Number 51 has told us that she's a nursing mother and she needs to express the breast at 10:30.

The room to do that is down on the first floor. It's really not set up for it.

Any objection to my excusing Juror Number 51?

MR. POGOZELSKI: None from the Government, Your Honor.

MR. ZIMET: No, sir.

MR. BARZEE: No, Your Honor.

THE COURT: All right. So when she comes in, I will excuse her.

All right. Let's bring in the jury.

COURTROOM SECURITY OFFICER: All rise.

(Prospective Panel enters the courtroom.)

THE COURT: All right. If you will be seated closest to me in the front row.

If everyone can take the next consecutive seat.

The last person in the front row is Ms. Schoonover. In the second row closest to me will be Ms. Rivero. And, again, be careful when you go into the second row because sometimes people trip going into the second row.

Who's Mr. Reano? Scoot over here in the front row. You're the last person in the front row.

And then we will have Mr. Reano here in the first seat in the second row.

If everyone can take the next consecutive seat. The last person in the second row is Mr. Ibarra. And be careful, sometimes people trip.

In the back row closest to me will be Ms. Jackson Charlie or Clarke. It's tough for me to read my writing sometimes.

If everyone can take the next consecutive seat in the back row. Be careful when you go in there. Don't trip.

The last person in the back row is Ms. Rivera-Abdo. In the front row closest to the wall is Ms. Hammond. And the last person in the front row is Mr. Siegrist.

In the second row closest to the wall, we have Mr. Osakwe. Osakwe is against the wall.

And the last -- sometimes you have to, kind of, scrunch in a little bit.

The last person in the row is Mr. Carella.

Against the wall in the third row is Mr. -- I can't read my writing again. Sainpreux.

The last person in that row is Ms. Wongsam.

And the fourth row against the wall, we've got Ms. Dowlatram. And the last person in that row is Mr. McGhee. And the back row, we have Mr. Olsen. And the last person in the back row is Ms. Arquillano.

And then against the wall on this side of the courtroom, we will start with Ms. Greene. And then we will just have everybody else in that first row there.

Please be seated.

Where is Ms. Levin? Ms. Levin, I'm going to go ahead and excuse you. If you could just give your badge to the Court's security officer on the way out. And if we could swear in the panel.

(Prospective panel sworn.)

THE COURT: Please be seated.

First of all, I want to apologize for our tardy start. Hold that against me, not against the lawyers. They were here ready, willing, and able and ready to go at 9:00. And hopefully, we'll be hitting the ground more smoothly for the rest of the trial.

I'm Bill Dimitrouleas. Welcome to the United States District Court for the Southern District of Florida.

We're here today to try a criminal case. And it's going to be a medium-sized case for federal court. It's not a real, real long case. It's not a real, real short case, but it will probably -- with the days off and the holidays and the other days that I'm not going to be available, it will probably take three or four weeks to try this case.

So what we're going to do today is try to select a jury. And I don't think we're going to be able to get a jury before lunchtime. So we'll take a break for lunch and come back, and we should be able to get a jury, hopefully, this afternoon, if we don't run out of jurors. But we've got a lot of jurors here; so I'm hopefully optimistic that we will be able to find 12 jurors and 2 or 3 or 4 alternates, depending on how many warm bodies we have at the end of the jury selection process as to how many alternates. So I'll pick -- I'd like to pick at least two alternates on this case.

I take it that everyone is here for the second week of jury service; is that correct? You all started your jury service last week?

Did anyone get called into the courthouse to either serve on a jury or be considered to serve on a jury last week or the first couple of days of this week? If so, please raise your hand.

I have one hand there. Is that Ms. Spivack?

PROSPECTIVE JUROR: Yes.

THE COURT: And we'll give you a microphone here.

So out of these 67 people, when were you lucky to be the only one called in?

PROSPECTIVE JUROR: Okay. So I got a text message yesterday. I didn't get anything in the mail.

THE COURT: Okay.

PROSPECTIVE JUROR: So that's why I'm here today. So I wasn't here last week.

THE COURT: So you weren't here last week?

PROSPECTIVE JUROR: No.

THE COURT: You're just here today?

PROSPECTIVE JUROR: Correct.

THE COURT: Thank you.

So nobody got called in last week or earlier this week. I take it that everyone here is a United States citizen. If you're not a United States citizen, please raise your hand. I don't see any hands.

I take it everyone here is over the age of 18. If you're under 18, please raise your hand.

I don't see any hands.

Is there anybody here that has been convicted of a felony and not restored to their civil rights? If so, please raise your hand.

I don't see any hands.

Is there anybody here that has any pending criminal charges against them? If so, please raise your hands.

I don't see any hands.

It looks to me like everybody here is qualified to sit as a juror in this particular case.

Now, I did mention this is a criminal case and based on that, we're going to be asking you some questions today to touch on your qualifications to serve as jurors in this case.

Let me take a few moments now to introduce to you some court personnel that we're going to be working with during the trial. You've met Crystal Barnes Butler, who is the court clerk, who's in charge of all the paperwork in the case. She kind of operates as the judge's secretary in the courtroom.

If there's any evidence that's introduced into the trial, it's under her care, custody, and control that it goes.

Terry Grant is our court security officer. He's in charge of courtroom security and decorum. If you have any problems of a personal nature, please address it to his attention, and he will bring to my attention if it's appropriate.

Our court reporter is Trish Bailey-Entin. She's taking down everything that I'm saying right now and will take down everything that is said during the course of this trial in this courtroom, including your answers to the questions during jury

selection. So if you would, please speak up nice and loudly and clearly so that we can get your answers down.

And as we did with Ms. Spivack, when you're giving your answers, we're going to ask you to use a hand-held microphone, and we'll pass the microphone around so we can get everyone's answers to all the questions.

And, again, if you stand, it makes it easier for some reason acoustically to hear here in the courtroom with the microphone.

Representing the United States are Assistant United States Attorneys Alexander Pogozelski.

And if you could introduce your agents and your co-counsel, Mr. Pogozelski.

MR. POGOZELSKI: Yes. Good morning, everyone.

My name is Alex Pogozelski. Next to me at counsel table is Jacqueline DerOvanesian with the Department of Justice. And we also have Special Agent Cesar Zayas as well as Molly Gold, our paralegal specialist.

THE COURT: Okay. In a moment, I'm going to be asking the attorneys to read a list of possible witnesses who might testify so listen up just in case you happen to know any of those witnesses.

Representing Patrick Boyd is William Barzee. Mr. Barzee, if you could introduce your client and your cocounsel.

MR. BARZEE: I will. Thank you, Your Honor.

Good morning, everyone. My name is William Barzee with my partner here, Ivlis Mantilla. We have the honor of representing Patrick Boyd.

Thank you for being here.

THE COURT: Representing Charles Boyd is Bruce Zimet.

MR. ZIMET: Thank you, Your Honor.

Good morning. My name is Bruce Zimet, and my client is Charles -- Charlie Boyd. And also with us is our paralegal Jessica Caldwell.

THE COURT: Does anybody know any of the lawyers? Court personnel? The defendants? Anybody involved in the case?

If so, please raise your hand. I have a hand there, is that Ms. Consotera?

PROSPECTIVE JUROR: Yeah, I know Bill Barzee.

THE COURT: Anything about you knowing him that would affect your ability to be fair?

PROSPECTIVE JUROR: No.

THE COURT: If it turns out that the Government proves its case in the case, are you going to be sitting there saying, "Oh, gee, how can I find somebody guilty because I know Bill Barzee"?

PROSPECTIVE JUROR: No.

THE COURT: If the Government doesn't prove the case,

are you going to be sitting there saying, "I don't like that Bill Barzee guy; so I'm going to find his client guilty"?

PROSPECTIVE JUROR: No.

THE COURT: So you're going to base your verdict on the facts and the laws you hear in this courtroom?

PROSPECTIVE JUROR: Correct.

THE COURT: Thank you, ma'am.

All right. I will ask the Government to read a list of possible witnesses who might testify in the case.

MR. POGOZELSKI: Yes, thank you, Your Honor.

Kathleen Eberspacher. Courtney Ruark-Coleman. Abigail Divilio. Jonathan Nicholls. Kendreas Ferdinand. Jon Atkinson. Kelsey Jones. Jon Weed. Jorge Humberto Ruiz Alvarado. Jenna Devuyst. Anthony Berger. Fred Hopkins. Dwayne Butler. Christopher Woo. Dhruv Ralhan.

Adam Bosius, Gustavo Borja. Adedayo Akanbi. Lisa Trissell. Daniel Conger. Jose Armando Rivera. Edgar Martinez. Vipulbhai, also known as Raj, Parekh. Michael Rosenbaum. Jesse Dresser. Martha Rumore. Christina Picard. William Fadel. Michael Coscia. Manjula Chitkula. Harpreet Dhanota. Christopher Trent. Peter Khaim or Khaimov. Nicole Wolfe and Special Agent Cesar Zayas.

THE COURT: Do any of those names ring a bell with anybody? If so, raise your hand.

I don't see any hands.

If it turns out that you're on the jury and a witness comes in and you say, "Oh gee, I do know that person," just let us know because at that point, we need to check into whether it would affect your ability to continue to be a fair and impartial juror.

If it turns out that a witness is your next-door neighbor and they have the keys to your house and they watch your children when they get home early from school, then maybe this wouldn't be a good case for you to serve on.

On the other hand, if it turns out that the witness is that neighbor across the street who lets his dogs run all over the neighborhood and plays loud music at night and you've had some cross words with him, maybe that wouldn't be a good case for you to serve on either.

Along those lines: Does anybody know anybody else on the panel? Anybody know any of the other prospective jurors? If so, please raise your hand.

I don't see any hands.

And when we pick a jury out of all the registered voters in Broward County, that's usually the case -- that we can get prospective jurors that really don't know anybody involved in the case or don't know each other.

Having said that, I had a husband and wife serve on the same jury once. My sister served on one of my juries once. You never know what's going to happen in a jury situation.

Mr. Zimet, do you have a list of other names that might be mentioned in the case?

MR. ZIMET: I do, Judge. May I proceed?

THE COURT: Yes.

MR. ZIMET: Thank you, Judge.

So in addition to the names that you heard from the Government, these names might be mentioned or potential witnesses in this case: Holly Dotson. Meg Gorman. Blair Rosiello. Diana Elliott. Antoine Brooks.

And I apologize for my side or my back towards you all. Terris Wiley. Kim Dannenfelser. Tracy Taylor. Nicole Sawyer. Collin Christenson. Sarah Tichinel. Dakota Flowers. Carly Ogren. Peter Colosi. Christopher Woo. Clifford Won. Lori Mayall. David Piontkowsky. Robertson Beckerlegge.

Lucas Morgan. Geoffrey Potter. Timothy Waters. Maxwell Weiss. Scott Mooney. Stephen Millan. Jason Gould. Matt Wester. Harpreet Dhanota, Susmitha Sunkara, Sekar Venkatesh, Carlos Vega, Daniel Gelbinovich, Steven Diamantstein, Paul Rosell, Brett Magueri.

THE COURT: Any additional witnesses, Mr. Barzee?

MR. BARZEE: No, Your Honor.

THE COURT: Any of those names ring a bell with anybody? If so, raise your hand.

I don't see any hands.

Crystal, do you have that calendar that --

THE COURTROOM DEPUTY: Yes, I do.

THE COURT: Let's talk a little bit about scheduling. Again, as I indicated earlier, we're going to start the jury selection process this morning. I don't think we'll get it done by lunchtime.

We'll take a break for lunch. Come back after lunch, and we should be able to, hopefully, get a jury this afternoon. That's pretty much the schedule that we're going to be operating on for the whole time that this case is in trial.

Usually, we start at 9:00 in the morning. We'll take a break halfway through the morning. Work till around noon. Take a break for lunch. Come back after lunch and take a break halfway through the afternoon and work until about 5:00.

There's only two situations where we ever work past 5:00. One is if there's an out-of-state witness on the stand and by going a little bit past 5:00 we can finish their testimony, so they can fly home.

The other situation is if the jury is deliberating and all 12 jurors want to continue their deliberation. So other than those two situations, you can assume we're going to be working from 9:00 to 5:00. There may be days that I have a hearing at 9:00; so we're going to start a little bit later than that, and I will let you know a day or two ahead of that time.

There may be some days that I have got hearings at 1:15

or 1:30 in the afternoon. I will let you know at that time, and we will be taking a longer lunch break. If you're selected on the jury, I will actually give you a calendar that will say, tentatively speaking, what days we're going to be off and what the hours we will be here so you can make doctor's appointments or try to schedule other things that can be consistent with that schedule.

Along those lines, we definitely are going to be off Tuesday, September 23rd, and Wednesday, September 24th, and Friday, September 26th, and Thursday, October 1st.

I've got a judge's meeting in West Palm Beach Thursday, October 8th, and then the whole next week I'm in Savannah, Georgia for a judge's conference.

So that kind of gives you an idea what to expect scheduling through the middle of October. And, again, I will give you a more detailed calendar if you're selected for the case of this afternoon.

THE COURTROOM DEPUTY: October 9th.

THE COURT: Thank you for correcting me.

Thursday October 9th we will be off. That's the judge's meeting in West Palm Beach.

Now, this part of the case is known as voir dire examination. And what I'm going to do is I'm going to give you some background information about jury trials in general and specifically about trying a criminal case.

Then I'm going to ask you to give us some background information about yourselves in the form of your answers to a series of questions that I'm going to ask everybody, and we'll start in a few moments with Ms. Wilson. We'll give her a microphone and ask her to stand and pass the microphone around until we get your answers to all the background questions.

I will turn it over to the attorneys and give them a brief opportunity to ask you some questions. When all the questioning is done, the lawyers and I will get together at sidebar and we'll select the 12 jurors and the 2, 3, or 4 alternates that are going to serve on this case.

The voir dire examination is for the purpose of determining if your decision in this case would in any way be influenced by opinions you now hold or by some personal knowledge or experience which you may have concerning the subject matter to be tried.

The object is to obtain 14 or 16 people who will impartially try the issues in this case based on the evidence presented in the courtroom without being influenced by any other factor.

Now, please understand that the questioning is not for the purpose of prying into your affairs for personal reasons, but only for the purpose of obtaining a fair and impartial jury.

As I mentioned, when we get to the end of the jury

selection process, we're going to select the jury. And that's kind of -- Mr. Pogozelski has been kind enough to pass one up.

As I mentioned at the end of the case, we will get together and select the jury. And that works as, kind of, a process of elimination because the attorneys have an opportunity to challenge or excuse prospective jurors.

Each side has a number of peremptory challenges. What that means is each side can challenge you and ask that you be excused. They don't have to give you a reason.

They only have a limited number of peremptory challenges. Additionally, each side has an unlimited number of challenges for cause, and by that, I mean each side can challenge you and ask that you be excused. In that situation, they have to give a reason and I have to agree with that reason.

If you're excused for either side -- by either side for either reason, please do not feel that your honesty or integrity is being questioned because it is not.

This case is the United States versus Patrick Boyd and Charles Boyd and another person not on trial here today. And I'm now going to summarize for you the pertinent portion of the indictment which sets forth the charges against the indictment, against the defendants.

The indictment is not to be considered as evidence, but as a mere formal charge against the defendants. You must not

consider it as evidence of the defendants' guilt and it's not evidence -- and it is not an indication of the law. The law will come from me.

You must consider -- and you must not be influenced by the fact that this indictment has been returned against the defendants.

And the indictment goes for 18 pages -- 17 pages. So I'm not going to read that to you at this time. You will have a copy that you can look at during your deliberations. But both the defendants are charged with conspiracy to introduce adulterated and misbranded drugs, two counts of introduction of misbranded drugs in interstate commerce, conspiracy to traffic in medical produced with false documentation, conspiracy to commit wire fraud, and three counts of wire fraud.

Count I, the conspiracy to introduce adulterated and misbranded drugs and to defraud the United States, charges that from as early as April of 2020 continuing through August of 2021 in Miami-Dade County and Palm Beach Counties in the Southern District of Florida and elsewhere that Patrick Boyd, Charles Boyd, and another person not on trial here today did knowingly, willfully, that is with the intent to further the objects of the conspiracy, combined, conspire, confederate and agree with each other and others known and unknown to the grand jury to commit an offense against the United States, that is with the intent to defraud, mislead, to introduce and deliver

for introduction in interstate commerce and cause to be introduced and delivered for introduction into interstate commerce, adulterated and misbranded drugs. And to defraud the United States by comparing, impeding, obstructing and impeding through deceitful and dishonest means the lawful government functions of the Federal Drug Administration and its oversight regulation of the interstate sale and distribution of drugs in the United States and its effort to safeguard the health and safety of consumers who purchased drugs in the United States.

It goes on to allege the purpose of the conspiracy, to allege the manner and means of the conspiracy, to allege certain overt acts. I'm not going to read all those to you at this time since you will have the copy of the indictment during your deliberations.

Counts II and III, charge introduction of misbranded drugs in interstate commerce, and they charge in Miami-Dade County in the Southern District of Florida that Patrick Boyd, Charles Boyd, and another person not on trial here today did, with the intent to defraud and mislead, introduce and deliver for introduction in interstate commerce and caused to be introduced and delivered for introduction in interstate commerce, a drug that was misbranded; and that the labeling of the drug was false and misleading, in any particular, including that the T3 pedigree accompanied the drug contained the drug contained falsified information.

Count II says that that happened on January 21st of 2021 and it was a shipment of misbranded HIV drugs, Biktarvy, from outside the State of Florida to a pharmacy located in the Southern District of Florida.

Count III charges they did the same thing, except it was a different pharmacy, and it was on February 23rd of 2021.

Count IV charges the same three people with conspiracy to traffic in medical products with false documentation. That's Count IV. Excuse me. And they charge in or around, at least as early, September 2020 continuing through around August of 2021 in Miami-Dade and Palm Beach Counties in the Southern District of Florida and elsewhere, that the three defendants, that as owners and agent of an organization in the supply chain of pre-retail medical produced did knowingly and wilfully combine to conspire, to confederate and agree with each and others known and unknown to the grand jury to knowingly and falsely make altered, forged and counterfeit the labeling and documentation of pre-retail medical produced and to knowingly possess, transport, and traffic in pre-retail medical products and involving false and altered and forged and counterfeited labeling and documentation in using a means of facilitating of interstate commerce, and that the value of medical produced involved in the offense was $5,000 or more.

Count V charges conspiracy to commit wire fraud and from in and around as early as April of 2022 -- excuse me,

April of 2020 continuing through August of 2021 in Miami-Dade and Palm Beach Counties in the Southern District of Florida and elsewhere, that the three defendants did willfully, that is with the intent to further the object of the conspiracy and knowingly combine, conspire, confederate with each other and others known and unknown to the grand jury to knowingly with the intent to defraud, devise and the intent to devise and scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises knowing that the pretenses representations, or promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice did knowingly transmit and caused to be transmitted by means of wire communication, interstate commerce, certain variety of signs, signals, pictures and sounds in violation of the law. And it goes on and lists the purpose of the conspiracy and the manner and means of conspiracy.

So Count V charges conspiracy to commit wire fraud.

Count VI, VII and VIII charge wire fraud, and it charged the same three defendants on the same dates in Miami-Dade and Palm Beach Counties and the Southern District of Florida and elsewhere, and knowingly with the intent to defraud, devise and intent to devise the scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and

promises, knowing that the pretenses, representations or promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice did knowingly transmit and caused to be transmitted by means of wire communication and interstate commerce certain writing signs, signals, pictures and sounds.

And it goes on, alleges the purpose of the scheme and artifice and the scheme and artifice and use of the wires.

And it charges specifically in Count VI, a wire transfer in the amount of $400,000 from JPMorgan Chase account ending in "5196," belonging to Worldwide Pharma Sales from the Southern District of Florida to a Citizens Bank, ending in "4795," belonging to Gentek outside the United States, for the purpose of diverted and misbranded HIV drugs. They allege that happened August 6th, 2020.

Count VII, charges on October 30th of 2020 that there was an email transmission from Adam Bosius, who is the third defendant not on trial here today, to the two defendants causing a wire transmission from inside the State of Florida to the outside the State of Florida standing in part as follows, "Great month between the two locations. We sold about 12.5 million that is 150 million a year with B-L-V-D back in play. Hopefully we can continue the momentum."

And finally, Count VIII charges on April 13th of the next year, 2021 there was an email transmission from Safe Chain

to its customer, pharmacy number one, causing a wire transmission from outside the State of Florida to inside the State of Florida -- inside the Southern District of Florida, attaching falsified T3 pedigrees, the company Safe Chain sale of misbranded and diverted HIV drugs to pharmacy number one.

Pharmacy one was a pharmacy located in Miami Beach, Florida. Pharmacy two is a pharmacy located in Miami Beach, Florida.

Now, you've heard the allegations in the indictment, which is not evidence, just an allegation.

Does anybody know anything about this case either through your own personal knowledge, rumor, or by discussion with anybody else? And if you know anything about the case, raise your hand. Don't see any hands.

Has anyone read or heard anything about the case in any of the news media? If so, raise your hand. Don't see any hands.

Does anybody have a state of mind with reference to the charges against these defendants which would in any way prevent you from acting with impartiality? If so, please raise your hand.

I have a hand back there from, is that Mr. Osakwe?

PROSPECTIVE JUROR: Yes. A couple of years ago, I was a victim of identity theft. I had to close my bank account and all my credit cards with Bank of America. I had to close my

bank account with Bank of America.

I went to the police. The police couldn't help me and told me they couldn't do anything, until -- except the amount is up to a certain level.

So since then I have been on my own, it's been several years, you know, fighting the case with a credit-reporting agency, several years I have been on it up until now.

So with that, I don't think I would be.

THE COURT: Well, they're not charged with identity theft. I bet you a box of donuts there are other people on the panel that have been the victim of identity theft.

There's no indication that these defendants stole your identity. The police didn't do a good job.

Are you saying that because you were a victim of a crime, you can't be fair to these defendants in this case or any defendant?

PROSPECTIVE JUROR: Yes.

THE COURT: You're saying that?

PROSPECTIVE JUROR: Yes.

THE COURT: So no matter what the charge, you can't be fair in a criminal case? Is that what you're telling me?

PROSPECTIVE JUROR: Well, I don't think I will. I'm not saying 100 percent sure, but I don't think I will.

THE COURT: So do you think that if the Government comes in and they don't prove the case, that you would find the

defendants guilty because you were the victim of an identity theft?

In other words, you come in here and you hear all the evidence and you say to yourself, "That's it. That's all they got. I have got a reasonable doubt."

Would you find the defendants guilty, if a case wasn't proven?

PROSPECTIVE JUROR: I'm not sure.

THE COURT: I'm sorry.

PROSPECTIVE JUROR: I'm not sure.

THE COURT: So you think you might find the defendants guilty even if they don't get proven guilty. That's what you're telling me, under oath?

PROSPECTIVE JUROR: I don't know.

THE COURT: Thank you, Mr. Osakwe.

Anybody else, because of the nature of the charge, can't be fair? If so, please raise your hand. Don't see any hands.

I have another hand back there. Okay. Is that Mr. Georges? Are you Mr. Georges?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me.

PROSPECTIVE JUROR: Just one of the victim, just a couple of weeks, someone counterfeit a check I deposit on the city of Miramar.

They remove all my information, the payment for the water bill. They put his own stuff. For me, I see those guy making some easy money when I'm working really hard. And then for something that's been selling drug, is really -- I really feel really bad about that.

Many people in the street, you see them lose their life. They are not killed physically, but, mentally, you see those people in the street because of the drug. People are innocent, to get that easy money, that I don't think it's really fair for me. I don't think for me, it is not, it's not a good way to make money in this country.

THE COURT: I think everybody would agree with it, Mr. Georges. But in this country, everyone is presumed to be innocent. And that presumption of innocence stays with them the whole trial. And it would only leave them in the jury room during your deliberations, if you were convinced of every essential element of the crime beyond a reasonable doubt.

So can you follow the law? Can you presume the defendants to be innocent? Can you hold the Government to its burden of proof of proving the case beyond a reasonable doubt?

PROSPECTIVE JUROR: I think I'm going to sidelight [sic] with the defendants.

THE COURT: Okay. So the same question that I asked of Mr. Osakwe, if you're chosen on the jury, you go back in the jury room and you talk to the other jurors and you conclude

that the Government's case just wasn't there, they didn't prove -- they didn't prove it. They certainly didn't prove it beyond a reasonable doubt and they didn't prove it to your satisfaction. You think the defendants are innocent of the charge. Would you find them guilty because you were the victim of a crime? Because you side with the Government. Because you don't like drug dealers.

PROSPECTIVE JUROR: Yes.

THE COURT: You would do that?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you, Mr. Georges.

And the defendants aren't charged with dealing drugs, by the way.

Anybody else, based on the nature of the charges, can't be fair. Is that Mr. Bradley?

PROSPECTIVE JUROR: Yes. Well, my husband is actually on Biktarvy, so I don't know. It's up there.

I don't know. I'm not saying I wouldn't be impartial, but I just, you know, he's on Biktarvy and I'm also on Descovy so it's always a concern.

It's always a concern of him, the meds not being right or whatever, so it's always on my mind.

THE COURT: And I appreciate that and because of that, do you think you can still presume the defendants to be guilty -- excuse me -- to be innocent or do you think that because of

your husband's situation, that that's going to cloud your judgment and maybe if the Government doesn't prove the case, you would still find him guilty?

PROSPECTIVE JUROR: It's always hard.

I don't -- I wouldn't say I would be against them. I guess, I would have to hear all the evidence.

THE COURT: Right.

PROSPECTIVE JUROR: But it's more than likely --

THE COURT: Being a juror on the case is a hard situation for anybody.

It's even harder if it's a criminal case, but if what you're telling me is that you could put aside the fact that your husband is on a particular drug and that the drug is alleged to have been misbranded in some situations in this case, but you can just rely on the evidence and find the defendants either guilty or not guilty, based on the evidence, presuming them to be innocent, holding the Government to its burden of proof, that's all we need to know.

PROSPECTIVE JUROR: I could, yes.

THE COURT: Yes. There was another hand, I think in the front row, Mr. Hawkins. If you could stand.

PROSPECTIVE JUROR: Is this case involving tainted supplements and/or drugs?

THE COURT: That's the allegations.

PROSPECTIVE JUROR: It's possible that tainted

substances caused a stroke in me and subsequent seizures and I don't think I could be fair towards them.

THE COURT: Thank you, Mr. Hawkins, I appreciate your candor.

Anybody else based on the nature of the charges thinks that maybe we should talk to them about their being fair? If so, raise your hand. And I don't see any hands.

Okay. Let's talk about a little bit about the scheduling. You know, it's a medium-sized federal case. Is there anybody that's got any situations going on where they got a real estate closing that's already planned. They have prepaid tickets to go out of town. They have got a sick child at home they have to take care of.

Something that's going on that would prevent them from being able to pay attention to the case and be a fair juror? Let's go row by row. Let's start with the first row and we've got Ms. Pasetti?

PROSPECTIVE JUROR: Yes, Ms. Pasetti.

My oldest son requires weekly therapy once a week for selective mutism and it's every Tuesday and it's a very hard thing for us to switch the dates. It would be up to their therapist and their flexibility.

THE COURT: What time on Tuesday does it happen?

PROSPECTIVE JUROR: It's at FIU in Miami at 6:00 p.m. right now.

THE COURT: All right. So if you get selected on the jury, if we break the trial at 4:00 on Tuesday, would that work for you?

PROSPECTIVE JUROR: I am usually on the road headed there by 4:30, so I would have to be home in Plantation before then to pick him up.

THE COURT: 3:45.

PROSPECTIVE JUROR: I guess I could find a way.

THE COURT: Well --

PROSPECTIVE JUROR: If it's a guarantee that I would be home before 4:30 every Tuesday, I would be willing.

THE COURT: If there's an accident on Broward Boulevard, I can't guarantee anything.

PROSPECTIVE JUROR: Yeah, I know.

THE COURT: The lawyers can take that into account in deciding whether or not they want to select you, Ms. Pasetti.

Next we have Mr. Kadin.

PROSPECTIVE JUROR: Yes, sir.

I misunderstood and thought we would only be going through this Friday, so I made arrangements that that would work. Unfortunately next week and the following week I have the Jewish holidays, but I also have a prepaid vacation through the 30th.

In addition, I pick up my granddaughter every day at 2:30, 2:45, but we could find somebody, but not for that long a

period of time.

THE COURT: Tell me about your prepaid vacation.

PROSPECTIVE JUROR: So we rented an Airbnb in Jensen Beach from the 24th through the 30th. That's all paid for. I can show you the receipt.

THE COURT: I don't need to see the receipt. Thank you, Mr. Kadin.

Ms. Allan.

PROSPECTIVE JUROR: Hello.

I have two twin boys. They have ADHD, so I'm the only one responsible to pick them up and drop them off at school. Everyone else in the family goes in before they go to school and they get off way after they're out from school.

THE COURT: What time do you drop them off?

PROSPECTIVE JUROR: I would be dropping them off at 8:00 in the morning. Today I had to beg a friend to do it for me. To be here.

THE COURT: What time do you pick them up?

PROSPECTIVE JUROR: I pick them up at 3:00. They have to be picked up by 3:00 today. I have no one to pick them up, actually.

THE COURT: We'll try to get you out of here before that.

PROSPECTIVE JUROR: Thank you.

THE COURT: Thank you, Ms. Allan.

Anybody else in the front row? We have another hand down there, Terry.

And that's Ms. McCarthy.

PROSPECTIVE JUROR: Hi. I'm supposed to be leaving Monday to go out of state.

My mother passed away earlier this year, so I have to go to her house upstate to settle some things.

THE COURT: So you're leaving on Monday?

PROSPECTIVE JUROR: For two weeks, and I have a cruise planned after that in October 7th for five days.

THE COURT: Thank you, Ms. McCarthy.

And we have got Ms. Schoonover?

PROSPECTIVE JUROR: Yes. I hear you say it's going to take like four weeks or --

THE COURT: It could.

PROSPECTIVE JUROR: Okay. But October the 12th, I need to be in Panama.

THE COURT: And how long are you going to be in Panama for?

PROSPECTIVE JUROR: Well, I come back November the 5th.

THE COURT: Come back when?

PROSPECTIVE JUROR: November. I leave October the 12th and I will be back November.

THE COURT: Thank you, Ms. Schoonover.

Anybody else in the front row?

Let's go to the second row. Let's see, that's Ms. Depass Russell.

PROSPECTIVE JUROR: Good morning.

My daughter and I both have a tissue disorder. I can go into SVT, tachycardia with my heart and be rushed out of here and I'm a single parent as well, so picking up my daughter, she has a heart issue, I would have to leave, as well.

THE COURT: I mean, if you have the heart issue, I guess we're going to call an ambulance and that would be the case no matter where you were.

So we're going to have alternate jurors, if you get sick, I will move up an alternate. What do you think about being able to serve in that situation?

PROSPECTIVE JUROR: I don't -- if I go into tachycardia, you have to call, you know, an ambulance and halt court or if I have to leave because my daughter is in school and I have to pick her up and go to the hospital, just letting you know.

THE COURT: We would accommodate you on that.

PROSPECTIVE JUROR: Okay.

THE COURT: Thank you, ma'am.

Who else in the second row? If you could stand, Mr. Valentin.

PROSPECTIVE JUROR: Yes, sir. I'm a retired federal

officer and I started way back with the United States Immigration and Naturalization Service. And when the agency ended, I continued on with immigration and customs enforcement. So I'm an ICE officer retired.

Now, I had to make cases in my career and the first thing that we were taught is you stack those charges. You stack the cases, you stack the charges, you stack them chronologically and I personally know that when you've got a -- we're not talking about tripping and making a mistake. We're talking about a stack of charges that are coming at you.

THE COURT: I'm having a tough time. Are you saying that the Government piles on charges?

PROSPECTIVE JUROR: Only when they're legitimate.

THE COURT: Okay.

PROSPECTIVE JUROR: If you have prior convictions --

THE COURT: These guys don't.

PROSPECTIVE JUROR: If you have prior convictions, all right, you stack them chronologically and you check them and write up your case and you present your case. And then the case goes before the trial attorney, which is basically a prosecutor for the immigration, and then the judge sees the proof. It goes into the court system.

THE COURT: Right.

PROSPECTIVE JUROR: So personally, I know if you got many charges stacked on you, you're not a "choir boy." You

didn't make a simple mistake. You're there for a reason.

THE COURT: So you can't presume the defendants to be innocent. You can't follow the constitution. Is that what you're telling me?

PROSPECTIVE JUROR: I can, but I can't guarantee you that I'm not going to, you know.

THE COURT: Can you follow the law?

PROSPECTIVE JUROR: I believe I can.

THE COURT: If the Government doesn't prove its case, are you going to sit there and say, well --

PROSPECTIVE JUROR: I know if the Government proves its case -- I'm sorry.

THE COURT: She can only take down one person at a time.

If the Government doesn't prove its case, are you going to sit there and say, "Well, based on my experience, they must have had a good reason to do this, so I'm going to find them guilty based on my experience and not the law and the evidence in this case"?

PROSPECTIVE JUROR: I don't think I would. However -- however, there's going to be, like, a tainting, do you know what I mean?

I can't give you a hundred percent guarantee. I feel -- as a person, as an individual, I feel if you didn't make the case, if you can't prove it, let him go. They got to

go.

THE COURT: They have to prove it beyond a reasonable doubt.

PROSPECTIVE JUROR: Beyond a reasonable doubt.

THE COURT: So can you hold them to that burden.

PROSPECTIVE JUROR: Yes, I agree.

But because I have been where I've been before -- and I did 28 years in the system, that I can't give you a hundred percent guarantee that I'm not going to be -- that's all I can say.

THE COURT: Thank you. Ms. Reano?

MR. ZIMET: Your Honor, we would reserve a matter to take up at the recess.

THE COURT: Sure.

PROSPECTIVE JUROR: Well, this is more like a personal reason. In February, I was a juror on a criminal case this year. And it was a case that it was like for six days and it really affected my mental health.

It made me anxious. I couldn't sleep. I was in bad shape. I went toward the end of case, but so I'm not sure if I would be able to go through this again.

THE COURT: All right. So that's Reano. Thank you, Ms. Reano.

Anybody else in the second row? All the way down at the end, Terry.

You're Mr. Ibarra?

PROSPECTIVE JUROR: Correct.

THE COURT: Go ahead.

PROSPECTIVE JUROR: I'm not sure if I can do this. I'm pretty honored to be selected, but I don't really understand everything what you read, maybe 60 percent of what --

THE COURT: I read it kind of fast. So I bet some other people didn't get it all either, but you will actually have a copy of what I read to you.

PROSPECTIVE JUROR: Maybe I'm too perfectionist, but if I'm here, I want to be a good one. I'm want to do my part good, but I'm not sure if I'm getting everything right. Maybe like 60 percent of what is being discussed here I'm getting, so I don't know if that's --

THE COURT: 60 percent of what I have been saying or 60 percent of what everybody has been talking about?

PROSPECTIVE JUROR: The whole thing. What you read and the other people speak.

THE COURT: Thank you, Mr. Ibarra. All right. We'll go on background.

And that's Ms. Ezzell?

PROSPECTIVE JUROR: Yes. So I have a flight on Friday out of Miami. It's at 6:00. So I was going to leave my office in Lauderhill at 2:00, so I don't know if I would be able to leave here and get there on time.

I'm a musician and I have a show in Iowa on Saturday and this is the only flight that we were able to find that would get me there early enough to set up and everything, that's the first thing. And then also the week -- you said this would be several weeks. If it were four weeks, I don't think -- I don't do calendar math well, October 9th that week, I will be in Miramar Beach for a festival as an attendant, not a performer; but I will be out pretty much that whole week. I don't know if that's within the time frame, I think, I don't know.

THE COURT: Let's do one at a time.

PROSPECTIVE JUROR: Yeah.

THE COURT: You're leaving for Miami at 6:00. When do you come back?

PROSPECTIVE JUROR: I would be back for -- I would be back Sunday night. So I think that Monday -- I would only be missing part of Friday, I suppose.

THE COURT: So to get to the Miami Airport, what time would you need to leave here by?

PROSPECTIVE JUROR: I haven't done that GPS math.

I was going to leave from my house at, like, 2:30. I wanted at least two hours to go through security because I heard it's not fun and I have not been through that airport before.

THE COURT: It's kind of a crowded airport.

PROSPECTIVE JUROR: Yeah.

THE COURT: And when have you got your out-of-town plans?

PROSPECTIVE JUROR: Being out of town would be, I believe, it's October 9th and I come back that following Sunday.

THE COURT: So...

PROSPECTIVE JUROR: Like a Wednesday to a Sunday.

THE COURT: Yeah. October 9th, I think, is a Thursday.

PROSPECTIVE JUROR: It might be the 8th. I didn't look at the calendar. I didn't want to open my phone.

MR. ZIMET: That's your judge's meeting.

THE COURT: Yeah, but the 9th is the judge's meeting, but the 8th we were in session. And we would also be in session on Friday the 10th, that you would miss. So you would miss October 8th and the 10th.

So if you got selected in the jury, if we just didn't have Court those two days, could you serve?

PROSPECTIVE JUROR: I think so.

THE COURT: Okay. Thank you, Ms. Ezzell. We'll let the lawyers think about if they want to be off for a couple of more days.

PROSPECTIVE JUROR: Good.

THE COURT: You're Mr. Lopez --

PROSPECTIVE JUROR: Yes.

THE COURT -- Guevara?

PROSPECTIVE JUROR: Yes, sir. I have a business trip August 1st -- sorry. October 1st to the 5th. It's a team of five peoples, plus me and we have ticket, hotel, everything paid already. Wednesday, Thursday, Friday.

THE COURT: I think Wednesday we will only be in session for the morning. We're off for the Jewish holiday for the 2nd. And the 3rd, we would miss that. So if we were not going to be in session the 1st, 2nd and the 3rd, you can serve?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Again, I will let the lawyers think about whether they want to miss that extra day and a half.

PROSPECTIVE JUROR: It is like a catch up later, I will do it. If I'm not here for that day.

THE COURT: No, no. If you're not here, nobody is here.

PROSPECTIVE JUROR: Okay.

THE COURT: Unless I move --

PROSPECTIVE JUROR: Okay.

THE COURT: In other words, unless I move up an alternate, if you get picked on the jury, the lawyers are saying they're okay with no court on the 1st, 2nd and the 3rd. Okay?

PROSPECTIVE JUROR: Okay.

THE COURT: And that's Ms. Musial?

PROSPECTIVE JUROR: Yes. I have flight on October 23rd. I don't know if that's outside -- that's after four weeks. But I figured that I would let you know.

THE COURT: And when are you coming back?

PROSPECTIVE JUROR: I would be coming back Monday, late afternoon. I don't know what date that is.

THE COURT: So the 23rd, I think is a Thursday.

PROSPECTIVE JUROR: Yes.

THE COURT: And you're coming back --

PROSPECTIVE JUROR: Monday.

THE COURT: -- Monday, the 27th.

PROSPECTIVE JUROR: Correct.

THE COURT: Okay. We'll let the lawyers take that into account and if you're selected, we will be off those days.

PROSPECTIVE JUROR: Okay. Thank you.

THE COURT: And you're Ms. --

PROSPECTIVE JUROR: Jackson-Clarke.

THE COURT: -- Jackson-Clarke. That's okay. I did that twice.

PROSPECTIVE JUROR: I have two children. A drop-off in the morning and pick them up in the afternoon.

And then my mom just had double knee replacement surgery, so I relieve her night nurse at 8:15 in the morning and she is with me until the night nurse comes back around 4:00.

THE COURT: Run that by me one more time about your mom.

PROSPECTIVE JUROR: She had double knee replacement. So I relieve her night nurse in the mornings at 8:15 and she is with me until the night nurse comes back around 4:00 p.m.

THE COURT: So who is with her today?

PROSPECTIVE JUROR: I had to ask my neighbor to take off and stay with her.

THE COURT: Thank you, ma'am.

Anybody else in this side of the courtroom that we haven't talked to about scheduling problems?

All right. Let's go out to the first row in the audience.

Mr. Siegrist.

PROSPECTIVE JUROR: Yes. We just received an offer on our house. With closing date of mid October and after that, we were planning on moving to Texas.

THE COURT: Are you going to close on the house and go to Texas that day or?

PROSPECTIVE JUROR: No. I would be already there in Texas. I came for jury duty. So as soon as we close, we are ready to move.

THE COURT: And when -- do you know for sure when you're going to close?

PROSPECTIVE JUROR: No. We just received the offer and

the tentative date is mid October.

THE COURT: So the lawyers can take that into account in deciding whether to select you. Thank you, sir.

PROSPECTIVE JUROR: Good morning.

THE COURT: Ms. Villanueva-Thompson?

PROSPECTIVE JUROR: Yes. I just have a doctor's appointment on the 30th. I waited two months for that specialist. It's at 9:45. That's all.

THE COURT: So would you be able to get here at, like, 11:00?

PROSPECTIVE JUROR: Yes.

THE COURT: If you're selected on the jury, then we will start the trial at 11:00 on the 30th.

PROSPECTIVE JUROR: Okay.

THE COURT: Okay. And that's Ms. --

PROSPECTIVE JUROR: Cristina Stanciu.

THE COURT: Stanciu. Okay.

PROSPECTIVE JUROR: I work for a CPA firm. They have a deadline October 15th, so for us it's the craziest time of the year to miss work.

So you're saying that this will take probably all the way until October. So I'd just like to see if that could be taken into consideration.

THE COURT: I guess to a varying degree, it's a financial hardship on people who serve on the jury, but without

citizens being willing to make that sacrifice, the system doesn't really work.

The lawyers will take into account the fact that it's going to be tough on you, but, I mean, your employer can't fire you or discipline you for being on jury duty.

If you were to be selected on the case, can you pay attention and be a good juror?

PROSPECTIVE JUROR: Of course.

THE COURT: Thank you, ma'am.

And that is Mr. Merchant?

PROSPECTIVE JUROR: Yes, sir. It's not until October 23rd or 24th, so it may not be an issue. I have a family camping trip planned that Thursday and Friday and into the weekend.

THE COURT: If we're still going in session and you're on the jury, we'll try to accommodate you and not be in trial on the 23rd and the 24th.

PROSPECTIVE JUROR: I have two prepaid trips booked. One from the 26th to the 29th of September, and one from the 1st to the 5th of October.

THE COURT: And that's Ms. Calcaterra.

PROSPECTIVE JUROR: Calcaterra, yes.

THE COURT: All right. Thank you, ma'am.

PROSPECTIVE JUROR: You're welcome.

THE COURT: Let's go to the second row back in the

audience.

PROSPECTIVE JUROR: Good morning, Your Honor.

THE COURT: You're Ms. Hausdorff.

PROSPECTIVE JUROR: That was very good. Yes.

I am out of the country starting next week for 2 weeks and then I am out on October 10th. And I don't know if this is a good time to mention my occupation, but some of my other unavailability would pertain to my occupation.

THE COURT: When we do the background information, I will be asking your occupation.

PROSPECTIVE JUROR: Okay.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR: Thank you.

PROSPECTIVE JUROR: Yes, sir. Good morning.

On this Friday, my wife and daughter and I have an appointment at the Greek Consulate in Tampa to renew my daughter's passport. That was a three-month wait for that appointment.

We also have a preplanned trip the 10th through the 13th of October. And I have military Reserve duty October 17th which is a Friday, 18th and 19th.

THE COURT: Where are you going in Tampa?

PROSPECTIVE JUROR: Greek Consulate.

THE COURT: Greek Consulate. Well, I have to let you go to that. Is that Mr. Siegrist?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR: I work in the IT department of a bank, so I have a little projects deadline, projects schedule for between now and the end of year.

Okay. I work in IT department of a bank. So I have quite a very tight schedule between now and the end of year managing a couple of projects that I need to go --

THE COURT: Thank you, sir.

PROSPECTIVE JUROR: And also going on a business trip on October 5th to October 9th and also October 10th is my birthday. I have a planned trip out of town for the whole week.

THE COURT: Thank you, sir.

Anybody else in the second row?

Let's go to the third row.

PROSPECTIVE JUROR: Good morning, Your Honor. I am a sole provider of a family of eight.

THE COURT: Anything other than that financial hardship that I need to know, Mr. Sainpreux?

PROSPECTIVE JUROR: That would be it.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR: Your Honor, I just wanted to let you know I have a scheduled surgery not until October 28th.

THE COURT: That's Ms. Spivack?

PROSPECTIVE JUROR: Yes.

THE COURT: If the case is still going on that long, how long do you think you would be out for the surgery? Is it outpatient?

PROSPECTIVE JUROR: It's eye surgery, so for that whole week.

THE COURT: I had cataract surgery a few years ago, and I went -- and I wasn't supposed to -- I went and refereed or officiated a St. Thomas Aquinas track meet that afternoon, but I didn't tell the doctor that I did that, so I won't ask you to do that.

PROSPECTIVE JUROR: I just wanted to let you know.

THE COURT: Thank you, ma'am. Anybody else in that row?

PROSPECTIVE JUROR: Hello. Can you hear me okay?

THE COURT: Yes. You're Ms. Greene?

PROSPECTIVE JUROR: Yes. September 25th, I'm going on family vacation for seven days to Bar Harbor, Maine; and I'm taking my 92 year old mother-in-law to visit her daughter there.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR: Thank you.

THE COURT: We'll go to the next row. Mr. Bufarale.

PROSPECTIVE JUROR: My name is Anthony. So I'm in international sales, so I do have trips planned over the course

of the next few weeks. It is for work, so that's at your discretion.

THE COURT: Tell me when the trips are?

PROSPECTIVE JUROR: The 23rd through the 26th of September. September 29th through October 3rd. October 5th through October 9th, as well.

THE COURT: And you're Mr. Bufarale.

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR: Good morning, Your Honor.

I have a prepaid cruise with my husband for October 11th for one week.

THE COURT: And this is Ms. Schultz?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR: Good morning.

I also have two younger kids, and I have to find someone to pick them up today. And this morning was a struggle to get them to school so...

THE COURT: What time do you drop them off?

PROSPECTIVE JUROR: They have to be there at 7:45, so I had to drop them off a little early.

THE COURT: What time do you pick them up?

PROSPECTIVE JUROR: I usually pick them up around 3:30, but today my sister is going to get them for me. She's going

to leave work a little early.

THE COURT: Thank you, ma'am.

Let's go back to the back row. Good morning.

Is that Mr. McGhee?

PROSPECTIVE JUROR: Yes, sir.

I'm scheduled for a closing on a home tomorrow. And I'm also an accountant and December 15th is going to be a busy time and I'm the principal, so it's going to be -- it will be pretty tough during that time.

THE COURT: Do you know what time your closing is tomorrow?

PROSPECTIVE JUROR: I'm not sure. I'm supposed to find out today, so I have to get to the bank. So they were saying maybe 10:00 or 11:00 tomorrow morning.

THE COURT: Well, the lawyers can take into account, the financial hardship thing, and if we need to, we will just not be in session for part of tomorrow for you to go to your closing.

PROSPECTIVE JUROR: Okay.

THE COURT: Okay.

PROSPECTIVE JUROR: Good morning, Your Honor.

I have an appointment this October 2nd for my driver's license renewal.

THE COURT: Did you know what time that was?

PROSPECTIVE JUROR: Around 9:00.

THE COURT: If you have an appointment then hopefully, you will be able to get in. I don't think we're starting -- that's a Friday, October -- no. What did you say? October 2nd.

PROSPECTIVE JUROR: Yes.

THE COURT: I think that's a Friday and I don't think we're not starting until 10:30.

MR. POGOZELSKI: I think -- Your Honor, I think we're off that day October 2nd for Yom Kippur is what I have.

THE COURT: Right. So we won't be in session.

PROSPECTIVE JUROR: Okay.

THE COURT: How about on this side of the courtroom?

PROSPECTIVE JUROR: Hello, Your Honor, and everybody.

My husband had to travel out of town for one week and I need to pick up my daughter and drop off in the morning 8:30 and pick up at 3 o'clock in the afternoon, so I don't have anybody for the next week.

THE COURT: Thank you, Ms. Garcia.

PROSPECTIVE JUROR: Yes.

PROSPECTIVE JUROR: Hello, Your Honor. I have some scheduled trips, as well. Tomorrow, September 18th and 19th I will be out of town.

And also, September -- October 10th, 11th and 12th, I will be out of town. And in September I will be out of town from the 3rd to the 7th for business trips.

THE COURT: So that's Mr. Elhaddad?

PROSPECTIVE JUROR: Elhaddad, yes.

THE COURT: And you're out of town tomorrow until when?

PROSPECTIVE JUROR: Tomorrow and Friday. I will be back on Sunday.

THE COURT: And then you're out of town again when?

PROSPECTIVE JUROR: On October 10, 11, 12, and 13. So I believe that's Columbus Day, so everybody is off.

THE COURT: Right. So it will be just be the 10th that you're out.

PROSPECTIVE JUROR: Yes.

THE COURT: The lawyers can take that into account as to whether they want to allow for it.

PROSPECTIVE JUROR: And November from the 3rd to the 7th.

THE COURT: Hopefully we will be done by November. Anybody else?

PROSPECTIVE JUROR: Good morning. I am in the same situation as him.

In my case, my first language isn't English. And sometimes I don't understand the information.

THE COURT: Have you been able to understand me okay?

PROSPECTIVE JUROR: No a hundred percent.

THE COURT: Thank you, Ms. --

PROSPECTIVE JUROR: Karen.

THE COURT: Karen Padron?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Let's go ahead and get some background information from everybody. We're going to start with Ms. Wilson.

If you would stand. Thank you. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: I live in Plantation.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: 14 years. Wait, I'm sorry. 11 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a seventh grade teacher.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I'm married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: He's a CFO for a local company.

THE COURT: What type of business?

PROSPECTIVE JUROR: Car sales. AutoNation, for business AutoNation owns in California.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury before?

PROSPECTIVE JUROR: Yes.

THE COURT: In state or federal court?

PROSPECTIVE JUROR: State.

THE COURT: Civil or criminal case?

PROSPECTIVE JUROR: Criminal. In Dade County. I was nineteen.

THE COURT: Were you the foremen of the jury?

PROSPECTIVE JUROR: No, I was an alternate.

THE COURT: So you didn't reach a verdict?

PROSPECTIVE JUROR: No.

THE COURT: Do you have any close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: No.

THE COURT: Have you or any member of your family been a victim of a crime?

PROSPECTIVE JUROR: No. Aside from, like, identity theft, like stolen credit cards, no.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: I don't think so.

THE COURT: Have you or any member of your family ever been arrested?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: My father is currently in prison. He's been in for about 15 years.

THE COURT: And what was the nature of charge?

PROSPECTIVE JUROR: It was lewd and lascivious conduct.

THE COURT: That would have been in state court?

PROSPECTIVE JUROR: State. I didn't go to the trial, but there was no trial.

THE COURT: Anything about that that would affect your ability to be fair.

PROSPECTIVE JUROR: No.

THE COURT: Do you have any hobbies?

PROSPECTIVE JUROR: Reading. I'm a teacher, I don't have hobbies. I work a lot.

THE COURT: We will move on to Ms. Allan. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: I live in Davie.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: Since I was born in 1994.

THE COURT: I got to do the math.

PROSPECTIVE JUROR: I'm 30. I'm going to be 31 next month.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm an RBT. So I work with kids with special needs.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I'm single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No, it's my first time here.

THE COURT: Close friends or relatives who are law

enforcement officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: My dad, but that was years ago. I don't know why.

THE COURT: Anybody been a victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Eating.

THE COURT: Thank you, ma'am. We'll move on to Mr. McCool.

PROSPECTIVE JUROR: In Broward County.

THE COURT: Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Sunrise, Florida.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: 2000.

THE COURT: For the last 25 years?

PROSPECTIVE JUROR: About that.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Airline employee.

THE COURT: Okay. How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No, sir.

THE COURT: Close friends or relatives who are police officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Swimming.

THE COURT: Thank you, sir.

Over to Ms. Pasetti. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: In Plantation.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: Since 1989.

THE COURT: Why don't you guys do the math for me.

PROSPECTIVE JUROR: What am I?

THE COURT: 36.

PROSPECTIVE JUROR: 36 years, right.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I am a mental health counselor and I work for the HCA hospitals.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: He also works for HCA in the legal department.

THE COURT: Is he a lawyer?

PROSPECTIVE JUROR: No, managing contracts and staffing.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes, two.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: No, they're seven and four.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: The only person I can think of is my husband's boss. Her husband is a police officer in Plantation.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: My brother once.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: It was in Miami after a car accident and I believe it was DUI-related, but he wasn't found guilty of it.

THE COURT: Anything about that that would affect your ability to be fair?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: My brother has been held at gun point before. That's the only thing that comes to mind.

THE COURT: Ever witness a crime?

PROSPECTIVE JUROR: No.

THE COURT: Do you have any hobbies?

PROSPECTIVE JUROR: The kids keep me busy, but I'm loving bird watching.

THE COURT: Thank you, ma'am.

Let's move on. Mr. Kadin, whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Cooper City.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: All my life which will be 65 years in about 10 days.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Mostly retired business consultant.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Retired real estate broker.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes, two.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: My son and his wife live out in California, both work for Disney.

My daughter and her husband both live here with the two grandchildren. He's a CFO of a tech company and she's a graphic design UX/UI for a local drug -- not drug, a supplement company.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: A long time ago in Miami, yes.

THE COURT: State court or federal?

PROSPECTIVE JUROR: State.

THE COURT: Civil or criminal case?

PROSPECTIVE JUROR: Criminal.

THE COURT: Were you the foreman?

PROSPECTIVE JUROR: I was an alternate.

THE COURT: So you did reach a verdict?

PROSPECTIVE JUROR: No, sir.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No, sir.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: Yes. My brother-in-law was murdered.

THE COURT: Have you witnessed a crime?

PROSPECTIVE JUROR: No, sir.

THE COURT: And any hobbies?

PROSPECTIVE JUROR: Scuba, music, and my grandchildren.

THE COURT: Thank you, sir.

We'll move over to Mr. Hyacinthe.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Miramar, Florida.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: About 37 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a registered nurse and also a Realtor.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single now.

THE COURT: Ever served on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives that are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime.

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies.

PROSPECTIVE JUROR: I love going to the gym and I love travel -- traveling.

THE COURT: Thank you, sir.

We'll move over to Ms. McCarthy. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Coral Springs.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: I was born here 52 years ago.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a retired customer service manager for Publix.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Retired store manager for Publix.

THE COURT: Any children?

PROSPECTIVE JUROR: Three.

THE COURT: Old enough to work.

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: One in pest control, one is an electrician, and the other works for a construction company.

THE COURT: Ever serve on a jury?
PROSPECTIVE JUROR: Yes.
THE COURT: State or federal court?
PROSPECTIVE JUROR: I believe it was state.
THE COURT: Civil or criminal case?
PROSPECTIVE JUROR: I think it was civil.
THE COURT: Were you the foreperson?
PROSPECTIVE JUROR: No.
THE COURT: Reach a verdict?
PROSPECTIVE JUROR: Yes.
THE COURT: Close friends or relatives who are policemen?
PROSPECTIVE JUROR: No.
THE COURT: Anybody been arrested?
PROSPECTIVE JUROR: Yes. Myself for driving on a suspended license when I was 20.
THE COURT: Anybody been a victim of a crime?
PROSPECTIVE JUROR: My car was stolen out of my driveway.
THE COURT: Ever witnessed a crime?
PROSPECTIVE JUROR: Shoplifting several times at work.
THE COURT: Do you have any hobbies?
PROSPECTIVE JUROR: Music, movies, traveling.
THE COURT: Thank you, ma'am.
We'll move over to Ms. Siegle. What county do you

live?

PROSPECTIVE JUROR: Plantation.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: 29 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a retired chef.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I'm married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: He's retired from the Army.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes.

THE COURT: How many.

PROSPECTIVE JUROR: One.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What does he or she do?

PROSPECTIVE JUROR: He's working in the SATCOM. He's an intelligence agent for the SATCOM.

THE COURT: In the military?

PROSPECTIVE JUROR: No, he's civilian.

THE COURT: He's civilian. Ever serve on a jury before?

PROSPECTIVE JUROR: Yes.

THE COURT: In state or federal court.

PROSPECTIVE JUROR: State.

THE COURT: Civil or criminal case?

PROSPECTIVE JUROR: Criminal.

THE COURT: Were you the foreperson?

PROSPECTIVE JUROR: No.

THE COURT: Did you reach a verdict?

PROSPECTIVE JUROR: No.

THE COURT: What happened?

PROSPECTIVE JUROR: Well, in the middle -- everything is doing, they just they decide like they don't -- I'm not really not remember the whole thing because I was in Texas at that time. And I thought about it, 30 something years, so but I know we --

THE COURT: Did they settle the case maybe?

PROSPECTIVE JUROR: Yes.

THE COURT: Anybody get arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: I just like to cook.

THE COURT: Thank you, ma'am.

Can you pass the microphone behind you to Mr. Ibarra.

Whereabouts in Broward County do you live, sir?

PROSPECTIVE JUROR: Hollywood, Florida.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: 20 years.

THE COURT: What type of work do you?

PROSPECTIVE JUROR: I'm a massage therapist.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I'm divorced.

THE COURT: When you were married, what did your spouse do?

PROSPECTIVE JUROR: Flight attendant.

THE COURT: Flight attendant?

PROSPECTIVE JUROR: Yes.

THE COURT: Any children?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime.

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Swimming.

THE COURT: 99 percent.

PROSPECTIVE JUROR: Thank you.

Pass over to /#34R pediatrician ^ Medina.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Coral Springs.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 20 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Uber driver.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: I have a family friend that he's a sheriff.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Just gaming.

THE COURT: Thank you, sir.

We'll move over to Ms. Depass Russell.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: West Miramar.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: On and off for 30 years.

THE COURT: What type of work do you?

PROSPECTIVE JUROR: I work for Norwegian Cruise Lines.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Divorced.

THE COURT: When you were married, what did your spouse do?

PROSPECTIVE JUROR: Coast Guard.

THE COURT: Any children?

PROSPECTIVE JUROR: One.

THE COURT: Old enough to work.

PROSPECTIVE JUROR: Yes, but she doesn't.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives with a policeman?

PROSPECTIVE JUROR: Yes.

THE COURT: Friends, relatives or both?

PROSPECTIVE JUROR: Friends.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: Just like your last three.

So my mother and my two sisters are all drug addicts that have been either abused or had been arrested.

THE COURT: Anything about that that would prevent you from being fair?

PROSPECTIVE JUROR: I can't say yes or no.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

PROSPECTIVE. JUROR: As I said, my mom and my sisters through circumstances.

THE COURT: Have you ever witnessed a crime?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: Theft, gang violence.

THE COURT: Do you have any hobbies?

PROSPECTIVE JUROR: Yes. Reading, movies and best with my daughter.

THE COURT: Thank you, ma'am.

Let's move over to Mr. Valentin. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: I live in Hollywood.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 38 years.

THE COURT: We know what you did for a living. How about your marital status?

PROSPECTIVE JUROR: I'm married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: She is, by career choice, she's a BSN, but she sat it down, so she's been a homemaker for many, many years.

THE COURT: Any children?

PROSPECTIVE JUROR: Yeah, I got two boys.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yeah, they're both working. One is an electrician and another one works for a French aircraft company.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: I was summoned about maybe a dozen or 15 years ago to serve with the state, but at the time I was

working, I put down what I do for a living, so they excluded me.

THE COURT: Anybody, been -- well, close friends or relatives who are police officers?

PROSPECTIVE JUROR: A whole bunch of people in my background who are law enforcement.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: I have an adopted step-brother who has a string of convictions in Florida, so he left the state so he wouldn't get the life sentence. He lives somewhere north near Canada.

THE COURT: Anybody been victim of a crime?

PROSPECTIVE JUROR: Me, as a child.

THE COURT: Ever witnessed a crime other than that?

PROSPECTIVE JUROR: I have seen things go down. Shoplifting, things on the street.

THE COURT: Do you have any hobbies?

PROSPECTIVE JUROR: Right now, I'm just relaxing, trying to wind down from a career.

THE COURT: Thank you, sir.

Pass the microphone to Mr. Grey. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Oakland Park.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: Eight years.

THE COURT: Where are you from, originally?
PROSPECTIVE JUROR: Colombia.
THE COURT: What type of work do you do?
PROSPECTIVE JUROR: I'm a fashion designer.
THE COURT: How about your marital status?
PROSPECTIVE JUROR: Married.
THE COURT: What does your spouse do?
PROSPECTIVE JUROR: Vice president over Renalchem.
THE COURT: Any children?
PROSPECTIVE JUROR: No.
THE COURT: Ever serve on a jury?
PROSPECTIVE JUROR: No.
THE COURT: Close friends or relatives who are policemen?
PROSPECTIVE JUROR: No.
THE COURT: Anybody been arrested?
PROSPECTIVE JUROR: No.
THE COURT: Victim of a crime?
PROSPECTIVE JUROR: No.
THE COURT: Witness to a crime?
PROSPECTIVE JUROR: No.
THE COURT: Any hobbies?
PROSPECTIVE JUROR: No.
THE COURT: Thank you, sir.
We'll move over to Mr. Aguerrevere.

PROSPECTIVE JUROR: Aguerrevere.

THE COURT: Easy for you to say.

Where do you live in Broward County?

PROSPECTIVE JUROR: I live in Weston.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 22 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Financial advisor.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Homemaker.

THE COURT: Any children?

PROSPECTIVE JUROR: Four.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: My older son work, he's a chemical engineer and the second one is working now with me.

My daughter is a teacher that lives in San Francisco and my younger is at the university now.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are

policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: My son was arrested once for basically trespassing and entered to make a phone call. It was very cold in New York at the time, but he was released right after.

THE COURT: Anybody victim of a crime?

PROSPECTIVE JUROR: I was kidnapped for just an hour.

THE COURT: Other than that, have you witnessed any crimes?

PROSPECTIVE JUROR: No.

THE COURT: And do you have any hobbies?

PROSPECTIVE JUROR: Golf and soccer.

THE COURT: Thank you, sir. Would you pass the microphone to Ms. Reano?

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Plantation.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 21 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm assistant manager at a retail store.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: He's a cook at a restaurant.

THE COURT: Any children?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve -- you served on a criminal case?

PROSPECTIVE JUROR: I did criminal. I have done civil. And this is my third time.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: Yes.

THE COURT: Friends, relatives, or both?

PROSPECTIVE JUROR: Friends.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: My ex-husband for DUI and causing an accident.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: Oh, yeah. Shoplifting at the store.

THE COURT: Do you have any hobbies?

PROSPECTIVE JUROR: Traveling.

THE COURT: Thank you, ma'am. If you would pass the

microphone back there to Ms. Jackson-Clarke.

I got it right the third time. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Tamarac.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: 11 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Ex-paramedic, but, currently, scheduling bank audits.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Bank auditor.

THE COURT: How many children?

PROSPECTIVE JUROR: Two.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: No, eleven and four.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: Yes, but not in the State of Florida.

THE COURT: Friends, relatives, or both?

PROSPECTIVE JUROR: Friends.

THE COURT: Anybody been arrested?
PROSPECTIVE JUROR: My brother.
THE COURT: What happened with him?
PROSPECTIVE JUROR: Shoplifting.
THE COURT: Anybody been the victim of a crime?
PROSPECTIVE JUROR: Me.
THE COURT: What happened?
PROSPECTIVE JUROR: Robbed at gunpoint.
THE COURT: Other than that, have you witnessed any crimes?
PROSPECTIVE JUROR: Yes, as a paramedic.
THE COURT: Do you have any hobbies?
PROSPECTIVE JUROR: Reading.
THE COURT: Thank you, ma'am.
We will move over to Ms. Musial.
Whereabouts in Broward County do you live?
PROSPECTIVE JUROR: Fort Lauderdale.
THE COURT: How long have you lived in South Florida?
PROSPECTIVE JUROR: 55 years.
THE COURT: What type of work do you do?
PROSPECTIVE JUROR: I'm a teacher.
THE COURT: How about your marital status?
PROSPECTIVE JUROR: Married.
THE COURT: What does your spouse do?
PROSPECTIVE JUROR: He works at IT for Royal Caribbean.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes, two.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: My daughter is a kindergarten teacher in Orlando and my son works in cyber security for Publix.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: My brother-in-law was an addict. So he was in and out of jail and arrested. And my biological father had been arrested and convicted and served time for, I guess, insurance fraud.

THE COURT: Anything about that that would affect your ability to be fair?

PROSPECTIVE JUROR: No, I wasn't close to him.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: I almost had my purse taken.

THE COURT: Other than that, have you witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Anything with the beach and reading.

THE COURT: Thank you, ma'am.

We'll move over to Mr. Lopez Guevara.

Where in Broward County do you live?

PROSPECTIVE JUROR: I live in Davie.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 15 years, since 2010.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: What kind of what, sir?

THE COURT: What type of work?

PROSPECTIVE JUROR: I am a tennis coach in university.

THE COURT: Which university?

PROSPECTIVE JUROR: Barry University. Barry University in Miami Shore.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I'm married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: She is orthodontist.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes. One little girl, three years old.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No, first time.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: My cousin's husband, but they live in Homestead, so we don't see each other too often.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Sports, watch and play different sports.

THE COURT: Thank you, sir.

We'll move over to Ms. Ezzell. Whereabouts in Broward County did you live?

PROSPECTIVE JUROR: North Lauderdale.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 11 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm in marine construction in the office and then I'm also a musician and a writer.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single, in a long-term relationship.

THE COURT: Any children?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: Yes.

THE COURT: Friends, relatives or both?

PROSPECTIVE JUROR: Both. My boyfriend is a federal agent.

THE COURT: For what agency?

PROSPECTIVE JUROR: He's with the Department of Commerce. He's a Special Agent.

THE COURT: Anything about that that would prevent you from being fair?

PROSPECTIVE JUROR: I don't think so.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: My brother.

THE COURT: What happened with him?

PROSPECTIVE JUROR: I was in middle school, so I really

don't remember a lot of it, but I know that it ended with him doing, like, community service for a little bit. It wasn't like a major thing.

THE COURT: Anybody been victim of a crime.

PROSPECTIVE JUROR: Me.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: I had my windshield wipers stolen off my car.

THE COURT: Anybody been a witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Aside from the music, I have two guinea pigs who keep me very busy. So that's that.

THE COURT: Thank you.

Pass the microphone over to Ms. Warren.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Good morning. Tamarac.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: First time 15 years, this time, nine years.

THE COURT: In between, where did you live?

PROSPECTIVE JUROR: Atlanta, Georgia.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I am in sales.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: Yes. Back in the 90s.

THE COURT: State or Federal court?

PROSPECTIVE JUROR: No, civil. State civil.

THE COURT: Were you the foreperson?

PROSPECTIVE JUROR: No.

THE COURT: Reach a verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: My uncle is a retired warden up in Virginia.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: My uncle's son. He's a lifetime idiot. He's in jail now.

THE COURT: Anybody been a victim of a crime?

PROSPECTIVE JUROR: That would be me in the city of Atlanta, had my car stolen, bullet come through my apartment window, and my storage unit broken into.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: I have seen some things, yes.

THE COURT: Do you have any hobbies?

PROSPECTIVE JUROR: I collect watches and watch football.

THE COURT: Thank you, ma'am. We'll move over to Ms. Tiburcio.

PROSPECTIVE JUROR: Yes.

THE COURT: And whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Coral Springs.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 30 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a teacher.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I'm a widow.

THE COURT: When your spouse was alive, what did your spouse do?

PROSPECTIVE JUROR: He worked for Pepsico International.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes.

THE COURT: How many?

PROSPECTIVE JUROR: Two.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: One is on sale and the other one an

operational engineer for Instagram.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: In 1989 or '88, someone broke into any apartment while I was inside.

THE COURT: Other than that, have you witnessed any crimes?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: I like to crochet.

THE COURT: Thank you, ma'am.

We'll move over to Ms. Rivera-Abdo.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Plantation.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: Since 1990.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Hospital administrator for HCA Healthcare.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: He's an executive for American Express and a volunteer firefighter for the City of Plantation.

THE COURT: Any children?

PROSPECTIVE JUROR: One.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What does he or she do?

PROSPECTIVE JUROR: He's an Army vet and he's a heavy-duty mechanic for Ryder now.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: Friends.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: My brother in the late '80s, mid-'90s. He's a recovered addict.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: Yes. Myself.
THE COURT: Tell me about that.
PROSPECTIVE JUROR: An attempted home invasion.
THE COURT: Other than that, have you witnessed any crimes?
PROSPECTIVE JUROR: No.
THE COURT: And do you have any hobbies?
PROSPECTIVE JUROR: I work out every day and I read.
THE COURT: Thank you.
We're going to go out here in the audience to Ms. -- is it Hammond?
PROSPECTIVE JUROR: Yes, sir.
THE COURT: And whereabouts in Broward County do you live?
PROSPECTIVE JUROR: Lighthouse Point.
THE COURT: And how long have you lived in South Florida?
PROSPECTIVE JUROR: 33 years.
THE COURT: What type of work do you do?
PROSPECTIVE JUROR: I'm a flight attendant.
THE COURT: How about your marital status?
PROSPECTIVE JUROR: Single. No children.
THE COURT: Ever serve on a jury?
PROSPECTIVE JUROR: Yes.
THE COURT: State or federal court?

PROSPECTIVE JUROR: State.

THE COURT: Civil or a criminal case?

PROSPECTIVE JUROR: Civil.

THE COURT: Were you the foreperson?

PROSPECTIVE JUROR: No.

THE COURT: Did you reach a verdict?

PROSPECTIVE JUROR: No. They settled while we were deliberating.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: Not to my knowledge.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: Car theft.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: Not to my knowledge.

THE COURT: And do you have any hobbies?

PROSPECTIVE JUROR: I'd say walking, running, snorkeling, gardening, cooking.

THE COURT: Let's move on to Mr. Diaz. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Pompano Beach.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 19 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a web developer for Miami-Dade public schools.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Divorced.

THE COURT: When you were married, what did your spouse do?

PROSPECTIVE JUROR: She worked for a company that imported vegetables and fruits.

THE COURT: Any children?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Yes. I sing in choirs and walking

with my dog.

THE COURT: Thank you, sir.

Let's move over to Ms. Calcaterra. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Down the river in -- down the road Tarpon River.

THE COURT: Where the new courthouse is going to be.

PROSPECTIVE JUROR: Yep.

THE COURT: What does the neighborhood think about that new courthouse going up there?

PROSPECTIVE JUROR: I don't really ask.

THE COURT: All right. I mean, it's there now, so I guess it doesn't matter.

How long have you lived in South Florida?

PROSPECTIVE JUROR: 16 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a landlord and a student.

THE COURT: What are you studying?

PROSPECTIVE JUROR: The Mystical Experience.

THE COURT: How about marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: A neighbor, who's also a friend.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: I have been.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: It was an armed robbery in my home.

THE COURT: Other than that, have you witnessed any crimes?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Traveling.

THE COURT: Thank you, ma'am.

We'll move on to Mr. Hawkins. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Fort Lauderdale.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 38 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I sell wine.

THE COURT: Your marital status?

PROSPECTIVE JUROR: None.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody that's been arrested?

PROSPECTIVE JUROR: Probably. Not that I'm aware of.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: My truck was stolen.

THE COURT: Have you ever witnessed a crime?

PROSPECTIVE JUROR: It's likely.

THE COURT: Sorry?

PROSPECTIVE JUROR: It's likely, yes.

THE COURT: And do you have any hobbies?

PROSPECTIVE JUROR: Exercise.

THE COURT: Thank you, sir.

We'll move often to Mr. Merchant. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Here in Fort Lauderdale.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: About 38 out of 44 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Senior Pastor at First Presbyterian Church in Fort Lauderdale.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: And what does your spouse do?
PROSPECTIVE JUROR: She's a teacher at Happy Land Day School.
THE COURT: And how many children?
PROSPECTIVE JUROR: Four.
THE COURT: Any of them old enough to work?
PROSPECTIVE JUROR: No, sir.
THE COURT: Ever serve on a jury?
PROSPECTIVE JUROR: No, sir.
THE COURT: Close friends or relatives who are law enforcement officers?
PROSPECTIVE JUROR: Yes.
THE COURT: Friends, relatives or both.
PROSPECTIVE JUROR: Friends.
THE COURT: Anybody been arrested?
PROSPECTIVE JUROR: Not that I'm aware of.
THE COURT: Victim of a crime?
PROSPECTIVE JUROR: No, sir.
THE COURT: Witness to a crime?
PROSPECTIVE JUROR: No, sir.
THE COURT: Any hobbies?
PROSPECTIVE JUROR: Yeah. Cook, fish, run.
THE COURT: Thank you, sir.
Let's move over to Stanciu-Marginean. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: I live in Hollywood.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: About 30 years.

THE COURT: How many years?

PROSPECTIVE JUROR: 30.

THE COURT: 30.

And what type of work do you do?

PROSPECTIVE JUROR: I'm an auditor. I work for a CPA firm.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I'm married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: He's remodeling.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes, one.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: Just know some people, but not very close.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.
THE COURT: Victim of a crime?
PROSPECTIVE JUROR: Hit and run.
THE COURT: Other than that, have you witnessed any crime?
PROSPECTIVE JUROR: No.
THE COURT: Do you have any hobbies?
PROSPECTIVE JUROR: Just walk on the beach. Travel.
THE COURT: Thank you, ma'am.
If you could pass the microphone over to Ms. Villanueva-Thompson. Whereabouts in Broward County do you live?
PROSPECTIVE JUROR: I live in Pembroke Pines.
THE COURT: And how long have you lived in South Florida?
PROSPECTIVE JUROR: 16 years.
THE COURT: What type of work do you do?
PROSPECTIVE JUROR: I do property management.
THE COURT: How about your marital status?
PROSPECTIVE JUROR: Married.
THE COURT: What does your spouse do?
PROSPECTIVE JUROR: He works for Homeland Security.
THE COURT: And what does he do for them?
PROSPECTIVE JUROR: He works for the Customs department.

THE COURT: Is he a --

PROSPECTIVE JUROR: He's an inspector; so he travels a lot for work.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes. I have three daughters. One is nine and the other two are 21 in college.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are police officers?

PROSPECTIVE JUROR: Yes. My dad's a retired police officer. My best friend's Miramar PD. My sister is retired from the sheriff's office.

THE COURT: There are law enforcement officers that are likely to testify in this case.

Are you -- of course, you can take into account what they do for a living, but are you going to automatically believe a police officer just because they're a police officer?

PROSPECTIVE JUROR: No.

THE COURT: Are you going to automatically disbelieve a police officer just because they're a police officer?

PROSPECTIVE JUROR: No.

THE COURT: So you'll take into account what they do for a living, but that doesn't make them automatically believable or unbelievable? Do you agree?

PROSPECTIVE JUROR: Correct.

THE COURT: And if you're selected on this case and if the Government doesn't prove the case and you have a reasonable doubt, would you have any problems going back and telling your relatives that you found somebody not guilty?

PROSPECTIVE JUROR: No.

THE COURT: In fact, you don't have to tell them anything about what happens on the case.

PROSPECTIVE JUROR: Right.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: Identity theft, myself.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Spending time with my children, walking, going to the theater.

THE COURT: Thank you, ma'am.

If you'd pass the microphone over there to Mr. Siegrist.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Weston.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 13 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: IT.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: She's taking care of the granddaughter.

THE COURT: Any children?

PROSPECTIVE JUROR: Three daughters.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: Two on IT and one is RTV.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: My wife was robbed once.

THE COURT: Have you ever witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies.

PROSPECTIVE JUROR: Movies.

THE COURT: Thank you, sir.

Can you pass the microphone behind you there to Mr. Carella. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Lauderhill.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: 25 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm unemployed.

THE COURT: What did you used to do?

PROSPECTIVE JUROR: I worked for Philip Stein glass company.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies.

PROSPECTIVE JUROR: None -- biking.

THE COURT: Thank you, sir.

If you pass the microphone over there to Ms. Hausdorff.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Oakland Park.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: 30 years, give or take the four years in college.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm an attorney.

THE COURT: What type of law do you practice?

PROSPECTIVE JUROR: Primarily labor and employment with some commercial complex litigation sprinkled in.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Have you served on a jury?

PROSPECTIVE JUROR: No, Your Honor.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: All retired now, family friends.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: Yes. My brother once for underage drinking in Wisconsin.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: My car was broken into.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies.

PROSPECTIVE JUROR: Reading and exercising.

THE COURT: Thank you, ma'am. Can you pass the microphone over there to Ms. Castillo?

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Tamarac.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: Three years.

THE COURT: Where are you from originally?

PROSPECTIVE JUROR: For living?

THE COURT: Where did you live before Tamarac?

PROSPECTIVE JUROR: Oh. I live in Brooklyn, New York.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm an assistant teacher.

THE COURT: Your martial status?

PROSPECTIVE JUROR: I'm married.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?
PROSPECTIVE JUROR: No.
THE COURT: Victim of a crime?
PROSPECTIVE JUROR: No.
THE COURT: Witness to a crime?
PROSPECTIVE JUROR: No.
THE COURT: Any hobbies?
PROSPECTIVE JUROR: Listening to music and walking.
THE COURT: You have an accent. Where are you from originally?
PROSPECTIVE JUROR: Because I have a sore throat now. I'm sorry.
THE COURT: So it's a Brooklyn accent.
PROSPECTIVE JUROR: Yes, well, that's okay.
THE COURT: Thank you, ma'am.
THE COURT: Mr. Siegle, whereabouts in Broward County do you live?
PROSPECTIVE JUROR: Up by Lighthouse Point.
THE COURT: And how long have you lived in South Florida?
PROSPECTIVE JUROR: 24 years.
THE COURT: What type of work do you do?
PROSPECTIVE JUROR: I work in technology and I'm also in the military reserve.
THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Attorney.

THE COURT: What type of law does your spouse practice?

PROSPECTIVE JUROR: Home building and construction law.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes.

THE COURT: How many?

PROSPECTIVE JUROR: One.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: Friends, yes.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: Yes, my mother when I was in sixth grade for a DUI.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Reading.

THE COURT: Thank you, sir.

Let's move over to Ms. Araiza.

PROSPECTIVE JUROR: Yes. Hi, Your Honor.

THE COURT: Where do you live in Broward County?

PROSPECTIVE JUROR: I live in Hollywood.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: Four and a half years.

THE COURT: Where are you from originally?

PROSPECTIVE JUROR: California.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a sales manager.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody arrested?

PROSPECTIVE JUROR: Yes, I have for a DUI.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: Yes, me. Sexual assault.

THE COURT: Other than that have you witnessed any crimes?

PROSPECTIVE JUROR: No.

THE COURT: And do you have any hobbies?

PROSPECTIVE JUROR: Yoga.

THE COURT: Sorry?

PROSPECTIVE JUROR: Yoga.

THE COURT: Thank you, ma'am.

And we'll move over to Mr. Humes. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: It's Humes.

THE COURT: One more time?

PROSPECTIVE JUROR: Humes.

THE COURT: Humes.

PROSPECTIVE JUROR: It's okay.

THE COURT: I thought that's what I said. Maybe not. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Pembroke Pines.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: Around five years.

THE COURT: Where were you from originally?

PROSPECTIVE JUROR: Wisconsin.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a technician.

THE COURT: In what type of field?

PROSPECTIVE JUROR: It's monthly just phone repairs.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I am married.
THE COURT: What does your spouse do?
PROSPECTIVE JUROR: She's a stay-at-home mom.
THE COURT: Any children?
PROSPECTIVE JUROR: Of course, two.
THE COURT: Old enough to work?
PROSPECTIVE JUROR: No.
THE COURT: Ever serve on a jury?
PROSPECTIVE JUROR: No.
THE COURT: Close friends or relatives who are policemen?
PROSPECTIVE JUROR: My uncle.
THE COURT: Anybody been arrested?
PROSPECTIVE JUROR: Yes, my cousin.
THE COURT: Anybody been a victim of a crime?
PROSPECTIVE JUROR: Second cousin.
THE COURT: And have you witnessed any crimes?
PROSPECTIVE JUROR: No, sir.
THE COURT: Any hobbies?
PROSPECTIVE JUROR: Whatever you would describe as sedentary things I guess. That would probably be accurate.
THE COURT: Thank you, sir.
Pass the microphone over to Mr. Kelly. Whereabouts in Broward County do you live?
PROSPECTIVE JUROR: Pompano Beach.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: 15 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Automotive parts.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: Me.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: It was all dropped.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: I have been robbed and shot.

THE COURT: Other than that, have you witnessed any crimes?

PROSPECTIVE JUROR: Plenty.

THE COURT: And do you have any hobbies?

PROSPECTIVE JUROR: Anything with my daughter.

THE COURT: Thank you, sir.

And we'll move over to Mr. Osawke.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Pembroke Pines.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: 22 years.

THE COURT: We know you do IT.

What about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Nurse practitioner.

THE COURT: What does she do?

PROSPECTIVE JUROR: Nurse practitioner.

THE COURT: A nurse practitioner. Any children?

PROSPECTIVE JUROR: Yes, four.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: The first one works with the Government, Maryland. The second one is a businessman. And then the third one works locally.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: Yes.

THE COURT: State or federal court?

PROSPECTIVE JUROR: State.

THE COURT: Civil or criminal case?

PROSPECTIVE JUROR: I think it's civil. I can't remember a hundred percent.

THE COURT: Were you the foreman of the jury? Did you reach a verdict?

PROSPECTIVE JUROR: No. It got settled.

THE COURT: They settled the case.

PROSPECTIVE JUROR: Yes.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody who's been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that. Well, you did already, the IT.

PROSPECTIVE JUROR: Identity theft.

THE COURT: And other than that, have you witnessed any crimes?

PROSPECTIVE JUROR: No.

THE COURT: Do you have any hobbies?

PROSPECTIVE JUROR: Watching sports.

THE COURT: All right.

Terry, if I could get the microphone. I think this is a good spot for us to go ahead and take a lunch break.

When we do select a jury in this case, I will be giving those jurors some preliminary instructions and one of those

instructions is that you are not to discuss the case or allow it to be discussed in your presence.

You know virtually nothing about the case, but I am going to instruct you, do not discuss the case. Do not allow it to be discussed in your presence.

If you bump into the lawyers or the defendants or the police officer out in the hallway and they walk right by you, they're not being rude. They're just following the rules of court. And that is that they are to have no contact with prospective jurors now and jurors later on.

If you were walking down the hall and the lawyer came walking the other way and you said, "Good morning" and he or she said, "Good morning" back and somebody way down the hall couldn't hear what you were saying, it just wouldn't look right.

So to avoid the appearance of impropriety, the lawyers aren't going to have any contact with you from now on in the case.

In fact, if you get on an elevator and one of the lawyers gets off the elevator, they're not commenting on your personal hygiene. They're avoiding the appearance of impropriety.

When we do come back, I will ask you to take the same exact seat that you are in right now, so they can count down from the end of the seat who's sitting next to you. And I'm

going to ask that you be out in the lobby at 1:15 and we should be able to resume the trial at that point.

So have a nice lunch. Terry will tell you how to go out one row at a time. We'll see you back at 1:15.

We're outside the presence of the jurors. You have a motion, Mr. Zimet?

MR. ZIMET: Yes, Judge. It relates to Mr. Valentin, his comments about the federal government. I will try to paraphrase, it's my recollection of the "Stacks charges and if they're really guilty they have more charges," suggesting that because there's charges in this case, they must be guilty.

The record is what the Court, I think, tried to rehabilitate him himself. My concern is what he said to the other jurors.

And I would ask the entire panel be stricken. In the alternative, I would ask the Court give an instruction to the jury that -- and I think we can wait until we actually have a jury in the box to do this, Judge -- that what Mr. Valentin said was inaccurate.

The Court should not -- the jury should not consider the number of charges as any indication of guilt and should not weigh that in the deliberations that -- because there's a certain number of charges, that means the defendants are guilty.

THE COURT: Just remind me and I will go ahead and give

that curative instruction after we select the jury.

I don't think that what Mr. Valentin said is going to so taint the jury they can't be fair. He just comes across as being a narrow-minded individual. And it's amazing to me how people will not be reluctant to embarrass themselves just to try to get off the jury.

So I will deny the motion to strike the panel.

Why don't we see if we can get rid of some of the challenges for cause, now. I have misgivings about doing that because once you start excusing jurors, then you have a tendency to spread like wildfire through the panel.

I think we need to get rid of the jury that has got a kid to pick up at 2:30 or 3:00.

MR. ZIMET: Right.

THE COURT: But the rest of them, we can either excuse them when we come back at 1:15 or we can wait and have them sit all the way to the end and excuse them.

Any preference?

MR. ZIMET: Judge, maybe we should wait until the end. I think it might be better.

THE COURT: What does the Government think?

MR. POGOZELSKI: I thought there were some pretty obvious scheduling problems.

THE COURT: Oh, there's no question about that.

MR. POGOZELSKI: And I think -- well, I understand --

THE COURT: And I don't know how you're going to be able to rehabilitate the scheduling problems. I mean some of them are just one day or a couple of days and if you guys want, I mean, if we're having a tough time getting a jury and you want put them on with the understanding we're going to have to take more recesses than we already have scheduled, we can do that.

MR. POGOZELSKI: Yeah, I think, I guess from the Government's perspective, the ones that have lengthy -- lengthy scheduling issues, we could strike them for cause now. And if there are some where it's a day or it's you miss a morning, maybe we leave those on and then discuss those later, but there were a few that I had marked where --

THE COURT: Why don't we go through them.

Juror Number 2, I think has to pick up her kids at 3:00.

MR. ZIMET: No objection to cause, Judge.

MR. POGOZELSKI: No objection to cause.

MR. ZIMET: No objection, Your Honor.

THE COURT: I will grant the challenge for cause on Juror Number 2, Ms. Allan.

I think we can leave Ms. Pasetti on for now because she just has the one conflict that she needs to leave by 3:45.

MR. POGOZELSKI: That was -- sorry to interrupt, but I think that was every Tuesday.

MR. ZIMET: Next Tuesday is not a problem. We don't have court so...

THE COURT: Well, I mean, let's leave her on for now. If it comes down to having to break at 3:45 on Tuesdays or running out of jurors and having to come back tomorrow, I would rather leave her on at this point.

MR. POGOZELSKI: I understand, Your honor.

THE COURT: Kadin, Number 5, I think he has to pick up his granddaughter at 2:30.

MR. ZIMET: Correct.

MR. POGOZELSKI: And I have vacation the 24th through the 30th.

THE COURT: Right. Any objection to cause for Mr. Kadin?

MR. ZIMET: No objection.

MR. ZIMET: No objection.

THE COURT: Mr. Pogozelski?

MR. POGOZELSKI: No objection.

THE COURT: I will grant the challenge for cause on Juror Number 5, Mr. Kadin.

Juror Number 7, Ms. McCarthy, is leaving for two weeks.

MR. POGOZELSKI: We would move to strike for cause.

MR. ZIMET: No objection, Judge.

MR. ZIMET: No objection.

THE COURT: Grant the challenge for cause on Juror

Number 7, Ms. McCarthy.

MR. POGOZELSKI: I have October 12th through November 5th, so we would move to strike for cause on scheduling.

THE COURT: Ms. Schoonover?

MR. POGOZELSKI: Number 8, yes. Ms. Schoonover.

MR. ZIMET: We have no objection, Judge.

MR. ZIMET: No objection.

THE COURT: I don't think there's any way we will get it done by October 12th.

So I will grant the challenge for cause on Juror Number 8, Ms. Schoonover.

We have Mr. Valentin who can't be fair and we could let him stay until the end, I guess.

MR. ZIMET: I think it's a good experience, Judge.

THE COURT: I don't think it will help him.

Mr. Ibarra said 60 percent. He understood, but he answered all my questions okay.

What do you guys think about Juror Number 15, Mr. Ibarra?

MR. ZIMET: I don't think he's clever enough to get off, Judge, so I think we should keep him on for now.

THE COURT: We'll leave him on for now.

MR. POGOZELSKI: Your Honor, I guess just one point is that because this case does involve some rather technical

terms, pharmaceuticals and drugs and T3s and pedigrees, we do think that language barrier, 60 percent, a misbranded adulteration, so we do -- we would move to strike for cause based on what he said about his understanding.

THE COURT: I think I rehabilitated him at this point, so we'll leave him on at this point.

Ms. Musial is going to be gone October 23rd through the 27th and that's Juror Number 17.

MR. POGOZELSKI: We would not -- hopefully, we'll be done by then.

THE COURT: You got to remember the week before that, I will be gone the 13th through the 17th. We'll leave her on at this point.

Juror Number 19, Ms. Ezzell, I've got October 8th through -- I can't read my writing.

MR. ZIMET: 8th through the 10th, I think.

THE COURT: Is that through the 10th.

MR. ZIMET: That's what I have, Judge. October 9th, the entire week, she said.

MR. POGOZELSKI: She had October 9th, there was a festival.

THE COURT: We're going to be off October 9th, then she said it was October 8th, Wednesday, so if we keep her on, then we have to be off the 8th and the 10th.

MR. POGOZELSKI: I would suggest keeping her on for now

because it's not --

THE COURT: We'll leave her on for now.

MR. ZIMET: Judge, I had something on Lopez out October 1st through the 5th, I don't know if the Court had that also, Number 18.

THE COURT: Yes, he has camping October 1st through the 5th.

MR. POGOZELSKI: So then he would miss --

THE COURT: Two days.

MR. ZIMET: -- just the 1st.

MR. POGOZELSKI: And the 3rd.

THE COURT: So let's leave him off at this point.

We'll go to the first row in the audience. Ms. Calcaterra has got a couple of times she's going to be out of town.

MR. ZIMET: We have no objection to cause for her, Judge.

MR. POGOZELSKI: No objection from the Government, Your Honor.

THE COURT: And we get to know whether -- how Mr. Barzee knows her.

MR. ZIMET: I don't think we should go there, Judge.

THE COURT: Any objection to Ms. Calcaterra, Mr. Barzee?

MR. ZIMET: No objection.

THE COURT: I will grant the challenge for cause.

MR. POGOZELSKI: We might want to remove our challenge for cause. Never mind. Just kidding.

THE COURT: We have Mr. Siegrist who has got a closing in mid-October and then he's high-tailing it for Texas. I think we can leave him on since we have alternates, if that happens.

What do you guys think.

MR. POGOZELSKI: Agreed, Your Honor. It's also tentative. These real estate transactions can obviously change and negotiate. So I think at least for the time being, we would leave him on.

THE COURT: Juror Number 31, Mr. Osakwe, has a conflict the 5th through the 9th.

MR. ZIMET: We have no objection for cause for him, Judge.

MR. POGOZELSKI: No objection from the Government.

MR. ZIMET: No objection.

THE COURT: I grant the challenge for cause on Juror Number 31, Mr. Osakwe.

Mr. Siegle, Number 35 has to go to Tampa.

MR. ZIMET: You don't have any connections, Judge, to get a better date and time?

THE COURT: I don't know why he's got to go to Tampa. He probably has got to go to Tarpon Springs. There's a Greek

consulates in Tampa, I think there's one in Miami, but maybe not.

MR. POGOZELSKI: That would be missing one day because the 13th is -- the 10th through the 13th, as I understood him, and then the 13th day is Columbus Day, so I would suggest leaving him on for now.

THE COURT: I have him also October 17th through the 19th. Did anybody write that down?

MR. POGOZELSKI: Yes, Your Honor. We do have that, as well.

MR. ZIMET: I have no objection for cause for him, Judge.

MR. ZIMET: No objection.

THE COURT: I will grant the challenge for cause for Mr. Siegle.

Juror Number 37, Ms. Hausdorff is going to be out of the country for two weeks.

MR. ZIMET: No objection, cause for her, Judge.

MR. ZIMET: No objection.

MR. POGOZELSKI: No objection, Your Honor.

THE COURT: So I will grant the challenge for cause on Juror Number 37, Ms. Hausdorff.

Juror Number 44, Ms. Greene. I think I have her being gone for seven days.

MR. ZIMET: No objection, Judge.

MR. ZIMET: No objection.

MR. POGOZELSKI: No objection, Judge.

THE COURT: I will grant the challenge for cause for Ms. Greene.

MR. POGOZELSKI: Then I have in my notes, Juror Number 43, Mr. Georges, I thought I had him out October 5th through the 9th. So that would be three full trial days, but perhaps we can leave him on for now.

MR. ZIMET: Let me check my notes.

THE COURT: I didn't write down his 5th through the 9th, maybe because of his answer about ITs. So I figured he was already gone. If he said the 5th through the 9th, that would be four days.

MR. ZIMET: No objection for cause.

THE COURT: I will grant the challenge for cause on Juror Number 43, Mr. Georges.

Juror Number 47, Ms. Dowlatram has to pick up her child at 3:30.

MR. ZIMET: We have no objection, Judge.

MR. ZIMET: No objection.

MR. POGOZELSKI: No objection.

THE COURT: I will grant the challenge for cause on Juror Number 47, Ms. Dowlatram.

Juror Number 48, Ms. Schultz is going on a cruise.

MR. ZIMET: No objection.

MR. ZIMET: No objection.

MR. POGOZELSKI: So she's going on the cruise. I had October 11th for one week, but is Your honor --

THE COURT: I think we're gone that week, so let's leave her on at this point.

MR. POGOZELSKI: Okay.

THE COURT: Juror Number 54, Mr. Bufarale, he has a bunch of trips that were for business.

MR. POGOZELSKI: We would move to strike for cause based on all those trips.

MR. ZIMET: No objection, Judge.

MR. POGOZELSKI: No objection.

THE COURT: Grant the challenge for cause on Juror Number 54, Mr. Bufarale.

Juror Number 66, Ms. Garcia has to pick up her child at 3:00.

MR. ZIMET: Was that daily, Judge?

THE COURT: She drops her child off at 8:30 and picks them up at 3:30. I think that's every day.

MR. ZIMET: We have no objection.

MR. POGOZELSKI: No objection, Your Honor.

THE COURT: Mr. Barzee?

MR. BARZEE: I'm sorry, Judge. That's Ms. Garcia?

THE COURT: Yes, 66.

MR. BARZEE: No objection.

THE COURT: I will grant the challenge for cause on Ms. Garcia.

I wrote something on 64, on Mr. Elhaddad.

MR. ZIMET: Out of town Thursday the 10th through the 13th.

MR. BARZEE: And tomorrow.

MR. POGOZELSKI: And tomorrow and Friday.

THE COURT: Yeah, that's too many.

MR. POGOZELSKI: Yeah, so we would move to strike for cause.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: Grant the challenge for cause on Juror Number 64, Ms. Elhaddad -- Mr. Elhaddad.

Any other challenges for cause at this point?

MR. POGOZELSKI: I think 62 had a language barrier, Ms. Rivero Padron.

MR. ZIMET: We have no objection to that. She does, I think.

THE COURT: Mr. Barzee?

MR. BARZEE: No objection.

THE COURT: Grant the challenge for cause on Juror Number 62, Ms. Rivero Padron.

Any other challenges for cause?

MR. ZIMET: Mr. Hawkins, 26. He's the one with the

adulterated drug thing.

THE COURT: Well, I mean he's going to go. It's just a question does he go now or does he go at the end?

MR. POGOZELSKI: I would want to keep as many as possible for now.

THE COURT: I can't imagine -- the only reason to keep him is so that people don't sit there and say the magic words to get off of jury duty.

Maybe he's being sincere. Maybe he can't be fair because of that, but I can't imagine you being able to rehabilitate him on that.

MR. ZIMET: Well, you know what's going to happen after lunch. People are going to have indentations on their forehead, and they're going to say, "Oh, my gosh. I just remembered this trip I have to take."

Right?

THE COURT: That could happen.

MR. ZIMET: Right.

MR. POGOZELSKI: So we would prefer -- the Government would prefer to keep him for now.

MR. ZIMET: If the Government prefers, then I think we should, Judge.

THE COURT: All right. So we'll be in recess until 1:15.

MR. ZIMET: Judge, I had two quick questions. I know

when they constructed this courtroom, the one thing they never did was have spaces for attorneys.

Do you have any ability to let us use -- I think there's space outside of Judge Smith's courtroom. I don't want to do that if we don't have permission.

Is there a way to get that?

THE COURT: Maybe Crystal can call around and see if you can do that.

MR. ZIMET: Okay.

THE COURT: She will check and let you know.

MR. ZIMET: And, Judge, what's your sense as far as this afternoon? How late we're going to go? How long are we going to go?

THE COURT: If we don't get a jury, we're going to break at that point. If we do, we will do openings and maybe get some testimony until 5:00.

MR. ZIMET: Thanks, Judge.

THE COURT: Okay.

COURTROOM SECURITY OFFICER: All rise.

(Off the record.)

THE COURT: We're back on the record. Counsel are present. Both defendants are present. Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: Nothing from the Government, Your Honor.

MR. ZIMET: Judge, as to Charles Boyd, I did not have a chance to look at the new discovery over lunch. Obviously, I'm doing things relating to jury selection and other matters. I just want to let the Court understand that that's where I am at.

THE COURT: Okay.

MR. BARZEE: No, Your Honor.

THE COURT: All right. Let's bring in the jurors.

( Prospective panel enter.)

THE COURT: Please be seated.

Does counsel concede the presence of the jury and waive its polling?

MR. ZIMET: Yes, sir.

MR. ZIMET: Yes, Your Honor.

MR. POGOZELSKI: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

All right. I've got a few jurors that I'm going to go ahead and excuse now.

Ms. Allan, you're excused.

Mr. Kadin, you're excused.

And if you could give your badges to Terry on the way out.

Ms. McCarthy, you're excused.

Ms. Schoonover, you're excused.
Ms. Calcaterra, you're excused.
Mr. Osakwe, you're excused.
Mr. Siegle, you're excused.
Ms. Hausdorff, you're excused.
Mr. Georges, you're excused.
Ms. Greene, you're excused.
PROSPECTIVE JUROR: Did you say "Grey?"
THE COURT: Greene.
Nice try.
PROSPECTIVE JUROR: I was hoping.
THE COURT: Mr. Bufarale, you're excused.
Ms. Rivero Padron, you're excused.
And Mr. Elhaddad, you're excused.
And Ms. Garcia, you're excused.
All right. Let's see where we left off. We left off maybe with Ms. Wongsam. Next -- we'll wait until we get the microphone to Ms. Wongsam.
MR. ZIMET: Judge, I think 39 is --
THE COURT: Yeah, I'm just going from the outside. But 39 is the one we left off with. We'll start with 46, so we can, kind of, snake through.
Ms. Wongsam, whereabouts in Broward County are you from?
PROSPECTIVE JUROR: Pembroke Pines.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 38 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm an office manager at a dental office.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: The father of my son was arrested on drug possession.

THE COURT: State court or federal court?

PROSPECTIVE JUROR: It was in Texas; so I don't know. I think it was state.

THE COURT: Anything about that that would affect your ability to be fair?

PROSPECTIVE JUROR: No.

THE COURT: And is your son old enough to work?

PROSPECTIVE JUROR: No. He's four.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: No. Just a hit-and-run many years ago for me.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: I'm sorry?

THE COURT: Besides that, have you ever witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: And do you have any hobbies?

PROSPECTIVE JUROR: Movies and my son.

THE COURT: Thank you.

All right. We'll move over to Mr. Lee. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Miller. My name is Lee, Tim Lee Miller. I live in Parkland.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 13 years.

THE COURT: What type work you do?

PROSPECTIVE JUROR: I sell equipment to mineral processing companies.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: She's a fashion designer.

THE COURT: Any children?

PROSPECTIVE JUROR: Yeah, three daughters.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: My oldest is a doctor in Ireland, the middle one works with me at our company, and the youngest is a counselor for autistic children.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are police officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: Had a pickup stolen once, and I was robbed about 50 years ago when I worked at a gas station.

THE COURT: Other than that robbery, have you witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: I make sourdough bread.

THE COURT: Thank you.

All right. We'll move over to, I guess it's, Ms. Spivack now.

PROSPECTIVE JUROR: Yes.

THE COURT: And whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Plantation.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 64 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a paralegal to an attorney.

THE COURT: What type of law does he practice?

PROSPECTIVE JUROR: Personal injury.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I'm married.

THE COURT: And what does your spouse do?

PROSPECTIVE JUROR: Hotel management.

THE COURT: Any children?

PROSPECTIVE JUROR: Two.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: My daughter is a psychologist. My son is a boat captain.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.
THE COURT: Close friends or relatives who are law enforcement officers?
PROSPECTIVE JUROR: No.
THE COURT: Anybody been arrested?
PROSPECTIVE JUROR: Yes.
THE COURT: Tell me about that.
PROSPECTIVE JUROR: My son was arrested a few years ago because he had a drug problem.
THE COURT: Anybody been the victim of a crime?
PROSPECTIVE JUROR: No.
THE COURT: Witness a crime?
PROSPECTIVE JUROR: No.
THE COURT: Any hobbies?
PROSPECTIVE JUROR: Traveling.
THE COURT: Thank you, ma'am.
PROSPECTIVE JUROR: Thank you.
THE COURT: We'll move over to Mr. Sargeant. And whereabouts in Broward County do you live?
PROSPECTIVE JUROR: Fort Lauderdale.
THE COURT: How long have you lived in South Florida?
PROSPECTIVE JUROR: 38 years.
THE COURT: What type of work do you do?
PROSPECTIVE JUROR: IT.
THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are police officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: A cousin.

THE COURT: And what happened with your cousin?

PROSPECTIVE JUROR: Drug stuff.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Games.

THE COURT: Thank you, sir.

We'll move over to Ms. Pascual.

PROSPECTIVE JUROR: Pascual.

THE COURT: Pascual. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Weston.

THE COURT: And How long have you lived in South Florida?

PROSPECTIVE JUROR: Four years and a half.

THE COURT: Where are you from originally?

PROSPECTIVE JUROR: Puerto Rico.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Well, I'm not working at the moment because I spend my time between here and Puerto Rico because my dad is bedridden and I go very frequently to Puerto Rico to take care of him.

THE COURT: Before that happened, what type of work did you do?

PROSPECTIVE JUROR: Account management.

THE COURT: I'm sorry?

PROSPECTIVE JUROR: Account management.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: He's a sales director for a communication company in South Florida.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes.

THE COURT: How many?

PROSPECTIVE JUROR: Two.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: My daughter is a physician

assistant doing her master in psychology; and my son, he works as a sales representative.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: And do you have any hobbies?

PROSPECTIVE JUROR: I exercise and my family.

THE COURT: Thank you. If you could pass the microphone over to -- I can't read my writing.

PROSPECTIVE JUROR: Mr. Sainpreux.

THE COURT: That's an "S." And whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Sunrise, Florida.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 40 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Commercial real estate broker.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Vice president of household affairs.

THE COURT: Any children?

PROSPECTIVE JUROR: Six.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of crime?

PROSPECTIVE JUROR: No?

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: No.

THE COURT: No hobbies?

PROSPECTIVE JUROR: Oh, hobbies? Chess.

THE COURT: If you could pass the microphone back to Ms. Schultz.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: No, Dowlatram.

THE COURT: Oh, I missed you, Ms. Dowlatram. I'm going to excuse you.

PROSPECTIVE JUROR: Oh, thank you.

THE COURT: So if you could give your badge to Terry on the way out.

And now we're up to Ms. Schultz.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Parkland.

THE COURT: And a little closer to the mic. And how long have you lived in South Florida?

PROSPECTIVE JUROR: 27 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I am a retired insurance agent.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Retired from insurance as well.

THE COURT: Any children?

PROSPECTIVE JUROR: Three.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: They work.

THE COURT: And what type of work do they do?
PROSPECTIVE JUROR: My son is a teacher. My daughter is a psychologist, and my youngest son does web design.
THE COURT: Ever serve on a jury?
PROSPECTIVE JUROR: Yes.
THE COURT: State or federal court?
PROSPECTIVE JUROR: State.
THE COURT: Civil or criminal case?
PROSPECTIVE JUROR: Criminal.
THE COURT: Were you the foreperson?
PROSPECTIVE JUROR: Yes, I was.
THE COURT: And did you reach a verdict?
PROSPECTIVE JUROR: Yes.
THE COURT: Close friends or relatives who are law enforcement officers?
PROSPECTIVE JUROR: No.
THE COURT: Anybody been arrested?
PROSPECTIVE JUROR: No.
THE COURT: Victim of a crime?
PROSPECTIVE JUROR: Yes.
THE COURT: Tell me about that.
PROSPECTIVE JUROR: My daughter was a victim of sexual assault. Our office was robbed, and my car was broken into a couple of times.
THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Yes. Exercise, reading, Bridge, and I volunteer with my church to visit assisted living facilities, two of them.

THE COURT: And I think when you're on your cruise we're not going to be in session, so that doesn't -- that wasn't a problem for us.

All right. If you could pass the microphone over there.

Ms. Francis, whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Pompano Beach.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 26 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a dispatcher for an equipment rental company.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: Yes.

THE COURT: Friends, relatives or both?

PROSPECTIVE JUROR: Close family friends.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: Our cars at my family's house used to get broken into a lot.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Walking, sleeping.

THE COURT: Thank you.

If you could pass the microphone over to Mr. Gonzalez Ortiz.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Margate.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: Ten years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Well, I sell animal and training goods to the US Customs and Border Protection, law enforcement, military, and also for the shooter training.

THE COURT: Your marital status?
PROSPECTIVE JUROR: Single.
THE COURT: Ever serve on a jury?
PROSPECTIVE JUROR: Once.
THE COURT: State or federal court?
PROSPECTIVE JUROR: State.
THE COURT: Civil or criminal case.
PROSPECTIVE JUROR: Civil.
THE COURT: Were you the foreman?
PROSPECTIVE JUROR: Yes.
THE COURT: And did you reach the verdict?
PROSPECTIVE JUROR: Yeah.
THE COURT: Close friends or relatives who are policemen?
PROSPECTIVE JUROR: Yes.
THE COURT: Friends, relatives or both?
PROSPECTIVE JUROR: Friends.
THE COURT: Anybody been arrested?
PROSPECTIVE JUROR: No.
THE COURT: Victim of a crime?
PROSPECTIVE JUROR: No.
THE COURT: Witness to a crime?
PROSPECTIVE JUROR: No.
THE COURT: And do you have any hobbies?
PROSPECTIVE JUROR: Outdoors.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR: Thank you.

THE COURT: If you'd pass the microphone over to Mr. Bradley.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Wilton Manors.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: Five years.

THE COURT: Where are you from originally?

PROSPECTIVE JUROR: Palm Springs, California.

THE COURT: And what type of work do you do?

PROSPECTIVE JUROR: Travel agent.

THE COURT: We know about your spouse. Any children?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Softball.

THE COURT: Thank you, sir.

We'll move over to Mr. Garcia.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Cooper City.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 33 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a letter carrier with the United States Postal Service.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: She's a clerk at Miami-Dade State Attorney's Office.

THE COURT: The fact that she works at a prosecutor's office and there's prosecutors here from the federal government, is that going to affect your ability to be fair?

PROSPECTIVE JUROR: Probably.

THE COURT: You think that you're going to vote for the prosecutors because of where your wife works?

PROSPECTIVE JUROR: Yeah.

THE COURT: So if the prosecutors put on their case and they don't prove anything, you're still going to find somebody guilty?

PROSPECTIVE JUROR: Oh, we need to see. We need to see.

THE COURT: Exactly.

So right now, if I sent you back right now, what would your verdict be?

It's a trick question.

PROSPECTIVE JUROR: Yeah.

THE COURT: It's a trick question.

PROSPECTIVE JUROR: Yeah, yeah.

THE COURT: Your verdict is not guilty, Mr. Garcia, because they're presumed to be innocent. They're innocent, and that innocence would only leave them in the jury room at the end of the trial during your deliberations if you're convinced beyond a reasonable doubt that the Government has proved each and every element of a crime beyond a reasonable doubt.

So at this point, they're innocent. Can you view them innocent now? Or are you saying, Well, my wife works for the prosecutors, I'm going to side with the prosecutors?

PROSPECTIVE JUROR: No, no. It's okay. We need to see what's going on.

THE COURT: Do you have any children?

PROSPECTIVE JUROR: A daughter.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yeah.

THE COURT: What does she do?

PROSPECTIVE JUROR: She live in Texas. She's on human traffic there. She's working on San Antonio.

THE COURT: Ever served on a jury before?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No, sir.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No, sir.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No, sir.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Traveling.

THE COURT: Thank you, sir.

If you'd pass the microphone back there to Ms. Arquillano.

PROSPECTIVE JUROR: Arquillano.

THE COURT: Arquillano, okay. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: I'm from Davie, sir.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: Around 19 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm an open heart nurse.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: He's a nurse, too.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: How many?

PROSPECTIVE JUROR: I have three.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: What do they do?

PROSPECTIVE JUROR: One is a medical assistant. The other one is a full-time college student.

THE COURT: Ever serve on a jury before?

PROSPECTIVE JUROR: No, sir.

THE COURT: Close friends or relatives who are law enforcement officers?

PROSPECTIVE JUROR: No, sir.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No, sir.

THE COURT: Victim of a crime?
PROSPECTIVE JUROR: No, sir.
THE COURT: Witness to a crime?
PROSPECTIVE JUROR: No, sir.
THE COURT: Any hobbies?
PROSPECTIVE JUROR: Cooking, baking.
THE COURT: Thank you, ma'am.
PROSPECTIVE JUROR: Thank you.
THE COURT: We'll move over to Ms. Portuhondo.
PROSPECTIVE JUROR: Yes.
THE COURT: Whereabouts in Broward County do you live?
PROSPECTIVE JUROR: Yes, Miramar.
THE COURT: Where do you live in Broward County? What city?
PROSPECTIVE JUROR: Miramar City.
THE COURT: Miramar, okay. And how long have you lived in South Florida?
PROSPECTIVE JUROR: 19 years.
THE COURT: What type of work do you do?
PROSPECTIVE JUROR: ACI Hospital.
THE COURT: I'm sorry?
PROSPECTIVE JUROR: What? Can you repeat for me, please?
THE COURT: What type of work do you do?
PROSPECTIVE JUROR: Oh, when I go to work?

THE COURT: Yeah.

PROSPECTIVE JUROR: ACI Hospital, nutrition department.

THE COURT: And how about your marital status? Are you married?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Retired.

THE COURT: What did your spouse used to do?

PROSPECTIVE JUROR: My husband? Retired.

THE COURT: Before he retired --

PROSPECTIVE JUROR: Before to retire, he got in the union.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes. One.

THE COURT: Does he or she work?

PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: She working assistant secretary in human resource.

THE COURT: Have you ever served on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: Excuse me?

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Traveling and cooking.

THE COURT: Thank you, ma'am.

If we can pass it over to Mr. -- is it Primmer?

PROSPECTIVE JUROR: Correct.

THE COURT: Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Coconut Creek.

THE COURT: And How long have you lived in South Florida?

PROSPECTIVE JUROR: 14 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a videographer.

THE COURT: Do you ever do stuff for lawyers in court?

PROSPECTIVE JUROR: No.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: She does communications for a detox

facility.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes.

THE COURT: How many?

PROSPECTIVE JUROR: Two.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR: I used to work in local news in Oklahoma, and we used to do undercover stuff with police officers all the time, so I witnessed crimes through that.

THE COURT: And do you have any hobbies?

PROSPECTIVE JUROR: Reading.

THE COURT: Thank you, sir.

If you can pass it over to Mr. Mundle. Whereabouts in Broward County do you live? Ms. Mundle, I'm sorry.

PROSPECTIVE JUROR: I live in Sunrise.

THE COURT: Where?

PROSPECTIVE JUROR: Sunrise.

THE COURT: And How long have you lived in South Florida?

PROSPECTIVE JUROR: Four years.

THE COURT: Where are you from originally?

PROSPECTIVE JUROR: Queens, New York.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I work for a commercial real estate special servicer in -- based out of Washington. I work a part-time job and I'm a full-time student.

THE COURT: What are you studying?

PROSPECTIVE JUROR: Business. Business.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Recently divorced, again.

THE COURT: And what did this spouse do for a living?

PROSPECTIVE JUROR: He's a flight attendant.

THE COURT: Any children?

PROSPECTIVE JUROR: Two.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: No. Fourteen and nine.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: Friends.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: My oldest daughter's father is currently incarcerated on murder charges.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: And do you have any hobbies?

PROSPECTIVE JUROR: Surviving the week.

THE COURT: Thank you, ma'am. If you'd pass the microphone over to Mr. McGhee.

Whereabouts in Broward County do you live, sir?

PROSPECTIVE JUROR: Miramar.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 25 years.

THE COURT: And you're an accountant or --

PROSPECTIVE JUROR: Accounting, yeah, tax season.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I'm single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: Yes.

THE COURT: Friends, relatives, or both?

PROSPECTIVE JUROR: Friends.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: I have for DUI.

THE COURT: Anybody been a victim of a crime?

PROSPECTIVE JUROR: Car stolen.

THE COURT: Ever witnessed a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Exercise and reading.

THE COURT: Thank you, sir.

We'll move over to Ms. -- is it Swett?

PROSPECTIVE JUROR: Yes.

THE COURT: And whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Plantation.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 17 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a premium audit, billings.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Logistics manager for an environmental services company.

THE COURT: Any children?

PROSPECTIVE JUROR: Yes.

THE COURT: How many?

PROSPECTIVE JUROR: One.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: Yes.

THE COURT: In state or federal court?

PROSPECTIVE JUROR: State, criminal case.

THE COURT: Were you the foreperson?

PROSPECTIVE JUROR: No.

THE COURT: Did you reach a verdict?

PROSPECTIVE JUROR: I was an alternate, so I don't know.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: Yes. I have a DUI over 20 years ago. And my husband had a DUI, I want to say 30 years ago.

THE COURT: Close friends or relatives who are police officers?

PROSPECTIVE JUROR: Friends.
THE COURT: Anybody been the victim of a crime?
PROSPECTIVE JUROR: No.
THE COURT: Ever witnessed a crime?
PROSPECTIVE JUROR: No.
THE COURT: Any hobbies?
PROSPECTIVE JUROR: Softball and golf.
THE COURT: Thank you. We'll move over to Mr. Olsen. Whereabouts in Broward County do you live?
PROSPECTIVE JUROR: Fort Lauderdale.
THE COURT: And how long have you lived in South Florida?
PROSPECTIVE JUROR: 37 years.
THE COURT: What type work do you do?
PROSPECTIVE JUROR: Equipment rental, sales.
THE COURT: How about marital status?
PROSPECTIVE JUROR: Married.
THE COURT: What does your spouse do?
PROSPECTIVE JUROR: Lobby membership renewal sales.
THE COURT: Any children?
PROSPECTIVE JUROR: Yes.
THE COURT: How many?
PROSPECTIVE JUROR: Two.
THE COURT: Old enough to work?
PROSPECTIVE JUROR: Yes.

THE COURT: What do they do?

PROSPECTIVE JUROR: Hedge fund business development and spirits industry, marketing and sales.

THE COURT: Ever serve on a jury before?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: Father-in-law who is retired Secret Service.

THE COURT: Anybody been the victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: How about witness a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Family, exercise, travel.

THE COURT: Thank you, sir. We'll come over to the other side of the courtroom, and we'll start with Mr. Amaya. Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Live in Coral Springs.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 12 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a sales engineer.
THE COURT: Your marital status?
PROSPECTIVE JUROR: Married.
THE COURT: What does your spouse do?
PROSPECTIVE JUROR: She's a dentist.
THE COURT: Any children?
PROSPECTIVE JUROR: One, girl.
THE COURT: Old enough to work?
PROSPECTIVE JUROR: Yes. She works as entrepreneurship and influencer.
THE COURT: Ever serve on a jury?
PROSPECTIVE JUROR: No.
THE COURT: Close friends or relatives who are policemen?
PROSPECTIVE JUROR: No, sir.
THE COURT: Anybody been arrested?
PROSPECTIVE JUROR: No.
THE COURT: Victim of a crime?
PROSPECTIVE JUROR: No.
THE COURT: Witness to a crime?
PROSPECTIVE JUROR: No.
THE COURT: Any hobbies?
PROSPECTIVE JUROR: Tennis, cycling, music.
THE COURT: Thank you.
PROSPECTIVE JUROR: Welcome.

THE COURT: We'll move over to Ms. Batlle.

PROSPECTIVE JUROR: Batlle.

THE COURT: Batlle. And whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Weston.

THE COURT: How long have you lived in South Florida?

PROSPECTIVE JUROR: 14 years, but not consecutively.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: I'm a second grade teacher.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: I'm married.

THE COURT: What does your spouse do?

PROSPECTIVE JUROR: Graphic design for commercial real estate.

THE COURT: Any children?

PROSPECTIVE JUROR: Two.

THE COURT: Old enough to work?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Family, reading, travel.

THE COURT: Thank you. If you'd pass the microphone over to Ms. Montana.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Deerfield Beach.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: 14 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: IT consultant.

THE COURT: Your marital status?

PROSPECTIVE JUROR: Divorced.

THE COURT: When you were married, what did your spouse do?

PROSPECTIVE JUROR: Marketing sales.

THE COURT: Any children?

PROSPECTIVE JUROR: No.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are

policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Yoga and sunrise watching.

THE COURT: And, finally, if we can move over to Mr. Selvan.

Whereabouts in Broward County do you live?

PROSPECTIVE JUROR: Weston.

THE COURT: And how long have you lived in South Florida?

PROSPECTIVE JUROR: About 23 years.

THE COURT: What type of work do you do?

PROSPECTIVE JUROR: Just graduated. Looking for employment.

THE COURT: What were you studying?

PROSPECTIVE JUROR: Finance.

THE COURT: How about your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Ever serve on a jury?

PROSPECTIVE JUROR: No.

THE COURT: Close friends or relatives who are policemen?

PROSPECTIVE JUROR: No.

THE COURT: Anybody been arrested?

PROSPECTIVE JUROR: No.

THE COURT: Victim of a crime?

PROSPECTIVE JUROR: No.

THE COURT: Witness to a crime?

PROSPECTIVE JUROR: No.

THE COURT: Any hobbies?

PROSPECTIVE JUROR: Reading.

THE COURT: Thank you, sir.

All right. Some of you have sat on civil juries. Some of you sat on criminal juries. And there's a difference between a civil case and a criminal case.

In a civil case, whoever proves they're more right than the other side wins. They're usually fighting about money or property rights. So if I was the lady of the scales of justice in a civil case, if you just tip the scales a little bit, then you win the case.

In a criminal case, it's a lot different. The defendants, as we have been talking about, are presumed to be innocent. That presumption stays with them the whole trial. The burden to prove the case is entirely on the Government.

The defendants have no burden at all. Their lawyers have no burden at all other than to be here and behave; and I'm sure they're going to do that.

So the burden is entirely on the Government to prove the case and they have to prove it beyond a reasonable doubt which is the highest standard of proof that exists in American law.

When we get to the end of the case, I'm going to read you some instructions on the law and I will tell you what the law is. In doing so, I will explain to you that there are different elements of a crime. Let's say there are four elements to a crime. The Government has to prove all four of them, and they have to prove them beyond a reasonable doubt before you return a verdict of guilty. If they prove three out of four, that's not good enough. That's a not guilty verdict.

So does everybody understand the difference between a civil case and a criminal case, the burden of proof, the presumption of innocence?

Anybody have any problems with following that law?

If so, please raise your hand.

I don't see any hands.

Those of you who sat on trials in the past, did you have a negative experience with your jury duty that something happened where -- you found out something afterwards or -- and you said to yourself, "Gee, I hope I never serve on a jury

again"?

Anybody ever have any negative experience with their jury duty? If so, please raise your hand.

And we talked about that already, Ms. Reano, I think. Reano -- is there an "O" at the end, Reano?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. I'm sorry. Some of you have been arrested, have relatives that have been arrested. Is there anybody sitting here right now that is still upset about the way they were treated by the criminal justice system? And maybe it wasn't a full-scale arrest. Maybe it was just a traffic ticket or speeding ticket, and the police officer was particularly nasty to you.

All right. I've got a hand there from Ms. Depass Russell. And what happened with you, Ms. Depass Russell?

PROSPECTIVE JUROR: Because of my medical condition, I have gotten pulled over before; and because I'm so thin and I really can't gain weight. I -- it's never, "Is there drugs in the car." It's, "Do you have crack cocaine in the car?" So I have been targeted. And also, I'm 100 percent Jamaican, and I have been pulled over with my friends that are of darker skin color, and the way we were treated were both very different because I don't look like I'm black. So I -- and my family, my mom, my sisters, they have a hard time.

My sisters should have been taken away from my mother,

and they weren't. And because of that they've had several abortions and had babies taken away from them for, like, heroin in their system, and so the system failed.

THE COURT: So how is that going to affect your ability to be fair in this case?

PROSPECTIVE JUROR: I don't trust the system.

THE COURT: All right. So let's say you're selected as a juror in this case, and you hear the case, and you're convinced, beyond a reasonable doubt, that one or both of the defendants are guilty. Would you find them not guilty because you don't trust the system?

PROSPECTIVE JUROR: It would be hard. It would have to be 100 percent, no reasonable doubt, like just --

THE COURT: Well, 100 percent, no reasonable doubt maybe not be --

PROSPECTIVE JUROR: It's the same thing, you're correct.

THE COURT: It may not be the same thing. In other words, there's no reasonable doubt. You can have a doubt, but it can't be a reasonable doubt. So it might not be 100 percent. I don't want to put a percentage on it.

But if they prove the case beyond a reasonable doubt, do you think that you might not find them guilty because you don't trust the system?

PROSPECTIVE JUROR: It would be hard because I'm very

tainted.

THE COURT: I appreciate your candor, Ms. Depass Russell.

Anybody else that's had a negative experience with the judicial system or courts or police officers? If so, please raise your hand.

All right. I've got another hand out there from -- let's see. Is that Ms. Stanciu?

PROSPECTIVE JUROR: Stanciu. Yes. Just with me and my family were in a car, and we were driving, minding our own business to a concert, and this person that seemed it was drugged or something hit our car and continued just running. So you know, we report it. And then when we got called into court, the police didn't show up. So because of them not showing them, we end up having to repair our own car, and nothing was ever done, and I feel just -- we were treated unfairly by the system.

THE COURT: And how do you think that's going to affect your ability to be fair in this case?

PROSPECTIVE JUROR: I'll be upset. You know, I'm upset at the system, you know, but -- you know. Because it was an unjustice to us that -- you know, my car is still not fixed, so how is this me -- not clouding my judgment? Maybe. I just have a strong resentment towards them.

THE COURT: So who are you going to hold it against?

Are you going to hold it against the defendants or the Government?

PROSPECTIVE JUROR: Obviously, the Government.

THE COURT: So because of -- I assume this was a local police officer that didn't show up? It wasn't an FBI agent or some type of federal agent that didn't show up in court?

PROSPECTIVE JUROR: So assuming that the federal agent would not show up, maybe this person that did the crime would walk free because they assumed that --

THE COURT: Well, if --

PROSPECTIVE JUROR: He did not show up.

THE COURT: If none of the Government's witnesses show up here, then the Boyds are going to be found not guilty.

PROSPECTIVE JUROR: I'm sorry?

THE COURT: If none of the Government witnesses show up here, then the Boyds will be found not guilty.

Do you understand that? Because the burden is on the Government. Just like the burden was on the police officer in your traffic case to show up.

PROSPECTIVE JUROR: Yeah.

THE COURT: He failed.

PROSPECTIVE JUROR: Yeah.

THE COURT: If the Government --

PROSPECTIVE JUROR: He set the other person free, and just -- I got the damage, you know. Nobody cared about me.

They care more about that person because he was too busy to show up.

THE COURT: So, again, I'm trying to understand how that is going to affect your ability to be fair, how that's not apples and oranges to what you're asked to do here. And that is, decide if the Government has satisfied its burden and proven its case beyond a reasonable doubt.

PROSPECTIVE JUROR: I just feel for them failing to show up did damage to myself and -- I don't know. You asked if we had a problem with that. I do because --

THE COURT: And I appreciate that.

PROSPECTIVE JUROR: -- I got the damage and nobody took care of my problem. The other person was set free so...

THE COURT: And I appreciate your candor. I'm just trying to understand the fact that you weren't treated fairly by, I guess, a state county court judge somewhere is going to make you unfair to who? The defendants or to the Government? Or you just don't want to be here and you're unfair to everybody?

PROSPECTIVE JUROR: I don't think a person here wants to be here but -- you know.

THE COURT: I want to be here.

PROSPECTIVE JUROR: Besides you. I don't know. I'll be just -- I'm pleased generally being here.

THE COURT: Thank you for your candor.

Anybody else had a negative experience with the judicial system or police officers? If so, please raise your hand.

Don't see any hands.

Some of you have been the victims of crime, and maybe the crimes never got solved. Ms. Stanciu is certainly not happy with the way she was victimized.

Is there anybody here that's going to hold it against the Government in this case because maybe the police officers did a lousy job in your case? If so, please raise your hand.

I don't see any hands.

Maybe you were the victim of a crime and it never got solved and you're saying to yourself, Well, they never caught the guy that victimized me. The Boyds are here, I'm going to take it out on them and find them guilty. Anybody thinking that way? If so, please raise your hand.

Don't see any hands.

Some of you have witnessed crimes, and there are going to be witnesses that come in here and testify. And sometimes they are asked tough questions on cross-examination. The lawyers have an ethical obligation to do that.

Is there anybody here that's going to be identifying with a witness or feeling sorry for the witness and allowing that to affect their ability to be fair? If so, please raise your hands.

Don't see any hands.

Some people have religious, moral or philosophical beliefs that make it difficult for them to serve on a criminal case. They feel that it's up to a higher authority to judge. And it's okay to feel that way, but we just need to know that.

Is there anybody here that's going to say, I can't decide this case because of religious, moral, or philosophical beliefs? If so, please raise your hands.

Don't see any hands.

Now, this case was investigated by the FBI and the Department of Health and Human Services. Has anybody ever had any negative or positive contacts with agents from those two agencies? If so, please raise your hand.

Don't see any hands.

Does anybody here have any connection to or work in or close family members who work in the pharmaceutical industry? If so, please raise your hand.

Okay. I have got a hand over there from Mr. Sullivan.

PROSPECTIVE JUROR: Sullivan.

THE COURT: Sullivan. Tell me about your connection to the pharmaceutical industry.

PROSPECTIVE JUROR: I did an internship in high school at a local pharma company as a bookkeeper.

THE COURT: Anything about that that's given you special insight into the industry?

PROSPECTIVE JUROR: I understand how it works, yes.

THE COURT: And let's say that you hear testimony in the case and you say, I don't think that's the way it works. I'm going to rely on my own knowledge of how it works. Are you going to do that, or are you going to listen to the testimony and evaluate it?

PROSPECTIVE JUROR: I would be impartial.

THE COURT: Okay. Thank you, sir.

Okay. And that is Ms. Montana.

PROSPECTIVE JUROR: Montana, yes. Yes, I used to work in a -- as a pharmaceutical sales.

THE COURT: And do you think that would affect your ability to be fair?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, ma'am.

Anybody else that has a connection to the pharmaceutical industry?

I don't see anybody else.

Anybody else that has any involvement with HIV prescription drugs? If so, please raise your hand.

Okay. I've got some hands over here.

Yes. Mr. McCool, anything about the fact that this case --

PROSPECTIVE JUROR: Medication, they prescribed the wrong pill that can run about 700 bucks. A whole bottle for 30

is $2,100. Three months, about 33-, $3,400. That's a lot of money for people to be spending on medication when other people are stealing it.

THE COURT: Right. And the allegations in this case, which are just allegations, are that the defendants were involved in diverted HIV drugs. Is that going to affect your ability to be fair?

PROSPECTIVE JUROR: Not necessarily. But if they're stealing it and giving it away from free and other people have to pay for it --

THE COURT: If the Government proves they did something wrong, that's one thing. What I'm driving at is if the Government doesn't prove it, is your experience with the drugs going to affect your ability to be fair and maybe give --

PROSPECTIVE JUROR: No.

THE COURT: -- the Government a little advantage?

PROSPECTIVE JUROR: No, no, not at all.

THE COURT: Thank you, Mr. McCool.

There as somebody else. And that's Mr. Ibarra. How about you, your familiarity with HIV drugs, is that going to affect your ability to be fair?

PROSPECTIVE JUROR: Yeah, I'm HIV positive for 20 years. And because of that, I've been taking medicine for the condition that results in bone damage from the side effects of the medicine. So I have two hip replacements already done.

And I'm apparently a candidate for a shoulder replacement now because of the bone damage of drugs for HIV.

THE COURT: So what do you think that is going -- how is that going to affect your ability to decide whether the Government has proven its case or not?

PROSPECTIVE JUROR: I don't know that part. I mean, I hear the word HIV and if I have any connection with that, and that's why I raised my hand.

THE COURT: Well, and that's what -- but I need to ask you.

PROSPECTIVE JUROR: Yes.

THE COURT: I appreciate you raising your hand.

PROSPECTIVE JUROR: Yes.

THE COURT: But the fact that you've had involvement with HIV drugs and there's been negative aspects, is that going to cause you to be less favorable to the defendants? Is that going to cause you to be less likely to give them the benefit of the presumption of innocence?

PROSPECTIVE JUROR: Yeah, I don't know because I didn't really understand what the case is. I understand it's a drug -- it's something with drugs or medicine, but I don't really know what the situation is.

THE COURT: Okay. So, let's say that you hear the whole case and you understand what the case is about. You understand what they were charged with, but the Government just

doesn't prove it. Do you think that you would find them guilty because you don't like the way the drugs have been done in the past? Or is my explanation in English confusing to you?

PROSPECTIVE JUROR: Yeah, it's confusing.

THE COURT: Okay. Thank you, Mr. Ibarra.

Anybody else that has any involvement with or opinion on diverted prescription IV -- HIV drugs? If so, please raise your hand.

Don't see any hands.

Other than the couple people that have talked about that, who else has had personal experience dealing with people who suffer from HIV? If you could raise your hand.

Okay. I've got a hand there from Ms. Rivera-Abdo and -- let's do Ms. Rivera-Abdo first. And what's your experience with that?

PROSPECTIVE JUROR: Only that my cousin has HIV positive. She has been for 40 years.

THE COURT: Anything about that that would affect your ability to be fair?

PROSPECTIVE JUROR: No.

THE COURT: Thank you, ma'am. Let's see. We had another hand from Ms. Depass Russell.

PROSPECTIVE JUROR: The answer is no, but I don't want to talk about it.

THE COURT: Okay.

PROSPECTIVE JUROR: It won't affect me.

THE COURT: The next one is Mr. Aguerrevere.

PROSPECTIVE JUROR: Aguerrevere.

THE COURT: It's easy for you to say.

PROSPECTIVE JUROR: My brother-in-law had HIV, but he's already passed.

THE COURT: Anything about that that would affect your ability to be fair?

PROSPECTIVE JUROR: No, not at all.

THE COURT: Out there in the audience, we have got a hand there from -- is it Mr. Hawkins?

No?

In that second, Mr. Humes, did I say that right?

PROSPECTIVE JUROR: Yeah. Some of my closest friends have tested for being positive for HIV, so -- but I don't think I would be impartial. Well, I think I would be impartial and hear the case.

THE COURT: Thank you, Mr. Humes.

PROSPECTIVE JUROR: Thank you.

THE COURT: Anybody else that has a connection with somebody with HIV?

I don't see any other hands.

By a show of hands, how many people have purchased drugs on the internet? If you could just raise your hand if you purchased drugs on the internet.

All right. So that's Ms. Ezzell?

PROSPECTIVE JUROR: Yes.

THE COURT: Anybody else who's purchased drugs on the internet? I don't see any -- oh, I've got another.

All right. And that's Ms. Depass Russell.

I think that was Mr. Ibarra.

Okay. Is that Mr. Hawkins? No.

So Mr. Merchant. Okay, Mr. Merchant's purchased drugs on the internet.

Give me a second. Is that Mr. Gonzalez? No. Maybe that's Mr. Bradley? I'm missing here.

Mr. Garcia? No.

Could you give him the microphone so we can figure out who he is because my chart is not helping me?

THE COURTROOM DEPUTY: Bradley.

THE COURT: It is Bradley.

THE COURTROOM DEPUTY: Yes.

THE COURT: All right. Mr. Bradley has purchased drugs on the internet.

Anybody else that I haven't mentioned their name.

Okay. I don't see anybody else's hand.

Does anybody here have exposure to the supply chain of prescription drugs in the United States? If so, please raise your hand.

I don't see any hands.

When we do select a jury in this case, I'm going to be giving them some preliminary instructions. And one of the instructions is that you're not to discuss the case or allow it to be discussed in your presence. You're not allowed to do independent research. You have to make your decision based on the law and the facts that you hear here in this courtroom. You know, the testimony comes from the witness stand. The law comes from me. And you're not allowed to, you know, Google and do independent research or try to find out stuff on their own.

Does everybody understand the role that you have in this case is that the evidence and the law has to be said in this courtroom? It can't be something that you bring in from the outside.

In fact, I allow you to have your cell phones now. I will allow the jury to have their cell phones during the trial except during deliberations. During deliberations, I'll collect the cell phones, give them back to you when you're done. But I don't want anyone attempting to Google some questions or try to get answers from outside the courtroom.

If you have a question, you can always write down the question and send it out. I'll talk to the lawyers and see if we can answer it.

But does everyone understand that you can't be independently investigating or being a detective in the case? Everybody understand that?

All right. After we're done with all the questioning, I'm going to get together with the lawyers and we'll pick the jury. The way that works is kind of a process of elimination. And sometimes when I announce the names of the 12 jurors and the alternates and then excuse everybody else to go on back home, one of the people will raise their hand and say, Gee, Judge, I didn't think I was going to get picked, I can't be fair. So then I've got to have Terry run to the elevator and grab everybody and bring everybody back and start all over again.

So is there anything best known to yourself as to something that you think you couldn't be fair and that we need to know about that we haven't already talked about? It's kind of like speak now or forever hold your peace.

Okay. I've got a hand there from Ms. Jackson-Clarke.

PROSPECTIVE JUROR: It's not necessarily I can't be fair thing, but more of I don't know if I will be able to be here every day because of my children situation.

THE COURT: Right.

PROSPECTIVE JUROR: That's it. Between my children and my mother, I can't guarantee every day.

THE COURT: Well, you've got to pick up your kids at 4:00, right?

PROSPECTIVE JUROR: Oh, no. I pick up my kids at 2:45.

THE COURT: Oh, 2:45.

PROSPECTIVE JUROR: The night nurse comes to take over for my mother at 4:00.

THE COURT: Okay.

PROSPECTIVE JUROR: Yeah.

THE COURT: That's a good point. Thank you, Ms. Jackson-Clarke.

Anybody else that has something that we haven't talked about that we need to discuss about their ability to be fair?

Ms. Ezzell.

PROSPECTIVE JUROR: I'm not sure how much it would affect it, but I just feel like I should mention that I said my boyfriend is a federal agent with commerce. Before he worked with commerce, he did work with the FDA, which I didn't know him at that time. He has talked a little about it and the things that he can say, but I just feel like I should say that. I don't know that it would affect me, but I just thought it was important.

THE COURT: We need to know whether it's going to affect you because the FDA is involved in this. So if --

PROSPECTIVE JUROR: I'm going to say I don't think so, but I just felt like since it was kind of pertinent it should be said.

THE COURT: I appreciate that.

And let me just quibble with you a little bit on your answer. A couple of questions. One, if you listen to the case

and the Government doesn't prove the case, do you think you're going to be thinking, How am I going to tell my boyfriend that I found somebody not guilty on an FDA case?

PROSPECTIVE JUROR: I'm not going to be worried about that.

THE COURT: All right. The second thing is, you say that you don't think it's going to affect you. Say you're getting on a plane and you're going to Los Angeles and you're about to take off and the pilot comes on the plane and he says, you know, Thank you for flying American Airlines, and it should be a six-hour flight to Los Angeles. Looks like a smooth flight. I think we're going to be able to land the plane.

We kind of need to know if you can be fair or not. So what do you think?

PROSPECTIVE JUROR: I would be fair.

THE COURT: Thank you, ma'am.

That Mr. Diaz. What else do we need to know, Mr. Diaz?

PROSPECTIVE JUROR: Okay. It's not that I can't be fair. I am 100 percent here. The only thing is, like I told you, I live by myself. My dog is already a senior. Right now she's doing great, but sometimes she gets a condition where I have to be feeding here like every hour little amounts, and I have no one to take care of her.

THE COURT: How often does that happen?

PROSPECTIVE JUROR: Let's say in the last three months

it's been twice that I have to be with her, like, for a week, or she would end up not eating, vomiting blood, so I would have to take care of her, but right now she's doing great.

THE COURT: All right. The lawyers can take that into account, Mr. Diaz. I appreciate you mentioning that.

And we have another hand back in the back from -- I think that is Mr. McGhee.

PROSPECTIVE JUROR: Again, it's not that I couldn't be fair, but if I was selected, like I mentioned before, I'm an accountant; and I'm the primary pretty much in my company. And I probably would have to do it, but it would be very difficult. I have clients with extensions to the 15th. If I don't meet their deadlines, they could get penalized.

THE COURT: I appreciate you mentioning that. And as I indicated before, it's a hardship to a varying degree on jurors, and the lawyers have heard that, and they can take that into account in deciding whether to select you.

I think we've got another hand there from Mr. Medina up here in the second row, Terry.

PROSPECTIVE JUROR: It's not that I can't be fair. It's I just got a message from my parents saying that I have court on the 8th of October. So I don't know if that's going to be effective against me or not to be a juror.

THE COURT: Do you know what time on October the 8th you have court?

PROSPECTIVE JUROR: I believe it's at ten.

THE COURT: So we'll either get that court thing changed for you if you're on the case, and if you're not -- if you're a juror and we can't get it changed, then we'll not be in recess that morning.

PROSPECTIVE JUROR: All right.

THE COURT: Okay. All right. Sometimes after you've heard everybody else's answers, it kind of jogs something about your answer. Maybe you forgot something or you want to amplify on your answer, because you are under oath.

Is there anybody here that needs to add or change or modify their answer? If so, please raise your hand.

I don't see any hands.

So I think we're ready for the Government to make its inquiry.

MR. POGOZELSKI: Thank you, Your Honor.

Good afternoon, ladies and gentlemen. I know you had no choice in being here; but we obviously -- both the Government, and I'm sure defense counsel and defendants appreciate you coming here, because this is a very important process. And all we're trying to do is pick a jury that is impartial, as the Judge has said.

And so when I start asking you questions, I might be selecting particular jurors. I'm not trying to pick on you. We're just trying to get a little more information about your

background.

So if I could -- again, I'm not trying to pick on you; but if I could ask, Ms. Montana, I believe you worked in -- I think over there, Number 65. I believe you said you worked in pharmaceutical sales, right?

PROSPECTIVE JUROR: Yes, I did.

MR. POGOZELSKI: Is that in the past or is that currently?

PROSPECTIVE JUROR: It's in the past. I worked with GlaxoSmithKline.

MR. POGOZELSKI: GlaxoSmith and Kline?

PROSPECTIVE JUROR: Yeah.

MR. POGOZELSKI: And what kind of -- you know, what kind of products were you selling for GlaxoSmithKline.

PROSPECTIVE JUROR: Yeah. One of my programs is in respiratory therapies, and we were selling in a -- I was involved in an educational program for respiratory medicine.

MR. POGOZELSKI: Got it. And who were your prospective customers that you would approach as a pharmaceutical sales representative?

PROSPECTIVE JUROR: Yeah. Medical on the -- pediatricians and also anybody involved on their respiratory system.

MR. POGOZELSKI: Okay. Thank you, Ms. Montana.

Ms. Warren, I believe you said you're from Atlanta; is

that right?

PROSPECTIVE JUROR: Originally from New York. Lived in Atlanta.

MR. POGOZELSKI: Lived in Atlanta.

PROSPECTIVE JUROR: Yeah.

MR. POGOZELSKI: Just curious. Where did you live in Atlanta? I was there for a few years.

PROSPECTIVE JUROR: Lived east out in Covington --

MR. POGOZELSKI: Vokay.

PROSPECTIVE JUROR: -- for years.

MR. POGOZELSKI: Got it. Got it. You had said that you collect watches as a hobby.

PROSPECTIVE JUROR: I do.

MR. POGOZELSKI: So what kind of watches do you collect?

PROSPECTIVE JUROR: I have everything from Movados to Raymond Weils. I'm trying to upscale as I make more money, you know.

MR. POGOZELSKI: Got it. And kind of generally speaking, where do you find these collectors or special watches that you collect?

PROSPECTIVE JUROR: Jared Jewelers. Different places that I travel. Every time I -- if I go on vacation somewhere, I usually buy a watch. That's my take-away. So --

MR. POGOZELSKI: Right.

PROSPECTIVE JUROR: Every island I've been to, I bought a watch.

MR. POGOZELSKI: I think you mentioned Jared Jewelers as an example.

PROSPECTIVE JUROR: Yes.

MR. POGOZELSKI: When you buy a watch from Jared Jewelers, do they give you any kind of, like, documentation or certificate of authenticity or anything like that?

PROSPECTIVE JUROR: Yeah, plus a warranty, yeah.

MR. POGOZELSKI: Plus the warranty. And from your perspective as a collector of these watches, are those types of documents important?

PROSPECTIVE JUROR: Absolutely.

MR. POGOZELSKI: Why are they important?

PROSPECTIVE JUROR: You sell me a watch and I come back home and it doesn't work, I got to be able to call somebody. And, hey, it's still under warranty. It's manufactured. Make sure that it's authentic. So, yeah, it's important.

MR. POGOZELSKI: Right. And I take it you haven't -- well, maybe you have. But have you bought any of these kinds of expensive or luxury watches from any, say, for example, a street vendor if you're traveling to Bermuda?

PROSPECTIVE JUROR: No.

MR. POGOZELSKI: No?

PROSPECTIVE JUROR: No. I buy real watches. Not

street watches.

MR. POGOZELSKI: Okay. Why not?

PROSPECTIVE JUROR: It's easier for me to go back to a JR Bull in the Bahamas and say, Hey, I bought this watch from you, than it is to find whoever on the street and say, Hey, show me the authenticity, show me the paperwork. People on the street don't have real watches.

MR. POGOZELSKI: So if the people on the street don't have the paperwork, does that make you question the legitimacy or where they got the watches?

PROSPECTIVE JUROR: I've never attempted to buy one, but I wouldn't just for that reason.

MR. POGOZELSKI: Okay. Understood. Thank you, Ms. Warren.

PROSPECTIVE JUROR: You're welcome.

Mr. Hawkins, I believe that's Juror Number 26.

PROSPECTIVE JUROR: Yes.

MR. POGOZELSKI: Obviously, I'm very sorry to hear about your experience; and I don't want to pry, so you don't have to answer any of my questions if you don't want to. But I think you had mentioned your experience was with supplements. This case does not have to do anything with supplements. If it had to do with prescription drugs --

PROSPECTIVE JUROR: Understood.

MR. POGOZELSKI: -- would that -- would your experience

affect your ability to assess the evidence impartially and hold us, the Government, to our burden?

PROSPECTIVE JUROR: You would be held to your burden, yes.

MR. POGOZELSKI: You would. So you would be able to be impartial, listen to the evidence, and then after all the evidence is presented, render a verdict not favoring one side or the other; is that fair?

PROSPECTIVE JUROR: Yes.

MR. POGOZELSKI: Thank you.

Mr. Bradley, Juror Number 52.

Judge, will you let me know -- I think you said 20 minutes. Will you let me know when I'm running out of time?

THE COURT: I will do that.

MR. POGOZELSKI: Okay. Thank you, Judge.

Mr. Bradley, I think you had raised your hand about purchasing drugs on the internet.

PROSPECTIVE JUROR: Yes.

MR. POGOZELSKI: Just out of curiosity, what kind of --

PROSPECTIVE JUROR: Just our HIV meds.

MR. POGOZELSKI: What's that?

PROSPECTIVE JUROR: Our HIV meds.

MR. POGOZELSKI: HIV meds.

PROSPECTIVE JUROR: Yeah.

MR. POGOZELSKI: And were they from, like, an internet

pharma -- like, can you give us a little more detail on --

PROSPECTIVE JUROR: Walgreens.

MR. POGOZELSKI: Walgreens, I see.

So like, you ordered it from Walgreens and then they delivered it to you?

PROSPECTIVE JUROR: Correct, yes.

MR. POGOZELSKI: And, again, I don't mean to pry, so you don't have to answer any of my other questions. But I think you had mentioned your husband takes Biktarvy -- or sorry. Yeah, your husband takes Biktarvy and you take Descovy. Are those -- are those important medications for you guys?

PROSPECTIVE JUROR: Yes, they are. Yes. That's his HIV meds and that's my Prep.

MR. POGOZELSKI: Okay thank you. Thank you very much, sir.

PROSPECTIVE JUROR: You're welcome.

MR. POGOZELSKI: Ms. Reano. Hi.

PROSPECTIVE JUROR: Hi.

MR. POGOZELSKI: I think you had mentioned that you had served on about three juries before; is that right?

PROSPECTIVE JUROR: No. This would be the third.

MR. POGOZELSKI: This would be the third, okay. And I think you had mentioned that the prior experience was stressful and caused some mental health.

PROSPECTIVE JUROR: It was a criminal issue and --

well, the people that were involved, they were kind of violent outside of the room. And then one of the -- there was this lady that went to the -- the last two days of the jury, she went to the room -- to the courtroom and she kept looking at me -- looking at me and I'm almost positive she was a shoplifter at my store. So she knew me, but I wasn't sure that she was there.

MR. POGOZELSKI: I see.

PROSPECTIVE JUROR: So I was part of the jury, but thank God I was the alternative, so they let me go. And the whole situation was -- I was alternate.

MR. POGOZELSKI: Right. And you said thank God you were an alternate.

PROSPECTIVE JUROR: Yeah.

MR. POGOZELSKI: Why do you say that?

PROSPECTIVE JUROR: Because I wasn't sure if she was the lady and I was really afraid because the person that she was with, it was the one that was going to be pretty much guilty, so we were going to be there, so the whole situation got me --

MR. POGOZELSKI: I see.

PROSPECTIVE JUROR: -- really stressed out. And it was just the fact that you're in the room, it was -- it was pretty stressful for me.

MR. POGOZELSKI: So is it fair to say it wasn't

necessarily the criminal trial itself. It was the juror and the -- and then a violent --

PROSPECTIVE JUROR: It was the whole thing. It was the whole thing. People were fighting outside the room at some point and then they had to start covering us. So I mean, I'm not used to that and the whole situation was really bad on me.

MR. POGOZELSKI: And do you think that will -- do you think those experiences or that experience would affect your ability to be impartial?

PROSPECTIVE JUROR: I have terrible anxiety in me, and I went to the doctor and even talked to my doctor about it. She said it probably was the whole situation I was going through. So I was not expecting to go through this again. I mean, I'm not going to say I'm never going to do it, but it's just the fact that it's been really like --

MR. POGOZELSKI: Right. And did you talk to your doctor about the fact that you were called in?

PROSPECTIVE JUROR: Yeah, yeah. I talked to the doctor about that.

MR. POGOZELSKI: And did the doctor give any kind of recommendation?

PROSPECTIVE JUROR: I mean, you know, if I can go through therapy or something like that, because it was really -- I mean, I don't know how to explain how bad it was, but it was bad.

MR. POGOZELSKI: I understand. I will stop asking about it. I'm sorry you had that experience.

PROSPECTIVE JUROR: Thank you. Thank you.

MR. POGOZELSKI: If we could talk to -- I think is it Ms. Stanciu -- I'm sorry about that. I'm sorry. First of all, that you had a bad experience with law enforcement. It sounds like it's lingered with you for a while now.

If an agent -- a federal agent testifies in this case, would you inherently distrust that federal agent with the experience with -- your prior experience with police kind of lead you to inherently not believe what a law enforcement officer says on the stand?

PROSPECTIVE JUROR: I don't think so.

MR. POGOZELSKI: You don't think so.

Okay. And you mentioned you might have some biases against the Government or the system in general.

PROSPECTIVE JUROR: It was just upsetting to me that just the person that did what they did and ran away did not -- I mean, they were there at the court. It's just the State did not show up. Therefore, they got dismissed and I got to pay --

MR. POGOZELSKI: You suffered the consequences.

PROSPECTIVE JUROR: -- for what they did.

MR. POGOZELSKI: Right. Would you be able to put those aside in this case?

PROSPECTIVE JUROR: Yes. I'm not going to stay mad at

people.

MR. POGOZELSKI: You would be able to?

PROSPECTIVE JUROR: I'm sorry?

MR. POGOZELSKI: You would be able to put that experience aside or not?

PROSPECTIVE JUROR: I believe so, yeah. I'm not going to stay and make somebody that didn't do something say that he's guilty just because I suffered that. I just thought it should be known that I was not happy with the system.

MR. POGOZELSKI: Okay, understood. Thank you.

Mr. Kelly, I think that's -- do I have that wrong? Remind me what -- what kind of work you do, Mr. Kelly.

PROSPECTIVE JUROR: Auto parts.

MR. POGOZELSKI: Auto parts. Okay, so my notes were correct. I got a little nervous there.

Do you -- you know, kind of, generally, do you sell auto parts?

PROSPECTIVE JUROR: I work at a dealership, Kia dealership and I'm their back counter parts guy.

MR. POGOZELSKI: Got it. And in that sales -- I'm sorry. You said what about the back?

PROSPECTIVE JUROR: Back counter for our garage.

MR. POGOZELSKI: Okay. Are you making or trying to make sales directly to customers or assisting the sales department? How does it work?

PROSPECTIVE JUROR: I mean, there's a little bit of that, but not completely. I deal mostly with mechanics in our dealership.

MR. POGOZELSKI: Got it. Thank you.

Let's see. I guess by a show of hands -- this might be a pretty stupid question, but is anyone here a mind reader?

Okay. And if I could just ask, Mr. Grey, since you said you're not a mind reader, are there ways that you are able to tell what someone might be thinking or intending to do even though you can't read directly into their mind?

PROSPECTIVE JUROR: No.

MR. POGOZELSKI: No? So if I kind of rolled up a ball of paper and you saw me go over and throw it directly at Special Agent Zayas, even though you weren't seeing and reading directly into my mind, would my actions indicate what I was intending to do?

PROSPECTIVE JUROR: Yes.

MR. POGOZELSKI: So -- and what about words? If I say something, is that another indication of what could be in my mind?

PROSPECTIVE JUROR: Yes.

MR. POGOZELSKI: Okay. So you would agree that even though we can't -- no one can read someone's mind, there are many ways that you can see what they intend to do by their actions, by their words? And what about the context

surrounding those words and actions?

PROSPECTIVE JUROR: I think that's the most important part.

MR. POGOZELSKI: That's the most important part, okay. Thank you.

And then another general question for everybody here. Does anyone feel like in a criminal case like this, you would need to hear from everyone on the witness stand, you know, everyone whose name is mentioned or involved in any way, you would need to hear from all of them before you could render a verdict or render a verdict of guilty?

Basically, you need to hear from every single person potentially involved in any of the allegations before you could render a verdict of guilty?

All right. I see no hands.

And the Government, Department of Justice, we are intending to call what is typically termed cooperating witnesses. And what these cooperating witnesses are, in essence, they pled guilty to a federal crime and they are often, usually testifying pursuant to a plea agreement, with the hope of receiving some sort of benefit, a reduction in their sentence as a possibility. The Judge could decide that they deserve a reduction in their sentence.

Is there -- is there anyone here, by virtue of that type of witness's guilty plea and the fact that they've already

pleaded guilty to federal criminal activity, that you would just take all their -- put all their testimony aside? They're a criminal. They pleaded guilty. I don't believe a word they say. Is there anyone who would view a cooperating witness in that fashion?

PROSPECTIVE JUROR: I would have doubt.

MR. POGOZELSKI: Yeah, sure.

PROSPECTIVE JUROR: They are trying to get something out of that.

MR. POGOZELSKI: Of course. And the Judge will instruct you that those types of witnesses should be viewed with more caution, but would you just disregard the testimony entirely?

PROSPECTIVE JUROR: I would doubt it.

MR. POGOZELSKI: You would have some doubt or you would -- okay. Would you need to see some sort of evidence that might --

PROSPECTIVE JUROR: Yeah.

MR. POGOZELSKI: -- support their testimony?

PROSPECTIVE JUROR: Absolutely.

MR. POGOZELSKI: Okay, understood. Thank you.

Anyone else?

I see you nodding your head.

All right. I think -- can you tell us about that?

PROSPECTIVE JUROR: If you're there when something

happens, you are supposed to be at fault for it. You shouldn't say I'm going to get a lesser -- I'm going to get a -- cut a deal because I'm speaking first. No. You were there. You should be held responsible like everybody else.

MR. POGOZELSKI: So I guess, I'm just trying to understand that you -- that because you were there and committed the crime with potentially other people, there should be no reduction or potential reduction if you decide to accept responsibility and then testify against others?

PROSPECTIVE JUROR: Suppose their crimes were worse.

MR. POGOZELSKI: Right. So if they're cooperating against someone that they directed to do things, then that would be, I guess, problematic from your perspective in terms of --

PROSPECTIVE JUROR: Yes.

MR. POGOZELSKI: Yeah, understood. Thank you. Thank you for your candor.

And I guess other than Ms. Warren, has anyone else here purchased any items, you know, collectibles, expensive luxury goods that come with some sort of certificate of authenticity?

All right. I'll pick on you --

PROSPECTIVE JUROR: Rivera-Abdo.

MR. POGOZELSKI: Sorry about that, Ms. Rivera-Abdo, tell us about -- tell us what -- just give us an example of an item.

PROSPECTIVE JUROR: My husband collects sports memorabilia. They always come with a certificate of authenticity.

THE COURT: And do you share Ms. Warren's feelings about the importance of those certificates of authenticity?

PROSPECTIVE JUROR: Oh, yes. Because at some point, we might want to sell them at a greater value when Dan Marino dies. We have a couple of those.

MR. POGOZELSKI: Fair enough. Fair enough. Look, we all die at some point, so -- and yeah.

PROSPECTIVE JUROR: Yeah.

MR. POGOZELSKI: And in terms of reselling the item, why is that certificate of authenticity important from your perspective?

PROSPECTIVE JUROR: Because it is certifying that that is his signature and it is of value. Otherwise, it could be counterfeit and it would be worthless.

MR. POGOZELSKI: Right. And does it also, kind of, prove where it came from, you know?

PROSPECTIVE JUROR: Oh, yeah. There's the bragging rights that he has with it. Of course.

MR. POGOZELSKI: Right. Unfortunately, I own some Chris Weber signed shoes, but I -- he did it in the locker room. I never got a certificate of authenticity. So thank you, Ms. Rivera-Abdo.

Another general question: Is there anyone here who views circumstantial evidence or just doesn't think circumstantial evidence really cuts it? And what I'm talking about that, you know, I think the easiest example to think of would be if you're locked in a warehouse all day, grinding away, doing work, and a coworker walks in, you know, their pants are kind of soaking wet beneath the knees, they have a wet umbrella, does that -- would that be enough for you to believe -- or is there anyone here that thinks that would be enough to believe that it's raining outside? If you could raise your hand.

Okay. Let's see. Remind me, anyone else here in sales?

PROSPECTIVE JUROR: Yes.

MR. POGOZELSKI: I saw a few hands, but I'll -- you were the first one, so I'll go ahead and ask you some questions.

What kind of sales?

PROSPECTIVE JUROR: It's typical sales. It's equipment for water treatment, pumping.

MR. POGOZELSKI: Got it.

PROSPECTIVE JUROR: Pumps.

MR. POGOZELSKI: And did -- were you -- were you in that sales job during COVID at all?

PROSPECTIVE JUROR: No. Not that same one, no.

MR. POGOZELSKI: Were you doing sales during COVID at all?

PROSPECTIVE JUROR: Yes.

MR. POGOZELSKI: Did that make it more difficult to sell?

PROSPECTIVE JUROR: Sure, because it limits your person-to-person visits, which is important in a sales job and it limits your traveling, also. So definitely.

MR. POGOZELSKI: Right. And the general business climate during COVID, kind of, made it more difficult to make sales. Is that -- did you have that experience?

PROSPECTIVE JUROR: It is a very technical sales what I do, so it was more the limiting on traveling and contact that they -- kind of make the situation --

MR. POGOZELSKI: Got it. So the -- right, the economic situation, it didn't necessarily affect. It was other factors about COVID.

PROSPECTIVE JUROR: Right, correct.

MR. POGOZELSKI: Thank you, sir.

THE COURT: That was Mr. Amaya for the record.

And your time has elapsed. If you wanted to ask one more question, you could.

MR. POGOZELSKI: I will not take any more time. Thank you very much, Your Honor. Thank you, everybody, for being so candid and sorry for prying.

THE COURT: Mr. Zimet.

MR. ZIMET: Mr. Barzee is going first.

THE COURT: Okay. Mr. Barzee.

MR. BARZEE: With the Court's permission. Thank you, Your Honor.

Again, thank you all for being here. Is it all right if I do it from here, Your Honor, as opposed to the podium?

THE COURT: Sure.

MR. BARZEE: I'm going to stand here, just so I can see everybody and I don't have my back to anyone.

So thank you all for being here. I know it's been a long day. On behalf of Patrick Boyd, we want to thank you for your attention and for your commitment to being here.

Serving on a jury is considered by many to be one of the highest ways that an individual can serve their community or their country. And it's -- it's moving to see you all here and it's appreciated.

So thank you for your time.

I would like to talk about some of the constitutional provisions that the Judge has already referred to a couple of times, but I think it's important enough for us to spend just a couple of minutes discussing them. And I'd like to know if anyone has a feeling inside where they, "Eh, I don't really agree with that." And -- and the first one is this idea of "presumption of innocence" and -- and let me explain to you why

I want to talk about this idea of the presumption of innocence.

Earlier this morning, the Judge read from an indictment. And the Judge said that the indictment was 17 or 18 pages and there were 7 or 8 different charges, different crimes that Charlie Boyd and Patrick Boyd are accused of.

So when you hear something like that, you hear that Patrick Boyd is charged with all of these different crimes and there's 17 or 18 pages of an indictment, is it realistic, is fair for us to ask you to, also at the same time, presume that Patrick Boyd is innocent of all of those charges?

You know that there's an indictment; right?

You know that we're here for a reason, that the Government has filed these charges. Is it -- is it possible for you to really put all of that aside and say, "Listen, as we sit here right here today, I'm going to assume -- I'm going to presume that Patrick Boyd is innocent of these alleged crimes"?

And let me just go through every -- well, first, let me just ask, in the front portion here, does anybody have difficulty with that concept?

I don't see any hands.

So let me -- I'm going to start picking on people then. Ms. Wilson, how do you feel about that when the Judge says he's charged with these, you know, 7 or 8 different crimes. There's 17 or 18 pages of an indictment. And by the way, you have to presume that he's innocent of all of that. Are you able to do

that?

PROSPECTIVE JUROR: Right. Yes, I'm able to do that. I think it's difficult, but it's the reality. And as a teacher, I have to hear lots of things all day, so -- and what makes sense and what doesn't, so...

MR. BARZEE: Thank you. I appreciate that.

Mr. McCool, how about you? How do you feel when -- when the Judge says to you 17, 18 pages of an indictment, all these different charges, but I want you to presume that he's innocent at this point.

PROSPECTIVE JUROR: It will be up to the State to determine if he did what he did was wrong.

MR. BARZEE: Right.

PROSPECTIVE JUROR: We won't know that until the end of trial. We can't do anything until we find out the facts.

MR. BARZEE: And prior to hearing those facts, you're okay presuming that he's innocent of these charges?

PROSPECTIVE JUROR: We don't know the facts right now, so we won't know that until the end. So at that point, this -- yes, he would be innocent until the State proves him guilty.

MR. BARZEE: Excellent.

And you mentioned that it's the State. In this case, it's the federal government that would have the burden of proving that; right?

PROSPECTIVE JUROR: Because they're the ones bringing

the charges against him.

MR. BARZEE: Correct. Because they're -- thank you. Because they're the one bringing the charges.

So that's a very important point that Mr. McCool makes. And that is that Patrick Boyd and Charlie Boyd, for that matter, his attorney, Mr. Zimet, and I and Ms. Mantilla, we don't have a burden here.

What does that mean? That means, theoretically, we could sit here through the whole trial -- like the Judge said, as long as we behave ourselves, we could sit here for the whole trial and do absolutely nothing. Not ask a single question of a witness, not offer a piece of paper of evidence, not stand up and make any argument whatsoever. The entire case would depend on whether or not the Government has satisfied their burden of proof because they're the ones that are bringing the charges. And because under the constitution, they have to prove their case beyond and to the exclusion of every reasonable doubt.

Mr. Ibarra, would you have any difficulty with that, with holding the Government to that -- to that burden to say it's the Government's job to prove their case? And the defense, we don't have to prove anything here? Do you understand?

PROSPECTIVE JUROR: No.

MR. BARZEE: No. Having difficulties with language?

PROSPECTIVE JUROR: Yes.

MR. BARZEE: No problem. Understood. Let me -- that's okay. Let me ask you for a second. Is anyone else having language difficulties? Anyone else having difficulty understanding everything that's being said here in the courtroom?

No hands.

So just Mr. Ibarra is the only one who is having that difficulty? Yes?

Okay. So let's go to the back row over here. Ms. Ezzell, is it, the musician. Hello.

So what do you think about this concept that I'm talking about where it's the Government's obligation, it's their duty, it's their job to prove the case and we don't have to prove anything on this side of the room? Do you think that's okay with you?

PROSPECTIVE JUROR: Well, I've never been in this situation before. And I do find it odd that, in theory, you can just, kind of, sit there. I mean, like you were saying earlier with the 17 or 18 or so pages and then you have to say, "Okay, well, these people are inherently innocent." There is, sort of, a discordance between A and B, both being true, that there's these charges, but also we're going to assume they're innocent.

But I'm, kind of, looking at it like a movie where you don't know the full plot until you get to the end and you've

seen the whole thing. Like, you may have assumption of, Okay, we're in the third act, we're going to do this and that, but then it might not actually happen that way. So you don't know what the full thing is until you get to the end. So that's, kind of, how I'm looking at it.

MR. BARZEE: That's -- I love the way you put that. So if you were on the jury, you would be able to promise to us that you're not going to make that decision until you go back into the jury room, the Judge instructs you on the law, and that's when you're going to make your decision and not before that?

PROSPECTIVE JUROR: Correct.

MR. BARZEE: And prior to that moment in time when you go back into that jury room, you would be able to follow the law and presume that he's innocent and that it's the Government's job to prove their case?

PROSPECTIVE JUROR: Yeah.

MR. BARZEE: Thank you. Thank you. Let me go over to this side of the room and just pick on some people randomly.

Mr. Kelly.

PROSPECTIVE JUROR: Yes.

MR. BARZEE: You work at a car dealership, I think you said?

PROSPECTIVE JUROR: I do, yes.

MR. BARZEE: What dealership is it?

PROSPECTIVE JUROR: Kia.

MR. BARZEE: Oh, a Kia dealership, all right. I'm not going to ask you about Kia. I just -- I didn't write it down and I wanted to know. I used to sell cars many years ago, so that's -- that's why I was interested in it.

What do you think about this idea that we're talking about where defense really doesn't have to put on any case? We don't have to prove anything? It's all the Government's job. They're the ones that brought these charges. They're the ones that have to prove something to you.

PROSPECTIVE JUROR: Oh, it's innocent until proven guilty.

MR. BARZEE: Do you have any problem with that?

PROSPECTIVE JUROR: No.

MR. BARZEE: Thank you.

Ms. Spivack, what do you think about this idea? I mean, it's almost as though -- and I think it was -- I don't want to put words in your mouth, but -- but somebody over here was talking about how there's almost like a disconnect. You know -- you know one thing, but then you're thinking about another.

One way of putting it may be "where there's smoke there's fire." I mean, here the smoke is there's an indictment, 17, 18 page indictment, right. We're in a federal courtroom, federal judge. This must be serious. But at the

same time, you're told you got to presume that they're innocent.

PROSPECTIVE JUROR: I'd have to hear your side.

MR. BARZEE: You would have to hear our side?

PROSPECTIVE JUROR: Yes.

MR. BARZEE: And what if you didn't hear our side and you only heard from one side and it was the Government. But at the end of the Government's case, "Eh," you weren't completely convinced?

PROSPECTIVE JUROR: I don't know. I don't know because I want to hear both sides and both facts.

THE COURT: Ms. Spivack, what I was trying to say earlier is if the Government puts on all of its case and they didn't prove it, you have a reasonable doubt, would you find either of the defendants guilty because they didn't do anything? They have a constitutional right not to do something.

PROSPECTIVE JUROR: No.

THE COURT: They don't have a burden. So would you find them guilty --

PROSPECTIVE JUROR: No.

THE COURT: -- even though the Government didn't prove the case?

PROSPECTIVE JUROR: No, I wouldn't.

THE COURT: I'm sorry to interrupt.

MR. BARZEE: No, no, no. Thank you.

Thank you.

PROSPECTIVE JUROR: Uh-huh.

MR. BARZEE: Let me, let me -- I'm going to pick on you a little bit more, Ms. Spivack, if I may.

PROSPECTIVE JUROR: Sure.

MR. BARZEE: A corollary of that that the Judge did not mention, but will mention at the end of the trial most likely, is that Patrick Boyd, as he sits here today, has a right to remain silent, to not testify in his own defense. He's allowed to, if he wants to, but he doesn't have to. And the Judge is going to say at the end of this trial, if Mr. Boyd didn't take the stand, if he didn't take the stand to defend himself, you can't hold that against him because everyone has a right to remain silent and to say, "You know what, let the Government prove this. You're saying I'm guilty. Prove it."

How would you feel about that if Mr. Boyd did not take the stand and defend himself in the case?

PROSPECTIVE JUROR: I don't know how to say this, but my opinion, where there's smoke there's fire.

MR. BARZEE: Right.

PROSPECTIVE JUROR: So I -- you know, that's just -- I've been through a lot with my son who has had drug problems. And my way of thinking is -- you know, just -- it's just the way I feel.

MR. BARZEE: Listen, yeah, I don't think there's any reason to -- to feel guilt about that. I think it's human nature. And it's what we generally believe, where there's smoke there's fire. But the law is going to say otherwise.

The law is going to say we cannot assume that there's fire just because there's smoke.

You cannot assume that these two men are guilty just because the Government filed a piece of paper somewhere. You follow me?

So are you -- are you able to break away from that human nature that says, "Come on, of course, they did something," right? Like, that's human nature. Are you able to put that aside?

PROSPECTIVE JUROR: Honestly, I don't know.

MR. BARZEE: No, that's --

PROSPECTIVE JUROR: I'm being honest.

MR. BARZEE: Thank you, I appreciate that.

Does anyone have a doubt about their ability to do that, like Ms. Spivack, because it's not an easy thing that we're asking you to do. It really isn't.

THE COURT: Mr. Barzee, your time has elapsed. If you wanted to ask one more question, you could.

MR. BARZEE: Thank you. Is there anyone else who has a similar feeling as Ms. Spivack? Because we need to know. We need to know if you think deep down inside it's going to be

hard for me to do this, we need to know.

Yes, ma'am, thank you. I see a couple of hands in back. We'll get to you.

First row, go ahead.

PROSPECTIVE JUROR: I agree. I think it would be hard for me to put that aside. And I'm also, kind of, stuck on something said earlier that these witnesses that are cooperating, that means something has been done. Unless that whole list of witnesses are in cahoots together against these two gentlemen -- at least that's where my mind is right now.

MR. BARZEE: Right. So -- and that's fair and I appreciate that.

So, you know, the Judge is the one who is going to instruct you on the law. And the law is the law. It's from the constitution from over 200 years of Supreme Court decisions. It's how we formed our society.

It doesn't mean that everybody can follow every single point in it. So if you can't, we appreciate your honesty.

So do you think you would have significant difficulty presuming Mr. Boyd, Patrick Boyd is innocent despite the fact that the Government has indicted him and spends 17 or 18 pages doing so?

PROSPECTIVE JUROR: I think it would be challenging for me.

MR. BARZEE: Thank you. I appreciate that. I see some

other hands.

THE COURT: Mr. Barzee, your time has elapsed.

MR. BARZEE: Okay. Thank you, thank you.

THE COURT: Mr. Zimet.

MR. ZIMET: Let me just pick up. My name is Bruce Zimet. Let me just pick up on Mr. Barzee's question because we have time restrictions, but his question is so important. I think it's really important for us to hear if people had a response. Ma'am.

PROSPECTIVE JUROR: I think it was me.

MR. ZIMET: Okay, please. Ms. -- speak in the microphone because the Court Reporter, Trish, has to get everything down, so make sure what you say is loud and clear.

PROSPECTIVE JUROR: Yeah. It is hard, I guess, as a human, because I think the Government, they did their homework. I mean, it's -- I mean, 17 pages, they did their homework. So to -- for the -- for the defendant not to do anything like defend, it's hard for me because I think they did their homework. I believe that they have to be here and the indictment is because they have some proof.

THE COURT: Ms. Tiburcio.

PROSPECTIVE JUROR: Yes.

THE COURT: And I -- maybe I spoke too fast earlier, but the indictment is not evidence.

PROSPECTIVE JUROR: Okay.

THE COURT: It's not evidence at all. It's like a policeman giving you a traffic ticket. You may have been speeding. You may not have been speeding. There's no evidence to that. The evidence comes from the witness stand. So if you've heard all the witnesses, you've heard all the evidence, you have the 17 pages that isn't evidence; but when you listen to the evidence and the law, at the end of Government's case, they haven't proven their case, why would the defense have to do anything if the Government didn't prove the case beyond a reasonable doubt?

PROSPECTIVE JUROR: If they did not prove the case, yes, they don't have to.

THE COURT: Right. So what I'm saying to you is if the Government doesn't prove its case, would you find the defendant guilty because he didn't do anything or because he didn't testify?

PROSPECTIVE JUROR: Because they didn't prove the case.

THE COURT: They didn't prove the case, what's your verdict?

PROSPECTIVE JUROR: Not guilty.

THE COURT: Thank you. I'm sorry to interrupt, Mr. Zimet.

MR. ZIMET: Thank you, Judge.

And thank you for your candor in answering that. Anyone have a sense similar to that, that feeling? And it's

nothing wrong in saying because we need to know that now.

Listen, we're representing these two guys. Their lives are on the line in this case, so we need to make sure that we have your thoughts, so we can hear and understand where you're coming from.

PROSPECTIVE JUROR: If I can express that in certain terms.

MR. ZIMET: Of course.

PROSPECTIVE JUROR: You're one zero down. You're starting one goal down.

MR. ZIMET: Excuse me?

PROSPECTIVE JUROR: You're starting one goal down, so you need to prove in my mind that they really did their homework.

THE COURT: So can you put aside your soccer analogy and follow the constitution or do you think that the soccer analogy --

PROSPECTIVE JUROR: I will try -- I try to follow the constitution, to follow the law, but in my mind --

THE COURT: But the law is it's zero-zero.

PROSPECTIVE JUROR: I understand.

MR. ZIMET: So let me -- let me just follow up on that, all right. And I'm not picking on you, okay. But my job, okay, just got to make sure -- it's more than I'm going to try. We got to know that you can do it.

PROSPECTIVE JUROR: I've never been in this position, so I don't know.

MR. ZIMET: So you're uncertain whether you can do it.

Does anyone -- does anyone agree with that? They would try, but they just can't tell us that they will actually do it? Anyone else?

And this is important.

Thank you, sir.

So I heard Judge Dimitrouleas earlier tell us what the indictment was. If I gave each of you a quiz right now, how many of you think -- how many do you think you would pass? Let's say 50 percent correct as to what the indictment is about? How many think you would get that amount?

I don't see any hands. Anyone?

So we understand we're going to start the case. Judge Dimitrouleas is going to give us more information. But we have to know what was charged, what the actual crimes are that are charged.

One thing that Judge Dimitrouleas told you and spoke to you about today, with each of those counts, there's something called an intent to defraud. And you heard the prosecutor go through the question, "Well, you really don't know what's in anyone's head, do you? You can't read minds."

You remember that question?

And then you had -- and then he said in front of you,

if I had this piece of paper and I throw it at this agent, you know what's in my mind; right?

Well, that's in your mind or what's in a person's mind only if you know all the facts. So all you know is that he has a piece of paper and he throws it in that direction. Do you know whether this agent wanted him to throw it? Wouldn't you want to know whether the agent had his hands up to catch it?

So if they're trying to prove that he had some bad intent in his mind by getting this paper and throwing it in his direction, if you don't know what he was doing with his hands up to catch it, you don't know whether there's some bad intent in that person's mind.

Do you understand the difference between part of the facts and all of the facts?

I will use your conversation earlier. The Government did their homework. Well, how about if the Government doesn't give you all the facts that you need to know if the person had the proper intent or not?

Would you want to make a judgment about whether someone has been proved guilty or not if the Government has not provided all the facts necessary for you to make that determination that what they're claiming and saying happened really did in that way? Who would want all the facts?

You can raise your hands. It's not going to hurt you. Everyone wants to know all the facts? Yes? Yes?

Back here. Yes? Arms work, right?

Does anyone not want all the facts?

Could you make a decision about someone being proved guilty if the Government hasn't provided to you all the facts that you need to have to make that determination?

If they didn't give you all the facts, what would your verdict need to be?

JURY PANEL: Not guilty.

MR. ZIMET: Not guilty, right, because the Government has not done what they're required to do. And what they're required to do is what? Prove somebody guilty -- what are the magic words?

PROSPECTIVE JUROR: Beyond a reasonable doubt.

MR. ZIMET: Beyond a reasonable doubt.

Can we all say that together? Let's go. One, two, three: Beyond a reasonable doubt.

JURY PANEL: Beyond a reasonable doubt.

MR. ZIMET: That's what we're here about. Can they do that? Can they actually do that with proof in this case?

We're going to go through witnesses, and you're going to see --

MR. POGOZELSKI: Your Honor, where are the questions? This is an opening statement.

THE COURT: I think he's getting to a question.

MR. ZIMET: Okay.

MR. POGOZELSKI: Sure.

MR. ZIMET: We're going to hear witnesses in this case, and you're going to hear the Government present direct examination, and then we're going to be able to have cross-examination.

Are you going to be able to listen and digest all of the witnesses' testimony, both what the Government presents and our cross-examination of the Government witnesses? Will you be open-minded to do that? How many people will be open-minded?

Yes?

Anyone who would not be open-minded?

Okay.

I'm sorry.

So under those circumstances, when you hear all the evidence in the case, do you want to know what information, for instance, Charlie Boyd had when he made decisions in this case? Do you want to have all that information to know that?

Anyone not think you want all the information of what was in -- what facts Charlie Boyd had when he made decisions in this case?

So he made decisions in this case, and the Government is going to have all these decisions and they're going to say, "Oh, he had the intent to defraud." Do you want to know what Charlie Boyd knew, what he was being told, what he was being provided, what he was aware of when he made those decisions?

Who would want to have all that?

Pastor, what do you think?

PROSPECTIVE JUROR: You need to have all the information.

MR. ZIMET: And let's give the pastor the mic just for a second.

Running out of time, Judge?

THE COURT: You got a minute.

MR. ZIMET: So I got to talk fast.

When you say you would know -- you want to know all the facts -- and whose job is it to give you all the facts that you can prove -- or that you can reach a verdict of proof beyond a reasonable doubt that someone had a necessary intent? Whose job is that?

PROSPECTIVE JUROR: My understanding it's the Government's job to prove beyond a reasonable doubt.

MR. ZIMET: Anyone disagree with that? That's the Government's job.

At the end of the day, does everyone understand when you go back to deliberate, whoever is on this jury, the determination is going to be is it proved or not proved? Proved or not proved? And the proof is on who, everyone?

The Government.

And how much proof is required?

JURY PANEL: Beyond a reasonable doubt.

MR. ZIMET: Beyond a reasonable doubt.

All right. Let's get to work.

Thank you, Judge.

THE COURT: All right. We're going to take a ten-minute recess. Remember my admonition not to discuss the case or allow it to be discussed in your presence.

When you come back, I'm going to ask you to wait out in the lobby, and then you will take the exact same seat that you're sitting in right now. And at that point, we'll get together with the lawyers and pick the jury. We will see you back here in about ten minutes.

(Prospective jury exits the courtroom.)

THE COURT: We're outside the presence of the jury. If you want a few moments to confer, then we will bring the jury back in and we'll do the challenges at sidebar.

MR. ZIMET: Can we keep the room, Judge?

THE COURT: Yeah.

MR. ZIMET: Okay, thank you.

THE COURT: Yeah. We'll be in recess for five or ten minutes.

(Recess taken.)

(Prospective jury not present.)

THE COURT: We're back on the record. Both counsel for the defendants are present. Both defendants are present. I would propose doing any more challenges for cause at this

point, then bringing the jury in and doing the peremptories at sidebar. Is that acceptable to everybody?

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

MR. POGOZELSKI: Yes, sir.

THE COURT: Any other challenges for cause?

MR. POGOZELSKI: Juror Number 16, I think she has the kids, 2:45 p.m. every day.

THE COURT: Any objection to Ms. Jackson-Clarke?

MR. ZIMET: No, Judge.

MR. BARZEE: No objection.

THE COURT: All right. Grant the challenge for cause on Juror Number 16, Ms. Jackson-Clarke.

MR. POGOZELSKI: And then actually -- sorry to go back in order -- I also had Number 13, who didn't trust the system.

MR. ZIMET: We have no objection, Judge.

MR. POGOZELSKI: Okay.

MR. BARZEE: No objection.

THE COURT: All right. Grant the challenge for cause on Juror Number 13, Ms. Depass Russell.

MR. POGOZELSKI: And then Number 15, I think Mr. Ibarra has a language barrier.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: I grant the challenge for cause on Juror

Number 15, Mr. Ibarra.

MR. POGOZELSKI: I think we have next Juror Number 28. She was the one that had a bad experience with the police. She seems to keep that in the back of her mind.

MR. ZIMET: Judge, you did a great attempt to rehabilitate her, but she wouldn't answer your question; so we have no objection to cause.

MR. BARZEE: No objection.

THE COURT: I grant the challenge for cause on Juror Number 28, Ms. Stanciu-Marginean.

MR. POGOZELSKI: And then next we have 39, who is the sole provider for somewhere between six and eight children. It seems like a huge burden for him. Juror Number 39.

THE COURT: Mr. Sainpreux.

MR. POGOZELSKI: Yes. Cleveland Sainpreux, that's right.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: Grant the challenge for cause on Juror Number 39.

MR. POGOZELSKI: No further challenges for cause from the Government, Your Honor.

THE COURT: Mr. Zimet.

MR. ZIMET: So we want to challenge for cause Juror Number 15.

THE COURT: 15 is gone.

MR. ZIMET: Okay. I didn't cross it out. I'm sorry. As is 15 and 16; correct?

THE COURT: Yes.

MR. ZIMET: Juror Number 57.

MR. POGOZELSKI: No objection, Your Honor.

MR. BARZEE: No objection.

THE COURT: I will grant the challenge for cause on Juror Number 57, Mr. McGhee.

MR. ZIMET: Juror Number 60, Judge. This is a language issue, I think, with her.

MR. POGOZELSKI: She seemed to understand the questions, and she answered. I mean, I noticed an accent but --

THE COURT: I don't see it with Ms. Portuhondo, so I will deny the challenge on Juror Number 60.

MR. BARZEE: 53, Garcia.

THE COURT: What's the reason?

MR. BARZEE: Your Honor, this was -- Mr. Garcia has the wife with the prosecutor's office and was saying, Well, I probably won't be fair. I probably couldn't be fair. And then he says, "Well, I'm willing to see what would happen," but he was equivocal and never answered affirmatively that he could serve in a fair way. He never stated so unequivocally.

MR. POGOZELSKI: I mean, there were a lot of jurors who

were equivocating on a variety of questions. I mean, I hear Mr. Barzee's point.

MR. BARZEE: I mean, he said, "Probably. I probably can't be."

MR. POGOZELSKI: I'm sorry, was this the soccer? The goal? No.

THE COURT: No. Garcia is 53. He's a mailman.

MR. POGOZELSKI: Oh, the mailman, right. Because his wife worked in the prosecutor's office.

No objection, Your Honor.

THE COURT: Grant the challenge for cause on Juror Number 53, Mr. Garcia.

MR. BARZEE: We may have one more. I'm sorry.

Yeah, Juror Number 42, Ms. Spivack. She was the one that equivocated on her ability to presume them to be innocent.

MR. POGOZELSKI: I thought that when Your Honor was asking her questions, she was clearer on that point that she could follow the law.

THE COURT: I've got a reasonable doubt on Ms. Spivack, so I will grant the challenge for cause on Juror Number 42, Ms. Spivack.

Any other challenges for cause?

MR. BARZEE: Yes, Your Honor. Juror Number 26, Mr. Hawkins. He's the one who indicated that he had some problem with the supplements that he received.

THE COURT: Any objection to Mr. Hawkins?

MR. POGOZELSKI: Yes, Your Honor. When I specifically asked him if he could be impartial especially in a case not involving supplements, he said yes, and he was certain and unequivocal on his yes.

THE COURT: He was certainly pretty strident before that. I've got a reasonable doubt as to whether he could be fair. I will grant the challenge for cause on Juror Number 26, Mr. Hawkins.

Any other challenges for cause?

MR. ZIMET: No, Judge.

MR. BARZEE: No, Your Honor.

THE COURT: Okay. Let's bring in the jury.

(Prospective jury present.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. ZIMET: Yes.

MR. BARZEE: Yes, Your Honor.

THE COURT: All right. Approach the bench, sidebar.

(Sidebar.)

THE COURT: So the lawyers can see who is coming up. We forget any other challenges for cause?

MR. POGOZELSKI: We forgot Valentin, Judge.

THE COURT: Any objection to Valentin?

MR. ZIMET: No, sir.

MR. BARZEE: No objection.

MR. POGOZELSKI: No objection.

THE COURT: I will grant the challenge for cause on Juror Number 12, Mr. Valentin.

Any other challenges for cause?

MR. ZIMET: Not from Charles Boyd, Judge.

MR. BARZEE: Not from Patrick Boyd.

MR. POGOZELSKI: Not from the Government.

THE COURT: How about Juror Number 4, Ms. Pasetti, who has to leave by 3:45 on Tuesdays?

MR. ZIMET: That's one we deferred on before lunch, I think, Judge.

MR. POGOZELSKI: That's pretty early. Was that --

THE COURT: Every Tuesday.

MR. POGOZELSKI: Yeah, I think the Government would move to strike for cause.

MR. BARZEE: No objection on behalf of Patrick Boyd.

MR. ZIMET: No objection from Charles Boyd.

THE COURT: I will grant the challenge for cause on Juror Number 4, Ms. Pasetti.

Any peremptory challenges through Juror Number 21, Ms. Tiburcio, Mr. Pogozelski?

MR. POGOZELSKI: Can you give me the numbers one more time, Your Honor?

THE COURT: The first 12 jurors through Juror Number 21

is Ms. Tiburcio.

MR. POGOZELSKI: Yes. 1 and 3, Jurors Number 1 and 3.

THE COURT: Okay. So you're going to strike Ms. Wilson, Number 1. And Mr. McCool, Number 3.

MR. POGOZELSKI: Yes.

THE COURT: That puts us through Juror Number 23, Ms. Hammond.

Mr. Zimet.

MR. ZIMET: We would strike Reano, Judge, Number 9.

THE COURT: Who?

MR. ZIMET: Number 9.

THE COURT: Reano, okay. That puts us through Juror Number --

MR. ZIMET: I did one.

THE COURT: Now, we're going through Diaz.

Mr. Barzee.

MR. BARZEE: Number 6, Your Honor.

THE COURT: Number 6 is Hyacinthe.

And then we're up through Number 27, Mr. Merchant.

Mr. Pogozelski.

MR. POGOZELSKI: We'll move to strike Number 23.

THE COURT: 23 is Ms. Hammond.

That puts us up through Juror Number 299, Ms. Villanueva.

Mr. Zimet.

MR. ZIMET: Juror 21 we strike, Judge.

THE COURT: So that's Ms. Tiburcio.

That puts us to Juror Number 30, Mr. Siegrist.

Mr. Barzee.

MR. BARZEE: Number 22, Your Honor, strike.

THE COURT: That is Rivera-Abdo.

That puts us up to Juror Number 32, Mr. Kelly.

Mr. Pogozelski.

MR. POGOZELSKI: Move to strike 32.

THE COURT: 32, okay. That puts us up to 33, Mr. Humes.

Mr. Zimet.

MR. ZIMET: Number 19, Judge.

THE COURT: Ms. Ezzell.

That puts us up to Juror Number 34, Ms. Araiza.

Mr. Barzee.

MR. BARZEE: Number 20.

THE COURT: Ms. Villanueva.

That puts us up to Juror Number 36, Ms. Castillo.

Mr. Pogozelski.

MR. POGOZELSKI: No strikes.

THE COURT: Mr. Zimet.

MR. ZIMET: Castillo.

THE COURT: You're going to strike Castillo?

MR. ZIMET: Yes. 36.

THE COURT: That puts us up to 38, Mr. Carella.
Mr. Barzee.
MR. BARZEE: We can go back; correct?
THE COURT: Yes.
MR. BARZEE: Number 27.
THE COURT: That's Mr. Merchant.
That puts us up to Number 40, Ms. Pascual.
Mr. Pogozelski.
MR. POGOZELSKI: Move to strike Number 40, Ms. Pascual.
THE COURT: That puts us up to Juror Number 41, Mr. Sargeant.
Mr. Zimet.
MR. ZIMET: I will strike Sargeant, Judge.
THE COURT: So that's 41, Sargeant.
MR. POGOZELSKI: Number 41?
THE COURT: Yeah, he just struck him.
So we're up to 45, Mr. Lee Miller.
Mr. Barzee.
MR. BARZEE: I apologize. Give me one second, Judge. We're up to?
THE COURT: 45.
MR. BARZEE: 30, Your Honor.
THE COURT: That's Siegrist.
That puts us up to Juror Number 46, Ms. Wongsam.
Mr. Pogozelski.

MR. POGOZELSKI: No strikes.
THE COURT: Mr. Zimet.
MR. ZIMET: Give me one moment, please, Judge. Sorry. Up to what number, Judge?
THE COURT: 46, Ms. Wongsam.
MR. ZIMET: Strike 46, Judge.
THE COURT: We're up to 47 -- 48, Ms. Schultz. Mr. Barzee.
MR. BARZEE: Strike.
THE COURT: You're going to strike Ms. Schultz?
MR. BARZEE: Yes.
THE COURT: So 48 is stricken. Now we're up to 49, Ms. Francis?
Mr. Pogozelski.
MR. POGOZELSKI: Move to strike 49, Ms. Francis.
THE COURT: We're up to 50, Mr. Gonzalez Ortiz. Mr. Zimet.
MR. ZIMET: Strike 50.
THE COURT: We're up to 52, Mr. Bradley. Mr. Barzee.
MR. BARZEE: We're going to strike.
THE COURT: Going to strike Bradley?
MR. BARZEE: Yeah.
THE COURT: Bradley, Number 52. That puts us up to Number 55, Mr. Olsen.

Mr. Pogozelski.

MR. POGOZELSKI: No strikes.

THE COURT: Mr. Zimet.

MR. ZIMET: One moment, please, Judge.

MR. BARZEE: Your Honor, how many strikes do we have left?

THE COURT: Defense has used 14.

MR. BARZEE: I'm sorry. What number are we on?

THE COURT: Olsen we're on.

MR. BARZEE: Olsen, 55, strike.

THE COURT: That puts us up to Swett, Juror Number 56.

Mr. Pogozelski.

MR. POGOZELSKI: No strikes.

THE COURT: Mr. Zimet.

MR. ZIMET: Strike Swett.

THE COURT: 56. That puts us up to 58, Ms. Mundle.

Mr. Barzee.

MR. BARZEE: Strike 58.

THE COURT: That puts us up to 59, Primmer.

Mr. Pogozelski.

MR. POGOZELSKI: No strikes.

THE COURT: Mr. Zimet.

MR. ZIMET: I want to make sure we have who we have.

THE COURT: At this point we have got Number 10, Aguerrevere; Number 11, Grey; Number 14, Medina; Number 17;

Musial; Number 18, Lopez; Number 20, Warren; Number 33, Humes; 34, Araiza; Number 38, Carella; Number 46, Wongsam; and Number 59, Primmer; and Number 60, Portuhondo. Is that 60 the last one, Crystal?

THE COURTROOM DEPUTY: That's what I have.

THE COURT: I think it's Portuhondo. 46, I think is still on, Wongsam.

MR. BARZEE: I thought we struck her. Did you strike her?

THE COURTROOM DEPUTY: That's what I have.

MR. BARZEE: Bruce, did, or one of us.

MR. ZIMET: Yes.

THE COURT: So who struck Wongsam?

THE COURTROOM DEPUTY: Defense.

THE COURT: I know, but which one?

MR. BARZEE: I have it as Bruce.

MR. ZIMET: I'll take it.

THE COURT: So that we've got 10, Aguerrevere; 11, Grey; 14, Medina; 17, Musial; 18, Lopez Guevara; 20, Warren; 24, Diaz; 33, Humes; 34, Araiza; 38, Carella; 50 is gone. 59, Primmer; and 60, Portuhondo.

THE COURTROOM DEPUTY: What about 45?

THE COURT: 45 was struck, I think.

So I think we are up to Portuhondo. So whose turn is it?

MR. BARZEE: Strike.

THE COURT: Who are you striking?

MR. BARZEE: Portuhondo.

MR. POGOZELSKI: Which number was that?

THE COURT: 60. So that puts us up to Arquillano.

Mr. Barzee.

MR. BARZEE: No strikes.

THE COURT: Mr. Zimet.

MR. ZIMET: Strike 61.

THE COURT: So how many strikes is that?

So that gives you one strike left, Mr. Barzee, and puts us up to 63, Selvan.

Mr. Pogozelski.

MR. POGOZELSKI: We would move to strike 63.

THE COURT: Then we're not going to get a jury, gentlemen.

MR. ZIMET: We have one strike left.

THE COURT: You have one strike left. I have to figure out how many the Government has. They struck Selvan. How many strikes does the Government have?

MR. POGOZELSKI: We have five.

THE COURT: You used more than five. You used seven you mean?

MR. POGOZELSKI: Used seven, yes, sorry.

THE COURTROOM DEPUTY: Correct.

THE COURT: So that puts us up to Montana.

Mr. Barzee.

MR. BARZEE: Accept.

THE COURT: Mr. Pogozelski.

MR. POGOZELSKI: No strikes.

THE COURT: If there's no back-strike, those would be the jurors. We have two left. If you want to pick those two as an alternate, we can swear the jury.

MR. POGOZELSKI: The Government is fine with those two alternates, Your Honor.

THE COURT: I don't think I'm comfortable going with one alternate.

MR. BARZEE: Maybe we back-pick someone we struck.

THE COURT: Okay. Is Batlle acceptable, Mr. Barzee?

MR. BARZEE: Acceptable.

THE COURT: So Batlle will be our first alternate. See if you can pick somebody that was struck to be the second alternate.

I didn't think I counted right. So we've got Aguerrevere, Number 10; Grey, Number 11; 14's Medina; 17's Musial; 18 is Lopez; 20 is Warren; 24 is Diaz; 33 is Humes; 34 is Araiza; 36, Castillo.

THE COURTROOM DEPUTY: I have Castillo 36 as being struck by defense.

THE COURT: Defense did strike Castillo, okay.

THE COURTROOM DEPUTY: Your numbers are correct I believe, Judge.

THE COURT: So we're up seven, eight, nine.

PROSPECTIVE JUROR: We're going to use Olsen as the second alternate by agreement of the parties.

THE COURT: Where is Olsen at?

MR. ZIMET: 55.

THE COURT: You want to go check with your clients and see if that's okay and then come back up?

MR. BARZEE: Yes, sir.

MR. ZIMET: Let me just make sure.

MS. DEROVANESIAN: And we confirm the list.

MR. ZIMET: 10, 11, 14, 17, 18, 20, 24, 33, 34.

MR. POGOZELSKI: 38, 59, 60.

MS. DEROVANESIAN: I think 60 is struck.

MR. ZIMET: 60 is struck.

MS. DEROVANESIAN: 38, 59.

THE COURT: And 65, Montana.

MR. ZIMET: Twelve. And two alternates are Batlle.

THE COURT: Batlle will be one and Olsen will be the second one.

MR. ZIMET: May we do that, Judge?

THE COURT: Yeah. Go check with them.

MR. ZIMET: May we approach, Judge?

THE COURT: Yes.

MR. ZIMET: Your Honor, on behalf of Charles Boyd, I conferred with him, and the jury is acceptable as constituted and discussed at sidebar.

MR. BARZEE: I've spoken with Patrick Boyd, and he accepts the jury as constituted.

MR. POGOZELSKI: The Government will accept.

THE COURT: Okay. Good job.

(Open Court.)

THE COURT: Members of the jury, we've selected 12 jurors and the 2 alternates that are going to serve on this case. If your name is not called, you're excused with the Court's thanks; and I imagine this is going to conclude your jury service for this week. I can't imagine they're going to call you in for tomorrow.

But if you would, give the marshal your badge on the way out. But the 14 jurors that will serve on this case and that I will ask to remain in their seats are Mr. Aguerrevere, Mr. Grey, Mr. Medina, Ms. Musial, Mr. Lopez, Ms. Warren, Mr. Diaz, Ms. Humes, Ms. Araiza, Mr. Carella, Mr. Primmer, Ms. Montana. The first alternate is Ms. Batlle and the second alternate is Mr. Olsen.

So if you 12 jurors can remain in their seats. The other jurors are excused with the Court's thanks.

We're missing someone? Do we have 14?

MR. ZIMET: We're good, Judge.

THE COURT: Mr. Grey, you wanted to say something to the lawyers.

PROSPECTIVE JUROR: Yes.

THE COURT: Let's get a microphone for him. Hold on.

PROSPECTIVE JUROR: I'm sorry for the mistake, but I just got an email at 3:35 that I was invited to Miami Fashion Week. So the preparation for the shows are going to take pretty much the whole remaining days of this month and the whole month of October, and it's very important for my career because I'm an independent worker. So...

THE COURT: We let everybody go, Mr. Grey. You're on the panel. When we get closer, maybe we can excuse you and move up an alternate. I've only got two alternates. This is something that I said before --

PROSPECTIVE JUROR: No, but like I say, I received the email just at 3:35. It was not confirmed.

THE COURT: You should have been aware of that when you came in here at 9:00 this morning, and certainly when I said that the case is going to take a month. So you're on the panel. All right. Let's -- we can get the microphone back.

We're going to rearrange everybody just a little bit. If we can have Mr. Aguerrevere move over one seat.

Mr. Grey, move over one seat. Mr. Medina, if you can come down and take the third seat from the right.

Ms. Musial, the fourth seat from my right. Mr. Lopez

Guevara, the fifth seat from my right. Ms. Warren, the sixth seat from my right. And the last seat in the front row is Mr. Diaz.

First seat in the back row is Mr. Humes. Second seat is Ms. Araiza. Third seat is Mr. Carella. Fourth seat is Mr. Primmer. Fifth seat is Ms. Montana. Sixth seat is Ms. Batlle, and the last seat is Ms. Olsen.

If we could swear in the jury.

(The jury was impaneled and sworn.)

THE COURT: Please be seated.

All right. Members of the jury: Now that you have been sworn, I need to explain some basic principles about a criminal trial and your duties as jurors.

These are preliminary instructions. At the end of the trial, I will give you more detailed instructions.

It will be your duty to decide what happened so you can determine whether the defendants are guilty or not guilty of the crimes charged in the indictment. At the end of the trial, I will explain the law that you must follow to reach your verdict. You must follow the law as I explain it to you even if you do not agree with the law.

You must decide the case solely on the evidence presented here in the courtroom. Evidence can come in many forms. It can be testimony about what someone saw or heard or smelled. It can be an exhibit admitted into evidence. It can

be someone's opinion. Some evidence proves a fact indirectly such as a witness who saw wet grass outside and people walking into the courthouse carrying wet umbrellas. Indirect evidence, sometimes called circumstantial evidence is simply a chain of circumstances that proves a fact. As far as the law is concerned, it makes no difference whether evidence is direct or indirect. You may choose to believe or disbelieve either kind. And you should give every piece of evidence whatever weight you think it deserves.

Certain things are not evidence and must not be considered. I will list them for you now.

One, statements and arguments of the lawyers. In their opening statements and closing arguments, the lawyers will discuss the case, but their remarks are not evidence.

Two, questions and objections of the lawyers. The lawyers' questions are not evidence. Only the witnesses' answers are evidence. You should not think something is true just because a lawyer's question suggested that it is. For instance, if a lawyer asks a witness, "You saw the defendant hit his sister, didn't you?" That question is no evidence whatsoever of what the witness saw or what the defendant did unless the witness agrees with it.

There are rules of evidence that control what can be received in evidence. When a lawyer asks a question or offers an exhibit and a lawyer on the other side thinks that it is not

permitted by the Rules of Evidence, that lawyer may object.

If I overrule the objection, then the witness may answer or exhibit received. If I sustain the objection, then the question cannot be answered and the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question and try not to guess what the answer would have been. Sometimes I may order that evidence be stricken and that you disregard or ignore the evidence. That means when you are deciding the case, you must not consider that evidence. Some evidence is admitted for only a limited purpose. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and no other.

In reaching your verdict, you have to decide what testimony to believe and what testimony not to believe. You may believe everything a witness says or part of it or none of it.

In considering of testimony of any witness, you may take into account:

One, the opportunity and ability of the witness to see or hear or know the things testified to;

Two, the witness's memory;

Three, the witness's manner while testifying;

Four, the witness's interest in the outcome of the case

and any bias or prejudice;

Five, whether other evidence contradicted the witness's testimony;

Six, the reasonableness of the witness's testimony in light of all the evidence; and

Seven, any other factors that bear on believability.

I will give you additional guidelines for determining credibility of witnesses at the end of the case.

As you know, this is a criminal case. There are three basic rules about a criminal case that you must keep in mind.

First, the defendants are presumed innocent until proven guilty. The indictment against the defendants brought by the Government is only an accusation. Nothing more. It is not proof of guilt or anything else. The defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the Government until the very end of the case. The defendants have no burden to prove their innocence or present any evidence or to testify.

Since the defendants have the right to remain silent and may choose whether to testify, you cannot legally put any weight on a defendant's choice not to testify it is not evidence.

Third, the Government must prove the defendants' guilt beyond a reasonable doubt. I will give you further instructions on this point later, but bear in mind that the

level of proof required is high.

Our law requires jurors to follow certain instructions regarding their personal conduct in order to help assure a just and fair trial. I will now give you those instructions.

One, do not talk either among yourselves or with anyone else anything related to the case. You may tell the people with whom you live and your employer that you are a juror and give them information about when you will be required to be in court, but you may not discuss with them or anyone else anything related to the case.

Two, do not at any time during the trial request, accept, agree to accept, or discuss with any person any type of payment or benefit in return for supplying any information about the trial.

Three, you must promptly tell me about any incident that you know of involving an attempt by any person to improperly influence you or any member of the jury.

Four, do not visit or view the premises or place where the charged crimes were allegedly committed or any other premises or place involved in the case.

And you must not use internet maps, or Google Earth or any other program or device to search for a view of any location discussed in the testimony.

Five, do not read, watch, or listen to any accounts or discussions relating to the case which may be reported by

newspapers, television, radio, the internet or any other news media.

Six, do not attempt to research any fact, issue or law related to this case, whether by discussions with others, by hardware or internet research or by any other means or source.

In this age of instant electronic communication and research, I want to emphasize, in addition to not talking face-to-face with anyone about the case, you must not communicate with anyone about this case by any other means, including by telephone text messages, email, internet chat, chat rooms, blogs, or social networking websites, such as Myspace, Facebook, or Twitter.

You must not provide any information about the case to anyone by any means whatsoever, and that includes posting information about the case or what you were doing in the case on any device or internet site, including blogs, chatrooms, social websites, or any other means.

You must also not use Google or otherwise search for any information about the case or the law that applies to the case or the people involved in the case, including the defendants, the witnesses, the lawyers or me.

It is important that you understand why these rules exist and why they are so important. Our law does not permit jurors to talk with anyone else about the case or to permit anyone to talk to them about the case because only jurors are

authorized to render a verdict.

Only you have been found to be fair and only you have promised to be fair. No one else is so qualified.

Our law also does not permit jurors to talk among themselves about the case until the Court tells them to begin deliberations because premature discussions can lead to a premature final decision.

Our law also does not permit you to visit a place discussed in the testimony.

First, you can't be sure that the place is in the same condition as it was on the day in question.

Second, even if it were in the same condition, once you go to the place discussed in the testimony to evaluate the evidence, in light of what you see, you become a witness, not a juror.

As a witness you may now have a mistaken view of the scene that neither party may have a chance to correct, and that is not fair.

Finally, our law requires that you not read or listen to any news accounts of the case and you not attempt to research any fact, issue or law related to the case.

Your decision must be based solely on the testimony and other evidence presented in this courtroom.

Also the law often uses words and phrases in special ways. So it is important any definitions you will hear come

only from me and not from any other source. It wouldn't be fair for the parties for you to base your decision on some reporter's view or opinion or upon other information that you acquired outside the courtroom.

These rules are designed to help guarantee a fair trial, and our law accordingly sets forth serious consequences if the rules are not followed. I trust that you understand and appreciate the importance of following these rules, and in accord with your oath and promise, I know you will do so.

Moving on now. If you wish to take notes to help you remember what witnesses said, you can take them; but if you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.

Don't leave them here on your chairs in the courtroom. Don't take them home with you. They will be safe in the jury deliberation room.

Do not let note-taking distract you so that you do not hear other answers by witnesses. When you leave the courtroom your note should be left in the jury deliberation room. Whether or not you take notes, you should rely upon your own memory of what was said.

Notes are not -- notes are to assist your memory only. They are not entitled to any greater weight than your memory or impression about the testimony.

Although the defendants are being tried together, you

must give separate consideration to each defendant and to each count. In doing so, you must determine the evidence, which evidence is in the case applies to a particular defendant and to a particular count, and disregard any evidence admitted solely against some other defendant.

The fact that you may find one of defendants guilty or not guilty should not control your verdict as to the other defendant.

The fact you should find one defendant guilty of some counts and not guilty of other counts is also a possibility. The trial is going to begin, first the Government will make an opening statement, which is simply an outline to help you understand the evidence as it comes in.

Next, defense counsels may but do not have to make an opening statement. Opening statements are neither evidence nor arguments.

The Government will then present its witnesses and counsel for the defense may cross-examine them. Following the Government's case the defendant may, if he wishes, present witnesses whom the Government may cross-examine.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and I will instruct you on law. After that you will go to the jury room to decide your verdict.

How long does the Government anticipate the opening

statement to be?

MS. DEROVANESIAN: Your Honor, we would estimate about 40, 45 minutes.

THE COURT: So let's go ahead and take a ten-minute recess.

During that time, Crystal will show you two different jury rooms, and you can choose the jury room that you want to be in.

I got in my law library during COVID so that we have a bigger facility for jury deliberation rooms to account for social distancing.

If you see there's four air purifiers here in the courtroom. They have UV lighting in them. The purifiers in the jury deliberation room have UV lighting in them to purify the air.

I notice no one is wearing a mask. You're entitled to wear a mask if you want to, but I think the concern that we had for COVID is significantly dissipated. But having said that, you can decide which jury deliberation room you want to pick.

The advantage to the one behind us is that it's right outside of the courtroom and it has two bathrooms in it. The disadvantage is it's kind of small. The advantage to the other room, is it's much bigger but it doesn't have bathrooms and it's farther away.

So at this time I would ask you to go with Crystal, and

she will get you phone numbers and everything in case we need to reach you and show you the two jury deliberation rooms. Giving you pad and pencil and if you want to take notes and we will be in recess for about ten minutes or so.

(Jury out.)

THE COURT: As far as Mr. Grey goes, I would propose leaving him on the jury. If we get farther into the case and we haven't lost any alternates, maybe consider excusing him.

MR. POGOZELSKI: Government agrees, Your Honor.

MR. ZIMET: We agree, unless he's acting up or whatever.

THE COURT: Well, if that happens, we will have to revisit.

Mr. Barzee.

MR. BARZEE: Agreed.

THE COURT: All right. So we will be in recess for about ten minutes, and then we'll do the opening statement from the Government and that will all for today.

MR. POGOZELSKI: Your Honor, we would request that all parties' opening statements be given in the same day.

THE COURT: No. Okay.

We'll be in recess for about ten minutes.

(Off the record.)

THE COURT: We're back on the record. Counsel are present.

Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: Nothing from the Government, Your Honor.

MR. ZIMET: No, Judge.

MR. BARZEE: No, Your Honor.

THE COURT: I think Crystal might have a calendar of our proposed days in court and hours. If she does, we will hand them out to everybody.

MR. ZIMET: Is Columbus Day a federal holiday?

THE COURT: I think so.

Counsel concede the presence of the jury and waive its polling?

MR. ZIMET: Yes, Your Honor.

MR. BARZEE: Yes, sir.

MR. POGOZELSKI: Yes, sir.

THE COURT: And did everyone follow my admonition not to discuss the case or largely discussed in your presence.

All right. We may begin with the opening statements and Ms. DerOvanesian, you may proceed.

MS. DEROVANESIAN: Thank you, Your Honor.

May I please ask permission to use the ELMO during the opening statement?

THE COURT: Okay.

MS. DEROVANESIAN: May I proceed?

THE COURT: Yes, you just need to use the microphone.

MS. DEROVANESIAN: I have the lapel mic. Is it working? May I proceed?

THE COURT: Yes.

MS. DEROVANESIAN: Members of the jury, every day people walk into pharmacies and they pick up bottles of prescription medication, without thinking twice about where those bottles of medication have been, whose hands they've been in, if they've been tampered with or if they have been stored property; and they don't need to think twice about that.

You're going to learn that the reason people don't need to think twice about that is because there are laws that apply to people who sell medicine.

One of those laws that you are going to learn about requires something that's called a pedigree or a T3. You're going to hear those words -- "pedigree" and "T3" -- quite a bit, and what you're going to learn about that is that it's somewhat of a certificate of authenticity or a paper that shows the full history of where that drug has been.

And members of the jury, this case is going to show you why those papers are so important. And you're going to learn that the defendants in this case violated that by purchasing medication, prescription HIV medication, that came from black market suppliers.

You'll learn it didn't have those pedigree documents

and that often they have fake information when they did have those pedigree documents.

And it's going to show you why those pedigrees are so important. You will see that if you don't have that document or if it has fake information on it, then those new drugs, that medication in the bottle of the prescription could have been anywhere. And you will see why that's so important because you're going to learn that in this case, the facts that they didn't have those pedigree documents and the fact that the pedigree documents when they did get them had false information meant that what was in those bottles had actually come from the streets; that it had been dispensed to patients before; and that somebody had bought it from desperate, homeless people on the street; and that then the defendants had sold it and passed it off to pharmacies as if it was legitimate.

And you'll see that that is why those pedigree documents are so important.

And members of the jury, we're not just talking about one bottle or two bottles. You're going to learn that in this case it was $90 million worth of HIV medication. And you will learn that that's just what the defendants paid for it; that they sold all of that medication for a profit. And you to learn that the consequences of this meant that sometimes those bottles were tampered with and sometimes, you will learn, that those bottles had the wrong drug altogether inside of them.

And members of the jury, these are the defendants, Patrick Boyd and Charles Boyd. You're going to learn that they are brothers and that they operated a company together called Safe Chain Solutions, but you're going to learn that what they did was anything but safe.

This is Charles Boyd. You're going to learn that he was the CEO of Safe Chain Solutions, and you'll learn that he was part of that decision to buy those HIV drugs from the black market suppliers, several of them, without those pedigree documents.

And you'll learn that he deployed their sales force to push those medications into as many pharmacies as possible.

Why?

Because they were worth a lot of money. They were making a lot of money. And you will learn that Charles Boyd also taught at least one of those black market suppliers how to fake those documents, how to make those pedigrees look as if they were legitimate when they weren't because the supplier didn't have that information because it was illegitimate medication.

And over here is Patrick Boyd. You're going to learn that he was in charge of sales for the company. You'll learn that he is the one who got those drugs into the pharmacies and that he worked closely with his brother. You will also learn that Patrick Boyd spent time in the warehouse and that he

actually saw the bottles of medication that were coming in. And you'll learn about some of the signs that he would have seen on those bottles, that they were dirty, showing where they had been.

And members of the jury, you will see that without Charles Boyd and Patrick Boyd agreeing to pass off these medications either without these pedigrees or with fake information on the pedigrees, these drugs, these HIV medications that came from the streets would have never made it from the streets into the pharmacies. And that's the basis of the crimes that the defendants are charged with in this case.

They're charged with several crimes that each relate to what they did with selling these prescription medications either without that paperwork, the pedigree, or with falsified information on the pedigree because, again, that is what caused these drugs to get from the streets into the patients' hands.

So I'm going to walk you through in a little bit more detail how the defendants did all of this.

You're going to learn that Charles Boyd and Patrick Boyd had a license to sell prescription medication to pharmacies, and you will learn that they operated this business for several years, but primarily, you will hear that they didn't sell something called "branded medications."

You will learn that "branded medications" are the type of medications you see advertised on TV commercials that have a

brand name.

You will learn there was a reason why they didn't primarily, at first, sell any of these branded medications. You will learn that the reason is because branded medications are sold at a set price, meaning that there's not a legitimate source to buy them much cheaper; so it doesn't make any business sense to buy them and resell them because then you'd have to mark them up.

But you're going to learn that they found an opportunity. That knowing that these HIV medications were normally sold at a set price, because they were those branded medications, they were approached by somebody who told them that despite all of that, they could get them dirt cheap.

You're going to hear about a person named Adam Bosius, and that's somebody who Charles Boyd and Patrick Boyd chose to partner with and made him part of their company.

You're going to learn that this Adam Bosius was somebody who they knew had already been charged with a healthcare-related crime. And you're going to learn that he's the one who introduced them to these black market suppliers that they eventually purchased these HIV medications from.

And you'll hear that once Charles Boyd and Patrick Boyd were introduced to those black market HIV suppliers, that transformed their business. You'll hear it from the salespeople. You'll hear it from their compliance team.

You'll see it in their emails and their text messages just how much more volume and how many more sales they were doing because of the low prices that they were getting.

You're going to see that these medications were coming from places that didn't look like they were selling legitimate medication. You'll see that we're talking about places that looked like an old beat-up apartment building, not a company. And you'll see that as soon as the defendants started making all of this money from the HIV sales, it was almost immediately apparent that these medications they were getting from these black market suppliers were illegitimate medications.

And you'll know that, it will be obvious because some of those medications at first didn't even have those pedigrees, those certificates of authentication, that history.

And I'm going to back up for a moment, and I'm going to use an analogy to explain this, because some of us might not be so familiar with the industry of buying and selling prescription medication.

So I'm going to ask you to think about somebody who sells a bunch of watches on the street. Maybe they have a Rolex that they're selling.

MR. ZIMET: Your Honor, I'm going to object. This is argumentative.

THE COURT: Sustained.

MS. DEROVANESIAN: Members of the jury, we're going to

show you how clear it was to Charles Boyd and Patrick Boyd that what they were getting, what they were buying, and what they were putting into pharmacies was illegitimate medicine.

We're going to show you that because you will see that the pricing that they were getting was too good to be true. You will see that they knew these prices were far lower than any legitimate channel. And you will see that they knew that if someone doesn't know what the standard pedigree documents are, then that means that they're not legitimately selling medicine in this industry.

And you will see that beyond that, they could tell by the way the bottles looked themselves. You'll hear that these bottles of medication arrived in beat-up boxes that were pulled out of the trash; that the bottles themselves looked dirty; and that there was evidence on those bottles that there had been something stuck on there before, like the patient's label from the previous person.

And that despite that, you will see that the defendants, Patrick Boyd and Charles Boyd, continued to buy millions and millions of dollars of that medication and sell it to pharmacies regardless.

You're going to meet some of the other people involved who Charles Boyd and Patrick Boyd bought these medications from. You're going to learn that these people were involved in offering and purchasing from people who offered cash to people

on the streets who were so desperate that they would agree to sell their HIV medication for cash. You will learn that those bottles were then put into a box and shipped to the defendants.

Now, these other people you're going to hear from, you're probably not going to like them very much. You're going to learn that they are criminals, that they've pled guilty to their own crimes, and that they are testifying, and they are hoping for a reduction in their sentence.

But you're going to see almost immediately when they testify that they are not, obviously, not legitimate business people. When you meet them and you hear from them, I want you to keep in mind that these are the people who you are going to learn that Charles Boyd and Patrick Boyd chose to do business with. And that these people who you're going to hear testify could not have gotten these black market drugs from the street into the pharmacies without Charles Boyd and Patrick Boyd.

They were required in order to pull that off. And members of the jury, you won't have to take their word for it. They will be corroborated by text messages, by emails, by documents, all of which you are going to see.

And members of the jury, as you can already tell, Charles Boyd and Patrick Boyd didn't do this alone. You can see that it took a number of people to pull off a scheme like this involving $90 million worth of medication in just over a year. But today, it's Patrick Boyd and it's Charles Boyd who

are on trial for their conduct and what they did.

I'm going to tell you a little bit more about one of those people you are going to meet. You are going to meet somebody named Peter, and that's one of the people who the defendants started buying HIV medication from upfront.

Now, you will learn they called him Peter because Charles Boyd and Patrick Boyd didn't even know his last name. Yet you will learn they were buying over $30 million of prescription medication trusting this person. You will learn that beyond Peter he was also known by a fake name. His fake name was King Kimchi. And you will hear that people called him King Kimchi, because, he will tell you, that's just how it works on the street.

And you're going to learn that this King Kimchi, this Peter guy, at first didn't even know what those important pedigree documents are supposed to look like. And he certainly didn't have them to go along with any of the medication that he was pulling off the streets, throwing into a dirty box, and sending to Patrick Boyd and Charles Boyd.

You're going to learn what that pedigree paperwork is supposed to look like. And I'm going to show you an example of it now.

You're going to learn that this is a standard form that is used by anyone in the industry of selling medication. Sometime it looks a little bit different, but you will learn

that the purpose of these forms is to show a complete and accurate history of when the drug was made by the manufacturer up here and then showing the full history of everyone whose hand it's been in, every transaction until it gets to the pharmacy, sort of like a receipt or a certificate of authenticity.

And you will learn that the purpose of this is because this is what makes people know that when they pick up their medication at the pharmacy, they know they can trust where it's been, where it came from, and that it hasn't been tampered with.

You're going to learn that if Patrick Boyd and Charles Boyd were buying medication legitimately, they would receive something like this automatically without asking for it. It's standard. It would be filled out. It would say who had owned the drug in the past, and they would receive it with no issues.

It also contains certain promises down at the bottom. You will learn about these, too. And these promises are essentially that the product is legitimate. That the medication came from a legitimate source.

Now, at first you're going to learn that Charles Boyd and Patrick Boyd were buying all of these HIV medications and not getting these papers, these pedigrees at all. And you will learn that they knew that was wrong. But you will learn that

they didn't have any issue with it at first for months. They started selling these HIV medications, not receiving these required documents, and selling them and pushing them into pharmacies anyway, promising they were legitimate when they knew they weren't.

But you're going to learn that these bottles, I mentioned they arrived dirty. And you will learn that because they had just ripped the patient label off where the previous patient's name was and then thrown them into a box and sent them to the defendants.

And members of the jury, you're going to hear that the people who sent those dirty boxes full of the dirty bottles from the street didn't tell Patrick Boyd and Charles Boyd directly exactly how they got them from the streets, but you will learn that they didn't need to. You're going to hear that Charles Boyd and Patrick Boyd were aware that there were schemes like this going on where patients were being paid for their medication. And you're going to see that they could see what those bottles looked like. You will see that that's because they were getting complaints from customers, from people in their own company, noticing, "Why are we getting these bottles of medication that look dirty or used or beat-up or scratched?"

And members of the jury, you're going to hear that some of these black market suppliers made these bottles look a

little bit nicer by picking out the prettiest ones or the cleanest-looking ones. And that will show you, again, why those pedigree documents are so important.

You'll learn that this information was more than enough for the defendants, Patrick Boyd and Charles Boyd, to know that what they were buying and what they were selling to pharmacies was illegitimate product, but you will learn that they didn't stop; that they kept going and going, $90 million worth, month after month. But you're also going to hear that there were significant consequences to this.

You're going to hear that within one month, there was an issue where one of these bottles that they sold from one of these black market suppliers, a patient opened it up and saw the foil on top of the seal, and it said a completely different drug's name. You'll see that they saw it had been tampered with in that way, and they had no issue continuing to buy and continuing to sell with no pedigree.

But you're going to learn that after a couple of months, people started to complain. Customers, pharmacies started to complain. And you'll learn that that's because they knew they weren't getting that important pedigree document, and that was concerning to them.

You'll learn that the defendants' compliance director who worked for them was also concerned about where these drugs were coming from, and you'll learn that that is when they knew

they couldn't get away with selling these black market HIV drugs without the pedigree anymore, and you'll see that's when they started falsifying and helping those black market suppliers create falsified documents.

You're going to see and you're going to hear how Charles Boyd helped show one of those suppliers how to make one of these look realistic enough that Patrick Boyd and Charles Boyd's compliance director wouldn't be able to tell that it was fake. You'll hear from the first of those dirty suppliers who did this, and you'll see the emails where Charles Boyd is showing him exactly what it should look like in order to be plausible, showing him what type of company it might have possibly been sold to first. And if you put a certain type of company's name in a certain place, then everybody in the industry would know that on its face, it's false.

You'll see him walking through those steps and going back and forth until they come up with one that looks like it could be plausible. And you'll see that they only send the compliance director the final products so that she won't see that they had to go back and forth about this so much. Because you're going to learn that if the information on these pedigrees is true, nobody needs to tell you what to write in it because it's just supposed to reflect the truth. It's just supposed to reflect the transactions that happened, where and when.

And when you hear this, it will be clear to you that Patrick Boyd and Charles Boyd were not only aware that the information that they started to get on these pedigree documents was false, but that they each had a role in helping suppliers figure out how to make it look like it could be possibly correct. But you'll learn that the consequences of what Patrick Boyd and Charles Boyd were doing still didn't stop when they started teaching these suppliers to falsify the pedigrees.

You'll learn around that same time, you will hear that patients started to receive these bottles and find that there were different pills inside of them altogether. You will learn HIV patients picked up their prescriptions at their pharmacies, opened them up, and saw that there was a entirely different drug inside altogether.

You'll learn that one had generic Excedrin inside of it. You to learn that one had an antipsychotic. You'll hear that Patrick Boyd knew about that. You'll hear that Charles Boyd knew about that. And again, you'll learn that this would have been a sign to anyone that they were buying black market drugs, as they knew all along, because you will see at this point, they already knew that they had been buying without these pedigrees for so long.

But you'll learn that didn't stop them. They continued to do tens of millions of dollars more business, buying more

and more of these bottles from the same places that you will see they knew were illegitimate black market sources.

You'll see their instant messages. You'll see their emails. You will see that the defendants knew how all of this worked. And after the first time a patient receives the wrong drug, it didn't stop them. And you will see after the second time a patient receives the wrong drug, it didn't stop them. And you will see that that's part of what makes these pedigrees so important and why people need to know exactly where these medications have been before they get into the pharmacies.

And members of the jury, in this case, you're going to have a unique opportunity to see that Patrick Boyd and Charles Boyd were not fooled and to see that they knew exactly what they were doing, because you're going to see that Patrick Boyd and Charles Boyd had some rules written down on paper in their company, rules that they put in place in their company years before any of this started.

And you're going to see that those rules spelled out many of these different things that they were doing wrong and spelled out that if these things are happening, you are likely buying counterfeit products or suspect products, and you shouldn't do it.

I'm going to give you some examples of what you're going to hear from those rules from Patrick Boyd and Charles Boyd's own company years before this started.

You're going to hear that their rules said if the pricing is too good to be true, the product is suspect and shouldn't be purchased. And you're going to learn that the pricing in this case was too good to be true and that the defendants knew it.

You're going to learn those rules also said that if a supplier didn't have this paperwork, this pedigree, then that meant the product was likely counterfeit or suspect. You will learn that beyond that, these rules, the defendants' own rules said that if a supplier is hesitant or unable to give you these pedigree documents, that means it's suspicious, it could be counterfeit, and you shouldn't buy it.

These rules will also show you that the defendants knew that the appearance of the bottles -- bottles arriving dirty, as you will learn they did -- was another indicator that you were buying suspect, illegitimate product.

And members of the jury, you're actually going to see in those rules that they specifically call out HIV medication because those are so commonly sold on the black market like this.

You're going to see those rules from about five years before the defendants started selling these black market HIV drugs, and that's going to show you that they knew all of these things they were doing was wrong. But members of the jury, even after they got caught not providing any pedigree at all

and even after they started selling them with these falsified pedigrees, you'll see that they still got caught.

You're going to learn that their compliance director learned that some of these pedigrees had false information. And these HIV medications I have been talking about are produced by several different suppliers you're going to hear about -- several different manufacturers rather.

And you're going to learn that one of those manufacturers actually also confirmed, after receiving a complaint and looking at one of those false pedigrees, the manufacturer was able to confirm that it was false. And what did they do?

Well, you're going to learn that the defendants, Patrick Boyd and Charles Boyd, continued buying from these black market suppliers for months; but you're also going to see that this is when they started their cover-up.

You're going to see many different ways in which the defendants tried to lie about what they were doing. Tried to pretend they were surprised about what was happening and tried to cover up what they had done. You're going to learn that these patients kept receiving wrong drugs in the bottle. Customers kept complaining, noticing that these bottles were dirty. That these pedigrees were not being provided. And telling Patrick Boyd and Charles Boyd directly that these medications were not safe to dispense.

And you will see that the defendants' reaction was to keep buying and blame other people. Blame the patients. Blame the manufacturer. Blame the customers.

And members of the jury, you're going to see that not until then did the defendants start to cover their tracks once they got caught. You're going to see that they will try -- they at first tried to say it was an honest mistake. But members of the jury, you're going to see that they knew that those black market suppliers didn't have these pedigrees in the first place and knew that it was falsified.

You're going to see that they tried to blame it all on one manufacturer. You will see that they tried to say all of these patients who were getting the wrong bottles, the wrong medication in their bottles was because one manufacturer was having an issue. But you're going to learn that wasn't true. You're going to learn these problems were not with one manufacturer. And it's going to be clear to you where the real problem was, and that it was with these black market suppliers that the defendants were buying from.

And you're going to see that eventually after having so many of these issues, one of the manufacturers of these HIV medications actually threatened to sue the defendants and their company and eventually does. And you're going to see that's what caused Patrick Boyd and Charles Boyd to really start to defend themselves because money was on the line at that point.

But you will see by this point it was clear then what was happening. You will see that they started switching to different dirty suppliers that had the same problems and doing all of this over and over again trying to avoid being caught. And you're going to see evidence of what they did to try to cover this up.

You will see letters that the defendants sent to their customers. You will see letters to one of those manufacturers trying to defend themselves. You will see explanations to the FDA about what was going on. And you will see that all of these explanations and all of these cover-ups contain lies. And you will see that they didn't start doing this. They didn't start trying to cover their tracks until they were caught.

You will see that the defendants, Patrick Boyd and Charles Boyd, actually started reporting some of these instances where patients opened bottles and got the wrong drugs. But I want you to pay close attention when you hear that evidence, because you're going to hear that that happened long after the actual incident.

It happened months after, and it was only reported by the defendants once they were caught and once they were in this mode of trying to cover their tracks. And you're even going to hear from lawyers who advised Patrick Boyd and Charles Boyd.

You're going to learn that those lawyers didn't know

all of the facts about what was going on. You will see that these lawyers only had select information to help try to defend Patrick Boyd and Charles Boyd. And you will see that Patrick Boyd and Charles Boyd continued this with multiple of these dirty suppliers one after the other.

You will learn they kept doing this for just over a year when they got to the point where they couldn't get away with it anymore, and it was over $90 million worth of those bottles of medications.

And members of the jury, you're going to see that there were severe consequences for what Patrick Boyd and Charles Boyd did. You're going to hear from a couple of those patients who walked into their pharmacies and took their bottle of prescription medication like they did every month and trusted that it hadn't been tampered with, that it came from a legitimate source.

But you're going to learn that one of those patients popped open his HIV medication and took one of the pills inside and it turns out it was not a HIV medication at all. You will learn he had an adverse reaction to it. He passed out for 24 hours, and that his husband found him and was concerned. You will hear from another patient who had a similar story.

And members of the jury, I want to be clear: You're not going to hear that Patrick Boyd or Charles Boyd are the people who actually opened up those bottles of medication and

put different pills inside or tampered with them.

You will learn that was not what they were doing, but it will show you exactly why those pedigrees are so important, because that's the exact type of consequence that will come when you sell medication either without that documentation, without that pedigree, or with false information on the pedigree.

Now, the Judge is going to instruct you on all of the law at the end of this trial, and you're going to hear about the charges. And you already did actually hear a list of what the charges were. And you're going to see that there are several of them, and they're all based on Patrick Boyd and Charles Boyd selling this medication either without the pedigrees altogether or with pedigrees that had false information, because selling these medications without that and with false documentation is what got them into the pharmacies and what got them in the patients' hands.

You will hear this referred to as something called selling adulterated and misbranded medication, and you will see that the charges are based on specific instances of that, because that's what caused those bottles to get into the patients' hands.

Now, members of the jury, you've already heard it's our burden to prove this to you beyond a reasonable doubt. And we're going to do that through witnesses and through evidence.

I have already told you about some of that.

You're going to get to see the defendants' own words in their emails, in their text messages, in their instant messages. You're going to see how much money they were making and how aware they were about everything that was happening. You're going to get to see those pedigree documents I showed you an example of.

You will get to see exactly how they were altered to make them look like it could be legitimate so they wouldn't get caught. And you're going to hear from a number of people who you're going to learn that the defendants lied to: The FDA, the defendants' customers, their own employees, their compliance director, and even their lawyers and, ultimately, from a couple of those patients who suffered the ultimate consequences of what Patrick Boyd and Charles Boyd did to make all this money.

And you're also going to see that Patrick Boyd and Charles Boyd knew that what they were doing was wrong because you're going to meet several people who worked for them. And you're going to see that these are people who didn't have a ton of experience working with pharmaceuticals. They were new to this industry, unlike Charles Boyd and Patrick Boyd.

But you're going to see that even though they didn't know too much about this industry, it was clear to them. You're going to see that these people knew there was no logical

explanation for how Patrick Boyd and Charles Boyd were suddenly able to get these medications that were known to be sold at set prices, how they were mysteriously able to get them so much cheaper than anybody else.

You're going to see that these people who worked for them could see that those bottles coming in were dirty, could see places where there were sticky marks left on the bottles. And you will see that those bottles, pictures of them were shared directly with Charles Boyd and with Patrick Boyd.

And you will hear that their customers starting calling this out, too. You will hear that the salespeople got sick of hearing about it at a certain point, that these medications were unsafe to dispense. You will see evidence of those complaints.

And when I ask -- when you hear from these people, when you hear from these employees who worked for Patrick Boyd and Charles Boyd, keep in mind how much less these people knew about what was going on than Patrick Boyd and Charles Boyd did, because you will learn these aren't all people who were in the warehouse. They weren't people who were on the relevant emails. They weren't the people talking to the suppliers. And they didn't have the years of experience in the industry that you will hear Patrick Boyd and Charles Boyd did.

And you will see that while each of those things were happening, Patrick Boyd and Charles Boyd knew and they

continued to accept those drugs, and they continued to push them into the pharmacies buying from the same dirty suppliers that they knew had problems months prior for almost a year. And you will learn that's how they eventually got into the hands of patients who had no idea where these medications had been. And at the end of this trial, you're going to see that what Patrick Boyd and Charles Boyd did was anything but safe. You're going to learn that they knew they were selling these medications at first without these required pedigrees at all. You will learn that they then sold it with pedigrees and information that they knew was false. And you will learn they did that because they knew they were not buying legitimate medication. You will see that's why they covered it all up.

But members of the jury, you're going to learn that none of this would have happened, that none of those bottles would have gotten into the hands of those patients if Patrick Boyd and Charles Boyd didn't purchase medication without those pedigrees and didn't sell it without those pedigrees or with false information on the pedigrees.

And we're going to ask you to find both Patrick Boyd and Charles Boyd guilty. Thank you.

THE COURT: All right. Members of the jury, we're going to go ahead and recess for the evening. Remember my admonition not to discuss the case or allowed it to be discussed in your presence. Crystal has printed out a calendar

for the next month. So I will ask her to hand that out to you. Obviously, it's subject to change, but that kind of gives you an idea if you need to make doctor appointments or something like that, the days we're not going to be in session, and you can hopefully work around that.

I'm going to ask you to come back tomorrow at 9:00 and be in the jury deliberation room. And shortly after that, we will hear the opening statements from the defense attorneys. So have a nice evening. See you back tomorrow.

(Jury exits the courtroom.)

THE COURT: If there's nothing else to come before the Court, we'll be in recess until 9:00 tomorrow morning.

(Court adjourned.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 9/20/2025

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN, FPR, RPR
Official Court Reporter
United States District Court
Southern District of Florida
U.S. Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

## $

**$2,100** [1] - 209:1
**$3,400** [1] - 209:1
**$30** [1] - 294:8
**$400,000** [1] - 62:10
**$5,000** [1] - 60:23
**$90** [4] - 287:20, 293:24, 297:8, 305:8

## '

**'80s** [1] - 125:23
**'88** [1] - 124:12

## /

**/#34R** [1] - 106:9
**/s/Patricia** [1] - 310:19

## 1

**1** [5] - 1:8, 1:18, 263:2, 263:4
**10** [7] - 7:20, 91:7, 98:18, 267:24, 268:18, 270:20, 271:13
**100** [6] - 64:23, 201:20, 202:13, 202:14, 202:21, 217:19
**10:00** [1] - 89:14
**10:30** [2] - 43:15, 90:7
**10th** [12] - 79:15, 79:16, 85:6, 85:19, 86:11, 90:23, 91:9, 155:16, 155:17, 155:24, 158:4, 161:4
**11** [8] - 91:7, 92:11, 115:6, 119:24, 267:25, 268:18, 270:20, 271:13
**11:00** [3] - 83:10, 83:13, 89:14
**11th** [3] - 88:12, 90:23, 160:3
**12** [12] - 7:20, 28:8, 46:15, 54:19, 56:10, 91:7, 194:24, 215:4, 262:4, 262:25, 272:9, 272:22
**12.5** [1] - 62:21
**12th** [5] - 72:16, 72:22, 90:23, 154:2, 154:10
**13** [7] - 1:5, 28:11, 91:7, 137:1, 167:19, 257:15, 257:20
**13th** [7] - 62:24, 85:20, 155:12, 158:4, 158:5, 161:5
**14** [11] - 56:17, 92:10, 187:17, 196:7, 197:13, 267:7, 267:25, 268:19, 271:13, 272:16, 272:24
**14's** [1] - 270:20
**15** [14] - 9:13, 27:6, 32:4, 93:23, 109:25, 118:13, 121:19, 146:2, 154:19, 257:21, 258:1, 258:25, 259:1, 259:3
**150** [1] - 62:22
**15th** [3] - 83:19, 89:7, 218:12
**16** [6] - 56:17, 129:15, 134:16, 257:7, 257:13, 259:3
**17** [15] - 58:7, 155:8, 191:23, 238:3, 238:8, 238:24, 239:8, 241:19, 243:24, 247:21, 248:16, 249:6, 267:25, 268:19, 271:13
**17's** [1] - 270:20
**17th** [3] - 85:20, 155:12, 158:7
**18** [15] - 47:20, 47:21, 58:7, 156:5, 238:4, 238:8, 238:24, 239:8, 241:19, 243:24, 247:21, 268:1, 268:19, 270:21, 271:13
**18th** [2] - 85:21, 90:21
**19** [5] - 128:1, 155:14, 184:3, 185:18, 264:13
**1989** [2] - 96:18, 124:12
**1990** [1] - 124:24
**1994** [1] - 94:14
**19th** [3] - 85:21, 90:21, 158:8
**1:15** [5] - 54:25, 150:1, 150:4, 151:16, 162:24
**1:30** [1] - 55:1
**1st** [9] - 55:10, 80:3, 80:9, 80:22, 84:20, 156:4, 156:6, 156:10

## 2

**2** [6] - 46:15, 56:10, 85:5, 152:15, 152:21, 272:10
**20** [11] - 102:16, 105:7, 106:14, 192:22, 209:22, 224:13, 264:17, 268:1, 268:19, 270:21, 271:13
**200** [1] - 247:15
**2000** [1] - 95:18
**2010** [1] - 118:13
**2017** [1] - 12:21
**2018** [1] - 11:17
**2020** [8] - 7:8, 18:2, 29:4, 58:17, 60:10, 61:1, 62:15, 62:16
**2021** [6] - 58:18, 60:2, 60:6, 60:11, 61:1, 62:25
**2022** [1] - 60:25
**2024** [1] - 7:2
**2025** [4] - 1:5, 7:11, 7:12, 15:25
**21** [5] - 113:21, 135:6, 262:21, 262:25, 264:1
**21st** [1] - 60:1
**22** [3] - 112:7, 147:3, 264:5
**23** [4] - 198:17, 263:6, 263:21, 263:22
**23rd** [8] - 55:9, 60:6, 81:2, 81:7, 84:12, 84:17, 88:4, 155:7
**24** [5] - 141:21, 268:20, 270:21, 271:13, 305:21
**24-cr-20255** [1] - 1:2
**24th** [5] - 55:9, 71:4, 84:12, 84:17, 153:11
**25** [3] - 95:19, 138:8, 190:20
**25th** [1] - 87:17
**26** [5] - 161:25, 177:15, 223:16, 260:23, 261:8
**26th** [3] - 55:10, 84:19, 88:4
**27** [3] - 175:15, 263:19, 265:5
**27th** [2] - 81:11, 155:8
**28** [4] - 35:19, 76:8, 258:2, 258:10
**28th** [1] - 86:24
**29** [1] - 103:4
**299** [2] - 263:23, 310:22
**29th** [2] - 84:19, 88:5
**2:00** [1] - 77:24
**2:30** [4] - 70:25, 78:21, 151:13, 153:9
**2:45** [4] - 70:25, 215:24, 215:25, 257:8
**2nd** [6] - 80:8, 80:9, 80:22, 89:22, 90:4, 90:9

## 3

**3** [6] - 46:15, 56:10, 90:16, 263:2, 263:4
**30** [12] - 94:16, 104:12, 107:13, 123:9, 133:4, 133:6, 133:7, 139:9, 192:23, 208:25, 264:3, 265:22
**30th** [7] - 29:4, 62:16, 70:23, 71:4, 83:7, 83:13, 153:12
**31** [3] - 94:16, 157:13, 157:20
**32** [3] - 264:7, 264:9, 264:10
**33** [8] - 126:18, 181:10, 209:1, 264:10, 268:1, 268:20, 270:21, 271:13
**33128** [1] - 1:19
**33132** [1] - 1:15
**33301** [2] - 1:23, 310:23
**34** [5] - 264:15, 268:2, 268:20, 270:22, 271:13
**35** [1] - 157:21
**355** [1] - 1:8
**36** [6] - 96:21, 96:22, 264:19, 264:25, 270:22, 270:23
**37** [4] - 100:10, 158:16, 158:22, 193:13
**38** [10] - 109:9, 130:19, 131:20, 166:3, 170:22, 265:1, 268:2, 268:20, 271:14, 271:17
**39** [5] - 165:19, 165:21, 258:11, 258:13, 258:20
**3:00** [5] - 71:19, 71:20, 151:13, 152:16, 160:16
**3:30** [3] - 88:24, 159:18, 160:19
**3:35** [2] - 273:6, 273:16
**3:45** [4] - 70:7, 152:23, 153:4, 262:10
**3rd** [8] - 1:18, 80:8, 80:9, 80:22, 88:5, 90:25, 91:14, 156:11

## 4

**4** [4] - 46:15, 56:10, 262:9, 262:20
**40** [6] - 1:18, 173:24, 211:17, 265:7, 265:9, 283:3
**400** [2] - 28:4, 32:23
**403** [3] - 10:15, 25:6, 32:12
**404(b** [10] - 9:23, 10:3, 10:4, 10:5, 12:11, 14:25, 15:13, 16:2, 17:9, 19:22
**404(b)** [1] - 12:14
**41** [3] - 265:10, 265:14, 265:15
**42** [2] - 260:14, 260:20
**43** [2] - 159:6, 159:16
**44** [2] - 131:20, 158:23
**45** [5] - 265:17, 265:21, 268:22, 268:23, 283:3
**46** [6] - 165:21, 265:24, 266:5, 266:6, 268:2, 268:6
**47** [3] - 159:17, 159:23, 266:7
**4795** [1] - 62:13
**48** [3] - 159:24, 266:7, 266:12
**49** [2] - 266:12, 266:15
**4:00** [5] - 70:2, 81:25, 82:5, 215:23, 216:2
**4:30** [2] - 70:5, 70:11
**4th** [1] - 1:15

## 5

**5** [2] - 153:8, 153:20
**50** [6] - 33:13, 168:19, 251:12, 266:16, 266:18, 268:20
**51** [2] - 43:14, 43:18
**5196** [1] - 62:11
**52** [4] - 101:11, 224:11, 266:19, 266:24
**53** [3] - 259:17, 260:7, 260:12
**54** [2] - 160:7, 160:14
**55** [4] - 116:19, 266:25, 267:10, 271:7
**56** [2] - 267:11, 267:16

**57** [2] - 259:5, 259:9
**58** [2] - 267:16, 267:18
**59** [5] - 267:19, 268:3, 268:20, 271:14, 271:17
**5:00** [5] - 54:13, 54:15, 54:16, 54:21, 163:16
**5:15** [1] - 1:6
**5th** [12] - 72:20, 80:3, 84:20, 86:11, 88:5, 154:3, 156:4, 156:7, 157:14, 159:6, 159:10, 159:12

## 6

**6** [3] - 1:22, 263:17, 263:18
**60** [16] - 33:13, 77:6, 77:13, 77:15, 77:16, 154:17, 155:2, 259:10, 259:16, 268:3, 268:21, 269:5, 271:14, 271:15, 271:16
**61** [1] - 269:9
**62** [2] - 161:16, 161:23
**63** [2] - 269:12, 269:14
**633** [1] - 1:22
**64** [3] - 161:3, 161:14, 169:9
**65** [3] - 98:17, 220:4, 271:18
**66** [2] - 160:15, 160:24
**67** [2] - 3:24, 47:4
**6:00** [3] - 69:24, 77:23, 78:13
**6th** [1] - 62:15

## 7

**7** [4] - 153:21, 154:1, 238:4, 238:23
**700** [1] - 208:25
**72** [1] - 30:24
**73** [2] - 32:4
**7:45** [1] - 88:21
**7th** [3] - 72:10, 90:25, 91:15

## 8

**8** [4] - 154:6, 154:12, 238:4, 238:23
**8:00** [1] - 71:16
**8:15** [2] - 81:23, 82:4
**8:30** [2] - 90:15, 160:18
**8th** [10] - 55:12, 79:10, 79:14, 79:16, 155:14, 155:16, 155:23, 155:24, 218:22, 218:24

## 9

**9** [2] - 263:9, 263:11
**9/17/2025** [1] - 310:19
**90s** [1] - 122:3
**92** [1] - 87:19
**99** [2] - 1:15, 106:7
**9:00** [9] - 1:6, 45:23, 54:10, 54:21, 54:22, 89:25, 273:18, 310:6, 310:12
**9:45** [1] - 83:8
**9th** [15] - 55:18, 55:20, 78:6, 79:5, 79:9, 79:13, 86:11, 88:6, 155:18, 155:20, 155:22, 157:14, 159:7, 159:11, 159:12

## A

**Abdo** [8] - 44:21, 124:20, 211:13, 211:14, 233:22, 233:23, 234:25, 264:6
**Abigail** [1] - 51:12
**ability** [28] - 8:17, 8:24, 28:20, 50:18, 52:4, 94:5, 98:2, 117:22, 163:3, 166:23, 181:21, 202:4, 203:19, 205:4, 206:24, 208:13, 209:7, 209:14, 209:21, 210:4, 211:19, 212:8, 216:8, 224:1, 227:9, 246:18, 260:15, 276:21
**able** [45] - 8:13, 14:18, 21:10, 22:25, 25:16, 32:15, 39:11, 40:4, 40:11, 45:23, 46:10, 46:12, 46:15, 54:7, 69:15, 73:14, 76:21, 77:24, 78:2, 83:9, 90:2, 91:22, 150:2, 152:2, 162:10, 215:17, 217:12, 222:16, 224:5, 228:23, 229:2, 229:4, 230:8, 238:25, 239:2, 242:7, 242:14, 246:10, 246:12, 254:4, 254:6, 298:8, 302:11, 308:2, 308:3
**abortions** [1] - 202:2
**above-entitled** [1] - 310:18
**absent** [1] - 9:10
**absolutely** [6] - 10:20, 17:1, 27:2, 222:13, 232:20, 240:11
**abundantly** [1] - 15:25
**abused** [1] - 108:12
**accent** [3] - 141:9, 141:13, 259:13
**accept** [6] - 233:8, 270:3, 272:6, 278:12, 309:1
**acceptable** [4] - 257:2, 270:14, 270:15, 272:2
**accepts** [1] - 272:5
**accident** [3] - 70:12, 97:24, 114:17
**accommodate** [2] - 73:20, 84:16
**accompanied** [1] - 59:24
**accord** [1] - 281:9
**according** [2] - 6:6, 37:15
**accordingly** [2] - 15:9, 281:6
**account** [19] - 6:24, 6:25, 62:10, 63:24, 64:1, 70:15, 81:14, 83:2, 84:3, 89:15, 91:12, 135:16, 135:23, 172:10, 172:12, 218:5, 218:17, 276:20, 283:10
**accountant** [4] - 6:21, 89:7, 190:21, 218:10
**accounting** [1] - 190:22
**accounts** [2] - 278:24, 280:20
**accuracy** [2] - 8:18, 19:4
**accurate** [4] - 34:1, 145:21, 295:2, 310:17
**accusation** [1] - 277:13
**accused** [1] - 238:5
**accusing** [1] - 18:7
**ACI** [2] - 185:20, 186:2
**acoustically** [1] - 49:8
**acquired** [1] - 281:4
**acquisition** [1] - 21:13
**act** [1] - 242:2
**acting** [5] - 33:24, 34:17, 36:18, 63:20, 284:10
**actions** [4] - 12:2, 230:15, 230:25, 231:1
**activity** [2] - 12:13, 232:1
**acts** [2] - 17:10, 59:12
**actual** [4] - 40:1, 40:12, 251:17, 304:20
**Adam** [6] - 12:21, 12:23, 51:16, 62:17, 290:14, 290:17
**add** [1] - 219:11
**ADD** [1] - 30:17
**addict** [2] - 117:17, 125:24
**addicts** [1] - 108:11
**addition** [3] - 53:6, 70:24, 279:7
**additional** [3] - 35:8, 53:20, 277:7
**additionally** [2] - 18:4, 57:11
**address** [6] - 11:24, 24:21, 28:15, 39:9, 40:15, 48:19
**addressed** [2] - 34:9, 42:10
**Adedayo** [1] - 51:16
**ADHD** [1] - 71:10
**adjourned** [1] - 310:13
**Administration** [1] - 59:6
**administrator** [1] - 125:1
**admissibility** [3] - 19:1, 19:18
**admissible** [8] - 10:8, 23:14, 28:17, 28:24, 29:2, 29:21, 36:5, 36:8
**admission** [2] - 31:21
**admit** [1] - 31:2
**admitted** [4] - 274:25, 276:11, 276:12, 282:4
**admonition** [4] - 164:16, 256:5, 285:17, 309:24
**adopted** [1] - 110:8
**adulterated** [5] - 58:11, 58:15, 59:3, 162:1, 306:19
**adulteration** [1] - 155:3
**advantage** [3] - 209:16, 283:20, 283:22
**adverse** [1] - 305:20
**advertised** [1] - 289:25
**advised** [1] - 304:24
**advisor** [1] - 112:9
**affairs** [2] - 56:22, 174:6
**affect** [26] - 50:18, 52:4, 94:4, 98:1, 117:21, 166:22, 181:21, 202:4, 203:18, 205:4, 206:24, 208:12, 209:6, 209:14, 209:21, 210:4, 211:18, 212:1, 212:7, 216:11, 216:16, 216:19, 217:7, 224:1, 227:8, 236:16
**affected** [1] - 76:18
**affirmatively** [1] - 259:23
**afraid** [1] - 226:17
**afternoon** [11] - 46:13, 54:7, 54:13, 55:1, 55:17, 81:6, 81:21, 87:9, 90:16, 163:12, 219:17
**afterwards** [1] - 200:24
**age** [2] - 47:20, 279:6
**agencies** [1] - 207:13
**agency** [3] - 64:7, 74:2, 120:16
**agent** [18] - 34:11, 35:1, 35:11, 60:13, 103:19, 120:15, 175:17, 180:13, 204:5, 204:6, 204:7, 216:12, 228:8, 228:9, 252:1, 252:6, 252:7
**Agent** [5] - 3:6, 49:17, 51:22, 120:18, 230:14
**agents** [3] - 36:19, 49:12, 207:12
**ago** [13] - 6:17, 63:23, 87:7, 95:4, 99:12, 101:11, 109:25, 167:4, 168:19, 170:8, 192:23, 243:4
**agree** [17] - 5:14, 5:16, 19:4, 57:14, 58:23, 60:15, 66:12, 76:6, 135:25, 230:22, 237:24, 247:5,

251:4, 274:21, 278:12, 284:10, 293:1
**agreed** [7] - 4:1, 4:23, 5:6, 5:15, 157:9, 284:15
**agreeing** [1] - 289:6
**agreement** [4] - 18:19, 19:25, 231:20, 271:5
**agrees** [2] - 275:22, 284:9
**Aguerrevere** [9] - 111:25, 112:1, 212:2, 212:3, 267:25, 268:18, 270:20, 272:17, 273:22
**ahead** [15] - 28:7, 28:10, 33:1, 35:17, 45:15, 54:23, 77:3, 92:3, 148:23, 150:25, 164:20, 235:16, 247:4, 283:4, 309:23
**air** [2] - 283:12, 283:15
**Airbnb** [1] - 71:3
**aircraft** [1] - 109:21
**airline** [1] - 95:22
**Airlines** [1] - 217:10
**Airport** [1] - 78:18
**airport** [2] - 78:23, 78:25
**Akanbi** [1] - 51:16
**Alex** [3] - 3:6, 34:21, 49:15
**Alexander** [2] - 1:13, 49:11
**alive** [1] - 123:14
**Allan** [5] - 71:8, 71:25, 94:10, 152:21, 164:21
**allegation** [1] - 63:10
**allegations** [10] - 12:6, 12:25, 13:2, 15:4, 27:10, 63:9, 68:24, 209:4, 209:5, 231:13
**allege** [6] - 12:2, 15:19, 59:10, 59:11, 62:14
**alleged** [4] - 14:15, 17:24, 68:14, 238:16
**allegedly** [1] - 278:19
**alleges** [2] - 10:14, 62:7
**allow** [13] - 8:12, 10:11, 25:18, 32:1, 33:8, 91:13, 149:1, 149:4, 164:17, 214:3, 214:14, 214:15, 256:6
**allowed** [5] - 27:18, 214:4, 214:8, 245:10, 309:24
**allowing** [2] - 33:10, 206:23
**allows** [1] - 25:6
**alluding** [1] - 10:16
**almost** [7] - 117:25, 226:5, 243:17, 243:19, 291:9, 293:9, 309:3
**alone** [1] - 293:22
**altered** [3] - 60:17, 60:20, 307:8
**alternate** [16] - 73:12, 73:13, 80:21, 93:6, 99:18, 192:19, 226:11, 226:13, 270:8, 270:12, 270:16, 270:18, 271:5, 272:20, 272:21, 273:13
**alternates** [11] - 46:15, 46:17, 46:18, 56:11, 157:6, 215:5, 270:10, 271:19, 272:10, 273:13, 284:8
**alternative** [3] - 26:6, 150:16, 226:10
**altogether** [4] - 287:25, 299:12, 299:15, 306:14
**Alvarado** [1] - 51:14
**AM** [1] - 1:6
**Amaya** [2] - 194:19, 236:20
**amazing** [1] - 151:4
**ambulance** [2] - 73:10, 73:16
**America** [2] - 63:25, 64:1
**AMERICA** [1] - 1:4
**American** [3] - 125:6, 200:6, 217:10
**amount** [3] - 62:10, 64:3, 251:13
**amounts** [1] - 217:22
**amplify** [1] - 219:9
**analogy** [3] - 250:15, 250:17, 291:16
**analysis** [3] - 6:19, 8:14, 33:18
**analyst's** [1] - 6:18
**Angeles** [2] - 217:8, 217:11
**animal** [1] - 178:23
**announce** [2] - 3:3, 215:4
**answer** [22] - 21:19, 21:22, 21:25, 22:1, 22:4, 25:19, 25:20, 38:1, 42:19, 42:22, 159:11, 211:23, 214:22, 216:25, 219:9, 219:10, 219:12, 223:20, 225:8, 258:6, 276:3, 276:7
**answered** [4] - 154:18, 259:13, 259:23, 276:4
**answering** [1] - 249:24
**answers** [10] - 48:25, 49:2, 49:4, 49:6, 56:2, 56:6, 214:19, 219:8, 275:17, 281:18
**Anthony** [3] - 11:18, 51:14, 87:24
**anticipate** [2] - 21:20, 282:25
**antipsychotic** [1] - 299:17
**Antoine** [1] - 53:9
**Antonio** [1] - 183:5
**anxiety** [1] - 227:10
**anxious** [1] - 76:19
**anyway** [1] - 296:4
**apartment** [3] - 122:19, 124:13, 291:7
**apologies** [1] - 7:12
**apologize** [3] - 45:21, 53:10, 265:19
**appalling** [2] - 25:2
**apparent** [1] - 291:10
**appearance** [4] - 9:4, 149:16, 149:21, 301:14
**APPEARANCES** [1] - 1:11
**appearances** [1] - 3:3
**apples** [1] - 205:5
**applies** [2] - 279:19, 282:3
**apply** [1] - 286:12
**appointment** [5] - 83:7, 85:16, 85:18, 89:22, 90:1
**appointments** [2] - 55:5, 310:3
**appreciate** [16] - 67:23, 69:3, 203:2, 205:11, 205:14, 210:12, 216:23, 218:5, 218:14, 219:20, 239:6, 246:17, 247:12, 247:18, 247:25, 281:8
**appreciated** [1] - 237:17
**approach** [3] - 220:19, 261:19, 271:24
**approached** [1] - 290:12
**appropriate** [2] - 24:21, 48:21
**April** [5] - 18:1, 58:17, 60:25, 61:1, 62:24
**Aquinas** [1] - 87:9
**Araiza** [7] - 143:2, 264:15, 268:2, 268:20, 270:22, 272:19, 274:5
**area** [1] - 14:24
**argue** [3] - 21:20, 27:15, 27:19
**argument** [8] - 5:22, 5:23, 6:1, 6:22, 8:6, 10:3, 22:8, 240:13
**argumentative** [1] - 291:23
**arguments** [5] - 13:15, 275:12, 275:13, 282:16, 282:22
**Armando** [1] - 51:17
**armed** [1] - 130:7
**arms** [1] - 253:1
**Army** [2] - 103:10, 125:13
**Arquillano** [5] - 45:10, 183:21, 183:22, 183:23, 269:5
**arrangements** [1] - 70:20
**arrest** [1] - 201:11
**arrested** [68] - 93:19, 95:3, 96:5, 97:20, 99:21, 100:21, 102:14, 104:16, 105:24, 106:25, 108:7, 108:12, 110:7, 111:16, 113:3, 113:4, 114:15, 116:1, 117:14, 117:18, 117:19, 119:9, 120:22, 122:14, 124:7, 125:20, 127:12, 128:18, 130:2, 131:4, 132:15, 133:25, 136:10, 137:20, 138:21, 139:23, 141:1, 142:17, 143:20, 145:13, 146:12, 148:9, 166:14, 166:17, 168:15, 170:5, 170:8, 171:7, 173:8, 174:16, 176:17, 178:3, 179:18, 180:21, 183:11, 184:24, 186:25, 188:13, 190:5, 191:7, 192:21, 194:12, 195:16, 196:24, 198:3, 199:5, 201:8
**arrived** [2] - 292:13, 296:7
**arriving** [1] - 301:14
**article** [12] - 11:15, 15:20, 28:13, 29:7, 29:12, 29:15, 29:18, 29:25, 30:10, 30:13, 30:18
**artifice** [6] - 61:8, 61:12, 61:23, 62:3, 62:8
**aside** [10] - 68:12, 93:14, 121:12, 228:24, 229:5, 232:2, 238:14, 246:13, 247:6, 250:15
**aspect** [1] - 10:22
**aspects** [1] - 210:15
**ass** [1] - 35:23
**assault** [2] - 143:23, 176:23
**assess** [1] - 224:1
**assist** [1] - 281:22
**Assistant** [2] - 1:14, 49:10
**assistant** [5] - 113:23, 140:18, 173:1, 184:17, 186:18
**assisted** [1] - 177:4
**assisting** [1] - 229:24
**associated** [1] - 35:24
**assume** [6] - 54:20, 204:4, 238:15, 241:22, 246:5, 246:7
**assumed** [1] - 204:9
**assuming** [1] - 204:7
**assumption** [1] - 242:1
**assure** [1] - 278:3
**Atkinson** [1] - 51:13
**Atlanta** [6] - 121:22, 122:19, 220:25, 221:3, 221:4, 221:7
**attaching** [1] - 63:4
**attempt** [6] - 17:21, 32:6, 258:5, 278:16, 279:3, 280:20

**attempted** [2] - 126:3, 223:11
**attempting** [1] - 214:18
**attendant** [5] - 78:7, 105:14, 105:15, 126:20, 189:20
**attention** [6] - 48:20, 69:15, 84:7, 237:13, 304:18
**Attorney** [1] - 142:3
**attorney** [7] - 30:3, 30:25, 39:9, 74:20, 139:12, 169:11, 240:6
**Attorney's** [1] - 181:18
**attorney-client** [1] - 39:9
**attorneys** [6] - 49:20, 56:7, 57:5, 163:2, 282:21, 310:8
**Attorneys** [2] - 1:14, 49:11
**attributed** [1] - 22:4
**audience** [5] - 82:13, 85:1, 126:10, 156:13, 212:10
**audit** [1] - 191:25
**auditor** [2] - 115:13, 133:9
**audits** [1] - 115:9
**August** [6] - 7:25, 58:17, 60:10, 61:1, 62:15, 80:3
**AUSA** [1] - 5:16
**authentic** [1] - 222:18
**authenticate** [2] - 11:24, 11:25
**authenticating** [1] - 34:1
**authentication** [1] - 291:14
**authenticity** [9] - 222:8, 223:6, 233:20, 234:3, 234:5, 234:13, 234:24, 286:18, 295:6
**authority** [1] - 207:4
**authorized** [1] - 280:1
**autistic** [1] - 168:9
**auto** [3] - 229:13, 229:14, 229:17
**automatically** [4] - 135:17, 135:20, 135:24, 295:14
**automotive** [1] - 146:4
**AutoNation** [2] - 92:19, 92:20
**available** [1] - 46:7
**avoid** [3] - 20:17, 149:16, 304:4
**avoiding** [1] - 149:21
**aware** [9] - 21:1, 37:2, 131:5, 132:16, 254:25, 273:17, 296:16, 299:2, 307:5

## B

**babies** [1] - 202:2
**back-pick** [1] - 270:13
**back-strike** [1] - 270:6
**backdoor** [1] - 17:21
**background** [9] - 36:13, 55:24, 56:1, 56:6, 77:20, 85:9, 92:4, 110:6, 220:1
**bad** [9] - 66:5, 76:19, 227:6, 227:24, 227:25, 228:6, 252:8, 252:11, 258:3
**badge** [3] - 45:16, 175:8, 272:15
**badges** [1] - 164:23
**Bahamas** [1] - 223:4
**Bailey** [2] - 48:22, 310:19
**BAILEY** [2] - 2:4, 310:20
**Bailey-Entin** [2] - 48:22, 310:19
**BAILEY-ENTIN** [2] - 2:4, 310:20
**baking** [1] - 185:6
**ball** [1] - 230:12
**Bank** [3] - 62:12, 63:25, 64:1
**bank** [9] - 6:24, 6:25, 63:24, 64:1, 86:4, 86:6, 89:13, 115:9, 115:13
**Bar** [1] - 87:18
**Barnes** [1] - 48:12
**barrier** [3] - 155:2, 161:16, 257:22
**Barry** [2] - 118:19
**BARZEE** [95] - 3:8, 8:4, 9:16, 13:15, 24:24, 35:14, 41:22, 42:22, 43:9, 43:13, 43:21, 50:1, 53:21, 160:23, 160:25, 161:6, 161:12, 161:21, 164:7, 237:4, 237:9, 239:6, 239:13, 239:16, 239:21, 240:2, 240:24, 241:1, 242:6, 242:13, 242:18, 242:22, 242:25, 243:2, 243:13, 243:15, 244:4, 244:6, 245:1, 245:4, 245:7, 245:21, 246:1, 246:15, 246:17, 246:23, 247:11, 247:25, 248:3, 257:4, 257:11, 257:18, 257:24, 258:8, 258:18, 259:7, 259:17, 259:19, 260:3, 260:13, 260:23, 261:12, 261:18, 262:1, 262:7, 262:17, 263:17, 264:5, 264:17, 265:3, 265:5, 265:19, 265:22, 266:9, 266:11, 266:21, 266:23, 267:5, 267:8, 267:10, 267:18, 268:8, 268:11, 268:16, 269:1, 269:3, 269:7, 270:3, 270:13, 270:15, 271:10, 272:4, 284:15, 285:6, 285:15
**Barzee** [40] - 1:17, 1:18, 3:9, 3:15, 4:12, 8:3, 9:15, 13:14, 24:23, 35:13, 41:20, 42:21, 49:23, 49:24, 50:2, 50:16, 50:23, 51:2, 53:20, 156:21, 156:24, 160:22, 161:20, 237:2, 237:3, 246:21, 248:2, 263:16, 264:4, 264:16, 265:2, 265:18, 266:8, 266:20, 267:17, 269:6, 269:11, 270:2, 270:14, 284:14
**Barzee's** [2] - 248:6, 260:2
**base** [2] - 51:4, 281:2
**based** [15] - 7:24, 48:7, 56:18, 67:14, 68:16, 69:5, 75:16, 75:18, 155:4, 160:10, 189:13, 214:5, 280:22, 306:12, 306:20
**basic** [2] - 274:12, 277:10
**basis** [6] - 6:6, 10:10, 14:24, 16:5, 31:18, 289:10
**Bates** [2] - 34:15, 34:19
**Bates-stamp** [1] - 34:15
**bathrooms** [2] - 283:21, 283:23
**Batlle** [8] - 196:1, 196:3, 270:14, 270:16, 271:19, 271:20, 272:20, 274:7
**batlle** [1] - 196:2
**beach** [2] - 118:5, 134:8
**Beach** [14] - 55:11, 55:21, 58:18, 60:11, 61:2, 61:21, 63:6, 63:7, 71:4, 78:7, 127:23, 145:25, 177:12, 197:10
**bear** [2] - 277:6, 277:25
**beat** [3] - 291:7, 292:13, 296:22
**beat-up** [3] - 291:7, 292:13, 296:22
**became** [1] - 22:11
**Beckerlegge** [1] - 53:14
**become** [1] - 280:14
**bedridden** [1] - 172:6
**BEFORE** [1] - 1:10
**beg** [1] - 71:16
**begin** [5] - 21:6, 39:12, 280:5, 282:11, 285:19
**beginning** [2] - 6:25, 35:19
**begins** [2] - 41:12, 41:18
**behalf** [7] - 3:7, 3:9, 3:12, 5:16, 237:12, 262:17, 272:1
**behave** [2] - 200:2, 240:10
**behind** [3] - 105:3, 138:4, 283:20
**belief** [1] - 9:12
**beliefs** [2] - 207:3, 207:8
**believability** [1] - 277:6
**believable** [1] - 135:25
**bell** [2] - 51:23, 53:22
**belonging** [2] - 62:11, 62:13
**bench** [1] - 261:19
**beneath** [1] - 235:7
**benefit** [4] - 18:21, 210:17, 231:21, 278:13
**Berger** [2] - 11:18, 51:14
**Bermuda** [1] - 222:22
**best** [6] - 18:14, 18:15, 41:24, 109:1, 135:12, 215:11
**bet** [2] - 64:10, 77:7
**better** [2] - 151:20, 157:23
**between** [16] - 9:21, 29:4, 30:7, 36:25, 38:17, 62:21, 86:5, 86:7, 121:21, 172:5, 199:16, 200:16, 215:20, 241:21, 252:13, 258:12
**beyond** [25] - 66:17, 66:20, 67:3, 76:2, 76:4, 182:17, 182:18, 200:5, 200:13, 202:9, 202:22, 205:7, 240:17, 249:9, 253:13, 253:14, 255:12, 255:16, 255:25, 256:1, 277:24, 292:11, 294:10, 301:9, 306:24
**Beyond** [2] - 253:16, 253:17
**bias** [1] - 277:1
**biases** [1] - 228:15
**bigger** [2] - 283:10, 283:23
**biking** [1] - 139:3
**Biktarvy** [5] - 60:2, 67:17, 67:19, 225:9, 225:10
**bill** [1] - 66:2
**Bill** [4] - 46:1, 50:16, 50:22, 51:2
**billings** [1] - 191:25
**biological** [1] - 117:18
**bird** [1] - 98:11
**birthday** [1] - 86:12
**bit** [17] - 22:8, 45:2, 54:2, 54:16, 54:22, 69:8, 121:2, 199:20, 216:24, 230:1, 245:5, 273:21, 286:17, 289:17, 294:2, 294:25, 297:1
**black** [19] - 201:23, 286:23, 288:8,

288:16, 290:20, 290:23, 291:11, 293:15, 296:25, 297:13, 298:1, 298:3, 299:20, 300:2, 301:19, 301:22, 302:15, 303:9, 303:18
**Blair** [1] - 53:9
**blame** [7] - 11:13, 21:1, 303:2, 303:3, 303:11
**blogs** [2] - 279:11, 279:16
**blood** [1] - 218:2
**blurt** [1] - 14:22
**BLVD** [1] - 62:22
**boat** [1] - 169:24
**bodies** [1] - 46:16
**bogus** [1] - 35:23
**bone** [2] - 209:24, 210:2
**booked** [1] - 84:18
**bookkeeper** [1] - 207:23
**Border** [1] - 178:24
**Borja** [1] - 51:16
**born** [2] - 94:14, 101:11
**Bosius** [6] - 12:21, 12:23, 51:16, 62:17, 290:14, 290:17
**boss** [1] - 97:18
**bottle** [5] - 208:25, 287:6, 287:19, 302:21, 305:13
**bottles** [34] - 286:6, 286:8, 287:11, 287:19, 287:24, 287:25, 289:1, 289:3, 292:12, 292:13, 292:14, 292:15, 293:3, 296:6, 296:12, 296:19, 296:22, 296:25, 297:12, 299:11, 300:1, 301:14, 302:22, 303:13, 303:14, 304:17, 305:9, 305:25, 306:21, 308:6, 308:7, 308:8, 309:15
**bottom** [1] - 295:18
**bought** [5] - 222:1, 222:20, 223:4, 287:13, 292:23
**Boulevard** [8] - 29:6, 29:9, 29:14, 29:20, 30:9, 36:14, 70:13, 310:22
**box** [5] - 64:10, 150:18, 293:3, 294:18, 296:9
**boxes** [2] - 292:13, 296:12
**boy** [1] - 74:25
**Boyd** [172] - 3:2, 3:3, 3:10, 3:13, 3:18, 3:21, 11:18, 15:22, 17:4, 19:8, 21:12, 21:16, 21:18, 21:21, 21:24, 21:25, 22:1, 22:5, 23:6, 24:3, 24:14, 24:20, 28:12, 28:13, 28:14, 29:7, 29:11, 29:15, 29:25, 30:8, 30:10, 30:11, 30:13, 31:1, 31:2, 31:24, 49:23, 50:4, 50:6, 50:9, 57:19, 57:20, 58:19, 58:20, 59:17, 59:18, 164:1, 237:12, 238:5, 238:7, 238:10, 238:16, 240:5, 245:9, 245:12, 245:17, 247:20, 254:16, 254:19, 254:24, 262:6, 262:7, 262:17, 262:18, 272:1, 272:4, 288:2, 288:6, 288:15, 288:21, 288:25, 289:6, 289:19, 289:20, 290:15, 290:22, 292:1, 292:19, 292:23, 293:13, 293:16, 293:22, 293:25, 294:7, 294:19, 295:12, 295:13, 295:22, 295:23, 296:13, 296:16, 297:5, 298:6, 298:7, 298:10, 299:2, 299:7, 299:18, 299:19, 300:12, 300:13, 300:15, 300:24, 302:14, 302:24, 303:24, 304:15, 304:16, 304:24, 305:3, 305:4, 305:11, 305:24, 306:12, 306:13, 307:15, 307:17, 307:18, 307:22, 308:1, 308:9, 308:16, 308:17, 308:18, 308:23, 308:25, 309:7, 309:17, 309:20, 309:21
**BOYD** [4] - 1:7, 1:17, 1:21
**Boyd's** [17] - 22:16, 22:17, 22:22, 23:2, 23:5, 23:7, 23:12, 23:24, 24:12, 25:19, 25:20, 25:24, 28:12, 30:24, 32:5, 298:8, 300:25
**Boyds** [7] - 29:23, 36:8, 36:15, 37:1, 204:13, 204:16, 206:14
**boyfriend** [3] - 120:14, 216:12, 217:2
**boys** [2] - 71:10, 109:18
**Bradley** [11] - 67:15, 180:4, 213:11, 213:15, 213:16, 213:18, 224:11, 224:16, 266:19, 266:22, 266:24
**Brady** [6] - 37:6, 37:15, 38:7, 38:22, 40:19, 40:22
**bragging** [1] - 234:20
**brand** [1] - 290:1
**branded** [5] - 289:23, 289:24, 290:3, 290:4, 290:11
**bread** [1] - 168:24
**break** [11] - 46:11, 54:6, 54:11, 54:12, 55:2, 70:2, 148:23, 153:4, 163:15, 246:10
**breast** [1] - 43:15
**Brett** [1] - 53:19
**Bridge** [1] - 177:3
**brief** [1] - 56:8
**briefly** [1] - 15:1
**bring** [20] - 14:19, 14:21, 15:8, 16:23, 17:6, 37:21, 37:22, 42:24, 43:5, 43:12, 43:24, 48:20, 163:23, 164:8, 214:12, 215:9, 256:14, 261:13, 285:1
**bringing** [4] - 239:25, 240:3, 240:15, 257:1
**broke** [1] - 124:12
**broken** [4] - 122:20, 140:2, 176:23, 178:9
**broker** [2] - 98:24, 174:1
**Brooklyn** [2] - 140:16, 141:13
**Brooks** [1] - 53:9
**Brosius** [2] - 39:16, 39:17
**brother** [13] - 29:12, 30:12, 97:21, 98:5, 99:24, 110:8, 116:2, 117:17, 120:23, 125:23, 139:24, 212:5, 288:24
**brother-in-law** [3] - 99:24, 117:17, 212:5
**brothers** [4] - 21:23, 25:10, 288:3
**brought** [5] - 12:21, 12:23, 16:19, 243:9, 277:12
**Broward** [66] - 52:20, 70:12, 92:6, 94:11, 95:14, 95:15, 96:14, 98:13, 100:7, 101:7, 105:4, 106:10, 107:10, 109:5, 110:22, 112:3, 113:17, 115:2, 116:16, 118:9, 119:19, 121:16, 123:4, 124:21, 126:13, 127:22, 129:4, 130:14, 131:16, 132:25, 134:11, 136:22, 138:5, 139:6, 140:9, 141:16, 143:4, 144:8, 144:15, 145:24, 146:25, 165:23, 167:14, 169:4, 170:19, 171:20, 173:19, 175:3, 175:11, 177:11, 178:17, 180:5, 181:6, 183:23, 185:11, 185:13, 187:13, 189:2, 190:16, 191:18, 193:9, 194:20, 196:3, 197:9, 198:13, 310:22
**Bruce** [8] - 1:21, 1:22, 3:12, 50:6, 50:8, 248:5, 268:11, 268:16
**Bruton** [10] - 20:17, 20:23, 21:24, 21:25, 22:8, 22:10, 24:7, 25:7, 31:7, 31:25
**BSN** [1] - 109:15
**bucks** [1] - 208:25
**Bufarale** [4] - 87:23, 88:7, 160:7, 160:14
**bufarale** [1] - 165:12
**building** [2] - 142:5, 291:7
**Bull** [1] - 223:4
**bullet** [1] - 122:19
**bump** [1] - 149:6
**bunch** [4] - 21:13, 110:5, 160:8, 291:20
**burden** [22] - 66:20, 68:18, 76:5, 199:25, 200:1, 200:2, 200:4, 200:17, 204:17, 204:18, 205:6, 224:2, 224:3, 239:23, 240:7, 240:14, 240:19, 244:19, 258:13, 277:16, 277:17, 306:24
**business** [19] - 12:22, 80:2, 86:10, 90:25, 92:18, 92:20, 98:20, 160:8, 189:16, 194:2, 203:11, 236:9, 289:21, 290:7, 290:24, 293:10, 293:13, 299:25
**businessman** [1] - 147:17
**busy** [4] - 89:7, 98:10, 121:13, 205:1
**Butler** [2] - 48:12, 51:15
**buy** [11] - 36:23, 221:24, 222:6, 222:25, 223:11, 288:8, 290:6, 290:7, 292:19, 297:16, 301:12
**buying** [17] - 291:17, 292:2, 294:5, 294:8, 295:13, 295:23, 297:6, 299:20, 299:22, 299:25, 300:21, 301:16, 302:14, 303:2, 303:19, 309:2, 309:12
**BY** [1] - 2:3

## C

**Cadwell** [1] - 3:14
**cahoots** [1] - 247:9
**Calcaterra** [6] - 84:21, 84:22, 129:3,

156:14, 156:23, 165:2
**Caldwell** [1] - 50:10
**calendar** [11] - 32:15, 33:3, 33:21, 42:7, 53:25, 55:3, 55:16, 78:6, 79:11, 285:7, 309:25
**California** [4] - 92:20, 99:6, 143:10, 180:11
**camping** [2] - 84:13, 156:6
**Canada** [1] - 110:11
**candid** [1] - 236:25
**candidate** [1] - 210:1
**candor** [6] - 69:4, 203:2, 205:14, 205:25, 233:17, 249:24
**cannot** [6] - 21:7, 246:5, 246:7, 276:4, 277:20
**capable** [1] - 34:1
**captain** [1] - 169:24
**car** [16] - 92:19, 97:23, 102:18, 121:8, 122:19, 127:15, 140:2, 176:23, 191:10, 201:19, 203:10, 203:12, 203:15, 203:22, 242:22
**cards** [2] - 63:25, 93:15
**care** [8] - 48:16, 69:13, 137:7, 172:7, 205:1, 205:13, 217:23, 218:3
**cared** [1] - 204:25
**career** [4] - 74:5, 109:14, 110:19, 273:9
**careful** [3] - 44:7, 44:14, 44:20
**Carella** [7] - 45:3, 138:5, 265:1, 268:2, 268:20, 272:19, 274:5
**Caribbean** [1] - 116:25
**Carlos** [1] - 53:18
**Carly** [1] - 53:13
**carrier** [1] - 181:12
**carry** [1] - 14:14
**carrying** [1] - 275:3
**cars** [2] - 178:8, 243:4
**CASE** [1] - 1:2
**case** [232] - 7:5, 9:8, 9:9, 10:18, 10:21, 10:23, 11:12, 12:7, 13:2, 15:7, 15:8, 16:24, 18:7, 18:10, 19:3, 21:9, 22:10, 25:4, 25:23, 26:20, 27:16, 28:3, 33:4, 34:11, 35:1, 37:19, 39:2, 41:6, 41:24, 46:3, 46:4, 46:5, 46:8, 46:18, 48:6, 48:7, 48:9, 48:13, 49:21, 50:13, 50:21, 50:25, 51:9, 52:9, 52:13, 52:20, 52:22, 53:2, 53:8, 54:9, 55:17, 55:22, 55:25, 56:11, 56:13, 56:18, 57:3, 57:19, 63:11, 63:13, 63:15, 64:6, 64:15, 64:21, 64:25, 65:6, 66:20, 67:1, 68:2, 68:9, 68:11, 68:15, 68:22, 69:9, 69:15, 73:11, 74:19, 74:20, 75:9, 75:12, 75:15, 75:19, 75:25, 76:16, 76:17, 76:20, 84:6, 87:2, 91:20, 93:2, 99:15, 102:5, 104:2, 104:14, 114:7, 127:2, 135:15, 136:2, 136:3, 136:8, 147:23, 148:4, 148:24, 149:1, 149:3, 149:4, 149:18, 150:11, 154:25, 164:17, 176:8, 179:7, 182:1, 192:15, 199:16, 199:17, 199:20, 199:21, 199:22, 199:25, 200:5, 200:8, 200:17, 202:5, 202:8, 202:22, 203:19, 204:19, 205:7, 206:9, 206:10, 207:4, 207:7, 207:10, 208:3, 208:23, 209:4, 210:5, 210:20, 210:24, 212:17, 214:1, 214:3, 214:11, 214:24, 216:25, 217:1, 217:3, 219:3, 223:22, 228:8, 228:24, 231:7, 239:22, 240:13, 240:17, 240:20, 241:13, 242:16, 243:7, 244:8, 244:13, 244:23, 245:18, 249:7, 249:8, 249:9, 249:11, 249:14, 249:17, 249:18, 250:3, 251:15, 253:19, 254:2, 254:15, 254:16, 254:20, 254:21, 256:6, 261:3, 272:11, 272:16, 273:19, 274:22, 275:14, 276:10, 276:25, 277:8, 277:9, 277:10, 277:17, 278:6, 278:10, 278:20, 278:25, 279:4, 279:8, 279:9, 279:13, 279:15, 279:19, 279:20, 279:24, 279:25, 280:5, 280:20, 280:21, 281:13, 282:3, 282:19, 284:1, 284:7, 285:18, 286:20, 286:22, 287:8, 287:20, 289:11, 300:11, 301:4, 309:24
**cases** [5] - 28:23, 37:13, 37:14, 74:5, 74:7
**cash** [2] - 292:25, 293:2
**Castillo** [7] - 140:8, 264:19, 264:23, 264:24, 270:22, 270:23, 270:25
**cataract** [1] - 87:7
**catch** [4] - 3:16, 80:13, 252:7, 252:11
**caught** [8] - 206:13, 301:25, 302:2, 303:6, 304:4, 304:14, 304:22, 307:10
**caused** [8] - 59:20, 61:13, 62:4, 69:1, 225:24, 289:15, 303:24, 306:21
**causing** [3] - 62:19, 63:1, 114:16
**caution** [1] - 232:12
**cell** [3] - 214:14, 214:15, 214:17
**CEO** [1] - 288:7
**certain** [17] - 11:13, 35:21, 36:13, 59:12, 61:14, 62:5, 64:4, 150:23, 250:6, 261:4, 275:10, 278:2, 295:18, 298:13, 298:14, 308:12
**certainly** [16] - 7:8, 10:24, 12:6, 16:2, 16:9, 23:15, 24:22, 25:11, 26:1, 29:10, 36:11, 67:2, 206:6, 261:6, 273:18, 294:16
**certificate** [7] - 222:8, 233:20, 234:2, 234:13, 234:24, 286:18, 295:5
**certificates** [2] - 234:5, 291:14
**certify** [1] - 310:16
**certifying** [1] - 234:15
**Cesar** [3] - 3:7, 49:17, 51:22
**CFO** [2] - 92:17, 99:8
**Chain** [11] - 11:19, 14:7, 18:3, 31:23, 35:20, 36:3, 37:11, 62:25, 63:4, 288:4, 288:7
**chain** [3] - 60:13, 213:22, 275:4
**Chain's** [1] - 6:24
**chairs** [1] - 281:14
**challenge** [34] - 32:16, 57:6, 57:8, 57:13, 152:20, 153:19, 153:25, 154:11, 157:1, 157:2, 157:19, 158:14, 158:21, 159:3, 159:15, 159:22, 160:13, 161:1, 161:13, 161:22, 257:12, 257:19, 257:25, 258:9, 258:19, 258:24, 259:8, 259:16, 260:11, 260:20, 261:8, 262:3, 262:19
**challenges** [16] - 3:25, 57:7, 57:11, 57:12, 151:9, 161:15, 161:24, 256:15, 256:25, 257:6, 258:21, 260:22, 261:10, 261:22, 262:5, 262:21
**challenging** [1] - 247:23
**chance** [4] - 33:15, 41:3, 164:2, 280:17
**change** [5] - 20:4, 20:13, 157:10, 219:11, 310:2
**changed** [4] - 12:22, 42:8, 219:3, 219:4
**channel** [1] - 292:7
**charge** [14] - 17:2, 17:18, 48:13, 48:18, 57:25, 59:15, 59:16, 60:9, 61:19, 64:20, 65:16, 67:5, 93:24, 288:22
**charged** [21] - 17:22, 25:9, 26:21, 26:22, 31:13, 31:14, 37:19, 58:10, 61:20, 64:9, 67:12, 210:25, 238:7, 238:23, 251:17, 251:18, 274:18, 278:19, 289:11, 289:12, 290:18
**charges** [37] - 48:3, 57:22, 58:16, 60:5, 60:7, 60:24, 61:18, 62:9, 62:16, 62:24, 63:19, 67:14, 69:5, 74:6, 74:7, 74:10, 74:12, 74:25, 150:9, 150:10, 150:11, 150:21, 150:23, 190:7, 238:4, 238:10, 238:13, 239:9, 239:17, 240:1, 240:3, 240:15, 241:22, 243:9, 306:10, 306:11, 306:20
**Charles** [83] - 3:3, 3:13, 3:21, 17:3, 19:8, 21:18, 21:23, 22:1, 22:5, 22:17, 22:22, 23:7, 23:12, 24:20, 25:20, 25:24, 28:13, 29:6, 29:25, 30:8, 30:13, 31:24, 50:6, 50:9, 57:20, 58:20, 59:18, 164:1, 262:6, 262:18, 272:1, 288:2, 288:6, 288:15, 289:6, 289:19, 290:15, 290:22, 292:1, 292:19, 292:23, 293:13, 293:16, 293:22, 293:25, 294:7, 294:19, 295:13, 295:22,

296:13, 296:16, 297:5, 298:6, 298:7, 298:10, 299:2, 299:7, 299:18, 300:13, 300:15, 300:25, 302:14, 302:24, 303:24, 304:16, 304:24, 305:3, 305:4, 305:11, 305:24, 306:13, 307:15, 307:18, 307:22, 308:1, 308:9, 308:17, 308:18, 308:23, 308:25, 309:7, 309:17, 309:21
**CHARLES** [2] - 1:7, 1:21
**Charlie** [7] - 44:17, 50:9, 238:5, 240:5, 254:16, 254:19, 254:24
**chart** [1] - 213:14
**Chase** [1] - 62:10
**chat** [3] - 30:6, 279:10, 279:11
**chatrooms** [1] - 279:16
**cheap** [1] - 290:13
**cheaper** [2] - 290:6, 308:4
**check** [8] - 30:9, 52:3, 65:24, 74:18, 159:9, 163:10, 271:8, 271:23
**chef** [1] - 103:6
**chemical** [1] - 112:19
**Chess** [1] - 174:25
**chief** [1] - 9:10
**child** [5] - 69:12, 110:13, 159:17, 160:15, 160:18
**children** [50] - 42:11, 52:8, 81:20, 92:21, 97:9, 98:25, 101:19, 103:11, 105:17, 107:21, 109:17, 111:9, 112:14, 114:4, 115:14, 117:1, 118:25, 120:6, 123:18, 125:8, 126:22, 128:11, 132:4, 133:15, 135:4, 136:17, 137:9, 142:6, 145:4, 147:11, 168:2, 168:9, 169:18, 172:18, 174:7, 175:22, 180:14, 182:24, 184:10, 186:13, 188:2, 189:21, 192:6, 193:20, 195:6, 196:15, 197:21, 215:18, 215:20, 258:12
**Chitkula** [1] - 51:20
**choice** [3] - 109:14, 219:18, 277:21
**choir** [1] - 74:25
**choirs** [1] - 128:25
**choose** [3] - 275:7, 277:20, 283:7
**chose** [3] - 18:1, 290:15, 293:13
**chosen** [1] - 66:24
**Chris** [1] - 234:23
**Christenson** [1] - 53:12
**Christina** [1] - 51:19
**Christopher** [3] - 51:15, 51:21, 53:13
**chronologically** [2] - 74:8, 74:18
**church** [1] - 177:4
**Church** [1] - 131:23
**Circuit** [1] - 22:10
**circumstances** [4] - 8:25, 108:20, 254:14, 275:5
**circumstantial** [3] - 235:2, 235:3, 275:4
**citizen** [2] - 47:17, 47:18
**citizens** [1] - 84:1
**Citizens** [1] - 62:12
**city** [3] - 65:25, 122:18, 185:14
**City** [4] - 98:15, 125:7, 181:7, 185:15
**civil** [23] - 30:4, 31:8, 47:24, 93:2, 99:15, 102:5, 102:6, 104:2, 114:8, 122:5, 127:2, 127:3, 147:23, 147:24, 176:8, 179:7, 179:8, 199:14, 199:16, 199:17, 199:20, 200:17
**civilian** [2] - 103:21, 103:22
**claim** [1] - 21:20
**claiming** [1] - 252:22
**Clarke** [8] - 44:17, 81:17, 81:18, 115:1, 215:15, 216:6, 257:9, 257:13
**classic** [4] - 14:9, 31:6, 31:24
**clean** [1] - 277:15
**cleanest** [1] - 297:2
**cleanest-looking** [1] - 297:2
**clear** [9] - 15:25, 20:20, 248:13, 292:1, 299:1, 303:17, 304:1, 305:23, 307:24
**clearer** [1] - 260:17
**clearly** [4] - 23:11, 36:1, 36:2, 49:2
**clerk** [3] - 42:3, 48:13, 181:17
**Cleveland** [1] - 258:15
**clever** [1] - 154:21
**client** [7] - 17:3, 38:13, 39:9, 39:25, 49:24, 50:8, 51:2
**clients** [6] - 4:9, 4:10, 16:20, 18:7, 218:12, 271:8
**Clifford** [1] - 53:13
**climate** [1] - 236:10
**Close** [1] - 146:9
**close** [69] - 13:11, 63:24, 63:25, 82:18, 82:21, 82:24, 93:9, 94:25, 96:2, 97:15, 100:18, 102:11, 104:20, 105:21, 106:21, 108:2, 110:3, 111:13, 112:25, 114:10, 115:20, 117:11, 117:23, 119:5, 120:10, 122:10, 124:4, 125:17, 127:9, 128:15, 129:24, 131:1, 132:10, 133:21, 133:24, 135:9, 137:17, 138:18, 139:20, 140:23, 142:14, 143:17, 145:10, 148:6, 166:11, 168:12, 170:2, 171:4, 173:5, 174:13, 176:14, 177:23, 178:2, 179:13, 180:18, 183:8, 184:21, 186:22, 188:10, 190:2, 191:2, 192:24, 194:6, 195:13, 196:21, 197:25, 199:2, 207:16, 304:18
**closely** [1] - 288:24
**closer** [2] - 175:13, 273:12
**closest** [6] - 44:2, 44:6, 44:16, 44:22, 44:24, 212:14
**closing** [8] - 69:11, 82:16, 89:6, 89:10, 89:18, 157:4, 275:13, 282:22
**cloud** [1] - 68:1
**clouding** [1] - 203:23
**co** [1] - 49:13
**co-counsel** [1] - 49:13
**coach** [1] - 118:17
**Coast** [1] - 107:20
**cocaine** [1] - 201:19
**coconspirator** [1] - 25:11
**coconspirators** [1] - 25:10
**Coconut** [1] - 187:14
**cocounsel** [1] - 49:25
**codefendant's** [1] - 24:1
**codefendants** [1] - 21:23
**cold** [1] - 113:6
**Coleman** [3] - 12:20, 13:8, 51:11
**collect** [5] - 122:24, 214:17, 221:12, 221:15, 221:21
**collectibles** [1] - 233:19
**collector** [1] - 222:11
**collectors** [1] - 221:20
**collects** [1] - 234:1
**college** [3] - 135:6, 139:10, 184:18
**Collin** [1] - 53:12
**Colombia** [1] - 111:2
**color** [1] - 201:22
**Colosi** [1] - 53:13
**Columbus** [3] - 91:8, 158:5, 285:10
**combine** [2] - 60:15, 61:5
**combined** [2] - 33:22, 58:22
**comfortable** [3] - 25:22, 25:24, 270:11
**coming** [14] - 3:24, 4:15, 14:6, 74:10, 81:4, 81:5, 81:9, 219:20, 250:5, 261:21, 289:1, 291:4, 297:25, 308:6
**comment** [2] - 18:4, 28:3
**commenting** [1] - 149:20
**comments** [1] - 150:8
**Commerce** [1] - 120:18
**commerce** [11] - 58:12, 59:1, 59:3, 59:16, 59:20, 59:22, 60:22, 61:14, 62:5, 216:12, 216:13
**commercial** [4] - 139:15, 174:1, 189:12, 196:13
**commercials** [1] - 289:25
**commit** [4] - 58:14, 58:24, 60:24, 61:18
**commitment** [1] - 237:13
**committed** [4] - 31:6, 31:17, 233:7, 278:19
**commonly** [1] - 301:19
**communicate** [2] - 36:4, 279:9
**communicated** [1] - 36:7
**communication** [4] - 61:14, 62:5, 172:17, 279:6
**communications** [2] - 38:16, 187:25
**community** [2] - 121:2, 237:15
**companies** [1] - 167:22
**company** [27] - 33:25, 36:25, 37:10, 63:4, 92:17, 99:8, 99:10, 101:25, 109:22, 128:9, 138:13, 168:8, 172:17, 177:18, 192:5, 207:23, 218:10, 288:3, 288:22, 290:16, 291:7, 296:21, 298:12, 300:16, 300:25, 303:23
**company's** [3] - 11:21, 15:17, 298:14
**compare** [3] - 8:8, 9:5, 33:12
**comparing** [1] - 59:4
**comparison** [1] - 8:11
**compel** [2] - 37:5, 39:15
**competent** [1] - 31:17
**complain** [2] - 297:19, 297:20

**complaining** [1] - 302:22
**complaint** [1] - 302:10
**complaints** [2] - 296:20, 308:14
**complete** [8] - 13:2, 13:12, 18:11, 20:6, 23:16, 24:2, 35:23, 295:1
**completely** [3] - 230:2, 244:8, 297:14
**completeness** [6] - 23:1, 23:9, 23:13, 23:17, 24:5, 26:1
**complex** [1] - 139:15
**compliance** [26] - 11:9, 11:11, 11:13, 13:5, 13:20, 14:3, 14:14, 16:20, 17:2, 17:12, 17:13, 17:14, 17:18, 17:19, 19:6, 36:12, 36:20, 36:21, 290:25, 297:23, 298:8, 298:19, 302:3, 307:13
**compliance's** [2] - 13:5, 13:6
**complicated** [1] - 35:4
**component** [1] - 7:5
**composite** [1] - 33:6
**concede** [3] - 164:11, 261:15, 285:12
**concept** [2] - 238:19, 241:11
**concern** [4] - 67:20, 67:21, 150:13, 283:17
**concerned** [3] - 275:6, 297:24, 305:21
**concerning** [9] - 14:20, 18:4, 21:22, 25:8, 32:6, 35:21, 37:23, 56:15, 297:22
**concert** [1] - 203:11
**conclude** [2] - 66:25, 272:12
**condition** [5] - 201:16, 209:24, 217:21, 280:11, 280:12
**conduct** [5] - 8:13, 37:18, 93:25, 278:3, 294:1
**confederate** [3] - 58:22, 60:15, 61:5
**confer** [1] - 256:14
**conference** [1] - 55:13
**conferred** [1] - 272:2
**confirm** [3] - 42:14, 271:12, 302:11
**confirmed** [2] - 273:16, 302:9
**conflict** [2] - 152:23, 157:13
**confused** [1] - 23:23
**confusing** [2] - 211:3, 211:4
**Conger** [1] - 51:17
**connection** [5] - 207:15, 207:20, 208:16, 210:7, 212:20
**connections** [1] - 157:22
**consecutive** [3] - 44:4, 44:13, 44:19
**consecutively** [1] - 196:7
**consequence** [1] - 306:4
**consequences** [7] - 228:21, 281:6, 287:23, 297:10, 299:6, 305:11, 307:15
**consider** [6] - 58:1, 58:4, 150:20, 276:10, 276:13, 284:8
**consideration** [3] - 39:1, 83:23, 282:1
**considered** [5] - 21:4, 46:23, 57:24, 237:14, 275:11
**considering** [1] - 276:19
**consistent** [1] - 55:6
**consotera** [1] - 50:15
**conspiracy** [24] - 10:9, 12:10, 13:22, 13:23, 13:24, 14:12, 16:21, 17:7, 17:24, 18:1, 36:1, 58:10, 58:12, 58:13, 58:15, 58:22, 59:10, 59:11, 60:7, 60:24, 61:4, 61:16, 61:17, 61:18
**conspire** [3] - 58:22, 60:15, 61:5
**constituted** [2] - 272:2, 272:5
**constitution** [5] - 75:3, 240:16, 247:15, 250:16, 250:19
**constitutional** [2] - 237:19, 244:16
**constructed** [1] - 163:1
**construction** [3] - 101:25, 120:1, 142:5
**construed** [1] - 16:2
**Consulate** [3] - 85:16, 85:23, 85:24
**consulates** [1] - 158:1
**consultant** [2] - 98:20, 197:15
**consumers** [1] - 59:9
**contact** [3] - 149:9, 149:17, 236:13
**contacts** [1] - 207:12
**contain** [1] - 304:11
**contained** [3] - 42:15, 59:24, 59:25
**contains** [1] - 295:18
**content** [1] - 7:6
**context** [8] - 29:3, 29:10, 29:11, 29:19, 30:12, 31:8, 230:25
**continuance** [2] - 33:3, 40:25
**continue** [5] - 41:21, 42:1, 52:4, 54:19, 62:23
**continued** [8] - 74:3, 203:12, 292:19, 299:24, 302:14, 305:4, 309:1
**continuing** [5] - 58:17, 60:10, 61:1, 297:16, 297:17
**contracts** [1] - 97:7
**contradict** [2] - 24:13, 26:17
**contradicted** [1] - 277:2
**contradicts** [1] - 8:22
**control** [4] - 48:16, 101:24, 275:23, 282:7
**controlled** [9] - 10:17, 10:19, 11:6, 11:16, 12:13, 14:20, 15:5, 16:13
**conversation** [2] - 37:1, 252:15
**convict** [1] - 26:21
**convicted** [2] - 47:23, 117:19
**convictions** [3] - 74:15, 74:17, 110:9
**convinced** [4] - 66:16, 182:16, 202:9, 244:9
**cook** [3] - 105:1, 114:3, 132:22
**cooking** [3] - 127:20, 185:6, 187:9
**Cooper** [1] - 181:7
**cooper** [1] - 98:15
**cooperating** [5] - 231:17, 231:18, 232:4, 233:11, 247:8
**copy** [3] - 58:9, 59:13, 77:9
**Coral** [4] - 101:8, 106:11, 123:6, 194:21
**core** [2] - 6:23, 6:24
**corollary** [1] - 245:7
**correct** [31] - 3:19, 3:20, 3:22, 4:13, 4:17, 10:2, 10:16, 38:1, 40:9, 40:10, 46:20, 47:14, 51:6, 77:2, 81:12, 136:1, 153:10, 187:12, 202:17, 225:6, 229:15, 236:18, 240:2, 242:12, 251:12, 259:3, 265:3, 269:25, 271:1, 280:17, 299:6
**corrected** [1] - 20:24
**correcting** [1] - 55:19
**corroborated** [1] - 293:19
**Coscia** [1] - 51:20
**cost** [1] - 21:14
**counsel** [17] - 3:3, 3:10, 3:15, 7:7, 15:16, 16:3, 43:4, 49:13, 49:15, 163:21, 164:11, 219:19, 256:23, 261:15, 282:18, 284:24, 285:12
**counselor** [2] - 96:24, 168:9
**counsels** [1] - 282:14
**count** [4] - 4:17, 149:24, 282:2, 282:4
**Count** [11] - 58:15, 60:1, 60:5, 60:7, 60:9, 60:24, 61:18, 61:19, 62:9, 62:16, 62:24
**counted** [1] - 270:19
**counter** [2] - 229:19, 229:22
**counterfeit** [6] - 60:17, 65:24, 234:17, 300:21, 301:8, 301:12
**counterfeited** [1] - 60:20
**Counties** [4] - 58:18, 60:11, 61:2, 61:21
**country** [5] - 66:11, 66:13, 85:5, 158:17, 237:16
**counts** [6] - 27:5, 58:11, 58:14, 251:20, 282:10
**Counts** [1] - 59:15
**County** [67] - 52:20, 58:18, 59:17, 92:7, 93:3, 94:11, 95:14, 95:15, 96:14, 98:14, 100:7, 101:7, 105:4, 106:10, 107:10, 109:5, 110:22, 112:3, 113:17, 115:3, 116:16, 118:9, 119:20, 121:16, 123:4, 124:21, 126:13, 127:22, 129:4, 130:15, 131:16, 132:25, 134:11, 136:22, 138:5, 139:6, 140:9, 141:16, 143:4, 144:8, 144:15, 145:24, 146:25, 165:23, 167:14, 169:4, 170:19, 171:20, 173:20, 175:3, 175:11, 177:11, 178:17, 180:5, 181:6, 183:24, 185:11, 185:13, 187:13, 189:2, 190:16, 191:18, 193:9, 194:20, 196:3, 197:9, 198:13
**county** [2] - 102:25, 205:16
**couple** [19] - 9:20, 13:8, 46:24, 63:23, 65:24, 79:21, 86:8, 152:3, 156:14, 176:24, 211:10, 216:25, 234:8, 237:20, 237:22, 247:2, 297:18, 305:12, 307:14
**course** [9] - 48:24, 84:8, 87:25, 135:16, 145:5, 232:10, 234:21, 246:11, 250:8
**Court** [42] - 2:4, 2:5, 3:1, 3:12, 4:23, 9:2, 17:17, 18:11, 18:14, 18:24, 19:5, 20:7, 20:8, 24:17, 25:5, 25:6, 26:10, 26:18, 26:25, 28:9, 32:10, 33:4, 43:5, 43:11, 46:2, 79:18, 150:12,

150:16, 150:20, 156:4, 163:23, 164:4, 247:15, 248:12, 272:8, 280:5, 285:1, 310:12, 310:13, 310:20, 310:21
**COURT** [1432] - 1:1, 3:2, 3:15, 3:18, 3:21, 3:24, 4:6, 4:12, 4:14, 4:20, 5:1, 5:4, 5:7, 5:13, 5:18, 5:22, 5:25, 6:12, 7:11, 7:15, 7:19, 7:22, 8:3, 8:5, 9:7, 9:11, 9:15, 9:17, 10:3, 11:1, 13:14, 13:16, 16:17, 19:10, 20:3, 20:12, 20:17, 20:22, 20:24, 22:6, 22:13, 22:19, 22:21, 22:24, 23:10, 24:22, 24:25, 25:22, 26:12, 26:14, 27:4, 27:7, 27:12, 27:21, 27:23, 28:7, 28:10, 28:22, 29:22, 30:2, 30:5, 30:15, 30:20, 32:1, 32:8, 32:18, 32:20, 33:1, 33:8, 33:19, 35:11, 35:15, 35:17, 36:7, 36:15, 36:23, 37:5, 37:20, 37:25, 38:6, 38:23, 39:6, 39:8, 39:14, 39:19, 40:7, 40:15, 40:21, 41:7, 41:14, 41:16, 41:19, 41:23, 42:18, 42:21, 42:23, 43:3, 43:11, 43:14, 43:22, 44:2, 45:20, 47:3, 47:8, 47:11, 47:13, 47:15, 49:19, 50:6, 50:11, 50:17, 50:20, 50:25, 51:4, 51:7, 51:23, 53:4, 53:20, 53:22, 54:2, 55:19, 64:9, 64:18, 64:20, 64:24, 65:9, 65:11, 65:15, 65:22, 66:12, 66:23, 67:9, 67:11, 67:23, 68:7, 68:9, 68:20, 68:24, 69:3, 69:23, 70:1, 70:7, 70:9, 70:12, 70:15, 71:2, 71:6, 71:14, 71:18, 71:22, 71:25, 72:8, 72:11, 72:15, 72:18, 72:21, 72:24, 73:9, 73:20, 73:22, 74:11, 74:14, 74:16, 74:23, 75:2, 75:7, 75:9, 75:13, 76:2, 76:5, 76:11, 76:14, 76:22, 77:3, 77:7, 77:15, 77:19, 78:11, 78:13, 78:18, 78:25, 79:2, 79:7, 79:9, 79:13, 79:20, 79:24, 80:1, 80:6, 80:11, 80:15, 80:18, 80:20, 80:25, 81:4, 81:7, 81:9, 81:11, 81:13, 81:16, 81:18, 82:1, 82:6, 82:9, 82:18, 82:23, 83:2, 83:5, 83:9, 83:12, 83:15, 83:17, 83:24, 84:9, 84:15, 84:21, 84:23, 84:25, 85:3, 85:9, 85:12, 85:22, 85:24, 86:2, 86:9, 86:14, 86:19, 86:22, 86:25, 87:2, 87:7, 87:13, 87:16, 87:21, 87:23, 88:3, 88:7, 88:9, 88:13, 88:15, 88:20, 88:23, 89:2, 89:10, 89:15, 89:20, 89:24, 90:1, 90:6, 90:10, 90:12, 90:18, 91:1, 91:3, 91:6, 91:9, 91:12, 91:16, 91:22, 91:24, 92:1, 92:3, 92:9, 92:12, 92:14, 92:16, 92:18, 92:21, 92:23, 92:25, 93:2, 93:5, 93:7, 93:9, 93:12, 93:16, 93:18, 93:21, 93:24, 94:1, 94:4, 94:7, 94:10, 94:13, 94:15, 94:18, 94:21, 94:23, 94:25, 95:3, 95:6, 95:8, 95:10, 95:12, 95:15, 95:17, 95:19, 95:21, 95:23, 95:25, 96:2, 96:5, 96:7, 96:9, 96:11, 96:13, 96:17, 96:19, 96:21, 96:23, 97:1, 97:3, 97:6, 97:9, 97:11, 97:13, 97:15, 97:20, 97:22, 98:1, 98:4, 98:7, 98:9, 98:12, 98:16, 98:19, 98:21, 98:23, 98:25, 99:2, 99:4, 99:11, 99:13, 99:15, 99:17, 99:19, 99:21, 99:23, 100:1, 100:3, 100:5, 100:9, 100:11, 100:14, 100:16, 100:18, 100:21, 100:23, 100:25, 101:2, 101:5, 101:9, 101:12, 101:15, 101:17, 101:19, 101:21, 101:23, 102:1, 102:3, 102:5, 102:7, 102:9, 102:11, 102:14, 102:17, 102:20, 102:22, 102:24, 103:3, 103:5, 103:7, 103:9, 103:11, 103:13, 103:15, 103:17, 103:20, 103:22, 103:25, 104:2, 104:4, 104:6, 104:8, 104:14, 104:16, 104:18, 104:20, 104:23, 104:25, 105:2, 105:6, 105:8, 105:10, 105:12, 105:15, 105:17, 105:19, 105:21, 105:24, 106:1, 106:3, 106:5, 106:7, 106:12, 106:15, 106:17, 106:19, 106:21, 106:25, 107:2, 107:4, 107:6, 107:8, 107:12, 107:14, 107:16, 107:18, 107:21, 107:23, 107:25, 108:2, 108:5, 108:7, 108:9, 108:13, 108:16, 108:18, 108:21, 108:23, 108:25, 109:3, 109:7, 109:10, 109:13, 109:17, 109:19, 109:23, 110:3, 110:7, 110:12, 110:14, 110:17, 110:20, 110:24, 111:1, 111:3, 111:5, 111:7, 111:9, 111:11, 111:13, 111:16, 111:18, 111:20, 111:22, 111:24, 112:2, 112:5, 112:8, 112:10, 112:12, 112:14, 112:16, 112:18, 112:23, 112:25, 113:3, 113:8, 113:10, 113:13, 113:15, 113:19, 113:22, 113:25, 114:2, 114:4, 114:6, 114:10, 114:13, 114:15, 114:18, 114:20, 114:23, 114:25, 115:5, 115:7, 115:10, 115:12, 115:14, 115:16, 115:18, 115:20, 115:24, 116:1, 116:3, 116:5, 116:7, 116:9, 116:12, 116:14, 116:18, 116:20, 116:22, 116:24, 117:1, 117:3, 117:5, 117:9, 117:11, 117:14, 117:16, 117:21, 117:24, 118:1, 118:4, 118:7, 118:11, 118:14, 118:16, 118:18, 118:21, 118:23, 118:25, 119:3, 119:5, 119:9, 119:11, 119:13, 119:15, 119:18, 119:22, 119:25, 120:3, 120:6, 120:8, 120:10, 120:13, 120:16, 120:19, 120:22, 120:24, 121:4, 121:6, 121:9, 121:11, 121:14, 121:18, 121:21, 121:23, 121:25, 122:2, 122:4, 122:6, 122:8, 122:10, 122:14, 122:17, 122:21, 122:23, 123:1, 123:4, 123:7, 123:10, 123:12, 123:14, 123:18, 123:20, 123:22, 123:24, 124:2, 124:4, 124:7, 124:9, 124:11, 124:14, 124:17, 124:19, 124:23, 124:25, 125:3, 125:5, 125:8, 125:10, 125:12, 125:15, 125:17, 125:20, 125:22, 125:25, 126:2, 126:4, 126:7, 126:9, 126:13, 126:16, 126:19, 126:21, 126:23, 126:25, 127:2, 127:4, 127:6, 127:9, 127:12, 127:14, 127:16, 127:18, 127:21, 127:24, 128:2, 128:5, 128:7, 128:11, 128:13, 128:15, 128:18, 128:20, 128:22, 128:24, 129:2, 129:7, 129:9, 129:12, 129:16, 129:18, 129:20, 129:22, 129:24, 130:2, 130:4, 130:6, 130:8, 130:11, 130:13, 130:17, 130:20, 130:22, 130:24, 131:1, 131:4, 131:6, 131:8, 131:10, 131:12, 131:14, 131:18, 131:21, 131:24, 132:1, 132:4, 132:6, 132:8, 132:10, 132:13, 132:15, 132:17, 132:19, 132:21, 132:23, 133:2, 133:5, 133:7, 133:11, 133:13, 133:15, 133:17, 133:19, 133:21, 133:25, 134:2, 134:4, 134:7, 134:9, 134:14, 134:17, 134:19, 134:21, 134:23, 135:1, 135:4, 135:7, 135:9, 135:14, 135:20, 135:23, 136:2, 136:7, 136:10, 136:12, 136:14, 136:16, 136:19, 136:24, 137:2, 137:4, 137:6, 137:9, 137:11, 137:13, 137:15, 137:17, 137:20, 137:22, 137:24, 138:1, 138:3, 138:7, 138:9, 138:11, 138:14, 138:16, 138:18, 138:21, 138:23, 138:25, 139:2, 139:4, 139:8, 139:11, 139:13, 139:16, 139:18, 139:20, 139:23, 140:1, 140:3, 140:5, 140:7, 140:11, 140:13, 140:15, 140:17, 140:19, 140:21, 140:23, 141:1, 141:3, 141:5, 141:7, 141:9,

141:13, 141:15, 141:16, 141:19, 141:22, 141:25, 142:2, 142:4, 142:6, 142:8, 142:10, 142:12, 142:14, 142:17, 142:20, 142:22, 142:24, 143:1, 143:4, 143:6, 143:9, 143:11, 143:13, 143:15, 143:17, 143:20, 143:22, 143:24, 144:2, 144:4, 144:6, 144:10, 144:12, 144:14, 144:17, 144:19, 144:21, 144:23, 144:25, 145:2, 145:4, 145:6, 145:8, 145:10, 145:13, 145:15, 145:17, 145:19, 145:22, 146:1, 146:3, 146:5, 146:7, 146:9, 146:12, 146:14, 146:16, 146:18, 146:21, 146:23, 147:2, 147:4, 147:7, 147:9, 147:11, 147:13, 147:15, 147:19, 147:21, 147:23, 148:1, 148:4, 148:6, 148:9, 148:11, 148:13, 148:16, 148:19, 148:21, 150:25, 151:15, 151:21, 151:24, 152:1, 152:14, 152:20, 153:3, 153:8, 153:13, 153:17, 153:19, 153:25, 154:5, 154:9, 154:16, 154:23, 155:5, 155:11, 155:17, 155:22, 156:2, 156:6, 156:9, 156:12, 156:20, 156:23, 157:1, 157:4, 157:13, 157:19, 157:24, 158:7, 158:14, 158:21, 159:3, 159:10, 159:15, 159:22, 160:4, 160:7, 160:13, 160:18, 160:22, 160:24, 161:1, 161:8, 161:13, 161:20, 161:22,

162:2, 162:6, 162:17, 162:23, 163:7, 163:10, 163:14, 163:18, 163:21, 164:6, 164:8, 164:10, 164:16, 165:9, 165:12, 165:20, 166:1, 166:4, 166:7, 166:9, 166:11, 166:14, 166:16, 166:19, 166:22, 166:25, 167:2, 167:5, 167:7, 167:10, 167:12, 167:17, 167:20, 167:23, 167:25, 168:2, 168:4, 168:6, 168:10, 168:12, 168:15, 168:17, 168:20, 168:23, 168:25, 169:4, 169:7, 169:10, 169:12, 169:14, 169:16, 169:18, 169:20, 169:22, 169:25, 170:2, 170:5, 170:7, 170:10, 170:12, 170:14, 170:16, 170:18, 170:21, 170:23, 170:25, 171:2, 171:4, 171:7, 171:9, 171:11, 171:13, 171:15, 171:17, 171:20, 171:23, 172:1, 172:3, 172:8, 172:11, 172:13, 172:15, 172:18, 172:20, 172:22, 172:24, 173:3, 173:5, 173:8, 173:10, 173:12, 173:14, 173:16, 173:19, 173:22, 173:25, 174:2, 174:4, 174:7, 174:9, 174:11, 174:13, 174:16, 174:18, 174:20, 174:22, 174:24, 175:1, 175:5, 175:8, 175:13, 175:16, 175:18, 175:20, 175:22, 175:24, 176:1, 176:4, 176:6, 176:8, 176:10, 176:12, 176:14, 176:17, 176:19, 176:21, 176:25,

177:2, 177:6, 177:13, 177:16, 177:19, 177:21, 177:23, 178:1, 178:3, 178:5, 178:7, 178:10, 178:12, 178:14, 178:19, 178:22, 179:1, 179:3, 179:5, 179:7, 179:9, 179:11, 179:13, 179:16, 179:18, 179:20, 179:22, 179:24, 180:1, 180:3, 180:7, 180:10, 180:12, 180:14, 180:16, 180:18, 180:21, 180:23, 180:25, 181:2, 181:4, 181:8, 181:11, 181:14, 181:16, 181:19, 181:23, 182:1, 182:6, 182:11, 182:13, 182:24, 183:1, 183:3, 183:6, 183:8, 183:11, 183:13, 183:15, 183:17, 183:19, 183:23, 184:1, 184:4, 184:6, 184:8, 184:10, 184:12, 184:14, 184:16, 184:19, 184:21, 184:24, 185:1, 185:3, 185:5, 185:7, 185:9, 185:11, 185:13, 185:16, 185:19, 185:21, 185:24, 186:1, 186:3, 186:6, 186:8, 186:10, 186:13, 186:15, 186:17, 186:20, 186:22, 186:25, 187:2, 187:4, 187:6, 187:8, 187:10, 187:13, 187:15, 187:18, 187:20, 187:22, 187:24, 188:2, 188:4, 188:6, 188:8, 188:10, 188:13, 188:15, 188:17, 188:19, 188:23, 188:25, 189:4, 189:6, 189:9, 189:11, 189:15, 189:17, 189:19, 189:21, 189:23, 189:25, 190:2, 190:5, 190:8, 190:10, 190:12,

190:14, 190:18, 190:21, 190:23, 190:25, 191:2, 191:5, 191:7, 191:9, 191:11, 191:13, 191:15, 191:18, 191:21, 191:24, 192:1, 192:3, 192:6, 192:8, 192:10, 192:12, 192:14, 192:16, 192:18, 192:21, 192:24, 193:2, 193:4, 193:6, 193:8, 193:11, 193:14, 193:16, 193:18, 193:20, 193:22, 193:24, 194:1, 194:4, 194:6, 194:10, 194:12, 194:14, 194:16, 194:18, 194:22, 194:25, 195:2, 195:4, 195:6, 195:8, 195:11, 195:13, 195:16, 195:18, 195:20, 195:22, 195:24, 196:1, 196:3, 196:6, 196:8, 196:10, 196:12, 196:15, 196:17, 196:19, 196:21, 196:24, 197:1, 197:3, 197:5, 197:7, 197:11, 197:14, 197:16, 197:18, 197:21, 197:23, 197:25, 198:3, 198:5, 198:7, 198:9, 198:11, 198:15, 198:18, 198:21, 198:23, 198:25, 199:2, 199:5, 199:7, 199:9, 199:11, 199:13, 201:7, 202:4, 202:7, 202:14, 202:18, 203:2, 203:18, 203:25, 204:4, 204:10, 204:12, 204:15, 204:21, 204:23, 205:3, 205:11, 205:14, 205:22, 205:25, 207:20, 207:24, 208:2, 208:8, 208:12, 208:15, 209:4, 209:11, 209:16, 209:18, 210:3, 210:9, 210:12, 210:14, 210:23, 211:5,

211:18, 211:21, 211:25, 212:2, 212:4, 212:7, 212:10, 212:18, 212:20, 213:3, 213:16, 213:18, 215:19, 215:22, 215:25, 216:3, 216:5, 216:18, 216:23, 217:6, 217:16, 217:24, 218:4, 218:14, 218:24, 219:2, 219:7, 224:14, 234:4, 236:20, 237:1, 237:3, 237:8, 244:12, 244:19, 244:22, 244:25, 246:21, 248:2, 248:4, 248:21, 248:23, 249:1, 249:13, 249:18, 249:21, 250:15, 250:20, 253:24, 255:8, 256:4, 256:13, 256:17, 256:19, 256:23, 257:6, 257:9, 257:12, 257:19, 257:25, 258:9, 258:14, 258:19, 258:23, 259:1, 259:4, 259:8, 259:15, 259:18, 260:7, 260:11, 260:19, 261:1, 261:6, 261:13, 261:15, 261:19, 261:21, 261:24, 262:3, 262:9, 262:14, 262:19, 262:25, 263:3, 263:6, 263:10, 263:12, 263:15, 263:18, 263:22, 264:2, 264:6, 264:10, 264:14, 264:18, 264:22, 264:24, 265:1, 265:4, 265:6, 265:10, 265:14, 265:16, 265:21, 265:23, 266:2, 266:5, 266:7, 266:10, 266:12, 266:16, 266:19, 266:22, 266:24, 267:3, 267:7, 267:9, 267:11, 267:14, 267:16, 267:19, 267:22, 267:24,

268:6, 268:13, 268:15, 268:18, 268:23, 269:2, 269:5, 269:8, 269:10, 269:15, 269:18, 269:22, 270:1, 270:4, 270:6, 270:11, 270:14, 270:16, 270:25, 271:3, 271:6, 271:8, 271:18, 271:20, 271:23, 271:25, 272:7, 272:9, 273:1, 273:4, 273:11, 273:17, 274:10, 283:4, 284:6, 284:12, 284:16, 284:21, 284:24, 285:7, 285:11, 285:17, 285:24, 286:1, 286:4, 291:24, 309:22, 310:11
**court** [40] - 3:13, 4:1, 4:14, 41:13, 41:16, 42:2, 46:4, 48:11, 48:12, 48:17, 48:22, 50:12, 73:17, 74:22, 80:22, 92:25, 94:1, 99:13, 102:3, 103:25, 122:4, 126:25, 147:21, 149:9, 153:2, 166:19, 176:6, 179:5, 187:20, 192:14, 203:14, 204:6, 205:16, 218:22, 218:25, 219:2, 228:19, 278:9, 285:8
**Court's** [5] - 18:12, 45:17, 237:4, 272:12, 272:23
**courthouse** [4] - 46:22, 129:7, 129:10, 275:3
**Courthouse** [1] - 310:22
**Courtney** [3] - 12:19, 13:8, 51:11
**COURTROOM** [14] - 43:1, 43:25, 54:1, 55:18, 163:19, 213:15, 213:17, 268:5, 268:10, 268:14, 268:22, 269:25, 270:23, 271:1
**courtroom** [28] - 44:1, 45:12, 48:14, 48:18, 48:25, 49:8, 51:5, 56:19, 82:10, 90:12, 163:1, 163:4, 194:19, 214:6, 214:12, 214:19, 226:4, 241:5, 243:25, 256:12, 274:23, 280:23, 281:4, 281:14, 281:18, 283:13, 283:21, 310:10
**courts** [1] - 203:5
**cousin** [5] - 145:14, 145:16, 171:8, 171:9, 211:16
**cousin's** [1] - 119:7
**cover** [7] - 302:16, 302:20, 303:5, 304:6, 304:11, 304:13, 304:23
**cover-up** [1] - 302:16
**cover-ups** [1] - 304:11
**covered** [2] - 23:20, 309:13
**covering** [1] - 227:5
**COVID** [6] - 235:24, 236:1, 236:10, 236:17, 283:9, 283:18
**Covington** [1] - 221:8
**coworker** [1] - 235:6
**CPA** [2] - 83:18, 133:9
**crack** [1] - 201:19
**craziest** [1] - 83:19
**create** [1] - 298:4
**credibility** [2] - 19:3, 277:8
**credit** [3] - 63:25, 64:6, 93:15
**credit-reporting** [1] - 64:6
**Creek** [1] - 187:14
**crime** [129] - 10:14, 11:2, 31:6, 31:13, 64:15, 66:17, 67:6, 93:13, 93:16, 95:6, 95:8, 96:7, 96:9, 98:4, 98:7, 99:23, 100:1, 100:23, 100:25, 102:17, 102:20, 104:18, 104:23, 106:1, 106:3, 107:2, 107:4, 108:16, 108:21, 110:12, 110:14, 111:18, 111:20, 113:8, 114:18, 114:20, 116:5, 117:24, 118:2, 119:11, 119:13, 121:4, 121:9, 122:17, 122:21, 124:9, 125:25, 127:14, 127:16, 128:20, 128:22, 130:4, 131:6, 131:8, 132:17, 132:19, 134:2, 134:5, 136:12, 136:14, 137:22, 137:24, 138:23, 138:25, 140:1, 140:3, 141:3, 141:5, 142:20, 142:22, 143:22, 145:15, 146:16, 148:11, 167:2, 167:5, 167:8, 168:17, 168:21, 170:10, 170:12, 171:11, 171:13, 173:10, 173:12, 174:18, 174:20, 176:19, 176:25, 178:5, 178:10, 179:20, 179:22, 180:23, 180:25, 182:18, 183:13, 183:15, 185:1, 185:3, 187:2, 187:4, 187:6, 188:15, 188:17, 190:8, 190:10, 191:9, 191:11, 193:2, 193:4, 194:10, 194:14, 195:18, 195:20, 197:1, 197:3, 198:5, 198:7, 199:7, 199:9, 200:11, 200:12, 204:8, 206:5, 206:12, 231:19, 233:7, 290:19
**crimes** [24] - 17:9, 113:11, 116:10, 124:15, 126:5, 130:9, 143:25, 145:17, 146:19, 148:17, 188:22, 206:6, 206:18, 233:10, 238:5, 238:7, 238:16, 238:23, 251:17, 274:18, 278:19, 289:11, 289:12, 293:7
**criminal** [39] - 12:13, 31:9, 37:14, 46:3, 48:2, 48:7, 55:25, 64:21, 68:11, 76:16, 93:2, 93:3, 99:15, 99:16, 102:5, 104:2, 104:3, 114:6, 114:8, 127:2, 147:23, 176:8, 176:9, 179:7, 192:15, 199:15, 199:16, 199:22, 200:17, 201:10, 207:3, 225:25, 227:1, 231:7, 232:1, 232:3, 274:13, 277:9, 277:10
**criminals** [1] - 293:6
**Cristina** [1] - 83:16
**critical** [2] - 15:3, 30:14
**critically** [1] - 11:20
**crochet** [1] - 124:18
**cross** [14] - 14:18, 14:22, 14:23, 35:3, 38:3, 38:5, 40:4, 52:13, 206:20, 254:5, 254:8, 259:2, 282:18, 282:20
**cross-examination** [6] - 14:22, 35:3, 38:5, 206:20, 254:5, 254:8
**cross-examine** [6] - 14:18, 14:23, 38:3, 40:4, 282:18, 282:20
**crowded** [1] - 78:25
**Cruise** [1] - 107:15
**cruise** [5] - 72:9, 88:11, 159:24, 160:2, 177:6
**crystal** [1] - 53:25
**Crystal** [8] - 42:24, 48:12, 163:7, 268:4, 283:6, 283:25, 285:7, 309:25
**cumbersome** [1] - 34:4
**curative** [2] - 21:2, 151:1
**curiosity** [1] - 224:19
**curious** [1] - 221:6
**custody** [1] - 48:16
**customer** [2] - 63:1, 101:13
**Customers** [1] - 297:19
**customers** [8] - 220:19, 229:24, 296:20, 302:22, 303:3, 304:8, 307:12, 308:10
**Customs** [2] - 134:24, 178:24
**customs** [1] - 74:3
**cut** [4] - 29:14, 30:9, 233:2
**cuts** [1] - 235:3
**cyber** [1] - 117:7
**cycling** [1] - 195:23

## D

**dad** [2] - 95:4, 172:6
**dad's** [1] - 135:11
**Dade** [8] - 58:18, 59:16, 60:11, 61:1, 61:21, 93:3, 128:3, 181:17
**daily** [1] - 160:17
**Dakota** [1] - 53:12
**damage** [5] - 204:25, 205:9, 205:12, 209:24, 210:2
**Dan** [1] - 234:7
**dangerous** [1] - 26:23
**Daniel** [2] - 51:17, 53:18
**Dannenfelser** [1] - 53:11
**darker** [1] - 201:21
**DATE** [1] - 310:19
**date** [4] - 81:6, 82:16, 83:1, 157:23
**dates** [3] - 10:9, 61:20, 69:21
**daughter** [16] - 73:4, 73:7, 73:17, 85:15, 87:19, 90:15, 99:7, 109:2, 112:21, 117:6, 146:22, 169:23, 172:25, 176:2, 176:22, 182:25
**daughter's** [2] - 85:17, 190:6
**daughters** [3] - 135:5, 137:10, 168:3
**David** [1] - 53:14
**Davie** [3] - 94:12, 118:10, 183:25
**days** [27] - 9:10, 9:13, 41:9, 41:11, 46:6, 46:7, 46:24, 54:21, 54:25, 55:4, 72:10, 76:17, 79:18, 79:22, 81:14, 87:18, 98:18, 152:3, 156:9, 158:24, 159:7, 159:13, 226:3, 273:8, 285:8, 310:4
**deadline** [2] - 83:19, 86:4
**deadlines** [1] - 218:13
**deal** [2] - 230:2, 233:3
**dealers** [1] - 67:7
**dealership** [6] - 229:18, 229:19,

230:3, 242:22, 242:25, 243:2
**dealing** [2] - 67:12, 211:11
**dealt** [1] - 28:8
**deceitful** [1] - 59:5
**December** [1] - 89:7
**decide** [15] - 4:16, 4:21, 10:8, 104:10, 205:6, 207:7, 210:4, 231:22, 233:8, 274:16, 274:22, 276:15, 281:13, 282:24, 283:19
**decided** [1] - 4:23
**deciding** [5] - 4:20, 70:16, 83:3, 218:17, 276:10
**decision** [9] - 56:13, 214:5, 242:8, 242:10, 253:3, 280:7, 280:22, 281:2, 288:8
**decisions** [6] - 247:16, 254:16, 254:19, 254:21, 254:22, 254:25
**decorum** [1] - 48:18
**deeds** [1] - 14:15
**deep** [1] - 246:25
**Deerfield** [1] - 197:10
**defend** [6] - 245:13, 245:18, 248:18, 303:25, 304:9, 305:2
**DEFENDANT** [2] - 1:17, 1:21
**Defendant** [5] - 15:21, 22:16, 24:14, 29:6, 29:7
**defendant** [25] - 8:16, 11:18, 21:1, 21:2, 21:3, 21:4, 21:8, 23:22, 23:23, 24:16, 25:12, 26:24, 62:18, 64:16, 248:17, 249:14, 275:19, 275:21, 277:14, 282:1, 282:3, 282:5, 282:8, 282:9, 282:19
**defendant's** [8] - 11:23, 22:3, 22:15, 24:15, 29:21, 33:25, 34:12, 277:21
**defendants** [93] - 4:2, 5:8, 7:7, 10:20, 11:17, 12:2, 12:3, 12:21, 13:4, 14:1, 15:16, 15:21, 16:3, 22:23, 24:5, 29:4, 30:7, 33:23, 36:6, 36:19, 36:22, 41:23, 42:12, 43:4, 50:12, 57:23, 57:25, 58:6, 58:10, 60:12, 61:3, 61:20, 62:18, 63:19, 64:12, 64:15, 65:1, 65:6, 65:11, 66:19, 66:22, 67:4, 67:12, 67:24, 68:16, 75:2, 149:6, 150:23, 163:22, 199:23, 200:1, 202:10, 204:1, 205:17, 209:5, 210:16, 219:19, 244:15, 256:24, 274:17, 277:11, 277:12, 277:17, 277:19, 279:21, 281:25, 282:6, 286:22, 287:14, 287:21, 288:1, 289:11, 289:18, 291:8, 292:19, 293:3, 294:5, 296:10, 297:5, 300:4, 301:5, 301:13, 301:22, 302:13, 302:18, 303:5, 303:19, 303:22, 304:7, 304:15, 304:22, 307:11
**Defendants** [1] - 1:8
**defendants'** [9] - 11:5, 34:16, 58:1, 277:23, 297:23, 301:9, 303:1, 307:2, 307:12
**defense** [17] - 5:16, 8:2, 19:14, 19:20, 27:14, 34:14, 219:19, 240:21, 243:7, 245:10, 249:8, 267:7, 268:14, 270:24, 282:14, 282:18, 310:8
**Defense** [1] - 270:25
**defenses** [1] - 11:13
**deferred** [1] - 262:11
**definitely** [2] - 55:8, 236:8
**definitions** [1] - 280:25
**defraud** [12] - 31:11, 31:14, 58:16, 58:25, 59:3, 59:19, 61:7, 61:8, 61:23, 61:24, 251:21, 254:23
**degree** [2] - 83:24, 218:15
**delay** [1] - 6:21
**delays** [1] - 9:10
**deliberate** [1] - 255:20
**deliberating** [3] - 27:1, 54:18, 127:8
**deliberation** [8] - 54:19, 281:16, 281:19, 283:10, 283:14, 283:19, 284:2, 310:7
**deliberations** [8] - 58:9, 59:14, 66:16, 150:22, 182:16, 214:16, 280:6
**deliver** [2] - 58:25, 59:19
**delivered** [3] - 59:2, 59:21, 225:5
**denied** [1] - 42:1
**denies** [1] - 40:7
**dental** [1] - 166:5
**dentist** [1] - 195:5
**deny** [10] - 9:17, 16:6, 19:13, 19:21, 26:3, 28:3, 35:15, 40:22, 151:7, 259:16
**department** [7] - 11:9, 86:3, 86:6, 97:5, 134:25, 186:2, 229:25
**Department** [5] - 25:3, 49:16, 120:17, 207:11, 231:16
**Depass** [8] - 73:2, 107:9, 201:14, 201:15, 203:2, 211:22, 213:5, 257:20
**deployed** [1] - 288:11
**depo** [1] - 30:15
**deposit** [1] - 65:24
**deposition** [25] - 21:3, 21:19, 22:14, 22:17, 22:22, 22:25, 23:2, 23:5, 23:7, 23:12, 23:14, 23:19, 24:1, 24:19, 25:24, 28:5, 28:12, 28:16, 29:1, 30:4, 30:12, 30:22, 30:25, 31:9, 32:5
**depositions** [2] - 23:21, 24:8
**deprived** [1] - 8:23
**DEPUTY** [11] - 54:1, 55:18, 213:15, 213:17, 268:5, 268:10, 268:14, 268:22, 269:25, 270:23, 271:1
**DerOvanesian** [4] - 1:13, 3:6, 49:16, 285:20
**DEROVANESIAN** [10] - 42:6, 271:12, 271:15, 271:17, 283:2, 285:21, 285:25, 286:2, 286:5, 291:25
**Descovy** [2] - 67:19, 225:10
**describe** [1] - 145:20
**described** [1] - 12:14
**description** [1] - 15:16
**deserve** [1] - 231:23
**deserves** [1] - 275:9
**design** [3] - 99:9, 176:3, 196:13
**designed** [1] - 281:5
**designer** [2] - 111:4, 168:1
**desperate** [2] - 287:13, 293:1
**despite** [3] - 247:20, 290:13, 292:18
**detail** [2] - 225:1, 289:18
**detailed** [3] - 15:16, 55:16, 274:15
**details** [1] - 6:19
**detective** [1] - 214:24
**determination** [6] - 18:25, 32:12, 252:22, 253:5, 255:21
**determinations** [1] - 25:6
**determine** [4] - 8:18, 239:12, 274:17, 282:2
**determining** [2] - 56:13, 277:7
**detox** [1] - 187:25
**developer** [1] - 128:3
**development** [1] - 194:2
**device** [2] - 278:22, 279:16
**devise** [4] - 61:7, 61:23
**Devuyst** [1] - 51:14
**Dhanota** [2] - 51:21, 53:17
**Dhruv** [1] - 51:15
**Diamantstein** [1] - 53:19
**Diana** [1] - 53:9
**Diaz** [9] - 127:21, 217:17, 218:5, 263:15, 268:20, 270:21, 272:19, 274:3
**die** [1] - 234:10
**dies** [1] - 234:8
**difference** [5] - 23:1, 199:15, 200:16, 252:13, 275:6
**different** [28] - 7:17, 13:8, 23:7, 24:5, 24:6, 28:2, 60:6, 119:16, 199:22, 200:11, 201:22, 221:22, 238:4, 238:7, 238:23, 239:9, 283:6, 294:25, 297:14, 299:12, 299:14, 300:19, 302:6, 302:7, 302:17, 304:3, 306:1
**difficult** [5] - 207:3, 218:11, 236:4, 236:10, 239:3
**difficulties** [2] - 240:24, 241:3
**difficulty** [5] - 238:19, 240:18, 241:3, 241:8, 247:19
**digest** [1] - 254:6
**diligence** [1] - 36:13
**DIMITROULEAS** [1] - 1:10
**Dimitrouleas** [5] - 2:5, 46:1, 251:9, 251:16, 251:19
**Dimitrouleas/Hunt** [1] - 1:2
**dire** [2] - 55:22, 56:12
**direct** [4] - 25:14, 25:18, 254:3, 275:6
**directed** [2] - 17:19, 233:12
**direction** [4] - 14:1, 14:2, 252:5, 252:10
**directly** [15] - 11:11, 11:15, 11:22, 12:6, 13:1, 13:11, 15:4, 15:18, 229:24, 230:10, 230:13, 230:15, 296:14, 302:24, 308:9
**director** [6] - 172:16, 297:23, 298:8, 298:19, 302:3, 307:13
**dirt** [1] - 290:13
**dirty** [14] - 289:3, 292:14, 294:18, 296:7, 296:12, 296:22, 298:9, 301:14, 302:23,

304:3, 305:5, 308:6, 309:2
**disadvantage** [1] - 283:22
**disagree** [1] - 255:17
**disbelieve** [2] - 135:20, 275:7
**discipline** [1] - 84:5
**disclosure** [1] - 37:16
**disconnect** [1] - 243:19
**discordance** [1] - 241:21
**discovery** [5] - 6:5, 7:1, 15:15, 41:6, 164:2
**discretion** [1] - 88:2
**discuss** [15] - 12:1, 15:5, 33:20, 149:1, 149:4, 152:12, 164:17, 214:3, 216:8, 256:5, 275:14, 278:9, 278:12, 285:18, 309:24
**discussed** [13] - 12:1, 77:13, 149:2, 149:5, 164:17, 214:4, 256:6, 272:3, 278:23, 280:9, 280:13, 285:18, 309:25
**discussing** [1] - 237:22
**discussion** [2] - 37:23, 63:12
**discussions** [3] - 278:25, 279:4, 280:6
**disgruntled** [1] - 14:5
**dishonest** [1] - 59:5
**dismissed** [1] - 228:20
**Disney** [1] - 99:6
**disorder** [1] - 73:4
**dispatcher** [1] - 177:17
**dispense** [2] - 302:25, 308:13
**dispensed** [1] - 287:12
**disregard** [5] - 17:4, 19:9, 232:12, 276:9, 282:4
**disregarded** [3] - 11:11, 13:4, 13:5
**dissipated** [1] - 283:18
**distancing** [1] - 283:11
**distract** [1] - 281:17
**distribution** [2] - 11:5, 59:7
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [13] - 2:5, 46:2, 58:19, 59:17, 60:4, 60:12, 61:2, 61:21, 62:12, 63:3, 310:21, 310:21
**distrust** [1] - 228:9
**diversion** [2] - 11:15, 29:8
**diverted** [5] - 24:10, 62:14, 63:5, 209:6, 211:7
**Divilio** [1] - 51:12
**DIVISION** [1] - 1:2
**divorced** [5] - 105:11, 107:17, 128:6, 189:18, 197:17
**doctor** [8] - 87:10, 168:7, 227:11, 227:17, 227:18, 227:20, 310:3
**doctor's** [2] - 55:5, 83:6
**document** [4] - 24:13, 29:19, 287:4, 297:21
**documentation** [7] - 58:13, 60:8, 60:18, 60:21, 222:7, 306:5, 306:16
**documents** [21] - 6:14, 8:8, 9:5, 41:1, 222:12, 286:25, 287:2, 287:9, 287:10, 287:17, 288:10, 288:17, 292:8, 293:20, 294:16, 296:3, 297:3, 298:4, 299:4, 301:11, 307:6
**dog** [2] - 129:1, 217:20
**dogs** [1] - 52:11
**dollars** [2] - 292:20, 299:25
**done** [22] - 14:1, 14:2, 14:4, 16:25, 17:8, 19:3, 28:5, 54:5, 56:9, 78:20, 91:16, 114:8, 154:10, 155:10, 203:16, 209:25, 211:2, 214:18, 215:1, 247:8, 253:10, 302:20
**donuts** [1] - 64:10
**door** [1] - 52:6
**Dotson** [1] - 53:8
**double** [2] - 81:22, 82:3
**doubt** [38] - 65:5, 66:17, 66:20, 67:3, 76:3, 76:4, 136:4, 182:17, 182:18, 200:5, 200:13, 202:9, 202:13, 202:14, 202:19, 202:20, 202:22, 205:7, 232:6, 232:14, 232:15, 240:17, 244:14, 246:18, 249:10, 253:13, 253:14, 253:16, 253:17, 255:13, 255:16, 255:25, 256:1, 260:19, 261:7, 277:24, 306:24
**Dowlatram** [5] - 45:8, 159:17, 159:23, 175:4, 175:5
**down** [29] - 43:16, 48:23, 49:2, 72:2, 75:13, 76:24, 109:15, 110:1, 110:15, 110:19, 129:5, 149:11, 149:13, 149:24, 153:4, 158:8, 159:10, 214:20, 243:3, 246:25, 248:13, 250:9, 250:10, 250:12, 273:24, 295:18, 300:15
**dozen** [1] - 109:24
**drafted** [1] - 27:23
**Dresser** [1] - 51:19
**drinking** [1] - 139:25
**driver** [1] - 106:16
**driver's** [1] - 89:22
**driveway** [1] - 102:19
**driving** [3] - 102:15, 203:10, 209:12
**drop** [6] - 71:11, 71:14, 81:20, 88:20, 88:22, 90:15
**drop-off** [1] - 81:20
**dropped** [1] - 146:15
**dropping** [1] - 71:15
**drops** [1] - 160:18
**Drug** [1] - 59:6
**drug** [28] - 11:15, 29:8, 30:1, 59:22, 59:23, 59:24, 66:4, 66:8, 67:7, 68:13, 99:9, 108:11, 162:1, 166:18, 170:9, 171:10, 210:21, 245:23, 286:19, 287:25, 295:2, 295:16, 299:15, 300:6, 300:7
**drug's** [1] - 297:15
**drugged** [1] - 203:12
**drugs** [49] - 11:16, 14:20, 21:14, 24:9, 37:11, 58:11, 58:12, 58:16, 59:3, 59:7, 59:9, 59:16, 60:2, 62:14, 63:5, 67:12, 68:23, 155:1, 201:18, 208:20, 209:6, 209:13, 209:20, 210:2, 210:15, 210:21, 211:2, 211:7, 212:24, 212:25, 213:3, 213:8, 213:18, 213:23, 223:23, 224:17, 287:5, 288:8, 288:23, 289:8, 289:16, 293:15, 297:24, 298:2, 299:21, 301:23, 302:21, 304:18, 309:1
**due** [1] - 36:13
**DUI** [7] - 97:24, 114:16, 142:19, 143:21, 191:8, 192:22, 192:23
**DUI-related** [1] - 97:24
**dump** [1] - 9:4
**dumped** [3] - 33:16, 35:7, 41:1
**during** [31] - 11:22, 12:5, 12:9, 12:10, 13:21, 13:24, 14:6, 14:12, 16:20, 17:3, 17:14, 30:11, 34:2, 48:11, 48:24, 48:25, 58:9, 59:13, 66:16, 89:9, 182:16, 214:15, 214:16, 235:24, 236:1, 236:10, 278:11, 283:6, 283:9, 285:22
**duties** [1] - 274:13
**duty** [9] - 82:21, 84:5, 85:20, 125:14, 162:8, 200:23, 201:3, 241:13, 274:16
**Dwayne** [1] - 51:15

### E

**early** [9] - 8:20, 52:8, 58:17, 60:10, 60:25, 78:3, 88:22, 89:1, 262:13
**Earth** [1] - 278:21
**easier** [2] - 49:7, 223:3
**easiest** [1] - 235:4
**East** [1] - 310:22
**east** [1] - 221:8
**Easy** [1] - 112:2
**easy** [4] - 66:3, 66:9, 212:4, 246:19
**eating** [2] - 95:11, 218:2
**Eberspacher** [7] - 11:8, 11:20, 12:17, 15:9, 15:21, 15:24, 51:11
**Eberspacher's** [1] - 12:5
**economic** [1] - 236:15
**Edgar** [1] - 51:17
**educational** [1] - 220:17
**effect** [1] - 29:13
**effective** [2] - 38:5, 218:23
**effectively** [1] - 14:23
**effects** [1] - 209:24
**effort** [2] - 42:11, 59:8
**eight** [5] - 27:5, 86:18, 110:25, 258:12, 271:3
**either** [20] - 23:10, 36:8, 46:22, 52:14, 57:16, 57:17, 63:11, 68:16, 77:8, 108:12, 151:15, 219:2, 244:15, 275:7, 278:5, 289:7, 289:14, 306:5, 306:13
**elapsed** [3] - 236:21, 246:21, 248:2
**electrician** [2] - 101:25, 109:21
**electronic** [1] - 279:6
**element** [2] - 66:17, 182:18
**elements** [2] - 200:11, 200:12
**elevator** [3] - 149:19, 149:20, 215:8
**eleven** [1] - 115:17
**Eleventh** [1] - 22:10
**Elhaddad** [6] - 91:1, 91:2, 161:3, 161:14, 165:14

**elicit** [1] - 11:5
**eliminate** [1] - 30:21
**elimination** [2] - 57:5, 215:3
**Elliott** [1] - 53:9
**ELMO** [1] - 285:22
**elsewhere** [4] - 58:19, 60:12, 61:3, 61:22
**email** [6] - 40:5, 62:17, 62:25, 273:6, 273:16, 279:10
**emails** [6] - 291:1, 293:19, 298:10, 300:4, 307:3, 308:21
**embarrass** [1] - 151:5
**emphasize** [1] - 279:7
**employee** [4] - 14:5, 34:17, 36:3, 95:22
**employees** [7] - 11:8, 35:20, 36:12, 36:21, 36:25, 307:12, 308:16
**employer** [2] - 84:4, 278:7
**employment** [6] - 18:2, 33:25, 34:18, 36:18, 139:14, 198:20
**end** [34] - 9:20, 28:2, 46:16, 56:25, 57:3, 76:20, 76:25, 86:5, 86:7, 149:25, 151:17, 151:19, 154:14, 162:3, 182:16, 200:8, 201:5, 203:15, 218:2, 239:14, 239:19, 241:25, 242:4, 244:8, 245:8, 245:12, 249:7, 255:19, 274:14, 274:18, 277:8, 277:17, 306:9, 309:6
**ended** [2] - 74:3, 121:1
**ending** [2] - 62:11, 62:12
**enforcement** [23] - 74:3, 93:10, 95:1, 97:16, 110:6, 127:10, 128:16, 129:25, 131:2, 132:11, 133:22, 135:14, 166:12, 170:3, 173:6, 174:14, 176:15, 177:24, 178:24, 180:19, 184:22, 228:6, 228:11
**engineer** [3] - 112:20, 124:1, 195:1
**English** [2] - 91:20, 211:3
**enter** [1] - 164:9
**entered** [1] - 113:5
**enters** [1] - 44:1
**ENTIN** [2] - 2:4, 310:20
**Entin** [2] - 48:22, 310:19
**entire** [3] - 150:15, 155:19, 240:13
**entirely** [5] - 23:7, 199:25, 200:4, 232:13, 299:14
**entitled** [4] - 4:21, 281:23, 283:16, 310:18
**entity** [1] - 8:12
**entrepreneurship** [1] - 195:9
**enumerated** [1] - 21:9
**environmental** [1] - 192:5
**equipment** [4] - 167:21, 177:17, 193:15, 235:19
**equivocal** [1] - 259:23
**equivocated** [1] - 260:15
**equivocating** [1] - 260:1
**erroneous** [1] - 27:25
**especially** [2] - 31:8, 261:3
**Esquire** [4] - 1:13, 1:17, 1:17, 1:21
**essence** [2] - 7:6, 231:19
**essential** [1] - 66:17
**essentially** [3] - 21:16, 21:17, 295:20
**estate** [6] - 69:11, 98:24, 157:10, 174:1, 189:12, 196:14
**estimate** [2] - 7:20, 283:2
**ethical** [1] - 206:21
**evaluate** [3] - 18:24, 208:6, 280:13
**eve** [5] - 6:9, 8:10, 8:23, 16:4, 18:5
**eve-of-trial** [1] - 16:4
**evening** [2] - 309:23, 310:9
**eventually** [4] - 290:21, 303:20, 303:23, 309:4
**evidence** [111] - 5:2, 9:24, 10:1, 10:5, 10:11, 10:13, 10:14, 10:15, 11:1, 11:2, 12:11, 12:15, 13:18, 13:25, 14:9, 14:12, 14:17, 14:19, 14:25, 15:2, 15:3, 15:12, 16:2, 16:16, 16:18, 17:1, 17:15, 17:16, 17:18, 17:21, 17:22, 18:25, 19:2, 19:14, 19:18, 19:19, 19:22, 20:9, 22:12, 25:5, 25:14, 26:7, 32:6, 32:21, 34:6, 48:15, 56:18, 57:24, 58:1, 58:2, 63:10, 65:4, 68:6, 68:15, 68:16, 75:18, 214:11, 224:1, 224:6, 224:7, 232:16, 235:2, 235:3, 240:12, 248:24, 249:1, 249:3, 249:4, 249:5, 249:6, 249:7, 254:15, 274:22, 274:23, 274:25, 275:1, 275:3, 275:4, 275:6, 275:8, 275:10, 275:14, 275:16, 275:17, 275:20, 275:23, 275:24, 276:8, 276:9, 276:10, 276:11, 276:12, 277:2, 277:5, 277:18, 277:22, 280:14, 280:23, 282:2, 282:3, 282:4, 282:13, 282:15, 282:21, 282:23, 292:15, 304:5, 304:19, 306:25, 308:13
**Evidence** [1] - 276:1
**evil** [1] - 29:25
**ex** [2] - 114:16, 115:8
**ex-husband** [1] - 114:16
**ex-paramedic** [1] - 115:8
**exact** [4] - 12:25, 149:24, 256:8, 306:4
**exactly** [8] - 32:11, 182:6, 296:14, 298:11, 300:9, 300:13, 306:3, 307:8
**examination** [9] - 14:22, 35:3, 38:5, 55:23, 56:12, 206:20, 254:4, 254:5, 254:8
**examine** [8] - 6:10, 8:21, 14:18, 14:23, 38:3, 40:4, 282:18, 282:20
**example** [6] - 222:4, 222:21, 233:24, 235:4, 294:21, 307:7
**examples** [1] - 300:23
**Excedrin** [1] - 299:16
**excellent** [1] - 239:21
**except** [3] - 60:5, 64:3, 214:16
**excerpt** [5] - 23:5, 23:19, 23:24, 24:19, 24:20
**excerpts** [5] - 20:19, 20:25, 21:6, 22:23, 29:1
**exclude** [8] - 5:19, 9:18, 9:23, 19:21, 28:4, 32:23, 33:6, 36:24
**excluded** [1] - 110:1
**exclusion** [1] - 240:17
**exculpatory** [2] - 21:22, 25:11
**excuse** [17] - 9:13, 26:13, 39:7, 43:23, 45:16, 57:6, 60:9, 60:25, 67:25, 151:15, 151:17, 164:20, 175:6, 187:5, 215:5, 250:11, 273:12
**excused** [20] - 4:1, 57:9, 57:13, 57:16, 164:21, 164:22, 164:25, 165:1, 165:2, 165:3, 165:4, 165:5, 165:6, 165:7, 165:12, 165:13, 165:14, 165:15, 272:11, 272:23
**excusing** [3] - 43:18, 151:10, 284:8
**executing** [2] - 61:12, 62:3
**executive** [1] - 125:6
**exercise** [6] - 35:4, 131:13, 173:15, 177:3, 191:14, 194:17
**exercising** [1] - 140:6
**Exhibit** [1] - 30:24
**exhibit** [21] - 8:9, 8:10, 8:13, 8:15, 8:19, 8:20, 8:21, 8:22, 9:6, 19:1, 33:6, 33:10, 33:12, 33:14, 42:8, 42:15, 274:25, 275:25, 276:3, 276:4
**exhibits** [13] - 5:19, 6:2, 6:4, 6:7, 6:17, 6:18, 7:7, 7:15, 7:18, 7:23, 32:24, 33:7
**exist** [2] - 8:15, 279:23
**exists** [3] - 22:10, 39:12, 200:6
**exits** [2] - 256:12, 310:10
**expect** [3] - 9:8, 35:1, 55:14
**expected** [2] - 12:8, 12:20
**expecting** [2] - 9:9, 227:13
**expensive** [2] - 222:21, 233:19
**Experience** [1] - 129:19
**experience** [25] - 56:15, 75:16, 75:18, 154:15, 200:23, 201:2, 203:4, 206:1, 209:13, 211:11, 211:15, 223:19, 223:21, 223:25, 225:23, 227:8, 228:2, 228:6, 228:10, 229:5, 236:11, 258:3, 307:21, 308:22
**experiences** [1] - 227:8
**explain** [7] - 200:10, 227:24, 237:25, 274:12, 274:19, 274:20, 291:16
**explanation** [2] - 211:3, 308:1
**explanations** [2] - 304:9, 304:11
**exposure** [1] - 213:22
**express** [2] - 43:15, 250:6
**Express** [1] - 125:7
**exquisite** [1] - 41:24
**extensions** [1] - 218:12
**extra** [1] - 80:12
**extraordinarily** [1] - 34:4
**extremely** [1] - 10:23
**extrinsic** [1] - 16:2
**eye** [1] - 87:5
**Ezzell** [8] - 77:21, 79:20, 119:19, 155:14, 213:1,

216:9, 241:10, 264:14

## F

**face** [4] - 22:11, 279:8, 298:15
**face-to-face** [1] - 279:8
**Facebook** [1] - 279:12
**facilitating** [1] - 60:21
**facilities** [1] - 177:5
**facility** [2] - 188:1, 283:10
**fact** [29] - 12:3, 14:6, 18:6, 18:8, 21:21, 31:6, 38:19, 58:5, 68:12, 84:3, 136:7, 149:19, 181:19, 205:15, 208:22, 210:14, 214:14, 226:23, 227:15, 227:17, 231:25, 247:20, 275:1, 275:5, 279:3, 280:21, 282:6, 282:9, 287:9
**factor** [1] - 56:20
**factors** [2] - 236:16, 277:6
**facts** [21] - 51:5, 214:6, 239:15, 239:16, 239:18, 244:11, 252:4, 252:14, 252:17, 252:21, 252:23, 252:25, 253:2, 253:4, 253:6, 254:19, 255:11, 287:8, 305:1
**Fadel** [1] - 51:20
**failed** [2] - 202:3, 204:21
**failing** [1] - 205:8
**fair** [57] - 28:3, 50:18, 52:4, 56:23, 64:15, 64:21, 65:17, 66:10, 67:15, 69:2, 69:6, 69:15, 94:5, 98:2, 108:14, 117:22, 120:20, 151:3, 154:13, 162:9, 166:23, 181:21, 202:5, 203:19, 205:4, 206:24, 208:13, 209:7, 209:14, 209:21, 211:19, 212:8, 215:8, 215:12, 215:17, 216:8, 217:13, 217:15, 217:19, 218:9, 218:20, 224:8, 226:25, 234:9, 238:9, 247:11, 259:21, 259:24, 261:8, 278:4, 280:2, 280:3, 280:18, 281:2, 281:5
**fairly** [2] - 13:11, 205:15
**faith** [1] - 18:16
**fake** [7] - 287:1, 287:5, 288:17, 289:7, 294:10, 298:9
**false** [23] - 21:21, 22:4, 25:11, 38:1, 58:13, 59:23, 60:8, 60:20, 61:9, 61:11, 61:25, 62:2, 287:10, 298:15, 299:4, 302:4, 302:10, 302:11, 306:6, 306:14, 306:16, 309:11, 309:19
**falsely** [1] - 60:17
**falsified** [7] - 29:6, 59:25, 63:4, 289:14, 298:4, 302:1, 303:10
**falsify** [1] - 299:8
**falsifying** [1] - 298:3
**familiar** [1] - 291:17
**familiarity** [1] - 209:20
**families** [1] - 42:11
**family** [17] - 42:10, 42:12, 71:12, 84:13, 86:18, 87:18, 93:12, 93:18, 106:23, 139:22, 173:15, 178:2, 194:17, 197:6, 201:23, 203:10, 207:16
**family's** [1] - 178:8
**far** [8] - 19:23, 31:9, 32:13, 39:14, 163:11, 275:5, 284:6, 292:6
**Fashion** [1] - 273:6
**fashion** [3] - 111:4, 168:1, 232:5
**fast** [3] - 77:7, 248:23, 255:9
**father** [5] - 93:22, 117:19, 166:17, 190:6, 194:8
**father-in-law** [1] - 194:8
**fault** [1] - 233:1
**favorable** [2] - 38:11, 210:16
**favoring** [1] - 224:7
**FBI** [3] - 6:21, 204:5, 207:10
**FDA** [5] - 216:13, 216:19, 217:3, 304:10, 307:11
**February** [2] - 60:6, 76:16
**federal** [27] - 46:4, 69:9, 73:25, 92:25, 99:13, 102:3, 103:25, 120:14, 126:25, 147:21, 150:8, 166:19, 176:6, 179:5, 181:20, 192:14, 204:6, 204:7, 216:12, 228:8, 228:9, 231:19, 232:1, 239:23, 243:24, 243:25, 285:10
**Federal** [4] - 1:22, 59:6, 122:4, 310:22
**feeding** [1] - 217:22
**feelings** [1] - 234:4
**fellow** [1] - 281:13
**felony** [2] - 31:14, 47:24
**felt** [1] - 216:21
**Ferdinand** [1] - 51:12
**festival** [2] - 78:7, 155:21
**few** [11] - 7:1, 48:10, 56:4, 87:7, 88:1, 152:13, 164:19, 170:8, 221:7, 235:15, 256:14
**field** [2] - 39:20, 144:23
**fifth** [2] - 274:1, 274:6
**fighting** [4] - 25:15, 64:6, 199:18, 227:4
**figure** [3] - 213:13, 269:18, 299:5
**figured** [2] - 81:3, 159:11
**file** [1] - 15:13
**filed** [6] - 10:6, 18:16, 20:18, 20:21, 238:13, 246:8
**filing** [3] - 5:15, 6:20, 21:11
**filled** [1] - 295:15
**final** [3] - 15:11, 280:7, 298:19
**finally** [3] - 62:24, 198:11, 280:19
**finance** [1] - 198:22
**financial** [10] - 6:16, 6:17, 6:18, 6:23, 7:9, 7:18, 83:25, 86:19, 89:16, 112:9
**financials** [1] - 7:4
**fine** [3] - 24:17, 41:25, 270:9
**finish** [1] - 54:16
**finished** [1] - 25:20
**fire** [5] - 84:4, 243:23, 245:20, 246:4, 246:6
**firefighter** [1] - 125:7
**firm** [2] - 83:18, 133:10
**First** [2] - 131:22, 247:4
**first** [44] - 12:18, 16:9, 20:3, 29:20, 43:16, 44:11, 45:13, 45:21, 46:24, 69:16, 74:5, 78:4, 82:12, 91:20, 94:24, 119:4, 121:19, 147:16, 156:13, 211:14, 228:5, 233:3, 235:16, 237:2, 237:24, 238:17, 262:25, 270:16, 272:20, 274:4, 277:11, 280:10, 282:11, 290:3, 291:13, 294:15, 295:22, 296:1, 298:9, 298:13, 300:5, 303:7, 303:10, 309:9
**fish** [1] - 132:22
**FIU** [1] - 69:24
**five** [12] - 42:2, 42:23, 72:10, 80:4, 144:18, 180:9, 256:19, 269:21, 269:22, 277:2, 278:24, 301:21
**five-minute** [2] - 42:2, 42:23
**fixed** [1] - 203:22
**Fl** [1] - 1:22
**FL** [1] - 1:23
**flexibility** [1] - 69:22
**flight** [9] - 77:22, 78:2, 81:1, 105:14, 105:15, 126:20, 189:20, 217:11, 217:12
**flip** [2] - 39:19, 39:22
**flip-flopped** [1] - 39:22
**flip-flopping** [1] - 39:19
**floor** [1] - 43:16
**flopped** [1] - 39:22
**flopping** [1] - 39:19
**Flores** [1] - 1:18
**FLORIDA** [1] - 1:1
**Florida** [88] - 1:4, 1:15, 1:19, 46:2, 58:19, 59:17, 60:3, 60:4, 60:12, 61:2, 61:22, 62:12, 62:19, 62:20, 63:2, 63:3, 63:7, 63:8, 92:9, 94:13, 95:16, 95:17, 96:17, 98:16, 100:8, 100:9, 101:10, 103:3, 105:5, 105:6, 106:13, 107:12, 109:8, 110:9, 110:24, 112:6, 113:20, 115:5, 115:23, 116:18, 118:12, 119:23, 121:18, 123:8, 124:23, 126:17, 127:25, 129:14, 130:18, 131:19, 133:3, 134:15, 136:25, 138:7, 139:8, 140:11, 141:20, 143:7, 144:17, 146:1, 147:2, 166:2, 167:18, 169:8, 170:21, 171:24, 172:17, 173:21, 173:23, 175:14, 177:14, 178:20, 180:8, 181:9, 184:2, 185:17, 187:16, 189:7, 190:19, 191:22, 193:12, 194:23, 196:6, 197:12, 198:16, 310:21, 310:23
**Flowers** [1] - 53:12
**flown** [1] - 16:7
**flurry** [2] - 16:4, 18:4
**fly** [1] - 54:17
**flying** [1] - 217:10
**foil** [1] - 297:14
**follow** [24] - 12:3, 13:6, 14:4, 17:4, 17:12, 17:13, 17:19, 19:9, 66:18, 75:3, 75:7, 164:16, 242:14, 246:9, 247:17, 250:16, 250:18, 250:19, 250:22, 260:18, 274:19, 274:20, 278:2, 285:17

**followed** [9] - 13:23, 13:24, 13:25, 16:24, 31:1, 31:4, 31:22, 31:23, 281:7
**following** [7] - 13:21, 70:21, 79:5, 149:8, 200:19, 281:8, 282:18
**follows** [1] - 62:20
**fooled** [1] - 300:13
**football** [1] - 122:25
**FOR** [3] - 1:13, 1:17, 1:21
**force** [1] - 288:11
**foregoing** [1] - 310:16
**forehead** [1] - 162:14
**foreman** [3] - 99:17, 148:1, 179:9
**foremen** [1] - 93:5
**forensic** [1] - 6:21
**foreperson** [6] - 102:7, 104:4, 122:6, 127:4, 176:10, 192:16
**forever** [1] - 215:14
**forfeiture** [6] - 4:17, 4:22, 4:23, 5:5, 5:7, 5:16
**forged** [2] - 60:17, 60:20
**forget** [1] - 261:22
**forgot** [2] - 219:9, 261:23
**form** [4] - 13:12, 15:8, 56:2, 294:23
**formal** [1] - 57:25
**formed** [1] - 247:16
**forms** [2] - 274:24, 295:1
**FORT** [1] - 1:2
**Fort** [9] - 1:4, 1:23, 116:17, 130:16, 131:17, 131:23, 170:20, 193:10, 310:23
**forth** [7] - 23:11, 42:9, 42:12, 57:22, 281:6, 298:17, 298:20
**forwarded** [2] - 11:18, 15:22
**foundation** [1] - 31:19
**four** [22] - 7:24, 46:8, 72:14, 78:5, 81:3, 97:12, 112:15, 115:17, 132:5, 139:9, 143:8, 147:12, 159:13, 167:1, 171:25, 189:8, 200:11, 200:12, 200:15, 276:25, 278:18, 283:12
**fourteen** [1] - 189:24
**fourth** [3] - 45:7, 273:25, 274:5
**FPR** [2] - 2:4, 310:20
**frame** [1] - 78:9
**Francis** [3] - 177:11, 266:13, 266:15
**Francisco** [1] - 112:21
**fraud** [6] - 58:14, 60:24, 61:18, 61:19, 117:20
**fraudulent** [4] - 61:9, 61:11, 61:25, 62:2
**Fred** [1] - 51:14
**free** [5] - 13:23, 204:9, 204:24, 205:13, 209:9
**French** [1] - 109:21
**frequently** [1] - 172:6
**Friday** [14] - 35:2, 55:10, 70:20, 77:22, 78:17, 79:15, 80:5, 84:13, 85:15, 85:21, 90:3, 90:6, 91:4, 161:7
**friend** [3] - 71:16, 106:23, 130:1
**friend's** [1] - 135:12
**friends** [80] - 93:9, 94:25, 96:2, 97:15, 100:18, 102:11, 104:20, 105:21, 106:21, 108:2, 108:5, 108:6, 110:3, 111:13, 112:25, 114:10, 114:13, 114:14, 115:20, 115:24, 115:25, 117:11, 119:5, 120:10, 122:10, 124:4, 125:17, 125:19, 127:9, 128:15, 129:24, 131:1, 132:10, 132:13, 132:14, 133:21, 135:9, 137:17, 138:18, 139:20, 139:22, 140:23, 142:14, 142:16, 143:17, 145:10, 146:9, 148:6, 166:11, 168:12, 170:2, 171:4, 173:5, 174:13, 176:14, 177:23, 178:1, 178:2, 179:13, 179:16, 179:17, 180:18, 183:8, 184:21, 186:22, 188:10, 190:2, 190:4, 191:2, 191:5, 191:6, 192:24, 193:1, 194:6, 195:13, 196:21, 197:25, 199:2, 201:21, 212:14
**Friends** [1] - 120:13
**front** [15] - 16:19, 37:20, 39:17, 44:3, 44:5, 44:9, 44:10, 44:22, 44:23, 68:21, 72:1, 72:25, 238:18, 251:25, 274:2
**fruits** [1] - 128:10
**full** [11] - 9:12, 9:13, 159:7, 184:18, 189:14, 201:11, 241:25, 242:4, 286:19, 295:3, 296:12
**full-scale** [1] - 201:11
**full-time** [2] - 184:18, 189:14
**fun** [1] - 78:23
**functions** [1] - 59:6
**fund** [1] - 194:2
**furtherance** [1] - 36:1

## G

**gain** [1] - 201:18
**games** [1] - 171:16
**gaming** [1] - 107:7
**gang** [1] - 108:24
**garage** [1] - 229:22
**Garcia** [12] - 90:18, 160:15, 160:23, 161:2, 165:15, 181:5, 182:13, 213:12, 259:17, 259:19, 260:7, 260:12
**gardening** [1] - 127:20
**gas** [1] - 168:19
**gatekeeper** [1] - 25:5
**gee** [2] - 50:22, 52:2
**Gee** [2] - 200:25, 215:6
**Gelbinovich** [1] - 53:18
**general** [7] - 12:16, 27:10, 55:24, 228:16, 231:6, 235:1, 236:9
**generally** [8] - 11:10, 12:8, 12:20, 12:22, 205:24, 221:19, 229:16, 246:3
**generic** [1] - 299:16
**Gentek** [1] - 62:13
**gentlemen** [6] - 25:9, 26:21, 37:13, 219:17, 247:10, 269:16
**Geoffrey** [1] - 53:15
**Georges** [7] - 65:20, 66:13, 67:11, 159:6, 159:16, 165:6
**Georgia** [2] - 55:13, 121:22
**Giglio** [7] - 37:6, 37:15, 38:4, 38:7, 38:17, 38:21, 40:20
**Giglio-Brady** [1] - 37:15
**Gilead** [1] - 30:3
**Gilead's** [1] - 30:25
**girl** [2] - 119:1, 195:7
**given** [6] - 9:18, 29:3, 38:6, 40:21, 207:24, 284:20
**glass** [1] - 138:12
**GlaxoSmith** [1] - 220:11
**GlaxoSmithKline** [2] - 220:10, 220:14
**goal** [3] - 250:10, 250:12, 260:6
**God** [2] - 226:10, 226:12
**Gold** [2] - 3:7, 49:18
**golf** [2] - 113:14, 193:7
**Gonzalez** [3] - 178:15, 213:10, 266:16
**goods** [2] - 178:24, 233:20
**Google** [4] - 214:8, 214:18, 278:21, 279:18
**Gorman** [1] - 53:8
**gosh** [1] - 162:14
**Gould** [1] - 53:16
**GOVERNMENT** [1] - 1:13
**government** [5] - 59:5, 150:8, 181:21, 239:23, 284:9
**Government** [102] - 6:6, 9:25, 10:14, 17:16, 19:25, 20:7, 20:18, 21:20, 22:6, 25:15, 25:22, 27:12, 33:19, 36:3, 37:15, 37:16, 40:21, 43:19, 50:20, 50:25, 51:8, 53:7, 64:24, 66:19, 67:6, 68:2, 68:17, 74:12, 75:9, 75:11, 75:15, 136:3, 147:17, 151:21, 156:18, 157:17, 162:19, 162:21, 163:24, 182:17, 199:25, 200:4, 200:12, 204:2, 204:3, 204:15, 204:18, 204:23, 205:6, 205:17, 206:9, 209:11, 209:13, 209:16, 210:5, 210:25, 217:1, 219:14, 219:19, 224:2, 228:16, 231:16, 238:13, 240:14, 240:19, 244:7, 244:13, 244:22, 245:15, 246:8, 247:21, 248:15, 249:9, 249:14, 252:15, 252:16, 252:20, 253:4, 253:9, 254:3, 254:7, 254:8, 254:21, 255:23, 258:22, 262:8, 262:15, 269:19, 269:20, 270:9, 272:6, 277:13, 277:16, 277:23, 282:11, 282:17, 282:20, 282:25, 284:18, 285:3
**Government's** [24] - 5:13, 6:12, 7:5, 9:18, 11:12, 12:17, 14:11, 18:21, 19:17, 26:20, 34:6, 39:18, 67:1, 152:9, 204:12, 240:20, 241:12, 242:16, 243:8, 244:8, 249:7, 255:16, 255:18, 282:19
**GPS** [1] - 78:20
**grab** [1] - 215:9
**grade** [3] - 92:13, 142:19, 196:9
**graduated** [1] - 198:19
**grand** [8] - 27:13, 27:14, 27:19, 27:20, 27:23, 58:23, 60:16, 61:6
**grandchildren** [2] - 99:8, 100:4
**granddaughter** [3] -

70:24, 137:8, 153:9
**Grant** [1] - 48:17
**grant** [27] - 19:16, 152:20, 153:19, 153:25, 154:11, 157:1, 157:19, 158:14, 158:21, 159:3, 159:15, 159:22, 160:13, 161:1, 161:13, 161:22, 257:12, 257:19, 257:25, 258:9, 258:19, 259:8, 260:11, 260:20, 261:8, 262:3, 262:19
**Graphic** [1] - 196:13
**graphic** [1] - 99:9
**grass** [1] - 275:2
**Great** [1] - 62:21
**great** [3] - 217:21, 218:3, 258:5
**greater** [2] - 234:7, 281:23
**Greek** [4] - 85:16, 85:23, 85:24, 157:25
**Greene** [5] - 45:12, 87:16, 158:23, 159:4, 165:7
**greene** [1] - 165:9
**Grey** [11] - 110:21, 165:8, 230:7, 267:25, 268:19, 270:20, 272:18, 273:1, 273:11, 273:23, 284:6
**grinding** [1] - 235:5
**ground** [1] - 45:24
**guarantee** [7] - 70:10, 70:13, 75:5, 75:23, 76:9, 215:21, 281:5
**Guard** [1] - 107:20
**guess** [19] - 20:25, 68:6, 70:8, 73:10, 83:24, 117:20, 129:13, 145:21, 152:8, 154:14, 154:24, 169:1, 205:16, 230:5, 233:5, 233:13, 233:18, 248:14, 276:7
**Guevara** [4] - 80:1, 118:8, 268:19, 274:1
**guidelines** [1] - 277:7
**guilt** [5] - 58:1, 150:21, 246:2, 277:14, 277:23
**guilty** [60] - 40:3, 50:22, 51:2, 65:1, 65:6, 65:12, 67:5, 67:24, 68:3, 68:16, 75:18, 97:25, 136:5, 150:10, 150:11, 150:24, 182:3, 182:13, 200:14, 200:15, 202:10, 202:23, 204:13, 204:16, 206:15, 211:1, 217:3, 226:19, 229:8, 231:11, 231:14, 231:19, 231:25, 232:1, 232:3, 239:20, 243:12, 244:15, 244:20, 245:16, 246:7, 249:15, 249:20, 252:20, 253:4, 253:8, 253:9, 253:11, 274:17, 277:12, 282:6, 282:7, 282:9, 282:10, 293:6, 309:21
**guinea** [1] - 121:13
**gun** [1] - 98:5
**gunpoint** [1] - 116:8
**Gustavo** [1] - 51:16
**guy** [5] - 51:2, 66:2, 206:14, 229:19, 294:15
**guys** [7] - 74:16, 96:19, 152:3, 154:19, 157:8, 225:11, 250:2
**gym** [1] - 101:3

## H

**half** [3] - 80:12, 143:8, 171:25
**halfway** [2] - 54:11, 54:13
**hall** [2] - 149:11, 149:13
**hallway** [1] - 149:7
**halt** [1] - 73:16
**hammond** [2] - 263:7, 263:22
**Hammond** [2] - 44:22, 126:11
**hand** [53] - 46:25, 47:1, 47:18, 47:21, 47:25, 49:4, 50:14, 51:24, 52:10, 52:17, 53:23, 63:14, 63:16, 63:21, 63:22, 65:17, 65:19, 68:20, 69:7, 72:1, 200:20, 201:3, 201:14, 203:6, 203:7, 206:3, 206:10, 206:16, 207:13, 207:17, 207:18, 208:20, 210:8, 210:12, 211:8, 211:12, 211:13, 211:22, 212:11, 212:24, 213:21, 213:24, 215:6, 215:15, 218:6, 218:18, 219:12, 224:16, 235:11, 285:9, 295:4, 310:1
**hand-held** [1] - 49:4
**hands** [44] - 47:19, 47:22, 48:1, 48:3, 48:4, 51:25, 52:18, 53:24, 63:14, 63:17, 65:18, 69:7, 200:21, 206:4, 206:11, 206:17, 206:25, 207:1, 207:8, 207:9, 207:14, 208:21, 211:9, 212:22, 212:23, 213:25, 219:13, 230:5, 231:15, 235:15, 238:20, 241:6, 247:2, 248:1, 251:14, 252:7, 252:10, 252:24, 286:8, 289:16, 306:17, 306:22, 309:5, 309:16
**Happy** [1] - 132:2
**happy** [3] - 29:1, 206:7, 229:9
**Harbor** [1] - 87:18
**hard** [11] - 66:3, 68:4, 68:9, 69:20, 201:24, 202:12, 202:25, 247:1, 247:5, 248:14, 248:18
**harder** [1] - 68:11
**hardship** [4] - 83:25, 86:19, 89:16, 218:15
**hardware** [1] - 279:5
**Harpreet** [2] - 51:20, 53:17
**Hashanah** [1] - 41:11
**Hausdorff** [5] - 85:3, 139:5, 158:16, 158:22, 165:5
**Hawkins** [10] - 68:21, 69:3, 130:14, 161:25, 212:11, 213:7, 223:16, 260:24, 261:1, 261:9
**HCA** [3] - 96:25, 97:4, 125:1
**head** [2] - 232:23, 251:23
**headed** [1] - 70:4
**Health** [1] - 207:11
**health** [4] - 59:8, 76:18, 96:24, 225:24
**healthcare** [1] - 290:19
**Healthcare** [1] - 125:2
**healthcare-related** [1] - 290:19
**hear** [83] - 4:3, 18:24, 19:5, 19:12, 20:9, 21:12, 25:16, 33:19, 43:9, 49:8, 51:5, 65:3, 68:6, 72:13, 87:15, 149:14, 202:8, 208:2, 210:7, 210:23, 212:17, 214:6, 223:18, 231:8, 231:10, 231:12, 238:6, 239:4, 244:3, 244:4, 244:6, 244:11, 248:8, 250:4, 254:2, 254:3, 254:14, 260:1, 276:22, 280:25, 281:18, 286:16, 289:22, 290:14, 290:22, 290:24, 290:25, 292:12, 293:4, 293:11, 293:14, 294:11, 296:11, 296:15, 296:24, 297:9, 297:11, 298:5, 298:9, 299:1, 299:10, 299:17, 299:18, 300:24, 301:1, 302:6, 304:18, 304:19, 304:24, 305:12, 305:22, 305:24, 306:9, 306:10, 306:18, 307:10, 308:10, 308:11, 308:15, 308:16, 308:23, 310:8
**heard** [14] - 37:8, 53:6, 63:9, 63:15, 78:23, 218:16, 219:8, 244:7, 249:5, 251:9, 251:21, 274:24, 306:23
**hearing** [4] - 10:8, 54:22, 239:16, 308:12
**hearings** [1] - 54:25
**hears** [1] - 10:19
**hearsay** [2] - 36:1, 36:17
**heart** [5] - 6:22, 73:5, 73:7, 73:9, 184:5
**heavy** [1] - 125:14
**heavy-duty** [1] - 125:14
**hedge** [1] - 194:2
**held** [4] - 49:4, 98:5, 224:3, 233:4
**hello** [5] - 71:9, 87:15, 90:13, 90:20, 241:10
**help** [8] - 13:12, 64:2, 154:16, 278:3, 281:5, 281:10, 282:12, 305:2
**helped** [1] - 298:6
**helping** [3] - 213:14, 298:3, 299:4
**hereby** [1] - 310:16
**heroin** [1] - 202:2
**hesitant** [1] - 301:10
**Hi** [1] - 143:3
**hi** [3] - 72:4, 225:17, 225:18
**high** [3] - 157:5, 207:22, 278:1
**high-tailing** [1] - 157:5
**higher** [1] - 207:4
**highest** [2] - 200:6, 237:15
**Highway** [1] - 1:22
**himself** [3] - 150:13, 245:13, 245:18
**hip** [1] - 209:25
**hiring** [1] - 18:8
**history** [4] - 286:19, 291:14, 295:2, 295:3
**hit** [4] - 134:3, 167:3, 203:12, 275:20
**hit-and-run** [1] - 167:3
**hitting** [1] - 45:24
**HIV** [44] - 10:21, 11:16, 29:20, 37:11, 60:2, 62:14, 63:5, 208:19, 209:6, 209:20, 209:22, 210:2, 210:7, 210:15, 211:7, 211:12, 211:16, 212:5, 212:15, 212:21, 224:20, 224:22, 224:23, 225:13, 286:23, 287:20, 288:8, 289:8, 290:10, 290:21, 290:23, 291:9, 293:2, 294:5, 295:23, 296:2,

298:1, 299:13, 301:18, 301:22, 302:5, 303:21, 305:18, 305:19
**hobbies** [63] - 94:7, 94:9, 95:10, 96:11, 98:9, 100:3, 101:2, 102:22, 104:25, 106:5, 107:6, 108:25, 110:17, 111:22, 113:13, 114:23, 116:12, 118:4, 119:15, 121:11, 122:23, 124:17, 126:7, 127:18, 128:24, 130:11, 131:12, 132:21, 134:7, 136:16, 138:1, 139:2, 140:5, 141:7, 142:24, 144:2, 145:19, 146:21, 148:19, 167:10, 168:23, 170:14, 171:15, 173:14, 174:22, 174:24, 174:25, 177:2, 178:12, 179:24, 181:2, 183:17, 185:5, 187:8, 188:23, 190:12, 191:13, 193:6, 194:16, 195:22, 197:5, 198:9, 199:11
**hobby** [1] - 221:12
**hold** [11] - 45:22, 56:14, 66:19, 76:5, 203:25, 204:1, 206:8, 215:14, 224:1, 245:14, 273:4
**holding** [2] - 68:17, 240:19
**holiday** [2] - 80:7, 285:10
**holidays** [3] - 9:14, 46:6, 70:22
**holly** [1] - 53:8
**Hollywood** [4] - 105:5, 109:6, 133:1, 143:5
**home** [13] - 52:8, 54:17, 69:13, 70:5, 70:11, 89:6, 126:3, 130:7, 142:5, 145:3, 215:6, 222:16, 281:15
**Homeland** [1] - 134:22
**homeless** [1] - 287:13
**homemaker** [2] - 109:15, 112:13
**Homestead** [1] - 119:8
**homework** [5] - 248:15, 248:16, 248:19, 250:14, 252:16
**honest** [4] - 38:7, 38:9, 246:16, 303:7
**honestly** [1] - 246:14
**honesty** [2] - 57:17, 247:18
**honor** [3] - 50:3, 153:7, 160:3
**Honor** [91] - 3:5, 3:8, 3:11, 3:20, 4:13, 5:17, 6:13, 7:13, 8:4, 9:9, 9:16, 10:2, 11:3, 12:18, 13:15, 15:1, 15:23, 16:5, 16:6, 20:20, 22:7, 22:20, 24:24, 28:25, 33:20, 35:14, 36:10, 41:22, 42:4, 42:6, 43:7, 43:10, 43:13, 43:19, 43:21, 50:1, 50:7, 51:10, 53:21, 76:12, 85:2, 86:17, 86:23, 88:10, 89:21, 90:8, 90:13, 90:20, 139:19, 143:3, 152:19, 154:24, 156:19, 157:9, 158:9, 158:20, 160:21, 163:25, 164:7, 164:14, 164:15, 219:16, 236:24, 237:5, 237:7, 253:22, 257:4, 258:22, 259:6, 259:19, 260:10, 260:16, 260:23, 261:2, 261:12, 261:18, 262:24, 263:17, 264:5, 265:22, 267:5, 270:10, 272:1, 283:2, 284:9, 284:19, 285:4, 285:6, 285:14, 285:21, 291:22
**HONORABLE** [1] - 1:10
**Honorable** [1] - 2:5
**honored** [1] - 77:5
**hope** [2] - 200:25, 231:21
**hopefully** [9] - 45:24, 46:12, 46:14, 54:7, 62:23, 90:1, 91:16, 155:9, 310:5
**hoping** [2] - 165:11, 293:8
**Hopkins** [1] - 51:14
**Hospital** [2] - 185:20, 186:2
**hospital** [2] - 73:18, 125:1
**hospitals** [1] - 96:25
**hotel** [2] - 80:4, 169:17
**hour** [3] - 113:9, 217:11, 217:22
**hours** [4] - 55:5, 78:22, 285:8, 305:21
**house** [6] - 52:7, 72:7, 78:21, 82:16, 82:18, 178:8
**household** [1] - 174:5
**huge** [1] - 258:13
**Human** [1] - 207:11
**human** [6] - 183:4, 186:19, 246:2, 246:11, 246:12, 248:15
**Humberto** [1] - 51:13
**Humes** [12] - 144:7, 144:9, 144:11, 144:12, 212:13, 212:18, 264:11, 268:1, 268:20, 270:21, 272:19, 274:4
**hundred** [4] - 75:23, 76:9, 91:23, 147:25
**hurt** [1] - 252:24
**husband** [15] - 52:23, 67:16, 68:13, 88:11, 90:14, 97:18, 99:7, 114:16, 119:7, 186:9, 192:23, 225:9, 225:10, 234:1, 305:21
**husband's** [2] - 68:1, 97:18
**Hyacinthe** [2] - 100:6, 263:18
**hygiene** [1] - 149:21

**I**

**I-V-L-I-S** [1] - 3:17
**Ibarra** [13] - 44:14, 77:1, 77:19, 105:3, 154:17, 154:20, 209:19, 211:5, 213:6, 240:18, 241:7, 257:21, 258:1
**ICE** [1] - 74:4
**idea** [8] - 8:25, 55:14, 237:24, 238:1, 243:6, 243:16, 309:5, 310:3
**identifying** [1] - 206:22
**identity** [8] - 63:24, 64:9, 64:11, 64:13, 65:1, 93:14, 136:13, 148:15
**idiot** [1] - 122:16
**ignore** [3] - 19:8, 276:7, 276:9
**II** [2] - 59:15, 60:1
**III** [2] - 59:15, 60:5
**illegal** [1] - 18:9
**illegitimate** [6] - 288:19, 291:11, 292:3, 297:7, 300:2, 301:16
**imagine** [4] - 162:6, 162:10, 272:12, 272:13
**immediately** [2] - 291:9, 293:9
**Immigration** [1] - 74:2
**immigration** [2] - 74:3, 74:21
**impaneled** [1] - 274:9
**impartial** [10] - 52:5, 56:23, 67:18, 208:7, 212:16, 219:22, 224:6, 227:9, 261:3
**impartiality** [1] - 63:20
**impartially** [2] - 56:18, 224:1
**impeach** [2] - 40:5, 40:11
**impeding** [2] - 59:4
**implemented** [2] - 11:21, 12:5
**implicated** [1] - 23:9
**importance** [2] - 234:5, 281:8
**important** [31] - 7:4, 9:2, 29:10, 216:17, 219:20, 222:12, 222:14, 222:18, 225:11, 231:2, 231:4, 234:13, 236:7, 237:21, 240:4, 248:7, 248:8, 251:7, 273:9, 279:22, 279:23, 280:25, 286:21, 287:4, 287:7, 287:17, 294:15, 297:3, 297:21, 300:9, 306:3
**imported** [1] - 128:10
**impossible** [1] - 8:15
**impression** [1] - 281:24
**improperly** [1] - 278:17
**impropriety** [2] - 149:16, 149:22
**impute** [1] - 21:23
**imputed** [1] - 22:5
**inaccurate** [1] - 150:19
**inadmissible** [4] - 28:16, 31:1, 31:2, 32:6
**incarcerated** [1] - 190:7
**incident** [2] - 278:15, 304:20
**include** [1] - 27:9
**included** [1] - 8:22
**includes** [2] - 31:23, 279:14
**including** [6] - 15:17, 48:25, 59:23, 279:10, 279:16, 279:20
**inconsistent** [2] - 39:20, 40:8
**incredible** [1] - 25:17
**incriminate** [1] - 24:8
**incriminating** [1] - 22:11
**indentations** [1] - 162:13
**independent** [3] - 214:5, 214:9, 273:10
**independently** [1] - 214:24
**indicate** [1] - 230:15
**indicated** [6] - 9:25, 32:20, 35:8, 54:3, 218:15, 260:24
**indicating** [1] - 20:18
**indication** [6] - 37:1, 38:8, 58:2, 64:12, 150:21, 230:19
**indicator** [1] - 301:15
**indict** [1] - 38:16
**indicted** [2] - 16:19, 247:21
**indictment** [40] - 5:5, 10:22, 12:25, 14:16, 15:4, 17:15, 17:22, 17:23, 17:25, 26:6, 26:7, 26:24, 27:4, 27:16, 27:24, 28:1, 31:13, 31:15, 37:14, 57:22, 57:24, 58:5, 58:7, 59:13, 63:9, 238:3, 238:8, 238:11, 238:24, 239:8, 243:24, 248:20, 248:24, 251:10, 251:12,

274:18, 277:12
**indirect** [2] - 275:3, 275:7
**indirectly** [1] - 275:1
**individual** [8] - 8:12, 33:5, 33:17, 34:15, 34:20, 75:24, 151:4, 237:15
**individuals** [1] - 35:22
**industry** [12] - 194:3, 207:16, 207:21, 207:25, 208:17, 291:17, 292:10, 294:24, 298:15, 307:22, 307:24, 308:22
**inextricably** [1] - 10:7
**influence** [1] - 278:17
**influenced** [3] - 56:14, 56:19, 58:4
**influencer** [1] - 195:10
**information** [42] - 27:13, 27:25, 38:11, 38:20, 38:22, 40:3, 41:1, 42:11, 55:24, 56:2, 59:25, 66:1, 85:9, 91:21, 92:4, 219:25, 251:16, 254:15, 254:17, 254:18, 255:4, 278:8, 278:13, 279:13, 279:15, 279:19, 281:3, 287:1, 287:5, 287:10, 288:19, 289:8, 289:15, 297:4, 298:21, 299:3, 302:4, 305:2, 306:6, 306:15, 309:11, 309:19
**inherently** [3] - 228:9, 228:11, 241:20
**injury** [1] - 169:13
**innocence** [7] - 66:14, 182:15, 200:18, 210:18, 237:25, 238:1, 277:18
**innocent** [26] - 66:9, 66:14, 66:19, 67:4, 67:25, 68:17, 75:3, 182:14, 182:19, 182:20, 199:24, 238:10, 238:16, 238:25, 239:10, 239:17, 239:20, 241:20, 241:23, 242:15, 243:11, 244:2, 247:20, 260:15, 277:11
**inquire** [1] - 9:3
**inquiry** [1] - 219:15
**inside** [12] - 62:19, 63:2, 63:3, 124:13, 237:23, 246:25, 287:25, 299:12, 299:15, 299:16, 305:18, 306:1
**insight** [1] - 207:25
**inspector** [1] - 135:2
**Instagram** [1] - 124:1
**instance** [2] - 254:16, 275:19
**instances** [2] - 304:17, 306:20
**instant** [3] - 279:6, 300:3, 307:3
**instruct** [11] - 15:5, 15:9, 16:12, 20:7, 26:18, 149:4, 232:11, 247:14, 276:12, 282:23, 306:8
**instructed** [1] - 17:3
**instructing** [3] - 14:3, 24:17, 24:19
**instruction** [4] - 21:3, 21:6, 150:16, 151:1
**instructions** [10] - 148:25, 149:1, 200:9, 214:2, 214:3, 274:14, 274:15, 277:25, 278:2, 278:4
**instructs** [1] - 242:9
**insurance** [3] - 117:20, 175:17, 175:21
**integrity** [1] - 57:18
**intelligence** [1] - 103:19
**intend** [6] - 10:5, 11:5, 23:4, 38:16, 42:13, 230:24
**intending** [3] - 230:9, 230:16, 231:17
**intent** [25] - 11:23, 15:3, 16:15, 18:6, 19:22, 24:15, 31:11, 31:13, 36:2, 36:5, 58:21, 58:25, 59:19, 61:4, 61:7, 61:22, 61:23, 251:21, 252:9, 252:11, 252:18, 254:23, 255:13
**intentionally** [3] - 14:14, 16:25, 18:8
**interest** [1] - 276:25
**interested** [1] - 243:5
**International** [1] - 123:17
**international** [1] - 87:25
**internet** [12] - 212:24, 212:25, 213:4, 213:9, 213:19, 224:17, 224:25, 278:21, 279:1, 279:5, 279:10, 279:16
**internship** [1] - 207:22
**interpret** [1] - 282:22
**interrupt** [3] - 152:24, 244:25, 249:21
**interstate** [10] - 58:12, 59:1, 59:2, 59:7, 59:16, 59:20, 59:21, 60:22, 61:14, 62:5
**intertwined** [1] - 10:7
**intervening** [1] - 9:14
**interview** [1] - 15:14
**intrinsic** [4] - 10:13, 12:6, 12:15, 15:12
**introduce** [17] - 10:1, 10:22, 11:2, 11:14, 20:19, 22:14, 22:16, 22:17, 23:12, 33:5, 48:10, 49:12, 49:24, 58:10, 58:15, 58:25, 59:19
**introduced** [12] - 19:15, 22:12, 25:25, 28:17, 31:7, 32:22, 48:15, 59:2, 59:21, 290:20, 290:23
**introducing** [4] - 23:24, 24:12, 24:13, 34:11
**introduction** [7] - 10:12, 58:11, 59:1, 59:2, 59:15, 59:20, 59:21
**invasion** [1] - 126:3
**invent** [1] - 18:6
**investigated** [1] - 207:10
**investigating** [1] - 214:24
**investigation** [2] - 36:14, 37:24
**invited** [1] - 273:6
**involve** [2] - 36:11, 154:25
**involved** [15] - 16:20, 50:12, 52:22, 60:23, 209:6, 216:19, 220:17, 220:22, 226:1, 231:9, 231:13, 278:20, 279:20, 292:22, 292:24
**involvement** [3] - 208:19, 210:14, 211:6
**involves** [3] - 28:12, 32:5, 33:22
**involving** [6] - 22:3, 60:20, 68:22, 261:4, 278:16, 293:24
**Iowa** [1] - 78:1
**Ireland** [1] - 168:7
**island** [1] - 222:1
**issue** [28] - 10:19, 13:20, 15:7, 16:13, 21:24, 21:25, 22:3, 24:11, 25:8, 28:6, 31:9, 31:25, 39:16, 42:4, 42:10, 42:16, 73:7, 73:9, 84:12, 225:25, 259:11, 279:3, 280:21, 296:1, 297:12, 297:16, 303:15
**issues** [9] - 11:10, 12:9, 12:23, 14:18, 14:20, 56:18, 152:10, 295:17, 303:21
**IT** [9] - 86:3, 86:6, 116:25, 137:3, 137:14, 147:4, 148:14, 170:24, 197:15
**item** [3] - 233:25, 234:12, 276:12
**items** [1] - 233:19
**itself** [4] - 4:25, 19:2, 28:17, 227:1
**IV** [3] - 60:7, 60:9, 211:7
**Ivlis** [5] - 1:17, 3:9, 3:17, 50:3

## J

**Jackson** [8] - 44:16, 81:17, 81:18, 115:1, 215:15, 216:6, 257:9, 257:13
**Jackson-Clarke** [7] - 81:17, 81:18, 115:1, 215:15, 216:6, 257:9, 257:13
**Jacqueline** [3] - 1:13, 3:6, 49:16
**jail** [2] - 117:18, 122:16
**Jamaican** [1] - 201:20
**January** [1] - 60:1
**Jared** [3] - 221:22, 222:3, 222:6
**Jason** [1] - 53:16
**Jenna** [1] - 51:14
**Jensen** [1] - 71:4
**Jesse** [1] - 51:19
**Jessica** [2] - 3:14, 50:10
**Jewelers** [3] - 221:22, 222:3, 222:7
**Jewish** [2] - 70:22, 80:7
**job** [19] - 26:10, 36:12, 36:21, 41:24, 64:13, 189:14, 206:10, 235:24, 236:7, 240:20, 241:13, 242:16, 243:8, 250:23, 255:11, 255:14, 255:16, 255:18, 272:7
**jogs** [1] - 219:8
**join** [1] - 13:15
**joining** [1] - 41:22
**Jon** [2] - 51:13
**Jonathan** [1] - 51:12
**Jones** [1] - 51:13
**Jorge** [1] - 51:13
**Jose** [1] - 51:17
**JPMorgan** [1] - 62:10
**JR** [1] - 223:4
**JUDGE** [1] - 1:10
**judge** [20] - 4:4, 5:23, 16:18, 19:23, 27:18, 28:5, 35:6, 35:16, 40:24, 74:21, 151:19, 156:3, 164:1, 165:19, 205:16, 207:4, 224:12, 243:25, 251:15, 258:5
**Judge** [97] - 4:22, 5:6, 5:11, 5:21, 8:6, 9:12, 10:4, 15:10, 18:4, 18:17, 20:6, 20:16, 25:17, 27:11, 31:11, 32:10, 33:2, 37:4, 37:7, 38:2, 38:12, 39:16, 39:21, 40:14, 53:3, 53:5, 150:7, 150:18, 152:17, 153:23, 154:7, 154:15, 154:22, 155:18, 156:17, 156:22, 157:16, 157:22, 158:12, 158:18, 158:25, 159:2, 159:19, 160:11, 160:17, 160:23, 161:11, 162:22, 162:25, 163:4, 163:11,

163:17, 215:7, 219:22, 224:15, 231:22, 232:10, 237:20, 238:2, 238:3, 238:22, 239:8, 240:9, 242:9, 245:7, 245:11, 247:13, 249:23, 251:9, 251:19, 255:7, 256:3, 256:16, 257:10, 257:16, 257:23, 258:17, 259:10, 261:11, 261:23, 262:6, 262:12, 263:9, 264:1, 264:13, 265:13, 265:19, 266:3, 266:4, 266:6, 267:4, 271:2, 271:22, 271:24, 272:25, 285:5, 306:8

**judge's** [6] - 48:14, 55:11, 55:13, 55:21, 79:12, 79:13

**judgment** [4] - 4:22, 68:2, 203:23, 252:19

**judgments** [1] - 9:18

**judicial** [2] - 203:5, 206:2

**July** [1] - 11:17

**juries** [4] - 52:24, 199:14, 199:15, 225:20

**JUROR** [1241] - 47:2, 47:6, 47:9, 47:12, 47:14, 50:16, 50:19, 50:24, 51:3, 51:6, 63:23, 64:17, 64:19, 64:22, 65:8, 65:10, 65:14, 65:21, 65:23, 66:21, 67:8, 67:10, 67:16, 68:4, 68:8, 68:19, 68:22, 68:25, 69:18, 69:24, 70:4, 70:8, 70:10, 70:14, 70:18, 71:3, 71:9, 71:15, 71:19, 71:24, 72:4, 72:9, 72:13, 72:16, 72:20, 72:22, 73:3, 73:15, 73:21, 73:25, 74:13, 74:15, 74:17, 74:24, 75:5, 75:8, 75:11, 75:20, 76:4, 76:6, 76:15, 77:2, 77:4, 77:10, 77:17, 77:22, 78:12, 78:15, 78:20, 79:1, 79:4, 79:8, 79:10, 79:19, 79:23, 79:25, 80:2, 80:10, 80:13, 80:17, 80:19, 80:24, 81:1, 81:5, 81:8, 81:10, 81:12, 81:15, 81:17, 81:20, 82:3, 82:7, 82:15, 82:20, 82:25, 83:4, 83:6, 83:11, 83:14, 83:16, 83:18, 84:8, 84:11, 84:18, 84:22, 84:24, 85:2, 85:4, 85:11, 85:13, 85:14, 85:23, 86:1, 86:3, 86:10, 86:17, 86:21, 86:23, 87:1, 87:5, 87:12, 87:15, 87:17, 87:22, 87:24, 88:4, 88:8, 88:10, 88:14, 88:16, 88:21, 88:24, 89:5, 89:12, 89:19, 89:21, 89:25, 90:5, 90:11, 90:13, 90:19, 90:20, 91:2, 91:4, 91:7, 91:11, 91:14, 91:18, 91:23, 91:25, 92:2, 92:8, 92:10, 92:13, 92:15, 92:17, 92:19, 92:22, 92:24, 93:1, 93:3, 93:6, 93:8, 93:11, 93:14, 93:17, 93:20, 93:22, 93:25, 94:2, 94:6, 94:8, 94:12, 94:14, 94:16, 94:19, 94:22, 94:24, 95:2, 95:4, 95:7, 95:9, 95:11, 95:14, 95:16, 95:18, 95:20, 95:22, 95:24, 96:1, 96:4, 96:6, 96:8, 96:10, 96:12, 96:16, 96:18, 96:20, 96:22, 96:24, 97:2, 97:4, 97:7, 97:10, 97:12, 97:14, 97:17, 97:21, 97:23, 98:3, 98:5, 98:8, 98:10, 98:15, 98:17, 98:20, 98:22, 98:24, 99:1, 99:3, 99:5, 99:12, 99:14, 99:16, 99:18, 99:20, 99:22, 99:24, 100:2, 100:4, 100:8, 100:10, 100:12, 100:15, 100:17, 100:20, 100:22, 100:24, 101:1, 101:3, 101:8, 101:11, 101:13, 101:16, 101:18, 101:20, 101:22, 101:24, 102:2, 102:4, 102:6, 102:8, 102:10, 102:13, 102:15, 102:18, 102:21, 102:23, 103:2, 103:4, 103:6, 103:8, 103:10, 103:12, 103:14, 103:16, 103:18, 103:21, 103:24, 104:1, 104:3, 104:5, 104:7, 104:9, 104:15, 104:17, 104:19, 104:22, 104:24, 105:1, 105:5, 105:7, 105:9, 105:11, 105:14, 105:16, 105:18, 105:20, 105:23, 105:25, 106:2, 106:4, 106:6, 106:8, 106:11, 106:14, 106:16, 106:18, 106:20, 106:23, 107:1, 107:3, 107:5, 107:7, 107:11, 107:13, 107:15, 107:17, 107:20, 107:22, 107:24, 108:1, 108:4, 108:6, 108:8, 108:10, 108:15, 108:17, 108:19, 108:22, 108:24, 109:1, 109:6, 109:9, 109:12, 109:14, 109:18, 109:20, 109:24, 110:5, 110:8, 110:13, 110:15, 110:18, 110:23, 110:25, 111:2, 111:4, 111:6, 111:8, 111:10, 111:12, 111:15, 111:17, 111:19, 111:21, 111:23, 112:1, 112:4, 112:7, 112:9, 112:11, 112:13, 112:15, 112:17, 112:19, 112:24, 113:2, 113:4, 113:9, 113:12, 113:14, 113:18, 113:21, 113:23, 114:1, 114:3, 114:5, 114:8, 114:12, 114:14, 114:16, 114:19, 114:21, 114:24, 115:4, 115:6, 115:8, 115:11, 115:13, 115:15, 115:17, 115:19, 115:22, 115:25, 116:2, 116:4, 116:6, 116:8, 116:11, 116:13, 116:17, 116:19, 116:21, 116:23, 116:25, 117:2, 117:4, 117:6, 117:10, 117:13, 117:15, 117:17, 117:23, 117:25, 118:3, 118:5, 118:10, 118:13, 118:15, 118:17, 118:19, 118:22, 118:24, 119:1, 119:4, 119:7, 119:10, 119:12, 119:14, 119:16, 119:21, 119:24, 120:1, 120:4, 120:7, 120:9, 120:12, 120:14, 120:17, 120:21, 120:23, 120:25, 121:5, 121:7, 121:10, 121:12, 121:17, 121:19, 121:22, 121:24, 122:1, 122:3, 122:5, 122:7, 122:9, 122:12, 122:15, 122:18, 122:22, 122:24, 123:3, 123:6, 123:9, 123:11, 123:13, 123:16, 123:19, 123:21, 123:23, 123:25, 124:3, 124:6, 124:8, 124:10, 124:12, 124:16, 124:18, 124:22, 124:24, 125:1, 125:4, 125:6, 125:9, 125:11, 125:13, 125:16, 125:19, 125:21, 125:23, 126:1, 126:3, 126:6, 126:8, 126:12, 126:15, 126:18, 126:20, 126:22, 126:24, 127:1, 127:3, 127:5, 127:7, 127:11, 127:13, 127:15, 127:17, 127:19, 127:23, 128:1, 128:3, 128:6, 128:9, 128:12, 128:14, 128:17, 128:19, 128:21, 128:23, 128:25, 129:5, 129:8, 129:11, 129:15, 129:17, 129:19, 129:21, 129:23, 130:1, 130:3, 130:5, 130:7, 130:10, 130:12, 130:16, 130:19, 130:21, 130:23, 130:25, 131:3, 131:5, 131:7, 131:9, 131:11, 131:13, 131:17, 131:20, 131:22, 131:25, 132:2, 132:5, 132:7, 132:9, 132:12, 132:14, 132:16, 132:18, 132:20, 132:22, 133:1, 133:4, 133:6, 133:9, 133:12, 133:14, 133:16, 133:18, 133:20, 133:23, 134:1, 134:3, 134:6, 134:8, 134:13, 134:16, 134:18, 134:20, 134:22, 134:24, 135:2, 135:5, 135:8, 135:11, 135:19, 135:22, 136:1, 136:6, 136:9, 136:11, 136:13, 136:15, 136:17, 136:23, 137:1, 137:3, 137:5, 137:7, 137:10, 137:12, 137:14, 137:16, 137:19, 137:21, 137:23, 137:25, 138:2, 138:6, 138:8, 138:10, 138:12, 138:15, 138:17, 138:20, 138:22, 138:24, 139:1, 139:3, 139:7, 139:9, 139:12, 139:14, 139:17, 139:19, 139:22, 139:24, 140:2, 140:4, 140:6, 140:10, 140:12, 140:14, 140:16, 140:18, 140:20, 140:22, 140:25, 141:2, 141:4, 141:6, 141:8, 141:11, 141:14, 141:18, 141:21, 141:23, 142:1, 142:3, 142:5, 142:7, 142:9, 142:11, 142:13, 142:16, 142:18,

142:21, 142:23, 142:25, 143:3, 143:5, 143:8, 143:10, 143:12, 143:14, 143:16, 143:19, 143:21, 143:23, 144:1, 144:3, 144:5, 144:9, 144:11, 144:13, 144:16, 144:18, 144:20, 144:22, 144:24, 145:1, 145:3, 145:5, 145:7, 145:9, 145:12, 145:14, 145:16, 145:18, 145:20, 145:25, 146:2, 146:4, 146:6, 146:8, 146:11, 146:13, 146:15, 146:17, 146:20, 146:22, 147:1, 147:3, 147:6, 147:8, 147:10, 147:12, 147:14, 147:16, 147:20, 147:22, 147:24, 148:3, 148:5, 148:8, 148:10, 148:12, 148:15, 148:18, 148:20, 165:8, 165:11, 165:25, 166:3, 166:5, 166:8, 166:10, 166:13, 166:15, 166:17, 166:20, 166:24, 167:1, 167:3, 167:6, 167:9, 167:11, 167:15, 167:19, 167:21, 167:24, 168:1, 168:3, 168:5, 168:7, 168:11, 168:14, 168:16, 168:18, 168:22, 168:24, 169:3, 169:6, 169:9, 169:11, 169:13, 169:15, 169:17, 169:19, 169:21, 169:23, 170:1, 170:4, 170:6, 170:8, 170:11, 170:13, 170:15, 170:17, 170:20, 170:22, 170:24, 171:1, 171:3, 171:6, 171:8, 171:10, 171:12, 171:14, 171:16, 171:19, 171:22, 171:25, 172:2, 172:4, 172:10, 172:12, 172:14, 172:16, 172:19, 172:21, 172:23, 172:25, 173:4, 173:7, 173:9, 173:11, 173:13, 173:15, 173:18, 173:21, 173:24, 174:1, 174:3, 174:5, 174:8, 174:10, 174:12, 174:15, 174:17, 174:19, 174:21, 174:23, 174:25, 175:4, 175:7, 175:12, 175:15, 175:17, 175:19, 175:21, 175:23, 175:25, 176:2, 176:5, 176:7, 176:9, 176:11, 176:13, 176:16, 176:18, 176:20, 176:22, 177:1, 177:3, 177:12, 177:15, 177:17, 177:20, 177:22, 177:25, 178:2, 178:4, 178:6, 178:8, 178:11, 178:13, 178:18, 178:21, 178:23, 179:2, 179:4, 179:6, 179:8, 179:10, 179:12, 179:15, 179:17, 179:19, 179:21, 179:23, 179:25, 180:2, 180:6, 180:9, 180:11, 180:13, 180:15, 180:17, 180:20, 180:22, 180:24, 181:1, 181:3, 181:7, 181:10, 181:12, 181:15, 181:17, 181:22, 181:25, 182:4, 182:10, 182:12, 182:22, 182:25, 183:2, 183:4, 183:7, 183:10, 183:12, 183:14, 183:16, 183:18, 183:22, 183:25, 184:3, 184:5, 184:7, 184:9, 184:11, 184:13, 184:15, 184:17, 184:20, 184:23, 184:25, 185:2, 185:4, 185:6, 185:8, 185:10, 185:12, 185:15, 185:18, 185:20, 185:22, 185:25, 186:2, 186:5, 186:7, 186:9, 186:11, 186:14, 186:16, 186:18, 186:21, 186:24, 187:1, 187:3, 187:5, 187:7, 187:9, 187:12, 187:14, 187:17, 187:19, 187:21, 187:23, 187:25, 188:3, 188:5, 188:7, 188:9, 188:12, 188:14, 188:16, 188:18, 188:20, 188:24, 189:3, 189:5, 189:8, 189:10, 189:12, 189:16, 189:18, 189:20, 189:22, 189:24, 190:1, 190:4, 190:6, 190:9, 190:11, 190:13, 190:17, 190:20, 190:22, 190:24, 191:1, 191:4, 191:6, 191:8, 191:10, 191:12, 191:14, 191:17, 191:20, 191:23, 191:25, 192:2, 192:4, 192:7, 192:9, 192:11, 192:13, 192:15, 192:17, 192:19, 192:22, 193:1, 193:3, 193:5, 193:7, 193:10, 193:13, 193:15, 193:17, 193:19, 193:21, 193:23, 193:25, 194:2, 194:5, 194:8, 194:11, 194:13, 194:15, 194:17, 194:21, 194:24, 195:1, 195:3, 195:5, 195:7, 195:9, 195:12, 195:15, 195:17, 195:19, 195:21, 195:23, 195:25, 196:2, 196:5, 196:7, 196:9, 196:11, 196:13, 196:16, 196:18, 196:20, 196:23, 196:25, 197:2, 197:4, 197:6, 197:10, 197:13, 197:15, 197:17, 197:20, 197:22, 197:24, 198:2, 198:4, 198:6, 198:8, 198:10, 198:14, 198:17, 198:19, 198:22, 198:24, 199:1, 199:4, 199:6, 199:8, 199:10, 199:12, 201:6, 201:16, 202:6, 202:12, 202:16, 202:25, 203:9, 203:20, 204:3, 204:7, 204:11, 204:14, 204:20, 204:22, 204:24, 205:8, 205:12, 205:20, 205:23, 207:19, 207:22, 208:1, 208:7, 208:10, 208:14, 208:24, 209:8, 209:15, 209:17, 209:22, 210:6, 210:11, 210:13, 210:19, 211:4, 211:16, 211:20, 211:23, 212:1, 212:3, 212:5, 212:9, 212:14, 212:19, 213:2, 215:16, 215:20, 215:24, 216:1, 216:4, 216:10, 216:20, 217:4, 217:15, 217:18, 217:25, 218:8, 218:20, 219:1, 219:6, 220:6, 220:9, 220:12, 220:15, 220:21, 221:2, 221:5, 221:8, 221:10, 221:13, 221:16, 221:22, 222:1, 222:5, 222:9, 222:13, 222:15, 222:23, 222:25, 223:3, 223:11, 223:15, 223:17, 223:24, 224:3, 224:9, 224:18, 224:20, 224:22, 224:24, 225:2, 225:6, 225:12, 225:16, 225:18, 225:21, 225:25, 226:9, 226:14, 226:16, 226:22, 227:3, 227:10, 227:18, 227:22, 228:3, 228:13, 228:17, 228:22, 228:25, 229:3, 229:6, 229:13, 229:18, 229:22, 230:1, 230:11, 230:17, 230:21, 231:2, 232:6, 232:8, 232:14, 232:18, 232:20, 232:25, 233:10, 233:15, 233:22, 234:1, 234:6, 234:11, 234:15, 234:20, 235:14, 235:19, 235:22, 235:25, 236:3, 236:6, 236:12, 236:18, 239:2, 239:11, 239:14, 239:18, 239:25, 240:23, 240:25, 241:16, 242:12, 242:17, 242:21, 242:24, 243:1, 243:11, 243:14, 244:3, 244:5, 244:10, 244:18, 244:21, 244:24, 245:3, 245:6, 245:19, 245:22, 246:14, 246:16, 247:5, 247:23, 248:10, 248:14, 248:22, 248:25, 249:11, 249:17, 249:20, 250:6, 250:9, 250:12, 250:18, 250:21, 251:1, 253:13, 255:3, 255:15, 271:4, 273:3, 273:5, 273:15

**Juror** [60] - 43:18, 152:15, 152:21, 153:20, 153:21, 153:25, 154:11, 154:19, 155:8, 155:14, 157:13, 157:19, 158:16, 158:22, 158:23, 159:5, 159:16, 159:17, 159:23, 159:24, 160:7, 160:13, 160:15, 161:13, 161:22, 223:16, 224:11, 257:7, 257:13, 257:20, 257:25, 258:2, 258:9, 258:13, 258:19, 258:24, 259:5, 259:9, 259:10, 259:16, 260:11, 260:14, 260:20, 260:23, 261:8, 262:4, 262:9, 262:20, 262:21,

262:25, 263:6, 263:12, 263:23, 264:3, 264:7, 264:15, 264:19, 265:10, 265:24, 267:11
**juror** [13] - 48:6, 52:5, 68:9, 69:15, 76:16, 84:7, 202:8, 218:23, 219:4, 227:1, 264:1, 278:7, 280:15
**jurors** [38] - 3:24, 42:24, 46:13, 46:14, 46:15, 48:9, 52:16, 52:21, 54:19, 56:10, 57:6, 66:25, 73:12, 148:25, 149:10, 150:5, 150:14, 151:10, 153:5, 164:8, 164:19, 215:4, 218:16, 219:24, 259:25, 262:25, 270:7, 272:10, 272:16, 272:22, 272:23, 274:13, 278:2, 279:24, 279:25, 280:4, 281:13
**Jurors** [1] - 263:2
**JURY** [4] - 1:9, 253:8, 253:17, 255:25
**Jury** [2] - 284:5, 310:10
**jury** [226] - 4:1, 4:6, 4:8, 4:16, 4:20, 5:5, 5:8, 5:9, 9:7, 9:11, 10:19, 13:12, 15:8, 16:19, 19:17, 22:2, 24:2, 24:19, 25:9, 25:12, 25:16, 25:21, 26:2, 26:7, 26:10, 26:12, 26:14, 26:16, 26:18, 26:19, 26:25, 27:1, 27:13, 27:14, 27:15, 27:19, 27:20, 27:23, 34:6, 34:7, 37:21, 41:5, 41:8, 43:6, 43:12, 43:14, 43:24, 46:10, 46:12, 46:16, 46:20, 46:23, 48:25, 52:1, 52:19, 52:24, 52:25, 54:3, 54:7, 54:18, 55:3, 55:24, 56:24, 56:25, 57:1, 57:4, 58:24, 60:16, 61:6, 66:15, 66:24, 66:25, 70:2, 79:17, 80:21, 82:21, 83:12, 83:25, 84:5, 84:16, 92:23, 93:5, 94:23, 95:25, 97:13, 99:11, 100:16, 102:1, 103:22, 105:19, 106:19, 107:25, 109:23, 111:11, 112:23, 115:18, 117:9, 119:3, 120:8, 122:2, 124:2, 125:15, 126:23, 128:13, 129:22, 130:24, 132:8, 133:19, 135:7, 137:15, 138:16, 139:18, 140:21, 142:12, 143:15, 145:8, 146:7, 147:19, 148:1, 148:24, 150:17, 150:18, 150:20, 151:1, 151:3, 151:6, 151:12, 152:4, 162:8, 163:14, 163:23, 164:3, 164:11, 166:9, 168:10, 169:25, 171:2, 173:3, 174:11, 176:4, 177:21, 179:3, 180:16, 182:15, 183:6, 184:19, 186:20, 188:8, 189:25, 190:25, 192:12, 194:4, 195:11, 196:19, 197:23, 198:25, 200:23, 200:25, 201:3, 214:1, 214:15, 215:3, 219:21, 226:3, 226:9, 237:14, 242:7, 242:9, 242:14, 255:20, 256:10, 256:12, 256:13, 256:14, 256:22, 257:1, 261:13, 261:14, 261:16, 269:15, 270:8, 272:2, 272:5, 272:9, 272:13, 274:8, 274:9, 274:11, 278:17, 281:13, 281:15, 281:19, 282:24, 283:7, 283:10, 283:14, 283:19, 284:2, 284:7, 285:2, 285:12, 286:5, 286:20, 287:18, 288:1, 289:5, 291:25, 293:18, 293:21, 296:11, 296:24, 300:11, 301:17, 301:24, 303:4, 303:8, 305:10, 305:23, 306:23, 309:14, 309:22, 310:7
**Justice** [3] - 25:3, 49:17, 231:16
**justice** [2] - 199:19, 201:10

## K

**Kadin** [6] - 70:17, 71:7, 98:13, 153:14, 153:20, 164:22
**kadin** [1] - 153:8
**Karen** [2] - 91:25, 92:1
**Kathleen** [2] - 11:8, 51:11
**keep** [15] - 42:24, 98:10, 121:13, 154:22, 155:23, 162:4, 162:6, 162:20, 256:16, 258:4, 277:10, 281:12, 293:12, 303:2, 308:17
**keeping** [1] - 155:25
**Kelly** [5] - 145:23, 229:11, 229:12, 242:20, 264:7
**Kelsey** [1] - 51:13
**Kendreas** [1] - 51:12
**kept** [5] - 226:4, 297:8, 302:21, 302:22, 305:6
**keys** [1] - 52:7
**Khaim** [2] - 37:12, 51:21
**Khaimov** [1] - 51:21
**Kia** [4] - 229:18, 243:1, 243:2, 243:3
**kid** [1] - 151:13
**kidding** [1] - 157:3
**kidnapped** [1] - 113:9
**kids** [7] - 88:17, 94:19, 98:10, 152:15, 215:22, 215:24, 257:8
**killed** [1] - 66:7
**Kim** [1] - 53:11
**Kimchi** [3] - 294:11, 294:12, 294:14
**kind** [41] - 17:11, 37:18, 45:1, 48:14, 55:14, 57:2, 57:4, 77:7, 78:25, 118:15, 165:22, 215:3, 215:13, 216:21, 217:13, 219:8, 220:13, 220:14, 221:14, 221:19, 222:7, 224:19, 226:1, 227:20, 228:10, 229:12, 229:16, 230:12, 234:18, 235:7, 235:18, 236:10, 236:14, 241:18, 241:24, 242:5, 247:6, 275:7, 283:22, 310:2
**kindergarten** [1] - 117:6
**kinds** [1] - 222:20
**King** [3] - 294:11, 294:12, 294:14
**Kippur** [3] - 41:18, 41:19, 90:9
**Kline** [1] - 220:11
**knee** [2] - 81:22, 82:3
**knees** [1] - 235:7
**knowing** [4] - 50:17, 61:10, 62:1, 290:10
**knowingly** [9] - 58:21, 60:14, 60:16, 60:18, 61:5, 61:6, 61:13, 61:22, 62:3
**knowledge** [8] - 15:3, 16:15, 36:5, 56:15, 63:12, 127:13, 127:17, 208:4
**known** [11] - 7:4, 15:23, 51:18, 55:22, 58:23, 60:16, 61:6, 215:11, 229:9, 294:10, 308:2
**knows** [2] - 25:15, 156:21

## L

**label** [2] - 292:16, 296:8
**labeling** [3] - 59:22, 60:17, 60:21
**labor** [1] - 139:14
**ladies** [1] - 219:17
**lady** [3] - 199:19, 226:3, 226:17
**Land** [1] - 132:2
**land** [1] - 217:12
**landlord** [1] - 129:17
**language** [7] - 91:20, 155:2, 161:16, 240:24, 241:3, 257:22, 259:10
**lapel** [1] - 286:2
**largely** [1] - 285:18
**lascivious** [1] - 93:25
**last** [31] - 6:3, 9:8, 9:10, 16:14, 32:13, 33:16, 41:2, 41:3, 44:5, 44:10, 44:14, 44:21, 44:22, 45:1, 45:3, 45:6, 45:8, 45:9, 46:21, 46:23, 47:10, 47:11, 47:16, 95:19, 108:10, 217:25, 226:3, 268:4, 274:2, 274:7, 294:7
**lasted** [1] - 23:20
**lasts** [1] - 35:3
**late** [4] - 7:25, 81:5, 125:23, 163:12
**LAUDERDALE** [1] - 1:2
**Lauderdale** [10] - 1:4, 1:23, 116:17, 119:21, 130:16, 131:17, 131:23, 170:20, 193:10, 310:23
**Lauderhill** [2] - 77:24, 138:6
**law** [84] - 26:9, 26:11, 26:15, 26:17, 27:10, 27:13, 27:25, 31:3, 31:9, 31:10, 31:18, 58:2, 61:15, 66:18, 75:7, 75:18, 87:19, 93:10, 94:25, 97:15, 99:24, 110:6, 117:17, 127:9, 128:15, 129:24, 131:1, 132:10, 133:21, 135:14, 139:13, 142:4, 142:5, 166:11, 169:12, 170:2, 173:5, 174:13, 176:14, 177:23, 178:24, 180:18, 184:21, 194:8, 200:7, 200:9, 200:10, 200:19, 212:5, 214:6, 214:7, 214:11, 228:6, 228:11, 242:9, 242:15, 246:4, 246:5, 247:14, 249:7, 250:19, 250:20, 260:18, 274:19, 274:20, 274:21, 275:5, 278:2, 279:3, 279:19, 279:23,

280:4, 280:8, 280:19, 280:21, 280:24, 281:6, 282:23, 283:9, 306:9
**lawful** [1] - 59:5
**laws** [3] - 51:5, 286:12, 286:14
**lawyer** [11] - 30:3, 38:12, 39:1, 39:2, 39:5, 97:6, 149:11, 275:19, 275:24, 275:25, 276:1
**lawyer's** [1] - 275:18
**lawyers** [37] - 18:8, 38:17, 39:25, 41:24, 45:22, 50:11, 56:9, 70:15, 79:21, 80:11, 80:21, 81:13, 83:2, 84:3, 89:15, 91:12, 149:6, 149:16, 149:20, 187:20, 200:1, 206:21, 214:21, 215:2, 218:4, 218:16, 256:10, 261:21, 273:2, 275:12, 275:13, 275:15, 279:21, 304:24, 304:25, 305:2, 307:13
**lawyers'** [1] - 275:16
**layers** [1] - 41:1
**lead** [2] - 228:11, 280:6
**learn** [85] - 29:5, 286:11, 286:14, 286:17, 286:21, 286:25, 287:8, 287:19, 287:21, 287:23, 287:24, 288:2, 288:4, 288:6, 288:7, 288:11, 288:15, 288:21, 288:22, 288:24, 289:2, 289:19, 289:21, 289:24, 290:2, 290:4, 290:9, 290:17, 290:19, 292:24, 293:2, 293:6, 293:13, 294:6, 294:8, 294:9, 294:14, 294:20, 294:23, 294:25, 295:7, 295:12, 295:19, 295:22, 295:25, 296:6, 296:7, 296:15, 297:4, 297:7, 297:18, 297:20, 297:23, 297:25, 298:21, 299:6, 299:10, 299:12, 299:16, 299:17, 299:19, 299:24, 301:3, 301:6, 301:9, 301:15, 302:3, 302:8, 302:13, 302:20, 303:15, 303:16, 304:25, 305:6, 305:17, 305:20, 306:2, 307:11, 308:19, 309:4, 309:8, 309:10, 309:11, 309:14
**learned** [1] - 302:4
**least** [8] - 21:10, 22:9, 46:18, 60:10, 78:22, 157:11, 247:10, 288:16
**leave** [27] - 66:15, 72:22, 73:7, 73:17, 77:23, 77:25, 78:19, 78:21, 89:1, 152:12, 152:22, 152:23, 153:3, 153:6, 154:23, 155:6, 155:12, 156:2, 156:12, 157:6, 157:12, 159:8, 160:5, 182:15, 262:10, 281:14, 281:18
**leaving** [6] - 72:4, 72:8, 78:13, 153:21, 158:6, 284:7
**lee** [1] - 167:13
**Lee** [3] - 167:15, 265:17
**left** [13] - 14:8, 18:2, 110:9, 165:16, 165:21, 267:6, 269:11, 269:17, 269:18, 270:7, 281:19, 308:7
**legal** [4] - 31:1, 31:3, 32:7, 97:4
**legally** [1] - 277:20
**legitimacy** [1] - 223:9
**legitimate** [13] - 74:13, 287:15, 288:18, 290:5, 291:5, 292:7, 293:10, 295:20, 295:21, 296:4, 305:16, 307:9, 309:12
**legitimately** [2] - 292:9, 295:13
**lengthy** [4] - 21:19, 29:2, 152:9
**less** [3] - 210:16, 210:17, 308:17
**lesser** [1] - 233:2
**letter** [2] - 37:18, 181:12
**letters** [2] - 304:7, 304:8
**letting** [1] - 73:18
**level** [2] - 64:4, 278:1
**Levin** [2] - 45:15
**lewd** [1] - 93:25
**library** [1] - 283:9
**license** [3] - 89:23, 102:16, 289:20
**lie** [1] - 302:18
**lied** [1] - 307:11
**lies** [1] - 304:11
**life** [3] - 66:7, 98:17, 110:10
**lifetime** [1] - 122:15
**light** [2] - 277:5, 280:14
**Lighthouse** [2] - 126:15, 141:18
**lighting** [2] - 283:13, 283:14
**likely** [8] - 68:8, 131:9, 131:11, 135:15, 210:17, 245:8, 300:20, 301:8
**limited** [7] - 13:10, 24:11, 24:16, 57:10, 276:11, 276:13
**limiting** [1] - 236:13
**limits** [2] - 236:6, 236:8
**line** [2] - 250:3, 303:25
**Lines** [1] - 107:15
**lines** [3] - 42:3, 52:15, 55:8
**lingered** [1] - 228:7
**linked** [1] - 22:12
**lip** [1] - 13:6
**Lisa** [1] - 51:16
**list** [8] - 42:15, 49:20, 51:8, 53:1, 247:9, 271:12, 275:11, 306:10
**Listen** [1] - 238:14
**listen** [10] - 49:21, 208:5, 216:25, 224:6, 246:1, 249:6, 250:2, 254:6, 278:24, 280:19
**listening** [1] - 141:8
**lists** [2] - 42:8, 61:16
**litigation** [1] - 139:15
**live** [83] - 92:7, 92:8, 94:11, 94:12, 95:15, 96:15, 98:14, 99:5, 99:7, 100:7, 101:7, 103:1, 105:4, 106:10, 107:10, 109:5, 109:6, 110:22, 112:3, 112:4, 113:17, 115:3, 116:16, 118:9, 118:10, 119:7, 119:20, 121:16, 121:21, 123:5, 124:21, 126:14, 127:22, 129:4, 130:15, 131:16, 132:25, 133:1, 134:12, 134:13, 136:22, 138:5, 139:6, 140:9, 140:15, 140:16, 141:17, 143:4, 143:5, 144:8, 144:15, 145:24, 146:25, 167:14, 167:16, 169:5, 170:19, 171:21, 173:20, 175:3, 175:11, 177:11, 178:17, 180:5, 181:6, 183:4, 183:24, 185:11, 185:13, 187:13, 189:2, 189:3, 190:16, 191:19, 193:9, 194:20, 194:21, 196:4, 197:9, 198:13, 217:20, 221:6, 278:7
**lived** [63] - 92:9, 94:13, 95:17, 96:17, 98:16, 100:9, 101:9, 103:3, 105:6, 106:12, 107:12, 109:7, 110:24, 112:5, 113:19, 115:5, 116:18, 118:11, 119:22, 121:18, 123:7, 124:23, 126:16, 127:24, 129:14, 130:17, 131:18, 133:2, 134:14, 136:24, 138:7, 139:8, 140:11, 141:19, 143:6, 144:17, 146:1, 147:2, 166:1, 167:17, 169:7, 170:21, 171:23, 173:22, 175:14, 177:13, 178:19, 180:7, 181:8, 184:1, 185:16, 187:15, 189:6, 190:18, 191:21, 193:11, 194:22, 196:6, 197:11, 198:15, 221:2, 221:4, 221:8
**lives** [3] - 110:10, 112:21, 250:2
**living** [7] - 109:10, 110:1, 135:17, 135:24, 140:14, 177:4, 189:19
**lobby** [3] - 150:1, 193:19, 256:8
**local** [5] - 92:17, 99:9, 188:20, 204:4, 207:23
**locally** [1] - 147:18
**located** [4] - 29:9, 60:3, 63:6, 63:7
**location** [1] - 278:23
**locations** [1] - 62:21
**locked** [1] - 235:5
**locker** [1] - 234:23
**logical** [1] - 307:25
**logistics** [1] - 192:4
**long-term** [2] - 17:12, 120:4
**look** [22] - 29:14, 33:15, 36:13, 41:4, 41:6, 41:8, 58:9, 79:10, 149:14, 164:2, 201:23, 234:9, 288:17, 291:5, 294:16, 294:21, 296:22, 296:25, 298:7, 298:11, 299:5, 307:9
**looked** [4] - 291:7, 292:12, 292:14, 296:19
**looking** [9] - 30:18, 35:23, 198:19, 226:4, 226:5, 241:24, 242:5, 297:2, 302:10
**looks** [4] - 48:5, 217:11, 294:25, 298:17
**Lopez** [8] - 79:24, 118:8, 156:3, 268:1, 268:19, 270:21, 272:18, 273:25
**Lori** [1] - 53:14
**Los** [2] - 217:8, 217:11
**lose** [1] - 66:6
**lost** [1] - 284:8
**loud** [2] - 52:12, 248:13
**loudly** [1] - 49:1
**lousy** [1] - 206:10

**love** [3] - 101:3, 242:6
**loving** [1] - 98:11
**low** [1] - 291:3
**lower** [1] - 292:6
**Lucas** [1] - 53:15
**lucky** [1] - 47:4
**lunch** [13] - 41:8, 46:11, 54:6, 54:12, 55:2, 148:23, 150:3, 162:13, 164:2, 262:11
**lunchtime** [2] - 46:11, 54:5
**luxury** [2] - 222:21, 233:19

## M

**ma'am** [35] - 51:7, 73:22, 82:9, 84:9, 84:23, 85:12, 87:13, 87:21, 88:15, 89:2, 95:12, 98:12, 102:24, 105:2, 109:3, 114:25, 116:14, 118:7, 123:1, 124:19, 130:13, 134:9, 136:19, 140:7, 141:15, 144:6, 170:16, 185:7, 187:10, 190:14, 208:15, 211:21, 217:16, 247:2, 248:9
**mad** [1] - 228:25
**magic** [2] - 162:7, 253:12
**Magueri** [1] - 53:19
**mail** [1] - 47:7
**mailman** [2] - 260:7, 260:8
**Maine** [1] - 87:18
**major** [1] - 121:3
**management** [4] - 134:18, 169:17, 172:10, 172:12
**manager** [6] - 101:14, 101:18, 113:23, 143:12, 166:5, 192:4
**managing** [2] - 86:8, 97:7
**mandatory** [1] - 21:5
**Manjula** [1] - 51:20
**manner** [4] - 8:8, 59:11, 61:17, 276:24
**Manors** [1] - 180:6
**Mantilla** [6] - 1:17, 3:9, 3:17, 50:3, 240:6
**manufactured** [2] - 33:10, 222:17
**manufacturer** [7] - 21:14, 295:2, 302:11, 303:3, 303:12, 303:14, 303:17
**manufacturers** [4] - 302:7, 302:9, 303:21, 304:8
**maps** [1] - 278:21
**Margate** [1] - 178:18
**Marginean** [2] - 132:24, 258:10
**marine** [1] - 120:1
**Marino** [1] - 234:7
**marital** [58] - 92:14, 94:21, 95:23, 97:1, 98:21, 100:14, 101:15, 103:7, 105:10, 106:17, 107:16, 109:11, 111:5, 112:10, 113:25, 115:10, 116:22, 118:21, 120:3, 121:25, 123:12, 125:3, 126:21, 128:5, 129:20, 130:22, 131:24, 133:11, 134:19, 137:4, 138:14, 139:16, 141:25, 143:13, 144:25, 146:5, 147:5, 166:7, 167:23, 169:14, 170:25, 172:13, 174:2, 175:18, 177:19, 179:1, 181:14, 184:6, 186:3, 187:22, 189:17, 190:23, 192:1, 193:16, 195:2, 196:10, 197:16, 198:23
**mark** [1] - 290:8
**marked** [1] - 152:13
**market** [18] - 286:24, 288:9, 288:16, 290:20, 290:23, 291:11, 293:15, 296:25, 297:13, 298:1, 298:3, 299:20, 300:2, 301:19, 301:22, 302:15, 303:9, 303:18
**marketing** [2] - 194:3, 197:20
**marks** [1] - 308:7
**married** [39] - 92:15, 97:2, 98:22, 101:16, 103:8, 105:12, 107:18, 109:12, 111:6, 112:11, 114:1, 115:11, 116:23, 118:22, 125:4, 128:7, 131:25, 133:12, 134:20, 137:5, 140:20, 142:1, 145:1, 147:6, 167:24, 169:15, 172:14, 174:3, 175:19, 181:15, 184:7, 186:4, 186:5, 187:23, 192:2, 193:17, 195:3, 196:11, 197:18
**marshal** [1] - 272:15
**Martha** [1] - 51:19
**martial** [1] - 140:19
**Martinez** [1] - 51:18
**Maryland** [1] - 147:17
**mask** [2] - 283:16, 283:17
**masquerade** [1] - 18:8
**massage** [1] - 105:9
**master** [1] - 173:1
**material** [3] - 38:4, 38:17, 40:22
**materially** [2] - 61:9, 61:25
**materials** [2] - 42:14, 42:15
**math** [4] - 78:6, 78:20, 94:15, 96:19
**Matt** [1] - 53:17
**matter** [7] - 56:16, 64:20, 73:11, 76:12, 129:13, 240:6, 310:18
**matters** [1] - 164:3
**Maxwell** [1] - 53:16
**Mayall** [1] - 53:14
**McCarthy** [6] - 72:3, 72:11, 101:6, 153:21, 154:1, 164:25
**McCool** [6] - 95:13, 208:22, 209:18, 239:7, 240:4, 263:4
**McGhee** [5] - 45:8, 89:4, 190:15, 218:7, 259:9
**mean** [31] - 7:11, 25:5, 57:12, 73:9, 75:22, 84:4, 129:12, 152:2, 152:4, 153:3, 162:2, 210:6, 225:7, 227:5, 227:14, 227:22, 227:24, 228:19, 230:1, 240:8, 241:18, 243:17, 243:23, 247:17, 248:16, 259:13, 259:25, 260:1, 260:3, 269:23
**meaning** [1] - 290:5
**means** [23] - 13:23, 14:7, 23:25, 37:19, 57:8, 59:5, 59:11, 60:21, 61:9, 61:13, 61:17, 61:24, 62:4, 150:23, 240:8, 247:8, 276:9, 279:5, 279:9, 279:14, 279:17, 292:9, 301:11
**meant** [3] - 287:11, 287:23, 301:8
**mechanic** [1] - 125:14
**mechanics** [1] - 230:2
**media** [2] - 63:16, 279:2
**medical** [9] - 58:13, 60:8, 60:14, 60:18, 60:19, 60:22, 184:17, 201:16, 220:21
**medication** [38] - 208:24, 209:2, 286:7, 286:8, 286:23, 287:6, 287:20, 287:22, 288:20, 289:1, 289:20, 291:6, 291:18, 292:13, 292:20, 293:2, 293:24, 294:5, 294:9, 294:17, 294:24, 295:9, 295:13, 295:21, 296:18, 296:22, 301:18, 303:14, 305:14, 305:18, 305:19, 305:25, 306:5, 306:13, 306:19, 309:13, 309:17
**medications** [31] - 10:21, 225:11, 288:12, 289:7, 289:9, 289:13, 289:23, 289:24, 289:25, 290:3, 290:4, 290:10, 290:12, 290:21, 291:4, 291:10, 291:11, 291:13, 292:23, 295:23, 296:2, 300:10, 302:5, 302:25, 303:22, 305:9, 306:15, 308:2, 308:12, 309:5, 309:9
**medicine** [7] - 209:23, 209:25, 210:21, 220:17, 286:13, 292:3, 292:10
**medina** [1] - 218:18
**Medina** [6] - 106:9, 267:25, 268:19, 270:20, 272:18, 273:23
**medium** [2] - 46:4, 69:9
**medium-sized** [2] - 46:4, 69:9
**meds** [5] - 67:21, 224:20, 224:22, 224:23, 225:13
**meet** [7] - 87:9, 218:12, 292:22, 293:11, 294:3, 307:19
**meeting** [4] - 55:11, 55:21, 79:12, 79:13
**meg** [1] - 53:8
**member** [3] - 93:12, 93:18, 278:17
**members** [23] - 207:16, 272:9, 274:11, 286:5, 286:20, 287:18, 288:1, 289:5, 291:25, 293:18, 293:21, 296:11, 296:24, 300:11, 301:17, 301:24, 303:4, 303:8, 305:10, 305:23, 306:23, 309:14, 309:22
**membership** [1] - 193:19
**memorabilia** [1] - 234:2
**memory** [4] - 276:23, 281:21, 281:22, 281:23
**men** [1] - 246:7
**mental** [5] - 28:15, 28:21, 76:18, 96:24, 225:24
**mentally** [1] - 66:7
**mention** [6] - 20:10, 48:7, 85:7, 216:11, 245:8
**mentioned** [15] - 53:2, 53:7, 56:25, 57:3, 213:20, 218:9,

222:3, 223:21, 225:9, 225:19, 225:23, 228:15, 231:9, 239:22, 296:7
**mentioning** [2] - 218:5, 218:14
**Merchant** [3] - 84:10, 131:15, 213:8
**merchant** [2] - 263:19, 265:6
**Merchant's** [1] - 213:8
**mere** [1] - 57:25
**message** [7] - 34:4, 34:5, 36:16, 47:6, 218:21
**messages** [24] - 29:4, 29:13, 33:5, 33:11, 33:14, 33:17, 33:22, 33:24, 34:2, 34:8, 34:10, 34:13, 34:15, 34:16, 34:20, 35:18, 36:11, 279:10, 291:1, 293:19, 300:3, 307:3, 307:4
**met** [3] - 16:14, 41:2, 48:12
**Miami** [20] - 1:15, 1:19, 58:18, 59:16, 60:11, 61:1, 61:21, 63:6, 63:7, 69:24, 77:23, 78:13, 78:18, 97:23, 99:12, 118:20, 128:3, 158:1, 181:17, 273:6
**Miami-Dade** [7] - 58:18, 59:16, 60:11, 61:1, 61:21, 128:3, 181:17
**mic** [3] - 175:13, 255:5, 286:2
**Michael** [2] - 51:18, 51:20
**microphone** [33] - 5:25, 47:3, 49:4, 49:5, 49:9, 56:5, 105:3, 110:21, 113:16, 115:1, 121:15, 134:10, 136:20, 138:4, 139:5, 140:8, 145:23, 148:22, 165:18, 173:17, 175:1, 177:9, 178:15, 180:3, 183:20, 190:15, 197:7, 213:13, 248:12, 273:4, 273:20, 286:1
**mid** [3] - 82:16, 83:1, 157:5
**mid-'90s** [1] - 125:24
**mid-October** [1] - 157:5
**middle** [4] - 55:15, 104:9, 120:25, 168:8
**might** [22] - 14:21, 38:18, 49:20, 51:9, 53:1, 53:7, 65:11, 79:10, 151:20, 157:2, 202:20, 202:23, 219:23, 228:15, 230:5, 230:9, 232:17, 234:7, 242:3, 285:7, 291:16, 298:12
**military** [4] - 85:20, 103:20, 141:24, 178:25
**Millan** [1] - 53:16
**Miller** [3] - 167:15, 167:16, 265:17
**million** [7] - 62:22, 287:20, 293:24, 294:8, 297:8, 305:8
**millions** [3] - 292:20, 299:25
**mind** [25] - 20:4, 38:2, 63:18, 67:22, 98:6, 157:3, 230:6, 230:8, 230:10, 230:15, 230:20, 230:23, 247:10, 250:13, 250:19, 252:2, 252:3, 252:9, 252:12, 258:4, 277:10, 277:25, 293:12, 308:17
**minded** [4] - 151:4, 254:9, 254:11
**minding** [1] - 203:10
**minds** [1] - 251:23
**mineral** [1] - 167:21
**minitrial** [1] - 16:9
**minute** [6] - 33:16, 42:2, 42:23, 255:8, 256:5, 283:4
**minutes** [8] - 224:13, 237:22, 256:11, 256:20, 283:3, 284:4, 284:17, 284:22
**Miramar** [9] - 65:25, 78:7, 100:8, 107:11, 135:12, 185:12, 185:15, 185:16, 190:17
**mirror** [1] - 12:24
**misbranded** [12] - 58:11, 58:12, 58:16, 59:3, 59:15, 59:22, 60:2, 62:14, 63:5, 68:14, 155:2, 306:19
**misdemeanor** [2] - 31:12, 31:16
**misgivings** [1] - 151:9
**mislead** [2] - 58:25, 59:19
**misleading** [2] - 26:19, 59:23
**misled** [1] - 25:9
**miss** [7] - 79:15, 79:16, 80:8, 80:12, 83:20, 152:11, 156:8
**missed** [1] - 175:5
**missing** [5] - 23:10, 78:17, 158:3, 213:11, 272:24
**mistake** [4] - 74:9, 75:1, 273:5, 303:7
**mistaken** [1] - 280:16
**misunderstood** [1] - 70:19
**mode** [1] - 304:23
**modify** [1] - 219:12
**Molly** [2] - 3:7, 49:18
**mom** [5] - 81:22, 82:2, 108:19, 145:3, 201:24
**moment** [6] - 49:19, 172:4, 242:13, 266:3, 267:4, 291:15
**moments** [3] - 48:10, 56:4, 256:14
**momentum** [1] - 62:23
**Monday** [10] - 35:2, 41:12, 41:16, 72:5, 72:8, 78:16, 81:5, 81:10, 81:11
**money** [15] - 4:22, 61:8, 61:24, 66:3, 66:9, 66:11, 199:18, 209:2, 221:17, 288:14, 288:15, 291:9, 303:25, 307:4, 307:16
**Montana** [9] - 197:8, 208:9, 208:10, 220:3, 220:24, 270:1, 271:18, 272:20, 274:6
**month** [12] - 35:7, 62:21, 85:17, 94:17, 273:8, 273:9, 273:19, 297:8, 297:9, 297:11, 305:14, 310:1
**monthly** [1] - 144:24
**months** [9] - 7:1, 83:7, 209:1, 217:25, 296:1, 297:19, 302:15, 304:21, 309:3
**Mooney** [1] - 53:16
**moral** [2] - 207:2, 207:7
**Morgan** [1] - 53:15
**morning** [34] - 3:5, 3:8, 3:11, 49:14, 50:2, 50:8, 54:4, 54:10, 54:11, 71:16, 73:3, 80:7, 81:21, 81:23, 83:4, 85:2, 85:14, 86:17, 88:10, 88:16, 88:18, 89:3, 89:14, 89:21, 90:15, 91:18, 121:17, 149:12, 149:13, 152:11, 219:5, 238:2, 273:18, 310:12
**mornings** [1] - 82:4
**most** [3] - 231:2, 231:4, 245:8
**mostly** [2] - 98:20, 230:2
**mother** [8] - 43:15, 72:6, 87:19, 108:11, 142:18, 201:25, 215:21, 216:2
**mother-in-law** [1] - 87:19
**motion** [38] - 5:15, 5:19, 6:1, 9:17, 9:23, 16:7, 18:9, 19:13, 19:16, 19:21, 20:14, 20:15, 20:17, 20:21, 20:23, 21:9, 21:11, 26:4, 26:5, 28:3, 28:4, 28:8, 32:5, 32:23, 33:6, 35:15, 35:16, 37:5, 39:15, 40:22, 40:24, 41:20, 41:22, 41:25, 150:6, 151:7
**motions** [5] - 5:18, 16:5, 18:5, 18:15, 40:23
**mouth** [1] - 243:18
**Movados** [1] - 221:16
**move** [51] - 32:23, 73:13, 80:18, 80:20, 82:22, 94:10, 95:12, 98:13, 100:6, 101:6, 102:25, 107:9, 109:4, 111:25, 116:15, 118:8, 119:19, 123:1, 124:20, 127:21, 129:3, 130:14, 131:15, 132:24, 143:2, 144:7, 146:24, 153:22, 154:3, 155:3, 160:9, 161:9, 167:13, 169:1, 170:18, 171:18, 181:5, 185:9, 191:16, 193:8, 196:1, 198:11, 262:16, 263:21, 264:9, 265:9, 266:15, 269:14, 273:13, 273:22, 273:23
**movie** [1] - 241:24
**Movies** [1] - 138:2
**movies** [3] - 102:23, 109:1, 167:11
**moving** [3] - 82:17, 237:16, 281:10
**MR** [495] - 3:5, 3:8, 3:11, 3:17, 3:20, 3:23, 4:4, 4:10, 4:13, 4:18, 4:21, 5:2, 5:6, 5:11, 5:14, 5:21, 5:23, 6:1, 6:13, 7:12, 7:17, 7:20, 7:23, 8:4, 8:6, 9:9, 9:12, 9:16, 10:2, 10:4, 11:3, 13:15, 13:17, 15:1, 15:10, 15:11, 16:18, 19:23, 20:6, 20:16, 20:20, 20:23, 21:5, 22:7, 22:15, 22:20, 22:23, 23:4, 23:15, 24:24, 25:1, 26:9, 26:13, 26:16, 27:5, 27:9, 27:18, 27:22, 28:5, 28:8, 28:11, 28:25, 29:24, 30:3, 30:6, 30:16, 30:24, 32:4, 32:10, 32:19, 32:25, 33:2, 33:9, 33:20, 34:21, 34:22, 34:24, 34:25, 35:6, 35:14, 35:16, 35:18, 36:10, 36:17, 37:4, 37:7, 37:22, 38:2, 38:12, 39:4, 39:7, 39:11, 39:16, 39:21, 40:10, 40:18, 40:24, 41:12, 41:15, 41:17, 41:22, 42:4, 42:19, 42:22, 43:7, 43:8, 43:9, 43:13, 43:19, 43:20, 43:21, 49:14, 50:1, 50:7, 51:10, 53:3, 53:5, 53:21, 76:12, 79:12, 90:8, 150:7, 151:14, 151:19, 151:22,

151:25, 152:8, 152:17, 152:18, 152:19, 152:24, 153:1, 153:7, 153:10, 153:11, 153:15, 153:16, 153:18, 153:22, 153:23, 153:24, 154:2, 154:6, 154:7, 154:8, 154:15, 154:21, 154:24, 155:9, 155:16, 155:18, 155:20, 155:25, 156:3, 156:8, 156:10, 156:11, 156:16, 156:18, 156:22, 156:25, 157:2, 157:9, 157:15, 157:17, 157:18, 157:22, 158:3, 158:9, 158:11, 158:13, 158:18, 158:19, 158:20, 158:25, 159:1, 159:2, 159:5, 159:9, 159:14, 159:19, 159:20, 159:21, 159:25, 160:1, 160:2, 160:6, 160:9, 160:11, 160:12, 160:17, 160:20, 160:21, 160:23, 160:25, 161:4, 161:6, 161:7, 161:9, 161:11, 161:12, 161:16, 161:18, 161:21, 161:25, 162:4, 162:12, 162:18, 162:19, 162:21, 162:25, 163:9, 163:11, 163:17, 163:24, 164:1, 164:7, 164:13, 164:14, 164:15, 165:19, 219:16, 220:7, 220:11, 220:13, 220:18, 220:24, 221:4, 221:6, 221:9, 221:11, 221:14, 221:19, 221:25, 222:3, 222:6, 222:10, 222:14, 222:19, 222:24, 223:2, 223:8, 223:13, 223:18, 223:25, 224:5, 224:10, 224:15, 224:19, 224:21, 224:23, 224:25, 225:3, 225:7, 225:14, 225:17, 225:19, 225:22, 226:8, 226:12, 226:15, 226:21, 226:25, 227:7, 227:16, 227:20, 228:1, 228:4, 228:14, 228:21, 228:23, 229:2, 229:4, 229:10, 229:14, 229:20, 229:23, 230:4, 230:12, 230:18, 230:22, 231:4, 232:7, 232:10, 232:15, 232:19, 232:21, 233:5, 233:11, 233:16, 233:23, 234:9, 234:12, 234:18, 234:22, 235:15, 235:21, 235:23, 236:1, 236:4, 236:9, 236:15, 236:19, 236:23, 237:2, 237:4, 237:9, 239:6, 239:13, 239:16, 239:21, 240:2, 240:24, 241:1, 242:6, 242:13, 242:18, 242:22, 242:25, 243:2, 243:13, 243:15, 244:4, 244:6, 245:1, 245:4, 245:7, 245:21, 246:1, 246:15, 246:17, 246:23, 247:11, 247:25, 248:3, 248:5, 248:11, 249:23, 250:8, 250:11, 250:22, 251:3, 253:9, 253:14, 253:18, 253:22, 253:25, 254:1, 254:2, 255:5, 255:9, 255:17, 256:1, 256:16, 256:18, 257:3, 257:4, 257:5, 257:7, 257:10, 257:11, 257:14, 257:16, 257:17, 257:18, 257:21, 257:23, 257:24, 258:2, 258:5, 258:8, 258:11, 258:15, 258:17, 258:18, 258:21, 258:24, 259:2, 259:5, 259:6, 259:7, 259:10, 259:12, 259:17, 259:19, 259:25, 260:3, 260:5, 260:8, 260:13, 260:16, 260:23, 261:2, 261:11, 261:12, 261:17, 261:18, 261:23, 261:25, 262:1, 262:2, 262:6, 262:7, 262:8, 262:11, 262:13, 262:15, 262:17, 262:18, 262:23, 263:2, 263:5, 263:9, 263:11, 263:14, 263:17, 263:21, 264:1, 264:5, 264:9, 264:13, 264:17, 264:21, 264:23, 264:25, 265:3, 265:5, 265:9, 265:13, 265:15, 265:19, 265:22, 266:1, 266:3, 266:6, 266:9, 266:11, 266:15, 266:18, 266:21, 266:23, 267:2, 267:4, 267:5, 267:8, 267:10, 267:13, 267:15, 267:18, 267:21, 267:23, 268:8, 268:11, 268:12, 268:16, 268:17, 269:1, 269:3, 269:4, 269:7, 269:9, 269:14, 269:17, 269:21, 269:24, 270:3, 270:5, 270:9, 270:13, 270:15, 271:7, 271:10, 271:11, 271:13, 271:14, 271:16, 271:19, 271:22, 271:24, 272:1, 272:4, 272:6, 272:25, 284:9, 284:10, 284:15, 284:19, 285:3, 285:5, 285:6, 285:10, 285:14, 285:15, 285:16, 291:22

**MS** [10] - 42:6, 271:12, 271:15, 271:17, 283:2, 285:21, 285:25, 286:2, 286:5, 291:25

**multiple** [4] - 33:11, 33:13, 41:1, 305:4

**Mundle** [3] - 189:1, 189:2, 267:16

**murder** [1] - 190:7

**murdered** [1] - 99:25

**Musial** [8] - 80:25, 116:15, 155:7, 268:1, 268:19, 270:21, 272:18, 273:25

**music** [6] - 52:12, 100:4, 102:23, 121:12, 141:8, 195:23

**musician** [3] - 78:1, 120:2, 241:10

**must** [23] - 57:25, 58:4, 75:16, 150:11, 243:25, 274:19, 274:20, 274:22, 275:10, 276:6, 276:10, 276:13, 277:10, 277:23, 278:15, 278:21, 279:8, 279:13, 279:18, 280:22, 282:1, 282:2

**mutism** [1] - 69:20

**Myspace** [1] - 279:12

**mysteriously** [1] - 308:3

**Mystical** [1] - 129:19

## N

**name** [17] - 3:16, 49:15, 50:2, 50:8, 87:24, 167:15, 213:20, 231:9, 248:5, 272:11, 290:1, 294:7, 294:10, 294:11, 296:9, 297:15, 298:14

**named** [2] - 290:14, 294:4

**names** [6] - 51:23, 53:1, 53:6, 53:7, 53:22, 215:4

**narrow** [1] - 151:4

**narrow-minded** [1] - 151:4

**nasty** [1] - 201:13

**Naturalization** [1] - 74:2

**nature** [8] - 48:19, 65:16, 67:14, 69:5, 93:24, 246:3, 246:11, 246:12

**NE** [1] - 1:15

**near** [1] - 110:11

**necessarily** [5] - 23:9, 209:8, 215:16, 227:1, 236:16

**necessary** [6] - 5:3, 13:2, 23:16, 24:2, 252:21, 255:13

**need** [50] - 5:25, 10:7, 16:9, 29:13, 29:14, 30:8, 33:3, 41:9, 52:3, 68:18, 71:6, 72:16, 78:19, 86:8, 86:20, 89:16, 90:15, 151:12, 182:4, 182:22, 207:5, 210:9, 215:12, 216:8, 216:18, 217:13, 217:17, 231:8, 231:10, 231:12, 232:16, 246:24, 246:25, 247:1, 250:1, 250:3, 250:13, 252:17, 253:5, 253:7, 255:3, 274:12, 284:1, 286:1, 286:10, 286:11, 296:15, 300:9, 310:3

**needed** [1] - 18:11

**needs** [5] - 43:15, 94:20, 152:23, 219:11, 298:22

**negative** [6] - 200:23, 201:2, 203:4, 206:1, 207:12, 210:15

**negotiate** [1] - 157:11

**neighbor** [4] - 52:7, 52:11, 82:7, 130:1

**neighborhood** [2] - 52:12, 129:9

**nervous** [1] - 229:15

**networking** [1] - 279:11

**never** [17] - 33:16, 52:25, 157:3, 163:1, 200:25, 201:18, 206:6, 206:12, 206:13, 223:11, 227:14, 234:24, 241:16, 251:1, 259:23, 259:24, 289:9

**new** [6] - 37:8, 129:7, 129:10, 164:2, 287:5, 307:21

**New** [4] - 113:6, 140:16, 189:10, 221:2

**news** [5] - 29:7, 63:16, 188:20, 279:1, 280:20

**newspaper** [1] - 28:13
**newspapers** [1] - 279:1
**next** [31] - 9:23, 20:17, 26:5, 28:4, 30:23, 32:3, 32:9, 35:12, 37:3, 41:17, 44:4, 44:13, 44:19, 49:15, 52:6, 55:12, 62:25, 70:17, 70:21, 85:5, 87:23, 88:1, 90:17, 94:16, 149:25, 153:1, 212:2, 258:2, 258:11, 282:14, 310:1
**Next** [1] - 165:17
**next-door** [1] - 52:6
**nice** [4] - 49:1, 150:3, 165:10, 310:9
**nicer** [1] - 297:1
**Nicholls** [1] - 51:12
**Nicole** [2] - 51:21, 53:11
**night** [12] - 34:24, 35:7, 41:3, 41:12, 41:18, 52:12, 78:16, 81:23, 81:24, 82:4, 82:5, 216:1
**nine** [4] - 121:20, 135:6, 189:24, 271:3
**nineteen** [1] - 93:4
**NO** [1] - 1:2
**nobody** [5] - 47:16, 80:15, 204:25, 205:12, 298:22
**nobody's** [1] - 42:8
**non** [1] - 34:17
**non-testifying** [1] - 34:17
**noncontrolled** [1] - 10:21
**none** [9] - 17:20, 43:19, 130:23, 139:3, 204:12, 204:15, 276:17, 309:15
**noon** [1] - 54:11
**normally** [2] - 5:7, 290:11
**north** [1] - 110:10
**North** [1] - 119:21
**Norwegian** [1] - 107:15
**note** [2] - 281:17, 281:19
**note-taking** [1] - 281:17
**notes** [10] - 39:25, 159:5, 159:9, 229:14, 281:10, 281:12, 281:20, 281:22, 284:3
**nothing** [9] - 24:14, 149:3, 163:24, 203:16, 240:11, 250:1, 277:13, 285:3, 310:11
**notice** [7] - 10:4, 14:10, 15:12, 15:13, 16:3, 18:23, 283:16
**noticed** [1] - 259:13
**noticing** [2] - 296:21, 302:22
**November** [7] - 7:1, 72:20, 72:22, 72:23, 91:14, 91:16, 154:3
**Number** [92] - 43:14, 43:18, 152:15, 152:21, 153:8, 153:20, 153:21, 154:1, 154:12, 154:19, 155:8, 155:14, 156:5, 157:13, 157:20, 157:21, 158:16, 158:22, 158:23, 159:5, 159:16, 159:17, 159:23, 159:24, 160:7, 160:14, 160:15, 161:14, 161:23, 220:4, 223:16, 224:11, 257:7, 257:13, 257:15, 257:20, 257:21, 258:1, 258:2, 258:10, 258:13, 258:20, 258:25, 259:5, 259:9, 259:10, 259:16, 260:12, 260:14, 260:20, 260:23, 261:8, 262:4, 262:9, 262:20, 262:21, 262:25, 263:2, 263:4, 263:6, 263:9, 263:11, 263:13, 263:19, 263:21, 263:23, 264:3, 264:7, 264:13, 264:15, 264:19, 265:7, 265:9, 265:10, 265:24, 266:24, 266:25, 267:11, 267:24, 267:25, 268:1, 268:2, 268:3, 270:20
**number** [21] - 5:18, 13:18, 57:7, 57:10, 57:11, 63:1, 63:5, 150:21, 150:23, 154:6, 263:17, 263:18, 264:5, 264:17, 265:5, 265:15, 266:4, 267:8, 269:4, 293:23, 307:10
**numbers** [4] - 34:15, 262:23, 271:1, 284:1
**nurse** [11] - 81:23, 81:24, 82:4, 82:5, 100:12, 147:8, 147:10, 147:11, 184:5, 184:9, 216:1
**nursing** [1] - 43:15
**nutrition** [1] - 186:2
**NW** [1] - 1:18

**O**

**o'clock** [1] - 90:16
**Oakland** [2] - 110:23, 139:7
**oath** [4] - 19:7, 65:13, 219:10, 281:9
**object** [4] - 56:17, 61:4, 276:1, 291:22
**objected** [1] - 19:20
**objecting** [1] - 20:2
**objection** [71] - 19:24, 20:1, 20:4, 20:5, 20:9, 28:19, 39:8, 43:18, 152:17, 152:18, 152:19, 153:13, 153:15, 153:16, 153:18, 153:23, 153:24, 154:7, 154:8, 156:16, 156:18, 156:23, 156:25, 157:15, 157:17, 157:18, 158:11, 158:13, 158:18, 158:19, 158:20, 158:25, 159:1, 159:2, 159:14, 159:19, 159:20, 159:21, 159:25, 160:1, 160:11, 160:12, 160:20, 160:21, 160:25, 161:11, 161:12, 161:18, 161:21, 257:9, 257:11, 257:16, 257:18, 257:23, 257:24, 258:7, 258:8, 258:17, 258:18, 259:6, 259:7, 260:10, 261:1, 261:24, 262:1, 262:2, 262:17, 262:18, 276:2, 276:3, 276:6
**objections** [3] - 16:11, 16:12, 275:15
**objects** [1] - 58:22
**obligation** [3] - 39:13, 206:21, 241:12
**obstructing** [1] - 59:4
**obtain** [2] - 56:17, 61:8
**obtaining** [2] - 56:23, 61:24
**obvious** [2] - 151:23, 291:12
**obviously** [7] - 157:10, 164:2, 204:3, 219:18, 223:18, 293:10, 310:2
**occupation** [3] - 85:7, 85:8, 85:10
**occurred** [1] - 12:9
**October** [55] - 55:10, 55:12, 55:15, 55:18, 55:20, 62:16, 72:10, 72:16, 72:22, 78:6, 79:5, 79:9, 79:16, 80:3, 81:2, 82:16, 83:1, 83:19, 83:22, 84:12, 84:20, 85:6, 85:20, 86:11, 86:24, 88:5, 88:6, 88:12, 89:22, 90:3, 90:4, 90:9, 90:23, 91:7, 154:2, 154:10, 155:7, 155:14, 155:18, 155:20, 155:22, 155:23, 156:4, 156:6, 157:5, 158:7, 159:6, 160:3, 218:22, 218:24, 273:9
**odd** [1] - 241:17
**OF** [3] - 1:1, 1:4, 1:9
**offense** [2] - 58:24, 60:23
**offer** [3] - 82:15, 82:25, 240:12
**offered** [2] - 8:13, 292:25
**offering** [1] - 292:25
**offers** [1] - 275:24
**Office** [1] - 181:18
**office** [10] - 36:4, 77:23, 120:2, 135:13, 166:5, 166:6, 176:23, 181:20, 259:20, 260:9
**officer** [19] - 16:20, 17:2, 17:18, 19:6, 45:17, 48:17, 74:1, 74:4, 97:18, 135:12, 135:18, 135:21, 149:7, 201:12, 204:5, 204:18, 228:12
**OFFICER** [3] - 43:1, 43:25, 163:19
**officers** [28] - 93:10, 95:1, 96:3, 97:16, 110:4, 127:10, 128:16, 129:25, 131:2, 132:11, 133:22, 135:10, 135:14, 166:12, 168:13, 170:3, 171:5, 173:6, 174:14, 176:15, 177:24, 180:19, 184:22, 188:22, 192:25, 203:5, 206:2, 206:9
**Official** [2] - 2:4, 310:20
**officiated** [1] - 87:9
**often** [6] - 119:8, 131:15, 217:24, 231:20, 280:24, 287:1
**Ogren** [1] - 53:13
**Oklahoma** [1] - 188:21
**old** [34] - 87:19, 97:11, 99:2, 101:21, 103:15, 107:23, 109:19, 112:16, 115:16, 117:3, 119:2, 123:22, 125:10, 132:6, 133:17, 137:11, 142:10, 145:6, 147:13, 166:25, 168:4, 169:20, 172:22, 174:9, 175:24, 183:1, 184:14, 188:6, 189:23, 192:10, 193:24, 195:8, 196:17, 291:7
**older** [1] - 112:19
**oldest** [3] - 69:19, 168:7, 190:6
**Olsen** [10] - 45:9, 193:8, 266:25, 267:9, 267:10, 271:4, 271:6, 271:20, 272:21, 274:7

**once** [16] - 6:17, 52:24, 69:19, 97:21, 113:4, 137:23, 139:24, 151:10, 168:18, 179:4, 280:12, 290:22, 303:5, 304:22
**one** [176] - 6:24, 7:18, 7:22, 11:13, 13:18, 15:11, 16:5, 20:17, 21:1, 21:3, 22:3, 22:14, 23:22, 24:16, 25:11, 26:15, 28:4, 28:15, 28:20, 29:5, 29:20, 29:22, 30:23, 32:3, 32:9, 32:13, 33:14, 34:20, 36:15, 37:3, 37:8, 37:12, 39:17, 42:4, 47:1, 47:5, 52:24, 54:15, 57:2, 63:1, 63:5, 63:6, 65:23, 71:11, 71:20, 75:13, 77:11, 78:11, 82:1, 84:19, 88:12, 90:14, 101:24, 103:14, 107:22, 109:20, 109:21, 112:20, 119:1, 123:25, 125:9, 133:16, 135:5, 137:14, 142:9, 144:10, 147:16, 147:17, 147:18, 148:25, 149:19, 150:4, 152:3, 152:23, 154:24, 158:1, 158:3, 160:3, 161:25, 163:1, 165:21, 168:8, 184:17, 184:18, 186:14, 192:9, 195:7, 202:9, 209:12, 212:2, 214:2, 215:6, 216:25, 217:23, 220:15, 223:11, 224:7, 226:2, 226:18, 230:23, 235:16, 235:25, 236:21, 237:14, 237:24, 240:3, 241:7, 243:20, 243:22, 244:7, 246:22, 247:13, 250:9, 250:10, 250:12, 251:19, 253:15, 258:3, 260:13, 260:14, 260:24, 262:11, 262:23, 263:14, 265:19, 266:3, 267:4, 268:4, 268:11, 268:15, 269:11, 269:17, 269:18, 270:12, 271:20, 271:21, 273:22, 273:23, 275:12, 276:21, 278:5, 280:3, 282:6, 282:9, 283:16, 283:20, 286:14, 287:19, 288:16, 288:23, 290:20, 294:2, 294:4, 297:11, 297:12, 298:6, 298:17, 299:16, 299:17, 302:8, 302:10, 303:12, 303:14, 303:16, 303:21, 304:8, 305:5, 305:17, 305:18
**ones** [8] - 21:10, 152:9, 239:25, 240:15, 243:9, 297:1, 297:2
**Oof** [1] - 29:16
**Ooff** [1] - 30:10
**open** [8] - 3:25, 4:14, 79:11, 184:5, 254:9, 254:11, 305:18
**Open** [1] - 272:8
**open-minded** [3] - 254:9, 254:11
**opened** [4] - 297:13, 299:14, 304:17, 305:25
**opening** [18] - 20:8, 20:10, 20:13, 41:5, 42:5, 42:17, 42:20, 253:23, 275:13, 282:12, 282:15, 282:25, 284:17, 284:20, 285:19, 285:23, 310:8
**openings** [1] - 163:15
**operated** [2] - 288:3, 289:21
**operates** [1] - 48:14
**operating** [4] - 12:4, 14:4, 16:22, 54:9
**operational** [1] - 124:1
**opinion** [10] - 31:1, 31:3, 32:7, 34:13, 35:21, 36:4, 211:6, 245:20, 275:1, 281:3
**opinions** [2] - 35:25, 56:14
**opportunity** [12] - 6:4, 6:10, 8:24, 9:5, 19:11, 33:12, 41:5, 56:8, 57:6, 276:21, 290:10, 300:12
**opposed** [4] - 4:2, 20:1, 23:3, 237:7
**opposing** [1] - 34:11
**opposite** [1] - 4:5
**optimistic** [1] - 46:14
**oranges** [1] - 205:5
**order** [6] - 25:23, 257:15, 276:8, 278:3, 293:17, 298:11
**Order** [1] - 3:1
**ordered** [1] - 225:4
**organization** [1] - 60:13
**originally** [10] - 18:10, 111:1, 140:13, 141:10, 143:9, 144:19, 172:1, 180:10, 189:9, 221:2
**Orlando** [1] - 117:7
**orthodontist** [1] - 118:24
**Ortiz** [2] - 178:16, 266:16
**Osakwe** [8] - 44:25, 63:22, 65:15, 66:24, 157:13, 157:20, 165:3
**Osawke** [1] - 146:24
**otherwise** [4] - 13:5, 234:16, 246:4, 279:18
**ourselves** [1] - 240:10
**out-of-state** [1] - 54:15
**out-of-town** [1] - 79:2
**outcome** [1] - 276:25
**outdoors** [1] - 179:25
**outline** [1] - 282:12
**outpatient** [1] - 87:4
**outright** [1] - 13:7
**outset** [1] - 15:15
**outside** [22] - 10:9, 17:7, 19:17, 42:3, 60:3, 62:13, 62:20, 63:2, 81:2, 150:5, 163:4, 165:20, 214:13, 214:19, 226:2, 227:4, 235:10, 256:13, 275:2, 281:4, 283:21
**outweighed** [2] - 10:24, 30:20
**overrule** [1] - 276:2
**oversight** [1] - 59:6
**overt** [1] - 59:12
**own** [24] - 8:18, 12:4, 20:12, 23:6, 23:8, 29:21, 34:12, 34:16, 63:12, 64:5, 66:2, 203:10, 203:15, 208:4, 214:9, 234:22, 245:10, 281:20, 293:7, 296:21, 300:25, 301:9, 307:2, 307:12
**owned** [1] - 295:16
**owner** [1] - 11:19
**owners** [1] - 60:13
**owns** [1] - 92:20

## P

**P.A** [1] - 1:22
**p.m** [3] - 69:24, 82:5, 257:8
**pad** [1] - 284:3
**Padron** [4] - 92:1, 161:17, 161:23, 165:13
**page** [1] - 243:24
**Pages** [1] - 1:8
**pages** [14] - 7:19, 7:21, 7:24, 27:6, 58:7, 238:4, 238:8, 238:24, 239:8, 241:19, 247:21, 248:16, 249:6
**paid** [5] - 13:6, 71:4, 80:5, 287:21, 296:17
**paint** [1] - 42:12
**palm** [1] - 180:11
**Palm** [6] - 55:11, 55:21, 58:18, 60:11, 61:2, 61:21
**Panama** [2] - 72:17, 72:18
**PANEL** [3] - 253:8, 253:17, 255:25
**Panel** [1] - 44:1
**panel** [10] - 45:18, 45:19, 52:16, 64:11, 150:15, 151:7, 151:11, 164:9, 273:12, 273:20
**pants** [1] - 235:7
**paper** [8] - 230:13, 240:12, 246:8, 252:1, 252:5, 252:9, 286:18, 300:15
**papers** [2] - 286:21, 295:24
**paperwork** [6] - 48:13, 223:6, 223:9, 289:14, 294:20, 301:7
**paragraph** [5] - 28:8, 28:11, 32:4, 35:19
**paragraphs** [1] - 27:10
**paralegal** [4] - 3:14, 49:18, 50:9, 169:11
**paramedic** [2] - 115:8, 116:11
**paraphrase** [1] - 150:9
**parcel** [1] - 16:4
**Parekh** [1] - 51:18
**parent** [1] - 73:6
**parents** [1] - 218:21
**Park** [2] - 110:23, 139:7
**Parkland** [2] - 167:16, 175:12
**part** [34] - 4:24, 5:5, 11:19, 16:4, 17:23, 22:21, 22:24, 23:12, 25:7, 25:13, 25:25, 26:19, 30:21, 36:24, 37:1, 38:21, 39:13, 55:22, 62:20, 77:11, 78:17, 89:17, 189:14, 210:6, 226:9, 231:3, 231:4, 252:13, 276:17, 288:8, 290:16, 300:8
**part-owner** [1] - 11:19
**part-time** [1] - 189:14
**particular** [10] - 23:5, 23:16, 24:19, 34:23, 48:6, 59:23, 68:13, 219:24, 282:3, 282:4
**particularly** [5] - 13:3, 16:5, 16:7, 24:11, 201:13
**parties** [3] - 18:23, 271:5, 281:2
**parties'** [1] - 284:20
**partner** [2] - 50:3, 290:16
**parts** [9] - 22:25, 23:13, 23:15, 27:16, 146:4, 229:13, 229:14, 229:17, 229:19
**party** [2] - 34:11, 280:17
**Pascual** [5] - 171:18, 171:19, 171:20, 265:7, 265:9
**Pasetti** [7] - 69:17, 69:18, 70:16, 96:14, 152:22, 262:9, 262:20
**pass** [27] - 49:5, 56:5, 57:2, 105:3, 106:9, 110:21, 113:15, 114:25, 121:15, 134:10, 136:20,

138:4, 139:5, 140:7, 145:23, 173:16, 175:1, 177:9, 178:15, 180:3, 183:20, 187:11, 189:1, 190:14, 197:7, 251:11, 289:6
**passed** [4] - 72:6, 212:6, 287:14, 305:20
**passport** [1] - 85:17
**past** [7] - 54:14, 54:16, 200:22, 211:3, 220:7, 220:9, 295:16
**pastor** [2] - 255:2, 255:5
**Pastor** [1] - 131:22
**patient** [5] - 296:8, 297:13, 300:5, 300:7, 305:22
**patient's** [2] - 292:16, 296:9
**patients** [13] - 287:12, 296:17, 299:11, 299:13, 302:21, 303:2, 303:13, 304:17, 305:12, 305:17, 307:14, 309:5, 309:16
**patients'** [3] - 289:16, 306:17, 306:22
**PATRICIA** [2] - 2:4, 310:20
**PATRICK** [2] - 1:7, 1:17
**Patrick** [98] - 3:2, 3:9, 3:18, 11:18, 15:22, 21:11, 21:16, 21:21, 21:25, 22:16, 23:2, 23:5, 23:6, 23:24, 24:3, 24:12, 24:14, 24:20, 25:19, 28:11, 28:12, 28:14, 29:7, 29:11, 29:15, 30:10, 30:11, 30:24, 31:1, 31:2, 31:24, 32:5, 49:23, 50:4, 57:19, 58:19, 59:17, 237:12, 238:5, 238:7, 238:10, 238:16, 240:5, 245:9, 247:20, 262:7, 262:17, 272:4, 288:2, 288:21, 288:25, 289:6, 289:20, 290:15, 290:22, 292:1, 292:19, 292:23, 293:13, 293:16, 293:22, 293:25, 294:7, 294:19, 295:12, 295:23, 296:13, 296:16, 297:5, 298:7, 299:2, 299:7, 299:18, 300:12, 300:14, 300:24, 302:14, 302:24, 303:24, 304:15, 304:24, 305:3, 305:4, 305:11, 305:24, 306:12, 307:15, 307:17, 307:22, 308:1, 308:9, 308:16, 308:18, 308:23, 308:25, 309:7, 309:17, 309:20
**Paul** [1] - 53:19
**pay** [5] - 69:15, 84:6, 209:10, 228:20, 304:18
**payment** [2] - 66:1, 278:13
**PD** [1] - 135:12
**peace** [1] - 215:14
**pediatrician** [1] - 106:9
**pediatricians** [1] - 220:22
**pedigree** [28] - 12:9, 13:3, 29:6, 59:24, 286:15, 286:16, 286:25, 287:2, 287:9, 287:10, 287:16, 288:9, 289:14, 289:15, 292:8, 294:16, 294:20, 297:3, 297:17, 297:21, 298:2, 299:3, 301:7, 301:11, 301:25, 306:6, 306:7, 307:6
**pedigrees** [28] - 11:24, 12:24, 63:4, 155:1, 287:3, 288:17, 289:7, 289:8, 291:13, 295:24, 298:22, 299:9, 299:23, 300:8, 302:2, 302:4, 302:10, 302:23, 303:9, 306:3, 306:14, 309:9, 309:10, 309:18, 309:19
**Pembroke** [4] - 134:13, 144:16, 147:1, 165:25
**penalized** [1] - 218:13
**pencil** [1] - 284:3
**pending** [3] - 5:18, 40:23, 48:2
**people** [77] - 37:10, 37:12, 38:13, 42:3, 42:12, 44:8, 44:15, 47:4, 56:17, 60:7, 64:10, 66:6, 66:8, 77:8, 77:18, 83:25, 110:5, 133:23, 151:5, 162:7, 162:13, 207:2, 209:2, 209:9, 211:10, 211:11, 212:23, 215:6, 223:6, 223:8, 226:1, 227:4, 229:1, 233:7, 238:21, 241:20, 242:19, 248:8, 254:9, 275:2, 278:6, 279:20, 286:6, 286:11, 286:13, 287:13, 292:22, 292:24, 292:25, 293:4, 293:11, 293:12, 293:14, 293:23, 294:3, 294:4, 294:11, 295:8, 296:12, 296:21, 297:19, 300:9, 303:2, 305:25, 307:10, 307:19, 307:20, 307:25, 308:5, 308:15, 308:17, 308:19, 308:20, 308:21
**peoples** [1] - 80:4
**Pepsico** [1] - 123:16
**percent** [18] - 64:23, 75:23, 76:9, 77:6, 77:13, 77:15, 77:16, 91:23, 106:7, 147:25, 154:17, 155:2, 201:20, 202:13, 202:14, 202:21, 217:19, 251:12
**percentage** [1] - 202:21
**peremptories** [1] - 257:1
**peremptory** [3] - 57:7, 57:10, 262:21
**perfectionist** [1] - 77:10
**perfectly** [1] - 33:25
**performer** [1] - 78:8
**perhaps** [3] - 35:1, 35:2, 159:7
**peril** [1] - 20:12
**period** [10] - 12:10, 13:21, 14:13, 16:21, 17:3, 17:7, 17:15, 17:24, 34:3, 71:1
**permission** [3] - 163:5, 237:4, 285:22
**permit** [4] - 279:23, 279:24, 280:4, 280:8
**permitted** [1] - 276:1
**person** [35] - 7:8, 8:12, 44:5, 44:10, 44:14, 44:21, 44:23, 45:3, 45:6, 45:8, 45:9, 52:2, 57:20, 58:20, 59:18, 75:13, 75:24, 97:17, 203:11, 204:8, 204:24, 205:1, 205:13, 205:20, 226:17, 228:18, 231:12, 236:7, 252:17, 278:12, 278:16, 290:14, 292:17, 294:9
**person's** [2] - 252:3, 252:12
**person-to-person** [1] - 236:7
**personal** [9] - 48:19, 56:14, 56:22, 63:12, 76:15, 149:21, 169:13, 211:11, 278:3
**personally** [2] - 74:8, 74:24
**personnel** [2] - 48:11, 50:12
**perspective** [5] - 19:12, 152:9, 222:11, 233:13, 234:14
**pertain** [1] - 85:8
**pertinent** [2] - 57:21, 216:21
**pest** [1] - 101:24
**Peter** [7] - 37:12, 51:21, 53:13, 294:4, 294:6, 294:10, 294:15
**Ph** [1] - 1:18
**Pharma** [1] - 62:11
**pharma** [2] - 207:23, 225:1
**pharmaceutical** [6] - 207:16, 207:21, 208:11, 208:17, 220:5, 220:19
**pharmaceuticals** [2] - 155:1, 307:21
**pharmacies** [17] - 286:6, 287:15, 288:12, 288:23, 289:10, 289:21, 292:3, 292:21, 293:16, 296:4, 297:6, 297:19, 299:13, 300:10, 305:13, 306:16, 309:2
**pharmacy** [10] - 60:3, 60:6, 63:1, 63:5, 63:6, 63:7, 295:5, 295:9
**Philip** [1] - 138:12
**philosophical** [2] - 207:2, 207:7
**phone** [4] - 79:11, 113:5, 144:24, 284:1
**phones** [3] - 214:14, 214:15, 214:17
**photos** [1] - 42:10
**phrases** [1] - 280:24
**physically** [1] - 66:7
**physician** [1] - 172:25
**Picard** [1] - 51:19
**pick** [39] - 46:17, 46:18, 52:19, 70:6, 70:24, 71:11, 71:18, 71:19, 71:20, 73:18, 81:21, 88:18, 88:23, 88:24, 90:15, 90:16, 151:13, 152:15, 153:8, 159:17, 160:15, 215:2, 215:22, 215:24, 219:21, 219:24, 220:2, 233:21, 242:19, 245:4, 248:5, 248:6, 256:10, 270:7, 270:13, 270:17, 283:19, 286:6, 295:8
**picked** [5] - 41:8, 71:20, 80:21, 215:7, 299:13
**picking** [5] - 41:4, 73:6, 238:21, 250:23, 297:1
**picks** [1] - 160:18
**pickup** [1] - 168:18
**pictures** [3] - 61:15, 62:6, 308:8
**piece** [5] - 240:12, 246:8, 252:1, 252:5, 275:8
**pigs** [1] - 121:13
**piles** [1] - 74:12
**pill** [1] - 208:25
**pills** [3] - 299:12,

305:18, 306:1
**pilot** [1] - 217:9
**Pines** [4] - 134:13, 144:16, 147:1, 165:25
**Piontkowsky** [1] - 53:14
**place** [9] - 12:4, 278:18, 278:20, 280:8, 280:10, 280:13, 298:14, 300:16, 303:10
**places** [5] - 221:22, 291:5, 291:6, 300:1, 308:7
**plaintiff's** [1] - 22:4
**plan** [1] - 20:19
**plane** [3] - 217:8, 217:9, 217:12
**planned** [6] - 14:12, 69:11, 72:10, 84:13, 86:12, 87:25
**planning** [1] - 82:17
**plans** [1] - 79:3
**plantation** [1] - 169:6
**Plantation** [9] - 70:5, 92:8, 96:16, 97:19, 103:2, 113:18, 124:22, 125:7, 191:20
**plausible** [2] - 298:12, 298:18
**play** [3] - 23:18, 62:22, 119:16
**played** [3] - 22:2, 25:20, 26:2
**playing** [1] - 24:18
**plays** [1] - 52:12
**plea** [2] - 231:20, 231:25
**pleaded** [2] - 232:1, 232:3
**pleading** [1] - 14:11
**pleased** [1] - 205:24
**pled** [2] - 231:19, 293:6
**plenty** [1] - 146:20
**plot** [1] - 241:25
**plus** [3] - 80:4, 222:9, 222:10
**PM** [1] - 1:6
**podium** [1] - 237:7
**POGOZELSKI** [206] - 3:5, 5:14, 6:13, 7:12, 7:17, 7:20, 7:23, 9:9, 10:2, 11:3, 15:1, 15:11, 20:20, 20:23, 22:7, 22:15, 22:20, 22:23, 23:4, 23:15, 28:25, 29:24, 30:3, 30:6, 30:16, 33:20, 34:22, 34:25, 36:10, 36:17, 42:4, 43:7, 43:19, 49:14, 51:10, 90:8, 151:22, 151:25, 152:8, 152:18, 152:24, 153:7, 153:11, 153:18, 153:22, 154:2, 154:6, 154:24, 155:9, 155:20, 155:25, 156:8, 156:11, 156:18, 157:2, 157:9, 157:17, 158:3, 158:9, 158:20, 159:2, 159:5, 159:21, 160:2, 160:6, 160:9, 160:12, 160:21, 161:7, 161:9, 161:16, 162:4, 162:19, 163:24, 164:15, 219:16, 220:7, 220:11, 220:13, 220:18, 220:24, 221:4, 221:6, 221:9, 221:11, 221:14, 221:19, 221:25, 222:3, 222:6, 222:10, 222:14, 222:19, 222:24, 223:2, 223:8, 223:13, 223:18, 223:25, 224:5, 224:10, 224:15, 224:19, 224:21, 224:23, 224:25, 225:3, 225:7, 225:14, 225:17, 225:19, 225:22, 226:8, 226:12, 226:15, 226:21, 226:25, 227:7, 227:16, 227:20, 228:1, 228:4, 228:14, 228:21, 228:23, 229:2, 229:4, 229:10, 229:14, 229:20, 229:23, 230:4, 230:12, 230:18, 230:22, 231:4, 232:7, 232:10, 232:15, 232:19, 232:21, 233:5, 233:11, 233:16, 233:23, 234:9, 234:12, 234:18, 234:22, 235:15, 235:21, 235:23, 236:1, 236:4, 236:9, 236:15, 236:19, 236:23, 253:22, 254:1, 257:5, 257:7, 257:14, 257:17, 257:21, 258:2, 258:11, 258:15, 258:21, 259:6, 259:12, 259:25, 260:5, 260:8, 260:16, 261:2, 261:23, 262:2, 262:8, 262:13, 262:15, 262:23, 263:2, 263:5, 263:21, 264:9, 264:21, 265:9, 265:15, 266:1, 266:15, 267:2, 267:13, 267:21, 269:4, 269:14, 269:21, 269:24, 270:5, 270:9, 271:14, 272:6, 284:9, 284:19, 285:3, 285:16
**Pogozelski** [21] - 1:13, 3:6, 28:24, 36:9, 49:11, 49:13, 49:15, 57:2, 153:17, 262:22, 263:20, 264:8, 264:20, 265:8, 265:25, 266:14, 267:1, 267:12, 267:20, 269:13, 270:4
**Point** [2] - 126:15, 141:18
**point** [43] - 6:11, 15:11, 23:10, 25:17, 25:18, 25:25, 27:3, 28:1, 39:10, 40:16, 42:13, 52:3, 98:6, 150:2, 153:6, 154:24, 155:5, 155:6, 155:13, 156:12, 160:5, 161:15, 163:15, 182:19, 216:5, 227:5, 234:6, 234:10, 239:10, 239:19, 240:4, 247:18, 256:9, 257:1, 260:2, 260:17, 267:24, 277:25, 299:22, 303:25, 304:1, 305:7, 308:12
**police** [26] - 64:2, 64:13, 96:2, 97:18, 110:4, 135:9, 135:11, 135:18, 135:21, 149:7, 168:12, 171:4, 188:21, 192:24, 201:12, 203:5, 203:14, 204:5, 204:18, 206:2, 206:9, 228:10, 258:3
**policeman** [2] - 108:3, 249:2
**policemen** [35] - 100:19, 102:12, 104:21, 105:22, 106:22, 111:14, 113:1, 114:11, 115:21, 117:12, 119:6, 120:11, 122:11, 124:5, 125:18, 137:18, 138:19, 139:21, 140:24, 142:15, 143:18, 145:11, 146:10, 148:7, 179:14, 183:9, 186:23, 188:11, 190:3, 191:3, 194:7, 195:14, 196:22, 198:1, 199:3
**policies** [3] - 11:21, 11:22, 15:18
**polling** [3] - 164:12, 261:16, 285:13
**Pompano** [3] - 127:23, 145:25, 177:12
**poor** [1] - 14:14
**popped** [1] - 305:18
**portion** [2] - 57:21, 238:18
**Portuhondo** [7] - 185:9, 259:15, 268:3, 268:6, 268:21, 268:24, 269:3
**position** [8] - 5:12, 5:13, 6:12, 10:13, 22:6, 22:13, 42:8, 251:1
**positions** [1] - 13:9
**positive** [5] - 207:12, 209:22, 211:17, 212:15, 226:5
**possess** [1] - 60:19
**possession** [1] - 166:18
**possibility** [2] - 231:22, 282:10
**possible** [7] - 29:2, 49:20, 51:9, 68:25, 162:5, 238:13, 288:12
**possibly** [2] - 298:13, 299:6
**Postal** [1] - 181:13
**posting** [1] - 279:14
**potential** [2] - 53:7, 233:8
**potentially** [2] - 231:13, 233:7
**Potter** [1] - 53:15
**practice** [4] - 17:12, 139:13, 142:4, 169:12
**practices** [1] - 12:22
**practitioner** [3] - 147:8, 147:10, 147:11
**pre** [3] - 60:14, 60:18, 60:19
**pre-retail** [3] - 60:14, 60:18, 60:19
**preexisting** [1] - 15:18
**prefer** [2] - 162:19, 162:20
**preference** [1] - 151:18
**prefers** [1] - 162:21
**prejudice** [9] - 10:25, 19:13, 19:16, 25:7, 25:8, 30:21, 32:12, 277:1
**prejudiced** [2] - 19:21, 20:10
**prejudicial** [4] - 10:20, 10:23, 35:18, 36:2
**preliminary** [3] - 148:25, 214:2, 274:14
**premature** [2] - 280:6, 280:7
**premises** [2] - 278:18, 278:20
**premium** [1] - 191:25
**Prep** [1] - 225:13
**prepaid** [5] - 69:12, 70:22, 71:2, 84:18, 88:11
**preparation** [2] - 18:12, 273:7
**prepare** [1] - 8:18
**preplanned** [1] - 85:19
**preponderance** [1] - 10:11
**Presbyterian** [1] - 131:22
**prescribed** [1] - 208:24
**prescription** [15] - 11:15, 29:8, 30:1, 208:20, 211:7,

213:23, 223:23, 286:7, 286:23, 287:6, 289:13, 289:20, 291:18, 294:9, 305:14
**prescriptions** [1] - 299:13
**presence** [13] - 19:17, 149:2, 149:5, 150:5, 164:11, 164:18, 214:4, 256:6, 256:13, 261:15, 285:12, 285:18, 309:25
**present** [21] - 3:13, 3:18, 3:21, 14:13, 18:24, 26:20, 43:4, 74:19, 163:22, 254:3, 256:22, 256:24, 261:14, 277:18, 282:17, 282:19, 282:22, 284:25
**presentation** [1] - 34:6
**presented** [8] - 5:2, 6:5, 7:6, 14:18, 56:19, 224:7, 274:23, 280:23
**presents** [1] - 254:7
**president** [2] - 111:8, 174:5
**press** [1] - 32:10
**presume** [10] - 66:18, 67:24, 75:2, 238:9, 238:16, 238:25, 239:9, 242:15, 244:1, 260:15
**presumed** [4] - 66:13, 182:14, 199:23, 277:11
**presuming** [3] - 68:17, 239:17, 247:20
**presumption** [6] - 66:14, 199:24, 200:18, 210:18, 237:25, 238:1
**pretend** [1] - 302:19
**pretenses** [4] - 61:9, 61:10, 61:25, 62:1
**prettiest** [1] - 297:1
**pretty** [12] - 54:8, 77:5, 78:8, 89:9, 151:22, 218:10, 226:18, 226:23, 230:6, 261:6, 262:13, 273:8
**prevent** [4] - 63:19, 69:14, 108:13, 120:19
**previous** [2] - 292:17, 296:8
**price** [2] - 290:5, 290:11
**prices** [3] - 291:3, 292:6, 308:3
**pricing** [3] - 292:5, 301:2, 301:4
**primarily** [3] - 139:14, 289:22, 290:3
**primary** [1] - 218:10
**Primmer** [4] - 187:11, 267:19, 268:3, 268:21
**primmer** [2] - 272:19, 274:6
**principal** [1] - 89:8
**principles** [1] - 274:12
**printed** [1] - 309:25
**prison** [1] - 93:22
**privilege** [1] - 39:9
**privileged** [1] - 38:19
**probative** [1] - 30:20
**problem** [11] - 22:10, 35:9, 153:1, 170:9, 177:8, 205:10, 205:13, 241:1, 243:13, 260:25, 303:18
**problematic** [1] - 233:13
**problems** [10] - 48:19, 82:11, 136:4, 151:23, 152:2, 200:19, 245:23, 303:16, 304:3, 309:3
**procedurally** [1] - 23:2
**procedure** [1] - 19:9
**procedures** [8] - 11:21, 11:22, 12:4, 14:4, 15:18, 16:22, 17:4
**proceed** [4] - 53:3, 285:20, 285:25, 286:3
**proceedings** [1] - 310:17
**process** [6] - 46:17, 54:4, 57:1, 57:5, 215:3, 219:21
**processing** [1] - 167:22
**produced** [15] - 6:3, 6:8, 6:15, 6:16, 6:17, 6:25, 8:1, 8:16, 15:14, 34:22, 58:13, 60:14, 60:18, 60:22, 302:6
**producing** [2] - 32:14, 32:15
**product** [5] - 295:20, 297:7, 301:2, 301:8, 301:16
**production** [2] - 5:23, 6:2
**products** [6] - 60:8, 60:19, 220:14, 298:19, 300:21
**proffer** [3] - 18:19, 18:20, 18:22
**proffered** [1] - 11:7
**proffering** [1] - 19:17
**proffers** [1] - 18:17
**profit** [1] - 287:22
**program** [2] - 220:17, 278:22
**programs** [1] - 220:15
**projects** [3] - 86:4, 86:8
**promise** [2] - 242:7, 281:9
**promised** [1] - 280:3
**promises** [6] - 61:10, 61:11, 62:1, 62:2, 295:18, 295:19
**promising** [1] - 296:4
**promptly** [1] - 278:15
**proof** [14] - 66:20, 68:18, 74:22, 200:6, 200:17, 240:15, 248:20, 253:19, 255:12, 255:22, 255:24, 277:14, 277:16, 278:1
**propensity** [6] - 13:18, 14:9, 14:19, 15:2, 16:16, 17:8
**proper** [1] - 252:18
**properly** [1] - 34:9
**property** [5] - 61:8, 61:24, 134:18, 199:19, 286:10
**propose** [2] - 256:25, 284:6
**proposed** [1] - 285:8
**prosecutor** [6] - 38:1, 40:6, 40:8, 40:9, 74:21, 251:21
**prosecutor's** [3] - 181:19, 259:20, 260:9
**prosecutors** [5] - 181:20, 181:24, 182:1, 182:21
**PROSPECTIVE** [1241] - 47:2, 47:6, 47:9, 47:12, 47:14, 50:16, 50:19, 50:24, 51:3, 51:6, 63:23, 64:17, 64:19, 64:22, 65:8, 65:10, 65:14, 65:21, 65:23, 66:21, 67:8, 67:10, 67:16, 68:4, 68:8, 68:19, 68:22, 68:25, 69:18, 69:24, 70:4, 70:8, 70:10, 70:14, 70:18, 71:3, 71:9, 71:15, 71:19, 71:24, 72:4, 72:9, 72:13, 72:16, 72:20, 72:22, 73:3, 73:15, 73:21, 73:25, 74:13, 74:15, 74:17, 74:24, 75:5, 75:8, 75:11, 75:20, 76:4, 76:6, 76:15, 77:2, 77:4, 77:10, 77:17, 77:22, 78:12, 78:15, 78:20, 79:1, 79:4, 79:8, 79:10, 79:19, 79:23, 79:25, 80:2, 80:10, 80:13, 80:17, 80:19, 80:24, 81:1, 81:5, 81:8, 81:10, 81:12, 81:15, 81:17, 81:20, 82:3, 82:7, 82:15, 82:20, 82:25, 83:4, 83:6, 83:11, 83:14, 83:16, 83:18, 84:8, 84:11, 84:18, 84:22, 84:24, 85:2, 85:4, 85:11, 85:13, 85:14, 85:23, 86:1, 86:3, 86:10, 86:17, 86:21, 86:23, 87:1, 87:5, 87:12, 87:15, 87:17, 87:22, 87:24, 88:4, 88:8, 88:10, 88:14, 88:16, 88:21, 88:24, 89:5, 89:12, 89:19, 89:21, 89:25, 90:5, 90:11, 90:13, 90:19, 90:20, 91:2, 91:4, 91:7, 91:11, 91:14, 91:18, 91:23, 91:25, 92:2, 92:8, 92:10, 92:13, 92:15, 92:17, 92:19, 92:22, 92:24, 93:1, 93:3, 93:6, 93:8, 93:11, 93:14, 93:17, 93:20, 93:22, 93:25, 94:2, 94:6, 94:8, 94:12, 94:14, 94:16, 94:19, 94:22, 94:24, 95:2, 95:4, 95:7, 95:9, 95:11, 95:14, 95:16, 95:18, 95:20, 95:22, 95:24, 96:1, 96:4, 96:6, 96:8, 96:10, 96:12, 96:16, 96:18, 96:20, 96:22, 96:24, 97:2, 97:4, 97:7, 97:10, 97:12, 97:14, 97:17, 97:21, 97:23, 98:3, 98:5, 98:8, 98:10, 98:15, 98:17, 98:20, 98:22, 98:24, 99:1, 99:3, 99:5, 99:12, 99:14, 99:16, 99:18, 99:20, 99:22, 99:24, 100:2, 100:4, 100:8, 100:10, 100:12, 100:15, 100:17, 100:20, 100:22, 100:24, 101:1, 101:3, 101:8, 101:11, 101:13, 101:16, 101:18, 101:20, 101:22, 101:24, 102:2, 102:4, 102:6, 102:8, 102:10, 102:13, 102:15, 102:18, 102:21, 102:23, 103:2, 103:4, 103:6, 103:8, 103:10, 103:12, 103:14, 103:16, 103:18, 103:21, 103:24, 104:1, 104:3, 104:5, 104:7, 104:9, 104:15, 104:17, 104:19, 104:22, 104:24, 105:1, 105:5, 105:7, 105:9, 105:11, 105:14, 105:16, 105:18, 105:20, 105:23, 105:25, 106:2, 106:4, 106:6, 106:8, 106:11, 106:14, 106:16, 106:18, 106:20, 106:23, 107:1, 107:3, 107:5, 107:7, 107:11, 107:13, 107:15, 107:17, 107:20, 107:22, 107:24, 108:1, 108:4, 108:6, 108:8, 108:10, 108:15, 108:17, 108:19, 108:22, 108:24, 109:1, 109:6, 109:9, 109:12, 109:14, 109:18, 109:20, 109:24, 110:5, 110:8, 110:13, 110:15, 110:18, 110:23, 110:25, 111:2, 111:4, 111:6, 111:8, 111:10,

111:12, 111:15,
111:17, 111:19,
111:21, 111:23,
112:1, 112:4, 112:7,
112:9, 112:11,
112:13, 112:15,
112:17, 112:19,
112:24, 113:2,
113:4, 113:9,
113:12, 113:14,
113:18, 113:21,
113:23, 114:1,
114:3, 114:5, 114:8,
114:12, 114:14,
114:16, 114:19,
114:21, 114:24,
115:4, 115:6, 115:8,
115:11, 115:13,
115:15, 115:17,
115:19, 115:22,
115:25, 116:2,
116:4, 116:6, 116:8,
116:11, 116:13,
116:17, 116:19,
116:21, 116:23,
116:25, 117:2,
117:4, 117:6,
117:10, 117:13,
117:15, 117:17,
117:23, 117:25,
118:3, 118:5,
118:10, 118:13,
118:15, 118:17,
118:19, 118:22,
118:24, 119:1,
119:4, 119:7,
119:10, 119:12,
119:14, 119:16,
119:21, 119:24,
120:1, 120:4, 120:7,
120:9, 120:12,
120:14, 120:17,
120:21, 120:23,
120:25, 121:5,
121:7, 121:10,
121:12, 121:17,
121:19, 121:22,
121:24, 122:1,
122:3, 122:5, 122:7,
122:9, 122:12,
122:15, 122:18,
122:22, 122:24,
123:3, 123:6, 123:9,
123:11, 123:13,
123:16, 123:19,
123:21, 123:23,
123:25, 124:3,
124:6, 124:8,
124:10, 124:12,
124:16, 124:18,
124:22, 124:24,
125:1, 125:4, 125:6,
125:9, 125:11,
125:13, 125:16,
125:19, 125:21,
125:23, 126:1,
126:3, 126:6, 126:8,
126:12, 126:15,
126:18, 126:20,
126:22, 126:24,
127:1, 127:3, 127:5,
127:7, 127:11,
127:13, 127:15,
127:17, 127:19,
127:23, 128:1,
128:3, 128:6, 128:9,
128:12, 128:14,
128:17, 128:19,
128:21, 128:23,
128:25, 129:5,
129:8, 129:11,
129:15, 129:17,
129:19, 129:21,
129:23, 130:1,
130:3, 130:5, 130:7,
130:10, 130:12,
130:16, 130:19,
130:21, 130:23,
130:25, 131:3,
131:5, 131:7, 131:9,
131:11, 131:13,
131:17, 131:20,
131:22, 131:25,
132:2, 132:5, 132:7,
132:9, 132:12,
132:14, 132:16,
132:18, 132:20,
132:22, 133:1,
133:4, 133:6, 133:9,
133:12, 133:14,
133:16, 133:18,
133:20, 133:23,
134:1, 134:3, 134:6,
134:8, 134:13,
134:16, 134:18,
134:20, 134:22,
134:24, 135:2,
135:5, 135:8,
135:11, 135:19,
135:22, 136:1,
136:6, 136:9,
136:11, 136:13,
136:15, 136:17,
136:23, 137:1,
137:3, 137:5, 137:7,
137:10, 137:12,
137:14, 137:16,
137:19, 137:21,
137:23, 137:25,
138:2, 138:6, 138:8,
138:10, 138:12,
138:15, 138:17,
138:20, 138:22,
138:24, 139:1,
139:3, 139:7, 139:9,
139:12, 139:14,
139:17, 139:19,
139:22, 139:24,
140:2, 140:4, 140:6,
140:10, 140:12,
140:14, 140:16,
140:18, 140:20,
140:22, 140:25,
141:2, 141:4, 141:6,
141:8, 141:11,
141:14, 141:18,
141:21, 141:23,
142:1, 142:3, 142:5,
142:7, 142:9,
142:11, 142:13,
142:16, 142:18,
142:21, 142:23,
142:25, 143:3,
143:5, 143:8,
143:10, 143:12,
143:14, 143:16,
143:19, 143:21,
143:23, 144:1,
144:3, 144:5, 144:9,
144:11, 144:13,
144:16, 144:18,
144:20, 144:22,
144:24, 145:1,
145:3, 145:5, 145:7,
145:9, 145:12,
145:14, 145:16,
145:18, 145:20,
145:25, 146:2,
146:4, 146:6, 146:8,
146:11, 146:13,
146:15, 146:17,
146:20, 146:22,
147:1, 147:3, 147:6,
147:8, 147:10,
147:12, 147:14,
147:16, 147:20,
147:22, 147:24,
148:3, 148:5, 148:8,
148:10, 148:12,
148:15, 148:18,
148:20, 165:8,
165:11, 165:25,
166:3, 166:5, 166:8,
166:10, 166:13,
166:15, 166:17,
166:20, 166:24,
167:1, 167:3, 167:6,
167:9, 167:11,
167:15, 167:19,
167:21, 167:24,
168:1, 168:3, 168:5,
168:7, 168:11,
168:14, 168:16,
168:18, 168:22,
168:24, 169:3,
169:6, 169:9,
169:11, 169:13,
169:15, 169:17,
169:19, 169:21,
169:23, 170:1,
170:4, 170:6, 170:8,
170:11, 170:13,
170:15, 170:17,
170:20, 170:22,
170:24, 171:1,
171:3, 171:6, 171:8,
171:10, 171:12,
171:14, 171:16,
171:19, 171:22,
171:25, 172:2,
172:4, 172:10,
172:12, 172:14,
172:16, 172:19,
172:21, 172:23,
172:25, 173:4,
173:7, 173:9,
173:11, 173:13,
173:15, 173:18,
173:21, 173:24,
174:1, 174:3, 174:5,
174:8, 174:10,
174:12, 174:15,
174:17, 174:19,
174:21, 174:23,
174:25, 175:4,
175:7, 175:12,
175:15, 175:17,
175:19, 175:21,
175:23, 175:25,
176:2, 176:5, 176:7,
176:9, 176:11,
176:13, 176:16,
176:18, 176:20,
176:22, 177:1,
177:3, 177:12,
177:15, 177:17,
177:20, 177:22,
177:25, 178:2,
178:4, 178:6, 178:8,
178:11, 178:13,
178:18, 178:21,
178:23, 179:2,
179:4, 179:6, 179:8,
179:10, 179:12,
179:15, 179:17,
179:19, 179:21,
179:23, 179:25,
180:2, 180:6, 180:9,
180:11, 180:13,
180:15, 180:17,
180:20, 180:22,
180:24, 181:1,
181:3, 181:7,
181:10, 181:12,
181:15, 181:17,
181:22, 181:25,
182:4, 182:10,
182:12, 182:22,
182:25, 183:2,
183:4, 183:7,
183:10, 183:12,
183:14, 183:16,
183:18, 183:22,
183:25, 184:3,
184:5, 184:7, 184:9,
184:11, 184:13,
184:15, 184:17,
184:20, 184:23,
184:25, 185:2,
185:4, 185:6, 185:8,
185:10, 185:12,
185:15, 185:18,
185:20, 185:22,
185:25, 186:2,
186:5, 186:7, 186:9,
186:11, 186:14,
186:16, 186:18,
186:21, 186:24,
187:1, 187:3, 187:5,
187:7, 187:9,
187:12, 187:14,
187:17, 187:19,
187:21, 187:23,
187:25, 188:3,
188:5, 188:7, 188:9,
188:12, 188:14,
188:16, 188:18,
188:20, 188:24,
189:3, 189:5, 189:8,
189:10, 189:12,
189:16, 189:18,
189:20, 189:22,
189:24, 190:1,
190:4, 190:6, 190:9,
190:11, 190:13,
190:17, 190:20,
190:22, 190:24,
191:1, 191:4, 191:6,
191:8, 191:10,
191:12, 191:14,
191:17, 191:20,
191:23, 191:25,
192:2, 192:4, 192:7,
192:9, 192:11,
192:13, 192:15,
192:17, 192:19,
192:22, 193:1,
193:3, 193:5, 193:7,
193:10, 193:13,
193:15, 193:17,
193:19, 193:21,
193:23, 193:25,
194:2, 194:5, 194:8,
194:11, 194:13,
194:15, 194:17,

194:21, 194:24, 195:1, 195:3, 195:5, 195:7, 195:9, 195:12, 195:15, 195:17, 195:19, 195:21, 195:23, 195:25, 196:2, 196:5, 196:7, 196:9, 196:11, 196:13, 196:16, 196:18, 196:20, 196:23, 196:25, 197:2, 197:4, 197:6, 197:10, 197:13, 197:15, 197:17, 197:20, 197:22, 197:24, 198:2, 198:4, 198:6, 198:8, 198:10, 198:14, 198:17, 198:19, 198:22, 198:24, 199:1, 199:4, 199:6, 199:8, 199:10, 199:12, 201:6, 201:16, 202:6, 202:12, 202:16, 202:25, 203:9, 203:20, 204:3, 204:7, 204:11, 204:14, 204:20, 204:22, 204:24, 205:8, 205:12, 205:20, 205:23, 207:19, 207:22, 208:1, 208:7, 208:10, 208:14, 208:24, 209:8, 209:15, 209:17, 209:22, 210:6, 210:11, 210:13, 210:19, 211:4, 211:16, 211:20, 211:23, 212:1, 212:3, 212:5, 212:9, 212:14, 212:19, 213:2, 215:16, 215:20, 215:24, 216:1, 216:4, 216:10, 216:20, 217:4, 217:15, 217:18, 217:25, 218:8, 218:20, 219:1, 219:6, 220:6, 220:9, 220:12, 220:15, 220:21, 221:2, 221:5, 221:8, 221:10, 221:13, 221:16, 221:22, 222:1, 222:5, 222:9, 222:13, 222:15, 222:23, 222:25, 223:3, 223:11, 223:15, 223:17, 223:24, 224:3, 224:9, 224:18, 224:20, 224:22, 224:24, 225:2, 225:6, 225:12, 225:16, 225:18, 225:21, 225:25, 226:9, 226:14, 226:16, 226:22, 227:3, 227:10, 227:18, 227:22, 228:3, 228:13, 228:17, 228:22, 228:25, 229:3, 229:6, 229:13, 229:18, 229:22, 230:1, 230:11, 230:17, 230:21, 231:2, 232:6, 232:8, 232:14, 232:18, 232:20, 232:25, 233:10, 233:15, 233:22, 234:1, 234:6, 234:11, 234:15, 234:20, 235:14, 235:19, 235:22, 235:25, 236:3, 236:6, 236:12, 236:18, 239:2, 239:11, 239:14, 239:18, 239:25, 240:23, 240:25, 241:16, 242:12, 242:17, 242:21, 242:24, 243:1, 243:11, 243:14, 244:3, 244:5, 244:10, 244:18, 244:21, 244:24, 245:3, 245:6, 245:19, 245:22, 246:14, 246:16, 247:5, 247:23, 248:10, 248:14, 248:22, 248:25, 249:11, 249:17, 249:20, 250:6, 250:9, 250:12, 250:18, 250:21, 251:1, 253:13, 255:3, 255:15, 271:4, 273:3, 273:5, 273:15

**prospective** [9] - 44:1, 52:16, 52:21, 57:6, 149:10, 220:18, 256:12, 256:22, 261:14

**Prospective** [2] - 45:19, 164:9

**protect** [2] - 25:7, 39:25

**Protection** [1] - 178:24

**prove** [50] - 16:25, 50:25, 64:25, 67:2, 67:3, 68:2, 75:9, 75:15, 75:25, 76:2, 136:3, 182:2, 199:25, 200:4, 200:5, 200:12, 200:13, 200:14, 202:22, 209:13, 211:1, 217:1, 234:19, 240:16, 240:20, 240:21, 241:13, 241:14, 242:16, 243:8, 243:10, 244:14, 244:22, 245:16, 249:9, 249:11, 249:14, 249:17, 249:18, 250:13, 252:8, 253:11, 255:12, 255:16, 277:18, 277:23, 306:24

**proved** [7] - 182:17, 252:20, 253:3, 255:21, 255:22

**proven** [7] - 65:7, 65:12, 205:7, 210:5, 243:11, 249:8, 277:12

**proves** [7] - 50:20, 75:11, 199:17, 209:11, 239:20, 275:1, 275:5

**provide** [4] - 8:7, 8:20, 29:1, 279:13

**provided** [8] - 6:18, 34:14, 34:19, 38:20, 252:21, 253:4, 254:25, 302:23

**provider** [2] - 86:18, 258:12

**providing** [2] - 26:16, 301:25

**proving** [2] - 66:20, 239:24

**provisions** [1] - 237:20

**pry** [2] - 223:19, 225:7

**prying** [2] - 56:22, 236:25

**psychologist** [2] - 169:23, 176:3

**psychology** [1] - 173:1

**public** [1] - 128:4

**Publix** [3] - 101:14, 101:18, 117:8

**Puerto** [3] - 172:2, 172:5, 172:6

**pull** [2] - 293:17, 293:23

**pulled** [3] - 201:17, 201:21, 292:13

**pulling** [1] - 294:18

**pumping** [1] - 235:20

**pumps** [1] - 235:22

**purchase** [1] - 309:17

**purchased** [11] - 21:14, 37:11, 59:9, 212:23, 212:25, 213:3, 213:8, 213:18, 233:19, 290:21, 301:3

**purchasing** [3] - 224:17, 286:22, 292:25

**purifiers** [2] - 283:12, 283:13

**purify** [1] - 283:14

**purpose** [17] - 8:11, 26:16, 38:4, 56:12, 56:22, 56:23, 59:10, 61:12, 61:16, 62:3, 62:7, 62:14, 276:11, 276:13, 276:14, 295:1, 295:7

**purse** [1] - 117:25

**pursuant** [2] - 7:25, 231:20

**push** [2] - 288:12, 309:1

**pushing** [1] - 296:3

**put** [26] - 19:12, 21:1, 22:24, 25:23, 33:10, 66:2, 68:12, 110:1, 152:5, 182:1, 202:21, 228:23, 229:4, 232:2, 238:14, 242:6, 243:7, 243:18, 246:13, 247:6, 250:15, 277:20, 293:3, 298:13, 300:16, 306:1

**puts** [20] - 244:13, 263:6, 263:12, 263:23, 264:3, 264:7, 264:10, 264:15, 264:19, 265:1, 265:7, 265:10, 265:24, 266:25, 267:11, 267:16, 267:19, 269:5, 269:11, 270:1

**putting** [4] - 22:21, 23:11, 243:22, 292:3

## Q

**qualifications** [1] - 48:9

**qualified** [2] - 48:5, 280:3

**Queen** [1] - 37:18

**queens** [1] - 189:10

**Queens** [2] - 29:8, 29:25

**questioned** [1] - 57:18

**questioning** [3] - 56:9, 56:21, 215:1

**questions** [23] - 30:12, 37:25, 48:8, 48:25, 49:6, 56:3, 56:6, 56:8, 154:18, 162:25, 206:20, 214:19, 216:25, 219:23, 223:20, 225:8, 235:17, 253:22, 259:13, 260:1, 260:17, 275:15, 275:16

**quibble** [1] - 216:24

**quick** [1] - 162:25

**quite** [2] - 86:7, 286:16

**quiz** [1] - 251:10

**quotation** [1] - 40:2

## R

**radio** [1] - 279:1

**raining** [1] - 235:10

**raise** [36] - 11:10, 16:11, 42:5, 46:24, 47:18, 47:21, 47:25, 48:3, 50:14, 51:24, 52:17, 53:23, 63:14, 63:16, 63:20, 65:17, 69:7, 200:20, 201:3, 203:6, 206:2, 206:10, 206:16, 206:24, 207:8, 207:13, 207:17, 208:20, 211:7, 211:12, 212:24, 213:23, 215:6, 219:12, 235:11, 252:24

**raised** [4] - 33:2, 42:6, 210:8, 224:16

**raising** [2] - 19:14, 210:12

**Raj** [1] - 51:18

**Ralhan** [1] - 51:15

**ran** [2] - 37:10, 228:18
**randomly** [1] - 242:19
**rather** [3] - 153:6, 154:25, 302:7
**Raymond** [1] - 221:17
**RBT** [1] - 94:19
**re** [1] - 19:14
**re-raising** [1] - 19:14
**reach** [13] - 93:7, 99:19, 102:9, 104:6, 122:8, 127:6, 148:2, 176:12, 179:11, 192:18, 255:12, 274:19, 284:2
**reaching** [1] - 276:15
**reaction** [2] - 303:1, 305:20
**read** [22] - 27:7, 44:17, 45:5, 49:20, 51:8, 58:8, 59:12, 63:15, 77:6, 77:7, 77:9, 77:17, 126:8, 155:15, 173:17, 200:8, 230:10, 230:23, 238:2, 251:23, 278:24, 280:19
**reader** [2] - 230:6, 230:8
**reading** [12] - 94:8, 109:1, 116:13, 118:6, 140:6, 142:25, 177:3, 188:24, 191:14, 197:6, 199:12, 230:14
**reads** [1] - 26:25
**ready** [6] - 32:15, 32:23, 45:23, 82:22, 219:14
**real** [15] - 16:18, 35:24, 46:5, 69:11, 98:24, 157:10, 174:1, 189:12, 196:13, 222:25, 223:7, 303:17
**realistic** [2] - 238:8, 298:7
**reality** [1] - 239:3
**really** [35] - 21:17, 25:2, 40:3, 43:17, 52:21, 66:3, 66:4, 66:5, 66:10, 76:18, 77:5, 84:2, 104:11, 120:25, 129:11, 150:10, 201:18, 210:20, 210:22, 226:17, 226:22, 227:6, 227:15, 227:24, 235:3, 237:23, 238:14, 243:7, 246:20, 248:8, 250:13, 251:22, 252:23, 303:24
**Realtor** [1] - 100:13
**Reano** [12] - 44:9, 44:11, 76:11, 76:22, 76:23, 113:16, 201:4, 201:5, 225:17, 263:9, 263:12
**reargue** [2] - 18:13, 40:25
**rearrange** [1] - 273:21
**reason** [24] - 8:7, 8:20, 14:24, 16:23, 18:23, 25:18, 27:2, 31:7, 49:8, 57:9, 57:14, 57:15, 57:17, 75:1, 75:17, 76:16, 162:6, 223:12, 238:12, 246:2, 259:18, 286:11, 290:2, 290:4
**reasonable** [36] - 6:8, 6:9, 6:15, 65:5, 66:17, 66:20, 67:3, 76:2, 76:4, 136:3, 182:17, 182:18, 200:5, 200:13, 202:9, 202:13, 202:14, 202:19, 202:20, 202:22, 205:7, 240:17, 244:14, 249:10, 253:13, 253:14, 253:16, 253:17, 255:13, 255:16, 255:25, 256:1, 260:19, 261:7, 277:24, 306:24
**reasonableness** [1] - 277:4
**reasons** [2] - 30:18, 56:22
**receipt** [3] - 71:5, 71:6, 295:5
**receive** [3] - 295:14, 295:16, 299:11
**received** [10] - 7:25, 8:2, 42:15, 82:15, 82:25, 260:25, 273:15, 275:24, 276:3, 276:5
**receives** [2] - 300:5, 300:7
**receiving** [5] - 42:8, 231:21, 296:2, 302:9, 302:21
**recently** [1] - 189:18
**Recess** [1] - 256:21
**recess** [14] - 42:2, 42:23, 42:25, 76:13, 162:23, 219:5, 256:5, 256:19, 283:5, 284:4, 284:16, 284:22, 309:23, 310:12
**recesses** [1] - 152:6
**recollection** [2] - 4:4, 150:9
**recommendation** [1] - 227:21
**recommendations** [2] - 13:5, 13:7
**record** [11] - 3:4, 20:6, 43:2, 43:3, 150:12, 163:20, 163:21, 236:20, 256:23, 284:23, 284:24
**records** [7] - 6:16, 6:23, 7:3, 7:9, 7:13, 7:25, 8:2
**recovered** [1] - 125:24
**redact** [3] - 5:4, 26:6, 27:17
**reduction** [5] - 231:21, 231:23, 233:8, 293:8
**refereed** [1] - 87:8
**reference** [1] - 63:18
**referred** [3] - 18:17, 237:20, 306:18
**reflect** [2] - 298:23, 298:24
**refresh** [1] - 7:1
**refutes** [1] - 8:22
**regarding** [1] - 278:3
**regardless** [1] - 292:21
**registered** [2] - 52:19, 100:12
**regulation** [1] - 59:7
**rehabilitate** [4] - 150:13, 152:2, 162:11, 258:6
**rehabilitated** [1] - 155:5
**rejected** [1] - 13:7
**relate** [3] - 10:16, 15:18, 289:12
**related** [8] - 12:13, 15:4, 97:24, 278:6, 278:10, 279:4, 280:21, 290:19
**relates** [7] - 6:1, 6:2, 11:7, 13:3, 24:20, 29:8, 150:7
**relating** [5] - 11:15, 27:10, 37:18, 164:3, 278:25
**relationship** [2] - 6:5, 120:5
**relatives** [69] - 93:9, 94:25, 96:2, 97:15, 100:18, 102:11, 104:20, 105:21, 106:21, 108:2, 108:5, 110:4, 111:13, 112:25, 114:10, 114:13, 115:20, 115:24, 117:11, 119:5, 120:10, 120:13, 122:10, 124:4, 125:17, 127:9, 128:15, 129:24, 131:1, 132:10, 132:13, 133:21, 135:9, 136:5, 137:17, 138:18, 139:20, 140:23, 142:14, 143:17, 145:10, 146:9, 148:6, 166:11, 168:12, 170:2, 171:4, 173:5, 174:13, 176:14, 177:23, 178:1, 179:13, 179:16, 180:18, 183:8, 184:21, 186:22, 188:10, 190:2, 191:2, 191:5, 192:24, 194:6, 195:13, 196:21, 197:25, 199:2, 201:8
**relaxing** [1] - 110:18
**released** [1] - 113:6
**relevance** [2] - 10:23, 19:18
**relevant** [12] - 11:11, 11:23, 12:6, 13:11, 17:15, 19:19, 19:22, 33:21, 34:12, 38:24, 39:3, 308:20
**relied** [1] - 27:14
**relieve** [2] - 81:23, 82:4
**religious** [2] - 207:2, 207:7
**reluctant** [1] - 151:5
**rely** [3] - 68:15, 208:4, 281:20
**remain** [5] - 245:10, 245:15, 272:17, 272:22, 277:19
**remaining** [1] - 273:8
**remarks** [2] - 39:20, 275:14
**remember** [8] - 104:11, 121:1, 147:25, 155:11, 251:24, 256:5, 281:11, 309:23
**remembered** [1] - 162:15
**remind** [3] - 150:25, 229:12, 235:12
**remodeling** [1] - 133:14
**remove** [2] - 66:1, 157:2
**Renalchem** [1] - 111:8
**render** [5] - 224:7, 231:10, 231:11, 231:14, 280:1
**renew** [2] - 40:24, 85:16
**renewal** [2] - 89:23, 193:19
**rental** [2] - 177:18, 193:15
**rented** [1] - 71:3
**repair** [1] - 203:15
**repairs** [1] - 144:24
**repeat** [1] - 185:22
**repeatedly** [1] - 16:12
**replacement** [3] - 81:22, 82:3, 210:1
**replacements** [1] - 209:25
**report** [3] - 19:7, 40:5, 203:13
**reported** [2] - 278:25, 304:21
**REPORTED** [1] - 2:3
**reporter** [2] - 42:2, 48:22
**Reporter** [3] - 2:4, 248:12, 310:20
**reporter's** [1] - 281:3
**reporting** [2] - 64:6, 304:16
**reports** [4] - 10:16, 15:14, 16:1, 37:9
**represent** [1] - 17:17
**representation** [2] - 9:19, 39:22
**representations** [5] - 34:2, 61:10, 61:11, 61:25, 62:1
**representative** [2] - 173:2, 220:20
**represented** [1] - 19:4
**representing** [6] - 38:12, 49:10, 49:23, 50:4, 50:6, 250:2
**represents** [2] - 22:17, 22:18
**request** [4] - 16:6,

28:12, 278:11, 284:19
**required** [10] - 15:13, 21:7, 253:10, 253:11, 255:24, 278:1, 278:8, 293:17, 296:3, 309:9
**requirement** [1] - 18:23
**requirements** [1] - 13:4
**requires** [6] - 6:8, 6:14, 69:19, 278:2, 280:19, 286:15
**research** [6] - 214:5, 214:9, 279:3, 279:5, 279:7, 280:21
**resell** [1] - 290:7
**reselling** [1] - 234:12
**resentment** [1] - 203:24
**Reserve** [1] - 85:20
**reserve** [2] - 76:12, 141:24
**resolvable** [1] - 21:25
**resolve** [1] - 22:3
**resource** [1] - 186:19
**respectfully** [1] - 16:6
**respiratory** [3] - 220:16, 220:17, 220:22
**respond** [1] - 27:18
**responds** [2] - 29:16, 30:10
**response** [8] - 6:14, 10:6, 11:4, 11:7, 20:18, 20:21, 30:15, 248:9
**responsibility** [1] - 233:9
**responsible** [2] - 71:11, 233:4
**responsive** [1] - 8:19
**rest** [2] - 45:25, 151:15
**restaurant** [1] - 114:3
**restored** [1] - 47:24
**restrictions** [1] - 248:7
**results** [1] - 209:24
**resume** [1] - 150:2
**retail** [5] - 30:19, 60:14, 60:18, 60:19, 113:23
**retire** [1] - 186:11
**retired** [18] - 73:25, 74:4, 98:20, 98:24, 101:13, 101:18, 103:6, 103:10, 122:12, 135:11, 135:12, 139:22, 175:17, 175:21, 186:7, 186:9, 186:10, 194:8
**return** [2] - 200:14, 278:13
**returned** [1] - 58:5
**reverse** [4] - 18:17, 18:19, 18:20, 18:22
**review** [9] - 6:4, 6:10, 8:14, 8:15, 8:18, 9:5, 21:11, 32:11, 41:4
**revisit** [1] - 284:13
**revisited** [2] - 19:11, 32:21
**Rico** [3] - 172:2, 172:5, 172:6
**rid** [2] - 151:8, 151:12
**rights** [4] - 5:10, 47:24, 199:19, 234:21
**ring** [2] - 51:23, 53:22
**ripped** [1] - 296:8
**rise** [3] - 43:1, 43:25, 163:19
**river** [1] - 129:5
**River** [1] - 129:6
**rivera** [2] - 211:13, 211:14
**Rivera** [8] - 37:13, 44:21, 51:17, 124:20, 233:22, 233:23, 234:25, 264:6
**Rivera-Abdo** [6] - 44:21, 124:20, 233:22, 233:23, 234:25, 264:6
**rivera-Abdo** [2] - 211:13, 211:14
**rivero** [1] - 165:13
**Rivero** [3] - 44:6, 161:17, 161:23
**road** [2] - 70:4, 129:5
**robbed** [5] - 116:8, 137:23, 146:17, 168:19, 176:23
**robbery** [2] - 130:7, 168:20
**Robertson** [1] - 53:14
**role** [3] - 11:9, 214:10, 299:4
**Rolex** [1] - 291:21
**rolled** [1] - 230:12
**room** [24] - 18:20, 43:16, 66:15, 66:25, 182:15, 226:2, 226:4, 226:23, 227:4, 234:24, 241:14, 242:9, 242:14, 242:19, 256:16, 281:13, 281:16, 281:19, 282:24, 283:7, 283:14, 283:19, 283:23, 310:7
**rooms** [4] - 279:11, 283:7, 283:10, 284:2
**Rosell** [1] - 53:19
**Rosenbaum** [1] - 51:19
**Rosh** [1] - 41:11
**Rosiello** [1] - 53:9
**row** [46] - 44:3, 44:5, 44:6, 44:7, 44:8, 44:9, 44:10, 44:12, 44:14, 44:16, 44:20, 44:21, 44:22, 44:23, 44:24, 45:3, 45:4, 45:6, 45:7, 45:8, 45:9, 45:10, 45:13, 68:21, 69:16, 72:1, 72:25, 73:1, 73:23, 76:24, 82:12, 84:25, 86:15, 86:16, 87:14, 87:23, 89:3, 150:4, 156:13, 218:19, 241:9, 247:4, 274:2, 274:4
**Royal** [1] - 116:25
**RPR** [2] - 2:4, 310:20
**RTV** [1] - 137:14
**Ruark** [3] - 12:20, 13:8, 51:11
**Ruark-Coleman** [3] - 12:20, 13:8, 51:11
**rude** [1] - 149:8
**Ruiz** [1] - 51:13
**rule** [12] - 6:8, 6:14, 8:7, 8:11, 20:14, 23:1, 23:9, 23:13, 23:17, 24:4, 26:1, 28:22
**Rule** [1] - 25:6
**ruled** [2] - 5:20, 18:12
**Rules** [1] - 276:1
**rules** [19] - 13:21, 149:8, 275:23, 277:10, 279:22, 281:5, 281:7, 281:8, 300:15, 300:16, 300:18, 300:24, 301:1, 301:6, 301:9, 301:13, 301:18, 301:21
**ruling** [3] - 20:14, 32:8, 32:20
**rulings** [1] - 19:10
**rumor** [1] - 63:12
**Rumore** [1] - 51:19
**run** [9] - 42:16, 46:13, 52:11, 82:1, 132:22, 134:3, 167:3, 208:25, 215:8
**running** [5] - 127:19, 153:5, 203:12, 224:13, 255:7
**rushed** [1] - 73:5
**Russell** [8] - 73:2, 107:9, 201:15, 203:3, 211:22, 213:5, 257:20
**Ryder** [1] - 125:14

## S

**sacrifice** [1] - 84:1
**safe** [4] - 281:15, 288:5, 302:25, 309:7
**Safe** [12] - 6:24, 11:19, 14:7, 18:3, 31:23, 35:20, 36:3, 37:11, 62:25, 63:4, 288:4, 288:7
**safeguard** [1] - 59:8
**safety** [1] - 59:9
**Sainpreux** [5] - 45:5, 86:20, 173:18, 258:14, 258:15
**sale** [3] - 59:7, 63:4, 123:25
**Sales** [1] - 62:11
**sales** [29] - 87:25, 92:19, 121:24, 143:12, 172:16, 173:2, 193:15, 193:19, 194:3, 195:1, 197:20, 208:11, 220:5, 220:19, 229:20, 229:24, 235:13, 235:18, 235:19, 235:24, 236:1, 236:7, 236:11, 236:12, 288:11, 288:22, 291:2, 291:9
**salespeople** [2] - 290:25, 308:11
**San** [2] - 112:21, 183:5
**Sarah** [1] - 53:12
**Sargeant** [4] - 170:18, 265:11, 265:13, 265:14
**sat** [4] - 109:15, 199:14, 199:15, 200:22
**SATCOM** [2] - 103:18, 103:19
**satisfaction** [1] - 67:4
**satisfied** [2] - 205:6, 240:14
**Saturday** [4] - 34:23, 34:24, 35:7, 78:1
**Savannah** [1] - 55:12
**saw** [11] - 36:15, 230:13, 235:15, 274:24, 275:2, 275:19, 275:21, 289:1, 297:13, 297:15, 299:14
**Sawyer** [1] - 53:11
**scale** [1] - 201:11
**scales** [2] - 199:19, 199:20
**scene** [1] - 280:17
**schedule** [5] - 54:8, 55:6, 55:7, 86:4, 86:7
**scheduled** [4] - 86:24, 89:6, 90:21, 152:6
**scheduling** [9] - 54:2, 55:15, 69:9, 82:11, 115:9, 151:23, 152:2, 152:10, 154:4
**scheme** [7] - 61:8, 61:12, 61:23, 62:3, 62:7, 62:8, 293:23
**schemes** [3] - 11:16, 29:8, 296:17
**school** [8] - 52:8, 71:11, 71:12, 71:13, 73:17, 88:19, 120:25, 207:22
**School** [1] - 132:3
**schools** [1] - 128:4
**Schoonover** [7] - 44:5, 72:12, 72:24, 154:5, 154:6, 154:12, 165:1
**Schultz** [5] - 88:13, 159:24, 175:2, 266:7, 266:10
**schultz** [1] - 175:10
**scientific** [2] - 9:24, 10:1
**scoot** [1] - 44:9
**scope** [3] - 33:24, 34:17, 36:18
**Scott** [1] - 53:16
**scratched** [1] - 296:23
**scrunch** [1] - 45:1
**scuba** [1] - 100:4
**scummies** [1] - 35:24
**seal** [1] - 297:14
**search** [2] - 278:22, 279:18
**season** [1] - 190:22
**seat** [21] - 44:4, 44:11, 44:13, 44:19, 149:24, 149:25, 256:8, 273:22,

273:23, 273:24, 273:25, 274:1, 274:2, 274:4, 274:5, 274:6, 274:7
**seated** [6] - 3:13, 44:2, 45:14, 45:20, 164:10, 274:10
**seats** [2] - 272:17, 272:22
**second** [33] - 7:22, 12:19, 44:6, 44:7, 44:8, 44:12, 44:14, 44:24, 46:19, 73:1, 73:23, 76:24, 84:25, 86:15, 112:20, 145:16, 147:17, 196:9, 212:13, 213:10, 217:6, 218:19, 241:2, 255:6, 265:19, 270:17, 271:5, 271:21, 272:20, 274:4, 277:16, 280:12, 300:6
**Secret** [1] - 194:8
**secretary** [2] - 48:14, 186:18
**Security** [1] - 134:22
**security** [5] - 45:17, 48:17, 48:18, 78:22, 117:7
**SECURITY** [3] - 43:1, 43:25, 163:19
**sedentary** [1] - 145:21
**see** [152] - 4:14, 8:21, 32:11, 47:19, 47:22, 48:1, 48:4, 51:25, 52:18, 53:24, 63:14, 63:16, 65:17, 66:2, 66:6, 66:7, 69:7, 71:6, 73:1, 83:22, 119:8, 150:4, 151:8, 163:7, 165:16, 182:4, 182:5, 182:22, 200:21, 203:8, 206:4, 206:11, 206:17, 207:1, 207:9, 207:14, 208:18, 211:9, 211:21, 212:22, 213:4, 213:21, 213:25, 214:21, 219:13, 225:3, 226:8, 226:21, 230:5, 230:24, 231:15, 232:16, 232:23, 235:12, 237:9, 237:16, 238:20, 247:2, 247:25, 251:14, 253:21, 256:10, 259:15, 259:22, 261:21, 270:16, 271:9, 276:21, 280:14, 283:12, 287:4, 287:7, 287:16, 289:5, 289:25, 291:1, 291:4, 291:6, 291:8, 292:4, 292:6, 292:7, 292:11, 292:18, 293:9, 293:20, 293:23, 296:18, 296:19, 297:15, 298:2, 298:5, 298:10, 298:16, 298:18, 298:19, 299:21, 300:2, 300:3, 300:4, 300:6, 300:8, 300:12, 300:13, 300:14, 300:18, 301:17, 301:21, 302:2, 302:15, 302:17, 303:1, 303:4, 303:6, 303:8, 303:11, 303:12, 303:20, 303:23, 304:1, 304:2, 304:5, 304:7, 304:8, 304:9, 304:10, 304:12, 304:15, 305:1, 305:3, 305:10, 306:11, 306:19, 307:2, 307:4, 307:6, 307:8, 307:17, 307:20, 307:23, 307:25, 308:5, 308:6, 308:7, 308:8, 308:13, 308:24, 309:6, 309:13, 310:9
**seeing** [1] - 230:14
**seeking** [1] - 11:1
**seem** [1] - 24:4
**sees** [1] - 74:21
**segments** [2] - 32:11, 32:19
**seizures** [1] - 69:1
**Sekar** [1] - 53:17
**select** [11] - 46:9, 56:10, 57:1, 57:4, 70:16, 83:3, 148:24, 151:1, 214:1, 218:17, 305:2
**selected** [12] - 55:2, 55:16, 70:1, 77:5, 79:17, 81:14, 83:12, 84:6, 136:2, 202:7, 218:9, 272:9
**selecting** [1] - 219:24
**selection** [5] - 46:16, 49:1, 54:4, 57:1, 164:3
**selective** [1] - 69:20
**sell** [17] - 130:21, 167:21, 178:23, 222:15, 229:16, 234:7, 236:5, 243:4, 286:13, 289:20, 289:23, 290:3, 292:20, 293:2, 297:17, 306:5, 309:18
**selling** [19] - 66:4, 220:14, 220:16, 289:13, 291:5, 291:17, 291:21, 292:9, 294:24, 296:2, 296:3, 297:6, 298:1, 301:22, 302:1, 306:13, 306:15, 306:19, 309:8
**sells** [1] - 291:20
**Selvan** [3] - 198:12, 269:12, 269:19
**send** [3] - 29:12, 214:21, 298:18
**sending** [6] - 29:11, 29:17, 29:25, 30:13, 30:17, 294:19
**sends** [3] - 29:7, 29:15, 30:9
**senior** [2] - 131:22, 217:20
**sense** [5] - 8:6, 163:11, 239:5, 249:25, 290:7
**sent** [9] - 11:17, 15:20, 15:21, 28:13, 34:2, 182:7, 296:9, 296:12, 304:7
**sentence** [4] - 110:10, 231:22, 231:23, 293:8
**separate** [3] - 23:21, 24:15, 282:1
**September** [13] - 1:5, 29:4, 55:9, 55:10, 60:10, 84:19, 87:17, 88:5, 90:21, 90:23, 90:24
**series** [1] - 56:3
**serious** [2] - 243:25, 281:6
**serve** [74] - 46:23, 48:9, 52:9, 52:14, 52:23, 56:11, 73:14, 79:18, 80:9, 83:25, 92:23, 94:23, 95:25, 97:13, 99:11, 102:1, 103:22, 105:19, 106:19, 107:25, 109:23, 109:25, 111:11, 112:23, 114:6, 115:18, 117:9, 119:3, 120:8, 122:2, 124:2, 125:15, 126:23, 128:13, 129:22, 130:24, 132:8, 133:19, 135:7, 137:15, 138:16, 140:21, 142:12, 143:15, 145:8, 146:7, 147:19, 166:9, 168:10, 169:25, 171:2, 173:3, 174:11, 176:4, 177:21, 179:3, 180:16, 184:19, 188:8, 189:25, 190:25, 192:12, 194:4, 195:11, 196:19, 197:23, 198:25, 200:25, 207:3, 237:15, 259:24, 272:10, 272:16
**served** [8] - 52:24, 100:16, 114:6, 117:19, 139:18, 183:6, 186:20, 225:20
**service** [6] - 13:6, 46:20, 46:21, 101:13, 121:2, 272:13
**Service** [3] - 74:2, 181:13, 194:9
**servicer** [1] - 189:13
**services** [1] - 192:5
**Services** [1] - 207:11
**serving** [1] - 237:14
**session** [9] - 79:14, 79:15, 80:7, 80:9, 84:15, 89:17, 90:10, 177:7, 310:4
**set** [7] - 43:17, 78:3, 204:24, 205:13, 290:5, 290:11, 308:2
**sets** [3] - 7:17, 57:22, 281:6
**settle** [2] - 72:7, 104:14
**settled** [3] - 127:7, 148:3, 148:4
**seven** [7] - 87:18, 97:12, 158:24, 269:22, 269:24, 271:3, 277:6
**seventh** [1] - 92:13
**sever** [1] - 4:24
**several** [12] - 64:5, 64:7, 78:5, 102:21, 202:1, 288:9, 289:12, 289:22, 302:6, 302:7, 306:12, 307:19
**severance** [1] - 20:18
**severe** [1] - 305:11
**sexual** [2] - 143:23, 176:22
**shady** [1] - 35:22
**shape** [1] - 76:20
**share** [1] - 234:4
**shared** [1] - 308:9
**sheriff** [1] - 106:24
**sheriff's** [1] - 135:13
**shipment** [1] - 60:2
**shipped** [1] - 293:3
**shipping** [1] - 12:24
**shoes** [1] - 234:23
**shooter** [1] - 178:25
**shoplifter** [1] - 226:6
**shoplifting** [4] - 102:21, 110:16, 114:21, 116:4
**Shore** [1] - 118:20
**short** [1] - 46:5
**shortly** [1] - 310:7
**shot** [1] - 146:17
**shoulder** [1] - 210:1
**show** [33] - 14:12, 17:8, 36:5, 71:5, 78:1, 203:14, 204:5, 204:6, 204:8, 204:11, 204:12, 204:15, 204:19, 205:2, 205:9, 212:23, 223:6, 228:20, 230:5, 283:6, 284:2, 286:20, 287:3, 292:1, 292:4, 294:21, 295:1, 297:2, 298:6, 301:13, 301:23, 306:3
**showed** [2] - 15:20, 307:6
**showing** [5] - 203:15, 289:3, 295:3, 298:11, 298:12
**shows** [2] - 273:7, 286:18
**sic** [2] - 32:4, 66:22
**sick** [3] - 69:12, 73:13, 308:11
**side** [25] - 30:19,

45:11, 53:10, 57:7, 57:8, 57:11, 57:12, 57:16, 67:6, 82:10, 90:12, 182:21, 194:19, 199:18, 209:24, 224:7, 241:14, 242:19, 244:3, 244:4, 244:6, 244:7, 275:25
**Sidebar** [1] - 261:20
**sidebar** [8] - 4:2, 4:7, 4:11, 56:10, 256:15, 257:2, 261:19, 272:3
**sidelight** [1] - 66:21
**sides** [1] - 244:11
**Siegle** [5] - 102:25, 141:16, 157:21, 158:15, 165:4
**Siegrist** [7] - 44:23, 82:14, 85:25, 136:21, 157:4, 264:3, 265:23
**sign** [2] - 5:8, 299:20
**signals** [2] - 61:15, 62:6
**signature** [1] - 234:16
**signed** [2] - 37:17, 234:23
**significant** [2] - 247:19, 297:10
**significantly** [1] - 283:18
**signs** [3] - 61:15, 62:5, 289:2
**silent** [3] - 245:10, 245:15, 277:19
**similar** [3] - 246:24, 249:25, 305:22
**simple** [1] - 75:1
**simplify** [1] - 34:5
**simply** [2] - 275:4, 282:12
**sincere** [1] - 162:9
**sing** [1] - 128:25
**single** [22] - 73:6, 94:22, 95:24, 100:15, 106:18, 120:4, 122:1, 126:22, 129:21, 138:15, 139:17, 143:14, 146:6, 166:8, 171:1, 177:20, 179:2, 190:24, 198:24, 231:12, 240:11, 247:17
**sister** [4] - 52:24, 88:25, 135:12, 275:20
**sisters** [4] - 108:11, 108:19, 201:24, 201:25
**sit** [9] - 48:5, 75:10, 75:16, 151:16, 162:7, 238:15, 240:9, 240:10, 241:18
**site** [1] - 279:16
**sits** [1] - 245:9
**sitting** [5] - 50:21, 51:1, 149:25, 201:9, 256:9
**situation** [17] - 26:24, 52:25, 54:18, 57:13, 68:1, 68:10, 73:14, 91:19, 210:22, 215:18, 226:11, 226:19, 227:6, 227:12, 236:14, 236:16, 241:17
**situations** [4] - 54:14, 54:20, 68:14, 69:10
**six** [6] - 76:17, 174:8, 217:11, 258:12, 277:4, 279:3
**six-hour** [1] - 217:11
**Sixth** [1] - 274:6
**sixth** [2] - 142:18, 274:1
**sized** [2] - 46:4, 69:9
**sketchy** [2] - 35:22, 35:23
**skin** [1] - 201:21
**slate** [1] - 277:15
**sleep** [1] - 76:19
**sleeping** [1] - 178:13
**small** [1] - 283:22
**smelled** [1] - 274:25
**Smith's** [1] - 163:4
**smoke** [5] - 243:22, 243:23, 245:20, 246:4, 246:6
**smooth** [1] - 217:11
**smoothly** [1] - 45:24
**snake** [1] - 165:22
**snorkeling** [1] - 127:20
**so..** [6] - 79:7, 88:19, 153:2, 205:13, 239:5, 273:10
**soaking** [1] - 235:7
**soccer** [4] - 113:14, 250:15, 250:16, 260:5
**social** [3] - 279:11, 279:17, 283:11
**society** [1] - 247:16
**softball** [2] - 181:3, 193:7
**sold** [10] - 62:21, 287:14, 287:22, 290:5, 290:11, 297:12, 298:13, 301:19, 308:2, 309:10
**sole** [2] - 86:18, 258:12
**solely** [3] - 274:22, 280:22, 282:5
**solicit** [2] - 30:25, 32:6
**Solutions** [2] - 288:4, 288:7
**solved** [2] - 206:6, 206:13
**someone** [13] - 14:5, 65:24, 88:18, 124:12, 230:9, 233:12, 252:19, 253:3, 255:13, 270:13, 272:24, 274:24, 292:8
**sometime** [1] - 294:25
**sometimes** [14] - 33:13, 44:7, 44:15, 44:18, 45:1, 91:21, 206:19, 215:4, 217:21, 219:7, 275:4, 276:8, 287:23, 287:24
**somewhat** [1] - 286:18
**somewhere** [5] - 110:10, 205:16, 221:23, 246:8, 258:12
**son** [15] - 69:19, 99:5, 112:19, 113:4, 117:7, 122:15, 166:17, 166:25, 167:11, 169:24, 170:8, 173:1, 176:2, 176:3, 245:23
**soon** [3] - 29:1, 82:21, 291:8
**sore** [1] - 141:11
**sorry** [39] - 7:12, 15:11, 30:6, 43:9, 65:9, 75:12, 80:3, 92:10, 131:10, 141:12, 152:24, 160:23, 167:6, 172:11, 185:21, 189:2, 201:7, 204:14, 206:23, 223:18, 225:10, 228:2, 228:5, 229:3, 229:21, 233:23, 236:25, 244:25, 249:21, 254:13, 257:14, 259:2, 260:5, 260:13, 266:4, 267:8, 269:24, 273:5
**Sorry** [1] - 144:4
**sort** [6] - 37:8, 231:21, 232:16, 233:20, 241:21, 295:5
**sought** [2] - 19:14, 32:21
**sounds** [4] - 37:17, 61:15, 62:6, 228:6
**source** [5] - 279:5, 281:1, 290:6, 295:21, 305:16
**sources** [2] - 37:10, 300:2
**sourdough** [1] - 168:24
**South** [61] - 92:9, 94:13, 95:17, 96:17, 98:16, 100:9, 101:9, 103:3, 105:6, 106:12, 107:12, 109:7, 110:24, 112:5, 113:19, 115:5, 116:18, 118:11, 119:22, 121:18, 123:7, 124:23, 126:16, 127:24, 129:14, 130:17, 131:18, 133:2, 134:14, 136:24, 138:7, 139:8, 140:11, 141:19, 143:6, 144:17, 146:1, 147:2, 166:1, 167:17, 169:7, 170:21, 171:23, 172:17, 173:22, 175:14, 177:13, 178:19, 180:7, 181:8, 184:1, 185:17, 187:15, 189:6, 190:18, 191:21, 193:11, 194:22, 196:6, 197:11, 198:15
**Southern** [10] - 46:2, 58:19, 59:17, 60:4, 60:11, 61:2, 61:21, 62:12, 63:3, 310:21
**SOUTHERN** [1] - 1:1
**space** [1] - 163:4
**spaces** [1] - 163:2
**spammy** [1] - 35:23
**spammy-ass** [1] - 35:23
**speaking** [3] - 55:4, 221:20, 233:3
**Special** [5] - 3:6, 49:17, 51:22, 120:18, 230:14
**special** [5] - 94:20, 189:13, 207:25, 221:20, 280:24
**specialist** [2] - 49:18, 83:8
**specific** [2] - 30:13, 306:20
**specifically** [6] - 11:23, 15:20, 55:25, 62:9, 261:2, 301:18
**speculate** [2] - 28:13, 28:21
**speeding** [3] - 201:12, 249:3
**spelled** [2] - 300:18, 300:20
**spend** [2] - 172:5, 237:21
**spending** [2] - 136:17, 209:2
**spends** [1] - 247:21
**spent** [1] - 288:25
**spirits** [1] - 194:3
**Spivack** [12] - 47:1, 49:3, 86:25, 169:2, 243:16, 244:12, 245:5, 246:19, 246:24, 260:14, 260:19, 260:21
**spoken** [1] - 272:4
**sports** [4] - 119:16, 119:17, 148:20, 234:1
**spot** [1] - 148:23
**spouse** [43] - 92:16, 97:3, 98:23, 101:17, 103:9, 105:12, 107:18, 109:13, 111:7, 112:12, 114:2, 115:12, 116:24, 118:23, 123:14, 123:15, 125:5, 128:7, 132:1, 133:13, 134:21, 137:6, 142:2, 142:4, 145:2, 147:7, 167:25, 169:16, 172:15, 174:4, 175:20, 180:14, 181:16, 184:8, 186:6, 186:8, 187:24, 189:19, 192:3, 193:18, 195:4, 196:12, 197:18
**spread** [1] - 151:11
**spreadsheet** [3] -

6:19, 34:19, 34:23
**Springs** [6] - 101:8, 106:11, 123:6, 157:25, 180:11, 194:21
**sprinkled** [1] - 139:15
**square** [1] - 24:4
**St** [1] - 87:9
**stack** [6] - 74:6, 74:7, 74:10, 74:18
**stacked** [1] - 74:25
**Stacks** [1] - 150:9
**staffing** [1] - 97:8
**stamp** [1] - 34:15
**stamps** [1] - 34:19
**Stanciu** [8] - 83:16, 83:17, 132:24, 203:8, 203:9, 206:6, 228:5, 258:10
**Stanciu-Marginean** [2] - 132:24, 258:10
**stand** [19] - 20:24, 28:19, 38:18, 40:14, 49:7, 54:15, 56:5, 68:21, 73:23, 92:6, 214:7, 228:12, 231:8, 237:9, 240:12, 245:13, 245:18, 249:4
**standard** [8] - 12:4, 14:4, 16:21, 22:9, 200:6, 292:8, 294:23, 295:15
**standing** [4] - 19:24, 20:1, 20:5, 62:20
**standpoint** [2] - 8:7, 8:16
**star** [1] - 39:18
**start** [23] - 18:1, 18:22, 45:12, 45:21, 54:3, 54:10, 54:22, 56:4, 69:16, 83:13, 92:4, 151:10, 165:21, 194:19, 215:9, 219:23, 227:5, 238:21, 251:15, 303:5, 303:24, 304:12, 304:13
**started** [18] - 46:20, 74:1, 291:8, 294:5, 296:2, 297:19, 297:20, 298:3, 299:3, 299:8, 299:11, 300:17, 300:25, 301:22, 302:1, 302:16, 304:2, 304:16
**starting** [8] - 19:6, 41:4, 85:5, 90:2, 90:7, 250:10, 250:12, 308:10
**starts** [1] - 277:15
**State** [11] - 60:3, 62:19, 62:20, 63:2, 63:3, 115:22, 181:17, 228:19, 239:11, 239:20, 239:22
**state** [32] - 28:15, 28:21, 54:15, 63:18, 72:5, 92:25, 93:1, 94:1, 94:2, 99:13, 99:14, 102:3, 102:4, 103:25, 104:1, 109:25, 110:9, 122:4, 122:5, 126:25, 127:1, 147:21, 147:22, 166:19, 166:21, 176:6, 176:7, 179:5, 179:6, 192:14, 192:15, 205:16
**statement** [23] - 20:8, 20:10, 20:13, 22:9, 22:11, 22:16, 23:6, 23:24, 24:12, 25:11, 25:13, 25:19, 26:9, 29:21, 40:1, 40:11, 40:12, 253:23, 282:12, 282:15, 283:1, 284:17, 285:23
**statements** [16] - 23:8, 24:6, 26:17, 34:12, 34:17, 35:25, 36:21, 41:5, 42:5, 42:17, 275:12, 275:13, 282:15, 284:20, 285:19, 310:8
**STATES** [3] - 1:1, 1:4, 1:10
**States** [21] - 1:14, 2:5, 3:2, 3:7, 25:3, 46:1, 47:17, 47:18, 49:10, 49:11, 57:19, 58:16, 58:24, 59:4, 59:8, 59:9, 62:13, 74:1, 181:13, 213:23, 310:21
**station** [1] - 168:19
**status** [61] - 38:13, 38:15, 92:14, 94:21, 95:23, 97:1, 98:21, 100:14, 101:15, 103:7, 105:10, 106:17, 107:16, 109:11, 111:5, 112:10, 113:25, 115:10, 116:22, 118:21, 120:3, 121:25, 123:12, 125:3, 126:21, 128:5, 129:20, 130:22, 131:24, 133:11, 134:19, 137:4, 138:14, 139:16, 140:19, 141:25, 143:13, 144:25, 146:5, 147:5, 166:7, 167:23, 169:14, 170:25, 172:13, 174:2, 175:18, 177:19, 179:1, 181:14, 184:6, 186:3, 187:22, 189:17, 190:23, 192:1, 193:16, 195:2, 196:10, 197:16, 198:23
**statute** [1] - 31:11
**stay** [5] - 82:8, 145:3, 154:14, 228:25, 229:7
**stay-at-home** [1] - 145:3
**stayed** [1] - 18:19
**stays** [2] - 66:14, 199:24
**stealing** [2] - 209:3, 209:9
**Stein** [1] - 138:12
**STENOGRAPHICALLY** [1] - 2:3
**step** [1] - 110:8
**step-brother** [1] - 110:8
**Stephen** [1] - 53:16
**steps** [2] - 12:2, 298:16
**Steven** [1] - 53:18
**sticky** [1] - 308:7
**still** [12] - 32:14, 67:24, 68:3, 84:15, 87:2, 182:2, 201:9, 203:22, 222:17, 268:7, 299:7, 302:2
**stole** [1] - 64:12
**stolen** [7] - 93:15, 102:18, 121:7, 122:19, 131:7, 168:18, 191:10
**stop** [6] - 228:1, 297:8, 299:7, 299:24, 300:6, 300:7
**storage** [1] - 122:20
**store** [4] - 101:18, 113:24, 114:22, 226:6
**stored** [1] - 286:9
**story** [4] - 13:3, 13:13, 23:16, 305:22
**strategy** [2] - 27:15, 28:1
**strategy-wise** [2] - 27:15, 28:1
**streamline** [1] - 34:6
**Street** [2] - 1:15, 1:18
**street** [14] - 52:11, 66:6, 66:8, 110:16, 222:22, 223:1, 223:5, 223:7, 223:8, 287:14, 291:20, 293:15, 294:13, 296:13
**streets** [7] - 287:12, 289:9, 289:10, 289:16, 293:1, 294:18, 296:14
**stressed** [1] - 226:22
**stressful** [2] - 225:24, 226:24
**stretch** [1] - 22:8
**stricken** [3] - 150:15, 266:12, 276:8
**strident** [1] - 261:6
**strike** [38] - 26:5, 27:16, 151:7, 152:10, 153:22, 154:3, 155:3, 160:9, 161:9, 262:16, 263:3, 263:9, 263:21, 264:1, 264:5, 264:9, 264:24, 265:9, 265:13, 266:6, 266:9, 266:10, 266:15, 266:18, 266:21, 266:22, 267:10, 267:15, 267:18, 268:8, 269:1, 269:9, 269:11, 269:14, 269:17, 269:18, 270:6, 270:25
**strikes** [10] - 264:21, 266:1, 267:2, 267:5, 267:13, 267:21, 269:7, 269:10, 269:20, 270:5
**striking** [1] - 269:2
**string** [1] - 110:9
**stroke** [1] - 69:1
**strong** [1] - 203:24
**struck** [10] - 265:16, 268:8, 268:13, 268:23, 269:19, 270:13, 270:17, 270:24, 271:15, 271:16
**struggle** [1] - 88:18
**stuck** [2] - 247:6, 292:16
**student** [3] - 129:17, 184:18, 189:14
**studying** [3] - 129:18, 189:15, 198:21
**stuff** [7] - 41:3, 41:8, 66:2, 171:10, 187:20, 188:21, 214:9
**stupid** [1] - 230:6
**subject** [7] - 19:10, 23:16, 24:1, 32:20, 38:15, 56:16, 310:2
**subpoena** [1] - 8:1
**subsequent** [1] - 69:1
**substance** [3] - 10:17, 10:19, 10:21
**substances** [8] - 10:17, 11:6, 11:16, 12:13, 14:20, 15:6, 16:13, 69:1
**sudden** [1] - 18:21
**suddenly** [1] - 308:1
**sue** [1] - 303:22
**suffer** [1] - 211:12
**suffered** [3] - 228:21, 229:8, 307:14
**sufficient** [2] - 16:3, 21:4
**suggest** [4] - 16:24, 17:11, 155:25, 158:5
**suggested** [1] - 275:18
**suggesting** [2] - 18:5, 150:10
**suggestion** [2] - 22:13, 22:15
**Sullivan** [2] - 207:18, 207:20
**sullivan** [1] - 207:19
**summarize** [4] - 27:8, 27:9, 57:21, 282:22
**summary** [17] - 5:19, 6:2, 6:6, 6:17, 6:18, 7:7, 7:15, 7:17, 7:18, 7:23, 8:9, 8:10, 8:22, 9:18, 12:16, 33:8, 33:9
**summoned** [1] - 109:24
**Sunday** [4] - 78:16, 79:6, 79:8, 91:5
**Sunkara** [1] - 53:17
**sunrise** [2] - 189:5, 198:10
**Sunrise** [3] - 95:16, 173:21, 189:3
**supplement** [1] - 99:9

**supplements** [5] - 68:23, 223:21, 223:22, 260:25, 261:4
**supplier** [3] - 288:18, 301:7, 301:10
**suppliers** [22] - 29:20, 286:24, 288:9, 288:16, 290:20, 290:23, 291:11, 296:25, 297:13, 298:4, 298:6, 298:9, 299:5, 299:8, 302:6, 302:15, 303:9, 303:18, 304:3, 305:5, 308:21, 309:2
**supply** [2] - 60:13, 213:22
**supplying** [1] - 278:13
**support** [2] - 10:11, 232:19
**suppose** [4] - 22:20, 23:4, 78:17, 233:10
**supposed** [10] - 11:25, 17:5, 72:4, 87:8, 89:12, 233:1, 294:16, 294:21, 298:23, 298:24
**supposedly** [2] - 13:23, 37:10
**Supreme** [1] - 247:15
**surgery** [5] - 81:23, 86:24, 87:3, 87:5, 87:7
**surplusage** [1] - 26:5
**surprise** [3] - 7:8, 7:13, 15:23
**surprised** [1] - 302:19
**surrounding** [1] - 231:1
**survive** [1] - 10:15
**surviving** [1] - 190:13
**Susmitha** [1] - 53:17
**suspect** [4] - 300:21, 301:2, 301:8, 301:16
**suspended** [1] - 102:16
**suspicious** [1] - 301:11
**sustain** [3] - 20:9, 276:3, 276:6
**sustained** [2] - 28:20, 291:24
**SVT** [1] - 73:5
**swear** [4] - 4:8, 45:17, 270:8, 274:8
**Swett** [3] - 191:16, 267:11, 267:15
**swimming** [2] - 96:12, 106:6
**switch** [1] - 69:21
**switching** [1] - 304:2
**sworn** [3] - 45:19, 274:9, 274:12
**system** [17] - 74:22, 76:8, 84:1, 201:10, 202:3, 202:6, 202:11, 202:24, 203:5, 203:17, 203:21, 206:2, 220:23, 228:16, 229:9, 257:15

**T**

**T3** [10] - 11:24, 12:8, 12:23, 12:24, 13:3, 15:18, 59:24, 63:4, 286:15, 286:16
**T3s** [2] - 29:6, 155:1
**table** [2] - 3:10, 49:16
**tachycardia** [2] - 73:5, 73:16
**tailing** [1] - 157:5
**taint** [1] - 151:3
**tainted** [3] - 68:22, 68:25, 203:1
**tainting** [1] - 75:21
**take-away** [1] - 221:24
**Tamarac** [4] - 115:4, 121:17, 140:10, 140:15
**Tampa** [5] - 85:16, 85:22, 157:21, 157:24, 158:1
**tampered** [6] - 286:9, 287:24, 295:10, 297:15, 305:15, 306:1
**tardy** [1] - 45:21
**target** [2] - 37:24, 38:16
**targeted** [1] - 201:20
**Tarpon** [2] - 129:6, 157:25
**taught** [2] - 74:6, 288:16
**tax** [1] - 190:22
**Taylor** [1] - 53:11
**teacher** [11] - 92:13, 94:8, 112:21, 116:21, 117:7, 123:11, 132:2, 140:18, 176:2, 196:9, 239:4
**teaching** [1] - 299:8
**team** [2] - 80:3, 290:25
**Teams** [22] - 29:3, 29:13, 30:5, 30:6, 32:24, 33:5, 33:13, 33:14, 33:17, 33:21, 33:22, 33:24, 34:2, 34:8, 34:10, 34:13, 34:15, 34:20, 35:18, 36:11, 36:25, 37:4
**tech** [1] - 99:8
**technical** [2] - 154:25, 236:12
**technically** [1] - 4:18
**technician** [1] - 144:22
**technology** [1] - 141:23
**telephone** [1] - 279:10
**television** [1] - 279:1
**ten** [10] - 9:10, 178:21, 219:1, 256:5, 256:11, 256:19, 283:4, 284:4, 284:17, 284:22
**ten-minute** [2] - 256:5, 283:4
**tendency** [1] - 151:11
**tennis** [2] - 118:17, 195:23
**tens** [1] - 299:25
**tentative** [2] - 83:1, 157:10
**tentatively** [1] - 55:4
**tenure** [4] - 11:22, 12:5, 12:9, 14:7
**term** [3] - 17:12, 35:22, 120:4
**termed** [1] - 231:17
**terms** [4] - 155:1, 233:13, 234:12, 250:7
**terrible** [1] - 227:10
**Terris** [1] - 53:11
**Terry** [9] - 48:17, 72:2, 76:25, 148:22, 150:3, 164:23, 175:8, 215:8, 218:19
**test** [1] - 10:15
**tested** [1] - 212:15
**testified** [3] - 19:7, 21:16, 276:22
**testifies** [2] - 19:24, 228:8
**testify** [28] - 11:8, 11:9, 11:14, 11:20, 12:8, 12:12, 12:17, 12:20, 12:23, 15:17, 16:10, 16:21, 18:25, 31:17, 35:1, 35:11, 49:21, 51:9, 135:15, 206:19, 233:9, 245:10, 249:16, 277:18, 277:20, 277:21, 293:10, 293:14
**testifying** [6] - 19:6, 34:10, 34:17, 231:20, 276:24, 293:7
**testimony** [29] - 11:7, 13:1, 13:9, 13:10, 19:25, 20:2, 21:3, 28:16, 36:24, 54:17, 163:16, 208:2, 208:5, 214:7, 232:2, 232:12, 232:19, 254:7, 274:24, 276:16, 276:19, 277:3, 277:4, 278:23, 280:9, 280:13, 280:22, 281:24
**testing** [1] - 9:24
**Texas** [7] - 82:17, 82:19, 82:21, 104:11, 157:5, 166:20, 183:4
**text** [5] - 47:6, 279:10, 291:1, 293:19, 307:3
**THE** [1444] - 1:10, 1:13, 3:2, 3:15, 3:18, 3:21, 3:24, 4:6, 4:12, 4:14, 4:20, 5:1, 5:4, 5:7, 5:13, 5:18, 5:22, 5:25, 6:12, 7:11, 7:15, 7:19, 7:22, 8:3, 8:5, 9:7, 9:11, 9:15, 9:17, 10:3, 11:1, 13:14, 13:16, 16:17, 19:10, 20:3, 20:12, 20:17, 20:22, 20:24, 22:6, 22:13, 22:19, 22:21, 22:24, 23:10, 24:22, 24:25, 25:22, 26:12, 26:14, 27:4, 27:7, 27:12, 27:21, 27:23, 28:7, 28:10, 28:22, 29:22, 30:2, 30:5, 30:15, 30:20, 32:1, 32:8, 32:18, 32:20, 33:1, 33:8, 33:19, 35:11, 35:15, 35:17, 36:7, 36:15, 36:23, 37:5, 37:20, 37:25, 38:6, 38:23, 39:6, 39:8, 39:14, 39:19, 40:7, 40:15, 40:21, 41:7, 41:14, 41:16, 41:19, 41:23, 42:18, 42:21, 42:23, 43:3, 43:11, 43:14, 43:22, 44:2, 45:20, 47:3, 47:8, 47:11, 47:13, 47:15, 49:19, 50:6, 50:11, 50:17, 50:20, 50:25, 51:4, 51:7, 51:23, 53:4, 53:20, 53:22, 54:1, 54:2, 55:18, 55:19, 64:9, 64:18, 64:20, 64:24, 65:9, 65:11, 65:15, 65:22, 66:12, 66:23, 67:9, 67:11, 67:23, 68:7, 68:9, 68:20, 68:24, 69:3, 69:23, 70:1, 70:7, 70:9, 70:12, 70:15, 71:2, 71:6, 71:14, 71:18, 71:22, 71:25, 72:8, 72:11, 72:15, 72:18, 72:21, 72:24, 73:9, 73:20, 73:22, 74:11, 74:14, 74:16, 74:23, 75:2, 75:7, 75:9, 75:13, 76:2, 76:5, 76:11, 76:14, 76:22, 77:3, 77:7, 77:15, 77:19, 78:11, 78:13, 78:18, 78:25, 79:2, 79:7, 79:9, 79:13, 79:20, 79:24, 80:1, 80:6, 80:11, 80:15, 80:18, 80:20, 80:25, 81:4, 81:7, 81:9, 81:11, 81:13, 81:16, 81:18, 82:1, 82:6, 82:9, 82:18, 82:23, 83:2, 83:5, 83:9, 83:12, 83:15, 83:17, 83:24, 84:9, 84:15, 84:21, 84:23, 84:25, 85:3, 85:9, 85:12, 85:22, 85:24, 86:2, 86:9, 86:14, 86:19, 86:22, 86:25, 87:2, 87:7, 87:13, 87:16, 87:21, 87:23, 88:3, 88:7, 88:9, 88:13, 88:15, 88:20, 88:23, 89:2, 89:10, 89:15, 89:20, 89:24, 90:1, 90:6, 90:10, 90:12, 90:18, 91:1, 91:3, 91:6, 91:9, 91:12, 91:16, 91:22, 91:24, 92:1, 92:3, 92:9, 92:12, 92:14, 92:16, 92:18, 92:21, 92:23, 92:25, 93:2, 93:5, 93:7, 93:9, 93:12, 93:16, 93:18, 93:21, 93:24, 94:1, 94:4, 94:7, 94:10, 94:13, 94:15, 94:18, 94:21, 94:23, 94:25,

95:3, 95:6, 95:8, 95:10, 95:12, 95:15, 95:17, 95:19, 95:21, 95:23, 95:25, 96:2, 96:5, 96:7, 96:9, 96:11, 96:13, 96:17, 96:19, 96:21, 96:23, 97:1, 97:3, 97:6, 97:9, 97:11, 97:13, 97:15, 97:20, 97:22, 98:1, 98:4, 98:7, 98:9, 98:12, 98:16, 98:19, 98:21, 98:23, 98:25, 99:2, 99:4, 99:11, 99:13, 99:15, 99:17, 99:19, 99:21, 99:23, 100:1, 100:3, 100:5, 100:9, 100:11, 100:14, 100:16, 100:18, 100:21, 100:23, 100:25, 101:2, 101:5, 101:9, 101:12, 101:15, 101:17, 101:19, 101:21, 101:23, 102:1, 102:3, 102:5, 102:7, 102:9, 102:11, 102:14, 102:17, 102:20, 102:22, 102:24, 103:3, 103:5, 103:7, 103:9, 103:11, 103:13, 103:15, 103:17, 103:20, 103:22, 103:25, 104:2, 104:4, 104:6, 104:8, 104:14, 104:16, 104:18, 104:20, 104:23, 104:25, 105:2, 105:6, 105:8, 105:10, 105:12, 105:15, 105:17, 105:19, 105:21, 105:24, 106:1, 106:3, 106:5, 106:7, 106:12, 106:15, 106:17, 106:19, 106:21, 106:25, 107:2, 107:4, 107:6, 107:8, 107:12, 107:14, 107:16, 107:18, 107:21, 107:23, 107:25, 108:2, 108:5, 108:7, 108:9, 108:13, 108:16, 108:18, 108:21, 108:23, 108:25, 109:3, 109:7, 109:10, 109:13, 109:17, 109:19, 109:23, 110:3, 110:7, 110:12, 110:14, 110:17, 110:20, 110:24, 111:1, 111:3, 111:5, 111:7, 111:9, 111:11, 111:13, 111:16, 111:18, 111:20, 111:22, 111:24, 112:2, 112:5, 112:8, 112:10, 112:12, 112:14, 112:16, 112:18, 112:23, 112:25, 113:3, 113:8, 113:10, 113:13, 113:15, 113:19, 113:22, 113:25, 114:2, 114:4, 114:6, 114:10, 114:13, 114:15, 114:18, 114:20, 114:23, 114:25, 115:5, 115:7, 115:10, 115:12, 115:14, 115:16, 115:18, 115:20, 115:24, 116:1, 116:3, 116:5, 116:7, 116:9, 116:12, 116:14, 116:18, 116:20, 116:22, 116:24, 117:1, 117:3, 117:5, 117:9, 117:11, 117:14, 117:16, 117:21, 117:24, 118:1, 118:4, 118:7, 118:11, 118:14, 118:16, 118:18, 118:21, 118:23, 118:25, 119:3, 119:5, 119:9, 119:11, 119:13, 119:15, 119:18, 119:22, 119:25, 120:3, 120:6, 120:8, 120:10, 120:13, 120:16, 120:19, 120:22, 120:24, 121:4, 121:6, 121:9, 121:11, 121:14, 121:18, 121:21, 121:23, 121:25, 122:2, 122:4, 122:6, 122:8, 122:10, 122:14, 122:17, 122:21, 122:23, 123:1, 123:4, 123:7, 123:10, 123:12, 123:14, 123:18, 123:20, 123:22, 123:24, 124:2, 124:4, 124:7, 124:9, 124:11, 124:14, 124:17, 124:19, 124:23, 124:25, 125:3, 125:5, 125:8, 125:10, 125:12, 125:15, 125:17, 125:20, 125:22, 125:25, 126:2, 126:4, 126:7, 126:9, 126:13, 126:16, 126:19, 126:21, 126:23, 126:25, 127:2, 127:4, 127:6, 127:9, 127:12, 127:14, 127:16, 127:18, 127:21, 127:24, 128:2, 128:5, 128:7, 128:11, 128:13, 128:15, 128:18, 128:20, 128:22, 128:24, 129:2, 129:7, 129:9, 129:12, 129:16, 129:18, 129:20, 129:22, 129:24, 130:2, 130:4, 130:6, 130:8, 130:11, 130:13, 130:17, 130:20, 130:22, 130:24, 131:1, 131:4, 131:6, 131:8, 131:10, 131:12, 131:14, 131:18, 131:21, 131:24, 132:1, 132:4, 132:6, 132:8, 132:10, 132:13, 132:15, 132:17, 132:19, 132:21, 132:23, 133:2, 133:5, 133:7, 133:11, 133:13, 133:15, 133:17, 133:19, 133:21, 133:25, 134:2, 134:4, 134:7, 134:9, 134:14, 134:17, 134:19, 134:21, 134:23, 135:1, 135:4, 135:7, 135:9, 135:14, 135:20, 135:23, 136:2, 136:7, 136:10, 136:12, 136:14, 136:16, 136:19, 136:24, 137:2, 137:4, 137:6, 137:9, 137:11, 137:13, 137:15, 137:17, 137:20, 137:22, 137:24, 138:1, 138:3, 138:7, 138:9, 138:11, 138:14, 138:16, 138:18, 138:21, 138:23, 138:25, 139:2, 139:4, 139:8, 139:11, 139:13, 139:16, 139:18, 139:20, 139:23, 140:1, 140:3, 140:5, 140:7, 140:11, 140:13, 140:15, 140:17, 140:19, 140:21, 140:23, 141:1, 141:3, 141:5, 141:7, 141:9, 141:13, 141:15, 141:16, 141:19, 141:22, 141:25, 142:2, 142:4, 142:6, 142:8, 142:10, 142:12, 142:14, 142:17, 142:20, 142:22, 142:24, 143:1, 143:4, 143:6, 143:9, 143:11, 143:13, 143:15, 143:17, 143:20, 143:22, 143:24, 144:2, 144:4, 144:6, 144:10, 144:12, 144:14, 144:17, 144:19, 144:21, 144:23, 144:25, 145:2, 145:4, 145:6, 145:8, 145:10, 145:13, 145:15, 145:17, 145:19, 145:22, 146:1, 146:3, 146:5, 146:7, 146:9, 146:12, 146:14, 146:16, 146:18, 146:21, 146:23, 147:2, 147:4, 147:7, 147:9, 147:11, 147:13, 147:15, 147:19, 147:21, 147:23, 148:1, 148:4, 148:6, 148:9, 148:11, 148:13, 148:16, 148:19, 148:21, 150:25, 151:15, 151:21, 151:24, 152:1, 152:14, 152:20, 153:3, 153:8, 153:13, 153:17, 153:19, 153:25, 154:5, 154:9, 154:16, 154:23, 155:5, 155:11, 155:17, 155:22, 156:2, 156:6, 156:9, 156:12, 156:20, 156:23, 157:1, 157:4, 157:13, 157:19, 157:24, 158:7, 158:14, 158:21, 159:3, 159:10, 159:15, 159:22, 160:4, 160:7, 160:13, 160:18, 160:22, 160:24, 161:1, 161:8, 161:13, 161:20, 161:22, 162:2, 162:6, 162:17, 162:23, 163:7, 163:10, 163:14, 163:18, 163:21, 164:6, 164:8, 164:10, 164:16, 165:9, 165:12, 165:20, 166:1, 166:4, 166:7, 166:9, 166:11, 166:14, 166:16, 166:19, 166:22, 166:25, 167:2, 167:5, 167:7, 167:10, 167:12, 167:17, 167:20, 167:23, 167:25, 168:2, 168:4, 168:6, 168:10, 168:12, 168:15, 168:17, 168:20, 168:23, 168:25, 169:4, 169:7, 169:10, 169:12, 169:14, 169:16, 169:18, 169:20, 169:22, 169:25, 170:2, 170:5, 170:7, 170:10, 170:12, 170:14, 170:16, 170:18, 170:21, 170:23, 170:25, 171:2, 171:4, 171:7, 171:9, 171:11, 171:13, 171:15, 171:17, 171:20, 171:23, 172:1, 172:3, 172:8, 172:11, 172:13, 172:15, 172:18, 172:20, 172:22,

172:24, 173:3, 173:5, 173:8, 173:10, 173:12, 173:14, 173:16, 173:19, 173:22, 173:25, 174:2, 174:4, 174:7, 174:9, 174:11, 174:13, 174:16, 174:18, 174:20, 174:22, 174:24, 175:1, 175:5, 175:8, 175:13, 175:16, 175:18, 175:20, 175:22, 175:24, 176:1, 176:4, 176:6, 176:8, 176:10, 176:12, 176:14, 176:17, 176:19, 176:21, 176:25, 177:2, 177:6, 177:13, 177:16, 177:19, 177:21, 177:23, 178:1, 178:3, 178:5, 178:7, 178:10, 178:12, 178:14, 178:19, 178:22, 179:1, 179:3, 179:5, 179:7, 179:9, 179:11, 179:13, 179:16, 179:18, 179:20, 179:22, 179:24, 180:1, 180:3, 180:7, 180:10, 180:12, 180:14, 180:16, 180:18, 180:21, 180:23, 180:25, 181:2, 181:4, 181:8, 181:11, 181:14, 181:16, 181:19, 181:23, 182:1, 182:6, 182:11, 182:13, 182:24, 183:1, 183:3, 183:6, 183:8, 183:11, 183:13, 183:15, 183:17, 183:19, 183:23, 184:1, 184:4, 184:6, 184:8, 184:10, 184:12, 184:14, 184:16, 184:19, 184:21, 184:24, 185:1, 185:3, 185:5, 185:7, 185:9, 185:11, 185:13, 185:16, 185:19, 185:21, 185:24, 186:1, 186:3, 186:6, 186:8, 186:10, 186:13, 186:15, 186:17, 186:20, 186:22, 186:25, 187:2, 187:4, 187:6, 187:8, 187:10, 187:13, 187:15, 187:18, 187:20, 187:22, 187:24, 188:2, 188:4, 188:6, 188:8, 188:10, 188:13, 188:15, 188:17, 188:19, 188:23, 188:25, 189:4, 189:6, 189:9, 189:11, 189:15, 189:17, 189:19, 189:21, 189:23, 189:25, 190:2, 190:5, 190:8, 190:10, 190:12, 190:14, 190:18, 190:21, 190:23, 190:25, 191:2, 191:5, 191:7, 191:9, 191:11, 191:13, 191:15, 191:18, 191:21, 191:24, 192:1, 192:3, 192:6, 192:8, 192:10, 192:12, 192:14, 192:16, 192:18, 192:21, 192:24, 193:2, 193:4, 193:6, 193:8, 193:11, 193:14, 193:16, 193:18, 193:20, 193:22, 193:24, 194:1, 194:4, 194:6, 194:10, 194:12, 194:14, 194:16, 194:18, 194:22, 194:25, 195:2, 195:4, 195:6, 195:8, 195:11, 195:13, 195:16, 195:18, 195:20, 195:22, 195:24, 196:1, 196:3, 196:6, 196:8, 196:10, 196:12, 196:15, 196:17, 196:19, 196:21, 196:24, 197:1, 197:3, 197:5, 197:7, 197:11, 197:14, 197:16, 197:18, 197:21, 197:23, 197:25, 198:3, 198:5, 198:7, 198:9, 198:11, 198:15, 198:18, 198:21, 198:23, 198:25, 199:2, 199:5, 199:7, 199:9, 199:11, 199:13, 201:7, 202:4, 202:7, 202:14, 202:18, 203:2, 203:18, 203:25, 204:4, 204:10, 204:12, 204:15, 204:21, 204:23, 205:3, 205:11, 205:14, 205:22, 205:25, 207:20, 207:24, 208:2, 208:8, 208:12, 208:15, 209:4, 209:11, 209:16, 209:18, 210:3, 210:9, 210:12, 210:14, 210:23, 211:5, 211:18, 211:21, 211:25, 212:2, 212:4, 212:7, 212:10, 212:18, 212:20, 213:3, 213:15, 213:16, 213:17, 213:18, 215:19, 215:22, 215:25, 216:3, 216:5, 216:18, 216:23, 217:6, 217:16, 217:24, 218:4, 218:14, 218:24, 219:2, 219:7, 224:14, 234:4, 236:20, 237:1, 237:3, 237:8, 244:12, 244:19, 244:22, 244:25, 246:21, 248:2, 248:4, 248:21, 248:23, 249:1, 249:13, 249:18, 249:21, 250:15, 250:20, 253:24, 255:8, 256:4, 256:13, 256:17, 256:19, 256:23, 257:6, 257:9, 257:12, 257:19, 257:25, 258:9, 258:14, 258:19, 258:23, 259:1, 259:4, 259:8, 259:15, 259:18, 260:7, 260:11, 260:19, 261:1, 261:6, 261:13, 261:15, 261:19, 261:21, 261:24, 262:3, 262:9, 262:14, 262:19, 262:25, 263:3, 263:6, 263:10, 263:12, 263:15, 263:18, 263:22, 264:2, 264:6, 264:10, 264:14, 264:18, 264:22, 264:24, 265:1, 265:4, 265:6, 265:10, 265:14, 265:16, 265:21, 265:23, 266:2, 266:5, 266:7, 266:10, 266:12, 266:16, 266:19, 266:22, 266:24, 267:3, 267:7, 267:9, 267:11, 267:14, 267:16, 267:19, 267:22, 267:24, 268:5, 268:6, 268:10, 268:13, 268:14, 268:15, 268:18, 268:22, 268:23, 269:2, 269:5, 269:8, 269:10, 269:15, 269:18, 269:22, 269:25, 270:1, 270:4, 270:6, 270:11, 270:14, 270:16, 270:23, 270:25, 271:1, 271:3, 271:6, 271:8, 271:18, 271:20, 271:23, 271:25, 272:7, 272:9, 273:1, 273:4, 273:11, 273:17, 274:10, 283:4, 284:6, 284:12, 284:16, 284:21, 284:24, 285:7, 285:11, 285:17, 285:24, 286:1, 286:4, 291:24, 309:22, 310:11
**theater** [1] - 136:18
**theft** [9] - 63:24, 64:10, 64:11, 65:2, 93:15, 108:24, 127:15, 136:13, 148:15
**theme** [2] - 11:12, 26:20
**themselves** [9] - 6:7, 24:8, 33:24, 151:5, 280:5, 292:12, 292:14, 303:25, 304:9
**theoretically** [1] - 240:8
**theory** [3] - 10:10, 241:17
**therapies** [1] - 220:16
**therapist** [2] - 69:22, 105:9
**therapy** [2] - 69:19, 227:23
**therefore** [6] - 8:17, 8:25, 21:22, 228:20, 277:14
**they've** [9] - 7:3, 7:13, 16:1, 33:16, 202:1, 231:25, 286:8, 286:9, 293:6
**thin** [1] - 201:17
**thinking** [6] - 206:15, 217:2, 230:9, 243:20, 245:24, 286:7
**thinks** [4] - 31:20, 69:5, 235:9, 275:25
**third** [13] - 42:19, 45:4, 62:17, 86:16, 114:9, 115:2, 147:18, 225:21, 225:22, 242:2, 273:24, 274:5, 277:23
**Thomas** [1] - 87:9
**Thompson** [2] - 83:5, 134:11
**thoughts** [1] - 250:4
**threatened** [1] - 303:22
**three** [28] - 9:12, 9:16, 9:21, 46:8, 58:14, 60:7, 60:12, 61:3, 61:20, 85:17, 101:20, 108:10, 119:2, 135:5, 137:10, 140:12, 159:7, 168:3, 175:23, 184:13, 200:14, 209:1, 217:25, 225:20, 253:16, 276:24, 277:9, 278:15
**three-month** [1] - 85:17
**throat** [1] - 141:11
**throw** [3] - 230:13, 252:1, 252:6
**throwing** [2] - 252:9, 294:18
**thrown** [1] - 296:9
**throws** [1] - 252:5
**Thursday** [9] - 41:17, 55:10, 55:11, 55:20, 79:9, 80:5, 81:7,

84:13, 161:4
**Tiburcio** [5] - 123:2, 248:21, 262:22, 263:1, 264:2
**Tichinel** [1] - 53:12
**ticket** [4] - 80:4, 201:12, 249:2
**tickets** [1] - 69:12
**tight** [1] - 86:7
**Tim** [1] - 167:15
**timeliness** [1] - 35:10
**timely** [2] - 8:8, 19:20
**Timothy** [1] - 53:15
**tip** [1] - 199:20
**tissue** [1] - 73:4
**today** [20] - 46:3, 46:9, 47:9, 47:13, 48:8, 57:20, 58:20, 59:18, 62:18, 71:16, 71:20, 82:6, 88:18, 88:25, 89:13, 238:15, 245:9, 251:20, 284:18, 293:25
**together** [9] - 33:11, 56:9, 57:4, 215:2, 247:9, 253:15, 256:10, 281:25, 288:3
**tomorrow** [14] - 89:6, 89:11, 89:14, 89:17, 90:21, 91:3, 91:4, 153:5, 161:6, 161:7, 272:14, 310:6, 310:9, 310:12
**ton** [1] - 307:20
**took** [4] - 205:12, 293:23, 305:13, 305:18
**top** [1] - 297:14
**topics** [3] - 13:10, 13:11, 23:20
**totally** [1] - 37:14
**touch** [1] - 48:9
**tough** [6] - 44:17, 74:11, 84:4, 89:9, 152:4, 206:20
**toward** [1] - 76:20
**towards** [3] - 53:10, 69:2, 203:24
**town** [13] - 16:8, 69:12, 79:2, 79:4, 86:12, 90:14, 90:22, 90:24, 91:3, 91:6, 156:15, 161:4
**track** [1] - 87:9
**tracks** [3] - 303:5, 304:13, 304:23
**Tracy** [1] - 53:11
**traffic** [7] - 58:12, 60:8, 60:19, 183:5, 201:12, 204:19, 249:2
**training** [2] - 178:23, 178:25
**transaction** [1] - 295:4
**transactions** [4] - 6:20, 35:21, 157:10, 298:24
**TRANSCRIPT** [1] - 1:9
**transcription** [1] - 310:17
**transfer** [1] - 62:10
**transformed** [1] - 290:24
**transmission** [4] - 62:17, 62:19, 62:25, 63:2
**transmit** [2] - 61:13, 62:4
**transmitted** [2] - 61:13, 62:4
**transport** [1] - 60:19
**trash** [1] - 292:14
**travel** [7] - 90:14, 101:4, 134:8, 180:13, 194:17, 197:6, 221:23
**traveling** [10] - 101:4, 102:23, 114:24, 130:12, 170:15, 183:18, 187:9, 222:22, 236:8, 236:13
**travels** [1] - 135:2
**treated** [4] - 201:10, 201:22, 203:16, 205:15
**treatment** [1] - 235:20
**Trent** [1] - 51:21
**trespassing** [1] - 113:5
**trial** [59] - 4:24, 5:3, 5:9, 6:9, 6:22, 8:1, 8:11, 8:23, 9:4, 9:10, 9:12, 9:13, 9:20, 16:4, 16:18, 18:5, 19:11, 21:13, 22:12, 24:18, 35:8, 45:25, 48:12, 48:16, 48:24, 54:9, 57:20, 58:20, 59:18, 62:18, 66:15, 70:2, 74:20, 83:13, 84:16, 94:2, 94:3, 150:2, 159:7, 182:16, 199:24, 214:16, 227:1, 239:15, 240:9, 240:11, 245:8, 245:12, 274:13, 274:15, 274:18, 278:4, 278:11, 278:14, 281:6, 282:11, 294:1, 306:9, 309:6
**TRIAL** [1] - 1:9
**trials** [2] - 55:24, 200:22
**trick** [2] - 182:9, 182:11
**tried** [10] - 14:14, 56:16, 150:12, 281:25, 302:18, 302:19, 303:7, 303:11, 303:12
**trip** [9] - 44:8, 44:15, 44:20, 80:2, 84:13, 85:19, 86:10, 86:12, 162:15
**tripping** [1] - 74:9
**trips** [7] - 84:18, 87:25, 88:3, 90:21, 90:25, 160:8, 160:10
**Trish** [2] - 48:22, 248:12
**Trissell** [1] - 51:17
**truck** [1] - 131:7
**true** [7] - 241:21, 275:17, 292:5, 298:22, 301:2, 301:4, 303:15
**trust** [6] - 202:6, 202:11, 202:24, 257:15, 281:7, 295:9
**trusted** [1] - 305:14
**trusting** [1] - 294:9
**truth** [2] - 25:3, 298:23
**try** [27] - 16:23, 17:6, 25:23, 26:21, 31:21, 37:22, 40:13, 46:3, 46:8, 46:9, 55:6, 56:18, 71:22, 84:16, 150:8, 151:6, 165:10, 214:9, 214:19, 250:18, 250:24, 251:5, 276:7, 303:6, 304:5, 305:2
**trying** [31] - 13:22, 14:15, 14:21, 15:6, 15:8, 16:25, 17:11, 18:13, 30:25, 31:2, 31:5, 36:12, 39:25, 55:25, 110:19, 205:3, 205:15, 219:21, 219:24, 219:25, 220:2, 221:17, 229:23, 232:8, 233:5, 244:12, 252:8, 304:4, 304:9, 304:13, 304:23
**Tuesday** [10] - 41:13, 41:14, 55:9, 69:20, 69:23, 70:2, 70:11, 152:25, 153:1, 262:14
**Tuesdays** [2] - 153:4, 262:10
**turn** [2] - 56:7, 268:24
**turns** [5] - 50:20, 52:1, 52:6, 52:10, 305:19
**TV** [1] - 289:25
**twelve** [1] - 271:19
**twice** [5] - 81:19, 218:1, 286:7, 286:10, 286:12
**twin** [1] - 71:10
**Twitter** [1] - 279:12
**two** [75] - 4:24, 7:17, 11:7, 11:17, 15:15, 23:21, 24:5, 24:6, 29:4, 30:7, 36:11, 37:8, 37:9, 37:12, 37:13, 46:18, 54:14, 54:20, 54:23, 58:11, 62:18, 62:21, 63:7, 71:10, 72:9, 78:22, 79:18, 81:20, 83:7, 84:18, 88:17, 97:10, 99:1, 99:7, 108:11, 109:18, 115:15, 117:2, 121:12, 123:21, 135:6, 137:14, 145:5, 153:21, 156:9, 158:17, 162:25, 169:19, 172:21, 177:5, 188:5, 189:22, 193:23, 196:16, 207:12, 209:25, 226:3, 246:7, 247:10, 250:2, 253:15, 270:7, 270:9, 271:19, 273:13, 275:15, 276:23, 278:11, 283:6, 283:21, 284:2, 287:19
**type** [75] - 10:1, 11:1, 92:12, 92:18, 94:18, 95:21, 96:23, 98:19, 100:11, 101:12, 103:5, 105:8, 106:15, 107:14, 111:3, 112:8, 113:22, 115:7, 116:20, 118:14, 118:16, 119:25, 121:23, 123:10, 124:25, 126:19, 128:2, 129:16, 130:20, 131:21, 133:8, 134:17, 137:2, 138:9, 139:11, 139:13, 140:17, 141:22, 142:4, 143:11, 144:21, 144:23, 146:3, 166:4, 167:20, 169:10, 169:12, 170:23, 172:3, 172:8, 173:25, 175:16, 176:1, 177:16, 178:22, 180:12, 181:11, 184:4, 185:19, 185:24, 187:18, 189:11, 191:24, 193:14, 194:25, 196:8, 197:14, 198:18, 204:6, 231:25, 278:12, 289:24, 298:12, 298:13, 306:4
**types** [2] - 222:11, 232:11
**typical** [1] - 235:19
**typically** [1] - 231:17

## U

**U.S** [1] - 310:22
**Uber** [1] - 106:16
**ultimate** [2] - 33:12, 307:14
**ultimately** [2] - 37:11, 307:13
**umbrella** [1] - 235:8
**umbrellas** [1] - 275:3
**unable** [1] - 301:10
**unavailability** [1] - 85:8
**unbelievable** [1] - 135:25
**uncertain** [1] - 251:3
**uncle** [2] - 122:12, 145:12
**uncle's** [1] - 122:15
**under** [14] - 8:25, 14:7, 19:6, 23:1, 23:13, 26:1, 31:11, 47:21, 48:16, 65:13, 219:10, 222:17, 240:16, 254:14
**underage** [1] - 139:24
**undercover** [1] - 188:21
**underlie** [1] - 34:16

**underlying** [9] - 6:14, 6:16, 6:19, 6:23, 7:3, 7:9, 8:1, 8:8, 9:5
**understood** [9] - 20:16, 154:17, 158:4, 223:13, 223:24, 229:10, 232:21, 233:16, 241:1
**unemployed** [1] - 138:10
**unequivocal** [1] - 261:5
**unequivocally** [1] - 259:24
**unfair** [2] - 205:17, 205:18
**unfairly** [1] - 203:17
**unfortunately** [2] - 70:21, 234:22
**union** [1] - 186:12
**unique** [1] - 300:12
**unit** [1] - 122:20
**UNITED** [3] - 1:1, 1:4, 1:10
**United** [21] - 1:14, 2:5, 3:2, 3:7, 25:2, 46:1, 47:17, 47:18, 49:10, 57:19, 58:16, 58:24, 59:4, 59:8, 59:9, 62:13, 74:1, 181:13, 213:23, 310:21
**university** [3] - 112:22, 118:17, 118:18
**University** [2] - 118:19
**Univest** [1] - 6:25
**unjustice** [1] - 203:22
**unknown** [3] - 58:23, 60:16, 61:6
**unless** [5] - 80:18, 80:20, 247:8, 275:22, 284:10
**unlike** [1] - 307:22
**unlimited** [1] - 57:11
**unrelated** [1] - 37:14
**unsafe** [1] - 308:13
**untimely** [1] - 8:17
**untrue** [1] - 25:14
**up** [118] - 4:15, 16:14, 20:2, 37:21, 37:22, 42:3, 43:17, 49:1, 49:21, 57:2, 64:4, 64:7, 67:17, 69:21, 70:6, 70:24, 71:11, 71:18, 71:19, 71:20, 73:6, 73:13, 73:18, 74:19, 76:13, 78:3, 80:13, 80:20, 81:21, 88:18, 88:23, 88:24, 90:15, 90:16, 122:12, 129:10, 141:18, 151:13, 152:15, 153:8, 159:17, 160:15, 160:19, 175:10, 203:14, 203:15, 204:5, 204:6, 204:8, 204:11, 204:13, 204:15, 204:19, 205:2, 205:9, 207:4, 215:22, 215:24, 218:2, 218:18, 228:20, 230:12, 239:11, 240:12, 248:5, 248:6, 250:22, 252:7, 252:11, 261:21, 263:19, 263:23, 264:7, 264:10, 264:15, 264:19, 265:1, 265:7, 265:10, 265:17, 265:20, 265:24, 266:4, 266:7, 266:12, 266:16, 266:19, 266:25, 267:11, 267:16, 267:19, 268:24, 269:5, 269:12, 270:1, 271:3, 271:9, 273:13, 284:10, 286:6, 290:8, 291:7, 291:15, 292:13, 295:3, 295:8, 296:22, 297:13, 298:17, 299:13, 299:14, 302:16, 302:20, 304:6, 305:25, 309:13
**upfront** [1] - 294:5
**ups** [1] - 304:11
**upscale** [1] - 221:17
**upset** [3] - 201:9, 203:20
**upsetting** [1] - 228:17
**upstate** [1] - 72:7
**US** [1] - 178:24
**uses** [1] - 280:24
**utilized** [1] - 25:12
**UV** [2] - 283:13, 283:14
**UX/UI** [1] - 99:9

## V

**vacation** [5] - 70:22, 71:2, 87:18, 153:11, 221:23
**vacuum** [1] - 28:23
**Valentin** [9] - 73:24, 109:4, 150:7, 150:18, 151:2, 154:13, 261:23, 261:24, 262:4
**value** [4] - 30:20, 60:22, 234:7, 234:16
**variety** [4] - 23:20, 30:18, 61:14, 260:1
**varying** [2] - 83:24, 218:15
**Vega** [1] - 53:18
**vegetables** [1] - 128:10
**vehicle** [1] - 25:8
**vendor** [1] - 222:22
**vendors** [3] - 12:1, 15:19, 36:13
**Venkatesh** [1] - 53:18
**verdict** [27] - 51:4, 93:7, 99:19, 102:9, 104:6, 122:8, 127:6, 148:2, 176:12, 179:11, 182:8, 182:13, 192:18, 200:14, 200:15, 224:7, 231:11, 231:14, 249:19, 253:7, 255:12, 274:20, 276:15, 280:1, 282:7, 282:24
**Verizon** [1] - 7:24
**versus** [2] - 3:2, 57:19
**vet** [1] - 125:13
**vetting** [1] - 12:1
**VI** [2] - 61:19, 62:9
**vice** [2] - 111:8, 174:5
**victim** [66] - 63:24, 64:11, 64:14, 65:1, 65:23, 67:5, 93:13, 95:6, 96:7, 98:4, 99:23, 100:23, 102:17, 104:18, 106:1, 107:2, 108:16, 110:12, 111:18, 113:8, 114:18, 116:5, 117:24, 119:11, 121:4, 122:17, 124:9, 125:25, 127:14, 128:20, 130:4, 131:6, 132:17, 134:2, 136:12, 138:23, 140:1, 141:3, 142:20, 143:22, 145:15, 146:16, 148:11, 167:2, 168:17, 170:10, 171:11, 173:10, 176:19, 176:22, 178:5, 179:20, 180:23, 183:13, 185:1, 187:2, 188:15, 190:8, 191:9, 193:2, 194:10, 195:18, 197:1, 198:5, 199:7, 206:12
**Victim** [2] - 137:22, 174:18
**victimized** [2] - 206:7, 206:14
**victims** [1] - 206:5
**video** [1] - 22:18
**videographer** [1] - 187:19
**view** [6] - 182:19, 232:4, 278:18, 278:22, 280:16, 281:3
**viewed** [1] - 232:11
**views** [1] - 235:2
**VII** [2] - 61:19, 62:16
**VIII** [2] - 61:19, 62:24
**Villanueva** [4] - 83:5, 134:11, 263:24, 264:18
**Villanueva-Thompson** [2] - 83:5, 134:11
**violated** [1] - 286:22
**violation** [1] - 61:15
**violence** [1] - 108:24
**violent** [2] - 226:1, 227:2
**Vipulbhai** [1] - 51:18
**Virginia** [1] - 122:13
**virtually** [1] - 149:3
**virtue** [1] - 231:24
**visit** [4] - 87:19, 177:4, 278:18, 280:8
**visits** [1] - 236:7
**voir** [2] - 55:22, 56:12
**vokay** [1] - 221:9
**Volume** [1] - 1:7
**volume** [1] - 291:2
**volunteer** [2] - 125:7, 177:4
**vomiting** [1] - 218:2
**vote** [1] - 181:23
**voters** [1] - 52:20
**vs** [1] - 1:5

## W

**WAC** [10] - 21:12, 21:21, 21:22, 22:16, 22:18, 23:25, 24:11, 24:13
**wait** [7] - 85:17, 92:10, 150:17, 151:16, 151:19, 165:17, 256:7
**waited** [1] - 83:7
**waive** [3] - 164:11, 261:16, 285:12
**waiver** [4] - 4:16, 4:18, 4:20, 5:9
**Walgreens** [3] - 225:2, 225:3, 225:4
**walk** [5] - 134:8, 149:7, 204:9, 286:6, 289:17
**walked** [1] - 305:13
**walking** [9] - 127:19, 128:25, 136:18, 141:8, 149:11, 149:12, 178:13, 275:2, 298:16
**walks** [1] - 235:6
**wall** [6] - 44:22, 44:24, 44:25, 45:4, 45:7, 45:11
**wants** [3] - 205:20, 245:11, 252:25
**warden** [1] - 122:12
**warehouse** [3] - 235:5, 288:25, 308:20
**warm** [1] - 46:16
**warranty** [3] - 222:9, 222:10, 222:17
**Warren** [9] - 121:15, 220:25, 223:14, 233:18, 268:1, 268:19, 270:21, 272:18, 274:1
**Warren's** [1] - 234:4
**Washington** [1] - 189:13
**watch** [9] - 52:7, 119:16, 122:24, 221:24, 222:2, 222:6, 222:15, 223:4, 278:24
**watches** [11] - 122:24, 221:12, 221:14, 221:20, 222:11, 222:21, 222:25, 223:1, 223:7, 223:10, 291:20
**watching** [3] - 98:11, 148:20, 198:10
**water** [2] - 66:2, 235:20
**Waters** [1] - 53:15
**ways** [5] - 230:8, 230:24, 237:15, 280:25, 302:17

**wear** [1] - 283:17
**wearing** [1] - 283:16
**weasel** [2] - 40:13
**weasels** [1] - 40:15
**web** [2] - 128:3, 176:3
**Weber** [1] - 234:23
**websites** [2] - 279:11, 279:17
**Wednesday** [11] - 6:3, 34:25, 35:7, 41:13, 41:14, 41:18, 55:9, 79:8, 80:5, 80:6, 155:23
**Weed** [1] - 51:13
**Week** [1] - 273:7
**week** [30] - 9:14, 35:12, 46:19, 46:21, 46:23, 46:24, 47:10, 47:11, 47:16, 55:12, 69:19, 70:21, 78:4, 78:6, 78:8, 85:5, 86:13, 87:6, 88:12, 90:14, 90:17, 155:11, 155:19, 160:3, 160:4, 190:13, 218:1, 272:13
**week-wise** [1] - 9:14
**weekend** [1] - 84:14
**weekends** [2] - 9:21
**weekly** [1] - 69:19
**weeks** [12] - 9:16, 46:8, 65:24, 72:9, 72:14, 78:5, 81:3, 85:5, 88:1, 153:21, 158:17
**weigh** [1] - 150:22
**weight** [4] - 201:18, 275:8, 277:21, 281:23
**Weils** [1] - 221:17
**Weiss** [1] - 53:16
**welcome** [5] - 46:1, 84:24, 195:25, 223:15, 225:16
**West** [2] - 55:11, 55:21
**west** [1] - 107:11
**Wester** [1] - 53:17
**Weston** [5] - 112:4, 136:23, 171:22, 196:5, 198:14
**wet** [4] - 235:7, 235:8, 275:2, 275:3
**whatsoever** [9] - 13:25, 14:10, 14:17, 17:1, 17:20, 31:8, 240:13, 275:21, 279:14
**whereabouts** [42] - 92:6, 96:14, 98:13, 100:7, 101:6, 105:4, 106:10, 107:10, 109:4, 110:21, 113:17, 115:2, 116:16, 119:19, 121:16, 123:4, 124:21, 126:13, 127:21, 129:3, 130:14, 131:15, 132:24, 134:11, 136:22, 138:5, 139:6, 140:9, 141:16, 144:7, 144:15, 145:23, 146:25, 165:23, 169:4, 170:19, 173:19, 177:11, 189:1, 191:18, 196:3, 197:9
**Whereabouts** [16] - 94:10, 95:15, 167:13, 171:20, 175:3, 175:11, 178:17, 180:5, 181:6, 183:23, 185:11, 187:13, 190:16, 193:9, 194:20, 198:13
**whole** [26] - 21:13, 27:7, 54:9, 55:12, 66:15, 77:17, 78:8, 86:12, 87:5, 104:11, 110:5, 199:24, 208:25, 210:24, 226:11, 226:19, 227:3, 227:4, 227:6, 227:12, 240:9, 240:10, 242:1, 247:9, 273:8, 273:9
**wholesale** [2] - 21:13, 30:19
**wholesaler** [1] - 21:15
**widow** [1] - 123:13
**wife** [8] - 52:23, 85:15, 99:5, 137:23, 181:24, 182:20, 259:20, 260:9
**wildfire** [1] - 151:11
**Wiley** [1] - 53:11
**wilfully** [1] - 60:14
**willfully** [2] - 58:21, 61:3
**WILLIAM** [1] - 1:10
**William** [6] - 1:17, 2:5, 3:9, 49:23, 50:2, 51:20
**willing** [5] - 6:21, 45:23, 70:11, 84:1, 259:22
**Wilson** [4] - 56:4, 92:5, 238:22, 263:4
**Wilton** [1] - 180:6
**win** [1] - 199:21
**wind** [1] - 110:19
**window** [1] - 122:20
**windshield** [1] - 121:7
**wine** [1] - 130:21
**wins** [1] - 199:18
**wipers** [1] - 121:7
**wire** [10] - 58:14, 60:24, 61:14, 61:18, 61:19, 62:4, 62:9, 62:19, 63:1
**wires** [1] - 62:8
**Wisconsin** [2] - 139:25, 144:20
**wise** [3] - 9:14, 27:15, 28:1
**wish** [1] - 281:10
**wishes** [1] - 282:19
**witness** [72] - 11:12, 11:14, 12:18, 12:19, 15:5, 16:7, 16:9, 16:22, 16:23, 19:24, 28:15, 28:16, 28:18, 28:19, 28:20, 28:21, 31:5, 34:11, 38:18, 38:23, 39:2, 39:5, 40:14, 52:1, 52:6, 52:10, 54:15, 96:9, 98:7, 100:25, 106:3, 107:4, 111:20, 119:13, 121:9, 128:22, 132:19, 138:25, 141:5, 170:12, 173:12, 174:20, 179:22, 180:25, 183:15, 185:3, 187:4, 187:6, 188:17, 194:14, 195:20, 197:3, 198:7, 199:9, 206:23, 214:7, 231:8, 232:4, 240:12, 249:4, 275:2, 275:19, 275:21, 275:22, 276:2, 276:17, 276:19, 276:21, 280:14, 280:16
**witness's** [7] - 38:25, 231:25, 276:23, 276:24, 276:25, 277:2, 277:4
**witnessed** [37] - 93:16, 95:8, 100:1, 102:20, 104:23, 108:21, 110:14, 113:10, 114:20, 116:9, 118:1, 122:21, 124:14, 126:4, 127:16, 130:8, 131:8, 134:4, 136:14, 137:24, 140:3, 142:22, 143:24, 145:17, 146:18, 148:16, 167:5, 167:7, 168:20, 171:13, 176:25, 178:10, 188:22, 190:10, 191:11, 193:4, 206:18
**witnesses** [38] - 9:19, 14:13, 15:15, 15:17, 18:2, 18:25, 19:5, 25:23, 33:23, 34:8, 34:9, 37:8, 37:9, 39:18, 49:20, 49:22, 51:9, 53:8, 53:20, 204:12, 204:15, 206:19, 231:18, 232:11, 247:7, 247:9, 249:5, 253:20, 254:2, 254:8, 277:8, 279:21, 281:11, 281:18, 282:17, 282:20, 306:25
**witnesses'** [3] - 13:1, 254:7, 275:16
**Wolfe** [1] - 51:22
**Won** [1] - 53:13
**Wongsam** [9] - 45:6, 165:17, 165:18, 165:23, 265:24, 266:5, 268:2, 268:7, 268:13
**Woo** [2] - 51:15, 53:13
**word** [3] - 210:7, 232:3, 293:18
**words** [14] - 38:25, 52:13, 65:3, 80:20, 162:7, 202:19, 230:18, 230:25, 231:1, 243:18, 253:12, 280:24, 286:16, 307:2
**worker** [1] - 273:10
**works** [21] - 57:4, 97:4, 101:25, 109:21, 116:25, 117:7, 134:22, 134:24, 147:16, 147:18, 168:8, 173:1, 181:19, 181:24, 182:20, 195:9, 208:1, 208:3, 208:4, 215:3, 294:13
**Worldwide** [1] - 62:11
**worried** [1] - 217:4
**worse** [1] - 233:10
**worth** [5] - 287:20, 288:14, 293:24, 297:8, 305:8
**worthless** [1] - 234:17
**write** [6] - 74:19, 158:8, 159:10, 214:20, 243:3, 298:22
**writer** [1] - 120:2
**writing** [5] - 44:17, 45:5, 62:5, 155:15, 173:17
**written** [2] - 5:9, 300:15
**wrongdoing** [1] - 17:10
**wrongful** [1] - 18:6
**wrote** [1] - 161:3

## Y

**year** [12] - 18:2, 62:22, 62:25, 72:6, 76:17, 83:20, 86:5, 86:7, 87:19, 293:25, 305:7, 309:3
**years** [90] - 12:4, 63:23, 64:6, 64:7, 76:8, 87:7, 92:10, 92:11, 93:23, 95:4, 95:19, 96:22, 98:17, 100:10, 101:11, 103:4, 104:12, 105:7, 106:14, 107:13, 109:9, 109:16, 109:25, 110:25, 112:7, 113:21, 115:6, 116:19, 118:13, 119:2, 119:24, 121:19, 121:20, 123:9, 126:18, 128:1, 129:15, 130:19, 131:20, 133:4, 133:5, 134:16, 137:1, 138:8, 139:9, 139:10, 140:12, 141:21, 143:8, 144:18, 146:2, 147:3, 166:3, 167:3, 167:19, 168:19, 169:9, 170:8, 170:22, 171:25, 173:24, 175:15, 177:15, 178:21, 180:9, 181:10,

184:3, 185:18, 187:17, 189:8, 190:20, 191:23, 192:22, 192:23, 193:13, 194:24, 196:7, 197:13, 198:17, 209:23, 211:17, 221:7, 221:10, 243:4, 247:15, 289:22, 300:17, 300:25, 301:21, 308:22
**yesterday** [2] - 11:4, 47:7
**yoga** [1] - 198:10
**Yoga** [2] - 144:3, 144:5
**Yom** [3] - 41:18, 41:19, 90:9
**York** [4] - 113:6, 140:16, 189:10, 221:2
**younger** [2] - 88:17, 112:22
**youngest** [2] - 168:8, 176:3
**yourself** [5] - 65:4, 200:25, 206:13, 215:11, 281:12
**yourselves** [2] - 56:2, 278:5

## Z

**Zayas** [4] - 3:7, 49:17, 51:22, 230:14
**zero** [4] - 17:1, 250:9, 250:20
**zero-zero** [1] - 250:20
**Zimet** [35] - 1:21, 1:22, 3:12, 5:22, 8:5, 9:11, 10:3, 13:16, 16:17, 20:25, 24:25, 26:1, 26:8, 42:18, 50:6, 50:8, 53:1, 150:6, 237:1, 240:6, 248:4, 248:6, 249:22, 258:23, 263:8, 263:25, 264:12, 264:22, 265:12, 266:2, 266:17, 267:3, 267:14, 267:22, 269:8
**ZIMET** [194] - 3:11, 3:17, 3:20, 3:23, 4:4, 4:10, 4:13, 4:18, 4:21, 5:2, 5:6, 5:11, 5:21, 5:23, 6:1, 8:6, 9:12, 10:4, 13:17, 15:10, 16:18, 19:23, 20:6, 20:16, 21:5, 25:1, 26:9, 26:13, 26:16, 27:5, 27:9, 27:18, 27:22, 28:5, 28:8, 28:11, 30:24, 32:4, 32:10, 32:19, 32:25, 33:2, 33:9, 34:21, 34:24, 35:6, 35:16, 35:18, 37:4, 37:7, 37:22, 38:2, 38:12, 39:4, 39:7, 39:11, 39:16, 39:21, 40:10, 40:18, 40:24, 41:12, 41:15, 41:17, 42:19, 43:8, 43:20, 50:7, 53:3, 53:5, 76:12, 79:12, 150:7, 151:14, 151:19, 152:17, 152:19, 153:1, 153:10, 153:15, 153:16, 153:23, 153:24, 154:7, 154:8, 154:15, 154:21, 155:16, 155:18, 156:3, 156:10, 156:16, 156:22, 156:25, 157:15, 157:18, 157:22, 158:11, 158:13, 158:18, 158:19, 158:25, 159:1, 159:9, 159:14, 159:19, 159:20, 159:25, 160:1, 160:11, 160:17, 160:20, 161:4, 161:11, 161:18, 161:25, 162:12, 162:18, 162:21, 162:25, 163:9, 163:11, 163:17, 164:1, 164:13, 164:14, 165:19, 237:2, 248:5, 248:11, 249:23, 250:8, 250:11, 250:22, 251:3, 253:9, 253:14, 253:18, 253:25, 254:2, 255:5, 255:9, 255:17, 256:1, 256:16, 256:18, 257:3, 257:10, 257:16, 257:23, 258:5, 258:17, 258:24, 259:2, 259:5, 259:10, 261:11, 261:17, 261:25, 262:6, 262:11, 262:18, 263:9, 263:11, 263:14, 264:1, 264:13, 264:23, 264:25, 265:13, 266:3, 266:6, 266:18, 267:4, 267:15, 267:23, 268:12, 268:17, 269:9, 269:17, 271:7, 271:11, 271:13, 271:16, 271:19, 271:22, 271:24, 272:1, 272:25, 284:10, 285:5, 285:10, 285:14, 291:22
**Zimet's** [1] - 13:15