UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-205500 Dimitrouleas/Hunt

UNITED STATES OF AMERICA, Fort Lauderdale, Florida

September 19, 2025

vs.

10:05 AM - 5:04 PM

PATRICK BOYD and CHARLES BOYD, Volume III

Defendants. Pages 1 to 263

---

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: Alexander Pogozelski, Esquire
Jacqueline DerOvanesian, Esquire
Assistant United States Attorneys
99 NE 4th Street
Miami, Florida 33132

FOR DEFENDANT PATRICK BOYD: William Barzee, Esquire
Ivlis Mantilla, Esquire
Barzee Flores
40 NW 3rd Street Ph 1
Miami, Florida 33128

FOR DEFENDANT CHARLES BOYD: Bruce Zimet, Esquire
633 S. Federal Highway Fl 6
Fort Lauderdale, Florida 33301

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

# I N D E X


| WITNESS: | PAGE: |
|---|---|
| LISA TRISSELL | |
| DIRECT EXAMINATION BY MR. POGOZELSKI: | 7 |
| CROSS-EXAMINATION BY MR. BARZEE: | 22 |
| CROSS-EXAMINATION BY MR. ZIMET: | 28 |
| REDIRECT EXAMINATION BY MR. POGOZELSKI: | 44 |
| GUSTAVO BORJA | |
| DIRECT EXAMINATION BY MS. DEROVANESIAN: | 53 |
| CROSS-EXAMINATION BY MR. BARZEE: | 75 |
| CROSS-EXAMINATION BY MR. ZIMET: | 84 |
| REDIRECT EXAMINATION BY MS. DEROVANESIAN: | 102 |
| ABIGAIL DIVILIO | |
| DIRECT EXAMINATION BY MR. POGOZELSKI: | 104 |
| VOIR DIRE EXAMINATION BY MR. ZIMET: | 123 |
| DIRECT EXAMINATION (CON'T) BY MR. POGOZELSKI: | 124 |
| VOIR DIRE EXAMINATION BY MR. ZIMET: | 170 |
| DIRECT EXAMINATION (CON'T) BY MR. POGOZELSKI: | 172 |


\- - -

# E X H I B I T S

\- - -


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Government's No. 30 | Pill Bottle | 70 |
| Government's No. 85 | Boulevard T3 | 172 |
| Government's No. 111 | 4/22/20 Email | 157 |
| Government's No. 119 | 7/10/20 Email | 175 |
| Government's No. 124 | 7/10/20 Email AD to CB | 178 |
| Government's No. 127 | 7/20/20 Email | 183 |
| Government's No. 136 | 8/11/20 Email | 187 |
| Government's No. 136A | Spreadsheet | 189 |
| Government's No. 160 | 9/21/20 Email | 197 |

| | | |
|---|---|---|
| Government's No. 173 | Email Divilio to Charles and Patrick Boyd | 201 |
| Government's No. 174 | Email Divilio to Charles and Patrick Boyd | 205 |
| Government's No. 177 | 10/1/20 Email | 215 |
| Government's No. 180 | 10/1/20 Email | 213 |
| Government's No. 181 | Email from Divilio to Kimchi and Charles Boyd | 218 |
| Government's No. 184 | Email from Divilio to Kimchi and Charles Boyd | 226 |
| Government's No. 186 | 10/6/20 Email | 229 |
| Government's No. 187 | 10/12/20 Email | 231 |
| Government's No. 278 | 5/3/21 Email | 148 |
| Government's No. 305 | 6/11/21 Email | 167 |
| Government's No. 418 | 8/17/20 Teams Message | 144 |
| Government's No. 421 | 9/1/20 Teams Message | 193 |
| Government's No. 425 | 9/10/20 Teams Message | 195 |
| Government's No. 429 | Teams Patrick Boyd and Divilio | 198 |
| Government's No. 435 | 10/1/20 Teams Message | 209 |
| Government's No. 436A | Document | 221 |
| Government's No. 437 | 10/2/20 Teams Message | 222 |
| Government's No. 440 | Teams messages between Divilio and Charles Boyd | 227 |
| Government's No. 461 | 6/11/21 Teams Message | 138 |
| Government's No. 471 | Document | 162 |
| Government's No. 472 | Document | 184 |
| Government's No. 514 | 8/17/20 Text | 142 |
| Government's No. 516 | 8/26/20 Text | 191 |

| | | |
|---|---|---|
| Government's No. 533 | 7/24/20 Facebook Message | 21 |
| Government's No. 631 | 4/22/24 Borja Interview | 63 |
| Government's No. 639 | Document | 124 |
| Government's No. 640 | Photographs of Gentek LLC | 132 |
| Government's No. 651 | Photograph | 13 |

(Call to the Order of the Court.)

THE COURT: We are back on the record. Counsel are present. Both defendants are present. I think we're waiting for one juror.

Anything to come before the Court while we wait?

MR. POGOZELSKI: Nothing from the Government, Your Honor.

MR. ZIMET: No, sir.

MR. BARZEE: No, sir.

THE COURT: Who is the next witness for the Government?

MR. POGOZELSKI: Lisa Trissell.

(Pause in proceeding.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Judge.

MR. ZIMET: Yes, Judge.

MR. BARZEE: Yes, sir.

THE COURT: Did you follow my instruction not to discuss the case or allow it to be discussed in your presence?

All right. The Government may call its next witness.

MR. POGOZELSKI: The Government calls Lisa Trissell.

///

///

///

Thereupon,

LISA TRISSELL,

having been first duly sworn or affirmed, was examined and testified as follows:

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please have a seat. If you could speak directly into the microphone, state your name and spell it for the court reporter.

THE WITNESS: Dr. Lisa Trissell, T-R-I-S-S-E-L.

DIRECT EXAMINATION

BY MR. POGOZELSKI:

Q. Good morning, Ms. Trissell.

A. Good morning.

Q. Ms. Trissell, are you here voluntarily?

A. No.

Q. Why are you here?

A. I have a court subpoena to be here.

Q. Do you want to be here?

A. No.

Q. Okay. Ms. Trissell, where are you from?

A. Cambridge, Maryland.

Q. Can you tell us a little bit about your educational background?

A. Sure. I was born in Salisbury, Maryland. I graduated high school there. I went to East Carolina University in

North Carolina for my undergrad, got my bachelor's of science in chemistry, and then went to the University of Maryland, Baltimore, for school of pharmacy, to get my doctor of pharmacy degree.

Q. And did you become a board-certified pharmacist after that?

A. Yes.

Q. Can you give us a brief overview of your work history after graduating from UMD Baltimore?

A. I first went to work for CVS Pharmacy. I was promoted to district manager and didn't like the stress of the district manager; so I transferred to a different CVS location in a Target.

I left there and went to another independent in Cambridge, Maryland, where I live, Craig's Drug Store and then decided to open my own pharmacy, Clayton's Pharmacy.

Q. And around when did you open Clayton's Pharmacy?

A. At the end of 2020 -- or 2010.

Q. And was that in Cambridge, Maryland?

A. Yes.

Q. Fair to say you're familiar with the pharmacy business?

A. Yes.

Q. How long did you own and operate Clayton's Pharmacy?

A. For 13 years.

Q. And what kind of pharmacy was Clayton's Pharmacy?

A. Just an open-door retail pharmacy where people get their

prescriptions filled from their providers. We had an over-the-counter area. We sold, you know, typical pharmacy stuff: deodorants, shampoos, over-the-counter medication, certain steroid creams -- things like that -- Tylenol.

Q. And did Clayton's -- did your pharmacy, Clayton's Pharmacy, dispense prescription drugs as well?

A. Yes.

Q. What kinds -- I know it was a 13-year period, but what kinds of prescription drugs?

A. I mean, everything. Blood pressure, cholesterol, diabetes, HIV, migraines meds -- pretty much anything that is on the market.

Q. And at some point in time, did you begin dispensing more HIV medications?

A. Yes. In 2014, we started working with our local health department to do the blister packaging medication compliance stuff for our HIV patients in our town to help increase compliance.

Q. And Dorchester County, is that -- how does that -- do you know how that ranks in terms of HIV positive rates?

A. Back then, in 2014, it was the third highest county in the state of Maryland after Baltimore City and Baltimore County.

Q. Did you have a lot of -- relatively a lot of HIV patients?

A. Yes. For our small town, it's a very large population.

Q. And what were the most common HIV drugs that you dispensed?

A. Biktarvy, Descovy, Truvada, Tivicay, Odefsey, Symtuza.
Q. And were some of those Gilead medications?
A. Yes.
Q. And were some manufactured by other drug manufacturers?
A. Yes, a few of them were.
Q. Janssen?
A. Janssen. I think Merck is one.
Q. ViiV?
A. ViiV.
Q. Okay. Where did you purchase these HIV drugs from?
A. Cardinal Health, who was my primary wholesaler.
Q. Was Cardinal Health an authorized distributor of these branded HIV medications?
A. Yes, sir.
Q. Did you purchase these HIV drugs from any other wholesale distributors?
A. No. We had a -- my buying group, which is where I had my insurance contracts and set up my drug pricing contracts, had their own warehouse where they worked with Cardinal to ship them to me, but they were still directly billed and shipped through Cardinal Health.
Q. Was there a wholesaler named "Masters" that ever tried to offer you HIV drugs?
A. They didn't offer us HIV drugs, but they did reach out to us to purchase things in the past.

Q. Generally speaking, what was Cardinal's pricing -- and let's talk about the time period, say, 2020. What was Cardinal's pricing for HIV drugs like Biktarvy?
A. A little over $3,300, I believe.
Q. And was there any way that you were able to get rebates from Cardinal Health?
A. We got rebates in general -- if we purchased over a certain percentage of our whole purchasing engineered pricing, then we would get a rebate but not for specific drugs.
Q. Got it.
And for the average HIV patient who came to your pharmacy, did they fill a lot of prescriptions?
A. Yes. Most HIV patients have multiple conditions and take preventative meds for other things since their immune system is lower.
Q. And if you had to ballpark -- I know it's been a little while, but ballpark how many prescriptions on average?
A. I would say 12 to 20, depending on the patient.
Q. Okay. And how long did you operate Clayton's Pharmacy?
A. 13 years.
Q. Throughout that time period, did you only purchase branded HIV drugs from Cardinal?
A. Yes.
Q. Throughout that 13 years or so, did you ever receive a complaint that an HIV bottle supplied by Cardinal had the wrong

drugs in it?
A. No, sir.
Q. Did you ever receive bottles of HIV drugs from Cardinal that the bottles themselves looked dirty?
A. No, sir.
Q. Scratched labels?
A. No. We actually had a policy with Cardinal if there was a medication that I couldn't use, to send it back. If it had any damage to the label or bottle, we were not allowed to return it.
Q. Did you ever receive bottles from Cardinal that there was a complaint that they weren't sealed? HIV drugs?
A. No, sir.
Q. Broken pills inside?
A. No.
Q. Any bottles you received from Cardinal that looked like they had been previously dispensed?
A. No, sir.
Q. Did you receive T3s or pedigrees from Cardinal?
A. We had access to them online at any time.
Q. Did you ever see a Cardinal T3 or pedigree that didn't make sense to you?
A. No, sir.
MR. POGOZELSKI: If we could pull up, just for the witness, Government's Exhibit 651.

BY MR. POGOZELSKI:
Q. Ms. Trissell, do you recognize this photo?
A. Yes.
Q. Is this a photo from your pharmacy?
A. It's -- yes.
Q. Okay.
MR. POGOZELSKI: The Government moves to introduce Government's Exhibit 651.
MR. ZIMET: We have no objection, Judge.
MR. BARZEE: No objection.
THE COURT: 651 will be received.
(Government's No. 651, Photograph, was received in Evidence.)
MR. POGOZELSKI: Permission to publish to the jury, Your Honor?
THE COURT: All right.
MR. POGOZELSKI: Thank you.
BY MR. POGOZELSKI:
Q. Ms. Trissell, what's in this photo? What's depicted in this photo?
A. These are the totes that we received our Cardinal orders in every day. You can see the little holes on the ends. They had sealed twist ties with serial numbers so we can make sure they matched what Cardinal warehouse sent so they hadn't been tampered with when we received them.

MR. POGOZELSKI: Okay. And if we could pull up -- we can take that down.

If we could pull up what's already in evidence as Government's Exhibit 183, page 8.

BY MR. POGOZELSKI:

Q. Ms. Trissell, did Cardinal ever send you HIV drugs like that?

A. No, sir.

Q. If it had, would you have been concerned?

A. Yes.

Q. Would you have accepted them?

MR. ZIMET: Objection, Judge. It's hypothetical. No foundation.

THE COURT: Overruled.

BY MR. POGOZELSKI:

Q. If Cardinal had shipped you drugs in that condition, would you have accepted them?

A. No, sir.

Q. Why not?

A. Because they would have had them separated like that, with plastic bags, and not -- without the patient insert attached with the glue that they're missing.

Q. In your pharmacy, while you operated Clayton's Pharmacy, did you generally Instacare a lot of extra stock of HIV medications?

A. No, sir. Because of the cost, we only ordered them as needed. So we would usually order up to that next week's worth of what we would need for the patients for the blister packs that were coming up.
Q. And were any of your HIV patients self-pay patients?
A. No, sir. There's so many programs out there. If they didn't have insurance, there were programs through the health program and Gilead themselves that would help them pay for their medications.
Q. And you had mentioned "insurances."
Did a lot of HIV patients use their insurance to get their HIV drugs?
A. Yeah, most everybody had insurance.
Q. And what kinds of insurances?
A. Commercial insurance, the state Medicaid medical assistance program and Medicare.
Q. So commercial, like Blue Cross Blue Shield?
A. CareFirst, yeah.
Q. Did you ever have any patient pay 3,300 or $3,000 out-of-pocket?
A. No, sir.
Q. Did you ever sell any bottles of HIV medication to wholesalers?
A. No, sir.
Q. Ms. Trissell, are you familiar with the defendants in this

case, Charles Boyd and Patrick Boyd?
A. Yes, sir.
Q. And do you see them here in the courtroom?
A. Yes.
Q. Could you identify, just by an article of clothing or where they're seated?
A. Charlie and Pat.
MR. ZIMET: We'll stipulate to the identification.
MR. POGOZELSKI: Okay.
THE COURT: The record will so reflect.
BY MR. POGOZELSKI:
Q. How do you know these two defendants, Patrick Boyd and Charles Boyd?
A. My ex-husband -- well, he has a crab processing plant in our town, and he used their facility to ship his crab meat overnight through FedEx through their facility, so I met them through him. And then they had invited us to a Fourth of July party for their employees at some point in 2015 and then like a waterfall party at one of their homes later that year.
Q. Did Charles Boyd ever contact you about opening his own pharmacy?
A. Yes, sir.
Q. Can you tell us about that?
A. They just reached out. They were trying to open their own retail pharmacy. I think they were trying to do a closed-door

pharmacy, which is more like mail order, not open door; and so they consulted with me since I had my pharmacy to help with the software to use and the -- how to get the insurance contracts and things like that to get it going.
Q. And at some point in time, did you -- did the defendants transition into a different line of business?
A. Yeah. It was doing -- they tried -- that's when they transferred into the wholesale market when they couldn't get the pharmacy started.
Q. And I'm sorry. I had a little bit of difficulty hearing you.
What was the business that they started later?
A. Wholesale pharmacy distribution.
Q. Okay. Wholesale distributor of pharmaceutical drugs?
A. Yes.
Q. And where was Safe Chain Solutions located?
A. In Cambridge, Maryland, where my pharmacy was.
Q. Was there a time when sales reps from Safe Chain came to your pharmacy to pitch HIV drugs?
A. Yes. Originally at first, they just came with generic drugs to try to get me to purchase those, and then later, it was HIV meds.
Q. And around -- do you remember, like around, roughly around when the sales reps came to pitch you on HIV drugs?
A. Around 2020 would be my best guess.

Q. COVID sound right?
A. Yeah.
Q. Okay. And what was the sales reps' pitch for the HIV drugs from Safe Chain?
MR. ZIMET: Objection as to hearsay, Judge.
THE COURT: Sustained.
BY MR. POGOZELSKI:
Q. Did they try to sell you these HIV drugs?
A. Yes, sir.
Q. Okay. And what was the pricing offered?
MR. ZIMET: Objection, Judge. That's hearsay, too. Those are the statements, also.
THE COURT: Sustained.
BY MR. POGOZELSKI:
Q. Did you buy HIV drugs from the defendant's company?
A. No, I did not.
Q. Why not?
A. One, I had asked if they had the VAWD crediting, which is --
MR. ZIMET: Judge, I'm going to object as to the line of questioning because it's soliciting a hearsay answer as part of it.
MR. POGOZELSKI: Your Honor.
MR. ZIMET: It's subsumed in the question itself.
THE COURT: I think she can answer why she didn't buy

it. Go ahead.

A. They didn't have the VAWD crediting, which was not necessarily required in general but some of our insurance contracts required it and some boards of pharmacy required it to prove the safe -- the safe medication was safe and it followed the right procedures. They said that the Kentucky facility had the VAWD --

MR. ZIMET: Objection, Judge. This is hearsay: "They said."

THE COURT: Sustained.

MR. POGOZELSKI: Judge, she's just continuing to explain why she didn't buy from them.

THE COURT: If she's relaying what was said to her, I'm not going to allow that.

BY MR. POGOZELSKI:

Q. Okay. Without repeating what they said to you, why didn't you buy HIV -- why didn't you take those sales reps up on the offer of purchasing HIV drugs from the company?

A. The VAWD crediting was through their Kentucky facility, but the -- they were saying that I could get the drugs same day to my pharmacy because it was in Cambridge, so I need them for a patient. So I didn't understand how drugs could be processed from Cambridge to Kentucky and back to Cambridge in the same day to go through the VAWD crediting facility.

Q. And was pricing a factor in your decision not to purchase

from Safe Chain?
A. With the HIV drugs, yes.
Q. Why was that?
A. Just the standard of brand name medications is, there's only one company that makes it, so they have kind of a -- they can make the price what they want.
It's not like a generic company or generic drug that has 20 manufacturers where they can compete for the pricing; so there's not a whole lot of fluctuation in what the price is compared to the average wholesale cost.
So the fact it was that much cheaper from a small company in Cambridge versus Cardinal Health, that's the one of the top three in the United States, didn't make sense to me.
Q. Why didn't it make sense?
A. Just because there's a standard of brand pricing and Cardinal is such a big company. They buy in bulk for so many pharmacies compared to a little guy. I don't know how they would get that ability to have such a lower price than Cardinal Health.
Q. I think you may have said Cardinal buys -- maybe I misheard -- buys in bulk from pharmacies?
A. They distribute to so many pharmacies --
Q. They distribute --
A. -- they can purchase -- have more purchasing ability, I guess.

Q. Got it.

Was the pricing Safe Chain, the defendant's company, offered a red flag to you?

A. Yes, sir.

MR. ZIMET: Objection, Judge, as to leading.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Did Charles Boyd at some point directly reach out to you about buying HIV drugs from his company?

A. Yes, sir.

MR. POGOZELSKI: If we could show just the witness Government's Exhibit 533.

BY MR. POGOZELSKI:

Q. Is this document Charles Boyd reaching out to you?

A. Yes, sir.

Q. All right.

MR. POGOZELSKI: The Government moves into evidence Government Exhibit 533.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 533 will be received.

(Government's No. 533, 7/24/20 Facebook Message, was received in Evidence.)

MR. POGOZELSKI: Permission to publish, Your Honor?

THE COURT: All right.

MR. POGOZELSKI: Thank you.
BY MR. POGOZELSKI:
Q. What is Charles Boyd -- actually, first, I will start with what is the date of this message here?
A. July 24th, 2020.
Q. And was this generally around the time that the sales reps had been approaching your pharmacy?
A. Yes.
Q. Did those sales reps approach you about selling HIV drugs at least a few times?
A. Yes. Just a couple of times. They would come in every -- on average three to four months trying to get our business.
Q. All right. And what is Charles Boyd writing to you here?
A. "Hey, there. Are you still doing a lot of HIV? If so, we should talk. We have just contracted with a supplier that you might want to consider."
Q. Did you respond to that message?
A. I did not.
MR. POGOZELSKI: One moment, Your Honor. Nothing further.
THE COURT: Mr. Barzee.

CROSS-EXAMINATION

BY MR. BARZEE:
Q. Thank you for being here.
A. Thanks.

Q. We know you don't want to be here, and we appreciate it.
A. Thank you.
Q. Thank you.
I just want to talk to you about VAWD for a moment, if I may.
Can you tell us what that stands for?
A. Verified-Accredited Wholesale Distributors.
Q. Right. And I think what you said is -- and I don't want to put words in your mouth. Tell me why is it that you needed that kind of accreditation.
A. It's not necessarily that it's needed in general, but some of our PMBs, the pharmacy benefit managers that you make your insurance contracts with require it for your drug purchasing and some state boards of pharmacy require it to be licensed in their state.
Q. Right.
But it's not required for everybody to be part of that in order to wholesale pharmaceuticals?
A. No, sir.
Q. That accreditation, this VAWD accreditation, that's done through the National Association of Boards of Pharmacy; correct?
A. Yes.
Q. So that's part of that whole, sort of, pharmaceuticals system that we have in the United States; correct?

A. Uh-huh.
Q. And they're the ones that kind of control all of the pharmacies and the flow of the medications from the manufacturers to ultimately the patients; correct?
A. So the National Association of Boards of Pharmacy is more for, like, the safe practices of pharmacy, not necessarily, like, the wholesalers and all the rules and stuff that they make, but yes.
Q. Right. It's independent.
A. Yes.
Q. Okay. And as it turned out, Safe Chain at that time was not a member of VAWD; correct?
A. Correct.
Q. And the Government asked you a question about people coming in and paying for the HIV medicines. And it, kind of, sounds like anybody can just go get the medicine, pretty much for free, because of all of the insurance programs and Medicaid and all these different groups.
Is that impression that I got correct?
A. It wasn't free. They had co-pays they still paid. They just didn't pay the $3,300.
Q. Right. So who's paying the $3,300? If Gilead is charging $3,300 and none of the patients are paying $3,300, how is Gilead getting $3,300 a bottle?
A. Well, we're -- the pharmacies are paying Cardinal Health,

who pays Gilead to get the medication, and the insurances pay us when we dispense it to the patient.

Q. So you get reimbursed by the insurance company. Gilead gets paid by you; right?

A. They get paid by Cardinal, and I pay Cardinal.

Q. I mean, by Cardinal -- Cardinal pays Gilead; so who is out the money?

A. Well, nowadays, it's the pharmacy but -- because they have changed the way insurance works, there's negative reimbursements on most medications.

Q. Right.

But back then, it would have been the insurance companies; right?

A. The insurance company is who is ultimately paying for it; correct.

Q. Right.

And then the insurance company charges consumers a premium to have that insurance; correct?

A. Yes, unless they have medical assistance.

Q. So putting aside the medical assistance, just for the insurance purposes, so that everybody who has insurance is subsidizing these payments in some way to Gilead -- correct? -- ultimately?

A. Indirectly. That's how insurance works.

Q. Right.

And when you talk about Medicaid or these different programs where people could go to get the medicine, those government programs are all subsidized by taxpayers; right?

MR. POGOZELSKI: Objection, Your Honor.

THE COURT: Overruled.

A. Could you repeat that?

BY MR. BARZEE:

Q. Those programs, like Medicaid -- that's subsidized by taxpayers?

A. Correct.

Q. In those cases, it's the taxpayers that are paying for the $3,300 a bottle; correct?

A. For any medication, yes.

Q. So it's not like the patients aren't -- it's not like we aren't all subsidizing this whole system. We are -- correct? -- in one way or another?

A. Yes.

Q. And so Gilead -- if Gilead wants to charge $3,300, the system allows Gilead to charge that premium and the people that end up paying it are the people that have to buy insurance or taxpayers; right?

A. Yes.

Q. Now, the Government showed you a photo of two beautiful boxes, a beautiful blue box and a beautiful red box, and those are boxes that Cardinal Health uses to transport their

medicines; correct?
A. Yes.
Q. And Cardinal Health is one of the big three distributors of Gilead's medications; correct?
A. Yes.
Q. And it's a multibillion-dollar company in this industry; correct?
A. Correct.
Q. They have their own vans. They have their own boxes. They have thousands of employees around the United States handling all of this distribution; correct?
A. The actual people that deliver the medications for us, it's their own vehicles. They're not owned by Cardinal. They're responsible for themselves and they're subcontracted to deliver through another company.
Q. So Cardinal subcontracts with other companies to deliver everything to everyone?
A. Yes.
Q. And they're sort of the five-star luxury service as far as delivering this medication is concerned. I mean, you don't get medicine -- you don't get boxes nicer than those from anyone else, do you?
A. No, sir. But I also use other secondary wholesalers for generic medications that weren't HIV meds or brand-name medications and they still didn't come like that.

Q. It didn't come like the box you saw in the second photo you're talking about?
A. It came with the box, but the medications inside didn't look like that.
Q. And you also received things through -- maybe not your pharmacy, but you're aware that common carriers are used to deliver things to pharmacies; correct?
A. Yes, I got shipments from FedEx and UPS from other secondary wholesalers; correct.
MR. BARZEE: Thank you.
Nothing further.
THE COURT: Mr. Zimet.
MR. ZIMET: Thank you, Judge.
If we could put 533 up.

CROSS-EXAMINATION

BY MR. ZIMET:
Q. 533, at the top it talks about from Charles Boyd; right? And it has some numbers, and then it says at Facebook Messenger?
A. Yes, sir.
Q. Underneath it says to Lisa Marie Trissell at some numbers at Facebook Messenger?
A. Yes, sir.
Q. You guys -- Charlie and you were on Facebook together?
A. Yes, sir.

Q. Been there for a while?
A. Yes.
Q. Still on Facebook with him?
A. Yes.
Q. And you were able to communicate with him any time you wanted to; correct?
A. Uh-huh.
Q. "Yes?"
You have to answer "yes."
A. Yes.
Q. Sorry.
And the inquiry that Charlie made to you was something that you looked at and decided that you were not interested in; correct?
A. Yes.
Q. And the decision not to engage Safe Chain -- you discussed it in your direct examination. One of the reasons that you gave was because you had these contracts with Cardinal; is that correct?
A. Correct.
Q. And that, from an overall business standpoint, was something that you thought was in your pharmacy's best interest; is that correct?
A. Yes.
Q. What are some of the benefits that Cardinal would provide

to your business?
A. Well, we got Monday through Friday delivery of the medications. We had billing that was 15 days out. We could return medications within a three-month time period if we aren't able to use them and we hadn't opened them or damaged them.
Q. And to have that contract, Cardinal wanted something in return from your pharmacy. Would that be correct to say?
A. Part of the contract is we had to purchase a certain amount of generics.
Q. And would that relate to HIV medications?
A. Indirectly. The contract was to have a certain percentage of generic to our brand. So we had to make sure that for every $3,300 bottle of Gilead med, we had to purchase $33 worth of -- or $330 worth of generics at the same time.
Q. So in addition to the VAWD issue, there's also a contractual issue with Cardinal as far as not wanting to engage in purchasing HIV potential drugs from Safe Chain; fair to say?
A. Yes, but that's what I did. I had secondary wholesalers that I purchased from on a daily basis, as well.
Q. HIV drugs?
A. No.
Q. So that's -- the question was HIV drugs.
A. Then no.
Q. So you talked -- and I don't want to be too repetitive, but

I want to go back to the issue of "authorized distributors." You used that term in your direct examination; correct?
A. Yes.
Q. "Authorized distributor" does not mean that it's authorized by some government agency; is that correct?
A. Correct.
Q. "Authorized distributor" means that the manufacturer is authorizing some company to be a distributor; is that correct?
A. Yes.
Q. It's a term of art, if you will, that's created by a manufacturer; correct?
A. Well, created by a manufacturer, but the words of pharmacy and stuff follow it for safety and for patients.
Q. For whatever reason, Gilead had said some -- certain companies should be authorized distributors; correct?
A. Yes.
Q. They make the determination.
So for instance, let's say that one of the authorized distributors distributes a product that doesn't have the product inside of the bottle, doesn't have all the product that it should. Is that a problem for the authorized distributor?
A. Yes.
Q. And they go and have to go back to the manufacturer and tell them that something happened; is that correct?
A. Correct.

Q. Now, in the HIV world, do you know whether that happened with Gilead?
A. Not as far as I witnessed.
Q. Well, Gilead didn't tell you that; correct?
A. I'm sorry?
Q. Gilead didn't tell you --
MR. POGOZELSKI: Objection, Your Honor. She just said she didn't know about any of this.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Have you heard anything from Gilead at any point --
MR. POGOZELSKI: Same question. Objection, Your Honor. And it's hearsay.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So from a standpoint of the safety of Gilead products, is there something in the system where, if there is a problem, Gilead should be sending out some type of notification to you?
A. Yes. There's recalls all the time for medications.
Q. Other than recalls, is there notification that you should be on the lookout for certain types of things that might be problematic with a product from the manufacturer?
A. Anytime that they -- a manufacturer finds a problem like that, even if it's like something wrong with the pill, a different whatever, they'll do a recall no matter what.

Q. That's what they should do at least?
A. Yes.
Q. That's what they should do?
A. Yes.
Q. Now, whether they do what they should do is another question; correct?
A. I mean -- yes. What I receive is the recall itself.
Q. Now, you talked about the relationship between the authorized -- between the manufacturer and the authorized distributor, and you were sort of hesitating for a couple minutes to describe what that was.
A. Because that's not my area of expertise. Like, I know how the supply chain works, but my direct interaction was with the wholesaler themselves.
Q. Totally understand, but let me see if I can help you with the word. Were you thinking of the word "monopoly" from that perspective?
A. Well, no. I feel like there's a reason brand medications are able to charge the price they make. They're the ones that do the years of research to get the product on the market; so they allow them a patent to be able to make that money back and recoup it before it goes generic for other companies to make money off of it. So that it's -- they're able to do further research to come out with new drugs later.
Q. And certainly they're allowed to ask for any amount of

money they want to ask for; correct?
A. Correct.
Q. But what they say the authorized distributor should get, that's what the -- excuse me, should pay for the drugs, that's what's called "WAC"?
A. Yes.
Q. Isn't that correct?
A. Yes.
Q. That's wholesale acquisition cost; isn't that right?
A. Yes.
Q. And that's what the outside world views as the amount of money the authorized distributor is paying to the manufacturer; correct?
A. Yes.
Q. In fact, that's not the actual cost that the authorized distributor is paying; isn't that correct?
A. Yes.
Q. If someone is looking -- someone just says this is the price of this drug and they're using the WAC number, that is not necessarily the correct number; is that right?
A. It's an average. It's not -- not a required price, yes, correct.
Q. Well, it's not a real price, is it?
MR. POGOZELSKI: Objection, Your Honor.
THE COURT: Overruled.

BY MR. ZIMET:
Q. You can answer.
A. So I don't know what a "real price" is.
Q. Well, let's agree on the definition of "real price" is an actual amount of money that's paid for a particular drug?
A. No, they don't always match.
Q. In fact, the WAC is always higher than the real number; isn't that correct?
A. I'm not -- I'm honestly not sure.
Q. You don't need to be an actuary to answer the question, ma'am.
The WAC number is higher than what's actually paid for for the drug; is that correct?
A. I don't know the answer to that question.
Q. We know that there are rebates --
MR. POGOZELSKI: Objection.
MR. ZIMET: Can I finish the question, please?
THE COURT: Go ahead.
BY MR. ZIMET:
Q. You know that the WAC -- excuse me.
You know that the WAC number is subject to relationships between the manufacturer and the authorized distributors, including rebates; isn't that correct?
A. They can, yes.
Q. And if rebates are paid because for a particular purchase,

that would lower the amount of money that was actually being paid for that drug; isn't that correct?
A. Yes. If there's a rebate, then yes.
Q. And that rebate number is not disclosed to you by your authorized distributor; is that correct?
A. Correct.
Q. So Cardinal tells you this is the WAC number. Let's say it's $3,300. We'll agree on that number as a WAC number for Cardinal.
If Cardinal is getting a rebate or getting other discounts or other credits that lowers the actual amount of money they've paid for that drug, they're not disclosing that to a pharmacy like you; is that correct?
A. Correct.
Q. So you are assuming, based on the WAC number, that's the number they paid, even though it may not be the accurate number; correct?
A. I mean, it's not -- yeah, we don't know what they actually paid, but that's how they make their money also.
There's always a markup on even the generics, I mean.
Q. And so when you decide what price you're going to charge, you have to do the finances, the business judgment of knowing how much the authorized distributor is charging you; correct?
A. By "authorized" you mean -- so like Cardinal Health?
Q. Cardinal is selling to you.

A. Yes.
Q. They are the authorized distributor?
A. Yes. So I base it off what I'm paying for it, that's correct.
Q. And you would expect you would have to pay a number based on WAC; isn't that correct?
A. Yes. But in real-life pharmacy times where that WAC was like a random number, we usually didn't use that in any of our calculations. That's why I didn't know the answer to your earlier question.
It's always there, but it's not something that we really focused on or used when we did our pricing or purchasing.
Q. Well, it's a number that the authorized distributor tells you it's going to cost you; isn't that correct?
A. Right. But it's not anything that we ever -- we ever focus on.
Q. Well, you focus on how much you have to pay out of your pharmacy; don't you?
A. Right. Which is what I pay to Cardinal Health.
Q. And that number has a relationship to WAC; does it not?
A. Yes, it has a relationship, but I'm saying we never focused on it.
Q. Whether you focused or not, the number does have a relationship to WAC; correct?
A. Yes. It has a relationship, yes.

Q. Now, the relationship is usually what you're supposed to pay is higher than the WAC number; isn't that correct?
A. Yes.
Q. So the WAC number predetermines how much the pharmacy is charging for that drug; isn't that correct?
A. Yes.
Q. And that then affects how much insurance companies are going to pay your -- the pharmacy for the drug. I mean, you're in business to make money, not to lose money, at least back then you weren't. Right?
A. Yes. But insurance contract prices aren't on WAC, it's on AWP.
Q. And that definition is what?
A. "Average wholesale price."
Q. And that's some kind of other formula that is created to allow insurance companies to pay a lot of money when they might not necessarily have to; is that correct?
A. Yes. I was just clarifying that's how they make their insurance contracts.
Q. And that's also government agencies that are paying pharmacies; isn't that correct?
A. Yes.
Q. That's an elevated number also relating to WAC; isn't that correct?
A. I don't know if it's elevated, but it's another number they

calculate.
Q. So the $3,300 that you mentioned in your direct examination, where that number would be -- what you said the number was for Biktarvy back then?
A. Yes.
Q. That would be the amount of money that you charged a patient for that product?
A. So we had a -- our system had a calculation for a percentage over it based on the cost of the medication and that is what we would bill to the insurance so that whatever our contract price was would fit in those guidelines and we would be paid for it.
Q. And you say "cost of that," that would be the WAC cost; is that correct?
A. We -- our system was set up to put in what we actually paid Cardinal.
Q. And that number was arrived at including the WAC cost; isn't that correct?
A. Yes. I was just saying it was not that exact number. It was the Cardinal number.
Q. Understood.
So, at the end of the day, whatever the WAC number, has an effect all the way down the chain all the way to the pharmacy? All the way to the patient? All the way to the insurance company? All the way to whoever is funding the insurance

company or the public agency that's paying? Is that correct?
A. Yes.
Q. Now, you talked about -- you were asked about pedigrees, and your answer was "We had the ability to go on to the portal," I think you said?
A. We had access to it, yes.
Q. You had access to the portal to look at a pedigree; is that correct?
A. Yes.
Q. And that is because the way it works, in the real-world pharmacy world, is that the T3 or the pedigree is placed on to the portal, on to the website, if you will, when the authorized distributor, in your case, were into HIV drugs, would put it on there when they send the HIV drugs to you; is that correct?
A. Yes.
Q. Now, whether or not you looked at the T3 or not, that's your call; is that correct?
A. Yes. We would if we felt like we had some -- an issue with the bottle or something like that to verify it.
Q. But in the ordinary course of business and transactions, you would not look on to the portal, on to the website to see what the T3 said because it came from Cardinal; is that right?
A. Yes. We didn't look at our secondary wholesaler unless we felt like there was something off.
Q. If there was an issue?

A. Yes.
Q. But ordinarily T3s are required from the partner ahead of you to put it on to the portal to describe what the path of drug has been from the manufacturer up to that stage; is that correct?
A. Yes.
Q. And the decision whether a pharmacy looks at it or not, or anyone looks at it, is dependent upon factors that they take into account; correct?
A. Yes.
Q. Now, from the standpoint of what's put on to the portal and when it's put on to the portal, is it your understanding that the T3s are physically attached to the delivery of the drugs?
In other words, is there -- and in one of those fancy red or blue containers, are there T3s inside of that container?
A. There's invoices with every drug in the NEC on it, so that we can go back to the online to match them up to find the T3s pedigree if we needed to.
Q. So my question is --
A. The pedigree is not included, no.
Q. Are there T3s inside of the boxes that you're getting from Cardinal with the drugs?
A. No.
Q. So there's no requirement that they be physically attached to the drugs themselves; correct?

A. No, you have to be able to have access to them.
Q. And that's something that you have some kind of a relationship with Cardinal to be able to do that; is that correct?
A. With any wholesaler, yes.
Q. How frequently do you go to the portal? If I'm misstating "portal," I apologize.
A. That's fine.
Q. I'm not too good at this stuff.
How often do you go to it relating to the HIV drugs that are coming, for instance, from Cardinal?
A. Very rarely. Because we really didn't ever have any issues with the product.
Q. And for some reason there's not a T3 that's in the portal, what you do is reach out to McKesson and say, "What's going on? We need that to be in there so we can look at it and it needs to be part of this transaction"; is that correct?
A. Cardinal, not McKesson, is the answer.
Q. Cardinal. I'm sorry; is that right?
A. Uh-huh.
Q. You used the term "PBM"; is that right?
A. Yes.
Q. And "PBM," those initials stand for what?
A. Pharmacy benefit manager.
Q. And they basically are involved in contracts, as far as

what pricing should be, also; is that correct?
A. They're the middleman between us and the insurance companies.
Q. And so they can dictate how much needs to be paid for a particular drug; is that correct?
A. Yes.
Q. So they can say, "Listen, you have to pay $3,400, for instance, for this bottle of Biktarvy"; correct?
A. They don't make the pricing to Cardinal. They decide how much the insurance company reimburses them.
Q. How much the insurance is going to pay to you?
A. Yes, but not how much the drug cost me.
Q. Correct. And that, in effect, has an effect upon what you can charge because you are looking at how much you are going to get from insurance; correct?
A. So we -- well, yes. We don't get to decide what we charge.
We have a contract ahead of time which isn't a specific drug. It's the average wholesale price, minus 9 percent or minus whatever that insurance contract is. So every day, whatever that average wholesale price is, that's what our contract comes out to be.
So it doesn't fluctuate as often as the cost of the drug to make.
Q. Of course. But they have an effect ultimately on how much you are paid from insurance for that drug; is that correct?

A. Correct.
Q. And what criteria do they use, if you know, for how much insurance should be actually paying?
A. I don't know. That's the whole problem with insurance companies now.
Q. Well, we could spend a couple of hours on that.
And we all understand that that is one of the reasons prices are so high; is that correct?
A. Correct.
Q. That goes back to what the manufacturers are charging to begin with, whether it's justified or not justified; is that correct?
A. Correct.
MR. ZIMET: Thank you, ma'am.
THE COURT: Redirect.
MR. POGOZELSKI: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. POGOZELSKI:
Q. Ms. Trissell, just a few questions. They might be a little scattershot given the different nature of the defendants' lawyer's questions.
I believe Mr. Barzee was talking about -- or Mr. Zimet -- they were talking about a recall, a manufacturer recall?
A. Yes.
Q. Do you remember that line of questioning?

A. Uh-huh.
Q. Underlying that questioning is the assumption that it would be a manufacturing issue for them to issue a recall?
A. Yes. The manufacturer themselves would issue the recall if they had a problem with their product.
Q. In their manufacturing facilities?
A. Correct.
Q. And could there be problems with secondary wholesalers selling HIV drugs that have nothing to do with the manufacturing?
A. Yeah. I mean, if the product had been tampered with after it left the manufacturing facility, they wouldn't have been aware that there was an issue with the product to send out a recall.
Q. And who is "they"?
A. Whoever the manufacturing is, Gilead or whoever manufactured the medication.
Q. Right. And the lawyers representing these defendants here asked -- or mentioned Gilead multiple, multiple times. Who were the other manufacturers whose HIV drugs you purchased at Clayton's?
A. Janssen, Merck, ViiV. Some of them were generic. Some were market so I -- I don't even know, Lupin. And some -- whoever made the generic ones. I'm not sure who they -- all of the manufacturers' names.

Q. And for the manufacturers -- I think one was Janssen. You mentioned ViiV. Did they have their own authorized distributors?
A. Yes, every manufacturer does.
Q. So that wasn't unique to Gilead?
A. No.
Q. And then there were some questions about VAWD standards and reimbursement. The VAWD standards, do they relate to patient safety?
A. Yes, patient safety and the integrity of the pharmacy dispensing.
Q. And as a former pharmacy owner, was that important too?
A. It was to me. That's why I went into pharmacy, was to help people.
Q. Was it particularly important when it came to HIV drugs?
A. Yes.
Q. Why?
A. It just means its -- their whole viral load depends on compliance. Missing one pill a month can change the levels of their viral load and start, you know, all the other infections they can get. And compliance is a huge issue, which is why I did the dispel packs so they had it all -- Monday through Sunday, time of day they needed to take it to help increase that compliance. So if they're not getting that med, it can really affect them.

Q. Right. And it could have widespread effect, potentially?
A. Uh-huh.
Q. Beyond just that individual?
A. Yes. I mean, the whole point of PrEP nowadays is to prevent spreading it. So if they are not getting what they thought they would, they could be spreading it without even realizing it.
Q. Were some of your HIV patients infected with HIV already?
A. Yes, most of them were.
Q. And were those HIV meds important to those patients, from your perspective?
A. Yes.
Q. And why was that?
A. For their health, their livelihood, their loved ones.
Q. Now, I think when one of the defendants' lawyers was asking you questions about, you know, reimbursements -- I think you mentioned reimbursements were going down over time.
Do you remember that line of questioning?
A. Yes, sir.
Q. Around 2020, when Charles Boyd had reached out to you, what was the reimbursement like?
A. That's when times were changing. So I would say in the beginning, when I started with HIV meds in 2014, '15 '16, we were making 2- or $300 every time we dispensed one. And by 2020, we were losing 50 to $100 every time we dispensed it.

Q. In 2020, you weren't breaking even?
A. Breaking even -- that's when it was starting to change. That's when we were going from not making any money to -- it was, kind of, the switchover of how it worked.
Q. So then around 2020 --
A. After that is when it started to really go downhill.
Q. Go down after 2020?
A. Yes, sir.
Q. When did you close Clayton's Pharmacy?
A. 2023.
Q. And why did you close the pharmacy?
A. Because there was no profit in pharmacy at any point after that. It started to go -- so in 2022, I broke even for the year. And starting in 2023, they warned us that the contracts for 2024 was just going to be worse and that we needed to have a cash flow set aside to start 2024 with the new contract.
I decided to get out and started that process in January 2023 and closed in July before it got to where I couldn't pay all my bills.
Q. You preferred to go out of business than to buy steeply discounted HIV drugs?
MR. ZIMET: Objection. Form.
THE COURT: It's misleading. I'll sustain the objection.
///

BY MR. POGOZELSKI:
Q. When you were losing money, did you think about, well, Safe Chain has these cheaper drugs as an option to stay in business?
A. No, that's why I closed. I mean, I wanted to have a pharmacy more than anything, but it's not worth somebody's health -- or doing anything that's against the books to keep it going.
MR. ZIMET: Judge, reserve as to a motion.
THE COURT: Okay.
BY MR. POGOZELSKI:
Q. You had also mentioned with Cardinal you had the ability to -- I think you said three months to return product from Cardinal?
A. Yes.
Q. And when you would do that, did you get your money back?
A. Yes. So if it's in that three months and there was no issues with it, we would get our money back, yes.
Q. So you didn't sell those branded drugs to other pharmacies or wholesalers?
A. No, sir.
Q. You just returned them to Cardinal?
A. Right. So when I closed my pharmacy, another pharmacy bought my records and bought the prescription drugs from me and that was all through the pharmacy, but that was the only time that that ever happened. That was the way that you're required

to do it.
Q. And kind of how much -- do you remember how much stock you had then?
A. I think the day that I closed, it was -- this is just an estimate because I'm not sure, but around $300,000.
Q. How much?
A. $300,000.
Q. Okay. And then when Mr. Zimet was asking you questions about T3s or pedigrees, do you remember that line of questioning?
A. Yes.
Q. And I think you had said something along the lines of if there was any issue, you would take a look at the T3?
A. Yes, sir.
Q. So in that photo I showed you earlier, would that be an example of where you would look at the T3?
A. Yes, sir.
Q. And why is that?
A. Because the product didn't look like it should when it comes from the manufacturer. It was missing the patient insert part of it and the glue was sticky. It's not what it would normally look like.
Q. Would you have billed that to insurers?
A. No, sir. We would try to return it.
Q. And then -- I mean, did you have any -- so on the T3s, did

you have any reason to doubt the safety or quality of the HIV drugs from Cardinal?
A. No, sir.
Q. And you had said you had been in business at Clayton's for about 13 years?
A. Yes, sir.
Q. And never had any of the kinds of problems that we discussed?
A. No.
Q. The T3s that you did receive through the portal from Cardinal, was that part of Cardinal's, kind of, distribution of drugs to you?
A. Yes. They had the file uploaded each day after your invoices were received.
Q. And was it part of Cardinal's integrated distribution of these branded drugs to your pharmacy?
A. Yes. And our secondary wholesalers had the same process.
Q. Okay. Who were some of those secondary wholesalers?
A. Anda Pharmaceuticals was the only one that we used on a regular basis. And then, like I said, my buying group had their own warehouse, API, American pharmacists, that we purchased from, but that was part of the Cardinal contract, as well.
MR. POGOZELSKI: May I have one moment, Your Honor?
THE COURT: Okay.

BY MR. POGOZELSKI:
Q. So I think you also testified that you rarely looked at the T3s or pedigrees for Cardinal?
A. Yes. There was only one time we got a bottle of a generic medication that looked like it had been scratched. We looked up the pedigree and it was with Cardinal, so they let us return it because we called them within 24 hours.
Q. And that was one time in 13 years?
A. Yes.
Q. And about -- if you had to estimate over those 13 years, how many bottles of prescription drugs did you purchase from Cardinal?
A. Hundreds a day, so times 13 years.
Q. I won't try to do the math, and I won't make you try to do that math.
MR. POGOZELSKI: No further questions.
Thank you very much, Ms. Trissell.
THE COURT: Thank you, Doctor. You may step down. You're excused.
The Government may call its next witness.
MS. DEROVANESIAN: Government calls Gustavo Borja.
///
///
///
///

Thereupon,

GUSTAVO BORJA,

having been first duly sworn or affirmed, was examined and testified as follows:

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Please have a seat. If you could speak directly into the microphone, state your name and spell it for the court reporter.

THE WITNESS: Gustavo Borja, G-U-S-T-A-V-O, B-O-R-J-A.

THE COURT: Is it J-A or K-A?

THE WITNESS: J-A.

THE COURT: Thank you, sir.

MS. DEROVANESIAN: May I proceed?

THE COURT: Okay.

DIRECT EXAMINATION

BY MS. DEROVANESIAN:

Q. Good morning, Mr. Borja.

A. Good morning.

Q. Can you tell us where you're from?

A. I'm originally from Ecuador. I live in New York.

Q. You live in New York?

A. New York, yeah.

Q. How long have you been in the United States?

A. 10 years.

Q. And can you tell us why you made the decision to come to

the United States?
A. Well, me and my husband made a decision to come here because we were being persecuted back in my country. We got kidnapped four times, unfortunately. So we came seeking for asylum here in this country.
Q. And I'm sorry to hear that.
Mr. Borja, can you tell us what you do for a living?
A. I work as a server in a restaurant.
Q. Okay. And I apologize, I'm going to ask you a few personal questions, but if you could bear with me.
Could you just tell me if you're familiar with the medication called Biktarvy?
A. I am. I have been taking Biktarvy for many years.
Q. And why have you been taking Biktarvy for many years?
A. I'm an HIV-positive patient.
Q. Okay. And would you mind telling us when you were first diagnosed with HIV?
A. Back in my country, in Ecuador, probably like 17 years ago.
Q. Okay. And did you start taking medication for HIV back then?
A. I did. Back in my country, I was taking a medicine that -- I don't remember the name. When I came to this country, they actually told me that that medication was discontinued 10 years ago here and it was a bad medication; so they put me on this new medication here.

Q. And what was the new medication that you got when you came to the United States?
A. I started with a different one, not Biktarvy. They changed me to Biktarvy a year after I was here.
Q. Okay. So is that three different medications that you have been on --
A. Yes.
Q. -- for HIV?
A. Yes.
Q. Okay. And in addition to that HIV medication, do you take other medications, as well?
A. No.
Q. Okay.
A. Just Biktarvy.
Q. But just in general, do you take other prescription medications?
A. Not prescription, just like vitamins.
Q. Okay. And, Mr. Borja, when you pick up your prescription for your HIV medication, does it come in a, you know, one of those orange bottles that looks like the pharmacy puts the pills in, or does it come in one of those sealed bottles --
A. It comes in a sealed bottle all the time.
Q. Okay. And does that sealed bottle have a logo on it?
A. Yeah. It's always the same bottle. It's a white bottle always with the same logo. The name and everything there, like

the prescription, the way -- how you should take the medication and everything. It's always the same way.
Q. Okay. And can you tell us how it is that you were getting your prescription medications back in 2020, 2021?
A. We always get it through our pharmacy. It's always been delivered directly to my house from the pharmacy. The pharmacy deliver it to my house.
Q. What pharmacy did you use for your prescriptions?
A. Elm Drugs in Manhattan.
Q. I'm sorry?
A. In Manhattan.
Q. In Manhattan. And where do you live in relation? Queens?
A. Queens, yes.
Q. So you mentioned that your medications are delivered from Elm to your home?
A. Yes.
Q. Why do you use that service?
A. It was offered since the first month led by our doctor, so it's always been delivered.
Q. And how frequently do you receive bottles of your HIV medication?
A. It's every 15 days pretty much, yeah.
Q. And how long is each bottle -- how long does it last?
A. One month.
Q. One month?

A. One month.
Q. And I apologize. I'm going to slow down a little bit because we have a court reporter who needs to take down everything that we say. So I have to make sure we're not talking over each other.
So you said once a day and it's a 30-day supply?
A. Yes.
Q. So does that mean that sometimes you would have more than one bottle at a time?
A. Yes.
Q. Okay. And what would you do with your, let's say, if you had a bottle and then you had another bottle, how would you decide which one to use first?
A. My husband is usually the one that takes care of all -- our medications.
So what he does is usually just use a marker or Sharpie and put the expiration date in order so take them in that order, the bottle.
Q. Does your husband also take medication for HIV?
A. He does, yes.
Q. And what medications does he take?
A. I don't remember the name.
Q. Is it different from what you're --
A. It is a different. It's not Biktarvy, but it's a different...

Q. Okay. And is his a PrEP drug?
A. Symtuza.
Q. Symtuza?
A. Yes.
Q. Do you keep your medications separate?
A. What was that? I'm sorry.
Q. Do you keep your medication separate from your husband's?
A. We keep it in the same storage.
Q. Okay. And I want to talk to you about a bottle of medication you received.
Do you remember opening a new bottle of Biktarvy in February of 2021?
A. I do, yes.
Q. And when you did that, did you notice anything different about it?
A. Totally. So well, I took the bottle. The bottle was completely sealed. It looks completely normal.
Once I opened the bottle, it was a completely different pill.
Q. What do you mean by that?
A. I was taking for so many years, Biktarvy, and it has a different color, so this pill was white. It was not like the color that used to be, like, reddish color that is always Biktarvy.
So this pill was completely white. And it has a watermark

on top of the pill. It was X3-something.

So at that moment, since the bottle was sealed, it has my name on it, it has the label correctly and everything, my thought was maybe they just changed the presentation of the pill. And I proceed to take my medicine.

Q. I want to pause you there for a second.

When you saw that the medication was different, you said that you took it because it looked similar to -- or it looked different from what you had seen before, but you just -- you figured maybe they changed what it looked like?

A. Yeah. I just thought they changed the presentation of the pill itself, not the bottle, because the bottle was the same. It was just the medication inside of the bottle was different.

Q. Okay. And were you eager to make sure that you did take the pill that day and not wait?

A. What was that? I'm sorry.

Q. Were you eager to make sure you did take your medication that day and not wait to try to figure out what the case was?

A. I honestly didn't think about it that night. I just got from work. I opened that bottle and since -- again, since it was sealed, my thought was just they changed the presentation, and I just took my regular pill.

Q. Do you take your pill at the same time every day?

A. Yeah, every night.

Q. Why do you do that?

A. It's -- I'm used to, took it with my husband every night since we take medications.
Q. Is it an important medication for you?
A. Absolutely.
Q. Why is that?
A. Because it's my life.
Q. Okay.
A. I can't skip any day my medicine; so we take it every day.
Q. What is your understanding of why you shouldn't skip a day of this medication?
A. Well, I know for a fact that my viral load in my blood can go up and can pretty much kill me if I miss my pills.
Q. Do you also expose your husband to risk if you don't take your pill?
A. Yeah, of course.
Q. And, Mr. Borja, after you took that pill from your bottle of Biktarvy that looked different from what you had seen before, can you tell us what happened?
A. So after that, I went to bed as usual.
And it was just next day, I couldn't pretty much wake up. I couldn't stand. I couldn't talk. I couldn't move.
I remember being conscious. Several times my husband tried to wake me up, but I remember opening my eyes, I was conscious. I remember him talking to me, but I couldn't even answer back because my tongue was completely numb and heavy.

My body was completely numb and heavy. I couldn't sit in my bed. I couldn't do anything.

My husband, at that moment, just thought that I was tired from work and just let me sleep. Since I was responding, like opening my eyes, he thought, "Well, he's okay."

So I just stayed in bed for the next -- pretty much since that night until the next day at 9:00 p.m. when I finally came back and could talk again.

Q. So is that a full day that you were out?
A. Yeah, yeah.
Q. Okay. Has anything like this ever happened to you before?
A. Never. Never before.
Q. Okay. And for the parts that you were conscious, do you remember if you felt any other symptoms?
A. No. It was just pretty much the heaviness of the body. It was like completely numb and I couldn't say a word because I was trying to talk, but my tongue wouldn't do anything at this point. It was completely numb.
Q. Was that scary?
A. Yes. I was scared, but I couldn't express it to my husband, so he could do something about it. So he just thought -- so he just thought he want to sleep all day and didn't do really much about it.
Q. What about the next day? How were you feeling the day after that?

A. This feeling continued for a couple of more days. So I went to see my doctor because, after I came back, I finally talked to my husband, and I remembered the watermark on the pill that I took. And I research and google, and it happened to be a medication for schizophrenia.

So I email my -- the first thing that I did was email my lawyer, my immigration lawyer, that was the first person that came to my mind to ask for help to see what can I do.

And he just told me to call the pharmacy. Go to the doctor.

So that's what I did the next day. I went to the doctor and the doctor -- my doctor confirmed that the medicine was for this type of psychiatric patients, so -- and he just told me I just needed to wait until the medicine wear off completely off my body.

But I thought I was just going to continue feeling that numbness for a couple of more days and that's what happened.

Q. Did that numbness eventually go away?

A. Yeah.

Q. Okay.

A. After a couple of days it did.

Q. And you said a couple of things in there that I want to follow up on.

First of all, did you take any pictures of the bottle of Biktarvy that you received that had the wrong pills inside?

A. I did, yes.
Q. Did you send that picture to anybody?
A. I did send it to my lawyer. And after that, when the investigation begins with Gilead and the pharmacy, I send it to the pharmacy and Gilead.
Q. I want to show you a document, just for the witness, please. Government's Exhibit 631. If I could take you to page 9, please.
Mr. Borja, do you recognize this email? It might be hard to see on that screen, but do you see --
A. Yes.
Q. -- yourself in the "to" line there?
A. Yes.
Q. Okay. And do you remember receiving an email from this email address that you see above?
A. Yes.
MS. DEROVANESIAN: Government moves to admit Exhibit 631.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 631 will be received.
(Government's No. 631, 4/22/24 Borja Interview, was received in Evidence.)
MS. DEROVANESIAN: Okay. And if we could, please, publish and we will actually start -- I'm sorry. My page

numbers are real small.
BY MS. DEROVANESIAN:
Q. Okay. Mr. Borja, do you see that picture on the screen?
A. Uh-huh.
Q. Can you tell us what that's a picture of?
A. That's a picture of the regular Biktarvy and the Biktarvy that I received.
Q. Okay. So I see two bottles here. So the one on the left looks like a red or a brown-colored pill.
A. Yeah.
Q. Which one is that?
A. That's Biktarvy.
Q. And then on the right, what are we looking at there?
A. That's the medicine that I received by mistake.
Q. Okay. And how did you have the other bottle to compare it to? Is that another bottle that you have at home?
A. That's an extra bottle that I have.
Q. Okay. And why did you take this picture to compare the two?
A. I need to compare it with the other picture, the other pills so I can send it to my doctor and the pharmacy.
Q. And I want to take you two pages later from this one, please.
Do you see this picture in front of you?
A. Yes.

Q. Was that the bottle of Biktarvy that had the wrong pills inside?
A. Yes.
Q. And I see some handwriting on here, "7/21"?
A. Yes.
Q. Did you know whose handwriting is that?
A. That's my husband's.
Q. And do you know why he writes numbers like that on medication?
A. He put the expiration date on every single bottle with a marker.
Q. Okay.
A. Sometimes the bottles are -- the expiration dates have a sticker on it with a label with dates on it. So he likes to take the stickers off and mark the expiration date, so we don't miss that.
Q. Okay. And I see a couple other dates on here. I see it says, "Filled 10/12/20."
Do you see that?
A. Yes.
Q. And written "2/3/20."
Do you see that?
A. Yes.
Q. Okay. And you mentioned before that you sometimes receive -- you will have an extra bottle on hand for the next

month; is that right?
A. Correct.
Q. So sometimes you will have multiple bottles at once?
A. Yes.
Q. Is that why you used the expiration date on the front, so you know that you take one that is still good?
A. Correct.
Q. Okay. So I just wanted to clarify that.
So there's a few different dates at play here. There's the date that the prescription was written, the date it was filled, and then you have written a date -- or your husband's written a date that it expires?
A. Yes.
Q. And then just to be clear: The date that you actually opened this bottle was in February, you said?
A. February 2021.
Q. Okay. And did you send these pictures to the manufacturer?
A. I did.
Q. And who is the manufacturer?
A. Gilead.
Q. Okay. And you mentioned that you went to your doctor the day after you had this incident; is that right?
A. Yes, correct.
Q. And who was your doctor at that time?
A. Dr. Metroka.

Q. And when you went to your doctor, did you explain what happened?
A. I did.
Q. Did you bring your bottle of medication?
A. I did.
Q. Do you think you would recognize that bottle if I showed it to you?
A. Yes.
MR. ZIMET: Judge, we would object as to foundation at this point.
THE COURT: See if she can authenticate it.
MR. ZIMET: She's just showing it to him at this point.
MS. DEROVANESIAN: May I approach the witness?
THE COURT: Okay.
BY MS. DEROVANESIAN:
Q. Mr. Borja, do you see what I have just handed you?
A. Yes.
Q. Do you recognize it?
A. Yes.
Q. Okay. And after you went to your doctor with this bottle of medication, did you then send it to Gilead?
A. They were insisting for me to send back the whole bottle with the whole content. And at that point, I was just debating to -- if I send back the whole thing or not because --
Q. Okay. And I'm sorry to interrupt you. We'll get into

that, but for right now, can you just tell us, did you send the bottle back?
A. I did.
Q. Are you able to see, looking at that bottle, if it looks like your bottle that you sent?
A. Yes.
Q. Okay. And how do you know that?
A. Because it's the type -- it's the medicine that I take every day, so yeah.
Q. Okay.
A. It's the same bottle.
Q. Okay.
MS. DEROVANESIAN: Government moves to admit Exhibit 30.
MR. ZIMET: I just have --
THE COURT: Is it the bottle, or is it the contents of the bottle?
MR. ZIMET: Exactly.
MS. DEROVANESIAN: They're -- well, the entire -- I mean, the entire bottle.
MR. ZIMET: There's no foundation.
THE COURT: Sustained.
BY MS. DEROVANESIAN:
Q. Mr. Borja, could you look inside that bottle?
A. Yes.

Q. What do you see inside?
A. Not the right medicine.
Q. But is that the medicine that you received, that you remember receiving? Does that look like it?
A. Yes.
Q. Does it look like it's been changed in any way?
A. Yes.
Q. Did you mention that you kept two of the pills?
A. I kept two of the pills.
Q. But does this look like what you sent back to Gilead?
A. Yes.
Q. Okay.
A. The whole bottle.
MS. DEROVANESIAN: Government moves to admit Exhibit 30.
MR. ZIMET: I'm questioning the inside of the bottle.
THE COURT: I sustain the objection.
If you want to introduce the outside of the bottle, but how would he know those were the same pills that he sent to Gilead and came back?
BY MS. DEROVANESIAN:
Q. Mr. Borja, do those look like the same pills that you sent?
THE COURT: That's not going to be good enough.
MS. DEROVANESIAN: Okay. Your Honor, we'll agree to admit the outside of the bottle and remove its contents.

THE COURT: What's the exhibit number?

MS. DEROVANESIAN: It's Exhibit 30.

THE COURT: 30 will be received.

(Government's No. 30, Pill Bottle, was received in Evidence.)

BY MS. DEROVANESIAN:

Q. Okay. Mr. Borja, when you brought this bottle of medication to your doctor -- I'm sorry. What was your doctor's name, again?

A. Metroka.

Q. Did your doctor ask you to show him or her the contents of the bottle?

A. Yes.

Q. And did you do that?

A. Yes.

Q. What was your doctor's reaction when they saw what was inside the bottle?

MR. ZIMET: That's hearsay, Judge.

THE COURT: Sustained.

A. What did he say?

BY MS. DEROVANESIAN:

Q. Well --

THE COURT: She'll ask the question.

BY MS. DEROVANESIAN:

Q. You're being asked not to answer that one.

When you went to your doctor and showed your doctor the contents of this bottle, were you doing that seeking medical attention from your doctor?
A. I was.
Q. Okay.
A. Yes.
Q. And I was trying to find an explanation to what was -- what type of medicine was that.
A. Yeah.
Q. Okay.
So when you were seeking this medical advice from your doctor and you showed the bottle of medication that you had taken, what did your doctor say about those pills?
MR. ZIMET: Objection, Judge.
MS. DEROVANESIAN: Your Honor, this is statement --
THE COURT: I will allow for the fact it was said, not the truth of the matter asserted.
MR. ZIMET: Judge, can the jury be instructed as to that?
THE COURT: You can consider what the doctor said, but you can't consider whether that's true or not.
MR. ZIMET: Thank you, Judge.
BY MS. DEROVANESIAN:
Q. Okay. Mr. Borja, when you showed your doctor the pills that were inside the bottle you received, what did your doctor

say about them?
A. Well, at first, he was shocked and he was looking at the pill. And that's when he confirmed that it was a psychotic medicine. So what he asked me to do was communicate with the pharmacy and ask them what was happening with that. And then the pharmacy was the one to send me to talk directly to Gilead.
Q. Okay. And when -- you mentioned that when your doctor saw the pill, he appeared shocked?
A. Yes.
Q. Did he tell you that he was concerned that you had taken this pill?
A. He was concerned --
MR. ZIMET: Objection, Judge.
MS. DEROVANESIAN: Your Honor, these are statements from medical diagnosis and treatment.
THE COURT: Then he can say what the doctor said, but you're asking more than that.
BY MS. DEROVANESIAN:
Q. Did the doctor tell you why he was concerned?
A. He was concerned because he said that Gilead does not distribute this type of medicine that was inside of the bottle.
Q. Were you concerned at that point?
A. Yes, I was.
Q. Why were you concerned?
A. Because I didn't know how that medicine got into the bottle

with my name on it.
Q. Okay.
MS. DEROVANESIAN: Can I have one moment, Your Honor?
THE COURT: Okay.
BY MS. DEROVANESIAN:
Q. Mr. Borja, after having that conversation with your doctor, did you take your -- and you mentioned already that you sent the bottle off to the manufacturer?
A. Uh-huh.
Q. And do you know if any sort of investigation was conducted?
A. They said they did.
MR. ZIMET: Objection. That's hearsay.
THE COURT: Sustained.
BY MS. DEROVANESIAN:
Q. Mr. Borja, without telling us what anybody said, can you tell us if you're aware of an investigation that they did?
A. It's not clear for me that they actually did it or not.
Q. Okay. And do you know how those pills got into the bottle that you received?
A. No.
Q. And do you know where your pharmacy actually got the bottle of medication that was dispensed to you?
A. They told me.
MR. ZIMET: Objection, again, Judge.
THE COURT: Sustained.

BY MS. DEROVANESIAN:
Q. Mr. Borja, do you know where Elm Drugs buys Biktarvy from?
A. From Gilead.
Q. That's your understanding?
A. That's what the pharmacist told me.
Q. Did they tell you who Gilead sells it to before it gets to Elm Drugs?
MR. ZIMET: Objection, Judge.
THE COURT: Sustained.
BY MS. DEROVANESIAN:
Q. Mr. Borja, have you -- had you been getting your medication from Elm Drugs for a while at this point?
A. Since the first day.
Q. Since when?
A. Nine years ago.
Q. Okay. And have you ever had an issue with a medication that you got from Elm Drugs from?
A. Never.
Q. And what about when you were in Ecuador, did you ever have an incident with your HIV drugs in Ecuador where you opened the bottle and you had the wrong drugs inside?
A. No, ma'am.
Q. And what about your husband? Has your husband ever, in your presence, had a bottle of medication that had the wrong pills inside?

A. No, never.
Q. Okay. Mr. Borja, you mentioned that you didn't know what -- if there was an investigation done. If I showed you a letter that you received from Gilead, would that refresh your memory?
A. Yes.
Q. Mr. Borja, I'm not going to ask you to read on here out loud, but I am going to direct you to the first line of the letter here. I will ask you to read that first line and tell me if that refreshes your memory as to whether there was an investigation you were aware of?
A. Yes. As I said before, they told me that --
MR. ZIMET: Objection. Excuse me.
THE COURT: The answer is "yes." I will sustain the rest.
BY MS. DEROVANESIAN:
Q. And are you aware if they concluded that investigation?
A. Yes.
MS. DEROVANESIAN: Okay. Thank you. Nothing further.
THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. BARZEE:
Q. Good morning, Mr. Borja.
A. Good morning.
Q. How are you now? Were there any adverse continuing effects

from this?

A. No. I'm good.

Q. Your doctor told you there was no issue with you missing that one day of the medication; correct?

A. No, it was okay.

Q. He said everything was fine?

A. Yeah, I continued taking my medicine after that.

Q. So I just want to ask you some follow-up questions, if I may, to get a better understanding of how you and your husband, kind of, handled the medicine.

First, let me ask you: How many different prescriptions are you on?

A. It's just Biktarvy.

Q. That's the only prescription that you take?

A. Yes.

Q. All right. And how many different medications is your husband on?

A. Just his HIV medication, just one.

Q. Just one?

A. Yes.

Q. And you mentioned that the two bottles are kept together and your husband is in charge of it?

A. Yes.

Q. Now, this particular prescription, it looks like it was written back on February 3rd of 2020; is that correct?

A. I don't remember.
MR. BARZEE: Do we have a picture of the bottle -- I don't remember what exhibit number that is -- with the "7/21"?
MS. DEROVANESIAN: 631.
MR. BARZEE: You have it in front of you. May I have it? Can I see the picture of bottle with the "7/21" written on it?
BY MR. BARZEE:
Q. Are you able to see that on your monitor?
A. Yes.
Q. It looks to me like it said that this prescription was written on February 3rd, 2020.
Is that what you read on that, as well?
A. Yes.
Q. And it was filled on October 12th of 2020. Is that what you read on it, as well?
A. Yes.
Q. And you took it on what date?
A. February 2021.
Q. So you took the medicine in that bottle a year after the prescription was written, and approximately --
A. That's the way I get my --
Q. That's okay. I just want to verify.
And about four months after the prescription had been

filled; correct?
A. I guess that's what this says. That's what the bottle says.
Q. Well, do you have, like, multiple of these bottles at home? Do you stockpile like four, five, six of them at a time?
A. I don't pile them. We receive every 15 days a bottle.
So we take them with the expiration date, so we don't miss them. But we have at least three bottles of his medication and my medication.
Q. But so you're getting a new bottle in the mail.
A. That's what the doctor prescribed them and the pharmacy just send them to me.
Q. Do you pay for these?
A. No.
Q. You get everything for free; right?
A. I get my medicine for free, yeah.
Q. Yeah. So they're sending you a different bottle every two weeks, and your husband takes it and puts it in a box somewhere, but you're not taking that medicine over the next two weeks?
A. Not until I finish the bottle that I'm on at that moment.
Q. So you have a bunch of bottles at a time?
A. As I said, I have at least three bottles.
Q. Well, if it's every two weeks and this particular bottle was filled in October of 2020, it was taken in February

of 2021, that's October to November, November to December, December to January, January to February, that's four months. If you get two bottles a month, that means you would have eight bottles.

MS. DEROVANESIAN: Objection. Compound question. Argumentative.

THE COURT: Overruled.

BY MS. DEROVANESIAN:

Q. Right?

A. That's -- I mean, don't have eight bottles. That's what I have.

Q. It's confusing, isn't it?

A. I understand. But that's what I have.

Q. Yeah. So you're getting this medication for free and you're not paying for it, and you have about eight bottles sitting there; correct?

A. No, I don't have eight bottles sitting there.

Q. Oh. You don't have eight bottles?

A. Eight bottles, no.

Q. No? How many do you have at a time?

A. At least three bottles.

Q. Three bottles?

A. Yes.

Q. Okay. And you said that this particular bottle when you looked at it, it looked perfect, that there was no problem with

it?
A. Yes.
Q. And it had a foil seal --
A. Yes.
Q. -- when you opened it up?
A. Yes.
Q. And you and your husband were standing next to each other when it was opened?
A. Yes.
Q. And did you or your husband notice anything wrong with that foil seal on that bottle?
A. With the seal?
Q. Yeah.
A. No. It was completely sealed, as I said before.
Q. How do you know it was completely sealed?
A. Because I opened the bottle.
Q. And you can tell, right, if the seal had been broken or not?
A. It was completely sealed.
Q. Perfect.
A. Perfectly sealed.
Q. No problem?
A. No problem at all. The bottle was perfect from the outside.
Q. Who delivered that bottle to your house?

A. The pharmacy send it to my house. They have delivery service. I don't know.
Q. Does it come, like, in an envelope? In a bag? In a box?
A. In a paper bag with my name on it.
Q. So it's just in a paper bag? It's not in a big red box that's sealed?
A. No. It's always in a paper bag, and it's delivered to my mailbox in my house.
Q. And when you talked to the pharmacist, the pharmacist suggested they would check with their --
MS. DEROVANESIAN: Objection. Hearsay.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Did your pharmacist do any investigation as to what could have happened to the bottle that you're aware of?
A. They were the one that called Gilead that day and Gilead opened me -- Gilead contacted me after the pharmacy called them.
Q. Did they also look into whoever their -- whoever it was that delivered it to you to check with them?
A. That, I don't know.
Q. Now, your immigration attorney -- did you and your immigration attorney discuss possibly filing a lawsuit against the pharmacy or against Gilead or against someone for causing you this --

A. Not really.
Q. -- long sleep?
A. No.
Q. How many times did you discuss this with your attorney?
A. Two times.
Q. All right. And after you woke up and you realized that there was a problem, you didn't go to the hospital?
A. No, because it was COVID season and we were just afraid of getting COVID at that time.
Q. And so did your doctor suggest that you go to the hospital immediately?
A. No, because I was fully conscious at that moment when I visit my doctor already.
Q. Now, you mentioned a couple of times that you learned at some point, somehow from google or something, that the medication was for schizophrenia?
A. Uh-huh.
Q. The medication was -- actually, we know the name of it, right, it was Seroquel; right?
A. I don't know the name.
Q. Oh, no?
A. No.
Q. How did you know it was for schizophrenia, but you didn't know that the name of it is Seroquel?
MS. DEROVANESIAN: Argumentative objection.

THE COURT: He looked at the stamp on the pill.

MR. BARZEE: The stamp on the pill says, "Schizophrenia"?

A. No, no, no. I Googled the watermark on the pill.

BY MR. BARZEE:

Q. Right.

A. But that didn't give me the name of medicine. Just what type of medicine it was.

Q. Right. And the type of medicine was Seroquel; wasn't it?

A. I don't remember that because I know that it was, for a fact, for psychotic patients, but not the name of the medicine.

Q. Okay. You spoke to your pharmacist about this, as well; correct?

A. Yes, I did.

Q. And the pharmacist indicated to you --

MS. DEROVANESIAN: Objection. Hearsay.

THE COURT: Sustained.

MR. BARZEE: Can I have one moment, Your Honor?

THE COURT: Okay.

MR. BARZEE: Thank you, everyone. Thank you, Mr. Borja. No further questions.

THE COURT: Mr. Zimet.

MR. ZIMET: May I approach to get the exhibit, please?

THE COURT: Okay.

///

CROSS-EXAMINATION

BY MR. ZIMET:

Q. Good morning, sir.

A. Good morning.

Q. So let's look at this picture which is Exhibit 631.

And this is a picture that you took or your husband took back --

A. I did.

Q. I'm sorry.

A. I did.

Q. You took it. And you took it sometime in February 2021?

A. Yes.

Q. Because you wanted to show that the pills were different colors; right?

A. Yes.

Q. And the pills -- the white-looking pills, those came from this bottle?

A. Yes.

Q. And there's another picture which had "7/21" on it. And that's a picture of this bottle I'm holding up?

A. Yes.

Q. That you saw?

A. Yes.

Q. So when you saw this picture -- when you saw this picture today, you said it was the same bottle?

A. Yes.
Q. Is that right?
MR. ZIMET: Can I show it -- approach, Judge?
THE COURT: Okay.
BY MR. ZIMET:
Q. This is the bottle that you sent to Gilead?
A. Yes.
Q. Can you look at that and look at the picture?
A. Yes.
Q. Can you tell us where "7/21" is on that bottle?
A. It's right here, but it's been removed, the sticker, but there's the marker.
Q. It's "been removed" you said?
A. I'm sorry.
Q. You said it's "been removed"?
A. Yes. The sticker that was on top has been removed, but you can see the blue marker here.
Q. So someone removed something from the bottle after you send it to Gilead?
A. After I send it because I didn't remove it. I send it the way it was.
Q. So you sent it to Gilead, and now that you see it, after it came back from Gilead, it's in a different condition than when it was sent?
A. It's in a different condition, yes.

Q. Do you know why it's a different condition after being sent to Gilead, the bottle?
A. I have no idea.
Q. Do you know who at Gilead looked at it?
A. What was that?
Q. Do you know if anyone at Gilead looked at it or said, "Let's put something else on this bottle"?
MS. DEROVANESIAN: Objection.
THE COURT: Overruled.
A. They opened the investigation. They closed the investigation. I send the bottle just the way it is in the picture. And as you can see, there's a blue marker here just like the "7/21."
BY MR. ZIMET:
Q. There's no "7/21" on that bottle that you can see, is there, sir?
A. That's what I'm saying. There's no "7/21," but there's the one in blue marker just like in the picture, and you can see that the sticker here has been removed.
Q. So they changed the condition of the bottle; right?
A. They did.
MS. DEROVANESIAN: Objection. Asked and answered.
THE COURT: Overruled.
MR. ZIMET: So if we can put up the two bottles together, please, the picture of it.

BY MR. ZIMET:
Q. So the white bottle -- or the white pills, those are ones that you took in February of 2021; correct?
A. Correct.
Q. And that was a new bottle; correct?
A. Correct.
Q. Now, the one on the left with the -- I don't know what color that is. What color do you describe that as?
A. Reddish.
Q. Reddish. Let's say, "reddish." Let's agree on reddish.
The reddish bottle -- the pills in the reddish bottle were pills that you had gotten previously from Elm Drugs; correct?
A. Can you repeat that again?
Q. The one -- the red pills?
A. Uh-huh.
Q. Those were in a bottle that you had gotten from Elm Drug previously, prior in time?
A. Correct.
Q. But you hadn't finished taking them -- those pills?
A. No, I open it just to take a picture.
Q. So that was a bottle that you opened on that day, also?
A. After that day, when I took the white pill.
Q. But you already had --
A. Because I had to take my medicine the next day.
Q. Of course, you have to take your medicine. But my question

to you, sir, is the red pills in that bottle, you'd gotten that before you got the bottle with the white pills; is that correct?
A. I don't remember exactly which one was first.
Q. Well, you got them every 15 days and the white pills you just got -- you said you got the day before that day; isn't that right?
A. I don't remember what order it was sent, those bottles.
Q. Sir, from your testimony, you don't get two bottles on the same day. You get one bottle every 15 days; is that correct?
A. Correct, yes.
Q. So if you got the white bottle on February -- what date? -- 15th?
A. I don't remember the exact date.
Q. Well, you would not have gotten another bottle the next day or the next couple of days; correct?
A. No. That bottle was in my house.
Q. The red pills had already been in your house?
A. Yes.
Q. Is that correct?
A. Yes.
Q. They were already there?
A. Yes.
Q. They had been delivered before the bottle with the white pills; correct?

A. Correct.
Q. And so you hadn't opened the bottle with the red pills yet; correct?
MS. DEROVANESIAN: Objection. Asked and answered.
MR. ZIMET: It's not --
THE COURT: Overruled.
BY MR. ZIMET:
Q. You had not opened the bottle with the red pills yet because you said you opened them to take the picture; is that correct?
A. Yes, correct.
Q. So the bottle that you already had you hadn't opened, but on that day, you decided to open the bottle with the white pills for some reason? Is that right?
A. Because it was the order that it was in my storage. So I grabbed the bottle that it was next to open, and it was the one with the white pills.
Q. That you had just gotten that day or a couple days before?
A. I didn't say I got it that day.
Q. Within a few days of when you opened it?
A. I didn't remember the exact dates when I got the bottles.
Q. So we would assume that since you had not opened the bottle on the left with the red pills that you had gotten earlier, there was no reason to open the bottle with the white pills the day you received it?

MS. DEROVANESIAN: Objection. Mischaracterizing his testimony.

THE COURT: It's cross-examination.

Overruled.

A. I can't really tell which one was first or not. I really can't tell which of the bottles got first to my house or what day exactly we got delivered which of the bottles.

BY MR. ZIMET:

Q. Well, would you open a bottle of pills if you weren't ready to take them and use them?

A. Can you repeat that?

Q. Would you open a bottle of pills that you received, if you weren't ready to take one of the pills?

A. If I have a bottle open already, I don't need to open a new bottle until I finish my previous bottle.

Q. Exactly. Okay.

A. Exactly.

Q. And the red -- the bottle with the red pills are -- the bottle that you previously had; isn't that correct?

A. But it was not opened, yet, because I opened the one with white pills first.

Q. Well, it wasn't opened, yet, because you still had other pills that you hadn't taken pictures of that you still had in your house; is that correct?

You weren't done with the previous bottles. You had been

stacking them up for months and hadn't opened them?

A. I haven't been stacking them up.

Q. The bottle you were using on the day that you received the bottle with the white pills, you still had pills to take from that bottle; did you not, sir?

A. No. Because I came home and opened a new bottle because I finished my previous bottle, and that's when I had this medicine.

MS. DEROVANESIAN: Objection. Relevance.

THE COURT: Well, let's go ahead and break for lunch now.

Members of the jury, I'm going to ask you to come back at 1:30. Let's make it 1:35. I've got a 1:30 hearing. Hopefully, I can do it in five minutes.

Remember my admonishment not to discuss the case or allow it to be discussed in your presence, and we'll see you back at 1:35.

(Jury exits.)

THE COURT: Mr. Borja, do you take one or two HIV pills a day?

THE WITNESS: One.

THE COURT: So why do they send you 30 pills every 15 days?

THE WITNESS: That's how the pharmacy sends it.

THE COURT: During the break of your testimony, you're

not allowed to discuss your testimony with anyone, and we'll see you back at 1:35.

MR. POGOZELSKI: Your Honor, may we approach and grab the physical exhibit, so we keep safe custody of it?

THE COURT: Sure.

(Off the record.)

THE COURT: We're back on the record. Counsel are present. Both defendants are present.

Anything to come before the Court before we bring the jury in?

MS. DEROVANESIAN: Your Honor, just very briefly, we wanted to raise -- we've moved to admit Government Exhibit 652. It was kept out due to an objection, but then, now, on cross-examination the witness was asked questions. It's a letter from Gilead about their investigation.

The witness has now been asked questions about what Gilead said relating to their investigation.

THE COURT: Did you object to hearsay on that?

MS. DEROVANESIAN: I did, but I believe that he was allowed to answer certain questions about it; so I think the door has been opened to admit it, rather than just have the selective commentary about it without seeing the actual document.

THE COURT: Mr. Zimet?

MR. ZIMET: Judge, on direct he said that they did an

investigation and they closed the investigation.

And so I don't know what else they want -- what that letter is is hearsay. The Court sustained the objection to the contents of what they said, not the fact it was closed. That's fair game, that was in.

THE COURT: I'm going to stick with my prior ruling.

Mr. Zimet, you wanted to do a motion outside of the presence of the jury?

MR. ZIMET: Let me do it at the end of day, Judge, if that's okay.

THE COURT: Okay.

MR. ZIMET: I have one matter to ask the Government about.

THE COURT: While you're doing that, maybe we can bring in Mr. Borja.

Let's bring in the jury.

(Jury enters.)

THE COURT: We have all the jurors back.

Does counsel concede the presence of the jury and waive its polling?

MR. ZIMET: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence? Okay.

Mr. Zimet, you may continue.

BY MR. ZIMET:
Q. Good afternoon, sir.
A. Good afternoon.
Q. Any answers that you gave before lunch that you have maybe thought about during the lunch hour that you want to change, fix, correct?
A. No, not really.
Q. Amend?
A. No.
Q. You're good with what you said so far?
A. Yes.
Q. I'm sorry?
A. I'm good. I haven't changed my mind at all.
Q. Excellent. So let me ask you about what your mind was before lunch and make sure that we understand what you're saying.
You received one bottle a month, one bottle every 30 days of Biktarvy in the count of 30 pills in each bottle; correct?
A. I said I received one bottle every 15 days.
Q. Every 15 days?
A. Yes.
Q. Of 30 pills in each bottle; correct?
A. Yes.
Q. Which means every 15 days you received twice as amount -- well, let me back up a second.

You take one pill a day?
A. Yes.
Q. Correct?
MS. DEROVANESIAN: Objection. Asked and answered, Your Honor. We have been over this multiple times.
THE COURT: We went over it outside the presence of the jury. Overruled.
BY MR. ZIMET:
Q. So that means that each 15 days, you get twice as much drugs as you need to take; correct?
A. Yes.
Q. Which means -- also, you said you took it for free which means your insurance was paying --
MS. DEROVANESIAN: Objection. Relevance.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Which means your insurance was paying twice as much as it should each month that you got -- excuse me, each 15 days that you got pills; is that correct?
A. I guess.
Q. Well --
A. That's what the pharmacy sent to me. I'm not requesting them to send me. That's what I get in my house.
Q. Well --
A. Delivered to my house.

Q. Well, you accepted it and received it knowing it was more than you were prescribed to have; is that correct?
A. Yeah. Because it gets delivered to my house, so I just grab the package when it gets to my house.
Q. Did you ever reach out to your pharmacist and say, "Listen, you're sending me too much"?
MS. DEROVANESIAN: Objection. Hearsay.
THE COURT: Overruled.
BY MR. ZIMET:
Q. You're sending me too much drugs that I'm supposed to get. That's unnecessary, and it's unnecessary for them to be billing insurance on your behalf.
Did you ever say that to them?
A. No, I haven't said.
Q. Do you think you should have?
MS. DEROVANESIAN: Objection. Relevance, lack of foundation.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Do you think you should have?
A. Maybe, but I never thought about it, honestly.
Q. Well, now that you're thinking about it, do you think you should?
A. I should.
MS. DEROVANESIAN: Objection.

THE COURT: Overruled.

BY MS. DEROVANESIAN:

Q. So and all these events you described, you said your husband was with you when these events occurred?

A. Yes.

Q. Your husband has interviewed with you with the Government; is that correct?

A. What was that?

Q. You were interviewed. You met with the Government concerning your testimony, previously?

A. Yes.

Q. And that was multiple times, several times that's happened; is that correct?

A. The interview?

Q. With you and your husband together with the Government.

A. Yes. It was, like, two times.

Q. Two times?

A. Yeah.

Q. And the last time -- well, did you interview before you testified here today?

A. He's here, yeah.

Q. I'm sorry?

A. He's here, yes.

Q. And he was with you when you spoke to the Government about what you would testify to; is that correct?

A. What do you mean?
Q. You got prepared to testify for today, did you not, with the Government?
A. I did not -- was prepared for anything. I was not --
Q. I know that, but did you have a session with the Government prosecutors prior to coming to testify when you went over what questions they anticipated asking you?
A. Yes.
Q. And was your husband with you when that session took place?
A. Yes.
Q. Is that correct?
A. Yes.
Q. And what's the most recent time that session took place? Yesterday?
A. No, today.
Q. Today?
A. I mean, before I walked in here.
Q. So your husband is in the building; is that correct?
A. Yes, he is.
Q. And you anticipate he's going to testify, also?
MS. DEROVANESIAN: Objection.
THE COURT: Sustained.
BY MR. ZIMET:
Q. And so based upon your interview with the Government, they showed you this bottle which has been marked --

MR. ZIMET: I don't know what exhibit it is.
SPEAKER: 30?
BY MR. ZIMET:
Q. Exhibit 30, they showed you this bottle; is that correct?
A. Before this?
Q. Yes.
A. No, I wasn't shown that bottle. I just saw the bottle here.
Q. First time today?
A. Yes.
Q. Since what? Four years ago?
A. Yes.
Q. Was the last time?
A. Yes.
Q. So --
MR. ZIMET: May I approach?
THE COURT: Okay.
BY MR. ZIMET:
Q. So other than the change to the bottle, which you observed taking place after Gilead sent it back to you, that bottle is in the same condition as when you sent it out; is that correct?
A. It's not in the same condition.
Q. Well, we talked earlier about something was different. There was a sticker over --
A. Yes. It's been removed. That's where you can't see the

"7/21" anymore.
Q. Understood. Other than that change, is it in the same condition as when it was sent to Gilead?
A. Yes, it's the only change.
Q. And I think you testified that you have been taking that medication for several years?
A. Yes.
Q. And the first time you took it, that you received it from Elm Pharmacy, was in what year?
A. 2016.
Q. 2016?
A. Yes.
Q. And so every -- or every 15 days from 2016 forward, you have been getting, every 15 days, a new bottle of Biktarvy?
MS. DEROVANESIAN: Objection. Asked and answered.
THE COURT: Overruled.
A. It's not been constant. Like for every single year, it's not been the same because for all -- I also changed my doctor during this time of my years here.
So now I have a different doctor and they prescribe differently. So I don't know how they do it, but all I said is the pharmacy sent the medicine to my house and that's all I know.
I don't ask them to refill more for me. I don't ask them to give me more. I just get them delivered to my house and

I grab the bag and that's it.
BY MR. ZIMET:
Q. How long, sir, have you been getting Biktarvy every 15 days, up till --
A. I can't really tell.
Q. Can I finish the question, please?
A. I'm sorry.
Q. -- 2021 when you got that bottle, how many years prior to that had you been getting Biktarvy every 15 days?
A. I don't really remember.
Q. Would it be more than a year?
A. I don't want to say something that I can't remember, honestly.
Q. So you did get Biktarvy in months prior to that February 2021 delivery; is that correct?
A. Yes.
Q. And when you received that bottle, you looked at the bottle on the outside; did you not?
A. When I received the bottle?
Q. Yes. When you received the bottle. It's right in front of you.
A. Yes.
Q. When you received the bottle, you looked at the outside of the bottle; is that correct?
A. Yes.

Q. And the outside of the bottle was no different than any previous bottles of Biktarvy that you had received from Elm Pharmacy; is that correct?
A. There was no difference.
Q. It looked identical; did it not?
A. Identical, yes.
MR. ZIMET: Thank you, sir.
THE COURT: Redirect.
MS. DEROVANESIAN: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. DEROVANESIAN:
Q. Good afternoon, Mr. Borja.
A. Good afternoon.
Q. I just have a couple of more questions for you.
A. Sure.
Q. You were asked a bunch of different questions about the medication you took and how many pills you received.
Do you remember those questions?
A. I do.
Q. Okay. Did you follow your doctor's recommendations as to taking these Biktarvy pills?
A. I did, yes.
Q. Were you given a prescription by your doctor?
A. Yes.
Q. And was this an important medication for you?

A. It is very important for me.
Q. And is HIV a serious condition?
A. It is.
Q. Okay. And you were asked some questions about the condition of the bottle that's sitting right in front of you. Do you remember that?
A. Yes.
Q. All we're talking about there is that the label was taken off. That's the change that you noticed?
A. That's the change I noticed.
Q. The label was removed?
A. Yes.
Q. And that label had your name and your date of birth on it, your personal information?
A. Yes.
Q. And did you -- you were asked various questions about what bottles you had in your house and when you received them. I just wanted to clarify, whenever you had extra medication, did you keep it in your home waiting until when you did need it?
A. Yes.
Q. Did you do anything else with it?
A. No.
MS. DEROVANESIAN: Okay. Thank you. Nothing further.

THE COURT: Thank you, sir. You may step down. You're excused.

The Government may call its next witness.

MR. POGOZELSKI: Yes, Your Honor. The United States calls Abigail Divilio.

Thereupon,

ABIGAIL DIVILIO,

having been first duly sworn or affirmed, was examined and testified as follows:

THE WITNESS: Yes.

THE COURTROOM DEPUTY: Please speak directly into the microphone, state your name and spell it for the record.

THE WITNESS: Abigail Divilio, A-B-I-G-A-I-L, D-I-V-I-L-I-O.

MR. POGOZELSKI: May I proceed, Your Honor?

DIRECT EXAMINATION

BY MR. POGOZELSKI:

Q. Good afternoon. Ms. Divilio, were you subpoenaed to testify here today?

A. Yes, I was.

Q. Do you want to be here?

A. No.

Q. Can you give us a little bit of brief background? Where are you from?

A. Sure. I live in eastern Maryland which is about 20 minutes

or so from the business Safe Chain. I was employed at Safe Chain from 2018 until -- my last day was in 2022.

Q. And sorry. Ms. Divilio, for the court reporter, I might preempt her and ask you to slow down a little bit.

So you're from eastern Maryland. Is that where you grew up?

A. Yes.

Q. And, Ms. Divilio, where do you currently work?

A. I currently work for the State of Maryland, the Maryland Natural Resources Police.

Q. Did you say "Natural Resources Police?"

A. Yes.

Q. What is your title or job there?

A. I am a research and reporting coordinator. So I help the -- that Boulevard with reporting requirements that are required by the governor's office, do research, and part of their strategic planning division.

Q. Can you tell us about your educational background?

A. Yes. I went to college in Upstate New York, a small liberal arts school, Hobart and William Smith. I have a degree in psychology, minor in environmental studies.

Q. And after college, what was your first job?

A. After college, I worked in the public mental health sector. I worked out of a community-based program helping individuals with various psychiatric diagnoses, kind of, incorporate back

into the community and attend medical appointments and things like that, with adults and children.
Q. How long did you do that?
A. Approximately -- maybe about two, two and a half years out of college.
Q. Okay. And after you worked in the public mental health sector, can you give us a brief overview of your work history prior to Safe Chain Solutions?
A. Sure.
After working in the public mental health, I then got a job working for the State of Maryland again as a contractual position. I worked in their fisheries department and that was short. That led me into a job at a local ecotoxicology research laboratory. There I held maybe two different positions there.
And their primary responsibility was regulatory testing for agro and some pharma products, so anything that was going to come to the market and eventually may be in the environment was, kind of, what -- the testing that they did.
There I managed their materials coming in. So it was a private contract research laboratory, so clients research materials that were coming in which were a variety of chemicals and products. I also held the job as safety manager, so managed safety for the -- it was about 180 employees at that time. And I also assisted in their radiation safety program.

Q. Okay. And I think you testified to this earlier, but when did you first start working for the defendant's company Safe Chain?
A. It was about August of 2018.
Q. And did you apply for the job, or how did you get the job?
A. I became aware of the position. A coworker of mine at the time, her husband worked for Safe Chain. And she let me know they were looking for additional help in the compliance department and it seemed like it was something that would be a fit with some of the things that I did at the laboratory where I worked.
I did have experience with regulatory audits and complying with a variety of state and federal guidelines and interpreting those guidelines for, you know, regular people who are filling out applications and helping that process move along.
So I became aware of the opportunity of Safe Chain through a coworker at the time, her husband worked there, and she let me know they were looking for help in the compliance department.
Q. You had some experience with licensing and general regulatory issues?
A. Yes.
Q. Did you have any experience with pharmaceutical sales prior to Safe Chain?
A. I had no experience with pharmaceutical sales.

Q. Or pharmaceutical wholesale distribution of drugs?
A. No, I hadn't.
Q. Did you interview for the job?
A. I did.
Q. Who did you interview with?
A. I know Jesse Hammett was the general manager there, I believe, was part of the interview. Charles Boyd. I don't remember if Patrick was there or not, but I know, at least, with Charles and Jesse.
Q. And were you eventually offered a job?
A. Yes.
Q. And what was your -- did you take the job?
A. I did take the job. I think we had a little bit of back-and-forth about the initial starting salary, but I did eventually accept a job there.
Q. What was your title when you started?
A. When I first started it was state regulations coordinator.
Q. What were your job responsibilities in that role?
A. Primarily managing the state licenses that Safe Chain held, as far as their licenses, where they were able to distribute to other states and, you know, managing customer licenses, making sure they were still valid and active.
At that time, Safe Chain was looking to expand their operations into a few other warehouse locations and managing their other warehouse sites. So helping manage not only the

Cambridge location, 40-plus licenses, but also looking to acquire those licenses for their other warehouse distribution sites.

Q. And do you recall, roughly, what your starting salary was?

A. I think I ended up accepting 63,000 a year.

Q. And did it include any, kind of, incentives?

A. There was a quarterly bonus structure.

Q. And while you were working for the defendants' company, did you get the impression that things should not be put in writing?

A. I did.

Q. Why? Why do you say that?

A. I got that impression, generally, from my coworkers. It was just --

MR. ZIMET: Objection, Judge. Based on hearsay.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Was there a general atmosphere -- putting aside what coworkers said, was there a general atmosphere that gave you that impression?

MR. ZIMET: Objection, Judge.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Other than anything anyone said to you, why did you feel or why did have you the impression that things should not be put

in writing?
A. Everyone liked to talk on the phone.
Q. Okay. Rather than what?
A. Rather than send a message or an email, which is was my preference just from the atmosphere that I came from, as far as good laboratory practices and things of that nature. Also we dealt with a ton of different sales groups; so it was, kind of, confusing to remember who was part of what sales group and writing things down was a way for me to reference back to as opposed to being bombarded with phone calls all day.
Q. You did not, kind of, follow that -- follow the not documentation?
A. I did not. It was, at that time, for my benefit.
Q. Got it.
And I think these binders are probably evidence of that. And we'll get to those documents, but what was Charles Boyd's role at Safe Chain?
A. He was the CEO and founder, and eventually, I did report directly to him. So he was my boss.
Q. And did you meet with him frequently?
A. Yes.
Q. Did you find him to be a gullible person?
A. No. I wouldn't describe him that way.
Q. What was Patrick Boyd's role?
A. I'm not quite sure his exact title, but he primarily dealt

with the sales team, the internal sales team and the external sales groups they worked with.
Q. And were the brothers, Patrick Boyd and Charles Boyd, very close?
A. Yes.
Q. Prior to COVID, spring 2020, what was the defendants' company, you know, main line of business?
A. They specialized in generic medications and hospital supplies, IV bags. Kind of a little bit of everything that a pharmacy would typically purchase.
Q. What about branded medications?
A. No. They didn't specialize in branded medications.
Q. And in, say, the 2018, 2019 time period, did Safe Chain have software for processing T3s or pedigrees?
A. They did. I think the name of the product was called The Systems House and it generated -- along with Track and Trace, they had, you know, two systems for the internal side of it and one that customers could access so they could get their T3s.
Q. What was Track and Trace?
A. Track and Trace was a software that's used for pedigree tracking.
Q. And during that time period, did you spend time or have to spend a lot of your time in compliance reviewing T3s or pedigrees?
A. Not typically. Most of the vendors that they purchased

from did send them electronic records; so everything was generated automatically. So then, when the pharmacy customers would go into the Track and Trace system, they would pull their own information as they needed it.
Q. And that would automatically be transmitted by those -- by the vendors around that time?
A. Yes.
Q. And then automatically transmitted from Safe Chain Solutions to the pharmacy customers?
A. Yes. They would just log in and collect their information. Almost all of the vendors at that time used that system.
Q. The Track and Trace?
A. Yes.
Q. Okay. And that was prior to the -- COVID?
A. Yes.
Q. Prior to COVID, HIV business?
A. Yes.
Q. Did you get promoted while working at Safe Chain?
A. Yes, I did.
Q. And who promoted you?
A. Charles.
Q. And what was the promotion?
A. To director of compliance.
Q. And when you were promoted to be the director of compliance, around when did that happen?

A. I think that was in about -- probably just about April 2019, I think, that springtime.
Q. Okay. And when you were promoted, who was in the compliance department, as far as you remember?
A. At the time, it was myself and Katie Eberspacher. And then shortly after, like in the spring, she then went out on maternity leave. So then it was just me.
Q. Was she replaced by anyone when she went out and did not return?
A. Not immediately. I did have support from someone who worked and reviewed --
Q. And who was that?
A. Kelsey Jones.
Q. Would that have been in -- around the summer of 2020? That Kelsey Jones was assisting?
A. I would have to think about time --
Q. Okay.
A. -- more closely.
Q. Fair enough. Fair enough.
A. I know when Katie went out on maternity leave, then Kelsey had filled in periodically and then eventually transitioned to the compliance department.
Q. And during your tenure as director of compliance, was the compliance department understaffed?
A. Yes.

Q. Did you have a lot of work on your plate?
A. Yes.
Q. Did you speak frequently with Charles Boyd about compliance issues?
A. Yes.
Q. And can you tell us, kind of, generally, what circumstances you would be talking to Charles Boyd about compliance issues?
A. We had a weekly managers meeting where myself, Charles and just the management team.
Charles and I also had one-on-ones. I don't remember if they were weekly or biweekly at this point. But during that time, we would talk about any ongoing projects or issues that could be arising.
So yes, we worked in the same building; so we saw each other daily.
Q. And then, kind of, sticking with the 2020, around COVID, summer 2020 time period, was there a computer software that you used in compliance? Or as part of your job, did you use any computer software?
A. I'm not sure.
Q. Were there software systems at Safe Chain that you utilized in compliance in any respect?
A. When they switched, we did shift softwares and switched to a program called Mathematica, I think was the most recent one I had there before I left.

They did transition over to that new system. And from the compliance side, it was very difficult to work with. There were not a lot of added pharmaceuticals wholesale features.

A lot of the needs that we had had to be added on to the software; so it became very manual because the software wasn't integrated into that system.

So we ended up having to check multiple sources to try and get something done.

Q. Did it make your job more difficult?
A. Yes, it made it very labor intensive.
Q. And did they -- did the defendants here, Charles Boyd or Patrick Boyd, consult with you about -- you know, when choosing this software?
A. No. Not initially.

I was, kind of, told that that was what they were going with and to try to figure out what compliance aspects needed to be incorporated into it.

Q. Okay. Around when did Patrick Boyd and Charles Boyd start buying and selling branded HIV drugs?
A. That would have been the spring of 2020.
Q. And at that time, did the amount of business at Safe Chain Solutions increase?
A. Yes, it did.
Q. Did it increase significantly?
A. Yes. I would say so.

Q. And once the HIV business ramped up, did your job as compliance director become more difficult?
A. Yes, it did.
Q. Why do you say that, or how so?
A. Between being either short-staffed or trying to train a new staff member, you know, that doesn't happen overnight. It takes some time to get a new person up and running.
I also had all my other job duties to make sure they were getting done. So working with the HIV products and that new line of business coming in, there's definitely a steep learning curve. It wasn't anything that we had sold before.
So it was just -- it became very labor intensive. Between new customers, new vendors, you know -- just trying to navigate a new business, also, a new line of business.
Q. And during the course of the buying and selling of HIV drugs, did you consistently identify issues with each HIV supplier?
A. I did.
Q. And did that make your job more difficult?
A. Yes, exponentially.
Q. Why do you say, "Exponentially"?
A. Because it seems with each HIV vendor that was brought on to purchase from, there was always issues.
There was always something not quite right with it, and it was very frustrating because as soon as one, you know -- they

may have decided not to purchase from one, there was another vendor right behind them to fill the hole that was left with their previous supplier.
Q. And at that time, did you feel pressured in your job to approve vendors?
A. Yes. There was certainly a lot of pressure.
The sales team, I know, had already been marketing and was excited about this new line of business. So there was already, you know, orders and talk and marketing spent advertising these drugs.
So when the vendors came to compliance to be approved, you know, there was a sense of urgency. I would get Teams messages saying, "Hey, did you approve this yet?" And there already seemed to be sales ready to go and be shipped out; so it was -- there was certainly a sense of urgency around the HIV drugs.
Q. Did at least some of that pressure come from Patrick Boyd?
A. Yes.
Q. Now, during this time period with all these various HIV suppliers, did there come a point in time where you started questioning whether the defendants actually wanted you to do your job?
A. Yes.
Q. Why do you say that?
A. It was overly frustrating because I would bring issues to their attention and it just seemed I would get a lot of, "Okay,

we will look into it." And it didn't seem like anybody ever looked into it.

And it was just constant. And I would -- my role in compliance was, you know -- I knew that they preferred somebody who was very factual; so I got in the habit of justifying my responses to their requests or to their vendors.

Like if I was going to say there was a problem, I was going to make sure I had reason to say what the problem was.

So yes, I just felt like I was always justifying myself and saying, "Here's a problem, here's what I found, when I was trying to verify this."

And it just seemed like I was going through all of these -- doing a lot of work to try to verify these vendors that were brought to the table. But they would end up making purchases from them anyway; so I felt like I'm here in this role, but it didn't always feel as though I was wanted there.

Q. Were sales more important to Charles Boyd and Patrick Boyd than compliance?

A. I would say yes.

Q. Can you explain or expound upon that?

A. Again, just bringing up issues with vendors, where I saw that maybe somebody didn't look like a good business to do business with, they would still take that avenue and do business with them.

So even though, you know, I might have said, "Hey, this

location doesn't look great" or whatever the issue I may have brought to their attention, they would eventually -- and dealing with HIV medications -- just continue to pursue a financial relationship with them anyway.
Q. When you raised those kinds of issues, did the defendants typically have some sort of explanation?
A. Yes. Or it was deferred to Adam Brosius with Worldwide saying, "Oh, that's Adam's guy. Let me see what I can find out." But it did feel like there was always an explanation for concerns or issues that I had.
Q. Okay. And over time did you get more and more frustrated in your role?
A. Yes, absolutely.
Q. Is that for all the reasons that you have been talking about?
A. Yes.
Q. We had mentioned this earlier in terms of Track and Trace, but were you familiar at the time what a T3 or pedigree was?
A. Yes.
Q. Is it like a shipping label?
A. No.
Q. Why not?
A. The pedigree in T3 is basically a drug's chain of custody or some people like to think of it like a passport. You know, you're seeing where this drug travels, the entirety of its

lifetime from the manufacturer to who else may have sold it and, you know, who it may exchange hands with.

So it helped to create that trail of validity that this is a legitimate product.

Q. And were these T3s pedigrees important in the context of these prescription drugs?

A. Yes, they are a legal requirement.

Q. Is it particularly important with HIV drugs?

A. Yes.

Q. Why do you say that?

A. Just like any drug, you know, people are consuming these; so it's important to make sure you have a traceable history of where this medication came from.

Q. And I think you alluded to this earlier, but were there a number of HIV suppliers?

A. Yes.

Q. What were the name -- what were some of the names of those HIV suppliers?

A. Boulevard 9229, Syntex -- or I'm sorry. Synergy, Gentek, Rapids Tex, Omom. I may have forgotten one or two there.

Q. It sounded like earlier when one disappeared, did another one pop up?

A. Yes.

Q. Did you have concerns with all of these HIV suppliers?

A. Yes. There were concerns that came up for each one.

Q. And in general, did you share those concerns with Charles Boyd?
A. Yes, I did.
Q. And at least at times, did you share those concerns with Patrick Boyd?
A. Yes, I did.
Q. And generally speaking, what were some of the concerns that you had with these suppliers or vendors of HIV medications?
A. Generally speaking, the T3s that we were provided, sometimes we did not get them all, and then when we eventually did get them, we found errors on the T3s. We may not have been able to verify all the transaction history that was provided on the documents.
We also had issues with contact information. The application that was filled out, when we would have questions or concerns, myself or someone else in the compliance department, and when we would try to contact them via the information on their contact forms, we were often unsuccessful.
Some of the email addresses that were used were just -- were generic email providers, like Gmail or Yahoo, that kind of thing.
There was also concerns about sometimes -- there was one instance where an email was provided and it said, "Inc." and that didn't match up with the emails on the company's website.
So those were just, kind of, some general concerns that

were -- came up through each of the various vendors.
Q. Now, I think you had mentioned earlier that you had looked up locations of at least a few of these vendors?
A. Yes. We typically looked up the vendor location when we were verifying the information they provided to us.
Q. Actually, I should have asked this before, but those general concerns that you just listed off, would those have been concerns that you shared with Charles Boyd?
A. Yes.
Q. And at least at times, Patrick Boyd?
A. Yes.
Q. All right. So talking about location, did you look up Boulevard's location?
A. Yes, I did.
MR. POGOZELSKI: If we could pull up for just the witness Government's Exhibit 639.
BY MR. POGOZELSKI:
Q. And if you could take a look at page 2, page 3, page 4 and if there is another page.
Do you recognize these photos as the listed location for Boulevard at the time?
A. Yes, it is.
MR. POGOZELSKI: The Government moves to admit Government Exhibit 639.
MR. ZIMET: Judge, we would ask -- I would -- I would

like to voir dire as to when she observed these pictures.

THE COURT: You can answer the question.

THE WITNESS: At the time of Boulevard's application; so that would have been 2019.

MR. ZIMET: 2019?

THE WITNESS: Yes.

MR. ZIMET: Okay. Thank you.

BY MR. POGOZELSKI:

Q. Would it have been 2020?

A. Yes. I'm sorry.

Q. Okay.

MR. ZIMET: Excuse me, based on, now, a different answer, can I ask another question?

THE COURT: Okay.

VOIR DIRE EXAMINATION

BY MR. ZIMET:

Q. When in 2020 did you look at these?

A. It would have been about April when they submitted their vendor application.

Q. Are these pictures, that you put into the file, of Boulevard's approval?

A. No. They weren't required for the approval.

Q. I didn't say, "required." Did you put them in the file or not and make a notation in the file that these pictures --

MR. POGOZELSKI: Your Honor, these are not foundational

questions.

THE COURT: Sustained.

Any other objections?

MR. ZIMET: No objection, Judge.

THE COURT: Mr. Barzee.

MR. BARZEE: No objection.

THE COURT: 639 will be received.

(Government's No. 639, Document, was received in Evidence.)

MR. POGOZELSKI: Permission to publish, Your Honor?

THE COURT: Okay.

(Publish)

DIRECT EXAMINATION (CON'T)

BY MR. POGOZELSKI:

Q. If we could just take a look at page 2.

How did Boulevard's -- do these photos look similar -- well, let me back up.

How did you look up Boulevard's location at the time of the vendor application?

A. We would use google Maps or something to confirm the address.

Q. And you had testified that these photos looked similar. How did Boulevard's location look at the time you looked them up?

A. It was a little bit -- it wasn't what we were expecting. There was a lot of residential in the area, as far as the big apartment buildings surrounding the area. It was, kind of, a rough looking area, kind of unkept, you know, not the best.
Q. And did it look to you like a wholesaler of expensive branded medication?
A. No, not necessarily. I mean, if you have seen the pictures of the Safe Chain building, it's a nice looking building with nice signs out front and things -- and I guess that's what I expected other wholesalers to look like.
Q. And in terms of the location and what -- Boulevard's address and looked like, did you share those concerns with Charles Boyd?
A. Yes. I think I shared these pictures with him.
Q. And would that have been in person?
A. It was probably on the Teams message or maybe email or probably messaging. We used messaging a lot.
Q. Could it have been in person?
A. There's a chance, yes, because, again, we spoke frequently.
Q. And did you work closely in the office?
A. His office was right upstairs from mine and there was -- there was only a few office spaces. It was an office front attached to a big warehouse.
Q. And with Boulevard, you mentioned -- I guess you said in general, you had problems contacting people on the vendor

applications for these suppliers of HIV. Was that -- did that apply to Boulevard 9229 LLC?
A. Yes, it did.
Q. And why was that concerning to you?
A. When they first began the relationship with Boulevard and after a transaction or two had taken place, and they had purchased some of the drugs, we weren't receiving the required T3 documents. So either myself or whoever may have been helping me at the moment -- I think that was Kelsey -- when we were trying to contact the customer to say, "Hey, we need this information, like when are you sending it."
You know, calling the number, that was provided on the application or trying to reach out to the email, was unsuccessful. The phone just rang. Didn't get responses to the email that I was sending to.
Q. Was the email that you were sending emails to, was that the one listed on application?
A. Yes, that was the only contact that I had.
Q. And who did you reach out to try to get contact information for Boulevard 9229 LLC?
A. After I was unsuccessful, you know, using what was provided, I know I'd spoken to Charles about, "Hey, do you have any additional contacts here?" I may have even asked the accounting department, "Do you have any additional contacts because I'm not having any success reaching anyone?"

Q. Why were you trying to reach out to this vendor, Boulevard?
A. They hadn't provided the necessary T3s; so we needed that information.
Q. And why was that concerning to you, the lack of T3s from Boulevard?
A. The sales and shipping were happening very quickly of those drugs. Again, on top of all the other things that I needed to do, I didn't want to get backlogged. And getting that information into our software system -- it was a requirement.
And eventually after some sales exchanges had happened already, you know, we did have customers calling asking for their T3s because they could tell from the information that they pulled out of Track and Trace that we -- that Safe Chain provided was not complete.
And they could tell that because the transaction would start from Boulevard and go to Safe Chain and then list the pharmacy customer's name. They knew that Boulevard was not the person manufacturing those drugs; so they recognized there were steps missing from the T3s.
Q. Were those T3s accurate?
A. No, they weren't.
Q. And did the defendants know that those types of T3s were going out to customers?
A. Yes. Because we didn't have any T3s from Boulevard to update our side of the system.

Q. So even without any T3s from Boulevard, the defendants were sending out T3s to customers?
A. Yes.
Q. And did you have customers call -- question the sourcing of the drugs based on the T3s?
A. Yes, we did.
Q. And was that a difficult task or conversation to have from your perspective in compliance?
A. Yes, it put me in a terrible position. I knew that we didn't have them, and I had customers calling -- asking questions that I didn't have answers to.
Q. And were you the one raising the alarm bells about this lack of T3s, pedigrees?
A. Myself and Kelsey -- I think we were equally concerned and saying, "Hey, guys we don't have this documentation that we need."
Q. And were you communicating that to Charles Boyd?
A. Yes.
Q. Was Charles Boyd the one raising the alarm bells about the lack of T3s, initially?
A. I don't -- I don't know if he was as concerned as I was.
Q. Okay. And receiving those T3s, pedigrees from Boulevard, tracking the history of the drug, was that a requirement under the company's standard operating procedures?
A. Yes, it was.

Q. So at least at this time, was that followed?
A. No, it wasn't.
Q. Did the defendants know that?
A. Yes.
Q. About how long did that last, the -- Boulevard's failure to provide any T3 information?
A. I think approximately three months. They began sending the T3s in August of 2020.
Q. And how? Was it by email?
A. They were emailing PDF copies.
Q. And what do you mean "PDF copies"?
A. So they would provide a PDF T3 which was not terribly unheard of. We did, at the time, work with one or two vendors that provided PDF T3s. But then we would have to update the software system to reflect those previous transactions prior to arriving at Safe Chain. That wasn't an unusual practice on a very small quantity of things and maybe one or two vendors. But Boulevard began sending binders of PDFs, electronic binders that had, at any time, one hundred documents or so.
Q. One hundred T3s?
A. Yes.
Q. And you mentioned they were emailed. What was the email address from which those Boulevard T3s came?
A. The email address that they came from was "consulting01234@gmail.com."

Q. Was there any, kind of, name associated with that email address?
A. Yes. The name was "King Kimchi."
Q. When you started receiving the Kim -- King Kimchi T3s, did you take steps to verify those?
A. We did.
Q. And what happened? What did you do?
A. So in order to verify the T3s, we would, kind of, work backwards from the most recent receipt which would have been Safe Chain and then verifying who Boulevard listed sold them the medications from.
So it would be Safe Chain, Boulevard, and then maybe a pharmacy. We would then try to contact that pharmacy to verify the transaction that, yes, they did, in fact, sell that drug in quantity to Boulevard. Sometimes if we weren't able to immediately contact someone, we would try and verify the next transaction whether that was from another wholesaler or from a manufacturer. We'd try to work backwards to call and verify the PO and information listed was accurate.
Q. Okay. And with those first King Kimchi T3s, were you able to verify them?
A. No. I believe we found some issues with each T3 that was provided, each version that we received over time.
Q. Okay. Did you confirm that the first King Kimchi T3 version was false?

A. I believe we did.
Q. And did you pass that along to Charles Boyd?
A. Yes.
Q. Did you pass it along to Patrick Boyd?
A. Probably.
Q. Okay. And after that, did you confirm a second King Kimchi T3 to be false?
A. Yes, I believe we did.
Q. Did you pass that along to Charles Boyd?
A. Yes.
Q. Did you pass that along to Patrick Boyd?
A. Yes.
Q. Was -- I think you mentioned this. Was Gentek LLC another HIV supplier?
A. Yes, they were.
Q. And did you approve Gentek as a vendor?
A. Yes.
Q. Did you, similar to Boulevard, look up its listed location?
A. Yes.
MR. POGOZELSKI: If we could take a look at, for just the witness, Government's Exhibit 640.
If we could go to page 2, as well.
BY MR. POGOZELSKI:
Q. Do these photos resemble the Gentek LLC location that you looked up at the time?

A. Yes.

MR. POGOZELSKI: Government moves to admit Government's Exhibit 640.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 640 will be received.

(Government's No. 640, Photographs of Gentek LLC, was received in Evidence.)

BY MR. POGOZELSKI:

Q. If we go to page 2, did you -- was there anything unusual about this location?

A. It looked better than Boulevard. It looked a bit more -- potentially a small business. I think we were described there were offices above and that the garage doors were, kind of, where the warehouse storage was.

Q. And did the defendants buy around $40 million worth of HIV drugs from Gentek LLC?

A. I don't know the monetary value of how much they purchased.

Q. Did they buy a lot of HIV drugs from Gentek?

A. Yes, they did.

Q. Did you try to verify, similar to Boulevard, Gentek's T3s?

A. Yes. We worked through the same process to work through the listed vendors and transactions to confirm what was listed.

Q. And were you personally -- or was compliance ever able to verify a Gentek T3?

A. I don't believe so. I believe it was my compliance partner at the time who was primarily working a lot of these. But with each one, I think we ran into a snag that there was one step along the way that was not valid.
Q. Did you talk to Patrick Boyd about trying to verify the Gentek T3s?
A. Yes.
Q. And do you know if Patrick Boyd was ever able to verify the Gentek T3s with drug rheapatonis (phonetic)
A. I don't. I was told it was okay and good to go; so I relied on his word. There was a language barrier. I don't speak Spanish and some of the other wholesale locations here were listed on -- as Spanish speaking businesses.
Q. You said, "You were told." You were told by who it was okay?
A. Patrick. I think he said it was good to go.
Q. And that was with the Gentek T3s?
A. Yes.
Q. You also mentioned Synergy Group Wholesalers. Was Synergy Group Wholesalers later in time?
A. Yes.
Q. Then Gentek and Boulevard?
A. Yes, I believe a few months after.
Q. And do you recall what kinds of concerns you had with Synergy Group Wholesalers?

A. I know that there were several, I think along the same lines that we had difficulty with their T3s. They may have provided an example I think at first, but, yeah, I think it was similar issues with them.
Q. Was it similar to Boulevard in terms of verification of T3s?
A. I think so because that was, kind of, an ongoing issue with all of them.
Q. Did you confirm that the first sample Synergy T3 was false, for you or for compliance?
A. I think we had some questions about it and we were told they provided an old template.
Q. Who told you that?
A. I think -- when we were trying to verify one of the T3s, I think Pat told us, "Oh, that was a mistake. That was an old template."
Q. In what context? Had compliance verified that that Synergy T3 was false?
A. Yes, I think we were trying to call it up and it ran into a snag and, kind of, figured out, "Hey, this doesn't seem right." You know, brought those concerns to their attention.
Q. Okay. And what was Patrick Boyd's explanation?
A. I think he told us that the company used an old template.
Q. Did you believe that explanation by this point in time?
A. No, I wouldn't say that I did.

Q. Okay. Were your concerns falling on "deaf ears" by this point?
A. I felt like it, yes.
Q. And with all these various vendors, did the defendants typically have some sort of explanation, like you just described, for problems that you identified?
A. Yes.
Q. Did Synergy then send a second version of a T3?
A. I think, yes, they did.
Q. Did you have concerns with that second version?
A. Yes, there were more issues.
Q. Did that one list Drogaria Biamonte?
A. Yes.
Q. And did you dig into that?
A. We did.
Q. And did you identify concerns with that T3?
A. I think it was just along the same lines as trying to contact someone, again, in the Spanish-speaking business, was unsuccessful, at least from the compliance side.
Q. Did you pass that along to Patrick Boyd?
A. Yes, I was told that Patrick had some basic Spanish-speaking skills and we were -- we asked him to reach out on our behalf to help us get it sorted out.
Q. Did you eventually receive a third version of a Synergy T3?
A. We did.

Q. Did you have concerns with that third version, as well?
A. Yes, I think it was in the same boat with us not being able to verify a transaction that was provided to us.
Q. Did that one list an authorized distributor, Cesar Castillo?
A. Yes, it did.
Q. Did you do some kind of diligence on the email address or the websites?
A. Yeah. And I think when I was looking at it, the email address that was provided to us, I think this is where it said, like, "Cesar Castillo, Inc." And on their website, when we looked it up, it said like, "Cesarcastillo.Org" or something, but there was some kind of discrepancy between what was provided to us and what was on the company's actual website.
Q. That was the third version of a Synergy T3?
A. Yes.
Q. Did you pass along those concerns you had to Charles Boyd?
A. Yes.
Q. And Patrick Boyd?
A. Yes.
Q. You also mentioned Omom Pharmaceuticals?
A. Yes.
Q. Did you have concerns with Omom Pharmaceuticals.
A. Yes, I think along the same lines as far as T3s that they were providing, unable to verify. And I think this was one of

the vendors that was attempting to deliver to the Utah warehouse. There were some licensing questioning about if they could deliver essentially a courier delivery from California to Utah because they didn't hold the Utah pharmacy license.

Q. Okay.

MR. POGOZELSKI: And if we could pull up Government's Exhibit 461, just for the witness.

BY MR. POGOZELSKI:

Q. Ms. Divilio, are these -- what are these? What is this document?

A. This looks like a Teams message between Charles and I on June 11th, 2021.

Q. And so I think you had testified Boulevard was back in around April, May 2020?

A. Yes.

Q. Okay. And then these Teams messages are about, they're in June of 2021, so sometime later.

If we could scroll to page 3 -- 3 and 4, bottom of page 3 first.

At that 8:52 p.m., what did you write there to Charles Boyd?

THE COURT: Are you moving in 461?

MR. POGOZELSKI: Oh. I'm sorry. Yes.

The Government moves to admit from Exhibit 461.

MR. ZIMET: Your Honor, an issue that we talked about

pretrial.

THE COURT: Overruled.

461 will be received.

(Government's No. 461, 6/11/21 Teams Message, was received in Evidence.)

MR. POGOZELSKI: Permission to publish, Your Honor?

THE COURT: Okay.

MR. POGOZELSKI: Thank you for the reminder. Sorry.

(Publish)

BY MR. POGOZELSKI:

Q. All right. If we could go back to the top of page 3 in that 8:52 p.m. message, there at the top.

What are you writing to Charles Boyd?

A. "Holly asked me if I knew anything about this. Collin declined the order from Omom which arrived to Utah in a beat-up minivan. I'm a little worried this can turn into another Mr. Unlimited."

Q. Okay. And if we could go to page 4.

And do you see there where you say, "All righty. Is there video at Utah? I wish I could have seen the van pull up."

A. Uh-huh.

Q. What was Charles Boyd's response to this beat-up minivan showing up with HIV drugs?

A. He says, "I'm not worried about what it showed up in. I think they hired a courier."

Q. Okay. Was this one of the concerns that you had with Omom?
A. Yes.
Q. Okay. We can take that down.
Aside from what you have already testified about with these various different sequential HIV suppliers, were there other complaints from customers, aside from T3s and what you mentioned?
A. Yes.
Q. What were those?
A. We eventually -- we did receive customer complaints about the wrong medication being inside the medication bottles. That happened, I think, on two instances where the drug inside was figured out to be psychiatric medication.
There's another instance where the patient recognized the medication, it was like Excedrin or something, some other generic pain reliever.
There was an issue where the patient consumed a medication and had some serious medical repercussions.
So yes, there were patients' complaints about the quality of the medications and receiving the wrong pills in bottles and things.
Q. And was Charles Boyd aware of this?
A. Yes.
Q. These various complaints?
A. Yes.

Q. And Patrick Boyd?
A. Yes.
Q. Did they start around August 2020?
A. Yes.
Q. And did the defendants, Charles Boyd and Patrick Boyd, blame the patients?
A. There were comments made and kind of -- all kinds of stories that could be used to explain this.
One of them was saying, "You know, these patients could potentially be -- you know, the patients are the ones trading these medications."
I knew they were expensive, so the thought was that -- the idea, that was kind of planted, was that patients could potentially be tampering with their own medications because they're expensive and these people could do those things.
It was just generally, kind of, negative commentation about the patients that were using these medications.
Q. Describe them as junkies?
A. Yes. That could be one way they described them.
Q. Okay.
MR. POGOZELSKI: If we could pull up for just the witness --
BY MR. POGOZELSKI:
Q. Actually, before we get there, you mentioned different drugs, wrong drugs in the bottles of HIV medicine.

Were there other customer complaints?
A. Yes. There was maybe one or two complaints about the general appearance of the bottle. There were -- it, kind of, started with one of bottles had some, kind of, like, adhesive or something stuck to the label; so it was kind of obscuring the lot information.
And I think -- I heard other complaints that, you know, there was just generally, kind of, not clean-looking on the bottles.
Q. Dirty bottles?
A. Yes.
Q. And those were just the complaints that you knew about?
A. Yes.
Q. Did you get the sense that you knew about all such customer complaints?
A. At the time, I thought that I did.
Q. And was there a point while you were working at Safe Chain that that changed? Did you learn about other issues that you didn't know at that time?
A. I learned about other issues after I was no longer employed there.
Q. Okay. Understood.
MR. POGOZELSKI: If we could pull up for just the witness, Government Exhibit 514.
///

BY MR. POGOZELSKI:
Q. Ms. Divilio, what are these? What is in this document?
A. These are text messages, text pictures from Charles Boyd to me and Jesse Hammett.
Q. Okay. And what's the date?
A. August 17th, 2020.
MR. POGOZELSKI: Government moves to admit Government Exhibit 514.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 514 will be received.
(Government's No. 514, 8/17/20 Text, was received in Evidence.)
MR. POGOZELSKI: Permission to publish, Your Honor?
THE COURT: Okay.
(Publish.)
MR. POGOZELSKI: If we could scroll to page 4.
BY MR. POGOZELSKI:
Q. Are these photos that Charles Boyd sent to you?
A. Yes. I believe he was provided these from the pharmacist who had that in their possession.
Q. And what was the date on these? Was it August 17th?
A. August 17th, 2020.
Q. And on this particular photo, at least, does it -- does the bottle look a little dirty there?

A. It does. It appears that it has some kind of adhesive, kind of, stuff at the top there.
Q. And if we could scroll to page 5, is this a photo of the pills that were in the bottle?
A. Yes.
MR. POGOZELSKI: And if we could scroll to the next page.
BY MR. POGOZELSKI:
Q. And what's on this page?
A. I think this was provided by the pharmacist.
It's a picture that is identifying that the pill that was in the bottle was Seroquel XR 400.
MR. POGOZELSKI: And if we could scroll to the top.
BY MR. POGOZELSKI:
Q. Was this "White Cross Pharmacy"?
A. Yes, I believe it was.
Q. What's the date, again?
A. August 17th, 2020.
Q. All right.
MR. POGOZELSKI: We can take that down.
If we could show the witness Government Exhibit 418.
BY MR. POGOZELSKI:
Q. Are these Teams messages that include Charles Boyd and you?
A. Yes, they are.
Q. What's the date?

A. August 17th, 2020.
MR. POGOZELSKI: Your Honor, the Government moves to admit Government Exhibit 418.
MR. ZIMET: Same as before, Judge.
THE COURT: Overruled.
418 will be received.
(Government's No. 418, 8/17/20 Teams Message, was received in Evidence.)
MR. POGOZELSKI: Permission to publish?
THE COURT: Okay.
(Publish.)
MR. POGOZELSKI: If we could go to the next page and highlight the Jesse Hammett 1:33 p.m. message.
BY MR. POGOZELSKI:
Q. And are these the same date as those text messages with the photos that we just looked at?
A. Yes, they are.
Q. Okay. And what is Jesse Hammett here writing to you and Charles Boyd?
A. "AstraZeneca manufactures the XR 400 and Gilead manufactures Biktarvy. They are not the same company and are not under the same parent company."
Q. And does he say anything after that? What's the next message?
A. "So unless they're made" -- "So unless they are made in the

same contract manufacturing plant, it's unlikely the pills for one would end up in the bottle of another."
Q. And what was your response?
A. "Yes. I was just looking into that, as well. Seems really weird that there could have been a mixup."
Q. So at least at this time, did it seem unlikely to you that this was a Gilead manufacturing issue with Seroquel in the bottle?
A. It seemed unlikely because as we were trying to, kind of, research what could have potentially happened, you know. And just a basic google search, we figured out that they were not manufactured by the same company. So again, it wouldn't be likely that these large manufacturers would have been under the same roof producing medication.
Q. All right. And did -- was there also a complaint about generic Excedrin in a bottle of Biktarvy around this time?
A. Yes, I believe so.
Q. Was that also White Cross Pharmacy?
A. I think it was.
Q. At least with this Seroquel in the bottle of Biktarvy -- actually, if we could scroll to page 4, there's a message from you at 2:59 p.m. at the top.
What did you write there?
A. "Do you think we should contact the other customer?"
Q. And what was Charles Boyd's response?

A. "Probably some of them, but I need to figure out the best way to bring it up."
Q. To the best of your knowledge, did the defendant send out any kind of letter notification to customers at this time?
A. No, not -- we didn't.
Q. Did the defendants notify the FDA at this time?
A. No.
Q. And then if we could scroll out and highlight the message from you at 6:23 p.m. message -- the 6:23 p.m. message.
All right. And there you describe a conversation with -- is that someone at Gilead? Clifford?
A. Yes.
Q. And then you write, "I have emailed them one picture."
Did you or the defendants tell Gilead at this time about this complaint from the pharmacy, the Seroquel?
A. No.
Q. And did you have more than one picture from Charles Boyd?
A. Yes, we did.
Q. And why did you only email Gilead one picture and not tell them about the complaint?
A. I think it just seemed best to be conservative. That was, kind of, the general impression that I was under is that we didn't want to raise a lot of unnecessary "red flags." So in an effort to be conservative, just sending them the one picture to see if we could get some explanation and have our questions

answered.

MR. POGOZELSKI: Okay. We can take that down.

BY MR. POGOZELSKI:

Q. Was there a second incident with Seroquel in one of the bottles distributed by the defendants in that fall time period?

A. Yes.

Q. Was that around October 2020?

A. Yes.

Q. Was Charles Boyd aware of this?

A. Yes.

Q. Patrick Boyd?

A. Yes.

Q. Did the defendants notify customers about that complaint in October 2020?

A. No, they didn't.

Q. Did they notify the FDA?

A. No, they didn't.

Q. And by this time in October of 2020, was there any notification to customers about the August 2020 complaints?

A. No, there wasn't.

Q. Was there any notification to the FDA about the August 2020 complaints?

A. No, there wasn't.

Q. As far as you knew, were there at least -- were there some or at least one similar problem with non Gilead HIV drugs?

A. I think I recall one product, which was a ViiV product -- I'm sorry. One complaint that was related to a ViiV product.

MR. POGOZELSKI: Okay. If we could pull up for, just the witness, Government's Exhibit 278.

BY MR. POGOZELSKI:

Q. And before I ask you questions about the document, the ViiV product, was it a complaint -- what kind of complaint was it?

A. I don't remember if they were complaining that there was the wrong medication or if there's broken pills. There was something -- again, an issue with the drug that was inside the product.

Q. Okay. So in front of you, is there an email?

A. Yes.

Q. And compliance, are you on this email?

A. Yes, I have access to the compliance email.

Q. What's the date?

A. 5/3/2021.

MR. POGOZELSKI: Your Honor, the Government moves into evidence Government's Exhibit 278.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 278 will be received.

(Government's No. 278, 5/3/21 Email, was received in Evidence.)

///

BY MR. POGOZELSKI:
Q. All right. Who is this email from?
A. Adam Brosius.
Q. And are Charles Boyd and Patrick Boyd copied on it?
A. Yes, they are.
MR. POGOZELSKI: And if we could zoom out.
BY MR. POGOZELSKI:
Q. Is Adam Boyd identifying the pills that were in the bottle of Tivicay here?
A. Adam Brosius.
Q. I'm sorry. Adam Brosius.
A. Yes, he's making a suggestion.
Q. And what is the drug that he's listed here?
A. He said, "Looks like FL 10, an Alzheimer's medication. FL 10 on the pills."
MR. POGOZELSKI: If we can zoom out.
And then if we could scroll down -- keep going down.
BY MR. POGOZELSKI:
Q. Is this a complaint from a customer, as far as you can tell?
A. The salespeople listed here are part of Worldwide Pharma Sales. I think that Mohammed Etminan person may be the customer.
Q. Okay. Is that Total Remedy?
A. I can't -- I can't remember if that's who it may be

associated with.
Q. Okay.
MR. POGOZELSKI: Scroll down a little bit.
BY MR. POGOZELSKI:
Q. Ms. Divilio, for this ViiV product, did the defendants report this to the FDA?
A. No.
Q. Did you ever --
MR. POGOZELSKI: We can pull that document down.
BY MR. POGOZELSKI:
Q. Did you ever tell the defendants that they should not be in the HIV business?
A. Yes.
Q. Was it multiple times?
A. Yes. I think that was said -- kind of questioning if -- because all of these efforts and all these problems we're having with all these vendors, is it worth the outcome.
Q. And what did they say?
A. I don't think I ever received a direct response to that. I think it was always, kind of, seen as a rhetorical question, but they continued to purchase. So...
Q. And who ultimately made those decisions to purchase from these HIV vendors?
A. Charles and Pat.
Q. And at that time, did you know anything about the discounts

or pricing offered by the vendors?

A. No, I wasn't involved in any of the pricing of the drugs.

Q. And at some point in time, was there a seizure?

A. Yes, there was.

Q. And despite all your frustrations, complaints, did you stay at the company after all this?

A. I did, until I secured other employment.

Q. And why did you stay?

A. I start looking for jobs at the end of 2020. It did take me, you know, nearly a year to find other employment. I certainly -- my family depended on my salary, much like most people. It would put my family in a very difficult situation if I just walked away and said, "Forget it, I quit."

I had other things going on in my personal life. My husband and I were looking for another house; so we had a mortgage pre-approval letter and quitting a job and not having income would have had a huge impact on that. We wouldn't have been able to pursue our purchase of a new home.

So just like anybody, you have other things going in your life. I was applying for jobs for nearly a year when I was finally contacted by my former employer to see if I would be interested in an opportunity there.

Q. You mentioned applying for jobs in 2020. Was that during COVID?

A. It was. And I think that just made it very difficult

with -- you know, just the atmosphere of the nation at the time, working from home. A lot of different remote opportunities. You weren't competing with other people anymore. You were competing nationwide for an opportunity because of, you know, a remote opportunity.
Q. Now, let's turn to Boulevard 9229 LLC in a little more detail. Was Boulevard 9229 LLC the first supplier of these HIV drugs --
A. Yes.
Q. -- to the defendants?
And as far as you understood, who brought on Boulevard 9229 LLC?
A. My understanding was that the HIV business was brought to Safe Chain through Adam Brosius. Many of these people were his contacts that he knew from the start. So it was, kind of, like a Worldwide Pharma vendor at first, is how it was presented which was not unusual at the time. Adam did bring various lines of business or various vendors that he worked with to Safe Chain for a relationship.
Q. You mentioned Worldwide Pharma. Kind of, generally, what was Worldwide Pharma?
A. Worldwide Pharma was Adam Brosius's business or -- the one that we worked with -- I think there were several of his businesses -- it was an external sales team. It was a group of people that, kind of, had a contract relationship with Safe

Chain to sell any medications, really not just HIV.

Q. And was Adam Brosius a part owner with the defendants of Safe Chain Solutions?

A. At some point, he did become a part owner. I'm not sure exactly when that relationship merged.

Q. Had Adam Brosius worked with the defendants prior to the HIV business?

A. Yes. He had been there as long as I had been employed there.

Q. Okay. And prior to all of these various HIV suppliers, did you have concerns about Adam Brosius?

A. I did.

Q. Why?

A. I found him -- I found him to be a bit sneaky. There would be times where we maybe would be on a conference call and everybody's talking about whatever the topic is and then randomly he would chime in, you know, he wouldn't announce himself on sales calls -- not just work calls, in general.

But I found that to be, kind of, just unprofessional and, kind of, rude, not to let yourself be known on a group phone call that was for work. I just, kind of, generally, found him to be, kind of, abrasive, not very easy to work with.

We also discovered that during the time which the Boyds were working with him, he was going through another legal indictment for Medicare fraud. So that was also a big concern

that this person that was -- obviously, has a track record of bad decisions was actively working with Safe Chain. So yeah, he just didn't seem very trustworthy to me.
Q. And prior to that Medicare fraud indictment, did you have concerns with vendors or customers that Adam Brosius brought to Safe Chain?
A. It certainly started with Boulevard. And it did seem that all of these relationships were initiated by Adam at first or from what I could tell.
Q. And generally speaking, did compliance have concerns about Adam Brosius's business practices prior to Boulevard and the HIV business?
A. Yes. I knew that he did have several businesses -- I mean, several names of businesses that exchanged, like, exchanged hands. He would have one business group called Black Cat and then it would be Worldwide Pharma. So he did seem to have this pattern of turning over businesses very quickly and --
Q. Did you share those concerns with Charles Boyd and Patrick Boyd?
A. I did. I expressed that I didn't really feel comfortable working with him directly. As far as -- at that time, as far as I knew, he was not my employer. You know, I reported to Charles. So I felt like I will work with you because you're my boss. I really didn't feel comfortable working with him or taking instruction from him.

Q. Was Adam Brosius close with the Boyds?
A. I would say, yes.
Q. And you mentioned a separate Medicare fraud indictment. Did the compliance team discover that indictment?
A. Yes, we did.
Q. Did you bring it to the Boyds' attention?
A. We did. Kelsey Jones, who was working with me at the time, was kind of -- I don't remember exactly how it came about, but she did -- you know, it was a pretty simple google search that they did that we had some kind of a long list of legal issues building.
Q. And after compliance brought that to the attention of the Boyds, did Charles Boyd send out an email about it?
A. He did. He sent an email to the management team, which included me, basically saying that while Adam worked through his legal issues, that they would be -- that we would work directly with Jenna and Garrett Mellott who were two of his sales employees.
Jenna was more of, like, an administrative person and Garrett was her father, who was also, kind of, an administrative lead that we would interact directly with them and, kind of, give a degree of separation between Safe Chain and Adam Brosius and wished him well as he figured out his legal woes.
Q. Okay. Was it the Boyds who proactively sent that email out

about Brosius's indictment?
A. No. I think it was in response to Kelsey and I discovering that.
Q. And you mentioned Charles Boyd's email suggesting some separation between Safe Chain and Adam Brosius.
Did Adam Brosius remain very involved with the HIV business going forward?
A. I would say he quieted down for maybe a week or two, but again, you could tell that the instruction that you were receiving from Jenna and Garrett was not their own words. It was definitely worded more like how Adam would have said things. But, you know, he remained involved even though he didn't interact with myself or compliance regularly.
Q. In that May, I think it was a May 2021 email, was that Adam Brosius identifying a problem with Tivicay pills?
A. Yes. It was him and his sales team.
Q. Was he sending that to Charles Boyd and Patrick Boyd?
A. Yes.
Q. And after Adam Brosius's indictment, did he attend a company holiday party?
A. He was around at the holiday parties. There was a celebration for their ten-year anniversary. I feel like he was always on the outskirts.
Q. Now, just turning back to Boulevard. Did Boulevard 9229 submit a vendor application?

A. Yes, they did.

MR. POGOZELSKI: If we could pull up for the witness Government Exhibit 111.

BY MR. POGOZELSKI:

Q. And is this an email that you received?

A. Yes, from an accounting person.

Q. What's the date?

A. April 22nd, 2020.

MR. POGOZELSKI: And then if we could go ahead and scroll to page 4.

BY MR. POGOZELSKI:

Q. Is this Boulevard's vendor application?

A. Yes, it is.

Q. All right. And was it your responsibility, as the compliance director, to review these type of vendor applications?

A. Yes it was.

MR. POGOZELSKI: All right. The Government moves to admit Government Exhibit 111.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 111 will be received.

(Government's No. 111, 4/22/20 Email, was received in Evidence.)

///

BY MR. POGOZELSKI:
Q. Okay. If we could go back to page 4, who is listed here as the -- I know it's hard to read -- the accounts receivable contact name?
A. The name is Ishbay, something with an S, S-L.
Q. Shukurov?
A. Yes.
Q. Okay. Did you have any idea who that was?
A. No.
Q. Did you learn who that was?
A. No.
Q. What is the email listed here?
A. "Boulevard9229@Gmail.com."
Q. Is there a phone number listed, as well?
A. Yes, there is.
Q. And are these the emails, phone numbers compliance tried to contact?
A. Yes.
Q. Unsuccessfully?
A. Yes.
Q. Who were your main points of contact at Boulevard?
A. We were given the name Peter, with no last name, no clue to the last name, and the King Kimchi person.
Q. Who gave you the name "Peter"?
A. Either Charles -- or Charles via Adam. That was the

contact that we were told.
Q. Okay. And did you talk to Charles Boyd about, you know, knowing this contact for Boulevard as only Peter?
A. We did. It seemed strange to all of us that no one knew this person's last name. They were just Peter from Boulevard.
Q. Okay. And King Kimchi. What was King Kimchi's role with respect to Boulevard as you understood it?
A. That was the person that they supposedly hired in about August of that year to begin to provide us with T3 documents.
Q. Okay.
MR. POGOZELSKI: If we could scroll back up to the first page.
BY MR. POGOZELSKI:
Q. What's the date of this vendor application?
A. 4/22/2020.
Q. Did you approve Boulevard's -- Boulevard 9229 LLC's vendor application?
A. I did.
Q. And what steps did you take to approve Boulevard at that time?
A. At the time we would look up the address to just, kind of, get an idea of what the business looked like. Make sure it was legit-looking business and we would also verify the customer's provided license, their wholesale license that they would send to us.

Q. And when you approved Boulevard 9229 LLC at this time, were you aware that Peter, last name unknown, would be the main point of contacts?
A. I didn't.
Q. And at this time, were you aware -- when you approved Boulevard, were you aware Boulevard would be sending HIV drugs without any T3s for months?
A. No.
Q. And at the time that you approved Boulevard, were you aware that when they -- when Boulevard provided T3s, it would be from King Kimchi?
A. No.
Q. Did Boulevard provide a scanned copy of a wholesaler license as part of its application?
A. They did provide a PDF version of a license.
Q. Is that -- if we could scroll to -- I think it should be on one of these pages here.
Is this the scanned copy that was provided?
A. Yes.
Q. Okay. And did you rely on the scanned copy to approve Boulevard?
A. Yes.
Q. At this time, did -- as far as you remember, did the company's SOPs require you to call the New York Board of Pharmacy to verify it?

A. No.
Q. And at this time, did you feel rushed to approve Boulevard 9229 as a vendor?
A. Yes.
Q. Did you feel pressure?
A. Yes.
Q. Who?
A. From the sales team. There was a lot of Teams messages saying, "Hey, did you get that vendor application? Did you approve that?"
Yeah, so there was a lot of urgency to hurry up and get this approved, so that the sales could start moving out the door.
Q. And did that pressure include -- you know, the people putting pressure on you, did that include Patrick Boyd?
A. Yes.
MR POGOZELSKI: If we could go back to the vendor application and highlight at the bottom. It says, "Please attach your Maryland and/or Utah state licenses."
BY MR. POGOZELSKI:
Q. Do you see that?
A. Yes.
Q. Did Boulevard provide a copy of a Maryland license?
A. No, they did not.
Q. Okay. And did you talk or communicate with Charles Boyd

about that?
A. Yes. At some point --
Q. You can just say yes.
A. Yes.
MR. ZIMET: Judge, she could say what her answer is.
THE COURT: You can finish your answer.
A. At some point, we were trying to determine if they had a Maryland license, also.
BY MR. POGOZELSKI:
Q. Okay.
MR. POGOZELSKI: We can pull up Government Exhibit 471 just for the witness.
BY MR. POGOZELSKI:
Q. Are these Teams messages between you and Charles Boyd?
A. Yes, they are.
Q. What is the date?
A. 6/1/2020.
MR. POGOZELSKI: Government moves to admit Government Exhibit 471.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 471 will be received.
(Government's No. 471, Document, was received in Evidence.)
///

BY MR. POGOZELSKI:
Q. If we could go to the next page.
Take a moment to look at it. But is Charles Boyd asking you for a copy of Boulevard 9229's license?
A. Yes, they were.
Q. Did you send him a scanned -- a scanned version of the license?
A. Yes, I did.
Q. And then, is there a discussion here about Boulevard and whether it had a Maryland license?
A. Yes. Charles was asking me if they had a Maryland license -- sorry. I just lost my place.
And yes, I just said, "New York is not a reciprocal state. I can double-check with the Maryland Board of Pharmacy and ask if they have a Maryland license."
Q. What did Charles Boyd say in response?
A. "I wouldn't call the board."
Q. And why did you suggest calling the Maryland Board of Pharmacy.
A. It was my understanding that Boulevard was a newer wholesaler; so I thought that it seemed possible that maybe they had a license that was just -- had not been issued or was maybe in the process of being issued.
I couldn't find anything when I went to their -- the Maryland Board of Pharmacy online verification system. So it

just didn't seem like a crazy idea to me to call the Board of Pharmacy to just ask them for help looking this information up because I couldn't find it easily.

Q. Would that have been the easiest solution to this question?

A. Yes, I believe it would have been.

Q. And you mentioned you had this understanding that Boulevard was a newer vendor.

Where did that come from?

A. I think that was just the general information that we received, kind of, this was a new business. They were a new vendor, from Adam and Charles. Kind of, you know, when we saw their license had been recently issued that was, kind of, the explanation for it.

Q. And did you disagree with Charles Boyd's suggestion about not calling the Maryland Board of Pharmacy?

A. I didn't see what the big deal was.

At the time I certainly didn't think it was a big deal to call them and just ask the question.

Q. Would they have just given you an answer?

A. I would have thought, yes.

MR. POGOZELSKI: We can take this exhibit down.

BY MR. POGOZELSKI:

Q. Do you recall, approximately, when the defendants started buying those HIV drugs from Boulevard and King Kimchi and Peter?

A. Pretty much immediately after that application was approved. So April of 2020.

MR. POGOZELSKI: Okay. If we could pull up for just the witness -- and I don't know if anyone needs to use the restroom. I have been going for a while. If we're good to keep going, I'm good to keep going.

THE COURT: We'll take a 15-minute recess.

Remember my admonition not to discuss the case or allow it to be discussed in your presence. And we'll see you back in the jury room in about 15 minutes.

(Jury exits.)

THE COURT: Ms. Divilio, during the break in your testimony, you're not allowed to discuss your testimony with anyone. Do you understand?

THE WITNESS: Yes.

THE COURT: We will see you back in about 15 minutes.

If there's nothing else to come before the Court, we'll be in recess for 15 minutes.

(Off the record.)

THE COURT: We're back on the record. Counsel are present, both defendants are present.

Ms. Divilio, you understand you're still under oath?

THE WITNESS: Yes.

THE COURT: Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: No, Your Honor.
MR. ZIMET: No, Your Honor.
MR. BARZEE: No, Your Honor.
THE COURT: Let's bring in the jury.
(Jury enters.)
THE COURT: Does counsel concede the presence of the jury and waive its polling?
MR. POGOZELSKI: Yes, Your Honor.
MR. ZIMET: Yes, sir.
MR. BARZEE: Yes, Your Honor.
THE COURT: Did everyone follow my admonishment not to discuss the case or allow it to be discussed in your presence.
All right. You may continue with the direct examination.
MR. POGOZELSKI: Thank you, Your Honor.
If we could pull up, for just the witness, Government's Exhibit 305.
BY MR. POGOZELSKI:
Q. Ms. Divilio, is this an email that you sent to the New York Board of Pharmacy?
A. Yes, it is.
Q. And are Charles Boyd and Patrick Boyd copied on it?
A. Yes, they are.
Q. And what is the date?
A. 6/11/2021.

MR. POGOZELSKI: At this time, the Government moves to admit Government's Exhibit 305.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 305 will be received.

(Government's No. 305, 6/11/21 Email, was received in Evidence.)

MR. POGOZELSKI: Thank you, Your Honor.

BY MR. POGOZELSKI:

Q. Ms. Divilio, in this email, did you attach a spreadsheet?

A. Yes, I did.

MR. POGOZELSKI: If we could pull up the spreadsheet, Government's Exhibit 305A.

BY MR. POGOZELSKI:

Q. Ms. Divilio, what is this spreadsheet, generally?

A. It is a spreadsheet showing all of the purchases that Safe Chain had made from Boulevard at that time, the drug name, the quantity, the lot number, and invoice date, and the amount paid for each invoice.

Q. What is the first invoice date there in column H -- or I'm sorry. "G"?

A. 5/5/2020.

Q. Okay. And if we could take a look at rows 84 to 85.

Was there a brief break there in terms of purchasing -- the defendants purchasing HIV drugs from Boulevard in those two

highlighted rows?
A. Yes. It looks like there was a brief break of a week or two.
Q. Okay. And prior to that, was Boulevard providing any T3s?
A. No, they weren't.
Q. Okay. And the first date was May 1st to August 27th. About how long was that, that Boulevard was not providing any T3s?
A. Approximately three months.
Q. Okay. And during that time period, were the defendants buying and selling HIV drugs from Boulevard?
A. Yes, they were.
Q. Okay. And at least, at times, providing T3s to customers?
A. Yes.
MR. POGOZELSKI: If we could scroll down to the bottom.
BY MR. POGOZELSKI:
Q. What's the final invoice date there in column "G"?
A. 3/31/2021.
Q. So May 5th to about -- to 3/31/2021, is that about 11 months?
A. Yes.
Q. And then if we could sum the invoiced amount there, you can, kind of, see -- do you see the sum down there at the bottom where the pointer is?
A. Yes.

Q. What's the invoiced amount that the defendants purchased or -- purchased the HIV drugs from Boulevard?
A. Approximately 38 million.
Q. Okay.
MR. POGOZELSKI: Now, if we could take this down and show just the witness Government's Exhibit 85.
BY MR. POGOZELSKI:
Q. Do you recognize this document?
A. Yes.
Q. And generally speaking, what is it?
A. This would be what the T3 would look like to a customer when they would go pull it out of the Track and Trace system.
Q. Okay. And did you see or were you familiar with these T3s as the compliance director at the defendants' company?
A. Yes.
MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 85.
MR. ZIMET: Judge, we need a little more foundation as to when and what this is.
THE COURT: Sustained.
BY MR. POGOZELSKI:
Q. Ms. Divilio, is there a name at the top on this T3, a company name?
A. It's a Safe Chain Solutions Drug Supply Chain Security Act document.

Q. And are these T3s that Safe Chain generated?
A. Yes. This would be an example of what the customer would have seen from Safe Chain. They would have pulled this out of the Track and Trace system, and these are the transactions that it would have reflected at the time.
Q. And what's the date on this particular one?
A. 6/2/20.
MR. POGOZELSKI: The Government would move into evidence Government's Exhibit 85.
MR. ZIMET: May I just inquire?
THE COURT: Okay.

VOIR DIRE EXAMINATION

BY MR. ZIMET:
Q. Who prepared this?
A. This was automatically generated from the Track and Trace system.
Q. So there's no individual who prepared it?
A. No.
Q. It's automatic, there's no individual that prepares it?
A. No, not this version.
Q. Was there another version that was prepared by somebody?
A. I'm not sure.
Q. So I apologize. I didn't quite understand. This is a document that is an automated version of something that was hand-prepared; is that right?

A. No.
Q. It was just prepared automatically?
A. Part of the T3 generation system was integrated into the software system. Many of our vendors at that time participated in that system. Boulevard did not.
So when a customer would go to pull their T3 or pedigree history, the T3s provided from Boulevard transactions were incomplete.
Q. So when did you first see this document?
A. I can't think of the date I saw this document.
Q. Would it have been while you were still working at Safe Chain?
A. Yes.
Q. Did you make any documentation of the circumstance when you saw it?
MR. POGOZELSKI: Your Honor, I don't believe that that goes to foundation.
THE COURT: How many pages is this document?
MR. POGOZELSKI: Over 2,000 pages.
THE COURT: How do we know this is accurate, Ms. Divilio?
THE WITNESS: So this is -- for example, the last person sold to on this pharmacy was listed as Grubb's Pharmacy. Grubb's Pharmacy had access to a Track and Trace system provided by Safe Chain. So Grubb's Pharmacy could go in and

retrieve this document. It would be a reflection of their drug transactions.

THE COURT: That was a bad question.

How do I know where this came from, that this is 2,000 pages of the records of Safe Chain?

MR. POGOZELSKI: Your Honor, may I -- sorry to interrupt. We do have a stipulation as to the authenticity of these seized documents.

THE COURT: So what is your objection, Mr. Zimet?

MR. ZIMET: Foundation as to relevance. And foundation as to this witness's knowledge of it.

THE COURT: Overruled.

85 will be received.

(Government's No. 85, Boulevard T3, was received in Evidence.)

DIRECT EXAMINATION (CON'T)

BY MR. POGOZELSKI:

Q. Ms. Divilio, I think you'd said this, but is this first page an example of a T3 that the defendants provided to customers?

A. Yes.

MR. ZIMET: Judge, excuse me. I'm going to object as assuming a fact not in evidence. We just heard testimony this was -- Safe Chain prepared it, not Charles Boyd, not Patrick Boyd. It's an improper question.

THE COURT: Overruled.

BY MR. POGOZELSKI:

Q. Was this an example of a T3 that the defendants' company provided to, for example, Grubb's Pharmacy?

A. Yes.

Q. And on this T3, did Boulevard buy Descovy directly from Gilead?

A. No, they did not.

MR. POGOZELSKI: If we could take a look at the next page and the next page. Next page. Next page. Next page.

All right. So there's a lot of Descovy there.

BY MR. POGOZELSKI:

Q. So at least for the pages that we have looked at here, do these Safe Chain T3s contain truthful information?

A. No.

Q. Okay.

MR. POGOZELSKI: And if we could highlight one of the certifications at the bottom where it says, "Received transaction information" and "Transaction statement from the prior owner of the product."

BY MR. POGOZELSKI:

Q. And I think you testified that these were provided to pharmacy customers?

A. Yes.

Q. Is that highlighted statement -- is that a true statement?

A. No.
Q. And was Charles Boyd aware that these T3s were provided to customers?
A. Yes.
Q. And what about Patrick Boyd?
A. Yes.
MR. POGOZELSKI: If we could scroll to page 823.
BY MR. POGOZELSKI:
Q. What is the -- if we could take a look at the date purchased -- that this Biktarvy was purchased from Boulevard by the defendants. What's the date there? Date purchased in reference?
A. It looks like 3/25/21.
Q. Okay.
MR. POGOZELSKI: And then if we could zoom out.
BY MR. POGOZELSKI:
Q. And look at the date purchased by the pharmacy from Safe Chain?
A. 3/29/21.
Q. Is that date -- are these dates after Boulevard had started providing at least some T3 information?
A. Yes.
MR. POGOZELSKI: If we could scroll out. And if we could take a look at the certifications at the bottom, again, that same certification under C -- well, let me back up.

BY MR. POGOZELSKI:
Q. What about F, "Did not knowingly provide false transactions information for this T3 in March of 2021"? Is that a true statement?
A. No.
MR. POGOZELSKI: We can take this down.
If we could show just the witness Government's Exhibit 119.
BY MR. POGOZELSKI:
Q. Are these emails that you sent that include Charles Boyd?
A. Yes, they are.
Q. What's the date here at the top?
A. 7/10/2020.
MR. POGOZELSKI: All right. The Government moves into evidence Government's Exhibit 119.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 119 will be received.
(Government's No. 119, 7/10/20 Email, was received in Evidence.)
MR. POGOZELSKI: Thank you, Your Honor. Permission to publish?
THE COURT: Okay.
(Publish.)
///

BY MR. POGOZELSKI:

Q. If we could scroll to the bottom of page 2, what's the date of this email that you sent to Charles Boyd?

A. July 8th.

Q. Okay.

A. 2020.

Q. And what are you writing in this email?

A. I wrote, "Good morning. A few weeks ago I asked for contact information for someone at Boulevard 9229 regarding T3s. They have not provided any T3 information to us and our T3s to our customers will need to be updated with the information about where these HIV medications are coming from. This could potentially create a huge backlog of work for us, and I would like to avoid that. I'm not sure who to contact there about this issue. Could someone please assist? Thanks."

Q. Is this an example of you trying to contact someone at Boulevard?

A. Yes.

Q. Okay. If we could then scroll up to the top of page 2, I guess you can already see it there.

What are you writing there on July 9th, 2020?

A. It looks like I was following up from the previous email. I don't think I got a response.

I just said, "Hey, guys, I need this T3 info ASAP. I have a customer who would like to know where these medications are

coming from before they decide that they will purchase and Boulevard has not provided any T3 information showing where these are being purchased. Who can I reach out to for this information?"

Q. All right. Was this -- did this become an urgent issue for you at this time?

A. Yes.

Q. Why was that?

A. The example of the T3s that we just provided, they were incomplete. They didn't show the previous drug transactions that happened before the product went to Boulevard which we're required to provide to our customers.

So we didn't have that information.

There was customers beginning to call to question where the medications were being sourced from before they would make a determination about if they were going to purchase with Safe Chain or not.

And also, it was just myself and one other person. So having to get all this information into the software system was a very manual process and, at this point, we knew we had a huge backlog of work building up. So that was, kind of, the concerns that we had customers asking.

We knew it was a massive undertaking to get all this information into our database, so that we could then generate the correct T3s for customers.

It was just becoming -- it was building, and we didn't really have anywhere to go with it.

MR. POGOZELSKI: We can take this down and just pull up for the witness Government Exhibit 124.

BY MR. POGOZELSKI:

Q. Is this an email you sent to Charles Boyd and Adam Brosius?

A. Yes, it is.

Q. What's the date here?

A. July 10th, 2020.

Q. So is this a day after that email we were just looking at?

A. Yes, it is.

MR. POGOZELSKI: Okay. The Government moves to admit Government's Exhibit 124.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 124 will be received.

(Government's No. 124, 7/10/20 Email AD to CB, was received in Evidence.)

MR. POGOZELSKI: Permission to publish?

THE COURT: Okay.

BY MR. POGOZELSKI:

Q. Ms. Divilio, why did you send this email to Charles Boyd and Adam Brosius?

A. At this point, after not receiving any feedback or information or returned phone calls, I was definitely really

frustrated.

So I sent this email to them to really, you know, emphasize the point that these rules are not just mine as the compliance person wanting to be difficult or making up things or, you know, being an obstacle to their end goal.

You know, these rules are the Drug Supply Chain Security Act's guidelines. They're not mine.

So I sent this email out of frustration, kind of, basically saying, like, "Look, we have a serious problem here and it's not one that I'm just making up. It's one that is a large issue. It's a requirement to be providing these documents and we're not doing it."

Besides the daily frustrations of phone calls and customers emailing myself and the other compliance person having no answer for them, you know, it was certainly just out of -- major point of frustration to try and get this across to them.

Q. And what do you write at the top there?

A. I wrote, "Good morning. In order for us to continue purchasing -- purchase HIV medication from Boulevard 9229, we will need them to comply with the Drug Supply Chain Security Act.

"They're required to provide us information about where the drugs came, as is clearly stated in Section 25 of the Act."

Q. And then where did you get that information below?

A. From the Drug Supply Chain Security Act.

Q. Okay. The statute?
A. What is it? Yes.
Q. Okay.
A. From the wholesale distributor's requirements.
Q. And why were you citing specific statutory requirements in this email to Charles Boyd and Adam Brosius?
A. Because the company wasn't doing that, and nobody else seemed to have the sense of urgency about it, besides myself and compliance.
Q. If we could highlight the bottom part where it says, "Fines for failure to comply can range and should be reported to the FDA as seen here."
Was this -- were these lack of Boulevard T3s and Safe Chain's provision of those T3s that we just looked at to pharmacy customers, was this reported to the FDA at this time?
A. No. It wasn't.
Q. Okay. If we could go to the next page.
Do you see where it says, "Real consequences"?
A. Yes.
Q. Why did you put that in there?
A. I just had a general sense, again, that everybody viewed me as this squeaky wheel and just, again, to emphasize these are not my rules.
I didn't make these up on Tuesday afternoon because I felt like being difficult. It was what everybody who is selling

drugs at a wholesale level needs to be participating in.

Q. And well, if we could highlight there where it says, "In addition to compliance dates and requirements for T3 documentation, transaction history, transaction information and transaction statement, and serialization, prohibited acts will include reselling or misbranding a product and failing to report issues with shipments and/or suspend or illegitimate product within 48 hours."

During your tenure and during the course of the HIV business, did the defendants comply with this?

A. No.

Q. And then if we could highlight where it starts, "Federal Law 21 United States Code 333, specifies penalties for a prohibited act and to include imprisonment for not more than one year, imprisonment for not more than three years."

Why were you including these criminal, potential criminal consequences in your email to Charles Boyd and Adam Brosius?

A. Because it seemed serious. And again, I didn't feel that anybody was taking my other "red flags" I brought to their attention, serious.

They continued purchasing drugs, despite my new compliance versions concerns or the inability to validate the T3s. So I guess I just felt like the next best thing was to say, "Hello, lay it out for you."

I mean, I don't know how else to tell someone that there's

serious repercussions besides, you know, quoting where those come from.

Q. All right. And then at the bottom, what does it say below the potential criminal penalties? The Drug Supply Chain Security Act?

A. The last line there?

Q. Yes.

A. "The DSCSA also establishes the primacy of the FDA in regulating the pharmaceutical supply chain. The state will not control what penalties are faced under the DSCSA."

Q. And were the defendants, as owners of Safe Chain Solutions, in the pharmaceutical supply chain?

A. Yes.

Q. Do you recall receiving a response to this email?

A. I did not. And then I followed up on this email with Charles and Adam about maybe ten days later or so.

MR. POGOZELSKI: If we could show just the witness Government Exhibit 127.

BY MR. POGOZELSKI:

Q. Is this the follow-up email from you to Charles Boyd and Adam Brosius?

A. Yes, it is.

Q. What's the date here?

A. 7/20/2020.

MR. POGOZELSKI: The Government moves into evidence

Government Exhibit 127.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 127 will be received.

(Government's No. 127, 7/20/20 Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. I guess the answer might be obvious, but why did you follow up with Charles Boyd and Adam Brosius?

A. I wanted to be sure they saw my email.

They didn't respond to it; so I just wanted to know if they had any response.

Q. By this point, had you been asking for Boulevard T3s for some time?

A. Yes, I had.

Q. And who were you asking?

A. I asked pretty much anyone that I thought may have some, kind of, relationship with someone there.

I asked our sales team. I asked this person, Mike Zingo, that I was referred to. I asked the Boyds if they had additional contact information.

I reached out to the information that was on the application and tried to contact those individuals. I spoke to the Peter, no name, one time on the phone. I asked anybody that I thought could give me the answer.

MR. POGOZELSKI: And we can take this exhibit down. If we could show just the witness Government Exhibit 472.

BY MR. POGOZELSKI:

Q. Ms. Divilio, is this a Teams message between you and Jon Atkinson?

A. Yes, it is.

Q. And is Jon Atkinson relaying a statement from Charles Boyd?

A. Yes, he is.

Q. And what's the date?

A. 7/20/2020.

MR. POGOZELSKI: Government moves into evidence Government Exhibit 472.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 472 will be received.

(Government's No. 472, Document, was received in Evidence.)

BY MR. POGOZELSKI:

Q. What is -- let me ask first: What did Jon Atkinson do at the defendant's company?

A. He was in the accounting department for -- you know, worked on accounts payable, made payments to the vendors on the company's behalf.

Q. What is he writing to you here?

A. He wrote, "Charlie just came in here and told me we have to

pay Boulevard today."
Q. And the date here, was that -- about how many days after those prior -- that follow-up email that you sent with the criminal consequences?
A. 10 days.
Q. So by this point, Boulevard -- and there was no Kimchi providing any T3s?
A. No.
Q. But the defendants continued to buy HIV drugs from Boulevard?
MR. ZIMET: Judge, same objection I made before.
THE COURT: Overruled.
BY MR. POGOZELSKI:
Q. I will ask the question again.
But the defendants continued buying these HIV drugs?
A. Yes.
Q. From -- okay. And what was your reaction upon learning this?
A. I was pretty aggravated. It seems like holding the payment was one of the only ways we could leverage getting the necessary documents that we needed. And to know they were just paying them regardless of the compliance needs or the documents was really frustrating because, you know, it just made me feel unheard, nobody cared that we needed all these documents, that the work was becoming this massive backload for myself and my

team member and, instead, business was just carrying on as usual.
Q. And sometime around this time period, did Charles Boyd tell you that Boulevard would be hiring someone to handle the T3s?
A. Yes. In about August, I was told that.
Q. Was it August that you maybe received the first T3?
A. Yes, about that time.
Q. Okay. It's possible that you were told about the hiring earlier?
A. Sometime in that time frame, yeah. That was the very end of July and August.
Q. Okay.
A. Starting -- so sometime about then.
Q. Okay. Who ended up being that person handling Boulevard's T3s?
A. That person's name was King Kimchi.
Q. And then who was the other contact for Boulevard?
A. Peter, with no last name.
Q. Did other employees working in compliance with you share concerns about buying HIV drugs from Boulevard?
A. Yes. Myself and pretty much all the employees, kind of, expressed some concern and, kind of, just general disbelief. Like this is who we're buying from. That was the general atmosphere amongst myself and others.
Q. That included Jon Atkinson?

A. Yes.

MR. POGOZELSKI: If we could pull up, for just the witness, Government's Exhibit 136.

BY MR. POGOZELSKI:

Q. Ms. Divilio, is this an email that you sent to Charles Boyd?

A. Yes, it is.

Q. And what is the date?

A. 8/11/2020.

MR. POGOZELSKI: All right. Government moves into evidence Government's Exhibit 136.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: That will be received.

(Government's No. 136, 8/11/20 Email, was received in Evidence.)

MR. POGOZELSKI: Thank you, Your Honor.

If we could scroll to the very bottom.

BY MR. POGOZELSKI:

Q. And what is Charles Boyd writing here to Sameer?

A. "Hi, Sameer. I would like to introduce to you Peter who owns Boulevard Wholesale. He needs some help completing a backlog of T3s ASAP. Peter is relatively new at this and needs some help from you and your team to guide him through the process. I have cc'd him on this email so that you all can

connect. I Hope this helps and we can get this resolved ASAP. Thanks. Best regards, CB."

MR. POGOZELSKI: And if we could go up one page.

BY MR. POGOZELSKI:

Q. Who responds to Charles Boyd's introduction between Sameer and Peter?

A. King Kimchi.

Q. What does King Kimchi write there?

A. "Can I have all lots numbers of products and date of purchase? Thank you."

MR. POGOZELSKI: And then if we could go up to the top.

BY MR. POGOZELSKI:

Q. Did you attach a spreadsheet to this email?

A. Yes, I did.

MR. POGOZELSKI: All right. If we could pull up Government's Exhibit 136A.

BY MR. POGOZELSKI:

Q. What does this spreadsheet show?

A. This is a receipt of goods spreadsheet. So it shows Column A, the NDC number; Column C is the quantity; Column D is the lot number; E is the description of the drugs; F is the received by date; G is an internal vendor code; and then it ends with the PO number that's associated with that purchase.

THE COURT: When we admitted 136, did that include 136A?

MR. ZIMET: No objection to that, Judge.

MR. BARZEE: No objection.

THE COURT: 136A will be received.

MR. POGOZELSKI: Thank you, Your Honor.

(Government's No. 136A, Spreadsheet, was received in Evidence.)

BY MR. POGOZELSKI:

Q. Was this spreadsheet providing King Kimchi basically details of all of the branded drugs that he sold to the defendants?

A. Yes, it was.

Q. And what information was Charles Boyd requesting to provide King Kimchi? Is it all this information in this spreadsheet?

A. Yes.

Q. And that included the lot number?

A. Yes.

Q. The drug description?

A. Yes.

Q. Receipt date?

A. Yes.

Q. So King Kimchi/Peter needed information from the defendants about the HIV drugs he sold to the defendants?

A. Yes.

Q. Needed to know which drugs he sold to the defendants?

A. Yes.

Q. Needed to know the lot number for all those drugs?
A. Yes.
Q. Needed to know the date that the defendants received those drugs?
A. Yes.
Q. Appear that Kimchi did not have records of those sales?
A. Correct.
Q. And what was the purpose of sending this spreadsheet to King Kimchi or Peter?
A. At the time, I thought it was primarily just to, kind of, cross-reference, you know, what we had received and what they had sent us. I didn't know that -- I guess I just didn't piece together that they didn't have that information, also.
Q. Okay. Was this information later used by King Kimchi/Peter to create T3s?
A. Yes.
MR. POGOZELSKI: We can take this one down.
And if we could show, just the witness, Government's Exhibit 516.
BY MR. POGOZELSKI:
Q. Ms. Divilio, are these -- what's in this document?
A. These look like text messages between Charles and I from August 26th, 2020.
Q. All right. August 26th, 2020.
MR. POGOZELSKI: Government moves into evidence

Government's Exhibit 516.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 516 will be received.

(Government's No. 516, 8/26/20 Text, was received in Evidence.)

BY MR. POGOZELSKI:

Q. So on August 26th, 2020, what does Charles Boyd text you here?

A. "So our buddy at Boulevard said he can provide all T3 documents. He sent this sample over last night. I told him it's missing the reference numbers, so he's going to add. Anything else that you think of that he needs to do?"

I responded, "Yes, the reference number, which is usually the PO, and if they can fill in the manufacturer's address too, that would make it perfect."

MR. POGOZELSKI: If we can go to the next page.

BY MR. POGOZELSKI:

Q. As far as you can recall, was this the first version of a Boulevard T3 that you received?

A. It looks similar to what we would have received, yes.

Q. Okay. And so the first transaction from the manufacturer, who's that? This Genvoya, who is that sold to?

A. It goes from Gilead to Independent Pharmacy Cooperative.

Q. And then what's the next transaction?

A. Then it goes to LMP Pharmacy.
Q. And then what's the next transaction for this drug?
A. BNR Wholesaler.
Q. Okay. And then what's the next one?
A. Boulevard 9229.
Q. All right. And then the next one?
A. Lastly, Safe Chain Solutions.
Q. So according to this T3, this HIV drug was sold four times before Boulevard sold it to the defendants?
A. Yes. That's what this is reflecting.
Q. Okay. As far as you knew, were the defendants receiving these Boulevard HIV drugs in Cambridge?
A. Yes.
Q. What is the "shipped to" address listed on this Kimchi T3?
A. It's listed to the Utah site.
Q. Okay.
MR. POGOZELSKI: Now, we can take this down.
BY MR. POGOZELSKI:
Q. Did you also talk to Patrick Boyd about Boulevard T3s around this same time period?
A. Yes, I believe so.
MR. POGOZELSKI: If we can show, just the witness, Government's Exhibit 421.
BY MR. POGOZELSKI:
Q. Are these Teams messages between you and Patrick Boyd?

A. Yes, they are.
Q. What's the date?
A. 9/1/2020.
MR. POGOZELSKI: Government would move into evidence Government's Exhibit 421.
MR. BARZEE: No objection.
MR. ZIMET: No objection, Judge.
THE COURT: 421 will be received.
(Government's No. 421, 9/1/20 Teams Message, was received in Evidence.)
MR. POGOZELSKI: If we could go to the next page.
BY MR. POGOZELSKI:
Q. Take a moment to review this, Ms. Divilio, and then we can look when you're done.
A. Yes.
Q. What are these messages with Patrick Boyd about?
A. I was referring to an email that one of the salespeople had sent to their customer. Their customer was inquiring about their T3s and when they would have them. I guess when they went to look in the Track and Trace system, there was nothing there.
So I asked that Pat address it with their salesperson because the salesperson had just, kind of, brushed it off and, in fact, that wasn't the issue that they blamed. It was because we didn't have any T3s from Boulevard to provide to

them.
Q. Okay. What was Patrick Boyd's response to you saying, "I guess I would prefer he just not make something up." Down at the 5:08 p.m.
A. Okay. Pat wrote, "I think for this one what he said is okay because we probably shouldn't have shipped without the T3, but I know that was out of the question at the time."
Q. And when you say, "And the reason for the delay was because Boulevard was refusing to give us documentation," what does Patrick Boyd write at the bottom?
A. "Right. We just can't tell client that."
Q. Did you agree with Patrick Boyd's responses here?
A. No.
Q. Why not?
A. Because I felt he was putting everybody in a bad position -- myself, the sales team. You know, we aren't getting what we needed. The clients were calling, asking for information we didn't have. So everybody was in a bad position all around and having to answer to people when you don't have any information is not great.
Q. Okay.
MR. POGOZELSKI: We can take this down.
BY MR. POGOZELSKI:
Q. Do you recall a pharmacy named Olympia Pharmacy?
A. Yes.

MR. POGOZELSKI: If we could show, just the witness, Government's Exhibit 425.

BY MR. POGOZELSKI:

Q. Are these Teams messages between you and Patrick Boyd?

A. Yes, they are.

Q. What's the date?

A. 9/10/2020.

MR. POGOZELSKI: Government would move into evidence Government's Exhibit 425.

MR. BARZEE: No objection.

MR. ZIMET: No objection.

THE COURT: 425 will be received.

(Government's No. 425, 9/10/20 Teams Message, was received in Evidence.)

BY MR. POGOZELSKI:

Q. What are these messages between you and Patrick Boyd about?

A. It looks like the same salesperson that was the topic of conversation in the last Teams message.

A pharmacist was calling him asking him when he could have -- expect the T3s for the HIV medications. And my response was we didn't receive any T3s From Boulevard, that John Atkinson from the accounting department was pulling the inventory report, so it could be sent to Boulevard to generate the T3s for us.

Q. And that inventory report, is that something similar to the

spreadsheet that we were looking at?
A. Yes, it would have been.
Q. So at least in September or September 10th, 2020, you knew this inventory report was being sent to Kimchi/Peter to create T3s?
A. Yes.
Q. Was it evident that King Kimchi had no documentation to create those T3s?
A. At the time, I don't know that I necessarily pieced it together that way. I guess I didn't think it was -- I just thought that they were not in the know of what we were receiving all the time. So it seemed to me like I was just giving it to them so -- to say this is exactly what I need, you know. At the time, I didn't think it was anything out of the norm.
Q. Did you have -- did you have to do that with any vendors prior to the HIV business?
A. No.
Q. Okay.
MR. POGOZELSKI: If we could pull up for the witness, just the witness, Government's Exhibit 160.
BY MR. POGOZELSKI:
Q. And are these emails that include you, King Kimchi and Charles Boyd, among others?
A. Yes, they are.

Q. And what's the date?
A. September 21st, 2020.
MR. POGOZELSKI: Okay. Government moves into evidence Government's Exhibit 160.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 160 will be received.
(Government's No. 160, 9/21/20 Email, was received in Evidence.)
MR. POGOZELSKI: Thank you, Your Honor. Permission to publish?
THE COURT: Okay.
(Publish.)
BY MR. POGOZELSKI:
Q. If we could scroll to page 2.
Is this another example of one of the first versions of the Kimchi T3s that you received?
A. Yes, it looks like it is.
Q. And what's the manufacturer listed there?
A. ViiV Healthcare.
Q. And under "Independent Pharmacy Cooperative," what's the company listed there?
A. Attain RX.
Q. And was Boulevard 9229 -- and I guess you could look at the two addresses -- are they both Rego Park, New York?

A. Yes.
Q. And what is the entity that purportedly sold these drugs to Boulevard?
A. BNR Wholesalers.
Q. Okay. And is that -- at least according to the name, is that a pharmacy?
A. No. It would appear to be a wholesaler.
Q. Okay.
MR. POGOZELSKI: If we could take this down and show, just the witness, Government's Exhibit 429.
BY MR. POGOZELSKI:
Q. Are these Teams messages between you and Patrick Boyd, again?
A. Yes, they are.
Q. What's the date?
A. 9/24/2020.
MR. POGOZELSKI: The Government would move into evidence Government's Exhibit 429.
MR. BARZEE: No objection.
MR. ZIMET: No objection.
THE COURT: 429 will be received.
(Government's No. 429 , Teams Patrick Boyd and Divilio, was received in Evidence.)
MR. POGOZELSKI: All right. If we could go to the next page.

BY MR. POGOZELSKI:
Q. And down towards the bottom, do you see -- I think it's 753. Do you see that message from Patrick Boyd to you?
A. Yes.
Q. What is Patrick Boyd writing there?
A. He writes, "So that call was interesting. The time was a little bit of it, but he said two of the bottles of one of the products looked different than how they normally look. He didn't call the manufacturer or anything, and he was really cool about it. But his pharmacist did call up the T3 and one of the vendors he said was closed for COVID. We may want to call the Boulevard trail and verify the hands it's touched to be safe.
Q. And this mention of, "He didn't call the manufacturer or anything and he was really cool about it," at this time is Patrick Boyd concerned about pharmacy customers contacting manufacturers?
A. I think at this time, I didn't think a whole lot about that. But it, kind of, just seemed like, yeah, they were trying to get the issue resolved with Safe Chain, not get manufacturers involved.
Q. Okay. And at this time, did you know -- were you aware of what Boulevard bottles looked like?
A. No, I don't think I had seen anything in person at this time.

Q. Okay.

MR. POGOZELSKI: And then if we go to the second page. And then if we could highlight the 7:54 p.m. message there from Patrick Boyd.

BY MR. POGOZELSKI:

Q. What does Patrick Boyd say there at 7:54 p.m. to you?

A. "After his pharmacy left, he was, like, 'look, guys, I'm good with this stuff. We just need transactions to be cleaner because the pharmacist gets worried.'"

Q. And was he referring to the owner of the pharmacy versus the pharmacist?

MR. BARZEE: Objection. Calls for speculation.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. What did you interpret this stuff to mean?

A. Whatever the Boulevard products were that they were purchasing.

Q. Were they primarily HIV drugs?

A. Yes.

Q. And does Patrick Boyd in these messages -- is he telling you to call up on the Boulevard T3s?

A. Yes.

Q. And did you subsequently do that?

A. Yes.

Q. Okay.

MR. POGOZELSKI: We can take this down. If we could pull up, for just the witness, Government's Exhibit 173.
BY MR. POGOZELSKI:
Q. And in that second email there, is that an email from you to Patrick Boyd and Charles Boyd?
A. Yes.
Q. And what's the date?
A. September 29th, 2020.
Q. Okay. We can zoom out.
MR. POGOZELSKI: The Government would move into evidence Government's Exhibit 173.
MR. BARZEE: No objection.
MR. ZIMET: No objection, Judge.
THE COURT: 173 will be received.
(Government's No. 173, Email Divilio to Charles and Patrick Boyd, was received in Evidence.)
BY MR. POGOZELSKI:
Q. All right. Now, if we could focus on your email to Patrick Boyd and Charles Boyd, can you -- and slowly for the court reporter -- just read through this due diligence you were doing on the Boulevard T3s.
A. Yes.
"Hello. I have been attempting to verify the T3s, which I have been provided by Boulevard, and I have not been successful. I began with the listed wholesaler, BNR

Wholesaler. When I googled this company, nothing came up. I was eventually able to google the address and found a BNR Wholesaler, and I called the number.

"The number listed on the screenshot is not in service. After some digging I found a PIC associated with this wholesaler, Jennie Seeram. And called and left a voicemail."

Q. And I'm sorry. Do you know what a "PIC" is?

A. It stands for "pharmacist in charge."

Q. Sorry to interrupt. You can continue.

A. "I attempted to verify Stain Rx and Attain RX. I could not find anything on these names on google. But then Googled the address and came up with 'local RX,' in parentheses 'Attain' and 'Stanley RX,' and in parentheses 'Stain RX.'

"I found a number for Stanley and it rang continuously. (I listed the phone number), in parentheses.

"I looked -- I spoke to someone at 'Local RX,' called at 11:40. The phone number is (718) 275-5300, and he stated that they do not sell anything to other pharmacies or wholesalers.

"He said that they return their products back to the vendor for credit. He also said he was not familiar with Attain RX and the pharmacy has never gone by that name, has always been Local RX. I also tried searching these pharmacy names on the NYUSED.gov website, and was not able to find any licenses associated with these pharmacy names.

"Lastly, I reached out to IPC, Independent Pharmacy

Cooperative, and spoke with Cassandra. I asked her to verify a few drugs by lot number and I asked her to try NDC 61958-2501-01 and lot --"

Q. You can skip the numbers.

A. Sorry.

Q. It's not your fault. And then we can go to the next page.

A. "And I list another NDC number and lot and another NDC number and lot. The highlighted lot was the only lot she was able to verify and confirm that they have sold that lot. When I asked about pharmacy Stain RX and Attain RX, she was not able to find either of these as customers in their system. She is going to dig a bit more and see if she can find any additional information for their system. I will let you know when IPC gets back with me. Thanks."

Q. Zoom out and go to the first page.

Did IPC get back to you?

A. Yes. I believe that they did get in contact with myself or another compliance person.

Q. Did Independent Pharmacy Cooperative confirm that these two Boulevard T3s were false?

A. Yes.

Q. And did you pass that along to Charles Boyd?

A. Yes, I did.

Q. And Patrick Boyd?

A. Yes.

Q. All right.
MR. POGOZELSKI: If we could zoom out.
BY MR. POGOZELSKI:
Q. At the top, Patrick Boyd writes, "We have had two bad returns." This is to Adam Brosius, "We need to get with Boulevard soon. We have had two bad returns with open bottles and broken pills last two days and the below sounds pretty bad."
At this time did you know anything about these open bottles and broken pills with Boulevard?
A. No, I don't believe I did.
Q. Would you, as the compliance director, would you have expected or wanted to know that information?
A. Yes.
Q. And would that have impacted any of the recommendations or advice to the defendants?
A. Yes, I think it would have.
Q. And would it have caused -- would it have caused you to question the Kimchi T3s even more?
A. Yes, I can see it would.
Q. Would it have caused you to question the sourcing of the Kimchi-Peter-Boulevard HIV drugs?
A. Yes.
Q. Okay.
MR. POGOZELSKI: Now, if we can show, just the witness,

Government's Exhibit -- actually we'll move ahead. We'll do Government's Exhibit 174.

BY MR. POGOZELSKI:

Q. Is this an email that you sent to Patrick Boyd and Charles Boyd?

A. Yes, it is.

Q. And is it one day later, one day after the prior email that you sent?

A. Yes.

MR. POGOZELSKI: Government moves into evidence Exhibit 174.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 174 will be received.

(Government's No. 174, Email Divilio to Charles and Patrick Boyd, was received in Evidence.)

BY MR. POGOZELSKI:

Q. Okay. And had you provided Independent Pharmacy Cooperative two screenshots of these Boulevard Kimchi T3s?

A. Yes, I did.

Q. And what was Independent Pharmacy Cooperative's response there to you after getting those screenshots?

A. Cassandra wrote, "Good afternoon. I called and left a voicemail message a few minutes ago. I realize you are gone for the day, but I wanted to follow up this way as well.

I heard back from my supervisor, her supervisor and so on about the request below.

"We can confirm that based on the provided documents -- thank you for those, they really helped -- we have no record of either transaction. We do not use PO numbers as the reference number that we provide to the pharmacy. We don't use a PO number downstream at all. It is an option that our pharmacies have if they would like to input a PO number to denote a specific order. I was asked to advise you to obtain documentation from your supplier about the trail of these items."

Q. Okay. And who is the supplier for the Biktarvy and Complera in those T3s?

A. I believe they were both from Boulevard.

Q. As far as you recall, did Boulevard provide any documentation supporting its purported purchases --

A. No.

Q. -- from Independent Pharmacy Cooperative or the other entities on this version of the Kimchi T3s?

A. No, they didn't.

Q. And why did you forward this email to Charles Boyd and Patrick Boyd?

A. I forwarded it on so they can be -- I was being transparent about the information that I received back from IPC verifying that this was -- you know, they're telling us this is not an

actual transaction that took place.
Q. Not an actual transaction that took place, two T3s with false information?
A. Yes.
Q. And you wanted Patrick Boyd and Charles Boyd to know about that?
A. Yes.
Q. Were you concerned by this email from Cassandra from Independent Pharmacy Cooperative?
A. Yes.
Q. Why?
A. Because she was confirming that the transactions on the listed T3s that we had were false, so then the information that we provided to customers was false.
Q. All right. And around this same time, did you do some internet sleuthing in relation to this particular vendor?
A. Yes. My colleague and I were, kind of, just Googling some things online to see what the heck is going on, especially with the pharmacy addresses close to each other on a T3 and things like that.
Q. Did you find an article?
A. We did.
MR. POGOZELSKI: If we could show, just the witness, Government's Exhibit 434A.
///

BY MR. POGOZELSKI:
Q. Is this the article that you found, Ms. Divilio?
A. Yes, it is.
Q. And is this the article that you shared with your colleague in compliance?
A. Yes, it was.
MR. POGOZELSKI: Government would move into evidence Government's Exhibit 434A.
MR. ZIMET: I'm sorry. Who was the communication with? I didn't hear.
MR. POGOZELSKI: Colleague in compliance.
MR. ZIMET: From the witness to another --
MR. POGOZELSKI: Another compliance employee.
MR. ZIMET: I think it's hearsay without more, Judge.
THE COURT: Sustained.
BY MR. POGOZELSKI:
Q. Do you know whether or not the defendants also saw this article around this time?
A. I think they might have. I don't recall if we shared it with them directly.
Q. Do you have a reasonable belief that they saw this article around the same time?
MR. ZIMET: Objection. Asked and answered.
THE COURT: Sustained.
///

BY MR. POGOZELSKI:
Q. All right. Then, in general, what was the article about?
MR. BARZEE: Objection.
THE COURT: Sustained.
BY MR. POGOZELSKI:
Q. What happened after you forwarded that IPC email confirming to falsify Boulevard Kimchi T3s to the defendants?
A. I don't think I got a response from either of them right away, but then Boulevard starting providing a different contact. IPC disappeared from their T3s.
MR. POGOZELSKI: If we could pull up, for just the witness, Government's Exhibit 435.
BY MR. POGOZELSKI:
Q. Are these Teams messages between you and Charles Boyd?
A. Yes, they are.
Q. And what's the date?
A. 10/1/2020.
MR. POGOZELSKI: Government moves into evidence Government's Exhibit 435.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 435 will be received.
(Government's No. 435, 10/1/20 Teams Message, was received in Evidence.)
///

BY MR. POGOZELSKI:
Q. All right. Is this one day after you forwarded the IPC confirmation of the falsified Boulevard T3s?
A. Yes, I believe so.
MR. POGOZELSKI: If we can go to the second page.
BY MR. POGOZELSKI:
Q. And at -- on the 4:47 p.m. message, what is Charles Boyd writing to you a day after the IPC confirmations of falsified T3s?
A. "Hey, Boulevard is sending over T3s from Monday's shipment. We need to verify ASAP."
Q. Was this an example of the urgency of the HIV business for the defendants?
A. Yes.
Q. And then you write?
A. "Okay. I can do that."
Q. And after that?
A. "Are they going to be sending over accurate information for the previous shipments?"
Q. Did Charles Boyd respond to that?
A. No, he didn't.
Q. Do you recall him responding to that question at all?
A. No, I don't think so.
Q. Okay. So were the prior Boulevard T3s, that the defendants provided to pharmacy customers with IPC, listed false?

A. Yes.

MR. POGOZELSKI: If we could zoom out and look at the bottom -- and, actually, not the bottom yet.

BY MR. POGOZELSKI:

Q. Do you see it -- looks like 5:51 you say, "I just got one"?

A. Yes.

Q. Is that a reference to a King Kimchi T3?

A. Yes.

Q. And then what do you write after that?

A. "Which I will call on now."

MR. POGOZELSKI: Okay. If we could zoom out.

BY MR. POGOZELSKI:

Q. At the bottom, did you send an image to Charles Boyd?

A. Yes, I did.

Q. All right.

MR. POGOZELSKI: If we could go to the next page.

BY MR. POGOZELSKI:

Q. Was this an image of a pharmacy or a location listed on this next version -- the next-day version of the Kimchi T3?

A. Yes, it was.

Q. Why did you send this image to Charles Boyd?

A. When I tried to call this pharmacy and verify the transaction. I wasn't successful in reaching anyone at this pharmacy. So I used the image to call the business next door, the foot and ankle treatment center, and they informed me that

the pharmacy has been closed.
Q. For some time?
A. Yes, I believe they told me it had been closed for a couple months at that point.
Q. Was this part of your attempt to verify the legitimacy of the next-day Kimchi T3?
A. Yes.
Q. Were you concerned, at this point, with this next version?
A. Yes.
Q. Why?
A. Because we had already received two false T3s, so what was the next version going to look like.
Q. Okay.
MR. POGOZELSKI: If we could show, just the witness, Government's Exhibit 180.
BY MR. POGOZELSKI:
Q. Is this an email from Mr. or Ms. King Kimchi to you on October 1st, 2020?
A. Yes, it is.
Q. And is it attaching a T3?
A. Yes, I believe so.
Q. And is this the T3 that you were referencing in the Teams chat with Charles Boyd?
A. Yes.
MR. POGOZELSKI: Government would move into evidence

Government's Exhibit 180.

THE COURT: No objection.

MR. BARZEE: No objection.

THE COURT: 180 will be received.

(Government's No. 180, 10/1/20 Email, was received in Evidence.)

MR. POGOZELSKI: If we can go to the next page. And I'm sorry. Was -- if we can go back up, real quick.

BY MR. POGOZELSKI:

Q. So 10/1, is this the next -- is this the day after the IPC confirmation of a false T3?

A. Yes.

MR. POGOZELSKI: All right. If we could scroll down to the Boulevard Kimchi T3.

BY MR. POGOZELSKI:

Q. Is there a different entity listed there as the purchaser from Gilead?

A. Yes.

Q. What entity is that?

A. Rochester Drug.

Q. And did you start trying to verify this King Kimchi T3?

A. Yes, I did.

Q. And were you in a rush to do so based on Charles Boyd's message before?

A. Yes. There's, again, that sense of urgency to get these

things approved, so they can continue purchasing.
Q. Okay. And did you find it suspicious that one day after IPC said it was a false T3, Rochester appears?
A. Yes.
Q. And Instacare Pharmacy, is that the pharmacy -- the photo that you had shared with Charles Boyd the same day?
A. Yes.
Q. And why were you looking up Instacare Pharmacy, the location?
A. I think I was looking just for more information. Looking for pharmacy contact information to call them because they weren't Safe Chain customers, so I didn't necessarily have their contact information.
Q. Okay.
MR. POGOZELSKI: If we could take this down and show, just the witness, Government's Exhibit 177.
BY MR. POGOZELSKI:
Q. Ms. Divilio, are these also emails the same day from King Kimchi to you regarding T3s?
A. Yes, they are.
MR. POGOZELSKI: Government would move into evidence Government's Exhibit 177.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 177 will be received.

(Government's No. 177, 10/1/20 Email, was received in Evidence.)

MR. POGOZELSKI: If we could scroll to the bottom of page 2.

BY MR. POGOZELSKI:

Q. What are you writing there to King Kimchi?

A. I wrote, "Hello. I am not able to verify these transactions on this T3. Instacare Pharmacy is no longer the address that you have listed on the T3. Do you have a board of pharmacy license on file that you can share with us? This will help me verify this pharmacy.

"I have also been in touch with Rochester Drug and awaiting more information from them to verify the original transaction. When I looked up Instacare Pharmacy, I attempted to call the number, which rang continuously until it disconnected with what sounded like a fax.

"I called the location next door to this address and was told that the pharmacy was moved and has not been at this location for three or four months. This would also explain why I cannot locate any information about them from the New York Board of Pharmacy website. We will need additional information to support these transactions.

"Also we need additional T3s from Monday since we received 551 pieces of inventory, and you have only provided one T3 for one NDC."

Q. Was this a lot of work for you to do in a short time?
A. Yes.
MR. POGOZELSKI: If we can zoom out. And if we could go up.
BY MR. POGOZELSKI:
Q. What was King Kimchi's response?
A. "Please send me the list. We get it done."
Q. And did you -- do you know what he was referring to as "the list"?
A. I think he was referencing another inventory list that we had been talking about, previously.
MR. POGOZELSKI: You can zoom out and then if we go up.
BY MR. POGOZELSKI:
Q. What does King Kimchi say at the bottom there?
A. "I need to know the T3 I send is that good. Pharmacy closed for business. Can't get any paperwork. I'm sorry."
Q. Were you satisfied with that response?
A. No.
Q. And why not?
A. If the pharmacy was closed and they couldn't get any paperwork, I mean, that would have been a problem for them also.
They also needed the T3 documents just as we did for them, a chain of custody, and that just didn't seem like a normal business practice not to get the documentation that you needed,

even if they were going out of business.
Q. And King Kimchi is saying he can't get any paperwork.
Without any paperwork, is there any way to create a legitimate T3?
A. No.
MR. POGOZELSKI: All right. If we zoom out.
BY MR. POGOZELSKI:
Q. What did you write back in response?
A. I wrote, "No, it is not good because if the pharmacy has been closed for business, how is a purchase made from them less than a month ago?"
Q. And what was King Kimchi's response to that?
A. "We always buy stuff from places who want to get out of business. Why not?"
Q. Are you satisfied with that response?
A. No.
MR. POGOZELSKI: We can take this down and show, just the witness, Government's Exhibit 181.
BY MR. POGOZELSKI:
Q. Is this an email the next day from you to King Kimchi and Charles Boyd?
A. Yes, it is.
MR. POGOZELSKI: All right. Government would move into evidence Government's Exhibit 181.
MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 181 will be received.

(Government's No. 181, Email from Divilio to Kimchi and Charles Boyd, was received in Evidence.)

BY MR. POGOZELSKI:

Q. All right. Ms. Divilio, what are you writing here to King Kimchi and -- with Charles Boyd on the chain?

A. Do you want me to read this?

Q. I know it's a lot, but yes.

A. I wrote, "Good morning. This link leads you to where you can see that there was a registration once active for this business establishment name and address. As you continue to click through the transfer notification, you can see that this business must have changed names and remained at the same location. The license has been discontinued since 3/30/2020. If you purchased this on 9/2/20, that means that the pharmacy did not hold an active license during the time of purchase.

"Also, the clip you shared with the pharmacy information, phone number is the number I called multiple times with no answer yesterday until I spoke with another business in the building who told me the pharmacy had been closed for months.

"The issue with having a lapse of licensure and location is that we have no way of knowing how this medication was stored or where it may have been stored or was it exposed to hot and humid conditions somewhere.

"All of these things could affect the integrity of the product which comes back to us when customers complain. Here is the link where you can see the last registrant to the link you provided me. Again, continuing to click through the registration history and transfers at the bottom of the page brings you to the most recent registrant."

Q. And here you're writing about no way of knowing how this medication was stored, where it may have been stored.

Was it exposed to hot and humid conditions, and you're discussing the integrity of the product.

Are you highlighting the importance of truthful, accurate T3s here?

A. Yes. And the ability to go back and, you know, look at the location and confirm either what they were or weren't saying by which pharmacy was at that location. You know, trying to confirm and prove to them that what they're telling was not accurate, and they could easily look at it as just the way I could, and that yes, there were concerns about how if you bought something from a pharmacy without a license or a license that had expired, what do you have to show that it was stored correctly, handled correctly, you know, there was nothing to those effects.

Q. Right. And why did you copy Charles Boyd, the prior ones were between you and King Kimchi? Why did you include Charles Boyd on this email?

A. Just to emphasize my concern, being transparent with what I'm saying "these vendors." I didn't want something to turn into a he-said/she-said kind of circumstance, so it made sense to me that here's the situation. I do not make the final call as far as if you all consider to continue doing business with them, so here we are in another circumstance; and, again, I don't make the business decisions.

But here's all the information that you need to make a good one.

Q. Did the defendants make a good business decision with Boulevard in your --

A. I would say no.

Q. Okay. At the time did you know whether or not Charles Boyd was communicating directly with Peter by text messages around this time?

A. No. At the time, I didn't know what communications they had.

MR. POGOZELSKI: If we could show just the witness Government's Exhibit 436A.

BY MR. POGOZELSKI:

Q. Is this a Teams message between you and another Safe Chain employee?

A. Yes, it is.

Q. And what's the date?

A. 10/2/2020.

Q. And are you relaying statements of Charles Boyd to you around this time?
A. Yes.
MR. POGOZELSKI: The Government would move into evidence Government's Exhibit 436A.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 436A will be received.
(Government's No. 436A, Document, was received in Evidence.)
BY MR. POGOZELSKI:
Q. All right. What are you writing in this document here, Ms. Divilio?
A. I wrote, "CB said he was annoyed and was blowing him up, but he's nothing more to tell them since he had not provided any legit documents."
Q. So by this point, Charles Boyd acknowledged Boulevard T3s were not legitimate?
A. Yes.
Q. And did you agree that these were not legitimate T3S Boulevard had provided?
A. Yes.
Q. And prior to providing these versions of the Kimchi T3S, was Boulevard providing any T3s for months?
A. No, they weren't.

Q. All right. So we're in October 2nd of 2020.

Had Boulevard provided any legitimate T3s by this point in time, October 2020?

A. No, they hadn't.

Q. Were the defendants, nonetheless, providing Boulevard T3s to pharmacy customers?

A. Yes.

Q. With false information?

A. Yes.

Q. Do you talk to Peter, last name unknown, on the phone around this time?

A. I did. I had one phone conversation with him.

MR. POGOZELSKI: Okay. If we could just show the witness Government's Exhibit 437.

BY MR. POGOZELSKI:

Q. Is this a Teams chat between you and Charles Boyd?

A. Yes, it is.

Q. Also dated October 2nd, 2020?

A. Yes.

MR. POGOZELSKI: Government moves into evidence Government Exhibit 437.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 437 will be received.

(Government's No. 437, 10/2/20 Teams Message, was

received in Evidence.)

MR. POGOZELSKI: Thank you, Your Honor.

If we can go to the next page and zoom in.

Thank you.

BY MR. POGOZELSKI:

Q. Are you relaying a phone call that you had with this Peter character around this time?

A. Yes, I am.

Q. I know it's kind of annoying, but if you can indulge us and read your message to Charles Boyd.

A. Sure.

"Hi, Charlie. Just letting you know that I spoke with Peter at 4:18. The conversation did not last very long. He explained to me that he buys drugs from pharmacies that are closing. When I asked what he does with the inventory while he waits to sell it, he says he stores it in his office, which is the registered wholesaler distribution address.

"When he buys it, he does not get any T3 information from the pharmacies that he purchases from. I explained to him that this was required by the DSCSA guidelines and was necessary to be provided within 24 hours.

"His justification was that he was -- that he owned a pharmacy in the past and never asked about where drugs came from or checked paperwork.

"I explained to him that this was required when acting as a

wholesaler and selling drugs for resale. He went from being very chipper to very somber rather quickly.

"He said he would be sending over more documentation, so I guess we will see what he sends."

Q. All right. And a couple of things here.

You relay that Peter said -- that you asked, "What do you do with your inventory while he waits to sell it?" He says he stores it in his office which is the registered wholesaler distribution address.

Was that the address in the photo that we looked at earlier?

A. Yes, I believe so.

Q. That's what he was referring to?

A. Yes.

Q. And did that look like a legitimate wholesaler to you?

A. No.

Q. And then you're saying that Peter said "When he buys it, he does not get any T3 information from the pharmacies that he purchases from."

Was this an indication, another indication that Peter had no way of creating a truthful, accurate T3?

A. That's correct.

Q. And you're telling this to who?

A. To Charles.

Q. And what is his response here?

A. Thanks.
Q. Okay. And without any T3 information, if Peter has no T3 information, is there any way to know where these HIV drugs are coming from?
A. No.
Q. And was that concerning to you?
A. Yes.
Q. Do you recall having any other phone calls with Peter after this?
A. No, I didn't.
Q. Do you know whether or not Charles Boyd did?
A. No, I don't know if he communicated with him.
Q. And did you ever exchange any kind of text messages with Peter?
A. No.
MR. POGOZELSKI: All right. If we could pull up Government's Exhibit 184 just for the witness.
BY MR. POGOZELSKI:
Q. Is this an email from you to King Kimchi and Charles Boyd again?
A. Yes, they were.
Q. And what's the date?
A. 10/5/2020.
MR. POGOZELSKI: All right. The Government would move into evidence Government's Exhibit, is it 184?

MR. ZIMET: Yes. No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 184 will be received.
(Government's No. 184, Email from Divilio to Kimchi and Charles Boyd, was received in Evidence.)
BY MR. POGOZELSKI:
Q. All right. And is there a second page to this? No? Okay.
So is King Kimchi sending over, as far as you can see here, is he sending over new, revised T3s at the bottom?
A. Yes, I believe he was.
Q. And what is your response here?
A. He asked me if it's all good to go.
I wrote, "Hello, I believe this is the same one you sent us this morning. I'm in the process of trying to verify these transactions. How were purchases made from Instacare Pharmacy on 9/15/20 when the pharmacy was closed?
"This license for this facility has not been active since 3/30/2020."
Q. All right. Are you again raising concerns with King Kimchi?
A. Yes.
Q. And Charles Boyd is on that email?
A. Yes, he is.
MR. POGOZELSKI: If we could pull up Government's Exhibit 440.

BY MR. POGOZELSKI:
Q. Are these Teams messages between you and Charles Boyd that same day?
A. Yes, they are.
Q. 10/5/2020?
A. Yes.
MR. POGOZELSKI: Government moves into evidence Government's Exhibit 440.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 440 will be received.
(Government's No. 440, Teams messages between Divilio and Charles Boyd, was received in Evidence.)
BY MR. POGOZELSKI:
Q. All right. Ms. Divilio, in these -- sorry, in these chats with Charles Boyd, what are you writing here in the 7:23 p.m. to Charles Boyd?
A. I wrote, "They provided another T3 which says" -- sorry.
"They provided another T3 which says the drug was purchased in 2018; however, I don't believe Boulevard's wholesale license was issued until 12/2019."
Q. And was your concern with the prior version that the purchase was much later, like when the supposed pharmacy that had sold it was closed?
A. Yes. My concern was that these dates aren't matching up.

Q. Did the new version, then, have -- basically, was it backdated?
A. Yes.
Q. And you're communicating that to Charles Boyd?
A. Yes.
Q. And then what do you write there at 8:25 p.m.?
A. "I do not think it was possible for them to have bought it from Instacare Pharmacy of this year because there's currently no pharmacy there."
Q. So there's the backdating, and then are you also raising an issue with the Boulevard's licensing at the top?
A. Yes.
Q. Okay.
A. At the top, yes.
MR. POGOZELSKI: If we could pull up just for the witness, Government's Exhibit 186.
BY MR. POGOZELSKI:
Q. Is this an email the next day from King Kimchi to you and Charles Boyd and Dakota Flowers?
A. Yes, it is.
MR. POGOZELSKI: Government would move into evidence Government's Exhibit 186.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 186 will be received.

(Government's No. 186, 10/6/20 Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. All right. If we could go to the second page. All right.

MR. POGOZELSKI: And then if this is possible, Ms. Gold, could we pull up side-by-side Government's Exhibit 180, page 2 with this one?

BY MR. POGOZELSKI:

Q. So in these two different versions within a short time period, are the dates of purchase by Instacare different between the two?

A. Yes, they are.

Q. And was that after you had raised the concern about Instacare being closed and a recent purchase or supposed purchase by Boulevard?

A. Yes, I believe it was.

Q. Okay. And is there also new information next to Instacare Pharmacy?

A. Yes. They've added the d/b/a Brookville RX.

Q. Okay. With these changes, were you becoming even more suspicious about these T3s?

A. Yes.

Q. And was Charles Boyd on the email with the altered T3 changing the dates for Instacare, backdating, and also adding the d/b/a?

A. Yes, he was.
Q. Okay.
THE COURT: Mr. Pogozelski, is this a good spot to break?
MR. POGOZELSKI: I think, if you'd indulge me, I could go quickly through another document.
THE COURT: Okay.
MR. POGOZELSKI: It links with this chain of questioning.
THE COURT: Okay.
MR. POGOZELSKI: I apologize. I'm sorry. I know it's Friday.
If we could pull up Government's Exhibit 187 just for the witness.
BY MR. POGOZELSKI:
Q. Ms. Divilio, is this an email from you to Patrick Boyd and Charles Boyd?
A. Yes, it is.
Q. And it's dated 10/12/2020?
A. Yes.
MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 187.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 187 will be received.

(Government's No. 187, 10/12/20 Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. So after -- I think, you, in the Teams messages, you said you couldn't reach Rochester Drug Co-op.

A. Yes.

Q. Did you reach out to Gilead at this point?

A. Yes, I did.

Q. And did you attach a screenshot of Boulevard T3?

A. Yes, we did.

Q. Or a full Boulevard T3? Something like that?

A. Yes.

Q. All right. And did Gilead respond here at the bottom?

A. Yes, they did.

Q. All right. What did Gilead write to you?

A. They wrote, "Dear Abbie, this matter has been referred to my team. The information contained in the pedigree transaction history document is inconsistent with our records. If this pedigree documentation is associated with Gilead products in your possession or control, we, therefore, believe it should be treated as an illegitimate product in quarantine and should be reported to the FDA via form FDA 3911.

"Please share with me a copy of the 3911 form involving Gilead products that you submit to the FDA."

MR. POGOZELSKI: Zoom out.

BY MR. POGOZELSKI:
Q. Why did you forward this to defendants Patrick Boyd and Charles Boyd?
A. I was not familiar with the 3911 reporting process, and, again, it was just being transparent, here's Gilead saying that this transaction was inconsistent to their records and should be treated as an illegitimate product.
Q. And was the Gilead email after IPC had confirmed Boulevard T3s to be false?
A. Yes, it was.
Q. Was it after Kimchi had altered the Instacare versions of the T3s?
A. Yes, it was.
Q. And did you do anything after receiving this response from Gilead?
A. I attempted to fill out the FDA Form 3911.
Q. And did you send that to Charles Boyd?
A. Yes.
Q. And did you intend to submit that FDA Form 3911?
A. Yes.
Q. Was it submitted?
A. No.
Q. Why not?
A. At that time Charles wanted to seek legal counsel regarding how to process this.

So there was -- they had some communications with their legal team at the time, and the advice given, based on the information that was provided, was that the 3911 form was not the responsibility of Safe Chain at that time, that it would have fallen to Gilead as the manufacturer.

Q. And did you later receive an email with the -- that Charles Boyd had sent to the lawyers about this?

A. Yes, about more than a month after this.

Q. Okay. And did that email include information about all these falsifications, these confirmations of falsified Boulevard T3s?

A. It did not contain all the information we had discovered at the time.

MR. POGOZELSKI: No further questions. We will return Monday, Your Honor.

THE COURT: We will go ahead and recess for the weekend.

Remember my admonition not to discuss the case or allow it to be discussed in your presence.

I'm going to ask you to come back at 9:00 on Monday and be in the jury deliberation room and shortly thereafter, we will resume the trial.

Have a nice weekend.

THE COURTROOM DEPUTY: All rise for the jury.

(Jury exits.)

THE COURT: And, again, Ms. Divilio, there's a break in your testimony. You're not allowed to discuss your testimony with anyone.

Do you understand?

THE WITNESS: Yes. We will see you back Monday at 9:00.

Have a nice weekend.

If there's nothing else to come before the Court, we will be in recess until Monday at 9:00.

MR. POGOZELSKI: Your Honor, I just wanted to clarify that "no further questions for today" --

THE COURT: I understand.

MR. POGOZELSKI: Okay.

Thank you.

THE COURT: We'll be in recess.

(Court adjourned at 5:04 PM.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: ^ *

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN, FPR, RPR
Official Court Reporter
United States District Court
Southern District of Florida
U.S. Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

## $

**$100** [1] - 47:25
**$3,000** [1] - 15:19
**$3,300** [11] - 11:4, 24:21, 24:22, 24:23, 24:24, 26:12, 26:18, 30:14, 36:8, 39:2
**$3,400** [1] - 43:7
**$300** [1] - 47:24
**$300,000** [2] - 50:5, 50:7
**$33** [1] - 30:14
**$330** [1] - 30:15
**$40** [1] - 132:16

## '

**'15** [1] - 47:23
**'16** [1] - 47:23
**'Attain'** [1] - 202:12
**'local** [2] - 202:12, 202:16
**'look** [1] - 200:7
**'Stain** [1] - 202:13
**'Stanley** [1] - 202:13

## /

**/s/Patricia** [1] - 234:21

## 1

**1** [2] - 1:8, 1:19
**10** [5] - 53:24, 54:23, 149:14, 149:15, 185:5
**10/1** [1] - 213:10
**10/1/20** [6] - 4:4, 4:5, 4:17, 209:23, 213:5, 215:1
**10/1/2020** [1] - 209:17
**10/12/20** [3] - 4:10, 65:18, 231:1
**10/12/2020** [1] - 230:19
**10/2/20** [2] - 4:19, 222:25
**10/2/2020** [1] - 220:25
**10/5/2020** [2] - 225:23, 227:5
**10/6/20** [2] - 4:9, 229:1
**102** [1] - 3:8
**104** [1] - 3:9
**10:05** [1] - 1:6
**10th** [2] - 178:9, 196:3
**11** [1] - 168:20
**111** [5] - 3:19, 157:3, 157:19, 157:22, 157:23
**119** [5] - 3:20, 175:8, 175:15, 175:18, 175:19
**11:40** [1] - 202:17
**11th** [1] - 137:12
**12** [1] - 11:18
**12/2019** [1] - 227:21
**123** [1] - 3:10
**124** [7] - 3:10, 3:21, 5:3, 178:4, 178:13, 178:16, 178:17
**127** [5] - 3:22, 182:18, 183:1, 183:4, 183:5
**12th** [1] - 77:16
**13** [8] - 5:5, 8:23, 11:20, 11:24, 51:5, 52:8, 52:10, 52:13
**13-year** [1] - 9:8
**132** [1] - 5:4
**136** [5] - 3:23, 187:3, 187:11, 187:15, 188:24
**136A** [5] - 3:24, 188:16, 188:25, 189:3, 189:5
**138** [1] - 4:21
**142** [1] - 4:24
**144** [1] - 4:13
**148** [1] - 4:11
**15** [18] - 30:3, 56:22, 78:6, 88:5, 88:10, 91:23, 94:19, 94:20, 94:24, 95:9, 95:18, 100:13, 100:14, 101:4, 101:9, 165:10, 165:16, 165:18
**15-minute** [1] - 165:7
**157** [1] - 3:19
**15th** [1] - 88:13
**160** [5] - 3:25, 196:21, 197:4, 197:7, 197:8
**162** [1] - 4:22
**167** [1] - 4:12
**17** [1] - 54:18
**170** [1] - 3:11
**172** [2] - 3:11, 3:18
**173** [5] - 4:1, 201:2, 201:11, 201:14, 201:15
**174** [5] - 4:2, 205:2, 205:11, 205:14, 205:15
**175** [1] - 3:20
**177** [5] - 4:4, 214:16, 214:22, 214:25, 215:1
**178** [1] - 3:21
**17th** [5] - 142:6, 142:22, 142:23, 143:18, 144:1
**180** [7] - 4:5, 106:24, 212:15, 213:1, 213:4, 213:5, 229:7
**181** [5] - 4:6, 217:18, 217:24, 218:2, 218:3
**183** [2] - 3:22, 14:4
**184** [6] - 4:7, 4:23, 225:17, 225:25, 226:3, 226:4
**186** [5] - 4:9, 228:16, 228:22, 228:25, 229:1
**187** [6] - 3:23, 4:10, 230:13, 230:22, 230:25, 231:1
**189** [1] - 3:24
**19** [1] - 1:5
**191** [1] - 4:25
**193** [1] - 4:14
**195** [1] - 4:15
**197** [1] - 3:25
**198** [1] - 4:16
**1:30** [2] - 91:13
**1:33** [1] - 144:13
**1:35** [3] - 91:13, 91:17, 92:2
**1st** [2] - 168:6, 212:18

## 2

**2** [10] - 47:24, 122:18, 124:16, 131:22, 132:10, 176:2, 176:19, 197:15, 215:4, 229:7
**2,000** [2] - 171:19, 172:4
**2/3/20** [1] - 65:21
**20** [3] - 11:18, 20:7, 104:25
**201** [1] - 4:1
**2010** [1] - 8:17
**2014** [3] - 9:15, 9:21, 47:23
**2015** [1] - 16:18
**2016** [3] - 100:10, 100:11, 100:13
**2018** [4] - 105:2, 107:4, 111:13, 227:20
**2019** [4] - 111:13, 113:2, 123:4, 123:5
**2020** [50] - 8:17, 11:2, 17:25, 22:5, 47:20, 47:25, 48:1, 48:5, 48:7, 56:4, 76:25, 77:13, 77:16, 78:25, 111:6, 113:14, 114:16, 114:17, 115:20, 123:9, 123:17, 129:8, 137:14, 140:3, 142:6, 142:23, 143:18, 144:1, 147:7, 147:14, 147:18, 147:19, 147:21, 151:9, 151:23, 157:8, 165:2, 176:6, 176:21, 178:9, 190:23, 190:24, 191:8, 196:3, 197:2, 201:8, 212:18, 222:1, 222:3, 222:18
**2021** [13] - 56:4, 58:12, 66:16, 77:20, 79:1, 84:11, 87:3, 101:8, 101:15, 137:12, 137:17, 156:14, 175:3
**2022** [2] - 48:13, 105:2
**2023** [3] - 48:10, 48:14, 48:18
**2024** [2] - 48:15, 48:16
**2025** [1] - 1:5
**205** [1] - 4:2
**209** [1] - 4:17
**21** [2] - 5:1, 181:13
**213** [1] - 4:5
**215** [1] - 4:4
**218** [1] - 4:6
**21st** [1] - 197:2
**22** [1] - 3:4
**221** [1] - 4:18
**222** [1] - 4:19
**226** [1] - 4:7
**227** [1] - 4:20
**229** [1] - 4:9
**22nd** [1] - 157:8
**231** [1] - 4:10
**24** [2] - 52:7, 223:21
**24-cr-205500** [1] - 1:2
**24th** [1] - 22:5
**25** [1] - 179:23
**258** [1] - 1:8
**26th** [3] - 190:23, 190:24, 191:8
**275-5300** [1] - 202:17
**278** [5] - 4:11, 148:4, 148:19, 148:22, 148:23
**27th** [1] - 168:6
**28** [1] - 3:4
**299** [1] - 234:24
**29th** [1] - 201:8
**2:59** [1] - 145:22
**2nd** [2] - 222:1, 222:18

## 3

**3** [5] - 122:18, 137:18, 138:11
**3,300** [1] - 15:19
**3/25/21** [1] - 174:13
**3/29/21** [1] - 174:19
**3/30/2020** [2] - 218:15, 226:18
**3/31/2021** [2] - 168:18, 168:19
**30** [12] - 3:17, 68:14, 69:15, 70:2, 70:3, 70:4, 91:22, 94:17, 94:18, 94:22, 99:2, 99:4
**30-day** [1] - 57:6
**305** [5] - 4:12, 166:17, 167:2, 167:5, 167:6
**305A** [1] - 167:13
**33128** [1] - 1:19
**33132** [1] - 1:16
**333** [1] - 181:13
**33301** [2] - 1:22, 234:24
**38** [1] - 169:3
**3911** [6] - 231:22, 231:23, 232:4, 232:16, 232:19, 233:3
**3rd** [3] - 1:19, 76:25, 77:13

## 4

**4** [7] - 122:18, 137:18, 138:18, 142:17, 145:21, 157:10, 158:2
**4/22/20** [2] - 3:19, 157:23
**4/22/2020** [1] - 159:15
**4/22/24** [2] - 5:2, 63:22
**40** [1] - 1:19
**40-plus** [1] - 109:1
**400** [2] - 143:12, 144:20
**418** [5] - 4:13, 143:21, 144:3, 144:6, 144:7
**421** [5] - 4:14, 192:23, 193:5, 193:8, 193:9
**425** [5] - 4:15, 195:2, 195:9, 195:12, 195:13
**429** [5] - 4:16, 198:10, 198:18, 198:21, 198:22
**434A** [2] - 207:24, 208:8
**435** [5] - 4:17, 209:12,

209:19, 209:22, 209:23
**436A** [5] - 4:18, 220:19, 221:5, 221:8, 221:9
**437** [5] - 4:19, 222:14, 222:21, 222:24, 222:25
**44** [1] - 3:5
**440** [5] - 4:20, 226:25, 227:8, 227:11, 227:12
**461** [6] - 4:21, 137:7, 137:22, 137:24, 138:3, 138:4
**471** [5] - 4:22, 162:11, 162:19, 162:22, 162:23
**472** [5] - 4:23, 184:2, 184:12, 184:15, 184:16
**48** [1] - 181:8
**4:18** [1] - 223:13
**4:47** [1] - 210:7
**4th** [1] - 1:15

## 5

**5** [1] - 143:3
**5/3/2021** [1] - 148:17
**5/3/21** [2] - 4:11, 148:23
**5/5/2020** [1] - 167:22
**50** [1] - 47:25
**514** [5] - 4:24, 141:24, 142:8, 142:11, 142:12
**516** [5] - 4:25, 190:19, 191:1, 191:4, 191:5
**53** [1] - 3:6
**533** [7] - 5:1, 21:12, 21:18, 21:21, 21:22, 28:14, 28:17
**551** [1] - 215:24
**5:04** [2] - 1:6, 234:16
**5:08** [1] - 194:4
**5:51** [1] - 211:5
**5th** [1] - 168:19

## 6

**6** [1] - 1:22
**6/1/2020** [1] - 162:17
**6/11/2021** [1] - 166:25
**6/11/21** [4] - 4:12, 4:21, 138:4, 167:6
**6/2/20** [1] - 170:7
**61958-2501-01** [1] - 203:3
**63** [1] - 5:2
**63,000** [1] - 109:5
**631** [7] - 5:2, 63:7, 63:18, 63:21, 63:22, 77:5, 84:5
**633** [1] - 1:22
**639** [5] - 5:3, 122:16, 122:24, 124:7, 124:8
**640** [5] - 5:4, 131:21, 132:3, 132:6, 132:7
**651** [5] - 5:5, 12:25, 13:8, 13:11, 13:12
**652** [1] - 92:12
**6:23** [2] - 146:9

## 7

**7** [1] - 3:3
**7/10/20** [4] - 3:20, 3:21, 175:19, 178:17
**7/10/2020** [1] - 175:13
**7/20/20** [2] - 3:22, 183:5
**7/20/2020** [2] - 182:24, 184:10
**7/21** [9] - 65:4, 77:4, 77:7, 84:19, 85:10, 86:13, 86:15, 86:17, 100:1
**7/24/20** [2] - 5:1, 21:22
**70** [1] - 3:17
**718** [1] - 202:17
**75** [1] - 3:7
**753** [1] - 199:3
**7:23** [1] - 227:16
**7:54** [2] - 200:3, 200:6

## 8

**8** [1] - 14:4
**8/11/20** [2] - 3:23, 187:15
**8/11/2020** [1] - 187:9
**8/17/20** [4] - 4:13, 4:24, 142:12, 144:7
**8/26/20** [2] - 4:25, 191:5
**823** [1] - 174:7
**84** [2] - 3:7, 167:23
**85** [7] - 3:18, 167:23, 169:6, 169:17, 170:9, 172:13, 172:14
**8:25** [1] - 228:6
**8:52** [2] - 137:20, 138:12
**8th** [1] - 176:4

## 9

**9** [2] - 43:18, 63:8
**9/1/20** [2] - 4:14, 193:9
**9/1/2020** [1] - 193:3
**9/10/20** [2] - 4:15, 195:13
**9/10/2020** [1] - 195:7
**9/15/20** [1] - 226:16
**9/2/20** [1] - 218:16
**9/21/20** [2] - 3:25, 197:8
**9/24/2020** [1] - 198:16
**9229** [14] - 120:19, 126:2, 126:20, 152:6, 152:7, 152:11, 156:24, 159:16, 160:1, 161:3, 176:9, 179:19, 192:5, 197:24
**9229's** [1] - 163:4
**99** [1] - 1:15
**9:00** [4] - 61:7, 233:20, 234:6, 234:9
**9th** [1] - 176:21

## A

**Abbie** [1] - 231:16
**ABIGAIL** [3] - 3:9, 104:7, 104:13
**Abigail** [1] - 104:5
**abigail** [1] - 104:13
**ability** [5] - 20:18, 20:24, 40:4, 49:11, 219:13
**able** [23] - 11:5, 29:5, 30:5, 33:19, 33:21, 33:23, 42:1, 42:3, 68:4, 77:10, 108:20, 121:12, 130:15, 130:20, 132:24, 133:8, 136:2, 151:18, 202:2, 202:23, 203:9, 203:10, 215:7
**above-entitled** [1] - 234:19
**abrasive** [1] - 153:22
**absolutely** [2] - 60:4, 119:13
**accept** [1] - 108:15
**accepted** [3] - 14:11, 14:17, 96:1
**accepting** [1] - 109:5
**access** [7] - 12:20, 40:6, 40:7, 42:1, 111:18, 148:15, 171:24
**according** [2] - 192:8, 198:5
**account** [1] - 41:9
**accounting** [4] - 126:24, 157:6, 184:21, 195:22
**accounts** [2] - 158:3, 184:22
**accreditation** [3] - 23:10, 23:20
**Accredited** [1] - 23:7
**accurate** [9] - 36:16, 127:20, 130:19, 171:20, 210:18, 219:11, 219:17, 224:21, 234:18
**acknowledged** [1] - 221:17
**acquire** [1] - 109:2
**acquisition** [1] - 34:9
**Act** [5] - 169:24, 179:21, 179:23, 179:25, 182:5
**act** [1] - 181:14
**Act's** [1] - 179:7
**acting** [1] - 223:25
**active** [4] - 108:22, 218:11, 218:17, 226:17
**actively** [1] - 154:2
**acts** [1] - 181:5
**actual** [8] - 27:12, 34:15, 35:5, 36:11, 92:22, 136:14, 207:1, 207:2
**actuary** [1] - 35:10
**AD** [2] - 3:21, 178:17
**Adam** [32] - 119:7, 149:3, 149:8, 149:10, 149:11, 152:14, 152:17, 152:22, 153:2, 153:6, 153:11, 154:5, 154:8, 154:11, 155:1, 155:15, 155:23, 156:5, 156:6, 156:11, 156:15, 156:19, 158:25, 164:11, 178:6, 178:23, 180:6, 181:17, 182:16, 182:21, 183:9, 204:5
**Adam's** [1] - 119:8
**add** [1] - 191:12
**added** [3] - 115:3, 115:4, 229:19
**adding** [1] - 229:24
**addition** [3] - 30:16, 55:10, 181:3
**additional** [7] - 107:8, 126:23, 126:24, 183:21, 203:12, 215:21, 215:23
**address** [20] - 63:15, 124:22, 125:12, 129:23, 129:24, 130:2, 136:7, 136:10, 159:21, 191:15, 192:14, 193:22, 202:2, 202:12, 215:9, 215:17, 218:12, 223:17, 224:9, 224:10
**addresses** [3] - 121:19, 197:25, 207:19
**adhesive** [2] - 141:4, 143:1
**adjourned** [1] - 234:16
**administrative** [2] - 155:19, 155:21
**admit** [15] - 63:17, 68:13, 69:14, 69:25, 92:12, 92:21, 122:23, 132:2, 137:24, 142:7, 144:3, 157:19, 162:18, 167:2, 178:12
**admitted** [1] - 188:24
**admonishment** [2] - 91:15, 166:11
**admonition** [3] - 93:22, 165:8, 233:18
**adults** [1] - 106:2
**adverse** [1] - 75:25
**advertising** [1] - 117:9
**advice** [3] - 71:11, 204:16, 233:2
**advise** [1] - 206:9
**affect** [2] - 46:25, 219:1
**affects** [1] - 38:7
**affirmed** [3] - 7:3, 53:3, 104:8
**afraid** [1] - 82:8
**afternoon** [7] - 94:2, 94:3, 102:12, 102:13, 104:18, 180:24, 205:23
**agencies** [1] - 38:20
**agency** [2] - 31:5, 40:1
**aggravated** [1] - 185:19
**ago** [7] - 54:18, 54:24, 74:15, 99:11, 176:8, 205:24, 217:11
**agree** [6] - 35:4, 36:8, 69:24, 87:10, 194:12, 221:20
**agro** [1] - 106:17

**ahead** [8] - 19:1, 35:18, 41:2, 43:17, 91:10, 157:9, 205:1, 233:16
**alarm** [2] - 128:12, 128:19
**Alexander** [1] - 1:13
**allow** [10] - 6:20, 19:14, 33:21, 38:16, 71:16, 91:16, 93:23, 165:8, 166:12, 233:18
**allowed** [6] - 12:9, 33:25, 92:1, 92:20, 165:13, 234:2
**allows** [1] - 26:19
**alluded** [1] - 120:14
**almost** [1] - 112:11
**altered** [2] - 229:23, 232:11
**Alzheimer's** [1] - 149:14
**AM** [1] - 1:6
**amend** [1] - 94:8
**AMERICA** [1] - 1:4
**American** [1] - 51:21
**amount** [12] - 30:9, 33:25, 34:11, 35:5, 36:1, 36:11, 39:6, 94:24, 115:21, 167:18, 168:22, 169:1
**Anda** [1] - 51:19
**ankle** [1] - 211:25
**anniversary** [1] - 156:22
**announce** [1] - 153:17
**annoyed** [1] - 221:14
**annoying** [1] - 223:9
**answer** [23] - 18:21, 18:25, 29:9, 35:2, 35:10, 35:14, 37:9, 40:4, 42:18, 60:24, 70:25, 75:14, 92:20, 123:2, 123:13, 162:5, 162:6, 164:19, 179:15, 183:8, 183:25, 194:19, 218:20
**answered** [6] - 86:22, 89:4, 95:4, 100:15, 147:1, 208:23
**answers** [2] - 94:4, 128:11
**anticipate** [1] - 98:20
**anticipated** [1] - 98:7
**anytime** [1] - 32:23
**anyway** [2] - 118:15, 119:4
**apartment** [1] - 125:3
**API** [1] - 51:21
**apologize** [5] - 42:7, 54:9, 57:2, 170:23, 230:11
**appear** [2] - 190:6, 198:7
**appearance** [1] - 141:3
**APPEARANCES** [1] - 1:11
**appeared** [1] - 72:8
**application** [15] - 121:15, 123:3, 123:19, 124:20, 126:13, 126:17, 156:25, 157:12, 159:14, 159:17, 160:14, 161:9, 161:18, 165:1, 183:23
**applications** [3] - 107:15, 126:1, 157:16
**apply** [2] - 107:5, 126:2
**applying** [2] - 151:20, 151:23
**appointments** [1] - 106:1
**appreciate** [1] - 23:1
**approach** [6] - 22:9, 67:13, 83:23, 85:3, 92:3, 99:16
**approaching** [1] - 22:7
**approval** [3] - 123:21, 123:22, 151:16
**approve** [8] - 117:5, 117:13, 131:16, 159:16, 159:19, 160:20, 161:2, 161:10
**approved** [7] - 117:11, 160:1, 160:5, 160:9, 161:12, 165:2, 214:1
**April** [5] - 113:2, 123:18, 137:14, 157:8, 165:2
**area** [5] - 9:2, 33:12, 125:2, 125:3, 125:4
**argumentative** [2] - 79:6, 82:25
**arising** [1] - 114:13
**arrived** [2] - 39:17, 138:15
**arriving** [1] - 129:16
**art** [1] - 31:10
**article** [7] - 16:5, 207:21, 208:2, 208:4, 208:18, 208:21, 209:2
**arts** [1] - 105:20
**ASAP** [4] - 176:24, 187:23, 188:1, 210:11
**aside** [5] - 25:20, 48:16, 109:18, 139:4, 139:6
**aspects** [1] - 115:16
**asserted** [1] - 71:17
**assist** [1] - 176:15
**assistance** [3] - 15:15, 25:19, 25:20
**Assistant** [1] - 1:14
**assisted** [1] - 106:25
**assisting** [1] - 113:15
**associated** [6] - 130:1, 150:1, 188:23, 202:5, 202:24, 231:19
**Association** [2] - 23:21, 24:5
**assume** [1] - 89:22
**assuming** [2] - 36:15, 172:23
**assumption** [1] - 45:2
**AstraZeneca** [1] - 144:20
**asylum** [1] - 54:5
**Atkinson** [5] - 184:5, 184:7, 184:19, 186:25, 195:22
**atmosphere** [5] - 109:18, 109:19, 110:5, 152:1, 186:24
**attach** [4] - 161:19, 167:10, 188:13, 231:9
**attached** [4] - 14:21, 41:13, 41:24, 125:23
**attaching** [1] - 212:20
**Attain** [4] - 197:23, 202:10, 202:20, 203:10
**attempt** [1] - 212:5
**attempted** [3] - 202:10, 215:14, 232:16
**attempting** [2] - 137:1, 201:23
**attend** [2] - 106:1, 156:19
**attention** [7] - 71:3, 117:25, 119:2, 134:21, 155:6, 155:12, 181:20
**attorney** [3] - 81:22, 81:23, 82:4
**Attorneys** [1] - 1:15
**audits** [1] - 107:12
**August** [18] - 107:4, 129:8, 140:3, 142:6, 142:22, 142:23, 143:18, 144:1, 147:19, 147:21, 159:9, 168:6, 186:5, 186:6, 186:11, 190:23, 190:24, 191:8
**authenticate** [1] - 67:11
**authenticity** [1] - 172:7
**authorized** [22] - 10:12, 31:1, 31:4, 31:7, 31:15, 31:18, 31:21, 33:9, 34:3, 34:12, 34:15, 35:22, 36:5, 36:23, 36:24, 37:2, 37:13, 40:12, 46:2, 136:4
**authorizing** [1] - 31:8
**automated** [1] - 170:24
**automatic** [1] - 170:19
**automatically** [5] - 112:2, 112:5, 112:8, 170:15, 171:2
**avenue** [1] - 118:23
**average** [8] - 11:11, 11:17, 20:10, 22:12, 34:21, 38:14, 43:18, 43:20
**avoid** [1] - 176:14
**awaiting** [1] - 215:12
**aware** [16] - 28:6, 45:13, 73:16, 75:11, 75:17, 81:15, 107:6, 107:16, 139:22, 147:9, 160:2, 160:5, 160:6, 160:9, 174:2, 199:22
**AWP** [1] - 38:12

## B

**B-O-R-J-A** [1] - 53:9
**bachelor's** [1] - 8:1
**back-and-forth** [1] - 108:14
**backdated** [1] - 228:2
**backdating** [2] - 228:10, 229:24
**background** [3] - 7:23, 104:23, 105:18
**backload** [1] - 185:25
**backlog** [3] - 176:13, 177:21, 187:23
**backlogged** [1] - 127:8
**backwards** [2] - 130:9, 130:18
**bad** [8] - 54:24, 154:2, 172:3, 194:15, 194:18, 204:4, 204:6, 204:8
**bag** [5] - 81:3, 81:4, 81:5, 81:7, 101:1
**bags** [2] - 14:21, 111:9
**Bailey** [1] - 234:21
**BAILEY** [2] - 2:2, 234:21
**Bailey-Entin** [1] - 234:21
**BAILEY-ENTIN** [2] - 2:2, 234:21
**ballpark** [2] - 11:16, 11:17
**Baltimore** [4] - 8:3, 8:8, 9:22
**barrier** [1] - 133:11
**Barzee** [5] - 1:17, 1:18, 22:21, 44:22, 124:5
**BARZEE** [53] - 3:4, 3:7, 6:10, 6:18, 13:10, 21:20, 22:23, 26:7, 28:10, 63:20, 75:22, 77:2, 77:6, 77:9, 81:13, 83:2, 83:5, 83:18, 83:20, 124:6, 132:5, 142:10, 148:21, 157:21, 162:21, 166:3, 166:10, 167:4, 175:17, 178:15, 183:3, 184:14, 187:13, 189:2, 191:3, 193:6, 195:10, 197:6, 198:19, 200:12, 201:12, 205:13, 209:3, 209:21, 213:3, 214:24, 218:1, 221:7, 222:23, 226:2, 227:10, 228:24, 230:24
**base** [1] - 37:3
**based** [11] - 36:15, 37:5, 39:9, 98:24, 105:24, 109:15, 123:12, 128:5, 206:3, 213:23, 233:2
**basic** [2] - 135:21, 145:11
**basis** [2] - 30:20, 51:20
**bear** [1] - 54:10
**beat** [2] - 138:15,

138:22
**beat-up** [2] - 138:15, 138:22
**beautiful** [3] - 26:23, 26:24
**became** [4] - 107:6, 107:16, 115:5, 116:12
**become** [4] - 8:5, 116:2, 153:4, 177:5
**becoming** [3] - 178:1, 185:25, 229:20
**bed** [3] - 60:19, 61:2, 61:6
**BEFORE** [1] - 1:10
**began** [4] - 126:5, 129:7, 129:18, 201:25
**begin** [3] - 9:13, 44:11, 159:9
**beginning** [2] - 47:23, 177:14
**begins** [1] - 63:4
**behalf** [3] - 96:12, 135:23, 184:23
**behind** [1] - 117:2
**belief** [1] - 208:21
**bells** [2] - 128:12, 128:19
**below** [4] - 179:24, 182:3, 204:7, 206:2
**benefit** [3] - 23:12, 42:24, 110:13
**benefits** [1] - 29:25
**best** [8] - 17:25, 29:22, 125:4, 146:1, 146:3, 146:21, 181:23, 188:2
**better** [2] - 76:9, 132:12
**between** [26] - 4:20, 33:8, 33:9, 35:22, 43:2, 116:5, 116:12, 136:13, 137:11, 155:22, 156:5, 162:14, 184:4, 188:5, 190:22, 192:25, 195:4, 195:16, 198:12, 209:14, 219:24, 220:21, 222:16, 227:2, 227:12, 229:11
**beyond** [1] - 47:3
**Biamonte** [1] - 135:12
**big** [8] - 20:16, 27:3, 81:5, 125:2, 125:23, 153:25, 164:16, 164:17
**Biktarvy** [34] - 10:1, 11:3, 39:4, 43:8, 54:12, 54:13, 54:14, 55:3, 55:4, 55:14, 57:24, 58:11, 58:21, 58:24, 60:17, 62:25, 64:6, 64:12, 65:1, 74:2, 76:13, 94:18, 100:14, 101:3, 101:9, 101:14, 102:2, 102:21, 144:21, 145:16, 145:20, 174:10, 206:12
**bill** [1] - 39:10
**billed** [2] - 10:20, 50:23
**billing** [2] - 30:3, 96:11
**bills** [1] - 48:19
**binders** [3] - 110:15, 129:18
**birth** [1] - 103:13
**bit** [13] - 7:22, 17:10, 57:2, 104:23, 105:4, 108:13, 111:9, 125:1, 132:12, 150:3, 153:14, 199:7, 203:12
**biweekly** [1] - 114:11
**Black** [1] - 154:15
**blame** [1] - 140:6
**blamed** [1] - 193:24
**blister** [2] - 9:16, 15:3
**blood** [2] - 9:10, 60:11
**blowing** [1] - 221:14
**Blue** [2] - 15:17
**blue** [5] - 26:24, 41:15, 85:17, 86:12, 86:18
**BNR** [4] - 192:3, 198:4, 201:25, 202:2
**board** [3] - 8:5, 163:17, 215:9
**Board** [8] - 160:24, 163:14, 163:18, 163:25, 164:1, 164:15, 166:20, 215:21
**board-certified** [1] - 8:5
**boards** [2] - 19:4, 23:14
**Boards** [2] - 23:21, 24:5
**boat** [1] - 136:2
**body** [3] - 61:1, 61:15, 62:15
**bombarded** [1] - 110:10
**bonus** [1] - 109:7
**books** [1] - 49:6
**Borja** [26] - 5:2, 52:21, 53:9, 53:17, 54:7, 55:18, 60:16, 63:9, 63:22, 64:3, 67:16, 68:24, 69:22, 70:7, 71:24, 73:6, 73:15, 74:2, 74:11, 75:2, 75:7, 75:23, 83:21, 91:19, 93:15, 102:12
**BORJA** [2] - 3:6, 53:2
**born** [1] - 7:24
**boss** [2] - 110:19, 154:24
**bottle** [154] - 11:25, 12:9, 24:24, 26:12, 30:14, 31:20, 40:19, 43:8, 52:4, 55:22, 55:23, 55:24, 56:23, 57:9, 57:12, 57:18, 58:9, 58:11, 58:16, 58:18, 59:2, 59:12, 59:13, 59:20, 60:16, 62:24, 64:15, 64:16, 64:17, 65:1, 65:10, 65:25, 66:15, 67:4, 67:6, 67:20, 67:22, 68:2, 68:4, 68:5, 68:11, 68:16, 68:17, 68:20, 68:24, 69:13, 69:16, 69:18, 69:25, 70:7, 70:12, 70:17, 71:2, 71:12, 71:25, 72:21, 72:25, 73:8, 73:18, 73:21, 74:21, 74:24, 77:2, 77:7, 77:21, 78:2, 78:6, 78:10, 78:17, 78:21, 78:24, 79:24, 80:11, 80:16, 80:23, 80:25, 81:15, 84:17, 84:20, 84:25, 85:6, 85:10, 85:18, 86:2, 86:7, 86:11, 86:15, 86:20, 87:2, 87:5, 87:11, 87:16, 87:21, 88:1, 88:2, 88:10, 88:12, 88:15, 88:17, 88:24, 89:2, 89:8, 89:12, 89:13, 89:16, 89:22, 89:24, 90:9, 90:12, 90:14, 90:15, 90:18, 90:19, 91:3, 91:4, 91:5, 91:6, 91:7, 94:17, 94:18, 94:19, 94:22, 98:25, 99:4, 99:7, 99:19, 99:20, 100:14, 101:8, 101:17, 101:19, 101:20, 101:23, 101:24, 102:1, 103:5, 141:3, 142:25, 143:4, 143:12, 145:2, 145:8, 145:16, 145:20, 149:8
**Bottle** [2] - 3:17, 70:4
**bottles** [46] - 12:3, 12:4, 12:11, 12:16, 15:22, 52:11, 55:20, 55:21, 56:20, 64:8, 65:13, 66:3, 76:21, 78:4, 78:8, 78:22, 78:23, 79:3, 79:4, 79:10, 79:15, 79:17, 79:18, 79:19, 79:21, 79:22, 86:24, 88:8, 88:9, 89:21, 90:6, 90:7, 90:25, 102:2, 103:17, 139:11, 139:20, 140:25, 141:4, 141:9, 141:10, 147:5, 199:7, 199:23, 204:6, 204:9
**bottom** [20] - 137:18, 161:18, 168:15, 168:24, 173:18, 174:24, 176:2, 180:10, 182:3, 187:18, 194:10, 199:2, 211:3, 211:13, 215:3, 216:14, 219:5, 226:9, 231:13
**bought** [4] - 49:23, 219:19, 228:7
**Boulevard** [122] - 3:18, 105:15, 120:19, 122:21, 125:24, 126:2, 126:5, 126:20, 127:1, 127:5, 127:16, 127:17, 127:24, 128:1, 128:22, 129:18, 129:23, 130:10, 130:12, 130:15, 131:18, 132:12, 132:21, 133:22, 134:5, 137:13, 152:6, 152:7, 152:11, 154:7, 154:11, 156:24, 158:21, 159:3, 159:5, 159:7, 159:16, 159:19, 160:1, 160:6, 160:9, 160:10, 160:13, 160:21, 161:2, 161:23, 163:4, 163:9, 163:20, 164:6, 164:24, 167:17, 167:25, 168:4, 168:7, 168:11, 169:2, 171:5, 171:7, 172:14, 173:6, 174:10, 174:20, 176:9, 176:17, 177:2, 177:11, 179:19, 180:13, 183:13, 185:1, 185:6, 185:10, 186:4, 186:17, 186:20, 187:22, 191:10, 191:20, 192:5, 192:9, 192:12, 192:19, 193:25, 194:9, 195:21, 195:23, 197:24, 198:3, 199:12, 199:23, 200:16, 200:21, 201:21, 201:24, 203:20, 204:6, 204:10, 204:22, 205:19, 206:14, 206:15, 209:7, 209:9, 210:3, 210:10, 210:24, 213:14, 220:11, 221:17, 221:21, 221:24, 222:2, 222:5, 229:15, 231:9, 231:11, 232:8, 233:11, 234:24
**Boulevard's** [13] - 122:13, 123:3, 123:21, 124:17, 124:19, 124:24, 125:11, 129:5, 157:12, 159:16, 186:14, 227:20, 228:11
**Boulevard9229@ Gmail.com** [1] - 158:13
**box** [7] - 26:24, 28:1, 28:3, 78:18, 81:3, 81:5
**boxes** [5] - 26:24, 26:25, 27:9, 27:21, 41:21
**BOYD** [4] - 1:7, 1:17, 1:21
**Boyd** [156] - 4:1, 4:3, 4:6, 4:8, 4:16, 4:20, 16:1, 16:12, 16:13, 16:20, 21:8, 21:14, 22:3, 22:13, 28:17,

47:20, 108:7, 111:3, 114:3, 114:7, 115:11, 115:12, 115:18, 117:16, 118:17, 121:2, 121:5, 122:8, 122:10, 125:13, 128:17, 128:19, 131:2, 131:4, 131:9, 131:11, 133:5, 133:8, 135:20, 136:17, 136:19, 137:21, 138:13, 139:22, 140:1, 140:5, 142:3, 142:19, 143:23, 144:19, 146:17, 147:9, 147:11, 149:4, 149:8, 154:18, 154:19, 155:13, 156:17, 159:2, 161:15, 161:25, 162:14, 163:3, 163:16, 166:22, 172:24, 172:25, 174:2, 174:5, 175:10, 176:3, 178:6, 178:22, 180:6, 181:17, 182:20, 183:9, 184:7, 186:3, 187:6, 187:20, 189:12, 191:8, 192:19, 192:25, 193:16, 194:10, 195:4, 195:16, 196:24, 198:12, 198:22, 199:3, 199:5, 199:16, 200:4, 200:6, 200:20, 201:5, 201:16, 201:19, 203:22, 203:24, 204:4, 205:4, 205:5, 205:16, 206:21, 206:22, 207:5, 209:14, 210:7, 210:20, 211:13, 211:21, 212:23, 214:6, 217:21, 218:4, 218:7, 219:23, 219:25, 220:13, 221:1, 221:17, 222:16, 223:10, 225:11, 225:19, 226:5, 226:22, 227:2, 227:13, 227:16, 227:17, 228:4, 228:19, 229:23, 230:16, 230:17, 232:2, 232:3, 232:17, 233:7

**Boyd's** [11] - 110:16, 110:24, 134:22, 138:22, 145:25, 156:4, 164:14, 188:5, 194:2, 194:12, 213:23

**Boyds** [5] - 153:23, 155:1, 155:13, 155:25, 183:20

**Boyds'** [1] - 155:6

**brand** [5] - 20:4, 20:15, 27:24, 30:13, 33:18

**brand-name** [1] - 27:24

**branded** [9] - 10:13, 11:21, 49:18, 51:16, 111:11, 111:12, 115:19, 125:6, 189:9

**break** [7] - 91:10, 91:25, 165:12, 167:24, 168:2, 230:4, 234:1

**breaking** [2] - 48:1, 48:2

**brief** [5] - 8:7, 104:23, 106:7, 167:24, 168:2

**briefly** [1] - 92:11

**bring** [10] - 67:4, 92:9, 93:14, 93:16, 117:24, 146:2, 152:17, 155:6, 165:25, 166:4

**bringing** [1] - 118:21

**brings** [1] - 219:6

**broke** [1] - 48:13

**broken** [5] - 12:14, 80:17, 148:9, 204:7, 204:10

**Brookville** [1] - 229:19

**Brosius** [21] - 119:7, 149:3, 149:10, 149:11, 152:14, 153:2, 153:6, 153:11, 154:5, 155:1, 155:23, 156:5, 156:6, 156:15, 178:6, 178:23, 180:6, 181:17, 182:21, 183:9, 204:5

**Brosius's** [4] - 152:22, 154:11, 156:1, 156:19

**brothers** [1] - 111:3

**brought** [10] - 70:7, 116:22, 118:14, 119:2, 134:21, 152:11, 152:13, 154:5, 155:12, 181:19

**Broward** [1] - 234:24

**brown** [1] - 64:9

**brown-colored** [1] - 64:9

**Bruce** [1] - 1:21

**brushed** [1] - 193:23

**buddy** [1] - 191:10

**building** [8] - 98:18, 114:14, 125:8, 155:11, 177:21, 178:1, 218:21

**buildings** [1] - 125:3

**bulk** [2] - 20:16, 20:21

**bunch** [2] - 78:22, 102:16

**business** [54] - 8:20, 17:6, 17:12, 22:12, 29:21, 30:1, 36:22, 38:9, 40:20, 48:20, 49:3, 51:4, 105:1, 111:7, 112:16, 115:21, 116:1, 116:10, 116:14, 117:8, 118:22, 118:23, 118:24, 132:13, 135:18, 150:12, 152:13, 152:18, 152:22, 153:7, 154:11, 154:12, 154:15, 156:6, 159:22, 159:23, 164:10, 181:10, 186:1, 196:17, 210:12, 211:24, 216:16, 216:25, 217:1, 217:10, 217:14, 218:12, 218:14, 218:20, 220:5, 220:7, 220:10

**businesses** [5] - 133:13, 152:24, 154:13, 154:14, 154:17

**buy** [12] - 18:15, 18:25, 19:12, 19:17, 20:16, 26:20, 48:20, 132:16, 132:19, 173:6, 185:9, 217:13

**buying** [10] - 10:17, 21:9, 51:20, 115:19, 116:15, 164:24, 168:11, 185:15, 186:20, 186:23

**buys** [6] - 20:20, 20:21, 74:2, 223:14, 223:18, 224:17

**BY** [191] - 2:1, 3:3, 3:4, 3:4, 3:5, 3:6, 3:7, 3:7, 3:8, 3:9, 3:10, 3:10, 3:11, 3:11, 7:11, 13:1, 13:18, 14:5, 14:15, 16:11, 18:7, 18:14, 19:15, 21:7, 21:13, 22:2, 22:23, 26:7, 28:16, 32:10, 32:15, 35:1, 35:19, 44:18, 49:1, 49:10, 52:1, 53:16, 64:2, 67:15, 68:23, 69:21, 70:6, 70:21, 70:24, 71:23, 72:18, 73:5, 73:14, 74:1, 74:10, 75:16, 75:22, 77:9, 79:8, 81:13, 83:5, 84:2, 85:5, 86:14, 87:1, 89:7, 90:8, 94:1, 95:8, 95:16, 96:9, 96:19, 97:2, 98:23, 99:3, 99:18, 101:2, 102:11, 104:17, 109:17, 109:23, 122:17, 123:8, 123:16, 124:15, 131:23, 132:9, 137:8, 138:10, 140:23, 142:1, 142:18, 143:8, 143:14, 143:22, 144:14, 147:3, 148:5, 149:1, 149:7, 149:18, 150:4, 150:10, 157:4, 157:11, 158:1, 159:13, 161:20, 162:9, 162:13, 163:1, 164:22, 166:18, 167:9, 167:14, 168:16, 169:7, 169:21, 170:13, 172:17, 173:2, 173:12, 173:21, 174:8, 174:16, 175:1, 175:9, 176:1, 178:5, 178:21, 182:19, 183:7, 184:3, 184:18, 185:13, 187:4, 187:19, 188:4, 188:12, 188:17, 189:7, 190:20, 191:7, 191:18, 192:18, 192:24, 193:12, 194:23, 195:3, 195:15, 196:22, 197:14, 198:11, 199:1, 200:5, 200:14, 201:3, 201:17, 204:3, 205:3, 205:17, 208:1, 208:16, 209:1, 209:5, 209:13, 210:1, 210:6, 211:4, 211:12, 211:17, 212:16, 213:9, 213:15, 214:17, 215:5, 216:5, 216:13, 217:7, 217:19, 218:5, 220:20, 221:11, 222:15, 223:5, 225:18, 226:6, 227:1, 227:14, 228:17, 229:3, 229:8, 230:15, 231:3, 232:1

## C

**calculate** [1] - 39:1

**calculation** [1] - 39:8

**calculations** [1] - 37:9

**California** [1] - 137:3

**Cambridge** [10] - 7:21, 8:13, 8:18, 17:17, 19:21, 19:23, 20:12, 109:1, 192:12

**cannot** [1] - 215:20

**Cardinal** [58] - 10:11, 10:12, 10:19, 10:21, 11:6, 11:22, 11:25, 12:3, 12:7, 12:11, 12:16, 12:19, 12:21, 13:21, 13:24, 14:6, 14:16, 20:12, 20:16, 20:18, 20:20, 24:25, 25:5, 25:6, 26:25, 27:3, 27:13, 27:16, 29:18, 29:25, 30:7, 30:17, 36:7, 36:9, 36:10, 36:24, 36:25, 37:19, 39:16, 39:20, 40:22, 41:22, 42:3, 42:11, 42:18, 42:19, 43:9, 49:11, 49:13, 49:21, 51:2, 51:11, 51:22, 52:3, 52:6, 52:12

**Cardinal's** [4] - 11:1, 11:3, 51:11, 51:15

**care** [1] - 57:14

**cared** [1] - 185:24

**CareFirst** [1] - 15:18

**Carolina** [2] - 7:25, 8:1

**carriers** [1] - 28:6

**carrying** [1] - 186:1
**case** [9] - 6:20, 16:1, 40:13, 59:18, 91:15, 93:23, 165:8, 166:12, 233:18
**CASE** [1] - 1:2
**cases** [1] - 26:11
**cash** [1] - 48:16
**Cassandra** [3] - 203:1, 205:23, 207:8
**Castillo** [2] - 136:5, 136:11
**Cat** [1] - 154:15
**caused** [3] - 204:18, 204:21
**causing** [1] - 81:24
**CB** [4] - 3:21, 178:17, 188:2, 221:14
**cc'd** [1] - 187:25
**celebration** [1] - 156:22
**center** [1] - 211:25
**CEO** [1] - 110:18
**certain** [7] - 9:4, 11:7, 30:9, 30:12, 31:14, 32:21, 92:20
**certainly** [7] - 33:25, 117:6, 117:15, 151:11, 154:7, 164:17, 179:15
**certification** [1] - 174:25
**certifications** [2] - 173:18, 174:24
**certified** [1] - 8:5
**certify** [1] - 234:17
**Cesar** [2] - 136:4, 136:11
**Cesarcastillo.Org** [1] - 136:12
**chain** [8] - 33:13, 39:23, 119:23, 182:9, 182:12, 216:24, 218:7, 230:8
**Chain** [61] - 17:16, 17:18, 18:4, 20:1, 21:2, 24:11, 29:16, 30:18, 49:3, 105:1, 105:2, 106:8, 107:3, 107:7, 107:16, 107:24, 108:19, 108:23, 110:17, 111:13, 112:8, 112:18, 114:21, 115:21, 125:8, 127:13, 127:16, 129:16, 130:10, 130:12, 141:17, 152:14, 152:19, 153:1, 153:3, 154:2, 154:6, 155:22, 156:5, 167:17, 169:24, 170:1, 170:3, 171:12, 171:25, 172:5, 172:24, 173:14, 174:18, 177:17, 179:6, 179:20, 179:25, 182:4, 182:11, 192:7, 199:20, 214:12, 220:21, 233:4
**Chain's** [1] - 180:14
**chance** [1] - 125:19
**change** [8] - 46:19, 48:2, 94:5, 99:19, 100:2, 100:4, 103:9, 103:10
**changed** [12] - 25:9, 55:3, 59:4, 59:10, 59:11, 59:21, 69:6, 86:20, 94:13, 100:18, 141:18, 218:14
**changes** [1] - 229:20
**changing** [2] - 47:22, 229:24
**character** [1] - 223:7
**charge** [8] - 26:18, 26:19, 33:19, 36:21, 43:14, 43:16, 76:22, 202:8
**charged** [1] - 39:6
**charges** [1] - 25:17
**charging** [4] - 24:22, 36:23, 38:5, 44:10
**Charles** [129] - 4:1, 4:2, 4:6, 4:8, 4:20, 16:1, 16:13, 16:20, 21:8, 21:14, 22:3, 22:13, 28:17, 47:20, 108:7, 108:9, 110:16, 111:3, 112:21, 114:3, 114:7, 114:8, 114:10, 115:11, 115:18, 118:17, 121:2, 122:8, 125:13, 126:22, 128:17, 128:19, 131:2, 131:9, 136:17, 137:11, 137:21, 138:13, 138:22, 139:22, 140:5, 142:3, 142:19, 143:23, 144:19, 145:25, 146:17, 147:9, 149:4, 150:24, 154:18, 154:23, 155:13, 156:4, 156:17, 158:25, 159:2, 161:25, 162:14, 163:3, 163:11, 163:16, 164:11, 164:14, 166:22, 172:24, 174:2, 175:10, 176:3, 178:6, 178:22, 180:6, 181:17, 182:16, 182:20, 183:9, 184:7, 186:3, 187:6, 187:20, 188:5, 189:12, 190:22, 191:8, 196:24, 201:5, 201:15, 201:19, 203:22, 205:4, 205:15, 206:21, 207:5, 209:14, 210:7, 210:20, 211:13, 211:21, 212:23, 213:23, 214:6, 217:21, 218:4, 218:7, 219:23, 219:25, 220:13, 221:1, 221:17, 222:16, 223:10, 224:24, 225:11, 225:19, 226:5, 226:22, 227:2, 227:13, 227:16, 227:17, 228:4, 228:19, 229:23, 230:17, 232:3, 232:17, 232:24, 233:7
**CHARLES** [2] - 1:7, 1:21
**Charlie** [5] - 16:7, 28:24, 29:12, 184:25, 223:12
**chat** [2] - 212:23, 222:16
**chats** [1] - 227:15
**cheaper** [2] - 20:11, 49:3
**check** [4] - 81:10, 81:20, 115:7, 163:14
**checked** [1] - 223:24
**chemicals** [1] - 106:22
**chemistry** [1] - 8:2
**children** [1] - 106:2
**chime** [1] - 153:17
**chipper** [1] - 224:2
**cholesterol** [1] - 9:10
**choosing** [1] - 115:12
**circumstance** [3] - 171:14, 220:3, 220:6
**circumstances** [1] - 114:6
**citing** [1] - 180:5
**City** [1] - 9:22
**clarify** [3] - 66:8, 103:18, 234:10
**clarifying** [1] - 38:18
**Clayton's** [11] - 8:15, 8:16, 8:22, 8:24, 9:5, 11:19, 14:23, 45:21, 48:9, 51:4
**clean** [1] - 141:8
**clean-looking** [1] - 141:8
**cleaner** [1] - 200:8
**clear** [2] - 66:14, 73:17
**clearly** [1] - 179:23
**click** [2] - 218:13, 219:4
**client** [1] - 194:11
**clients** [2] - 106:21, 194:17
**Clifford** [1] - 146:11
**clip** [1] - 218:18
**close** [5] - 48:9, 48:11, 111:4, 155:1, 207:19
**closed** [18] - 16:25, 48:18, 49:4, 49:22, 50:4, 86:10, 93:1, 93:4, 199:11, 212:1, 212:3, 216:16, 216:20, 217:10, 218:21, 226:16, 227:24, 229:14
**closed-door** [1] - 16:25
**closely** [2] - 113:18, 125:20
**closing** [1] - 223:15
**clothing** [1] - 16:5
**clue** [1] - 158:22
**Co** [1] - 231:5
**co** [1] - 24:20
**Co-op** [1] - 231:5
**co-pays** [1] - 24:20
**code** [1] - 188:22
**Code** [1] - 181:13
**colleague** [3] - 207:17, 208:4, 208:11
**collect** [1] - 112:10
**college** [4] - 105:19, 105:22, 105:23, 106:5
**Collin** [1] - 138:14
**color** [5] - 58:22, 58:23, 87:8
**colored** [1] - 64:9
**colors** [1] - 84:14
**Column** [3] - 188:20
**column** [2] - 167:20, 168:17
**comfortable** [2] - 154:20, 154:24
**coming** [10] - 15:4, 24:14, 42:11, 98:6, 106:20, 106:22, 116:10, 176:12, 177:1, 225:4
**commentary** [1] - 92:22
**commentation** [1] - 140:16
**comments** [1] - 140:7
**commercial** [2] - 15:15, 15:17
**common** [2] - 9:25, 28:6
**communicate** [3] - 29:5, 72:4, 161:25
**communicated** [1] - 225:12
**communicating** [3] - 128:17, 220:14, 228:4
**communication** [1] - 208:9
**communications** [2] - 220:16, 233:1
**community** [2] - 105:24, 106:1
**community-based** [1] - 105:24
**companies** [8] - 25:12, 27:16, 31:15, 33:22, 38:7, 38:16, 43:3, 44:5
**company** [33] - 18:15, 19:18, 20:5, 20:7, 20:11, 20:16, 21:2, 21:9, 25:3, 25:14, 25:17, 27:6, 27:15, 31:8, 39:25, 40:1, 43:10, 107:2, 109:8, 111:7, 134:23, 144:21, 144:22, 145:12, 151:6, 156:20, 169:14, 169:23, 173:3, 180:7, 184:20, 197:22, 202:1
**company's** [5] - 121:24, 128:24, 136:14, 160:24, 184:23
**compare** [3] - 64:15, 64:18, 64:20
**compared** [2] - 20:10, 20:17
**compete** [1] - 20:8

**competing** [2] - 152:3, 152:4
**complain** [1] - 219:2
**complaining** [1] - 148:8
**complaint** [10] - 11:25, 12:12, 145:15, 146:15, 146:20, 147:13, 148:2, 148:7, 149:19
**complaints** [12] - 139:6, 139:10, 139:19, 139:24, 141:1, 141:2, 141:7, 141:12, 141:15, 147:19, 147:22, 151:5
**Complera** [1] - 206:13
**complete** [1] - 127:14
**completely** [12] - 58:17, 58:18, 58:25, 60:25, 61:1, 61:16, 61:18, 62:14, 80:14, 80:15, 80:19
**completing** [1] - 187:22
**compliance** [52] - 9:16, 9:18, 46:19, 46:21, 46:24, 107:8, 107:18, 111:23, 112:23, 112:25, 113:4, 113:22, 113:23, 113:24, 114:3, 114:7, 114:18, 114:22, 115:2, 115:16, 116:2, 117:11, 118:4, 118:18, 121:16, 128:8, 132:24, 133:1, 134:10, 134:17, 135:19, 148:14, 148:15, 154:10, 155:4, 155:12, 156:13, 157:15, 158:16, 169:14, 179:3, 179:14, 180:9, 181:3, 181:21, 185:22, 186:19, 203:18, 204:12, 208:5, 208:11, 208:13
**comply** [3] - 179:20, 180:11, 181:10
**complying** [1] - 107:12
**compound** [1] - 79:5
**computer** [2] - 114:17, 114:19
**CON'T** [4] - 3:10, 3:11, 124:14, 172:16
**concede** [3] - 6:14, 93:19, 166:6
**concern** [6] - 153:25, 186:22, 220:1, 227:22, 227:25, 229:13
**concerned** [13] - 14:9, 27:20, 72:10, 72:12, 72:19, 72:20, 72:22, 72:24, 128:14, 128:21, 199:16, 207:8, 212:8
**concerning** [4] - 97:10, 126:4, 127:4, 225:6
**concerns** [30] - 119:10, 120:24, 120:25, 121:1, 121:4, 121:7, 121:16, 121:22, 121:25, 122:7, 122:8, 125:12, 133:24, 134:21, 135:1, 135:10, 135:16, 136:1, 136:17, 136:23, 139:1, 153:11, 154:5, 154:10, 154:18, 177:22, 181:22, 186:20, 219:18, 226:19
**concluded** [1] - 75:17
**condition** [10] - 14:16, 85:23, 85:25, 86:1, 86:20, 99:21, 99:22, 100:3, 103:2, 103:5
**conditions** [3] - 11:13, 218:25, 219:9
**conducted** [1] - 73:10
**conference** [1] - 153:15
**confirm** [10] - 124:21, 130:24, 131:6, 132:23, 134:9, 203:9, 203:19, 206:3, 219:14, 219:16
**confirmation** [2] - 210:3, 213:11
**confirmations** [2] - 210:8, 233:10
**confirmed** [3] - 62:12, 72:3, 232:8
**confirming** [2] - 207:12, 209:6
**confusing** [2] - 79:12, 110:8
**connect** [1] - 188:1
**conscious** [4] - 60:22, 60:23, 61:13, 82:12
**consequences** [3] - 180:18, 181:17, 185:4
**conservative** [2] - 146:21, 146:24
**consider** [4] - 22:16, 71:20, 71:21, 220:5
**consistently** [1] - 116:16
**constant** [2] - 100:17, 118:3
**consult** [1] - 115:12
**consulted** [1] - 17:2
**consulting01234@ gmail.com** [1] - 129:25
**consumed** [1] - 139:17
**consumers** [1] - 25:17
**consuming** [1] - 120:11
**contact** [26] - 16:20, 121:14, 121:17, 121:18, 126:10, 126:18, 126:19, 130:13, 130:16, 135:18, 145:24, 158:4, 158:17, 158:21, 159:1, 159:3, 176:9, 176:14, 176:16, 183:21, 183:23, 186:17, 203:17, 209:10, 214:11, 214:13
**contacted** [2] - 81:17, 151:21
**contacting** [2] - 125:25, 199:16
**contacts** [4] - 126:23, 126:24, 152:15, 160:3
**contain** [2] - 173:14, 233:12
**contained** [1] - 231:17
**container** [1] - 41:15
**containers** [1] - 41:15
**content** [1] - 67:23
**contents** [5] - 68:16, 69:25, 70:11, 71:2, 93:4
**context** [2] - 120:5, 134:17
**continue** [9] - 62:16, 93:25, 119:3, 166:13, 179:18, 202:9, 214:1, 218:12, 220:5
**continued** [6] - 62:1, 76:7, 150:21, 181:21, 185:9, 185:15
**continuing** [3] - 19:11, 75:25, 219:4
**continuously** [2] - 202:14, 215:15
**contract** [13] - 30:7, 30:9, 30:12, 38:11, 39:11, 43:17, 43:19, 43:21, 48:16, 51:22, 106:21, 145:1, 152:25
**contracted** [1] - 22:15
**contracts** [9] - 10:18, 17:3, 19:4, 23:13, 29:18, 38:19, 42:25, 48:14
**contractual** [2] - 30:17, 106:11
**control** [3] - 24:2, 182:10, 231:20
**conversation** [6] - 73:6, 128:7, 146:10, 195:18, 222:12, 223:13
**cool** [2] - 199:10, 199:15
**Cooperative** [7] - 191:24, 197:21, 203:1, 203:19, 205:19, 206:18, 207:9
**Cooperative's** [1] - 205:21
**coordinator** [2] - 105:14, 108:17
**copied** [2] - 149:4, 166:22
**copies** [2] - 129:10, 129:11
**copy** [7] - 160:13, 160:18, 160:20, 161:23, 163:4, 219:23, 231:23
**correct** [130] - 23:22, 23:25, 24:4, 24:12, 24:13, 24:19, 25:15, 25:18, 25:22, 26:10, 26:12, 26:15, 27:1, 27:4, 27:7, 27:8, 27:11, 28:7, 28:9, 29:6, 29:14, 29:19, 29:20, 29:23, 30:8, 31:2, 31:5, 31:6, 31:8, 31:11, 31:15, 31:24, 31:25, 32:4, 33:6, 34:1, 34:2, 34:7, 34:13, 34:16, 34:20, 34:22, 35:8, 35:13, 35:23, 36:2, 36:5, 36:6, 36:13, 36:14, 36:17, 36:23, 37:4, 37:6, 37:14, 37:24, 38:2, 38:5, 38:17, 38:21, 38:24, 39:14, 39:18, 40:1, 40:8, 40:14, 40:17, 41:5, 41:9, 41:25, 42:4, 42:17, 43:1, 43:5, 43:8, 43:13, 43:15, 43:25, 44:1, 44:8, 44:9, 44:12, 44:13, 45:7, 66:2, 66:7, 66:23, 76:4, 76:25, 78:1, 79:16, 83:13, 87:3, 87:4, 87:5, 87:6, 87:12, 87:18, 88:3, 88:10, 88:11, 88:16, 88:20, 88:25, 89:1, 89:3, 89:10, 89:11, 90:19, 90:24, 94:6, 94:18, 94:22, 95:3, 95:10, 95:19, 96:2, 97:7, 97:13, 97:25, 98:11, 98:18, 99:4, 99:21, 101:15, 101:24, 102:3, 177:25, 190:7, 224:22
**correctly** [3] - 59:3, 219:21
**cost** [11] - 15:1, 20:10, 34:9, 34:15, 37:14, 39:9, 39:13, 39:17, 43:12, 43:22
**counsel** [7] - 6:3, 6:14, 92:7, 93:19, 165:20, 166:6, 232:24
**count** [1] - 94:18
**counter** [2] - 9:2, 9:3
**country** [5] - 54:3, 54:5, 54:18, 54:21, 54:22
**County** [2] - 9:19, 9:22
**county** [1] - 9:21
**couple** [14] - 22:11, 33:10, 44:6, 62:1, 62:17, 62:21, 62:22, 65:17, 82:14, 88:16, 89:18, 102:14, 212:3, 224:5
**courier** [2] - 137:3, 138:25
**course** [6] - 40:20, 43:24, 60:15, 87:25, 116:15, 181:9
**COURT** [164] - 1:1, 6:3, 6:11, 6:14, 6:19,

13:11, 13:16, 14:14, 16:10, 18:6, 18:13, 18:25, 19:10, 19:13, 21:6, 21:21, 21:25, 22:21, 26:5, 28:12, 32:9, 32:14, 34:25, 35:18, 44:15, 48:23, 49:9, 51:25, 52:18, 53:10, 53:12, 53:14, 63:21, 67:11, 67:14, 68:16, 68:22, 69:17, 69:23, 70:1, 70:3, 70:19, 70:23, 71:16, 71:20, 72:16, 73:4, 73:13, 73:25, 74:9, 75:14, 75:20, 79:7, 81:12, 83:1, 83:17, 83:19, 83:22, 83:24, 85:4, 86:9, 86:23, 89:6, 90:3, 91:10, 91:19, 91:22, 91:25, 92:5, 92:7, 92:18, 92:24, 93:6, 93:11, 93:14, 93:18, 93:22, 95:6, 95:15, 96:8, 96:18, 97:1, 98:22, 99:17, 100:16, 102:8, 104:1, 109:16, 109:22, 123:2, 123:14, 124:2, 124:5, 124:7, 124:11, 132:6, 137:22, 138:2, 138:7, 142:11, 142:15, 144:5, 144:10, 148:22, 157:22, 162:6, 162:22, 165:7, 165:12, 165:16, 165:20, 165:24, 166:4, 166:6, 166:11, 167:5, 169:20, 170:11, 171:18, 171:20, 172:3, 172:9, 172:12, 173:1, 175:18, 175:23, 178:16, 178:20, 183:4, 184:15, 185:12, 187:14, 188:24, 189:3, 191:4, 193:8, 195:12, 197:7, 197:12, 198:21, 200:13, 201:14, 205:14, 208:15, 208:24, 209:4, 209:22, 213:2, 213:4, 214:25, 218:2, 221:8, 222:24, 226:3, 227:11, 228:25, 230:3, 230:7, 230:10, 230:25, 233:16, 234:1, 234:12, 234:15

**court** [6] - 7:8, 7:17, 53:8, 57:3, 105:3, 201:19
**Court** [12] - 2:3, 2:4, 6:1, 6:6, 92:9, 93:3, 165:17, 165:24, 234:8, 234:16, 234:22, 234:22
**Courthouse** [1] - 234:23
**courtroom** [1] - 16:3
**COURTROOM** [4] - 7:6, 53:6, 104:11, 233:24
**COVID** [9] - 18:1, 82:8, 82:9, 111:6, 112:14, 112:16, 114:16, 151:24, 199:11
**coworker** [2] - 107:6, 107:17
**coworkers** [2] - 109:13, 109:19
**crab** [2] - 16:14, 16:15
**Craig's** [1] - 8:14
**crazy** [1] - 164:1
**creams** [1] - 9:4
**create** [6] - 120:3, 176:13, 190:15, 196:4, 196:8, 217:3
**created** [3] - 31:10, 31:12, 38:15
**creating** [1] - 224:21
**credit** [1] - 202:20
**crediting** [4] - 18:18, 19:2, 19:19, 19:24
**credits** [1] - 36:11
**criminal** [4] - 181:16, 182:4, 185:4
**criteria** [1] - 44:2
**cross** [4] - 75:20, 90:3, 92:14, 190:11
**CROSS** [8] - 3:4, 3:4, 3:7, 3:7, 22:22, 28:15, 75:21, 84:1
**Cross** [3] - 15:17, 143:15, 145:18
**cross-examination** [3] - 75:20, 90:3, 92:14
**CROSS-EXAMINATION** [8] - 3:4, 3:4, 3:7, 3:7, 22:22, 28:15, 75:21, 84:1
**cross-reference** [1] - 190:11
**curve** [1] - 116:11
**custody** [3] - 92:4, 119:23, 216:24
**customer** [14] - 108:21, 126:10, 139:10, 141:1, 141:14, 145:24, 149:19, 149:23, 169:11, 170:2, 171:6, 176:25, 193:18
**customer's** [2] - 127:17, 159:23
**customers** [32] - 111:18, 112:2, 112:9, 116:13, 127:11, 127:23, 128:2, 128:4, 128:10, 139:6, 146:4, 147:13, 147:19, 154:5, 168:13, 172:20, 173:23, 174:3, 176:11, 177:12, 177:14, 177:22, 177:25, 179:13, 180:15, 199:16, 203:11, 207:14, 210:25, 214:12, 219:2, 222:6
**CVS** [2] - 8:9, 8:11

## D

**D-I-V-I-L-I-O** [1] - 104:14
**d/b/a** [2] - 229:19, 229:25
**daily** [3] - 30:20, 114:15, 179:13
**Dakota** [1] - 228:19
**damage** [1] - 12:9
**damaged** [1] - 30:5
**database** [1] - 177:24
**date** [55] - 22:4, 57:17, 65:10, 65:15, 66:5, 66:10, 66:11, 66:12, 66:14, 77:19, 78:7, 88:12, 88:14, 103:13, 142:5, 142:22, 143:17, 143:25, 144:15, 148:16, 157:7, 159:14, 162:16, 166:24, 167:18, 167:20, 168:6, 168:17, 170:6, 171:10, 174:9, 174:11, 174:17, 174:20, 175:12, 176:2, 178:8, 182:23, 184:9, 185:2, 187:8, 188:9, 188:22, 189:19, 190:3, 193:2, 195:6, 197:1, 198:15, 201:7, 209:16, 220:24, 225:22
**DATE** [1] - 234:21
**dated** [2] - 222:18, 230:19
**dates** [10] - 65:13, 65:14, 65:17, 66:9, 89:21, 174:20, 181:3, 227:25, 229:10, 229:24
**days** [26] - 30:3, 56:22, 62:1, 62:17, 62:21, 78:6, 88:5, 88:10, 88:16, 89:18, 89:20, 91:23, 94:17, 94:19, 94:20, 94:24, 95:9, 95:18, 100:13, 100:14, 101:4, 101:9, 182:16, 185:2, 185:5, 204:7
**deaf** [1] - 135:1
**deal** [2] - 164:16, 164:17
**dealing** [1] - 119:3
**dealt** [2] - 110:7, 110:25
**Dear** [1] - 231:16
**debating** [1] - 67:23
**December** [2] - 79:1, 79:2
**decide** [5] - 36:21, 43:9, 43:16, 57:13, 177:1
**decided** [5] - 8:14, 29:13, 48:17, 89:13, 117:1
**decision** [6] - 19:25, 29:16, 41:7, 53:25, 54:2, 220:10
**decisions** [3] - 150:22, 154:2, 220:7
**declined** [1] - 138:15
**DEFENDANT** [2] - 1:17, 1:21
**defendant** [1] - 146:3
**defendant's** [4] - 18:15, 21:2, 107:2, 184:20
**defendants** [50] - 6:4, 15:25, 16:12, 17:5, 45:18, 92:8, 115:11, 117:20, 119:5, 127:22, 128:1, 129:3, 132:16, 135:4, 140:5, 146:6, 146:14, 147:5, 147:13, 150:5, 150:11, 152:10, 153:2, 153:6, 164:23, 165:21, 167:25, 168:10, 169:1, 172:19, 174:11, 181:10, 182:11, 185:9, 185:15, 189:10, 189:21, 189:22, 189:24, 190:3, 192:9, 192:11, 204:16, 208:17, 209:7, 210:13, 210:24, 220:10, 222:5, 232:2
**Defendants** [1] - 1:8
**defendants'** [6] - 44:20, 47:15, 109:8, 111:6, 169:14, 173:3
**deferred** [1] - 119:7
**definitely** [3] - 116:10, 156:11, 178:25
**definition** [2] - 35:4, 38:13
**degree** [3] - 8:4, 105:20, 155:22
**delay** [1] - 194:8
**deliberation** [1] - 233:21
**deliver** [7] - 27:12, 27:14, 27:16, 28:7, 56:7, 137:1, 137:3
**delivered** [11] - 56:6, 56:14, 56:19, 80:25, 81:7, 81:20, 88:24, 90:7, 95:25, 96:3, 100:25
**delivering** [1] - 27:20
**delivery** [5] - 30:2, 41:13, 81:1, 101:15, 137:3
**denote** [1] - 206:8
**deodorants** [1] - 9:3
**department** [11] - 9:16, 106:12, 107:9, 107:19, 113:4, 113:22, 113:24, 121:17, 126:24, 184:21, 195:22
**depended** [1] - 151:11
**dependent** [1] - 41:8
**depicted** [1] - 13:19
**DEPUTY** [4] - 7:6, 53:6, 104:11, 233:24
**DerOvanesian** [1] - 1:13
**DEROVANESIAN** [55]

- 3:6, 3:8, 52:21, 53:13, 53:16, 63:17, 63:24, 64:2, 67:13, 67:15, 68:13, 68:19, 68:23, 69:14, 69:21, 69:24, 70:2, 70:6, 70:21, 70:24, 71:15, 71:23, 72:14, 72:18, 73:3, 73:5, 73:14, 74:1, 74:10, 75:16, 75:19, 77:5, 79:5, 79:8, 81:11, 82:25, 83:16, 86:8, 86:22, 89:4, 90:1, 91:9, 92:11, 92:19, 95:4, 95:14, 96:7, 96:16, 96:25, 97:2, 98:21, 100:15, 102:9, 102:11, 103:24
**Descovy** [3] - 10:1, 173:6, 173:11
**describe** [6] - 33:11, 41:3, 87:8, 110:23, 140:18, 146:10
**described** [4] - 97:3, 132:13, 135:6, 140:19
**description** [2] - 188:21, 189:17
**DESCRIPTION** [1] - 3:16
**despite** [2] - 151:5, 181:21
**detail** [1] - 152:7
**details** [1] - 189:9
**determination** [2] - 31:17, 177:16
**determine** [1] - 162:7
**diabetes** [1] - 9:10
**diagnosed** [1] - 54:17
**diagnoses** [1] - 105:25
**diagnosis** [1] - 72:15
**dictate** [1] - 43:4
**difference** [1] - 102:4
**different** [40] - 8:11, 17:6, 24:18, 26:1, 32:25, 44:20, 55:3, 55:5, 57:23, 57:24, 58:14, 58:18, 58:22, 59:7, 59:9, 59:13, 60:17, 66:9, 76:11, 76:16, 78:17, 84:13, 85:23, 85:25, 86:1, 99:23, 100:20, 102:1, 102:16, 106:14, 110:7, 123:12, 139:5, 140:24, 152:2, 199:8, 209:9, 213:16, 229:9, 229:10
**different..** [1] - 57:25
**differently** [1] - 100:21
**difficult** [9] - 115:2, 115:9, 116:2, 116:19, 128:7, 151:12, 151:25, 179:4, 180:25
**difficulty** [2] - 17:10, 134:2
**dig** [2] - 135:14, 203:12
**digging** [1] - 202:5
**diligence** [2] - 136:7, 201:20
**Dimitrouleas** [1] - 2:3
**DIMITROULEAS** [1] - 1:10
**Dimitrouleas/Hunt** [1] - 1:2
**dire** [1] - 123:1
**DIRE** [4] - 3:10, 3:11, 123:15, 170:12
**direct** [8] - 29:17, 31:2, 33:13, 39:2, 75:8, 92:25, 150:19, 166:13
**DIRECT** [10] - 3:3, 3:6, 3:9, 3:10, 3:11, 7:10, 53:15, 104:16, 124:14, 172:16
**directly** [14] - 7:7, 10:20, 21:8, 53:7, 56:6, 72:6, 104:11, 110:19, 154:21, 155:17, 155:21, 173:6, 208:20, 220:14
**director** [7] - 112:23, 112:24, 113:23, 116:2, 157:15, 169:14, 204:12
**dirty** [3] - 12:4, 141:10, 142:25
**disagree** [1] - 164:14
**disappeared** [2] - 120:21, 209:10
**disbelief** [1] - 186:22
**disclosed** [1] - 36:4
**disclosing** [1] - 36:12
**disconnected** [1] - 215:15
**discontinued** [2] - 54:23, 218:15
**discounted** [1] - 48:21
**discounts** [2] - 36:10, 150:25
**discover** [1] - 155:4
**discovered** [2] - 153:23, 233:12
**discovering** [1] - 156:2
**discrepancy** [1] - 136:13
**discuss** [11] - 6:20, 81:23, 82:4, 91:15, 92:1, 93:23, 165:8, 165:13, 166:12, 233:18, 234:2
**discussed** [8] - 6:20, 29:16, 51:8, 91:16, 93:23, 165:9, 166:12, 233:19
**discussing** [1] - 219:10
**discussion** [1] - 163:9
**dispel** [1] - 46:22
**dispense** [2] - 9:6, 25:2
**dispensed** [5] - 9:25, 12:17, 47:24, 47:25, 73:22
**dispensing** [2] - 9:13, 46:11
**distribute** [4] - 20:22, 20:23, 72:21, 108:20
**distributed** [1] - 147:5
**distributes** [1] - 31:19
**distribution** [8] - 17:13, 27:11, 51:11, 51:15, 108:1, 109:2, 223:17, 224:9
**distributor** [16] - 10:12, 17:14, 31:4, 31:7, 31:8, 31:21, 33:10, 34:3, 34:12, 34:16, 36:5, 36:23, 37:2, 37:13, 40:13, 136:4
**distributor's** [1] - 180:4
**Distributors** [1] - 23:7
**distributors** [7] - 10:16, 27:3, 31:1, 31:15, 31:19, 35:22, 46:3
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [3] - 2:4, 234:22, 234:23
**district** [2] - 8:10
**Divilio** [40] - 4:1, 4:2, 4:6, 4:7, 4:16, 4:20, 104:5, 104:13, 104:18, 105:3, 105:8, 137:9, 142:2, 150:5, 165:12, 165:22, 166:19, 167:10, 167:15, 169:22, 171:21, 172:18, 178:22, 184:4, 187:5, 190:21, 193:13, 198:22, 201:15, 205:15, 208:2, 214:18, 218:3, 218:6, 221:13, 226:4, 227:12, 227:15, 230:16, 234:1
**DIVILIO** [2] - 3:9, 104:7
**division** [1] - 105:17
**DIVISION** [1] - 1:2
**doctor** [33] - 8:3, 56:18, 62:2, 62:10, 62:11, 62:12, 64:21, 66:21, 66:24, 67:1, 67:20, 70:8, 70:11, 71:1, 71:3, 71:12, 71:13, 71:20, 71:24, 71:25, 72:7, 72:16, 72:19, 73:6, 76:3, 78:11, 82:10, 82:13, 100:18, 100:20, 102:23
**Doctor** [1] - 52:18
**doctor's** [3] - 70:8, 70:16, 102:20
**document** [18] - 21:14, 63:6, 92:23, 137:10, 142:2, 148:6, 150:9, 169:8, 169:25, 170:24, 171:9, 171:10, 171:18, 172:1, 190:21, 221:12, 230:6, 231:18
**Document** [8] - 4:18, 4:22, 4:23, 5:3, 124:8, 162:23, 184:16, 221:9
**documentation** [11] - 110:12, 128:15, 171:14, 181:4, 194:9, 196:7, 206:10, 206:16, 216:25, 224:3, 231:19
**documents** [14] - 110:16, 121:13, 126:8, 129:19, 159:9, 172:8, 179:11, 185:21, 185:22, 185:24, 191:11, 206:3, 216:23, 221:16
**dollar** [1] - 27:6
**done** [7] - 23:20, 75:3, 90:25, 115:8, 116:9, 193:14, 216:7
**door** [7] - 8:25, 16:25, 17:1, 92:21, 161:13, 211:24, 215:17
**doors** [1] - 132:14
**Dorchester** [1] - 9:19
**double** [1] - 163:14
**double-check** [1] - 163:14
**doubt** [1] - 51:1
**down** [35] - 14:2, 39:23, 47:17, 48:7, 52:18, 57:2, 57:3, 104:1, 105:4, 110:9, 139:3, 143:20, 147:2, 149:17, 150:3, 150:9, 156:8, 164:21, 168:15, 168:23, 169:5, 175:6, 178:3, 184:1, 190:17, 192:17, 194:3, 194:22, 198:9, 199:2, 201:1, 213:13, 214:15, 217:17
**downhill** [1] - 48:6
**downstream** [1] - 206:7
**Dr** [2] - 7:9, 66:25
**Drogaria** [1] - 135:12
**Drug** [10] - 8:14, 87:16, 169:24, 179:6, 179:20, 179:25, 182:4, 213:20, 215:12, 231:5
**drug** [34] - 10:4, 10:18, 20:7, 23:13, 34:19, 35:5, 35:13, 36:2, 36:12, 38:5, 38:8, 41:4, 41:16, 43:5, 43:12, 43:18, 43:22, 43:25, 58:1, 119:25, 120:11, 128:23, 130:14, 133:9, 139:12, 148:10, 149:13, 167:17, 172:1, 177:10, 189:17, 192:2, 192:8, 227:19
**drug's** [1] - 119:23
**Drugs** [6] - 56:9, 74:2, 74:7, 74:12, 74:17, 87:12
**drugs** [100] - 9:6, 9:9, 9:25, 10:10, 10:15, 10:23, 10:24, 11:3, 11:9, 11:22, 12:1, 12:3, 12:12, 14:6,

14:16, 15:12, 17:14, 17:19, 17:21, 17:24, 18:3, 18:8, 18:15, 19:18, 19:20, 19:22, 20:2, 21:9, 22:9, 30:18, 30:21, 30:23, 33:24, 34:4, 40:13, 40:14, 41:13, 41:22, 41:25, 42:10, 45:9, 45:20, 46:15, 48:21, 49:3, 49:18, 49:23, 51:2, 51:12, 51:16, 52:11, 74:20, 74:21, 95:10, 96:10, 108:1, 115:19, 116:16, 117:10, 117:15, 120:6, 120:8, 126:7, 127:7, 127:18, 128:5, 132:17, 132:19, 138:23, 140:25, 147:25, 151:2, 152:8, 160:6, 164:24, 167:25, 168:11, 169:2, 179:23, 181:1, 181:21, 185:9, 185:15, 186:20, 188:21, 189:9, 189:22, 189:24, 190:1, 190:4, 192:12, 198:2, 200:18, 203:2, 204:22, 223:14, 223:23, 224:1, 225:3
**DSCSA** [3] - 182:8, 182:10, 223:20
**due** [2] - 92:13, 201:20
**duly** [3] - 7:3, 53:3, 104:8
**during** [15] - 91:25, 94:5, 100:19, 111:22, 113:23, 114:11, 116:15, 117:18, 151:23, 153:23, 165:12, 168:10, 181:9, 218:17
**duties** [1] - 116:8

## E

**eager** [2] - 59:14, 59:17
**ears** [1] - 135:1
**easiest** [1] - 164:4
**easily** [2] - 164:3, 219:17
**East** [2] - 7:25, 234:24
**eastern** [2] - 104:25, 105:5
**easy** [1] - 153:22
**Eberspacher** [1] - 113:5
**ecotoxicology** [1] - 106:13
**Ecuador** [4] - 53:20, 54:18, 74:19, 74:20
**educational** [2] - 7:22, 105:18
**effect** [5] - 39:23, 43:13, 43:24, 47:1
**effects** [2] - 75:25, 219:22
**effort** [1] - 146:24
**efforts** [1] - 150:16
**eight** [6] - 79:3, 79:10, 79:15, 79:17, 79:18, 79:19
**either** [7] - 116:5, 126:8, 158:25, 203:11, 206:5, 209:8, 219:14
**electronic** [2] - 112:1, 129:18
**elevated** [2] - 38:23, 38:25
**Elm** [10] - 56:9, 56:15, 74:2, 74:7, 74:12, 74:17, 87:12, 87:16, 100:9, 102:2
**email** [71] - 62:6, 63:9, 63:14, 63:15, 110:4, 121:19, 121:20, 121:23, 125:16, 126:13, 126:15, 126:16, 129:9, 129:22, 129:24, 130:1, 136:7, 136:9, 146:19, 148:12, 148:14, 148:15, 149:2, 155:13, 155:14, 155:25, 156:4, 156:14, 157:5, 158:12, 166:19, 167:10, 176:3, 176:7, 176:22, 178:6, 178:10, 178:22, 179:2, 179:8, 180:6, 181:17, 182:14, 182:15, 182:20, 183:10, 185:3, 187:5, 187:25, 188:13, 193:17, 201:4, 201:18, 205:4, 205:7, 206:21, 207:8, 209:6, 212:17, 217:20, 219:25, 225:19, 226:22, 228:18, 229:23, 230:16, 232:8, 233:6, 233:9
**Email** [32] - 3:19, 3:20, 3:21, 3:22, 3:23, 3:25, 4:1, 4:2, 4:4, 4:5, 4:6, 4:7, 4:9, 4:10, 4:11, 4:12, 148:23, 157:23, 167:6, 175:19, 178:17, 183:5, 187:15, 197:8, 201:15, 205:15, 213:5, 215:1, 218:3, 226:4, 229:1, 231:1
**emailed** [2] - 129:22, 146:13
**emailing** [2] - 129:10, 179:14
**emails** [6] - 121:24, 126:16, 158:16, 175:10, 196:23, 214:18
**emphasize** [3] - 179:2, 180:22, 220:1
**employed** [3] - 105:1, 141:20, 153:8
**employee** [2] - 208:13, 220:22
**employees** [6] - 16:18, 27:10, 106:24, 155:18, 186:19, 186:21
**employer** [2] - 151:21, 154:22
**employment** [2] - 151:7, 151:10
**end** [9] - 8:17, 26:20, 39:22, 93:9, 118:14, 145:2, 151:9, 179:5, 186:10
**ended** [3] - 109:5, 115:7, 186:14
**ends** [2] - 13:22, 188:23
**engage** [2] - 29:16, 30:17
**engineered** [1] - 11:8
**enters** [2] - 93:17, 166:5
**Entin** [1] - 234:21
**ENTIN** [2] - 2:2, 234:21
**entire** [2] - 68:19, 68:20
**entirety** [1] - 119:25
**entities** [1] - 206:19
**entitled** [1] - 234:19
**entity** [3] - 198:2, 213:16, 213:19
**envelope** [1] - 81:3
**environment** [1] - 106:18
**environmental** [1] - 105:21
**equally** [1] - 128:14
**errors** [1] - 121:11
**especially** [1] - 207:18
**Esquire** [5] - 1:13, 1:14, 1:17, 1:18, 1:21
**essentially** [1] - 137:3
**establishes** [1] - 182:8
**establishment** [1] - 218:12
**estimate** [2] - 50:5, 52:10
**Etminan** [1] - 149:22
**events** [2] - 97:3, 97:4
**eventually** [12] - 62:18, 106:18, 108:10, 108:15, 110:18, 113:21, 119:2, 121:10, 127:10, 135:24, 139:10, 202:2
**Evidence** [37] - 13:13, 21:23, 63:23, 70:5, 124:9, 132:8, 138:5, 142:13, 144:8, 148:24, 157:24, 162:24, 167:7, 172:15, 175:20, 178:18, 183:6, 184:17, 187:16, 189:6, 191:6, 193:10, 195:14, 197:9, 198:23, 201:16, 205:16, 209:24, 213:6, 215:2, 218:4, 221:10, 223:1, 226:5, 227:13, 229:2, 231:2
**evidence** [29] - 14:3, 21:17, 110:15, 148:19, 169:16, 170:9, 172:23, 175:15, 182:25, 184:11, 187:11, 190:25, 193:4, 195:8, 197:3, 198:18, 201:11, 205:10, 208:7, 209:18, 212:25, 214:21, 217:24, 221:5, 222:20, 225:25, 227:7, 228:21, 230:21
**evident** [1] - 196:7
**ex** [1] - 16:14
**ex-husband** [1] - 16:14
**exact** [4] - 39:19, 88:14, 89:21, 110:25
**exactly** [8] - 68:18, 88:4, 90:7, 90:16, 90:17, 153:5, 155:8, 196:13
**examination** [7] - 29:17, 31:2, 39:3, 75:20, 90:3, 92:14, 166:14
**EXAMINATION** [26] - 3:3, 3:4, 3:4, 3:5, 3:6, 3:7, 3:7, 3:8, 3:9, 3:10, 3:10, 3:11, 3:11, 7:10, 22:22, 28:15, 44:17, 53:15, 75:21, 84:1, 102:10, 104:16, 123:15, 124:14, 170:12, 172:16
**examined** [3] - 7:3, 53:3, 104:8
**example** [11] - 50:16, 134:3, 170:2, 171:22, 172:19, 173:3, 173:4, 176:16, 177:9, 197:16, 210:12
**Excedrin** [2] - 139:15, 145:16
**excellent** [1] - 94:14
**exchange** [2] - 120:2, 225:13
**exchanged** [2] - 154:14
**exchanges** [1] - 127:10
**excited** [1] - 117:8
**excuse** [6] - 34:4, 35:20, 75:13, 95:18, 123:12, 172:22
**excused** [2] - 52:19, 104:2
**Exhibit** [84] - 12:25, 13:8, 14:4, 21:12, 21:18, 63:7, 63:18, 68:14, 69:15, 70:2, 84:5, 92:12, 99:4, 122:16, 122:24, 131:21, 132:3, 137:7, 137:24, 141:24, 142:8, 143:21, 144:3, 148:4, 148:19, 157:3, 157:19, 162:11, 162:19,

166:17, 167:2, 167:13, 169:6, 169:17, 170:9, 175:8, 175:15, 178:4, 178:13, 182:18, 183:1, 184:2, 184:12, 187:3, 187:11, 188:16, 190:19, 191:1, 192:23, 193:5, 195:2, 195:9, 196:21, 197:4, 198:10, 198:18, 201:2, 201:11, 205:1, 205:2, 205:11, 207:24, 208:8, 209:12, 209:19, 212:15, 213:1, 214:16, 214:22, 217:18, 217:24, 220:19, 221:5, 222:14, 222:21, 225:17, 225:25, 226:25, 227:8, 228:16, 228:22, 229:7, 230:13, 230:22
**exhibit** [7] - 70:1, 77:3, 83:23, 92:4, 99:1, 164:21, 184:1
**exits** [3] - 91:18, 165:11, 233:25
**expand** [1] - 108:23
**expect** [2] - 37:5, 195:20
**expected** [2] - 125:10, 204:13
**expecting** [1] - 125:1
**expensive** [3] - 125:5, 140:12, 140:15
**experience** [4] - 107:12, 107:20, 107:23, 107:25
**expertise** [1] - 33:12
**expiration** [6] - 57:17, 65:10, 65:13, 65:15, 66:5, 78:7
**expired** [1] - 219:20
**expires** [1] - 66:12
**explain** [5] - 19:12, 67:1, 118:20, 140:8, 215:19
**explained** [3] - 223:14, 223:19, 223:25
**explanation** [8] - 71:7, 119:6, 119:9, 134:22, 134:24, 135:5, 146:25, 164:13
**exponentially** [1] - 116:20
**Exponentially** [1] - 116:21
**expose** [1] - 60:13
**exposed** [2] - 218:24, 219:9
**expound** [1] - 118:20
**express** [1] - 61:20
**expressed** [2] - 154:20, 186:22
**external** [2] - 111:1, 152:24
**extra** [4] - 14:24, 64:17, 65:25, 103:18
**eyes** [2] - 60:23, 61:5

## F

**Facebook** [6] - 5:1, 21:22, 28:18, 28:22, 28:24, 29:3
**faced** [1] - 182:10
**facilities** [1] - 45:6
**facility** [7] - 16:15, 16:16, 19:7, 19:19, 19:24, 45:12, 226:17
**fact** [10] - 20:11, 34:15, 35:7, 60:11, 71:16, 83:11, 93:4, 130:14, 172:23, 193:24
**factor** [1] - 19:25
**factors** [1] - 41:8
**factual** [1] - 118:5
**failing** [1] - 181:6
**failure** [2] - 129:5, 180:11
**fair** [5] - 8:20, 30:18, 93:5, 113:19
**fall** [1] - 147:5
**fallen** [1] - 233:5
**falling** [1] - 135:1
**false** [15] - 130:25, 131:7, 134:9, 134:18, 175:2, 203:20, 207:3, 207:13, 207:14, 210:25, 212:11, 213:11, 214:3, 222:8, 232:9
**falsifications** [1] - 233:10
**falsified** [3] - 210:3, 210:8, 233:10
**falsify** [1] - 209:7
**familiar** [7] - 8:20, 15:25, 54:11, 119:18, 169:13, 202:20, 232:4
**family** [2] - 151:11, 151:12
**fancy** [1] - 41:14
**far** [21] - 27:19, 30:17, 32:3, 42:25, 94:10, 108:20, 110:5, 113:4, 125:2, 136:24, 147:24, 149:19, 152:11, 154:21, 160:23, 191:19, 192:11, 206:15, 220:5, 226:8
**father** [1] - 155:20
**fault** [1] - 203:6
**fax** [1] - 215:16
**FDA** [12] - 146:6, 147:16, 147:21, 150:6, 180:12, 180:15, 182:8, 231:22, 231:24, 232:16, 232:19
**features** [1] - 115:3
**February** [12] - 58:12, 66:15, 66:16, 76:25, 77:13, 77:20, 78:25, 79:2, 84:11, 87:3, 88:12, 101:15
**federal** [1] - 107:13
**Federal** [3] - 1:22, 181:12, 234:23
**FedEx** [2] - 16:16, 28:8
**feedback** [1] - 178:24
**felt** [10] - 40:18, 40:24, 61:14, 118:9, 118:15, 135:3, 154:23, 180:24, 181:23, 194:15
**few** [13] - 10:5, 22:10, 44:19, 54:9, 66:9, 89:20, 108:24, 122:3, 125:22, 133:23, 176:8, 203:2, 205:24
**figure** [3] - 59:18, 115:16, 146:1
**figured** [5] - 59:10, 134:20, 139:13, 145:11, 155:23
**file** [5] - 51:13, 123:20, 123:23, 123:24, 215:10
**filing** [1] - 81:23
**fill** [4] - 11:12, 117:2, 191:15, 232:16
**Filled** [1] - 65:18
**filled** [7] - 9:1, 66:10, 77:16, 78:1, 78:25, 113:21, 121:15
**filling** [1] - 107:14
**final** [2] - 168:17, 220:4
**finally** [3] - 61:7, 62:2, 151:21
**finances** [1] - 36:22
**financial** [1] - 119:4
**fine** [2] - 42:8, 76:6
**Fines** [1] - 180:10
**finish** [5] - 35:17, 78:21, 90:15, 101:6, 162:6
**finished** [2] - 87:19, 91:7
**first** [46] - 7:3, 8:9, 17:20, 22:3, 53:3, 54:16, 56:18, 57:13, 62:6, 62:7, 62:24, 72:2, 74:13, 75:8, 75:9, 76:11, 88:4, 90:5, 90:6, 90:21, 99:9, 100:8, 104:8, 105:22, 107:2, 108:17, 126:5, 130:20, 130:24, 134:3, 134:9, 137:19, 152:7, 152:16, 154:8, 159:12, 167:20, 168:6, 171:9, 172:18, 184:19, 186:6, 191:19, 191:22, 197:16, 203:15
**fisheries** [1] - 106:12
**fit** [2] - 39:11, 107:10
**five** [3] - 27:19, 78:5, 91:14
**five-star** [1] - 27:19
**fix** [1] - 94:6
**Fl** [1] - 1:22
**FL** [2] - 149:14, 149:15
**flag** [1] - 21:3
**flags** [2] - 146:23, 181:19
**Flores** [1] - 1:18
**FLORIDA** [1] - 1:1
**Florida** [6] - 1:4, 1:16, 1:19, 1:22, 234:23, 234:24
**flow** [2] - 24:3, 48:16
**Flowers** [1] - 228:19
**fluctuate** [1] - 43:22
**fluctuation** [1] - 20:9
**focus** [3] - 37:15, 37:17, 201:18
**focused** [3] - 37:12, 37:21, 37:23
**foil** [2] - 80:3, 80:11
**follow** [13] - 6:19, 31:13, 62:23, 76:8, 93:22, 102:20, 110:11, 166:11, 182:20, 183:8, 185:3, 205:25
**follow-up** [3] - 76:8, 182:20, 185:3
**followed** [3] - 19:6, 129:1, 182:15
**following** [1] - 176:22
**follows** [3] - 7:4, 53:4, 104:9
**foot** [1] - 211:25
**FOR** [3] - 1:13, 1:17, 1:21
**foregoing** [1] - 234:17
**Forget** [1] - 151:13
**forgotten** [1] - 120:20
**Form** [2] - 232:16, 232:19
**form** [4] - 48:22, 231:22, 231:23, 233:3
**former** [2] - 46:12, 151:21
**forms** [1] - 121:18
**formula** [1] - 38:15
**FORT** [1] - 1:2
**Fort** [3] - 1:4, 1:22, 234:24
**forth** [1] - 108:14
**forward** [4] - 100:13, 156:7, 206:21, 232:2
**forwarded** [3] - 206:23, 209:6, 210:2
**foundation** [8] - 14:13, 67:9, 68:21, 96:17, 169:18, 171:17, 172:10
**foundational** [1] - 123:25
**founder** [1] - 110:18
**four** [8] - 22:12, 54:4, 77:25, 78:5, 79:2, 99:11, 192:8, 215:19
**Fourth** [1] - 16:17
**FPR** [2] - 2:2, 234:21
**frame** [1] - 186:10
**fraud** [3] - 153:25, 154:4, 155:3
**free** [6] - 24:17, 24:20, 78:15, 78:16, 79:14, 95:12
**frequently** [5] - 42:6, 56:20, 110:20, 114:3, 125:19
**Friday** [2] - 30:2, 230:12
**front** [8] - 64:24, 66:5, 77:6, 101:20, 103:5, 125:9, 125:22,

148:12
**frustrated** [2] - 119:11, 179:1
**frustrating** [3] - 116:25, 117:24, 185:23
**frustration** [2] - 179:8, 179:16
**frustrations** [2] - 151:5, 179:13
**full** [2] - 61:9, 231:11
**fully** [1] - 82:12
**funding** [1] - 39:25

## G

**game** [1] - 93:5
**garage** [1] - 132:14
**Garrett** [3] - 155:17, 155:20, 156:10
**general** [20] - 11:7, 19:3, 23:11, 55:15, 107:20, 108:6, 109:18, 109:19, 121:1, 121:25, 122:7, 125:25, 141:3, 146:22, 153:18, 164:9, 180:21, 186:22, 186:23, 209:2
**generally** [14] - 11:1, 14:24, 22:6, 109:13, 114:6, 121:7, 121:9, 140:16, 141:8, 152:20, 153:21, 154:10, 167:15, 169:10
**generate** [2] - 177:24, 195:23
**generated** [4] - 111:16, 112:2, 170:1, 170:15
**generation** [1] - 171:3
**generic** [13] - 17:20, 20:7, 27:24, 30:13, 33:22, 45:22, 45:24, 52:4, 111:8, 121:20, 139:16, 145:16
**generics** [3] - 30:10, 30:15, 36:20
**Gentek** [13] - 5:4, 120:19, 131:13, 131:16, 131:24, 132:7, 132:17, 132:19, 132:25, 133:6, 133:9, 133:17, 133:22
**Gentek's** [1] - 132:21
**Genvoya** [1] - 191:23
**Gilead** [66] - 10:2, 15:8, 24:22, 24:24, 25:1, 25:3, 25:6, 25:22, 26:18, 26:19, 30:14, 31:14, 32:2, 32:4, 32:6, 32:11, 32:16, 32:18, 45:16, 45:19, 46:5, 63:4, 63:5, 66:20, 67:21, 69:10, 69:20, 72:6, 72:20, 74:3, 74:6, 75:4, 81:16, 81:17, 81:24, 85:6, 85:19, 85:22, 85:23, 86:2, 86:4, 86:6, 92:15, 92:17, 99:20, 100:3, 144:20, 145:7, 146:11, 146:14, 146:19, 147:25, 173:7, 191:24, 213:17, 231:7, 231:13, 231:15, 231:19, 231:24, 232:5, 232:8, 232:15, 233:5
**Gilead's** [1] - 27:4
**given** [5] - 44:20, 102:23, 158:22, 164:19, 233:2
**glue** [2] - 14:22, 50:21
**Gmail** [1] - 121:20
**goal** [1] - 179:5
**gold** [1] - 229:6
**goods** [1] - 188:19
**google** [7] - 62:4, 82:15, 124:21, 145:11, 155:9, 202:2, 202:11
**googled** [1] - 202:1
**Googled** [2] - 83:4, 202:11
**Googling** [1] - 207:17
**Government** [51] - 6:7, 6:11, 6:21, 6:22, 13:7, 21:17, 21:18, 24:14, 26:23, 52:20, 92:12, 93:12, 97:6, 97:9, 97:15, 97:24, 98:3, 98:5, 98:24, 104:3, 122:23, 122:24, 137:24, 141:24, 142:7, 143:21, 144:2, 144:3, 148:18, 157:3, 157:18, 157:19, 162:11, 162:18, 167:1, 169:16, 170:8, 175:14, 178:4, 178:12, 182:18, 182:25, 183:1, 184:2, 184:12, 198:17, 201:10, 221:4, 222:21, 225:24, 230:21
**government** [25] - 26:3, 31:5, 38:20, 52:21, 63:17, 68:13, 69:14, 132:2, 142:7, 162:18, 184:11, 187:10, 190:25, 193:4, 195:8, 197:3, 205:10, 208:7, 209:18, 212:25, 214:21, 217:23, 222:20, 227:7, 228:21
**GOVERNMENT** [1] - 1:13
**Government's** [133] - 3:17, 3:18, 3:19, 3:20, 3:21, 3:22, 3:23, 3:24, 3:25, 4:1, 4:2, 4:4, 4:5, 4:6, 4:7, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 4:20, 4:21, 4:22, 4:23, 4:24, 4:25, 5:1, 5:2, 5:3, 5:4, 5:5, 12:25, 13:8, 13:12, 14:4, 21:12, 21:22, 63:7, 63:22, 70:4, 122:16, 124:8, 131:21, 132:2, 132:7, 137:6, 138:4, 142:12, 144:7, 148:4, 148:19, 148:23, 157:23, 162:23, 166:16, 167:2, 167:6, 167:13, 169:6, 169:17, 170:9, 172:14, 175:7, 175:15, 175:19, 178:13, 178:17, 183:5, 184:16, 187:3, 187:11, 187:15, 188:16, 189:5, 190:18, 191:1, 191:5, 192:23, 193:5, 193:9, 195:2, 195:9, 195:13, 196:21, 197:4, 197:8, 198:10, 198:18, 198:22, 201:2, 201:11, 201:15, 205:1, 205:2, 205:15, 207:24, 208:8, 209:12, 209:19, 209:23, 212:15, 213:1, 213:5, 214:16, 214:22, 215:1, 217:18, 217:24, 218:3, 220:19, 221:5, 221:9, 222:14, 222:25, 225:17, 225:25, 226:4, 226:24, 227:8, 227:12, 228:16, 228:22, 229:1, 229:6, 230:13, 230:22, 231:1
**governor's** [1] - 105:16
**grab** [3] - 92:3, 96:4, 101:1
**grabbed** [1] - 89:16
**graduated** [1] - 7:24
**graduating** [1] - 8:8
**great** [2] - 119:1, 194:20
**grew** [1] - 105:5
**Group** [3] - 133:19, 133:20, 133:25
**group** [6] - 10:17, 51:20, 110:8, 152:24, 153:20, 154:15
**groups** [3] - 24:18, 110:7, 111:2
**Grubb's** [4] - 171:23, 171:24, 171:25, 173:4
**guess** [15] - 17:25, 20:25, 78:2, 95:20, 125:9, 125:24, 176:20, 181:23, 183:8, 190:12, 193:19, 194:3, 196:10, 197:24, 224:4
**guide** [1] - 187:24
**guidelines** [5] - 39:11, 107:13, 107:14, 179:7, 223:20
**gullible** [1] - 110:22
**Gustavo** [2] - 52:21, 53:9
**GUSTAVO** [3] - 3:6, 53:2, 53:9
**guy** [2] - 20:17, 119:8
**guys** [4] - 28:24, 128:15, 176:24, 200:7

## H

**habit** [1] - 118:5
**half** [1] - 106:4
**Hammett** [4] - 108:6, 142:4, 144:13, 144:18
**hand** [2] - 65:25, 170:25
**hand-prepared** [1] - 170:25
**handed** [1] - 67:16
**handle** [1] - 186:4
**handled** [2] - 76:10, 219:21
**handling** [2] - 27:10, 186:14
**hands** [3] - 120:2, 154:15, 199:12
**handwriting** [2] - 65:4, 65:6
**hard** [2] - 63:9, 158:3
**he-said/she-said** [1] - 220:3
**health** [7] - 9:15, 15:7, 47:14, 49:6, 105:23, 106:6, 106:10
**Health** [11] - 10:11, 10:12, 10:21, 11:6, 20:12, 20:19, 24:25, 26:25, 27:3, 36:24, 37:19
**Healthcare** [1] - 197:20
**hear** [2] - 54:6, 208:10
**heard** [4] - 32:11, 141:7, 172:23, 206:1
**hearing** [2] - 17:10, 91:13
**hearsay** [14] - 18:5, 18:11, 18:21, 19:8, 32:13, 70:18, 73:12, 81:11, 83:16, 92:18, 93:3, 96:7, 109:15, 208:14
**heaviness** [1] - 61:15
**heavy** [2] - 60:25, 61:1
**heck** [1] - 207:18
**held** [3] - 106:14, 106:23, 108:19
**Hello** [3] - 181:24, 215:7, 226:13
**hello** [1] - 201:23
**help** [15] - 9:17, 15:8, 17:2, 33:15, 46:13, 46:23, 62:8, 105:14, 107:8, 107:18, 135:23, 164:2, 187:22, 187:24, 215:11
**helped** [2] - 120:3, 206:4
**helping** [4] - 105:24,

107:15, 108:25, 126:9
**helps** [1] - 188:1
**hereby** [1] - 234:17
**hesitating** [1] - 33:10
**hi** [1] - 223:12
**Hi** [1] - 187:21
**high** [2] - 7:24, 44:8
**higher** [3] - 35:7, 35:12, 38:2
**highest** [1] - 9:21
**highlight** [8] - 144:13, 146:8, 161:18, 173:17, 180:10, 181:2, 181:12, 200:3
**highlighted** [3] - 168:1, 173:25, 203:8
**highlighting** [1] - 219:11
**Highway** [1] - 1:22
**himself** [1] - 153:18
**hired** [2] - 138:25, 159:8
**hiring** [2] - 186:4, 186:8
**history** [9] - 8:7, 106:7, 120:12, 121:12, 128:23, 171:7, 181:4, 219:5, 231:18
**HIV** [119] - 9:11, 9:14, 9:17, 9:20, 9:23, 9:25, 10:10, 10:13, 10:15, 10:23, 10:24, 11:3, 11:11, 11:13, 11:22, 11:25, 12:3, 12:12, 14:6, 14:24, 15:5, 15:11, 15:12, 15:22, 17:19, 17:22, 17:24, 18:3, 18:8, 18:15, 19:17, 19:18, 20:2, 21:9, 22:9, 22:14, 24:15, 27:24, 30:11, 30:18, 30:21, 30:23, 32:1, 40:13, 40:14, 42:10, 45:9, 45:20, 46:15, 47:8, 47:10, 47:23, 48:21, 51:1, 54:15, 54:17, 54:19, 55:8, 55:10, 55:19, 56:20, 57:19, 74:20, 76:18, 91:19, 103:2, 112:16, 115:19, 116:1, 116:9, 116:15, 116:16, 116:22, 117:15, 117:18, 119:3, 120:8, 120:15, 120:18, 120:24, 121:8, 126:1, 131:14, 132:16, 132:19, 138:23, 139:5, 140:25, 147:25, 150:12, 150:23, 152:7, 152:13, 153:1, 153:7, 153:10, 154:12, 156:6, 160:6, 164:24, 167:25, 168:11, 169:2, 176:12, 179:19, 181:9, 185:9, 185:15, 186:20, 189:22, 192:8, 192:12, 195:20, 196:17, 200:18, 204:22, 210:12, 225:3
**HIV-positive** [1] - 54:15
**Hobart** [1] - 105:20
**hold** [2] - 137:4, 218:17
**holding** [2] - 84:20, 185:19
**hole** [1] - 117:2
**holes** [1] - 13:22
**holiday** [2] - 156:20, 156:21
**Holly** [1] - 138:14
**home** [7] - 56:15, 64:16, 78:4, 91:6, 103:19, 151:18, 152:2
**homes** [1] - 16:19
**honestly** [4] - 35:9, 59:19, 96:21, 101:13
**Honor** [46] - 6:8, 13:15, 18:23, 21:24, 22:19, 26:4, 32:7, 32:12, 34:24, 44:16, 51:24, 69:24, 71:15, 72:14, 73:3, 83:18, 92:3, 92:11, 93:21, 95:5, 102:9, 104:4, 104:15, 123:25, 124:10, 137:25, 138:6, 142:14, 144:2, 148:18, 166:1, 166:2, 166:3, 166:8, 166:10, 166:15, 167:8, 171:16, 172:6, 175:21, 187:17, 189:4, 197:10, 223:2, 233:15, 234:10
**Honorable** [1] - 2:3
**HONORABLE** [1] - 1:10
**Hope** [1] - 188:1
**hopefully** [1] - 91:14
**hospital** [3] - 82:7, 82:10, 111:8
**hot** [2] - 218:24, 219:9
**hour** [1] - 94:5
**hours** [4] - 44:6, 52:7, 181:8, 223:21
**House** [1] - 111:16
**house** [17] - 56:6, 56:7, 80:25, 81:1, 81:8, 88:17, 88:18, 90:6, 90:24, 95:23, 95:25, 96:3, 96:4, 100:22, 100:25, 103:17, 151:15
**huge** [4] - 46:21, 151:17, 176:13, 177:20
**humid** [2] - 218:25, 219:9
**hundred** [2] - 129:19, 129:20
**hundreds** [1] - 52:13
**hurry** [1] - 161:11
**husband** [27] - 16:14, 54:2, 57:14, 57:19, 60:1, 60:13, 60:22, 61:3, 61:21, 62:3, 74:23, 76:9, 76:17, 76:22, 78:18, 80:7, 80:10, 84:6, 97:4, 97:6, 97:15, 98:9, 98:18, 107:7, 107:17, 151:15
**husband's** [3] - 58:7, 65:7, 66:11
**hypothetical** [1] - 14:12

**I**

**idea** [5] - 86:3, 140:13, 158:8, 159:22, 164:1
**identical** [2] - 102:5, 102:6
**identification** [1] - 16:8
**identified** [1] - 135:6
**identify** [3] - 16:5, 116:16, 135:16
**identifying** [3] - 143:11, 149:8, 156:15
**III** [1] - 1:7
**illegitimate** [3] - 181:7, 231:21, 232:7
**image** [4] - 211:13, 211:18, 211:21, 211:24
**immediately** [4] - 82:11, 113:10, 130:16, 165:1
**immigration** [3] - 62:7, 81:22, 81:23
**immune** [1] - 11:14
**impact** [1] - 151:17
**impacted** [1] - 204:15
**importance** [1] - 219:11
**important** [10] - 46:12, 46:15, 47:10, 60:3, 102:25, 103:1, 118:17, 120:5, 120:8, 120:12
**impression** [6] - 24:19, 109:9, 109:13, 109:20, 109:25, 146:22
**imprisonment** [2] - 181:14, 181:15
**improper** [1] - 172:25
**inability** [1] - 181:22
**Inc** [2] - 121:23, 136:11
**incentives** [1] - 109:6
**incident** [3] - 66:22, 74:20, 147:4
**include** [11] - 109:6, 143:23, 161:14, 161:15, 175:10, 181:6, 181:14, 188:24, 196:23, 219:24, 233:9
**included** [4] - 41:20, 155:15, 186:25, 189:15
**including** [3] - 35:23, 39:17, 181:16
**income** [1] - 151:17
**incomplete** [2] - 171:8, 177:10
**inconsistent** [2] - 231:18, 232:6
**incorporate** [1] - 105:25
**incorporated** [1] - 115:17
**increase** [4] - 9:17, 46:23, 115:22, 115:24
**Independent** [8] - 191:24, 197:21, 202:25, 203:19, 205:18, 205:21, 206:18, 207:9
**independent** [2] - 8:13, 24:9
**indicated** [1] - 83:15
**indication** [2] - 224:20
**indictment** [6] - 153:25, 154:4, 155:3, 155:4, 156:1, 156:19
**indirectly** [2] - 25:24, 30:12
**individual** [3] - 47:3, 170:17, 170:19
**individuals** [2] - 105:24, 183:23
**indulge** [2] - 223:9, 230:5
**industry** [1] - 27:6
**infected** [1] - 47:8
**infections** [1] - 46:20
**info** [1] - 176:24
**information** [65] - 103:14, 112:4, 112:10, 121:14, 121:18, 122:5, 126:11, 126:19, 127:3, 127:9, 127:12, 129:6, 130:19, 141:6, 164:2, 164:9, 173:14, 173:19, 174:21, 175:3, 176:9, 176:10, 176:12, 177:2, 177:4, 177:13, 177:19, 177:24, 178:25, 179:22, 179:24, 181:4, 183:21, 183:22, 189:12, 189:13, 189:21, 190:13, 190:14, 194:18, 194:20, 203:13, 204:13, 206:24, 207:3, 207:13, 210:18, 214:10, 214:11, 214:13, 215:13, 215:20, 215:21, 218:18, 220:8, 222:8, 223:18, 224:18, 225:2, 225:3, 229:17, 231:17, 233:3, 233:9, 233:12
**informed** [1] - 211:25
**initial** [1] - 108:14
**initials** [1] - 42:23
**initiated** [1] - 154:8
**input** [1] - 206:8
**inquire** [1] - 170:10
**inquiring** [1] - 193:18
**inquiry** [1] - 29:12
**insert** [2] - 14:21, 50:20

**inside** [19] - 12:14, 28:3, 31:20, 41:15, 41:21, 59:13, 62:25, 65:2, 68:24, 69:1, 69:16, 70:17, 71:25, 72:21, 74:21, 74:25, 139:11, 139:12, 148:10
**insisting** [1] - 67:22
**Instacare** [11] - 14:24, 214:5, 214:8, 215:14, 226:15, 228:8, 229:10, 229:14, 229:17, 229:24, 232:11
**instacare** [1] - 215:8
**instance** [5] - 31:18, 42:11, 43:8, 121:23, 139:14
**instances** [1] - 139:12
**instead** [1] - 186:1
**instructed** [1] - 71:18
**instruction** [3] - 6:19, 154:25, 156:9
**insurance** [37] - 10:18, 15:7, 15:11, 15:13, 15:15, 17:3, 19:3, 23:13, 24:17, 25:3, 25:9, 25:12, 25:14, 25:17, 25:18, 25:21, 25:24, 26:20, 38:7, 38:11, 38:16, 38:19, 39:10, 39:24, 39:25, 43:2, 43:10, 43:11, 43:15, 43:19, 43:25, 44:3, 44:4, 95:13, 95:17, 96:12
**insurances** [3] - 15:10, 15:14, 25:1
**insurers** [1] - 50:23
**integrated** [3] - 51:15, 115:6, 171:3
**integrity** [3] - 46:10, 219:1, 219:10
**intend** [1] - 232:19
**intensive** [2] - 115:10, 116:12
**interact** [2] - 155:21, 156:13
**interaction** [1] - 33:13
**interest** [1] - 29:23
**interested** [2] - 29:13, 151:22
**interesting** [1] - 199:6
**internal** [3] - 111:1, 111:17, 188:22
**internet** [1] - 207:16
**interpret** [1] - 200:15
**interpreting** [1] - 107:13
**interrupt** [3] - 67:25, 172:7, 202:9
**interview** [6] - 97:14, 97:19, 98:24, 108:3, 108:5, 108:7
**Interview** [2] - 5:2, 63:22
**interviewed** [2] - 97:6, 97:9
**introduce** [3] - 13:7, 69:18, 187:21
**introduction** [1] - 188:5
**inventory** [7] - 195:23, 195:25, 196:4, 215:24, 216:10, 223:15, 224:7
**investigation** [13] - 63:4, 73:10, 73:16, 75:3, 75:11, 75:17, 81:14, 86:10, 86:11, 92:15, 92:17, 93:1
**invited** [1] - 16:17
**invoice** [4] - 167:18, 167:19, 167:20, 168:17
**invoiced** [2] - 168:22, 169:1
**invoices** [2] - 41:16, 51:14
**involved** [5] - 42:25, 151:2, 156:6, 156:12, 199:21
**involving** [1] - 231:23
**IPC** [12] - 202:25, 203:13, 203:16, 206:24, 209:6, 209:10, 210:2, 210:8, 210:25, 213:10, 214:3, 232:8
**Ishbay** [1] - 158:5
**issue** [26] - 30:16, 30:17, 31:1, 40:18, 40:25, 45:3, 45:4, 45:13, 46:21, 50:13, 74:16, 76:3, 119:1, 134:7, 137:25, 139:17, 145:7, 148:10, 176:15, 177:5, 179:11, 193:24, 199:20, 218:22, 228:11
**issued** [4] - 163:22, 163:23, 164:12, 227:21
**issues** [21] - 42:12, 49:17, 107:21, 114:4, 114:7, 114:12, 116:16, 116:23, 117:24, 118:21, 119:5, 119:10, 121:14, 130:22, 134:4, 135:11, 141:18, 141:20, 155:10, 155:16, 181:7
**items** [1] - 206:11
**itself** [3] - 18:24, 33:7, 59:12
**IV** [1] - 111:9
**Ivlis** [1] - 1:18

## J

**J-A** [1] - 53:11
**JA** [1] - 53:10
**Jacqueline** [1] - 1:13
**Janssen** [4] - 10:6, 10:7, 45:22, 46:1
**January** [3] - 48:18, 79:2
**Jenna** [3] - 155:17, 155:19, 156:10
**Jennie** [1] - 202:6
**Jesse** [5] - 108:6, 108:9, 142:4, 144:13, 144:18
**job** [21] - 105:13, 105:22, 106:10, 106:13, 106:23, 107:5, 108:3, 108:10, 108:12, 108:13, 108:15, 108:18, 114:18, 115:9, 116:1, 116:8, 116:19, 117:4, 117:21, 151:16
**jobs** [3] - 151:9, 151:20, 151:23
**John** [1] - 195:22
**Jon** [4] - 184:5, 184:7, 184:19, 186:25
**Jones** [3] - 113:13, 113:15, 155:7
**JUDGE** [1] - 1:10
**judge** [11] - 18:20, 19:11, 49:8, 67:9, 71:18, 92:25, 122:25, 162:5, 169:18, 172:22, 185:11
**Judge** [41] - 6:16, 6:17, 13:9, 14:12, 18:5, 18:11, 19:8, 21:5, 21:19, 28:13, 63:19, 70:18, 71:14, 71:22, 72:13, 73:24, 74:8, 85:3, 93:9, 109:15, 109:21, 124:4, 132:4, 142:9, 144:4, 157:20, 162:20, 175:16, 183:2, 184:13, 187:12, 189:1, 191:2, 193:7, 197:5, 201:13, 205:12, 208:14, 209:20, 221:6, 226:1
**judgment** [1] - 36:22
**July** [7] - 16:17, 22:5, 48:18, 176:4, 176:21, 178:9, 186:11
**June** [2] - 137:12, 137:17
**junkies** [1] - 140:18
**juror** [1] - 6:5
**jurors** [1] - 93:18
**JURY** [1] - 1:9
**jury** [16] - 6:15, 13:14, 71:18, 91:12, 91:18, 92:10, 93:8, 93:16, 93:19, 95:7, 165:10, 165:25, 166:4, 166:7, 233:21, 233:24
**Jury** [4] - 93:17, 165:11, 166:5, 233:25
**justification** [1] - 223:22
**justified** [2] - 44:11
**justifying** [2] - 118:5, 118:9

## K

**KA** [1] - 53:10
**Katie** [2] - 113:5, 113:20
**keep** [9] - 49:6, 58:5, 58:7, 58:8, 92:4, 103:19, 149:17, 165:6
**Kelsey** [7] - 113:13, 113:15, 113:20, 126:9, 128:14, 155:7, 156:2
**Kentucky** [3] - 19:6, 19:19, 19:23
**kept** [4] - 69:8, 69:9, 76:21, 92:13
**kidnapped** [1] - 54:4
**kill** [1] - 60:12
**Kim** [1] - 130:4
**Kimchi** [49] - 4:6, 4:7, 130:3, 130:4, 130:20, 130:24, 131:6, 158:23, 159:6, 160:11, 164:24, 185:6, 186:16, 188:7, 188:8, 189:8, 189:13, 190:6, 190:9, 192:14, 196:7, 196:23, 197:17, 204:19, 204:22, 205:19, 206:19, 209:7, 211:7, 211:19, 212:6, 212:17, 213:14, 213:21, 214:19, 215:6, 216:14, 217:2, 217:20, 218:3, 218:7, 219:24, 221:23, 225:19, 226:4, 226:8, 226:20, 228:18, 232:11
**Kimchi's** [3] - 159:6, 216:6, 217:12
**Kimchi-Peter-Boulevard** [1] - 204:22
**Kimchi/Peter** [3] - 189:21, 190:14, 196:4
**kind** [74] - 8:24, 20:5, 23:10, 24:2, 24:15, 38:15, 42:2, 48:4, 50:2, 51:11, 76:10, 105:25, 106:19, 109:6, 110:7, 110:11, 111:9, 114:6, 114:16, 115:15, 121:20, 121:25, 125:3, 125:4, 130:1, 130:8, 132:14, 134:7, 134:20, 136:7, 136:13, 140:7, 140:13, 140:16, 141:3, 141:4, 141:5, 141:8, 143:1, 143:2, 145:9, 146:4, 146:22, 148:7, 150:15, 150:20, 152:15, 152:20, 152:25, 153:19, 153:20, 153:21, 153:22, 155:8, 155:10, 155:20, 155:22, 159:21, 164:10, 164:11, 164:12, 168:23, 177:21, 179:8, 183:18, 186:21, 186:22, 190:10, 193:23, 199:19,

207:17, 220:3, 223:9, 225:13
**kinds** [7] - 9:8, 9:9, 15:14, 51:7, 119:5, 133:24, 140:7
**King** [36] - 130:3, 130:4, 130:20, 130:24, 131:6, 158:23, 159:6, 160:11, 164:24, 186:16, 188:7, 188:8, 189:8, 189:13, 189:21, 190:9, 190:14, 196:7, 196:23, 211:7, 212:17, 213:21, 214:18, 215:6, 216:6, 216:14, 217:2, 217:12, 217:20, 218:6, 219:24, 225:19, 226:8, 226:19, 228:18
**knowing** [5] - 36:22, 96:1, 159:3, 218:23, 219:7
**knowingly** [1] - 175:2
**knowledge** [2] - 146:3, 172:11
**known** [1] - 153:20

## L

**label** [8] - 12:9, 59:3, 65:14, 103:8, 103:11, 103:13, 119:20, 141:5
**labels** [1] - 12:6
**labor** [2] - 115:10, 116:12
**laboratory** [4] - 106:14, 106:21, 107:10, 110:6
**lack** [5] - 96:16, 127:4, 128:13, 128:20, 180:13
**language** [1] - 133:11
**lapse** [1] - 218:22
**large** [3] - 9:24, 145:13, 179:10
**last** [18] - 56:23, 97:19, 99:13, 105:2, 129:5, 158:22, 158:23, 159:5, 160:2, 171:22, 182:6, 186:18, 191:11, 195:18, 204:7, 219:3, 222:10, 223:13
**lastly** [2] - 192:7, 202:25
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:22, 234:24
**Law** [1] - 181:13
**lawsuit** [1] - 81:23
**lawyer** [3] - 62:7, 63:3
**lawyer's** [1] - 44:21
**lawyers** [3] - 45:18, 47:15, 233:7
**lay** [1] - 181:24
**lead** [1] - 155:21
**leading** [1] - 21:5
**leads** [1] - 218:10
**learn** [2] - 141:18, 158:10
**learned** [2] - 82:14, 141:20
**learning** [2] - 116:10, 185:17
**least** [23] - 22:10, 33:1, 38:9, 78:8, 78:23, 79:21, 108:8, 117:16, 121:4, 122:3, 122:10, 129:1, 135:19, 142:24, 145:6, 145:20, 147:24, 147:25, 168:13, 173:13, 174:21, 196:3, 198:5
**leave** [2] - 113:7, 113:20
**led** [2] - 56:18, 106:13
**left** [10] - 8:13, 45:12, 64:8, 87:7, 89:23, 114:25, 117:2, 200:7, 202:6, 205:23
**legal** [7] - 120:7, 153:24, 155:10, 155:16, 155:24, 232:24, 233:2
**legit** [2] - 159:23, 221:16
**legit-looking** [1] - 159:23
**legitimacy** [1] - 212:5
**legitimate** [6] - 120:4, 217:4, 221:18, 221:20, 222:2, 224:15
**less** [1] - 217:10
**letter** [6] - 75:4, 75:9, 92:15, 93:3, 146:4, 151:16
**letting** [1] - 223:12
**level** [1] - 181:1
**levels** [1] - 46:19
**leverage** [1] - 185:20
**liberal** [1] - 105:20
**license** [21] - 137:4, 159:24, 160:14, 160:15, 161:23, 162:8, 163:4, 163:7, 163:10, 163:12, 163:15, 163:22, 164:12, 215:10, 218:15, 218:17, 219:19, 226:17, 227:20
**licensed** [1] - 23:14
**licenses** [7] - 108:19, 108:20, 108:21, 109:1, 109:2, 161:19, 202:23
**licensing** [3] - 107:20, 137:2, 228:11
**licensure** [1] - 218:22
**life** [4] - 37:7, 60:6, 151:14, 151:20
**lifetime** [1] - 120:1
**likely** [1] - 145:13
**line** [13] - 17:6, 18:20, 44:25, 47:18, 50:9, 63:12, 75:8, 75:9, 111:7, 116:10, 116:14, 117:8, 182:6
**lines** [5] - 50:12, 134:2, 135:17, 136:24, 152:18
**link** [3] - 218:10, 219:3
**links** [1] - 230:8
**LISA** [2] - 3:3, 7:2
**Lisa** [4] - 6:12, 6:22, 7:9, 28:21
**list** [8] - 127:16, 135:12, 136:4, 155:10, 203:7, 216:7, 216:9, 216:10
**listed** [27] - 122:7, 122:20, 126:17, 130:10, 130:19, 131:18, 132:23, 133:13, 149:13, 149:21, 158:2, 158:12, 158:14, 171:23, 192:14, 192:15, 197:19, 197:22, 201:25, 202:4, 202:15, 207:13, 210:25, 211:18, 213:16, 215:9
**Listen** [2] - 43:7, 96:5
**live** [5] - 8:14, 53:20, 53:21, 56:12, 104:25
**livelihood** [1] - 47:14
**living** [1] - 54:7
**LLC** [11] - 5:4, 126:2, 126:20, 131:13, 131:24, 132:7, 132:17, 152:6, 152:7, 152:12, 160:1
**LLC's** [1] - 159:16
**LMP** [1] - 192:1
**load** [3] - 46:18, 46:20, 60:11
**local** [2] - 9:15, 106:13
**Local** [1] - 202:22
**locate** [1] - 215:20
**located** [1] - 17:16
**location** [21] - 8:11, 109:1, 119:1, 122:4, 122:12, 122:13, 122:20, 124:19, 124:24, 125:11, 131:18, 131:24, 132:11, 211:18, 214:9, 215:17, 215:19, 218:15, 218:22, 219:14, 219:15
**locations** [3] - 108:24, 122:3, 133:12
**log** [1] - 112:10
**logo** [2] - 55:23, 55:25
**Look** [1] - 179:9
**look** [51] - 28:4, 40:7, 40:21, 40:23, 42:16, 50:13, 50:16, 50:19, 50:22, 68:24, 69:4, 69:6, 69:10, 69:22, 81:19, 84:5, 85:8, 118:1, 118:22, 119:1, 122:12, 122:18, 123:17, 124:16, 124:17, 124:19, 124:24, 125:5, 125:10, 131:18, 131:20, 142:25, 159:21, 163:3, 167:23, 169:11, 173:9, 174:9, 174:17, 174:24, 190:22, 193:14, 193:20, 197:24, 199:8, 211:2, 212:12, 219:13, 219:17, 224:15
**looked** [38] - 12:4, 12:16, 29:13, 40:16, 52:2, 52:5, 59:8, 59:10, 60:17, 79:25, 83:1, 86:4, 86:6, 101:17, 101:23, 102:5, 118:2, 122:2, 122:4, 124:23, 124:24, 125:12, 131:25, 132:12, 136:12, 144:16, 159:22, 173:13, 180:14, 199:8, 199:23, 202:16, 215:14, 224:10
**looking** [24] - 34:18, 43:14, 64:13, 68:4, 72:2, 84:16, 107:8, 107:18, 108:23, 109:1, 125:4, 125:8, 136:9, 141:8, 145:4, 151:9, 151:15, 159:23, 164:2, 178:10, 196:1, 214:8, 214:10
**lookout** [1] - 32:21
**looks** [16] - 41:7, 41:8, 55:20, 58:17, 64:9, 68:4, 76:24, 77:12, 137:11, 168:2, 174:13, 176:22, 191:21, 195:17, 197:18, 211:5
**Looks** [1] - 149:14
**lose** [1] - 38:9
**losing** [2] - 47:25, 49:2
**lost** [1] - 163:12
**loud** [1] - 75:8
**loved** [1] - 47:14
**lower** [3] - 11:15, 20:18, 36:1
**lowers** [1] - 36:11
**lunch** [4] - 91:10, 94:4, 94:5, 94:15
**Lupin** [1] - 45:23
**luxury** [1] - 27:19

## M

**ma'am** [3] - 35:11, 44:14, 74:22
**mail** [2] - 17:1, 78:10
**mailbox** [1] - 81:8
**main** [3] - 111:7, 158:21, 160:2
**major** [1] - 179:16
**manage** [1] - 108:25
**managed** [2] - 106:20, 106:24
**management** [2] - 114:9, 155:14
**manager** [5] - 8:10, 8:11, 42:24, 106:23, 108:6
**managers** [2] - 23:12, 114:8
**managing** [3] - 108:19, 108:21,

108:24
**Manhattan** [3] - 56:9, 56:11, 56:12
**Mantilla** [1] - 1:18
**manual** [2] - 115:5, 177:20
**manufactured** [3] - 10:4, 45:17, 145:12
**manufacturer** [24] - 31:7, 31:11, 31:12, 31:23, 32:22, 32:23, 33:9, 34:12, 35:22, 41:4, 44:23, 45:4, 46:4, 50:20, 66:17, 66:19, 73:8, 120:1, 130:18, 191:22, 197:19, 199:9, 199:14, 233:5
**manufacturer's** [1] - 191:15
**manufacturers** [9] - 10:4, 20:8, 24:4, 44:10, 45:20, 46:1, 145:13, 199:17, 199:21
**manufacturers'** [1] - 45:25
**manufactures** [2] - 144:20, 144:21
**manufacturing** [8] - 45:3, 45:6, 45:10, 45:12, 45:16, 127:18, 145:1, 145:7
**Maps** [1] - 124:21
**March** [1] - 175:3
**Marie** [1] - 28:21
**mark** [1] - 65:15
**marked** [1] - 98:25
**marker** [6] - 57:16, 65:11, 85:12, 85:17, 86:12, 86:18
**market** [5] - 9:12, 17:8, 33:20, 45:23, 106:18
**marketing** [2] - 117:7, 117:9
**markup** [1] - 36:20
**Maryland** [22] - 7:21, 7:24, 8:2, 8:14, 8:18, 9:22, 17:17, 104:25, 105:5, 105:9, 106:11, 161:19, 161:23, 162:8, 163:10, 163:11, 163:14, 163:15, 163:18, 163:25, 164:15
**massive** [2] - 177:23, 185:25
**Masters** [1] - 10:22
**match** [3] - 35:6, 41:17, 121:24
**matched** [1] - 13:24
**matching** [1] - 227:25
**materials** [2] - 106:20, 106:22
**maternity** [2] - 113:7, 113:20
**math** [2] - 52:14, 52:15
**Mathematica** [1] - 114:24
**matter** [5] - 32:25, 71:17, 93:12, 231:16, 234:19
**McKesson** [2] - 42:15, 42:18
**mean** [25] - 9:10, 25:6, 27:20, 31:4, 33:7, 36:18, 36:20, 36:24, 38:8, 45:11, 47:4, 49:4, 50:25, 57:8, 58:20, 68:20, 79:10, 98:1, 98:17, 125:7, 129:11, 154:13, 181:25, 200:15, 216:21
**means** [9] - 31:7, 46:18, 79:3, 94:24, 95:9, 95:12, 95:13, 95:17, 218:16
**meat** [1] - 16:15
**med** [2] - 30:14, 46:24
**Medicaid** [4] - 15:15, 24:17, 26:1, 26:8
**medical** [8] - 15:15, 25:19, 25:20, 71:2, 71:11, 72:15, 106:1, 139:18
**Medicare** [4] - 15:16, 153:25, 154:4, 155:3
**medication** [63] - 9:3, 9:16, 12:8, 15:22, 19:5, 25:1, 26:13, 27:20, 39:9, 45:17, 52:5, 54:12, 54:19, 54:23, 54:24, 54:25, 55:1, 55:10, 55:19, 56:1, 56:21, 57:19, 58:7, 58:10, 59:7, 59:13, 59:17, 60:3, 60:10, 62:5, 65:9, 67:4, 67:21, 70:8, 71:12, 73:22, 74:11, 74:16, 74:24, 76:4, 76:18, 78:8, 78:9, 79:14, 82:16, 82:18, 100:6, 102:17, 102:25, 103:18, 120:13, 125:6, 139:11, 139:13, 139:15, 139:17, 145:14, 148:9, 149:14, 179:19, 218:23, 219:8
**medications** [43] - 9:14, 10:2, 10:13, 14:25, 15:9, 20:4, 24:3, 25:10, 27:4, 27:12, 27:24, 27:25, 28:3, 30:3, 30:4, 30:11, 32:19, 33:18, 55:5, 55:11, 55:16, 56:4, 56:14, 57:15, 57:21, 58:5, 60:2, 76:16, 111:8, 111:11, 111:12, 119:3, 121:8, 130:11, 139:20, 140:11, 140:14, 140:17, 153:1, 176:12, 176:25, 177:15, 195:20
**medicine** [30] - 24:16, 26:2, 27:21, 54:21, 59:5, 60:8, 62:12, 62:14, 64:14, 68:8, 69:2, 69:3, 71:8, 72:4, 72:21, 72:25, 76:7, 76:10, 77:21, 78:16, 78:19, 83:7, 83:8, 83:9, 83:11, 87:24, 87:25, 91:8, 100:22, 140:25
**medicines** [2] - 24:15, 27:1
**meds** [6] - 9:11, 11:14, 17:22, 27:24, 47:10, 47:23
**meet** [1] - 110:20
**meeting** [1] - 114:8
**Mellott** [1] - 155:17
**member** [3] - 24:12, 116:6, 186:1
**members** [1] - 91:12
**memory** [2] - 75:5, 75:10
**mental** [3] - 105:23, 106:6, 106:10
**mention** [2] - 69:8, 199:14
**mentioned** [28] - 15:10, 39:2, 45:19, 46:2, 47:17, 49:11, 56:14, 65:24, 66:21, 72:7, 73:7, 75:2, 76:21, 82:14, 119:17, 122:2, 125:24, 129:22, 131:13, 133:19, 136:21, 139:7, 140:24, 151:23, 152:20, 155:3, 156:4, 164:6
**Merck** [2] - 10:7, 45:22
**merged** [1] - 153:5
**Message** [14] - 4:13, 4:14, 4:15, 4:17, 4:19, 4:21, 5:1, 21:22, 138:4, 144:7, 193:9, 195:13, 209:23, 222:25
**message** [21] - 22:4, 22:17, 110:4, 125:16, 137:11, 138:12, 144:13, 144:24, 145:21, 146:8, 146:9, 184:4, 195:18, 199:3, 200:3, 205:24, 210:7, 213:24, 220:21, 223:10
**messages** [21] - 4:20, 117:12, 137:16, 142:3, 143:23, 144:15, 161:8, 162:14, 190:22, 192:25, 193:16, 195:4, 195:16, 198:12, 200:20, 209:14, 220:14, 225:13, 227:2, 227:12, 231:4
**messaging** [2] - 125:17
**Messenger** [2] - 28:19, 28:22
**met** [2] - 16:16, 97:9
**Metroka** [2] - 66:25, 70:10
**Miami** [2] - 1:16, 1:19
**microphone** [3] - 7:7, 53:7, 104:12
**middleman** [1] - 43:2
**might** [9] - 22:16, 32:21, 38:16, 44:19, 63:9, 105:3, 118:25, 183:8, 208:19
**migraines** [1] - 9:11
**Mike** [1] - 183:19
**million** [2] - 132:16, 169:3
**mind** [4] - 54:16, 62:8, 94:13, 94:14
**mine** [4] - 107:6, 125:21, 179:3, 179:7
**minivan** [2] - 138:16, 138:22
**minor** [1] - 105:21
**minus** [2] - 43:18, 43:19
**minutes** [7] - 33:11, 91:14, 104:25, 165:10, 165:16, 165:18, 205:24
**misbranding** [1] - 181:6
**mischaracterizing** [1] - 90:1
**misheard** [1] - 20:21
**misleading** [1] - 48:23
**miss** [3] - 60:12, 65:16, 78:7
**missing** [6] - 14:22, 46:19, 50:20, 76:3, 127:19, 191:12
**misstating** [1] - 42:6
**mistake** [2] - 64:14, 134:15
**mixup** [1] - 145:5
**Mohammed** [1] - 149:22
**moment** [12] - 22:19, 23:4, 51:24, 59:2, 61:3, 73:3, 78:21, 82:12, 83:18, 126:9, 163:3, 193:13
**Monday** [7] - 30:2, 46:22, 215:23, 233:15, 233:20, 234:5, 234:9
**Monday's** [1] - 210:10
**monetary** [1] - 132:18
**money** [17] - 25:7, 33:21, 33:23, 34:1, 34:12, 35:5, 36:1, 36:11, 36:19, 38:9, 38:16, 39:6, 48:3, 49:2, 49:15, 49:17
**monitor** [1] - 77:10
**monopoly** [1] - 33:16
**month** [12] - 30:4, 46:19, 56:18, 56:24, 56:25, 57:1, 66:1, 79:3, 94:17, 95:18, 217:11, 233:8
**months** [16] - 22:12, 49:12, 49:16, 77:25, 79:2, 91:1, 101:14, 129:7, 133:23, 160:7, 168:9, 168:20, 212:4, 215:19, 218:21, 221:24
**morning** [12] - 7:12, 7:13, 53:17, 53:18, 75:23, 75:24, 84:3, 84:4, 176:8, 179:18, 218:10, 226:14
**mortgage** [1] - 151:16

**most** [11] - 9:25, 11:13, 15:13, 25:10, 47:9, 98:13, 111:25, 114:24, 130:9, 151:11, 219:6
**motion** [2] - 49:8, 93:7
**mouth** [1] - 23:9
**move** [15] - 60:21, 107:15, 170:8, 193:4, 195:8, 198:17, 201:10, 205:1, 208:7, 212:25, 214:21, 217:23, 221:4, 225:24, 228:21
**moved** [2] - 92:12, 215:18
**moves** [27] - 13:7, 21:17, 63:17, 68:13, 69:14, 122:23, 132:2, 137:24, 142:7, 144:2, 148:18, 157:18, 162:18, 167:1, 169:16, 175:14, 178:12, 182:25, 184:11, 187:10, 190:25, 197:3, 205:10, 209:18, 222:20, 227:7, 230:21
**moving** [2] - 137:22, 161:12
**MR** [472] - 3:3, 3:4, 3:4, 3:5, 3:7, 3:7, 3:9, 3:10, 3:10, 3:11, 3:11, 6:7, 6:9, 6:10, 6:12, 6:16, 6:17, 6:18, 6:22, 7:11, 12:24, 13:1, 13:7, 13:9, 13:10, 13:14, 13:17, 13:18, 14:1, 14:5, 14:12, 14:15, 16:8, 16:9, 16:11, 18:5, 18:7, 18:11, 18:14, 18:20, 18:23, 18:24, 19:8, 19:11, 19:15, 21:5, 21:7, 21:11, 21:13, 21:17, 21:19, 21:20, 21:24, 22:1, 22:2, 22:19, 22:23, 26:4, 26:7, 28:10, 28:13, 28:16, 32:7, 32:10, 32:12, 32:15, 34:24, 35:1, 35:16, 35:17, 35:19, 44:14, 44:16, 44:18, 48:22, 49:1, 49:8, 49:10, 51:24, 52:1, 52:16, 63:19, 63:20, 67:9, 67:12, 68:15, 68:18, 68:21, 69:16, 70:18, 71:14, 71:18, 71:22, 72:13, 73:12, 73:24, 74:8, 75:13, 75:22, 77:2, 77:6, 77:9, 81:13, 83:2, 83:5, 83:18, 83:20, 83:23, 84:2, 85:3, 85:5, 86:14, 86:24, 87:1, 89:5, 89:7, 90:8, 92:3, 92:25, 93:9, 93:12, 93:21, 94:1, 95:8, 95:16, 96:9, 96:19, 98:23, 99:1, 99:3, 99:16, 99:18, 101:2, 102:7, 104:4, 104:15, 104:17, 109:15, 109:17, 109:21, 109:23, 122:15, 122:17, 122:23, 122:25, 123:5, 123:7, 123:8, 123:12, 123:16, 123:25, 124:4, 124:6, 124:10, 124:15, 131:20, 131:23, 132:2, 132:4, 132:5, 132:9, 137:6, 137:8, 137:23, 137:25, 138:6, 138:8, 138:10, 140:21, 140:23, 141:23, 142:1, 142:7, 142:9, 142:10, 142:14, 142:17, 142:18, 143:6, 143:8, 143:13, 143:14, 143:20, 143:22, 144:2, 144:4, 144:9, 144:12, 144:14, 147:2, 147:3, 148:3, 148:5, 148:18, 148:20, 148:21, 149:1, 149:6, 149:7, 149:16, 149:18, 150:3, 150:4, 150:9, 150:10, 157:2, 157:4, 157:9, 157:11, 157:18, 157:20, 157:21, 158:1, 159:11, 159:13, 161:17, 161:20, 162:5, 162:9, 162:11, 162:13, 162:18, 162:20, 162:21, 163:1, 164:21, 164:22, 165:3, 166:1, 166:2, 166:3, 166:8, 166:9, 166:10, 166:15, 166:18, 167:1, 167:3, 167:4, 167:8, 167:9, 167:12, 167:14, 168:15, 168:16, 169:5, 169:7, 169:16, 169:18, 169:21, 170:8, 170:10, 170:13, 171:16, 171:19, 172:6, 172:10, 172:17, 172:22, 173:2, 173:9, 173:12, 173:17, 173:21, 174:7, 174:8, 174:15, 174:16, 174:23, 175:1, 175:6, 175:9, 175:14, 175:16, 175:17, 175:21, 176:1, 178:3, 178:5, 178:12, 178:14, 178:15, 178:19, 178:21, 182:17, 182:19, 182:25, 183:2, 183:3, 183:7, 184:1, 184:3, 184:11, 184:13, 184:14, 184:18, 185:11, 185:13, 187:2, 187:4, 187:10, 187:12, 187:13, 187:17, 187:19, 188:3, 188:4, 188:11, 188:12, 188:15, 188:17, 189:1, 189:2, 189:4, 189:7, 190:17, 190:20, 190:25, 191:2, 191:3, 191:7, 191:17, 191:18, 192:17, 192:18, 192:22, 192:24, 193:4, 193:6, 193:7, 193:11, 193:12, 194:22, 194:23, 195:1, 195:3, 195:8, 195:10, 195:11, 195:15, 196:20, 196:22, 197:3, 197:5, 197:6, 197:10, 197:14, 198:9, 198:11, 198:17, 198:19, 198:20, 198:24, 199:1, 200:2, 200:5, 200:12, 200:14, 201:1, 201:3, 201:10, 201:12, 201:13, 201:17, 204:2, 204:3, 204:25, 205:3, 205:10, 205:12, 205:13, 205:17, 207:23, 208:1, 208:7, 208:9, 208:11, 208:12, 208:13, 208:14, 208:16, 208:23, 209:1, 209:3, 209:5, 209:11, 209:13, 209:18, 209:20, 209:21, 210:1, 210:5, 210:6, 211:2, 211:4, 211:11, 211:12, 211:16, 211:17, 212:14, 212:16, 212:25, 213:3, 213:7, 213:9, 213:13, 213:15, 214:15, 214:17, 214:21, 214:23, 214:24, 215:3, 215:5, 216:3, 216:5, 216:12, 216:13, 217:6, 217:7, 217:17, 217:19, 217:23, 217:25, 218:1, 218:5, 220:18, 220:20, 221:4, 221:6, 221:7, 221:11, 222:13, 222:15, 222:20, 222:22, 222:23, 223:2, 223:5, 225:16, 225:18, 225:24, 226:1, 226:2, 226:6, 226:24, 227:1, 227:7, 227:9, 227:10, 227:14, 228:15, 228:17, 228:21, 228:23, 228:24, 229:3, 229:5, 229:8, 230:5, 230:8, 230:11, 230:15, 230:21, 230:23, 230:24, 231:3, 231:25, 232:1, 233:14, 234:10, 234:13
**MS** [55] - 3:6, 3:8, 52:21, 53:13, 53:16, 63:17, 63:24, 64:2, 67:13, 67:15, 68:13, 68:19, 68:23, 69:14, 69:21, 69:24, 70:2, 70:6, 70:21, 70:24, 71:15, 71:23, 72:14, 72:18, 73:3, 73:5, 73:14, 74:1, 74:10, 75:16, 75:19, 77:5, 79:5, 79:8, 81:11, 82:25, 83:16, 86:8, 86:22, 89:4, 90:1, 91:9, 92:11, 92:19, 95:4, 95:14, 96:7, 96:16, 96:25, 97:2, 98:21, 100:15, 102:9, 102:11, 103:24
**multibillion** [1] - 27:6
**multibillion-dollar** [1] - 27:6
**multiple** [10] - 11:13, 45:19, 66:3, 78:4, 95:5, 97:12, 115:7, 150:14, 218:19
**must** [1] - 218:14

## N

**name** [41] - 7:7, 20:4, 27:24, 53:7, 54:22, 55:25, 57:22, 59:3, 70:9, 73:1, 81:4, 82:18, 82:20, 82:24, 83:7, 83:11, 103:13, 104:12, 111:15, 120:17, 127:17, 130:1, 130:3, 158:4, 158:5, 158:22, 158:23, 158:24, 159:5, 160:2, 167:17, 169:22, 169:23, 183:24, 186:16, 186:18, 198:5, 202:21, 218:12, 222:10
**named** [2] - 10:22, 194:24
**names** [7] - 45:25, 120:17, 154:14, 202:11, 202:22, 202:24, 218:14
**nation** [1] - 152:1
**National** [2] - 23:21, 24:5
**nationwide** [1] - 152:4
**Natural** [2] - 105:10, 105:11
**nature** [2] - 44:20, 110:6
**navigate** [1] - 116:13
**NDC** [5] - 188:20, 203:2, 203:7, 215:25
**NE** [1] - 1:15
**nearly** [2] - 151:10,

151:20
**NEC** [1] - 41:16
**necessarily** [8] - 19:3, 23:11, 24:6, 34:20, 38:17, 125:7, 196:9, 214:12
**necessary** [3] - 127:2, 185:21, 223:20
**need** [23] - 15:3, 19:21, 35:10, 42:16, 64:20, 90:14, 95:10, 103:19, 126:10, 128:16, 146:1, 169:18, 176:11, 176:24, 179:20, 196:13, 200:8, 204:5, 210:11, 215:21, 215:23, 216:15, 220:8
**needed** [20] - 15:2, 23:9, 23:11, 41:18, 46:23, 48:15, 62:14, 112:4, 115:16, 127:2, 127:7, 185:21, 185:24, 189:21, 189:24, 190:1, 190:3, 194:17, 216:23, 216:25
**needs** [10] - 42:16, 43:4, 57:3, 115:4, 165:4, 181:1, 185:22, 187:22, 187:23, 191:13
**negative** [2] - 25:9, 140:16
**never** [9] - 37:21, 51:7, 61:12, 74:18, 75:1, 96:21, 202:21, 223:23
**New** [9] - 53:20, 53:21, 53:22, 105:19, 160:24, 163:13, 166:19, 197:25, 215:20
**new** [27] - 33:24, 48:16, 54:25, 55:1, 58:11, 78:10, 87:5, 90:14, 91:6, 100:14, 115:1, 116:5, 116:7, 116:9, 116:13, 116:14, 117:8, 151:18, 164:10, 181:21, 187:23, 226:9, 228:1, 229:17
**newer** [2] - 163:20, 164:7
**next** [51] - 6:11, 6:21, 15:2, 52:20, 60:20, 61:6, 61:7, 61:24, 62:11, 65:25, 78:19, 80:7, 87:24, 88:15, 88:16, 89:16, 104:3, 130:16, 143:6, 144:12, 144:23, 163:2, 173:9, 173:10, 180:17, 181:23, 191:17, 191:25, 192:2, 192:4, 192:6, 193:11, 198:24, 203:6, 211:16, 211:19, 211:24, 212:6, 212:8, 212:12, 213:7, 213:10, 215:17, 217:20, 223:3, 228:18, 229:17
**next-day** [2] - 211:19, 212:6
**nice** [4] - 125:8, 125:9, 233:23, 234:7
**nicer** [1] - 27:21
**night** [5] - 59:19, 59:24, 60:1, 61:7, 191:11
**nine** [1] - 74:15
**NO** [1] - 1:2
**nobody** [2] - 180:7, 185:24
**non** [1] - 147:25
**none** [1] - 24:23
**nonetheless** [1] - 222:5
**norm** [1] - 196:15
**normal** [2] - 58:17, 216:24
**normally** [2] - 50:22, 199:8
**North** [1] - 8:1
**notation** [1] - 123:24
**nothing** [12] - 6:7, 22:19, 28:11, 45:9, 75:19, 103:25, 165:17, 193:20, 202:1, 219:21, 221:15, 234:8
**notice** [2] - 58:14, 80:10
**noticed** [2] - 103:9, 103:10
**notification** [6] - 32:18, 32:20, 146:4, 147:19, 147:21, 218:13
**notify** [3] - 146:6, 147:13, 147:16
**November** [2] - 79:1
**nowadays** [2] - 25:8, 47:4
**numb** [4] - 60:25, 61:1, 61:16, 61:18
**NUMBER** [1] - 3:16
**number** [53] - 34:19, 34:20, 35:7, 35:12, 35:21, 36:4, 36:7, 36:8, 36:15, 36:16, 36:17, 37:5, 37:8, 37:13, 37:20, 37:23, 38:2, 38:4, 38:23, 38:25, 39:3, 39:4, 39:17, 39:19, 39:20, 39:22, 70:1, 77:3, 120:15, 126:12, 158:14, 167:18, 188:20, 188:21, 188:23, 189:15, 190:1, 191:14, 202:3, 202:4, 202:14, 202:15, 202:17, 203:2, 203:7, 203:8, 206:6, 206:7, 206:8, 215:15, 218:19
**numbers** [10] - 13:23, 28:18, 28:21, 64:1, 65:8, 158:16, 188:9, 191:12, 203:4, 206:5
**numbness** [2] - 62:17, 62:18
**NW** [1] - 1:19
**NYUSED.gov** [1] - 202:23

## O

**oath** [1] - 165:22
**object** [4] - 18:20, 67:9, 92:18, 172:22
**objection** [110] - 13:9, 13:10, 14:12, 18:5, 18:11, 19:8, 21:5, 21:19, 21:20, 26:4, 32:7, 32:12, 34:24, 35:16, 48:22, 48:24, 63:19, 63:20, 69:17, 71:14, 72:13, 73:12, 73:24, 74:8, 75:13, 79:5, 81:11, 82:25, 83:16, 86:8, 86:22, 89:4, 90:1, 91:9, 92:13, 93:3, 95:4, 95:14, 96:7, 96:16, 96:25, 98:21, 100:15, 109:15, 109:21, 124:4, 124:6, 132:4, 132:5, 142:9, 142:10, 148:20, 148:21, 157:20, 157:21, 162:20, 162:21, 167:3, 167:4, 172:9, 175:16, 175:17, 178:14, 178:15, 183:2, 183:3, 184:13, 184:14, 185:11, 187:12, 187:13, 189:1, 189:2, 191:2, 191:3, 193:6, 193:7, 195:10, 195:11, 197:5, 197:6, 198:19, 198:20, 200:12, 201:12, 201:13, 205:12, 205:13, 208:23, 209:3, 209:20, 209:21, 213:2, 213:3, 214:23, 214:24, 217:25, 218:1, 221:6, 221:7, 222:22, 222:23, 226:1, 226:2, 227:9, 227:10, 228:23, 228:24, 230:23, 230:24
**objections** [1] - 124:3
**obscuring** [1] - 141:5
**observed** [2] - 99:19, 123:1
**obstacle** [1] - 179:5
**obtain** [1] - 206:9
**obvious** [1] - 183:8
**obviously** [1] - 154:1
**occurred** [1] - 97:4
**October** [10] - 77:16, 78:25, 79:1, 147:7, 147:14, 147:18, 212:18, 222:1, 222:3, 222:18
**Odefsey** [1] - 10:1
**OF** [3] - 1:1, 1:4, 1:9
**offer** [3] - 10:23, 10:24, 19:18
**offered** [5] - 18:10, 21:3, 56:18, 108:10, 151:1
**office** [7] - 105:16, 125:20, 125:21, 125:22, 223:16, 224:8
**offices** [1] - 132:14
**Official** [2] - 2:3, 234:22
**often** [3] - 42:10, 43:22, 121:18
**old** [3] - 134:12, 134:15, 134:23
**Olympia** [1] - 194:24
**Omom** [5] - 120:20, 136:21, 136:23, 138:15, 139:1
**once** [5] - 57:6, 58:18, 66:3, 116:1, 218:11
**one** [127] - 6:5, 10:7, 16:19, 18:18, 20:5, 20:12, 22:19, 26:16, 27:3, 29:17, 31:18, 41:14, 44:7, 46:1, 46:19, 47:15, 47:24, 51:19, 51:24, 52:4, 52:8, 55:3, 55:19, 55:21, 56:24, 56:25, 57:1, 57:9, 57:13, 57:14, 64:8, 64:11, 64:22, 66:6, 70:25, 72:6, 73:3, 76:4, 76:18, 76:19, 81:16, 83:18, 86:18, 87:7, 87:14, 88:4, 88:10, 89:17, 90:5, 90:13, 90:20, 91:19, 91:21, 93:12, 94:17, 94:19, 95:1, 111:18, 114:10, 114:24, 116:25, 117:1, 120:20, 120:21, 120:22, 120:25, 121:22, 126:17, 128:12, 128:19, 129:13, 129:17, 129:19, 129:20, 133:3, 134:14, 135:12, 136:4, 136:25, 139:1, 140:9, 140:19, 141:2, 141:4, 145:2, 146:13, 146:17, 146:19, 146:24, 147:4, 147:25, 148:1, 148:2, 152:22, 154:15, 159:4, 160:17, 170:6, 173:17, 177:18, 179:10, 181:15, 183:24, 185:20, 188:3, 190:17, 192:4, 192:6, 193:17, 194:5, 197:16, 199:7, 199:10, 205:7, 210:2, 211:5, 214:2, 215:24, 215:25, 220:9, 222:12, 226:13, 229:7
**one-on-ones** [1] - 114:10
**ones** [8] - 24:2, 33:19, 45:24, 47:14, 87:2, 114:10, 140:10,

219:23
**ongoing** [2] - 114:12, 134:7
**online** [4] - 12:20, 41:17, 163:25, 207:18
**op** [1] - 231:5
**open** [15] - 8:15, 8:16, 8:25, 16:24, 17:1, 87:20, 89:13, 89:16, 89:24, 90:9, 90:12, 90:14, 204:6, 204:9
**open-door** [1] - 8:25
**opened** [23] - 30:5, 58:18, 59:20, 66:15, 74:20, 80:5, 80:8, 80:16, 81:17, 86:10, 87:21, 89:2, 89:8, 89:9, 89:12, 89:20, 89:22, 90:20, 90:22, 91:1, 91:6, 92:21
**opening** [4] - 16:20, 58:11, 60:23, 61:5
**operate** [2] - 8:22, 11:19
**operated** [1] - 14:23
**operating** [1] - 128:24
**operations** [1] - 108:24
**opportunities** [1] - 152:3
**opportunity** [4] - 107:16, 151:22, 152:4, 152:5
**opposed** [1] - 110:10
**option** [2] - 49:3, 206:7
**orange** [1] - 55:20
**Order** [1] - 6:1
**order** [11] - 15:2, 17:1, 23:18, 57:17, 88:8, 89:15, 130:8, 138:15, 179:18, 206:9
**ordered** [1] - 15:1
**orders** [2] - 13:21, 117:9
**ordinarily** [1] - 41:2
**ordinary** [1] - 40:20
**original** [1] - 215:13
**originally** [2] - 17:20, 53:20
**out-of-pocket** [1] - 15:20
**outcome** [1] - 150:17
**outside** [9] - 34:11, 69:18, 69:25, 80:24, 93:7, 95:6, 101:18, 101:23, 102:1
**outskirts** [1] - 156:23
**over-the-counter** [2] - 9:2, 9:3
**overall** [1] - 29:21
**overly** [1] - 117:24
**overnight** [2] - 16:16, 116:6
**overruled** [19] - 14:14, 26:5, 34:25, 79:7, 86:9, 86:23, 89:6, 90:4, 95:7, 95:15, 96:8, 96:18, 97:1, 100:16, 138:2, 144:5, 172:12, 173:1, 185:12
**overview** [2] - 8:7, 106:7
**own** [13] - 8:15, 8:22, 10:19, 16:20, 16:24, 27:9, 27:13, 46:2, 51:21, 112:4, 140:14, 156:10
**owned** [2] - 27:13, 223:22
**owner** [5] - 46:12, 153:2, 153:4, 173:20, 200:10
**owners** [1] - 182:11
**owns** [1] - 187:22

## P

**p.m** [13] - 61:7, 137:20, 138:12, 144:13, 145:22, 146:9, 194:4, 200:3, 200:6, 210:7, 227:16, 228:6
**package** [1] - 96:4
**packaging** [1] - 9:16
**packs** [2] - 15:3, 46:22
**PAGE** [2] - 3:2, 3:16
**page** [51] - 14:4, 63:8, 63:25, 122:18, 122:19, 124:16, 131:22, 132:10, 137:18, 138:11, 138:18, 142:17, 143:3, 143:7, 143:9, 144:12, 145:21, 157:10, 158:2, 159:12, 163:2, 172:19, 173:10, 174:7, 176:2, 176:19, 180:17, 188:3, 191:17, 193:11, 197:15, 198:25, 200:2, 203:6, 203:15, 210:5, 211:16, 213:7, 215:4, 219:5, 223:3, 226:7, 229:4, 229:7
**pages** [6] - 64:22, 160:17, 171:18, 171:19, 172:5, 173:13
**Pages** [1] - 1:8
**paid** [15] - 24:20, 25:4, 25:5, 35:5, 35:12, 35:25, 36:2, 36:12, 36:16, 36:19, 39:12, 39:15, 43:4, 43:25, 167:18
**pain** [1] - 139:16
**paper** [3] - 81:4, 81:5, 81:7
**paperwork** [5] - 216:16, 216:21, 217:2, 217:3, 223:24
**parent** [1] - 144:22
**parentheses** [3] - 202:12, 202:13, 202:15
**Park** [1] - 197:25
**part** [20] - 18:21, 23:17, 23:24, 30:9, 42:17, 50:21, 51:11, 51:15, 51:22, 105:16, 108:7, 110:8, 114:18, 149:21, 153:2, 153:4, 160:14, 171:3, 180:10, 212:5
**participated** [1] - 171:4
**participating** [1] - 181:1
**particular** [9] - 35:5, 35:25, 43:5, 76:24, 78:24, 79:24, 142:24, 170:6, 207:16
**particularly** [2] - 46:15, 120:8
**parties** [1] - 156:21
**partner** [2] - 41:2, 133:1
**parts** [1] - 61:13
**party** [3] - 16:18, 16:19, 156:20
**pass** [7] - 131:2, 131:4, 131:9, 131:11, 135:20, 136:17, 203:22
**passport** [1] - 119:24
**past** [2] - 10:25, 223:23
**Pat** [4] - 16:7, 134:15, 150:24, 193:22
**pat** [1] - 194:5
**patent** [1] - 33:21
**path** [1] - 41:3
**patient** [14] - 11:11, 11:18, 14:21, 15:19, 19:22, 25:2, 39:7, 39:24, 46:8, 46:10, 50:20, 54:15, 139:14, 139:17
**patients** [20] - 9:17, 9:23, 11:13, 15:3, 15:5, 15:11, 24:4, 24:23, 26:14, 31:13, 47:8, 47:10, 62:13, 83:11, 140:6, 140:9, 140:10, 140:13, 140:17
**patients'** [1] - 139:19
**PATRICIA** [2] - 2:2, 234:21
**Patrick** [60] - 4:1, 4:3, 4:16, 16:1, 16:12, 108:8, 110:24, 111:3, 115:12, 115:18, 117:16, 118:17, 121:5, 122:10, 131:4, 131:11, 133:5, 133:8, 133:16, 134:22, 135:20, 135:21, 136:19, 140:1, 140:5, 147:11, 149:4, 154:19, 156:17, 161:15, 166:22, 172:24, 174:5, 192:19, 192:25, 193:16, 194:2, 194:10, 194:12, 195:4, 195:16, 198:12, 198:22, 199:3, 199:5, 199:16, 200:4, 200:6, 200:20, 201:5, 201:16, 201:18, 203:24, 204:4, 205:4, 205:16, 206:22, 207:5, 230:16, 232:2
**PATRICK** [2] - 1:7, 1:17
**pattern** [1] - 154:17
**Pause** [1] - 6:13
**pause** [1] - 59:6
**pay** [18] - 15:5, 15:8, 15:19, 24:21, 25:1, 25:5, 34:4, 37:5, 37:17, 37:19, 38:2, 38:8, 38:16, 43:7, 43:11, 48:19, 78:13, 185:1
**payable** [1] - 184:22
**paying** [17] - 24:15, 24:22, 24:23, 24:25, 25:14, 26:11, 26:20, 34:12, 34:16, 37:3, 38:20, 40:1, 44:3, 79:15, 95:13, 95:17, 185:22
**payment** [1] - 185:19
**payments** [2] - 25:22, 184:22
**pays** [3] - 24:20, 25:1, 25:6
**PBM** [2] - 42:21, 42:23
**PDF** [5] - 129:10, 129:11, 129:12, 129:14, 160:15
**PDFs** [1] - 129:18
**pedigree** [12] - 12:21, 40:7, 40:11, 41:18, 41:20, 52:6, 111:20, 119:18, 119:23, 171:6, 231:17, 231:19
**pedigrees** [9] - 12:19, 40:3, 50:9, 52:3, 111:14, 111:24, 120:5, 128:13, 128:22
**penalties** [3] - 181:13, 182:4, 182:10
**people** [18] - 8:25, 24:14, 26:2, 26:19, 26:20, 27:12, 46:14, 107:14, 119:24, 120:11, 125:25, 140:15, 151:12, 152:3, 152:14, 152:25, 161:14, 194:19
**percent** [1] - 43:18
**percentage** [3] - 11:8, 30:12, 39:9
**perfect** [4] - 79:25, 80:20, 80:23, 191:16
**perfectly** [1] - 80:21
**period** [13] - 9:8, 11:2, 11:21, 30:4, 111:13, 111:22, 114:17, 117:18, 147:5, 168:10, 186:3, 192:20, 229:10
**periodically** [1] - 113:21
**permission** [9] - 13:14, 21:24, 124:10, 138:6, 142:14, 144:9, 175:21, 178:19, 197:10

**persecuted** [1] - 54:3
**person** [20] - 62:7, 110:22, 116:7, 125:15, 125:18, 127:18, 149:22, 154:1, 155:19, 157:6, 158:23, 159:8, 171:23, 177:18, 179:4, 179:14, 183:19, 186:14, 199:24, 203:18
**person's** [2] - 159:5, 186:16
**personal** [3] - 54:9, 103:14, 151:14
**personally** [1] - 132:24
**perspective** [3] - 33:17, 47:11, 128:8
**Peter** [23] - 158:22, 158:24, 159:3, 159:5, 160:2, 164:25, 183:24, 186:18, 187:21, 187:23, 188:6, 190:9, 204:22, 220:14, 222:10, 223:6, 223:13, 224:6, 224:17, 224:20, 225:2, 225:8, 225:14
**Ph** [1] - 1:19
**pharma** [1] - 106:17
**Pharma** [6] - 149:21, 152:16, 152:20, 152:21, 152:22, 154:16
**pharmaceutical** [6] - 17:14, 107:23, 107:25, 108:1, 182:9, 182:12
**pharmaceuticals** [3] - 23:18, 23:24, 115:3
**Pharmaceuticals** [3] - 51:19, 136:21, 136:23
**pharmacies** [13] - 20:17, 20:21, 20:22, 24:3, 24:25, 28:7, 38:21, 49:18, 202:18, 206:7, 223:14, 223:19, 224:18
**pharmacist** [15] - 8:5, 74:5, 81:9, 81:14, 83:12, 83:15, 96:5, 142:20, 143:10, 195:19, 199:10, 200:9, 200:11, 202:8
**pharmacists** [1] - 51:21
**pharmacy** [113] - 8:3, 8:15, 8:20, 8:24, 8:25, 9:2, 9:5, 11:11, 13:4, 14:23, 16:21, 16:25, 17:1, 17:2, 17:9, 17:13, 17:17, 17:19, 19:4, 19:21, 22:7, 23:12, 23:14, 24:6, 25:8, 28:6, 30:8, 31:12, 36:12, 37:7, 37:18, 38:4, 38:8, 39:23, 40:11, 41:7, 42:24, 46:10, 46:12, 46:13, 48:11, 48:12, 49:5, 49:22, 49:24, 51:16, 55:20, 56:5, 56:6, 56:8, 62:9, 63:4, 63:5, 64:21, 72:5, 72:6, 73:21, 78:11, 81:1, 81:17, 81:24, 91:24, 95:22, 100:22, 111:10, 112:2, 112:9, 127:17, 130:13, 137:4, 146:15, 171:23, 173:23, 174:17, 180:15, 194:24, 198:6, 199:16, 200:7, 200:10, 202:21, 202:22, 202:24, 203:10, 206:6, 207:19, 210:25, 211:18, 211:22, 211:24, 212:1, 214:5, 214:11, 215:10, 215:11, 215:18, 216:15, 216:20, 217:9, 218:16, 218:18, 218:21, 219:15, 219:19, 222:6, 223:23, 226:16, 227:23, 228:9
**Pharmacy** [44] - 8:9, 8:15, 8:16, 8:22, 8:24, 9:5, 11:19, 14:23, 23:21, 24:5, 48:9, 100:9, 102:3, 143:15, 145:18, 160:25, 163:14, 163:19, 163:25, 164:2, 164:15, 166:20, 171:23, 171:24, 171:25, 173:4, 191:24, 192:1, 194:24, 197:21, 202:25, 203:19, 205:18, 205:21, 206:18, 207:9, 214:5, 214:8, 215:8, 215:14, 215:21, 226:15, 228:8, 229:18
**pharmacy's** [1] - 29:22
**phone** [16] - 110:2, 110:10, 126:14, 153:20, 158:14, 158:16, 178:25, 179:13, 183:24, 202:15, 202:17, 218:19, 222:10, 222:12, 223:6, 225:8
**phonetic** [1] - 133:9
**photo** [11] - 13:2, 13:4, 13:19, 13:20, 26:23, 28:1, 50:15, 142:24, 143:3, 214:5, 224:10
**Photograph** [2] - 5:5, 13:12
**Photographs** [2] - 5:4, 132:7
**photos** [6] - 122:20, 124:17, 124:23, 131:24, 142:19, 144:16
**physical** [1] - 92:4
**physically** [2] - 41:13, 41:24
**PIC** [2] - 202:5, 202:7
**pick** [1] - 55:18
**picture** [26] - 63:2, 64:3, 64:5, 64:6, 64:18, 64:20, 64:24, 77:2, 77:7, 84:5, 84:6, 84:19, 84:20, 84:24, 85:8, 86:12, 86:18, 86:25, 87:20, 89:9, 143:11, 146:13, 146:17, 146:19, 146:24
**pictures** [9] - 62:24, 66:17, 90:23, 123:1, 123:20, 123:24, 125:7, 125:14, 142:3
**piece** [1] - 190:12
**pieced** [1] - 196:9
**pieces** [1] - 215:24
**pile** [1] - 78:6
**Pill** [2] - 3:17, 70:4
**pill** [24] - 32:24, 46:19, 58:19, 58:22, 58:25, 59:1, 59:5, 59:12, 59:15, 59:22, 59:23, 60:14, 60:16, 62:4, 64:9, 72:3, 72:8, 72:11, 83:1, 83:2, 83:4, 87:22, 95:1, 143:11
**pills** [57] - 12:14, 55:21, 60:12, 62:25, 64:21, 65:1, 69:8, 69:9, 69:19, 69:22, 71:13, 71:24, 73:18, 74:25, 84:13, 84:16, 87:2, 87:11, 87:12, 87:14, 87:19, 88:1, 88:2, 88:5, 88:18, 88:25, 89:2, 89:8, 89:14, 89:17, 89:23, 89:24, 90:9, 90:12, 90:13, 90:18, 90:21, 90:23, 91:4, 91:19, 91:22, 94:18, 94:22, 95:19, 102:17, 102:21, 139:20, 143:4, 145:1, 148:9, 149:8, 149:15, 156:15, 204:7, 204:10
**pitch** [3] - 17:19, 17:24, 18:3
**place** [7] - 98:9, 98:13, 99:20, 126:6, 163:12, 207:1, 207:2
**placed** [1] - 40:11
**places** [1] - 217:13
**planning** [1] - 105:17
**plant** [2] - 16:14, 145:1
**planted** [1] - 140:13
**plastic** [1] - 14:21
**plate** [1] - 114:1
**play** [1] - 66:9
**PM** [2] - 1:6, 234:16
**PMBs** [1] - 23:12
**PO** [6] - 130:19, 188:23, 191:15, 206:5, 206:6, 206:8
**pocket** [1] - 15:20
**POGOZELSKI** [300] - 3:3, 3:5, 3:9, 3:10, 3:11, 6:7, 6:12, 6:16, 6:22, 7:11, 12:24, 13:1, 13:7, 13:14, 13:17, 13:18, 14:1, 14:5, 14:15, 16:9, 16:11, 18:7, 18:14, 18:23, 19:11, 19:15, 21:7, 21:11, 21:13, 21:17, 21:24, 22:1, 22:2, 22:19, 26:4, 32:7, 32:12, 34:24, 35:16, 44:16, 44:18, 49:1, 49:10, 51:24, 52:1, 52:16, 92:3, 104:4, 104:15, 104:17, 109:17, 109:23, 122:15, 122:17, 122:23, 123:8, 123:25, 124:10, 124:15, 131:20, 131:23, 132:2, 132:9, 137:6, 137:8, 137:23, 138:6, 138:8, 138:10, 140:21, 140:23, 141:23, 142:1, 142:7, 142:14, 142:17, 142:18, 143:6, 143:8, 143:13, 143:14, 143:20, 143:22, 144:2, 144:9, 144:12, 144:14, 147:2, 147:3, 148:3, 148:5, 148:18, 149:1, 149:6, 149:7, 149:16, 149:18, 150:3, 150:4, 150:9, 150:10, 157:2, 157:4, 157:9, 157:11, 157:18, 158:1, 159:11, 159:13, 161:17, 161:20, 162:9, 162:11, 162:13, 162:18, 163:1, 164:21, 164:22, 165:3, 166:1, 166:8, 166:15, 166:18, 167:1, 167:8, 167:9, 167:12, 167:14, 168:15, 168:16, 169:5, 169:7, 169:16, 169:21, 170:8, 171:16, 171:19, 172:6, 172:17, 173:2, 173:9, 173:12, 173:17, 173:21, 174:7, 174:8, 174:15, 174:16, 174:23, 175:1, 175:6, 175:9, 175:14, 175:21, 176:1, 178:3, 178:5, 178:12, 178:19, 178:21, 182:17, 182:19, 182:25, 183:7, 184:1, 184:3, 184:11, 184:18, 185:13, 187:2, 187:4, 187:10, 187:17, 187:19, 188:3, 188:4,

188:11, 188:12, 188:15, 188:17, 189:4, 189:7, 190:17, 190:20, 190:25, 191:7, 191:17, 191:18, 192:17, 192:18, 192:22, 192:24, 193:4, 193:11, 193:12, 194:22, 194:23, 195:1, 195:3, 195:8, 195:15, 196:20, 196:22, 197:3, 197:10, 197:14, 198:9, 198:11, 198:17, 198:24, 199:1, 200:2, 200:5, 200:14, 201:1, 201:3, 201:10, 201:17, 204:2, 204:3, 204:25, 205:3, 205:10, 205:17, 207:23, 208:1, 208:7, 208:11, 208:13, 208:16, 209:1, 209:5, 209:11, 209:13, 209:18, 210:1, 210:5, 210:6, 211:2, 211:4, 211:11, 211:12, 211:16, 211:17, 212:14, 212:16, 212:25, 213:7, 213:9, 213:13, 213:15, 214:15, 214:17, 214:21, 215:3, 215:5, 216:3, 216:5, 216:12, 216:13, 217:6, 217:7, 217:17, 217:19, 217:23, 218:5, 220:18, 220:20, 221:4, 221:11, 222:13, 222:15, 222:20, 223:2, 223:5, 225:16, 225:18, 225:24, 226:6, 226:24, 227:1, 227:7, 227:14, 228:15, 228:17, 228:21, 229:3, 229:5, 229:8, 230:5, 230:8, 230:11, 230:15, 230:21, 231:3, 231:25, 232:1, 233:14, 234:10, 234:13

**Pogozelski** [2] - 1:13, 230:3

**point** [35] - 9:13, 16:18, 17:5, 21:8, 32:11, 47:4, 48:12, 61:18, 67:10, 67:12, 67:23, 72:22, 74:12, 82:15, 114:11, 117:19, 134:24, 135:2, 141:17, 151:3, 153:4, 160:3, 162:2, 162:7, 177:20, 178:24, 179:3, 179:16, 183:13, 185:6, 212:4, 212:8, 221:17, 222:2, 231:7

**pointer** [1] - 168:24

**points** [1] - 158:21

**Police** [2] - 105:10, 105:11

**policy** [1] - 12:7

**polling** [3] - 6:15, 93:20, 166:7

**pop** [1] - 120:22

**population** [1] - 9:24

**portal** [11] - 40:5, 40:7, 40:12, 40:21, 41:3, 41:11, 41:12, 42:6, 42:7, 42:14, 51:10

**position** [5] - 106:12, 107:6, 128:9, 194:16, 194:18

**positions** [1] - 106:15

**positive** [2] - 9:20, 54:15

**possession** [2] - 142:21, 231:20

**possible** [4] - 163:21, 186:8, 228:7, 229:5

**possibly** [1] - 81:23

**potential** [3] - 30:18, 181:16, 182:4

**potentially** [6] - 47:1, 132:13, 140:10, 140:14, 145:10, 176:13

**practice** [2] - 129:16, 216:25

**practices** [3] - 24:6, 110:6, 154:11

**pre** [1] - 151:16

**pre-approval** [1] - 151:16

**predetermines** [1] - 38:4

**preempt** [1] - 105:4

**prefer** [1] - 194:3

**preference** [1] - 110:5

**preferred** [2] - 48:20, 118:4

**premium** [2] - 25:17, 26:19

**PrEP** [2] - 47:4, 58:1

**prepared** [8] - 98:2, 98:4, 170:14, 170:17, 170:21, 170:25, 171:2, 172:24

**prepares** [1] - 170:19

**prescribe** [1] - 100:20

**prescribed** [2] - 78:11, 96:2

**prescription** [17] - 9:6, 9:9, 49:23, 52:11, 55:15, 55:17, 55:18, 56:1, 56:4, 66:10, 76:14, 76:24, 77:12, 77:22, 77:25, 102:23, 120:6

**prescriptions** [5] - 9:1, 11:12, 11:17, 56:8, 76:11

**presence** [12] - 6:14, 6:20, 74:24, 91:16, 93:8, 93:19, 93:24, 95:6, 165:9, 166:6, 166:12, 233:19

**present** [6] - 6:4, 92:8, 165:21

**presentation** [3] - 59:4, 59:11, 59:21

**presented** [1] - 152:16

**pressure** [6] - 9:10, 117:6, 117:16, 161:5, 161:14, 161:15

**pressured** [1] - 117:4

**pretrial** [1] - 138:1

**pretty** [13] - 9:11, 24:16, 56:22, 60:12, 60:20, 61:6, 61:15, 155:9, 165:1, 183:17, 185:19, 186:21, 204:7

**prevent** [1] - 47:5

**preventative** [1] - 11:14

**previous** [9] - 90:15, 90:25, 91:7, 102:2, 117:3, 129:15, 176:22, 177:10, 210:19

**previously** [6] - 12:17, 87:12, 87:17, 90:19, 97:10, 216:11

**price** [14] - 20:6, 20:9, 20:18, 33:19, 34:19, 34:21, 34:23, 35:3, 35:4, 36:21, 38:14, 39:11, 43:18, 43:20

**prices** [2] - 38:11, 44:8

**pricing** [14] - 10:18, 11:1, 11:3, 11:8, 18:10, 19:25, 20:8, 20:15, 21:2, 37:12, 43:1, 43:9, 151:1, 151:2

**primacy** [1] - 182:8

**primarily** [5] - 108:19, 110:25, 133:2, 190:10, 200:18

**primary** [2] - 10:11, 106:16

**private** [1] - 106:21

**proactively** [1] - 155:25

**problem** [16] - 31:21, 32:17, 32:23, 44:4, 45:5, 79:25, 80:22, 80:23, 82:7, 118:7, 118:8, 118:10, 147:25, 156:15, 179:9, 216:21

**problematic** [1] - 32:22

**problems** [5] - 45:8, 51:7, 125:25, 135:6, 150:16

**procedures** [2] - 19:6, 128:24

**proceed** [3] - 53:13, 59:5, 104:15

**proceeding** [1] - 6:13

**proceedings** [1] - 234:18

**process** [10] - 48:17, 51:17, 107:15, 132:22, 163:23, 177:20, 187:25, 226:14, 232:4, 232:25

**processed** [1] - 19:22

**processing** [2] - 16:14, 111:14

**producing** [1] - 145:14

**product** [28] - 31:19, 31:20, 32:22, 33:20, 39:7, 42:13, 45:5, 45:11, 45:13, 49:12, 50:19, 111:15, 120:4, 148:1, 148:2, 148:7, 148:11, 150:5, 173:20, 177:11, 181:6, 181:8, 219:2, 219:10, 231:21, 232:7

**products** [10] - 32:16, 106:17, 106:23, 116:9, 188:9, 199:8, 200:16, 202:19, 231:19, 231:24

**profit** [1] - 48:12

**program** [5] - 15:8, 15:16, 105:24, 106:25, 114:24

**programs** [6] - 15:6, 15:7, 24:17, 26:2, 26:3, 26:8

**prohibited** [2] - 181:5, 181:14

**projects** [1] - 114:12

**promoted** [5] - 8:9, 112:18, 112:20, 112:24, 113:3

**promotion** [1] - 112:22

**prosecutors** [1] - 98:6

**prove** [2] - 19:5, 219:16

**provide** [15] - 29:25, 129:6, 129:12, 159:9, 160:13, 160:15, 161:23, 175:2, 177:12, 179:22, 189:12, 191:10, 193:25, 206:6, 206:15

**provided** [43] - 121:9, 121:12, 121:23, 122:5, 126:12, 126:22, 127:2, 127:14, 129:14, 130:23, 134:3, 134:12, 136:3, 136:10, 136:14, 142:20, 143:10, 159:24, 160:10, 160:18, 171:7, 171:25, 172:19, 173:4, 173:22, 174:2, 176:10, 177:2, 177:9, 201:24, 205:18, 206:3, 207:14, 210:25, 215:24, 219:4, 221:15, 221:21, 222:2, 223:21, 227:18, 227:19, 233:3

**providers** [2] - 9:1, 121:20

**providing** [12] - 136:25, 168:4, 168:7, 168:13, 174:21, 179:11, 185:7, 189:8, 209:9, 221:23, 221:24,

222:5
**provision** [1] - 180:14
**psychiatric** [3] - 62:13, 105:25, 139:13
**psychology** [1] - 105:21
**psychotic** [2] - 72:3, 83:11
**public** [4] - 40:1, 105:23, 106:6, 106:10
**publish** [11] - 13:14, 21:24, 63:25, 124:10, 138:6, 142:14, 144:9, 175:22, 178:19, 197:11, 197:13
**Publish** [5] - 124:12, 138:9, 142:16, 144:11, 175:24
**pull** [29] - 12:24, 14:1, 14:3, 112:3, 122:15, 137:6, 138:20, 140:21, 141:23, 148:3, 150:9, 157:2, 162:11, 165:3, 166:16, 167:12, 169:12, 171:6, 178:3, 187:2, 188:15, 196:20, 201:2, 209:11, 225:16, 226:24, 228:15, 229:6, 230:13
**pulled** [2] - 127:13, 170:3
**pulling** [1] - 195:22
**purchase** [28] - 10:10, 10:15, 10:25, 11:21, 17:21, 19:25, 20:24, 30:9, 30:14, 35:25, 52:11, 111:10, 116:23, 117:1, 150:21, 150:22, 151:18, 177:1, 177:16, 179:19, 188:10, 188:23, 217:10, 218:17, 227:23, 229:10, 229:14, 229:15
**purchased** [16] - 11:7, 30:20, 45:20, 51:22, 111:25, 126:7, 132:18, 169:1, 169:2, 174:10, 174:11, 174:17, 177:3, 218:16, 227:19
**purchaser** [1] - 213:16
**purchases** [6] - 118:14, 167:16, 206:16, 223:19, 224:19, 226:15
**purchasing** [12] - 11:8, 19:18, 20:24, 23:13, 30:18, 37:12, 167:24, 167:25, 179:19, 181:21, 200:17, 214:1
**purported** [1] - 206:16
**purportedly** [1] - 198:2
**purpose** [1] - 190:8
**purposes** [1] - 25:21
**pursue** [2] - 119:3, 151:18
**put** [19] - 23:9, 28:14, 39:15, 40:13, 41:3, 41:11, 41:12, 54:24, 57:17, 65:10, 86:7, 86:24, 109:9, 109:25, 123:20, 123:23, 128:9, 151:12, 180:20
**puts** [2] - 55:20, 78:18
**putting** [4] - 25:20, 109:18, 161:15, 194:15

## Q

**quality** [2] - 51:1, 139:19
**quantity** [4] - 129:17, 130:15, 167:18, 188:20
**quarantine** [1] - 231:21
**quarterly** [1] - 109:7
**queens** [2] - 56:12, 56:13
**questioning** [10] - 18:21, 44:25, 45:2, 47:18, 50:10, 69:16, 117:20, 137:2, 150:15, 230:9
**questions** [26] - 44:19, 44:21, 46:7, 47:16, 50:8, 52:16, 54:10, 76:8, 83:21, 92:14, 92:16, 92:20, 98:7, 102:14, 102:16, 102:18, 103:4, 103:16, 121:15, 124:1, 128:11, 134:11, 146:25, 148:6, 233:14, 234:11
**quick** [1] - 213:8
**quickly** [4] - 127:6, 154:17, 224:2, 230:6
**quieted** [1] - 156:8
**quit** [1] - 151:13
**quite** [3] - 110:25, 116:24, 170:23
**quitting** [1] - 151:16
**quoting** [1] - 182:1

## R

**radiation** [1] - 106:25
**raise** [2] - 92:12, 146:23
**raised** [2] - 119:5, 229:13
**raising** [4] - 128:12, 128:19, 226:19, 228:10
**ramped** [1] - 116:1
**ran** [2] - 133:3, 134:19
**random** [1] - 37:8
**randomly** [1] - 153:17
**rang** [3] - 126:14, 202:14, 215:15
**range** [1] - 180:11
**ranks** [1] - 9:20
**Rapids** [1] - 120:20
**rarely** [2] - 42:12, 52:2
**rates** [1] - 9:20
**rather** [4] - 92:21, 110:3, 110:4, 224:2
**reach** [11] - 10:24, 21:8, 42:15, 96:5, 126:13, 126:19, 127:1, 135:22, 177:3, 231:5, 231:7
**reached** [4] - 16:24, 47:20, 183:22, 202:25
**reaching** [3] - 21:14, 126:25, 211:23
**reaction** [2] - 70:16, 185:17
**read** [8] - 75:7, 75:9, 77:14, 77:17, 158:3, 201:20, 218:8, 223:10
**ready** [3] - 90:9, 90:13, 117:14
**real** [8] - 34:23, 35:3, 35:4, 35:7, 37:7, 40:10, 64:1, 213:8
**Real** [1] - 180:18
**real-life** [1] - 37:7
**real-world** [1] - 40:10
**realize** [1] - 205:24
**realized** [1] - 82:6
**realizing** [1] - 47:7
**really** [22] - 37:11, 42:12, 46:25, 48:6, 61:23, 82:1, 90:5, 94:7, 101:5, 101:10, 145:4, 153:1, 154:20, 154:24, 178:2, 178:25, 179:2, 185:23, 199:9, 199:15, 206:4
**reason** [8] - 31:14, 33:18, 42:14, 51:1, 89:14, 89:24, 118:8, 194:8
**reasonable** [1] - 208:21
**reasons** [3] - 29:17, 44:7, 119:14
**rebate** [4] - 11:9, 36:3, 36:4, 36:10
**rebates** [5] - 11:5, 11:7, 35:15, 35:23, 35:25
**receipt** [3] - 130:9, 188:19, 189:19
**receivable** [1] - 158:3
**receive** [13] - 11:24, 12:3, 12:11, 12:19, 33:7, 51:10, 56:20, 65:25, 78:6, 135:24, 139:10, 195:21, 233:6
**Received** [1] - 173:18
**received** [116] - 12:16, 13:11, 13:12, 13:21, 13:25, 21:21, 21:23, 28:5, 51:14, 58:10, 62:25, 63:21, 63:23, 64:7, 64:14, 69:3, 70:3, 70:4, 71:25, 73:19, 75:4, 89:25, 90:12, 91:3, 94:17, 94:19, 94:24, 96:1, 100:8, 101:17, 101:19, 101:20, 101:23, 102:2, 102:17, 103:17, 124:7, 124:8, 130:23, 132:6, 132:8, 138:3, 138:5, 142:11, 142:12, 144:6, 144:8, 148:22, 148:23, 150:19, 157:5, 157:22, 157:23, 162:22, 162:23, 164:10, 167:5, 167:6, 172:13, 172:14, 175:18, 175:19, 178:16, 178:18, 183:4, 183:5, 184:15, 184:16, 186:6, 187:14, 187:15, 188:22, 189:3, 189:5, 190:3, 190:11, 191:4, 191:5, 191:20, 191:21, 193:8, 193:9, 195:12, 195:14, 197:7, 197:8, 197:17, 198:21, 198:23, 201:14, 201:16, 205:14, 205:16, 206:24, 209:22, 209:24, 212:11, 213:4, 213:5, 214:25, 215:1, 215:23, 218:2, 218:4, 221:8, 221:9, 222:24, 223:1, 226:3, 226:5, 227:11, 227:13, 228:25, 229:1, 230:25, 231:1
**receiving** [12] - 63:14, 69:4, 126:7, 128:22, 130:4, 139:20, 156:10, 178:24, 182:14, 192:11, 196:12, 232:14
**recent** [5] - 98:13, 114:24, 130:9, 219:6, 229:14
**recently** [1] - 164:12
**recess** [5] - 165:7, 165:18, 233:16, 234:9, 234:15
**reciprocal** [1] - 163:13
**recognize** [6] - 13:2, 63:9, 67:6, 67:18, 122:20, 169:8
**recognized** [2] - 127:18, 139:14
**recommendations** [2] - 102:20, 204:15
**record** [9] - 6:3, 16:10, 92:6, 92:7, 104:12, 154:1, 165:19, 165:20, 206:4
**records** [6] - 49:23, 112:1, 172:5, 190:6, 231:18, 232:6
**recoup** [1] - 33:22
**red** [15] - 21:3, 26:24, 41:14, 64:9, 81:5, 87:14, 88:1, 88:18, 89:2, 89:8, 89:23, 90:18, 146:23, 181:19
**reddish** [7] - 58:23,

87:9, 87:10, 87:11
**redirect** [2] - 44:15, 102:8
**REDIRECT** [4] - 3:5, 3:8, 44:17, 102:10
**reference** [7] - 110:9, 174:12, 190:11, 191:12, 191:14, 206:5, 211:7
**referencing** [2] - 212:22, 216:10
**referred** [2] - 183:20, 231:16
**referring** [4] - 193:17, 200:10, 216:8, 224:13
**refill** [1] - 100:24
**reflect** [2] - 16:10, 129:15
**reflected** [1] - 170:5
**reflecting** [1] - 192:10
**reflection** [1] - 172:1
**refresh** [1] - 75:4
**refreshes** [1] - 75:10
**refusing** [1] - 194:9
**regarding** [3] - 176:9, 214:19, 232:24
**regardless** [1] - 185:22
**regards** [1] - 188:2
**registered** [2] - 223:17, 224:8
**registrant** [2] - 219:3, 219:6
**registration** [2] - 218:11, 219:5
**Rego** [1] - 197:25
**regular** [4] - 51:20, 59:22, 64:6, 107:14
**regularly** [1] - 156:13
**regulating** [1] - 182:9
**regulations** [1] - 108:17
**regulatory** [3] - 106:16, 107:12, 107:21
**reimbursed** [1] - 25:3
**reimbursement** [2] - 46:8, 47:21
**reimbursements** [3] - 25:10, 47:16, 47:17
**reimburses** [1] - 43:10
**relate** [2] - 30:11, 46:8
**related** [1] - 148:2
**relating** [3] - 38:23, 42:10, 92:17
**relation** [2] - 56:12, 207:16
**relationship** [13] - 33:8, 37:20, 37:21, 37:24, 37:25, 38:1, 42:3, 119:4, 126:5, 152:19, 152:25, 153:5, 183:18
**relationships** [2] - 35:21, 154:8
**relatively** [2] - 9:23, 187:23
**relay** [1] - 224:6
**relaying** [4] - 19:13, 184:7, 221:1, 223:6
**Relevance** [1] - 91:9
**relevance** [3] - 95:14, 96:16, 172:10
**relied** [1] - 133:11
**reliever** [1] - 139:16
**rely** [1] - 160:20
**remain** [1] - 156:6
**remained** [2] - 156:12, 218:14
**Remedy** [1] - 149:24
**remember** [36] - 17:23, 44:25, 47:18, 50:2, 50:9, 54:22, 57:22, 58:11, 60:22, 60:23, 60:24, 61:14, 63:14, 69:4, 77:1, 77:3, 83:10, 88:4, 88:8, 88:14, 89:21, 91:15, 101:10, 101:12, 102:18, 103:6, 108:8, 110:8, 113:4, 114:10, 148:8, 149:25, 155:8, 160:23, 165:8, 233:18
**remembered** [1] - 62:3
**reminder** [1] - 138:8
**remote** [2] - 152:2, 152:5
**remove** [2] - 69:25, 85:20
**removed** [8] - 85:11, 85:13, 85:15, 85:16, 85:18, 86:19, 99:25, 103:11
**repeat** [3] - 26:6, 87:13, 90:11
**repeating** [1] - 19:16
**repercussions** [2] - 139:18, 182:1
**repetitive** [1] - 30:25
**replaced** [1] - 113:8
**report** [6] - 110:18, 150:6, 181:7, 195:23, 195:25, 196:4
**REPORTED** [1] - 2:1
**reported** [4] - 154:22, 180:11, 180:15, 231:22
**reporter** [5] - 7:8, 53:8, 57:3, 105:3, 201:20
**Reporter** [2] - 2:3, 234:22
**reporting** [3] - 105:14, 105:15, 232:4
**representing** [1] - 45:18
**reps** [5] - 17:18, 17:24, 19:17, 22:6, 22:9
**reps'** [1] - 18:3
**request** [1] - 206:2
**requesting** [2] - 95:22, 189:12
**requests** [1] - 118:6
**require** [3] - 23:13, 23:14, 160:24
**required** [15] - 19:3, 19:4, 23:17, 34:21, 41:2, 49:25, 105:16, 123:22, 123:23, 126:7, 177:12, 179:22, 223:20, 223:25
**requirement** [5] - 41:24, 120:7, 127:9, 128:23, 179:11
**requirements** [4] - 105:15, 180:4, 180:5, 181:3
**resale** [1] - 224:1
**research** [9] - 33:20, 33:24, 62:4, 105:14, 105:16, 106:14, 106:21, 145:10
**reselling** [1] - 181:6
**resemble** [1] - 131:24
**reserve** [1] - 49:8
**residential** [1] - 125:2
**resolved** [2] - 188:1, 199:20
**Resources** [2] - 105:10, 105:11
**respect** [2] - 114:22, 159:7
**respond** [4] - 22:17, 183:11, 210:20, 231:13
**responded** [1] - 191:14
**responding** [2] - 61:4, 210:22
**responds** [1] - 188:5
**response** [21] - 138:22, 145:3, 145:25, 150:19, 156:2, 163:16, 176:23, 182:14, 183:12, 194:2, 195:21, 205:21, 209:8, 216:6, 216:17, 217:8, 217:12, 217:15, 224:25, 226:11, 232:14
**responses** [3] - 118:6, 126:14, 194:12
**responsibilities** [1] - 108:18
**responsibility** [3] - 106:16, 157:14, 233:4
**responsible** [1] - 27:14
**rest** [1] - 75:15
**restaurant** [1] - 54:8
**restroom** [1] - 165:5
**resume** [1] - 233:22
**retail** [2] - 8:25, 16:25
**retrieve** [1] - 172:1
**return** [9] - 12:9, 30:4, 30:8, 49:12, 50:24, 52:6, 113:9, 202:19, 233:14
**returned** [2] - 49:21, 178:25
**returns** [2] - 204:5, 204:6
**review** [2] - 157:15, 193:13
**reviewed** [1] - 113:11
**reviewing** [1] - 111:23
**revised** [1] - 226:9
**rheapatonis** [1] - 133:9
**rhetorical** [1] - 150:20
**righty** [1] - 138:19
**rise** [1] - 233:24
**risk** [1] - 60:13
**rochester** [1] - 213:20
**Rochester** [3] - 214:3, 215:12, 231:5
**role** [7] - 108:18, 110:17, 110:24, 118:3, 118:15, 119:12, 159:6
**roof** [1] - 145:14
**room** [2] - 165:10, 233:21
**rough** [1] - 125:4
**roughly** [2] - 17:23, 109:4
**rows** [2] - 167:23, 168:1
**RPR** [2] - 2:2, 234:21
**rude** [1] - 153:20
**rules** [4] - 24:7, 179:3, 179:6, 180:23
**ruling** [1] - 93:6
**running** [1] - 116:7
**rush** [1] - 213:23
**rushed** [1] - 161:2
**RX** [11] - 197:23, 202:10, 202:12, 202:13, 202:16, 202:20, 202:22, 203:10, 229:19
**Rx** [1] - 202:10

## S

**S-L** [1] - 158:5
**Safe** [57] - 17:16, 17:18, 18:4, 20:1, 21:2, 24:11, 29:16, 30:18, 49:2, 105:1, 105:2, 106:8, 107:2, 107:7, 107:16, 107:24, 108:19, 108:23, 110:17, 111:13, 112:8, 112:18, 114:21, 115:21, 125:8, 127:13, 127:16, 129:16, 130:10, 130:12, 141:17, 152:14, 152:19, 152:25, 153:3, 154:2, 154:6, 155:22, 156:5, 167:16, 169:24, 170:1, 170:3, 171:11, 171:25, 172:5, 172:24, 173:14, 174:17, 177:16, 180:13, 182:11, 192:7, 199:20, 214:12, 220:21, 233:4
**safe** [6] - 19:5, 24:6, 92:4, 199:13
**safety** [8] - 31:13, 32:16, 46:9, 46:10, 51:1, 106:23, 106:24, 106:25
**said/she** [1] - 220:3
**salary** [3] - 108:14, 109:4, 151:11
**Sales** [1] - 149:22
**sales** [27] - 17:18, 17:24, 18:3, 19:17, 22:6, 22:9, 107:23, 107:25, 110:7, 110:8, 111:1, 111:2, 117:7, 117:14, 118:17, 127:6, 127:10, 152:24,

153:18, 155:18, 156:16, 161:8, 161:12, 183:19, 190:6, 194:16
**salespeople** [2] - 149:21, 193:17
**salesperson** [3] - 193:22, 193:23, 195:17
**Salisbury** [1] - 7:24
**Sameer** [3] - 187:20, 187:21, 188:5
**sample** [2] - 134:9, 191:11
**satisfied** [2] - 216:17, 217:15
**saw** [16] - 28:1, 59:7, 70:16, 72:7, 84:22, 84:24, 99:7, 114:14, 118:21, 164:11, 171:10, 171:15, 183:10, 208:17, 208:21
**scanned** [5] - 160:13, 160:18, 160:20, 163:6
**scared** [1] - 61:20
**scary** [1] - 61:19
**scattershot** [1] - 44:20
**Schizophrenia** [1] - 83:3
**schizophrenia** [3] - 62:5, 82:16, 82:23
**school** [3] - 7:25, 8:3, 105:20
**science** [1] - 8:1
**scratched** [2] - 12:6, 52:5
**screen** [2] - 63:10, 64:3
**screenshot** [2] - 202:4, 231:9
**screenshots** [2] - 205:19, 205:22
**scroll** [21] - 137:18, 142:17, 143:3, 143:6, 143:13, 145:21, 146:8, 149:17, 150:3, 157:10, 159:11, 160:16, 168:15, 174:7, 174:23, 176:2, 176:19, 187:18, 197:15, 213:13, 215:3
**seal** [4] - 80:3, 80:11, 80:12, 80:17
**sealed** [13] - 12:12, 13:23, 55:21, 55:22, 55:23, 58:17, 59:2, 59:21, 80:14, 80:15, 80:19, 80:21, 81:6
**search** [2] - 145:11, 155:9
**searching** [1] - 202:22
**season** [1] - 82:8
**seat** [2] - 7:6, 53:6
**seated** [1] - 16:6
**second** [12] - 28:1, 59:6, 94:25, 131:6, 135:8, 135:10, 147:4, 200:2, 201:4, 210:5, 226:7, 229:4
**secondary** [7] - 27:23, 28:9, 30:19, 40:23, 45:8, 51:17, 51:18
**Section** [1] - 179:23
**sector** [2] - 105:23, 106:7
**secured** [1] - 151:7
**Security** [5] - 169:24, 179:6, 179:20, 179:25, 182:5
**see** [58] - 12:21, 13:22, 16:3, 33:15, 40:21, 62:2, 62:8, 63:10, 63:15, 64:3, 64:8, 64:24, 65:4, 65:17, 65:19, 65:22, 67:11, 67:16, 68:4, 69:1, 77:7, 77:10, 85:17, 85:22, 86:12, 86:15, 86:18, 91:16, 92:2, 99:25, 119:8, 138:19, 146:25, 151:21, 161:21, 164:16, 165:9, 165:16, 168:23, 169:13, 171:9, 176:20, 180:18, 199:2, 199:3, 203:12, 204:20, 207:18, 211:5, 218:11, 218:13, 219:3, 224:4, 226:8, 234:5
**seeing** [2] - 92:22, 119:25
**seek** [1] - 232:24
**seeking** [3] - 54:4, 71:2, 71:11
**seem** [8] - 118:1, 134:20, 145:6, 154:3, 154:7, 154:16, 164:1, 216:24
**Seeram** [1] - 202:6
**seized** [1] - 172:8
**seizure** [1] - 151:3
**selective** [1] - 92:22
**self** [1] - 15:5
**self-pay** [1] - 15:5
**sell** [8] - 15:22, 18:8, 49:18, 130:14, 153:1, 202:18, 223:16, 224:7
**selling** [8] - 22:9, 36:25, 45:9, 115:19, 116:15, 168:11, 180:25, 224:1
**sells** [1] - 74:6
**send** [35] - 12:8, 14:6, 40:14, 45:13, 63:2, 63:3, 63:4, 64:21, 66:17, 67:21, 67:22, 67:24, 68:1, 72:6, 78:12, 81:1, 85:18, 85:20, 86:11, 91:22, 95:23, 110:4, 112:1, 135:8, 146:3, 155:13, 159:24, 163:6, 178:22, 211:13, 211:21, 216:7, 216:15, 232:17
**sending** [19] - 32:18, 78:17, 96:6, 96:10, 126:11, 126:15, 126:16, 128:2, 129:7, 129:18, 146:24, 156:17, 160:6, 190:8, 210:10, 210:18, 224:3, 226:8, 226:9
**sends** [2] - 91:24, 224:4
**sense** [10] - 12:22, 20:13, 20:14, 117:12, 117:15, 141:14, 180:8, 180:21, 213:25, 220:3
**sent** [36] - 13:24, 68:5, 69:10, 69:19, 69:22, 73:7, 85:6, 85:22, 85:24, 86:1, 88:8, 95:22, 99:20, 99:21, 100:3, 100:22, 142:19, 155:14, 155:25, 166:19, 175:10, 176:3, 178:6, 179:2, 179:8, 185:3, 187:5, 190:12, 191:11, 193:18, 195:23, 196:4, 205:4, 205:8, 226:13, 233:7
**separate** [3] - 58:5, 58:7, 155:3
**separated** [1] - 14:20
**separation** [2] - 155:22, 156:5
**September** [5] - 1:5, 196:3, 197:2, 201:8
**sequential** [1] - 139:5
**serial** [1] - 13:23
**serialization** [1] - 181:5
**serious** [6] - 103:2, 139:18, 179:9, 181:18, 181:20, 182:1
**Seroquel** [8] - 82:19, 82:24, 83:9, 143:12, 145:7, 145:20, 146:15, 147:4
**server** [1] - 54:8
**service** [4] - 27:19, 56:17, 81:2, 202:4
**session** [3] - 98:5, 98:9, 98:13
**set** [3] - 10:18, 39:15, 48:16
**several** [7] - 60:22, 97:12, 100:6, 134:1, 152:23, 154:13, 154:14
**shampoos** [1] - 9:3
**share** [7] - 121:1, 121:4, 125:12, 154:18, 186:19, 215:10, 231:23
**shared** [6] - 122:8, 125:14, 208:4, 208:19, 214:6, 218:18
**Sharpie** [1] - 57:16
**Shield** [1] - 15:17
**shift** [1] - 114:23
**ship** [2] - 10:19, 16:15
**shipment** [1] - 210:10
**shipments** [3] - 28:8, 181:7, 210:19
**shipped** [5] - 10:20, 14:16, 117:14, 192:14, 194:6
**shipping** [2] - 119:20, 127:6
**shocked** [2] - 72:2, 72:8
**short** [4] - 106:13, 116:5, 216:1, 229:9
**short-staffed** [1] - 116:5
**shortly** [2] - 113:6, 233:21
**show** [24] - 21:11, 63:6, 70:11, 84:13, 85:3, 143:21, 169:6, 175:7, 177:10, 182:17, 184:2, 188:18, 190:18, 192:22, 195:1, 198:9, 204:25, 207:23, 212:14, 214:15, 217:17, 219:20, 220:18, 222:13
**showed** [10] - 26:23, 50:15, 67:6, 71:1, 71:12, 71:24, 75:3, 98:25, 99:4, 138:24
**showing** [4] - 67:12, 138:23, 167:16, 177:2
**shown** [1] - 99:7
**shows** [1] - 188:19
**Shukurov** [1] - 158:6
**side** [6] - 111:17, 115:2, 127:25, 135:19, 229:6
**side-by-side** [1] - 229:6
**significantly** [1] - 115:24
**signs** [1] - 125:9
**similar** [10] - 59:8, 124:17, 124:23, 131:18, 132:21, 134:4, 134:5, 147:25, 191:21, 195:25
**simple** [1] - 155:9
**single** [2] - 65:10, 100:17
**sit** [1] - 61:1
**site** [1] - 192:15
**sites** [2] - 108:25, 109:3
**sitting** [3] - 79:16, 79:17, 103:5
**situation** [2] - 151:12, 220:4
**six** [1] - 78:5
**skills** [1] - 135:22
**skip** [3] - 60:8, 60:9, 203:4
**sleep** [3] - 61:4, 61:22, 82:2
**sleuthing** [1] - 207:16
**slow** [2] - 57:2, 105:4
**slowly** [1] - 201:19
**small** [6] - 9:24, 20:11, 64:1, 105:19, 129:17, 132:13
**Smith** [1] - 105:20
**snag** [2] - 133:3, 134:20
**sneaky** [1] - 153:14
**so..** [1] - 150:21

**software** [13] - 17:3, 111:14, 111:20, 114:17, 114:19, 114:21, 115:5, 115:13, 127:9, 129:15, 171:4, 177:19
**softwares** [1] - 114:23
**sold** [14] - 9:2, 116:11, 120:1, 130:10, 171:23, 189:9, 189:22, 189:24, 191:23, 192:8, 192:9, 198:2, 203:9, 227:24
**soliciting** [1] - 18:21
**solution** [1] - 164:4
**Solutions** [8] - 17:16, 106:8, 112:9, 115:22, 153:3, 169:24, 182:11, 192:7
**somber** [1] - 224:2
**someone** [16] - 34:18, 81:24, 85:18, 113:10, 121:16, 130:16, 135:18, 146:11, 176:9, 176:15, 176:16, 181:25, 183:18, 186:4, 202:16
**sometime** [5] - 84:11, 137:17, 186:3, 186:10, 186:13
**sometimes** [7] - 57:8, 65:13, 65:24, 66:3, 121:10, 121:22, 130:15
**somewhere** [2] - 78:19, 218:25
**soon** [2] - 116:25, 204:6
**SOPs** [1] - 160:24
**sorry** [35] - 17:10, 29:11, 32:5, 42:19, 54:6, 56:10, 58:6, 59:16, 63:25, 67:25, 70:8, 84:9, 85:14, 94:12, 97:22, 101:7, 105:3, 120:19, 123:10, 137:23, 138:8, 148:2, 149:11, 163:12, 167:21, 172:6, 202:7, 202:9, 203:5, 208:9, 213:8, 216:16, 227:15, 227:18, 230:11
**sort** [6] - 23:24, 27:19, 33:10, 73:10, 119:6, 135:5
**sorted** [1] - 135:23
**sound** [1] - 18:1
**sounded** [2] - 120:21, 215:16
**sounds** [2] - 24:15, 204:7
**sourced** [1] - 177:15
**sources** [1] - 115:7
**sourcing** [2] - 128:4, 204:21
**SOUTHERN** [1] - 1:1
**Southern** [1] - 234:23
**spaces** [1] - 125:22
**Spanish** [4] - 133:12, 133:13, 135:18, 135:22
**Spanish-speaking** [2] - 135:18, 135:22
**SPEAKER** [1] - 99:2
**speaking** [8] - 11:1, 121:7, 121:9, 133:13, 135:18, 135:22, 154:10, 169:10
**specialize** [1] - 111:12
**specialized** [1] - 111:8
**specific** [4] - 11:9, 43:17, 180:5, 206:9
**specifies** [1] - 181:13
**speculation** [1] - 200:12
**spell** [3] - 7:8, 53:8, 104:12
**spend** [3] - 44:6, 111:22, 111:23
**spent** [1] - 117:9
**spoken** [1] - 126:22
**spot** [1] - 230:3
**spreading** [2] - 47:5, 47:6
**Spreadsheet** [2] - 3:24, 189:5
**spreadsheet** [11] - 167:10, 167:12, 167:15, 167:16, 188:13, 188:18, 188:19, 189:8, 189:13, 190:8, 196:1
**spring** [3] - 111:6, 113:6, 115:20
**springtime** [1] - 113:2
**squeaky** [1] - 180:22
**stacking** [2] - 91:1, 91:2
**staff** [1] - 116:6
**staffed** [1] - 116:5
**stage** [1] - 41:4
**Stain** [2] - 202:10, 203:10
**stamp** [2] - 83:1, 83:2
**stand** [2] - 42:23, 60:21
**standard** [3] - 20:4, 20:15, 128:24
**standards** [2] - 46:7, 46:8
**standing** [1] - 80:7
**standpoint** [3] - 29:21, 32:16, 41:11
**stands** [2] - 23:6, 202:8
**Stanley** [1] - 202:14
**star** [1] - 27:19
**start** [13] - 22:3, 46:20, 48:16, 54:19, 63:25, 107:2, 115:18, 127:16, 140:3, 151:9, 152:15, 161:12, 213:21
**started** [16] - 9:15, 17:9, 17:12, 47:23, 48:6, 48:13, 48:17, 55:3, 108:16, 108:17, 117:19, 130:4, 141:4, 154:7, 164:23, 174:20
**starting** [6] - 48:2, 48:14, 108:14, 109:4, 186:13, 209:9
**starts** [1] - 181:12
**state** [13] - 7:7, 9:22, 15:15, 23:14, 23:15, 53:7, 104:12, 107:13, 108:17, 108:19, 161:19, 163:13, 182:9
**State** [2] - 105:9, 106:11
**statement** [7] - 71:15, 173:19, 173:25, 175:4, 181:5, 184:7
**statements** [3] - 18:12, 72:14, 221:1
**STATES** [3] - 1:1, 1:4, 1:10
**states** [1] - 108:21
**States** [11] - 1:14, 2:4, 20:13, 23:25, 27:10, 53:23, 54:1, 55:2, 104:4, 181:13, 234:22
**statute** [1] - 180:1
**statutory** [1] - 180:5
**stay** [3] - 49:3, 151:5, 151:8
**stayed** [1] - 61:6
**steep** [1] - 116:10
**steeply** [1] - 48:20
**STENOGRAPHICALLY** [1] - 2:1
**step** [3] - 52:18, 104:1, 133:3
**steps** [3] - 127:19, 130:5, 159:19
**steroid** [1] - 9:4
**stick** [1] - 93:6
**sticker** [5] - 65:14, 85:11, 85:16, 86:19, 99:24
**stickers** [1] - 65:15
**sticking** [1] - 114:16
**sticky** [1] - 50:21
**still** [13] - 10:20, 22:14, 24:20, 27:25, 29:3, 66:6, 90:22, 90:23, 91:4, 108:22, 118:23, 165:22, 171:11
**stipulate** [1] - 16:8
**stipulation** [1] - 172:7
**stock** [2] - 14:24, 50:2
**stockpile** [1] - 78:5
**storage** [3] - 58:8, 89:15, 132:15
**Store** [1] - 8:14
**stored** [5] - 218:23, 218:24, 219:8, 219:20
**stores** [2] - 223:16, 224:8
**stories** [1] - 140:8
**strange** [1] - 159:4
**strategic** [1] - 105:17
**Street** [2] - 1:15, 1:19
**stress** [1] - 8:10
**structure** [1] - 109:7
**stuck** [1] - 141:5
**studies** [1] - 105:21
**stuff** [9] - 9:3, 9:17, 24:7, 31:13, 42:9, 143:2, 200:8, 200:15, 217:13
**subcontracted** [1] - 27:14
**subcontracts** [1] - 27:16
**subject** [1] - 35:21
**submit** [3] - 156:25, 231:24, 232:19
**submitted** [2] - 123:18, 232:21
**subpoena** [1] - 7:17
**subpoenaed** [1] - 104:18
**subsequently** [1] - 200:23
**subsidized** [2] - 26:3, 26:8
**subsidizing** [2] - 25:22, 26:15
**subsumed** [1] - 18:24
**success** [1] - 126:25
**successful** [2] - 201:25, 211:23
**suggest** [2] - 82:10, 163:18
**suggested** [1] - 81:10
**suggesting** [1] - 156:4
**suggestion** [2] - 149:12, 164:14
**sum** [2] - 168:22, 168:23
**summer** [2] - 113:14, 114:17
**Sunday** [1] - 46:23
**supervisor** [2] - 206:1
**supplied** [1] - 11:25
**supplier** [7] - 22:15, 116:17, 117:3, 131:14, 152:7, 206:10, 206:12
**suppliers** [8] - 117:19, 120:15, 120:18, 120:24, 121:8, 126:1, 139:5, 153:10
**supplies** [1] - 111:9
**Supply** [5] - 169:24, 179:6, 179:20, 179:25, 182:4
**supply** [4] - 33:13, 57:6, 182:9, 182:12
**support** [2] - 113:10, 215:22
**supporting** [1] - 206:16
**supposed** [4] - 38:1, 96:10, 227:23, 229:14
**supposedly** [1] - 159:8
**surrounding** [1] - 125:3
**suspend** [1] - 181:7
**suspicious** [2] - 214:2, 229:21
**sustain** [3] - 48:23, 69:17, 75:14
**sustained** [23] - 18:6, 18:13, 19:10, 21:6, 32:9, 32:14, 68:22, 70:19, 73:13, 73:25, 74:9, 81:12, 83:17, 93:3, 98:22, 109:16, 109:22, 124:2, 169:20, 200:13, 208:15, 208:24, 209:4
**switched** [2] - 114:23
**switchover** [1] - 48:4

**sworn** [3] - 7:3, 53:3, 104:8
**symptoms** [1] - 61:14
**Symtuza** [3] - 10:1, 58:2, 58:3
**Synergy** [9] - 120:19, 133:19, 133:25, 134:9, 134:17, 135:8, 135:24, 136:15
**Syntex** [1] - 120:19
**system** [26] - 11:14, 23:25, 26:15, 26:19, 32:17, 39:8, 39:15, 112:3, 112:11, 115:1, 115:6, 127:9, 127:25, 129:15, 163:25, 169:12, 170:4, 170:16, 171:3, 171:4, 171:5, 171:24, 177:19, 193:20, 203:11, 203:13
**Systems** [1] - 111:16
**systems** [2] - 111:17, 114:21

## T

**T-R-I-S-S-E-L** [1] - 7:9
**T3** [71] - 3:18, 12:21, 40:11, 40:16, 40:22, 42:14, 50:13, 50:16, 119:18, 119:23, 126:8, 129:6, 129:12, 130:22, 130:24, 131:7, 132:25, 134:9, 134:18, 135:8, 135:16, 135:24, 136:15, 159:9, 169:11, 169:22, 171:3, 171:6, 172:14, 172:19, 173:3, 173:6, 174:21, 175:3, 176:10, 176:24, 177:2, 181:3, 186:6, 191:10, 191:20, 192:8, 192:14, 194:6, 199:10, 207:19, 211:7, 211:19, 212:6, 212:20, 212:22, 213:11, 213:14, 213:21, 214:3, 215:8, 215:9, 215:24, 216:15, 216:23, 217:4, 223:18, 224:18, 224:21, 225:2, 227:18, 227:19, 229:23, 231:9, 231:11
**T3s** [106] - 12:19, 41:2, 41:13, 41:15, 41:17, 41:21, 50:9, 50:25, 51:10, 52:3, 111:14, 111:18, 111:23, 120:5, 121:9, 121:11, 127:2, 127:4, 127:12, 127:19, 127:20, 127:22, 127:24, 128:1, 128:2, 128:5, 128:13, 128:20, 128:22, 129:8, 129:14, 129:20, 129:23, 130:4, 130:8, 130:20, 132:21, 133:6, 133:9, 133:17, 134:2, 134:6, 134:14, 136:24, 139:6, 160:7, 160:10, 168:4, 168:8, 168:13, 169:13, 170:1, 171:7, 173:14, 174:2, 176:10, 176:11, 177:9, 177:25, 180:13, 180:14, 181:22, 183:13, 185:7, 186:4, 186:15, 187:23, 190:15, 192:19, 193:19, 193:25, 195:20, 195:21, 195:24, 196:5, 196:8, 197:17, 200:21, 201:21, 201:23, 203:20, 204:19, 205:19, 206:13, 206:19, 207:2, 207:13, 209:7, 209:10, 210:3, 210:9, 210:10, 210:24, 212:11, 214:19, 215:23, 219:12, 221:17, 221:24, 222:2, 222:5, 226:9, 229:21, 232:9, 232:12, 233:11
**T3S** [2] - 221:20, 221:23
**table** [1] - 118:14
**talks** [1] - 28:17
**tampered** [2] - 13:25, 45:11
**tampering** [1] - 140:14
**Target** [1] - 8:12
**task** [1] - 128:7
**taxpayers** [4] - 26:3, 26:9, 26:11, 26:21
**team** [15] - 111:1, 114:9, 117:7, 152:24, 155:4, 155:14, 156:16, 161:8, 183:19, 186:1, 187:24, 194:16, 231:17, 233:2
**Teams** [34] - 4:13, 4:14, 4:15, 4:16, 4:17, 4:19, 4:20, 4:21, 117:12, 125:16, 137:11, 137:16, 138:4, 143:23, 144:7, 161:8, 162:14, 184:4, 192:25, 193:9, 195:4, 195:13, 195:18, 198:12, 198:22, 209:14, 209:23, 212:22, 220:21, 222:16, 222:25, 227:2, 227:12, 231:4
**template** [3] - 134:12, 134:16, 134:23
**ten** [2] - 156:22, 182:16
**ten-year** [1] - 156:22
**tenure** [2] - 113:23, 181:9
**term** [3] - 31:2, 31:10, 42:21
**terms** [5] - 9:20, 119:17, 125:11, 134:5, 167:24
**terrible** [1] - 128:9
**terribly** [1] - 129:12
**testified** [11] - 7:4, 52:2, 53:4, 97:20, 100:5, 104:9, 107:1, 124:23, 137:13, 139:4, 173:22
**testify** [5] - 97:25, 98:2, 98:6, 98:20, 104:19
**testimony** [10] - 88:9, 90:2, 91:25, 92:1, 97:10, 165:13, 172:23, 234:2
**testing** [2] - 106:16, 106:19
**Tex** [1] - 120:20
**text** [7] - 142:3, 144:15, 190:22, 191:8, 220:14, 225:13
**Text** [4] - 4:24, 4:25, 142:12, 191:5
**THE** [184] - 1:10, 1:13, 6:3, 6:11, 6:14, 6:19, 7:5, 7:6, 7:9, 13:11, 13:16, 14:14, 16:10, 18:6, 18:13, 18:25, 19:10, 19:13, 21:6, 21:21, 21:25, 22:21, 26:5, 28:12, 32:9, 32:14, 34:25, 35:18, 44:15, 48:23, 49:9, 51:25, 52:18, 53:5, 53:6, 53:9, 53:10, 53:11, 53:12, 53:14, 63:21, 67:11, 67:14, 68:16, 68:22, 69:17, 69:23, 70:1, 70:3, 70:19, 70:23, 71:16, 71:20, 72:16, 73:4, 73:13, 73:25, 74:9, 75:14, 75:20, 79:7, 81:12, 83:1, 83:17, 83:19, 83:22, 83:24, 85:4, 86:9, 86:23, 89:6, 90:3, 91:10, 91:19, 91:21, 91:22, 91:24, 91:25, 92:5, 92:7, 92:18, 92:24, 93:6, 93:11, 93:14, 93:18, 93:22, 95:6, 95:15, 96:8, 96:18, 97:1, 98:22, 99:17, 100:16, 102:8, 104:1, 104:10, 104:11, 104:13, 109:16, 109:22, 123:2, 123:3, 123:6, 123:14, 124:2, 124:5, 124:7, 124:11, 132:6, 137:22, 138:2, 138:7, 142:11, 142:15, 144:5, 144:10, 148:22, 157:22, 162:6, 162:22, 165:7, 165:12, 165:15, 165:16, 165:20, 165:23, 165:24, 166:4, 166:6, 166:11, 167:5, 169:20, 170:11, 171:18, 171:20, 171:22, 172:3, 172:9, 172:12, 173:1, 175:18, 175:23, 178:16, 178:20, 183:4, 184:15, 185:12, 187:14, 188:24, 189:3, 191:4, 193:8, 195:12, 197:7, 197:12, 198:21, 200:13, 201:14, 205:14, 208:15, 208:24, 209:4, 209:22, 213:2, 213:4, 214:25, 218:2, 221:8, 222:24, 226:3, 227:11, 228:25, 230:3, 230:7, 230:10, 230:25, 233:16, 233:24, 234:1, 234:5, 234:12, 234:15
**themselves** [6] - 12:4, 15:8, 27:14, 33:14, 41:25, 45:4
**thereafter** [1] - 233:21
**therefore** [1] - 231:20
**Thereupon** [3] - 7:1, 53:1, 104:6
**they've** [2] - 36:11, 229:19
**thinking** [2] - 33:16, 96:22
**third** [4] - 9:21, 135:24, 136:1, 136:15
**thousands** [1] - 27:10
**three** [15] - 20:13, 22:12, 27:3, 30:4, 49:12, 49:16, 55:5, 78:8, 78:23, 79:21, 79:22, 129:7, 168:9, 181:15, 215:19
**three-month** [1] - 30:4
**throughout** [2] - 11:21, 11:24
**ties** [1] - 13:23
**tired** [1] - 61:3
**title** [3] - 105:13, 108:16, 110:25
**Tivicay** [3] - 10:1, 149:9, 156:15
**today** [9] - 84:25, 97:20, 98:2, 98:15, 98:16, 99:9, 104:19, 185:1, 234:11
**together** [6] - 28:24, 76:21, 86:25, 97:15, 190:13, 196:10
**ton** [1] - 110:7
**tongue** [2] - 60:25, 61:17
**took** [21] - 58:16, 59:8,

59:22, 60:1, 60:16, 62:4, 77:19, 77:21, 84:6, 84:11, 87:3, 87:22, 95:12, 98:9, 98:13, 100:8, 102:17, 207:1, 207:2
**top** [18] - 20:12, 28:17, 59:1, 85:16, 127:7, 138:11, 138:12, 143:2, 143:13, 145:22, 169:22, 175:12, 176:19, 179:17, 188:11, 204:4, 228:11, 228:14
**topic** [2] - 153:16, 195:17
**Total** [1] - 149:24
**totally** [2] - 33:15, 58:16
**totes** [1] - 13:21
**touch** [1] - 215:12
**touched** [1] - 199:12
**towards** [1] - 199:2
**town** [3] - 9:17, 9:24, 16:15
**Trace** [12] - 111:16, 111:19, 111:20, 112:3, 112:12, 119:17, 127:13, 169:12, 170:4, 170:15, 171:24, 193:20
**traceable** [1] - 120:12
**Track** [12] - 111:16, 111:19, 111:20, 112:3, 112:12, 119:17, 127:13, 169:12, 170:4, 170:15, 171:24, 193:20
**track** [1] - 154:1
**tracking** [2] - 111:21, 128:23
**trading** [1] - 140:10
**trail** [3] - 120:3, 199:12, 206:10
**train** [1] - 116:5
**transaction** [21] - 42:17, 121:12, 126:6, 127:15, 130:14, 130:17, 136:3, 173:19, 181:4, 181:5, 191:22, 191:25, 192:2, 206:5, 207:1, 207:2, 211:23, 215:13, 231:17, 232:6
**Transaction** [1] - 173:19
**transactions** [13] - 40:20, 129:15, 132:23, 170:4, 171:7, 172:2, 175:2, 177:10, 200:8, 207:12, 215:8, 215:22, 226:15
**TRANSCRIPT** [1] - 1:9
**transcription** [1] - 234:18
**transfer** [1] - 218:13
**transferred** [2] - 8:11, 17:8
**transfers** [1] - 219:5
**transition** [2] - 17:6, 115:1
**transitioned** [1] - 113:21
**transmitted** [2] - 112:5, 112:8
**transparent** [3] - 206:23, 220:1, 232:5
**transport** [1] - 26:25
**travels** [1] - 119:25
**treated** [2] - 231:21, 232:7
**treatment** [2] - 72:15, 211:25
**TRIAL** [1] - 1:9
**trial** [1] - 233:22
**tried** [7] - 10:22, 17:7, 60:22, 158:16, 183:23, 202:22, 211:22
**TRISSELL** [2] - 3:3, 7:2
**Trissell** [13] - 6:12, 6:22, 7:9, 7:12, 7:14, 7:20, 13:2, 13:19, 14:6, 15:25, 28:21, 44:19, 52:17
**true** [3] - 71:21, 173:25, 175:3
**trustworthy** [1] - 154:3
**truth** [1] - 71:17
**truthful** [3] - 173:14, 219:11, 224:21
**Truvada** [1] - 10:1
**try** [17] - 17:21, 18:8, 50:24, 52:14, 59:18, 115:7, 115:16, 118:13, 121:17, 126:19, 130:13, 130:16, 130:18, 132:21, 179:16, 203:2
**trying** [22] - 16:24, 16:25, 22:12, 61:17, 71:7, 116:5, 116:13, 118:11, 126:10, 126:13, 127:1, 133:5, 134:14, 134:19, 135:17, 145:9, 162:7, 176:16, 199:20, 213:21, 219:15, 226:14
**Tuesday** [1] - 180:24
**turn** [3] - 138:16, 152:6, 220:2
**turned** [1] - 24:11
**turning** [2] - 154:17, 156:24
**twice** [3] - 94:24, 95:9, 95:17
**twist** [1] - 13:23
**two** [43] - 16:12, 26:23, 64:8, 64:19, 64:22, 69:8, 69:9, 76:21, 78:17, 78:20, 78:24, 79:3, 82:5, 86:24, 88:9, 91:19, 97:16, 97:17, 106:4, 106:14, 111:17, 120:20, 126:6, 129:13, 129:17, 139:12, 141:2, 155:17, 156:8, 167:25, 168:3, 197:25, 199:7, 203:19, 204:4, 204:6, 204:7, 205:19, 207:2, 212:11, 229:9, 229:11
**Tylenol** [1] - 9:4
**type** [8] - 32:18, 62:13, 68:8, 71:8, 72:21, 83:8, 83:9, 157:15
**types** [2] - 32:21, 127:22
**typical** [1] - 9:2
**typically** [5] - 111:10, 111:25, 119:6, 122:4, 135:5

## U

**U.S** [1] - 234:23
**ultimately** [5] - 24:4, 25:14, 25:23, 43:24, 150:22
**UMD** [1] - 8:8
**unable** [1] - 136:25
**under** [8] - 128:23, 144:22, 145:13, 146:22, 165:22, 174:25, 182:10, 197:21
**undergrad** [1] - 8:1
**underlying** [1] - 45:2
**underneath** [1] - 28:21
**understaffed** [1] - 113:24
**understood** [5] - 39:21, 100:2, 141:22, 152:11, 159:7
**undertaking** [1] - 177:23
**unfortunately** [1] - 54:4
**unheard** [2] - 129:13, 185:24
**unique** [1] - 46:5
**UNITED** [3] - 1:1, 1:4, 1:10
**United** [11] - 1:14, 2:4, 20:13, 23:25, 27:10, 53:23, 54:1, 55:2, 104:4, 181:13, 234:22
**University** [2] - 7:25, 8:2
**unkept** [1] - 125:4
**unknown** [2] - 160:2, 222:10
**unless** [4] - 25:19, 40:23, 144:25
**unlikely** [3] - 145:1, 145:6, 145:9
**unlimited** [1] - 138:17
**unnecessary** [3] - 96:11, 146:23
**unprofessional** [1] - 153:19
**unsuccessful** [4] - 121:18, 126:14, 126:21, 135:19
**unsuccessfully** [1] - 158:19
**unusual** [3] - 129:16, 132:10, 152:17
**up** [107] - 10:18, 12:24, 14:1, 14:3, 15:2, 15:4, 19:17, 26:20, 28:14, 39:15, 41:4, 41:17, 52:6, 55:18, 60:12, 60:20, 60:23, 62:23, 76:8, 80:5, 82:6, 84:20, 86:24, 91:1, 91:2, 94:25, 101:4, 105:6, 109:5, 115:7, 116:1, 116:7, 118:14, 118:21, 120:22, 120:25, 121:24, 122:1, 122:3, 122:4, 122:12, 122:15, 124:18, 124:19, 124:25, 131:18, 131:25, 134:19, 136:12, 137:6, 138:15, 138:20, 138:22, 138:23, 138:24, 140:21, 141:23, 145:2, 146:2, 148:3, 157:2, 159:11, 159:21, 161:11, 162:11, 164:2, 165:3, 166:16, 167:12, 174:25, 176:19, 176:22, 177:21, 178:3, 179:4, 179:10, 180:24, 182:15, 182:20, 183:9, 185:3, 186:14, 187:2, 188:3, 188:11, 188:15, 194:3, 196:20, 199:10, 200:21, 201:2, 202:1, 202:12, 205:25, 209:11, 213:8, 214:8, 215:14, 216:4, 216:12, 221:14, 225:16, 226:24, 227:25, 228:15, 229:6, 230:13
**update** [2] - 127:25, 129:14
**updated** [1] - 176:11
**uploaded** [1] - 51:13
**UPS** [1] - 28:8
**upstairs** [1] - 125:21
**Upstate** [1] - 105:19
**urgency** [6] - 117:12, 117:15, 161:11, 180:8, 210:12, 213:25
**urgent** [1] - 177:5
**uses** [1] - 26:25
**usual** [2] - 60:19, 186:2
**Utah** [7] - 137:1, 137:4, 138:15, 138:20, 161:19, 192:15
**utilized** [1] - 114:21

## V

**valid** [2] - 108:22, 133:4
**validate** [1] - 181:22

**validity** [1] - 120:3
**value** [1] - 132:18
**van** [1] - 138:20
**vans** [1] - 27:9
**variety** [2] - 106:22, 107:13
**various** [10] - 103:16, 105:25, 117:18, 122:1, 135:4, 139:5, 139:24, 152:17, 152:18, 153:10
**VAWD** [11] - 18:18, 19:2, 19:7, 19:19, 19:24, 23:4, 23:20, 24:12, 30:16, 46:7, 46:8
**vehicles** [1] - 27:13
**vendor** [22] - 116:22, 117:2, 122:4, 123:19, 124:20, 125:25, 127:1, 131:16, 152:16, 156:25, 157:12, 157:15, 159:14, 159:16, 161:3, 161:9, 161:17, 164:7, 164:11, 188:22, 202:19, 207:16
**vendors** [27] - 111:25, 112:6, 112:11, 116:13, 117:5, 117:11, 118:6, 118:13, 118:21, 121:8, 122:1, 122:3, 129:13, 129:17, 132:23, 135:4, 137:1, 150:17, 150:23, 151:1, 152:18, 154:5, 171:4, 184:22, 196:16, 199:11, 220:2
**verification** [2] - 134:5, 163:25
**Verified** [1] - 23:7
**verified** [1] - 134:17
**Verified-Accredited** [1] - 23:7
**verify** [33] - 40:19, 77:24, 118:11, 118:13, 121:12, 130:5, 130:8, 130:13, 130:16, 130:18, 130:21, 132:21, 132:25, 133:5, 133:8, 134:14, 136:3, 136:25, 159:23, 160:25, 199:12, 201:23, 202:10, 203:1, 203:9, 210:11, 211:22, 212:5, 213:21, 215:7, 215:11, 215:13, 226:14
**verifying** [3] - 122:5, 130:10, 206:24
**version** [20] - 130:23, 130:25, 135:8, 135:10, 135:24, 136:1, 136:15, 160:15, 163:6, 170:20, 170:21, 170:24, 191:19, 206:19, 211:19, 212:8, 212:12, 227:22, 228:1
**versions** [5] - 181:22, 197:16, 221:23, 229:9, 232:11
**versus** [2] - 20:12, 200:10
**via** [3] - 121:17, 158:25, 231:22
**video** [1] - 138:20
**viewed** [1] - 180:21
**views** [1] - 34:11
**ViiV** [9] - 10:8, 10:9, 45:22, 46:2, 148:1, 148:2, 148:6, 150:5, 197:20
**viral** [3] - 46:18, 46:20, 60:11
**visit** [1] - 82:13
**vitamins** [1] - 55:17
**voicemail** [2] - 202:6, 205:24
**VOIR** [4] - 3:10, 3:11, 123:15, 170:12
**voir** [1] - 123:1
**Volume** [1] - 1:7
**voluntarily** [1] - 7:14
**vs** [1] - 1:5

## W

**WAC** [20] - 34:5, 34:19, 35:7, 35:12, 35:20, 35:21, 36:7, 36:8, 36:15, 37:6, 37:7, 37:20, 37:24, 38:2, 38:4, 38:11, 38:23, 39:13, 39:17, 39:22
**wait** [4] - 6:6, 59:15, 59:18, 62:14
**waiting** [2] - 6:4, 103:19
**waits** [2] - 223:16, 224:7
**waive** [3] - 6:15, 93:19, 166:7
**wake** [2] - 60:20, 60:23
**walked** [2] - 98:17, 151:13
**wants** [1] - 26:18
**warehouse** [9] - 10:19, 13:24, 51:21, 108:24, 108:25, 109:2, 125:23, 132:15, 137:2
**warned** [1] - 48:14
**waterfall** [1] - 16:19
**watermark** [3] - 58:25, 62:3, 83:4
**ways** [1] - 185:20
**wear** [1] - 62:14
**website** [7] - 40:12, 40:21, 121:24, 136:11, 136:14, 202:23, 215:21
**websites** [1] - 136:8
**week** [2] - 156:8, 168:2
**week's** [1] - 15:2
**weekend** [3] - 233:17, 233:23, 234:7
**weekly** [2] - 114:8, 114:11
**weeks** [4] - 78:18, 78:20, 78:24, 176:8
**weird** [1] - 145:5
**wheel** [1] - 180:22
**white** [16] - 55:24, 58:22, 58:25, 84:16, 87:2, 87:22, 88:2, 88:5, 88:12, 88:24, 89:13, 89:17, 89:24, 90:21, 91:4
**White** [2] - 143:15, 145:18
**white-looking** [1] - 84:16
**whole** [12] - 11:8, 20:9, 23:24, 26:15, 44:4, 46:18, 47:4, 67:22, 67:23, 67:24, 69:13, 199:18
**Wholesale** [2] - 23:7, 187:22
**wholesale** [17] - 10:15, 17:8, 17:13, 17:14, 20:10, 23:18, 34:9, 38:14, 43:18, 43:20, 108:1, 115:3, 133:12, 159:24, 180:4, 181:1, 227:20
**wholesaler** [16] - 10:11, 10:22, 33:14, 40:23, 42:5, 125:5, 130:17, 160:13, 163:21, 198:7, 201:25, 202:6, 223:17, 224:1, 224:8, 224:15
**Wholesaler** [3] - 192:3, 202:1, 202:3
**wholesalers** [11] - 15:23, 24:7, 27:23, 28:9, 30:19, 45:8, 49:19, 51:17, 51:18, 125:10, 202:18
**Wholesalers** [4] - 133:19, 133:20, 133:25, 198:4
**widespread** [1] - 47:1
**WILLIAM** [1] - 1:10
**William** [3] - 1:17, 2:3, 105:20
**wish** [1] - 138:20
**wished** [1] - 155:23
**witness** [46] - 6:11, 6:21, 12:25, 21:11, 52:20, 63:6, 67:13, 92:14, 92:16, 104:3, 122:16, 131:21, 137:7, 140:22, 141:24, 143:21, 148:4, 157:2, 162:12, 165:4, 166:16, 169:6, 175:7, 178:4, 182:17, 184:2, 187:3, 190:18, 192:22, 195:1, 196:20, 196:21, 198:10, 201:2, 204:25, 207:23, 208:12, 209:12, 212:14, 214:16, 217:18, 220:18, 222:14, 225:17, 228:16, 230:14
**WITNESS** [16] - 3:2, 7:5, 7:9, 53:5, 53:9, 53:11, 91:21, 91:24, 104:10, 104:13, 123:3, 123:6, 165:15, 165:23, 171:22, 234:5
**witness's** [1] - 172:11
**witnessed** [1] - 32:3
**woes** [1] - 155:24
**woke** [1] - 82:6
**word** [4] - 33:16, 61:16, 133:11
**worded** [1] - 156:11
**words** [4] - 23:9, 31:12, 41:14, 156:10
**works** [4] - 25:9, 25:24, 33:13, 40:10
**world** [4] - 32:1, 34:11, 40:10, 40:11
**Worldwide** [7] - 119:7, 149:21, 152:16, 152:20, 152:21, 152:22, 154:16
**worried** [3] - 138:16, 138:24, 200:9
**worse** [1] - 48:15
**worth** [6] - 15:2, 30:14, 30:15, 49:5, 132:16, 150:17
**write** [11] - 137:20, 145:23, 146:13, 179:17, 188:8, 194:10, 210:15, 211:9, 217:8, 228:6, 231:15
**writes** [3] - 65:8, 199:6, 204:4
**writing** [17] - 22:13, 109:10, 110:1, 110:9, 138:13, 144:18, 176:7, 176:21, 184:24, 187:20, 199:5, 210:8, 215:6, 218:6, 219:7, 221:12, 227:16
**written** [8] - 65:21, 66:10, 66:11, 76:25, 77:7, 77:13, 77:22
**wrote** [12] - 176:8, 179:18, 184:25, 194:5, 205:23, 215:7, 217:9, 218:10, 221:14, 226:13, 227:18, 231:16

## X

**X3-something** [1] - 59:1
**XR** [2] - 143:12, 144:20

## Y

**Yahoo** [1] - 121:20
**year** [14] - 16:19, 48:14, 55:4, 77:21, 100:9, 100:17, 101:11, 109:5, 151:10, 151:20, 156:22, 159:9, 181:15, 228:8

**years** [21] - 8:23, 11:20, 11:24, 33:20, 51:5, 52:8, 52:10, 52:13, 53:24, 54:13, 54:14, 54:18, 54:23, 58:21, 74:15, 99:11, 100:6, 100:19, 101:8, 106:4, 181:15
**yesterday** [2] - 98:14, 218:20
**York** [9] - 53:20, 53:21, 53:22, 105:19, 160:24, 163:13, 166:19, 197:25, 215:20
**yourself** [2] - 63:12, 153:20

## Z

**Zimet** [9] - 1:21, 28:12, 44:22, 50:8, 83:22, 92:24, 93:7, 93:25, 172:9
**ZIMET** [119] - 3:4, 3:7, 3:10, 3:11, 6:9, 6:17, 13:9, 14:12, 16:8, 18:5, 18:11, 18:20, 18:24, 19:8, 21:5, 21:19, 28:13, 28:16, 32:10, 32:15, 35:1, 35:17, 35:19, 44:14, 48:22, 49:8, 63:19, 67:9, 67:12, 68:15, 68:18, 68:21, 69:16, 70:18, 71:14, 71:18, 71:22, 72:13, 73:12, 73:24, 74:8, 75:13, 83:23, 84:2, 85:3, 85:5, 86:14, 86:24, 87:1, 89:5, 89:7, 90:8, 92:25, 93:9, 93:12, 93:21, 94:1, 95:8, 95:16, 96:9, 96:19, 98:23, 99:1, 99:3, 99:16, 99:18, 101:2, 102:7, 109:15, 109:21, 122:25, 123:5, 123:7, 123:12, 123:16, 124:4, 132:4, 137:25, 142:9, 144:4, 148:20, 157:20, 162:5, 162:20, 166:2, 166:9, 167:3, 169:18, 170:10, 170:13, 172:10, 172:22, 175:16, 178:14, 183:2, 184:13, 185:11, 187:12, 189:1, 191:2, 193:7, 195:11, 197:5, 198:20, 201:13, 205:12, 208:9, 208:12, 208:14, 208:23, 209:20, 214:23, 217:25, 221:6, 222:22, 226:1, 227:9, 228:23, 230:23
**Zingo** [1] - 183:19
**zoom** [13] - 149:6, 149:16, 174:15, 201:9, 203:15, 204:2, 211:2, 211:11, 216:3, 216:12, 217:6, 223:3, 231:25