UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-205500 Dimitrouleas/Hunt

UNITED STATES OF AMERICA, Fort Lauderdale, Florida

September 25, 2025

vs.

10:05 AM - 4:56 PM

PATRICK BOYD and CHARLES BOYD, Volume V

Defendants. Pages 1 to 243

---

# TRANSCRIPT OF JURY TRIAL
## BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
## UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
Alexander Pogozelski, Esquire
Jacqueline DerOvanesian, Esquire
Assistant United States Attorneys
99 NE 4th Street
Miami, Florida 33132

FOR DEFENDANT PATRICK BOYD:
William Barzee, Esquire
Ivlis Mantilla, Esquire
Barzee Flores
40 NW 3rd Street Ph 1
Miami, Florida 33128

FOR DEFENDANT CHARLES BOYD:
Bruce Zimet, Esquire
633 S. Federal Highway Fl 6
Fort Lauderdale, Florida 33301

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

# I N D E X


| WITNESS: | PAGE: |
|---|---|
| MARTHA RUMORE | |
| DIRECT EXAMINATION BY MS. DEROVANESIAN: | 10 |
| CROSS-EXAMINATION BY MR. BARZEE: | 202 |


\- - -

# E X H I B I T S

\- - -


| Number | Description | Page |
|---|---|---|
| Government's No. 203 | Email | 81 |
| Government's No. 204 | Email | 71 |
| Government's No. 205 | Email | 96 |
| Government's No. 206 | Email | 103 |
| Government's No. 207 | Email | 105 |
| Government's No. 208 | Email | 108 |
| Government's No. 209 | Email | 112 |
| Government's No. 225 | Email | 117 |
| Government's No. 237 | Email | 122 |
| Government's No. 245 | Email | 154 |
| Government's No. 269 | Email | 160 |
| Government's No. 273 | Email | 158 |
| Government's No. 320 | Email | 125 |
| Government's No. 322 | Email | 173 |
| Government's No. 323 | Email | 176 |
| Government's No. 324 | Email | 182 |

| | | |
|---|---|---|
| Government's No. 328 | Memo | 22 |
| Government's No. 329 | Document | 18 |
| Government's No. 333 | Email | 180 |

(Call to the Order of the Court.)

THE COURT: We're back on the record. Counsel are present. Defendants are present.

Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: Yes, Your Honor.

The Government had filed a motion to admit certain exhibits. These were financial records, Verizon Wireless call records for which we have a stipulation as to admissibility. It would have come in through the agent.

And then the second category has to do with evidence seized from Safe Chain. We had a stipulation as to authenticity as to these exhibits. These would have come in through, again, the agent or Abbie Divilio. And then to streamline things, we moved the Court to, at a minimum, provisionally admit these exhibits, so we can call our out-of-town traveling witness, who has to leave the country. And I don't know what the defense's position is on this, but they will, obviously, have the ability to cross-examine both the agent and Abbie Divilio on these documents in the second category. And they're all admissible because we have a stipulation on authenticity, and they are either statements of the defendants or emails or messages to the defendants that are not offered to prove the truth of the matter asserted but for notice, knowledge, intent.

THE COURT: Mr. Zimet.

MR. ZIMET: Your Honor, as to the first category, we agree there has been a stipulation as to the records that have been proffered by the Government.

As far as the second category, we have no objection, but we would request a cautionary instruction that the exhibits, the statements other than of the defendants, are not offered for the truth of the matter asserted in the statements.

THE COURT: Okay. Just when that's introduced, ask me for the curative instruction and I will give it.

MR. ZIMET: And I think that's going to be right at the very beginning; so, obviously, I will do that at that point.

THE COURT: Okay.

MR. ZIMET: The last category -- and this is more of a housekeeping issue -- there are Cellebrite printouts, if that's the right term or not, that is part of what the Government's going to move into evidence.

I'm concerned that the pages that we have might not necessarily be the correct order of communications. I have no problem with them being introduced. I talked with the prosecutor before this exhibit, this part of the exhibit is presented to the jury.

If we get that far, we're going to review them and make sure they're in the proper order. We might have to reorganize what's been presented, but we have no objection to the

admissibility of them today.

THE COURT: Mr. Barzee.

MR. BARZEE: Same, Your Honor.

THE COURT: All right. So I will provisionally admit all these exhibits subject to a motion to strike if they're not tied up and subject to my giving the request for curative instruction.

I think we have all the jurors.

Mr. Medina's court date is October the 8th at -- no, October the 8th at 1:00. So what I'm going to tell him is we will take a long lunch break on October 8th, go to court. It's a preliminary hearing on a civil matter, and we'll call the county court judge and ask the judge to take his case first.

MR. ZIMET: Any feedback, Judge, on his health issue?

THE COURT: I guess he's here.

MR. ZIMET: Okay.

THE COURT: That's all I know.

Anything further before we bring in the jury?

MR. POGOZELSKI: Nothing from the Government. Thank you, Your Honor.

MR. ZIMET: No, sir.

MR. BARZEE: No, Your Honor.

THE COURT: If we have all the jurors, let's bring them in.

I have to break at 4:00 today. I've got a Zoom hearing

on the new courthouse that I can't miss.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. ZIMET: Yes, sir.

MR. POGOZELSKI: Yes, sir.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

Mr. Medina, I got your court date notice on October 8th at 1:00. It's just six blocks south of here in the county courthouse. We will take a longer lunch break that day. We'll call the county court judge and let them know that you're a juror in my case and ask them to take your case early.

Okay?

Are we going to call a witness out of turn?

MS. DEROVANESIAN: Yes, Your Honor.

THE COURT: Okay. The Government had to move some things around to account for scheduling and everything; so we're going to interrupt Ms. --

MR. POGOZELSKI: Divilio's testimony.

THE COURT: -- Ms. Divilio's testimony, take this witness's testimony, and then you can resume her testimony afterwards.

The Government may call its next witness.

MS. DEROVANESIAN: Thank you, Your Honor.

The Government calls Martha Rumore.

MR. POGOZELSKI: Your Honor, just to clarify: The exhibits in the Government's motion have been provisionally admitted subject to time or linking them up later?

THE COURT: Correct.

MR. POGOZELSKI: Okay. Thank you, Your Honor.

MR. ZIMET: Judge, we would ask for the instruction that we talked about earlier.

THE COURT: If those exhibits contain statements of people other than Mr. Patrick Boyd and Charles Boyd, they're offered for the fact that they were said, not for the truth of the matter asserted.

You may proceed.

Thereupon,

MARTHA RUMORE,

having been first duly sworn or affirmed, was examined and testified as follows:

THE WITNESS: I do.

COURTROOM DEPUTY: Please state your name and spell it for the court reporter.

THE WITNESS: Martha Rumore, M-A-R-T-H-A, R-U-M-O-R-E.

///

DIRECT EXAMINATION

BY MS. DEROVANESIAN:

Q. Good morning, Ms. Rumore.

A. Good morning.

Q. Could you please tell us where you're from?

A. New York.

Q. And can you tell us what you do for a living?

A. I'm an attorney.

Q. Can you tell us a little bit about your educational background as an attorney?

A. I have a JD from City University of New York, and I have an LLM in intellectual property from Benjamin School of Law.

Q. Can you tell us what an LLM is?

A. It's a master's of law, an advanced law degree.

Q. Okay. And what type of law do you practice?

A. Currently, I practice healthcare law; but, previously, I practiced intellectual property and healthcare.

Q. Ms. Rumore, could you please tell us what intellectual property law is?

A. It has to do with patents, trademarks, and copyrights.

Q. And what about healthcare law? What does that entail?

A. Healthcare law is very diversified. It's things like Medicare, Board of Pharmacy matters, manufacturers, wholesalers, regulations, FDA rules -- those types of things.

Q. What types of clients do you represent as a healthcare

lawyer?
A. It varies from individual pharmacists to large corporate entities.
Q. Okay. And could you just tell us a little bit about your work history as a healthcare lawyer and as a patent lawyer?
A. I started my career as an intellectual property attorney, and I worked at various law firms in intellectual property. And then in November of 2019, I worked for Frier Levitt as a healthcare attorney.
Q. And before you were an attorney, did you have a different career?
A. I also worked as a pharmacist. Early on in my career, I was a pharmacist. I practiced in a hospital as an oncology satellite pharmacist for 22 years at a single hospital on the weekends while I was a professor of pharmacy law at several colleges of pharmacy.
I also worked in the pharmaceutical industry in medication safety and drug regulatory affairs, pharmacovigilance.
Q. Ms. Rumore, did you also work as a professor?
A. Yes.
Q. What type of class did you teach?
A. I taught pharmacy law. I also taught drug regulatory affairs.
Q. Okay. And could you just tell us briefly about your educational background to become a pharmacist?

A. I had a BS in pharmacy from St. John's University. After that, I went another two years to complete the doctorate of pharmacy for the pharmacy degree at St. John's University, also.

And then after that, I went for a master's degree in drug information and biomedical communication.

Q. Okay. I would like to focus a little bit about your job as an attorney.

Are you familiar with a law firm called Frier Levitt?

A. Yes.

Q. How are you familiar with that law firm?

A. That was my previous employer.

Q. Can you tell us what type of work you did at this law firm?

A. That was healthcare law. It was some intellectual property, but it was mostly healthcare law. And my clients, as I mentioned, they were diversified from pharmacy -- Board of Pharmacy matters to manufacturers, all sorts of different DEA matters, all sorts of different healthcare-related matters.

Q. And, Ms. Rumore, do you still work at that law firm?

A. No.

Q. When did you leave?

A. August 6th, 2025.

Q. Okay. Could you tell us why you left that law firm?

A. I was let go.

Q. Do you know why?

A. I filed a complaint for age discrimination because they tried to fire my 72-year-old secretary, Yolanda. And when I stood up for her, things escalated. And then I'm also old, and it was age discrimination.

They wanted me to train my replacement and all sorts of things. So I filed a -- I have a pending matter, an EEOC matter pending for a claim for age discrimination.
Q. Ms. Rumore, are you working at a new law firm now?
A. Yes.
Q. And what law firm is that?
A. Health Law Alliance.
Q. What type of work are you doing at your current law firm?
A. It's health law.
Q. Is that the same kind of work that you were doing before?
A. Yes.
Q. Ms. Rumore, are you familiar with a company called Safe Chain Solutions?
A. Yes.
Q. How are you familiar with that company?
A. They were one of my clients.
Q. Was this when you worked at the Frier Levitt firm?
A. Yes.
Q. Could you tell us around what years that was that you represented them?
A. I think it was from August of 2020 to -- I think I stopped

doing work directly for them, I think it was 2022, maybe.
Q. Okay. And at first, when you first started working with Safe Chain in the summer of 2020, do you know which other lawyers were also working with this company?
A. Yes. My immediate boss, John Morrone.
Q. And has Mr. Morrone since passed away?
A. Yes.
Q. When did Mr. Morrone pass away?
A. November 16th, 2020.
Q. Okay. Ms. Rumore, could you please tell us who was your point of contact at the company Safe Chain?
A. It was Charlie Boyd and Abbie Divilio.
Q. Did you also interact with Patrick Boyd?
A. That was much later on, yes.
Q. Can you tell us, just generally, what was your understanding of what Safe Chain's business was?
A. They were a secondary to tertiary wholesaler, small wholesaler.
Q. Can you tell us what you mean by a secondary or a tertiary wholesaler?
A. There are large wholesalers in the country, and they -- a handful of large wholesalers, and then there are smaller wholesalers that also are licensed in all different states and everything. So they would be, like, a secondary -- they wouldn't be a large, well-known, you know, wholesaler. They

were smaller.
Q. Okay. Can you tell us what your understanding was about how Safe Chain -- where Safe Chain purchased drugs from and what types of customers they sold medications to?
A. So my understanding is they were a full-line wholesaler, all different products. And that they purchased -- I also thought maybe sometimes they purchased directly from manufacturers, sometimes they purchased from another wholesaler.
And that was their -- that's why they're secondary because they purchased from a primary wholesaler and their customers would be pharmacies, primarily pharmacies.
Q. So were they selling medication to pharmacies?
A. Yes.
Q. Ms. Rumore, you mentioned that you first started working for Safe Chain in the summer of 2020. Do you remember if, at that point, you were asked to give them any sort of opinion on whether they were buying and selling HIV medications from legitimate sources?
A. No.
Q. Okay. Was it your role, at that point, to approve their purchasing from certain suppliers of HIV medication?
A. No.
Q. And was it your role, for instance, to look into and investigate the different suppliers they were purchasing from?

A. No.
Q. Were you asked in the summer of 2020 to look into whether or not Boulevard 9229 LLC was a legitimate supplier of medication?
A. No.
Q. Were you asked to look into whether Gentek LLC was a legitimate supplier of medication?
A. No.
Q. Were you asked to look into whether Rapid's Tex was a legitimate supplier of HIV medication?
A. No.
Q. What about a company called Synergy?
A. No.
Q. Ms. Rumore, is that the type of work you would normally do as an attorney? Look into the types of suppliers a wholesaler is buying from to determine if they are legitimate?
A. No. That's the responsibility and the role of the wholesaler. My responsibility is to provide legal advice.
Q. And did you have the right information to do that sort of thing, to look into the legitimacy of a player?
A. No, I couldn't do that. That would be a compliance officer or wholesaler would do that.
Q. Okay. And at first, were you even told by Charles Boyd or Patrick Boyd who these suppliers were that they were purchasing medication from?

A. No.
Q. Okay. And just to be clear: When you did work for Safe Chain, did you actually go to their facility to see it?
A. No.
Q. Did you actually meet their employees in person?
A. No.
Q. Did you actually see the products they were selling --
A. No.
Q. -- in person?
Did you actually meet either Charles or Patrick Boyd in person?
A. No.
Q. How did you communicate with them?
A. Through emails and there was a -- phone calls, as well.
Q. Okay. And is that typical for the way that you have done business as an attorney around this time frame?
A. Yes.
Q. Was this also during the COVID-19 pandemic?
A. Yes.
Q. You mentioned that you did some work for the defendants and for Safe Chain in the summer of 2020; is that right?
A. Yes.
Q. And at first, were you presented with some general questions that they wanted answered?
A. Yes.

Q. Okay. And then later, were you involved in defending Safe Chain when a drug manufacturer threatened to sue them?
A. Yes.
Q. And, Ms. Rumore, as time went on, did you start to have concerns about whether or not you were receiving full and accurate information from the defendants?
A. Yes.
MS. DEROVANESIAN: Okay. I would like to start with August of 2020. And I would like to show, please, just for the witness, Government Exhibit 329.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, do you recognize the document in front of you?
A. Yes.
Q. Can you just tell us what it is?
A. It's a communication from me to Charles Boyd dated August 21st.
MS. DEROVANESIAN: Your Honor, the Government moves into evidence Exhibit 329.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 329 will be received.
(Government's No. 329, Document, was received in Evidence.)
BY MS. DEROVANESIAN:
Q. Ms. Rumore, I would like to draw your attention to the last

page here -- actually, second to last -- page 2. Do you see an email from John Morrone to Charles Boyd here?
A. Yes.
Q. Okay. And he mentions he's attaching a memo regarding a recall.
Do you remember that?
A. Yes.
Q. Did you draft a memo regarding a recall?
A. Yes.
Q. And at the time, in August 2020, were you told why Charles Boyd wanted you to prepare a memo regarding a recall?
A. No.
MR. ZIMET: Excuse me, Judge.
Objection at this point, as to asking about something said to her or not said to her. It's hearsay.
THE COURT: Sustained.
MS. DEROVANESIAN: Your Honor, may I clarify? We're talking about statements of the defendant.
THE COURT: Then she can answer that.
MS. DEROVANESIAN: Okay.
BY MS. DEROVANESIAN:
Q. So, Ms. Rumore, just to be clear: At this time, August 2020, were you told by Charles Boyd why they needed a memo regarding recall procedures?
A. Not the specifics, no.

Q. Okay. And then later, in this August 21st, 2020, email from Charles Boyd, which starts on that first page, do you see where he says that he has drafted an email to send to Gilead's QA team?
A. Yes.
Q. And he's asking if you have any changes.
Do you see here -- and we'll have to take you to the next page.
Do you see where he's explaining an incident and a complaint from a pharmacy?
A. Yes.
Q. Okay. And do you see in the middle of that paragraph where he's mentioning that a customer discovered a generic Excedrin in the bottle and not Biktarvy?
A. Yes.
Q. Do you see where it says that Gilead shipped the product -- well, sorry. I will read you the whole sentence, says, "The PIC at White Cross filed a complaint."
Do you see that part?
A. Yes.
Q. And can you tell us what a PIC is?
A. Pharmacist in charge.
Q. And it says that person filed a complaint with Gilead and shipped the product back to Gilead?
A. Yes.

Q. Do you remember seeing that?
A. Yes.
Q. Ms. Rumore, before you received this email and this proposed response, did you know about an incident that Safe Chain had, which is described here, where a patient received the wrong pills in their bottle?
A. No. I found out about it from this email.
Q. Okay. And then in your response, which is on the first page here, you mention that somewhere in the email, "Safe Chain should indicate they assume Gilead has reported the incident to FDA and is conducting an investigation."
Do you remember giving that advice?
A. Yes.
Q. And do you remember why you said that Safe Chain should assume Gilead has reported the incident to the FDA at this point?
A. Because there's a requirement to notify the FDA if a product is illegitimate.
Q. And in whose possession was the drug in question at this time?
A. I understood the drug was being sent back to Gilead from the previous email -- I understood that the product was being shipped back to Gilead.
Q. And was that because of Charles Boyd's statement in that next email?

A. Yes.
Q. Okay. And then I would like to show you --
MS. DEROVANESIAN: Please, just for the witness, Government Exhibit 328.
BY MS. DEROVANESIAN:
Q. Do you recognize this email?
A. Yes.
Q. Can you tell us what this is -- or, actually, just tell us who it's from?
A. It's from John Morrone to Charles Boyd, providing the memo.
MS. DEROVANESIAN: Your Honor, the Government moves into evidence Government Exhibit 328.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 328 will be received.
(Government's No. 328, Memo, was received in Evidence.)
MS. DEROVANESIAN: If we could go to the second page, please.
BY MS. DEROVANESIAN:
Q. Can you tell us what this is?
A. This is the body of the memo on recalls that I wrote.
Q. Is this that same memo that you were just telling us about that you prepared in the summer of 2020?
A. Yes.
Q. Okay. And to be clear, at this point, when you wrote the

memo, did you know why Charles Boyd wanted you to write this memo?
A. No.
Q. Did you know that there was any sort of incident with a bottle that contains the wrong pills?
A. No.
MR. ZIMET: Objection, Judge. She already answered she doesn't know. Now, she's asking another question about what she should know or did know.
THE COURT: It's repetitious.
I sustain the objection.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, I would like to take your attention to page 3 and towards the middle of the page in this third paragraph, where you wrote, "As previously mentioned, recalls are considered the responsibility of the manufacturer; however, because of their position in the supply chain, wholesalers frequently conduct the actual recall."
Do you remember giving that advice to Safe Chain?
A. Yes.
Q. And then later in that same paragraph, you note that, "If the product defect, which led to the recall, occurs at the wholesaler, the wholesaler will play a greater role."
Do you remember saying that?
A. Yes.

Q. In this scenario, who would the wholesaler be?
A. Safe Chain.
Q. Okay. And, Ms. Rumore, would your advice vary if you knew that there were issues or concerns with where the wholesaler was getting the drugs from?
A. Yes.
Q. How would that change?
A. It would -- you know, the recall may have been more placed on the wholesaler if they were in possession of the drug versus the manufacturer, the drug being at the manufacturer.
MR. ZIMET: Judge, I'm going to object and ask that we have a sidebar, please.
THE COURT: We can do it at the end.
BY MS. DEROVANESIAN:
Q. All right. Ms. Rumore, and at this point, had anyone told you any reason to believe that there was anything wrong with where the drugs were coming from?
A. No.
Q. Okay. And then I would like to take your attention to page 5, please.
Towards the middle of this last paragraph, do you see that sentence that starts with "It is imperative"?
A. Yes.
Q. Okay. Where you say, "It is imperative to cease all distribution of the product and quarantine it, report any

customer complaints to the manufacturer immediately.

"If the manufacturer fails to act properly and notify the FDA or complete the necessary paperwork and the situation is likely to warrant a recall or result in patient harm, then the duty falls upon the wholesaler" -- do you remember giving this advice to Safe Chain in August of 2020?

A. Yes.

Q. And then do you see this next part that says, "The wholesaler then has a duty to report the situation to the FDA and initiate the recall"?

Do you remember saying that?

A. Yes.

Q. Okay.

A. Thank you.

Q. We can take that one down.

Ms. Rumore, after you learned about this one incident in August of 2020, where a patient received a bottle of medication with the wrong pills inside, did you make any suggestions as to how that problem occurred?

A. No, I wasn't -- I didn't know.

Q. Okay. And did you know about just one incident of the wrong pills inside the bottle?

A. At that time, yes.

Q. Okay. I would like to show you Government Exhibit 418, which was already admitted. Okay.

And, Ms. Rumore, do you see that this is a Microsoft Teams chat between Jesse Hammett, Charles Boyd, and Abbie Divilio?
A. Yes.
Q. Okay. And did you know who Abbie Divilio was?
A. Yes.
Q. Who was she?
A. She was their compliance officer for Safe Chain.
Q. Okay. And I would like to take you to the second page here. And to a few lines down where there's a message from Jesse Hammett explaining that, "AstraZeneca manufactures the XR 400 and Gilead manufacturers the Biktarvy."
"They're not the same company and are not under the same parent company."
Do you see that?
A. Yes.
Q. And do you see below where he says, "So unless they're made in the same contract manufacturing plant, it's unlikely the pills for one would end up in the bottle of another"?
Do you see that?
A. Yes.
Q. Ms. Rumore, in August of 2020, did Charles Boyd tell you about this situation, about a concern with different pills ending up in a bottle of a Gilead product?
A. No, I was only aware of the Excedrin.
Q. Okay. And so did Patrick Boyd tell you about this

situation of another instance with the wrong pills in the bottle in August of 2020?
A. No.
Q. Okay. And they didn't -- did either of them tell you that this was in the same week as that other incident?
A. No.
Q. Okay. And, Ms. Rumore, would that have been important information to you at the time?
A. Yes. I would have been thinking differently about maybe it was a supply, you know, from their supplier versus, you know, Excedrin. If a bottle is dispensed and a patient's dispensed is sealed, the patient could open it and put the Excedrin in and that could have accounted for the first one.
Q. Ms. Rumore, I just want to be clear for a moment.
So you mentioned that you were aware of the bottle that had Excedrin inside; is that right?
A. Yes.
Q. And you were not aware of another bottle that had Seroquel inside; is that correct?
A. No, I wasn't aware.
Q. And can you explain to us how knowing about also a bottle of Seroquel -- a bottle that had Seroquel in it, would have changed the advice that you provided to the defendants.
A. It would have raised some red flags as to why there's two incidents and the wrong drug in the wrong bottle.

One is understandable. Two would have made me think differently.

Q. Okay. And, Ms. Rumore, do you remember at this point in time in August of 2020, if Charles or Patrick Boyd told you that they were working with a supplier, buying medication from a supplier called Boulevard 9229 LLC?

A. No, not at that time.

Q. Okay. And did you know anything, at this point, about what was going on between Charles Boyd and Patrick Boyd and their supplier, Boulevard 9229?

A. No.

Q. And, Ms. Rumore, when you were working for Safe Chain and giving them advice at this point, were you under the impression that they had standard operating procedures?

A. Yes.

Q. And can you tell us, in the context of a pharmaceutical company, what is a standard operating procedure?

A. So every wholesaler has to have standard operating procedures. If something like this occurs, what are they going to do. Who is responsible for what? How they're going to handle it?

You know, they're going to investigate, they're going to quarantine, they're going to notify the FDA.

All that has got to be spelled out in their SOPs.

It should have things like red flags, what they should look

for. Those type of things.
Q. You just said SOPs.
Is that what you use to abbreviate standard operating procedures?
A. Yes. It's the same thing as policy and procedures.
Q. Are these kind of like rules for a company?
A. Yes.
Q. And you mentioned that you were under the impression that Safe Chain had SOPs.
Were you also under the impression they were following their SOPs?
A. Yes to both.
Q. Okay. And, Ms. Rumore, do you know what a T3 or a pedigree is?
A. Yes.
Q. Can you explain to us what that means?
A. That's a piece of paper that is required under the Drug Supply Chain Security Act, which was enacted in 2013, to make sure that a drug follows a chain all the way back to the manufacturer, and that's to make sure that it's not counterfeit or there's nothing wrong with it.
So it's called -- it's a pedigree or T3. It's called T3 because there's three parts to it.
One is the information on the transaction.
The other is the history of the transaction, going all the

way back to the manufacturer.

And the third part is, like, a statement that would be made from one company to the next, you know that this is legitimate product and all that.

So on the document --

MR. ZIMET: Judge, reserving, again.

THE COURT: Okay.

BY MS. DEROVANESIAN:

Q. And, Ms. Rumore, was it your impression that Safe Chain was receiving these T3s and pedigrees with any medication they bought at this time?

MR. ZIMET: Objection as to form, Judge. That's leading and suggestive.

THE COURT: Sustained.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, in August of 2020, did you know whether or not the defendants were receiving these T3s or pedigrees with the shipment of medication?

A. We -- they told us they were.

Q. Who told you that?

A. We -- the client. Because we asked them -- we asked them about their SOPs and what they may -- they said they were following the Drug Supply Chain Security Act.

MR. ZIMET: Judge, could we have the witness identify the source of the information?

THE COURT: Sustained.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, do you remember who it was who told you about the company's SOPs?
A. It was Abbie Divilio.
Q. And did you discuss these with Charles Boyd, as well?
MR. ZIMET: Objection, Judge. It's leading. It's suggestive again.
THE COURT: Overruled.
A. I don't recall, you know, the exact conversation with Charles Boyd. But I know we offered to review their SOPs because that's one of the things we would do, make sure they were in compliance with DSCSA, and they refused.
They didn't want to spend for the legal fees. They said they were in compliance, and that's how I recall it.
They said they were in compliance and it wasn't a priority for them.
BY MS. DEROVANESIAN:
Q. Okay. And, Ms. Rumore, early on in August of 2020, you mentioned you didn't know who these suppliers were.
Did Charles Boyd ever tell you the name of who they were dealing with in August of 2020?
A. In August of 2020, no.
Q. Okay. Did Charles Boyd ever tell you that their point of contact at this supplier was somebody named Peter?

A. No.
Q. Did Patrick Boyd ever tell you their point of contact being someone named Peter?
MR. ZIMET: I will object as to form again.
THE COURT: Overruled.
BY MS. DEROVANESIAN:
Q. Did Patrick Boyd ever tell you that their supplier was some guy named Peter?
A. No.
Q. And did either Charles or Patrick Boyd tell you, in August of 2020, that they didn't know this guy's last name?
A. No.
MR. ZIMET: Judge, I'm going to object as to foundation, whether she had any conversations with either one of them In August. There's no foundation as to that.
THE COURT: Overruled.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, did either Charles or Patrick Boyd in August of 2020 tell you that this person named Peter was using an alias?
MR. BARZEE: Objection. Your Honor, she's assuming facts not in evidence.
She never spoke to Patrick Boyd in August. She hadn't even met him at that time. She had no idea who he was.
THE COURT: All right.

Do you want to clarify it?

MR. BARZEE: It's misleading.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, did Charles or Patrick Boyd tell you anything about this person who they were dealing with from Boulevard 9229 in August?

MR. BARZEE: Objection.

THE COURT: Sustained.

MR. BARZEE: It's assuming a fact not in evidence.

She never spoke to Patrick Boyd in August of 2020, and she knows that.

THE COURT: I sustained the objection, Mr. Barzee.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, did you have any conversations about the supplier in August 2020?

A. No.

Q. Okay. And would it matter to you who the individual was who they were dealing with?

A. In hindsight, it would, yeah.

Q. Okay. Ms. Rumore, I would like to show you Government Exhibit 639, which has already been admitted.

Ms. Rumore, when you were doing work for Safe Chain in August of 2020, did either Charles or Patrick Boyd show you this picture?

MR. BARZEE: Objection. Assuming facts not in

evidence. She had no involvement with Patrick Boyd in 2020, Your Honor, and the Government knows that.

THE COURT: So rephrase the question, unless you can lay a predicate.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, did Charles Boyd show you this picture in August of 2020?

A. I have never seen this picture.

Q. Did anybody show you this picture in August of 2020?

A. No, I've never seen this before.

Q. Did Charles Boyd explain to you that this was his supplier -- this is the location of his supplier of HIV medication?

MR. ZIMET: Objection, again, Judge. Leading and suggestive.

THE COURT: Overruled.

BY MS. DEROVANESIAN:

Q. Did Charles --

A. I don't see any letterhead -- you know, the marquee for any kind of wholesaler.

Q. Ms. Rumore --

A. It's stores.

Q. -- let me clarify. Did Charles Boyd ever tell you that this was a location of where he was buying all his HIV medications from?

A. No.
MR. ZIMET: Judge, reserve again.
THE COURT: Okay.
BY MS. DEROVANESIAN:
Q. And would that have mattered to you?
MR. ZIMET: Same objection, Judge.
A. Yes.
MR. ZIMET: And reserve again.
THE COURT: Overruled.
BY MS. DEROVANESIAN:
Q. Why would it matter to you to see that this is where Charles Boyd was sourcing HIV medication from?
A. Because as a wholesaler, I would expect there would be space requirements. There's requirements for signage. I don't see anything like that. I see a cannabis dispenser. I don't see a wholesaler here.
Q. And based on your experience, does this look like the type of place where millions of dollars of HIV medication would be sold from?
A. No. This would raise flags for me.
Q. Okay. I would like to show you Government Exhibit 640, which is also admitted.
MS. DEROVANESIAN: So if we could please publish that one.
///

BY MS. DEROVANESIAN:
Q. Ms. Rumore, did Charles Boyd show you this picture?
A. No.
MS. DEROVANESIAN: Okay. And then let's look at the second page here.
BY MS. DEROVANESIAN:
Q. Did Charles Boyd show you this picture in August of 2020?
A. No.
Q. And did Charles Boyd explain to you that they were buying HIV medications from a location that looked like this?
A. No.
Q. And did Charles Boyd explain to you that they were buying millions and millions of dollars of HIV medications from a place that looked like this?
MR. ZIMET: Objection. Assuming facts not in evidence.
MS. DEROVANESIAN: Your Honor, she's being asked whether or not she was told something. She's competent to answer.
THE COURT: I think there has to be a predicate that she's having conversations with Charles Boyd at this time and that it wasn't mentioned. If she wasn't even talking to him then --
MR. ZIMET: And they know that, Judge. This is so misleading.
THE COURT: So ask the question. So lay a predicate

whether she was having conversations with Charles Boyd or Patrick Boyd in August.

MR. BARZEE: Your Honor, I would like to reserve a motion at this time as well.

THE COURT: Okay.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, in August of 2020, had you met Charles Boyd by phone or in email?

A. I think there was a phone call in August of -- sometime.

Q. Okay. And those emails we were just looking at where you were providing advice, those were in August as well?

A. Yes.

Q. Okay. So had you had conversations with Charles Boyd about the sale of HIV medication in August of 2020?

A. No, not about the sale.

Q. Well, those emails regarding the problems they were having with their HIV medication, were those in 2020?

A. Just the Excedrin.

Q. Okay.

A. Nothing else.

Q. And when you spoke to Charles Boyd on the phone, did he tell you that they were buying HIV medication from places like this?

MR. ZIMET: Judge --

A. I've never seen this picture before.

MR. ZIMET: Judge, same objection. There's no foundation. All right.

THE COURT: She said she talked to him once. Overruled.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, did Charles Boyd --

A. I never -- no. He's never --

MR. ZIMET: Excuse me. Can she be allowed to answer? Finish her answer? She said she talked to him once, and then that's interrupted because, obviously, this never came up in the conversation.

THE COURT: If you weren't done with your answer, you can finish your answer.

THE WITNESS: Could you repeat the question?

MS. DEROVANESIAN: Sure.

BY MR. BARZEE:

Q. Ms. Rumore, when you spoke to Charles Boyd, did he tell you that they were buying HIV medications from a place that looked like this?

A. No.

Q. Would that have mattered to you?

MR. ZIMET: Judge, same objection as to foundation. All right. She can ask what was discussed but not the leading question as to what was not discussed.

THE COURT: Overruled.

BY MS. DEROVANESIAN:
Q. Ms. Rumore, would that have mattered to you --
A. Yes.
Q. -- at the time?
A. Because this looks like a house with a garage and there's no signage.
Q. Okay. And --
A. It doesn't look good.
Q. And why is that concerning to you?
MR. ZIMET: Objection, Judge.
THE COURT: Overruled.
BY MS. DEROVANESIAN:
Q. Why does that concern you?
A. Because there's a requirement for a wholesaler to have a -- at least they would have to have a sign outside.
MR. ZIMET: Reserve again, Judge.
THE COURT: Okay.
BY MS. DEROVANESIAN:
Q. All right. Ms. Rumore, when you spoke with Charles Boyd in August of 2020, did he tell you that they were buying HIV medication with no T3 and no pedigree?
A. No.
Q. Okay. And would that have mattered to you?
A. Absolutely.
Q. Why would that matter to you?

A. Because, like I mentioned before, the T3 is pedigree. You can't accept product in your inventory -- a wholesaler cannot accept product in their inventory without a T3 pedigree document, nor can they sell without an appropriately verified T3 document to any customers.
Q. Would that have impacted the advice you provided to Charles Boyd or Safe Chain in August of 2020?
A. Yes.
MR. ZIMET: Reserve again, Judge, to the whole line of questioning.
THE COURT: Overruled.
BY MS. DEROVANESIAN:
Q. How would it have impacted the advice that you provided?
A. I would have told them they can't obtain product from any supplier that doesn't provide them with a T3.
Q. Okay. And, Ms. Rumore, I would like to show you --
MS. DEROVANESIAN: And please publish a Government exhibit that was already admitted, Exhibit 124.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, I'm going to show you a document that was admitted as Government Exhibit 124.
MS. DEROVANESIAN: If we could do this the old-fashioned way, please.
THE COURTROOM DEPUTY: This is already in, Counsel?
MS. DEROVANESIAN: It is, yes.

BY MS. DEROVANESIAN:
Q. All right. Ms. Rumore, when you spoke to Charles Boyd in August of 2020, did he mention to you that Abbie Divilio had sent him an email about wholesaler-distributor requirements?
A. No.
Q. Did he mention to you that Abbie had told him that in order to continue purchasing medications from Boulevard 9229, we need them to comply with the Drug Supply Chain Security Act?
A. No.
Q. Did he tell you that Abbie Divilio had laid out the statute and requirements as you see here in this email?
A. No.
Q. Okay. And, for instance, did he tell you that Abbie Divilio had told him that, "A wholesale distributor shall not accept ownership of a product unless the previous owner to -- prior to or at the time of transaction provides the transaction history, the transaction information and a transaction statement for the product"?
A. No.
Q. Okay. And did he tell you that Abbie Divilio had also shared with him what the penalties were for violating the DSCSA?
A. No.
Q. And then on the second page, did Charles Boyd tell you that Abbie Divilio had warned him about what she described as "real

consequences"?
A. No.
Q. Okay. And down here, did Charles Boyd tell you that Abbie Divilio had warned him about the criminal penalties --
A. No.
Q. -- for violating the statute?
Ms. Rumore, would that have been important to you to know at the time that Abbie Divilio had sent this warning to Charles Boyd?
A. I -- yeah, I wonder why it was sent.
Q. Okay. And would that have impacted the advice that you gave to Charles Boyd and to Safe Chain?
A. It would have been more information at my disposal and more for me to think about what was going on, ask more questions.
Q. And when you spoke with Charles Boyd in August of 2020, did he tell you that his sales reps were selling these HIV products for a cheaper price to customers who were willing to accept them without the T3 pedigree?
A. No.
MR. ZIMET: Objection, Your Honor. That assumes facts not in evidence.
THE COURT: The jury will rely on their own recollection of what the evidence is.
You may proceed.
MS. DEROVANESIAN: Okay. Your Honor, I would like to

show the witness Government Exhibit 420, which actually was already admitted; so if we could, please, publish that one.

BY MS. DEROVANESIAN:

Q. All right. Ms. Rumore, I would like to take you to page 2 of this document, please.

And do you see the second message from the bottom there, where it says, "Pat Boyd, are they able to get pedigrees now? That is a big thing with a lot of mine that Boulevard didn't have before."

Do you see that message?

A. Yes.

Q. When you spoke to Charles Boyd, did he share with you that a sales rep had raised this concern with him?

A. No.

MR. ZIMET: Objection, Judge. Assumes a fact not in evidence as to Charles Boyd.

THE COURT: Is this something that would normally come up in a conversation with Mr. Boyd?

THE WITNESS: No. We assumed they were getting T3s. I mean, that's just -- you know...

THE COURT: The conversation that you had with him, would this have been something that you would have expected him to volunteer or not?

THE WITNESS: If he didn't have -- if he was getting a drug without a T3, he should have disclosed that to us, yes.

THE COURT: Overruled.

THE WITNESS: Absolutely.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, did Charles Boyd, during these conversations, tell you that the supplier where they were getting HIV medication from didn't actually even keep records of what they were selling to Safe Chain?

A. No.

Q. Okay. I would like to show you Government Exhibit 136, which was also already admitted. And I would like to show you page 2 of this document.

Ms. Rumore, do you see at the bottom here where somebody named King Kimchi says, "Can I have all lot numbers of all products with the date of purchase?"

Do you see that?

A. Yes.

Q. Did Charles Boyd tell you that the person he bought HIV medication from had to ask him for the products he sold and the date of purchase?

A. No.

MS. DEROVANESIAN: Okay. Thank you. We can take that one down.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, when you spoke to Charles Boyd, did he tell you about customer complaints about the way the bottles of

medication looked?
A. No.
Q. Did he tell you that customers had complained that the bottles appeared to be dirty?
A. No.
Q. Did he tell that sales reps shared with him that the bottles appeared to be dirty?
A. No.
Q. Did he share with you that the compliance department had heard that the bottles appeared to be dirty?
A. No.
Q. Would that have been relevant to the advice you were providing to the defendants?
A. Yes. Because product from another supplier is usually not dirty, and the smudged labels and things like that are red flags.
Q. Okay. Ms. Rumore, when you spoke to Charles Boyd, did he tell you that his supplier for HIV medication didn't even know what a T3 was supposed to look like?
MR. ZIMET: Judge, can we have some date this supposed conversation took place?
THE COURT: Sustained.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, was your conversation with Charles Boyd in August of 2020?

A. Yes.
Q. Do you recall the exact date or roughly what week it might have been?
A. Not the exact date, no.
Q. If I showed you your billing records, would that refresh your recollection?
A. Yes.
MS. DEROVANESIAN: May I approach the witness?
THE COURT: Okay.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, does that document refresh your recollection as to when you had a conversation with Charles Boyd?
A. Yes.
Q. Okay. And can you tell us when that was?
A. It says here I had a call --
MR. ZIMET: Objection.
A. -- with Charles --
MR. ZIMET: Excuse me.
A. -- with Charles Boyd.
MR. ZIMET: That's not refreshing recollection.
THE COURT: Yeah, you can't just read from it. You can look at it. If that refreshes your recollection, then you can testify from it.
A. The call was on August 20th, 2020.
///

BY MS. DEROVANESIAN:
Q. Okay. And do you remember if, during that call, Charles Boyd told you that the supplier of the HIV medication didn't know what a T3 pedigree was even supposed to look like?
A. No. That didn't -- wasn't discussed on that call.
Q. Would that have been something you would have wanted to know?
A. It's something I would have wanted to know, and it's something that I would have remembered.
Q. Why do you say it's something that you would have remembered?
A. Because it's a requirement that was -- every wholesaler knows it.
Q. Okay. And to be clear: Ms. Rumore, even without knowing all of these things that you just told us, did you advise Charles Boyd that it was okay to continue purchasing HIV medication from Boulevard?
A. No.
Q. Okay. And did you know that they continued buying HIV medication from that same supplier for months and months after that?
A. No, I was not aware of that.
Q. Okay. And did you know that they were buying millions of dollars of HIV medication from that supplier after that?
A. I didn't know they were buying millions of dollars of

anything. I thought they were a small, secondary or tertiary wholesaler. That came out way at the end, and I didn't know who they were buying from.

Q. And just to be clear: When you say that you didn't know they were buying so much HIV medication and you didn't know who they were buying from, are you saying at the beginning of your representation in August?

A. Yes.

Q. Okay. Ms. Rumore, I would like to show you a document that has been admitted as Government Exhibit 173.

Ms. Rumore, do you see where it says -- where there's an email here at the bottom half from Abbie Divilio to Patrick Boyd and to Charles Boyd?

A. Yes.

Q. Okay. And do you see where Abbie says, "Hello, I have been attempting to verify the T3s which have been provided by Boulevard, and I have not been successful"?

Do you see that part?

A. Yes.

Q. Okay. And do you see where she says below, "After some digging, I found a PIC associated with this wholesaler and called and left them a voicemail"?

A. Yes.

Q. And do you see where she says, "I attempted to verify Stain RX and Attain RX. I couldn't find anything by those names on

Google"?
Do you see that?
A. Yes.
Q. And do you see where she says, "I spoke to someone at Local RX and he stated they do not sell anything to other pharmacies or wholesalers"?
Do you see that?
A. Yes.
Q. Do you see where she said, "He said they return their products back to the vendor for credit"?
A. Yes.
Q. Okay. And then a little bit after that, do you see where she says, "I also tried searching these pharmacy names on the NYSED.gov website and was not able to find any licenses associated with these pharmacy names"?
Do you see that?
A. Yes.
Q. And do you see where she says, "I asked -- I spoke with Cassandra at IPC. I asked her to verify a few drugs by lot number"?
And then continuing on to the next page, she said, "Where -- when I asked about the pharmacies Stain RX and Attain RX, she was not able to find either of these as customers in the system"?
Do you see that?

A. Yes.
Q. And do you recall Charles Boyd telling you about an incident like this --
A. No.
Q. -- where Abbie Divilio had tried to verify a T3 that was provided to them?
A. No.
Q. Okay. And do you remember Charles Boyd telling you that Abbie determined that the information on that pedigree was false?
A. No.
Q. And do you see above here where Patrick Boyd says, "We need to get with Boulevard soon. We have had two bad returns with open bottles and broken pills the last two days and the below sounds pretty bad"?
A. I haven't -- wasn't made aware of that.
Q. And would that have been important to you?
A. Yes.
Q. Why?
A. It would indicate perhaps some problem with the source of their products.
They're having two incidents: open bottles, broken pills. It's -- and then I don't know what they're trying to verify with pharmacies.
I don't know if that previous email, what that indicates if

they're sourcing from pharmacies or what at that indicates. I'm not sure I understand that one.
Q. And then if you could give me one moment, please.
All right.
MS. DEROVANESIAN: If we could please show Government Exhibit 174, which was also already admitted, please.
Okay.
BY MS. DEROVANESIAN:
Q. And, Ms. Rumore, do you see down below here, an email from someone named Cassandra at IPCRX.com?
A. Yes.
Q. Do you see where that email goes to Abbie Divilio?
A. Yes.
Q. And do you see here where she says, "We can confirm based on the provided documents, we have no record of either transaction"?
Do you see that?
A. Yes.
Q. And do you see where she explains that they don't use a PO number in the way that it's -- "We do not use PO numbers as a reference number we provide to the pharmacy"?
A. Yes.
Q. Okay. And do you see where she says, "I advise you obtain documentation from your supplier about the trail of these items"?

A. Yes.
Q. Okay. And then above this, in the next email above it, do you see where Abbie Divilio forwarded that email to Charles Boyd and Patrick Boyd?
A. Yes.
Q. And were you made aware that this pharmacy confirmed that the information on a pedigree was false?
A. No.
Q. Would that have mattered to you?
A. Yes.
Q. Why?
A. Again, it would indicate some, perhaps, issue with the source of the product.
I would be asking about their vetting process, again, and all that because there's a problem.
MS. DEROVANESIAN: We can take that one down, please.
BY MS. DEROVANESIAN:
Q. I would like to show you Government Exhibit 177, which was also admitted already.
And I would like to, please, start on page 2.
Ms. Rumore, do you see at the bottom half of this page an email from someone named King Kimchi to Abbie Divilio?
A. Yes.
Q. And do you see -- actually, I'm going to refer you to the email below that from Abbie Divilio.

Do you see that one that says, "I'm not able to verify these transactions on this T3"?
A. Yes.
Q. Do you see where it says, "Instacare Pharmacy is no longer at the address that you have listed"?
A. Yes.
Q. Okay. And do you see the next paragraph where she says, "When I looked up Instacare Pharmacy, I attempted to call the number, which rang until it disconnected with what sounded like a fax"?
A. Yes.
Q. Do you see that?
A. Yes.
Q. And do you see where it says, "I called the location next door to this address and was told this pharmacy has not been at this location for three to four months"?
A. Yes.
Q. And do you see where she says, "That would also explain why I cannot locate any information about them from the New York BOP web page"?
That actually continues on to the next page.
A. Yes.
Q. And do you know what the NYBOP is?
A. New York Board of Pharmacy.
Q. Okay. And then down below this, do you see where she says,

"We will need additional information to support these transactions. Also, we need the additional T3s for Monday since you -- since we received 551 pieces of inventory and you have only provided one T3"?

Do you see that?

A. Yes.

Q. Okay. And then I would like to take you back to page 1, please.

And do you see, at the bottom of the page, the response that Abbie Divilio received to all of that?

A. Yes.

Q. Okay. Do you see where someone named King Kimchi says, "Pharmacy closed for business. Can't get any paperwork. I'm sorry"?

A. Yes.

Q. And do you see above this where Abbie responds and says, "No, it's not good. Because if the pharmacy has been closed for business, how was a purchase made from them less than a month ago?"

Do you see that?

A. Yes.

Q. And do you see up above where the response to that is, "We always buy stuff from places who want to get out from business. Why not?"

Do you see that?

A. I see it.
Q. Were you shown this email back in 2020?
A. No.
Q. Would this have been relevant to the advice you were giving to Safe Chain and the defendants?
A. Yes, because it's showing that it's -- product is coming from a pharmacy. How could product be coming -- pharmacies can't sell to wholesalers. They can only sell maybe 5 percent of their inventory to wholesalers, and some states -- not in New York State, which, you know, if this is pertaining to New York, New York doesn't have a 5 percent rule.
Pharmacy can't sell to a wholesaler. They can return product to a wholesaler, but they can't sell product to a wholesaler and the wholesaler to then sell to another pharmacy.
Q. Okay. And I would like to show you Government Exhibit 181 which is also already admitted. Okay. I will show you the second page first.
Do you see where there's a link here to something at NYSED.gov?
A. Yes.
Q. And then we got to go back to the first page to see the rest of that email. And then down at the bottom, where it says, "NYS professions, online verification."
A. Yes.
Q. And is this sent to Charles Boyd?

A. Yes.
Q. Okay. And then let's look at this top email.
Do you see where Abbie Divilio says that, "As you click through the transfer notification, you can see the business must have changed names and remained at the same location. The license has been discontinued since 3/30/2020. If you purchased this on 9/2/20, that means the pharmacy did not hold an active license during the time of purchase"?
Do you see that?
A. Yes.
Q. And do you see where it says, "The clip you shared with the pharmacy information is the number. I called multiple times, no answer, until I spoke with another business in the building who told me the pharmacy has been closed for months"?
Do you see that?
A. Yes.
Q. And do you see where it says, "The issue with having a lapse of licensure and location is that we have no way of knowing how this medication was stored or where it may have been stored. Was it exposed to hot and humid conditions somewhere? All of these things could affect the integrity of the product, which comes back to us when the customers complain".
Do you see that?
A. Yes.

Q. And of up above here, do you see who Abbie Divilio sent that email to?
A. Yes.
Q. Who is that?
A. She sent it to King Kimchi, Charles Boyd, and she sent it to herself, compliance at Safe Chain.
Q. Okay. I would like to show you another document that was already admitted. This one is Exhibit 437.
All right. Ms. Rumore, I would like to show you the second page here.
And do you see at the top where it says, "This is a conversation between Charles Boyd and Abbie Divilio"?
A. Yes.
Q. And I would like to show you this first message here.
Do you see in -- starting in -- well, let's start with the first line where she says, "I spoke to Peter, the conversation did not last very long"?
A. Yes.
Q. And do you see where she says, "He explained to me that he buys drugs from pharmacies that are closing. When I asked what he does with the inventory while he waits to sell it, he said he stores it in his office, which is the registered wholesale distribution address. When he buys it, he does not get any T3 information from the pharmacies he purchases from"?
Do you see that?

A. Yes.
Q. And do you see after that where she says, "I explained to him that this information was required by the DSCSA guidelines and was necessary to be provided within 24 hours"?
Do you see that?
A. Yes.
Q. And do you see where she says, "His justification was that he has owned a pharmacy in the past and never asked about where the drugs came from or checked paperwork"?
Do you see that?
A. Yes.
Q. And do you see how -- well, actually, before we get there, do you see where she says, "I explained to him that this was required when acting as wholesaler"?
And then she says, "He went from being very chipper to very somber rather quickly?"
Do you see that?
A. Yes.
Q. And how does Charles Boyd respond to all of that information?
A. He says, "Thanks."
Q. Okay. Ms. Rumore, I would like to show you Government Exhibit 187, which is also in evidence. I would like to start with page 4 here, please.
Do you see an email here from qualitycomplaints@Gilead.com

to somebody named Dakota Flowers?
A. Yes.
Q. And do you see it copying the compliance@SafeChain email address as well?
A. Yes.
Q. Okay. And do you know what Gilead Sciences is?
A. Say the question again.
Q. Are you familiar with the company Gilead Sciences?
A. Yes.
Q. Can you tell us what Gilead Sciences is?
A. It's a very large pharmaceutical company. They manufacture mostly HIV drugs.
Q. Okay.
A. AIDS.
Q. And in this email, do you see the top line where it says: "Thank you for contacting Gilead Sciences with your Biktarvy inquiry"?
A. Yes.
Q. And page 3, I will show you, at the bottom.
Do you see where Dakota Flowers says, "There's no complaint. I just needed a verification on the product expiration date"?
Do you see that?
A. Yes.
Q. Okay. And then do you see the response from Gilead saying,

"I understand you do not have a product quality complaint, but we would still like to understand the reason for your inquiry and ensure that the Biktarvy bottle in question is not missing an expiration date in the variable print area of the bottle. We would greatly appreciate a response to our questions"?
A. Yes.
Q. Do you see that?
A. I see it.
Q. Okay. And do you see the response up above that?
A. Yes.
Q. Okay. And do you see where she says, "We're in the process of verifying T3 lot numbers and vendors. We would also like to know if this product was sold to Rochester Drug Co-op" and then a reference number?
Do you see that?
A. Yes.
Q. Okay. And do you see a response -- we'll go to the previous page, page 2, from Gilead here.
A. Yes.
Q. And do you see where they say, "If Safe Chain needs to verify the supply chain of the product, we would like to see a copy of the invoice in order to authenticate the product"?
Do you see that?
A. Yes.
Q. And do you see the response that says, "We're attempting to

verify the T3 attached. If you're able to verify the first transaction from Gilead to Rochester Drug, it would be greatly appreciated"?
A. Yes.
Q. Do you see that?
A. Yes.
Q. I would like to show you the first page of this email. And towards the bottom, do you see a response from someone named Lori Mayall?
A. Yes.
Q. And is that person's email address at Gilead.com?
A. Yes.
Q. Do you see the second sentence here where she says, "The information contained in the pedigree transaction history document is inconsistent with our records"?
A. Yes.
Q. And do you see where it says, "If this pedigree documentation is associated with Gilead product in your possession or control, we therefore believe it should be treated as illegitimate product and quarantined and should be reported to the FDA via a Form FDA 3911. Please share with me a copy of any 3911 form involving Gilead products that you submit to the FDA"?
Do you see where she says that?
A. Yes.

Q. Okay. And then up above here, do see where this email was forwarded to Charles Boyd and to Pat Boyd?
A. Yes.
Q. And do you see where Abbie Divilio tells Charles Boyd and Pat Boyd, "Gilead believes this to be a counterfeit drug, which we should report to the FDA. I think we should review more of the lots we have received"?
Do you see where she says that?
A. Yes.
Q. Okay. And in -- this is October 12th of 2020. Do you recall being told about this incident in October of 2020?
A. No.
Q. And would that have been important to you to see?
A. Yes.
Q. Why?
A. Because this email chain has a lot of different things in here. It's already been a determination that -- from Gilead that there's a product that's illegitimate because of the pedigree and, you know, that's something that needs to be reported to the FDA either by Gilead or by Safe Chain.
Q. Okay. Thank you.
MS. DEROVANESIAN: And we can take this one down.
BY MS. DEROVANESIAN:
Q. I would like to show you Government Exhibit 176, which was also admitted, okay. And I'm going to show you page 2 here, an

email. And I believe we have looked at this part of this email before; so I will just highlight one part here.

Do you see where Abbie Divilio is telling -- is emailing King Kimchi and Charles Boyd?

A. Yes.

Q. Okay. And do you see where she says, "This pharmacy has moved and has not been at this location for three to four months"?

A. Yes.

Q. And do you see where she says, in that last paragraph, "Will need additional information to support the transactions"?

A. Yes.

Q. Do you see where she's highlighting below that "They've received 551 pieces of inventory with only one T3"?

A. Yes.

Q. Okay. And then I would like to turn your attention to Charles Boyd's response on the next page.

Do you see where he says, "FYI doesn't look great right now but waiting to hear back"?

A. Yes.

Q. Rochester Drug filed for bankruptcy in March as well, and I'm pretty sure they're not operating."

Do you see that?

A. Yes.

Q. And do you see a response above this from Adam Brosius to

Charles Boyd?
A. Yes.
Q. Can you tell us what that response is to Charles Boyd?
A. It says, "Just fill in whatever info you want, LOL." Laugh out loud.
Q. Okay.
A. And then there's some curse word, initials, WTF.
Q. Okay. And I would like to show you Government Exhibit 440, which is also already admitted. Okay. And if I could please take you to the second page here. Okay.
And do you see a conversation between Charles Boyd and Abbie Divilio here?
A. Yes.
Q. Okay. And do you see where Abbie is telling Charles, "They provided another T3, which says the drug was purchased in 2018. However, I don't believe Boulevard's wholesale license was issued until 12/2019"?
Do you see that?
A. Yes.
Q. And do you see where she says, "I'm trying to get in touch with Rochester Drug again to see if I can verify what they provided"?
A. Yes.
MS. DEROVANESIAN: And if we could zoom back out, please.

BY MS. DEROVANESIAN:
Q. Do you see below where Abbie Divilio says, "I do not think it was possible for them to have bought it from Instacare pharmacy of this year because there's currently no pharmacy there"?
A. Yes.
MS. DEROVANESIAN: And is there another page to this? No? Okay. Thank you.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, at this time, in October of 2020, were you aware that Abbie Divilio had been trying to verify T3 information and realizing that it was falsified?
A. No. And this would have been a grave concern. It could be a patient safety issue. They could not accept the product. They couldn't sell the product. They had to quarantine the product. I mean, this would have caused me to have a lot of different advice for them at that point.
Q. Okay. And at the same time, had anybody told you about customer complaints about the products they received from Safe Chain?
A. Just the Excedrin.
Q. Okay.
A. With that one pharmacy.
Q. Had you heard about instances where pharmacies returned large quantities of products because they were concerned about

the products' safety?
A. No.
Q. I would like to show you Government Exhibit 182, which was also already admitted. I would like to start with page 3, please.
And do you see an email here from a place called Olympia Plaza?
A. Yes.
Q. And do you see that going to someone named John Nicholls?
A. Yes.
Q. And below that, copying Pat Boyd?
A. Yes.
Q. Okay. And do you see where it says, "As per our agreement, please see the attached list for products set for return"?
That first line of the email? Do you see that?
A. Yes.
Q. And then I would like to take you to page 1. All right.
In this third paragraph down, do you see where this person references a phone call he had with Pat?
A. Yes.
Q. Do you see where he says, "You mentioned yourself, the vendors supplying the medication are frequently not reliable, inconsistent and have difficulties for various reasons"?
Do you see that?
A. Yes.

Q. Okay. And then below that, do you see where he says, "After carefully considering all facts and consulting our advisors, we made a decision to return all medications sourced out from the suppliers in question. I understand that it is a setback to accept the merchandise back, and I'm truly sorry for the inconvenience"?
Do you see that?
A. Yes.
Q. Do you see right below that where he says what his decision to return all this product was based on?
A. Yes.
Q. Do you see where he says, "That decision was based on the California State Board of Pharmacy regulations"?
Do you see that?
A. Yes.
Q. Do you see where he says, "It was based on the DSCSA provisions"?
A. Yes.
Q. And do you see where he said that "It was based on our moral obligation to ensure health and safety of our customers"?
A. Yes.
Q. Okay. And then up above here, can you see who this email was sent to?
A. Sent to Jonathan Nicholls from Safe Chain and Pat Boyd.
Q. Okay.

A. And then some.
Q. And then are there various people copied below?
A. The compliance person was cc'd.
Q. Is that Abbie Divilio?
A. Abbie and then somebody else from the Olympia, and I don't know if this was an RX pharmacist.
Q. Okay.
A. Accounting department from Safe Chain.
Q. Thank you, Ms. Rumore.
And if I could please show you Government Exhibit 184, which was also admitted.
Okay.
And actually, I think I showed you this one.
Do you see -- yeah, we can skip that one. Thank you.
I would like to show you Government Exhibit 204 --
MS. DEROVANESIAN: Just to the witness, please.
BY MS. DEROVANESIAN:
Q. And actually, before I do that, Ms. Rumore, in October of 2020, were you told that customers like Olympia RX had sent back a large amount of products because they deemed it to be unsafe to dispense?
A. No.
Q. And were you aware that they did this based on safety risks that were highlighted in that email previously?
A. No. I was not aware of any of this.

Q. And, Ms. Rumore, I would like to show you Government Exhibit 183, please. And this one is already in evidence.
And then if we could go to -- well, actually in this first line. Do you see where Olympia Plaza says to Pat Boyd, "The items were quarantined immediately after we discovered a suspicious packaging"?
A. Yes.
Q. And do you see below where he says, "We deemed it unsafe to dispense the product from you"?
A. Yes.
Q. Okay. And do you see where he says below that in the next paragraph, "First time in our 14 years of our company's existence where we were initiating a return of this magnitude. I do not take it lightly"?
Do you see that?
A. Yes.
Q. Okay. And I would like to take you to the photos attached to this email.
And then if we could go to the next one, please.
Do you see this photo of a box of medication that was attached to that email?
A. Yes.
Q. Okay. And do you see on some of these bottles where there are little spots on them?
A. Yes.

Q. Okay. And did anybody show you that this is what the product looked like that Safe Chain was shipping out in October of 2020?
A. No.
Q. Would that have mattered to you?
A. Yes.
Q. Why?
A. Because, you know, there's a circle with a smudge on it.
I don't know what it looks like -- I mean, I don't know. It doesn't -- I would have to really examine it, but to me it looks like some have the little package insert attached and some have it like ripped it off, and it's all, you know, mixed up like this. I don't know.
Q. If you were aware of this in October of 2020, would it have caused you to ask more questions?
A. Yes.
Q. Would it have impacted the advice you gave to the defendants and to Safe Chain?
A. All of this would have impacted the advice.
Q. Okay? And then I would like to go back to what I was starting to ask you about before.
Do you remember being asked by -- being asked by Safe Chain to answer some general questions about T3 requirements?
A. Yes.
Q. Okay.

MS. DEROVANESIAN: And I would like to show just the witness, please, Government Exhibit 204.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, do you recognize this document in front of you?

A. Yes.

Q. Could you please tell us what it is?

A. It's some answers to some queries that Safe Chain presented to John Morrone, and these are my answers to those. They're general information about T3 transactions, what an FDA Form 3911 was, and what, you know, what each of those pertains. That's what's on page 1 there...

And I said --

Q. I'm sorry, Ms. Rumore.

Before you get into the substance, I want to establish: Was this email, up above -- do you see where it's sent by Charles Boyd?

A. Yes.

MS. DEROVANESIAN: Your Honor, the Government moves to admit Exhibit 204.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 204 will be received.

(Government's No. 204, Email, was received in Evidence.)

BY MS. DEROVANESIAN:

Q. Ms. Rumore, now we can get into the substance here.

Could we please go to the second page, actually the third page, please? Okay.

Ms. Rumore, do you see at the bottom here an email from Charles Boyd to John Morrone?

A. Yes.

Q. And can you just remind us who John Morrone is?

A. That was my immediate supervisor at Frier Levitt.

Q. Is he an attorney as well?

A. Yes.

Q. And do you see where Charles Boyd poses two questions below?

A. Yes.

Q. And in this first question, do you see where Charles Boyd says, "We have tried to verify each transaction on the T3 and have not had any luck with AmerisourceBergen"?

Do you see that?

A. Yes.

Q. And do you see where it says, "They refused to provide us with any information"?

Do you see that?

A. Yes.

Q. And then do you see where he says, "If we cannot verify the transaction, is it still okay to accept the product and sell the goods?"

Do you see that?

A. Yes.
Q. Okay. And in this email, where he's asking this question, does he disclose that Safe Chain has already confirmed that the transaction history is false?
MR. ZIMET: Objection --
A. No.
MR. ZIMET: Excuse me. Judge, objection. The document speaks for itself.
THE COURT: Sustained.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, do you see the second question?
A. Yes.
Q. Okay. And do you see where Charles Boyd asks, or says, "Gilead told our compliance team that if we cannot verify a T3 transaction, then we need to fill one of these Form 3911s out"?
Do you see that?
A. Yes.
Q. And you said this -- he says, "This is after they just requested our invoice from our supplier and we refused."
Do you see that?
A. Yes.
Q. And do you see where he says, "Is this a requirement or just a recommendation?"
A. Yes.
Q. Okay. At this point, had Charles Boyd told you about that

email we saw earlier from Gilead to him?
A. No.
Q. And then I would like to go up above here. I think your response actually starts on the previous page.
MS. DEROVANESIAN: And if we could go one page back. There we go. Thank you.
BY MS. DEROVANESIAN:
Q. Do you see a response from yourself on October 13th here?
A. Yes.
Q. Okay. And did you provide answers to Charles Boyd's questions below?
A. Yes.
Q. Okay. And do you see where you said that TX -- where you talk about T3, and then you say, "TX info stuff on the invoice"?
A. Yes.
Q. What is TX in this context?
A. TX is the part of the T3. There's T1, T2 and T3.
So T1 is history.
T2 or TX is the information which pertains to that particular transaction.
And then T3 is a statement that's made that, you know, that they're vouching for the product. It's a statement that's made on a T3 document.
Q. Okay. And is this the same type of transaction, T3

pedigree information that you have been talking about today?
A. That, again, is T3, yes.
Q. And then where you say, "This info must be exchanged at the time of ownership -- at the time of change of ownership of the products."
Do you see that?
A. Yes.
Q. Do you remember giving that response?
A. Yes.
Q. And do you see after that where you say, "Wholesale distributors, repackagers and dispensers cannot accept ownership of a product unless they are provided with associated T3 data"?
Do you see that?
A. Yes.
Q. And in this context, was Safe Chain a wholesale distributor?
A. Yes.
Q. And do you see where it says, "The T3 data requirements mandate all parties who have ownership of a product need to keep that product's T3 data for six years"?
A. Yes.
Q. Do you remember giving this advice?
A. Yes.
Q. And then I would like to take a moment to focus on the

second part here. At this time, on October 13th, did you have any information about anything wrong with the suppliers of the HIV medication?
A. No.
Q. Okay. Did you have any information about the T3 information being falsified --
A. No.
Q. -- at this point? Okay.
So when you answered this question in Number 2, was it kind of a hypothetical?
A. It was hypothetical except where they said they can't verify from AmerisourceBergen.
Q. Do you see a mention here of a pharmacy confirming that a transaction didn't happen?
MR. ZIMET: Objection, Judge. Again, the document speaks for itself.
THE COURT: Sustained.
BY MS. DEROVANESIAN:
Q. Okay. And I would like to turn your attention -- actually kind of below Number 2 -- and we might need to expand -- well, that goes on to the next page, so I guess we'll start there.
Do you see where you said, "This scenario is unclear to me without knowing more"?
A. Yes.
Q. Why did you say to me that "the scenario was unclear to

you" without nothing more?
A. Because I didn't know who their supplier was and if they were purchasing from AmerisourceBergen, Gilead. I didn't have any details, so this -- that's why it's so general.
Q. Okay. And then do you see after that where you say, "Did Gilead sell drug to Safe Chain?"
A. Yes.
Q. And why did you ask if Gilead sold the drug to Safe Chain?
A. Because I didn't know if that is where the source of their drugs, if it was -- they were buying direct from Gilead. They could have.
Q. Okay. And then after that, you say, "If so," -- and then I think your response continues on to the next page.
You say, "If so, they needed to provide the T3 data. They need to fill out this form."
Do you see that?
A. Yes.
Q. And then below that, you say, "If a product is thought suspect or is found to be counterfeit, the product needs to be quarantined and investigated?
A. Yes.
Q. And you say, "We cannot answer without knowing details, such as what P&Ps were used to clear the product."
Can you tell us what a P&P is?
A. A P&P is -- I was referring to the same thing as the SOPs.

They're procedures of what their -- how they -- their products and who handles what when. So that -- all that information -- I didn't have all the details of any of that. I've never seen their SOPs. So I ...
Q. Okay.
And do you -- I'm sorry. Were you finished?
A. That's why it's general. It says, "We cannot answer without knowing details." I was asking for more information.
Q. Okay. And do you see where you say, "Let me know if you want me on the call tomorrow"?
A. Yes.
Q. All right. And I'd like to take you briefly back to the first page here.
Do you see in the middle here where your responses were forwarded to Charles Boyd?
A. Yes.
Q. And, Ms. Rumore, do you remember having a phone call with Charles Boyd after you sent this advice?
A. Yes.
Q. Okay. And do you remember on that phone call, if Charles Boyd told you that, actually, at this point, the manufacturer had confirmed the transactions were false?
A. No.
Q. Okay.
MS. DEROVANESIAN: We can take that one down.

BY MS. DEROVANESIAN:
Q. Ms. Rumore, in around November of 2020, was Gilead -- did Gilead contact Safe Chain?
A. So -- yes.
Q. Okay. And just to remind us, who is Gilead?
A. Pharmaceutical manufacturer.
Q. Okay. And did Safe Chain eventually get sued by Gilead later on?
A. Yes.
Q. Okay. And can you tell us, just at a very high level, what was the basis of that lawsuit?
A. It was that Safe Chain was distributing the Gilead product without the appropriate pedigree and also that would be a violation of the trademark, Gilead's trademark because the product could be illegitimate.
Q. Okay. And before that lawsuit was formally filed in court, was there a series of letters sent back and forth from Gilead to Safe Chain?
A. Yes.
Q. Okay. And did Frier Levitt, the law firm that you worked at, represent Safe Chain in that matter?
A. Yes.
Q. And were you part of that communication back and forth before the lawsuit was filed?
A. Yes.

Q. And at that point, what was your role in relation to the defendants, Charles and Patrick Boyd?
A. I was their attorney and important for me to inform them of the DSCSA, the requirements, the T3, and also to prevent them from getting sued from Gilead.
Q. Okay. And, Ms. Rumore, are you familiar with a term called "zealous advocacy"?
A. Yes.
Q. Can you tell us what that term means to you?
A. It means that, you know, you do everything that you can within the confines of law to advise your client the best course of action.
Q. At this point, in November of 2020, were you acting as a zealous advocate for Charles and Patrick Boyd?
A. Absolutely.
Q. And for Safe Chain?
A. Yes. And I had no reason to, you know, know there was nothing else going on or, you know.
Q. At the time, were you trusting the information that Charles and Patrick Boyd provided?
A. Yes.
Q. Ms. Rumore, I would like to show --
MS. DEROVANESIAN: Just for the witness, please, Government Exhibit 203.
///

BY MS. DEROVANESIAN:
Q. And, Ms. Rumore, can you just tell us if you recognize this?
A. It's an email from Gilead's counsel, Peter Colosi, to Safe Chain compliance.
Q. Okay. And can you tell us the date?
A. November 23rd, 2020.
MS. DEROVANESIAN: And then if we could take, just the witness, please, to the next page, the attachment.
BY MS. DEROVANESIAN:
Q. And, Ms. Rumore, can you tell us just first if you recognize this?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: The Government moves to admit Exhibit 203.
MR. ZIMET: No objection, Judge.
MS. DEROVANESIAN: All right. If we could please publish this one.
THE COURT: 203 will be received.
(Government's No. 203, Email, was received in Evidence.)
MS. DEROVANESIAN: Okay. And actually, if we could start with that attachment, please.
BY MS. DEROVANESIAN:
Q. Is this that letter you were telling us about from Gilead

to Safe Chain?
A. Yes.
Q. Okay. And do you see where in this second -- well, let's start with the first paragraph.
Do you see where it says, "I'm an attorney with Gilead's anticounterfeiting and brand protection team"?
A. Yes.
Q. And do you see where they say, "I'm writing for two reasons, to follow up on correspondence regarding Biktarvy and to seek your cooperation with our investigation into a Biktarvy lot number"?
Do you see that?
A. Yes.
Q. And do you see where it says, "First, on or about October 5th, 2020, Dakota Flowers and Abbie Divilio contacted Gilead in an attempt to verify the Drug Supply Chain Security Act document attached hereto"?
Do you see that?
A. Yes.
Q. And do you remember at the time, if you were aware of Abbie Divilio and Dakota Flowers reaching out to verify the Drug Supply Chain Security Act document?
A. No.
Q. Okay. And did you learn that when you read this letter?
A. Yes.

Q. Okay. And then do you see where it says, "Next, Gilead responded that the information contained in the document was inconsistent with our records"?
Do you see that?
A. Yes.
Q. And is that the same or similar sentence to what we saw in that email I showed you before that came from Gilead to Safe Chain?
A. Yes.
Q. Okay. And to be clear: Here in November 2020, had you seen that email?
A. No.
Q. Okay. And it said that, "If the document referenced a Gilead product, it should be treated as illegitimate product and quarantined and should be reported to the FDA."
Do you see that?
A. Yes.
Q. Do you remember reading that?
A. In this letter, yes.
Q. Okay. And do you remember if that was news to you?
A. Yes, it was.
Q. Okay. And I would like to take you to -- well, actually, we'll look at the second part here.
"Second, we are investigating a bottle of Biktarvy that was dispensed by White Cross Pharmacy. The bottle in question

contained foreign tablets."
Do you see that?
A. Yes.
Q. Do you remember reading about that?
A. In this letter, yes.
Q. Okay. And do you see in the last paragraph where it says, "Safe Chain Solutions has been identified as a possible source the counterfeit Biktarvy at issue"?
A. Yes.
Q. Okay. And do you see where Gilead is requesting information from Safe Chain?
A. Yes.
Q. Okay. And then I would like to take you, please, to page 3. Do you see where it says, "Gilead takes the risk of counterfeit medication seriously, exposing patients to potential injury from taking what they thought were genuine Gilead medicine strikes at the core of our mission"?
Do you see that?
A. Yes.
Q. Okay. And then do you see down below where it says, "Due to public health and legal risks associated with selling illegitimate or counterfeit products, we look forward to your cooperation in this investigation"?
A. Yes.
Q. Okay. And, Ms. Rumore, do you remember when you received

this letter?
A. It was November 24th, the day after it was written, I believe.
Q. Okay. And at this point, what was your reaction to reading the allegations in the letter?
A. There was new information. There was a secondary complaint that Gilead was investigating, and that's the first we have seen of that and we had no information from that previously.
There was something about them being contacted, Gilead, and that there was a determination of illegitimate product. We didn't see -- I didn't see any of that before this.
Q. Okay. And before you got this letter, had you been provided any information that there was any sort of problem with the source of the HIV medication that Safe Chain was selling?
A. No.
Q. Okay. And just to be clear: At this point in November of 2020, was it your role to look into the suppliers and the sources of HIV medication that Safe Chain was selling?
A. No.
Q. No?
A. It was -- compliance officer would do that.
Q. And at this point, in November of 2020, did you review or approve of the sources of medication that Safe Chain was buying HIV drugs from?

A. No.

THE COURT: And, Ms. DerOvanesian, is this a good spot to take a break?

MS. DEROVANESIAN: It is, Your Honor.

Thank you.

THE COURT: All right. Members of the jury, we're going to go ahead and recess for lunch. Remember my admonition not to discuss the case or allow it to be discussed in your presence.

I'm going to ask you to come back at 1:00 and be back in the jury deliberation room at that time. And I just want to let you know we're going to have to break a little early today. We are going to break right about at 4:00.

So have a nice lunch. We'll see you back at 1:00.

COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: Ms. Rumore, during your break in the testimony, you're not allowed to discuss your testimony with anyone.

Do you understand?

THE WITNESS: Yes, Your Honor.

THE COURT: And we'll see you back at 1:00.

THE WITNESS: Thank you.

THE COURT: Any matters that you wanted to bring up outside the presence of the jury, Mr. Zimet?

MR. ZIMET: And the witness, Judge.

THE COURT: Okay.

(Witness exits.)

THE COURT: Okay.

MR. ZIMET: Judge, the first matter is that the witness has -- the one that we're reserving was that the witness was testifying as to expert matters that an expert witness would need to testify to.

There's been no designation of this witness as an expert witness.

THE COURT: So what is the Government's position on that?

MS. DEROVANESIAN: Your Honor, she's not providing expert testimony. This is a fact witness, and she's testifying as to the advice that she gave and what she did and learned.

THE COURT: She talked about laws and stuff like that.

MS. DEROVANESIAN: She's testifying as to the content of documents primarily that were already entered into evidence and as to the substance of those laws that are actually contained within those emails.

She's not providing an opinion or a legal conclusion of any sort as to what is proper. She's simply advising -- she's testifying as to what she did advise the defendants and what information she had to form the advice she provided as well as reading through documents that were already entered into

evidence, which do cite the law, but she's not being asked to opine on that law or draw any sort of conclusions from it.

THE COURT: So you don't have any objection to my telling the jury that she was not designated as an expert in this case and they should ignore any of her testimony that would deal with expert testimony?

MS. DEROVANESIAN: Your Honor, we would request that it be clarified that they shouldn't ignore her testimony but that she is not an expert. She's hasn't been designated as an expert, and that they're not to rely on any sort of conclusion of law that she draws, and that Your Honor will be instructing the jury on the law, just to alleviate any potential confusion there may be.

THE COURT: Mr. Zimet.

MR. ZIMET: Judge, it's not potential confusion.

She's testifying to things she should not be allowed to testify to.

She's testifying to things as to what should be done. If she had known certain things, this is what she would do based upon what the law is, what the requirements are -- all that should be stricken, Judge.

THE COURT: All right. I'm going to tell them that she wasn't designated as an expert and they can't rely on any of her conclusions of law.

The next one?

MR. ZIMET: The next one, Judge, is -- I don't know how many there were, I've lost count -- as to things that were asked in a leading manner.

As to: Did Charles Boyd -- I think she asked a couple about Patrick Boyd also -- did they say X, did they say Y, did they say this or that, in one conversation on August 20th?

The Government knows what was said in that conversation. The conversation had nothing to do with the things that supposedly weren't disclosed. The Government knows that.

So to ask that question is improper. It misleads the jury, and I reserve it, and I would request a mistrial based upon that, or an instruction to strike all those questions: Did Charles Boyd tell you something during the August 20th conversation?

Unless -- unless she testifies that that was a subject matter and an issue in that conversation, which it wasn't.

THE COURT: All right. The motion for a mistrial is denied.

I mean, there are leading questions, and then there are leading questions.

I mean, I guess there's some argument that if you ask a question that could have a yes-or-no answer to it, maybe it's leading.

To me, a more leading question is when you say: "Isn't

it true that..."

So I don't think --

MR. ZIMET: But Judge --

THE COURT: -- that there's any prejudice to the Court's rulings.

MR. ZIMET: Judge --

THE COURT: And certainly on cross-examination, you can bring out everything that was said during that August conversation.

MR. ZIMET: And, Judge, I don't want to reargue with the Court. May I just add, though, that this is a situation where the Government is asking the question about something they know was not discussed in a conversation.

THE COURT: They also are under the impression -- and you notified them -- that you're going to have an advice of counsel defense. That seems to me that what was told to counsel and what wasn't told to counsel is relevant.

MR. ZIMET: But it relates to the advice that was given.

The advice in that call related to a recall -- issues relating to a recall, not all these other things about other aspects, other issues.

So to bring up that something wasn't asked, something wasn't disclosed, which had nothing to do with the supposed advice that was given, that's improper, Judge. That's just

disingenuous, and it's misleading to the jury.

THE COURT: I think it was marginally relevant and certainly, if you think wasn't fair, you can barbecue them during closing argument about it.

Anything else we need to discuss?

MR. ZIMET: Those were the issues I reserved on, Judge.

THE COURT: Anything else?

MR. BARZEE: Your Honor, on behalf of Patrick Boyd, it's much more egregious what the Government did with Patrick Boyd, asking this witness: Did Patrick Boyd disclose to you A? Did Patrick Boyd disclose to you B in a series of a half dozen questions, knowing, at the time that the Government asked the question, knowing that Patrick Boyd had no conversations with this witness.

THE COURT: And the jury --

MR. BARZEE: They were clearly implying to the jury that Patrick Boyd was in communication with the witness and failed to disclose pertinent facts.

That was the reason for the question. That was the implication for the jury.

The Government knew that there was no contact between Patrick Boyd and this witness. It was improper. It was done purposefully to mislead the jury.

I move for a mistrial. And absent that, I would ask for some curative instruction informing the jury that it was

improper to ask those questions related to Patrick Boyd when the Government knew he had no contact with this witness.

THE COURT: All right. I am going to deny the motion for mistrial.

I think the curative instruction has already been given when the jury was told that it was only Charles Boyd during August when they had the conversation.

Anything else we need to discuss?

MR. ZIMET: Not --

MR. POGOZELSKI: Not from the Government, Your Honor.

THE COURT: Mr. Barzee?

MR. BARZEE: No, Your Honor.

THE COURT: We'll be in recess until 1:00.

(Off the record from 11:55 AM to 1:07 PM, after which the following proceedings were had:)

THE COURT: All right. We're back on the record.

Counsel are present. Both defendants are present.

Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: Just very quickly, Your Honor.

I talked to defense counsel. Our plan was not to call Abbie Divilio right after this witness.

THE COURT: That's fine.

MR. POGOZELSKI: And probably as early as we can, the week of October 6, just because of the length of the witness,

and I just wanted to clarify that with the Court.

THE COURT: That's fine.

Are you going to finish this witness before 4:00?

MS. DEROVANESIAN: We believe so, yes.

THE COURT: I don't know. Okay.

Let's bring in the jury.

(Jury enters.)

MR. ZIMET: Judge, I have one issue.

Can the Court give the instruction concerning the expertise to the jury before we continue with the direct examination?

THE COURT: Sure.

MR. ZIMET: Thank you.

(Witness enters.)

THE COURT: Ms. Rumore, you understand that you're still under oath?

THE WITNESS: Yes, Your Honor.

COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. BARZEE: Yes, sir.

MR. ZIMET: Yes, sir.

THE COURT: And did everyone follow my admonition not

to discuss the case or allow it to be discussed in your presence?

All right. The Government didn't designate Dr. Rumore as an expert; therefore, she's not allowed to testify as an expert. So disregard any of her testimony that had to do with expert testimony or any of her conclusions on the law. I'll tell you what the law is.

And the Government may continue.

MS. DEROVANESIAN: Thank you, Your Honor.

BY MS. DEROVANESIAN:

Q. Good afternoon, Ms. Rumore.

When we broke for lunch, we were talking about a letter that Safe Chain received from Gilead.

Do you remember that?

A. Yes.

Q. And that was in November of 2020?

A. Yes.

Q. Okay. And you were explaining to us that there were certain pieces of information in that letter from Gilead that you did not know before you received that letter.

Do you remember that?

A. Yes.

Q. Did you have any back-and-forth conversations with Charles Boyd about what was in this letter?

A. I believe so.

Q. Okay. And did you exchange emails back and forth about how to respond to it?
A. Yes.
Q. Okay. And by this point, how long had you known Charles Boyd, at least through email and phone?
A. Back from October of 2020, is it?
Q. Did you say you had a phone call in August?
A. A phone call in August --
MR. ZIMET: Judge, objection.
A. -- and --
MR. ZIMET: Object. Excuse me.
The witness answered, and then there's a leading question.
THE COURT: That's a leading question. I sustain the objection.
BY MS. DEROVANESIAN:
Q. Had you spoken to Charles Boyd by this point?
A. Yes.
Q. Had you exchanged emails with him by this point?
A. Yes.
Q. And could you just describe for us what kind of a relationship you had with Charles Boyd by November of 2020, when you start defending Safe Chain against these Gilead accusations?
A. I was representing Safe Chain and advocating for them and

that was the relationship: attorney-client.

Q. And I would like to show you --

MS. DEROVANESIAN: Just for the witness, please, Government Exhibit 205.

BY MS. DEROVANESIAN:

Q. Do you see this document in front of you?

A. Yes.

Q. Can you tell us what it is?

A. It is --

Q. You don't need to tell us about the contents just yet. If you can tell us what it is, generally.

A. It's an email from me to Abbie Divilio and Charles Boyd.

Q. Okay.

MS. DEROVANESIAN: Government moves to admit Exhibit 205.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 205 will be received.

(Government's No. 205, Email, was received in Evidence.)

MS. DEROVANESIAN: And could we please publish this one.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, I would like to start with page 4 here.

And do you see a message at the bottom here from Abbie Divilio?

A. Yes.
Q. And remind us what her role was again?
A. She's the compliance officer at Safe Chain.
Q. Okay. And do you see this email that she's sending to Charles Boyd?
A. Yes.
Q. Okay. And do you see where she's explaining that we have three things going on?
A. Yes.
Q. And she says, "One, White Cross dispensed a bottle which is in question by Gilead and sold by us"?
A. Yes.
Q. Do you see where she says, "Two, we inquired about Biktarvy lot to verify in August because someone complained about the packaging"?
Do you see that?
A. Yes.
Q. And then three, she says, "We inquired about Biktarvy lot in October while we attempted to verify the T3 and expiration date"?
A. Yes.
Q. Do you see where she says, "Biktarvy was verified to be a legitimate product"?
Do you see that in the -- let's see, third -- fourth line from the bottom?

A. Yes.
Q. Okay. And then if we go on to the next page, to continue this email, do you see where she says, "In early October, we attempted to verify a transaction on the T3, Rochester Drug from Gilead"?
A. Yes.
Q. Okay. You mentioned that you learned new information from the Gilead letter. Did you also learn any new information from what Abbie Divilio was providing in this email?
A. Yes. This October 6th, attempting to verify a transaction from Rochester Drug from Gilead.
Q. Okay. And what month is this email sent in where you're learning this?
We can take you back to page 4.
A. November.
Q. And would that information have been relevant to you back in October when it happened?
A. Yes.
Q. Why?
A. Because again, it's another thing that happened, and there was a correspondence between Abbie and Gilead that I wasn't aware of.
Q. Okay. And do you remember sending a draft response to Gilead's letter to Charles Boyd and Abbie Divilio?
A. The November 23rd letter, sending a draft of that, yes.

Q. Okay. I would like to take you to that attachment to this email, which starts on page 6.

Okay. And does this look like a draft of that letter that you prepared?

A. Yes.

Q. Okay. And where did you get the information that you are putting in this letter?

A. From Safe Chain.

Q. Okay. And was Charles Boyd part of providing that information?

A. Yes.

Q. Okay.

MR. BARZEE: Objection, Your Honor. I'm going to ask for a more specific answer than "Safe Chain. "

THE COURT: Okay.

MR. BARZEE: Was Patrick Boyd involved in that?

THE WITNESS: I can't recall if Patrick Boyd was involved, but I do know that Charles Boyd and Abbie Divilio were involved.

BY MS. DEROVANESIAN:

Q. All right.

Ms. Rumore, I would like to turn your attention to the second page of this draft.

Do you see in the middle of this page where there's blue text and some red text?

A. Yes.
Q. Okay. And the sentence before that --
MS. DEROVANESIAN: Well, actually, let's zoom out for just a moment.
BY MS. DEROVANESIAN:
Q. And I will just take you -- sorry -- back to the first page to just to orient what we're talking about here.
So do you see where it says, "Regarding one Biktarvy lot, Safe Chain contacted your QC complaints office on October 5th, 2020, attempting to verify T3 information"?
Do you see that?
A. Yes.
Q. And were you part of that contact on October 5th, 2020?
A. No.
Q. Okay. And so in this explanation on the next page, do you see the blue and the red text?
A. Yes.
Q. Do you know whose writing is that blue text?
A. That's Abbie Divilio.
Q. Okay. And she says, "Just want to add the customer White Cross did not return product to our facility. They sent it directly to Gilead."
And do you see the red text that follows that?
A. Yes.
Q. Who is writing that?

A. That's me.
Q. And you say, "This conflicts with the information you provided in the email chain of 11/25, where you stated that there was no complaint and you were just seeking info about the expiration date."
Do you remember -- do you remember if you were under the impression at this time that there wasn't an actual complaint and they were just seeking the expiration date, like you were saying?
A. They were trying to verify the expiration date. There was no complaint.
Q. Okay. And was that your understanding at the time?
A. That was my understanding.
Q. I'm sorry. I'm going to try not to talk over you.
Is that your understanding at the time you wrote this draft?
A. Yes.
Q. Thank you.
And then I would like to take you back to page 2.
And do you see this response from Abbie Divilio to you and to Charles Boyd?
A. Yes.
Q. Okay. And do you see where she says, at the bottom, "We would prefer not to include a copy of the T3 exposing our vendors without their consent"?

Do you remember seeing that?
A. Yes.
Q. And do you remember talking to Charles Boyd as well about not wanting to provide the information about their vendors?
A. Yes.
Q. And just to clarify: Who are the vendors in this context? What would their role be?
A. The vendors are their suppliers. So wherever they purchased the product from, that would be their T3, the sources.
Q. So are you talking about the people -- the entities that Safe Chain purchased medication from?
A. Yes.
Q. Okay. And did -- in this email, did Abbie explain why they did not want to expose who their vendors were?
A. It's not in this email, no.
Q. Okay. I would like to show you --
MS. DEROVANESIAN: Please just for the witness, Government Exhibit 206.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, do you recognize this email?
A. Yes.
Q. And is this from you to Charles Boyd and Abbie Divilio?
A. Yes.
Q. Okay.

MS. DEROVANESIAN: Government moves to admit Exhibit 206.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 206 will be received.
(Government's No. 206, Email, was received in Evidence.)
BY MS. DEROVANESIAN:
Q. And, Ms. Rumore, if we scroll through here -- let's see.
Is this another conversation about that draft response you're preparing to Gilead?
A. Yes.
Q. Okay. And I would like to turn your attention to page 4.
Do you see this response from Abbie Divilio to Charles Boyd here?
A. Yes.
Q. Okay. And do you see the last sentence in that first paragraph, where it says, "White Cross claimed this bottle contained Seroquel ER 300, which is the attachment entitled 'Biktarvy Lot CCPDA complaint convo'"?
Do you see that?
A. Yes.
Q. Do you remember if, at this time in November of 2020, you had been made aware of an issue with Seroquel in a bottle of Biktarvy?
A. Not at this time. I don't think it was November. It was

after that, I think.
Q. Okay. And then I want to turn your attention to page 2, please.
Do you see your response to Charles Boyd on the bottom half of this page?
A. Yes.
Q. Okay. And do you see where you say, "I have a few questions. I do not see any mention of Seroquel as indicated in Abbie's email, just generic Excedrin"?
When you said "generic Excedrin," is that the August incident of the wrong pills in the bottle that you told us about earlier?
A. Yes.
Q. And was that the only August incident of wrong pills in the bottle that you were aware of before this letter?
A. Yes.
Q. Okay. And then you say, "Please let me know. In previous correspondence with Gilead, you indicated generic Excedrin"?
A. Yes.
Q. And then do you see -- and I'm going to have to take you to the bottom of page 1, and it will carry on to page 2.
Do you see Abbie Divilio's response here, where she says, "I apologize. The note at the bottom of the email regarding the Seroquel was just a note to Charlie and is not related to this issue"?

Do you see that?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: I would like to show just the witness, please, Government Exhibit 207.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, do you recognize this document?
A. It's -- the bottom one is an email from Abbie to me and to Charles Boyd.
Q. Okay.
A. Which --
MS. DEROVANESIAN: Government moves to admit Exhibit 207.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 207 will be received.
(Government's No. 207, Email, was received in Evidence.)
BY MS. DEROVANESIAN:
Q. Ms. Rumore, are you continuing your conversation here about how to respond to Gilead's letter?
A. Yes.
Q. Okay. I would like to show you page 2, please.
Okay. Ms. Rumore, I think -- the top here is cut off, but can you see from the bottom that this is your response to Abbie and to Charles Boyd?

A. Yes.
Q. Okay. And at this time, you just told us that you were just learning about the Seroquel bottle and other information that you didn't have before; is that right?
A. Yes.
Q. And here you're telling Charlie and Abbie what your opinion is about this response to Gilead; is that fair?
A. Yes.
Q. Okay. And then you say here that, "Once they made a determination the product was illegitimate, they had 24 hours to notify the FDA and their trading partners of that."
Do you remember giving that advice?
A. Yes.
Q. Okay. And what was that based on? Why did you say it was on the manufacturer to notify in this instance?
A. Because they had the control of the product.
If the product was sent to them, then they would be the ones to notify the FDA, and they would also be the ones to know that if there were other issues with the lot, they would be the ones to do testing on it.
So most of these FDA reports are going to come from the manufacturer, not from the wholesaler.
Q. Ms. Rumore, at this point in November -- or are we in December yet?
At this point in November -- we're in December now.

At this point in December of 2020, were you aware of any issues that Safe Chain had with medication outside of Gilead?
A. No.
Q. Okay. And would that be a relevant fact for you giving this advice?
A. Yes, it would.
Q. How would it be relevant for you to know if Safe Chain had bottles of medication manufactured by other manufacturers that had similar problems?
A. One of the things that would come to mind is that it wouldn't be necessarily a Gilead problem, that it would be more likely to be a source problem.
Q. Okay.
A. One thing that I would go to right away.
Q. When you say "a source," are you talking about the people from whom the medication is purchased?
A. Yes.
Q. Okay. And then I would like to show you the first page of Government Exhibit 207.
And do you see at the top here the email from Charles Boyd?
A. Yes.
Q. Do you see where he says, "Please leave out our vendors' license numbers"?
A. Yes.
Q. Does he explain here why he doesn't want you to share the

vendors' license numbers with Gilead?
A. No.
MS. DEROVANESIAN: Okay. And I would like to please just show Ms. Rumore, Government Exhibit 208.
BY MR. POGOZELSKI:
Q. Ms. Rumore, do you recognize this email?
A. Yes. It's an email from me to Charles Boyd and Abbie that we sent the response to Gilead.
MS. DEROVANESIAN: Government moves to admit Exhibit 208.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 208 will be received.
(Government's No. 208, Email, was received in Evidence.)
BY MS. DEROVANESIAN:
Q. Ms. Rumore, have we just been talking about some of the back-and-forth about the response to Gilead's letter?
A. Yes.
Q. Did you eventually send a letter to Gilead?
A. Yes.
Q. Was that letter approved by Charles Boyd?
A. Yes.
Q. And did that letter contain information that you received from Charles Boyd?
A. Yes.

Q. Okay. I would like to turn your attention to the attachment, which starts on page 3. Okay.
Is this the letter that you wrote?
A. Yes.
Q. All right. I would like to show you the second paragraph here.
Do you see where you say, "As an initial matter, Safe Chain is committed to fully cooperating with your investigation. We proactively take action to prevent the distribution and sale of counterfeit products, including working with federal and local authorities to enforce laws"?
Do you see that?
A. Yes.
Q. And did Charles Boyd represent to you that that was true at this point?
A. Yes.
Q. And did you believe it at this point?
A. Yes, I did.
Q. Did you have any reason to doubt it at that point?
A. No.
Q. And then see below that where you say, "It is important to point out that Safe Chain proactively contacted Gilead requesting T3 information verification."
A. Yes.
Q. And did Charles Boyd represent to you that that was true?

A. I believe so. I believe Abbie did.
Q. Okay. Did Charles Boyd approve this letter before it went out?
A. Yes.
Q. And then on the next page, in the middle of that first paragraph here, you note a situation where you say your investigation revealed that the product was illegitimate and details of that investigation were only known to you and not shared with Safe Chain.
At this point when you wrote this letter, did you believe that to be true?
A. Yes.
Q. And who provided you the information that went into this letter?
A. Safe Chain.
Q. Who -- could you tell us who specifically you spoke to when you went back and forth about this draft?
A. I think at this point, it was just Abbie and Charles.
Q. Okay.
A. I don't think Patrick.
Q. Okay. And then in that second paragraph, that first line where you say, "Regarding two Biktarvy lot CCXKVA, your November 23rd letter is the first time we are being contacted that there's an investigation into this lot number."
A. Yes.

Q. Do you see that?
A. Yes.
Q. And based on the information that you had at the time, did you believe that to be true?
A. Yes.
Q. Okay. And then a little bit below that, a few lines below, you say, "We can assure you we are purchasing from an authorized trading partner."
A. Yes.
Q. Ms. Rumore, at the time that you wrote this in December of 2020, did you believe that to be true?
A. Yes.
Q. Did you have any information that we went over earlier about different issues with the supplier --
A. No.
Q. -- at that point?
A. I had none of that information.
Q. If you had some of that information, would it impact what you would have said in this letter?
MR. ZIMET: Objection, Judge. Foundation.
THE COURT: Overruled.
A. I would not have assured Gilead that they were purchasing from an authorized trading partner.
BY MS. DEROVANESIAN:
Q. Okay.

A. That's for sure.

MS. DEROVANESIAN: And then I would like to show just the witness, please, Government Exhibit 209.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, do you recognize this email?

A. This is from me to Danielle Manning of Frier Levitt and copying Abbie Divilio.

Q. Okay.

MS. DEROVANESIAN: Let's go to page 4, just for the witness, please.

BY MS. DEROVANESIAN:

Q. And do you recognize this letter?

A. Yes. This is Gilead's response to the response that we sent them to their November letter.

Q. Okay.

MS. DEROVANESIAN: Government moves to admit Exhibit 209.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 209 will be received.

(Government's No. 209, Email, was received in Evidence.)

BY MS. DEROVANESIAN:

Q. Ms. Rumore, I would like to show you -- we'll start with the attachment page 4.

Is this a letter that Gilead sent in response to what you

sent?
A. Yes.
Q. Okay. And did this letter identify statements in your letter that were inconsistent with their information?
A. Yes. They said that we had made misrepresentations to them.
Q. Okay. And then I would like to show you under -- in this middle paragraph on the first page here, do you see where it says, "The reply letter asserted contrary to the plain text of Gilead's October 9th email that Gilead determined the product as illegitimate"?
Do you see that?
A. Yes.
Q. Do you remember reading that?
A. Yes.
Q. Do you remember reading where he says, "In fact, Gilead cannot make any determination regarding a product, as we did not know whether the T3 document related to a product in Safe Chain's possession or control. We simply commented on the T3's veracity and stated that if the T3 document did pertain to a product, they should quarantine it and all related products"?
Do you remember reading that?
A. Yes.
Q. Did that concern you to read?
A. Yes.

Q. Why?
A. Because there was a determination made that Gilead said they could not make the determination regarding the product, and that they didn't know whether the T3 related to a product that Safe Chain had in their possession. And they were just commenting on the T3 document's veracity, and they were advising Safe Chain to quarantine the product.
Q. Ms. Rumore, were you involved in the communications in early October that are being referred to here?
A. No.
Q. And did that concern you?
A. Yes.
Q. Why?
A. Because I didn't have all the facts. I didn't know what was going on. I was -- there was some concealment of facts. It wasn't disclosed to us.
Q. Okay. And then on the next page, I'd like to show you the third paragraph. Do you see where it says, "Gilead reiterates its request for Safe Chain's source of Biktarvy it sold to White Cross"?
A. Yes.
Q. And remember before when we were talking about how Charles Boyd and Abbie Divilio didn't want to share the source of the drugs?
A. Yes.

Q. Did you end up sharing the source of the drugs in that final letter that went out?
A. I don't think -- no.
Q. And here, do you see Gilead is asking you for it, reiterating that request?
A. Yes.
Q. Okay. And then do you see that last sentence here where it says, "Gilead is simply attempting to determine how this illegitimate product made its way into the supply chain"?
Do you see that?
A. Yes.
Q. Do you remember reading that?
A. Yes.
Q. Did that concern you?
A. Yes.
Q. Why?
A. Because they're calling the product illegitimate, and then that's a grave concern.
And that they're indicating that Safe Chain isn't being transparent and providing them with information, so that's of concern now.
Q. Okay. And then down below, in the paragraph that's titled "FDA Recalls," towards the middle, it says, "In either case, did Gilead manufacture these medicines as either the bottle contained foreign tablets or the pedigree documentation

associated with the medicine was fraudulent."

Did you see that?

A. Yes.

Q. Do you remember reading that?

A. Yes.

Q. Do you remember being concerned about that?

A. Yes.

Q. Why?

A. Because it would indicate that maybe there should be a product recall, so there's no patient harm. If there's -- and that is why there's a whole paragraph on recalls.

Q. And do you remember if you had sent that recall memo explaining recall laws to Safe Chain prior to this?

A. Yes.

Q. Thank you.

MS. DEROVANESIAN: We can that take that one down.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, after this exchange of letters with Gilead, did you hear about additional instances of Safe Chain receiving bottles of medication with the wrong pills inside?

A. Yes.

Q. I would like to show you Government Exhibit --

MS. DEROVANESIAN: Just for the witness, please, Government Exhibit 225.

///

BY MS. DEROVANESIAN:
Q. Ms. Rumore, can you tell us if you recognize the document on the screen?
A. Yes. It's an email from Charles Boyd to me, copying Abbie Divilio.
MS. DEROVANESIAN: Government moves to admit Exhibit 225.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 225 will be received.
(Government's No. 225, Email, was received in Evidence.)
BY MS. DEROVANESIAN:
Q. Okay. And, Ms. Rumore, I'm going to take you to the end of this document on page 6.
Do you see this email from Abbie Divilio to you and to Charles Boyd?
A. Yes.
Q. Okay. And do you see where she says, "Yesterday afternoon, we received a call from one of our customers with another claim that the Biktarvy he bought from us was filled with the wrong medication."
Do you see that?
A. Yes.
Q. Okay. Do you see where she says later that, "She consumed 16 out of 30 tabs. She may have been having some adverse

effects of the medication."

Do you see that?

A. Yes.

Q. Okay. And do you remember reading that back in 2021?

A. Yes.

Q. Did that concern you to read?

A. Yes. Very much so.

Q. Why?

A. Because there's a patient harm now. There's another mix-up. There's another incident. It occurs in February and there's a mix-up with Biktarvy and Stribild.

Q. And in this instance, is Abbie Divilio and Charles Boyd -- are they making you aware of it at the relevant time when it happens?

A. It was yesterday after that, she said. So it occurred February 3rd, according to this email.

Q. Okay. And then about halfway down in this big paragraph, do you see where it says Biktarvy -- "the Biktarvy was not Biktarvy and was actually another HIV medication also manufactured by Gilead"?

A. Yes.

Q. Okay. And so based on this information, did you know -- I will strike that.

Did you know at this point that Safe Chain had had instances of wrong pills in the bottle with other non-Gilead

medication?
A. No.
Q. Okay. And in this email -- I will show you page 4, and at the bottom here, your response starts.
Do you see that?
A. Yes.
Q. Do you see it continues on to page 5?
A. Yes.
Q. And are you giving them advice on what to do in response to this incident?
A. Yes.
Q. Okay. And then on page 3, do you see a response from Charles Boyd?
A. Yes.
Q. And is he following up to clarify, "We have 24 hours to notify the FDA or Gilead does"?
Did you see that?
A. Yes.
Q. And then your response starts on page 2.
Do you see where you explain to Charles that "The reason it was Gilead's responsibility and not yours is that for past issues, your investigation consisted of the pharmacy sending the products to Gilead and you asking Gilead to look into the matter and make their determination"?
Do you see that?

A. Yes.
Q. Okay. And then your response continues on the next page --
MS. DEROVANESIAN: If we could please go to page 3.
BY MS. DEROVANESIAN:
Q. And then do you see in that second line, "You should notify the FDA when you receive written confirmation from the pharmacist"?
Do you see that?
A. Yes.
Q. Okay. And then on page 1, do you see your response to Charles Boyd here at the bottom?
A. Yes.
Q. Do you see where you're telling him, "You're required to notify the FDA if you make a determination that a product is unfit or likely to cause harm"?
A. Yes.
Q. Okay. And then do you see his response to you saying that he needs to notify the FDA?
A. Yes.
Q. Does he agree that he should notify the FDA?
A. No. This is a pushback.
Q. What do you mean it's "pushback"?
A. He doesn't want to open a can of worms with the FDA. They can't determine the product is unfit. They're just a wholesaler. It says here, "How are we to determine if a

product is unfit? Isn't that for the doctor to decide?" and stuff like that. They haven't got a clue what a product can and can't do -- those types of statements.
Q. And had you heard those types of statements from Charles Boyd at this point?
A. They didn't want to notify the FDA, yeah.
Q. Okay. And when he says, "I don't want to open a potential can of worms with the FDA" -- do you see that?
A. Yes.
Q. And do you see above that that where he says, "We did not previously report to the FDA on the other issues. I would think that would be a problem."
Do you see that?
A. Yes.
Q. All right.
MS. DEROVANESIAN: I would like to please show, just for the witness, Government Exhibit 237.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, do you recognize this document?
A. It's an email from me to Charles Boyd and Abbie Divilio.
Q. Okay.
MS. DEROVANESIAN: Government moves to admit Government Exhibit 237.
MR. ZIMET: No objection.
MR. BARZEE: No objection.

THE COURT: 237 will be received.

(Government's No. 237, Email, was received in Evidence.)

BY MS. DEROVANESIAN:

Q. Ms. Rumore, the date of that last email that we were looking at, that was February '21; is that right?

A. Yes.

Q. And is this email also in February of 2021?

A. Yes.

Q. Okay. And I would like to show you the third page of this email.

Do you see an email from Peter Colosi?

A. Yes.

Q. Is that somebody who works for Gilead?

A. Yes.

Q. Is that the manufacturer who we have been talking about?

A. Yes.

Q. Okay. And in this middle paragraph, do you see at the end where it says, "Medicine Shoppe told us that in October 2020, it purchased a bottle of Biktarvy, lot CDFYCA, that contains Seroquel tablets from Safe Chain"?

Do you see that?

A. Yes.

Q. And when you read this, were you surprised?

A. Yes.

Q. Why were you surprised to read that in October 2020,

somebody purchased a bottle of Biktarvy from Safe Chain that contained Seroquel tablets?
A. Because we weren't informed of that.
Q. Okay. Did Charles Boyd tell you in October 2020?
A. No.
Q. And then do you see, on the first page of this email, your response?
A. Yes.
Q. And do you see, where you note in the bottom here, that he's raising an issue with an October 2020 incident? Do you see that?
A. Yes.
Q. Ms. Rumore, do you know if Seroquel is manufactured by somebody other than Gilead?
A. Yes.
Q. Okay. So unlike the Stribild issue that Charles Boyd shared with you, did he share with you this issue where the bottle in the medication -- the medication in the bottle was from a different manufacturer?
A. No.
Q. Would that have been an important thing for you to know?
A. Yes, because I wouldn't be thinking maybe it was some kind of mix-up at the, you know, manufacturer level. If the manufacturer makes Biktarvy and Stribild, it could have been, you know, a manufacturing issue, but this is a whole different

product.
Q. Would that have impacted the legal advice that you gave to Charles Boyd and to Safe Chain at this point?
A. Yes.
Q. How?
A. I would have inquired more about their vetting and make sure -- you know, ask them who their suppliers are, have they been vetting, and are they following their SOPs, are they getting T3s that are verified -- those types of questions.
Q. Okay. And, Ms. Rumore, you mentioned before that you were under the impression that this was -- only an issue with Gilead products.
Did Patrick Boyd ever tell you that they only had these problems with Gilead products?
A. I don't recall if it was -- if they did.
Q. Okay. I would like to show you Government Exhibit 320 --
MS. DEROVANESIAN: Just for the witness.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, do you recognize this email?
A. Yes.
Q. And do you see who it's from?
A. From Pat Boyd.
Q. And who it's to?
A. To myself, Charles Boyd, and Abbie Divilio.
Q. Okay.

MS. DEROVANESIAN: Government moves to admit Exhibit 320.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 320 will be received.

(Government's No. 320, Email, was received in Evidence.)

BY MS. DEROVANESIAN:

Q. We jumped ahead in time a little bit, but now we're in April of 2021. Do you see that?

A. Yes.

Q. Do you see in this bullet point, it lists -- the second to last one, where Patrick Boyd says, "We have only had issues with Gilead products from these vendors. No other medications in any instance, branded or generic"?

Do you see that?

A. Yes.

Q. Now, Ms. Rumore, you mentioned that because you didn't know about other instances that involved other manufacturers, you were operating as if this might have been a Gilead problem; is that right?

A. Yes.

Q. And did you, therefore, send letters and communications to that effect?

A. Yes.

Q. Okay. And would those letters and communications have been

different if you knew that that wasn't the case?
A. Yes.
Q. Okay. I would like to show you Government Exhibit 116, which is already in evidence. Okay.
Do you see here below in the middle here where it's an email from June 30, 2020?
A. Yes.
Q. Okay. And do you see here where it says, "Kalorama received a damaged Selzentry" on the attached invoice?
Do you see that?
A. Yes.
Q. And is that long before you received that letter from Gilead?
A. This is the -- in June of 2020.
Q. Okay.
A. This is way before.
Q. Okay. And did Charles Boyd tell you about this instance before you engaged with Gilead?
A. No.
Q. Would you have wanted to know about that?
A. Absolutely.
Q. Would that have been important to the advice you gave to Charles Boyd and Safe Chain?
A. Yes.
Q. Why?

A. Because it indicates that there's a -- the product is damaged, and so it might indicate a supply issue, a supplier problem.
Q. And did --
A. And I'm not sure the Selzentry -- you know, who makes that.
Q. Okay.
A. If that's a Gilead product or not. I would have to look that up.
Q. Okay. And at this point in, let's say, February of 2021, were you aware -- did anybody tell you about this issue with this Selzentry bottle from June?
A. No.
Q. Okay. I would like to show you Government Exhibit 196.
MS. DEROVANESIAN: Before we do that, could we go to the photos in this exhibit, please.
Okay.
BY MS. DEROVANESIAN:
Q. Do you see this picture attached?
A. Yes.
Q. Is that a bottle of medication?
A. Yes.
Q. Do you see in this picture who it's manufactured by?
A. Yes.
Q. Who is that?
A. ViiV.

Q. Is that a different company from Gilead?
A. Yes, I believe so.
Q. Okay. And is there anything else that you noticed about this bottle of medication?
A. Yeah. The expiration -- the NDC number is smeared, which is a red flag.
Q. Why is that a red flag?
A. Because when it comes from a source, it shouldn't be smeared like that. Nothing should be occluded. This doesn't look like a new bottle of product that's purchased from a source. This looks like a product that's been around.
Q. Would you have wanted to know about this?
A. Absolutely.
Q. Why?
A. Because then I would really be saying that, you know: Where did you get this from? And asking -- you know, asking questions, and it would have put things in a different perspective.
Q. And would that have impacted the advice that you gave?
A. Absolutely.
Q. Okay.
MS. DEROVANESIAN: We can take that one down.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, were you ever told about an issue with a bottle of Symtuza?

A. No.
Q. Were you ever told about an issue with Symtuza in -- in November of 2020?
A. No.
Q. Would that have been an important thing for you to know?
A. Yes.
Q. Would that have impacted the legal advice that you gave?
A. Yes. All of these things that I didn't know.
There's omissions. You can't provide legal advice if you don't have the full picture.
Q. I'm sorry to keep repeating these questions, but if you knew that, would that have also impacted your communications, how you responded to Gilead?
A. Completely.
Q. And can you tell us how?
A. I probably would have taken a less zealous tone with them, and it would have been different.
I wouldn't have necessarily been so certain that it was a Gilead problem and that Safe Chain had all sorts of appropriate, you know, policies and procedures for sourcing their products, vetting the T3s, and I started to think about gray market at this point. If there was this many incidents, this would have caused me grave concern.
Q. At this point had you asked to see Safe Chain's standard operating procedures?

A. We asked several times.
Q. Okay.
A. They didn't want us to review them because I remember at the time, we wanted that project to review their SOPs, but they didn't want to because they didn't want to spend the legal fees.
We were assured that there was no problem there and it wasn't necessary for us to spend time with that.
MR. BARZEE: Your Honor, I'm going to object to the "they" and "the Safe Chain."
There's two separate defendants on trial here, and if the witness could please confine her comments to one of the two defendants or both, if necessary.
THE COURT: Sustained.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, who did you speak to about reviewing Safe Chain's SOPs?
A. I know it was Abbie Divilio.
I'm not sure if it was just Charlie Boyd and/or Patrick Boyd. I can't -- I can't differentiate at this point, but I may ask later on. I can't tell you, but I know it was definitely Charles Boyd and Abbie Divilio.
Q. And along those same lines, did Charles or Patrick or anyone tell you about an issue with a Harvoni bottle in September of 2020?

A. No.
Q. Did Charles or Patrick or anyone tell you about an issue with a bottle of statin in September of 2021?
A. No.
Q. Okay.
MS. DEROVANESIAN: And I would like to show you Government Exhibit 277, which is already in evidence. Okay.
BY MS. DEROVANESIAN:
Q. And do you see this email that's referring to an Alzheimer's medication here?
A. Yes.
Q. And do you see at the top where it's talking about a bottle of Tivicay in the subject line?
A. Yes.
MS. DEROVANESIAN: I would like to take you to the next page, please. Maybe the next one. Okay. Maybe the next page. Sorry.
BY MS. DEROVANESIAN:
Q. Do you see an email that says, "Here is a picture of the Tivicay bottle and pills"?
A. Yes.
Q. And do you see below that, "If you get me a return label, I will have them send it back as soon as possible"?
A. Yes.
MS. DEROVANESIAN: And if you can back out of that,

please. And then if we go to the previous page. And the one before this.
BY MS. DEROVANESIAN:
Q. Do you see an email from Adam Brosius to Charles Boyd and Patrick Boyd here?
A. They're copied on it. It's Garrett Mellott.
Q. But Patrick Boyd and Charles Boyd, do you see them copied?
A. Yes.
Q. Do you see here where he's explaining that what's inside the pills looks like a medication used in the treatment of Alzheimer's disease?
A. Yes.
Q. And do you remember being notified by Charles Boyd or Patrick Boyd or anybody about this instance?
A. No.
Q. Would that have been important to you?
A. Yes.
MS. DEROVANESIAN: I would like to take you to Government Exhibit 196, please. And which we'll show just to the witness. Actually, it's in evidence, and we'll publish it.
BY MS. DEROVANESIAN:
Q. And do you see an email here from November of 2020?
A. Yes.
Q. And do you see an email from someone named Garrett to Charles Boyd and Patrick Boyd?

A. Yes.
Q. And do you see here where it says, "Another HIV bottle issue"?
Do you see that?
A. Yes.
Q. Okay. And do you see where he's referring to a Symtuza bottle here?
A. Yes.
Q. Were you notified in November of 2020 about this issue?
A. No.
Q. Would you have wanted to know about this issue?
A. Yes.
Q. Would this have impacted the legal advice that you gave?
A. Definitely.
Q. Would this have impacted the response that you gave to Gilead about these issues?
A. Absolutely.
Q. Okay. Ms. Rumore, can you see on page 3 here, do you see this picture of the bottle?
A. Yes.
Q. And do you see the manufacturer of this medication --
A. Yes.
Q. -- pictured.
Who is the manufacturer of this medication?
A. ViiV.

Q. Is that a separate company from Gilead?
A. I believe so, yes.
Q. Would you have wanted to know back in November of 2020 that Safe Chain was having these issues with the wrong pills inside the bottle with medications manufactured by other manufacturers, not just Gilead?
A. Yes.
Q. Would that have impacted your legal advice?
A. Yes.
Q. Okay. And do you see what's pictured here?
A. Yes.
Q. And can you read the name of this medication?
A. Symtuza.
Q. And do you know who manufactures that medication?
A. Not offhand.
Q. Okay. Thank you.
MS. DEROVANESIAN: We can take that one down.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, I would like to show you what's been admitted as Government Exhibit 505.
MS. DEROVANESIAN: If we could please publish that. Actually, we'll start -- I'm sorry -- with 501, which has been admitted. Is that what we have up? Thank you so much.
And I'm going to ask to zoom in a bit so we can read this a little bit. If we could please go to page 2. Okay.

BY MS. DEROVANESIAN:
Q. Do you see this blue message over here on the left?
A. Yes.
Q. All right. If we scroll to the bottom of it, do you see the date here, 8/14/2020, at the bottom under the word "red"?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: And then if we scroll back up, can we click on those photos to enlarge them, please? Okay.
BY MS. DEROVANESIAN:
Q. Do you see this bottle?
A. Yes.
Q. Does this -- you mentioned the other bottle you saw didn't look new.
Does this look like a new bottle?
A. No.
Q. Why not?
A. There's smudges. It's dirty on the top, and the manufacturer's name is smudged, like --
Q. Okay.
MS. DEROVANESIAN: And then if you could, just scroll us please to the next photo. And to the next photo. And the next photo. Okay.
BY MS. DEROVANESIAN:
Q. Do you see a pill pictured in this photo?

A. Yes.
Q. Do you see where it says the drug is Seroquel?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: And we can back out of that one, please.
BY MS. DEROVANESIAN:
Q. And then on the next page, do you see where this message says "Bipolar Medication Review"?
A. Yes.
Q. Do you see this message going from Garrett Mellott, at the top, to somebody saved as "Hacksaw" Boyd?
A. Yes.
Q. And do you see the response over here, in green, to this person saying "bipolar medication" after all those pictures?
A. Yes.
Q. Okay. And what is that message? What does it say?
A. It says read -- that it's read.
Q. This green message over here on the right, do you see what the message is?
Do you see where it says "WTF?"
A. Yes.
Q. Is that the response?
A. I think so, yes.
MS. DEROVANESIAN: Okay. It's a little hard to read

these sometimes, if you could bear with me.

Okay. And then if we could go to the next page, please.

BY MS. DEROVANESIAN:

Q. And do you see in this green message where it says, "Bottle does look like Boulevard"?

A. Yes.

MS. DEROVANESIAN: And then if you could go to the next page, please.

BY MS. DEROVANESIAN:

Q. Where it says, "Came from Gentek?"

Do you see that?

A. Yes.

Q. Okay. At this point, did you know who -- in August of 2020, did you know who any of Safe Chain's suppliers were?

A. No.

Q. Okay. And do you see this message to the right in green, Hacksaw Boyd's response?

A. Yes.

Q. I'm not going to ask you to say the actual word, but does he say the F-word in response?

A. Yes.

Q. And then I would like to take you to the next page.

At the top, do you see the response from Hacksaw Boyd here?

A. Yes.

Q. Does it say, "Well, I'm drunk already"?
A. Yes.
Q. Ms. Rumore, are you part of this text thread?
A. No.
Q. Were you made aware of this text thread?
A. No.
Q. Would this have been important for you to see?
A. Yes.
Q. And then if we could go to page 9, please. Okay. And do you see the date here in this middle blue message, 8/18/2020?
A. Yes.
Q. Is that just a couple days after those other messages we were just looking at with the bipolar meds?
A. Yes.
Q. Do you see -- we'll scroll down to this bottom message -- where it says, "My pharmacist said the patient opened the Biktarvy and there's a generic Excedrin inside of it."
Do you see that?
A. Yes.
MS. DEROVANESIAN: And let's open these photos, please. Okay. And then the next one.
BY MS. DEROVANESIAN:
Q. Do you see this bottle here?
A. Yes.
Q. You mentioned that a couple of the other bottles didn't

look like new bottles. What do you think about this one?
A. This -- there's an email that the patient opened it.
Q. Okay.
A. So I'm assuming that this is the return from the patient. If it is, then, you know, it could have been handled by the patient.
Q. Sure. Just looking at the bottle in the picture, as you see it, does it look new or does it look used?
A. It looks used.
Q. You mentioned before that you were actually aware of a bottle that had a generic Excedrin inside of it; is that right?
A. Yes.
Q. Did anyone send you these pictures at that time?
A. No.
Q. And did anyone explain to you that this was just a couple days after a bipolar med was found in another bottle?
A. No.
Q. Okay.
MS. DEROVANESIAN: And then let's look at the next picture, please. And the next one, please.
BY MS. DEROVANESIAN:
Q. Okay. And did anyone show you these pictures?
A. No.
Q. Okay.
MS. DEROVANESIAN: All right. And then could we please

go to page 12?

BY MS. DEROVANESIAN:

Q. Do you see the message at the top here that is from Garrett Mellott to Hacksaw Boyd?

A. Yes.

Q. And do you see where he says, "Hi, can you please look at the text below? Global has an issue with one of the Biktarvy bottles"?

A. Yes.

Q. And then do you see below where he says, "One of the bottles has been tampered with. I checked all the bottles from that lot, and they seem okay except for the bottle also seems lighter, has less tablets, weighs 8.5 grams lighter. Also, the foil seal on top is a different color, looks damaged. I initially felt the bottle was half full when I shook it and noticed the seal looked abnormal"?

Ms. Rumore, the date here is 9/18/2020. Did anybody at Safe Chain tell you about this incident?

A. No.

Q. Okay.

MS. DEROVANESIAN: And let's look at the pictures, please.

BY MR. POGOZELSKI:

Q. Do you see where he's showing how much this bottle weighs?

A. Yes.

MS. DEROVANESIAN: And then in the next picture. Okay. More of the same and then the next one.

BY MS. DEROVANESIAN:

Q. Do you see where he's comparing two bottles here?

A. Yes.

Q. If you had known that there was an incident where one bottle weighed less than it was expected to, would that have concerned you at the time?

A. Yes.

Q. Would that have been important for you to know at the time?

A. Yes.

Q. Would that have impacted the advice that you gave at the time?

A. Yes.

Q. And what about the foil? He mentions that the foil on the top looks like a different color and looked damaged. Do you see that in these photos?

A. Yes.

Q. And would that be an important thing for you to know at the time?

A. Yes.

Q. Why?

A. Because if the foil was damaged, it could have been somebody, you know, tampered with it or resealed or something like that.

Q. And would that concern you?
A. Yes.
Q. Would that change the advice that you gave to the defendants?
A. Yes.
Q. Okay. And then I would like to take you to page 15.
And do you see the message from Hacksaw Boyd saying, "Guessing it was from Boulevard"?
A. Yes.
Q. Okay. And do you see the response from Garrett Mellott saying, "Yup"?
A. Yes.
Q. And then I would like to take you to page 16.
Do you see these messages on the right from Hacksaw Boyd?
A. Yes.
Q. And do you see that there are photos attached?
A. Yes.
Q. And now this is September 28, 2020. Do you see that?
A. Yes.
MS. DEROVANESIAN: And then let's take a look at these photos, please.
BY MS. DEROVANESIAN:
Q. Do you see a picture of a bottle of medication here?
A. Yes.
Q. Okay.

MS. DEROVANESIAN: And then down below, let's look at that second one.

BY MS. DEROVANESIAN:

Q. Do you see the top of a bottle of medication here?

A. Yes.

Q. And then down below, do you see an open bottle of medication here?

A. Yes.

Q. And then do you see --

MS. DEROVANESIAN: We can zoom out.

BY MS. DEROVANESIAN:

Q. And do you see the response from Garrett Mellott to Hacksaw Boyd on the left?

A. Yes.

Q. And do you see where he says "WTF"?

A. Yes.

Q. And then carrying on to the next page, do you see Hacksaw Boyd's response, "We have another issue with a Boulevard product. Customer just called pissed"?

Do you see that?

A. Yes.

Q. And then do you see the response saying, "Oh, no. Definitely a growing issue"?

Do you see that?

A. Yes.

Q. Were you made aware of this in September of 2020?
A. No.
Q. Would that have made a difference to you?
A. Yes.
Q. Why?
A. Because at that time, we were only aware of one incident, maximum two incidents. This is so many different problems that we needed to be made aware of to provide legal advice. These are admissions.
Q. And then on page 21 of that same text thread, do you see where Garrett Mellott says, at the top, "What do we tell a pharmacy if they already dispensed a bottle?"
Do you see that?
A. Yes.
Q. And do you see Hacksaw Boyd's response in green over on the right?
A. Yes.
Q. Do you see where he says to tell the pharmacies "that we believe it was an isolated incident"?
A. Yes.
Q. And based on what you've now seen, does it look like an isolated incident?
A. No, not at all.
Q. Do you see Garrett's response saying, "Gilead believes that, question mark"?

A. Yes.
Q. Okay. And then do you see Hacksaw Boyd's response saying, "No, I think Gilead believes someone else is doing this"?
A. Yes.
Q. Okay. And, Ms. Rumore, were you shown these messages in September or March -- September of '21 -- sorry, September of 2020 or March of 2021?
A. No.
Q. Were you shown them ever?
A. No.
Q. Would you have wanted to see these?
A. Yes.
Q. Would they have made a difference to you?
A. Yes.
Q. Would they have impacted the legal advice that you provided to the defendants?
A. Throughout, yes.
Q. Would this have impacted the communications you had with Gilead?
A. Yes.
Q. Okay. Ms. Rumore, I would like to show you Government Exhibit 503, please. I'm sorry. I meant 505.
THE COURTROOM DEPUTY: Already admitted?
MS. DEROVANESIAN: It is, yes.
///

BY MS. DEROVANESIAN:
Q. Ms. Rumore, do you see another text message thread pictured here?
A. Yes.
Q. Do you see that same person -- well, actually, let's look at the participants at the top.
Do you see Charles Boyd at the top?
A. Yes.
Q. Do you see Peter Boulevard?
A. Yes.
Q. Do you see Adam Brosius?
A. Yes.
Q. And do you see Hacksaw Boyd?
A. Yes.
Q. Does it say Hacksaw Boyd with "owner" in parentheses?
A. Yes.
Q. And does it also say "owner" in parentheses when it says Charles Boyd?
A. Yes.
Q. Okay. I'd like to show you this first message. Do you see where Hacksaw Boyd, the owner, says, "Hey, Peter, we have a number of complaints from customers over the last three weeks regarding products coming from Boulevard. These pictures are from a client who received these in his bottle of Biktarvy. These broken pills look like atorvastatin, which is for high

cholesterol. Then we had another customer call today, pissed that he got his bottle of Harvoni already opened? This is too many incidents. Any idea what's going on? Maybe we should get on a call to discuss."

Do you see that message?

A. Yes.

Q. Okay. And do you see the pictures that are sent with the message?

A. Yes.

MS. DEROVANESIAN: We'll blow them up. We can just zoom in actually. That's fine.

BY MS. DEROVANESIAN:

Q. Okay. Do you see two pictures of first, a bottle of medication with the seal open?

A. Yes.

Q. And in that second picture, can you see broken pills?

A. Yes.

Q. Okay. And do you see down below where it says that this was sent on September 29th of 2020?

A. Yes.

Q. And do you remember earlier in your testimony when you told us that you had a phone call with Charles Boyd in October of 2020?

A. Yes.

Q. Did he mention this to you?

A. None of this, no.
Q. Okay. Would you have wanted to know that?
A. Absolutely.
Q. And did Charles Boyd mention to you that they were going to continue purchasing HIV medication from this same supplier for months after this?
A. No. He never said anything about the supplier purchasing. He didn't say anything.
Q. Okay. And did he tell you that they were going to continue purchasing millions of dollars' worth of HIV medication from the same supplier?
A. No.
Q. Did he tell you that they were going to continue selling that HIV medication to pharmacies throughout the United States?
A. No.
Q. Would you have wanted to know that at the time?
A. Yes.
Q. Would that have impacted the advice you gave?
A. Absolutely, yes.
Q. Okay.

MS. DEROVANESIAN: And then I'm going to show you page 5 of this same exhibit. Okay. And is there a PDF we can open here?

Okay.

///

BY MS. DEROVANESIAN:
Q. Do you see this document that was attached to that text thread?
A. Yes.
Q. Okay. And do you see at the top that this is a -- that it says that it's a Safe Chain, Drug Supply Security Chain Act document?
A. Yes.
Q. Okay. And at this time, did Charles Boyd or anybody at Safe Chain tell you that Gilead had confirmed that this was a false T3 they received?
A. No.
Q. Okay. Would you have wanted to know that someone from Boulevard was sending a T3 that was determined to be false?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: And we can back out of that.
BY MS. DEROVANESIAN:
Q. And do you see below that where he says, "Charlie, please review with Abbie"?
A. Yes.
Q. And then the next message, do you see where there's another attachment sent?
A. Yes.
Q. Okay. And do you see now there's another T3 attached here?

A. Yes.
Q. Okay.
MS. DEROVANESIAN: And then do we still have that first one open? Could we go back to that one? Okay. Thank you. And then back to the second one.
BY MS. DEROVANESIAN:
Q. Do you see the "sold to," who is listed in "sold to" in the second one?
A. Rochester.
Q. Okay. And what about in the first one?
A. It's Instacare.
Q. So are there different entities listed as the "sold to" entity on these two documents?
A. Yes.
Q. Okay. And then let's go back to the message.
And do you see after that second one how this person Peter Boulevard says, "That more better one."
Do you see that?
A. Yes.
Q. And do you see where he says, "Let's get this going, guys"?
A. Yes.
Q. Okay. And in October of 2020, did Charles Boyd or anybody else tell you that they were sending back and forth drafts of T3 documents with someone named Peter from Boulevard?
A. No.

Q. And did they tell you that Gilead had confirmed that one -- at least one of these was false?
A. No.
Q. Okay. Would that have mattered to you?
A. Absolutely.
Q. Okay. Ms. Rumore, at the same time, did they mention anything about an IPC pedigree?
MR. BARZEE: Your Honor, I'm going to object to the "did they."
MS. DEROVANESIAN: I can clarify.
THE COURT: Sustained.
BY MS. DEROVANESIAN:
Q. Did Charles Boyd mention anything about a pedigree that said IPC being determined to be false?
A. No.
Q. Did anybody from Safe Chain ever tell you that?
A. No.
Q. Okay. Ms. Rumore, do you remember earlier in your testimony when you told us that you would have been suspicious about their supplier, Safe Chain's supplier, just based on the facts that they didn't receive the pedigrees at the beginning?
A. Yes.
Q. Okay. And so now we just talked about a lot of issues with the wrong pills in the bottle.
Is that fair?

A. Yes.
Q. And many of those you said you weren't aware of? That you weren't told about.
Is that fair?
A. Yes.
Q. Even if none of those issues happened with the wrong pills in the bottle, would you still have been concerned about the fact that Safe Chain was buying medication from a supplier who at first didn't even know what a T3 was?
A. Absolutely, yes.
Q. Can you tell us why that would matter, even separate and apart from all of the issues from the wrong pills in the bottle?
A. Because there's a couple of different problems under the DSCSA, and one of them is fraudulent transactions.
So the product could be okay, but it can't be traced back. It could have been there's something wrong with the pedigree, where it came from; but the product itself could be -- even if the pedigree is something wrong with that, the product could be okay. So there's a difference.
Q. And does the pedigree or the truthfulness of the pedigree in your experience matter even if the right drugs are inside the bottle?
MR. BARZEE: Your Honor, objection. That's a legal question. It calls for a legal opinion and an expert opinion.

THE COURT: I'll tell the jury what the law is. I'll let her testify based on her experience.

BY MS. DEROVANESIAN:

Q. Do you need me to repeat that?

Ms. Rumore, other than the -- even if the correct drugs are inside the bottle, in your experience, is the T3 being correct still important for other reasons?

A. Yes. The T3 is what -- you can't accept product into inventory without a T3.

So even if there's nothing wrong with the product, if it's not accompanied by an appropriate T3, you can't accept it.

Q. And does a T3 help you verify that the drug has been stored in the proper conditions?

A. It's not going to talk about storage on the T3, no.

Q. Is it going to tell you whose hands it's been in?

A. Yes.

Q. Okay. All right.

I would like to talk to you about March of 2021.

MS. DEROVANESIAN: And I would like to show you, just for the witness, please, Government Exhibit 245.

BY MS. DEROVANESIAN:

Q. All right. Ms. Rumore, do you recognize the document in front of you?

A. Yes.

Q. And can you tell us who this email is from and who it's to?

A. It's from Charles Boyd to myself and Abbie Divilio.
Q. Okay.
MS. DEROVANESIAN: Government moves to admit Exhibit 245.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 245 will be received.
(Government's No. 245, Email, was received in Evidence.)
MS. DEROVANESIAN: Thank you. Can we please publish this?
BY MS. DEROVANESIAN:
Q. And I would like to take you to page 4, please.
Do you see something here called an "E pharmacy alert"?
A. Yes.
Q. Is this a mass email that gets sent out?
A. Yes.
Q. And do you see below where it says, "Gilead Sciences is writing to inform you that three pharmacies have reported separate instances where patients returned bottles of Gilead product, Biktarvy and Descovy listed below"?
Do you see that?
A. Yes.
Q. And do you see that it says, "These pharmacies reported purchasing the suspect Biktarvy and Descovy bottles from Safe Chain Solutions LLC"?

Do you see that?
A. Yes.
Q. Okay. At the time, were you surprised to see the mention of "Descovy"?
A. Yes.
Q. Do you know what Descovy is?
A. It's another HIV drug.
Q. Why were you surprised to see that other HIV drug listed in addition to Biktarvy?
A. Because everything was Biktarvy up until this point.
Q. When you say "everything was Biktarvy up until this point," do you mean that what you were informed of was Biktarvy?
A. Informed of the incidents, yes. The incident was Biktarvy. This is the first I'm seeing the word "Descovy" on anything.
Q. Okay.
A. It went to all -- the alert went to all the pharmacists.
Q. Okay. And do you see at the end here it starts to say, "Gilead has," and then we'll have to continue to the next page, "identified false information on Safe Chain's Drug Supply Chain Security Act documentation"?
Do you see that? At the very top.
A. Yes.
Q. And then third paragraph, do you see where it says, "Based on the visual inspection of the four Biktarvy bottles and the one Descovy bottle, Gilead has determined that the Biktarvy

bottles did not contain Biktarvy tablets and the Descovy bottle did not contain Descovy tablets"?

Do you see that?

A. Yes.

Q. Do you see where it says, "The three of the four Biktarvy bottles in the -- for three of the four Biktarvy bottles the induction seals were tampered with and the Descovy bottle is not consistent with genuine Descovy packaging"?

Do you see that?

A. Yes.

Q. Do you remember reading this at the time back in March of 2021?

A. I remember reading this alert, yes.

Q. Were you concerned when you read this alert?

A. Yes. First of all, I didn't hear of Descovy until this and then I see some information here about induction seals being tampered with. I'm surprised, yeah.

Q. Okay. And this is not information that you had learned before?

A. No.

Q. Okay. And remind us, back in March of 2021, you used that word "zealous advocate."

Were you acting still as a zealous advocate for Safe Chain at this point?

A. Yes, I was.

Q. Were you acting as a zealous advocate for Patrick Boyd and Charles Boyd?
A. Yes.
Q. And in doing that, did you write a response letter to Gilead after this?
A. Yes.
Q. Okay. At this point, were you working -- you mentioned before you were working with someone named John Morrone.
Was there anybody else from Frier Levitt, any other attorneys that started working on this matter with you?
A. Jesse Dresser.
Q. Was he an attorney as well?
A. Yes.
Q. And was he helping you in responding to these matters?
A. Yes.
Q. Okay. I would like to show you Government -- just for the witness, please -- Government Exhibit 273.
Okay. And do you recognize this email?
A. Yes.
Q. Can you tell us who it's from and who it's to?
A. It's from me to Charles Boyd, Abbie Divilio, copying Anthony Berger from Safe Chain, Pat Boyd and my supervisor, Jesse Dresser.
Q. Okay.
MS. DEROVANESIAN: Government moves to admit Exhibit

273.

MR. BARZEE: No objection.

MR. ZIMET: No objection, Judge.

THE COURT: 273 will be received.

(Government's No. 273, Email, was received in Evidence.)

MS. DEROVANESIAN: If we could publish this to the jury and we'll start on page 1 at the bottom.

BY MS. DEROVANESIAN:

Q. Do you see who this email is from?

A. It's from Robertson Beckerlegge from Baker Law.

Q. I'm sorry. Do you know who that is?

A. Yeah, that's Gilead's counsel, outside counsel.

Q. Okay. And is this an email directed to you and Jesse Dresser?

A. Yes.

Q. Okay. And if I take you to the next page, do you see in this middle -- well, the second paragraph here where he says he's following up on emails?

A. Yes.

Q. And he's asking if you represent Safe Chain?

A. Yes.

Q. Okay. And do you see where he's saying, "Safe Chain's purported willingness to cooperate in removing illegitimate product from the stream of commerce are both undermined by failing to respond"?

A. Yes.
Q. Okay. And here below that, do you see where it says, "Provide any correspondence Safe Chain intends to use to notify its downstream customers about the illegitimate product purchased"?
Do you see that?
A. Yes.
Q. Okay. And at this point, were you still in the role of a zealous advocate on behalf of Safe Chain?
A. Yes, I was.
Q. And at this point, were you aware that you didn't have all of the information from Safe Chain about what happened?
A. No, I wasn't aware.
Q. Now, Ms. Rumore, eventually did Gilead end up suing Safe Chain? Filing a lawsuit formally?
A. Yes.
Q. Did the law firm Frier Levitt defend Safe Chain in that lawsuit?
A. Yes.
Q. And did you have any part in that?
A. Just writing, you know, memos and being asked questions from my boss to put together different memos and things, but no, not really.
Q. Okay. Ms. Rumore, after this point in April of 2021, do you know if Safe Chain continued to purchase HIV medication

from other suppliers, in addition to the ones that we have spoken about?
A. Not that I was aware of.
Q. I want to show you Government Exhibit 269.
MS. DEROVANESIAN: Just to the witness, please.
BY MS. DEROVANESIAN:
Q. And can you tell us who this email is to and from?
A. It's from Charles Boyd to myself, Abbie and Jesse Dresser and cc'd Pat Boyd.
MS. DEROVANESIAN: Government moves to admit 269.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 269 will be received.
(Government's No. 269, Email, was received in Evidence.)
MS. DEROVANESIAN: Thank you.
And if we can publish that.
BY MS. DEROVANESIAN:
Q. And we'll look at this top email here.
Do you see the email from Charles Boyd to you?
A. Yes.
Q. And others?
And do you see Patrick Boyd copied?
A. Yes.
Q. Okay. And do you see down below where you say, "Synergy had provided a copy of the AD's parking slip and a sample T3"?

A. Yes.
Q. Do you know what "AD" means in this context?
A. I don't want to speculate. I would --
Q. What did you interpret that to mean?
A. Authorized distributor.
Q. And can you remind us what an authorized distributor is in the context of buying and selling medication?
A. There's -- an authorized distributor is what Safe Chain -- what Gilead used for their HIV -- certain of their HIV medications.
They had a limited distribution network, and they had about 20 different distributors, wholesalers, that they had exclusive relationships with, and that's an authorized distributor.
And everybody else that's selling the medication, all the other wholesalers are not what they call "authorized distributors," but they still can be considered legitimate trading partners.
It's just that it's outside of Gilead's narrow network.
Q. Okay. And do you see later in that paragraph where Charles Boyd says, "Since we have never had an issue with a Synergy product, is there any reason to not continue business as normal?"
Do you see that?
A. Yes.
Q. And do you see where he says below, "We have $3 million in

back orders. We would like to start filling those ASAP"?
Do you see that?
A. Yes.
Q. Is Charles Boyd sending this email seeking advice? Is he sending that to you?
A. Yes.
Q. I would like to show you what's already been admitted, Government Exhibit 243.
I would like to take you to page 4. At the bottom here, do you see here an email from someone named Dakota Flowers at Safe Chain?
A. Yes.
Q. Do you see where it says, "I'm contacting you to see if there's a way for me to verify a pedigree with your company or point me in the right direction of someone who would be able to. We recently added a new supplier who receives his product from DMS. We want to make sure that everything is in order in on our T3s"?
Do you see that?
A. Yes.
Q. Then let's go to page 3, please.
Do you see a response email at the bottom asking what company you are purchasing from and if there is a specific transaction you're looking to verify?
Do you see that?

A. Yes.
Q. And do you see the response above?
A. Yes.
Q. Do you see where she says, "We're purchasing from Synergy Group Wholesalers"?
A. Yes.
Q. And do you remember, is Synergy the company that was mentioned in that last email that we just looked at where Charles Boyd was asking you if it was okay to buy from them?
A. Yes.
Q. Where he was telling you that they had never had an incident or a reason to doubt them?
A. Yes.
Q. And then do you see below here where she says, "There are minor things that we picked up on on the T3 paperwork."
A. Yes.
Q. First, she mentions the phone numbers are in the wrong area code, and then she mentions a Gmail account listed.
A. Yes.
Q. Okay. And then on the previous page, page 2, do you see a response that says, "Hello, Dakota." And then in that first line, she starts, "These products were not purchased from us"?
A. Yes.
Q. Do you see that?
A. Yes.

Q. Do you see the next part where she says, "We have no existing relationship with Synergy Group Wholesalers, so any transaction history they gave you with our information is incorrect"?
A. Yes.
Q. And then on the previous page, page 1, do you see at the bottom where this is forwarded to Patrick Boyd?
A. Yes.
Q. Okay. And do you see where it says, "Good morning, Pat. We were attempting to verify the T3 information provided to us from the new vendor, and this Synergy, and this is the response that we received"?
Do you see that?
A. Yes.
Q. Do you see where it copies that same response?
A. Yes.
Q. Where it says --
A. I apologize.
Q. Where it says -- I'm sorry. I'll try not to talk over you.
Do you see where it says, "We have no existing relationship with Synergy Group"?
A. Yes.
Q. And do you see a response from Patrick Boyd up above?
A. Yes.
Q. Okay. And what does he say there?

A. "Possible problem."
Q. Okay.
And what's the date of this email?
A. March 10, 2021.
Q. And if could quickly go back to Government Exhibit 269 that we were looking at before.
Was that email mentioning the issue with the Synergy T3 before this email, where you were told "we have never had an issue with the Synergy product"?
A. Yes. That obviously wasn't true.
Q. Would you have liked to know about that --
A. Yes.
Q. -- when you received this email?
A. Yes.
Q. I would like to show you Government Exhibit 264, which was also admitted. Okay.
And do you see this is an email from Charles Boyd to Abbie Divilio?
A. Yes.
Q. And does this one dated 4/6/2021?
A. Yes.
Q. And is that also before the April 12th email that Charles Boyd sent to you?
A. Yes, it's before.
Q. And do you see where he says, "This is not an AD that

solves that problem. Unless they can get us invoices going back to Gilead, I don't see how we can buy from them"?

Do you see that?

A. Yes.

Q. Do and you see that the subject line here he's taking about Synergy again?

A. Yes.

Q. Okay. And would this be important information for you to know at the time?

A. Yes.

MS. DEROVANESIAN: And then let's go to Government Exhibit 268, which is also in evidence.

BY MS. DEROVANESIAN:

Q. Do you see this email at the bottom from Abbie Divilio to Charles Boyd and Patrick Boyd?

A. Yes.

Q. Okay. And then if you look, do you see where she's attaching, the attachment to this email is -- let's see. Okay.

MS. DEROVANESIAN: Can we get to the attachment? Thank you. All right.

BY MS. DEROVANESIAN:

Q. Do you see this attachment here?

A. Yes.

Q. And do you see where it says "ownership history," and it lists the ownership -- alleged ownership history of an alleged

medication?
A. Yes.
MS. DEROVANESIAN: And then now we can go back to that first page, please.
BY MS. DEROVANESIAN:
Q. And do you see at the bottom where Abbie Divilio tells Charles Boyd, "I'm a little leery of this information as well"?
A. Yes.
Q. And then do you see where she says, "I can see that the proper company name is Cesar Castillo LLC"?
A. Yes.
Q. Okay. And then do you see where she says, "Also, the email is incorrect from the company web page"?
A. Yes.
Q. And then she says, "Not sure if I can point the finger and say this is fraudulent, but it does seem to be incomplete."
Do you see that?
A. Yes.
Q. Is this information that you would have liked to know at the time?
A. Yes.
Q. And, again, was that email, April 9th, was that before the April 12th email where Charles Boyd told you that "We have never had an issue with the Synergy product"?
A. Yes.

Q. I would like to show you Government Exhibit 463, also already admitted.

Do you see at the top here where this shows a conversation between Adam Brosius, Charles Boyd, and Patrick Boyd?

A. Yes.

Q. Okay. And I'd like to show you -- well, let's look at this first message first.

It says, "Synergy is asking if we are cutting a PO."

Do you see that?

A. Yes.

Q. Do you know what a "PO" means?

A. Purchase order.

Q. Okay. And then we'll go to page 3.

Do you see where Patrick Boyd says, "I can call them tomorrow if Abbie can tell me the exact issues. I know we had that initial hiccup but wasn't sure about anything else"?

Do you see that?

A. Yes.

Q. All right. And then let's go to page 4.

Do you see what Charles Boyd responds about Synergy to Adam Brosius and Patrick Boyd?

A. Yes.

Q. What does he say?

A. He said, "The T3 didn't go back to an AD but to a ghetto PR distributor."

Q. Okay. And let's go to the next page.
Does Charles Boyd say anything else about Synergy here?
A. He says, "Between that and lying the first time, we just need to be careful."
Q. Okay. And let's go to the next page.
Can you tell us if Patrick Boyd responds to that?
A. He says, "Okay. Got it."
Q. And then, again, is the date of this message April 7, 2021, before that April 12th message from Charles Boyd to you saying that "We've never had an issue with the Synergy product"?
A. Yes.
Q. Okay.
THE COURT: Is this a good spot to take a break, Ms. DerOvanesian?
MS. DEROVANESIAN: It is, Your Honor.
Thank you.
THE COURT: All right. Members of the jury, we're going to take a ten-minute recess.
Remember my admonition not to discuss the case nor allow it to be discussed in your presence.
We will see you back in the jury room in about ten minutes.
COURT SECURITY OFFICER: All rise.
(Jury exits.)
THE COURT: And again, Dr. Rumore, during the break in

your testimony, you're not allowed to discuss your testimony with anyone.

Do you understand?

THE WITNESS: Yes, Your Honor.

THE COURT: We will see you back in about ten minutes.

And if there's nothing else to come before the Court, we'll be in recess for ten minutes.

COURT SECURITY OFFICER: All rise.

(Jury exits.)

(Off the record from 2:43 PM to 2:55 PM, after which the following proceedings were had:)

THE COURT: We're back on the record.

Counsel are present. Both defendants are present.

Anything to come before the Court before we bring the jury in?

MS. DEROVANESIAN: Just very briefly, Your Honor. I hope to be wrapping up shortly, but we expect, of course, this witness will carry over to another day.

We just wanted to know if the Court has any position on whether the witness can be permitted to travel home to New York during this break and to come back on Sunday.

THE COURT: Sure.

MS. DEROVANESIAN: Okay. Thank you.

THE COURT: She can come back on Monday if she wants. I'm coming back on Monday.

MS. DEROVANESIAN: Thank you, Your Honor.

THE COURT: But I'm not coming from New York.

Anything further before we bring the jury in?

MR. ZIMET: No, Judge.

MR. BARZEE: No, Your Honor.

THE COURT: All right. If we have all the jurors, let's bring them in.

Dr. Rumore, you understand you're still under oath?

THE WITNESS: Yes, Your Honor.

(Jury enters.)

COURT SECURITY OFFICER: All rise.

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. ZIMET: Yes, Your Honor.

MR. POGOZELSKI: Yes, Your Honor.

MR. BARZEE: Yes, sir.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

All right. You may continue.

MS. DEROVANESIAN: Thank you.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, before the break, we were speaking about a company called Synergy.

Do you remember that?

A. Yes.
Q. Okay. And just to be clear: At that point in April of 2021, were you working in a role to approve of different vendors on behalf of Safe Chain?
A. No.
Q. Okay. You mentioned earlier in your testimony that at various points, Charles Boyd pushed back on you when you told him to notify the FDA of incidents.
Do you remember saying that?
A. Yes.
Q. And did that attitude continue?
A. Yes. It was not just once. It was several times.
Q. Okay.
MS. DEROVANESIAN: I would like to show you, please just for the witness, Government Exhibit 322. And I will show you, again, just for the witness -- well, actually, you can see on this first page.
BY MS. DEROVANESIAN:
Q. Can you tell us, is this an email that you received?
A. Yes.
Q. And can you see down below that it's forwarded from Charles Boyd?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: Government moves into evidence

Exhibit 322.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 322 will be received.

(Government's No. 322, Email, was received in Evidence.)

MS. DEROVANESIAN: Thank you. If we could please publish this to the jury. We will start on page 6.

BY MS. DEROVANESIAN:

Q. All right. And do you see at the bottom half of this email, an email from a man named Mark and his last name is "E-Y"?

A. Yes.

Q. Okay. And do you see the email below it where he's sending out a notification?

A. Yes.

Q. Okay. And do you see where he says, "Please be advised, RX Out is promoting Safe Chain Solutions, a wholesaler located in Cambridge, Maryland"?

Do you see that?

A. Yes.

Q. Do you see where he says, "Safe Chain is not a VAWD certified wholesaler and is currently under investigation for distributing potentially counterfeit Biktarvy and Descovy by the FDA"?

A. Yes.

Q. Do you see that?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: And then I will take you to page 5, please.
BY MS. DEROVANESIAN:
Q. And do you see here at the top where Charles Boyd says, "Hey, guys, please see the email below"?
A. Yes.
Q. And is he forwarding that email that we just read from?
A. Yes.
Q. Okay. And do you see where he says, "This is from a guy named Mark Ey. He has sent this to several of our customers, falsely accusing us of being under investigation with the FDA"?
A. Yes.
Q. Do you see later where he's asking, "What do you think the best approach is?"
A. Yes.
Q. And do you see before that where he says, "I'd like a letter from you all to go out to him today addressing this"?
A. Yes.
Q. Okay. And was this email directed to you?
A. Yes.
Q. Okay. And, Ms. Rumore, did you, in fact, send a letter responding to this person, who had said that Safe Chain was

under investigation by the FDA?
A. Yes.
Q. Okay. And did you send what's called a cease and desist letter to that person?
A. Yes, I did.
Q. Could you explain to us what a cease and desist letter is?
A. It's a letter that says, you know, stop doing a certain conduct and stop it immediately.
So cease it and desist. Stop -- and stop this conduct right away. Stop, in this case, this email that was going out to pharmacies.
Q. And based on this communication with Charles Boyd, were you under the impression that what he had said in that email wasn't true?
A. Yes.
Q. Were you under the impression that Safe Chain was not under investigation by the FDA at that point?
A. Absolutely. I would not -- they were not under investigation as far as I knew at that point.
Q. Did you send a letter to that effect the same day?
A. Yes.
Q. And I would like to show you, Ms. Rumore --
MS. DEROVANESIAN: Just for the witness, please. Government Exhibit 323.
///

BY MS. DEROVANESIAN:

Q. And I would like to show you at the bottom of this page, do you see an email from Charles Boyd?

A. Yes.

Q. And is that email to you and to Jesse Dresser?

A. Yes.

MS. DEROVANESIAN: Government moves to admit Exhibit 323.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 323 will be received.

(Government's No. 323, Email, was received in Evidence.)

MS. DEROVANESIAN: Okay.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, that email that we were just looking at with the alert that said Safe Chain was being investigated by the FDA, that was May 12th of 2021.

Does that sound right, the previous email?

A. Yes.

Q. Okay. And this one is just one day later, May 13th?

A. Yes.

Q. And do you see at the bottom of this page here where Charles Boyd is forwarding correspondence from the FDA?

A. Yes.

Q. Okay. And do you see where he's saying, "Do you recommend

us having counsel on the call or does that make us look guilty? Please advise"?

Do you see that?

A. Yes.

Q. Let's go to the second page so we can see what he's forwarding.

And do you see here, at the bottom half, communications between the FDA and Safe Chain, Charles Boyd, and Abbie Divilio?

A. Yes.

Q. And then do you see, starting at the bottom of this page and continuing on to the next page, questions from the FDA, responses from Abbie Divilio?

A. Yes.

Q. And then at the bottom of that page -- I'm on page 3 -- bottom of page 3, continuing on to page 4, a list of other requests from the FDA?

A. Yes.

Q. Okay. And then at the bottom of page 4, do you see correspondence from the FDA to Abbie Divilio and Charles Boyd saying that "products have been identified as illegitimate"?

Do you see that?

A. Yes.

Q. And then page 5, do you see at the bottom here, where the FDA is asking Safe Chain questions directed at Abbie Divilio

and Patrick Boyd -- sorry, Charles Boyd?
A. Yes.
Q. And do you see where she asked, "What is Safe Chain doing with the products named in the falsified pedigrees?"
Do you see that?
A. Yes.
Q. Do you see where she's asking, "Is Safe Chain purchasing products from unauthorized distributors?"
Do you see that?
A. Yes.
Q. Do you see where she says, "What is Safe Chain's strategy moving forward to ensure you're not purchasing products that are unsafe for consumers?"
Do you see that?
A. Yes.
Q. Okay. And are all of those emails we just talked about -- were you on those original emails?
A. No.
Q. Were they forwarded to you here by Charles Boyd on May 13, 2021?
A. No.
Q. We can go back to page 1.
May 13, 2021, do you see that date at the bottom?
A. Yes.
Q. Here, do you see where Charles Boyd is forwarding all that

correspondence to you from the FDA?

A. On that date, May 13th.

Q. Okay. And before that date, were you aware that he was engaging in all of this back-and-forth with the FDA?

A. No.

Q. And do you see where he says, "Do you recommend us having counsel on that call, or does that make us look guilty?"

A. Yes.

Q. And were you concerned when you saw this email for the first time?

A. Yes, I was.

Q. Was this just one day after you sent a cease and desist letter to someone insisting that Safe Chain was not under investigation by the FDA?

A. Yes, it was upsetting. I had made an assertion that they weren't under investigation by the FDA and there was all this back-and-forth with Safe Chain and the FDA, and I'm not aware of what -- of the -- what's going on between them.

Q. Okay. And then up above here, do you see a response from Jesse Dresser to you?

A. Yes.

Q. Do you see where he says, "I don't know about you, but I think this looks not great"?

Do you remember reading that?

A. Yes.

Q. "Why weren't they making us aware of the fact that they were being asked questions by the FDA?"
Do you remember reading that?
A. Yes, I do.
Q. And did you share those same concerns that Jesse Dresser notes here?
A. Yes.
Q. Okay. I would like to show you --
MS. DEROVANESIAN: Just the witness, please. Government Exhibit 333.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, is this a continuation of that same email thread?
A. Yes.
MS. DEROVANESIAN: Government moves to admit Exhibit 333.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 333 will be received.
(Government's No. 333, Email, was received in Evidence.)
MS. DEROVANESIAN: Okay.
BY MS. DEROVANESIAN:
Q. And then, Ms. Rumore, do you see, at the top here, where you're saying to Jesse, "Hi," and then you say, "FDA asked some questions, but here is a bunch of queries from May 4th,

May 7th, May 13th, and not sure they gave the FDA the right answers. Not good"?

Do you see that?

A. Yes.

Q. Do you remember reading through that correspondence with the FDA and being concerned?

A. Yes.

Q. Why were you concerned?

A. Because there's correspondence on these dates that we're not involved with and they're going back and forth with the FDA. I don't know what FDA is asking them. I don't know what FDA is telling them or what they're telling FDA. So we needed to be involved in that.

It's a lack of information being provided to the attorneys. How could you give an answer? How can you help? I mean, it's -- we needed to know this. And this would indicate that there was more going on with the FDA. There was an investigation with the FDA.

Q. Okay. So based on this, was the letter you sent saying that Safe Chain was not under investigation by the FDA, now that you have seen this, was that a true statement?

A. No.

Q. And did you make that statement based on Charles Boyd's request?

A. Yes.

Q. Okay. I would like to show you --

MS. DEROVANESIAN: Just the witness, please, Government Exhibit 324.

BY MS. DEROVANESIAN:

Q. And, Ms. Rumore, can you see --

MS. DEROVANESIAN: Let's take you to page 3, please.

BY MS. DEROVANESIAN:

Q. Do you see an email from Abbie Divilio to you, Charles Boyd, Patrick Boyd, and copying Jesse Dresser?

A. Yes.

MS. DEROVANESIAN: Government moves to admit Exhibit 324.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 324 will be received.

(Government's No. 324, Email, was received in Evidence.)

MS. DEROVANESIAN: If we could please publish. We'll start with this page that we're on.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, do you see where Abbie Divilio is saying, "Here are our two most recent communications with Christina Picard"?

A. Yes.

MS. DEROVANESIAN: And then let's go to the first page, please.

///

BY MS. DEROVANESIAN:
Q. And do you see at the bottom here where you're emailing Jesse Dresser?
A. Yes.
Q. And remind me, is Jesse Dresser another lawyer that you worked with?
A. Yes, that's my boss.
Q. Okay. And do you see here where you tell your boss, "I went through the information Safe Chain provided for FDA 3911 and FDA may have several reasons for wanting to speak with them."
Do you see that?
A. Yes.
Q. And your response continues on to the next page here.
And here, do you lay out several different concerns with the responses that Safe Chain provided?
A. Yes.
Q. Are you identifying issues here where you think that Safe Chain provided information that wasn't fully true to the FDA?
A. Yes.
Q. And did that concern you?
A. Yes.
Q. Why?
A. Because you can't make a false statement to the FDA.
Q. Okay. And to be clear: Abbie Divilio was forwarding you

this correspondence. Were you part of it at the time, with the FDA?
A. No.
Q. Okay. And then I would like to take you back to the first page.
Do you see at the top here, Jesse Dresser's response after you shared those observations and those concerns?
A. Yes.
Q. Do you see where he says, "I see that FDA call got rescheduled until Wednesday, which is good"?
A. Yes.
Q. Do you see that?
A. Yes.
Q. And then do you see later where he says, "I would like to go over these observations which you listed below with them on the call today"?
Do you see that?
A. Yes.
Q. Do you see where he said, "In addition, can you review the timing of the advice we gave and when they responded so we can cover our end as we would have advised differently had they keyed us in fully at the right time"?
Do you see that?
A. Yes.
Q. Do you remember reading that message from Jesse Dresser?

A. Yes, I did.
Q. And did you share that concern about the advice -- about making sure that you knew the full picture at this point?
A. I was kind of relieved when I read this because he articulated exactly how I was feeling.
Q. What do you mean? Why does that give you relief?
A. Because he said, can you review the timing when they responded because we would have advised them differently. That's what I have been saying all day. We would have advised them differently had they keyed us in fully at the right time.
Q. And, Ms. Rumore, is this email from 2021 -- was this before you saw some of the evidence that I have shown you today?
A. Yes.
Q. Ms. Rumore, I want to ask you a few questions regarding information relating to Safe Chain. Okay.
At this point, in 2021, had anybody told you that Safe Chain had a compliance director back in 2019 who had warned them that she was concerned that they were not following their own rules about providing pedigrees and T3s?
MR. ZIMET: Objection, Judge. Foundation.
THE COURT: Overruled.
A. No. No, I thought Abbie Divilio was always their compliance officer. I didn't know they had somebody before her.
Q. Would it have concerned you if you learned that the former

compliance officer, all the way back in 2019, had warned Charles and Patrick Boyd that she thought they weren't following these procedures?

A. Yes. That would have been a concern.

Q. Why would that concern you?

A. Because somebody quits a company because the company is not in compliance, then that is an issue, and it needs -- to me, I would have handled this differently.

Q. Okay. And, Ms. Rumore, had you done a thorough review of all the pedigrees and T3s that Safe Chain sent out with its sales?

A. It's not my job.

Q. Okay.

A. And I didn't do that, no.

Q. Okay. I would like to show you Government Exhibit 88, and I'm going to show you it to you in hard copy, if that's all right?

MS. DEROVANESIAN: This is already admitted.

BY MS. DEROVANESIAN:

Q. Ms. Rumore, do you see the binder that I just put in front of you?

A. Yes.

MS. DEROVANESIAN: If we could, just bring up electronically Exhibit 88 so that we can look at the first page together, please.

BY MS. DEROVANESIAN:
Q. Ms. Rumore, do you see, on the first page here, where this says it's a Safe Chain Drug Supply Chain Security Act document?
A. Yes. Yes.
Q. Do you see the first transaction on this T3?
A. Yes.
Q. And do you see where it says the manufacturer sold it to AmerisourceBergen?
A. Yes.
Q. And then below that, do you see where it says that AmerisourceBergen sold it to Amsterdam Wellness?
A. Yes.
Q. Okay. And it says that's a pharmacy in New York. Do you see that?
A. Yes.
Q. Okay. And do you see where it says that Amsterdam Wellness sold to Boulevard 9229 LLC?
A. Yes.
Q. Okay. And then I would like you to -- you've got a hard copy of this, and you can see it's quite a thick stack of papers there.
Could you flip to the second page of that?
Do you see that same pharmacy listed as a pharmacy that sold medication to Boulevard 9229?
A. I don't know if it's a pharmacy or a wholesaler.

Q. Okay.
A. It says, "Amsterdam Wholesaler Pharma." That could be a wholesaler's name, not necessarily a pharmacy.
Q. Did anybody tell you that Amsterdam Wellness was a pharmacy?
A. No.
Q. Okay. And I would ask you to look at page 3 and page 4.
Tell me if you see that same name, Amsterdam Wellness, listed there.
A. Yes.
Q. And, Ms. Rumore, you can see how many pages are in this binder.
Did anybody at Safe Chain show you all of these T3s in this exhibit before?
A. No.
Q. And, Ms. Rumore, were you aware that, according to these T3 documents that Safe Chain sent out with purchases, with sales, according to these, there were thousands of bottles of HIV medication that came all from one pharmacy in New York.
Did anyone at Safe Chain tell you that?
MR. BARZEE: That's assuming facts not in evidence, Your Honor. She testified that she didn't know whether or not it was a pharmacy or a wholesaler.
THE COURT: Rephrase the question.
///

BY MS. DEROVANESIAN:
Q. Did anybody at Safe Chain tell you that according to the T3s3 they sent out to customers, thousands of bottles of HIV medication came from this same place, Amsterdam Wellness, in New York?
A. No.
Q. Would that have mattered to you?
A. It would be very odd for a pharmacy to have 1,000 bottles of -- of anything.
Q. What about 2,000 bottles?
A. No. It can't be because the pharmacy -- if a pharmacy -- it's the 5 percent rule. They're only going to be selling 5 percent of their inventory. It can't be a large quantity. If they're a pharmacy selling to a wholesaler, it has to be a very small quantity.
Q. And based on your experience as a pharmacist, would it make any sense to you that a single pharmacy would have 1,000 or 2,000 bottles of any medication just in stock in the pharmacy?
A. As a pharmacist, I would have to say that's very peculiar.
Q. And would you also think it's peculiar to believe that a pharmacy had shut down and had that much extra HIV medication?
A. That would also be odd.
The other thing I want to say is sometimes a pharmacy is a pharmacy and a wholesaler. So they, you know, that's a different story. They could have had two licenses. I don't

know.
Q. And then I would like to turn your attention -- you can look on the screen if it's easier -- to the bottom of this page of Government Exhibit 88, where it says "transaction statement."
And do you see here where Safe Chain's T3 makes certain guarantees?
A. Yes.
Q. Okay. And I would like to draw your attention to subsection D.
Do you see where it says, "Safe Chain did not knowingly ship a suspect or illegitimate product"?
A. Yes.
Q. And do you see under F where it says they did not knowingly provide false transaction information?
A. Yes.
Q. Do you see that?
A. Yes.
Q. And I won't make you flip through every one of these pages, but could you look through, in the binder, a few of them and tell me if you see those same certifications on each page.
A. Yes. That's standard language for TS, transaction statement.
Q. Okay.
A. It's on all of them. I don't know if it's on all of them.

Q. Is it on every page that you see?
A. Every page, I'm looking A to G.
Q. Okay. I won't make you look at every page.
Have you looked at a dozen or so?
A. Yeah.
Q. Okay. Thank you, Ms. Rumore.
MS. DEROVANESIAN: And we can take this one down now.
BY MS. DEROVANESIAN:
Q. Ms. Rumore, I would like to show you what's been admitted as Government Exhibit 152. And I would like to show you the second page here.
Did anybody at Safe Chain show you that this is what the bottles of medication looked like when they came in from that supplier, Boulevard?
A. No.
Q. Would that have been relevant to you?
A. Absolutely.
Q. Why?
A. Because they don't come in a carton all mixed-up like that. They come, you know, in -- they're lined up. It doesn't look like that.
Q. Okay.
MS. DEROVANESIAN: And I also like to show you what's been admitted as Government Exhibit 430. Okay. If we could go to the next page, please. Okay.

BY MS. DEROVANESIAN:
Q. And if you could, do you see that this is a conversation between someone named Garrett and Charles Boyd?
A. Yes.
Q. And do you see at the top here where it says, "We have client, Bay 19 New York. He has a few issues with pedigree -- dirty labels and a few invoices that were voided and reissued."
Do you see that?
A. Yes.
Q. Okay. Do you see where he says later, "Of course, it is Boulevard product."
A. Yes.
Q. And do you see after that where he says, "I think he's fine but would really like to talk to someone in compliance to assure him everything is on the up-and-up."
Do you see that?
A. Yes.
Q. Now this is from September of 2020.
Were you made aware of this type of complaint back in September 2020?
A. No.
Q. Would this have been important to you?
A. Yes.
Q. Why?
A. Because it's another complaint about a problem with issues

with pedigree, dirty labels and invoices that were voided and reissued.

Not so much that last one, invoices voided, but dirty labels and issues with pedigree are certainly problematic.

Q. Okay. Ms. Rumore, I would like to show you Government Exhibit 602, which was already admitted.

And now, Ms. Rumore, you mentioned that you didn't receive the standard -- didn't -- you weren't taken up on your offer to review Safe Chain's standard operating procedures; is that right?

A. Yes.

Q. I would like to take you to page 3.

First, I would like to show you this subsection A and the first bullet point.

During 2020 and 2021, did anybody at Safe Chain tell you that it was in their own rules that you should be alert for a product offered for sale at a very low price or one that is too good to be true?

A. Say the question again.

Q. Did anybody tell you that this statement was in their own policies and procedures?

A. No, but I recognize this language from the FDA guidance.

Q. You recognize this language from the FDA guidance?

A. Yeah.

Q. Did anybody at Safe Chain tell you that this procedure was

actually approved by Charles Boyd and Patrick Boyd?
A. No.
Q. Okay. And then down below, do you see where it says, "A trading partner that had a history of problematic or potentially false transaction histories or pedigrees"?
Do you see that?
A. Yes.
Q. And did anybody tell you back in 2020 or 2021 that this was in Safe Chain's own policies as early as 2015?
A. No.
Q. Okay. And then do you see below that where it says, "A trading partner that is reluctant to provide a transaction history or pedigree associated with the product being purchased or doesn't do so in a timely manner"?
Did anybody at Safe Chain in 2020 or 2021 tell you that this was in their very own policies and procedures?
A. No.
Q. And did anyone at Safe Chain tell you that it was Charles Boyd and Patrick Boyd who were responsible for approving these?
A. No.
Q. Okay. And then I want to go back to this first part, where it says, "Offers for product for sale at a very low price or one that is too good to be true."
Did anybody tell you in 2020 or 2021 that the pricing

Safe Chain was selling HIV medication for was considered very low?

MR. BARZEE: Objection, Your Honor. Vague and assumes facts not in evidence.

THE COURT: Overruled.

A. I know it had to be lower than the price that -- because they're a secondary wholesaler, than the price from an authorized distributor, where there's a limited distribution network and the price is very high. So that, I did know.

BY MS. DEROVANESIAN:

Q. Did you know that salespeople at Safe Chain said this basically sold itself because the price was so low?

A. No. I wasn't told that.

Q. Okay. And then I want to zoom out for a moment.

Do you see where it says Subsection B and there's a bullet point it lists there?

A. Yes.

Q. Okay. And do you see where it says, "Products that have been previously or is currently being counterfeited or diverted, e.g., HIV"?

Do you see that?

A. Yes.

Q. Okay. And did anybody tell you that all the way back in 2015, it was in their own policies and procedures that this was a red flag to look out for?

A. No.
Q. Okay.
MS. DEROVANESIAN: And then I would like to show you Government Exhibit 600, please, which is also already admitted. Okay. Let's see. Let's focus on the bottom here.
BY MS. DEROVANESIAN:
Q. Do you see where it says "a trading partner"?
Well, I will back up.
Do you see where this says, "It's processed to identify suspect products in a timely and efficient manner"?
A. Yes.
Q. And do you see where it says, "Purchasing product from a source that is known or suspected to have been involved in transactions of suspect products"?
Do you see that?
A. Yes.
Q. And do you see where it says, "A trading partner that has been involved in business transactions where they have sold or delivered suspect or illegitimate products"?
A. Yes.
Q. And do you see again here where it says, "Trading partner that has a history of problematic or potentially false transaction histories or pedigrees, such as those that contain misspelled words or incomplete information"?
Do you see that?

A. Yes. This is right from the FDA's guideline.
Q. Okay. And are you familiar with these guidelines?
A. Yes.
Q. Are they commonly used in the industry?
A. Yes.
Q. But were you aware that these were actually in the policies and procedures of Safe Chain back in 2015?
A. We never reviewed their -- they didn't want us to review their SOPs. They really didn't.
Q. So did you know that Charles Boyd and Patrick Boyd approved procedures that mentioned this as a red flag of suspect and illegitimate products specifically?
A. No.
Q. And then I would like to show you what was already admitted as Government Exhibit 601.
And do you see here where it says, "Standard operating procedure for product tracing"?
A. Yes.
Q. At the top?
A. Yes.
Q. Okay. And do you see where it's talking about under bullet point one, "Product Tracing Information"?
A. Yes.
Q. Is that the information that's on the T3s that we have been talking about all day?

A. Yes.

MS. DEROVANESIAN: I'm sorry. If we could back out of this.

Thank you.

BY MS. DEROVANESIAN:

Q. If you see down below, bullet point C here. Do you see where it says, "The transaction information must have all of the following to be considered complete"?

A. Yes.

MS. DEROVANESIAN: And then if we could please back out of that.

BY MS. DEROVANESIAN:

Q. And then do you see under point 3 where it says "Product Transaction Statement"?

A. Yes.

Q. Okay. And do you see other information that is required to be provided at the time of transferring ownership?

A. Yes.

Q. Does that mean at the time Safe Chain receives a drug that they have purchased?

A. Yes.

Q. Okay.

MS. DEROVANESIAN: And then we could please back out of that one.

///

BY MS. DEROVANESIAN:
Q. Do you see under 2A where it says, "Safe Chains Solutions must have the transaction history supplied by the trading partner they are purchasing from"?
A. Yes.
Q. Okay. And is this also from that standard FDA guidance you said you recognized?
A. I believe so, yes.
Q. And at the time, in 2020 or 2021, did anybody from Safe Chain tell you that this was part of Safe Chain's own rules that you must have that transaction history and it must be complete?
A. No. I didn't review their SOPs.
Q. Did anybody at Safe Chain tell you that Charles Boyd and Patrick Boyd actually reviewed this procedure in 2015 that contained that specific rule?
A. No.
Q. Okay. Ms. Rumore --
MS. DEROVANESIAN: You can back out of that one. Thank you.
BY MS. DEROVANESIAN:
Q. You spent a lot of time today telling us about different documents and communications that you had between you and each of the defendants; is that fair?
A. Yes.

Q. Okay. And based on your communication and the working relationship you had with Charles Boyd and with Patrick Boyd, did you make any observations about their demeanor towards you with respect to these issues?

MR. BARZEE: Objection, Your Honor. Relevance, their demeanor towards her.

THE COURT: Sustained.

BY MS. DEROVANESIAN:

Q. Did you notice anything about the defendants' reactions when you would raise issues?

A. Sometimes they were, you know, strongly against something we were saying, and sometimes they would -- we would -- if we were on the call, they would start cursing, using bad language, and I felt -- I felt disrespected as -- you know, Abbie and I were the only two women on the call and I didn't think that was right. That was one thing that I noticed.

And the other thing was there was a lot of -- there was pushback at times from them.

Q. And are you referring to both Charles Boyd and Patrick Boyd?

A. I remember the curse words, but it was mostly Patrick Boyd, but also Charlie Boyd was cursing.

Q. Okay. And when you had these conversations about the various issues with what was going on at Safe Chain, did either defendant express a lot of concern to you about the patients

who were receiving these medications?
A. No.
Q. Ms. Rumore, is it safe to say you've seen a lot of new information today that you didn't have back in 2020 or 2021?
A. Yes.
Q. And you heard me ask you over and over again about different evidence. Would this have been important to you? Do you remember all those questions?
A. Yes.
Q. After seeing the evidence that you have seen today, would you have responded differently to the FDA if you knew everything that you have seen today?
A. Yes.
Q. Would you have responded differently to Gilead if you saw everything that you have seen today?
A. Absolutely, yes.
Q. And would you have agreed to continue representing and defending Safe Chain if you knew and saw what you've seen today?
A. I would not have continued if there was something that -- all of this that I wasn't aware of, it's a different -- it's a different matter. It wouldn't be something that I could handle.
Q. Okay. Thank you.
MS. DEROVANESIAN: I will pass the witness, Your Honor.

THE COURT: Mr. Barzee.

MS. DEROVANESIAN: May I approach the witness to collect the binder?

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. BARZEE:

Q. Good afternoon, Doctor.

A. Good afternoon.

Q. No response?

A. I said, "Good afternoon."

Q. Oh, I didn't hear you.

A. I said, "Good afternoon."

Q. You have to speak into the microphone so we can all hear you.

Okay?

A. Thank you.

Q. The prosecutor just asked you, about three or four questions ago, the following question: "Did you verify the T3s of all the vendors?"

Do you remember her asking you that question?

A. Yes, I do.

Q. And your answer was, "That's not my job."

Correct?

A. Yes.

Q. The -- traditionally, in a warehouse corporation like

Safe Chain was, there's going to be management? Compliance? Sales? People working in the warehouse? Lots of different moving parts? Correct?
A. Usually, yes.
Q. You have been in this industry for a long time; right?
A. No.
Q. No?
A. No.
Q. How long ago were you a pharmacist?
A. That has nothing to do as a healthcare attorney. I have only been a healthcare attorney since November of 2019.
Q. I'm talking about in the pharmacy world, buying and selling medications, when were you a pharmacist?
A. I was a pharmacist in a hospital, and I wasn't involved with buying and selling medications.
Q. When were you a pharmacist?
Why are you giving me a hard time? I'm asking you a simple question.
MS. DEROVANESIAN: Objection.
A. I graduated from pharmacy school in 1978 --
BY MR. BARZEE:
Q. Okay.
A. -- with a BS in pharmacy, and I have a doctorate in pharmacy from 1980.
Q. So you have a -- you have a lot of initials after your

name, and I want to go through them with you so we can establish your credentials here as somebody in the field who knows about these things.

P-H-A-R-M, capital D, what does that mean?
A. Doctor of pharmacy.
Q. So should I address you as doctor?
A. You don't have to.
Q. MS?
A. Master of science.
Q. And that's a master's of what kind of science?
A. It's an advanced degree in pharmacy, and that was in biomedical communication and drug information.
Q. And JD, what does that refer to?
A. Ut's a law degree, juris doctorate.
Q. So you're a doctor at least two times over?
A. Yes.
Q. An LLM?
A. That's an advanced law degree in intellectual property.
Q. And you were senior counsel at Frier Levitt?
A. Yes.
Q. What is a senior counsel?
A. It's above an associate but less than a partner.
Q. And Frier Levitt, what kind of a firm is that? Are they in this healthcare field? Is this a specialized firm that handles this type of work?

A. Yes, they're a healthcare firm.
Q. All right.
Is it fair to say that you know something of this industry, then?
A. Yes, I know something of this industry.
Q. And so when you say "it's not my job to verify T3s," whose job is it to verify T3s?
A. Wholesaler.
Q. The wholesaler?
A. And their department that takes care of that.
Q. And what department in a wholesaler would be verifying the T3s?
What department, traditionally, would be the department that would handle the verification of T3s?
A. It depends. It could be -- it depends on the size of a wholesaler, if they have such a department, but in this case, there was a compliance department.
Q. Right.
So traditionally -- and in this case -- it's the compliance department at the wholesaler whose job is going to be to verify the T3s. It's not your job?
A. No, it's not my job.
Q. And it's not the salesperson's job?
A. It's not a salesperson's job, no.
Q. Right.

It's a compliance job?
A. Yes.
Q. And you were aware that the compliance department, during this period of time at Safe Chain, was headed up by somebody named Abbie Divilio; correct?
A. Yes.
Q. Now, the prosecutor also said back in 2019 -- which predates the time that we're looking at in the indictment here. But back in 2019, you said, "Well, if somebody quits because the corporation is not in compliance, that's a problem."
Is that what I heard you say?
A. 2019?
Q. Yeah.
A. I don't -- I believe I started working on Safe Chain matters in 2020.
Q. I think you did too, which is why I was surprised you were giving your opinion on why a compliance officer would have quit back in 2019.
Do you want to retract your answer at this point?
MS. DEROVANESIAN: Objection. Mischaracterizing her testimony. Argumentative. She hasn't said that was her statement.
THE COURT: It's cross-examination.
Overruled.
BY MR. BARZEE:

Q. We can ask the court reporter to read it back.
The prosecutor was asking you about "Well, 2019 compliance," and your answer was, "Well, if somebody quits because they're not in compliance, that's something that would be concerning to me."
Do you remember that?
A. I did say that, yes.
Q. Who told you that somebody quit because Safe Chain wasn't in compliance?
A. I just heard it here today.
Q. But that's not true. Where did you hear that?
MS. DEROVANESIAN: Objection. Counsel is testifying.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Where did you hear that somebody quit because Safe Chain wasn't in compliance? Was that in a piece of evidence?
A. No. I just heard that -- that was just brought up.
Q. From whom?
A. It was just a question: Did I know that a compliance officer had quit in 2019? And my answer was, "No, I wasn't."
Q. Somebody had quit in 2019, but they didn't quit because Safe Chain wasn't in compliance.
You added that.
MS. DEROVANESIAN: Objection. Lack of personal knowledge.

THE COURT: Overruled.

BY MR. BARZEE:

Q. That's my point.

You have no idea why they quit in 2019. It had nothing to do with whether or not Safe Chain was in compliance. You just added that at the end.

You want to see these two guys convicted?

MS. DEROVANESIAN: Objection. Counsel is testifying. This is argumentative. A compound question. He needs to allow the witness to answer.

THE COURT: He asked the question, and she didn't answer; so he moved over to another question.

BY MR. BARZEE:

Q. You want to see these two guys convicted?

A. You're putting words in my mouth. I never said that.

Q. Do you?

A. No, I don't.

Q. They were your clients.

You had a sacred responsibility to them, didn't you?

A. And they had a responsibility to be honest and to provide all the information for me to provide adequate legal advice to them.

They can't be deceptive. You can't, you know, be manipulative.

Q. Are you finished?

A. Yes.
Q. They paid your law firm over $300,000 for your memos and your emails that went on for over a year.
Are you aware of that?
A. No, I'm not.
Q. How much money did you -- what were you charging an hour?
A. I don't recall my billable rate at that time.
Q. Well, tell us what your billable rate is today.
MS. DEROVANESIAN: Objection. Relevance.
A. Yeah.
THE COURT: Overruled.
You can answer the question.
A. My billable rate today at Frier Levitt, when I left, was 485.
BY MR. BARZEE:
Q. $485.
And that's for one hour of work?
A. Yes.
Q. And how many hours do you think you spend over a year and a half representing these two individuals at Safe Chain?
A. I wouldn't speculate on something like that. I don't know. I would have to look at the bills.
Q. Does $300,000 to Frier Levitt sound reasonable to you?
We can go through the invoices if you force us to.
A. I can't give an answer. I don't know the answer.

Q. Is it fair to say with your two doctorates and your MS degree and your LLM and senior counsel at Frier Levitt, is it fair to say that you knew a little bit more about the industry than Charlie Boyd and Patrick Boyd?
A. No. Because they're in the business of the wholesale business and I'm an attorney.
Q. So you're telling this jury that with all of those degrees and all of that experience, by the simple virtue of the fact that they opened a business, they had more knowledge about the pharmaceutical industry than you did?
A. In the wholesaler business, yes.
Q. I'm not saying the wholesale business. I'm saying the pharmaceutical business, the FDA, the regulations, the rules.
Who knew more about all of those things, Charlie Boyd and Pat Boyd or Dr. Martha?
A. I know more about the FDA, yes.
Q. I just wanted to go through some of the documents that the Government brought up.
MR. BARZEE: And maybe, Molly, if you can help me.
BY MR. BARZEE:
Q. The first was Government Exhibit 329, dealing with White Cross and Excedrin.
Is Patrick Boyd on that document?
A. No.
MR. BARZEE: Asking you to bring up Government

Exhibit 328.

BY MR. BARZEE:

Q. Is Patrick Boyd on that document?

A. No.

MR. BARZEE: Bringing up Government's Exhibit 418.

BY MR. BARZEE:

Q. Is Patrick Boyd on that document?

A. No.

Q. And you remember the Government asking you, "Well, did Patrick Boyd tell you about Boulevard? Did Patrick Boyd tell you about Gentek and the warehouse and where they were buying these medicines?"

Do you remember those questions?

A. Yes.

Q. The truth is you hadn't even spoken to Patrick Boyd until almost a year later; isn't that true?

A. I don't -- I can't answer that. I can't answer it.

Q. Do you remember talking to Patrick Boyd in the summer of 2020?

A. There's a call, yes.

Q. There was a call?

A. Yes.

Q. Tell me about the call in the summer of 2020.

A. There was a call in August that was with -- regarding -- I don't know what. I don't remember the call, but there was a

call.

Q. There was a call in August of 2020, but you don't remember what was discussed on the call?

A. No.

Q. Do you remember who was on the call?

A. It was myself, John Morrone. I think Charles Boyd, and I'm not sure if it was Abbie Divilio or not.

Q. I asked you about Patrick Boyd. Was he on that call?

A. No.

Q. Did you hear my question?

MS. DEROVANESIAN: Objection. Argumentative.

THE COURT: Sustained.

BY MR. BARZEE:

Q. I'm asking about Patrick Boyd. All right.

A. Patrick Boyd was --

Q. Let me ask you the question. Please.

MS. DEROVANESIAN: Objection, Your Honor. The witness needs to be allowed a reasonable amount of time to answer the question.

THE COURT: There wasn't any question at that point.

BY MR. BARZEE:

Q. I'm asking you about Patrick Boyd. And I'm reminding you of on direct at the beginning of your testimony where the Government was showing you photographs of different pharmacies and different buildings, and they were asking you questions

about: Did Patrick Boyd tell you that this was where they were getting the medicines?

And your answer was, no.

Do you remember that? It happened earlier today.

A. Yes.

Q. Okay. The truth is you hadn't even spoken to Patrick Boyd in the summer of 2020, when you were being asked those questions about those photographs of the pharmacies and the building, had you?

A. Patrick Boyd came later, and I don't remember exactly, but it was later on.

Q. Much later, wasn't it?

A. Yes.

Q. So that's not a fair question to ask you, is it?

MS. DEROVANESIAN: Objection.

THE COURT: Sustained.

MR. BARZEE: Let's pull up Government's Exhibit 124.

BY MR. BARZEE:

Q. Is Patrick Boyd on that?

A. No.

MR. BARZEE: Government's Exhibit 639.

BY MR. BARZEE:

Q. Here's the photograph that I was just talking about. That was August 2020.

The Government was asking you, "Did Patrick Boyd tell you

that this is where they were buying Boulevard?"

You don't have any memory of talking to Patrick Boyd during that period of time, do you, in August of 2020?

A. No.

MR. BARZEE: Go to 640, please.

BY MR. BARZEE:

Q. Government asked you, "Did Patrick Boyd tell you that this is where Gentek or one of the other wholesalers had their corporation?"

And you said, "No, Patrick Boyd didn't tell me that."

Do you remember that?

A. Yes.

Q. Yeah, the truth is you had never even spoken to Patrick Boyd during that period of time, had you?

A. No.

MR. BARZEE: Let's go to Government's 136.

BY MR. BARZEE:

Q. Patrick Boyd is not on that document either, is he?

A. No.

MR. BARZEE: Let's go to Government's Exhibit 177.

BY MR. BARZEE:

Q. Everyone in a business has a job; right?

There's a compliance department. There's a sales department. There's a management department. Sometimes they hire outside counsel.

That would be your job; right?
A. I'm outside counsel, yes.
Q. So everyone has their own job; right?
A. Yes.
Q. And compliance's job is to check the vendors, check the T3s, check the paperwork; correct?
MS. DEROVANESIAN: Objection. Vague as to if he's talking about this company, in general.
THE COURT: Overruled.
It's cross-examination.
BY MR. BARZEE:
Q. Correct?
A. It may not be a compliance person. It could be that they don't have a compliance person; so it depends on the company.
Q. Let's assume they have a compliance department and let's assume the compliance department's person's name is Abbie. Whose job would it be to check the vendors and the T3s and the paperwork and the licensing and things like that?
A. It normally would be the compliance person, but I don't know what their business structure was or who was responsible for what at Safe Chain.
Q. Do you have any evidence whatsoever to suggest that it was Pat Boyd's responsibility?
A. No.
MR. BARZEE: Let's go to Government Exhibit 181.

BY MR. BARZEE:
Q. Is Patrick Boyd on that document?
A. No.
MR. BARZEE: Government Exhibit 437.
BY MR. BARZEE:
Q. Is Patrick Boyd on that document?
A. No.
MR. BARZEE: Government Exhibit 176.
BY MR. BARZEE:
Q. Is Patrick Boyd on that document?
A. No.
MR. BARZEE: Government Exhibit 440.
BY MR. BARZEE:
Q. Is Patrick Boyd on that document?
A. No.
MR. BARZEE: Government Exhibit 184.
BY MR. BARZEE:
Q. Is Patrick Boyd on that document?
A. No.
MR. BARZEE: Government Exhibit 204.
BY MR. BARZEE:
Q. Is Pat Boyd on that document?
A. No.
MR. BARZEE: Government Exhibit 205.
BY MR. BARZEE:

Q. Is Patrick Boyd on that document?
A. No.
MR. BARZEE: Government Exhibit 206.
BY MR. BARZEE:
Q. Is Patrick Boyd on that document?
A. No.
Q. I wanted to take a time-out here.
This document, I think, is the one that's talking about Seroquel that might have been in a bottle of Biktarvy.
You might have to go to the second or third page of it. Yeah.
Email regarding Seroquel.
Do you remember that?
You testified about the document earlier.
A. Yeah. December 4th, 2020?
Q. Yeah.
A. It says, "I do not see any mention of Seroquel."
Q. Right.
But you remember the issue that was discussed about Seroquel being in one of the bottles of Biktarvy?
A. No.
Q. Forget about that document for a second. Just look at me for a second.
Do you remember earlier today talking to the prosecutor, and there was a discussion about Seroquel being in a Biktarvy

bottle?
Do you remember that?
A. Yes.
THE COURT: Mr. Barzee, is this a good spot to take a break?
MR. BARZEE: It certainly is, Your Honor.
THE COURT: Members of the jury, we're going to recess for the weekend.
Remember my admonition not to discuss the case or allow it to be discussed in your presence.
And I'm going to ask you to come back on Monday at 1:00. Go ahead and go to lunch first, come at 1:00, and hopefully we will be able to resume at that time.
Have a nice weekend. We'll see you back Monday at 1:00.
COURT SECURITY OFFICER: All rise.
(Jury exits.)
THE COURT: And again, Dr. Rumore, during the break in testimony, you're not allowed to discuss your testimony with anyone, and we will see you back Monday at 1:00.
(Witness exits.)
THE COURT: And if there's nothing else to come before the Court, we will be in recess for this case until Monday.
THE COURTROOM DEPUTY: All rise.
(Jury Trial adjourned at 4:56 PM.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 9/25/2025

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN, FPR, RPR
Official Court Reporter
United States District Court
Southern District of Florida
U.S. Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

## $

**$300,000** [2] - 209:2, 209:23
**$485** [1] - 209:16

## '

**'21** [2] - 122:5, 145:6
**'Biktarvy** [1] - 103:19

## /

**/s/Patricia** [1] - 219:8

## 1

**1** [10] - 1:8, 1:19, 54:7, 66:17, 71:11, 104:21, 120:10, 158:7, 164:6, 178:22
**1,000** [2] - 189:8, 189:17
**10** [2] - 3:3, 165:4
**103** [1] - 3:13
**105** [1] - 3:14
**108** [1] - 3:15
**10:05** [1] - 1:6
**11/25** [1] - 101:3
**112** [1] - 3:16
**116** [1] - 126:3
**117** [1] - 3:17
**11:55** [1] - 92:14
**12** [1] - 140:1
**12/2019** [1] - 64:17
**122** [1] - 3:18
**124** [3] - 40:18, 40:21, 213:17
**125** [1] - 3:22
**12th** [5] - 62:10, 165:22, 167:23, 169:9, 176:17
**13** [2] - 178:19, 178:23
**136** [2] - 44:9, 214:16
**13th** [5] - 74:8, 76:1, 176:20, 179:2, 181:1
**14** [1] - 69:12
**15** [1] - 142:6
**152** [1] - 191:10
**154** [1] - 3:19
**158** [1] - 3:21
**16** [2] - 117:25, 142:13
**160** [1] - 3:20
**16th** [1] - 14:9
**173** [2] - 3:23, 48:10
**174** [1] - 51:6
**176** [3] - 3:24, 62:24, 216:8
**177** [2] - 52:18, 214:20
**18** [1] - 4:2
**180** [1] - 4:3
**181** [2] - 55:15, 215:25
**182** [2] - 3:25, 66:3
**183** [1] - 69:2
**184** [2] - 68:10, 216:16
**187** [1] - 58:23
**19** [1] - 192:6
**196** [2] - 127:13, 132:19
**1978** [1] - 203:20
**1980** [1] - 203:24
**1:00** [10] - 7:10, 8:12, 86:10, 86:14, 86:22, 92:13, 218:12, 218:15, 218:20
**1:07** [1] - 92:14

## 2

**2** [15] - 19:1, 43:4, 44:11, 52:20, 60:18, 62:25, 76:9, 76:20, 101:19, 104:2, 104:21, 105:22, 119:19, 134:25, 163:20
**2,000** [2] - 189:10, 189:18
**20** [1] - 161:12
**2013** [1] - 29:18
**2015** [4] - 194:9, 195:24, 197:7, 199:15
**2018** [1] - 64:15
**2019** [12] - 11:8, 185:17, 186:1, 203:11, 206:7, 206:9, 206:12, 206:18, 207:2, 207:20, 207:21, 208:4
**202** [1] - 3:4
**2020** [94] - 13:25, 14:3, 14:9, 15:16, 16:2, 17:21, 18:9, 19:10, 19:23, 20:1, 22:23, 25:6, 25:17, 26:21, 27:2, 28:4, 30:16, 31:19, 31:22, 31:23, 32:11, 32:19, 33:10, 33:15, 33:23, 34:1, 34:7, 34:9, 36:7, 37:7, 37:14, 37:17, 39:20, 40:7, 41:3, 42:15, 45:25, 46:24, 55:2, 62:10, 62:11, 65:10, 68:19, 70:3, 70:14, 79:2, 80:13, 81:7, 82:15, 83:10, 85:18, 85:23, 94:16, 95:6, 95:22, 100:10, 100:13, 103:22, 107:1, 111:11, 122:18, 122:25, 123:4, 123:10, 126:6, 126:14, 129:3, 130:25, 132:22, 133:9, 134:3, 137:15, 142:18, 144:1, 145:7, 147:19, 147:23, 150:22, 192:18, 192:20, 193:15, 194:8, 194:15, 194:25, 199:9, 201:4, 206:15, 211:19, 211:23, 212:2, 213:7, 213:24, 214:3, 217:15
**2021** [24] - 118:4, 122:7, 125:9, 127:9, 131:3, 145:7, 153:18, 156:12, 156:21, 159:24, 165:4, 169:8, 172:3, 176:17, 178:20, 178:23, 185:11, 185:16, 193:15, 194:8, 194:15, 194:25, 199:9, 201:4
**2022** [1] - 14:1
**2025** [2] - 1:5, 12:22
**203** [5] - 3:10, 80:24, 81:16, 81:20, 81:21
**204** [7] - 3:11, 68:15, 71:2, 71:19, 71:22, 71:23, 216:20
**205** [6] - 3:12, 96:4, 96:15, 96:18, 96:19, 216:24
**206** [6] - 3:13, 102:19, 103:2, 103:5, 103:6, 217:3
**207** [6] - 3:14, 105:5, 105:13, 105:16, 105:17, 107:19
**208** [5] - 3:15, 108:4, 108:10, 108:13, 108:14
**209** [5] - 3:16, 112:3, 112:17, 112:20, 112:21
**20th** [3] - 46:24, 89:6, 89:14
**21** [1] - 144:10
**21st** [2] - 18:16, 20:1
**22** [2] - 4:1, 11:14
**225** [5] - 3:17, 116:24, 117:7, 117:10, 117:11
**237** [5] - 3:18, 121:17, 121:23, 122:1, 122:2
**23rd** [3] - 81:7, 98:25, 110:23
**24** [3] - 58:4, 106:10, 119:15
**24-cr-205500** [1] - 1:2
**243** [1] - 162:8
**245** [5] - 3:19, 153:20, 154:4, 154:7, 154:8
**24th** [1] - 85:2
**25** [1] - 1:5
**264** [1] - 165:15
**268** [1] - 166:12
**269** [6] - 3:20, 160:4, 160:10, 160:13, 160:14, 165:5
**273** [5] - 3:21, 157:17, 158:1, 158:4, 158:5
**277** [1] - 131:7
**28** [1] - 142:18
**299** [1] - 219:11
**29th** [1] - 147:19
**2:43** [1] - 170:10
**2:55** [1] - 170:10
**2A** [1] - 199:2

## 3

**3** [17] - 23:13, 59:19, 66:4, 84:14, 109:2, 119:12, 120:3, 133:18, 161:25, 162:21, 168:13, 177:15, 177:16, 182:6, 188:7, 193:12, 198:13
**3/30/2020** [1] - 56:6
**30** [2] - 117:25, 126:6
**300** [1] - 103:18
**320** [5] - 3:22, 124:16, 125:2, 125:5, 125:6
**322** [5] - 3:23, 172:15, 173:1, 173:4, 173:5
**323** [5] - 3:24, 175:24, 176:8, 176:11, 176:12
**324** [5] - 3:25, 182:3, 182:12, 182:15, 182:16
**328** [6] - 4:1, 22:4, 22:12, 22:15, 22:16, 211:1
**329** [6] - 4:2, 18:10, 18:18, 18:21, 18:22, 210:21
**33128** [1] - 1:19
**33132** [1] - 1:16
**333** [5] - 4:3, 180:10, 180:16, 180:19, 180:20
**33301** [2] - 1:22, 219:12
**3911** [4] - 61:21, 61:22, 71:10, 183:9
**3911s** [1] - 73:15
**3rd** [2] - 1:19, 118:16

## 4

**4** [13] - 58:24, 96:23, 98:14, 103:12, 112:9, 112:24, 119:3, 154:12, 162:9, 168:19, 177:16, 177:19, 188:7
**4/6/2021** [1] - 165:20
**40** [1] - 1:19
**400** [1] - 26:11
**418** [2] - 25:24, 211:5
**420** [1] - 43:1
**430** [1] - 191:24
**437** [2] - 57:8, 216:4
**440** [2] - 64:8, 216:12
**463** [1] - 168:1
**485** [1] - 209:14
**4:00** [3] - 7:25, 86:13, 93:3
**4:56** [2] - 1:6, 218:25
**4th** [3] - 1:15, 180:25, 217:15

## 5

**5** [9] - 24:20, 55:8, 55:11, 119:7, 148:22, 174:4, 177:24, 189:12
**501** [1] - 134:22
**503** [1] - 145:22
**505** [2] - 134:20, 145:22
**551** [2] - 54:3, 63:14
**5th** [3] - 82:15, 100:9, 100:13

## 6

**6** [5] - 1:22, 92:25, 99:2, 117:14, 173:7
**600** [1] - 196:4
**601** [1] - 197:15
**602** [1] - 193:6
**633** [1] - 1:22
**639** [2] - 33:21, 213:21
**640** [2] - 35:21, 214:5
**6th** [2] - 12:22, 98:10

## 7

**7** [1] - 169:8
**71** [1] - 3:11
**72-year-old** [1] - 13:2
**7th** [1] - 181:1

## 8

**8.5** [1] - 140:13
**8/14/2020** [1] - 135:5
**8/18/2020** [1] - 138:10
**81** [1] - 3:10
**88** [3] - 186:15, 186:24, 190:4
**8th** [4] - 7:9, 7:10, 7:11, 8:11

## 9

**9** [1] - 138:9
**9/18/2020** [1] - 140:17
**9/2/20** [1] - 56:7
**9/25/2025** [1] - 219:8
**9229** [7] - 16:3, 28:6, 28:10, 33:6, 41:7, 187:17, 187:24
**96** [1] - 3:12
**99** [1] - 1:15
**9th** [2] - 113:10, 167:22

## A

**Abbie** [85] - 5:14, 5:20, 14:12, 26:2, 26:4, 31:5, 41:3, 41:6, 41:10, 41:14, 41:20, 41:25, 42:4, 42:8, 48:12, 48:15, 50:5, 50:9, 51:12, 52:3, 52:22, 52:25, 54:10, 54:16, 56:3, 57:1, 57:12, 62:4, 63:3, 64:12, 64:14, 65:2, 65:11, 68:4, 68:5, 82:15, 82:21, 92:22, 96:12, 96:25, 98:9, 98:21, 98:24, 99:18, 100:19, 101:20, 102:14, 102:23, 103:13, 104:22, 105:8, 105:24, 106:6, 108:7, 110:1, 110:18, 112:7, 114:23, 117:5, 117:15, 118:12, 121:20, 124:24, 130:18, 130:22, 149:20, 154:1, 157:21, 160:8, 165:18, 166:14, 167:6, 168:15, 177:8, 177:13, 177:20, 177:25, 182:8, 182:20, 183:25, 185:22, 200:14, 206:5, 212:7, 215:16
**Abbie's** [1] - 104:9
**abbreviate** [1] - 29:3
**ability** [1] - 5:19
**able** [7] - 43:7, 49:14, 49:23, 53:1, 61:1, 162:15, 218:13
**abnormal** [1] - 140:16
**above-entitled** [1] - 219:6
**absent** [1] - 91:24
**absolutely** [14] - 39:24, 44:2, 80:15, 126:21, 128:13, 128:20, 133:17, 148:3, 148:19, 151:5, 152:10, 175:18, 191:17, 201:16
**accept** [10] - 40:2, 40:3, 41:15, 42:17, 65:14, 67:5, 72:23, 75:11, 153:8, 153:11
**accompanied** [1] - 153:11
**according** [4] - 118:16, 188:16, 188:18, 189:2
**account** [2] - 8:20, 163:18
**accounted** [1] - 27:13
**accounting** [1] - 68:8
**accurate** [2] - 18:6, 219:5
**accusations** [1] - 95:24
**accusing** [1] - 174:14
**Act** [8] - 29:18, 30:23, 41:8, 82:17, 82:22, 149:6, 155:20, 187:3
**act** [1] - 25:2
**acting** [4] - 58:14, 80:13, 156:23, 157:1
**action** [2] - 80:12, 109:9
**active** [1] - 56:8
**actual** [3] - 23:18, 101:7, 137:20
**AD** [3] - 161:2, 165:25, 168:24
**AD's** [1] - 160:25
**Adam** [5] - 63:25, 132:4, 146:11, 168:4, 168:21
**add** [2] - 90:11, 100:20
**added** [3] - 162:16, 207:23, 208:6
**addition** [3] - 155:9, 160:1, 184:19
**additional** [4] - 54:1, 54:2, 63:11, 116:19
**address** [6] - 53:5, 53:15, 57:23, 59:4, 61:11, 204:6
**addressing** [1] - 174:20
**adequate** [1] - 208:21
**adjourned** [1] - 218:25
**admissibility** [2] - 5:9, 7:1
**admissible** [1] - 5:21
**admissions** [1] - 144:9
**admit** [19] - 5:7, 5:16, 7:4, 71:19, 81:15, 96:14, 103:1, 105:12, 108:9, 112:16, 117:6, 121:22, 125:1, 154:3, 157:25, 160:10, 176:7, 180:15, 182:11
**admitted** [29] - 9:6, 25:25, 33:21, 35:22, 40:18, 40:21, 43:2, 44:10, 48:10, 51:6, 52:19, 55:16, 57:8, 62:25, 64:9, 66:4, 68:11, 134:19, 134:23, 145:23, 162:7, 165:16, 168:2, 186:18, 191:9, 191:24, 193:6, 196:4, 197:14
**admonition** [6] - 8:8, 86:7, 93:25, 169:19, 171:17, 218:9
**advanced** [3] - 10:14, 204:11, 204:18
**adverse** [1] - 117:25
**advice** [43] - 16:18, 21:12, 23:19, 24:3, 25:6, 27:23, 28:13, 37:11, 40:6, 40:13, 42:11, 45:12, 55:4, 65:17, 70:17, 70:19, 75:23, 78:18, 87:15, 87:24, 90:15, 90:18, 90:20, 90:25, 106:12, 107:5, 119:9, 124:2, 126:22, 128:19, 129:7, 129:9, 133:13, 134:8, 141:12, 142:3, 144:8, 145:15, 148:18, 162:4, 184:20, 185:2, 208:21
**advise** [5] - 47:15, 51:23, 80:11, 87:23, 177:2
**advised** [4] - 173:16, 184:21, 185:8, 185:9
**advising** [2] - 87:22, 114:7
**advisors** [1] - 67:3
**advocacy** [1] - 80:7
**advocate** [5] - 80:14, 156:22, 156:23, 157:1, 159:9
**advocating** [1] - 95:25
**affairs** [2] - 11:18, 11:23
**affect** [1] - 56:21
**affirmed** [1] - 9:18
**afternoon** [6] - 94:11, 117:18, 202:7, 202:8, 202:10, 202:12
**afterwards** [1] - 8:25
**age** [3] - 13:1, 13:4, 13:7
**agent** [3] - 5:10, 5:14, 5:20
**ago** [3] - 54:19, 202:18, 203:9
**agree** [2] - 6:3, 120:20
**agreed** [1] - 201:17
**agreement** [1] - 66:13
**ahead** [3] - 86:7, 125:8, 218:12
**AIDS** [1] - 59:14
**alert** [6] - 154:13, 155:16, 156:13, 156:14, 176:16, 193:16
**Alexander** [1] - 1:13
**alias** [1] - 32:20
**allegations** [1] - 85:5
**alleged** [2] - 166:25
**alleviate** [1] - 88:12
**Alliance** [1] - 13:11
**allow** [7] - 8:9, 86:8, 94:1, 169:20, 171:18, 208:9, 218:9
**allowed** [7] - 38:8, 86:18, 88:16, 94:4, 170:1, 212:18, 218:19
**almost** [1] - 211:16
**Alzheimer's** [2] - 131:10, 132:11
**AM** [2] - 1:6, 92:14
**AMERICA** [1] - 1:4
**AmerisourceBergen** [5] - 72:15, 76:12, 77:3, 187:8, 187:11
**amount** [2] - 68:20, 212:18
**Amsterdam** [6] - 187:11, 187:16, 188:2, 188:4, 188:8, 189:4
**answer** [26] - 19:19, 36:18, 38:8, 38:9, 38:12, 38:13, 56:13, 70:23, 77:22, 78:7, 89:23, 99:14, 181:15, 202:22, 206:19, 207:3, 207:20, 208:10, 208:12, 209:12, 209:25, 211:17, 212:18, 213:3
**answered** [4] - 17:24, 23:7, 76:9, 95:12
**answers** [4] - 71:7, 71:8, 74:10, 181:2
**Anthony** [1] - 157:22
**anticounterfeiting** [1] - 82:6
**apart** [1] - 152:12
**apologize** [2] - 104:23, 164:18
**APPEARANCES** [1] - 1:11
**appeared** [3] - 45:4, 45:7, 45:10
**appreciate** [1] - 60:5
**appreciated** [1] - 61:3
**approach** [3] - 46:8, 174:17, 202:2
**appropriate** [3] - 79:13, 129:20, 153:11
**appropriately** [1] - 40:4
**approve** [4] - 15:21, 85:24, 110:2, 172:3
**approved** [3] - 108:21, 194:1, 197:10
**approving** [1] - 194:20
**April** [8] - 125:9, 159:24, 165:22, 167:22, 167:23, 169:8, 169:9, 172:2
**area** [2] - 60:4, 163:17
**argument** [2] - 89:22, 91:4
**argumentative** [3] - 206:21, 208:9,

212:11
**articulated** [1] - 185:5
**ASAP** [1] - 162:1
**aspects** [1] - 90:22
**asserted** [4] - 5:24, 6:8, 9:14, 113:9
**assertion** [1] - 179:15
**Assistant** [1] - 1:14
**associate** [1] - 204:22
**associated** [7] - 48:21, 49:15, 61:18, 75:12, 84:21, 116:1, 194:13
**assume** [4] - 21:10, 21:15, 215:15, 215:16
**assumed** [1] - 43:19
**assumes** [3] - 42:20, 43:15, 195:3
**assuming** [6] - 32:21, 33:9, 33:25, 36:15, 139:4, 188:21
**assure** [2] - 111:7, 192:15
**assured** [2] - 111:22, 130:7
**AstraZeneca** [1] - 26:10
**atorvastatin** [1] - 146:25
**attached** [11] - 61:1, 66:14, 69:17, 69:21, 70:11, 82:17, 126:9, 127:18, 142:16, 149:2, 149:25
**attaching** [2] - 19:4, 166:18
**attachment** [10] - 81:9, 81:23, 99:1, 103:18, 109:2, 112:24, 149:23, 166:18, 166:19, 166:22
**Attain** [2] - 48:25, 49:22
**attempt** [1] - 82:16
**attempted** [4] - 48:24, 53:8, 97:19, 98:4
**attempting** [6] - 48:16, 60:25, 98:10, 100:10, 115:8, 164:10
**attention** [11] - 18:25, 23:13, 24:19, 63:16, 76:19, 99:22, 103:12, 104:2, 109:1, 190:2, 190:9
**attitude** [1] - 172:11
**attorney** [16] - 10:8, 10:10, 11:6, 11:9, 11:10, 12:8, 16:15, 17:16, 72:8, 80:3, 82:5, 96:1, 157:12, 203:10, 203:11, 210:6
**attorney-client** [1] - 96:1
**Attorneys** [1] - 1:15
**attorneys** [2] - 157:10, 181:14
**August** [53] - 12:22, 13:25, 18:9, 18:16, 19:10, 19:23, 20:1, 25:6, 25:17, 26:21, 27:2, 28:4, 30:16, 31:19, 31:22, 31:23, 32:10, 32:15, 32:18, 32:23, 33:6, 33:10, 33:15, 33:23, 34:7, 34:9, 36:7, 37:2, 37:7, 37:9, 37:11, 37:14, 39:20, 40:7, 41:3, 42:15, 45:25, 46:24, 48:7, 89:6, 89:14, 90:8, 92:7, 95:7, 95:8, 97:14, 104:10, 104:14, 137:14, 211:24, 212:2, 213:24, 214:3
**authenticate** [1] - 60:22
**authenticity** [2] - 5:13, 5:22
**authorities** [1] - 109:11
**authorized** [8] - 111:8, 111:23, 161:5, 161:6, 161:8, 161:13, 161:15, 195:8
**aware** [36] - 26:24, 27:15, 27:18, 27:20, 47:22, 50:16, 52:6, 65:11, 68:23, 68:25, 70:14, 82:20, 98:22, 103:23, 104:15, 107:1, 118:13, 127:10, 138:5, 139:10, 144:1, 144:6, 144:8, 152:2, 159:11, 159:13, 160:3, 179:3, 179:17, 180:1, 188:16, 192:19, 197:6, 201:21, 206:3, 209:4

**B**

**back-and-forth** [4] - 94:23, 108:17, 179:4, 179:17
**background** [2] - 10:10, 11:25
**bad** [3] - 50:13, 50:15, 200:13
**BAILEY** [2] - 2:2, 219:9
**Bailey** [1] - 219:8
**BAILEY-ENTIN** [2] - 2:2, 219:9
**Bailey-Entin** [1] - 219:8
**Baker** [1] - 158:10
**bankruptcy** [1] - 63:21
**barbecue** [1] - 91:3
**Barzee** [7] - 1:17, 1:18, 7:2, 33:12, 92:11, 202:1, 218:4
**BARZEE** [85] - 3:4, 7:3, 7:22, 18:20, 22:14, 32:21, 33:2, 33:7, 33:9, 33:25, 37:3, 38:16, 71:21, 91:8, 91:16, 92:12, 93:23, 96:17, 99:13, 99:16, 103:4, 105:15, 108:12, 112:19, 117:9, 121:25, 125:4, 130:9, 151:8, 152:24, 154:6, 158:2, 160:12, 171:5, 171:16, 173:3, 176:10, 180:18, 182:14, 188:21, 195:3, 200:5, 202:6, 203:21, 206:25, 207:14, 208:2, 208:13, 209:15, 210:19, 210:20, 210:25, 211:2, 211:5, 211:6, 212:13, 212:21, 213:17, 213:18, 213:21, 213:22, 214:5, 214:6, 214:16, 214:17, 214:20, 214:21, 215:11, 215:25, 216:1, 216:4, 216:5, 216:8, 216:9, 216:12, 216:13, 216:16, 216:17, 216:20, 216:21, 216:24, 216:25, 217:3, 217:4, 218:6
**based** [20] - 35:17, 51:14, 67:10, 67:12, 67:16, 67:19, 68:23, 88:20, 89:12, 106:14, 111:3, 118:22, 144:21, 151:20, 153:2, 175:12, 181:19, 181:23, 189:16, 200:1
**Based** [1] - 155:23
**basis** [1] - 79:11
**Bay** [1] - 192:6
**bear** [1] - 137:1
**Beckerlegge** [1] - 158:10
**become** [1] - 11:25
**BEFORE** [1] - 1:10
**beginning** [4] - 6:12, 48:6, 151:21, 212:23
**behalf** [3] - 91:8, 159:9, 172:4
**believes** [3] - 62:5, 144:24, 145:3
**below** [45] - 26:16, 48:20, 50:14, 51:9, 52:25, 53:25, 63:13, 65:2, 66:11, 67:1, 67:9, 68:2, 69:8, 69:11, 72:11, 74:11, 76:20, 77:18, 84:20, 109:21, 111:6, 115:22, 126:5, 131:22, 140:7, 140:10, 143:1, 143:6, 147:18, 149:19, 154:17, 154:20, 159:2, 160:24, 161:25, 163:14, 172:21, 173:13, 174:8, 184:15, 187:10, 194:3, 194:11, 198:6
**Benjamin** [1] - 10:12
**Berger** [1] - 157:22
**best** [2] - 80:11, 174:17
**better** [1] - 150:17
**Between** [1] - 169:3
**between** [11] - 26:2, 28:9, 57:12, 64:11, 91:21, 98:21, 168:4, 177:8, 179:18, 192:3, 199:23
**big** [2] - 43:8, 118:17
**Biktarvy** [42] - 20:14, 26:11, 59:16, 60:3, 82:9, 82:10, 83:24, 84:8, 97:13, 97:18, 97:22, 100:8, 103:24, 110:22, 114:19, 117:20, 118:11, 118:18, 118:19, 122:19, 123:1, 123:24, 138:17, 140:7, 146:24, 154:20, 154:24, 155:9, 155:10, 155:11, 155:12, 155:13, 155:24, 155:25, 156:1, 156:5, 156:6, 173:23, 217:9, 217:20, 217:25
**billable** [3] - 209:7, 209:8, 209:13
**billing** [1] - 46:5
**bills** [1] - 209:22
**binder** [4] - 186:20, 188:12, 190:20, 202:3
**biomedical** [2] - 12:6, 204:12
**Bipolar** [1] - 136:9
**bipolar** [3] - 136:15, 138:13, 139:16
**bit** [9] - 10:9, 11:4, 12:7, 49:12, 111:6, 125:8, 134:24, 134:25, 210:3
**blocks** [1] - 8:12
**blow** [1] - 147:10
**blue** [5] - 99:24, 100:16, 100:18, 135:2, 138:10
**Board** [4] - 10:23, 12:16, 53:24, 67:13
**body** [1] - 22:21
**BOP** [1] - 53:20
**boss** [4] - 14:5, 159:22, 183:7, 183:8
**Bottle** [1] - 137:5
**bottle** [71] - 20:14, 21:6, 23:5, 25:17, 25:22, 26:18, 26:23, 27:2, 27:11, 27:15, 27:18, 27:21, 27:22, 27:25, 60:3, 60:4, 83:24, 83:25, 97:10, 103:17, 103:23, 104:11, 104:15, 106:3, 115:24, 118:25, 122:19, 123:1, 123:18, 127:11, 127:20, 128:4, 128:10, 128:24, 130:24, 131:3, 131:12, 131:20, 133:2, 133:7, 133:19, 134:5, 135:11, 135:13, 135:15,

138:23, 139:7, 139:11, 139:16, 140:12, 140:15, 140:24, 141:7, 142:23, 143:4, 143:6, 144:12, 146:24, 147:2, 147:13, 151:24, 152:7, 152:13, 152:23, 153:6, 155:25, 156:1, 156:7, 217:9, 218:1
**bottles** [28] - 44:25, 45:4, 45:7, 45:10, 50:14, 50:22, 69:23, 107:8, 116:20, 138:25, 139:1, 140:8, 140:11, 141:4, 154:19, 154:24, 155:24, 156:1, 156:6, 188:18, 189:3, 189:8, 189:10, 189:18, 191:13, 217:20
**bottom** [42] - 43:6, 44:12, 48:12, 52:21, 54:9, 55:22, 59:19, 61:8, 72:3, 96:24, 97:25, 101:23, 104:4, 104:21, 104:23, 105:8, 105:24, 119:4, 120:11, 123:9, 135:4, 135:5, 138:15, 158:7, 162:9, 162:22, 164:7, 166:14, 167:6, 173:9, 176:2, 176:22, 177:7, 177:11, 177:15, 177:16, 177:19, 177:24, 178:23, 183:2, 190:3, 196:5
**bought** [4] - 30:11, 44:17, 65:3, 117:20
**Boulevard** [24] - 16:3, 28:6, 28:10, 33:5, 41:7, 43:8, 47:17, 48:17, 50:13, 137:6, 142:8, 143:18, 146:9, 146:23, 149:14, 150:17, 150:24, 187:17, 187:24, 191:14, 192:11, 211:10, 214:1, 219:11
**Boulevard's** [1] - 64:16
**box** [1] - 69:20
**BOYD** [4] - 1:7, 1:17, 1:21
**Boyd** [277] - 9:12, 14:12, 14:13, 16:23, 16:24, 17:10, 18:15, 19:2, 19:11, 19:23, 20:2, 22:10, 23:1, 26:2, 26:21, 26:25, 28:4, 28:9, 31:6, 31:11, 31:21, 31:24, 32:2, 32:7, 32:10, 32:18, 32:23, 33:4, 33:10, 33:23, 34:1, 34:6, 34:11, 34:23, 35:12, 36:2, 36:7, 36:9, 36:12, 36:20, 37:1, 37:2, 37:7, 37:13, 37:21, 38:6, 38:17, 39:19, 40:7, 41:2, 41:24, 42:3, 42:9, 42:12, 42:15, 43:7, 43:12, 43:16, 43:18, 44:4, 44:17, 44:24, 45:17, 45:24, 46:12, 46:19, 47:3, 47:16, 48:13, 50:2, 50:8, 50:12, 52:4, 55:25, 57:5, 57:12, 58:19, 62:2, 62:4, 62:5, 63:4, 64:1, 64:3, 64:11, 66:11, 67:24, 69:4, 71:16, 72:4, 72:10, 72:13, 73:13, 73:25, 78:15, 78:18, 78:21, 80:2, 80:14, 80:20, 89:4, 89:5, 89:14, 91:8, 91:10, 91:11, 91:13, 91:17, 91:22, 92:1, 92:6, 94:24, 95:5, 95:17, 95:22, 96:12, 97:5, 98:24, 99:9, 99:16, 99:17, 99:18, 101:21, 102:3, 102:23, 103:13, 104:4, 105:9, 105:25, 107:20, 108:7, 108:21, 108:24, 109:14, 109:25, 110:2, 114:23, 117:4, 117:16, 118:12, 119:13, 120:11, 121:5, 121:20, 123:4, 123:16, 124:3, 124:13, 124:22, 124:24, 125:12, 126:17, 126:23, 130:19, 130:20, 130:22, 132:4, 132:5, 132:7, 132:13, 132:14, 132:25, 136:12, 137:24, 140:4, 142:7, 142:14, 143:13, 146:7, 146:13, 146:15, 146:18, 146:21, 147:22, 148:4, 149:9, 150:22, 151:13, 154:1, 157:1, 157:2, 157:21, 157:22, 160:8, 160:9, 160:19, 160:22, 161:20, 162:4, 163:9, 164:7, 164:23, 165:17, 165:23, 166:15, 167:7, 167:23, 168:4, 168:14, 168:20, 168:21, 169:2, 169:6, 169:9, 172:7, 172:22, 174:7, 175:12, 176:3, 176:23, 177:8, 177:20, 178:1, 178:19, 178:25, 182:9, 186:2, 192:3, 194:1, 194:19, 197:10, 199:14, 199:15, 200:2, 200:19, 200:20, 200:21, 200:22, 210:4, 210:14, 210:15, 210:23, 211:3, 211:7, 211:10, 211:15, 211:18, 212:6, 212:8, 212:14, 212:15, 212:22, 213:1, 213:6, 213:10, 213:19, 213:25, 214:2, 214:7, 214:10, 214:14, 214:18, 216:2, 216:6, 216:10, 216:14, 216:18, 216:22, 217:1, 217:5
**Boyd's** [9] - 21:24, 63:17, 74:10, 137:18, 143:18, 144:15, 145:2, 181:23, 215:23
**brand** [1] - 82:6
**branded** [1] - 125:14
**break** [13] - 7:11, 7:25, 8:13, 86:3, 86:12, 86:13, 86:17, 169:13, 169:25, 170:21, 171:23, 218:5, 218:18
**briefly** [3] - 11:24, 78:12, 170:16
**bring** [13] - 5:4, 7:18, 7:23, 86:24, 90:8, 90:23, 92:18, 93:6, 170:14, 171:3, 171:7, 186:23, 210:25
**bringing** [1] - 211:5
**broke** [1] - 94:12
**broken** [4] - 50:14, 50:22, 146:25, 147:16
**Brosius** [5] - 63:25, 132:4, 146:11, 168:4, 168:21
**brought** [2] - 207:17, 210:18
**Broward** [1] - 219:11
**Bruce** [1] - 1:21
**BS** [2] - 12:1, 203:23
**building** [2] - 56:13, 213:9
**buildings** [1] - 212:25
**bullet** [5] - 125:11, 193:14, 195:15, 197:21, 198:6
**bunch** [1] - 180:25
**business** [17] - 14:16, 17:16, 54:13, 54:18, 54:23, 56:4, 56:13, 161:21, 196:18, 210:5, 210:6, 210:9, 210:11, 210:12, 210:13, 214:22, 215:20
**buy** [3] - 54:23, 163:9, 166:2
**buying** [23] - 15:18, 16:16, 28:5, 34:24, 36:9, 36:12, 37:22, 38:18, 39:20, 47:19, 47:23, 47:25, 48:3, 48:5, 48:6, 77:10, 85:24, 152:8, 161:7, 203:12, 203:15, 211:11, 214:1
**buys** [2] - 57:20, 57:23
**BY** [166] - 2:1, 3:3, 3:4, 10:2, 18:11, 18:24, 19:21, 22:5, 22:19, 23:12, 24:14, 30:8, 30:15, 31:2, 31:18, 32:6, 32:17, 33:3, 33:13, 34:5, 34:17, 35:4, 35:10, 36:1, 36:6, 37:6, 38:5, 38:16, 39:1, 39:12, 39:18, 40:12, 40:19, 41:1, 43:3, 44:3, 44:23, 45:23, 46:10, 47:1, 51:8, 52:17, 62:23, 65:1, 65:9, 68:17, 71:3, 71:24, 73:10, 74:7, 76:18, 79:1, 81:1, 81:10, 81:24, 94:10, 95:16, 96:5, 96:22, 99:20, 100:5, 102:20, 103:7, 105:6, 105:18, 108:5, 108:15, 111:24, 112:4, 112:11, 112:22, 116:17, 117:1, 117:12, 120:4, 121:18, 122:3, 124:18, 125:7, 127:17, 128:23, 130:15, 131:8, 131:18, 132:3, 132:21, 134:18, 135:1, 135:10, 135:24, 136:7, 137:4, 137:10, 138:22, 139:21, 140:2, 140:23, 141:3, 142:22, 143:3, 143:11, 146:1, 147:12, 149:1, 149:18, 150:6, 151:12, 153:3, 153:21, 154:11, 158:8, 160:6, 160:17, 166:13, 166:21, 167:5, 171:22, 172:18, 173:8, 174:6, 176:1, 176:14, 180:11, 180:22, 182:4, 182:7, 182:19, 183:1, 186:19, 187:1, 189:1, 191:8, 192:1, 195:10, 196:6, 198:5, 198:12, 199:1, 199:21, 200:8, 202:6, 203:21, 206:25, 207:14, 208:2, 208:13, 209:15, 210:20, 211:2, 211:6, 212:13, 212:21, 213:18, 213:22, 214:6, 214:17, 214:21, 215:11, 216:1, 216:5, 216:9, 216:13, 216:17, 216:21, 216:25, 217:4

## C

**California** [1] - 67:13
**Cambridge** [1] - 173:18
**cannabis** [1] - 35:15
**cannot** [8] - 40:2, 53:19, 72:22, 73:14, 75:11, 77:22, 78:7, 113:17
**capital** [1] - 204:4
**care** [1] - 205:10
**career** [3] - 11:6, 11:11, 11:12
**careful** [1] - 169:4
**carefully** [1] - 67:2
**carry** [2] - 104:21, 170:18
**carrying** [1] - 143:17
**carton** [1] - 191:19
**case** [16] - 7:13, 8:9, 8:15, 86:8, 88:5, 94:1, 115:23, 126:1, 169:19, 171:18, 175:10, 205:16, 205:19, 218:9, 218:23
**CASE** [1] - 1:2
**Cassandra** [2] - 49:19, 51:10
**Castillo** [1] - 167:10
**category** [5] - 5:11, 5:21, 6:2, 6:5, 6:14
**caused** [3] - 65:16, 70:15, 129:23
**cautionary** [1] - 6:6
**cc'd** [2] - 68:3, 160:9
**CCPDA** [1] - 103:19
**CCXKVA** [1] - 110:22
**CDFYCA** [1] - 122:19
**cease** [5] - 24:24, 175:3, 175:6, 175:9, 179:12
**Cellebrite** [1] - 6:15
**certain** [8] - 5:7, 15:22, 88:19, 94:19, 129:18, 161:9, 175:7, 190:6
**certainly** [4] - 90:7, 91:3, 193:4, 218:6
**certifications** [1] - 190:21
**certified** [1] - 173:22
**certify** [1] - 219:4
**Cesar** [1] - 167:10
**Chain** [152] - 5:12, 13:17, 14:3, 14:11, 15:3, 15:16, 17:3, 17:21, 18:2, 21:5, 21:9, 21:14, 23:19, 24:2, 25:6, 26:7, 28:12, 29:9, 29:18, 30:9, 30:23, 33:22, 40:7, 41:8, 42:12, 44:7, 55:5, 57:6, 60:20, 62:20, 65:20, 67:24, 68:8, 70:2, 70:18, 70:22, 71:7, 73:3, 75:16, 77:6, 77:8, 79:3, 79:7, 79:12, 79:18, 79:21, 80:16, 81:5, 82:1, 82:16, 82:22, 83:8, 84:7, 84:11, 85:14, 85:19, 85:24, 94:13, 95:23, 95:25, 97:3, 99:8, 99:14, 100:9, 102:12, 107:2, 107:7, 109:7, 109:22, 110:9, 110:15, 114:5, 114:7, 115:19, 116:13, 116:19, 118:24, 122:20, 123:1, 124:3, 126:23, 129:19, 130:10, 134:4, 140:18, 149:6, 149:10, 151:16, 152:8, 154:25, 155:19, 156:23, 157:22, 158:20, 159:3, 159:9, 159:12, 159:15, 159:17, 159:25, 161:8, 162:11, 172:4, 173:17, 173:21, 174:25, 175:16, 176:16, 177:8, 177:25, 178:3, 178:7, 179:13, 179:17, 181:20, 183:9, 183:16, 183:19, 185:15, 185:17, 186:10, 187:3, 188:13, 188:17, 188:20, 189:2, 190:11, 191:12, 193:15, 193:25, 194:15, 194:18, 195:1, 195:11, 197:7, 198:19, 199:10, 199:14, 200:24, 201:18, 203:1, 206:4, 206:14, 207:8, 207:15, 207:22, 208:5, 209:20, 215:21
**chain** [6] - 23:17, 29:19, 60:21, 62:16, 101:3, 115:9
**Chain's** [14] - 14:16, 113:19, 114:19, 129:24, 130:17, 137:15, 151:20, 155:19, 158:22, 178:11, 190:6, 193:9, 194:9, 199:10
**Chains** [1] - 199:2
**change** [3] - 24:7, 75:4, 142:3
**changed** [2] - 27:23, 56:5
**changes** [1] - 20:6
**charge** [1] - 20:22
**charging** [1] - 209:6
**Charles** [183] - 9:12, 16:23, 17:10, 18:15, 19:2, 19:11, 19:23, 20:2, 21:24, 22:10, 23:1, 26:2, 26:21, 28:4, 28:9, 31:6, 31:11, 31:21, 31:24, 32:10, 32:18, 33:4, 33:23, 34:6, 34:11, 34:18, 34:23, 35:12, 36:2, 36:7, 36:9, 36:12, 36:20, 37:1, 37:7, 37:13, 37:21, 38:6, 38:17, 39:19, 40:7, 41:2, 41:24, 42:3, 42:9, 42:12, 42:15, 43:12, 43:16, 44:4, 44:17, 44:24, 45:17, 45:24, 46:12, 46:17, 46:19, 47:3, 47:16, 48:13, 50:2, 50:8, 52:4, 55:25, 57:5, 57:12, 58:19, 62:2, 62:4, 63:4, 63:17, 64:1, 64:3, 64:11, 64:14, 71:16, 72:4, 72:10, 72:13, 73:13, 73:25, 74:10, 78:15, 78:18, 78:21, 80:2, 80:14, 80:19, 89:4, 89:14, 92:6, 94:24, 95:5, 95:17, 95:22, 96:12, 97:5, 98:24, 99:9, 99:18, 101:21, 102:3, 102:23, 103:13, 104:4, 105:9, 105:25, 107:20, 108:7, 108:21, 108:24, 109:14, 109:25, 110:2, 110:18, 114:23, 117:4, 117:16, 118:12, 119:13, 119:20, 120:11, 121:5, 121:20, 123:4, 123:16, 124:3, 124:24, 126:17, 126:23, 130:22, 130:23, 131:2, 132:4, 132:7, 132:13, 132:25, 146:7, 146:18, 147:22, 148:4, 149:9, 150:22, 151:13, 154:1, 157:2, 157:21, 160:8, 160:19, 161:20, 162:4, 163:9, 165:17, 165:23, 166:15, 167:7, 167:23, 168:4, 168:20, 169:2, 169:9, 172:7, 172:22, 174:7, 175:12, 176:3, 176:23, 177:8, 177:20, 178:1, 178:19, 178:25, 181:23, 182:8, 186:2, 192:3, 194:1, 194:19, 197:10, 199:14, 200:2, 200:19, 212:6
**CHARLES** [2] - 1:7, 1:21
**Charlie** [8] - 14:12, 104:24, 106:6, 130:19, 149:19, 200:22, 210:4, 210:14
**chat** [1] - 26:2
**cheaper** [1] - 42:17
**check** [4] - 215:5, 215:6, 215:17
**checked** [2] - 58:9, 140:11
**chipper** [1] - 58:15
**cholesterol** [1] - 147:1
**Christina** [1] - 182:21
**circle** [1] - 70:8
**cite** [1] - 88:1
**City** [1] - 10:11
**civil** [1] - 7:12
**claim** [2] - 13:7, 117:19
**claimed** [1] - 103:17
**clarified** [1] - 88:8
**clarify** [8] - 9:4, 19:17, 33:1, 34:23, 93:1, 102:6, 119:15, 151:10
**class** [1] - 11:21
**clear** [11] - 17:2, 19:22, 22:25, 27:14, 47:14, 48:4, 77:23, 83:10, 85:17, 172:2, 183:25
**clearly** [1] - 91:16
**click** [2] - 56:3, 135:9
**client** [5] - 30:21, 80:11, 96:1, 146:24, 192:6
**clients** [4] - 10:25, 12:15, 13:20, 208:18
**clip** [1] - 56:11
**closed** [3] - 54:13, 54:17, 56:14
**closing** [2] - 57:20, 91:4
**clue** [1] - 121:2
**Co** [1] - 60:13
**Co-op** [1] - 60:13
**code** [1] - 163:18
**collect** [1] - 202:3
**colleges** [1] - 11:16
**color** [2] - 140:14, 141:16
**Colosi** [2] - 81:4, 122:11
**coming** [6] - 24:17, 55:6, 55:7, 146:23, 170:25, 171:2
**commented** [1] - 113:19
**commenting** [1] - 114:6
**comments** [1] - 130:12
**commerce** [1] - 158:24
**committed** [1] - 109:8
**commonly** [1] - 197:4
**communicate** [1] - 17:13
**communication** [7] - 12:6, 18:15, 79:23, 91:17, 175:12, 200:1, 204:12
**communications** [9] - 6:19, 114:8, 125:22, 125:25, 129:12, 145:18, 177:7, 182:21, 199:23
**company** [24] - 13:16, 13:19, 14:4, 14:11, 16:12, 26:12, 26:13, 28:17, 29:6, 30:3, 59:8, 59:11, 128:1, 134:1, 162:14, 162:23, 163:7, 167:10, 167:13, 171:24, 186:6,

215:8, 215:14
**company's** [2] - 31:4, 69:12
**comparing** [1] - 141:4
**competent** [1] - 36:17
**complain"** [1] - 56:23
**complained** [2] - 45:3, 97:14
**complaint** [13] - 13:1, 20:10, 20:18, 20:23, 59:21, 60:1, 85:6, 101:4, 101:7, 101:11, 103:19, 192:19, 192:25
**complaints** [5] - 25:1, 44:25, 65:19, 100:9, 146:22
**complete** [4] - 12:2, 25:3, 198:8, 199:12
**completely** [1] - 129:14
**compliance** [37] - 16:21, 26:7, 31:13, 31:15, 31:16, 45:9, 57:6, 68:3, 73:14, 81:5, 85:22, 97:3, 185:17, 185:23, 186:1, 186:7, 192:14, 203:1, 205:17, 205:19, 206:1, 206:3, 206:10, 206:17, 207:3, 207:4, 207:9, 207:16, 207:19, 207:22, 208:5, 214:23, 215:13, 215:14, 215:15, 215:16, 215:19
**compliance's** [1] - 215:5
**compliance@ SafeChain** [1] - 59:3
**comply** [1] - 41:8
**compound** [1] - 208:9
**concealment** [1] - 114:15
**concede** [3] - 8:4, 93:20, 171:12
**concern** [17] - 26:22, 39:13, 43:13, 65:13, 113:24, 114:11, 115:14, 115:18, 115:21, 118:6, 129:23, 142:1, 183:21, 185:2, 186:4, 186:5, 200:25
**concerned** [11] - 6:18, 65:25, 116:6, 141:8, 152:7, 156:14, 179:9, 181:6, 181:8, 185:18, 185:25
**concerning** [3] - 39:9, 93:9, 207:5
**concerns** [5] - 18:5, 24:4, 180:5, 183:15, 184:7
**conclusion** [2] - 87:21, 88:10
**conclusions** [3] - 88:2, 88:24, 94:6
**conditions** [2] - 56:20, 153:13
**conduct** [3] - 23:18, 175:8, 175:9
**conducting** [1] - 21:11
**confine** [1] - 130:12
**confines** [1] - 80:11
**confirm** [1] - 51:14
**confirmation** [1] - 120:6
**confirmed** [5] - 52:6, 73:3, 78:22, 149:10, 151:1
**confirming** [1] - 76:13
**conflicts** [1] - 101:2
**confusion** [2] - 88:12, 88:15
**consent** [1] - 101:25
**consequences** [1] - 42:1
**considered** [4] - 23:16, 161:16, 195:1, 198:8
**considering** [1] - 67:2
**consisted** [1] - 119:22
**consistent** [1] - 156:8
**consulting** [1] - 67:2
**consumed** [1] - 117:24
**consumers** [1] - 178:13
**contact** [7] - 14:11, 31:25, 32:2, 79:3, 91:21, 92:2, 100:13
**contacted** [5] - 82:15, 85:9, 100:9, 109:22, 110:23
**contacting** [2] - 59:16, 162:13
**contain** [5] - 9:11, 108:23, 156:1, 156:2, 196:23
**contained** [8] - 61:14, 83:2, 84:1, 87:20, 103:18, 115:25, 123:2, 199:16
**contains** [2] - 23:5, 122:19
**content** [1] - 87:17
**contents** [1] - 96:10
**context** [6] - 28:16, 74:17, 75:16, 102:6, 161:2, 161:7
**continuation** [1] - 180:12
**continue** [13] - 41:7, 47:16, 93:10, 94:8, 98:2, 148:5, 148:9, 148:13, 155:18, 161:21, 171:20, 172:11, 201:17
**continued** [3] - 47:19, 159:25, 201:20
**continues** [5] - 53:21, 77:13, 119:7, 120:2, 183:14
**continuing** [4] - 49:21, 105:19, 177:12, 177:16
**contract** [1] - 26:17
**contrary** [1] - 113:9
**control** [3] - 61:19, 106:16, 113:19
**conversation** [22] - 31:10, 38:11, 43:18, 43:21, 45:21, 45:24, 46:12, 57:12, 57:16, 64:11, 89:6, 89:8, 89:15, 89:17, 90:9, 90:13, 92:7, 103:9, 105:19, 168:3, 192:2
**conversations** [9] - 32:14, 33:14, 36:20, 37:1, 37:13, 44:4, 91:14, 94:23, 200:23
**convicted** [2] - 208:7, 208:14
**convo'** [1] - 103:19
**cooperate** [1] - 158:23
**cooperating** [1] - 109:8
**cooperation** [2] - 82:10, 84:23
**copied** [4] - 68:2, 132:6, 132:7, 160:22
**copies** [1] - 164:15
**copy** [6] - 60:22, 61:22, 101:24, 160:25, 186:16, 187:20
**copying** [6] - 59:3, 66:11, 112:7, 117:4, 157:21, 182:9
**copyrights** [1] - 10:20
**core** [1] - 84:17
**corporate** [1] - 11:2
**corporation** [3] - 202:25, 206:10, 214:9
**correct** [10] - 6:19, 9:7, 27:19, 153:5, 153:6, 202:23, 203:3, 206:5, 215:6, 215:12
**correspondence** [10] - 82:9, 98:21, 104:18, 159:3, 176:23, 177:20, 179:1, 181:5, 181:9, 184:1
**Counsel** [1] - 40:24
**counsel** [22] - 5:2, 8:4, 81:4, 90:16, 90:17, 92:17, 92:21, 93:20, 158:12, 170:13, 171:12, 177:1, 179:7, 204:19, 204:21, 207:12, 208:8, 210:2, 214:25, 215:2
**count** [1] - 89:2
**counterfeit** [8] - 29:20, 62:5, 77:19, 84:8, 84:15, 84:22, 109:10, 173:23
**counterfeited** [1] - 195:19
**country** [2] - 5:17, 14:21
**county** [3] - 7:13, 8:12, 8:14
**couple** [5] - 89:4, 138:12, 138:25, 139:15, 152:14
**course** [3] - 80:12, 170:17, 192:10
**COURT** [142] - 1:1, 5:2, 6:1, 6:9, 6:13, 7:2, 7:4, 7:15, 7:17, 7:23, 8:4, 8:8, 8:19, 8:23, 9:7, 9:11, 18:21, 19:16, 19:19, 22:15, 23:10, 24:13, 30:7, 30:14, 31:1, 31:9, 32:5, 32:16, 32:25, 33:8, 33:12, 34:3, 34:16, 35:3, 35:9, 36:19, 36:25, 37:5, 38:3, 38:12, 38:25, 39:11, 39:17, 40:11, 42:22, 43:17, 43:21, 44:1, 45:22, 46:9, 46:21, 71:22, 73:9, 76:17, 81:20, 86:2, 86:6, 86:15, 86:17, 86:22, 86:24, 87:2, 87:4, 87:11, 87:16, 88:3, 88:14, 88:22, 89:18, 90:4, 90:7, 90:14, 91:2, 91:7, 91:15, 92:3, 92:11, 92:13, 92:16, 92:23, 93:2, 93:5, 93:12, 93:15, 93:18, 93:20, 93:25, 95:14, 96:18, 99:15, 103:5, 105:16, 108:13, 111:21, 112:20, 117:10, 122:1, 125:5, 130:14, 151:11, 153:1, 154:7, 158:4, 160:13, 169:13, 169:17, 169:23, 169:25, 170:5, 170:8, 170:12, 170:22, 170:24, 171:2, 171:6, 171:11, 171:12, 171:17, 173:4, 176:11, 180:19, 182:15, 185:21, 188:24, 195:5, 200:7, 202:1, 202:4, 206:23, 207:13, 208:1, 208:11, 209:11, 212:12, 212:20, 213:16, 215:9, 218:4, 218:7, 218:16, 218:18, 218:22
**Court** [15] - 2:3, 2:4, 5:1, 5:4, 5:15, 90:11, 92:18, 93:1, 93:9, 170:6, 170:14, 170:19, 218:23, 219:9, 219:10
**court** [8] - 7:9, 7:11, 7:13, 8:11, 8:14, 9:22, 79:16, 207:1
**Court's** [1] - 90:5
**Courthouse** [1] - 219:11
**courthouse** [2] - 8:1, 8:13
**COURTROOM** [5] - 8:2, 9:21, 40:24, 145:23, 218:24
**cover** [1] - 184:21
**COVID-19** [1] - 17:18
**credentials** [1] - 204:2
**credit** [1] - 49:10
**criminal** [1] - 42:4
**Cross** [7] - 20:18, 83:25, 97:10, 100:21, 103:17, 114:20, 210:22
**CROSS** [2] - 3:4, 202:5
**cross** [4] - 5:19, 90:7, 206:23, 215:10

**cross-examination** [3] - 90:7, 206:23, 215:10
**CROSS-EXAMINATION** [2] - 3:4, 202:5
**cross-examine** [1] - 5:19
**curative** [4] - 6:10, 7:6, 91:25, 92:5
**current** [1] - 13:12
**curse** [2] - 64:7, 200:21
**cursing** [2] - 200:13, 200:22
**customer** [7] - 20:13, 25:1, 44:25, 65:19, 100:20, 143:19, 147:1
**customers** [14] - 15:4, 15:11, 40:5, 42:17, 45:3, 49:23, 56:22, 67:20, 68:19, 117:19, 146:22, 159:4, 174:13, 189:3
**cut** [1] - 105:23
**cutting** [1] - 168:8

## D

**Dakota** [6] - 59:1, 59:20, 82:15, 82:21, 162:10, 163:21
**damaged** [5] - 126:9, 127:2, 140:14, 141:16, 141:23
**Danielle** [1] - 112:6
**data** [4] - 75:13, 75:19, 75:21, 77:14
**date** [23] - 7:9, 8:11, 44:14, 44:19, 45:20, 46:2, 46:4, 59:22, 60:4, 81:6, 97:20, 101:5, 101:8, 101:10, 122:4, 135:5, 138:10, 140:17, 165:3, 169:8, 178:23, 179:2, 179:3
**DATE** [1] - 219:8
**dated** [2] - 18:15, 165:20
**dates** [1] - 181:9
**days** [3] - 50:14, 138:12, 139:16
**DEA** [1] - 12:17
**deal** [1] - 88:6
**dealing** [4] - 31:22, 33:5, 33:18, 210:21
**December** [5] - 106:24, 106:25, 107:1, 111:10, 217:15
**deceptive** [1] - 208:23
**decide** [1] - 121:1
**decision** [3] - 67:3, 67:9, 67:12
**deemed** [2] - 68:20, 69:8
**defect** [1] - 23:22
**defend** [1] - 159:17
**defendant** [2] - 19:18, 200:25
**DEFENDANT** [2] - 1:17, 1:21
**defendants** [20] - 5:3, 5:23, 6:7, 17:20, 18:6, 27:23, 30:17, 45:13, 55:5, 70:18, 80:2, 87:23, 92:17, 130:11, 130:13, 142:4, 145:16, 170:13, 199:24
**Defendants** [1] - 1:8
**defendants'** [1] - 200:9
**defending** [3] - 18:1, 95:23, 201:18
**defense** [2] - 90:16, 92:21
**defense's** [1] - 5:18
**definitely** [3] - 130:22, 133:14, 143:23
**degree** [7] - 10:14, 12:3, 12:5, 204:11, 204:14, 204:18, 210:2
**degrees** [1] - 210:7
**deliberation** [1] - 86:11
**delivered** [1] - 196:19
**demeanor** [2] - 200:3, 200:6
**denied** [1] - 89:19
**deny** [1] - 92:3
**department** [14] - 45:9, 68:8, 205:10, 205:11, 205:13, 205:16, 205:17, 205:20, 206:3, 214:23, 214:24, 215:15
**department's** [1] - 215:16
**DEPUTY** [5] - 8:2, 9:21, 40:24, 145:23, 218:24
**DEROVANESIAN** [275] - 3:3, 8:18, 9:2, 10:2, 18:8, 18:11, 18:17, 18:24, 19:17, 19:20, 19:21, 22:3, 22:5, 22:11, 22:17, 22:19, 23:12, 24:14, 30:8, 30:15, 31:2, 31:18, 32:6, 32:17, 33:3, 33:13, 34:5, 34:17, 35:4, 35:10, 35:23, 36:1, 36:4, 36:6, 36:16, 37:6, 38:5, 38:15, 39:1, 39:12, 39:18, 40:12, 40:17, 40:19, 40:22, 40:25, 41:1, 42:25, 43:3, 44:3, 44:21, 44:23, 45:23, 46:8, 46:10, 47:1, 51:5, 51:8, 52:16, 52:17, 62:22, 62:23, 64:24, 65:1, 65:7, 65:9, 68:16, 68:17, 71:1, 71:3, 71:18, 71:24, 73:10, 74:5, 74:7, 76:18, 78:25, 79:1, 80:23, 81:1, 81:8, 81:10, 81:15, 81:18, 81:22, 81:24, 86:4, 87:13, 87:17, 88:7, 93:4, 94:9, 94:10, 95:16, 96:3, 96:5, 96:14, 96:20, 96:22, 99:20, 100:3, 100:5, 102:18, 102:20, 103:1, 103:7, 105:4, 105:6, 105:12, 105:18, 108:3, 108:9, 108:15, 111:24, 112:2, 112:4, 112:9, 112:11, 112:16, 112:22, 116:16, 116:17, 116:23, 117:1, 117:6, 117:12, 120:3, 120:4, 121:16, 121:18, 121:22, 122:3, 124:17, 124:18, 125:1, 125:7, 127:14, 127:17, 128:22, 128:23, 130:15, 131:6, 131:8, 131:15, 131:18, 131:25, 132:3, 132:18, 132:21, 134:17, 134:18, 134:21, 135:1, 135:8, 135:10, 135:21, 135:24, 136:5, 136:7, 136:25, 137:4, 137:8, 137:10, 138:20, 138:22, 139:19, 139:21, 139:25, 140:2, 140:21, 141:1, 141:3, 142:20, 142:22, 143:1, 143:3, 143:10, 143:11, 145:24, 146:1, 147:10, 147:12, 148:21, 149:1, 149:17, 149:18, 150:3, 150:6, 151:10, 151:12, 153:3, 153:19, 153:21, 154:3, 154:9, 154:11, 157:25, 158:6, 158:8, 160:5, 160:6, 160:10, 160:15, 160:17, 166:11, 166:13, 166:19, 166:21, 167:3, 167:5, 169:15, 170:16, 170:23, 171:1, 171:21, 171:22, 172:14, 172:18, 172:25, 173:6, 173:8, 174:4, 174:6, 175:23, 176:1, 176:7, 176:13, 176:14, 180:9, 180:11, 180:15, 180:21, 180:22, 182:2, 182:4, 182:6, 182:7, 182:11, 182:17, 182:19, 182:23, 183:1, 186:18, 186:19, 186:23, 187:1, 189:1, 191:7, 191:8, 191:23, 192:1, 195:10, 196:3, 196:6, 198:2, 198:5, 198:10, 198:12, 198:23, 199:1, 199:19, 199:21, 200:8, 201:25, 202:2, 203:19, 206:20, 207:12, 207:24, 208:8, 209:9, 212:11, 212:17, 213:15, 215:7
**DerOvanesian** [3] - 1:13, 86:2, 169:14
**Descovy** [12] - 154:20, 154:24, 155:4, 155:6, 155:14, 155:25, 156:1, 156:2, 156:7, 156:8, 156:15, 173:23
**describe** [1] - 95:21
**described** [2] - 21:5, 41:25
**Description** [1] - 3:9
**designate** [1] - 94:3
**designated** [3] - 88:4, 88:9, 88:23
**designation** [1] - 87:9
**desist** [4] - 175:3, 175:6, 175:9, 179:12
**details** [5] - 77:4, 77:22, 78:3, 78:8, 110:8
**determination** [8] - 62:17, 85:10, 106:10, 113:17, 114:2, 114:3, 119:24, 120:14
**determine** [4] - 16:16, 115:8, 120:24, 120:25
**determined** [5] - 50:9, 113:10, 149:14, 151:14, 155:25
**difference** [3] - 144:3, 145:13, 152:20
**different** [33] - 11:10, 12:17, 12:18, 14:23, 15:6, 15:25, 26:22, 62:16, 65:17, 111:14, 123:19, 123:25, 126:1, 128:1, 128:17, 129:17, 140:14, 141:16, 144:7, 150:12, 152:14, 159:22, 161:12, 172:3, 183:15, 189:25, 199:22, 201:7, 201:21, 201:22, 203:2, 212:24, 212:25
**differentiate** [1] - 130:20
**differently** [8] - 27:9, 28:2, 184:21, 185:8, 185:10, 186:8, 201:11, 201:14
**difficulties** [1] - 66:23
**digging** [1] - 48:21
**DIMITROULEAS** [1] - 1:10
**Dimitrouleas** [1] - 2:3
**Dimitrouleas/Hunt** [1] - 1:2
**direct** [3] - 77:10, 93:10, 212:23
**DIRECT** [2] - 3:3, 10:1

**directed** [3] - 158:13, 174:22, 177:25
**direction** [1] - 162:15
**directly** [3] - 14:1, 15:7, 100:22
**director** [1] - 185:17
**dirty** [8] - 45:4, 45:7, 45:10, 45:15, 135:18, 192:7, 193:1, 193:3
**disclose** [4] - 73:3, 91:10, 91:11, 91:18
**disclosed** [4] - 43:25, 89:9, 90:24, 114:16
**disconnected** [1] - 53:9
**discontinued** [1] - 56:6
**discovered** [2] - 20:13, 69:5
**discrimination** [3] - 13:1, 13:4, 13:7
**discuss** [13] - 8:9, 31:6, 86:8, 86:18, 91:5, 92:8, 94:1, 147:4, 169:19, 170:1, 171:18, 218:9, 218:19
**discussed** [12] - 8:9, 38:23, 38:24, 47:5, 86:8, 90:13, 94:1, 169:20, 171:18, 212:3, 217:19, 218:10
**discussion** [1] - 217:25
**disease** [1] - 132:11
**disingenuous** [1] - 91:1
**dispense** [2] - 68:21, 69:9
**dispensed** [5] - 27:11, 83:25, 97:10, 144:12
**dispenser** [1] - 35:15
**dispensers** [1] - 75:11
**disposal** [1] - 42:13
**disregard** [1] - 94:5
**disrespected** [1] - 200:14
**distributing** [2] - 79:12, 173:23
**distribution** [5] - 24:25, 57:23, 109:9, 161:11, 195:8
**distributor** [9] - 41:4, 41:14, 75:17, 161:5, 161:6, 161:8, 161:13, 168:25, 195:8
**distributors** [4] - 75:11, 161:12, 161:16, 178:8
**District** [3] - 2:4, 219:10, 219:10
**DISTRICT** [3] - 1:1, 1:1, 1:10
**diversified** [2] - 10:22, 12:16
**diverted** [1] - 195:20
**Divilio** [65] - 5:14, 5:20, 14:12, 26:2, 26:4, 31:5, 41:3, 41:10, 41:14, 41:20, 41:25, 42:4, 42:8, 48:12, 50:5, 51:12, 52:3, 52:22, 52:25, 54:10, 56:3, 57:1, 57:12, 62:4, 63:3, 64:12, 65:2, 65:11, 68:4, 82:15, 82:21, 92:22, 96:12, 96:25, 98:9, 98:24, 99:18, 100:19, 101:20, 102:23, 103:13, 112:7, 114:23, 117:5, 117:15, 118:12, 121:20, 124:24, 130:18, 130:22, 154:1, 157:21, 165:18, 166:14, 167:6, 177:9, 177:13, 177:20, 177:25, 182:8, 182:20, 183:25, 185:22, 206:5, 212:7
**Divilio's** [3] - 8:22, 8:23, 104:22
**DIVISION** [1] - 1:2
**DMS** [1] - 162:17
**doctor** [4] - 121:1, 204:5, 204:6, 204:15
**Doctor** [1] - 202:7
**doctorate** [3] - 12:2, 203:23, 204:14
**doctorates** [1] - 210:1
**Document** [2] - 4:2, 18:22
**document** [45] - 18:12, 30:5, 40:4, 40:5, 40:20, 43:5, 44:11, 46:11, 48:9, 57:7, 61:15, 71:4, 73:7, 74:24, 76:15, 82:17, 82:22, 83:2, 83:13, 96:6, 105:7, 113:18, 113:20, 117:2, 117:14, 121:19, 149:2, 149:7, 153:22, 187:3, 210:23, 211:3, 211:7, 214:18, 216:2, 216:6, 216:10, 216:14, 216:18, 216:22, 217:1, 217:5, 217:8, 217:14, 217:22
**document's** [1] - 114:6
**documentation** [4] - 51:24, 61:18, 115:25, 155:20
**documents** [9] - 5:20, 51:15, 87:18, 87:25, 150:13, 150:24, 188:17, 199:23, 210:17
**dollars** [4] - 35:18, 36:13, 47:24, 47:25
**dollars'** [1] - 148:10
**done** [5] - 17:15, 38:12, 88:18, 91:22, 186:9
**door** [1] - 53:15
**doubt** [2] - 109:19, 163:12
**down** [27] - 25:15, 26:9, 42:3, 44:22, 51:9, 52:16, 53:25, 55:22, 62:22, 66:18, 78:25, 84:20, 115:22, 116:16, 118:17, 128:22, 134:17, 138:15, 143:1, 143:6, 147:18, 160:24, 172:21, 189:21, 191:7, 194:3, 198:6
**downstream** [1] - 159:4
**dozen** [2] - 91:12, 191:4
**Dr** [5] - 94:3, 169:25, 171:8, 210:15, 218:18
**draft** [8] - 19:8, 98:23, 98:25, 99:3, 99:23, 101:16, 103:9, 110:17
**drafted** [1] - 20:3
**drafts** [1] - 150:23
**draw** [3] - 18:25, 88:2, 190:9
**draws** [1] - 88:11
**Dresser** [11] - 157:11, 157:23, 158:14, 160:8, 176:5, 179:20, 180:5, 182:9, 183:3, 183:5, 184:25
**Dresser's** [1] - 184:6
**drug** [21] - 11:18, 11:22, 12:5, 18:2, 21:19, 21:21, 24:9, 24:10, 27:25, 29:19, 43:25, 62:5, 64:15, 77:6, 77:8, 136:2, 153:12, 155:7, 155:8, 198:19, 204:12
**Drug** [14] - 29:17, 30:23, 41:8, 60:13, 61:2, 63:21, 64:21, 82:16, 82:22, 98:4, 98:11, 149:6, 155:19, 187:3
**drugs** [13] - 15:3, 24:5, 24:17, 49:19, 57:20, 58:9, 59:12, 77:10, 85:25, 114:24, 115:1, 152:22, 153:5
**drunk** [1] - 138:1
**DSCSA** [6] - 31:13, 41:22, 58:3, 67:16, 80:4, 152:15
**Due** [1] - 84:20
**duly** [1] - 9:18
**during** [16] - 17:18, 44:4, 47:2, 56:8, 86:17, 89:14, 90:8, 91:4, 92:6, 169:25, 170:21, 193:15, 206:3, 214:2, 214:14, 218:18
**duty** [2] - 25:5, 25:9

**E**

**e.g** [1] - 195:20
**early** [8] - 8:15, 11:12, 31:19, 86:12, 92:24, 98:3, 114:9, 194:9
**easier** [1] - 190:3
**East** [1] - 219:11
**educational** [2] - 10:9, 11:25
**EEOC** [1] - 13:6
**effect** [2] - 125:23, 175:20
**effects** [1] - 118:1
**efficient** [1] - 196:10
**egregious** [1] - 91:9
**either** [14] - 5:22, 17:10, 27:4, 32:10, 32:14, 32:18, 33:23, 49:23, 51:15, 62:20, 115:23, 115:24, 200:24, 214:18
**electronically** [1] - 186:24
**email** [124] - 19:2, 20:1, 20:3, 21:3, 21:7, 21:9, 21:22, 21:25, 22:6, 37:8, 41:4, 41:11, 48:12, 50:25, 51:9, 51:12, 52:2, 52:3, 52:22, 52:25, 55:2, 55:22, 56:2, 57:2, 58:25, 59:3, 59:15, 61:7, 61:11, 62:1, 62:16, 63:1, 66:6, 66:15, 67:22, 68:24, 69:18, 69:21, 71:15, 72:3, 73:2, 74:1, 81:4, 83:7, 83:11, 95:5, 96:12, 97:4, 98:3, 98:9, 98:12, 99:2, 101:3, 102:14, 102:16, 102:21, 104:9, 104:23, 105:8, 107:20, 108:6, 108:7, 112:5, 113:10, 117:4, 117:15, 118:16, 119:3, 121:20, 122:4, 122:7, 122:10, 122:11, 123:6, 124:19, 126:6, 131:9, 131:19, 132:4, 132:22, 132:24, 139:2, 153:25, 154:15, 157:18, 158:9, 158:13, 160:7, 160:18, 160:19, 162:4, 162:10, 162:22, 163:8, 165:3, 165:7, 165:8, 165:13, 165:17, 165:22, 166:14, 166:18, 167:12, 167:22, 167:23, 172:19, 173:10, 173:13, 174:8, 174:10, 174:22, 175:10, 175:13, 176:3, 176:5, 176:15, 176:18, 179:9, 180:12, 182:8, 185:11, 217:12
**Email** [34] - 3:10, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:17, 3:18, 3:19, 3:20, 3:21, 3:22, 3:23, 3:24, 3:25, 4:3, 71:23, 81:21, 96:19, 103:6, 105:17,

108:14, 112:21, 117:11, 122:2, 125:6, 154:8, 158:5, 160:14, 173:5, 176:12, 180:20, 182:16
**emailing** [2] - 63:3, 183:2
**emails** [11] - 5:23, 17:14, 37:10, 37:16, 87:20, 95:1, 95:19, 158:18, 178:16, 178:17, 209:3
**employees** [1] - 17:5
**employer** [1] - 12:12
**enacted** [1] - 29:18
**end** [10] - 24:13, 26:18, 48:2, 115:1, 117:13, 122:17, 155:17, 159:14, 184:21, 208:6
**ending** [1] - 26:23
**enforce** [1] - 109:11
**engaged** [1] - 126:18
**engaging** [1] - 179:4
**enlarge** [1] - 135:9
**ensure** [3] - 60:3, 67:20, 178:12
**entail** [1] - 10:21
**entered** [2] - 87:18, 87:25
**enters** [5] - 8:3, 93:7, 93:14, 93:19, 171:10
**Entin** [1] - 219:8
**ENTIN** [2] - 2:2, 219:9
**entities** [3] - 11:3, 102:11, 150:12
**entitled** [2] - 103:18, 219:6
**entity** [1] - 150:13
**ER** [1] - 103:18
**escalated** [1] - 13:3
**Esquire** [5] - 1:13, 1:14, 1:17, 1:18, 1:21
**establish** [2] - 71:14, 204:2
**eventually** [3] - 79:7, 108:19, 159:14
**Evidence** [19] - 18:23, 22:16, 71:23, 81:21, 96:19, 103:6, 105:17, 108:14, 112:21, 117:11, 122:2, 125:6, 154:8, 158:5, 160:14, 173:5, 176:12, 180:20, 182:16
**evidence** [27] - 5:11, 6:17, 18:18, 22:12, 32:22, 33:9, 34:1, 36:15, 42:21, 42:23, 43:16, 58:23, 69:2, 87:18, 88:1, 126:4, 131:7, 132:20, 166:12, 172:25, 185:12, 188:21, 195:4, 201:7, 201:10, 207:16, 215:22
**exact** [4] - 31:10, 46:2, 46:4, 168:15
**exactly** [2] - 185:5, 213:10
**EXAMINATION** [4] - 3:3, 3:4, 10:1, 202:5
**examination** [4] - 90:7, 93:11, 206:23, 215:10
**examine** [2] - 5:19, 70:10
**examined** [1] - 9:18
**Excedrin** [13] - 20:13, 26:24, 27:11, 27:12, 27:16, 37:18, 65:21, 104:9, 104:10, 104:18, 138:17, 139:11, 210:22
**except** [2] - 76:11, 140:12
**exchange** [2] - 95:1, 116:18
**exchanged** [2] - 75:3, 95:19
**exclusive** [1] - 161:12
**excuse** [4] - 19:13, 38:8, 46:18, 95:11
**Excuse** [1] - 73:7
**Exhibit** [91] - 18:10, 18:18, 22:4, 22:12, 25:24, 33:21, 35:21, 40:18, 40:21, 43:1, 44:9, 48:10, 51:6, 52:18, 55:15, 57:8, 58:23, 62:24, 64:8, 66:3, 68:10, 68:15, 69:2, 71:2, 71:19, 80:24, 81:16, 96:4, 96:15, 102:19, 103:2, 105:5, 105:13, 107:19, 108:4, 108:10, 112:3, 112:17, 116:22, 116:24, 117:7, 121:17, 121:23, 124:16, 125:2, 126:3, 127:13, 131:7, 132:19, 134:20, 145:22, 153:20, 154:4, 157:17, 157:25, 160:4, 162:8, 165:5, 165:15, 166:12, 168:1, 172:15, 173:1, 175:24, 176:8, 180:10, 180:16, 182:3, 182:12, 186:15, 186:24, 190:4, 191:10, 191:24, 193:6, 196:4, 197:15, 210:21, 211:1, 211:5, 213:17, 213:21, 214:20, 215:25, 216:4, 216:8, 216:12, 216:16, 216:20, 216:24, 217:3
**exhibit** [6] - 6:21, 40:18, 127:15, 148:22, 188:14
**exhibits** [7] - 5:8, 5:13, 5:16, 6:7, 7:5, 9:5, 9:11
**existence** [1] - 69:13
**existing** [2] - 164:2, 164:20
**exits** [6] - 86:16, 87:3, 169:24, 170:9, 218:17, 218:21
**expand** [1] - 76:20
**expect** [2] - 35:13, 170:17
**expected** [2] - 43:22, 141:7
**experience** [6] - 35:17, 152:22, 153:2, 153:6, 189:16, 210:8
**expert** [13] - 87:7, 87:10, 87:14, 88:4, 88:6, 88:9, 88:10, 88:23, 94:4, 94:5, 94:6, 152:25
**expertise** [1] - 93:10
**expiration** [7] - 59:22, 60:4, 97:19, 101:5, 101:8, 101:10, 128:5
**explain** [11] - 27:21, 29:16, 34:11, 36:9, 36:12, 53:18, 102:14, 107:25, 119:20, 139:15, 175:6
**explained** [3] - 57:19, 58:2, 58:13
**explaining** [6] - 20:9, 26:10, 94:18, 97:7, 116:13, 132:9
**explains** [1] - 51:19
**explanation** [1] - 100:15
**expose** [1] - 102:15
**exposed** [1] - 56:20
**exposing** [2] - 84:15, 101:24
**express** [1] - 200:25
**extra** [1] - 189:21
**EY** [1] - 173:11
**Ey** [1] - 174:13

**F**

**F-word** [1] - 137:21
**facility** [2] - 17:3, 100:21
**fact** [10] - 9:13, 33:9, 43:15, 87:14, 107:4, 113:16, 152:8, 174:24, 180:1, 210:8
**facts** [11] - 32:22, 33:25, 36:15, 42:20, 67:2, 91:18, 114:14, 114:15, 151:21, 188:21, 195:4
**failed** [1] - 91:18
**failing** [1] - 158:25
**fails** [1] - 25:2
**fair** [9] - 91:3, 106:7, 151:25, 152:4, 199:24, 205:3, 210:1, 210:3, 213:14
**falls** [1] - 25:5
**false** [13] - 50:10, 52:7, 73:4, 78:22, 149:11, 149:14, 151:2, 151:14, 155:19, 183:24, 190:15, 194:5, 196:22
**falsely** [1] - 174:14
**falsified** [3] - 65:12, 76:6, 178:4
**familiar** [7] - 12:9, 12:11, 13:16, 13:19, 59:8, 80:6, 197:2
**far** [3] - 6:5, 6:23, 175:19
**fashioned** [1] - 40:23
**fax** [1] - 53:10
**FDA** [67] - 10:24, 21:11, 21:15, 21:17, 25:3, 25:9, 28:23, 61:21, 61:23, 62:6, 62:20, 71:9, 83:15, 106:11, 106:18, 106:21, 115:23, 119:16, 120:6, 120:14, 120:18, 120:20, 120:23, 121:6, 121:8, 121:11, 172:8, 173:24, 174:14, 175:1, 175:17, 176:17, 176:23, 177:8, 177:12, 177:17, 177:20, 177:25, 179:1, 179:4, 179:14, 179:16, 179:17, 180:2, 180:24, 181:1, 181:6, 181:11, 181:12, 181:17, 181:18, 181:20, 183:9, 183:10, 183:19, 183:24, 184:2, 184:9, 193:22, 193:23, 199:6, 201:11, 210:13, 210:16
**FDA's** [1] - 197:1
**February** [5] - 118:10, 118:16, 122:5, 122:7, 127:9
**federal** [1] - 109:10
**Federal** [2] - 1:22, 219:11
**feedback** [1] - 7:14
**fees** [2] - 31:14, 130:6
**felt** [3] - 140:15, 200:14
**few** [8] - 26:9, 49:19, 104:7, 111:6, 185:14, 190:20, 192:6, 192:7
**field** [2] - 204:2, 204:24
**filed** [8] - 5:7, 13:1, 13:6, 20:18, 20:23, 63:21, 79:16, 79:24
**filing** [1] - 159:15
**fill** [3] - 64:4, 73:15, 77:15
**filled** [1] - 117:20
**filling** [1] - 162:1
**final** [1] - 115:2
**financial** [1] - 5:8
**fine** [4] - 92:23, 93:2, 147:11, 192:13
**finger** [1] - 167:15
**finish** [3] - 38:9, 38:13, 93:3
**finished** [2] - 78:6, 208:25
**fire** [1] - 13:2
**firm** [15] - 12:9, 12:11, 12:13, 12:19, 12:23,

13:8, 13:10, 13:12, 13:21, 79:20, 159:17, 204:23, 204:24, 205:1, 209:2
**firms** [1] - 11:7
**first** [58] - 6:2, 7:13, 9:18, 14:2, 15:15, 16:23, 17:23, 20:2, 21:8, 27:13, 55:17, 55:21, 57:14, 57:16, 61:1, 61:7, 66:15, 69:3, 72:13, 78:13, 81:11, 82:4, 85:7, 87:5, 100:6, 103:16, 107:18, 110:5, 110:21, 110:23, 113:8, 123:6, 146:20, 147:13, 150:3, 150:10, 152:9, 155:14, 156:15, 163:17, 163:21, 167:4, 168:7, 169:3, 172:17, 179:10, 182:23, 184:4, 186:24, 187:2, 187:5, 193:13, 193:14, 194:22, 210:21, 218:12
**First** [2] - 69:12, 82:14
**Fl** [1] - 1:22
**flag** [4] - 128:6, 128:7, 195:25, 197:11
**flags** [4] - 27:24, 28:25, 35:20, 45:16
**flip** [2] - 187:22, 190:19
**Flores** [1] - 1:18
**FLORIDA** [1] - 1:1
**Florida** [6] - 1:4, 1:16, 1:19, 1:22, 219:10, 219:12
**Flowers** [5] - 59:1, 59:20, 82:15, 82:21, 162:10
**focus** [3] - 12:7, 75:25, 196:5
**foil** [4] - 140:14, 141:15, 141:23
**follow** [4] - 8:8, 82:9, 93:25, 171:17
**following** [11] - 29:10, 30:23, 92:15, 119:15, 124:8, 158:18, 170:11, 185:18, 186:3, 198:8, 202:18
**follows** [3] - 9:19, 29:19, 100:23
**FOR** [3] - 1:13, 1:17, 1:21
**force** [1] - 209:24
**foregoing** [1] - 219:4
**foreign** [2] - 84:1, 115:25
**forget** [1] - 217:22
**Form** [3] - 61:21, 71:10, 73:15
**form** [5] - 30:12, 32:4, 61:22, 77:15, 87:24
**formally** [2] - 79:16, 159:15
**former** [1] - 185:25
**FORT** [1] - 1:2
**Fort** [3] - 1:4, 1:22, 219:12
**forth** [10] - 79:17, 79:23, 94:23, 95:1, 108:17, 110:17, 150:23, 179:4, 179:17, 181:10
**forward** [2] - 84:22, 178:12
**forwarded** [6] - 52:3, 62:2, 78:15, 164:7, 172:21, 178:19
**forwarding** [5] - 174:10, 176:23, 177:6, 178:25, 183:25
**foundation** [6] - 32:14, 32:15, 38:2, 38:22, 111:20, 185:20
**four** [6] - 53:16, 63:8, 155:24, 156:5, 156:6, 202:17
**fourth** [1] - 97:24
**FPR** [2] - 2:2, 219:9
**frame** [1] - 17:16
**fraudulent** [3] - 116:1, 152:15, 167:16
**frequently** [2] - 23:18, 66:22
**Frier** [13] - 11:8, 12:9, 13:21, 72:7, 79:20, 112:6, 157:9, 159:17, 204:19, 204:23, 209:13, 209:23, 210:2
**front** [5] - 18:12, 71:4, 96:6, 153:23, 186:20
**full** [5] - 15:5, 18:5, 129:10, 140:15, 185:3
**full-line** [1] - 15:5
**fully** [4] - 109:8, 183:19, 184:22, 185:10
**FYI** [1] - 63:18

## G

**garage** [1] - 39:5
**Garrett** [8] - 132:6, 132:24, 136:11, 140:4, 142:10, 143:12, 144:11, 192:3
**Garrett's** [1] - 144:24
**general** [6] - 17:23, 70:23, 71:9, 77:4, 78:7, 215:8
**generally** [2] - 14:15, 96:11
**generic** [7] - 20:13, 104:9, 104:10, 104:18, 125:14, 138:17, 139:11
**Gentek** [4] - 16:6, 137:11, 211:11, 214:8
**genuine** [2] - 84:16, 156:8
**ghetto** [1] - 168:24
**Gilead** [106] - 20:16, 20:23, 20:24, 21:10, 21:15, 21:21, 21:23, 26:11, 26:23, 59:6, 59:8, 59:10, 59:16, 59:25, 60:18, 61:2, 61:18, 61:22, 62:5, 62:17, 62:20, 73:14, 74:1, 77:3, 77:6, 77:8, 77:10, 79:2, 79:3, 79:5, 79:7, 79:12, 79:17, 80:5, 81:25, 82:16, 83:1, 83:7, 83:14, 84:10, 84:14, 84:17, 85:7, 85:9, 94:13, 94:19, 95:23, 97:11, 98:5, 98:8, 98:11, 98:21, 100:22, 103:10, 104:18, 106:7, 107:2, 107:11, 108:1, 108:8, 108:19, 109:22, 111:22, 112:25, 113:10, 113:16, 114:2, 114:18, 115:4, 115:8, 115:24, 116:18, 118:20, 118:25, 119:16, 119:23, 122:13, 123:14, 124:11, 124:14, 125:13, 125:19, 126:13, 126:18, 127:7, 128:1, 129:13, 129:19, 133:16, 134:1, 134:6, 144:24, 145:3, 145:19, 149:10, 151:1, 154:17, 154:19, 155:18, 155:25, 157:5, 159:14, 161:9, 166:2, 201:14
**Gilead's** [12] - 20:3, 79:14, 81:4, 82:5, 98:24, 105:20, 108:17, 112:13, 113:10, 119:21, 158:12, 161:18
**Gilead.com** [1] - 61:11
**given** [3] - 90:19, 90:25, 92:5
**global** [1] - 140:7
**Gmail** [1] - 163:18
**goods** [1] - 72:24
**Google** [1] - 49:1
**Government** [97] - 5:7, 6:4, 7:19, 8:19, 9:1, 9:3, 18:10, 18:17, 22:4, 22:11, 22:12, 25:24, 33:20, 34:2, 35:21, 40:17, 40:21, 43:1, 44:9, 48:10, 51:5, 52:18, 55:15, 58:22, 62:24, 64:8, 66:3, 68:10, 68:15, 69:1, 71:2, 71:18, 80:24, 81:15, 89:7, 89:9, 90:12, 91:9, 91:12, 91:21, 92:2, 92:10, 94:3, 94:8, 96:4, 102:19, 105:5, 105:12, 107:19, 108:4, 112:3, 112:16, 116:22, 116:24, 121:17, 121:22, 124:16, 126:3, 127:13, 131:7, 132:19, 134:20, 145:21, 153:20, 157:16, 157:17, 160:4, 162:8, 165:5, 165:15, 166:11, 168:1, 172:15, 175:24, 180:10, 182:2, 186:15, 190:4, 191:10, 191:24, 193:5, 196:4, 197:15, 210:18, 210:21, 210:25, 211:9, 212:24, 213:25, 215:25, 216:4, 216:8, 216:12, 216:16, 216:20, 216:24, 217:3
**government** [14] - 96:14, 103:1, 108:9, 117:6, 121:22, 125:1, 154:3, 157:25, 160:10, 172:25, 176:7, 180:15, 182:11, 214:7
**GOVERNMENT** [1] - 1:13
**Government's** [46] - 3:10, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:17, 3:18, 3:19, 3:20, 3:21, 3:22, 3:23, 3:24, 3:25, 4:1, 4:2, 4:3, 6:16, 9:5, 18:22, 22:16, 71:23, 81:21, 87:11, 96:19, 103:6, 105:17, 108:14, 112:21, 117:11, 122:2, 125:6, 154:8, 158:5, 160:14, 173:5, 176:12, 180:20, 182:16, 211:5, 213:17, 213:21, 214:16, 214:20
**graduated** [1] - 203:20
**grams** [1] - 140:13
**grave** [3] - 65:13, 115:18, 129:23
**gray** [1] - 129:22
**great** [2] - 63:18, 179:23
**greater** [1] - 23:23
**greatly** [2] - 60:5, 61:2
**green** [5] - 136:14, 136:19, 137:5, 137:17, 144:15
**Group** [3] - 163:5, 164:2, 164:21
**growing** [1] - 143:23
**guarantees** [1] - 190:7
**guess** [3] - 7:15, 76:21, 89:22
**Guessing** [1] - 142:8
**guidance** [3] - 193:22, 193:23, 199:6
**guideline** [1] - 197:1
**guidelines** [2] - 58:3, 197:2
**guilty** [2] - 177:1, 179:7
**guy** [2] - 32:8, 174:12
**guys** [4] - 150:20, 174:8, 208:7, 208:14

## H

**Hacksaw** [13] - 136:12, 137:18, 137:24, 140:4, 142:7, 142:14, 143:13, 143:17, 144:15, 145:2, 146:13, 146:15, 146:21
**half** [8] - 48:12, 52:21, 91:12, 104:4, 140:15, 173:9, 177:7, 209:20
**halfway** [1] - 118:17
**Hammett** [2] - 26:2, 26:10
**handful** [1] - 14:22
**handle** [3] - 28:21, 201:23, 205:14
**handled** [2] - 139:5, 186:8
**handles** [2] - 78:2, 204:24
**hands** [1] - 153:15
**hard** [4] - 136:25, 186:16, 187:19, 203:17
**harm** [4] - 25:4, 116:10, 118:9, 120:15
**Harvoni** [2] - 130:24, 147:2
**headed** [1] - 206:4
**health** [4] - 7:14, 13:13, 67:20, 84:21
**Health** [1] - 13:11
**healthcare** [14] - 10:16, 10:17, 10:21, 10:22, 10:25, 11:5, 11:9, 12:14, 12:15, 12:18, 203:10, 203:11, 204:24, 205:1
**healthcare-related** [1] - 12:18
**hear** [8] - 63:19, 116:19, 156:15, 202:11, 202:13, 207:11, 207:15, 212:10
**heard** [7] - 45:10, 65:24, 121:4, 201:6, 206:11, 207:10, 207:17
**hearing** [2] - 7:12, 7:25
**hearsay** [1] - 19:15
**Hello** [2] - 48:15, 163:21
**help** [3] - 153:12, 181:15, 210:19
**helping** [1] - 157:14
**hereby** [1] - 219:4
**hereto** [1] - 82:17
**herself** [1] - 57:6
**Hi** [2] - 140:6, 180:24
**hiccup** [1] - 168:16
**high** [3] - 79:10, 146:25, 195:9
**highlight** [1] - 63:2
**highlighted** [1] - 68:24
**highlighting** [1] - 63:13
**Highway** [1] - 1:22
**hindsight** [1] - 33:19
**hire** [1] - 214:25
**histories** [2] - 194:5, 196:23
**history** [14] - 11:5, 29:25, 41:17, 61:14, 73:4, 74:19, 164:3, 166:24, 166:25, 194:4, 194:13, 196:22, 199:3, 199:11
**HIV** [43] - 15:18, 15:22, 16:10, 34:12, 34:24, 35:12, 35:18, 36:10, 36:13, 37:14, 37:17, 37:22, 38:18, 39:20, 42:16, 44:5, 44:17, 45:18, 47:3, 47:16, 47:19, 47:24, 48:5, 59:12, 76:3, 85:14, 85:19, 85:25, 118:19, 133:2, 148:5, 148:10, 148:14, 155:7, 155:8, 159:25, 161:9, 188:18, 189:3, 189:21, 195:1, 195:20
**hold** [1] - 56:7
**home** [1] - 170:20
**honest** [1] - 208:20
**Honor** [49] - 5:6, 6:2, 7:3, 7:20, 7:22, 8:18, 9:2, 9:4, 9:8, 18:17, 19:17, 22:11, 32:21, 34:2, 36:16, 37:3, 42:20, 42:25, 71:18, 86:4, 86:21, 87:13, 88:7, 88:11, 91:8, 92:10, 92:12, 92:20, 93:17, 93:22, 94:9, 99:13, 130:9, 151:8, 152:24, 169:15, 170:4, 170:16, 171:1, 171:5, 171:9, 171:14, 171:15, 188:22, 195:3, 200:5, 201:25, 212:17, 218:6
**Honorable** [1] - 2:3
**HONORABLE** [1] - 1:10
**hope** [1] - 170:17
**hopefully** [1] - 218:13
**hospital** [3] - 11:13, 11:14, 203:14
**hot** [1] - 56:20
**hour** [2] - 209:6, 209:17
**hours** [4] - 58:4, 106:10, 119:15, 209:19
**house** [1] - 39:5
**housekeeping** [1] - 6:15
**humid** [1] - 56:20
**hypothetical** [2] - 76:10, 76:11

## I

**idea** [3] - 32:24, 147:3, 208:4
**identified** [3] - 84:7, 155:19, 177:21
**identify** [3] - 30:24, 113:3, 196:9
**identifying** [1] - 183:18
**ignore** [2] - 88:5, 88:8
**illegitimate** [18] - 21:18, 61:20, 62:18, 79:15, 83:14, 84:22, 85:10, 106:10, 110:7, 113:11, 115:9, 115:17, 158:23, 159:4, 177:21, 190:12, 196:19, 197:12
**immediate** [2] - 14:5, 72:7
**immediately** [3] - 25:1, 69:5, 175:8
**impact** [1] - 111:18
**impacted** [16] - 40:6, 40:13, 42:11, 70:17, 70:19, 124:2, 128:19, 129:7, 129:12, 133:13, 133:15, 134:8, 141:12, 145:15, 145:18, 148:18
**imperative** [2] - 24:22, 24:24
**implication** [1] - 91:20
**implying** [1] - 91:16
**important** [17] - 27:7, 42:7, 50:17, 62:13, 80:3, 109:21, 123:21, 126:22, 129:5, 132:16, 138:7, 141:10, 141:19, 153:7, 166:8, 192:22, 201:7
**impression** [9] - 28:13, 29:8, 29:10, 30:9, 90:14, 101:7, 124:11, 175:13, 175:16
**improper** [4] - 89:11, 90:25, 91:22, 92:1
**incident** [22] - 20:9, 21:4, 21:10, 21:15, 23:4, 25:16, 25:21, 27:5, 50:3, 62:11, 104:11, 104:14, 118:10, 119:10, 123:10, 140:18, 141:6, 144:6, 144:19, 144:22, 155:13, 163:12
**incidents** [7] - 27:25, 50:22, 129:22, 144:7, 147:3, 155:13, 172:8
**include** [1] - 101:24
**including** [1] - 109:10
**incomplete** [2] - 167:16, 196:24
**inconsistent** [4] - 61:15, 66:23, 83:3, 113:4
**inconvenience** [1] - 67:6
**incorrect** [2] - 164:4, 167:13
**indicate** [6] - 21:10, 50:20, 52:12, 116:9, 127:2, 181:16
**indicated** [2] - 104:8, 104:18
**indicates** [3] - 50:25, 51:1, 127:1
**indicating** [1] - 115:19
**indictment** [1] - 206:8
**individual** [2] - 11:2, 33:17
**individuals** [1] - 209:20
**induction** [2] - 156:7, 156:16
**industry** [7] - 11:17, 197:4, 203:5, 205:3, 205:5, 210:3, 210:10
**info** [4] - 64:4, 74:14, 75:3, 101:4
**inform** [2] - 80:3, 154:18
**information** [76] - 12:6, 16:19, 18:6, 27:8, 29:24, 30:25, 41:17, 42:13, 50:9, 52:7, 53:19, 54:1, 56:12, 57:24, 58:3, 58:20, 61:14, 63:11, 65:12, 71:9, 72:19, 74:20, 75:1, 76:2, 76:5, 76:6, 78:2, 78:8, 80:19, 83:2, 84:11, 85:6, 85:8, 85:13, 87:24, 94:19, 98:7, 98:8, 98:16, 99:6, 99:10, 100:10, 101:2, 102:4, 106:3, 108:23, 109:23, 110:13, 111:3, 111:13, 111:17, 111:18, 113:4, 115:20, 118:22, 155:19, 156:16, 156:18, 159:12, 164:3, 164:10, 166:8, 167:7, 167:19, 181:14, 183:9, 183:19, 185:15, 190:15, 196:24, 197:24, 198:7, 198:16, 201:4, 204:12, 208:21
**Information** [1] - 197:22
**informed** [3] - 123:3, 155:12, 155:13
**informing** [1] - 91:25
**initial** [2] - 109:7, 168:16
**initials** [2] - 64:7, 203:25
**initiate** [1] - 25:10
**initiating** [1] - 69:13
**injury** [1] - 84:16
**inquired** [3] - 97:13, 97:18, 124:6
**inquiry** [2] - 59:17, 60:2
**insert** [1] - 70:11
**inside** [11] - 25:18, 25:22, 27:16, 27:19, 116:20, 132:9, 134:4, 138:17, 139:11, 152:22, 153:6
**insisting** [1] - 179:13
**inspection** [1] -

155:24
**Instacare** [4] - 53:4, 53:8, 65:3, 150:11
**instance** [8] - 15:24, 27:1, 41:13, 106:15, 118:12, 125:14, 126:17, 132:14
**instances** [5] - 65:24, 116:19, 118:25, 125:18, 154:19
**instructing** [1] - 88:11
**instruction** [8] - 6:6, 6:10, 7:7, 9:9, 89:13, 91:25, 92:5, 93:9
**integrity** [1] - 56:21
**intellectual** [7] - 10:12, 10:17, 10:18, 11:6, 11:7, 12:14, 204:18
**intends** [1] - 159:3
**intent** [1] - 5:25
**interact** [1] - 14:13
**interpret** [1] - 161:4
**interrupt** [1] - 8:21
**interrupted** [1] - 38:10
**introduced** [2] - 6:9, 6:20
**inventory** [8] - 40:2, 40:3, 54:3, 55:9, 57:21, 63:14, 153:9, 189:13
**investigate** [2] - 15:25, 28:22
**investigated** [2] - 77:20, 176:16
**investigating** [2] - 83:24, 85:7
**investigation** [17] - 21:11, 82:10, 84:23, 109:8, 110:7, 110:8, 110:24, 119:22, 173:22, 174:14, 175:1, 175:17, 175:19, 179:14, 179:16, 181:18, 181:20
**invoice** [4] - 60:22, 73:19, 74:15, 126:9
**invoices** [5] - 166:1, 192:7, 193:1, 193:3, 209:24
**involved** [11] - 18:1, 99:16, 99:18, 99:19, 114:8, 125:18, 181:10, 181:13, 196:13, 196:18, 203:14
**involvement** [1] - 34:1
**involving** [1] - 61:22
**IPC** [3] - 49:19, 151:7, 151:14
**IPCRX.com** [1] - 51:10
**isolated** [2] - 144:19, 144:22
**issue** [34] - 6:15, 7:14, 52:12, 56:17, 65:14, 84:8, 89:17, 93:8, 103:23, 104:25, 123:10, 123:16, 123:17, 123:25, 124:11, 127:2, 127:10, 128:24, 129:2, 130:24, 131:2, 133:3, 133:9, 133:11, 140:7, 143:18, 143:23, 161:20, 165:7, 165:9, 167:24, 169:10, 186:7, 217:19
**issued** [1] - 64:17
**issues** [23] - 24:4, 90:20, 90:22, 91:6, 106:19, 107:2, 111:14, 119:22, 121:11, 125:12, 133:16, 134:4, 151:23, 152:6, 152:12, 168:15, 183:18, 192:6, 192:25, 193:4, 200:4, 200:10, 200:24
**items** [2] - 51:25, 69:5
**itself** [4] - 73:8, 76:16, 152:18, 195:12
**Ivlis** [1] - 1:18

## J

**Jacqueline** [1] - 1:13
**JD** [2] - 10:11, 204:13
**Jesse** [15] - 26:2, 26:10, 157:11, 157:23, 158:14, 160:8, 176:5, 179:20, 180:5, 180:24, 182:9, 183:3, 183:5, 184:6, 184:25
**job** [16] - 12:7, 186:12, 202:22, 205:6, 205:7, 205:20, 205:21, 205:22, 205:23, 205:24, 206:1, 214:22, 215:1, 215:3, 215:5, 215:17
**John** [9] - 14:5, 19:2, 22:10, 66:9, 71:8, 72:4, 72:6, 157:8, 212:6
**John's** [2] - 12:1, 12:3
**Jonathan** [1] - 67:24
**JUDGE** [1] - 1:10
**judge** [14] - 7:13, 8:14, 24:11, 30:6, 35:2, 37:24, 38:1, 38:22, 45:20, 73:7, 88:15, 90:6, 95:9
**Judge** [36] - 7:14, 9:9, 18:19, 19:13, 23:7, 30:12, 30:24, 31:7, 32:13, 34:14, 35:6, 36:23, 39:10, 39:16, 40:9, 43:15, 71:20, 76:15, 81:17, 87:1, 87:5, 88:21, 89:1, 90:3, 90:10, 90:25, 91:6, 93:8, 103:3, 111:20, 117:8, 158:3, 171:4, 173:2, 182:13, 185:20
**jumped** [1] - 125:8
**June** [3] - 126:6, 126:14, 127:11
**juris** [1] - 204:14
**juror** [1] - 8:15
**jurors** [3] - 7:8, 7:23, 171:6
**jury** [32] - 5:5, 6:22, 7:18, 8:5, 42:22, 86:6, 86:11, 86:25, 88:4, 88:12, 89:12, 91:1, 91:15, 91:16, 91:20, 91:23, 91:25, 92:6, 92:19, 93:6, 93:10, 93:21, 153:1, 158:6, 169:17, 169:21, 170:15, 171:3, 171:13, 173:7, 210:7, 218:7
**Jury** [9] - 8:3, 86:16, 93:7, 93:19, 169:24, 170:9, 171:10, 218:17, 218:25
**JURY** [1] - 1:9
**justification** [1] - 58:7

## K

**Kalorama** [1] - 126:8
**keep** [3] - 44:6, 75:21, 129:11
**keyed** [2] - 184:22, 185:10
**Kimchi** [5] - 44:13, 52:22, 54:12, 57:5, 63:4
**kind** [10] - 13:14, 29:6, 34:20, 76:9, 76:20, 95:21, 123:22, 185:4, 204:10, 204:23
**King** [5] - 44:13, 52:22, 54:12, 57:5, 63:4
**know..** [1] - 43:20
**knowing** [8] - 27:21, 47:14, 56:19, 76:23, 77:22, 78:8, 91:12, 91:13
**knowingly** [2] - 190:11, 190:14
**knowledge** [3] - 5:25, 207:25, 210:9
**known** [6] - 14:25, 88:19, 95:4, 110:8, 141:6, 196:13
**knows** [6] - 33:11, 34:2, 47:13, 89:7, 89:9, 204:3

## L

**label** [1] - 131:22
**labels** [4] - 45:15, 192:7, 193:1, 193:4
**lack** [2] - 181:14, 207:24
**laid** [1] - 41:10
**language** [4] - 190:22, 193:22, 193:23, 200:13
**lapse** [1] - 56:18
**large** [8] - 11:2, 14:21, 14:22, 14:25, 59:11, 65:25, 68:20, 189:13
**last** [17] - 6:14, 18:25, 19:1, 24:21, 32:11, 50:14, 57:17, 63:10, 84:6, 103:16, 115:7, 122:4, 125:12, 146:22, 163:8, 173:10, 193:3
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:22, 219:12
**laugh** [1] - 64:4
**Law** [3] - 10:12, 13:11, 158:10
**law** [36] - 10:14, 10:15, 10:16, 10:19, 10:21, 10:22, 11:7, 11:15, 11:22, 12:9, 12:11, 12:13, 12:14, 12:15, 12:19, 12:23, 13:8, 13:10, 13:12, 13:13, 79:20, 80:11, 88:1, 88:2, 88:11, 88:12, 88:20, 88:24, 94:6, 94:7, 153:1, 159:17, 204:14, 204:18, 209:2
**laws** [4] - 87:16, 87:19, 109:11, 116:13
**lawsuit** [5] - 79:11, 79:16, 79:24, 159:15, 159:18
**lawyer** [4] - 11:1, 11:5, 183:5
**lawyers** [1] - 14:4
**lay** [3] - 34:4, 36:25, 183:15
**leading** [11] - 30:13, 31:7, 34:14, 38:23, 89:3, 89:20, 89:21, 89:24, 89:25, 95:12, 95:14
**learn** [2] - 82:24, 98:8
**learned** [5] - 25:16, 87:15, 98:7, 156:18, 185:25
**learning** [2] - 98:13, 106:3
**least** [4] - 39:15, 95:5, 151:2, 204:15
**leave** [3] - 5:17, 12:21, 107:22
**led** [1] - 23:22
**leery** [1] - 167:7
**left** [5] - 12:23, 48:22, 135:2, 143:13, 209:13
**legal** [15] - 16:18, 31:14, 84:21, 87:21, 124:2, 129:7, 129:9, 130:5, 133:13, 134:8, 144:8, 145:15, 152:24, 152:25, 208:21
**legitimacy** [1] - 16:20
**legitimate** [8] - 15:19, 16:3, 16:7, 16:10, 16:16, 30:3, 97:23, 161:16
**length** [1] - 92:25
**less** [5] - 54:18, 129:16, 140:13, 141:7, 204:22
**letter** [45] - 81:25, 82:24, 83:19, 84:5, 85:1, 85:5, 85:12, 94:12, 94:19, 94:20, 94:24, 98:8, 98:24, 98:25, 99:3, 99:7, 104:15, 105:20, 108:17, 108:19,

108:21, 108:23, 109:3, 110:2, 110:10, 110:14, 110:23, 111:19, 112:12, 112:14, 112:25, 113:3, 113:4, 113:9, 115:2, 126:12, 157:4, 174:20, 174:24, 175:4, 175:6, 175:7, 175:20, 179:13, 181:19

**letterhead** [1] - 34:19

**letters** [4] - 79:17, 116:18, 125:22, 125:25

**level** [2] - 79:10, 123:23

**Levitt** [13] - 11:8, 12:9, 13:21, 72:7, 79:20, 112:6, 157:9, 159:17, 204:19, 204:23, 209:13, 209:23, 210:2

**license** [5] - 56:6, 56:8, 64:16, 107:23, 108:1

**licensed** [1] - 14:23

**licenses** [2] - 49:14, 189:25

**licensing** [1] - 215:18

**licensure** [1] - 56:18

**lighter** [2] - 140:13

**lightly** [1] - 69:14

**likely** [3] - 25:4, 107:12, 120:15

**limited** [2] - 161:11, 195:8

**line** [12] - 15:5, 40:9, 57:16, 59:15, 66:15, 69:4, 97:24, 110:21, 120:5, 131:13, 163:22, 166:5

**lined** [1] - 191:20

**lines** [3] - 26:9, 111:6, 130:23

**link** [1] - 55:18

**linking** [1] - 9:6

**list** [2] - 66:14, 177:16

**listed** [9] - 53:5, 150:7, 150:12, 154:20, 155:8, 163:18, 184:15, 187:23, 188:9

**lists** [3] - 125:11, 166:25, 195:16

**living** [1] - 10:7

**LLC** [6] - 16:3, 16:6, 28:6, 154:25, 167:10, 187:17

**LLM** [4] - 10:12, 10:13, 204:17, 210:2

**local** [1] - 109:10

**Local** [1] - 49:4

**locate** [1] - 53:19

**located** [1] - 173:17

**location** [8] - 34:12, 34:24, 36:10, 53:14, 53:16, 56:5, 56:18, 63:7

**LOL** [1] - 64:4

**look** [50] - 15:24, 16:2, 16:6, 16:9, 16:15, 16:20, 28:25, 35:17, 36:4, 39:8, 45:19, 46:22, 47:4, 56:2, 63:18, 83:23, 84:22, 85:18, 99:3, 119:23, 127:7, 128:10, 135:14, 135:15, 137:6, 139:1, 139:8, 139:19, 140:6, 140:21, 142:20, 143:1, 144:21, 146:5, 146:25, 160:18, 166:17, 168:6, 177:1, 179:7, 186:24, 188:7, 190:3, 190:20, 191:3, 191:20, 195:25, 209:22, 217:22

**looked** [12] - 36:10, 36:14, 38:18, 45:1, 53:8, 63:1, 70:2, 140:16, 141:16, 163:8, 191:4, 191:13

**looking** [9] - 37:10, 122:5, 138:13, 139:7, 162:24, 165:6, 176:15, 191:2, 206:8

**looks** [9] - 39:5, 70:9, 70:11, 128:11, 132:10, 139:9, 140:14, 141:16, 179:23

**Lori** [1] - 61:9

**lost** [1] - 89:2

**loud** [1] - 64:5

**low** [4] - 193:17, 194:23, 195:2, 195:12

**lower** [1] - 195:6

**luck** [1] - 72:15

**lunch** [6] - 7:11, 8:13, 86:7, 86:14, 94:12, 218:12

**lying** [1] - 169:3


## M


**magnitude** [1] - 69:13

**man** [1] - 173:10

**management** [2] - 203:1, 214:24

**mandate** [1] - 75:20

**manipulative** [1] - 208:24

**manner** [3] - 89:3, 194:14, 196:10

**Manning** [1] - 112:6

**Mantilla** [1] - 1:18

**manufacture** [2] - 59:11, 115:24

**manufactured** [5] - 107:8, 118:20, 123:13, 127:22, 134:5

**manufacturer** [19] - 18:2, 23:16, 24:10, 25:1, 25:2, 29:20, 30:1, 78:22, 79:6, 106:15, 106:22, 122:15, 123:19, 123:23, 123:24, 133:21, 133:24, 187:7

**manufacturer's** [1] - 135:19

**manufacturers** [7] - 10:23, 12:17, 15:8, 26:11, 107:8, 125:18, 134:6

**manufactures** [2] - 26:10, 134:14

**manufacturing** [2] - 26:17, 123:25

**March** [7] - 63:21, 145:6, 145:7, 153:18, 156:11, 156:21, 165:4

**marginally** [1] - 91:2

**Mark** [2] - 173:10, 174:13

**mark** [1] - 144:25

**market** [1] - 129:22

**marquee** [1] - 34:19

**MARTHA** [3] - 3:3, 9:17, 9:23

**Martha** [3] - 9:3, 9:23, 210:15

**Maryland** [1] - 173:18

**mass** [1] - 154:15

**master** [1] - 204:9

**master's** [3] - 10:14, 12:5, 204:10

**matter** [19] - 5:24, 6:8, 7:12, 9:14, 13:6, 13:7, 33:17, 35:11, 39:25, 79:21, 87:5, 89:17, 109:7, 119:24, 152:11, 152:22, 157:10, 201:22, 219:6

**mattered** [8] - 35:5, 38:21, 39:2, 39:23, 52:9, 70:5, 151:4, 189:7

**matters** [8] - 10:23, 12:17, 12:18, 86:24, 87:7, 157:14, 206:15

**maximum** [1] - 144:7

**Mayall** [1] - 61:9

**mean** [13] - 14:19, 43:20, 65:16, 70:9, 89:20, 89:22, 120:22, 155:12, 161:4, 181:15, 185:6, 198:19, 204:4

**means** [6] - 29:16, 56:7, 80:9, 80:10, 161:2, 168:11

**meant** [1] - 145:22

**med** [1] - 139:16

**Medicare** [1] - 10:23

**Medication** [1] - 136:9

**medication** [74] - 11:17, 15:13, 15:22, 16:4, 16:7, 16:10, 16:25, 25:17, 28:5, 30:10, 30:18, 34:13, 35:12, 35:18, 37:14, 37:17, 37:22, 39:21, 44:6, 44:18, 45:1, 45:18, 47:3, 47:17, 47:20, 47:24, 48:5, 56:19, 66:22, 69:20, 76:3, 84:15, 85:14, 85:19, 85:24, 102:12, 107:2, 107:8, 107:16, 116:20, 117:21, 118:1, 118:19, 119:1, 123:18, 127:20, 128:4, 131:10, 132:10, 133:21, 133:24, 134:12, 134:14, 136:15, 142:23, 143:4, 143:7, 147:14, 148:5, 148:10, 148:14, 152:8, 159:25, 161:7, 161:14, 167:1, 187:24, 188:19, 189:4, 189:18, 189:21, 191:13, 195:1

**medications** [14] - 15:4, 15:18, 34:25, 36:10, 36:13, 38:18, 41:7, 67:3, 125:13, 134:5, 161:10, 201:1, 203:13, 203:15

**medicine** [2] - 84:17, 116:1

**Medicine** [1] - 122:18

**medicines** [3] - 115:24, 211:12, 213:2

**Medina** [1] - 8:11

**Medina's** [1] - 7:9

**meds** [1] - 138:13

**meet** [2] - 17:5, 17:10

**Mellott** [6] - 132:6, 136:11, 140:4, 142:10, 143:12, 144:11

**members** [3] - 86:6, 169:17, 218:7

**Memo** [2] - 4:1, 22:16

**memo** [10] - 19:4, 19:8, 19:11, 19:24, 22:10, 22:21, 22:22, 23:1, 23:2, 116:12

**memory** [1] - 214:2

**memos** [3] - 159:21, 159:22, 209:2

**mention** [11] - 21:9, 41:3, 41:6, 76:13, 104:8, 147:25, 148:4, 151:6, 151:13, 155:3, 217:17

**mentioned** [21] - 12:16, 15:15, 17:20, 23:15, 27:15, 29:8, 31:20, 36:21, 40:1, 66:21, 98:7, 124:10, 125:17, 135:13, 138:25, 139:10, 157:7, 163:8, 172:6, 193:7, 197:11

**mentioning** [2] - 20:13, 165:7

**mentions** [4] - 19:4, 141:15, 163:17, 163:18

**merchandise** [1] - 67:5

**message** [27] - 26:9, 43:6, 43:10, 57:14, 96:24, 135:2, 136:8, 136:11, 136:17, 136:19, 136:20, 137:5, 137:17, 138:10, 138:15, 140:3, 142:7, 146:2,

146:20, 147:5, 147:8, 149:22, 150:15, 168:7, 169:8, 169:9, 184:25
**messages** [4] - 5:23, 138:12, 142:14, 145:5
**met** [2] - 32:24, 37:7
**Miami** [2] - 1:16, 1:19
**microphone** [1] - 202:13
**Microsoft** [1] - 26:1
**middle** [12] - 20:12, 23:14, 24:21, 78:14, 99:24, 110:5, 113:8, 115:23, 122:17, 126:5, 138:10, 158:17
**might** [8] - 6:18, 6:24, 46:2, 76:20, 125:19, 127:2, 217:9, 217:10
**million** [1] - 161:25
**millions** [6] - 35:18, 36:13, 47:23, 47:25, 148:10
**mind** [1] - 107:10
**mine** [1] - 43:8
**minimum** [1] - 5:15
**minor** [1] - 163:15
**minute** [1] - 169:18
**minutes** [3] - 169:22, 170:5, 170:7
**mischaracterizing** [1] - 206:20
**mislead** [1] - 91:23
**misleading** [3] - 33:2, 36:24, 91:1
**misleads** [1] - 89:11
**misrepresentations** [1] - 113:5
**miss** [1] - 8:1
**missing** [1] - 60:3
**mission** [1] - 84:17
**misspelled** [1] - 196:24
**mistrial** [4] - 89:12, 89:18, 91:24, 92:4
**mix** [3] - 118:10, 118:11, 123:23
**mix-up** [3] - 118:10, 118:11, 123:23
**mixed** [2] - 70:12, 191:19
**mixed-up** [1] - 191:19
**Molly** [1] - 210:19
**moment** [5] - 27:14, 51:3, 75:25, 100:4, 195:14
**Monday** [7] - 54:2, 170:24, 170:25, 218:11, 218:14, 218:20, 218:23
**money** [1] - 209:6
**month** [2] - 54:19, 98:12
**months** [6] - 47:20, 53:16, 56:14, 63:8, 148:6
**moral** [1] - 67:20
**morning** [3] - 10:3, 10:4, 164:9
**Morrone** [10] - 14:5, 14:6, 14:8, 19:2, 22:10, 71:8, 72:4, 72:6, 157:8, 212:6
**most** [2] - 106:21, 182:21
**mostly** [3] - 12:15, 59:12, 200:21
**motion** [6] - 5:7, 7:5, 9:5, 37:4, 89:18, 92:3
**mouth** [1] - 208:15
**move** [3] - 6:17, 8:19, 91:24
**moved** [3] - 5:15, 63:7, 208:12
**moves** [19] - 18:17, 22:11, 71:18, 81:15, 96:14, 103:1, 105:12, 108:9, 112:16, 117:6, 121:22, 125:1, 154:3, 157:25, 160:10, 172:25, 176:7, 180:15, 182:11
**moving** [2] - 178:12, 203:3
**MR** [175] - 3:4, 5:6, 6:2, 6:11, 6:14, 7:3, 7:14, 7:16, 7:19, 7:21, 7:22, 8:6, 8:7, 8:22, 9:4, 9:8, 9:9, 18:19, 18:20, 19:13, 22:13, 22:14, 23:7, 24:11, 30:6, 30:12, 30:24, 31:7, 32:4, 32:13, 32:21, 33:2, 33:7, 33:9, 33:25, 34:14, 35:2, 35:6, 35:8, 36:15, 36:23, 37:3, 37:24, 38:1, 38:8, 38:16, 38:22, 39:10, 39:16, 40:9, 42:20, 43:15, 45:20, 46:16, 46:18, 46:20, 71:20, 71:21, 73:5, 73:7, 76:15, 81:17, 87:1, 87:5, 88:15, 89:1, 90:3, 90:6, 90:10, 90:18, 91:6, 91:8, 91:16, 92:9, 92:10, 92:12, 92:20, 92:24, 93:8, 93:13, 93:22, 93:23, 93:24, 95:9, 95:11, 96:16, 96:17, 99:13, 99:16, 103:3, 103:4, 105:14, 105:15, 108:5, 108:11, 108:12, 111:20, 112:18, 112:19, 117:8, 117:9, 121:24, 121:25, 125:3, 125:4, 130:9, 140:23, 151:8, 152:24, 154:5, 154:6, 158:2, 158:3, 160:11, 160:12, 171:4, 171:5, 171:14, 171:15, 171:16, 173:2, 173:3, 176:9, 176:10, 180:17, 180:18, 182:13, 182:14, 185:20, 188:21, 195:3, 200:5, 202:6, 203:21, 206:25, 207:14, 208:2, 208:13, 209:15, 210:19, 210:20, 210:25, 211:2, 211:5, 211:6, 212:13, 212:21, 213:17, 213:18, 213:21, 213:22, 214:5, 214:6, 214:16, 214:17, 214:20, 214:21, 215:11, 215:25, 216:1, 216:4, 216:5, 216:8, 216:9, 216:12, 216:13, 216:16, 216:17, 216:20, 216:21, 216:24, 216:25, 217:3, 217:4, 218:6
**MS** [277] - 3:3, 8:18, 9:2, 10:2, 18:8, 18:11, 18:17, 18:24, 19:17, 19:20, 19:21, 22:3, 22:5, 22:11, 22:17, 22:19, 23:12, 24:14, 30:8, 30:15, 31:2, 31:18, 32:6, 32:17, 33:3, 33:13, 34:5, 34:17, 35:4, 35:10, 35:23, 36:1, 36:4, 36:6, 36:16, 37:6, 38:5, 38:15, 39:1, 39:12, 39:18, 40:12, 40:17, 40:19, 40:22, 40:25, 41:1, 42:25, 43:3, 44:3, 44:21, 44:23, 45:23, 46:8, 46:10, 47:1, 51:5, 51:8, 52:16, 52:17, 62:22, 62:23, 64:24, 65:1, 65:7, 65:9, 68:16, 68:17, 71:1, 71:3, 71:18, 71:24, 73:10, 74:5, 74:7, 76:18, 78:25, 79:1, 80:23, 81:1, 81:8, 81:10, 81:15, 81:18, 81:22, 81:24, 86:4, 87:13, 87:17, 88:7, 93:4, 94:9, 94:10, 95:16, 96:3, 96:5, 96:14, 96:20, 96:22, 99:20, 100:3, 100:5, 102:18, 102:20, 103:1, 103:7, 105:4, 105:6, 105:12, 105:18, 108:3, 108:9, 108:15, 111:24, 112:2, 112:4, 112:9, 112:11, 112:16, 112:22, 116:16, 116:17, 116:23, 117:1, 117:6, 117:12, 120:3, 120:4, 121:16, 121:18, 121:22, 122:3, 124:17, 124:18, 125:1, 125:7, 127:14, 127:17, 128:22, 128:23, 130:15, 131:6, 131:8, 131:15, 131:18, 131:25, 132:3, 132:18, 132:21, 134:17, 134:18, 134:21, 135:1, 135:8, 135:10, 135:21, 135:24, 136:5, 136:7, 136:25, 137:4, 137:8, 137:10, 138:20, 138:22, 139:19, 139:21, 139:25, 140:2, 140:21, 141:1, 141:3, 142:20, 142:22, 143:1, 143:3, 143:10, 143:11, 145:24, 146:1, 147:10, 147:12, 148:21, 149:1, 149:17, 149:18, 150:3, 150:6, 151:10, 151:12, 153:3, 153:19, 153:21, 154:3, 154:9, 154:11, 157:25, 158:6, 158:8, 160:5, 160:6, 160:10, 160:15, 160:17, 166:11, 166:13, 166:19, 166:21, 167:3, 167:5, 169:15, 170:16, 170:23, 171:1, 171:21, 171:22, 172:14, 172:18, 172:25, 173:6, 173:8, 174:4, 174:6, 175:23, 176:1, 176:7, 176:13, 176:14, 180:9, 180:11, 180:15, 180:21, 180:22, 182:2, 182:4, 182:6, 182:7, 182:11, 182:17, 182:19, 182:23, 183:1, 186:18, 186:19, 186:23, 187:1, 189:1, 191:7, 191:8, 191:23, 192:1, 195:10, 196:3, 196:6, 198:2, 198:5, 198:10, 198:12, 198:23, 199:1, 199:19, 199:21, 200:8, 201:25, 202:2, 203:19, 204:8, 206:20, 207:12, 207:24, 208:8, 209:9, 210:1, 212:11, 212:17, 213:15, 215:7
**multiple** [1] - 56:12
**must** [6] - 56:5, 75:3, 198:7, 199:3, 199:11

## N

**name** [11] - 9:21, 31:21, 32:11, 134:12, 135:19, 167:10, 173:10, 188:3, 188:8, 204:1, 215:16
**named** [20] - 31:25, 32:3, 32:8, 32:19, 44:13, 51:10, 52:22, 54:12, 59:1, 61:8,

66:9, 132:24, 150:24, 157:8, 162:10, 173:10, 174:13, 178:4, 192:3, 206:5
**names** [4] - 48:25, 49:13, 49:15, 56:5
**narrow** [1] - 161:18
**NDC** [1] - 128:5
**NE** [1] - 1:15
**necessarily** [4] - 6:19, 107:11, 129:18, 188:3
**necessary** [4] - 25:3, 58:4, 130:8, 130:13
**need** [15] - 41:7, 50:12, 54:1, 54:2, 63:11, 73:15, 75:20, 76:20, 77:15, 87:8, 91:5, 92:8, 96:10, 153:4, 169:4
**needed** [6] - 19:23, 59:21, 77:14, 144:8, 181:12, 181:16
**needs** [7] - 60:20, 62:19, 77:19, 120:18, 186:7, 208:9, 212:18
**network** [3] - 161:11, 161:18, 195:9
**never** [19] - 32:23, 33:10, 34:8, 34:10, 37:25, 38:7, 38:10, 58:8, 78:3, 148:7, 161:20, 163:11, 165:8, 167:24, 169:10, 197:8, 208:15, 214:13
**New** [13] - 10:6, 10:11, 53:19, 53:24, 55:10, 55:11, 170:20, 171:2, 187:13, 188:19, 189:5, 192:6
**new** [13] - 8:1, 13:8, 85:6, 98:7, 98:8, 128:10, 135:14, 135:15, 139:1, 139:8, 162:16, 164:11, 201:3
**news** [1] - 83:20
**next** [48] - 9:1, 20:7, 21:25, 25:8, 30:3, 49:21, 52:2, 53:7, 53:14, 53:21, 63:17, 69:11, 69:19, 76:21, 77:13, 81:9, 88:25, 89:1, 98:2, 100:15, 110:5, 114:17, 120:2, 131:15, 131:16, 135:22, 135:23, 136:8, 137:2, 137:8, 137:23, 138:21, 139:19, 139:20, 141:1, 141:2, 143:17, 149:22, 155:18, 158:16, 164:1, 169:1, 169:5, 177:12, 183:14, 191:25
**Next** [1] - 83:1
**nice** [2] - 86:14, 218:14
**Nicholls** [2] - 66:9, 67:24
**NO** [1] - 1:2
**non** [1] - 118:25
**non-Gilead** [1] - 118:25
**none** [3] - 111:17, 148:1, 152:6
**normal** [1] - 161:22
**normally** [3] - 16:14, 43:17, 215:19
**note** [5] - 23:21, 104:23, 104:24, 110:6, 123:9
**notes** [1] - 180:6
**nothing** [13] - 7:19, 29:21, 37:20, 77:1, 80:18, 89:8, 90:24, 128:9, 153:10, 170:6, 203:10, 208:4, 218:22
**notice** [3] - 5:25, 8:11, 200:9
**noticed** [3] - 128:3, 140:16, 200:16
**notification** [2] - 56:4, 173:14
**notified** [3] - 90:15, 132:13, 133:9
**notify** [14] - 21:17, 25:2, 28:23, 106:11, 106:15, 106:18, 119:16, 120:5, 120:14, 120:18, 120:20, 121:6, 159:3, 172:8
**November** [24] - 11:8, 14:9, 79:2, 80:13, 81:7, 83:10, 85:2, 85:17, 85:23, 94:16, 95:22, 98:15, 98:25, 103:22, 103:25, 106:23, 106:25, 110:23, 112:14, 129:3, 132:22, 133:9, 134:3, 203:11
**number** [10] - 49:20, 51:20, 51:21, 53:9, 56:12, 60:14, 82:11, 110:24, 128:5, 146:22
**Number** [3] - 3:9, 76:9, 76:20
**numbers** [6] - 44:13, 51:20, 60:12, 107:23, 108:1, 163:17
**NW** [1] - 1:19
**NYBOP** [1] - 53:23
**NYS** [1] - 55:23
**NYSED.gov** [2] - 49:14, 55:19

**O**

**oath** [2] - 93:16, 171:8
**object** [6] - 24:11, 32:4, 32:13, 95:11, 130:9, 151:8
**objection** [79] - 6:5, 6:25, 18:19, 18:20, 19:14, 22:13, 22:14, 23:7, 23:11, 30:12, 31:7, 32:21, 33:7, 33:12, 33:25, 34:14, 35:6, 36:15, 38:1, 38:22, 39:10, 42:20, 43:15, 46:16, 71:20, 71:21, 73:5, 73:7, 76:15, 81:17, 88:3, 95:9, 95:15, 96:16, 96:17, 99:13, 103:3, 103:4, 105:14, 105:15, 108:11, 108:12, 111:20, 112:18, 112:19, 117:8, 117:9, 121:24, 121:25, 125:3, 125:4, 152:24, 154:5, 154:6, 158:2, 158:3, 160:11, 160:12, 173:2, 173:3, 176:9, 176:10, 180:17, 180:18, 182:13, 182:14, 185:20, 195:3, 200:5, 203:19, 206:20, 207:12, 207:24, 208:8, 209:9, 212:11, 212:17, 213:15, 215:7
**obligation** [1] - 67:20
**observations** [3] - 184:7, 184:15, 200:3
**obtain** [2] - 40:14, 51:23
**obviously** [4] - 5:19, 6:12, 38:10, 165:10
**occluded** [1] - 128:9
**occurred** [2] - 25:19, 118:15
**occurs** [3] - 23:22, 28:19, 118:10
**October** [29] - 7:9, 7:10, 7:11, 8:11, 62:10, 62:11, 65:10, 68:18, 70:2, 70:14, 74:8, 76:1, 82:15, 92:25, 95:6, 97:19, 98:3, 98:10, 98:17, 100:9, 100:13, 113:10, 114:9, 122:18, 122:25, 123:4, 123:10, 147:22, 150:22
**odd** [2] - 189:8, 189:22
**OF** [3] - 1:1, 1:4, 1:9
**offer** [1] - 193:8
**offered** [5] - 5:24, 6:8, 9:13, 31:11, 193:17
**Offers** [1] - 194:23
**offhand** [1] - 134:15
**office** [2] - 57:22, 100:9
**OFFICER** [6] - 86:15, 93:18, 169:23, 170:8, 171:11, 218:16
**officer** [8] - 16:21, 26:7, 85:22, 97:3, 185:23, 186:1, 206:17, 207:20
**Official** [2] - 2:3, 219:9
**old** [2] - 13:3, 40:23
**old-fashioned** [1] - 40:23
**Olympia** [4] - 66:7, 68:5, 68:19, 69:4
**omissions** [1] - 129:9
**Once** [1] - 106:9
**once** [3] - 38:3, 38:9, 172:12
**oncology** [1] - 11:13
**one** [88] - 13:20, 25:15, 25:16, 25:21, 26:18, 27:13, 28:1, 29:24, 30:3, 31:12, 32:14, 35:24, 43:2, 44:22, 51:2, 51:3, 52:16, 53:1, 54:4, 57:8, 62:22, 63:2, 63:14, 65:23, 68:13, 68:14, 69:2, 69:19, 73:15, 74:5, 78:25, 81:19, 87:6, 88:25, 89:1, 89:6, 93:8, 96:21, 100:8, 105:8, 107:10, 107:14, 116:16, 117:19, 125:12, 128:22, 130:12, 131:16, 132:1, 134:17, 136:5, 138:21, 139:1, 139:20, 140:7, 141:2, 141:6, 143:2, 144:6, 150:4, 150:5, 150:8, 150:10, 150:16, 150:17, 151:1, 151:2, 152:15, 155:25, 165:20, 176:20, 179:12, 188:19, 190:19, 191:7, 193:3, 193:17, 194:24, 197:22, 198:24, 199:19, 200:16, 209:17, 214:8, 217:8, 217:20
**One** [2] - 97:10, 140:10
**ones** [4] - 106:18, 106:20, 160:1
**online** [1] - 55:23
**op** [1] - 60:13
**open** [10] - 27:12, 50:14, 50:22, 120:23, 121:7, 138:20, 143:6, 147:14, 148:23, 150:4
**opened** [4] - 138:16, 139:2, 147:2, 210:9
**operating** [9] - 28:14, 28:17, 28:18, 29:3, 63:22, 125:19, 129:25, 193:9, 197:16
**opine** [1] - 88:2
**opinion** [6] - 15:17, 87:21, 106:6, 152:25, 206:17
**order** [6] - 6:19, 6:24, 41:6, 60:22, 162:17, 168:12
**Order** [1] - 5:1
**orders** [1] - 162:1
**orient** [1] - 100:7
**original** [1] - 178:17
**out-of-town** [1] - 5:17
**outside** [7] - 39:15, 86:25, 107:2, 158:12, 161:18, 214:25, 215:2
**overruled** [17] - 31:9,

32:5, 32:16, 34:16, 35:9, 38:4, 38:25, 39:11, 40:11, 44:1, 111:21, 185:21, 195:5, 206:24, 208:1, 209:11, 215:9
**own** [9] - 42:22, 185:19, 193:16, 193:20, 194:9, 194:16, 195:24, 199:10, 215:3
**owned** [1] - 58:8
**owner** [4] - 41:15, 146:15, 146:17, 146:21
**ownership** [9] - 41:15, 75:4, 75:12, 75:20, 166:24, 166:25, 198:17

**P**

**P&P** [2] - 77:24, 77:25
**P&Ps** [1] - 77:23
**package** [1] - 70:11
**packaging** [3] - 69:6, 97:15, 156:8
**page** [143] - 19:1, 20:2, 20:8, 21:9, 22:17, 23:13, 23:14, 24:20, 26:8, 36:5, 41:24, 43:4, 44:11, 49:21, 52:20, 52:21, 53:20, 53:21, 54:7, 54:9, 55:17, 55:21, 57:10, 58:24, 59:19, 60:18, 61:7, 62:25, 63:17, 64:10, 65:7, 66:4, 66:17, 71:11, 72:1, 72:2, 74:4, 74:5, 76:21, 77:13, 78:13, 81:9, 84:14, 96:23, 98:2, 98:14, 99:2, 99:23, 99:24, 100:6, 100:15, 101:19, 103:12, 104:2, 104:5, 104:21, 105:22, 107:18, 109:2, 110:5, 112:9, 112:24, 113:8, 114:17, 117:14, 119:3, 119:7, 119:12, 119:19, 120:2, 120:3, 120:10, 122:9, 123:6, 131:16, 132:1, 133:18, 134:25, 136:8, 137:2, 137:9, 137:23, 138:9, 140:1, 142:6, 142:13, 143:17, 144:10, 148:22, 154:12, 155:18, 158:7, 158:16, 162:9, 162:21, 163:20, 164:6, 167:4, 167:13, 168:13, 168:19, 169:1, 169:5, 172:17, 173:7, 174:4, 176:2, 176:22, 177:5, 177:11, 177:12, 177:15, 177:16, 177:19, 177:24, 178:22, 182:6, 182:18, 182:23, 183:14, 184:5, 186:24, 187:2, 187:22, 188:7, 190:3, 190:21, 191:1, 191:2, 191:3, 191:11, 191:25, 193:12, 217:10
**PAGE** [1] - 3:2
**Page** [1] - 3:9
**Pages** [1] - 1:8
**pages** [3] - 6:18, 188:11, 190:19
**paid** [1] - 209:2
**pandemic** [1] - 17:18
**paper** [1] - 29:17
**papers** [1] - 187:21
**paperwork** [6] - 25:3, 54:13, 58:9, 163:15, 215:6, 215:18
**paragraph** [23] - 20:12, 23:14, 23:21, 24:21, 53:7, 63:10, 66:18, 69:12, 82:4, 84:6, 103:17, 109:5, 110:6, 110:21, 113:8, 114:18, 115:22, 116:11, 118:17, 122:17, 155:23, 158:17, 161:19
**parent** [1] - 26:13
**parentheses** [2] - 146:15, 146:17
**parking** [1] - 160:25
**part** [20] - 6:16, 6:21, 20:19, 25:8, 30:2, 48:18, 63:1, 63:2, 74:18, 76:1, 79:23, 83:23, 99:9, 100:13, 138:3, 159:20, 164:1, 184:1, 194:22, 199:10
**participants** [1] - 146:6
**particular** [1] - 74:21
**parties** [1] - 75:20
**partner** [9] - 111:8, 111:23, 194:4, 194:12, 196:7, 196:17, 196:21, 199:4, 204:22
**partners** [2] - 106:11, 161:17
**parts** [2] - 29:23, 203:3
**pass** [2] - 14:8, 201:25
**passed** [1] - 14:6
**past** [2] - 58:8, 119:21
**Pat** [14] - 43:7, 62:2, 62:5, 66:11, 66:19, 67:24, 69:4, 124:22, 157:22, 160:9, 164:9, 210:15, 215:23, 216:22
**patent** [1] - 11:5
**patents** [1] - 10:20
**patient** [11] - 21:5, 25:4, 25:17, 27:12, 65:14, 116:10, 118:9, 138:16, 139:2, 139:4, 139:6
**patient's** [1] - 27:11
**patients** [3] - 84:15, 154:19, 200:25
**PATRICIA** [2] - 2:2, 219:9
**Patrick** [92] - 9:12, 14:13, 16:24, 17:10, 26:25, 28:4, 28:9, 32:2, 32:7, 32:10, 32:18, 32:23, 33:4, 33:10, 33:23, 34:1, 37:2, 48:13, 50:12, 52:4, 80:2, 80:14, 80:20, 89:5, 91:8, 91:10, 91:11, 91:13, 91:17, 91:22, 92:1, 99:16, 99:17, 110:20, 124:13, 125:12, 130:20, 130:23, 131:2, 132:5, 132:7, 132:14, 132:25, 157:1, 160:22, 164:7, 164:23, 166:15, 168:4, 168:14, 168:21, 169:6, 178:1, 182:9, 186:2, 194:1, 194:19, 197:10, 199:15, 200:2, 200:19, 200:21, 210:4, 210:23, 211:3, 211:7, 211:10, 211:15, 211:18, 212:8, 212:14, 212:15, 212:22, 213:1, 213:6, 213:10, 213:19, 213:25, 214:2, 214:7, 214:10, 214:14, 214:18, 216:2, 216:6, 216:10, 216:14, 216:18, 217:1, 217:5
**PATRICK** [2] - 1:7, 1:17
**PDF** [1] - 148:22
**peculiar** [2] - 189:19, 189:20
**pedigree** [26] - 29:13, 29:22, 39:21, 40:1, 40:3, 42:18, 47:4, 50:9, 52:7, 61:14, 61:17, 62:19, 75:1, 79:13, 115:25, 151:7, 151:13, 152:17, 152:19, 152:21, 162:14, 192:6, 193:1, 193:4, 194:13
**pedigrees** [9] - 30:10, 30:17, 43:7, 151:21, 178:4, 185:19, 186:10, 194:5, 196:23
**penalties** [2] - 41:21, 42:4
**pending** [2] - 13:6, 13:7
**people** [5] - 9:12, 68:2, 102:11, 107:15, 203:2
**per** [1] - 66:13
**percent** [4] - 55:8, 55:11, 189:12, 189:13
**perhaps** [2] - 50:20, 52:12
**period** [3] - 206:4, 214:3, 214:14
**permitted** [1] - 170:20
**person** [17] - 17:5, 17:9, 17:11, 20:23, 32:19, 33:5, 44:17, 66:18, 68:3, 136:15, 146:5, 150:16, 174:25, 175:4, 215:13, 215:14, 215:19
**person's** [2] - 61:11, 215:16
**personal** [1] - 207:24
**perspective** [1] - 128:18
**pertain** [1] - 113:20
**pertaining** [1] - 55:10
**pertains** [2] - 71:10, 74:20
**pertinent** [1] - 91:18
**Peter** [11] - 31:25, 32:3, 32:8, 32:19, 57:16, 81:4, 122:11, 146:9, 146:21, 150:17, 150:24
**Ph** [1] - 1:19
**PHARM** [1] - 204:4
**Pharma** [1] - 188:2
**pharmaceutical** [6] - 11:17, 28:16, 59:11, 79:6, 210:10, 210:13
**pharmacies** [18] - 15:12, 15:13, 49:5, 49:22, 50:24, 51:1, 55:7, 57:20, 57:24, 65:24, 144:18, 148:14, 154:18, 154:23, 175:11, 212:24, 213:8
**pharmacist** [14] - 11:12, 11:13, 11:14, 11:25, 20:22, 68:6, 120:7, 138:16, 189:16, 189:19, 203:9, 203:13, 203:14, 203:16
**pharmacists** [2] - 11:2, 155:16
**pharmacovigilance** [1] - 11:18
**Pharmacy** [8] - 10:23, 12:17, 53:4, 53:8, 53:24, 54:13, 67:13, 83:25
**pharmacy** [52] - 11:15, 11:16, 11:22, 12:1, 12:3, 12:16, 20:10, 49:13, 49:15, 51:21, 52:6, 53:15, 54:17, 55:7, 55:12, 55:14, 56:7, 56:12, 56:14, 58:8, 63:6, 65:4, 65:23, 76:13, 119:22, 144:12, 154:13, 187:13, 187:23, 187:25, 188:3, 188:5, 188:19, 188:23, 189:8, 189:11, 189:14, 189:17, 189:18, 189:21,

189:23, 189:24, 203:12, 203:20, 203:23, 203:24, 204:5, 204:11
**phone** [12] - 17:14, 37:8, 37:9, 37:21, 66:19, 78:17, 78:20, 95:5, 95:7, 95:8, 147:22, 163:17
**photo** [5] - 69:20, 135:22, 135:23, 135:25
**photograph** [1] - 213:23
**photographs** [2] - 212:24, 213:8
**photos** [7] - 69:17, 127:15, 135:9, 138:20, 141:17, 142:16, 142:21
**PIC** [3] - 20:18, 20:21, 48:21
**Picard** [1] - 182:21
**picked** [1] - 163:15
**picture** [18] - 33:24, 34:6, 34:8, 34:9, 36:2, 36:7, 37:25, 127:18, 127:22, 129:10, 131:19, 133:19, 139:7, 139:20, 141:1, 142:23, 147:16, 185:3
**pictured** [4] - 133:23, 134:10, 135:25, 146:2
**pictures** [7] - 136:15, 139:13, 139:22, 140:21, 146:23, 147:7, 147:13
**piece** [2] - 29:17, 207:16
**pieces** [3] - 54:3, 63:14, 94:19
**pill** [1] - 135:25
**pills** [21] - 21:6, 23:5, 25:18, 25:22, 26:18, 26:22, 27:1, 50:14, 50:22, 104:11, 104:14, 116:20, 118:25, 131:20, 132:10, 134:4, 146:25, 147:16, 151:24, 152:6, 152:12
**pissed** [2] - 143:19, 147:1
**place** [6] - 35:18, 36:14, 38:18, 45:21, 66:6, 189:4
**placed** [1] - 24:8
**places** [2] - 37:22, 54:23
**plain** [1] - 113:9
**plan** [1] - 92:21
**plant** [1] - 26:17
**play** [1] - 23:23
**player** [1] - 16:20
**Plaza** [2] - 66:7, 69:4
**PM** [5] - 1:6, 92:14, 170:10, 218:25
**PO** [4] - 51:20, 168:8, 168:11
**POGOZELSKI** [13] - 5:6, 7:19, 8:7, 8:22, 9:4, 9:8, 92:10, 92:20, 92:24, 93:22, 108:5, 140:23, 171:15
**Pogozelski** [1] - 1:13
**point** [66] - 6:12, 14:11, 15:17, 15:21, 19:14, 21:16, 22:25, 24:15, 28:3, 28:8, 28:13, 31:24, 32:2, 65:17, 73:25, 76:8, 78:21, 80:1, 80:13, 85:4, 85:17, 85:23, 95:4, 95:17, 95:19, 106:23, 106:25, 107:1, 109:15, 109:17, 109:19, 109:22, 110:10, 110:18, 111:16, 118:24, 121:5, 124:3, 125:11, 127:9, 129:22, 129:24, 130:20, 137:14, 155:10, 155:11, 156:24, 157:7, 159:8, 159:11, 159:24, 162:15, 167:15, 172:2, 175:17, 175:19, 185:3, 185:16, 193:14, 195:16, 197:22, 198:6, 198:13, 206:19, 208:3, 212:20
**points** [1] - 172:7
**policies** [6] - 129:20, 193:21, 194:9, 194:16, 195:24, 197:6
**policy** [1] - 29:5
**polling** [3] - 8:5, 93:21, 171:13
**poses** [1] - 72:10
**position** [4] - 5:18, 23:17, 87:11, 170:19
**possession** [5] - 21:19, 24:9, 61:19, 113:19, 114:5
**possible** [4] - 65:3, 84:7, 131:23, 165:1
**potential** [4] - 84:16, 88:12, 88:15, 121:7
**potentially** [3] - 173:23, 194:5, 196:22
**PR** [1] - 168:24
**practice** [2] - 10:15, 10:16
**practiced** [2] - 10:17, 11:13
**predates** [1] - 206:8
**predicate** [3] - 34:4, 36:19, 36:25
**prefer** [1] - 101:24
**prejudice** [1] - 90:4
**preliminary** [1] - 7:12
**prepare** [1] - 19:11
**prepared** [2] - 22:23, 99:4
**preparing** [1] - 103:10
**presence** [10] - 8:4, 8:10, 86:9, 86:25, 93:20, 94:2, 169:20, 171:12, 171:19, 218:10
**present** [6] - 5:3, 92:17, 170:13
**presented** [4] - 6:22, 6:25, 17:23, 71:7
**pretty** [2] - 50:15, 63:22
**prevent** [2] - 80:4, 109:9
**previous** [11] - 12:12, 21:22, 41:15, 50:25, 60:18, 74:4, 104:17, 132:1, 163:20, 164:6, 176:18
**previously** [6] - 10:16, 23:15, 68:24, 85:8, 121:11, 195:19
**price** [7] - 42:17, 193:17, 194:23, 195:6, 195:7, 195:9, 195:12
**pricing** [1] - 194:25
**primarily** [2] - 15:12, 87:18
**primary** [1] - 15:11
**print** [1] - 60:4
**printouts** [1] - 6:15
**priority** [1] - 31:16
**proactively** [2] - 109:9, 109:22
**problem** [16] - 6:20, 25:19, 50:20, 52:15, 85:13, 107:11, 107:12, 121:12, 125:19, 127:3, 129:19, 130:7, 165:1, 166:1, 192:25, 206:10
**problematic** [3] - 193:4, 194:4, 196:22
**problems** [5] - 37:16, 107:9, 124:14, 144:7, 152:14
**procedure** [4] - 28:17, 193:25, 197:17, 199:15
**procedures** [15] - 19:24, 28:14, 28:19, 29:4, 29:5, 78:1, 129:20, 129:25, 186:3, 193:9, 193:21, 194:16, 195:24, 197:7, 197:11
**proceed** [2] - 9:15, 42:24
**proceedings** [3] - 92:15, 170:11, 219:5
**process** [2] - 52:14, 60:11
**processed** [1] - 196:9
**product** [93] - 20:16, 20:24, 21:18, 21:22, 23:22, 24:25, 26:23, 30:4, 40:2, 40:3, 40:14, 41:15, 41:18, 45:14, 52:13, 55:6, 55:7, 55:13, 56:22, 59:21, 60:1, 60:13, 60:21, 60:22, 61:18, 61:20, 62:18, 65:14, 65:15, 65:16, 67:10, 69:9, 70:2, 72:23, 74:23, 75:12, 75:20, 77:18, 77:19, 77:23, 79:12, 79:15, 83:14, 85:10, 97:23, 100:21, 102:9, 106:10, 106:16, 106:17, 110:7, 113:10, 113:17, 113:18, 113:21, 114:3, 114:4, 114:7, 115:9, 115:17, 116:10, 120:14, 120:24, 121:1, 121:2, 124:1, 127:1, 127:7, 128:10, 128:11, 143:19, 152:16, 152:18, 152:19, 153:8, 153:10, 154:20, 158:24, 159:4, 161:21, 162:16, 165:9, 167:24, 169:10, 190:12, 192:11, 193:17, 194:13, 194:23, 196:12, 197:17
**Product** [2] - 197:22, 198:13
**product's** [1] - 75:21
**Products** [1] - 195:18
**products** [32] - 15:6, 17:7, 42:16, 44:14, 44:18, 49:10, 50:21, 61:22, 65:19, 65:25, 66:14, 68:20, 75:5, 78:1, 84:22, 109:10, 113:21, 119:23, 124:12, 124:14, 125:13, 129:21, 146:23, 163:22, 177:21, 178:4, 178:8, 178:12, 196:10, 196:14, 196:19, 197:12
**products'** [1] - 66:1
**professions** [1] - 55:23
**professor** [2] - 11:15, 11:19
**proffered** [1] - 6:4
**project** [1] - 130:4
**promoting** [1] - 173:17
**proper** [4] - 6:24, 87:22, 153:13, 167:10
**properly** [1] - 25:2
**property** [7] - 10:12, 10:17, 10:19, 11:6, 11:7, 12:15, 204:18
**proposed** [1] - 21:4
**prosecutor** [5] - 6:21, 202:17, 206:7, 207:2, 217:24
**protection** [1] - 82:6
**prove** [1] - 5:24
**Provide** [1] - 159:3
**provide** [13] - 16:18, 40:15, 51:21, 72:18, 74:10, 77:14, 102:4, 129:9, 144:8, 190:15, 194:12, 208:20, 208:21
**provided** [24] - 27:23, 40:6, 40:13, 48:16, 50:6, 51:15, 54:4, 58:4, 64:15, 64:22,

75:12, 80:20, 85:13, 87:24, 101:3, 110:13, 145:15, 160:25, 164:10, 181:14, 183:9, 183:16, 183:19, 198:17
**provides** [1] - 41:16
**providing** [9] - 22:10, 37:11, 45:13, 87:13, 87:21, 98:9, 99:9, 115:20, 185:19
**provisionally** [3] - 5:16, 7:4, 9:5
**provisions** [1] - 67:17
**public** [1] - 84:21
**publish** [12] - 35:23, 40:17, 43:2, 81:19, 96:20, 132:20, 134:21, 154:9, 158:6, 160:16, 173:7, 182:17
**pull** [1] - 213:17
**purchase** [6] - 44:14, 44:19, 54:18, 56:8, 159:25, 168:12
**purchased** [17] - 15:3, 15:6, 15:7, 15:8, 15:11, 56:7, 64:15, 102:9, 102:12, 107:16, 122:19, 123:1, 128:10, 159:5, 163:22, 194:13, 198:20
**purchases** [2] - 57:24, 188:17
**purchasing** [17] - 15:22, 15:25, 16:24, 41:7, 47:16, 77:3, 111:7, 111:22, 148:5, 148:7, 148:10, 154:24, 162:23, 163:4, 178:7, 178:12, 199:4
**Purchasing** [1] - 196:12
**purported** [1] - 158:23
**purposefully** [1] - 91:23
**pushback** [3] - 120:21, 120:22, 200:18
**pushed** [1] - 172:7
**put** [4] - 27:12, 128:17, 159:22, 186:20
**putting** [2] - 99:7, 208:15

## Q

**QA** [1] - 20:4
**QC** [1] - 100:9
**quality** [1] - 60:1
**qualitycomplaints@Gilead.com** [1] - 58:25
**quantities** [1] - 65:25
**quantity** [2] - 189:13, 189:15
**quarantine** [5] - 24:25, 28:23, 65:15, 113:21, 114:7
**quarantined** [4] - 61:20, 69:5, 77:20, 83:15
**queries** [2] - 71:7, 180:25
**questioning** [1] - 40:10
**questions** [27] - 17:24, 42:14, 60:5, 70:15, 70:23, 72:10, 74:11, 89:13, 89:20, 89:21, 91:12, 92:1, 104:8, 124:9, 128:17, 129:11, 159:21, 177:12, 177:25, 180:2, 180:25, 185:14, 201:8, 202:18, 211:13, 212:25, 213:8
**quickly** [3] - 58:16, 92:20, 165:5
**quit** [7] - 206:17, 207:8, 207:15, 207:20, 207:21, 208:4
**quite** [1] - 187:20
**quits** [3] - 186:6, 206:9, 207:3

## R

**R-U-M-O-R-E** [1] - 9:24
**raise** [2] - 35:20, 200:10
**raised** [2] - 27:24, 43:13
**raising** [1] - 123:10
**rang** [1] - 53:9
**Rapid's** [1] - 16:9
**rate** [3] - 209:7, 209:8, 209:13
**rather** [1] - 58:16
**reaching** [1] - 82:21
**reaction** [1] - 85:4
**reactions** [1] - 200:9
**read** [16] - 20:17, 46:21, 82:24, 113:24, 118:6, 122:23, 122:25, 134:12, 134:24, 136:18, 136:25, 156:14, 174:10, 185:4, 207:1
**reading** [16] - 83:18, 84:4, 85:4, 87:25, 113:14, 113:16, 113:22, 115:12, 116:4, 118:4, 156:11, 156:13, 179:24, 180:3, 181:5, 184:25
**real** [1] - 41:25
**realizing** [1] - 65:12
**really** [5] - 70:10, 128:15, 159:23, 192:14, 197:9
**reargue** [1] - 90:10
**reason** [8] - 24:16, 60:2, 80:17, 91:19, 109:19, 119:20, 161:21, 163:12
**reasonable** [2] - 209:23, 212:18
**reasons** [4] - 66:23, 82:9, 153:7, 183:10
**receive** [3] - 120:6, 151:21, 193:7
**received** [58] - 18:21, 18:22, 21:3, 21:5, 22:15, 22:16, 25:17, 54:3, 54:10, 62:7, 63:14, 65:19, 71:22, 71:23, 81:20, 81:21, 84:25, 94:13, 94:20, 96:18, 96:19, 103:5, 103:6, 105:16, 105:17, 108:13, 108:14, 108:23, 112:20, 112:21, 117:10, 117:11, 117:19, 122:1, 122:2, 125:5, 125:6, 126:9, 126:12, 146:24, 149:11, 154:7, 154:8, 158:4, 158:5, 160:13, 160:14, 164:12, 165:13, 172:19, 173:4, 173:5, 176:11, 176:12, 180:19, 180:20, 182:15, 182:16
**receives** [2] - 162:16, 198:19
**receiving** [5] - 18:5, 30:10, 30:17, 116:19, 201:1
**recent** [1] - 182:21
**recently** [1] - 162:16
**recess** [6] - 86:7, 92:13, 169:18, 170:7, 218:7, 218:23
**recognize** [17] - 18:12, 22:6, 71:4, 81:2, 81:12, 102:21, 105:7, 108:6, 112:5, 112:12, 117:2, 121:19, 124:19, 153:22, 157:18, 193:22, 193:23
**recognized** [1] - 199:7
**recollection** [5] - 42:23, 46:6, 46:11, 46:20, 46:22
**recommend** [2] - 176:25, 179:6
**recommendation** [1] - 73:23
**record** [6] - 5:2, 51:15, 92:14, 92:16, 170:10, 170:12
**records** [7] - 5:8, 5:9, 6:3, 44:6, 46:5, 61:15, 83:3
**red** [11] - 27:24, 28:25, 45:15, 99:25, 100:16, 100:23, 128:6, 128:7, 135:5, 195:25, 197:11
**refer** [2] - 52:24, 204:13
**reference** [2] - 51:21, 60:14
**referenced** [1] - 83:13
**references** [1] - 66:19
**referred** [1] - 114:9
**referring** [4] - 77:25, 131:9, 133:6, 200:19
**refresh** [2] - 46:5, 46:11
**refreshes** [1] - 46:22
**refreshing** [1] - 46:20
**refused** [3] - 31:13, 72:18, 73:19
**Regarding** [2] - 100:8, 110:22
**regarding** [13] - 19:4, 19:8, 19:11, 19:24, 37:16, 82:9, 104:23, 113:17, 114:3, 146:23, 185:14, 211:24, 217:12
**registered** [1] - 57:22
**regulations** [3] - 10:24, 67:13, 210:13
**regulatory** [2] - 11:18, 11:22
**reissued** [2] - 192:7, 193:2
**reiterates** [1] - 114:18
**reiterating** [1] - 115:5
**related** [7] - 12:18, 90:20, 92:1, 104:24, 113:18, 113:21, 114:4
**relates** [1] - 90:18
**relating** [2] - 90:21, 185:15
**relation** [1] - 80:1
**relationship** [5] - 95:22, 96:1, 164:2, 164:20, 200:2
**relationships** [1] - 161:13
**relevance** [1] - 200:5
**Relevance** [1] - 209:9
**relevant** [9] - 45:12, 55:4, 90:17, 91:2, 98:16, 107:4, 107:7, 118:13, 191:16
**reliable** [1] - 66:22
**relief** [1] - 185:6
**relieved** [1] - 185:4
**reluctant** [1] - 194:12
**rely** [3] - 42:22, 88:10, 88:23
**remained** [1] - 56:5
**remember** [74] - 15:16, 19:6, 21:1, 21:12, 21:14, 23:19, 23:24, 25:5, 25:11, 28:3, 31:3, 47:2, 50:8, 70:22, 75:8, 75:23, 78:17, 78:20, 82:20, 83:18, 83:20, 84:4, 84:25, 86:7, 94:14, 94:21, 98:23, 101:6, 102:1, 102:3, 103:22, 106:12, 113:14, 113:16, 113:22, 114:22, 115:12, 116:4, 116:6, 116:12, 118:4, 130:3, 132:13, 147:21, 151:18, 156:11, 156:13, 163:7, 169:19, 171:25, 172:9, 179:24, 180:3, 181:5, 184:25, 200:21, 201:8, 202:20, 207:6, 211:9, 211:13, 211:18, 211:25, 212:2,

212:5, 213:4, 213:10, 214:11, 217:13, 217:19, 217:24, 218:2, 218:9
**remembered** [2] - 47:9, 47:11
**remind** [6] - 72:6, 79:5, 97:2, 156:21, 161:6, 183:5
**reminding** [1] - 212:22
**removing** [1] - 158:23
**reorganize** [1] - 6:24
**rep** [1] - 43:13
**repackagers** [1] - 75:11
**repeat** [2] - 38:14, 153:4
**repeating** [1] - 129:11
**repetitious** [1] - 23:10
**rephrase** [2] - 34:3, 188:24
**replacement** [1] - 13:5
**reply** [1] - 113:9
**report** [4] - 24:25, 25:9, 62:6, 121:11
**reported** [7] - 21:10, 21:15, 61:21, 62:20, 83:15, 154:18, 154:23
**REPORTED** [1] - 2:1
**reporter** [2] - 9:22, 207:1
**Reporter** [2] - 2:3, 219:9
**reports** [1] - 106:21
**represent** [5] - 10:25, 79:21, 109:14, 109:25, 158:20
**representation** [1] - 48:7
**represented** [1] - 13:24
**representing** [3] - 95:25, 201:17, 209:20
**reps** [2] - 42:16, 45:6
**request** [7] - 6:6, 7:6, 88:7, 89:12, 114:19, 115:5, 181:24
**requested** [1] - 73:19
**requesting** [2] - 84:10, 109:23
**requests** [1] - 177:17
**required** [5] - 29:17, 58:3, 58:14, 120:13, 198:16
**requirement** [4] - 21:17, 39:14, 47:12, 73:22
**requirements** [8] - 35:14, 41:4, 41:11, 70:23, 75:19, 80:4, 88:20
**rescheduled** [1] - 184:10
**resealed** [1] - 141:24
**reserve** [6] - 35:2, 35:8, 37:3, 39:16, 40:9, 89:12
**reserved** [1] - 91:6
**reserving** [2] - 30:6, 87:6
**respect** [1] - 200:4
**respond** [4] - 58:19, 95:2, 105:20, 158:25
**responded** [6] - 83:2, 129:13, 184:20, 185:8, 201:11, 201:14
**responding** [2] - 157:14, 174:25
**responds** [3] - 54:16, 168:20, 169:6
**response** [62] - 21:4, 21:8, 54:9, 54:22, 59:25, 60:5, 60:9, 60:17, 60:25, 61:8, 63:17, 63:25, 64:3, 74:4, 74:8, 75:8, 77:13, 98:23, 101:20, 103:9, 103:13, 104:4, 104:22, 105:24, 106:7, 108:8, 108:17, 112:13, 112:25, 119:4, 119:9, 119:12, 119:19, 120:2, 120:10, 120:17, 123:7, 133:15, 136:14, 136:23, 137:18, 137:21, 137:24, 142:10, 143:12, 143:18, 143:22, 144:15, 144:24, 145:2, 157:4, 162:22, 163:2, 163:21, 164:11, 164:15, 164:23, 179:19, 183:14, 184:6, 202:9
**responses** [3] - 78:14, 177:13, 183:16
**responsibility** [7] - 16:17, 16:18, 23:16, 119:21, 208:19, 208:20, 215:23
**responsible** [3] - 28:20, 194:19, 215:20
**rest** [1] - 55:22
**result** [1] - 25:4
**resume** [2] - 8:24, 218:13
**retract** [1] - 206:19
**return** [9] - 49:9, 55:12, 66:14, 67:3, 67:10, 69:13, 100:21, 131:22, 139:4
**returned** [2] - 65:24, 154:19
**returns** [1] - 50:13
**revealed** [1] - 110:7
**review** [13] - 6:23, 31:11, 62:6, 85:23, 130:3, 130:4, 149:20, 184:19, 185:7, 186:9, 193:9, 197:8, 199:13
**Review** [1] - 136:9
**reviewed** [2] - 197:8, 199:15
**reviewing** [1] - 130:16
**ripped** [1] - 70:12
**rise** [8] - 8:2, 86:15, 93:18, 169:23, 170:8, 171:11, 218:16, 218:24
**risk** [1] - 84:14
**risks** [2] - 68:23, 84:21
**Robertson** [1] - 158:10
**Rochester** [7] - 60:13, 61:2, 63:21, 64:21, 98:4, 98:11, 150:9
**role** [10] - 15:21, 15:24, 16:17, 23:23, 80:1, 85:18, 97:2, 102:7, 159:8, 172:3
**room** [2] - 86:11, 169:21
**roughly** [1] - 46:2
**RPR** [2] - 2:2, 219:9
**rule** [3] - 55:11, 189:12, 199:16
**rules** [6] - 10:24, 29:6, 185:19, 193:16, 199:11, 210:13
**rulings** [1] - 90:5
**RUMORE** [2] - 3:3, 9:17
**rumore** [1] - 169:25
**Rumore** [144] - 9:3, 9:23, 10:3, 10:18, 11:19, 12:19, 13:8, 13:16, 14:10, 15:15, 16:14, 18:4, 18:12, 18:25, 19:22, 21:3, 23:13, 24:3, 24:15, 25:16, 26:1, 26:21, 27:7, 27:14, 28:3, 28:12, 29:13, 30:9, 30:16, 31:3, 31:19, 32:18, 33:4, 33:14, 33:20, 33:22, 34:6, 34:21, 36:2, 37:7, 38:6, 38:17, 39:2, 39:19, 40:16, 40:20, 41:2, 42:7, 43:4, 44:4, 44:12, 44:24, 45:17, 45:24, 46:11, 47:14, 48:9, 48:11, 51:9, 52:21, 57:9, 58:22, 65:10, 68:9, 68:18, 69:1, 71:4, 71:13, 71:25, 72:3, 73:11, 78:17, 79:2, 80:6, 80:22, 81:2, 81:11, 84:25, 86:17, 93:15, 94:3, 94:11, 96:23, 99:22, 102:21, 103:8, 105:7, 105:19, 105:23, 106:23, 108:4, 108:6, 108:16, 111:10, 112:5, 112:23, 114:8, 116:18, 117:2, 117:13, 121:19, 122:4, 123:13, 124:10, 124:19, 125:17, 128:24, 130:16, 133:18, 134:19, 138:3, 140:17, 145:5, 145:21, 146:2, 151:6, 151:18, 153:5, 153:22, 159:14, 159:24, 171:8, 171:23, 174:24, 175:22, 176:15, 180:12, 180:23, 182:5, 182:20, 185:11, 185:14, 186:9, 186:20, 187:2, 188:11, 188:16, 191:6, 191:9, 193:5, 193:7, 199:18, 201:3, 218:18
**RX** [8] - 48:25, 49:5, 49:22, 49:23, 68:6, 68:19, 173:16

## S

**sacred** [1] - 208:19
**Safe** [159] - 5:12, 13:16, 14:3, 14:11, 14:16, 15:3, 15:16, 17:2, 17:21, 18:1, 21:4, 21:9, 21:14, 23:19, 24:2, 25:6, 26:7, 28:12, 29:9, 30:9, 33:22, 40:7, 42:12, 44:7, 55:5, 57:6, 60:20, 62:20, 65:20, 67:24, 68:8, 70:2, 70:18, 70:22, 71:7, 73:3, 75:16, 77:6, 77:8, 79:3, 79:7, 79:12, 79:18, 79:21, 80:16, 81:5, 82:1, 83:8, 84:7, 84:11, 85:14, 85:19, 85:24, 94:13, 95:23, 95:25, 97:3, 99:8, 99:14, 100:9, 102:12, 107:2, 107:7, 109:7, 109:22, 110:9, 110:15, 113:18, 114:5, 114:7, 114:19, 115:19, 116:13, 116:19, 118:24, 122:20, 123:1, 124:3, 126:23, 129:19, 129:24, 130:10, 130:17, 134:4, 137:15, 140:18, 149:6, 149:10, 151:16, 151:20, 152:8, 154:24, 155:19, 156:23, 157:22, 158:20, 158:22, 159:3, 159:9, 159:12, 159:15, 159:17, 159:25, 161:8, 162:11, 172:4, 173:17, 173:21, 174:25, 175:16, 176:16, 177:8, 177:25, 178:3, 178:7, 178:11, 179:13, 179:17, 181:20, 183:9, 183:16, 183:18, 185:15, 185:17, 186:10, 187:3, 188:13, 188:17, 188:20, 189:2, 190:6, 190:11, 191:12, 193:9, 193:15, 193:25, 194:9, 194:15, 194:18, 195:1, 195:11, 197:7, 198:19, 199:2,

199:10, 199:14, 200:24, 201:18, 203:1, 206:4, 206:14, 207:8, 207:15, 207:22, 208:5, 209:20, 215:21
**safe** [1] - 201:3
**safety** [5] - 11:18, 65:14, 66:1, 67:20, 68:23
**sale** [5] - 37:14, 37:15, 109:9, 193:17, 194:23
**sales** [7] - 42:16, 43:13, 45:6, 186:11, 188:17, 203:2, 214:23
**salespeople** [1] - 195:11
**salesperson's** [2] - 205:23, 205:24
**sample** [1] - 160:25
**satellite** [1] - 11:14
**saved** [1] - 136:12
**saw** [7] - 74:1, 83:6, 135:13, 179:9, 185:12, 201:14, 201:18
**scenario** [3] - 24:1, 76:22, 76:25
**scheduling** [1] - 8:20
**School** [1] - 10:12
**school** [1] - 203:20
**science** [2] - 204:9, 204:10
**Sciences** [5] - 59:6, 59:8, 59:10, 59:16, 154:17
**screen** [2] - 117:3, 190:3
**scroll** [5] - 103:8, 135:4, 135:8, 135:21, 138:15
**seal** [3] - 140:14, 140:16, 147:14
**sealed** [1] - 27:12
**seals** [2] - 156:7, 156:16
**searching** [1] - 49:13
**second** [36] - 5:11, 5:20, 6:5, 19:1, 22:17, 26:8, 36:5, 41:24, 43:6, 55:17, 57:9, 61:13, 64:10, 72:1, 73:11, 76:1, 82:3, 83:23, 83:24, 99:23, 109:5, 110:21, 120:5, 125:11, 143:2, 147:16, 150:5, 150:8, 150:16, 158:17, 177:5, 187:22, 191:11, 217:10, 217:22, 217:23
**secondary** [7] - 14:17, 14:19, 14:24, 15:10, 48:1, 85:6, 195:7
**secretary** [1] - 13:2
**Security** [8] - 29:18, 30:23, 41:8, 82:16, 82:22, 149:6, 155:20, 187:3
**SECURITY** [6] - 86:15, 93:18, 169:23, 170:8, 171:11, 218:16
**see** [517] - 17:3, 17:7, 19:1, 20:2, 20:7, 20:9, 20:12, 20:16, 20:19, 24:21, 25:8, 26:1, 26:14, 26:16, 26:19, 34:19, 35:11, 35:15, 35:16, 41:11, 43:6, 43:10, 44:12, 44:15, 48:11, 48:15, 48:18, 48:20, 48:24, 49:2, 49:4, 49:7, 49:9, 49:12, 49:16, 49:18, 49:25, 50:12, 51:9, 51:12, 51:14, 51:17, 51:19, 51:23, 52:3, 52:21, 52:24, 53:1, 53:4, 53:7, 53:12, 53:14, 53:18, 53:25, 54:5, 54:9, 54:12, 54:16, 54:20, 54:22, 54:25, 55:1, 55:18, 55:21, 56:3, 56:4, 56:9, 56:11, 56:15, 56:17, 56:24, 57:1, 57:11, 57:15, 57:19, 57:25, 58:2, 58:5, 58:7, 58:10, 58:12, 58:13, 58:17, 58:25, 59:3, 59:15, 59:20, 59:23, 59:25, 60:7, 60:8, 60:9, 60:11, 60:15, 60:17, 60:20, 60:21, 60:23, 60:25, 61:5, 61:8, 61:13, 61:17, 61:24, 62:1, 62:4, 62:8, 62:13, 63:3, 63:6, 63:10, 63:13, 63:18, 63:23, 63:25, 64:11, 64:14, 64:18, 64:20, 64:21, 65:2, 66:6, 66:9, 66:13, 66:14, 66:15, 66:18, 66:21, 66:24, 67:1, 67:7, 67:9, 67:12, 67:14, 67:16, 67:19, 67:22, 68:14, 69:4, 69:8, 69:11, 69:15, 69:20, 69:23, 71:15, 72:3, 72:10, 72:13, 72:16, 72:18, 72:20, 72:22, 72:25, 73:11, 73:13, 73:16, 73:20, 73:22, 74:8, 74:13, 75:6, 75:10, 75:14, 75:19, 76:13, 76:22, 77:5, 77:16, 78:9, 78:14, 82:3, 82:5, 82:8, 82:12, 82:14, 82:18, 83:1, 83:4, 83:16, 84:2, 84:6, 84:10, 84:14, 84:18, 84:20, 85:11, 86:14, 86:22, 96:6, 96:24, 97:4, 97:7, 97:13, 97:16, 97:22, 97:24, 98:3, 99:24, 100:8, 100:11, 100:16, 100:23, 101:20, 101:23, 103:8, 103:13, 103:16, 103:20, 104:4, 104:7, 104:8, 104:20, 104:22, 105:1, 105:24, 107:20, 107:22, 109:7, 109:12, 109:21, 111:1, 113:8, 113:12, 114:18, 115:4, 115:7, 115:10, 116:2, 117:15, 117:18, 117:22, 117:24, 118:2, 118:18, 119:5, 119:7, 119:12, 119:17, 119:20, 119:25, 120:5, 120:8, 120:10, 120:13, 120:17, 121:8, 121:10, 121:13, 122:11, 122:17, 122:21, 123:6, 123:9, 123:11, 124:21, 125:9, 125:11, 125:15, 126:5, 126:8, 126:10, 127:18, 127:22, 129:24, 131:9, 131:12, 131:19, 131:22, 132:4, 132:7, 132:9, 132:22, 132:24, 133:2, 133:4, 133:6, 133:18, 133:21, 134:10, 135:2, 135:4, 135:11, 135:25, 136:2, 136:8, 136:11, 136:14, 136:19, 136:21, 137:5, 137:12, 137:17, 137:24, 138:7, 138:10, 138:15, 138:18, 138:23, 139:8, 140:3, 140:6, 140:10, 140:24, 141:4, 141:17, 142:7, 142:10, 142:14, 142:16, 142:18, 142:23, 143:4, 143:6, 143:9, 143:12, 143:15, 143:17, 143:20, 143:22, 143:24, 144:10, 144:13, 144:15, 144:18, 144:24, 145:2, 145:11, 146:2, 146:5, 146:7, 146:9, 146:11, 146:13, 146:20, 147:5, 147:7, 147:13, 147:16, 147:18, 149:2, 149:5, 149:19, 149:22, 149:25, 150:7, 150:16, 150:18, 150:20, 154:13, 154:17, 154:21, 154:23, 155:1, 155:3, 155:8, 155:17, 155:21, 155:23, 156:3, 156:5, 156:9, 156:16, 158:9, 158:16, 158:22, 159:2, 159:6, 160:19, 160:22, 160:24, 161:19, 161:23, 161:25, 162:2, 162:10, 162:13, 162:19, 162:22, 162:25, 163:2, 163:4, 163:14, 163:20, 163:24, 164:1, 164:6, 164:9, 164:13, 164:15, 164:20, 164:23, 165:17, 165:25, 166:2, 166:3, 166:5, 166:14, 166:17, 166:18, 166:22, 166:24, 167:6, 167:9, 167:12, 167:17, 168:3, 168:9, 168:14, 168:17, 168:20, 169:21, 170:5, 172:16, 172:21, 173:9, 173:13, 173:16, 173:19, 173:21, 174:1, 174:7, 174:8, 174:12, 174:16, 174:19, 176:3, 176:22, 176:25, 177:3, 177:5, 177:7, 177:11, 177:19, 177:22, 177:24, 178:3, 178:5, 178:7, 178:9, 178:11, 178:14, 178:23, 178:25, 179:6, 179:19, 179:22, 180:23, 181:3, 182:5, 182:8, 182:20, 183:2, 183:8, 183:12, 184:6, 184:9, 184:12, 184:14, 184:17, 184:19, 184:23, 186:20, 187:2, 187:5, 187:7, 187:10, 187:14, 187:16, 187:20, 187:23, 188:8, 188:11, 190:6, 190:11, 190:14, 190:17, 190:21, 191:1, 192:2, 192:5, 192:8, 192:10, 192:13, 192:16, 194:3, 194:6, 194:11, 195:15, 195:18, 195:21, 196:5, 196:7, 196:9, 196:12, 196:15, 196:17, 196:21, 196:25, 197:16, 197:21, 198:6, 198:13, 198:16, 199:2, 208:7, 208:14, 217:17, 218:14, 218:20
**seeing** [4] - 21:1, 102:1, 155:14, 201:10
**seek** [1] - 82:10
**seeking** [3] - 101:4, 101:8, 162:4
**seem** [2] - 140:12, 167:16

**seized** [1] - 5:12
**sell** [11] - 40:4, 49:5, 55:8, 55:12, 55:13, 55:14, 57:21, 65:15, 72:23, 77:6
**selling** [16] - 15:13, 15:18, 17:7, 42:16, 44:7, 84:21, 85:15, 85:19, 148:13, 161:7, 161:14, 189:12, 189:14, 195:1, 203:12, 203:15
**Selzentry** [3] - 126:9, 127:5, 127:11
**send** [8] - 20:3, 108:19, 125:22, 131:23, 139:13, 174:24, 175:3, 175:20
**sending** [9] - 97:4, 98:23, 98:25, 119:22, 149:14, 150:23, 162:4, 162:5, 173:13
**senior** [3] - 204:19, 204:21, 210:2
**sense** [1] - 189:17
**sent** [33] - 21:21, 41:4, 42:8, 42:10, 55:25, 57:1, 57:5, 67:23, 67:24, 68:19, 71:15, 78:18, 79:17, 98:12, 100:21, 106:17, 108:8, 112:14, 112:25, 113:1, 116:12, 147:7, 147:19, 149:23, 154:15, 165:23, 174:13, 179:12, 181:19, 186:10, 188:17, 189:3
**sentence** [7] - 20:17, 24:22, 61:13, 83:6, 100:2, 103:16, 115:7
**separate** [4] - 130:11, 134:1, 152:11, 154:19
**September** [11] - 1:5, 130:25, 131:3, 142:18, 144:1, 145:6, 147:19, 192:18, 192:20
**series** [2] - 79:17, 91:11
**seriously** [1] - 84:15
**Seroquel** [17] - 27:18, 27:22, 103:18, 103:23, 104:8, 104:24, 106:3, 122:20, 123:2, 123:13, 136:2, 217:9, 217:12, 217:17, 217:20, 217:25
**set** [1] - 66:14
**setback** [1] - 67:5
**several** [6] - 11:15, 130:1, 172:12, 174:13, 183:10, 183:15
**shall** [1] - 41:14
**share** [8] - 43:12, 45:9, 61:21, 107:25, 114:23, 123:17, 180:5, 185:2
**shared** [6] - 41:21, 45:6, 56:11, 110:9, 123:17, 184:7
**sharing** [1] - 115:1
**ship** [1] - 190:12
**shipment** [1] - 30:18
**shipped** [3] - 20:16, 20:24, 21:23
**shipping** [1] - 70:2
**shook** [1] - 140:15
**Shoppe** [1] - 122:18
**shortly** [1] - 170:17
**show** [85] - 18:9, 22:2, 25:24, 33:20, 33:23, 34:6, 34:9, 35:21, 36:2, 36:7, 40:16, 40:20, 43:1, 44:9, 44:10, 48:9, 51:5, 52:18, 55:15, 55:16, 57:7, 57:9, 57:14, 58:22, 59:19, 61:7, 62:24, 62:25, 64:8, 66:3, 68:10, 68:15, 69:1, 70:1, 71:1, 80:22, 96:2, 102:17, 105:4, 105:22, 107:18, 108:4, 109:5, 112:2, 112:23, 113:7, 114:17, 116:22, 119:3, 121:16, 122:9, 124:16, 126:3, 127:13, 131:6, 132:19, 134:19, 139:22, 145:21, 146:20, 148:21, 153:19, 157:16, 160:4, 162:7, 165:15, 168:1, 168:6, 172:14, 172:15, 175:22, 176:2, 180:8, 182:1, 186:15, 186:16, 188:13, 191:9, 191:10, 191:12, 191:23, 193:5, 193:13, 196:3, 197:14
**showed** [3] - 46:5, 68:13, 83:7
**showing** [3] - 55:6, 140:24, 212:24
**shown** [4] - 55:2, 145:5, 145:9, 185:12
**shows** [1] - 168:3
**shut** [1] - 189:21
**sidebar** [1] - 24:12
**sign** [1] - 39:15
**signage** [2] - 35:14, 39:6
**similar** [2] - 83:6, 107:9
**simple** [2] - 203:17, 210:8
**simply** [3] - 87:22, 113:19, 115:8
**single** [2] - 11:14, 189:17
**situation** [6] - 25:3, 25:9, 26:22, 27:1, 90:11, 110:6
**six** [2] - 8:12, 75:21
**size** [1] - 205:15
**skip** [1] - 68:14
**slip** [1] - 160:25
**small** [3] - 14:17, 48:1, 189:15
**smaller** [2] - 14:22, 15:1
**smeared** [2] - 128:5, 128:9
**smudge** [1] - 70:8
**smudged** [2] - 45:15, 135:19
**smudges** [1] - 135:18
**sold** [16] - 15:4, 35:19, 44:18, 60:13, 77:8, 97:11, 114:19, 150:7, 150:12, 187:7, 187:11, 187:17, 187:24, 195:12, 196:18
**Solutions** [5] - 13:17, 84:7, 154:25, 173:17, 199:2
**solves** [1] - 166:1
**somber** [1] - 58:16
**someone** [18] - 32:3, 49:4, 51:10, 52:22, 54:12, 61:8, 66:9, 97:14, 132:24, 145:3, 149:13, 150:24, 157:8, 162:10, 162:15, 179:13, 192:3, 192:14
**sometime** [1] - 37:9
**sometimes** [7] - 15:7, 15:8, 137:1, 189:23, 200:11, 200:12, 214:24
**somewhere** [2] - 21:9, 56:21
**soon** [2] - 50:13, 131:23
**SOPs** [14] - 28:24, 29:2, 29:9, 29:11, 30:22, 31:4, 31:11, 77:25, 78:4, 124:8, 130:4, 130:17, 197:9, 199:13
**sorry** [16] - 20:17, 54:14, 67:5, 71:13, 78:6, 100:6, 101:14, 129:11, 131:17, 134:22, 145:6, 145:22, 158:11, 164:19, 178:1, 198:2
**sort** [7] - 15:17, 16:19, 23:4, 85:13, 87:22, 88:2, 88:10
**sorts** [4] - 12:17, 12:18, 13:5, 129:19
**sound** [2] - 176:18, 209:23
**sounded** [1] - 53:9
**sounds** [1] - 50:15
**source** [14] - 30:25, 50:20, 52:13, 77:9, 84:7, 85:14, 107:12, 107:15, 114:19, 114:23, 115:1, 128:8, 128:11, 196:13
**sourced** [1] - 67:3
**sources** [4] - 15:19, 85:19, 85:24, 102:10
**sourcing** [3] - 35:12, 51:1, 129:20
**south** [1] - 8:12
**Southern** [1] - 219:10
**SOUTHERN** [1] - 1:1
**space** [1] - 35:14
**speaking** [1] - 171:23
**speaks** [2] - 73:8, 76:16
**specialized** [1] - 204:24
**specific** [3] - 99:14, 162:23, 199:16
**specifically** [2] - 110:16, 197:12
**specifics** [1] - 19:25
**speculate** [2] - 161:3, 209:21
**spell** [1] - 9:21
**spelled** [1] - 28:24
**spend** [4] - 31:14, 130:5, 130:8, 209:19
**spent** [1] - 199:22
**spoken** [5] - 95:17, 160:2, 211:15, 213:6, 214:13
**spot** [3] - 86:2, 169:13, 218:4
**spots** [1] - 69:24
**St** [2] - 12:1, 12:3
**stack** [1] - 187:20
**Stain** [2] - 48:24, 49:22
**standard** [9] - 28:14, 28:17, 28:18, 29:3, 129:24, 190:22, 193:8, 193:9, 199:6
**Standard** [1] - 197:16
**start** [18] - 18:4, 18:8, 52:20, 57:15, 58:23, 66:4, 76:21, 81:23, 82:4, 95:23, 96:23, 112:23, 134:22, 158:7, 162:1, 173:7, 182:18, 200:13
**started** [6] - 11:6, 14:2, 15:15, 129:21, 157:10, 206:14
**starting** [3] - 57:15, 70:21, 177:11
**starts** [9] - 20:2, 24:22, 74:4, 99:2, 109:2, 119:4, 119:19, 155:17, 163:22
**state** [1] - 9:21
**State** [2] - 55:10, 67:13
**statement** [12] - 21:24, 30:2, 41:18, 74:22, 74:23, 181:21, 181:23, 183:24, 190:5, 190:23, 193:20, 206:22
**Statement** [1] - 198:14
**statements** [8] - 5:22, 6:7, 6:8, 9:11, 19:18, 113:3, 121:3, 121:4
**states** [2] - 14:23, 55:9
**STATES** [3] - 1:1, 1:4, 1:10
**States** [4] - 1:14, 2:4, 148:14, 219:10
**statin** [1] - 131:3
**statute** [2] - 41:10, 42:6

**STENOGRAPHICAL LY** [1] - 2:1
**still** [11] - 12:19, 60:2, 72:23, 93:16, 150:3, 152:7, 153:7, 156:23, 159:8, 161:16, 171:8
**stipulation** [4] - 5:9, 5:12, 5:22, 6:3
**stock** [1] - 189:18
**stood** [1] - 13:3
**stop** [5] - 175:7, 175:8, 175:9, 175:10
**stopped** [1] - 13:25
**storage** [1] - 153:14
**stored** [3] - 56:19, 56:20, 153:12
**stores** [2] - 34:22, 57:22
**story** [1] - 189:25
**strategy** [1] - 178:11
**stream** [1] - 158:24
**streamline** [1] - 5:15
**Street** [2] - 1:15, 1:19
**Stribild** [3] - 118:11, 123:16, 123:24
**stricken** [1] - 88:21
**strike** [3] - 7:5, 89:13, 118:23
**strikes** [1] - 84:17
**strongly** [1] - 200:11
**structure** [1] - 215:20
**stuff** [4] - 54:23, 74:14, 87:16, 121:2
**subject** [6] - 7:5, 7:6, 9:6, 89:16, 131:13, 166:5
**submit** [1] - 61:23
**subsection** [2] - 190:10, 193:13
**Subsection** [1] - 195:15
**substance** [3] - 71:14, 71:25, 87:19
**successful** [1] - 48:17
**sue** [1] - 18:2
**sued** [2] - 79:7, 80:5
**suggest** [1] - 215:22
**suggestions** [1] - 25:18
**suggestive** [3] - 30:13, 31:8, 34:15
**suing** [1] - 159:14
**summer** [8] - 14:3, 15:16, 16:2, 17:21, 22:23, 211:18, 211:23, 213:7
**Sunday** [1] - 170:21
**supervisor** [2] - 72:7, 157:22
**supplied** [1] - 199:3
**supplier** [32] - 16:3, 16:7, 16:10, 27:10, 28:5, 28:6, 28:10, 31:25, 32:7, 33:15, 34:12, 40:15, 44:5, 45:14, 45:18, 47:3, 47:20, 47:24, 51:24, 73:19, 77:2, 111:14, 127:2, 148:5, 148:7, 148:11, 151:20, 152:8, 162:16, 191:14
**suppliers** [12] - 15:22, 15:25, 16:15, 16:24, 31:20, 67:4, 76:2, 85:18, 102:8, 124:7, 137:15, 160:1
**supply** [5] - 23:17, 27:10, 60:21, 115:9, 127:2
**Supply** [8] - 29:18, 30:23, 41:8, 82:16, 82:22, 149:6, 155:19, 187:3
**supplying** [1] - 66:22
**support** [2] - 54:1, 63:11
**supposed** [4] - 45:19, 45:20, 47:4, 90:24
**supposedly** [1] - 89:9
**surprised** [6] - 122:23, 122:25, 155:3, 155:8, 156:17, 206:16
**suspect** [7] - 77:19, 154:24, 190:12, 196:10, 196:14, 196:19, 197:11
**suspected** [1] - 196:13
**suspicious** [2] - 69:6, 151:19
**sustain** [2] - 23:11, 95:14
**sustained** [14] - 19:16, 30:14, 31:1, 33:8, 33:12, 45:22, 73:9, 76:17, 130:14, 151:11, 200:7, 207:13, 212:12, 213:16
**sworn** [1] - 9:18
**Symtuza** [4] - 128:25, 129:2, 133:6, 134:13
**Synergy** [17] - 16:12, 160:24, 161:21, 163:4, 163:7, 164:2, 164:11, 164:21, 165:7, 165:9, 166:6, 167:24, 168:8, 168:20, 169:2, 169:10, 171:24
**system** [1] - 49:24

**T**

**T1** [2] - 74:18, 74:19
**T2** [2] - 74:18, 74:20
**T3** [67] - 29:13, 29:22, 39:21, 40:1, 40:3, 40:5, 40:15, 42:18, 43:25, 45:19, 47:4, 50:5, 53:2, 54:4, 57:23, 60:12, 61:1, 63:14, 64:15, 65:11, 70:23, 71:9, 72:14, 73:14, 74:14, 74:18, 74:22, 74:24, 74:25, 75:2, 75:13, 75:19, 75:21, 76:5, 77:14, 80:4, 97:19, 98:4, 100:10, 101:24, 102:9, 109:23, 113:18, 113:20, 114:4, 114:6, 149:11, 149:14, 149:25, 150:24, 152:9, 153:6, 153:8, 153:9, 153:11, 153:12, 153:14, 160:25, 163:15, 164:10, 165:7, 168:24, 187:5, 188:16, 190:6
**T3's** [1] - 113:19
**T3s** [20] - 30:10, 30:17, 43:19, 48:16, 54:2, 124:9, 129:21, 162:18, 185:19, 186:10, 188:13, 197:24, 202:18, 205:6, 205:7, 205:12, 205:14, 205:21, 215:6, 215:17
**T3s3** [1] - 189:3
**tablets** [7] - 84:1, 115:25, 122:20, 123:2, 140:13, 156:1, 156:2
**tabs** [1] - 117:25
**tampered** [4] - 140:11, 141:24, 156:7, 156:17
**taught** [2] - 11:22
**teach** [1] - 11:21
**team** [3] - 20:4, 73:14, 82:6
**Teams** [1] - 26:1
**ten** [4] - 169:18, 169:21, 170:5, 170:7
**ten-minute** [1] - 169:18
**term** [3] - 6:16, 80:6, 80:9
**tertiary** [3] - 14:17, 14:19, 48:1
**testified** [3] - 9:19, 188:22, 217:14
**testifies** [1] - 89:16
**testify** [5] - 46:23, 87:8, 88:17, 94:4, 153:2
**testifying** [8] - 87:7, 87:14, 87:17, 87:23, 88:16, 88:18, 207:12, 208:8
**testimony** [21] - 8:22, 8:23, 8:24, 86:18, 87:14, 88:5, 88:6, 88:8, 94:5, 94:6, 147:21, 151:19, 170:1, 172:6, 206:21, 212:23, 218:19
**testing** [1] - 106:20
**Tex** [1] - 16:9
**text** [12] - 99:25, 100:16, 100:18, 100:23, 113:9, 138:3, 138:5, 140:7, 144:10, 146:2, 149:2
**that..** [1] - 90:1
**THE** [153] - 1:10, 1:13, 5:2, 6:1, 6:9, 6:13, 7:2, 7:4, 7:15, 7:17, 7:23, 8:2, 8:4, 8:8, 8:19, 8:23, 9:7, 9:11, 9:20, 9:23, 18:21, 19:16, 19:19, 22:15, 23:10, 24:13, 30:7, 30:14, 31:1, 31:9, 32:5, 32:16, 32:25, 33:8, 33:12, 34:3, 34:16, 35:3, 35:9, 36:19, 36:25, 37:5, 38:3, 38:12, 38:14, 38:25, 39:11, 39:17, 40:11, 40:24, 42:22, 43:17, 43:19, 43:21, 43:24, 44:1, 44:2, 45:22, 46:9, 46:21, 71:22, 73:9, 76:17, 81:20, 86:2, 86:6, 86:17, 86:21, 86:22, 86:23, 86:24, 87:2, 87:4, 87:11, 87:16, 88:3, 88:14, 88:22, 89:18, 90:4, 90:7, 90:14, 91:2, 91:7, 91:15, 92:3, 92:11, 92:13, 92:16, 92:23, 93:2, 93:5, 93:12, 93:15, 93:17, 93:20, 93:25, 95:14, 96:18, 99:15, 99:17, 103:5, 105:16, 108:13, 111:21, 112:20, 117:10, 122:1, 125:5, 130:14, 145:23, 151:11, 153:1, 154:7, 158:4, 160:13, 169:13, 169:17, 169:25, 170:4, 170:5, 170:12, 170:22, 170:24, 171:2, 171:6, 171:9, 171:12, 171:17, 173:4, 176:11, 180:19, 182:15, 185:21, 188:24, 195:5, 200:7, 202:1, 202:4, 206:23, 207:13, 208:1, 208:11, 209:11, 212:12, 212:20, 213:16, 215:9, 218:4, 218:7, 218:18, 218:22, 218:24
**there..** [1] - 71:11
**therefore** [3] - 61:19, 94:4, 125:22
**Thereupon** [1] - 9:16
**They've** [1] - 63:13
**thick** [1] - 187:20
**thinking** [2] - 27:9, 123:22
**third** [9] - 23:14, 30:2, 66:18, 72:1, 97:24, 114:18, 122:9, 155:23, 217:10
**thorough** [1] - 186:9
**thousands** [2] - 188:18, 189:3
**thread** [6] - 138:3, 138:5, 144:10, 146:2, 149:3, 180:13
**threatened** [1] - 18:2
**three** [10] - 29:23, 53:16, 63:7, 97:8, 97:18, 146:22, 154:18, 156:5, 156:6, 202:17
**throughout** [2] - 145:17, 148:14
**tied** [1] - 7:6
**time-out** [1] - 217:7

**timely** [2] - 194:14, 196:10
**timing** [2] - 184:20, 185:7
**titled** [1] - 115:22
**Tivicay** [2] - 131:13, 131:20
**today** [19] - 7:1, 7:25, 75:1, 86:12, 147:1, 174:20, 184:16, 185:12, 199:22, 201:4, 201:10, 201:12, 201:15, 201:19, 207:10, 209:8, 209:13, 213:4, 217:24
**together** [2] - 159:22, 186:25
**tomorrow** [2] - 78:10, 168:15
**tone** [1] - 129:16
**took** [1] - 45:21
**top** [25] - 56:2, 57:11, 59:15, 105:23, 107:20, 131:12, 135:18, 136:12, 137:24, 140:3, 140:14, 141:16, 143:4, 144:11, 146:6, 146:7, 149:5, 155:21, 160:18, 168:3, 174:7, 180:23, 184:6, 192:5, 197:19
**touch** [1] - 64:20
**towards** [6] - 23:14, 24:21, 61:8, 115:23, 200:3, 200:6
**town** [1] - 5:17
**traced** [1] - 152:16
**tracing** [1] - 197:17
**Tracing** [1] - 197:22
**trademark** [2] - 79:14
**trademarks** [1] - 10:20
**trading** [9] - 106:11, 111:8, 111:23, 161:17, 194:4, 194:12, 196:7, 196:17, 199:3
**Trading** [1] - 196:21
**traditionally** [3] - 202:25, 205:13, 205:19
**trail** [1] - 51:24
**train** [1] - 13:5
**Transaction** [1] - 198:14
**transaction** [30] - 29:24, 29:25, 41:16, 41:17, 41:18, 51:16, 61:2, 61:14, 72:14, 72:23, 73:4, 73:15, 74:21, 74:25, 76:14, 98:4, 98:10, 162:24, 164:3, 187:5, 190:4, 190:15, 190:22, 194:5, 194:12, 196:23, 198:7, 199:3, 199:11
**transactions** [8] - 53:2, 54:2, 63:11, 71:9, 78:22, 152:15, 196:14, 196:18
**TRANSCRIPT** [1] - 1:9
**transcription** [1] - 219:5
**transfer** [1] - 56:4
**transferring** [1] - 198:17
**transparent** [1] - 115:20
**travel** [1] - 170:20
**traveling** [1] - 5:17
**treated** [2] - 61:20, 83:14
**treatment** [1] - 132:10
**TRIAL** [1] - 1:9
**Trial** [1] - 218:25
**trial** [1] - 130:11
**tried** [4] - 13:2, 49:13, 50:5, 72:14
**true** [14] - 90:1, 109:14, 109:25, 110:11, 111:4, 111:11, 165:10, 175:14, 181:21, 183:19, 193:18, 194:24, 207:11, 211:16
**truly** [1] - 67:5
**trusting** [1] - 80:19
**truth** [6] - 5:24, 6:8, 9:13, 211:15, 213:6, 214:13
**truthfulness** [1] - 152:21
**try** [2] - 101:14, 164:19
**trying** [4] - 50:23, 64:20, 65:11, 101:10
**TS** [1] - 190:22
**turn** [8] - 8:17, 63:16, 76:19, 99:22, 103:12, 104:2, 109:1, 190:2
**Two** [1] - 97:13
**two** [23] - 12:2, 27:24, 28:1, 50:13, 50:14, 50:22, 72:10, 82:8, 110:22, 130:11, 130:12, 141:4, 144:7, 147:13, 150:13, 182:21, 189:25, 200:15, 204:15, 208:7, 208:14, 209:20, 210:1
**TX** [5] - 74:13, 74:14, 74:17, 74:18, 74:20
**type** [10] - 10:15, 11:21, 12:13, 13:12, 16:14, 29:1, 35:17, 74:25, 192:19, 204:25
**types** [7] - 10:24, 10:25, 15:4, 16:15, 121:3, 121:4, 124:9
**typical** [1] - 17:15

## U

**U.S** [1] - 219:11
**unauthorized** [1] - 178:8
**unclear** [2] - 76:22, 76:25
**under** [27] - 26:12, 28:13, 29:8, 29:10, 29:17, 90:14, 93:16, 101:6, 113:7, 124:11, 135:5, 152:14, 171:8, 173:22, 174:14, 175:1, 175:13, 175:16, 175:18, 179:13, 179:16, 181:20, 190:14, 197:21, 198:13, 199:2
**undermined** [1] - 158:24
**understandable** [1] - 28:1
**understood** [2] - 21:21, 21:22
**unfit** [3] - 120:15, 120:24, 121:1
**UNITED** [3] - 1:1, 1:4, 1:10
**United** [4] - 1:14, 2:4, 148:14, 219:10
**University** [3] - 10:11, 12:1, 12:3
**unless** [7] - 26:16, 34:3, 41:15, 75:12, 89:16, 166:1
**unlike** [1] - 123:16
**unlikely** [1] - 26:17
**unsafe** [3] - 68:21, 69:8, 178:13
**up** [49] - 7:6, 9:6, 13:3, 26:18, 26:23, 38:10, 43:18, 53:8, 54:22, 57:1, 60:9, 62:1, 67:22, 70:13, 71:15, 74:3, 82:9, 86:24, 90:23, 115:1, 118:10, 118:11, 119:15, 123:23, 127:8, 134:23, 135:8, 147:10, 155:10, 155:11, 158:18, 159:14, 163:15, 164:23, 170:17, 179:19, 186:23, 191:19, 191:20, 192:15, 193:8, 196:8, 206:4, 207:17, 210:18, 210:25, 211:5, 213:17
**up-and-up** [1] - 192:15
**upsetting** [1] - 179:15
**ut's** [1] - 204:14

## V

**vague** [2] - 195:3, 215:7
**variable** [1] - 60:4
**varies** [1] - 11:2
**various** [5] - 11:7, 66:23, 68:2, 172:7, 200:24
**vary** [1] - 24:3
**VAWD** [1] - 173:21
**vendor** [2] - 49:10, 164:11
**vendors** [12] - 60:12, 66:22, 101:25, 102:4, 102:6, 102:8, 102:15, 125:13, 172:4, 202:19, 215:5, 215:17
**vendors'** [2] - 107:22, 108:1
**veracity** [2] - 113:20, 114:6
**verification** [4] - 55:23, 59:21, 109:23, 205:14
**verified** [3] - 40:4, 97:22, 124:9
**verify** [31] - 48:16, 48:24, 49:19, 50:5, 50:23, 53:1, 60:21, 61:1, 64:21, 65:11, 72:14, 72:22, 73:14, 76:12, 82:16, 82:21, 97:14, 97:19, 98:4, 98:10, 100:10, 101:10, 153:12, 162:14, 162:24, 164:10, 202:18, 205:6, 205:7, 205:20
**verifying** [2] - 60:12, 205:11
**Verizon** [1] - 5:8
**versus** [2] - 24:9, 27:10
**vetting** [4] - 52:14, 124:6, 124:8, 129:21
**via** [1] - 61:21
**ViiV** [2] - 127:25, 133:25
**violating** [2] - 41:21, 42:6
**violation** [1] - 79:14
**virtue** [1] - 210:8
**visual** [1] - 155:24
**voicemail** [1] - 48:22
**voided** [3] - 192:7, 193:1, 193:3
**Volume** [1] - 1:7
**volunteer** [1] - 43:23
**vouching** [1] - 74:23
**vs** [1] - 1:5

## W

**waiting** [1] - 63:19
**waits** [1] - 57:21
**waive** [3] - 8:5, 93:21, 171:13
**wants** [1] - 170:24
**warehouse** [3] - 202:25, 203:2, 211:11
**warned** [4] - 41:25, 42:4, 185:18, 186:1
**warning** [1] - 42:8
**warrant** [1] - 25:4
**web** [2] - 53:20, 167:13
**website** [1] - 49:14
**Wednesday** [1] - 184:10
**week** [3] - 27:5, 46:2, 92:25
**weekend** [2] - 218:8, 218:14
**weekends** [1] - 11:15
**weeks** [1] - 146:22
**weighed** [1] - 141:7
**weighs** [2] - 140:13, 140:24
**well-known** [1] - 14:25
**Wellness** [5] - 187:11, 187:16, 188:4, 188:8, 189:4

**whatsoever** [1] - 215:22
**White** [7] - 20:18, 83:25, 97:10, 100:20, 103:17, 114:20, 210:22
**whole** [4] - 20:17, 40:9, 116:11, 123:25
**wholesale** [6] - 41:14, 57:22, 64:16, 75:16, 210:5, 210:12
**Wholesale** [1] - 75:10
**Wholesaler** [1] - 188:2
**wholesaler** [47] - 14:17, 14:18, 14:20, 14:25, 15:5, 15:9, 15:11, 16:15, 16:18, 16:22, 23:23, 24:1, 24:4, 24:9, 25:5, 25:9, 28:18, 34:20, 35:13, 35:16, 39:14, 40:2, 41:4, 47:12, 48:2, 48:21, 55:12, 55:13, 55:14, 58:14, 106:22, 120:25, 173:17, 173:22, 187:25, 188:23, 189:14, 189:24, 195:7, 205:8, 205:9, 205:11, 205:16, 205:20, 210:11
**wholesaler's** [1] - 188:3
**wholesaler-distributor** [1] - 41:4
**wholesalers** [11] - 10:24, 14:21, 14:22, 14:23, 23:17, 49:6, 55:8, 55:9, 161:12, 161:15, 214:8
**Wholesalers** [2] - 163:5, 164:2
**WILLIAM** [1] - 1:10
**William** [2] - 1:17, 2:3
**willing** [1] - 42:17
**willingness** [1] - 158:23
**Wireless** [1] - 5:8
**WITNESS** [13] - 3:2, 9:20, 9:23, 38:14, 43:19, 43:24, 44:2, 86:21, 86:23, 93:17, 99:17, 170:4, 171:9
**witness** [53] - 5:17, 8:17, 9:1, 18:10, 22:3, 30:24, 43:1, 46:8, 68:16, 71:2, 80:23, 81:9, 87:1, 87:3, 87:5, 87:6, 87:7, 87:9, 87:10, 87:14, 91:10, 91:14, 91:17, 91:22, 92:2, 92:22, 92:25, 93:3, 95:12, 96:3, 102:18, 105:4, 112:3, 112:10, 116:23, 121:17, 124:17, 130:12, 132:20, 153:20, 157:17, 160:5, 170:18, 170:20, 172:15, 172:16, 175:23, 180:9, 182:2, 201:25, 202:2, 208:10, 212:17
**Witness** [2] - 93:14, 218:21
**witness's** [1] - 8:24
**women** [1] - 200:15
**wonder** [1] - 42:10
**word** [6] - 64:7, 135:5, 137:20, 137:21, 155:14, 156:22
**words** [3] - 196:24, 200:21, 208:15
**works** [1] - 122:13
**world** [1] - 203:12
**worms** [2] - 120:23, 121:8
**worth** [1] - 148:10
**wrapping** [1] - 170:17
**write** [2] - 23:1, 157:4
**writing** [5] - 82:8, 100:18, 100:25, 154:18, 159:21
**written** [2] - 85:2, 120:6
**wrote** [7] - 22:21, 22:25, 23:15, 101:15, 109:3, 110:10, 111:10
**WTF** [3] - 64:7, 136:21, 143:15

## X

**XR** [1] - 26:10

## Y

**year** [4] - 65:4, 209:3, 209:19, 211:16
**years** [5] - 11:14, 12:2, 13:23, 69:12, 75:21
**yes-or-no** [1] - 89:23
**Yesterday** [1] - 117:18
**yesterday** [1] - 118:15
**Yolanda** [1] - 13:2
**York** [13] - 10:6, 10:11, 53:19, 53:24, 55:10, 55:11, 170:20, 171:2, 187:13, 188:19, 189:5, 192:6
**yourself** [2] - 66:21, 74:8
**Yup** [1] - 142:11

## Z

**zealous** [7] - 80:7, 80:14, 129:16, 156:22, 156:23, 157:1, 159:9
**ZIMET** [77] - 6:2, 6:11, 6:14, 7:14, 7:16, 7:21, 8:6, 9:9, 18:19, 19:13, 22:13, 23:7, 24:11, 30:6, 30:12, 30:24, 31:7, 32:4, 32:13, 34:14, 35:2, 35:6, 35:8, 36:15, 36:23, 37:24, 38:1, 38:8, 38:22, 39:10, 39:16, 40:9, 42:20, 43:15, 45:20, 46:16, 46:18, 46:20, 71:20, 73:5, 73:7, 76:15, 81:17, 87:1, 87:5, 88:15, 89:1, 90:3, 90:6, 90:10, 90:18, 91:6, 92:9, 93:8, 93:13, 93:24, 95:9, 95:11, 96:16, 103:3, 105:14, 108:11, 111:20, 112:18, 117:8, 121:24, 125:3, 154:5, 158:3, 160:11, 171:4, 171:14, 173:2, 176:9, 180:17, 182:13, 185:20
**Zimet** [4] - 1:21, 6:1, 86:25, 88:14
**zoom** [6] - 64:24, 100:3, 134:24, 143:10, 147:11, 195:14
**Zoom** [1] - 7:25