UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-205500 Dimitrouleas/Hunt

UNITED STATES OF AMERICA, | Fort Lauderdale, Florida
| September 29, 2025
vs. | 1:01 PM - 5:03 PM
PATRICK BOYD and CHARLES BOYD, | Volume VI
Defendants. | Pages 1 to 185

---

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: Alexander Pogozelski, Esquire
Jacqueline DerOvanesian, Esquire
Assistant United States Attorneys
99 NE 4th Street
Miami, Florida 33132

FOR DEFENDANT PATRICK BOYD: William Barzee, Esquire
Ivlis Mantilla, Esquire
Barzee Flores
40 NW 3rd Street Ph 1
Miami, Florida 33128

FOR DEFENDANT CHARLES BOYD: Bruce Zimet, Esquire
633 S. Federal Highway Fl 6
Fort Lauderdale, Florida 33301

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

(Call to the Order of the Court:)

THE COURT: Back on the record.

Counsel are present. The defendants are present.

We got a note from a juror. I guess she emailed the note to us and also handwrote it and brought it in today.

MR. ZIMET: Judge, do you know which juror that is, number-wise?

THE COURT: She was 65 on the list.

THE COURTROOM DEPUTY: Hold on one second, Judge.

I'm pulling up the sheet. I can probably help. Hold on one second.

THE COURT: She might be 12. Batille and Olsen are alternates? Batille and Olsen are alternates, and she's number 12, which would be the third one from the left in the back row.

THE COURTROOM DEPUTY: She's 12.

MR. POGOZELSKI: And this is the second note from her, similar to this; is that right?

THE COURT: Right.

MR. POGOZELSKI: I mean, I --

MR. ZIMET: Could we just discuss it with our clients?

THE COURT: Sure.

(Pause in proceedings.)

THE COURT: So what's the parties' position on Ms. Montana's situation?

MR. POGOZELSKI: Your Honor, this is a difficult situation. I would -- the Government would defer to the Court on the Court's preference for this juror.

MR. ZIMET: And, Judge, actually, we agree with the Government. We don't have underlying substantiation. I'm not saying what she's saying is inaccurate. It's just -- it's a call for the Court to make, we think.

THE COURT: Well, Crystal tells me she's back in the jury room crying, and I'm concerned that's going to affect the other jurors.

I'm concerned about her saying that her mind isn't focused on the case. I mean, I can tell her just do the best she can and keep her on the jury, and hope we don't have a medical breakdown here that's going to affect the rest of the jurors and then we get closer to the end of the case, maybe release her; and I can release her now and move up Ms. Batille.

MR. ZIMET: Judge, our position, if you release her, we would not be objecting to that, if that has any bearing on the Court's decision.

All those factors are judicial determinations. They're all concerns for us also.

THE COURT: All right.

I think, let's ask Ms. Montana to come out. I think I'm going to go ahead and release her.

(Juror enters.)

THE COURT: You can have a seat anywhere, Ms. Montana. Did you leave anything in the jury room?

JUROR: Say that again?

THE COURT: Did you leave anything in the jury room?

JUROR: No.

THE COURT: I don't think we need the microphone.

If you can give your juror badge to Terry, I'm going to go ahead and excuse you and hope that you feel better.

JUROR: I'm sorry.

THE COURT: She can go out the front door now.

JUROR: Thank you.

(Juror exits.)

THE COURT: Anything else to come before the Court before we bring in the jury?

MR. POGOZELSKI: Nothing from the Government, Your Honor.

MR. ZIMET: No, Judge.

MR. BARZEE: No, Your Honor.

THE COURT: All right.

Terry, if we have all the jurors, let's bring them in.

COURT SECURITY: Yes, sir.

(Jury enters.)

THE COURT: Are we going to resume with Ms. Rumore?

MR. POGOZELSKI: Ms. Rumore, yes, Your Honor.

THE COURT: If we could ask her to come on in.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. BARZEE: Yes, Judge.

MR. ZIMET: Yes, Judge.

THE COURT: Did everyone follow my admonition on discussing the case or allowing it to be discussed in your presence?

All right. I had to excuse Ms. Montana, which means Ms. Batille, you're now on the jury, and hopefully everybody else is going to be fine so we can finish this case.

Ms. Rumore is still under oath. I think we're with Mr. Barzee's examination.

Thereupon,

MARTHA RUMORE,

having been first duly sworn or affirmed, was examined and testified as follows:

CROSS-EXAMINATION (con't)

BY MR. BARZEE:

Q. Good afternoon.

A. Good afternoon.

Q. We left off with me asking you whether or not Pat Boyd was on certain emails or correspondence between someone at

Safe Chain and your office.

Do you recall that?

A. Yes.

MR. BARZEE: All right. And I'm going to ask the Government if you can pull up Exhibit 207. And we're just going to go through that and finish that up.

Do you see 207 in front of you?

THE COURT: Not yet.

MR. BARZEE: Not yet.

THE COURTROOM DEPUTY: Just give it a second.

BY MR. BARZEE:

Q. All right. Do you have that in front of you now?

A. Yes.

Q. And Pat Boyd is not on that Government exhibit, is he?

A. No.

Q. All right. Thank you.

MR. BARZEE: And could we bring up Government's Exhibit 208, please.

BY MR. BARZEE:

Q. And Pat Boyd is not on that correspondence either, is he?

A. No.

Q. And this isn't unusual for him not to be on all of this correspondence, is it?

A. I don't know.

Q. Well, if his role was mostly in sales as opposed to

compliance or making those types of decisions with the lawyers, it's not unusual for him to not be on any of these; correct?
A. I don't know his role.
MR. BARZEE: Let's go to Government 209.
BY MR. BARZEE:
Q. He's not on this document either, is he?
A. No.
MR. BARZEE: Let's go to Government 225.
BY MR. BARZEE:
Q. Pat's not on that one, is he?
A. No.
MR. BARZEE: Government 237.
BY MR. BARZEE:
Q. Pat's not on that one?
A. No.
MR. BARZEE: Government 116.
BY MR. BARZEE:
Q. Pat's not on that one?
A. No.
MR. BARZEE: Government's 501.
BY MR. BARZEE:
Q. These are those different chat boxes from the Cellebrite extractions.
Pat wasn't involved in those communications, was he?
A. What I have here, no.

Q. Right.
Those were not involving Pat Boyd, were they?
A. I'm looking at page 1. There's 23 pages; so from what I see on page 1, no.
Q. All right. Let's scroll through the rest of those pages and just confirm that he's not on that.
A. It's too small. Could you make it larger?
Q. Sure.
Is he on that one?
A. No.
Q. All right. Is he on this one?
A. No.
Q. Is he on this one?
A. No.
Q. This one?
A. No.
Q. This one?
A. No.
Q. This one?
A. No.
Q. This one?
A. No.
Q. Is he on this one?
A. No.
Q. Is he on this one?

A. No.
Q. How about this one?
A. No.
Q. Is Patrick Boyd on this one?
A. No.
Q. This one?
A. No.
Q. This one?
A. No.
Q. How about this one?
A. No.
No.
No.
No.
No.
No.
No.
No.
No.
No.
No.
No.
No.
No.
No.

Q. Thank you.
And Exhibit 505, please.
These are more of those Cellebrite extractions from telephone instant messages.
Is he on this document here?
A. No.
No.
No.
Could we go back?
Keep going. I'm sorry.
Q. That's okay.
A. No.
No.
No.
No.
No.
No.
No.
No.
No.
No.
No.
No.
No.
No.

No.
No.
No.
MR. BARZEE: Government Exhibit 245.
BY MR. BARZEE:
Q. Is Patrick Boyd on that?
A. No.
MR. BARZEE: Government's 264.
A. No.
MR. BARZEE: Government's 323.
A. No.
MR. BARZEE: Government's 333.
A. No.
MR. BARZEE: Government's 430.
A. No.
MR. BARZEE: Thank you.
Thank you, Molly.
BY MR. BARZEE:
Q. Is it fair to say that you probably spent more time communicating with Abbie Divilio than you did with Pat Boyd?
A. Yes.
Q. All right. And Abbie was the compliance officer at Safe Chain; correct?
A. Yes.
Q. All right. And we previously established that compliance

is the part of Safe Chain that would be involved in doing things like checking the vendors? Making sure licenses were in order? Compliance-type issues? Correct?

A. Yes.

Q. All right. And as far as you know, was Abbie Divilio -- did she have access to you whenever she needed you? Could she pick up the phone if she had a question and give you a call?

A. Most of the time, but sometimes she would have to make an appointment.

Q. She would have to make an appointment, but she wouldn't have to get permission from Charlie Boyd or Patrick Boyd to reach out to you to ask you a question, as far as you know; right?

MS. DEROVANESIAN: Objection. Lack of personal knowledge.

THE COURT: Overruled.

A. I don't know if she had to clear it with them before she called me or not.

BY MR. BARZEE:

Q. You never heard anything that would suggest that to you, though, did you? In all the time that you communicated with her, she never said anything like that, did she?

A. She often had to clear things.

Q. I'm not asking about clearing things.

I'm asking whether or not she had to clear communications

with you, with Charlie or Patrick, as far as you know?
A. I think so, yeah.
Q. You think so. You're just guessing; right?
MS. DEROVANESIAN: Objection. Argumentative.
A. I wouldn't know.
THE COURT: Sustained.
BY MR. BARZEE:
Q. I'm sorry. Are you guessing?
Do you have an answer as to whether or not she had to clear it with Charlie or Pat, without guessing?
A. No, I don't know if she had to.
Q. Thank you.
Now, the -- and you communicated with her relatively frequently, didn't you?
A. I would say yes.
Q. Yeah.
Now, if you recall -- and I know it was a while ago, but if you recall your direct testimony when the prosecutor was asking you a series of questions, the questions were basically, "Did you know about this Fact A? And your answer would be, "No, I didn't know." And then the follow-up question would be "And had you known that, would you have given different advice?" And your answer would be, "Yes."
Do you recall that?
A. Yes.

Q. And you answered the same way to about 30 or 40 different questions in a row:
"Did you know about this?
"No.
"If you had known that, would it have changed your opinion?
"Yes."
Do you recall that?
A. I don't know if it was 40 different, but yes.
Q. Whatever the repetition was, whatever the number, it seemed like it was the same thing over and over again. Fair to say?
A. Yes.
Q. Did you practice that with the Government before you took the stand?
A. No.
Q. Did they tell you what questions they were going to ask you?
A. No.
Q. Did they show you the documents before you took the stand?
A. I saw some documents, yes.
Q. I'm not asking if you saw documents. I'm asking if the Government showed you documents and kind of let you know ahead of time that they were going to ask you about them.
A. Yes.
Q. Oh, they did.
I want to ask you about one of the specific documents that

they talked to you about, and it's Exhibit 187.

MR. BARZEE: If we could pull 187 up, please.

BY MR. BARZEE:

Q. Just take a look for that second, and let me just ask you: Do you remember being asked about this document? It was an email from quality complaints at Gilead to someone named Dakota Flowers?

A. No. I'm not copied on this.

Q. I'm not asking if you're copied on it. I'm asking if you recall seeing it when the Government was asking you questions?

A. I think, yes.

Q. You do; right?

And it's an email from somebody named Dakota Flowers; correct?

A. Yes.

Q. And it's to Gilead Sciences; right?

A. Yes.

Q. And you know who Gilead Sciences is; correct?

A. Yes.

Q. That's a very large pharmaceutical company; right?

A. Yes.

Q. $70 billion company?

A. I don't know. I can't answer that.

Q. Is that how they identified themselves in their complaint that they filed against the Florida defendants?

A. I don't think I have read that complaint.
Q. Well, are you aware of that complaint?
A. I think the firm was aware, yeah.
Q. I didn't ask you if the firm was aware of it. I asked if you were aware of it?
A. I'm not sure what complaint you're talking about.
MR. BARZEE: Excuse me, Your Honor.
Your Honor, may I approach?
THE COURT: Okay.
A. Yes. I'm aware of this complaint.
BY MR. BARZEE:
Q. That was a complaint that Gilead filed against dozens and dozens and dozens of pharmacists, doctors, brokers, criminal defendants in Florida; correct?
MS. DEROVANESIAN: Objection. Relevance to this other lawsuit.
THE COURT: Sustained.
BY MR. BARZEE:
Q. That lawsuit was filed --
MS. DEROVANESIAN: Objection. Relevance to this unrelated lawsuit.
THE COURT: I haven't heard the whole question yet.
BY MR. BARZEE:
Q. In November of 2000; correct?
A. I don't know when it was filed.

THE COURT: I don't know if you can refresh her recollection.

BY MR. BARZEE:

Q. Would taking a look at the docket refresh your recollection as to the date that it was filed?

MS. DEROVANESIAN: Your Honor, I'd object to this. She's already said she's not familiar with it.

THE COURT: Sustained.

MS. DEROVANESIAN: She's already looked at it.

THE COURT: I sustained the objection.

If she worked on the appeal --

MR. BARZEE: Well --

THE COURT: -- refresh her recollection. If it's something that other members of her firm worked on, then I don't think you can refresh her recollection from something that other people did.

BY MR. BARZEE:

Q. Do you think being abreast and aware of a major lawsuit involving Gilead --

MS. DEROVANESIAN: Objection. Assuming --

THE COURT: I haven't heard the whole question yet.

BY MR. BARZEE:

Q. -- involving Gilead and multiple suppliers of these medicines and clinics and pharmacies would have been something that you should be aware of, given the fact that you were

representing Safe Chain at the same time, knowing that Safe Chain and Gilead were having disputes?

MS. DEROVANESIAN: Object to counsel testifying through the questions, assuming facts not in evidence, and asking questions that she's already said she doesn't have personal knowledge of.

THE COURT: I've already told the jury that the lawyer's questions aren't evidence, only the witness's answer. I overrule the objection.

BY MR. BARZEE:

Q. Do you think it's something that you probably should have been aware of?

A. No. Because I'm not a litigator.

Q. Right.

But you were trying to help Safe Chain; right?

A. Yes.

Q. And they were having problems; right?

A. Yes.

Q. And a lot of the problems and difficulties they were having were related to Gilead; right?

A. Yes.

Q. And you saw correspondence between Safe Chain and Gilead; right?

A. Yes.

Q. And during this period of time, Gilead filed a major, major

lawsuit against dozens of defendants in South Florida dealing with HIV medications?

MS. DEROVANESIAN: Objection. Again, Your Honor, lack of personal knowledge. She's been asked about this multiple times. She's answered several times she's not aware of it.

THE COURT: Sustained.

MR. BARZEE: Let me go back to Government's Exhibit 187, if we can put that back up again.

BY MR. BARZEE:

Q. So we have established that although you don't know about the lawsuit, you are familiar with Gilead Sciences; correct?

A. Yes.

Q. All right. And in this email, you see the top line where it says, "Thank you for contacting Gilead Sciences with your Biktarvy inquiry"?

A. I don't see that on this exhibit.

MR. BARZEE: Maybe we can go down to the second page, please.

There it is.

BY MR. BARZEE:

Q. So you see on -- we're at Exhibit 187 on the second page, and it's from Clifford Won to quality -- to compliance, rather, at Safe Chain.

"Thanks for the additional insight. If Safe Chain Solutions needs to verify the supply chain, we would like to

see a copy of the invoice."

Do you see that?

A. I see it.

Q. All right. And then above that is the email from Abbie to Clifford, saying she's attempting to verify a T3.

Do you see that?

A. Yes.

Q. And it's involving Rochester Drugs, I believe; correct?

A. Yes.

Q. All right. And then you receive the response from Gilead where it says, "I understand you do not have a product quality complaint, but we would still like to understand the reason for your inquiry."

Do you see that language?

A. No, it's not in front of me.

MR. BARZEE: If we could go to page 2, please. Go to page 3.

BY MR. BARZEE:

Q. You see from quality complaints to Dakota Flowers, "Hi, Dakota. Thank you for your response. I understand you don't have a product quality complaint, but we would still like to understand the reasons for the inquiry"?

A. Yes.

Q. All right.

MR. BARZEE: And then go back to the first page again.

BY MR. BARZEE:
Q. And you see that Abbie then sends -- forwards this to Charlie Boyd and Patrick Boyd; correct?
A. Yes.
Q. And she says, "Gilead believes this to be a counterfeit drug, which we should report to the FDA. I think we should review more of the lots we have received."
Do you see where it says that?
A. Yes.
Q. And this is on October 12th of 2020; correct?
A. Yes.
Q. All right. Now, when you were testifying last week and the Government asked you if you had been notified about this on or about October 12th, you answered, "No, I was not."
Do you recall that?
A. Yes.
Q. The truth is you -- oh, the Government then asked you, "Would it have been important for you to see this email?"
And what's your answer to that question?
A. Yes.
Q. Yes.
And you said "It would be important because the email chain has lots of different things in here. It's already been a determination that -- from Gilead -- that there's a product that's illegitimate because of the pedigree, and, you know,

that's something that needs to be reported to the FDA either by Gilead or by Safe Chain"; correct?
A. Yes.
Q. And it was your testimony under oath that you had not been informed of that; correct?
A. No.
Q. No?
A. That was my testimony.
Q. Right.
Now, whenever you sent a bill to Safe Chain asking them to send you money for your work, you would note a date and the subject matter of the work that you did; correct?
A. Yes.
Q. Would taking a look at your records refresh your recollection as to whether or not you charged Safe Chain over $1,000 for reviewing this email chain and giving them your opinion?
MS. DEROVANESIAN: Objection, Your Honor. This witness has not suggested that she needs her memory refreshed. She answered the question she's been asked.
THE COURT: Overruled.
BY MR. BARZEE:
Q. Would taking a look at your financial records, your charges to Safe Chain, remind you that you were, in fact, notified of this?

A. I was not notified of this.
Q. Would you like to take a look at this?
A. Yes.
Q. Do you see the highlighted portion there?
A. Yes.
Q. Okay. And that was on October 14th; correct?
A. Yes.
Q. And can you tell us what work you did for Safe Chain two days after this correspondence?
A. This was --
THE COURT: Ask her if it refreshes her recollection.
BY MR. BARZEE:
Q. Has your recollection been refreshed?
A. Yes.
It has nothing to do with this email that you showed me, Exhibit 187. Nothing whatsoever.
Q. On October 14th of 2020, you charged Safe Chain over $1,000 for research and a response to the FDA-related queries pertaining to T3 requirements, FDA Form 3911 -- that would be the form that either Gilead or Safe Chain would have to file; correct? And then a client meeting for an hour.
MS. DEROVANESIAN: Objection. Hearsay.
THE COURT: Sustained.
BY MR. BARZEE:
Q. You weren't the only attorney at Frier Levitt that was

working for Safe Chain, were you?
A. No.
Q. Can you go through with us who all the different attorneys are that did work for Safe Chain?
A. My boss, John Marrone, was working with Safe Chain, and then I got assignments from him with regard to Safe Chain.
And then later on, maybe in March of 2021, Jesse Dresser became involved because John Marrone had passed away. And then -- then the litigation team took over, and it was Lucas Morgan and Jesse Dresser and it was litigation, and I wasn't so involved.
Q. So we have John Marrone, you. Whose initials are "ATM"?
A. ATM is -- I think that's Arielle Miliambro.
Q. And who is that?
A. She is one of the partners.
Q. And did she do work, as far as you know, for Safe Chain?
A. I don't know. That, I do not know.
Q. Would looking at your bills refresh your memory as to whether or not she was claiming to have done work for Safe Chain?
A. If I see the bill, yeah.
Yes.
Q. Did that refresh your recollection?
A. I have no recollection of her doing any work or KP. There's other lawyers here that I had no knowledge of them

doing any of this work.

KGK -- the only attorney that I'm aware is John -- JEM, John Marrone.

Q. So what you're saying is there were other attorneys at Frier Levitt during the same period of time that you were working for them who were doing work for Safe Chain, according to your refreshed memory at this point?

A. According to this bill, yes. And I wasn't aware of it at the time or until now.

Q. That's pretty important, isn't it?

A. Yes.

Q. Because if other attorneys at your firm were working with Safe Chain, consulting with Safe Chain, answering Safe Chain's questions, talking to Abbie, doing research and you had no idea, that could present a significant problem for your clients; couldn't it?

A. Yes. And it could affect my overall knowledge of what I knew.

Q. Right.

So all of those answers where you're saying to the Government "No, I didn't know that, I would have given a different answer; No, I didn't know that, I would have given a different answer; No, I didn't know that, I would have given a different answer" -- fair to say that that's a problem now because apparently other attorneys at your firm are doing a lot

of work for Safe Chain; right?

MS. DEROVANESIAN: Objection. Calls for speculation.

THE COURT: Sustained.

A. Yes, it's a problem.

BY MR. BARZEE:

Q. Do you know that these other attorneys were charging Safe Chain tens of thousands of dollars for that work?

A. I didn't know those other attorneys were working for -- on anything for Safe Chain. I thought just myself and a few assignments from John Marrone.

Q. And do you know whether or not John Marrone told you every conversation that he ever had with Charlie or Pat?

A. No.

Q. It's unlikely that he would have done that; correct?

A. Very unlikely.

Q. Now, you represented Charlie and Pat for a while; right?

A. Yes.

Q. And you were, I think in your words, "a zealous advocate"?

A. Yes.

Q. And you know they were having these struggles with Gilead and there was tension between Safe Chain and Gilead.

Is that fair to say?

A. Yes.

Q. And you know that Charlie and Pat, Safe Chain, they felt like Gilead was trying to crush them?

MS. DEROVANESIAN: Objection.
THE COURT: Sustained.
MS. DEROVANESIAN: Calls for speculation.
BY MR. BARZEE:
Q. Are you aware of the fact that Charlie and Pat had a little bit of a chip on their shoulder when it came to Gilead. Is that fair to say?
MS. DEROVANESIAN: Same objection.
THE COURT: Sustained.
BY MR. BARZEE:
Q. You recall being asked about broken pills or wrong medication in bottles when the Government was talking to you?
A. Not broken. When the Government was talking to me, yes.
Q. Yeah. And you recall on more than one occasion suggesting to Safe Chain that perhaps the wrong pills in the wrong bottle was a manufacturing issue?
A. Yes.
Q. And, in fact, you were aware of the fact that Gilead had a problem with wrong pills in wrong bottles in other situations; correct?
A. Yes.
Q. For example, you knew about their -- one of their authorized distributors, a great big company called McKesson; right?
A. I didn't know that was one of their authorized

distributors.
Q. You knew that McKesson had an issue with Seroquel in Biktarvy bottles; correct?
MS. DEROVANESIAN: Objection. Lack of foundation.
A. No, sorry.
THE COURT: Sustained.
BY MR. BARZEE:
Q. You were aware of other problems, you said, that Gilead had with wrong pills in bottles?
MS. DEROVANESIAN: Objection, lack of foundation.
THE COURT: Overruled.
A. Yes, I was aware.
BY MR. BARZEE:
Q. Okay. That's something that happened; right?
A. It happens with many manufacturers, yes.
Q. Right. What happened when the FBI showed up to talk to you?
A. They gave me a subpoena.
Q. Who did?
A. The FBI.
Q. A particular agent? Do you remember who it was? I want you to describe for me what happened.
A. Two agents came to my door on Long Island and served me a subpoena.
Q. And was it -- when you say "to my door," is that your law

office?
A. No, my home.
Q. So the FBI showed up at your house?
A. Yes.
Q. Were you home alone?
A. Yes.
Q. They knocked on the door, and did they identify themselves as FBI agents?
A. Yes.
Q. How did you feel?
A. I almost had a heart attack.
Q. That's scary when the FBI shows up at your door and starts knocking; right?
A. Yes.
Q. And one of the fears is that you have done something wrong and you're going to get in trouble or you're going to be arrested, or why are they here?
Like all these thoughts go through your mind; right?
A. No.
Q. Why were you so scared?
A. I was scared because it was the FBI and I thought it would be just a process server.
I understood I was going to be called to testify in this case before I left my firm. So...
Q. How did you know? Who talked to you and told you, you were

going to be a witness?
A. My boss, Jesse Dresser.
Q. Did he tell you you might be a witness, or he said, you're going to be a witness?
MS. DEROVANESIAN: Objection. Hearsay.
THE COURT: Sustained.
MR. BARZEE: It's not for the truth of the matter asserted, Your Honor. I'm trying to inquire as to her state of mind.
THE COURT: I sustained the objection.
BY MR. BARZEE:
Q. And this was, obviously, before you got fired from Frier Levitt; correct?
A. Yes.
Q. How many times have you met with FBI agents or the Government or had discussions with FBI agents or the Government related to this case?
A. Four.
Q. Four separate times?
A. Yes.
Q. And did you often go over the same material in those different meetings?
A. Not the same, no. It was different.
Q. Did you hire an attorney to represent you in that process?
A. No.

Q. Did the thought of hiring an attorney to represent you in your interest ever enter into your mind?
A. No. Not if it's out-of-pocket. The firm had their own attorney, and I was no longer with them; so I didn't have access to my emails or my documents.
Q. And so you didn't want to pay for the attorney yourself, which is why you didn't have one representing you?
Is that what you said?
MS. DEROVANESIAN: Objection. Relevance.
THE COURT: Overruled.
BY MR. BARZEE:
Q. You're talking about it being out-of-pocket. I just want to understand what that meant.
A. Yeah, it could cost a lot of money for an attorney.
Q. And so, basically, what you did was -- were you afraid that the Government might consider you a target of their investigation?
A. No.
Q. Did they tell you that you weren't a target and that you had nothing to worry about?
A. I didn't ask that.
Q. I didn't -- my question is: Did they ever say to you -- did one of those FBI agents or one of the prosecutors sitting behind me or anyone else say, "Hey, Martha, you got nothing to worry about. Don't worry."

A. No.
Q. And you were never concerned that the Government might be considering you to be an accomplice of Charlie and Pat? Someone who helped them commit this huge criminal enterprise?
A. No.
Q. That thought never entered your mind?
A. No.
Q. And the reason that thought never entered your mind is because you didn't do anything criminal; right?
A. No.
Q. You just advised them to the best of your ability; correct?
A. Yes.
Q. Now, there was some discussion about standard operating procedures and I just want to spend a couple of minutes talking to you about standard operating procedures if I might.
Now, do pharmaceutical wholesalers, is it a requirement in the law for them to have standard operating procedures?
A. Yes.
Q. And the reason that they have to have standard operating procedures because, you know, wholesale companies can get relatively large.
How many employees are generally in them?
A. It varies by the size of the wholesaler.
Q. Do you have a sense as to how many employees Safe Chain had, for example?

A. No, not at all.
Q. But the idea behind the standard operating procedure, you would agree with me, it's that it is advising the employees of the corporation how to handle particular situations.
Is that fair to say?
A. Yes.
Q. And as it turns out, you're now aware of the fact that Safe Chain did have standard operating procedures; correct?
A. Yes.
Q. And, in fact, Safe Chain's standard operating procedures, it looked to you like they came almost directly word-for-word from the FDA websites; correct?
A. Yes.
Q. And those standard operating procedures that Safe Chain had advising their employees on how to comply with the law, from your point of view, came right from the FDA; right?
A. I didn't see them all, but a part that I read looked like it was from the FDA guidance.
Q. And those are the procedures that the people in compliance are supposed to be following as they do things like verify licenses, check the vendors and do all of their due diligence; correct?
MS. DEROVANESIAN: Objection. Lack of personal knowledge.
THE COURT: Overruled.

BY MR. BARZEE:
Q. Is that correct?
A. It could be compliance. Maybe they don't have a compliance department if they're small.
Q. We know that they did, though; right?
A. Yes.
Q. So in their case, obviously, the standard operating procedure is telling whoever is in compliance the things that they are supposed to be doing to follow the law; correct?
A. But not just compliance. I mean, it's --
Q. Everyone?
A. -- sales force -- everything.
Q. All of the employees in the corporation; right?
A. All of the employees.
MR. BARZEE: Your Honor, may I have one moment, please.
THE COURT: Okay.
MR. BARZEE: Thank you. Thank you, Your Honor.
THE COURT: Mr. Zimet.
MR. ZIMET: Good afternoon, Jurors.

CROSS-EXAMINATION

BY MR. ZIMET:
Q. Ma'am, I don't know how many times -- I lost count -- on Mr. Barzee's examination you said that you never had seen the Florida complaint filed in 2020.
Is that correct?

A. I didn't say I've never seen it. I was aware that there was a complaint and I was aware of the front page of it, but I hadn't read it.
Q. And that's all, right?
A. Yeah.
Q. You had no idea what was inside of it, other than it's a front page. Is that your testimony?
A. Yes.
Q. And you're certain that that testimony as you're about everything else that you testified in the past seven or eight hours during the last week and today?
A. I'm not sure of your question. Could you repeat it?
Q. Are you certain, as your memory, as what you just testified about, as you are about everything else that you've testified in the last seven or eight hours?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Well, you do know that, in fact, you wrote a memo about that complaint, didn't you?
A. Yes.
Q. And you wrote a memo about the complaint to summarize what was inside that complaint?
A. No.
Q. You wrote a memo, okay, and sent it to Mr. Dresser; did you

not?
A. Yes.
Q. You also sent it to my client, Charles Boyd; did you not?
A. I don't recall.
Q. You also sent it to Patrick Boyd; did you not?
A. I don't recall.
Q. You also made comments about the significance of the lawsuit; did you not?
A. No.
Q. Do you remember whether you did or not make comments concerning the significance of it?
A. Yes.
Q. So you remember that you did?
A. I think I was asked to look into civil liability. That's about it.
MS. DEROVANESIAN: Your Honor, I would ask for the witness to have clarification about what lawsuit he's referring to in this line of questioning. It seems like there's some confusion.
THE COURT: Okay. Which lawsuit?
MR. ZIMET: The lawsuit of Gilead Science, Inc., *Gilead Sciences Ireland, UC v. AJC Medical Group*, et al., filed in the Southern District of Florida November 2021.
A. I don't recall writing a memo addressing specifics. I think I was asked questions in general about civil liability.

But I don't have my memo. I don't know what I wrote.
BY MR. ZIMET:
Q. So you did write a memo. You don't know what was in it. You're speculating as to what might be in it?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Overruled.
A. Can you show me what I wrote? You're referring to it.
THE COURT: You have to wait for me to rule before you answer.
THE WITNESS: Sorry.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Do you recall giving the opinion that because of this complaint, we now know Gilead was aware of other issues with its products?
MS. DEROVANESIAN: Objection. Hearsay.
THE COURT: Well, what the lawyers say isn't evidence. Overruled.
BY MR. ZIMET:
Q. Do you recall saying that in your memo?
A. No.
MR. ZIMET: May I approach, Judge?
THE COURT: Okay.
BY MR. ZIMET:
Q. And why don't you look at that first, and then I will have

some questions after you read it to yourself.
A. Yes.
MR. ZIMET: May I approach, Judge?
THE COURT: Okay.
BY MR. ZIMET:
Q. After having read that, is your recollection refreshed as to the fact that you wrote a memo in the spring of 2021 concerning the Florida lawsuit filed by Gilead in November of 2020?
A. The memo didn't pertain to that lawsuit as far as I'm aware.
Q. So the document that I just showed you did not relate to the Gilead lawsuit? Is that your testimony?
A. That does.
Q. I'm sorry?
A. That does. That email that you just showed me is a summary.
Q. It's your memo, isn't it?
A. It's not a memo. It's an email.
Q. The email, okay, is your summary of what the lawsuit is, isn't that correct?
A. Yes, it is.
Q. So you -- you're saying it's not a memo but it's an email. Is that the distinction you're making?
A. Yes.

Q. So it's -- let's call it an email then.
The email that you circulated was circulated to Charlie Boyd, was it not?
MS. DEROVANESIAN: Your Honor, I'm going to object to this line of questioning. It's about the same lawsuit that the Court already ruled was irrelevant.
THE COURT: Overruled.
A. I think what you just showed me, I sent to my boss, Jesse Dresser, the Boyds.
BY MR. ZIMET:
Q. You sent it to the Boyds; right?
A. Yes.
Q. Charlie Boyd, Patrick Boyd; right?
A. Yes.
Q. Because it was important; correct?
A. I believe they were subpoenaed. I think that's why -- they were subpoenaed in that case, if I recall, and that's why I was asked to look at that.
Q. It was important to tell the Boyds what this lawsuit was about; isn't that correct?
A. Yes.
Q. And you sent the memo describing what was in the lawsuit; isn't that correct?
A. Sent an email, yes.
Q. Email. Sorry. I apologize.

And then you also gave an opinion concerning that lawsuit, isn't that correct?

A. I'm not sure if that opinion pertained to that lawsuit. I don't think it did.

Q. So you do recall that at the end of this email you said, "I will obtain the complaint, so now we know Gilead was aware of other issues with its products"?

MS. DEROVANESIAN: Objection. Hearsay. He's reading from documents that are not in evidence, out-of-court statements.

THE COURT: Sustained.

MR. ZIMET: Judge, may I respond?

THE COURT: Sure. Go ahead.

MR. ZIMET: It's not offered for the truth of the matter asserted. It's offered as the advice that's provided to our clients.

THE COURT: You can refresh her recollection from it.

MR. ZIMET: May I approach?

THE COURT: Okay.

BY MR. ZIMET:

Q. You provided -- look at that first, and I'm going to ask you after you have read that to yourself whether that refreshed your recollection that you provided an opinion to the Boyds concerning the significance of that lawsuit.

A. It's a summary of the lawsuit, yes.

Q. Is your recollection refreshed that you gave an opinion concerning the significance of the lawsuit to the Boyds and to Mr. Dresser?

MS. DEROVANESIAN: Objection, Your Honor. Asked and answered.

THE COURT: Overruled.

A. Yeah, it's a summary. I'm not sure it's an opinion.

It's more of, like, a summary of what the complaint is about.

BY MR. ZIMET:

Q. Well, you expressed something that was in your mind as to why it was significant; did you not?

Read the last sentence to yourself first and then answer my question.

MS. DEROVANESIAN: Your Honor, I'd object to this. This is not refreshing her recollection. It's back-dooring hearsay.

THE COURT: Overruled.

BY MR. ZIMET:

Q. Is your recollection refreshed?

A. Yes.

Q. That you provided an opinion concerning the significance of a lawsuit to Dresser, Boyd, Boyd, and others?

A. Yes.

Q. And what was that opinion that you expressed?

A. Defendants have endangered the health and safety of thousands of individuals or economically disadvantaged and placed Florida communities at an increased risk of exposure to HIV.
Q. Okay. And?
A. And that's it.
Q. That's your opinion?
A. That's all the opinion that I see here.
Q. Well, that's the recitation of what's in the lawsuit. Your opinion is right after that recitation; isn't it, ma'am?
A. It's not an opinion. It's an observation.
It says, "Now we know Gilead was aware."
MS. DEROVANESIAN: Objection. Hearsay.
THE COURT: Go ahead. You can answer.
A. It says, "So now we're aware Gilead -- now we know Gilead was aware of other issues with its products."
BY MR. ZIMET:
Q. Okay.
A. It's --
Q. I'm sorry.
A. It's not an opinion. It's a fact.
Q. So you were now stating a fact to the clients, to the Boyds, as to what Gilead was doing; is that correct?
A. Yes.
MR. ZIMET: May I approach, Judge?

THE COURT: Okay.

BY MR. ZIMET:

Q. So this fact that you were expressing was a significant fact in what was happening with Gilead at that moment, that being May of 2021; isn't that correct?

A. Yes.

Q. And it was important enough that you would put it on an official Frier Levitt email and send to the clients; correct?

A. Yes.

Q. So when you sent it to them, that reaffirmed other opinions that you had given to the Boyds, all during the time of your representation of them; isn't that correct?

A. No.

Q. You had not told the Boyds on numerous occasions, "This is what Gilead is doing. They have manufacturing problems. This issue with wrong pills is a Gilead issue."

You have not been saying that to them?

A. It could be. I never said it was. I said that's what I thought at some point when there was a mix-up between two Gilead products that seemed like it could be a manufacturing issue, but I never definitively said it was a manufacturing issue.

Q. Okay. So let's understand what you're saying.

You're saying that you did express an opinion that you thought it could be that situation; is that correct?

A. Yes.
Q. And you're saying that to the Boyds because you thought that that was a potential of what was happening in this matter; isn't that correct?
A. For at least one of the incidents, yes.
Q. You said it on more than one occasion; did you not?
A. The one that I thought was a mix-up was when there was another Gilead product in the bottle.
Q. So it was one time that you said that? Is that your testimony?
A. I'm not sure if it was more than once.
Q. Well, you said it was one time with two Gilead products. Did that happen more than once?
A. Yes.
Q. So more than twice?
A. I don't know. I was only aware of three incidents.
Q. So in the instances that you were aware of, you believed that there was some evidence that this was a Gilead issue and not a Safe Chain issue; is that correct?
A. It could have been either. But it was a possibility that it could have been a Gilead issue.
Q. Did you express to them, when you said to them you believed it was possibly a Gilead issue, it could also be a Safe Chain issue?
A. Yes.

Q. So whatever communication there is about that would include both a Gilead issue, possibly, and also, possibly, a Safe Chain issue; is that correct?

MS. DEROVANESIAN: Objection. Vague. He's referring to a particular document. He should show it to her.

THE COURT: Overruled.

BY MR. ZIMET:

Q. You can answer the question.

A. It could have been either a Safe Chain issue or a Gilead.

Q. And the question is not what you testified before.

The question to you is: When you presented that to the Boyds, did you present that it could be one or the other at the same time?

A. It could be one or the other at the same time, yes.

Q. And you expressed that to the Boyds that it could be one or either; correct?

A. Yes.

Q. So if there's a document that doesn't have that way, that would be inconsistent with your testimony; is that correct?

A. I'm not sure of the question.

Q. Well, if we looked at some of the times that you did that, communicated that to the Boyds concerning your belief that it was possibly, in your words, "a Gilead issue," there would also be the statement that it could also possibly be a Safe Chain issue; correct?

A. Yes.
Q. So let's go back a little bit and talk about your first involvement in this case.
You testified to the Government when they asked you the question, the prosecutors, that your first involvement was in August of 2020; is that correct?
A. Yes.
Q. That's not accurate, is it?
A. I believe it is.
Q. Well, your first involvement actually was in June of 2020, was it not?
A. I don't recall.
Q. You don't remember?
A. No.
Q. So you remember something in August but not something in June if that took place?
A. Can you refresh my memory of what I did in June? A bill or something?
Q. We're trying to see how -- we want to see what your memory actually is without needing to be refreshed, if you have a real memory of things?
A. I know I had several memos to write, you know, from my boss, but they were in general, you know, memos -- they were regarding Safe Chain but not what was going on at Safe Chain or anything like that.

It was just general informing them of the Drug Supply Chain Security Act and things like that.

Q. Do you remember in June of 2020, your boss, Mr. Marrone, said to you or forwarded to you a request for a legal opinion concerning HIV drugs?

A. I'm not sure it was June. It could have been. I'm not sure.

Q. And you wrote a memo concerning it; correct?

A. Yes.

Q. And you sent that memo to Mr. Marrone; correct?

A. Yes.

Q. You didn't send it to Charlie Boyd; you didn't send it to Patrick Boyd; correct?

A. No.

Q. Because there would be no reason to send it to them because it was requested of you by Mr. Marrone; correct?

A. Yes.

Q. And whether Mr. Marrone decided to forward it to the clients or not was his decision, not your decision; correct?

A. Yes.

Q. And at the time that you wrote your first memo, you had no conversation with Charlie Boyd or with Patrick Boyd, isn't that correct?

A. No.

Q. Because your role was not to be co-counsel, if you will,

with Mr. Marrone.

Your role would be, if there's a legal issue to write a memo about, he would assign it to you, you write it and give it back to him; correct?

A. Yes.

Q. You don't know what conversation even led up to that request for you to write the memo; isn't that correct?

A. Correct.

Q. You did find out, however, that the memo never got to Charlie Boyd or to Patrick Boyd; isn't that correct?

A. I was not aware of that.

Q. That wasn't gone over between you and the Government in preparation for trial?

A. No.

Q. You did send it to Mr. Marrone when you first wrote it; correct?

A. Yes.

Q. And then you resent it later on to Mr. Marrone when he requested it in October; isn't that correct?

A. I think it was a different memo in October on recalls.

Q. Well --

A. -- separate memo. I don't recall sending the same memo twice to him.

Q. And whatever the records show would be the records of what actually happened; right?

A. Yes.
Q. Be safe to say you don't have a very good memory of exactly that?
A. No.
Q. So, let's say, for discussion's sake, that took place, the memo that you wrote in June of 2020, without any conversation with the Boyds, you never, ever spoke to any Boyd until August 21st of 2020; isn't that correct?
A. I'm not sure I spoke to them in August. I would have to see the records.
Q. Well, you testified, when the prosecutors asked you questions, that you were on a telephone call in August of 2020 and you testified under oath that Charlie Boyd was on that conversation, didn't you?
A. It was August.
Q. August?
A. It was in August? Can you refresh my memory?
Q. I'm asking about your testimony, ma'am. We want to look at what your memory is.
Do you remember testifying in this court last week?
A. Yes.
Q. Do you remember testifying in this court when the prosecutor asked the question that you were on a call on August 21st, 2020?
A. If I said yes, it was yes.

Q. That's not my question.

My question is: Do you remember testifying last week to that time and date of a conversation?

A. Yes.

Q. And you also remember testifying that Charlie Boyd was on that conversation?

A. I believe it was Charlie and Abbie if that was the first call.

Q. Well, you testified last week that it was them.

Today, you're saying you believe it was them. Was it them or do you believe it was them?

MS. DEROVANESIAN: Objection. Argumentative. Asked and answered.

THE COURT: Overruled.

A. I believe it was a call, yeah, and it was Charlie and Abbie and John Marrone and I.

BY MR. ZIMET:

Q. So my question to you, ma'am, was do you recall that, in fact, there was that call with Charlie Boyd on the phone, or do you believe that it was with Charlie on the phone on August 21st, 2020?

A. Can I ask for my billables? My bills to see it?

Q. We'll get to that in a second.

What I'm asking you is your memory of what you testified five days ago.

A. Yes.
Q. Yes, what?
A. It must have been a call. It was a call.
Q. Well, "must have been" and "there was a call" are two different things.
Was there actually a call that Charlie Boyd was on that date that you testified he was on when you testified only five days ago?
A. I believe I was shown my phone records, and that's how I was able to say yes.
Q. You also testified you didn't know what was said on that call; did you not?
A. Yes.
Q. So you're testifying about a call that you say you believe Charlie Boyd was on but you don't know what was said; is that correct?
A. Yes.
Q. You also testified when you were asked a series of questions: Was this said on the call? Was this said on the call?
And you answered very quickly, "No, no, no, no, no."
Do you recall those questions?
A. Yes.
Q. So you testified to this jury that things on a call that you don't remember what was said, you do remember what was not

said.
Is that your testimony, ma'am?
A. Yes. Because the things that were not said would have been in my memory.
Q. So you would remember what's not said but not remember what was said? Is that what you're testifying to this jury?
A. Yes.
Q. Is that correct?
A. Yes.
Q. Okay. You also know that the questions about what were not said would be something that you had no knowledge of one way or the other in August of 2020; isn't that correct?
A. Can you repeat the question?
Q. Sure.
You said certain things were not said on the call. Those things would have no pertinence whatsoever to the subject matter of that call; isn't that correct?
A. I have no way of answering that. I don't know.
Q. So you know something wasn't said. You don't know what was said on the call.
You don't know what was pertinent to the call at all; correct?
MS. DEROVANESIAN: Objection. Compound question. Argumentative.
THE COURT: It's compound. I sustain the objection.

BY MR. ZIMET:
Q. You do not remember what was pertinent to that phone call; isn't that correct?
A. No.
Q. Well, let's try to look at the context of what was happening then.
Do you remember what you did the day before the call that might have any, any connection to the call itself?
A. No.
Q. So not only do you not remember what you did on the 21st when the call took place, that you don't remember what was in it, you don't know whether you were doing anything the day before that might have any reference or relevance to the call itself; is that correct?
A. No. I don't know what I was doing the day before the call five years ago.
Q. And these are all things five years ago, and you were testifying under oath against Charlie Boyd and Patrick Boyd; is that correct?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Sustained.
BY MR. ZIMET:
Q. You don't remember what happened five years ago as to matters that relate to Charlie Boyd and Patrick Boyd also; isn't that correct?

A. No, it's not true.
Q. I'm sorry?
A. It's not correct, no.
Q. Well, at least as of this call, you don't remember; correct?
A. I don't remember the call. I'm sorry.
Q. You don't remember the subject matter of the call?
A. No.
Q. You don't remember the purpose of the call?
A. I don't -- no.
Q. Well, isn't it correct that this was a second occasion that Charlie Boyd was looking for legal advice and assistance as to a problem that had occurred?
MS. DEROVANESIAN: Objection.
A. No.
MS. DEROVANESIAN: Lack of personal knowledge.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Do you think anything would refresh your recollection -- let me ask this way: You have no memory as to what the purpose of the call is; is that correct?
A. I don't recall, yeah, what the call was about.
Q. So do you think that looking at something might refresh your recollection as to what you don't remember today?
A. Yes.

MR. ZIMET: May I approach?
THE COURT: Okay.
BY MR. ZIMET:
Q. I'm showing you your billing records from Frier Levitt, include the month of August.
I want to give you the whole month so you can look at it and see whether that helps refresh your recollection as to what you were doing that you don't remember today.
A. These records are from 2021. You're talking about August of 2020?
MR. ZIMET: Hold on. I want to make sure I get the right ones to you.
May I approach again, Judge?
THE COURT: Okay.
A. I don't see a call in August.
BY MR. ZIMET:
Q. So can you look at the August 21st, 2020, entry?
A. Okay. Says "Review client email and respond to same. Discuss with JEM."
MS. DEROVANESIAN: Your Honor, if we are going to be reading from this document, I ask Mr. Zimet to move it into evidence so the jury can see it.
THE COURT: It's not in evidence; so you cannot read the document.
MS. DEROVANESIAN: We have no objection to moving it

into evidence if that's his preference.

MR. ZIMET: Reserve a motion, Judge.

THE COURT: Okay.

BY MR. ZIMET:

Q. I don't want you to read it out loud. You can read on August 21st to yourself and other entries of what took place on that day.

Have you read it?

A. I read it.

Q. Did it refresh your recollection that there was a call on the 21st?

A. No. There's no call on the 21st.

Q. Did you testify on direct examination that there was a call on the 21st?

A. There was a call on the 20th.

Q. Okay. Were you involved in that call?

A. Yes.

Q. All right. So your recollection is refreshed there was a call on the 20th?

A. Yes.

Q. Who was it with?

A. It says, "With the client." It's with client and my boss.

Q. Okay. And that's one that you don't remember what it was about?

A. No.

Q. How about looking at the days before? Would that refresh your recollection as to what you were doing the day before?
A. The day before I had an internal meeting with my boss to discuss the project. I was doing some research on a memo.
Q. And what memo was that?
A. Recall memo.
Q. And did you have -- do you recall what your discussion was about the recall memo?
A. He just told me to put together a memo about what a wholesaler requirement would be if there was a mix-up, what type of recall it would be and more or less a legal memorandum.
Q. And that's under the Safe Chain billing records; correct?
A. Yes.
Q. So related to Safe Chain; correct?
A. Yes.
Q. Did you have conversations with your boss, Mr. Marrone, as to what led to him giving you that assignment?
A. No.
MS. DEROVANESIAN: Objection. Calls for hearsay.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Did you have any discussions whatsoever with Mr. Boyd as to what led to that request for a recall memorandum?
A. No.
Q. You testified on direct examination Mr. Boyd asked you to

write a memo concerning recall.
Do you recall that testimony?
A. My boss asked for the memo.
Q. That's not my question, ma'am.
The question to you is do you recall when you testified to this jury last week, you testified that it was Mr. Boyd that asked you to write that memorandum?
MS. DEROVANESIAN: Objection. Asked and answered. It mischaracterizes her testimony.
THE COURT: Overruled.
A. Mr. Marrone asked me to write the memorandum.
BY MR. ZIMET:
Q. What was my question to you, ma'am?
A. It wasn't Mr. Boyd.
Q. So your testimony last week was inaccurate; is that right?
A. Yes.
Q. When you testified that way, did you realize it was inaccurate?
A. No.
Q. You just realized that now?
A. Yes.
Q. Anything else that you testified yesterday that was inaccurate?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Sustained.

BY MR. ZIMET:
Q. Is there anything, any testimony that you gave last week that you would like to change, amend or expand upon from your last week's testimony?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Overruled.
A. No.
BY MR. ZIMET:
Q. So the memo that you wrote was introduced into evidence by the Government last week.
Do you recall looking at that?
A. Yes.
Q. On the recall?
A. Yes.
Q. And you testified that when you wrote that memo, you only were aware of one issue involving wrong drugs? That's the Excedrin drugs; is that correct?
A. Yes.
Q. Now, do you know whether or not Charlie Boyd had conversations with Mr. Marrone prior to the time of you being instructed to write that memo on recall?
A. I don't know that.
Q. You don't know whether Mr. Boyd informed Mr. Marrone about a second incident or not; is that correct?
MS. DEROVANESIAN: Objection. Hearsay. Lack of

personal knowledge.

THE COURT: It's repetitive. I sustain the objection.

BY MR. ZIMET:

Q. So let me ask you this: Frier Levitt is a big law firm; right?

A. No.

Q. It's a small firm?

A. Mid-size.

Q. Mid-size law firm.

And they memorialize their work product; do they not?

A. Yes.

Q. So for instance, the records of a communication that they would have with a client would be something that would be memorialized in the records; is that correct?

A. If it was written, yes.

Q. Well, a conversation with the client, you should write down what's said back and forth; correct?

A. No.

Q. It's not something that's standard at Frier Levitt?

A. No.

Q. So heaven forbid that the lawyer dies or something like that, one would never know what was actually said if it wasn't memorialized in a memo; is that correct?

A. Yes.

Q. Have you gone back to look at Frier Levitt records to see

whether or not there was any communication between Mr. Marrone and Charlie Boyd that led up to this August 20th memo that you wrote in conversation?

MS. DEROVANESIAN: Objection. Calls for hearsay.

THE COURT: Overruled.

A. No.

BY MR. ZIMET:

Q. When you met with the Government four or five times, did they show you any documents that might exist relating to communications between Charlie Boyd and Mr. Marrone?

A. No.

Q. If they had shown you documents that talked about what had been discussed and what the issues were, that would affect the accuracy of your testimony last week; isn't that correct?

A. No.

Q. Well, if you had seen a -- if the Government prosecutors had shown you before you testified that, in fact, Charlie Boyd had communicated to Mr. Marrone about two incidents, you would not be able to testify that had not been presented to Frier Levitt; is that correct?

MS. DEROVANESIAN: Objection. Asked and answered. Calls for hearsay.

THE COURT: Sustained.

BY MR. ZIMET:

Q. Did the Government show you any documents that related to

that, two-time incidents?
A. No.
Q. When you testified last week that you had not seen something, you were speaking about yourself individually as opposed to Frier Levitt collectively; isn't that correct?
A. Yes.
Q. So if there was any sense or -- and, again, you would not want to mislead the jury; correct?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Sustained.
BY MR. ZIMET:
Q. When you testified that you had not seen anything or didn't know what was said, you're not testifying and you didn't try to suggest in any way that that was Frier Levitt not knowing; isn't that correct?
A. That's correct.
Q. So whatever the Frier Levitt records actually show, that is what was communicated to Mr. Marrone; isn't that correct?
A. Whatever the records are. I don't know what the records are.
Q. Because you've never seen them; right?
A. No.
Q. You never asked about them?
A. I wouldn't be asking about them.
Q. It wasn't part of what your job was; right?

A. I wouldn't ask. I mean, I wouldn't ask about -- I didn't know about all these other attorneys working on Safe Chain matters or anything like that.
Q. Well, we'll get to that in a second. Okay.
But you, since the purpose of where we are right now, there was never a reason ever for you to look into what had happened with Mr. Marrone and the Boyds as part of your representation of Safe Chain and the Boyds; correct?
A. No, I wouldn't do that.
Q. You wouldn't do that because it wasn't necessary; correct?
A. It's not my place to do that. I wouldn't have.
Q. It wasn't your place as a healthcare attorney to do that; correct?
A. I wouldn't know. He had passed away in November.
I wouldn't know where to even look, except maybe the files but...
Q. Your testimony is you wouldn't know where to look for what had happened between Mr. Marrone and the Boyds after Mr. Marrone died? Is that your testimony?
A. Yes.
Q. So it didn't cross your mind that maybe we should look in the Frier Levitt files as to what had happened with Marrone and the Boyds?
A. I didn't look, no.
Q. We know you didn't look. But the question to you is you

had the ability to look in the files; correct?
A. Yes.
Q. And you made the conscious decision not to do it because it wasn't necessary to learn what had happened up to the time you actually were representing Safe Chain and the Boyds; isn't that correct?
A. I wouldn't look in the files to see what had gone on, no.
Q. Well, we know you didn't, okay?
The question to you that you did not believe it was necessary to do that as part of your zealous advocacy; is that correct?
A. It's not something that I have ever done -- is look in files and see what other attorneys are doing. It's -- that's not -- what I do.
Q. We know you didn't do it. Okay.
The question to you, ma'am, is: You decided it wasn't necessary for you to do that as part of your zealous representation -- excuse me, zealous advocacy on behalf of Safe Chain and the Boyds?
A. No, I didn't make that conscious decision. I just didn't think to look anywhere for anything.
Q. So it never crossed your mind?
A. No.
Q. Is that what you're saying?
A. It never crossed my mind.

Q. Okay. So let's talk for a second about your -- and you testified about your credentials and your education and your employment background.

I believe, and correct me if I'm wrong, you testified that you became a healthcare attorney in November of 2019; is that correct?

A. Yes.

Q. Up to that point, you never had been a healthcare attorney; is that correct?

A. Yes.

Q. And that was a change for you from what you had done before?

A. Yes.

Q. Did you get any training at Frier Levitt as far as what you needed to do to be a healthcare attorney?

A. No.

Q. So in August -- let's say, June of 2020, you had had about seven months' experience as a healthcare attorney?

A. Yes.

Q. Would you say you were a rookie at that point?

A. I had taught as a professor, drug regulatory affairs. So I had some background, healthcare background.

Q. But you had no training as far as how to be a healthcare attorney; is that correct?

A. No.

Q. And in your role, at least as of June of 2020, was not to be co-counsel with Marrone but, as we testified already, to write some memos when he assigned you memos?

MS. DEROVANESIAN: Objection. Asked and answered.

THE COURT: I will allow some latitude.

BY MR. ZIMET:

Q. Go ahead. You can answer.

A. Yes.

Q. Okay. There came a point where you became more active in cases; correct?

A. With clients, yes.

Q. Well, the Boyds' clients, or, excuse me, Charlie Boyd as clients, you became more active in the call that you can't remember in August of 2020; correct?

A. I can't answer that. Could you rephrase it?

Q. Sure. The first contact that you had with Charlie Boyd was in August 2020 and the call that you don't remember what it was about; correct?

A. Yes.

Q. Do you remember in that call where you introduced yourself as a new healthcare attorney?

A. No.

MS. DEROVANESIAN: Objection. Lack of foundation. She just stated that she doesn't recall.

THE COURT: I guess the answer will be no, ut let's

hear what the answer is.
A. I don't recall.
BY MR. ZIMET:
Q. Do you recall ever telling the Boyds that you were a new healthcare attorney when you first started your actual representation of them?
A. No, I don't recall that.
Q. Did you ever tell them that you had less than a year's experience as a healthcare attorney when you first started representing them?
A. No.
Q. Did you ever tell them that you had never been trained how to be a healthcare attorney when you first started representing them?
A. No.
Q. And just so it's clear: From your perspective, there's a transformation from writing memos for Mr. Marrone at his request to actually representing the Boyds and Safe Chain as a healthcare attorney; is that correct?
A. No. Because I have a working knowledge of FDA regulations, pharmacy, I have enough of a background to advise.
Q. In your judgment, okay, you had enough background, but you had never been trained to be a healthcare attorney and involved in the issues that related to Safe Chain and the Boyds; isn't that correct?

A. No.
Q. It's not correct?
A. No.
Q. Let's talk about the date where you start your actual representation of Safe Chain and the Boyds.
What date would that be, in your mind, approximately?
A. Maybe October.
Q. Okay. And that will be when you were requested to write a memorandum related to questions that Charles Boyd, "Charlie Boyd," had presented to Mr. Marrone?
A. There were three questions, yes.
Q. So that would be the time when you said, "I started my representation of Safe Chain and the Boyds"; correct?
A. Yes.
Q. Okay. And then from there, it expanded, when unfortunately Mr. Marrone passed away in November of 2020; correct?
A. Yes.
Q. So instead of you writing some memos and providing support to Mr. Marrone, you were the attorney representing the Safe Chain and the Boyds; correct?
A. Yes.
Q. Now, taking over a case for somebody else -- had you ever been involved in that situation before, where you took over a case for somebody who, unfortunately, was no longer in the firm and, obviously, no longer alive?

A. Yes.
Q. And, obviously, the first thing that you want to do is educate yourself as to what had happened prior to you getting involved; isn't that correct?
A. Yes.
Q. And to do that, you needed to know what events had taken place involving this client and Frier Levitt leading up to that transformation of you becoming the lead attorney; correct?
A. Yes.
Q. And to do that, what you would want to do -- since, obviously, Mr. Marrone is not alive to speak to -- is look into the Safe Chain files; isn't that correct?
A. I didn't know it, but...
Q. You should have, shouldn't you?
A. I'm not sure.
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Overruled.
A. Is there something in these files that I -- that -- was there something in the files? Because I didn't -- I didn't look.
BY MR. ZIMET:
Q. You didn't look because you didn't think it was necessary; correct?
Is that correct?
A. I can't answer that. I didn't look because it didn't occur

to me.
Q. So it was something that you thought was appropriate or necessary to do at that point? Would that be safe to say?
A. It just didn't occur to me to look in the files.
Q. Let me ask you a couple of questions about your testimony that you just didn't think about it.
How different was that situation from a patient going to a doctor and the doctor wanting to know the history of that patient before that doctor had seen them?
MS. DEROVANESIAN: Objection. Argumentative. Lack of foundation.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So you didn't look in the files, but did you ask the Boyds what had happened up to this point?
A. Yes.
Q. And when was that?
A. That would have come out in any conversations we had or anything like that.
Q. Let me ask you this: Did you arrange -- they had Zoom in 2020, Frier Levitt; right?
A. Yes.
Q. And you had access to Zoom?
A. Yes.
Q. Did you send an email or some kind of communication to the

Boyds and say, "Listen, I'm new on the case. Yes, I had some knowledge because I wrote some memo, but to effectively represent you, I really need to have a conversation, a meeting with you to go over what I have missed because Marrone was doing it and I wasn't"?

Did you have that conversation with the Boyds about doing that?

A. I don't recall, no.

Q. The answer is no, you didn't; isn't that correct?

(Simultaneous talking.)

BY MR. ZIMET:

Q. So when you said "I don't recall," that means, you did not; correct?

A. Yes.

MS. DEROVANESIAN: Objection. Argumentative.

THE COURT: Overruled.

BY MR. ZIMET:

Q. So just so we understand, when you started representing the Boyds, you didn't look in the file, you didn't ask them what happened up to that point, but you decided that that would be something not necessary to have what you describe as zealous advocacy; is that right?

A. It was more like them having problems and bringing them to our attention, and if they had a problem or if there was something that I didn't know, they would have brought it to my

attention.
Q. So I don't mean to be flippant.
How would they know what you didn't know if you had not gone through the files and asked them questions? They're supposed to read your mind?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So the burden was on them to tell you things that had happened before?
It was not on you to ask, "What is the history? What has happened up to this point with your case?"
Is that your testimony?
A. No.
Q. So when you testified a couple of minutes ago that "It was up to them to tell me what happened," you're saying it's not up to you to ask them what happened?
A. I wasn't aware there was anything to ask.
Q. So your testimony now is that because you're unaware of what questions to ask, you didn't ask any questions of the Boyds? Is that your testimony?
A. I don't routinely ask clients, you know, this type -- I mean, if there was a situation, they bring it to the attention of their lawyer for legal advice.
It's not that I'm not going to be asking them all sorts of

questions.
Q. And that is your standard practice, SOP? Your standard operating procedures is not to ask new clients, who are new to you, okay, what had happened up to that point in the representation? That's your SOP?
A. I assume that my boss told me everything that I needed and that was it and just proceeded.
Q. Did you not testify that you did not have any conversations about what had happened prior in time to getting involved with your boss, as far as conversations he had with the Boyds?
MS. DEROVANESIAN: Objection. Compound question. Argumentative.
THE COURT: Overruled.
A. I didn't think there was anything else that I needed to know.
BY MR. ZIMET:
Q. So you made a judgment call. There's nothing else that you needed to know; is that correct?
A. No, I didn't do anything.
I just, you know, picked up where John Marrone left off, and I didn't know that, any of this background, what was going on.
I wrote several memos, and that's how -- all I recall.
Q. Well, let's talk about what you did know.
What you did know is that Gilead -- which is a large

manufacturing company; correct?
A. Yes.
Q. Who manufactured HIV drugs; correct?
A. Yes.
Q. Was making inquiries of Safe Chain; correct?
A. At what time?
Q. When did you first know that happened?
A. There was a letter from Gilead, November 2020.
Q. Well, you knew in August of 2020 that Mr. Boyd was drafting a letter or an email to Gilead; isn't that correct?
A. Yes.
Q. And that was in response to something that Gilead had requested; correct?
A. Yes.
Q. So you knew it wasn't November. It was in August that you knew that Gilead was making inquiries; correct?
A. Yes.
Q. And asking for information; correct?
A. Yes.
Q. So as a zealous -- you weren't a zealous advocate at that point.
But at some point, when you became a zealous advocate, did you think that "Maybe I should try to figure out why is Gilead asking for information from Safe Chain?"
Did you think about that?

A. Yes.
Q. And you memorialized what your thought was to the clients; did you not?
A. Yes.
Q. And what were your thoughts?
A. I don't recall.
Q. You had some thoughts, but you don't remember what those thoughts were? Is that your testimony?
A. Yes.
Q. How did you communicate -- or did you communicate those thoughts to the Boyds?
A. I'm sorry. Could you refresh my memory on the Gilead email?
Q. I apologize, okay. We have to ask what your memory is. Okay.
You have testified that you expressed -- you had thoughts. The question is: Did you express those thoughts to the Boyds? Yes or no?
A. Yes.
Q. In what form did you express those thoughts to the Boyds?
A. I think we went over what the email -- the content of the email, and I think I said something about making sure that somebody reports it to the FDA. It was an email, that somebody should report it to the FDA, I recall that.
Q. And you believe that Gilead were the ones that should do

that; correct?
A. Yes.
Q. And you communicated to the Boyds as far as communicating to the FDA that was Gilead's responsibility and not necessarily the Boyds at that point; correct?
A. At that point, yes.
THE COURT: Mr. Zimet, is this a good spot to break?
MR. ZIMET: Sure, Judge.
THE COURT: All right. Members of the jury, we'll take a 15-minute recess. Remember my admonition not to discuss the case or allow it to be discussed in your presence.
We'll see you back in the jury room in about 15 minutes.
THE COURT SECURITY OFFICER: All rise.
(Jury exits.)
THE COURT: Again, Dr. Rumore, during the break in your testimony, you're not allowed to discuss your testimony with anyone, and we'll see you back in about 15 minutes.
THE WITNESS: Yes, Your Honor.
THE COURT: And if there's nothing else to come before the court, we'll be in recess for 15 minutes.
MR. ZIMET: Judge, I had reserved. We can do it when we come back.
THE COURT: You can do it now.
MR. ZIMET: May the witness be excused first?

THE COURT: Sure.

(Witness exits.)

MR. ZIMET: I'm not so sure how good my memory is for 15 minutes from now. It wasn't a joke.

THE COURT: If you would asked, I would have given a curative instruction right there that the burden is on the Government, but go ahead.

MR. ZIMET: So, Judge, I want to make sure we're on the same page as far as what was said and what was done.

THE COURT: Okay.

MR. ZIMET: And the purpose of the application.

In the process of refreshing the witness's recollection with the billing records of Frier Levitt, at which time the Government got up and made a statement in front of the jury that if Mr. Zimet wants to introduce them, he can, suggesting that we have an obligation to present evidence, which we don't.

The Government knows the prosecutor said that and knows it's improper. It's burden-shifting. It violates the Boyds' Fifth Amendment rights, and also Sixth Amendment issues relate to it; we would, therefore, request a mistrial.

THE COURT: A mistrial is denied.

MR. ZIMET: We also then request a curative instruction and --

THE COURT: I will tell the jury that the burden is on the Government to prove the case and the defense doesn't have

any burden.

MR. ZIMET: And I would ask that the Court make direct reference to the comment that was made.

THE COURT: I would have done that if you would have asked for a curative instruction at that point.

MR. ZIMET: I'm asking for it now, Judge, and include in that. There's no reason not to do it at this point.

THE COURT: I will give a curative instruction that the burden is on the Government.

All right. We'll take a 15-minute recess.

MR. BARZEE: Your Honor, Patrick Boyd joins the motion for mistrial. And if I may point out, it wasn't just once that the Government said, "You can go ahead and introduce it," but it was twice, which doubles the harm that was done by them, suggesting we had a burden to introduce evidence.

Joining the motion for mistrial.

THE COURT: Okay. The motion is denied.

MS. DEROVANESIAN: Your Honor --

MR. ZIMET: Just as a housekeeping matter, can we have a stipulation that an objection from one Boyd would apply to the other without us having to get up unless there's something to add?

THE COURT: It's okay with me if it's okay with the Government.

MS. DEROVANESIAN: We have no objection to that,

Your Honor.

We also have one brief matter we wanted to bring before the Court.

THE COURT: Okay.

MS. DEROVANESIAN: It doesn't have to be right this moment.

THE COURT: Go ahead.

MS. DEROVANESIAN: Your Honor, at this point, as we argued right after opening statements, it's been even more clear here that the issue of what other lawyers at Frier Levitt and elsewhere were doing for the defendants has been put directly at issue by the defense.

We should be permitted to ask about those issues.

THE COURT: You keep asking this lawyer whether or not she knew about anything -- and she doesn't -- but there's other lawyers that might know about things. There's other lawyers that might have told Mr. Charles or Patrick Boyd things; and, unfortunately for the Government, one of them is dead.

So you made your motion. I ruled.

Anything else?

MS. DEROVANESIAN: Your Honor, I just wanted to clarify that there are implications that are being made about what those other lawyers said, about the amount of money that was spent, the bill being put in front of her, and she's being asked "Were you aware of these other lawyers?" implying they

were giving advice relating to this matter, when in reality, it had nothing to do with anything related to this case.

THE COURT: I don't know that.

MS. DEROVANESIAN: Well, Your Honor --

THE COURT: You may know that. I don't know that.

MS. DEROVANESIAN: Your Honor, the billing records that were read from in Court should be admitted, and those records clearly show exactly what those calls, those matters related to.

It's been put at issue. It's been highly suggested to the jury what that advice was and that it somehow is relevant to this witness's testimony, and since those records have already been read from, we submit that they should be admitted into evidence at this point and the jury should be able to hear what those other matters related to, rather than just implying that so much money was spent on lawyers; so, therefore, the defendants must have been seeking legal advice in good faith, which is what we have here.

THE COURT: You objected to information coming into evidence from a document that wasn't in evidence, and I allowed the recollection to be refreshed, and that's my recollection of how the testimony came in from the billing records.

Your request is denied.

MS. DEROVANESIAN: May I just ask to clarify? Are we then permitted to ask follow-up questions about that same

record that she was asked about, including the billing entries that she was asked about, and the individuals, the other attorneys she was asked about, and what they were doing?

THE COURT: You can ask her whatever questions you want to ask, and if she needs to refresh her recollection, she can refresh her recollection.

Anything further?

MR. ZIMET: No, Judge.

MR. POGOZELSKI: Nothing from the Government, Your Honor. Thank you.

THE COURT: We'll be in recess.

THE COURT SECURITY OFFICER: All rise.

(Off the record.)

THE COURT: We're back on the record.

Counsel are present. Both defendants are present.

Anything to come before the Court before we bring the jury in?

MS. DEROVANESIAN: No, Your Honor.

MR. ZIMET: No, sir.

MR. BARZEE: No, Your Honor.

THE COURT: All right. Let's bring the jury in.

MR. ZIMET: Just to remind the Court about the instruction, please.

THE COURT: Right.

(Witness enters.)

THE COURT: Do you understand you're still under oath?

THE WITNESS: Yes.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. ZIMET: Yes, Your Honor.

MR. BARZEE: Yes, Your Honor.

THE COURT: Did everyone follow my admonition about discussing the case or allowing it to be discussed in your presence?

During the cross-examination, there was a comment about something going into evidence.

I want to remind you that the burden of proving the case is on the Government. The defense has no burden at all.

Mr. Zimet, you may proceed.

MR. ZIMET: Thank you, Your Honor.

BY MR. ZIMET:

Q. I want to direct your attention -- and you've already given some testimony concerning Safe Chain's compliance department.

Do you recall that testimony?

A. Yes.

Q. And the way it was structured is that Safe Chain had an internal compliance office and then also had outside counsel when issues arose or when matters arose that needed outside

counsel attention.
Would that be an accurate description?
A. Yes.
Q. And the compliance department was run by a woman whose name has been mentioned several times, Abbie Divilio?
A. Yes.
Q. And you had contact with her; did you not?
A. Yes.
Q. And the contact with her was all during the time period of your representation of Safe Chain and the Boyds; is that correct?
A. Yes.
Q. Now, you found Abbie Divilio to be intelligent; correct?
MS. DEROVANESIAN: Objection. Improper opinion.
THE COURT: Overruled.
A. I don't know if she's intelligent or not. I can't answer that.
BY MR. ZIMET:
Q. Well, you had communications with her; did you not?
A. Yes.
Q. And those communications, okay, she did not show any signs of not being intelligent, did she?
A. No.
Q. You hesitated before answering.
Was there a reason for the hesitation?

A. Yeah. I don't think she was as well aware of the Drug Supply Chain Security Act as she should have been.
Q. Okay. So as far as intelligence -- the question was intelligence not -- and I will get to it in a second -- not as to the issue of her familiarity with the rules and regulations. So let's take intelligence first.
A. I can't comment on her intelligence.
Q. Okay. Did you find her to be knowledgeable as to regulations concerning what was relevant to Safe Chain's operations?
A. Not entirely.
Q. Was she lacking in certain ways that you identified?
A. Yes.
Q. In what ways were those?
A. She didn't seem like she had a handle on the Drug Supply Chain Security Act requirements.
Q. And is there anything in particular that you thought she didn't have a good handle on?
A. What to do when there's suspect product.
Q. And when did you make that observation that she did not have a good handle on the rules?
A. When she kept asking the same question over and over again. It was answered and she would still ask the same question.
After three incidents, she still didn't have a clue what was the process was after it was explained to her.

Q. What was the same question that she kept asking over and over again?
A. What do we do? Who do we send the product to? Things like that.
Q. She's asking for guidance from you?
A. Yes.
Q. And you interpreted that to be that she didn't have a handle on what the rules were?
A. No. Compliance also, for a wholesaler, should know those answers.
Q. So she wasn't up to what you believed a compliance officer should be; is that correct?
A. That's correct.
Q. And, therefore, you wanted to make sure that the clients knew that and what was lacking, you would provide; is that correct?
A. I had provided it in a memo.
Q. But when you saw she didn't do what you thought she should be doing, did you try to correct her?
A. Multiple times.
Q. Did you do that in writing?
A. Yes.
Q. And how about her competence? Did you make observations about her competence?
MS. DEROVANESIAN: Objection. Improper opinion.

THE COURT: Overruled.
BY MR. ZIMET:
Q. Did you think she was competent?
MS. DEROVANESIAN: Objection. Lack of foundation. She just stated she didn't make observations about this.
THE COURT: Sustained.
BY MR. ZIMET:
Q. You interacted with her for at least a year; did you not?
A. I don't know if it was a full year, but it was months.
Q. Pretty close -- right? -- to a full year?
A. Yes.
Q. And during that full year of interaction with her, you had the ability to discuss matters with her; correct?
A. Yes.
Q. You had the ability to see whether she grasped what the rules were that you were talking about; correct?
A. Yes.
Q. See whether she had the ability to apply what you did saying; correct?
A. I don't know if she applied them or not. I don't know if she followed through on my advice or not.
At times, we gave her advice, but it seemed like she didn't follow it -- or Safe Chain didn't follow it.
Q. And just based on those interactions and observations, you believed she was competent; did you not?

MS. DEROVANESIAN: Objection. Asked and answered.
THE COURT: Sustained.
MS. DEROVANESIAN: She already --
BY MR. ZIMET:
Q. Did you believe she was incompetent?
MS. DEROVANESIAN: Same objection.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Did you ever advise the Boyds that you thought that their compliance officer was incompetent?
A. Yes.
Q. Why did you do that?
A. I didn't say she was incompetent. I just -- I think I expressed that she didn't have a clue. I think that was my language.
Q. That she didn't have a clue what she was doing?
A. Yes.
Q. You knew they were relying on her being a compliance officer, knowing what to do and having a clue; isn't that correct?
A. Yes.
Q. Now, the question that I just asked you about her knowledge, her having a clue, had you discussed that with the Government prior to your testimony?
A. Yes.

Q. And you informed the Government that you, through your experiences, believed that their director of compliance did not have a clue as far as what she was doing?

MS. DEROVANESIAN: Objection. Hearsay.

THE COURT: Overruled.

BY MR. ZIMET:

Q. You can answer.

A. Yeah, I felt she wasn't the best compliance officer, no.

Q. That wasn't my question, ma'am.

The question to you was did you tell that to the Government that you believed that she didn't have a clue what she was doing during communications with the Government prior to testifying?

A. Yes.

Q. And you saw Ms. Divilio in the courthouse when you came down to testify yourself; did you not?

A. No.

Q. You knew she was going to be a government witness; correct?

MS. DEROVANESIAN: Objection.

THE COURT: Overruled.

A. No.

BY MR. ZIMET:

Q. And you believed it was important for the Government to know that someone who possibly could be a witness in this case, you believe, didn't have a clue what they were doing?

MS. DEROVANESIAN: Objection. Improper opinion to comment on other witnesses.

THE COURT: Overruled.

BY MR. ZIMET:

Q. You can answer.

A. Can you repeat the question?

Q. Sure.

You believed it was important for the Government to know that somebody who was involved in this case and possibly could be a witness in this case, did not have a clue as far as what they're doing when you had your communications with the Government?

A. I thought it was an important fact, yes.

Q. Do you recall -- I know it was five days ago, but do you recall that fact that you believed that she did not have a clue being brought out during your direct examination in front of this jury?

A. No.

Q. It wasn't asked, was it?

A. I don't think so, no.

Q. So -- and if we can approximate, I realize it's hard -- if you want to look at what's in front of you, which I think are the billing records -- can you give us an approximate date when you reached the conclusion that Abbie Divilio did not have a clue what she's doing as a compliance director?

A. I couldn't come up with that answer from looking at the billing records.
Q. Was there a particular event that got you over the border or over the hump, whatever metaphor you want to use, that she didn't have a clue?
A. Yes.
Q. What event was that?
A. When there was a second event, third event, and she still didn't know what to do and kept asking -- she asked the same question over again: Do we get the product back? Should we send it to Gilead?
It was the same answer. Same question. Same answer.
It's like three different -- she just wasn't following what she was supposed to do.
If she had SOPs that apparently were shown to me, she would have known exactly what to do if she was following her own SOPs.
Q. So you believe she was not following her own SOPs; is that correct?
A. I didn't know if she was or she wasn't, but I didn't think she was, no.
Q. There's a simple -- I will ask it this way: Isn't there a simple way to figure out whether she's following her SOPs by asking her "what did you do," and then comparing them to what the SOPs were?

A. I didn't see her SOPs.
Q. You knew what the SOPs were that were standard. You talked about that in your direct examination; correct?
You were shown. You said, "These are our standard --"
A. Everyone's SOPs are different. I can't say they had standard SOPs or what their SOPs contained, and I don't know if she was following them or not following them; but it seemed to me she was asking the same question that I had already answered multiple times.
She was starting from scratch every single time.
Q. So let me ask the question, so you can answer the question that I'm asking you. All right.
You were asked on direct examination and shown some SOPs that were dated 2015; were you not?
A. I was shown them in the courtroom, yes.
Q. In front of this jury; correct?
A. Yes.
Q. And you said, "These are the standard ones for -- from the FDA or whoever publishes them"; correct?
A. No, I said they looked like they were verbatim, parts of it, from the FDA guidance.
Q. Okay.
A. I hadn't read the whole SOP.
Q. You were shown, you said it was, from what you saw; correct?

A. I was shown an SOP, yes.
Q. And it was represented to you in the question that it was something that was from Safe Chain; correct?
A. Yes.
Q. And so to know whether that was being followed or not, one way to do that would be to ask Abbie Divilio: What did you do, and then compare that with what you knew were the standard SOPs; correct?
A. I asked Abbie Divilio what she was doing, and she told me, and so did Charlie Boyd, that they were following their procedures. They had told me that.
Q. Not my question.
The question is -- and please answer the question: Asking her what she did -- what she did, and then you comparing that to what you knew the SOPs said you should do?
THE COURT: Mr. Zimet, when did she know the SOPs?
MR. ZIMET: She knew them beforehand, Judge.
THE COURT: Let me hear her say that.
BY MR. ZIMET:
Q. You knew the SOPs, okay, in 2020 because you had worked with them for years; isn't that correct?
A. I know nothing about their SOPs.
Q. No, no, no. Not their SOPs.
The FDA guidance, okay, as to what SOPs should be, that's what you were familiar with.

That's what you testified to on direct examination; correct?
A. The SOPs may or may not contain FDA guidance.
Their particular SOPs that I looked at looked like they were verbatim from the FDA guidance. The language was from the FDA guidance.
Q. So you knew what those FDA guidance SOPs were in 2020; correct?
A. I knew what the FDA guidances said.
Q. In 2020; correct?
A. Yes.
Q. And then you had the ability to ask Abbie Divilio, "What did you do," and compare that to what you knew were the FDA SOP guidance that existed in 2020; isn't that correct?
A. And I did. I asked them if they were obtaining T3.
They were asked -- all those questions were asked of them, and I was assured that they were following what they were supposed to do as a wholesaler.
Q. And you asked specifically Abbie Divilio, "What did you do with a T3?" Is that correct?
A. I sent them a memo.
There was a memo that explained what the DSCSA requirements are for T3, and any wholesaler should know what the requirements are for T3.
Q. Okay. The question to you, ma'am, is not what she should

have known, okay? The question is what did they do, and did you ask Abbie Divilio "What did you do with the T3s as part of your approval process?"
A. I did.
Q. And what did she say?
A. She said they had forms and that they were vetting all of their vendors.
Q. Okay.
A. Yes.
Q. Did you ask her were there occasions in which the information from their vendors were not accurate?
A. I told them that they cannot accept product if the T3 wasn't validated.
Q. Not my question, ma'am.
Did she tell you there were forms, T3s that were provided that did not have accurate information in them?
A. No, she did not.
Q. Did you ask her whether that existed?
MS. DEROVANESIAN: Objection. Calls for hearsay.
THE COURT: Overruled.
A. I asked her if they were validating their sources.
BY MR. ZIMET:
Q. What was my question to you, ma'am?
A. Can you repeat the question?
Q. You don't remember what it was?

MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Repeat the question.
BY MR. ZIMET:
Q. Did you ask her whether or not she had, in fact, checked the accuracy of the vendors who were submitting T3s?
A. I gave them the link to search for the licenses of their vendors, and I told them that the vendors have to be licensed in the state that they are sending in product to, that there's a responsibility to check the licenses, yes.
Q. And what was my question, as it relates to the licenses or related to T3s?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Sustained.
BY MR. ZIMET:
Q. We'll get to licenses in a second.
But my question relates to conversations you had with Abbie Divilio concerning whether she was checking the accuracy of the T3 information that was provided by vendors?
A. The answer is yes, and multiple times I told them what -- that they have to check the -- they have to verify the T3.
Q. And did she tell you that there were times in which the T3 information was inaccurate?
A. No.
Q. Never knew that before?
A. No.

Q. Never heard about that?
A. No.
Q. Is this the first time today you ever heard about that?
A. No. I heard about that further on.
Q. When further on?
A. I don't know exactly.
Q. Was it 2020?
A. I don't know exactly when they -- but I know there were three incidents. I don't know exactly when they were having problems verifying the T3.
Q. So the answer to one of the T3 questions about licenses, let's talk about licenses for a second.
Did you inquire whether or not Abbie Divilio was involved in the approval process for each of the five major vendors relating to the Safe Chain purchases of HIV drugs?
A. I didn't know there were five vendors.
Q. How about all of the vendors?
A. I assumed that she was verifying licenses.
She has testified that's part of due diligence, the wholesaler is required to check a license of their supplier.
Q. And that's important because if someone like Safe Chain is purchasing from a company, they need to purchase from someone who is licensed; isn't that correct?
A. Yes.
Q. That license speaks a lot about integrity, or should at

least, the integrity of the company in which these HIV drugs are being purchased from; is that correct?
A. It has nothing to do with integrity. It has to do with whether or not they have a license.
Q. They have license -- I'm sorry. Finish.
A. It depends. They just have a license. That doesn't have anything to do with integrity.
Q. A license is based upon a state evaluating whether they are worthy of having a license or not; isn't that correct?
A. They could have a license, but they could have other issues.
Q. Well, to get a license, you have to pass an inspection concerning who you are, what you are, who's involved in your company; isn't that correct?
A. No, not every state does an inspection for a wholesaler license.
Q. Not every state does, but many of them do; is that right?
A. Many do, yes.
Q. To know whether someone has gotten a license is not someone sending in ten bucks to the state and getting a piece of paper back, is it?
A. No, they have to verify there's a license with their sources.
Q. And so a state doing that, one would have a reasonable belief they had passed the inspection test about that

particular state; is that correct?
MR. POGOZELSKI: Objection. Calls for speculation regarding what one would believe.
THE COURT: Sustained.
BY MR. ZIMET:
Q. It's certainly not unreasonable to rely upon a state inspection to believe -- excuse me, a state license to believe that had it passed whatever the requirements were of the state to be operating in that industry; isn't that correct?
MS. DEROVANESIAN: Same objection and also improper opinion.
A. I can't answer that.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So did you do any -- and, let's say, for instance, you're familiar with New York licensing; isn't that correct?
A. Yes.
Q. That's one of the more stringent evaluators, is that right?
A. I can't say that.
Q. What do you need to do in New York to get a license to be a wholesaler distributor? What do you got to show?
A. You would have to show SOPs.
You would have to have certain space requirements. There has to be signage. You have to have somebody that's responsible -- they call it a responsible person.

Those are some of the requirements, and that responsible person has to have familiarity with a pharmaceutical business.
Q. And from the standpoint of Safe Chain or someone who is receiving drugs, pharmaceuticals from a company that has a license, what would Safe Chain need to do to approve that that vendor is sufficient to do business with?
MS. DEROVANESIAN: Objection. Improper opinion. It's a hypotheticals. She's not been qualified as an expert witness.
THE COURT: She's not an expert. I sustain the objection.
BY MR. ZIMET:
Q. Are you familiar with compliance?
A. Yes.
Q. Are you familiar with what requirements are in compliance for someone to accept a new vendor?
A. Yes.
Q. And what are the -- and let's use the ones you're familiar with.
What needs to be done by a company to approve a vendor to do business with?
MS. DEROVANESIAN: Same objection.
THE COURT: I will allow her to testify as to her experience.
A. They often have a form. And on that form, it would have --

ask questions like "have you had any problems previously? How long have you had your license? Are you licensed in that state? Are there any pending -- any pending issues with any regulatory authorities," those types of questions.

BY MR. ZIMET:

Q. Do you know whether that was done by Safe Chain in evaluating, for instance, Boulevard?

A. I was informed by Abbie that they had a vetting form, yes.

Q. And did she tell you that they had passed? Boulevard had passed the vetting process?

A. She didn't indicate.

Q. Did you ask her?

A. No.

Q. Why not?

A. I didn't know anything about Boulevard until maybe March or later of 2021.

Q. When you found out about Boulevard, did you ask her?

A. I found out about Boulevard from my supervisor.

Q. That wasn't my question to you, ma'am.

Did you ask Abbie Divilio whether she had fully vetted Boulevard?

A. No. I assumed she did.

Q. And that was based on you believing she knew how to do her job; isn't that correct?

A. Yes.

Q. Bad assumption. Right?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So you just testified earlier that she did not know what she was doing.
The assumption you just testified in front of this jury that you assumed she did do it the right way?
MS. DEROVANESIAN: Objection. Compound question.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Was that consistent with your thought as far as Abbie Divilio's performance?
A. She put in writing that they were vetting their supplies. That's in there somewhere.
Q. It's not a question of whether she put it in writing.
The question to you is did you believe she knew what she was doing when she vetted Boulevard?
A. I don't know. I can't answer.
Q. Did you try to double-check and see whether she knew what she was doing when she vetted Boulevard?
A. No. My job was not to vet their suppliers.
Q. Your job is to make sure they're doing things in the correct way; is it not?
A. Yes.

Q. And part of doing what -- deciding whether they're doing it in the correct way is to see whether their compliance director, what you described as she didn't know what she was doing, to properly have vetted this vendor; is that correct?
A. No, that's not my job either.
Q. Is it the job of anyone at Frier Levitt?
A. My job is to provide legal advice. It's not to vet their suppliers or make sure they're vetting their suppliers.
They were given advice as to what the requirements were and we were assured they were vetting their suppliers.
Q. So when you think that your clients, in this case, Safe Chain, was doing something based upon the advice being given by their compliance director, who you described as not knowing what she was doing, is it your testimony that you had no obligation to follow up on that as representing this client? Is that your testimony?
A. No. I mean, I have no knowledge of what she was or wasn't doing.
I just was assured from her that she had a vetting process and they were vetting their supplies. I can't comment -- I can't really answer your question.
Q. So let's talk for a second about, you say it's -- you said "It's not my job" to a whole bunch of things between last week and today.
Let's talk about what your job was from your perspective as

representing a client, Safe Chain and the Boyds. Right?

So you are an expert in regulations; correct?

A. I've got a working knowledge of them, yes.

Q. Working knowledge, even though, okay, you just started in November of 2019.

You know what the rules are; correct?

A. Yes.

Q. And part of your job is to give a legal opinion as to whether or not your client is following those rules; isn't that correct?

A. Yes.

Q. Because if they're not following the rules, okay, it's your obligation in representing them to say, "Listen, this isn't being followed. This needs to be followed. You need to make a change"; isn't that correct?

A. But you have to be told they're not following.

You can't -- I can't say "you're not following" if you don't tell me you're not following and you assure me that you are following.

Q. Well, ma'am, with all due respect, you need to ask "What are you doing," so you can make a determination whether they're being followed or not; is that correct?

A. That's correct.

We did ask, and we were told that they had policies and procedures. They had SOPs. They were appropriately vetting

their sources.

There was nothing to lead me to believe that they weren't doing that.

Q. Well, you knew that Gilead had a problem with what they were doing; did you not?

A. Yes.

Q. You knew that Gilead had a problem because they were asking questions about what was being done; isn't that correct?

A. Gilead had a problem with their vetting, yes.

Q. And being the analytical top-notch healthcare attorney, the first thing that went through your mind is why is, like, "Why is Gilead asking these questions?" Isn't that correct?

A. No. I knew there was an incident that had occurred and that's why they were writing an email to Safe -- to -- to Gilead.

Q. They were writing numerous emails to Safe Chain; isn't that correct? Is that correct?

A. I only know about the email that they were putting together. Then there was a letter from -- I mean, I wouldn't want to say yes without knowing more.

Q. Well, in representing a client, did you not instruct the client that "Anything you hear from Gilead, we need to see it, hear it and talk about"? Is that correct?

A. Yes, they knew that.

Q. And that's what you found out, that there were

communications; isn't that correct? From Gilead?
A. We were not told about all of the communications from Gilead. That's the problem.
There were communications from Gilead to Safe Chain early on. There were things going on that we were not made aware of.
Q. You know what Gilead was communicated [sic] because you saw the communications from Gilead; did you not?
A. I saw an email from Gilead.
Q. Just one, that's all you have ever seen?
A. No. And then there was a letter.
Q. Well, before the letter, there was another --
MS. DEROVANESIAN: Objection, Your Honor. I ask that the witness be able to finish her answers before another question is asked.
THE COURT: If you weren't done with your answer, you can finish your answer.
A. I know there was an email, and I know there was a letter from Gilead in November 23rd of 2020 that asked for a response; and we drafted a response to that, and then there was communication back and forth from Gilead after that.
BY MR. ZIMET:
Q. So before the November letter, there were communications originally from the quality people, quality assurance if you will, at Gilead; and then it changed, and then it was someone from the counterfeiting section at Gilead; isn't that correct?

A. I know there was a person from the counterfeiting section, yes.
Q. Who wrote to Safe Chain; isn't that correct?
A. Yes.
Q. So when you saw that, did you analyze, "Well, wait a second, what is that about?" Did you?
A. I -- that was from their quality department and their counterfeiting person.
I don't know why he was involved really, except it could be a trademark issue.
Q. Well, it could be; it might be.
Did you try to find out what it was?
A. What was -- I don't understand what I'm supposed to ask.
Q. Well, you were supposed --
A. Get a letter from Gilead.
Q. When you get something from the counterfeiting department at Gilead, did something go through your mind that maybe there's a counterfeiting issue that Safe Chain needs to be aware of and I need to find out what's involved?
A. Wouldn't that be in the communication from Gilead? That they would have addressed that in the letter?
Q. And what was in the letter that they were concerned about?
A. There were two lots that were referred to in that letter.
Q. And so for the counterfeiting section of Gilead to be involved, they had the concern about how that related to

Gilead; isn't that correct?
A. Yes.
Q. So, in your mind, from your experience, from all these years of teaching, all of the degrees that you have, did something go through your mind that Safe Chain might have a problem with what was happening with Gilead products?
A. Yes. And I was concerned that I only knew about one of the incidents in that letter, not the second one.
Q. So when you saw there's a second one, immediately you asked, "What was the second one?"
A. Yes.
Q. And who did you ask?
A. I asked Safe Chain, Abbie.
Q. Did you ask that in an email?
A. Yes.
Q. And what did the email ask?
A. I don't recall, but I did say, "This is the first" -- I don't know if it was an email or a call, but I remember writing to Gilead that this was the first that we're hearing about the second incident.
Q. And that was in the fall of 2020, ma'am? Is that your testimony?
A. That was after November 23rd.
Q. I'm talking about before November 23rd.
A. No. After November 23rd, that was the first time that we

got a notice about that second incident, and it was news to me. I hadn't seen that before.
Q. Ma'am, I'm directing your attention before the November 23rd communication, before that time, to the counterfeiting section communicated to Safe Chain that there was an issue and they wanted information concerning what had taken place.
A. I don't recall, no.
Q. Well --
A. Except for the email that -- that first email.
Q. Isn't it correct to give legal advice, you've got to know what the issue is that you're giving advice concerning?
A. You're asking me about specific dates from five years ago, and I'm not -- I don't particularly recall any additional communication from Gilead before November 23rd, other than that other email.
Q. So the counterfeiting department's involvement from Gilead, or before they had not been involved, that did not designate or indicate anything to you that you thought there was a concern or an issue? Is that your testimony?
A. That's not my testimony. There was a big concern.
Q. Did you try to find out from Gilead what the concern was?
A. It was in the letter.
Q. So it was all explained in the letter what the concern was?
A. Yes.

Q. And did you look at that concern and say to yourself, before even to the clients, "I need to get to the bottom of this?"
A. Yes.
Q. And what did you do to try to get to the bottom of what the Gilead issue was?
A. I reached out to Safe Chain.
Q. And so then -- and let me just ask it this way simply: Did you think there was an issue that Gilead had as to how these drugs got into the supply chain they were talking about?
Did that cross your mind?
A. I couldn't speculate.
Q. I'm not asking to speculate.
I'm asking what your thinking was. You're a healthcare attorney, well-experienced, maybe not in healthcare, well experienced with these regulations and so forth, well-aware from your experience and expertise, as to why manufacturers have issues with secondary wholesalers like Safe Chain.
Did it not cross your mind that there's a potential gray market issue of how these pills got into the supply chain?
A. Not at the time, no.
Q. Didn't cross your mind at all? Is that what you're saying?
A. No.
Q. Would it be correct to say that you missed it?
A. It could have been that. It could have been a problem at

Gilead.

It could have been -- the one incident that I'm aware of, it seemed that it was a dispensed medication and maybe the patient put Excedrin in the bottle. You know, there were a lot of different things. I couldn't say.

Q. But to represent somebody, properly represent them, effectively represent them, you don't deal in "could be's" or "maybe" or "so forth."

What you deal in is what are the facts; isn't that correct?

A. The fact was we were assured that they were following what they needed to do to vet these suppliers.

Q. The facts of what was out there at that moment concerning those transactions; isn't that correct?

A. There were two transactions on that letter.

And the second one, we had not been informed of. Apparently, Safe Chain was aware of it.

Q. So you did no investigation at all concerning what the facts were leading up to what Gilead was concerned about; is that correct?

A. That's not correct.

Q. Okay. And in your factual investigation, you wanted to determine for yourself how to represent your client by determining how those drugs got into the supply chain; isn't that correct?

A. Yes.

Q. That's the issue; right? Gilead thinks that these drugs improperly got into the supply chain.
Was that obvious to you at that point?
A. Yes.
Q. Okay. So to decide how to represent a client, you would want to know what was the source of these drugs. Where did they come from when they got to Safe Chain; isn't that correct?
A. Yes.
Q. And you found out that they came from a company called Gentek; isn't that correct?
A. Yes.
Q. And you found out that Gentek was licensed in the state of Connecticut; isn't that correct?
A. I wasn't aware of that.
Q. Well, you checked it out, didn't you?
A. No.
Q. You didn't think it was important to check out the company that sold those drugs to Safe Chain?
A. I didn't check Gentek's licenses, no.
Q. You certainly want to check out and see whether they were legitimate or not, did you not?
A. That's not my job either, no.
Q. So --
A. It's a compliance officer.
Q. So if your client that sold drugs and the company selling

them is defrauding your client, that's not something that you want to try to find out in your legal representation of your client?

A. It's something that I would be interested in, but I don't know if they're vetting Gentek. We were told they vetted everything. I don't know what else I was supposed to do.

Q. You just said just because they were licensed and they're vetted by a state doesn't mean they're doing things honestly and correctly and not fraudulently; isn't that correct?

A. Yes.

Q. So you said you were interested. Is that a synonym for trying to find out?

A. If I'm told that they vetted Gentek, I don't know what additional vetting, you know, you think attorneys are going to do for their sources.

Q. Well, let me see whether you agree with this or not.

One of the things to do is try to find out who was involved in these transactions themselves, and how did it take place? Wouldn't that be one thing that you would be interested in?

A. Yes.

Q. And you asked, "How did you guys get to Gentek?"

Did you not?

A. I didn't ask them about how they got to Gentek, no.

Q. Did you ask them, "Did Gentek come to you with an offer or did someone connect you with Gentek?"

A. No.
Q. That wasn't an important -- something that you were interested in?
A. The word "Gentek" as their source came out around the time of the Gilead letter. I never -- we never asked them who their sources were.
Q. So you never asked?
A. Maybe, you know, others, but I didn't.
Q. You knew who Adam Brosius was; correct?
A. I thought he was their sales rep.
Q. You knew about his background; did you not?
A. No.
Q. If you had checked the file -- well, actually, did you ever know who Adam Brosius was in relationship to Safe Chain?
A. I was told he was their sales representative.
Q. Did you ever check out whether he had any legal problems?
A. No.
Q. Did John Marrone ever tell you he had legal problems?
A. No.
Q. You're not aware of it?
A. No.
Q. Did you ever check the billing records to see all the work that was --
A. I don't have access to everyone's billing records.
Q. How about --

A. I only have access to my own.
Q. Now, about Safe Chain's billing records, as to what occurred, what work was done relating to Adam Brosius's indictment?
A. I answered that. I only have access to my own billing entries. I can't see anyone else's.
Q. Do you know whether Adam Brosius, as an indicted person, conned Safe Chain into doing business with Gentek?
MS. DEROVANESIAN: Objection. Argumentative. Lack of foundation. Assuming facts not in evidence.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Did you explore what Adam Brosius's role was in connecting Safe Chain with Gentek?
A. Adam Brosius came on the scene late. I don't know, and so I don't know anything about him and Gentek, but I do know that he was then on a few calls and things like that.
But I was told that he was a sales representative from Florida.
Q. Did you ask any questions about what his background was?
A. No. I wouldn't ask anything like that.
Q. Did you ask anyone at Frier Levitt, "What do you know about Adam Brosius?"
A. No, I didn't ask anyone that.
Q. Would it be appropriate for you to find what work had been

done, if any, vetting Adam Brosius; is that correct?
A. I just know he appeared on certain calls. That's all I know.
Q. You since found out that he was indicted; correct?
A. Yes.
Q. When did you find out he was indicted?
A. I think a couple of months before this case.
Q. In 2025?
A. Yeah. I started to look, and I saw he was indicted.
Q. And where were you looking?
A. I just got curious, and I looked and saw he was indicted.
Q. You got curious and looked at what?
A. I know there's a criminal case against Safe Chain, and I just googled and saw it.
Q. Out of the blue, you just googled Adam Brosius's name prior to coming to testify in this case? Is that your testimony?
A. Yes. I mean, it just -- I stumbled upon it.
Q. You just stumbled across his name, and you looked it up on Google.
Is that your testimony, ma'am?
A. I didn't know anything about what he was involved, you know -- all I saw was that there was a criminal case against him.
Q. Well, there's a lot of people whose names came up in this case.

For some reason, you wanted to google Adam Brosius's name in 2025? Is that your testimony?
A. I did google his name, yeah.
Q. I understand that.
But the reason you did it is just something that came to your mind in 2025 to do?
A. I was doing some background in looking what's going on in this case.
Q. Doing background, I'm sorry -- finish.
A. I was looking at what's involved, what this case was about; and then there was something about Adam Brosius.
Q. So you're doing background about this case in preparation for your witness in this case.
Is that your testimony?
A. Yeah, I wanted to know what this was all about.
Q. You wanted to know what this was all about?
A. Yes.
Q. To better prepare you to be a witness?
A. To find out what I'm being subpoenaed to appear for, U.S. v. Boyd.
Q. So you think that was on the internet, to find out what you were being subpoenaed for? Is that what your testimony is?
A. I wanted to know what the indictment was, yes.
Q. So --
A. The complaint.

Q. -- you wanted to know what the indictment was, so that you could see how to fit your testimony in with what was indicted? Is that your testimony?
A. No, I just wanted to know a little bit more about what he was being called as a witness for, since I had no background on it.
Q. So you're certainly told by the Government "All we want you to do is come in and tell the truth"; right?
A. Yes.
Q. And to use your memory, not something that's on the internet. They told you that also; did they not?
A. No.
Q. They didn't tell you?
A. No one told me that.
Q. Did you tell them you were doing research on the internet before you came in to testify?
MS. DEROVANESIAN: Objection. Hearsay.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Did you tell them that?
A. No.
Q. Did you tell them that part of your testimony was based on what you saw on the internet as opposed to what your memory was?
MS. DEROVANESIAN: Objection. Mischaracterizing her

testimony. Argumentative.

THE COURT: Overruled.

A. I had no testimony about Adam Brosius that I recall.

BY MR. ZIMET:

Q. Yet you looked up things about this case, did you not, ma'am?

A. Yes.

Q. Did you tell them that you looked up things about this case to prepare you to be -- to prepare yourself to be a witness? Did you tell --

A. I just read the complaint.

Q. I'm sorry. Did you tell the Government that?

A. I read the complaint.

Q. Did you tell the Government that, ma'am?

A. No.

Q. Answer my question.

A. No.

Q. And the reason you didn't tell the Government that is that you didn't want them to think that you were catering your testimony to something that you had read on the internet; isn't that correct?

A. No.

Q. Something that sort of slipped your mind to tell them about that so they could make an evaluation of your testimony?

MS. DEROVANESIAN: Objection. Argumentative.

THE COURT: Overruled.
A. I think it's important to find out what I'm being called -- what the case is about that I'm being called as a witness.
BY MR. ZIMET:
Q. And that's important so your memory could be refreshed as to what occurred five years ago? Is that your testimony?
A. No.
Q. So as part of your preparation to testify, you met with the Government initially on what date?
A. I don't recall the exact date.
Q. It was in August of this year?
A. It may have been. I'm not sure.
Q. Let's -- let's try to figure out together.
You're fired from Frier Levitt August the 6th; is that right?
A. Yes.
Q. So it was before or after you were fired from Frier Levitt that you first had your conference, communication with the Government?
A. After.
Q. So sometime in August?
A. Yes.
Q. And the initial meeting took place where?
A. I think it was at the federal building in Medford.
Q. And that is for us not familiar with where Medford is, is

that in New York?
A. Yes.
Q. Long Island, is it?
A. Yes.
Q. And who was present at that first meeting?
A. Agent Jackie.
Q. Agent Jackie. You're talking about the prosecutor who asked you questions?
A. Yes. Agent Alex and Agent Cesar.
Q. Anyone else?
A. No, I believe that was it.
Q. So the prosecutors came to New York to talk to you; is that correct?
A. I didn't know where they were based from, and I didn't ask.
Q. I'm not questioning where they were based in.
They met you in New York; correct?
A. Yes.
Q. What did you bring to the meeting?
A. Myself.
Q. Did you bring some documents?
A. I had a few memos that I had written, yes.
Q. So you've already been fired from Frier Levitt, but you brought documents to the meeting, the first meeting with the prosecutors; is that correct?
A. I had three memos that I had written, yes.

Q. And you thought that they would be helpful to the Government -- is that correct? -- to see it?
A. I thought it would be helpful to me, to show I gave the appropriate advice.
Q. So you were concerned that potentially the advice that you gave could be questioned as far as -- as far as whether or not it was legitimate advice; isn't that correct?
A. No. I wanted to show that I gave the correct advice.
Q. As opposed to the incorrect advice?
A. Yes.
Q. Because if it was incorrect advice, you potentially could have exposure for what the Boyds were charged with; is that correct?
A. I don't know if I would have exposure.
Q. Well, you were worried about it; weren't you?
A. I've never been a witness in a case, if that's what you're asking me, and I have never given testimony. So yes, I am -- I was concerned and I am concerned.
Q. Because you believe that if it's found and determined that you gave advice that was relied upon by the Boyds and the Government thinks the Boyds did something wrong, you could have some problems yourself; isn't that correct?
MS. DEROVANESIAN: Objection. Improper opinion. Calls for a legal conclusion.
THE COURT: Calls for her state of mind. Overruled.

BY MR. ZIMET:
Q. Isn't that correct?
A. I wanted to show that I had given them the correct advice via memorandum DSCSA rules and everything else.
Q. To protect yourself; correct?
A. Yes.
Q. Protect yourself against potentially being accused of doing something wrong; isn't that correct?
A. No.
Q. Well, it's true that the Boyds did rely upon your advice. There's no question about that; is that correct?
MS. DEROVANESIAN: Objection. Calls for speculation. Lack of personal knowledge.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Are you aware of whether or not the Boyds relied upon your advice?
MS. DEROVANESIAN: Same objection. Calls for speculation.
THE COURT: She can answer yes or no.
A. I think they relied on my advice, but I don't know if they followed it.
BY MR. ZIMET:
Q. And you then testified -- came in and said, "Well, my advice would have been different if I had known these

additional facts." We spent half a day talking about that; did you not?
A. Yes.
Q. And certainly that was an attempt by yourself to say, "Well, even if I gave advice that was wrong, I wouldn't have done that if I had known certain things from the Boyds"; isn't that correct?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Overruled.
A. None of the advice was wrong.
BY MR. ZIMET:
Q. So the advice that you gave to the Boyds was correct? Is that what you're saying?
A. Yes. Yes, it was.
Q. So all the questions that you were asked, that had you known X, Y, Z, would you have given different advice, you're not saying that the advice you gave was wrong at all?
A. No, I'm not.
Q. So you then had documents, when you met with the prosecutors, that were shown to you; is that correct?
A. Yes.
Q. In New York?
A. Yes.
Q. In Medford.
And that meeting led to a second meeting; is that correct?

A. Yes.
Q. And where was that second meeting?
A. It was in the Suffolk police department.
Q. That's in New York also?
A. Yes.
Q. And who was at that second meeting?
A. I believe it was just Agent Jack and Agent Alex. I'm not sure.
Q. And they introduced you that they were agents; is that correct?
A. Yes.
Q. And at the second meeting, you went into more detail of what had happened at the first meeting; is that correct?
A. Yes.
Q. Now, at one of those two meetings, the issue of your employment came up; did it not?
A. Yes.
Q. And you told them that you had been fired from Frier Levitt; is that correct?
A. Yes.
Q. And you told them that the reason that you were fired was because you were having -- or you were being age-discriminated against?
A. Yes.
Q. Did they then ask you, that's what you're saying, but what

did Frier Levitt tell you as the reason that you were fired?
A. Frier Levitt said that -- that they were trying to reach me during my vacation. That's what they said.
Q. Because you were not responsive to your employers, that's why you were fired? That's the reason they gave?
A. While I was on vacation, yes.
Q. And that was the only reason why they said you were fired?
A. Yes.
Q. And you think that's a lie; correct?
A. Yes, it is.
Q. So if you told the agents, Agent Jackie and Agent Alex, that you were fired based on Frier Levitt lying about you?
A. Yes.
MS. DEROVANESIAN: Objection. Hearsay.
THE COURT: Overruled.
BY MR. ZIMET:
Q. So you were making an accusation against your former employer that they lied; is that correct?
A. Yes.
Q. Now, was there any follow-up discussion between you and the agents concerning your accusation that your employer had lied about you?
A. I mentioned that I have an age discrimination EEOC complaint pending. It's ongoing, and it was the reason why I was let go.

Q. Did you file an affidavit in that case? Did you make a statement in that case?
A. To who?
Q. The EEOC.
A. Yes. I have a complaint number, and I have an interview scheduled.
Q. Well, you filed a complaint that you swore to; is that right?
A. It's an intake, yes.
Q. Did the Government ask to see that so they could evaluate whether you were being truthful or not?
Yes or no?
A. I have a complaint number. I don't know the relevance of that to this case.
MS. DEROVANESIAN: Your Honor, I'd object to vague with just the description of the Government with respect to her EEOC claim versus the Government in this criminal case.
THE COURT: If she doesn't understand the question, she can ask for clarification.
Overruled.
BY MR. ZIMET:
Q. Did the prosecutors in this case -- Agent Jackie and Agent Alex, they're the prosecutors; right?
A. Yes.
Q. Did they ask you for a copy of your claim, your statement

that Frier Levitt had lied about why you're being fired, in reality, it was because of age discrimination?

A. No.

Q. Did they tell you at any point that we need to evaluate this to determine the trustworthiness and truthfulness before we put you on the witness stand?

A. No.

Q. You certainly would have provided it to them if they asked for it; correct?

A. I don't know what you're asking me to provide.

Q. Your statement as to why you claim Frier Levitt was lying about why you're fired, in fact, you're fired because of age discrimination?

A. Yes, I would have provided a statement.

Q. It's only them not asking that you didn't provide it; is that correct?

A. Yes.

Q. And you have no objection to us looking at it also; correct?

A. I don't know what -- other than the complaint number, I don't know what you -- documents you would be asking about other than from Frier Levitt finding out all the investigation that went on about age discrimination. They had outside counsel that they hired. They tried to fire my secretary, 72-year-old secretary twice. This is after, in December, I got

a very large bonus and was doing a good job.

And then they hired a secretary, who was 72, and twice they tried to fire her. And when I stood up for her, then they dragged me into this, and it became this whole age discrimination thing.

Q. So that whole scenario you just talked about --

A. Yes.

Q. -- was fully investigated by Frier Levitt?

A. Yes.

Q. And they found there was no basis for it, right?

A. Yes, that's what they said to me.

Q. So certainly there's a dispute as to who's lying?

A. Yes, there is.

Q. The Government prosecutors did not express to you at any point that they wanted to see those documents because one of the two of you is lying; correct?

A. There are emails from -- you can get many, many emails from their outside counsel that investigated it. There's a whole file of documents that I sent to that outside counsel. There's a big paper trail on that.

Q. And I'm asking about you to the Government, okay.

The prosecutors, that Government, never requested one single document to evaluate whether you're telling the truth or not; correct?

A. No.

Q. Now, when you were told that you were fired for a false reason, did you respond to Frier Levitt that you're lying about what reason you're saying you fired me for?
A. Yes, I did.
Q. You sent an email to Frier Levitt; is that correct?
A. Yes, I did.
Q. And you signed it saying, "You're liars; I'm telling the truth"?
A. Yes. They asked me to release them from liability. They sent me a form to release them, and the form said I would not file an age discrimination claim, and they would give me $23,000, and I refused.
Q. So they were trying to buy you off?
A. Yes, they were.
Q. Basically; right?
A. Yes.
Q. And so they're trying to bribe you, okay, and you reported that to the Government that Frier Levitt was trying to bribe one of their employees; correct?
A. No.
Q. You didn't tell the Government that?
A. That's not a bribe.
Q. Well, to pay --
A. That was a settlement.
Q. They're offering for you to pay off -- not to go after them

for age discrimination?

MS. DEROVANESIAN: Objection. Relevance.

THE COURT: Sustained.

BY MR. ZIMET:

Q. So that all took place sometime in August, leading up to August 6th when you were fired; is that correct?

A. Yes.

Q. And you knew that Frier Levitt was responsible for whatever representation they gave to the Boyds and Safe Chain; is that correct?

A. Yes.

Q. And you knew that if the representation was not good, that Frier Levitt would have exposure for what's called malpractice; is that correct?

A. Yes.

Q. You knew if they had exposure for malpractice that would be very, very important for the Boyds and for Safe Chain; isn't that correct?

A. Yes.

MS. DEROVANESIAN: Objection. Calls for speculation.

THE COURT: Overruled.

BY MR. ZIMET:

Q. And so you wanted to make sure, from that standpoint of malpractice, you actually had a concern for yourself; correct?

A. Yes.

Q. So you wanted to make sure that you did not have any exposure for malpractice relating to your involvement with the Boyds' representation; correct?
A. Yes.
Q. And certainly, the Government talked to you about that during at least the first two interviews; is that correct?
A. Briefly but -- very briefly.
Q. And so tell us what the conversation was with the Government concerning your concern about malpractice?
MS. DEROVANESIAN: Objection. Calls for hearsay.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Go ahead.
A. Well, I was concerned that why was I being called as a witness, and I was concerned that one of the defenses was advice of counsel, and so I was concerned, yes.
Q. About malpractice?
A. Yes.
Q. And so you talked about malpractice with the Government prosecutors; correct?
A. Not really discussed it, no. Just that -- what does advice of counsel mean, and what are all the implications.
Q. So when you answered a couple of minutes ago that you discussed malpractice with the prosecutors, that was inaccurate?

MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Did you or did you not talk about malpractice with the prosecutors?
A. I asked about exposure, yes.
Q. So you asked for a legal opinion from the prosecutors about your exposure; is that correct?
A. No.
Q. Whose exposure did you ask about?
A. I asked, you know, what a lawyer's responsibility would be in this case, and what they would, you know, and that's all.
Q. Okay. So let's break that down.
Was that at one of the first two meetings that you asked that question?
A. Yes.
Q. And that was where Agent Alex and Agent Jackie were?
A. Yes.
Q. So you asked the question of them; correct?
A. Yes.
Q. And so what was the answer -- first of all, who gave you the answer to that? Which one of them or did both of them?
A. I don't think they really answered it. They just said, "Just tell the truth. You have to come and tell the truth about the case."

They didn't really talk to me about what malpractice or getting my own attorney or anything like that. It wasn't discussed.
Q. You just answered the question that you had a conversation with them about your exposure; correct?
A. I expressed that I was concerned, but they didn't really address it.
Q. What did they say?
A. They said just be honest. Come and tell the truth and that you can only be accused of malpractice if you knew everything and you provided legal advice that was followed --
Q. So you --
A. -- based on that complete picture of knowledge.
Q. So you did discuss malpractice, as you just indicated in your answer; correct?
A. I wouldn't use the word "malpractice."
Q. You just did.
A. It was -- I wanted to know what the exposure was.
Q. So the answer that you just gave about what they said to you about malpractice never took place?
A. No.
Q. And I don't mean this to be offensive: Did you just make that answer up that you just discussed?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Overruled.

BY MR. ZIMET:
Q. You can answer the question.
A. No. I asked them what my exposure was.
I said that to you, and the word "malpractice" -- we really didn't get into that, and they really didn't answer it.
Q. So when you answered a couple of minutes ago that they talked about malpractice in their answer to you, was that something that you just made up?
A. I guess if you want to call exposure malpractice, you can but...
Q. Well, what we're looking for is what was -- it's not what I want.
What we want to know what was actually said, ma'am. Was malpractice actually said, or is it something that you just made up in your answer?
A. I don't recall.
Q. So that would have been no earlier than August the 6th; correct?
A. That I met with them?
Q. Yeah.
A. No, no. Earlier than August 6th.
Q. And today is September 29th?
A. Yes.
Q. So approximately -- my math is not very good -- let's say, you don't remember the conversation 45 days with the two

prosecutors? Is that your testimony?
A. No.
Q. It's not your testimony or it is?
A. No, it's not my testimony.
Q. Well, you just said that you don't recall.
To me -- well, let me ask it this way properly: When you say, "you don't recall," is that not the same as "I don't remember"?
Is it?
Yes or no?
A. It's not the same, no.
Q. So there's a difference between "I don't recall" and "I don't remember"? Is that your testimony?
A. I'm not sure. I'm not sure if there's a difference between "I don't recall," and "I don't remember."
Q. Well, let me ask you the question this way: Are you saying "I don't recall" to avoid giving a truthful answer?
MS. DEROVANESIAN: Objection. Argumentative.
THE COURT: Overruled.
A. No. I just -- I think I answered the question, though.
BY MR. ZIMET:
Q. Well, the jury will decide that, but the question to you was "Okay, are you using 'I don't recall' to avoid giving a truthful answer?"
A. No.

Q. You would never do that; right?
A. No.
Q. Of course not.
A. But I have been here.
THE WITNESS: And I do need to use the restroom, Your Honor.
THE COURT: We'll take a ten-minute recess.
Remember my admonishment not to discuss the case or allow it to be discussed in your presence.
We'll see you back in the jury room in about ten minutes.
(Jury exits.)
THE COURT: And if there's nothing else to come before the Court, we'll be in recess for ten minutes.
THE COURT SECURITY: All rise.
(Off the record.)
COURT SECURITY: All rise.
(Jury enters.)
THE COURT: Please be seated. We're back on the record.
Everybody except for Agent Alex is present.
Anything to come before the Court before we bring in the jury in?
MS. DEROVANESIAN: Not at this time.
MR. ZIMET: Judge, there's a Brady issue. I can take

it up at the end of the day.

THE COURT: Go ahead.

MR. ZIMET: So the witness testified concerning Government witness Abigail Divilio, as far as her ability to follow the rules, a certain degree to her responsiveness as well as her competence. Those are all things that she supposedly said to the Government.

We have not received any kind of notification of that prior to Divilio's testimony. It's Brady evidence.

We would ask the Court to instruct or compel the Government to present any report relating to that on this witness and any other information they have concerning that; as well as Brady, concerning this witness, concerning whether or not she truthfully made an accusation against Frier Levitt that they lied concerning her firing because, obviously, that is an issue that goes to her trustworthiness and truthfulness as a witness that we need to evaluate and look at, as far as additional cross-examinations.

THE COURT: What's the Government's position?

MS. DEROVANESIAN: Your Honor, I guess I want to clarify are the two different pieces of information that they're claiming is Brady, and if it is as to this witness versus another witness?

It sounds like his position is that, first, she's made statements on the witness stand that she believes another

witness was not competent or acting appropriately?

THE COURT: Do you have any reports or any information about that?

MS. DEROVANESIAN: I don't recall that, Your Honor.

THE COURT: You don't recall her saying that, or you don't recall having any reports or any information that would indicate that Ms. Divilio was incompetent?

MS. DEROVANESIAN: I don't have a personal recollection of that, Your Honor, but I would defer to what is in the report because I was not present personally for every moment of these meetings.

THE COURT: So you're going to look through any reports that you have, and if there's anything written about her being incompetent, you're going to turn it over to defense counsel.

MS. DEROVANESIAN: Yes, Your Honor. And I would also note that we have turned over the reports relating to this witness that we have, but we are happy to do a double-check and make sure.

THE COURT: See if there's another report.

And the other issue that Mr. Zimet wanted to bring up?

MS. DEROVANESIAN: I'm sorry. I was unclear on what his second issue was. Was that with respect to the Frier Levitt law firm?

THE COURT: The lawsuit.

MS. DEROVANESIAN: The lawsuit.

THE COURT: Do you have any reason to believe that this client is lying and that Frier Levitt is telling the truth?

MS. DEROVANESIAN: Your Honor, we don't. We have the facts that this witness shared, and we've turned those over.

THE COURT: And if something comes up and it turns out that you think that this witness is lying about her age discrimination suit, you'll turn that over to defense counsel.

MS. DEROVANESIAN: Absolutely.

MR. POGOZELSKI: And, Your Honor, just to add to that, we did interview a current Frier Levitt attorney who disputed her allegation; and that, I believe, that was in the report of that witness's --

THE COURT: Which witness is that?

MR. POGOZELSKI: Jesse Dresser.

THE COURT: Okay.

MR. POGOZELSKI: That he said he believed that she was fired because she wasn't responding to clients in a timely manner, something in that fashion; so they have that report.

THE COURT: If that report wasn't turned over, you will turn that over.

MR. POGOZELSKI: Yes, Your Honor. That report was turned over, but we'll double-check to make sure.

THE COURT: Okay. Anything further before we bring in the jury?

MR. ZIMET: Yes, Judge.

If, in fact, this witness had not told the Government that, in fact, Divilio was incompetent and she's testified that she did do that to the Government, we think that's Brady material also.

In other words, Agent Jackie said she wasn't there and doesn't remember hearing it. If no one heard it, that means the witness made it up, that she told the Government that.

THE COURT: I'm not going to have prosecutors turn out to be witnesses in the case.

MR. ZIMET: We can have a stipulation as to it. If it's Brady, if a witness is lying, just because she lied to the prosecutor doesn't mean that we're not entitled to it and try to bring it out on cross-examination of her also.

THE COURT: Her saying that she told the prosecutors that she thought Ms. Divilio was incompetent during vigorous cross-examination may not be the words that she used.

In other words, she may have said, "Ms. Divilio wasn't doing a good job," and you cross-examine her and the "incompetent" comes out. So...

MR. ZIMET: Judge, there's nothing even close to that in any of the reports of the conversations with this witness. It's not even in the same ballpark. So if she didn't say anything even close to that, we would suggest that that's Brady, okay, and how that can be presented to the jury is another issue, but it doesn't mean it's not Brady. It doesn't

disqualify as Brady.

THE COURT: Let's have the prosecutors have an opportunity on redirect to clarify that.

Anything further before we bring the jury in?

MR. ZIMET: Yes. Judge, if that has not happened, I wouldn't be able to use that on cross-examination of this witness, not for them on redirect.

It's my obligation to do that on cross. If she's lied to this jury and we have evidence she has lied, I have an obligation to present that during her cross.

MR. POGOZELSKI: And, Your Honor, my recollection of that first interview that she's referring to is that she -- that Ms. Rumore, Dr. Rumore said something to the effect of the compliance director wasn't doing a good job and wasn't doing her job, and at the same time when we show her documents that she had never seen before with the compliance director is flagging all of these problems with the T3s and the lack of T3s, then she come to a different conclusion and she says, "I didn't know that at the time"; so how can she comment on a witness's credibility based on information that she did not even know that witness was providing to the defendants and raising repeatedly in emails?

THE COURT: That's consistent with her testimony that she didn't think that the compliance officer was doing a good job. She had problems with the way the compliance officer was

doing it.

Mr. Zimet got her to say that she was incompetent, got her to say that she told the prosecutors she was incompetent. I think that was a strong word.

I don't think there's any Brady here. She can testify that the compliance officer wasn't doing a good job, and then it's up to the jury to decide whether the compliance officer wasn't doing a good job and the Boyds relied on that to their detriment, or the compliance officer wasn't doing a good job because she wasn't getting the information from the Boyds.

That's a question for the jury. I don't think it goes to her credibility.

MR. POGOZELSKI: Right. And, obviously, they'll have, just as with Dr. Rumore, plenty of time to cross-examine the compliance director on whether she was incompetent or not but both testify.

THE COURT: Anything further, Mr. Zimet, before we bring in the jury?

MR. ZIMET: No, Judge.

THE COURT: All right. If we have all the jurors, bring them in. Let's get Dr. Rumore back on the stand.

(Witness enters.)

THE COURT: And, Dr. Rumore, you understand that you're still under oath?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Judge.

MR. BARZEE: Yes, Judge.

MR. ZIMET: Yes, Judge.

THE COURT: Did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

Mr. Zimet, you may continue.

BY MR. ZIMET:

Q. Ma'am, is there any answer that you would like to change or amend?

A. No.

Q. From the prior section?

A. No.

Q. So let's look, if we can, at Government's Exhibit 204.

And this was something that was introduced all on direct examination last week.

Do you recall that?

A. Yes.

Q. And this is an email chain. And why don't we go, if we can, through each page so you can refresh your recollection as to what it is.

A. Yes.
Q. And the next page?
And that's the last page; correct?
A. Yes.
Q. So let's start with the last entry going from first -- from last to first, I guess, that way.
So it starts out on Tuesday, October 13th, 2020, 5:43 p.m.
It's an email from Charles Boyd to John Marrone.
He was still alive, obviously, at that point; correct?
A. Yes.
Q. And the subject is "compliance call"; is that correct?
A. Yes.
Q. And so he asked John three questions. "Do you have any availability tomorrow to discuss a few compliance topics listed below? T3 requirements.
"We have tried to verify each transaction on the T3 and have not had any luck with AmerisourceBergen.
"They refused to provide us with any information. So I guess my question is if we cannot verify the transaction, is it still okay to accept and sell the goods based off the T3 info our suppliers provide -- provides?
"Second: FDA Form 3911, Gilead told our compliance team that if we cannot verify a T3 transaction, that we need to fill out -- fill one of these out. This was after they requested our invoice from our supplier and we refused.

"Is this a requirement or just a recommendation? It seems a little over the top, and we're not familiar with FDA requirements since we're not licenses [sic] by the FDA.

"Three: We stopped selling that one lot number we had an issue with several weeks ago. Do you think we can now continue to sell since the issue was with just one bottle out of about 30 we sold?"

That's the question, and then what happens, if we scroll upward in the email, is that Mr. Marrone, at the bottom of page 2, sends you an email asking you, "Can you help answer these questions?"

Correct?

A. Yes.

Q. And then you provide, going to the top of page 2 but then the bottom of page 1, you provide your answers.

A. Yes.

Q. Is that correct?

A. Yes.

Q. All right. So before we get into the substance of the answers, this is Charles Boyd asking the attorney from Frier Levitt -- who is really the attorney on the case at this point, you're assisting him by writing memos -- he's asking for answers to legal questions; correct?

A. I was asked to provide general advice on those three questions, yes.

Q. My question to you is that this is Mr. Boyd asking Mr. Marrone three legal questions?
A. Yes.
Q. And then Mr. Marrone is sending to you, "Can you help out in answering these questions," and that's what you proceeded to do in this memorandum; correct?
A. Yes.
Q. And this is Mr. Boyd asking for legal advice; correct?
A. Yes.
Q. And so you start answering the questions concerning T3s?
A. Correct.
Q. And in your mind, was this something that Mr. Boyd was looking for assistance to understand what a T3 -- what the T3 requirements are?
A. Yes.
Q. Which would show -- at least, I ask you did it show, in your mind, that he was unfamiliar with what all the requirements were?
A. Yes.
Q. And he wanted his legal advisor to tell them what they were; correct?
A. Yes.
Q. And you proceed to answer with this answer: "HX" -- what does that stand for?
A. TX?

Q. I don't know. I have to go to the eye doctor. It looks like HX.
A. Oh, HX, transaction history.
Q. Okay. That's like an abbreviation for history?
A. Yes.
Q. That's like a medical thing? HX? Right?
It starts with "Manufacturer. TX info. Stuff on the invoice."
What does TX stand for?
A. Transaction history and then transaction. So the TX would have been like T2, would be information that's on the invoice; so it would have been transaction information.
Q. "TX statement, just a statement that is made by the trading partner. Info, 'must' -- capitalized -- be exchanged at the time of change of ownership of the product. At the same time, wholesale distributors, repackagers, and dispensers cannot accept ownership of a product unless they are provided with associated T3 data.
"The T3 data requirements mandate all parties who have ownership of a product need to keep that product T3 for six years."
So this is a pretty decent or well-written summary of what T3s are all about; is that right?
A. Yes.
Q. And it's a generic description, but it's short and concise

as to what a T3 is; correct?
A. Yes.
Q. And you thought that was necessary to educate Mr. Boyd, based upon the question that he was asking concerning T3s; correct?
A. What I was asked to do is provide a general overview of T3 in that first one.
Q. It's to assist the client?
A. Yes.
Q. So the client knew what they should be doing; correct?
A. Yes.
Q. Next: "FDA Form 3911 is to notify the FDA about illegitimate product which they defined as, quote, 'are or may be counterfeit, diverted, stolen, intentionally adulterated, unfit for distribution, or the subject of a fraudulent transaction.' Interestingly, the FDA guidance never mentions T3 as a basis for this determination.
"FDA gets very few of these 3911 forms, less than 200 a year, and they are mostly filled out by manufacturers. In 2018, the vast majority, 120, came from drug manufacturers, mostly product returns, 22 from wholesale distributors and only 8 from dispensers."
So if you recall -- if we can just go back to the earlier page, when Mr. -- back further, please. Page 3.
Mr. Boyd says, "It seems a little over" -- and this is

Number 2 -- "a little over the top, and we're not familiar with FDA requirements since we're not licenses" -- I assume that that meant "licensed by the FDA."

When you read that, was that a concern of yours? That last sentence?

A. No.

Q. It showed that there was a lack of knowledge by Charles Boyd as to what the FDA requirements were?

A. Yes.

MS. DEROVANESIAN: Objection. Calls for speculation.

THE COURT: Overruled.

BY MR. ZIMET:

Q. I'm sorry. I didn't hear your answer.

A. Yes.

Q. And that was something that was important since they're Frier Levitt's client, to make sure that you educate them as to what the requirements are; correct?

A. Yes.

Q. The sentence that "We're not familiar with FDA requirements since we're not licensed by the FDA," that's not accurate, is it?

A. They're not licensed by the FDA.

Q. They're not licensed, but they're still under FDA regulations; aren't they?

A. They have to be familiar with the DSCSA, and those are the

FDA requirements --
Q. Right.
A. -- as a wholesaler?
Q. So that certainly shows the naivete on Mr. Boyd's part concerning what the FDA is and what the requirements are; right?
MS. DEROVANESIAN: Objection. Calls for speculation and an improper opinion.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Did you think at the time when you read that, that Mr. Boyd was naive as to what the FDA requirements were and whether they were under the FDA requirements?
A. I was -- my job was to explain the Form 3911, and he didn't -- obviously, he's admitting that he doesn't have -- he's not familiar with it.
THE COURT: That really didn't answer the question.
If you can answer yes or no, and then you can explain your answer afterwards.
THE WITNESS: Okay.
A. Repeat the question, please.
BY MR. ZIMET:
Q. In your mind, did you think that showed a naivete on Mr. Boyd's part, as far as the FDA and the requirements?
A. Yes.

MR. ZIMET: Let's go back, please, Molly.
Thank you.
BY MR. ZIMET:
Q. So Number 3, in your response, "If a product is thought suspect or is found to be counterfeit, the product needs to be quarantined and investigated. We cannot answer without knowing details such as what P&Ps were used to clear the product. Have they heard from the manufacturer regarding their investigation? Let me know if you want me on the call tomorrow."
So in paragraph 3, you're basically saying, "I can't really give a legal opinion without knowing more facts."
Would that be fair to say?
A. Yes, I needed more information.
Q. So you would agree that there are occasions that you had, as a healthcare attorney, that you are asking for facts and information to give a legal opinion; correct?
A. Yes.
Q. And this is one of those occasions?
A. Yes.
Q. And certainly another occasion would be whether or not they're complying with the rules and FDA regulations concerning drugs that are entering the supply chain; is that correct?
A. Yes.
Q. And you would have the ability and certainly the obligation to ask questions to get facts concerning those issues before

you gave a legal opinion; is that correct?
A. Yes.
Q. All right. So that happens on October 13th, and it makes reference to "a call tomorrow."
Was there a call the next day?
A. I believe so.
Q. Were you on the call?
A. I believe so. I'm not positive.
Q. Do you remember what -- I'm sorry?
A. What was the date of this?
Q. Let's go to the top just to make sure.
This is -- no, that's the wrong one. October 13th.
A. Yeah, I think I was on the call, but I can't be positive.
Q. Okay. And it says, "October 14th, compliance call." Do you see that?
A. Yes.
Q. So do you remember being on the call?
A. No.
Q. Do you remember what -- well, if you don't remember being on the call, I would assume you don't remember what was discussed on the call?
A. No.
Q. Do you know what the purpose would be for a call the next day after this memo came out?
A. Maybe to review this, but I'm not sure.

Q. Would it also to be how to implement these things into their practice?

MS. DEROVANESIAN: Objection. Lack of personal knowledge.

THE COURT: Overruled.

BY MR. ZIMET:

Q. You can answer.

A. Yes.

Q. So are you aware that the practice at Safe Chain at this time concerning approval of T3s changed?

A. No.

Q. Well, you made a statement, I believe, that T3s have to come with -- or I forget the exact verb or term it is -- with the product when it's delivered to the purchaser?

A. Yes.

Q. And I'm probably screwing up the wording but that's essentially what that says; correct?

A. Yes.

Q. And that was supposedly the way it should happen concerning -- based on the FDA guidance; correct?

A. Yes.

Q. But Safe Chain -- let me ask it this way: Are you aware that Safe Chain said around this time, "We're not going to follow that guideline. We're going to do something even better than that"?

MS. DEROVANESIAN: Objection. Lack of foundation. Lack of personal knowledge. She's already testified that she was not familiar with these procedures that they had at this company.

THE COURT: Overruled.

A. Could you repeat the question?

BY MR. ZIMET:

Q. Sure.

Are you aware around this time that Safe Chain went beyond the FDA requirements and changed their procedures?

A. No.

Q. Are you aware that Safe Chain implemented a procedure that before a HIV drug could be purchased, the compliance department had to have the T3 in their hands and review and approve before the transactions could go forward?

A. I wasn't aware of their SOPs, but that's what the DSCSA requires.

Q. Okay. So you've mentioned SOPs, FDA requirements.

My question is what they were actually doing at that time to make sure that before they sent out a purchase order, before they paid one cent for any product, the T3 had to be approved by the compliance officer?

A. I wasn't aware of that, no.

Q. That would be something that would be important for you to know in evaluating whether or not they were being compliant; is

that correct?
A. We were assured that they were following what they needed to do with regard to T3 repeatedly.
Q. Would what they were doing by changing their procedures be something important for you to know whether or not they were, in fact, reviewing T3s appropriately? Isn't that correct?
A. I didn't know anything about them changing their procedures.
Q. Did you ever check into what their procedures really were?
A. We asked them to review their SOPs. They refused. They didn't want to spend the money on the legal fees.
Q. Let's talk about that for a second.
What they were refusing was to spend the money to rewrite, okay, the SOPs; correct?
A. No. We wanted to review them.
Q. You wanted to review them?
A. Yes.
Q. But not rewrite them? Is that what you're saying?
A. We would have critiqued them.
Q. And it would have charged legal fees to critique the T3s -- excuse me, critique the SOPs; correct?
A. Yes.
Q. And they said from an economic business standpoint, we don't need that. And, in fact, they didn't need it because their SOPs, as you just testified to, were exactly what the FDA

said they should be; isn't that correct?

MS. DEROVANESIAN: Objection.

A. That's not what I said. I said that their SOPs had some statements in there that looked like they were taken directly from the FDA guidance. I didn't review their SOPs, and I don't know if their SOPs were complete, what they said. Just that the portion that I was shown looked like it was directly from a FDA guidance.

BY MR. ZIMET:

Q. Shown in this courtroom; right?

A. Yes.

Q. And so did you see anything that you saw that was inconsistent with what they should have been?

A. I saw it for a few seconds.

Q. Did you ask to look at it more to make sure it was that way?

A. In the courtroom?

Q. Yeah.

A. You're asking me if I was asked in this courtroom to review their SOPs thoroughly? Is that what you're asking me? Because I hadn't done that, no.

Q. Ask to review them?

A. No, I haven't been asked to review them.

I was shown a portion of their SOPs. That's all I was shown.

Q. And did you ask, "Can I have some more time to look at their whole SOPs to see if they're consistent with the FDA guidelines?"
A. I don't know if I am supposed to ask that in this courtroom, in this case, at this time.
Q. Well let's look at --
A. I --
Q. I'm sorry.
A. Yeah, I have no knowledge of what I am supposed to ask to review their SOPs today or tomorrow. That's, you know, not something that I'm going to --
Q. Fair enough.
A. Yeah, no.
Q. Fair enough.
Let me ask it this way then: In the brief period of time that you had to look at it, did you see anything in those SOPs of Safe Chain that were inconsistent with the FDA guidelines?
A. I looked at them for one page of it. I don't know what was in the SOPs, as I said.
Q. So let's --
THE COURT: That doesn't answer the question. If you just answer yes or no, and then you can explain your answer.
THE WITNESS: Okay.
A. No.
///

BY MR. ZIMET:
Q. In fact, you worked with Abigail Divilio concerning improving some of the procedures at Safe Chain concerning approval of vendors; did you not?
A. No.
MS. DEROVANESIAN: Objection. Vague.
BY MR. ZIMET:
Q. It never happened?
A. No.
THE COURT: And you have to wait until I rule on the objection before you answer.
THE WITNESS: I'm sorry, Your Honor.
MS. DEROVANESIAN: Your Honor, the objection is to vague based on the lack of any time frame for that question.
THE COURT: If she understands the question, she can answer.
BY MR. ZIMET:
Q. Is your answer "No?"
A. No.
Q. You don't have a recollection of any communication you had with Abbie Divilio concerning improvement of the intake form for new vendors of HIV drugs? Is that your testimony?
A. I don't recall reviewing her intake form.
Q. So that's different than, "No, I never did it," because you just don't have a memory of doing it?

A. I don't have a memory of doing it.
Q. You're not saying it didn't happen; you just don't remember it?
A. I don't remember it, no.
Q. So we're here, October 14th. This has a date of 11/25 that it's forwarded to Abbie -- Abigail Divilio -- on the 25th of November of 2020. But after October 13th, what work did you do on the Safe Chain matter?
A. There was a -- I'm not sure.
Q. Okay. Let me ask you this -- I want to ask sort of a leading, suggestive question.
The next significant thing that happened was Mr. Marrone passed away. Would that be fair to say?
A. November 16th.
Q. Right.
So within a month of that, Mr. Marrone passed away; correct?
A. Yes.
Q. So at that point, you were -- and that was November 16th. And that was just about one year to the day that you had become a healthcare attorney; correct?
A. Yes.
Q. You had not been the lead counsel in any case like this which had potential litigation; correct?
A. No.

Q. And so this would be a first for you; is that correct?
A. Yes.
Q. And Frier Levitt made the determination that despite your lack of experience as a healthcare attorney, you should be the lead attorney on the Safe Chain matter? Is that correct?
MS. DEROVANESIAN: Objection. Vague as to who the speaker is.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Is that correct?
A. Repeat the question, please.
Q. Sure.
Frier Levitt said that we want you, okay, to be the lead attorney on the Safe Chain matter after Mr. Marrone passed away?
A. Frier Levitt indicated nothing to me.
Q. You were not told, "You're now the lead attorney on the case?"
A. No.
Q. No communication?
A. No communication whatsoever.
Q. So you went from memo writer without any instruction what you should now be doing on the case; is that --
A. No. I was -- and there was a list of John Marrone's cases and nothing was -- I wasn't assigned any partner to work with

on it.
Q. So it was just you by yourself?
A. Yes.
Q. That's a pretty awesome responsibility; correct?
A. Yes.
Q. You knew that you had a lot, okay, under your control as well as an obligation to a client and a lot of people; is that correct?
A. Yes.
MS. DEROVANESIAN: Object to the compound question.
THE COURT: Sustained.
BY MR. ZIMET:
Q. You knew you had a lot of responsibility to a company, Safe Chain; correct?
A. Yes.
Q. You knew you had a lot of responsibility to individuals, Charlie Boyd and Patrick Boyd; correct?
A. Yes.
Q. And ultimately, you knew you had a lot of responsibility to all the employees and workers at Safe Chain; isn't that correct?
A. Yes.
Q. And so, while you had only been given certain pieces of information by Mr. Marrone, which you've described, I think, in your testimony thus far, you didn't know the whole Safe Chain

story up to that point; isn't that correct?
MS. DEROVANESIAN: Objection to the compound question.
THE COURT: Overruled.
BY MR. ZIMET:
Q. You can answer.
A. I thought I had the whole story. I didn't know there was anything else to know.
Q. Well, you knew that events that happened as far back as June of 2020; correct?
A. I didn't know any of the events, no. I knew I was asked to write a memo in June.
Q. Exactly.
A. Maybe I was asked to write a memo.
Q. You didn't know any of the events; so you wanted to educate yourself as to what the events were; isn't that correct?
A. Yes.
Q. Okay. Obviously, that's an important thing for a lawyer to know, what the facts are; correct?
A. Yes.
Q. And you were the lead lawyer; correct?
A. Yes.
Q. So you then engage in finding out what had happened from day one up to that point involving Safe Chain and the Boyds; isn't that correct?
A. Whatever it is they told me. I didn't ask a whole bunch of

questions, no.
Q. Well, you certainly wanted to find out why they got into the HIV market; correct?
A. No, I never asked them that.
Q. You didn't care about that?
A. No, I never asked.
Q. Was it important?
A. They had been in business for ten years. I didn't know that was -- they had just started in the HIV business.
Q. You didn't know they just started?
A. No.
Q. In the spring of 2019, and it's 2020 --
A. No.
Q. -- in the HIV business?
A. No.
Q. That wasn't important to you?
Was it important to you how much experience they had in the HIV market at that point?
A. No, I didn't ask.
Q. Was it not important to you? Is that the reason you didn't ask?
A. I understood they were a wholesaler.
Q. Well, HIV drugs are much more --
THE COURT: Mr. Zimet, is this a good spot to take a break?

MR. ZIMET: Can I just finish this question, Judge?
THE COURT: Sure.
BY MR. ZIMET:
Q. You knew that HIV drugs were expensive drugs; did you not?
A. Yes.
THE COURT: Members of the jury, we're going to go ahead and recess for the evening.
Remember my admonition not to discuss the case nor allow it to be discussed in your presence.
I'm going to ask you to come back tomorrow at 9:30. So have a nice evening and see you back at 9:30.
THE COURTROOM DEPUTY: All rise.
(Jury exits.)
THE COURT: Thank you, Dr. Rumore.
During the break in your testimony, you're not allowed to discuss your testimony with anyone. We'll see you back tomorrow at 9:30.
THE WITNESS: Yes, Your Honor.
THE COURT: And if there's nothing else to come before the Court, we'll be in recess until 9:30 tomorrow.
MR. POGOZELSKI: Your Honor, I had just had one minor thing I wanted to flag for you. It's a little bit of an unusual motion that I have drafted, I wanted to file.
I will wait for the witness to leave before I discuss the substance.

(Witness excused.)

MR. POGOZELSKI: One of the witnesses that we intend to call next week is an inmate, Peter Kind. And the United States Marshal Service has informed me that they only move inmates from FDC, where he's currently housed, up here on Thursdays. And this Thursday, I believe, is Yom Kippur, if I'm not mistaken.

THE COURT: Right.

MR. POGOZELSKI: And one of the supervisors in the marshal's office told me I could -- or should file a motion seeking court authorization for any federal law enforcement officer, such as our agents, to transport this inmate from FDC to Fort Lauderdale, and I couldn't find anyone else who has filed such a motion.

THE COURT: Is he Jewish?

MR. POGOZELSKI: He is Jewish, yes. He's Orthodox.

THE COURT: Well, then don't move him.

MR. POGOZELSKI: What's that?

THE COURT: So don't move him.

MR. POGOZELSKI: Well, then he wouldn't be able to be moved until the following week.

THE COURT: Give me an order ordering the marshals to move him some day other than Yom Kippur, and I will sign the order.

MR. POGOZELSKI: Okay. I will do that. Thank you,

Your Honor. I appreciate it.

THE COURT: Anything further before we recess?

All right. Have a nice evening.

MR. POGOZELSKI: You too, Your Honor.

(Trial was adjourned at 5:03 PM.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 9/30/2025

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN, FPR, RPR
Official Court Reporter
United States District Court
Southern District of Florida
U.S. Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

**$**

**$1,000** [2] - 23:16, 24:17
**$23,000** [1] - 130:12
**$70** [1] - 16:22

**'**

**'are** [1] - 149:13
**'must'** [1] - 148:14

**/**

**/s/Patricia** [1] - 167:12

**1**

**1** [5] - 1:8, 1:19, 9:3, 9:4, 146:15
**11/25** [1] - 160:5
**116** [1] - 8:16
**12** [3] - 3:13, 3:15, 3:16
**120** [1] - 149:20
**12th** [2] - 22:10, 22:14
**13th** [4] - 145:7, 153:3, 153:12, 160:7
**14th** [4] - 24:6, 24:17, 153:14, 160:5
**15** [4] - 77:13, 77:18, 77:21, 78:4
**15-minute** [2] - 77:10, 79:10
**16th** [2] - 160:14, 160:19
**187** [5] - 16:1, 16:2, 20:8, 20:21, 24:16
**1:01** [1] - 1:6

**2**

**2** [4] - 21:16, 146:10, 146:14, 150:1
**200** [1] - 149:18
**2000** [1] - 17:24
**2015** [1] - 92:14
**2018** [1] - 149:20
**2019** [3] - 66:5, 104:5, 164:12
**2020** [34] - 22:10, 24:17, 35:24, 39:9, 47:6, 47:10, 48:3, 50:6, 50:8, 50:12, 50:24, 51:21, 53:12, 56:10, 56:17, 66:17, 67:1, 67:14, 67:17, 69:16, 71:21, 75:8, 75:9, 93:20, 94:7, 94:10, 94:14, 97:7, 106:18, 108:21, 145:7, 160:7, 163:9, 164:12
**2021** [6] - 25:7, 37:23, 39:7, 44:5, 56:9, 101:16
**2025** [4] - 1:5, 116:8, 117:2, 117:6
**204** [1] - 144:18
**207** [2] - 7:5, 7:7
**208** [1] - 7:18
**209** [1] - 8:4
**20th** [3] - 57:15, 57:19, 62:2
**21st** [9] - 50:8, 50:24, 51:21, 54:10, 56:17, 57:6, 57:11, 57:12, 57:14
**22** [1] - 149:21
**225** [1] - 8:8
**23** [1] - 9:3
**237** [1] - 8:12
**23rd** [6] - 106:18, 108:23, 108:24, 108:25, 109:4, 109:15
**24-cr-205500** [1] - 1:2
**245** [1] - 12:4
**25th** [1] - 160:6
**264** [1] - 12:8
**29** [1] - 1:5
**299** [1] - 167:15
**29th** [1] - 135:22

**3**

**3** [4] - 21:17, 149:24, 152:4, 152:10
**30** [2] - 15:1, 146:7
**323** [1] - 12:10
**33128** [1] - 1:19
**33132** [1] - 1:16
**333** [1] - 12:12
**33301** [2] - 1:22, 167:16
**3911** [5] - 24:19, 145:22, 149:12, 149:18, 151:14
**3rd** [1] - 1:19

**4**

**40** [3] - 1:19, 15:1, 15:8
**430** [1] - 12:14
**45** [1] - 135:25
**4th** [1] - 1:15

**5**

**501** [1] - 8:20
**505** [1] - 11:2
**5:03** [2] - 1:6, 167:5
**5:43** [1] - 145:7

**6**

**6** [1] - 1:22
**633** [1] - 1:22
**65** [1] - 3:9
**6th** [4] - 120:14, 131:6, 135:17, 135:21

**7**

**72** [1] - 129:2
**72-year-old** [1] - 128:25

**8**

**8** [1] - 149:22

**9**

**9/30/2025** [1] - 167:12
**99** [1] - 1:15
**9:30** [4] - 165:10, 165:11, 165:17, 165:20

**A**

**Abbie** [24] - 12:20, 12:22, 13:5, 21:4, 22:2, 26:14, 51:7, 51:15, 84:5, 84:13, 90:24, 93:6, 93:9, 94:12, 94:19, 95:2, 96:17, 97:13, 101:8, 101:20, 102:13, 108:13, 159:21, 160:6
**abbreviation** [1] - 148:4
**Abigail** [3] - 138:4, 159:2, 160:6
**ability** [8] - 33:11, 65:1, 87:13, 87:15, 87:18, 94:12, 138:4, 152:24
**able** [6] - 52:10, 62:19, 81:14, 106:13, 142:6, 166:20
**above-entitled** [1] - 167:10
**abreast** [1] - 18:18
**absolutely** [1] - 140:8
**accept** [4] - 95:12, 100:16, 145:20, 148:17
**access** [6] - 13:6, 32:5, 71:23, 114:24, 115:1, 115:5
**accomplice** [1] - 33:3
**according** [2] - 26:6, 26:8
**accuracy** [3] - 62:14, 96:5, 96:17
**accurate** [6] - 47:8, 84:2, 95:11, 95:16, 150:20, 167:9
**accusation** [3] - 126:17, 126:21, 138:14
**accused** [2] - 123:7, 134:10
**Act** [3] - 48:2, 85:2, 85:16
**acting** [1] - 139:1
**active** [2] - 67:9, 67:13
**actual** [2] - 68:5, 69:4
**Adam** [12] - 114:9, 114:14, 115:3, 115:7, 115:13, 115:15, 115:23, 116:1, 116:15, 117:1, 117:11, 119:3
**add** [2] - 79:22, 140:9
**additional** [5] - 20:24, 109:14, 113:14, 124:1, 138:18
**address** [1] - 134:7
**addressed** [1] - 107:21
**addressing** [1] - 37:24
**adjourned** [1] - 167:5
**admitted** [2] - 81:7, 81:13
**admitting** [1] - 151:15
**admonishment** [1] - 137:8
**admonition** [5] - 6:8, 77:10, 83:9, 144:9, 165:8
**adulterated** [1] - 149:14
**advice** [36] - 14:22, 41:15, 55:12, 73:24, 81:1, 81:11, 81:17, 87:21, 87:22, 103:7, 103:9, 103:12, 109:11, 109:12, 122:4, 122:5, 122:7, 122:8, 122:9, 122:11, 122:20, 123:3, 123:10, 123:17, 123:21, 123:25, 124:5, 124:10, 124:12, 124:16, 124:17, 132:16, 132:21, 134:11, 146:24, 147:8
**advise** [2] - 68:21, 88:9
**advised** [1] - 33:11
**advising** [2] - 34:3, 34:15
**advisor** [1] - 147:20
**advocacy** [3] - 65:10, 65:18, 72:22
**advocate** [3] - 27:18, 75:20, 75:22
**affairs** [1] - 66:21
**affect** [4] - 4:9, 4:14, 26:17, 62:13
**affidavit** [1] - 127:1
**affirmed** [1] - 6:18
**afraid** [1] - 32:15
**afternoon** [3] - 6:22, 6:23, 35:19
**afterwards** [1] - 151:19
**age** [9] - 125:22, 126:23, 128:2, 128:12, 128:23, 129:4, 130:11, 131:1, 140:6
**age-discriminated** [1] - 125:22
**agent** [4] - 29:21, 121:6, 121:7, 121:9
**Agent** [11] - 121:9, 125:7, 126:11, 127:22, 127:23, 133:17, 137:21, 141:5
**agents** [9] - 29:23, 30:8, 31:15, 31:16, 32:23, 125:9, 126:11, 126:21, 166:12
**ago** [13] - 14:17, 51:25, 52:8, 54:16, 54:17, 54:23, 73:15, 90:14, 109:13, 120:6, 132:23, 135:6, 146:5
**agree** [4] - 4:4, 34:3, 113:16, 152:14
**ahead** [12] - 4:24, 5:8, 15:21, 41:13, 43:14, 67:7, 78:7, 79:13, 80:7, 132:13, 138:2, 165:7
**AJC** [1] - 37:22
**al** [1] - 37:22

**Alex** [6] - 121:9, 125:7, 126:11, 127:23, 133:17, 137:21
**Alexander** [1] - 1:13
**alive** [3] - 69:25, 70:11, 145:9
**allegation** [1] - 140:11
**allow** [6] - 67:5, 77:11, 100:23, 137:9, 144:10, 165:9
**allowed** [3] - 77:17, 81:20, 165:15
**allowing** [2] - 6:9, 83:10
**almost** [2] - 30:11, 34:11
**alone** [1] - 30:5
**alternates** [2] - 3:14
**amend** [2] - 60:3, 144:14
**Amendment** [2] - 78:19
**AMERICA** [1] - 1:4
**AmerisourceBergen** [1] - 145:17
**amount** [1] - 80:23
**analytical** [1] - 105:10
**analyze** [1] - 107:5
**answer** [64] - 14:9, 14:20, 14:23, 16:23, 19:8, 22:19, 26:22, 26:23, 26:24, 38:9, 42:13, 43:14, 46:8, 67:7, 67:15, 67:25, 68:1, 70:25, 72:9, 84:16, 89:7, 90:5, 91:1, 91:12, 92:11, 93:13, 96:19, 97:11, 99:12, 102:19, 103:21, 106:15, 106:16, 119:16, 123:20, 133:21, 133:22, 134:15, 134:19, 134:23, 135:2, 135:5, 135:7, 135:15, 136:17, 136:24, 144:13, 146:10, 147:23, 150:13, 151:17, 151:18, 151:19, 152:6, 154:7, 158:21, 158:22, 159:11, 159:16, 159:18, 163:5
**answered** [19] - 15:1, 20:5, 22:14, 23:20, 42:5, 51:13, 52:21, 59:8, 62:21, 67:4, 85:23, 88:1, 92:8, 115:5, 132:23, 133:23, 134:4, 135:6, 136:20
**answering** [5] - 26:13, 53:18, 84:24, 147:5, 147:10
**answers** [6] - 26:20, 86:10, 106:13, 146:15, 146:20, 146:23
**apologize** [2] - 40:25, 76:14
**appeal** [1] - 18:11
**appear** [1] - 117:19
**APPEARANCES** [1] - 1:11
**appeared** [1] - 116:2
**application** [1] - 78:11
**applied** [1] - 87:20
**apply** [2] - 79:20, 87:18
**appointment** [2] - 13:9, 13:10
**appreciate** [1] - 167:1
**approach** [7] - 17:8, 38:22, 39:3, 41:18, 43:25, 56:1, 56:13
**appropriate** [3] - 71:2, 115:25, 122:4
**appropriately** [3] - 104:25, 139:1, 156:6
**approval** [4] - 95:3, 97:14, 154:10, 159:4
**approve** [3] - 100:5, 100:20, 155:14
**approved** [1] - 155:21
**approximate** [2] - 90:21, 90:23
**argued** [1] - 80:9
**argumentative** [24] - 14:4, 36:16, 38:5, 51:12, 53:24, 54:20, 59:24, 60:5, 63:9, 70:16, 71:10, 72:15, 73:6, 74:12, 96:1, 96:12, 102:2, 115:9, 119:1, 119:25, 124:8, 133:1, 134:24, 136:18
**Arielle** [1] - 25:13
**arose** [2] - 83:25
**arrange** [1] - 71:20
**arrested** [1] - 30:17
**asserted** [2] - 31:8, 41:15
**assign** [1] - 49:3
**assigned** [2] - 67:3, 161:25
**assignment** [1] - 58:17
**assignments** [2] - 25:6, 27:10
**assist** [1] - 149:8
**assistance** [2] - 55:12, 147:13
**Assistant** [1] - 1:14
**assisting** [1] - 146:22
**associated** [1] - 148:18
**assume** [3] - 74:6, 150:2, 153:20
**assumed** [3] - 97:18, 101:22, 102:8
**Assuming** [1] - 115:10
**assuming** [2] - 18:20, 19:4
**assumption** [2] - 102:1, 102:7
**assurance** [1] - 106:23
**assure** [1] - 104:18
**assured** [5] - 94:17, 103:10, 103:19, 111:10, 156:2
**ATM** [2] - 25:12, 25:13
**attack** [1] - 30:11
**attempt** [1] - 124:4
**attempting** [1] - 21:5
**attention** [6] - 72:24, 73:1, 73:23, 83:19, 84:1, 109:3
**attorney** [33] - 24:25, 26:2, 31:24, 32:1, 32:4, 32:6, 32:14, 64:12, 66:5, 66:8, 66:15, 66:18, 66:24, 67:21, 68:5, 68:9, 68:13, 68:19, 68:23, 69:19, 70:8, 105:10, 110:15, 134:2, 140:10, 146:20, 146:21, 152:15, 160:21, 161:4, 161:5, 161:14, 161:17
**Attorneys** [1] - 1:15
**attorneys** [10] - 25:3, 26:4, 26:12, 26:25, 27:6, 27:8, 64:2, 65:13, 82:3, 113:14
**August** [29] - 47:6, 47:15, 50:8, 50:9, 50:12, 50:15, 50:16, 50:17, 50:24, 51:21, 53:12, 56:5, 56:9, 56:15, 56:17, 57:6, 62:2, 66:17, 67:14, 67:17, 75:9, 75:15, 120:11, 120:14, 120:21, 131:5, 131:6, 135:17, 135:21
**authorities** [1] - 101:4
**authorization** [1] - 166:11
**authorized** [2] - 28:23, 28:25
**availability** [1] - 145:14
**avoid** [2] - 136:17, 136:23
**aware** [45] - 17:2, 17:3, 17:4, 17:5, 17:10, 18:18, 18:25, 19:12, 20:5, 26:2, 26:8, 28:5, 28:18, 29:8, 29:12, 34:7, 36:1, 36:2, 38:14, 39:11, 41:6, 43:12, 43:15, 43:16, 45:16, 45:17, 49:11, 60:16, 73:18, 80:25, 85:1, 106:5, 107:19, 110:16, 111:2, 111:16, 112:14, 114:20, 123:16, 154:9, 154:22, 155:9, 155:12, 155:16, 155:23
**awesome** [1] - 162:4

## B

**back-dooring** [1] - 42:16
**background** [12] - 66:3, 66:22, 68:21, 68:22, 74:21, 114:11, 115:20, 117:7, 117:9, 117:12, 118:5
**bad** [1] - 102:1
**badge** [1] - 5:7
**BAILEY** [2] - 2:2, 167:13
**Bailey** [1] - 167:12
**BAILEY-ENTIN** [2] - 2:2, 167:13
**Bailey-Entin** [1] - 167:12
**ballpark** [1] - 141:22
**BARZEE** [65] - 5:18, 6:6, 6:21, 7:4, 7:9, 7:11, 7:17, 7:19, 8:4, 8:5, 8:8, 8:9, 8:12, 8:13, 8:16, 8:17, 8:20, 8:21, 12:4, 12:5, 12:8, 12:10, 12:12, 12:14, 12:16, 12:18, 13:19, 14:7, 16:2, 16:3, 17:7, 17:11, 17:18, 17:23, 18:3, 18:12, 18:17, 18:22, 19:10, 20:7, 20:9, 20:17, 20:20, 21:16, 21:18, 21:25, 22:1, 23:22, 24:12, 24:24, 27:5, 28:4, 28:10, 29:7, 29:13, 31:7, 31:11, 32:11, 35:1, 35:15, 35:17, 79:11, 82:20, 83:8, 144:7
**Barzee** [2] - 1:17, 1:18
**Barzee's** [2] - 6:15, 35:23
**based** [14] - 87:24, 98:8, 101:23, 103:12, 118:22, 121:14, 121:15, 126:12, 134:13, 142:20, 145:20, 149:4, 154:20, 159:14
**basis** [2] - 129:10, 149:17
**Batille** [4] - 3:13, 3:14, 4:16, 6:12
**be's** [1] - 111:7
**bearing** [1] - 4:18
**became** [6] - 25:8, 66:5, 67:9, 67:13, 75:22, 129:4
**become** [1] - 160:20
**becoming** [1] - 70:8
**BEFORE** [1] - 1:10
**beforehand** [1] - 93:17
**behalf** [1] - 65:18
**behind** [2] - 32:24, 34:2
**belief** [2] - 46:22, 98:25
**believes** [2] - 22:5, 138:25
**below** [1] - 145:15
**best** [3] - 4:12, 33:11, 89:8
**better** [3] - 5:8, 117:18, 154:24
**between** [12] - 6:25, 19:22, 27:21, 44:19, 49:12, 62:1, 62:10, 64:18, 103:23, 126:20, 136:12, 136:14
**beyond** [1] - 155:9
**big** [4] - 28:23, 61:4, 109:21, 129:20
**Biktarvy** [2] - 20:15, 29:3

**bill** [5] - 23:10, 25:21, 26:8, 47:17, 80:24
**billables** [1] - 51:22
**billing** [12] - 56:4, 58:12, 78:13, 81:6, 81:22, 82:1, 90:23, 91:2, 114:22, 114:24, 115:2, 115:5
**billion** [1] - 16:22
**bills** [2] - 25:18, 51:22
**bit** [4] - 28:6, 47:2, 118:4, 165:22
**blue** [1] - 116:15
**bonus** [1] - 129:1
**border** [1] - 91:3
**boss** [11] - 25:5, 31:2, 40:8, 47:23, 48:3, 57:22, 58:3, 58:16, 59:3, 74:6, 74:10
**bottle** [4] - 28:15, 45:8, 111:4, 146:6
**bottles** [4] - 28:12, 28:19, 29:3, 29:9
**bottom** [4] - 110:2, 110:5, 146:9, 146:15
**Boulevard** [9] - 101:7, 101:9, 101:15, 101:17, 101:18, 101:21, 102:18, 102:21, 167:15
**boxes** [1] - 8:22
**BOYD** [4] - 1:7, 1:17, 1:21
**Boyd** [65] - 6:24, 7:14, 7:20, 9:2, 10:4, 12:6, 12:20, 13:11, 22:3, 37:3, 37:5, 40:3, 40:13, 42:23, 48:12, 48:13, 48:22, 49:10, 50:7, 50:13, 51:5, 51:19, 52:6, 52:15, 54:18, 54:24, 55:12, 58:22, 58:25, 59:6, 59:14, 60:19, 60:23, 62:2, 62:10, 62:17, 67:12, 67:16, 69:9, 69:10, 75:9, 79:11, 79:20, 80:17, 93:10, 117:20, 145:8, 146:20, 147:1, 147:8, 147:12, 149:3, 149:25, 150:8, 151:11, 162:17
**Boyd's** [2] - 151:4, 151:24
**Boyds** [51] - 40:9, 40:11, 40:19, 41:23, 42:2, 43:23, 44:11, 44:14, 45:2, 46:12, 46:15, 46:22, 50:7, 64:7, 64:8, 64:18, 64:23, 65:5, 65:19, 68:4, 68:18, 68:24, 69:5, 69:13, 69:20, 71:14, 72:1, 72:6, 72:19, 73:21, 74:10, 76:11, 76:17, 76:20, 77:3, 77:5, 84:10, 88:9, 104:1, 122:12, 122:20, 122:21, 123:10, 123:16, 124:6, 124:12, 131:9, 131:17, 143:8, 143:10, 163:23
**Boyds'** [3] - 67:12, 78:18, 132:3
**Brady** [10] - 137:25, 138:9, 138:13, 138:22, 141:3, 141:11, 141:24, 141:25, 142:1, 143:5
**break** [5] - 77:7, 77:16, 133:13, 164:25, 165:15
**breakdown** [1] - 4:14
**bribe** [3] - 130:17, 130:18, 130:22
**brief** [2] - 80:2, 158:15
**briefly** [2] - 132:7
**bring** [16] - 5:14, 5:20, 7:17, 73:23, 80:2, 82:16, 82:21, 121:18, 121:20, 137:22, 139:20, 140:23, 141:13, 142:4, 143:18, 143:21
**bringing** [1] - 72:23
**broken** [2] - 28:11, 28:13
**brokers** [1] - 17:13
**Brosius** [8] - 114:9, 114:14, 115:7, 115:15, 115:23, 116:1, 117:11, 119:3
**Brosius's** [4] - 115:3, 115:13, 116:15, 117:1
**brought** [4] - 3:6, 72:25, 90:16, 121:23
**Broward** [1] - 167:15
**Bruce** [1] - 1:21
**bucks** [1] - 98:20
**building** [1] - 120:24
**bunch** [2] - 103:23, 163:25
**burden** [9] - 73:9, 78:6, 78:18, 78:24, 79:1, 79:9, 79:15, 83:14, 83:15
**burden-shifting** [1] - 78:18
**business** [8] - 100:2, 100:6, 100:21, 115:8, 156:23, 164:8, 164:9, 164:14
**but..** [3] - 64:16, 70:13, 135:10
**buy** [1] - 130:13
**BY** [124] - 2:1, 6:21, 7:11, 7:19, 8:5, 8:9, 8:13, 8:17, 8:21, 12:5, 12:18, 13:19, 14:7, 16:3, 17:11, 17:18, 17:23, 18:3, 18:17, 18:22, 19:10, 20:9, 20:20, 21:18, 22:1, 23:22, 24:12, 24:24, 27:5, 28:4, 28:10, 29:7, 29:13, 31:11, 32:11, 35:1, 35:21, 36:18, 38:2, 38:12, 38:19, 38:24, 39:5, 40:10, 41:20, 42:10, 42:19, 43:17, 44:2, 46:7, 51:17, 54:1, 54:22, 55:18, 56:3, 56:16, 57:4, 58:21, 59:12, 60:1, 60:8, 61:3, 62:7, 62:24, 63:11, 67:6, 68:3, 70:21, 71:13, 72:11, 72:17, 73:8, 74:16, 83:18, 84:18, 87:2, 87:7, 88:4, 88:8, 89:6, 89:22, 90:4, 93:19, 95:22, 96:3, 96:14, 99:5, 99:14, 100:12, 101:5, 102:4, 102:11, 106:21, 115:12, 118:19, 119:4, 120:4, 123:1, 123:15, 123:23, 124:11, 126:16, 127:21, 131:4, 131:22, 132:12, 133:3, 135:1, 136:21, 144:12, 150:12, 151:10, 151:22, 152:3, 154:6, 155:7, 157:9, 159:1, 159:7, 159:17, 161:9, 162:12, 163:4, 165:3

## C

**cannot** [6] - 56:23, 95:12, 145:19, 145:23, 148:16, 152:6
**capitalized** [1] - 148:14
**care** [1] - 164:5
**case** [51] - 4:12, 4:15, 6:9, 6:13, 30:24, 31:17, 35:7, 40:17, 47:3, 69:22, 69:24, 72:1, 73:12, 77:11, 78:25, 81:2, 83:10, 83:15, 89:24, 90:9, 90:10, 103:11, 116:7, 116:13, 116:16, 116:22, 116:25, 117:8, 117:10, 117:12, 117:13, 119:5, 119:8, 120:3, 122:16, 127:1, 127:2, 127:14, 127:17, 127:22, 133:12, 133:25, 137:8, 141:9, 144:10, 146:21, 158:5, 160:23, 161:18, 161:23, 165:8
**CASE** [1] - 1:2
**cases** [2] - 67:10, 161:24
**catering** [1] - 119:19
**Cellebrite** [2] - 8:22, 11:3
**cent** [1] - 155:21
**certain** [10] - 6:25, 36:9, 36:13, 53:15, 85:12, 99:23, 116:2, 124:6, 138:5, 162:23
**certainly** [11] - 99:6, 112:20, 118:7, 124:4, 128:8, 129:12, 132:5, 151:4, 152:20, 152:24, 164:2
**certify** [1] - 167:8
**Cesar** [1] - 121:9
**chain** [9] - 20:25, 22:22, 23:16, 110:10, 110:20, 111:23, 112:2, 144:23, 152:22
**Chain** [101] - 7:1, 12:23, 13:1, 19:1, 19:2, 19:15, 19:22, 20:23, 20:24, 23:2, 23:10, 23:15, 23:24, 24:8, 24:17, 24:20, 25:1, 25:4, 25:5, 25:6, 25:16, 25:20, 26:6, 26:13, 27:1, 27:7, 27:9, 27:21, 27:24, 28:15, 33:24, 34:8, 34:14, 45:19, 45:23, 46:2, 46:9, 46:24, 47:24, 48:1, 58:12, 58:14, 64:2, 64:8, 65:5, 65:19, 68:18, 68:24, 69:5, 69:13, 69:20, 70:12, 75:5, 75:24, 83:23, 84:10, 85:2, 85:16, 87:23, 93:3, 97:15, 97:21, 100:3, 100:5, 101:6, 103:12, 104:1, 105:16, 106:4, 107:3, 107:18, 108:5, 108:13, 109:5, 110:7, 110:18, 111:16, 112:7, 112:18, 114:14, 115:8, 115:14, 116:13, 131:9, 131:17, 154:9, 154:22, 154:23, 155:9, 155:12, 158:17, 159:3, 160:8, 161:5, 161:14, 162:14, 162:20, 162:25, 163:23
**Chain's** [5] - 26:13, 34:10, 83:20, 85:9, 115:2
**change** [5] - 60:3, 66:11, 104:15, 144:13, 148:15
**changed** [4] - 15:5, 106:24, 154:10, 155:10
**changing** [2] - 156:4, 156:7
**charged** [4] - 23:15, 24:17, 122:12, 156:20
**charges** [1] - 23:23
**charging** [1] - 27:6
**CHARLES** [2] - 1:7, 1:21
**Charles** [6] - 37:3, 69:9, 80:17, 145:8, 146:20, 150:8
**Charlie** [34] - 13:11, 14:1, 14:10, 22:3, 27:12, 27:16, 27:24, 28:5, 33:3, 40:3, 40:13, 48:12, 48:22, 49:10, 50:13, 51:5,

51:7, 51:15, 51:19, 51:20, 52:6, 52:15, 54:18, 54:24, 55:12, 60:19, 62:2, 62:10, 62:17, 67:12, 67:16, 69:9, 93:10, 162:17
**chat** [1] - 8:22
**check** [13] - 34:21, 96:9, 96:20, 97:20, 102:20, 112:17, 112:19, 112:20, 114:16, 114:22, 139:17, 140:22, 156:9
**checked** [3] - 96:4, 112:15, 114:13
**checking** [2] - 13:2, 96:17
**chip** [1] - 28:6
**circulated** [2] - 40:2
**civil** [2] - 37:14, 37:25
**claim** [4] - 127:17, 127:25, 128:11, 130:11
**claiming** [2] - 25:19, 138:22
**clarification** [2] - 37:17, 127:19
**clarify** [4] - 80:21, 81:24, 138:21, 142:3
**clear** [7] - 13:17, 13:23, 13:25, 14:9, 68:16, 80:10, 152:7
**clearing** [1] - 13:24
**clearly** [1] - 81:8
**client** [23] - 24:21, 37:3, 56:18, 57:22, 61:13, 61:16, 70:7, 103:15, 104:1, 104:9, 105:21, 105:22, 111:22, 112:5, 112:25, 113:1, 113:3, 140:2, 149:8, 149:10, 150:16, 162:7
**clients** [16] - 3:21, 26:16, 41:16, 43:22, 44:8, 48:19, 67:11, 67:12, 67:13, 73:22, 74:3, 76:2, 86:14, 103:11, 110:2, 140:17
**Clifford** [2] - 20:22, 21:5
**clinics** [1] - 18:24
**close** [3] - 87:10, 141:20, 141:23
**closer** [1] - 4:15
**clue** [12] - 85:24, 88:14, 88:16, 88:19, 88:23, 89:3, 89:11, 89:25, 90:10, 90:15, 90:25, 91:5
**co** [2] - 48:25, 67:2
**co-counsel** [2] - 48:25, 67:2
**collectively** [1] - 63:5
**coming** [2] - 81:19, 116:16
**comment** [6] - 79:3, 83:12, 85:7, 90:2, 103:20, 142:19
**comments** [2] - 37:7, 37:10
**commit** [1] - 33:4
**communicate** [2] - 76:10
**communicated** [8] - 13:21, 14:13, 46:22, 62:18, 63:18, 77:3, 106:6, 109:5
**communicating** [2] - 12:20, 77:3
**communication** [12] - 46:1, 61:12, 62:1, 71:25, 106:20, 107:20, 109:4, 109:15, 120:18, 159:20, 161:20, 161:21
**communications** [12] - 8:24, 13:25, 62:10, 84:19, 84:21, 89:12, 90:11, 106:1, 106:2, 106:4, 106:7, 106:22
**communities** [1] - 43:3
**companies** [1] - 33:20
**company** [14] - 16:20, 16:22, 28:23, 75:1, 97:22, 98:1, 98:14, 100:4, 100:20, 112:9, 112:17, 112:25, 155:4, 162:13
**compare** [2] - 93:7, 94:13
**comparing** [2] - 91:24, 93:14
**compel** [1] - 138:10
**competence** [3] - 86:23, 86:24, 138:6
**competent** [3] - 87:3, 87:25, 139:1
**complaint** [24] - 16:24, 17:1, 17:2, 17:6, 17:10, 17:12, 21:12, 21:21, 35:24, 36:2, 36:20, 36:22, 36:23, 38:14, 41:6, 42:8, 117:25, 119:11, 119:13, 126:24, 127:5, 127:7, 127:13, 128:20
**complaints** [2] - 16:6, 21:19
**complete** [2] - 134:13, 157:6
**compliance** [39] - 8:1, 12:22, 12:25, 13:3, 20:22, 34:19, 35:3, 35:8, 35:10, 83:20, 83:24, 84:4, 86:9, 86:11, 88:10, 88:18, 89:2, 89:8, 90:25, 100:13, 100:15, 103:2, 103:13, 112:24, 142:14, 142:16, 142:24, 142:25, 143:6, 143:7, 143:9, 143:15, 145:11, 145:14, 145:22, 153:14, 155:13, 155:22
**compliance-type** [1] - 13:3
**compliant** [1] - 155:25
**comply** [1] - 34:15
**complying** [1] - 152:21
**compound** [6] - 53:23, 53:25, 74:11, 102:9, 162:10, 163:2
**con't** [1] - 6:20
**concede** [3] - 6:3, 83:5, 144:4
**concern** [9] - 107:25, 109:19, 109:21, 109:22, 109:24, 110:1, 131:24, 132:9, 150:4
**concerned** [13] - 4:9, 4:11, 33:2, 107:22, 108:7, 111:18, 122:5, 122:18, 132:14, 132:15, 132:16, 134:6
**concerning** [35] - 37:11, 39:8, 41:1, 41:24, 42:2, 42:22, 46:22, 48:5, 48:8, 59:1, 83:20, 85:9, 96:17, 98:13, 109:6, 109:12, 111:12, 111:17, 126:21, 132:9, 138:3, 138:12, 138:13, 138:15, 147:10, 149:4, 151:5, 152:21, 152:25, 154:10, 154:20, 159:2, 159:3, 159:21
**concerns** [1] - 4:21
**concise** [1] - 148:25
**conclusion** [3] - 90:24, 122:24, 142:18
**conference** [1] - 120:18
**confirm** [1] - 9:6
**confusion** [1] - 37:19
**connect** [1] - 113:25
**Connecticut** [1] - 112:13
**connecting** [1] - 115:13
**connection** [1] - 54:8
**conned** [1] - 115:8
**conscious** [2] - 65:3, 65:20
**consider** [1] - 32:16
**considering** [1] - 33:3
**consistent** [3] - 102:12, 142:23, 158:2
**consulting** [1] - 26:13
**contact** [3] - 67:16, 84:7, 84:9
**contacting** [1] - 20:14
**contain** [1] - 94:3
**contained** [1] - 92:6
**content** [1] - 76:21
**context** [1] - 54:5
**continue** [2] - 144:11, 146:5
**control** [1] - 162:6
**conversation** [14] - 27:12, 48:22, 49:6, 50:6, 50:14, 51:3, 51:6, 61:16, 62:3, 72:3, 72:6, 132:8, 134:4, 135:25
**conversations** [7] - 58:16, 60:20, 71:18, 74:8, 74:10, 96:16, 141:21
**copied** [2] - 16:8, 16:9
**copy** [2] - 21:1, 127:25
**corporation** [2] - 34:4, 35:13
**correct** [269] - 8:2, 12:23, 13:3, 16:14, 16:18, 17:14, 17:24, 20:11, 21:8, 22:3, 22:10, 23:2, 23:5, 23:12, 24:6, 24:21, 27:14, 28:20, 29:3, 31:13, 33:11, 34:8, 34:12, 34:22, 35:2, 35:9, 35:25, 39:21, 40:15, 40:20, 40:23, 41:2, 43:23, 44:5, 44:8, 44:12, 44:25, 45:4, 45:19, 46:3, 46:16, 46:19, 46:25, 47:6, 48:8, 48:10, 48:13, 48:16, 48:19, 48:23, 49:4, 49:7, 49:8, 49:10, 49:16, 49:19, 50:8, 52:16, 53:8, 53:12, 53:17, 53:22, 54:3, 54:14, 54:19, 54:25, 55:3, 55:5, 55:11, 55:21, 58:12, 58:14, 60:17, 60:24, 61:14, 61:17, 61:23, 62:14, 62:20, 63:5, 63:8, 63:15, 63:16, 63:18, 64:8, 64:10, 64:13, 65:1, 65:6, 65:11, 66:4, 66:6, 66:9, 66:24, 67:10, 67:14, 67:18, 68:19, 68:25, 69:2, 69:13, 69:16, 69:20, 70:4, 70:8, 70:12, 70:23, 70:24, 72:9, 72:13, 74:18, 75:1, 75:3, 75:5, 75:10, 75:13, 75:16, 75:18, 77:1, 77:5, 84:11, 84:13, 86:12, 86:13, 86:16, 86:19, 87:13, 87:16, 87:19, 88:20, 89:18, 91:19, 92:3, 92:16, 92:19, 92:25, 93:3, 93:8, 93:21, 94:2, 94:8, 94:10, 94:14, 94:20, 97:23, 98:2, 98:9, 98:14, 99:1, 99:9, 99:16, 101:24, 102:24, 103:2, 103:4, 104:2, 104:6, 104:10, 104:15, 104:22, 104:23, 105:8, 105:12, 105:17, 105:23, 106:1, 106:25, 107:3, 108:1, 109:11, 110:24, 111:9, 111:13, 111:19, 111:20, 111:24, 112:7, 112:10, 112:13, 113:9, 114:9, 116:1, 116:4, 119:21, 121:13, 121:16, 121:24, 122:2, 122:7, 122:8, 122:13, 122:22,

123:2, 123:3, 123:5, 123:8, 123:11, 124:7, 124:12, 124:20, 124:25, 125:10, 125:13, 125:19, 126:9, 126:18, 128:9, 128:16, 128:19, 129:16, 129:24, 130:5, 130:19, 131:6, 131:10, 131:14, 131:18, 131:24, 132:3, 132:6, 132:20, 133:8, 133:19, 134:5, 134:15, 135:18, 145:3, 145:9, 145:11, 146:12, 146:17, 146:23, 147:6, 147:8, 147:11, 147:21, 149:1, 149:5, 149:10, 150:17, 152:16, 152:22, 153:1, 154:17, 154:20, 156:1, 156:6, 156:14, 156:21, 157:1, 160:17, 160:21, 160:24, 161:1, 161:5, 161:10, 162:4, 162:8, 162:14, 162:17, 162:21, 163:1, 163:9, 163:15, 163:18, 163:20, 163:24, 164:3
**correctly** [1] - 113:9
**correspondence** [5] - 6:25, 7:20, 7:23, 19:22, 24:9
**cost** [1] - 32:14
**counsel** [18] - 3:4, 6:3, 19:3, 48:25, 67:2, 82:15, 83:5, 83:24, 84:1, 128:24, 129:18, 129:19, 132:16, 132:22, 139:14, 140:7, 144:4, 160:23
**count** [1] - 35:22
**counterfeit** [3] - 22:5, 149:14, 152:5
**counterfeiting** [8] - 106:25, 107:1, 107:8, 107:16, 107:18, 107:24, 109:5, 109:17
**couple** [6] - 33:14, 71:5, 73:15, 116:7, 132:23, 135:6
**course** [1] - 137:3
**COURT** [206] - 1:1, 3:3, 3:9, 3:13, 3:19, 3:22, 3:24, 4:8, 4:22, 5:1, 5:4, 5:6, 5:10, 5:13, 5:19, 5:21, 5:23, 5:25, 6:1, 6:3, 6:8, 7:8, 13:16, 14:6, 17:9, 17:17, 17:22, 18:1, 18:8, 18:10, 18:13, 18:21, 19:7, 20:6, 23:21, 24:11, 24:23, 27:3, 28:2, 28:9, 29:6, 29:11, 31:6, 31:10, 32:10, 34:25, 35:16, 35:18, 36:17, 37:20, 38:6, 38:8, 38:11, 38:17, 38:23, 39:4, 40:7, 41:11, 41:13, 41:17, 41:19, 42:6, 42:18, 43:14, 44:1, 46:6, 51:14, 53:25, 54:21, 55:17, 56:2, 56:14, 56:23, 57:3, 58:20, 59:10, 59:25, 60:6, 61:2, 62:5, 62:23, 63:10, 67:5, 67:25, 70:17, 71:12, 72:16, 73:7, 74:13, 77:7, 77:9, 77:14, 77:16, 77:20, 77:24, 78:1, 78:5, 78:10, 78:21, 78:24, 79:4, 79:8, 79:17, 79:23, 80:4, 80:7, 80:14, 81:3, 81:5, 81:19, 82:4, 82:11, 82:12, 82:14, 82:21, 82:24, 83:1, 83:5, 83:9, 84:15, 87:1, 87:6, 88:2, 88:7, 89:5, 89:20, 90:3, 93:16, 93:18, 95:20, 96:2, 96:13, 99:4, 99:13, 100:10, 100:23, 102:3, 102:10, 106:15, 115:11, 118:18, 119:2, 120:1, 122:25, 123:14, 123:20, 124:9, 126:15, 127:18, 131:3, 131:21, 132:11, 133:2, 134:25, 136:19, 137:7, 137:13, 137:15, 137:17, 137:19, 138:2, 138:19, 139:2, 139:5, 139:12, 139:19, 139:24, 140:1, 140:5, 140:13, 140:15, 140:19, 140:23, 141:8, 141:14, 142:2, 142:23, 143:17, 143:20, 143:23, 144:1, 144:2, 144:4, 144:9, 150:11, 151:9, 151:17, 154:5, 155:5, 158:21, 159:10, 159:15, 161:8, 162:11, 163:3, 164:24, 165:2, 165:6, 165:14, 165:19, 166:8, 166:15, 166:17, 166:19, 166:22, 167:2
**court** [5] - 41:9, 50:20, 50:22, 77:21, 166:11
**Court** [18] - 2:3, 2:4, 3:1, 4:2, 4:7, 5:13, 40:6, 79:2, 80:3, 81:7, 82:16, 82:22, 137:14, 137:22, 138:10, 165:20, 167:13, 167:14
**Court's** [2] - 4:3, 4:19
**courthouse** [1] - 89:15
**Courthouse** [1] - 167:15
**COURTROOM** [5] - 3:10, 3:16, 7:10, 83:3, 165:12
**courtroom** [5] - 92:15, 157:10, 157:17, 157:19, 158:5
**credentials** [1] - 66:2
**credibility** [2] - 142:20, 143:12
**criminal** [6] - 17:13, 33:4, 33:9, 116:13, 116:22, 127:17
**critique** [2] - 156:20, 156:21
**critiqued** [1] - 156:19
**CROSS** [2] - 6:20, 35:20
**cross** [13] - 64:21, 83:12, 110:11, 110:19, 110:22, 138:18, 141:13, 141:16, 141:18, 142:6, 142:8, 142:10, 143:14
**cross-examination** [4] - 83:12, 141:13, 141:16, 142:6
**CROSS-EXAMINATION** [2] - 6:20, 35:20
**cross-examinations** [1] - 138:18
**cross-examine** [2] - 141:18, 143:14
**crossed** [2] - 65:22, 65:25
**crush** [1] - 27:25
**crying** [1] - 4:9
**Crystal** [1] - 4:8
**curative** [4] - 78:6, 78:22, 79:5, 79:8
**curious** [2] - 116:11, 116:12
**current** [1] - 140:10

## D

**Dakota** [4] - 16:7, 16:13, 21:19, 21:20
**data** [2] - 148:18, 148:19
**DATE** [1] - 167:12
**date** [11] - 18:5, 23:11, 51:3, 52:7, 69:4, 69:6, 90:23, 120:9, 120:10, 153:10, 160:5
**dated** [1] - 92:14
**dates** [1] - 109:13
**days** [6] - 24:9, 51:25, 52:8, 58:1, 90:14, 135:25
**dead** [1] - 80:18
**deal** [2] - 111:7, 111:9
**dealing** [1] - 20:1
**December** [1] - 128:25
**decent** [1] - 148:22
**decide** [3] - 112:5, 136:22, 143:7
**decided** [3] - 48:18, 65:16, 72:20
**deciding** [1] - 103:1
**decision** [5] - 4:19, 48:19, 65:3, 65:20
**decisions** [1] - 8:1
**DEFENDANT** [2] - 1:17, 1:21
**defendants** [9] - 3:4, 16:25, 17:14, 20:1, 43:1, 80:11, 81:17, 82:15, 142:21
**Defendants** [1] - 1:8
**defense** [5] - 78:25, 80:12, 83:15, 139:14, 140:7
**defenses** [1] - 132:15
**defer** [2] - 4:2, 139:9
**defined** [1] - 149:13
**definitively** [1] - 44:21
**defrauding** [1] - 113:1
**degree** [1] - 138:5
**degrees** [1] - 108:4
**delivered** [1] - 154:14
**denied** [3] - 78:21, 79:17, 81:23
**department** [7] - 35:4, 83:20, 84:4, 107:7, 107:16, 125:3, 155:13
**department's** [1] - 109:17
**DEPUTY** [5] - 3:10, 3:16, 7:10, 83:3, 165:12
**DerOvanesian** [1] - 1:13
**DEROVANESIAN** [114] - 13:14, 14:4, 17:15, 17:20, 18:6, 18:9, 18:20, 19:3, 20:3, 23:18, 24:22, 27:2, 28:1, 28:3, 28:8, 29:4, 29:10, 31:5, 32:9, 34:23, 36:16, 37:16, 38:5, 38:16, 40:4, 41:8, 42:4, 42:15, 43:13, 46:4, 51:12, 53:23, 54:20, 55:14, 55:16, 56:20, 56:25, 58:19, 59:8, 59:24, 60:5, 60:25, 62:4, 62:21, 63:9, 67:4, 67:23, 70:16, 71:10, 72:15, 73:6, 74:11, 79:18, 79:25, 80:5, 80:8, 80:21, 81:4, 81:6, 81:24, 82:18, 84:14, 86:25, 87:4, 88:1, 88:3, 88:6, 89:4, 89:19, 90:1, 95:19, 96:1, 96:12, 99:10, 100:7, 100:22, 102:2, 102:9, 106:12, 115:9, 118:17, 118:25, 119:25, 122:23, 123:12, 123:18, 124:8, 126:14, 127:15, 131:2, 131:20, 132:10, 133:1, 134:24, 136:18, 137:24, 138:20, 139:4, 139:8, 139:15,

139:21, 139:25, 140:3, 140:8, 150:10, 151:7, 154:3, 155:1, 157:2, 159:6, 159:13, 161:6, 162:10, 163:2
**describe** [2] - 29:22, 72:21
**described** [3] - 103:3, 103:13, 162:24
**describing** [1] - 40:22
**description** [3] - 84:2, 127:16, 148:25
**designate** [1] - 109:18
**despite** [1] - 161:3
**detail** [1] - 125:12
**details** [1] - 152:7
**determination** [4] - 22:24, 104:21, 149:17, 161:3
**determinations** [1] - 4:20
**determine** [2] - 111:22, 128:5
**determined** [1] - 122:19
**determining** [1] - 111:23
**detriment** [1] - 143:9
**died** [1] - 64:19
**dies** [1] - 61:21
**difference** [2] - 136:12, 136:14
**different** [22] - 8:22, 14:22, 15:1, 15:8, 22:23, 25:3, 26:22, 26:23, 26:24, 31:22, 31:23, 49:20, 52:5, 71:7, 91:13, 92:5, 111:5, 123:25, 124:16, 138:21, 142:18, 159:24
**difficult** [1] - 4:1
**difficulties** [1] - 19:19
**diligence** [2] - 34:21, 97:19
**Dimitrouleas** [1] - 2:3
**DIMITROULEAS** [1] - 1:10
**Dimitrouleas/Hunt** [1] - 1:2
**direct** [10] - 14:18, 57:13, 58:25, 79:2, 83:19, 90:16, 92:3, 92:13, 94:1, 144:19
**directing** [1] - 109:3
**directly** [4] - 34:11, 80:12, 157:4, 157:7
**director** [7] - 89:2, 90:25, 103:2, 103:13, 142:14, 142:16, 143:15
**disadvantaged** [1] - 43:2
**discriminated** [1] - 125:22
**discrimination** [8] - 126:23, 128:2, 128:13, 128:23, 129:5, 130:11, 131:1, 140:7
**discuss** [13] - 3:21, 56:19, 58:4, 77:10, 77:17, 87:13, 134:14, 137:8, 144:10, 145:14, 165:8, 165:16, 165:24
**discussed** [13] - 6:9, 62:13, 77:11, 83:10, 88:23, 132:21, 132:24, 134:3, 134:23, 137:9, 144:10, 153:21, 165:9
**discussing** [2] - 6:9, 83:10
**discussion** [3] - 33:13, 58:7, 126:20
**discussion's** [1] - 50:5
**discussions** [2] - 31:16, 58:22
**dispensed** [1] - 111:3
**dispensers** [2] - 148:16, 149:22
**dispute** [1] - 129:12
**disputed** [1] - 140:10
**disputes** [1] - 19:2
**disqualify** [1] - 142:1
**distinction** [1] - 39:24
**distribution** [1] - 149:15
**distributor** [1] - 99:21
**distributors** [4] - 28:23, 29:1, 148:16, 149:21
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [4] - 2:4, 37:23, 167:14, 167:14
**diverted** [1] - 149:14
**Divilio** [22] - 12:20, 13:5, 84:5, 84:13, 89:15, 90:24, 93:6, 93:9, 94:12, 94:19, 95:2, 96:17, 97:13, 101:20, 138:4, 139:7, 141:2, 141:15, 141:17, 159:2, 159:21, 160:6
**Divilio's** [2] - 102:13, 138:9
**DIVISION** [1] - 1:2
**docket** [1] - 18:4
**doctor** [4] - 71:8, 71:9, 148:1
**doctors** [1] - 17:13
**document** [10] - 8:6, 11:5, 16:5, 39:12, 46:5, 46:18, 56:21, 56:24, 81:20, 129:23
**documents** [17] - 15:18, 15:19, 15:20, 15:21, 15:25, 32:5, 41:9, 62:9, 62:12, 62:25, 121:20, 121:23, 124:19, 128:21, 129:15, 129:19, 142:15
**dollars** [1] - 27:7
**done** [16] - 25:19, 27:14, 30:15, 65:12, 66:11, 78:9, 79:4, 79:14, 100:20, 101:6, 105:8, 106:15, 115:3, 116:1, 124:6, 157:21
**door** [5] - 5:10, 29:23, 29:25, 30:7, 30:12
**dooring** [1] - 42:16
**double** [3] - 102:20, 139:17, 140:22
**double-check** [3] - 102:20, 139:17, 140:22
**doubles** [1] - 79:14
**down** [4] - 20:17, 61:16, 89:16, 133:13
**dozens** [4] - 17:12, 17:13, 20:1
**Dr** [6] - 77:16, 142:13, 143:14, 143:21, 143:23, 165:14
**drafted** [2] - 106:19, 165:23
**drafting** [1] - 75:9
**dragged** [1] - 129:4
**Dresser** [6] - 25:7, 25:10, 31:2, 40:9, 42:23, 140:14
**dresser** [2] - 36:25, 42:3
**drug** [4] - 22:6, 66:21, 149:20, 155:13
**Drug** [3] - 48:1, 85:1, 85:15
**Drugs** [1] - 21:8
**drugs** [18] - 48:5, 60:16, 60:17, 75:3, 97:15, 98:1, 100:4, 110:10, 111:23, 112:1, 112:6, 112:18, 112:25, 152:22, 159:22, 164:23, 165:4
**DSCSA** [4] - 94:22, 123:4, 150:25, 155:16
**due** [3] - 34:21, 97:19, 104:20
**duly** [1] - 6:18
**during** [15] - 19:25, 26:5, 36:11, 44:11, 77:16, 83:12, 84:9, 87:12, 89:12, 90:16, 126:3, 132:6, 141:15, 142:10, 165:15

## E

**early** [1] - 106:4
**East** [1] - 167:15
**economic** [1] - 156:23
**economically** [1] - 43:2
**educate** [4] - 70:3, 149:3, 150:16, 163:14
**education** [1] - 66:2
**EEOC** [3] - 126:23, 127:4, 127:16
**effect** [1] - 142:13
**effectively** [2] - 72:2, 111:7
**eight** [2] - 36:11, 36:15
**either** [9] - 7:20, 8:6, 23:1, 24:20, 45:20, 46:9, 46:16, 103:5, 112:22
**elsewhere** [1] - 80:11
**email** [40] - 16:6, 16:13, 20:13, 21:4, 22:18, 22:22, 23:16, 24:15, 39:16, 39:19, 39:20, 39:23, 40:1, 40:2, 40:24, 40:25, 41:5, 44:8, 56:18, 71:25, 75:10, 76:13, 76:21, 76:22, 76:23, 105:14, 105:18, 106:8, 106:17, 108:14, 108:16, 108:18, 109:10, 109:16, 130:5, 144:23, 145:8, 146:9, 146:10
**emailed** [1] - 3:5
**emails** [6] - 6:25, 32:5, 105:16, 129:17, 142:22
**employees** [8] - 33:22, 33:24, 34:3, 34:15, 35:13, 35:14, 130:19, 162:20
**employer** [2] - 126:18, 126:21
**employers** [1] - 126:4
**employment** [2] - 66:3, 125:16
**end** [3] - 4:15, 41:5, 138:1
**endangered** [1] - 43:1
**enforcement** [1] - 166:11
**engage** [1] - 163:22
**enter** [1] - 32:2
**entered** [2] - 33:6, 33:8
**entering** [1] - 152:22
**enterprise** [1] - 33:4
**enters** [8] - 4:25, 5:22, 6:2, 82:25, 83:4, 137:18, 143:22, 144:3
**ENTIN** [2] - 2:2, 167:13
**Entin** [1] - 167:12
**entirely** [1] - 85:11
**entitled** [2] - 141:12, 167:10
**entries** [3] - 57:6, 82:1, 115:6
**entry** [2] - 56:17, 145:5
**Esquire** [5] - 1:13, 1:14, 1:17, 1:18, 1:21
**essentially** [1] - 154:17
**established** [2] - 12:25, 20:10
**et** [1] - 37:22
**evaluate** [4] - 127:10, 128:4, 129:23, 138:17
**evaluating** [3] - 98:8, 101:7, 155:25
**evaluation** [1] - 119:24
**evaluators** [1] - 99:18
**evening** [3] - 165:7, 165:11, 167:3
**event** [4] - 91:3, 91:7, 91:8
**events** [5] - 70:6, 163:8, 163:10,

163:14, 163:15
**evidence** [18] - 19:4, 19:8, 38:17, 41:9, 45:18, 56:22, 56:23, 57:1, 60:9, 78:16, 79:15, 81:14, 81:20, 83:13, 115:10, 138:9, 142:9
**exact** [2] - 120:10, 154:13
**exactly** [8] - 50:2, 81:8, 91:16, 97:6, 97:8, 97:9, 156:25, 163:12
**examination** [13] - 6:15, 35:23, 57:13, 58:25, 83:12, 90:16, 92:3, 92:13, 94:1, 141:13, 141:16, 142:6, 144:20
**EXAMINATION** [2] - 6:20, 35:20
**examinations** [1] - 138:18
**examine** [2] - 141:18, 143:14
**examined** [1] - 6:18
**example** [2] - 28:22, 33:25
**Excedrin** [2] - 60:17, 111:4
**except** [4] - 64:15, 107:9, 109:10, 137:21
**exchanged** [1] - 148:14
**excuse** [7] - 5:8, 6:11, 17:7, 65:18, 67:12, 99:7, 156:21
**excused** [2] - 77:25, 166:1
**Exhibit** [9] - 7:5, 7:18, 11:2, 12:4, 16:1, 20:8, 20:21, 24:16, 144:18
**exhibit** [2] - 7:14, 20:16
**exist** [1] - 62:9
**existed** [2] - 94:14, 95:18
**exits** [5] - 5:12, 77:15, 78:2, 137:12, 165:13
**expand** [1] - 60:3
**expanded** [1] - 69:15
**expensive** [1] - 165:4
**experience** [7] - 66:18, 68:9, 100:24, 108:3, 110:17, 161:4, 164:17
**experienced** [2] - 110:15, 110:16
**experiences** [1] - 89:2
**expert** [3] - 100:8, 100:10, 104:2
**expertise** [1] - 110:17
**explain** [3] - 151:14, 151:18, 158:22
**explained** [3] - 85:25, 94:22, 109:24
**explore** [1] - 115:13
**exposure** [13] - 43:3, 122:12, 122:14, 131:13, 131:16, 132:2, 133:6, 133:8, 133:10, 134:5, 134:18, 135:3, 135:9
**express** [5] - 44:24, 45:22, 76:17, 76:20, 129:14
**expressed** [6] - 42:11, 42:25, 46:15, 76:16, 88:14, 134:6
**expressing** [1] - 44:3
**extractions** [2] - 8:23, 11:3
**eye** [1] - 148:1

**F**

**Fact** [1] - 14:20
**fact** [25] - 18:25, 23:24, 28:5, 28:18, 34:7, 34:10, 36:19, 39:7, 43:21, 43:22, 44:3, 44:4, 51:19, 62:17, 90:13, 90:15, 96:4, 111:10, 128:12, 141:1, 141:2, 156:6, 156:24, 159:2
**factors** [1] - 4:20
**facts** [11] - 19:4, 111:9, 111:12, 111:18, 115:10, 124:1, 140:4, 152:11, 152:15, 152:25, 163:18
**factual** [1] - 111:21
**fair** [10] - 12:19, 15:10, 26:24, 27:22, 28:7, 34:5, 152:12, 158:12, 158:14, 160:13
**faith** [1] - 81:17
**fall** [1] - 108:21
**false** [1] - 130:1
**familiar** [14] - 18:7, 20:11, 93:25, 99:16, 100:13, 100:15, 100:18, 120:25, 146:2, 150:1, 150:19, 150:25, 151:16, 155:3
**familiarity** [2] - 85:5, 100:2
**far** [21] - 13:5, 13:12, 14:1, 25:16, 39:10, 66:14, 66:23, 74:10, 77:3, 78:9, 85:3, 89:3, 90:10, 102:12, 122:6, 138:4, 138:17, 151:24, 162:25, 163:8
**fashion** [1] - 140:18
**FBI** [9] - 29:16, 29:20, 30:3, 30:8, 30:12, 30:21, 31:15, 31:16, 32:23
**FDA** [48] - 22:6, 23:1, 24:18, 24:19, 34:12, 34:16, 34:18, 68:20, 76:23, 76:24, 77:4, 92:19, 92:21, 93:24, 94:3, 94:5, 94:6, 94:7, 94:9, 94:13, 145:22, 146:2, 146:3, 149:12, 149:16, 149:18, 150:2, 150:3, 150:8, 150:19, 150:20, 150:22, 150:23, 151:1, 151:5, 151:12, 151:13, 151:24, 152:21, 154:20, 155:10, 155:18, 156:25, 157:5, 157:8, 158:2, 158:17
**FDA-related** [1] - 24:18
**FDC** [2] - 166:5, 166:12
**fears** [1] - 30:15
**federal** [2] - 120:24, 166:11
**Federal** [2] - 1:22, 167:15
**fees** [2] - 156:11, 156:20
**felt** [2] - 27:24, 89:8
**few** [6] - 27:9, 115:17, 121:21, 145:14, 149:18, 157:14
**Fifth** [1] - 78:19
**figure** [3] - 75:23, 91:23, 120:13
**file** [8] - 24:20, 72:19, 114:13, 127:1, 129:19, 130:11, 165:23, 166:10
**filed** [11] - 16:25, 17:12, 17:19, 17:25, 18:5, 19:25, 35:24, 37:22, 39:8, 127:7, 166:14
**files** [11] - 64:15, 64:22, 65:1, 65:7, 65:13, 70:12, 70:18, 70:19, 71:4, 71:14, 73:4
**fill** [2] - 145:23, 145:24
**filled** [1] - 149:19
**financial** [1] - 23:23
**fine** [1] - 6:13
**finish** [7] - 6:13, 7:6, 98:5, 106:13, 106:16, 117:9, 165:1
**fire** [2] - 128:24, 129:3
**fired** [17] - 31:12, 120:14, 120:17, 121:22, 125:18, 125:21, 126:1, 126:5, 126:7, 126:12, 128:1, 128:12, 130:1, 130:3, 131:6, 140:17
**firing** [1] - 138:15
**firm** [12] - 17:3, 17:4, 18:14, 26:12, 26:25, 30:24, 32:3, 61:4, 61:7, 61:9, 69:24, 139:23
**first** [38] - 6:18, 21:25, 38:25, 41:21, 42:13, 47:2, 47:5, 47:10, 48:21, 49:15, 51:7, 67:16, 68:5, 68:9, 68:13, 70:2, 75:7, 77:25, 85:6, 97:3, 105:11, 108:17, 108:19, 108:25, 109:10, 120:18, 121:5, 121:23, 125:13, 132:6, 133:14, 133:21, 138:24, 142:12, 145:5, 145:6, 149:7, 161:1
**fit** [1] - 118:2
**five** [11] - 51:25, 52:7, 54:16, 54:17, 54:23, 62:8, 90:14, 97:14, 97:16, 109:13, 120:6
**Fl** [1] - 1:22
**flag** [1] - 165:22
**flagging** [1] - 142:17
**flippant** [1] - 73:2
**Flores** [1] - 1:18
**FLORIDA** [1] - 1:1
**Florida** [14] - 1:4, 1:16, 1:19, 1:22, 16:25, 17:14, 20:1, 35:24, 37:23, 39:8, 43:3, 115:19, 167:14, 167:16
**Flowers** [3] - 16:7, 16:13, 21:19
**focused** [1] - 4:12
**follow** [12] - 6:8, 14:21, 35:9, 81:25, 83:9, 87:23, 103:15, 126:20, 138:5, 144:9, 154:24
**follow-up** [3] - 14:21, 81:25, 126:20
**followed** [7] - 87:21, 93:5, 104:14, 104:22, 123:22, 134:11
**following** [18] - 34:20, 91:13, 91:16, 91:18, 91:23, 92:7, 93:10, 94:17, 104:9, 104:12, 104:16, 104:17, 104:18, 104:19, 111:10, 156:2, 166:21
**follows** [1] - 6:19
**FOR** [3] - 1:13, 1:17, 1:21
**forbid** [1] - 61:21
**force** [1] - 35:12
**foregoing** [1] - 167:8
**forget** [1] - 154:13
**Form** [4] - 24:19, 145:22, 149:12, 151:14
**form** [9] - 24:20, 76:20, 100:25, 101:8, 130:10, 159:21, 159:23
**former** [1] - 126:17
**forms** [3] - 95:6, 95:15, 149:18
**FORT** [1] - 1:2
**Fort** [4] - 1:4, 1:22, 166:13, 167:16
**forth** [4] - 61:17, 106:20, 110:16, 111:8
**forward** [2] - 48:18, 155:15
**forwarded** [2] - 48:4, 160:6
**forwards** [1] - 22:2
**foundation** [7] - 29:4, 29:10, 67:23, 71:11, 87:4, 115:10, 155:1
**four** [3] - 31:18, 31:19, 62:8

**FPR** [2] - 2:2, 167:13
**frame** [1] - 159:14
**fraudulent** [1] - 149:15
**fraudulently** [1] - 113:9
**frequently** [1] - 14:14
**Frier** [45] - 24:25, 26:5, 31:13, 44:8, 56:4, 61:4, 61:19, 61:25, 62:20, 63:5, 63:14, 63:17, 64:22, 66:14, 70:7, 71:21, 78:13, 80:10, 103:6, 115:22, 120:14, 120:17, 121:22, 125:19, 126:1, 126:2, 126:12, 128:1, 128:11, 128:22, 129:8, 130:2, 130:5, 130:18, 131:8, 131:13, 138:14, 139:23, 140:2, 140:10, 146:21, 150:16, 161:3, 161:13, 161:16
**front** [12] - 5:10, 7:7, 7:12, 21:15, 36:2, 36:7, 78:14, 80:24, 90:16, 90:22, 92:16, 102:7
**full** [3] - 87:9, 87:10, 87:12
**fully** [2] - 101:20, 129:8

## G

**general** [5] - 37:25, 47:23, 48:1, 146:24, 149:6
**generally** [1] - 33:22
**generic** [1] - 148:25
**Gentek** [12] - 112:10, 112:12, 113:5, 113:13, 113:21, 113:23, 113:24, 113:25, 114:4, 115:8, 115:14, 115:16
**Gentek's** [1] - 112:19
**Gilead** [87] - 16:6, 16:16, 16:18, 17:12, 18:19, 18:23, 19:2, 19:20, 19:22, 19:25, 20:11, 20:14, 21:10, 22:5, 22:24, 23:2, 24:20, 27:20, 27:21, 27:25, 28:6, 28:18, 29:8, 37:21, 38:14, 39:8, 39:13, 41:6, 43:12, 43:15, 43:23, 44:4, 44:15, 44:16, 44:20, 45:8, 45:12, 45:18, 45:21, 45:23, 46:2, 46:9, 46:23, 74:25, 75:8, 75:10, 75:12, 75:16, 75:23, 76:12, 76:25, 91:11, 105:4, 105:7, 105:9, 105:12, 105:15, 105:22, 106:1, 106:3, 106:4, 106:6, 106:7, 106:8, 106:18, 106:20, 106:24, 106:25, 107:15, 107:17, 107:20, 107:24, 108:1, 108:6, 108:19, 109:15, 109:17, 109:22, 110:6, 110:9, 111:1, 111:18, 112:1, 114:5, 145:22
**Gilead's** [1] - 77:4
**given** [14] - 14:22, 18:25, 26:21, 26:22, 26:23, 44:11, 78:5, 83:19, 103:9, 103:13, 122:17, 123:3, 124:16, 162:23
**goods** [1] - 145:20
**Google** [1] - 116:19
**google** [2] - 117:1, 117:3
**googled** [2] - 116:14, 116:15
**GOVERNMENT** [1] - 1:13
**Government** [70] - 4:2, 4:5, 5:15, 7:5, 7:14, 8:4, 8:8, 8:12, 8:16, 12:4, 15:12, 15:21, 16:10, 22:13, 22:17, 26:21, 28:12, 28:13, 31:16, 32:16, 33:2, 47:4, 49:12, 60:10, 62:8, 62:16, 62:25, 78:7, 78:14, 78:17, 78:25, 79:9, 79:13, 79:24, 80:18, 82:9, 83:15, 88:24, 89:1, 89:10, 89:12, 89:23, 90:8, 90:12, 118:7, 119:12, 119:14, 119:18, 120:9, 120:19, 122:2, 122:21, 127:10, 127:16, 127:17, 129:14, 129:21, 129:22, 130:18, 130:21, 132:5, 132:9, 132:19, 138:4, 138:7, 138:11, 141:1, 141:3, 141:7
**government** [1] - 89:18
**Government's** [9] - 7:17, 8:20, 12:8, 12:10, 12:12, 12:14, 20:7, 138:19, 144:18
**grasped** [1] - 87:15
**gray** [1] - 110:19
**great** [1] - 28:23
**Group** [1] - 37:22
**guess** [6] - 3:5, 67:25, 135:9, 138:20, 145:6, 145:19
**guessing** [3] - 14:3, 14:8, 14:10
**guidance** [13] - 34:18, 86:5, 92:21, 93:24, 94:3, 94:5, 94:6, 94:7, 94:14, 149:16, 154:20, 157:5, 157:8
**guidances** [1] - 94:9
**guideline** [1] - 154:24
**guidelines** [2] - 158:3, 158:17
**guys** [1] - 113:21

## H

**half** [1] - 124:1
**handle** [5] - 34:4, 85:15, 85:18, 85:21, 86:8
**hands** [1] - 155:14
**handwrote** [1] - 3:6
**happy** [1] - 139:17
**hard** [1] - 90:21
**harm** [1] - 79:14
**health** [1] - 43:1
**healthcare** [19] - 64:12, 66:5, 66:8, 66:15, 66:18, 66:22, 66:23, 67:21, 68:5, 68:9, 68:13, 68:19, 68:23, 105:10, 110:14, 110:15, 152:15, 160:21, 161:4
**hear** [6] - 68:1, 81:14, 93:18, 105:22, 105:23, 150:13
**heard** [8] - 13:20, 17:22, 18:21, 97:1, 97:3, 97:4, 141:6, 152:8
**hearing** [2] - 108:19, 141:6
**hearsay** [15] - 24:22, 31:5, 38:16, 41:8, 42:17, 43:13, 58:19, 60:25, 62:4, 62:22, 89:4, 95:19, 118:17, 126:14, 132:10
**heart** [1] - 30:11
**heaven** [1] - 61:21
**help** [4] - 3:11, 19:15, 146:10, 147:4
**helped** [1] - 33:4
**helpful** [2] - 122:1, 122:3
**helps** [1] - 56:7
**hereby** [1] - 167:8
**hesitated** [1] - 84:24
**hesitation** [1] - 84:25
**Hi** [1] - 21:19
**highlighted** [1] - 24:4
**highly** [1] - 81:10
**Highway** [1] - 1:22
**hire** [1] - 31:24
**hired** [2] - 128:24, 129:2
**hiring** [1] - 32:1
**history** [5] - 71:8, 73:11, 148:3, 148:4, 148:10
**HIV** [14] - 20:2, 43:4, 48:5, 75:3, 97:15, 98:1, 155:13, 159:22, 164:3, 164:9, 164:14, 164:18, 164:23, 165:4
**hold** [3] - 3:10, 3:11, 56:11
**home** [2] - 30:2, 30:5
**honest** [1] - 134:9
**honestly** [1] - 113:8
**Honor** [50] - 4:1, 5:16, 5:18, 5:24, 6:5, 17:7, 17:8, 18:6, 20:3, 23:18, 31:8, 35:15, 35:17, 37:16, 40:4, 42:4, 42:15, 56:20, 77:19, 79:11, 79:18, 80:1, 80:8, 80:21, 81:4, 81:6, 82:10, 82:18, 82:20, 83:7, 83:8, 83:17, 106:12, 127:15, 137:6, 138:20, 139:4, 139:9, 139:15, 140:3, 140:9, 140:21, 142:11, 143:25, 159:12, 159:13, 165:18, 165:21, 167:1, 167:4
**Honorable** [1] - 2:3
**HONORABLE** [1] - 1:10
**hope** [2] - 4:13, 5:8
**hopefully** [1] - 6:12
**hour** [1] - 24:21
**hours** [2] - 36:11, 36:15
**house** [1] - 30:3
**housed** [1] - 166:5
**housekeeping** [1] - 79:19
**huge** [1] - 33:4
**hump** [1] - 91:4
**HX** [4] - 147:23, 148:2, 148:3, 148:6
**hypotheticals** [1] - 100:8

## I

**idea** [3] - 26:15, 34:2, 36:6
**identified** [2] - 16:24, 85:12
**identify** [1] - 30:7
**illegitimate** [2] - 22:25, 149:13
**immediately** [1] - 108:9
**implement** [1] - 154:1
**implemented** [1] - 155:12
**implications** [2] - 80:22, 132:22
**implying** [2] - 80:25, 81:15
**important** [23] - 22:18, 22:22, 26:10, 40:15, 40:19, 44:7, 89:23, 90:8, 90:13, 97:21, 112:17, 114:2, 120:2, 120:5, 131:17, 150:15, 155:24, 156:5, 163:17, 164:7, 164:16, 164:17, 164:20
**improper** [8] - 78:18, 84:14, 86:25, 90:1, 99:10, 100:7, 122:23, 151:8
**improperly** [1] - 112:2
**improvement** [1] - 159:21
**improving** [1] - 159:3
**inaccurate** [6] - 4:6,

59:15, 59:18, 59:23, 96:22, 132:25
**Inc** [1] - 37:21
**incident** [5] - 60:24, 105:13, 108:20, 109:1, 111:2
**incidents** [7] - 45:5, 45:16, 62:18, 63:1, 85:24, 97:9, 108:8
**include** [3] - 46:1, 56:5, 79:6
**including** [1] - 82:1
**incompetent** [11] - 88:5, 88:10, 88:13, 139:7, 139:14, 141:2, 141:15, 141:19, 143:2, 143:3, 143:15
**inconsistent** [3] - 46:19, 157:13, 158:17
**incorrect** [2] - 122:9, 122:11
**increased** [1] - 43:3
**indicate** [3] - 101:11, 109:19, 139:7
**indicated** [2] - 134:14, 161:16
**indicted** [6] - 115:7, 116:4, 116:6, 116:9, 116:11, 118:2
**indictment** [3] - 115:4, 117:23, 118:1
**individually** [1] - 63:4
**individuals** [3] - 43:2, 82:2, 162:16
**industry** [1] - 99:9
**info** [3] - 145:21, 148:7, 148:14
**information** [20] - 75:18, 75:24, 81:19, 95:11, 95:16, 96:18, 96:22, 109:6, 138:12, 138:21, 139:2, 139:6, 142:20, 143:10, 145:18, 148:11, 148:12, 152:13, 152:16, 162:24
**informed** [6] - 23:5, 60:23, 89:1, 101:8, 111:15, 166:4
**informing** [1] - 48:1
**initial** [1] - 120:23
**initials** [1] - 25:12
**inmate** [2] - 166:3, 166:12
**inmates** [1] - 166:4
**inquire** [2] - 31:8, 97:13
**inquiries** [2] - 75:5, 75:16
**inquiry** [3] - 20:15, 21:13, 21:22
**inside** [2] - 36:6, 36:23
**insight** [1] - 20:24
**inspection** [4] - 98:12, 98:15, 98:25, 99:7
**instance** [3] - 61:12, 99:15, 101:7
**instances** [1] - 45:17
**instant** [1] - 11:4
**instead** [1] - 69:18
**instruct** [2] - 105:21, 138:10
**instructed** [1] - 60:21
**instruction** [6] - 78:6, 78:22, 79:5, 79:8, 82:23, 161:22
**intake** [3] - 127:9, 159:21, 159:23
**integrity** [4] - 97:25, 98:1, 98:3, 98:7
**intelligence** [4] - 85:3, 85:4, 85:6, 85:7
**intelligent** [3] - 84:13, 84:16, 84:22
**intend** [1] - 166:2
**intentionally** [1] - 149:14
**interacted** [1] - 87:8
**interaction** [1] - 87:12
**interactions** [1] - 87:24
**interest** [1] - 32:2
**interested** [4] - 113:4, 113:11, 113:19, 114:3
**interestingly** [1] - 149:16
**internal** [2] - 58:3, 83:24
**internet** [5] - 117:21, 118:11, 118:15, 118:23, 119:20
**interpreted** [1] - 86:7
**interview** [3] - 127:5, 140:10, 142:12
**interviews** [1] - 132:6
**introduce** [3] - 78:15, 79:13, 79:15
**introduced** [4] - 60:9, 67:20, 125:9, 144:19
**investigated** [3] - 129:8, 129:18, 152:6
**investigation** [5] - 32:17, 111:17, 111:21, 128:22, 152:8
**invoice** [4] - 21:1, 145:25, 148:8, 148:11
**involved** [19] - 8:24, 13:1, 25:8, 25:11, 57:16, 68:23, 69:23, 70:4, 74:9, 90:9, 97:13, 98:13, 107:9, 107:19, 107:25, 109:18, 113:17, 116:21, 117:10
**involvement** [5] - 47:3, 47:5, 47:10, 109:17, 132:2
**involving** [7] - 9:2, 18:19, 18:23, 21:8, 60:16, 70:7, 163:23
**Ireland** [1] - 37:22
**irrelevant** [1] - 40:6
**Island** [2] - 29:23, 121:3
**issue** [39] - 28:16, 29:2, 44:16, 44:21, 44:22, 45:18, 45:19, 45:21, 45:23, 45:24, 46:2, 46:3, 46:9, 46:23, 46:25, 49:2, 60:16, 80:10, 80:12, 81:10, 85:5, 107:10, 107:18, 109:6, 109:12, 109:20, 110:6, 110:9, 110:20, 112:1, 125:15, 137:25, 138:16, 139:20, 139:22, 141:25, 146:5, 146:6
**issues** [13] - 13:3, 38:14, 41:7, 43:16, 62:13, 68:24, 78:19, 80:13, 83:25, 98:11, 101:3, 110:18, 152:25
**itself** [2] - 54:8, 54:14
**Ivlis** [1] - 1:18

## J

**Jack** [1] - 125:7
**Jackie** [6] - 121:6, 121:7, 126:11, 127:22, 133:17, 141:5
**Jacqueline** [1] - 1:13
**JEM** [2] - 26:2, 56:19
**Jesse** [5] - 25:7, 25:10, 31:2, 40:9, 140:14
**Jewish** [2] - 166:15, 166:16
**job** [20] - 63:25, 101:24, 102:22, 102:23, 103:5, 103:6, 103:7, 103:23, 103:25, 104:8, 112:22, 129:1, 141:18, 142:14, 142:15, 142:25, 143:6, 143:8, 143:9, 151:14
**John** [13] - 25:5, 25:8, 25:12, 26:2, 26:3, 27:10, 27:11, 51:16, 74:20, 114:18, 145:8, 145:13, 161:24
**joining** [1] - 79:16
**joins** [1] - 79:11
**joke** [1] - 78:4
**JUDGE** [1] - 1:10
**judge** [5] - 3:7, 4:17, 41:12, 137:25, 141:20
**Judge** [23] - 3:10, 4:4, 5:17, 6:6, 6:7, 38:22, 39:3, 43:25, 56:13, 57:2, 77:8, 77:22, 78:8, 79:6, 82:8, 93:17, 140:25, 142:5, 143:19, 144:6, 144:7, 144:8, 165:1
**judgment** [2] - 68:22, 74:17
**judicial** [1] - 4:20
**June** [10] - 47:10, 47:16, 47:17, 48:3, 48:6, 50:6, 66:17, 67:1, 163:9, 163:11
**juror** [5] - 3:5, 3:7, 4:3, 5:7, 5:12
**Juror** [1] - 4:25
**JUROR** [4] - 5:3, 5:5, 5:9, 5:11
**Jurors** [1] - 35:19
**jurors** [4] - 4:10, 4:15, 5:20, 143:20
**Jury** [5] - 5:22, 77:15, 83:4, 137:18, 144:3
**JURY** [1] - 1:9
**jury** [40] - 4:9, 4:13, 5:2, 5:4, 5:14, 6:2, 6:4, 6:12, 19:7, 52:24, 53:6, 56:22, 59:6, 63:8, 77:9, 77:12, 78:14, 78:24, 81:11, 81:14, 82:17, 82:21, 83:6, 90:17, 92:16, 102:7, 136:22, 137:10, 137:12, 137:23, 140:24, 141:24, 142:4, 142:9, 143:7, 143:11, 143:18, 144:5, 165:6, 165:13

## K

**keep** [4] - 4:13, 11:10, 80:14, 148:20
**kept** [3] - 85:22, 86:1, 91:9
**KGK** [1] - 26:2
**kind** [3] - 15:21, 71:25, 138:8
**Kind** [1] - 166:3
**Kippur** [2] - 166:6, 166:23
**knocked** [1] - 30:7
**knocking** [1] - 30:13
**knowing** [7] - 19:1, 63:14, 88:19, 103:14, 105:20, 152:6, 152:11
**knowledge** [21] - 13:15, 19:6, 20:4, 25:25, 26:17, 34:24, 53:11, 55:16, 61:1, 68:20, 72:2, 88:23, 103:17, 104:3, 104:4, 123:13, 134:13, 150:7, 154:4, 155:2, 158:9
**knowledgeable** [1] - 85:8
**known** [7] - 14:22, 15:5, 91:16, 95:1, 123:25, 124:6, 124:16
**knows** [2] - 78:17
**KP** [1] - 25:24

## L

**lack** [19] - 13:14, 20:3, 29:4, 29:10, 34:23, 55:16, 60:25, 67:23, 71:10, 87:4, 115:9, 123:13, 142:17, 150:7, 154:3, 155:1, 155:2, 159:14, 161:4
**lacking** [2] - 85:12, 86:15
**language** [3] - 21:14, 88:15, 94:5
**large** [4] - 16:20, 33:21, 74:25, 129:1
**larger** [1] - 9:7
**last** [20] - 22:12, 36:11, 36:15, 42:13, 50:20, 51:2, 51:9,

59:6, 59:15, 60:2, 60:4, 60:10, 62:14, 63:3, 103:23, 144:20, 145:3, 145:5, 145:6, 150:4
**late** [1] - 115:15
**latitude** [1] - 67:5
**LAUDERDALE** [1] - 1:2
**Lauderdale** [4] - 1:4, 1:22, 166:13, 167:16
**law** [8] - 29:25, 33:17, 34:15, 35:9, 61:4, 61:9, 139:23, 166:11
**lawsuit** [26] - 17:16, 17:19, 17:21, 18:18, 20:1, 20:11, 37:8, 37:17, 37:20, 37:21, 39:8, 39:10, 39:13, 39:20, 40:5, 40:19, 40:22, 41:1, 41:3, 41:24, 41:25, 42:2, 42:23, 43:9, 139:24, 139:25
**lawyer** [5] - 61:21, 73:24, 80:14, 163:17, 163:20
**lawyer's** [2] - 19:8, 133:11
**lawyers** [9] - 8:1, 25:25, 38:17, 80:10, 80:16, 80:23, 80:25, 81:16
**lead** [7] - 70:8, 105:2, 160:23, 161:5, 161:13, 161:17, 163:20
**leading** [4] - 70:7, 111:18, 131:5, 160:11
**learn** [1] - 65:4
**least** [7] - 45:5, 55:4, 67:1, 87:8, 98:1, 132:6, 147:16
**leave** [3] - 5:2, 5:4, 165:24
**led** [5] - 49:6, 58:17, 58:23, 62:2, 124:25
**left** [4] - 3:15, 6:24, 30:24, 74:20
**legal** [24] - 48:4, 49:2, 55:12, 58:11, 73:24, 81:17, 103:7, 104:8, 109:11, 113:2, 114:16, 114:18, 122:24, 133:7, 134:11, 146:23, 147:2, 147:8, 147:20, 152:11, 152:16, 153:1, 156:11, 156:20
**legitimate** [2] - 112:21, 122:7
**less** [3] - 58:11, 68:8, 149:18
**letter** [16] - 75:8, 75:10, 105:19, 106:10, 106:11, 106:17, 106:22, 107:15, 107:21, 107:22, 107:23, 108:8, 109:23, 109:24, 111:14, 114:5
**Levitt** [44] - 24:25, 26:5, 31:13, 44:8, 56:4, 61:4, 61:19, 61:25, 62:20, 63:5, 63:14, 63:17, 64:22, 66:14, 70:7, 71:21, 78:13, 80:10, 103:6, 115:22, 120:14, 120:17, 121:22, 125:19, 126:1, 126:2, 126:12, 128:1, 128:11, 128:22, 129:8, 130:2, 130:5, 130:18, 131:8, 131:13, 138:14, 139:23, 140:2, 140:10, 146:21, 161:3, 161:13, 161:16
**Levitt's** [1] - 150:16
**liability** [3] - 37:14, 37:25, 130:9
**liars** [1] - 130:7
**license** [16] - 97:20, 97:25, 98:4, 98:5, 98:6, 98:8, 98:9, 98:10, 98:12, 98:16, 98:19, 98:22, 99:7, 99:20, 100:5, 101:2
**licensed** [9] - 96:7, 97:23, 101:2, 112:12, 113:7, 150:3, 150:20, 150:22, 150:23
**licenses** [12] - 13:2, 34:21, 96:6, 96:9, 96:10, 96:15, 97:11, 97:12, 97:18, 112:19, 146:3, 150:2
**licensing** [1] - 99:16
**lie** [1] - 126:9
**lied** [7] - 126:18, 126:21, 128:1, 138:15, 141:11, 142:8, 142:9
**line** [3] - 20:13, 37:18, 40:5
**link** [1] - 96:6
**list** [2] - 3:9, 161:24
**listed** [1] - 145:14
**Listen** [2] - 72:1, 104:13
**litigation** [3] - 25:9, 25:10, 160:24
**litigator** [1] - 19:13
**look** [41] - 16:4, 18:4, 23:14, 23:23, 24:2, 37:14, 38:25, 40:18, 41:21, 50:18, 54:5, 56:6, 56:17, 61:25, 64:6, 64:15, 64:17, 64:21, 64:24, 64:25, 65:1, 65:7, 65:12, 65:21, 70:11, 70:20, 70:22, 70:25, 71:4, 71:14, 72:19, 90:22, 110:1, 116:9, 138:17, 139:12, 144:18, 157:15, 158:1, 158:6, 158:16
**looked** [15] - 18:9, 34:11, 34:17, 46:21, 92:20, 94:4, 116:11, 116:12, 116:18, 119:5, 119:8, 157:4, 157:7, 158:18
**looking** [13] - 9:3, 25:18, 55:12, 55:23, 58:1, 60:11, 91:1, 116:10, 117:7, 117:10, 128:18, 135:11, 147:13
**looks** [1] - 148:1
**lost** [1] - 35:22
**loud** [1] - 57:5
**Lucas** [1] - 25:10
**luck** [1] - 145:17
**lying** [8] - 126:12, 128:11, 129:12, 129:16, 130:2, 140:2, 140:6, 141:11

**M**

**ma'am** [21] - 35:22, 43:10, 50:18, 51:18, 53:2, 59:4, 59:13, 65:16, 89:9, 94:25, 95:14, 95:23, 101:19, 104:20, 108:21, 109:3, 116:20, 119:6, 119:14, 135:13, 144:13
**major** [4] - 18:18, 19:25, 97:14
**majority** [1] - 149:20
**malpractice** [18] - 131:13, 131:16, 131:24, 132:2, 132:9, 132:17, 132:19, 132:24, 133:4, 134:1, 134:10, 134:14, 134:16, 134:20, 135:4, 135:7, 135:9, 135:14
**mandate** [1] - 148:19
**manner** [1] - 140:18
**Mantilla** [1] - 1:18
**manufactured** [1] - 75:3
**manufacturer** [1] - 152:8
**Manufacturer** [1] - 148:7
**manufacturers** [4] - 29:15, 110:17, 149:19, 149:20
**manufacturing** [5] - 28:16, 44:15, 44:20, 44:21, 75:1
**March** [2] - 25:7, 101:15
**market** [3] - 110:20, 164:3, 164:18
**Marrone** [43] - 25:5, 25:8, 25:12, 26:3, 27:10, 27:11, 48:3, 48:10, 48:16, 48:18, 49:1, 49:15, 49:18, 51:16, 58:16, 59:11, 60:20, 60:23, 62:1, 62:10, 62:18, 63:18, 64:7, 64:18, 64:19, 64:22, 67:2, 68:17, 69:10, 69:16, 69:19, 70:11, 72:4, 74:20, 114:18, 145:8, 146:9, 147:2, 147:4, 160:12, 160:16, 161:14, 162:24
**Marrone's** [1] - 161:24
**Marshal** [1] - 166:4
**marshal's** [1] - 166:10
**marshals** [1] - 166:22
**Martha** [1] - 32:24
**MARTHA** [1] - 6:17
**material** [2] - 31:21, 141:4
**math** [1] - 135:24
**matter** [13] - 23:12, 31:7, 41:15, 45:3, 53:17, 55:7, 79:19, 80:2, 81:1, 160:8, 161:5, 161:14, 167:10
**matters** [6] - 54:24, 64:3, 81:8, 81:15, 83:25, 87:13
**McKesson** [2] - 28:23, 29:2
**mean** [14] - 3:20, 4:12, 35:10, 64:1, 73:2, 73:23, 103:17, 105:19, 113:8, 116:17, 132:22, 134:22, 141:12, 141:25
**means** [3] - 6:11, 72:12, 141:6
**meant** [2] - 32:13, 150:3
**Medford** [3] - 120:24, 120:25, 124:24
**Medical** [1] - 37:22
**medical** [2] - 4:14, 148:6
**medication** [2] - 28:12, 111:3
**medications** [1] - 20:2
**medicines** [1] - 18:24
**meeting** [14] - 24:21, 58:3, 72:3, 120:23, 121:5, 121:18, 121:23, 124:25, 125:2, 125:6, 125:12, 125:13
**meetings** [4] - 31:22, 125:15, 133:14, 139:11
**members** [3] - 18:14, 77:9, 165:6
**memo** [43] - 36:19, 36:22, 36:25, 37:24, 38:1, 38:3, 38:20, 39:7, 39:10, 39:18, 39:19, 39:23, 40:22, 48:8, 48:10, 48:21, 49:3, 49:7, 49:9, 49:20, 49:22, 50:6, 58:4, 58:5, 58:6, 58:8, 58:9, 59:1, 59:3, 60:9, 60:15, 60:21, 61:23, 62:2, 72:2, 86:17, 94:21, 94:22, 153:24, 161:22, 163:11, 163:13
**memorandum** [7] - 58:11, 58:23, 59:7, 59:11, 69:9, 123:4, 147:6
**memorialize** [1] - 61:10

**memorialized** [3] - 61:14, 61:23, 76:2
**memory** [21] - 23:19, 25:18, 26:7, 36:13, 47:17, 47:19, 47:21, 50:2, 50:17, 50:19, 51:24, 53:4, 55:20, 76:12, 76:14, 78:3, 118:10, 118:23, 120:5, 159:25, 160:1
**memos** [10] - 47:22, 47:23, 67:3, 68:17, 69:18, 74:23, 121:21, 121:25, 146:22
**mentioned** [3] - 84:5, 126:23, 155:18
**mentions** [1] - 149:16
**messages** [1] - 11:4
**met** [6] - 31:15, 62:8, 120:8, 121:16, 124:19, 135:19
**metaphor** [1] - 91:4
**Miami** [2] - 1:16, 1:19
**microphone** [1] - 5:6
**mid** [2] - 61:8, 61:9
**mid-size** [2] - 61:8, 61:9
**might** [14] - 3:13, 31:3, 32:16, 33:2, 33:15, 38:4, 54:8, 54:13, 55:23, 62:9, 80:16, 80:17, 107:11, 108:5
**Miliambro** [1] - 25:13
**mind** [25] - 4:11, 30:18, 31:9, 32:2, 33:6, 33:8, 42:11, 64:21, 65:22, 65:25, 69:6, 73:5, 105:11, 107:17, 108:3, 108:5, 110:11, 110:19, 110:22, 117:6, 119:23, 122:25, 147:12, 147:17, 151:23
**minor** [1] - 165:21
**minute** [1] - 137:7
**minutes** [10] - 33:14, 73:15, 77:13, 77:18, 77:21, 78:4, 132:23, 135:6, 137:11, 137:14
**mischaracterizes** [1] - 59:9
**mischaracterizing** [1] - 118:25
**mislead** [1] - 63:8
**missed** [2] - 72:4, 110:24
**mistaken** [1] - 166:7
**mistrial** [4] - 78:20, 78:21, 79:12, 79:16
**mix** [3] - 44:19, 45:7, 58:10
**mix-up** [3] - 44:19, 45:7, 58:10
**Molly** [2] - 12:17, 152:1
**moment** [5] - 35:15, 44:4, 80:6, 111:12, 139:10
**money** [6] - 23:11, 32:14, 80:23, 81:16, 156:11, 156:13
**Montana** [3] - 4:23, 5:1, 6:11
**Montana's** [1] - 3:25
**month** [3] - 56:5, 56:6, 160:16
**months** [2] - 87:9, 116:7
**months'** [1] - 66:18
**Morgan** [1] - 25:10
**most** [1] - 13:8
**mostly** [3] - 7:25, 149:19, 149:21
**motion** [8] - 57:2, 79:11, 79:16, 79:17, 80:19, 165:23, 166:10, 166:14
**move** [6] - 4:16, 56:21, 166:4, 166:17, 166:19, 166:23
**moved** [1] - 166:21
**moving** [1] - 56:25
**MR** [219] - 3:7, 3:17, 3:20, 3:21, 4:1, 4:4, 4:17, 5:15, 5:17, 5:18, 5:24, 6:5, 6:6, 6:7, 6:21, 7:4, 7:9, 7:11, 7:17, 7:19, 8:4, 8:5, 8:8, 8:9, 8:12, 8:13, 8:16, 8:17, 8:20, 8:21, 12:4, 12:5, 12:8, 12:10, 12:12, 12:14, 12:16, 12:18, 13:19, 14:7, 16:2, 16:3, 17:7, 17:11, 17:18, 17:23, 18:3, 18:12, 18:17, 18:22, 19:10, 20:7, 20:9, 20:17, 20:20, 21:16, 21:18, 21:25, 22:1, 23:22, 24:12, 24:24, 27:5, 28:4, 28:10, 29:7, 29:13, 31:7, 31:11, 32:11, 35:1, 35:15, 35:17, 35:19, 35:21, 36:18, 37:21, 38:2, 38:12, 38:19, 38:22, 38:24, 39:3, 39:5, 40:10, 41:12, 41:14, 41:18, 41:20, 42:10, 42:19, 43:17, 43:25, 44:2, 46:7, 51:17, 54:1, 54:22, 55:18, 56:1, 56:3, 56:11, 56:16, 57:2, 57:4, 58:21, 59:12, 60:1, 60:8, 61:3, 62:7, 62:24, 63:11, 67:6, 68:3, 70:21, 71:13, 72:11, 72:17, 73:8, 74:16, 77:8, 77:22, 77:25, 78:3, 78:8, 78:11, 78:22, 79:2, 79:6, 79:11, 79:19, 82:8, 82:9, 82:19, 82:20, 82:22, 83:7, 83:8, 83:17, 83:18, 84:18, 87:2, 87:7, 88:4, 88:8, 89:6, 89:22, 90:4, 93:17, 93:19, 95:22, 96:3, 96:14, 99:2, 99:5, 99:14, 100:12, 101:5, 102:4, 102:11, 106:21, 115:12, 118:19, 119:4, 120:4, 123:1, 123:15, 123:23, 124:11, 126:16, 127:21, 131:4, 131:22, 132:12, 133:3, 135:1, 136:21, 137:25, 138:3, 140:9, 140:14, 140:16, 140:21, 140:25, 141:10, 141:20, 142:5, 142:11, 143:13, 143:19, 144:6, 144:7, 144:8, 144:12, 150:12, 151:10, 151:22, 152:1, 152:3, 154:6, 155:7, 157:9, 159:1, 159:7, 159:17, 161:9, 162:12, 163:4, 165:1, 165:3, 165:21, 166:2, 166:9, 166:16, 166:18, 166:20, 166:25, 167:4
**MS** [114] - 13:14, 14:4, 17:15, 17:20, 18:6, 18:9, 18:20, 19:3, 20:3, 23:18, 24:22, 27:2, 28:1, 28:3, 28:8, 29:4, 29:10, 31:5, 32:9, 34:23, 36:16, 37:16, 38:5, 38:16, 40:4, 41:8, 42:4, 42:15, 43:13, 46:4, 51:12, 53:23, 54:20, 55:14, 55:16, 56:20, 56:25, 58:19, 59:8, 59:24, 60:5, 60:25, 62:4, 62:21, 63:9, 67:4, 67:23, 70:16, 71:10, 72:15, 73:6, 74:11, 79:18, 79:25, 80:5, 80:8, 80:21, 81:4, 81:6, 81:24, 82:18, 84:14, 86:25, 87:4, 88:1, 88:3, 88:6, 89:4, 89:19, 90:1, 95:19, 96:1, 96:12, 99:10, 100:7, 100:22, 102:2, 102:9, 106:12, 115:9, 118:17, 118:25, 119:25, 122:23, 123:12, 123:18, 124:8, 126:14, 127:15, 131:2, 131:20, 132:10, 133:1, 134:24, 136:18, 137:24, 138:20, 139:4, 139:8, 139:15, 139:21, 139:25, 140:3, 140:8, 150:10, 151:7, 154:3, 155:1, 157:2, 159:6, 159:13, 161:6, 162:10, 163:2
**multiple** [5] - 18:23, 20:4, 86:20, 92:9, 96:19
**must** [3] - 52:3, 52:4, 81:17

**N**

**naive** [1] - 151:12
**naivete** [2] - 151:4, 151:23
**name** [5] - 84:4, 116:15, 116:18, 117:1, 117:3
**named** [2] - 16:6, 16:13
**names** [1] - 116:24
**NE** [1] - 1:15
**necessarily** [1] - 77:4
**necessary** [8] - 64:10, 65:4, 65:10, 65:17, 70:22, 71:3, 72:21, 149:3
**need** [17] - 5:6, 72:3, 97:22, 99:20, 100:5, 104:14, 104:20, 105:22, 107:19, 110:2, 128:4, 137:5, 138:17, 145:23, 148:20, 156:24
**needed** [10] - 13:6, 66:15, 70:6, 74:6, 74:14, 74:18, 83:25, 111:11, 152:13, 156:2
**needing** [1] - 47:20
**needs** [8] - 20:25, 23:1, 23:19, 82:5, 100:20, 104:14, 107:18, 152:5
**never** [36] - 13:20, 13:22, 33:2, 33:6, 33:8, 35:23, 36:1, 44:18, 44:21, 49:9, 50:7, 61:22, 63:21, 63:23, 64:6, 65:22, 65:25, 66:8, 68:12, 68:23, 96:24, 97:1, 114:5, 114:7, 122:16, 122:17, 129:22, 134:20, 137:1, 142:16, 149:16, 159:8, 159:24, 164:4, 164:6
**new** [7] - 67:21, 68:4, 72:1, 74:3, 100:16, 159:22
**New** [7] - 99:16, 99:20, 121:1, 121:12, 121:16, 124:22, 125:4
**news** [1] - 109:1
**next** [6] - 145:2, 149:12, 153:5, 153:23, 160:12, 166:3
**nice** [2] - 165:11, 167:3
**NO** [1] - 1:2
**none** [1] - 124:10
**notch** [1] - 105:10
**note** [5] - 3:5, 3:6, 3:17, 23:11, 139:16
**nothing** [17] - 5:15, 24:15, 24:16, 32:20, 32:24, 74:17, 77:20, 81:2, 82:9, 93:22, 98:3, 105:2, 137:13, 141:20, 161:16, 161:25, 165:19
**notice** [1] - 109:1
**notification** [1] - 138:8

**notified** [3] - 22:13, 23:24, 24:1
**notify** [1] - 149:12
**November** [19] - 17:24, 37:23, 39:8, 64:14, 66:5, 69:16, 75:8, 75:15, 104:5, 106:18, 106:22, 108:23, 108:24, 108:25, 109:4, 109:15, 160:7, 160:14, 160:19
**number** [7] - 3:8, 3:14, 15:9, 127:5, 127:13, 128:20, 146:4
**Number** [2] - 150:1, 152:4
**number-wise** [1] - 3:8
**numerous** [2] - 44:14, 105:16
**NW** [1] - 1:19

## O

**oath** [6] - 6:14, 23:4, 50:13, 54:18, 83:1, 143:24
**object** [6] - 18:6, 19:3, 40:4, 42:15, 127:15, 162:10
**objected** [1] - 81:19
**objecting** [1] - 4:18
**objection** [95] - 13:14, 14:4, 17:15, 17:20, 18:10, 18:20, 19:9, 20:3, 23:18, 24:22, 27:2, 28:1, 28:8, 29:4, 29:10, 31:5, 31:10, 32:9, 34:23, 36:16, 38:5, 38:16, 41:8, 42:4, 43:13, 46:4, 51:12, 53:23, 53:25, 54:20, 55:14, 56:25, 58:19, 59:8, 59:24, 60:5, 60:25, 61:2, 62:4, 62:21, 63:9, 67:4, 67:23, 70:16, 71:10, 72:15, 73:6, 74:11, 79:20, 79:25, 84:14, 86:25, 87:4, 88:1, 88:6, 89:4, 89:19, 90:1, 95:19, 96:1, 96:12, 99:2, 99:10, 100:7, 100:11, 100:22, 102:2, 102:9, 106:12, 115:9, 118:17, 118:25, 119:25, 122:23, 123:12, 123:18, 124:8, 126:14, 128:18, 131:2, 131:20, 132:10, 133:1, 134:24, 136:18, 150:10, 151:7, 154:3, 155:1, 157:2, 159:6, 159:11, 159:13, 161:6, 163:2
**obligation** [7] - 78:16, 103:15, 104:13, 142:8, 142:10, 152:24, 162:7
**observation** [2] - 43:11, 85:20
**observations** [3] - 86:23, 87:5, 87:24
**obtain** [1] - 41:6
**obtaining** [1] - 94:15
**obvious** [1] - 112:3
**obviously** [10] - 31:12, 35:7, 69:25, 70:2, 70:11, 138:15, 143:13, 145:9, 151:15, 163:17
**occasion** [4] - 28:14, 45:6, 55:11, 152:20
**occasions** [4] - 44:14, 95:10, 152:14, 152:18
**occur** [2] - 70:25, 71:4
**occurred** [4] - 55:13, 105:13, 115:3, 120:6
**October** [13] - 22:10, 22:14, 24:6, 24:17, 49:19, 49:20, 69:7, 145:7, 153:3, 153:12, 153:14, 160:5, 160:7
**OF** [3] - 1:1, 1:4, 1:9
**offensive** [1] - 134:22
**offer** [1] - 113:24
**offered** [2] - 41:14, 41:15
**offering** [1] - 130:25
**office** [4] - 7:1, 30:1, 83:24, 166:10
**officer** [13] - 12:22, 86:11, 88:10, 88:19, 89:8, 112:24, 142:24, 142:25, 143:6, 143:7, 143:9, 155:22, 166:12
**OFFICER** [4] - 6:1, 77:14, 82:12, 144:2
**Official** [2] - 2:3, 167:13
**official** [1] - 44:8
**often** [3] - 13:23, 31:21, 100:25
**Olsen** [2] - 3:13, 3:14
**once** [3] - 45:11, 45:13, 79:12
**one** [81] - 3:10, 3:12, 3:15, 8:10, 8:14, 8:18, 9:9, 9:11, 9:13, 9:15, 9:17, 9:19, 9:21, 9:23, 9:25, 10:2, 10:4, 10:6, 10:8, 10:10, 15:25, 25:15, 28:14, 28:22, 28:25, 30:15, 32:7, 32:23, 35:15, 45:5, 45:6, 45:7, 45:9, 45:12, 46:12, 46:14, 46:15, 53:11, 57:23, 60:16, 61:22, 79:20, 80:2, 80:18, 93:5, 97:11, 98:24, 99:3, 99:18, 106:9, 108:7, 108:8, 108:9, 108:10, 111:2, 111:15, 113:17, 113:19, 118:14, 125:15, 129:15, 129:22, 130:19, 132:15, 133:14, 133:22, 141:6, 145:24, 146:4, 146:6, 149:7, 152:18, 153:12, 155:21, 158:18, 160:20, 163:23, 165:21, 166:2, 166:9
**ones** [4] - 56:12, 76:25, 92:18, 100:18
**ongoing** [1] - 126:24
**opening** [1] - 80:9
**operating** [11] - 33:13, 33:15, 33:17, 33:19, 34:2, 34:8, 34:10, 34:14, 35:7, 74:3, 99:9
**operations** [1] - 85:10
**opinion** [29] - 15:5, 23:17, 38:13, 41:1, 41:3, 41:23, 42:1, 42:7, 42:22, 42:25, 43:7, 43:8, 43:10, 43:11, 43:21, 44:24, 48:4, 84:14, 86:25, 90:1, 99:11, 100:7, 104:8, 122:23, 133:7, 151:8, 152:11, 152:16, 153:1
**opinions** [1] - 44:10
**opportunity** [1] - 142:3
**opposed** [4] - 7:25, 63:5, 118:23, 122:9
**Order** [1] - 3:1
**order** [4] - 13:3, 155:20, 166:22, 166:24
**ordering** [1] - 166:22
**originally** [1] - 106:23
**Orthodox** [1] - 166:16
**out-of-court** [1] - 41:9
**out-of-pocket** [2] - 32:3, 32:12
**outside** [5] - 83:24, 83:25, 128:23, 129:18, 129:19
**overall** [1] - 26:17
**overrule** [1] - 19:9
**Overruled** [2] - 70:17, 89:20
**overruled** [41] - 13:16, 23:21, 29:11, 32:10, 34:25, 38:6, 38:11, 38:18, 40:7, 42:6, 42:18, 46:6, 51:14, 58:20, 59:10, 60:6, 62:5, 72:16, 74:13, 84:15, 87:1, 89:5, 90:3, 95:20, 102:10, 118:18, 119:2, 120:1, 122:25, 124:9, 126:15, 127:20, 131:21, 132:11, 134:25, 136:19, 150:11, 154:5, 155:5, 161:8, 163:3
**overview** [1] - 149:6
**own** [6] - 32:3, 91:16, 91:18, 115:1, 115:5, 134:2
**ownership** [3] - 148:15, 148:17, 148:20

## P

**P&Ps** [1] - 152:7
**p.m** [1] - 145:7
**page** [19] - 9:3, 9:4, 20:17, 20:21, 21:16, 21:17, 21:25, 36:2, 36:7, 78:9, 144:24, 145:2, 145:3, 146:10, 146:14, 146:15, 149:24, 158:18
**Pages** [1] - 1:8
**pages** [2] - 9:3, 9:5
**paid** [1] - 155:21
**paper** [2] - 98:20, 129:20
**paragraph** [1] - 152:10
**part** [14] - 13:1, 34:17, 63:25, 64:7, 65:10, 65:17, 95:2, 97:19, 103:1, 104:8, 118:22, 120:8, 151:4, 151:24
**particular** [7] - 29:21, 34:4, 46:5, 85:17, 91:3, 94:4, 99:1
**particularly** [1] - 109:14
**parties** [1] - 148:19
**parties'** [1] - 3:24
**partner** [2] - 148:14, 161:25
**partners** [1] - 25:15
**parts** [1] - 92:20
**pass** [1] - 98:12
**passed** [10] - 25:8, 64:14, 69:16, 98:25, 99:8, 101:9, 101:10, 160:13, 160:16, 161:14
**past** [1] - 36:10
**Pat** [12] - 6:24, 7:14, 7:20, 8:24, 9:2, 12:20, 14:10, 27:12, 27:16, 27:24, 28:5, 33:3
**Pat's** [3] - 8:10, 8:14, 8:18
**patient** [3] - 71:7, 71:9, 111:4
**PATRICIA** [2] - 2:2, 167:13
**Patrick** [15] - 10:4, 12:6, 13:11, 14:1, 22:3, 37:5, 40:13, 48:13, 48:22, 49:10, 54:18, 54:24, 79:11, 80:17, 162:17
**PATRICK** [2] - 1:7, 1:17
**Pause** [1] - 3:23
**pay** [3] - 32:6, 130:23, 130:25
**pedigree** [1] - 22:25
**pending** [3] - 101:3, 126:24
**people** [5] - 18:16, 34:19, 106:23, 116:24, 162:7
**performance** [1] - 102:13
**perhaps** [1] - 28:15
**period** [4] - 19:25, 26:5, 84:9, 158:15
**permission** [1] - 13:11
**permitted** [2] - 80:13,

81:25
person [5] - 99:25, 100:2, 107:1, 107:8, 115:7
personal [10] - 13:14, 19:5, 20:4, 34:23, 55:16, 61:1, 123:13, 139:8, 154:3, 155:2
personally [1] - 139:10
perspective [2] - 68:16, 103:25
pertain [1] - 39:10
pertained [1] - 41:3
pertaining [1] - 24:19
pertinence [1] - 53:16
pertinent [2] - 53:21, 54:2
Peter [1] - 166:3
Ph [1] - 1:19
pharmaceutical [3] - 16:20, 33:16, 100:2
pharmaceuticals [1] - 100:4
pharmacies [1] - 18:24
pharmacists [1] - 17:13
pharmacy [1] - 68:21
phone [5] - 13:7, 51:19, 51:20, 52:9, 54:2
pick [1] - 13:7
picked [1] - 74:20
picture [1] - 134:13
piece [1] - 98:20
pieces [2] - 138:21, 162:23
pills [6] - 28:11, 28:15, 28:19, 29:9, 44:16, 110:20
place [12] - 47:16, 50:5, 54:11, 57:6, 64:11, 64:12, 70:7, 109:7, 113:18, 120:23, 131:5, 134:20
placed [1] - 43:3
plenty [1] - 143:14
PM [3] - 1:6, 167:5
pocket [2] - 32:3, 32:12
POGOZELSKI [23] - 3:17, 3:20, 4:1, 5:15, 5:24, 6:5, 82:9, 99:2, 140:9, 140:14, 140:16, 140:21, 142:11, 143:13, 144:6, 165:21, 166:2, 166:9, 166:16, 166:18, 166:20, 166:25, 167:4
Pogozelski [1] - 1:13
point [29] - 26:7, 34:16, 44:19, 66:8, 66:20, 67:9, 71:3, 71:15, 72:20, 73:12, 74:4, 75:21, 75:22, 77:5, 77:6, 79:5, 79:7, 79:12, 80:8, 81:14, 112:3, 128:4, 129:15, 145:9, 146:22, 160:19, 163:1, 163:23, 164:18
police [1] - 125:3
policies [1] - 104:24
polling [3] - 6:4, 83:6, 144:5
portion [3] - 24:4, 157:7, 157:24
position [4] - 3:24, 4:17, 138:19, 138:24
positive [2] - 153:8, 153:13
possibility [1] - 45:20
possibly [7] - 45:23, 46:2, 46:23, 46:24, 89:24, 90:9
potential [3] - 45:3, 110:19, 160:24
potentially [3] - 122:5, 122:11, 123:7
practice [4] - 15:12, 74:2, 154:2, 154:9
preference [2] - 4:3, 57:1
preparation [3] - 49:13, 117:12, 120:8
prepare [3] - 117:18, 119:9
presence [9] - 6:3, 6:10, 77:11, 83:5, 83:11, 137:9, 144:4, 144:10, 165:9
present [12] - 3:4, 26:15, 46:12, 78:16, 82:15, 121:5, 137:21, 138:11, 139:10, 142:10
presented [4] - 46:11, 62:19, 69:10, 141:24
pretty [4] - 26:10, 87:10, 148:22, 162:4
previously [2] - 12:25, 101:1
problem [12] - 26:15, 26:24, 27:4, 28:19, 55:13, 72:24, 105:4, 105:7, 105:9, 106:3, 108:6, 110:25
problems [12] - 19:17, 19:19, 29:8, 44:15, 72:23, 97:10, 101:1, 114:16, 114:18, 122:22, 142:17, 142:25
procedure [3] - 34:2, 35:8, 155:12
procedures [17] - 33:14, 33:15, 33:17, 33:20, 34:8, 34:10, 34:14, 34:19, 74:3, 93:11, 104:25, 155:3, 155:10, 156:4, 156:8, 156:9, 159:3
proceed [2] - 83:16, 147:23
proceeded [2] - 74:7, 147:5
proceedings [2] - 3:23, 167:9
process [8] - 30:22, 31:24, 78:12, 85:25, 95:3, 97:14, 101:10, 103:19
product [21] - 21:11, 21:21, 22:24, 45:8, 61:10, 85:19, 86:3, 91:10, 95:12, 96:8, 148:15, 148:17, 148:20, 149:13, 149:21, 152:4, 152:5, 152:7, 154:14, 155:21
products [6] - 38:15, 41:7, 43:16, 44:20, 45:12, 108:6
professor [1] - 66:21
project [1] - 58:4
properly [3] - 103:4, 111:6, 136:6
prosecutor [5] - 14:18, 50:23, 78:17, 121:7, 141:12
prosecutors [20] - 32:23, 47:5, 50:11, 62:16, 121:12, 121:24, 124:20, 127:22, 127:23, 129:14, 129:22, 132:20, 132:24, 133:5, 133:7, 136:1, 141:8, 141:14, 142:2, 143:3
protect [2] - 123:5, 123:7
prove [1] - 78:25
provide [10] - 86:15, 103:7, 128:10, 128:15, 145:18, 145:21, 146:14, 146:15, 146:24, 149:6
provided [11] - 41:15, 41:21, 41:23, 42:22, 86:17, 95:15, 96:18, 128:8, 128:14, 134:11, 148:17
provides [1] - 145:21
providing [2] - 69:18, 142:21
proving [1] - 83:14
publishes [1] - 92:19
pull [2] - 7:5, 16:2
pulling [1] - 3:11
purchase [2] - 97:22, 155:20
purchased [2] - 98:2, 155:13
purchaser [1] - 154:14
purchases [1] - 97:15
purchasing [1] - 97:22
purpose [5] - 55:9, 55:20, 64:5, 78:11, 153:23
put [10] - 20:8, 44:7, 58:9, 80:11, 80:24, 81:10, 102:14, 102:16, 111:4, 128:6
putting [1] - 105:18

**Q**

qualified [1] - 100:8
quality [8] - 16:6, 20:22, 21:11, 21:19, 21:21, 106:23, 107:7
quarantined [1] - 152:6
queries [1] - 24:18
questioned [1] - 122:6
questioning [3] - 37:18, 40:5, 121:15
questions [42] - 14:19, 15:2, 15:15, 16:10, 19:4, 19:5, 19:8, 26:14, 37:25, 39:1, 50:12, 52:19, 52:22, 53:10, 69:9, 69:11, 71:5, 73:4, 73:20, 74:1, 81:25, 82:4, 94:16, 97:11, 101:1, 101:4, 105:8, 105:12, 115:20, 121:8, 124:15, 145:13, 146:11, 146:23, 146:25, 147:2, 147:5, 147:10, 152:25, 164:1
quickly [1] - 52:21
quote [1] - 149:13

**R**

raising [1] - 142:22
rather [2] - 20:22, 81:15
reach [2] - 13:12, 126:2
reached [2] - 90:24, 110:7
read [21] - 17:1, 34:17, 36:3, 39:1, 39:6, 41:22, 42:13, 56:23, 57:5, 57:8, 57:9, 73:5, 81:7, 81:13, 92:23, 119:11, 119:13, 119:20, 150:4, 151:11
reading [2] - 41:8, 56:21
reaffirmed [1] - 44:10
real [1] - 47:20
reality [2] - 81:1, 128:2
realize [2] - 59:17, 90:21
realized [1] - 59:20
really [13] - 72:3, 103:21, 107:9, 132:21, 133:23, 134:1, 134:6, 135:4, 135:5, 146:21, 151:17, 152:10, 156:9
reason [19] - 21:12, 33:8, 33:19, 48:15, 64:6, 79:7, 84:25, 117:1, 117:5, 119:18, 125:21, 126:1, 126:5, 126:7, 126:24, 130:2, 130:3, 140:1, 164:20
reasonable [1] - 98:24
reasons [1] - 21:22
recall' [1] - 136:23
receive [1] - 21:10
received [2] - 22:7, 138:8
receiving [1] - 100:4
recess [9] - 77:10, 77:21, 79:10, 82:11, 137:7, 137:14, 165:7, 165:20, 167:2
recitation [2] - 43:9, 43:10
recollection [30] -

18:2, 18:4, 18:13, 18:15, 23:15, 24:11, 24:13, 25:23, 25:24, 39:6, 41:17, 41:23, 42:1, 42:16, 42:20, 55:19, 55:24, 56:7, 57:10, 57:18, 58:2, 78:12, 81:21, 82:5, 82:6, 139:8, 142:11, 144:24, 159:20
**recommendation** [1] - 146:1
**record** [6] - 3:3, 82:1, 82:13, 82:14, 137:16, 137:20
**records** [25] - 23:14, 23:23, 49:24, 50:10, 52:9, 56:4, 56:9, 58:12, 61:12, 61:14, 61:25, 63:17, 63:19, 78:13, 81:6, 81:7, 81:12, 81:22, 90:23, 91:2, 114:22, 114:24, 115:2
**redirect** [2] - 142:3, 142:7
**reference** [3] - 54:13, 79:3, 153:4
**referred** [1] - 107:23
**referring** [4] - 37:17, 38:7, 46:4, 142:12
**refresh** [19] - 18:1, 18:4, 18:13, 18:15, 23:14, 25:18, 25:23, 41:17, 47:18, 50:17, 55:19, 55:23, 56:7, 57:10, 58:1, 76:12, 82:5, 82:6, 144:24
**refreshed** [11] - 23:19, 24:13, 26:7, 39:6, 41:22, 42:1, 42:20, 47:20, 57:18, 81:21, 120:5
**refreshes** [1] - 24:11
**refreshing** [2] - 42:16, 78:12
**refused** [4] - 130:12, 145:18, 145:25, 156:10
**refusing** [1] - 156:13
**regard** [2] - 25:6, 156:3
**regarding** [3] - 47:24, 99:3, 152:8
**regulations** [7] - 68:20, 85:5, 85:9, 104:2, 110:16, 150:24, 152:21
**regulatory** [2] - 66:21, 101:4
**relate** [3] - 39:12, 54:24, 78:19
**related** [12] - 19:20, 24:18, 31:17, 58:14, 62:25, 68:24, 69:9, 81:2, 81:8, 81:15, 96:11, 107:25
**relates** [2] - 96:10, 96:16
**relating** [7] - 62:9, 81:1, 97:15, 115:3, 132:2, 138:11, 139:16
**relationship** [1] - 114:14
**relatively** [2] - 14:13, 33:21
**release** [6] - 4:16, 4:17, 4:24, 130:9, 130:10
**Relevance** [4] - 17:15, 17:20, 32:9, 131:2
**relevance** [2] - 54:13, 127:13
**relevant** [2] - 81:11, 85:9
**relied** [4] - 122:20, 123:16, 123:21, 143:8
**rely** [2] - 99:6, 123:10
**relying** [1] - 88:18
**remember** [48] - 16:5, 29:21, 37:10, 37:13, 47:13, 47:15, 48:3, 50:20, 50:22, 51:2, 51:5, 52:25, 53:5, 54:2, 54:7, 54:10, 54:11, 54:23, 55:4, 55:6, 55:7, 55:9, 55:24, 56:8, 57:23, 67:14, 67:17, 67:20, 76:7, 77:10, 95:25, 108:18, 135:25, 136:8, 136:13, 136:15, 137:8, 141:6, 153:9, 153:17, 153:19, 153:20, 160:2, 160:4, 165:8
**remind** [3] - 23:24, 82:22, 83:14
**rep** [1] - 114:10
**repackagers** [1] - 148:16
**repeat** [8] - 36:12, 53:13, 90:6, 95:24, 96:2, 151:21, 155:6, 161:11
**repeatedly** [2] - 142:22, 156:3
**repetition** [1] - 15:9
**repetitive** [1] - 61:2
**rephrase** [1] - 67:15
**report** [9] - 22:6, 76:24, 138:11, 139:9, 139:19, 140:11, 140:18, 140:19, 140:21
**REPORTED** [1] - 2:1
**reported** [2] - 23:1, 130:17
**Reporter** [2] - 2:3, 167:13
**reports** [6] - 76:23, 139:2, 139:6, 139:12, 139:16, 141:21
**represent** [8] - 31:24, 32:1, 72:3, 111:6, 111:7, 111:22, 112:5
**representation** [12] - 44:12, 64:7, 65:18, 68:6, 69:5, 69:13, 74:5, 84:10, 113:2, 131:9, 131:12, 132:3
**representative** [2] - 114:15, 115:18
**represented** [2] - 27:16, 93:2
**representing** [12] - 19:1, 32:7, 65:5, 68:10, 68:13, 68:18, 69:19, 72:18, 103:15, 104:1, 104:13, 105:21
**request** [7] - 48:4, 49:7, 58:23, 68:18, 78:20, 78:22, 81:23
**requested** [6] - 48:16, 49:19, 69:8, 75:13, 129:22, 145:24
**required** [1] - 97:20
**requirement** [3] - 33:16, 58:10, 146:1
**requirements** [25] - 24:19, 85:16, 94:22, 94:24, 99:8, 99:23, 100:1, 100:15, 103:9, 145:15, 146:3, 147:14, 147:18, 148:19, 150:2, 150:8, 150:17, 150:19, 151:1, 151:5, 151:12, 151:13, 151:24, 155:10, 155:18
**requires** [1] - 155:17
**research** [4] - 24:18, 26:14, 58:4, 118:15
**resent** [1] - 49:18
**reserve** [1] - 57:2
**reserved** [1] - 77:22
**respect** [3] - 104:20, 127:16, 139:22
**respond** [3] - 41:12, 56:18, 130:2
**responding** [1] - 140:17
**response** [7] - 21:10, 21:20, 24:18, 75:12, 106:18, 106:19, 152:4
**responsibility** [7] - 77:4, 96:9, 133:11, 162:4, 162:13, 162:16, 162:19
**responsible** [4] - 99:25, 100:1, 131:8
**responsive** [1] - 126:4
**responsiveness** [1] - 138:5
**rest** [2] - 4:14, 9:5
**restroom** [1] - 137:5
**resume** [1] - 5:23
**returns** [1] - 149:21
**Review** [1] - 56:18
**review** [11] - 22:7, 153:25, 155:14, 156:10, 156:15, 156:16, 157:5, 157:19, 157:22, 157:23, 158:10
**reviewing** [3] - 23:16, 156:6, 159:23
**rewrite** [2] - 156:13, 156:18
**rights** [1] - 78:19
**rise** [8] - 6:1, 77:14, 82:12, 83:3, 137:15, 137:17, 144:2, 165:12
**risk** [1] - 43:3
**Rochester** [1] - 21:8
**role** [6] - 7:25, 8:3, 48:25, 49:2, 67:1, 115:13
**rookie** [1] - 66:20
**room** [5] - 4:9, 5:2, 5:4, 77:12, 137:10
**routinely** [1] - 73:22
**row** [2] - 3:15, 15:2
**RPR** [2] - 2:2, 167:13
**rule** [2] - 38:8, 159:10
**ruled** [2] - 40:6, 80:19
**rules** [10] - 85:5, 85:21, 86:8, 87:16, 104:6, 104:9, 104:12, 123:4, 138:5, 152:21
**Rumore** [10] - 5:23, 5:24, 6:14, 77:16, 142:13, 143:14, 143:21, 143:23, 165:14
**RUMORE** [1] - 6:17
**run** [1] - 84:4

## S

**safe** [2] - 50:2, 71:3
**Safe** [104] - 7:1, 12:22, 13:1, 19:1, 19:15, 19:22, 20:23, 20:24, 23:2, 23:10, 23:15, 23:24, 24:8, 24:17, 24:20, 25:1, 25:4, 25:5, 25:6, 25:16, 25:20, 26:6, 26:13, 27:1, 27:7, 27:9, 27:21, 27:24, 28:15, 33:24, 34:8, 34:10, 34:14, 45:19, 45:23, 46:2, 46:9, 46:24, 47:24, 58:12, 58:14, 64:2, 64:8, 65:5, 65:19, 68:18, 68:24, 69:5, 69:13, 69:20, 70:12, 75:5, 75:24, 83:20, 83:23, 84:10, 85:9, 87:23, 93:3, 97:15, 97:21, 100:3, 100:5, 101:6, 103:12, 104:1, 105:14, 105:16, 106:4, 107:3, 107:18, 108:5, 108:13, 109:5, 110:7, 110:18, 111:16, 112:7, 112:18, 114:14, 115:2, 115:8, 115:14, 116:13, 131:9, 131:17, 154:9, 154:22, 154:23, 155:9, 155:12, 158:17, 159:3, 160:8, 161:5, 161:14, 162:14, 162:20, 162:25, 163:23
**safety** [1] - 43:1
**sake** [1] - 50:5
**sales** [5] - 7:25, 35:12, 114:10, 114:15, 115:18
**saw** [17] - 15:19, 15:20, 19:22, 86:18, 89:15, 92:24, 106:6, 106:8, 107:5, 108:9,

116:9, 116:11, 116:14, 116:22, 118:23, 157:12, 157:14
**scared** [2] - 30:20, 30:21
**scary** [1] - 30:12
**scenario** [1] - 129:6
**scene** [1] - 115:15
**scheduled** [1] - 127:6
**Science** [1] - 37:21
**Sciences** [5] - 16:16, 16:18, 20:11, 20:14, 37:22
**scratch** [1] - 92:10
**screwing** [1] - 154:16
**scroll** [2] - 9:5, 146:8
**search** [1] - 96:6
**seat** [1] - 5:1
**seated** [1] - 137:19
**second** [31] - 3:10, 3:12, 3:17, 7:10, 16:4, 20:17, 20:21, 51:23, 55:11, 60:24, 64:4, 66:1, 85:4, 91:8, 96:15, 97:12, 103:22, 107:6, 108:8, 108:9, 108:10, 108:20, 109:1, 111:15, 124:25, 125:2, 125:6, 125:12, 139:22, 145:22, 156:12
**secondary** [1] - 110:18
**seconds** [1] - 157:14
**secretary** [3] - 128:24, 128:25, 129:2
**section** [5] - 106:25, 107:1, 107:24, 109:5, 144:16
**SECURITY** [7] - 5:21, 6:1, 77:14, 82:12, 137:15, 137:17, 144:2
**Security** [3] - 48:2, 85:2, 85:16
**see** [52] - 7:7, 9:4, 20:13, 20:16, 20:21, 21:1, 21:2, 21:3, 21:6, 21:14, 21:19, 22:2, 22:8, 22:18, 24:4, 25:21, 34:17, 43:8, 47:19, 50:10, 51:22, 56:7, 56:15, 56:22, 61:25, 65:7, 65:13, 77:12, 77:18, 87:15, 87:18, 92:1, 102:20, 103:2, 105:22, 112:20, 113:16, 114:22, 115:6, 118:2, 122:2, 127:10, 129:15, 137:10, 139:19, 153:15, 157:12, 158:2, 158:16, 165:11, 165:16
**seeing** [1] - 16:10
**seeking** [2] - 81:17, 166:11
**seem** [1] - 85:15
**sell** [2] - 145:20, 146:6
**selling** [2] - 112:25, 146:4
**send** [9] - 23:11, 44:8, 48:12, 48:15, 49:15, 71:25, 86:3, 91:11
**sending** [4] - 49:22, 96:8, 98:20, 147:4
**sends** [2] - 22:2, 146:10
**sense** [2] - 33:24, 63:7
**sent** [15] - 23:10, 36:25, 37:3, 37:5, 40:8, 40:11, 40:22, 40:24, 44:10, 48:10, 94:21, 129:19, 130:5, 130:10, 155:20
**sentence** [3] - 42:13, 150:5, 150:19
**separate** [2] - 31:19, 49:22
**September** [2] - 1:5, 135:22
**series** [2] - 14:19, 52:18
**Seroquel** [1] - 29:2
**served** [1] - 29:23
**server** [1] - 30:22
**Service** [1] - 166:4
**settlement** [1] - 130:24
**seven** [3] - 36:10, 36:15, 66:18
**several** [5] - 20:5, 47:22, 74:23, 84:5, 146:5
**shared** [1] - 140:4
**sheet** [1] - 3:11
**shifting** [1] - 78:18
**short** [1] - 148:25
**shoulder** [1] - 28:6
**show** [17] - 15:18, 38:7, 46:5, 49:24, 62:9, 62:25, 63:17, 81:8, 84:21, 99:21, 99:22, 122:3, 122:8, 123:3, 142:15, 147:16
**showed** [9] - 15:21, 24:15, 29:16, 30:3, 39:12, 39:16, 40:8, 150:7, 151:23
**showing** [1] - 56:4
**shown** [14] - 52:9, 62:12, 62:17, 91:15, 92:4, 92:13, 92:15, 92:24, 93:1, 124:20, 157:7, 157:10, 157:24, 157:25
**shows** [2] - 30:12, 151:4
**sic** [2] - 106:6, 146:3
**sign** [1] - 166:23
**signage** [1] - 99:24
**signed** [1] - 130:7
**significance** [5] - 37:7, 37:11, 41:24, 42:2, 42:22
**significant** [4] - 26:15, 42:12, 44:3, 160:12
**signs** [1] - 84:21
**similar** [1] - 3:18
**simple** [2] - 91:22, 91:23
**simply** [1] - 110:8
**simultaneous** [1] - 72:10
**single** [2] - 92:10, 129:23
**sitting** [1] - 32:23
**situation** [6] - 3:25, 4:2, 44:25, 69:23, 71:7, 73:23
**situations** [2] - 28:19, 34:4
**six** [1] - 148:20
**Sixth** [1] - 78:19
**size** [3] - 33:23, 61:8, 61:9
**slipped** [1] - 119:23
**small** [3] - 9:7, 35:4, 61:7
**so..** [2] - 30:24, 141:19
**sold** [3] - 112:18, 112:25, 146:7
**Solutions** [1] - 20:25
**someone** [12] - 6:25, 16:6, 33:4, 89:24, 97:21, 97:22, 98:19, 100:3, 100:16, 106:24, 113:25
**sometime** [2] - 120:21, 131:5
**sometimes** [1] - 13:8
**somewhere** [1] - 102:15
**SOP** [5] - 74:2, 74:5, 92:23, 93:1, 94:13
**SOPs** [38] - 91:15, 91:17, 91:18, 91:23, 91:25, 92:1, 92:2, 92:5, 92:6, 92:13, 93:8, 93:15, 93:16, 93:20, 93:22, 93:23, 93:24, 94:3, 94:4, 94:7, 99:22, 104:25, 155:16, 155:18, 156:10, 156:14, 156:21, 156:25, 157:3, 157:5, 157:6, 157:20, 157:24, 158:2, 158:10, 158:16, 158:19
**sorry** [19] - 5:9, 11:10, 14:8, 29:5, 38:10, 39:15, 40:25, 43:20, 55:2, 55:6, 76:12, 98:5, 117:9, 119:12, 139:21, 150:13, 153:9, 158:8, 159:12
**sort** [2] - 119:23, 160:10
**sorts** [1] - 73:25
**sounds** [1] - 138:24
**source** [2] - 112:6, 114:4
**sources** [5] - 95:21, 98:23, 105:1, 113:15, 114:6
**South** [1] - 20:1
**Southern** [2] - 37:23, 167:14
**SOUTHERN** [1] - 1:1
**space** [1] - 99:23
**speaker** [1] - 161:7
**speaking** [1] - 63:4
**speaks** [1] - 97:25
**specific** [2] - 15:25, 109:13
**specifically** [1] - 94:19
**specifics** [1] - 37:24
**speculate** [2] - 110:12, 110:13
**speculating** [1] - 38:4
**speculation** [8] - 27:2, 28:3, 99:2, 123:12, 123:19, 131:20, 150:10, 151:7
**spend** [3] - 33:14, 156:11, 156:13
**spent** [4] - 12:19, 80:24, 81:16, 124:1
**spot** [2] - 77:7, 164:24
**spring** [2] - 39:7, 164:12
**stand** [7] - 15:13, 15:18, 128:6, 138:25, 143:21, 147:24, 148:9
**standard** [17] - 33:13, 33:15, 33:17, 33:19, 34:2, 34:8, 34:10, 34:14, 35:7, 61:19, 74:2, 92:2, 92:4, 92:6, 92:18, 93:7
**standpoint** [3] - 100:3, 131:23, 156:23
**start** [3] - 69:4, 145:5, 147:10
**started** [9] - 68:5, 68:9, 68:13, 69:12, 72:18, 104:4, 116:9, 164:9, 164:10
**starting** [1] - 92:10
**starts** [3] - 30:12, 145:7, 148:7
**state** [15] - 31:8, 96:8, 98:8, 98:15, 98:17, 98:20, 98:24, 99:1, 99:6, 99:7, 99:8, 101:3, 112:12, 113:8, 122:25
**statement** [9] - 46:24, 78:14, 127:2, 127:25, 128:11, 128:14, 148:13, 154:12
**statements** [4] - 41:10, 80:9, 138:25, 157:4
**STATES** [3] - 1:1, 1:4, 1:10
**States** [4] - 1:14, 2:4, 166:3, 167:14
**stating** [1] - 43:22
**STENOGRAPHICALLY** [1] - 2:1
**still** [11] - 6:14, 21:12, 21:21, 83:1, 85:23, 85:24, 91:8, 143:24, 145:9, 145:20, 150:23
**stipulation** [2] - 79:20, 141:10
**stolen** [1] - 149:14
**stood** [1] - 129:3
**stopped** [1] - 146:4
**story** [2] - 163:1, 163:6
**Street** [2] - 1:15, 1:19
**stringent** [1] - 99:18
**strong** [1] - 143:4
**structured** [1] - 83:23
**struggles** [1] - 27:20
**stuff** [1] - 148:7
**stumbled** [2] - 116:17, 116:18

**subject** [5] - 23:12, 53:16, 55:7, 145:11, 149:15
**submit** [1] - 81:13
**submitting** [1] - 96:5
**subpoena** [2] - 29:18, 29:24
**subpoenaed** [4] - 40:16, 40:17, 117:19, 117:22
**substance** [2] - 146:19, 165:25
**substantiation** [1] - 4:5
**sufficient** [1] - 100:6
**Suffolk** [1] - 125:3
**suggest** [3] - 13:20, 63:14, 141:23
**suggested** [2] - 23:19, 81:10
**suggesting** [3] - 28:14, 78:15, 79:15
**suggestive** [1] - 160:11
**suit** [1] - 140:7
**summarize** [1] - 36:22
**summary** [6] - 39:17, 39:20, 41:25, 42:7, 42:8, 148:22
**supervisor** [1] - 101:18
**supervisors** [1] - 166:9
**supplier** [2] - 97:20, 145:25
**suppliers** [7] - 18:23, 102:22, 103:8, 103:10, 111:11, 145:21
**supplies** [2] - 102:14, 103:20
**Supply** [3] - 48:1, 85:2, 85:15
**supply** [6] - 20:25, 110:10, 110:20, 111:23, 112:2, 152:22
**support** [1] - 69:18
**supposed** [10] - 34:20, 35:9, 73:5, 91:14, 94:18, 107:13, 107:14, 113:6, 158:4, 158:9
**supposedly** [2] - 138:7, 154:19
**suspect** [2] - 85:19, 152:5
**sustain** [3] - 53:25, 61:2, 100:10
**sustained** [34] - 14:6, 17:17, 18:8, 18:10, 20:6, 24:23, 27:3, 28:2, 28:9, 29:6, 31:6, 31:10, 36:17, 41:11, 54:21, 55:17, 59:25, 62:23, 63:10, 71:12, 73:7, 87:6, 88:2, 88:7, 96:13, 99:4, 99:13, 102:3, 115:11, 123:14, 131:3, 133:2, 151:9, 162:11
**swore** [1] - 127:7
**sworn** [1] - 6:18
**synonym** [1] - 113:11

**T**

**T2** [1] - 148:11
**T3** [27] - 21:5, 24:19, 94:15, 94:20, 94:23, 94:24, 95:12, 96:18, 96:20, 96:21, 97:10, 97:11, 145:15, 145:16, 145:20, 145:23, 147:13, 148:18, 148:19, 148:20, 149:1, 149:6, 149:17, 155:14, 155:21, 156:3
**T3s** [13] - 95:2, 95:15, 96:5, 96:11, 142:17, 142:18, 147:10, 148:23, 149:4, 154:10, 154:12, 156:6, 156:20
**target** [2] - 32:16, 32:19
**taught** [1] - 66:21
**teaching** [1] - 108:4
**team** [2] - 25:9, 145:22
**telephone** [2] - 11:4, 50:12
**ten** [5] - 98:20, 137:7, 137:10, 137:14, 164:8
**ten-minute** [1] - 137:7
**tens** [1] - 27:7
**tension** [1] - 27:21
**term** [1] - 154:13
**Terry** [2] - 5:7, 5:20
**test** [1] - 98:25
**testified** [38] - 6:19, 36:10, 36:13, 36:14, 46:10, 47:4, 50:11, 50:13, 51:9, 51:24, 52:7, 52:11, 52:18, 52:24, 58:25, 59:5, 59:6, 59:17, 59:22, 60:15, 62:17, 63:3, 63:12, 66:2, 66:4, 67:2, 73:15, 76:16, 94:1, 97:19, 102:5, 102:7, 123:24, 138:3, 141:2, 155:2, 156:25
**testify** [11] - 30:23, 57:13, 62:19, 74:8, 89:16, 100:23, 116:16, 118:16, 120:8, 143:5, 143:16
**testifying** [11] - 19:3, 22:12, 50:20, 50:22, 51:2, 51:5, 52:14, 53:6, 54:18, 63:13, 89:13
**testimony** [59] - 14:18, 23:4, 23:8, 36:7, 36:9, 39:13, 45:10, 46:19, 50:18, 53:2, 59:2, 59:9, 59:15, 60:2, 60:4, 62:14, 64:17, 64:19, 71:5, 73:13, 73:19, 73:21, 76:8, 77:17, 81:12, 81:22, 83:20, 83:21, 88:24, 103:14, 103:16, 108:22, 109:20, 109:21, 116:16, 116:20, 117:2, 117:14, 117:22, 118:2, 118:3, 118:22, 119:1, 119:3, 119:20, 119:24, 120:6, 122:17, 136:1, 136:3, 136:4, 136:13, 138:9, 142:23, 159:22, 162:25, 165:15, 165:16
**THE** [219] - 1:10, 1:13, 3:3, 3:9, 3:10, 3:13, 3:16, 3:19, 3:22, 3:24, 4:8, 4:22, 5:1, 5:4, 5:6, 5:10, 5:13, 5:19, 5:23, 5:25, 6:1, 6:3, 6:8, 7:8, 7:10, 13:16, 14:6, 17:9, 17:17, 17:22, 18:1, 18:8, 18:10, 18:13, 18:21, 19:7, 20:6, 23:21, 24:11, 24:23, 27:3, 28:2, 28:9, 29:6, 29:11, 31:6, 31:10, 32:10, 34:25, 35:16, 35:18, 36:17, 37:20, 38:6, 38:8, 38:10, 38:11, 38:17, 38:23, 39:4, 40:7, 41:11, 41:13, 41:17, 41:19, 42:6, 42:18, 43:14, 44:1, 46:6, 51:14, 53:25, 54:21, 55:17, 56:2, 56:14, 56:23, 57:3, 58:20, 59:10, 59:25, 60:6, 61:2, 62:5, 62:23, 63:10, 67:5, 67:25, 70:17, 71:12, 72:16, 73:7, 74:13, 77:7, 77:9, 77:14, 77:16, 77:19, 77:20, 77:24, 78:1, 78:5, 78:10, 78:21, 78:24, 79:4, 79:8, 79:17, 79:23, 80:4, 80:7, 80:14, 81:3, 81:5, 81:19, 82:4, 82:11, 82:12, 82:14, 82:21, 82:24, 83:1, 83:2, 83:3, 83:5, 83:9, 84:15, 87:1, 87:6, 88:2, 88:7, 89:5, 89:20, 90:3, 93:16, 93:18, 95:20, 96:2, 96:13, 99:4, 99:13, 100:10, 100:23, 102:3, 102:10, 106:15, 115:11, 118:18, 119:2, 120:1, 122:25, 123:14, 123:20, 124:9, 126:15, 127:18, 131:3, 131:21, 132:11, 133:2, 134:25, 136:19, 137:5, 137:7, 137:13, 137:15, 137:19, 138:2, 138:19, 139:2, 139:5, 139:12, 139:19, 139:24, 140:1, 140:5, 140:13, 140:15, 140:19, 140:23, 141:8, 141:14, 142:2, 142:23, 143:17, 143:20, 143:23, 143:25, 144:1, 144:2, 144:4, 144:9, 150:11, 151:9, 151:17, 151:20, 154:5, 155:5, 158:21, 158:23, 159:10, 159:12, 159:15, 161:8, 162:11, 163:3, 164:24, 165:2, 165:6, 165:12, 165:14, 165:18, 165:19, 166:8, 166:15, 166:17, 166:19, 166:22, 167:2
**themselves** [3] - 16:24, 30:7, 113:18
**therefore** [3] - 78:20, 81:16, 86:14
**Thereupon** [1] - 6:16
**thinking** [1] - 110:14
**thinks** [2] - 112:1, 122:21
**third** [2] - 3:15, 91:8
**thoroughly** [1] - 157:20
**thoughts** [8] - 30:18, 76:5, 76:7, 76:8, 76:11, 76:16, 76:17, 76:20
**thousands** [2] - 27:7, 43:2
**three** [10] - 45:16, 69:11, 85:24, 91:13, 97:9, 121:25, 145:13, 146:4, 146:24, 147:2
**Thursday** [1] - 166:6
**Thursdays** [1] - 166:5
**timely** [1] - 140:17
**today** [9] - 3:6, 36:11, 51:10, 55:24, 56:8, 97:3, 103:24, 135:22, 158:10
**together** [3] - 58:9, 105:19, 120:13
**tomorrow** [7] - 145:14, 152:9, 153:4, 158:10, 165:10, 165:17, 165:20
**took** [11] - 15:12, 15:18, 25:9, 47:16, 50:5, 54:11, 57:6, 69:23, 120:23, 131:5, 134:20
**top** [6] - 20:13, 105:10, 146:2, 146:14, 150:1, 153:11
**top-notch** [1] - 105:10
**topics** [1] - 145:14
**trademark** [1] - 107:10
**trading** [1] - 148:13
**trail** [1] - 129:20
**trained** [2] - 68:12, 68:23
**training** [2] - 66:14, 66:23
**transaction** [8] - 145:16, 145:19,

145:23, 148:3, 148:10, 148:12, 149:16
**transactions** [4] - 111:13, 111:14, 113:18, 155:15
**TRANSCRIPT** [1] - 1:9
**transcription** [1] - 167:9
**transformation** [2] - 68:17, 70:8
**transport** [1] - 166:12
**trial** [1] - 49:13
**TRIAL** [1] - 1:9
**Trial** [1] - 167:5
**tried** [3] - 128:24, 129:3, 145:16
**trouble** [1] - 30:16
**true** [2] - 55:1, 123:10
**trustworthiness** [2] - 128:5, 138:16
**truth** [10] - 22:17, 31:7, 41:14, 118:8, 129:23, 130:8, 133:24, 134:9, 140:2
**truthful** [3] - 127:11, 136:17, 136:24
**truthfully** [1] - 138:14
**truthfulness** [2] - 128:5, 138:16
**try** [12] - 54:5, 63:13, 75:23, 86:19, 102:20, 107:12, 109:22, 110:5, 113:2, 113:17, 120:13, 141:12
**trying** [9] - 19:15, 27:25, 31:8, 47:19, 113:12, 126:2, 130:13, 130:17, 130:18
**Tuesday** [1] - 145:7
**turn** [4] - 139:14, 140:7, 140:20, 141:8
**turned** [4] - 139:16, 140:4, 140:19, 140:22
**turns** [2] - 34:7, 140:5
**twice** [5] - 45:15, 49:23, 79:14, 128:25, 129:2
**two** [15] - 24:8, 29:23, 44:19, 45:12, 52:4, 62:18, 63:1, 107:23, 111:14, 125:15, 129:16, 132:6, 133:14, 135:25, 138:21
**two-time** [1] - 63:1
**TX** [5] - 147:25, 148:7, 148:9, 148:10, 148:13
**type** [3] - 13:3, 58:11, 73:22
**types** [2] - 8:1, 101:4

## U

**U.S** [2] - 117:20, 167:15
**UC** [1] - 37:22
**ultimately** [1] - 162:19
**unaware** [1] - 73:19
**unclear** [1] - 139:21
**under** [10] - 6:14, 23:4, 50:13, 54:18, 58:12, 83:1, 143:24, 150:23, 151:13, 162:6
**underlying** [1] - 4:5
**understood** [2] - 30:23, 164:22
**unfamiliar** [1] - 147:17
**unfit** [1] - 149:15
**unfortunately** [3] - 69:15, 69:24, 80:18
**UNITED** [3] - 1:1, 1:4, 1:10
**United** [4] - 1:14, 2:4, 166:3, 167:14
**unless** [2] - 79:21, 148:17
**unlikely** [2] - 27:14, 27:15
**unreasonable** [1] - 99:6
**unrelated** [1] - 17:21
**unusual** [3] - 7:22, 8:2, 165:23
**up** [54] - 3:11, 4:16, 7:5, 7:6, 7:17, 13:7, 14:21, 16:2, 20:8, 29:16, 30:3, 30:12, 44:19, 45:7, 49:6, 58:10, 62:2, 65:4, 66:8, 70:7, 71:15, 72:20, 73:12, 73:16, 74:4, 74:20, 78:14, 79:21, 81:25, 86:11, 91:1, 103:15, 111:18, 116:18, 116:24, 119:5, 119:8, 125:16, 126:20, 129:3, 131:5, 134:23, 135:8, 135:15, 138:1, 139:20, 140:5, 141:7, 143:7, 154:16, 163:1, 163:23, 166:5
**upward** [1] - 146:9
**ut** [1] - 67:25

## V

**vacation** [2] - 126:3, 126:6
**vague** [5] - 46:4, 127:15, 159:6, 159:14, 161:6
**validated** [1] - 95:13
**validating** [1] - 95:21
**varies** [1] - 33:23
**vast** [1] - 149:20
**vendor** [4] - 100:6, 100:16, 100:20, 103:4
**vendors** [13] - 13:2, 34:21, 95:7, 95:11, 96:5, 96:7, 96:18, 97:14, 97:16, 97:17, 159:4, 159:22
**verb** [1] - 154:13
**verbatim** [2] - 92:20, 94:5
**verify** [8] - 20:25, 21:5, 34:20, 96:20, 98:22, 145:16, 145:19, 145:23
**verifying** [2] - 97:10, 97:18
**versus** [2] - 127:17, 138:23
**vet** [3] - 102:22, 103:7, 111:11
**vetted** [7] - 101:20, 102:18, 102:21, 103:4, 113:5, 113:8, 113:13
**vetting** [13] - 95:6, 101:8, 101:10, 102:14, 103:8, 103:10, 103:19, 103:20, 104:25, 105:9, 113:5, 113:14, 116:1
**VI** [1] - 1:7
**via** [1] - 123:4
**view** [1] - 34:16
**vigorous** [1] - 141:15
**violates** [1] - 78:18
**Volume** [1] - 1:7
**vs** [1] - 1:5

## W

**wait** [4] - 38:8, 107:5, 159:10, 165:24
**waive** [3] - 6:4, 83:6, 144:5
**wants** [1] - 78:15
**ways** [2] - 85:12, 85:14
**websites** [1] - 34:12
**week** [15] - 22:12, 36:11, 50:20, 51:2, 51:9, 59:6, 59:15, 60:2, 60:10, 62:14, 63:3, 103:23, 144:20, 166:3, 166:21
**week's** [1] - 60:4
**weeks** [1] - 146:5
**well-aware** [1] - 110:16
**well-experienced** [1] - 110:15
**well-written** [1] - 148:22
**whatsoever** [4] - 24:16, 53:16, 58:22, 161:21
**whole** [12] - 17:22, 18:21, 56:6, 92:23, 103:23, 129:4, 129:6, 129:18, 158:2, 162:25, 163:6, 163:25
**wholesale** [3] - 33:20, 148:16, 149:21
**wholesaler** [10] - 33:23, 58:10, 86:9, 94:18, 94:23, 97:20, 98:15, 99:21, 151:3, 164:22
**wholesalers** [2] - 33:16, 110:18
**WILLIAM** [1] - 1:10
**William** [2] - 1:17, 2:3
**wise** [1] - 3:8
**WITNESS** [9] - 38:10, 77:19, 83:2, 137:5, 143:25, 151:20, 158:23, 159:12, 165:18
**witness** [40] - 23:18, 31:1, 31:3, 31:4, 37:17, 77:25, 89:18, 89:24, 90:10, 100:9, 106:13, 117:13, 117:18, 118:5, 119:9, 120:3, 122:16, 128:6, 132:15, 138:3, 138:4, 138:12, 138:13, 138:17, 138:22, 138:23, 138:25, 139:1, 139:17, 140:4, 140:6, 140:13, 141:1, 141:7, 141:11, 141:21, 142:7, 142:21, 165:24, 166:1
**Witness** [3] - 78:2, 82:25, 143:22
**witness's** [5] - 19:8, 78:12, 81:12, 140:12, 142:20
**witnesses** [3] - 90:2, 141:9, 166:2
**woman** [1] - 84:4
**Won** [1] - 20:22
**word** [6] - 34:11, 114:4, 134:16, 135:4, 143:4
**word-for-word** [1] - 34:11
**wording** [1] - 154:16
**words** [5] - 27:18, 46:23, 141:5, 141:16, 141:17
**workers** [1] - 162:20
**worried** [1] - 122:15
**worry** [3] - 32:20, 32:25
**worthy** [1] - 98:9
**write** [14] - 38:3, 47:22, 49:2, 49:3, 49:7, 59:1, 59:7, 59:11, 60:21, 61:16, 67:3, 69:8, 163:11, 163:13
**writer** [1] - 161:22
**writing** [10] - 37:24, 68:17, 69:18, 86:21, 102:14, 102:16, 105:14, 105:16, 108:19, 146:22
**written** [5] - 61:15, 121:21, 121:25, 139:13, 148:22
**wrote** [16] - 36:19, 36:22, 36:25, 38:1, 38:7, 39:7, 48:8, 48:21, 49:15, 50:6, 60:9, 60:15, 62:3, 72:2, 74:23, 107:3

## Y

**year** [7] - 87:8, 87:9, 87:10, 87:12, 120:11, 149:19, 160:20
**year's** [1] - 68:8
**years** [9] - 54:16, 54:17, 54:23, 93:21, 108:4, 109:13, 120:6, 148:21, 164:8

**yesterday** [1] - 59:22
**Yom** [2] - 166:6, 166:23
**York** [7] - 99:16, 99:20, 121:1, 121:12, 121:16, 124:22, 125:4
**yourself** [19] - 32:6, 39:1, 41:22, 42:13, 57:6, 63:4, 67:20, 70:3, 89:16, 110:1, 111:22, 119:9, 122:22, 123:5, 123:7, 124:4, 131:24, 162:2, 163:15

**Z**

**zealous** [8] - 27:18, 65:10, 65:17, 65:18, 72:21, 75:20, 75:22
**Zimet** [12] - 1:21, 35:18, 56:21, 77:7, 78:15, 83:16, 93:16, 139:20, 143:2, 143:17, 144:11, 164:24
**ZIMET** [131] - 3:7, 3:21, 4:4, 4:17, 5:17, 6:7, 35:19, 35:21, 36:18, 37:21, 38:2, 38:12, 38:19, 38:22, 38:24, 39:3, 39:5, 40:10, 41:12, 41:14, 41:18, 41:20, 42:10, 42:19, 43:17, 43:25, 44:2, 46:7, 51:17, 54:1, 54:22, 55:18, 56:1, 56:3, 56:11, 56:16, 57:2, 57:4, 58:21, 59:12, 60:1, 60:8, 61:3, 62:7, 62:24, 63:11, 67:6, 68:3, 70:21, 71:13, 72:11, 72:17, 73:8, 74:16, 77:8, 77:22, 77:25, 78:3, 78:8, 78:11, 78:22, 79:2, 79:6, 79:19, 82:8, 82:19, 82:22, 83:7, 83:17, 83:18, 84:18, 87:2, 87:7, 88:4, 88:8, 89:6, 89:22, 90:4, 93:17, 93:19, 95:22, 96:3, 96:14, 99:5, 99:14, 100:12, 101:5, 102:4, 102:11, 106:21, 115:12, 118:19, 119:4, 120:4, 123:1, 123:15, 123:23, 124:11, 126:16, 127:21, 131:4, 131:22, 132:12, 133:3, 135:1, 136:21, 137:25, 138:3, 140:25, 141:10, 141:20, 142:5, 143:19, 144:8, 144:12, 150:12, 151:10, 151:22, 152:1, 152:3, 154:6, 155:7, 157:9, 159:1, 159:7, 159:17, 161:9, 162:12, 163:4, 165:1, 165:3
**Zoom** [2] - 71:20, 71:23