UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-205500 Dimitrouleas/Hunt

UNITED STATES OF AMERICA, | Fort Lauderdale, Florida
September 30, 2025
vs.
9:47 AM - 5:11 PM
PATRICK BOYD and CHARLES BOYD, | Volume VII
Defendants. | Pages 1 to 280

---

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
Alexander Pogozelski, Esquire
Jacqueline DerOvanesian, Esquire
Assistant United States Attorneys
99 NE 4th Street
Miami, Florida 33132

FOR DEFENDANT PATRICK BOYD:
William Barzee, Esquire
Ivlis Mantilla, Esquire
Barzee Flores
40 NW 3rd Street Ph 1
Miami, Florida 33128

FOR DEFENDANT CHARLES BOYD:
Bruce Zimet, Esquire
633 S. Federal Highway Fl 6
Fort Lauderdale, Florida 33301

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

# I N D E X


| WITNESS: | PAGE: |
|---|---|
| MARTHA RUMORE | |
| CROSS-EXAMINATION (con't) BY MR. ZIMET: | 16 |
| REDIRECT EXAMINATION BY MS. DEROVANESIAN: | 118 |
| VIPULBHAI PAREKH | |
| DIRECT EXAMINATION BY MR. POGOZELSKI: | 188 |
| CROSS-EXAMINATION BY MR. BARZEE: | 215 |
| CROSS-EXAMINATION BY MR. ZIMET: | 230 |
| REDIRECT EXAMINATION BY MR. POGOZELSKI: | 244 |


- - -

# E X H I B I T S

- - -


| Number | Description | Page |
|---|---|---|
| Government's No. 305A | Email | 140 |
| Government's No. 337 | Email | 208 |
| Government's No. 337A | Email | 208 |
| Government's No. 660 | Photograph | 205 |
| Government's No. 661 | Document | 214 |

(Call to the Order of the Court.)

THE COURT: We're back on the record. Counsel are present. Both defendants are present.

Anything to come before the Court before we bring the jury in?

MR. ZIMET: Judge, I just have one matter. I just have one matter.

Mr. Charles Boyd received a notice that the substance abuse evaluation recommended a 26-week outpatient program. They wanted him to start yesterday. Obviously, he can't do that here. Can I submit just a short order that that should commence once the trial is completed?

THE COURT: Sure.

MR. ZIMET: Okay. I will get that to the Court.

I don't know -- he called the probation officer up in Maryland to let her know what had happened. I just want to make sure that all the different parties know.

THE COURT: Okay.

MR. ZIMET: Thank you.

THE COURT: Today I've got a federal bar luncheon; so we're going to have to break a little before noon, maybe a quarter to noon, and go to like maybe 1:15. And I need to fill out a calendar for the jury for the rest of October.

So are there any other dates in October that we're going to be off, the last two weeks that you guys have problems

with? I think on the 24th, I'm going to be out in the afternoon; so I will have to look at that.

Anything else the last two weeks?

MR. ZIMET: Judge, we'll just check and get back to you after lunch if there's anything. Is that okay?

THE COURT: Okay.

MR. POGOZELSKI: Same from the Government. We don't think there's anything, but we'll just do the same thing as defense counsel.

THE COURT: All right. Let's bring in the jury.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

I apologize for our tardy delay. The hearing that I had at 9:00 took longer than I thought it was going to take. Hold that against me and not against the lawyers. They were here, ready, willing, and able to go at 9:30.

I think we're ready to resume the cross-examination,

Mr. Zimet.

MR. ZIMET: Thank you, Judge.

THE WITNESS: Your Honor, can I ask you a question?

THE COURT: Sure.

THE WITNESS: I don't want to continue with my testimony without having my own counsel. I feel that I've been -- this is about the eleventh hour of testimony, four and a half hours of cross, and there hasn't been a single document or a piece of evidence saying that any legal advice I provided is incorrect or that any legal advice --

MS. DEROVANESIAN: Your Honor, I'm sorry to interrupt. May I ask that we address this matter outside of the presence of the jury?

THE COURT: All right. Members of the jury, let me ask you to go to the jury room for a few minutes, please.

(Jury exits.)

THE COURT: All right. You can continue.

THE WITNESS: I haven't been shown any evidence that any legal advice that I provided, Your Honor, was incorrect or any legal advice that I provided to the client could even remotely be construed as furtherance of a crime.

And then yesterday, the word "accomplice" came out, and I --

THE COURT: Did it come out from the prosecutors or from the defense attorneys?

THE WITNESS: From the defense attorney.

THE COURT: They can ask you whatever questions they want.

THE WITNESS: And I didn't realize any implications like that in this matter.

THE COURT: Have you ever been in a criminal trial before?

THE WITNESS: Never.

THE COURT: Do you realize that criminal defense attorneys sometimes have strategies that are going to be ethical but are going to try to create a reasonable doubt for their client so that their clients will get a fair trial. And sometimes that strategy might be to try the witnesses in the case and make them look bad?

THE WITNESS: I feel like I'm being interrogated rather than giving testimony.

THE COURT: You are being interrogated. That's cross-examination. That happens in criminal cases. I mean, if you want to have a lawyer here, you can have a lawyer here.

Does anybody think she needs a lawyer?

MR. POGOZELSKI: Not from the Government's perspective, Your Honor.

MR. ZIMET: I would prefer responding to that without the presence of the witness, Judge.

THE COURT: Okay. So he thinks you need your lawyer.

THE WITNESS: Yes.

THE COURT: So do you want to go get a lawyer?

THE WITNESS: Yes. I will retain a lawyer and then continue with my testimony.

THE COURT: Okay. So what are we supposed to do today when you do that? Do you want to stay here? Do you want to come back next week? Because we're off the rest of this week.

THE WITNESS: Next week, I told the prosecutors I will be in Europe, on international travel, from the 3rd to the 18th.

THE COURT: So if we won't finish your trial testimony today, then you're going to have to come back, and the next time that the case is going to be in session is October the 6th.

Why don't you step outside, and I will talk about it with the lawyers.

(Witness exits.)

THE COURT: Okay. The witness is outside the presence of the Court.

You wanted to say something, Mr. Zimet?

MR. ZIMET: Judge, I was shocked she didn't have a lawyer to begin with. Mr. Dresser, who's still at the law firm -- he has a lawyer. I know the law firm offered her to have him as her lawyer. She declined. While she was still working there, they made that offer.

To me, she needs a lawyer. I don't think the request is in bad faith, but I think she has some exposure.

THE COURT: What's the Government's position?

MR. POGOZELSKI: We do not believe that she has any exposure. This is the first time that she has raised the prospect of retaining a lawyer. To the extent, she can afford one, we would prefer that she retain counsel and continue testifying as soon as possible rather than taking an extended trip, especially where we could very well rest before she even returns.

THE COURT: So why don't you give her immunity, and we can continue the trial?

MR. POGOZELSKI: We see no basis for giving her immunity.

THE COURT: So you want me to recess the trial today and just wait and see when she's going to come back?

MR. POGOZELSKI: No, we certainly don't want that.

THE COURT: Well, how am I going to get her a lawyer today, to finish her testimony today?

MR. POGOZELSKI: Can you give me one moment, Your Honor?

THE COURT: Okay.

(Pause in the proceedings.)

MS. DEROVANESIAN: Your Honor, the only other suggestion we can think of is the possibility of seeking

approval to offer this witness immunity, but understanding that it's not because the Government has any belief that she requires immunity or has exposure and therefore not allowing her to be questioned or suggest that through the questioning of the witness, but just understanding that that is just being used as a mechanism to allow the trial to go forward.

THE COURT: How about we bring her back in, tell her that these prosecutors have no intention of charging you with anything, and see if she still wants a lawyer? And if she does, then I guess she'll have to look into getting one from the court community.

MR. BARZEE: Your Honor, on behalf of Patrick Boyd, if the Government or the Court confers any suggestion of immunity on the witness, I'd like an opportunity to cross-examine on that issue.

MR. ZIMET: And so would we, Judge, because she's expressed that she needs a lawyer to protect herself. The Government's now going to say we're not going to prosecute you. That's fair cross-examination.

MR. BARZEE: I mean, the witness is basically invoking her Fifth Amendment right at this point.

THE COURT: Yeah, I think she's doing it because of the severity of the cross-examination that occurred in this courtroom. I think it scared her. And she's a lawyer that doesn't do criminal law and thinks that lawyers asking

questions about her being charged, that maybe she's going to get charged. And the prosecutors don't have any intention of charging her.

So if she still wants to continue, then I will have to let you cross-examine her. I don't know if we're going to finish her today doing that.

I don't know how much longer Mr. Zimet is going to go. I don't know how much redirect you're going to have.

MR. ZIMET: Judge, for what it's worth, my suggestion is -- is let her get her lawyer, have her come back -- she can't have it both ways. Come back on the 6th to finish her examination with the lawyer or not a lawyer, whatever she decides to do.

THE COURT: Here's what I'm inclined to do. Bring her back in. Tell her the prosecutors have no intention at this time of charging you with a crime and that if you want to have a lawyer, it's your right, but you will need to be back here with your lawyer on the 6th.

MR. POGOZELSKI: Yes. We agree with that, Your Honor.

THE COURT: Anything further, Mr. Zimet?

MR. ZIMET: No. Just so it's understood, we are going to examine her in that area, and if the Court is -- the Government is going to object and the Court is inclined to sustain that objection, we would object to that procedure.

THE COURT: I think you've already got into that area,

but if there's objections, I'll rule on the objections. Anything further?

MR. BARZEE: It's not a question of ruling on objections. The question is whether or not I'm going to be permitted to cross-examine her on this issue.

THE COURT: And I'm going to let you ask questions. If there's objections, I'll rule on the objections.

MR. BARZEE: Understood.

Thank you, Your Honor.

THE COURT: All right. Let's bring Ms. Rumore back in.

(Witness enters.)

THE COURT: Ms. Rumore, do you understand there's a difference between malpractice, civil negligence, and criminal intent?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. The prosecutors have no intention of charging you with a crime at this time.

THE WITNESS: Okay. Your Honor.

THE COURT: All right. If you want to have a lawyer, you have a right to have a lawyer. If you want to exercise your Fifth Amendment right, you have the right to do that, but we will have to come back on the 6th to do that.

THE WITNESS: I think I will proceed then, Your Honor.

THE COURT: Okay. Anything further before we bring the jury in?

THE WITNESS: As long as --

MR. POGOZELSKI: Nothing from the Government, Your Honor.

THE WITNESS: As long as the Government --

MR. ZIMET: I can't hear what you're saying.

MR. BARZEE: We can't hear.

(Reporter requests clarification.)

THE COURT: And you understand, Ms. Rumore, you're still under oath?

THE WITNESS: Yes, Your Honor.

MR. BARZEE: Your Honor, respectfully, can I ask the witness to repeat what she just said because we weren't able to hear it?

THE COURT: I think she was saying something to the court reporter.

THE WITNESS: I was saying, "As long as the Government -- I'm assured that the Government would" --

THE COURT: I'm going to tell the jury right now, when they come back in, that the Government has no intention of charging you with any crime at this time.

THE WITNESS: Okay.

MR. ZIMET: Judge, there's another matter, then, with that, that's an issue.

THE COURT: Okay. I have to ask you to go back outside again, Ms. Rumore.

THE WITNESS: Okay, Your Honor.

(Witness exits.)

MR. ZIMET: Judge, the issue --

THE COURT: She's out of the courtroom. Go ahead.

MR. ZIMET: The issue is, Judge, these prosecutors can only speak for themselves. They cannot bind the United States Government.

So any representation is that these prosecutors have no intention of prosecuting you, and it's not the Government. They cannot bind the Government without a formal immunity order.

THE COURT: That's why I said, "at this time."

If you want me to get more specific about it, I can sit there and say, "If you testify that you killed somebody, they can charge you with that."

MR. ZIMET: Well, does that mean if she perjures herself, she can't be prosecuted?

THE COURT: I can tell her that, if she perjures herself, you know. And then you're going to want to say, "Well, you said something different here and something-something different here, you can be charged with perjury."

You're trying to scare her. You're trying to intimidate her into finishing her testimony. And I understand what a zealous advocate does, but I've been doing this for

27 years in federal court, and there's no way that she's ever going to get charged with a crime for what she said so far.

MS. DEROVANESIAN: And, Your Honor, the Court's instruction to the witness was more than sufficient. She hasn't expressed that she has any additional concerns or questions, and there's no reason to go beyond what the Court has already told this witness, which is clearly just so that it can be cross-examined on further.

She's received enough information. She's made a decision, and she'd like to go forward.

THE COURT: Anything further before we bring Ms. Rumore back?

MR. ZIMET: No, Judge.

THE COURT: Okay. Let's bring in Ms. Rumore.

(Witness enters.)

THE COURT: Let's bring in the jury.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your

presence?

The prosecutors have indicated they have no intention of charging Dr. Rumore with a crime at this time, and she's decided to go ahead and testify because the other option is to come back on Monday, and she's going to be out of the country on Monday; so she's decided she will go ahead and testify.

Is that right, Dr. Rumore?

THE WITNESS: Yes, Your Honor.

THE COURT: Mr. Zimet, you may continue.

MR. ZIMET: Thank you, Judge.

Thereupon,

MARTHA RUMORE,

having been first duly sworn or affirmed, was examined and testified as follows:

CROSS-EXAMINATION (con't)

BY MR. ZIMET:

Q. Good morning, ma'am.

A. Good morning.

Q. So this morning, you were given immunity by the Government; is that correct?

A. I don't know if that's what it's called. I have no idea.

THE COURT: I said, "They had no intention of prosecuting her."

BY MR. ZIMET:

Q. Do you interpret that to be that you've been given

immunity?

MS. DEROVANESIAN: Objection. Calls for a legal conclusion.

THE COURT: Sustained.

BY MR. ZIMET:

Q. Do you believe that you've gotten immunity and are not going to be prosecuted?

MS. DEROVANESIAN: Same objection.

THE COURT: Sustained.

BY MR. ZIMET:

Q. So the place we left off yesterday, before you were told you're not being prosecuted, relates to an email or communication that you received, I believe it was on November 23rd from an attorney for Gilead; is that correct?

A. I'm not sure that's where we left off.

Q. Well, let's start there, then.

A. Okay.

MR. ZIMET: May I have that exhibit, please, Molly.

And this is, for the record, Government's Exhibit -- this is 204.

BY MR. ZIMET:

Q. This is the email that was received on the 14th, and then there's a cover email from Charlie Boyd to you related to the compliance call, but let's go to the November 23rd email from Colosi.

And this is addressed from Colosi. And this is addressed from Colosi to "To whom it may concern"; is that correct, Exhibit 203?

Do you see that, ma'am?

A. Yes.

MR. ZIMET: If we can go to page 2, please.

BY MR. ZIMET:

Q. This is a letter that was described on direct examination. I think you said that you recognized this?

A. Yes.

Q. And this was a letter from Mr. Colosi, who is a legal attorney for Gilead; is that correct?

A. Yes.

Q. He was at the time?

A. Yes.

Q. And so he is telling you -- or telling Safe Chain that he is from the anti-counterfeiting and brand protection team; is that correct?

A. Yes.

Q. Now, I think you testified yesterday that up to this point, you had no belief that this matter involved the black market or the gray market concerning pharmaceutical drugs; is that correct?

A. Yes.

Q. And so you not believing it or not thinking that, you had

certainly not conveyed that to Charlie Boyd or to Pat Boyd; correct?
A. I didn't convey anything of the sort to them, no.
Q. Now, this letter --
THE COURT: Mr. Zimet, you need to be close to a microphone.
MR. ZIMET: Is this okay?
THE COURT: I guess.
BY MR. ZIMET:
Q. Did this letter change your mind that there was a black market or gray market issue concerning pharmaceutical drugs from Gilead?
A. Not at the time.
Q. And there's nothing in this letter that made you believe that that was a concern; is that correct?
A. No.
Q. And not having that belief, you certainly did not communicate that to Charlie or to Pat, I think, that there is an issue of the drugs you are purchasing coming from the black market or the gray market; correct?
A. It's a two-part question.
The first part said the black market, and I did tell them there was a problem with their sources. I didn't mention the black market or the gray market to them.
Q. So when did you communicate there's a problem with their

sources?
A. I don't recall exactly.
Q. Do you recall approximately in relationship to this letter? Was it before this letter?
A. I believe it was after the third incident. I was made aware of a third incident.
Q. And how did you communicate that?
A. I'm sure it was either by phone -- you know, phone call or something. I'm not positive.
Q. Did you memorialize that in any way in the Frier Levitt file? That you believed that your clients had acquired drugs that had been on the gray market?
A. I didn't put the words "gray market" anywhere, no.
Q. You believed that there were problems with their sources of drugs; is that correct?
A. Yes.
Q. What specifically did you communicate to Charlie Boyd and Pat Boyd about what those problems were when you first communicated that?
A. I asked them if there was a problem with their vetting because of these issues that were occurring.
Q. Did you describe to them or did you identify to them what you thought the problem was with their sources? Not the vetting but the sources themselves?
A. No, I wouldn't speculate as to what that was.

Q. So the answer is no --
A. No.
Q. -- you didn't say anything about their sources; is that correct?
A. No. That's their business.
I mean, I don't know what sources they even had at this point other than Gentek.
Q. And you believed at that point it was not something that you should inquire about their sources, how they got them or anything of the sort; is that correct?
A. I believe that that information should have been provided by the clients, so no.
Q. And the reason the clients would know they should provide that information would be because you would ask them for that information; is that correct?
A. No. The reason is because we need to know the full picture before we could provide legal advice. And I had a very narrow role with regard to FDA advice. That's -- and there's something that involves the FDA, the Drug Supply Chain Security Act, and all these other incidents that I wasn't made aware of that have come out in this courtroom, then I think I was supposed to be made aware of those things early on. There seems to be tons of incidents that I didn't know about.
Q. So is your testimony that you thought there was a problem with their sources but you decided it was not necessary or

appropriate for you to ask them any questions about their sources? Is that your testimony, ma'am?

A. I asked them --

Q. Yes or no -- excuse me. Please answer yes or no.

A. The answer is "No."

Q. So is there any time prior to this November 23rd letter where you asked Charles Boyd or Pat Boyd, "Tell me something about these sources. I'm concerned that these sources are not legitimate"?

A. I'm sure it was discussed. I just don't recall.

Q. When you say "I'm sure it was discussed," was that a question you asked them about these sources?

A. I didn't ask them a question about the sources. They didn't provide any information other than Gentek, and I didn't know there was more than one source at this point.

Q. Let's talk about Gentek for a moment.

Did you ask them, "I'm concerned about Gentek. Tell me how you got involved with them and tell me what you know about them"?

Did you ask that question?

A. No. That's not what -- I was supposed to provide legal advice on the Drug Supply Chain Security Act and the rule for wholesalers. I wouldn't be asking them -- I'm not an investigator. I'm not the FBI. I'm not -- my job is not to go delve into their business without them providing the

information.

They -- they could have turned and said we have this supplier, Gentek, could you -- I don't know, but -- you know, it's not my job to go do an investigation on their business model.

Q. Isn't your job, ma'am, to give legal advice based upon facts?

A. Based upon the information that the client provides to me.

Q. And if you don't ask for the information, there's no way for you to know what the information is, is there?

A. If I don't know what to ask, what am I going to be asking?

Q. Let me put -- let me ask you this way: If you think that there's a problem and concern about a source of the drugs, why would it not be natural, appropriate, and necessary for you to get the facts and information about that source that they know?

A. I can't answer that.

Q. You can't answer -- you can't answer it, or you choose not to answer it?

A. I can't answer that.

Q. So after reading this letter from Mr. Colosi from November 23rd, 2020, you believed that your suspicion or your concern that you had before the letter was reinforced; is that correct?

A. I don't know what suspicion or concern you're referring to.

Q. Well, I thought you testified a few minutes ago that prior

to receiving this letter, you expressed concern to the Boyds about the source of the drugs that they -- the HIV drugs that Safe Chain was receiving.
Am I mistaken?
A. No, that's correct.
Q. So the question to you, then, is having read this letter, was your concern -- did your concern about the source of the drugs -- did that remain?
A. Yes.
Q. And at that point, did you decide that you wanted to ask for some information about that source of drugs?
A. Yes, I did.
Q. Okay. And in what forum did you ask for it?
A. We -- I think we had a meeting with the client. I'm not sure, but I know that I needed information to respond to this letter by December 4th, I think it was. So I elicited information from the client regarding what was the contents of this letter.
Q. So you asked about something that, before you thought, was not necessary to ask about; is that correct?
A. It was brought to my attention via this letter.
Q. So what the letter provided you was a basis for you to go further than you thought was necessary in representing Safe Chain and the Boyds; is that correct?
A. No. What I felt was that there were things in this letter

that were not provided to me from Safe Chain or the Boyds, specifically, the second incident in here.
Q. So let me ask you this question: What interaction had you had with the Boyds prior to November 23rd concerning the operation of the business, other than the August 21st call with Mr. Morrone and the October 14th call with Mr. Morrone?
A. I just understood that they were a secondary or tertiary wholesaler. I didn't really ask them about their business model. I understand that they sold HIV drugs, but I thought they were -- they sold all kinds of medication. So I didn't ask them many specifics.
I asked them about their SOPs. I asked them if they were vetting their suppliers. I provided information on the T3. I provided legal advice as to what a wholesaler's requirements are. That's about it.
Q. Okay. So having read this letter, did you think that Gilead needed to explain to you what this investigation was about?
A. Yes.
Q. And, obviously, this investigation had gone -- began with an individual named Christopher Won? Is that right -- his name? Initially, from Gilead?
A. I don't recall that name.
Q. Was there a second individual, who was from the counterfeiting section, that we talked about yesterday, that

became involved?
A. There was outside counsel, Mr. Brekenledge.
Q. Well, that's later on. That's in 2021. We're talking about November 2020.
Mr. Colosi, as we just talked about -- discussed earlier, he is in-house counsel for Gilead; correct?
A. Yes.
Q. So now it's the lawyer wanting to talk to the lawyer for Safe Chain; is that correct?
A. I called him, but he didn't speak to me.
Q. So tell us when you reached out for Mr. Colosi to speak with him.
A. As soon as I received this letter.
Q. And what -- what were you calling him for? What did you want to ask him?
A. I wanted to know what that second incident was about.
Q. Okay.
A. But first -- I spoke to the client first.
Q. Did you also want to know this was a black or gray market case, where your clients were receiving drugs that had been sourced from the gray or black market?
A. No.
Q. That didn't matter to you?
A. I wasn't asking him about that. I was asking him about the two incidents that pertained to my client.

Q. My question, ma'am, is did you have a concern that these incidents were part of the receipt of drugs that had been in the gray or black market by Safe Chain during that time period?
A. No.
Q. Did that cross your mind?
A. Not at that time, no.
Q. So Mr. Colosi did not -- did he not answer your call? Not return your call?
A. I reached out. I didn't hear back from him; so I didn't pursue it.
Q. So --
A. I just responded to the letter in writing.
Q. So was there an email that you sent to him or actually a phone call that you made to him?
A. I believe I reached out by phone.
Q. Okay. So there should be a record of that --
A. I think so.
Q. -- call? Okay.
So then you drafted a response to that communication from Mr. Colosi; is that correct?
A. Yes.
MR. ZIMET: Can we put that up, please?
BY MR. ZIMET:
Q. Now, this is Exhibit 208. This is the actual response that you submitted to Mr. Colosi; is that correct?

A. Yes.
Q. Did you do a draft of your response before this communication?
A. I believe so.
Q. Now, in the draft that you wrote, did you state that you believed that Gilead had a problem in their manufacturing division with the wrong drugs getting into a Gilead bottle or product?
A. I believe so.
Q. And what was the basis for you thinking that?
A. I know that manufacturers often have mix-ups like that; so it could be from the manufacturer. That was a possibility.
Q. So did you have knowledge of Gilead being one of those manufacturers that had problems with the wrong drugs getting into the wrong bottle?
MS. DEROVANESIAN: Objection. Calls for hearsay.
THE COURT: Overruled.
A. Yes.
BY MR. ZIMET:
Q. And tell the jury what knowledge you had, as of responding to this letter in -- your response was December, I think you said, of Gilead having a problem -- a manufacturing problem with wrong pills in their bottles.
A. I remember they had recall, recall.
Q. And certainly, that was a fact that was significant to you

in representing Safe Chain and the Boyds; correct?
A. Yes.
Q. And it was important to you because at that point, you were concerned whether the source of these wrong drugs was Gilead?
A. Yes.
Q. And the reason that was important to you is that, if Gilead was a source of those drugs, it would be unfair to make a claim or a suggestion that Safe Chain was the causation or the source of these wrong drugs in the bottle; correct?
A. Yes.
Q. And that was part of your zealous representation of Safe Chain and the Boyds; is that correct?
A. Yes.
Q. Now, you wanted Gilead to conduct an investigation to determine whether or not they had a history of wrong drugs in a bottle; correct?
A. Yes.
Q. In fact, you made requests for them to respond to give you that information; isn't that correct?
A. Yes. We asked if there were any mix-ups, and we even asked if it pertained to that lot or if they had any other complaints with regard to that lot.
Q. And the reason to do that is as part of your zealous representation of Safe Chain and the Boyds; correct?
A. Yes.

Q. Now, prior to your testimony -- I think you said you had four meetings with the Government? With the prosecutors? That's what you to referred as Agent Alex and Agent Jake yesterday?
A. Yes.
Q. In any of those conversations that you had with them, did the topic of your belief or your knowledge that Gilead had a history of wrong pills in their bottles come up in those conversations?
A. Yes.
Q. And you informed the prosecutors that, in fact, you did have knowledge of those instances; correct?
A. I was aware of at least one instance that Gilead had a recall.
Q. Because of wrong pills in a bottle?
A. Yes.
Q. And you informed the prosecutors of that; is that correct?
A. Yes.
Q. Did they ask you any more questions concerning when that took place or what drugs were involved?
A. No, I don't recall what the drugs were.
Q. The question to you, ma'am, was did the prosecutors ask you for any details as to when that occurred and what Gilead drugs were involved?
A. No.

Q. So that issue was just dropped after you brought it up?
A. Yes.
THE COURT: It's repetitive, Mr. Zimet.
BY MR. ZIMET:
Q. So, at that point, you were looking for information from Gilead, and you filed the reply or the response communication to Mr. Colosi; is that correct?
A. Yes.
Q. And we talked about it the first day that you testified. We're talking about it today.
Mr. Colosi then filed a reply to your response; did he not?
A. Yes.
MR. ZIMET: Can we put that up, please?
BY MR. ZIMET:
Q. And the response from Mr. Colosi is in front of you, and that's dated December the 10th of 2020; is that correct?
A. Yes.
Q. And Mr. Colosi takes -- it speaks for itself, but he takes exception to some of the things that were included in your correspondence. Would that be correct to say?
A. Yes.
Q. And he wants you to give him a response to this, to present what Safe Chain's position is; is that correct?
A. Yes.
Q. And you told him that you would respond; is that correct?

A. I -- I'm not sure if I sent him an email or how I answered.
Q. Okay. So Gilead was looking for Safe Chain's position in reply or response to the December 10th communication; is that correct?
A. Yes.
Q. And you told him at some point that you would but you needed some time; is that correct?
A. I don't recall that.
Q. Do you recall him responding that that's fine, to give some time for response but "please give me a call so we can discuss this"?
A. I don't recall that.
MR. ZIMET: Hold on one moment, Judge.
THE COURT: Okay.
BY MR. ZIMET:
Q. Do you think that anything could potentially refresh your recollection as to what communications you had with Mr. Colosi after the December 10th response that he made?
A. Yes.
MR. ZIMET: May I approach, Judge?
THE COURT: Okay.
MS. DEROVANESIAN: May I just ask what's being shown to the witness?
Thank you.
///

BY MR. ZIMET:
Q. If you could look at that and read it to yourself, and I'm going to ask you, after having read that, did anything refresh your recollection as far as what Mr. Colosi communicated to you?
A. Yes.
Q. And what did it communicate to you?
A. That we were -- he was still waiting for a response, and I have an email here that "We're still working on it."
Q. And did Mr. Colosi say, "Please give me a call. I'm available all next week"?
A. Yes.
Q. And you did not return that call or accept that invitation to return a call to Mr. Colosi; is that correct?
A. A call was not set up, no.
Q. And for the rest of December, tell us what work you did on the Safe Chain matter.
A. It was the 18th. And I think that after this was Christmas holiday. I'm not sure I did much until maybe the early part of January.
Q. And then in the early part of January, Mr. Colosi contacted you again saying, "We still don't have a response and still please give me a call"; is that correct?
A. I'm not certain. I need to be refreshed on that.
Q. Well, let me back up for just a second.

In January, you got a communication from Ms. Divilio; is that correct?
A. I don't recall.
MR. ZIMET: May I approach?
THE COURT: Okay.
BY MR. ZIMET:
Q. Do you recall that?
A. Yes.
Q. And Ms. Divilio wanted to get an update as far as what was going on with the response; is that correct?
A. No. I'm asking her to let me know how she wishes to proceed.
Q. Well, didn't she initiate the email to you asking what was going on?
A. December 29th.
Q. She asked you for an update; correct?
A. She asked me the next step of the situation with Gilead, "Is there a next step?"
Q. And you also heard from Mr. Colosi, asking you around the same time where was the update or give us an update, where's your response and how about my request for a telephone call?
Do you recall that?
A. Yes.
Q. And so up until that time, you still had not called Mr. Colosi; is that correct?

A. No.
Q. There's still information you wanted to know about the case; did you not?
A. From Safe Chain, yes.
Q. Not from Gilead?
A. Both.
Q. And so you were asked by the Gilead attorney to give him a call, at which time you would have had an opportunity to discuss whatever information you wanted from Gilead, but you decided you did not want to do that; is that correct?
A. I wanted to speak to Safe Chain before I prepared a response to Gilead.
Q. How about the telephone call to Mr. Colosi? Did you not --
A. That was --
Q. I'm sorry.
A. It was the first -- as soon as I received the November 23rd letter.
Q. We're talking about the invitation that he gave to you in December, as well as the invitation he gave to you in January. Both of those invitations you did not avail yourself of and did not call him; is that correct?
A. No.
Q. And the reason you did not call him was because you were no longer interested in the information that you thought Safe Chain needed to defend itself against the accusations from

Gilead?
A. No. It's because I felt that his response was taking a very adversarial tone against the client and that it didn't -- it wasn't cooperative. It wasn't -- it was adversarial.
Q. So the question -- you thought it was adversarial, there's no reason to speak to him on the telephone. Is that your testimony?
A. No, I didn't call him after that.
Q. But the reason you didn't call him was because you thought the tone of the letter was adversarial?
MS. DEROVANESIAN: Objection. Asked and answered.
THE COURT: She didn't answer.
A. Yes, I told him it was adversarial. And it was -- we had asked if there were any similar incidences with lots, and we didn't -- I didn't get any answer like that in his response.
BY MR. ZIMET:
Q. So the question that I think is in front of you is was the reason that you did not call him was because you believed that his reply was adversarial?
A. At the time, I felt that it was -- the purpose was to shut down the secondary and tertiary wholesalers and just have their authorized distributors.
Q. So you thought that was not worth a telephone call because of those factors? Is that your testimony?
A. I didn't call him, no.

Q. So at that point, he was still looking for a response and still looking for a telephone call, at that point being in January of 2021; correct?
A. I don't know what he was doing at that time.
Q. Well, did he not communicate to you that "Where's the response?"
Number two, "I'm still waiting on the call that I asked you about"?
A. Yes. But I'm not sure what information I had from Safe Chain to prepare a response either at that time.
Q. You did not need any information to have a telephone call with Mr. Colosi; is that correct?
A. Yes, I did. Because I didn't know about that second incident that was in that letter, and then he wrote another letter, and I needed to discuss that with the client.
Q. Did you need to discuss with the client, getting on a call with Mr. Colosi and saying, "Listen, what is this case really about?"
A. That wasn't my assignment. I mean, it's, you know...
Q. So is it your testimony --
MS. DEROVANESIAN: Your Honor, I'd ask the witness be allowed to finish her sentence.
MR. ZIMET: I'm sorry.
MS. DEROVANESIAN. It sounds like she was mid-sentence.
MR. ZIMET: I thought she was finished.

THE COURT: If you weren't done with your answer, you can finish your answer.
A. Yeah. I felt that there was a letter. I responded. He responded back, and then, you know, at that point, I think, I wanted some supervision at the firm. I wanted some guidance, and I didn't receive any. So I was waiting for another partner to be involved in this case, not knowing that there were so many different lawyers that were involved in Safe Chain matters.
BY MR. ZIMET:
Q. So who did you ask for some help in representing Safe Chain in January of 2021?
A. I'm sure I asked the firm, maybe John Levitt, maybe.
Q. Do you recall speaking or communicating with Mr. Levitt at that point?
A. I'm sure I communicated that I was working on a Safe Chain matter and there were incidents and things like that, and I think he was even copied on some correspondence, but I'm not sure.
Q. And did he get back to you?
A. No.
Q. And so Mr. Levitt -- that's the Levitt of Frier Levitt?
A. Yes.
Q. So the named partner of a law firm is asked by someone handling the case for some assistance or some guidance and that

person never responded?
A. I didn't receive any guidance until March.
Q. Did that concern you?
A. Yes, it does.
Q. Did you tell the clients that "I'm reaching out to the named partner of this law firm and not getting any response. I think you are entitled to know that"?
A. No, I didn't.
Q. And the reason you didn't do that was because why?
A. I thought I could handle it.
Q. Well, obviously, by reaching out for help, you thought you needed help, and so they were rejecting or ignoring your request?
A. At this time, I didn't have a supervisor, no.
Q. Well --
A. Since John Moronne passed away, until March, I had no supervisor.
Q. Even if you didn't have a supervisor, you knew there were people much more experienced in this area than you were; correct?
A. No.
MS. DEROVANESIAN: Objection. Vague as to what area he's referring to.
THE COURT: Overruled.
///

BY MR. ZIMET:
Q. You can answer the question.
A. No. I don't think anyone at that firm had more experience in the FDA and the Drug Supply Chain Security Act.
Q. Well, you're a healthcare attorney for about one year at that point?
A. Yes.
Q. So is your testimony that there are other attorneys at Frier Levitt that had less experience as a healthcare attorney than you did?
A. They had less experience in that particular area.
Q. So you were the most experienced attorney at Frier Levitt in the area that you just described?
A. Yes.
Q. So the most experienced attorney at Frier Levitt did not think it was necessary to ask the attorney for Gilead whether this case involved gray or black market drugs; is that correct?
A. No, I didn't ask him that.
Q. And you didn't think it was necessary?
A. No.
Q. Did it cross your mind that potentially Safe Chain was being conned and misled by these vendors who they had concerns about?
A. It's actually what I --
MS. DEROVANESIAN: Objection. Calls for speculation.

THE COURT: Overruled.
A. That's what I believed.
BY MR. ZIMET:
Q. You believed, in fact, that they were being deceived?
A. Yes, I did.
Q. I'm sorry. I interrupted you.
A. I believed that they were -- there was some bad choices maybe for their vendors, that they were being deceived, or that there was a mix-up from a patient or that it was a mix-up from the manufacturer, but I didn't go to gray market at that time.
Q. Okay.
MR. ZIMET: And if we can put on the ELMO for a few minutes, Judge.
BY MR. ZIMET:
Q. We have thrown around a lot of terms, and I thought it might be helpful if we sort of visualize how things worked.
And this handwritten diagram -- and I apologize for my printing or lack of the same -- this describes what a drug manufacturer such as Gilead, what their drug chain would be in the normal course of their business; is that correct?
A. Yes.
Q. So let's just walk through it together, if that's okay with you.
A. Yes.
Q. So the manufacturer at the top would be Gilead; is that

correct?
A. Yes.
Q. And Gilead, I think you testified, had what are known as authorized distributors. And those are people that they selected, that they say, "Okay, we will sell our drugs to you"; correct?
A. Yes.
Q. Only to you that are one of the authorized distributors, not to anybody else?
A. Yes.
Q. And then the authorized distributors have a separate transaction with a pharmacy where they sell the drugs which they got from Gilead to the pharmacy; correct?
A. No.
Q. The authorized distributors do not do that?
A. They could also sell -- in addition to that route, they could also sell to a secondary or tertiary wholesaler.
Q. But if they don't do that, this would be the pattern that that it would have?
A. Yes.
Q. We'll get to that part in a second.
A. Yes.
Q. I'm not trying to avoid that.
This would be the traditional way of how Gilead would work something with their drugs, including HIV drugs; correct?

A. Yes.
Q. And so under these circumstances, the drugs would go from one to the other, to the other, and then, ultimately, to the patient; correct?
A. Yes.
Q. And the advantage of that to the manufacturer is they would set what's called the WAC, or the wholesale acquisition cost; correct?
A. They would set a price, yeah.
Q. And that price would be set for what the authorized distributor would be purchasing the drugs from the manufacturer; correct?
A. Yes.
Q. And then the authorized distributor would have a separate transaction with the pharmacy, and that would be based on the WAC number, and obviously, they would want to sell the drugs for a higher price than they had purchased it for?
A. Yes.
Q. And that way -- and then, ultimately, it was sent to the pharmacy and then go to the patient, where their insurance would pay it, some federal government would pay it, a program would pay it, or even the patient would pay for it; right?
A. Yes.
Q. Now, under that scenario, the price is controlled by the manufacturer; correct?

A. Yes.
Q. And that's a way of them keeping the price at a higher level; correct?
A. Yes.
Q. And certainly, when a wholesale distributor gets involved, that potentially could be a threat to the high prices that the manufacturer is setting; isn't that correct?
A. Yes.
Q. So let me show you this diagram. And this is -- this is a diagram of the second circumstance, I think, that you were alluding to?
A. Yes.
Q. Is that correct?
A. Yes.
Q. So in this one, it would go from the manufacturer to the authorized distributor, just like the last one, and then they would sell it to the licensed distributor, who you described as the wholesale distributor.
It's the same thing; correct?
A. Yes.
Q. And then that would go to the pharmacy and that would go to the patient?
A. Yes.
Q. Correct?
Now, under that circumstance, if the patient ends up with a

drug or a bottle from Gilead, let's say, and it has the wrong drug in it, one would look and say, "How did that happen?"
A. Yes.
Q. And so one of the things that you would want to do, for your client's sake, is try to figure out what happened?
A. Yes.
Q. And so in trying to find out what happened, you would want to know when in this process did this bottle of wrong drugs get into the system; correct?
A. Yes. It's also their compliance person, who knows more about the transaction.
Q. Well, that's a potential witness to help out -- to figure out what happened?
A. Yes.
Q. It's kind of like a puzzle, really, isn't it?
A. Yes.
Q. To try to figure out what it is?
A. Yes.
Q. And how it happened?
A. Yes.
Q. Correct?
So each of these entities are potential, okay, for being the source of the wrong drug in the bottle; correct?
A. Yes.
Q. It could be the manufacturer. And I think that's what you

alluded to in your letter or your draft letter that you were writing in response to Mr. Colosi. You had a feeling, based on your experience and knowledge, that Gilead had a prior history of wrong drugs in their bottles?
A. Yes.
Q. That was a manufacturing issue and causation; correct?
A. Could be.
Q. And that was one of the "could be's." All these are "could be's"; correct?
A. Yes.
Q. Your instinct or concern when, you saw the Colosi letter, was that it could be a manufacturing issue? That Gilead somehow, some way, okay, had made a mistake?
A. Yes.
Q. It also could be the authorized distributor somehow --
A. Yes.
Q. -- made a mistake?
It also could be the licensed distributor or the wholesaler. In this case, that would be Safe Chain; correct?
A. Yes.
Q. It could be the pharmacy somehow made a mistake; correct?
A. Yes.
Q. And it also could be the patient, in certain circumstances, either made a mistake or sometimes deliberately wants to say that occurred; correct?

A. Yes.
Q. And that could potentially be an example of fraud. Sometimes patients have been known -- in your practice, you've seen, I'm sure, that patients have said, "Wrong pills in the bottle," okay, "I want to get my money back," or "I want to get another bottle," or something like that; correct?
A. Yes.
Q. And that's, obviously, one of the concerns that one would have when there's an issue of wrong pills in a bottle from a manufacturer; correct?
A. Yes.
Q. So your job as being the, I think you said, "zealous advocate" for Safe Chain was to make some kind of determination, have facts, at least, that you could argue, it's not us. It's not Safe Chain that's doing this; correct?
A. At this point, I was asking for more information, but yes.
Q. That's your goal; right?
A. But it's also the goal of the company and their compliance officer. My goal is to get the information and put together a response. I don't have at my disposal all the information regarding the product. I haven't seen it. I don't know how it came in. It's in totes -- all different bottles in totes. Those are all red flags, those are all issues that I don't know about.
The T3s -- looking at their T3s, there's all sorts of

things that would lead one to believe it was one of these parties versus another.

Q. And you wanted to make sure that you could take what you thought was the best position for your client, that being Safe Chain, in this issue of wrong pills in a bottle?

A. Yes.

Q. Is that correct?

And so you wanted to find out what facts, okay, that are out there that could allow you to make the determination was it Safe Chain's fault that the wrong pills got into the bottle; correct?

A. Yes.

Q. Okay. So in trying to do that, in trying to make that determination, you wanted to gather information and find out what was this chain of distribution of these pills? Is that correct to say?

A. Yes.

Q. And if it was black market or gray market -- whatever terminology you want to use -- that could be something that entered into this chain, maybe from the manufacturer first, but somehow left the chain, and then it got back into the chain through another means, and the other means were commonly described as black market or gray market; isn't that correct?

A. That would be through the patient.

Q. It could be the patient. It could be something else also;

correct?
A. Yes.
Q. And the lawsuit that we talked about yesterday, the one in Florida --
A. Yes.
Q. -- that was a situation where, in fact, Gilead drugs ended up being entered into the black or gray market; isn't that correct?
A. That Gilead -- I'm not sure what the -- I know the lawsuit was Gilead against all these suppliers, pharmacies.
Q. Right.
A. And it was that there was diversion of the Gilead product.
Q. And what "diversion" meant is Gilead drugs had gone to pharmacies?
A. Yes.
Q. Something had happened with the drugs that got to the pharmacies that ended up then coming back into the market from the pharmacies into the gray or black market; correct?
A. Yes.
Q. So, obviously, that was a concern that that could have been happening in this case; isn't that correct?
A. When was that lawsuit filed? I don't think it was at this time frame that I had a response to Mr. Colosi.
Q. I believe your testimony was it was November of 2020 yesterday when it was filed. I believe the Colosi letter was

November 23rd of 2020.
Would that help you?
A. Yes.
Q. Okay. So there certainly was a potential knowing -- and your firm, to your knowledge, had been following that Florida lawsuit; correct? Your firm being Frier Levitt?
A. Yes.
Q. So they were aware that that lawsuit existed; correct?
A. Yes.
Q. And they were aware, during this time period, that there were gray or black market entries of Gilead HIV drugs that were getting back into the supply chain; correct?
A. I know the lawsuit was filed in November of 2020.
Q. Correct.
A. I don't know when I became aware of the actual date of that lawsuit. Somehow, it seems to me, it's after this Gilead response and everything.
Q. Do you recall seeing anything which would lead you to believe that Frier Levitt had been following the lawsuit prior to you learning of the lawsuit?
"You" being Martha Rumore --
A. No.
Q. -- herself?
A. I know I was asked to do something on that lawsuit at some point, and that's when I think I was made aware of it.

Q. And --
A. But I don't know exactly when that was.
Q. So I'm not allowed to testify, but let's just assume for a second that that happened sometime in May or June of 2021.
MS. DEROVANESIAN: Objection. Assuming facts not in evidence.
THE COURT: I'll allow a little latitude.
BY MR. ZIMET:
Q. Okay. So assuming that's the date, okay, time period, when you learned of that lawsuit in that time period, did you make a connection that "Well, maybe the drugs that are involved that supposedly Safe Chain is receiving and then distributing came from the fraud that was described in the Gilead lawsuit filed in the Southern District of Florida"?
A. No. Because the client indicated that they had not provided their products to anybody that was a defendant in that case. They sent us an email saying that.
Q. Understood.
But the question is the people that are described in that case are people who received the drugs and then put them out into the black market; correct?
A. Yes.
Q. So Safe Chain would not be delivering those drugs to those people. They potentially could be receiving those drugs in the black market through those people, who you described earlier of

having concerns about, that were distributors?

MS. DEROVANESIAN: Objection. Calls for speculation.

THE COURT: Overruled.

A. Say the question again, please.

BY MR. ZIMET:

Q. Sure.

You had a concern that you expressed on direct examination -- excuse me, on cross-examination, a little bit ago, that you had concerns about the sources of the drugs that Safe Chain was receiving?

A. Yes.

Q. The HIV drugs; correct?

A. Yes.

Q. And the Florida lawsuit ended with pharmacies receiving drugs improperly but then letting them out or disposing them into the gray or black market; correct?

A. Yes.

Q. And you had a concern that those drugs that were then put in the black market were acquired by these vendors, who you had a concern about, and potentially had been sold to Safe Chain; isn't that correct?

A. No, it was the other way around. I was concerned that Safe Chain had sold to these pharmacies. That was the concern that we had, whether Safe Chain was involved in the distribution of the drug from Safe Chain to these defendants.

Q. Right.

But did you focus at all in the fact that, at the end of this scheme, the drugs that were subject of that lawsuit then ended out into the black or gray market?

A. My concern was for my client.

Q. Well, if your client had purchased those drugs that had gone back into the gray or black market, that would be something that would be a concern; that your clients were being duped with getting drugs that should not have been in the market itself? Isn't that correct?

A. But we asked the question, "Did you provide any product to those defendants?" And they said, "Absolutely --" there was a "No." We asked several times because we need -- we wanted to make sure there was clarification.

By that time -- I guess that was in May. And the partner Jesse Dresser was involved as well, and we received that information that they didn't have anything to do with any of the defendants in that case.

Q. Right.

A. But there was a subpoena for Safe Chain, and that's how we got involved with that.

Q. The question, though, is not whether or not Safe Chain provided the drugs that were the subject of the South Florida -- Southern District of Florida lawsuit.

The question was -- or the question should have been: Did

Safe Chain acquire drugs that had been a part of that fraud and had been misled as to the legitimacy of the drugs by the vendors who you had a concern about?

It's not production of Safe Chain to them. It's --

MS. DEROVANESIAN: Objection.

BY MR. ZIMET:

Q. -- what Safe Chain received. Did you have a concern about that?

A. No. Because --

MS. DEROVANESIAN: Objection to counsel testifying and the compound question.

THE COURT: It's a compound question.

BY MR. ZIMET:

Q. Let's ask the last part of it.

Instead of the issue being a concern about Safe Chain providing the drugs to what was charged in that Southern District of Florida lawsuit, did you have a concern that Safe Chain had received -- not produced but received drugs through the black or gray market that had been part of the Southern District of Florida lawsuit?

A. No. Because a wholesaler can't buy drugs from a pharmacy. There's a 5 percent rule.

Q. Well, they're not supposed to; correct?

A. Yes. And we were -- we were not told that they bought, you know, from pharmacies.

Q. Well, Safe Chain, to your knowledge, was not buying from pharmacies. They were buying from wholesalers; correct?
A. Yes.
Q. And so one of the issues would be how did those wholesalers, who you had a concern about, acquire the drugs they were selling to Safe Chain; correct?
A. Yes.
Q. And if that happened, Safe Chain could have been duped into thinking that they were receiving legitimate drugs, not black market drugs.
MS. DEROVANESIAN: Objection. Calls for speculation.
MR. ZIMET: Is that correct?
THE COURT: Sustained.
BY MR. ZIMET:
Q. Did it cross your mind that, in fact, Safe Chain had been receiving drugs that had gotten into -- from the black market to the wholesalers they were purchasing from?
A. After the third incident, I started to think, yes, that there could be a problem.
Q. With that -- "a" problem, but the problem I just described; is that correct?
A. Yes. It could, yes. That was one of many of the thoughts that it could be that; that it could be the manufacturer. It could be, but it was...
Q. It's part of the puzzle?

A. Yes.
Q. And so as part of the puzzle, one of the things that you would want to do is to find out what's the story with these wholesalers that Safe Chain is purchasing drugs from, or even if they're supposedly an authorized distributor they're buying these HIV drugs from; correct?
A. No. That's not my job to do detective work and find -- ask them their sources and then vet their sources.
I mean, that's a wholesaler's job. They have a compliance officer. That wasn't my job. My job was to provide legal advice.
Q. So you said you were a "zealous advocate"; correct?
A. Yes.
Q. Are you saying that giving legal advice -- you were a zealous advocate in giving legal advice?
A. I believe I was a zealous advocate, yes --
Q. Well --
A. -- because I believed everything that they said.
Q. Well, you describe -- all you do is just -- and I don't mean to diminish it. What you do is give legal advice; correct?
A. Yes.
Q. Whatever the law is, you say, "This is the law"; correct?
A. Yes.
Q. There's nothing being zealous or an advocate of just

telling the client what the law is, is it?
A. I think, yes, there is.
Q. Isn't it correct, ma'am, that being a zealous advocate is advocating a position for your client?
A. Which I did, yes.
Q. And that's much different than just giving legal advice, isn't it?
A. Yes.
Q. So in being a zealous advocate for your client, you've got to know what you're advocating; isn't that correct?
A. Yes.
Q. And you want to have facts that you can base your advocating on; isn't that correct?
A. Yes.
Q. And to get those facts, you need to do fact-finding by asking questions; isn't that correct?
A. Yes. I did ask questions of Safe Chain, and I was provided answers and that formed the basis of my answers to Gilead.
Q. And so you asked questions: What about this wholesaler that you purchased from? Tell us about them.
Did you not?
A. It was -- Gentek was the only wholesaler that we were aware of.
Q. So Abbie Divilio, the person you said, I think yesterday -- you gave some description of her not being the best, I guess,

compliance director around, to be polite about it; right?
A. Yes.
Q. She would know, because it was her job as far as doing the background investigation, of any potential vendors that Safe Chain was purchasing drugs from; is that correct?
A. I would expect anybody that's been in the wholesale business for ten years to know the business.
Q. Well, the person assigned to do that at Safe Chain was Abbie Divilio; correct?
A. Yes.
MS. DEROVANESIAN: Objection. Lack of personal knowledge.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Is that right?
A. She was the compliance officer.
Q. And she was the person who's responsible for doing the vetting and approval of any new vendor; isn't that correct?
A. I don't know if she did it alone or if she did it in concert with others at the -- at the company, but it would fall -- the policies and procedures, how it's done should have been, you know, been through her.
Q. At the end of the day, there's not a vendor that should have been approved at -- for Safe Chain to do business with until Abbie Divilio, during that time period, said "approved"?

MS. DEROVANESIAN: Objection. Lack of personal knowledge. Calls for speculation.
THE COURT: Sustained.
MS. DEROVANESIAN: She's already answered this, too.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Do you know whether or not Abbie Divilio approved Gentek as a vendor?
A. She indicated she did, yes.
Q. And when she approved Gentek as a vendor, do you know whether or not she was provided truthful information by Gentek?
A. I -- no.
Q. Did you find --
A. I --
Q. I'm sorry.
A. The answer is no.
Q. Did you find out at a later point that she had been lied to in the application process relating to Gentek?
A. Yes.
Q. And so she was deceived as far as her approval of Gentek as a vendor; is that correct?
MS. DEROVANESIAN: Objection. Calls for speculation.
THE COURT: It's repetitive.
Sustained.
THE WITNESS: Should I answer it?

MR. ZIMET: No.
THE COURT: No.
THE WITNESS: Okay.
BY MR. ZIMET:
Q. What was the false information she had been provided?
A. She said that -- this came from an email from my boss, Jesse Dresser, that I was first informed that Gentek didn't have a license in the particular -- in the state of Maryland, I believe. They had a Connecticut license but not a license in the state of Maryland.
Q. Anything else that you learned that Gentek had lied about?
A. No.
Q. And so you found out that Safe Chain had been given incorrect information that led to their approval by the compliance department of Safe Chain to be a vendor; is that correct?
A. Yes, that was my understanding.
Q. Now --
A. I then found out from Gilead later on that their T3s were --
Q. Hold on one second. We'll get to that in a minute. Okay?
MS. DEROVANESIAN: Objection, Your Honor. I ask that she be allowed to finish explaining her answer.
THE COURT: You can finish your answer.
A. Yeah. Afterwards, later on, in addition to that, we found

out that Gilead made a determination on the T3s from Gentek and said they were false. That was --
BY MR. ZIMET:
Q. Much later?
A. -- much later.
Q. And so those were T3s for transactions that had been approved by Ms. Divilio; is that correct?
A. I don't know if she approved the T3s. She should have, yes.
Q. That was her job?
A. Yes.
Q. So that would be twice that Gentek was deceiving Safe Chain; correct?
MS. DEROVANESIAN: Objection. Calls for speculation.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Is that correct?
A. Yes.
Q. And when you found out that information, that confirmed your concern that the vendor, at least Gentek as a vendor, was someone that was doing something that was inappropriate; correct?
A. Without a license, yes. The answer is yes.
Q. As well as false information on a T3; correct?
A. Yes.

Q. "Yes?"
A. Yes.
Q. So the false information on a T3 was lying about where Gentek had gotten their drugs from; is that correct?
A. Yes.
Q. And so the lying about where they got their drugs from would be consistent with your concern that it was coming from the black or gray market; is that correct?
A. If there's a problem like that with the source, yes, it could be an issue more likely than the manufacturer. It's coming from the source. So...
Q. Okay. So in that scenario, okay, it would not be the manufacturer. It might not be the distributor. It might be the licensed distributor, okay, who then sold it to Safe Chain; is that correct?
A. There's more -- it could be more than one licensed distributor.
So it could be authorized distributor to a licensed distributor to a secondary licensed distributor like Safe Chain.
Q. So that would be consistent with --
A. Yes.
Q. -- this --
A. Yes.
Q. -- what you just described?

A. Except for the pharmacy.

Authorized distributor doesn't -- it doesn't go from an authorized distributor to a pharmacy to a wholesaler.

Q. Right. But this would be the black or gray drug distribution scenario as opposed to a legitimate one; correct?

A. Yes.

Q. Because this first licensed distributor, in this case Gentek, would be getting it from another source or lying about where they got it from, and then selling it to Safe Chain; correct?

A. Yes.

Q. And so that was the circumstance with Gentek that you believed existed up until -- well, you still believe that's what existed, don't you?

A. Could you rephrase it?

Q. This scenario that we have of Gentek lying multiple times, that this is the scenario of how Safe Chain got their drugs, HIV drugs from Gentek?

A. I didn't assume that, but the fact that they didn't have a license in the state was a red flag.

Q. As well as lying on a T3; correct?

A. Yeah, which came out later.

Q. Right.

A. That was -- that was something that --

Q. That was --

A. The transaction was not valid.
Q. And that was sort of the clincher --
A. Yes.
Q. -- for your conclusion that this was what occurred; correct?
A. Yes.
Q. So under those circumstances, Safe Chain was a victim of the fraud that was being committed by Gentek?
MS. DEROVANESIAN: Objection.
BY MR. ZIMET:
Q. Isn't that correct?
MS. DEROVANESIAN: Calls for a legal conclusion and speculation.
THE COURT: It's speculative.
I sustain the objection.
BY MR. ZIMET:
Q. So did you communicate that conclusion, not -- the conclusion of how the drugs got there to Safe Chain? The Gentek drugs we're talking about.
A. At that point, my partner -- my supervisor was more involved than I was.
Q. But you concurred with his judgment --
A. Yes.
Q. -- that was the case; correct?
A. Yes.

Q. And that would have been up until the time in which Gilead got a court order to raid Safe Chain's facilities; is that correct?
A. I think that was later.
Q. In July of 2021?
A. Okay.
Q. Does July 26th, 2021, sound like an accurate date?
A. Maybe, yes.
Q. So your understanding -- and you were still involved in the case at that point; correct?
A. Yes.
Q. Your understanding is that all of the records, all of the computers -- all of everything that was at the facility of Safe Chain was seized pursuant to that court order that Gilead had obtained; is that correct?
A. Yes.
Q. So Gilead was on the offensive; is that correct?
A. Yes.
Q. And you felt they were on the offensive, and they were trying to -- I'll ask the question -- destroy Safe Chain?

MS. DEROVANESIAN: Objection. Compound question. Calls for speculation.

THE COURT: He's asking what she thought at the time. Overruled.

///

BY MR. ZIMET:
Q. At the time, did you believe that Gilead was trying to destroy Safe Chain?
A. At that time when there was a raid and all that, I really thought maybe Safe Chain did something wrong.
Q. So you didn't think that Gilead was -- the purpose was trying to --
A. Not in --
Q. -- destroy Safe Chain?
(Reporter requests one speaker at a time.)
BY MR. ZIMET:
Q. You did not believe at that point that Gilead was trying to destroy Safe Chain?
A. Not when there was a seizure like that, no.
Q. You had thought of that prior to that time; is that correct?
A. Yes.
Q. And you had expressed that "Gilead is out to destroy you"?
A. That was expressed to me from Safe Chain multiple times.
Q. And you never said to Safe Chain, "I don't think that's the case at all"?
A. No. I agreed with them.
Q. And so what you're saying is because Safe Chain was able to raid -- excuse me, that Gilead was able to raid Safe Chain, that changed your mind that there was something there?

A. Yes. Because they had a -- they were able to get a TRO. There must be some evidence that a court thought was warranting a seizure of Safe Chain's supplies.
Q. And so you also learned at that time that there's information that Gilead had withheld from you?
"You" being the counsel, Frier Levitt counsel for Safe Chain; isn't that correct?
A. I don't think that was the first time that I found out that Gilead wasn't -- they weren't transparent, and they weren't providing the information that we were asking.
Q. And certainly, they weren't -- and part of what you're asking for is, "Is this a situation of drugs that are improperly coming into the drug supply chain?"
Isn't that correct?
A. Yes. And I wanted to know if it was any other products that they had and any other lots, and I wanted to know more about the magnitude of what was going on.
Q. You wanted to know whether these were black market or gray market drugs, didn't you?
A. Yes.
Q. You kept on asking for that answer -- didn't you? -- from Gilead?
A. I kept asking if it was a problem from them, yeah. If they were aware of -- if it was a problem that originated from them or they were aware of problems and if they could tell us more

information about it.
Q. Sure.
And that's one of the reasons that you kept on hounding them to get information; isn't that correct?
A. Yes.
Q. They declined to do that. They never told you that, did they?
A. No, they didn't.
Q. They withheld that information from you as to what was being investigated concerning the black market or gray market entry of drugs?
MS. DEROVANESIAN: Objection. Asked and answered. Calls for speculation.
THE COURT: It's repetitive.
Sustained.
BY MR. ZIMET:
Q. So the next thing that happened in February of 2021 is that you learned that there was a new call that was made to Safe Chain concerning a drug issue, HIV drug issue; correct?
A. I believe that was the third incident.
Q. That would be in February of 2021?
A. I think so, yes.
Q. All right. And that incident, to the best of your recollection, involved what transaction or what transactions?
A. I don't recall. I would have to see what the actual email

was.
Q. Okay. And you had communications with Ms. Divilio concerning that; is that correct?
A. Yes.
Q. And in those conversations, you wanted to find out whether there was any basis for those accusations; is that correct?
A. Yes.
Q. And you did your research, if you will; correct? Factual research?
A. I would like to see what the -- I certainly did ask questions when I received that third incident.
Q. Okay.
A. And there were communications, I believe, back and forth.
Q. And then you formulated whatever response you were going to give to Gilead; correct?
A. Yes.
Q. Now, based upon the February incident, did you think it was necessary to ask Gilead, "Is this a gray market or a black market situation?"
A. I'm not sure what I asked at that point, and I think I asked a lot of questions from the client.
Q. I didn't say did you ask questions about the clients. The question is: Did you ask that of Gilead?
A. I think the product was sent to Gilead to do an analysis. I'm not sure of all the details.

Q. Okay.
A. The product was being sent back to Gilead. They were going to conduct a determination, I think.
Q. And in that circumstance, if they're going to conduct an investigation or review, the purpose of that, okay, is to determine whether or not there's a supply chain issue; correct?
A. Yes. They have to make a determination if the product is illegitimate.
Q. And if it's illegitimate, that means it should not have gotten into the supply chain; is that correct?
A. Correct.
Q. And that was something that you were concerned about in representing Safe Chain; correct?
A. Yes.
MR. ZIMET: So if we can put up Government's Exhibit 225, please, and if we can go to the last page.
BY MR. ZIMET:
Q. This is the Divilio communication that you got on February 4th of 2021?
A. Yes.
Q. And this describes the call that was received by one of their customers; is that correct?
A. Yes.
Q. And this -- and I think this was discussed to a certain degree on direct examination, but at the bottom, there's

basically four questions that are asked of you by Ms. Divilio concerning this complaint; correct?
A. Yes.
Q. And that is "We have some questions. What should the pharmacy do with the remaining pills returned to us? Who should we report this to? Just our supplier who bought this from? What is the next step to be sure that we're complying with reporting regulations?"
Correct?
A. Yes.
Q. And that's what you would expect from a compliance director to be asking outside counsel? That's what term that's used for what you guys were or what you were, "outside counsel" at that point?
A. No, I wouldn't be expecting these questions. I would be expecting her to know what their SOPs say. This is where there was a repetition of the same information from the third incident.
If they had SOPs, she knows what the pharmacy is supposed to do with the remaining pills. She knows if it gets returned to them or to Gilead. She's supposed to know who to report this to in the time frame if there's a determination.
She puts: "Just our supplier who we bought this from." She has to know that's not in full compliance with the DSCSA. And the next step, okay -- I mean, I could advise her what the

next step was, which I did. But I wouldn't expect these kinds of rudimentary questions from the compliance officer of a wholesale that's been in business for ten years.

Q. She had been -- I think we discussed had been a compliance director for about a year up to that point?

A. Yes.

Q. And what you just talked about for the last couple of minutes, that would be consistent with your testimony that you thought she was incompetent?

A. Yes.

Q. So based on that being incompetent, your response was "Wait a second. Okay. These questions are not good questions from the standpoint of this compliance director knowing what she's doing"; isn't that correct?

A. Yes, it is.

Q. And in the email chain -- we can look through all the pages -- did you communicate that back to Safe Chain? That "This is evidence of the incompetence of your director of compliance"?

A. No. But I had conveyed that to them verbally several times, but this is the answer to her questions.

Number 1: Quarantine the lot. Conduct an investigation of the suspect product.

And they could either ask for the product back, or they could ask that the pharmacy send the product to the

manufacturer. Either way it was okay.

And I advised them that it was better for them to get the product back and then send it to Gilead with a cover letter, and then once the investigation is complete and there's a determination, then it has to be reported to the FDA within 24 hours and their immediate trading partners regarding the issue.

But the fact that the bottle was unopened, I mentioned that -- and there was another Gilead product found in the bottle. I thought that was significant.

Q. And in reading that, you thought, "Wait a second, compliance, they're not -- she's incompetent. This is not a good sign for the client."

And really, you had no opinion as far as Gilead having some ulterior motive or certain things Gilead was up to relating to this at all; correct?

MS. DEROVANESIAN: Objection to the compound question.

THE COURT: Sustained.

BY MR. ZIMET:

Q. Did you address this issue, what Ms. Divilio sent you, concerning any involvement of Gilead and anything that Gilead might be wanting to do related to this?

A. When I saw it was another Gilead product in an unopened bottle, my mind went to manufacturing issue.

Q. And did you believe that the company, it's like these

manufacturers, were using the DSCSA to avoid costly recalls of their product when mix-ups occur?

A. Yes. I felt that we hadn't received an answer back, if there were other problems and it could be that they didn't want to recall the product because it cost them a lot of money, and they rather blame the wholesaler.

Q. And so when you were shown this exhibit by the Government during your direct examination, I'm not sure that page 2 was shown to you, and let's look at that now.

And at the bottom of page 2, you have an email to Mr. Boyd concerning this issue, Biktarvy issue with the customer; correct?

A. Yes.

Q. And could you read the last sentence of that paragraph to the jury, please?

A. It says, "The companies are using the DSCSA to avoid costly recalls of their products when mix-ups occur."

Q. And so you believe that would be a motive of Gilead trying to point a finger at Safe Chain and saying, "It's your responsibility to report this," so that they did not have to report it and eventually engaged in a recall; is that correct?

A. The thought crossed my mind, yes. That's what I articulated in that last sentence.

Q. And that was a tactic that you were aware of from your experience that large manufacturing companies such as Gilead

utilized to try to avoid recalls?

MS. DEROVANESIAN: Objection. Calls for speculation.

THE COURT: Overruled.

MS. DEROVANESIAN: Lacks foundation.

BY MR. ZIMET:

Q. You can answer the question.

A. I worked for the pharmaceutical industry; so I know that's a tactic. They don't want to issue a recall. They will issue a market withdrawal. They'll make it a minor thing, but when it's a bigger issue -- and I happen to know that's true.

Q. And without naming the company that you work for, that would be part of what's called "Big Pharma"; correct?

A. Yes.

Q. So your experience with Big Pharma is they would use tactics, such as what you just described, to avoid having to spend money to recall drugs that should be recalled; correct?

A. Yes.

Q. And because of Big Pharma -- with Big Pharma, at the end of the day, it's the bottom line that really counts; isn't that correct?

MS. DEROVANESIAN: Objection. Lack of personal knowledge. Calls for speculation.

THE COURT: Sustained.

BY MR. ZIMET:

Q. From your experience working with Big Pharma, was it your

experience at the end of the day, it's the bottom line that drove the decision-making of Big Pharma on issues such as recall?

MS. DEROVANESIAN: Same objection. Also irrelevant.

THE COURT: Overruled.

BY MR. ZIMET:

Q. You can answer.

A. Often there were a lot of factors that were financial where they had to -- the safety issues, adverse reactions reported to them -- things like that.

They, you know, sometimes they wouldn't want to put a certain adverse event in a package insert. Sometimes they would.

Same thing here with the recall. Sometimes they would investigate it and say it was an isolated incident. It doesn't warrant a recall.

Other times it would be a recall. Sometimes it would be a market withdrawal.

Sometimes it would be something they could correct, like if a label was -- they could fix the label or something like that, they could do a corrective action.

So it all depends. It's not necessarily their bottom line all the time. It's patient safety issues sometimes. I mean, it's all different factors.

Q. So from the standpoint from of a drug, these HIV drugs --

which are expensive drugs; correct?
A. Yes.
Q. You don't know the exact price of them because that wasn't of your concern, but you know they were expensive during that time period?
A. Yes.
Q. With expensive drugs a recall would be more financially hurtful to a manufacturer than, let's say, a drug that is not as expensive. Would that be fair to say?
A. Not really.
It would be more the magnitude of the vehicle. The level of the recall. And if it's for -- to the consumer level or if it's to the authorized distributor level, it depends on financially what the impact would be.
Q. I'm sorry. If you have more to answer, please do.
A. No.
Q. At that time, was it your belief that what Gilead was doing in avoiding giving you information, avoiding answering questions was attempting to avoid having to do a recall of these HIV drugs?
MS. DEROVANESIAN: Objection. Asked and answered, also calls for speculation.
THE COURT: I think she's answered it.
Sustained.
///

BY MR. ZIMET:
Q. So the communication with Gilead from this incident involved reporting the incident to Gilead? The one you have in front of you?
A. Yes.
Q. And that was Safe Chain saying to Gilead, "We have learned of a problem. This is what the problem is"; correct?
A. Yes.
Q. And that is cooperative with Gilead; correct?
A. Yes.
Q. And that was based on your advice; is that correct?
A. Yes.
Q. And that would be the appropriate thing to do under those circumstances?
A. Also, their SOPs should specify how they handle suspect product, calls "suspect product."
At this point, it's the illegitimate, it's suspect.
Q. And then it can jump from suspect to illegitimate based on further facts; correct?
A. Yes.
Q. And whether or not those facts exist or not is something that you, in representing an entity, would want to find out whether those facts exist or not; correct?
A. No, that's a determination that's made.
I couldn't make a determination if a product is

illegitimate. It either has to be made by one of the trading partners; so it would either have to be made by Safe Chain or a determination had to be made by Gilead.

In this case, it would seem to more likely to fall on Gilead because it was their product in both the mix-up. So...

Q. We understand that you could not make the determination, but you could give legal advice based on the facts whether the determination of illegality, okay, was appropriate; isn't that correct?

A. I did provide that advice in this email.

Q. For them to send the notification to Gilead; correct?

A. Yes.

Q. And Gilead would then make a determination whether it was more than just suspect; correct?

A. Yes.

Q. And to make that determination, a lawyer such as yourself can advise a client whether the facts that are there, okay, elevate it from suspect to actually something that is illegitimate; correct?

A. Not unless I know all the information.

Q. I'm sorry?

A. I would have to see the product. I would have to see -- there's a ton of stuff that would go into such a determination if it's illegitimate.

Q. And you would have to get facts to make that legal advice

as to what it was; correct?
A. It would be more than facts.
I would have to see the physical product. I would have to see their processes.
I mean, you know, that's a different thing.
Q. But you did make a determination that it was suspect; did you not?
A. Yes. Based on the information -- the email that they received.
Q. So it was based on facts that you gave legal advice that it should be determined, okay, to be suspect?
A. Yes.
Q. So you are -- sorry.
A. It should be determined to be illegitimate or not. It was suspect based on the email that Safe Chain received.
Q. And you gave the advice that based on that email, based on those facts it should be determined to be suspect; correct?
A. They have to -- no, their duty is then to make an investigation whether or not it's illegitimate product.
Q. Well, you advised them that "you should send it to Gilead," for them to make the determination; correct?
A. Yes.
Q. So you gave legal advice based on the facts that you knew that it wasn't Safe Chain's responsibility.
It should be Gilead's responsibility; correct?

A. To make the determination, yes.
Q. Okay.
A. We were asking Gilead to make that determination.
Q. Okay. And Safe Chain did it based on your advice; isn't that correct?
A. Yes.
Q. So we then start getting some more communication or you start getting more communications from Gilead concerning issues that they are having with Safe Chain; is that correct?
A. Yes.
Q. And one of the determinations that had, or one of the things that happened is that all of a sudden, instead of Mr. Colosi communicating with you, it ends up being that there's a new lawyer, an outside law firm that starts communicating with you?
A. Yes.
Q. And I think that would be, maybe February 23rd-ish.
Do you recall?
A. I don't recall exactly. But it might be around that time.
Q. And the nature of that communication was -- is that they were making accusations against Safe Chain; is that correct?
A. Yes.
Q. And you believe that at that point, what was happening, that the case was evolving from a case of investigation to a situation of accusations; correct?

A. Yes -- no, no. There were accusations from November 23rd, in that letter.
Q. Did you inform the clients that the case was now transforming from an investigation to accusations?
A. No. I didn't see that transition at all.
I saw that there were accusations in November, in the November 23rd letter. Gilead was making accusations.
Q. So you never told the client in the spring or late winter of 2021 the case was transforming from investigation to accusations?
A. There was no transformation.
There was a -- accusations, like I said, in November. November 23rd, 2020, there were accusations from Gilead.
Q. And whenever, if there's a document that you said that to Safe Chain, that would be something that would be erroneous on your part?
A. That there was a transition?
Q. Uh-huh.
A. I'm not aware of having said that, no.
Q. Okay. And then in mid March of 2021, there's another development that took place; isn't that correct?
A. I don't recall.
Q. Was there something called a PharmAlert that came out?
A. Yes.
Q. And whether you remember the exact date, does mid-March

sound like the accurate date?
A. It could be, yes.
Q. And at that point, that PharmAlert was issued by Gilead; correct?
A. Yes.
Q. And that pharma complaint was making accusations that Safe Chain was responsible for black market or gray market drugs getting into the supply chain; isn't that correct?
A. I believe that was in that PharmAlert, yes.
Q. And claiming they were knowingly selling black market or gray market drugs to pharmacies and then were selling it to patients; correct?
A. Yes.
Q. Now, at that point, you were still representing Safe Chain; correct?
A. Yes.
Q. And you believe that was a false accusation; correct?
A. Yes.
Q. Based on what you knew at that point?
A. Yes.
Q. And you formulated a response to that accusation; isn't that correct?
A. Yes. Based on the information Safe Chain provided, to provide that response, yes.
Q. And certainly, at that point, Gilead had not provided you

any of the information that you had requested; correct?
A. No, they hadn't.
Q. Now, you hadn't called to try to get information, but you believed that they hadn't sent you information that you had requested by other means; isn't that correct?
A. No. They hadn't provided it to Safe Chain, was my understanding, either.
Q. And that was a concern of yours; that you felt that Safe Chain was being blindsided; isn't that correct?
A. I don't think that Gilead was being transparent. Instead they just sent out a PharmAlert to 40,000 pharmacists instead of --
Q. How many?
A. It was -- a PharmAlert is a massive email to pharmacists throughout the country.
Q. And that's attacking the reputation of Safe Chain?
A. Yes, it did.
Q. And for a small company like Safe Chain, that can be pretty much a death sentence; correct?
MS. DEROVANESIAN: Objection. Calls for speculation.
THE COURT: If she knows.
BY MR. ZIMET:
Q. If you know?
A. Yes, it could.
Q. And that seemed, in your mind, at that point, pretty unfair

that Gilead was using those tactics; isn't that correct?
A. Gilead was asked to provide a determination on the first incident, the second incident, and as far as we were aware, they hadn't provided any determination. There was something that said it was inconsistent with their records, but they never provided a determination. And then they backpedaled and said that wasn't a determination, so -- that it wasn't their responsibility to report it to the FDA because it wasn't a determination.
Q. So let's just break that down for a second.
Requests were made to Gilead by Safe Chain requesting information; correct?
A. Yes.
Q. And the response from Gilead is that what was being requested and the information or the documentation that was provided was, quote, "inconsistent" with their records?
A. At least in one of the cases.
Q. What does that mean?
Well, let me ask you -- that's a bad question -- at the time, what did you think that meant?
A. I didn't think that was a determination when it said "inconsistent with their records." They should have said, "The product is illegitimate," but I didn't see the wording there.
Q. So you really didn't know what it meant, did you?
A. No.

Q. So in response to a question, you get information from Gilead. Gilead's response was -- and I'll ask you whether this is the correct label, ambiguous, that you wouldn't get an answer to your question?
A. No.
Q. Is that fair to say?
A. And we asked Gilead for an answer after that, after we received that.
Q. In your mind, did you have a thought as to why Gilead was doing that? Of giving this -- what we just discussed? This vague answer to a question? That all you wanted as information; correct?
MS. DEROVANESIAN: Objection. Call for speculation. It's also a compound question.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Did you have any thought, in your mind, as to why Gilead was giving you this vague answer to questions?
MS. DEROVANESIAN: Same objection.
THE COURT: She can testify to what she was thinking at the time.
A. I thought Gilead was being -- not being transparent with Safe Chain and not providing -- and in the interest of patient safety, if they had -- they should have specified that there was a problem, and it should have been clearer, rather than

send a PharmAlert out. I thought that was very damaging.

We asked for determinations, and we just didn't get it. We asked if it was the same lot, and we didn't find out. So the information wasn't forthcoming from Gilead.

BY MR. ZIMET:

Q. And the reason --

THE COURT: Mr. Zimet, is this a good spot to break?

MR. ZIMET: Sure, Judge.

THE COURT: Members of the jury, we're going to go ahead and recess for lunch. Remember my admonition not to discuss the case or allow it to be discussed in your presence, and I'll ask you to come back at 1:15.

So have a nice lunch and see you back at 1:15.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: If there's nothing to come before the Court, we will be in recess until 1:15.

THE COURT SECURITY OFFICER: All rise. Remain standing.

(Off the record.)

THE COURT: We're back on the record.

Counsel are present. Both defendants are present.

Anything to come before the Court before we bring in the jury?

MR. POGOZELSKI: No, Your Honor.

MR. ZIMET: No, Judge.
MR. BARZEE: No, Your Honor.
THE COURT: And let's bring in the jury, and if someone can bring in Dr. Rumore.
(Witness enters.)
THE COURT: Dr. Rumore, you understand that you're still under oath?
THE WITNESS: Yes, Your Honor.
THE COURT SECURITY OFFICER: All rise.
(Jury enters.)
THE COURT: Does counsel concede the presence of the jury and waive its polling?
MR. POGOZELSKI: Yes, Your Honor.
MR. ZIMET: Yes, sir.
MR. BARZEE: Yes, Your Honor.
THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence? All right.
Mr. Zimet, you may continue.
MR. ZIMET: Thank you, Judge. Can -- are you all set?
THE WITNESS: Yes.
BY MR. ZIMET:
Q. Just going back to this morning, any answers that you gave that you wanted to clarify, expand, change from this morning?
A. No.

MR. ZIMET: We're going to look at Government's Exhibit 245, which was introduced previously. And if we can go to page 4.
BY MR. ZIMET:
Q. This begins -- at the bottom of page 4 begins -- this is the actual PharmAlert; is that correct?
Can you see it?
A. The beginning of it.
Q. Okay. So this is directed to pharmacists; correct?
A. Yes.
Q. And this was one you were referencing this morning?
A. Yes.
Q. And this talks about informing pharmacies around the country about four separate incidents in which patients have returned products of Gilead products, Biktarvy, after discovering the bottles contained foreign tablets and no Biktarvy tablets, and it talks about a fifth incident involving Descovy?
A. Yes.
Q. And then it identifies: "The pharmacies reported purchasing the suspect Biktarvy and Descovy bottles from Safe Chain Solutions, LLC, a wholesaler located in Cambridge, Maryland. Safe Chain has informed us that it purchased Biktarvy from Gentek LLC. Neither Safe Chain nor Gentek is an authorized distributor of Gilead products, including Biktarvy

and Descovy.

"Gilead has" --

MR. ZIMET: And it continues on the next page. Thank you.

BY MR. ZIMET:

Q. -- "identified false information on Safe Chain's Drug Supply Chain Security Act documentation, pedigree documentation, provided to pharmacies with their purchase of Biktarvy. The investigation is continuing; however, we have not found any evidence suggesting that the integrity of these bottles was compromised by Gilead or our contractors.

"Gilead is working closely with the U.S. Food and Drug Administration, FDA, to prevent further distribution of illegitimate drug products, including Biktarvy and Descovy, and to support the agency's investigation into the reported instances."

And this is in bold: "Gilead recommends that you purchase Gilead products directly from Gilead authorized distributors as our authorized distributors share our commitment to patient safety.

"A list of Gilead authorized distributors of record is available on our corporate website," and it gives a link to it.

"Based on a visual inspection of four Biktarvy bottles and the one Descovy bottle, Gilead has determined that the Biktarvy bottles did not contain Biktarvy tablets and the Descovy bottle

did not contain Descovy tablets. For three of the four Biktarvy bottles, the induction seals were tampered with, and the Descovy bottle is not consistent with genuine Descovy packaging. Further assessments are underway.

"If you identify any potential suspect Gilead product, please immediately contact Gilead. We will assist you in verifying the product legitimacy of the supply chain as asserted under the Drug Supply Chain Security Act.

"Please report all adverse events following or coincident with the use of any Gilead products to Gilead Science or to the FDA MedWatch program or via the internet." And it has "to view the information," the following...

And that's what you saw back in March of 2021; is that correct?

A. Yes.

Q. And what that PharmAlert is telling pharmacists, that the better policy is to buy from or have something from the authorized distributors of Gilead; correct?

A. Yes.

Q. As opposed to the secondary wholesalers like Safe Chain; correct?

A. Yes.

Q. And they're saying that it's safe with them but it's not safe with Safe Chain, according to them; correct?

MS. DEROVANESIAN: Objection, Your Honor. The document

speaks for itself. He just read the whole document.

THE COURT: Sustained.

BY MR. ZIMET:

Q. And when you read that, okay, you had a concern from reading it yourself that, in fact, they were saying something that was not accurate; correct?

A. My concern, no. That was -- yes. The answer is yes, but there's a whole bunch of things in there that I had, you know, no knowledge of and that was -- like the word "Descovy," that never came up. The fact that there were no Biktarvy tablets in the bottle, that wasn't something that was previously known. The fact that there was an induction seal issue, that was never disclosed. So all of these things were brand-new.

Q. And, obviously, those were factors that you wanted to consider in your zealous representation of Safe Chain; correct?

A. I had to respond to this. They asked me to respond to this because it damaged their reputation, Safe Chain's reputation.

Q. And the purpose of your response was to attempt, at least, to try to save Safe Chain's reputation in light of this document; is that correct?

A. Based on the information that I was aware of, what they told me, yes. And I drafted something.

Q. And so at that point --

MR. ZIMET: If we go to page 1, if we can.

BY MR. ZIMET:

Q. You also included -- and this would be on March 16th at 4:01 p.m. to Charlie.

MR. ZIMET: If we can expand that a little bit, enlarge it, please.

BY MR. ZIMET:

Q. "I'll tend to this by this evening. Letter to go out tomorrow morning. We never heard back from Gilead regarding several quality reports nor their findings and now they issue this."

Why did you write that?

A. Because we had asked them to make a determination whether the products were illegitimate, and we were awaiting to hear from them. And instead of hearing back, they sent this out to all the pharmacists.

Q. And we'll use the pronounce "them." You're referring to Gilead; correct?

A. Yes.

Q. That was disappointing to you, was it not?

A. This was a shock that this went out, and I think it was a shock to the client as well.

Q. Without you having an opportunity to hear back from them, as far as what the allegations were, so you could investigate and figure out whether or not they were accurate or not; correct?

A. Or that Safe Chain could figure it out as well.

Q. Or someone on behalf of Safe Chain who is representing them; correct?
A. Their compliance officer would be the one to report it to the FDA and everything.
Q. Or whoever else they want or asked to do that; correct?
A. Yes. Yes.
Q. So at that point, you knew that -- or let me ask it this way: At that point, it was pretty clear to you that Gilead was after Safe Chain to do them harm?
MS. DEROVANESIAN: Objection.
BY MR. ZIMET:
Q. Correct?
MS. DEROVANESIAN: Calls for speculation.
THE COURT: Overruled.
A. It seemed that way from that alert, yes. Because they hadn't communicated. I haven't seen a whole bunch of things in there.
Like I just mentioned to you, the Descovy and this and that, and I wasn't made aware of anything like that from Safe Chain so --
BY MR. ZIMET:
Q. Well, it --
A. -- it looked like there was information that Gilead had that they didn't share.
Q. Well, and as we look in this bottom email, you had never

heard back from Gilead regarding several quality reports nor their findings, and now they issue this?
A. Yes.
MS. DEROVANESIAN: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So moving forward from that, you got a demand letter -- you being Safe Chain -- got a demand letter from Gilead; correct?
A. After this?
Q. Yes. Subsequently.
A. Yeah, I don't recall the exact date though.
Q. Sometime after. A precise date we will see later on, but we don't need that right this moment; right?
A. Yes.
Q. And things -- and I think your term was "Things escalated from there"?
A. Yes.
Q. And by "escalated," it means that Gilead came after Safe Chain even harder and harder; isn't that correct?
A. I think the November 23rd letter was pretty strong. The allegations, the way they worded that, and now they sent out an alert.
Q. That would be an escalation, would it not?
A. I think this was an escalation, yes, the PharmAlert.
Q. The pharma one?

A. Yeah.
Q. And then there, whatever label we want to give to it, there's more communications from Gilead to Safe Chain; correct?
A. There were, yeah.
Q. And more lawyers got it -- got involved from the outside; not just Gilead lawyers. Correct?
A. Yes, and more lawyers from Frier Levitt as well.
Q. So you were, I guess, beefing up for a potential lawsuit; is that correct? I know "beefing up" is not a legal term.
A. I don't know if I can say that, that I was expecting there to be a lawsuit.
Q. Well, some reevaluation was done at Gilead concerning some of their trading partners; is that correct?
A. I don't know what Gilead was doing at that time.
Q. How about Safe Chain? They were evaluating some of their trading partners at that point; is that correct?
A. I only knew that they had Gentek as a trading -- you know, as a source at that point.
Q. Well, they terminated Gentek; correct?
A. They were supposed to, yes.
Q. Do you know whether they did or not?
A. No.
Q. How about Boulevard? You heard about them as one of the trading partners.
A. I believe that was later in March, I heard the word

"Boulevard."
Q. And they were terminated; correct?
A. I don't know those details.
I mean, that's -- it's starting to get -- it's not something that I was directly involved with in terminating Boulevard.
Q. Well, not whether you were directly involved. You were part of team --
A. Yeah.
Q. -- representing Safe Chain; correct?
A. I think they were instructed at some point, but I don't know the details. I couldn't tell you.
Q. So someone else from Frier Levitt, if they were involved would know that.
You do not know that; is that correct?
A. I remember there being an email about -- from Jesse Dresser. The first time I saw the word "Boulevard" and it said that "Boulevard is a pharmacy, not a wholesaler."
I don't know what conversation he had or how he found that out.
Q. Well, you learned that Safe Chain investigated and learned that Boulevard had submitted a false certification as far as their licensing was concerned; isn't that correct?
A. Gentek had submitted a false license.
I'm not sure Boulevard submitted a false license to them.

Q. You don't know that?
A. No.
Q. You never heard anything like that during your representation; is that your testimony?
A. There's an email that I said came from Jesse Dresser and it says that Gentek had no license in Maryland but it had a license in Connecticut, and it said that Boulevard is not a wholesaler. It's a pharmacy.
That's what I read.
Q. Right. And you also learned, did you not, that Boulevard had been approved as a wholesaler based upon a phony license they had submitted to Safe Chain; isn't that correct?
A. I don't know if that's correct, no, unless you refresh my memory. I don't know if that's correct.
Q. So part of your representation did not include learning that various vendors had submitted false information to Safe Chain?
MS. DEROVANESIAN: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So you were involved in reviewing the certain documents during your direct examination. And one of the documents that you reviewed was Government's Exhibit 505.
MR. ZIMET: If we can put that up, please. If we can enlarge it a little bit.

BY MR. ZIMET:
Q. This is a conversation that involved Charlie Boyd, Peter from Boulevard, Adam Brosius, and also Hacksaw Boyd; correct?
A. Yes.
Q. And if we scroll down a little bit, there's conversations that took place that we talked about on your direct examination were read to you.
A. Yeah.
Q. And there's some pictures of some pills and bottles and things like that.
A. Yes.
Q. Now you were shown this before you testified by the Government; is that correct?
A. No.
Q. You never saw it before?
A. No.
Q. Okay. Did you ever have a chance to review this entire document?
A. No.
Q. Well, let's see if we can look at something in this document.
You've talked a whole bunch about T3s and whether things were correctly done with T3s or not.
Do you recall that testimony?

A. Yes.

Q. So if we can scroll down -- these are not page numbered.

So we're talking about October 7, 2020, and there's something from Peter Boulevard to Hacksaw Boyd, who we'll find out is Charles Boyd.

MS. DEROVANESIAN: Objection.

MR. ZIMET: What?

MS. DEROVANESIAN: To counsel testifying about what we'll find out.

THE COURT: Do you think Hacksaw Boyd is somebody other than Charles Boyd?

MS. DEROVANESIAN: I actually thought he was saying who Peter Boulevard was, but either way, it's up to the witness to answer that.

THE COURT: Overruled.

BY MR. ZIMET:

Q. So Hacksaw Boyd, Charlie Boyd, different name, same person.

So Peter Boulevard is saying, "Just place the order tomorrow and we'll do the best, or I'll do the best."

Do you see that?

A. Yes.

Q. And then response from Hacksaw Boyd. "This is not about doing your best. This is a requirement by law. We need these or other something similar and they need to be able to get verified. I don't make the rules."

A. I see that.
Q. Okay. And that, if we scroll up, is in reference to T3s.
And if you would like to read it, feel free to.
I think we're -- so let's start with the, "Good morning."
"Hey, guys, good morning. I sent all this stuff to compliance, that the only thing -- thinks we have, I don't know what else to do. Let me know if we can go forward. Thank you so much."
That's from Boulevard, Peter Boulevard to Boyd.
And then the conversation continues leading up to the section where Boulevard says, "I'll do my best," or "I'll do my best."
And Charlie Boyd responds, "This is not about doing your best. And with T3s, it's not about doing one's best."
Is that correct?
A. No, they can't take product into their inventory without the T3.
Q. And it is a requirement of law; correct?
A. Yes.
Q. Just as Mr. Boyd said in this text to Peter Boulevard?
A. Yes.
Q. And "we need the" -- recipient -- "need these or something similar and they need to be able to get verified."
That's the law also; correct?
A. Not something similar, no. It has to be a T3.

Q. It has to be verified; correct?
A. Yes.
Q. And Mr. Boyd doesn't make the rules.
Those are the rules that are made that, in fact, you provided as part of your job as being legal counsel; correct?
A. Yes, I gave him that advice.
Q. So that was not shown to you during your direct testimony; is that correct? That section, those sections?
A. I don't recall. I'm sorry.
Q. Okay. Now you were asked questions and you have spoken quite a few times during your testimony about SOPs; right?
A. Yes.
Q. Isn't it correct that you were working with Abbie Divilio concerning the Gentek SOPs?
A. No.
Q. Do you recall having conversations with her concerning the Gilead SOBs -- excuse me, SOPs. Do you?
A. Gilead's SOPs, no.
Q. How about Safe Chain's SOPs?
A. I asked her to -- I answered this question about five times.
We asked her to review the SOPs. We wanted to review them, and they didn't want us to do that. They said they had SOPs. They were excellent. They're in compliance and they're following them.

Q. Do you recall having conversations with her about her working on the SOPs?
A. No. There was an email later on, if I could just add, that said they were improving their forms and this and that, which might be part of their SOPs.
Q. Weren't there conversations that -- communications that you had with her about conversations you had concerning working on improving the Safe Chain SOPs?
A. No.
Q. Do you recall having conversations with Abbie Divilio where she informed you that she was still working on improving the Safe Chain SOPs that were mentioned in the last conversation that you and she had?
A. She was improving them, yes.
Q. Do you recall her having a conversation with you about improving the Safe Chain SOPs?
A. No. I think she just sent me an email that said, by the way, she was improving them, or something like that.
MR. ZIMET: May I approach the witness, Judge?
THE COURT: Okay.
BY MR. ZIMET:
Q. Just read that to yourself, please.
Isn't it fact that you, in fact, had conversations with Abbie Divilio about improving the Safe Chain SOPs?
A. I don't recall that conversation.

Q. You're not saying it didn't happen; you just don't recall it?

A. I don't recall that.

MS. DEROVANESIAN: Objection. Asked and answered.

THE COURT: Sustained.

MR. ZIMET: May I approach?

A. And she's working on improving her SOPs. It doesn't say anything about my input.

BY MR. ZIMET:

Q. It does talk about having conversations, does it not, with her about it?

A. It says --

MS. DEROVANESIAN: Objection. Asked and answered.

THE COURT: She volunteered information about what was in the document.

Overruled.

A. It says she's improving her SOPs.

BY MR. ZIMET:

Q. Does she not make reference, ma'am, to having a conversation with you and her concerning the topic of improving the Safe Chain SOPs?

MR. POGOZELSKI: Same objection.

THE COURT: Overruled.

A. She refers to it, yes.

BY MR. ZIMET:

Q. And you have no recollection of having a conversation with her; is that correct?
A. No, I don't.
Q. Do you think she just made that up?
A. Maybe.
MS. DEROVANESIAN: Objection. Calls for speculation.
THE COURT: Sustained.
BY MR. ZIMET:
Q. And so the back-and-forth between Gilead attorneys and Safe Chain attorneys continued all the way to the time of the seizure; is that correct? In July of 2021?
A. I believe so.
Q. And so you were hearing from Safe Chain, Abbie Divilio, that they thought they were doing things the correct way; isn't that correct?
A. All along, yes.
Q. In fact -- and you were evaluating what you thought was being done or not done; correct?
A. No. I took it on face value. I advised them about obtaining T3s, vetting suppliers, and they assured me that they were doing that.
Q. And you thought -- well, let me ask it this way: You talked about what an authorized distributor was; correct?
A. Yes.
Q. And we saw in the PharmAlert how much Gilead valued the

authorized distributors; correct?
A. Yes.
Q. And you heard from Abbie Divilio suggesting that, well, maybe Safe Chain should become an authorized distributor of Gilead; isn't that correct?
A. I did hear that, but I'm not sure if it was just from Abbie. I think it was also from Charlie Boyd.
Q. And you responded to that?
A. And maybe Patrick Boyd as well.
Q. And you responded to that; did you not?
A. Yes.
Q. And you thought it was a good idea?
A. I had no opinion on that.
Q. You never stated an opinion on that?
A. No.
Q. Do you recall on February 22, 2021, writing an email to Abbie Divilio and Charles Boyd?
A. No, I don't recall specifically.
Q. And let me ask you if you recall saying these words, "Okay. This is great. I was thinking the exact same thing about you guys becoming an A.D. Can I add that to the letter?"
A. You refreshed my memory.
Q. So you did say it?
A. Yeah, I did.
Q. So you thought it was a good idea?

A. I guess I did.
Q. Not I guess, you wrote it; didn't you?
A. Yeah.
Q. I'm sorry?
A. You're right. You're correct.
Q. And you thought it was a great idea?
MS. DEROVANESIAN: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. You had been thinking that even before Abbie Divilio had sent you that email suggesting that; isn't that correct?
MS. DEROVANESIAN: Same objection.
THE COURT: Overruled.
A. I don't know -- I put that in writing like that, I guess.
Q. Well, you put --
A. I was thinking they could, you know, maybe be an authorized distributor.
Q. And you wanted to add that to the letter, obviously, to Gilead requesting that; correct?
A. They asked me to.
Q. Well, didn't you ask them, "Can I add that to the letter?"
A. Yes.
Q. So you're asking them whether you could add that to the letter, correct, not them asking you first?
A. They had asked for me to ask Gilead if they could be an

authorized distributor. That wasn't my idea.

Q. But you were thinking the same thing?

MS. DEROVANESIAN: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. ZIMET:

Q. And Charlie Boyd responds to that also; did he not?

A. I'm not sure.

Q. Well, if you remember Charlie Boyd responding, "Please do. Maybe note that" --

MS. DEROVANESIAN: Objection. Hearsay.

THE COURT: Well, what he's reading from is in evidence.

You may proceed.

MR. ZIMET: No, Judge, it is not in evidence.

THE COURT: It's not in evidence?

MR. ZIMET: I don't want to mislead the Court. It's not in evidence. I am asking her --

THE COURT: I understand that. It's not in evidence. So the lawyer's questions are not evidence; the answers are evidence.

Go ahead.

BY MR. ZIMET:

Q. Do you remember Charlie Boyd responding: "Please do. Maybe note that we work with over 4,000 independent retail pharmacies as well"?

A. Yes, I do remember that email.
Q. And so he was affirming the fact that, on behalf of Safe Chain, they thought it would be a good idea to become a Gilead authorized distributor; correct?
MS. DEROVANESIAN: Objection. Call for speculation.
THE COURT: Sustained.
BY MR. ZIMET:
Q. When you read that, did you believe that Charlie Boyd wanted Safe Chain to become an authorized distributor of Gilead?
MS. DEROVANESIAN: Objection. Asked and answered.
THE COURT: Overruled.
A. Yes, I believed that.
BY MR. ZIMET:
Q. And, in fact, the request was made to Gilead, was it not?
A. Yes.
Q. And they said "no"?
A. I don't think Gilead ever answered that question.
Q. Another one of Gilead's not answers?
A. I don't believe that was answered.
Q. Another one where Gilead did not respond?
MS. DEROVANESIAN: Objection. Argumentative. Asked and answered.
THE COURT: Overruled.
///

BY MR. ZIMET:
Q. I'm sorry. I did not hear your answer.
A. They did not respond. As far as I recall, they did not respond to that request.
Q. Now, in April of 2021, there was an attempt by Safe Chain to revise and improve their vendor intake form; isn't that correct?
A. Yes.
Q. And you were consulted about that; were you not?
A. Yes.
Q. And you gave input as to improving it; did you not?
A. I believe I did.
Q. So that would be you trying to improve the forms that -- and the documents that were really the SOPs of Safe Chain; correct?
A. I'm not sure the vendor intake form was part of their SOPs.
Q. Well, it should have been.
A. It may not have been. Sometimes it's just a separate document that's referred to in an SOP.
Q. Do you know whether there were, in fact, improvements to the vendor intake form?
MS. DEROVANESIAN: Objection. Asked and answered.
THE COURT: Overruled.
A. I don't know exactly. I don't recall.
///

BY MR. ZIMET:
Q. How about generally? Do you know?
A. I know they were working on improving the vendor intake form and I think -- maybe I saw it. I'm not positive. I can't really definitively say.
Q. Maybe I can show you something that maybe would refresh your recollection.
MR. ZIMET: May I approach?
THE COURT: Okay.
BY MR. ZIMET:
Q. I wonder if you could look at that and see whether there were changes in the Safe Chain vendor intake form. And you can look at every page if you want to.
A. I don't know if there's any changes. There's a vendor intake application here, but I don't know if this has changed, if it's improved. I don't recall anything like that.
MR. ZIMET: May I approach just for a second, Judge, the witness?
THE COURT: Okay.
MR. ZIMET: Let me see if I can abbreviate the process a little bit.
If I can ask questions from here, Judge?
THE COURT: As long as you use the microphone.
MS. DEROVANESIAN: Your Honor, I would object to this procedure. This isn't refreshing her memory. She said this

didn't refresh her memory. To ask her specific questions about the document --

THE COURT: It's a big document. Mr. Zimet can point to a part of it if he wants to.

BY MR. ZIMET:

Q. So there's a Gentek vendor intake application; correct?

A. Yes.

Q. And this appears to be a one-page document?

A. Yes.

Q. And then there's some things that follow like a W-9 form; correct?

A. Yes.

Q. It's a long one.

And that basically appears to be what the application is for Gentek?

A. I don't know. I don't know what the application is.

Q. Well, it's what's in front of you.

A. What's in front of me, there's an application, yes.

Q. Which is a one-page application?

A. Yes.

MR. ZIMET: And if we go further on --

MS. DEROVANESIAN: Your Honor, I would object to this. He's not refreshing her memory.

THE COURT: Just point to some aspect of the document and see if that refreshes her recollection.

MR. ZIMET: Okay.

BY MR. ZIMET:

Q. Let's look at this one, okay? And I -- what I would like to do is compare -- obviously the names are different, but to compare what the application form is between the one that you just saw and this one, and I'm going to ask whether there's a difference between the two.

A. Just in the size of it, it looks different.

MS. DEROVANESIAN: Your Honor, again, I would object. This is not refreshing her recollection. She's not stated that she has any recollection. She now has a document in front of her, and she's not identifying any memory she has. She's just being asked questions --

THE COURT: Sustained.

MS. DEROVANESIAN: -- about the document.

MR. ZIMET: I'm sorry. I didn't hear you.

THE COURT: Sustained.

BY MR. ZIMET:

Q. Do you know whether, based on looking at these documents, do you notice any difference between the application forms between the Gentek and the one -- subsequent one that you're looking at now?

MS. DEROVANESIAN: Same objection.

THE COURT: Sustained.

You can ask her if looking at that document, does that

refresh her recollection that the documents changed.

BY MR. ZIMET:

Q. So looking at those two documents, is your recollection refreshed as to whether or not there was a change in the Safe Chain application forms that were required of vendor applicants.

A. But I don't know if I saw the change. I don't know if I saw the original one, but they are different, yes.

Q. Okay. So your recollection is refreshed that there was a difference?

A. There is a difference. I see it now.

I don't know if at the time, you know, but there's a difference in these forms.

Q. Okay. And --

THE COURT: Dr. Rumore, he's not asking you whether there is a difference.

He's asking you looking at that, does that refresh your recollection that there's a difference?

THE WITNESS: No. I don't recall seeing either one of those forms.

THE COURT: So it didn't refresh your recollection?

THE WITNESS: No.

THE COURT: Thank you.

BY MR. ZIMET:

Q. And the reason you were giving input -- and I think we

discussed the fact that you did give input into changing the application form, is that you thought there should be certain information requested of vendors before they were approved; isn't that correct?
A. No, that's not my job.
Q. Well, you did give input; did you not?
A. I think I may have looked at what she was asking on -- what she was going to ask vendors or something, but I'm not positive.
That's really not the job of a lawyer, to prepare a vendor intake form.
Q. Well, whether it's the job or not, isn't it correct you gave input into what you thought should be in it?
MS. DEROVANESIAN: Objection. Asked and answered.
THE COURT: I think she's answered that, but go ahead one more time.
A. Yeah, I don't -- if you could refresh my memory, show me where I answered.
BY MR. ZIMET:
Q. Sure.
A. And provided specific input, then --
Q. Sure. Let's look at this chain of emails from April 7, 2021.
A. Yes.
Q. Yes what?

A. It says it's an improved intake vendor form.
Q. And it has your comments relating to it; does it not? You can look at the whole document, ma'am.
A. It says it's an improved vendor form. Can you take a look and see if there's something?
THE COURT: You have to read it to yourself.
THE WITNESS: Oh, okay.
A. She's sending me an approved intake vendor form, and she's asking me is there anything else that could be added and this is April 7, 2021.
BY MR. ZIMET:
Q. And you responded?
MS. DEROVANESIAN: Your Honor, I would object to this as well. Same reasons. This is not refreshing her memory. She's being asked to read from a document.
THE COURT: And if after she has read from the document, Mr. Zimet can ask her whether that refreshes her recollection.
If she says no, we'll move on.
If she says yes, then he can ask the question.
A. Yes, I asked her to --
MR. POGOZELSKI: Objection, Your Honor.
BY MR. ZIMET:
Q. Before you do that, because there's certain rules, I need to ask you this question: After reading that document, is your

recollection refreshed as to whether you gave comments concerning the proposed new vendor application form?
A. Yes.
Q. Now that your recollection is refreshed, did you offer your opinion as to what additions should be made in this newly devised form?
A. Yes. I added some things to it.
Q. Even though that wasn't your job, you went beyond what your job was to do that on behalf of Safe Chain. Is that correct?
A. The are were based on the DSCSA. Like I'm asking a question, you might consider is it colocated in a pharmacy. So is it a wholesaler in a pharmacy?
You know, certain things that could be added to improve it.
Q. So my question to you, ma'am was, even though it wasn't your job, you were -- and I think you testified it wasn't your job to try to improve that, it was their job.
A. It was.
Q. Even though it wasn't your job, you added your suggestions as to how to make that document better than what you thought it was.
A. Yes.
Q. Correct?
A. I was helping her with her form. I helped her with her form.
Q. And it was more than just helping Abbie. It was helping

Safe Chain; was it not?
A. Yes.
Q. And the reason that that vendor form was so important is to try to flush out companies or vendors that were fraudulently acting; isn't that correct?
A. To make sure that -- yes, that is correct.
Q. And you believed that was in the best interests of Safe Chain, correct?
A. Yes.
Q. Because of what you had learned had happened already?
A. Yes.
MR. ZIMET: Thank you, ma'am.
May I approach, Judge?
THE COURT: Okay.
MR. ZIMET: Pass the witness.
THE COURT: Mr. Barzee, did you want to ask a couple of questions?
MR. BARZEE: I'm good, Your Honor. Thank you.
THE COURT: Redirect.

REDIRECT EXAMINATION

BY MS. DEROVANESIAN:
Q. Good afternoon, Dr. Rumore.
A. Good afternoon.
Q. One of the first things that we heard in your testimony today was that you are not being prosecuted by the Government.

Is that your understanding?
A. I shouldn't be prosecuted. I didn't do anything wrong.
Q. And so you believe you didn't do anything wrong at the time as well, back in 2020, 2021?
A. No. I didn't do anything wrong, and I don't believe any of my actions, you know, would rise to the level of malpractice or anything like that. None of my legal advice could even be misconstrued in the committing of a crime or anything like that. So I was pretty upset this morning, and I apologize.
Q. Dr. Rumore, do you remember on cross-examination being asked some questions about if you were an accomplice? Do you remember that?
A. Yes, I do.
Q. Did you feel like you were being an accomplice to a crime at any point working with Safe Chain?
A. I didn't believe that Safe Chain had committed a crime in all of my -- I believed everything they said. I never thought that they committed any crime.
Q. Did you believe that you were acting as an accomplice to Patrick Boyd at that point?
A. No.
Q. Did you believe you were acting as an accomplice to Charles Boyd at that point?
A. No.
Q. Dr. Rumore, in 2020 and 2021, did you feel like you even

really knew what was going on at Safe Chain?
A. No.
Q. Okay. And after your direct examination on Thursday, did you feel like you knew what was really going on at Safe Chain back in 2020 and 2021?
A. No. In this courtroom I heard all these incidents that I had never heard before, and all these different drug names -- Sizensky and Macovey [sic] -- all these other drugs that were involved, and there were tons of incidents -- not "tons," but there were a lot of incidents that you mentioned that I was not aware of.
In addition to finding out some incidents from the Gilead alert -- there was an incident there. There was an incident in the Gilead letter. There were a lot of things that -- I mean, I knew about three, and then there was so many.
Q. Okay. And you were just on cross-examination for seven hours.
You recall that?
A. Yes.
Q. Over the course of a couple of days?
A. Yes.
Q. Was that intimidating to you?
MR. ZIMET: Objection, Judge.
THE COURT: Overruled.
///

BY MS. DEROVANESIAN:
Q. Were you intimidated by that?
A. I went home -- I went to the hotel last night and started to cry. Yes, I'm very upset. I did not expect all this in this trial.
MR. ZIMET: Excuse me. I make a motion -- reserve to make a motion. Actually, I ask to make a motion now and a curative instruction.
THE COURT: Ignore the fact that she was crying last night.
BY MS. DEROVANESIAN:
Q. You can continue.
MR. ZIMET: The totality of the answer?
THE COURT: No. Just the fact she was crying last night.
MR. ZIMET: That she went home last night after testifying and was crying.
THE COURT: Yeah, the fact she was crying, ignore that.
MR. ZIMET: That's the instruction to the jury; is that correct?
THE COURT: Right.
MR. ZIMET: Fine.
BY MS. DEROVANESIAN:
Q. Dr. Rumore, you can continue your answer.
You were explaining why you were intimidated.

A. Yes, because I didn't do anything wrong. I gave legal advice. There's the legal advice. There's not a single document that's been shown to me that the legal advice that I provided was incorrect. There's not a single exhibit that's been discussed that showed that the legal advice I provided led to the committing of a crime, if that's indeed what occurred.

So I don't -- you know, I'm -- and it seems like that I'm upset because the blame is trying to be shifted from the defendants to their attorney.

MR. ZIMET: Objection, Judge.

THE COURT: Overruled.

MR. ZIMET: Move to strike the answer.

THE COURT: Denied.

BY MS. DEROVANESIAN:

Q. Dr. Rumore, during your cross-examination, do you remember being asked if you were concerned about being a witness in this case? Do you remember questions like that?

A. Yes.

Q. And you were asked some questions about if you looked up the indictment of this case.

Do you remember being asked about that?

A. Yes.

Q. And do you remember being asked questions about if you spoke to the Government prior to this trial?

A. Yes.

Q. Okay. And, Dr. Rumore, I don't want you to tell me any of the substance of a conversation in this answer, but without telling me any substance, can you tell me if a defense lawyer also reached out to you before this trial?
A. Yes.
Q. Was that Mr. Zimet?
A. Yes.
Q. Okay. And was that before the Government ever approached you with a subpoena in this case?
A. Yes.
Q. How long before?
A. It's a few months before while I was at Frier Levitt.
Q. Okay. And without telling me the substance, did you have a conversation with Mr. Zimet at that point?
A. Yes. Myself and my supervisor, Jesse Dresser, and I believe I had one conversation with him separately because Jesse Dresser had met with him separately as well.
Q. Okay. And, Dr. Rumore, again, I don't want you to tell me what was said during this conversation, but after that conversation, were you intimidated about the prospect of being a witness in this case?
MR. ZIMET: Objection, Judge.
THE COURT: Overruled.
MR. ZIMET: And also reserve to make a motion. I'll make it right now, Judge.

THE COURT: You can make it when we take a break.
MR. ZIMET: Okay.
A. I'm intimidated to be here, period, to be a witness in any case. I've never been a witness in a case, let alone a criminal case; so I'm very intimidated. I'm sorry.
BY MS. DEROVANESIAN:
Q. That's all right.
And, Dr. Rumore, just to be clear: Back when you were approached by defense counsel, did that conversation intimidate you?
A. Yes, it did.
MR. ZIMET: Judge, objection. Reserve a motion, Judge.
THE COURT: Same ruling. We'll do it at a break.
BY MS. DEROVANESIAN:
Q. All right. Now, Dr. Rumore, you just testified on cross-examination for quite a long time. I've got a few follow-up questions for you about some of those topics.
Would it be fair to say you were asked lots of questions about things that you said and things you thought back in 2020 and 2021?
A. Yes.
Q. And was that based on what you knew back at the time in 2020 and 2021?
MR. BARZEE: Objection, Your Honor. That's vague.
THE COURT: Overruled.

A. Yes. The questions are based on what I knew at that time --
BY MS. DEROVANESIAN:
Q. Have you --
A. -- not what I know now.
Q. And I think you said something like you had a narrow set of information at that time.
Do you recall saying something like that?
A. Yes.
Q. And so does that mean that you know more now than you did then when you were sending those emails?
A. I know very, very much more now than I did then.
Q. Do you know more about what Safe Chain was doing than you did then?
A. Yes.
Q. Do you know more now about who Safe Chain was buying medication from than you did then?
A. Yes.
Q. Now, Dr. Rumore, even setting that aside, can you just remind us, what was your role as a lawyer advising Safe Chain back in 2020 and 2021?
A. First, I was advising them on the law: the DSCSA, T3, recalls, how to handle -- you know, all the things that a wholesaler would be interested in with regard to supply chain.
And then there were incidences, and I was advising them how

to reply to these incidences that came in.

First, there was an incident, and then we would have to reply or do something about it. The PharmAlert, that came, and then we had to reply to it. Those were the kinds of legal advice that we were giving.

Q. Okay. And to be clear, were you giving Safe Chain your approval of who they should be buying from or selling medication to?

A. Never, no.

Q. Okay. And so did Charles Boyd ever come to you and say, "Hi, Dr. Rumore. Can you please give us some advice about if we should keep buying from this HIV medication supplier?"

A. Never.

Q. What about Patrick Boyd?

A. Never, no.

Q. Did Charles Boyd ever come to you and say, "Hi, I noticed some suspicious things about our HIV medication supplier. I'm wondering if you can help me make sure it's safe to buy from them."

MR. ZIMET: Objection. Leading.

THE COURT: Sustained.

A. No.

MR. ZIMET: Excuse me. Move to strike, Judge.

THE COURT: Granted. Ignore the last answer.

///

BY MS. DEROVANESIAN:

Q. Did Charles Boyd or Patrick Boyd ever come to you and raise any suspicions about the suppliers that they were purchasing from?

A. Not -- they didn't come to us, but at some point that unraveled, like the email where he's saying Gentek doesn't have a license, Boulevard -- some issue with Boulevard.

Q. And that's in 2021?

A. Yes.

Q. Okay. Did Charles Boyd ever come to you and tell you that they had a customer complaint about $300,000 of product that was unsafe to dispense?

A. No.

Q. What about Patrick Boyd?

A. No.

Q. And you were asked on cross-examination a series of questions about, "Well, did you ask them about their suppliers? Did you ask them this? Did you ask them that?"

Do you remember those types of questions?

A. Yes, yes.

Q. Okay. And without being told any reason that there's something wrong with the supplier, did you feel like you had a reason to ask any further?

A. No. I don't feel that I have to be a detective or an investigator finding out information that I haven't been told

so I didn't -- I don't think that's -- you know, attorneys do that.

They go looking, snooping around in files and stuff of clients. I didn't think that was something that I needed to do.

Q. And although you weren't acting as an investigator, you mentioned several times that you asked if they had standard operating procedures that they were following.

Do you remember all those questions?

A. Yes, yes.

Q. Okay. And, Dr. Rumore, again, based on the information that you had back in 2020 and 2021, you mentioned that it looked to you at that point like maybe Charles Boyd was naive.

Do you remember saying that on cross-examination?

A. Yes.

Q. Okay. And that was based on the information that was provided to you back at that point?

A. Yes.

Q. And was one of the things that you thought he might be naive about, this whole notion of pedigrees being required?

A. No. I think he knows that -- anybody that's a wholesaler knows that they have to get a pedigree.

I don't think -- it wouldn't be -- he couldn't not know that. Let's put it that way.

Q. Okay.

MS. DEROVANESIAN: And I think, actually, we can bring up Government Exhibit 204.
BY MS. DEROVANESIAN:
Q. And while we're pulling it up -- there we go.
Do you see, if we go to the next page we can see the questions posed, maybe the next page.
There we go. Do you remember being shown this document and saying that based on his vague questions, it looked like maybe he was a little bit naive about these requirements?
A. I don't recall. I'm sorry. I don't recall.
Q. That's all right, but do you remember --
MS. DEROVANESIAN: We can take that one down.
BY MS. DEROVANESIAN:
Q. Do you remember generally saying that at one point, you thought maybe he was just naive?
A. Yeah, I thought maybe they were naive, yes.
Q. But did Charles Boyd ever tell you that he actually knows all about the T3 requirements in this industry?
A. No.
Q. Did he ever tell you that before Safe Chain, he was the director of logistics for a prescription drug company?
MR. ZIMET: Objection, Judge. Form, assuming facts not in evidence.
THE COURT: What the lawyers say isn't evidence. It's the answer. Overruled.

BY MS. DEROVANESIAN:
Q. Did he ever tell you that?
A. No.
Q. Did Charles Boyd ever tell you that he was responsible for managing state and federal licensing and pedigree compliance requirements?
Did he tell you that?
A. No.
Q. Did he tell you those responsibilities including -- included the FDA and the DEA?
Did he tell you that?
A. No.
Q. Did he tell you that in that same role he was responsible for drug recalls?
A. No.
Q. And when you thought that maybe one possibility was they were naive, was that before you had ever seen what their SOPs said?
A. I never saw what their SOPs said except here.
Q. And when we looked at those --
MS. DEROVANESIAN: We can pull up Government Exhibit 601, please.
BY MS. DEROVANESIAN:
Q. So at that point you hadn't seen this document, for instance, that has standard operating procedures for product

tracing. Do you see that?
A. Yes.
Q. Did Charles Boyd tell you, for instance, that these rules that he had approved said, down here below, that they're complying with the DSCSA.
Do you see all of this language?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: And we can pull up Government Exhibit 602, please.
BY MS. DEROVANESIAN:
Q. And do you remember Charles Boyd telling you that he actually had standard operating procedures for vendor and transaction history authentication that he had approved?
A. Not that specific title.
Q. Okay.
A. I know there were SOPs, but I didn't know there was one for vendor and transaction history authentication. But I was told they had a vendor -- I was told they had SOPs that --
Q. I'm going to try to save a little time here, but do you remember on direct examination when we walked through these and highlighted the various red flags from the FDA guidance that are in here?
A. Yes.
Q. Do you remember that?

A. Yes.
Q. And do you remember Charles Boyd telling you that he was actually well aware of all of those red flags? He wasn't naive.
Do you remember him saying that?
A. Yes, I believe so.
Q. I'm sorry. I might have been confusing my question.
Are you saying you remember us pointing those out in these procedures?
A. Yes.
Q. But at the time, separate and apart from these, do you remember Charles Boyd ever telling you that he was familiar with all of these various red flags?
A. No. We never discussed the SOPs or the red flags or anything like that.
Q. Okay. Do you remember on cross-examination Mr. Zimet asking you some questions about if you saw anything at all wrong with the sections of these procedures that we showed you on direct examination?
Do you remember him asking you that?
A. Yes.
Q. And do you remember what you said?
A. That I hadn't read the whole thing and I couldn't opine on the SOPs without reading everything that was in there.
Q. Okay. But was it your assumption back in 2020 and in 2021

that these were being followed, whatever the SOPs were?
A. Yes, and that was in writing from the client.
Q. Okay.
A. Somewhere on one of those emails.
Q. And did Charles Boyd ever tell you that employees complained that they actually weren't being followed?
A. No.
Q. Okay. Dr. Rumore, I think another possibility that you said that you thought of back in 2020 and 2021 was that maybe they were deceived.
Do you remember being asked questions about if the defendants were potentially deceived in some way?
A. Yes.
Q. And was that based again on the information that you had back in 2020 and in 2021?
A. Yes. We believed that they could have been deceived. That could have been --
Q. Dr. Rumore, now that you have seen additional documents, do you feel like you were deceived?
A. I feel like information was concealed from me, and that maybe I was even manipulated into providing advice for whatever reason, you know, the whole situation wasn't disclosed to me.
Q. Okay. And actually you were asked a lot of questions about somebody named Abbie Divilio?
A. Yes.

Q. Do you remember that?
A. Yes.
Q. And just, can you remind us, who is Abbie Divilio?
A. The compliance officer at Safe Chain.
Q. Okay. And I think at one point again, you were talking about back in 2020 or back in 2021, you thought maybe she was just -- I think you said unfamiliar with the rules maybe?
A. Yeah.
Q. Okay. And you were asked a lot of questions about if she was incompetent. Do you remember those?
A. Yes.
Q. And I think at one point you said, you thought maybe she didn't have a clue?
A. Yes.
Q. Okay. And again, you were talking then about what you knew back in 2020 and 2021?
A. Yes.
Q. Okay. And I think Mr. Barzee asked you whose job it was to verify T3s and verify vendors.
I just want to be clear: Were you actually behind the scenes at Safe Chain in their daily operations?
A. No.
Q. Do you have any idea what was actually going on behind the scenes at Safe Chain's daily operations?
A. No.

Q. Okay. And did Charles Boyd ever tell you that Abbie Divilio had actually raised compliance issues with him?
A. No.
Q. What about Patrick Boyd?
A. No.
Q. Okay. And I want to talk to you about some things that, in your words, Abbie Divilio didn't have a clue about.
MS. DEROVANESIAN: I would like to show you Government Exhibit 133.
BY MS. DEROVANESIAN:
Q. Okay. And do you see on this email, at the top, that Abbie Divilio isn't on it?
A. No. Abbie Divilio is not on it.
Q. Okay. And do you see --
MS. DEROVANESIAN: If we can zoom back out to the bottom, please.
BY MS. DEROVANESIAN:
Q. -- where there's a discussion about how Safe Chain isn't getting pedigrees, and if they don't, they're out of risk of compliance -- they're out of compliance and in risk of fines or suspension.
Do you see that?
A. Yes.
Q. And again, Abbie Divilio, not part of this conversation, is she?

A. No.
Q. Okay.
MS. DEROVANESIAN: And then, let's take a look at Government Exhibit 501, please.
BY MS. DEROVANESIAN:
Q. And again, here, can you see from the top of this information, Abbie Divilio isn't part of it?
A. No.
Q. Okay.
MS. DEROVANESIAN: And then if we could please go to page 3.
BY MS. DEROVANESIAN:
Q. Do you remember here where they were talking about a bipolar medication and a bottle -- and a bottle of HIV meds?
A. From reading this, yes.
Q. Okay. And again, Abbie Divilio, not part of this conversation; right?
A. No.
Q. Okay.
MS. DEROVANESIAN: Let's look at page 12.
BY MS. DEROVANESIAN:
Q. Okay. Do you see at the top here where it says, "One of the bottles has been tampered with"?
A. Yes.
Q. And again, between two people, neither of them of whom is

Abbie Divilio; right?
A. No, not Abbie Divilio.
Q. All right.
MS. DEROVANESIAN: And then let's look at page 16, please. Okay. And if we could blow up these pictures, if you don't mind, or zoom in.
BY MS. DEROVANESIAN:
Q. All right. Do you remember us talking about these bottles of medication?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: And if we could zoom -- sorry, scroll down.
BY MS. DEROVANESIAN:
Q. And this open bottle of medication here with the broken pills, do you remember that?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: And then if we could please zoom out. Okay. And then page 17, please.
BY MS. DEROVANESIAN:
Q. And here where it says, "Another issue with the Boulevard product. Customer just called, pissed" in September of 2020.
Do you see that?
A. Yes.

Q. Again, Abbie Divilio is not part of this conversation, is she?
A. No.
Q. Okay.
MS. DEROVANESIAN: And I would like to take a look, please, at Government's Exhibit 505.
BY MS. DEROVANESIAN:
Q. Okay. And again, here at the top, conversation does not include Abbie Divilio; does it?
A. No.
Q. Okay. And just -- let's look at this first message, where it says, "We have a number of complaints from customers over the last three weeks regarding product coming from Boulevard."
Do you see that?
A. Yes.
Q. And then we have more pictures here.
MS. DEROVANESIAN: We can zoom in on that bottom one, please.
BY MS. DEROVANESIAN:
Q. A picture of a bottle that had broken pills?
A. Yes.
Q. Okay. And again Abbie Divilio not part of this conversation, is she?
A. No.
Q. Just like you're not?

A. No, I'm not on any of these.
Q. Okay. And then --
A. It looks like text messages.
Q. I'm sorry. I missed that.
A. These are, text messages.
Q. Is that what they look like to you?
A. Yeah.
Q. Okay.
A. And the -- I didn't know how to text in 2020.
Q. Okay. So safe to say --
A. I still struggle with it.
Q. Okay. So safe to say you weren't texting about any of these issues, then?
A. No, I'm not in the texts.
Q. And, Dr. Rumore, I think Mr. Zimet asked you some questions about another portion of a text thread there where Charles Boyd pointed out in 20- -- in September of 2020, that providing T3s is the law -- I'm sorry, October.

Do you remember him pointing out another part of that text where Charles Boyd said providing T3s is the law?
A. Yes.
Q. He doesn't make the law?
A. Yes.

MS. DEROVANESIAN: And then could we please show Government Exhibit 305A?

BY MS. DEROVANESIAN:
Q. And I just want to focus your attention on the totals here down -- one moment.
THE COURT: I have 305 in evidence. I don't know that I have 305A.
MS. DEROVANESIAN: We believe it was entered at the same time. And I think we showed this calculation already as well.
THE COURT: Mr. Zimet?
MR. ZIMET: Judge, I don't have it, but if they want to move it in, that's fine.
THE COURT: Mr. Barzee?
MR. BARZEE: No objection.
THE COURT: 305A will be received.
(Government's No. 305A, Email, was received in Evidence.)
BY MS. DEROVANESIAN:
Q. All right. And do you see on this exhibit, the invoice date, the top one -- the earliest one in May of 2020?
A. Yes.
Q. And then down at the bottom, do you see it going through June? July? August? September?
A. Yes.
Q. Through the end of September?
A. Yes.
Q. Okay. And when Charles Boyd -- when you looked at that

text message when Charles Boyd said providing T3s is the law in October, did he ever tell you that, by that point, they had already purchased -- let's see what this number is.

Did Charles Boyd tell you they had already purchased over 11, almost $12 million of HIV medication without those T3s?

A. No.

Q. Okay. And did he tell you they were going to continue buying from suppliers who at first didn't provide those pedigree or T3 documents?

A. I was told they were compliant. They were always getting T3, and they were following their SOPs.

Q. Okay.

A. That -- I was not told that, no.

Q. Okay.

MS. DEROVANESIAN: And I want to show you another document, Government Exhibit 438. And if we could please go to page 2.

BY MS. DEROVANESIAN:

Q. Now, again, here, we're looking at a conversation. Do you see at the top where we can see that Abbie Divilio is not part of this conversation?

A. Yes.

Q. Okay. And do you see down below where Charles Boyd says the T3 -- "We know the T3 is not what it needs to be from Boulevard in October of 2020."

Do you see that?
A. Yes.
Q. Okay. And then do you see that Abbie Divilio is not part of this conversation?
A. No.
Q. Okay.
MS. DEROVANESIAN: And then if you could please zoom out.
BY MS. DEROVANESIAN:
Q. And do you see down below where Charles Boyd says, "We don't need him going to the California Board of Pharmacy," a few messages below?
A. Yes.
Q. Okay.
MS. DEROVANESIAN: Thanks. We can take that one down.
BY MS. DEROVANESIAN:
Q. And again Abbie Divilio wasn't part of that last message either, was she?
A. No.
Q. Okay. I want to talk to you about some things that Abbie Divilio did have a clue about. I would like to show you -- well, first of all you mentioned that -- I think you said Abbie Divilio seemed, in 2020, to you, like maybe she wasn't as aware of the DSCSA as she should be?
A. Yes.

Q. Do you remember saying that?
A. Yes.
MS. DEROVANESIAN: I would like to show you Government Exhibit 124.
BY MS. DEROVANESIAN:
Q. And again, at the top, you can see that -- is Abbie Divilio on this email here?
A. Yes.
Q. She's the sender?
A. Yes.
Q. And here, is she actually pasting the DSCSA into an email?
A. Yes.
Q. In 2020?
A. She's got the wholesaler distributor requirements.
Q. Okay. And back in 2020, did you know that she had done this, that she had sent an email like this to Charles Boyd?
A. No.
Q. Okay. And then down below the actual language of that statute, do you see below where she says what the fines and the penalties are?
A. Yes.
Q. Do you see that?
So back in 2020 and did you know -- did you know that she was actually sending these fines and penalties to Charles Boyd?
A. No.

MS. DEROVANESIAN: And then if we could go, please, to the second page.

BY MS. DEROVANESIAN:

Q. You see where it says "real consequences"?

A. Yes.

Q. Is Abbie Divilio pasting here more information about the DSCSA?

A. Yes.

Q. Okay. And is she pasting, down below in those bullet points, some criminal penalties. Do you see that?

A. Yes.

Q. And so back in 2020 and 2021, when you said that you thought maybe she just wasn't familiar with this, was that before you knew that she'd sent this email?

A. This is the first I'm seeing this email.

Q. Okay.

A. Yes.

Q. And did Abbie Divilio ever tell you that she actually had to follow up on this email because she didn't get a response?

A. No.

Q. Did Charles Boyd ever tell you that Abbie Divilio sent this email and she was concerned about this?

A. No.

Q. Did Patrick Boyd ever tell you that?

A. No.

Q. Did either of them ever tell you that she not only sent it but highlighted the real consequences and then followed up?
A. No.
Q. Okay. Dr. Rumore, you were asked several questions about what was Abbie's job and whether it was her job to be checking vendors, checking licenses.
Do you remember that?
A. Yes.
Q. I would like to show you Government's Exhibit 471.
And do you see this is a conversation between Charles Boyd and Abbie Divilio?
A. Yes.
MS. DEROVANESIAN: And if we could scroll down to the next page, please.
BY MS. DEROVANESIAN:
Q. All right. Do you see towards the bottom here where Abbie Divilio says to Charles Boyd that she is suggesting double-checking someone's license with the Maryland Board of Pharmacy.
MS. DEROVANESIAN: There we go. The top one here.
A. Yes.
BY MS. DEROVANESIAN:
Q. And do you see Charles Boyd's response to Abbie Divilio asking to double-check if somebody has a wholesaler license with the board of pharmacy, right below it?

A. Yes.
Q. Do you see where he says, "I wouldn't call the board"?
A. Yes.
Q. Okay. So back in 2020 and 2021, were you aware that Abbie Divilio was having conversations like this with Charles Boyd?
A. No.
Q. And were you aware that Charles Boyd was giving her responses like this, like "I wouldn't call the board"?
A. No.
THE COURT: How about the rest of the response?
THE WITNESS: No. I haven't.
THE COURT: Highlight the rest of the response.
You may proceed.
BY MS. DEROVANESIAN:
Q. Were you aware of that?
A. No.
Q. On cross-examination you mentioned that sometimes you would get questions over and over from Abbie Divilio about the proper procedure, what to do in different situations.
Do you remember that?
A. Yes.
Q. Okay. And then I think you were asked about Government Exhibit 225 in reference to her asking you questions.
MS. DEROVANESIAN: If we could pull that one up,

please.
BY MS. DEROVANESIAN:
Q. And then, I think you testified about this document before, and do you see below where you said to Charles Boyd and Abbie Divilio, "You are required to notify the FDA in certain circumstances"?
A. Yes.
Q. Okay. And I won't make you read through the whole email again unless you would like to, but do you remember you were testifying that this is where you were advising them that they needed to report something to the FDA?
A. If they make a determination, yes.
Q. Okay. And do you remember testifying that Charles Boyd gave you pushback when you would suggest reporting things to the FDA?
A. It's in this email.
Q. Okay.
A. At the top.
Q. And is that consistent with your memory, too?
A. Yes.
Q. Okay. And then do you see where he responds here at the top, "I don't want to open a potential can of worms with the FDA."
Do you see that?
A. Yes.

Q. Okay.

MS. DEROVANESIAN: We can take that one down, please.

BY MS. DEROVANESIAN:

Q. Dr. Rumore, do you remember a series of questions about what you thought might be the problem back in 2020 and 2021?

A. Yes.

Q. Do you remember talking about different guesses you might have had at the time of what might have been going on?

A. There were a couple of different things, a couple of different reasons in 2021 why this was happening.

It was either a manufacturing issue, a wholesaler issue, patient, it was dispensed to a patient, and it was tampered with.

It was a lot of different things.

Q. Okay. And was part of the reason why, it was why you were making all of these different guesses, because you didn't have the full information.

You didn't know what the real answer was?

MR. ZIMET: Objection, Judge. Form, leading, suggestive.

THE COURT: It's leading. I sustain the objection.

BY MS. DEROVANESIAN:

Q. Did you have all -- did you have full information?

I'm sorry, I'm going to try to finish and not talk over you.

Did you have full information at that time?
A. No.
Q. Okay. And so let's talk about some of those guesses that you were making that you mentioned on cross-examination.
So you said at one point, you thought maybe it could be a Gilead issue with a manufacturer.
Do you remember saying that?
A. Yes.
Q. Okay. And I think you actually said that on direct examination, too.
Do you remember that?
A. Yes.
Q. Okay. And, again, I think you said that was based on information that you had at that time; is that --
A. Yes.
Q. -- what you remember.
And at that point in 2020 and 2021, were you under the impression that there was no issue with any other manufacturers?
A. No. There was no -- I was not aware of any issue with any other manufacturer -- Safe Chain.
Q. I'm sorry to interrupt you.
So was that part of why you thought maybe one guess, it's Gilead?
MR. BARZEE: Your Honor, I'm going to object.

She never testified that she was making guesses. The Government is misstating evidence.

THE COURT: Again --

MR. BARZEE: Purposefully.

THE COURT: What the lawyers say isn't evidence. The jury will rely on their own recollection of what the testimony was.

A. It would seem to be more of a Gilead problem if it was just Gilead products.

If it was other HIV meds, there's plenty of drugs out there that are HIV meds.

If Safe Chain had a problem with all these other Pfizer products or something like that, then I wouldn't have thought it was a Gilead problem.

BY MS. DEROVANESIAN:

Q. And back at the time in 2020, 2021, had they advised you of any issues with the other drug manufacturers that they were having?

A. No. In fact, they put in writing that, isn't it odd. It's just Gilead products. There's an email somewhere that says that.

Q. Okay. And do you remember on cross-examination you were asked some questions about if you knew if Gilead has ever had an issue with a mix-up of drugs before.

Do you remember that?

A. No.
Q. Do you remember being asked about if you knew about a previous Gilead recall?
A. Yes.
Q. Okay. And when you said you were familiar with a previous Gilead recall, do you know if that was an HIV medication?
A. I believe it was, yes.
Q. Okay. And when that happened, did -- to your knowledge, did Gilead respond by doing a drug recall?
A. Yes.
Q. Okay. And did they take steps to address what had happened?
A. Yes.
Q. Okay.
A. It was a public recall.
Q. Okay.
MS. DEROVANESIAN: I would like to show you Government Exhibit 209, please. And if you could go to the letter attachment. Okay.
BY MS. DEROVANESIAN:
Q. And do you remember receiving this letter from Gilead here?
A. Yes.
Q. Okay. And do you remember here if Gilead was identifying, even just by the subject line, the sale of counterfeit Biktarvy?

A. Yes.

THE COURT: Ms. DerOvanesian, about how much longer is your redirect going to be?

MS. DEROVANESIAN: I'm really bad at estimating but I will try to move through it within an hour, I think is reasonable.

THE COURT: All right.

Members of the jury, we're going to go ahead and take a 15-minute recess.

Remember my admonition not to discuss the case or allow it to be discussed in your presence, and we'll see you back in the jury room in about 15 minutes.

THE COURT SECURITY OFFICER: All rise.

THE COURT: Again, Dr. Rumore, during the break in your testimony, you're not allowed to discuss your testimony with anyone. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And we'll see you back in about 15 minutes.

(Witness out.)

THE COURT: You had some motions, Mr. Zimet?

MR. ZIMET: I do, Judge.

The redirect examination of this witness, the question and specific areas is that I had a conference with her which was either a telephone or Zoom conference prior to the time of trial, and that she was intimidated by me during that

conference.

There was a report that we got where she said that. I never dreamed that a prosecutor would try to bring that out as part of their testimony at a trial about something happened out of court which, obviously, would make me a witness in the case.

There's absolutely no relevance at all. If there's even a scintilla of relevance, it's outweighed by the prejudicial effect. It confused the issue. It suggests that I did something improper outside of the courtroom with a witness prior to trial, suggesting that I was trying to do something to shape her evidence -- shape her testimony.

THE COURT: Or maybe she's just intimidated by lawyers.

MR. ZIMET: Well, it might be, but there's no reason -- even if that's the case, Judge, no reason to bring that out prior to trial without any factual basis whatsoever, and now it makes me a witness.

How can I refute what that woman has said? Because it's going to be used against my client without getting on the witness stand and saying that she's absolutely wrong.

THE COURT: I can tell the jury your position is you didn't do anything wrong, there was no intimidation. She's wrong.

MR. ZIMET: Well, first of all, I would ask for a mistrial.

THE COURT: Denied.

MR. ZIMET: I would ask that the testimony be stricken.

THE COURT: Denied.

MR. ZIMET: Ask that the curative instruction would be that there's absolutely no -- there's no basis for that testimony, and the jury should totally disregard that testimony that any attorney speaking with the witness ahead of time, ahead of trial is not inappropriate and there's no evidence of any intimidation.

THE COURT: I can tell the jury there's nothing inappropriate with you talking to a witness before trial, just like it's not inappropriate for the Government to have done so.

MR. ZIMET: But, Judge, that does not address the intimidation issue. That's the problem with it.

THE COURT: And there's nothing you can say or do to change or affect the fact that she was intimidated, whether it was a legitimate basis for her to be intimidated or not, there's nothing you would be able to testify to if you were a witness that would be able to refute the fact that she felt intimidated.

You could testify that you didn't do anything to intimidate her, but there's nothing that you could do to refute what she was feeling, and a lot of this cross-examination was what she was feeling and thinking; and she came in and was emotional in front of the jury. I think it's all relevant.

MR. ZIMET: Well, Judge, what I can do, and I suggest I should be able to do to represent my client, is to be able to testify as to what that conversation was.

It was nothing that was said that was intimidating, threatening in any shape or form, so the jury understands that it was false testimony from this witness.

And that goes to her credibility.

Not only is she attacking my client improperly, she's attacking her lawyer improperly -- his lawyer, I'm sorry, improperly.

And that's why I would request the mistrial, as well as the relief because I can't be in the position of representing Mr. Boyd and being a witness in the same trial.

MS. DEROVANESIAN: Your Honor, this issue was raised before trial, and that is precisely why we did not go into any of the substance of that conversation, because with what she's testified to, it is just what she felt and what her perception was.

And, Your Honor, candidly, we didn't intend to ask these questions in this way, but defense counsel opened the door to those questions during their cross-examination, and I can read for the Court from the transcript.

But just to summarize, I mean, there were various questions on her cross-examination about how she found out about this indictment, what steps she took after that, googling

what was going on, the fact that she was scared to be involved in it, to be a witness in this case, the fact that -- it was strongly suggested that the reason she was googling and looking into those things was because the Government has reached out to her and wanted to ask her questions.

So in reality, as she's testified, she also was approached by the defense, and that's what sprung some of these concerns on for her. So that's part of her complete, truthful testimony the defense counsel put directly at issue.

We didn't go into the substance. We're not aware of the substance. And there's nothing improper with her finishing out her answer to those questions that they asked on cross-examination so that she can give the full, truthful picture.

And I would also note for Your Honor that I suspect one reason that she might have been a little hesitant, even answering those questions on cross-examination, is because we instructed her prior to trial -- prior to her testimony, rather, not to mention the substance to us or to the jury of any conversations that she had.

So there's nothing improper here. There's no basis for a mistrial.

The witness testified based on her perception. It was a continuation of defense counsel's own cross-examination.

THE COURT: You know, when I rule for a lawyer and they

keep arguing after I've ruled for them, it makes me think maybe I made a mistake.

Maybe the lawyer thinks it's wrong -- a decision and they want to protect the record, but my ruling is the same.

The motion for a mistrial is denied.

If you want a curative instruction, I'll tell the jury there's nothing wrong with the lawyer talking to a witness before the trial.

There's nothing wrong with Mr. Zimet or the prosecutors talking to a witness, and Mr. Zimet's testimony would be that he didn't do anything to intimidate Dr. Rumore.

Anything further?

MR. ZIMET: No, Judge.

MS. DEROVANESIAN: No, Your Honor.

THE COURT: Mr. Barzee?

MR. BARZEE: No, Your Honor. Thank you.

THE COURT: We'll be in recess for about 10 minutes.

(Off the record.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: We're back on the record. Counsel are present, both defendants are present.

Anything to come before the Court before we bring the jury in?

MS. DEROVANESIAN: No, Your Honor.

MR. ZIMET: No, Judge, other than the instruction.

THE COURT: Anything further, Mr. Barzee?

MR. BARZEE: No, Your Honor. Thank you.

THE COURT: How about the last two weeks in October? Anything to let me know about your unavailability. I think we got us going every day except for Friday the 24th, we're off; Monday, the 27th, we'll be here one to five; and Friday the 31st, we'll be here eleven to five.

MR. ZIMET: Judge, I have an all-day mediation that's set on the 28th that -- they're out-of-town lawyers.

THE COURT: You will have to cancel that. We're way far behind in this case. We will lose a jury. I can't afford to lose another full day.

Any other problems with any of those days before I turn over the calendars to the jurors?

MS. DEROVANESIAN: Nothing from the Government.

THE COURT: Anything further, Mr. Barzee?

MR. BARZEE: No, Your Honor.

THE COURT: Dr. Rumore, you understand that you're still under oath?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Let's bring in the jury.

THE COURT SECURITY OFFICER: All rise.

(Jury enter.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence? All right.

Let me instruct that there's nothing wrong with a lawyer talking to a witness before the trial. There's nothing with Mr. Zimet talking to a witness. There's nothing wrong with the prosecutors talking to a witness.

And Mr. Zimet's testimony would be that he didn't do anything to intimidate any witness.

Ms. DerOvanesian, you may continue.

MS. DEROVANESIAN: Thank you.

BY MS. DEROVANESIAN:

Q. Dr. Rumore, do you remember on cross-examination being asked some questions about when Gilead started to take an adversarial tone?

A. Yes.

Q. And do you remember talking about how it turned into something called litigation?

A. Yes.

Q. Can you tell us in your own terms what litigation means?

A. A lawsuit.

Q. And does a particular type of lawyer do litigation?

A. Yes.
Q. And is that the type of lawyer that you are?
A. No.
Q. And so you were asked some questions on cross-examination about a point in time when you asked for some assistance from your law firm. Do you remember those questions?
A. Yes.
Q. And you mentioned somebody named Jesse Dresser who got involved at that point?
A. Yes.
Q. Is Jesse Dresser a litigator?
A. Yes.
Q. And you mentioned that you're not a litigator, but do you remember being asked some questions on your background of the FDA regulations?
A. Yes.
Q. And your background on pharmacy regulations and laws?
A. Yes.
Q. Is that your -- what you describe as your wheelhouse?
A. That's my area, FDA, DSCSA and pharmacy law. Those are my three areas.
Q. Okay. And what was the subject of the class that you taught as a professor?
A. Drug regulatory affairs.
Q. Okay.

A. Food, drug, cosmetic law. I taught at a law school, Maurice Deane law school. I taught food, drug, cosmetic law.
Q. Dr. Rumore, do you remember on cross-examination being asked about other lawyers at Frier Levitt who worked on matters for Safe Chain?
A. Yes.
Q. Okay. And just to be clear, can you tell us: Does Frier Levitt do a variety of different types of legal work?
A. Yes.
Q. And can you just tell us generally what those different types of law are at Frier Levitt?
A. There's litigation. There's board of pharmacy matters. There's healthcare audits from either pharmacy benefit managers with chain drugstores or audits from -- Medicare audits and things like that from healthcare plans.
Q. Did Frier Levitt do something known as transactional law?
A. Yes.
Q. Can you tell us what transactional law is?
A. Yeah, that's contract law. That's not my wheelhouse at all. Contracts and mergers and acquisitions and things like that.
Q. And were there other lawyers at Frier Levitt who did those other areas of law that you don't?
A. Yes.
Q. And I think you were shown those bills. Do you remember

looking through those bills?
A. Yes.
Q. And do you remember seeing the names of different various lawyers who worked on matters for Safe Chain?
A. Yes.
Q. Do you remember being asked, if you looked at the records of what those different people were doing for Safe Chain?
A. I didn't.
Q. Okay.
A. No.
Q. And do you remember exactly what type of work those other types of lawyers were doing for Safe Chain off the top of your head?
A. No. I wouldn't know.
Q. Okay. From looking at those billing records, were you able to see if they were doing a different type of work from what you were doing?
A. I didn't review them really that good.
Q. Okay.
A. I could look at them and I would be able to tell, but I didn't look at them.
Q. If you showed you a copy, would that help refresh your memory?
A. Yes, I would know exactly what they were doing.
Q. Okay. Dr. Rumore, I'll give you a second to flip through

these a little bit, but I just wanted to focus you, just a little bit, to what you were asked about on cross-examination.

You were asked about what the -- who these other lawyers were and if you knew what they were doing. But first, I just want to kind of take you through the first few pages.

If you can review those and let me know if that refreshes your memory as to which lawyers were working on matters for Safe Chain?

A. Yes.

Q. Okay. And can you tell me what other lawyers --

THE COURT: Let me interrupt you. Is this document in evidence?

MS. DEROVANESIAN: It is not.

THE COURT: Have you seen this document before?

THE WITNESS: In this courtroom.

THE COURT: Okay. Go ahead.

BY MS. DEROVANESIAN:

Q. Dr. Rumore, can you tell us if there were other lawyers who were working on matters for Safe Chain?

A. Yes.

Q. Okay. And just based on flipping through the first couple of pages, did that refresh your memory as to whether they were doing a different type of work from what you were doing for Safe Chain?

A. Yes.

Q. Okay. And you --
A. The word "indictment" here, that's a litigation term.
Q. Well -- okay.
And, Dr. Rumore, you mentioned something called transactional law before. Do you remember talking about that?
A. Yes.
Q. And just flipping through here, do you see -- does it refresh your memory of whether there was any transactional law being done on behalf of Safe Chain?
A. Yes.
Q. And I'll give you a minute, if you need to review it further, but do you see a lot of that, a lot of different types of work aside from what you were doing?
MR. ZIMET: Judge, at this point, it's way beyond refreshing recollection.
THE COURT: Sustained.
BY MS. DEROVANESIAN:
Q. Dr. Rumore, I'm going to come take that from you and I've got another question for you.
That transactional work you mentioned and the work that lawyers were doing that you mentioned, is that somebody -- you mentioned that you have one wheelhouse.
Is that a separate issue, a straight type of wheelhouse?
A. Yes.
Q. Altogether?

A. Yes.
Q. Do you remember also being asked some questions about your former colleague, John Moronne?
A. Yes.
Q. And do you remember the cross-examination questions about what he might have done, what he might have known or said?
A. Yes.
Q. And do you remember if you worked with Mr. Morrone?
A. Yes, I did.
Q. And specifically you testified on direct examination about a conversation with Charles Boyd in August of 2021.
Do you remember that?
A. Yes.
Q. And do you remember if John Moronne was part of that conversation, too?
A. He had to be, yeah, that's --
THE COURT: 2020 or 2021?
THE WITNESS: 2020, Your Honor.
BY MS. DEROVANESIAN:
Q. I meant 2020. I don't know if I misspoke.
Is that your memory, 2020?
A. 2020, yes.
Q. Okay. And then you were asked about a conversation in October.
Do you remember, it was pointed out to you on one of those

bills where you had a phone call?
A. Yes.
Q. In October?
A. Yes.
Q. Okay. And was John Moronne part of that as well?
A. Yes.
Q. Okay. And you mentioned that you were on that phone call and Charles Boyd was on that phone call, too; is that right?
A. Yes.
Q. And I think you testified previously that there wasn't a mention on that phone call that Safe Chain had been buying medication with no T3 for months.
Do you remember saying that?
A. Yes.
Q. Okay. And if you heard a fact like that, would that be something that would stand out to you?
A. Yes.
MR. ZIMET: Objection, Judge. It's not proper redirect examination. That wasn't brought out on cross-examination. This is trying to repeat direct examination.
THE COURT: Sustained.
MR. ZIMET: It's improper.
BY MS. DEROVANESIAN:
Q. Dr. Rumore, I would like to be clear about a couple of the documents that were shown and who was participating in them.

MS. DEROVANESIAN: If we could, please look at Government Exhibit 116. All right. And I think there are some photos at the end here. If we could look at those, please. There we go.

BY MS. DEROVANESIAN:

Q. Do you remember looking at these photos on direct examination?

A. On direct, yes.

Q. And then do you see -- if we can go back to just the first page, please, of this email where these -- these pictures of this bottle are being sent, can you see from the top here if you were sent this email?

MR. ZIMET: Objection, Judge. Improper redirect examination. It was not asked about on cross.

THE COURT: Sustained.

A. I'm not on the email.

MS. DEROVANESIAN:

Q. Dr. Rumore --

MR. ZIMET: Excuse me. Move to strike, Judge.

THE COURT: If I sustain the objection, that means you can't answer.

THE WITNESS: Sorry.

THE COURT: Ignore the last answer.

THE WITNESS: I'm getting tired.

BY MS. DEROVANESIAN:

Q. Dr. Rumore, do you remember on cross-examination being asked about the possibility that John Moronne was informed of different things?
A. Yes.
Q. Okay. And to your knowledge, when you saw the emails that we looked at on direct examination, was John Moronne included in the email about a damaged bottle of Selzentry?
A. Yes.
Q. He was?
A. Say the question again. I'm sorry.
Q. I might have made it confusing.
A. I'm just tired. I'm sorry.
Q. No problem.
A. You have to go a little slower now.
Q. I can do that.
So I was asking you, if you remember on cross-examination, you were asked about whether or not John Moronne was aware of or informed of certain things.
Do you remember those types of questions?
A. Yes.
Q. Okay. And so then I was asking if you also remember some of the emails that we looked at on your direct examination showing issues with bottles of medication?
A. Yes.
Q. Okay. And from those emails, do you remember if

John Moronne was copied on those emails with the defendants or not?

MR. ZIMET: Objection, Judge. This is attempting to restate redirect examination. It's improper redirect examination.

THE COURT: Sustained.

BY MS. DEROVANESIAN:

Q. Dr. Rumore, do you remember on cross-examination when you were asked about the various inquiries from Gilead?

A. Yes.

Q. And do you remember being asked some questions about if you ever wondered why they were inquiring of Safe Chain?

A. Yes.

Q. Okay. Did you actually see letters where Gilead explained why they were inquiring?

A. No.

Q. Okay.

MS. DEROVANESIAN: Well, let's look at Government's Exhibit 203, please. Okay. And if we could please go to the last page of the letter. Sorry. The previous one. I'm sorry. One before this one. Thank you.

BY MS. DEROVANESIAN:

Q. Do you see where they say that they're doing this due to public health and legal risks associated with selling illegitimate or counterfeit products?

A. Yes.
Q. Okay. And do you recall being asked about whether you ever inquired why Safe Chain -- excuse me. Why Gilead was reaching out in the first place.
Do you remember those questions?
A. Yes.
Q. Okay. And I would like to show you Government Exhibit 187.
Now, at the time back in 2020, were you aware that Gilead had, months prior, told Safe Chain that the product should be treated as illegitimate and should be reported to the FDA?
A. No.
Q. And that the information contained in the pedigree transaction history document is inconsistent with their records?
A. No. That was -- that "inconsistent with records" was from the November 23rd.
Q. Okay. And above where Abbie Divilio says, "Gilead believes this to be a counterfeit drug which we should report to the FDA"?
A. No. I didn't see that at the time, no.
Q. Okay. Do you remember being asked questions on cross-examination about if you ever wanted to see the standard operating procedures of Safe Chain?
A. Yes.
Q. Okay. And I think you were asked that more than once.

Do you remember that?
A. Yes.
Q. Do you remember being asked if the reason you wanted to see them was so that you could make more money?
A. I was asked that, yes.
Q. And what was the reason why you wanted to see those standard operating procedures?
A. Because it would have been important to know if they were doing their procedures right in accordance with the latest FDA guidelines and things like that, and if they -- they actually needed to have a policy and procedures as a wholesaler. They need to have those in place for the recalls and things like that -- T3. All that has to be in place.
Q. Okay. And in addition to having standard operating procedures, would it matter to you if they were -- whether or not they were following those standard operating procedures?
A. Yes.
Q. Okay. Do you remember being asked about somebody named Adam Brosius?
A. Yes.
Q. And I think you said you were told he was a salesman?
A. Yes.
Q. Do you remember who told you that?
A. I think it was Charles Boyd. I'm not sure.
I don't want to misspeak. I'm not sure who told me.

Q. Okay.
A. But I believe when I asked who he was, I was told he was a salesperson. I'm not sure who told me.
Q. Okay. Well, do you remember if Charles Boyd ever told you that Adam Brosius was actually a part owner of the company?
A. No.
Q. Do you remember if Patrick Boyd ever told you that Adam Brosius was a part owner of the company?
A. No.
Q. Okay. Do you remember on cross-examination being asked about an instance in February of 2021 where Safe Chain reported an issue with the wrong pill in the bottle to Gilead?
A. Yes.
Q. Okay. And I think we've already looked at this document; so I won't make you look at it again, but you mentioned that was one incident in February --
A. Yes.
Q. -- that you recall?
And at that point, in February of 2021, do you remember if you were also asked or told about an issue with Seroquel in a bottle from back in August?
A. Back in August, no.
Q. What about in October?
A. No.
Q. And what about an issue with the bottle of Symtuza?

A. No.
Q. And what about a $300,000 return from a customer who deemed product to be unsafe?
A. No.
Q. And in that instance, when you were reporting that one incident to Gilead, were you asked to report any of those instances to Gilead?
A. No.
Q. And do you remember that's where you also said you were recommending it be reported to the FDA? That one incident that you were aware of?
A. I'm not sure.
Q. Okay. I can show you Government Exhibit 225.
MS. DEROVANESIAN: And if we go to the second page here, maybe the third page. I'm sorry. Maybe the last page. Okay.
BY MS. DEROVANESIAN:
Q. Okay. And, Dr. Rumore, is this what we were just talking about in February, where there is a bottle that is being returned by a customer?
A. Yes.
Q. Okay. And then I think we're on the first page.
MS. DEROVANESIAN: If we can go there, please.
BY MS. DEROVANESIAN:
Q. And see below where you're saying that the FDA should be

notified?
A. Yes.
Q. Okay. At this point, were you asked to notify the FDA about all those other incidents?
A. No.
Q. Okay. And, in fact, in that same email where you told that that might open up a can of worms because you didn't inform the FDA of those other incidents?
A. No.
MS. DEROVANESIAN: We can take that one down. Thank you.
BY MS. DEROVANESIAN:
Q. Dr. Rumore, do you remember being asked some questions about the licenses that the suppliers had?
A. Yes.
Q. You were asked about a company called Gentek and their license application?
A. Yes.
Q. Okay. I would like to show you Government's Exhibit 640.
MS. DEROVANESIAN: If we could go to the second page, please.
BY MS. DEROVANESIAN:
Q. In those discussions about Gentek's license, did Charles Boyd or Patrick Boyd show you that this is what Gentek looked like?

MR. ZIMET: Objection, Judge. Again, trying to restate direct examination.

THE COURT: Sustained.

BY MS. DEROVANESIAN:

Q. Dr. Rumore, do you remember being asked on cross-examination some questions about something called a "PharmAlert"?

A. Yes.

Q. Okay. And that was -- would you describe that as, like, a newsletter alert to pharmacies?

A. It's a bulletin that goes out to pharmacists for different things.

Q. Okay. And to put this into context, was that around March of 2021, you said?

A. Yes.

Q. Okay. And you said at that point, based on the information that you had, you didn't think Gilead was being very transparent with Safe Chain.

Is that what you said?

A. No, they weren't.

Q. Okay. And, again, is that based on the information that you had at the time in 2020? In 2021?

A. Yes.

Q. Okay. And at that point, were you aware of any other incidents with Seroquel in August or October?

A. No.
Q. Or a Symtuza bottle previously?
A. No.
Q. Okay. Or a customer who deemed a large quantity to be unsafe?
A. No.
Q. Okay. And you mentioned that an alert like this could be, I think you said -- and I don't know if it was your words or defense counsel's, but the word "death sentence" was used. A death sentence to a company for an alert like this to go out.
Do you remember that?
A. Yes.
Q. Okay. The company's reputation aside, do you think that an alert about wrong pills and counterfeit medication -- do you think there's an importance to also have consumers know about those things?
A. Yes.
Q. Okay. And do you think -- you mentioned that you didn't think that Gilead had been transparent with Safe Chain.
Do you think that those are things that Safe Chain should have been transparent about with you?
A. I think that if there was a consumer alert, that should have gone out from the manufacturer.
Q. Okay. And if there were, for instance, issues with wrong pills in the bottle, pedigree issues, do you think that's

something Safe Chain should have been transparent with you about as their lawyer?
A. Yes.
Q. And do you think that's something that Safe Chain should have been transparent with pharmacies about?
A. Yes.
Q. Okay. Do you remember a series of questions about if Patrick Boyd was included on certain emails?
A. Yes.
Q. And do you remember being shown one after the next of several of those instances?
A. Yes.
Q. Okay. And I'd like to just show you a few other documents to ask you, kind of, the same question, if that's all right.
And starting with Government Exhibit 203, do you see where it says, "This is a letter from Gilead concerning counterfeit drugs"?
A. Yes.
Q. Is Patrick Boyd on that one?
A. Yes.
MS. DEROVANESIAN: Let's look at Government Exhibit 269.
BY MS. DEROVANESIAN:
Q. Okay. Do you see Patrick Boyd on this one?
A. Yes.

Q. Okay. What about 273? Do you see Patrick Boyd on this one?
A. Yes.
Q. Okay. What about 320?
A. Yes.
Q. Do you see Patrick Boyd on this one?
A. Yes.
Q. Okay. What about 322? And we'll go down to the second email here at the bottom.
A. Yes.
Q. Okay. Is Patrick Boyd on that one?
A. Yes.
Q. What about 324?
And this is about the FDA communications we talked about on Thursday; is that right?
A. Yes.
Q. Okay. Is --
A. Patrick Boyd is not on this.
Q. I think actually if we go to the bottom here. All right. There we go.
Attaching these communications with the FDA, do you see Patrick Boyd on that one?
A. Yes.
Q. All right. Government Exhibit 420, please.
A. Yes.

Q. A long list here, but do you see Patrick Boyd on this conversation here?
A. Yes.
Q. Okay. And if we scroll to the second page here, where there's a conversation about "if we can get pedigrees now" -- do you see that?
A. Yes.
Q. Okay. And you see Patrick Boyd's responds to that one?
A. Yes.
Q. Okay. And what about Government Exhibit 174?
A. Yes.
Q. Okay. You see Patrick Boyd on this one?
A. The top one.
Q. Okay. What about Government Exhibit 182?
A. Yes.
Q. Okay. Dr. Rumore, we just looked at several emails that involved Patrick Boyd. Do you recall having emails from Patrick Boyd directly to you?
A. Yes.
Q. Okay. I would like to show you one of those.

MS. DEROVANESIAN: Government Exhibit 320.

BY MS. DEROVANESIAN:
Q. And could you see -- let's see, in this bullet point list, second from the bottom, where he says to you, "We've only had issues with Gilead products from these vendors. No other

medications in any instance branded or generic."
    Do you see that?
A. Yes. That's -- that's where I got that from, that there was only Gilead products. That's one of the places.
Q. Okay. But he didn't show you those pictures of the broken pills, the open bottles that we looked at previously?
A. No.
Q. Okay. Dr. Rumore, do you remember when you were shown a handwritten diagram on your cross-examination?
A. Yes.
        MS. DEROVANESIAN: Could I please use the ELMO?
BY MS. DEROVANESIAN:
Q. Dr. Rumore, I used a purple pen; but, otherwise, is this generally what the other one looked like?
A. Yes.
Q. Okay. And what we're looking at here, is this the type of information that you would get from a T3 or a pedigree? A transaction history?
A. Yes. It has -- it wouldn't have the patient on there.
Q. Okay. But maybe up until that point, showing from the manufacturer to whoever it was sold through, is that what would be shown on a pedigree?
A. Yes.
Q. Okay. And you were asked some questions about how you could look at different possibilities of who could be

responsible for an issue with a drug.
Do you remember those questions?
A. Yes.
Q. Okay. And you, kind of, walked through the different entities, the different types of people listed here.
Do you remember that?
A. Yes.
Q. Okay. Is that why a pedigree or a T3 is important to be able to do that exercise?
A. You have to trace the product all the way back to the manufacturer.
Q. Okay. So if you aren't getting a pedigree in the first place or if it's not a truthful pedigree, would you be able to do that process if there's an issue?
A. Would you be able?
Q. Would you be able to trace the product history?
A. No.
Q. Okay. Would that be a problem?
A. You can't take the product into your inventory unless you have a T3.
Q. Okay. And you walked through some different ways that you could think of who might be responsible for what happened to a drug.
Do you remember doing that?
A. Yes.

Q. Okay. And I just want to put this in the context of what you knew and didn't know back in 2020 and 2021.
So let's talk about the manufacturer. That's the one up at the top.
Do you remember talking about that on cross? The manufacturer?
A. Yes.
Q. Okay. And would it be important to you to know -- like you just told us before -- if there were issues with not just one manufacturer, but drugs manufactured by multiple manufacturers, all from the same supplier?
A. Yes.
Q. Okay.
A. That would be important.
Q. And would it also be important to you to know if there were instances where the bottles of medication that had the wrong drugs inside had drugs that were manufactured by a totally different company?
Would that be important to know?
A. Yes.
Q. Okay. So then, I would like to talk to you about this next one: "Authorized distributor."
In determining if this step on the pedigree is where something went wrong, would you want to know if the manufacturer had confirmed that this transaction didn't really

happen? It wasn't true?
Would that be important to know?
A. Yes.
Q. Okay. And then I'll jump down to pharmacies for just a moment.
In determining what was going on, would you want to know if pharmacies had complained about issues with the product?
A. Yes.
Q. Okay. Would you want to know if a pharmacy determined that a product wasn't safe?
A. Yes.
Q. Would you want to know if pharmacies determined that they couldn't dispense it because it looked used?
A. Yes.
Q. Okay. And would you want to see photos if the pharmacies sent them?
A. Yes.
Q. Would that be important?
A. Yes.
Q. Okay. And, Dr. Rumore, if a company is buying medication that has a proper T3, is a patient ever going to be listed on a T3?
A. No, no.
Q. Why is that?
A. Because it's only -- a T3 is only a document between

trading partners, and a patient is not a trading partner. So the pharmacy is the last trading partner on this list.

Q. So, in other words, is there ever an instance that you're aware of where a patient should be dispensed a bottle of medication that has been with another patient before?

A. No.

Q. Okay.

A. The pharmacy can't take back medication from a patient, period.

Q. Okay. But in looking into the supply chain and what might have gone wrong, would you want to know if a patient complained that they had received the wrong pills in the bottle?

A. Yes.

Q. And would you want to know if the patient had suffered adverse effects?

A. Yes.

Q. Would you want to see pictures if they were available?

A. Yes. But, again, that's -- you know, those -- it's not really -- that's the compliance officer. You know, that's -- we're getting into the weeds of what my role is as an attorney is and what the wholesaler's role is.

Q. Okay. And if you knew that the whole T3 was falsified, would you even have a reason to be getting down to that level of the patient?

A. No.

Q. Okay. And so what's left here is what was identified as "licensed distributor." And from what you know, was Safe Chain a licensed distributor of medication?
A. Yes.
Q. Okay. And there's something that's not on here, but we have talked quite a bit about it -- the suppliers that they're getting the their medication from.
Do you remember talking a bit about the suppliers they got their medication from?
A. Yes.
MS. DEROVANESIAN: Let's go to Government's Exhibit 639, if we could.
BY MS. DEROVANESIAN:
Q. In looking at the suppliers, would it be important to know if it was a place that looked like this?
A. Yes.
MR. ZIMET: Excuse me, Judge. Objection. Restating direct examination again. It's improper redirect.
THE COURT: It's beyond the scope of cross. I sustain the objection.
BY MS. DEROVANESIAN:
Q. Dr. Rumore, is it safe to say you've learned a lot of new information about those suppliers throughout this trial?
A. Yes.
Q. Okay. And in looking at different issues with the supply

chain, would it be important for you to know that even after those issues, the licensed distributor continued buying from those same places for months?

A. Yes.

Q. Okay. Dr. Rumore, I think you testified a few different times on cross-examination that your advice was correct based on the information that you had at the time.

Do you remember saying that?

A. Yes.

Q. And you were asked about a lot of things that Abbie did or didn't have a clue about.

Do you remember that?

A. Yes.

Q. Okay. Is it safe to say that there are a lot things that you didn't have a clue about --

A. Yes.

Q. -- back in 2020 and 2021?

A. I was -- all the information was not provided to me.

Q. Okay. And I won't make you walk through all of those things again, but I actually counted 94 different times on Thursday --

MR. BARZEE: Objection. Your Honor, that's improper.

THE COURT: Sustained.

MR. BARZEE: Move to strike.

THE COURT: What the lawyers ask -- their questions are

not evidence.

BY MS. DEROVANESIAN:

Q. Do you remember how many different times you said you were learning a new fact about Safe Chain that you weren't told before?

A. It was a bunch.

Q. Okay. And did you trust the information that you were getting from Charles Boyd and Patrick Boyd back in 2020 and 2021?

A. Yes.

Q. Okay.

MS. DEROVANESIAN: Thank you. Nothing further.

THE COURT: Thank you, ma'am. You may step down, ma'am. You're excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: The Government may call its next witness.

MR. POGOZELSKI: Thank you, Your Honor. The Government calls Vipulbhai Parekh.

THE COURTROOM DEPUTY: Please raise your right hand.

Thereupon,

VIPULBHAI PAREKH,

having been first duly sworn or affirmed, was examined and testified as follows:

THE COURTROOM DEPUTY: If you'll pull the base of the microphone close to you as possible. Pull the base of the

microphone. Thank you.
And if you could state your name and spell it for the court reporter.
THE WITNESS: Sure. My name is Vipul Parekh. That is V-I-P-U-L. The last name is Parekh, P-A-R-E-K-H.

DIRECT EXAMINATION

BY MR. POGOZELSKI:
Q. All right. Good afternoon, Mr. Parekh.
A. Good afternoon.
Q. Sorry for keeping you waiting all this time. We appreciate your patience. You traveled from out of town.
Can we start with a little bit of your background? Where are you originally from?
A. So I'm originally from India.
Q. And did you do some studies or work in India?
A. So I graduated in 1991. I got my bachelor of pharmacy in -- back in 1991. Then I did -- after I graduated, I worked for one of the manufacturing companies for two and a half years. And then I got the job in -- the government job. That is one of the government of Gujarat.
(Reporter requests clarification.)
A. That is the government of Gujarat. That is G-U-J-A-R-A-T.
There was -- FDA is one of the divisions called Food and Drug Laboratory. So I was appointed in there, and I worked until I came to the U.S.

BY MR. POGOZELSKI:
Q. And the Government agency -- was it basically the equivalent of the Food and Drug Administration here in the United States?
A. That is correct.
Q. And what was your role or title there?
A. So I worked for the FDA's division called Food and Drug Laboratory. And that is -- we get samples from all over, and we test those samples.
Q. Okay. And, Mr. Parekh, when did you come to the United States?
A. So I got married in 1995, and I came to the U.S. in 1997.
Q. Okay. And why did you come to the United States?
A. So I got my -- American citizen, and that's why I came here.
Q. And where did you -- did you come settle down with your wife somewhere?
A. So I came to the U.S., and I lived in New Jersey all of my time.
Q. And is that where you live now? In New Jersey?
A. Yes.
Q. And I think you talked a little bit about your background in India.
When you came to the United States, did you take any kind of exams, or did you do anything -- did you become a

board-certified pharmacist? A supervising pharmacist?
A. So I came to the United States in 1997. Then I started working in one of the pharmacies as a pharmacy tech, pharmacy technician. And, meanwhile, I was preparing for my exam for pharmacy in the New York State.
Q. And did you eventually become a certified or -- sorry -- a licensed pharmacist in New York State?
A. Yes. So I got my license in 2001.
Q. Okay. And then did you get a job as a pharmacist after that?
A. Once I got my degree in pharmacy as a registered pharmacist, I got a job in Rite Aid Pharmacy as a pharmacy manager.
Q. Sorry. I lost a little track of time. Around when what was that?
A. That was in 2001.
Q. All right. How long did you work at Rite Aid as a pharmacy manager?
A. I worked about two and a half years as a pharmacy manager in the Rite Aid Pharmacy.
Q. And then after that, did you become a partner in a pharmacy?
A. Yes.
Q. What was that pharmacy?
A. That is called Leroy Pharmacy in the Bronx, New York.

Q. All right. Was there a LeMed Pharmacy?
A. So we changed the name from Leroy Pharmacy to LeMed Pharmacy. So that was LeMed Pharmacy.
Q. And what was your role at LeMed Pharmacy or Leroy Pharmacy?
A. I was a supervising pharmacist.
Q. And what does a supervising pharmacist do?
A. So a supervising pharmacist basically is managing the whole pharmacy. So you have to manage the pharmacy and outside that is called over-the-counter stuff. So a supervising pharmacist is responsible for all day-to-day operations.
Q. Did you do that for a number of years?
A. Yes. So we started Leroy Pharmacy back in 2004. Then we changed the name to LeMed Pharmacy. And at that time, I was a supervising pharmacist from 2005.
Q. Okay. And then at some point in time, was Legend Drugs opened?
A. So we needed more space for LeMed Pharmacy; so we moved LeMed Pharmacy to our spot, to a bigger area in the Bronx. And in the same place, we started Legend Drugs.
Q. Around what time period was that?
A. That was in 2017.
Q. Okay. And what was your position -- did your position change? Were you still the manager or supervising pharmacist at Legend Drugs?
A. I was the supervising pharmacist at Legend Drugs.

Q. Okay. And since Legend Drugs opened, you said, in 2017, have you been the manager or supervising pharmacist since then?
A. Yes.
Q. And who owns -- or who are the owners of Legend Drugs?
A. So there are three ladies. One is my wife and the other two ladies -- those are my partner's wife.
Q. Where is Legend Drugs located?
A. In the Bronx.
Q. And is it near a large hospital?
A. Yes. So we are in the Bronx. We are across from Montefiore Hospital. That is a big hospital in the Bronx area. It has medicine -- I mean, the college of medicine in the same hospital.
Q. All right. What kind of pharmacy is Legend Drugs?
A. So Legend Drugs is an open-door pharmacy, meaning that anybody can come in for their prescription needs.
Q. Open door? Do you sell over-the-counter products? Nonprescription over-the-counter products?
A. So we are a retail pharmacy, open-door retail pharmacy, meaning we have a prescription area. We have over-the-counter. We sell all different -- different goods, kind of stationery. We have household. We have -- and prescriptions.
Q. Okay. Would you compare it to a much smaller version of a CVS, just for example?
A. Yes.

Q. All right. And since opening Legend Drugs in 2017, what kinds of drugs have been dispensed at Legend Drugs?
A. So all kinds of medicine, actually, all kind of drugs. All, I would say, like for --
Q. Blood pressure medication?
A. Blood pressure medication, for diabetes, for the cholesterol, for infectious diseases.
Q. Infectious diseases, does that include HIV drugs?
A. Yes.
Q. All right. And what are some of the most common HIV drugs dispensed at Legend Drugs?
A. Common HIV drugs are Biktarvy, Descovy -- and there are many, actually.
Q. Okay. Include Tivicay? Juluca?
A. Yes.
Q. And are a lot of the patients at Legend Drugs referred by that hospital that you referred to? Montefiore Hospital?
A. Yes.
Q. And what kinds of patients are referred by that hospital?
A. So we work very closely with the hospital's different departments. Like, we work with the transplant division. We work with the infectious disease. That is one of the departments of HIV medication to dispense -- I mean, prescribe.
Q. Okay. And at Legend Drugs, who have you historically bought branded HIV drugs from? What companies?

A. So we work with the -- our primary wholesalers are McKesson. We have a Kinray. Kinray is now Cardinal's -- one of the divisions. We work with Anda. We work with Amerisource. We work with Safe Chain.
Q. Okay. And what kind of pricing was offered by McKesson or Cardinal, for example, on these branded HIV drugs?
A. So McKesson and Kinray -- they are our primary wholesaler. The discounts are kind of WAC minus 1.5, 1.75, 2, 2.25.
Q. And how do those discounts work? Is there anything that you have to do to get those discounts from McKesson or Cardinal?
A. Yes. So how that discount works is there's two kinds of medication: one is brand and the generic. So if you want to get a discount on a brand medication, you have to buy a certain number, a certain percentage of the generic medication.
Q. All right. And I'm sorry if I missed part of this. The discounts generally offered by McKesson or Cardinal, you said they were around what percentages?
A. So it starts from like 1.5. It goes up and up. It depends on how much you buy generic medication from them.
Q. And is that 1.5 percent off of WAC --
A. Yes.
Q. -- for whatever drug it is?
A. Yes.
Q. And then if you purchase a larger amount of generics from a

McKesson, you might be able to get up to a 2.5 percent off WAC?
A. Yes.
Q. Okay. You had mentioned Safe Chain Solutions as one of the companies you purchased HIV drugs.
How did you become familiar or start purchasing these HIV drugs from Safe Chain?
A. So we work -- we are enrolled with the Legacy Health GPO. GPO meaning group purchasing organization. That is GPO. So Legacy Health usually get good deals for medication, for over-the-counter, for getting softwares and stuff. They get good deals on those stuff.
Q. And you said group purchasing organization. Does that mean a bunch of pharmacies banding together to buy in bulk?
A. Yes.
Q. So kind of strength in numbers? You can get better discounts on a variety of things buying through the group, the GPO?
A. Yes.
Q. Okay. And you mentioned getting better discounts on software. Is that one of the benefits of a GPO like that?
A. Yes.
Q. Okay. And I think you testified that the Legacy GPO is how you became familiar with Safe Chain; is that right?
A. Can you repeat the question?
Q. Was it Legacy GPO -- through Legacy GPO that you became

familiar with Safe Chain?
A. Yes, it is.
Q. And you talked about the group, the GPO getting discounts for its members. Did you work through Legacy with McKesson or Cardinal as well?
A. Yes.
Q. Okay. So Legacy wasn't just limited to Safe Chain?
A. Yes.
Q. It was not limited to Safe Chain?
A. Not limited.
Q. Okay.
A. Yes.
Q. Okay. Around when did you start buying these branded HIV drugs from Safe Chain?
A. That actually would be in August 2020.
Q. And when you started buying these branded HIV drugs from Safe Chain, were you also buying HIV drugs from your primary wholesalers?
A. Yes.
Q. And that would be McKesson or Cardinal?
A. Yes, they were our primary wholesaler.
Q. Okay. And the primary or secondary -- how did you use Safe Chain during that time period?
A. So our primary was McKesson and Kinray, and when we needed more, we get it from Safe Chain --

Q. Okay.
A. -- additional.
Q. Got it.
Did Safe Chain offer a discount on its branded HIV drugs sold to your pharmacy?
A. Yes.
Q. Ballpark, what was that discount?
A. So for Safe Chain, we got the discount up to 7, 7-plus.
Q. 7-plus percent off WAC?
A. Yes.
Q. And how did that compare to the discount offered by McKesson, for example?
A. That was a large discount actually, a good discount.
Q. Okay. And when you started buying these HIV drugs from Safe Chain with that larger discount, were you suspicious of the pricing at all?
A. I was really curious how we get this much discount.
Q. Had you ever heard of such a large discount in the past?
A. No.
Q. And you were curious about it, but obviously, did you go ahead and buy the HIV -- the discounted HIV drugs from Safe Chain?
A. Yes.
Q. And why did you do that?
A. So, first of all, we are not buying too much from Safe

Chain. We were -- it's not a primary. And so the discount was better. That's why we got -- we purchase from Safe Chain.
Q. Okay. And did you -- with McKesson or Kinray, you mentioned having to purchase some generic drugs to get a larger discount.
Did you buy any generic drugs, as far as you recall, from Safe Chain?
A. No.
Q. Just the branded medications?
A. Yes.
Q. And when you started buying these branded HIV drugs from Safe Chain, did Safe Chain provide you with T3s or pedigrees?
A. Can you repeat it again? I'm sorry.
Q. Sure.
When you were buying from Safe Chain the branded HIV drugs, did Safe Chain provide you with T3s or pedigrees?
A. No.
Q. And was that different from McKesson?
A. So McKesson and Kinray -- they have a portal. So whenever you want, you can go on the portal, log in yourself, and you can get the pedigree.
Q. And about how long did you buy HIV drugs from Safe Chain, to your recollection?
A. About six to eight months.
Q. Okay. So August 2020 to about March of 2021?

A. March 2021, yes.
Q. And during that time period, did Safe Chain provide you any T3s or pedigrees for those HIV drugs?
A. No.
Q. All right. And did there come a point in time where you -- actually, strike that question.
For the HIV drugs that you purchased from Safe Chain, did you dispense those to patients?
A. Yes.
Q. And HIV patients, did they pay out of pocket?
A. No.
Q. How did they pay for the HIV drugs?
A. So all of our patients, they are -- either they have a commercial insurance or state insurance or Medicare insurance.
Q. Okay. So various different types of insurances?
A. Yes.
Q. All right. And when you dispense the HIV drugs from Safe Chain to those patients, did you bill those drugs to those various insurers?
A. Yes.
Q. Okay. Now, you mentioned you started buying the branded HIV drugs from Safe Chain around August of 2020. In the interest of time, I won't walk through some of the -- some of the documents that are already in evidence. So I'll try and streamline this for your sake as well.

Around when you started buying from Safe Chain, August 2020, did anyone at Safe Chain notify you about a customer complaint that same month that a patient received a bottle of Biktarvy with Seroquel in it?

MR. BARZEE: Objection. Hearsay.

THE COURT: I'll allow it for the fact it was said or not said.

BY MR. POGOZELSKI:

Q. Do you want me to ask it again?

A. Yes.

Q. August 2020, when you started purchasing HIV drugs from Safe Chain, did anyone at Safe Chain notify you about a customer complaint in August 2020 that they received a bottle of Biktarvy with Seroquel in it?

A. No.

Q. Also in August of 2020, did anyone at Safe Chain notify you about a complaint about a bottle of Biktarvy with generic Excedrin in it?

A. No.

Q. And this was around the time you first started purchasing HIV drugs from Safe Chain?

A. Yes.

Q. Now, as a pharmacy customer of Safe Chain, would you have expected Safe Chain to notify you about these types of customer complaints?

A. Yes.
Q. And let's talk about September 2020.
Did anyone at Safe Chain notify you in September of 2020 about a customer complaint that a bottle had been tampered with?
A. No.
Q. As a customer of Safe Chain for about a month then, is that something that you would have expected this wholesale distribution company to tell you, their customer?
A. Yes.
Q. Would that have impact- -- would that and the August 2020 complaints, would that have impacted your decision to buy HIV drugs from Safe Chain?
A. Yes.
Q. And why is that?
A. Because if the medication is not right in the bottle, I wouldn't dispense it to my patient. That is the patient's health.
Q. Okay. Did anyone at Safe Chain notify you about a complaint around September 2020 where a customer said he received a bottle that was open with no seal?
A. No.
Q. All right. What about also in September 2020? Did anyone at Safe Chain notify you about a complaint that a bottle contained broken statin pills in it rather than the HIV drugs

that were supposed to be in the bottle?
A. No.
Q. Would those -- would those facts have impacted your decision to continue purchasing from Safe Chain?
A. Yes.
Q. Okay. October 2020, did anyone at Safe Chain notify you about a complaint that a, bottle they distributed, Biktarvy, contained Seroquel in it, in October of 2020?
A. No.
Q. November of 2020, did anyone at Safe Chain notify you about a customer complaint that a bottle of Symtuza had a different drug in it?
A. No.
Q. February 2021, did anyone at Safe Chain notify you about a customer complaint then regarding a different drug inside a bottle of Biktarvy?
A. No.
Q. Okay. Now, you had testified that you stopped purchasing from Safe Chain sometime in March of 2021.
Why did you stop buying these HIV drugs from Safe Chain?
A. So we got -- we came to know about e-Pharm/alert from the company Gilead, that had some trouble with the medication with some of the distribution. So we stop buying from anyone else, and we just start -- we kept our primary wholesaler.
Q. Okay. And that Gilead e-Pharm/alerts --

MR. POGOZELSKI: If we could pull up Government Exhibit 245 and scroll to the bottom of page 4, top of page 5.

BY MR. POGOZELSKI:

Q. Does this look like the Gilead e-Pharm/alert that you're referencing?

A. Can you go to the first page?

Q. Yes.

A. That was different with e-Pharm at the top.

Q. So it looked different?

A. Yes.

Q. All right. And then this e-Pharm/alert mentioned Descovy. Did anyone at Safe Chain notify you about a complaint about a bottle of Descovy that they distributed? That Safe Chain distributed around March of 2021?

A. No.

Q. All right. And then in this e-Pharm/alert, I think on the second page, it talks about false information in T3s -- in Safe Chain's T3s related to Gentek.

Did anyone at Safe Chain notify you about that false information in Safe Chain's Gentek T3s?

A. No.

Q. All right. At some point in time, did you have a problem -- your pharmacy have a problem with a product -- HIV product purchased from Safe Chain?

A. Yes.

Q. And what was that problem?
A. So we dispensed Biktarvy to one of our patients, and he called me the next day.
MR. BARZEE: Objection. Hearsay, Your Honor.
THE COURT: I'll allow it for the fact it was said, not the truth of the matter asserted.
BY MR. POGOZELSKI:
Q. You may continue, Mr. Parekh.
A. Okay. So he says that the bottle has different pills in there.
Q. Okay. And did that patient send you photos of the pills in the bottle?
A. Yes.
MR. POGOZELSKI: All right. And if we could pull up, for just the witness what's marked as Government's Exhibit 660. And then if we just scroll through a few of these pages so Mr. Parekh can take a look at these.
BY MR. POGOZELSKI:
Q. Are these the photos that your patient provided to you, Mr. Parekh?
A. Yes.
MR. POGOZELSKI: At this time, the Government would move Government Exhibit 660 into evidence.
MR. ZIMET: Object as to foundation, Judge.
MR. BARZEE: Same objection.

THE COURT: Overruled.

660 will be received.

(Government's No. 660, Photograph, was received in Evidence.)

MR. POGOZELSKI: Thank you, Your Honor.

Permission to publish?

THE COURT: Okay.

BY MR. POGOZELSKI:

Q. All right. Mr. Parekh, these photos that were sent to you by your patient, do you see the imprint on that?

A. Yes.

Q. Do you know what drugs that is, or did the patient say?

A. It's Seroquel XR 300 milligram.

Q. Okay. Is that the same drug that was in multiple bottles of Biktarvy where customers complained to Safe Chain prior to this happening at your pharmacy?

MR. BARZEE: Objection. Compound question, Your Honor.

THE COURT: Sustained.

MR. POGOZELSKI: Sure. I mean, we can go through all the documents. I'll just strike that question.

BY MR. POGOZELSKI:

Q. I had asked you a series of questions about whether Safe Chain notified you about various complaints in August, September, October, February, March.

Did some of those complaints that I was referencing include

Seroquel in bottles of Biktarvy?
A. Yes.
Q. And is that what's in these photos, Seroquel in a bottle of Biktarvy, that your patient sent to you?
A. Yes.
Q. Would you have wanted to know about all of those incidents involving Seroquel in bottles of Biktarvy while you were buying from Safe Chain?
A. Yes.
Q. And had anything like this ever happened in your entire pharmacy career with McKesson?
A. None of the wholesalers.
Q. So not McKesson? Nothing like this? Wrong drug in a bottle of HIV medication?
A. No.
Q. Not with Kinray?
A. No.
Q. Not with Cardinal?
A. No.
Q. And how long have you been in the pharmacy business in the United States?
A. 2001.
Q. Okay. What about when you worked at Rite Aid? Do you recall there ever being an instance of a HIV or branded drug bottle that had the wrong drug in it while you worked at Rite

Aid as a manager?
A. No.
Q. Okay. Did you eventually request T3s or pedigrees from Safe Chain?
A. Yes.
Q. And do you recall what prompted that request?
A. So we got the e-Pharm/alert and we heard that; so we requested all pedigree from Safe Chain.
Q. All right. If we could -- and was that prior to the patient complaint and the photos?
A. Yes.
Q. All right.
MR. POGOZELSKI: If we could pull up for the witness what's marked Government's Exhibit 337 and 337A, which are the attachments.
BY MR. POGOZELSKI:
Q. Mr. Parekh, are these emails -- do these emails include an email of your pharmacy received attaching Safe Chain Solutions' T3s or pedigrees?
A. Yes.
Q. Okay. And if we go back up to the top, what is the date of the email at the top?
A. The date was April 19th.
Q. And that's when you requested the T3s or pedigrees?
A. Yes.

Q. All right.

MR. POGOZELSKI: At this time the Government would move to admit Government Exhibit 337 and 337A.

MR. BARZEE: No objection.

MR. ZIMET: No objection, Judge.

THE COURT: 337 and 337A will be received.

(Government's No. 337, Email, was received in Evidence.)

(Government's No. 337A, Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. All right. If we could scroll to page 2 of the attachment, sorry, in 337A.

All right. This T3 pedigree -- when you received this Safe Chain T3 or pedigree, was there anything that stood out to you?

A. Yes.

Q. What was that?

A. So usually, on the wholesaler is direct buy. And I see on this it's from Gilead, a medication went to -- Truvada, that went to Puerto Rico. Then it came to Connecticut. Then it came to Maryland. It says Cambridge, Maryland, and then from there to us.

Q. Okay. And why did that stand out to you, about this T3 or pedigree?

A. Usually, as I say, it's a direct buy.

Q. Okay. Was there anything about Drogueria Betances to

Gentek that jumped out to you?
A. Yeah. It's curious that it came from Puerto Rico back to U.S.
Q. So that it would go from Gilead to Puerto Rico to Connecticut. Is that what you're referencing?
A. Yes.
MR. POGOZELSKI: Now, if we could show the witness for a memo what's already in evidence, Government's Exhibit 640, and if we go to page 2.
BY MR. POGOZELSKI:
Q. Had you known, Mr. Parekh, that this was the location of Gentek LLC, the supplier of HIV drugs to your pharmacy, would you have bought these HIV drugs from Safe Chain Solutions?
A. Actually, I saw this the first time -- and can you repeat the question again?
Q. Sure.
Had you known this entity that's listed on your T3, Gentek LLC -- we can go back to the first page as well.
Had you known this was the location of the HIV supplier to Safe Chain for the drug Safe Chain sold to you, would that have influenced your decision to buy from Safe Chain?
A. It doesn't look like it's a warehouse. It looks like it's an apartment building.
Q. Okay.
MR. POGOZELSKI: If we could go to Government's

Exhibit 249.

BY MR. POGOZELSKI:

Q. So the date here is March 17th of 2021.

Is that around the time that you stopped buying these discounted HIV drugs from Safe Chain, Mr. Parekh?

A. Yes.

Q. Okay. And there's an attachment there. Gilead letter, and the subject line is "Response on Gilead PR from Patrick Boyd."

Do you see where it says, "Do not send this proactively"?

Do you see that, Mr. Parekh?

A. Yes.

Q. If we go to the letter itself, did you ever receive this letter?

Do you recall ever receiving this letter from Safe Chain, Mr. Parekh?

A. No.

Q. If we could highlight there in the letter where it says, "As of late 2020, Safe Chain no longer sources any products from Gentek LLC."

Do you see that highlighted part?

A. Yes.

Q. Okay. Now, if we could go back to Government's Exhibit 337A and go to page 10, which are the T3s, pedigrees you received from Safe Chain, do you see the date purchased and referenced for when Safe Chain bought this Descovy from Gentek?

MR. POGOZELSKI: If we could highlight there January 7, 2021.

A. Yes.

BY MR. POGOZELSKI:

Q. Does that contradict the statement in that customer letter that we just looked at?

A. Yes.

MR. POGOZELSKI: If we go to page 11.

BY MR. POGOZELSKI:

Q. Same here: Does that show a January 2021 purchase?

A. Yes.

Q. That contradicts that letter that Patrick Boyd sent around?

A. Yes.

MR. POGOZELSKI: All right. And then if we could go to page 13 -- actually, let's do page -- keep going. Keep going. Keep going.

All right. Actually, I missed that part.

BY MR. POGOZELSKI:

Q. So what drug is listed here on this T3 here that you received from Safe Chain?

A. Prezista.

Q. And what is the drug manufacturer there? Janssen?

A. Yeah, Janssen.

Q. All right. And according to this T3, who did Janssen purportedly sell this drug?

A. To wholesaler's group.
Q. Is that in Puerto Rico?
A. Yes.
Q. So when you looked at this T3, did you have the same kind of questions as the prior one that we looked at with Gentek?
A. Yes.
MR. POGOZELSKI: All right. If we go to page 16. Okay.
BY MR. POGOZELSKI:
Q. And the "sold to" here, Synergy Group Wholesalers.
Do you see that?
A. Yes.
MR. POGOZELSKI: Actually, let's go to page 22. All right.
BY MR. POGOZELSKI:
Q. Mr. Parekh, do you recall if this is T3 or pedigree associated with that bottle of Biktarvy that your patient sent you photos of that had Seroquel?
And we can show it side-by-side with the photo of the bottle with the lot number. It looks like the lot number on that bottle is CDGWZA.
And do you see that at the top, at the pedigree?
A. Yes.
Q. All right. So is this the T3 or pedigree associated with this patient complaint of yours?

A. Yes.
Q. All right. And in looking at this Safe Chain Solutions T3 or pedigree, was there anything that stood out to you as unusual?
A. No.
Q. The number of transactions on here?
A. Yes. That is -- it went from Gilead to Amerisource to Rapids Tex and then Safe Chain and then us.
Q. Okay. So Gilead, Amerisource, Rapids Tex, Mr. Unlimited, Safe Chain, Legend Drugs. And what was the discount that Safe Chain was selling these drugs to you for?
A. So we got discount about 7 -- 7-plus.
Q. 7-plus percent after Gilead had purportedly sold it to Amerisource and Amerisource purportedly sold it to Rapids Tex, and then somehow Mr. Unlimited and Safe Chain, and then you got it at a far discounted price than McKesson or Cardinal?
A. Yes.
Q. Okay. Were these Safe Chain T3s or pedigrees -- were they different from the ones that you received from McKesson, for example?
A. Usually, McKesson is a direct buy. So it's from Gilead to there to them.
Q. Okay.
MR. POGOZELSKI: And if we could show just the witness Government Exhibit 661.

BY MR. POGOZELSKI:
Q. Is this an example of a McKesson T3 or pedigree for your pharmacy in that same time period of 2020?
A. Yes.
Q. Does it include purchases from McKesson, for example, of Biktarvy in 2020?
A. Yes.
Q. Okay.
MR. POGOZELSKI: The Government would move Government Exhibit 661 into evidence.
MR. BARZEE: No objection.
MR. ZIMET: No objection.
THE COURT: 661 will be received.
(Government's No. 661, Document, was received in Evidence.)
BY MR. POGOZELSKI:
Q. Okay. And so when you said it would show a direct purchase, can you just tell us what you meant by direct purchase on this McKesson T3?
A. So McKesson got the medication direct from the manufacturer and it came direct to us.
Q. Okay. And what was the pricing offered by McKesson around this time period?
A. 2 and 2.25 percent.
Q. Okay. And that 2.25 percent required you to buy a certain

amount of generics from McKesson as well?
A. Yes.
Q. Okay. Now --
MR. POGOZELSKI: We can take that down.
BY MR. POGOZELSKI:
Q. Mr. Parekh, had Safe Chain told you about all these customer complaints I was asking you about between August of 2020, when you first purchased, and March of 2021, would you have bought these discounted HIV drugs from Safe Chain?
A. No.
Q. Would you have dispensed Safe Chain discounted HIV drugs to patients?
A. No.
Q. Would you have billed Safe Chain's discounted HIV drugs to any of those insurers?
A. No.
Q. Okay.
MR. POGOZELSKI: One moment, Your Honor.
THE COURT: Okay.
MR. POGOZELSKI: No further questions, Your Honor.
THE COURT: Mr. Barzee.

CROSS-EXAMINATION

BY MR. BARZEE:
Q. How are you, sir?
A. I'm okay.

Q. The prosecutor was asking you about something called "wholesale acquisition cost."
Do you remember those questions?
A. Yes.
Q. And wholesale acquisition cost, that's something that's made up; right?
A. That's an acquisition cost, yeah.
Q. It's a made-up number, though. It's not real; is it?
MR. POGOZELSKI: Objection, Your Honor. Lack of personal knowledge. Speculation.
THE COURT: Overruled.
A. I don't know.
BY MR. BARZEE:
Q. Well, let's talk about what this wholesale acquisition cost is.
That's a price that the manufacturer is claiming that they charge their wholesalers for the medication; correct?
MR. POGOZELSKI: Objection. Lack of personal knowledge.
THE COURT: Overruled.
A. I'm not sure.
BY MR. BARZEE:
Q. Do you understand what wholesale acquisition cost refers to?
A. That's a cost, actually.

Q. The cost to whom?
A. So that's a cost to -- for the wholesale person.
Q. Right.
So it's a number that the manufacturer -- let's say, for example, Gilead -- says, "For a bottle of Biktarvy, we're going to decide that the wholesale acquisition cost is" whatever number they want to charge; right?
A. I'm not sure, sir, on that.
Q. Well, they can sell it for much less than the wholesale acquisition cost?
MR. POGOZELSKI: Objection, Your Honor.
BY MR. BARZEE:
Q. They can sell it --
MR. POGOZELSKI: He just said he doesn't know.
THE COURT: And you have to wait until Mr. Barzee finishes his question before you object.
BY MR. BARZEE:
Q. You would agree with me that Gilead can sell their medication for more than the wholesale acquisition cost. They can sell it for less than the wholesale acquisition cost; correct?
A. That's not my subject, sir.
Q. You don't know what they sell it for; right?
A. I don't know.
Q. Well, let's think about it for a second because the

Government asked you a lot of questions about it. They said, "Well, from McKesson, you were paying 2 and a half, maybe up to 3 percent off of the wholesale acquisition cost"; correct?

A. Yes.

Q. All right. And if McKesson is buying it from Gilead at the wholesale acquisition cost and then they're selling it to you for less then the wholesale acquisition cost, McKesson is not going to be a billion-dollar company for very long, are they?

A. I'm not sure.

Q. It doesn't make any sense, does it?

A. I don't know.

Q. You would agree with me that it doesn't make any sense?

How could Gilead sell it --

MR. POGOZELSKI: Objection. This is repetitive. He just said he doesn't know multiple times.

THE COURT: Next question.

I sustain the objection.

BY MR. BARZEE:

Q. So let's look at the difference in these costs.

Did you think that the price that Safe Chain was giving you was too good to be true?

A. Yes.

Q. You did.

So what do you sell in your pharmacy other than medications?

A. Over-the-counter.
Q. Okay. And you also sell, like, electronics? Do you sell clocks? Do you sell hair dryers -- things like that? Shampoo?
A. Yes.
Q. So let's just say hypothetically a clock usually costs ten bucks and somebody comes in off the street and says, "Hey, I can sell you a bunch of clocks for 10 cents apiece," that would be too good to be true; right?
A. Can you repeat that? I'm so sorry.
Q. Yeah.
If the going rate for an item in your pharmacy -- let's say, a clock or an electronic was $10, and somebody came in and they offered to sell you a bunch of those items for 10 cents, that would be too good to be true; right?
A. Yes.
Q. And you would refuse to purchase it, wouldn't you?
A. Yes.
Q. And the reason you would refuse to purchase it if they're offering it to you at a price that was too good to be true, is because that would mean it would be likely illegal; right?
A. I can't answer that. It's legal or illegal -- i can't answer that.
Q. But that's the reason why you wouldn't buy something that was completely underpriced. If it's too good to be true, that means there's a problem with it; right? It's illegal or

there's an issue; right?
A. So there's a difference between 10 cents to $10.
Q. Agreed. Agreed.
A. Or $9 to $10.
Q. Agreed. And so let's talk about that.
If it was 10 cents to $10, that would be too good to be true and you wouldn't touch it; correct?
A. I think so.
Q. Okay. And now let's talk about the difference between 3 percent and 7 percent, all right, so we understand what we're talking about here.
How much is a bottle of Biktarvy? Give me a general price.
A. About 3,200.
Q. Okay.
MR. BARZEE: Your Honor, may I use the contraption here?
THE COURT: Okay.
MR. BARZEE: Since everyone else has used it, I get to use it too.
BY MR. BARZEE:
Q. So, let's say -- let's just round it off so it's easy, okay.
Let's just say, hypothetically, that a bottle of Biktarvy is $3,000. All right?
Are you with me?

A. Yes.
Q. Now, let's say that McKesson comes along and says, "We're going to give it to you for 3 percent under wholesale acquisition cost." That would mean it would be how much, if the 3,000 was the wholesale acquisition cost?
A. So it's going to be minus $30.
Q. Minus $30?
THE COURT: Minus $90.
THE WITNESS: I mean minus $90.
MR. BARZEE: Thank you, Judge.
BY MR. BARZEE:
Q. That's minus $90. So that would mean you would be paying $2,100; correct?
THE COURT: No.
MR. BARZEE: No?
You would be paying -- help me out.
THE COURT: 2,910.
MR. BARZEE: 2,910. Thank you, Judge.
I should just ask you the rest of these questions if it's all right with the Court.
BY MR. BARZEE:
Q. All right. Let's do it for 7 percent.
All right. You said that Safe Chain was giving you a discount of 7 percent off of WAC; correct?
A. Yes.

Q. So how much would it be now?
A. Minus $210.
Q. Minus 210. So 3,000 minus 210 is what?
THE COURT: 2,790.
BY MR. BARZEE:
Q. 2,790.
So that's the difference that we're talking about? 2,910 versus 2,790; right?
A. Okay.
Q. Is that correct?
A. Okay.
Q. That's not a huge difference; is it?
A. No.
Q. And, in fact, one of the reasons why Safe Chain was offering you that extra -- whatever it is -- hundred bucks or 200 bucks, the extra 2 and a half, 3 percent is because of something called short-dating; correct?
A. No.
Q. Are you familiar with something called short-dating in the industry?
A. Yes, I do.
Q. And short-dating is when the expiration date on the medicine is coming up quickly. It's not like a year from now, but it's a month from now or two months from now.
You've heard of that -- right? -- in the industry?

A. Yes.
Q. And isn't it true that if you're buying medication with a short date on it, you can get it for less? You can receive it for a greater discount?
A. Yes.
Q. Right?
That's standard in the industry; isn't it, sir?
A. I'm not sure it's standard; but, yes, that's one of the things.
Q. And, in fact, you even explained that to the Government when you met them up in New York. You told them that you were getting discounts from Safe Chain as a result of them being short-dated.
Didn't you inform the Government of that?
A. I don't recall that, sir.
Q. You don't recall that.
Would seeing the notes of your interview refresh your memory?
A. Yes.
MR. BARZEE: May I approach, Your Honor?
THE COURT: Okay.
MR. BARZEE: Just read this to yourself, this paragraph. Just read it to yourself.
A. So --
///

BY MR. BARZEE:
Q. Hold on.
A. Okay.
Q. Does that refresh your memory as to whether or not you discussed with the Government the fact that you were purchasing medications from Safe Chain at a higher discount in part because of short dates?
A. That is not correct.
Q. Okay.
A. Can you show the documents to -- oh...
Q. Well, this isn't in evidence. I'm asking if it refreshes your memory.
If it doesn't, it doesn't.
A. Right. What you're asking is not correct.
Q. You're saying that you never told the Government that good discounts occur when medication was near its expiration date, which is less than a year to be short-dated?
A. Okay. And can you read it?
Q. "Product did not recall if medications received from Safe Chain were near the expiration dates."
A. Yes.
Q. Right. But as far as that, short-dating is when you get a discount because of a short date. You discussed that with the Government?
A. Yes.

Q. All right. And you told the Government, "I don't remember whether or not that was the discount we were getting from Safe Chain but that is a discount in the industry"; correct?
A. Yes.
Q. All right. You were also part of a group purchasing organization; correct?
A. Yes.
Q. And that's another way that you can manage to get discounted medications, by being part of a larger group; correct?
A. Yes.
Q. And this whole wholesale acquisition cost, this whole made-up number in the first place is really just so the manufacturers can have the greatest profits; right?
A. I'm not sure.
Q. Well, Gilead is allowed to sell the medicine for whatever they want, can't they?
MR. POGOZELSKI: Objection, Your Honor. Asked and answered. No personal knowledge. Repetitive.
THE COURT: Overruled.
If he knows.
BY MR. BARZEE:
Q. Are you aware of any law in the United States of America that prevents Gilead from selling a bottle of Biktarvy for $2,500 instead of 3,000?

A. No, I'm not aware.
Q. And you're aware that Gilead and these other great big manufacturers have what they call, "our own authorized distributors," and they're the only ones that get to buy the medications?
A. I'm not aware of those things.
Q. Well, you're aware of the fact that you can't buy from Gilead, can you?
A. We cannot.
Q. Right.
You have to go through an authorized distributor; right? Or you have to go -- you have to buy it from somebody else. You can't buy it direct from Gilead?
A. Yes.
Q. And Gilead does that to keep a monopoly on the system. Isn't that true?
MR. POGOZELSKI: Objection, Your Honor.
THE COURT: If he knows.
BY MR. BARZEE:
Q. Gilead sets it up that way in order to keep a monopoly on the system; correct?
A. I'm not sure on that, sir.
Q. Well, you --
MR. POGOZELSKI: He's testifying, Your Honor. He's stating his own opinions in the form of questions.

THE COURT: What the lawyers say isn't evidence.

BY MR. BARZEE:

Q. You've been in this industry for a while, sir.

You understand that these major pharmaceutical companies, Big Pharma, they set it up this way so that people can't get the medicines at a discounted rate; isn't that true?

A. I'm not sure, sir, on that one.

Q. All right. Let me ask you a question.

You said, "Oh, if Gilead had told me that they had these problems, I wouldn't have bought from them."

Do you remember that testimony?

MR. POGOZELSKI: I believe it's Safe Chain.

BY MR. BARZEE:

Q. Safe Chain. I'm sorry.

Do you remember that testimony?

A. Yes.

Q. Did McKesson tell you about the fact that they had problems --

MS. DEROVANESIAN: Objection. Objection, Your Honor.

BY MR. BARZEE:

Q. -- with Seroquel?

MR. POGOZELSKI: Objection, Your Honor. It assumes some facts not in evidence.

THE COURT: It's cross-examination.

Overruled.

BY MR. BARZEE:
Q. Did McKesson tell you about the fact that they had complaints? McKesson had complaints from pharmacies about Seroquel showing up in Biktarvy bottles?
A. No.
Q. If you heard about that from McKesson, would you stop buying from McKesson?
A. Yeah. My decision would be on that, yes.
Q. How long have you been in this pharmacy industry in the United States?
A. From 2001.
Q. All right. You've heard of Gilead having problems with the wrong pills in wrong bottles, haven't you?
A. Yes.
Q. Do you still buy Gilead medications?
A. Yes.
Q. Do you have any personal knowledge as to whether or not Safe Chain stopped purchasing from Gentek at some point?
A. No.
Q. Do you have any personal knowledge as to why Safe Chain might have reengaged Gentek at some point?
A. No.
Q. You were asked some questions about the T3s.
Do you remember those questions?
A. Yes.

Q. And you talked about this idea of direct buy; right?
A. Yes.
Q. And I'm going to just show you a little diagram, if I may. And I know I didn't spell it correctly, but let's assume the first word is "manufacturer." The second is "authorized distributor," and the third is "pharmacy."
That would symbolize what you call a direct buy; correct?
A. Yes.
Q. In other words, in this case, it would be Gilead to, let's say, McKesson, to your pharmacy; correct?
A. Yes.
Q. And the Government showed you some T3s that had two or three other individuals in between "authorized distributor" and "pharmacy"; correct?
A. Yes.
Q. Now, that's perfectly legal; isn't it?
MR. POGOZELSKI: Objection, Your Honor. He can't opine on legal conclusions.
THE COURT: If he knows.
BY MR. BARZEE:
Q. That's perfectly legal -- isn't it? -- for it to go from, for example, a manufacturer, to an authorized distributor, to a wholesaler, to another wholesaler, and then to a? Pharmacy.
That's permissible; correct?
A. I think so.

Q. Of course.

MR. BARZEE: Your Honor, may I have one moment, please?

THE COURT: All right.

MR. BARZEE: Thank you, sir.

Thank you, Your Honor.

THE COURT: Mr. Zimet.

CROSS-EXAMINATION

BY MR. ZIMET:

Q. Good afternoon, sir.

A. Good afternoon.

Q. When you first began your pharmacy, first began purchasing from Safe Chain, that was what year?

A. 2020.

Q. I'm sorry?

A. 2020.

Q. 2020?

A. Yes.

Q. And the first sale of -- a first purchase of HIV drugs from Safe Chain was in 2020?

A. Yes.

Q. Do you remember what month that was approximately?

A. August 2020.

Q. And what was the method in which you were able to view any T3s, pedigrees, for your purchases from Safe Chain?

A. We never had it.

Q. I'm sorry?
A. We never had the pedigree.
Q. You never had a pedigree?
A. No.
Q. Well, weren't you aware that Safe Chain had a portal in which the pedigree information was placed and then you could go on the portal and view the pedigree and download if you wanted or do anything you wanted with it; isn't that correct?
A. I wasn't aware of that.
Q. You weren't aware of it?
A. Yes.
Q. So that doesn't mean there wasn't a pedigree. You just weren't aware of where to get pedigree; isn't that correct?
A. McKesson and Kinray -- they sent us an email that if you want a pedigree, there is a portal, and we were aware of those.
Q. That's McKesson, correct?
A. McKesson and Kinray.
Q. This is Safe Chain, not McKesson; right?
A. They did not send any information, sir.
Q. Did you inquire of them as far as where their pedigrees were?
A. No.
Q. So you didn't get one. You never contacted Safe Chain about getting it, and you say you're unaware that there was a portal which you could look yourself and get it?

Is that your testimony?
Yes? No?
A. Yes.
Q. Okay. So you get a call after the PharmAlert came in. PharmAlert, we think, is probably around March 15th, March 16, 2021. Does that sound right?
A. Yes.
Q. So sometime after that, there's a call that comes into the pharmacy, Legend Pharmacy; correct?
A. Can you say it again?
Q. Sure.
You received a call from one of your clients or patients of the pharmacy concerning a bottle of Biktarvy; is that correct?
A. Yes.
Q. When was that? What date was that?
A. It was April 20, 2021.
Q. April?
A. April 31st, 2021.
Q. April 21st, 2021. And the name of the patient was Mr. Martinez; is that correct?
A. Yes.
Q. So Mr. Martinez wanted to return the bottle to you to get a refund; isn't that correct?
A. No.
Q. Didn't he ask to return the bottle to you?

A. So he says that I got -- "I got the wrong medication in this bottle. It's not look like the one that I'm getting from you."

And I said, "Can you read it, on the pill?"

And he read me the numbers on the pill.

I said, "That's not the Biktarvy; so you can call Gilead."

Q. Well, didn't he ask you to return the pill -- return the bottle to the pharmacy?

A. So he says, "Can I get another bottle?"

Q. And you said yes or no?

A. I said no.

Q. And the reason you said no was because when you sold the bottle to him, you didn't know what was inside the bottle and you assumed what was in the bottle was Biktarvy; correct?

A. Yes.

Q. And so you didn't think it was anything that you had any knowledge of, what was inside the bottle being the wrong pill; isn't that correct?

A. No. We do know what number the medication -- I mean, what's the number on the pill is Biktarvy, what is the color of Biktarvy.

Because when it comes, it comes with leaflets. And there's a picture of the medication. They have a number on the pill of the -- that particular medication with leaflets and stuff.

Q. I apologize. I don't think my question was very clear.

When you received a bottle of Biktarvy from Safe Chain, from McKesson -- wherever it is -- it's sealed, is it not?
A. Yes.
Q. And when you get it in your pharmacy and it's sealed, you have, you believe, what's inside is Biktarvy; correct?
A. Yes.
Q. But you don't open the bottle to know what is actually inside it; correct?
A. Yes.
Q. So if, for any reason, what's inside is not all Biktarvy pills or one of or many or several is not Biktarvy, you have no knowledge of that when you sell it to your customer because you have not opened it; isn't that correct?
A. Yes.
Q. And by the same token, if it comes from McKesson, you have no knowledge or, in fact, your assumption or belief is that McKesson doesn't know that either; isn't that correct?
A. Yes.
Q. Because it's sealed from the manufacturer; isn't that correct?
A. Yes.
Q. It's supposed to be sealed from the manufacturer, and if it had been opened and you receive it in an opened condition, you're going to reject it and send it right back to where it came from, aren't you?

A. Yes.
Q. So in this instance, Mr. Martinez asked you to return the bottle to your pharmacy; correct?
A. He wanted to exchange it.
Q. An exchange? Basically a credit; right?
Is that right?
A. Yes.
Q. And you said, "No, we're not going to do it because we didn't know what was inside the bottle when we sold it to you. We believed it was all Biktarvy"; correct?
A. Not correct. Our policy is we cannot take the medication back once we dispense. Once it goes out of the door, we cannot take any medication back. That's our policy.
Q. You could have given him a refund if you wanted to; correct?
A. No.
Q. You're not allowed to give him a refund if the customer gets something different than what he's paying for?
A. So for medication, it's not.
Q. I'm sorry?
A. So for medication, we cannot refund because we cannot take it back. It is other items -- electronic or something -- we take it back, and we give the money to them.
Q. But when you say "you can't," you're allowed to do it, but from a business standpoint, it doesn't make any sense because

you are giving money to the patient, refunding the money, and you have nothing in return that has any value because it's been opened; correct? The bottle has been opened?
A. So that's our policy. Medication is not returnable, sir.
Q. It's a policy, okay. It's not a law that you're not allowed to give a refund. It's your pharmacy's policy?
A. As a pharmacy, we cannot take medication back.
Q. That's not the question, sir. It's not whether you can take medication back. It's whether you can give the patient a refund; correct?
A. We never did that, sir.
Q. I'm sorry?
A. We never did that. We have a policy that we cannot take any medication back.
Q. Fair enough, sir.
So what you told him was contact Gilead; isn't that correct?
A. Yes.
Q. In fact, contact them and tell them that their product did not have all Biktarvy product in it; correct?
A. Yes. Because that was the first instance in my life I heard that it's a different medication in the bottle.
Q. Understood.
And you thought --
A. And --

Q. I'm sorry. Finish.
A. And the manufacturer is Gilead. So I told him to call Gilead direct and talk to them.
Q. In fact, you know that's what he did, pursuant to your instructions; correct?
A. Yes.
Q. And he reached out to Gilead, and the Gilead lawyer spoke with him; isn't that correct?
A. Gilead lawyer called us.
Q. I'm sorry?
A. Gilead lawyer called us.
Q. Called you?
A. Called us for the documents.
Q. Okay. And --
A. I'm not sure that the Gilead lawyer talked to him or not because I'm not aware -- and I think I probably told him to call Gilead.
Q. Well, when you gave a statement to the agents up in New York, did you tell them that Gilead had investigated the incident and a Gilead lawyer contacted Parekh.
That's you?
A. Yes, that's me.
Q. And did Mr. Martinez then speak with the Gilead lawyer?
A. I'm not sure on that, sir.
Q. Did Gilead send a notice out that one of their bottles had

a wrong pill in it pursuant to the incident that occurred with your client?
A. Yes.
Q. They did send a notice?
A. Well, not a notice. They call us, and they ask for the documents -- all the pedigrees and invoices and everything.
Q. So the pedigree that you sent them was the pedigree that you got from the Safe Chain transaction; is that correct?
A. Because they asked for that, actually, and they send the letter, the e-Pharm letter that we saw, that was the Safe Chain name on that.
Q. Was it your testimony earlier, sir, that there were no pedigrees or T3 documents from Safe Chain?
A. So I'm not sure that you had the timeline correct or not, but we asked pedigree to Safe Chain on the 19th April.
On the 20th, the Safe Chain person called -- person sent us an email that she will send the pedigree and this -- she informed the upper management to get the pedigree.
Q. Okay.
A. On the 21st, we got the pedigree with the zip file.
Q. And that's what you provided to the Gilead attorney; is that correct?
A. Then after, yes.
Q. I'm sorry?
A. After 21st, once we get it, we had it, we print it, and

then we provide it to Gilead attorney.
Q. So Gilead made a determination that, in fact, there was a wrong pill in the Gilead bottle of Biktarvy; is that correct?
A. Can you repeat that again? I'm sorry.
Q. Gilead made a determination that there was a pill inside the Biktarvy bottle that was not Biktarvy; is that correct?
A. Yes.
Q. And after that determination was made, did Gilead send a notice out to pharmacies that, in fact, that had occurred so pharmacies could be alerted to the fact that one of their bottles had the wrong pill in it or wrong pills in it? Did you ever see the notice from Gilead telling that you?
A. Before that, no.
Q. How about after the fact that they received it? Did they send you a notice?
A. Yes.
Q. And did they send that to other pharmacies that had been purchasing Biktarvy from Gilead that had been sourced from Gilead?
A. Maybe.
Q. I'm sorry?
A. Maybe they send it. I'm not aware of it.
Q. You don't know that they did; is that correct?
A. Yes.
Q. They should have; is that right?

MR. POGOZELSKI: Objection, Your Honor.

THE COURT: Sustained.

BY MR. ZIMET:

Q. Well, you were aware -- or I think you were asked questions by the prosecutor about ever having notice from Safe Chain that there had been wrong pills in the bottle, okay, would you not also expect that if Gilead knew there was wrong pills in the bottle, that you would have received a notice?

A. Well, first of all, if I had got notice from Safe Chain, I would stop my purchasing, and I would report to Gilead or whoever is the manufacturer.

Q. Okay. And how about if Gilead became aware of it and determined there was a wrong pill in the bottle, you would expect the same from Gilead; isn't that correct?

A. Can you repeat it again? I don't get it.

Q. If Gilead made a determination that one of their bottles had a wrong pill in it, you would expect notification from Gilead that that, in fact, had occurred; isn't that correct?

A. Yes.

MR. ZIMET: Now, if we could put a picture of the bottle -- I think that's -- is that the A?

It's a Government's Exhibit, Judge.

BY MR. ZIMET:

Q. So that's the picture of the pill that was sent to you by Mr. Martinez; is that right?

A. Yes.
Q. And then you also had some pictures of the bottle; is that correct?
A. Yes.
MR. ZIMET: Can we show that -- there's that picture.
BY MR. ZIMET:
Q. Now, on that bottle, there's something called a lot, L-O-T, colon, and then there's some letters?
A. Yes.
Q. The lot is from the manufacturer; is that correct?
A. Yes.
Q. And it's somewhat analogous or the same thing as a batch, if you will. That's the batch of Biktarvy that has that identification number; is that correct?
A. Yes.
Q. And so if there's going to be notification from the manufacturer or anyone concerning a bad pill, it would be notification of anyone receiving pills that were made under that batch or that lot number?
MR. POGOZELSKI: Objection, Your Honor. This is misleading questioning.
THE COURT: It's cross-examination.
Overruled.
A. Can you repeat that again?
///

BY MR. ZIMET:

Q. Sure.

Any kind of notification concerning a bad batch, if you will, of pills would be identified by whatever the lot number is on this particular bottle. In this case, it looks like -- I feel like I'm at the eye doctor -- CDGWZA, I think it is. Something like that?

A. Yeah.

Q. Right?

A. Yes.

Q. And so if there's going to be notification that there's a problem, the notification should go to anyone who has received the pills made in that batch or that lot number; isn't that right?

A. Yes.

Q. There would be no reason to send a notification to another lot that it was not affected by the wrong pill in the bottle. The notification would be sent for that batch of pills, not for a different or separate batch of pills; isn't that correct?

A. Yes.

Q. And so if that happened another pharmacy, ABC Pharmacy down the street from wherever you are, would know that we should not accept anything -- any bottles with that lot number on it; correct?

A. Yes.

Q. Now, in this particular situation of this lot number being shown to you, do you know whether there was any credit given to Mr. Martinez by Gilead?
A. I'm not aware, sir.
Q. I'm sorry?
A. I'm not aware on that.
Q. Did you inquire of Mr. Martinez of whether that happened or not? In other words, whether Gilead paid Mr. Martinez for the error in their bottle of pills?
MR. POGOZELSKI: Objection, Your Honor. Gilead's error?
THE COURT: It's cross-examination.
Overruled.
MR. POGOZELSKI: Okay.
A. Can you repeat that?
BY MR. ZIMET:
Q. Sure.
Do you know whether Gilead paid Mr. Martinez any money for their error -- for the error in their bottle of pills?
I'm not saying Gilead made the error, but whether they paid any money to Mr. Martinez because there was an error in one of their bottles?
A. I don't know that, no.
Q. Have you -- and where is Mr. Martinez today?
A. Where is he today?

Q. Around now, this time, in 2025, is he still up in New York with you? Still a customer of yours?
A. So after that incident, he don't -- he's not our patient anymore.
Q. He doesn't come back to you guys anymore?
A. No.
Q. After that incident?
So you're not aware of whether he's around to come and testify himself or not?
A. No.
MR. ZIMET: Thank you, sir.
THE COURT: About how long is your redirect going to be?
MR. POGOZELSKI: I'll make it very brief for everyone's sake, Your Honor.

REDIRECT EXAMINATION

BY MR. POGOZELSKI:
Q. Okay. Again, I apologize, Mr. Parekh.
The discounts -- so when Mr. Barzee was asking you questions about 10 cents for a clock versus $10 for a clock -- do you remember that line of questioning?
A. Yes.
Q. Okay. To get the discount of 1.5 to 2.5 percent from McKesson or Cardinal, did you have to buy other medicine to get a discount?

A. You have to buy generic medication, yes.
Q. Okay. So there was something else you had to do to get that discount?
A. Yes.
Q. Did you have to do anything else? Buy any other type of medications from Safe Chain to get the much larger discount?
A. No.
Q. Okay. And the discounts, I think you mentioned from McKesson or Cardinal, 1.5 to 2.5 percent, and then Safe Chain's discounts were around what?
A. About more than 7 percent.
Q. More than 7 percent.
So that's maybe four to five times cheaper than McKesson or Cardinal?
A. It's the largest discount, yes.
Q. Okay. And then when we were looking at Safe Chain T3s versus McKesson T3s, McKesson could only offer you a discount of, say, 1.5 to 2.5, but they had purchased directly from the manufacturer?
A. Yes.
Q. And they required you to buy generic medications as well to get that kind of discount off WAC?
A. Yes.
Q. Safe Chain, according to those T3s -- at least one of them that we looked at -- it went from manufacturer, had four other

entities before it even arrived to your pharmacy? Four or five; right?

A. Yes.

Q. And you didn't have to buy generic or generic drugs from Safe Chain?

A. No.

Q. And there's four or five other entities supposedly involved in these sales?

A. Yes.

Q. And somehow they're offering it four to five times cheaper than McKesson or Cardinal, who buy direct from the manufacturer.

Is that why you found it curious? The pricing was too good to be true, as you told the lawyers representing these defendants?

A. Yes.

Q. And then there was some questioning about short dates.

MR. POGOZELSKI: If we could pull up the photos that were provided by Mr. Martinez. I think it's 660.

BY MR. POGOZELSKI:

Q. Would this have been a purchase in March of 2021 from Safe Chain, Mr. Parekh?

A. Yes.

Q. And then the expiration date here on this bottle is what?

A. Is October 2022.

Q. Okay. And would that qualify as a short-dated product?
A. No.
Q. Okay. And then when one of the lawyers representing a defendant here was asking you a lot of questions about notice from Gilead and a specific lot number -- do you remember that line of questioning?
A. Yes.
Q. And the line of questioning about whether Gilead sent you a notice or sent out a notice about this bottle with the wrong drugs in it?
A. Yes.
Q. Where did you buy that bottle with the wrong drugs in it?
A. It came from Safe Chain.
Q. Safe Chain?
A. Yes.
Q. You did not buy that directly from Gilead?
A. Yes.
Q. Right.
And that Gilead e-Pharm/alert that we looked at, that was March 2021?
A. Yes.
Q. That was an alert about various -- up to five instances of foreign drugs in bottles distributed by Safe Chain; right?
A. Yes.
Q. Okay.

MR. POGOZELSKI: No further questions. Thank you very much for your patience, Mr. Parekh.

THE COURT: Mr. Parekh, you may step down. You're excused.

All right, members of the jury, we're going to go ahead and recess for the weekend. Remember my admonition not to discuss the case or allow it to be discussed in your presence, and I will ask you to be back Monday at 9:00.

So have a nice long weekend, and we'll see you back Monday at 9:00.

(Jury exits.)

THE COURT: Let's wait and see what the juror wants. It looks like he wanted to say something as he was leaving.

MR. ZIMET: Judge, just a housekeeping matter. I know there's all this talk of the government shutdown, if that happens --

THE COURT: We keep going.

MR. ZIMET: Okay. So maybe we can just let the jurors know also because they might have a concern.

THE COURT: Yeah, I probably should have said that before I excused them.

MR. ZIMET: Hopefully, it doesn't, or if it does, it's short.

THE COURT: The last government shutdown, we were able to continue operating for some time after the shutdown because

of fees that the judiciary has that they can utilize. And I think that if that money ever ran out, then people just wouldn't get paid. I don't know that the courthouse would necessarily close, but hopefully we'll never have to find out.

I'm thinking about this: If the juror that has the fashion show, did I tell him that maybe as we get closer to the end of the case, I would think about letting him go?

MR. POGOZELSKI: I don't recall that.

THE COURT: I don't know if I said that or not. We'll see.

THE COURTROOM DEPUTY: He doesn't have anything written out; but, of course, I knew this was going to come up -- but it was Mr. Gray. He's talking about the fashion week, which is that whole week you have there.

He's going to write it out, but he doesn't have it written. This whole week here is the fashion week. So...

THE COURT: All right. So is he writing something out now?

THE COURTROOM DEPUTY: I asked him if he could, if you guys want to wait.

THE COURT: Yeah, we'll wait.

THE COURTROOM DEPUTY: You'll wait? Okay.

THE COURT: I think we will just tell him we'll address that on the 8th --

THE COURTROOM DEPUTY: Okay. I asked him to finish

writing it.

THE COURT: -- which is the last, or the 10th, I guess.

MR. POGOZELSKI: I'm sorry. Which week is this, Your Honor?

THE COURT: I think the fashion week is the week of the 20th. So before we recess for the fashion week, we have three and a half days of trial left.

How far does the Government think we're going to be along at that point?

MR. POGOZELSKI: Let's see, so three and a half days next week, we still have to finish the direct of Ms. Divilio, which I think would be probably two hours, and then I remember defense counsel something like a day of cross.

Is that fair.

MR. ZIMET: Probably a good chunk of a day.

MR. POGOZELSKI: Okay.

And then we have Peter Kind, I would imagine, would be probably at least a day witness.

So I would expect -- I was hoping that we would rest next week, but those two outstanding witnesses, plus at least a few more, I think it's unlikely we will be able to rest next week, but hopefully very early the following week, the 20th.

MR. ZIMET: Brosius would be a long witness. You're not going to call him?

MR. POGOZELSKI: Brosius would be a long witness if we

call him, yes.

THE COURT: All right. We'll see what he writes out. I think what we will tell him is we'll let him know before we recess on the 10th.

And the question is do we go without any alternates when there's going to be a whole week break? Maybe we'll find out he can just go to a couple of days of the fashion week and maybe that will be enough. I don't know if the fashion week is all week. Maybe it's not.

MR. POGOZELSKI: Maybe there are events at night that he could attend after court. I guess we will have to figure it out. The Government would prefer not to proceed without any alternates.

THE COURT: I share that concern.

THE COURTROOM DEPUTY: I made copies of it, Judge. Is it okay to send out?

THE COURT: Yes.

Is he sticking around, Crystal.

THE COURTROOM DEPUTY: He was still in there.

THE COURT: That's okay. We will tell him next week.

THE COURTROOM DEPUTY: I just told him that I would hand it to you but I would not have an answer.

THE COURT: All right. So he wants to be excused for three weeks.

MR. POGOZELSKI: At least from the Government's

perspective, we agree with Your Honor that this is something that we can address next week.

THE COURT: All right. So I think I'll write on the note "I'll give you an answer by Friday, October 10th."

And we'll see how the case is going along and at that point --

MR. POGOZELSKI: And I don't know if you would be able to provide some specific schedule if he has showings on this day, are there particular hours that are most important to him? Maybe gather a little more information during a break next week would be helpful for everyone.

THE COURT: He said before that it was very important for his career to be there, and he said that after he was picked on the jury.

MR. ZIMET: Judge, we concur with the Court's position.

THE COURT: All right. We'll be in recess until 9:00 on Monday.

(Trial was adjourned at 5:11 PM.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 10/1/2025

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN, FPR, RPR
Official Court Reporter
United States District Court
Southern District of Florida
U.S. Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

## $

**$10** [5] - 219:12, 220:2, 220:4, 220:6, 244:20
**$12** [1] - 141:5
**$2,100** [1] - 221:13
**$2,500** [1] - 225:25
**$210** [1] - 222:2
**$3,000** [1] - 220:24
**$30** [2] - 221:6, 221:7
**$300,000** [2] - 127:11, 173:2
**$90** [3] - 221:8, 221:9, 221:12

## /

**/s/Patricia** [1] - 252:20

## 1

**1** [4] - 1:8, 1:19, 72:22, 92:24
**1.5** [6] - 194:8, 194:19, 194:21, 244:23, 245:9, 245:18
**1.75** [1] - 194:8
**10** [7] - 157:17, 210:23, 219:7, 219:13, 220:2, 220:6, 244:20
**10/1/2025** [1] - 252:20
**10th** [6] - 31:16, 32:3, 32:18, 250:2, 251:4, 252:4
**11** [2] - 141:5, 211:8
**116** [1] - 167:2
**118** [1] - 3:4
**12** [1] - 136:20
**124** [1] - 143:4
**13** [1] - 211:15
**133** [1] - 135:9
**140** [1] - 3:13
**14th** [2] - 17:22, 25:6
**15** [2] - 152:12, 152:18
**15-minute** [1] - 152:9
**15th** [1] - 232:5
**16** [4] - 3:3, 137:4, 212:7, 232:5
**16th** [1] - 93:1
**17** [1] - 137:20
**174** [1] - 179:10
**17th** [1] - 210:3
**182** [1] - 179:14
**187** [1] - 170:7
**188** [1] - 3:5
**18th** [2] - 8:10, 33:18
**1991** [2] - 188:16, 188:17
**1995** [1] - 189:12
**1997** [2] - 189:12, 190:2
**19th** [2] - 207:23, 238:15
**1:15** [4] - 4:22, 87:12, 87:13, 87:17

## 2

**2** [10] - 18:6, 74:8, 74:10, 141:17, 194:8, 208:10, 209:9, 214:24, 218:2, 222:16
**2,790** [3] - 222:4, 222:6, 222:8
**2,910** [3] - 221:17, 221:18, 222:7
**2.25** [3] - 194:8, 214:24, 214:25
**2.5** [4] - 195:1, 244:23, 245:9, 245:18
**20** [2] - 139:17, 232:16
**200** [1] - 222:16
**2001** [4] - 190:8, 190:16, 206:22, 228:11
**2004** [1] - 191:12
**2005** [1] - 191:14
**2017** [3] - 191:21, 192:1, 193:1
**2020** [68] - 23:21, 26:4, 31:16, 49:24, 50:1, 50:13, 82:13, 100:3, 119:4, 119:25, 120:5, 124:19, 124:23, 125:21, 128:12, 132:25, 133:9, 133:15, 134:6, 134:16, 137:23, 139:9, 139:17, 140:18, 141:25, 142:23, 143:13, 143:15, 143:23, 144:12, 146:4, 148:5, 149:17, 150:16, 165:17, 165:18, 165:20, 165:21, 165:22, 170:8, 175:22, 182:2, 186:17, 187:8, 196:15, 198:25, 199:22, 200:2, 200:11, 200:13, 200:16, 201:2, 201:3, 201:11, 201:20, 201:23, 202:6, 202:8, 202:10, 210:18, 214:3, 214:6, 215:8, 230:13, 230:15, 230:16, 230:19, 230:22
**2021** [60] - 26:3, 37:3, 38:12, 51:4, 65:5, 65:7, 68:17, 68:21, 70:19, 82:9, 82:20, 91:13, 105:11, 106:16, 110:5, 115:23, 116:10, 119:4, 119:25, 120:5, 124:20, 124:23, 125:21, 127:8, 128:12, 132:25, 133:9, 133:15, 134:6, 134:16, 144:12, 146:4, 148:5, 148:10, 149:17, 150:16, 165:11, 165:17, 172:11, 172:19, 175:14, 175:22, 182:2, 186:17, 187:9, 198:25, 199:1, 202:14, 202:19, 203:14, 210:3, 211:2, 211:10, 215:8, 232:6, 232:16, 232:18, 232:19, 246:21, 247:20
**2022** [1] - 246:25
**2025** [2] - 1:5, 244:1
**203** [3] - 18:3, 169:19, 177:15
**204** [2] - 17:20, 129:2
**205** [1] - 3:16
**208** [3] - 3:14, 3:15, 27:24
**209** [1] - 151:18
**20th** [3] - 238:16, 250:6, 250:22
**210** [2] - 222:3
**214** [1] - 3:17
**215** [1] - 3:6
**21st** [4] - 25:5, 232:19, 238:20, 238:25
**22** [2] - 106:16, 212:13
**225** [3] - 70:16, 146:24, 173:13
**230** [1] - 3:6
**23rd** [13] - 17:14, 17:24, 22:6, 23:21, 25:4, 35:16, 50:1, 81:17, 82:1, 82:7, 82:13, 95:20, 170:16
**23rd-ish** [1] - 81:17
**24** [1] - 73:6
**24-cr-205500** [1] - 1:2
**244** [1] - 3:7
**245** [2] - 89:2, 203:2
**249** [1] - 210:1
**24th** [2] - 5:1, 158:5
**26-week** [1] - 4:9
**269** [1] - 177:22
**26th** [1] - 65:7
**27** [1] - 15:1
**273** [1] - 178:1
**27th** [1] - 158:6
**28th** [1] - 158:9
**299** [1] - 252:23
**29th** [1] - 34:15

## 3

**3** [5] - 136:11, 218:3, 220:10, 221:3, 222:16
**3,000** [3] - 221:5, 222:3, 225:25
**3,200** [1] - 220:13
**30** [1] - 1:5
**300** [1] - 205:13
**305** [1] - 140:4
**305A** [5] - 3:13, 139:25, 140:5, 140:14, 140:15
**31st** [2] - 158:7, 232:18
**320** [2] - 178:4, 179:21
**322** [1] - 178:8
**324** [1] - 178:13
**33128** [1] - 1:19
**33132** [1] - 1:16
**33301** [2] - 1:22, 252:24
**337** [5] - 3:14, 207:14, 208:3, 208:6, 208:7
**337A** [7] - 3:15, 207:14, 208:3, 208:6, 208:8, 208:11, 210:23
**3rd** [2] - 1:19, 8:9

## 4

**4** [3] - 89:3, 89:5, 203:2
**4,000** [1] - 108:24
**40** [1] - 1:19
**40,000** [1] - 84:11
**420** [1] - 178:24
**438** [1] - 141:16
**471** [1] - 145:9
**4:01** [1] - 93:2
**4th** [3] - 1:15, 24:16, 70:19

## 5

**5** [2] - 54:22, 203:2
**501** [1] - 136:4
**505** [2] - 98:23, 138:6
**5:11** [2] - 1:6, 252:18

## 6

**6** [1] - 1:22
**601** [1] - 130:22
**602** [1] - 131:10
**633** [1] - 1:22
**639** [1] - 185:12
**640** [2] - 174:19, 209:8
**660** [6] - 3:16, 204:15, 204:23, 205:2, 205:3, 246:19
**661** [5] - 3:17, 213:25, 214:10, 214:13, 214:14
**6th** [4] - 8:14, 11:11, 11:18, 12:22

## 7

**7** [11] - 100:3, 115:22, 116:10, 197:8, 211:1, 213:12, 220:10, 221:22, 221:24, 245:11, 245:12
**7-plus** [4] - 197:8, 197:9, 213:12, 213:13

## 8

**8th** [1] - 249:24

## 9

**9** [1] - 220:4
**94** [1] - 186:20
**99** [1] - 1:15
**9:00** [4] - 5:22, 248:8, 248:10, 252:16
**9:30** [1] - 5:24
**9:47** [1] - 1:6

## A

**A.D** [1] - 106:21
**Abbie** [44] - 57:24, 58:9, 58:25, 59:7, 102:13, 103:10, 103:24, 105:13, 106:3, 106:7, 106:17, 107:10, 117:25, 133:24,

134:3, 135:2, 135:7, 135:12, 135:13, 135:24, 136:7, 136:16, 137:1, 137:2, 138:1, 138:9, 138:22, 141:20, 142:3, 142:17, 142:21, 142:23, 143:6, 144:6, 144:18, 144:21, 145:11, 145:17, 145:23, 146:5, 146:19, 147:5, 170:17, 186:10
**Abbie's** [1] - 145:5
**abbreviate** [1] - 111:20
**ABC** [1] - 242:21
**able** [22] - 5:24, 13:12, 66:23, 66:24, 67:1, 100:24, 101:23, 154:18, 154:19, 155:2, 162:15, 162:20, 181:9, 181:13, 181:15, 181:16, 195:1, 230:23, 248:24, 250:21, 252:7
**above-entitled** [1] - 252:20
**absolutely** [3] - 153:7, 153:20, 154:5
**Absolutely** [1] - 53:12
**abuse** [1] - 4:9
**accept** [2] - 33:13, 242:23
**accomplice** [5] - 6:22, 119:11, 119:14, 119:19, 119:22
**accordance** [1] - 171:9
**according** [3] - 91:24, 211:24, 245:24
**accurate** [5] - 65:7, 83:1, 92:6, 93:23, 252:19
**accusation** [2] - 83:17, 83:21
**accusations** [12] - 35:25, 69:6, 81:21, 81:25, 82:1, 82:4, 82:6, 82:7, 82:10, 82:12, 82:13, 83:6
**acquire** [2] - 54:1, 55:5
**acquired** [2] - 20:11, 52:19
**acquisition** [16] - 43:7, 216:2, 216:5, 216:7, 216:14, 216:23, 217:6, 217:10, 217:19, 217:20, 218:3, 218:6, 218:7, 221:4, 221:5, 225:12
**acquisitions** [1] - 161:20
**Act** [5] - 21:20, 22:22, 40:4, 90:7, 91:8
**acting** [4] - 118:5, 119:19, 119:22, 128:6
**action** [1] - 76:21
**actions** [1] - 119:6
**actual** [5] - 27:24, 50:15, 68:25, 89:6, 143:18
**Adam** [4] - 99:3, 171:19, 172:5, 172:8
**add** [5] - 103:3, 106:21, 107:18, 107:21, 107:23
**added** [4] - 116:9, 117:7, 117:13, 117:18
**addition** [4] - 42:16, 60:25, 120:12, 171:14
**additional** [3] - 15:5, 133:18, 197:2
**additions** [1] - 117:5
**address** [6] - 6:12, 73:20, 151:11, 154:13, 249:23, 252:2
**addressed** [2] - 18:1
**adjourned** [1] - 252:18
**Administration** [2] - 90:13, 189:3
**admit** [1] - 208:3
**admonition** [7] - 5:18, 15:24, 87:10, 88:16, 152:10, 159:4, 248:6
**advantage** [1] - 43:6
**adversarial** [7] - 36:3, 36:4, 36:5, 36:10, 36:13, 36:19, 159:18
**adverse** [4] - 76:9, 76:12, 91:9, 184:15
**advice** [32] - 6:9, 6:10, 6:19, 6:20, 21:17, 21:18, 22:22, 23:6, 25:14, 56:11, 56:14, 56:15, 56:20, 57:6, 78:11, 79:7, 79:10, 79:25, 80:10, 80:16, 80:23, 81:4, 102:6, 119:7, 122:2, 122:3, 122:5, 126:5, 126:11, 133:21, 186:6
**advise** [2] - 71:25, 79:17
**advised** [4] - 73:2, 80:20, 105:19, 150:16
**advising** [4] - 125:20, 125:22, 125:25, 147:10
**advocate** [8] - 14:25, 47:13, 56:12, 56:15, 56:16, 56:25, 57:3, 57:9
**advocating** [3] - 57:4, 57:10, 57:13
**affairs** [1] - 160:24
**affect** [1] - 154:16
**affected** [1] - 242:17
**affirmed** [2] - 16:13, 187:22
**affirming** [1] - 109:2
**afford** [2] - 9:6, 158:11
**afternoon** [7] - 5:2, 118:22, 118:23, 188:8, 188:9, 230:9, 230:10
**afterwards** [1] - 60:25
**agency** [1] - 189:2
**agency's** [1] - 90:15
**Agent** [2] - 30:3
**agents** [1] - 237:18
**ago** [2] - 23:25, 52:9
**agree** [4] - 11:19, 217:18, 218:12, 252:1
**agreed** [4] - 66:22, 220:3, 220:5
**ahead** [12] - 14:4, 16:4, 16:6, 87:10, 108:21, 115:15, 152:8, 154:7, 154:8, 163:16, 197:21, 248:5
**Aid** [5] - 190:12, 190:17, 190:20, 206:23, 207:1
**alert** [9] - 94:15, 95:22, 120:13, 175:10, 176:7, 176:10, 176:14, 176:22, 247:22
**alerted** [1] - 239:10
**Alex** [1] - 30:3
**Alexander** [1] - 1:13
**all-day** [1] - 158:8
**allegations** [2] - 93:22, 95:21
**allow** [12] - 5:19, 10:6, 15:25, 48:9, 51:7, 87:11, 88:17, 152:10, 159:5, 200:6, 204:5, 248:7
**allowed** [8] - 37:22, 51:3, 60:23, 152:15, 225:16, 235:17, 235:24, 236:6
**allowing** [1] - 10:3
**alluded** [1] - 46:1
**alluding** [1] - 44:11
**almost** [1] - 141:5
**alone** [2] - 58:19, 124:4
**alternates** [2] - 251:5, 251:13
**altogether** [1] - 164:25
**AM** [1] - 1:6
**ambiguous** [1] - 86:3
**Amendment** [2] - 10:21, 12:21
**America** [1] - 225:23
**AMERICA** [1] - 1:4
**American** [1] - 189:14
**Amerisource** [5] - 194:4, 213:7, 213:9, 213:14
**amount** [2] - 194:25, 215:1
**analogous** [1] - 241:12
**analysis** [1] - 69:24
**Anda** [1] - 194:3
**answer** [46] - 21:1, 22:4, 22:5, 23:16, 23:17, 23:18, 23:19, 27:7, 36:12, 36:15, 38:1, 38:2, 40:2, 59:16, 59:25, 60:23, 60:24, 61:23, 67:21, 72:21, 74:3, 75:6, 76:7, 77:15, 86:4, 86:7, 86:11, 86:18, 92:7, 100:14, 110:2, 121:13, 121:24, 122:12, 123:2, 126:24, 129:25, 148:18, 156:12, 167:21, 167:23, 219:21, 219:22, 251:22, 252:4
**answered** [22] - 32:1, 36:11, 59:4, 68:12, 77:21, 77:23, 95:4, 98:18, 102:20, 104:4, 104:13, 107:7, 108:3, 109:11, 109:18, 109:20, 109:23, 110:22, 115:14, 115:15, 115:18, 225:19
**answering** [2] - 77:18, 156:17
**answers** [5] - 57:18, 88:23, 108:19, 109:19
**anti** [1] - 18:17
**anti-counterfeiting** [1] - 18:17
**apart** [1] - 132:11
**apartment** [1] - 209:23
**apiece** [1] - 219:7
**apologize** [5] - 5:21, 41:17, 119:9, 233:25, 244:18
**APPEARANCES** [1] - 1:11
**applicants** [1] - 114:6
**application** [13] - 59:18, 111:15, 112:6, 112:14, 112:16, 112:18, 112:19, 113:5, 113:20, 114:5, 115:2, 117:2, 174:17
**appointed** [1] - 188:24
**appreciate** [1] - 188:10
**approach** [8] - 32:20, 34:4, 103:19, 104:6, 111:8, 111:17, 118:13, 223:20
**approached** [3] - 123:8, 124:9, 156:7
**appropriate** [4] - 22:1, 23:14, 78:13, 79:8
**approval** [5] - 10:1, 58:18, 59:20, 60:14, 126:7
**approved** [11] - 58:24, 58:25, 59:7, 59:10, 61:7, 61:8, 98:11, 115:3, 116:8, 131:4, 131:14
**April** [9] - 110:5, 115:22, 116:10, 207:23, 232:16, 232:17, 232:18, 232:19, 238:15
**area** [10] - 11:22, 11:25, 39:19, 39:22, 40:11, 40:13, 160:20, 191:18, 192:11, 192:20
**areas** [3] - 152:23, 160:21, 161:23
**argue** [1] - 47:14
**arguing** [1] - 157:1
**argumentative** [1] - 109:22
**arrived** [1] - 246:1

**articulated** [1] - 74:23
**aside** [3] - 125:19, 164:13, 176:13
**aspect** [1] - 112:24
**asserted** [2] - 91:8, 204:6
**assessments** [1] - 91:4
**assigned** [1] - 58:8
**assignment** [1] - 37:19
**assist** [1] - 91:6
**assistance** [2] - 38:25, 160:5
**Assistant** [1] - 1:14
**associated** [3] - 169:24, 212:17, 212:24
**assume** [3] - 51:3, 63:19, 229:4
**assumed** [1] - 233:14
**assumes** [1] - 227:22
**assuming** [3] - 51:5, 51:9, 129:22
**assumption** [2] - 132:25, 234:16
**assured** [2] - 13:17, 105:20
**attaching** [2] - 178:21, 207:18
**attachment** [3] - 151:19, 208:10, 210:7
**attachments** [1] - 207:15
**attacking** [3] - 84:16, 155:8, 155:9
**attempt** [2] - 92:18, 110:5
**attempting** [2] - 77:19, 169:3
**attend** [1] - 251:11
**attention** [2] - 24:21, 140:2
**attorney** [14] - 7:1, 17:14, 18:12, 35:7, 40:5, 40:9, 40:12, 40:15, 40:16, 122:9, 154:7, 184:20, 238:21, 239:1
**Attorneys** [1] - 1:15
**attorneys** [6] - 6:25, 7:10, 40:8, 105:9, 105:10, 128:1
**audits** [3] - 161:13, 161:14
**August** [17] - 25:5, 140:21, 165:11, 172:21, 172:22, 175:25, 196:15, 198:25, 199:22, 200:2, 200:11, 200:13, 200:16, 201:11, 205:23, 215:7, 230:22
**authentication** [2] - 131:14, 131:18
**authorized** [32] - 36:22, 42:4, 42:8, 42:11, 42:15, 43:10, 43:14, 44:16, 46:15, 56:5, 62:18, 63:2, 63:3, 77:13, 89:25, 90:18, 90:19, 90:21, 91:18, 105:23, 106:1, 106:4, 107:16, 108:1, 109:4, 109:9, 182:22, 226:3, 226:11, 229:5, 229:13, 229:22
**avail** [1] - 35:20
**available** [3] - 33:11, 90:22, 184:17
**avoid** [6] - 42:23, 74:1, 74:16, 75:1, 75:15, 77:19
**avoiding** [2] - 77:18
**awaiting** [1] - 93:12
**aware** [46] - 20:6, 21:20, 21:22, 30:13, 50:8, 50:10, 50:15, 50:25, 57:22, 67:24, 67:25, 74:24, 82:19, 85:3, 92:21, 94:19, 120:11, 132:3, 142:24, 146:4, 146:8, 146:16, 149:20, 156:10, 168:17, 170:8, 173:11, 175:24, 184:4, 225:23, 226:1, 226:2, 226:6, 226:7, 231:5, 231:9, 231:10, 231:13, 231:15, 237:16, 239:22, 240:4, 240:12, 243:4, 243:6, 244:8

## B

**bachelor** [1] - 188:16
**back-and-forth** [1] - 105:9
**background** [5] - 58:4, 160:14, 160:17, 188:12, 189:22
**backpedaled** [1] - 85:6
**bad** [7] - 7:14, 9:2, 41:7, 85:19, 152:4, 241:17, 242:3
**Bailey** [1] - 252:20
**BAILEY** [2] - 2:2, 252:21
**Bailey-Entin** [1] - 252:20
**BAILEY-ENTIN** [2] - 2:2, 252:21
**ballpark** [1] - 197:7
**banding** [1] - 195:13
**bar** [1] - 4:20
**Barzee** [11] - 1:17, 1:18, 118:16, 134:18, 140:12, 157:15, 158:1, 158:16, 215:21, 217:15, 244:19
**BARZEE** [55] - 3:6, 5:17, 10:12, 10:20, 12:3, 12:8, 13:6, 13:11, 15:23, 88:2, 88:15, 118:18, 124:24, 140:13, 149:25, 150:4, 157:16, 158:2, 158:17, 159:3, 186:22, 186:24, 200:5, 204:4, 204:25, 205:17, 208:4, 214:11, 215:23, 216:13, 216:22, 217:12, 217:17, 218:18, 220:15, 220:18, 220:20, 221:10, 221:11, 221:15, 221:18, 221:21, 222:5, 223:20, 223:22, 224:1, 225:22, 226:19, 227:2, 227:13, 227:20, 228:1, 229:20, 230:2, 230:4
**base** [3] - 57:12, 187:24, 187:25
**based** [35] - 23:6, 23:8, 43:15, 46:2, 69:17, 72:11, 78:11, 78:18, 79:7, 80:8, 80:10, 80:15, 80:16, 80:23, 81:4, 83:19, 83:23, 90:23, 92:21, 98:11, 113:19, 117:10, 124:22, 125:1, 128:11, 128:16, 129:8, 133:14, 149:13, 156:23, 163:21, 175:16, 175:21, 186:6
**basis** [9] - 9:13, 24:22, 28:10, 57:18, 69:6, 153:16, 154:5, 154:17, 156:21
**batch** [7] - 241:12, 241:13, 241:19, 242:3, 242:13, 242:18, 242:19
**be's** [2] - 46:8, 46:9
**became** [5] - 26:1, 50:15, 195:23, 195:25, 240:12
**become** [7] - 106:4, 109:3, 109:9, 189:25, 190:6, 190:21, 195:5
**becoming** [1] - 106:21
**beefing** [2] - 96:8, 96:9
**BEFORE** [1] - 1:10
**began** [3] - 25:20, 230:11
**begin** [1] - 8:22
**beginning** [1] - 89:8
**begins** [2] - 89:5
**behalf** [5] - 10:12, 94:1, 109:2, 117:9, 164:9
**behind** [3] - 134:20, 134:23, 158:11
**belief** [6] - 10:2, 18:21, 19:17, 30:7, 77:17, 234:16
**believes** [1] - 170:17
**below** [10] - 131:4, 141:23, 142:10, 142:12, 143:18, 143:19, 144:9, 145:25, 147:4, 173:25
**benefit** [1] - 161:13
**benefits** [1] - 195:20
**best** [11] - 48:4, 57:25, 68:23, 100:19, 100:23, 101:11, 101:12, 101:14, 118:7
**Betances** [1] - 208:25
**better** [6] - 73:2, 91:17, 117:19, 195:15, 195:19, 198:2
**between** [13] - 12:13, 105:9, 113:5, 113:7, 113:20, 113:21, 136:25, 145:10, 183:25, 215:7, 220:2, 220:9, 229:13
**beyond** [4] - 15:6, 117:8, 164:14, 185:19
**Big** [7] - 75:12, 75:14, 75:18, 75:25, 76:2, 227:5
**big** [3] - 112:3, 192:11, 226:2
**bigger** [2] - 75:10, 191:18
**Biktarvy** [48] - 74:11, 89:15, 89:17, 89:21, 89:24, 89:25, 90:9, 90:14, 90:23, 90:24, 90:25, 91:2, 92:10, 151:25, 193:12, 200:4, 200:14, 200:17, 202:7, 202:16, 204:2, 205:15, 206:1, 206:4, 206:7, 212:17, 214:6, 217:5, 220:12, 220:23, 225:24, 228:4, 232:13, 233:6, 233:14, 233:20, 233:21, 234:1, 234:5, 234:10, 234:11, 235:10, 236:20, 239:3, 239:6, 239:18, 241:13
**bill** [1] - 199:18
**billed** [1] - 215:14
**billing** [1] - 162:15
**billion** [1] - 218:8
**billion-dollar** [1] - 218:8
**bills** [3] - 161:25, 162:1, 166:1
**bind** [2] - 14:6, 14:10
**bipolar** [1] - 136:14
**bit** [12] - 52:8, 93:3, 98:25, 99:6, 111:21, 129:9, 163:1, 163:2, 185:6, 185:8, 188:12, 189:22
**black** [30] - 18:21, 19:10, 19:19, 19:22, 19:24, 26:19, 26:21, 27:3, 40:17, 48:18, 48:23, 49:7, 49:18, 50:11, 51:21, 51:25, 52:16, 52:19, 53:4, 53:7, 54:19, 55:9, 55:16, 62:8, 63:4, 67:18, 68:10, 69:18, 83:7, 83:10
**blame** [2] - 74:6, 122:8

**blindsided** [1] - 84:9
**blood** [2] - 193:5, 193:6
**blow** [1] - 137:5
**Board** [2] - 142:11, 145:18
**board** [5] - 145:25, 146:2, 146:9, 161:12, 190:1
**board-certified** [1] - 190:1
**bold** [1] - 90:17
**boss** [1] - 60:6
**bottle** [89] - 28:7, 28:15, 29:9, 29:16, 30:15, 45:1, 45:8, 45:23, 47:5, 47:6, 47:9, 48:5, 48:10, 73:8, 73:10, 73:24, 90:24, 90:25, 91:3, 92:11, 136:14, 137:15, 138:20, 167:11, 168:7, 172:12, 172:21, 172:25, 173:19, 176:2, 176:25, 184:4, 184:12, 200:4, 200:13, 200:17, 201:4, 201:16, 201:21, 201:24, 202:1, 202:7, 202:11, 202:16, 203:13, 204:9, 204:12, 206:3, 206:14, 206:25, 212:17, 212:20, 212:21, 217:5, 220:12, 220:23, 225:24, 232:13, 232:22, 232:25, 233:2, 233:8, 233:9, 233:13, 233:14, 233:17, 234:1, 234:7, 235:3, 235:9, 236:3, 236:22, 239:3, 239:6, 240:6, 240:8, 240:13, 240:21, 241:2, 241:7, 242:5, 242:17, 243:9, 243:19, 246:24, 247:9, 247:12
**bottles** [27] - 28:23, 30:8, 46:4, 47:22, 89:16, 89:21, 90:11, 90:23, 90:25, 91:2, 99:10, 136:23, 137:8, 168:23, 180:6, 182:16, 205:14, 206:1, 206:7, 228:4, 228:13, 237:25, 239:11, 240:16, 242:23, 243:22, 247:23
**bottom** [15] - 70:25, 74:10, 75:19, 76:1, 76:22, 89:5, 94:25, 135:16, 138:17, 140:20, 145:16, 178:9, 178:19, 179:24, 203:2
**bought** [8] - 54:24, 71:6, 71:23, 193:25, 209:13, 210:25, 215:9, 227:10
**Boulevard** [23] - 96:23, 97:1, 97:6, 97:17, 97:18, 97:22, 97:25, 98:7, 98:10, 99:3, 100:4, 100:13, 100:18, 101:9, 101:11, 101:20, 127:7, 137:22, 138:13, 141:25, 252:23
**BOYD** [4] - 1:7, 1:17, 1:21
**Boyd** [90] - 4:8, 10:12, 17:23, 19:1, 20:17, 20:18, 22:7, 74:10, 99:2, 99:3, 100:4, 100:5, 100:10, 100:11, 100:17, 100:22, 101:9, 101:13, 101:20, 102:3, 106:7, 106:9, 106:17, 108:6, 108:8, 108:23, 109:8, 119:20, 119:23, 126:10, 126:14, 126:16, 127:2, 127:10, 127:14, 128:13, 129:17, 130:4, 131:3, 131:12, 132:2, 132:12, 133:5, 135:1, 135:4, 139:16, 139:20, 140:25, 141:1, 141:4, 141:23, 142:10, 143:16, 143:24, 144:21, 144:24, 145:10, 145:17, 146:6, 146:8, 147:4, 147:13, 155:13, 165:11, 166:8, 171:24, 172:4, 172:7, 174:24, 177:8, 177:19, 177:24, 178:1, 178:6, 178:11, 178:18, 178:22, 179:1, 179:12, 179:17, 179:18, 187:8, 210:8, 211:12
**Boyd's** [2] - 145:23, 179:8
**Boyds** [7] - 24:1, 24:24, 25:1, 25:4, 29:1, 29:12, 29:24
**brand** [4] - 18:17, 92:13, 194:13, 194:14
**brand-new** [1] - 92:13
**branded** [11] - 180:1, 193:25, 194:6, 196:13, 196:16, 197:4, 198:9, 198:11, 198:15, 199:21, 206:24
**break** [8] - 4:21, 85:10, 87:7, 124:1, 124:13, 152:14, 251:6, 252:10
**Brekenledge** [1] - 26:2
**brief** [1] - 244:14
**bring** [17] - 4:4, 5:10, 10:7, 11:14, 12:10, 12:24, 15:11, 15:14, 15:16, 87:23, 88:3, 88:4, 129:1, 153:3, 153:15, 157:22, 158:21
**broken** [4] - 137:15, 138:20, 180:5, 201:25
**Bronx** [5] - 190:25, 191:18, 192:8, 192:10, 192:11
**Brosius** [6] - 99:3, 171:19, 172:5, 172:8, 250:23, 250:25
**brought** [3] - 24:21, 31:1, 166:19
**Broward** [1] - 252:23
**Bruce** [1] - 1:21
**bucks** [3] - 219:6, 222:15, 222:16
**building** [1] - 209:23
**bulk** [1] - 195:13
**bullet** [2] - 144:9, 179:23
**bulletin** [1] - 175:11
**bunch** [7] - 92:8, 94:16, 99:23, 187:6, 195:13, 219:7, 219:13
**business** [12] - 21:5, 22:25, 23:4, 25:5, 25:8, 41:20, 58:7, 58:24, 72:3, 206:20, 235:25
**buy** [31] - 54:21, 91:17, 126:18, 194:14, 194:20, 195:13, 197:21, 198:6, 198:22, 201:12, 208:17, 208:24, 209:21, 213:21, 214:25, 219:23, 226:4, 226:7, 226:12, 226:13, 228:15, 229:1, 229:7, 244:24, 245:1, 245:5, 245:21, 246:4, 246:11, 247:12, 247:16
**buying** [27] - 55:1, 55:2, 56:5, 125:16, 126:7, 126:12, 141:8, 166:11, 183:20, 186:2, 195:16, 196:13, 196:16, 196:17, 197:14, 197:25, 198:11, 198:15, 199:21, 200:1, 202:20, 202:23, 206:7, 210:4, 218:5, 223:2, 228:7
**BY** [188] - 2:1, 3:3, 3:4, 3:5, 3:6, 3:6, 3:7, 16:16, 16:24, 17:5, 17:10, 17:21, 18:7, 19:9, 27:23, 28:19, 31:4, 31:14, 32:15, 33:1, 34:6, 36:16, 38:10, 40:1, 41:3, 41:14, 51:8, 52:5, 54:6, 54:13, 55:14, 58:14, 59:6, 60:4, 61:3, 61:16, 64:10, 64:16, 66:1, 66:11, 68:16, 70:17, 73:19, 75:5, 75:24, 76:6, 78:1, 84:22, 86:16, 87:5, 88:22, 89:4, 90:5, 92:3, 92:25, 93:5, 94:11, 94:21, 95:6, 98:20, 99:1, 100:16, 103:21, 104:9, 104:18, 104:25, 105:8, 107:9, 108:5, 108:22, 109:7, 109:14, 110:1, 111:1, 111:10, 112:5, 113:2, 113:18, 114:2, 114:24, 115:19, 116:11, 116:23, 118:21, 121:1, 121:11, 121:23, 122:14, 124:6, 124:14, 125:3, 127:1, 129:3, 129:13, 130:1, 130:23, 131:11, 135:10, 135:17, 136:5, 136:12, 136:21, 137:7, 137:14, 137:21, 138:7, 138:19, 140:1, 140:16, 141:18, 142:9, 142:16, 143:5, 144:3, 145:15, 145:22, 146:15, 147:2, 148:3, 148:22, 150:15, 151:20, 159:15, 163:17, 164:17, 165:19, 166:23, 167:5, 167:25, 169:7, 169:22, 173:17, 173:24, 174:12, 174:22, 175:4, 177:23, 179:22, 180:12, 185:13, 185:21, 187:2, 188:7, 189:1, 200:8, 203:3, 204:7, 204:18, 205:8, 205:21, 207:16, 208:9, 209:10, 210:2, 211:4, 211:9, 211:18, 212:9, 212:15, 214:1, 214:16, 215:5, 215:23, 216:13, 216:22, 217:12, 217:17, 218:18, 220:20, 221:11, 221:21, 222:5, 224:1, 225:22, 226:19, 227:2, 227:13, 227:20, 228:1, 229:20, 230:8, 240:3, 240:23, 241:6, 242:1, 243:16, 244:17, 246:20

## C

**calculation** [1] - 140:7

**calendar** [1] - 4:23
**calendars** [1] - 158:14
**California** [1] - 142:11
**Cambridge** [2] - 89:22, 208:20
**cancel** [1] - 158:10
**candidly** [1] - 155:19
**cannot** [9] - 14:6, 14:10, 226:9, 235:11, 235:12, 235:21, 236:7, 236:13
**Cardinal** [11] - 194:6, 194:11, 194:17, 196:5, 196:20, 206:18, 213:16, 244:24, 245:9, 245:14, 246:11
**Cardinal's** [1] - 194:2
**career** [2] - 206:11, 252:13
**CASE** [1] - 1:2
**case** [44] - 5:19, 7:14, 8:13, 15:25, 26:20, 35:3, 37:17, 38:7, 38:25, 40:17, 46:19, 49:21, 51:17, 51:20, 53:18, 63:7, 64:24, 65:10, 66:21, 79:4, 81:24, 82:3, 82:9, 87:11, 88:17, 122:17, 122:20, 123:9, 123:21, 124:4, 124:5, 152:10, 153:6, 153:15, 156:2, 158:11, 159:5, 229:9, 242:5, 248:7, 249:7, 252:5
**cases** [2] - 7:18, 85:17
**causation** [2] - 29:8, 46:6
**CDGWZA** [2] - 212:21, 242:6
**cents** [5] - 219:7, 219:13, 220:2, 220:6, 244:20
**certain** [15] - 33:24, 46:23, 70:24, 73:15, 76:12, 98:21, 115:2, 116:24, 117:13, 147:5, 168:18, 177:8, 194:14, 194:15, 214:25
**certainly** [9] - 9:17, 19:1, 19:17, 28:25, 44:5, 50:4, 67:11, 69:10, 83:25
**certification** [1] - 97:22
**certified** [2] - 190:1, 190:6
**certify** [1] - 252:19
**Chain** [270] - 18:16, 21:19, 22:22, 24:3, 24:24, 25:1, 26:9, 27:3, 29:1, 29:8, 29:12, 29:24, 33:17, 35:4, 35:11, 35:25, 37:10, 38:8, 38:11, 38:16, 40:4, 40:21, 46:19, 47:13, 47:15, 48:5, 51:12, 51:23, 52:10, 52:20, 52:23, 52:24, 52:25, 53:20, 53:22, 54:1, 54:4, 54:7, 54:15, 54:18, 55:1, 55:6, 55:8, 55:15, 56:4, 57:17, 58:5, 58:8, 58:24, 60:13, 60:15, 61:13, 62:14, 62:20, 63:9, 63:17, 64:7, 64:18, 65:14, 65:20, 66:3, 66:5, 66:9, 66:13, 66:19, 66:20, 66:23, 66:24, 67:7, 68:19, 70:13, 72:17, 74:19, 78:6, 79:2, 80:15, 81:4, 81:9, 81:21, 82:15, 83:7, 83:14, 83:23, 84:6, 84:9, 84:16, 84:18, 85:11, 86:23, 89:22, 89:23, 89:24, 90:7, 91:8, 91:20, 91:24, 92:15, 93:25, 94:1, 94:9, 94:20, 95:8, 95:19, 96:3, 96:15, 97:10, 97:21, 98:12, 98:17, 103:8, 103:12, 103:16, 103:24, 104:21, 105:10, 105:13, 106:4, 109:3, 109:9, 110:5, 110:14, 111:12, 114:5, 117:9, 118:1, 118:8, 119:15, 119:16, 120:1, 120:4, 125:13, 125:16, 125:20, 126:6, 129:20, 134:4, 134:21, 135:18, 149:21, 150:12, 161:5, 162:4, 162:7, 162:12, 163:8, 163:19, 163:24, 164:9, 166:11, 169:12, 170:3, 170:9, 170:23, 172:11, 175:18, 176:19, 176:20, 177:1, 177:4, 185:2, 187:4, 194:4, 195:3, 195:6, 195:23, 196:1, 196:7, 196:9, 196:14, 196:17, 196:23, 196:25, 197:4, 197:8, 197:15, 197:22, 198:1, 198:2, 198:7, 198:12, 198:15, 198:16, 198:22, 199:2, 199:7, 199:18, 199:22, 200:1, 200:2, 200:12, 200:16, 200:21, 200:23, 200:24, 201:3, 201:7, 201:13, 201:19, 201:24, 202:4, 202:6, 202:10, 202:14, 202:19, 202:20, 203:12, 203:13, 203:19, 203:24, 205:15, 205:23, 206:8, 207:4, 207:8, 207:18, 208:13, 209:13, 209:20, 209:21, 210:5, 210:14, 210:18, 210:24, 210:25, 211:20, 213:2, 213:8, 213:10, 213:11, 213:15, 213:18, 215:6, 215:9, 215:11, 218:20, 221:23, 222:14, 223:12, 224:6, 224:20, 225:3, 227:12, 227:14, 228:18, 228:20, 230:12, 230:19, 230:24, 231:5, 231:18, 231:23, 234:1, 238:8, 238:10, 238:13, 238:15, 238:16, 240:5, 240:9, 245:6, 245:16, 245:24, 246:5, 246:22, 247:13, 247:14, 247:23
**chain** [17] - 41:19, 48:15, 48:20, 48:21, 50:12, 67:13, 70:6, 70:10, 72:16, 83:8, 91:7, 115:22, 125:24, 161:14, 184:10, 186:1
**Chain's** [15] - 31:23, 32:2, 48:10, 65:2, 67:3, 80:24, 90:6, 92:17, 92:19, 102:19, 134:24, 203:18, 203:20, 215:14, 245:9
**chance** [1] - 99:18
**change** [6] - 19:10, 88:24, 114:4, 114:7, 154:16, 191:23
**changed** [5] - 66:25, 111:15, 114:1, 191:2, 191:13
**changes** [2] - 111:12, 111:14
**changing** [1] - 115:1
**charge** [3] - 14:15, 216:17, 217:7
**charged** [5] - 11:1, 11:2, 14:21, 15:2, 54:16
**charging** [6] - 10:8, 11:3, 11:16, 12:17, 13:20, 16:3
**Charles** [42] - 4:8, 22:7, 100:5, 100:11, 106:17, 119:23, 126:10, 126:16, 127:2, 127:10, 128:13, 129:17, 130:4, 131:3, 131:12, 132:2, 132:12, 133:5, 135:1, 139:16, 139:20, 140:25, 141:1, 141:4, 141:23, 142:10, 143:16, 143:24, 144:21, 145:10, 145:17, 145:23, 146:6, 146:8, 147:4, 147:13, 165:11, 166:8, 171:24, 172:4, 174:24, 187:8
**CHARLES** [2] - 1:7, 1:21
**Charlie** [13] - 17:23, 19:1, 19:18, 20:17, 93:2, 99:2, 100:17, 101:13, 106:7, 108:6, 108:8, 108:23, 109:8
**cheaper** [2] - 245:13, 246:10
**check** [2] - 5:4, 145:24
**checking** [3] - 145:5, 145:6, 145:18
**choices** [1] - 41:7
**cholesterol** [1] - 193:7
**choose** [1] - 23:17
**Christmas** [1] - 33:18
**Christopher** [1] - 25:21
**chunk** [1] - 250:15
**circumstance** [4] - 44:10, 44:25, 63:12, 70:4
**circumstances** [5] - 43:2, 46:23, 64:7, 78:14, 147:6
**citizen** [1] - 189:14
**civil** [1] - 12:13
**claim** [1] - 29:7
**claiming** [2] - 83:10, 216:16
**clarification** [3] - 13:7, 53:14, 188:21
**clarify** [1] - 88:24
**class** [1] - 160:22
**clear** [7] - 94:8, 124:8, 126:6, 134:20, 161:7, 166:24, 233:25
**clearer** [1] - 86:25
**clearly** [1] - 15:7
**client** [27] - 6:20, 7:12, 23:8, 24:14, 24:17, 26:18, 26:25, 36:3, 37:15, 37:16, 48:4, 51:15, 53:5, 53:6, 57:1, 57:4, 57:9, 69:21, 73:13, 79:17, 82:8, 93:20, 133:2, 153:19, 155:2, 155:8, 238:2
**client's** [1] - 45:5
**clients** [11] - 7:12, 20:11, 21:12, 21:13, 26:20, 39:5, 53:8, 69:22, 82:3, 128:4, 232:12
**clincher** [1] - 64:2
**clock** [4] - 219:5, 219:12, 244:20
**clocks** [2] - 219:3, 219:7
**close** [3] - 19:5, 187:25, 249:4
**closely** [2] - 90:12, 193:20
**closer** [1] - 249:6
**clue** [5] - 134:13, 135:7, 142:21, 186:11, 186:15
**coincident** [1] - 91:9
**colleague** [1] - 165:3
**college** [1] - 192:12
**colocated** [1] - 117:11

**colon** [1] - 241:8
**color** [1] - 233:20
**Colosi** [29] - 17:25, 18:1, 18:2, 18:11, 23:20, 26:5, 26:11, 27:7, 27:20, 27:25, 31:7, 31:11, 31:15, 31:18, 32:17, 33:4, 33:10, 33:14, 33:21, 34:19, 34:25, 35:13, 37:12, 37:17, 46:2, 46:11, 49:23, 49:25, 81:13
**coming** [7] - 19:19, 49:17, 62:7, 62:11, 67:13, 138:13, 222:23
**commence** [1] - 4:12
**comments** [2] - 116:2, 117:1
**commercial** [1] - 199:14
**commitment** [1] - 90:19
**committed** [3] - 64:8, 119:16, 119:18
**committing** [2] - 119:8, 122:6
**common** [2] - 193:10, 193:12
**commonly** [1] - 48:22
**communicate** [8] - 19:18, 19:25, 20:7, 20:17, 33:7, 37:5, 64:17, 72:17
**communicated** [4] - 20:19, 33:4, 38:16, 94:16
**communicating** [3] - 38:14, 81:13, 81:15
**communication** [10] - 17:13, 27:19, 28:3, 31:6, 32:3, 34:1, 70:18, 78:2, 81:7, 81:20
**communications** [8] - 32:17, 69:2, 69:13, 81:8, 96:3, 103:6, 178:14, 178:21
**community** [1] - 10:11
**companies** [7] - 74:16, 74:25, 118:4, 188:18, 193:25, 195:4, 227:4
**company** [15] - 47:18, 58:20, 73:25, 75:11, 84:18, 129:21, 172:5, 172:8, 174:16, 176:10, 182:18, 183:20, 201:9, 202:22, 218:8
**company's** [1] - 176:13
**compare** [4] - 113:4, 113:5, 192:23, 197:11
**complained** [4] - 133:6, 183:7, 184:11, 205:15
**complaint** [15] - 71:2, 83:6, 127:11, 200:3, 200:13, 200:17, 201:4, 201:20, 201:24, 202:7, 202:11, 202:15, 203:12, 207:10, 212:25
**complaints** [9] - 29:21, 138:12, 200:25, 201:12, 205:23, 205:25, 215:7, 228:3
**complete** [2] - 73:4, 156:8
**completed** [1] - 4:12
**completely** [1] - 219:24
**compliance** [23] - 17:24, 45:10, 47:18, 56:9, 58:1, 58:16, 60:15, 71:11, 71:24, 72:2, 72:4, 72:13, 72:19, 73:12, 94:3, 101:6, 102:24, 130:5, 134:4, 135:2, 135:20, 184:19
**compliant** [1] - 141:10
**complying** [2] - 71:7, 131:5
**compound** [6] - 54:11, 54:12, 65:21, 73:17, 86:14, 205:17
**compromised** [1] - 90:11
**computers** [1] - 65:13
**con't** [2] - 3:3, 16:15
**concealed** [1] - 133:20
**concede** [4] - 5:13, 15:19, 88:11, 158:24
**concern** [31] - 18:2, 19:15, 23:13, 23:22, 23:24, 24:1, 24:7, 27:1, 39:3, 46:11, 49:20, 52:7, 52:18, 52:20, 52:23, 53:5, 53:8, 54:3, 54:7, 54:15, 54:17, 55:5, 61:20, 62:7, 77:4, 84:8, 92:4, 92:7, 248:19, 251:14
**concerned** [8] - 22:8, 22:17, 29:4, 52:22, 70:12, 97:23, 122:16, 144:22
**concerning** [21] - 18:22, 19:11, 25:4, 30:19, 68:10, 68:19, 69:3, 71:2, 73:21, 74:11, 81:8, 96:12, 102:14, 102:16, 103:7, 104:20, 117:2, 177:16, 232:13, 241:17, 242:3
**concerns** [6] - 15:5, 40:22, 47:8, 52:1, 52:9, 156:8
**concert** [1] - 58:20
**conclusion** [5] - 17:3, 64:4, 64:12, 64:17, 64:18
**conclusions** [1] - 229:18
**concur** [1] - 252:15
**concurred** [1] - 64:22
**condition** [1] - 234:23
**conduct** [4] - 29:14, 70:3, 70:4, 72:22
**conference** [3] - 152:23, 152:24, 153:1
**confers** [1] - 10:13
**confirmed** [2] - 61:19, 182:25
**confused** [1] - 153:9
**confusing** [2] - 132:7, 168:11
**Connecticut** [4] - 60:9, 98:7, 208:19, 209:5
**connection** [1] - 51:11
**conned** [1] - 40:22
**consequences** [2] - 144:4, 145:2
**consider** [2] - 92:15, 117:11
**consistent** [5] - 62:7, 62:21, 72:8, 91:3, 147:19
**construed** [1] - 6:21
**consulted** [1] - 110:9
**consumer** [2] - 77:12, 176:22
**consumers** [1] - 176:15
**contact** [3] - 91:6, 236:16, 236:19
**contacted** [3] - 33:21, 231:23, 237:20
**contain** [2] - 90:25, 91:1
**contained** [4] - 89:16, 170:12, 201:25, 202:8
**contents** [1] - 24:17
**context** [2] - 175:13, 182:1
**continuation** [1] - 156:24
**continue** [15] - 6:5, 6:17, 8:4, 9:7, 9:12, 11:4, 16:9, 88:19, 121:12, 121:24, 141:7, 159:13, 202:4, 204:8, 248:25
**continued** [2] - 105:10, 186:2
**continues** [2] - 90:3, 101:10
**continuing** [1] - 90:9
**contract** [1] - 161:19
**contractors** [1] - 90:11
**contracts** [1] - 161:20
**contradict** [1] - 211:5
**contradicts** [1] - 211:12
**contraption** [1] - 220:15
**controlled** [1] - 43:24
**conversation** [30] - 97:19, 99:2, 101:10, 103:12, 103:15, 103:25, 104:20, 105:1, 123:2, 123:14, 123:16, 123:19, 123:20, 124:9, 135:24, 136:17, 138:1, 138:8, 138:23, 141:19, 141:21, 142:4, 145:10, 155:3, 155:16, 165:11, 165:15, 165:23, 179:2, 179:5
**conversations** [13] - 30:6, 30:9, 69:5, 99:6, 102:16, 103:1, 103:6, 103:7, 103:10, 103:23, 104:10, 146:5, 156:20
**convey** [1] - 19:3
**conveyed** [2] - 19:1, 72:20
**cooperative** [2] - 36:4, 78:9
**copied** [2] - 38:18, 169:1
**copies** [1] - 251:15
**copy** [1] - 162:22
**corporate** [1] - 90:22
**correct** [303] - 16:20, 17:14, 18:2, 18:12, 18:18, 18:23, 19:2, 19:15, 19:20, 20:15, 21:4, 21:10, 21:15, 23:23, 24:5, 24:20, 24:24, 26:6, 26:9, 27:20, 27:25, 29:1, 29:9, 29:12, 29:16, 29:19, 29:24, 30:12, 30:17, 31:7, 31:16, 31:20, 31:23, 31:25, 32:4, 32:7, 33:14, 33:23, 34:2, 34:10, 34:16, 34:25, 35:10, 35:21, 37:3, 37:12, 39:20, 40:17, 41:20, 42:1, 42:6, 42:13, 42:25, 43:4, 43:8, 43:12, 43:25, 44:3, 44:7, 44:13, 44:19, 44:24, 45:9, 45:21, 45:23, 46:6, 46:9, 46:19, 46:21, 46:25, 47:6, 47:10, 47:15, 48:7, 48:11, 48:16, 48:23, 49:1, 49:8, 49:18, 49:21, 50:6, 50:8, 50:12, 50:14, 51:21, 52:12, 52:16, 52:21, 53:10, 54:23, 55:2, 55:6, 55:12, 55:21, 56:6, 56:12, 56:21, 56:23, 57:3, 57:10, 57:13, 57:16, 58:5, 58:9, 58:18, 59:21, 60:16, 61:7, 61:13, 61:17, 61:22, 61:24, 62:4, 62:8, 62:15, 63:5, 63:10, 63:21, 64:5, 64:11, 64:24, 65:3, 65:10, 65:15, 65:17, 66:16, 67:7, 67:14, 68:4, 68:19, 69:3, 69:6, 69:8, 69:15, 70:6, 70:10, 70:11, 70:13, 70:22, 71:2, 71:9, 72:14, 73:16, 74:12, 74:21, 75:12, 75:16, 75:20, 76:19, 77:1, 78:7, 78:9, 78:11, 78:19, 78:23, 79:9, 79:11, 79:14, 79:19, 80:1, 80:17, 80:21, 80:25, 81:5, 81:9, 81:21, 81:25, 82:21, 83:4, 83:8, 83:12,

83:15, 83:17, 83:22, 84:1, 84:5, 84:9, 84:19, 85:1, 85:12, 86:3, 86:12, 89:6, 89:9, 91:14, 91:18, 91:21, 91:24, 92:6, 92:15, 92:20, 93:16, 93:24, 94:2, 94:5, 94:12, 95:8, 95:19, 96:3, 96:6, 96:9, 96:13, 96:16, 96:19, 97:2, 97:10, 97:15, 97:23, 98:12, 98:13, 98:14, 99:4, 99:14, 101:15, 101:18, 101:24, 102:1, 102:5, 102:8, 102:13, 105:2, 105:11, 105:14, 105:15, 105:18, 105:23, 106:1, 106:5, 107:5, 107:11, 107:19, 107:24, 109:4, 110:7, 110:15, 112:6, 112:11, 115:4, 115:12, 117:9, 117:22, 118:5, 118:6, 118:8, 121:20, 186:6, 189:5, 216:17, 217:21, 218:3, 220:7, 221:13, 221:24, 222:10, 222:17, 224:8, 224:14, 225:3, 225:6, 225:10, 226:21, 229:7, 229:10, 229:14, 229:24, 231:8, 231:13, 231:16, 232:9, 232:13, 232:20, 232:23, 233:14, 233:18, 234:5, 234:8, 234:13, 234:17, 234:20, 235:3, 235:10, 235:11, 235:15, 236:3, 236:10, 236:17, 236:20, 237:5, 237:8, 238:8, 238:14, 238:22, 239:3, 239:6, 239:23, 240:14, 240:18, 241:3, 241:10, 241:14, 242:19, 242:24

**corrective** [1] - 76:21

**correctly** [2] - 99:24, 229:4

**correspondence** [2] - 31:20, 38:18

**cosmetic** [2] - 161:1, 161:2

**cost** [20] - 43:7, 74:5, 216:2, 216:5, 216:7, 216:14, 216:23, 216:25, 217:1, 217:2, 217:6, 217:10, 217:19, 217:20, 218:3, 218:6, 218:7, 221:4, 221:5, 225:12

**costly** [2] - 74:1, 74:16

**costs** [2] - 218:19, 219:5

**counsel** [23] - 4:2, 5:9, 5:13, 6:6, 9:7, 15:19, 26:2, 26:6, 54:10, 67:6, 71:12, 71:13, 87:22, 88:11, 100:8, 102:5, 124:9, 155:20, 156:9, 157:20, 158:24, 250:13

**counsel's** [2] - 156:24, 176:9

**counted** [1] - 186:20

**counter** [6] - 191:9, 192:17, 192:18, 192:20, 195:10, 219:1

**counterfeit** [5] - 151:24, 169:25, 170:18, 176:14, 177:16

**counterfeiting** [2] - 18:17, 25:25

**country** [3] - 16:5, 84:15, 89:14

**counts** [1] - 75:19

**couple** [8] - 72:7, 118:16, 120:20, 148:9, 163:21, 166:24, 251:7

**course** [4] - 41:20, 120:20, 230:1, 249:12

**court** [9] - 10:11, 13:15, 15:1, 65:2, 65:14, 67:2, 153:5, 188:3, 251:11

**Court** [18] - 2:3, 2:4, 4:1, 4:4, 4:14, 8:19, 10:13, 11:22, 11:23, 15:6, 87:17, 87:23, 108:16, 155:22, 157:22, 221:20, 252:21, 252:22

**COURT** [252] - 1:1, 4:2, 4:13, 4:18, 4:20, 5:6, 5:10, 5:11, 5:13, 5:18, 6:4, 6:14, 6:17, 6:24, 7:2, 7:6, 7:9, 7:17, 7:25, 8:2, 8:5, 8:11, 8:18, 9:3, 9:11, 9:15, 9:18, 9:22, 10:7, 10:22, 11:14, 11:20, 11:25, 12:6, 12:10, 12:12, 12:16, 12:19, 12:24, 13:8, 13:14, 13:18, 13:24, 14:4, 14:12, 14:18, 15:11, 15:14, 15:16, 15:17, 15:19, 15:24, 16:9, 16:22, 17:4, 17:9, 19:5, 19:8, 28:17, 31:3, 32:14, 32:21, 34:5, 36:12, 38:1, 39:24, 41:1, 51:7, 52:3, 54:12, 55:13, 58:13, 59:3, 59:5, 59:23, 60:2, 60:24, 61:15, 64:14, 65:23, 68:14, 73:18, 75:3, 75:23, 76:5, 77:23, 84:21, 86:15, 86:20, 87:7, 87:9, 87:14, 87:16, 87:18, 87:21, 88:3, 88:6, 88:9, 88:11, 88:16, 92:2, 94:14, 95:5, 98:19, 100:10, 100:15, 103:20, 104:5, 104:14, 104:23, 105:7, 107:8, 107:13, 108:4, 108:11, 108:15, 108:18, 109:6, 109:12, 109:24, 110:23, 111:9, 111:19, 111:23, 112:3, 112:24, 113:14, 113:17, 113:24, 114:15, 114:21, 114:23, 115:15, 116:6, 116:16, 118:14, 118:16, 118:19, 120:24, 121:9, 121:14, 121:18, 121:21, 122:11, 122:13, 123:23, 124:1, 124:13, 124:25, 126:21, 126:24, 129:24, 140:4, 140:9, 140:12, 140:14, 146:11, 146:13, 148:21, 150:3, 150:5, 152:2, 152:7, 152:13, 152:14, 152:18, 152:20, 153:13, 153:21, 154:1, 154:3, 154:10, 154:15, 156:25, 157:15, 157:17, 157:19, 157:20, 158:1, 158:3, 158:10, 158:16, 158:18, 158:21, 158:22, 158:24, 159:4, 163:11, 163:14, 163:16, 164:16, 165:17, 166:21, 167:15, 167:20, 167:23, 169:6, 175:3, 185:19, 186:23, 186:25, 187:13, 187:16, 200:6, 204:5, 205:1, 205:7, 205:18, 208:6, 214:13, 215:19, 215:21, 216:11, 216:20, 217:15, 218:16, 220:17, 221:8, 221:14, 221:17, 222:4, 223:21, 225:20, 226:18, 227:1, 227:24, 229:19, 230:3, 230:6, 240:2, 241:22, 243:12, 244:12, 248:3, 248:12, 248:17, 248:20, 248:24, 249:9, 249:17, 249:21, 249:23, 250:2, 250:5, 251:2, 251:14, 251:17, 251:20, 251:23, 252:3, 252:12, 252:16

**Court's** [2] - 15:3, 252:15

**Courthouse** [1] - 252:23

**courthouse** [1] - 249:3

**COURTROOM** [9] - 187:19, 187:24, 249:11, 249:19, 249:22, 249:25, 251:15, 251:19, 251:21

**courtroom** [6] - 10:24, 14:4, 21:21, 120:6, 153:10, 163:15

**cover** [2] - 17:23, 73:3

**create** [1] - 7:11

**credibility** [1] - 155:7

**credit** [2] - 235:5, 243:2

**crime** [11] - 6:21, 11:16, 12:17, 13:20, 15:2, 16:3, 119:8, 119:14, 119:16, 119:18, 122:6

**criminal** [7] - 7:6, 7:9, 7:18, 10:25, 12:13, 124:5, 144:10

**cross** [50] - 5:25, 6:8, 7:18, 10:14, 10:19, 10:23, 11:5, 12:5, 15:8, 27:5, 40:21, 52:8, 55:15, 119:10, 120:16, 122:15, 124:16, 127:16, 128:14, 132:16, 146:18, 149:4, 150:22, 154:23, 155:21, 155:24, 156:13, 156:17, 156:24, 159:16, 160:4, 161:3, 163:2, 165:5, 166:19, 167:14, 168:1, 168:16, 169:8, 170:22, 172:10, 175:6, 180:9, 182:5, 185:19, 186:6, 227:24, 241:22, 243:12, 250:13

**CROSS** [6] - 3:3, 3:6, 3:6, 16:15, 215:22, 230:7

**cross-examination** [38] - 5:25, 7:18, 10:19, 10:23, 52:8, 119:10, 120:16, 122:15, 124:16, 127:16, 128:14, 132:16, 146:18, 149:4, 150:22, 154:23, 155:21, 155:24, 156:13, 156:17, 156:24, 159:16, 160:4, 161:3, 163:2, 165:5, 166:19, 168:1, 168:16, 169:8, 170:22, 172:10, 175:6, 180:9, 186:6, 227:24, 241:22, 243:12

**CROSS-EXAMINATION** [6] - 3:3, 3:6, 3:6, 16:15, 215:22, 230:7

**cross-examine** [3] - 10:14, 11:5, 12:5
**cross-examined** [1] - 15:8
**crossed** [1] - 74:22
**cry** [1] - 121:4
**crying** [4] - 121:9, 121:14, 121:17, 121:18
**Crystal** [1] - 251:18
**curative** [3] - 121:8, 154:4, 157:6
**curious** [4] - 197:17, 197:20, 209:2, 246:13
**customer** [21] - 74:11, 127:11, 137:23, 173:2, 173:20, 176:4, 200:3, 200:13, 200:23, 200:24, 201:4, 201:7, 201:9, 201:20, 202:11, 202:15, 211:5, 215:7, 234:12, 235:17, 244:2
**customers** [3] - 70:22, 138:12, 205:15
**CVS** [1] - 192:24

## D

**daily** [2] - 134:21, 134:24
**damaged** [2] - 92:17, 168:7
**damaging** [1] - 87:1
**date** [18] - 50:15, 51:9, 65:7, 82:25, 83:1, 95:11, 95:12, 140:18, 207:21, 207:23, 210:3, 210:24, 222:22, 223:3, 224:16, 224:23, 232:15, 246:24
**DATE** [1] - 252:20
**dated** [4] - 31:16, 223:13, 224:17, 247:1
**dates** [4] - 4:24, 224:7, 224:20, 246:17
**dating** [4] - 222:17, 222:19, 222:22, 224:22
**day-to-day** [1] - 191:10
**days** [5] - 120:20, 158:13, 250:7, 250:10, 251:7
**DEA** [1] - 130:10
**deals** [2] - 195:9, 195:11
**Deane** [1] - 161:2
**death** [3] - 84:19, 176:9, 176:10
**deceived** [7] - 41:4, 41:8, 59:20, 133:10, 133:12, 133:16, 133:19
**deceiving** [1] - 61:12
**December** [8] - 24:16, 28:21, 31:16, 32:3, 32:18, 33:16, 34:15, 35:19
**decide** [2] - 24:10, 217:6
**decided** [4] - 16:4, 16:6, 21:25, 35:10
**decides** [1] - 11:13
**decision** [7] - 15:10, 76:2, 157:3, 201:12, 202:4, 209:21, 228:8
**decision-making** [1] - 76:2
**declined** [2] - 8:24, 68:6
**deemed** [2] - 173:2, 176:4
**defend** [1] - 35:25
**DEFENDANT** [3] - 1:17, 1:21, 152:17
**defendant** [2] - 51:16, 247:4
**defendants** [10] - 4:3, 52:25, 53:12, 53:18, 87:22, 122:9, 133:12, 157:21, 169:1, 246:15
**Defendants** [1] - 1:8
**defense** [12] - 5:9, 6:25, 7:1, 7:9, 123:3, 124:9, 155:20, 156:7, 156:9, 156:24, 176:9, 250:13
**definitively** [1] - 111:5
**degree** [2] - 70:25, 190:11
**delay** [1] - 5:21
**deliberately** [1] - 46:24
**delivering** [1] - 51:23
**delve** [1] - 22:25
**demand** [2] - 95:7, 95:8
**denied** [4] - 122:13, 154:1, 154:3, 157:5
**department** [1] - 60:15
**departments** [2] - 193:21, 193:23
**DEPUTY** [9] - 187:19, 187:24, 249:11, 249:19, 249:22, 249:25, 251:15, 251:19, 251:21
**DerOvanesian** [3] - 1:13, 152:2, 159:13
**DEROVANESIAN** [168] - 3:4, 6:11, 9:24, 15:3, 17:2, 17:8, 28:16, 32:22, 36:11, 37:21, 37:24, 39:22, 40:25, 51:5, 52:2, 54:5, 54:10, 55:11, 58:11, 59:1, 59:4, 59:22, 60:22, 61:14, 64:9, 64:12, 65:21, 68:12, 73:17, 75:2, 75:4, 75:21, 76:4, 77:21, 84:20, 86:13, 86:19, 91:25, 94:10, 94:13, 95:4, 98:18, 100:6, 100:8, 100:12, 104:4, 104:13, 105:6, 107:7, 107:12, 108:3, 108:10, 109:5, 109:11, 109:22, 110:22, 111:24, 112:22, 113:9, 113:15, 113:23, 115:14, 116:13, 118:21, 121:1, 121:11, 121:23, 122:14, 124:6, 124:14, 125:3, 127:1, 129:1, 129:3, 129:12, 129:13, 130:1, 130:21, 130:23, 131:9, 131:11, 135:8, 135:10, 135:15, 135:17, 136:3, 136:5, 136:10, 136:12, 136:20, 136:21, 137:4, 137:7, 137:12, 137:14, 137:19, 137:21, 138:5, 138:7, 138:17, 138:19, 139:24, 140:1, 140:6, 140:16, 141:15, 141:18, 142:7, 142:9, 142:15, 142:16, 143:3, 143:5, 144:1, 144:3, 145:13, 145:15, 145:20, 145:22, 146:15, 146:25, 147:2, 148:2, 148:3, 148:22, 150:15, 151:17, 151:20, 152:4, 155:14, 157:14, 157:24, 158:15, 159:14, 159:15, 163:13, 163:17, 164:17, 165:19, 166:23, 167:1, 167:5, 167:17, 167:25, 169:7, 169:18, 169:22, 173:14, 173:17, 173:23, 173:24, 174:10, 174:12, 174:20, 174:22, 175:4, 177:21, 177:23, 179:21, 179:22, 180:11, 180:12, 185:11, 185:13, 185:21, 187:2, 187:12, 227:19
**Descovy** [15] - 89:18, 89:21, 90:1, 90:14, 90:24, 90:25, 91:1, 91:3, 92:9, 94:18, 193:12, 203:11, 203:13, 210:25
**describe** [4] - 20:22, 56:19, 160:19, 175:9
**described** [10] - 18:8, 40:13, 44:17, 48:23, 51:13, 51:19, 51:25, 55:20, 62:25, 75:15
**describes** [2] - 41:18, 70:21
**description** [1] - 57:25
**Description** [1] - 3:12
**destroy** [5] - 65:20, 66:3, 66:9, 66:13, 66:18
**details** [4] - 30:23, 69:25, 97:3, 97:12
**detective** [2] - 56:7, 127:24
**determination** [32] - 47:14, 48:9, 48:14, 61:1, 70:3, 70:7, 71:22, 73:5, 78:24, 78:25, 79:3, 79:6, 79:8, 79:13, 79:16, 79:23, 80:6, 80:21, 81:1, 81:3, 85:2, 85:4, 85:6, 85:7, 85:9, 85:21, 93:11, 147:12, 239:2, 239:5, 239:8, 240:16
**determinations** [2] - 81:11, 87:2
**determine** [2] - 29:15, 70:6
**determined** [7] - 80:11, 80:14, 80:17, 90:24, 183:9, 183:12, 240:13
**determining** [2] - 182:23, 183:6
**development** [1] - 82:21
**devised** [1] - 117:6
**diabetes** [1] - 193:6
**diagram** [5] - 41:17, 44:9, 44:10, 180:9, 229:3
**difference** [13] - 12:13, 113:7, 113:20, 114:10, 114:11, 114:13, 114:16, 114:18, 218:19, 220:2, 220:9, 222:7, 222:12
**different** [51] - 4:17, 14:20, 14:21, 38:8, 47:22, 57:6, 76:24, 80:5, 100:17, 113:4, 113:8, 114:8, 120:7, 146:20, 148:7, 148:9, 148:10, 148:14, 148:16, 161:8, 161:10, 162:3, 162:7, 162:16, 163:23, 164:12, 168:3, 175:11, 180:25, 181:4, 181:5, 181:21, 182:18, 185:25, 186:5, 186:20, 187:3, 192:21, 193:20, 198:18, 199:15, 202:11, 202:15, 203:8, 203:9, 204:9, 213:19, 235:18, 236:22, 242:19
**diminish** [1] - 56:20
**Dimitrouleas** [1] - 2:3
**DIMITROULEAS** [1] - 1:10
**Dimitrouleas/Hunt** [1] - 1:2
**direct** [32] - 18:8, 52:7, 70:25, 74:8, 98:22, 99:7, 102:7, 120:3, 131:21, 132:19, 149:9, 165:10, 166:20, 167:6, 167:8, 168:6, 168:22, 175:2,

185:18, 208:17, 208:24, 213:21, 214:17, 214:18, 214:20, 214:21, 226:13, 229:1, 229:7, 237:3, 246:11, 250:11
**DIRECT** [2] - 3:5, 188:6
**directed** [1] - 89:9
**directly** [7] - 90:18, 97:5, 97:7, 156:9, 179:18, 245:18, 247:16
**director** [6] - 58:1, 71:11, 72:5, 72:13, 72:18, 129:21
**disappointing** [1] - 93:18
**disclosed** [2] - 92:13, 133:22
**discount** [28] - 194:12, 194:14, 197:4, 197:7, 197:8, 197:11, 197:13, 197:15, 197:17, 197:18, 198:1, 198:5, 213:10, 213:12, 221:24, 223:4, 224:6, 224:23, 225:2, 225:3, 244:23, 244:25, 245:3, 245:6, 245:15, 245:17, 245:22
**discounted** [8] - 197:21, 210:5, 213:16, 215:9, 215:11, 215:14, 225:9, 227:6
**discounts** [12] - 194:8, 194:9, 194:10, 194:17, 195:16, 195:19, 196:3, 223:12, 224:16, 244:19, 245:8, 245:10
**discovering** [1] - 89:16
**discuss** [12] - 5:19, 15:25, 32:10, 35:9, 37:15, 37:16, 87:11, 88:17, 152:10, 152:15, 159:5, 248:7
**discussed** [18] - 5:19, 15:25, 22:10, 22:11, 26:5, 70:24, 72:4, 86:10, 87:11, 88:17, 115:1, 122:5, 132:14, 152:11, 159:5, 224:5, 224:23, 248:7
**discussion** [1] - 135:18
**discussions** [1] - 174:23
**disease** [1] - 193:22
**diseases** [2] - 193:7, 193:8
**dispense** [7] - 127:12, 183:13, 193:23, 199:8, 199:17, 201:17, 235:12
**dispensed** [6] - 148:12, 184:4, 193:2, 193:11, 204:2, 215:11
**disposal** [1] - 47:20
**disposing** [1] - 52:15
**disregard** [1] - 154:6
**distributed** [4] - 202:7, 203:13, 203:14, 247:23
**distributing** [1] - 51:12
**distribution** [6] - 48:15, 52:24, 63:5, 90:13, 201:9, 202:23
**distributor** [35] - 43:11, 43:14, 44:5, 44:16, 44:17, 44:18, 46:15, 46:18, 56:5, 62:13, 62:14, 62:17, 62:18, 62:19, 63:2, 63:3, 63:7, 77:13, 89:25, 105:23, 106:4, 107:17, 108:1, 109:4, 109:9, 143:14, 182:22, 185:2, 185:3, 186:2, 226:11, 229:6, 229:13, 229:22
**distributors** [12] - 36:22, 42:4, 42:8, 42:11, 42:15, 52:1, 90:18, 90:19, 90:21, 91:18, 106:1, 226:4
**District** [7] - 2:4, 51:14, 53:24, 54:17, 54:20, 252:22, 252:22
**DISTRICT** [3] - 1:1, 1:1, 1:10
**diversion** [2] - 49:12, 49:13
**Divilio** [49] - 34:1, 34:9, 57:24, 58:9, 58:25, 59:7, 61:7, 69:2, 70:18, 71:1, 73:20, 102:13, 103:10, 103:24, 105:13, 106:3, 106:17, 107:10, 133:24, 134:3, 135:2, 135:7, 135:12, 135:13, 135:24, 136:7, 136:16, 137:1, 137:2, 138:1, 138:9, 138:22, 141:20, 142:3, 142:17, 142:21, 142:23, 143:6, 144:6, 144:18, 144:21, 145:11, 145:17, 145:23, 146:5, 146:19, 147:5, 170:17, 250:11
**DIVISION** [1] - 1:2
**division** [3] - 28:7, 189:7, 193:21
**divisions** [2] - 188:23, 194:3
**doctor** [1] - 242:6
**Document** [2] - 3:17, 214:14
**document** [31] - 6:8, 82:14, 91:25, 92:1, 92:20, 99:19, 99:22, 104:15, 110:19, 112:2, 112:3, 112:8, 112:24, 113:11, 113:15, 113:25, 116:3, 116:15, 116:17, 116:25, 117:19, 122:3, 129:7, 130:24, 141:16, 147:3, 163:11, 163:14, 170:13, 172:14, 183:25
**documentation** [3] - 85:15, 90:7, 90:8
**documents** [16] - 98:21, 98:22, 110:14, 113:19, 114:1, 114:3, 133:18, 141:9, 166:25, 177:13, 199:24, 205:20, 224:10, 237:13, 238:6, 238:13
**dollar** [1] - 218:8
**done** [10] - 38:1, 58:21, 96:12, 99:24, 105:18, 143:15, 154:12, 164:9, 165:6
**door** [5] - 155:21, 192:15, 192:17, 192:19, 235:12
**double** [2] - 145:18, 145:24
**double-check** [1] - 145:24
**double-checking** [1] - 145:18
**doubt** [1] - 7:11
**down** [25] - 36:21, 85:10, 99:6, 100:2, 129:12, 131:4, 137:13, 140:3, 140:20, 141:23, 142:10, 142:15, 143:18, 144:9, 145:13, 148:2, 174:10, 178:8, 183:4, 184:23, 187:13, 189:16, 215:4, 242:21, 248:3
**download** [1] - 231:7
**Dr** [44] - 16:3, 16:7, 88:4, 88:6, 114:15, 118:22, 119:10, 119:25, 121:24, 122:15, 123:1, 123:18, 124:8, 124:15, 125:19, 126:11, 128:11, 133:8, 133:18, 139:15, 145:4, 148:4, 152:14, 157:11, 158:18, 159:16, 161:3, 162:25, 163:18, 164:4, 164:18, 166:24, 167:18, 168:1, 169:8, 173:18, 174:13, 175:5, 179:16, 180:8, 180:13, 183:20, 185:22, 186:5
**draft** [3] - 28:2, 28:5, 46:1
**drafted** [2] - 27:19, 92:22
**dreamed** [1] - 153:3
**Dresser** [8] - 53:16, 60:7, 97:17, 98:5, 123:15, 123:17, 160:8, 160:11
**dresser** [1] - 8:22
**Drogueria** [1] - 208:25
**dropped** [1] - 31:1
**drove** [1] - 76:2
**Drug** [9] - 21:19, 22:22, 40:4, 90:6, 90:12, 91:8, 188:24, 189:3, 189:7
**drug** [35] - 41:18, 41:19, 45:1, 45:2, 45:23, 52:25, 63:4, 67:13, 68:19, 76:25, 77:8, 90:14, 120:7, 129:21, 130:14, 150:17, 151:9, 160:24, 161:1, 161:2, 170:18, 181:1, 181:23, 194:23, 202:12, 202:15, 205:14, 206:13, 206:24, 206:25, 209:20, 211:19, 211:22, 211:25
**Drugs** [15] - 191:15, 191:19, 191:24, 191:25, 192:1, 192:4, 192:7, 192:14, 192:15, 193:1, 193:2, 193:11, 193:16, 193:24, 213:10
**drugs** [127] - 18:22, 19:11, 19:19, 20:11, 20:15, 23:13, 24:2, 24:8, 24:11, 25:9, 26:20, 27:2, 28:7, 28:14, 29:4, 29:7, 29:9, 29:15, 30:20, 30:21, 30:23, 40:17, 42:5, 42:12, 42:25, 43:2, 43:11, 43:16, 45:8, 46:4, 49:6, 49:13, 49:16, 50:11, 51:11, 51:20, 51:23, 51:24, 52:9, 52:12, 52:15, 52:18, 53:3, 53:6, 53:9, 53:23, 54:1, 54:2, 54:16, 54:18, 54:21, 55:5, 55:9, 55:10, 55:16, 56:4, 56:6, 58:5, 62:4, 62:6, 63:17, 63:18, 64:18, 64:19, 67:12, 67:19, 68:11, 75:16, 76:25, 77:1, 77:7, 77:20, 83:8, 83:11, 120:8, 150:10, 150:24, 177:17, 182:10, 182:17, 193:2, 193:3, 193:8, 193:10, 193:12, 193:25, 194:6, 195:4, 195:6, 196:14, 196:16, 196:17, 197:4, 197:14, 197:21, 198:4, 198:6, 198:11, 198:15,

198:22, 199:3, 199:7, 199:12, 199:17, 199:18, 199:22, 200:11, 200:21, 201:13, 201:25, 202:20, 205:12, 209:12, 209:13, 210:5, 213:11, 215:9, 215:11, 215:14, 230:18, 246:4, 247:10, 247:12, 247:23
**drugstores** [1] - 161:14
**dryers** [1] - 219:3
**DSCSA** [10] - 71:24, 74:1, 74:16, 117:10, 125:22, 131:5, 142:24, 143:11, 144:7, 160:20
**due** [1] - 169:23
**duly** [2] - 16:13, 187:22
**duped** [2] - 53:9, 55:8
**during** [17] - 27:3, 50:10, 58:25, 74:8, 77:4, 98:3, 98:22, 102:7, 102:11, 122:15, 123:19, 152:14, 152:25, 155:21, 196:23, 199:2, 252:10
**duty** [1] - 80:18

## E

**e-Pharm** [2] - 203:8, 238:10
**e-Pharm/alert** [6] - 202:21, 203:4, 203:11, 203:16, 207:7, 247:19
**e-Pharm/alerts** [1] - 202:25
**earliest** [1] - 140:18
**early** [4] - 21:22, 33:19, 33:21, 250:22
**East** [1] - 252:23
**easy** [1] - 220:21
**effect** [1] - 153:9
**effects** [1] - 184:15
**eight** [1] - 198:24
**either** [17] - 20:8, 37:10, 46:24, 72:24, 73:1, 79:1, 79:2, 84:7, 100:13, 114:19, 142:18, 145:1, 148:11, 152:24, 161:13, 199:13, 234:17
**electronic** [2] - 219:12, 235:22
**electronics** [1] - 219:2
**elevate** [1] - 79:18
**eleven** [1] - 158:7
**eleventh** [1] - 6:7
**elicited** [1] - 24:16
**ELMO** [2] - 41:12, 180:11
**email** [48] - 17:12, 17:22, 17:23, 17:24, 27:13, 32:1, 33:9, 34:13, 51:17, 60:6, 68:25, 72:16, 74:10, 79:10, 80:8, 80:15, 80:16, 84:14, 94:25, 97:16, 98:5, 103:3, 103:17, 106:16, 107:11, 109:1, 127:6, 135:11, 143:7, 143:11, 143:16, 144:14, 144:15, 144:19, 144:22, 147:8, 147:16, 150:20, 167:10, 167:12, 167:16, 168:7, 174:6, 178:9, 207:18, 207:22, 231:14, 238:17
**Email** [6] - 3:13, 3:14, 3:15, 140:15, 208:7, 208:8
**emails** [12] - 115:22, 125:11, 133:4, 168:5, 168:22, 168:25, 169:1, 177:8, 179:16, 179:17, 207:17
**emotional** [1] - 154:25
**employees** [1] - 133:5
**end** [7] - 53:2, 58:23, 75:18, 76:1, 140:23, 167:3, 249:7
**ended** [4] - 49:6, 49:17, 52:14, 53:4
**ends** [2] - 44:25, 81:13
**engaged** [1] - 74:21
**enlarge** [2] - 93:3, 98:25
**enrolled** [1] - 195:7
**enter** [1] - 158:23
**entered** [3] - 48:20, 49:7, 140:6
**enters** [6] - 5:12, 12:11, 15:15, 15:18, 88:5, 88:10
**Entin** [1] - 252:20
**ENTIN** [2] - 2:2, 252:21
**entire** [2] - 99:18, 206:10
**entities** [4] - 45:22, 181:5, 246:1, 246:7
**entitled** [2] - 39:7, 252:20
**entity** [2] - 78:22, 209:17
**entries** [1] - 50:11
**entry** [1] - 68:11
**equivalent** [1] - 189:3
**erroneous** [1] - 82:15
**error** [6] - 243:9, 243:11, 243:19, 243:20, 243:21
**escalated** [2] - 95:15, 95:18
**escalation** [2] - 95:23, 95:24
**especially** [1] - 9:9
**Esquire** [5] - 1:13, 1:14, 1:17, 1:18, 1:21
**estimating** [1] - 152:4
**ethical** [1] - 7:11
**Europe** [1] - 8:9
**evaluating** [2] - 96:15, 105:17
**evaluation** [1] - 4:9
**evening** [1] - 93:6
**event** [1] - 76:12
**events** [2] - 91:9, 251:10
**eventually** [3] - 74:21, 190:6, 207:3
**evidence** [29] - 6:9, 6:18, 51:6, 67:2, 72:18, 90:10, 108:12, 108:14, 108:15, 108:17, 108:18, 108:19, 108:20, 129:23, 129:24, 140:4, 150:2, 150:5, 153:12, 154:8, 163:12, 187:1, 199:24, 204:23, 209:8, 214:10, 224:11, 227:1, 227:23
**Evidence** [5] - 140:15, 205:4, 208:7, 208:8, 214:15
**evolving** [1] - 81:24
**exact** [4] - 77:3, 82:25, 95:11, 106:20
**exactly** [6] - 20:2, 51:2, 81:19, 110:24, 162:11, 162:24
**exam** [1] - 190:4
**EXAMINATION** [12] - 3:3, 3:4, 3:5, 3:6, 3:6, 3:7, 16:15, 118:20, 188:6, 215:22, 230:7, 244:16
**examination** [61] - 5:25, 7:18, 10:19, 10:23, 11:12, 18:8, 52:8, 70:25, 74:8, 98:22, 99:7, 119:10, 120:3, 120:16, 122:15, 124:16, 127:16, 128:14, 131:21, 132:16, 132:19, 146:18, 149:4, 149:10, 150:22, 152:22, 154:23, 155:21, 155:24, 156:13, 156:17, 156:24, 159:16, 160:4, 161:3, 163:2, 165:5, 165:10, 166:19, 166:20, 167:7, 167:14, 168:1, 168:6, 168:16, 168:22, 169:4, 169:5, 169:8, 170:22, 172:10, 175:2, 175:6, 180:9, 185:18, 186:6, 227:24, 241:22, 243:12
**examine** [4] - 10:14, 11:5, 11:22, 12:5
**examined** [3] - 15:8, 16:13, 187:22
**example** [9] - 47:2, 192:24, 194:6, 197:12, 213:20, 214:2, 214:5, 217:5, 229:22
**exams** [1] - 189:25
**Excedrin** [1] - 200:18
**excellent** [1] - 102:24
**except** [3] - 63:1, 130:19, 158:5
**exception** [1] - 31:19
**exchange** [2] - 235:4, 235:5
**excuse** [9] - 22:4, 52:8, 66:24, 102:17, 121:6, 126:23, 167:19, 170:3, 185:17
**excused** [4] - 187:14, 248:4, 248:21, 251:23
**exercise** [2] - 12:20, 181:9
**exhibit** [4] - 17:18, 74:7, 122:4, 140:17
**Exhibit** [41] - 17:19, 18:3, 27:24, 70:16, 89:2, 98:23, 129:2, 130:22, 131:10, 135:9, 136:4, 138:6, 139:25, 141:16, 143:4, 145:9, 146:24, 151:18, 167:2, 169:19, 170:7, 173:13, 174:19, 177:15, 177:22, 178:24, 179:10, 179:14, 179:21, 185:12, 203:2, 204:15, 204:23, 207:14, 208:3, 209:8, 210:1, 210:23, 213:25, 214:10, 240:22
**exist** [2] - 78:21, 78:23
**existed** [3] - 50:8, 63:13, 63:14
**exits** [5] - 6:16, 8:17, 14:2, 87:15, 248:11
**expand** [2] - 88:24, 93:3
**expect** [8] - 58:6, 71:11, 72:1, 121:4, 240:7, 240:14, 240:17, 250:19
**expected** [2] - 200:24, 201:8
**expecting** [3] - 71:15, 71:16, 96:10
**expensive** [4] - 77:1, 77:4, 77:7, 77:9
**experience** [8] - 40:3, 40:9, 40:11, 46:3, 74:25, 75:14, 75:25, 76:1
**experienced** [3] - 39:19, 40:12, 40:15
**expiration** [4] - 222:22, 224:16, 224:20, 246:24
**explain** [1] - 25:17
**explained** [2] - 169:14, 223:10
**explaining** [2] - 60:23, 121:25
**exposure** [3] - 9:2, 9:5, 10:3
**expressed** [6] - 10:17, 15:5, 24:1, 52:7, 66:18, 66:19
**extended** [1] - 9:8

**extent** [1] - 9:6
**extra** [2] - 222:15, 222:16
**eye** [1] - 242:6

## F

**face** [1] - 105:19
**facilities** [1] - 65:2
**facility** [1] - 65:13
**fact** [48] - 28:25, 29:18, 30:11, 41:4, 49:6, 53:2, 55:15, 57:15, 63:19, 73:8, 92:5, 92:10, 92:12, 102:4, 103:23, 105:17, 109:2, 109:15, 110:20, 115:1, 121:9, 121:14, 121:18, 150:19, 154:16, 154:19, 156:1, 156:2, 166:15, 174:6, 187:4, 200:6, 204:5, 222:14, 223:10, 224:5, 226:7, 227:17, 228:2, 234:16, 236:19, 237:4, 239:2, 239:9, 239:10, 239:14, 240:18
**fact-finding** [1] - 57:15
**factors** [4] - 36:24, 76:8, 76:24, 92:14
**facts** [20] - 23:7, 23:15, 47:14, 48:8, 51:5, 57:12, 57:15, 78:19, 78:21, 78:23, 79:7, 79:17, 79:25, 80:2, 80:10, 80:17, 80:23, 129:22, 202:3, 227:23
**factual** [2] - 69:8, 153:16
**fair** [7] - 7:12, 10:19, 77:9, 86:6, 124:18, 236:15, 250:14
**faith** [1] - 9:2
**fall** [2] - 58:20, 79:4
**false** [13] - 60:5, 61:2, 61:24, 62:3, 83:17, 90:6, 97:22, 97:24, 97:25, 98:16, 155:6, 203:17, 203:19
**falsified** [1] - 184:22
**familiar** [7] - 132:12, 144:13, 151:5, 195:5, 195:23, 196:1, 222:19
**far** [16] - 15:2, 33:4, 34:9, 58:3, 59:20, 73:14, 85:3, 93:22, 97:22, 110:3, 158:11, 198:6, 213:16, 224:22, 231:20, 250:8
**fashion** [7] - 249:6, 249:13, 249:16, 250:5, 250:6, 251:7, 251:8
**fault** [1] - 48:10
**FBI** [1] - 22:24
**FDA** [26] - 21:18, 21:19, 40:4, 73:5, 85:8, 90:13, 91:11, 94:4, 130:10, 131:22, 147:5, 147:11, 147:15, 147:23, 160:15, 160:20, 170:10, 170:19, 171:9, 173:10, 173:25, 174:3, 174:8, 178:14, 178:21, 188:23
**FDA's** [1] - 189:7
**February** [12] - 68:17, 68:21, 69:17, 70:19, 81:17, 106:16, 172:11, 172:16, 172:19, 173:19, 202:14, 205:24
**federal** [4] - 4:20, 15:1, 43:21, 130:5
**Federal** [2] - 1:22, 252:23
**fees** [1] - 249:1
**felt** [9] - 24:25, 36:2, 36:20, 38:3, 65:19, 74:3, 84:8, 154:19, 155:17
**few** [12] - 6:15, 23:25, 41:12, 102:11, 123:12, 124:16, 142:12, 163:5, 177:13, 186:5, 204:16, 250:21
**Fifth** [2] - 10:21, 12:21
**fifth** [1] - 89:17
**figure** [6] - 45:5, 45:12, 45:17, 93:23, 93:25, 251:11
**file** [2] - 20:11, 238:20
**filed** [6] - 31:6, 31:11, 49:22, 49:25, 50:13, 51:13
**files** [1] - 128:3
**fill** [1] - 4:22
**financial** [1] - 76:8
**financially** [2] - 77:7, 77:14
**findings** [2] - 93:8, 95:2
**fine** [3] - 32:9, 121:22, 140:11
**fines** [3] - 135:20, 143:19, 143:24
**finger** [1] - 74:19
**finish** [12] - 8:11, 9:19, 11:6, 11:11, 37:22, 38:2, 60:23, 60:24, 148:24, 237:1, 249:25, 250:11
**finished** [1] - 37:25
**finishes** [1] - 217:16
**finishing** [2] - 14:24, 156:11
**firm** [11] - 8:23, 38:5, 38:13, 38:24, 39:6, 40:3, 50:5, 50:6, 81:14, 160:6
**first** [45] - 9:5, 16:13, 19:22, 20:18, 26:18, 31:9, 35:16, 48:20, 60:7, 63:7, 67:8, 85:2, 97:17, 107:24, 118:24, 125:22, 126:2, 138:11, 141:8, 142:22, 144:15, 153:24, 163:4, 163:5, 163:21, 167:9, 170:4, 173:22, 181:12, 187:22, 197:25, 200:20, 203:6, 209:14, 209:18, 215:8, 225:13, 229:5, 230:11, 230:18, 236:21, 240:9
**five** [8] - 102:20, 158:6, 158:7, 245:13, 246:2, 246:7, 246:10, 247:22
**fix** [1] - 76:20
**Fl** [1] - 1:22
**flag** [1] - 63:20
**flags** [5] - 47:23, 131:22, 132:3, 132:13, 132:14
**flip** [1] - 162:25
**flipping** [2] - 163:21, 164:7
**Flores** [1] - 1:18
**FLORIDA** [1] - 1:1
**Florida** [14] - 1:4, 1:16, 1:19, 1:22, 49:4, 50:5, 51:14, 52:14, 53:24, 54:17, 54:20, 252:22, 252:24
**flush** [1] - 118:4
**focus** [3] - 53:2, 140:2, 163:1
**follow** [7] - 5:18, 15:24, 88:16, 112:10, 124:17, 144:19, 159:4
**follow-up** [1] - 124:17
**followed** [3] - 133:1, 133:6, 145:2
**following** [8] - 50:5, 50:19, 91:9, 102:25, 128:8, 141:11, 171:16, 250:22
**following..** [1] - 91:12
**follows** [2] - 16:14, 187:23
**food** [2] - 161:1, 161:2
**Food** [4] - 90:12, 188:23, 189:3, 189:7
**FOR** [3] - 1:13, 1:17, 1:21
**foregoing** [1] - 252:19
**foreign** [2] - 89:16, 247:23
**form** [21] - 110:6, 110:16, 110:21, 111:4, 111:12, 112:10, 113:5, 115:2, 115:11, 116:1, 116:4, 116:8, 117:2, 117:6, 117:23, 117:24, 118:3, 129:22, 148:19, 155:5, 226:25
**formal** [1] - 14:10
**formed** [1] - 57:18
**former** [1] - 165:3
**forms** [6] - 103:4, 110:13, 113:20, 114:5, 114:13, 114:20
**formulated** [2] - 69:14, 83:21
**FORT** [1] - 1:2
**Fort** [3] - 1:4, 1:22, 252:24
**forth** [2] - 69:13, 105:9
**forthcoming** [1] - 87:4
**forum** [1] - 24:13
**forward** [4] - 10:6, 15:10, 95:7, 101:7
**foundation** [2] - 75:4, 204:24
**four** [11] - 6:7, 30:2, 71:1, 89:14, 90:23, 91:1, 245:13, 245:25, 246:1, 246:7, 246:10
**FPR** [2] - 2:2, 252:21
**frame** [2] - 49:23, 71:22
**fraud** [4] - 47:2, 51:13, 54:1, 64:8
**fraudulently** [1] - 118:4
**free** [1] - 101:3
**Friday** [3] - 158:5, 158:6, 252:4
**Frier** [16] - 20:10, 38:22, 40:9, 40:12, 40:15, 50:6, 50:19, 67:6, 96:7, 97:13, 123:12, 161:4, 161:8, 161:11, 161:16, 161:22
**front** [7] - 31:15, 36:17, 78:4, 112:17, 112:18, 113:11, 154:25
**full** [7] - 21:16, 71:24, 148:17, 148:23, 149:1, 156:13, 158:12
**furtherance** [1] - 6:21

## G

**G-U-J-A-R-A-T** [1] - 188:22
**gather** [2] - 48:14, 252:10
**general** [1] - 220:12
**generally** [5] - 111:2, 129:14, 161:10, 180:14, 194:17
**generic** [11] - 180:1, 194:13, 194:15, 194:20, 198:4, 198:6, 200:17, 245:1, 245:21, 246:4
**generics** [2] - 194:25, 215:1
**Gentek** [46] - 21:7, 22:14, 22:16, 22:17, 23:3, 57:22, 59:7, 59:10, 59:11, 59:18, 59:20, 60:7, 60:11, 61:1, 61:12, 61:20, 62:4, 63:8, 63:12, 63:16, 63:18, 64:8, 64:19, 89:24, 96:17, 96:19, 97:24, 98:6, 102:14, 112:6, 112:15, 113:21,

127:6, 174:16, 174:24, 203:18, 203:20, 209:1, 209:12, 209:17, 210:19, 210:25, 212:5, 228:18, 228:21
**Gentek's** [1] - 174:23
**genuine** [1] - 91:3
**Gilead** [225] - 17:14, 18:12, 19:12, 25:17, 25:22, 26:6, 28:6, 28:7, 28:13, 28:22, 29:4, 29:6, 29:14, 30:7, 30:13, 30:23, 31:6, 32:2, 34:17, 35:5, 35:7, 35:9, 35:12, 36:1, 40:16, 41:19, 41:25, 42:3, 42:13, 42:24, 45:1, 46:3, 46:12, 49:6, 49:9, 49:10, 49:12, 49:13, 50:11, 50:16, 51:13, 57:18, 60:19, 61:1, 65:1, 65:14, 65:17, 66:2, 66:6, 66:12, 66:18, 66:24, 67:5, 67:9, 67:22, 69:15, 69:18, 69:23, 69:24, 70:2, 71:21, 73:3, 73:9, 73:14, 73:15, 73:21, 73:23, 74:18, 74:25, 77:17, 78:2, 78:3, 78:6, 78:9, 79:3, 79:5, 79:11, 79:13, 80:20, 81:3, 81:8, 82:7, 82:13, 83:3, 83:25, 84:10, 85:1, 85:2, 85:11, 85:14, 86:2, 86:7, 86:9, 86:17, 86:22, 87:4, 89:15, 89:25, 90:2, 90:11, 90:12, 90:17, 90:18, 90:21, 90:24, 91:5, 91:6, 91:10, 91:18, 93:7, 93:16, 94:8, 94:23, 95:1, 95:8, 95:18, 96:3, 96:6, 96:12, 96:14, 102:17, 105:9, 105:25, 106:5, 107:19, 107:25, 109:4, 109:10, 109:15, 109:18, 109:21, 120:12, 120:14, 149:6, 149:24, 150:8, 150:9, 150:14, 150:20, 150:23, 151:3, 151:6, 151:9, 151:21, 151:23, 159:17, 169:9, 169:14, 170:3, 170:8, 170:17, 172:12, 173:6, 173:7, 175:17, 176:19, 177:16, 179:25, 180:4, 202:22, 202:25, 203:4, 208:18, 209:4, 210:7, 210:8, 213:7, 213:9, 213:13, 213:21, 217:5, 217:18, 218:5, 218:13, 225:16, 225:24, 226:2, 226:8, 226:13, 226:15, 226:20, 227:9, 228:12, 228:15, 229:9, 233:6, 236:16, 237:2, 237:3, 237:7, 237:9, 237:11, 237:15, 237:17, 237:19, 237:20, 237:23, 237:25, 238:21, 239:1, 239:2, 239:3, 239:5, 239:8, 239:12, 239:18, 239:19, 240:7, 240:10, 240:12, 240:14, 240:16, 240:18, 243:3, 243:8, 243:18, 243:20, 247:5, 247:8, 247:16, 247:19
**Gilead's** [5] - 80:25, 86:2, 102:18, 109:19, 243:10
**given** [5] - 16:19, 16:25, 60:13, 235:14, 243:2
**goal** [3] - 47:17, 47:18, 47:19
**goods** [1] - 192:21
**googling** [2] - 155:25, 156:3
**Government** [63] - 5:7, 10:2, 10:13, 11:23, 13:2, 13:4, 13:17, 13:19, 14:7, 14:9, 14:10, 16:19, 30:2, 74:7, 99:14, 118:25, 122:24, 123:8, 129:2, 130:21, 131:9, 135:8, 136:4, 139:25, 141:16, 143:3, 146:23, 150:2, 151:17, 154:12, 156:4, 158:15, 167:2, 170:7, 173:13, 177:15, 177:21, 178:24, 179:10, 179:14, 179:21, 187:16, 187:17, 189:2, 203:1, 204:22, 204:23, 208:2, 208:3, 213:25, 214:9, 218:1, 223:10, 223:14, 224:5, 224:15, 224:24, 225:1, 229:12, 250:8, 251:12
**government** [6] - 43:21, 188:19, 188:20, 188:22, 248:15, 248:24
**GOVERNMENT** [1] - 1:13
**Government's** [29] - 3:13, 3:14, 3:15, 3:16, 3:17, 7:21, 9:3, 10:18, 17:19, 70:15, 89:1, 98:23, 138:6, 140:15, 145:9, 169:18, 174:19, 185:11, 204:15, 205:3, 207:14, 208:7, 208:8, 209:8, 209:25, 210:22, 214:14, 240:22, 251:25
**GPO** [9] - 195:7, 195:8, 195:17, 195:20, 195:22, 195:25, 196:3
**graduated** [2] - 188:16, 188:17
**granted** [1] - 126:24
**gray** [28] - 18:22, 19:11, 19:20, 19:24, 20:12, 20:13, 26:19, 26:21, 27:3, 40:17, 41:10, 48:18, 48:23, 49:7, 49:18, 50:11, 52:16, 53:4, 53:7, 54:19, 62:8, 63:4, 67:18, 68:10, 69:18, 83:7, 83:11, 249:13
**great** [3] - 106:20, 107:6, 226:2
**greater** [1] - 223:4
**greatest** [1] - 225:14
**Group** [1] - 212:10
**group** [7] - 195:8, 195:12, 195:16, 196:3, 212:1, 225:5, 225:9
**guess** [11] - 10:10, 19:8, 53:15, 57:25, 96:8, 107:1, 107:2, 107:14, 149:23, 250:2, 251:11
**guesses** [4] - 148:7, 148:16, 149:3, 150:1
**guidance** [4] - 38:5, 38:25, 39:2, 131:22
**guidelines** [1] - 171:10
**Gujarat** [2] - 188:20, 188:22
**guys** [6] - 4:25, 71:13, 101:5, 106:21, 244:5, 249:20

## H

**Hacksaw** [5] - 99:3, 100:4, 100:10, 100:17, 100:22
**hair** [1] - 219:3
**half** [7] - 6:8, 188:18, 190:19, 218:2, 222:16, 250:7, 250:10
**hand** [2] - 187:19, 251:22
**handle** [3] - 39:10, 78:15, 125:23
**handling** [1] - 38:25
**handwritten** [2] - 41:17, 180:9
**harder** [2] - 95:19
**harm** [1] - 94:9
**head** [1] - 162:13
**Health** [2] - 195:7, 195:9
**health** [2] - 169:24, 201:18
**healthcare** [4] - 40:5, 40:9, 161:13, 161:15
**hear** [9] - 13:5, 13:6, 13:13, 27:9, 93:12, 93:21, 106:6, 110:2, 113:16
**heard** [17] - 34:19, 93:7, 95:1, 96:23, 96:25, 98:3, 106:3, 118:24, 120:6, 120:7, 166:15, 197:18, 207:7, 222:25, 228:6, 228:12, 236:22
**hearing** [3] - 5:21, 93:13, 105:13
**hearsay** [4] - 28:16, 108:10, 200:5, 204:4
**help** [8] - 38:11, 39:11, 39:12, 45:12, 50:2, 126:18, 162:22, 221:16
**helped** [1] - 117:23
**helpful** [2] - 41:16, 252:11
**helping** [3] - 117:23, 117:25
**hereby** [1] - 252:19
**herself** [4] - 10:17, 14:17, 14:19, 50:23
**hesitant** [1] - 156:16
**Hi** [2] - 126:11, 126:16
**high** [1] - 44:6
**higher** [3] - 43:17, 44:2, 224:6
**highlight** [3] - 146:13, 210:17, 211:1
**highlighted** [3] - 131:22, 145:2, 210:20
**Highway** [1] - 1:22
**himself** [1] - 244:9
**historically** [1] - 193:24
**history** [8] - 29:15, 30:8, 46:3, 131:14, 131:18, 170:13, 180:18, 181:16
**HIV** [57] - 24:2, 25:9, 42:25, 50:11, 52:12, 56:6, 63:18, 68:19, 76:25, 77:20, 126:12, 126:17, 136:14, 141:5, 150:10, 150:11, 151:6, 193:8, 193:10, 193:12, 193:23, 193:25, 194:6, 195:4, 195:5, 196:13, 196:16, 196:17, 197:4, 197:14, 197:21, 198:11, 198:15, 198:22, 199:3, 199:7, 199:10, 199:12, 199:17, 199:22, 200:11, 200:21, 201:12, 201:25, 202:20, 203:23, 206:14, 206:24, 209:12, 209:13, 209:19, 210:5, 215:9, 215:11, 215:14, 230:18
**hold** [4] - 5:23, 32:13,

60:21, 224:2
**holiday** [1] - 33:19
**home** [2] - 121:3, 121:16
**Honor** [77] - 5:15, 5:17, 6:3, 6:11, 6:19, 7:22, 9:21, 9:24, 10:12, 11:19, 12:9, 12:15, 12:18, 12:23, 13:3, 13:10, 13:11, 14:1, 15:3, 15:21, 15:23, 16:8, 37:21, 60:22, 87:25, 88:2, 88:8, 88:13, 88:15, 91:25, 111:24, 112:22, 113:9, 116:13, 116:22, 118:18, 124:24, 149:25, 152:17, 155:14, 155:19, 156:15, 157:14, 157:16, 157:24, 158:2, 158:17, 158:20, 159:1, 159:3, 165:18, 186:22, 187:15, 187:17, 204:4, 205:5, 205:17, 215:18, 215:20, 216:9, 217:11, 220:15, 223:20, 225:18, 226:17, 226:24, 227:19, 227:22, 229:17, 230:2, 230:5, 240:1, 241:20, 243:10, 244:15, 250:4, 252:1
**Honorable** [1] - 2:3
**HONORABLE** [1] - 1:10
**hopefully** [3] - 248:22, 249:4, 250:22
**hoping** [1] - 250:19
**hospital** [5] - 192:9, 192:11, 192:13, 193:17, 193:19
**Hospital** [2] - 192:11, 193:17
**hospital's** [1] - 193:20
**hotel** [1] - 121:3
**hounding** [1] - 68:3
**hour** [2] - 6:7, 152:5
**hours** [5] - 6:8, 73:6, 120:17, 250:12, 252:9
**house** [1] - 26:6
**household** [1] - 192:22
**housekeeping** [1] - 248:14
**huge** [1] - 222:12
**hundred** [1] - 222:15
**hurtful** [1] - 77:8
**hypothetically** [2] - 219:5, 220:23

## I

**idea** [8] - 16:21, 106:12, 106:25, 107:6, 108:1, 109:3, 134:23, 229:1
**identification** [1] - 241:14
**identified** [3] - 90:6, 185:1, 242:4
**identifies** [1] - 89:20
**identify** [2] - 20:22, 91:5
**identifying** [2] - 113:12, 151:23
**ignore** [4] - 121:9, 121:18, 126:24, 167:23
**ignoring** [1] - 39:12
**illegal** [3] - 219:20, 219:21, 219:25
**illegality** [1] - 79:8
**illegitimate** [14] - 70:8, 70:9, 78:17, 78:18, 79:1, 79:19, 79:24, 80:14, 80:19, 85:23, 90:14, 93:12, 169:25, 170:10
**imagine** [1] - 250:17
**immediate** [1] - 73:6
**immediately** [1] - 91:6
**immunity** [9] - 9:11, 9:14, 10:1, 10:3, 10:13, 14:10, 16:19, 17:1, 17:6
**impact** [2] - 77:14, 201:11
**impacted** [2] - 201:12, 202:3
**implications** [1] - 7:4
**importance** [1] - 176:15
**important** [15] - 29:3, 29:6, 118:3, 171:8, 181:8, 182:8, 182:14, 182:15, 182:19, 183:2, 183:18, 185:14, 186:1, 252:9, 252:12
**impression** [1] - 149:18
**imprint** [1] - 205:10
**improper** [8] - 153:10, 156:11, 156:21, 166:22, 167:13, 169:4, 185:18, 186:22
**improperly** [5] - 52:15, 67:13, 155:8, 155:9, 155:10
**improve** [4] - 110:6, 110:13, 117:13, 117:16
**improved** [3] - 111:16, 116:1, 116:4
**improvements** [1] - 110:20
**improving** [12] - 103:4, 103:8, 103:11, 103:14, 103:16, 103:18, 103:24, 104:7, 104:17, 104:20, 110:11, 111:3
**in-house** [1] - 26:6
**inappropriate** [4] - 61:21, 154:8, 154:11, 154:12
**incidences** [3] - 36:14, 125:25, 126:1
**incident** [27] - 20:5, 20:6, 25:2, 26:16, 37:14, 55:18, 68:20, 68:23, 69:11, 69:17, 71:18, 76:15, 78:2, 78:3, 85:3, 89:17, 120:13, 126:2, 172:16, 173:6, 173:10, 237:20, 238:1, 244:3, 244:7
**incidents** [14] - 21:20, 21:23, 26:25, 27:2, 38:17, 89:14, 120:6, 120:9, 120:10, 120:12, 174:4, 174:8, 175:25, 206:6
**inclined** [2] - 11:14, 11:23
**include** [7] - 98:15, 138:9, 193:8, 193:14, 205:25, 207:17, 214:5
**included** [5] - 31:19, 93:1, 130:10, 168:6, 177:8
**including** [4] - 42:25, 89:25, 90:14, 130:9
**incompetence** [1] - 72:18
**incompetent** [4] - 72:9, 72:11, 73:12, 134:10
**inconsistent** [5] - 85:5, 85:16, 85:22, 170:13, 170:15
**incorrect** [4] - 6:10, 6:19, 60:14, 122:4
**indeed** [1] - 122:6
**independent** [1] - 108:24
**India** [3] - 188:14, 188:15, 189:23
**indicated** [3] - 16:2, 51:15, 59:9
**indictment** [3] - 122:20, 155:25, 164:2
**individual** [2] - 25:21, 25:24
**individuals** [1] - 229:13
**induction** [2] - 91:2, 92:12
**industry** [8] - 75:7, 129:18, 222:20, 222:25, 223:7, 225:3, 227:3, 228:9
**infectious** [3] - 193:7, 193:8, 193:22
**influenced** [1] - 209:21
**inform** [3] - 82:3, 174:7, 223:14
**information** [82] - 15:9, 21:11, 21:14, 21:15, 22:14, 23:1, 23:8, 23:9, 23:10, 23:15, 24:11, 24:15, 24:17, 25:13, 29:19, 31:5, 35:2, 35:9, 35:24, 37:9, 37:11, 47:16, 47:19, 47:20, 48:14, 53:17, 59:11, 60:5, 60:14, 61:19, 61:24, 62:3, 67:5, 67:10, 68:1, 68:4, 68:9, 71:17, 77:18, 79:20, 80:8, 83:23, 84:1, 84:3, 84:4, 85:12, 85:15, 86:1, 86:12, 87:4, 90:6, 91:12, 92:21, 94:23, 98:16, 104:14, 115:3, 125:7, 127:25, 128:11, 128:16, 133:14, 133:20, 136:7, 144:6, 148:17, 148:23, 149:1, 149:14, 170:12, 175:16, 175:21, 180:17, 185:23, 186:7, 186:18, 187:7, 203:17, 203:20, 231:6, 231:19, 252:10
**informed** [8] - 30:11, 30:17, 60:7, 89:23, 103:11, 168:2, 168:18, 238:18
**informing** [1] - 89:13
**initiate** [1] - 34:13
**input** [7] - 104:8, 110:11, 114:25, 115:1, 115:6, 115:13, 115:21
**inquire** [3] - 21:9, 231:20, 243:7
**inquired** [1] - 170:3
**inquiries** [1] - 169:9
**inquiring** [2] - 169:12, 169:15
**insert** [1] - 76:12
**inside** [9] - 182:17, 202:15, 233:13, 233:17, 234:5, 234:8, 234:10, 235:9, 239:5
**inspection** [1] - 90:23
**instance** [11] - 30:13, 130:25, 131:3, 172:11, 173:5, 176:24, 180:1, 184:3, 206:24, 235:2, 236:21
**instances** [6] - 30:12, 90:16, 173:7, 177:11, 182:16, 247:22
**instead** [6] - 54:15, 81:12, 84:10, 84:11, 93:13, 225:25
**instinct** [1] - 46:11
**instruct** [1] - 159:7
**instructed** [2] - 97:11, 156:18
**instruction** [6] - 15:4, 121:8, 121:19, 154:4, 157:6, 157:25
**instructions** [1] - 237:5
**insurance** [4] - 43:20, 199:14
**insurances** [1] - 199:15
**insurers** [2] - 199:19, 215:15
**intake** [10] - 110:6, 110:16, 110:21, 111:3, 111:12, 111:15, 112:6, 115:11, 116:1, 116:8
**integrity** [1] - 90:10
**intend** [1] - 155:19

**intent** [1] - 12:14
**intention** [8] - 10:8, 11:2, 11:15, 12:17, 13:19, 14:9, 16:2, 16:22
**interaction** [1] - 25:3
**interest** [2] - 86:23, 199:23
**interested** [2] - 35:24, 125:24
**interests** [1] - 118:7
**international** [1] - 8:9
**internet** [1] - 91:11
**interpret** [1] - 16:25
**interrogated** [2] - 7:15, 7:17
**interrupt** [3] - 6:11, 149:22, 163:11
**interrupted** [1] - 41:6
**interview** [1] - 223:17
**intimidate** [5] - 14:24, 124:9, 154:22, 157:11, 159:12
**intimidated** [10] - 121:2, 121:25, 123:20, 124:3, 124:5, 152:25, 153:13, 154:16, 154:17, 154:20
**intimidating** [2] - 120:22, 155:4
**intimidation** [3] - 153:22, 154:9, 154:14
**introduced** [1] - 89:2
**inventory** [2] - 101:16, 181:19
**investigate** [2] - 76:15, 93:22
**investigated** [3] - 68:10, 97:21, 237:19
**investigation** [14] - 23:4, 25:17, 25:20, 29:14, 58:4, 70:5, 72:22, 73:4, 80:19, 81:24, 82:4, 82:9, 90:9, 90:15
**investigator** [3] - 22:24, 127:25, 128:6
**invitation** [3] - 33:13, 35:18, 35:19
**invitations** [1] - 35:20
**invoice** [1] - 140:17
**invoices** [1] - 238:6
**invoking** [1] - 10:20
**involved** [28] - 18:21, 22:18, 26:1, 30:20, 30:24, 38:7, 38:8, 40:17, 44:5, 51:11, 52:24, 53:16, 53:21, 64:21, 65:9, 68:24, 78:3, 96:5, 97:5, 97:7, 97:13, 98:21, 99:2, 120:9, 156:1, 160:9, 179:17, 246:7
**involvement** [1] - 73:21
**involves** [1] - 21:19
**involving** [2] - 89:17, 206:7
**irrelevant** [1] - 76:4
**ish** [1] - 81:17
**isolated** [1] - 76:15
**issue** [47] - 10:15, 12:5, 13:23, 14:3, 14:5, 19:11, 19:19, 31:1, 46:6, 46:12, 47:9, 48:5, 54:15, 62:10, 68:19, 70:6, 73:7, 73:20, 73:24, 74:11, 75:8, 75:10, 92:12, 93:8, 95:2, 127:7, 137:22, 148:11, 149:6, 149:18, 149:20, 150:24, 153:9, 154:14, 155:14, 156:9, 164:23, 172:12, 172:20, 172:25, 181:1, 181:14, 220:1
**issued** [1] - 83:3
**issues** [18] - 20:21, 47:23, 55:4, 76:2, 76:9, 76:23, 81:8, 135:2, 139:13, 150:17, 168:23, 176:24, 176:25, 179:25, 182:9, 183:7, 185:25, 186:2
**item** [1] - 219:11
**items** [2] - 219:13, 235:22
**itself** [5] - 31:18, 35:25, 53:10, 92:1, 210:12
**Ivlis** [1] - 1:18

## J

**Jacqueline** [1] - 1:13
**Jake** [1] - 30:3
**Janssen** [3] - 211:22, 211:23, 211:24
**January** [8] - 33:20, 33:21, 34:1, 35:19, 37:3, 38:12, 211:1, 211:10
**Jersey** [2] - 189:18, 189:20
**Jesse** [8] - 53:16, 60:7, 97:16, 98:5, 123:15, 123:17, 160:8, 160:11
**job** [27] - 22:24, 23:4, 23:6, 47:12, 56:7, 56:9, 56:10, 58:3, 61:10, 102:5, 115:5, 115:10, 115:12, 117:8, 117:9, 117:15, 117:16, 117:18, 134:18, 145:5, 188:19, 190:9, 190:12
**John** [9] - 38:13, 39:16, 165:3, 165:14, 166:5, 168:2, 168:6, 168:17, 169:1
**Judge** [44] - 6:2, 7:24, 10:16, 14:5, 15:13, 16:10, 32:13, 32:20, 41:13, 87:8, 88:1, 88:20, 103:19, 108:14, 111:17, 111:22, 118:13, 120:23, 122:10, 123:22, 123:25, 124:12, 126:23, 129:22, 148:19, 152:21, 153:15, 154:13, 155:1, 157:13, 157:25, 166:18, 167:13, 167:19, 169:3, 175:1, 185:17, 204:24, 208:5, 221:10, 221:18, 240:22, 251:15
**JUDGE** [1] - 1:10
**judge** [11] - 4:6, 5:4, 8:21, 11:9, 13:22, 14:3, 140:10, 158:8, 164:14, 248:14, 252:15
**judgment** [1] - 64:22
**judiciary** [1] - 249:1
**Juluca** [1] - 193:14
**July** [4] - 65:5, 65:7, 105:11, 140:21
**jump** [2] - 78:18, 183:4
**jumped** [1] - 209:1
**June** [2] - 51:4, 140:21
**juror** [2] - 248:12, 249:5
**jurors** [2] - 158:14, 248:18
**jury** [39] - 4:5, 4:23, 5:10, 5:14, 6:13, 6:14, 6:15, 6:16, 12:25, 13:18, 15:16, 15:18, 15:20, 28:20, 74:15, 87:9, 87:15, 87:24, 88:3, 88:10, 88:12, 121:19, 150:6, 152:8, 152:12, 153:21, 154:6, 154:10, 154:25, 155:5, 156:19, 157:6, 157:23, 158:11, 158:21, 158:25, 248:5, 248:11, 252:14
**JURY** [1] - 1:9
**Jury** [2] - 5:12, 158:23

## K

**keep** [8] - 126:12, 157:1, 211:15, 211:16, 226:15, 226:20, 248:17
**keeping** [2] - 44:2, 188:10
**kept** [4] - 67:21, 67:23, 68:3, 202:24
**killed** [1] - 14:14
**Kind** [1] - 250:17
**kind** [15] - 45:15, 47:13, 163:5, 177:14, 181:4, 189:24, 192:14, 192:21, 193:3, 194:5, 194:8, 195:15, 212:4, 242:3, 245:22
**kinds** [7] - 25:10, 72:1, 126:4, 193:2, 193:3, 193:19, 194:12
**Kinray** [9] - 194:2, 194:7, 196:24, 198:3, 198:19, 206:16, 231:14, 231:17
**know..** [1] - 37:19
**knowing** [3] - 38:7, 50:4, 72:13
**knowingly** [1] - 83:10
**knowledge** [21] - 28:13, 28:20, 30:7, 30:12, 46:3, 50:5, 55:1, 58:12, 59:2, 75:22, 92:9, 151:8, 168:5, 216:10, 216:19, 225:19, 228:17, 228:20, 233:17, 234:12, 234:16
**known** [8] - 42:3, 47:3, 92:11, 161:16, 165:6, 209:11, 209:17, 209:19
**knows** [10] - 45:10, 71:19, 71:20, 84:21, 128:21, 128:22, 129:17, 225:21, 226:18, 229:19

## L

**label** [4] - 76:20, 86:3, 96:2
**Laboratory** [2] - 188:24, 189:8
**lack** [6] - 41:18, 58:11, 59:1, 75:21, 216:9, 216:18
**lacks** [1] - 75:4
**ladies** [2] - 192:5, 192:6
**language** [2] - 131:6, 143:18
**large** [5] - 74:25, 176:4, 192:9, 197:13, 197:18
**larger** [5] - 194:25, 197:15, 198:4, 225:9, 245:6
**largest** [1] - 245:15
**last** [24] - 4:25, 5:3, 44:16, 54:14, 70:16, 72:7, 74:14, 74:23, 103:12, 121:3, 121:9, 121:14, 121:16, 126:24, 138:13, 142:17, 158:3, 167:23, 169:20, 173:15, 184:2, 188:5, 248:24, 250:2
**late** [2] - 82:8, 210:18
**latest** [1] - 171:9
**latitude** [1] - 51:7
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:22, 252:24
**law** [32] - 8:22, 8:23, 10:25, 38:24, 39:6, 56:23, 57:1, 81:14, 100:23, 101:18, 101:24, 125:22, 139:18, 139:20, 139:22, 141:1, 160:6, 160:20, 161:1, 161:2, 161:11, 161:16, 161:18, 161:19,

161:23, 164:5, 164:8, 225:23, 236:5
**laws** [1] - 160:17
**lawsuit** [20] - 49:3, 49:9, 49:22, 50:6, 50:8, 50:13, 50:16, 50:19, 50:20, 50:24, 51:10, 51:13, 52:14, 53:3, 53:24, 54:17, 54:20, 96:8, 96:11, 159:24
**lawyer** [44] - 7:19, 7:20, 7:25, 8:2, 8:3, 8:22, 8:23, 8:24, 9:1, 9:6, 9:18, 10:9, 10:17, 10:24, 11:10, 11:12, 11:17, 11:18, 12:19, 12:20, 26:8, 79:16, 81:14, 115:10, 123:3, 125:20, 155:9, 156:25, 157:3, 157:7, 159:8, 159:25, 160:2, 177:2, 237:7, 237:9, 237:11, 237:15, 237:20, 237:23
**lawyer's** [1] - 108:19
**lawyers** [24] - 5:23, 8:16, 10:25, 38:8, 96:5, 96:6, 96:7, 129:24, 150:5, 153:13, 158:9, 161:4, 161:22, 162:4, 162:12, 163:3, 163:7, 163:10, 163:18, 164:21, 186:25, 227:1, 246:14, 247:3
**lead** [2] - 48:1, 50:18
**leading** [4] - 101:10, 126:20, 148:19, 148:21
**leaflets** [2] - 233:22, 233:24
**learned** [10] - 51:10, 60:11, 67:4, 68:18, 78:6, 97:21, 98:10, 118:10, 185:22
**learning** [3] - 50:20, 98:15, 187:4
**least** [9] - 30:13, 47:14, 61:20, 85:17, 92:18, 245:24, 250:18, 250:20, 251:25
**leaving** [1] - 248:13
**led** [2] - 60:14, 122:5
**left** [5] - 17:11, 17:15, 48:21, 185:1, 250:7
**Legacy** [7] - 195:7, 195:9, 195:22, 195:25, 196:4, 196:7
**legal** [34] - 6:9, 6:10, 6:19, 6:20, 17:2, 18:11, 21:17, 22:21, 23:6, 25:14, 56:10, 56:14, 56:15, 56:20, 57:6, 64:12, 79:7, 79:25, 80:10, 80:23, 96:9, 102:5, 119:7, 122:1, 122:2, 122:3, 122:5, 126:4, 161:8, 169:24, 219:21, 229:16, 229:18, 229:21
**Legend** [16] - 191:15, 191:19, 191:24, 191:25, 192:1, 192:4, 192:7, 192:14, 192:15, 193:1, 193:2, 193:11, 193:16, 193:24, 213:10, 232:9
**legitimacy** [2] - 54:2, 91:7
**legitimate** [4] - 22:9, 55:9, 63:5, 154:17
**LeMed** [7] - 191:1, 191:2, 191:3, 191:4, 191:13, 191:17, 191:18
**Leroy** [4] - 190:25, 191:2, 191:4, 191:12
**less** [7] - 40:9, 40:11, 217:9, 217:20, 218:7, 223:3, 224:17
**letter** [55] - 18:8, 18:11, 19:4, 19:10, 19:14, 20:3, 20:4, 22:6, 23:20, 23:22, 24:1, 24:6, 24:16, 24:18, 24:21, 24:22, 24:25, 25:16, 26:13, 27:12, 28:21, 35:17, 36:10, 37:14, 37:15, 38:3, 46:1, 46:11, 49:25, 73:3, 82:2, 82:7, 93:6, 95:7, 95:8, 95:20, 106:21, 107:18, 107:21, 107:24, 120:14, 151:18, 151:21, 169:20, 177:16, 210:7, 210:12, 210:13, 210:14, 210:17, 211:5, 211:12, 238:10
**letters** [2] - 169:14, 241:8
**letting** [2] - 52:15, 249:7
**level** [6] - 44:3, 77:11, 77:12, 77:13, 119:6, 184:23
**Levitt** [20] - 20:10, 38:13, 38:14, 38:22, 40:9, 40:12, 40:15, 50:6, 50:19, 67:6, 96:7, 97:13, 123:12, 161:4, 161:8, 161:11, 161:16, 161:22
**license** [16] - 60:8, 60:9, 61:23, 63:20, 97:24, 97:25, 98:6, 98:7, 98:11, 127:7, 145:18, 145:24, 174:17, 174:23, 190:8
**licensed** [11] - 44:17, 46:18, 62:14, 62:16, 62:18, 62:19, 63:7, 185:2, 185:3, 186:2, 190:7
**licenses** [2] - 145:6, 174:14
**licensing** [2] - 97:23, 130:5
**lied** [2] - 59:17, 60:11
**life** [1] - 236:21
**light** [1] - 92:19
**likely** [3] - 62:10, 79:4, 219:20
**limited** [3] - 196:7, 196:9, 196:10
**line** [8] - 75:19, 76:1, 76:22, 151:24, 210:8, 244:21, 247:6, 247:8
**link** [1] - 90:22
**list** [4] - 90:21, 179:1, 179:23, 184:2
**listed** [4] - 181:5, 183:21, 209:17, 211:19
**Listen** [1] - 37:17
**litigation** [5] - 159:21, 159:23, 159:25, 161:12, 164:2
**litigator** [2] - 160:11, 160:13
**live** [1] - 189:20
**lived** [1] - 189:18
**LLC** [5] - 89:22, 89:24, 209:12, 209:18, 210:19
**located** [2] - 89:22, 192:7
**location** [2] - 209:11, 209:19
**log** [1] - 198:20
**logistics** [1] - 129:21
**look** [36] - 5:2, 7:14, 10:10, 33:2, 45:2, 72:16, 74:9, 89:1, 94:25, 99:21, 111:11, 111:13, 113:3, 115:22, 116:3, 116:4, 136:3, 136:20, 137:4, 138:5, 138:11, 139:6, 162:20, 162:21, 167:1, 167:3, 169:18, 172:15, 177:21, 180:25, 203:4, 204:17, 209:22, 218:19, 231:25, 233:2
**looked** [23] - 94:23, 115:7, 122:19, 128:13, 129:8, 130:20, 140:25, 162:6, 168:6, 168:22, 172:14, 174:25, 179:16, 180:6, 180:14, 183:13, 185:15, 203:9, 211:6, 212:4, 212:5, 245:25, 247:19
**looking** [22] - 31:5, 32:2, 37:1, 37:2, 47:25, 113:19, 113:22, 113:25, 114:3, 114:17, 128:3, 141:19, 156:3, 162:1, 162:15, 167:6, 180:16, 184:10, 185:14, 185:25, 213:2, 245:16
**looks** [6] - 113:8, 139:3, 209:22, 212:20, 242:5, 248:13
**lose** [2] - 158:11, 158:12
**lost** [1] - 190:14
**LOT** [1] - 241:7
**lunch** [3] - 5:5, 87:10, 87:13
**luncheon** [1] - 4:20
**lying** [5] - 62:3, 62:6, 63:8, 63:16, 63:21

## M

**ma'am** [13] - 16:17, 18:4, 22:2, 23:6, 27:1, 30:22, 57:3, 104:19, 116:3, 117:14, 118:12, 187:13, 187:14
**Macovey** [1] - 120:8
**made-up** [2] - 216:8, 225:13
**magnitude** [2] - 67:17, 77:11
**major** [1] - 227:4
**malpractice** [2] - 12:13, 119:6
**manage** [2] - 191:8, 225:8
**management** [1] - 238:18
**manager** [6] - 190:13, 190:18, 190:19, 191:23, 192:2, 207:1
**managers** [1] - 161:13
**managing** [2] - 130:5, 191:7
**manipulated** [1] - 133:21
**Mantilla** [1] - 1:18
**manufactured** [2] - 182:10, 182:17
**manufacturer** [41] - 28:12, 41:10, 41:19, 41:25, 43:6, 43:12, 43:25, 44:7, 44:15, 45:25, 47:10, 48:20, 55:23, 62:10, 62:13, 73:1, 77:8, 149:6, 149:21, 176:23, 180:21, 181:11, 182:3, 182:6, 182:10, 182:25, 211:22, 214:20, 216:16, 217:4, 229:5, 229:22, 234:19, 234:22, 237:2, 240:11, 241:10, 241:17, 245:19, 245:25, 246:12
**manufacturers** [8] - 28:11, 28:14, 74:1, 149:19, 150:17, 182:10, 225:14, 226:3
**manufacturing** [8] - 28:6, 28:22, 46:6, 46:12, 73:24, 74:25, 148:11, 188:18
**March** [19] - 39:2,

39:16, 82:20, 82:25, 91:13, 93:1, 96:25, 175:13, 198:25, 199:1, 202:19, 203:14, 205:24, 210:3, 215:8, 232:5, 246:21, 247:20
**marked** [2] - 204:15, 207:14
**market** [47] - 18:21, 18:22, 19:11, 19:20, 19:22, 19:24, 20:12, 20:13, 26:19, 26:21, 27:3, 40:17, 41:10, 48:18, 48:23, 49:7, 49:17, 49:18, 50:11, 51:21, 51:25, 52:16, 52:19, 53:4, 53:7, 53:10, 54:19, 55:10, 55:16, 62:8, 67:18, 67:19, 68:10, 69:18, 69:19, 75:9, 76:18, 83:7, 83:10, 83:11
**married** [1] - 189:12
**Martha** [1] - 50:21
**MARTHA** [2] - 3:3, 16:12
**Martinez** [12] - 232:20, 232:22, 235:2, 237:23, 240:25, 243:3, 243:7, 243:8, 243:18, 243:21, 243:24, 246:19
**Maryland** [8] - 4:16, 60:8, 60:10, 89:23, 98:6, 145:18, 208:20
**massive** [1] - 84:14
**matter** [13] - 4:6, 4:7, 6:12, 7:5, 13:22, 18:21, 26:23, 33:17, 38:17, 171:15, 204:6, 248:14, 252:20
**matters** [6] - 38:9, 161:4, 161:12, 162:4, 163:7, 163:19
**Maurice** [1] - 161:2
**McKesson** [47] - 194:2, 194:5, 194:7, 194:10, 194:17, 195:1, 196:4, 196:20, 196:24, 197:12, 198:3, 198:18, 198:19, 206:11, 206:13, 213:16, 213:19, 213:21, 214:2, 214:5, 214:19, 214:20, 214:22, 215:1, 218:2, 218:5, 218:7, 221:2, 227:17, 228:2, 228:3, 228:6, 228:7, 229:10, 231:14, 231:16, 231:17, 231:18, 234:2, 234:15, 234:17, 244:24, 245:9, 245:13, 245:17, 246:11
**mean** [25] - 7:18, 10:20, 14:16, 21:6, 37:19, 56:9, 56:20, 71:25, 76:23, 80:5, 85:18, 97:4, 120:14, 125:10, 155:23, 192:12, 193:23, 195:12, 205:19, 219:20, 221:4, 221:9, 221:12, 231:12, 233:19
**meaning** [3] - 192:15, 192:20, 195:8
**means** [8] - 48:22, 70:9, 84:5, 95:18, 159:23, 167:20, 219:25
**meant** [5] - 49:13, 85:20, 85:24, 165:20, 214:18
**meanwhile** [1] - 190:4
**mechanism** [1] - 10:6
**mediation** [1] - 158:8
**Medicare** [2] - 161:14, 199:14
**medication** [51] - 25:10, 125:17, 126:8, 126:12, 126:17, 136:14, 137:9, 137:15, 141:5, 151:6, 166:12, 168:23, 176:14, 182:16, 183:20, 184:5, 184:8, 185:3, 185:7, 185:9, 193:5, 193:6, 193:23, 194:13, 194:14, 194:15, 194:20, 195:9, 201:16, 202:22, 206:14, 208:18, 214:20, 216:17, 217:19, 223:2, 224:16, 233:1, 233:19, 233:23, 233:24, 235:11, 235:13, 235:19, 235:21, 236:4, 236:7, 236:9, 236:14, 236:22, 245:1
**medications** [10] - 180:1, 198:9, 218:25, 224:6, 224:19, 225:9, 226:5, 228:15, 245:6, 245:21
**medicine** [6] - 192:12, 193:3, 222:23, 225:16, 244:24
**medicines** [1] - 227:6
**meds** [3] - 136:14, 150:10, 150:11
**MedWatch** [1] - 91:11
**meeting** [1] - 24:14
**meetings** [1] - 30:2
**members** [5] - 6:14, 87:9, 152:8, 196:4, 248:5
**memo** [1] - 209:8
**memorialize** [1] - 20:10
**memory** [17] - 98:14, 106:22, 111:25, 112:1, 112:23, 113:12, 115:17, 116:14, 147:19, 162:23, 163:7, 163:22, 164:8, 165:21, 223:18, 224:4, 224:12
**mention** [3] - 19:23, 156:19, 166:11
**mentioned** [25] - 73:8, 94:18, 103:12, 120:10, 128:7, 128:12, 142:22, 146:18, 149:4, 160:8, 160:13, 164:4, 164:20, 164:21, 164:22, 166:7, 172:15, 176:7, 176:18, 195:3, 195:19, 198:4, 199:21, 203:11, 245:8
**mergers** [1] - 161:20
**message** [3] - 138:11, 141:1, 142:17
**messages** [3] - 139:3, 139:5, 142:12
**met** [2] - 123:17, 223:11
**method** [1] - 230:23
**Miami** [2] - 1:16, 1:19
**microphone** [4] - 19:6, 111:23, 187:25, 188:1
**mid** [3] - 37:24, 82:20, 82:25
**mid-March** [1] - 82:25
**mid-sentence** [1] - 37:24
**might** [24] - 7:13, 41:16, 62:13, 73:22, 81:19, 103:5, 117:11, 128:19, 132:7, 148:5, 148:7, 148:8, 153:14, 156:16, 165:6, 168:11, 174:7, 181:22, 184:10, 195:1, 228:21, 248:19
**milligram** [1] - 205:13
**million** [1] - 141:5
**mind** [11] - 19:10, 27:5, 40:21, 55:15, 66:25, 73:24, 74:22, 84:25, 86:9, 86:17, 137:6
**minor** [1] - 75:9
**minus** [9] - 194:8, 221:6, 221:7, 221:8, 221:9, 221:12, 222:2, 222:3
**minute** [2] - 60:21, 164:11
**minutes** [7] - 6:15, 23:25, 41:13, 72:8, 152:12, 152:18, 157:17
**misconstrued** [1] - 119:8
**mislead** [1] - 108:16
**misleading** [1] - 241:21
**misled** [2] - 40:22, 54:2
**missed** [3] - 139:4, 194:16, 211:17
**misspeak** [1] - 171:25
**misspoke** [1] - 165:20
**misstating** [1] - 150:2
**mistake** [5] - 46:13, 46:17, 46:21, 46:24, 157:2
**mistaken** [1] - 24:4
**mistrial** [4] - 153:25, 155:11, 156:22, 157:5
**mix** [8] - 28:11, 29:20, 41:9, 74:2, 74:17, 79:5, 150:24
**mix-up** [4] - 41:9, 79:5, 150:24
**mix-ups** [4] - 28:11, 29:20, 74:2, 74:17
**model** [2] - 23:5, 25:9
**Molly** [1] - 17:18
**moment** [8] - 9:20, 22:16, 32:13, 95:13, 140:3, 183:5, 215:18, 230:2
**Monday** [6] - 16:5, 16:6, 158:6, 248:8, 248:10, 252:17
**money** [10] - 47:5, 74:5, 75:16, 171:4, 235:23, 236:1, 243:18, 243:21, 249:2
**monopoly** [2] - 226:15, 226:20
**Montefiore** [2] - 192:11, 193:17
**month** [4] - 200:3, 201:7, 222:24, 230:21
**months** [6] - 123:12, 166:12, 170:9, 186:3, 198:24, 222:24
**morning** [10] - 16:17, 16:18, 16:19, 88:23, 88:24, 89:11, 93:7, 101:4, 101:5, 119:9
**Moronne** [8] - 39:16, 165:3, 165:14, 166:5, 168:2, 168:6, 168:17, 169:1
**Morrone** [3] - 25:6, 165:8
**most** [4] - 40:12, 40:15, 193:10, 252:9
**motion** [6] - 121:6, 121:7, 123:24, 124:12, 157:5
**motions** [1] - 152:20
**motive** [2] - 73:15, 74:18
**move** [10] - 116:19, 122:12, 126:23, 140:11, 152:5, 167:19, 186:24, 204:23, 208:2, 214:9
**moved** [1] - 191:17
**moving** [1] - 95:7
**MR** [327] - 3:3, 3:5, 3:6, 3:6, 3:7, 4:6, 4:14, 4:19, 5:4, 5:7, 5:15, 5:16, 5:17, 6:2, 7:21, 7:23, 8:21, 9:4, 9:13, 9:17, 9:20, 10:12, 10:16, 10:20, 11:9, 11:19, 11:21, 12:3, 12:8, 13:2, 13:5, 13:6, 13:11, 13:22, 14:3, 14:5, 14:16, 15:13, 15:21,

15:22, 15:23, 16:10, 16:16, 16:24, 17:5, 17:10, 17:18, 17:21, 18:6, 18:7, 19:7, 19:9, 27:22, 27:23, 28:19, 31:4, 31:13, 31:14, 32:13, 32:15, 32:20, 33:1, 34:4, 34:6, 36:16, 37:23, 37:25, 38:10, 40:1, 41:3, 41:12, 41:14, 51:8, 52:5, 54:6, 54:13, 55:12, 55:14, 58:14, 59:6, 60:1, 60:4, 61:3, 61:16, 64:10, 64:16, 66:1, 66:11, 68:16, 70:15, 70:17, 73:19, 75:5, 75:24, 76:6, 78:1, 84:22, 86:16, 87:5, 87:8, 87:25, 88:1, 88:2, 88:13, 88:14, 88:15, 88:20, 88:22, 89:1, 89:4, 90:3, 90:5, 92:3, 92:24, 92:25, 93:3, 93:5, 94:11, 94:21, 95:6, 98:20, 98:24, 99:1, 100:7, 100:16, 103:19, 103:21, 104:6, 104:9, 104:18, 104:22, 104:25, 105:8, 107:9, 108:5, 108:14, 108:16, 108:22, 109:7, 109:14, 110:1, 111:1, 111:8, 111:10, 111:17, 111:20, 112:5, 112:21, 113:1, 113:2, 113:16, 113:18, 114:2, 114:24, 115:19, 116:11, 116:22, 116:23, 118:12, 118:15, 118:18, 120:23, 121:6, 121:13, 121:16, 121:19, 121:22, 122:10, 122:12, 123:22, 123:24, 124:2, 124:12, 124:24, 126:20, 126:23, 129:22, 140:10, 140:13, 148:19, 149:25, 150:4, 152:21, 153:14, 153:24, 154:2, 154:4, 154:13, 155:1, 157:13, 157:16, 157:25, 158:2, 158:8, 158:17, 159:1, 159:2, 159:3, 164:14, 166:18, 166:22, 167:13, 167:19, 169:3, 175:1, 185:17, 186:22, 186:24, 187:17, 188:7, 189:1, 200:5, 200:8, 203:1, 203:3, 204:4, 204:7, 204:14, 204:18, 204:22, 204:24, 204:25, 205:5, 205:8, 205:17, 205:19, 205:21, 207:13, 207:16, 208:2, 208:4, 208:5, 208:9, 209:7, 209:10, 209:25, 210:2, 211:1, 211:4, 211:8, 211:9, 211:14, 211:18, 212:7, 212:9, 212:13, 212:15, 213:24, 214:1, 214:9, 214:11, 214:12, 214:16, 215:4, 215:5, 215:18, 215:20, 215:23, 216:9, 216:13, 216:18, 216:22, 217:11, 217:12, 217:14, 217:17, 218:14, 218:18, 220:15, 220:18, 220:20, 221:10, 221:11, 221:15, 221:18, 221:21, 222:5, 223:20, 223:22, 224:1, 225:18, 225:22, 226:17, 226:19, 226:24, 227:2, 227:12, 227:13, 227:20, 227:22, 228:1, 229:17, 229:20, 230:2, 230:4, 230:8, 240:1, 240:3, 240:20, 240:23, 241:5, 241:6, 241:20, 242:1, 243:10, 243:14, 243:16, 244:11, 244:14, 244:17, 246:18, 246:20, 248:1, 248:14, 248:18, 248:22, 249:8, 250:3, 250:10, 250:15, 250:16, 250:23, 250:25, 251:10, 251:25, 252:7, 252:15

**MS** [168] - 3:4, 6:11, 9:24, 15:3, 17:2, 17:8, 28:16, 32:22, 36:11, 37:21, 37:24, 39:22, 40:25, 51:5, 52:2, 54:5, 54:10, 55:11, 58:11, 59:1, 59:4, 59:22, 60:22, 61:14, 64:9, 64:12, 65:21, 68:12, 73:17, 75:2, 75:4, 75:21, 76:4, 77:21, 84:20, 86:13, 86:19, 91:25, 94:10, 94:13, 95:4, 98:18, 100:6, 100:8, 100:12, 104:4, 104:13, 105:6, 107:7, 107:12, 108:3, 108:10, 109:5, 109:11, 109:22, 110:22, 111:24, 112:22, 113:9, 113:15, 113:23, 115:14, 116:13, 118:21, 121:1, 121:11, 121:23, 122:14, 124:6, 124:14, 125:3, 127:1, 129:1, 129:3, 129:12, 129:13, 130:1, 130:21, 130:23, 131:9, 131:11, 135:8, 135:10, 135:15, 135:17, 136:3, 136:5, 136:10, 136:12, 136:20, 136:21, 137:4, 137:7, 137:12, 137:14, 137:19, 137:21, 138:5, 138:7, 138:17, 138:19, 139:24, 140:1, 140:6, 140:16, 141:15, 141:18, 142:7, 142:9, 142:15, 142:16, 143:3, 143:5, 144:1, 144:3, 145:13, 145:15, 145:20, 145:22, 146:15, 146:25, 147:2, 148:2, 148:3, 148:22, 150:15, 151:17, 151:20, 152:4, 155:14, 157:14, 157:24, 158:15, 159:14, 159:15, 163:13, 163:17, 164:17, 165:19, 166:23, 167:1, 167:5, 167:17, 167:25, 169:7, 169:18, 169:22, 173:14, 173:17, 173:23, 173:24, 174:10, 174:12, 174:20, 174:22, 175:4, 177:21, 177:23, 179:21, 179:22, 180:11, 180:12, 185:11, 185:13, 185:21, 187:2, 187:12, 227:19

**multiple** [5] - 63:16, 66:19, 182:10, 205:14, 218:15

**must** [1] - 67:2

## N

**naive** [7] - 128:13, 128:20, 129:9, 129:15, 129:16, 130:17, 132:4

**name** [10] - 25:22, 25:23, 100:17, 188:2, 188:4, 188:5, 191:2, 191:13, 232:19, 238:11

**named** [6] - 25:21, 38:24, 39:6, 133:24, 160:8, 171:18

**names** [3] - 113:4, 120:7, 162:3

**naming** [1] - 75:11

**narrow** [2] - 21:17, 125:6

**natural** [1] - 23:14

**nature** [1] - 81:20

**NE** [1] - 1:15

**near** [3] - 192:9, 224:16, 224:20

**necessarily** [2] - 76:22, 249:4

**necessary** [7] - 21:25, 23:14, 24:20, 24:23, 40:16, 40:19, 69:18

**need** [20] - 4:22, 7:25, 11:17, 19:5, 21:16, 33:24, 37:11, 37:16, 53:13, 57:15, 95:13, 100:23, 100:24, 101:22, 101:23, 116:24, 142:11, 164:11, 171:12

**needed** [11] - 24:15, 25:17, 32:7, 35:25, 37:15, 39:12, 128:4, 147:11, 171:11, 191:17, 196:24

**needs** [5] - 7:20, 9:1, 10:17, 141:24, 192:16

**negligence** [1] - 12:13

**never** [31] - 7:8, 39:1, 66:20, 68:6, 82:8, 85:6, 92:10, 92:12, 93:7, 94:25, 98:3, 99:16, 106:14, 119:17, 120:7, 124:4, 126:9, 126:13, 126:15, 130:19, 132:14, 150:1, 153:3, 224:15, 230:25, 231:2, 231:3, 231:23, 236:11, 236:13, 249:4

**new** [7] - 58:18, 68:18, 81:14, 92:13, 117:2, 185:22, 187:4

**New** [8] - 189:18, 189:20, 190:5, 190:7, 190:25, 223:11, 237:19, 244:1

**newly** [1] - 117:5

**newsletter** [1] - 175:10

**next** [25] - 8:7, 8:8, 8:12, 33:11, 34:17, 34:18, 68:17, 71:7, 71:25, 72:1, 90:3, 129:5, 129:6, 145:14, 177:10, 182:21, 187:16, 204:3, 218:16, 250:11, 250:20, 250:21, 251:20, 252:2, 252:10

**nice** [2] - 87:13, 248:9

**night** [5] - 121:3, 121:10, 121:15, 121:16, 251:10

**NO** [1] - 1:2

**none** [2] - 119:7, 206:12

**nonprescription** [1] - 192:18

**noon** [2] - 4:21, 4:22

**normal** [1] - 41:20

**note** [4] - 108:9, 108:24, 156:15,

252:4
**notes** [1] - 223:17
**nothing** [20] - 13:2, 19:14, 56:25, 87:16, 154:10, 154:15, 154:18, 154:22, 155:4, 156:11, 156:21, 157:7, 157:9, 158:15, 159:7, 159:8, 159:9, 187:12, 206:13, 236:2
**notice** [14] - 4:8, 113:20, 237:25, 238:4, 238:5, 239:9, 239:12, 239:15, 240:5, 240:8, 240:9, 247:4, 247:9
**noticed** [1] - 126:16
**notification** [9] - 79:11, 240:17, 241:16, 241:18, 242:3, 242:11, 242:12, 242:16, 242:18
**notified** [2] - 174:1, 205:23
**notify** [14] - 147:5, 174:3, 200:2, 200:12, 200:16, 200:24, 201:3, 201:19, 201:24, 202:6, 202:10, 202:14, 203:12, 203:19
**notion** [1] - 128:20
**November** [18] - 17:14, 17:24, 22:6, 23:21, 25:4, 26:4, 35:16, 49:24, 50:1, 50:13, 82:1, 82:6, 82:7, 82:12, 82:13, 95:20, 170:16, 202:10
**Number** [1] - 3:12
**number** [24] - 37:7, 43:16, 72:22, 138:12, 141:3, 191:11, 194:15, 212:20, 213:6, 216:8, 217:4, 217:7, 225:13, 233:19, 233:20, 233:23, 241:14, 241:19, 242:4, 242:13, 242:23, 243:1, 247:5
**numbered** [1] - 100:2
**numbers** [2] - 195:15, 233:5
**NW** [1] - 1:19

## O

**oath** [3] - 13:9, 88:7, 158:19
**object** [9] - 11:23, 11:24, 111:24, 112:22, 113:9, 116:13, 149:25, 204:24, 217:16
**objection** [89] - 11:24, 17:2, 17:8, 28:16, 36:11, 39:22, 40:25, 51:5, 52:2, 54:5, 54:10, 55:11, 58:11, 59:1, 59:22, 60:22, 61:14, 64:9, 64:15, 65:21, 68:12, 73:17, 75:2, 75:21, 76:4, 77:21, 84:20, 86:13, 86:19, 91:25, 94:10, 95:4, 98:18, 100:6, 104:4, 104:13, 104:22, 105:6, 107:7, 107:12, 108:3, 108:10, 109:5, 109:11, 109:22, 110:22, 113:23, 115:14, 116:22, 120:23, 122:10, 123:22, 124:12, 124:24, 126:20, 129:22, 140:13, 148:19, 148:21, 166:18, 167:13, 167:20, 169:3, 175:1, 185:17, 185:20, 186:22, 200:5, 204:4, 204:25, 205:17, 208:4, 208:5, 214:11, 214:12, 216:9, 216:18, 217:11, 218:14, 218:17, 225:18, 226:17, 227:19, 227:22, 229:17, 240:1, 241:20, 243:10
**objections** [5] - 12:1, 12:4, 12:7
**obtained** [1] - 65:15
**obtaining** [1] - 105:20
**obviously** [11] - 4:10, 25:20, 39:11, 43:16, 47:8, 49:20, 92:14, 107:18, 113:4, 153:5, 197:20
**occur** [3] - 74:2, 74:17, 224:16
**occurred** [8] - 10:23, 30:23, 46:25, 64:4, 122:6, 238:1, 239:9, 240:18
**occurring** [1] - 20:21
**October** [18] - 4:23, 4:24, 8:13, 25:6, 100:3, 139:18, 141:2, 141:25, 158:3, 165:24, 166:3, 172:23, 175:25, 202:6, 202:8, 205:24, 246:25, 252:4
**odd** [1] - 150:19
**OF** [3] - 1:1, 1:4, 1:9
**offensive** [2] - 65:17, 65:19
**offer** [5] - 8:25, 10:1, 117:4, 197:4, 245:17
**offered** [6] - 8:23, 194:5, 194:17, 197:11, 214:22, 219:13
**offering** [3] - 219:19, 222:15, 246:10
**OFFICER** [8] - 5:11, 15:17, 87:14, 87:18, 88:9, 152:13, 157:19, 158:22
**officer** [8] - 4:15, 47:19, 56:10, 58:16, 72:2, 94:3, 134:4, 184:19
**Official** [2] - 2:3, 252:21
**often** [2] - 28:11, 76:8
**oh..** [1] - 224:10
**once** [7] - 4:12, 73:4, 170:25, 190:11, 235:12, 238:25
**One** [1] - 136:22
**one** [129] - 4:6, 4:7, 9:7, 9:20, 10:10, 22:15, 28:13, 30:13, 32:13, 40:5, 42:8, 43:3, 44:15, 44:16, 45:2, 45:4, 46:8, 47:8, 48:1, 49:3, 55:4, 55:22, 56:2, 60:21, 62:16, 63:5, 66:10, 68:3, 70:21, 78:3, 79:1, 81:11, 85:17, 89:11, 90:24, 94:3, 95:25, 96:23, 98:22, 109:19, 109:21, 112:8, 112:13, 112:19, 113:3, 113:5, 113:6, 113:21, 114:8, 114:19, 115:16, 118:24, 123:16, 128:19, 129:12, 129:14, 130:16, 131:17, 133:4, 134:5, 134:12, 138:17, 140:3, 140:18, 142:15, 145:20, 146:25, 148:2, 149:5, 149:23, 156:15, 158:6, 164:22, 165:25, 169:20, 169:21, 172:16, 173:5, 173:10, 174:10, 177:10, 177:19, 177:24, 178:2, 178:6, 178:11, 178:22, 179:8, 179:12, 179:13, 179:20, 180:4, 180:14, 182:3, 182:9, 182:22, 188:18, 188:20, 188:23, 190:3, 192:5, 193:22, 194:2, 194:13, 195:3, 195:20, 204:2, 212:5, 215:18, 222:14, 223:8, 227:7, 230:2, 231:23, 232:12, 233:2, 234:11, 237:25, 239:10, 240:16, 243:21, 245:24, 247:3
**one's** [1] - 101:14
**one-page** [2] - 112:8, 112:19
**ones** [2] - 213:19, 226:4
**open** [9] - 137:15, 147:22, 174:7, 180:6, 192:15, 192:17, 192:19, 201:21, 234:7
**open-door** [2] - 192:15, 192:19
**opened** [8] - 155:20, 191:16, 192:1, 234:13, 234:23, 236:3
**opening** [1] - 193:1
**operating** [8] - 128:8, 130:25, 131:13, 170:23, 171:7, 171:14, 171:16, 248:25
**operation** [1] - 25:5
**operations** [3] - 134:21, 134:24, 191:10
**opine** [2] - 132:23, 229:17
**opinion** [4] - 73:14, 106:13, 106:14, 117:5
**opinions** [1] - 226:25
**opportunity** [3] - 10:14, 35:8, 93:21
**opposed** [2] - 63:5, 91:20
**option** [1] - 16:4
**Order** [1] - 4:1
**order** [6] - 4:11, 14:11, 65:2, 65:14, 100:18, 226:20
**organization** [3] - 195:8, 195:12, 225:6
**original** [1] - 114:8
**originally** [2] - 188:13, 188:14
**originated** [1] - 67:24
**otherwise** [1] - 180:13
**out-of-town** [1] - 158:9
**outpatient** [1] - 4:9
**outside** [11] - 6:12, 8:15, 8:18, 13:24, 26:2, 71:12, 71:13, 81:14, 96:5, 153:10, 191:8
**outstanding** [1] - 250:20
**outweighed** [1] - 153:8
**over-the-counter** [6] - 191:9, 192:17, 192:18, 192:20, 195:10, 219:1
**overruled** [29] - 28:17, 39:24, 41:1, 52:3, 58:13, 61:15, 65:24, 75:3, 76:5, 94:14, 100:15, 104:16, 104:23, 107:13, 109:12, 109:24, 110:23, 120:24, 122:11, 123:23, 124:25, 129:25, 205:1, 216:11, 216:20, 225:20, 227:25, 241:23, 243:13
**own** [6] - 6:6, 150:6, 156:24, 159:23, 226:3, 226:25
**owner** [2] - 172:5, 172:8
**owners** [1] - 192:4

**owns** [1] - 192:4

**P**

**P-A-R-E-K-H** [1] - 188:5
**p.m** [1] - 93:2
**package** [1] - 76:12
**packaging** [1] - 91:4
**PAGE** [1] - 3:2
**page** [42] - 18:6, 70:16, 74:8, 74:10, 89:3, 89:5, 90:3, 92:24, 100:2, 111:13, 112:8, 112:19, 129:5, 129:6, 136:11, 136:20, 137:4, 137:20, 141:17, 144:2, 145:14, 167:10, 169:20, 173:14, 173:15, 173:22, 174:20, 179:4, 203:2, 203:6, 203:17, 208:10, 209:9, 209:18, 210:23, 211:8, 211:15, 212:7, 212:13
**Page** [1] - 3:12
**pages** [4] - 72:17, 163:5, 163:22, 204:16
**Pages** [1] - 1:8
**paid** [4] - 243:8, 243:18, 243:20, 249:3
**paragraph** [2] - 74:14, 223:23
**Parekh** [21] - 187:18, 188:4, 188:5, 188:8, 189:10, 204:8, 204:17, 204:20, 205:9, 207:17, 209:11, 210:5, 210:10, 210:15, 212:16, 215:6, 237:20, 244:18, 246:22, 248:2, 248:3
**PAREKH** [2] - 3:5, 187:21
**part** [45] - 19:21, 19:22, 27:2, 29:11, 29:23, 33:19, 33:21, 42:21, 54:1, 54:14, 54:19, 55:25, 56:2, 67:11, 75:12, 82:16, 97:8, 98:15, 102:5, 103:5, 110:16, 112:4, 135:24, 136:7, 136:16, 138:1, 138:22, 139:19, 141:20, 142:3, 142:17, 148:15, 149:23, 153:4, 156:8, 165:14, 166:5, 172:5, 172:8, 194:16, 210:20, 211:17, 224:6, 225:5, 225:9
**participating** [1] - 166:25
**particular** [7] - 40:11, 60:8, 159:25, 233:24, 242:5, 243:1, 252:9
**parties** [2] - 4:17, 48:2
**partner** [8] - 38:6, 38:24, 39:6, 53:15, 64:20, 184:1, 184:2, 190:21
**partner's** [1] - 192:6
**partners** [6] - 73:6, 79:2, 96:13, 96:16, 96:24, 184:1
**pass** [1] - 118:15
**passed** [1] - 39:16
**past** [1] - 197:18
**pasting** [3] - 143:11, 144:6, 144:9
**Pat** [4] - 19:1, 19:18, 20:18, 22:7
**patience** [2] - 188:11, 248:2
**patient** [37] - 41:9, 43:4, 43:20, 43:22, 44:22, 44:25, 46:23, 48:24, 48:25, 76:23, 86:23, 90:19, 148:12, 180:19, 183:21, 184:1, 184:4, 184:5, 184:8, 184:11, 184:14, 184:24, 200:3, 201:17, 204:11, 204:19, 205:10, 205:12, 206:4, 207:10, 212:17, 212:25, 232:19, 236:1, 236:9, 244:3
**patient's** [1] - 201:17
**patients** [13] - 47:3, 47:4, 83:12, 89:14, 193:16, 193:19, 199:8, 199:10, 199:13, 199:18, 204:2, 215:12, 232:12
**PATRICIA** [2] - 2:2, 252:21
**PATRICK** [2] - 1:7, 1:17
**Patrick** [26] - 10:12, 106:9, 119:20, 126:14, 127:2, 127:14, 135:4, 144:24, 172:7, 174:24, 177:8, 177:19, 177:24, 178:1, 178:6, 178:11, 178:18, 178:22, 179:1, 179:8, 179:12, 179:17, 179:18, 187:8, 210:8, 211:12
**pattern** [1] - 42:18
**Pause** [1] - 9:23
**pay** [6] - 43:21, 43:22, 199:10, 199:12
**paying** [4] - 218:2, 221:12, 221:16, 235:18
**pedigree** [35] - 90:7, 128:22, 130:5, 141:9, 170:12, 176:25, 180:17, 180:22, 181:8, 181:12, 181:13, 182:23, 198:21, 207:8, 208:12, 208:13, 208:23, 212:16, 212:22, 212:24, 213:3, 214:2, 231:2, 231:3, 231:6, 231:7, 231:12, 231:13, 231:15, 238:7, 238:15, 238:17, 238:18, 238:20
**pedigrees** [15] - 128:20, 135:19, 179:5, 198:12, 198:16, 199:3, 207:3, 207:19, 207:24, 210:23, 213:18, 230:24, 231:20, 238:6, 238:13
**pen** [1] - 180:13
**penalties** [3] - 143:20, 143:24, 144:10
**people** [11] - 39:19, 42:4, 51:19, 51:20, 51:24, 51:25, 136:25, 162:7, 181:5, 227:5, 249:2
**percent** [18] - 54:22, 194:21, 195:1, 197:9, 213:13, 214:24, 214:25, 218:3, 220:10, 221:3, 221:22, 221:24, 222:16, 244:23, 245:9, 245:11, 245:12
**percentage** [1] - 194:15
**percentages** [1] - 194:18
**perception** [2] - 155:17, 156:23
**perfectly** [2] - 229:16, 229:21
**period** [13] - 27:3, 50:10, 51:9, 51:10, 58:25, 77:5, 124:3, 184:9, 191:20, 196:23, 199:2, 214:3, 214:23
**perjures** [2] - 14:16, 14:18
**perjury** [1] - 14:22
**permissible** [1] - 229:24
**permission** [1] - 205:6
**permitted** [1] - 12:5
**person** [9] - 39:1, 45:10, 57:24, 58:8, 58:17, 100:17, 217:2, 238:16
**personal** [8] - 58:11, 59:1, 75:21, 216:10, 216:18, 225:19, 228:17, 228:20
**perspective** [2] - 7:21, 252:1
**pertained** [2] - 26:25, 29:21
**Peter** [7] - 99:3, 100:4, 100:13, 100:18, 101:9, 101:20, 250:17
**Pfizer** [1] - 150:12
**Ph** [1] - 1:19
**Pharm** [2] - 203:8, 238:10
**Pharm/alert** [6] - 202:21, 203:4, 203:11, 203:16, 207:7, 247:19
**Pharm/alerts** [1] - 202:25
**pharma** [2] - 83:6, 95:25
**Pharma** [7] - 75:12, 75:14, 75:18, 75:25, 76:2, 227:5
**pharmaceutical** [4] - 18:22, 19:11, 75:7, 227:4
**pharmacies** [25] - 49:10, 49:14, 49:17, 49:18, 52:14, 52:23, 54:25, 55:2, 83:11, 89:13, 89:20, 90:8, 108:25, 175:10, 177:5, 183:4, 183:7, 183:12, 183:15, 190:3, 195:13, 228:3, 239:9, 239:10, 239:17
**pharmacist** [13] - 190:1, 190:7, 190:9, 190:12, 191:5, 191:6, 191:7, 191:9, 191:14, 191:23, 191:25, 192:2
**pharmacists** [6] - 84:11, 84:14, 89:9, 91:16, 93:14, 175:11
**pharmacy** [65] - 42:12, 42:13, 43:15, 43:20, 44:21, 46:21, 54:21, 63:1, 63:3, 71:5, 71:19, 72:25, 97:18, 98:8, 117:11, 117:12, 145:25, 160:17, 160:20, 161:12, 161:13, 183:9, 184:2, 184:8, 188:16, 190:3, 190:5, 190:11, 190:12, 190:17, 190:19, 190:22, 190:24, 191:8, 192:14, 192:15, 192:19, 197:5, 200:23, 203:23, 205:16, 206:11, 206:20, 207:18, 209:12, 214:3, 218:24, 219:11, 228:9, 229:6, 229:10, 229:14, 229:23, 230:11, 232:9, 232:13, 233:8, 234:4, 235:3, 236:7, 242:21, 246:1
**Pharmacy** [17] - 142:11, 145:19, 190:12, 190:20, 190:25, 191:1, 191:2, 191:3, 191:4, 191:12, 191:13, 191:17, 191:18, 232:9, 242:21
**pharmacy's** [1] - 236:6
**PharmAlert** [14] -

82:23, 83:3, 83:9, 84:11, 84:14, 87:1, 89:6, 91:16, 95:24, 105:25, 126:3, 175:7, 232:4, 232:5
**phone** [8] - 20:8, 27:14, 27:15, 166:1, 166:7, 166:8, 166:11
**phony** [1] - 98:11
**photo** [1] - 212:19
**Photograph** [2] - 3:16, 205:3
**photos** [10] - 167:3, 167:6, 183:15, 204:11, 204:19, 205:9, 206:3, 207:10, 212:18, 246:18
**physical** [1] - 80:3
**picked** [1] - 252:14
**picture** [7] - 21:16, 138:20, 156:14, 233:23, 240:20, 240:24, 241:5
**pictures** [7] - 99:10, 137:5, 138:16, 167:10, 180:5, 184:17, 241:2
**piece** [1] - 6:9
**pill** [16] - 172:12, 233:4, 233:5, 233:7, 233:17, 233:20, 233:23, 238:1, 239:3, 239:5, 239:11, 240:13, 240:17, 240:24, 241:17, 242:17
**pills** [32] - 28:23, 30:8, 30:15, 47:4, 47:9, 48:5, 48:10, 48:15, 71:5, 71:20, 99:10, 137:16, 138:20, 176:14, 176:25, 180:6, 184:12, 201:25, 204:9, 204:11, 228:13, 234:11, 239:11, 240:6, 240:7, 241:18, 242:4, 242:13, 242:18, 242:19, 243:9, 243:19
**pissed** [1] - 137:23
**place** [12] - 17:11, 30:20, 82:21, 99:7, 100:18, 170:4, 171:12, 171:13, 181:13, 185:15, 191:19, 225:13
**placed** [1] - 231:6
**places** [2] - 180:4, 186:3
**plans** [1] - 161:15
**plenty** [1] - 150:10
**plus** [1] - 250:20
**PM** [2] - 1:6, 252:18
**pocket** [1] - 199:10
**Pogozelski** [1] - 1:13
**POGOZELSKI** [85] - 3:5, 3:7, 5:7, 5:15, 7:21, 9:4, 9:13, 9:17, 9:20, 11:19, 13:2, 15:21, 87:25, 88:13, 104:22, 116:22, 159:1, 187:17, 188:7, 189:1, 200:8, 203:1, 203:3, 204:7, 204:14, 204:18, 204:22, 205:5, 205:8, 205:19, 205:21, 207:13, 207:16, 208:2, 208:9, 209:7, 209:10, 209:25, 210:2, 211:1, 211:4, 211:8, 211:9, 211:14, 211:18, 212:7, 212:9, 212:13, 212:15, 213:24, 214:1, 214:9, 214:16, 215:4, 215:5, 215:18, 215:20, 216:9, 216:18, 217:11, 217:14, 218:14, 225:18, 226:17, 226:24, 227:12, 227:22, 229:17, 240:1, 241:20, 243:10, 243:14, 244:14, 244:17, 246:18, 246:20, 248:1, 249:8, 250:3, 250:10, 250:16, 250:25, 251:10, 251:25, 252:7
**point** [69] - 10:21, 18:20, 21:7, 21:8, 22:15, 24:10, 29:3, 31:5, 32:6, 37:1, 37:2, 38:4, 38:15, 40:6, 47:16, 50:25, 59:17, 64:20, 65:10, 66:12, 69:20, 71:14, 72:5, 74:19, 78:17, 81:23, 83:3, 83:14, 83:19, 83:25, 84:25, 92:23, 94:7, 94:8, 96:16, 96:18, 97:11, 112:3, 112:24, 119:15, 119:20, 119:23, 123:14, 127:5, 128:13, 128:17, 129:14, 130:24, 134:5, 134:12, 141:2, 149:5, 149:17, 160:5, 160:9, 164:14, 172:19, 174:3, 175:16, 175:24, 179:23, 180:20, 191:15, 199:5, 203:22, 228:18, 228:21, 250:9, 252:6
**pointed** [2] - 139:17, 165:25
**pointing** [2] - 132:8, 139:19
**points** [1] - 144:10
**policies** [1] - 58:21
**policy** [8] - 91:17, 171:11, 235:11, 235:13, 236:4, 236:5, 236:6, 236:13
**polite** [1] - 58:1
**polling** [4] - 5:14, 15:20, 88:12, 158:25
**portal** [6] - 198:19, 198:20, 231:5, 231:7, 231:15, 231:25
**portion** [1] - 139:16
**posed** [1] - 129:6
**position** [10] - 9:3, 31:23, 32:2, 48:4, 57:4, 153:21, 155:12, 191:22, 252:15
**positive** [3] - 20:9, 111:4, 115:9
**possibilities** [1] - 180:25
**possibility** [5] - 9:25, 28:12, 130:16, 133:8, 168:2
**possible** [2] - 9:8, 187:25
**potential** [7] - 45:12, 45:22, 50:4, 58:4, 91:5, 96:8, 147:22
**potentially** [7] - 32:16, 40:21, 44:6, 47:2, 51:24, 52:20, 133:12
**PR** [1] - 210:8
**practice** [1] - 47:3
**precise** [1] - 95:12
**precisely** [1] - 155:15
**prefer** [3] - 7:23, 9:7, 251:12
**prejudicial** [1] - 153:9
**prepare** [2] - 37:10, 115:10
**prepared** [1] - 35:11
**preparing** [1] - 190:4
**prescribe** [1] - 193:23
**prescription** [3] - 129:21, 192:16, 192:20
**prescriptions** [1] - 192:22
**presence** [14] - 5:13, 5:20, 6:12, 7:24, 8:18, 15:19, 16:1, 87:11, 88:11, 88:18, 152:11, 158:24, 159:6, 248:7
**present** [7] - 4:3, 31:22, 87:22, 157:21
**pressure** [2] - 193:5, 193:6
**pretty** [5] - 84:18, 84:25, 94:8, 95:20, 119:9
**prevent** [1] - 90:13
**prevents** [1] - 225:24
**previous** [3] - 151:3, 151:5, 169:20
**previously** [5] - 89:2, 92:11, 166:10, 176:2, 180:6
**Prezista** [1] - 211:21
**price** [11] - 43:9, 43:10, 43:17, 43:24, 44:2, 77:3, 213:16, 216:16, 218:20, 219:19, 220:12
**prices** [1] - 44:6
**pricing** [4] - 194:5, 197:16, 214:22, 246:13
**primary** [8] - 194:1, 194:7, 196:17, 196:21, 196:22, 196:24, 198:1, 202:24
**print** [1] - 238:25
**printing** [1] - 41:18
**proactively** [1] - 210:9
**probation** [1] - 4:15
**problem** [30] - 19:23, 19:25, 20:20, 20:23, 21:24, 23:13, 28:6, 28:22, 55:19, 55:20, 62:9, 67:23, 67:24, 78:7, 86:25, 148:5, 150:8, 150:12, 150:14, 154:14, 168:13, 181:18, 203:23, 204:1, 219:25, 242:12
**problems** [10] - 4:25, 20:14, 20:18, 28:14, 67:25, 74:4, 158:13, 227:10, 227:18, 228:12
**procedure** [3] - 11:24, 111:25, 146:20
**procedures** [12] - 58:21, 128:8, 130:25, 131:13, 132:9, 132:18, 170:23, 171:7, 171:9, 171:11, 171:15, 171:16
**proceed** [5] - 12:23, 34:12, 108:13, 146:14, 251:12
**proceedings** [2] - 9:23, 252:19
**process** [4] - 45:8, 59:18, 111:20, 181:14
**processes** [1] - 80:4
**produced** [1] - 54:18
**product** [43] - 28:8, 47:21, 49:12, 53:11, 69:24, 70:2, 70:7, 72:23, 72:24, 72:25, 73:3, 73:9, 73:23, 74:2, 74:5, 78:16, 78:25, 79:5, 79:22, 80:3, 80:19, 85:23, 91:5, 91:7, 101:16, 127:11, 130:25, 137:23, 138:13, 170:9, 173:3, 181:10, 181:16, 181:19, 183:7, 183:10, 203:23, 203:24, 224:19, 236:19, 236:20, 247:1
**production** [1] - 54:4
**products** [19] - 51:16, 67:15, 74:17, 89:15, 89:25, 90:14, 90:18, 91:10, 93:12, 150:9, 150:13, 150:20, 169:25, 179:25, 180:4, 192:17, 192:18, 210:18
**professor** [1] - 160:23
**profits** [1] - 225:14
**program** [3] - 4:9, 43:21, 91:11
**prompted** [1] - 207:6
**pronounce** [1] - 93:15
**proper** [3] - 146:19,

166:18, 183:21
**proposed** [1] - 117:2
**prosecute** [1] - 10:18
**prosecuted** [5] - 14:17, 17:7, 17:12, 118:25, 119:2
**prosecuting** [2] - 14:9, 16:23
**prosecutor** [3] - 153:3, 216:1, 240:5
**prosecutors** [15] - 6:24, 8:8, 10:8, 11:2, 11:15, 12:16, 14:5, 14:8, 16:2, 30:2, 30:11, 30:17, 30:22, 157:9, 159:10
**prospect** [2] - 9:6, 123:20
**protect** [2] - 10:17, 157:4
**protection** [1] - 18:17
**provide** [15] - 21:13, 21:17, 22:14, 22:21, 53:11, 56:10, 79:10, 83:24, 85:2, 141:8, 198:12, 198:16, 199:2, 239:1, 252:8
**provided** [29] - 6:9, 6:19, 6:20, 21:11, 24:22, 25:1, 25:13, 25:14, 51:16, 53:23, 57:17, 59:11, 60:5, 83:23, 83:25, 84:6, 85:4, 85:6, 85:16, 90:8, 102:5, 115:21, 122:4, 122:5, 128:17, 186:18, 204:19, 238:21, 246:19
**provides** [1] - 23:8
**providing** [8] - 22:25, 54:16, 67:10, 86:23, 133:21, 139:17, 139:20, 141:1
**public** [2] - 151:15, 169:24
**publish** [1] - 205:6
**Puerto** [4] - 208:19, 209:2, 209:4, 212:2
**pull** [9] - 130:21, 131:9, 146:25, 187:24, 187:25, 203:1, 204:14, 207:13, 246:18
**pulling** [1] - 129:4
**purchase** [12] - 90:8, 90:17, 194:25, 198:2, 198:4, 211:10, 214:18, 214:19, 219:16, 219:18, 230:18, 246:21
**purchased** [12] - 43:17, 53:6, 57:20, 89:23, 141:3, 141:4, 195:4, 199:7, 203:24, 210:24, 215:8, 245:18
**purchases** [2] - 214:5, 230:24
**purchasing** [20] - 19:19, 43:11, 55:17, 56:4, 58:5, 89:21, 127:3, 195:5, 195:8, 195:12, 200:11, 200:20, 202:4, 202:18, 224:5, 225:5, 228:18, 230:11, 239:18, 240:10
**purple** [1] - 180:13
**purportedly** [3] - 211:25, 213:13, 213:14
**purpose** [4] - 36:20, 66:6, 70:5, 92:18
**purposefully** [1] - 150:4
**pursuant** [3] - 65:14, 237:4, 238:1
**pursue** [1] - 27:10
**pushback** [1] - 147:14
**put** [19] - 20:13, 23:12, 27:22, 31:13, 41:12, 47:19, 51:20, 52:18, 70:15, 76:11, 98:24, 107:14, 107:15, 128:24, 150:19, 156:9, 175:13, 182:1, 240:20
**puts** [1] - 71:23
**puzzle** [3] - 45:15, 55:25, 56:2

## Q

**qualify** [1] - 247:1
**quality** [2] - 93:8, 95:1
**quantity** [1] - 176:4
**quarantine** [1] - 72:22
**quarter** [1] - 4:22
**questioned** [1] - 10:4
**questioning** [6] - 10:4, 241:21, 244:21, 246:17, 247:6, 247:8
**questions** [84] - 7:2, 11:1, 12:6, 15:6, 22:1, 30:19, 57:16, 57:17, 57:19, 69:11, 69:21, 69:22, 71:1, 71:4, 71:15, 72:2, 72:12, 72:21, 77:19, 86:18, 102:10, 108:19, 111:22, 112:1, 113:13, 118:17, 119:11, 122:17, 122:19, 122:23, 124:17, 124:18, 125:1, 127:17, 127:19, 128:9, 129:6, 129:8, 132:17, 133:11, 133:23, 134:9, 139:15, 145:4, 146:19, 146:24, 148:4, 150:23, 155:20, 155:21, 155:24, 156:5, 156:12, 156:17, 159:17, 160:4, 160:6, 160:14, 165:2, 165:5, 168:19, 169:11, 170:5, 170:21, 174:13, 175:6, 177:7, 180:24, 181:2, 186:25, 205:22, 212:5, 215:20, 216:3, 218:1, 221:19, 226:25, 228:23, 228:24, 240:4, 244:20, 247:4, 248:1
**quickly** [1] - 222:23
**quite** [3] - 102:11, 124:16, 185:6
**quote** [1] - 85:16

## R

**raid** [4] - 65:2, 66:4, 66:24
**raise** [2] - 127:2, 187:19
**raised** [3] - 9:5, 135:2, 155:14
**ran** [1] - 249:2
**Rapids** [3] - 213:8, 213:9, 213:14
**rate** [2] - 219:11, 227:6
**rather** [6] - 7:15, 9:8, 74:6, 86:25, 156:19, 201:25
**reached** [6] - 26:11, 27:9, 27:15, 123:4, 156:4, 237:7
**reaching** [3] - 39:5, 39:11, 170:3
**reactions** [1] - 76:9
**read** [23] - 24:6, 25:16, 33:2, 33:3, 74:14, 92:1, 92:4, 98:9, 99:8, 101:3, 103:22, 109:8, 116:6, 116:15, 116:16, 132:23, 147:8, 155:22, 223:22, 223:23, 224:18, 233:4, 233:5
**reading** [7] - 23:20, 73:11, 92:5, 108:11, 116:25, 132:24, 136:15
**ready** [2] - 5:24, 5:25
**real** [4] - 144:4, 145:2, 148:18, 216:8
**reality** [1] - 156:6
**realize** [2] - 7:4, 7:9
**really** [19] - 25:8, 37:17, 45:15, 66:4, 73:14, 75:19, 77:10, 85:24, 110:14, 111:5, 115:10, 120:1, 120:4, 152:4, 162:18, 182:25, 184:19, 197:17, 225:13
**reason** [29] - 15:6, 21:13, 21:16, 29:6, 29:23, 35:23, 36:6, 36:9, 36:18, 39:9, 87:6, 114:25, 118:3, 127:21, 127:23, 133:22, 148:15, 153:14, 153:15, 156:3, 156:16, 171:3, 171:6, 184:23, 219:18, 219:23, 233:12, 234:10, 242:16
**reasonable** [2] - 7:11, 152:6
**reasons** [4] - 68:3, 116:14, 148:10, 222:14
**recalled** [1] - 75:16
**receipt** [1] - 27:2
**receive** [5] - 38:6, 39:2, 210:12, 223:3, 234:23
**received** [41] - 4:8, 15:9, 17:13, 17:22, 26:13, 35:16, 51:20, 53:16, 54:7, 54:18, 69:11, 70:21, 74:3, 80:9, 80:15, 86:8, 140:14, 140:15, 184:12, 200:3, 200:13, 201:21, 205:2, 205:3, 207:18, 208:6, 208:7, 208:8, 208:12, 210:24, 211:20, 213:19, 214:13, 214:14, 224:19, 232:12, 234:1, 239:14, 240:8, 242:12
**receiving** [12] - 24:1, 24:3, 26:20, 51:12, 51:24, 52:10, 52:14, 55:9, 55:16, 151:21, 210:14, 241:18
**recess** [9] - 9:15, 87:10, 87:17, 152:9, 157:17, 248:6, 250:6, 251:4, 252:16
**recipient** [1] - 101:22
**recognized** [1] - 18:9
**recollection** [19] - 32:17, 33:4, 68:24, 105:1, 111:7, 112:25, 113:10, 113:11, 114:1, 114:3, 114:9, 114:18, 114:21, 116:18, 117:1, 117:4, 150:6, 164:15, 198:23
**recommended** [1] - 4:9
**recommending** [1] - 173:10
**recommends** [1] - 90:17
**record** [9] - 4:2, 17:19, 27:16, 87:20, 87:21, 90:21, 157:4, 157:18, 157:20
**records** [8] - 65:12, 85:5, 85:16, 85:22, 162:6, 162:15, 170:14, 170:15
**red** [6] - 47:23, 63:20, 131:22, 132:3, 132:13, 132:14
**REDIRECT** [4] - 3:4, 3:7, 118:20, 244:16
**redirect** [10] - 11:8, 118:19, 152:3, 152:22, 166:18, 167:13, 169:4, 185:18, 244:12
**reengaged** [1] - 228:21
**reevaluation** [1] - 96:12
**reference** [3] - 101:2, 104:19, 146:24
**referenced** [1] -

210:25
**referencing** [4] - 89:11, 203:5, 205:25, 209:5
**referred** [5] - 30:3, 110:19, 193:16, 193:17, 193:19
**referring** [3] - 23:24, 39:23, 93:15
**refers** [2] - 104:24, 216:23
**refresh** [14] - 32:16, 33:3, 98:13, 111:6, 112:1, 114:1, 114:17, 114:21, 115:17, 162:22, 163:22, 164:8, 223:17, 224:4
**refreshed** [6] - 33:24, 106:22, 114:4, 114:9, 117:1, 117:4
**refreshes** [4] - 112:25, 116:17, 163:6, 224:11
**refreshing** [5] - 111:25, 112:23, 113:10, 116:14, 164:15
**refund** [6] - 232:23, 235:14, 235:17, 235:21, 236:6, 236:10
**refunding** [1] - 236:1
**refuse** [2] - 219:16, 219:18
**refute** [3] - 153:18, 154:19, 154:22
**regard** [3] - 21:18, 29:22, 125:24
**regarding** [7] - 24:17, 47:21, 73:6, 93:7, 95:1, 138:13, 202:15
**registered** [1] - 190:11
**regulations** [3] - 71:8, 160:15, 160:17
**regulatory** [1] - 160:24
**reinforced** [1] - 23:22
**reject** [1] - 234:24
**rejecting** [1] - 39:12
**related** [3] - 17:23, 73:22, 203:18
**relates** [1] - 17:12
**relating** [3] - 59:18, 73:15, 116:2
**relationship** [1] - 20:3
**relevance** [2] - 153:7, 153:8
**relevant** [1] - 154:25
**relief** [1] - 155:12
**rely** [1] - 150:6
**remain** [2] - 24:8, 87:18
**remaining** [2] - 71:5, 71:20
**remember** [112] - 28:24, 82:25, 87:10, 97:16, 108:8, 108:23, 109:1, 119:10, 119:12, 122:15, 122:17, 122:21, 122:23, 127:19, 128:9, 128:14, 129:7, 129:11, 129:14, 131:12, 131:21, 131:25, 132:2, 132:5, 132:8, 132:12, 132:16, 132:20, 132:22, 133:11, 134:1, 134:10, 136:13, 137:8, 137:16, 139:19, 143:1, 145:7, 146:21, 147:9, 147:13, 148:4, 148:7, 149:7, 149:11, 149:16, 150:22, 150:25, 151:2, 151:21, 151:23, 152:10, 159:16, 159:20, 160:6, 160:14, 161:3, 161:25, 162:3, 162:6, 162:11, 164:5, 165:2, 165:5, 165:8, 165:12, 165:14, 165:25, 166:13, 167:6, 168:1, 168:16, 168:19, 168:21, 168:25, 169:8, 169:11, 170:5, 170:21, 171:1, 171:3, 171:18, 171:23, 172:4, 172:7, 172:10, 172:19, 173:9, 174:13, 175:5, 176:11, 177:7, 177:10, 180:8, 181:2, 181:6, 181:24, 182:5, 185:8, 186:8, 186:12, 187:3, 216:3, 225:1, 227:11, 227:15, 228:24, 230:21, 244:21, 247:5, 248:6, 250:12
**remind** [2] - 125:20, 134:3
**remotely** [1] - 6:21
**repeat** [10] - 13:12, 166:20, 195:24, 198:13, 209:14, 219:9, 239:4, 240:15, 241:24, 243:15
**repetition** [1] - 71:17
**repetitive** [5] - 31:3, 59:23, 68:14, 218:14, 225:19
**rephrase** [1] - 63:15
**reply** [7] - 31:6, 31:11, 32:3, 36:19, 126:1, 126:3, 126:4
**report** [12] - 71:6, 71:21, 74:20, 74:21, 85:8, 91:9, 94:3, 147:11, 153:2, 170:18, 173:6, 240:10
**REPORTED** [1] - 2:1
**reported** [7] - 73:5, 76:9, 89:20, 90:15, 170:10, 172:11, 173:10
**reporter** [4] - 13:7, 13:15, 188:3, 188:21
**Reporter** [3] - 2:3, 66:10, 252:21
**reporting** [4] - 71:8, 78:3, 147:14, 173:5
**reports** [2] - 93:8, 95:1
**represent** [1] - 155:2
**representation** [6] - 14:8, 29:11, 29:24, 92:15, 98:4, 98:15
**representing** [11] - 24:23, 29:1, 38:11, 70:13, 78:22, 83:14, 94:1, 97:10, 155:12, 246:14, 247:3
**reputation** [5] - 84:16, 92:17, 92:19, 176:13
**request** [8] - 9:1, 34:21, 39:13, 109:15, 110:4, 155:11, 207:3, 207:6
**requested** [6] - 84:1, 84:5, 85:15, 115:3, 207:8, 207:24
**requesting** [2] - 85:11, 107:19
**requests** [5] - 13:7, 29:18, 66:10, 85:11, 188:21
**required** [5] - 114:5, 128:20, 147:5, 214:25, 245:21
**requirement** [2] - 100:23, 101:18
**requirements** [5] - 25:14, 129:9, 129:18, 130:6, 143:14
**requires** [1] - 10:3
**research** [2] - 69:8, 69:9
**reserve** [3] - 121:6, 123:24, 124:12
**respectfully** [1] - 13:11
**respond** [9] - 24:15, 29:18, 31:25, 92:16, 109:21, 110:3, 110:4, 151:9
**responded** [7] - 27:12, 38:3, 38:4, 39:1, 106:8, 106:10, 116:12
**responding** [5] - 7:23, 28:20, 32:9, 108:8, 108:23
**responds** [4] - 101:13, 108:6, 147:21, 179:8
**response** [39] - 27:19, 27:24, 28:2, 28:21, 31:6, 31:11, 31:15, 31:22, 32:3, 32:10, 32:18, 33:8, 33:22, 34:10, 34:21, 35:12, 36:2, 36:15, 37:1, 37:6, 37:10, 39:6, 46:2, 47:20, 49:23, 50:17, 69:14, 72:11, 83:21, 83:24, 85:14, 86:1, 86:2, 92:18, 100:22, 144:19, 145:23, 146:11, 146:13
**Response** [1] - 210:8
**responses** [1] - 146:9
**responsibilities** [1] - 130:9
**responsibility** [4] - 74:20, 80:24, 80:25, 85:8
**responsible** [7] - 58:17, 83:7, 130:4, 130:13, 181:1, 181:22, 191:10
**rest** [9] - 4:23, 8:7, 9:9, 33:16, 146:11, 146:13, 221:19, 250:19, 250:21
**restate** [2] - 169:4, 175:1
**restating** [1] - 185:17
**result** [1] - 223:12
**resume** [1] - 5:25
**retail** [3] - 108:24, 192:19
**retain** [2] - 8:3, 9:7
**retaining** [1] - 9:6
**return** [10] - 27:8, 33:13, 33:14, 173:2, 232:22, 232:25, 233:7, 235:2, 236:2
**returnable** [1] - 236:4
**returned** [4] - 71:5, 71:20, 89:15, 173:20
**returns** [1] - 9:10
**review** [7] - 70:5, 99:18, 102:22, 162:18, 163:6, 164:11
**reviewed** [1] - 98:23
**reviewing** [1] - 98:21
**revise** [1] - 110:6
**Rico** [4] - 208:19, 209:2, 209:4, 212:2
**rise** [9] - 5:11, 15:17, 87:14, 87:18, 88:9, 119:6, 152:13, 157:19, 158:22
**risk** [2] - 135:19, 135:20
**risks** [1] - 169:24
**Rite** [5] - 190:12, 190:17, 190:20, 206:23, 206:25
**role** [7] - 21:18, 125:20, 130:13, 184:20, 184:21, 189:6, 191:4
**room** [2] - 6:15, 152:12
**round** [1] - 220:21
**route** [1] - 42:16
**RPR** [2] - 2:2, 252:21
**rudimentary** [1] - 72:2
**rule** [5] - 12:1, 12:7, 22:22, 54:22, 156:25
**ruled** [1] - 157:1
**rules** [6] - 100:25, 102:3, 102:4, 116:24, 131:3, 134:7
**ruling** [3] - 12:3, 124:13, 157:4
**rumore** [1] - 88:6
**Rumore** [50] - 12:10, 12:12, 13:8, 13:25, 15:11, 15:14, 16:3, 16:7, 50:21, 88:4, 114:15, 118:22, 119:10, 119:25, 121:24, 122:15, 123:1, 123:18, 124:8, 124:15, 125:19, 126:11,

128:11, 133:8, 133:18, 139:15, 145:4, 148:4, 152:14, 157:11, 158:18, 159:16, 161:3, 162:25, 163:18, 164:4, 164:18, 166:24, 167:18, 168:1, 169:8, 173:18, 174:13, 175:5, 179:16, 180:8, 180:13, 183:20, 185:22, 186:5
**RUMORE** [2] - 3:3, 16:12

## S

**Safe** [280] - 18:16, 24:3, 24:24, 25:1, 26:9, 27:3, 29:1, 29:8, 29:12, 29:24, 31:23, 32:2, 33:17, 35:4, 35:11, 35:25, 37:10, 38:8, 38:11, 38:16, 40:21, 46:19, 47:13, 47:15, 48:4, 48:10, 51:12, 51:23, 52:10, 52:20, 52:22, 52:24, 52:25, 53:20, 53:22, 54:1, 54:4, 54:7, 54:15, 54:18, 55:1, 55:6, 55:8, 55:15, 56:4, 57:17, 58:5, 58:8, 58:24, 60:13, 60:15, 61:13, 62:14, 62:20, 63:9, 63:17, 64:7, 64:18, 65:2, 65:14, 65:20, 66:3, 66:5, 66:9, 66:13, 66:19, 66:20, 66:23, 66:24, 67:3, 67:6, 68:19, 70:13, 72:17, 74:19, 78:6, 79:2, 80:15, 80:24, 81:4, 81:9, 81:21, 82:15, 83:7, 83:14, 83:23, 84:6, 84:9, 84:16, 84:18, 85:11, 86:23, 89:21, 89:23, 89:24, 90:6, 91:20, 91:24, 92:15, 92:17, 92:19, 93:25, 94:1, 94:9, 94:20, 95:8, 95:19, 96:3, 96:15, 97:10, 97:21, 98:12, 98:17, 102:19, 103:8, 103:12, 103:16, 103:24, 104:21, 105:10, 105:13, 106:4, 109:3, 109:9, 110:5, 110:14, 111:12, 114:5, 117:9, 118:1, 118:8, 119:15, 119:16, 120:1, 120:4, 125:13, 125:16, 125:20, 126:6, 129:20, 134:4, 134:21, 134:24, 135:18, 149:21, 150:12, 161:5, 162:4, 162:7, 162:12, 163:8, 163:19, 163:24, 164:9, 166:11, 169:12, 170:3, 170:9, 170:23, 172:11, 175:18, 176:19, 176:20, 177:1, 177:4, 185:2, 187:4, 194:4, 195:3, 195:6, 195:23, 196:1, 196:7, 196:9, 196:14, 196:17, 196:22, 196:25, 197:4, 197:8, 197:15, 197:22, 197:25, 198:2, 198:7, 198:12, 198:15, 198:16, 198:22, 199:2, 199:7, 199:17, 199:22, 200:1, 200:2, 200:12, 200:16, 200:21, 200:23, 200:24, 201:3, 201:7, 201:13, 201:19, 201:24, 202:4, 202:6, 202:10, 202:14, 202:19, 202:20, 203:12, 203:13, 203:18, 203:19, 203:20, 203:24, 205:15, 205:23, 206:8, 207:4, 207:8, 207:18, 208:13, 209:13, 209:20, 209:21, 210:5, 210:14, 210:18, 210:24, 210:25, 211:20, 213:2, 213:8, 213:10, 213:11, 213:15, 213:18, 215:6, 215:9, 215:11, 215:14, 218:20, 221:23, 222:14, 223:12, 224:6, 224:20, 225:2, 227:12, 227:14, 228:18, 228:20, 230:12, 230:19, 230:24, 231:5, 231:18, 231:23, 234:1, 238:8, 238:10, 238:13, 238:15, 238:16, 240:5, 240:9, 245:6, 245:9, 245:16, 245:24, 246:5, 246:22, 247:13, 247:14, 247:23
**safe** [8] - 91:23, 91:24, 126:18, 139:10, 139:12, 183:10, 185:22, 186:14
**safety** [4] - 76:9, 76:23, 86:24, 90:20
**sake** [3] - 45:5, 199:25, 244:15
**sale** [2] - 151:24, 230:18
**sales** [1] - 246:8
**salesman** [1] - 171:21
**salesperson** [1] - 172:3
**samples** [2] - 189:8, 189:9
**save** [2] - 92:19, 131:20
**saw** [16] - 46:11, 73:23, 82:6, 91:13, 97:17, 99:16, 105:25, 111:4, 113:6, 114:7, 114:8, 130:19, 132:17, 168:5, 209:14, 238:10
**scare** [1] - 14:23
**scared** [2] - 10:24, 156:1
**scenario** [5] - 43:24, 62:12, 63:5, 63:16, 63:17
**scenes** [2] - 134:21, 134:24
**schedule** [1] - 252:8
**scheme** [1] - 53:3
**school** [2] - 161:1, 161:2
**Science** [1] - 91:10
**scintilla** [1] - 153:8
**scope** [1] - 185:19
**scroll** [9] - 99:6, 100:2, 101:2, 137:13, 145:13, 179:4, 203:2, 204:16, 208:10
**seal** [2] - 92:12, 201:21
**sealed** [4] - 234:2, 234:4, 234:19, 234:22
**seals** [1] - 91:2
**second** [24] - 25:2, 25:24, 26:16, 33:25, 37:13, 42:21, 44:10, 51:4, 60:21, 72:12, 73:11, 85:3, 85:10, 111:17, 144:2, 162:25, 173:14, 174:20, 178:8, 179:4, 179:24, 203:17, 217:25, 229:5
**secondary** [6] - 25:7, 36:21, 42:17, 62:19, 91:20, 196:22
**section** [3] - 25:25, 101:11, 102:8
**sections** [2] - 102:8, 132:18
**Security** [5] - 21:19, 22:22, 40:4, 90:7, 91:8
**SECURITY** [8] - 5:11, 15:17, 87:14, 87:18, 88:9, 152:13, 157:19, 158:22
**see** [98] - 9:13, 9:16, 10:9, 18:4, 68:25, 69:10, 79:22, 80:3, 80:4, 82:5, 85:23, 87:13, 89:7, 95:12, 99:21, 100:20, 101:1, 111:11, 111:20, 112:25, 114:11, 116:5, 129:5, 131:1, 131:6, 135:11, 135:14, 135:22, 136:6, 136:22, 137:24, 138:14, 140:17, 140:20, 141:3, 141:20, 141:23, 142:1, 142:3, 142:10, 143:6, 143:19, 143:22, 144:4, 144:10, 145:10, 145:16, 145:23, 146:2, 147:4, 147:21, 147:24, 152:11, 152:18, 162:16, 164:7, 164:12, 167:9, 167:11, 169:14, 169:23, 170:20, 170:22, 171:3, 171:6, 173:25, 177:15, 177:24, 178:1, 178:6, 178:21, 179:1, 179:6, 179:8, 179:12, 179:23, 180:2, 183:15, 184:17, 205:10, 208:17, 210:9, 210:10, 210:20, 210:24, 212:11, 212:22, 239:12, 248:9, 248:12, 249:10, 250:10, 251:2, 252:5
**seeing** [5] - 50:18, 114:19, 144:15, 162:3, 223:17
**seeking** [1] - 9:25
**seem** [2] - 79:4, 150:8
**seized** [1] - 65:14
**seizure** [3] - 66:14, 67:3, 105:11
**selected** [1] - 42:5
**sell** [23] - 42:5, 42:12, 42:16, 42:17, 43:16, 44:17, 192:17, 192:21, 211:25, 217:9, 217:13, 217:18, 217:20, 217:23, 218:13, 218:24, 219:2, 219:3, 219:7, 219:13, 225:16, 234:12
**selling** [9] - 55:6, 63:9, 83:10, 83:11, 126:7, 169:24, 213:11, 218:6, 225:24
**Selzentry** [1] - 168:7
**send** [19] - 72:25, 73:3, 79:11, 80:20, 87:1, 204:11, 210:9, 231:19, 234:24, 237:25, 238:4, 238:9, 238:17, 239:8, 239:15, 239:17, 239:22, 242:16, 251:16
**sender** [1] - 143:9
**sending** [3] - 116:8, 125:11, 143:24
**sense** [3] - 218:10, 218:12, 235:25
**sent** [32] - 27:13, 32:1, 43:19, 51:17, 69:24, 70:2, 73:20, 84:4, 84:11, 93:13, 95:21, 101:5, 103:17, 107:11, 143:16,

144:14, 144:21, 145:1, 167:11, 167:12, 183:16, 205:9, 206:4, 211:12, 212:17, 231:14, 238:7, 238:16, 240:24, 242:18, 247:8, 247:9
**sentence** [7] - 37:22, 37:24, 74:14, 74:23, 84:19, 176:9, 176:10
**separate** [7] - 42:11, 43:14, 89:14, 110:18, 132:11, 164:23, 242:19
**separately** [2] - 123:16, 123:17
**September** [10] - 1:5, 137:23, 139:17, 140:21, 140:23, 201:2, 201:3, 201:20, 201:23, 205:24
**series** [4] - 127:16, 148:4, 177:7, 205:22
**Seroquel** [12] - 172:20, 175:25, 200:4, 200:14, 202:8, 205:13, 206:1, 206:3, 206:7, 212:18, 227:21, 228:4
**session** [1] - 8:13
**set** [8] - 33:15, 43:7, 43:9, 43:10, 88:20, 125:6, 158:9, 227:5
**sets** [1] - 226:20
**setting** [2] - 44:7, 125:19
**settle** [1] - 189:16
**seven** [1] - 120:16
**several** [9] - 53:13, 72:20, 93:8, 95:1, 128:7, 145:4, 177:11, 179:16, 234:11
**severity** [1] - 10:23
**shampoo** [1] - 219:3
**shape** [3] - 153:12, 155:5
**share** [3] - 90:19, 94:24, 251:14
**shifted** [1] - 122:8
**shock** [2] - 93:19, 93:20
**shocked** [1] - 8:21
**short** [13] - 4:11, 222:17, 222:19, 222:22, 223:3, 223:13, 224:7, 224:17, 224:22, 224:23, 246:17, 247:1, 248:23
**short-dated** [3] - 223:13, 224:17, 247:1
**short-dating** [4] - 222:17, 222:19, 222:22, 224:22
**show** [26] - 44:9, 111:6, 115:17, 135:8, 139:24, 141:15, 142:21, 143:3, 145:9, 151:17, 170:7, 173:13, 174:19, 174:24, 177:13, 179:20, 180:5, 209:7, 211:10, 212:19, 213:24, 214:17, 224:10, 229:3, 241:5, 249:6
**showed** [5] - 122:5, 132:18, 140:7, 162:22, 229:12
**showing** [3] - 168:23, 180:20, 228:4
**showings** [1] - 252:8
**shown** [14] - 6:18, 32:22, 74:7, 74:9, 99:13, 102:7, 122:3, 129:7, 161:25, 166:25, 177:10, 180:8, 180:22, 243:2
**shut** [1] - 36:20
**shutdown** [3] - 248:15, 248:24, 248:25
**sic** [1] - 120:8
**side** [2] - 212:19
**side-by-side** [1] - 212:19
**sign** [1] - 73:13
**significant** [2] - 28:25, 73:10
**similar** [4] - 36:14, 100:24, 101:23, 101:25
**single** [3] - 6:8, 122:2, 122:4
**sit** [1] - 14:13
**situation** [7] - 34:17, 49:6, 67:12, 69:19, 81:25, 133:22, 243:1
**situations** [1] - 146:20
**six** [1] - 198:24
**size** [1] - 113:8
**Sizensky** [1] - 120:8
**slower** [1] - 168:14
**small** [1] - 84:18
**smaller** [1] - 192:23
**snooping** [1] - 128:3
**so..** [3] - 62:11, 79:5, 249:16
**SOBs** [1] - 102:17
**software** [1] - 195:20
**softwares** [1] - 195:10
**sold** [13] - 25:9, 25:10, 52:20, 52:23, 62:14, 180:21, 197:5, 209:20, 212:10, 213:13, 213:14, 233:12, 235:9
**Solutions** [4] - 89:22, 195:3, 209:13, 213:2
**Solutions'** [1] - 207:18
**someone** [5] - 38:24, 61:21, 88:3, 94:1, 97:13
**something-something** [1] - 14:21
**sometime** [4] - 51:4, 95:12, 202:19, 232:8
**sometimes** [12] - 7:10, 7:13, 46:24, 47:3, 76:11, 76:12, 76:14, 76:17, 76:19, 76:23, 110:18, 146:18
**somewhat** [1] - 241:12
**somewhere** [3] - 133:4, 150:20, 189:17
**soon** [3] - 9:8, 26:13, 35:16
**SOP** [1] - 110:19
**SOPs** [30] - 25:12, 71:16, 71:19, 78:15, 102:11, 102:14, 102:17, 102:18, 102:19, 102:22, 102:23, 103:2, 103:5, 103:8, 103:12, 103:16, 103:24, 104:7, 104:17, 104:21, 110:14, 110:16, 130:17, 130:19, 131:17, 131:19, 132:14, 132:24, 133:1, 141:11
**sorry** [46] - 6:11, 35:15, 37:23, 41:6, 59:15, 77:15, 79:21, 80:13, 102:9, 107:4, 110:2, 113:16, 124:5, 129:10, 132:7, 137:12, 139:4, 139:18, 148:24, 149:22, 155:9, 167:22, 168:10, 168:12, 169:20, 173:15, 188:10, 190:6, 190:14, 194:16, 198:13, 208:11, 219:9, 227:14, 230:14, 231:1, 235:20, 236:12, 237:1, 237:10, 238:24, 239:4, 239:21, 243:5, 250:3
**sort** [4] - 19:3, 21:10, 41:16, 64:2
**sorts** [1] - 47:25
**sound** [3] - 65:7, 83:1, 232:6
**sounds** [1] - 37:24
**source** [14] - 22:15, 23:13, 23:15, 24:2, 24:7, 24:11, 29:4, 29:7, 29:8, 45:23, 62:9, 62:11, 63:8, 96:18
**sourced** [2] - 26:21, 239:18
**sources** [18] - 19:23, 20:1, 20:14, 20:23, 20:24, 21:3, 21:6, 21:9, 21:25, 22:2, 22:8, 22:12, 22:13, 52:9, 56:8, 210:18
**South** [1] - 53:23
**Southern** [5] - 51:14, 53:24, 54:16, 54:20, 252:22
**SOUTHERN** [1] - 1:1
**space** [1] - 191:17
**speaker** [1] - 66:10
**speaking** [2] - 38:14, 154:7
**speaks** [2] - 31:18, 92:1
**specific** [7] - 14:13, 112:1, 115:21, 131:15, 152:23, 247:5, 252:8
**specifically** [4] - 20:17, 25:2, 106:18, 165:10
**specifics** [1] - 25:11
**specified** [1] - 86:24
**specify** [1] - 78:15
**speculate** [1] - 20:25
**speculation** [18] - 40:25, 52:2, 55:11, 59:2, 59:22, 61:14, 64:13, 65:22, 68:13, 75:2, 75:22, 77:22, 84:20, 86:13, 94:13, 105:6, 109:5, 216:10
**speculative** [1] - 64:14
**spell** [2] - 188:2, 229:4
**spend** [1] - 75:16
**spoken** [1] - 102:10
**spot** [2] - 87:7, 191:18
**spring** [1] - 82:8
**sprung** [1] - 156:7
**stand** [3] - 153:20, 166:16, 208:22
**standard** [9] - 128:7, 130:25, 131:13, 170:22, 171:7, 171:14, 171:16, 223:7, 223:8
**standing** [1] - 87:19
**standpoint** [3] - 72:13, 76:25, 235:25
**start** [9] - 4:10, 17:16, 81:7, 81:8, 101:4, 188:12, 195:5, 196:13, 202:24
**started** [13] - 55:18, 121:3, 159:17, 190:2, 191:12, 191:19, 196:16, 197:14, 198:11, 199:21, 200:1, 200:11, 200:20
**starting** [2] - 97:4, 177:15
**starts** [2] - 81:14, 194:19
**state** [7] - 28:5, 60:8, 60:10, 63:20, 130:5, 188:2, 199:14
**State** [2] - 190:5, 190:7
**statement** [2] - 211:5, 237:18
**STATES** [3] - 1:1, 1:4, 1:10
**States** [12] - 1:14, 2:4, 14:6, 189:4, 189:11, 189:13, 189:24, 190:2, 206:21, 225:23, 228:10, 252:22
**statin** [1] - 201:25
**stating** [1] - 226:25
**stationery** [1] - 192:21
**statute** [1] - 143:19
**stay** [1] - 8:6
**STENOGRAPHICALLY** [1] - 2:1
**step** [9] - 8:15, 34:17, 34:18, 71:7, 71:25, 72:1, 182:23, 187:13, 248:3

**steps** [2] - 151:11, 155:25
**sticking** [1] - 251:18
**still** [27] - 8:22, 8:24, 10:9, 11:4, 13:9, 33:8, 33:9, 33:22, 34:24, 35:2, 37:1, 37:2, 37:7, 63:13, 65:9, 83:14, 88:7, 103:11, 139:11, 158:19, 191:23, 228:15, 244:1, 244:2, 250:11, 251:19
**stood** [2] - 208:13, 213:3
**stop** [4] - 202:20, 202:23, 228:6, 240:10
**stopped** [3] - 202:18, 210:4, 228:18
**story** [1] - 56:3
**straight** [1] - 164:23
**strategies** [1] - 7:10
**strategy** [1] - 7:13
**streamline** [1] - 199:25
**street** [2] - 219:6, 242:22
**Street** [2] - 1:15, 1:19
**strength** [1] - 195:15
**stricken** [1] - 154:2
**strike** [6] - 122:12, 126:23, 167:19, 186:24, 199:6, 205:20
**strong** [1] - 95:20
**strongly** [1] - 156:3
**struggle** [1] - 139:11
**studies** [1] - 188:15
**stuff** [7] - 79:23, 101:5, 128:3, 191:9, 195:10, 195:11, 233:24
**subject** [6] - 53:3, 53:23, 151:24, 160:22, 210:8, 217:22
**submit** [1] - 4:11
**submitted** [6] - 27:25, 97:22, 97:24, 97:25, 98:12, 98:16
**subpoena** [2] - 53:20, 123:9
**subsequent** [1] - 113:21
**subsequently** [1] - 95:10
**substance** [8] - 4:8, 123:2, 123:3, 123:13, 155:16, 156:10, 156:11, 156:19
**sudden** [1] - 81:12
**suffered** [1] - 184:14
**sufficient** [1] - 15:4
**suggest** [3] - 10:4, 147:14, 155:1
**suggested** [1] - 156:3
**suggesting** [5] - 90:10, 106:3, 107:11, 145:17, 153:11
**suggestion** [4] - 9:25, 10:13, 11:9, 29:8
**suggestions** [1] - 117:18
**suggestive** [1] - 148:20
**suggests** [1] - 153:9
**summarize** [1] - 155:23
**supervising** [9] - 190:1, 191:5, 191:6, 191:7, 191:9, 191:14, 191:23, 191:25, 192:2
**supervision** [1] - 38:5
**supervisor** [5] - 39:14, 39:17, 39:18, 64:20, 123:15
**supplier** [9] - 23:3, 71:6, 71:23, 126:12, 126:17, 127:22, 182:11, 209:12, 209:19
**suppliers** [11] - 25:13, 49:10, 105:20, 127:3, 127:17, 141:8, 174:14, 185:6, 185:8, 185:14, 185:23
**supplies** [1] - 67:3
**supply** [9] - 50:12, 67:13, 70:6, 70:10, 83:8, 91:7, 125:24, 184:10, 185:25
**Supply** [5] - 21:19, 22:22, 40:4, 90:7, 91:8
**support** [1] - 90:15
**supposed** [9] - 8:5, 21:22, 22:21, 54:23, 71:19, 71:21, 96:20, 202:1, 234:22
**supposedly** [3] - 51:12, 56:5, 246:7
**suspect** [14] - 72:23, 78:15, 78:16, 78:17, 78:18, 79:14, 79:18, 80:6, 80:11, 80:15, 80:17, 89:21, 91:5, 156:15
**suspension** [1] - 135:21
**suspicion** [2] - 23:21, 23:24
**suspicions** [1] - 127:3
**suspicious** [2] - 126:17, 197:15
**sustain** [6] - 11:24, 64:15, 148:21, 167:20, 185:19, 218:17
**sustained** [31] - 17:4, 17:9, 55:13, 59:3, 59:5, 59:24, 68:15, 73:18, 75:23, 77:24, 86:15, 92:2, 95:5, 98:19, 104:5, 105:7, 107:8, 108:4, 109:6, 113:14, 113:17, 113:24, 126:21, 164:16, 166:21, 167:15, 169:6, 175:3, 186:23, 205:18, 240:2
**sworn** [2] - 16:13, 187:22
**symbolize** [1] - 229:7
**Symtuza** [3] - 172:25, 176:2, 202:11
**Synergy** [1] - 212:10
**system** [3] - 45:9, 226:15, 226:21

## T

**T3** [34] - 25:13, 61:24, 62:3, 63:21, 101:17, 101:25, 125:22, 129:18, 141:9, 141:11, 141:24, 166:12, 171:13, 180:17, 181:8, 181:20, 183:21, 183:22, 183:25, 184:22, 208:12, 208:13, 208:22, 209:17, 211:19, 211:24, 212:4, 212:16, 212:24, 213:2, 214:2, 214:19, 238:13
**T3s** [33] - 47:25, 60:19, 61:1, 61:6, 61:8, 99:23, 99:24, 101:2, 101:14, 105:20, 134:19, 139:17, 139:20, 141:1, 141:5, 198:12, 198:16, 199:3, 203:17, 203:18, 203:20, 207:3, 207:19, 207:24, 210:23, 213:18, 228:23, 229:12, 230:24, 245:16, 245:17, 245:24
**tablets** [5] - 89:16, 89:17, 90:25, 91:1, 92:10
**tactic** [2] - 74:24, 75:8
**tactics** [2] - 75:15, 85:1
**talks** [3] - 89:13, 89:17, 203:17
**tampered** [4] - 91:2, 136:23, 148:12, 201:4
**tardy** [1] - 5:21
**taught** [3] - 160:23, 161:1, 161:2
**team** [2] - 18:17, 97:8
**tech** [1] - 190:3
**technician** [1] - 190:4
**telephone** [7] - 34:21, 35:13, 36:6, 36:23, 37:2, 37:11, 152:24
**ten** [3] - 58:7, 72:3, 219:5
**tend** [1] - 93:6
**term** [4] - 71:12, 95:15, 96:9, 164:2
**terminated** [2] - 96:19, 97:2
**terminating** [1] - 97:5
**terminology** [1] - 48:19
**terms** [2] - 41:15, 159:23
**tertiary** [3] - 25:7, 36:21, 42:17
**test** [1] - 189:9
**testified** [19] - 16:14, 18:20, 23:25, 31:9, 42:3, 99:13, 117:15, 124:15, 147:3, 150:1, 155:17, 156:6, 156:23, 165:10, 166:10, 186:5, 187:23, 195:22, 202:18
**testify** [9] - 14:14, 16:4, 16:6, 51:3, 86:20, 154:18, 154:21, 155:3, 244:9
**testifying** [7] - 9:8, 54:10, 100:8, 121:17, 147:10, 147:13, 226:24
**testimony** [38] - 6:6, 6:7, 7:16, 8:4, 8:11, 9:19, 14:24, 21:24, 22:2, 30:1, 36:7, 36:24, 37:20, 40:8, 49:24, 72:8, 98:4, 99:25, 102:7, 102:11, 118:24, 150:6, 152:15, 153:4, 153:12, 154:2, 154:6, 155:6, 156:9, 156:18, 157:10, 159:11, 227:11, 227:15, 232:1, 238:12
**Tex** [3] - 213:8, 213:9, 213:14
**text** [7] - 101:20, 139:3, 139:5, 139:9, 139:16, 139:19, 141:1
**texting** [1] - 139:12
**texts** [1] - 139:14
**THE** [299] - 1:10, 1:13, 4:2, 4:13, 4:18, 4:20, 5:6, 5:10, 5:11, 5:13, 5:18, 6:3, 6:4, 6:5, 6:14, 6:17, 6:18, 6:24, 7:1, 7:2, 7:4, 7:6, 7:8, 7:9, 7:15, 7:17, 7:25, 8:1, 8:2, 8:3, 8:5, 8:8, 8:11, 8:18, 9:3, 9:11, 9:15, 9:18, 9:22, 10:7, 10:22, 11:14, 11:20, 11:25, 12:6, 12:10, 12:12, 12:15, 12:16, 12:18, 12:19, 12:23, 12:24, 13:1, 13:4, 13:8, 13:10, 13:14, 13:16, 13:18, 13:21, 13:24, 14:1, 14:4, 14:12, 14:18, 15:11, 15:14, 15:16, 15:17, 15:19, 15:24, 16:8, 16:9, 16:22, 17:4, 17:9, 19:5, 19:8, 28:17, 31:3, 32:14, 32:21, 34:5, 36:12, 38:1, 39:24, 41:1, 51:7, 52:3, 54:12, 55:13, 58:13, 59:3, 59:5, 59:23, 59:25, 60:2, 60:3, 60:24, 61:15, 64:14, 65:23, 68:14, 73:18, 75:3, 75:23, 76:5, 77:23, 84:21, 86:15, 86:20,

87:7, 87:9, 87:14, 87:16, 87:18, 87:21, 88:3, 88:6, 88:8, 88:9, 88:11, 88:16, 88:21, 92:2, 94:14, 95:5, 98:19, 100:10, 100:15, 103:20, 104:5, 104:14, 104:23, 105:7, 107:8, 107:13, 108:4, 108:11, 108:15, 108:18, 109:6, 109:12, 109:24, 110:23, 111:9, 111:19, 111:23, 112:3, 112:24, 113:14, 113:17, 113:24, 114:15, 114:19, 114:21, 114:22, 114:23, 115:15, 116:6, 116:7, 116:16, 118:14, 118:16, 118:19, 120:24, 121:9, 121:14, 121:18, 121:21, 122:11, 122:13, 123:23, 124:1, 124:13, 124:25, 126:21, 126:24, 129:24, 140:4, 140:9, 140:12, 140:14, 146:11, 146:12, 146:13, 148:21, 150:3, 150:5, 152:2, 152:7, 152:13, 152:14, 152:17, 152:18, 152:20, 153:13, 153:21, 154:1, 154:3, 154:10, 154:15, 156:25, 157:15, 157:17, 157:19, 157:20, 158:1, 158:3, 158:10, 158:16, 158:18, 158:20, 158:21, 158:22, 158:24, 159:4, 163:11, 163:14, 163:15, 163:16, 164:16, 165:17, 165:18, 166:21, 167:15, 167:20, 167:22, 167:23, 167:24, 169:6, 175:3, 185:19, 186:23, 186:25, 187:13, 187:15, 187:16, 187:19, 187:24, 188:4, 200:6, 204:5, 205:1, 205:7, 205:18, 208:6, 214:13, 215:19, 215:21, 216:11, 216:20, 217:15, 218:16, 220:17, 221:8, 221:9, 221:14, 221:17, 222:4, 223:21, 225:20, 226:18, 227:1, 227:24, 229:19, 230:3, 230:6, 240:2, 241:22, 243:12, 244:12, 248:3, 248:12, 248:17, 248:20, 248:24, 249:9, 249:11, 249:17, 249:19, 249:21, 249:22, 249:23, 249:25, 250:2, 250:5, 251:2, 251:14, 251:15, 251:17, 251:19, 251:20, 251:21, 251:23, 252:3, 252:12, 252:16

**themselves** [2] - 14:6, 20:24
**therefore** [1] - 10:3
**Thereupon** [2] - 16:11, 187:20
**thinking** [10] - 18:25, 28:10, 55:9, 86:20, 106:20, 107:10, 107:16, 108:2, 154:24, 249:5
**thinks** [4] - 7:25, 10:25, 101:6, 157:3
**third** [8] - 20:5, 20:6, 55:18, 68:20, 69:11, 71:17, 173:15, 229:6
**thoughts** [1] - 55:22
**thread** [1] - 139:16
**threat** [1] - 44:6
**threatening** [1] - 155:5
**three** [9] - 91:1, 120:15, 138:13, 160:21, 192:5, 229:13, 250:6, 250:10, 251:24
**throughout** [2] - 84:15, 185:23
**thrown** [1] - 41:15
**Thursday** [3] - 120:3, 178:15, 186:21
**timeline** [1] - 238:14
**tired** [2] - 167:24, 168:12
**title** [2] - 131:15, 189:6
**Tivicay** [1] - 193:14
**today** [11] - 4:20, 8:5, 8:12, 9:15, 9:19, 11:6, 31:10, 118:25, 243:24, 243:25
**together** [3] - 41:22, 47:19, 195:13
**token** [1] - 234:15
**tomorrow** [2] - 93:7, 100:19
**ton** [1] - 79:23
**tone** [3] - 36:3, 36:10, 159:18
**tons** [3] - 21:23, 120:9
**took** [6] - 5:22, 30:20, 82:21, 99:7, 105:19, 155:25
**top** [20] - 41:25, 135:11, 136:6, 136:22, 138:8, 140:18, 141:20, 143:6, 145:20, 147:18, 147:22, 162:12, 167:11, 179:13, 182:4, 203:2, 203:8, 207:21, 207:22, 212:22
**topic** [2] - 30:7, 104:20
**topics** [1] - 124:17
**totality** [1] - 121:13
**totally** [2] - 154:6, 182:17
**totals** [1] - 140:2
**totes** [2] - 47:22
**touch** [1] - 220:7
**towards** [1] - 145:16
**town** [2] - 158:9, 188:11
**trace** [2] - 181:10, 181:16
**tracing** [1] - 131:1
**track** [1] - 190:14
**trading** [9] - 73:6, 79:1, 96:13, 96:16, 96:17, 96:24, 184:1, 184:2
**traditional** [1] - 42:24
**transaction** [11] - 42:12, 43:15, 45:11, 64:1, 68:24, 131:14, 131:18, 170:13, 180:18, 182:25, 238:8
**transactional** [5] - 161:16, 161:18, 164:5, 164:8, 164:20
**transactions** [3] - 61:6, 68:24, 213:6
**TRANSCRIPT** [1] - 1:9
**transcript** [1] - 155:22
**transcription** [1] - 252:19
**transformation** [1] - 82:11
**transforming** [2] - 82:4, 82:9
**transition** [2] - 82:5, 82:17
**transparent** [8] - 67:9, 84:10, 86:22, 175:18, 176:19, 176:21, 177:1, 177:5
**transplant** [1] - 193:21
**travel** [1] - 8:9
**traveled** [1] - 188:11
**treated** [1] - 170:10
**Trial** [1] - 252:18
**trial** [23] - 4:12, 7:6, 7:12, 8:11, 9:12, 9:15, 10:6, 121:5, 122:24, 123:4, 152:25, 153:4, 153:11, 153:16, 154:8, 154:11, 155:13, 155:15, 156:18, 157:8, 159:8, 185:23, 250:7
**TRIAL** [1] - 1:9
**trip** [1] - 9:9
**TRO** [1] - 67:1
**trouble** [1] - 202:22
**true** [12] - 75:10, 183:1, 218:21, 219:8, 219:14, 219:19, 219:24, 220:7, 223:2, 226:16, 227:6, 246:14
**trust** [1] - 187:7
**truth** [1] - 204:6
**truthful** [4] - 59:11, 156:8, 156:13, 181:13
**Truvada** [1] - 208:18
**try** [14] - 7:11, 7:13, 45:5, 45:17, 75:1, 84:3, 92:19, 117:16, 118:4, 131:20, 148:24, 152:5, 153:3, 199:24
**trying** [16] - 14:23, 42:23, 45:7, 48:13, 65:20, 66:2, 66:7, 66:12, 74:18, 110:13, 122:8, 153:11, 166:20, 175:1
**turn** [1] - 158:13
**turned** [2] - 23:2, 159:20
**twice** [1] - 61:12
**two** [17] - 4:25, 5:3, 19:21, 26:25, 37:7, 113:7, 114:3, 136:25, 158:3, 188:18, 190:19, 192:6, 194:12, 222:24, 229:12, 250:12, 250:20
**two-part** [1] - 19:21
**type** [8] - 159:25, 160:2, 162:11, 162:16, 163:23, 164:23, 180:16, 245:5
**types** [9] - 127:19, 161:8, 161:11, 162:12, 164:12, 168:19, 181:5, 199:15, 200:24

## U

**U.S** [6] - 90:12, 188:25, 189:12, 189:18, 209:3, 252:23
**ulterior** [1] - 73:15
**ultimately** [2] - 43:3, 43:19
**unavailability** [1] - 158:4
**unaware** [1] - 231:24
**under** [12] - 13:9, 43:2, 43:24, 44:25, 64:7, 78:13, 88:7, 91:8, 149:17, 158:19, 221:3, 241:18
**underpriced** [1] - 219:24
**understood** [5] - 11:21, 12:8, 25:7, 51:18, 236:23
**underway** [1] - 91:4
**unfair** [2] - 29:7, 84:25
**unfamiliar** [1] - 134:7
**UNITED** [3] - 1:1, 1:4, 1:10
**United** [12] - 1:14, 2:4, 14:6, 189:4, 189:10, 189:13, 189:24, 190:2, 206:21, 225:23, 228:10, 252:22
**unless** [4] - 79:20, 98:13, 147:9, 181:19

**unlikely** [1] - 250:21
**unlimited** [2] - 213:9, 213:15
**unopened** [2] - 73:8, 73:23
**unraveled** [1] - 127:6
**unsafe** [3] - 127:12, 173:3, 176:5
**unusual** [1] - 213:4
**up** [65] - 4:15, 18:20, 27:22, 30:8, 31:1, 31:13, 33:15, 33:25, 34:24, 41:9, 44:25, 49:7, 49:17, 63:13, 65:1, 70:15, 72:5, 73:15, 79:5, 81:13, 92:10, 96:8, 96:9, 98:24, 100:13, 101:2, 101:10, 105:4, 122:19, 124:17, 129:2, 129:4, 130:21, 131:9, 137:5, 144:19, 145:2, 146:25, 150:24, 174:7, 180:20, 182:3, 194:19, 195:1, 197:8, 203:1, 204:14, 207:13, 207:21, 216:6, 216:8, 218:2, 222:23, 223:11, 225:13, 226:20, 227:5, 228:4, 237:18, 244:1, 246:18, 247:22, 249:12
**update** [4] - 34:9, 34:16, 34:20
**upper** [1] - 238:18
**ups** [4] - 28:11, 29:20, 74:2, 74:17
**upset** [3] - 119:9, 121:4, 122:8
**utilize** [1] - 249:1
**utilized** [1] - 75:1

## V

**V-I-P-U-L** [1] - 188:5
**vague** [5] - 39:22, 86:11, 86:18, 124:24, 129:8
**valid** [1] - 64:1
**value** [2] - 105:19, 236:2
**valued** [1] - 105:25
**variety** [2] - 161:8, 195:16
**various** [10] - 98:16, 131:22, 132:13, 155:23, 162:3, 169:9, 199:15, 199:19, 205:23, 247:22
**vehicle** [1] - 77:11
**vendor** [25] - 58:18, 58:23, 59:8, 59:10, 59:21, 60:15, 61:20, 110:6, 110:16, 110:21, 111:3, 111:12, 111:14, 112:6, 114:5, 115:10, 116:1, 116:4, 116:8, 117:2, 118:3, 131:13, 131:18, 131:19
**vendors** [12] - 40:22, 41:8, 52:19, 54:3, 58:4, 98:16, 115:3, 115:8, 118:4, 134:19, 145:6, 179:25
**verbally** [1] - 72:20
**verified** [3] - 100:25, 101:23, 102:1
**verify** [2] - 134:19
**verifying** [1] - 91:7
**version** [1] - 192:23
**versus** [4] - 48:2, 222:8, 244:20, 245:17
**vet** [1] - 56:8
**vetting** [5] - 20:20, 20:24, 25:13, 58:18, 105:20
**via** [2] - 24:21, 91:11
**victim** [1] - 64:7
**view** [3] - 91:11, 230:23, 231:7
**VII** [1] - 1:7
**Vipul** [1] - 188:4
**VIPULBHAI** [2] - 3:5, 187:21
**Vipulbhai** [1] - 187:18
**visual** [1] - 90:23
**visualize** [1] - 41:16
**Volume** [1] - 1:7
**volunteered** [1] - 104:14
**vs** [1] - 1:5

## W

**W-9** [1] - 112:10
**WAC** [8] - 43:7, 43:16, 194:8, 194:21, 195:1, 197:9, 221:24, 245:22
**Wait** [2] - 72:11, 73:11
**wait** [6] - 9:16, 217:15, 248:12, 249:20, 249:21, 249:22
**waiting** [4] - 33:8, 37:7, 38:6, 188:10
**waive** [4] - 5:14, 15:20, 88:12, 158:25
**walk** [3] - 41:22, 186:19, 199:23
**walked** [3] - 131:21, 181:4, 181:21
**wants** [7] - 10:9, 11:4, 31:22, 46:24, 112:4, 248:12, 251:23
**warehouse** [1] - 209:22
**warrant** [1] - 76:16
**warranting** [1] - 67:2
**was..** [1] - 55:24
**ways** [2] - 11:11, 181:21
**website** [1] - 90:22
**weeds** [1] - 184:20
**week** [23] - 8:7, 8:8, 33:11, 249:13, 249:14, 249:16, 250:3, 250:5, 250:6, 250:11, 250:20, 250:22, 251:6, 251:7, 251:8, 251:9, 251:20, 252:2, 252:10
**weekend** [2] - 248:6, 248:9
**weeks** [5] - 4:25, 5:3, 138:13, 158:3, 251:24
**whatsoever** [1] - 153:16
**wheelhouse** [4] - 160:19, 161:19, 164:22, 164:23
**whole** [16] - 92:1, 92:8, 94:16, 99:23, 116:3, 128:20, 132:23, 133:22, 147:8, 184:22, 191:7, 225:12, 249:14, 249:16, 251:6
**wholesale** [21] - 43:7, 44:5, 44:18, 58:6, 72:3, 201:8, 216:2, 216:5, 216:14, 216:23, 217:2, 217:6, 217:9, 217:19, 217:20, 218:3, 218:6, 218:7, 221:3, 221:5, 225:12
**wholesaler** [25] - 25:8, 42:17, 46:19, 54:21, 57:19, 57:22, 63:3, 74:6, 89:22, 97:18, 98:8, 98:11, 117:12, 125:24, 128:21, 143:14, 145:24, 148:11, 171:11, 194:7, 196:21, 202:24, 208:17, 229:23
**wholesaler's** [4] - 25:14, 56:9, 184:21, 212:1
**Wholesalers** [1] - 212:10
**wholesalers** [11] - 22:23, 36:21, 55:2, 55:5, 55:17, 56:4, 91:20, 194:1, 196:18, 206:12, 216:17
**wife** [3] - 189:17, 192:5, 192:6
**WILLIAM** [1] - 1:10
**William** [2] - 1:17, 2:3
**willing** [1] - 5:24
**winter** [1] - 82:8
**wishes** [1] - 34:11
**withdrawal** [2] - 75:9, 76:18
**withheld** [2] - 67:5, 68:9
**WITNESS** [37] - 3:2, 6:3, 6:5, 6:18, 7:1, 7:4, 7:8, 7:15, 8:1, 8:3, 8:8, 12:15, 12:18, 12:23, 13:1, 13:4, 13:10, 13:16, 13:21, 14:1, 16:8, 59:25, 60:3, 88:8, 88:21, 114:19, 114:22, 116:7, 146:12, 158:20, 163:15, 165:18, 167:22, 167:24, 187:15, 188:4, 221:9
**Witness** [1] - 88:5
**witness** [51] - 7:24, 8:17, 8:18, 10:1, 10:5, 10:14, 10:20, 12:11, 13:12, 14:2, 15:4, 15:7, 15:15, 32:23, 37:21, 45:12, 100:13, 103:19, 111:18, 118:15, 122:16, 123:21, 124:3, 124:4, 152:19, 152:22, 153:5, 153:11, 153:17, 153:20, 154:7, 154:11, 154:19, 155:6, 155:13, 156:2, 156:23, 157:7, 157:10, 159:8, 159:9, 159:10, 159:12, 187:16, 204:15, 207:13, 209:7, 213:24, 250:18, 250:23, 250:25
**witnesses** [2] - 7:13, 250:20
**woman** [1] - 153:18
**Won** [1] - 25:21
**wonder** [1] - 111:11
**wondered** [1] - 169:12
**wondering** [1] - 126:18
**word** [7] - 6:22, 92:9, 96:25, 97:17, 164:2, 176:9, 229:5
**worded** [1] - 95:21
**wording** [1] - 85:23
**words** [7] - 20:13, 106:19, 135:7, 176:8, 184:3, 229:9, 243:8
**works** [1] - 194:12
**worms** [2] - 147:22, 174:7
**worth** [2] - 11:9, 36:23
**write** [3] - 93:10, 249:15, 252:3
**writes** [1] - 251:2
**writing** [8] - 27:12, 46:2, 106:16, 107:14, 133:2, 150:19, 249:17, 250:1
**written** [2] - 249:11, 249:16
**wrote** [3] - 28:5, 37:14, 107:2

## X

**XR** [1] - 205:13

## Y

**year** [5] - 40:5, 72:5, 222:23, 224:17, 230:12
**years** [6] - 15:1, 58:7, 72:3, 188:19, 190:19, 191:11
**yesterday** [9] - 4:10, 6:22, 17:11, 18:20, 25:25, 30:4, 49:3,

49:25, 57:24
**York** [6] - 190:5, 190:7, 190:25, 223:11, 237:19, 244:1
**yourself** [10] - 33:2, 35:20, 79:16, 92:5, 103:22, 116:6, 198:20, 223:22, 223:23, 231:25

## Z

**zealous** [11] - 14:25, 29:11, 29:23, 47:12, 56:12, 56:15, 56:16, 56:25, 57:3, 57:9, 92:15
**Zimet** [21] - 1:21, 6:1, 8:20, 11:7, 11:20, 16:9, 19:5, 31:3, 87:7, 88:19, 112:3, 116:17, 123:6, 123:14, 132:16, 139:15, 140:9, 152:20, 157:9, 159:9, 230:6
**ZIMET** [187] - 3:3, 3:6, 4:6, 4:14, 4:19, 5:4, 5:16, 6:2, 7:23, 8:21, 10:16, 11:9, 11:21, 13:5, 13:22, 14:3, 14:5, 14:16, 15:13, 15:22, 16:10, 16:16, 16:24, 17:5, 17:10, 17:18, 17:21, 18:6, 18:7, 19:7, 19:9, 27:22, 27:23, 28:19, 31:4, 31:13, 31:14, 32:13, 32:15, 32:20, 33:1, 34:4, 34:6, 36:16, 37:23, 37:25, 38:10, 40:1, 41:3, 41:12, 41:14, 51:8, 52:5, 54:6, 54:13, 55:12, 55:14, 58:14, 59:6, 60:1, 60:4, 61:3, 61:16, 64:10, 64:16, 66:1, 66:11, 68:16, 70:15, 70:17, 73:19, 75:5, 75:24, 76:6, 78:1, 84:22, 86:16, 87:5, 87:8, 88:1, 88:14, 88:20, 88:22, 89:1, 89:4, 90:3, 90:5, 92:3, 92:24, 92:25, 93:3, 93:5, 94:11, 94:21, 95:6, 98:20, 98:24, 99:1, 100:7, 100:16, 103:19, 103:21, 104:6, 104:9, 104:18, 104:25, 105:8, 107:9, 108:5, 108:14, 108:16, 108:22, 109:7, 109:14, 110:1, 111:1, 111:8, 111:10, 111:17, 111:20, 112:5, 112:21, 113:1, 113:2, 113:16, 113:18, 114:2, 114:24, 115:19, 116:11, 116:23, 118:12, 118:15, 120:23, 121:6, 121:13, 121:16, 121:19, 121:22, 122:10, 122:12, 123:22, 123:24, 124:2, 124:12, 126:20, 126:23, 129:22, 140:10, 148:19, 152:21, 153:14, 153:24, 154:2, 154:4, 154:13, 155:1, 157:13, 157:25, 158:8, 159:2, 164:14, 166:18, 166:22, 167:13, 167:19, 169:3, 175:1, 185:17, 204:24, 208:5, 214:12, 230:8, 240:3, 240:20, 240:23, 241:5, 241:6, 242:1, 243:16, 244:11, 248:14, 248:18, 248:22, 250:15, 250:23, 252:15
**Zimet's** [2] - 157:10, 159:11
**zip** [1] - 238:20
**Zoom** [1] - 152:24
**zoom** [6] - 135:15, 137:6, 137:12, 137:19, 138:17, 142:7