UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-20255-Dimitrouleas/Hunt

| | |
|---|---|
| UNITED STATES OF AMERICA, | Fort Lauderdale, Florida |
| | October 21, 2025 |
| vs. | 9:00 AM - 3:00 PM |
| PATRICK BOYD and CHARLES BOYD, | Volume XII |
| Defendants. | Pages 1 to 204 |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| FOR THE GOVERNMENT: | Alexander Pogozelski, Esquire<br>Jacqueline DerOvanesian, Esquire<br>Assistant United States Attorneys<br>99 NE 4th Street<br>Miami, Florida 33132 |
| FOR DEFENDANT PATRICK BOYD: | William Barzee, Esquire<br>Ivlis Mantilla, Esquire<br>Barzee Flores<br>40 NW 3rd Street Ph 1<br>Miami, Florida 33128 |
| FOR DEFENDANT CHARLES BOYD: | Bruce Zimet, Esquire<br>633 S. Federal Highway Fl 6<br>Fort Lauderdale, Florida 33301 |

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

# I N D E X


| WITNESS: | PAGE: |
|---|---|
| ABIGAIL DIVILIO (CON'T) | |
| DIRECT EXAMINATION (con't)BY MR. POGOZELSKI: | 6 |
| CROSS-EXAMINATION BY MR. BARZEE: | 111 |


\- - -

# E X H I B I T S

\- - -


| Number | Description | Page |
|---|---|---|
| Government's No. 97 | Document | 27 |
| Government's No. 227 | Email | 49 |
| Government's No. 251 | Email | 62 |
| Government's No. 252 | Email | 44 |
| Government's No. 299 | Email | 79 |
| Government's No. 300 | Document- FDA Response | 80 |
| Government's No. 303, 303A, 303B | Documents | 181 |
| Government's No. 316 | Email | 93 |
| Government's No. 319 | Email Chain | 64 |
| Government's No. 341 | Email | 14 |
| Government's No. 348 | Email | 81 |
| Government's No. 361 | Email | 50 |
| Government's No. 362 | Email | 51 |
| Government's No. 363 | Email | 54 |
| Government's No. 367 | Email | 58 |
| Government's No. 369 | Email | 60 |

| | | |
|---|---|---|
| Government's No. 372 | Email | 55 |
| Government's No. 449A, 449B and 449C | Emails | 10 |
| Government's No. 457 | Email | 72 |
| Government's No. 474 | Teams Message | 19 |
| Government's No. 477 | Messages | 28 |
| Government's No. 483 | Teams Chats | 83 |
| Government's No. 486 | Teams Messages | 66 |
| Government's No. 490 | Teams Message | 106 |
| Government's No. 495 | Teams Chats | 86 |
| Government's No. 497 | Teams Message | 103 |
| Government's No. 634A | Drug Notification Form | 40 |
| Government's No. 657 | Email | 57 |
| Government's No. 669 | Letter | 77 |
| Government's No. 671 | Teams Messages | 73 |
| Government's No. 672 | Teams Messages | 75 |

(Call to the Order of the Court.)

THE COURT: We are back on the record. Counsel are present. Both defendants are present. I understand we have all the jurors.

Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: No, Your Honor.

MR. ZIMET: No, sir.

MR. BARZEE: No, Your Honor.

THE COURT: All right. If we have all the jurors, let's bring them in.

Ms. Divilio, you understand that you're still under oath?

THE WITNESS: Yes.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

All right. I think we're ready to resume direct examination.

MR. POGOZELSKI: Thank you, Your Honor.

Thereupon,

ABIGAIL DIVILIO (CON'T),

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION (con't)

BY MR. POGOZELSKI:

Q. Good morning, ma'am.

A. Good morning.

Q. Do you recall the HIV vendor Synergy Group Wholesalers or Synergy Wholesalers Group?

A. Yes.

Q. And was Synergy Group Wholesalers, Synergy -- was that one of the vendors that you identified problems or concerns with?

A. Yes.

Q. All right.

MR. POGOZELSKI: If we could pull up Government's Exhibit 243, which is already in evidence.

BY MR. POGOZELSKI:

Q. Do you see this email on your screen, Ms. Divilio?

A. Yes.

Q. What are you writing to Patrick Boyd here on March 10th of 2021?

A. "Good morning, Pat. We were attempting to verify the T3 information provided to us from the new vendor Synergy, and

this is the response that we received."

The below -- that is an email to Dakota, who is the other compliance person.

It says, "Hello, Dakota. I apologize for the delay. I missed this email when it first came in. These products were not purchased from us. We did employ someone named Jeffrey Anderson; however, he is no longer with the company.

"We have no existing relationship with Synergy Group Wholesalers; so any transaction history that they give with our information is incorrect. We appreciate you bringing this to our attention and will submit a report with the FDA."

Q. Did DMS Pharmaceutical Group confirm that this Synergy T3 was false?

A. Yes, they did.

Q. And why did you forward that along to Patrick Boyd?

A. To just share with him another issue with the wholesale vendors we were experiencing, as far as we were trying to verify the transaction history and they were telling us it was false.

Q. Okay.

MR. POGOZELSKI: And if we could go to page 6 of this document.

BY MR. POGOZELSKI:

Q. Do you see where it says, "To authenticate a subsequent transaction, contact Jeffrey Anderson?"

A. Yes.
Q. What is the email address listed there for Jeffrey Anderson?
A. Jeffreyandersonms@gmail.com.
Q. Okay. Was that a concern for you on top of the DMS Pharma email that we just went over?
A. Yes.
Q. Why was that?
A. Because this person was using just a generic platform, Gmail, instead of a standard business email.
Q. Okay. And then if we go back up to the bottom of page 4, is that different than the actual DMS Pharma email address that Jeffrey Anderson had listed on that Synergy T3?
A. Yes, it is.
Q. Okay. Was that part of the reason that you had concerns with the Gmail address listed on that Synergy T3?
A. Yes.
Q. And did you and Dakota Flowers have concerns about buying HIV drugs from Synergy Group Wholesalers?
A. Yes, we did.
Q. And did you share those concerns with Charles Boyd as well?
A. Yes.
Q. Was Dakota Flowers also in compliance at the time?
A. Yes, she was.
Q. Did you and Dakota Flowers believe that the defendants

would not move forward and buy HIV drugs with Synergy at this time, based on the email?

MR. BARZEE: Objection as to what Dakota thought, Your Honor.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Did you believe that the defendants would not go forward and buy these HIV drugs from Synergy, based on these emails?

A. No. It seemed that they had already made arrangements to purchase themselves; so they would do what they wanted to do.

Q. And did Dakota Flowers share those concerns?

A. Yes.

Q. And did the defendants go on to sell HIV drugs sourced from Synergy after this?

A. Yes.

Q. And if we go back up to the very top of the email, what does Patrick Boyd write there, just to Adam Brosius the same day?

A. "Possible problem."

Q. All right.

MR. POGOZELSKI: Now, if we could show just the witness what's been marked as Government's Exhibit 449A and 449B, 449C.

BY MR. POGOZELSKI:

Q. Okay. Are these messages between you Dakota Flowers the same day as that email?

A. Yes.
Q. And if we go back to A -- I guess A and C, are you relaying a conversation that you had just had with Patrick Boyd around that same time?
A. Yes, it looks like that's what I was doing.
MR. POGOZELSKI: Okay. The Government would move to admit Government's Exhibit 449A, B and C.
MR. BARZEE: No objection.
MR. ZIMET: No objection, Judge.
THE COURT: 449A, B, and C will be received.
(Government's No. 449A, 449B and 449C, Emails, were received in Evidence.)
BY MR. POGOZELSKI:
Q. All right. Can you just read here what Patrick Boyd told you that same day that you forwarded the DMS Pharma email?
A. I wrote, "I just talked with Pat. He said that Synergy vendor sent us the wrong T3s and we should expect new ones."
Q. And then if we go to B.
A. Dakota wrote, "Right. Then why do they list someone from a company that no longer works there?"
Q. Did you believe Patrick Boyd's explanation at the time?
A. At the time, I think it was just general feelings that I had not a lot of say in what was going to happen anyway; so I think we just accepted it.
Q. Okay. And then on the next page, was this -- the "he"

here, is that Patrick Boyd that you're referring to?
A. Yes.
Q. All right. And what is Patrick Boyd saying here?
A. "He asked that you email that person back, just let them know that we were provided with incorrect information, and have a good day."
Q. And that person -- do you know who that person is referring to on March 10th of 2021?
A. I think it references the person that told us that the current T3 history was incorrect.
Q. At DMS Pharma?
A. Yes.
Q. Okay.
MR. POGOZELSKI: Now, if we could pull up Government's Exhibit 40J.
BY MR. POGOZELSKI:
Q. Did the defendants -- did Safe Chain pay Synergy Group Wholesalers six days after that email exchange?
A. Yes.
Q. Okay. And after that, did Synergy Group Wholesalers send over a second new version of a T3 or pedigree?
A. Yes, I believe they did.
Q. And did you or Dakota Flowers identify problems with that second new version of the Synergy T3?
A. I believe so.

I think Dakota was the one primarily working on some of these T3s, especially around this time, but I think there was just constant issues.

Q. Okay.

MR. POGOZELSKI: If we could pull up Government's Exhibit 264, which is already in evidence, and go down to page 3.

BY MR. POGOZELSKI:

Q. So now if you look here, we're in April 5th, 2021.

Can you go ahead and read this email that you sent to Charles Boyd about Synergy?

A. Yes. "Charlie, I think Synergy will be a problem based on some of the issues they previously provided. They provided some T3 information to Adam, despite asking them to send it directly to compliance. One transaction they had on their T3 listed DMS Pharma, and when we reached out to them, DMS Pharma let us know that the person listed on the T3 that was provided to us no longer works there and that they did not have a relationship with Synergy.

"DMS Pharma also filed a report to the FDA that this company was falsifying T3 documents. Synergy updated the paperwork and listed a different wholesaler, Wholesalers Group, and I spoke with Francisco Cano, who verified that he sold product to Synergy.

"Wholesalers Group is a Puerto Rican -- is in Puerto Rico,

and I had a really, really hard time finding much, if any, information about them, except that they also operate under the name Drogueria Bayamon, which raised a little concern because this is not a listed as an AD on Gilead's website.

"Also, the only number provided was a cell phone number. I guess I would have expected to be calling a business. Let me know what other information you need."

Q. Are these the additional concerns that you identified in the second version of a Synergy T3?

A. Yes.

MR. POGOZELSKI: If we could scroll out and then go up.

BY MR. POGOZELSKI:

Q. What does Charles Boyd write to you here in response?

A. "Thanks, Abbie. Neither Wholesaler Group nor Drogueria Bayamon is an AD; so I would think that's a big problem. Are we sure it's not Drogueria Betances?"

Q. All right. And if you go up to the bottom of page 1, do you see where you said, "This is the information I was able to find on them"?

A. Yes.

Q. Were you doing research in response to Charles Boyd question of whether it was not Drogueria Betances?

A. Yes.

Q. And if we go to the next page, is this a screenshot of the information you found on that company listed on the second

Synergy T3?

A. Yes.

Q. Okay. And the contact name here, Mohammed Salemi -- do you know whether or not Mohammed Salemi was under indictment at the time?

A. I don't remember.

Q. All right.

MR. POGOZELSKI: If we could pull up just for the witness Government's Exhibit 341.

BY MR. POGOZELSKI:

Q. Is this an email exchange between you and Charles Boyd also in April of 2021?

A. Yes.

MR. POGOZELSKI: All right. The Government moves into evidence Government's Exhibit 341.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 341 will be received.

(Government's No. 341, Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. And then if we go down, do you see where you reference Mohammed Salemi in your email here? Right there (indicating)?

A. Yes.

Q. And then if we go to the next page, what did you -- what do you write there?

A. "When I googled this person, this came up from the U.S. States Attorney. It links to a website. Based on Adam's comments last week, I'm a bit concerned that this is a vendor he's bringing to the table, and it's an association with an individual who was found guilty of counterfeiting drugs and falsifying documents.

"I think we need to get an understanding of the relationship between Value Wholesale and Mohammed Salemi."

Q. Now, if we go back up to the first page, what does Charles Boyd write here?

A. "Also, this vendor contacted us directly through our website so has nothing do with Adam."

Q. Okay. Now, if we go to Government's Exhibit 264 on the second page, does this relate to that second Synergy T3 that we were talking about?

A. Yes.

Q. All right. And is Mohammed Salemi -- is that the same person that you had posted that U.S. Attorney Office's link about being found guilty or convicted for counterfeiting drugs?

A. Yes.

Q. If we go to the very top, I think at the top of the email exchange, what does Charles Boyd write here in this first paragraph?

MR. ZIMET: Judge, this is Exhibit 264, and now he's skipping back with exhibit numbers.

MR. POGOZELSKI: What's that?
MR. ZIMET: This is Exhibit 264.
MR. POGOZELSKI: Yes, that's what I said.
MR. ZIMET: I understand.
MR. POGOZELSKI: Yeah.
MR. ZIMET: You were skipping back and forth, the exhibit numbers.
Just for the record, this is 264.
THE COURT: Right.
BY MR. POGOZELSKI:
Q. Okay. We're on Government's Exhibit 264.
What does Charles Boyd write here in the first paragraph?
A. "Good morning. Yeah, so this is not AD. So that solves that problem. Unless they can get us invoices going back to Gilead, I don't see how we can buy from them."
Q. To your knowledge, did Synergy Group provide invoices going back to Gilead?
A. I don't think so.
Q. And after this email exchange, did the defendants buy HIV drugs from Synergy?
A. Yes.
Q. After this email exchange, did the defendants sell those HIV drugs from Synergy to pharmacies?
A. Yes.
MR. POGOZELSKI: Okay. Now, if we can go to

Government's Exhibit 463, which is in evidence.

BY MR. POGOZELSKI:

Q. So this is a day after your email, the emails that we just looked at, and it's about Synergy here. Adam Brosius is writing about Synergy.

If we go to page 4, do you see what Charles Boyd writes here?

A. Yes.

Q. And as far as you know, this reference to PR Distributor -- was that a reference to Drogueria Bayamon?

A. Yes, I believe so.

Q. And if we zoom out and go to the next page, do you see what Charles Boyd writes here?

A. Yes.

Q. And this is to Adam Brosius, Pat Boyd, and Garrett.

Do you agree -- do you agree that Synergy was lying on that first T3 that was confirmed to be false by DMS Pharma?

A. I mean, it looks like everyone is lying. Yes, I mean, they didn't provide true information.

Q. All right. And if we go to the next page, what does Patrick Boyd write there?

A. "Okay. Got it."

Q. All right.

MR. POGOZELSKI: We can take that down, and let's go to the next day. Let's go to Government's Exhibit 527, which is

in evidence.

BY MR. POGOZELSKI:

Q. And before I ask you about that, was there a third version of a Synergy T3 that was provided after those first two?

A. I don't remember how many versions were provided. Again, Dakota was working primarily on those verifications of the T3 transactions, but I'm sure there were multiple versions.

Q. Okay. So now we're on April 8th of 2021. Do you know who Jon Weed is?

A. Yes.

Q. Who is Jon Weed?

A. He's a Safe Chain sales representative.

Q. And so Jon Weed is asking for news on HIV brand suppliers.

Do you see where Patrick Boyd says, "I'm making progress with paperwork?"

A. Yes.

Q. Do you see where he's says, "I'm on a rampage with compliance to get some stuff rolling?"

A. Yes.

Q. Did Patrick Boyd pressure you to approve Synergy T3s?

A. Yes. There was a constant rush to get those -- any T3s approved.

Q. And was that an example of the urgency of the HIV business to these two defendants here, Charles and Patrick Boyd?

A. Yes.

Q. And what was the purpose of that pressure or urgency from the defendants?
A. At the time, it seemed like there was just -- you know, the HIV medications were coming in and out the door so quickly. You know, they were received and sold the same day. So it seemed they were moving quickly so everybody always just wanted to get them out the door.
There were backorders for a product; so it seemed that everybody just wanted to get it out the door as quickly as possible.
Q. Okay.
MR. POGOZELSKI: And if we could pull up -- or actually, just for the witness, Government's Exhibit 474, which is also on April 8, 2021.
BY MR. POGOZELSKI:
Q. Are these Teams messages between you and Patrick Boyd?
A. Yes.
MR. POGOZELSKI: At this time, the Government moves into evidence Government's Exhibit 474.
MR. BARZEE: No objection.
MR. ZIMET: No objection, Judge.
THE COURT: 474 will be received.
(Government's No. 474, Teams Message, was received in Evidence.)
BY MR. POGOZELSKI:

Q. All right. So on April 8th -- if we go to page 3, I believe -- do you see what Patrick Boyd writes here? What does he write to you on that same day, as the text exchange about going on a rampage?
A. Pat wrote, "I've got to call Carlos in a few. Want me to just tell them we need AD T3s prior to sending a PO?"
Q. And what did you write in response?
A. I wrote, "Yes, please. And please send them to compliance@safechain.com."
Q. All right. And was this after the two false versions of the Synergy T3s?
A. Yes.
Q. And what is Patrick Boyd's solution here, just as it relates to Synergy?
A. They wanted the T3s to reflect all the way back to an authorized distributor.
Q. And who does he say he's going to call to have that happen?
A. Carlos.
Q. Was Carlos Vega the owner of Synergy Group Wholesalers, as far as you know?
A. Yes, I believe he was.
Q. Okay. And is this an example of Patrick Boyd having a solution to the problems you identified with the first two Synergy T3s?
A. Yes.

Q. And did you agree with this solution of calling and saying, "We need AD, authorized distributor of T3s, after two false T3s"?
A. That was -- I didn't agree with any of it, but it seemed like there was always so much confusion about what needed to be done, you know, the explanation that these were new businesses just starting out so maybe they didn't have all the information or understand the requirements.
So a lot of these times, it seemed like it was a collaborative effort as far as trying to help these new businesses come along. So that was sort of why it was sort of explained to me in that way, and why, I guess, at the time, I just sort of accepted it. I don't know that I ever agreed with any of it, but it was also clear it didn't matter. There were still purchases being made and at such a rapid pace. It didn't matter because most of these medications were already gone.
Q. And was Synergy Group Wholesalers -- we just walked through those three versions of T3s -- is it similar to Boulevard 9229 LLC and their T3s?
A. Yes. The problems between all of the wholesalers were all sort of all along the same lines.
Q. Okay.
MR. POGOZELSKI: And if we could show -- pull up what's already in evidence Government's Exhibit 268.
BY MR. POGOZELSKI:

Q. Did you identify concerns with the third version of the Synergy T3s?
A. Yes.
Q. And what were the concerns that you're conveying here to Charles and Patrick Boyd with that third Synergy T3?
A. I wrote, "Good morning. I'm a little leery of this information. Cesar Castillo is a 3PL provider; so I would expect to see a transaction between Gilead and Cesar Castillo.
"I can't imagine Gilead sold anything to Cesar Castillo. Also, on the on the 3PL web page, I can see that the proper company name is Cesar Castillo, LLC, not Inc., as listed on their pedigree.
"Also, the email is incorrect. From the company website, their emails end with cesarcastillo.com, not the cesarcastilloinc.com as listed on the pedigree. Not sure I can point the finger and say this is fraudulent, but it does seem to be incomplete."
Q. And the part that you write about the email not matching Cesar Castillo's website was similar to the problem with the first Synergy T3, the Jeffrey Anderson email?
A. Yes.
Q. At least on the third version, is it not a Gmail.com?
A. Correct.
Q. Okay. And what does Patrick Boyd write to Charles Boyd, above your email there, identifying concerns with that third

Synergy T3?
A. "She has every reason to be skeptical, but we need not to use words like 'I can't imagine.' That wouldn't cover us whether it's good or bad."
Q. All right.
MR. POGOZELSKI: Now, if we can go a few days later and show Government's Exhibit 269, which is already in evidence.
BY MR. POGOZELSKI:
Q. All right. You see this email on April 12th to Martha Rumore, you, copying Patrick Boyd?
A. Yes.
Q. All right. And do you see what Charles Boyd writes here about Synergy?
Can you go ahead and read that for us.
A. Okay.
"Also, Synergy has provided a copy of the AD's packing slip and a sample T3. We have an order of theirs, which is going through our new due diligence checklist, and Abbie is verifying all T3 documents prior anything being received.
"Since we have never had an issue with the Synergy products, is there any reason to not continue business as normal if additional due diligence items are completed? We now have three million in backorders, and we would like to start filling those ASAP. Thanks."
Q. All right. Is there information in this email to the

lawyers relating to Synergy that is left out?
A. Yes.
Q. And what is not in this email from Charles Boyd to the lawyers as it relates to Synergy?
A. The information regarding the Gmail concerns, the fact that Dakota had verified that one of the transactions wasn't correct.
The contact listed with this company was someone who is no longer associated what the T3 document was reflecting, and just our own -- the multiple steps we had taken to try to verify the transaction history, and there was just constant issues and incorrect information that I previously provided to the Boyds.
Q. All right. And is this email to Martha Rumore and another Frier Levitt attorney -- is it similar to the October 2020 email we looked at yesterday?
A. Yes.
Q. And how is it similar?
A. I don't think we gave the attorneys or the legal groups the full picture of what was happening. Like, you know, there was information and details that Safe Chain knew that weren't shared with the legal team, for them to give us -- for them to provide the best information they could, based on all the information that we had available to us.
It was, you know, things were not included, so that the legal advice that was given was only based on the limited

information that they provided.
Q. Who you say "they," who is they?
A. Pat and Charlie, in these conversations.
Q. All right. And do you recall ever seeing an email from Martha Rumore or a Frier Levitt attorney that said, "Approved. You can buy from Synergy"?
A. I don't recall we ever got something that was explicit like that.
Q. Okay. And after, I think we looked at Government's Exhibit J --
MR. POGOZELSKI: If we could pull that back up.
BY MR. POGOZELSKI:
Q. So did the defendants go ahead after that and continue buying HIV drugs from Synergy after all those emails that we looked at?
A. Yes.
Q. And did you approve those Synergy -- those third versions of the Synergy T3s, despite all your concerns?
A. Yes. I think we accepted them, but we were always working behind and catching up; so those products aren't even in Safe Chain's possession any longer.
Q. And why did you approve those Synergy -- the third version of the Synergy T3s, despite all your concerns with Synergy and the false -- prior to the false ones?
A. Because I think at that point -- well, months before this

it became clear it didn't matter whether we approved it or not because there was still transactions taking place.

Q. Okay.

MR. POGOZELSKI: We can take this down, and we can show just the witness Government's Exhibit 97.

BY MR. POGOZELSKI:

Q. Ms. Divilio, are these Safe Chain Solutions T3s or pedigrees?

A. No, I don't think this is one that they would have produced. I think this may have been provided to us from a wholesaler.

Q. Okay. Do you see where it says Sender: Safe Chain Solutions; Receiver: SRX Specialty Pharmacy and Omom as the owner, and then Safe Chain and SRX."

A. Yes.

Q. Does this look like a Safe Chain Solutions T3 or pedigree?

A. It could be. Sorry. It's been a while since I have seen these.

Q. Okay. And if we go to page 14, is there a reference to Synergy in here?

A. Yes.

MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 97.

MR. BARZEE: No objection.

MR. ZIMET: No objection.

THE COURT: 97 will be received.

(Government's No. 97, Document, was received in Evidence.)

BY MR. POGOZELSKI:

Q. Okay. Ms. Divilio, at least according to -- let's see if we go -- are we on page 14? Okay.

Do you see the shipment date and transaction date here?

A. Yes.

Q. By the blue line?

A. Yes.

Q. Did the defendants, Charles and Patrick Boyd, continue selling Synergy Group HIV products all the way in September of 2021?

A. Yes.

Q. Was that after the Gilead seizure at Safe Chain Solutions?

A. Yes.

Q. And was this long after those false T3s you confirmed and forwarded along to Charles Boyd and Patrick Boyd?

A. Yes.

Q. And do you recall if Frier Levitt, on behalf of Safe Chain, had sent a demand letter to Synergy Group before this? Before September of 2021?

A. I don't recall the demand letter. Was that maybe -- was that associated with something with payment?

Q. Yes.

A. Okay. I didn't have anything to do with the payments of anything, but it probably did.

Q. Okay.

MR. POGOZELSKI: If we could take this down.

BY MR. POGOZELSKI:

Q. Do you recall a vendor named Invicta?

A. Yes.

Q. And was that another, at least, potential HIV vendor?

A. Yes, I believe it was.

MR. POGOZELSKI: If we could show just the witness Government's Exhibit 477.

BY MR. POGOZELSKI:

Q. Are these messages between you and Patrick Boyd, April 2021?

A. Yes.

MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 477.

MR. BARZEE: No objection.

MR. ZIMET: No objection.

THE COURT: 477 will be received.

(Government's No. 477, Messages, was received in Evidence.)

MR. POGOZELSKI: Thank you, Your Honor. And if we can go to page 2.

BY MR. POGOZELSKI:

Q. So we see the date is April 22nd, 2021.
Is this a few weeks after all the Synergy -- or at least some of the Synergy emails that we were looking at?
A. Yes.
Q. And there's a discussion here of Cintex and Invicta.
What does Patrick Boyd write to you here on April 22nd, of 2021?
A. He wrote, "Two quick things. HIV has arrived. Cintex is trying to reach you."
Q. All right. And was Cintex another HIV vendor around the same time?
A. Yes, they were.
Q. And what do you write to Patrick Boyd here about Cintex?
A. I wrote, "Do you know who from Cintex? They were the ones that had AmerisourceBergen as their AD, but they said they didn't have them as a customer."
Q. And when you say "They said they didn't have them as a customer," who are you referring to?
A. I believe when we reached out to AmerisourceBergen, they said Cintex was not someone who was a customer of theirs.
Q. Okay. And if we go to page 3, do you see what Patrick Boyd writes here? What does Patrick Boyd write in the context of Cintex?
A. "I think our responses to these people should be along the lines of, 'Being the AD didn't confirm your account. We cannot

buy Gilead brand products from you; however, if you have other products with T3s to an AD, we are happy to approve you.'"

Q. Okay. Is this about buying non-Gilead products from Cintex?

A. Yes, I believe it was.

Q. Okay. And did you agree with Patrick Boyd's suggestion there?

A. No.

Q. And why not?

A. Because it was just like this was constant. This was -- I don't know -- the same issues with different vendors constantly.

You know, we would buy from them for a while, and then something would happen, and they turn it over and go to another vendor pretty quickly.

And, again, after this just happened so many times, it was apparent no matter what myself or Dakota or Kelsey or whoever else was in compliance with us, I mean, no matter what we brought to the table, it didn't matter; so I just wrote, "Okay."

Q. And had Cintex at this point provided at least one false T3 that AmerisourceBergen confirmed to be false?

A. They listed them as one of their -- that we were listed on the transaction history; and, yes, when we reached to AmerisourceBergen to confirm that that was one of their

customers, they said they weren't a customer.
Q. And did Patrick Boyd and Charles Boyd go on to buy non-Gilead products from Cintex despite that?
A. I believe they did, yes.
Q. And did they sell those non-Gilead HIV products from Cintex to pharmacy customers, as far as you know?
A. Yes.
Q. Did you approve those T3s for non-Gilead?
A. Yes. Myself or Dakota probably did.
Q. Okay.
MR. POGOZELSKI: Now, if we could pull up Government's Exhibit 272, which is already in evidence.
Thank you.
BY MR. POGOZELSKI:
Q. So this the last one, the last messages, I believe, were April 22nd; so this is about six days before.
And do you see where Adam Brosius writes to Patrick Boyd, "Take a look. Let's chat about these privately"?
A. Yes.
Q. And do you see where there's an attachment there?
A. Yes. Sorry.
Q. And then if we take -- just take a quick look at the attachment, does this look -- do these Invicta T3s look at least somewhat similar to the other -- the majority of the Safe Chain Solutions T3s we looked at in terms of the template?

A. Yes.
Q. And is "Safe Chain Solutions" just replaced with "Invicta Wholesale Supply" at the top?
A. Yes.
Q. All right. Now, if we go back up to the first page, I think over a month ago, you had testified about Adam Brosius. You thought he was kind of sneaky.
Do you recall that?
A. Yes.
Q. And these messages between Adam Brosius and Patrick Boyd here -- are you involved in these messages?
A. No.
Q. And what is Adam Brosius asking to talk to Patrick Boyd about privately in the context of these emails?
A. I guess the content and format of the T3s that were --
MR. BARZEE: Objection to the speculation. Move to strike, Your Honor.
THE COURT: Sustained.
MR. BARZEE: Move --
THE COURT: Ignore the last answer.
BY MR. POGOZELSKI:
Q. Okay. Is this an example of Patrick Boyd being sneaky with Adam Brosius?
MR. BARZEE: Objection, your Honor.
THE COURT: Sustained.

MR. BARZEE: Argumentative.

Move to strike.

THE COURT: There's nothing to strike.

MR. POGOZELSKI: Let's pull up what's already in evidence Government's Exhibit 529.

BY MR. POGOZELSKI:

Q. All right. So now we're in May of 2021.

Do you see Adam Brosius and Patrick Boyd on these text exchanges?

A. Yes.

Q. Are you on this text exchange?

A. No.

Q. All right. And do you see where Patrick Boyd writes, "Cintex was pretty tiny, too. If I can help with Invicta in any way, let me know"?

Do you see that?

A. Yes.

Q. And what does Adam Brosius write here to Patrick Boyd?

A. "They are scared about the paperwork."

Q. And what does Patrick Boyd write in response to that in relation to Invicta?

A. "I can help with that off the record, if they have some questions. We won't report them in any fashion regardless."

Q. And that part, "We wouldn't report them in any fashion regardless," was that consistent with your experience working

at Safe Chain?
A. I would like to report anything that I found, but I guess that is consistent with what was not reported.
Q. Okay.
MR. POGOZELSKI: Now, let's -- we can take this down. Let's go back to where we had left off yesterday, which was Government's Exhibit 213.
And if we scroll to the top of page 2 -- and then let's -- if we can see the date of this.
Sorry about that, Ms. Gould.
BY MR. POGOZELSKI:
Q. So Monday, December 14, 2020. Subject line: Biktarvy lots. And then if we go to your email, what do you write here to Charles Boyd in December of 2020?
A. "Charlie, of the Biktarvy lots in question, we have sold 39 bottles of Lot CDGXKA and 14 of CCXKVA. This is the lot that White Cross sent to Gilead. I'm looking into the other requests Martha had for us relating to SOP updates."
Q. Okay. Were you researching the sales of these lot numbers based on a call with Martha Rumore?
A. Yes, it was based on her request.
Q. All right. And when you say "For this CCXKVA, this is the lot that White Cross sent to Gilead," is that a reference to a bottle with the wrong drugs in it that White Cross sent to Gilead in August of 2020?

A. Yes, I think so.
Q. And you write here that "we" -- is that Safe Chain? "We have sold?"
A. Yes.
Q. So 14 bottles of the same lot that White Cross sent to Gilead about the wrong drugs?
A. Correct.
Q. Okay. And did the defendants sell bottles of that same lot, at least a couple, after learning about the customer complaint?
A. Yes.
Q. So, in other words, were they not quarantined?
A. No. And I think at this time, they had two suppliers of the same drug; so we were trying to sort out where each drug may have been purchased from.
Q. Okay. And were the two suppliers Gentek and Boulevard?
A. Yes.
Q. All right.
MR. POGOZELSKI: Now, if we could pull up what's already into evidence Government's Exhibit 505.
Okay.
BY MR. POGOZELSKI:
Q. Do you see this is a text to Charles Boyd, Peter Boulevard, and Adam Brosius?
A. Yes.

Q. All right. If we scroll down, do you see the date here? September 29, 2020?
A. Yes.
Q. Was that around the time that you had reached out to IPC about Boulevard T3s?
A. Yes, I believe so.
Q. Okay. And do you see where Charles Boyd writes to Peter and Adam Brosius, "These are pictures from a client who received these in his bottle of Biktarvy. These broken pills look like statin, which is for high cholesterol"?
Do you see that?
A. Yes.
Q. And do you recall Charles Boyd making you aware of this specific customer complaint at this time?
A. No.
Q. And then do you see where he says, "We had another customer call today pissed off that he received his bottle of Harvoni already opened"?
Do you recall Charles Boyd making you aware of that specific customer complaint around this time?
A. No.
MR. POGOZELSKI: And then if we could open up the second photo there.
BY MR. POGOZELSKI:
Q. And while we're doing that, Ms. Divilio, do you recall if

the complaint about the broken statin pills was ever reported to the FDA?
A. No, I don't think it was.
Q. What about reported to the manufacturer?
A. No.
Q. Letters to customers about that particular complaint or --
A. No.
Q. And so if we look at the photo --
MR. POGOZELSKI: If we could pull up -- I think there should be a higher resolution version of that.
BY MR. POGOZELSKI:
Q. And what about the -- while we're looking for that -- the open bottle of Harvoni? As far as you know, was that reported to the FDA?
A. No.
Q. Reported to the manufacturer?
A. No.
Q. Okay. At this time in September of 2020, were you aware that Charles Boyd was having these text exchanges with Adam Brosius and Peter from Boulevard?
A. No.
Q. At this time, were you aware that Adam and Charles Boyd were having phone calls with Peter from Boulevard?
A. No.
Q. Were you aware they were discussing the IPC T3s or the T3s

that you had confirmed to be false around this time period?
A. No.
Q. Okay.
MR. POGOZELSKI: If we could pull up Government's Exhibit 196, which is in evidence.
BY MR. POGOZELSKI:
Q. All right. Do you see this email in front of you from November 12th of 2020?
A. Yes.
Q. All right now, if we -- it looks like you're -- are you on the top email, at least? Is your email address anywhere there?
A. No, it's not.
Q. All right. If we go to the bottom of page 1, do you see there's a pharmacy name there? Ascan Pharmacy?
A. Yes.
Q. And then we go to the top of page 2, what does that pharmacy write?
A. "Prezcobix inside sealed Symtuza bottle. See image and lot number. Triumeq bottles showing correct info on left side bottle and questionable info on the left."
Q. As far as you recall, were you made aware of this complaint by Charles Boyd or Patrick Boyd at this time?
A. No.
Q. As far as you know, was this complaint about the wrong drug in the bottle, with the Janssen product, reported to the FDA?

A. No, I don't think they were the same issues.
Q. Was it ever reported to Janssen, as far as you know?
A. No.
Q. Do you remember any customer letters going out about this?
MR. POGOZELSKI: And let's actually scroll down to page 4 and then page 5.
BY MR. POGOZELSKI:
Q. It's kind of hard to see, but do you see that lot number there? 20EG062?
A. Yes.
Q. All right. Do you remember sending out any customer letters about that specific lot with regard to this complaint involving a Janssen bottle?
A. No.
Q. All right.
MR. POGOZELSKI: Now, if we could show just the witness Government's Exhibit 634A.
BY MR. POGOZELSKI:
Q. Ms. Divilio, were you involved in submitting some drug notification forms to the FDA in late March of 2021?
A. Yes.
Q. And do you recognize this document as one of those?
A. Yes.
Q. All right. If we can go through a couple more of the pages here.

Is this Safe Chain Solutions?
A. Yes.
MR. POGOZELSKI: All right. At this time the Government moves into evidence Government's Exhibit 634A.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 634A will be received.
(Government's No. 634A, Drug Notification Form, was received in Evidence.)
MR. POGOZELSKI: Thank you. Now, if we go to -- and actually, now that we do have that photo, if we're able to bring up the photo and maybe side-by-side if possible. If not, we will just pull up the photo quickly.
BY MR. POGOZELSKI:
Q. And while we're doing that, do you see these lots numbers here on this drug notification form?
A. Yes.
Q. The Janssen bottle of Symtuza with the different drug in it, Lot 20EG062, is that listed there?
A. No, it's not.
Q. Okay. And as far as you know, the bottle with the broken statin pills, is that on this notification?
A. No, it's not.
Q. Okay. Now, if we go to the next page of this exhibit, who is listed here under "Contact Information?"

A. Charles Boyd.
Q. All right. And what does it say here under "Submit by Email?"
A. "A willfully false statement is a criminal offense pursuant to the U.S. Code, Title 18, Section 1001."
Q. Okay. Now if we go to the next page, do you see where it says, "For each complaint, Safe Chain declined these specific lots from any vendors, quarantined the specific lot, and contacted the manufacturer and immediately filing a product quality complaint"?
Do you see that?
A. Yes.
Q. And one of the lots that is listed in this one, at least, is the CCXKVA. Was that the White Cross one that we were just looking at in the email?
A. Yes, I believe that was referencing that one.
Q. Was that the one where you had emailed Charles Boyd about selling that lot after the customer complaint?
A. Yes.
Q. Okay. So is this statement, "For each complaint including that CCXKVA, Safe Chain declined these lots and quarantined the specific lots" -- was that a true statement?
A. No.
Q. And was this submitted to the FDA, as far as you know?
A. Yes, I believe it was.

Q. Okay. And the form starts with a narrative about a complaint about another Gilead product in a bottle of -- it talks about a Stribild.
Did you see that? Do you remember that complaint?
A. Yeah -- thank you.
Yes.
Q. And that the Stribild in the bottle of Biktarvy, is that customer complaint after these other ones that involved non-Gilead products in the bottles?
A. It was right around the same time frame. I can't quite remember which one came, in which succession they came.
MR. POGOZELSKI: All right. And if we go back up to page 1 --
BY MR. POGOZELSKI:
Q. What is the date of this initial notification to the FDA?
A. March 25th, 2021.
Q. And prior to that, were there multiple other customer complaints about wrong drugs in the bottle?
A. Yes.
Q. And were some of those complaints in August of 2020?
A. Yes.
Q. September of 2020?
A. Yes.
Q. October of 2020?
A. Yes.

Q. November 2020?
A. Yes.
Q. Okay. And did the defendants file these types of drug notification forms back then at the time of the complaints?
A. No.
Q. And was this submitted many months after several of those complaints?
A. Yes.
Q. All right.
MR. POGOZELSKI: Now, if we could pull up Government's Exhibit 252.
BY MR. POGOZELSKI:
Q. Do you see --
MR. POGOZELSKI: This is already in evidence.
BY MR. POGOZELSKI:
Q. Do you see -- so the notification we looked at on that FDA form is March 25th of 2021.
What's the date of this Charles Boyd email to Patrick Boyd, Adam Brosius, and Anthony Berger?
THE COURT: I don't have 252 in evidence.
MR. POGOZELSKI: I apologize. Then we will show just the witness Government's Exhibit 252.
BY MR. POGOZELSKI:
Q. Is this an email from Charles Boyd and to Pat Boyd and others? And does it include an email below with you on it?

A. Yes.

MR. POGOZELSKI: All right. At this time, the Government moves into evidence Government's Exhibit 252.

I apologize, Your Honor.

MR. ZIMET: No objection, Judge.

MR. BARZEE: No objection.

THE COURT: 252 will be received.

(Government's No. 252, Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. So, Ms. Divilio, the FDA notification form we just looked at, is that on March 25th of 2021?

A. Yes.

Q. And is that one day after this email?

A. Yes.

Q. All right.

MR. POGOZELSKI: If we can go ahead and scroll to page 4 --

BY MR. POGOZELSKI:

Q. Is this a letter from Gilead outside counsel?

A. Yes, it is.

Q. And is it threatening a lawsuit?

MR. ZIMET: Objection, Judge. The document speaks for itself.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Okay.

MR. POGOZELSKI: If we go to page 5, the next page, and if we highlight the part that starts, "In addition, the Federal Food Drug and Cosmetic Act establishes both civil and criminal penalties for sales of adulterated and misbranded counterfeit drugs," and cites a statute, "21 United States Code 331."

BY MR. POGOZELSKI:

Q. Was that the same statute that you had highlighted or sent to Charles Boyd and Adam Brosius back in July of 2020?

A. Yes, I believe it is.

Q. And that July 2020 email, was that the one where you highlighted the criminal consequences to Charles Boyd and Adam Brosius?

A. Yes.

Q. And if we go back up, as far as you know, was it this demand letter that led to the defendants filing those FDA forms the next day?

A. Yes.

Q. All right.

MR. POGOZELSKI: If we could pull up what is already in evidence Government's Exhibit 225. All right.

Now we're back in February of 2021.

And if you go down, and then keep going down, a little further down, and then even a little further down, and then even a little further down. All right. There we go.

BY MR. POGOZELSKI:
Q. All right. So do you see this email you send here to Charles Boyd and Martha Rumore?
A. Yes.
Q. All right. And does it reference the Stribild in the bottle of Gilead medicine as reported by a pharmacy?
A. Yes, it does.
Q. And this is in February -- was this in February of 2021?
A. Yes, it is.
Q. And as far as you remember, was that Stribild in the bottle -- was that one of the lots or complaints referenced in the FDA form we looked at about a month and a half later that was filed?
A. I think so. I would have to look at the lot numbers.
Q. Fair enough.
A. They're very close and confusing.
Q. Was there a reference to Stribild in that FDA form that we looked at?
A. Yes.
Q. Was that FDA form that was filled out and submitted, was it about a month and a half or more later or after this email?
A. Yes.
MR. POGOZELSKI: Okay. If we scroll up to the very top --
BY MR. POGOZELSKI:

Q. -- do you see where Charles Boyd writes, "If we contact the FDA on this situation but did not previously on the other issues, I would think that would be a problem"?

Do you see that?

A. Yes.

Q. And where he says, "I don't want to open a potential can of worms with the FDA when we can't really determine if the product is unfit or could cause harm" --

A. Yes.

Q. -- do you see that?

Was the complaint referenced in your email below with the Stribild -- was it filed, submitted to the FDA in February of 2021?

A. No.

Q. And Charles Boyd's statement here about, "I don't want to open up a potential can of worms with the FDA," was that consistent with your experience working at Safe Chain?

A. Yes.

Q. And how did you interpret that when you received the email?

MR. ZIMET: Objection, Judge.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Did you agree with this statement about opening up a potential can of worms with the FDA?

A. No.

Q. What was your reaction to that statement?

MR. ZIMET: Objection, Judge.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Based -- did you work very closely with Charles Boyd during your tenure?

A. Yes, I would say so.

Q. And based on your experience working closely with Charles Boyd in communications and conversations with you, did he try to avoid scrutiny from regulators?

MR. ZIMET: Objection, Judge.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. All right.

MR. POGOZELSKI: Let's go ahead and show just the witness Government's Exhibit 227.

BY MR. POGOZELSKI:

Q. Are these emails from you to Martha and Charles Boyd in February of 2021?

A. Yes.

MR. POGOZELSKI: At this time, the Government moves into evidence Government's Exhibit 227.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 227 will be received.

(Government's No. 227, Email, was received in Evidence.)
BY MR. POGOZELSKI:
Q. All right. Now, if we go to the bottom of page 2, and then you see where you're writing to Charles Boyd, "Biktarvy issue with customer"?
A. Yes.
Q. And then the next page, does this relate -- is this also related to that customer complaint we were just looking at? The Stribild with Martha Rumore?
A. Yes.
Q. And then if we go back up, what was Gentek LLC?
A. That was another one of the HIV wholesalers.
Q. Okay. And Edel Reyes here -- what is his title listed as?
A. A misspelled "president": P-E-S-I-D-E-N-T.
Q. When he writes here to Charles Boyd, "Please go ahead and destroy the product. That's a mixed batch error on our AD" --
Do you have any idea what that means?
A. I think he's trying to blame the authorized distributor for mislabeling or an error on their end.
Q. Okay.
MR. POGOZELSKI: If we can pull up for just the witness Government's Exhibit 361.
BY MR. POGOZELSKI:
Q. And are these, Ms. Divilio -- are these emails that involve compliance@safechain.com with a customer?

MR. POGOZELSKI: Maybe we scroll to the next page.
A. Yes, I think that was one of the pharmacy customers.
MR. POGOZELSKI: At this time, the Government -- and back up.
BY MR. POGOZELSKI:
Q. Would you have shared -- would compliance have shared any types of concerns identified by customers with Charles Boyd?
A. Yes.
MR. POGOZELSKI: At this time, the Government would move into evidence Government's Exhibit 361.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 361 will be received.
(Government's No. 361, Email, was received in Evidence.)
BY MR. POGOZELSKI:
Q. So we were just looking at the Edel Reyes, Gentek "Pesident," email.
If we go to the second page here, what is this customer from RPH Partners, Inc. -- what are they asking from compliance here?
A. "We need a contact person at Gentek LLC. I'm needing to verify some information on the pedigrees. Appreciate your help with this information."
Q. All right. And then if we go back up, does Ms. Flowers

provide contact information for Gentek?
A. Yes, she does.
Q. And if you recall, is that the same email address for the pesident of Gentek?
A. Yes, I think so.
Q. All right. And then what does the customer write here at the top?
A. "Hi, Dakota. Happy New Year. Hope all is well. I wanted to confirm the email for Gentek is correct because I keep getting 'undeliverable message.' Sales@gentekusa.com.
"Please let me know when you get a chance, and if you have a phone number, that would be great. Thanks for your help."
MR. POGOZELSKI: All right. Now, if we can show just the witness Government's Exhibit 362.
BY MR. POGOZELSKI:
Q. Is this an email from you to Charles Boyd relating to that same customer?
A. Yes.
MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 362.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 362 will be received.
(Government's No. 362, Email, was received in Evidence.)
BY MR. POGOZELSKI:

Q. All right. And who do you write to Charles Boyd in relation to that? The customer that had the undeliverable message from Gentek?
A. "Hey, Charlie. Attached is a letter from San Diego Wholesale stating they no longer want to do business with us. I believe this is in part due to them having to wait for T3s" --
(Reporter requests clarification.)
THE WITNESS: Sorry.
A. -- "which were ones we had to manually update from Gentek. Also, they are stating some licensing discrepancies from Gentek and the supplier in Puerto Rico. As far as the T3s, Dakota and I always worked with them to get them the T3s ASAP."
BY MR. POGOZELSKI:
Q. And as far as you recall, what were -- were there licensing discrepancies with Gentek LLC?
A. I don't remember what licensing issues there were.
It may have been a state-to-state issue as far as where they were able to distribute.
Q. Okay. For Gentek LLC, were you ever able to verify any Gentek T3s?
A. I don't remember specifics about Gentek. I feel like Dakota may have been the one primarily working with T3s at that time.
Q. Was Gentek the one that had Drogueria Betances listed on

the T3s?
A. Yes.
Q. Was it Patrick Boyd who was calling Drogueria Betances?
A. I believe so, yes.
Q. Okay. So were you personally ever able to verify any Gentek LLC T3s?
A. No.

MR. POGOZELSKI: All right. If we could go to page 3 the letter.

BY MR. POGOZELSKI:
Q. What is the customer here write in the letter?
A. "Dear Safe Chain Solutions, this letter is to notify you that RPH Partners, Inc., d/b/a San Diego Wholesale Distribution has terminated our business relationship and will no longer engage in any pharmaceutical sales transactions. This termination is effective as of December 31st, 2020.

"Transaction history discrepancies and neglected requests for licensing information from Downstream Wholesale Distribution Partners, Gentek LLC, in Stamford, Connecticut, and Drogueria Betances in Caguas, Puerto Rico, led to this decision. This decision is not appealable as mandated by our standards. They" --
Q. Thank you. Sorry to interrupt.

MR. POGOZELSKI: Now, if we can go -- show the witness Government's Exhibit 363.

BY MR. POGOZELSKI:
Q. And are these follow-up emails, as it appears, from Charles Boyd to Adam Brosius and Patrick Boyd after the email that you sent that we just looked at?
A. Yes.
MR. POGOZELSKI: All right. The Government would move into evidence Government's Exhibit 363.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 363 will be received.
(Government's No. 363, Email, was received in Evidence.)
BY MR. POGOZELSKI:
Q. And at the top email where Charles Boyd writes "Big DBs,"
Do you know what that means?
A. I can guess.
MR. ZIMET: Objection, Judge.
MR. POGOZELSKI: All right. We'll move on. And if we take a look Government's Exhibit 372, just the witness.
BY MR. POGOZELSKI:
Q. Is this an email from Patrick Boyd to Charles Boyd, above emails that you're on, in April of 2021?
A. Yes.
MR. POGOZELSKI: All right. At this time, the Government moves into evidence Government's Exhibit 372.
MR. BARZEE: No objection.

MR. ZIMET: No objection.
THE COURT: 372 will be received.
(Government's No. 372, Email, was received in Evidence.)
BY MR. POGOZELSKI:
Q. All right. Do you see where Patrick Boyd writes here to Charles Boyd, "We are writing to inform you that Gilead has mentioned that a former supplier of SCS Gentek has provided us with records inconsistent with Gilead's tracing"?
Do you see that?
A. Yes.
Q. That language "inconsistent with Gilead's tracing" -- is that language similar to that October 2020 email you received from Gilead?
A. No.
Q. "Inconsistent with our records"?
A. I'm sorry. Can you say that again?
Q. Do you remember the October 2020 email where Gilead said that the Boulevard T3 was "inconsistent with our records"?
A. Yes.
Q. Is this language here, about Gilead saying that the Gentek T3 records were inconsistent with Gilead's tracing, is that similar language?
A. Yes.
Q. All right. And do you see where Patrick Boyd writes SCS -- is that Safe Chain Solutions?

A. Yes.
Q. "SCS closed its account with Gentek in December 2020 and has not purchased since."
Do you see that in the email?
A. Yes.
Q. All right.
MR. POGOZELSKI: If we could pull up side-by-side with this Government's Exhibit 657, which is in evidence.
BY MR. POGOZELSKI:
Q. Do you see on this T3 here, this Gentek T3, a Safe Chain Solutions purchase from Gentek January 12th of 2021?
A. Yes.
Q. Does that contradict Patrick Boyd's email over there on the left?
A. Yes.
Q. And what does Patrick Boyd write there at the top of his email on left.
A. "Dear Valued Customer."
Q. Okay.
THE COURT: I don't have 657 in evidence.
MR. POGOZELSKI: I believe we introduced this through another witness.
THE COURT: If there's an agreement, fine, but I don't have it in evidence.
MR. POGOZELSKI: May I have a moment to confer with the

defense, Your Honor?

THE COURT: Okay.

MR. ZIMET: Judge, we have no objection.

THE COURT: Mr. Barzee?

MR. BARZEE: I'm sorry. No objection, Your Honor.

THE COURT: What's the exhibit number again?

MR. POGOZELSKI: That was 657.

THE COURT: 657 will be received.

(Government's No. 657, Email, was received in Evidence.)

MR. POGOZELSKI: And then we can take down 657 and show what is in evidence, I hope, Government's Exhibit 40F, which was entered yesterday.

BY MR. POGOZELSKI:

Q. Do you see that $1.6 million in payments to Gentek LLC in January 2021?

A. Yes.

Q. And does that appear to also contradict Patrick Boyd's statement in that email that we just looked at?

A. Yes.

MR. POGOZELSKI: If we could pull up for just the witness Government's Exhibit 367.

BY MR. POGOZELSKI:

Q. Is this an email from Patrick Boyd to "orders" on November of 2020?

A. Yes.

MR. POGOZELSKI: At this time, the Government would move Government's Exhibit 367 into evidence.

MR. BARZEE: No objection.

MR. ZIMET: No objection.

THE COURT: 367 will be received.

(Government's No. 367, Email, was received in Evidence.)

MR. POGOZELSKI: I don't know, Your Honor, if this might be a good time to take a brief break.

THE COURT: All right. Members of the jury, let's take a 15-minute recess.

Remember my admonition not to discuss the case or allow it to be discussed in your presence, and we'll see you back in the jury room in about 15 minutes.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: And if there's nothing else to come before the Court, we will be in recess for five minutes.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: Again, Ms. Divilio, during the break in your testimony, you're not allowed to discuss your testimony with anyone, and we'll see you back in about 15 minutes.

And if there's else to come before the Court, we'll be in recess for 15 minutes.

THE COURT SECURITY OFFICER: All rise.

(Off the record from 10:28 AM to 10:49 AM, after which the following proceedings were had:)

THE COURT: We are back on the record.

Counsel are present. Both defendants are present. We need to get Ms. Divilio back.

MR. POGOZELSKI: Yes, Your Honor.

THE COURT: Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: No, Your Honor.

MR. ZIMET: No, Your Honor.

MR. BARZEE: No, Your Honor.

THE COURT: If we have all the jurors, let's bring them in.

Ms. Divilio, you understand that you're still under oath.

THE WITNESS: Yes.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

THE COURT: Mr. Pogozelski, you can continue.

MR. POGOZELSKI: If we can pull up for just the witness, Government's Exhibit 369.

BY MR. POGOZELSKI:

Q. Ms. Divilio, is this an email from Tyler Tedrow to Patrick Boyd in February of 2021?

A. Yes, it is.

Q. Does it have to do with a customer return?

A. Yes, it is.

MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 369.

MR. BARZEE: No objection.

MR. ZIMET: No objection Your Honor.

THE COURT: 369 will be received.

(Government's No. 369, Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. All right.

MR. POGOZELSKI: If we that take that down and pull up Government's Exhibit 245, which should be in evidence.

BY MR. POGOZELSKI:

Q. Ms. Divilio, do you remember a Gilead e-Pharm/alert coming out in March of 2021?

A. Yes, I do.

Q. All right. And if we take a look here, did Charles Boyd put together a response to that alert?

A. Yes.
Q. Now, if we go to the second page, do you see where in Charles Boyd's email, he writes, "All products, most or must have proper T3 documentation tracing the products back to Gilead and their AD"?
A. Yes.
Q. Was that a true statement from Boulevard 9229?
A. No.
Q. And by this point, had you confirmed at least two versions of Boulevard T3s to be false?
A. Yes.
Q. And this is March 16th of 2021.
Had you confirmed a Synergy T3 to be false?
A. Yes.
Q. All right. And then if we go to page 7, is this a letter that went out to at least some customers, as far as you know?
A. Yes.
Q. Okay. And is there anything in this letter -- we can take a moment. Is there anything in the letter about Boulevard?
A. No, there's not.
Q. And do you see here where in the letter that Charles Boyd attached it says, "As of late 2020, Safe Chain no longer sources any products from Gilead LLC"?
Do you see that?
A. Yes.

Q. Is that contradicted by the Gentek T3 we looked at earlier?
A. Yes.
Q. Is it contradicted by the payments of Gentek in January 2021 that we looked at earlier?
A. Yes.
Q. All right.
MR. POGOZELSKI: If we could show just the witness Government's Exhibit 251.
BY MR. POGOZELSKI:
Q. Is this an email from Charles Boyd to compliance a few days later, March 23rd of 2021?
A. Yes.
MR. POGOZELSKI: The Government would move into evidence Government's Exhibit 251.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 251 will be received.
(Government's No. 251, Email, was received in Evidence.)
BY MR. POGOZELSKI:
Q. All right. Ms. Divilio, does this appear to be the defendant's response to that Gilead e-Pharm/alert that went the out to pharmacies?
A. Yes.
Q. If we go to page 2, do you see where it says, "Safe Chain has and will continue to verify all T3 information in

accordance with industry regulations"?
A. Yes.
Q. Was that true based on your experience as the director of compliance at Safe Chain?
A. No.
Q. And this part here about "Safe Chain rigorously pursues all opportunities to reinforce the integrity of our supply chain" -- is that your experience working for these two defendants and their company, Safe Chain?
A. No.
Q. And why do you say that?
A. Because at this point, I had already brought up so many issues that we were having with all these various vendors and with HIV vendors, and it just seemed that, regardless of what myself or the other compliance team members brought up, that business just continued as usual.
MR. POGOZELSKI: Okay. We can zoom out.
BY MR. POGOZELSKI:
Q. And was this an alert that the defendant sent out to pharmacies in response to Gilead's alert?
A. Yes.
Q. All right. And if we go up to the date, March 23rd of 2021, do you recall if the defendants were still buying HIV drugs from Boulevard at this point?
A. I think that they still may have been.

Q. Okay.

MR. POGOZELSKI: If we can show -- take this down and show the witness just Government's Exhibit 319.

BY MR. POGOZELSKI:

Q. Ms. Divilio, is this -- is this an email chain between you and a pharmacy customer?

A. Yes.

Q. And is this something that you would have shared with, at least, Charles Boyd?

A. Yes.

Q. This type of information? Okay.

MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 319.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 319 will be received.

(Government's No. 319, Email Chain, was received in Evidence.)

BY MR. POGOZELSKI:

Q. Do you see where the customer writes, "We need further details on how Safe Chain came to the conclusion of this discrepant lot number. What do you mean by 'quality complaint?' Please elaborate"?

Do you see that?

A. Yes.

Q. The quality complaint language, is that included in letters to customers?
A. Yes.
Q. And where did that term or language "quality complaint" come from?
A. I think that was just a generalized term instead of saying there was a problem.
Q. And what kind of problem? Can you give us an example of the types of problems?
A. Instead of, you know, acknowledging that there was incorrect pills in the bottle -- that's a legitimate problem -- I think by using the term "quality complaint," it sort of glossed over it a little bit more and was intentionally vague.
Q. And is this customer here at least questioning what that terminology meant?
A. Yes.
Q. What does the customer write here at the bottom?
A. "We've dispensed an alarming volume of this lot number, and we need to know if this is something that needs to be escalated to both prescribers and board of pharmacy or if this is something that can be handled at this level, depending upon how your investigation was conducted."
Q. Okay.
MR. POGOZELSKI: We can take that down. And then if we go to -- if we can show just the witness Government's

Exhibit 486.

BY MR. POGOZELSKI:

Q. Are these Teams chats between and you Charles Boyd, March 31st, 2021?

A. Yes.

MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 486.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 486 will be received.

(Government's No. 486, Teams Messages, was received in Evidence.)

BY MR. POGOZELSKI:

Q. All right. And March 31st of 2021, was this after Gilead's e-Pharm/alert that we looked at?

A. Yes.

Q. Was this after that letter from Gilead's outside counsel that we looked at?

A. Yes.

MR. POGOZELSKI: And then if we go down, and then keep going down. Actually, sorry. Go -- okay.

BY MR. POGOZELSKI:

Q. So do you see where there's some discussion about Boulevard and licensing?

A. Yes.

Q. What was it that prompted you to look back into Boulevard's licensing March 31st, 2021?
A. I think we were just looking over their licensing -- or a customer may have asked for it, and just kind of looking to confirm their license number again.
Q. Okay. And did you confirm that it was -- what happened with Boulevard's license when you looked into it?
A. When Boulevard first provided their pharmaceutical license, they provided us with a document that said, Wholesale distributor." It had an expiration date. It had a license number. It looked like what you have expected it to look for a wholesale distributor.

When we went to verify the license on the New York Board of Pharmacy website, we typed in the license number, and it did present a valid pharmacy license, which was something at the time, we overlooked that it was only a registered pharmacy license number, not a wholesaler.

So at this time, I couldn't get confirmation from Boulevard about, "Hey, what's the deal with your license? Are you -- is the pharmacy able to be duly licensed as a pharmacy and a wholesaler?"

So during that time, we also reached out to the New York -- well, I reached out to the New York Board of Pharmacy to look up the license and to kind of give me some insight as to what is going on with the license.

Q. All right. And is Charles Boyd -- what is Charles Boyd asking you to do here in these messages on March 31st, 2021?
A. I told him I had not heard from the New York Board of Pharmacy.
Charlie says, "Can you email King Shithead and ask him?" And I say, "Ask him for his license again?"
Charlie wrote, "Yes. And that the New York Board of Pharmacy only shows them registered as a pharmacy. Can they tell us why?"
Q. And then what do you ask Charles Boyd here?
A. I say, "Sure. Do you have an email address for the Peter person?"
Q. And then what email address does he provide for the Peter person?
A. "This is all I can find: Boulevard0102@gmail.com.'
Q. And then if we go to the next page, what does Charles Boyd write there?
A. "But add King also. Screw it."
Q. And who is "King"?
A. King Kimchi was the person that was providing the T3s from -- for Boulevard.
MR. POGOZELSKI: All right. And then if we can go to -- actually, go back up for a second.
BY MR. POGOZELSKI:
Q. This email here, boulevard0102@gmail.com, do you recall

using that or communicating with that email much?
A. No.
Q. Okay.
MR. POGOZELSKI: If we could pull up Government's Exhibit 503 and go to page 46.
BY MR. POGOZELSKI:
Q. And then do you see where Charles Boyd asks Peter Boulevard for his email here?
A. Yes.
Q. If you scroll down, what email does Peter provide?
A. Consulting012345@Gmail.
Q. Is all right. That different than the email that he provided you in these Teams messages?
A. Yes.
Q. And this consulting email, what email -- what name is that associated with?
A. With Peter Boulevard. That was the one that was on, I think the -- one of the applications.
Q. Was it King Kimchi?
A. Yes.
Q. And did Charles Boyd in those Teams messages give you the impression that King Kimchi and Peter were different people?
MR. ZIMET: Objection, Judge.
THE COURT: Sustained.
BY MR. POGOZELSKI:

Q. How did you interpret those Teams messages between you and Charles Boyd as it related to Peter and King?
A. I thought King Kimchi was a separate person from Peter. I thought that was Boulevard's employee.
Q. And are these text messages here at least inconsistent with that?
MR. ZIMET: Objection, Judge.
THE COURT: Sustained.
MR. POGOZELSKI: If we could go to Government's Exhibit 349, which is in evidence, and then if we go down to page 2.
BY MR. POGOZELSKI:
Q. Is that an email from King Kimchi with the consulting email address to compliance?
A. Yes.
MR. POGOZELSKI: If we go to the top.
BY MR. POGOZELSKI:
Q. What do you write here about the T3s from Boulevard to Charles Boyd?
A. "Attached are T3s we received from Boulevard. However, they have the product being shipped to our Utah warehouse. I was unaware we have anything to going to Utah. Can you please confirm?"
Q. All right. And what does Charles Boyd write in response here?

A. "Yes, I'm not sure why our Utah facility is on there, but we'll tell him to fix it."
Q. And was the "him" in these emails -- is that the King Kimchi?
A. Yes.
MR. POGOZELSKI: All right. And then if we can go back to Government's Exhibit 503, page 35.
BY MR. POGOZELSKI:
Q. So August 27, 2020, the same day, what does Charles Boyd write to Peter Boulevard here?
A. "Hey, Peter. All of the T3s have our Utah address on them, and they need our Maryland address. Can you fix, please?"
MR. POGOZELSKI: All right. We can take that down.
BY MR. POGOZELSKI:
Q. When you testified previously about a month ago, we looked at a Teams message where Charles Boyd talked about not calling the Maryland Board of Pharmacy.
Do you recall that?
A. Yes.
Q. Did Charles Boyd instead ask you to reach out to Frier Levitt about Boulevard's Maryland license?
A. Yes. I think we had some questions about licensing in general.
Q. All right.
MR. POGOZELSKI: If we could show just the witness

Government's Exhibit 357.

BY MR. POGOZELSKI:

Q. Is this an email that you sent to Frier Levitt around that time?

A. Yes.

Q. And did Charles Boyd ask you to reach out to Frier Levitt?

A. Yes, I think that was -- we discussed that.

MR. POGOZELSKI: All right. At this time, the Government moves into evidence Government's Exhibit 357.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 357 will be received.

(Government's No. 457, Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. Do you recall, Ms. Divilio, why you were asking Frier Levitt whether as a licensed wholesaler, it was Safe Chain's responsibility to ensure that another distributor is licensed in the state of Maryland before purchasing from them?

A. I think that was -- we were looking for, you know, an explicit guideline as far as can Safe Chain purchase from other wholesalers that may or may not be licensed in Maryland.

Maryland holds some reciprocity with some other states where the licensing is equivalent, the requirements are equivalent; so you don't necessarily have to hold that state license but not all states are like that.

But it was a little bit ambiguous as far as what states you could interact with.

Q. And this language about a virtual wholesaler and domestic broker, where would that -- that question that you asked there, where would that that information have come from?

A. I think these were proposed by Charles.

I don't really know much about virtual wholesaling or domestic brokerage.

MR. POGOZELSKI: All right. And then if we could take this down, and show just the witness Government's Exhibit 671.

BY MR. POGOZELSKI:

Q. Are these Teams chats a few days later between Charles Boyd and Adam Brosius?

A. Yes.

MR. POGOZELSKI: The Government moves to admit Government's Exhibit 671.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 671 will be received.

(Government's No. 671, Teams Messages, was received in Evidence.)

MR. POGOZELSKI: All right. And if we go to the next page.

BY MR. POGOZELSKI:

Q. Do you see where Charles Boyd says, "Abbie called Frier

again"?
A. Yes.
Q. Do you recall calling Frier Levitt to try to get an answer?
A. Yeah, I probably would have if I wasn't getting an email response from them.
Q. As the director of compliance, was it your preference to reach out to the Maryland Board of Pharmacy directly?
MR. ZIMET: Objection, Judge. Form. Leading.
THE COURT: Overruled.
BY MR. POGOZELSKI:
Q. As the director of compliance for Safe Chain, was it your preference to reach out to the Maryland Board of Pharmacy directly to ask these questions?
A. Yes.
Q. Where Charles Boyd says, "I'm pretty sure the exposure is on the supplier," having worked with him so long, how do you interpret that?
MR. ZIMET: Objection, Judge.
THE COURT: Sustained.
MR. POGOZELSKI: All right. Let's go ahead and show just the witness Government's Exhibit 672.
BY MR. POGOZELSKI:
Q. Are these Teams chats in August 2020 between Pat Boyd, Charles Boyd, and Jesse Hammett?
A. Yes.

MR. POGOZELSKI: At this time, the Government moves into evidence Government's Exhibit 692.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 672 will be received.

(Government's No. 672, Teams Messages, was received in Evidence.)

MR. POGOZELSKI: Thank you.

If we go to the second page here.

BY MR. POGOZELSKI:

Q. Do you see -- what does Jesse Hammett right here to Pat and Charles Boyd?

A. "I don't want to get in the compliance business, but we're sure Boulevard has a Maryland license; right?"

Q. And what does Charles Boyd write here below that?

A. "They do not have a Maryland license, but according to Abbie, it's the responsibility of the vendor, not customer to ensure that."

Q. All right. Do you recall telling Charles Boyd that?

A. No.

Q. And by this point, August 27th of 2020, had Safe Chain been buying these HIV drugs from Boulevard for several months at least?

A. Yes.

Q. Did that include -- without setting aside licensing issues,

were there a lot of other problems that you identify with Boulevard?
A. Yes.
Q. And as far as you know, did Boulevard ship these HIV drugs directly to Safe Chain's Maryland warehouse?
A. Yes.
Q. And where Charles Boyd says, "Boulevard does not have a Maryland license," do you recall if the vendor intake form required vendors to provide a copy of their Maryland license?
A. I believe it asked for their Maryland or Utah license where Safe Chain had warehouses.
Q. Okay. And did that happen with Boulevard, to the best of your recollection?
A. No.
Q. Did that happen with Gentek, to the best of your recollection?
A. No.
Q. Were these kind of exceptions that were made for the HIV vendors?
A. Yes, it seemed like it.
Q. And who made those exceptions for these HIV vendors?
A. I would say compliance was guided by Pat and Charles, based on the business decisions.
Q. Okay.
MR. POGOZELSKI: Now, we can take this down and show

just the witness Government's Exhibit 669.

BY MR. POGOZELSKI:

Q. Do you recall seeing a letter like this from Martha Rumore to Boulevard?

A. Yes, I believe I saw it at some point.

Q. And do you recall providing the contact information to Ms. Rumore of King Kimchi and Ishbay Shukurov?

A. Yes, I did.

MR. POGOZELSKI: All right. The Government moves into evidence Government's Exhibit 669.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 669 will be received.

(Government's No. 669, Letter, was received in Evidence.)

BY MR. POGOZELSKI:

Q. All right. If we go to page 2, do you see where it says, "Finally, with respect to Biktarvy Lot CDGXKA on October 5th, 2020, Safe Chain asked Gilead to verify pedigree information that purported to show that Gilead sold five bottles of Biktarvy, lot number, to Rochester Drug, who, in turn, appeared to have sold them to Boulevard.

"On October 9th, Gilead determined that the information contained in the document did not match Gilead's records and directed Safe Chain to quarantine any product associated with this lot number that remained in Safe Chain's possession."

MR. POGOZELSKI: If we scroll out and then go a few paragraphs down -- this one.
BY MR. POGOZELSKI:
Q. "As required under the Drug Supply Chain Security Act, upon being informed that the above-mentioned pedigree was falsified and that the product associated with this falsified pedigree documentation is considered illegitimate, Safe Chain reported the matter to the FDA, quarantined the product, and notified all pharmacy customers to which Safe Chain sold these lots."
Was that -- is that true for that October 2020 Gilead email?
A. No.
Q. Did you fill out an FDA form to notify the FDA about that Gilead email back in October 2020?
A. Yes.
Q. Did you send that to Charles Boyd?
A. Yes.
Q. Was it submitted at the time?
A. No, it wasn't.
Q. Okay.
MR. POGOZELSKI: You can take that down.
BY MR. POGOZELSKI:
Q. The part about quarantining the product, was that true?
A. There was an attempt to quarantine some of the products, but I'm not sure if it applies to this one particular instance.

Q. Okay.
MR. POGOZELSKI: If we could show just the witness Government's Exhibit 299.
BY MR. POGOZELSKI:
Q. Is this an email, Ms. Divilio, that you sent to the FDA in July of 2021?
A. Yes.
Q. And is this something that at least Charles Boyd would have been aware of at the time?
A. Yes.
Q. And that shared mailbox, "compliance," do you know if Charles Boyd had access to that?
A. Yes, he did.
Q. What about Patrick Boyd?
A. I'm not sure if Pat did.
Q. Okay.
A. But I know Charles did.
MR. POGOZELSKI: At this time, the Government would move into evidence Government Exhibit 299.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 299 will be received.
(Government's No. 299, Email, was received in Evidence.)
MR. POGOZELSKI: If then we go to page 2.
BY MR. POGOZELSKI:

Q. So the email is July of 2021. Does this look like that same 3911 drug notification form that you had sent to Charles Boyd back in October of 2020?
A. Yes.
MR. POGOZELSKI: And then if we could show just the witness Government's Exhibit 300.
BY MR. POGOZELSKI:
Q. Ms. Divilio, is this the FDA's response to the attempted submission of a termination request?
A. Yes, it was.
Q. Is this something that would have shared with at least Charles Boyd?
A. Yes.
MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 300.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 300 will be received.
(Government's No. 300, Document- FDA Response, was received in Evidence.)
BY MR. POGOZELSKI:
Q. Now just to switch gears for a moment, do you recall Track and Trace?
A. Yes.
MR. POGOZELSKI: If we could show just the witness

Government's Exhibit 348.

BY MR. POGOZELSKI:

Q. Is this an email in May of 2021 that you sent to a bunch of customers? Pharmacy customers?

MR. POGOZELSKI: And if we can scroll down.

A. Yes, it's from the compliance inbox.

MR. POGOZELSKI: All right. If we keep going down.

BY MR. POGOZELSKI:

Q. Does this have to do with Track and Trace at Safe Chain?

A. Yes.

MR. POGOZELSKI: At this time, the Government moves into evidence Government's Exhibit 348.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 348 will be received.

(Government's No. 348, Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. So here compliance is writing, "Dear Valued Safe Chain Customers, we're pleased to announce as of April 1st, we're now utilizing Track and Trace." And there's a Word document that's attached.

MR. POGOZELSKI: And if we go up to the top so we can see the date.

BY MR. POGOZELSKI:

Q. Do you recall whether or not Track and Trace was being for

pharmacy customers purchasing HIV product prior to April 1st?

A. I believe some of the customers may have been using it. I don't quite remember when Track and Trace was rolled out to customers.

During my tenure at Safe Chain, they switched softwares -- software platforms, and I know the initial software platform kind of had its own way to pull T3 documents. And then when we switched to the new software platform, I think Track and Trace was always kind of running in the background, and I know Safe Chain would get some of the T3s for their own transactions out of Track and Trace.

Q. When you say "for their own transactions," would that be from wholesalers or vendors that Safe Chain was buying from?

A. Correct.

Q. Did that apply to Boulevard?

A. No.

Q. Did that apply to Synergy?

A. No.

Q. Did that apply to Gentek?

A. No.

Q. Did that apply to Omom?

A. No.

Q. Did that apply to Cintex?

A. No.

Q. Did that apply to Rapid's Tex?

A. No.
Q. Did Safe Chain use that Track and Trace with most or many of the other vendors prior to the HIV business?
A. Yes. They tried to use that because it was the most efficient way to get the information.
Q. Okay.
MR. POGOZELSKI: And then we can take this down and show just the witness Government's Exhibit 483.
BY MR. POGOZELSKI:
Q. Now, going back about a year before that email we looked at, are these Teams chats between and you Charles Boyd in May of 2020?
A. Yes.
MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 483.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 483 will be received.
(Government's No. 483, Teams Chats, was received in Evidence.)
BY MR. POGOZELSKI:
Q. All right. If we go to the next page, do you see where Charles Boyd is asking you about to check with the T3 laws for accessing them?
A. Yes.

Q. And this is May 21st of 2020.
By this point, were the defendants buying HIV drugs from Boulevard?
A. Yes, it started about that time.
Q. Was that without any T3s whatsoever?
A. Yes.
Q. All right. And then you write here, "Currently, the sales team has access to these and should be emailing them to their customers."
Do you see that?
A. Yes.
Q. So for some customers, did they receive their T3s by email?
A. Yes.
Q. And is it your recollection that at least some customers would be able to use or were able to use Track and Trace for these HIV T3s?
A. No. Because they were able to pull their own T3s out of Track and Trace, but the transaction history was incomplete.
Q. Okay.
A. Because Safe Chain was receiving PDF versions, so that information would need to be imported into their software platform in order to be updated and correct.
Q. So is that why some customers were questioning the T3s for months before Boulevard provided any information whatsoever?
A. Yes. Because the information that they were able to access

themselves was incomplete.
Q. Okay. And "incomplete" -- was that information false?
A. Yes.
Q. All right. I think you had already testified about a month ago that Adam Brosius at some point had become a part owner of Safe Chain Solutions.
Do you recall that?
A. Yes.
Q. Do you recall when you learned that?
A. I don't recall exactly when or how that may have been announced to Safe Chain employees, but Adam had always been involved with Safe Chain for as long as I had worked there. He had his own sales team and everything that worked closely with Safe Chain.
Q. All right.
MR. POGOZELSKI: If we could show just the witness Government's Exhibit 495.
BY MR. POGOZELSKI:
Q. Are these Teams chats between Adam Brosius and Charles Boyd, January 2020?
A. Yes.
MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 495.
MR. ZIMET: No objection.
MR. BARZEE: No objection.

THE COURT: 495 will be received.

(Government's No. 495, Teams Chats, was received in Evidence.)

BY MR. POGOZELSKI:

Q. And if we go to page 3, are you familiar with the company -- I think it's Talbert Capital Partners, et al.?

Does that ring a bell?

A. Vaguely. Maybe I heard the name, but I'm not quite sure how it's associated with the Boyds or Adam.

Q. Okay. And do you see where there's some discussion about Worldwide and an investment and questions about Adam Brosius's Worldwide Pharma Sales Group and address?

A. Yes.

Q. Do you see where Charles Boyd writes, "I also need to write a description of what you do"?

A. Yes.

Q. What does Adam Brosius write in response to what he does?

A. "I make it rain."

Q. Did Adam Brosius bring a lot of business to Safe Chain, as far as you know, beginning around 2018?

A. Yes. As far as I could tell, he was always pretty incorporated into bringing business to Safe Chain.

Q. Okay.

MR. POGOZELSKI: We can take that down.

BY MR. POGOZELSKI:

Q. We talked about Omom. Were you able to verify Omom's T3s?
A. I don't believe so. I think that was one of the ones that we always had -- we were running into issues when we were trying to verify the transaction history they provided.
Q. And if you recall, was Omom the one that delivered HIV drugs in a beat-up minivan?
A. Yes.
Q. And was that fine by Charles Boyd?
A. Yes.
Q. Did you think it was fine?
A. No. I asked the warehouse manager to decline it.
Q. And why did you think it was not appropriate, as the compliance director, to receive HIV drugs in a busted-up minivan?
A. Because that's really shady, and it just seemed like we didn't have all the information that we needed to even begin working with that vendor.
I know myself -- and I think that was Dakota, still at compliance at the time, we were still were working on verifying that. So to learn there was a delivery being made to the warehouse, you know, in a regular old minivan didn't seem good. It's not how you would receive to expect a package.
Q. Right. Okay.
So I want to talk now about some things that you may not have known about while you were working at Safe Chain.

MR. POGOZELSKI: If we could pull up Government's Exhibit 353, which should be in evidence. All right.

BY MR. POGOZELSKI:

Q. Do you see where Garrett writes here, "Boulevard did send us one for free," with a subject line of Global Damage, open Product?

A. Yes.

Q. Do you see where Adam Brosius down here is writing, "distributor is asking"?

A. Yes.

MR. POGOZELSKI: So if we go down, actually go back up for one second.

BY MR. POGOZELSKI:

Q. This Emin Pharma Sales -- do you know if that was one of the sale reps for Adam Brosius?

A. Yes. I think it was, yes.

Q. All right. Do you see where he says, "Worst case is that the foil on top says albuterol," with multiple exclamation points?

A. Yes.

MR. POGOZELSKI: All right. If we scroll down, I think page 5 and 6 have these photos -- and then 6.

BY MR. POGOZELSKI:

Q. Do you see where this bottle has "albuterol inhalation" on the foiling under the cap?

A. Yes.
Q. Do you recall being made aware of this complaint, pharmacy complaint around this time, late May, June of 2020?
A. No.
Q. Is that something you would have expected to be informed about as the director of compliance?
A. Yes.
Q. And why is that?
A. Because it's a problem with the bottle. I mean, obviously, those pills are not albuterol.
MR. POGOZELSKI: All right. And then if we scroll back up to the very top --
BY MR. POGOZELSKI:
Q. I think you see May 29, 2020. Was this fairly early in the relationship, the business partnership with Boulevard?
A. Yes.
Q. And would you have been more concerned about Boulevard had you known about this incident?
A. Yes.
Q. All right.
MR. POGOZELSKI: And if we could pull up Government's Exhibit 505 and go to page 4.
BY MR. POGOZELSKI:
Q. Do you see where Adam Brosius writes to Peter and Charles on September 30, 2020, "Are you free at 11:15"?

A. Yes.

MR. POGOZELSKI: All right. And then if we go down.

BY MR. POGOZELSKI:

Q. Was this around the time that you confirmed the IPC Boulevard T3 was false?

A. Yes, I believe so.

MR. POGOZELSKI: All right. And then if we open up what Peter sends after that message about a phone call --

BY MR. POGOZELSKI:

Q. -- was this the next version of a King Kimchi T3 that you recall receiving after the IPC one was confirmed to be false?

A. Yes, this was one of them.

MR. POGOZELSKI: Okay. Actually, close this and go down. I think there was another version sent. Let's open that one. All right.

BY MR. POGOZELSKI:

Q. Does this look like the one that you started trying to verify with Gilead?

A. Yes.

Q. And was IPC replaced with another company on this one?

A. Yes.

Q. And then were the pharmacies Attain RX, Stain RX also replaced?

A. Yes.

Q. And were you aware of these text exchanges between Peter,

Adam, and Charles Boyd around this time?

A. No.

Q. Would that have given you more concern about Boulevard?

A. Yes.

Q. And why do you say that?

A. Because every time I asked for information about Peter or how to contact this person, I was told nobody knew more information, and they were clearly speaking with him.

When myself and compliance was trying to figure out what was going on and trying to verify these transactions, you know, we were asking and looking for more information and were never able to receive it.

MR. BARZEE: Your Honor, may I ask for clarification as to the "they" in the sentence? That "they" were speaking to him, who she's referring to.

THE COURT: If she knows.

A. When myself or whoever I was working with in compliance would ask Pat or Charlie who Peter was -- so we were looking for additional information or contact information -- they both referred to Peter as just Peter from Boulevard.

They didn't have a last name to provide us. The only information that we had to go off of was the vendor wholesale application, which only had an email and a phone number.

BY MR. POGOZELSKI:

Q. Okay.

MR. BARZEE: Your Honor, the testimony was that "they" were speaking to Peter. That's the clarification I want.

Does she have any evidence that Patrick Boyd was speaking to Peter Boulevard?

MR. POGOZELSKI: I think we can just look at the text thread --

THE COURT: You can cross-examine on that.

MR. BARZEE: Okay.

BY MR. POGOZELSKI:

Q. Is the T3 that Gilead confirmed was false?

A. It may have been one of them.

MR. POGOZELSKI: Okay. We can take that down.

BY MR. POGOZELSKI:

Q. These texts are around October 1st of 2020. Do you recall having a call, a phone call with Peter around that time?

A. I did speak to someone saying they were Peter about that time.

Q. And do you remember what Peter told you?

A. I was looking for more information about the transaction history and trying to confirm it.

He was pretty brief with me, saying that it's all good, you know, very vague, and I could tell he didn't want to be on the phone with me.

Q. Did he tell you he had no paperwork to create T3s?

A. Yes. I don't recall if that was on the phone or if that

was in our previous email exchanges about his business practices and how he acquired these drugs and that he did not necessarily have T3s information himself or proof of purchase.

Q. All right. Now, after Gilead confirmed that the Rochester Drug version that we just looked at was false, did Peter, "King Kimchi," start sending another new version of the Boulevard T3s?

A. Yes.

Q. All right.

MR. POGOZELSKI: If we could show just the witness Government's Exhibit 316.

BY MR. POGOZELSKI:

Q. Is this an email from Peter, "King Kimchi," to you and Charles Boyd on October 13, 2020?

A. Yes. Yes, it is.

MR. POGOZELSKI: All right. The Government moves into evidence Government's Exhibit 316.

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: 316 will be received.

(Government's No. 316, Email, was received in Evidence.)

BY MR. POGOZELSKI:

Q. If we go to the second page here, are these the latest, greatest King Kimchi T3s?

MR. ZIMET: Objection, Judge. Argumentative.

THE COURT: Sustained.

MR. ZIMET: Move to strike.

BY MR. POGOZELSKI:

Q. Are these the third versions of the King Kimchi T3s?

A. Yes, I believe they were.

MR. POGOZELSKI: All right. And then if we could go to page 12 and compare that side-by-side with what's in evidence Government's Exhibit 170, page 2.

BY MR. POGOZELSKI:

Q. On the right side, is this the IPC Boulevard King Kimchi T3 that you confirmed to be false, if you recall?

A. Yes.

Q. And did you forward that to Patrick Boyd and Charles Boyd?

A. Yes.

Q. Then on the third version, I'll say, over here, are there new entities in these sold to columns?

A. Yes, there were.

Q. All right. But is the drug the same for both of these? Biktarvy?

A. Yes, it is.

Q. Is the lot number the same on both of these?

A. Yes, it is.

Q. All right. Are there just changes made to the transaction history?

A. Yes.

Q. Okay. And that October 13th, 2021, that we're looking on at the left, is that after IPC confirmed that to be false? Confirmed this one to be false?
A. Yes.
Q. And was this October 13 one with the AmerisourceBergen and Amsterdam Wellness, was that after Gilead had confirmed the Rochester one to be false?
A. Yes.
Q. And did you question the legitimacy of these third versions of the King Kimchi T3s?
A. Yes.
Q. All right.
MR. POGOZELSKI: So if we could show what should already be in evidence Government's Exhibit 190.
BY MR. POGOZELSKI:
Q. So also on October 13th, what does Dakota Flowers write to Mr. King Kimchi?
A. She's asking, "Do you have any additional information or documents that supports these purchases invoices or pedigrees from AmerisourceBergen or Amsterdam Wellness Pharmacy? I'm unable to get in contact or confirm with these facilities."
Q. What does Mr. King Kimchi say in response?
A. "No, I do not, but it is 100 percent NP."
Q. And were you -- as the director of compliance, were you satisfied with that response?

A. No.
Q. Is Charles Boyd copied on this?
A. Yes.
MR. POGOZELSKI: And if we could show just the witness Government's Exhibit 191.
BY MR. POGOZELSKI:
Q. Are these emails between you and Mr. Khaim also on October 13, 2020?
A. Yes.
MR. POGOZELSKI: At this time the Government moves into evidence Government's Exhibit 191.
THE COURT: I already have that in evidence.
MR. POGOZELSKI: All right. Thank you, Your Honor.
BY MR. POGOZELSKI:
Q. So that same day we were looking at the Amerisource T3s, what do you write, addressing Mr. King Kimchi as King?
A. I wrote, "I appreciate your efforts, but please just understand that we have to be able to verify these transactions. If you think you could find something to support this, it would be greatly appreciated. We will continue with our efforts on our end but should you find something, please pass it on."
Q. And if we go down one, what does King Kimchi say that prompted your response?
A. "You will have no problems. It's all accurate."

MR. POGOZELSKI: All right. And if we go back up.
BY MR. POGOZELSKI:
Q. The shared mailbox -- was that something that Charles Boyd had access to?
A. Yes.
Q. And when you're asking for paperwork here, what does King Kimchi say in response to your email?
A. "I only have what I have and sent one page of invoice to Charles."
Q. Okay. Do you recall seeing an invoice?
A. I don't recall seeing one in this circumstance.
Q. Okay.
MR. POGOZELSKI: Let's pull up what's already into evidence Government's Exhibit 88.
BY MR. POGOZELSKI:
Q. Do you recall Peter telling you he bought his drugs or got his drugs from closed-down pharmacies, plural?
A. I remember him telling me that his business practice was to go into pharmacies that were closing down, purchasing their inventory, and then, you know, from there, they would be closed down.
Q. And do you remember relaying that conversation to Charles Boyd in a Teams message?
A. I probably did.
Q. Okay. Now, if we look at this exhibit, you see Amsterdam

Wellness Pharmacy listed here?
A. Yes.
Q. Do you see these purchase dates where Boulevard purportedly bought it, Atripla in December of 2019?
A. Yes.
Q. And then what's the date that it was sold to Safe Chain?
A. January 4th, 2021.
Q. And then date sold to the pharmacy?
A. January 5th, 2021.
Q. Is that an example of how quickly these HIV products moved?
A. Yes.
Q. And then if we go to page 8, do you see here where it says Boulevard purchased -- purportedly purchased this product in March of 2021?
A. Yes.
Q. Do you see where is says Amsterdam purportedly purchased this back in 2019?
A. Yes.
Q. And then Safe Chain and pharmacy -- are those all on the same day, March 1st, 2021, these transactions here?
A. Yes, they are.
MR. POGOZELSKI: Okay. And then if we go to page 279, and then if we keep flipping through pages here --
BY MR. POGOZELSKI:
Q. Do you see the same pharmacy listed over and over again in

the sold to column, where Boulevard is supposedly got its drugs?
A. Yes.
Q. If we keep going, as far as you know, were these T3s, these Boulevard T3s provided to at least some pharmacy customers that are listed here at the bottom?
A. Yes.
Q. Listing one pharmacy here as "Boulevard Source" -- is that inconsistent or does that contradict what Peter had told you about how he got the drugs?
A. Yes.
Q. And were you concerned about the conversation that you had with Peter about his practices and his inability to get paperwork?
A. Yes. And it also seemed just typical of what was going on with our constant issues with Boulevard.
Q. And can you elaborate on that?
A. Just all the issues with getting T3s, trying to keep up with the amount of paperwork that we were receiving from them because, you know, we received these binders of PDFs that had hundreds of documents in them, and in the next week, the exact same thing would happen. So in our attempt to try to verify everything, we were always just behind.
And, you know, with the issues with Boulevard's licensing, you know, customers were beginning to call and have questions

about transaction history, even just making sure that the customers would have their T3 documents that we were required to provide. It was all kind of just snowballing.

Q. And did a lot of those customers receive falsified T3s?
A. Yes.
Q. And were Charles Boyd and Patrick Boyd aware of that?
A. Yes.
Q. Did you ultimately -- did you end up approving these Boulevard T3s with Amerisource and Amsterdam Wellness Pharmacy on all of them?
A. I think so.
Q. And why did you do that?
A. I think because, again, at that point, it didn't matter because as you can see, these drugs were sold, you know, almost the same day that they arrived at the warehouse; so it didn't matter.
Q. All right.

MR. POGOZELSKI: We'll take this down, and I want to pull up Government's Exhibit 667, which should be in evidence.

BY MR. POGOZELSKI:

Q. Ms. Divilio, were you aware of -- and we can just scroll through these pages -- were you aware of a variety of different returns to Boulevard because the product labels were illegible?
A. No, I haven't seen this before.
Q. Okay. And, generally speaking, around the time Boulevard's

relationship began, did you know how the drugs were shipped or what the bottles looked like?

A. I didn't.

Q. You did not?

A. No.

Q. Okay. At some point in time, did you learn how they were shipped?

A. I learned later, I think, even after I left working at Safe Chain, and I had seen some pictures passed around after my employment there.

Q. What was your reaction of seeing those photos of how Boulevard shipped those drugs?

MR. ZIMET: Objection, Judge, as to relevance.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Were you surprised that did you not learn about that during your employment?

MR. ZIMET: Objection, Judge.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. As the director of compliance, would you have expected to be told about how these drugs are being shipped?

MR. ZIMET: Objection as to relevance, Judge.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. During the period of time that you worked at Safe Chain, what were your -- what was your role as a director of compliance?

MR. ZIMET: Objection. Asked and answered, Judge.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Did Charles Boyd or Patrick Boyd tell you how the Boulevard drugs were shipped?

A. No.

Q. All right.

Let's take a look at Government's Exhibit 600, which is in evidence.

Were these SOPs for Safe Chain in place prior to you joining the company?

MR. ZIMET: Objection, Judge. Asked and answered. It was the first part of her testimony two weeks ago.

THE COURT: Sustained.

MR. POGOZELSKI: Your Honor, I don't think we went over the SOPs. We certainly didn't go over these SOPs with Ms. Divilio.

THE COURT: Let's move on.

BY MR. POGOZELSKI:

Q. Were the SOPs at Safe Chain followed during your tenure as it concerns HIV?

A. No.

Q. And were Charles Boyd and Pat Boyd aware of that?
A. Yes.
Q. Were they the ones who made the decisions to disregard the SOPs?
A. I wouldn't say we necessarily discussed the SOPs, but it did seem that with HIV, there was always an exception.
Q. All right.
MR. POGOZELSKI: I want to show you just the witness Government's Exhibit 497.
BY MR. POGOZELSKI:
Q. This is July 30th of 2021. Is this a Teams message with Adam Brosius, Patrick Boyd, and Garrett?
A. Yes.
MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 497.
MR. ZIMET: No objection.
MR. BARZEE: No objection.
THE COURT: 497 will be received.
(Government's No. 497, Teams Message, was received in Evidence.)
BY MR. POGOZELSKI:
Q. Ms. Divilio, do you recall, was this around the time of the Gilead seizure as far as you recall?
A. Yes, about that time.
Q. And can you -- were you present for that?

A. I was on vacation.
Q. Generally, do you know what happened?
A. I do. My coworker, Dakota Flowers, called me from the bathroom, letting me know --
MR. BARZEE: Objection. Hearsay.
THE COURT: Sustained.
MR. BARZEE: Relevance also.
BY MR. POGOZELSKI:
Q. All right. Let's look at page 2 of this.
Do you see -- was Cintex one of those HIV vendors we were previously discussing?
A. Yes.
Q. All right. And as far as you know, do these messages appear to be after the Gilead seizure?
A. Right around then, yes.
Q. All right. And what does Patrick Boyd write in the context of this Cintex vendor here?
A. "If you get him, obviously, let him know it's Gilead only, and civil, no feds."
Q. All right. And then what does Adam Brosius write down here?
A. "Civil action is the key to all of this. One company doesn't like what another company is doing. There may be underlying issues, but this is civil."
Q. Had you identified a lot of underlying issues by this

point?
A. Yes.
Q. Did that apply to all the HIV vendors?
A. Yes.
Q. All right.
MR. POGOZELSKI: If we could show just the witness Government's Exhibit 490. All right.
BY MR. POGOZELSKI:
Q. Are these messages between Pat and Charles Boyd in April of 2020?
A. Yes.
MR. POGOZELSKI: The Government moves to admit Government's Exhibit 490.
MR. ZIMET: Objection, Judge, as to relevance.
MR. POGOZELSKI: Your Honor, this goes directly to what she had testified about, about a month ago.
MR. ZIMET: Judge --
MR. POGOZELSKI: And there are statements of the defendants.
MR. ZIMET: That's a different issue. That's hearsay. We are not objecting to that.
It's relevance, Judge, and 403.
MR. POGOZELSKI: I would just say it corroborates what she earlier testified about, about a month ago.
THE COURT: Let me read it.

Overruled.

MR. POGOZELSKI: The Government moves into evidence Government's Exhibit 490.

THE COURT: 490 will be received.

(Government's No. 490, Teams Message, was received in Evidence.)

MR. POGOZELSKI: Thank you.

BY MR. POGOZELSKI:

Q. All right. Ms. Divilio, do you see this message here from Pat Boyd to Charles Boyd?

A. Yes.

Q. All right. I think you had testified about a month ago about the defendants not wanting things in writing.

Do you recall that?

A. Yes.

Q. And is this statement by Patrick Boyd here consistent with your experience at Safe Chain?

A. Yes.

Q. And Tyler -- would that have been Tyler Tedrow?

A. Yes.

Q. Did Tyler Tedrow run an outside contracted sales group on behalf of Safe Chain?

A. Yes.

Q. To sell just pharmaceuticals on behalf of Safe Chain?

A. Yes.

Q. And was that similar to Adam Brosius's role with Worldwide?
A. Yes.
Q. Now, without getting into any of the actual concerns, did you in compliance have concerns with Tyler Tedrow's business practices? Just yes or no.
A. Yes.
Q. And did you share those concerns with Charles Boyd?
A. Yes.
Q. What about with Patrick Boyd?
A. Yes.
Q. And did you share concerns you had with Adam Brosius with both of these two defendants?
A. Yes.
Q. Did Charles and Patrick Boyd continue doing business with Tyler Tedrow despite you voicing those concerns?
A. Yes.
Q. Did the same apply to Adam Brosius?
A. Yes.
Q. All right. Did you eventually quit your job at Safe Chain?
A. Yes.
Q. And did you talk to Charles Boyd about that?
A. Yes.
Q. Tell us about that conversation.
A. I resigned in, I guess, it was December of 2021. I had gotten another job offer at my previous place of employment,

and it was just a much better fit for me, for my well-being, overall well-being.

And when I let Charlie know I was going to be resigning, he told me that he wasn't surprised; you know, he didn't blame me, I guess, based on all the legal actions and things that were taking place during that time.

Q. And you said you found a new job that was better for you, I guess overall for your health.

What did you mean by that?

A. Working at Safe Chain had become incredibly stressful, not a place I wanted to be. It took me over a year to find another job.

You know, the atmosphere with COVID and where we live is kind of a smaller community area; so there's not a lot of -- you know, not a lot of job options that were a good fit for me or my family at that time.

So it did take over a year to find something comparable. It was just very stressful. Again, it wasn't a place that I wanted to be. It just wasn't where I wanted to be, and I was looking for any opportunity to leave; but, you know, of course, at the end of the day, with the family -- they depend on income from me.

So it did take some time to find something else until my former employer reached out, asking if I was looking for something, and they offered me a job.

Q. Did the job at Safe Chain take its toll on you?
A. Yes.
Q. How?
A. It sounds kind of funny, but my eye twitched for, like, six months after working at Safe Chain. It began twitching again when I had to come here.
Definitely weight gain. I did seek some mental health therapy just because it was very -- it was exhausting. I was utterly exhausted.
It was definitely stressful. I was not a person I wanted to be for my family; so, yeah, it was not great.
Q. Did you have an exit interview with HR when you departed?
A. I did speak with -- they had a contractor, an HR person. I did have a conversation with her, and it was pretty typical. I mean, it wasn't anything over the top or anything.
Q. Did you give a reason why you were leaving?
A. I did kind of let her know that it really wasn't a good place for me. It was very clear that the compliance decisions and the business decisions were not in alignment.
It was also clear that my role in compliance was not to guide the business decisions. At the end of the day, they were not mine to make.
My job was to bring forth any information that I found, and I felt like I did that, to the best of my ability, and it just -- you just felt like you were spinning your wheels all

the time; so it was not a place I care to be.
Q. Did you submit a resignation letter?
A. I did.
Q. Did you include anything in the letter about all the concerns that you had flagged?
A. No. My resignation letter was pretty generic, maybe even seen as positive.
At that point, I had what I wanted, which was not to have to work there anymore. It didn't -- there was no point at that time to, like, burn any bridges or go out with a bang.
Again, I was getting what I wanted, which was not to be employed there.
Q. And when you left, did the defendants offer to hire a lawyer for you?
A. They did. Shortly after I left, I received an email offering, you know, that they would compensate any lawyers and offered some suggestions.
Q. Did you take them up on it?
A. No.
Q. Why not?
A. I didn't really see how accepting their legal support would be in my best interest.
If I needed to go that route or felt that I wanted to, I would have pursued it on my own.
MR. POGOZELSKI: Okay.

May have I a moment, Your Honor?

THE COURT: Okay.

MR. POGOZELSKI: No further questions.

THE COURT: Mr. Barzee.

CROSS-EXAMINATION

BY MR. BARZEE:

Q. Good afternoon.

A. Good afternoon.

Q. It sounds incredibly stressful. I'm sorry you had to go through all of that stress.

My eye was twitching last night also; so I understand the eye twitching from stress.

Let me ask you a question since you were just talking about the fact that Safe Chain offered you an attorney. And you said, "No, I don't need an attorney" -- right? -- basically?

A. I said, "If I needed an attorney, I would pursue it myself."

Q. Right.

And did you pursue it yourself? Did you hire an attorney?

A. I reached out to a couple of law firms, but there was a conflict of interest because the Boyds have used several of those law firms in our small community.

Q. The Boyds/Safe Chain employed lots of lawyers over the years; correct?

A. From my time there, they did employ a few different law

firms.

Q. Yeah. But obviously, there are lawyers outside of Maryland.

So if you wanted a lawyer you could have presumably found one that didn't have a conflict; right?

A. Sure.

Q. But you decided not to do that; correct?

A. Correct.

Q. And I'm assuming -- correct me if I'm wrong, but I'm assuming that one of the reasons that you didn't do that is because you didn't feel like you needed a lawyer?

A. At that time of my departure, I didn't think that I needed legal representation at that time.

Q. Did that feeling change at some point?

A. I mean, I'm here without legal representation. I guess, I'm not sure.

I still do not feel I need legal representation at this time.

Q. All right. So you didn't feel like you needed legal representation when it was offered. There might have been some conflicts with lawyers in Maryland, but the truth is you didn't feel like you needed to hire an attorney; correct?

A. If I wanted to pursue representation, I would.

Q. Yeah, that's not my question, though.

You mentioned conflicts with lawyers in Maryland, but the

truth is if you felt like you needed to hire an attorney -- you didn't feel like you needed an attorney?

MR. POGOZELSKI: Objection.

BY MR. BARZEE:

Q. Is that fair to say?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. BARZEE:

Q. And the reason you didn't feel as though you needed an attorney was because you didn't do anything wrong; right?

A. No, I did not.

Q. You were there through Boulevard and Gentek and Synergy and Rapid's and Omom and anyone else that we can think of to mention, but you didn't commit any crimes, did you?

A. No, I did not.

Q. You did your best; right?

A. Yes.

Q. Through all of it; right?

A. Yes.

Q. Even when you knew there were problems with Boulevard or you knew there were problems with Gentek or you knew there were problems with Synergy, you continued trying to make it work? You continued doing your best; right?

A. I don't agree with the statement of "trying to make it work." That wasn't my --

Q. Well --
A. -- under my purview --
Q. Okay.
A. -- trying to make anything work.
Q. Is it fair to say, then, that you were doing your best?
A. Yes.
Q. All right. At some point, federal agents showed up at your door and knocked; correct?
A. Yes.
Q. Was that at your home?
A. I have had various federal agents show up at my home, my office -- yes.
Q. Well, let's talk about that.
Let's talk about the first time that the feds came and approached you.
Where were you?
A. They came to my work, and a coworker let me know there were federal agents requesting to speak with me there.
Q. Now, where were you working at the time?
A. I was working at Eurofins; which is a contract research laboratory.
Q. Is it fair to say that that was a stressful situation for you?
A. It was worrisome, primarily because I had just started working there again.

Q. Right.
And federal agents are showing up. Anyone would be uncomfortable in that situation; right?
A. Part of my role there was also to deal with auditing. So federal agents do show up for auditing purposes; so I was not quite sure at the time who it was or what the circumstances surrounding that situation were.
Q. And how many agents were there?
A. I believe it was two.
Q. Do you remember who they were?
A. I don't at the time. I asked to speak with them outside of my work.
Q. Well, now do you know who they were?
A. Yes. I believe it may have been Agent Zias.
Q. Agent Zias.
Do you see him in the courtroom?
A. Yes.
Q. Point him out. Describe something that he's wearing for the record.
A. A blue --
MR. POGOZELSKI: Objection. Relevance.
THE COURT: Sustained.
BY MR. POGOZELSKI:
Q. So this agent shows up with another agent at your work and they take you outside.

Tell me what happens. How does it play out?
A. I think we spoke in the conference room for a few minutes, and I asked them -- I was like basically, "I can't talk with you about this. I'm on another company's dime right now, so I need to speak with you outside of working hours about this situation."
Q. Did they tell you why they were there and what they wanted to talk to you about?
A. I think they just briefly mentioned it was related to Safe Chain.
Q. All right?
A. And I feel like I knew that already.
Q. You didn't think they were for an audit. You thought they were there because of what had happened at Safe Chain?
A. Yes. They're looking to speak directly to me and not my job title, so I figured it was something going on.
Q. Right. And then is that when the stress level kind of increases for you?
A. Yeah, I think it was generally worrisome.
Q. Sure. That's fair. Anyone would be concerned.
So you made an appointment to meet with them a second time?
A. Yes. We spoke after work hours.
Q. Tell me about that. Where was the agreement that you would meet them? How did that play out?
A. I think we went to the local police station, to use one of

their interview rooms.

Q. So you had to go to the police station to speak to them?

A. Yes.

Q. And which police department was that?

A. Easton Police Department.

Q. And how did that feel, having to walk into a police department in order to answer questions of federal agents?

MR. POGOZELSKI: Objection. Relevance.

THE COURT: Overruled.

A. Do I answer that?

BY MR. BARZEE:

Q. Yeah.

A. Sorry.

Q. It's okay.

I'm not trying to put you on the spot.

A. Honestly, I expected it.

Q. All right.

A. Given the circumstances and all the legal issues that Safe Chain had been having, developed over the many years, I was more aggravated because, again, I just started at a new place at work. It's very difficult to take off time when you really haven't accumulated much. So having to do these things outside of work hours and on my personal time, you know, it's not great.

Q. So I think what I heard you say was you weren't surprised.

Any other feelings?

Were you scared at all?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. BARZEE:

Q. At this particular point as opposed to the first approach?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Overruled.

BY MR. BARZEE:

Q. Walking into the police department, knowing you're going in there to speak to federal agents, are your palms getting sweaty? Are you feeling some level of fear inside?

MR. POGOZELSKI: Objection to the commentary and testifying.

THE COURT: Overruled.

A. No, I wouldn't say I was fearful.

BY MR. BARZEE:

Q. No?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. BARZEE:

Q. So how long was that interview for, inside the police department with federal agents?

A. I don't remember the exact length of time.

Q. Can you give us an estimate? Was it under an hour? Was it

multiple hours?
A. Maybe between one and two hours.
Q. And you're in a conference room, you said?
A. It was in an interview room, so not quite as large as a conference room.
Q. Right.
So one of those interview rooms in police departments -- so it's relatively small rooms with no windows and a door that locks from the outside; correct?
A. I think so, yes.
Q. And you weren't scared?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. And when they were talking to you, did it seem to you that they were suggesting in any way that you had done anything wrong at any time?
A. No.
Q. Okay. And then you met with them again?
A. Yes.
Q. Tell me about that. After that meeting -- first, they come to your work, and then you have a meeting at the police department, where they question you in an interrogation room for a couple of hours. They let you out, and then there's a third meeting?

MR. POGOZELSKI: Objection. "Interrogation room" -- again, commentary. Testifying.

THE COURT: Sustained.

BY MR. BARZEE:

Q. There's a third meeting?

A. Yes.

Q. Tell me about that. Where was the third meeting?

A. I don't -- I don't remember the details exactly of where we may have met, but we did continue to use the Easton Police Department most of the time.

Q. Do you think the third meeting was also at the police department, or you're not sure?

A. We also used a hotel conference room at one point.

Q. How many times did you meet at the hotel conference room?

A. I think maybe twice.

Q. And how many times did you meet at the police department?

A. Maybe three, four times.

Q. And was it always the same agents?

A. Primarily. Or sometimes it would be one of the other agents supporting the case.

Q. And so we have they came to the -- so I think you mentioned so far maybe five or six meetings; is that fair?

A. Yes, approximately.

Q. But there were more meetings than that; right?

A. I did meet with the DOJ attorneys.

Q. When you say "DOJ attorneys," the attorneys from the Department of Justice?
A. Yes.
Q. Which attorneys did you meet from the DOJ?
A. The two that are here today.
Q. How many times have you met with them?
A. Maybe approximately four or five times.
Q. So it sounds like altogether you have met with government representatives a dozen times or close to that?
A. Maybe approximately that many times.
Q. And at any time, did any of those agents or people from the Department of Justice ever suggest to you that you were going to be arrested or criminally charged or that you had committed some kind of a crime?
A. No.
Q. Did they ever assure you that you had nothing to worry about? That they knew that you didn't commit a crime?
A. No.
Q. The prosecutors never said to you, Listen, you're just a witness? You're not a defendant? You didn't do anything wrong? We're not going to charge you?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Let me talk to you about your start at Safe Chain and how

you started working there.
Okay?
A. Okay.
Q. All right. You actually got the interview through a friend of yours; right?
A. Yes. A friend -- a coworker and a girl I had become friends with, her husband worked at Safe Chain.
Q. And that's Kristin Hammett?
A. Yes.
Q. And her husband is Jesse Hammett?
A. Yes.
Q. And we've seen Jesse Hammett's name on emails that have been introduced and chats. That's the same Jesse Hammett who's the husband of your friend?
A. Yes.
Q. And they were looking for someone to come in and help specifically in compliance; correct?
A. Yes.
Q. And you had a background dealing with regulatory agencies, licensing issues, permitting when you first came there; correct?
A. Yes. It was not specific to the pharmaceutical industry, but I did have some experience working with audits and regulations.
Q. Right.

And you also had experience doing research in a scientific laboratory; correct?
A. Yes.
Q. And I want to just talk to you for couple of minutes about that level of experience because that's -- working as a researcher in a scientific laboratory, that requires a degree of specificity. You have to be very careful about everything that happens and everything that you do; correct?
A. Yes.
Q. And one of the things that you would have learned, as a researcher working in a scientific laboratory, is the importance of documenting your work; correct?
A. Yes.
Q. And when we say "documenting your work," that means as part of the scientific method and what you would have done in a laboratory is every step you take, you note it somewhere. You keep track of everything that's done so that other people can come and look at it later if need be; correct?
A. Yes.
Q. So it's fair to say then that you understand why it's important to put things in writing?
A. Yes.
Q. All right. And we'll talk about that a little bit more a little bit later; but right now, we can agree that, based on your scientific background, working in a laboratory, you

understand the importance of notating important events?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.

Is this a good spot to take a break, Mr. Barzee?

MR. BARZEE: Yes, sir.

THE COURT: All right. Members of the jury, we're going to go ahead and recess for lunch. I've got a 1:15 hearing that should be done by 1:30; so I'm going to ask that you come back at 1:30.

Remember my admonition not to discuss the case or allow it to be discussed in your presence. We'll see you back at 1:30.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: Again, Ms. Divilio, you can't discuss your testimony, and we'll see you back here at 1:30.

And if there's nothing else to come before the Court, we will be in recess until 1:15 on other matters.

THE COURT SECURITY OFFICER: All rise.

(Off the record from 12:13 AM to 1:15 pm, after which the following proceedings were had:)

THE COURT: We are back on the record. Counsel are present. Both defendants are present. Anything to come before the court before we bring the jury in?

MR. POGOZELSKI: No, Your Honor.

MR. ZIMET: No, sir.

MR. BARZEE: No, Your Honor.

THE COURT: All right. If we have all the jurors, let's bring them in. And we'll go ahead and bring Ms. Divilio.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

MR. POGOZELSKI: Yes, your Honor.

MR. BARZEE: Yes, Judge.

MR. ZIMET: Yes, your Honor.

THE COURT: I apologize for our tardy start. Our hearing took longer that I thought it was going to take. Hold that against me and not against the lawyers. They were here ready, willing, and able to go at 1:30.

Mr. Barzee, you may proceed.

MR. BARZEE: Thank you, your Honor.

BY MR. BARZEE:

Q. I trust you had a pleasant break.

A. I'm sorry?

Q. I trust you had a pleasant break.
A. Yes, it was okay.
Q. I want to go back to when you first started at Safe Chain. That was back in 2018, I believe.
A. Yes.
Q. And you were originally hired as a state regulator coordinator? State regulations?
A. Yes, state regulations.
Q. So your job doing that was to make sure that all the state licenses were renewed on time?
A. Yes.
Q. And making sure that any reporting requirements were met?
A. Yes.
Q. You also had to manage incoming customer applications?
A. Yes.
Q. A customer would be somebody who wanted to purchase medicine from Safe Chain; correct?
A. Yes, pharmacy customers.
Q. And you also managed incoming vendor applications?
A. Not solely, but yes.
Q. Not solely. That was one of your jobs as a state regulator coordinator; correct?
A. Yes.
Q. And you also reviewed and validated customer and vendor licenses as part of that?

A. Yes.
Q. So as far as back as August of 2018, approximately two years prior to Boulevard ever coming onto the scene, you were experienced in checking the licenses of customers and of vendors?
A. Yes, verifying them.
Q. Verifying them. Making sure that they were able to purchase medicine from Safe Chain as well as sell medicines to Safe Chain?
A. Yes.
Q. And that was your job?
A. Yes.
Q. Everyone at Safe Chain had their own job; right? Everybody had a certain lane that they stayed in; correct?
A. Yes. Compliance was shared because there's only two of us; so we shared a lot of duties.
Q. And those duties involved what we talked about -- the vendor applications; correct?
A. Yes.
Q. Now, when you showed up at Safe Chain, you didn't know how to do these things, did you?
A. No.
Q. How did you learn?
A. A lot of the, you know, policies and procedures and things that I was trained on were by my coworker at the time. You

know, Charles was pretty savvy in those areas; so I relied on him and his knowledge.

Jesse Hammett also had some industry knowledge that I relied on.

Q. There were also standard operating procedures; correct?
A. Yes.
Q. And the SOPs -- let's just take a moment to talk about that -- they were an evolving process; is that fair to say?
A. Yes.
Q. They were in place when you first got there; right?
A. Yes.
Q. And the standard operating procedures would outline the different steps that you should take when, for example, verifying a customer's license; correct?
A. Yes.
Q. As well as the steps you should take when you're onboarding a potential vendor; right?
A. Yes.
Q. And you would always be working on how to improve the standard operating procedures; is that fair to say?
A. It wasn't solely my project to update those. We also relied heavily on consultants to guide those.
Q. I didn't say only you, but that was part of your job -- was working on the SOPs in order to improve them; correct?
A. Yes.

Q. And you mentioned using consultants.
So Safe Chain was paying consultants to help you, to help the company work on the SOPs; correct?
A. Yes.
Q. And Safe Chain, I think you mentioned earlier, had employed lots of different lawyers in the Maryland area at different times; correct?
A. Yes, they used a few different legal firms.
Q. They also spent a considerable amount of money on computer programs in order to keep track of everything; correct?
A. I don't -- I don't know the cost of those software platforms.
Q. I'm not asking the cost, but you're aware of them going out and purchasing these big, expensive sort of databases or processors -- things like Track and Trace or Ecumenic that we heard.
You're familiar with those; right?
A. Yes. They used various software platforms.
Q. And those various software platforms are designed in part -- there's lots of different things that they do, but one of the things they do is keep track of T3s? Hold T3s for people to view; correct?
A. Yes.
Q. The SOPs were there for a particular purpose, were they not?

A. Yes.
Q. And please explain to the jury, from your point of view, why did you have these binders at Safe Chain that were labeled "Standard Operating Procedures?" What was the purpose behind that?
A. They should be the guidelines that, you know, we follow to run the business.
Q. And when you say "we," who are you referring to?
A. Everyone that worked at Safe Chain.
Q. So these were kind of the rules that the employees that worked at Safe Chain were supposed to follow when doing certain tasks; correct?
A. Yes.
Q. And one of those is the onboarding of vendor applications; correct?
A. Yes.
Q. Now, I just want to go over a couple of terms with you because we have been talking about them in the trial.
Customers are the pharmacies that are purchasing the medications from Safe Chain; correct?
A. Yes.
Q. The vendors are presumably wholesalers that are selling medicines to Safe Chain; correct?
A. Yes, who Safe Chain is purchasing from.
Q. All right.

And your understanding of vendors and purchasing from the vendors is that Safe Chain would be able to purchase medications from wholesalers; correct?
A. Yes, or manufacturers.
Q. And the -- right, or the manufacturers.
And the manufacturer or the wholesaler would have to have some kind of a license that matched up with Safe Chain's license?
A. Yes. In most instances, yes.
Q. I'm sorry?
A. In most instances, yes.
Q. Sometimes yes and sometimes no?
A. Well, sometimes if it was coming directly from a manufacturer, we can find those things online as far as licensing and things.
Q. But would they have to be licensed in Maryland or in Utah?
A. Maybe.
Q. Maybe not?
A. That was one of those areas where Safe Chain was always seeking clarification -- about who could, you know, could they have these business relationships with other pharmacies or wholesalers if they didn't exactly hold that license.
Q. The truth is it can get a little complicated; right?
A. Yes.
Q. And when we're talking about the FDA rules and regulations

and the statutes and the laws all related to these issues, it's sometimes difficult to follow. Fair to say?
A. Yes.
Q. And when it was difficult to follow, when you weren't sure of something, you would have to ask for help?
A. Yes.
Q. And you knew that one of the places you could go to for help was consultants; correct?
A. At times. We didn't always have, like, an open contract with some of the consultants. Sometimes they would help us with a project and that project would be finished and, you know, there would be some discussion on we would go back to the consultants for financial reasons as far as who we had a contract to work with at the time.
Q. Okay. And attorneys?
A. Yes.
Q. While you were there, I think the law firm that was doing most of the work for Safe Chain was Frier Levitt. Is that your understanding of that as well?
A. Yes. They were, I think, the main one that stands out in my mind.
Q. And you had contacts at Frier Levitt that you were able to reach out to for guidance; correct?
A. Yes, over time, I did.
Q. And those were people that we have seen on the emails?

Martha Rushmore [sic], I think it is one of the names?
A. Yes.
Q. There's another name. Jesse Dresser, I believe?
A. Yes.
Q. Not to be confused with your friend's husband Jesse Hammett; right?
A. Yes.
Q. John Morrone? Another attorney?
A. Yes.
Q. And no one at Safe Chain ever told you, "Hey, you're not allowed to call the lawyers when you have questions. You have to come to me"?
Did anyone ever say something like that to you?
A. Well, I didn't necessarily have that relationship with the attorneys until some time. I wasn't included on phone calls or things like that; so there was a little -- I wasn't involved with those interactions for a long time before.
I was kind of told, "Oh, reach out to Martha at Frier or John Morrone to send those questions to."
Q. So, most respectfully, listen to my question because you didn't answer it.
My question was no one at Safe Chain ever told you that you weren't allowed to call the attorneys when you had a question, did they?
A. Not explicitly.

Q. Not explicitly? That means that they did so in some other way other than explicitly?
A. It means that I didn't necessarily have that relationship with them, with the attorneys.
Q. I appreciate that, but that's not my question.
I'm asking whether or not Charlie Boyd or Pat Boyd ever, in any way, explicitly or implicitly, told you you were not allowed to call the attorneys if you had a question.
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
And let's not try to talk at the same time, please.
BY MR. BARZEE:
Q. You would agree with me that the language that we use when we describe events that occurred is important, would you not?
A. Sure.
Q. And we talked about the scientific method and the importance of, for example, writing everything down; right?
A. Yes.
MR. BARZEE: Your Honor, may I use the ELMO?
THE COURT: Okay.
BY MR. BARZEE:
Q. When I asked you about whether or not Charlie or Pat ever told you that you couldn't call the attorneys, your answer was not implicitly.
And that means they never said that to you directly;

correct?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. BARZEE:

Q. In your direct testimony, you answered a few times using the words "not sure. I'm not sure."

And I just want to ask you what you mean when you say "I'm not sure." Can you explain that to me?

A. In what instance?

Q. If you say that you're not sure about something that happened, for example, are you saying that you have a doubt as to what happened? Are you saying that you cannot explain exactly what happened? What do you mean when you say "I'm not sure?"

MR. POGOZELSKI: Objection. Clarify the context.

THE COURT: Sustained.

BY MR. BARZEE:

Q. Well, for example, a lot of times on direct -- and we can go through line by line if we need to -- you used the words "I think."

Do you recall that?

A. I mean, not -- maybe I guess I would need more context --

Q. Okay.

A. -- as to which circumstance.

Q. I'm happy to give you context.

A. Okay.
Q. So, for example, one of the questions the prosecutor asked you was: "Do you know if Patrick Boyd was ever able to verify Gentek T3s?"
And you said, "I don't," but then you went on to say, "I was told it was good to go."
And the prosecutor asked you, "You were told? You were told by who?"
And your answer was, "Patrick. I think he said it was good to go."
So there's a context of "I think."
So when Abigail says, "I think," what does she mean by that? Does that mean you're not sure?
A. In that circumstance, I was referring to Pat saying, "It was good to go."
Q. No, I understand that. But what you said was -- the question was you said you were told. You were told by who it was okay.
And your answer was "Patrick. I think he said it was good to go."
So in that sentence, we know you're talking about Patrick Boyd. My question is what does that mean: "I think?" Does that mean you're not sure?
A. I mean, maybe. As many of these incidents were five or more years ago.

Q. That's fair.
So at least in that context, "I think" is the equivalent of "I'm not sure"? Right?
A. Possibly.
Q. And when you say "possibly," that also means not sure, doesn't it?
A. Yes, it could.
Q. So, for example, when Alex -- when the prosecutor asked you, "Now, you mentioned Synergy Group Wholesalers. Was Synergy Group Wholesalers later in time, meaning after Gentek," and your answer was, "Yes, I believe a few months after."
In that context, when you say, "I believe," what does that mean?
A. It means --
Q. "Maybe?"
A. It means sometime after. I don't recall the exact date or time.
Q. So is it fair to say "not sure" or "possibly?"
A. Yes, possibly.
Q. And when the prosecutor said, "Do you recall what kinds of concerns you had with Synergy Group Wholesalers," and your answer was, "I think, along the same lines that we had difficulty with their T3s" -- does that mean you're not really sure exactly what it was?
A. No. I feel like in that circumstance, it could just be

something as far as habitual, just the way I talk.

Q. Well, for example, one of the questions that the prosecutor asked you was, "Did you confirm the first sample Synergy T3 was false?"

And your answer was, "I think we had some questions."

And the question was, "Who told you that?"

And your answer was, "I think when we're trying to verify one of the T3s, I think Pat told us, 'Oh, that was a mistake.'" Do you recall that testimony?

A. Not in great detail.

Q. When you heard me saying that -- and I used the words "I think," "I think" that you used two or three times in that sentence -- is it fair to say that that means "I'm not sure but this is what I seem to remember"?

A. Yes, I was trying to recall my memory about the circumstance.

Q. And, for example, when the prosecutor says, "Did Synergy ever send a second version?" And you said, "I think, yes, they did," that indicates a lack of certainty; is that fair to say?

A. Yes, it could.

Q. Now, I want to talk to you about those vendor applications, if I may.

And we're going to try to approach this in the scientific method as being as specific as we can with the language that we use.

Okay? Is that fair?

What is the first step under your SOPs that you're supposed to do when you receive a vendor application?

A. I don't have these memorized. I mean, it's a document that I haven't reviewed in several years.

Q. So do you feel like in order to go through it right now with some specificity, you would have to go back and review your SOPs?

A. Yes. It's not something that I have memorized.

Q. Is it fair to say that one of the first things that compliance needs to do is to check the vendor's license on the application?

A. Yes. They should have sent us a copy of the license as well, what was requested.

Q. And one of the things compliance's job -- I'm not asking you what the vendor's job is. I'm asking what compliance's job is.

One of the first things that compliance's job is when they receive an application from a vendor is to check the license.

Is that fair to say?

A. Yes.

Q. And when we say "check a license," can you please tell the jury what steps you're supposed to take when checking a license?

A. When we would go to, depending on where the application was

coming from, we would go to that state's board of pharmacy web page and verify using their online verification system.
Q. Now, I'm sorry to nit-pick with you, but when you're saying "we."
Who are you referring to when you say "we"?
A. Myself or whoever else -- we as in the compliance team.
Q. So let me just ask about you as a compliance officer, rather than having you speak on behalf of the rest of the team. Okay?
So what would you do when you received an application?
A. I would go to the board of pharmacy web page to verify the license they provided us.
Q. And the wholesaler that's attempting to be a vendor would have to have a special kind of a license, would they not?
A. Yes.
Q. And please tell the jury what that special license is.
A. In order to do wholesale business, they would need to have a wholesaler's license.
Q. And a wholesaler's license is different from a pharmacy license, is it not?
A. Yes.
Q. Now, let's just put that on the side for a second and talk about what your understanding of the law is as far as pharmacies without a wholesale license being able to sell their products.

Is a pharmacy that doesn't have a wholesale license allowed to sell their products to Safe Chain?

A. Yes.

Q. Are they allowed to sell as much of their products as they want?

A. They are allowed to sell a certain percentage of their inventory, but I don't recall what that percentage is.

Q. It's a small percentage, isn't it? Something around 10 -- 5 to 10 percent?

A. Somewhere in that range.

Q. All right. But if you're buying a lot of medicine from one pharmacy, they would need a wholesale license, would they not?

A. Yes.

Q. Okay. And they would also have to have a license in the same state that Safe Chain is licensed, would they not?

A. Some states do.

There's -- Maryland does hold, or at least at the time, did hold some reciprocity with some other states.

Q. And Safe Chain had how many different state licenses?

A. I think the Cambridge location held 47.

Q. So you would -- it sounds like what you're doing, then, when you get the vendor application is you're going to check to see if they are a pharmacy or a wholesaler; right?

A. We would verify whatever license they sent us; so you should be able to see that on the copy they send us.

Q. And by "verification," you check on what computer database?
A. Either the board of pharmacy web page is -- vary by state, or some states vary a little bit with -- like New York has, I think it's kind of part of their Department of Health that also regulates that, but usually, you can tell by the license.
Q. And these vendor applications, these are people that want to sell medicine to Safe Chain. Who is bringing these vendor applications to compliance?
A. We would usually get these after the accounting team reviewed them, but sales -- part of the sales staff or I think -- I guess maybe even an option online, I think, on maybe Safe Chain's website, where you could fill out a vendor application, but usually, they went to the accounting side first, and they would share that with the compliance side.
Q. And let's just talk about it with a little specificity.
We've talked a lot about several vendors in this case, and I'm going to go through them with you. Boulevard, Gentek Synergy, Rapid's, Omom, Invicta -- those were all brought to Safe Chain by Adam Brosius and Worldwide Pharma, were they not?
A. I think so. I know my memory was refreshed when they said one of those people filled out an application online, I guess, on their own.
Q. All the others came from Adam Brosius and Worldwide Pharma?
A. I think so.
Q. And, in fact, back in those days when you were getting all

of those applications for the HIV business, you felt like you were working for Worldwide Pharma; right?
A. Yes. There was definitely those feelings at times.
Q. Because they were the ones that were sending in the vendor applications, Worldwide Pharma -- and let's just take a moment step back for a second.
Worldwide Pharma is an outside sales organization; correct?
A. When I first started, that was my understanding of the relationship.
Q. What is your understanding now? Did it change?
A. At some point, Adam became a part owner of Safe Chain. I don't know the exact date of that, but sometime during my tenure there that happened.
Q. I agree. I'm not asking about Adam Brosius.
I'm asking you about an entity known as Worldwide Pharma. That was always an outside sales organization, was it not?
A. Yes.
Q. And Worldwide Pharma didn't merge with Safe Chain when Adam became a 25 percent owner, did it?
A. No, I don't think so.
Q. No.
So Worldwide Pharma, the outside sales organization that was owned by Adam Brosius -- they're the ones that were bringing you all of these vendor applications; correct?
A. Sorry, excuse me.

MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Now, I believe on your direct testimony you said that you felt pressure to approve those vendors; is that correct?
A. Yes.
Q. And that that pressure came from sales?
A. Yes.
Q. And when you say that "it came from sales," quote-unquote, are we talking about Worldwide Pharma?
A. Yes, and some of the internal salespeople as well.
Q. All right. So different things mean different things to different people.
What do you mean when you use the word "pressure?"
A. In this circumstance, constant emails or messages.
We used Skype and then Teams messaging. You know, constantly being pinged on those things, you know, asking about the status of something, you know, people popping in, asking if the HIV medications were clear to be shipped -- those sort of circumstances.
And these -- HIV was not my only job there. So amongst the daily tasks, getting pinged on these things frequently, that generated the feeling of feeling pressured.
Q. Did it seem to you that the individuals, these salespeople from Worldwide or salespeople from inside Safe Chain, when they

were asking you these questions, did it seem to you that it was their intention to pressure you into approving these applications? Or alternatively, was it just that you felt pressure because all these different people were asking you about the same thing over and over again?

MR. POGOZELSKI: Objection. Requires speculation what people's intention was.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. You have no idea what their intentions were; right?

A. Right.

Q. It was just how you were perceiving things; correct?

A. I could sense that there was a sense of urgency to get the sales out. I mean, that was pretty widely talked about.

Q. You mentioned more than once Patrick Boyd pressuring you to approve vendors.

Do you recall that?

A. Yes.

Q. It sounds horrible. It sounds like Patrick Boyd is standing over you, telling you you had to approve vendors. That's not what happened; is it?

MR. POGOZELSKI: Objection to counsel testifying.

THE COURT: He finally turned it into a question. Overruled.

BY MR. BARZEE:

Q. That's not what happened, is it?
A. Can you ask that again? I'm sorry.
Q. Yeah.
You answered questions from the prosecutors. You said that on more than one occasion, you said you felt pressured by Patrick Boyd to approve these vendors.
Patrick Boyd wasn't standing over you saying, "Abbie, you have to approve this vendor," was he?
A. No. But I could still feel pressure by the circumstance.
Q. You could feel pressure, right. What really happened was Patrick would just ask you a question: "Has Gentek been approved," for example, or "Was Boulevard approved yet?" Right?
A. Yes.
Q. Other than an inquiry, he wasn't forcing you to do something against your will, was he?
A. I mean, I guess no.
Q. No. Of course, not; right?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. As a matter of fact, sometimes Safe Chain had to turn away business. Even if the salespeople wanted something to happen, sometimes you would say no; right?
A. Yes.

Q. And if someone didn't have a proper license, you would say no; correct?
A. Yes.
Q. And when you said no, because this person doesn't have the right license, Patrick Boyd never came to you and said, "I don't care what your opinion is. You have to do it anyway"?
A. No.
Q. The truth is you're the one who would make the final decision as to whether or not a vendor was approved or not; correct?
A. I approved their paperwork. It didn't mean I approved doing business with them.
Q. Well, I'm not asking if you wanted to do business or not.
When I say "approved," I mean approved their application; right? Their vendor application. That would be up to you; right?
A. Yes.
Q. Now, I mentioned Pat. I represent Patrick Boyd. Charlie Boyd has a different attorney, who will probably ask you questions about Charlie Boyd.
Do you understand?
A. Yes.
Q. So I'm just going to confine my questions to Pat Boyd and his involvement with everything that you have testified to, if I may.

Is that all right?
A. Okay.
Q. And we said that everyone at Safe Chain had sort of their own role. Is that fair to say?
A. Yes.
Q. And Pat Boyd's role was primarily dealing with the sales Teams; correct?
A. Yes.
Q. In fact, you didn't really interact with Pat on a daily basis, did you?
A. No, not daily.
Q. Well, fair to say you only spoke to him infrequently?
A. At least weekly. We had weekly manager's meetings and things where everyone participated.
Q. So he would be at a manager's meeting, but outside of that, you weren't really talking to him day in and day out; correct?
A. Not typically.
Q. In fact, he wasn't really even in the office other than for those manager meetings; right?
A. No. He worked out of a different office sometimes.
Q. Over in Easton; right?
A. Yes.
Q. And sometimes he worked at home; right?
A. I guess.
Q. You guess, meaning you don't know -- right? -- because he

wasn't there at Safe Chain?
A. Right. I had one office location.
Q. In fact, this was -- a lot of this happened during COVID; right?
A. Yes.
Q. So let's talk about COVID for a second.
That was a dramatic thing that happened to all of us back in 2020, was it not?
MR. POGOZELSKI: Objection. Relevance.
THE COURT: Sustained.
BY MR. BARZEE:
Q. COVID had an impact on you, did it not?
MR. POGOZELSKI: Objection. Relevance.
THE COURT: Overruled.
A. I think the same as anyone, you know, trying to --
BY MR. BARZEE:
Q. I agree.
A. -- operate things differently.
Q. Of course. And one of the ways that it impacted you is rather than -- you have children; correct?
A. Yes.
Q. How many?
A. Two.
Q. All right. So one of the differences is rather than send the children off to school in the morning and then go to work,

the schools got shut down; right?
A. Yes.
Q. And so you asked Charlie Boyd if you could work from home?
A. Yes.
Q. And Charlie said yes?
A. Yes.
Q. And so you're at home, and you're also taking care of your two children at the same time.
A. I wasn't home alone with my children; but, yes, at times, and I did still go to the office for DEA regulatory purposes.
Q. But when you were doing things like onboarding vendors and going through the applications, a lot of that work you were doing from home; correct?
A. For a period of time, yes.
Q. And so Pat's -- Patrick Boyd, who I represent, isn't in the office. A lot of this time you're not in the office. You're at home, working from home; correct?
A. Yes.
Q. As a matter of fact, this may be a good time to go through some of the documents.
MR. BARZEE: And, Jessica, maybe you can help me.
BY MR. BARZEE:
Q. Some of the documents that the Government asked you to comment on during their testimony, and let's just begin with Government's Exhibit 124.

MR. BARZEE: Could we bring that up, please.
BY MR. BARZEE:
Q. This is an email that you wrote back in July of 2020 that you sent to Charles Boyd and Adam Brosius, outlining wholesale distributor requirements; correct?
A. Yes.
Q. Patrick Boyd wasn't on that email, was he?
A. No, he wasn't.
Q. Any reason why you left him off?
A. I believe at this time with the T3 issues, I was primarily dealing with, Adam and Charlie. So since they were already part of the conversation, it just made sense to send this to them.
Q. Thank you.
MR. BARZEE: Let's go to 127, Government's Exhibit 127.
BY MR. BARZEE:
Q. This is, again, discussions about getting more information from one of the vendors that you send to Charlie and to Adam but not to Pat; correct?
A. Yes.
MR. BARZEE: Let's go to Government's Exhibit 472.
BY MR. BARZEE:
Q. I know this is a little tedious, but it's important.
This is a document that the Government asked you to opine on. And Pat Boyd is not on this either, having to do with

Boulevard; correct?
A. That's correct.
MR. BARZEE: Let's go to 516.
BY MR. BARZEE:
Q. These are -- what is this? Teams or texts? Text messages between you and Charlie, I guess?
A. I think so, yes.
Q. Yeah. And Pat is not included on that, is he?
A. No.
MR. BARZEE: Let's go to Government's Exhibit 160, please.
BY MR. BARZEE:
Q. Here's an email that you were writing about some missing pedigrees.
You cc'd Dakota Flowers, who, by this time, had joined you in compliance.
Oh, this was related to King Kimchi.
Pat Boyd is not on this, is he?
A. No, he's not.
MR. BARZEE: All right. Let's go to Government's Exhibit 435.
BY MR. BARZEE:
Q. This was a Teams chat between you and Charlie Boyd.
We don't have to go through it. We know Pat is not on this, is he?

A. No, he's not.

MR. BARZEE: Government's Exhibit 180.

BY MR. BARZEE:

Q. Again, having to do with Boulevard. Something from King Kimchi to compliance and to Abbie, not Pat Boyd; correct?

A. That's correct.

MR. BARZEE: Let's go to Government's Exhibit 177 again.

BY MR. BARZEE:

Q. Again, King Kimchi and Abbie, but no Pat Boyd; correct?

A. Yes, that's correct.

MR. BARZEE: 181, please.

BY MR. BARZEE:

Q. Compliance, King Kimchi, Online Verifications -- nothing to do with Pat Boyd; correct?

A. He was not on that email, no.

MR. BARZEE: Let's go to Government's Exhibit 436.

BY MR. BARZEE:

Q. This is a Teams chat.

The Teams chat, by the way, how does that work? Is that like text messages for everybody at the company?

A. Teams is a Microsoft product. It's just a platform like for chatting. So you can pretty much chat with anybody that has a Microsoft account.

Q. But you have --

A. You have to be logged into Teams. It's what replaced Skype.
Q. Right?
A. Like a chat platform.
Q. But when you want to chat with somebody else who's on the platform, you have to put their name in?
A. Yes. And you have favorites. I think Safe Chain had its own group. So it's like all the Safe Chain employees were in that -- in that Teams chat.
Q. On this one, Pat's not on this; right?
A. No, he's not.
MR. BARZEE: Okay. 437.
BY MR. BARZEE:
Q. Now, this is Teams also -- right? -- or is this something else?
No, this is Teams?
A. It's Teams.
Q. Microsoft Teams, yeah --
A. Yes.
Q. -- between Charles Boyd and Abbie Divilio.
Pat's not on this?
A. That's correct.
MR. BARZEE: Let's go to 184.
BY MR. BARZEE:
Q. Again, these are the documents that the Government asked

you to give your opinion on or to comment on in some way, an email between you and King Kimchi that Pat Boyd is not included on; correct?
A. Yes.
MR. BARZEE: 440, please.
BY MR. BARZEE:
Q. Teams between you and Charlie Boyd, again, leaving Pat out of it; correct?
A. Yes.
MR. BARZEE: Let's go to 186.
BY MR. BARZEE:
Q. Correspondence between and you and Charles and King Kimchi but leaving Pat Boyd out of it; correct?
MR. POGOZELSKI: Objection to the "leaving out of it" commentary.
THE COURT: Overruled.
BY MR. BARZEE:
Q. Correct?
A. Yes.
MR. BARZEE: Let's go to 341.
BY MR. BARZEE:
Q. An email between you and Charles Boyd, compliance, but leaving Pat Boyd out of it; correct?
A. Yes.
MR. BARZEE: Government's Exhibit 213.

BY MR. BARZEE:
Q. No Pat Boyd; correct?
A. Correct.
MR. BARZEE: Government's Exhibit 505.
BY MR. BARZEE:
Q. This is -- you were asked to comment on something here. These are text messages from an iPhone involving Charles Boyd, Peter Boulevard, Adam Brosius, and Hacksaw Boyd, who we all know is Charlie, but no Pat Boyd; correct?
A. That's correct.
MR. BARZEE: 634.
BY MR. BARZEE:
Q. This was the drug notification -- I think this is a 3911; right?
A. Yes, that is.
Q. And that's -- this is the one where there was some discussion about labeling it, and it ended up getting labeled as a fraudulent transaction.
Do you remember that?
A. Yes.
MR. BARZEE: Let's go to page 2.
BY MR. BARZEE:
Q. And that's from Charlie Boyd. Pat Boyd's not on this document, is he?
A. That's correct.

Q. And again, Mr. Zimet will talk to you about Charles Boyd's involvement.

MR. BARZEE: Let's go to page 225.

BY MR. BARZEE:

Q. And here's discussions with the attorney that we mentioned before, Martha Rumore, and you -- oh, and Charles Boyd, but Patrick is left out of this discussion as well; correct?

A. Yes.

Q. And that's a discussion about Biktarvy and Stribild and FDA and stuff like that; right?

A. Yes.

MR. BARZEE: Let's go to 227.

BY MR. BARZEE:

Q. This had to do with Gentek, I believe.

Compliance between you and Martha, cc'ing Charlie, but you didn't cc Pat Boyd, did you?

A. No.

MR. BARZEE: Let's go to 361.

BY MR. BARZEE:

Q. This is an email between Dakota Flowers and somebody named Tim Streck and cc'd with compliance down, below talking about Gentek's pedigrees. And Charlie -- I mean, Pat Boyd is not a part of this conversation at all, is he?

A. No.

MR. BARZEE: Go to 362.

BY MR. BARZEE:
Q. Here, you're talking about San Diego Warehouse, saying that they haven't received the T3, and they're not going to do business with us anymore.
And this is a correspondence between you and Charlie Boyd; correct?
A. Yes.
Q. Leaving Pat Boyd out of it; correct?
A. Yes.
MR. BARZEE: Let's go to 245.
BY MR. BARZEE:
Q. Here's an email from Charlie to Martha talking about the Gilead letter or response that Safe Chain is going to send to Gilead in response to their e-Pharm/alert, and Patrick is not on this, is he?
A. No.
Q. But you are; right?
A. Yes.
Q. Let's go back to that. But Patrick is left out of that; correct?
A. Yes.
Q. All right.
MR. BARZEE: And then let's go to 251.
BY MR. BARZEE:
Q. This is from Charles Boyd to compliance, again having to do

with the e-Pharm/alert, and Pat is left out of that conversation as well; correct?
A. Yes.
MR. BARZEE: Let's go to Exhibit 319, please.
BY MR. BARZEE:
Q. Email from Johnny Platero to you and a bunch of people are cc'd. This has to do with a bottle of Biktarvy, and Pat Boyd is not included in this discussion, is he?
A. No.
MR. BARZEE: Let's go to 486.
BY MR. BARZEE:
Q. This is a Teams chat between you and Charlie Boyd talking about Peter Boulevard, and Pat's not included in that conversation, is he?
A. No.
MR. BARZEE: Let's go to 503.
BY MR. BARZEE:
Q. These are cell phone extractions between Charlie Boyd and Peter Khaim, and Pat's is not included in that, is he?
A. No.
MR. BARZEE: Let's go to 349.
BY MR. BARZEE:
Q. This is an email from Charlie Boyd to Jesse Hammett in compliance, and they're talking about whether or not you can ship something to Utah versus Maryland and who needs what kind

of a license.

Do you remember this email?

A. Yes.

Q. And Patrick Boyd was not involved in those discussions, was he?

A. No.

MR. BARZEE: And let's go to 357.

BY MR. BARZEE:

Q. And this is a -- I didn't realize you corresponded directly with John Morrone before he passed away?

A. Once or twice. I don't think I -- I don't know if I got a response to this email.

Q. All right. But you at least reached out directly to him?

A. Yes.

Q. All right. And you didn't see cc Pat Boyd on this or include him in any in any way?

A. Not on this email here.

MR. BARZEE: Let's go to 671.

BY MR. BARZEE:

Q. Teams -- this is between Adam Brosius and Charlie Boyd.

Pat wasn't on that Teams; correct?

A. No. I'm sorry, I said no.

Q. I know it's tedious. Sorry.

MR. BARZEE: Exhibit 672.

BY MR. BARZEE:

Q. This is -- Pat Boyd is on this one. This is with Pat, Jesse, and Charles Boyd, and I think they're discussing --

MR. BARZEE: Let's go to page 2. There's only two pages. Let's go back to the first page first.

BY MR. BARZEE:

Q. It says that this is a Microsoft Teams chat between Pat Boyd, Jesse Hammett, and Charles Boyd.

Do you see that on the first page?

A. Yes.

Q. And it says, "Participants, three?"

A. Yes.

Q. And then if you go to the second page, it's really just a conversation between Jesse and Charles Boyd, meaning Pat's not responding to anything. He's not offering anything. He's not indicating that he's involved in this in any way; correct?

MR. POGOZELSKI: Objection. The document speaks for itself.

THE COURT: Overruled.

BY MR. BARZEE:

Q. Nothing there from Patrick Boyd; correct?

A. No.

MR. BARZEE: Let's go to 669.

BY MR. BARZEE:

Q. This is Frier Levitt's letter written by Martha to King Kimchi and Ishbay Shukurov.

That's the name that was on the Boulevard application; right?
A. Yes.
Q. Right. And Pat Boyd had nothing to do with this as far as you know, did he?
A. With this letter?
Q. Yeah.
A. No. It was generated by the legal team.
Q. Okay.
MR. BARZEE: And then let's go to 229. I might have imagined that one.
Let's go to 300.
BY MR. BARZEE:
Q. This is a termination request.
Somebody wanting to -- a 3911 termination request, where you're saying, "We never received confirmation of its receipt."
Do you see that where a red arrow is pointing?
A. Yes.
Q. Pat wasn't involved in that, was he?
A. No.
MR. BARZEE: And then let's go to 348, please.
BY MR. BARZEE:
Q. This is an email to all the pharmacies.
Patrick was not involved in this correspondence either, was he?

A. No. This one was emailed to the pharmacy customers.
Q. Got it.
MR. BARZEE: And let's go to 483.
BY MR. BARZEE:
Q. And I think this is Charlie Boyd asking you about T3 requirements. Do you recall that?
Do you want to look at it?
A. Yes, if I could see it, please.
Q. The Government asked you about it. Do you recall now?
A. Yes.
Q. Patrick wasn't involved in that conversation or that discussion?
A. No, he wasn't.
MR. BARZEE: Let's go to 495.
BY MR. BARZEE:
Q. These are texts chats, rather, between Adam Brosius and Charles Boyd not involving Patrick; correct?
A. Correct.
MR. BARZEE: Let's go to 353.
BY MR. BARZEE:
Q. This is Garrett and Adam talking about Global and a bottle of something that Boulevard was -- oh, this is the foil on the albuterol.
Do you remember this?
A. Yes.

Q. Patrick wasn't involved in that, wasn't he?
A. No, he's not on these emails.
Q. And I want to just clarify because when the Government was asking you about that, you replied "they."
Patrick Boyd, as far as you know, your own personal knowledge, Patrick Boyd never spoke to Peter Khaim, did he?
A. I'm not sure.
Q. As far as you know, based on your knowledge, are you aware of any communication that Patrick Boyd ever had with Peter Khaim?
A. No.
Q. Are you aware of any communication whatsoever that Patrick Boyd ever had with somebody called themselves King Kimchi?
A. No.
MR. BARZEE: Let's go to 316, I think it's T3s. Yeah, this is when King Kimchi is sending a binder, I guess, of the T3s. Yeah, go to page 2. These are all the T3s.
BY MR. BARZEE:
Q. That binder of T3s -- that wasn't sent to Pat, was it?
A. No.
MR. BARZEE: Let's go to 190, please.
BY MR. BARZEE:
Q. Here's a conversation between King Kimchi and you, or rather -- I'm sorry.
It was between King Kimchi and Dakota Flowers. You were

cc'd on it and Charlie Boyd was but Pat wasn't?
A. No.
Q. Pat wasn't involved, was he?
A. He wasn't on these emails.
MR. BARZEE: Let's go to 191.
BY MR. BARZEE:
Q. This is King Kimchi to the shared mailbox at compliance. Do you recall this one?
A. Yes.
Q. And you wrote, "King, I appreciate your efforts. Please understand we have to be able to verify these transactions. If you think you can find something to support this, it would be greatly appreciated."
This is in October of 2020; right?
A. Yes.
Q. Okay. And you have been dealing with these Boulevard issues now for April, May, June, July -- seven months?
A. Yes, about that.
Q. All right. And you're still very polite, and you're asking him kindly and professionally, "I need some supporting information"; correct?
A. Yes.
Q. And I think you testified this is when -- maybe we have to go to page 2 for this.
I think this is when you testified that King Kimchi lies to

you, and he said, "You will have it. No problem. It's all accurate"; right?

A. Yes, that was his response.

Q. And that wasn't true. That was a lie, wasn't it?

A. Yeah, I don't think he provided us with the information.

Q. And he lied to Charlie Boyd, too; right?

A. I don't know what their conversations were.

Q. You know some of it. You know that -- you know that he was claiming that he had purchased these medicines from different pharmacies that were going out of business; right?

A. That's what that person told me.

Q. That's what who told you?

A. The -- Peter.

Q. Right?

A. -- or King Kimchi person.

Q. And that's a lie; correct?

A. Yes, that's not correct.

Q. You're saying you didn't know that he told Charlie the same story?

A. I don't know what he and Charlie could have spoken about.

Q. Do you know that Peter -- I'm going to call him Peter Boulevard because it's easier for me -- that Peter Boulevard told the same story to Adam and to Charlie that he told to you about where he was getting the medicines?

MR. POGOZELSKI: Objection. Asked and answered. She

said she doesn't know.

THE COURT: Sustained.

MR. BARZEE: Let's go to Exhibit 88, please.

BY MR. BARZEE:

Q. And the Government showed you this one. Do you recall them showing you this T3?

A. Yes.

Q. And that T3 was -- that wasn't accurate, was it?

A. No. I think we discovered that when we tried to verify those sales transactions.

Q. And you didn't notify Pat Boyd.

You didn't forward that to him and let him know that that had occurred, did you?

A. I don't think we did.

Q. Okay. Let's go to -- and when you say "we," I'm going to ask you to just testify as to your own --

A. Okay.

Q. -- actions, just as to be clear.

A. Sorry.

Q. That's all right.

MR. BARZEE: Let's go to 667, please.

BY MR. BARZEE:

Q. These were returns. And I think the prosecutor asked you if you ever saw this document. These are returns that Safe Chain made to Boulevard of different products; correct?

A. Yes.
Q. Apparently.
And I think what you said was "I've never seen this document," or "I didn't know about that"; is that correct?
A. That's correct.
Q. Just to be clear: If a bottle comes in and it's dirty, is that something that is reported to compliance, or is that handled by someone else?
A. Typically, if there's complaints about products, it would be dealt directly with the warehouse staff and the purchaser or procurement team. It's not something that would necessarily come to compliance.
Q. So when we see messy labels or smudges on a bottle or a dirty bottle, those aren't things that compliance would necessarily become aware of, are they?
A. In the standard course of business, no.
But one or two of the complaints were related to the bottle labels, and that's kind of how I became aware of them, but I was not typically involved in the return process.
Q. Right.
And do you know whether or not Pat Boyd was involved in the return process?
A. I believe he was because I dealt directly with the sales team and which customers were returning them and things.
Q. So let's go back to that language. I asked you --

MR. BARZEE: Do me a favor. Take that down and give me back the ELMO.

BY MR. BARZEE:

Q. I asked you if Pat Boyd was involved in those processes, and your answer was "I believe."

Does that mean you're not sure?

MR. POGOZELSKI: Objection, Your Honor. She testified what she meant by "I believe" earlier.

THE COURT: Sustained.

MR. BARZEE: Give me one second, Your Honor. I'm sorry.

BY MR. BARZEE:

Q. I think on direct you testified that the Government was asking you about whether or not you shared your concerns about the suppliers with Pat Boyd.

Do you remember being asked that question?

A. I don't know if I was specifically asked about Pat but...

Q. You didn't share your concerns about them with Pat Boyd, did you?

A. There were times I didn't, but I also reported directly to Charlie.

Q. Right.

A. So it made sense to report to him first.

Q. So you didn't address those concerns with -- it's not a question of whether or not you should have.

I just want to know factually, you did not bring those concerns to Pat Boyd?

A. No.

Q. So when you discovered the T3s that you received from King Kimchi were false, that's not something that you brought to Pat, is it?

A. I'm not sure if he was on those emails that we forwarded them.

Q. Do you have any recollection, sitting here today, going to Pat Boyd and saying, "I have a concern about this particular T3 at Boulevard"?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. BARZEE:

Q. You approved -- well, let's start with Boulevard.

You approved the Boulevard application; correct?

A. Yes.

Q. And I want to go through that process with you.

MR. BARZEE: Can we bring up Government's Exhibit 111, please.

BY MR. BARZEE:

Q. And this is just in general, not necessarily with Pat Boyd, but I'm shifting now to ask you general questions.

Okay?

A. Okay.

Q. I think you might have seen this earlier. This is Government's Exhibit 111, and it's an email from Courtney, I guess, first, at Pharma Sales, and it's sent to invoices@SafeChain.
Do you see that?
A. Yes.
Q. It says, "Hello. See the attached vendor application, license, and W-9 for Boulevard 9229"; correct?
A. Yes.
Q. And what time did Courtney from Worldwide Pharma Sales send that email?
A. 2:39 p.m.
Q. And again, Worldwide Pharma Sales -- that's Adam Brosius's company from the outside; right?
A. Yes.
Q. So at 2:39 p.m., Adam Brosius's Worldwide Pharma Sales sends an email to invoices@safechain at 2:39 p.m.; correct?
A. Yes.
Q. And on April 22nd -- that's a Wednesday -- were you at the office, or are you working at home because of COVID?
A. I don't remember where I was working that day.
Q. Okay. Let's keep going and maybe it will refresh your memory as we go a little further.
Kenzi Nalley then forwards -- it looks like she forwards that email and the application.

Oh, look at the attachments: Boulevard license, Boulevard W-9, Boulevard application, and she says, "New vendor for approval. Thanks."

Do you see that?

A. Yes.

Q. And that is at what time?

A. 6:56.

Q. UTC, so we have to subtract three hours from that, I think. So that would be 3:55:50 p.m.

Does that sound right to you?

MR. POGOZELSKI: Objection, Your Honor, about the time.

MR. BARZEE: If you know.

BY MR. BARZEE:

Q. Do you know how that works?

A. I'm not real sharp on my time zones. I don't know what UTC stands for.

Q. I can't figure that out either. We're together on that.

Is there another page.

Oh, and there it is. That's the application -- that's the what? The license?

A. Yes, that's a copy of a license they sent us.

Q. And then you send --

MR. BARZEE: Go ahead to the other pages.

BY MR. BARZEE:

Q. That's the W-9. That's the vendor with Ishbay Shukurov;

right?
A. Yes.
Q. And then you approved that application; correct?
A. Yes.
Q. And you approved that application at 3:13 p.m.; correct?
A. I don't -- I'm not sure what time I approved it.
MR. BARZEE: Can we get the --
BY MR. BARZEE:
Q. We're looking at an email that you sent saying "approved," to refresh your recollection as to what time it was?
A. Yes.
Q. So you approved that at 3:14 p.m.; correct?
A. Yes.
Q. So that means that you only had that application for -- what? -- about 15 minutes?
MR. POGOZELSKI: Objection, Your Honor. We haven't established the timeline. The time zones are different on the email we're looking at versus that.
THE COURT: Overruled.
BY MR. BARZEE:
Q. Would taking a look at this refresh your memory as to how long you spent on the application?
A. Sure.
Q. You can track it.
MR. POGOZELSKI: And if counsel is --

BY MR. BARZEE:
Q. Does that refresh your memory as to the time?
A. Yes.
Q. All right. So you had that Boulevard application for approximately 15 minutes prior to its approval?
A. Yes.
Q. That seems quick.
A. The only thing I needed to verify was the license.
Q. Well, this is onboarding of a vendor; right?
A. Yes.
Q. Didn't we go through all the steps that you had to take to onboard a vendor?
A. I verified the information that they provided on the application and the license.
Q. Who did you verify the license with?
A. I looked up the number that they provided on the New York Board of Pharmacy website.
Q. But it wasn't -- it wasn't a valid license?
A. It was a valid license number.
When we later sent that license to New York Board of Pharmacy, the New York Board of Pharmacy confirmed it was a fraudulent license.
Q. So let's go back to the -- okay.
This is the license that we're talking about; right?
A. Yes.

Q. So tell me what was wrong with this license.
Now, you know; right? At the time you didn't, but now you do?
A. That's correct.
Q. So explain to the jury what you can see now in this license.
A. Okay. This is a copy of the license that was provided to us. The number that I type in on the New York Board of Pharmacy website is on that lower left-hand corner.
Q. So hold on one second. I'm going to touch this and see -- okay, that number there; right?
A. Yes, that registration number.
Q. Okay.
A. When you go to the New York Board of Pharmacy website, there's a couple of different -- mind you, it's been several years since I have looked at this website.
There's a few drop-down menus, and you essentially type in the registration number, and the information associated with that registration number comes up.
And the information that was associated with this license number was a valid pharmacy license. The error of that, which was confirmed with the New York Board of Pharmacy, is that, yes, that was a valid pharmacy registration number. It was not a valid wholesale license.
So the area that was falsified was essentially they took

off -- they replaced "pharmacy" with that center statement there which says, "registered wholesaler of drugs and devices."

Q. So let's just go through that little slower.

All right?

A. Yes.

Q. So, first and foremost, can we agree that Boulevard lied and they're the ones that created this fraudulent license?

A. Yes, that's correct.

Q. And they put in big print here, in capital letters, right in the middle of it, "Registered Wholesaler of Drugs and/or Devices"; right?

A. Yes.

Q. All right. So you get it in. You think it's a vendor application. And you look at it, and it looks like a wholesaler license; right?

A. Yes.

Q. Now, your job is to verify whether or not that's true; right?

A. Yes.

Q. And you go to the Registration Number 037678. You look it up in the computer, and it says "valid pharmacy license"; correct?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Overruled.

A. Yes.

BY MR. BARZEE:

Q. It says, "Valid pharmacy license."

It doesn't say, "Valid wholesaler license"; correct?

A. That registration number was valid, is what caught my attention.

Q. Yes. I appreciate that. It's not my question.

It is valid. It's a valid number registered to a pharmacy as supposed to a wholesaler; correct?

A. Yes. That's correct.

Q. You missed that?

A. Yes.

Q. Anyone might have missed it because someone was committing a fraudulent act on you, and they were purposely trying to trick you; right?

MR. POGOZELSKI: Objection. It requires speculation.

THE COURT: Sustained.

BY MR. BARZEE:

Q. Well, you missed it, but the reason you missed it is because you had been misled into believing it was a wholesaler; right?

MR. POGOZELSKI: Objection.

THE COURT: Sustained.

BY MR. BARZEE:

Q. If you had caught it and you realized back then on the day that you approved Boulevard in 15 minutes, if you had caught

that and seen that they weren't a real wholesaler, if you looked at it carefully, you would have known that they weren't a wholesaler; correct?
A. Well, that is also what the wholesale license looks like.
Q. Agreed.
But when you look up the numbers, you would -- if you looked at it carefully, you would have seen that those numbers were associated with a pharmacy as supposed to a wholesaler; correct?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Overruled.
A. Yes. I could have seen that.
BY MR. BARZEE:
Q. And that was April 20th of 2020 -- right? -- or thereabouts?
A. Yeah, sometime in the spring.
Q. But you missed it?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Did Pat Boyd pressure you to approve this license?
A. I don't know if it was Pat specifically; but, yes, there was pressure to get this into the system so there could be purchases made.
Q. With all due respect, I asked you if Pat pressured you to

approve this license.

Please answer my question.

MR. POGOZELSKI: Objection. Asked and answered. Argumentative.

THE COURT: Overruled.

BY MR. BARZEE:

Q. Did Patrick Boyd, the man sitting right there on trial, did he pressure you to approve of the Boulevard license in 15 minutes from your house?

A. I don't recall if it was Pat specifically.

Q. Do you have any memory of Patrick Boyd pressuring you in any way to approve that Boulevard license?

MR. POGOZELSKI: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. BARZEE:

Q. When you discovered that you had been duped and that they had lied to you and sent you this fraudulent license, you stopped dealing with Boulevard; right?

A. I don't remember the time frame.

It was -- we received confirmation from the New York Board of Pharmacy that the license had been altered.

Q. My question is when you found out that you had been duped, that you had been sent a fraudulent license that you had approved in 15 minutes, when you discovered that, Safe Chain ceased doing business with Boulevard?

True or false?
A. I don't recall the exact timeline of that.
Q. Would looking at your deposition testimony refresh your recollection?
A. Sure.
MR. POGOZELSKI: I ask if the counsel is going to speak to the witness, that it be in the microphone and on the record.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Did you stop doing business with them as soon as you discovered that the license was invalid?
A. Yes.
MR. POGOZELSKI: Objection to the term "you."
MR. BARZEE: I'm sorry. Let me ask it in a better way. I apologize.
BY MR. BARZEE:
Q. Did Safe Chain stop doing business with Boulevard once you discovered that you had been duped?
A. Yes. I believe -- yes, stopped doing business with them.
MR. BARZEE: Your Honor, if we're going to break, this would be a good place.
THE COURT: All right. Members of the jury, we're going to recess for the evening. Remember my admonition not to discuss the case or allow it to be discussed in your presence.
I'm going to ask you to go to lunch first tomorrow, and

come in at 1:00, and we'll resume the trial at 1:00.

So have a nice evening, and see you back tomorrow at 1:00.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: Ms. Divilio, you're not allowed to discuss your testimony, and we'll see you back tomorrow at 1:00.

THE WITNESS: Yes.

THE COURT: And if there's nothing else to come before the Court, we will be in recess until 9:00 tomorrow morning on other matters, 1:00 on this case.

MR. POGOZELSKI: Your Honor, just one minor point. Defense counsel had pointed out to me that yesterday I inadvertently did not move a document into evidence, which was Government's Exhibit 303, 303A, and 303B.

THE COURT: That's correct.

MR. POGOZELSKI: And I think there's no objection to moving that document with the attachments into evidence.

MR. ZIMET: That's correct, Judge.

MR. BARZEE: Correct.

THE COURT: 303, 303A and B will be received.

(Government's No. 303, 303A, 303B, Documents, were received in Evidence.)

MR. POGOZELSKI: Thank you, Your Honor -- and I apologize for that.

THE COURT: And we'll be in recess.

THE COURT SECURITY OFFICER: All rise.

(Jury trial adjourned at 3:00 PM.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 10/22/2025

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN, FPR, RPR
Official Court Reporter
United States District Court
Southern District of Florida
U.S. Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

**'**

'Being [1] - 29:25
'Oh [1] - 138:8
'quality [1] - 64:22
'undeliverable [1] - 51:10

**/**

/s/Patricia [1] - 182:10

**0**

037678 [1] - 176:20

**1**

1 [5] - 1:8, 1:19, 13:17, 38:13, 42:13
1.6 [1] - 57:14
10 [3] - 4:2, 141:8, 141:9
10/22/2025 [1] - 182:10
100 [1] - 95:23
1001 [1] - 41:5
103 [1] - 4:10
106 [1] - 4:8
10:28 [1] - 59:1
10:49 [1] - 59:1
10th [2] - 6:22, 11:8
111 [3] - 3:4, 170:19, 171:2
11:15 [1] - 89:25
12 [1] - 94:7
124 [1] - 150:25
127 [2] - 151:15
12:13 [1] - 124:20
12th [3] - 23:9, 38:8, 56:11
13 [3] - 93:14, 95:5, 96:8
13th [2] - 95:1, 95:16
14 [6] - 3:19, 26:19, 27:6, 34:12, 34:16, 35:5
15 [8] - 58:13, 58:22, 58:24, 173:15, 174:5, 177:25, 179:9, 179:24
15-minute [1] - 58:10
160 [1] - 152:10
16th [1] - 61:12
170 [1] - 94:8
177 [1] - 153:7
18 [1] - 41:5
180 [1] - 153:2
181 [2] - 3:16, 153:12
184 [1] - 154:23
186 [1] - 155:10
19 [1] - 4:4
190 [2] - 95:14, 164:21
191 [3] - 96:5, 96:11, 165:5
196 [1] - 38:5
1:00 [5] - 181:1, 181:3, 181:7, 181:11
1:15 [3] - 124:7, 124:18, 124:20
1:30 [5] - 124:8, 124:9, 124:12, 124:16, 125:20
1st [4] - 81:19, 82:1, 92:14, 98:20

**2**

2 [14] - 28:24, 34:8, 38:16, 49:3, 62:24, 70:11, 77:16, 79:24, 94:8, 104:9, 156:21, 161:3, 164:17, 165:24
2018 [3] - 86:20, 126:4, 127:2
2019 [2] - 98:4, 98:17
2020 [40] - 24:14, 34:12, 34:14, 34:25, 36:2, 37:18, 38:8, 42:20, 42:22, 42:24, 43:1, 45:9, 45:11, 53:16, 55:12, 55:17, 56:2, 57:24, 61:22, 71:9, 74:23, 75:21, 77:18, 78:10, 78:14, 80:3, 83:12, 84:1, 85:20, 89:3, 89:14, 89:25, 92:14, 93:14, 96:8, 105:10, 149:8, 151:3, 165:14, 178:14
2021 [43] - 6:23, 11:8, 12:9, 14:12, 18:8, 19:14, 27:13, 27:22, 28:14, 29:1, 29:7, 33:7, 39:20, 42:16, 43:17, 44:11, 45:22, 46:8, 47:13, 48:19, 54:21, 56:11, 57:15, 60:6, 60:22, 61:12, 62:4, 62:11, 63:23, 66:4, 66:14, 67:2, 68:2, 79:6, 80:1, 81:3, 95:1, 98:7, 98:9, 98:14, 98:20, 103:11, 107:24
2025 [1] - 1:5
20EG062 [2] - 39:9, 40:19
20th [1] - 178:14
21 [2] - 1:5, 45:6
213 [2] - 34:7, 155:25
21st [1] - 84:1
225 [2] - 45:21, 157:3
227 [6] - 3:11, 48:16, 48:22, 48:25, 49:1, 157:12
229 [1] - 162:10
22nd [4] - 29:1, 29:6, 31:16, 171:19
23rd [2] - 62:11, 63:22
24-cr-20255-Dimitrouleas/Hunt [1] - 1:3
243 [1] - 6:18
245 [2] - 60:19, 158:10
25 [1] - 143:19
251 [6] - 3:12, 62:8, 62:14, 62:17, 62:18, 158:23
252 [7] - 3:13, 43:11, 43:20, 43:22, 44:3, 44:7, 44:8
25th [3] - 42:16, 43:17, 44:11
264 [6] - 12:6, 15:13, 15:24, 16:2, 16:8, 16:11
268 [1] - 21:24
269 [1] - 23:7
27 [2] - 3:10, 71:9
272 [1] - 31:12
279 [1] - 98:22
27th [1] - 75:21
28 [1] - 4:5
29 [2] - 36:2, 89:14
299 [6] - 3:14, 79:3, 79:19, 79:22, 79:23, 182:13
2:39 [3] - 171:12, 171:16, 171:17

**3**

3 [5] - 12:7, 20:1, 29:21, 53:8, 86:5
30 [1] - 89:25
300 [6] - 3:15, 80:6, 80:15, 80:18, 80:19, 162:12
303 [4] - 3:16, 181:15, 181:21, 181:22
303A [4] - 3:16, 181:15, 181:21, 181:22
303B [3] - 3:16, 181:15, 181:22
30th [1] - 103:11
316 [6] - 3:17, 93:11, 93:17, 93:20, 93:21, 164:15
319 [6] - 3:18, 64:3, 64:13, 64:16, 64:17, 159:4
31st [5] - 53:16, 66:4, 66:14, 67:2, 68:2
331 [1] - 45:6
33128 [1] - 1:20
33132 [1] - 1:16
33301 [2] - 1:23, 182:14
341 [6] - 3:19, 14:9, 14:15, 14:18, 14:19, 155:20
348 [6] - 3:20, 81:1, 81:12, 81:15, 81:16, 162:21
349 [2] - 70:10, 159:21
35 [1] - 71:7
353 [2] - 88:2, 163:19
357 [4] - 72:1, 72:9, 72:12, 160:7
361 [6] - 3:21, 49:22, 50:10, 50:13, 50:14, 157:18
362 [6] - 3:22, 51:14, 51:20, 51:23, 51:24, 157:25
363 [5] - 3:23, 53:25, 54:7, 54:10, 54:11
367 [5] - 3:24, 57:21, 58:2, 58:5, 58:6
369 [5] - 3:25, 60:3, 60:11, 60:14, 60:15
372 [5] - 4:1, 54:18, 54:24, 55:2, 55:3
39 [1] - 34:15
3911 [3] - 80:2, 156:13, 162:15
3:00 [2] - 1:6, 182:3
3:13 [1] - 173:5
3:14 [1] - 173:12
3:55:50 [1] - 172:9
3PL [2] - 22:7, 22:10
3rd [1] - 1:19

**4**

4 [5] - 8:11, 17:6, 39:6, 44:17, 89:22
40 [2] - 1:19, 4:11
403 [1] - 105:22
40F [1] - 57:11
40J [1] - 11:15
435 [1] - 152:21
436 [1] - 153:17
437 [1] - 154:12
44 [1] - 3:13
440 [1] - 155:5
449A [5] - 4:2, 9:22, 10:7, 10:10, 10:11
449B [3] - 4:2, 9:22, 10:11
449C [3] - 4:2, 9:22, 10:11
457 [2] - 4:3, 72:13
46 [1] - 69:5
463 [1] - 17:1
47 [1] - 141:20
472 [1] - 151:21
474 [5] - 4:4, 19:13, 19:19, 19:22, 19:23
477 [5] - 4:5, 28:11, 28:17, 28:20, 28:21
483 [6] - 4:6, 83:8, 83:15, 83:18, 83:19, 163:3
486 [6] - 4:7, 66:1, 66:7, 66:10, 66:11, 159:10
49 [1] - 3:11
490 [6] - 4:8, 105:7, 105:13, 106:3, 106:4, 106:5
495 [6] - 4:9, 85:17, 85:23, 86:1, 86:2, 163:14
497 [5] - 4:10, 103:9, 103:15, 103:18, 103:19
4th [2] - 1:16, 98:7

**5**

5 [4] - 39:6, 45:2, 88:22, 141:9
50 [1] - 3:21
503 [3] - 69:5, 71:7, 159:16
505 [3] - 35:20, 89:22, 156:4
51 [1] - 3:22
516 [1] - 152:3
527 [1] - 17:25
529 [1] - 33:5
54 [1] - 3:23
55 [1] - 4:1
57 [1] - 4:12
58 [1] - 3:24
5th [3] - 12:9, 77:17, 98:9

**6**

6 [5] - 1:22, 3:3, 7:21, 88:22
60 [1] - 3:25
600 [1] - 102:11
62 [1] - 3:12

**633** [1] - 1:22
**634** [1] - 156:11
**634A** [5] - 4:11, 39:17, 40:4, 40:7, 40:8
**64** [1] - 3:18
**657** [7] - 4:12, 56:8, 56:20, 57:7, 57:8, 57:9, 57:10
**66** [1] - 4:7
**667** [2] - 100:19, 167:21
**669** [6] - 4:13, 77:1, 77:10, 77:13, 77:14, 161:22
**671** [6] - 4:14, 73:10, 73:16, 73:19, 73:20, 160:18
**672** [5] - 4:15, 74:21, 75:5, 75:6, 160:24
**692** [1] - 75:2
**6:56** [1] - 172:7

## 7

**7** [1] - 61:15
**72** [1] - 4:3
**73** [1] - 4:14
**75** [1] - 4:15
**77** [1] - 4:13
**79** [1] - 3:14

## 8

**8** [2] - 19:14, 98:12
**80** [1] - 3:15
**81** [1] - 3:20
**83** [1] - 4:6
**86** [1] - 4:9
**88** [2] - 97:14, 167:3
**8th** [2] - 18:8, 20:1

## 9

**9229** [3] - 21:18, 61:7, 171:8
**93** [1] - 3:17
**97** [5] - 3:10, 26:5, 26:23, 27:1, 27:2
**99** [1] - 1:16
**9:00** [2] - 1:6, 181:10
**9th** [1] - 77:22

## A

**Abbie** [8] - 13:14, 23:18, 73:25, 75:17, 146:7, 153:5, 153:10, 154:20
**Abigail** [1] - 136:12
**ABIGAIL** [2] - 3:3, 6:3
**ability** [1] - 109:24
**able** [21] - 13:18, 40:11, 52:19, 52:20, 53:5, 67:20, 84:15, 84:17, 84:25, 87:1, 91:12, 96:18, 125:20, 127:7, 131:2, 132:22, 136:3, 140:24, 141:25, 165:11
**above-entitled** [1] - 182:8
**above-mentioned** [1] - 78:5
**accepted** [3] - 10:24, 21:13, 25:19
**accepting** [1] - 110:21
**access** [4] - 79:12, 84:8, 84:25, 97:4
**accessing** [1] - 83:24
**accordance** [1] - 63:1
**according** [2] - 27:5, 75:16
**account** [3] - 29:25, 56:2, 153:24
**accounting** [2] - 142:9, 142:13
**accumulated** [1] - 117:22
**accurate** [4] - 96:25, 166:2, 167:8, 182:7
**acknowledging** [1] - 65:10
**acquired** [1] - 93:2
**act** [1] - 177:13
**Act** [2] - 45:4, 78:4
**action** [1] - 104:22
**actions** [2] - 108:5, 167:18
**actual** [2] - 8:12, 107:3
**AD** [10] - 13:4, 13:15, 16:13, 20:6, 21:2, 29:15, 29:25, 30:2, 49:16, 61:5
**AD's** [1] - 23:16
**Adam** [53] - 9:17, 12:14, 15:12, 17:4, 17:15, 31:17, 32:6, 32:10, 32:13, 32:23, 33:8, 33:18, 35:24, 36:8, 37:20, 37:22, 43:19, 45:9, 45:13, 54:3, 73:13, 85:5, 85:11, 85:19, 86:9, 86:11, 86:17, 86:19, 88:8, 88:15, 89:24, 91:1, 103:12, 104:20, 107:1, 107:11, 107:17, 142:19, 142:23, 143:11, 143:14, 143:18, 143:23, 151:4, 151:11, 151:18, 156:8, 160:20, 163:16, 163:21, 166:23, 171:13, 171:16
**Adam's** [1] - 15:2
**add** [1] - 68:18
**addition** [1] - 45:3
**additional** [4] - 13:8, 23:22, 91:19, 95:18
**address** [12] - 8:2, 8:12, 8:16, 38:11, 51:3, 68:11, 68:13, 70:14, 71:11, 71:12, 86:12, 169:24
**addressing** [1] - 96:16
**adjourned** [1] - 182:3
**admit** [3] - 10:7, 73:15, 105:12
**admonition** [6] - 5:21, 58:11, 59:23, 124:10, 125:11, 180:23
**adulterated** [1] - 45:5
**advice** [1] - 24:25
**affirmed** [1] - 6:4
**afternoon** [2] - 111:7, 111:8
**agencies** [1] - 122:19
**Agent** [1] - 115:14
**agent** [3] - 115:15, 115:24
**agents** [12] - 114:7, 114:11, 114:18, 115:2, 115:5, 115:8, 117:7, 118:11, 118:23, 120:18, 120:20, 121:11
**aggravated** [1] - 117:20
**ago** [8] - 32:6, 71:15, 85:5, 102:16, 105:16, 105:24, 106:12, 136:25
**agree** [12] - 17:16, 21:1, 21:4, 30:6, 47:23, 113:24, 123:24, 134:13, 143:14, 149:17, 176:6
**agreed** [2] - 21:13, 178:5
**agreement** [2] - 56:23, 116:23
**ahead** [10] - 12:10, 23:14, 25:13, 44:16, 48:15, 49:15, 74:20, 124:7, 125:4, 172:23
**al** [1] - 86:6
**alarming** [1] - 65:18
**albuterol** [4] - 88:18, 88:24, 89:10, 163:23
**alert** [3] - 60:25, 63:19, 63:20
**Alex** [1] - 137:8
**Alexander** [1] - 1:13
**alignment** [1] - 109:19
**allow** [6] - 5:22, 58:11, 59:24, 124:10, 125:12, 180:24
**allowed** [8] - 58:21, 133:11, 133:23, 134:8, 141:1, 141:4, 141:6, 181:6
**almost** [1] - 100:14
**alone** [1] - 150:9
**altered** [1] - 179:21
**alternatively** [1] - 145:3
**altogether** [1] - 121:8
**AM** [4] - 1:6, 59:1, 124:20
**ambiguous** [1] - 73:1
**AMERICA** [1] - 1:4
**Amerisource** [2] - 96:15, 100:9
**AmerisourceBergen** [6] - 29:15, 29:19, 30:22, 30:25, 95:5, 95:20
**amount** [2] - 99:19, 129:9
**Amsterdam** [5] - 95:6, 95:20, 97:25, 98:16, 100:9
**Anderson** [5] - 7:7, 7:25, 8:3, 8:13, 22:20
**announce** [1] - 81:19
**announced** [1] - 85:11
**answer** [14] - 32:20, 74:3, 117:7, 117:10, 133:21, 134:23, 136:9, 136:19, 137:11, 137:22, 138:5, 138:7, 169:5, 179:2
**answered** [22] - 102:4, 102:15, 113:6, 118:3, 118:7, 118:19, 119:12, 121:22, 124:2, 134:9, 135:2, 135:5, 144:1, 146:4, 146:19, 166:25, 170:12, 176:23, 178:10, 178:18, 179:3, 179:13
**Anthony** [1] - 43:19
**anyway** [2] - 10:23, 147:6
**apologize** [6] - 7:4, 43:21, 44:4, 125:17, 180:15, 181:25
**apparent** [1] - 30:17
**appealable** [1] - 53:21
**appear** [3] - 57:17, 62:20, 104:14
**APPEARANCES** [1] - 1:12
**appeared** [1] - 77:20
**application** [24] - 91:23, 139:3, 139:12, 139:19, 139:25, 140:10, 141:22, 142:13, 142:21, 147:14, 147:15, 162:1, 170:16, 171:7, 171:25, 172:2, 172:19, 173:3, 173:5, 173:14, 173:22, 174:4, 174:14, 176:14
**applications** [13] - 69:18, 126:14, 126:19, 127:18, 130:14, 138:21, 142:6, 142:8, 143:1, 143:5, 143:24, 145:3, 150:12
**applies** [1] - 78:25
**apply** [8] - 82:15, 82:17, 82:19, 82:21, 82:23, 82:25, 105:3, 107:17
**appointment** [1] - 116:21
**appreciate** [6] - 7:10, 50:23, 96:17, 134:5, 165:10, 177:6
**appreciated** [2] - 96:20, 165:13
**approach** [2] - 118:6, 138:23
**approached** [1] - 114:15
**appropriate** [1] - 87:12
**approval** [2] - 172:3, 174:5
**approve** [14] - 18:20, 25:17, 25:22, 30:2, 31:8, 144:5, 145:16, 145:20, 146:6, 146:8, 178:21, 179:1, 179:8, 179:12
**Approved** [1] - 25:5

**approved** [18] - 18:22, 26:1, 146:12, 147:9, 147:11, 147:14, 170:15, 170:16, 173:3, 173:5, 173:6, 173:9, 173:12, 177:25, 179:24
**approving** [2] - 100:8, 145:2
**April** [17] - 12:9, 14:12, 18:8, 19:14, 20:1, 23:9, 28:14, 29:1, 29:6, 31:16, 54:21, 81:19, 82:1, 105:9, 165:17, 171:19, 178:14
**area** [3] - 108:14, 129:6, 175:25
**areas** [2] - 128:1, 131:19
**argumentative** [3] - 33:1, 93:25, 179:4
**arrangements** [1] - 9:9
**arrested** [1] - 121:13
**arrived** [2] - 29:8, 100:15
**arrow** [1] - 162:17
**ASAP** [2] - 23:24, 52:13
**Ascan** [1] - 38:14
**aside** [1] - 75:25
**Assistant** [1] - 1:15
**associated** [9] - 24:9, 27:24, 69:16, 77:24, 78:6, 86:9, 175:18, 175:20, 178:8
**association** [1] - 15:4
**assuming** [2] - 112:9, 112:10
**assure** [1] - 121:16
**atmosphere** [1] - 108:13
**Atripla** [1] - 98:4
**attached** [5] - 52:4, 61:22, 70:20, 81:21, 171:7
**attachment** [2] - 31:20, 31:23
**attachments** [2] - 172:1, 181:18
**Attain** [1] - 90:22
**attempt** [2] - 78:24, 99:22
**attempted** [1] - 80:8
**attempting** [2] - 6:24, 140:13
**attention** [2] - 7:11, 177:5
**attorney** [13] - 24:14, 25:5, 111:14, 111:15, 111:16, 111:19, 112:22, 113:1, 113:2, 113:10, 133:8, 147:19, 157:5
**Attorney** [2] - 15:2, 15:18
**Attorneys** [1] - 1:15
**attorneys** [11] - 24:18, 120:25, 121:1, 121:4, 132:15, 133:15, 133:23, 134:4, 134:8, 134:23
**audit** [1] - 116:13
**auditing** [2] - 115:4, 115:5
**audits** [1] - 122:23
**August** [6] - 34:25, 42:20, 71:9, 74:23, 75:21, 127:2
**authenticate** [1] - 7:24
**authorized** [3] - 20:16, 21:2, 49:18
**available** [1] - 24:23
**avoid** [1] - 48:10
**aware** [18] - 36:13, 36:19, 37:18, 37:22, 37:25, 38:21, 79:9, 89:2, 90:25, 100:6, 100:21, 100:22, 103:1, 129:13, 164:8, 164:12, 168:15, 168:18

**B**

**background** [3] - 82:9, 122:19, 123:25
**backorders** [2] - 19:8, 23:23
**bad** [1] - 23:4
**Bailey** [1] - 182:10
**BAILEY** [2] - 2:3, 182:11
**Bailey-Entin** [1] - 182:10
**BAILEY-ENTIN** [2] - 2:3, 182:11
**bang** [1] - 110:10
**Barzee** [6] - 1:18, 1:19, 57:4, 111:4, 124:4, 125:21
**BARZEE** [190] - 3:4, 5:9, 5:20, 9:3, 10:8, 14:17, 19:20, 26:24, 28:18, 32:16, 32:19, 32:24, 33:1, 40:6, 44:6, 48:24, 50:12, 51:22, 54:9, 54:25, 57:5, 58:3, 59:11, 59:22, 60:12, 62:16, 64:15, 66:9, 72:11, 73:18, 75:4, 77:12, 79:21, 80:17, 81:14, 83:17, 85:25, 91:13, 92:1, 92:8, 93:19, 103:17, 104:5, 104:7, 111:6, 113:4, 113:8, 117:11, 118:5, 118:9, 118:17, 118:21, 119:14, 120:4, 121:24, 124:5, 125:2, 125:10, 125:15, 125:22, 125:23, 134:12, 134:19, 134:21, 135:4, 135:17, 144:3, 145:25, 146:21, 149:11, 149:16, 150:21, 150:22, 151:1, 151:2, 151:15, 151:16, 151:21, 151:22, 152:3, 152:4, 152:10, 152:12, 152:20, 152:22, 153:2, 153:3, 153:7, 153:9, 153:12, 153:13, 153:17, 153:18, 154:12, 154:13, 154:23, 154:24, 155:5, 155:6, 155:10, 155:11, 155:17, 155:20, 155:21, 155:25, 156:1, 156:4, 156:5, 156:11, 156:12, 156:21, 156:22, 157:3, 157:4, 157:12, 157:13, 157:18, 157:19, 157:25, 158:1, 158:10, 158:11, 158:23, 158:24, 159:4, 159:5, 159:10, 159:11, 159:16, 159:17, 159:21, 159:22, 160:7, 160:8, 160:18, 160:19, 160:24, 160:25, 161:3, 161:5, 161:19, 161:22, 161:23, 162:10, 162:13, 162:21, 162:22, 163:3, 163:4, 163:14, 163:15, 163:19, 163:20, 164:15, 164:18, 164:21, 164:22, 165:5, 165:6, 167:3, 167:4, 167:21, 167:22, 169:1, 169:3, 169:10, 169:12, 170:14, 170:19, 170:21, 172:12, 172:13, 172:23, 172:24, 173:7, 173:8, 173:20, 174:1, 177:1, 177:17, 177:23, 178:13, 178:20, 179:6, 179:15, 180:9, 180:14, 180:16, 180:20, 181:20
**based** [15] - 9:2, 9:8, 12:12, 15:2, 24:22, 24:25, 34:20, 34:21, 48:5, 48:8, 63:3, 76:22, 108:5, 123:24, 164:8
**basis** [1] - 148:10
**batch** [1] - 49:16
**bathroom** [1] - 104:4
**Bayamon** [3] - 13:3, 13:15, 17:10
**beat** [1] - 87:6
**beat-up** [1] - 87:6
**became** [4] - 26:1, 143:11, 143:19, 168:18
**become** [4] - 85:5, 108:10, 122:6, 168:15
**BEFORE** [1] - 1:10
**began** [2] - 101:1, 109:5
**begin** [2] - 87:16, 150:24
**beginning** [2] - 86:20, 99:25
**behalf** [4] - 27:20, 106:22, 106:24, 140:8
**behind** [3] - 25:20, 99:23, 130:4
**bell** [1] - 86:7
**below** [5] - 7:2, 43:25, 47:11, 75:15, 157:21
**Berger** [1] - 43:19
**best** [8] - 24:22, 76:12, 76:15, 109:24, 110:22, 113:16, 113:23, 114:5
**Betances** [5] - 13:16, 13:22, 52:25, 53:3, 53:20
**better** [3] - 108:1, 108:7, 180:14
**between** [37] - 9:24, 14:11, 15:8, 19:16, 21:20, 22:8, 28:13, 32:10, 64:5, 66:3, 70:1, 73:12, 74:23, 83:11, 85:19, 90:25, 96:7, 105:9, 119:2, 152:6, 152:23, 154:20, 155:2, 155:7, 155:12, 155:22, 157:15, 157:20, 158:5, 159:12, 159:18, 160:20, 161:6, 161:13, 163:16, 164:23, 164:25
**Big** [1] - 54:13
**big** [3] - 13:15, 129:14, 176:9
**Biktarvy** [10] - 34:12, 34:15, 36:9, 42:7, 49:4, 77:17, 77:20, 94:19, 157:9, 159:7
**binder** [2] - 164:16, 164:19
**binders** [2] - 99:20, 130:3
**bit** [6] - 15:3, 65:13, 73:1, 123:23, 123:24, 142:3
**blame** [2] - 49:18, 108:4
**blue** [2] - 27:9, 115:20
**board** [4] - 65:20, 140:1, 140:11, 142:2
**Board** [14] - 67:13, 67:23, 68:3, 68:7, 71:17, 74:7, 74:12, 174:17, 174:20, 174:21, 175:8, 175:14, 175:22, 179:20
**bottle** [24] - 34:24, 36:9, 36:17, 37:13, 38:18, 38:20, 38:25, 39:13, 40:18, 40:21, 42:2, 42:7, 42:18, 46:6, 46:11, 65:11, 88:24, 89:9, 159:7, 163:21, 168:6, 168:13, 168:14, 168:17
**bottles** [7] - 34:16, 35:5, 35:8, 38:19, 42:9, 77:19, 101:2
**bottom** [6] - 8:11, 13:17, 38:13, 49:3,

65:17, 99:6
**bought** [2] - 97:16, 98:4
**Boulevard** [81] - 21:18, 35:16, 35:23, 36:5, 37:20, 37:23, 55:18, 61:7, 61:10, 61:19, 63:24, 66:23, 67:8, 67:18, 68:21, 69:7, 69:17, 70:18, 70:20, 71:10, 75:14, 75:22, 76:2, 76:4, 76:7, 76:12, 77:4, 77:21, 82:15, 84:3, 84:24, 88:4, 89:15, 89:17, 90:5, 91:3, 91:20, 92:4, 93:6, 94:10, 98:3, 98:13, 99:1, 99:5, 99:8, 99:16, 100:9, 100:23, 101:12, 102:7, 113:12, 113:20, 127:3, 142:17, 146:12, 152:1, 153:4, 156:8, 159:13, 162:1, 163:22, 165:16, 166:22, 167:25, 170:11, 170:15, 170:16, 171:8, 172:1, 172:2, 174:4, 176:6, 177:25, 179:8, 179:12, 179:18, 179:25, 180:17, 182:13
**Boulevard's** [6] - 67:1, 67:7, 70:4, 71:21, 99:24, 100:25
**boulevard0102@gmail.com** [2] - 68:15, 68:25
**BOYD** [4] - 1:7, 1:18, 1:22
**Boyd** [223] - 6:22, 7:15, 8:21, 9:17, 10:3, 10:14, 11:1, 11:3, 12:11, 13:13, 13:21, 14:11, 15:10, 15:22, 16:12, 17:6, 17:13, 17:15, 17:21, 18:14, 18:20, 18:24, 19:16, 20:2, 20:22, 22:5, 22:24, 23:10, 23:12, 24:3, 27:11, 27:18, 28:13, 29:6, 29:13, 29:21, 29:22, 31:2, 31:17, 32:10, 32:13, 32:22, 33:8, 33:13, 33:18, 33:20, 34:14, 35:23, 36:7, 36:13, 36:19, 37:19, 37:22, 38:22, 41:1, 41:17, 43:18, 43:24, 45:9, 45:12, 46:3, 47:1, 48:5, 48:9, 48:18, 49:4, 49:15, 50:7, 51:16, 52:1, 53:3, 54:3, 54:13, 54:20, 55:5, 55:6, 55:24, 56:16, 57:23, 60:6, 60:24, 61:21, 62:10, 64:9, 66:3, 68:1, 68:10, 68:16, 69:7, 69:21, 70:2, 70:19, 70:24, 71:9, 71:16, 71:20, 72:6, 73:12, 73:25, 74:15, 74:23, 74:24, 75:12, 75:15, 75:19, 76:7, 78:16, 79:8, 79:12, 79:14, 80:3, 80:12, 83:11, 83:23, 85:20, 86:14, 87:8, 91:1, 92:3, 93:14, 94:13, 96:2, 97:3, 97:23, 100:6, 102:7, 103:1, 103:12, 104:16, 105:9, 106:10, 106:16, 107:7, 107:9, 107:14, 107:21, 134:6, 136:3, 136:22, 145:15, 145:19, 146:6, 146:7, 147:5, 147:18, 147:19, 147:20, 147:23, 150:3, 150:15, 151:4, 151:7, 151:25, 152:18, 152:23, 153:5, 153:10, 153:15, 154:20, 155:2, 155:7, 155:13, 155:22, 155:23, 156:2, 156:8, 156:9, 156:23, 157:6, 157:16, 157:22, 158:5, 158:8, 158:25, 159:7, 159:12, 159:18, 159:23, 160:4, 160:15, 160:20, 161:1, 161:2, 161:7, 161:13, 161:20, 162:4, 163:5, 163:17, 164:5, 164:6, 164:9, 164:13, 165:1, 166:6, 167:11, 168:21, 169:4, 169:15, 169:18, 170:2, 170:10, 170:22, 178:21, 179:7, 179:11
**Boyd's** [10] - 10:21, 20:13, 30:6, 47:15, 56:13, 57:17, 61:3, 148:6, 156:23, 157:1
**Boyds** [3] - 24:12, 86:9, 111:21
**Boyds/Safe** [1] - 111:23
**brand** [2] - 18:13, 30:1
**break** [6] - 58:8, 58:20, 124:4, 125:24, 126:1, 180:20
**bridges** [1] - 110:10
**brief** [2] - 58:8, 92:21
**briefly** [1] - 116:9
**bring** [13] - 5:5, 5:11, 40:12, 59:8, 59:12, 86:19, 109:23, 124:24, 125:4, 151:1, 170:1, 170:19
**bringing** [5] - 7:10, 15:4, 86:22, 142:7, 143:24
**broken** [3] - 36:9, 37:1, 40:21
**broker** [1] - 73:4
**brokerage** [1] - 73:8
**Brosius** [37] - 9:17, 17:4, 17:15, 31:17, 32:6, 32:10, 32:13, 32:23, 33:8, 33:18, 35:24, 36:8, 37:20, 43:19, 45:9, 45:13, 54:3, 73:13, 85:5, 85:19, 86:17, 86:19, 88:8, 88:15, 89:24, 103:12, 104:20, 107:11, 107:17, 142:19, 142:23, 143:14, 143:23, 151:4, 156:8, 160:20, 163:16
**Brosius's** [4] - 86:11, 107:1, 171:13, 171:16
**brought** [5] - 30:19, 63:12, 63:15, 142:18, 170:5
**Broward** [1] - 182:13
**Bruce** [1] - 1:22
**bunch** [2] - 81:3, 159:6
**burn** [1] - 110:10
**business** [33] - 8:10, 13:6, 18:23, 23:21, 52:5, 53:14, 63:16, 75:13, 76:23, 83:3, 86:19, 86:22, 89:15, 93:1, 97:18, 107:4, 107:14, 109:19, 109:21, 130:7, 131:21, 140:17, 143:1, 146:23, 147:12, 147:13, 158:4, 166:10, 168:16, 179:25, 180:10, 180:17, 180:19
**businesses** [2] - 21:6, 21:11
**busted** [1] - 87:13
**busted-up** [1] - 87:13
**but..** [1] - 169:17
**buy** [8] - 9:1, 9:8, 16:15, 16:19, 25:6, 30:1, 30:13, 31:2
**buying** [8] - 8:18, 25:14, 30:3, 63:23, 75:22, 82:13, 84:2, 141:11
**BY** [228] - 2:2, 3:4, 6:7, 6:19, 7:23, 9:6, 9:23, 10:13, 11:16, 12:8, 13:12, 14:10, 14:20, 16:10, 17:2, 18:2, 19:15, 19:25, 21:25, 23:8, 25:12, 26:6, 27:4, 28:5, 28:12, 28:25, 31:14, 32:21, 33:6, 34:11, 35:22, 36:24, 37:11, 38:6, 39:7, 39:18, 40:14, 42:14, 43:12, 43:15, 43:23, 44:9, 44:18, 44:25, 45:7, 46:1, 46:25, 47:22, 48:4, 48:13, 48:17, 49:2, 49:23, 50:5, 50:16, 51:15, 51:25, 52:14, 53:10, 54:1, 54:12, 54:19, 55:4, 56:9, 57:13, 57:22, 60:4, 60:16, 60:20, 62:9, 62:19, 63:18, 64:4, 64:19, 66:2, 66:13, 66:22, 68:24, 69:6, 69:25, 70:12, 70:17, 71:8, 71:14, 72:2, 72:14, 73:11, 73:24, 74:10, 74:22, 75:10, 77:2, 77:15, 78:3, 78:22, 79:4, 79:25, 80:7, 80:21, 81:2, 81:8, 81:17, 81:24, 83:9, 83:21, 85:18, 86:4, 86:25, 88:3, 88:13, 88:23, 89:13, 89:23, 90:3, 90:9, 90:16, 91:24, 92:9, 92:13, 93:12, 93:22, 94:3, 94:9, 95:15, 96:6, 96:14, 97:2, 97:15, 98:24, 100:20, 101:15, 101:20, 101:25, 102:6, 102:22, 103:10, 103:21, 104:8, 105:8, 106:8, 111:6, 113:4, 113:8, 115:23, 117:11, 118:5, 118:9, 118:17, 118:21, 119:14, 120:4, 121:24, 125:23, 134:12, 134:21, 135:4, 135:17, 144:3, 145:9, 145:25, 146:21, 149:11, 149:16, 150:22, 151:2, 151:16, 151:22, 152:4, 152:12, 152:22, 153:3, 153:9, 153:13, 153:18, 154:13, 154:24, 155:6, 155:11, 155:17, 155:21, 156:1, 156:5, 156:12, 156:22, 157:4, 157:13, 157:19, 158:1, 158:11, 158:24, 159:5, 159:11, 159:17, 159:22, 160:8, 160:19, 160:25, 161:5, 161:19, 161:23, 162:13, 162:22, 163:4, 163:15, 163:20, 164:18, 164:22, 165:6, 167:4, 167:22, 169:3, 169:12, 170:14, 170:21, 172:13, 172:24, 173:8, 173:20, 174:1, 177:1, 177:17, 177:23, 178:13, 178:20, 179:6, 179:15, 180:9, 180:16

## C

**Caguas** [1] - 53:20
**Cambridge** [1] -

141:20
**cannot** [2] - 29:25, 135:12
**Cano** [1] - 12:23
**cap** [1] - 88:25
**Capital** [1] - 86:6
**capital** [1] - 176:9
**care** [3] - 110:1, 147:6, 150:7
**careful** [1] - 123:7
**carefully** [2] - 178:2, 178:7
**Carlos** [3] - 20:5, 20:18, 20:19
**CASE** [1] - 1:3
**case** [10] - 5:22, 58:11, 59:24, 88:17, 120:20, 124:10, 125:12, 142:16, 180:24, 181:11
**Castillo** [4] - 22:7, 22:8, 22:9, 22:11
**Castillo's** [1] - 22:19
**catching** [1] - 25:20
**caught** [3] - 177:4, 177:24, 177:25
**cc** [2] - 157:16, 160:15
**cc'd** [4] - 152:15, 157:21, 159:7, 165:1
**cc'ing** [1] - 157:15
**CCXKVA** [4] - 34:16, 34:22, 41:14, 41:21
**CDGXKA** [2] - 34:16, 77:17
**ceased** [1] - 179:25
**cell** [2] - 13:5, 159:18
**center** [1] - 176:1
**certain** [3] - 127:14, 130:11, 141:6
**certainly** [1] - 102:19
**certainty** [1] - 138:19
**certify** [1] - 182:6
**Cesar** [5] - 22:7, 22:8, 22:9, 22:11, 22:19
**cesarcastillo.com** [1] - 22:14
**cesarcastilloinc.com** [1] - 22:15
**Chain** [107] - 3:18, 11:17, 18:12, 24:20, 26:7, 26:12, 26:14, 26:16, 27:15, 27:20, 31:25, 32:2, 34:1, 35:2, 40:1, 41:7, 41:21, 47:17, 53:12, 55:25, 56:10, 61:22, 62:24, 63:4, 63:6, 63:9, 64:17, 64:21, 72:20, 74:11, 75:21, 76:11, 77:18, 77:24, 78:4, 78:7, 78:9, 81:9, 81:18, 82:5, 82:10, 82:13, 83:2, 84:20, 85:6, 85:11, 85:12, 85:14, 86:19, 86:22, 87:25, 98:6, 98:19, 101:9, 102:1, 102:13, 102:23, 106:17, 106:22, 106:24, 107:19, 108:10, 109:1, 109:5, 111:14, 111:23, 116:10, 116:14, 117:19, 121:25, 122:7, 126:3, 126:17, 127:8, 127:9, 127:13, 127:20, 129:2, 129:5, 130:3, 130:9, 130:11, 130:20, 130:23, 130:24, 131:2, 131:19, 132:18, 133:10, 133:22, 141:2, 141:15, 141:19, 142:7, 142:19, 143:11, 143:18, 144:25, 146:22, 148:3, 149:1, 154:7, 154:8, 158:13, 167:25, 179:24, 180:17
**chain** [2] - 63:8, 64:5
**Chain's** [6] - 25:21, 72:16, 76:5, 77:25, 131:7, 142:12
**chance** [1] - 51:11
**change** [2] - 112:14, 143:10
**changes** [1] - 94:23
**charge** [1] - 121:21
**charged** [1] - 121:13
**Charles** [116] - 8:21, 12:11, 13:13, 13:21, 14:11, 15:9, 15:22, 16:12, 17:6, 17:13, 18:24, 22:5, 22:24, 23:12, 24:3, 27:11, 27:18, 31:2, 34:14, 35:23, 36:7, 36:13, 36:19, 37:19, 37:22, 38:22, 41:1, 41:17, 43:18, 43:24, 45:9, 45:12, 46:3, 47:1, 47:15, 48:5, 48:8, 48:18, 49:4, 49:15, 50:7, 51:16, 52:1, 54:3, 54:13, 54:20, 55:6, 60:24, 61:3, 61:21, 62:10, 64:9, 66:3, 68:1, 68:10, 68:16, 69:7, 69:21, 70:2, 70:19, 70:24, 71:9, 71:16, 71:20, 72:6, 73:6, 73:12, 73:25, 74:15, 74:24, 75:12, 75:15, 75:19, 76:7, 76:22, 78:16, 79:8, 79:12, 79:17, 80:2, 80:12, 83:11, 83:23, 85:19, 86:14, 87:8, 89:24, 91:1, 93:14, 94:13, 96:2, 97:3, 97:9, 97:22, 100:6, 102:7, 103:1, 105:9, 106:10, 107:7, 107:14, 107:21, 128:1, 151:4, 154:20, 155:12, 155:22, 156:7, 157:1, 157:6, 158:25, 161:2, 161:7, 161:13, 163:17
**CHARLES** [2] - 1:7, 1:22
**Charlie** [36] - 12:12, 25:3, 34:15, 52:4, 68:5, 68:7, 91:18, 108:3, 134:6, 134:22, 147:18, 147:20, 150:3, 150:5, 151:11, 151:18, 152:6, 152:23, 155:7, 156:9, 156:23, 157:15, 157:22, 158:5, 158:12, 159:12, 159:18, 159:23, 160:20, 163:5, 165:1, 166:6, 166:18, 166:20, 166:23, 169:21
**chat** [10] - 31:18, 152:23, 153:19, 153:20, 153:23, 154:4, 154:5, 154:9, 159:12, 161:6
**chats** [7] - 66:3, 73:12, 74:23, 83:11, 85:19, 122:13, 163:16
**Chats** [4] - 4:6, 4:9, 83:19, 86:2
**chatting** [1] - 153:23
**check** [6] - 83:23, 139:11, 139:19, 139:22, 141:22, 142:1
**checking** [2] - 127:4, 139:23
**checklist** [1] - 23:18
**children** [4] - 149:20, 149:25, 150:8, 150:9
**cholesterol** [1] - 36:10
**Cintex** [15] - 29:5, 29:8, 29:10, 29:13, 29:14, 29:20, 29:23, 30:4, 30:21, 31:3, 31:5, 33:14, 82:23, 104:10, 104:17
**circumstance** [7] - 97:11, 135:24, 136:14, 137:25, 138:16, 144:15, 146:9
**circumstances** [3] - 115:6, 117:18, 144:20
**cites** [1] - 45:6
**civil** [4] - 45:4, 104:19, 104:22, 104:24
**claiming** [1] - 166:9
**clarification** [4] - 52:8, 91:13, 92:2, 131:20
**clarify** [2] - 135:15, 164:3
**clear** [7] - 21:14, 26:1, 109:18, 109:20, 144:19, 167:18, 168:6
**clearly** [1] - 91:8
**client** [1] - 36:8
**close** [3] - 46:16, 90:13, 121:9
**closed** [3] - 56:2, 97:17, 97:20
**closed-down** [1] - 97:17
**closely** [3] - 48:5, 48:8, 85:13
**closing** [1] - 97:19
**Code** [2] - 41:5, 45:6
**collaborative** [1] - 21:10
**column** [1] - 99:1
**columns** [1] - 94:16
**coming** [5] - 19:4, 60:21, 127:3, 131:13, 140:1
**comment** [3] - 150:24, 155:1, 156:6
**commentary** [3] - 118:13, 120:2, 155:15
**comments** [1] - 15:3
**commit** [2] - 113:14, 121:17
**committed** [1] - 121:13
**committing** [1] - 177:12
**communicating** [1] - 69:1
**communication** [2] - 164:9, 164:12
**communications** [1] - 48:9
**community** [2] - 108:14, 111:22
**company** [16] - 7:7, 10:20, 12:21, 13:25, 22:11, 22:13, 24:8, 63:9, 86:6, 90:20, 102:14, 104:22, 104:23, 129:3, 153:21, 171:14
**company's** [1] - 116:4
**comparable** [1] - 108:17
**compare** [1] - 94:7
**compensate** [1] - 110:16
**complaint** [23] - 35:10, 36:14, 36:20, 37:1, 37:6, 38:21, 38:24, 39:12, 41:7, 41:10, 41:18, 41:20, 42:2, 42:4, 42:8, 47:11, 49:8, 64:23, 65:1, 65:4, 65:12, 89:2, 89:3
**complaints** [7] - 42:18, 42:20, 43:4, 43:7, 46:11, 168:9, 168:17
**completed** [1] - 23:22
**compliance** [48] - 7:3, 8:23, 12:15, 18:18, 30:18, 50:6, 50:20, 62:10, 63:4, 63:15, 70:14, 74:6, 74:11, 75:13, 76:22, 79:11, 81:6, 81:18, 87:13, 87:19, 89:6, 91:9, 91:17, 95:24, 101:21, 102:3, 107:4, 109:18, 109:20, 122:17, 127:15, 139:11, 140:6, 140:7, 142:8, 142:14, 152:16, 153:5, 153:14, 155:22, 157:15, 157:21, 158:25, 159:24, 165:7, 168:7, 168:12, 168:14
**compliance's** [3] - 139:15, 139:16, 139:18

**compliance@safechain.com** [2] - 20:9, 49:25
**complicated** [1] - 131:23
**computer** [3] - 129:9, 142:1, 176:21
**CON'T** [2] - 3:3, 6:3
**con't** [1] - 6:6
**con't)BY** [1] - 3:3
**concede** [3] - 5:16, 59:18, 125:6
**concern** [4] - 8:5, 13:3, 91:3, 170:10
**concerned** [4] - 15:3, 89:17, 99:12, 116:20
**concerns** [25] - 6:14, 8:15, 8:18, 8:21, 9:11, 13:8, 22:1, 22:4, 22:25, 24:5, 25:18, 25:23, 50:7, 102:24, 107:3, 107:4, 107:7, 107:11, 107:15, 110:5, 137:21, 169:14, 169:18, 169:24, 170:2
**conclusion** [1] - 64:21
**conducted** [1] - 65:22
**confer** [1] - 56:25
**conference** [5] - 116:2, 119:3, 119:5, 120:13, 120:14
**confine** [1] - 147:23
**confirm** [10] - 7:12, 29:25, 30:25, 51:9, 67:5, 67:6, 70:23, 92:20, 95:21, 138:3
**confirmation** [3] - 67:18, 162:16, 179:20
**confirmed** [16] - 17:17, 27:17, 30:22, 38:1, 61:9, 61:13, 90:4, 90:11, 92:10, 93:4, 94:11, 95:2, 95:3, 95:6, 174:21, 175:22
**conflict** [2] - 111:21, 112:5
**conflicts** [2] - 112:21, 112:25
**confused** [1] - 133:5
**confusing** [1] - 46:16
**confusion** [1] - 21:5
**Connecticut** [1] - 53:19
**consequences** [1] - 45:12
**considerable** [1] - 129:9
**considered** [1] - 78:7
**consistent** [4] - 33:25, 34:3, 47:17, 106:16
**constant** [6] - 12:3, 18:21, 24:11, 30:10, 99:16, 144:15
**constantly** [2] - 30:12, 144:17
**consultants** [6] - 128:22, 129:1, 129:2, 132:8, 132:10, 132:13
**consulting** [2] - 69:15, 70:13
**consulting012345@Gmail** [1] - 69:11
**contact** [10] - 7:25, 14:3, 24:8, 47:1, 50:22, 51:1, 77:6, 91:7, 91:19, 95:21
**Contact** [1] - 40:25
**contacted** [2] - 15:11, 41:9
**contacts** [1] - 132:22
**contained** [1] - 77:23
**content** [1] - 32:15
**context** [9] - 29:22, 32:14, 104:16, 135:15, 135:22, 135:25, 136:11, 137:2, 137:12
**continue** [8] - 23:21, 25:13, 27:11, 60:1, 62:25, 96:20, 107:14, 120:9
**continued** [3] - 63:16, 113:22, 113:23
**contract** [3] - 114:20, 132:9, 132:14
**contracted** [1] - 106:21
**contractor** [1] - 109:13
**contradict** [3] - 56:13, 57:17, 99:9
**contradicted** [2] - 62:1, 62:3
**conversation** [12] - 10:3, 97:22, 99:12, 107:23, 109:14, 151:12, 157:23, 159:2, 159:14, 161:13, 163:11, 164:23
**conversations** [3] - 25:3, 48:9, 166:7
**conveying** [1] - 22:4
**convicted** [1] - 15:19
**coordinator** [2] - 126:7, 126:22
**copied** [1] - 96:2
**copy** [6] - 23:16, 76:9, 139:13, 141:25, 172:21, 175:7
**copying** [1] - 23:10
**corner** [1] - 175:9
**correct** [103] - 22:23, 24:7, 35:7, 38:19, 51:9, 82:14, 84:22, 111:24, 112:7, 112:8, 112:9, 112:22, 114:8, 119:9, 122:17, 122:21, 123:2, 123:8, 123:12, 123:18, 126:17, 126:22, 127:14, 127:18, 128:5, 128:14, 128:24, 129:3, 129:7, 129:10, 129:22, 130:12, 130:15, 130:20, 130:23, 131:3, 132:8, 132:23, 135:1, 143:7, 143:24, 144:5, 145:12, 147:2, 147:10, 148:7, 148:16, 149:20, 150:13, 150:17, 151:5, 151:19, 152:1, 152:2, 153:5, 153:6, 153:10, 153:11, 153:15, 154:22, 155:3, 155:8, 155:13, 155:18, 155:23, 156:2, 156:3, 156:9, 156:10, 156:25, 157:7, 158:6, 158:8, 158:20, 159:2, 160:21, 161:15, 161:20, 163:17, 163:18, 165:21, 166:16, 166:17, 167:25, 168:4, 168:5, 170:16, 171:8, 171:17, 173:3, 173:5, 173:12, 175:4, 176:8, 176:22, 177:3, 177:8, 177:9, 178:3, 178:9, 181:16, 181:19, 181:20
**corresponded** [1] - 160:9
**correspondence** [3] - 155:12, 158:5, 162:24
**corroborates** [1] - 105:23
**Cosmetic** [1] - 45:4
**cost** [2] - 129:11, 129:13
**counsel** [12] - 5:2, 5:16, 44:19, 59:4, 59:18, 66:17, 124:22, 125:6, 145:22, 173:25, 180:6, 181:13
**counterfeit** [1] - 45:5
**counterfeiting** [2] - 15:5, 15:19
**couple** [7] - 35:9, 39:24, 111:20, 119:24, 123:4, 130:17, 175:15
**course** [4] - 108:20, 146:18, 149:19, 168:16
**COURT** [133] - 1:1, 5:2, 5:10, 5:16, 5:21, 9:5, 10:10, 14:18, 16:9, 19:22, 27:1, 28:20, 32:18, 32:20, 32:25, 33:3, 40:7, 43:20, 44:7, 44:24, 47:21, 48:3, 48:12, 48:25, 50:13, 51:23, 54:10, 55:2, 56:20, 56:23, 57:2, 57:4, 57:6, 57:8, 58:5, 58:9, 58:14, 58:16, 58:18, 58:20, 58:25, 59:3, 59:7, 59:12, 59:18, 59:23, 60:1, 60:14, 62:17, 64:16, 66:10, 69:24, 70:8, 72:12, 73:19, 74:9, 74:19, 75:5, 77:13, 79:22, 80:18, 81:15, 83:18, 86:1, 91:16, 92:7, 93:20, 94:1, 96:12, 101:14, 101:19, 101:24, 102:5, 102:17, 102:21, 103:18, 104:6, 105:25, 106:4, 111:2, 111:4, 113:7, 115:22, 117:9, 118:4, 118:8, 118:15, 118:20, 119:13, 120:3, 121:23, 124:3, 124:6, 124:13, 124:15, 124:19, 124:22, 125:3, 125:6, 125:11, 125:17, 134:10, 134:20, 135:3, 135:16, 144:2, 145:8, 145:23, 146:20, 149:10, 149:14, 155:16, 161:18, 167:2, 169:9, 170:13, 173:19, 176:24, 177:16, 177:22, 178:11, 178:19, 179:5, 179:14, 180:8, 180:22, 181:4, 181:6, 181:9, 181:16, 181:21, 182:1, 182:2
**court** [1] - 124:24
**Court** [11] - 2:3, 2:4, 5:1, 5:5, 58:17, 58:23, 59:7, 124:17, 181:10, 182:11, 182:12
**Courthouse** [1] - 182:13
**Courtney** [2] - 171:2, 171:10
**courtroom** [1] - 115:16
**cover** [1] - 23:3
**COVID** [5] - 108:13, 149:3, 149:6, 149:12, 171:20
**coworker** [4] - 104:3, 114:17, 122:6, 127:25
**create** [1] - 92:24
**created** [1] - 176:7
**crime** [2] - 121:14, 121:17
**crimes** [1] - 113:14
**criminal** [3] - 41:4, 45:4, 45:12
**criminally** [1] - 121:13
**Cross** [5] - 34:17, 34:23, 34:24, 35:5, 41:14
**CROSS** [2] - 3:4, 111:5
**cross** [1] - 92:7
**CROSS-EXAMINATION** [2] - 3:4, 111:5
**cross-examine** [1] - 92:7
**current** [1] - 11:10
**customer** [31] - 29:16, 29:18, 29:20, 31:1, 35:9, 36:14, 36:16, 36:20, 39:4, 39:11,

41:18, 42:8, 42:17, 49:5, 49:8, 49:25, 50:19, 51:6, 51:17, 52:2, 53:11, 60:8, 64:6, 64:20, 65:14, 65:17, 67:4, 75:17, 126:14, 126:16, 126:24
**Customer** [1] - 56:18
**customer's** [1] - 128:14
**customers** [26] - 31:1, 31:6, 37:6, 50:2, 50:7, 61:16, 65:2, 78:9, 81:4, 82:1, 82:2, 82:4, 84:9, 84:12, 84:14, 84:23, 99:5, 99:25, 100:2, 100:4, 126:18, 127:4, 130:19, 163:1, 168:24
**Customers** [1] - 81:19

## D

**d/b/a** [1] - 53:13
**daily** [3] - 144:22, 148:9, 148:11
**Dakota** [24] - 7:2, 7:4, 8:18, 8:23, 8:25, 9:3, 9:11, 9:24, 10:19, 11:23, 12:1, 18:6, 24:6, 30:17, 31:9, 51:8, 52:12, 52:23, 87:18, 95:16, 104:3, 152:15, 157:20, 164:25
**Damage** [1] - 88:5
**database** [1] - 142:1
**databases** [1] - 129:14
**date** [14] - 27:7, 29:1, 34:9, 36:1, 42:15, 43:18, 63:22, 67:10, 81:23, 98:6, 98:8, 137:16, 143:12
**DATE** [1] - 182:10
**dates** [1] - 98:3
**days** [6] - 11:18, 23:6, 31:16, 62:10, 73:12, 142:25
**DBs** [1] - 54:13
**DEA** [1] - 150:10
**deal** [2] - 67:19, 115:4
**dealing** [5] - 122:19, 148:6, 151:11, 165:16, 179:18
**dealt** [2] - 168:10, 168:23
**Dear** [2] - 53:12, 81:18
**dear** [1] - 56:18
**December** [6] - 34:12, 34:14, 53:16, 56:2, 98:4, 107:24
**decided** [1] - 112:7
**decision** [3] - 53:21, 147:9
**decisions** [5] - 76:23, 103:3, 109:18, 109:19, 109:21
**decline** [1] - 87:11
**declined** [2] - 41:7, 41:21
**DEFENDANT** [2] - 1:18, 1:22
**defendant** [2] - 63:19, 121:20
**defendant's** [1] - 62:21
**defendants** [23] - 5:3, 8:25, 9:7, 9:13, 11:17, 16:19, 16:22, 18:24, 19:2, 25:13, 27:11, 35:8, 43:3, 45:16, 59:4, 63:9, 63:23, 84:2, 105:19, 106:13, 107:12, 110:13, 124:23
**Defendants** [1] - 1:8
**defense** [2] - 57:1, 181:13
**definitely** [3] - 109:7, 109:10, 143:3
**degree** [1] - 123:6
**delay** [1] - 7:4
**delivered** [1] - 87:5
**delivery** [1] - 87:20
**demand** [3] - 27:21, 27:23, 45:16
**departed** [1] - 109:12
**department** [7] - 117:4, 117:7, 118:10, 118:23, 119:23, 120:12, 120:16
**Department** [5] - 117:5, 120:10, 121:2, 121:12, 142:4
**departments** [1] - 119:7
**departure** [1] - 112:12
**deposition** [1] - 180:3
**DerOvanesian** [1] - 1:14
**describe** [2] - 115:18, 134:14
**Description** [1] - 3:9
**description** [1] - 86:15
**designed** [1] - 129:19
**despite** [5] - 12:14, 25:18, 25:23, 31:3, 107:15
**destroy** [1] - 49:16
**detail** [1] - 138:10
**details** [3] - 24:20, 64:21, 120:8
**determine** [1] - 47:7
**determined** [1] - 77:22
**developed** [1] - 117:19
**devices** [1] - 176:2
**Devices** [1] - 176:11
**Diego** [3] - 52:4, 53:13, 158:2
**differences** [1] - 149:24
**different** [26] - 8:12, 12:22, 30:11, 40:18, 69:12, 69:22, 100:22, 105:20, 111:25, 128:13, 129:6, 129:8, 129:20, 140:19, 141:19, 144:12, 144:13, 145:4, 147:19, 148:20, 166:9, 167:25, 173:17, 175:15
**differently** [1] - 149:18
**difficult** [3] - 117:21, 132:2, 132:4
**difficulty** [1] - 137:23
**diligence** [2] - 23:18, 23:22
**dime** [1] - 116:4
**DIMITROULEAS** [1] - 1:10
**Dimitrouleas** [1] - 2:4
**direct** [5] - 5:24, 135:5, 135:18, 144:4, 169:13
**DIRECT** [2] - 3:3, 6:6
**directed** [1] - 77:24
**directly** [14] - 12:15, 15:11, 74:7, 74:13, 76:5, 105:15, 116:15, 131:13, 134:25, 160:9, 160:13, 168:10, 168:23, 169:20
**director** [8] - 63:3, 74:6, 74:11, 87:13, 89:6, 95:24, 101:21, 102:2
**dirty** [2] - 168:6, 168:14
**discovered** [6] - 167:9, 170:4, 179:16, 179:24, 180:11, 180:18
**discrepancies** [3] - 52:11, 52:16, 53:17
**discrepant** [1] - 64:22
**discuss** [9] - 5:22, 58:11, 58:21, 59:24, 124:10, 124:15, 125:12, 180:24, 181:6
**discussed** [8] - 5:22, 58:12, 59:24, 72:7, 103:5, 124:11, 125:12, 180:24
**discussing** [3] - 37:25, 104:11, 161:2
**discussion** [9] - 29:5, 66:23, 86:10, 132:12, 156:17, 157:7, 157:9, 159:8, 163:12
**discussions** [3] - 151:17, 157:5, 160:4
**dispensed** [1] - 65:18
**disregard** [1] - 103:3
**distribute** [1] - 52:19
**Distribution** [2] - 53:13, 53:19
**distributor** [8] - 20:16, 21:2, 49:18, 67:10, 67:12, 72:17, 88:9, 151:5
**Distributor** [1] - 17:9
**District** [3] - 2:4, 182:12, 182:12
**DISTRICT** [3] - 1:1, 1:2, 1:11
**Divilio** [26] - 5:12, 6:20, 26:7, 27:5, 36:25, 39:19, 44:10, 49:24, 58:20, 59:5, 59:14, 60:5, 60:21, 62:20, 64:5, 72:15, 79:5, 80:8, 100:21, 102:20, 103:22, 106:9, 124:15, 125:4, 154:20, 181:6
**DIVILIO** [2] - 3:3, 6:3
**DIVISION** [1] - 1:2
**DMS** [9] - 7:12, 8:5, 8:12, 10:15, 11:11, 12:16, 12:20, 17:17
**Document** [4] - 3:10, 3:15, 27:2, 80:19
**document** [15] - 7:22, 24:9, 39:22, 44:22, 67:9, 77:23, 81:20, 139:4, 151:24, 156:24, 161:16, 167:24, 168:4, 181:14, 181:18
**documentation** [2] - 61:4, 78:7
**documenting** [2] - 123:12, 123:14
**documents** [10] - 12:21, 15:6, 23:19, 82:7, 95:19, 99:21, 100:2, 150:20, 150:23, 154:25
**Documents** [2] - 3:16, 181:22
**DOJ** [3] - 120:25, 121:1, 121:4
**domestic** [2] - 73:3, 73:8
**done** [5] - 21:6, 119:16, 123:15, 123:17, 124:8
**door** [5] - 19:4, 19:7, 19:9, 114:8, 119:8
**doubt** [1] - 135:11
**down** [47] - 12:6, 14:21, 17:24, 26:4, 28:4, 34:5, 36:1, 39:5, 45:23, 45:24, 45:25, 57:10, 60:18, 64:2, 65:24, 66:20, 66:21, 69:10, 70:10, 71:13, 73:10, 76:25, 78:2, 78:21, 81:5, 81:7, 83:7, 86:24, 88:8, 88:11, 88:21, 90:2, 90:14, 92:12, 96:23, 97:17, 97:19, 97:21, 100:18, 104:20, 134:17, 150:1, 157:21, 169:1, 175:17
**Downstream** [1] - 53:18
**dozen** [1] - 121:9
**dramatic** [1] - 149:7
**Dresser** [1] - 133:3
**Drogueria** [8] - 13:3, 13:14, 13:16, 13:22, 17:10, 52:25, 53:3, 53:20
**drop** [1] - 175:17
**drop-down** [1] - 175:17
**drug** [10] - 35:14, 38:24, 39:19, 40:16, 40:18, 43:3, 80:2, 94:18, 156:13
**Drug** [6] - 4:11, 40:8, 45:4, 77:20, 78:4, 93:5
**Drugs** [1] - 176:10
**drugs** [30] - 8:19, 9:1, 9:8, 9:13, 15:5, 15:19, 16:20, 16:23, 25:14, 34:24, 35:6,

42:18, 45:6, 63:24, 75:22, 76:4, 84:2, 87:6, 87:13, 93:2, 97:16, 97:17, 99:2, 99:10, 100:14, 101:1, 101:12, 101:22, 102:8, 176:2
**due** [4] - 23:18, 23:22, 52:6, 178:25
**duly** [2] - 6:4, 67:20
**duped** [3] - 179:16, 179:22, 180:18
**during** [11] - 48:5, 58:20, 67:22, 82:5, 101:16, 102:1, 102:23, 108:6, 143:12, 149:3, 150:24
**duties** [2] - 127:16, 127:17

**E**

**e-Pharm/alert** [5] - 60:21, 62:21, 66:15, 158:14, 159:1
**early** [1] - 89:14
**easier** [1] - 166:22
**East** [1] - 182:13
**Easton** [3] - 117:5, 120:9, 148:21
**Ecumenic** [1] - 129:15
**Edel** [2] - 49:13, 50:17
**effective** [1] - 53:16
**efficient** [1] - 83:5
**effort** [1] - 21:10
**efforts** [3] - 96:17, 96:21, 165:10
**either** [4] - 142:2, 151:25, 162:24, 172:17
**elaborate** [2] - 64:23, 99:17
**ELMO** [2] - 134:19, 169:2
**Email** [33] - 3:11, 3:12, 3:13, 3:14, 3:17, 3:18, 3:19, 3:20, 3:21, 3:22, 3:23, 3:24, 3:25, 4:1, 4:3, 4:12, 14:19, 41:3, 44:8, 49:1, 50:14, 51:24, 54:11, 55:3, 57:9, 58:6, 60:15, 62:18, 64:17, 72:13, 79:23, 81:16, 93:21
**email** [108] - 6:20, 7:2, 7:5, 8:2, 8:6, 8:10, 8:12, 9:2, 9:16, 9:25, 10:15, 11:4, 11:18, 12:10, 14:11, 14:22, 15:21, 16:19, 16:22, 17:3, 22:13, 22:18, 22:20, 22:25, 23:9, 23:25, 24:3, 24:13, 24:15, 25:4, 34:13, 38:7, 38:11, 41:15, 43:18, 43:24, 43:25, 44:13, 45:11, 46:2, 46:21, 47:11, 47:19, 50:18, 51:3, 51:9, 51:16, 54:3, 54:13, 54:20, 55:12, 55:17, 56:4, 56:13, 56:17, 57:18, 57:23, 60:5, 61:3, 62:10, 64:5, 68:5, 68:11, 68:13, 68:25, 69:1, 69:8, 69:10, 69:12, 69:15, 70:13, 72:3, 74:4, 78:11, 78:14, 79:5, 80:1, 81:3, 83:10, 84:12, 91:23, 93:1, 93:13, 97:7, 110:15, 151:3, 151:7, 152:13, 153:16, 155:2, 155:22, 157:20, 158:12, 159:6, 159:23, 160:2, 160:12, 160:17, 162:23, 171:2, 171:11, 171:17, 171:25, 173:9, 173:18
**emailed** [2] - 41:17, 163:1
**emailing** [1] - 84:8
**Emails** [2] - 4:2, 10:11
**emails** [18] - 9:8, 17:3, 22:14, 25:14, 29:3, 32:14, 48:18, 49:24, 54:2, 54:21, 71:3, 96:7, 122:12, 132:25, 144:15, 164:2, 165:4, 170:7
**Emin** [1] - 88:14
**employ** [2] - 7:6, 111:25
**employed** [3] - 110:12, 111:23, 129:5
**employee** [1] - 70:4
**employees** [3] - 85:11, 130:10, 154:8
**employer** [1] - 108:24
**employment** [3] - 101:10, 101:17, 107:25
**end** [6] - 22:14, 49:19, 96:21, 100:8, 108:21, 109:21
**ended** [1] - 156:17
**engage** [1] - 53:15
**ensure** [2] - 72:17, 75:18
**entered** [1] - 57:12
**enters** [3] - 5:15, 59:17, 125:5
**Entin** [1] - 182:10
**ENTIN** [2] - 2:3, 182:11
**entities** [1] - 94:16
**entitled** [1] - 182:8
**entity** [1] - 143:15
**equivalent** [3] - 72:23, 72:24, 137:2
**error** [3] - 49:16, 49:19, 175:21
**escalated** [1] - 65:19
**especially** [1] - 12:2
**Esquire** [5] - 1:13, 1:14, 1:18, 1:18, 1:22
**essentially** [2] - 175:17, 175:25
**established** [1] - 173:17
**establishes** [1] - 45:4
**estimate** [1] - 118:25
**et** [1] - 86:6
**Eurofins** [1] - 114:20
**evening** [2] - 180:23, 181:2
**events** [2] - 124:1, 134:14
**eventually** [1] - 107:19
**Evidence** [31] - 10:12, 14:19, 19:24, 27:3, 28:22, 40:9, 44:8, 49:1, 50:15, 51:24, 54:11, 55:3, 57:9, 58:6, 60:15, 62:18, 64:18, 66:12, 72:13, 73:21, 75:7, 77:14, 79:23, 80:20, 81:16, 83:20, 86:3, 93:21, 103:20, 106:6, 181:23
**evidence** [57] - 6:18, 12:6, 14:15, 17:1, 18:1, 19:19, 21:24, 23:7, 26:22, 28:16, 31:12, 33:5, 35:20, 38:5, 40:4, 43:14, 43:20, 44:3, 45:21, 48:22, 50:10, 51:19, 54:7, 54:24, 56:8, 56:20, 56:24, 57:11, 58:2, 60:10, 60:19, 62:14, 64:12, 66:6, 70:10, 72:9, 75:2, 77:10, 79:19, 80:14, 81:12, 83:14, 85:22, 88:2, 92:3, 93:17, 94:7, 95:14, 96:11, 96:12, 97:14, 100:19, 102:12, 103:14, 106:2, 181:14, 181:18
**evolving** [1] - 128:8
**exact** [5] - 99:21, 118:24, 137:16, 143:12, 180:2
**exactly** [5] - 85:10, 120:8, 131:22, 135:13, 137:24
**EXAMINATION** [4] - 3:3, 3:4, 6:6, 111:5
**examination** [1] - 5:25
**examine** [1] - 92:7
**examined** [1] - 6:4
**example** [14] - 18:23, 20:22, 32:22, 65:8, 98:10, 128:13, 134:17, 135:11, 135:18, 136:2, 137:8, 138:2, 138:17, 146:12
**except** [1] - 13:2
**exception** [1] - 103:6
**exceptions** [2] - 76:18, 76:21
**exchange** [7] - 11:18, 14:11, 15:22, 16:19, 16:22, 20:3, 33:11
**exchanges** [4] - 33:9, 37:19, 90:25, 93:1
**exclamation** [1] - 88:18
**excuse** [1] - 143:25
**exhausted** [1] - 109:9
**exhausting** [1] - 109:8
**Exhibit** [108] - 6:18, 9:22, 10:7, 11:15, 12:6, 14:9, 14:15, 15:13, 15:24, 16:2, 16:11, 17:1, 17:25, 19:13, 19:19, 21:24, 23:7, 25:9, 26:5, 26:23, 28:11, 28:17, 31:12, 33:5, 34:7, 35:20, 38:5, 39:17, 40:4, 43:11, 43:22, 44:3, 45:21, 48:16, 48:22, 49:22, 50:10, 51:14, 51:20, 53:25, 54:7, 54:18, 54:24, 56:8, 57:11, 57:21, 58:2, 60:3, 60:11, 60:19, 62:8, 62:14, 64:3, 64:13, 66:1, 66:7, 69:5, 70:10, 71:7, 72:1, 72:9, 73:10, 73:16, 74:21, 75:2, 77:1, 77:10, 79:3, 79:19, 80:6, 80:15, 81:1, 81:12, 83:8, 83:15, 85:17, 85:23, 88:2, 89:22, 93:11, 93:17, 94:8, 95:14, 96:5, 96:11, 97:14, 100:19, 102:11, 103:9, 103:15, 105:7, 105:13, 106:3, 150:25, 151:15, 151:21, 152:10, 152:21, 153:2, 153:7, 153:17, 155:25, 156:4, 159:4, 167:3, 170:19, 171:2, 181:15
**exhibit** [6] - 15:25, 16:7, 40:24, 57:6, 97:25, 160:24
**existing** [1] - 7:8
**exit** [1] - 109:12
**exits** [4] - 58:15, 58:19, 124:14, 181:5
**expect** [3] - 10:17, 22:8, 87:22
**expected** [5] - 13:6, 67:11, 89:5, 101:21, 117:16
**expensive** [1] - 129:14
**experience** [9] - 33:25, 47:17, 48:8, 63:3, 63:8, 106:17, 122:23, 123:1, 123:5
**experienced** [1] - 127:4
**experiencing** [1] - 7:17
**expiration** [1] - 67:10
**explain** [4] - 130:2, 135:8, 135:12, 175:5
**explained** [1] - 21:12
**explanation** [2] - 10:21, 21:6
**explicit** [2] - 25:7, 72:20
**explicitly** [4] - 133:25, 134:1, 134:2, 134:7
**exposure** [1] - 74:15
**extractions** [1] - 159:18
**eye** [3] - 109:4, 111:11, 111:12

## F


facilities [1] - 95:21
facility [1] - 71:1
fact [8] - 24:5, 111:14, 142:25, 146:22, 148:9, 148:18, 149:3, 150:19
factually [1] - 170:1
fair [19] - 46:15, 113:5, 114:5, 114:22, 116:20, 120:22, 123:20, 128:8, 128:20, 132:2, 137:1, 137:18, 138:13, 138:19, 139:1, 139:10, 139:20, 148:4, 148:12
fairly [1] - 89:14
false [26] - 7:13, 7:19, 17:17, 20:10, 21:2, 25:24, 27:17, 30:21, 30:22, 38:1, 41:4, 61:10, 61:13, 85:2, 90:5, 90:11, 92:10, 93:5, 94:11, 95:2, 95:3, 95:7, 138:4, 170:5, 180:1
falsified [4] - 78:5, 78:6, 100:4, 175:25
falsifying [2] - 12:21, 15:6
familiar [2] - 86:5, 129:17
family [3] - 108:16, 108:21, 109:11
far [34] - 7:17, 17:9, 20:20, 21:10, 31:6, 37:13, 38:21, 38:24, 39:2, 40:21, 41:24, 45:15, 46:10, 52:12, 52:15, 52:18, 61:16, 72:20, 73:1, 76:4, 86:20, 86:21, 99:4, 103:23, 104:13, 120:22, 127:2, 131:14, 132:13, 138:1, 140:23, 162:4, 164:5, 164:8
fashion [2] - 33:23, 33:24
favor [1] - 169:1
favorites [1] - 154:7
FDA [27] - 3:15, 7:11, 12:20, 37:2, 37:14, 38:25, 39:20, 41:24, 42:15, 43:16, 44:10, 45:16, 46:12, 46:17, 46:20, 47:2, 47:7, 47:12, 47:16, 47:24, 78:8, 78:13, 79:5, 80:19, 131:25, 157:9
FDA's [1] - 80:8
fear [1] - 118:12
fearful [1] - 118:16
February [6] - 45:22, 46:8, 47:12, 48:19, 60:6
Federal [3] - 1:22, 45:3, 182:13
federal [8] - 114:7, 114:11, 114:18, 115:2, 115:5, 117:7, 118:11, 118:23
feds [2] - 104:19, 114:14
feelings [3] - 10:22, 118:1, 143:3
felt [8] - 109:24, 109:25, 110:23, 113:1, 143:1, 144:5, 145:3, 146:5
few [12] - 20:5, 23:6, 29:2, 62:10, 73:12, 78:1, 111:25, 116:2, 129:8, 135:5, 137:11, 175:17
figure [2] - 91:9, 172:17
figured [1] - 116:16
file [1] - 43:3
filed [3] - 12:20, 46:13, 47:12
filing [2] - 41:9, 45:16
fill [2] - 78:13, 142:12
filled [2] - 46:20, 142:21
filling [1] - 23:24
final [1] - 147:8
Finally [1] - 77:17
finally [1] - 145:23
financial [1] - 132:13
fine [3] - 56:23, 87:8, 87:10
finger [1] - 22:16
finished [1] - 132:11
firm [1] - 132:17
firms [4] - 111:20, 111:22, 112:1, 129:8
first [31] - 6:4, 7:5, 15:9, 15:22, 16:12, 17:17, 18:4, 20:23, 22:20, 32:5, 67:8, 102:16, 114:14, 118:6, 119:21, 122:20, 126:3, 128:10, 138:3, 139:2, 139:10, 139:18, 142:14, 143:8, 161:4, 161:8, 169:23, 171:3, 176:6, 180:25
fit [2] - 108:1, 108:15
five [5] - 58:17, 77:19, 120:22, 121:7, 136:24
fix [2] - 71:2, 71:12
Fl [1] - 1:22
flagged [1] - 110:5
flipping [1] - 98:23
Flores [1] - 1:19
FLORIDA [1] - 1:2
Florida [6] - 1:4, 1:16, 1:20, 1:23, 182:12, 182:14
Flowers [12] - 8:18, 8:23, 8:25, 9:11, 9:24, 11:23, 50:25, 95:16, 104:3, 152:15, 157:20, 164:25
foil [2] - 88:18, 163:22
foiling [1] - 88:25
follow [8] - 5:21, 54:2, 59:23, 125:11, 130:6, 130:11, 132:2, 132:4
follow-up [1] - 54:2
followed [1] - 102:23
following [2] - 59:2, 124:21
follows [1] - 6:5
Food [1] - 45:4
FOR [3] - 1:13, 1:18, 1:22
forcing [1] - 146:15
foregoing [1] - 182:6
foremost [1] - 176:6
form [11] - 40:16, 42:1, 43:17, 44:10, 46:12, 46:17, 46:20, 74:8, 76:8, 78:13, 80:2
Form [2] - 4:11, 40:8
format [1] - 32:15
former [2] - 55:7, 108:24
forms [3] - 39:20, 43:4, 45:16
FORT [1] - 1:2
Fort [3] - 1:4, 1:23, 182:14
forth [2] - 16:6, 109:23
forward [5] - 7:15, 9:1, 9:7, 94:13, 167:12
forwarded [3] - 10:15, 27:18, 170:7
forwards [2] - 171:24
four [2] - 120:17, 121:7
FPR [2] - 2:3, 182:11
frame [2] - 42:10, 179:19
Francisco [1] - 12:23
fraudulent [7] - 22:16, 156:18, 174:22, 176:7, 177:13, 179:17, 179:23
free [2] - 88:5, 89:25
frequently [1] - 144:22
friend [3] - 122:4, 122:6, 122:14
friend's [1] - 133:5
friends [1] - 122:7
Frier [13] - 24:14, 25:5, 27:20, 71:20, 72:3, 72:6, 72:15, 73:25, 74:3, 132:18, 132:22, 133:18, 161:24
front [1] - 38:7
full [1] - 24:19
funny [1] - 109:4


## G


gain [1] - 109:7
Garrett [4] - 17:15, 88:4, 103:12, 163:21
gears [1] - 80:22
general [4] - 10:22, 71:23, 170:22, 170:23
generalized [1] - 65:6
generally [3] - 100:25, 104:2, 116:19
generated [2] - 144:23, 162:8
generic [2] - 8:9, 110:6
Gentek [34] - 35:16, 49:11, 50:17, 50:22, 51:1, 51:4, 51:9, 52:3, 52:10, 52:11, 52:16, 52:20, 52:21, 52:22, 52:25, 53:6, 53:19, 55:7, 55:20, 56:2, 56:10, 56:11, 57:14, 62:1, 62:3, 76:15, 82:19, 113:12, 113:21, 136:4, 137:10, 142:17, 146:11, 157:14
Gentek's [1] - 157:22
Gilead [40] - 16:15, 16:17, 22:8, 22:9, 27:15, 30:1, 30:3, 31:3, 31:5, 31:8, 34:17, 34:23, 34:25, 35:6, 42:2, 42:9, 44:19, 46:6, 55:6, 55:13, 55:17, 55:20, 60:21, 61:5, 61:23, 62:21, 77:18, 77:19, 77:22, 78:10, 78:14, 90:18, 92:10, 93:4, 95:6, 103:23, 104:14, 104:18, 158:13, 158:14
Gilead's [8] - 13:4, 55:8, 55:11, 55:21, 63:20, 66:14, 66:17, 77:23
girl [1] - 122:6
given [3] - 24:25, 91:3, 117:18
Global [2] - 88:5, 163:21
glossed [1] - 65:13
Gmail [3] - 8:10, 8:16, 24:5
Gmail.com [1] - 22:22
googled [1] - 15:1
Gould [1] - 34:10
government [1] - 121:8
GOVERNMENT [1] - 1:13
Government [40] - 10:6, 14:14, 19:18, 26:22, 28:16, 40:4, 44:3, 48:21, 50:3, 50:9, 51:19, 54:6, 54:24, 58:1, 60:10, 62:13, 64:12, 66:6, 72:9, 73:15, 75:1, 77:9, 79:18, 79:19, 80:14, 81:11, 83:14, 85:22, 93:16, 96:10, 103:14, 105:12, 106:2, 150:23, 151:24, 154:25, 163:9, 164:3, 167:5, 169:13
Government's [165] - 3:10, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:17, 3:18, 3:19, 3:20, 3:21, 3:22, 3:23, 3:24, 3:25, 4:1, 4:2, 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 6:17, 9:22, 10:7, 10:11, 11:14, 12:5, 14:9, 14:15, 14:19, 15:13, 16:11, 17:1, 17:25, 19:13,

19:19, 19:23, 21:24, 23:7, 25:9, 26:5, 26:23, 27:2, 28:11, 28:17, 28:21, 31:11, 33:5, 34:7, 35:20, 38:4, 39:17, 40:4, 40:8, 43:10, 43:22, 44:3, 44:8, 45:21, 48:16, 48:22, 49:1, 49:22, 50:10, 50:14, 51:14, 51:20, 51:24, 53:25, 54:7, 54:11, 54:18, 54:24, 55:3, 56:8, 57:9, 57:11, 57:21, 58:2, 58:6, 60:3, 60:11, 60:15, 60:19, 62:8, 62:14, 62:18, 64:3, 64:13, 64:17, 65:25, 66:7, 66:11, 69:4, 70:9, 71:7, 72:1, 72:9, 72:13, 73:10, 73:16, 73:20, 74:21, 75:2, 75:6, 77:1, 77:10, 77:14, 79:3, 79:23, 80:6, 80:15, 80:19, 81:1, 81:12, 81:16, 83:8, 83:15, 83:19, 85:17, 85:23, 86:2, 88:1, 89:21, 93:11, 93:17, 93:21, 94:8, 95:14, 96:5, 96:11, 97:14, 100:19, 102:11, 103:9, 103:15, 103:19, 105:7, 105:13, 106:3, 106:5, 150:25, 151:15, 151:21, 152:10, 152:20, 153:2, 153:7, 153:17, 155:25, 156:4, 170:19, 171:2, 181:15, 181:22

**great** [4] - 51:12, 109:11, 117:24, 138:10
**greatest** [1] - 93:24
**greatly** [2] - 96:20, 165:13
**Group** [20] - 6:10, 6:11, 6:13, 7:8, 7:12, 8:19, 11:17, 11:20, 12:22, 12:25, 13:14, 16:16, 20:19, 21:17, 27:12, 27:21, 86:12, 137:9, 137:10, 137:21
**group** [2] - 106:21, 154:8
**groups** [1] - 24:18
**guess** [19] - 10:2, 13:6, 21:12, 32:15, 34:2, 54:15, 107:24, 108:5, 108:8, 112:15, 135:22, 142:11, 142:21, 146:17, 148:24, 148:25, 152:6, 164:16, 171:3
**guidance** [1] - 132:23
**guide** [2] - 109:21, 128:22
**guided** [1] - 76:22
**guideline** [1] - 72:20
**guidelines** [1] - 130:6
**guilty** [2] - 15:5, 15:19

## H

**habitual** [1] - 138:1
**Hacksaw** [1] - 156:8
**half** [2] - 46:12, 46:21
**Hammett** [9] - 74:24, 75:11, 122:8, 122:10, 122:13, 128:3, 133:6, 159:23, 161:7
**Hammett's** [1] - 122:12
**hand** [1] - 175:9
**handled** [2] - 65:21, 168:8
**happy** [2] - 30:2, 135:25
**Happy** [1] - 51:8
**hard** [2] - 13:1, 39:8
**harm** [1] - 47:8
**Harvoni** [2] - 36:17, 37:13
**Health** [1] - 142:4
**health** [2] - 108:8, 109:7
**heard** [5] - 68:3, 86:8, 117:25, 129:16, 138:11
**hearing** [2] - 124:8, 125:18
**hearsay** [2] - 104:5, 105:20
**heavily** [1] - 128:22
**held** [1] - 141:20
**Hello** [2] - 7:4, 171:7
**help** [12] - 21:10, 33:14, 33:22, 50:23, 51:12, 122:16, 129:2, 132:5, 132:8, 132:10, 150:21
**hereby** [1] - 182:6
**hi** [1] - 51:8
**high** [1] - 36:10
**higher** [1] - 37:10
**highlight** [1] - 45:3
**highlighted** [2] - 45:8, 45:12
**Highway** [1] - 1:22
**himself** [1] - 93:3
**hire** [4] - 110:13, 111:19, 112:22, 113:1
**hired** [1] - 126:6
**history** [11] - 7:9, 7:18, 11:10, 24:11, 30:24, 53:17, 84:18, 87:4, 92:20, 94:24, 100:1
**HIV** [37] - 6:10, 8:19, 9:1, 9:8, 9:13, 16:19, 16:23, 18:13, 18:23, 19:4, 25:14, 27:12, 28:8, 29:8, 29:10, 31:5, 49:12, 63:14, 63:23, 75:22, 76:4, 76:18, 76:21, 82:1, 83:3, 84:2, 84:16, 87:5, 87:13, 98:10, 102:24, 103:6, 104:10, 105:3, 143:1, 144:19, 144:21
**hold** [7] - 72:24, 125:18, 129:21, 131:22, 141:17, 141:18, 175:10
**holds** [1] - 72:22
**home** [10] - 114:10, 114:11, 148:23, 150:3, 150:7, 150:9, 150:13, 150:17, 171:20
**honestly** [1] - 117:16
**Honor** [41] - 5:7, 5:9, 5:18, 5:20, 6:1, 9:4, 28:23, 32:17, 32:24, 44:4, 57:1, 57:5, 58:7, 59:6, 59:9, 59:10, 59:11, 59:20, 59:22, 60:13, 91:13, 92:1, 96:13, 102:18, 105:15, 111:1, 124:25, 125:2, 125:8, 125:10, 125:14, 125:16, 125:22, 134:19, 169:7, 169:10, 172:11, 173:16, 180:20, 181:12, 181:24
**Honorable** [1] - 2:4
**HONORABLE** [1] - 1:10
**hope** [2] - 51:8, 57:11
**horrible** [1] - 145:19
**hotel** [2] - 120:13, 120:14
**hour** [1] - 118:25
**hours** [7] - 116:5, 116:22, 117:23, 119:1, 119:2, 119:24, 172:8
**house** [1] - 179:9
**HR** [2] - 109:12, 109:13
**hundreds** [1] - 99:21
**husband** [4] - 122:7, 122:10, 122:14, 133:5

## I

**idea** [2] - 49:17, 145:10
**identified** [5] - 6:14, 13:8, 20:23, 50:7, 104:25
**identify** [3] - 11:23, 22:1, 76:1
**identifying** [1] - 22:25
**ignore** [1] - 32:20
**illegible** [1] - 100:23
**illegitimate** [1] - 78:7
**image** [1] - 38:18
**imagine** [2] - 22:9, 23:3
**imagined** [1] - 162:11
**immediately** [1] - 41:9
**impact** [1] - 149:12
**impacted** [1] - 149:19
**implicitly** [2] - 134:7, 134:24
**importance** [3] - 123:12, 124:1, 134:17
**important** [4] - 123:21, 124:1, 134:14, 151:23
**imported** [1] - 84:21
**impression** [1] - 69:22
**improve** [2] - 128:19, 128:24
**inability** [1] - 99:13
**inadvertently** [1] - 181:14
**inbox** [1] - 81:6
**Inc** [3] - 22:11, 50:20, 53:13
**incident** [1] - 89:18
**incidents** [1] - 136:24
**include** [4] - 43:25, 75:25, 110:4, 160:16
**included** [8] - 24:24, 65:1, 133:15, 152:8, 155:2, 159:8, 159:13, 159:19
**including** [1] - 41:20
**income** [1] - 108:21
**incoming** [2] - 126:14, 126:19
**incomplete** [4] - 22:17, 84:18, 85:1, 85:2
**inconsistent** [7] - 55:8, 55:11, 55:15, 55:18, 55:21, 70:5, 99:9
**incorporated** [1] - 86:22
**incorrect** [6] - 7:10, 11:5, 11:10, 22:13, 24:12, 65:11
**increases** [1] - 116:18
**incredibly** [2] - 108:10, 111:9
**indicates** [1] - 138:19
**indicating** [2] - 14:22, 161:15
**indictment** [1] - 14:4
**individual** [1] - 15:5
**individuals** [1] - 144:24
**industry** [3] - 63:1, 122:22, 128:3
**info** [2] - 38:19, 38:20
**inform** [1] - 55:6
**information** [50] - 6:25, 7:10, 11:5, 12:14, 13:2, 13:7, 13:18, 13:25, 17:19, 21:7, 22:7, 23:25, 24:5, 24:12, 24:20, 24:22, 24:23, 25:1, 50:23, 50:24, 51:1, 53:18, 62:25, 64:11, 73:5, 77:6, 77:18, 77:22, 83:5, 84:21, 84:24, 84:25, 85:2, 87:16, 91:6, 91:8, 91:11, 91:19, 91:22, 92:19, 93:3, 95:18, 109:23, 151:17, 165:21, 166:5, 174:13, 175:18, 175:20
**Information** [1] - 40:25
**informed** [2] - 78:5, 89:5
**infrequently** [1] - 148:12
**inhalation** [1] - 88:24
**initial** [2] - 42:15, 82:6

**inquiry** [1] - 146:15
**inside** [4] - 38:18, 118:12, 118:22, 144:25
**insight** [1] - 67:24
**instance** [2] - 78:25, 135:9
**instances** [2] - 131:9, 131:11
**instead** [4] - 8:10, 65:6, 65:10, 71:20
**intake** [1] - 76:8
**integrity** [1] - 63:7
**intention** [2] - 145:2, 145:7
**intentionally** [1] - 65:13
**intentions** [1] - 145:10
**interact** [2] - 73:2, 148:9
**interactions** [1] - 133:17
**interest** [2] - 110:22, 111:21
**internal** [1] - 144:11
**interpret** [3] - 47:19, 70:1, 74:17
**interrogation** [2] - 119:23, 120:1
**interrupt** [1] - 53:23
**interview** [6] - 109:12, 117:1, 118:22, 119:4, 119:7, 122:4
**introduced** [2] - 56:21, 122:13
**invalid** [1] - 180:11
**inventory** [2] - 97:20, 141:7
**investigation** [1] - 65:22
**investment** [1] - 86:11
**Invicta** [7] - 28:6, 29:5, 31:23, 32:2, 33:14, 33:21, 142:18
**invoice** [2] - 97:8, 97:10
**invoices** [3] - 16:14, 16:16, 95:19
**invoices@safechain** [2] - 171:4, 171:17
**involve** [1] - 49:24
**involved** [16] - 32:11, 39:19, 42:8, 85:12, 127:17, 133:16, 160:4, 161:15, 162:19, 162:24, 163:11, 164:1, 165:3, 168:19, 168:21, 169:4
**involvement** [2] - 147:24, 157:2
**involving** [3] - 39:13, 156:7, 163:17
**IPC** [7] - 36:4, 37:25, 90:4, 90:11, 90:20, 94:10, 95:2
**iPhone** [1] - 156:7
**Ishbay** [3] - 77:7, 161:25, 172:25
**issue** [5] - 7:16, 23:20, 49:4, 52:18, 105:20
**issues** [20] - 12:3, 12:13, 24:11, 30:11, 39:1, 47:3, 52:17, 63:13, 75:25, 87:3, 99:16, 99:18, 99:24, 104:24, 104:25, 117:18, 122:20, 132:1, 151:10, 165:17
**items** [1] - 23:22
**itself** [2] - 44:23, 161:17
**Ivlis** [1] - 1:18

**J**

**Jacqueline** [1] - 1:14
**Janssen** [4] - 38:25, 39:2, 39:13, 40:18
**January** [6] - 56:11, 57:15, 62:4, 85:20, 98:7, 98:9
**Jeffrey** [5] - 7:6, 7:25, 8:2, 8:13, 22:20
**jeffreyandersonms @gmail.com** [1] - 8:4
**Jesse** [12] - 74:24, 75:11, 122:10, 122:12, 122:13, 128:3, 133:3, 133:6, 159:23, 161:2, 161:7, 161:13
**Jessica** [1] - 150:21
**job** [19] - 107:19, 107:25, 108:7, 108:12, 108:15, 108:25, 109:1, 109:23, 116:16, 126:9, 127:11, 127:13, 128:23, 139:15, 139:16, 139:18, 144:21, 176:17
**jobs** [1] - 126:21
**John** [3] - 133:8, 133:19, 160:10
**Johnny** [1] - 159:6
**joined** [1] - 152:15
**joining** [1] - 102:14
**Jon** [3] - 18:9, 18:11, 18:13
**Judge** [24] - 10:9, 19:21, 40:5, 44:5, 44:22, 47:20, 48:2, 48:11, 50:11, 54:16, 69:23, 70:7, 74:8, 74:18, 93:25, 101:13, 101:18, 101:23, 102:4, 102:15, 105:14, 105:22, 125:15, 181:19
**JUDGE** [1] - 1:11
**judge** [3] - 15:24, 57:3, 105:17
**July** [7] - 45:9, 45:11, 79:6, 80:1, 103:11, 151:3, 165:17
**June** [2] - 89:3, 165:17
**jurors** [4] - 5:4, 5:10, 59:12, 125:3
**JURY** [1] - 1:10
**jury** [15] - 5:6, 5:17, 58:9, 58:13, 59:8, 59:19, 124:6, 124:24, 125:7, 130:2, 139:23, 140:16, 175:5, 180:22, 181:5
**Jury** [7] - 5:15, 58:15, 58:19, 59:17, 124:14, 125:5, 182:3
**Justice** [2] - 121:2, 121:12

**K**

**keep** [11] - 45:23, 51:9, 66:20, 81:7, 98:23, 99:4, 99:18, 123:17, 129:10, 129:21, 171:22
**Kelsey** [1] - 30:17
**Kenzi** [1] - 171:24
**key** [1] - 104:22
**Khaim** [4] - 96:7, 159:19, 164:6, 164:10
**Kimchi** [34] - 68:20, 69:19, 69:22, 70:3, 70:13, 71:4, 77:7, 90:10, 93:6, 93:13, 93:24, 94:4, 94:10, 95:10, 95:17, 95:22, 96:16, 96:23, 97:7, 152:17, 153:5, 153:10, 153:14, 155:2, 155:12, 161:25, 164:13, 164:16, 164:23, 164:25, 165:7, 165:25, 166:15, 170:5
**kind** [21] - 32:7, 39:8, 65:8, 67:4, 67:24, 76:18, 82:7, 82:9, 100:3, 108:14, 109:4, 109:17, 116:17, 121:14, 130:10, 131:7, 133:18, 140:14, 142:4, 159:25, 168:18
**kindly** [1] - 165:20
**kinds** [1] - 137:20
**King** [40] - 68:5, 68:18, 68:19, 68:20, 69:19, 69:22, 70:2, 70:3, 70:13, 71:3, 77:7, 90:10, 93:5, 93:13, 93:24, 94:4, 94:10, 95:10, 95:17, 95:22, 96:16, 96:23, 97:6, 152:17, 153:4, 153:10, 153:14, 155:2, 155:12, 161:24, 164:13, 164:16, 164:23, 164:25, 165:7, 165:10, 165:25, 166:15, 170:4
**knocked** [1] - 114:8
**knowing** [1] - 118:10
**knowledge** [5] - 16:16, 128:2, 128:3, 164:6, 164:8
**known** [4] - 87:25, 89:18, 143:15, 178:2
**knows** [1] - 91:16
**Kristin** [1] - 122:8

**L**

**labeled** [2] - 130:3, 156:17
**labeling** [1] - 156:17
**labels** [3] - 100:23, 168:13, 168:18
**laboratory** [6] - 114:21, 123:2, 123:6, 123:11, 123:16, 123:25
**lack** [1] - 138:19
**lane** [1] - 127:14
**language** [10] - 55:11, 55:12, 55:20, 55:22, 65:1, 65:4, 73:3, 134:13, 138:24, 168:25
**large** [1] - 119:4
**last** [6] - 15:3, 31:15, 32:20, 91:21, 111:11
**late** [3] - 39:20, 61:22, 89:3
**latest** [1] - 93:23
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:23, 182:14
**law** [5] - 111:20, 111:22, 111:25, 132:17, 140:23
**laws** [2] - 83:23, 132:1
**lawsuit** [1] - 44:21
**lawyer** [3] - 110:14, 112:4, 112:11
**lawyers** [10] - 24:1, 24:4, 110:16, 111:23, 112:2, 112:21, 112:25, 125:19, 129:6, 133:11
**leading** [1] - 74:8
**learn** [4] - 87:20, 101:6, 101:16, 127:23
**learned** [3] - 85:9, 101:8, 123:10
**learning** [1] - 35:9
**least** [23] - 22:22, 27:5, 28:8, 29:2, 30:21, 31:24, 35:9, 38:11, 41:13, 61:9, 61:16, 64:9, 65:14, 70:5, 75:23, 79:8, 80:11, 84:14, 99:5, 137:2, 141:17, 148:13, 160:13
**leave** [1] - 108:20
**leaving** [6] - 109:16, 155:7, 155:13, 155:14, 155:23, 158:8
**led** [2] - 45:16, 53:20
**leery** [1] - 22:6
**left** [15] - 24:1, 34:6, 38:19, 38:20, 56:14, 56:17, 95:2, 101:8, 110:13, 110:15, 151:9, 157:7, 158:19, 159:1, 175:9
**left-hand** [1] - 175:9
**legal** [12] - 24:18, 24:21, 24:25, 108:5, 110:21, 112:13, 112:15, 112:17, 112:19, 117:18, 129:8, 162:8

**legitimacy** [1] - 95:9
**legitimate** [1] - 65:11
**length** [1] - 118:24
**Letter** [2] - 4:13, 77:14
**letter** [20] - 27:21, 27:23, 44:19, 45:16, 52:4, 53:9, 53:11, 53:12, 61:15, 61:18, 61:19, 61:21, 66:17, 77:3, 110:2, 110:4, 110:6, 158:13, 161:24, 162:6
**letters** [5] - 37:6, 39:4, 39:12, 65:1, 176:9
**letting** [1] - 104:4
**level** [4] - 65:21, 116:17, 118:12, 123:5
**Levitt** [10] - 24:14, 25:5, 27:20, 71:21, 72:3, 72:6, 72:16, 74:3, 132:18, 132:22
**Levitt's** [1] - 161:24
**license** [75] - 67:5, 67:7, 67:8, 67:10, 67:13, 67:14, 67:15, 67:17, 67:19, 67:24, 67:25, 68:6, 71:21, 72:25, 75:14, 75:16, 76:8, 76:9, 76:10, 128:14, 131:7, 131:8, 131:22, 139:11, 139:13, 139:19, 139:22, 139:24, 140:12, 140:14, 140:16, 140:18, 140:19, 140:20, 140:24, 141:1, 141:12, 141:14, 141:24, 142:5, 147:1, 147:5, 160:1, 171:8, 172:1, 172:20, 172:21, 174:8, 174:14, 174:15, 174:18, 174:19, 174:20, 174:22, 174:24, 175:1, 175:6, 175:7, 175:20, 175:21, 175:24, 176:7, 176:15, 176:21, 177:2, 177:3, 178:4, 178:21, 179:1, 179:8, 179:12, 179:17, 179:21, 179:23, 180:11
**licensed** [6] - 67:20, 72:16, 72:17, 72:21, 131:16, 141:15
**licenses** [4] - 126:10, 126:25, 127:4, 141:19
**licensing** [13] - 52:11, 52:15, 52:17, 53:18, 66:24, 67:2, 67:3, 71:22, 72:23, 75:25, 99:24, 122:20, 131:15
**lie** [2] - 166:4, 166:16
**lied** [3] - 166:6, 176:6, 179:17
**lies** [1] - 165:25
**limited** [1] - 24:25
**line** [5] - 27:9, 34:12, 88:5, 135:19
**lines** [3] - 21:21, 29:25, 137:22
**link** [1] - 15:18
**links** [1] - 15:2
**list** [1] - 10:19
**listed** [21] - 8:2, 8:13, 8:16, 12:16, 12:17, 12:22, 13:4, 13:25, 22:11, 22:15, 24:8, 30:23, 40:19, 40:25, 41:13, 49:13, 52:25, 98:1, 98:25, 99:6
**Listen** [1] - 121:19
**listen** [1] - 133:20
**listing** [1] - 99:8
**live** [1] - 108:13
**LLC** [10] - 21:19, 22:11, 49:11, 50:22, 52:16, 52:20, 53:6, 53:19, 57:14, 61:23
**local** [1] - 116:25
**location** [2] - 141:20, 149:2
**locks** [1] - 119:9
**logged** [1] - 154:1
**look** [27] - 12:9, 26:16, 31:18, 31:22, 31:23, 36:10, 37:8, 46:14, 54:18, 60:24, 67:1, 67:11, 67:23, 80:1, 90:17, 92:5, 97:25, 102:11, 104:9, 123:18, 163:7, 172:1, 173:21, 176:14, 176:20, 178:6
**looked** [25] - 17:4, 24:15, 25:9, 25:15, 31:25, 43:16, 44:10, 46:12, 46:18, 54:4, 57:18, 62:1, 62:4, 66:15, 66:18, 67:7, 67:11, 71:15, 83:10, 93:5, 101:2, 174:16, 175:16, 178:2, 178:7
**looking** [21] - 29:3, 34:17, 37:12, 41:15, 49:8, 50:17, 67:3, 67:4, 72:19, 91:11, 91:18, 92:19, 95:1, 96:15, 108:20, 108:24, 116:15, 122:16, 173:9, 173:18, 180:3
**looks** [6] - 10:5, 17:18, 38:10, 171:24, 176:14, 178:4
**lower** [1] - 175:9
**lunch** [2] - 124:7, 180:25
**lying** [2] - 17:16, 17:18

## M

**ma'am** [1] - 6:8
**mailbox** [3] - 79:11, 97:3, 165:7
**main** [1] - 132:20
**majority** [1] - 31:24
**man** [1] - 179:7
**manage** [1] - 126:14
**managed** [1] - 126:19
**manager** [2] - 87:11, 148:19
**manager's** [2] - 148:13, 148:15
**mandated** [1] - 53:21
**Mantilla** [1] - 1:18
**manually** [1] - 52:10
**manufacturer** [5] - 37:4, 37:16, 41:9, 131:6, 131:14
**manufacturers** [2] - 131:4, 131:5
**March** [16] - 6:22, 11:8, 39:20, 42:16, 43:17, 44:11, 60:22, 61:12, 62:11, 63:22, 66:4, 66:14, 67:2, 68:2, 98:14, 98:20
**marked** [1] - 9:22
**Martha** [15] - 23:9, 24:13, 25:5, 34:18, 34:20, 46:3, 48:18, 49:9, 77:3, 133:1, 133:18, 157:6, 157:15, 158:12, 161:24
**Maryland** [21] - 71:12, 71:17, 71:21, 72:18, 72:21, 72:22, 74:7, 74:12, 75:14, 75:16, 76:5, 76:8, 76:9, 76:10, 112:3, 112:21, 112:25, 129:6, 131:16, 141:17, 159:25
**match** [1] - 77:23
**matched** [1] - 131:7
**matching** [1] - 22:18
**matter** [12] - 21:14, 21:16, 26:1, 30:17, 30:18, 30:19, 78:8, 100:13, 100:16, 146:22, 150:19, 182:8
**matters** [2] - 124:18, 181:11
**mean** [27] - 17:18, 30:18, 64:22, 89:9, 108:9, 109:15, 112:15, 135:7, 135:13, 135:22, 136:12, 136:13, 136:22, 136:23, 136:24, 137:13, 137:23, 139:4, 144:12, 144:14, 145:14, 146:17, 147:11, 147:14, 157:22, 169:6
**meaning** [3] - 137:10, 148:25, 161:13
**means** [11] - 49:17, 54:14, 123:14, 134:1, 134:3, 134:25, 137:5, 137:14, 137:16, 138:13, 173:14
**meant** [2] - 65:15, 169:8
**medications** [5] - 19:4, 21:16, 130:20, 131:3, 144:19
**medicine** [5] - 46:6, 126:17, 127:8, 141:11, 142:7
**medicines** [4] - 127:8, 130:23, 166:9, 166:24
**meet** [6] - 116:21, 116:24, 120:14, 120:16, 120:25, 121:4
**meeting** [7] - 119:21, 119:22, 119:25, 120:5, 120:7, 120:11, 148:15
**meetings** [4] - 120:22, 120:24, 148:13, 148:19
**members** [3] - 58:9, 63:15, 180:22
**Members** [1] - 124:6
**memorized** [2] - 139:4, 139:9
**memory** [6] - 138:15, 142:20, 171:23, 173:21, 174:2, 179:11
**mental** [1] - 109:7
**mention** [1] - 113:14
**mentioned** [11] - 55:7, 78:5, 112:25, 116:9, 120:21, 129:1, 129:5, 137:9, 145:15, 147:18, 157:5
**menus** [1] - 175:17
**merge** [1] - 143:18
**Message** [6] - 4:4, 4:8, 4:10, 19:23, 103:19, 106:5
**message** [7] - 51:10, 52:3, 71:16, 90:8, 97:23, 103:11, 106:9
**Messages** [8] - 4:5, 4:7, 4:14, 4:15, 28:21, 66:11, 73:20, 75:6
**messages** [17] - 9:24, 19:16, 28:13, 31:15, 32:10, 32:11, 68:2, 69:13, 69:21, 70:1, 70:5, 104:13, 105:9, 144:15, 152:5, 153:21, 156:7
**messaging** [1] - 144:16
**messy** [1] - 168:13
**met** [5] - 119:19, 120:9, 121:6, 121:8, 126:12
**method** [3] - 123:15, 134:16, 138:24
**Miami** [2] - 1:16, 1:20
**microphone** [1] - 180:7
**Microsoft** [4] - 153:22, 153:24, 154:18, 161:6
**middle** [1] - 176:10
**might** [5] - 58:8, 112:20, 162:10, 171:1, 177:12
**million** [2] - 23:23, 57:14
**mind** [2] - 132:21, 175:15
**mine** [1] - 109:22
**minivan** [3] - 87:6, 87:14, 87:21
**minor** [1] - 181:12
**minutes** [11] - 58:13, 58:17, 58:22, 58:24,

116:2, 123:4, 173:15, 174:5, 177:25, 179:9, 179:24
**misbranded** [1] - 45:5
**mislabeling** [1] - 49:19
**misled** [1] - 177:19
**missed** [6] - 7:5, 177:10, 177:12, 177:18, 178:17
**missing** [1] - 152:13
**misspelled** [1] - 49:14
**mistake** [1] - 138:8
**mixed** [1] - 49:16
**Mohammed** [5] - 14:3, 14:4, 14:22, 15:8, 15:17
**moment** [6] - 56:25, 61:19, 80:22, 111:1, 128:7, 143:5
**Monday** [1] - 34:12
**money** [1] - 129:9
**month** [8] - 32:6, 46:12, 46:21, 71:15, 85:4, 105:16, 105:24, 106:12
**months** [7] - 25:25, 43:6, 75:22, 84:24, 109:5, 137:11, 165:17
**morning** [7] - 6:8, 6:9, 6:24, 16:13, 22:6, 149:25, 181:10
**Morrone** [3] - 133:8, 133:19, 160:10
**most** [9] - 21:16, 61:3, 83:2, 83:4, 120:10, 131:9, 131:11, 132:18, 133:20
**move** [14] - 9:1, 10:6, 32:16, 32:19, 33:2, 50:10, 54:6, 54:17, 58:2, 62:13, 79:19, 94:2, 102:21, 181:14
**moved** [1] - 98:10
**moves** [25] - 14:14, 19:18, 26:22, 28:16, 40:4, 44:3, 48:21, 51:19, 54:24, 60:10, 64:12, 66:6, 72:9, 73:15, 75:1, 77:9, 80:14, 81:11, 83:14, 85:22, 93:16, 96:10, 103:14, 105:12, 106:2
**moving** [2] - 19:6, 181:18
**MR** [584] - 3:3, 3:4, 5:7, 5:8, 5:9, 5:18, 5:19, 5:20, 6:1, 6:7, 6:17, 6:19, 7:21, 7:23, 9:3, 9:6, 9:21, 9:23, 10:6, 10:8, 10:9, 10:13, 11:14, 11:16, 12:5, 12:8, 13:11, 13:12, 14:8, 14:10, 14:14, 14:16, 14:17, 14:20, 15:24, 16:1, 16:2, 16:3, 16:4, 16:5, 16:6, 16:10, 16:25, 17:2, 17:24, 18:2, 19:12, 19:15, 19:18, 19:20, 19:21, 19:25, 21:23, 21:25, 23:6, 23:8, 25:11, 25:12, 26:4, 26:6, 26:22, 26:24, 26:25, 27:4, 28:4, 28:5, 28:10, 28:12, 28:16, 28:18, 28:19, 28:23, 28:25, 31:11, 31:14, 32:16, 32:19, 32:21, 32:24, 33:1, 33:4, 33:6, 34:5, 34:11, 35:19, 35:22, 36:22, 36:24, 37:9, 37:11, 38:4, 38:6, 39:5, 39:7, 39:16, 39:18, 40:3, 40:5, 40:6, 40:10, 40:14, 42:12, 42:14, 43:10, 43:12, 43:14, 43:15, 43:21, 43:23, 44:2, 44:5, 44:6, 44:9, 44:16, 44:18, 44:22, 44:25, 45:2, 45:7, 45:20, 46:1, 46:23, 46:25, 47:20, 47:22, 48:2, 48:4, 48:11, 48:13, 48:15, 48:17, 48:21, 48:23, 48:24, 49:2, 49:21, 49:23, 50:1, 50:3, 50:5, 50:9, 50:11, 50:12, 50:16, 51:13, 51:15, 51:19, 51:21, 51:22, 51:25, 52:14, 53:8, 53:10, 53:24, 54:1, 54:6, 54:8, 54:9, 54:12, 54:16, 54:17, 54:19, 54:23, 54:25, 55:1, 55:4, 56:7, 56:9, 56:21, 56:25, 57:3, 57:5, 57:7, 57:10, 57:13, 57:20, 57:22, 58:1, 58:3, 58:4, 58:7, 59:6, 59:9, 59:10, 59:11, 59:20, 59:21, 59:22, 60:2, 60:4, 60:10, 60:12, 60:13, 60:16, 60:18, 60:20, 62:7, 62:9, 62:13, 62:15, 62:16, 62:19, 63:17, 63:18, 64:2, 64:4, 64:12, 64:14, 64:15, 64:19, 65:24, 66:2, 66:6, 66:8, 66:9, 66:13, 66:20, 66:22, 68:22, 68:24, 69:4, 69:6, 69:23, 69:25, 70:7, 70:9, 70:12, 70:16, 70:17, 71:6, 71:8, 71:13, 71:14, 71:25, 72:2, 72:8, 72:10, 72:11, 72:14, 73:9, 73:11, 73:15, 73:17, 73:18, 73:22, 73:24, 74:8, 74:10, 74:18, 74:20, 74:22, 75:1, 75:3, 75:4, 75:8, 75:10, 76:25, 77:2, 77:9, 77:11, 77:12, 77:15, 78:1, 78:3, 78:21, 78:22, 79:2, 79:4, 79:18, 79:20, 79:21, 79:24, 79:25, 80:5, 80:7, 80:14, 80:16, 80:17, 80:21, 80:25, 81:2, 81:5, 81:7, 81:8, 81:11, 81:13, 81:14, 81:17, 81:22, 81:24, 83:7, 83:9, 83:14, 83:16, 83:17, 83:21, 85:16, 85:18, 85:22, 85:24, 85:25, 86:4, 86:24, 86:25, 88:1, 88:3, 88:11, 88:13, 88:21, 88:23, 89:11, 89:13, 89:21, 89:23, 90:2, 90:3, 90:7, 90:9, 90:13, 90:16, 91:13, 91:24, 92:1, 92:5, 92:8, 92:9, 92:12, 92:13, 93:10, 93:12, 93:16, 93:18, 93:19, 93:22, 93:25, 94:2, 94:3, 94:6, 94:9, 95:13, 95:15, 96:4, 96:6, 96:10, 96:13, 96:14, 97:1, 97:2, 97:13, 97:15, 98:22, 98:24, 100:18, 100:20, 101:13, 101:15, 101:18, 101:20, 101:23, 101:25, 102:4, 102:6, 102:15, 102:18, 102:22, 103:8, 103:10, 103:14, 103:16, 103:17, 103:21, 104:5, 104:7, 104:8, 105:6, 105:8, 105:12, 105:14, 105:15, 105:17, 105:18, 105:20, 105:23, 106:2, 106:7, 106:8, 110:25, 111:3, 111:6, 113:3, 113:4, 113:6, 113:8, 115:21, 115:23, 117:8, 117:11, 118:3, 118:5, 118:7, 118:9, 118:13, 118:17, 118:19, 118:21, 119:12, 119:14, 120:1, 120:4, 121:22, 121:24, 124:2, 124:5, 124:25, 125:1, 125:2, 125:8, 125:9, 125:10, 125:14, 125:15, 125:16, 125:22, 125:23, 134:9, 134:12, 134:19, 134:21, 135:2, 135:4, 135:15, 135:17, 144:1, 144:3, 145:6, 145:9, 145:22, 145:25, 146:19, 146:21, 149:9, 149:11, 149:13, 149:16, 150:21, 150:22, 151:1, 151:2, 151:15, 151:16, 151:21, 151:22, 152:3, 152:4, 152:10, 152:12, 152:20, 152:22, 153:2, 153:3, 153:7, 153:9, 153:12, 153:13, 153:17, 153:18, 154:12, 154:13, 154:23, 154:24, 155:5, 155:6, 155:10, 155:11, 155:14, 155:17, 155:20, 155:21, 155:25, 156:1, 156:4, 156:5, 156:11, 156:12, 156:21, 156:22, 157:3, 157:4, 157:12, 157:13, 157:18, 157:19, 157:25, 158:1, 158:10, 158:11, 158:23, 158:24, 159:4, 159:5, 159:10, 159:11, 159:16, 159:17, 159:21, 159:22, 160:7, 160:8, 160:18, 160:19, 160:24, 160:25, 161:3, 161:5, 161:16, 161:19, 161:22, 161:23, 162:10, 162:13, 162:21, 162:22, 163:3, 163:4, 163:14, 163:15, 163:19, 163:20, 164:15, 164:18, 164:21, 164:22, 165:5, 165:6, 166:25, 167:3, 167:4, 167:21, 167:22, 169:1, 169:3, 169:7, 169:10, 169:12, 170:12, 170:14, 170:19, 170:21, 172:11, 172:12, 172:13, 172:23, 172:24, 173:7, 173:8, 173:16, 173:20, 173:25, 174:1, 176:23, 177:1, 177:15, 177:17, 177:21, 177:23, 178:10, 178:13, 178:18, 178:20, 179:3, 179:6, 179:13, 179:15, 180:6, 180:9, 180:13, 180:14, 180:16, 180:20, 181:12, 181:17, 181:19, 181:20, 181:24
**multiple** [5] - 18:7, 24:10, 42:17, 88:18, 119:1
**must** [1] - 61:3

## N

**Nalley** [1] - 171:24
**name** [11] - 13:3, 14:3, 22:11, 38:14, 69:15, 86:8, 91:21, 122:12, 133:3, 154:6, 162:1
**named** [3] - 7:6, 28:6, 157:20
**names** [1] - 133:1
**narrative** [1] - 42:1
**NE** [1] - 1:16

**necessarily** [8] - 72:24, 93:3, 103:5, 133:14, 134:3, 168:11, 168:15, 170:22
**need** [21] - 13:7, 15:7, 20:6, 21:2, 23:2, 50:22, 59:5, 64:20, 65:19, 71:12, 84:21, 86:14, 111:15, 112:17, 116:5, 123:18, 135:19, 135:22, 140:17, 141:12, 165:20
**needed** [12] - 21:5, 87:16, 110:23, 111:16, 112:11, 112:12, 112:19, 112:22, 113:1, 113:2, 113:9, 174:8
**needing** [1] - 50:22
**needs** [3] - 65:19, 139:11, 159:25
**neglected** [1] - 53:17
**never** [8] - 23:20, 91:11, 121:19, 134:25, 147:5, 162:16, 164:6, 168:3
**New** [15] - 51:8, 67:13, 67:22, 67:23, 68:3, 68:7, 142:3, 172:2, 174:16, 174:20, 174:21, 175:8, 175:14, 175:22, 179:20
**new** [12] - 6:25, 10:17, 11:21, 11:24, 21:6, 21:10, 23:18, 82:8, 93:6, 94:16, 108:7, 117:20
**news** [1] - 18:13
**next** [17] - 10:25, 13:24, 14:24, 17:12, 17:20, 17:25, 40:24, 41:6, 45:2, 45:17, 49:7, 50:1, 68:16, 73:22, 83:22, 90:10, 99:21
**nice** [1] - 181:2
**night** [1] - 111:11
**nit** [1] - 140:3
**nit-pick** [1] - 140:3
**NO** [1] - 1:3
**nobody** [1] - 91:7
**non** [5] - 30:3, 31:3, 31:5, 31:8, 42:9
**non-Gilead** [5] - 30:3, 31:3, 31:5, 31:8, 42:9
**normal** [1] - 23:22
**notating** [1] - 124:1
**note** [1] - 123:16
**nothing** [9] - 15:12, 33:3, 58:16, 121:16, 124:17, 153:14, 161:20, 162:4, 181:9
**notification** [9] - 39:20, 40:16, 40:22, 42:15, 43:4, 43:16, 44:10, 80:2, 156:13
**Notification** [2] - 4:11, 40:8
**notified** [1] - 78:8
**notify** [3] - 53:12, 78:13, 167:11
**November** [3] - 38:8, 43:1, 57:23
**NP** [1] - 95:23
**Number** [2] - 3:9, 176:20
**number** [27] - 13:5, 38:19, 39:8, 51:12, 57:6, 64:22, 65:18, 67:5, 67:11, 67:14, 67:17, 77:20, 77:25, 91:23, 94:21, 174:16, 174:19, 175:8, 175:11, 175:12, 175:18, 175:19, 175:21, 175:23, 177:4, 177:7
**numbers** [7] - 15:25, 16:7, 34:19, 40:15, 46:14, 178:6, 178:7
**NW** [1] - 1:19

## O

**oath** [2] - 5:13, 59:15
**objecting** [1] - 105:21
**Objection** [2] - 32:24, 93:25
**objection** [113] - 9:3, 10:8, 10:9, 14:16, 14:17, 19:20, 19:21, 26:24, 26:25, 28:18, 28:19, 32:16, 40:5, 40:6, 44:5, 44:6, 44:22, 47:20, 48:2, 48:11, 48:23, 48:24, 50:11, 50:12, 51:21, 51:22, 54:8, 54:9, 54:16, 54:25, 55:1, 57:3, 57:5, 58:3, 58:4, 60:12, 60:13, 62:15, 62:16, 64:14, 64:15, 66:8, 66:9, 69:23, 70:7, 72:10, 72:11, 73:17, 73:18, 74:8, 74:18, 75:3, 75:4, 77:11, 77:12, 79:20, 79:21, 80:16, 80:17, 81:13, 81:14, 83:16, 83:17, 85:24, 85:25, 93:18, 93:19, 101:13, 101:18, 101:23, 102:4, 102:15, 103:16, 103:17, 104:5, 105:14, 113:3, 113:6, 115:21, 117:8, 118:3, 118:7, 118:13, 118:19, 119:12, 120:1, 121:22, 124:2, 134:9, 135:2, 135:15, 144:1, 145:6, 145:22, 146:19, 149:9, 149:13, 155:14, 161:16, 166:25, 169:7, 170:12, 172:11, 173:16, 176:23, 177:15, 177:21, 178:10, 178:18, 179:3, 179:13, 180:13, 181:17
**obviously** [3] - 89:9, 104:18, 112:2
**occasion** [1] - 146:5
**occurred** [2] - 134:14, 167:13
**October** [17] - 1:5, 24:14, 42:24, 55:12, 55:17, 77:17, 77:22, 78:10, 78:14, 80:3, 92:14, 93:14, 95:1, 95:5, 95:16, 96:8, 165:14
**OF** [3] - 1:2, 1:4, 1:10
**offense** [1] - 41:4
**offer** [2] - 107:25, 110:13
**offered** [4] - 108:25, 110:17, 111:14, 112:20
**offering** [2] - 110:16, 161:14
**office** [8] - 114:12, 148:18, 148:20, 149:2, 150:10, 150:16, 171:20
**Office's** [1] - 15:18
**OFFICER** [7] - 58:14, 58:18, 58:25, 124:13, 124:19, 181:4, 182:2
**officer** [1] - 140:7
**Official** [2] - 2:3, 182:11
**old** [1] - 87:21
**Omom** [6] - 26:13, 82:21, 87:1, 87:5, 113:13, 142:18
**Omom's** [1] - 87:1
**onboard** [1] - 174:12
**onboarding** [4] - 128:16, 130:14, 150:11, 174:9
**once** [3] - 145:15, 160:11, 180:17
**one** [89] - 6:13, 12:1, 12:15, 24:6, 26:9, 30:21, 30:23, 30:25, 31:15, 39:22, 41:13, 41:14, 41:16, 41:17, 42:11, 44:13, 45:11, 46:11, 49:12, 50:2, 52:23, 52:25, 69:17, 69:18, 78:2, 78:25, 87:2, 87:5, 88:5, 88:12, 88:14, 90:11, 90:12, 90:15, 90:17, 90:20, 92:11, 95:3, 95:5, 95:7, 96:23, 97:8, 97:11, 99:8, 104:10, 104:22, 112:5, 112:10, 116:25, 119:2, 119:7, 120:13, 120:19, 123:10, 126:21, 129:20, 130:14, 131:19, 132:7, 132:20, 133:1, 133:10, 133:22, 136:2, 138:2, 138:8, 139:10, 139:15, 139:18, 141:11, 142:21, 146:5, 147:8, 149:2, 149:19, 149:24, 151:18, 154:10, 156:16, 161:1, 162:11, 163:1, 165:8, 167:5, 168:17, 169:10, 175:10, 181:12
**ones** [10] - 10:17, 25:24, 29:14, 42:8, 52:10, 87:2, 103:3, 143:4, 143:23, 176:7
**online** [4] - 131:14, 140:2, 142:11, 142:21
**Online** [1] - 153:14
**open** [8] - 36:22, 37:13, 47:6, 47:16, 88:5, 90:7, 90:14, 132:9
**opened** [1] - 36:18
**opening** [1] - 47:23
**operate** [2] - 13:2, 149:18
**operating** [3] - 128:5, 128:12, 128:20
**Operating** [1] - 130:4
**opine** [1] - 151:24
**opinion** [2] - 147:6, 155:1
**opportunities** [1] - 63:7
**opportunity** [1] - 108:20
**opposed** [1] - 118:6
**option** [1] - 142:11
**options** [1] - 108:15
**order** [7] - 23:17, 84:22, 117:7, 128:24, 129:10, 139:6, 140:17
**Order** [1] - 5:1
**orders** [1] - 57:23
**organization** [3] - 143:7, 143:16, 143:22
**originally** [1] - 126:6
**outline** [1] - 128:12
**outlining** [1] - 151:4
**outside** [14] - 44:19, 66:17, 106:21, 112:2, 115:11, 115:25, 116:5, 117:22, 119:9, 143:7, 143:16, 143:22, 148:15, 171:14
**overall** [2] - 108:2, 108:8
**overlooked** [1] - 67:16
**Overruled** [1] - 178:11
**overruled** [12] - 74:9, 106:1, 117:9, 118:8, 118:15, 145:24, 149:14, 155:16, 161:18, 173:19, 176:24, 179:5
**own** [13] - 24:10, 82:7, 82:10, 82:12, 84:17, 85:13, 110:24, 127:13, 142:22, 148:4, 154:8, 164:5, 167:16
**owned** [1] - 143:23
**owner** [5] - 20:19, 26:14, 85:5, 143:11, 143:19

## P

**P-E-S-I-D-E-N-T** [1] - 49:14
**p.m** [6] - 171:12, 171:16, 171:17, 172:9, 173:5, 173:12
**pace** [1] - 21:15
**package** [1] - 87:22
**packing** [1] - 23:16
**page** [69] - 7:21, 8:11, 10:25, 12:7, 13:17, 13:24, 14:24, 15:9, 15:14, 17:6, 17:12, 17:20, 20:1, 22:10, 26:19, 27:6, 28:24, 29:21, 32:5, 34:8, 38:13, 38:16, 39:6, 40:24, 41:6, 42:13, 44:17, 45:2, 49:3, 49:7, 50:1, 50:19, 53:8, 61:2, 61:15, 62:24, 68:16, 69:5, 70:11, 71:7, 73:23, 75:9, 77:16, 79:24, 83:22, 86:5, 88:22, 89:22, 93:23, 94:7, 94:8, 97:8, 98:12, 98:22, 104:9, 140:2, 140:11, 142:2, 156:21, 157:3, 161:3, 161:4, 161:8, 161:12, 164:17, 165:24, 172:18
**PAGE** [1] - 3:2
**Page** [1] - 3:9
**Pages** [1] - 1:8
**pages** [5] - 39:24, 98:23, 100:22, 161:4, 172:23
**palms** [1] - 118:11
**paperwork** [8] - 12:22, 18:15, 33:19, 92:24, 97:6, 99:14, 99:19, 147:11
**paragraph** [2] - 15:23, 16:12
**paragraphs** [1] - 78:2
**part** [19] - 8:15, 22:18, 33:24, 45:3, 52:6, 63:6, 78:23, 85:5, 102:16, 115:4, 123:14, 126:25, 128:23, 129:19, 142:4, 142:10, 143:11, 151:12, 157:23
**Participants** [1] - 161:10
**participated** [1] - 148:14
**particular** [5] - 37:6, 78:25, 118:6, 129:24, 170:10
**Partners** [4] - 50:20, 53:13, 53:19, 86:6
**partnership** [1] - 89:15
**pass** [1] - 96:22
**passed** [2] - 101:9, 160:10
**Pat** [66] - 6:24, 10:16, 17:15, 20:5, 25:3, 43:24, 74:23, 75:11, 76:22, 79:15, 91:18, 103:1, 105:9, 106:10, 134:6, 134:22, 136:14, 138:8, 147:18, 147:23, 148:6, 148:9, 151:19, 151:25, 152:8, 152:18, 152:24, 153:5, 153:10, 153:15, 155:2, 155:7, 155:13, 155:23, 156:2, 156:9, 156:23, 157:16, 157:22, 158:8, 159:1, 159:7, 160:15, 160:21, 161:1, 161:6, 162:4, 162:19, 164:19, 165:1, 165:3, 167:11, 168:21, 169:4, 169:15, 169:17, 169:18, 170:2, 170:6, 170:10, 170:22, 178:21, 178:22, 178:25, 179:10
**Pat's** [6] - 150:15, 154:10, 154:21, 159:13, 159:19, 161:13
**PATRICIA** [2] - 2:3, 182:11
**PATRICK** [2] - 1:7, 1:18
**Patrick** [86] - 6:22, 7:15, 9:17, 10:3, 10:14, 10:21, 11:1, 11:3, 17:21, 18:14, 18:20, 18:24, 19:16, 20:2, 20:13, 20:22, 22:5, 22:24, 23:10, 27:11, 27:18, 28:13, 29:6, 29:13, 29:21, 29:22, 30:6, 31:2, 31:17, 32:10, 32:13, 32:22, 33:8, 33:13, 33:18, 33:20, 38:22, 43:18, 53:3, 54:3, 54:20, 55:5, 55:24, 56:13, 56:16, 57:17, 57:23, 60:5, 79:14, 92:3, 94:13, 100:6, 102:7, 103:12, 104:16, 106:16, 107:9, 107:14, 136:3, 136:9, 136:19, 136:22, 145:15, 145:19, 146:6, 146:7, 146:11, 147:5, 147:18, 150:15, 151:7, 157:7, 158:14, 158:19, 160:4, 161:20, 162:24, 163:11, 163:17, 164:1, 164:5, 164:6, 164:9, 164:12, 179:7, 179:11
**pay** [1] - 11:17
**paying** [1] - 129:2
**payment** [1] - 27:24
**payments** [3] - 28:1, 57:14, 62:3
**PDF** [1] - 84:20
**PDFs** [1] - 99:20
**pedigree** [7] - 11:21, 22:12, 22:15, 26:16, 77:18, 78:5, 78:6
**pedigrees** [5] - 26:8, 50:23, 95:19, 152:14, 157:22
**penalties** [1] - 45:5
**people** [12] - 29:24, 69:22, 121:11, 123:17, 129:21, 132:25, 142:6, 142:21, 144:13, 144:18, 145:4, 159:6
**people's** [1] - 145:7
**perceiving** [1] - 145:12
**percent** [3] - 95:23, 141:9, 143:19
**percentage** [3] - 141:6, 141:7, 141:8
**period** [3] - 38:1, 102:1, 150:14
**permitting** [1] - 122:20
**person** [20] - 7:3, 8:9, 11:4, 11:7, 11:9, 12:17, 15:1, 15:18, 50:22, 68:12, 68:14, 68:20, 70:3, 91:7, 109:10, 109:13, 147:4, 166:11, 166:15
**personal** [2] - 117:23, 164:5
**personally** [1] - 53:5
**Pesident** [1] - 50:18
**pesident** [1] - 51:4
**Peter** [40] - 35:23, 36:7, 37:20, 37:23, 68:11, 68:13, 69:7, 69:10, 69:17, 69:22, 70:2, 70:3, 71:10, 71:11, 89:24, 90:8, 90:25, 91:6, 91:18, 91:20, 92:2, 92:4, 92:15, 92:16, 92:18, 93:5, 93:13, 97:16, 99:9, 99:13, 156:8, 159:13, 159:19, 164:6, 164:9, 166:13, 166:21, 166:22
**Ph** [1] - 1:19
**Pharm/alert** [5] - 60:21, 62:21, 66:15, 158:14, 159:1
**Pharma** [23] - 8:5, 8:12, 10:15, 11:11, 12:16, 12:20, 17:17, 86:12, 88:14, 142:19, 142:23, 143:2, 143:5, 143:7, 143:15, 143:18, 143:22, 144:10, 171:3, 171:10, 171:13, 171:16
**pharmaceutical** [3] - 53:15, 67:8, 122:22
**Pharmaceutical** [1] - 7:12
**pharmaceuticals** [1] - 106:24
**pharmacies** [11] - 16:23, 62:22, 63:20, 90:22, 97:17, 97:19, 130:19, 131:21, 140:24, 162:23, 166:10
**Pharmacy** [19] - 26:13, 38:14, 67:14, 67:23, 68:4, 68:8, 71:17, 74:7, 74:12, 95:20, 98:1, 100:9, 174:17, 174:21, 175:9, 175:14, 175:22, 179:21
**pharmacy** [37] - 31:6, 38:14, 38:17, 46:6, 50:2, 64:6, 65:20, 67:15, 67:16, 67:20, 68:8, 78:9, 81:4, 82:1, 89:2, 98:8, 98:19, 98:25, 99:5, 99:8, 126:18, 140:1, 140:11, 140:19, 141:1, 141:12, 141:23, 142:2, 163:1, 175:21, 175:23, 176:1, 176:21, 177:2, 177:7, 178:8
**phone** [10] - 13:5, 37:23, 51:12, 90:8, 91:23, 92:15, 92:23, 92:25, 133:15, 159:18
**photo** [5] - 36:23, 37:8, 40:11, 40:12, 40:13
**photos** [2] - 88:22, 101:11
**pick** [1] - 140:3
**picture** [1] - 24:19
**pictures** [2] - 36:8, 101:9
**pills** [5] - 36:9, 37:1, 40:22, 65:11, 89:10
**pinged** [2] - 144:17, 144:22
**pissed** [1] - 36:17
**place** [11] - 26:2, 102:13, 107:25, 108:6, 108:11, 108:18, 109:18, 110:1, 117:20, 128:10, 180:21
**places** [1] - 132:7
**Platero** [1] - 159:6
**platform** [7] - 8:9, 82:6, 82:8, 84:22, 153:22, 154:4, 154:6
**platforms** [4] - 82:6, 129:12, 129:18, 129:19
**play** [2] - 116:1, 116:24
**pleasant** [2] - 125:24, 126:1
**pleased** [1] - 81:19
**plural** [1] - 97:17
**PM** [2] - 1:6, 182:3
**pm** [1] - 124:20
**PO** [1] - 20:6
**Pogozelski** [2] - 1:13, 60:1
**POGOZELSKI** [334] - 3:3, 5:7, 5:18, 6:1, 6:7, 6:17, 6:19, 7:21, 7:23, 9:6, 9:21, 9:23,

10:6, 10:13, 11:14, 11:16, 12:5, 12:8, 13:11, 13:12, 14:8, 14:10, 14:14, 14:20, 16:1, 16:3, 16:5, 16:10, 16:25, 17:2, 17:24, 18:2, 19:12, 19:15, 19:18, 19:25, 21:23, 21:25, 23:6, 23:8, 25:11, 25:12, 26:4, 26:6, 26:22, 27:4, 28:4, 28:5, 28:10, 28:12, 28:16, 28:23, 28:25, 31:11, 31:14, 32:21, 33:4, 33:6, 34:5, 34:11, 35:19, 35:22, 36:22, 36:24, 37:9, 37:11, 38:4, 38:6, 39:5, 39:7, 39:16, 39:18, 40:3, 40:10, 40:14, 42:12, 42:14, 43:10, 43:12, 43:14, 43:15, 43:21, 43:23, 44:2, 44:9, 44:16, 44:18, 44:25, 45:2, 45:7, 45:20, 46:1, 46:23, 46:25, 47:22, 48:4, 48:13, 48:15, 48:17, 48:21, 49:2, 49:21, 49:23, 50:1, 50:3, 50:5, 50:9, 50:16, 51:13, 51:15, 51:19, 51:25, 52:14, 53:8, 53:10, 53:24, 54:1, 54:6, 54:12, 54:17, 54:19, 54:23, 55:4, 56:7, 56:9, 56:21, 56:25, 57:7, 57:10, 57:13, 57:20, 57:22, 58:1, 58:7, 59:6, 59:9, 59:20, 60:2, 60:4, 60:10, 60:16, 60:18, 60:20, 62:7, 62:9, 62:13, 62:19, 63:17, 63:18, 64:2, 64:4, 64:12, 64:19, 65:24, 66:2, 66:6, 66:13, 66:20, 66:22, 68:22, 68:24, 69:4, 69:6, 69:25, 70:9, 70:12, 70:16, 70:17, 71:6, 71:8, 71:13, 71:14, 71:25, 72:2, 72:8, 72:14, 73:9, 73:11, 73:15, 73:22, 73:24, 74:10, 74:20, 74:22, 75:1, 75:8, 75:10, 76:25, 77:2, 77:9, 77:15, 78:1, 78:3, 78:21, 78:22, 79:2, 79:4, 79:18, 79:24, 79:25, 80:5, 80:7, 80:14, 80:21, 80:25, 81:2, 81:5, 81:7, 81:8, 81:11, 81:17, 81:22, 81:24, 83:7, 83:9, 83:14, 83:21, 85:16, 85:18, 85:22, 86:4, 86:24, 86:25, 88:1, 88:3, 88:11, 88:13, 88:21, 88:23, 89:11, 89:13, 89:21, 89:23, 90:2, 90:3, 90:7, 90:9, 90:13, 90:16, 91:24, 92:5, 92:9, 92:12, 92:13, 93:10, 93:12, 93:16, 93:22, 94:3, 94:6, 94:9, 95:13, 95:15, 96:4, 96:6, 96:10, 96:13, 96:14, 97:1, 97:2, 97:13, 97:15, 98:22, 98:24, 100:18, 100:20, 101:15, 101:20, 101:25, 102:6, 102:18, 102:22, 103:8, 103:10, 103:14, 103:21, 104:8, 105:6, 105:8, 105:12, 105:15, 105:18, 105:23, 106:2, 106:7, 106:8, 110:25, 111:3, 113:3, 113:6, 115:21, 115:23, 117:8, 118:3, 118:7, 118:13, 118:19, 119:12, 120:1, 121:22, 124:2, 124:25, 125:8, 125:14, 134:9, 135:2, 135:15, 144:1, 145:6, 145:9, 145:22, 146:19, 149:9, 149:13, 155:14, 161:16, 166:25, 169:7, 170:12, 172:11, 173:16, 173:25, 176:23, 177:15, 177:21, 178:10, 178:18, 179:3, 179:13, 180:6, 180:13, 181:12, 181:17, 181:24

**point** [23] - 22:16, 25:25, 30:21, 61:9, 63:12, 63:24, 75:21, 77:5, 84:2, 85:5, 100:13, 101:6, 105:1, 110:8, 110:9, 112:14, 114:7, 115:18, 118:6, 120:13, 130:2, 143:11, 181:12

**pointed** [1] - 181:13

**pointing** [1] - 162:17

**points** [1] - 88:19

**police** [10] - 116:25, 117:2, 117:4, 117:6, 118:10, 118:22, 119:7, 119:22, 120:11, 120:16

**Police** [2] - 117:5, 120:9

**policies** [1] - 127:24

**polite** [1] - 165:19

**polling** [3] - 5:17, 59:19, 125:7

**popping** [1] - 144:18

**positive** [1] - 110:7

**possession** [2] - 25:21, 77:25

**possible** [3] - 9:19, 19:10, 40:12

**possibly** [4] - 137:4, 137:5, 137:18, 137:19

**posted** [1] - 15:18

**potential** [5] - 28:8, 47:6, 47:16, 47:24, 128:17

**PR** [1] - 17:9

**practice** [1] - 97:18

**practices** [3] - 93:2, 99:13, 107:5

**preference** [2] - 74:6, 74:12

**prescribers** [1] - 65:20

**presence** [9] - 5:16, 5:23, 58:12, 59:18, 59:25, 124:11, 125:6, 125:13, 180:24

**present** [8] - 5:3, 59:4, 67:15, 103:25, 124:23

**president** [1] - 49:14

**pressure** [12] - 18:20, 19:1, 144:5, 144:7, 144:14, 145:2, 145:4, 146:9, 146:10, 178:21, 178:23, 179:8

**pressured** [3] - 144:23, 146:5, 178:25

**pressuring** [2] - 145:15, 179:11

**presumably** [2] - 112:4, 130:22

**pretty** [10] - 30:15, 33:14, 74:15, 86:21, 92:21, 109:14, 110:6, 128:1, 145:14, 153:23

**previous** [2] - 93:1, 107:25

**previously** [5] - 12:13, 24:12, 47:2, 71:15, 104:11

**Prezcobix** [1] - 38:18

**primarily** [7] - 12:1, 18:6, 52:23, 114:24, 120:19, 148:6, 151:10

**print** [1] - 176:9

**privately** [2] - 31:18, 32:14

**problem** [11] - 9:19, 12:12, 13:15, 16:14, 22:19, 47:3, 65:7, 65:8, 65:11, 89:9, 166:1

**problems** [10] - 6:14, 11:23, 20:23, 21:20, 65:9, 76:1, 96:25, 113:20, 113:21, 113:22

**procedures** [4] - 127:24, 128:5, 128:12, 128:20

**Procedures** [1] - 130:4

**proceed** [1] - 125:21

**proceedings** [3] - 59:2, 124:21, 182:7

**process** [4] - 128:8, 168:19, 168:22, 170:18

**processes** [1] - 169:4

**processors** [1] - 129:15

**procurement** [1] - 168:11

**produced** [1] - 26:10

**product** [16] - 12:24, 19:8, 38:25, 41:9, 42:2, 47:8, 49:16, 70:21, 77:24, 78:6, 78:8, 78:23, 82:1, 98:13, 100:23, 153:22

**Product** [1] - 88:6

**products** [20] - 7:5, 23:21, 25:20, 27:12, 30:1, 30:2, 30:3, 31:3, 31:5, 42:9, 61:3, 61:4, 61:23, 78:24, 98:10, 140:25, 141:2, 141:4, 167:25, 168:9

**professionally** [1] - 165:20

**programs** [1] - 129:10

**progress** [1] - 18:14

**project** [3] - 128:21, 132:11

**prompted** [2] - 67:1, 96:24

**proof** [1] - 93:3

**proper** [3] - 22:10, 61:4, 147:1

**proposed** [1] - 73:6

**prosecutor** [7] - 136:2, 136:7, 137:8, 137:20, 138:2, 138:17, 167:23

**prosecutors** [2] - 121:19, 146:4

**provide** [9] - 16:16, 17:19, 24:22, 51:1, 68:13, 69:10, 76:9, 91:21, 100:3

**provided** [25] - 6:25, 11:5, 12:13, 12:17, 13:5, 18:4, 18:5, 23:16, 24:12, 25:1, 26:10, 30:21, 55:7, 67:8, 67:9, 69:13, 84:24, 87:4, 99:5, 140:12, 166:5, 174:13, 174:16, 175:7

**provider** [1] - 22:7

**providing** [2] - 68:20, 77:6

**Puerto** [4] - 12:25, 52:12, 53:20

**pull** [27] - 6:17, 11:14, 12:5, 14:8, 19:12, 21:23, 25:11, 31:11, 33:4, 35:19, 37:9, 38:4, 40:13, 43:10, 45:20, 49:21, 56:7, 57:20, 60:2, 60:18, 69:4, 82:7, 84:17, 88:1, 89:21, 97:13, 100:19

**purchase** [8] - 9:10, 56:11, 72:20, 93:3, 98:3, 126:16, 127:8, 131:2

**purchased** [7] - 7:6, 35:15, 56:3, 98:13, 98:16, 166:9

**purchaser** [1] - 168:10

**purchases** [3] - 21:15, 95:19, 178:24

**purchasing** [7] -

72:18, 82:1, 97:19, 129:14, 130:19, 130:24, 131:1
**purported** [1] - 77:19
**purportedly** [3] - 98:3, 98:13, 98:16
**purpose** [3] - 19:1, 129:24, 130:4
**purposely** [1] - 177:13
**purposes** [2] - 115:5, 150:10
**pursuant** [1] - 41:4
**pursue** [3] - 111:16, 111:19, 112:23
**pursued** [1] - 110:24
**pursues** [1] - 63:6
**purview** [1] - 114:2
**put** [6] - 60:25, 117:15, 123:21, 140:22, 154:6, 176:9

## Q

**quality** [4] - 41:10, 65:1, 65:4, 65:12
**quarantine** [2] - 77:24, 78:24
**quarantined** [4] - 35:12, 41:8, 41:21, 78:8
**quarantining** [1] - 78:23
**questionable** [1] - 38:20
**questioning** [2] - 65:14, 84:23
**questions** [17] - 33:23, 71:22, 74:13, 86:11, 99:25, 111:3, 117:7, 133:11, 133:19, 136:2, 138:2, 138:5, 145:1, 146:4, 147:20, 147:23, 170:23
**quick** [3] - 29:8, 31:22, 174:7
**quickly** [6] - 19:4, 19:6, 19:9, 30:15, 40:13, 98:10
**quit** [1] - 107:19
**quite** [5] - 42:10, 82:3, 86:8, 115:6, 119:4
**quote** [1] - 144:9
**quote-unquote** [1] - 144:9

## R

**rain** [1] - 86:18
**raised** [1] - 13:3
**rampage** [2] - 18:17, 20:4
**range** [1] - 141:10
**rapid** [1] - 21:15
**Rapid's** [3] - 82:25, 113:13, 142:18
**rather** [5] - 140:8, 149:20, 149:24, 163:16, 164:24
**reach** [7] - 29:9, 71:20, 72:6, 74:7, 74:12, 132:23, 133:18
**reached** [9] - 12:16, 29:19, 30:24, 36:4, 67:22, 67:23, 108:24, 111:20, 160:13
**reaction** [2] - 48:1, 101:11
**read** [4] - 10:14, 12:10, 23:14, 105:25
**ready** [2] - 5:24, 125:20
**real** [2] - 172:15, 178:1
**realize** [1] - 160:9
**realized** [1] - 177:24
**really** [14] - 13:1, 47:7, 73:7, 87:15, 109:17, 110:21, 117:21, 137:23, 146:10, 148:9, 148:16, 148:18, 161:12
**reason** [7] - 8:15, 23:2, 23:21, 109:16, 113:9, 151:9, 177:18
**reasons** [2] - 112:10, 132:13
**receipt** [1] - 162:16
**receive** [7] - 84:12, 87:13, 87:22, 91:12, 100:4, 139:3, 139:19
**received** [77] - 7:1, 10:10, 10:12, 14:18, 14:19, 19:5, 19:22, 19:23, 23:19, 27:1, 27:2, 28:20, 28:21, 36:9, 36:17, 40:7, 40:9, 44:7, 44:8, 47:19, 48:25, 49:1, 50:13, 50:14, 51:23, 51:24, 54:10, 54:11, 55:2, 55:3, 55:12, 57:8, 57:9, 58:5, 58:6, 60:14, 60:15, 62:17, 62:18, 64:16, 64:17, 66:10, 66:11, 70:20, 72:12, 72:13, 73:19, 73:20, 75:5, 75:6, 77:13, 77:14, 79:22, 79:23, 80:18, 80:20, 81:15, 81:16, 83:18, 83:19, 86:1, 86:2, 93:20, 93:21, 99:20, 103:18, 103:19, 106:4, 106:5, 110:15, 140:10, 158:3, 162:16, 170:4, 179:20, 181:21, 181:23
**Receiver** [1] - 26:13
**receiving** [3] - 84:20, 90:11, 99:19
**recess** [8] - 58:10, 58:17, 58:24, 124:7, 124:18, 180:23, 181:10, 182:1
**reciprocity** [2] - 72:22, 141:18
**recognize** [1] - 39:22
**recollection** [6] - 76:13, 76:16, 84:14, 170:9, 173:10, 180:4
**record** [9] - 5:2, 16:8, 33:22, 59:1, 59:3, 115:19, 124:20, 124:22, 180:7
**records** [5] - 55:8, 55:15, 55:18, 55:21, 77:23
**red** [1] - 162:17
**reference** [7] - 14:21, 17:9, 17:10, 26:19, 34:23, 46:5, 46:17
**referenced** [2] - 46:11, 47:11
**references** [1] - 11:9
**referencing** [1] - 41:16
**referred** [1] - 91:20
**referring** [7] - 11:1, 11:7, 29:18, 91:15, 130:8, 136:14, 140:5
**reflect** [1] - 20:15
**reflecting** [1] - 24:9
**refresh** [5] - 171:22, 173:10, 173:21, 174:2, 180:3
**refreshed** [1] - 142:20
**regard** [1] - 39:12
**regarding** [1] - 24:5
**regardless** [3] - 33:23, 33:25, 63:14
**registered** [4] - 67:16, 68:8, 176:2, 177:7
**Registered** [1] - 176:10
**registration** [5] - 175:12, 175:18, 175:19, 175:23, 177:4
**Registration** [1] - 176:20
**regular** [1] - 87:21
**regulates** [1] - 142:5
**regulations** [5] - 63:1, 122:24, 126:7, 126:8, 131:25
**regulator** [2] - 126:6, 126:21
**regulators** [1] - 48:10
**regulatory** [2] - 122:19, 150:10
**reinforce** [1] - 63:7
**relate** [2] - 15:14, 49:7
**related** [6] - 49:8, 70:2, 116:9, 132:1, 152:17, 168:17
**relates** [2] - 20:14, 24:4
**relating** [3] - 24:1, 34:18, 51:16
**relation** [2] - 33:21, 52:2
**relationship** [9] - 7:8, 12:19, 15:8, 53:14, 89:15, 101:1, 133:14, 134:3, 143:9
**relationships** [1] - 131:21
**relatively** [1] - 119:8
**relaying** [2] - 10:2, 97:22
**Relevance** [3] - 115:21, 117:8, 149:13
**relevance** [6] - 101:13, 101:23, 104:7, 105:14, 105:22, 149:9
**relied** [3] - 128:1, 128:4, 128:22
**remained** [1] - 77:25
**remember** [28] - 14:6, 18:5, 39:4, 39:11, 42:4, 42:11, 46:10, 52:17, 52:22, 55:17, 58:11, 60:21, 82:3, 92:18, 97:18, 97:22, 115:10, 118:24, 120:8, 124:10, 138:14, 156:19, 160:2, 163:24, 169:16, 171:21, 179:19, 180:23
**renewed** [1] - 126:10
**replaced** [5] - 32:2, 90:20, 90:23, 154:1, 176:1
**replied** [1] - 164:4
**report** [6] - 7:11, 12:20, 33:23, 33:24, 34:2, 169:23
**reported** [11] - 34:3, 37:1, 37:4, 37:13, 37:16, 38:25, 39:2, 46:6, 78:7, 168:7, 169:20
**REPORTED** [1] - 2:2
**reporter** [1] - 52:8
**Reporter** [2] - 2:3, 182:11
**reporting** [1] - 126:12
**represent** [2] - 147:18, 150:15
**representation** [5] - 112:13, 112:15, 112:17, 112:20, 112:23
**representative** [1] - 18:12
**representatives** [1] - 121:9
**reps** [1] - 88:15
**request** [4] - 34:21, 80:9, 162:14, 162:15
**requested** [1] - 139:14
**requesting** [1] - 114:18
**requests** [3] - 34:18, 52:8, 53:17
**required** [3] - 76:9, 78:4, 100:2
**requirements** [5] - 21:8, 72:23, 126:12, 151:5, 163:6
**requires** [3] - 123:6, 145:6, 177:15
**research** [3] - 13:21, 114:20, 123:1
**researcher** [2] - 123:6, 123:11
**researching** [1] - 34:19
**resignation** [2] - 110:2, 110:6
**resigned** [1] - 107:24
**resigning** [1] - 108:3
**resolution** [1] - 37:10
**respect** [2] - 77:17, 178:25
**respectfully** [1] - 133:20
**responding** [1] - 161:14
**response** [20] - 7:1, 13:13, 13:21, 20:7, 33:20, 60:25, 62:21, 63:20, 70:24, 74:5, 80:8, 86:17, 95:22,

95:25, 96:24, 97:7, 158:13, 158:14, 160:12, 166:3
**Response** [2] - 3:15, 80:19
**responses** [1] - 29:24
**responsibility** [2] - 72:17, 75:17
**rest** [1] - 140:8
**resume** [2] - 5:24, 181:1
**return** [3] - 60:8, 168:19, 168:22
**returning** [1] - 168:24
**returns** [3] - 100:23, 167:23, 167:24
**review** [1] - 139:7
**reviewed** [3] - 126:24, 139:5, 142:10
**Reyes** [2] - 49:13, 50:17
**Rican** [1] - 12:25
**Rico** [3] - 12:25, 52:12, 53:20
**rigorously** [1] - 63:6
**ring** [1] - 86:7
**rise** [7] - 58:14, 58:18, 58:25, 124:13, 124:19, 181:4, 182:2
**Rochester** [3] - 77:20, 93:4, 95:7
**role** [6] - 102:2, 107:1, 109:20, 115:4, 148:4, 148:6
**rolled** [1] - 82:3
**rolling** [1] - 18:18
**room** [9] - 58:13, 116:2, 119:3, 119:4, 119:5, 119:23, 120:1, 120:13, 120:14
**rooms** [3] - 117:1, 119:7, 119:8
**route** [1] - 110:23
**RPH** [2] - 50:20, 53:13
**RPR** [2] - 2:3, 182:11
**rules** [2] - 130:10, 131:25
**Rumore** [9] - 23:10, 24:13, 25:5, 34:20, 46:3, 49:9, 77:3, 77:7, 157:6
**run** [2] - 106:21, 130:7
**running** [2] - 82:9, 87:3
**rush** [1] - 18:21
**Rushmore** [1] - 133:1
**RX** [2] - 90:22

## S

**Safe** [109] - 11:17, 18:12, 24:20, 25:20, 26:7, 26:12, 26:14, 26:16, 27:15, 27:20, 31:24, 32:2, 34:1, 35:2, 40:1, 41:7, 41:21, 47:17, 53:12, 55:25, 56:10, 61:22, 62:24, 63:4, 63:6, 63:9, 64:21, 72:16, 72:20, 74:11, 75:21, 76:5, 76:11, 77:18, 77:24, 77:25, 78:7, 78:9, 81:9, 81:18, 82:5, 82:9, 82:13, 83:2, 84:20, 85:6, 85:11, 85:12, 85:14, 86:19, 86:22, 87:25, 98:6, 98:19, 101:8, 102:1, 102:13, 102:23, 106:17, 106:22, 106:24, 107:19, 108:10, 109:1, 109:5, 111:14, 116:9, 116:14, 117:18, 121:25, 122:7, 126:3, 126:17, 127:8, 127:9, 127:13, 127:20, 129:2, 129:5, 130:3, 130:9, 130:11, 130:20, 130:23, 130:24, 131:2, 131:7, 131:19, 132:18, 133:10, 133:22, 141:2, 141:15, 141:19, 142:7, 142:12, 142:19, 143:11, 143:18, 144:25, 146:22, 148:3, 149:1, 154:7, 154:8, 158:13, 167:24, 179:24, 180:17
**sale** [1] - 88:15
**Salemi** [5] - 14:3, 14:4, 14:22, 15:8, 15:17
**sales** [18] - 18:12, 34:19, 45:5, 53:15, 84:7, 85:13, 106:21, 142:10, 143:7, 143:16, 143:22, 144:7, 144:9, 145:14, 148:6, 167:10, 168:23
**Sales** [6] - 86:12, 88:14, 171:3, 171:10, 171:13, 171:16
**sales@gentekusa.com** [1] - 51:10
**salespeople** [4] - 144:11, 144:24, 144:25, 146:23
**sample** [2] - 23:17, 138:3
**San** [3] - 52:4, 53:13, 158:2
**satisfied** [1] - 95:25
**savvy** [1] - 128:1
**saw** [2] - 77:5, 167:24
**scared** [3] - 33:19, 118:2, 119:11
**scene** [1] - 127:3
**school** [1] - 149:25
**schools** [1] - 150:1
**scientific** [7] - 123:1, 123:6, 123:11, 123:15, 123:25, 134:16, 138:23
**screen** [1] - 6:20
**screenshot** [1] - 13:24
**screw** [1] - 68:18
**scroll** [13] - 13:11, 34:8, 36:1, 39:5, 44:16, 46:23, 50:1, 69:10, 78:1, 81:5, 88:21, 89:11, 100:21
**scrutiny** [1] - 48:10
**SCS** [3] - 55:7, 55:24, 56:2
**sealed** [1] - 38:18
**second** [21] - 11:21, 11:24, 13:9, 13:25, 15:14, 36:23, 50:19, 61:2, 68:23, 75:9, 88:12, 93:23, 116:21, 138:18, 140:22, 143:6, 149:6, 161:12, 169:10, 175:10
**Section** [1] - 41:5
**Security** [1] - 78:4
**SECURITY** [7] - 58:14, 58:18, 58:25, 124:13, 124:19, 181:4, 182:2
**see** [102] - 6:20, 7:24, 13:18, 14:21, 16:15, 17:6, 17:12, 18:14, 18:17, 20:2, 22:8, 22:10, 23:9, 23:12, 26:12, 27:5, 27:7, 29:1, 29:21, 31:17, 31:20, 33:8, 33:13, 33:16, 34:9, 35:23, 36:1, 36:7, 36:11, 36:16, 38:7, 38:13, 38:18, 39:8, 40:15, 41:6, 41:11, 42:4, 43:13, 43:16, 46:2, 47:1, 47:4, 47:10, 49:4, 55:5, 55:9, 55:24, 56:4, 56:10, 57:14, 58:12, 58:22, 61:2, 61:21, 61:24, 62:24, 64:20, 64:24, 66:23, 69:7, 73:25, 75:11, 77:16, 81:23, 83:22, 84:10, 86:10, 86:14, 88:4, 88:8, 88:17, 88:24, 89:14, 89:24, 97:25, 98:3, 98:12, 98:16, 98:25, 100:14, 104:10, 106:9, 110:21, 115:16, 124:11, 124:16, 141:23, 141:25, 160:15, 161:8, 162:17, 163:8, 168:13, 171:5, 171:7, 172:4, 175:5, 175:10, 181:2, 181:7
**seeing** [5] - 25:4, 77:3, 97:10, 97:11, 101:11
**seek** [1] - 109:7
**seeking** [1] - 131:20
**seem** [7] - 22:16, 87:21, 103:6, 119:15, 138:14, 144:24, 145:1
**seizure** [3] - 27:15, 103:23, 104:14
**sell** [11] - 9:13, 16:22, 31:5, 35:8, 106:24, 127:8, 140:24, 141:2, 141:4, 141:6, 142:7
**selling** [3] - 27:12, 41:18, 130:22
**send** [15] - 11:20, 12:14, 20:8, 46:2, 78:16, 88:4, 133:19, 138:18, 141:25, 149:24, 151:12, 151:18, 158:13, 171:10, 172:22
**Sender** [1] - 26:12
**sending** [5] - 20:6, 39:11, 93:6, 143:4, 164:16
**sends** [2] - 90:8, 171:17
**sense** [4] - 145:13, 151:12, 169:23
**sent** [26] - 10:17, 12:10, 27:21, 34:17, 34:23, 34:24, 35:5, 45:8, 54:4, 63:19, 72:3, 79:5, 80:2, 81:3, 90:14, 97:8, 139:13, 141:24, 151:4, 164:19, 171:3, 172:21, 173:9, 174:20, 179:17, 179:23
**sentence** [3] - 91:14, 136:21, 138:13
**separate** [1] - 70:3
**September** [6] - 27:12, 27:22, 36:2, 37:18, 42:22, 89:25
**setting** [1] - 75:25
**seven** [1] - 165:17
**several** [6] - 43:6, 75:22, 111:21, 139:5, 142:16, 175:15
**shady** [1] - 87:15
**share** [7] - 7:16, 8:21, 9:11, 107:7, 107:11, 142:14, 169:18
**shared** [11] - 24:21, 50:6, 64:8, 79:11, 80:11, 97:3, 127:15, 127:16, 165:7, 169:14
**sharp** [1] - 172:15
**shifting** [1] - 170:23
**ship** [2] - 76:4, 159:25
**shipment** [1] - 27:7
**shipped** [7] - 70:21, 101:1, 101:7, 101:12, 101:22, 102:8, 144:19
**Shithead** [1] - 68:5
**shortly** [1] - 110:15
**show** [32] - 9:21, 21:23, 23:7, 26:4, 28:10, 39:16, 43:21, 48:15, 51:13, 53:24, 57:10, 62:7, 64:2, 64:3, 65:25, 71:25, 73:10, 74:20, 76:25, 77:19, 79:2, 80:5, 80:25, 83:8, 85:16, 93:10, 95:13, 96:4, 103:8, 105:6, 114:11, 115:5
**showed** [3] - 114:7, 127:20, 167:5
**showing** [3] - 38:19, 115:2, 167:6
**shows** [2] - 68:8, 115:24

**Shukurov** [3] - 77:7, 161:25, 172:25
**shut** [1] - 150:1
**sic** [1] - 133:1
**side** [11] - 38:19, 40:12, 56:7, 94:7, 94:10, 140:22, 142:13, 142:14
**side-by-side** [3] - 40:12, 56:7, 94:7
**similar** [8] - 21:18, 22:19, 24:14, 24:17, 31:24, 55:12, 55:22, 107:1
**sitting** [2] - 170:9, 179:7
**situation** [5] - 47:2, 114:22, 115:3, 115:7, 116:6
**six** [4] - 11:18, 31:16, 109:4, 120:22
**skeptical** [1] - 23:2
**skipping** [2] - 15:25, 16:6
**Skype** [2] - 144:16, 154:2
**slip** [1] - 23:16
**slower** [1] - 176:3
**small** [3] - 111:22, 119:8, 141:8
**smaller** [1] - 108:14
**smudges** [1] - 168:13
**sneaky** [2] - 32:7, 32:22
**snowballing** [1] - 100:3
**software** [7] - 82:6, 82:8, 84:21, 129:11, 129:18, 129:19
**softwares** [1] - 82:5
**sold** [13] - 12:23, 19:5, 22:9, 34:15, 35:3, 77:19, 77:21, 78:9, 94:16, 98:6, 98:8, 99:1, 100:14
**solely** [3] - 126:20, 126:21, 128:21
**solution** [3] - 20:13, 20:23, 21:1
**Solutions** [11] - 26:7, 26:13, 26:16, 27:15, 31:25, 32:2, 40:1, 53:12, 55:25, 56:11, 85:6
**solves** [1] - 16:13
**someone** [9] - 7:6, 10:19, 24:8, 29:20, 92:16, 122:16, 147:1, 168:8, 177:12
**sometime** [3] - 137:16, 143:12, 178:16
**sometimes** [10] - 120:19, 131:12, 131:13, 132:2, 132:10, 146:22, 146:24, 148:20, 148:23
**somewhat** [1] - 31:24
**somewhere** [2] - 123:16, 141:10
**soon** [1] - 180:10
**SOP** [1] - 34:18
**SOPs** [12] - 102:13, 102:19, 102:23, 103:4, 103:5, 128:7, 128:24, 129:3, 129:24, 139:2, 139:8
**sorry** [21] - 26:17, 31:21, 34:10, 52:9, 53:23, 55:16, 57:5, 66:21, 111:9, 117:13, 125:25, 131:10, 140:3, 143:25, 146:2, 160:22, 160:23, 164:24, 167:19, 169:11, 180:14
**sort** [9] - 21:11, 21:13, 21:21, 35:14, 65:12, 129:14, 144:19, 148:3
**sound** [1] - 172:10
**sounds** [6] - 109:4, 111:9, 121:8, 141:21, 145:19
**Source** [1] - 99:8
**sourced** [1] - 9:13
**sources** [1] - 61:23
**SOUTHERN** [1] - 1:2
**Southern** [1] - 182:12
**speaking** [5] - 91:8, 91:14, 92:2, 92:4, 100:25
**speaks** [2] - 44:22, 161:16
**special** [2] - 140:14, 140:16
**Specialty** [1] - 26:13
**specific** [8] - 36:14, 36:20, 39:12, 41:7, 41:8, 41:22, 122:22, 138:24
**specifically** [4] - 122:17, 169:17, 178:22, 179:10
**specificity** [3] - 123:7, 139:7, 142:15
**specifics** [1] - 52:22
**speculation** [3] - 32:16, 145:6, 177:15
**spent** [2] - 129:9, 173:22
**spinning** [1] - 109:25
**spoken** [1] - 166:20
**spot** [2] - 117:15, 124:4
**spring** [1] - 178:16
**SRX** [2] - 26:13, 26:14
**staff** [2] - 142:10, 168:10
**Stain** [1] - 90:22
**Stamford** [1] - 53:19
**standard** [5] - 8:10, 128:5, 128:12, 128:20, 168:16
**Standard** [1] - 130:4
**standards** [1] - 53:22
**standing** [2] - 145:20, 146:7
**stands** [2] - 132:20, 172:16
**start** [5] - 23:23, 93:6, 121:25, 125:17, 170:15
**started** [7] - 84:4, 90:17, 114:24, 117:20, 122:1, 126:3, 143:8
**starting** [1] - 21:7
**starts** [2] - 42:1, 45:3
**state** [12] - 52:18, 72:18, 72:24, 126:6, 126:7, 126:8, 126:9, 126:21, 141:15, 141:19, 142:2
**state's** [1] - 140:1
**state-to-state** [1] - 52:18
**statement** [11] - 41:4, 41:20, 41:22, 47:15, 47:23, 48:1, 57:18, 61:7, 106:16, 113:24, 176:1
**statements** [1] - 105:18
**STATES** [3] - 1:1, 1:4, 1:11
**states** [6] - 72:22, 72:25, 73:1, 141:16, 141:18, 142:3
**States** [5] - 1:15, 2:4, 15:2, 45:6, 182:12
**statin** [3] - 36:10, 37:1, 40:22
**stating** [2] - 52:5, 52:11
**station** [2] - 116:25, 117:2
**status** [1] - 144:18
**statute** [2] - 45:6, 45:8
**statutes** [1] - 132:1
**stayed** [1] - 127:14
**STENOGRAPHICALLY** [1] - 2:2
**step** [3] - 123:16, 139:2, 143:6
**steps** [5] - 24:10, 128:13, 128:16, 139:23, 174:11
**still** [12] - 5:12, 21:15, 26:2, 59:14, 63:23, 63:25, 87:18, 87:19, 112:17, 146:9, 150:10, 165:19
**stop** [2] - 180:10, 180:17
**stopped** [2] - 179:18, 180:19
**story** [2] - 166:19, 166:23
**Streck** [1] - 157:21
**Street** [2] - 1:16, 1:19
**stress** [3] - 111:10, 111:12, 116:17
**stressful** [5] - 108:10, 108:18, 109:10, 111:9, 114:22
**Stribild** [8] - 42:3, 42:7, 46:5, 46:10, 46:17, 47:12, 49:9, 157:9
**strike** [4] - 32:17, 33:2, 33:3, 94:2
**stuff** [2] - 18:18, 157:10
**subject** [2] - 34:12, 88:5
**submission** [1] - 80:9
**submit** [2] - 7:11, 110:2
**Submit** [1] - 41:2
**submitted** [5] - 41:24, 43:6, 46:20, 47:12, 78:18
**submitting** [1] - 39:19
**subsequent** [1] - 7:24
**subtract** [1] - 172:8
**succession** [1] - 42:11
**suggest** [1] - 121:12
**suggesting** [1] - 119:16
**suggestion** [1] - 30:6
**suggestions** [1] - 110:17
**supplier** [3] - 52:12, 55:7, 74:16
**suppliers** [4] - 18:13, 35:13, 35:16, 169:15
**Supply** [2] - 32:3, 78:4
**supply** [1] - 63:7
**support** [3] - 96:19, 110:21, 165:12
**supporting** [2] - 120:20, 165:20
**supports** [1] - 95:19
**supposed** [5] - 130:11, 139:2, 139:23, 177:8, 178:8
**supposedly** [1] - 99:1
**surprised** [3] - 101:16, 108:4, 117:25
**surrounding** [1] - 115:7
**sustained** [40] - 9:5, 32:18, 32:25, 44:24, 47:21, 48:3, 48:12, 69:24, 70:8, 74:19, 94:1, 101:14, 101:19, 101:24, 102:5, 102:17, 104:6, 113:7, 115:22, 118:4, 118:20, 119:13, 120:3, 121:23, 124:3, 134:10, 135:3, 135:16, 144:2, 145:8, 146:20, 149:10, 167:2, 169:9, 170:13, 177:16, 177:22, 178:19, 179:14, 180:8
**sweaty** [1] - 118:12
**switch** [1] - 80:22
**switched** [2] - 82:5, 82:8
**sworn** [1] - 6:4
**Symtuza** [2] - 38:18, 40:18
**Synergy** [69] - 6:10, 6:11, 6:13, 6:25, 7:8, 7:12, 8:13, 8:16, 8:19, 9:1, 9:8, 9:14, 10:16, 11:17, 11:20, 11:24, 12:11, 12:12, 12:19, 12:21, 12:24, 13:9, 14:1, 15:14, 16:16, 16:20, 16:23, 17:4, 17:5, 17:16, 18:4, 18:20, 20:11, 20:14, 20:19, 20:24, 21:17, 22:2, 22:5, 22:20, 23:1, 23:13, 23:16, 23:20, 24:1, 24:4, 25:6, 25:14, 25:17, 25:18, 25:22, 25:23, 26:20, 27:12, 27:21, 29:2, 29:3,

61:13, 82:17, 113:12, 113:22, 137:9, 137:10, 137:21, 138:3, 138:17, 142:18
**system** [2] - 140:2, 178:23

## T

**T3** [47] - 6:24, 7:12, 8:13, 8:16, 11:10, 11:21, 11:24, 12:14, 12:15, 12:17, 12:21, 13:9, 14:1, 15:14, 17:17, 18:4, 18:6, 22:5, 22:20, 23:1, 23:17, 23:19, 24:9, 26:16, 30:21, 55:18, 55:21, 56:10, 61:4, 61:13, 62:1, 62:25, 82:7, 83:23, 90:5, 90:10, 92:10, 94:10, 100:2, 138:3, 151:10, 158:3, 163:5, 167:6, 167:8, 170:10
**T3s** [66] - 10:17, 12:2, 18:20, 18:21, 20:6, 20:11, 20:15, 20:24, 21:2, 21:3, 21:18, 21:19, 22:2, 25:18, 25:23, 26:7, 27:17, 30:2, 31:8, 31:23, 31:25, 32:15, 36:5, 37:25, 52:7, 52:12, 52:13, 52:21, 52:23, 53:1, 53:6, 61:10, 68:20, 70:18, 70:20, 71:11, 82:10, 84:5, 84:12, 84:16, 84:17, 84:23, 87:1, 92:24, 93:3, 93:7, 93:24, 94:4, 95:10, 96:15, 99:4, 99:5, 99:18, 100:4, 100:9, 129:21, 136:4, 137:23, 138:8, 164:15, 164:17, 164:19, 170:4
**table** [2] - 15:4, 30:19
**Talbert** [1] - 86:6
**talks** [1] - 42:3
**tardy** [1] - 125:17
**tasks** [2] - 130:12, 144:22
**team** [10] - 24:21, 63:15, 84:8, 85:13, 140:6, 140:8, 142:9, 162:8, 168:11, 168:24
**Teams** [46] - 4:4, 4:6, 4:7, 4:8, 4:9, 4:10, 4:14, 4:15, 19:16, 19:23, 66:3, 66:11, 69:13, 69:21, 70:1, 71:16, 73:12, 73:20, 74:23, 75:6, 83:11, 83:19, 85:19, 86:2, 97:23, 103:11, 103:19, 106:5, 144:16, 148:7, 152:5, 152:23, 153:19, 153:20, 153:22, 154:1, 154:9, 154:14, 154:16, 154:17, 154:18, 155:7, 159:12, 160:20, 160:21, 161:6
**tedious** [2] - 151:23, 160:23
**Tedrow** [4] - 60:5, 106:19, 106:21, 107:15
**Tedrow's** [1] - 107:4
**template** [1] - 31:25
**tenure** [4] - 48:6, 82:5, 102:23, 143:13
**term** [4] - 65:4, 65:6, 65:12, 180:13
**terminated** [1] - 53:14
**termination** [4] - 53:16, 80:9, 162:14, 162:15
**terminology** [1] - 65:15
**terms** [2] - 31:25, 130:17
**testified** [12] - 6:5, 32:6, 71:15, 85:4, 105:16, 105:24, 106:12, 147:24, 165:23, 165:25, 169:7, 169:13
**testify** [1] - 167:16
**testifying** [3] - 118:14, 120:2, 145:22
**testimony** [11] - 58:21, 92:1, 102:16, 124:16, 135:5, 138:9, 144:4, 150:24, 180:3, 181:7
**Tex** [1] - 82:25
**text** [11] - 20:3, 33:8, 33:11, 35:23, 37:19, 70:5, 90:25, 92:5, 152:5, 153:21, 156:7
**texts** [3] - 92:14, 152:5, 163:16
**THE** [138] - 1:10, 1:13, 5:2, 5:10, 5:14, 5:16, 5:21, 9:5, 10:10, 14:18, 16:9, 19:22, 27:1, 28:20, 32:18, 32:20, 32:25, 33:3, 40:7, 43:20, 44:7, 44:24, 47:21, 48:3, 48:12, 48:25, 50:13, 51:23, 52:9, 54:10, 55:2, 56:20, 56:23, 57:2, 57:4, 57:6, 57:8, 58:5, 58:9, 58:14, 58:16, 58:18, 58:20, 58:25, 59:3, 59:7, 59:12, 59:16, 59:18, 59:23, 60:1, 60:14, 62:17, 64:16, 66:10, 69:24, 70:8, 72:12, 73:19, 74:9, 74:19, 75:5, 77:13, 79:22, 80:18, 81:15, 83:18, 86:1, 91:16, 92:7, 93:20, 94:1, 96:12, 101:14, 101:19, 101:24, 102:5, 102:17, 102:21, 103:18, 104:6, 105:25, 106:4, 111:2, 111:4, 113:7, 115:22, 117:9, 118:4, 118:8, 118:15, 118:20, 119:13, 120:3, 121:23, 124:3, 124:6, 124:13, 124:15, 124:19, 124:22, 125:3, 125:6, 125:11, 125:17, 134:10, 134:20, 135:3, 135:16, 144:2, 145:8, 145:23, 146:20, 149:10, 149:14, 155:16, 161:18, 167:2, 169:9, 170:13, 173:19, 176:24, 177:16, 177:22, 178:11, 178:19, 179:5, 179:14, 180:8, 180:22, 181:4, 181:6, 181:8, 181:9, 181:16, 181:21, 182:1, 182:2
**theirs** [2] - 23:17, 29:20
**themselves** [3] - 9:10, 85:1, 164:13
**therapy** [1] - 109:8
**thereabouts** [1] - 178:15
**Thereupon** [1] - 6:2
**third** [14] - 18:3, 22:1, 22:5, 22:22, 22:25, 25:17, 25:22, 94:4, 94:15, 95:9, 119:25, 120:5, 120:7, 120:11
**thread** [1] - 92:6
**threatening** [1] - 44:21
**three** [6] - 21:18, 23:23, 120:17, 138:12, 161:10, 172:8
**Tim** [1] - 157:21
**timeline** [2] - 173:17, 180:2
**tiny** [1] - 33:14
**title** [2] - 49:13, 116:16
**Title** [1] - 41:5
**today** [3] - 36:17, 121:5, 170:9
**together** [2] - 60:25, 172:17
**toll** [1] - 109:1
**tomorrow** [4] - 180:25, 181:2, 181:7, 181:10
**took** [3] - 108:11, 125:18, 175:25
**top** [17] - 8:5, 9:16, 15:21, 32:3, 34:8, 38:11, 38:16, 46:24, 51:7, 54:13, 56:16, 70:16, 81:22, 88:18, 89:12, 109:15
**touch** [1] - 175:10
**Trace** [11] - 80:23, 81:9, 81:20, 81:25, 82:3, 82:8, 82:11, 83:2, 84:15, 84:18, 129:15
**tracing** [4] - 55:8, 55:11, 55:21, 61:4
**track** [4] - 123:17, 129:10, 129:21, 173:24
**Track** [11] - 80:22, 81:9, 81:20, 81:25, 82:3, 82:8, 82:11, 83:2, 84:15, 84:18, 129:15
**trained** [1] - 127:25
**transaction** [15] - 7:9, 7:18, 7:25, 12:15, 22:8, 24:11, 27:7, 30:24, 53:17, 84:18, 87:4, 92:19, 94:23, 100:1, 156:18
**transactions** [11] - 18:7, 24:6, 26:2, 53:15, 82:10, 82:12, 91:10, 96:19, 98:20, 165:11, 167:10
**TRANSCRIPT** [1] - 1:10
**transcription** [1] - 182:7
**trial** [4] - 130:18, 179:7, 181:1, 182:3
**TRIAL** [1] - 1:10
**trick** [1] - 177:14
**tried** [2] - 83:4, 167:9
**Triumeq** [1] - 38:19
**true** [9] - 17:19, 41:22, 61:7, 63:3, 78:10, 78:23, 166:4, 176:17, 180:1
**trust** [2] - 125:24, 126:1
**truth** [4] - 112:21, 113:1, 131:23, 147:8
**try** [6] - 24:10, 48:9, 74:3, 99:22, 134:11, 138:23
**trying** [19] - 7:17, 21:10, 29:9, 35:14, 49:18, 87:4, 90:17, 91:9, 91:10, 92:20, 99:18, 113:22, 113:24, 114:4, 117:15, 138:7, 138:15, 149:15, 177:13
**turn** [3] - 30:14, 77:20, 146:22
**turned** [1] - 145:23
**twice** [2] - 120:15, 160:11
**twitched** [1] - 109:4
**twitching** [3] - 109:5, 111:11, 111:12
**two** [21] - 18:4, 18:24, 20:10, 20:23, 21:2, 35:13, 35:16, 61:9, 63:8, 102:16, 107:12, 115:9, 119:2, 121:5, 127:2, 127:15, 138:12, 149:23, 150:8, 161:3, 168:17
**Two** [1] - 29:8
**Tyler** [6] - 60:5, 106:19, 106:21, 107:4, 107:15
**type** [3] - 64:11, 175:8, 175:17
**typed** [1] - 67:14
**types** [3] - 43:3, 50:7,

65:9
**typical** [2] - 99:15, 109:14
**typically** [3] - 148:17, 168:9, 168:19

## U

**U.S** [4] - 15:1, 15:18, 41:5, 182:13
**ultimately** [1] - 100:8
**unable** [1] - 95:21
**unaware** [1] - 70:22
**uncomfortable** [1] - 115:3
**undeliverable** [1] - 52:2
**under** [11] - 5:12, 13:2, 14:4, 40:25, 41:2, 59:14, 78:4, 88:25, 114:2, 118:25, 139:2
**underlying** [2] - 104:24, 104:25
**unfit** [1] - 47:8
**UNITED** [3] - 1:1, 1:4, 1:11
**United** [4] - 1:15, 2:4, 45:6, 182:12
**unless** [1] - 16:14
**unquote** [1] - 144:9
**up** [74] - 6:17, 8:11, 9:16, 11:14, 12:5, 13:11, 13:17, 14:8, 15:1, 15:9, 19:12, 21:23, 25:11, 25:20, 31:11, 32:5, 33:4, 35:19, 36:22, 37:9, 38:4, 40:12, 40:13, 42:12, 43:10, 45:15, 45:20, 46:23, 47:16, 47:23, 49:11, 49:21, 50:4, 50:25, 54:2, 56:7, 57:20, 60:2, 60:18, 63:12, 63:15, 63:22, 67:24, 68:23, 69:4, 81:22, 87:6, 87:13, 88:1, 88:11, 89:12, 89:21, 90:7, 97:1, 97:13, 99:18, 100:8, 100:19, 110:18, 114:7, 114:11, 115:2, 115:5, 115:24, 127:20, 131:7, 147:15, 151:1, 156:17, 170:19, 174:16, 175:19, 176:21, 178:6
**update** [2] - 52:10, 128:21
**updated** [2] - 12:21, 84:22
**updates** [1] - 34:18
**urgency** [3] - 18:23, 19:1, 145:13
**usual** [1] - 63:16
**Utah** [7] - 70:21, 70:22, 71:1, 71:11, 76:10, 131:16, 159:25
**UTC** [2] - 172:8, 172:15
**utilizing** [1] - 81:20
**utterly** [1] - 109:9

## V

**vacation** [1] - 104:1
**vague** [2] - 65:13, 92:22
**vaguely** [1] - 86:8
**valid** [10] - 67:15, 174:18, 174:19, 175:21, 175:23, 175:24, 176:21, 177:4, 177:7
**Valid** [2] - 177:2, 177:3
**validated** [1] - 126:24
**Value** [1] - 15:8
**Valued** [2] - 56:18, 81:18
**variety** [1] - 100:22
**various** [4] - 63:13, 114:11, 129:18, 129:19
**vary** [2] - 142:2, 142:3
**Vega** [1] - 20:19
**vendor** [38] - 6:10, 6:25, 10:17, 15:3, 15:11, 28:6, 28:8, 29:10, 30:15, 75:17, 76:8, 87:17, 91:22, 104:17, 126:19, 126:24, 127:18, 128:17, 130:14, 138:21, 139:3, 139:19, 140:13, 141:22, 142:6, 142:7, 142:12, 143:4, 143:24, 146:8, 147:9, 147:15, 171:7, 172:2, 172:25, 174:9, 174:12, 176:13
**vendor's** [2] - 139:11, 139:16
**vendors** [24] - 6:14, 7:17, 30:11, 41:8, 63:13, 63:14, 76:9, 76:19, 76:21, 82:13, 83:3, 104:10, 105:3, 127:5, 130:22, 131:1, 131:2, 142:16, 144:5, 145:16, 145:20, 146:6, 150:11, 151:18
**verification** [2] - 140:2, 142:1
**Verifications** [1] - 153:14
**verifications** [1] - 18:6
**verified** [3] - 12:23, 24:6, 174:13
**verify** [25] - 6:24, 7:18, 24:10, 50:23, 52:20, 53:5, 62:25, 67:13, 77:18, 87:1, 87:4, 90:18, 91:10, 96:18, 99:22, 136:3, 138:7, 140:2, 140:11, 141:24, 165:11, 167:9, 174:8, 174:15, 176:17
**verifying** [5] - 23:18, 87:19, 127:6, 127:7, 128:14
**version** [14] - 11:21, 11:24, 13:9, 18:3, 22:1, 22:22, 25:22, 37:10, 90:10, 90:14, 93:5, 93:6, 94:15, 138:18
**versions** [9] - 18:5, 18:7, 20:10, 21:18, 25:17, 61:9, 84:20, 94:4, 95:9
**versus** [2] - 159:25, 173:18
**view** [2] - 129:22, 130:2
**virtual** [2] - 73:3, 73:7
**voicing** [1] - 107:15
**volume** [1] - 65:18
**Volume** [1] - 1:7
**vs** [1] - 1:6

## W

**W-9** [3] - 171:8, 172:2, 172:25
**wait** [1] - 52:6
**waive** [3] - 5:17, 59:19, 125:7
**walk** [1] - 117:6
**walked** [1] - 21:17
**walking** [1] - 118:10
**Warehouse** [1] - 158:2
**warehouse** [6] - 70:21, 76:5, 87:11, 87:21, 100:15, 168:10
**warehouses** [1] - 76:11
**ways** [1] - 149:19
**wearing** [1] - 115:18
**web** [4] - 22:10, 140:1, 140:11, 142:2
**website** [11] - 13:4, 15:2, 15:12, 22:13, 22:19, 67:14, 142:12, 174:17, 175:9, 175:14, 175:16
**Wednesday** [1] - 171:19
**Weed** [3] - 18:9, 18:11, 18:13
**week** [2] - 15:3, 99:21
**weekly** [2] - 148:13
**weeks** [2] - 29:2, 102:16
**weight** [1] - 109:7
**well-being** [2] - 108:1, 108:2
**Wellness** [4] - 95:6, 95:20, 98:1, 100:9
**whatsoever** [3] - 84:5, 84:24, 164:12
**wheels** [1] - 109:25
**White** [5] - 34:17, 34:23, 34:24, 35:5, 41:14
**wholesale** [10] - 7:16, 67:12, 91:22, 140:17, 140:24, 141:1, 141:12, 151:4, 175:24, 178:4
**Wholesale** [6] - 15:8, 32:3, 52:5, 53:13, 53:18, 67:9
**wholesaler** [17] - 12:22, 26:11, 67:17, 67:21, 72:16, 73:3, 131:6, 140:13, 141:23, 176:2, 176:15, 177:3, 177:8, 177:19, 178:1, 178:3, 178:8
**Wholesaler** [2] - 13:14, 176:10
**wholesaler's** [2] - 140:18, 140:19
**wholesalers** [7] - 21:20, 49:12, 72:21, 82:13, 130:22, 131:3, 131:22
**Wholesalers** [14] - 6:10, 6:11, 6:13, 7:9, 8:19, 11:18, 11:20, 12:22, 12:25, 20:19, 21:17, 137:9, 137:10, 137:21
**wholesaling** [1] - 73:7
**widely** [1] - 145:14
**willfully** [1] - 41:4
**WILLIAM** [1] - 1:10
**William** [2] - 1:18, 2:4
**willing** [1] - 125:20
**windows** [1] - 119:8
**witness** [33] - 9:21, 14:9, 19:13, 26:5, 28:10, 39:16, 43:22, 48:16, 49:21, 51:14, 53:24, 54:18, 56:22, 57:21, 60:3, 62:7, 64:3, 65:25, 71:25, 73:10, 74:21, 77:1, 79:2, 80:6, 80:25, 83:8, 85:16, 93:10, 96:4, 103:8, 105:6, 121:20, 180:7
**WITNESS** [5] - 3:2, 5:14, 52:9, 59:16, 181:8
**word** [1] - 144:14
**Word** [1] - 81:20
**words** [5] - 23:3, 35:12, 135:6, 135:19, 138:11
**works** [3] - 10:20, 12:18, 172:14
**Worldwide** [16] - 86:11, 86:12, 107:1, 142:19, 142:23, 143:2, 143:5, 143:7, 143:15, 143:18, 143:22, 144:10, 144:25, 171:10, 171:13, 171:16
**worms** [3] - 47:7, 47:16, 47:24
**worrisome** [2] - 114:24, 116:19
**worry** [1] - 121:16
**Worst** [1] - 88:17
**write** [36] - 9:17, 13:13, 14:25, 15:10, 15:22, 16:12, 17:21, 20:3, 20:7, 22:18, 22:24, 29:6, 29:13, 29:22, 33:18, 33:20, 34:13, 35:2, 38:17, 51:6, 52:1, 53:11, 56:16, 65:17, 68:17, 70:18, 70:24, 71:10, 75:15, 84:7, 86:14, 86:17, 95:16, 96:16,

104:16, 104:20
**writes** [18] - 17:6, 17:13, 20:2, 23:12, 29:22, 31:17, 33:13, 36:7, 47:1, 49:15, 54:13, 55:5, 55:24, 61:3, 64:20, 86:14, 88:4, 89:24
**writing** [10] - 6:22, 17:5, 49:4, 55:6, 81:18, 88:8, 106:13, 123:21, 134:17, 152:13
**written** [1] - 161:24
**wrote** [12] - 10:16, 10:19, 20:5, 20:8, 22:6, 29:8, 29:14, 30:19, 68:7, 96:17, 151:3, 165:10

**X**

**XII** [1] - 1:7

**Y**

**year** [3] - 83:10, 108:11, 108:17
**Year** [1] - 51:8
**years** [6] - 111:24, 117:19, 127:3, 136:25, 139:5, 175:16
**yesterday** [4] - 24:15, 34:6, 57:12, 181:13
**York** [13] - 67:13, 67:22, 67:23, 68:3, 68:7, 142:3, 174:16, 174:20, 174:21, 175:8, 175:14, 175:22, 179:20
**yourself** [1] - 111:19

**Z**

**Zias** [2] - 115:14, 115:15
**Zimet** [2] - 1:22, 157:1
**ZIMET** [60] - 5:8, 5:19, 10:9, 14:16, 15:24, 16:2, 16:4, 16:6, 19:21, 26:25, 28:19, 40:5, 44:5, 44:22, 47:20, 48:2, 48:11, 48:23, 50:11, 51:21, 54:8, 54:16, 55:1, 57:3, 58:4, 59:10, 59:21, 60:13, 62:15, 64:14, 66:8, 69:23, 70:7, 72:10, 73:17, 74:8, 74:18, 75:3, 77:11, 79:20, 80:16, 81:13, 83:16, 85:24, 93:18, 93:25, 94:2, 101:13, 101:18, 101:23, 102:4, 102:15, 103:16, 105:14, 105:17, 105:20, 125:1, 125:9, 125:16, 181:19
**zones** [2] - 172:15, 173:17
**zoom** [2] - 17:12, 63:17