UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-20255-Dimitrouleas/Hunt

UNITED STATES OF AMERICA, | Fort Lauderdale, Florida
October 22, 2025
vs.
1:00 PM - 5:00 PM
PATRICK BOYD and CHARLES BOYD, | Volume XIII
Defendants. | Pages 1 to 178

---

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: Alexander Pogozelski, Esquire
Jacqueline DerOvanesian, Esquire
Assistant United States Attorneys
99 NE 4th Street
Miami, Florida 33132

FOR DEFENDANT PATRICK BOYD: William Barzee, Esquire
Ivlis Mantilla, Esquire
Barzee Flores
40 NW 3rd Street Ph 1
Miami, Florida 33128

FOR DEFENDANT CHARLES BOYD: Bruce Zimet, Esquire
633 S. Federal Highway Fl 6
Fort Lauderdale, Florida 33301

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

# I N D E X

WITNESS: PAGE:

ABIGAIL DIVILIO CON'T)
CROSS-EXAMINATION (con't) BY MR. BARZEE: 5
CROSS-EXAMINATION BY MR. ZIMET: 43

\- - -

N O E X H I B I T S M A R K E D

(Call to the Order of the Court.)

THE COURT: We are back on the record. Counsel are present. Both defendants are present.

We're waiting for two jurors. One is in the parking lot.

Anything to come before the Court before we get the jury here?

MR. POGOZELSKI: Just a couple of quick things, Your Honor.

I had shared with counsel for Charles Boyd a draft stipulation we had, and I think counsel for Patrick Boyd needs to review it; but my understanding is that we should be having a stipulation as to the location of some data servers that relate to an email, a couple of electronic messages.

We're hoping to have that finalized in lieu of calling the custodians of record for Microsoft and Yahoo.

And then, as I was just telling counsel for Patrick Boyd, we think we are likely to rest after this witness, unless something completely unexpected happens.

THE COURT: Okay.

MR. POGOZELSKI: So I wanted to update the Court on that.

THE COURT: I guess we can get Ms. Divilio back in.

MR. POGOZELSKI: Yes. One moment.

THE COURT: Tomorrow is 9:00 to 4:00, and Monday is

1:00 to 5:00, I think.

And, Ms. Divilio, you understand that you're still under oath?

THE WITNESS: Yes.

THE COURT: Apparently, there's one juror that's not here yet, but he's supposed to be five minutes away.

(Pause in proceedings.)

THE COURT: Let's bring in the jury.

(Jury in.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

All right. Mr. Barzee, you may continue.

Thereupon,

ABIGAIL DIVILIO CON'T),

having been first duly sworn or affirmed, was examined and testified as follows:

CROSS-EXAMINATION (con't)

BY MR. BARZEE:

Q. Good afternoon.

A. Good afternoon.
Q. Welcome back.
MR. BARZEE: Can we bring up Government's Exhibit 111, please. And go to the second or third page.
BY MR. BARZEE:
Q. That's the license that you received from Boulevard; correct?
A. Yes.
Q. And last time we were here, we were talking about the steps that you take to onboard or to approve one of these vendors. Do you remember that?
A. Yes.
Q. And one of the things that you do is check the license number, the registration number, which was down at the bottom; correct?
A. Correct.
Q. And when you checked it, that's when it came back to a pharmacy as opposed to a wholesaler; right?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. After -- after that part, you then check the physical address of the vendor; correct?
A. Yes. We looked up the mailing address on the application.
Q. Well, you do more than just look at the mailing address.

You actually look for the address because you want to look up the building to see if it looks legitimate; right?
A. To just get an idea what the building looks like, yes.
Q. All right.
MR. BARZEE: And can we pull up composite exhibit --
BY MR. BARZEE:
Q. And you did that in Boulevard, obviously; correct?
A. Yes.
MR. BARZEE: Let's bring up Exhibit 639, please, the Government's exhibit.
BY MR. BARZEE:
Q. So do you recognize that?
A. Yes.
Q. That was the physical address that you looked up for Boulevard. And you saw this photo when you looked it up?
A. Yes.
Q. All right. And was there anything that stood out to you viewing this photo, when you were making the determination as a compliance director, as to whether or not you would approve this wholesaler to do business with Safe Chain?
A. It looked like it was a little bit of an unusual area with the heavy residential presence in the background, what looks like an apartment building or something. It looked like it was kind of in a very congested strip mall.
Q. Anything that -- any red flag was raised as a result of

this photo?
A. It didn't look like some of the other businesses that we had worked with previously.
Q. Any red flag as a result of this photo?
A. I mean, just that, again, it didn't look like a lot of the other businesses or vendors that we worked with in the past.
Q. Maybe so, but that's not my question.
My question was whether or not there was a red flag, whether or not there was something that said "Whoa, warning, stop."
Anything like that?
A. Not particularly.
Q. Okay. So you weren't bothered by this when you looked it up?
A. Again, I guess, I just thought it didn't look like some of the typical businesses. I don't know if I felt bothered or not.
Q. Well, that's my question. Why don't you take a moment and think about it.
Did it bother you when you saw this photo?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Did you bring any concerns about this photograph that you were responsible for looking up, did you bring any concerns

about the appearance to Pat Boyd?
A. No.
Q. Did you bring any concerns of the appearance of Boulevard and its location next to an apartment building to Charlie Boyd?
A. I believe I sent him this picture.
Q. Before approving Boulevard or --
A. Sometime --
Q. -- much later?
A. I don't remember exactly when, but sometime in our discussions about Boulevard.
Q. Was it before you approved Boulevard? Did you send him this photo and say, "Hey, Charlie, this doesn't look like the ones that we've had before. I have a question about approving this. What do you think?"
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Well, you would agree with me that this was presented to Charlie Boyd months after you approved Boulevard as a vendor; correct?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
MR. BARZEE: Let's go to Government's Exhibit 640.
BY MR. BARZEE:
Q. Do you recognize this one?

A. Yes.
Q. And tell us what it is.
A. That looks to be the Gentek wholesaler.
Q. Any concerns when you looked this up?
A. It looked a little bit more like a warehouse situation, but no, not -- no real concerns right off the bat.
Q. When you say "right off the bat," that suggests that there may have been a concern.
So was there a concern after "right off the bat?"
A. Well, the concerns with a lot of these vendors didn't start with the initial application process.
Q. So that's my question.
Prior -- you're the head of compliance, and your job is to verify them as part of the onboarding process; right?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Did you approve Gentek after viewing that photo?
A. Yes.
Q. So neither one of those photos prevented you, as head of compliance, from authorizing Safe Chain to do business with those companies?
A. No.
Q. Okay.

MR. BARZEE: You can take that down.

BY MR. BARZEE:

Q. The last time we were here, we went through a lot of the exhibits that the Government had introduced that had nothing to do with Pat Boyd.

Do you recall that?

A. Yes.

Q. And what I would like to do today is take some time, to be fair, to go through some of the exhibits that Pat Boyd was mentioned on with you.

All right?

A. Okay.

Q. So the first one I would like to do is pull up Exhibit 429, and this is a Teams chat between you and Pat back in September 24th of 2020.

MR. BARZEE: And let's go to the second page, please.

BY MR. BARZEE:

Q. Do me a favor, you remember the Government talking to you about this exhibit --

MR. BARZEE: Let's go down to the next page, I think.

BY MR. BARZEE:

Q. Do you recall this conversation with Pat Boyd?

A. Can I just have a second to read it?

Q. Sure.

A. Yes.

MR. BARZEE: And we can go back to the front page as well.

BY MR. BARZEE:

Q. And tell me what this discussion was about.

MR. POGOZELSKI: Objection, Your Honor. The document speaks for itself.

THE COURT: Overruled.

BY MR. BARZEE:

Q. Do you recall this conversation that you had with Pat Boyd?

A. We were talking about some compliance training. I was asking if he saw something coming in, I guess, from a customer saying they filled out an application.

Q. Let me help you and go to down to this. I think this is what you and the Government were talking about last time.

A. Okay.

Q. And Pat Boyd is saying -- he's telling you about a call that he had where there was an issue with two bottles of one of the products from Boulevard, and someone didn't like the way it looked. And Pat Boyd says, "We may want to call up the Boulevard trail and verify the hands it's touched too," and it says "be sage," but we can assume that he meant "be safe."

Do you see that?

A. Yes.

Q. All right. Do you remember now that was -- that was an

inquiry and you and Pat were talking about how you were going to handle this issue with the two bottles and Pat was asking you to verify the Boulevard T3s to see whose hand it went through?
A. Yes.
Q. Do you recall that?
A. Yes.
Q. All right. So this is September 24th of 2020.
Patrick Boyd, the defendant, is the one asking you, the compliance director, to check the Boulevard T3s; correct?
A. Yes.
MR. BARZEE: And let's go to Government's Exhibit 173, please, and go down.
BY MR. BARZEE:
Q. All right. Now, this is an email that you sent to Pat Boyd and Charles Boyd --
MR. BARZEE: Thank you.
BY MR. BARZEE:
Q. -- on September 29, 2020, which is -- what? -- five days after Pat's request for you to check the Boulevard T3s; correct?
A. Yes, about that.
Q. All right. And so fair to say it took you five days to do the work that you did that went into creating this email response?

A. Yes, it's possible.
Q. All right. And in the email response that's in evidence, Government's Exhibit 173, you informed Pat that you did exactly what he asked you to do.
You called to see if you could verify the T3s, and it turns out that the T3s were invalid. They were fraudulent. They were fake. They didn't go back to the person that was claimed; correct?
A. Yes. I think that was the --
Q. All right.
A. -- issues that I was having.
Q. Right.
And all of the work that you did on those T3s, that work that went into this September 29, 2020, email, Government's Exhibit 173 that we've discussed quite a bit, all of that work was done because Patrick Boyd had made that request; correct?
A. Yes, at that time.
Q. All right. If Patrick Boyd was involved in a conspiracy to traffic in fake T3s with Charlie Boyd and Peter Boulevard, why would he be asking a compliance director to verify the very T3s he's supposedly dealing with illegally?
MR. POGOZELSKI: Objection, Your Honor. Compound question. Legal conclusions. Speculation.
THE COURT: Sustained.
BY MR. BARZEE:

Q. After you sent this email, as a result of Pat Boyd's request -- let's go up to the top -- Pat Boyd says, "I'm on an Acumatica call, but we have to get with Boulevard soon. We've had two bad returns with open bottles and broken pills in the last two days and the below sounds pretty bad."

Is that accurate?

MR. POGOZELSKI: Objection.

Compound question.

THE COURT: Overruled.

BY MR. BARZEE:

Q. Is that accurate?

A. Yes, that's what he wrote.

Q. Now, Acumatica -- that was a computer program; right?

A. Yes.

MR. BARZEE: Thank you. We can take that down.

BY MR. BARZEE:

Q. I want to spend a minute with you talking about that computer program, Acumatica.

Can you explain to the jury what it is?

A. Acumatica was a software platform that Safe Chain chose to switch to from their previous platform.

It was supposed to be designed for, you know, warehouse inventory and those things.

Q. One of the really cool things about this program is it had something called a "compliance hold."

Do you recall that?
A. Yes.
Q. And a "compliance hold" means that the program could, on its own -- I mean, it wasn't artificial intelligence -- but the program on its own could put a hold on any transactions coming in or out of Safe Chain if certain preconditions were met; correct?
A. Partially, but --
Q. Tell me how -- go ahead. I'm sorry.
A. The compliance hold was primarily for functions like controlled substances, and it would verify licenses at that time.
It would verify that the customer had the appropriate DEA registration to purchase those controlled substances and also if a license was expired. That was a function that we had built into Acumatica.
Q. In fact, Safe Chain requested that this automatic compliance hold was programmed into the system; correct?
A. Yes. They needed to have that incorporated into the software.
Q. When you say "they needed to have it incorporated into the software," who is the "they" in that sentence?
A. Safe Chain.
Q. All right. So my question was Safe Chain actually requested that this be put into the system?

A. Yes.
Q. All right. And part of that automatic hold, for example, was -- let's just, for example, hypothetically, if Boulevard's license expired during this trading period that went on, if it was set up in the system, Acumatica would automatically issue a compliance hold; correct?
A. Yes, if the license was expired.
Q. All right. In addition to the automatic compliance hold, there was also a manual hold; correct?
A. I think that was more on the purchasing and processing side.
Q. I'm not asking you which side it was on. I'm asking you whether or not there was also a manual hold.
A. I'm not sure, then.
Q. Would reading your deposition testimony discussing this refresh your recollection as to whether or not there was a manual hold?
A. Sure.
MR. BARZEE: May I approach, Your Honor?
THE COURT: Okay.
MR. POGOZELSKI: Objection, Your Honor.
If counsel is going to speak to the witness, please do so in the mic.
THE COURT: Sustained.
BY MR. BARZEE:

Q. Do me a favor, just read that over and let us know if it refreshes your memory.
I apologize.
A. Okay.
Q. Thank you.
Does that refresh your memory?
A. Partially.
Q. Did Acumatica have something called a "manual hold?"
A. Yes.
Q. And the "manual hold" is something that compliance could put in when they wanted to stop transactions from occurring; correct?
A. I don't remember the details of it, honestly.
There was one, I can rely on the testimony to say that I remembered many years ago when that one, when I reported that, but I don't recall the details of Acumatica, the ins and outs.
Q. Well, I'm not asking you for details.
We heard that there's an automatic hold. You've agreed with me that there's a manual hold; right?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.
A. Yes.
BY MR. BARZEE:
Q. All right. And the manual hold is when you go into the

program yourself and put a stop on transactions, is it not?

MR. POGOZELSKI: Objection. Asked and answered. She said she was not sure.

THE COURT: Sustained.

BY MR. BARZEE:

Q. You don't remember that?

MR. POGOZELSKI: Objection.

Argumentative.

THE COURT: Sustained.

BY MR. BARZEE:

Q. You agree with me that having a manual hold that you could push a button and stop transactions would be a wonderful thing; right?

MR. POGOZELSKI: Objection.

Asked and answered. Argumentative.

THE COURT: Sustained.

BY MR. BARZEE:

Q. Did Patrick Boyd or Charles Boyd ever override any kind of a compliance hold -- automatic or manual -- that was set in that system?

A. I don't recall.

MR. BARZEE: Let's go back to some of the exhibits that Pat Boyd was mentioned on.

Can we bring up 421, please.

BY MR. BARZEE:

Q. And this was a Teams chat between you and Pat Boyd.

MR. BARZEE: And let's go down to the second page.

BY MR. BARZEE:

Q. And this is where you're complaining about a salesman named Jon Nicholls?

A. Yes.

Q. That's the Jon Nicholls that testified in this trial last month; right?

MR. POGOZELSKI: Objection, Your Honor. Improper question.

THE COURT: If she knows.

A. I don't know.

BY MR. BARZEE:

Q. So in this chat with you and Pat, you were complaining that Jon Nicholls had made up some excuse to a pharmacy that was asking for T3s.

Do you recall that?

A. Yes.

Q. All right. And Pat said, "I think for this one what he said was okay because we probably shouldn't have shipped without the T3, but I know that was out of the question at the time."

Do you recall that?

A. Yes.

Q. And this was back -- this was September 1st, 2020.

So this would have been the period of time where you were receiving all of the T3s from Boulevard in great big binders, and you were getting hundreds of them at a time.

Do you recall that?

A. Yes, about this time.

Q. Right.

And that -- that upset you that Nicholls, apparently, had blamed the lack of the T3 on compliance; is that fair to say?

A. Yes.

Q. And you felt that it wasn't compliance's fault, that it was because Boulevard was dragging its feet and Nicholls should have told them that in an honest way; right?

A. Yes. The frustration was that we didn't have T3s to provide to the customers yet.

Q. Well, was it that you didn't have T3s, or was it that Boulevard was dragging its feet?

A. I think it was both.

Q. All right. Do you know whether or not this particular lack of T3s was due to the fact that Boulevard had not provided it or because of the fact that Boulevard was dragging its feet and it was slow to get in to you at that time?

MR. POGOZELSKI: Objection.

BY MR. BARZEE:

Q. Maybe it was sitting in a binder?

MR. POGOZELSKI: Objection.

Asked and answered.

THE COURT: Sustained.

BY MR. BARZEE:

Q. When Pat says, "It shouldn't have been sent out without a T3" -- do you recall Pat saying that?

A. Yes.

Q. And Pat's correct about that, isn't he?

A. Yes.

Q. And that particular transaction, that had to do with one of your customers, Olympia.

Do you recall that customer? Olympia?

A. I recall the customer, but I'm not sure if it was associated with this particular conversation.

Q. Do you recall that the reason the medicine was shipped out was because a customer was demanding the medicine, needed it immediately for patients?

A. I wouldn't have been part of that conversation.

Q. And you recall Olympia was the customer that, ultimately, Safe Chain refunded something like $300,000 when they asked for a refund?

A. I'm not sure what that transaction could have been. That's not really under my purview.

Q. Okay.

MR. BARZEE: Let's go to Government's Exhibit 425, please. And let's go up down to the second page.

BY MR. BARZEE:
Q. So this is a conversation between you and Pat Boyd discussing this issue where Jonathan Nicholls apparently blamed the lack of a T3 on you or on compliance.
Do you recall that?
A. Yes.
Q. All right. And do you see where you say -- and this is September 10th, so this is about nine days later.
You're saying, "We didn't receive the T3s. John A is pulling the inventory report for me to send to them so they can generate the T3s for us"; correct?
A. Yes.
Q. So you remember that this was back in the time where Peter Boulevard was acting like he didn't know what T3s were and didn't know how to fill them out.
Do you remember that?
MR. POGOZELSKI: Objection to his characterization of Peter Boulevard "acting."
THE COURT: Overruled.
BY MR. BARZEE:
Q. Do you remember that?
A. I didn't speak with him, but there were just general problems with getting the T3s.
Q. But you remember that there was -- there was a story about them being new at this and not being familiar with the T3s?

A. Yes. We were told that they were a newer business and didn't know all the ins and outs of what needed to be provided.
Q. Right.
And so one of the things that Peter Boulevard asked of Safe Chain was for Safe Chain to send him back a list of all the bottles that they had purchased with all the lot numbers.
Do you recall that?
A. Yes.
Q. And at the time, when Peter Boulevard was making that request for all of that information from Safe Chain, he was saying that he needed that in order to create the T3s; right?
A. Yes.
Q. And is it fair to say that you didn't think that was out of the norm? You didn't think there was any problem with that?
A. No. At the time I didn't think it was -- I mean, I didn't think it was -- I felt like they should have had that information, but at the time, we were so backlogged with work. It just seemed like we needed to get him the information he needed so he could generate the information for us.
Q. Yeah, but that's not my question. That's what happened. You're right.
But my question is when he was making the request of Safe Chain: "Can you please send us a list of everything we purchased from you and all the lot numbers so I can make these T3s?" You didn't think that was a problem?

A. No, at the time I did not.
Q. Because he tricked you; right?
A. I guess I didn't -- at the time, I didn't think of it as being tricked. I mean, that was something I certainly thought well after the fact after my employment at Safe Chain.
Q. Right.
But at the time, in real-time when all of this is happening and he's making this request of you and Charlie Boyd and Safe Chain and he's saying, "Please send me a list of everything" -- you're head of compliance -- you didn't see a problem with that; right?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.
BY MR. BARZEE:
Q. Right?
A. No.
Q. When you say "No," you mean you're agreeing with me?
A. Yes.
Q. Thank you. I know I asked that in a confusing way.
Give me one second.
MR. BARZEE: Let's go to Government's Exhibit 187, please.
BY MR. BARZEE:
Q. And this is another document that Patrick Boyd is on, and

you were sending this to Charlie Boyd and Patrick, a note regarding this lot. And you said, "Gilead believes this to be a counterfeit drug, which we should report to the FDA."

Do you remember this email?

A. Yes.

Q. And this was -- this came about as a result of you, in compliance, reaching out to Gilead in order to verify a T3; correct?

A. Yes.

MR. BARZEE: And let's scroll down.

BY MR. BARZEE:

Q. Gilead responded that it was -- and this is the famous "inconsistent with our records" answer; right?

A. Yes.

Q. All right. And you then received that email from Lori Mayal on October 9th of 2020, and you forwarded that to Patrick and Charlie so that they could be become aware; correct?

A. Yes.

Q. And you sent it to them, because, I think, what you testified to was at the time, back on October 9th, you were unfamiliar with the process for filling out a 3911; right?

A. Yes, it was new to me.

Q. Even though you were the head of compliance, it was still new to you; right?

A. Yes.

Q. And, in fact, the whole form -- the 3911 form hadn't been around that long at that point; right?
A. I'm not sure.
Q. It was relatively new?
MR. POGOZELSKI: Objection. Asked and answered. It requires speculation.
THE COURT: Sustained.
BY MR. BARZEE:
Q. So since you were unfamiliar with how to fill out the 3911 form, you sent it to Charlie and Pat for guidance?
A. Yes.
Q. And you know that Charlie then went to Frier Levitt and asked them about how and when to fill out a 3911; correct?
A. There was a conversation with Frier Levitt, but I don't know that I was on all those communications, but there was some discussion with them.
Q. All right. You weren't being ignored here. It was followed up.
Charlie Boyd took it to Frier Levitt and discussed it with them; correct?
A. I believe so.
Q. Okay.
MR. BARZEE: Let's bring up Government's Exhibit 477, please.
BY MR. BARZEE:

Q. This is another Teams message between you and Pat Boyd, and on this one you're talking --

MR. BARZEE: Let's go to page 2.

Let me clear this. I'm sorry.

Go to page 2. I think you're on page 3.

Thank you.

Let's go down a little bit. All right.

BY MR. BARZEE:

Q. So do you see at around 5:30 p.m., you're asking about Cintex?

Do you want to take a second?

A. Yes, I see that.

Q. Do you recall this issue? Pat was letting you know that someone from Cintex was trying to get in touch with you.

A. Okay. Yes, I see that I'm asking, "Who do you know from Cintex?"

Q. Right.

And do you remember the issue? This was the issue where you had checked one of the T3s, and it went up to AmerisourceBergen, and AmerisourceBergen did not confirm --

A. Yes.

Q. -- what was on the T3?

A. Yes.

Q. All right. And so you were talking with Pat Boyd about doing your job at Pat's request, checking these T3s, going up

the chain, making sure they were valid, and this was one that came back with a problem.

And you were informing Pat of that; correct?

MR. POGOZELSKI: Objection.

Compound question.

THE COURT: Sustained.

BY MR. BARZEE:

Q. You were informing Pat of a problem; correct?

A. Yes.

Q. At 5:30 p.m.?

A. Yes. I let them know that AmerisourceBergen had said that they were not their customer.

Q. And Pat's response to you was, "We should ask Cintex for more"; correct?

A. Yes.

Q. And he says, "Let me see."

MR. BARZEE: And then let's go down to page 3.

BY MR. BARZEE:

Q. Pat says, "AmerisourceBergen said that? Richard, from compliance?"

And then he says, "Of [sic] AmerisourceBergen says that, we can't set them up." And then he, you know, says, "if," because that's what he meant to say.

"If AmerisourceBergen says that," meaning "if AmerisourceBergen says it's a false T3, then we can't set them

up"; right?
A. Yes.
Q. And then he says, "At least not for Gilead."
Do you see that?
A. Yes.
Q. And what AmerisourceBergen -- what the claim was, was that Gilead had sold medicine to AmerisourceBergen and AmerisourceBergen had sold it down to Cintex; correct?
A. Yes.
Q. All right. And Pat says, "These people suck. LOL."
Do you see that?
A. Yes.
Q. And your response was, "Yeah, they really do."
And Pat says, "I think our response to these people should be" -- and it's funny. Pat says, "I think", meaning he's not sure; right?
MR. POGOZELSKI: Objection, Your Honor.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Pat says, "I think our response to these people should be along the lines of being that the AD didn't confirm your account, we cannot buy Gilead brand products from you. However, if you have other products with T3s to an authorized distributor, an AD, then we would be happy to approve you."
Do you see that?

A. Yes.

Q. That's exactly the kind of response you would want to hear from someone like Pat Boyd; right?

MR. POGOZELSKI: Objection.

THE COURT: Sustained.

BY MR. BARZEE:

Q. That was Pat Boyd confirmed that you should not do business if the T3 came back invalid; correct?

A. Yes.

Q. I want to talk to you about Gentek.

And Gentek was the one where we saw the picture earlier of the warehouse; right?

A. Yes.

Q. And you approved Gentek?

MR. BARZEE: We can take down that chat, Jess. Thank you.

BY MR. BARZEE:

Q. You approved Gentek as a vendor on or about June 12, 2020; correct?

A. I'm not sure of the time.

Q. Would looking at your testimony last month refresh your recollection?

A. Sure.

MR. BARZEE: I don't have a date. Hold on.

BY MR. BARZEE:

Q. Well, let's skip the date for now.
You approved Gentek as a vendor?
A. Yes.
Q. All right. A couple of months after approving Gentek as a vendor, you asked Patrick Boyd to verify one of the T3s when you were doing your compliance work.
Do you recall that?
A. Yes, I may have.
Q. And you asked him to be the one that would call because the wholesaler was a company called Betances in Puerto Rico; correct?
A. Yes.
Q. And apparently, Pat Boyd spoke a little bit of Spanish and the people at the company only spoke Spanish; so you were asking Pat to call up and try to verify the T3 for you? Correct?
A. Yes.
Q. And the prosecutor asked you whether you knew whether or not Patrick Boyd was able to make that verification. Do you recall that?
MR. POGOZELSKI: Objection. Asked and answered. We covered it yesterday.
THE COURT: Overruled.
BY MR. BARZEE:
Q. Do you recall the prosecutor asking you that question?

A. I don't remember that exact question but I know we talked about it.
Q. You told the prosecutor that you did not know whether or not Patrick Boyd was able to verify that T3; correct?
A. That sounds correct.
Q. So Patrick Boyd never said to you that he verified that T3 or that they were good to go?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. Now, you never voiced any concern about doing business with Gentek to Patrick Boyd, did you?
A. I'm not sure if I did or didn't explicitly just Pat.
Q. I didn't ask if it was just Pat. It could be Pat and 100,000 people.
The question is did you ever express to Pat Boyd that Safe Chain should not be doing business with Gentek?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.
You can answer.
THE WITNESS: Sorry.
A. I'm not sure.
BY MR. BARZEE:

Q. Okay. Safe Chain did ultimately stop doing business with Gentek because of product complaints; correct?
A. I don't remember the exact reason, but they did eventually stop working with them.
Q. Would looking at your deposition testimony refresh your recollection as to the reason why Safe Chain stopped doing business with Gentek?
A. Sure.
Q. I'm going to approach you and ask you to read it over to see if it refreshes your memory.
Okay?
A. Okay.
Q. Did that refresh your memory as to why Safe Chain stopped doing business with Gentek?
A. Yes.
Q. And is it fair to say that Safe Chain stopped doing business with Gentek in part because of product complaints?
A. Yes.
Q. Now, I want to talk to you about a company called Synergy. Do you recall that company?
A. Yes.
Q. And Synergy was a new vendor; correct?
A. Yes.
Q. You checked their license?
A. Yes.

Q. You checked their physical plant?
A. Yes.
Q. You looked at a picture online to see what it looked like?
A. I believe so, yes.
Q. And you verified their license?
A. Yes.
Q. And you approved them, as head of compliance?
A. I believe it was me.
Q. All right. And that was on March 2nd, 2021?
A. I'm not sure of the exact date.

MR. BARZEE: Let's pull up Government's Exhibit 242, please.

THE COURT: Did you say 242?

MR. BARZEE: Yes, sir.

THE COURT: I don't think that's in evidence.

MR. BARZEE: No?

Well, in that case, let me bring this up to see if it would refresh your recollection then.

May I approach, Your Honor?

THE COURT: Okay.

BY MR. BARZEE:

Q. Would looking at an email from you about the verification process refresh your recollection?
A. Sure.
Q. Does that refresh your recollection?

A. Yes.
Q. And then after that, do you remember Dakota was making an attempt to verify T3s?
A. Yes, she probably was.
Q. And she was doing that at Pat Boyd's request; correct?
A. I think that sort of just became what -- the steps we began to initiate with each of new HIV vendors.
So I don't know that it needed to be in a certain request. At this point, we were trying to verify all the information that we could.
Q. And one of the companies on the T3 responded to her saying that they did not have a relationship with Synergy and the T3 must have been false.
Do you recall that?
A. Yes. I believe that was a response she got.
Q. And then do you recall what the next steps were?
A. I'm sure we relayed that information to Pat and Charlie.
Q. There was a discussion as to whether or not a 3911 would be filled out.
Do you recall that discussion?
A. I don't -- about the false T3?
Q. Yes.
A. I don't remember the details of that.
Q. Do you remember DMS, the company, saying that they would file and submit a report to the FDA?

A. I think vaguely, yes.
Q. And when you got that email from them saying that they would handle it and make a report to the FDA, you forwarded that email to Pat Boyd; correct?
A. Probably.
MR. BARZEE: Let's pull up exhibit -- Government's Exhibit 243, which I believe is in evidence.
BY MR. BARZEE:
Q. So this is the email from DMS Pharmaceutical Group saying, "This wasn't us. We don't have a relationship with Synergy Group, so the information on the T3 is incorrect. We will submit a report to the FDA."
Do you recall that?
A. Yes.
Q. All right. And then if you look up, you took that email that's in light blue and you forwarded it to Pat Boyd, and you said, "Good morning, Pat. We were attempting to verify the T3 information provided to us on the new vendor Synergy, and this is the response that we received."
And Pat Boyd's answer was, "Possible problem"; correct?
A. Yes, but that email wasn't to me at the top.
Q. I'm sorry. Say that -- oh, you're right. Thank you.
Pat Boyd then sent it to Adam Brosius at Pharma Sales saying, "possible problem"; correct?
A. Yes.

Q. And we know that this particular vendor, Synergy, came from Adam Brosius; correct?
A. I don't remember if Adam forwarded this on to us or not.
Q. No, no, no. I'm not asking about whether or not he forwarded anything to you.
I'm asking whether or not you recall that Adam Brosius is the one that introduced this vendor to Safe Chain.
A. I don't necessarily remember if Adam was the person that brought this on, because there were several in quick succession, as far as the HIV vendors.
Q. All the HIV vendors came from Adam Brosius, didn't they?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.
BY MR. BARZEE:
Q. Didn't all of them come from Adam Brosius?
A. I think most of them, but I know there was one or two that may have filled out the application for vendor online.
Q. Boulevard came from Adam Brosius; right?
A. I think so.
Q. Gentek?
A. I think so.
Q. Synergy?
A. Possibly.
Q. Rapid's?

A. Possibly.
Q. Omom?
A. Possibly.
Q. Pat and Adam Brosius go back and forth discussing the T3s, and you ultimately receive a new T3 from Synergy; correct?
MR. POGOZELSKI: Objection.
Compound question.
THE COURT: Sustained.
BY MR. BARZEE:
Q. You received a new T3 from Synergy; correct?
A. Yes. I believe we did.
Q. And you were able to verify that new T3 and decided that it was verifiable, meaning it was okay; correct?
MR. POGOZELSKI: Objection.
Compound question.
THE COURT: Sustained.
BY MR. BARZEE:
Q. You were able to verify the T3?
A. Myself or Dakota. It looks like Dakota was primarily working on this particular project, but one of us was able to verify the information.
Q. Would looking at an email that you sent to Pat Boyd, following up with Pat Boyd as to whether or not this was done, refresh your recollection?
A. Sure.

Q. Did that email refresh your recollection as to whether or not you were able to verify those T3s?
A. Yes, I was.
Q. And you discovered that based on your work, those T3s were valid and consistent with the records of everyone from the vendor; correct?
A. Yes.
Q. Now, you never told Pat Boyd that you shouldn't be doing -- that Safe Chain, rather, should not be doing business with Synergy, did you?
A. I don't recall.
Q. Do you. Remember at the --
MR. BARZEE: Go ahead. We can take that down.
BY MR. BARZEE:
Q. Do you remember at the very beginning of our conversation we talked about your scientific background?
Do you recall that discussion?
A. Yes.
Q. And we talked about the importance of noting things, scientific notification; correct?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Sustained.
BY MR. BARZEE:
Q. I asked you whether or not you had ever told Pat Boyd that

Safe Chain should not be doing business with Boulevard, and your answer was you didn't recall.

I asked you if you ever told Pat Boyd that Safe Chain shouldn't be doing business with Gentek, and your answer was "I don't recall."

I asked you if you ever told Pat Boyd that you shouldn't be doing business with Synergy, and your answer was "I don't recall."

Did you ever put anything in writing, anywhere, in an email, a chat, a text message, that suggested in any way to Pat Boyd that Safe Chain should not be doing business with these vendors?

MR. POGOZELSKI: Objection.

Compound question.

THE COURT: Overruled.

A. I don't recall if I spoke specifically with Pat, but that was a topic of conversation many times.

BY MR. BARZEE:

Q. I'm sorry. That wasn't my question; so let me ask it again.

You've already testified that you don't recall whether you told Pat Boyd to stop doing business with Boulevard. You already testified that you don't recall whether you ever told Pat Boyd to stop doing business with Gentek. You've already testified that you don't recall whether you ever told Pat Boyd

to stop doing business with Synergy.

My question was did you ever put anything in writing, as the director of compliance for Safe Chain, that Safe Chain should not be doing business with these HIV vendors?

A. Yes, I did.

Q. Where is it?

A. In the document that you have.

Q. What document?

A. I don't know them by exhibit number, but there's plenty, where I pointed out several issues with the various HIV vendors.

Q. That's not my question. I'm asking a simple question.

Did you ever put in writing something to Pat Boyd -- or cc'd Pat Boyd, even, I'll take -- that says Safe Chain should stop doing business with Boulevard, with Gentek, with Synergy, with Rapid's, with Omom?

Did you ever say that to him? Did you ever put that in writing? As the director of compliance with a scientific background, did you ever put in writing we have to stop doing this?

MR. POGOZELSKI: Objection. Compound question. Asked and answered. Argumentative.

THE COURT: Overruled.

A. I guess I don't recall, then.

MR. BARZEE: I have nothing further, Your Honor.

THE COURT: Mr. Zimet.

MR. ZIMET: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. ZIMET:

Q. Good afternoon.

A. Good afternoon.

Q. I'm sorry?

A. Good afternoon.

Q. I want to pick up on that issue of writing.

I believe in some of your earlier testimony, you said that you are the kind of person who likes, because of your background, to put things in writing so you could preserve certain thoughts and certain information.

Did I get that correct?

A. Yes, I tend to.

Q. And in this case, you describe that for a period of time, that you had a level of discomfort working at Safe Chain; is that correct?

A. Yes.

Q. You said you were looking for a job because you wanted to get out?

I think you said that?

A. Yes.

Q. And I'm assuming -- and tell me if I'm incorrect -- that one of the reasons you wanted to do that is because you were

uncomfortable in the job that you had.
Fair to say?
A. I was not satisfied with my job there and just didn't think it was working out well for me.
Q. It wasn't a good fit?
A. Right.
Q. And did you keep any kind of a -- as you indicated earlier, you like to write things down -- any kind of a diary or anything like that to sort of memorialize as things were happening at the time what was bothering you or what you thought was problematic?
A. No, I don't believe so.
Q. When you met with the Government on the 12 -- I think it was approximately 12. I don't know the exact count -- did they ask you, "Have you put any of this stuff in writing that your memory or trying to remember from the year and fifteen or year and three or four months that relate to this case?
A. I'm sorry. Can you ask that differently?
Q. Sure.
Did they ask you whether you had put anything in writing about sort of a timetable or a series of events that had taken place in this case?
A. No, I don't believe they did.
Q. But you did, in fact, do that, did you not?
A. I did for my own memory multiple times.

Q. And did you keep that?
A. I think I did.
Q. And did you provide it to the Government?
A. Yes.
Q. And they have a copy of what you wrote down as far as the series of events?
A. Yes, I believe they should.
MR. ZIMET: Why don't we look at -- well, let me back up and ask it this way.
BY MR. ZIMET:
Q. Did you also provide, as part of your job, a timetable of events?
A. Yes. It was -- I was requested to kind of work out some of the problems because we had so many issues going on. We were trying to keep track of the order in which events and which things took place.
Q. And that sort of started in the fall of 2020 when legal counsel from Frier Levitt got involved in the case; correct?
A. I don't remember the exact time, but I think it was requested that we, you know, kind of try and make a timeline of events.
Q. One of the reasons for that is that the lawyer from Frier Levitt who's is involved in the case was John Morrone, and he passed away, and then another lawyer picked up the case, and there were certain things that she needed to know moving

forward; correct?
MR. POGOZELSKI: Objection.
It requires speculation.
THE COURT: If she knows.
A. Yes. After Mr. Morrone passed away, the other attorney picked up, and she was trying to kind of fill in the back information that she may not have had.
BY MR. ZIMET:
Q. And she was asking questions as far as what had happened prior to her getting involved and also events happening at Safe Chain; correct?
A. Yes.
Q. As a normal attorney would do, trying to get the facts before they gave an opinion; correct?
MR. POGOZELSKI: Objection as to what "a normal attorney would do."
THE COURT: Sustained.
BY MR. ZIMET:
Q. As an attorney might do in getting facts before they gave an opinion?
MR. POGOZELSKI: Same objection.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Did she ask for facts, this woman attorney?
A. Yes. She asked for information, and I attempted to provide

her with the facts that I know.
Q. And you did that, to the best of your ability; correct?
A. Yes.
Q. And that was emailed to her or provided to her in some way? Communicated to her; correct?
A. Yes.
MR. ZIMET: And if we can look at Boyd Exhibit 144 and just for the witness, if she can look at that.
BY MR. ZIMET:
Q. Do you recognize that document?
A. Yes. It looks like what we had to work on.
Q. And it's your work product, is it not?
A. Yes, I believe this draft is.
Q. And that is a series of events, a timeline of events beginning in August of 2020; is that correct?
A. Yes.
Q. And that memorializes things that you learned as part of your job as head of compliance; correct?
A. Yes.
Q. Working with the Safe Chain team in trying to have Safe Chain be a compliant company; correct?
A. Yes.
Q. And part of that includes --
MR. ZIMET: If we move down a little bit.
Keep going.

BY MR. ZIMET:
Q. Part of that included conversations that took place, telephone conversations that took place involving the Gilead attorneys -- excuse me, involving the Safe Chain attorneys from Frier Levitt and Safe Chain people, including yourself and Charlie Boyd; is that correct?
A. Can I have a minute, please, to read it?
Q. Sure.
And if you want to have it scrolled for you, just say it and we can do it.
A. Okay.
Q. Does that appear to be accurate?
A. Yes.
Q. And it's accurate -- and that was -- I think if we go to the top, it was prepared, it looks like, on 3/25/2021?
A. Yes.
Q. And so that would have been, obviously, much closer in time to the events than today; correct?
A. Yes.
Q. And certainly, your memory would have been much better then than it was today; correct?
A. Yes.
Q. And for a lot of reasons, you wanted to sort of put things that happened back during that time period out of your mind; is that correct?

A. Yes.
Q. And some of the questions I'm going to ask you today, I'm going to try to ask them in a way that you can answer them as to what you saw and observed at the time as opposed to what you're looking back on retrospectively.
Okay?
A. Okay.
Q. And you would agree there's a difference between knowing what happened later on and looking at events that occurred previously?
A. Yes.
Q. And so to the extent -- and I don't mean this in an offensive way. To a certain degree, we all are influenced, maybe jaded even, about our knowledge of what ultimately happened as to events that occurred prior to that time; correct?
A. Yes.
Q. So this job that you had -- sorry.
This job that you had at Safe Chain was, in your mind, objectively, an important job; correct?
A. Yes.
Q. And the director of compliance in many ways is responsible and has responsibilities that can affect many people's lives; is that correct?
A. Yes.

Q. And you took that job seriously; correct?
A. Yes, I tried to.
Q. And to the best of your ability?
A. Yes.
Q. And certainly part of the job, part of the ingredients, if you will, that would be important for that job would be a level of integrity; correct?
A. Yes.
Q. Also, a level of honesty in what you're dealing with; correct?
A. Yes.
Q. Also being able to communicate; correct?
A. Yes.
Q. And also to admit if you have done something wrong; is that correct?
A. Yes.
Q. And like all of us, there are occasions in your job where you did something that was either a mistake or an error; is that correct?
A. Yes, probably.
Q. Well, we talked about one yesterday, I think, in your examination related to the Boulevard license.
A. Yes.
Q. And that was a mistake which, you know, when I say "mistake," I'm not casting blame. Okay.

It's just something that, compliance tries to catch what, in this instance you didn't catch.

Would that be fair to say?

A. Yes.

Q. And for lack of a better description, whoever was behind it -- and we don't have to -- we have other testimony relating to that -- whatever is behind that was able to pull off something on Safe Chain; correct?

MR. POGOZELSKI: Objection.

It requires speculation.

THE COURT: Sustained.

BY MR. ZIMET:

Q. So because of that approval, Boulevard was able to do business with Safe Chain; correct?

A. Yes.

MR. ZIMET: And if we can show Government's Exhibit 111 to you.

BY MR. ZIMET:

Q. This is what was introduced in the Government's part of case as far as the approval process for Boulevard; do you recall that?

A. I'm sorry. Could you repeat that?

Q. Sure.

This is what was introduced in the Government's case, in your direct examination, as evidence of the approval of

Boulevard by Safe Chain; correct?
A. Yes.
Q. That's not the actual approval, though, is it?
A. I'm sorry. What do you mean?
Q. Well, you're not approving anything on there, are you?
A. This was the -- this was the -- can you scroll down?
This was the email from our accounting team, so then the accounting team then sends this over to the compliance side.
Q. Right. But it does not conclude with your approving of Boulevard, that exhibit?
A. No. This particular email does not. The final approval.
MR. ZIMET: So, if we can look at Boyd Exhibit for identification 306.
And this will be just for the witness.
BY MR. ZIMET:
Q. Is this exhibit for identification the actual approval that you authored on April 22nd, 2020?
A. Yes.
Q. And that's the one I think yesterday, I think there's some issue as far as timing is concerned, but this is something that you approved at 3:13 p.m.; is that correct?
A. Yes.
Q. And had been sent to you at 2:56 p.m.; is that correct?
A. Yes.
Q. Now, the approval process --

MR. ZIMET: We can take that down.
BY MR. ZIMET:
Q. The approval process for that Boulevard application, I think you testified that you checked the registration for Boulevard; is that correct?
A. Yes.
Q. I'm not going to go through all the details of that. We have heard it a couple of times.
Other than that, did you do any kind of investigation concerning any of the individual or individuals that were part of that application?
A. No.
Q. And is there a reason that you did not check any of those individuals out?
A. That wasn't something that we would typically do.
Q. So, and I'm listening to your answer, and you say it's not something that you typically would do.
It's something that you were able to do if you chose to; is that correct?
A. Sure.
Q. And on this occasion, you chose not to do that; is that correct?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.

A. No, I didn't at this time.
BY MR. ZIMET:
Q. And was there a particular reason why you did not choose to do any kind of background check concerning the individuals listed on Boulevard?
A. Well, prior to the application coming to the compliance department, any credit checks or any things would have been done first by the accounting department.
They're the ones that sent that on to compliance. But we didn't typically do -- I mean, I don't recall ever doing background investigations on people who were applying as a vendor.
Q. Well, a year later, you did, did you not?
A. We did start to look into the people more as the years went on, as time went on.
Q. And as a matter of fact, a year later, you did find out that somebody was actually under indictment that was applying as part of the company for Safe Chain approval; isn't that correct?
A. Yes.
Q. And so that was part of an evolution, if you will, of things that were done in compliance to improve the compliance department.
Would that be fair to say?
A. Yes.

Q. And that was something you want to be a participant in; correct?
A. I guess.
Q. Was --
A. I mean, it was part of my job to, you know, try and verify these vendors. It was not something that I was super eager to be involved with. It was just a job duty.
Q. Okay. So it's part of the job that you weren't enthused as far as that part of your job; is that fair to say?
A. Sure.
Q. As far as Charlie Boyd was concerned, he did not try in any way to dissuade you not to do that; is that correct?
A. No, I don't believe so.
Q. Well, you don't recall anytime he said, "Don't check out any of these people"?
He didn't say anything like that, did he?
A. No.
Q. In fact, his attitude was quite different. He wanted you to find out as much information as you could; isn't that correct?
A. At times, I think.
Q. Especially as time went on, and we saw -- and you saw that there's more issues and problems with the vendors; isn't that correct?
A. Yes.

Q. And you had a concern with vendor to vendor, I think you expressed that on your direct examination, that you were concerned as far as the types of vendors that were being presented to Safe Chain; is that correct?
A. Yes.
Q. And part of your concern was that there was a nexus or a connection with each of those concerns -- vendors you had a concern with, with the person by the name of Adam Brosius; isn't that correct?
A. Yes, many of them were.
Q. Many, if not all -- many, if not all of the five that we talked about; correct?
A. I believe so. I don't -- again, I don't remember exactly who brought some of the vendors to Safe Chain for business but...
Q. It would be safe to say that you were not wanting to be a member of the Adam Brosius fan club back in the day?
A. That's correct.
Q. He was pretty offensive?
A. He could be.
Q. You thought, you believed, that he had his own interest in mind as opposed to the best interests of Safe Chain; isn't that correct?
A. I just felt he was just sneaky and made me uncomfortable.
Q. And manipulative; correct.

A. Yes, he could be.
Q. And you were concerned that his manipulations were affecting Safe Chain itself; correct?
A. It certainly had an impact on the various departments.
Q. And part of the concern about Adam Brosius being sneaky is he would do and say things that ended up not being truthful; is that correct?
A. I really tried to limit my interaction with him, but there were times where we found him to just give conflicting information and it made our jobs very difficult.
Q. And one of the things that you wanted to find out from Adam Brosius when you're trying to get ahold of a connection or somebody at Boulevard was, "Please try to do that"; isn't that correct?
A. Yes.
Q. Because you knew, at least as far as Boulevard was concerned, Adam Brosius was the contact person?
A. Yes.
Q. And so when you realized that there was a problem with T3s or pedigrees, the person that you wanted to turn to was Brosius because of the connection with Boulevard; correct?
A. Yes. And I spoke with Charlie about, "Hey, can you reach out to somebody?" I felt desperate, trying to find contact information, so yes.
Q. And Charlie, in fact, went to Brosius, did he not?

A. I believe so, at some point.
Q. And one of the reasons that Brosius was so important in that process is that Brosius had a financial stake in the success of Boulevard; is that correct?
MR. POGOZELSKI: Objection.
It requires speculation.
THE COURT: If she knows.
A. I don't know.
BY MR. ZIMET:
Q. Well, you didn't believe that Brosius was involved with Boulevard for philanthropic reasons, did you?
MR. POGOZELSKI: Objection.
Argumentative.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Brosius was involved with a company by the name of Worldwide; is that correct?
A. Yes.
Q. And Worldwide was, essentially, a group of salespeople; is that correct?
A. Yes.
Q. And the group of salespeople were involved in the HIV business or transactions; correct?
A. Yes.
Q. And the salespeople, obviously, I think you've testified

earlier, pushed trying to get you to do your job quicker because they wanted to get sales done and make money; correct?
A. Yes.
Q. And that was some of the pressure that you felt in doing your job when you were the compliance director?
A. Yes.
Q. Now, the issue of T3s or pedigrees -- that was an ongoing issue at Safe Chain, was it not?
A. With the HIV vendors, yes, it was.
Q. Well, the HIV vendor, the first one was Boulevard around May of 2020; correct?
A. Yes.
Q. Were there any other outstanding T3 or pedigree issues at Safe Chain at that time?
A. Not that I can think of, off the top of my head.
Many of our vendors use the Track and Trace system. There were a few that used PDFs, but we had them already established with the data entry team, so I can't think of anything else, really, that was outstanding at that time.
Q. So let's take a second just to take a step back, and let's go to approximately May to early June of 2020 at Safe Chain.
There was a system in effect which provided for people or vendors selling drugs to Safe Chain to submit or provide T3s or pedigrees; is that correct?
A. Yes.

Q. And that system entailed what? What did they do or what could they do as far as pedigrees were concerned?
These are the vendors to Safe Chain?
A. The vendors would send that to Safe Chain automatically, so that it was already incorporated into their software system.
Q. And just so we're all on the same page, because some of this terminology is easy for you, but since we weren't with you at the time, I want to make sure that we're accurate with what we're saying.
You use the term "send" the pedigrees or T3s to Safe Chain. How would they send it? That information?
A. Electronically.
Q. So it would be by email or something like that?
A. Some of them were automatically initiated.
For example, if the vendor uses Track and Trace and Safe Chain was also using Track and Trace, they could just, it would be paired with the invoice. So they would, the sales would be, the transaction would be automatic.
And then there were one or two small vendors that would email us PDFs that our data team would then enter into Safe Chain's software platform.
Q. Okay. So there's one of two methods, I think you described, as far as the vendor getting the T3 information to Safe Chain back in May, June of 2021 -- or 2020; is that correct?

A. Yes.
Q. Now, the automatic way, would there be a portal or somewhere where they would have to send the information to electronically?
A. I think so.
I don't remember exactly how the connection worked, but we were essentially, basically, saying we're using the same piece of software, so we can see that the information provided by the vendor was there.
Q. When you say "we" -- I apologize for pressing this a little bit -- instead of the pronoun, was there some part of Safe Chain that was responsible for observing or monitoring the T3s that were coming in, or should be coming in?
A. Compliance could check, myself or whoever else was in compliance, could check to look up individual T3s if we needed to; but I believe, at that time, it was the sales team's responsibility to get their T3s out of the system and email those also to their customer.
Q. You started hesitating.
Are you sure about that?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.
A. That's the part that I remember.
BY MR. ZIMET:

Q. Okay. And it might be something else, but this is your recollection as of today?
A. Yes.
Q. So, obviously, that's a compliance issue if the T3s are coming in; correct?
A. I'm sorry?
Q. It's a compliance issue that the T3s are coming in from the vendors; correct?
A. They should be coming from all the vendors, but it shouldn't be an issue because we should have them.
Q. Well, understood.
But the question is who from compliance would be monitoring whether the vendor did what they were supposed to be doing in submitting the T3s to Safe Chain?
A. Myself or whoever else I could have been working with at that time.
Q. Now you describe yourself as being very busy during that time period, had a lot of responsibilities, juggling a lot of things at one time.
Was that something that you did on a transaction-to-transaction basis?
A. No, we didn't.
Q. Something you did on a daily basis at that time?
A. No.
Q. Something that you did on a weekly basis?

A. No.
Q. Something you did on a monthly basis?
A. Probably about monthly if we needed to look into an issue or something that wasn't as it appears it should be.
Q. So we have a vendor sending the pedigree or T3 in, but if Safe Chain is then selling whatever they just bought, they need to send a T3 or pedigree out when the transaction takes place of selling to, in most cases, a pharmacy; correct?
A. Yes.
Q. And who is in charge of doing that in the late May, early June time period?
A. It would have been automatic, automated, so the sale would be reflected in the system, and I believe at that time, I don't remember what software platform they were using, but I believe at that time, it was the customer or the sales team's responsibility to pull those T3s documents for their customers.
Q. So when you say "it was the customer's responsibility to pull the T3s," can you be a little more specific?
As far as when you say "the customer," the pharmacy should pull them?
A. Yes.
Q. Okay. Or the salesperson's responsibility?
A. Yes.
Q. Or they could just be in the portal; is that correct?
A. Yes.

Q. And when you say that would be something automatic that would take place, who is in charge of monitoring what automatically was supposedly taking place?
A. I don't know.
I mean, the T3s fell under the compliance department, but if -- the only reason at that time we may know if there was a problem is if a customer said, "Hey, this T3 doesn't look right," because the transaction would be initiated from when the product entered the warehouse. It would be entered into the software system, and then it would be essentially in there until it was sold.
And that sales transaction and like the accounting side person and processing side would be what would complete the transaction history.
Q. So in all cases when Safe Chain was selling pharmaceuticals, there would always be a T3 going with the sale; is that correct?
A. Yes.
Q. And even with the Boulevard transactions where they did not submit a T3 with the HIV drugs Safe Chain was sending out with the sale to the pharmacy a T3; isn't that correct?
A. Yes, there was some documentation.
Q. So to say that Safe Chain was not sending out any T3s at all with the Boulevard HIV drugs, would be inaccurate; correct?
A. Correct.

Q. Now, the T3s that were sent out were incomplete; correct?
A. Yes.
Q. They did not have all the things on them that they should have had on them; is that correct?
A. Yes.
Q. And we've spent a lot of time, even in your testimony a lot of time talking about what should have been on the T3s, both coming in and going out?
A. Yes.
Q. Correct?
So for the T3s that were going out from Safe Chain, those T3s needed to be corrected or completed at some point; is that correct?
A. Yes.
Q. And when you became aware of that fact, one of your responsibilities was to try to get that done; is that correct?
A. Yes.
Q. And that was something that you did, attempted to do, at least, in good faith; correct?
A. Yes.
Q. And those were your marching orders -- to get that done in good faith; is that correct?
A. Yes.
Q. Because the goal was to make sure that all of the records, both the records coming in and the records going out -- and

when I say "coming in," from the vendor, and then going out to the pharmacy would be accurate; correct?
A. Yes.
Q. And Charlie Boyd was part of the -- he was your supervisor at that point; correct?
A. Yes.
Q. And he certainly communicated to you that that's something that he wanted and insisted be done; correct?
A. Yes.
Q. Now, trying to get that done is a lot different than getting it done; correct?
A. Yes.
Q. And part of the reasons for your angina or whatever it might be, okay, came from the difficulties in trying to get that done; is that right?
A. Yes.
Q. And so you started your path of trying to get it done sometime in early June, I believe, at least the documents show, that you reached out to try to find out what in the world is going on with the Boulevard T3s; correct?
A. Yes, that sounds correct.
Q. So, at that point, you had had conversations with Charlie Boyd about the status of Boulevard; correct?
A. Yes.
Q. And, in fact, I think even we saw something in your direct

testimony where there was a Teams message, I believe, between you and Charlie Boyd concerning the status of the license for Boulevard.

Do you remember that?

MR. ZIMET: Put that up.

BY MR. ZIMET:

Q. It would be a Teams conversation on June 1st.

MR. ZIMET: It's Government's Exhibit 471.

BY MR. ZIMET:

Q. And so this is something -- I don't know if you remember the first part of your testimony something -- were you shown this document?

A. Yes. I have seen this recently.

MR. ZIMET: And if we scroll down a little bit.

Actually, I'm sorry, go up.

My apologies.

BY MR. ZIMET:

Q. So Charlie Boyd says, "Hey, there."

And you say, "Hey."

That's an Eastern Maryland kind of thing? "Hey, hey, there" kind of thing?

MR. POGOZELSKI: Objection, Your Honor.

Relevance.

THE COURT: Overruled.

MR. ZIMET: I'll withdraw it.

BY MR. ZIMET:
Q. "Do you have a copy of Boulevard 9229 license?"
You say, "Let me check."
Your answer is, "No, I do not. I do not even see a vendor file for them. I can check with Kenzi."
Kenzi is who?
A. Kenzi worked in the accounting department?
Q. Then you say, "I had never heard of them until the HIV meds, and they were set up in the system; so I thought Kelsey must have approved."
Now, this is 6/1/2020, which is, what, nine days if my math is correct, after the time that you approved them; is that correct?
A. I think I approved them in April.
Q. April?
A. This is in June.
Q. Okay. So it's about a month and 40 days?
A. Uh-huh.
Q. And I assume that it's because you were so busy, you didn't remember that you had done that?
A. Yeah, I mean, I think that's reasonable to think.
Q. I'm not questioning if it's reasonable. I'm just trying to figure out the reason why.
A. I guess because the name didn't stand out to me at this time when I was being asked.

Q. As well as there's probably nothing really remarkable, okay, that you remember something about them; correct?
A. At the time, no.
Q. And so then you say, "NN, never mind, found it."
And then you send the file to Charlie Boyd.
And he says, "This is New York. What about Maryland?"
And you say, "This is the only one I have. Want me to ask?"
And Charlie says, "They need one to ship to us, right? Or is that their responsibility, not ours?"
And you respond, "Yes, they do as a wholesaler. New York is not a reciprocal state. I can double-check with Maryland BOP."
That's Bureau of Pharmacy?
A. The Board of Pharmacy.
Q. The Board of Pharmacy.
"And ask them if they have a Maryland license?"
Charlie says, "I wouldn't call the board."
Then Charlie says, "Let's just ask them for a copy. I would think that they would have to have one to be an approved vendor, right?"
And your response was, "Usually, yes, but we have no way of knowing what we're going to be purchasing from them because" -- I guess it should be "that" -- "is not communicated to us. They have been -- there have been so many new vendors for all

the various supplies, we just approved it with the New York license for the time being."

And is that the end of that?

MR. ZIMET: Let's scroll to the bottom.

BY MR. ZIMET:

Q. Charlie says, "Yes, for sure." And he says, "We need to also audit all the vendors to make sure we have what we need. Purchasing can do that."

And that's the end of what you were shown -- is that correct? -- for that day?

A. During the testimony? Is that what you're asking?

Q. Yes.

A. I believe so. I'm not quite sure, but I've seen this document before.

Q. I'm sorry?

A. I have seen this document before.

Q. And the last part of what Charlie is suggesting would be to do something to improve the system at Safe Chain to find out whether prospective vendors have licenses in other places besides their home state; correct?

A. Yes, saying that purchasing can take care of that.

Q. As part of the process to improve Safe Chain's intake system; correct?

A. Possibly, yes.

MR. ZIMET: We can take that down.

BY MR. ZIMET:
Q. But that did not end the topic of whether Boulevard should have a Maryland license or not, did it?
A. I don't believe so. I think we continued that conversation with the legal team.
Q. As a matter of fact, the conversation was directed by Charlie assigning you the responsibility: Go check with Frier Levitt and get a legal opinion; correct?
A. I believe so.
Q. So one option that you suggested was reaching out to Maryland BOP, which Charlie said, "I don't want to do that. What I do want to do is get a legal opinion from our legal -- from our attorneys"; correct?
A. Yes.
Q. And that's what you, in fact, did. You followed those directions, did you not?
A. Yes, I believe so.
Q. And on June the 2nd, the very next day, you send an email to John Morrone, asking him the legal question, which was the subject matter of what Charlie brought up himself as to the legal issue; correct?
A. I believe so, yes.
Q. Now, Charlie Boyd was anxious to get an answer and asked you what Frier Levitt had said to you in response to the question; isn't that correct?

A. Probably.
Q. In fact, on multiple times he asked you, "Have you heard back from Frier Levitt relating to Boulevard?"; correct?
A. I think so.
Q. Were those communicated by Teams messages? Text messages?
A. Possibly. I don't remember how that could have been communicated.
Q. So it was a topic that he was pursuing and asking you to get the answer, if possible; correct?
A. Yes.
Q. And you heard back from John Morrone at one point saying he was working on it; correct?
A. I believe so, yes.
Q. And you responded and got back to Charlie Boyd saying, "They're working on it"; correct?
A. Yes.
Q. The problem is they never gave you an answer, did they? The law firm, Frier Levitt?
A. I don't think at that time, to my initial inquiry, they did.
Q. In fact, you, into the month of September, kept asking them for the legal opinion concerning that issue, did you not?
A. Yes, I believe I did follow up with them.
Q. And you still never got an answer, did you?
A. I don't -- I don't think I got a direct answer to that

initial email.
Q. Which you repeated multiple times to them, asking for the answer; correct?
A. Yes, I think so.
Q. Now, Charlie Boyd, responding to that, didn't fire Frier Levitt, did he?
A. No.
Q. Although moving forward, there were some real issues with Frier Levitt, were there not?
A. I know they eventually switched legal teams. I don't remember the details or time frame of exactly when.
Q. Well, that would be after the civil case was filed in July of 2021; correct?
A. I guess so. I don't remember the exact date.
Q. July 26, 2021, was the raid at Safe Chain. That's the day that, I think, you were not present. You were on vacation maybe?
A. I think that was in August or later in the year. Later in the summer, I think.
I was on vacation during -- when that happened.
Q. And that was a pretty significant event at Safe Chain; correct?
A. Yes.
Q. And you were pretty upset about it; correct?
A. Yes.

Q. And Charlie was communicating with you about that? What had occurred; correct?
A. I don't know if I was able to speak to him that day because it was -- when that took place, they confiscated everyone's phone. So I don't think I was able -- I don't remember if I was able to communicate with him that day or within the day or so after.
Q. Do you remember talking to him on July 30th of 2021?
A. I don't remember that particular day.
MR. ZIMET: If I, with the Court's permission, can approach the witness, Judge.
THE COURT: Okay.
BY MR. ZIMET:
Q. I handed you a document. And I wonder if -- you can look at anything you want in there, but the area I'm trying to refresh your recollection is on that last page.
If you can read it to yourself and then let me know whether or not your recollection is refreshed concerning a conversation with Charlie Boyd on that date in July.
A. Okay.
Q. Is your recollection -- I'm sorry. Is your recollection refreshed?
A. Yes.
Q. So at that time, Charlie was asking how you were doing?
A. Yes.

Q. And you conveyed to him the fact that you were okay but there were employees that were worried and concerned about their jobs; correct?
A. Yes.
Q. And Charlie attempted to try to comfort you about that; correct?
A. Yes.
Q. And you expressed that part of what the concern was is that where this was coming from and who was responsible for what had occurred; correct?
A. Yes.
Q. And your thought was -- and you were communicating what people were thinking -- was the fact that Adam Brosius, okay, was somebody that was in large part responsible for what had just occurred?
A. Yes. That was the topic of conversation amongst employees, you know, that everyone was concerned about his involvement in the situation.
Q. And Charlie offered his support, and he also told you something that you had felt also -- is that you knew that compliance was taking a large brunt of the criticism; isn't that correct?
MR. POGOZELSKI: Objection, Your Honor, on hearsay grounds.
THE COURT: I'll allow it.

Overruled.
A. Yes.
BY MR. ZIMET:
Q. And what had happened is within the company, there was some finger-pointing taken on; correct?
A. Yeah, I would say a little bit.
Q. And part of the finger-pointing was directed toward your department; correct?
A. Yes.
Q. As well as you being the head of department yourself; correct?
A. Probably.
Q. And Charlie was trying to comfort you to let you know that you should not let it affect you; correct?
A. Yes.
Q. In fact, Charlie had been a very strong supporter of you all during the time period that you were at Safe Chain involved in the compliance department; correct?
A. Yes.
Q. He communicated with you regularly; correct?
A. Yes.
Q. You had access to him; correct?
A. Yes.
Q. If you needed to see him and asked to be able to see him, he would make time to do that, if possible; correct?

A. Yes.
Q. You would talk about personal family matters also?
A. Yes.
Q. In fact, your families did things together; correct?
A. Yes.
Q. Your sons played hockey together, for instance?
A. Yes.
Q. And you are familiar with his family? His kids? His wife? Et cetera?
MR. POGOZELSKI: Objection.
Relevance.
THE COURT: Overruled.
A. Yes.
BY MR. ZIMET:
Q. Now, that relationship allowed you also to get a bonus at the end of 2020; isn't that correct?
A. I believe it was -- I had quarterly bonuses that were part of my compensation structure. I don't remember a particular, like, extra bonus or anything.
Q. Wasn't there a Christmas bonus that you received?
A. Yes. All the employees got a Christmas bonus.
Q. Was yours particularly generous?
A. I didn't ask what other people's were.
Q. Well, did you believe it was incredibly generous?
A. I don't remember what the amount was, but I thought any

bonus was generous.
Q. Let me see if I can refresh your recollection as far as that's concerned.
MR. ZIMET: May I approach, Judge?
THE COURT: Okay.
A. I'm sorry. Where did you want me to start this?
BY MR. ZIMET:
Q. I apologize for not orally responding to you. I'm not allowed to.
A. Okay.
Q. Is your recollection refreshed now as far as the Christmas bonus that you got?
A. I don't remember the quantity, but I do remember getting a Christmas bonus.
Q. And you remember that you believed and you communicated to Charlie that it was incredibly generous?
A. Yes, it was.
Q. Unexpected?
A. Yes. Because in my previous place of employment, I never got bonuses.
Q. And so at that point, as far as your relationship with Charlie Boyd, it was positive, was it not?
A. Yes.
Q. It was also positive for Safe Chain at that point; correct?
A. Yes.

Q. I mean, obviously, there were problems, but it was still a positive experience that you were having; correct?
A. Overall.
Q. But there were problems that were surfacing at that point also; correct?
A. Yes.
Q. And the problems that were surfacing related to the HIV drugs; is that correct?
A. Yes.
Q. And the HIV drugs that were in play or vendors that were in play at that point were Boulevard as well as Gentek; correct?
A. Yes.
Q. And you had been involved in a series of communications with representatives from Gilead between July of 2020 and December of 2020; correct?
A. Yes, I believe that was the time frame.
Q. Do you remember who those people were that you were communicating with?
A. It was one of their compliance people -- was how our conversation initially started. And then it moved -- their -- Gilead's compliance person then forwarded our compliance emails on to their legal team. I can't think of their names, off the top of my head.
Q. I'll try to refresh you a little bit later on with their names, but it was sort of an evolution of Gilead people that

you're communicating with?
A. Yes.
Q. It went from, basically, people that take reports, ask some questions to more investigative stuff, and then ultimately to their in-house legal attorney. That's redundant, but is that correct?
A. Yes.
Q. And with each communication, Gilead became a lot more accusatory towards Safe Chain; is that correct?
A. Over time, yes, it did change tones, especially once their legal team got involved.
Q. That was a person by the name of Peter Colosi, who was the in-house legal person; correct?
A. Yes, I recognize that name.
Q. And then he wrote -- there was a letter that was submitted to Safe Chain in November of 2020, which he introduced himself as well as presented what he thought were some legal issues that had come up?
A. Yes.
Q. And at that point, Mr. Morrone had already passed away; correct?
A. I believe so.
Q. And Martha -- and pronounce her last name. I always mess it up.
A. Rumore, I think, is how she pronounced it.

Q. We'll agree on Rumore.
She became the point person for Safe Chain?
A. Yes.
Q. For Frier Levitt representing Safe Chain; correct?
A. Yes.
Q. Did she express any kind of limitations on what she could do as an attorney representing Safe Chain?
A. I don't -- I don't know -- I'm not sure if she expressed any exact limitations. I know they had a whole team of people, and sometimes she would collaborate with other attorneys at their organization.
Q. That would be later on 2021, wouldn't it? I'm talking about 2020.
A. Not that I was aware of.
Q. Okay. Did she say anything to you that, you know, "I just do regulatory things? I don't do litigation or anything like that"?
MR. POGOZELSKI: Objection.
Calls for hearsay.
THE COURT: Overruled.
A. I don't -- I don't recall if that came up in the conversation.
BY MR. ZIMET:
Q. Did she say anything to you, for instance, that, you know, "It's not my job to ask you questions. It's your job to give

me information"?
A. Not that I can think of, off the top of my head.
Q. And she did ask questions, did she not?
A. Yes.
Q. And so once this November 2023 letter came from Colosi, it was the response to get together with you, Charlie Boyd, and Martha Rumore to figure out what the response should be; is that correct?
A. Yes. We -- Safe Chain reached out to them to help respond to that letter.
Q. And you were involved in a conference call relating to what the response should be; correct?
A. I think, so yes.
Q. In fact, at that conference call, obviously, the people on it, Ms. Rumore was not a participant in earlier events -- correct? -- that Mr. Morrone had been?
A. Yes.
Q. And so she needed to be updated on facts; correct?
A. Yes.
Q. And she was free to ask you any questions that were necessary; correct?
A. Yes, she would have been.
Q. And you honestly answered all the questions that she had; is that correct?
A. Yes.

Q. And did you that because you thought -- and I'm sure you still do -- think that would be in Safe Chain's best interest, to give all the information to the attorneys so that they could provide the best legal advice that they could; correct?
A. Yes.
Q. Do you remember what the subject matter was of Mr. Colosi's November 2020 letter?
A. I think it was just regarding our initial request about the T3 documents and trying to verify those.
Q. Okay. Do you recall anything concerning any kind of lots of drugs that maybe were problematic, that were subject of that letter?
A. I don't remember if that was addressed in that initial letter to Safe Chain.
Q. Okay. Let me see if I can organize it a little bit question-wise.
There was Ms. Mayal, okay, sent you a -- and she is part of the counterfeit investigator's team -- correct? -- at Gilead? Correct?
A. I think so. That name is not standing out to me, but there were a few people that we interacted with; so it could have been, yes.
Q. And that was in October 2020, that letter from her came in; correct?
A. Yes.

Q. And Mr. Morrone was still alive at that time?
A. I believe so. I don't remember exactly when he passed away.
Q. And you saw, I think on direct examination, there was an email that Charlie Boyd sent that had three topics on it that were gone over with you?
A. Yes.
Q. Do you remember that?
A. Yes.
Q. Yes?
And then after that, there was a conference call that took place because Ms. Rumore responded to the memo, which basically said, "Here's some general responses, but I need to know a lot more information."
Correct?
A. Uh-huh.
Q. Correct?
A. Yes.
Q. And the purpose of that subsequent call was to get more information; correct?
MR. POGOZELSKI: Objection.
It requires speculation.
THE COURT: If she knows.
A. I don't -- I don't remember what we may have talked about on that particular call.

BY MR. ZIMET:
Q. But as a result of that call, a decision was made that the 3911 that you had prepared was not going to be sent in to the FDA; correct?
A. Yes, sometime around there.
Q. And that was a result of that call; correct?
MR. POGOZELSKI: Objection.
It requires speculation.
THE COURT: Sustained.
BY MR. ZIMET:
Q. When, in relationship to that call, was that legal advice given?
A. I believe Martha said that if the -- related to the drug complaint, it would be the manufacturer's responsibility to report it at that time, based on the email exchanges we had.
Q. And the conversation took place; correct?
A. I don't remember the conversation.
Q. But --
A. I remember the emails because I was able to, you know, be reminded of the content but...
Q. Well, the advice was given, according to your timetable, after that conversation took place, that conference call; isn't that correct?
A. I believe so.
THE COURT: Mr. Zimet, is this a good spot to take a

break?

MR. ZIMET: Sure, Judge.

THE COURT: All right. Members of the jury, we're going to take a 15-minute recess.

Remember my admonition not to discuss the case or allow it to be discussed in your presence, and we'll see you back in the jury room in 15 minutes.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: Again, Ms. Divilio, you can't discuss your testimony during the break, and we'll see you back in about 15 minutes.

And if there's nothing else to come before the Court, we'll be in recess for 15 minutes.

THE COURT SECURITY OFFICER: All rise.

(Off the record from 3:04 PM to 3:20 PM, after which the following proceedings were had:)

THE COURT SECURITY OFFICER: All rise.

THE COURT: We are back on the record. Counsel are present. Both defendants are present.

Ms. Divilio, you understand you're still under oath?

THE WITNESS: Yes.

THE COURT: Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: No, sir.

MR. ZIMET: No, sir.

MR. BARZEE: No, sir.

THE COURT: If we have all the jurors, let's bring them in.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

Mr. Zimet, you may continue.

MR. ZIMET: Thank you, Judge.

BY MR. ZIMET:

Q. So I think where we stopped was the communication from Mr. Colosi, the attorney for Gilead, that came sometime late November 2020.

And then you're involved in the conference call to get ready and prepare a response on behalf of Safe Chain.

Do you recall that, generally speaking?

A. Yes.

Q. And the author of that response ultimately was the

attorney; is that correct?
A. Yes.
Q. And you reviewed the response yourself, did you not?
A. Maybe. I don't remember if I did or not.
Q. You were involved in the preparation of it; correct?
A. Yes.
Q. And if there was anything that you thought was factually erroneous, you had the ability to speak up and say, "That's wrong. It needs to be corrected"?
A. Yes.
Q. And up to that point, you were aware that Mr. Morrone had given legal advice that was unnecessary for Safe Chain to provide copies of any T3s to Gilead?
A. Yes. I don't remember who provided that, but that was some discussion.
Q. In fact, it was in a communication from Mr. Morrone to Mr. Charlie Boyd, and then he forwarded it to you to put it in the Safe Chain files; isn't that correct?
A. Possibly. I'm sorry. I don't remember that instance.
Q. But as of late 2020, your understanding was that Safe Chain's position, based on legal advice, that they did not need to provide T3s to Gilead; correct?
A. Yes.
Q. So in November and December of 2020, would it be correct to say that there was some antagonism building between Gilead and

Safe Chain?
A. Yes.
Q. And the position that Gilead was taking was that Safe Chain was not acting properly; correct?
A. Yes. I think that was part of it.
Q. And Safe Chain's response was that we are and, in fact, what Gilead is doing is trying to interfere with our business; isn't that correct?
A. Yes, that was --
Q. Generally, that's -- that's where they were in each corner of the ring, so to speak?
A. Yes, that's accurate.
Q. And so, Ms. Rumore, in giving legal advice, did not suggest that that was an unreasonable position that Safe Chain was taking; correct?
A. Yes.
Q. She said it was unreasonable?
A. No. I'm sorry. Yes.
Q. I'm now doing what he did; right?
A. Sorry. I'm agreeing with your statement, that she -- the guidance from Frier was essentially that at that time, we didn't need to provide Gilead with additional information.
Q. And at that point, the Gilead attorney replied or the response was submitted to Gilead, and then Gilead did a reply to that response; correct?

A. Yes. There were a lot of back-and-forth between the attorneys there.
Q. And then in the middle of December, first week, first ten days, the communications basically ended, and Gilead wanted to know when Safe Chain was going to reply to them.
That's how it was left; correct?
A. I think so. I think there was some -- maybe a little bit of lag in communication. I don't recall why. But, again, there was a lot of back-and-forth between the legal teams there.
Q. And the legal team asked your lawyer -- or Frier Levitt lawyer representing Safe Chain to give them a call so they could talk things out.
Wasn't that part of the communications that you saw that were forwarded to you?
A. I don't remember that, but I believe -- I'm sure they talked on the phone and things.
Q. Well, he offered, but didn't Ms. Rumore tell you that she wasn't going to speak with them?
A. I don't remember exactly that instance.
Q. Nothing else happens in December of 2020.
Then in January 2021, you reach out to the lawyers, basically, "Can you give me an update?" Correct?
A. Probably.
Q. I used "me." It should be "us." Can you give "us" an

update?
A. Right.
Q. She wasn't representing you. She was representing Safe Chain?
A. Right.
Q. And Ms. Rumore basically said, "There's nothing really to do at this point. Let's just wait on them"; correct?
A. I believe that was the general tone of the conversations that we had.
Q. And later on, you found out that Gilead was -- and not what you believe, but what they were saying -- was interpreting your lack of response as evasion of working with them; isn't that correct?
MR. POGOZELSKI: Objection. It requires speculation, and what Gilead interpreted.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Was it not communicated from Gilead that they had not heard from Safe Chain and they were concerned about that?
A. I believe they did follow up with another communication saying something along those lines.
Q. And at that point, Charlie Boyd wanted to communicate with Gilead; correct?
MR. POGOZELSKI: Objection as to what Charles Boyd wanted.

MR. ZIMET: Let me rephrase.
THE COURT: Okay.
BY MR. ZIMET:
Q. At that point, Charlie Boyd communicated that he wanted to have -- he wanted Safe Chain to be able to communicate through their lawyers with Gilead; isn't that correct?
A. I believe so, yes.
Q. And Martha Rumore was still pretty much the main attorney at that point representing Safe Chain, from Frier Levitt; correct?
A. I believe so.
Q. And you then -- "you," being Gilead -- then got some information that there was another problem with one of the products of a vendor; isn't that correct?
MR. POGOZELSKI: Objection as to "you," being Gilead.
BY MR. ZIMET:
Q. "You," being Safe Chain.
I apologize.
A. I'm sorry. Can you ask that again?
Q. Yeah.
Safe Chain received some communication that there was an issue with a Safe Chain drug had been sold to a pharmacy? That there was a problem with the drug?
A. Yes. I believe there was another complaint in that early 2021.

Q. And that created more reason for Martha Rumore to get re-involved in the case; correct?
A. Yes. It would have.
Q. And as time went on, she gave legal advice as far as what to do concerning the new complaint that came in; correct?
A. Yes.
Q. And one of the issues that always came up with her was what were the legal responsibilities of Safe Chain as far as the complaint concerning quality of product, whether the wrong pills were in the bottle? Broken pills? Things like that?
A. Yes, that was a topic of conversation.
Q. A pretty constant topic of conversation, and something that you yourself, as director of compliance, really weren't well-versed in because you didn't have much experience in that area.
Fair to say?
A. Correct.
Q. And Charlie Boyd didn't have much experience either, and he was looking for advice as far as what the right thing would be to do; correct?
MR. POGOZELSKI: Objection.
It requires speculation.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Based on your communications with Charlie Boyd, did he not

communicate to you that he wanted to know what was the right thing for Safe Chain to do?

A. Yes.

Q. Now, part of that included continuing communication with Gilead and trying to find out facts and information to decide what course should be taken; correct?

A. I'm sorry. Can you rephrase that?

Q. Sure.

Part of that included trying to get more information so a decision could be made as far as what course to take?

A. Yes.

Q. And there was a time where it seemed a little bit confusing, at least from what Ms. Rumore was saying, as far as what the right legal course should be?

A. Yes.

Q. And you were confused, not because you're not intelligent enough to understand, it's just what she was saying was confusing; correct?

A. Yes. And there was just a lot going on at that time, and it was difficult to decipher what legal response applied to what situation, and there was a lot of things going on.

Q. And things were happening fast; right?

A. Yes.

Q. And it wasn't just with HIV drugs. There were things happening within the company; correct?

A. Yes.
Q. And Charlie Boyd, while he was your supervisor for compliance, also had a lot of other hats he was wearing at the same time; isn't that correct?
A. Yes.
Q. And that took up his time; correct?
A. Sure.
Q. And energy?
A. I don't think I can answer for his energy levels.
Q. He was pretty energetic, but he still gave all he could to Safe Chain -- correct? -- that you saw.
MR. POGOZELSKI: Objection.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So things were progressing. And then in the middle of March, all of a sudden, there was this Pharm/alert that came out; correct?
A. Yes.
Q. And that very much changed the dynamics between Gilead and Safe Chain; isn't that correct?
A. It definitely had an impact.
Q. And it was very accusatory -- correct? -- towards Safe Chain?
A. I don't remember the exact verbiage in there; but, yes, it was very negative.

Q. And, essentially, I think you were shown the document -- excuse me, shown the document earlier as to what was said. And a response was written very quickly to try to get out publicly what was being said -- correct? -- by Gilead?
A. Gilead sent out the e-Pharm/alert quickly, I guess. Is that what you're asking?
Q. They sent it out quickly. Safe Chain is made to look like the worst thing in world. They want to respond; correct?
A. Yes.
Q. So a response is drafted; correct?
A. Yes.
Q. You're involved in looking at the response; correct?
A. I believe I was on the emails with it, but I did not craft the response.
Q. You were not the writer of the response, but you also looked at it from the standpoint of accuracy; correct?
A. Yes.
Q. And you knew that part of what was being submitted was saying, "We're not a bad company. We want to do the right thing"; correct?
A. Yes.
Q. And that was something which was consistent with what your interaction was with Charlie Boyd all during that time period; correct?
A. Yes, during that time.

Q. And so a response was submitted. And then, on March 23rd of 2021, there's a demand letter that comes in on behalf of Gilead from outside counsel; is that correct?
A. Yes, I believe so.
Q. And they make all sorts of accusations against Safe Chain; correct?
A. Yes.
Q. And you immediately responded to each of the paragraphs that were included in that demand; isn't that correct?
A. It was myself and Dakota that had to work on the responses to their letter.
Q. And you did that, did you not?
A. I believe so, yes.
Q. And what you put in those responses was factually accurate; is that correct?
A. Yes.
Q. It was based upon what you knew as a head of compliance as well as working with the colleague, Dakota Flowers; correct?
A. Yes.
Q. And you provided that to Safe Chain counsel, Frier Levitt; correct?
A. Yes.
Q. At that point, another attorney had gotten involved from Frier Levitt.
His name was Jesse Dresser; is that correct?

A. Yes, that sounds correct.
Q. And he became the lead attorney where Martha became -- she was the only attorney. He basically took her place; correct?
A. Yeah. I think from what I could tell, they were both kind of working on the project.
Q. And at that point, there was discussion as far as what should be done, what the response should be on behalf of Safe Chain; correct?
A. Yes.
Q. And at that time, there's communication within Safe Chain that what was going on was really a Gilead issue, not a Safe Chain issue; isn't that correct?
A. Yes. At the time, that's how it seemed.
Q. And the Gilead issue was that they were having a problem -- Gilead -- with wrong pills in bottles; isn't that correct?
A. Yes. That's what we thought at that time.
Q. And that thought was in good faith; correct?
A. Yes.
Q. And it was also based on what people were saying, including attorneys; correct?
A. Yes.
Q. As well as predominantly Mr. Brosius; correct?
A. Yes.
Q. He was claiming he had an insight as to the industry; correct?

MR. POGOZELSKI: Objection. It requires speculation. Hearsay.

THE COURT: Overruled.

BY MR. ZIMET:

Q. You can answer.

A. Sorry.

I didn't communicate with him directly. So I think that was -- that was the impression that was given to me -- is that Adam and Charlie were working on information together and had the connections and things.

Q. Well, was it Charlie who was getting information, or Brosius's information given to Charlie?

There's a big difference.

MR. POGOZELSKI: Objection.

Asked and answered.

THE COURT: Overruled.

BY MR. ZIMET:

Q. You can answer.

A. I'm not sure how the communication went back and forth.

Q. Was Charlie claiming to you that it was his inside information that it was a Gilead issue?

A. No.

Q. And you knew from, even though you -- I won't say "even though" -- although you were assigned to compliance, you understood that Gilead, as a company, and Safe Chain, as a

wholesaler distributor, were in competition with each other; correct?

MR. POGOZELSKI: Objection.

It requires speculation.

THE COURT: Overruled.

A. I don't know that I would have interpreted it at that time as in competition with each other.

BY MR. ZIMET:

Q. Well, Gilead was expressing that in a e-Pharm/alert, that for people, if they really wanted to have safe product, they needed to get it through their authorized distributors; isn't that correct?

A. Yes.

Q. And Safe Chain was not an authorized distributor; correct?

A. That's correct.

Q. But Safe Chain, okay, was a wholesaler. And since they were not an authorized distributor, they would be in competition with the authorized distributors; correct?

A. Possibly.

Q. So at that point, demands were made by Gilead.

You were a part of drafting a response to that, and a response was then sent to Gilead; correct?

A. Yes.

Q. And there's a series of communications that go back and forth between Gilead and Safe Chain; correct?

A. Yes.
Q. Now, in one of the responses -- and it was actually written or signed off on by Martha Rumore -- there was an accusation or an issue relating to drugs, pharmaceuticals that had gotten to the Medicine Shoppe. And, in fact, okay, well, Gilead drugs had gone to the Medicine Shoppe where there's a wrong pill in the bottle; correct?
A. Yes.
Q. And that had related to an incident that happened back in the fall, maybe September, October-ish?
A. Yes. I believe that's when that took place.
Q. And you were aware of that issue; correct?
A. Yes.
Q. And you were aware of that issue. And when Gilead raised it in the spring of 2023, you responded to Ms. Rumore, "This is what happened with that incident. I found out about it. I made an inquiry communication to Gilead. They never communicated back. We never heard anything back from them." Is that correct?
A. Possibly, yes.
Q. Well, it is, isn't it.
A. I don't remember my exact verbiage, but that was sort of how the situation unfolded.
Q. In the ballpark.
Because it was basically, "Gilead, it's on you because you

never got back to us after we informed you what was going on"?
A. Yes. That's what led us to initially contact them.
Q. And Gilead immediately responds and says, "You're wrong. Safe Chain never told us about that"; correct?
A. I don't remember exactly what their response was.
Q. Well, generically, that's what they were saying; isn't that correct?
MR. POGOZELSKI: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. And so Charlie Boyd said to you, "Let's make sure that we're 100 percent factually correct"; isn't that right?
A. Possibly.
Q. And in response to that, you looked on your records to see whether or not you had sent anything to Gilead; isn't that correct?
A. Yeah, that sounds like what I would have done.
Q. Well, that's what you actually did, ma'am; isn't that correct?
MR. POGOZELSKI: Objection. Asked and answered. Argumentative.
THE COURT: Sustained.
BY MR. ZIMET:
Q. And in searching your emails, you discovered that you had

made a mistake when you said that you had communicated that information about Medicine Shoppe to Gilead in the fall of 2020; isn't that correct?
A. Possibly.
Q. Do you have any doubt about that, ma'am?
A. Well, I don't remember what exactly was communicated to Gilead.
Again, there's a lot of documents sent back and forth. I don't remember the details of each one.
Q. So I'm not asking the details. But conceptually, wasn't it correct that you found out that in your representation to Ms. Rumore that, in fact, you had notified Gilead about the "Medicine Shoppe wrong pill" issue was inaccurate?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.
A. If I made a mistake, I would have just told her that.
BY MR. ZIMET:
Q. And you did tell her you made a mistake, didn't you?
A. I'm sorry?
Q. You did tell her you made a mistake. There's nothing wrong with making mistakes.
A. If I did, I would have admitted that, yes.
Q. And you did tell her that, didn't you?
MR. POGOZELSKI: Objection.

Asked and answered.
THE COURT: She hasn't answered it.
Overruled.
A. Yes, I would have told her that if I made a mistake.
BY MR. ZIMET:
Q. I'll be clearer in the question.
You did tell her that you made a mistake; isn't that correct?
A. Yes.
Q. And it was somewhat embarrassing professionally; correct?
A. I don't remember the details of how I may have felt.
Q. Well, it had become an issue in communications between the two law firms relating to what appeared to be a dispute; correct?
A. Yes.
Q. And Gilead was communicating that "Safe Chain, you're not being honest with us. You just told us something that's just wrong"; isn't that correct?
A. I don't remember what Gilead said.
Q. You read all the correspondences, didn't you?
A. It's been several months.
Q. I'm sorry?
A. It's been several months since I reviewed the Gilead correspondence.
Q. And you were anxious to make sure that the issue was

cleared up with Gilead; isn't that correct?
A. I don't remember the details of, again, how I felt; but if I made a mistake, I would certainly be very cautious about correcting it.
Q. When you say "cautious about correcting," you wanted to correct it, did you not?
A. Oh, yes. I would have tried to correct it or get them the correct information.
Q. And you were repeatedly reaching out to Martha Rumore to correct it because it was just an honest mistake; correct?
A. Probably. Again, I don't remember each communication I may have had with Martha and her legal team.
Q. And I apologize for asking the question. I'm not asking for each communication.
The question is you kept going back to Martha to get an update as to whether or not she communicated your mistake to Gilead; correct?
MR. POGOZELSKI: Objection. Asked and answered. She said she doesn't remember these details, Your Honor.
THE COURT: If you remember, answer the question. If not, you don't remember.
A. I don't remember.
BY MR. ZIMET:
Q. And so at that point, did you feel a lot of guilt concerning what was happening?

A. I don't think I felt guilty. If I made a mistake, I obviously would have just shared that I made that mistake. I don't think I felt guilty about anything.
Q. And at that point, you had not learned about the mistake about Boulevard; correct?
A. Which mistake are you referencing?
Q. There's only one that I'm aware of -- that's the mistake concerning approving them as a vendor.
Was there more than one?
A. Are you talking about -- I'm sorry. Can you rephrase that?
Q. At that point -- and we're talking sometime in early April of 2021 -- you had not learned about the mistake you had made in April of 2020, when you approved Boulevard based upon the false registration documentation?
A. No. I don't think at that time I knew their license was falsified.
Q. And you approved it based on the false documentation; correct?
A. Yes.
Q. And so while all this was happening, there were different vendors that were making application to Safe Chain; correct?
A. Yes. I think there were additional applications.
Q. And I want to --
MR. ZIMET: If I can approach, Judge?
THE COURT: Okay.

MR. ZIMET: Can I do it on the ELMO? Can we do that real quick.

BY MR. ZIMET:

Q. This is Exhibit 40B.

I'm showing you this just to give you a sense -- this is in evidence -- just to give you a sense as to when the various vendors started working with Safe Chain.

A. Okay.

Q. Does that look accurate and consistent with your memory?

A. Yeah. The ends are cut off a little bit.

Q. I'm sorry?

A. The ends of the document that you're showing me are cut off a little bit. I don't know if you can zoom out a little bit.

Q. I'm not very good at that. So...

THE COURT: You have to slide it the other way.

A. There you go. Now I can see the whole thing.

BY MR. ZIMET:

Q. Sorry.

Does that look right to you?

A. Yes.

Q. I realize it's not the exact date.

So there comes a time where business stops with Boulevard; correct?

A. Yes.

Q. And that's based on discovery of the false documentation;

correct?
A. Yes.
Q. And also Gentek comes to a stop also; correct?
A. Yes.
Q. And Gentek comes to a stop, it looks like sometime beginning of January; correct?
A. Yes.
Q. You were asked yesterday about some documents that said some kind of communication that Gentek stopped at the end of 2020.
Remember that question? You were asked by the prosecutor about that?
A. Yes.
Q. It looks like that might have been like -- what? -- about 11 days off.
It really wasn't the end of 2020. It was the first days of 2021, based on that?
A. Yes. It looks like mid-January 2021.
Q. So it was an 11-day mistake?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Sustained.
BY MR. ZIMET:
Q. So you learn about the Boulevard issue, and Boulevard's out? Right? They're cut loose?

A. Yes.

MR. ZIMET: And if we can just show the witness Boyd Exhibit 311, please.

I'll turn the ELMO off. And scroll down.

BY MR. ZIMET:

Q. And this appears to be the April 30, 2021, demand letter to Boulevard based on the cutting off?

A. Yes.

MR. ZIMET: And scroll through the whole thing just to make sure.

BY MR. ZIMET:

Q. And you're familiar with that when it was happening.

You didn't write the letter, but you were familiar with that was happening; correct?

A. Yes.

Q. And that was part of Safe Chain's attempt to get rid of vendors that were problematic; isn't that correct?

A. Yes. This was an attempt to address the issues that we were having with Boulevard.

Q. And another demand letter was sent to Gentek at some point also?

A. I believe there was something sent to them.

Q. And so because Gentek and Boulevard were no longer there, there were other HIV vendors that were being brought to Safe Chain to do business with them; correct?

A. Yes.
Q. And the next one or two in order was Synergy and Rapid's Tex and Mr. Unlimited; right?
A. Yes.
Q. And Synergy -- I think we have discussed quite a bit about what the issues were.
You had approved Synergy at one point; is that correct?
A. Yes.
Q. And that was a mistake; correct?
A. My approval was based on verifying that they had a license. It wasn't on the subsequent business transactions with them.
Q. Okay. But it turns out that the information on the T3s was inaccurate; correct?
A. Yes, I think that was a concern.
Q. But the approval itself was based on the information that you had; correct?
A. Yes.
Q. And it turned out down the road that they were not really worthy of being a vendor; correct?
A. Yes.
Q. And that was for a variety of circumstances occurred. And we talked about them with you and possibly other witnesses also, but it was something in Safe Chain's best interest to terminate the relationship with them; correct?
A. Yes.

MR. ZIMET: And, in fact, if we can look at -- I believe it's Boyd Exhibit 312 for identification, just for the witness. And scroll down.
BY MR. ZIMET:
Q. This looks like an August 9, 2021, letter. Is that familiar to you?
A. I remember the letters being sent, but I don't remember the details of the content.
Q. But conceptually, it was basically cutting them off; correct?
A. Yes.
MR. ZIMET: And look at 314, Boyd Exhibit 314 for identification, just for the witness.
BY MR. ZIMET:
Q. This would be June 17, 2024, Rapid's Tex?
THE COURT: 2021?
MR. ZIMET: I'm sorry.
THE COURT: You mean '21?
MR. ZIMET: '21, yes.
BY MR. ZIMET:
Q. Does that appear to be accurate?
A. Yes.
Q. With your recollection of what was happening at the time?
A. Yes.
MR. ZIMET: And if we could look at Boyd Exhibit 315

relating to Omom, just for the witness.

MR. POGOZELSKI: Your Honor, I would object to the extent she's never seen these documents before.

MR. ZIMET: I don't know why we have speaking objections, Judge.

THE COURT: If that refreshes your recollection, she can testify.

A. Yes, I know the letters were sent.

BY MR. ZIMET:

Q. Okay. Does that refresh your recollection that an Omom letter was sent during that time period?

A. Yes.

Q. And that was Safe Chain basically cutting all of the HIV vendors that you were involved, either you directly or your compliance department, in approving; correct?

A. Yes.

Q. Now, one of the vendors that was not approved was not a vendor that came from Brosius; is that correct?

A. I'm not -- I'm not sure which one you might be referring to.

Q. Let me see if I can refresh your recollection as far as that one is concerned.

Value Wholesale?

A. I remember the name, but I don't recall who brought it to Safe Chain or if they initiated that --

Q. Okay.
A. -- themselves.
Q. So yesterday, we had some discussion during your direct examination concerning this vendor, who ultimately you were able to find out through a Google search had been indicted for counterfeit drug activities.
Do you recall that?
A. Which vendor was that? Was that Value Wholesale?
Q. Value Wholesale.
A. Okay.
MR. ZIMET: So why don't we look at Exhibit 264 for a second, Government's exhibit.
BY MR. ZIMET:
Q. And this is dated -- go from top to bottom, I guess April 6, 2021, and this is relating to the Synergy issue.
Do you recall this from yesterday?
A. Yes.
Q. And if we scroll down, you had done some work -- you and your department had done some work concerning the authorized distributors; correct?
A. Yes.
MR. ZIMET: Keep going down, please.
BY MR. ZIMET:
Q. And this is April 5th, 2021, email that you talk about Synergy being a problem?

A. Yes.
Q. And you describe the fact that the wholesaler, Wholesaler's Group, okay, is in Puerto Rico. You had a difficult time finding them, except they also operate under the name of -- you can probably pronounce it better than I can.
A. Drogueria Bayamon.
Q. Excellent.
-- "which raised a little concern because it's not listed as an AD on Gilead's website.
"Also, the only number provided was a cell phone number. I guess I would have expected to be calling a business. Let me know what other information you need."
And then you go up, and you show --
MR. ZIMET: Go under, up a little bit. If you can enlarge the Wholesaler Group, Inc.
BY MR. ZIMET:
Q. You do a photoshop shot of Wholesaler's Group, and this is that person, Mohammed Salemi, who is supposedly the contact person for that group?
A. Yes, that was on the application they provided.
Q. Well, that was for Wholesaler's Group. They weren't on the application, were they?
A. Yes, I'm sorry. You're correct.
Q. So you saw this. This was as April 5th or 6th of 2021; correct?

A. Yes.
Q. And this was a Synergy issue relating to who the -- well, who the authorized distributor was and whether there really was one or not; correct?
A. Yes.
MR. ZIMET: And if we go up a little bit.
BY MR. ZIMET:
Q. And Charlie's response, "Good morning. Yeah, so this is not an AD; so that solves that problem. Unless they can get us invoices going back to Gilead, I don't see how we can buy from them. We need to fast-track that vendor intake form but also plan for how to handle our existing customers like this. We can chat later this a.m."
So at that point, April 5th or 6th, that was an issue that was relating to Synergy, and that name really was only a name relating to a non-AD company -- correct? -- the Mohammed name?
A. Yes. I think we got that information from the T3 they provided when we asked for one, to see if we would do business with them.
MR. ZIMET: Then we go to Exhibit 341, Government's Exhibit 341. Keep going down. Let's start from the bottom.
BY MR. ZIMET:
Q. This is a communication from Value Wholesale, and they want to basically sign up with Safe Chain; correct?
A. Yes.

Q. And there's a Cesar who was communicating.

There's an offer sheet for Safe Chain as to what they could be providing. And this is April 16th. This is, like, ten days after you had made the discovery relating to Synergy and this other -- and that other company; correct?

A. Yes.

MR. ZIMET: So let's scroll up a little bit. Here's the offer sheet. Keep going up. This is sales again. Keep going down.

BY MR. ZIMET:

Q. "I just want to circle back on the offer sheet, see if everything has cleared on your end. We have the offer set aside for you; so whenever everything is cleared, we're ready to move forward. The PO can be sent to the given address, and they'll take care of everything."

And then you respond, "Yes, I approve them."

Actually, Pat Boyd asked, "Did we clear these guys?"

And you said, "Yes, I approved them on 4/21."

And then on 4/26, "Did we get the sample T3 for Gilead products, or was it non-Gilead?"

Pat, again: "I believe we have terms as well as -- as well; so we're not paying right out of the gate. Adam, Garrett, thoughts on ordering the attached."

This is sent to you or sent to purchasing, rather, at Safe Chain. "We would like to order all of this."

Keep going.

"Let me know how you like to proceed."

And you say, and the date of this --

MR. ZIMET: Go up just to -- go up to make sure that we have the correct date.

BY MR. ZIMET:

Q. You say -- this is April 26, 2021.

You say, "Hello, Charlie. There seems to be some confusion about who was supposed to" -- well -- "who was supposed to ask or send what? I never asked for any documents from this vendor as seeing that Pat and Adam were speaking with Cesar from Value Wholesaler pretty frequently and I thought they were sending one over.

"While reviewing their documents, again, just to see if I missed something, I happened to notice that the person who completed the application is someone by the name of Mohammed Salemi. I googled this person to see if their email came up with the company name so I could contact him or Cesar or both to get a quick response."

MR. ZIMET: Keep going down.

BY MR. ZIMET:

Q. "When I googled this person, this came up from the U.S. States Attorney. Based on Adam's comments last week, I'm a bit concerned that this is a vendor he's bringing to the table and is in association with an individual who was found guilty of

counterfeiting drugs and falsifying documents. I think we need to get an understanding of the relationship between Value Wholesale and Mohammed Salemi. Let me know how you would like to proceed."

Let's go up to see how Charlie responded.

"You guys in compliance are the only ones that should be getting documents relating to any vendor or customer setup. Too much room for error otherwise. (Game of telephone.) Good catch on this one, but we almost ordered product; so we need to make sure no one is approved until fully vetted.

"Also, this vendor contacted us directly through our website, so nothing to do with Adam."

And that ended the application for that vendor; correct?

A. Yes, I believe it did.

Q. And that was based upon what you were able to do; correct?

A. Yes. In this situation, I found some information before they had placed any orders or anything with them.

Q. So it's one of the ways in which compliance at first, okay, maybe had a miss, but ultimately was successful in protecting Safe Chain; correct?

A. Yes, over time.

Q. And so this was consistent in late April of 2021 of how Charlie wanted compliance to work with HIV vendors; isn't that correct?

A. Yes.

Q. And in this situation, this HIV vendor, okay, who happened to be a convicted felon for exactly what shouldn't be done, was trying to get into Safe Chain to make money off of Safe Chain; correct?

MR. POGOZELSKI: Objection as to what this felon wanted to do.

THE COURT: Sustained.

BY MR. ZIMET:

Q. The reason you brought it to Charlie's attention was what?

A. Because I googled the name and found some unsavory information about them.

Q. Disqualifying information; correct?

A. Yes.

Q. And what did Charlie Boyd do?

A. He chose not to do business with this particular vendor.

Q. Disqualified them; correct?

A. Yes.

Q. So at that point, in late April of 2021, Safe Chain was working with other vendors. Synergy was involved. There's some issues with Synergy. Some issues with Omom, and we discussed some of those yesterday.

In May of 2021, Safe Chain received a subpoena, did they not?

A. I believe so.

Q. It was a subpoena from a lawsuit that was filed in the

Southern District of Florida by Gilead; correct?
A. I think -- I think that was, yes, about that time frame.
Q. And in that lawsuit, they were alleging -- "they," being Gilead -- was alleging that Gilead drugs had gotten into the black market; isn't that correct?
A. Yes.
Q. Up to that point, had anyone from Gilead communicated with you that they believed that the drugs that Safe Chain was involved with from their vendors were, in fact, black market drugs?
A. No. I -- I don't believe I would have been in those conversations.
Q. That would be a conversation that you would be likely to remember if that took place; correct?
A. Possibly, yes.
Q. You had regular communications with the FDA -- is that correct? -- up till late spring, early summer of 2021; correct?
A. We had some phone calls regarding the 3911 forms and how to proceed with those.
Q. Up to that point, had anyone from the FDA said to you that "We believe that the drugs that Safe Chain is purchasing from these vendors are black market drugs"?
A. No, I don't believe they used those terms at the time.
Q. You tried to assist in complying with a subpoena from the

Southern District of Florida; is that correct?
A. Yes.
Q. And you were involved in communications with the Frier Levitt lawyers, who were representing Safe Chain, in responding to that subpoena; isn't that correct?
A. Yes, I believe so.
Q. And they were making commentary and evaluations of that lawsuit to see whether there's any potential connection between the black market drugs and Safe Chain; correct?
A. They would ask me for information, and I would provide it.
Q. Did they ever tell you that they thought that there was a connection between the drugs that Safe Chain was selling and the black market?
A. I don't believe so.
Q. In fact, they were opining it had nothing to do with Safe Chain; correct?
A. Yes. At that time, they believed that Safe Chain was not involved in the black market suspicion.
Q. And your belief at that time was that this was consistent with the Gilead problem, which had been articulated by others and Safe Chain as well as the lawyers for Safe Chain up to that point; isn't that correct?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Sustained.

MR. ZIMET: This is in April of 2021, Judge, a later time.

THE COURT: Ask another question.

BY MR. ZIMET:

Q. Did this subpoena from the Florida lawsuit change in any way what was being communicated to Safe Chain, including yourself, concerning the issue of whether this was a Gilead manufacturing issue as opposed to a Safe Chain issue?

A. The information that was communicated to me was that yes, this could potentially still be a Gilead manufacturing issue.

Q. And one of the leading proponents of that was Adam Brosius; is that correct?

A. Yes, I would say.

Q. So at this point, you were working as head of compliance. Gilead was still having issues with Safe Chain, and you were trying to gather factual information to help the lawyers in defending Safe Chain; is that correct?

A. Yes.

Q. And the lawyers, by the way, were not Mr. Barzee and myself; correct?

A. Correct.

Q. And in that role, you also had on your plate approval issues relating to new vendors; correct?

A. Yes.

Q. And so there was a lot for you to juggle at that point. Is

that fair to say?
A. Yes.
Q. And you were working with -- Dakota Flowers was with you in compliance at that point?
A. Yes. I believe in April 2021, she was still there.
Q. You believed in the integrity of the compliance department in late spring, early summer 2021?
A. Yes.
Q. And you believed in the integrity of Safe Chain up to that point; correct?
A. Yes.
Q. You also believed that at that point, from your observations and from what you were doing at your job, that certain vendors -- not that they're people -- but certain people involved with vendors were trying to take advantage of Safe Chain; isn't that correct?
A. I don't think at that point I had come to that conclusion. I just knew something was going on, and I couldn't quite put my finger on it.
Q. And the more information you learned and in looking at things in retrospect, you then realized that certain unsavory people were trying to take advantage of Safe Chain; isn't that correct?
MR. POGOZELSKI: Objection as to what -- it's speculation.

THE COURT: I'll allow it.
Overruled.
A. Again, I don't know if I could say who was taking advantage of who. I just knew something going on that wasn't meshing up, and it didn't seem good.
BY MR. ZIMET:
Q. Now, up to this point, Charlie Boyd had been an advocate for compliance's involvement in making sure that Safe Chain was doing things the legal way; isn't that correct?
A. Yes.
Q. In fact, there were numerous communications that you have seen, and you also experienced where Charlie Boyd said that "Compliance needs to be the ultimate judge as to whether a vendor is approved or not"; isn't that correct?
A. Yes.
Q. Also, Charlie, when there's issues concerning T3s, said the final decision concerning a T3 needed to be made by compliance; isn't that correct?
A. Yes.
Q. And that would put it in your shop, on your plate, with you and your workers that were working with you, to make evaluations concerning whether or not a T3 would be approved or not approved; correct?
A. Yes.
Q. It came to a point where in October of 2020, where Charlie

Boyd authorized a change in the processing of Gilead T3s and purchases; isn't that correct?
A. Maybe. I would need more context about what you're referencing.
Q. Sure.
Leading up to that point, Safe Chain would receive pharmaceutical HIV drugs from Boulevard, would come in and most of the time, many times, at least until things got on track, without a T3; correct?
A. Yes.
Q. They would then go out pretty quickly -- maybe the next day, same day, couple of days later -- to a pharmacy; correct?
A. Yes, usually the same day.
Q. That put compliance in a very, very difficult position; correct?
A. Yes.
Q. It basically gave you no time to do any kind of an evaluation; correct?
A. Yes.
Q. And even if you did an evaluation, you got the sales department over your shoulder breathing heavily, making sure that you weren't going to stop the transaction; correct?
A. Yes.
Q. And that put a lot of pressure on you; correct?
A. Yes.

Q. And you expressed your displeasure with that to Charlie; did you not?
A. Yes.
Q. And he came up with a remedy that he believed would deal with that issue; isn't that correct?
A. We did change the process a little bit about that time.
Q. Well, it changed quite a bit, actually, because what happened was before Safe Chain would accept any HIV drugs from Boulevard, compliance had to receive the T3 first; correct?
A. They came usually the same day as the product.
Q. Well, wasn't the procedure that Safe Chain Compliance had to receive the T3 and had to approve the T3 before the drugs should come into Safe Chain and be accepted at Safe Chain?
A. We needed to have the T3s before they would ship out.
Q. And so you needed to approve them before anything would leave; correct?
A. Yes.
Q. And that was the new procedure that would stop the pressure -- hopefully, alleviate or reduce dramatically the pressure that you were under; correct?
A. Well, that was what was supposed to have been happening anyway, but having his support helped ensure that we were getting the documents that we ultimately needed because we were backlogged.
Q. It was a good faith attempt to do things the right way,

wasn't it?
A. Yes.
Q. Now, when that happened, your team started to look at these T3s that were being presented and provided by Boulevard and started seeing issues; correct?
A. Yes.
Q. And a lot of issues have been discussed -- and the jury has heard them ad nauseam for three or four weeks now -- but the issues, basically, involved the fact that the pharmacies that supposedly Boulevard was purchasing the drugs from were not corresponding. You couldn't corroborate, okay, all of those transactions.
Would that be fair to say, in a general sense?
A. Yes.
Q. It could be a whole bunch of reasons why you couldn't corroborate it. Some of -- well, I'll get to that in a second.
You were given a lot of reasons why or you saw a lot of transactions that could not be corroborated; correct?
A. Yes.
Q. And one of the things that we have seen is that for a particular transaction, if the T3 documentation did not pass muster, a second set of T3 documents were then submitted for approval for that transaction.
Would that be fair to say?
A. Yes.

Q. And sometimes the second set weren't consistent with what was required, and then a third set came in; correct?
A. Yes.
Q. Now, as head of compliance, did you make any determination that there was a limitation as far as how many times a T3 could be presented to Safe Chain for a particular transaction?
A. No. We didn't have any guidelines like that in place.
Q. And so what happened was eventually documentation that was considered or believed to be sufficient was presented to Safe Chain and a transaction was approved; correct?
A. Yes.
Q. Now, in doing that, obviously, you can look in retrospect, look backward -- hindsight is 20/20 of course -- and say after one, you should stop and say forget it; right?
A. Right.
Q. But that wasn't the way Safe Chain was operating; correct?
A. Correct.
Q. And whether that was a good judgment or bad judgment, it was the judgment; correct?
A. Yes.
Q. And it was something that continued during your time, involvement with Boulevard transactions; isn't that correct?
A. Yes.
Q. Now, you made the discovery concerning Boulevard transactions when you had a communication with Peter from

Boulevard; correct?
A. I'm sorry. Can you say that again?
Q. You had a conversation, a telephone conversation with Peter from Boulevard?
A. I spoke with him once, yes.
Q. It was a one-time conversation. And then you wrote, basically, an email or a memo -- whatever you want to call it -- to Charlie describing what that conversation was like; correct?
A. Yes.
Q. In the conversation, you expressed that Peter had started off as very chipper; right?
A. Yes.
Q. Very happy?
A. Yes.
Q. And by the end, he wasn't so happy?
A. Right.
Q. And basically, he wasn't so happy because you laid the law down to him; correct?
A. Yes, in a way.
Q. You had told him what was acceptable and what wasn't acceptable; correct?
A. Yes.
Q. And he responded to you, okay, as to he was going to try to do something, but he didn't give you anything definite at that

point; correct?
A. I don't think he really gave me a resolution to the issues that we were having.
Q. He did tell you that the drugs he was supplying through his company, which supposedly was a wholesale distributor but really wasn't a licensed wholesale distributor, had come from pharmacies; correct?
A. Yes.
Q. And he used the pharmacies as an excuse why the paperwork wasn't available; correct?
A. Yes, I believe he did.
Q. And that was the story that he was telling, at least, as to why he couldn't come up with the documents that were required to come up to support the transaction?
A. Yes.
Q. So at that point, he said -- and this was, I think, sometime in August -- okay, that he would have further discussions; is that right?
A. I don't remember him saying he was going to have further discussions with someone.
Q. So you had heard, and you had -- and we saw the attempts that you made.
You started in June trying to get information as to who to contact at Boulevard; right? You sent an email to Brosius first; right?

A. Yes.
Q. The reason Brosius -- we talked about he's the contact. And then you got a guy named Zangari; is that right?
A. There were several people that I attempted to contact. I don't remember everyone's -- person's name.
Q. And Mellott? Wasn't Mellott one of them?
A. Yes. That was a Worldwide sales team member.
Q. And you thought they were the best people to reach out to because they're the ones that brought Boulevard in?
A. Yes.
Q. And they said -- one of them said -- maybe it was Zangari in response here, "We don't work for them. We are just consultants. We sent an email to Boulevard and let them know"; correct?
A. Yes, I received some kind of response like that.
Q. Meanwhile, you didn't hear anything; right?
A. Right.
Q. And that's when you sent that email to Charlie and to Brosius, "Here's what the law is"; correct?
A. Right.
Q. Now, Charlie wanted you to send that email out, didn't he?
A. I don't know if we discussed that email.
Q. Okay.
A. I might have discussed that email with him prior to sending it.

Q. But your main purpose was in getting Brosius's attention; correct?
A. Yes. And to confirm that we needed the T3 documents and to try to make him aware of what the issues were.
Q. And that was sometime, mid-July, I think? Mid-July 20th-ish?
A. Yes.
Q. You heard from Charlie that he had heard from Brosius that there was some movement right after that. Do you recall that?
A. I don't recall having an email from Charlie about that.
Q. How about a text or a Teams message? Do you recall that, or would you like to be refreshed?
A. Sure, if you have something.
MR. ZIMET: May I approach, Judge?
THE COURT: Okay.
A. Okay.
BY MR. ZIMET:
Q. Is your recollection now refreshed?
A. Yes.
Q. In fact, what Charlie told you on July 21st was that "Adam said that Boulevard has agreed to hire someone to handle all their T3s. We should be seeing those in the near future"; correct?
A. Correct.
Q. So, at least at that point, there appeared to be some

movement, some reaction to getting things done in the correct way?

A. I don't know what that was in response to exactly, but I do know that Charlie told me that Adam was going to be hired -- I'm sorry, not Adam -- that Boulevard was going to be hiring someone to generate their T3 documents.

Q. And that led to the eventual conversation with Peter Boulevard and then the communications with this King Kimchi; right?

A. Yes. That King Kimchi person was the person that we were told would be generating the documents.

Q. And he was basically your contact as far as the documents were concerned; is that right?

A. Yes.

Q. And you never actually spoke to him orally; is that correct?

A. No.

Q. All your communications were by email?

A. Yes.

Q. And by text or just by email?

A. No, I never texted anyone.

Q. And he tried -- the documents speak for themselves, but a lot of the documents were attempts to provide information to see whether you would approve what he was providing to you for a T3; correct?

A. There was some communications about that.
I think we provided them with a -- Safe Chain provided them with a template, but it was primarily just conversations about needing information, needing the T3s for the sales and things that were already -- had already taken place.
Q. And at that point, we're talking at that point being August of 2021, there was a backlog, was there not --
A. Yes, there was.
Q. -- of T3s?
And the goal was to make sure that the backlog got satisfied. In other words, all the T3s that hadn't been provided would, in fact, be provided?
A. Yes.
Q. And so the goal was to get up-to-speed, up-to-date to be current with the T3s; correct?
A. Yes.
Q. That would be the T3s that were coming in that Safe Chain was receiving from Boulevard; correct?
A. Yes.
Q. And then the other part of the assignment, if you will, was that Safe Chain needed to update the T3s that they had sent out; correct?
A. Yes.
Q. So the T3s that had been sent out -- and most or all of those were automatically sent out; is that correct?

A. Yes. I believe that they could be collected automatically.
Q. And so when they were sent out -- and we discussed it a little bit ago -- they were not complete; correct?
A. Correct.
Q. They would start out with who the manufacturer was, which was essentially Gilead; correct?
A. Yes.
Q. And then the next transaction would be Boulevard to Safe Chain to the pharmacy; correct?
A. Yes.
Q. So when the pharmacy received the T3 from Safe Chain, it showed that Safe Chain had received the product, gave it to the pharmacy, and had received it from Boulevard; correct?
A. I'm sorry. Could you say that again?
Q. Sure.
The pharmacy ultimately receives the drugs?
A. Yes.
Q. The T3 that they get or have access to -- it's really in the portal. They can go look at it; correct?
A. Uh-huh.
Q. "Yes?"
A. Yes.
Q. What that would show was a transaction from Safe Chain to the pharmacy as well as the transaction from Boulevard to Safe Chain?

A. Yes.
Q. Correct?
A. That's correct.
Q. And that was automatically done by Safe Chain?
A. Yes.
Q. But what was not included was how Boulevard got their drugs; correct?
A. That's correct.
Q. And the reason that wasn't there was because Boulevard had not provided it?
A. Yes, that's correct.
Q. Now, the process of that happening -- and when I say "that happening," that's the T3 going from -- excuse me, going from Safe Chain to the pharmacy. -
Was that an automatic transaction, or was that something that someone was monitoring and doing themselves?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.
A. That was automatic.
BY MR. ZIMET:
Q. So if one would say, "Oh, Charlie Boyd sent that T3, okay, from Safe Chain to Pharmacy X," Charlie Boyd would never have seen that T3; correct?
A. I don't know.

Q. You have no reason to believe since it was automatic, that he would have any involvement with it; correct?

MR. POGOZELSKI: Objection.

Asked and answered.

THE COURT: Overruled.

A. I don't -- I don't think he would typically, but I don't know.

BY MR. ZIMET:

Q. Well, you can't say that any of the T3s sent during that time period from Safe Chain to any pharmacy were sent by Charlie Boyd; correct?

A. No. They were automatic.

Q. Same thing for Pat Boyd; correct?

A. No.

Q. I'm getting into what Mr. Barzee was doing where "No" means "Yes," and "Yes" means "No."

There's no involvement with Pat Boyd in sending this. They were automatically sent; correct?

A. That's correct.

Q. So at some point -- and do you have, like, the approximate date when Boulevard started sending something that at least resembled something of a T3 to Safe Chain?

A. It was probably in late summer or fall, I guess, of 2020.

Q. And at that point, an evaluation has to start as to what they sent -- is that right? -- or not yet?

A. Yes. Because we had received so much product from them, we needed to ensure we had documents for each transaction.
Q. Who would be doing that at Safe Chain? That process?
A. I think we enlisted either the warehouse manager or -- I'm sorry, Jesse Hammett, who was in charge of operations, or even the accounting team to help pull that information.
Q. Okay. So that would be a manual process?
A. I didn't do that process myself, but I think it was a matter of pulling reports about the sales.
Q. Okay. And then that would have to be put somewhere to make an amended T3. Is that the right terminology?
A. We would have to have manually gone in and updated each document by lot number.
Q. And then that would be made available on the portal to the pharmacy that purchased the drugs from Safe Chain?
A. Yes.
Q. And so with that process, the pharmacy would have a completed T3 -- correct? -- or have access to a completed T3?
A. Yes.
Q. And it would be late; correct?
A. Yes.
Q. It should be done -- what? -- within 24, 48 hours of the transaction? In that range?
A. Yes.
Q. But it was better late than not having it completed;

correct?
A. Yes, they should have had access to the correct information.
Q. And that was a judgment call in compliance that you thought was okay to do; correct?
A. That wasn't my judgment call.
We were receiving so many late T3s, we were trying to provide the accurate information that we -- that we had access to.
Q. And your goal was to -- although it wasn't timely, to make sure that the T3 obligation was complied with; correct?
A. Yes.
Q. Both in receiving product with T3s as well as selling product with T3s; correct?
A. Yes.
MR. ZIMET: Can we go to -- is 436 in evidence, Judge? Government's Exhibit 436?
THE COURT: 436A is in evidence.
MR. ZIMET: Can we put that up, please, and scroll down.
Just "A," Judge, not --
THE COURT: Maybe 436 is in evidence, and "A" was mentioned and not put in.
MR. POGOZELSKI: I think we just have "A" in, not the full 436.

THE COURT: That is what is consistent with my records.

MR. ZIMET: Okay. We'll go from there, then.

Let's go to 505. Government's Exhibit 505, page 11.

BY MR. ZIMET:

Q. And this is a conversation between Peter -- we'll call him "Peter Boulevard" at this point -- and Charlie Boyd.

And Peter says, "We'll try to do the best. Just place the order tomorrow, and we'll do the best."

MR. ZIMET: Scroll down, please.

BY MR. ZIMET:

Q. And Charlie responds, "This is not about doing your best. This is a requirement by law. We need these or other similar, and they need to be able to get verified. I don't make the rules."

And that was on October the 7, 2020.

Was that consistent with how Charlie was communicating concerning the Boulevard T3s?

A. I -- I was not on these text messages; but, yes, there was an urgency to have the T3 information.

Q. Let me focus a little more directly, then.

Charlie was saying, "It's a requirement of the law. Safe Chain needs these," or something similar, "and they need to be able to get verified. That's what the rules are"?

A. Yes.

Q. And was that Charlie's message to you and to Boulevard and

Adam Brosius?
A. I can only speak for myself; but, yes, he was in agreement with me that we needed the T3 documents.
Q. So on direct examination yesterday, you made a statement concerning approving of certain transactions, I think, just because -- and I'm paraphrasing --just because if you said no, the transaction would go ahead anyhow.
Do you recall that testimony?
A. Yes.
Q. And so were you telling this jury that you said something was acceptable, met regulatory requirements, even though it wasn't?
A. No. I was saying that there were times in which it was clear it didn't matter what my determination may have been, that whatever the business decision would be would have carried on anyway.
Q. Well, there's a difference between a business decision and a regulatory decision.
What Charlie is saying there is that certain things had to be done before a transaction takes place.
Would you agree with that?
A. Yes. In this situation, yes.
Q. And you're saying that certain business decisions, okay, were business decisions that you did not agree with; is that correct?

A. Yes.
Q. They weren't regulatory decisions that were being overruled. These were business decisions that you had a difference of opinion concerning; correct?
A. Yes, at times.
Q. Were there times when it wasn't that way involving Charlie Boyd?
A. I can't think of an exact example at this moment, but there were certainly times where I felt like it, again, just didn't matter what I said. Whatever was going to happen would happen.
Q. Well, was it a difference as to what the interpretation of a regulation was or a difference between -- a difference concerning a business judgment decision?
A. I'm sorry. Can you ask that another way?
Q. Sure.
Obviously, there's certain business decisions that are made in any business; correct?
A. Right.
Q. Including Safe Chain; correct?
A. Yes.
Q. And you, in compliance, might have a difference of opinion concerning that business decision; correct?
A. Yes.
Q. You might think it's stupid, for instance?
A. Possibly.

Q. Or for whatever reason, you don't think it's a sound business decision; correct?
A. Correct.
Q. There are also regulatory requirements that exist in a regulated business like Safe Chain; correct?
A. Yes.
Q. Were there times when you gave your regulatory approval for a transaction when you believed that it was not the correct decision to make?
A. No. My decisions were based on the information that I had available to me at that time.
Q. Well, yesterday, you said that you said -- and I'm paraphrasing again -- you said yes to a transaction, okay, just because they would do it anyhow.
Do you recall that testimony?
A. Yes.
Q. When you said yes to transactions, that meant a regulatory yes; correct?
A. No. It may have just meant a yes based on the information that was provided to me.
Q. Well, the question to you, then, is did you ever give a regulatory yes when you knew the correct answer was a regulatory no?
A. No.
Q. Did Charlie Boyd ever ask you to give a regulatory yes when

it should have been a regulatory no?
A. No.
Q. When Charlie Boyd had discussions with you concerning the business and what the requirements were, did he ever tell you that you didn't know what you were talking about from the perspective of regulations?
A. No.
Q. How did you get along with Martha Rumore?
A. I wouldn't say I had any particular relationship with her. It was just email exchanges. I don't think we had much of a relationship.
Q. Did she ever accuse you of not being competent?
A. Not to my face.
Q. Did she behind your back?
A. I don't know.
Q. Did you hear that she did?
A. Not that I can remember.
Q. It would seem to be something that you would likely to remember if that happened; correct?
A. I would think, yes.
Q. And you don't have any memory of that?
A. No.
Q. Whatever it was, whoever said anything, whoever, okay, directed any angst toward you, Charlie Boyd stood up for you; did he not?

A. I'm not sure.
Q. You wrote a resignation letter; correct?
A. Yes.
Q. It was laudatory concerning your experience; correct?
A. It was positive.
Q. You didn't say anything like it was a miserable experience, I can't believe I worked for somebody like that, or anything like that at all?
A. No.
Q. In fact, when you were applying for jobs, you put him down as a reference; isn't that correct?
A. No. I was required to. It was a law enforcement background investigation.
Q. Okay. Did you tell law enforcement you were working for somebody or a company that was doing illegal things?
A. I had to discuss with them the subpoena and this whole circumstance.
Q. Okay. And that was based upon the subpoena that you had to testify in this trial; is that correct?
A. Yes.
Q. Now, this wasn't the first time that you testified, okay, in a proceeding relating to Safe Chain; is that correct?
A. I testified a few weeks ago.
Q. In this courtroom?
A. Yes.

Q. You testified at deposition in the Safe Chain civil lawsuit; correct?
A. Yes, I did.
Q. And the civil lawsuit, whatever the exact date it was filed, Gilead was the plaintiff in that lawsuit, the civil lawsuit; correct?
A. Yes.
Q. And Gilead was going after a lot of different people; correct?
A. I believe so, yes.
Q. And you agreed to take a deposition with Gilead's counsel; correct?
A. Yes.
Q. You spoke with them before the deposition, did you not?
A. I believe so. I don't remember the details of who I spoke with when as far as Gilead deposition went.
Q. Well, you certainly met with them, and they wanted to find out what you were going to say at the deposition -- isn't that correct? -- the Gilead lawyers?
A. I don't remember the details of what we discussed.
Q. Not details, just whether you had a conversation with them.
A. I did speak with them.
Q. And after you spoke with them, you sat for a deposition; correct?
A. Yes.

Q. And you answered questions; correct?
A. Yes.
Q. And you were never named in that civil lawsuit; correct?
A. No.
Q. And you had a concern that possibly you could get named in that civil lawsuit; correct?
A. I don't recall if that was a concern of mine.
Q. You don't recall?
A. No.
Q. Just so we're clear: Is "I don't recall" different than "No?"
A. I don't recall if that was a concern of mine at the time.
Q. Did you believe that testifying after meeting with Gilead's lawyers would improve your chances of not being named in that lawsuit?
A. No. I don't recall giving that any additional thought.
Q. But you did give it some thought?
A. I don't recall.
Q. And then I think you testified yesterday that some government agents came to your business in 2022; is that correct?
A. Yes.
Q. As a matter of fact, the deposition was in June of 2022; correct?
A. Yes.

Q. And so at that point, you were working with Gilead -- correct? -- as a witness?

MR. POGOZELSKI: Objection to the characterization of "working."

THE COURT: It's cross-examination.

Overruled.

A. No, I wouldn't consider myself a witness.

BY MR. ZIMET:

Q. Well, you were a witness, weren't you?

A. I don't know. I would have to look back at the documents. I don't recall if I was considered a witness.

MR. ZIMET: May I approach, Judge?

THE COURT: Okay.

BY MR. ZIMET:

Q. See if that refreshes your recollection.

A. Okay.

Q. Does it refresh your recollection?

A. Yes. I did this, yes.

Q. You did it as a Gilead witness; correct?

A. Yes.

Q. And then you became a government witness; correct?

A. Yes.

Q. And you met with the Government, I think you said ten, twelve times; correct?

A. I don't recall exactly how many times. I believe I said

less than ten.
Q. Whatever the number was, you approximated with Mr. Barzee yesterday.
We have not met before today, have we?
A. No.
Q. But we had communicated; correct?
A. Yes, I believe you emailed me.
Q. Well, you know I emailed you; correct?
A. Yes.
Q. And the email requested that you and I have a Zoom conference concerning your testimony; correct?
A. Yes.
Q. And you, coming to this case, want to be fair and neutral; correct?
A. Yes.
Q. Not take a side; correct?
A. Correct.
Q. You want to be fair to both sides; correct?
A. Sure.
Q. And you made a decision that talking to the Government ten times and refusing to talk to Charlie or Pat's lawyers was fair; correct?
MR. POGOZELSKI: Objection. Argumentative.
THE COURT: Overruled.

BY MR. ZIMET:
Q. You can answer.
A. I just didn't feel that it was necessary.
Q. Well, not necessary for you; correct?
When you say "not necessary," you mean not necessary for you?
A. Yes.
Q. But you can understand why someone representing somebody would want to speak with a witness beforehand; correct?
A. Possibly, yes.
Q. So it wasn't in your interest to have a conversation with Charlie or Pat's lawyers?
A. No.
Q. Correct?
And I think yesterday you talked about a couple of other things that weren't in your interest.
Is that what motivated you as far as what to do in this case? What was in your interest as opposed to Safe Chain's interest?
A. My interest would be not to have to be here at all.
Q. Well, you are here, obviously?
A. Yes.
Q. You did have an interest in making sure that you stayed as a non-charged person in the civil case; correct?
A. I don't know if I discussed that at length; but, yes,

that's important.
Q. And the decision-maker as to whether or not you are charged in the civil case would be Gilead and their attorneys; correct?
A. I believe so. I'm not familiar with all the legal ins and outs.
Q. Well, it's, for instance, if you refused to talk to Gilead's attorneys, you would believe that you would have a greater chance of being named in the civil case; correct?
A. I don't know.
Q. You also believed if -- and, obviously, you knew who Gilead was suing; correct?
A. Yes.
Q. You knew what evidence they believed was accurate; correct?
A. I'm sorry. Can you repeat that?
Q. Yeah.
You knew what evidence -- you knew what evidence that they believed was accurate; correct?
A. Maybe some of it.
Q. And you certainly wanted to be in a situation where you provided Gilead what they were looking for; isn't that correct?
MR. POGOZELSKI: Objection as to what Gilead was looking for.
THE COURT: Overruled.
BY MR. ZIMET:
Q. You can answer.

A. Oh, I'm sorry.
I think I was just there to answer questions.
Q. So your testimony is it didn't cross your mind that the answers that you gave to questions should be something that Gilead and their attorneys liked and wanted to hear?
A. No.
Q. It never crossed your mind at all?
A. No. I just was there to answer questions, based on my experience.
Q. And in the ten or twelve times that you met with the Government, were you concerned that possibly you could be charged with something in this case?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.
BY MR. ZIMET:
Q. You can answer that one.
A. No. I guess because my name was not on the subpoena.
Q. I'm sorry. I don't understand the answer.
Because your name wasn't on a subpoena, that means you didn't think --
A. I mean the court case didn't involve me. It involved Safe Chain versus the United States.
Q. Which case are you talking about? Safe Chain and the United States?

A. The one we're sitting in right now.
Q. It's United States v. Charles Boyd and Patrick Boyd.
A. Okay. Sorry.
Q. Well, you don't need to apologize to me.
Are you saying because you weren't indicted, you didn't think you had exposure in this case when you gave your statement to the Government in 2022?
A. I'm not sure what my level of exposure is.
Q. You do have some concern that you might have some because you approved transactions which the Government has claimed as fraudulent; correct?
A. I'm not sure.
Q. Well, you approved transactions that the Government is alleging were fraudulent; isn't that correct?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.
BY MR. ZIMET:
Q. Didn't you?
A. Yes.
Q. Did you have some concern because you did that, you had some exposure?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Sustained.

BY MR. ZIMET:
Q. How many T3s do you think you approved?
A. I'm not sure.
Q. Hundreds?
A. Potentially.
Q. Maybe thousands?
A. Again, I'm not sure.
Q. In evaluating or even considering the possibilities that we just discussed, did you consider that but for your approval, Boulevard would not have been able to make any money in this case?
A. No.
Q. That did not cross your mind?
A. I'm sorry?
Q. That did not cross your mind?
A. No.
Q. That's accurate, though, isn't it?
MR. POGOZELSKI: Objection.
It requires speculation.
THE COURT: Sustained.
BY MR. ZIMET:
Q. Now, you publicly have praised Safe Chain prior to the time of this case; is that correct?
A. When I was working there, yes.
Q. And you basically said that the compliance department of

Safe Chain was doing a good job in what they were assigned to do; isn't that correct?
A. Yes. At the time, I believed we were doing what we do.
Q. And that was in 2021, you were saying that; correct?
A. I believe so.
Q. I'm sorry?
A. I believe so.
Q. And you were saying that because you believed in what you did was all done in good faith. Even though there were some mistakes made, your activity and your conduct was done in good faith; correct?
A. Yes.
Q. As well as the conduct of Charlie Boyd?
MR. POGOZELSKI: Objection.
THE COURT: Sustained.
BY MR. ZIMET:
Q. You made a video for Safe Chain about the compliance department, did you not?
A. It was part of a marketing project, yes. I was involved in that.
Q. And you sat in front of a camera; correct?
A. Yes.
Q. And you said things that were complimentary about Gilead's -- excuse me, about Safe Chain's -- Freudian slip -- compliance department, did you not?

A. Yes.
Q. Does this sound familiar?
"Compliance at Safe Chain means that the company works to make sure that products that Safe Chain distributes are legitimate, safe products for our customers and consumers, and that goes hand-in-hand with federal and state guidelines, making sure that wholesale distribution disburses safe products. Patient safety is our number one concern; so we want to make certain that the products that we are selling and are representing our company are quality products."
That's what you said, did you not?
A. Probably.
Q. And when you said it, you meant it, didn't you?
A. I did at that time.
Q. And that was something that you wanted the outside world to know was happening at your company; correct?
A. Yes.
Q. And it was something that, obviously, because it's on the internet, is memorialized, as your word, as far as the company that you're working for during that time period; correct?
A. Yes.
Q. You were proud of working there, were you not?
A. Yes. While I was there, yes.
Q. And in your interactions with Charlie Boyd and the communications that you had with him and the meetings that you

had with him, you wanted Charlie Boyd to believe that you were looking out for his back; isn't that correct?
A. I wanted him to believe that I was doing a good job and what my job there was.
Q. And part of your job was looking out for the back of the president of Safe Chain and the well-being of the company; is that correct?
A. Sure.
Q. And you believed that you did that; correct?
A. Yes, I tried my best to.
Q. Not only did you try, you think that you did?
A. I tried my best to.
Q. A few hiccups along the way, but you do believe you did a good job; correct?
A. Yes, I tried to.
Q. Now, the information that Charlie Boyd was providing to Boulevard concerning their T3s -- was that accurate information as far as what was needed on a T3?
A. Can you give me more context of what you mean?
Q. That all of the points on a T3 need to be filled out correctly?
A. Yes.
Q. That all of the transactions need to be included, all the way up to the manufacturer?
A. Yes.

Q. All the information on there needed to be factually accurate?
A. Yes.
Q. If anything was inaccurate, okay, that would not justify the T3 being accepted?
A. Correct.
Q. Those were all things that were admonitions and things that Charlie Boyd was saying to you in real-time; correct?
A. Yes, I believe so.
THE COURT: Is this a good spot to take a break, Mr. Zimet?
MR. ZIMET: Yes, sir.
THE COURT: All right. Members of the jury, we're going to recess for the evening.
Remember my admonition not to discuss the case or allow it to be discussed in your presence, and we'll see you back tomorrow at 9:00.
Have a nice evening, and see you back tomorrow at 9:00.
THE COURT SECURITY OFFICER: All rise.
(Jury exits.)
THE COURT: Again, Ms. Divilio, during the break in your testimony, you're not allowed to discuss your testimony with anyone and we'll see you back tomorrow at 9:00.
THE WITNESS: Thank you.
THE COURT: If you all have filed or going to file proposed jury instructions, can you do them in electronically

in Word, so that if I'm going to make some changes, I can just change them on the Word processor?

MR. ZIMET: Yes, sir.

MR. POGOZELSKI: Yes, your Honor.

THE COURT: And if there's nothing else to come before the Court, we'll be in recess until 9:00 tomorrow morning.

MR. POGOZELSKI: Your Honor?

THE COURT: Yes.

MR. POGOZELSKI: I apologize.

Assuming we rest today, we would just ask --

MS. DEROVANESIAN: Tomorrow.

MR. POGOZELSKI: -- or sorry, tomorrow, we would just ask that the defense let us know who their witnesses will be.

THE COURT: They don't have to do that.

All right. We'll be in recess.

(Jury trial was adjourned at 5:00 PM.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 10/23/2025

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN, FPR, RPR
Official Court Reporter
United States District Court
Southern District of Florida
U.S. Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

**$**

**$300,000** [1] - 22:19

**'**

**'21** [2] - 111:18, 111:19

**/**

**/s/Patricia** [1] - 160:6

**1**

**1** [2] - 1:8, 1:19
**10/23/2025** [1] - 160:6
**100** [1] - 102:13
**100,000** [1] - 33:16
**10th** [1] - 23:8
**11** [2] - 108:15, 140:3
**11-day** [1] - 108:19
**111** [2] - 6:3, 51:16
**12** [3] - 31:18, 44:13, 44:14
**144** [1] - 47:7
**15** [3] - 86:7, 86:12, 86:14
**15-minute** [1] - 86:4
**16th** [1] - 116:3
**17** [1] - 111:15
**173** [3] - 13:12, 14:3, 14:15
**187** [1] - 25:22
**1:00** [2] - 1:6, 5:1
**1st** [2] - 20:25, 67:7

**2**

**2** [2] - 28:3, 28:5
**20/20** [1] - 128:13
**2020** [31] - 11:15, 13:8, 13:19, 14:14, 20:25, 26:16, 31:18, 45:17, 47:15, 52:17, 59:11, 59:21, 60:24, 77:16, 79:14, 79:15, 80:16, 81:13, 83:7, 83:23, 87:20, 88:20, 88:24, 90:21, 103:3, 106:13, 108:10, 108:16, 124:25, 137:23, 140:15
**2021** [28] - 35:9, 60:24, 73:13, 73:15, 74:8, 81:12, 90:22, 92:25, 97:2, 106:12, 108:17, 108:18, 109:6, 111:5, 111:16, 113:15, 113:24, 114:24, 117:7, 118:22, 119:18, 119:22, 120:17, 122:1, 123:5, 123:7, 134:7, 155:4
**2022** [3] - 147:20, 147:23, 153:7
**2023** [2] - 82:5, 101:15
**2024** [1] - 111:15
**2025** [1] - 1:5
**20th** [1] - 132:6
**20th-ish** [1] - 132:6
**21st** [1] - 132:20
**22** [1] - 1:5
**22nd** [1] - 52:17
**23rd** [1] - 97:1
**24** [1] - 138:22
**24-cr-20255-Dimitrouleas/Hunt** [1] - 1:3
**242** [2] - 35:11, 35:13
**243** [1] - 37:7
**24th** [2] - 11:15, 13:8
**26** [2] - 73:15, 117:7
**264** [1] - 113:11
**29** [2] - 13:19, 14:14
**299** [1] - 160:9
**2:56** [1] - 52:23
**2nd** [2] - 35:9, 71:18

**3**

**3** [2] - 28:5, 29:17
**3/25/2021** [1] - 48:15
**30** [1] - 109:6
**306** [1] - 52:13
**30th** [1] - 74:8
**311** [1] - 109:3
**312** [1] - 111:2
**314** [2] - 111:12
**315** [1] - 111:25
**33128** [1] - 1:20
**33132** [1] - 1:16
**33301** [2] - 1:23, 160:10
**341** [2] - 115:20, 115:21
**3911** [7] - 26:21, 27:1, 27:9, 27:13, 36:18, 85:3, 120:19
**3:04** [1] - 86:16
**3:13** [1] - 52:21
**3:20** [1] - 86:16
**3rd** [1] - 1:19

**4**

**4/21** [1] - 116:18
**4/26** [1] - 116:19
**40** [2] - 1:19, 68:17
**40B** [1] - 107:4
**421** [1] - 19:24
**425** [1] - 22:24
**429** [1] - 11:13
**43** [1] - 3:4
**436** [4] - 139:16, 139:17, 139:22, 139:25
**436A** [1] - 139:18
**471** [1] - 67:8
**477** [1] - 27:23
**48** [1] - 138:22
**4:00** [1] - 4:25
**4th** [1] - 1:16

**5**

**5** [1] - 3:3
**505** [2] - 140:3
**5:00** [3] - 1:6, 5:1, 159:17
**5:30** [2] - 28:9, 29:10
**5th** [3] - 113:24, 114:24, 115:14

**6**

**6** [2] - 1:22, 113:15
**6/1/2020** [1] - 68:11
**633** [1] - 1:22
**639** [1] - 7:9
**640** [1] - 9:23
**6th** [2] - 114:24, 115:14

**7**

**7** [1] - 140:15

**9**

**9** [1] - 111:5
**9229** [1] - 68:2
**99** [1] - 1:16
**9:00** [5] - 4:25, 158:16, 158:17, 158:22, 159:6
**9th** [2] - 26:16, 26:20

**A**

**a.m** [1] - 115:13
**ABIGAIL** [2] - 3:3, 5:20
**ability** [3] - 47:2, 50:3, 88:8
**able** [21] - 32:19, 33:4, 39:12, 39:18, 39:20, 40:2, 50:12, 51:7, 51:13, 53:18, 74:3, 74:5, 74:6, 76:24, 85:19, 92:5, 113:5, 118:15, 140:13, 140:23, 154:10
**above-entitled** [1] - 160:4
**accept** [1] - 126:8
**acceptable** [3] - 129:21, 129:22, 141:11
**accepted** [2] - 126:13, 158:5
**access** [5] - 76:22, 135:18, 138:18, 139:2, 139:8
**according** [1] - 85:21
**account** [1] - 30:22
**accounting** [6] - 52:7, 52:8, 54:8, 64:12, 68:7, 138:6
**accuracy** [1] - 96:16
**accurate** [17] - 15:6, 15:11, 48:12, 48:14, 60:8, 66:2, 89:12, 97:14, 107:9, 111:21, 139:8, 151:13, 151:17, 154:17, 157:17, 158:2, 160:3
**accusation** [1] - 101:3
**accusations** [1] - 97:5
**accusatory** [2] - 80:9, 95:22
**accuse** [1] - 144:12
**acting** [3] - 23:14, 23:18, 89:4
**activities** [1] - 113:6
**activity** [1] - 155:10
**actual** [2] - 52:3, 52:16
**Acumatica** [8] - 15:3, 15:13, 15:18, 15:20, 16:16, 17:5, 18:8, 18:16
**AD** [5] - 30:21, 30:24, 114:9, 115:9, 115:16
**ad** [1] - 127:8
**Adam** [24] - 37:23, 38:2, 38:3, 38:6, 38:8, 38:11, 38:16, 38:19, 39:4, 56:8, 56:17, 57:5, 57:12, 57:17, 75:13, 99:9, 116:22, 117:11, 118:12, 122:11, 132:20, 133:4, 133:5, 141:1
**Adam's** [1] - 117:23
**addition** [1] - 17:8
**additional** [3] - 89:22, 106:22, 147:16
**address** [7] - 6:23, 6:24, 6:25, 7:1, 7:14, 109:18, 116:14
**addressed** [1] - 83:13
**adjourned** [1] - 159:17
**admit** [1] - 50:14
**admitted** [1] - 103:23
**admonition** [4] - 5:15, 86:5, 87:12, 158:14
**admonitions** [1] - 158:7
**advantage** [3] - 123:15, 123:22, 124:3
**advice** [8] - 83:4, 85:11, 85:21, 88:12, 88:21, 89:13, 93:4, 93:19
**advocate** [1] - 124:7
**affect** [2] - 49:23, 76:14
**affecting** [1] - 57:3
**affirmed** [1] - 5:21
**afternoon** [5] - 5:25, 6:1, 43:5, 43:6, 43:8
**agents** [1] - 147:20
**ago** [3] - 18:15, 135:3, 145:23
**agree** [6] - 9:18, 19:11, 49:8, 81:1, 141:21, 141:24
**agreed** [3] - 18:18, 132:21, 146:11
**agreeing** [2] - 25:18, 89:20
**agreement** [1] - 141:2
**ahead** [3] - 16:9, 40:13, 141:7
**ahold** [1] - 57:12
**Alexander** [1] - 1:13
**alive** [1] - 84:1
**alleging** [3] - 120:3, 120:4, 153:14
**alleviate** [1] - 126:19
**allow** [6] - 5:16, 75:25, 86:5, 87:13, 124:1, 158:14
**allowed** [3] - 77:15, 78:9, 158:21
**almost** [1] - 118:9
**amended** [1] - 138:11
**AMERICA** [1] - 1:4
**AmerisourceBergen** [10] - 28:20, 29:11, 29:19, 29:21, 29:24, 29:25, 30:6, 30:7, 30:8
**amount** [1] - 77:25
**angina** [1] - 66:13

**angst** [1] - 144:24
**answer** [26] - 26:13, 33:22, 37:20, 41:2, 41:4, 41:7, 49:3, 53:16, 68:4, 71:23, 72:9, 72:17, 72:24, 72:25, 73:3, 95:9, 99:5, 99:18, 105:20, 143:22, 150:2, 151:25, 152:2, 152:8, 152:17, 152:19
**answered** [35] - 6:19, 8:21, 9:15, 9:21, 10:16, 18:21, 19:2, 19:15, 22:1, 25:13, 27:5, 32:21, 33:9, 33:20, 38:13, 40:22, 42:22, 53:24, 61:22, 82:23, 99:15, 102:9, 102:21, 103:15, 104:1, 104:2, 105:18, 108:21, 121:24, 136:18, 137:4, 147:1, 152:14, 153:16, 153:24
**answers** [1] - 152:4
**antagonism** [1] - 88:25
**anxious** [2] - 71:23, 104:25
**anyhow** [2] - 141:7, 143:14
**anytime** [1] - 55:14
**anyway** [2] - 126:22, 141:16
**apartment** [2] - 7:23, 9:4
**apologies** [1] - 67:16
**apologize** [7] - 18:3, 61:10, 78:8, 92:18, 105:13, 153:4, 159:9
**appear** [2] - 48:12, 111:21
**appearance** [2] - 9:1, 9:3
**APPEARANCES** [1] - 1:12
**appeared** [2] - 104:13, 132:25
**application** [12] - 6:24, 10:11, 12:13, 38:18, 53:3, 53:11, 54:6, 106:21, 114:20, 114:22, 117:16, 118:13
**applications** [1] - 106:22
**applied** [1] - 94:20
**applying** [3] - 54:11, 54:17, 145:10
**approach** [8] - 17:19, 34:9, 35:19, 74:11, 78:4, 106:24, 132:14, 148:12
**appropriate** [1] - 16:13
**approval** [15] - 51:13, 51:20, 51:25, 52:3, 52:11, 52:16, 52:25, 53:3, 54:18, 110:10, 110:15, 122:22, 127:23, 143:7, 154:9
**approve** [8] - 6:10, 7:19, 10:19, 30:24, 116:16, 126:12, 126:15, 133:24
**approved** [25] - 9:11, 9:19, 31:14, 31:18, 32:2, 35:7, 52:21, 68:10, 68:12, 68:14, 69:20, 70:1, 106:13, 106:17, 110:7, 112:17, 116:18, 118:10, 124:14, 124:22, 124:23, 128:10, 153:10, 153:13, 154:2
**approving** [8] - 9:6, 9:13, 32:4, 52:5, 52:9, 106:8, 112:15, 141:5
**approximate** [1] - 137:20
**approximated** [1] - 149:2
**April** [16] - 52:17, 68:14, 68:15, 106:11, 106:13, 109:6, 113:15, 113:24, 114:24, 115:14, 116:3, 117:7, 118:22, 119:18, 122:1, 123:5
**area** [3] - 7:21, 74:15, 93:15
**argumentative** [6] - 19:8, 19:15, 42:22, 58:13, 102:22, 149:24
**articulated** [1] - 121:20
**artificial** [1] - 16:4
**aside** [1] - 116:13
**assigned** [2] - 99:24, 155:1
**assigning** [1] - 71:7
**assignment** [1] - 134:20
**assist** [1] - 120:25
**Assistant** [1] - 1:15
**associated** [1] - 22:13
**association** [1] - 117:25
**assume** [2] - 12:22, 68:19
**assuming** [2] - 43:24, 159:10
**attached** [1] - 116:23
**attempt** [4] - 36:3, 109:16, 109:18, 126:25
**attempted** [4] - 46:25, 65:18, 75:5, 131:4
**attempting** [1] - 37:17
**attempts** [2] - 130:21, 133:23
**attention** [2] - 119:9, 132:1
**attitude** [1] - 55:18
**attorney** [14] - 46:5, 46:13, 46:16, 46:19, 46:24, 80:5, 81:7, 87:19, 88:1, 89:23, 92:8, 97:23, 98:2, 98:3
**Attorney** [1] - 117:23
**attorneys** [10] - 48:4, 71:13, 81:10, 83:3, 90:2, 98:20, 151:3, 151:7, 152:5
**Attorneys** [1] - 1:15
**audit** [1] - 70:7
**August** [5] - 47:15, 73:18, 111:5, 130:17, 134:6
**author** [1] - 87:25
**authored** [1] - 52:17
**authorized** [8] - 30:23, 100:11, 100:14, 100:17, 100:18, 113:19, 115:3, 125:1
**authorizing** [1] - 10:22
**automated** [1] - 63:12
**automatic** [13] - 16:17, 17:2, 17:8, 18:18, 19:19, 60:18, 61:2, 63:12, 64:1, 136:15, 136:20, 137:1, 137:12
**automatically** [8] - 17:5, 60:4, 60:14, 64:3, 134:25, 135:1, 136:4, 137:18
**available** [3] - 130:10, 138:14, 143:11
**aware** [8] - 26:17, 65:15, 81:14, 88:11, 101:12, 101:14, 106:7, 132:4

## B

**back-and-forth** [2] - 90:1, 90:9
**background** [7] - 7:22, 40:16, 42:19, 43:12, 54:4, 54:11, 145:13
**backlog** [2] - 134:7, 134:10
**backlogged** [2] - 24:17, 126:24
**backward** [1] - 128:13
**bad** [4] - 15:4, 15:5, 96:19, 128:18
**Bailey** [1] - 160:6
**BAILEY** [2] - 2:3, 160:7
**Bailey-Entin** [1] - 160:6
**BAILEY-ENTIN** [2] - 2:3, 160:7
**ballpark** [1] - 101:24
**Barzee** [6] - 1:18, 1:19, 5:18, 122:19, 137:15, 149:2
**BARZEE** [86] - 3:3, 5:14, 5:24, 6:3, 6:5, 6:21, 7:5, 7:6, 7:9, 7:11, 8:23, 9:17, 9:23, 9:24, 10:18, 11:1, 11:2, 11:16, 11:17, 11:20, 11:22, 12:2, 12:4, 12:9, 13:12, 13:14, 13:17, 13:18, 14:25, 15:10, 15:15, 15:16, 17:19, 17:25, 18:24, 19:5, 19:10, 19:17, 19:22, 19:25, 20:2, 20:3, 20:13, 21:23, 22:3, 22:24, 23:1, 23:20, 25:15, 25:22, 25:24, 26:10, 26:11, 27:8, 27:23, 27:25, 28:3, 28:8, 29:7, 29:17, 29:18, 30:19, 31:6, 31:15, 31:17, 31:24, 31:25, 32:24, 33:11, 33:25, 35:11, 35:14, 35:16, 35:21, 37:6, 37:8, 38:15, 39:9, 39:17, 40:13, 40:14, 40:24, 41:18, 42:25, 87:2, 87:11
**based** [19] - 40:4, 85:15, 88:21, 93:25, 97:17, 98:19, 106:13, 106:17, 107:25, 108:17, 109:7, 110:10, 110:15, 117:23, 118:15, 143:10, 143:19, 145:18, 152:8
**basis** [4] - 62:21, 62:23, 62:25, 63:2
**bat** [3] - 10:6, 10:7, 10:9
**Bayamon** [1] - 114:6
**became** [7] - 36:6, 65:15, 80:8, 81:2, 98:2, 148:21
**become** [2] - 26:17, 104:12
**BEFORE** [1] - 1:10
**beforehand** [1] - 150:9
**began** [1] - 36:6
**beginning** [3] - 40:15, 47:15, 108:6
**behalf** [3] - 87:22, 97:2, 98:7
**behind** [3] - 51:5, 51:7, 144:14
**belief** [1] - 121:19
**believes** [1] - 26:2
**below** [1] - 15:5
**best** [12] - 47:2, 50:3, 56:22, 83:2, 83:4, 110:23, 131:8, 140:7, 140:8, 140:11, 157:10, 157:12
**Betances** [1] - 32:10
**better** [4] - 48:20, 51:5, 114:5, 138:25
**between** [19] - 11:14, 20:1, 23:2, 28:1, 49:8, 67:1, 79:14, 88:25, 90:1, 90:9, 95:19, 100:25, 104:12, 118:2, 121:8, 121:12, 140:5, 141:17, 142:12
**big** [2] - 21:2, 99:13
**binder** [1] - 21:24
**binders** [1] - 21:2
**bit** [24] - 7:21, 10:5, 14:15, 28:7, 32:13, 47:24, 61:11, 67:14, 76:6, 79:24, 83:15, 90:7, 94:12, 107:10, 107:13, 110:5, 114:14, 115:6, 116:7, 117:23, 126:6, 126:7, 135:3

**black** [6] - 120:5, 120:9, 120:23, 121:9, 121:13, 121:18
**blame** [1] - 50:25
**blamed** [2] - 21:8, 23:3
**blue** [1] - 37:16
**Board** [2] - 69:15, 69:16
**board** [1] - 69:18
**bonus** [7] - 77:15, 77:19, 77:20, 77:21, 78:1, 78:12, 78:14
**bonuses** [2] - 77:17, 78:20
**BOP** [2] - 69:13, 71:11
**bother** [1] - 8:20
**bothered** [2] - 8:13, 8:16
**bothering** [1] - 44:10
**bottle** [2] - 93:10, 101:7
**bottles** [5] - 12:18, 13:2, 15:4, 24:6, 98:15
**bottom** [4] - 6:14, 70:4, 113:14, 115:21
**bought** [1] - 63:6
**Boulevard** [85] - 6:6, 7:7, 7:15, 9:3, 9:6, 9:10, 9:11, 9:19, 12:19, 12:21, 13:3, 13:10, 13:20, 14:19, 15:3, 21:2, 21:11, 21:16, 21:19, 21:20, 23:14, 23:18, 24:4, 24:9, 38:19, 41:1, 41:22, 42:15, 50:22, 51:13, 51:20, 52:1, 52:10, 53:3, 53:5, 54:5, 57:13, 57:16, 57:21, 58:4, 58:11, 59:10, 64:19, 64:24, 66:20, 66:23, 67:3, 68:2, 71:2, 72:3, 79:11, 106:5, 106:13, 107:22, 108:24, 109:7, 109:19, 109:23, 125:7, 126:9, 127:4, 127:10, 128:22, 128:24, 129:1, 129:4, 130:24, 131:9, 131:13, 132:21, 133:5, 133:8, 134:18, 135:8, 135:13, 135:24, 136:6, 136:9, 137:21, 140:6, 140:17, 140:25, 154:10, 157:17, 160:9
**Boulevard's** [2] - 17:3, 108:24
**Boyd** [105] - 4:10, 4:11, 4:18, 9:1, 9:4, 9:19, 11:5, 11:9, 11:23, 12:10, 12:17, 12:20, 13:9, 13:15, 13:16, 14:16, 14:18, 14:19, 15:2, 19:18, 19:23, 20:1, 23:2, 25:8, 25:25, 26:1, 27:19, 28:1, 28:24, 31:3, 31:7, 32:5, 32:13, 32:19, 33:4, 33:6, 33:13, 33:17, 37:4, 37:16, 37:23, 39:22, 39:23, 40:8, 40:25, 41:3, 41:6, 41:11, 41:22, 41:24, 41:25, 42:13, 42:14, 47:7, 48:6, 52:12, 55:11, 66:4, 66:23, 67:2, 67:18, 69:5, 71:23, 72:14, 73:5, 74:19, 78:22, 82:6, 84:5, 88:17, 91:22, 91:24, 92:4, 93:18, 93:25, 95:2, 96:23, 102:12, 109:2, 111:2, 111:12, 111:25, 116:17, 119:14, 124:7, 124:12, 125:1, 136:22, 136:23, 137:11, 137:13, 137:17, 140:6, 142:7, 143:25, 144:3, 144:24, 153:2, 155:13, 156:24, 157:1, 157:16, 158:8
**BOYD** [4] - 1:7, 1:18, 1:22
**Boyd's** [3] - 15:1, 36:5, 37:20
**brand** [1] - 30:22
**break** [4] - 86:1, 86:11, 158:10, 158:20
**breathing** [1] - 125:21
**bring** [11] - 5:8, 6:3, 7:9, 8:24, 8:25, 9:3, 19:24, 27:23, 35:17, 86:24, 87:3
**bringing** [1] - 117:24
**broken** [2] - 15:4, 93:10
**Brosius** [27] - 37:23, 38:2, 38:6, 38:11, 38:16, 38:19, 39:4, 56:8, 56:17, 57:5, 57:12, 57:17, 57:20, 57:25, 58:2, 58:3, 58:10, 58:16, 75:13, 98:22, 112:18, 122:11, 130:24, 131:2, 131:19, 132:8, 141:1
**Brosius's** [2] - 99:12, 132:1
**brought** [7] - 38:9, 56:14, 71:20, 109:24, 112:24, 119:9, 131:9
**Broward** [1] - 160:9
**Bruce** [1] - 1:22
**brunt** [1] - 75:21
**building** [5] - 7:2, 7:3, 7:23, 9:4, 88:25
**built** [1] - 16:16
**bunch** [1] - 127:15
**Bureau** [1] - 69:14
**business** [43] - 7:20, 10:22, 24:1, 31:7, 33:12, 33:18, 34:1, 34:7, 34:14, 34:17, 40:9, 41:1, 41:4, 41:7, 41:11, 41:22, 41:24, 42:1, 42:4, 42:15, 51:14, 56:14, 58:23, 89:7, 107:22, 109:25, 110:11, 114:11, 115:18, 119:15, 141:15, 141:17, 141:23, 141:24, 142:3, 142:13, 142:16, 142:17, 142:22, 143:2, 143:5, 144:4, 147:20
**businesses** [3] - 8:2, 8:6, 8:16
**busy** [2] - 62:17, 68:19
**but..** [2] - 56:15, 85:20
**button** [1] - 19:12
**buy** [2] - 30:22, 115:10
**BY** [133] - 2:2, 3:3, 3:4, 5:24, 6:5, 6:21, 7:6, 7:11, 8:23, 9:17, 9:24, 10:18, 11:2, 11:17, 11:22, 12:4, 12:9, 13:14, 13:18, 14:25, 15:10, 15:16, 17:25, 18:24, 19:5, 19:10, 19:17, 19:25, 20:3, 20:13, 21:23, 22:3, 23:1, 23:20, 25:15, 25:24, 26:11, 27:8, 27:25, 28:8, 29:7, 29:18, 30:19, 31:6, 31:17, 31:25, 32:24, 33:11, 33:25, 35:21, 37:8, 38:15, 39:9, 39:17, 40:14, 40:24, 41:18, 43:4, 45:10, 46:8, 46:18, 46:23, 47:9, 48:1, 51:12, 51:18, 52:15, 53:2, 54:2, 58:9, 58:15, 61:25, 67:6, 67:9, 67:17, 68:1, 70:5, 71:1, 74:13, 76:3, 77:14, 78:7, 81:23, 85:1, 85:10, 87:17, 91:17, 92:3, 92:16, 93:24, 95:14, 99:4, 99:17, 100:8, 102:11, 102:24, 103:18, 104:5, 105:23, 107:3, 107:17, 108:23, 109:5, 109:11, 111:4, 111:14, 111:20, 112:9, 113:13, 113:23, 114:16, 115:7, 115:22, 116:10, 117:6, 117:21, 119:8, 122:4, 124:6, 132:17, 136:21, 137:8, 140:4, 140:10, 148:8, 148:14, 150:1, 151:24, 152:16, 153:18, 154:1, 154:21, 155:16

## C

**camera** [1] - 155:21
**cannot** [1] - 30:22
**care** [2] - 70:21, 116:15
**carried** [1] - 141:15
**case** [26] - 5:16, 35:17, 43:16, 44:17, 44:22, 45:18, 45:23, 45:24, 51:20, 51:24, 73:12, 86:5, 87:13, 93:2, 149:13, 150:18, 150:24, 151:3, 151:8, 152:12, 152:22, 152:24, 153:6, 154:11, 154:23, 158:14
**CASE** [1] - 1:3
**cases** [2] - 63:8, 64:15
**casting** [1] - 50:25
**catch** [3] - 51:1, 51:2, 118:9
**cautious** [2] - 105:3, 105:5
**cc'd** [1] - 42:14
**cell** [1] - 114:10
**certain** [14] - 16:6, 36:8, 43:13, 45:25, 49:13, 123:14, 123:21, 141:5, 141:19, 141:23, 142:16, 156:9
**certainly** [9] - 25:4, 48:20, 50:5, 57:4, 66:7, 105:3, 142:9, 146:17, 151:19
**certify** [1] - 160:2
**Cesar** [3] - 116:1, 117:11, 117:18
**cetera** [1] - 77:9
**Chain** [168] - 7:20, 10:22, 15:20, 16:6, 16:17, 16:23, 16:24, 22:19, 24:5, 24:10, 24:23, 25:5, 25:9, 33:18, 34:1, 34:6, 34:13, 34:16, 38:7, 40:9, 41:1, 41:3, 41:11, 42:3, 42:14, 43:17, 46:11, 47:20, 47:21, 48:4, 48:5, 49:19, 51:8, 51:14, 52:1, 54:18, 56:4, 56:14, 56:22, 57:3, 59:8, 59:14, 59:21, 59:23, 60:3, 60:4, 60:10, 60:16, 60:24, 61:12, 62:14, 63:6, 64:15, 64:20, 64:23, 65:11, 70:18, 73:15, 73:21, 76:17, 78:24, 80:9, 80:16, 81:2, 81:4, 81:7, 82:9, 83:14, 87:22, 88:12, 88:18, 89:1, 89:3, 89:14, 90:5, 90:12, 91:4, 91:19, 92:5, 92:9, 92:17, 92:21, 92:22, 93:8, 94:2, 95:11, 95:20, 95:23, 96:7, 97:5, 97:20, 98:8, 98:10, 98:12, 99:25, 100:14, 100:16, 100:25, 102:4, 104:16, 106:21, 107:7, 109:25, 112:13, 112:25, 115:24, 116:2, 116:25, 118:20, 119:3,

119:18, 119:22, 120:8, 120:22, 121:4, 121:9, 121:12, 121:16, 121:17, 121:21, 122:6, 122:8, 122:15, 122:17, 123:9, 123:16, 123:22, 124:8, 125:6, 126:8, 126:11, 126:13, 128:6, 128:10, 128:16, 134:2, 134:17, 134:21, 135:9, 135:11, 135:12, 135:23, 135:25, 136:4, 136:14, 136:23, 137:10, 137:22, 138:3, 138:15, 140:22, 142:19, 143:5, 145:22, 146:1, 152:23, 152:24, 154:22, 155:1, 155:17, 156:3, 156:4, 157:6
**chain** [1] - 29:1
**Chain's** [9] - 60:21, 70:22, 83:2, 88:21, 89:6, 109:16, 110:23, 150:18, 155:24
**chance** [1] - 151:8
**chances** [1] - 147:14
**change** [5] - 80:10, 122:5, 125:1, 126:6, 159:2
**changed** [2] - 95:19, 126:7
**changes** [1] - 159:1
**characterization** [2] - 23:17, 148:3
**charge** [3] - 63:10, 64:2, 138:5
**charged** [3] - 150:24, 151:2, 152:12
**CHARLES** [2] - 1:7, 1:22
**Charles** [5] - 4:10, 13:16, 19:18, 91:24, 153:2
**Charlie** [89] - 9:4, 9:12, 9:19, 14:19, 25:8, 26:1, 26:17, 27:10, 27:12, 27:19, 36:17, 48:6, 55:11, 57:22, 57:25, 66:4, 66:22, 67:2, 67:18, 69:5, 69:9, 69:18, 69:19, 70:6, 70:17, 71:7, 71:11, 71:20, 71:23, 72:14, 73:5, 74:1, 74:19, 74:24, 75:5, 75:19, 76:13, 76:16, 78:16, 78:22, 82:6, 84:5, 88:17, 91:22, 92:4, 93:18, 93:25, 95:2, 96:23, 99:9, 99:11, 99:12, 99:20, 102:12, 117:8, 118:5, 118:23, 119:14, 124:7, 124:12, 124:16, 124:25, 126:1, 129:8, 131:18, 131:21, 132:8, 132:10, 132:20, 133:4, 136:22, 136:23, 137:11, 140:6, 140:11, 140:16, 140:21, 141:19, 142:6, 143:25, 144:3, 144:24, 149:21, 150:12, 155:13, 156:24, 157:1, 157:16, 158:8
**Charlie's** [3] - 115:8, 119:9, 140:25
**chat** [6] - 11:14, 20:1, 20:14, 31:15, 41:10, 115:13
**check** [13] - 6:13, 6:22, 13:10, 13:20, 53:13, 54:4, 55:14, 61:14, 61:15, 68:3, 68:5, 69:12, 71:7
**checked** [5] - 6:17, 28:19, 34:24, 35:1, 53:4
**checking** [1] - 28:25
**checks** [1] - 54:7
**chipper** [1] - 129:12
**choose** [1] - 54:3
**chose** [4] - 15:20, 53:18, 53:21, 119:15
**Christmas** [4] - 77:20, 77:21, 78:11, 78:14
**Cintex** [5] - 28:10, 28:14, 28:16, 29:13, 30:8
**circle** [1] - 116:11
**circumstance** [1] - 145:17
**circumstances** [1] - 110:21
**civil** [9] - 73:12, 146:1, 146:4, 146:5, 147:3, 147:6, 150:24, 151:3, 151:8
**claim** [1] - 30:6
**claimed** [2] - 14:7, 153:10
**claiming** [2] - 98:24, 99:20
**clear** [4] - 28:4, 116:17, 141:14, 147:10
**cleared** [3] - 105:1, 116:12, 116:13
**clearer** [1] - 104:6
**closer** [1] - 48:17
**club** [1] - 56:17
**collaborate** [1] - 81:10
**colleague** [1] - 97:18
**collected** [1] - 135:1
**Colosi** [3] - 80:12, 82:5, 87:19
**Colosi's** [1] - 83:6
**comfort** [2] - 75:5, 76:13
**coming** [14] - 12:12, 16:5, 54:6, 61:13, 62:5, 62:7, 62:9, 65:8, 65:25, 66:1, 75:9, 134:17, 149:13
**commentary** [1] - 121:7
**comments** [1] - 117:23
**communicate** [6] - 50:12, 74:6, 91:22, 92:5, 94:1, 99:7
**communicated** [17] - 47:5, 66:7, 69:24, 72:5, 72:7, 76:20, 78:15, 91:18, 92:4, 101:18, 103:1, 103:6, 105:16, 120:7, 122:6, 122:9, 149:6
**communicating** [7] - 74:1, 75:12, 79:18, 80:1, 104:16, 116:1, 140:16
**communication** [15] - 80:8, 87:18, 88:16, 90:8, 91:20, 92:21, 94:4, 98:10, 99:19, 101:17, 105:11, 105:14, 108:9, 115:23, 128:25
**communications** [14] - 27:15, 79:13, 90:4, 90:14, 93:25, 100:24, 104:12, 120:16, 121:3, 124:11, 133:8, 133:18, 134:1, 156:25
**companies** [2] - 10:23, 36:11
**company** [22] - 32:10, 32:14, 34:19, 34:20, 36:24, 47:21, 54:18, 58:16, 76:4, 94:25, 96:19, 99:25, 115:16, 116:5, 117:18, 130:5, 145:15, 156:3, 156:10, 156:16, 156:19, 157:6
**compensation** [1] - 77:18
**competent** [1] - 144:12
**competition** [3] - 100:1, 100:7, 100:18
**complaining** [2] - 20:4, 20:14
**complaint** [4] - 85:14, 92:24, 93:5, 93:9
**complaints** [2] - 34:2, 34:17
**complete** [2] - 64:13, 135:3
**completed** [5] - 65:12, 117:16, 138:18, 138:25
**completely** [1] - 4:19
**compliance** [64] - 7:19, 10:13, 10:22, 12:11, 13:10, 14:20, 15:25, 16:3, 16:10, 16:18, 17:6, 17:8, 18:10, 19:19, 21:8, 23:4, 25:10, 26:7, 26:23, 29:20, 32:6, 35:7, 42:3, 42:18, 47:18, 49:22, 51:1, 52:8, 54:6, 54:9, 54:22, 59:5, 61:14, 61:15, 62:4, 62:7, 62:12, 64:5, 75:21, 76:18, 79:19, 79:21, 93:13, 95:3, 97:17, 99:24, 112:15, 118:6, 118:18, 118:23, 122:14, 123:4, 123:6, 124:17, 125:14, 126:9, 128:4, 139:4, 142:21, 154:25, 155:17, 155:25
**Compliance** [3] - 124:13, 126:11, 156:3
**compliance's** [2] - 21:10, 124:8
**compliant** [1] - 47:21
**complied** [1] - 139:11
**complimentary** [1] - 155:23
**complying** [1] - 120:25
**composite** [1] - 7:5
**compound** [7] - 14:22, 15:8, 29:5, 39:7, 39:15, 41:14, 42:21
**computer** [2] - 15:13, 15:18
**CON'T** [2] - 3:3, 5:20
**con't** [2] - 3:3, 5:23
**concede** [2] - 5:10, 87:7
**conceptually** [2] - 103:10, 111:9
**concern** [16] - 10:8, 10:9, 33:12, 56:1, 56:6, 56:8, 57:5, 75:8, 110:14, 114:8, 147:5, 147:7, 147:12, 153:9, 153:21, 156:8
**concerned** [14] - 52:20, 55:11, 56:3, 57:2, 57:17, 60:2, 75:2, 75:17, 78:3, 91:19, 112:22, 117:24, 133:13, 152:11
**concerning** [26] - 53:10, 54:4, 67:2, 72:22, 74:18, 83:10, 93:5, 93:9, 105:25, 106:8, 113:4, 113:19, 122:7, 124:16, 124:17, 124:22, 128:24, 140:17, 141:5, 142:4, 142:13, 142:22, 144:3, 145:4, 149:11, 157:17
**concerns** [7] - 8:24, 8:25, 9:3, 10:4, 10:6, 10:10, 56:7
**conclude** [1] - 52:9
**conclusion** [1] - 123:17
**conclusions** [1] - 14:23
**conduct** [2] - 155:10, 155:13
**conference** [6] - 82:11, 82:14, 84:11, 85:22, 87:21, 149:11
**confirm** [3] - 28:20, 30:21, 132:3
**confirmed** [1] - 31:7

**confiscated** [1] - 74:4
**conflicting** [1] - 57:9
**confused** [1] - 94:16
**confusing** [3] - 25:20, 94:13, 94:18
**confusion** [1] - 117:8
**congested** [1] - 7:24
**connection** [6] - 56:7, 57:12, 57:21, 61:6, 121:8, 121:12
**connections** [1] - 99:10
**consider** [2] - 148:7, 154:9
**considered** [2] - 128:9, 148:11
**considering** [1] - 154:8
**consistent** [8] - 40:5, 96:22, 107:9, 118:22, 121:19, 128:1, 140:1, 140:16
**conspiracy** [1] - 14:18
**constant** [1] - 93:12
**consultants** [1] - 131:13
**consumers** [1] - 156:5
**contact** [9] - 57:17, 57:23, 102:2, 114:18, 117:18, 130:24, 131:2, 131:4, 133:12
**contacted** [1] - 118:11
**content** [2] - 85:20, 111:8
**context** [2] - 125:3, 157:19
**continue** [2] - 5:18, 87:15
**continued** [2] - 71:4, 128:21
**continuing** [1] - 94:4
**controlled** [2] - 16:11, 16:14
**conversation** [30] - 11:23, 12:10, 22:13, 22:17, 23:2, 27:14, 40:15, 41:17, 67:7, 71:4, 71:6, 74:18, 75:16, 79:20, 81:22, 85:16, 85:17, 85:22, 93:11, 93:12, 120:13, 129:3, 129:6, 129:8, 129:11, 133:7, 140:5, 146:21, 150:11
**conversations** [6] - 48:2, 48:3, 66:22, 91:8, 120:12, 134:3
**conveyed** [1] - 75:1
**convicted** [1] - 119:2
**cool** [1] - 15:24
**copies** [1] - 88:13
**copy** [3] - 45:5, 68:2, 69:19
**corner** [1] - 89:10
**correct** [445] - 6:7, 6:15, 6:16, 6:23, 7:7, 9:20, 13:10, 13:21, 14:8, 14:16, 16:7, 16:18, 17:6, 17:9, 18:12, 22:7, 23:11, 26:8, 26:17, 27:13, 27:20, 29:3, 29:8, 29:14, 30:8, 31:8, 31:19, 32:11, 32:16, 33:4, 33:5, 34:2, 34:22, 36:5, 37:4, 37:20, 37:24, 38:2, 39:5, 39:10, 39:13, 40:6, 40:20, 43:14, 43:18, 45:18, 46:1, 46:11, 46:14, 47:2, 47:5, 47:15, 47:18, 47:21, 48:6, 48:18, 48:21, 48:25, 49:16, 49:20, 49:24, 50:1, 50:7, 50:10, 50:12, 50:15, 50:19, 51:8, 51:14, 52:1, 52:21, 52:23, 53:5, 53:19, 53:22, 54:19, 55:2, 55:12, 55:20, 55:24, 56:4, 56:9, 56:12, 56:18, 56:23, 56:25, 57:3, 57:7, 57:14, 57:21, 58:4, 58:17, 58:20, 58:23, 59:2, 59:11, 59:24, 60:25, 62:5, 62:8, 63:8, 63:24, 64:17, 64:21, 64:24, 64:25, 65:1, 65:4, 65:10, 65:13, 65:16, 65:19, 65:22, 66:2, 66:5, 66:8, 66:11, 66:20, 66:21, 66:23, 68:12, 68:13, 69:2, 70:10, 70:20, 70:23, 71:8, 71:13, 71:21, 71:25, 72:3, 72:9, 72:12, 72:15, 73:3, 73:13, 73:22, 73:24, 74:2, 75:3, 75:6, 75:10, 75:22, 76:5, 76:8, 76:11, 76:14, 76:18, 76:20, 76:22, 76:25, 77:4, 77:16, 78:24, 79:2, 79:5, 79:8, 79:11, 79:15, 80:6, 80:9, 80:13, 80:21, 81:4, 82:8, 82:12, 82:16, 82:18, 82:21, 82:24, 83:4, 83:18, 83:19, 83:24, 84:15, 84:17, 84:20, 85:4, 85:6, 85:16, 85:23, 88:1, 88:5, 88:18, 88:22, 88:24, 89:4, 89:8, 89:15, 89:25, 90:6, 90:23, 91:7, 91:13, 91:23, 92:6, 92:10, 92:14, 93:2, 93:5, 93:17, 93:20, 94:6, 94:18, 94:25, 95:4, 95:6, 95:11, 95:17, 95:20, 95:22, 96:4, 96:8, 96:10, 96:12, 96:16, 96:20, 96:24, 97:3, 97:6, 97:9, 97:15, 97:18, 97:21, 97:25, 98:1, 98:3, 98:8, 98:12, 98:15, 98:17, 98:20, 98:22, 98:25, 100:2, 100:12, 100:14, 100:15, 100:18, 100:22, 100:25, 101:7, 101:12, 101:19, 102:4, 102:7, 102:13, 102:17, 102:20, 103:3, 103:11, 104:8, 104:10, 104:14, 104:18, 105:1, 105:6, 105:7, 105:8, 105:10, 105:17, 106:5, 106:18, 106:21, 107:23, 108:1, 108:3, 108:6, 109:14, 109:17, 109:25, 110:7, 110:9, 110:13, 110:16, 110:19, 110:24, 111:10, 112:15, 112:18, 113:20, 114:23, 114:25, 115:4, 115:16, 115:24, 116:5, 117:5, 118:13, 118:15, 118:20, 118:24, 119:4, 119:12, 119:16, 120:1, 120:5, 120:14, 120:17, 120:18, 121:1, 121:5, 121:9, 121:16, 121:22, 122:12, 122:17, 122:20, 122:21, 122:23, 123:10, 123:16, 123:23, 124:9, 124:14, 124:18, 124:23, 125:2, 125:9, 125:12, 125:15, 125:18, 125:22, 125:24, 126:5, 126:9, 126:16, 126:20, 127:5, 127:18, 128:2, 128:10, 128:16, 128:17, 128:19, 128:22, 129:1, 129:9, 129:19, 129:22, 130:1, 130:7, 130:10, 131:14, 131:19, 132:2, 132:23, 132:24, 133:1, 133:16, 133:25, 134:15, 134:18, 134:22, 134:25, 135:3, 135:4, 135:6, 135:9, 135:13, 135:19, 136:2, 136:3, 136:7, 136:8, 136:11, 136:24, 137:2, 137:11, 137:13, 137:18, 137:19, 138:18, 138:20, 139:1, 139:2, 139:5, 139:11, 139:14, 141:25, 142:4, 142:17, 142:19, 142:22, 143:2, 143:3, 143:5, 143:8, 143:18, 143:22, 144:19, 145:2, 145:4, 145:11, 145:19, 145:22, 146:2, 146:6, 146:9, 146:12, 146:19, 146:24, 147:1, 147:3, 147:6, 147:21, 147:24, 148:2, 148:19, 148:21, 148:24, 149:6, 149:8, 149:11, 149:14, 149:16, 149:17, 149:18, 149:22, 150:4, 150:9, 150:14, 150:24, 151:3, 151:8, 151:11, 151:13, 151:17, 151:20, 153:11, 153:14, 154:23, 155:2, 155:4, 155:11, 155:21, 156:16, 156:20, 157:2, 157:7, 157:9, 157:14, 158:6, 158:8
**corrected** [2] - 65:12, 88:9
**correcting** [2] - 105:4, 105:5
**correctly** [1] - 157:21
**correspondence** [1] - 104:24
**correspondences** [1] - 104:20
**corresponding** [1] - 127:11
**corroborate** [2] - 127:11, 127:16
**corroborated** [1] - 127:18
**counsel** [12] - 4:2, 4:10, 4:11, 4:17, 5:10, 17:22, 45:18, 86:19, 87:7, 97:3, 97:20, 146:11
**count** [1] - 44:14
**counterfeit** [3] - 26:3, 83:18, 113:6
**counterfeiting** [1] - 118:1
**couple** [6] - 4:8, 4:14, 32:4, 53:8, 125:12, 150:15
**course** [4] - 94:6, 94:10, 94:14, 128:13
**COURT** [117] - 1:1, 4:2, 4:20, 4:23, 4:25, 5:5, 5:8, 5:10, 5:15, 6:20, 8:22, 9:16, 9:22, 10:17, 12:8, 14:24, 15:9, 17:20, 17:24, 18:22, 19:4, 19:9, 19:16, 20:11, 22:2, 23:19, 25:14, 27:7, 29:6, 30:18, 31:5, 32:23, 33:10, 33:21, 35:13, 35:15, 35:20, 38:14, 39:8, 39:16, 40:23, 41:15, 42:23, 43:1, 46:4, 46:17, 46:22, 51:11, 53:25, 58:7, 58:14, 61:23, 67:24, 74:12, 75:25, 77:12, 78:5, 81:20, 84:23, 85:9, 85:25, 86:3, 86:8, 86:10, 86:15, 86:18, 86:19, 86:23, 87:3, 87:5, 87:7, 87:12, 91:16, 92:2, 93:23,

95:13, 99:3, 99:16, 100:5, 102:10, 102:23, 103:16, 104:2, 105:20, 106:25, 107:15, 108:22, 111:16, 111:18, 112:6, 119:7, 121:25, 122:3, 124:1, 132:15, 136:19, 137:5, 139:18, 139:22, 140:1, 148:5, 148:13, 149:25, 151:23, 152:15, 153:17, 153:25, 154:20, 155:15, 158:10, 158:12, 158:18, 158:20, 158:24, 159:5, 159:8, 159:14
**court** [1] - 152:22
**Court** [10] - 2:3, 2:4, 4:1, 4:6, 4:21, 86:13, 86:23, 159:6, 160:7, 160:8
**Court's** [1] - 74:10
**Courthouse** [1] - 160:9
**courtroom** [1] - 145:24
**covered** [1] - 32:22
**craft** [1] - 96:13
**create** [1] - 24:11
**created** [1] - 93:1
**creating** [1] - 13:24
**credit** [1] - 54:7
**criticism** [1] - 75:21
**cross** [4] - 148:5, 152:3, 154:13, 154:15
**CROSS** [4] - 3:3, 3:4, 5:23, 43:3
**cross-examination** [1] - 148:5
**CROSS-EXAMINATION** [4] - 3:3, 3:4, 5:23, 43:3
**crossed** [1] - 152:7
**current** [1] - 134:15
**custodians** [1] - 4:16
**customer** [12] - 12:12, 16:13, 22:11, 22:12, 22:15, 22:18, 29:12, 61:18, 63:15, 63:19, 64:7, 118:7
**customer's** [1] - 63:17
**customers** [5] - 21:14, 22:10, 63:16, 115:12, 156:5
**cut** [3] - 107:10, 107:12, 108:25
**cutting** [3] - 109:7, 111:9, 112:13

## D

**daily** [1] - 62:23
**Dakota** [6] - 36:2, 39:19, 97:10, 97:18, 123:3
**data** [3] - 4:13, 59:18, 60:20
**date** [11] - 31:24, 32:1, 35:10, 73:14, 74:19, 107:21, 117:3, 117:5, 134:14, 137:21, 146:4
**DATE** [1] - 160:6
**dated** [1] - 113:14
**days** [11] - 13:19, 13:23, 15:5, 23:8, 68:11, 68:17, 90:4, 108:15, 108:16, 116:3, 125:12
**DEA** [1] - 16:13
**deal** [1] - 126:4
**dealing** [2] - 14:21, 50:9
**December** [4] - 79:15, 88:24, 90:3, 90:21
**decide** [1] - 94:5
**decided** [1] - 39:12
**decipher** [1] - 94:20
**decision** [12] - 85:2, 94:10, 124:17, 141:15, 141:17, 141:18, 142:13, 142:22, 143:2, 143:9, 149:20, 151:2
**decision-maker** [1] - 151:2
**decisions** [6] - 141:23, 141:24, 142:2, 142:3, 142:16, 143:10
**DEFENDANT** [2] - 1:18, 1:22
**defendant** [1] - 13:9
**Defendants** [1] - 1:8
**defendants** [2] - 4:3, 86:20
**defending** [1] - 122:17
**defense** [1] - 159:13
**definite** [1] - 129:25
**definitely** [1] - 95:21
**degree** [1] - 49:13
**demand** [4] - 97:2, 97:9, 109:6, 109:20
**demanding** [1] - 22:15
**demands** [1] - 100:20
**department** [15] - 54:7, 54:8, 54:23, 64:5, 68:7, 76:8, 76:10, 76:18, 112:15, 113:19, 123:6, 125:21, 154:25, 155:18, 155:25
**departments** [1] - 57:4
**deposition** [9] - 17:15, 34:5, 146:1, 146:11, 146:14, 146:16, 146:18, 146:23, 147:23
**DerOvanesian** [1] - 1:14
**DEROVANESIAN** [1] - 159:11
**describe** [3] - 43:16, 62:17, 114:2
**described** [1] - 60:23
**describing** [1] - 129:8
**description** [1] - 51:5
**designed** [1] - 15:22
**desperate** [1] - 57:23
**details** [15] - 18:13, 18:16, 18:17, 36:23, 53:7, 73:11, 103:9, 103:10, 104:11, 105:2, 105:19, 111:8, 146:15, 146:20, 146:21
**determination** [3] - 7:18, 128:4, 141:14
**diary** [1] - 44:8
**difference** [8] - 49:8, 99:13, 141:17, 142:4, 142:11, 142:12, 142:21
**different** [5] - 55:18, 66:10, 106:20, 146:8, 147:10
**differently** [1] - 44:18
**difficult** [4] - 57:10, 94:20, 114:3, 125:14
**difficulties** [1] - 66:14
**Dimitrouleas** [1] - 2:4
**DIMITROULEAS** [1] - 1:10
**direct** [7] - 51:25, 56:2, 66:25, 72:25, 84:4, 113:3, 141:4
**directed** [3] - 71:6, 76:7, 144:24
**directions** [1] - 71:16
**directly** [4] - 99:7, 112:14, 118:11, 140:20
**director** [8] - 7:19, 13:10, 14:20, 42:3, 42:18, 49:22, 59:5, 93:13
**disburses** [1] - 156:7
**discomfort** [1] - 43:17
**discovered** [2] - 40:4, 102:25
**discovery** [3] - 107:25, 116:4, 128:24
**discuss** [7] - 5:16, 86:5, 86:10, 87:13, 145:16, 158:14, 158:21
**discussed** [15] - 5:16, 14:15, 27:19, 86:6, 87:13, 110:5, 119:21, 127:7, 131:22, 131:24, 135:2, 146:20, 150:25, 154:9, 158:15
**discussing** [3] - 17:15, 23:3, 39:4
**discussion** [8] - 12:5, 27:16, 36:18, 36:20, 40:17, 88:15, 98:6, 113:3
**discussions** [4] - 9:10, 130:18, 130:20, 144:3
**displeasure** [1] - 126:1
**dispute** [1] - 104:13
**disqualified** [1] - 119:16
**disqualifying** [1] - 119:12
**dissuade** [1] - 55:12
**distributes** [1] - 156:4
**distribution** [1] - 156:7
**distributor** [7] - 30:24, 100:1, 100:14, 100:17, 115:3, 130:5, 130:6
**distributors** [3] - 100:11, 100:18, 113:20
**DISTRICT** [3] - 1:1, 1:2, 1:11
**District** [5] - 2:4, 120:1, 121:1, 160:8, 160:8
**Divilio** [5] - 4:23, 5:2, 86:10, 86:21, 158:20
**DIVILIO** [2] - 3:3, 5:20
**DIVISION** [1] - 1:2
**DMS** [2] - 36:24, 37:9
**document** [13] - 12:6, 25:25, 42:7, 42:8, 47:10, 67:12, 70:14, 70:16, 74:14, 96:1, 96:2, 107:12, 138:13
**documentation** [6] - 64:22, 106:14, 106:17, 107:25, 127:21, 128:8
**documents** [22] - 63:16, 66:18, 83:9, 103:8, 108:8, 112:3, 117:10, 117:14, 118:1, 118:7, 126:23, 127:22, 130:13, 132:3, 133:6, 133:11, 133:12, 133:22, 133:23, 138:2, 141:3, 148:10
**done** [25] - 14:16, 39:23, 50:14, 54:8, 54:22, 59:2, 65:16, 65:21, 66:8, 66:10, 66:11, 66:15, 66:17, 68:20, 98:7, 102:18, 113:18, 113:19, 119:2, 133:1, 136:4, 138:22, 141:20, 155:9, 155:10
**double** [1] - 69:12
**double-check** [1] - 69:12
**doubt** [1] - 103:5
**down** [33] - 6:14, 11:1, 11:20, 12:14, 13:13, 15:15, 20:2, 22:25, 26:10, 28:7, 29:17, 30:8, 31:15, 40:13, 44:8, 45:5, 47:24, 52:6, 53:1, 67:14, 70:25, 109:4, 110:18, 111:3, 113:18, 113:22, 115:21, 116:9, 117:20, 129:19, 139:20, 140:9, 145:10
**draft** [2] - 4:10, 47:13
**drafted** [1] - 96:10
**drafting** [1] - 100:21
**dragging** [3] - 21:11, 21:16, 21:20
**dramatically** [1] - 126:19
**Dresser** [1] - 97:25
**Drogueria** [1] - 114:6
**drug** [5] - 26:3, 85:13, 92:22, 92:23, 113:6
**drugs** [25] - 59:23, 64:20, 64:24, 79:8, 79:10, 83:11, 94:24,

101:4, 101:5, 118:1, 120:4, 120:8, 120:10, 120:22, 120:23, 121:9, 121:12, 125:7, 126:8, 126:12, 127:10, 130:4, 135:16, 136:7, 138:15
**due** [1] - 21:19
**duly** [1] - 5:21
**during** [15] - 17:4, 48:24, 62:17, 70:11, 73:20, 76:17, 86:11, 96:23, 96:25, 112:11, 113:3, 128:21, 137:9, 156:20, 158:20
**duty** [1] - 55:7
**dynamics** [1] - 95:19

**E**

**e-Pharm/alert** [2] - 96:5, 100:9
**eager** [1] - 55:6
**early** [7] - 59:21, 63:10, 66:18, 92:24, 106:11, 120:17, 123:7
**East** [1] - 160:9
**Eastern** [1] - 67:20
**easy** [1] - 60:7
**effect** [1] - 59:22
**either** [4] - 50:18, 93:18, 112:14, 138:4
**electronic** [1] - 4:14
**electronically** [3] - 60:12, 61:4, 158:25
**ELMO** [2] - 107:1, 109:4
**email** [40] - 4:14, 13:15, 13:24, 14:2, 14:14, 15:1, 26:4, 26:15, 35:22, 37:2, 37:4, 37:9, 37:15, 37:21, 39:22, 40:1, 41:10, 52:7, 52:11, 60:13, 60:20, 61:17, 71:18, 73:1, 84:5, 85:15, 113:24, 117:17, 129:7, 130:24, 131:13, 131:18, 131:21, 131:22, 131:24, 132:10, 133:18, 133:20, 144:10, 149:10
**emailed** [3] - 47:4, 149:7, 149:8
**emails** [4] - 79:21, 85:19, 96:13, 102:25
**embarrassing** [1] - 104:10
**employees** [3] - 75:2, 75:16, 77:21
**employment** [2] - 25:5, 78:19
**end** [8] - 70:3, 70:9, 71:2, 77:16, 108:9, 108:16, 116:12, 129:16
**ended** [3] - 57:6, 90:4, 118:13
**ends** [2] - 107:10, 107:12
**energetic** [1] - 95:10
**energy** [2] - 95:8, 95:9
**enforcement** [2] - 145:12, 145:14
**enlarge** [1] - 114:15
**enlisted** [1] - 138:4
**ensure** [2] - 126:22, 138:2
**entailed** [1] - 60:1
**enter** [1] - 60:20
**entered** [2] - 64:9
**enters** [1] - 87:6
**enthused** [1] - 55:8
**ENTIN** [2] - 2:3, 160:7
**Entin** [1] - 160:6
**entitled** [1] - 160:4
**entry** [1] - 59:18
**erroneous** [1] - 88:8
**error** [2] - 50:18, 118:8
**especially** [2] - 55:22, 80:10
**Esquire** [5] - 1:13, 1:14, 1:18, 1:18, 1:22
**essentially** [6] - 58:19, 61:7, 64:10, 89:21, 96:1, 135:6
**established** [1] - 59:17
**et** [1] - 77:9
**evaluating** [1] - 154:8
**evaluation** [3] - 125:18, 125:20, 137:24
**evaluations** [2] - 121:7, 124:22
**evasion** [1] - 91:12
**evening** [2] - 158:13, 158:17
**event** [1] - 73:21
**events** [12] - 44:21, 45:6, 45:12, 45:15, 45:21, 46:10, 47:14, 48:18, 49:9, 49:15, 82:15
**eventual** [1] - 133:7
**eventually** [3] - 34:3, 73:10, 128:8
**evidence** [11] - 14:2, 35:15, 37:7, 51:25, 107:6, 139:16, 139:18, 139:22, 151:13, 151:16
**evolution** [2] - 54:21, 79:25
**exact** [12] - 33:1, 34:3, 35:10, 44:14, 45:19, 73:14, 81:9, 95:24, 101:22, 107:21, 142:8, 146:4
**exactly** [13] - 9:9, 14:3, 31:2, 56:13, 61:6, 73:11, 84:2, 90:20, 102:5, 103:6, 119:2, 133:3, 148:25
**EXAMINATION** [4] - 3:3, 3:4, 5:23, 43:3
**examination** [7] - 50:22, 51:25, 56:2, 84:4, 113:4, 141:4, 148:5
**examined** [1] - 5:21
**example** [4] - 17:2, 17:3, 60:15, 142:8
**excellent** [1] - 114:7
**except** [1] - 114:4
**exchanges** [2] - 85:15, 144:10
**excuse** [6] - 20:15, 48:4, 96:2, 130:9, 136:13, 155:24
**Exhibit** [26] - 6:3, 7:9, 9:23, 11:13, 13:12, 14:3, 14:15, 22:24, 25:22, 27:23, 35:11, 37:7, 47:7, 51:16, 52:12, 67:8, 107:4, 109:3, 111:2, 111:12, 111:25, 113:11, 115:20, 115:21, 139:17, 140:3
**exhibit** [8] - 7:5, 7:10, 11:19, 37:6, 42:9, 52:10, 52:16, 113:12
**exhibits** [3] - 11:4, 11:9, 19:22
**exist** [1] - 143:4
**existing** [1] - 115:12
**exits** [2] - 86:9, 158:19
**expected** [1] - 114:11
**experience** [6] - 79:2, 93:14, 93:18, 145:4, 145:6, 152:9
**experienced** [1] - 124:12
**expired** [3] - 16:15, 17:4, 17:7
**explain** [1] - 15:19
**explicitly** [1] - 33:14
**exposure** [3] - 153:6, 153:8, 153:22
**express** [2] - 33:17, 81:6
**expressed** [5] - 56:2, 75:8, 81:8, 126:1, 129:11
**expressing** [1] - 100:9
**extent** [2] - 49:12, 112:3
**extra** [1] - 77:19

**F**

**face** [1] - 144:13
**fact** [34] - 16:17, 21:19, 21:20, 25:5, 27:1, 44:24, 54:16, 55:18, 57:25, 65:15, 66:25, 71:6, 71:15, 72:2, 72:21, 75:1, 75:13, 76:16, 77:4, 82:14, 88:16, 89:6, 101:5, 103:12, 111:1, 114:2, 120:9, 121:15, 124:11, 127:9, 132:20, 134:12, 145:10, 147:23
**facts** [6] - 46:13, 46:19, 46:24, 47:1, 82:18, 94:5
**factual** [1] - 122:16
**factually** [4] - 88:7, 97:14, 102:13, 158:1
**fair** [16] - 11:9, 13:23, 21:8, 24:13, 34:16, 44:2, 51:3, 54:24, 55:9, 93:16, 123:1, 127:13, 127:24, 149:13, 149:18, 149:22
**faith** [6] - 65:19, 65:22, 98:17, 126:25, 155:9, 155:11
**fake** [2] - 14:7, 14:19
**fall** [4] - 45:17, 101:10, 103:2, 137:23
**false** [6] - 29:25, 36:13, 36:21, 106:14, 106:17, 107:25
**falsified** [1] - 106:16
**falsifying** [1] - 118:1
**familiar** [7] - 23:25, 77:8, 109:12, 109:13, 111:6, 151:4, 156:2
**families** [1] - 77:4
**family** [2] - 77:2, 77:8
**famous** [1] - 26:12
**fan** [1] - 56:17
**far** [28] - 38:10, 45:5, 46:9, 51:20, 52:20, 55:9, 55:11, 56:3, 57:16, 60:2, 60:23, 63:19, 78:2, 78:11, 78:21, 93:4, 93:8, 93:19, 94:10, 94:13, 98:6, 112:21, 128:5, 133:12, 146:16, 150:17, 156:19, 157:18
**fast** [2] - 94:22, 115:11
**fast-track** [1] - 115:11
**fault** [1] - 21:10
**favor** [2] - 11:18, 18:1
**FDA** [7] - 26:3, 36:25, 37:3, 37:12, 85:4, 120:16, 120:21
**federal** [1] - 156:6
**Federal** [2] - 1:22, 160:9
**feet** [3] - 21:11, 21:16, 21:20
**fell** [1] - 64:5
**felon** [2] - 119:2, 119:5
**felt** [12] - 8:16, 21:10, 24:16, 56:24, 57:23, 59:4, 75:20, 104:11, 105:2, 106:1, 106:3, 142:9
**few** [4] - 59:17, 83:21, 145:23, 157:13
**fifteen** [1] - 44:16
**figure** [2] - 68:23, 82:7
**file** [4] - 36:25, 68:5, 69:5, 158:24
**filed** [4] - 73:12, 119:25, 146:5, 158:24
**files** [1] - 88:18
**fill** [4] - 23:15, 27:9, 27:13, 46:6
**filled** [4] - 12:13, 36:19, 38:18, 157:20
**filling** [1] - 26:21
**final** [2] - 52:11, 124:17
**finalized** [1] - 4:15
**financial** [1] - 58:3
**finger** [3] - 76:5, 76:7,

123:19
**finger-pointing** [2] - 76:5, 76:7
**fire** [1] - 73:5
**firm** [1] - 72:18
**firms** [1] - 104:13
**first** [12] - 5:21, 11:13, 54:8, 59:10, 67:11, 90:3, 108:16, 118:18, 126:9, 130:25, 145:21
**fit** [1] - 44:5
**five** [4] - 5:6, 13:19, 13:23, 56:11
**Fl** [1] - 1:22
**flag** [3] - 7:25, 8:4, 8:8
**Flores** [1] - 1:19
**FLORIDA** [1] - 1:2
**Florida** [9] - 1:4, 1:16, 1:20, 1:23, 120:1, 121:1, 122:5, 160:8, 160:10
**Flowers** [2] - 97:18, 123:3
**focus** [1] - 140:20
**follow** [4] - 5:15, 72:23, 87:12, 91:20
**followed** [2] - 27:18, 71:15
**following** [2] - 39:23, 86:17
**follows** [1] - 5:22
**FOR** [3] - 1:13, 1:18, 1:22
**foregoing** [1] - 160:2
**forget** [1] - 128:14
**form** [4] - 27:1, 27:10, 115:11
**forms** [1] - 120:19
**FORT** [1] - 1:2
**Fort** [3] - 1:4, 1:23, 160:10
**forth** [6] - 39:4, 90:1, 90:9, 99:19, 100:25, 103:8
**forward** [3] - 46:1, 73:8, 116:14
**forwarded** [8] - 26:16, 37:3, 37:16, 38:3, 38:5, 79:21, 88:17, 90:15
**four** [2] - 44:17, 127:8
**FPR** [2] - 2:3, 160:7
**frame** [3] - 73:11, 79:16, 120:2
**fraudulent** [3] - 14:6, 153:11, 153:14
**free** [1] - 82:20
**frequently** [1] - 117:12
**Freudian** [1] - 155:24
**Frier** [19] - 27:12, 27:14, 27:19, 45:18, 45:22, 48:5, 71:7, 71:24, 72:3, 72:18, 73:5, 73:9, 81:4, 89:21, 90:11, 92:9, 97:20, 97:24, 121:3
**front** [2] - 12:2, 155:21
**frustration** [1] - 21:13
**full** [1] - 139:25
**fully** [1] - 118:10
**function** [1] - 16:15
**functions** [1] - 16:10
**funny** [1] - 30:15
**future** [1] - 132:22

## G

**game** [1] - 118:8
**Garrett** [1] - 116:23
**gate** [1] - 116:22
**gather** [1] - 122:16
**general** [4] - 23:22, 84:13, 91:8, 127:13
**generally** [2] - 87:23, 89:10
**generate** [3] - 23:11, 24:19, 133:6
**generating** [1] - 133:11
**generically** [1] - 102:6
**generous** [4] - 77:22, 77:24, 78:1, 78:16
**Gentek** [24] - 10:3, 10:19, 31:10, 31:11, 31:14, 31:18, 32:2, 32:4, 33:13, 33:18, 34:2, 34:7, 34:14, 34:17, 38:21, 41:4, 41:24, 42:15, 79:11, 108:3, 108:5, 108:9, 109:20, 109:23
**Gilead** [81] - 26:2, 26:7, 26:12, 30:3, 30:7, 30:22, 48:3, 79:14, 79:25, 80:8, 83:18, 87:19, 88:13, 88:22, 88:25, 89:3, 89:7, 89:22, 89:23, 89:24, 90:4, 91:10, 91:15, 91:18, 91:23, 92:6, 92:12, 92:15, 94:5, 95:19, 96:4, 96:5, 97:3, 98:11, 98:14, 98:15, 99:21, 99:25, 100:9, 100:20, 100:22, 100:25, 101:5, 101:14, 101:17, 101:25, 102:3, 102:16, 103:2, 103:7, 103:12, 104:16, 104:19, 104:23, 105:1, 105:17, 115:10, 116:19, 116:20, 120:1, 120:4, 120:7, 121:20, 122:7, 122:10, 122:15, 125:1, 135:6, 146:5, 146:8, 146:16, 146:19, 148:1, 148:19, 151:3, 151:10, 151:20, 151:21, 152:5
**Gilead's** [6] - 79:21, 114:9, 146:11, 147:13, 151:7, 155:24
**given** [7] - 85:12, 85:21, 88:12, 99:8, 99:12, 116:14, 127:17
**goal** [4] - 65:24, 134:10, 134:14, 139:10
**Google** [1] - 113:5
**googled** [3] - 117:17, 117:22, 119:10
**government** [2] - 147:20, 148:21
**GOVERNMENT** [1] - 1:13
**Government** [11] - 11:4, 11:18, 12:15, 44:13, 45:3, 148:23, 149:20, 152:11, 153:7, 153:10, 153:13
**Government's** [19] - 6:3, 7:10, 9:23, 13:12, 14:3, 14:14, 22:24, 25:22, 27:23, 35:11, 37:6, 51:16, 51:19, 51:24, 67:8, 113:12, 115:20, 139:17, 140:3
**great** [1] - 21:2
**greater** [1] - 151:8
**grounds** [1] - 75:24
**group** [3] - 58:19, 58:22, 114:19
**Group** [6] - 37:9, 37:11, 114:3, 114:15, 114:17, 114:21
**guess** [14] - 4:23, 8:15, 12:12, 25:3, 42:24, 55:3, 68:24, 69:24, 73:14, 96:5, 113:14, 114:11, 137:23, 152:18
**guidance** [2] - 27:10, 89:21
**guidelines** [2] - 128:7, 156:6
**guilt** [1] - 105:24
**guilty** [3] - 106:1, 106:3, 117:25
**guy** [1] - 131:3
**guys** [2] - 116:17, 118:6

## H

**Hammett** [1] - 138:5
**hand** [3] - 13:3, 156:6
**hand-in-hand** [1] - 156:6
**handed** [1] - 74:14
**handle** [4] - 13:2, 37:3, 115:12, 132:21
**hands** [1] - 12:21
**happy** [4] - 30:24, 129:14, 129:16, 129:18
**hats** [1] - 95:3
**head** [13] - 10:13, 10:21, 25:10, 26:23, 35:7, 47:18, 59:15, 76:10, 79:23, 82:2, 97:17, 122:14, 128:4
**hear** [4] - 31:2, 131:16, 144:16, 152:5
**heard** [11] - 18:18, 53:8, 68:8, 72:2, 72:11, 91:18, 101:18, 127:8, 130:21, 132:8
**hearsay** [3] - 75:23, 81:19, 99:2
**heavily** [1] - 125:21
**heavy** [1] - 7:22
**Hello** [1] - 117:8
**help** [4] - 12:14, 82:9, 122:16, 138:6
**helped** [1] - 126:22
**hereby** [1] - 160:2
**hesitating** [1] - 61:19
**hiccups** [1] - 157:13
**Highway** [1] - 1:22
**himself** [2] - 71:20, 80:16
**hindsight** [1] - 128:13
**hire** [1] - 132:21
**hired** [1] - 133:4
**hiring** [1] - 133:5
**history** [1] - 64:14
**HIV** [20] - 36:7, 38:10, 38:11, 42:4, 42:10, 58:22, 59:9, 59:10, 64:20, 64:24, 68:8, 79:7, 79:10, 94:24, 109:24, 112:13, 118:23, 119:1, 125:7, 126:8
**hockey** [1] - 77:6
**hold** [19] - 15:25, 16:3, 16:5, 16:10, 16:18, 17:2, 17:6, 17:8, 17:9, 17:13, 17:17, 18:8, 18:10, 18:18, 18:19, 18:25, 19:11, 19:19, 31:24
**home** [1] - 70:20
**honest** [3] - 21:12, 104:17, 105:10
**honestly** [2] - 18:13, 82:23
**honesty** [1] - 50:9
**Honor** [20] - 4:9, 5:12, 5:14, 12:6, 14:22, 17:19, 17:21, 20:9, 30:17, 35:19, 42:25, 43:2, 67:22, 75:23, 87:9, 87:11, 105:19, 112:2, 159:4, 159:7
**HONORABLE** [1] - 1:10
**Honorable** [1] - 2:4
**hopefully** [1] - 126:19
**hoping** [1] - 4:15
**hours** [1] - 138:22
**house** [2] - 80:5, 80:13
**hundreds** [2] - 21:3, 154:4
**hypothetically** [1] - 17:3

## I

**idea** [1] - 7:3
**identification** [4] - 52:13, 52:16, 111:2, 111:13
**ignored** [1] - 27:17
**illegal** [1] - 145:15
**illegally** [1] - 14:21
**immediately** [3] - 22:16, 97:8, 102:3
**impact** [2] - 57:4, 95:21
**importance** [1] - 40:19
**important** [4] - 49:20, 50:6, 58:2, 151:1
**impression** [1] - 99:8
**improper** [1] - 20:9
**improve** [4] - 54:22,

70:18, 70:22, 147:14
**in-house** [2] - 80:5, 80:13
**inaccurate** [4] - 64:24, 103:13, 110:13, 158:4
**Inc** [1] - 114:15
**incident** [2] - 101:9, 101:16
**included** [6] - 48:2, 94:4, 94:9, 97:9, 136:6, 157:23
**includes** [1] - 47:23
**including** [4] - 48:5, 98:19, 122:6, 142:19
**incomplete** [1] - 65:1
**inconsistent** [1] - 26:13
**incorporated** [3] - 16:19, 16:21, 60:5
**incorrect** [2] - 37:11, 43:24
**incredibly** [2] - 77:24, 78:16
**indicated** [1] - 44:7
**indicted** [2] - 113:5, 153:5
**indictment** [1] - 54:17
**individual** [3] - 53:10, 61:15, 117:25
**individuals** [3] - 53:10, 53:14, 54:4
**industry** [1] - 98:24
**influenced** [1] - 49:13
**information** [56] - 24:10, 24:17, 24:18, 24:19, 36:9, 36:17, 37:11, 37:18, 39:21, 43:13, 46:7, 46:25, 55:19, 57:10, 57:24, 60:11, 60:23, 61:3, 61:8, 82:1, 83:3, 84:14, 84:20, 89:22, 92:13, 94:5, 94:9, 99:9, 99:11, 99:12, 99:21, 103:2, 105:8, 110:12, 110:15, 114:12, 115:17, 118:16, 119:11, 119:12, 121:10, 122:9, 122:16, 123:20, 130:23, 133:23, 134:4, 138:6, 139:3, 139:8, 140:19, 143:10, 143:19, 157:16, 157:17, 158:1
**informed** [2] - 14:3, 102:1
**informing** [2] - 29:3, 29:8
**ingredients** [1] - 50:5
**initial** [5] - 10:11, 72:19, 73:1, 83:8, 83:13
**initiate** [1] - 36:7
**initiated** [3] - 60:14, 64:8, 112:25
**inquiry** [3] - 13:1, 72:19, 101:17
**inside** [1] - 99:20
**insight** [1] - 98:24
**insisted** [1] - 66:8
**instance** [7] - 51:2, 77:6, 81:24, 88:19, 90:20, 142:24, 151:6
**instead** [1] - 61:11
**instructions** [1] - 158:25
**intake** [2] - 70:22, 115:11
**integrity** [3] - 50:7, 123:6, 123:9
**intelligence** [1] - 16:4
**intelligent** [1] - 94:16
**interacted** [1] - 83:21
**interaction** [2] - 57:8, 96:23
**interactions** [1] - 156:24
**interest** [9] - 56:21, 83:2, 110:23, 150:11, 150:16, 150:18, 150:19, 150:20, 150:23
**interests** [1] - 56:22
**interfere** [1] - 89:7
**internet** [1] - 156:19
**interpretation** [1] - 142:11
**interpreted** [2] - 91:15, 100:6
**interpreting** [1] - 91:11
**introduced** [5] - 11:4, 38:7, 51:19, 51:24, 80:16
**invalid** [2] - 14:6, 31:8
**inventory** [2] - 15:23, 23:10
**investigation** [2] - 53:9, 145:13
**investigations** [1] - 54:11
**investigative** [1] - 80:4
**investigator's** [1] - 83:18
**invoice** [1] - 60:17
**invoices** [1] - 115:10
**involve** [1] - 152:22
**involved** [26] - 14:18, 45:18, 45:23, 46:10, 55:7, 58:10, 58:16, 58:22, 76:17, 79:13, 80:11, 82:11, 87:21, 88:5, 93:2, 96:12, 97:23, 112:14, 119:19, 120:9, 121:3, 121:18, 123:15, 127:9, 152:22, 155:19
**involvement** [5] - 75:17, 124:8, 128:22, 137:2, 137:17
**involving** [3] - 48:3, 48:4, 142:6
**ish** [2] - 101:10, 132:6
**issue** [37] - 12:18, 13:2, 17:5, 23:3, 28:13, 28:18, 43:9, 52:20, 59:7, 59:8, 62:4, 62:7, 62:10, 63:3, 71:21, 72:22, 92:22, 98:11, 98:12, 98:14, 99:21, 101:4, 101:12, 101:14, 103:13, 104:12, 104:25, 108:24, 113:15, 115:2, 115:14, 122:7, 122:8, 122:10, 126:5
**issues** [20] - 14:11, 42:10, 45:14, 55:23, 59:13, 73:8, 80:17, 93:7, 109:18, 110:6, 119:20, 122:15, 122:23, 124:16, 127:5, 127:7, 127:9, 130:2, 132:4
**itself** [3] - 12:7, 57:3, 110:15
**Ivlis** [1] - 1:18

## J

**Jacqueline** [1] - 1:14
**jaded** [1] - 49:14
**January** [3] - 90:22, 108:6, 108:18
**Jess** [1] - 31:15
**Jesse** [2] - 97:25, 138:5
**job** [28] - 10:13, 28:25, 43:20, 44:1, 44:3, 45:11, 47:18, 49:18, 49:19, 49:20, 50:1, 50:5, 50:6, 50:17, 55:5, 55:7, 55:8, 55:9, 59:1, 59:5, 81:25, 123:13, 155:1, 157:3, 157:4, 157:5, 157:14
**jobs** [3] - 57:10, 75:3, 145:10
**John** [4] - 23:9, 45:23, 71:19, 72:11
**Jon** [3] - 20:5, 20:7, 20:15
**Jonathan** [1] - 23:3
**judge** [1] - 124:13
**JUDGE** [1] - 1:11
**Judge** [11] - 74:11, 78:4, 86:2, 87:16, 106:24, 112:5, 122:1, 132:14, 139:16, 139:21, 148:12
**judgment** [6] - 128:18, 128:19, 139:4, 139:6, 142:13
**juggle** [1] - 122:25
**juggling** [1] - 62:18
**July** [8] - 73:12, 73:15, 74:8, 74:19, 79:14, 132:5, 132:6, 132:20
**June** [11] - 31:18, 59:21, 60:24, 63:11, 66:18, 67:7, 68:16, 71:18, 111:15, 130:23, 147:23
**juror** [1] - 5:5
**jurors** [2] - 4:4, 87:3
**Jury** [5] - 5:9, 86:9, 87:6, 158:19, 159:17
**jury** [12] - 4:7, 5:8, 5:11, 15:19, 86:3, 86:7, 86:24, 87:8, 127:7, 141:10, 158:12, 158:25
**JURY** [1] - 1:10
**justify** [1] - 158:4

## K

**keep** [10] - 44:7, 45:1, 45:15, 47:25, 113:22, 115:21, 116:8, 117:1, 117:20
**Kelsey** [1] - 68:9
**Kenzi** [3] - 68:5, 68:6, 68:7
**kept** [2] - 72:21, 105:15
**kids** [1] - 77:8
**Kimchi** [2] - 133:8, 133:10
**kind** [19] - 7:24, 19:18, 31:2, 43:11, 44:7, 44:8, 45:13, 45:20, 46:6, 53:9, 54:4, 67:20, 67:21, 81:6, 83:10, 98:4, 108:9, 125:17, 131:15
**King** [2] - 133:8, 133:10
**knowing** [2] - 49:8, 69:23
**knowledge** [1] - 49:14
**knows** [4] - 20:11, 46:4, 58:7, 84:23

## L

**lack** [5] - 21:8, 21:18, 23:4, 51:5, 91:12
**lag** [1] - 90:8
**laid** [1] - 129:18
**large** [2] - 75:14, 75:21
**last** [10] - 6:9, 11:3, 12:15, 15:5, 20:7, 31:21, 70:17, 74:16, 80:23, 117:23
**late** [11] - 63:10, 87:19, 88:20, 118:22, 119:18, 120:17, 123:7, 137:23, 138:20, 138:25, 139:7
**laudatory** [1] - 145:4
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:23, 160:10
**law** [8] - 72:18, 104:13, 129:18, 131:19, 140:12, 140:21, 145:12, 145:14
**lawsuit** [11] - 119:25, 120:3, 121:8, 122:5, 146:2, 146:4, 146:5, 146:6, 147:3, 147:6, 147:15
**lawyer** [4] - 45:22, 45:24, 90:11, 90:12
**lawyers** [10] - 90:22, 92:6, 121:4, 121:21, 122:16, 122:19, 146:19, 147:14, 149:21, 150:12
**lead** [1] - 98:2
**leading** [2] - 122:11, 125:6
**learn** [1] - 108:24
**learned** [4] - 47:17, 106:4, 106:12, 123:20

**least** [9] - 30:3, 57:16, 65:19, 66:18, 94:13, 125:8, 130:12, 132:25, 137:21
**leave** [1] - 126:16
**led** [2] - 102:2, 133:7
**left** [1] - 90:6
**legal** [29] - 14:23, 45:17, 71:5, 71:8, 71:12, 71:19, 71:21, 72:22, 73:10, 79:22, 80:5, 80:11, 80:13, 80:17, 83:4, 85:11, 88:12, 88:21, 89:13, 90:9, 90:11, 93:4, 93:8, 94:14, 94:20, 105:12, 124:9, 151:4
**legitimate** [2] - 7:2, 156:5
**length** [1] - 150:25
**less** [1] - 149:1
**letter** [15] - 80:15, 82:5, 82:10, 83:7, 83:12, 83:14, 83:23, 97:2, 97:11, 109:6, 109:13, 109:20, 111:5, 112:11, 145:2
**letters** [2] - 111:7, 112:8
**letting** [1] - 28:13
**level** [4] - 43:17, 50:6, 50:9, 153:8
**levels** [1] - 95:9
**Levitt** [18] - 27:12, 27:14, 27:19, 45:18, 45:23, 48:5, 71:8, 71:24, 72:3, 72:18, 73:6, 73:9, 81:4, 90:11, 92:9, 97:20, 97:24, 121:4
**license** [15] - 6:6, 6:13, 16:15, 17:4, 17:7, 34:24, 35:5, 50:22, 67:2, 68:2, 69:17, 70:2, 71:3, 106:15, 110:10
**licensed** [1] - 130:6
**licenses** [2] - 16:11, 70:19
**lieu** [1] - 4:15
**light** [1] - 37:16
**likely** [3] - 4:18, 120:13, 144:18
**limit** [1] - 57:8
**limitation** [1] - 128:5
**limitations** [2] - 81:6, 81:9
**lines** [2] - 30:21, 91:21
**list** [3] - 24:5, 24:23, 25:9
**listed** [2] - 54:5, 114:8
**listening** [1] - 53:16
**litigation** [1] - 81:16
**lives** [1] - 49:23
**location** [2] - 4:13, 9:4
**LOL** [1] - 30:10
**look** [29] - 6:25, 7:1, 8:2, 8:5, 8:15, 9:12, 37:15, 45:8, 47:7, 47:8, 52:12, 54:14, 61:15, 63:3, 64:7, 74:14, 96:7, 107:9, 107:19, 111:1, 111:12, 111:25, 113:11, 127:3, 128:12, 128:13, 135:19, 148:10
**looked** [13] - 6:24, 7:14, 7:15, 7:21, 7:23, 8:13, 10:4, 10:5, 12:20, 35:3, 96:16, 102:15
**looking** [15] - 8:25, 31:21, 34:5, 35:22, 39:22, 43:20, 49:5, 49:9, 93:19, 96:12, 123:20, 151:20, 151:22, 157:2, 157:5
**looks** [11] - 7:2, 7:3, 7:22, 10:3, 39:19, 47:11, 48:15, 108:5, 108:14, 108:18, 111:5
**loose** [1] - 108:25
**Lori** [1] - 26:15

**M**

**ma'am** [2] - 102:19, 103:5
**mailing** [2] - 6:24, 6:25
**main** [2] - 92:8, 132:1
**maker** [1] - 151:2
**mall** [1] - 7:24
**manager** [1] - 138:4
**manipulations** [1] - 57:2
**manipulative** [1] - 56:25
**Mantilla** [1] - 1:18
**manual** [10] - 17:9, 17:13, 17:17, 18:8, 18:10, 18:19, 18:25, 19:11, 19:19, 138:7
**manually** [1] - 138:12
**manufacturer** [2] - 135:5, 157:24
**manufacturer's** [1] - 85:14
**manufacturing** [2] - 122:8, 122:10
**March** [3] - 35:9, 95:16, 97:1
**marching** [1] - 65:21
**market** [6] - 120:5, 120:9, 120:23, 121:9, 121:13, 121:18
**marketing** [1] - 155:19
**Martha** [11] - 80:23, 82:7, 85:13, 92:8, 93:1, 98:2, 101:3, 105:9, 105:12, 105:15, 144:8
**Maryland** [6] - 67:20, 69:6, 69:12, 69:17, 71:3, 71:11
**math** [1] - 68:11
**matter** [9] - 54:16, 71:6, 71:20, 83:6, 138:9, 141:14, 142:10, 147:23, 160:4
**matters** [1] - 77:2
**Mayal** [2] - 26:16, 83:17
**mean** [16] - 8:5, 16:4, 24:15, 25:4, 25:18, 49:12, 52:4, 54:10, 55:5, 64:5, 68:21, 79:1, 111:18, 150:5, 152:22, 157:19
**meaning** [3] - 29:24, 30:15, 39:13
**means** [5] - 16:3, 137:15, 137:16, 152:20, 156:3
**meant** [5] - 12:22, 29:23, 143:17, 143:19, 156:13
**meanwhile** [1] - 131:16
**medicine** [3] - 22:14, 22:15, 30:7
**Medicine** [4] - 101:5, 101:6, 103:2, 103:13
**meds** [1] - 68:9
**meeting** [1] - 147:13
**meetings** [1] - 156:25
**Mellott** [2] - 131:6
**member** [2] - 56:17, 131:7
**members** [2] - 86:3, 158:12
**memo** [2] - 84:12, 129:7
**memorialize** [1] - 44:9
**memorialized** [1] - 156:19
**memorializes** [1] - 47:17
**memory** [9] - 18:2, 18:6, 34:10, 34:13, 44:16, 44:25, 48:20, 107:9, 144:21
**mentioned** [3] - 11:10, 19:23, 139:23
**meshing** [1] - 124:4
**mess** [1] - 80:23
**message** [5] - 28:1, 41:10, 67:1, 132:11, 140:25
**messages** [4] - 4:14, 72:5, 140:18
**met** [7] - 16:6, 44:13, 141:11, 146:17, 148:23, 149:4, 152:10
**methods** [1] - 60:22
**Miami** [2] - 1:16, 1:20
**mic** [1] - 17:23
**Microsoft** [1] - 4:16
**mid** [3] - 108:18, 132:5, 132:6
**mid-January** [1] - 108:18
**mid-July** [2] - 132:5, 132:6
**middle** [2] - 90:3, 95:15
**might** [9] - 46:19, 62:1, 66:14, 108:14, 112:19, 131:24, 142:21, 142:24, 153:9
**mind** [8] - 48:24, 49:19, 56:22, 69:4, 152:3, 152:7, 154:13, 154:15
**mine** [2] - 147:7, 147:12
**minute** [2] - 15:17, 48:7
**minutes** [4] - 5:6, 86:7, 86:12, 86:14
**miserable** [1] - 145:6
**miss** [1] - 118:19
**missed** [1] - 117:15
**mistake** [20] - 50:18, 50:24, 50:25, 103:1, 103:17, 103:19, 103:21, 104:4, 104:7, 105:3, 105:10, 105:16, 106:1, 106:2, 106:4, 106:6, 106:7, 106:12, 108:19, 110:9
**mistakes** [2] - 103:22, 155:10
**Mohammed** [4] - 114:18, 115:16, 117:17, 118:3
**moment** [3] - 4:24, 8:18, 142:8
**Monday** [1] - 4:25
**money** [3] - 59:2, 119:3, 154:10
**monitoring** [4] - 61:12, 62:12, 64:2, 136:16
**month** [4] - 20:8, 31:21, 68:17, 72:21
**monthly** [2] - 63:2, 63:3
**months** [5] - 9:19, 32:4, 44:17, 104:21, 104:23
**morning** [3] - 37:17, 115:8, 159:6
**Morrone** [9] - 45:23, 46:5, 71:19, 72:11, 80:20, 82:16, 84:1, 88:11, 88:16
**most** [4] - 38:17, 63:8, 125:7, 134:24
**motivated** [1] - 150:17
**move** [2] - 47:24, 116:14
**moved** [1] - 79:20
**movement** [2] - 132:9, 133:1
**moving** [2] - 45:25, 73:8
**MR** [295] - 3:3, 3:4, 4:8, 4:21, 4:24, 5:12, 5:13, 5:14, 5:24, 6:3, 6:5, 6:19, 6:21, 7:5, 7:6, 7:9, 7:11, 8:21, 8:23, 9:15, 9:17, 9:21, 9:23, 9:24, 10:15, 10:18, 11:1, 11:2, 11:16, 11:17, 11:20, 11:22, 12:2, 12:4, 12:6, 12:9, 13:12, 13:14, 13:17, 13:18, 14:22, 14:25, 15:7, 15:10, 15:15, 15:16, 17:19, 17:21, 17:25, 18:20, 18:24, 19:2, 19:5, 19:7, 19:10, 19:14, 19:17, 19:22, 19:25, 20:2, 20:3, 20:9, 20:13, 21:22, 21:23, 21:25, 22:3, 22:24, 23:1, 23:17, 23:20, 25:12, 25:15, 25:22, 25:24, 26:10, 26:11, 27:5,

27:8, 27:23, 27:25, 28:3, 28:8, 29:4, 29:7, 29:17, 29:18, 30:17, 30:19, 31:4, 31:6, 31:15, 31:17, 31:24, 31:25, 32:21, 32:24, 33:8, 33:11, 33:19, 33:25, 35:11, 35:14, 35:16, 35:21, 37:6, 37:8, 38:12, 38:15, 39:6, 39:9, 39:14, 39:17, 40:13, 40:14, 40:21, 40:24, 41:13, 41:18, 42:21, 42:25, 43:2, 43:4, 45:8, 45:10, 46:2, 46:8, 46:15, 46:18, 46:21, 46:23, 47:7, 47:9, 47:24, 48:1, 51:9, 51:12, 51:16, 51:18, 52:12, 52:15, 53:1, 53:2, 53:23, 54:2, 58:5, 58:9, 58:12, 58:15, 61:21, 61:25, 67:5, 67:6, 67:8, 67:9, 67:14, 67:17, 67:22, 67:25, 68:1, 70:4, 70:5, 70:25, 71:1, 74:10, 74:13, 75:23, 76:3, 77:10, 77:14, 78:4, 78:7, 81:18, 81:23, 84:21, 85:1, 85:7, 85:10, 86:2, 86:25, 87:1, 87:2, 87:9, 87:10, 87:11, 87:16, 87:17, 91:14, 91:17, 91:24, 92:1, 92:3, 92:15, 92:16, 93:21, 93:24, 95:12, 95:14, 99:1, 99:4, 99:14, 99:17, 100:3, 100:8, 102:8, 102:11, 102:21, 102:24, 103:14, 103:18, 103:25, 104:5, 105:18, 105:23, 106:24, 107:1, 107:3, 107:17, 108:20, 108:23, 109:2, 109:5, 109:9, 109:11, 111:1, 111:4, 111:12, 111:14, 111:17, 111:19, 111:20, 111:25, 112:2, 112:4, 112:9, 113:11, 113:13, 113:22, 113:23, 114:14, 114:16, 115:6, 115:7, 115:20, 115:22, 116:7, 116:10, 117:4, 117:6, 117:20, 117:21, 119:5, 119:8, 121:23, 122:1, 122:4, 123:24, 124:6, 132:14, 132:17, 136:17, 136:21, 137:3, 137:8, 139:16, 139:19, 139:24, 140:2, 140:4, 140:9, 140:10, 148:3, 148:8, 148:12, 148:14, 149:23, 150:1, 151:21, 151:24, 152:13, 152:16, 153:15, 153:18, 153:23, 154:1, 154:18, 154:21, 155:14, 155:16, 158:11, 159:3, 159:4, 159:7, 159:9, 159:12

**MS** [1] - 159:11
**multiple** [3] - 44:25, 72:2, 73:2
**must** [2] - 36:13, 68:10
**muster** [1] - 127:22

## N

**name** [19] - 56:8, 58:16, 68:24, 80:12, 80:14, 80:23, 83:20, 97:25, 112:24, 114:4, 115:15, 115:16, 117:16, 117:18, 119:10, 131:5, 152:18, 152:20
**named** [6] - 20:4, 131:3, 147:3, 147:5, 147:14, 151:8
**names** [2] - 79:22, 79:25
**nauseam** [1] - 127:8
**NE** [1] - 1:16
**near** [1] - 132:22
**necessarily** [1] - 38:8
**necessary** [5] - 82:21, 150:3, 150:4, 150:5
**need** [18] - 63:6, 69:9, 70:6, 70:7, 84:13, 88:21, 89:22, 114:12, 115:11, 118:1, 118:9, 125:3, 140:12, 140:13, 140:22, 153:4, 157:20, 157:23
**needed** [25] - 16:19, 16:21, 22:15, 24:2, 24:11, 24:18, 24:19, 36:8, 45:25, 61:15, 63:3, 65:12, 76:24, 82:18, 100:11, 124:17, 126:14, 126:15, 126:23, 132:3, 134:21, 138:2, 141:3, 157:18, 158:1
**needing** [2] - 134:4
**needs** [4] - 4:11, 88:9, 124:13, 140:22
**negative** [1] - 95:25
**neutral** [1] - 149:13
**never** [19] - 33:6, 33:12, 40:8, 68:8, 69:4, 72:17, 72:24, 78:19, 101:17, 101:18, 102:1, 102:4, 112:3, 117:10, 133:15, 133:21, 136:23, 147:3, 152:7
**New** [3] - 69:6, 69:11, 70:1
**new** [14] - 23:25, 26:22, 26:24, 27:4, 34:22, 36:7, 37:18, 39:5, 39:10, 39:12, 69:25, 93:5, 122:23, 126:18
**newer** [1] - 24:1
**next** [7] - 9:4, 11:20, 36:16, 71:18, 110:2, 125:11, 135:8
**nexus** [1] - 56:6
**nice** [1] - 158:17
**Nicholls** [6] - 20:5, 20:7, 20:15, 21:7, 21:11, 23:3
**nine** [2] - 23:8, 68:11
**NN** [1] - 69:4
**NO** [1] - 1:3
**non** [3] - 115:16, 116:20, 150:24
**non-AD** [1] - 115:16
**non-charged** [1] - 150:24
**non-Gilead** [1] - 116:20
**norm** [1] - 24:14
**normal** [2] - 46:13, 46:15
**note** [1] - 26:1
**nothing** [10] - 11:4, 42:25, 69:1, 86:13, 90:21, 91:6, 103:21, 118:12, 121:15, 159:5
**notice** [1] - 117:15
**notification** [1] - 40:20
**notified** [1] - 103:12
**noting** [1] - 40:19
**November** [5] - 80:16, 82:5, 83:7, 87:20, 88:24
**number** [8] - 6:14, 42:9, 114:10, 138:13, 149:2, 156:8
**numbers** [2] - 24:6, 24:24
**numerous** [1] - 124:11
**NW** [1] - 1:19

## O

**oath** [2] - 5:3, 86:21
**object** [1] - 112:2
**objection** [72] - 6:19, 8:21, 9:15, 9:21, 10:15, 12:6, 14:22, 15:7, 17:21, 18:20, 19:2, 19:7, 19:14, 20:9, 21:22, 21:25, 23:17, 25:12, 27:5, 29:4, 30:17, 31:4, 32:21, 33:8, 33:19, 38:12, 39:6, 39:14, 40:21, 41:13, 42:21, 46:2, 46:15, 46:21, 51:9, 53:23, 58:5, 58:12, 61:21, 67:22, 75:23, 77:10, 81:18, 84:21, 85:7, 91:14, 91:24, 92:15, 93:21, 95:12, 99:1, 99:14, 100:3, 102:8, 102:21, 103:14, 103:25, 105:18, 108:20, 119:5, 121:23, 123:24, 136:17, 137:3, 148:3, 149:23, 151:21, 152:13, 153:15, 153:23, 154:18, 155:14
**objections** [1] - 112:5
**objectively** [1] - 49:20
**obligation** [1] - 139:11
**observations** [1] - 123:13
**observed** [1] - 49:4
**observing** [1] - 61:12
**obviously** [12] - 7:7, 48:17, 58:25, 62:4, 79:1, 82:14, 106:2, 128:12, 142:16, 150:21, 151:10, 156:18
**occasion** [1] - 53:21
**occasions** [1] - 50:17
**occurred** [6] - 49:9, 49:15, 74:2, 75:10, 75:15, 110:21
**occurring** [1] - 18:11
**October** [7] - 1:5, 26:16, 26:20, 83:23, 101:10, 124:25, 140:15
**October-ish** [1] - 101:10
**OF** [3] - 1:2, 1:4, 1:10
**offensive** [2] - 49:13, 56:19
**offer** [4] - 116:2, 116:8, 116:11, 116:12
**offered** [2] - 75:19, 90:18
**OFFICER** [5] - 86:8, 86:15, 86:18, 87:5, 158:18
**Official** [2] - 2:3, 160:7
**Olympia** [3] - 22:10, 22:11, 22:18
**Omom** [5] - 39:2, 42:16, 112:1, 112:10, 119:20
**onboard** [1] - 6:10
**onboarding** [1] - 10:14
**once** [3] - 80:10, 82:5, 129:5
**one** [71] - 4:4, 4:24, 5:5, 6:10, 6:13, 9:25, 10:21, 11:13, 12:18, 13:9, 15:24, 18:14, 18:15, 20:19, 22:9, 24:4, 25:21, 28:2, 28:19, 29:1, 31:11, 32:5, 32:9, 36:11, 38:7, 38:17, 39:20, 43:25, 45:22, 50:21, 52:19, 57:11, 58:2, 59:10, 60:19, 60:22, 62:19, 65:15, 69:7, 69:9, 69:20, 71:10, 72:11, 79:19, 92:13, 93:7, 101:2, 103:9, 106:7, 106:9, 110:2, 110:7, 112:17, 112:19, 112:22, 115:4, 115:18, 117:13, 118:9, 118:10, 118:18, 122:11, 127:20,

128:14, 129:6, 131:6, 131:11, 136:22, 152:17, 153:1, 156:8
**one-time** [1] - 129:6
**ones** [4] - 9:13, 54:9, 118:6, 131:9
**ongoing** [1] - 59:7
**online** [2] - 35:3, 38:18
**open** [1] - 15:4
**operate** [1] - 114:4
**operating** [1] - 128:16
**operations** [1] - 138:5
**opining** [1] - 121:15
**opinion** [7] - 46:14, 46:20, 71:8, 71:12, 72:22, 142:4, 142:21
**opposed** [5] - 6:18, 49:4, 56:22, 122:8, 150:18
**option** [1] - 71:10
**orally** [2] - 78:8, 133:15
**Order** [1] - 4:1
**order** [6] - 24:11, 26:7, 45:15, 110:2, 116:25, 140:8
**ordered** [1] - 118:9
**ordering** [1] - 116:23
**orders** [2] - 65:21, 118:17
**organization** [1] - 81:11
**organize** [1] - 83:15
**otherwise** [1] - 118:8
**outs** [3] - 18:16, 24:2, 151:5
**outside** [2] - 97:3, 156:15
**outstanding** [2] - 59:13, 59:19
**overall** [1] - 79:3
**override** [1] - 19:18
**overruled** [29] - 12:8, 15:9, 18:22, 23:19, 25:14, 32:23, 33:21, 38:14, 41:15, 42:23, 53:25, 61:23, 67:24, 76:1, 77:12, 81:20, 99:3, 99:16, 100:5, 103:16, 104:3, 124:2, 136:19, 142:3, 148:6, 149:25, 151:23, 152:15, 153:17
**Overruled** [1] - 137:5
**own** [4] - 16:4, 16:5, 44:25, 56:21

**P**

**p.m** [4] - 28:9, 29:10, 52:21, 52:23
**page** [13] - 6:4, 11:16, 11:20, 12:2, 20:2, 22:25, 28:3, 28:5, 29:17, 60:6, 74:16, 140:3
**PAGE** [1] - 3:2
**Pages** [1] - 1:8
**paired** [1] - 60:17
**paperwork** [1] - 130:9
**paragraphs** [1] - 97:8
**paraphrasing** [2] - 141:6, 143:13
**parking** [1] - 4:4
**part** [42] - 6:22, 10:14, 17:2, 22:17, 34:17, 45:11, 47:17, 47:23, 48:2, 50:5, 51:19, 53:10, 54:18, 54:21, 55:5, 55:8, 55:9, 56:6, 57:5, 61:11, 61:24, 66:4, 66:13, 67:11, 70:17, 70:22, 75:8, 75:14, 76:7, 77:17, 83:17, 89:5, 90:14, 94:4, 94:9, 96:18, 100:21, 109:16, 134:20, 155:19, 157:5
**partially** [2] - 16:8, 18:7
**participant** [2] - 55:1, 82:15
**particular** [14] - 21:18, 22:9, 22:13, 38:1, 39:20, 52:11, 54:3, 74:9, 77:18, 84:25, 119:15, 127:21, 128:6, 144:9
**particularly** [2] - 8:12, 77:22
**pass** [1] - 127:21
**passed** [4] - 45:24, 46:5, 80:20, 84:2
**past** [1] - 8:6
**Pat** [66] - 9:1, 11:5, 11:9, 11:14, 11:23, 12:10, 12:17, 12:20, 13:1, 13:2, 13:15, 14:3, 15:1, 15:2, 19:23, 20:1, 20:14, 20:19, 22:4, 22:5, 23:2, 27:10, 28:1, 28:13, 28:24, 29:3, 29:8, 29:19, 30:10, 30:14, 30:15, 30:20, 31:3, 31:7, 32:13, 32:15, 33:14, 33:15, 33:17, 36:5, 36:17, 37:4, 37:16, 37:17, 37:20, 37:23, 39:4, 39:22, 39:23, 40:8, 40:25, 41:3, 41:6, 41:10, 41:16, 41:22, 41:24, 41:25, 42:13, 42:14, 116:17, 116:21, 117:11, 137:13, 137:17
**Pat's** [6] - 13:20, 22:7, 28:25, 29:13, 149:21, 150:12
**path** [1] - 66:17
**patient** [1] - 156:8
**patients** [1] - 22:16
**PATRICIA** [2] - 2:3, 160:7
**PATRICK** [2] - 1:7, 1:18
**Patrick** [15] - 4:11, 4:17, 13:9, 14:16, 14:18, 19:18, 25:25, 26:1, 26:16, 32:5, 32:19, 33:4, 33:6, 33:13, 153:2
**Pause** [1] - 5:7
**paying** [1] - 116:22
**PDFs** [2] - 59:17, 60:20
**pedigree** [3] - 59:13, 63:5, 63:7
**pedigrees** [5] - 57:20, 59:7, 59:24, 60:2, 60:10
**people** [26] - 30:10, 30:14, 30:20, 32:14, 33:16, 48:5, 54:11, 54:14, 55:15, 59:22, 75:13, 79:17, 79:19, 79:25, 80:3, 81:9, 82:14, 83:21, 98:19, 100:10, 123:14, 123:15, 123:22, 131:4, 131:8, 146:8
**people's** [2] - 49:23, 77:23
**percent** [1] - 102:13
**period** [11] - 17:4, 21:1, 43:16, 48:24, 62:18, 63:11, 76:17, 96:23, 112:11, 137:10, 156:20
**permission** [1] - 74:10
**person** [19] - 14:7, 38:8, 43:11, 56:8, 57:17, 57:20, 64:13, 79:21, 80:12, 80:13, 81:2, 114:18, 114:19, 117:15, 117:17, 117:22, 133:10, 150:24
**person's** [1] - 131:5
**personal** [1] - 77:2
**perspective** [1] - 144:6
**Peter** [13] - 14:19, 23:13, 23:18, 24:4, 24:9, 80:12, 128:25, 129:3, 129:11, 133:7, 140:5, 140:6, 140:7
**Ph** [1] - 1:19
**Pharm/alert** [3] - 95:16, 96:5, 100:9
**Pharma** [1] - 37:23
**Pharmaceutical** [1] - 37:9
**pharmaceutical** [1] - 125:7
**pharmaceuticals** [2] - 64:16, 101:4
**pharmacies** [3] - 127:9, 130:7, 130:9
**pharmacy** [17] - 6:18, 20:15, 63:8, 63:19, 64:21, 66:2, 92:22, 125:12, 135:9, 135:11, 135:13, 135:16, 135:24, 136:14, 137:10, 138:15, 138:17
**Pharmacy** [4] - 69:14, 69:15, 69:16, 136:23
**philanthropic** [1] - 58:11
**phone** [4] - 74:5, 90:17, 114:10, 120:19
**photo** [7] - 7:15, 7:18, 8:1, 8:4, 8:20, 9:12, 10:19
**photograph** [1] - 8:24
**photos** [1] - 10:21
**photoshop** [1] - 114:17
**physical** [3] - 6:22, 7:14, 35:1
**pick** [1] - 43:9
**picked** [2] - 45:24, 46:6
**picture** [3] - 9:5, 31:11, 35:3
**piece** [1] - 61:7
**pill** [2] - 101:6, 103:13
**pills** [4] - 15:4, 93:10, 98:15
**place** [19] - 44:22, 45:16, 48:2, 48:3, 63:7, 64:2, 64:3, 74:4, 78:19, 84:12, 85:16, 85:22, 98:3, 101:11, 120:14, 128:7, 134:5, 140:7, 141:20
**placed** [1] - 118:17
**places** [1] - 70:19
**plaintiff** [1] - 146:5
**plan** [1] - 115:12
**plant** [1] - 35:1
**plate** [2] - 122:22, 124:20
**platform** [4] - 15:20, 15:21, 60:21, 63:14
**play** [2] - 79:10, 79:11
**played** [1] - 77:6
**plenty** [1] - 42:9
**PM** [5] - 1:6, 86:16, 159:17
**PO** [1] - 116:14
**POGOZELSKI** [84] - 4:8, 4:21, 4:24, 5:12, 6:19, 8:21, 9:15, 9:21, 10:15, 12:6, 14:22, 15:7, 17:21, 18:20, 19:2, 19:7, 19:14, 20:9, 21:22, 21:25, 23:17, 25:12, 27:5, 29:4, 30:17, 31:4, 32:21, 33:8, 33:19, 38:12, 39:6, 39:14, 40:21, 41:13, 42:21, 46:2, 46:15, 46:21, 51:9, 53:23, 58:5, 58:12, 61:21, 67:22, 75:23, 77:10, 81:18, 84:21, 85:7, 86:25, 87:9, 91:14, 91:24, 92:15, 93:21, 95:12, 99:1, 99:14, 100:3, 102:8, 102:21, 103:14, 103:25, 105:18, 108:20, 112:2, 119:5, 121:23, 123:24, 136:17, 137:3, 139:24, 148:3, 149:23, 151:21, 152:13, 153:15, 153:23, 154:18, 155:14, 159:4, 159:7, 159:9, 159:12
**Pogozelski** [1] - 1:13
**point** [50] - 27:2, 36:9, 58:1, 65:12, 66:5, 66:22, 72:11, 78:21, 78:24, 79:4, 79:11, 80:20, 81:2, 88:11,

89:23, 91:7, 91:22, 92:4, 92:9, 97:23, 98:6, 100:20, 105:24, 106:4, 106:11, 109:20, 110:7, 115:14, 119:18, 120:7, 120:21, 121:22, 122:14, 122:25, 123:4, 123:10, 123:12, 123:17, 124:7, 124:25, 125:6, 130:1, 130:16, 132:25, 134:6, 137:20, 137:24, 140:6, 148:1
**pointed** [1] - 42:10
**pointing** [2] - 76:5, 76:7
**points** [1] - 157:20
**polling** [2] - 5:11, 87:8
**portal** [4] - 61:2, 63:24, 135:19, 138:14
**position** [4] - 88:21, 89:3, 89:14, 125:14
**positive** [4] - 78:22, 78:24, 79:2, 145:5
**possibilities** [1] - 154:8
**Possible** [1] - 37:20
**possible** [4] - 14:1, 37:24, 72:9, 76:25
**possibly** [16] - 38:24, 39:1, 39:3, 70:24, 72:6, 88:19, 100:19, 101:20, 102:14, 103:4, 110:22, 120:15, 142:25, 147:5, 150:10, 152:11
**potential** [1] - 121:8
**potentially** [2] - 122:10, 154:5
**praised** [1] - 154:22
**preconditions** [1] - 16:6
**predominantly** [1] - 98:22
**preparation** [1] - 88:5
**prepare** [1] - 87:22
**prepared** [2] - 48:15, 85:3
**presence** [7] - 5:10, 5:17, 7:22, 86:6, 87:7, 87:14, 158:15
**present** [5] - 4:3, 73:16, 86:20
**presented** [6] - 9:18, 56:4, 80:17, 127:4, 128:6, 128:9
**preserve** [1] - 43:12
**president** [1] - 157:6
**pressing** [1] - 61:10
**pressure** [4] - 59:4, 125:24, 126:19, 126:20
**pretty** [9] - 15:5, 56:19, 73:21, 73:24, 92:8, 93:12, 95:10, 117:12, 125:11
**prevented** [1] - 10:21
**previous** [2] - 15:21, 78:19
**previously** [2] - 8:3, 49:10
**primarily** [3] - 16:10, 39:19, 134:3
**problem** [16] - 24:14, 24:25, 25:10, 29:2, 29:8, 37:20, 37:24, 57:19, 64:7, 72:17, 92:13, 92:23, 98:14, 113:25, 115:9, 121:20
**problematic** [3] - 44:11, 83:11, 109:17
**problems** [6] - 23:23, 45:14, 55:23, 79:1, 79:4, 79:7
**procedure** [2] - 126:11, 126:18
**proceed** [3] - 117:2, 118:4, 120:20
**proceeding** [1] - 145:22
**proceedings** [3] - 5:7, 86:17, 160:3
**process** [15] - 10:11, 10:14, 26:21, 35:23, 51:20, 52:25, 53:3, 58:3, 70:22, 126:6, 136:12, 138:3, 138:7, 138:8, 138:17
**processing** [3] - 17:10, 64:13, 125:1
**processor** [1] - 159:2
**product** [12] - 34:2, 34:17, 47:12, 64:9, 93:9, 100:10, 118:9, 126:10, 135:12, 138:1, 139:13, 139:14
**products** [10] - 12:19, 30:22, 30:23, 92:14, 116:20, 156:4, 156:5, 156:8, 156:9, 156:10
**professionally** [1] - 104:10
**program** [6] - 15:13, 15:18, 15:24, 16:3, 16:5, 19:1
**programmed** [1] - 16:18
**progressing** [1] - 95:15
**project** [3] - 39:20, 98:5, 155:19
**pronoun** [1] - 61:11
**pronounce** [2] - 80:23, 114:5
**pronounced** [1] - 80:25
**properly** [1] - 89:4
**proponents** [1] - 122:11
**proposed** [1] - 158:25
**prosecutor** [4] - 32:18, 32:25, 33:3, 108:11
**prospective** [1] - 70:19
**protecting** [1] - 118:19
**proud** [1] - 156:22
**provide** [12] - 21:14, 45:3, 45:11, 46:25, 59:23, 83:4, 88:13, 88:22, 89:22, 121:10, 133:23, 139:8
**provided** [19] - 21:19, 24:2, 37:18, 47:4, 59:22, 61:8, 88:14, 97:20, 114:10, 114:20, 115:18, 127:4, 134:2, 134:12, 136:10, 143:20, 151:20
**providing** [3] - 116:3, 133:24, 157:16
**publicly** [2] - 96:3, 154:22
**Puerto** [2] - 32:10, 114:3
**pull** [9] - 7:5, 11:13, 35:11, 37:6, 51:7, 63:16, 63:18, 63:20, 138:6
**pulling** [2] - 23:10, 138:9
**purchase** [1] - 16:14
**purchased** [3] - 24:6, 24:24, 138:15
**purchases** [1] - 125:2
**purchasing** [7] - 17:10, 69:23, 70:8, 70:21, 116:24, 120:22, 127:10
**purpose** [2] - 84:19, 132:1
**pursuing** [1] - 72:8
**purview** [1] - 22:22
**push** [1] - 19:12
**pushed** [1] - 59:1
**put** [24] - 16:5, 16:25, 18:11, 19:1, 41:9, 42:2, 42:13, 42:17, 42:19, 43:12, 44:15, 44:20, 48:23, 67:5, 88:17, 97:14, 123:18, 124:20, 125:14, 125:24, 138:10, 139:19, 139:23, 145:10

**Q**

**quality** [2] - 93:9, 156:10
**quantity** [1] - 78:13
**quarterly** [1] - 77:17
**question-wise** [1] - 83:16
**questioning** [1] - 68:22
**questions** [11] - 46:9, 49:2, 80:4, 81:25, 82:3, 82:20, 82:23, 147:1, 152:2, 152:4, 152:8
**quick** [4] - 4:8, 38:9, 107:2, 117:19
**quicker** [1] - 59:1
**quickly** [4] - 96:3, 96:5, 96:7, 125:11
**quite** [6] - 14:15, 55:18, 70:13, 110:5, 123:18, 126:7

**R**

**raid** [1] - 73:15
**raised** [3] - 7:25, 101:14, 114:8
**range** [1] - 138:23
**Rapid's** [4] - 38:25, 42:16, 110:2, 111:15
**rather** [2] - 40:9, 116:24
**re** [1] - 93:2
**re-involved** [1] - 93:2
**reach** [3] - 57:22, 90:22, 131:8
**reached** [2] - 66:19, 82:9
**reaching** [3] - 26:7, 71:10, 105:9
**reaction** [1] - 133:1
**read** [6] - 11:24, 18:1, 34:9, 48:7, 74:17, 104:20
**reading** [1] - 17:15
**ready** [2] - 87:22, 116:13
**real** [5] - 10:6, 25:7, 73:8, 107:2, 158:8
**real-time** [2] - 25:7, 158:8
**realize** [1] - 107:21
**realized** [2] - 57:19, 123:21
**really** [17] - 15:24, 22:22, 30:13, 57:8, 59:19, 69:1, 91:6, 93:13, 98:11, 100:10, 108:16, 110:18, 115:3, 115:15, 130:2, 130:6, 135:18
**reason** [13] - 22:14, 34:3, 34:6, 53:13, 54:3, 64:6, 68:23, 93:1, 119:9, 131:2, 136:9, 137:1, 143:1
**reasonable** [2] - 68:21, 68:22
**reasons** [8] - 43:25, 45:22, 48:23, 58:2, 58:11, 66:13, 127:15, 127:17
**receive** [5] - 23:9, 39:5, 125:6, 126:9, 126:12
**received** [12] - 6:6, 26:15, 37:19, 39:10, 77:20, 92:21, 119:22, 131:15, 135:11, 135:12, 135:13, 138:1
**receives** [1] - 135:16
**receiving** [4] - 21:2, 134:18, 139:7, 139:13
**recently** [1] - 67:13
**recess** [5] - 86:4, 86:14, 158:13, 159:6, 159:15
**reciprocal** [1] - 69:12
**recognize** [4] - 7:12, 9:25, 47:10, 80:14
**recollection** [22] - 17:16, 31:22, 34:6, 35:18, 35:23, 35:25, 39:24, 40:1, 62:2, 74:16, 74:18, 74:21, 78:2, 78:11, 111:23, 112:6, 112:10, 112:21, 132:18,

148:15, 148:17
**record** [4] - 4:2, 4:16, 86:16, 86:19
**records** [7] - 26:13, 40:5, 65:24, 65:25, 102:15, 140:1
**red** [3] - 7:25, 8:4, 8:8
**reduce** [1] - 126:19
**redundant** [1] - 80:5
**reference** [1] - 145:11
**referencing** [2] - 106:6, 125:4
**referring** [1] - 112:19
**reflected** [1] - 63:13
**refresh** [16] - 17:16, 18:6, 31:21, 34:5, 34:13, 35:18, 35:23, 35:25, 39:24, 40:1, 74:16, 78:2, 79:24, 112:10, 112:21, 148:17
**refreshed** [5] - 74:18, 74:22, 78:11, 132:12, 132:18
**refreshes** [4] - 18:2, 34:10, 112:6, 148:15
**refund** [1] - 22:20
**refunded** [1] - 22:19
**refused** [1] - 151:6
**refusing** [1] - 149:21
**regarding** [3] - 26:2, 83:8, 120:19
**registration** [4] - 6:14, 16:14, 53:4, 106:14
**regular** [1] - 120:16
**regularly** [1] - 76:20
**regulated** [1] - 143:5
**regulation** [1] - 142:12
**regulations** [1] - 144:6
**regulatory** [11] - 81:16, 141:11, 141:18, 142:2, 143:4, 143:7, 143:17, 143:22, 143:23, 143:25, 144:1
**relate** [2] - 4:14, 44:17
**related** [4] - 50:22, 79:7, 85:13, 101:9
**relating** [14] - 51:6, 72:3, 82:11, 101:4, 104:13, 112:1, 113:15, 115:2, 115:15, 115:16, 116:4, 118:7, 122:23, 145:22
**relationship** [9] - 36:12, 37:10, 77:15, 78:21, 85:11, 110:24, 118:2, 144:9, 144:11
**relatively** [1] - 27:4
**relayed** [1] - 36:17
**Relevance** [1] - 77:11
**relevance** [1] - 67:23
**rely** [1] - 18:14
**remarkable** [1] - 69:1
**remedy** [1] - 126:4
**remember** [81] - 6:11, 9:9, 11:18, 12:25, 18:13, 19:6, 23:13, 23:16, 23:21, 23:24, 26:4, 28:18, 33:1, 34:3, 36:2, 36:23, 36:24, 38:3, 38:8, 40:12, 40:15, 44:16, 45:19, 56:13, 61:6, 61:24, 63:14, 67:4, 67:10, 68:20, 69:2, 72:6, 73:11, 73:14, 74:5, 74:8, 74:9, 77:18, 77:25, 78:13, 78:15, 79:17, 83:6, 83:13, 84:2, 84:8, 84:24, 85:17, 85:19, 86:5, 88:4, 88:14, 88:19, 90:16, 90:20, 95:24, 101:22, 102:5, 103:6, 103:9, 104:11, 104:19, 105:2, 105:11, 105:19, 105:20, 105:21, 105:22, 108:11, 111:7, 112:24, 120:14, 130:19, 131:5, 144:17, 144:19, 146:15, 146:20, 158:14
**remembered** [1] - 18:15
**reminded** [1] - 85:20
**repeat** [2] - 51:22, 151:14
**repeated** [1] - 73:2
**repeatedly** [1] - 105:9
**rephrase** [3] - 92:1, 94:7, 106:10
**replied** [1] - 89:23
**reply** [2] - 89:24, 90:5
**report** [6] - 23:10, 26:3, 36:25, 37:3, 37:12, 85:15
**REPORTED** [1] - 2:2
**reported** [1] - 18:15
**Reporter** [2] - 2:3, 160:7
**reports** [2] - 80:3, 138:9
**representation** [1] - 103:11
**representatives** [1] - 79:14
**representing** [9] - 81:4, 81:7, 90:12, 91:3, 92:9, 121:4, 150:8, 156:10
**request** [10] - 13:20, 14:16, 15:2, 24:10, 24:22, 25:8, 28:25, 36:5, 36:8, 83:8
**requested** [5] - 16:17, 16:25, 45:13, 45:20, 149:10
**required** [3] - 128:2, 130:13, 145:12
**requirement** [2] - 140:12, 140:21
**requirements** [3] - 141:11, 143:4, 144:4
**requires** [11] - 27:6, 46:3, 51:10, 58:6, 84:22, 85:8, 91:14, 93:22, 99:1, 100:4, 154:19
**resembled** [1] - 137:22
**residential** [1] - 7:22
**resignation** [1] - 145:2
**resolution** [1] - 130:2
**respond** [4] - 69:11, 82:9, 96:8, 116:16
**responded** [8] - 26:12, 36:11, 72:14, 84:12, 97:8, 101:15, 118:5, 129:24
**responding** [3] - 73:5, 78:8, 121:4
**responds** [2] - 102:3, 140:11
**response** [38] - 13:25, 14:2, 29:13, 30:13, 30:14, 30:20, 31:2, 36:15, 37:19, 69:22, 71:24, 82:6, 82:7, 82:12, 87:22, 87:25, 88:3, 89:6, 89:24, 89:25, 91:12, 94:20, 96:3, 96:10, 96:12, 96:14, 96:15, 97:1, 98:7, 100:21, 100:22, 102:5, 102:15, 115:8, 117:19, 131:12, 131:15, 133:3
**responses** [4] - 84:13, 97:10, 97:14, 101:2
**responsibilities** [4] - 49:23, 62:18, 65:16, 93:8
**responsibility** [7] - 61:17, 63:16, 63:17, 63:22, 69:10, 71:7, 85:14
**responsible** [5] - 8:25, 49:22, 61:12, 75:9, 75:14
**rest** [2] - 4:18, 159:10
**result** [6] - 7:25, 8:4, 15:1, 26:6, 85:2, 85:6
**retrospect** [2] - 123:21, 128:12
**retrospectively** [1] - 49:5
**returns** [1] - 15:4
**review** [1] - 4:12
**reviewed** [2] - 88:3, 104:23
**reviewing** [1] - 117:14
**Richard** [1] - 29:19
**Rico** [2] - 32:10, 114:3
**rid** [1] - 109:16
**ring** [1] - 89:11
**rise** [5] - 86:8, 86:15, 86:18, 87:5, 158:18
**road** [1] - 110:18
**role** [1] - 122:22
**room** [2] - 86:7, 118:8
**RPR** [2] - 2:3, 160:7
**rules** [2] - 140:14, 140:23
**Rumore** [16] - 80:25, 81:1, 82:7, 82:15, 84:12, 89:13, 90:18, 91:6, 92:8, 93:1, 94:13, 101:3, 101:15, 103:12, 105:9, 144:8

## S

**safe** [5] - 12:22, 56:16, 100:10, 156:5, 156:7
**Safe** [177] - 7:20, 10:22, 15:20, 16:6, 16:17, 16:23, 16:24, 22:19, 24:4, 24:5, 24:10, 24:22, 25:5, 25:8, 33:17, 34:1, 34:6, 34:13, 34:16, 38:7, 40:9, 41:1, 41:3, 41:11, 42:3, 42:14, 43:17, 46:10, 47:20, 48:4, 48:5, 49:19, 51:8, 51:14, 52:1, 54:18, 56:4, 56:14, 56:22, 57:3, 59:8, 59:14, 59:21, 59:23, 60:3, 60:4, 60:10, 60:15, 60:20, 60:24, 61:11, 62:14, 63:6, 64:15, 64:20, 64:23, 65:11, 70:18, 70:22, 73:15, 73:21, 76:17, 78:24, 80:9, 80:16, 81:2, 81:4, 81:7, 82:9, 83:2, 83:14, 87:22, 88:12, 88:18, 88:20, 89:1, 89:3, 89:6, 89:14, 90:5, 90:12, 91:3, 91:19, 92:5, 92:9, 92:17, 92:21, 92:22, 93:8, 94:2, 95:11, 95:20, 95:22, 96:7, 97:5, 97:20, 98:7, 98:10, 98:11, 99:25, 100:14, 100:16, 100:25, 102:4, 104:16, 106:21, 107:7, 109:16, 109:24, 110:23, 112:13, 112:25, 115:24, 116:2, 116:24, 118:20, 119:3, 119:18, 119:22, 120:8, 120:22, 121:4, 121:9, 121:12, 121:15, 121:17, 121:21, 122:6, 122:8, 122:15, 122:17, 123:9, 123:16, 123:22, 124:8, 125:6, 126:8, 126:11, 126:13, 128:6, 128:9, 128:16, 134:2, 134:17, 134:21, 135:8, 135:11, 135:12, 135:23, 135:24, 136:4, 136:14, 136:23, 137:10, 137:22, 138:3, 138:15, 140:21, 142:19, 143:5, 145:22, 146:1, 150:18, 152:22, 152:24, 154:22, 155:1, 155:17, 155:24, 156:3, 156:4, 157:6
**safety** [1] - 156:8
**sage** [1] - 12:22
**sale** [3] - 63:12, 64:17, 64:21
**Salemi** [3] - 114:18, 117:17, 118:3
**sales** [10] - 59:2,

60:17, 61:16, 63:15, 64:12, 116:8, 125:20, 131:7, 134:4, 138:9
**Sales** [1] - 37:23
**salesman** [1] - 20:4
**salespeople** [3] - 58:19, 58:22, 58:25
**salesperson's** [1] - 63:22
**sample** [1] - 116:19
**sat** [2] - 146:23, 155:21
**satisfied** [2] - 44:3, 134:11
**saw** [14] - 7:15, 8:20, 12:12, 31:11, 49:4, 55:22, 66:25, 84:4, 90:14, 95:11, 114:24, 127:17, 130:21
**scientific** [3] - 40:16, 40:20, 42:18
**scroll** [11] - 26:10, 52:6, 67:14, 70:4, 109:4, 109:9, 111:3, 113:18, 116:7, 139:19, 140:9
**scrolled** [1] - 48:9
**search** [1] - 113:5
**searching** [1] - 102:25
**second** [12] - 6:4, 11:16, 11:24, 20:2, 22:25, 25:21, 28:11, 59:20, 113:12, 127:16, 127:22, 128:1
**SECURITY** [5] - 86:8, 86:15, 86:18, 87:5, 158:18
**see** [39] - 7:2, 12:23, 13:3, 14:5, 23:7, 25:10, 28:9, 28:12, 28:15, 29:16, 30:4, 30:11, 30:25, 34:10, 35:3, 35:17, 61:8, 68:4, 76:24, 78:2, 83:15, 86:6, 86:11, 102:15, 107:16, 112:21, 115:10, 115:18, 116:11, 117:14, 117:17, 118:5, 121:8, 133:24, 148:15, 158:15, 158:17, 158:22
**seeing** [3] - 117:11, 127:5, 132:22
**seem** [2] - 124:5, 144:18
**selling** [7] - 59:23, 63:6, 63:8, 64:15, 121:12, 139:13, 156:9
**send** [14] - 9:11, 23:10, 24:5, 24:23, 25:9, 60:4, 60:10, 60:11, 61:3, 63:7, 69:5, 71:18, 117:10, 131:21
**sending** [8] - 26:1, 63:5, 64:20, 64:23, 117:12, 131:24, 137:17, 137:21
**sends** [1] - 52:8
**sense** [3] - 107:5, 107:6, 127:13
**sent** [39] - 9:5, 13:15, 15:1, 22:4, 26:19, 27:10, 37:23, 39:22, 52:23, 54:9, 65:1, 83:17, 84:5, 85:3, 96:5, 96:7, 100:22, 102:16, 103:8, 109:20, 109:22, 111:7, 112:8, 112:11, 116:14, 116:24, 130:24, 131:13, 131:18, 134:21, 134:24, 134:25, 135:2, 136:22, 137:9, 137:10, 137:18, 137:25
**sentence** [1] - 16:22
**September** [8] - 11:15, 13:8, 13:19, 14:14, 20:25, 23:8, 72:21, 101:10
**series** [5] - 44:21, 45:6, 47:14, 79:13, 100:24
**seriously** [1] - 50:1
**servers** [1] - 4:13
**set** [9] - 17:5, 19:19, 29:22, 29:25, 68:9, 116:12, 127:22, 128:1, 128:2
**setup** [1] - 118:7
**several** [5] - 38:9, 42:10, 104:21, 104:23, 131:4
**shared** [2] - 4:10, 106:2
**sheet** [3] - 116:2, 116:8, 116:11
**ship** [2] - 69:9, 126:14
**shipped** [2] - 20:20, 22:14
**shop** [1] - 124:20
**Shoppe** [4] - 101:5, 101:6, 103:2, 103:13
**shot** [1] - 114:17
**shoulder** [1] - 125:21
**show** [5] - 51:16, 66:18, 109:2, 114:13, 135:23
**showed** [1] - 135:12
**showing** [2] - 107:5, 107:12
**shown** [4] - 67:11, 70:9, 96:1, 96:2
**sic** [1] - 29:21
**side** [6] - 17:11, 17:12, 52:8, 64:12, 64:13, 149:16
**sides** [1] - 149:18
**sign** [1] - 115:24
**signed** [1] - 101:3
**significant** [1] - 73:21
**similar** [2] - 140:12, 140:22
**simple** [1] - 42:12
**sitting** [2] - 21:24, 153:1
**situation** [8] - 10:5, 75:18, 94:21, 101:23, 118:16, 119:1, 141:22, 151:19
**skip** [1] - 32:1
**slide** [1] - 107:15
**slip** [1] - 155:24
**slow** [1] - 21:21
**small** [1] - 60:19
**sneaky** [2] - 56:24, 57:5
**so..** [1] - 107:14
**software** [8] - 15:20, 16:20, 16:22, 60:5, 60:21, 61:8, 63:14, 64:10
**sold** [4] - 30:7, 30:8, 64:11, 92:22
**solves** [1] - 115:9
**someone** [9] - 12:19, 28:14, 31:3, 117:16, 130:20, 132:21, 133:6, 136:16, 150:8
**sometime** [9] - 9:7, 9:9, 66:18, 85:5, 87:19, 106:11, 108:5, 130:17, 132:5
**sometimes** [2] - 81:10, 128:1
**somewhat** [1] - 104:10
**somewhere** [2] - 61:3, 138:10
**sons** [1] - 77:6
**soon** [1] - 15:3
**sorry** [40] - 16:9, 28:4, 33:23, 37:22, 41:19, 43:7, 44:18, 49:18, 51:22, 52:4, 62:6, 67:15, 70:15, 74:21, 78:6, 88:19, 89:18, 89:20, 92:19, 94:7, 99:6, 103:20, 104:22, 106:10, 107:11, 107:18, 111:17, 114:23, 129:2, 133:5, 135:14, 138:5, 142:14, 151:14, 152:1, 152:19, 153:3, 154:14, 155:6, 159:12
**sort** [7] - 36:6, 44:9, 44:21, 45:17, 48:23, 79:25, 101:22
**sorts** [1] - 97:5
**sound** [2] - 143:1, 156:2
**sounds** [5] - 15:5, 33:5, 66:21, 98:1, 102:18
**Southern** [3] - 120:1, 121:1, 160:8
**SOUTHERN** [1] - 1:2
**Spanish** [2] - 32:13, 32:14
**speaking** [3] - 87:23, 112:4, 117:11
**speaks** [1] - 12:7
**specific** [1] - 63:18
**specifically** [1] - 41:16
**speculation** [13] - 14:23, 27:6, 46:3, 51:10, 58:6, 84:22, 85:8, 91:14, 93:22, 99:1, 100:4, 123:25, 154:19
**speed** [1] - 134:14
**spend** [1] - 15:17
**spent** [1] - 65:6
**spot** [2] - 85:25, 158:10
**spring** [3] - 101:15, 120:17, 123:7
**stake** [1] - 58:3
**stand** [1] - 68:24
**standing** [1] - 83:20
**standpoint** [1] - 96:16
**start** [6] - 10:10, 54:14, 78:6, 115:21, 135:5, 137:24
**started** [10] - 45:17, 61:19, 66:17, 79:20, 107:7, 127:3, 127:5, 129:11, 130:23, 137:21
**state** [3] - 69:12, 70:20, 156:6
**statement** [3] - 89:20, 141:4, 153:7
**STATES** [3] - 1:1, 1:4, 1:11
**States** [7] - 1:15, 2:4, 117:23, 152:23, 152:25, 153:2, 160:8
**status** [2] - 66:23, 67:2
**stayed** [1] - 150:23
**STENOGRAPHICALLY** [1] - 2:2
**step** [1] - 59:20
**steps** [3] - 6:9, 36:6, 36:16
**still** [12] - 5:2, 26:23, 72:24, 79:1, 83:2, 84:1, 86:21, 92:8, 95:10, 122:10, 122:15, 123:5
**stipulation** [2] - 4:11, 4:13
**stood** [2] - 7:17, 144:24
**stop** [16] - 8:10, 18:11, 19:1, 19:12, 34:1, 34:4, 41:22, 41:24, 42:1, 42:15, 42:19, 108:3, 108:5, 125:22, 126:18, 128:14
**stopped** [5] - 34:6, 34:13, 34:16, 87:18, 108:9
**stops** [1] - 107:22
**story** [2] - 23:24, 130:12
**Street** [2] - 1:16, 1:19
**strip** [1] - 7:24
**strong** [1] - 76:16
**structure** [1] - 77:18
**stuff** [2] - 44:15, 80:4
**stupid** [1] - 142:24
**subject** [3] - 71:20, 83:6, 83:11
**submit** [4] - 36:25, 37:12, 59:23, 64:20
**submitted** [5] - 80:15, 89:24, 96:18, 97:1, 127:22
**submitting** [1] - 62:14
**subpoena** [9] - 119:22, 119:25, 120:25, 121:5, 122:5, 145:16, 145:18, 152:18,

152:20
**subsequent** [2] - 84:19, 110:11
**substances** [2] - 16:11, 16:14
**success** [1] - 58:4
**successful** [1] - 118:19
**succession** [1] - 38:10
**suck** [1] - 30:10
**sudden** [1] - 95:16
**sufficient** [1] - 128:9
**suggest** [1] - 89:13
**suggested** [2] - 41:10, 71:10
**suggesting** [1] - 70:17
**suggests** [1] - 10:7
**suing** [1] - 151:11
**summer** [4] - 73:19, 120:17, 123:7, 137:23
**super** [1] - 55:6
**supervisor** [2] - 66:4, 95:2
**supplies** [1] - 70:1
**supplying** [1] - 130:4
**support** [3] - 75:19, 126:22, 130:14
**supporter** [1] - 76:16
**supposed** [6] - 5:6, 15:22, 62:13, 117:9, 126:21
**supposedly** [5] - 14:21, 64:3, 114:18, 127:10, 130:5
**surfacing** [2] - 79:4, 79:7
**suspicion** [1] - 121:18
**sustained** [35] - 6:20, 8:22, 9:16, 9:22, 10:17, 14:24, 17:24, 19:4, 19:9, 19:16, 22:2, 27:7, 29:6, 30:18, 31:5, 33:10, 39:8, 39:16, 40:23, 46:17, 46:22, 51:11, 58:14, 85:9, 91:16, 93:23, 95:13, 102:10, 102:23, 108:22, 119:7, 121:25, 153:25, 154:20, 155:15
**switch** [1] - 15:21
**switched** [1] - 73:10
**sworn** [1] - 5:21
**Synergy** [23] - 34:19, 34:22, 36:12, 37:10, 37:18, 38:1, 38:23, 39:5, 39:10, 40:10, 41:7, 42:1, 42:15, 110:2, 110:5, 110:7, 113:15, 113:25, 115:2, 115:15, 116:4, 119:19, 119:20
**system** [14] - 16:18, 16:25, 17:5, 19:20, 59:16, 59:22, 60:1, 60:5, 61:17, 63:13, 64:10, 68:9, 70:18, 70:23

**T**

**T3** [58] - 20:21, 21:8, 22:5, 23:4, 26:7, 28:22, 29:25, 31:8, 32:15, 33:4, 33:6, 36:11, 36:12, 36:21, 37:11, 37:17, 39:5, 39:10, 39:12, 39:18, 59:13, 60:23, 63:5, 63:7, 64:7, 64:16, 64:20, 64:21, 83:9, 115:17, 116:19, 124:17, 124:22, 125:9, 126:9, 126:12, 127:21, 127:22, 128:5, 132:3, 133:6, 133:25, 135:11, 135:18, 136:13, 136:22, 136:24, 137:22, 138:11, 138:18, 139:11, 140:19, 141:3, 157:18, 157:20, 158:5
**T3s** [69] - 13:3, 13:10, 13:20, 14:5, 14:6, 14:13, 14:19, 14:20, 20:16, 21:2, 21:13, 21:15, 21:19, 23:9, 23:11, 23:14, 23:23, 23:25, 24:11, 24:25, 28:19, 28:25, 30:23, 32:5, 36:3, 39:4, 40:2, 40:4, 57:19, 59:7, 59:23, 60:10, 61:12, 61:15, 61:17, 62:4, 62:7, 62:14, 63:16, 63:18, 64:5, 64:23, 65:1, 65:7, 65:11, 65:12, 66:20, 88:13, 88:22, 110:12, 124:16, 125:1, 126:14, 127:4, 132:22, 134:4, 134:9, 134:11, 134:15, 134:17, 134:21, 134:24, 137:9, 139:7, 139:13, 139:14, 140:17, 154:2, 157:17
**table** [1] - 117:24
**team** [15] - 47:20, 52:7, 52:8, 59:18, 60:20, 71:5, 79:22, 80:11, 81:9, 83:18, 90:11, 105:12, 127:3, 131:7, 138:6
**team's** [2] - 61:16, 63:15
**Teams** [7] - 11:14, 20:1, 28:1, 67:1, 67:7, 72:5, 132:11
**teams** [2] - 73:10, 90:9
**telephone** [3] - 48:3, 118:8, 129:3
**template** [1] - 134:3
**ten** [6] - 90:3, 116:3, 148:23, 149:1, 149:20, 152:10
**tend** [1] - 43:15
**term** [1] - 60:10
**terminate** [1] - 110:24
**terminology** [2] - 60:7, 138:11
**terms** [2] - 116:21, 120:24
**testified** [12] - 5:22, 20:7, 26:20, 41:21, 41:23, 41:25, 53:4, 58:25, 145:21, 145:23, 146:1, 147:19
**testify** [2] - 112:7, 145:19
**testifying** [1] - 147:13
**testimony** [17] - 17:15, 18:14, 31:21, 34:5, 43:10, 51:6, 65:6, 67:1, 67:11, 70:11, 86:11, 141:8, 143:15, 149:11, 152:3, 158:21
**Tex** [2] - 110:3, 111:15
**text** [5] - 41:10, 72:5, 132:11, 133:20, 140:18
**texted** [1] - 133:21
**THE** [122] - 1:10, 1:13, 4:2, 4:20, 4:23, 4:25, 5:4, 5:5, 5:8, 5:10, 5:15, 6:20, 8:22, 9:16, 9:22, 10:17, 12:8, 14:24, 15:9, 17:20, 17:24, 18:22, 19:4, 19:9, 19:16, 20:11, 22:2, 23:19, 25:14, 27:7, 29:6, 30:18, 31:5, 32:23, 33:10, 33:21, 33:23, 35:13, 35:15, 35:20, 38:14, 39:8, 39:16, 40:23, 41:15, 42:23, 43:1, 46:4, 46:17, 46:22, 51:11, 53:25, 58:7, 58:14, 61:23, 67:24, 74:12, 75:25, 77:12, 78:5, 81:20, 84:23, 85:9, 85:25, 86:3, 86:8, 86:10, 86:15, 86:18, 86:19, 86:22, 86:23, 87:3, 87:5, 87:7, 87:12, 91:16, 92:2, 93:23, 95:13, 99:3, 99:16, 100:5, 102:10, 102:23, 103:16, 104:2, 105:20, 106:25, 107:15, 108:22, 111:16, 111:18, 112:6, 119:7, 121:25, 122:3, 124:1, 132:15, 136:19, 137:5, 139:18, 139:22, 140:1, 148:5, 148:13, 149:25, 151:23, 152:15, 153:17, 153:25, 154:20, 155:15, 158:10, 158:12, 158:18, 158:20, 158:23, 158:24, 159:5, 159:8, 159:14
**themselves** [3] - 113:2, 133:22, 136:16
**Thereupon** [1] - 5:19
**thinking** [1] - 75:13
**third** [2] - 6:4, 128:2
**thoughts** [2] - 43:13, 116:23
**thousands** [1] - 154:6
**three** [3] - 44:17, 84:5, 127:8
**timeline** [2] - 45:20, 47:14
**timely** [1] - 139:10
**timetable** [3] - 44:21, 45:11, 85:21
**timing** [1] - 52:20
**today** [7] - 11:8, 48:18, 48:21, 49:2, 62:2, 149:4, 159:10
**together** [4] - 77:4, 77:6, 82:6, 99:9
**tomorrow** [8] - 4:25, 140:8, 158:16, 158:17, 158:22, 159:6, 159:11, 159:12
**tone** [1] - 91:8
**tones** [1] - 80:10
**took** [15] - 13:23, 27:19, 37:15, 45:16, 48:2, 48:3, 50:1, 74:4, 84:11, 85:16, 85:22, 95:6, 98:3, 101:11, 120:14
**top** [7] - 15:2, 37:21, 48:15, 59:15, 79:23, 82:2, 113:14
**topic** [6] - 41:17, 71:2, 72:8, 75:16, 93:11, 93:12
**topics** [1] - 84:5
**touch** [1] - 28:14
**touched** [1] - 12:21
**toward** [2] - 76:7, 144:24
**towards** [2] - 80:9, 95:22
**Trace** [3] - 59:16, 60:15, 60:16
**track** [3] - 45:15, 115:11, 125:8
**Track** [3] - 59:16, 60:15, 60:16
**trading** [1] - 17:4
**traffic** [1] - 14:19
**trail** [1] - 12:21
**training** [1] - 12:11
**transaction** [25] - 22:9, 22:21, 60:18, 62:21, 63:7, 64:8, 64:12, 64:14, 125:22, 127:21, 127:23, 128:6, 128:10, 130:14, 135:8, 135:23, 135:24, 136:15, 138:2, 138:23, 141:7, 141:20, 143:8, 143:13
**transaction-to-transaction** [1] - 62:21
**transactions** [16] - 16:5, 18:11, 19:1, 19:12, 58:23, 64:19, 110:11, 127:12, 127:18, 128:22, 128:25, 141:5, 143:17, 153:10, 153:13, 157:23

**TRANSCRIPT** [1] - 1:10
**transcription** [1] - 160:3
**trial** [3] - 20:7, 145:19, 159:17
**TRIAL** [1] - 1:10
**tricked** [2] - 25:2, 25:4
**tried** [8] - 50:2, 57:8, 105:7, 120:25, 133:22, 157:10, 157:12, 157:15
**tries** [1] - 51:1
**truthful** [1] - 57:6
**try** [15] - 32:15, 45:20, 49:3, 55:5, 55:11, 57:13, 65:16, 66:19, 75:5, 79:24, 96:3, 129:24, 132:4, 140:7, 157:11
**trying** [26] - 28:14, 36:9, 44:16, 45:15, 46:6, 46:13, 47:20, 57:12, 57:23, 59:1, 66:10, 66:14, 66:17, 68:22, 74:15, 76:13, 83:9, 89:7, 94:5, 94:9, 119:3, 122:16, 123:15, 123:22, 130:23, 139:7
**turn** [2] - 57:20, 109:4
**turned** [1] - 110:18
**turns** [2] - 14:5, 110:12
**twelve** [2] - 148:24, 152:10
**two** [10] - 4:4, 12:18, 13:2, 15:4, 15:5, 38:17, 60:19, 60:22, 104:13, 110:2
**types** [1] - 56:3
**typical** [1] - 8:16
**typically** [4] - 53:15, 53:17, 54:10, 137:6

## U

**U.S** [2] - 117:22, 160:9
**ultimate** [1] - 124:13
**ultimately** [10] - 22:18, 34:1, 39:5, 49:14, 80:4, 87:25, 113:4, 118:19, 126:23, 135:16
**uncomfortable** [2] - 44:1, 56:24
**under** [8] - 5:3, 22:22, 54:17, 64:5, 86:21, 114:4, 114:14, 126:20
**understood** [2] - 62:11, 99:25
**unexpected** [2] - 4:19, 78:18
**unfamiliar** [2] - 26:21, 27:9
**unfolded** [1] - 101:23
**UNITED** [3] - 1:1, 1:4, 1:11
**United** [6] - 1:15, 2:4, 152:23, 152:25, 153:2, 160:8
**unless** [2] - 4:18, 115:9
**unlimited** [1] - 110:3
**unnecessary** [1] - 88:12
**unreasonable** [2] - 89:14, 89:17
**unsavory** [2] - 119:10, 123:21
**unusual** [1] - 7:21
**up** [76] - 6:3, 6:24, 7:1, 7:5, 7:9, 7:14, 7:15, 8:14, 8:25, 10:4, 11:13, 12:20, 15:2, 17:5, 19:24, 20:15, 22:25, 27:18, 27:23, 28:19, 28:25, 29:22, 30:1, 32:15, 35:11, 35:17, 37:6, 37:15, 39:23, 43:9, 45:9, 45:24, 46:6, 57:6, 61:15, 67:5, 67:15, 68:9, 71:20, 72:23, 80:18, 80:24, 81:21, 88:8, 88:11, 91:20, 93:7, 95:6, 105:1, 114:13, 114:14, 115:6, 115:24, 116:7, 116:8, 117:4, 117:18, 117:22, 118:5, 120:7, 120:17, 120:21, 121:21, 123:9, 124:4, 124:7, 125:6, 126:4, 130:13, 130:14, 134:14, 139:19, 144:24, 157:24
**up-to-date** [1] - 134:14
**up-to-speed** [1] - 134:14
**update** [5] - 4:21, 90:23, 91:1, 105:16, 134:21
**updated** [2] - 82:18, 138:12
**upset** [2] - 21:7, 73:24
**urgency** [1] - 140:19
**uses** [1] - 60:15

## V

**vacation** [2] - 73:16, 73:20
**vaguely** [1] - 37:1
**valid** [2] - 29:1, 40:5
**Value** [5] - 112:23, 113:8, 115:23, 117:11, 118:2
**value** [1] - 113:9
**variety** [1] - 110:21
**various** [4] - 42:10, 57:4, 70:1, 107:6
**vendor** [38] - 6:23, 9:19, 31:18, 32:2, 32:5, 34:22, 37:18, 38:1, 38:7, 38:18, 40:6, 54:12, 56:1, 59:10, 60:15, 60:23, 61:9, 62:13, 63:5, 66:1, 68:4, 69:21, 92:14, 106:8, 110:19, 112:18, 113:4, 113:8, 115:11, 117:10, 117:24, 118:7, 118:11, 118:13, 119:1, 119:15, 124:14
**vendors** [39] - 6:10, 8:6, 10:10, 36:7, 38:10, 38:11, 41:12, 42:4, 42:11, 55:6, 55:23, 56:3, 56:7, 56:14, 59:9, 59:16, 59:23, 60:3, 60:4, 60:19, 62:8, 62:9, 69:25, 70:7, 70:19, 79:10, 106:21, 107:7, 109:17, 109:24, 112:14, 112:17, 118:23, 119:19, 120:9, 120:23, 122:23, 123:14, 123:15
**verbiage** [2] - 95:24, 101:22
**verifiable** [1] - 39:13
**verification** [2] - 32:19, 35:22
**verified** [4] - 33:6, 35:5, 140:13, 140:23
**verify** [20] - 10:14, 12:21, 13:3, 14:5, 14:20, 16:11, 16:13, 26:7, 32:5, 32:15, 33:4, 36:3, 36:9, 37:17, 39:12, 39:18, 39:21, 40:2, 55:5, 83:9
**verifying** [1] - 110:10
**versed** [1] - 93:14
**versus** [1] - 152:23
**vetted** [1] - 118:10
**video** [1] - 155:17
**viewing** [2] - 7:18, 10:19
**voiced** [1] - 33:12
**Volume** [1] - 1:7
**vs** [1] - 1:6

## W

**wait** [1] - 91:7
**waiting** [1] - 4:4
**waive** [2] - 5:11, 87:8
**warehouse** [5] - 10:5, 15:22, 31:12, 64:9, 138:4
**warning** [1] - 8:9
**ways** [2] - 49:22, 118:18
**wearing** [1] - 95:3
**website** [2] - 114:9, 118:12
**week** [2] - 90:3, 117:23
**weekly** [1] - 62:25
**weeks** [2] - 127:8, 145:23
**welcome** [1] - 6:2
**well-being** [1] - 157:6
**well-versed** [1] - 93:14
**Whoa** [1] - 8:9
**whole** [6] - 27:1, 81:9, 107:16, 109:9, 127:15, 145:16
**Wholesale** [5] - 112:23, 113:8, 113:9, 115:23, 118:3
**wholesale** [3] - 130:5, 130:6, 156:7
**wholesaler** [8] - 6:18, 7:20, 10:3, 32:10, 69:11, 100:1, 100:16, 114:2
**Wholesaler** [2] - 114:15, 117:12
**Wholesaler's** [3] - 114:2, 114:17, 114:21
**wife** [1] - 77:8
**WILLIAM** [1] - 1:10
**William** [2] - 1:18, 2:4
**wise** [1] - 83:16
**withdraw** [1] - 67:25
**witness** [16] - 4:18, 17:22, 47:8, 52:14, 74:11, 109:2, 111:3, 111:13, 112:1, 148:2, 148:7, 148:9, 148:11, 148:19, 148:21, 150:9
**WITNESS** [5] - 3:2, 5:4, 33:23, 86:22, 158:23
**witnesses** [2] - 110:22, 159:13
**woman** [1] - 46:24
**wonder** [1] - 74:14
**wonderful** [1] - 19:12
**word** [1] - 156:19
**Word** [2] - 159:1, 159:2
**words** [1] - 134:11
**workers** [1] - 124:21
**works** [1] - 156:3
**world** [3] - 66:19, 96:8, 156:15
**Worldwide** [3] - 58:17, 58:19, 131:7
**worried** [1] - 75:2
**worst** [1] - 96:8
**worthy** [1] - 110:19
**write** [2] - 44:8, 109:13
**writer** [1] - 96:15
**writing** [9] - 41:9, 42:2, 42:13, 42:18, 42:19, 43:9, 43:12, 44:15, 44:20
**written** [2] - 96:3, 101:2
**wrote** [5] - 15:12, 45:5, 80:15, 129:6, 145:2

## X

**XIII** [1] - 1:7

## Y

**Yahoo** [1] - 4:16
**year** [5] - 44:16, 54:13, 54:16, 73:18
**years** [2] - 18:15, 54:14
**yesterday** [12] - 32:22, 50:21, 52:19, 108:8, 113:3, 113:16, 119:21, 141:4, 143:12, 147:19, 149:3, 150:15
**York** [3] - 69:6, 69:11, 70:1
**yourself** [8] - 19:1, 48:5, 62:17, 74:17,

76:10, 88:3, 93:13, 122:7

## Z

**Zangari** [2] - 131:3, 131:11
**Zimet** [5] - 1:22, 43:1, 85:25, 87:15, 158:10
**ZIMET** [125] - 3:4, 5:13, 43:2, 43:4, 45:8, 45:10, 46:8, 46:18, 46:23, 47:7, 47:9, 47:24, 48:1, 51:12, 51:16, 51:18, 52:12, 52:15, 53:1, 53:2, 54:2, 58:9, 58:15, 61:25, 67:5, 67:6, 67:8, 67:9, 67:14, 67:17, 67:25, 68:1, 70:4, 70:5, 70:25, 71:1, 74:10, 74:13, 76:3, 77:14, 78:4, 78:7, 81:23, 85:1, 85:10, 86:2, 87:1, 87:10, 87:16, 87:17, 91:17, 92:1, 92:3, 92:16, 93:24, 95:14, 99:4, 99:17, 100:8, 102:11, 102:24, 103:18, 104:5, 105:23, 106:24, 107:1, 107:3, 107:17, 108:23, 109:2, 109:5, 109:9, 109:11, 111:1, 111:4, 111:12, 111:14, 111:17, 111:19, 111:20, 111:25, 112:4, 112:9, 113:11, 113:13, 113:22, 113:23, 114:14, 114:16, 115:6, 115:7, 115:20, 115:22, 116:7, 116:10, 117:4, 117:6, 117:20, 117:21, 119:8, 122:1, 122:4, 124:6, 132:14, 132:17, 136:21, 137:8, 139:16, 139:19, 140:2, 140:4, 140:9, 140:10, 148:8, 148:12, 148:14, 150:1, 151:24, 152:16, 153:18, 154:1, 154:21, 155:16, 158:11, 159:3
**zoom** [1] - 107:13
**Zoom** [1] - 149:10