UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-20255-Dimitrouleas/Hunt

UNITED STATES OF AMERICA, Fort Lauderdale, Florida

October 23, 2025

vs.

9:07 AM - 3:33 PM

PATRICK BOYD and CHARLES BOYD, Volume XIV

Defendants. Pages 1 to 146

---

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
Alexander Pogozelski, Esquire
Jacqueline DerOvanesian, Esquire
Assistant United States Attorneys
99 NE 4th Street
Miami, Florida 33132

FOR DEFENDANT PATRICK BOYD:
William Barzee, Esquire
Ivlis Mantilla, Esquire
Barzee Flores
40 NW 3rd Street Ph 1
Miami, Florida 33128

FOR DEFENDANT CHARLES BOYD:
Bruce Zimet, Esquire
633 S. Federal Highway Fl 6
Fort Lauderdale, Florida 33301

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

# I N D E X


| WITNESS: | PAGE: |
|---|---|
| ABIGAIL DIVILIO (CON'T) | |
| CROSS-EXAMINATION (con't) BY MR. ZIMET: | 6 |
| REDIRECT EXAMINATION BY MR. POGOZELSKI: | 30 |


\- - -

# E X H I B I T S

\- - -


| Number | Description | Page |
|---|---|---|
| Government's No. 680 | Letter | 70 |
| Government's No. 681 | Government stipulation | 72 |
| | Government stipulation | 81 |
| Government's No. 700 | Document | 111 |
| Government's No. 701 | Document | 111 |
| Government's No. 702 | Document | 111 |
| Government's No. 703 | Document | 112 |
| Government's No. 704 | Document | 112 |
| Government's No. 705 | Document | 112 |
| Government's No. 706 | Document | 112 |
| Government's No. 708 | Document | 112 |
| Government's No. 709 | Document | 112 |
| Government's No. 711 | Document | 113 |
| Defendant's No. 131 | Document | 114 |
| Defendant's No. 160 | Document | 121 |

| | | |
|---|---|---|
| Defendant's No. 177 | Document | 116 |
| Defendant's No. 194 | Document | 122 |
| Defendant's No. 195 | Document | 122 |
| Defendant's No. 196 | Document | 113 |
| Defendant's No. 201 | Document | 127 |
| Defendant's No. 202 | Document | 114 |
| Defendant's No. 203 | Document | 123 |
| Defendant's No. 209 | Document | 124 |
| Defendant's No. 210 | Document | 124 |
| Defendant's No. 217 | Document | 125 |
| Defendant's No. 259 | Document | 126 |
| Defendant's No. 289 | Document | 126 |
| Defendant's No. 301 | Document | 115 |
| Defendant's No. 306 | Document | 115 |
| Defendant's No. 307 | Document | 115 |
| Defendant's No. 308 | Document | 115 |
| Defendant's No. 310 | Document | 115 |
| Defendant's No. 311 | Document | 116 |
| Defendant's No. 312 | Document | 117 |
| Defendant's No. 313 | Document | 114 |
| Defendant's No. 314 | Document | 114 |
| Defendant's No. 315 | Document | 114 |
| Defendant's No. 662 | Document | 120 |

(Call to the Order of the Court.)

THE COURT: We are back on the record. Counsel are present. Both defendants are present. Anything to come before the Court before we bring the jury in.

MR. POGOZELSKI: No, Your Honor. I think my colleague stepped out for just a second to use the restroom.

THE COURT: Okay.

MR. ZIMET: Nothing from Charles Boyd, Judge.

MR. BARZEE: No, Your Honor. Thank you.

THE COURT: If we can get Ms. Divilio back in.

MR. POGOZELSKI: Yes, Your Honor.

And I understand Ms. Divilio just walked into the restroom, Your Honor.

THE COURT: Okay.

(Pause in proceedings.)

(Witness enters.)

THE COURT: Ms. Divilio, do you understand you're still under oath?

THE WITNESS: Yes.

THE COURT SECURITY OFFICER: All rise.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

Mr. Zimet, you may proceed.

MR. ZIMET: Thank you, Judge.

Thereupon,

ABIGAIL DIVILIO (CON'T),

having been first duly sworn or affirmed, was examined and testified as follows:

CROSS-EXAMINATION (con't)

BY MR. ZIMET:

Q. Good afternoon.

What I would like to begin with is whether there are any questions that you answered yesterday that you would like to expand on your answer? Modify? Change any answers from yesterday?

A. Not as of this time.

Q. Well, now is the time to do it if you are going to.

A. No.

Q. You're familiar with something known as a VRS system, the verification router system?

A. No.

Q. Was that not a plan that was to be implemented at Safe Chain that would allow verification of products that were

coming into Safe Chain with the manufacturers?
A. Not that I can recall, at least not during my time there.
Q. That would assist -- if that were such a program, that would assist compliance in verification; correct?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: It's not asked and answered.
On those grounds, overruled.
BY MR. ZIMET:
Q. Go ahead.
A. I'm not familiar with it.
Q. You're familiar with SOPs; correct?
A. Yes.
Q. And you are familiar with SOPs that you wanted to implement and make sure that were known to everyone at Safe Chain; correct?
A. I mean, there were company SOPs.
MR. ZIMET: And why don't we, if we can, show the witness Boyd's Exhibit 203 for identification, just for the witness.
I apologize. It's the wrong exhibit number.
BY MR. ZIMET:
Q. Let me ask you this: Were there SOPs that you wanted to have as part of the record or part of the Safe Chain files that existed in 2020?

A. I'm not sure what you mean by "that I wanted."
Q. Well, did you not ask that certain SOP files be printed and made part of the Safe Chain files?
A. Possibly.
Q. Did you send or ask for the advice from Martha concerning any potential SOP files?
A. Yes. I believe we did use her to review some of the SOPs that we were working to update.
Q. And she was giving her input into that; is that correct?
A. Yes.
Q. That was something that was valuable to Safe Chain to use -- the attorney's advice to decide what the SOP should be; is that correct?
A. Yes. We used them for guidance, yes.
Q. That was something that was encouraged by Charlie Boyd; is that correct?
A. Yes.
Q. And, in fact, Martha did make suggestions.
"Martha," being Rumore; correct?
A. Yes, I believe she did.
MR. ZIMET: If we could look at 301, just for the witness. Boyd 301, just for the witness, please.
BY MR. ZIMET:
Q. This is part of the SOPs that you were submitting to Martha for review, and this relates to the vendor intake forms;

correct?
A. Yes. This was the vendor intake form, I believe.
Q. This would have been on April 7, 2021?
A. Yes.
Q. And that was something that was advocated by Charlie Boyd; is that correct?
A. I believe so. I think we had all come to the conclusion we needed to make some improvements, and we were looking to do so.
Q. And the improvements that were necessary was to expand what was being reviewed and looked at; is that correct?
A. I believe so.
Q. And part of that expansion included trying to get some kind of understanding of at least who the principals were that were involved in these companies; is that correct?
A. Yes.
Q. And we saw yesterday one of them, Mohammed Salemi -- if I'm mispronouncing it. I'm not a good name pronouncer.
But that was one that you found out had been convicted of counterfeit drug trafficking; correct?
A. Yes.
Q. That was part of the new intake form that actually discovered that; correct?
A. Yes.
Q. So that was a reflection of what you're looking at that was then implemented that then became effective; correct?

A. Yes, I believe so.
Q. And the same thing: Obviously, Peter Khaim -- if that form had existed back in the time that Peter Khaim's company, Boulevard, was evaluated April of 2020, you would have been able to get the same kind of result and the same kind of information; correct?
MR. POGOZELSKI: Objection. Speculation.
THE COURT: Sustained.
BY MR. ZIMET:
Q. That expanded verification form, vendor verification form was not in existence in April of 2020 when Boulevard made their application; correct?
A. Yes, that's correct.
Q. So yesterday, we talked about the timeline you had created, and I think we looked at Exhibit 140, Boyd's, for identification.
And then we also talked about when the demand letter came out from Gilead, that you did a paragraph-by-paragraph review of the allegations that were made in that, that were attachments to that letter.
Do you recall that?
A. Yes.
MR. ZIMET: And so if we can then look at Boyd Exhibit for identification 289, just for the witness, please.

BY MR. ZIMET:
Q. And this is an email from you to Dakota on March 24th; correct?
A. Yes.
Q. And I think it was March 23rd. I think I misspoke. March 23rd was the demand letter -- is that correct? -- the day before?
A. I don't recall the exact time. It was all about that time.
MR. ZIMET: If we can scroll down, please, for the witness.
BY MR. ZIMET:
Q. It appears that on this document, there's things that are in black print. And then underneath each of those paragraphs, there appears to be -- I'll use the term "purple." I'm not a good color describer.
Would that be accurate, though?
A. Yes.
Q. And the purple typing is yours; correct?
A. I believe so.
Q. And why don't you just scroll down, and why don't you read each of those paragraphs to yourself, and when you need to scroll down, just say, "Please scroll down," and we'll accommodate that.
A. Okay.
Scroll down, please.

Scroll down.
Scroll down.
Scroll down. Scroll down.
Q. It appears to be the end.
A. I'm sorry?
Q. Does this appear to be the end?
A. Yes. I believe that's where the documents are attached then after that.
Q. Okay. Now, was that exhibit for identification accurate as far as what you presented?
A. Yes.
Q. And at the time, you believed it was complete, at least as much time as you had to complete it, before producing it to Dakota; is that correct?
A. I'm sorry. Can you say that again?
Q. Yeah.
You believed it was as thorough as you could do in the brief amount of time you had before getting it to Dakota for her to review?
A. Yes. I was hoping she could review it and see if anything had been missed.
Q. And you wanted to put all your thoughts together to be helpful in the response to the Gilead demand letter; correct?
A. Yes.
Q. Now, you have also written a summary or provided a summary

of the communications of Frier Levitt concerning the January -- excuse me, concerning the June 2nd request for a legal opinion concerning the State of Maryland issue that was raised by Charlie Boyd in the messages on June the 1st?

Do you remember those?

A. Yes, I believe so.

MR. ZIMET: So why don't we look at Exhibit 201 for identification.

BY MR. ZIMET:

Q. And in this exhibit for identification, you're responding to Charlie Boyd and presenting him a thread of the emails from Frier about the licensing requirements for your vendors; is that correct?

A. Could you scroll down so I could see the initial request?

Q. Sure.

A. Sorry.

Okay.

Q. And your initial request had been on June the 2nd; is that correct?

A. Yes.

Q. And these include all of the updated requests that were made that were never responded to -- is that correct? -- by the Frier Levitt law firm?

A. I don't recall if we -- what the response could have been to this chain or if we got one.

Q. Well, certainly as of October 30th 2020, there had not been a response; correct?
A. Yes. I think that's where my email ends, yes.
Q. And also, we talked yesterday about the memorialization of communication that you had concerning legal advice from Mr. Marrone.
MR. ZIMET: If we could go to 201 for identification. I'm sorry. 203 for identification.
My apologies.
BY MR. ZIMET:
Q. Do you see that?
And that is the memorialization of the advice John Marrone gave to Charlie Boyd that Safe Chain did not need to -- was not obligated to provide T3s or pedigrees to Gilead; is that correct?
A. Yes.
Q. And that is documented, and Mr. Boyd asked you to preserve that in the Safe Chain files; correct?
A. Yes.
Q. And that's what you did; correct?
A. I believe so, yes.
Q. We also talked yesterday about the change in practice and policy concerning the Boulevard T3s and when authorization was required in relationship to receiving product.
Do you remember those questions?

A. Yes.
Q. Safe Chain had something called "management meetings"; is that correct?
A. Yes.
Q. And you were part of the management team; is that right?
A. Yes.
Q. And part of that management team, every major division at Safe Chain had an opportunity to speak, and basically say, "What's going on? What's happening? What's new?" And what's about to happen in their division? Is that correct?
A. Yes.
MR. ZIMET: And if we can go to Exhibit 160 for identification, and go down to the compliance section.
BY MR. ZIMET:
Q. You can read everything if you want, but I want to focus on the compliance section.
A. Okay.
Q. Do you see that?
A. Yes.
Q. Does that accurately reflect what occurred at that management meeting?
A. Yes.
Q. And basically, it's the announcement of a new verification process relating to Boulevard products; correct?
A. Yes.

Q. And it was based upon consultation with the compliance department; correct?
A. Yes.
Q. And what it describes is Boulevard will be sending to compliance the T3 prior to shipping; is that correct?
A. Yes.
Q. And then compliance will verify and either approve or deny if approved product -- if approved, then product will be shipped to the warehouse and have to make sure that the receipt -- the product matches the T3; is that correct?
A. Yes.
Q. And it also describes they're still waiting on T3s from Boulevard; correct?
A. Yes.
Q. T3s had started, but it certainly had not been up-to-date at that point; is that correct?
A. Was this in, I think --
Q. In October?
A. Yes, that's correct.
Q. So the warehouse part of this is described as when product came in to Boulevard, it would go to the warehouse part of the building?
A. Yes.
Q. And that's a totally separate section; is that correct?
A. Yes.

Q. And if you recall, approximately how many people -- how many employees were working in the warehouse part of the Safe Chain?
A. At that time, five or six, I believe.
Q. And their job was to review what was coming in, evaluate it, and make certain evaluations concerning whether it matched the T3s or not; correct?
A. Yes.
Q. They would inspect the bottles themselves; correct?
A. Yes.
Q. If the bottles were dirty or something was wrong with them, they would not accept them. Their job was to send them back to the vendor; correct?
A. Yes, I believe so.
Q. And you would not be part of that "sending back to the vendor" aspect. That would not be a compliance issue; is that correct?
A. No, I wasn't involved with that process.
Q. And just the same part of the process, for instance, if it went to a pharmacy and the pharmacy rejected it and sent it back to the warehouse and the warehouse either sent it back to the vendor or do whatever with it, that would not be a compliance issue; correct?
A. No. I wouldn't have -- I wouldn't have always been aware of that.

Q. And it's not something that was within the purview of what compliance would be doing in, say, a damaged bottle that was sent back by the pharmacy; correct?
A. Not up until HIV, no, that hadn't been the process.
Q. And in HIV, if a bottle was sent back that was smeared or whatever to the warehouse, that would not necessarily be something that compliance would be involved in; is that correct?
A. Not necessarily.
Q. Okay. Were there times where you did get involved?
A. During some of the customer complaints was when I was notified about issues, typically.
Sometimes the customers would reach out directly to compliance, but as far as what the warehouse was approving or, you know, their day-to-day handlings, I wasn't involved in that.
Q. Understood.
Yesterday, we talked about the letters that you received from myself concerning wanting to speak with you prior to your testimony.
A. Yes.
MR. ZIMET: And if we could look at 137 for identification and 196 for identification, for the witness only.
BY MR. ZIMET:

Q. And the question to you, for each of them: Do those correctly reflect the emails sent to you and your responses to them?
A. Yes.
Q. The February one you did not respond to; correct?
A. I'm sorry?
Q. The February letter you did not respond to; correct?
A. I'm not sure.
Q. You don't recall?
A. No.
Q. And the August letter, you did respond to; correct?
A. Yes, I believe that was my response that you just showed me.
Q. Okay. And those appear to be in the same condition they were when you received and sent them -- correct? -- those emails?
A. Yes.
Q. Yesterday, you talked about your resignation letter.
MR. ZIMET: If we could go 194 to the witness for identification, please.
BY MR. ZIMET:
Q. Does that appear to be that letter?
A. Yes, it does.
Q. And you include in that letter that you truly appreciated the opportunity that you have been given -- or given me, and

this is addressed to Charlie, and it's December 30th of 2021; correct?
A. Yes.
Q. "I truly appreciate the opportunity you have given me over the last three years to learn about the pharmaceutical industry and the trust you placed to me to guide the compliance department.
"I think Safe Chain has great company values, and they have planted a seed within me I can use throughout my career." Those are your words; correct?
A. Yes.
Q. And then, I think, yesterday you also talked about a text you had sent to Safe Chain to Mr. Boyd and to Jesse Hammett concerning your new job application?
A. Yes.
Q. And this was in April of 2024? About a year ago?
A. Yes.
Q. A year and a half ago, rather.
In this, you said that you were required to include their names; is that right?
A. Yes.
Q. In it, you write you hope that it is all right -- asking for their input -- and I appreciate your help with this, that being your application; correct?
A. Yes.

Q. And those were your words; correct?
A. Yes.
Q. And Jesse responds, "Awesome. Good luck. We'll let you know if we hear anything."
And you respond, "Thanks so much."
And Charlie sends, "NP," as in "no problem. "Sounds good"; right?
A. Yes.
Q. That was his response to that. He didn't at any point suggest he wouldn't do that or not do that; correct?
A. He could have, but if that was the response, I would have documented that.
Q. I'm sorry?
A. He could have responded in that way.
Q. But he didn't?
A. No.
Q. So yesterday -- and, again, we talked a little bit about some of the bumpy parts of your involvement at Safe Chain.
And yesterday, we discussed the incident where Martha Rumore sent an email or communication to Gilead's counsel saying that -- relating to a Medicine Shoppe wrong pill issue, that "We had" -- "we," being Safe Chain -- "had communicated to Gilead and Gilead never responded."
Do you recall those questions?
A. Yes.

Q. And you went back, and then you looked, and you found that, in fact, you had made a mistake and had not, in fact, made that communication to Gilead; correct?

MR. POGOZELSKI: Objection.

Asked and answered yesterday.

THE COURT: Sustained.

BY MR. ZIMET:

Q. You corresponded back to Martha in an email; is that correct?

A. I believe so.

MR. ZIMET: And so why don't we look at Exhibit 210 for identification, please.

BY MR. ZIMET:

Q. Is that your email?

A. Yes, it is.

Q. And you begin by saying, "Good morning, Martha. After reviewing our emails again, I made an error and misspoke when I said Gilead never told us what to do with the Biktarvy Lot CDFYCA.

"I spoke with the pharmacist at Med Shoppe when this all began, and he wanted to know if we would be reporting this to the manufacturer, and I let him know I was not sure at the time."

And it continues on.

This is the incident that we were referring to yesterday;

correct?
A. Yes.
Q. And this is the incident that you got frustrated because Martha never confirmed to you that she had, in fact, told Gilead that there was a mistake when we said there had not been any communication back from Gilead concerning -- after we had notified them; is that correct?
MR. POGOZELSKI: Objection.
Speculation.
THE COURT: Overruled.
A. I don't -- I don't recall if I was frustrated.
I just realized I made an error and wanted to communicate what I had discovered once I went back through the documents.
BY MR. ZIMET:
Q. Frustration related to the fact that you want to know whether she had sent that corrected information to Gilead and whether they had responded or not; isn't that correct?
A. I have to read this and see what her response was to this to get a better recollection of what the chain of events was here.
Q. Well, this email is you telling her about the mistake.
Her responses are in subsequent communications; so it would not be on this communication.
You can read this if you want, but this would be after the date of this communication, the frustration.

A. What was your question?
Q. The question related to the frustration, not relating to this document, relating to asking Martha whether she communicated that to Gilead and what Gilead's response was or reply was to that new information that you had corrected to Martha?
A. I don't recall if I was frustrated or not.
Q. Okay. So an AD, besides being your initials, were "authorized distributors"; correct?
A. Yes.
Q. And authorized distributors were people who had -- or companies, rather, that had special relationships with manufacturers; correct?
A. Yes.
Q. And the special relationship was that they were able to purchase the pharmaceuticals directly from the manufacturers; correct?
A. Yes.
Q. And they had certain contracts? Certain agreements? Certain relationships? Correct?
MR. POGOZELSKI: Objection. Speculation.
THE COURT: If she knows.
BY MR. ZIMET:
Q. If you know.

A. I don't know all the ins and outs of what would make someone meet the requirements for an authorized distributor.
Q. But certainly, an authorized distributor were the only people that the manufacturers would sell drugs to; correct?
A. Yes, in some instances.
Q. Now, Gilead and Safe Chain were having, let's say, in February, March and April of 2021, having a lot of issues -- correct? -- back and forth.
A. Yes.
Q. And during that time period -- February, March, and April -- there were a lot of communications back and forth; correct?
MR. POGOZELSKI: Objection.
Asked and answered.
THE COURT: Overruled.
A. Yes.
BY MR. ZIMET:
Q. And you were involved in some of those communications, some of the issues that were arising; correct?
A. Sometimes, yes.
Q. At one point, though, in February of 2024, in communications with Martha as well as with Charlie, you said, "I have an idea. Why don't we go to Gilead and ask if we can be an authorized distributor with Gilead"; isn't that correct?
A. I don't know if I was the one to say that.

Q. Okay.

MR. ZIMET: Why don't we look at Exhibit 209 for identification. If we can scroll down to February 22nd, 2021, at 3:59 p.m., that email to Martha from you.

BY MR. ZIMET:

Q. This is one that we're talking about (indicating).

"Charlie and I discussed," and what I'm referring to is the last paragraph of that email.

A. Okay.

Q. You can certainly read anything you want, but that's what I'm going to be questioning you about.

A. Okay.

Q. Does that refresh your recollection?

A. Yes.

Q. In fact, you did have that idea, did you not?

A. Yes, I suggested it here to her to Martha.

Q. You said, "An odd question: Through all of this, is there an opportunity to ask them," meaning Gilead, "if we could venture into a business relationship as an AD in an effort to preserve the drug chain and integrity of their products"; correct?

A. Yes.

Q. And Martha responded to that, did she not?

A. Yes, she did.

Q. She responded the same day, actually; correct?

A. I can't see the bottom part, where I wrote that to her.
Q. We're going to open it.
A. Yes.
Q. And she said, "Okay. This is great. I was thinking the exact same thing about you guys becoming AD. Can I add that to the letter?"
A. Yes.
Q. And then Charlie responded to that, didn't he?
A. Yes.
Q. In a few minutes after that; right?
A. Yes.
Q. "Please do. Maybe note that we work with over 4,000 independent retail pharmacies as well"; correct?
A. Yes.
Q. So, at that point, that concept was being considered? At least you thought of it, Safe Chain's lawyer thought it was great and so did Charlie; correct?
MR. POGOZELSKI: Objection. Speculation.
THE COURT: Overruled.
A. Yes.
BY MR. ZIMET:
Q. In fact, that was proposed to Gilead at one point, was it not?
A. I believe so, in the letter that Martha responded with.

Q. So in your preparation to testify, have you discussed with the Government the concept of good faith?

A. I'm not sure how you mean.

Q. Well, have they ever asked you about good faith?

A. I don't recall if we discussed that specifically.

Q. So the term "good faith conduct," good faith, we talked about yesterday with Charlie, that had never been raised by the Government with you prior to your testimony?

MR. POGOZELSKI: Objection.

Asked and answered.

THE COURT: Sustained.

BY MR. ZIMET:

Q. We sort of began this part of your testimony concerning Adam Brosius.

And Adam Brosius comments about where he thought the problems were coming with all this; that it wasn't a Safe Chain issue, it was a Gilead issue; correct?

A. Yes.

MR. ZIMET: Can we look at Exhibit 217, please, for identification, just the witness.

BY MR. ZIMET:

Q. Do you recognize that email?

A. Yes.

Q. It's a letter from Adam Brosius -- an email from Adam Brosius, April 30, 2021; correct?

A. Yes, it is.
Q. "I don't agree with giving more info --" and that's to Gilead, "unless they agree to meet our demands for a past release. It only pushed us into a more vulnerable position. Gilead has problems they need to fix. We are fixing our own. Them pushing a public opinion on this is the last thing they want to do.
"I met with some high-level industry people this week that gave me some insight as to where more counterfeit and super-low-priced product is coming from. Super interesting info, and their theories, to say the least. These problems are Gilead industry issues, not Safe Chain issues. Let's keep it that way."
Is that accurate? What Adam Brosius was saying?
A. Yes, it is.
Q. And that's something that was consistent with what Brosius was presenting to Safe Chain; correct?
A. I didn't interact with Adam --
Q. By choice.
A. -- on a daily basis; but, yes, those were the messages that were conveyed.
Q. And that was something that, from your observation of this email, was a position that he wanted Safe Chain to take; is that correct?
A. I believe so.

MR. ZIMET: Thank you, ma'am.

I'll pass the witness.

THE COURT: Mr. Pogozelski, redirect.

REDIRECT EXAMINATION

BY MR. POGOZELSKI:

Q. Good morning, ma'am. I'll try to be brief. I know that you have been here for a while now.

One of the last exhibits that the lawyer defending Charles Boyd had showed you was those February 2021 emails involving this idea of Safe Chain becoming an authorized distributor.

Do you recall just looking at those?

A. Yes.

Q. And do you recall Charles Boyd's response about noting that "we work with 40,000 independent retail pharmacies"?

MR. ZIMET: 4,000.

MR. POGOZELSKI: 4,000. I'm sorry.

A. Yes.

MR. POGOZELSKI: If we could pull up Government's Exhibit 40, which is in evidence.

BY MR. POGOZELSKI:

Q. Are those the same pharmacy customers that received over $92 million worth of these HIV products from these five different HIV vendors?

A. Yes, they would have been.

Q. And that's over the course of about May 2020 until at least

mid-July of 2021?
A. Yes.
Q. And I think over the last couple of days, both of the lawyers, defending Charles Boyd and Patrick Boyd, had asked you a lot of questions about your approval of the Boulevard application.
Do you recall that?
A. Yes.
Q. And do you recall the questions about approving that application in about 15 minutes or 16 minutes or so?
A. Yes.
Q. At that time, did you have a lot of other job responsibilities?
A. Yes.
Q. What were some of those other responsibilities that took up your time?
A. Besides just the HIV vendors and product coming in and out, I was also dealing with DEA paperwork, documentation, controlled substance ordering, audits from other boards of pharmacy agencies.
There was also customer audits. So if a customer received an audit from a board of pharmacy, they would send that on to Safe Chain to have them provide documents.
Any subpoenas a pharmacy customer may have received, we would -- compliance would get those as well and process those

and, you know, provide any required documents.

T3s, kind of employee training, onboarding -- throughout my time there, I had several new employees; so I was frequently training a new person to get up to speed, hopefully.

So there were a lot of other things going on besides just the HIV sales.

Q. And did you feel a bit overwhelmed in your role as the director of compliance at that time?

MR. BARZEE: Objection.

Your Honor, leading.

THE COURT: Sustained.

MR. BARZEE: Also asked and answered.

BY MR. POGOZELSKI:

Q. Did you feel rushed to approve the application?

A. Yes.

Q. Was that a consistent theme at the HIV business?

MR. BARZEE: Asked and answered, Your Honor.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Now when you approved the application, was that a very long or involved process?

A. No, at the time, it wasn't.

Q. And after you approved, for example, Boulevard's application, did that mean that the defendants had to continue doing business with Boulevard?

A. No.
Q. Just based on your approval?
A. No.
Q. Could subsequent events with Boulevard change the decision about doing business with Boulevard?
A. Yes.
Q. And did that same -- that same thing apply to Synergy?
A. Yes.
Q. Now, at the time that you approved Boulevard's application, do you recall seeing a name Ishbay Shukurov on the application?
A. Yes, I believe that was the name on there.
Q. And when you approved it, did you know that Peter, last name unknown, was the actual owner?
A. No.
Q. At the time that you approved that application for Boulevard, did you know that the defendants would buy HIV drugs from Boulevard without any information about the sourcing of the drugs?
A. No.
Q. At the time that you approved Boulevard's application, did you know that the defendants would sell those same HIV drugs from Boulevard to pharmacies without any information about the sourcing of the drugs?
MR. BARZEE: Objection. That's assuming facts that are not in evidence, Your Honor.

THE COURT: Overruled.

MR. BARZEE: And it's asked and answered.

THE COURT: Overruled.

BY MR. POGOZELSKI:

Q. I'll it ask again.

At the time that you approved that application, did you know that the defendants then sold those drugs, HIV drugs sourced from Boulevard to pharmacy customers without any information about where they came from?

A. No.

Q. And at the time that you approved that application, did you know anything about how cheap they were getting the drugs?

A. No.

Q. Now, after you learned that the defendants were buying these HIV drugs without any information about where they came from --

MR. ZIMET: Objection, Judge. That does assume a fact not in evidence because they did have information from Boulevard.

THE COURT: What the lawyers say isn't evidence. The answers are evidence.

BY MR. POGOZELSKI:

Q. After you learned that the defendants were buying and selling these HIV drugs from Boulevard without any information, T3s, about the sources of the drugs, did you send an email to

Charles Boyd about that?
A. Yes.
Q. And is that the email that we have looked at that lays out the criminal consequences of doing so?
A. Yes.
Q. Is that the email that you followed up on ten days later?
MR. ZIMET: Objection, Judge. Beyond the scope of cross-examination.
THE COURT: Overruled.
A. Yes.
BY MR. POGOZELSKI:
Q. And why did you send those emails, even though you had approved the vendor application prior to that?
A. Because at that point, I was -- it was very difficult because we didn't have the T3s information that we needed, and there already had been sales from Boulevard, and we were required to provide those documents to the customers, and we weren't able to provide the completed correct documents to the customers.
Q. And why did you send the follow-up email to that?
A. Because I didn't receive a response from my initial email.
Q. Were both of those emails to Charles Boyd?
A. Yes.
Q. Now, going back to your approval of the application, when you approved it, did you know anything about a King Kimchi, who

would be providing much later those false T3s?

A. No.

Q. When you approved it, did you know that King Kimchi would have no paperwork to create any type of truthful T3?

A. No.

Q. So aside from the license issue with Boulevard, did you have other concerns over time with Boulevard as an HIV vendor?

A. Yes.

Q. And did you relay those concerns to Charles Boyd?

A. Yes.

Q. Did you relay those concerns to Patrick Boyd?

A. Yes.

Q. And I think Patrick Boyd's lawyer was asking you a lot of questions about where you had responded on direct examination, possibly, I think, and specific to whether you relayed those concerns to Patrick Boyd.

Do you remember those questions?

A. Yes.

Q. Did you send emails to Patrick Boyd and Charles Boyd about those King Kimchi falsified T3s?

A. Yes, I believe there were emails and conversation.

Q. And the concerns that you had, did you raise them consistently in writing with these defendants?

A. Yes.

Q. And when you approved the application for Boulevard, and I

think the lawyer defending Charles Boyd showed you the photo of Boulevard's location.

Do you recall that?

A. Yes.

Q. At the time that you approved Boulevard's application and looked at that location, did you know that the defendants would buy over $38 million worth of HIV drugs from Boulevard?

A. No.

Q. Would all of those facts have changed or factored into your decision to approve Boulevard as a vendor?

MR. ZIMET: Objection, Judge.

THE COURT: Overruled.

A. Yes. If I had that information, but that wasn't available at the start of the process.

BY MR. POGOZELSKI:

Q. Now, I think you were asked at the very beginning, when the lawyer defending Patrick Boyd was questioning you, whether or not you were scared when federal agents approached you to talk to you.

Do you recall that?

A. Yes.

Q. And I think you had testified you weren't scared, you weren't surprised?

A. Yes.

Q. Why weren't you surprised?

A. I guess because Safe Chain had a variety of ongoing legal issues, so it was not surprising. At that time, DEA agents had already shown up at my house.

MR. ZIMET: Objection, Judge.

I have a motion to make.

THE COURT: Sustained.

MR. ZIMET: Also, I make a motion to reserve to make a motion, Judge.

THE COURT: Okay.

BY MR. POGOZELSKI:

Q. Okay. And when, I think, the lawyer defending Charles Boyd had also asked you some questions about declining to meet with him.

Do you recall those questions today and yesterday?

A. Yes.

Q. And why did you decline to meet with the lawyer defending Charles Boyd prior to this trial?

A. Again, it just didn't seem in my own best interest. There was a lot of legal activity going on.

My hope was always just never have to be in this position. So I guess I just would just deal with whatever was going on as it came. I was very hesitant to get involved with the Safe Chain attorneys and legal team.

Q. And were those the same reasons that you declined the defendant's offer to hire attorneys for you when you resigned?

A. Yes.
Q. And why was that?
A. Again, I just didn't want to -- I didn't agree with the business decisions they had made, so I really didn't want to be looped into being in agreements with their legal team.
Q. Understood. Now, I think the lawyer defending Charles Boyd had also asked you questions about how Charles Boyd wore many hats as the CEO of Safe Chain; do you recall that?
A. Yes.
Q. And some questions about his energy levels and how busy he was. Do you recall those lines of questions?
A. Yes.
Q. All right.

MR. POGOZELSKI: If we could pull up Government's Exhibit 408, which is in evidence, and go to page 2.

BY MR. POGOZELSKI:
Q. Do you see here where Charles Boyd is asking for the vendor intake form for Boulevard from Kenzie Nalley?
A. Yes.
Q. And is this just a little over a month after you had approved the vendor?
A. Yes.
Q. Okay. And then if we zoom out, do you see where Kenzie Nalley asks, "something sketchy with them"?
A. Yes.

Q. And what does Charles Boyd write there in response?
A. He wrote, "I'm just looking at a few things. Want to make sure that we're all good."
Q. And then what does Kenzie Nalley write?
A. "Because I know they have three contacts there, and I finally called the one guy and made him explain to me who was who."
Q. And was that a similar type of issue you had contacting anyone at Boulevard?
A. Yes.
Q. And when you had those problems contacting people at Boulevard, did you go to your manager about that?
A. Yes.
Q. And who was your manager at that time?
A. Charles.
Q. Okay. And you were also asked some questions about your relative lack of experience in the pharmaceutical industry.
Do you recall those questions?
A. Yes.
Q. And how you were kind of learning on the job when you arrived at Safe Chain?
A. Yes.
Q. Had Safe Chain been in business for at least some years prior to you joining?
A. Yes, they had.

MR. POGOZELSKI: If we could pull up Government's Exhibit 653.

BY MR. POGOZELSKI:

Q. Now, at the time that you joined Safe Chain, did you know that Charles Boyd had had prior experience managing Allstate and federal licensing in pedigree licensing requirements?

A. I recall that he did have some previous work experience and that's how he got into the pharmaceutical industry.

Q. Did you know he had compliance experience specifically related to pedigrees?

A. I don't know if I knew that exact --

Q. And that at another earlier job, that he developed overall SOPs?

A. I don't know if I knew specifically that he had that experience.

Q. And that he was in charge of keeping another company compliant with Allstate and federal licensing regulations, including with the FDA?

A. I think I just knew that he had general pharmaceutical experience. I don't know that I had ever seen his resumé.

Q. Did you know whether or not, at some point, Charles Boyd was the compliance officer at Safe Chain?

A. I don't recall if I knew that.

Q. Okay.

MR. POGOZELSKI: We can take this down.

BY MR. POGOZELSKI:
Q. You were also asked a lot of questions yesterday about what you thought at the time that you were working there.
Do you recall those questions?
A. Yes.
Q. Questions about how you were doing your best at the time.
A. Yes.
Q. And some questions about what you thought about Charles Boyd's efforts at the time?
A. Yes.
Q. Through the documents in evidence that we looked at throughout this trial, have you since learned a lot of things that changed your perspective?
A. Yes.
Q. And can you elaborate on that?
A. At the time, I really thought that myself and the Boyds were all sort of in the same boat, as being equally shocked and surprised of things that were happening, or issues that we were having; but after the fact of learning and seeing additional documents about other things and side conversations that were taking place, I definitely felt kind of taken advantage of.
I felt like I was sort of intentionally being kind of dragged around and run around all the time. And I could see what wasted effort I put into trying to do the right thing when I felt like I had five people working against me all the time

in the background, that I didn't know about.
Q. Did you work really hard while you were at Safe Chain?
A. Yes, I tried to.
Q. And were you surprised when you saw, for example, the text messages between Charles Boyd, Peter Boulevard, and Adam Brosius about those broken statin pills?
A. Yes.
Q. Were you surprised, in those text messages, about the open Harvoni bottle?
A. Yes.
Q. And were you surprised about other emails that we looked at with wrong pills in Janssen bottles?
A. Yes.
Q. Issues with ViiV product?
A. Yes.
Q. Were those all the types of issues that you were not informed about at the time?
A. That's correct.
Q. Charles Boyd didn't tell you about those at the time?
A. No.
Q. Patrick Boyd didn't tell you about those at the time?
MR. BARZEE: Objection. That assumes facts not in evidence. It's assuming that Patrick Boyd was aware of them himself, and he wasn't, and the Government knows that.
THE COURT: What the lawyers say in a question or in an

objection isn't evidence. Overruled.

BY MR. POGOZELSKI:

Q. I think I now lost my place.

Did Patrick Boyd tell you about those complaints, at least some of which he was on, those emails we looked at?

A. No.

Q. And did they not tell you, these two defendants, about their various conversations with these vendors?

A. No.

Q. Peter King Kimchi, for example?

A. No.

MR. BARZEE: Objection. Both defendants did not have communications with Peter King Kimchi, and he knows that, Your Honor. It's improper.

THE COURT: Okay. And making a speaking objection is improper.

But if you're going to say "both," that's objectionable.

BY MR. POGOZELSKI:

Q. Did Charles Boyd tell you about his conversations with King Kimchi?

A. No.

Q. Did Patrick Boyd tell you in detail about any of his conversations with Carlos Vega at Synergy Group Wholesalers?

MR. BARZEE: Assumes facts not in evidence, Your Honor.

THE COURT: Again, what the lawyers say isn't evidence. Overruled.

BY MR. POGOZELSKI:

Q. Did Patrick Boyd tell you any details about his conversations with Carlos Vega of Synergy Group Wholesalers?

A. No.

Q. Did either Charles Boyd or Patrick Boyd tell you any of the details about a lot of their conversations with Adam Brosius?

A. No.

MR. POGOZELSKI: Now, I want to pull up a document that the lawyer defending Charles Boyd showed you yesterday, which is Government's Exhibit 436A.

BY MR. POGOZELSKI:

Q. Do you recall looking at this document yesterday, I think it was?

A. Yes.

Q. And this is dated October 2nd of 2020. Is that right?

A. Yes.

Q. And is this you relaying a conversation you had with Charles Boyd around that time?

A. Yes.

MR. POGOZELSKI: Now, if we could pull up Government's Exhibit -- it should be 41.

BY MR. POGOZELSKI:

Q. And Charles Boyd talked to you about a phone call, about a

five-minute phone call that he had with Peter on that same day?

MR. ZIMET: Judge, this is asked and answered now.

THE COURT: Overruled.

A. No, I don't believe so.

BY MR. POGOZELSKI:

Q. And looking throughout this exhibit, did you know about all these phone calls at the time between Charles Boyd and Peter, King Kimchi?

A. No.

Q. Now if we can talk a little bit about Adam Brosius.

I think you were asked a lot of questions about Adam Brosius and how he brought a lot of these HIV suppliers to Safe Chain.

Do you recall those questions?

A. Yes.

Q. And do you recall being asked about how Adam Brosius was the main point of contact for Boulevard and Peter?

A. Yes.

MR. POGOZELSKI: If we could pull up Government's Exhibit 499 and go to page 3.

BY MR. POGOZELSKI:

Q. Do you see here on August 27th of 2020, where Adam Brosius is writing about Peter sending product, and then Adam Brosius writes, "You may want to call him. Sorry to get you so involved"?

A. Yes.
Q. And what does Charles Boyd say in response to these Teams messages from Adam Brosius here?
A. He wrote, "It's all good. He and I have been talking a lot because of T3 stuff. We did send him 500k this A.M."
Q. And if you recall August 27th of 2020, was that before you had approved any Boulevard T3s?
A. I think about that -- somewhere, yes, I believe so, because I think the T3s started coming in about September.
Q. Okay. So this payment, at least on August 27th, he's referring to would have been before that?
A. Yes.
Q. And do you recall being asked about how Adam Brosius had supposedly lied to the defendants on numerous occasions?
A. Yes.
MR. POGOZELSKI: All right. If we could pull up --
BY MR. POGOZELSKI:
Q. And questions about how Adam Brosius kept things from these two defendants?
A. Yes.
MR. POGOZELSKI: If we could pull up Government's Exhibit 529.
BY MR. POGOZELSKI:
Q. All right. What is Adam Brosius telling Patrick Boyd here in the context of an HIV vendor?

A. Adam wrote, "They are scared about the paperwork."
Q. And then what does Patrick Boyd write?
A. "I can help with that, off the record, if they have some questions. We wouldn't report them in any fashion regardless."
MR. POGOZELSKI: If we could go to Government's Exhibit 272.
BY MR. POGOZELSKI:
Q. Now, this is in April 16, 2021. It's Adam Brosius and Patrick Boyd.
What does Adam Brosius write to Patrick Boyd here?
A. "Take a look. Let's chat about these privately."
Q. Is that without your involvement?
A. Yes.
Q. Was that prior one without your involvement?
A. Yes.
Q. At least according to these documents, was Patrick Boyd and Adam Brosius keeping things from you?
A. Yes.
Q. Now, you've also been asked some questions about different vendors, and I think one who had been indicted, Mohammed Salemi.
Do you recall those questions?
A. Yes.
Q. Was Adam Brosius indicted in July of 2020?
A. Yes, I believe that's when he was.

Q. And who was it that brought that indictment from a company perspective or employee perspective to the defendant's attention?

MR. BARZEE: Objection, asked and answered.

THE COURT: Overruled.

A. Can I answer?

BY MR. POGOZELSKI:

Q. Yes.

A. It was me and Kelsey, I believe, in compliance at the time.

Q. And did that lead to a message from one of the defendants about that indictment and Adam Brosius's involvement in the company?

A. Yes.

Q. And at that time, did you know that Adam Brosius was a part owner of Safe Chain?

A. No, I didn't.

Q. Is that something that you would have expected to know as the director of compliance?

MR. ZIMET: Objection, Judge.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. As a director of compliance, if an owner is indicted, is that something that would be relevant to your work?

MR. ZIMET: Objection, Judge.

THE COURT: Overruled.

A. Yes.
BY MR. POGOZELSKI:
Q. And why?
A. I mean, he was indicted for some pretty terrible things, so it does not look good for the business to be interacting with that person, if that person is a part owner.
Q. And in the message to the management team that was sent out about Adam Brosius and Adam Brosius's indictment, did it suggest that he was stepping away from the business for a while?
MR. ZIMET: Objection, Judge.
THE COURT: Overruled.
BY MR. POGOZELSKI:
Q. Did that message, after you and Kelsey Jones brought the indictment to their attention, did that message to the management team suggest Adam Brosius would be stepping away from the business for a while?
A. Yes, it did.
Q. And was that true, as far as you knew, during the course of the HIV business?
A. Not that I could tell.
Q. And is he in a lot of, or at least some of these documents that we have looked at about these various HIV vendors?
A. Yes.
Q. Now, you were also asked, I think, a fair amount of

questions about Patrick Boyd's involvement with these HIV vendors.

Do you recall those questions?

A. Yes.

MR. POGOZELSKI: If we could pull up Government's Exhibit 507. And if we go to page 3. And then page 4.

BY MR. POGOZELSKI:

Q. Do you see where this is July of -- July 13th of 2020.

So is that just about three days after you sent that email about the criminal consequences related to Boulevard?

A. Yes, I believe so.

Q. Do you see where Amanda Richardson writes to Patrick Boyd, "All these brokers, we need names"?

A. Yes.

Q. What does Patrick Boyd write in response?

A. "Yes, I know the HIV guys pretty well."

Q. Okay. And then if we go back up, I think you were asked some questions about improved diligence when you had googled and found out that Salemi was indicted.

Do you recall that?

A. Yes.

Q. What did Amanda Richardson write to Patrick Boyd here in July of 2020?

A. "This stuff worries me so much. Mainly because we have dealt with so many people who have been indicted and it's

scary."
Q. And do you know who Amanda Richardson was?
A. I think she was a salesperson. I don't quite remember.
Q. Okay.
MR. POGOZELSKI: We can take that down.
BY MR. POGOZELSKI:
Q. Now, I believe the lawyer defending Charles Boyd had asked you some questions about background investigations on various vendors.
Do you recall those questions?
A. Yes.
Q. And did you and Kelsey Jones try to do a background investigation on the Boulevard people in August of 2020?
A. We may have.
Q. And would showing you a document refresh your recollection as to that?
A. Yes.
MR. POGOZELSKI: If we could show just the witness what's marked as Government's Exhibit 678. And then go to the next page.
BY MR. POGOZELSKI:
Q. Is this a Teams chat between you and Kelsey Jones on August 7th of 2020?
A. Yes.
Q. And does this refresh your recollection as to whether you

tried to do a background investigation on Boulevard in August, early August of 2020?

A. Yes.

Q. And the questions about approving the vendor application and doing these background investigations, was there a way to do a background investigation on someone, Peter, last name unknown?

A. No.

Q. What about a background investigation on a King Kimchi?

A. No.

Q. Now, there were also a lot of questions about how the defendants wanted you to do your job in compliance.

Do you recall those questions?

A. Yes.

Q. During this time period of HIV with Boulevard, Gentek, Synergy, Rapid's Tex, Omom, Cintex, Invicta, Value Wholesale, all these vendors, did there come a point in time where you felt that the defendants did not want you to do your job?

A. Yes.

Q. Can you elaborate on that?

A. I felt like I was spinning my wheels.

As soon as we would get one HIV vendor and work with them or not, there was always another one immediately to replace them.

It was happening in quick succession. Again, with other

job duties, it definitely felt like it didn't matter if I approved them or not.

The only thing that I was approving is if they were presenting a valid license and mailing address at that time. So yeah, it just seemed very much like if I said no to the five, there would be six more coming.

Q. And using Boulevard and Synergy as an example, when you emailed the defendants about the first few falsified T3s for those vendors, did you end those emails with "let me know how you wish to proceed"?

A. Yes.

Q. Why did you end your emails confirming the false T3s or pedigrees with that statement?

A. I guess because it was clear to me that the business decisions that they were going to make were not my own anyway, so just looking for guidance was "what do you want me to do with this."

That's how I felt every time.

Q. Now, the lawyer representing Charles Boyd had asked you about your approval of the third, I believe it was the third version of the Boulevard King Kimchi T3s.

Do you recall that?

A. Yes.

Q. And was that after you had shared the two prior falsified versions?

A. Yes.
Q. And --
MR. POGOZELSKI: If we could show just the witness Government's Exhibit -- what's marked as Government's Exhibit 679. And go down.
BY MR. POGOZELSKI:
Q. So on October 14, 2020, there's also some questions about consultation with Frier Levitt lawyers in the context of Boulevard.
Do you recall those questions?
A. Yes.
Q. Prior to you approving those Boulevard, the third Boulevard T3s, did Charles Boyd tell you "we're covered by legal"?
A. Yes, that was the general tone.
Q. Okay. And were you on that October 14, 2020, call with Frier Levitt?
A. No. I wasn't.
Q. Do you have any idea what was said on that call?
A. No.
Q. Were you relying on Charles Boyd's recitation for him telling you "we're good to go. We're covered by legal"?
A. Yes.
MR. POGOZELSKI: And then if we could show just the witness Government's Exhibit 373.
BY MR. POGOZELSKI:

Q. Do you recall, based on some of the emails that we looked at, that Martha Rumore was one of the participants on that call with just Charles Boyd and not you?
A. I don't recall who he spoke with.
Q. Did you believe Charles Boyd at that time?
A. Yes.

THE COURT: Mr. Pogozelski, about how much longer is your redirect going to be?

MR. POGOZELSKI: Probably say, 20 to 30 minutes max.

THE COURT: THE COURT: Let's take a 15-minute recess.

Remember my admonition not to discuss the case or allow it to be discussed in your presence. We'll see you back in the jury room in about five minutes.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: Again, Ms. Divilio, during the break in your testimony, you're not allowed to discuss your testimony with anyone.

We'll be see you back in 15 minutes.

THE WITNESS: Yes.

(Witness exits.)

THE COURT: You have a motion, Mr. Zimet?

MR. ZIMET: Yes, Judge.

The witness had volunteered -- and I assume had gone over this with the Government previously -- that Safe Chain --

THE COURT: Why do you assume that?

Why do you assume that she had gone over her answer with the Government previously?

MR. ZIMET: Well, I would hope that the Government had instructed her not to talk about anything relating to DEA or any other matters.

Her answer was -- she began her answer, "Because Safe Chain had a lot of other legal issues going on at that point."

The only other legal issue going on at that point would have been a DEA issue. And so my assumption is that the Government had spoken to her before, that you can't talk about anything other than HIV unless I ask you about something else. So that's my assumption.

If I'm wrong, I'm wrong.

THE COURT: Go ahead.

MR. ZIMET: She then volunteers that there's a DEA legal problem or legal issue that the company was having, suggesting that there's something involving DEA, obviously, involves controlled substances, something more serious, much different than what's charged in this case.

There's no application for a 404(b), other evidence whatsoever. It inserts something that is absolutely prejudicial as to our clients.

So I would make two requests. One is a mistrial.

Second, if the Court denies that, that that answer be

stricken and the jury be instructed to disregard that answer.

THE COURT: I sustained the objection.

Had you wanted the answer stricken, that probably was the time --

MR. ZIMET: That's why --

THE COURT: -- to ask for it to be stricken.

My recollection is that you opened the door to how she was feeling about law enforcement coming in and contacting her.

So I may have been wrong in sustaining the objection, but in an abundance of caution, I sustained the objection. I don't think that it's prejudicial to the point that it deprives the defendants of a fair trial or vitiates the fairness of this trial just to mention that the DEA, along with the FBI, came to her house; so the motion for a mistrial is denied.

Anything further?

MR. ZIMET: No, Judge.

MR. POGOZELSKI: No, Your Honor.

MR. BARZEE: No, Your Honor.

THE COURT: We'll be in recess for 15 minutes.

(Off the record from 10:29 AM to 10:47 AM, after which the following proceedings were had:)

THE COURT: We are back on the record. Counsel are present. Both defendants are present.

Anything to bring before the Court before we get started?

MR. POGOZELSKI: No, Your Honor.

MR. ZIMET: No, sir.

MR. BARZEE: No, Your Honor.

THE COURT: If we have all the jurors, let's bring them in.

(Witness enters.)

THE COURT: And, Ms. Divilio, you understand that you're still under oath?

THE WITNESS: Yes.

(Pause in proceedings.)

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

Mr. Pogozelski, you may continue.

MR. POGOZELSKI: Thank you, Your Honor.

BY MR. POGOZELSKI:

Q. Ms. Divilio, when we were having a bit of difficulty pulling up a document, we were talking about your approval of the Boulevard T3s based on what Charles Boyd had told you about

a call with the lawyers.
Do you recall that?
A. Yes.
Q. And do you recall at least one of the lawyers here defending these two individuals, asking you whether you were concerned about having some exposure for having approved hundreds of thousands of these falsified Boulevard T3s.
Do you recall that line of questioning?
A. Yes.
MR. POGOZELSKI: If we could pull up for just the witness Government's Exhibit 373.
BY MR. POGOZELSKI:
Q. Ms. Divilio, is this a couple of days after that Teams chat that we looked at where Charles Boyd said he had a good call with Frier?
A. Yes.
Q. And as far as you recall, did you start approving all those Boulevard falsified T3s based on what Charles Boyd had told you?
A. Yes.
Q. And is that at least part of the reason you didn't feel like you had any exposure in this case to use the defense's lawyer's terminology?
A. Yes.
Q. And is that part of the reason you weren't scared when

federal agents came to talk to you?
A. Yes.
Q. Based on the emails that we've looked at to Frier Levitt about those Boulevard T3s and about those Synergy T3s, did Charles Boyd provide complete, accurate information to the lawyers?
A. No.
Q. And were the lawyers the reason he gave you for approving the Boulevard falsified T3s?
A. Yes.
Q. All right. Now, you were also asked a fair amount of questions about your background prior to Safe Chain, and I think one of the lawyers had talked about it in terms of the scientific method and the importance of documenting concerns.
Do you recall that line of questioning?
A. Yes.
Q. Is that something that you did while you worked at Safe Chain?
A. Yes.
Q. And is that why we've looked at so many documents and emails that you've sent to these two defendants?
A. Yes.
MR. POGOZELSKI: If we could pull up Government's Exhibit 490.
BY MR. POGOZELSKI:

Q. Do you see where Patrick Boyd writes to Charles Boyd in April of 2020, "but it is the kind of thing, an email that should have been a phone call because now it's on the record"?
A. Yes.
Q. Was your approach to documenting things different than that of Charles and Patrick Boyd?
A. Yes.
MR. POGOZELSKI: And if we could publish this for the jury because I believe it is in evidence.
THE COURT: It is.
MR. POGOZELSKI: Okay.
And now, if we could show just the witness what is marked Government's Exhibit 543.
BY MR. POGOZELSKI:
Q. Do you see text messages with Charles Boyd and Patrick Boyd in April of 2019?
A. Yes.
Q. And do they also discuss being cautious about being what's put in writing?
A. I haven't seen these before. I'll read them quickly. Yes.
Q. Is that consistent with your experience working at Safe Chain?
A. Yes.
MR. POGOZELSKI: At this time the Government would move into evidence Government's Exhibit 543.

MR. ZIMET: It's hearsay, Judge.
MR. POGOZELSKI: Both defendants are on this thread.
MR. ZIMET: They're not the declarants, Judge.
THE COURT: I didn't hear what you said.
MR. ZIMET: They're not the declarants. It's a Tony Berger and a Jesse Hammett, are the declarants.
MR. BARZEE: There's also an objection to relevance based on the date.
THE COURT:
MR. POGOZELSKI: I would just final argument, it corroborates her testimony.
THE COURT: I'm going to sustain the objection.
MR. POGOZELSKI: All right. If we could --
BY MR. POGOZELSKI:
Q. And do you recall also being asked questions about how the defendants wanted you to do your job as the compliance director?
A. Yes.
Q. And do you know these background investigations and look into these various vendors?
A. Yes.
MR. POGOZELSKI: If we could pull up what is already in evidence, Government's Exhibit 475. And if we go down a little bit.
BY MR. POGOZELSKI:

Q. Do you see where Pat Boyd writes, "Just respond to Dakota since she's new," and let's go to the next page. "She's still in training."

Go to the next page. Do you see where Patrick Boyd writes, "Abbie may be a lost cause"?

A. Yes.

Q. And then if we go to the next page, and the next page.

Do you see where Patrick Boyd writes, "I want to get Dakota Flowers as far away from Abbie's habits as possible?"

A. Yes.

Q. Is this about three months after Patrick Boyd had sent that message about you not putting things in writing?

A. Yes.

Q. And was Dakota Flowers also in compliance?

A. Yes, she was.

Q. All right.

MR. POGOZELSKI: We can take that down.

BY MR. POGOZELSKI:

Q. I think on the very beginning of your cross-examination, you were shown a lot of documents and asked whether or not Patrick Boyd was left off of those documents.

Do you recall that?

A. Yes.

MR. POGOZELSKI: If we could pull up Government's Exhibit 108.

THE COURTROOM DEPUTY: Is it in evidence?

MR. POGOZELSKI: Yes, this is in evidence.

BY MR. POGOZELSKI:

Q. Do you see this email from Patrick Boyd to Anthony Berger?

A. Yes.

Q. Was Anthony Berger an owner of Safe Chain at a point in time?

A. Yes, he was.

Q. The underlined email from Katie Eberspacher to Charles and Patrick Boyd, was Katie in compliance?

A. Yes, she was.

MR. POGOZELSKI: And then if we can go to the newsletter she attaches. And then go to the next page.

BY MR. POGOZELSKI:

Q. Do you recall seeing this newsletter having to do with prescription drug diversion?

A. I don't think I have seen this particular newsletter.

Q. And do you recall -- do you see where it talks about wholesalers distributing drugs with falsified T3s?

MR. BARZEE: Objection, Your Honor. She just testified she's unfamiliar with the document.

THE COURT: Sustained.

BY MR. POGOZELSKI:

Q. Was this an email -- this article, was this an email that Patrick Boyd forwarded to Anthony Berger?

A. Yes.
Q. All right.
MR. POGOZELSKI: Now, if we could go to Government's Exhibit 347, which is in evidence.
BY MR. POGOZELSKI:
Q. In April of 2021, is this another instance of you trying your best to look into an HIV vendor?
A. Yes.
Q. And you're looking into the social media presence, and you were asked a lot of questions about whether you did background investigations on these individuals identified with these vendors.
What does Patrick Boyd write to Charles Boyd, leaving you off that email?
A. I believe that says, "It's not for her to worry about their social presence."
Q. Now, do you also recall --
MR. POGOZELSKI: We can take that down.
BY MR. POGOZELSKI:
Q. -- some questions from the lawyer defending Charles Boyd about whether or not Gilead had informed Safe Chain, the defendants, about these black market drugs, or that Safe Chain was involved in black market drugs.
Do you recall those questions?
A. Yes.

Q. Did Gilead, as early as October of 2020, send an email about Boulevard and counterfeit drugs?
A. I believe they did.
Q. And did Gilead continue sending emails and letters about Safe Chain's distribution of what Gilead said were counterfeit drugs?
A. Yes.
Q. Misbranded and adulterated drugs, according to those letters?
A. Yes.
Q. And did some of those letters cite to one of the same criminal statutes that you had sent in your July 2020 email to Charles Boyd?
A. Yes.
Q. Again, going back to emails where Patrick Boyd was left off.

MR. POGOZELSKI: If we could pull up Government's Exhibit 196, which is in evidence.

BY MR. POGOZELSKI:
Q. And if you go -- this is November of 2020 with Charles and Patrick Boyd and Adam Brosius.

If you go down, do you see where a pharmacy is complaining about Prezcobix inside a sealed Symtuza bottle?
A. Yes.
Q. And Triumeq, having questionable info, on the left?

A. Yes.
Q. And if we go down, do you see that's a ViiV product?
A. Yes, it is.
Q. And then go down. Do you know if Symtuza is a Janssen product?
A. I believe it is.
Q. Okay. If we go back up, are you left off this email chain?
A. Yes, I was.
MR. POGOZELSKI: Now, if we can pull up what's already in evidence, Government's Exhibit 320.
BY MR. POGOZELSKI:
Q. Do you see this mail that Patrick Boyd sent to Martha Rumore, Charles Boyd, and some others?
A. Yes.
Q. Do you see where he writes, "We have only had issues with Gilead products from these vendors. No other medications in any instance, branded or generic"?
A. Yes.
Q. Is that contradicted by at least that email that we just looked at with Patrick Boyd on it?
A. Yes.
Q. And I think --
MR. POGOZELSKI: We can take that down.
BY MR. POGOZELSKI:
Q. You were also asked some questions about whether you were a

"Gilead witness."

Do you recall that line of questioning?

A. Yes.

Q. And about some meeting with Gilead lawyers?

A. Yes.

Q. Was it a phone call or a meeting? Something to discuss logistics?

MR. ZIMET: Objection, Judge. Leading. Suggested.

THE COURT: Overruled.

A. I don't recall having a specific meeting with them, but I would have had to have spoken with them to know where to go for the deposition and make arrangements to take off work and things.

BY MR. POGOZELSKI:

Q. Did you receive a subpoena for that deposition?

A. Yes.

Q. Did you want to be deposed by Gilead?

A. No.

Q. Were the Gilead lawyers at least at times hostile towards you?

A. Yes, it was difficult.

Q. All right. That's similar to here. Were you subpoenaed to testify here?

A. Yes.

Q. Do you want to be here?

A. No.
Q. And I think another document that the lawyer defending Charles Boyd had shown you --
MR. POGOZELSKI: Just in case I have the Boyd exhibit wrong, we have what's marked and not in evidence, just for just the witness, Government's Exhibit 680.
BY MR. POGOZELSKI:
Q. Do you recall looking at this letter to Synergy Group Wholesalers with defense lawyer yesterday?
A. Yes.
MR. POGOZELSKI: At this time, the Government would move into evidence Government's Exhibit 680.
MR. ZIMET: No objection, Judge.
MR. BARZEE: No objection.
THE COURT: 680 will be received.
(Government's No. 680, Letter, was received in Evidence.)
BY MR. POGOZELSKI:
Q. Okay. Now, I believe the lawyer defending Charles Boyd had asked you if the defendants stopped buying and selling HIV drugs from Synergy around the time of this letter.
Do you recall that?
A. Yes.
Q. And what is the date here of this letter?
A. August 9, 2021.
MR. POGOZELSKI: And if we could show that side-by-side

with what's in evidence Government's Exhibit 97, page 14.

BY MR. POGOZELSKI:

Q. Do you see here a shipment date of September 10th of 2021, from Safe Chain to a pharmacy involving Synergy Group Wholesalers?

A. Yes.

Q. Is this T3 or Safe Chain T3 or pedigree show that the defendants continued selling these Synergy HIV drugs about a month after that letter, on the left?

A. Yes.

Q. And was that letter on the left sent after all the Gilead threats of litigation and an e-Pharm/alert?

A. Yes, it was.

Q. And was it after the FDA had begun asking questions?

A. Yes, it was.

Q. And as far as you recall, was it after the Gilead seizure?

A. Yes.

Q. But nonetheless, this T3 shows a sale of Synergy product about a month later?

A. Yes, it does.

MR. POGOZELSKI: May I have one moment, Your Honor?

THE COURT: Okay.

MR. POGOZELSKI: No further questions.

THE COURT: Thank you, ma'am.

You may step down. You're excused.

The Government may call its next witness.

MR. POGOZELSKI: The Government rests, Your Honor.

THE COURT: Members of the jury, let me ask you to go in the jury room for a few minutes, please.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: I see a stipulation was filed last night or today. Are you moving that stipulation into evidence?

MR. POGOZELSKI: Yes, Your Honor. We would like to.

MR. ZIMET: I have no objection, Judge. They rested. I don't think they want to unrest and introduce evidence.

THE COURT: And reopen the case?

MR. ZIMET: Reopen the case.

They still haven't produced the video of Charles Boyd that the Court ordered them to, relating to the deposition to complete the record.

THE COURT: So are you moving to reopen your case?

MR. POGOZELSKI: Yes, Your Honor, and move into evidence the stipulation regarding the data servers.

MR. ZIMET: No objection, Judge.

THE COURT: Mr. Barzee?

MR. BARZEE: I object.

THE COURT: That objection is overruled. We'll make the stipulation 681.

(Government's No. 681, Government stipulation, was

received in Evidence.)

THE COURT: You have a Rule 29 motion, Mr. Zimet?

MR. ZIMET: Mr. Barzee will go first.

THE COURT: All right.

MR. BARZEE: Your Honor, we move for a judgment of acquittal as to Count I on behalf of Patrick Boyd, arguing that the Government has failed to establish a prima facia case and add that Patrick Boyd knowingly and willfully, with the intent to further the objects of the conspiracy that's laid out, commit an offense against the United States with the intent to defraud and mislead by introducing or delivering introduction into interstate commerce or causing such introduction to be made via adulterated and misbranded drugs as well as defrauding the United States by impairing, impeding, obstructing, defeating through deceitful and dishonest means the lawful functions of the FDA.

The Government hasn't put on any evidence against Patrick Boyd establishing that he entered into a conspiracy with Adam Brosius and Charles Boyd to commit those two acts or either of those two acts.

Additionally, we move for a judgment of acquittal as to Counts II and III against Patrick Boyd, which allege actual introduction of misbranded drugs into interstate commerce.

The Government has failed to establish that Patrick Boyd did so with any intent to defraud or mislead or, in fact,

having any knowledge whatsoever that the T3s at issue were falsified.

And that's Count II and Count III for the particular shipments made on January 21st and February 23rd. There's been no evidence whatsoever that Patrick Boyd was involved in either of those two acts.

As to Count Number IV, we move for a judgment of acquittal as to Patrick Boyd. The Government has failed to introduce any evidence whatsoever that Patrick Boyd entered into a conspiracy with Adam Brosius and Charles Boyd to knowingly, willfully, falsely alter or forge counterfeit or labeling documentation of any of these products. There's no evidence of that in the record.

As to Count V, we move for a judgment of acquittal on the conspiracy to commit wire fraud. The Government has failed to introduce any evidence whatsoever that Adam Brosius, Patrick Boyd, and Charles Boyd entered into an agreement to commit wire fraud, the purpose of which was to conceal the receipt of fraud proceeds, amongst other reasons.

We move for a judgment of acquittal as to Counts VI through VIII, the wire fraud counts. Again, there's no evidence that Patrick Boyd directed any wires to be sent out or that he did so with any intent of concealing or diverting fraud proceeds, specifically as to the Count VI, August 6th wire, Count VII, the October 30th wire, or Count VIII, the April 13th

wire.

Thank you, Your Honor.

THE COURT: Mr. Zimet.

MR. ZIMET: Your Honor, may it please the Court.

On behalf of Charles Boyd, we make a motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal.

The Government has failed to establish a prima facie case as to each of eight counts in the indictment.

Each of the counts allege an intent to defraud. While there's testimony concerning activities, there's not sufficient evidence to allow a reasonably minded jury to convict based on the essential element of intent to defraud.

It's lacking the evidence to present, as well as the good faith testimony of the Government's own witness, that Charles Boyd acted in good faith related to these transactions.

Based on that, there's not enough evidence for the case to go to the jury at this point.

MR. BARZEE: Your Honor, with the Court's permission, Patrick Boyd would like to adopt those arguments as well.

THE COURT: All right. The arguments, the adopted arguments are denied.

I think the Government has set forth a prima facie case.

What's the defense going to do at this point?

MR. ZIMET: Judge, can we have a few minutes to consult with our clients and then come back to the Court.

THE COURT: Okay. How about the deposition that hasn't been produced? What's the Government's position on that?

MR. POGOZELSKI: Ms. Gould is looking up the time stamps and I guess we would like to know from Mr. Zimet exactly which time stamps that he wants.

MR. ZIMET: I want the answer to the question about the WAC. The answer that was given.

MR. POGOZELSKI: Okay. So I guess --

MR. ZIMET: You cut off the answer.

MR. POGOZELSKI: So could we -- I would ask for a moment to confer with Mr. Zimet. We will show him what we have and we can align on where to start, where to stop, and --

THE COURT: Let's take a 15-minute recess to accommodate, hopefully, both situations.

MR. ZIMET: Thank you.

MR. POGOZELSKI: Thank you, Your Honor.

THE COURT SECURITY OFFICER: All rise.

(Off the record from 11:13 AM to 11:42 AM, after which the following proceedings were had:)

THE COURT: Back on the record.

We are back on the record.

Counsel are present. Both defendants are present. What's the status on the deposition?

MR. ZIMET: So we have met with the Government. We have identified what should be played, and I think it's all ready to be played.

THE COURT: Okay.

MR. ZIMET: If the Court wants to macro view where we're at and course of action moving forward.

THE COURT: Sure.

So bring the jury back in. The Government is going to reopen their case, introduce the stipulation, and then are they going to play the --

MR. ZIMET: The video.

THE COURT: -- the video.

MR. ZIMET: Yes.

THE COURT: And then I'm going to turn to the defense and say what?

MR. ZIMET: Well, I think probably the best thing is for them to rest again, just in front of the jury.

THE COURT: Right.

MR. ZIMET: And then, at that point, I think we can stipulate that we would -- can stipulate that we would have renewed our Rule 29 motions, the same ruling from the Court, so we don't have to do that again formally.

THE COURT: Well, they can rest in front of the jury, and then we will see what the defense is going to do.

MR. ZIMET: Right. So...

THE COURT: What's the defense --

MR. ZIMET: This is what the defense going to do.

THE COURT: Okay.

MR. ZIMET: The defense has some exhibits that we want to introduce that we're getting together. We need to go over with the Government what they are to introduce them.

The defense will not be calling any witnesses. Neither defendant will be testifying.

THE COURT: Okay.

MR. ZIMET: I'm sure the Court will go through a colloquy with the defendants as far as they're not testifying.

THE COURT: Right.

MR. ZIMET: Then we will renew our Rule 29 motions with the Court, and then at that point, obviously, the issue is closing arguments, when are we going to a charge conference and then closing arguments.

THE COURT: Well, you need time to go over the exhibits with the Government that you are going to introduce.

MR. ZIMET: Yes.

THE COURT: So why don't we bring the jury in. The Government can reopen their case. They can enter the stipulation. Play the rest of the deposition. They can rest again.

And then I can recess for lunch. Bring the jury back at 1:00, and then you can introduce your exhibits, and then you

can rest, and I'll send the jury home until Monday at 1:00. We will do closings then, but after the jury leaves, we will do a charge conference.

MR. ZIMET: That make sense, Judge. Just from the standpoint of timing on Monday, we have 1:00 until 5:00.

THE COURT: Right.

MR. ZIMET: Do you read the instructions before closing or after closing?

THE COURT: I read them after closing. Unless everybody agrees they should be read before closing, then I reluctantly do that if everybody agrees.

MR. ZIMET: I guess my only other question is if we do closings on Monday -- and I'm figuring potentially an hour for each side and two hours for the Government -- that pretty much will block off all of Monday afternoon.

Maybe give instructions Tuesday morning to the jury when they come in?

THE COURT: We will see how much time the closing arguments are going to take. We will play it by ear.

MR. ZIMET: Okay. It doesn't sound like they're a one-hour person, Judge.

THE COURT: I'm sorry?

MR. ZIMET: It doesn't sound like they're a one-hour person.

THE COURT: Oh, I don't know. You guys have been

arguing the case the whole case.

MR. ZIMET: You said that before.

THE COURT: So we'll see what's reasonable.

MR. ZIMET: Thank you.

THE COURT: All right. Let's bring in the jury.

MR. POGOZELSKI: And, Your Honor, did you mark the stipulation as an exhibit?

I neglected to take it down.

THE COURT: 681 -- I thought that was your next number.

MR. POGOZELSKI: Okay. Thank you, Your Honor. 681 for the stipulation.

MR. ZIMET: And, Judge, we were having some computer issues getting our proposed instructions to you. So I think that's almost done.

THE COURT: Okay. Well, send them to me over lunch, and we'll do the charge conference this afternoon.

Do we have a defense exhibit list?

MR. ZIMET: We have one that we can get to the Court.

THE COURT: Okay.

THE COURT SECURITY OFFICER: All rise.

(Jury in.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

All right. Mr. Pogozelski, I think you wanted to reopen your case; is that correct?

MR. POGOZELSKI: That is correct, Your Honor. And we would move into evidence a stipulation of the parties as Government's Exhibit 681.

THE COURT: 681 will be received.

(Government's No. 681, Government stipulation, was received in Evidence.)

MR. POGOZELSKI: And then finally, we will play a short clip of Charles Boyd's deposition.

THE COURT: Okay. Go ahead.

(Video published.)

MR. POGOZELSKI: Now the Government re-rests, Your Honor.

THE COURT: Members of the jury, we're going to recess for lunch.

Remember my admonition not to discuss the case or allow it to be discussed in your presence. I'll ask you to come back at 1:00. So have a nice lunch we'll see back at 1:00.

And, again, we're not working late today. See you back at 1:00.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: Any objection to my having a colloquy with Patrick and Charles Boyd now?

MR. ZIMET: No objection.

MR. BARZEE: No objection.

THE COURT: Do you understand that you have a constitutional right to testify, Patrick Boyd?

DEFENDANT PATRICK BOYD: Yes, Your Honor.

THE COURT: And Charles Boyd?

DEFENDANT CHARLES BOYD: Yes, Your Honor.

THE COURT: You have a constitutional right not to testify.

Do you understand that, Patrick Boyd?

DEFENDANT PATRICK BOYD: Yes, Your Honor.

THE COURT: Charles Boyd?

DEFENDANT CHARLES BOYD: Yes, Your Honor.

THE COURT: And there may be strategy reasons for or against you testifying.

Do you understand that, Patrick Boyd?

DEFENDANT PATRICK BOYD: Yes, Your Honor.

THE COURT: And Charles Boyd?

DEFENDANT CHARLES BOYD: Yes, Your Honor.

THE COURT: Now, your lawyers have been to law school, and they've tried a lot of cases. They give you the benefit of

their legal advice, but it's your life. You don't have to follow the advice.

Do you understand that, Patrick Boyd?

DEFENDANT PATRICK BOYD: Yes, Your Honor.

THE COURT: Charles Boyd?

DEFENDANT CHARLES BOYD: Yes, Your Honor.

THE COURT: And whatever decision you are making is your decision, and you're pretty much going to be stuck with that.

Do you understand that, Patrick Boyd?

DEFENDANT PATRICK BOYD: I do, Your Honor.

THE COURT: And Charles Boyd?

DEFENDANT CHARLES BOYD: Yes, Your Honor.

THE COURT: For example, if you decide to testify and you turn out to be a lousy witness and get convicted, you can't complain about that later on because you decided to testify.

Do you understand that, Patrick Boyd?

DEFENDANT PATRICK BOYD: Yes, I do, Your Honor.

THE COURT: And Charles Boyd?

DEFENDANT CHARLES BOYD: Yes, Your Honor.

THE COURT: On the other hand, if you decide not to testify and if the jury comes back guilty, you can't come back later on and say, "Oh, Judge, if the jury would have just heard my side of the story, they would have let me go."

Do you understand that, Patrick Boyd?

DEFENDANT PATRICK BOYD: Yes, Your Honor.

THE COURT: Charles Boyd?

DEFENDANT CHARLES BOYD: Yes, Your Honor.

THE COURT: Have you had enough time to think about this and talk about it with your lawyer, Patrick Boyd?

DEFENDANT PATRICK BOYD: We have, Your Honor.

THE COURT: And Charles Boyd?

DEFENDANT CHARLES BOYD: Yes, Your Honor.

THE COURT: And do you agree with the strategy of not testifying and just resting your case, just introducing some exhibits, and not calling any other witnesses, Patrick Boyd?

DEFENDANT PATRICK BOYD: Yes, I do, Your Honor.

THE COURT: And Charles Boyd?

DEFENDANT CHARLES BOYD: I do, Your Honor.

THE COURT: Any further inquiry on the colloquy from anybody?

MR. ZIMET: Not by Charles Boyd's counsel, Judge.

MR. BARZEE: No, Your Honor.

THE COURT: So let me hand out a rough, rough draft of the Government's proposed instructions. And then, hopefully, by 1:00, we will have the defense instructions, and we will try to meld them together so that we know what the instructions are.

And then if you can have your exhibits ready to go at 1:00, you can introduce the exhibits, and then when you rest,

I'll excuse the jury, and we'll do the charge conference.

Anything further before we break for lunch?

MR. ZIMET: No, sir.

MR. POGOZELSKI: No, Your Honor.

MR. BARZEE: No, Your Honor.

THE COURT: We'll be in recess until 1:00.

THE COURT SECURITY OFFICER: All rise.

(Off the record from 11:53 AM to 1:04 PM, after which the following proceedings were had:)

THE COURT: We are back on the record.

Counsel are present. Both defendants are present.

Anything to come before the Court before we bring the jury in?

MR. ZIMET: So, Judge, if we can update the Court.

THE COURT: Okay.

MR. ZIMET: We provided the Government with the exhibits that we want to introduce. Also the exhibits themselves.

I believe the Government wants some more time to review them and has proposed that they be able to present some objections. If they have any, the Court will rule, and then we introduce them right before we start on Monday.

We were not going to publish them. I don't want to take two hours to scroll through exhibits.

We would rest, and I would say, "Defense rests, subject

to the introduction of exhibits," and that would be it, if that works for the Court.

THE COURT: It works for the Court, except I would like to resolve the exhibits today.

So, in other words, you could rest, and then I can excuse the jury, and then we could come back at 3:30 or so and agree on the exhibits.

MR. ZIMET: We're fine with that, Judge. We're here, obviously. I don't think there should be a problem.

MS. DEROVANESIAN: Yes. No problem with that.

Just to clarify: Would we take up the charge conference in between now and 3:30?

THE COURT: Right.

MS. DEROVANESIAN: Okay. No problem with that.

THE COURT: I don't think the exhibits are going to impact the jury instructions.

MR. ZIMET: They shouldn't. They won't.

THE COURT: All right. So let's bring in the jury.

(Pause in proceedings.)

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

Mr. Barzee.

MR. BARZEE: Your Honor, on behalf of Patrick Boyd, the defense rests.

THE COURT: Mr. Zimet.

MR. ZIMET: May it please the Court, on behalf of the Charles Boyd, Charles Boyd rests with the condition that we'll be submitting some exhibits to the Court.

THE COURT: All right. Members of the jury, we're going to go ahead and recess for the weekend.

Remember my admonishment not to discuss the case or allow it to be discussed in your presence. And I'm going to ask you to come in at 1:00 on Monday.

At that point, we should be ready for closing arguments. I'm going to work with the lawyers this afternoon on the jury instructions.

So have a nice weekend. Everybody stay healthy, and we will see you back Monday at 1:00.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: Do you want to renew your Rule 29 motions?

MR. BARZEE: Your Honor, at this time, on behalf of Patrick Boyd, we renew our Rule 29 motions.

THE COURT: Mr. Zimet?

MR. ZIMET: Same as to Charles Boyd, Judge. We adopt all previously made arguments and all previously made motions and ask the Court to so rule.

THE COURT: All right. I think it's a question of fact for the jury. I deny the Rule 29 motion.

Let's go ahead and do a charge conference.

I added a couple of possible instructions to the proposed instructions that the Government has submitted. And when we get to them, I'll indicate it, but what I would propose doing is just going through the rough draft and seeing if there's any objections, and if so, I can rule on the objections or additions or deletions.

The first one is Instruction Basic 1. That looks okay to me.

The next instruction is Basic 2.1, where a defendant doesn't testify. That looks okay to me.

And, again, if you have a problem with this, just pipe up and let me know.

Basic Instruction 3 looks okay to me.

Basic Instruction 4 looks okay to me.

Basic Instruction 5 looks okay to me.

And I don't think the Government had any Basic 6s. So there's two Basic Instruction 6s that I will give, if anybody asks about them.

One is you must consider some witnesses' testimony with more caution than others. It talks about paid informants. Witnesses who have been promised immunity. Witnesses that hope to get more favorable treatment in their own cases.

Anybody want that instruction?

MR. BARZEE: Patrick Boyd requests that instruction, Your Honor.

THE COURT: All right. So I'll give that one.

The next one is the same instruction, but basically, if the person has been convicted of a felony.

Anyone want that instruction?

MR. BARZEE: Patrick Boyd requests that instruction, Your Honor.

THE COURT: So I'll give that instruction.

The next one is charts and summaries. Any objection to that?

MR. ZIMET: No, Judge.

MR. BARZEE: No objection.

THE COURT: So I'll give that.

The next one is note-taking. That looks okay to me.

The next one is a Basic Instruction Number 8 that I didn't see in the Government's, maybe I missed it; but it just says, basically, the indictment charges eight separate crimes called counts. Each count has a number. You'll be given a copy of the indictment.

Count I charges conspiracy to introduce altered and misbranded drugs.

Counts II and III charge substantive offenses. Introduction to a misbranded drug.

Count IV charges conspiracy to traffic in medical products.

Count V charges conspiracy to commit wire fraud.

Counts VI, VII and VIII charge substantive offenses called wire fraud.

Any objection to Basic Instruction Number 8?

MR. BARZEE: Not from Patrick Boyd.

MR. ZIMET: I just have a suggestion, Judge. Instead of bifurcating the substantive charge from the conspiracy, to do the three conspiracies, and then do the substantive charges.

In other words, we start with I, IV, and V, and then we go to II and III, and then we go back to IV and back to V. I would suggest putting --

THE COURT: The object is different as to the different conspiracies. So I think if I do I, IV, and V, then I have to say, Count I charges the defendant -- Counts I, IV, and V charge the defendants knowingly and willfully conspired to introduce adulterated and misbranded drugs as to Count I, traffic in medical products with false documentation, as to Count IV, and wire fraud as to Count V.

I think it's just simpler just to break all the

different counts out.

Any other objections?

MR. ZIMET: No, sir.

THE COURT: So I'll leave it the way that I have suggested it.

The next one is Basic Instruction 8.1. Any objection to that?

MR. ZIMET: No, Judge.

MR. BARZEE: No, Your Honor.

THE COURT: So I'll give that.

The next one is the general conspiracy charge. Any objection to that?

MR. BARZEE: No objection.

MR. ZIMET: None, Judge.

THE COURT: I'll give that.

The next one is the multiple objects of the conspiracy. Any objection to that?

MR. BARZEE: No objection.

MR. ZIMET: No, Judge.

THE COURT: The next one is the Food, Drug and Cosmetic Act instruction.

Any objection to that?

MR. BARZEE: No objection.

MR. ZIMET: None, Judge.

THE COURT: The next one is Counts I, II and III, that

talk about either the conspiracy or the substantive offenses of adulterated or misbranded drugs.

Any objection to that?

MR. BARZEE: No objection.

MR. ZIMET: None, Judge.

THE COURT: So I'll give that.

Next one is the definition of "adulterated." Any objection to that?

MR. BARZEE: No objection.

MR. ZIMET: None, Judge.

THE COURT: I'll give that.

The next one is the definition of "misbranded."

Any objection to that?

MR. ZIMET: No, Judge.

MR. BARZEE: No objection.

THE COURT: I'll take out page 27 since there is nothing on it.

The next one is Count III, conspiracy. It says Count I. It should be Count IV, shouldn't it?

MR. POGOZELSKI: Your Honor, I think this is the third object of Count I.

THE COURT: Oh, yeah, you're right. The third object of Count I.

Any objection to that?

MR. ZIMET: None, Judge.

MR. BARZEE: No objection.

THE COURT: So I'll give that.

Now the next one is the conspiracy to traffic in medical products.

Any objection to that?

MR. ZIMET: No, Judge.

MR. BARZEE: No objection.

THE COURT: So I'll give that.

Count V is conspiracy to commit wire fraud.

Any objection to that?

MR. BARZEE: No objection.

MR. ZIMET: No, Judge.

THE COURT: So I'll give that.

Counts VI, VII, and VIII are the wire fraud.

Any objection to that?

MR. ZIMET: No, Judge.

MR. BARZEE: No objection.

THE COURT: I'll give that.

The next one is the Pinkerton instruction. Any objection to that?

MR. ZIMET: We would object to that, Judge.

MR. BARZEE: We'll join the objection.

THE COURT: It's kind of like the aiding and abetting, except for conspiracy.

MR. POGOZELSKI: Your Honor, we do think it's

appropriate here where it is a company -- a relatively small company with different people in different roles.

Patrick Boyd in sales. Adam Brosius in sales. Charles Boyd, you know, CEO, over compliance.

THE COURT: I'll give it over the defendants' objection.

The next one is the aiding and abetting.

MR. ZIMET: Judge, can I just add one more part to that objection?

THE COURT: Okay.

MR. ZIMET: I'm not trying to re-argue.

Basically, the way it's written -- I understand the concept of Pinkerton.

The way it's written is basically telling the jury how they should deliberate. In other words, it's basically saying deliberate on the conspiracy counts first, find them guilty, and then you can go ahead and apply it to the other counts.

I think that goes beyond what the Court should be doing in instructing the jury.

THE COURT: I don't read it that way. It's a standard instruction, I think, from the Eleventh Circuit, is it not?

MR. POGOZELSKI: Yes, Your Honor.

THE COURT: So I'm going to go ahead and give it.

The next one is the aiding and abetting instruction. Any objection to that?

MR. ZIMET: No, Judge.

MR. BARZEE: No objection.

THE COURT: The next one I put in -- no, I don't think I put it in. The Government put it in -- deliberate ignorance as proof of knowledge.

I assume that the defense is going to object to that?

MR. ZIMET: Of course.

MR. BARZEE: Object.

THE COURT: Let me hear from the Government on that.

MR. POGOZELSKI: Yes, Your Honor.

This case, based on the evidence that's presented, the witness testimony, is certainly one that warrants a deliberate ignorance instruction because it is not a case where the proof -- the only relevant proof of knowledge or the only proof presented at trial goes directly to actual knowledge.

There's a lot of evidence in here that has to do with the defendants deliberately avoiding to learn the true illicit origin of the drugs.

There's evidence of looking the other way, intentionally trying to seek outside counsel with kind of partial information. You know, when Peter Khaim says, "I got them from closed-down pharmacies," there's no real further inquiry into that.

All the T3s show one pharmacy. There's no questioning of Mr. Khaim about the fact there was only one pharmacy listed

there.

The failures, as demonstrated through Ms. Divilio's testimony, to follow through or try to verify in any sense some of the other vendors here. So there is, obviously, some proof of actual knowledge; but there's abundant proof of deliberate ignorance, especially where you're getting, as demonstrated in the photos that have been entered into evidence, boxes with bottles of missing labels, scuffed up, dirty, looked they had been dispensed before; the articles about drug diversion that have been entered into evidence, and the defendants simply making no further inquiries.

There's been a lot of evidence about that that came in from different witnesses. And the case law certainly supports that. And I think in the case of *United States v. Ahrens*, or *Ahrins* (phonetically) -- I'm sure I'm mispronouncing that -- this was a case before Your Honor where Your Honor gave the deliberate ignorance instruction, and it was upheld by the Eleventh Circuit. And some of the facts are quite similar insofar as there were some suspicious transactions in that case.

So there was evidence established that the defendant there was aware of the high probability that she was receiving fraudulently obtained funds, based on the suspicious circumstances surrounding the deposits.

And certainly here, there are a lot of suspicious

circumstances surrounding everything regarding Boulevard, regarding the other HIV vendors.

And so it does seem to be squarely within the Eleventh Circuit's case law, where they have upheld this type of deliberate ignorance instruction. And it's actually quite similar to the cases where you have, let's say, a drug courier who's carrying a box under very suspicious circumstances.

Here, they are receiving the shipments of dirty bottles, very cheap, you know, all of the indicia of the illicit nature of drugs. And a lot of the defense is: "We're not a re-packer. We don't look inside the bottles. We just ship them out as we get them."

So we think that this squarely puts the facts and evidence presented in this case within the ambit of all of the cases in the Eleventh Circuit where that deliberate ignorance instruction has been upheld, particularly where you do have a false story given by a coconspirator, one that makes no sense and where the defendants make no further inquiry.

THE COURT: I mean, usually when I give a deliberate ignorance instruction, it's a drug case where you have a courier and he's saying, "I thought it was marijuana."

I did give it in the other case that you mentioned that was affirmed by the Eleventh Circuit. I have denied it in cases.

Any further argument, Mr. Zimet?

MR. ZIMET: Judge, I think what the Government is trying to do is say that the defendant should have known and because they were lied to, they should have disbelieved the lie. And there's no evidence that they deliberately tried to believe a lie that was, at the end of the day, was a lie.

All it is trying to say is retrospectively say is they should have done something.

That's not what the deliberate ignorance instruction is about, and there's no evidence at all that they essentially put their head in the sand and tried not to find certain information out.

THE COURT: Anything further, Mr. Barzee?

MR. BARZEE: No. Mr. Zimet's argument is exactly correct, Your Honor. We join that argument.

THE COURT: Well, I think there's circumstantial evidence of deliberate ignorance, and I'll leave it up to the jury.

I think the instruction is accurate when it says "negligence, carelessness, foolishness isn't enough to prove knowledge"; so I'm going to give it over the defendants' objection.

The next one I will put in is the theory of defense instructions.

Any objections to those instructions from the Government?

MR. POGOZELSKI: Your Honor, I don't think I see those in my --

THE COURT: No, they were just filed by the defense half an hour ago.

MR. POGOZELSKI: Oh, I see.

MR. BARZEE: You received an email.

MR. POGOZELSKI: We were reviewing exhibits; so can you just give us one moment to take a look at it, Your Honor?

THE COURT: Sure.

MR. BARZEE: Your Honor, can I raise a concern --

THE COURT: Okay.

MR. BARZEE: -- about the underlining in some of the instructions?

THE COURT: Where is the underlining?

MR. BARZEE: On page 3, the word "possible" is underlined.

THE COURT: I think that's the way it is in the standard instructions; so I'll leave that in.

MR. BARZEE: Page 26, the words "other" and "companies" are underlined.

I would ask that those underlines be removed, as well as the possible underlining "reasonable doubt."

The idea of stressing one word over all the other words in the instruction I think is a problem. Each of these words are equally important.

THE COURT: What's the Government's position on my redacting the underlining on those two instructions?

MR. POGOZELSKI: I think for the ones that are underlined in the pattern jury instructions, they should be left in.

I think for the ones that are not, we would not object to taking that out.

THE COURT: So I think that's the misbranded definition on page 26?

MR. POGOZELSKI: Yes, Your Honor. We are fine with removing those and just leaving in the ones that are underlined in the pattern jury instructions.

THE COURT: I think there was only one other one, right, that we're talking about? The "possible?"

MR. BARZEE: Correct, Your Honor.

THE COURT: I'll leave "possible" underlined, and I'll try to remember to redact the "companies" and on page 26.

MR. BARZEE: And the word "other."

THE COURT: Where is that? I don't see "other."

MR. BARZEE: In the same paragraph as the companies, in the first sentence.

THE COURT: Now I see it.

MR. BARZEE: Or first clause, rather.

THE COURT: I'll grant it and try to take both of those out.

MR. POGOZELSKI: So we can --

THE COURT: So we're back to the theory of defense instruction.

MR. POGOZELSKI: So we did take a look Patrick Boyd's theory of defense.

THE COURT: Are they basically the same, just changing the names?

MR. BARZEE: Yes, Your Honor.

MR. POGOZELSKI: Your Honor, so we would object to that. That's more appropriate for closing arguments.

They are free -- they have been making those arguments throughout the trial, their theory of defense, with just about every witness.

THE COURT: I think the Eleventh Circuit already says that I should give a theory of defense instruction. The question is, is this an appropriate instruction?

MR. POGOZELSKI: And I think it's not appropriate here because it talks about the other standard pattern instructions about intent to defraud and good faith and things of that nature and looking back retrospectively, and wilfulness.

These are all terms that are already defined in the pattern jury instructions. So this would just muddy the waters and make it more confusing for the jury when it should be relying on the pattern jury instructions for the Eleventh Circuit for these terms.

THE COURT: I don't think there is a pattern jury instruction for theory of defense; so over the Government's objection, I'll give the theory of defense instruction.

The next one is good faith reliance on advice of counsel.

Any objection to that.

MR. ZIMET: We do, Your Honor. We're not asserting that defense.

THE COURT: Okay. All right. So we'll take that out.

MR. POGOZELSKI: Your Honor, if I could just respond briefly.

THE COURT: Yeah.

MR. POGOZELSKI: I think a lot of the -- at least a fair amount of questioning here, and certainly during opening statements, there's been a lot of questioning about "Do criminals hire lawyers? Do criminals seek legal counsel so they can get things right?" -- a lot of questioning of Ms. Divilio on that front.

So we certainly think that the good faith reliance on counsel's instruction is appropriate here.

THE COURT: What if they're not going to argue it?

MR. POGOZELSKI: Well, they essentially already have.

THE COURT: If they're saying they are withdrawing their request for the instruction, they're not going to argue it.

MR. POGOZELSKI: Essentially, they already have made that argument to the jury.

THE COURT: So if the jury comes back with the question on it, I'll tell them that's not a defense.

MR. POGOZELSKI: Well, all the references to lawyers and how that makes them not criminals, we think this defense -- or sorry, this instruction is only appropriate, especially where one of the lawyers testified.

THE COURT: And you can argue that to the jury that you're not going to hear any instruction from the Court that the lawyers -- that the advice is a defense in this case.

MR. POGOZELSKI: Well, if the defense is conceding that they're not going to argue that their consulting of lawyers or seeking legal counsel is in any way one of their defenses, then that would be a different fact pattern, but I haven't heard that yet.

MR. ZIMET: Judge, just so it's clear, our defense is good faith, not good faith reliance on the advice of counsel.

MR. POGOZELSKI: And, Your Honor, this is the same argument that they made, I believe, during the crime fraud hearing that ended up in the release of the privileged documents and then the subsequent litigation.

So the good faith defense, in part, that they're asserting is that they consulted lawyers; and if they're going to make that argument, then this instruction is appropriate

because the only way you can make that argument and use that defense that you consulted lawyers is if they were provided the complete, fulsome, accurate information.

So if they're going to argue anything about lawyers and legal services -- one of the exhibits that they're trying to introduce are the Frier Levitt billing records, which certainly supports this notion that they want to argue that they consulted lawyers and that makes them not guilty of the crimes charged.

THE COURT: Well, is there a good faith defense?

MR. ZIMET: Yes.

THE COURT: In addition to good faith reliance of counsel?

MR. ZIMET: They're two separate defenses, Judge.

You can go and try to speak with a lawyer. That's good faith.

What advice the lawyer gives you and you rely upon that, that's good faith reliance of counsel.

There's two separate concepts.

Our concept, our defense is based on good faith through all the transactions, including going and speaking with the lawyer. Not what advice was given that they followed, just that they went to a lawyer and spoke to a lawyer.

MR. POGOZELSKI: Your Honor, that's exactly what you should not be permitted to do. It's either you are consulting

a lawyer and it's an advice of counsel defense, or you're not talking about any consultations with lawyers.

THE COURT: Well, I don't think I have Special Instruction 17 in here, which is just a good faith defense.

MR. ZIMET: That's what we submitted, Judge. There's just a couple of words we have changed, but that's the proposal that we have as our special instruction -- a good faith instruction.

THE COURT: Let me see the words that you changed. For some reason, I don't have it here.

MR. BARZEE: Your Honor, it was emailed to the Court.

THE COURT: I understand that, but I don't have it.

I got the theory of defense one, but I must not have print out the good faith one.

MR. POGOZELSKI: It also doesn't appear -- well, I guess the defense counsel could answer it. It's not clear that that's the pattern good faith defense, setting aside the fact that it's not appropriate to argue involvement of attorneys unless you give the good faith reliance on counsel.

And then giving both of them would be confusing to the jury. You're either going to argue that the fact that they consulted attorneys supports their good faith or not. So it's either --

THE COURT: I'm inclined to give a good faith instruction, but if I'm going to give it, I think I should give

both of them -- the generic good faith and the reliance upon counsel.

And the defendants can argue to the jury that they're not relying on the good faith reliance on counsel defense.

MR. POGOZELSKI: And then, Your Honor, we would request that it be the pattern jury instruction for good faith, to the extent this one is not.

MR. ZIMET: And while the Court is getting that, what was added, Judge, was their good faith relates to wilfulness as well as intent to defraud. That was the modification of that instruction.

The standard only relates to intent to defraud, but good faith does relate to the element of wilfulness, and that was what was added to the standard.

MR. POGOZELSKI: So I think sticking with the pattern, especially where you have two different good faith defenses, would be the middle ground and appropriate approach here, not an altered, modified version of good faith.

THE COURT: I don't know there's much of a difference between good faith being the defense to a charge that requires wilfulness as opposed to a charge that requires intent to defraud.

It seems to me that it's pretty much the same thing. If I'm going to give the good faith defense, I'm inclined to include wilfulness and/or an intent to defraud.

MR. ZIMET: And that's what the requested instruction is, Judge.

THE COURT: So what I'm inclined to do is give both instructions.

MR. POGOZELSKI: Understood, Your Honor.

THE COURT: Anything further on that?

MR. ZIMET: No, Judge.

MR. BARZEE: No, Your Honor.

THE COURT: The next one is the instruction on knowingly and willfully. That looks okay to me.

The next one is 9.2. It looks okay to me.

The next one is 10.4, multiple defendants, multiple counts. It looks okay to me.

The next one is duty to deliberate -- oh, I did see this one. What I did was I went in there and tried to make it double-spaced.

No, that's the theory of defense. That's not the good faith one, Crystal.

THE COURTROOM DEPUTY: There was two emails I got. The exhibit list, and then I have the others. So it's in which attachment?

I have the theory of defense, proposed jury instruction final, and then I have proposed jury instruction, and then theory of defense instruction.

THE COURT: Try the proposed jury instruction.

THE COURTROOM DEPUTY: Okay.

THE COURT: Okay. See if it's as to good faith.

THE COURTROOM DEPUTY: We will do that. Coming right up.

THE COURT: So B11, duty to deliberate, looks okay.

B12, verdict, looks okay.

So I have the good faith one. I just need to remember to add "willfulness and/or."

How about the verdict form? Any objection to the two verdict forms?

MR. BARZEE: No objection.

MR. ZIMET: None, Judge.

THE COURT: So do you want to come back at 3:30, and we can talk about the defense exhibits?

MR. POGOZELSKI: Yes, Your Honor, that works.

THE COURT: Any further?

MR. ZIMET: No, Judge.

THE COURT: So we will be in recess until 3:30.

MR. ZIMET: Do you want to discuss the length of closing?

THE COURT: Yeah, we can do that.

How about 55 minutes? Because if you want four hours and we start at 1:00, I'm not going to get done by 5:00. So if I do 55 minutes, that gives me 20 minutes for a break.

MR. ZIMET: And then we will instruct them on Tuesday

morning?

THE COURT: Unless you guys don't use your 55 minutes.

MR. ZIMET: How long, generally, are your instructions? Certain judges speak slower than others.

THE COURT: This is a lot of instructions. This is going to take at least a half hour, maybe 45 minutes.

MR. ZIMET: I would think Tuesday morning would make more sense.

THE COURT: I have seen the Government get up and make a half hour closing argument before.

MR. ZIMET: Him?

THE COURT: I don't know Mr. Pogozelski, but...

MR. POGOZELSKI: I can be brief, Your Honor. I can do it in an hour and a half between the two.

MR. ZIMET: I'm sure we will figure it out. If it looks -- you're not going to bifurcate your instructions, obviously.

THE COURT: No.

MR. ZIMET: So we will figure that out.

THE COURT: No.

Each side, each defendant will have 55 minutes.

The Government will have an hour and 50 minutes.

Mr. Pogozelski, you're going to do the closings?

MR. POGOZELSKI: That's correct.

THE COURT: So how much time do you want on your first

closing argument?

MR. POGOZELSKI: I would say -- what did we say? I have an hour and 50?

THE COURT: Right.

MR. POGOZELSKI: So I would take, say, hour five for opening, and then 45 for rebuttal?

THE COURT: Do you want a warning on your first 65 minutes?

MR. POGOZELSKI: Yes, Judge, that would be wonderful.

THE COURT: How much?

MR. POGOZELSKI: I would say a ten-minute warning would be great. Thank you.

THE COURT: Mr. Barzee, you want a warning on your 55?

MR. BARZEE: I would, Your Honor. I would like a 30-minute warning and then a 10-minute.

THE COURT: And, Mr. Zimet, a warning on your 55?

MR. ZIMET: Same thing, Judge.

THE COURT: Anything further before we recess until 3:30?

MR. ZIMET: No, sir.

MR. BARZEE: No, Your Honor.

THE COURT: We'll see everybody back at 3:30.

THE COURT SECURITY OFFICER: All rise.

(Off the record from 1:39 PM to 3:09 PM, after which the following proceedings were had:)

THE COURT: We're back on the record. Counsel are present. Both defendants are present.

I have handed the out the final draft of the jury instructions. We're here to agree on the defense exhibits.

MS. DEROVANESIAN: Yes, Your Honor.

We received a list from defense counsel. I can start with the easy ones that we have no objection to and would just agree to admit.

THE COURT: Okay.

MS. DEROVANESIAN: So that includes Government's Exhibit 700, Government's Exhibit 701.

THE COURT: Slow down. Slow down.

MS. DEROVANESIAN: Sorry.

THE COURT: So we're going to admit 700.

(Government's No. 700, Document, was received in Evidence.)

THE COURT: We're going to admit 701.

(Government's No. 701, Document, was received in Evidence.)

THE COURT: Okay.

MR. POGOZELSKI: 702.

THE COURT: Okay.

(Government's No. 702, Document, was marked for Identification.)

MS. DEROVANESIAN: 703.

THE COURT: All right.

(Government's No. 703, Document, was received in Evidence.)

MS. DEROVANESIAN: 704.

THE COURT: Okay.

(Government's No. 704, Document, was received in Evidence.)

MS. DEROVANESIAN: 705.

THE COURT: I think that's already in.

(Government's No. 705, Document, was received in Evidence.)

MS. DEROVANESIAN: Okay. And then 706.

THE COURT: That's already in.

(Government's No. 706, Document, was received in Evidence.)

MS. DEROVANESIAN: 708.

THE COURT: Okay.

(Government's No. 708, Document, was received in Evidence.)

MS. DEROVANESIAN: 709.

THE COURT: All right.

(Government's No. 709, Document, was received in Evidence.)

MS. DEROVANESIAN: 711.

THE COURT: Okay.

(Government's No. 711, Document, was received in Evidence.)

THE COURT: Okay.

MR. ZIMET: Judge, let me just interrupt one second.

You say it's already in, but I think what happened was the Government abridged those exhibits from what the original exhibit was; so we're introducing the original exhibit.

Those are bank records. So instead of introducing entire bank records, they just introduced certain pages of it.

THE COURT: Okay.

MR. ZIMET: So what we're doing is the entire record, and so I didn't want the Court to be confused that it's already in because what's in is not the entire record. It's a portion of it.

THE COURT: Okay. Well, the whole exhibit is now in.

MR. ZIMET: Correct.

MS. DEROVANESIAN: Okay. And then we have several more that we agreed to including 196.

THE COURT: I think 196 is already in.

MS. DEROVANESIAN: Okay. I'm sorry. Now that's a defense exhibit, so Defense 196.

THE COURT: Hold on. Okay.

(Defendant's No. 196, Document, was received in Evidence.)

THE COURT: 196 is in.

MS. DEROVANESIAN: And then the rest of these are also defense exhibits.

131. However, we noted that that one is consumed within 196. We don't object if they want it in separately.

THE COURT: Okay. 131 is in.

(Defendant's No. 131, Document, was received in Evidence.)

MS. DEROVANESIAN: 313.

THE COURT: Okay. 313 is in.

(Defendant's No. 313, Document, was received in Evidence.)

MS. DEROVANESIAN: 314.

THE COURT: Okay. That's in.

(Defendant's No. 314, Document, was received in Evidence.)

MS. DEROVANESIAN: 315.

THE COURT: That's in.

(Defendant's No. 315, Document, was received in Evidence.)

MS. DEROVANESIAN: 202.

THE COURT: 202 is in.

(Defendant's No. 202, Document, was received in Evidence.)

MS. DEROVANESIAN: 301.

THE COURT: 301 is in.

(Defendant's No. 301, Document, was received in Evidence.)

MS. DEROVANESIAN: 306.

THE COURT: 306 is in.

(Defendant's No. 306, Document, was received in Evidence.)

MS. DEROVANESIAN: 307.

THE COURT: 307 is in.

(Defendant's No. 307, Document, was received in Evidence.)

MS. DEROVANESIAN: 308.

THE COURT: 308 is in.

(Defendant's No. 308, Document, was received in Evidence.)

MS. DEROVANESIAN: And 310.

THE COURT: 310 is in.

(Defendant's No. 310, Document, was received in Evidence.)

MS. DEROVANESIAN: And then I have a short list of exhibits that were on the defense list, but I believe they have already been admitted as a different exhibit number.

THE COURT: What's the harm in putting them in twice?

MS. DEROVANESIAN: I suppose just the redundancy and the potential confusion for the jurors if there are two separate -- if there's a version that has a defense stamp and a

version that has a Government stamp, that would suggest that perhaps they're different.

THE COURT: I don't have any problem putting in redundant exhibits.

If the jury is going to go through 600 exhibits, we're going to be here a long time.

MS. DEROVANESIAN: Understood.

And the main -- well, I have several that fall into one kind of one category of issues, and then I have just got one I wanted to take up separately from those, and that is Government's Exhibit 662.

THE COURT: Before we do that, why don't we go through the ones that you're in agreement on but were hesitant because they were redundant.

MS. DEROVANESIAN: That was just three of them. So that was Defense Exhibit 177.

THE COURT: 177 is in.

(Defendant's No. 177, Document, was received in Evidence.)

MS. DEROVANESIAN: Defense Exhibit 311.

THE COURT: 311 is in.

(Defendant's No. 311, Document, was received in Evidence.)

MS. DEROVANESIAN: Defense Exhibit 312.

THE COURT: 312 is in.

(Defendant's No. 312, Document, was received in Evidence.)

THE COURT: Next one.

MS. DEROVANESIAN: We object to the admission of Government's Exhibit 662 for several different reasons.

Your Honor, this was the compilation of the Frier Levitt law firm's billing records. Primarily, there was no foundation laid for the entirety of this record. It was not authenticated. It contains hearsay within hearsay.

THE COURT: I thought you all agreed that each party didn't have to authentic the documents.

MS. DEROVANESIAN: That was for a different set of documents, Your Honor, that were obtained pursuant to the Gilead seizure.

These records came from that law firm and were not subject to the same agreement.

THE COURT: So you listed exhibits on the Government's exhibit list, and now you want to object to them as not being authentic?

MS. DEROVANESIAN: Your Honor, there's a reason for that.

If the Court recalls, these records were put in front of a government witness, that attorney, Martha Rumore; and aside from them containing hearsay, she wasn't able to authentic them.

So she wasn't able to lay the foundation that they were accurate, that they are what they purport to be, and more importantly than that, we were prohibited from inquiring further about these records.

They were put in front of her at various points on cross-examination for a very select purpose of refreshing her memory, but then it was objected to when we were attempting to inquire about other parts of these records.

THE COURT: Well, I mean, if they're in evidence as a defense exhibit, aren't you able to comment on them?

MS. DEROVANESIAN: Your Honor, I think the problem is that the person who is able to comment on them was not allowed to. The person who -- the only person who worked at that law firm, who would have any familiarity with that law firm's records, was specifically prohibited from explaining what those other entries are that relate to other people.

So to prohibit a witness from commenting on them but then to allow them in at the end so they can be used as argument and speculation as to what those records meant seems improper.

THE COURT: So give me an example of a piece of 662 that they objected to that you feel that Ms. Rumore would have been able to clarify something that's not favorable to the defense?

MS. DEROVANESIAN: Your Honor, without a transcript in

front of me, I can't quote something specific that was objected to, but I can give the Court an example.

There were other -- there were other matters being worked on by the law firm and other individuals at the law firm. One of them was another subpoena that they received in conjunction with a different case.

On its face, some of these billing entries, especially to a jury, are confusing and it's not clear that they relate to completely unrelated matters. So it seems pretty clear that the defense argument is going to be, "Hey, look at these billing records. They hired lawyers. They paid all of this money," because that is what was argued in opening statement as well.

And so to use those entries to suggest to the jury that they were seeking this advice of counsel, that this was part of their good faith effort to comply with the law, when in reality it's pretty clear that these entries actually do, and if this witness was allowed to be asked these questions, we believe she would explain they were relating to a subpoena, relating to other bad conduct by the defendants and their company.

And so that would be misleading to the jury because she was not allowed to elaborate on those aspects of bills, to now allow them in just for the sake of argument, and there's no basis, really, to make those arguments just based on the face of the bills without that context.

THE COURT: Are you done?

MS. DEROVANESIAN: Yes, Your Honor.

THE COURT: I seem to remember there being testimony about lawyers from that law firm working on other cases.

You can certainly argue that to the jury, and if they talk about things that they objected to, you can argue that to the jury.

662 is received.

(Defendant's No. 662, Document, was received in Evidence.)

MS. DEROVANESIAN: Thank you, Your Honor.

And then I believe there are only maybe about ten exhibits left. I don't know if it would aid the Court if we pulled them up on the screen, but I believe there were objections to each of them, are all based on hearsay.

THE COURT: So pull them up.

MS. DEROVANESIAN: Okay. We'll start with Defense Exhibit 160.

Okay, Your Honor. We object to this, Defense 160. It's an out-of-court statement. It is, I believe, authored by somebody named Blair Rosiello and contains various out-of-court statements and is not subject to an exception.

THE COURT: So Blair is sending it to who?

MS. DEROVANESIAN: To a manager's list serve.

THE COURT: And who is on the manager's list serve?

MS. DEROVANESIAN: We believe it's a variety of people, including the defendants, but the declarant here is this person Blair Rosiello.

THE COURT: So why is that hearsay?

MS. DEROVANESIAN: Because it's her out-of-court statements being offered to prove the truth of the matter asserted in this email.

THE COURT: I was kind of asking the defense attorneys.

MS. DEROVANESIAN: I'm sorry. I thought you were looking at me.

MR. ZIMET: It's a business record. It's a manager's meeting which was testified to as regularly held at Safe Chain's manager meeting on that date.

All the managers are present at that -- traditionally at those meetings, and it was seized by Gilead, when they did the seizure of all the records at Safe Chain, when they did their July 26, 2001, seizure. It's part of the records of the company.

THE COURT: Was Ms. Divilio on the chain of management?

MR. ZIMET: Yes. She's the compliance director. She testified she goes to those meetings.

THE COURT: Okay. 160 will be received.

(Defendant's No. 160, Document, was received in Evidence.)

THE COURT: Next one.

MS. DEROVANESIAN: Next one is Defense 194.

And, Your Honor, the declarant of this document is Abbie Divilio.

THE COURT: Wasn't she shown this during her testimony?

MS. DEROVANESIAN: She was shown it, and she was certainly asked about what she stated in her resignation letter, but the actual letter itself was not received in evidence at that time and is hearsay.

THE COURT: I'll allow 194.

(Defendant's No. 194, Document, was received in Evidence.)

THE COURT: Next one.

MS. DEROVANESIAN: 195.

And, Your Honor, our basis for this one is the same as the previous. This is the out-of-court statements of Abbie Divilio.

THE COURT: Was she shown this during her cross-examination?

MR. ZIMET: Yes.

THE COURT: So I'll admit 195.

(Defendant's No. 195, Document, was received in Evidence.)

THE COURT: Next one.

MS. DEROVANESIAN: 203. Defense 203, and, Your Honor, down below here, these are the statements of John Marrone who

is an attorney.

THE COURT: You need to go back up to the top.

I don't remember Ms. Divilio having had her recollection refreshed from this.

Oh, she was.

MR. ZIMET: She testified about this, Judge.

THE COURT: What in this exhibit did she testify about?

MR. ZIMET: I'm sorry?

THE COURT: What in this exhibit did she testify about?

MR. ZIMET: That Marrone was asked about not sending T3s to Gilead.

He said he would agree that it was not necessary, and Charles Boyd asked Divilio to keep it in the Safe Chain files. That was her testimony today, and she was shown the document today.

THE COURT: All right. I'm going to allow in -- what's it? -- 203?

MS. DEROVANESIAN: Yes, I believe, that's 203, Defense 203.

THE COURT: 203 will be received.

(Defendant's No. 203, Document, was received in Evidence.)

THE COURT: Next one.

MS. DEROVANESIAN: Next one is Defense 209.

And, Your Honor, again, these are the same grounds as

our previous objection as being self-serving hearsay.

THE COURT: I'll allow it.

209 is received.

(Defendant's No. 209, Document, was received in Evidence.)

THE COURT: Next one.

MS. DEROVANESIAN: 210 is our next one, Defense 210.

THE COURT: This is Ms. Divilio's letter saying she made a mistake?

MR. ZIMET: Yes, sir.

THE COURT: I'm going to allow that in.

210 will be received.

(Defendant's No. 210, Document, was received in Evidence.)

MS. DEROVANESIAN: Defense 217 is the next one.

THE COURT: Okay.

MS. DEROVANESIAN: And, Your Honor, again, this is hearsay. I don't believe this is subject to the same reasoning as the previous documents. This is a statement of Adam Brosius.

THE COURT: Did Ms. Divilio testify about this?

MR. ZIMET: Yes, Judge.

THE COURT: What did she say?

MR. ZIMET: She said that Adam Brosius took the position that this was a Gilead problem. It was not a Safe

Chain problem.

THE COURT: I'm going to admit 217.

(Defendant's No. 217, Document, was received in Evidence.)

MS. DEROVANESIAN: The next one is Defense 223.

And, Your Honor, this one is the out-of-court statement of Abbie Divilio to Blair Rosiello. I believe she may have testified about SOPs or submitting SOPs, but I do not believe that she testified to the specific document or the attachment.

THE COURT: Let me see the attachment.

Mr. Zimet.

MR. ZIMET: She testified about SOPs that she was following at times and she did all of the approvals, and these are SOPs that she's saying she wants to have.

THE COURT: I don't remember her seeing this.

MR. ZIMET: Not about these specific ones but about SOPs at the time.

THE COURT: I'm going to sustain the objection.

Next one.

MS. DEROVANESIAN: Defense 259.

And, Your Honor, this is a statement of Martha Rumore. In addition to it being hearsay, it's also irrelevant. It relates to other lawsuits involving a drug manufacturer that are not at issue in this case.

MR. ZIMET: She testified about this in

cross-examination when she testified about the memo that she did and the analysis she did of the other Florida lawsuit and the connection with this lawsuit.

THE COURT: I'm going to allow 259.

(Defendant's No. 259, Document, was received in Evidence.)

MS. DEROVANESIAN: And then, Your Honor, our last exhibit, I believe, is Defense 289.

And, Your Honor this is the statement of Abbie Divilio to Dakota Flowers. We do believe she was asked about this document on cross-examination, but again, this is her out-of-court statement.

There is not a defendant involved in this email; so we believe this one should be kept out as well.

THE COURT: I mean, a lot of these documents were referred to, to refresh her recollection, but then she testified to them.

So I'm going to let -- is it 289?

MR. ZIMET: It's 289.

MS. DEROVANESIAN: It's 289.

THE COURT: 289 will be received.

(Defendant's No. 289, Document, was received in Evidence.)

MS. DEROVANESIAN: I believe that covers all the defense exhibits, but feel free to correct me.

MR. ZIMET: I want to look at one. I think we had 201, which I don't think you addressed.

MS. DEROVANESIAN: 201? I don't think we saw 201.

I think we might have -- I thought your 1 was a 2. Do you also have a 202?

MR. ZIMET: No.

MR. POGOZELSKI: So I apologize then.

Where we said "202," it was really supposed to be "201." So there's no Defense 202.

THE COURT: Is that correct, Mr. Zimet?

MR. ZIMET: Correct.

THE COURT: 201 is received.

(Defendant's No. 201, Document, was received in Evidence.)

THE COURT: Not 202.

Anything else.

MR. ZIMET: Those are all the exhibits, Judge.

THE COURT: So, let's say the jury wants to see exhibits. How are they going to do that during their deliberations?

Do you have paper copies? Do you have something electronic for them to be able to pull up?

MS. DEROVANESIAN: Your Honor, the Government has a combination of exhibits. We have paper copies of some and then we have a clean laptop where they can view the electronic

versions.

THE COURT: All right. You're going to have to get with the defense attorneys so that they're satisfied that the laptop is clean and doesn't have any, you know, secret emails on it, and that the information that is obtainable by the jury is only the exhibits that have been admitted.

MS. DEROVANESIAN: We will do that, Your Honor.

THE COURT: How about for the defense exhibits?

How does the jury get to see them?

MR. ZIMET: One second, please. We'll put ours on a drive for the computer, Judge.

COURTROOM DEPUTY: But you have to make sure -- because I did check. You have to have your own device to put the drive in unless you all are going to coordinate together.

THE COURT: When we're done with closing arguments, I'm going to turn to everyone and say, "Are we in agreement that all the evidence is in there that's supposed to be there and nothing's there that's not supposed to be there?" Before I send it to back to the jury.

And I don't want to send something back to the jury and have the jury come out with a question about an exhibit that wasn't introduced.

MR. ZIMET: So, Judge, if we can consult internally and then speak with the Government and whatever position we have, that's the position we'll be taking.

THE COURT: Come up with a joint solution or have paper copies for everything.

MR. ZIMET: That's fine. We will meet with the Government, if we can, and come up a solution. If not, we will have paper copies.

THE COURT: Anything else we need to discuss?

MS. DEROVANESIAN: Nothing from the Government.

MR. BARZEE: No, thank you.

THE COURT: See everybody Monday at 1:00.

THE COURT SECURITY OFFICER: All rise.

(Jury Trial was adjourned at 3:33 PM.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 10/24/2025

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN, FPR, RPR
Official Court Reporter
United States District Court
Southern District of Florida
U.S. Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

**$**

$38 [1] - 37:7
$92 [1] - 30:22

**/**

/s/Patricia [1] - 129:17

**1**

1 [4] - 1:8, 1:19, 88:14, 127:4
10-minute [1] - 110:15
10.4 [1] - 107:12
10/24/2025 [1] - 129:17
108 [1] - 64:25
10:29 [1] - 58:20
10:47 [1] - 58:20
10th [1] - 71:3
111 [3] - 3:13, 3:14, 3:15
112 [6] - 3:16, 3:17, 3:18, 3:19, 3:20, 3:21
113 [2] - 3:22, 4:4
114 [5] - 3:24, 4:6, 4:20, 4:21, 4:22
115 [5] - 4:13, 4:14, 4:15, 4:16, 4:17
116 [2] - 4:1, 4:18
117 [1] - 4:19
11:13 [1] - 76:20
11:42 [1] - 76:20
11:53 [1] - 85:8
120 [1] - 4:23
121 [1] - 3:25
122 [2] - 4:2, 4:3
123 [1] - 4:7
124 [2] - 4:8, 4:9
125 [1] - 4:10
126 [2] - 4:11, 4:12
127 [1] - 4:5
131 [4] - 3:24, 114:3, 114:5, 114:6
137 [1] - 18:22
13th [2] - 51:8, 74:25
14 [3] - 55:7, 55:15, 71:1
140 [1] - 10:16
15 [3] - 31:10, 56:19, 58:19
15-minute [2] - 56:10, 76:15
16 [2] - 31:10, 48:8
160 [6] - 3:25, 15:12, 120:18, 120:19, 121:22, 121:23
17 [1] - 105:4
177 [4] - 4:1, 116:16, 116:17, 116:18
194 [5] - 4:2, 19:19, 122:1, 122:9, 122:10
195 [4] - 4:3, 122:13, 122:20, 122:21
196 [9] - 4:4, 18:23, 67:18, 113:18, 113:19, 113:21, 113:23, 113:25, 114:4
1:00 [13] - 78:25, 79:1, 79:5, 81:23, 81:25, 84:21, 84:25, 85:6, 87:15, 87:20, 108:23, 129:9
1:04 [1] - 85:8
1:39 [1] - 110:24
1st [1] - 13:4

**2**

2 [2] - 39:15, 127:4
2.1 [1] - 88:16
20 [2] - 56:9, 108:24
2001 [1] - 121:17
201 [9] - 4:5, 13:7, 14:7, 127:1, 127:3, 127:9, 127:12, 127:13
2019 [1] - 62:16
202 [8] - 4:6, 114:20, 114:21, 114:22, 127:5, 127:8, 127:9, 127:15
2020 [20] - 7:25, 10:4, 10:12, 14:1, 30:25, 45:17, 46:22, 47:6, 48:24, 51:8, 51:23, 52:13, 52:23, 53:2, 55:7, 55:15, 62:2, 67:1, 67:12, 67:20
2021 [11] - 9:3, 20:1, 25:7, 26:3, 28:25, 30:9, 31:1, 48:8, 66:6, 70:24, 71:3
2024 [2] - 20:16, 25:21
2025 [1] - 1:5
203 [10] - 4:7, 7:19, 14:8, 122:24, 123:17, 123:18, 123:19, 123:20, 123:21
209 [5] - 4:8, 26:2, 123:24, 124:3, 124:4
210 [6] - 4:9, 22:11, 124:7, 124:12, 124:13
217 [5] - 4:10, 28:19, 124:15, 125:2, 125:3
21st [1] - 74:4
223 [1] - 125:5
22nd [1] - 26:3
23 [1] - 1:5
23rd [3] - 11:5, 11:6, 74:4
24-cr-20255-Dimitrouleas/Hunt [1] - 1:3
24th [1] - 11:2
259 [4] - 4:11, 125:20, 126:4, 126:5
26 [4] - 99:19, 100:9, 100:17, 121:17
27 [1] - 92:16
272 [1] - 48:6
27th [3] - 46:22, 47:6, 47:10
289 [8] - 4:12, 10:25, 126:8, 126:18, 126:19, 126:20, 126:21, 126:22
29 [7] - 73:2, 75:6, 77:21, 78:13, 87:23, 87:25, 88:6
299 [1] - 129:20
2nd [3] - 13:2, 13:18, 45:17

**3**

3 [4] - 46:20, 51:6, 88:20, 99:15
30 [3] - 3:4, 28:25, 56:9
30-minute [1] - 110:15
301 [6] - 4:13, 8:21, 8:22, 114:24, 114:25, 115:1
306 [4] - 4:14, 115:3, 115:4, 115:5
307 [4] - 4:15, 115:7, 115:8, 115:9
308 [4] - 4:16, 115:11, 115:12, 115:13
30th [3] - 14:1, 20:1, 74:25
310 [4] - 4:17, 115:15, 115:16, 115:17
311 [4] - 4:18, 116:20, 116:21, 116:22
312 [4] - 4:19, 116:24, 116:25, 117:1
313 [4] - 4:20, 114:8, 114:9, 114:10
314 [3] - 4:21, 114:12, 114:14
315 [3] - 4:22, 114:16, 114:18
320 [1] - 68:10
33128 [1] - 1:20
33132 [1] - 1:16
33301 [2] - 1:23, 129:21
347 [1] - 66:4
373 [2] - 55:24, 60:11
3:09 [1] - 110:24
3:30 [6] - 86:6, 86:12, 108:13, 108:18, 110:19, 110:22
3:33 [2] - 1:6, 129:11
3:59 [1] - 26:4
3rd [1] - 1:19

**4**

4 [2] - 51:6, 88:21
4,000 [3] - 27:12, 30:15, 30:16
40 [2] - 1:19, 30:19
40,000 [1] - 30:14
404(b [1] - 57:21
408 [1] - 39:15
41 [1] - 45:23
436A [1] - 45:12
45 [2] - 109:6, 110:6
475 [1] - 63:23
490 [1] - 61:24
499 [1] - 46:20
4th [1] - 1:16

**5**

5 [1] - 88:22
50 [2] - 109:22, 110:3
500k [1] - 47:5
507 [1] - 51:6
529 [1] - 47:22
543 [2] - 62:13, 62:25
55 [6] - 108:22, 108:24, 109:2, 109:21, 110:13, 110:16
5:00 [2] - 79:5, 108:23

**6**

6 [2] - 1:22, 3:3
600 [1] - 116:5
633 [1] - 1:22
65 [1] - 110:8
653 [1] - 41:2
662 [6] - 4:23, 116:11, 117:5, 118:21, 120:8, 120:9
678 [1] - 52:19
679 [1] - 55:5
680 [5] - 3:11, 70:6, 70:12, 70:15, 70:16
681 [8] - 3:11, 72:24, 72:25, 80:9, 80:10, 81:9, 81:10, 81:11
6s [2] - 88:23, 88:24
6th [1] - 74:24

**7**

7 [1] - 9:3
70 [1] - 3:11
700 [4] - 3:13, 111:11, 111:14, 111:15
701 [4] - 3:14, 111:11, 111:17, 111:18
702 [3] - 3:15, 111:21, 111:23
703 [3] - 3:16, 111:25, 112:2
704 [3] - 3:17, 112:4, 112:6
705 [3] - 3:18, 112:8, 112:10
706 [3] - 3:19, 112:12, 112:14
708 [3] - 3:20, 112:16, 112:18
709 [3] - 3:21, 112:20, 112:22
711 [3] - 3:22, 112:24, 113:1
72 [1] - 3:11
7th [1] - 52:23

**8**

8 [2] - 89:21, 90:10
8.1 [1] - 91:6
81 [1] - 3:12

**9**

9 [1] - 70:24
9.2 [1] - 107:11
97 [1] - 71:1
99 [1] - 1:16
9:07 [1] - 1:6

**A**

A.M [1] - 47:5
Abbie [5] - 64:5, 122:3, 122:15, 125:7, 126:9
Abbie's [1] - 64:9
abetting [3] - 93:23, 94:7, 94:24
ABIGAIL [2] - 3:3, 6:8
able [10] - 10:5, 24:15, 35:18, 85:20, 117:24, 118:1, 118:10, 118:12,

118:23, 127:22
**above-entitled** [1] - 129:15
**abridged** [1] - 113:6
**absolutely** [1] - 57:22
**abundance** [1] - 58:10
**abundant** [1] - 96:5
**accept** [1] - 17:12
**accommodate** [2] - 11:23, 76:16
**according** [2] - 48:16, 67:8
**accurate** [8] - 11:16, 12:9, 29:14, 61:5, 98:18, 104:3, 118:2, 129:14
**accurately** [1] - 15:20
**acquittal** [6] - 73:6, 73:21, 74:8, 74:14, 74:20, 75:7
**Act** [1] - 91:21
**acted** [1] - 75:16
**action** [1] - 77:6
**activities** [1] - 75:11
**activity** [1] - 38:19
**acts** [3] - 73:19, 73:20, 74:6
**actual** [5] - 33:13, 73:22, 95:15, 96:5, 122:7
**AD** [3] - 24:8, 26:19, 27:5
**Adam** [34] - 28:14, 28:15, 28:24, 28:25, 29:14, 29:18, 43:5, 45:8, 46:10, 46:11, 46:16, 46:22, 46:23, 47:3, 47:13, 47:18, 47:24, 48:1, 48:8, 48:10, 48:17, 48:24, 49:11, 49:14, 50:8, 50:16, 67:21, 73:19, 74:10, 74:16, 94:3, 124:20, 124:24
**add** [4] - 27:5, 73:8, 94:8, 108:8
**added** [3] - 88:8, 106:9, 106:14
**addition** [2] - 104:12, 125:22
**additional** [1] - 42:19
**additionally** [1] - 73:21
**additions** [1] - 88:13
**address** [1] - 54:4
**addressed** [2] - 20:1, 127:2
**adjourned** [1] - 129:11
**admission** [1] - 117:4
**admit** [5] - 111:8, 111:14, 111:17, 122:20, 125:2
**admitted** [2] - 115:21, 128:6
**admonishment** [1] - 87:13
**admonition** [6] - 6:2, 56:11, 59:17, 81:2, 81:21, 87:1
**adopt** [2] - 75:20, 88:2
**adopted** [1] - 75:21
**adulterated** [5] - 67:8, 73:13, 90:22, 92:2, 92:7
**advantage** [1] - 42:21
**advice** [13] - 8:5, 8:12, 14:5, 14:12, 83:1, 83:2, 102:4, 103:11, 103:18, 104:17, 104:22, 105:1, 119:15
**advocated** [1] - 9:5
**affirmed** [2] - 6:9, 97:23
**afternoon** [4] - 6:13, 79:15, 80:16, 87:17
**agencies** [1] - 31:20
**agents** [3] - 37:18, 38:2, 61:1
**ago** [3] - 20:16, 20:18, 99:4
**agree** [8] - 29:2, 29:3, 39:3, 84:9, 86:7, 111:4, 111:8, 123:12
**agreed** [2] - 113:18, 117:10
**agreement** [4] - 74:17, 116:13, 117:16, 128:16
**agreements** [2] - 24:19, 39:5
**agrees** [2] - 79:10, 79:11
**ahead** [7] - 7:10, 57:15, 81:15, 87:12, 88:7, 94:17, 94:23
**Ahrens** [1] - 96:14
**Ahrins** [1] - 96:15
**aid** [1] - 120:13
**aiding** [3] - 93:23, 94:7, 94:24
**Alexander** [1] - 1:13
**align** [1] - 76:14
**allegations** [1] - 10:20
**allege** [2] - 73:22, 75:10
**allow** [16] - 6:3, 6:25, 56:11, 59:18, 75:12, 81:3, 81:21, 87:2, 87:14, 118:18, 119:23, 122:9, 123:16, 124:2, 124:11, 126:4
**allowed** [4] - 56:17, 118:12, 119:18, 119:22
**Allstate** [2] - 41:5, 41:17
**almost** [1] - 80:14
**alter** [1] - 74:11
**altered** [2] - 90:1, 106:18
**AM** [6] - 1:6, 58:20, 76:20, 85:8
**Amanda** [3] - 51:12, 51:22, 52:2
**ambit** [1] - 97:14
**AMERICA** [1] - 1:4
**amount** [4] - 12:18, 50:25, 61:11, 102:14
**analysis** [1] - 126:2
**announcement** [1] - 15:23
**answer** [12] - 6:16, 49:6, 57:2, 57:7, 57:25, 58:1, 58:3, 76:8, 76:9, 76:11, 105:16
**answered** [11] - 6:15, 7:6, 7:7, 22:5, 25:14, 28:10, 32:12, 32:17, 34:2, 46:2, 49:4
**answers** [2] - 6:16, 34:21
**Anthony** [3] - 65:4, 65:6, 65:25
**anyway** [1] - 54:15
**apologies** [1] - 14:9
**apologize** [2] - 7:21, 127:7
**appear** [4] - 12:6, 19:14, 19:22, 105:15
**APPEARANCES** [1] - 1:12
**application** [20] - 10:13, 20:14, 20:24, 31:6, 31:10, 32:14, 32:20, 32:24, 33:9, 33:10, 33:15, 33:20, 34:6, 34:11, 35:13, 35:24, 36:25, 37:5, 53:4, 57:21
**apply** [2] - 33:7, 94:17
**appreciate** [2] - 20:4, 20:23
**appreciated** [1] - 19:24
**approach** [2] - 62:5, 106:17
**approached** [1] - 37:18
**appropriate** [9] - 94:1, 101:10, 101:16, 101:17, 102:20, 103:7, 103:25, 105:18, 106:17
**approval** [5] - 31:5, 33:2, 35:24, 54:20, 59:24
**approvals** [1] - 125:13
**approve** [3] - 16:7, 32:14, 37:10
**approved** [19] - 16:8, 32:20, 32:23, 33:9, 33:12, 33:15, 33:20, 34:6, 34:11, 35:13, 35:25, 36:3, 36:25, 37:5, 39:21, 47:7, 54:2, 60:6
**approving** [7] - 18:14, 31:9, 53:4, 54:3, 55:12, 60:17, 61:8
**April** [12] - 9:3, 10:4, 10:12, 20:16, 25:7, 25:11, 28:25, 48:8, 62:2, 62:16, 66:6, 74:25
**argue** [12] - 94:11, 102:21, 102:24, 103:9, 103:13, 104:4, 104:7, 105:18, 105:21, 106:3, 120:5, 120:6
**argued** [1] - 119:12
**arguing** [2] - 73:6, 80:1
**argument** [13] - 63:10, 97:25, 98:13, 98:14, 103:2, 103:20, 103:25, 104:1, 109:10, 110:1, 118:19, 119:10, 119:23
**arguments** [12] - 75:20, 75:21, 75:22, 78:15, 78:16, 79:19, 87:17, 88:3, 101:10, 101:11, 119:24, 128:15
**arising** [1] - 25:19
**arrangements** [1] - 69:12
**arrived** [1] - 40:21
**article** [1] - 65:24
**articles** [1] - 96:9
**aside** [3] - 36:6, 105:17, 117:24
**aspect** [1] - 17:16
**aspects** [1] - 119:22
**asserted** [1] - 121:7
**asserting** [2] - 102:7, 103:24
**assist** [2] - 7:3, 7:4
**Assistant** [1] - 1:15
**assume** [5] - 34:17, 56:24, 57:1, 57:2, 95:6
**assumes** [2] - 43:22, 44:25
**assuming** [2] - 33:24, 43:23
**assumption** [2] - 57:10, 57:13
**attached** [1] - 12:7
**attaches** [1] - 65:13
**attachment** [3] - 107:21, 125:9, 125:10
**attachments** [1] - 10:21
**attempting** [1] - 118:7
**attention** [2] - 49:3, 50:15
**attorney** [2] - 117:23, 123:1
**attorney's** [1] - 8:12
**attorneys** [6] - 38:23, 38:25, 105:18, 105:22, 121:8, 128:3
**Attorneys** [1] - 1:15
**audit** [1] - 31:22
**audits** [2] - 31:19, 31:21
**August** [10] - 19:11, 46:22, 47:6, 47:10, 52:13, 52:23, 53:1, 53:2, 70:24, 74:24
**authentic** [3] - 117:11, 117:19, 117:25
**authenticated** [1] - 117:9
**authored** [1] - 120:20
**authorization** [1] - 14:23
**authorized** [6] - 24:9, 24:11, 25:2, 25:3, 25:24, 30:10
**available** [1] - 37:13
**avoiding** [1] - 95:17
**aware** [3] - 17:24, 43:23, 96:22
**Awesome** [1] - 21:3

**B**

**B11** [1] - 108:5
**B12** [1] - 108:6
**background** [10] - 43:1, 52:8, 52:12, 53:1, 53:5, 53:6,

53:9, 61:12, 63:19, 66:10
**bad** [1] - 119:20
**BAILEY** [2] - 2:3, 129:18
**Bailey** [1] - 129:17
**BAILEY-ENTIN** [2] - 2:3, 129:18
**Bailey-Entin** [1] - 129:17
**bank** [2] - 113:8, 113:9
**Barzee** [7] - 1:18, 1:19, 72:21, 73:3, 87:4, 98:12, 110:13
**BARZEE** [62] - 5:9, 6:1, 32:9, 32:12, 32:17, 33:24, 34:2, 43:22, 44:12, 44:25, 49:4, 58:18, 59:3, 59:16, 63:7, 65:20, 70:14, 72:22, 73:5, 75:19, 81:1, 82:6, 84:18, 85:5, 86:25, 87:5, 87:24, 89:6, 89:12, 89:18, 90:11, 91:9, 91:13, 91:18, 91:23, 92:4, 92:9, 92:15, 93:1, 93:7, 93:11, 93:17, 93:22, 95:2, 95:8, 98:13, 99:6, 99:10, 99:12, 99:15, 99:19, 100:15, 100:18, 100:20, 100:23, 101:8, 105:11, 107:8, 108:11, 110:14, 110:21, 129:8
**based** [14] - 16:1, 33:2, 56:1, 59:25, 60:18, 61:3, 63:8, 75:12, 75:17, 95:11, 96:23, 104:20, 119:24, 120:15
**Basic** [7] - 88:14, 88:16, 88:23, 88:24, 89:21, 90:10, 91:6
**basic** [3] - 88:20, 88:21, 88:22
**basis** [3] - 29:20, 119:24, 122:14
**became** [1] - 9:25
**becoming** [2] - 27:5, 30:10
**BEFORE** [1] - 1:10
**began** [3] - 22:21, 28:13, 57:7
**begin** [2] - 6:14, 22:16
**beginning** [2] - 37:16, 64:19
**begun** [1] - 71:14
**behalf** [5] - 73:6, 75:5, 87:5, 87:8, 87:24
**below** [1] - 122:25
**benefit** [1] - 82:25
**Berger** [4] - 63:6, 65:4, 65:6, 65:25
**best** [4] - 38:18, 42:6, 66:7, 77:16
**better** [1] - 23:19
**between** [6] - 43:5, 46:7, 52:22, 86:12, 106:20, 109:14
**beyond** [2] - 35:7, 94:18
**bifurcate** [1] - 109:16
**bifurcating** [1] - 90:13
**Biktarvy** [1] - 22:18
**billing** [4] - 104:6, 117:7, 119:7, 119:11
**bills** [2] - 119:22, 119:25
**bit** [5] - 21:17, 32:7, 46:10, 59:23, 63:24
**black** [3] - 11:13, 66:22, 66:23
**Blair** [4] - 120:21, 120:23, 121:3, 125:7
**block** [1] - 79:15
**board** [1] - 31:22
**boards** [1] - 31:19
**boat** [1] - 42:17
**bottle** [4] - 18:2, 18:5, 43:9, 67:23
**bottles** [6] - 17:9, 17:11, 43:12, 96:8, 97:9, 97:11
**bottom** [1] - 27:1
**Boulevard** [46] - 10:4, 10:12, 14:23, 15:24, 16:4, 16:13, 16:21, 31:5, 32:25, 33:4, 33:5, 33:16, 33:17, 33:22, 34:8, 34:19, 34:24, 35:16, 36:6, 36:7, 36:25, 37:7, 37:10, 39:18, 40:9, 40:12, 43:5, 46:17, 47:7, 51:10, 52:13, 53:1, 53:15, 54:7, 54:21, 55:9, 55:12, 59:25, 60:7, 60:18, 61:4, 61:9, 67:2, 97:1, 129:20
**Boulevard's** [5] - 32:23, 33:9, 33:20, 37:2, 37:5
**box** [1] - 97:7
**boxes** [1] - 96:7
**Boyd** [134] - 5:8, 8:15, 8:22, 9:5, 10:24, 13:4, 13:11, 14:13, 14:17, 20:13, 30:9, 31:4, 35:1, 35:22, 36:9, 36:11, 36:16, 36:19, 37:1, 37:17, 38:11, 38:17, 39:6, 39:7, 39:17, 40:1, 41:5, 41:21, 43:5, 43:19, 43:21, 43:23, 44:4, 44:20, 44:23, 45:4, 45:7, 45:11, 45:20, 45:25, 46:7, 47:2, 47:24, 48:2, 48:9, 48:10, 48:16, 51:12, 51:15, 51:22, 52:7, 54:19, 55:13, 56:3, 56:5, 59:25, 60:14, 60:18, 61:5, 62:1, 62:6, 62:15, 64:1, 64:4, 64:8, 64:11, 64:21, 65:4, 65:10, 65:25, 66:13, 66:20, 67:13, 67:15, 67:21, 68:12, 68:13, 68:20, 70:3, 70:4, 70:18, 72:14, 73:6, 73:8, 73:18, 73:19, 73:22, 73:25, 74:5, 74:8, 74:9, 74:10, 74:17, 74:22, 75:5, 75:16, 75:20, 82:4, 82:8, 82:10, 82:14, 82:16, 82:20, 82:22, 83:3, 83:5, 83:10, 83:12, 83:17, 83:19, 83:25, 84:2, 84:5, 84:7, 84:11, 84:13, 87:5, 87:9, 87:25, 88:2, 89:6, 89:12, 90:11, 94:3, 94:4, 123:13
**BOYD** [22] - 1:7, 1:18, 1:22, 82:9, 82:11, 82:15, 82:17, 82:21, 82:23, 83:4, 83:6, 83:11, 83:13, 83:18, 83:20, 84:1, 84:3, 84:6, 84:8, 84:12, 84:14
**Boyd's** [10] - 7:19, 10:16, 30:13, 36:13, 42:9, 51:1, 55:20, 81:14, 84:17, 101:4
**Boyds** [1] - 42:16
**branded** [1] - 68:17
**break** [4] - 56:16, 85:2, 90:25, 108:24
**brief** [3] - 12:18, 30:6, 109:13
**briefly** [1] - 102:11
**bring** [9] - 5:4, 58:24, 59:4, 77:8, 78:20, 78:24, 80:5, 85:12, 86:18
**broken** [1] - 43:6
**brokers** [1] - 51:13
**Brosius** [31] - 28:14, 28:15, 28:24, 28:25, 29:14, 29:17, 43:6, 45:8, 46:10, 46:12, 46:16, 46:22, 46:23, 47:3, 47:13, 47:18, 47:24, 48:8, 48:10, 48:17, 48:24, 49:14, 50:8, 50:16, 67:21, 73:19, 74:10, 74:16, 94:3, 124:20, 124:24
**Brosius's** [2] - 49:11, 50:8
**brought** [3] - 46:12, 49:1, 50:14
**Broward** [1] - 129:20
**Bruce** [1] - 1:22
**building** [1] - 16:22
**bumpy** [1] - 21:18
**business** [12] - 26:19, 32:16, 32:25, 33:5, 39:4, 40:23, 50:5, 50:9, 50:17, 50:20, 54:14, 121:11
**busy** [1] - 39:10
**but..** [1] - 109:12
**buy** [2] - 33:16, 37:7
**buying** [3] - 34:14, 34:23, 70:19
**BY** [74] - 2:2, 3:3, 3:4, 6:12, 7:9, 7:22, 8:23, 10:10, 11:1, 11:11, 13:9, 14:10, 15:14, 18:25, 19:21, 22:7, 22:13, 23:14, 24:24, 25:17, 26:5, 27:22, 28:12, 28:21, 30:5, 30:20, 32:13, 32:19, 34:4, 34:22, 35:11, 37:15, 38:10, 39:16, 41:3, 42:1, 44:2, 44:19, 45:3, 45:13, 45:24, 46:5, 46:21, 47:17, 47:23, 48:7, 49:7, 49:21, 50:2, 50:13, 51:7, 52:6, 52:21, 55:6, 55:25, 59:22, 60:12, 61:25, 62:14, 63:14, 63:25, 64:18, 65:3, 65:14, 65:23, 66:5, 66:19, 67:19, 68:11, 68:24, 69:14, 70:7, 70:17, 71:2

## C

**career** [1] - 20:9
**carelessness** [1] - 98:19
**Carlos** [2] - 44:24, 45:5
**carrying** [1] - 97:7
**CASE** [1] - 1:3
**case** [36] - 6:3, 56:11, 57:20, 59:18, 60:22, 70:4, 72:12, 72:13, 72:17, 73:7, 75:9, 75:17, 75:24, 77:9, 78:21, 80:1, 81:3, 81:6, 81:21, 84:10, 87:2, 87:13, 95:11, 95:13, 96:13, 96:14, 96:16, 96:20, 97:4, 97:14, 97:20, 97:22, 103:11, 119:6, 125:24
**cases** [6] - 82:25, 89:4, 97:6, 97:15, 97:24, 120:4
**category** [1] - 116:9
**causing** [1] - 73:12
**caution** [2] - 58:10, 89:2
**cautious** [1] - 62:18
**CDFYCA** [1] - 22:19
**CEO** [2] - 39:8, 94:4
**certain** [8] - 8:2, 17:6, 24:19, 24:20, 98:10, 109:4, 113:9
**certainly** [12] - 14:1, 16:15, 25:3, 26:10, 95:12, 96:13, 96:25, 102:14, 102:19, 104:6, 120:5, 122:6
**certify** [1] - 129:13
**Chain** [45] - 6:25, 7:1, 7:15, 7:24, 8:3, 8:11, 14:13, 14:18, 15:2, 15:8, 17:3, 20:8, 20:13, 21:18, 21:22, 25:6, 28:16, 29:12, 29:17, 29:23, 30:10, 31:23, 38:1, 38:23, 39:8, 40:21, 40:23, 41:4, 41:22, 43:2, 46:13, 49:15, 56:25, 57:8, 61:12, 61:18, 62:22, 65:6, 66:21, 66:22, 71:4, 71:7, 121:16, 123:13, 125:1
**chain** [5] - 13:25,

23:19, 26:20, 68:7, 121:19
**Chain's** [3] - 27:16, 67:5, 121:13
**change** [3] - 6:16, 14:22, 33:4
**changed** [4] - 37:9, 42:13, 105:6, 105:9
**changing** [1] - 101:6
**charge** [14] - 41:16, 78:15, 79:3, 80:16, 85:1, 86:11, 88:7, 90:3, 90:8, 90:13, 90:21, 91:11, 106:20, 106:21
**charged** [2] - 57:20, 104:9
**charges** [6] - 89:23, 90:1, 90:5, 90:7, 90:14, 90:20
**CHARLES** [11] - 1:7, 1:22, 82:11, 82:17, 82:23, 83:6, 83:13, 83:20, 84:3, 84:8, 84:14
**Charles** [72] - 5:8, 30:8, 30:13, 31:4, 35:1, 35:22, 36:9, 36:19, 37:1, 38:11, 38:17, 39:6, 39:7, 39:17, 40:1, 40:15, 41:5, 41:21, 42:8, 43:5, 43:19, 44:20, 45:7, 45:11, 45:20, 45:25, 46:7, 47:2, 52:7, 54:19, 55:13, 55:20, 56:3, 56:5, 59:25, 60:14, 60:18, 61:5, 62:1, 62:6, 62:15, 65:9, 66:13, 66:20, 67:13, 67:20, 68:13, 70:3, 70:18, 72:14, 73:19, 74:10, 74:17, 75:5, 75:16, 81:14, 82:4, 82:10, 82:16, 82:22, 83:5, 83:12, 83:19, 84:2, 84:7, 84:13, 84:17, 87:9, 88:2, 94:3, 123:13
**Charlie** [12] - 8:15, 9:5, 13:4, 13:11, 14:13, 20:1, 21:6, 25:22, 26:7, 27:8, 27:17, 28:7
**charts** [1] - 89:15
**chat** [3] - 48:11, 52:22, 60:13
**cheap** [2] - 34:12, 97:9
**check** [1] - 128:13
**choice** [1] - 29:19
**Cintex** [1] - 53:16
**Circuit** [6] - 94:21, 96:18, 97:15, 97:23, 101:14, 101:25
**Circuit's** [1] - 97:4
**circumstances** [3] - 96:24, 97:1, 97:7
**circumstantial** [1] - 98:15
**cite** [1] - 67:11
**clarify** [2] - 86:11, 118:23
**clause** [1] - 100:23
**clean** [2] - 127:25, 128:4
**clear** [6] - 54:14, 103:17, 105:16, 119:8, 119:9, 119:17
**clients** [2] - 57:23, 76:2
**clip** [1] - 81:14
**closed** [1] - 95:22
**closed-down** [1] - 95:22
**closing** [13] - 78:15, 78:16, 79:7, 79:8, 79:9, 79:10, 79:18, 87:16, 101:10, 108:20, 109:10, 110:1, 128:15
**closings** [3] - 79:2, 79:13, 109:23
**coconspirator** [1] - 97:17
**colleague** [1] - 5:5
**colloquy** [3] - 78:11, 82:3, 84:15
**color** [1] - 11:15
**combination** [1] - 127:24
**coming** [9] - 7:1, 17:5, 28:16, 29:10, 31:17, 47:9, 54:6, 58:8, 108:3
**comment** [2] - 118:10, 118:12
**commenting** [1] - 118:17
**comments** [1] - 28:15
**commerce** [2] - 73:12, 73:23
**commit** [6] - 73:10, 73:19, 74:15, 74:17, 90:7, 93:9
**communicate** [1] - 23:12
**communicated** [2] - 21:22, 24:4
**communication** [6] - 14:5, 21:20, 22:3, 23:6, 23:23, 23:25
**communications** [6] - 13:1, 23:22, 25:11, 25:18, 25:22, 44:13
**companies** [5] - 9:14, 24:12, 99:19, 100:17, 100:20
**company** [11] - 7:17, 10:3, 20:8, 41:16, 49:1, 49:12, 57:17, 94:1, 94:2, 119:20, 121:18
**compilation** [1] - 117:6
**complain** [1] - 83:16
**complaining** [1] - 67:22
**complaints** [2] - 18:11, 44:4
**complete** [5] - 12:12, 12:13, 61:5, 72:16, 104:3
**completed** [1] - 35:18
**completely** [1] - 119:9
**compliance** [25] - 7:4, 15:13, 15:16, 16:1, 16:5, 16:7, 17:16, 17:23, 18:2, 18:7, 18:14, 20:6, 31:25, 32:8, 41:9, 41:22, 49:9, 49:18, 49:22, 53:12, 63:16, 64:14, 65:10, 94:4, 121:20
**compliant** [1] - 41:17
**comply** [1] - 119:16
**computer** [2] - 80:12, 128:11
**CON'T** [2] - 3:3, 6:8
**con't** [2] - 3:3, 6:11
**conceal** [1] - 74:18
**concealing** [1] - 74:23
**concede** [4] - 5:22, 59:12, 80:22, 86:21
**conceding** [1] - 103:12
**concept** [4] - 27:15, 28:2, 94:13, 104:20
**concepts** [1] - 104:19
**concern** [1] - 99:10
**concerned** [1] - 60:6
**concerning** [12] - 8:5, 13:1, 13:2, 13:3, 14:5, 14:23, 17:6, 18:19, 20:14, 23:6, 28:13, 75:11
**concerns** [6] - 36:7, 36:9, 36:11, 36:16, 36:22, 61:14
**conclusion** [1] - 9:7
**condition** [2] - 19:14, 87:9
**conduct** [2] - 28:6, 119:20
**confer** [1] - 76:13
**conference** [6] - 78:15, 79:3, 80:16, 85:1, 86:12, 88:7
**confirmed** [1] - 23:4
**confirming** [1] - 54:12
**confused** [1] - 113:12
**confusing** [3] - 101:23, 105:20, 119:8
**confusion** [1] - 115:24
**conjunction** [1] - 119:6
**connection** [1] - 126:3
**consequences** [2] - 35:4, 51:10
**consider** [1] - 89:1
**considered** [1] - 27:15
**consistent** [3] - 29:16, 32:16, 62:21
**consistently** [1] - 36:23
**conspiracies** [2] - 90:14, 90:19
**conspiracy** [16] - 73:9, 73:18, 74:10, 74:15, 90:1, 90:5, 90:7, 90:13, 91:11, 91:16, 92:1, 92:18, 93:3, 93:9, 93:24, 94:16
**conspired** [1] - 90:21
**constitutional** [2] - 82:8, 82:12
**consult** [2] - 76:1, 128:23
**consultation** [2] - 16:1, 55:8
**consultations** [1] - 105:2
**consulted** [4] - 103:24, 104:2, 104:8, 105:22
**consulting** [2] - 103:13, 104:25
**consumed** [1] - 114:3
**contact** [1] - 46:17
**contacting** [3] - 40:8, 40:11, 58:8
**contacts** [1] - 40:5
**containing** [1] - 117:24
**contains** [2] - 117:9, 120:21
**context** [3] - 47:25, 55:8, 119:25
**continue** [3] - 32:24, 59:20, 67:4
**continued** [1] - 71:8
**continues** [1] - 22:24
**contracts** [1] - 24:19
**contradicted** [1] - 68:19
**controlled** [2] - 31:19, 57:19
**conversation** [2] - 36:21, 45:19
**conversations** [6] - 42:20, 44:8, 44:20, 44:24, 45:5, 45:8
**conveyed** [1] - 29:21
**convict** [1] - 75:12
**convicted** [3] - 9:18, 83:15, 89:10
**coordinate** [1] - 128:14
**copies** [4] - 127:21, 127:24, 129:2, 129:5
**copy** [1] - 89:25
**correct** [88] - 7:4, 7:12, 7:16, 8:9, 8:13, 8:16, 8:19, 9:1, 9:6, 9:10, 9:14, 9:19, 9:22, 9:25, 10:6, 10:13, 10:14, 11:3, 11:6, 11:18, 12:14, 12:23, 13:13, 13:19, 13:22, 14:2, 14:15, 14:18, 14:20, 15:3, 15:10, 15:24, 16:2, 16:5, 16:10, 16:13, 16:16, 16:19, 16:24, 17:7, 17:9, 17:13, 17:17, 17:23, 18:3, 18:8, 19:5, 19:7, 19:11, 19:15, 20:2, 20:10, 20:24, 21:1, 21:10, 22:3, 22:9, 23:1, 23:7, 23:17, 24:9, 24:13, 24:17, 24:20, 25:4, 25:8, 25:12, 25:19, 25:24, 26:21, 26:25, 27:13, 27:17, 28:17, 28:25, 29:17, 29:24, 35:18, 43:18, 81:6, 81:7, 98:14, 100:15, 109:24, 113:16, 126:25, 127:10, 127:11
**corrected** [2] - 23:16, 24:5
**correctly** [1] - 19:2
**corresponded** [1] - 22:8
**corroborates** [1] - 63:11

**Cosmetic** [1] - 91:20
**counsel** [25] - 5:2, 5:22, 21:20, 58:22, 59:12, 76:24, 80:22, 84:17, 85:11, 86:21, 95:20, 102:5, 102:16, 103:14, 103:18, 104:13, 104:18, 105:1, 105:16, 105:19, 106:2, 106:4, 111:1, 111:6, 119:15
**counsel's** [1] - 102:20
**Count** [21] - 73:6, 74:3, 74:7, 74:14, 74:24, 74:25, 90:1, 90:5, 90:7, 90:20, 90:22, 90:24, 92:18, 92:19, 92:21, 92:23, 93:9
**count** [1] - 89:24
**counterfeit** [5] - 9:19, 29:9, 67:2, 67:5, 74:11
**Counts** [5] - 73:22, 74:20, 90:3, 90:20, 91:25
**counts** [10] - 74:21, 75:9, 75:10, 89:24, 90:8, 91:1, 93:14, 94:16, 94:17, 107:13
**couple** [4] - 31:3, 60:13, 88:8, 105:6
**courier** [2] - 97:6, 97:21
**course** [4] - 30:25, 50:19, 77:6, 95:7
**court** [6] - 120:20, 120:21, 121:5, 122:15, 125:6, 126:12
**Court** [32] - 2:3, 2:4, 5:1, 5:4, 57:25, 58:24, 72:15, 75:4, 76:2, 77:5, 77:21, 78:10, 78:14, 80:18, 85:12, 85:14, 85:21, 86:2, 86:3, 87:8, 87:10, 88:4, 94:18, 103:10, 105:11, 106:8, 113:12, 117:22, 119:2, 120:13, 129:18, 129:19
**COURT** [310] - 1:1, 5:2, 5:7, 5:10, 5:14, 5:17, 5:20, 5:22, 6:2, 7:7, 10:9, 22:6, 23:10, 24:23, 25:15, 27:20, 28:11, 30:3, 32:11, 32:18, 34:1, 34:3, 34:20, 35:9, 37:12, 38:6, 38:9, 43:25, 44:15, 45:1, 46:3, 49:5, 49:20, 49:25, 50:12, 56:7, 56:10, 56:14, 56:16, 56:22, 57:1, 57:15, 58:2, 58:6, 58:19, 58:22, 59:4, 59:7, 59:12, 59:17, 62:10, 63:4, 63:9, 63:12, 65:22, 69:9, 70:15, 71:22, 71:24, 72:3, 72:5, 72:7, 72:12, 72:17, 72:21, 72:23, 73:2, 73:4, 75:3, 75:21, 76:3, 76:15, 76:19, 76:22, 77:4, 77:7, 77:12, 77:14, 77:18, 77:23, 78:1, 78:3, 78:9, 78:12, 78:17, 78:20, 79:6, 79:9, 79:18, 79:22, 79:25, 80:3, 80:5, 80:9, 80:15, 80:19, 80:20, 80:22, 81:2, 81:10, 81:15, 81:19, 82:1, 82:3, 82:7, 82:10, 82:12, 82:16, 82:18, 82:22, 82:24, 83:5, 83:7, 83:12, 83:14, 83:19, 83:21, 84:2, 84:4, 84:7, 84:9, 84:13, 84:15, 84:19, 85:6, 85:7, 85:10, 85:15, 86:3, 86:13, 86:15, 86:18, 86:21, 87:1, 87:7, 87:11, 87:21, 87:23, 88:1, 88:5, 89:8, 89:14, 89:19, 90:18, 91:4, 91:10, 91:15, 91:20, 91:25, 92:6, 92:11, 92:16, 92:22, 93:2, 93:8, 93:13, 93:18, 93:23, 94:5, 94:10, 94:20, 94:23, 95:3, 95:9, 97:19, 98:12, 98:15, 99:3, 99:9, 99:11, 99:14, 99:17, 100:1, 100:8, 100:13, 100:16, 100:19, 100:22, 100:24, 101:2, 101:6, 101:14, 102:1, 102:9, 102:12, 102:21, 102:23, 103:3, 103:9, 104:10, 104:12, 105:3, 105:9, 105:12, 105:24, 106:19, 107:3, 107:6, 107:9, 107:25, 108:2, 108:5, 108:13, 108:16, 108:18, 108:21, 109:2, 109:5, 109:9, 109:12, 109:18, 109:20, 109:25, 110:4, 110:7, 110:10, 110:13, 110:16, 110:18, 110:22, 110:23, 111:1, 111:9, 111:12, 111:14, 111:17, 111:20, 111:22, 112:1, 112:5, 112:9, 112:13, 112:17, 112:21, 112:25, 113:3, 113:10, 113:15, 113:19, 113:22, 113:25, 114:5, 114:9, 114:13, 114:17, 114:21, 114:25, 115:4, 115:8, 115:12, 115:16, 115:22, 116:3, 116:12, 116:17, 116:21, 116:25, 117:3, 117:10, 117:17, 118:9, 118:21, 120:1, 120:3, 120:16, 120:23, 120:25, 121:4, 121:8, 121:19, 121:22, 121:25, 122:4, 122:9, 122:12, 122:17, 122:20, 122:23, 123:2, 123:7, 123:9, 123:16, 123:20, 123:23, 124:2, 124:6, 124:8, 124:11, 124:16, 124:21, 124:23, 125:2, 125:10, 125:15, 125:18, 126:4, 126:15, 126:21, 127:10, 127:12, 127:15, 127:18, 128:2, 128:8, 128:15, 129:1, 129:6, 129:9, 129:10
**Court's** [1] - 75:19
**Courthouse** [1] - 129:20
**COURTROOM** [5] - 65:1, 107:19, 108:1, 108:3, 128:12
**covered** [2] - 55:13, 55:21
**covers** [1] - 126:24
**create** [1] - 36:4
**created** [1] - 10:15
**crime** [1] - 103:20
**crimes** [2] - 89:23, 104:8
**Criminal** [1] - 75:6
**criminal** [3] - 35:4, 51:10, 67:12
**criminals** [3] - 102:16, 103:6
**cross** [6] - 35:8, 64:19, 118:6, 122:18, 126:1, 126:11
**CROSS** [2] - 3:3, 6:11
**cross-examination** [6] - 35:8, 64:19, 118:6, 122:18, 126:1, 126:11
**CROSS-EXAMINATION** [2] - 3:3, 6:11
**Crystal** [1] - 107:18
**customer** [4] - 18:11, 31:21, 31:24
**customers** [5] - 18:13, 30:21, 34:8, 35:17, 35:19
**cut** [1] - 76:11

## D

**daily** [1] - 29:20
**Dakota** [7] - 11:2, 12:14, 12:18, 64:1, 64:8, 64:14, 126:10
**damaged** [1] - 18:2
**data** [1] - 72:19
**DATE** [1] - 129:17
**date** [6] - 16:15, 23:25, 63:8, 70:23, 71:3, 121:13
**dated** [1] - 45:17
**day-to-day** [1] - 18:15
**days** [4] - 31:3, 35:6, 51:9, 60:13
**DEA** [7] - 31:18, 38:2, 57:5, 57:10, 57:16, 57:18, 58:13
**deal** [1] - 38:21
**dealing** [1] - 31:18
**dealt** [1] - 51:25
**deceitful** [1] - 73:15
**December** [1] - 20:1
**decide** [3] - 8:12, 83:14, 83:21
**decided** [1] - 83:16
**decision** [4] - 33:4, 37:10, 83:7, 83:8
**decisions** [2] - 39:4, 54:15
**declarant** [2] - 121:2, 122:2
**declarants** [3] - 63:3, 63:5, 63:6
**decline** [1] - 38:16
**declined** [1] - 38:24
**declining** [1] - 38:12
**defeating** [1] - 73:15
**DEFENDANT** [20] - 1:18, 1:22, 82:9, 82:11, 82:15, 82:17, 82:21, 82:23, 83:4, 83:6, 83:11, 83:13, 83:18, 83:20, 84:1, 84:3, 84:6, 84:8, 84:12, 84:14
**defendant** [7] - 78:8, 88:16, 90:20, 96:21, 98:2, 109:21, 126:13
**Defendant's** [50] - 3:24, 3:25, 4:1, 4:2, 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 4:20, 4:21, 4:22, 4:23, 113:23, 114:6, 114:10, 114:14, 114:18, 114:22, 115:1, 115:5, 115:9, 115:13, 115:17, 116:18, 116:22, 117:1, 120:9, 121:23, 122:10, 122:21, 123:21, 124:4, 124:13, 125:3, 126:5, 126:22, 127:13
**defendant's** [2] - 38:25, 49:2
**Defendants** [1] - 1:8
**defendants** [37] - 5:3, 32:24, 33:16, 33:21, 34:7, 34:14, 34:23, 36:23, 37:6, 44:7, 44:12, 47:14, 47:19, 49:10, 53:12, 53:18, 54:8, 58:12, 58:23, 61:21, 63:2, 63:16, 66:22, 70:19, 71:8, 76:24, 78:11, 85:11, 90:21, 95:17, 96:10,

97:18, 106:3, 107:12, 111:2, 119:20, 121:2
**defendants'** [2] - 94:5, 98:20
**defending** [13] - 30:8, 31:4, 37:1, 37:17, 38:11, 38:16, 39:6, 45:11, 52:7, 60:5, 66:20, 70:2, 70:18
**defense** [58] - 70:9, 75:25, 77:14, 77:24, 78:1, 78:2, 78:4, 78:7, 80:17, 84:21, 87:6, 95:6, 97:10, 98:22, 99:3, 101:2, 101:5, 101:12, 101:15, 102:2, 102:3, 102:8, 103:4, 103:6, 103:11, 103:12, 103:17, 103:23, 104:2, 104:10, 104:20, 105:1, 105:4, 105:13, 105:16, 105:17, 106:4, 106:20, 106:24, 107:17, 107:22, 107:24, 108:14, 111:4, 111:6, 113:21, 114:2, 115:20, 115:25, 118:10, 118:24, 119:10, 121:8, 124:15, 125:20, 126:25, 128:3, 128:8
**Defense** [15] - 85:25, 113:21, 116:16, 116:20, 116:24, 120:17, 120:19, 122:1, 122:24, 123:19, 123:24, 124:7, 125:5, 126:8, 127:9
**defense's** [1] - 60:22
**defenses** [3] - 103:14, 104:14, 106:16
**defined** [1] - 101:21
**definitely** [2] - 42:21, 54:1
**definition** [3] - 92:7, 92:12, 100:8
**defraud** [9] - 73:11, 73:25, 75:10, 75:13, 101:19, 106:10, 106:12, 106:22, 106:25
**defrauding** [1] - 73:13
**deletions** [1] - 88:13
**deliberate** [13] - 94:15, 94:16, 95:4, 95:12, 96:5, 96:17, 97:5, 97:15, 97:19, 98:8, 98:16, 107:14, 108:5
**deliberately** [2] - 95:17, 98:4
**deliberations** [1] - 127:20
**delivering** [1] - 73:11
**demand** [3] - 10:18, 11:6, 12:23
**demands** [1] - 29:3
**demonstrated** [2] - 96:2, 96:6
**denied** [3] - 58:14, 75:22, 97:23
**denies** [1] - 57:25
**deny** [2] - 16:7, 88:6
**department** [2] - 16:2, 20:7
**deposed** [1] - 69:17
**deposition** [7] - 69:12, 69:15, 72:15, 76:3, 76:25, 78:22, 81:14
**deposits** [1] - 96:24
**deprives** [1] - 58:11
**DEPUTY** [5] - 65:1, 107:19, 108:1, 108:3, 128:12
**DerOvanesian** [1] - 1:14
**DEROVANESIAN** [60] - 86:10, 86:14, 111:5, 111:10, 111:13, 111:25, 112:4, 112:8, 112:12, 112:16, 112:20, 112:24, 113:17, 113:20, 114:1, 114:8, 114:12, 114:16, 114:20, 114:24, 115:3, 115:7, 115:11, 115:15, 115:19, 115:23, 116:7, 116:15, 116:20, 116:24, 117:4, 117:12, 117:20, 118:11, 118:25, 120:2, 120:11, 120:17, 120:24, 121:1, 121:5, 121:9, 122:1, 122:5, 122:13, 122:24, 123:18, 123:24, 124:7, 124:15, 124:17, 125:5, 125:20, 126:7, 126:20, 126:24, 127:3, 127:23, 128:7, 129:7
**described** [1] - 16:20
**describer** [1] - 11:15
**describes** [2] - 16:4, 16:12
**Description** [1] - 3:10
**detail** [1] - 44:23
**details** [2] - 45:4, 45:8
**developed** [1] - 41:12
**device** [1] - 128:13
**difference** [1] - 106:19
**different** [17] - 30:23, 48:19, 57:20, 62:5, 90:18, 91:1, 94:2, 96:13, 103:15, 106:16, 115:21, 116:2, 117:5, 117:12, 119:6
**difficult** [2] - 35:14, 69:21
**difficulty** [1] - 59:23
**diligence** [1] - 51:18
**DIMITROULEAS** [1] - 1:10
**Dimitrouleas** [1] - 2:4
**direct** [1] - 36:14
**directed** [1] - 74:22
**directly** [3] - 18:13, 24:16, 95:15
**director** [5] - 32:8, 49:18, 49:22, 63:17, 121:20
**dirty** [3] - 17:11, 96:8, 97:8
**disbelieved** [1] - 98:3
**discovered** [2] - 9:22, 23:13
**discuss** [12] - 6:3, 56:11, 56:17, 59:18, 62:18, 69:6, 81:3, 81:21, 87:2, 87:13, 108:19, 129:6
**discussed** [11] - 6:3, 21:19, 26:7, 28:1, 28:5, 56:12, 59:18, 81:3, 81:22, 87:2, 87:14
**dishonest** [1] - 73:15
**dispensed** [1] - 96:9
**disregard** [1] - 58:1
**distributing** [1] - 65:19
**distribution** [1] - 67:5
**distributor** [4] - 25:2, 25:3, 25:24, 30:10
**distributors** [2] - 24:9, 24:11
**District** [3] - 2:4, 129:19, 129:19
**DISTRICT** [3] - 1:1, 1:2, 1:11
**diversion** [2] - 65:16, 96:9
**diverting** [1] - 74:23
**Divilio** [16] - 5:10, 5:12, 5:17, 56:16, 59:7, 59:23, 60:13, 102:18, 121:19, 122:3, 122:16, 123:3, 123:13, 124:21, 125:7, 126:9
**DIVILIO** [2] - 3:3, 6:8
**Divilio's** [2] - 96:2, 124:8
**division** [2] - 15:7, 15:10
**DIVISION** [1] - 1:2
**document** [12] - 11:12, 24:3, 45:10, 45:14, 52:15, 59:24, 65:21, 70:2, 122:2, 123:14, 125:9, 126:11
**Document** [70] - 3:13, 3:14, 3:15, 3:16, 3:17, 3:18, 3:19, 3:20, 3:21, 3:22, 3:24, 3:25, 4:1, 4:2, 4:3, 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 4:20, 4:21, 4:22, 4:23, 111:15, 111:18, 111:23, 112:2, 112:6, 112:10, 112:14, 112:18, 112:22, 113:1, 113:23, 114:6, 114:10, 114:14, 114:18, 114:22, 115:1, 115:5, 115:9, 115:13, 115:17, 116:18, 116:22, 117:1, 120:9, 121:23, 122:10, 122:21, 123:21, 124:4, 124:13, 125:3, 126:5, 126:22, 127:13
**documentation** [3] - 31:18, 74:12, 90:23
**documented** [2] - 14:17, 21:12
**documenting** [2] - 61:14, 62:5
**documents** [18] - 12:7, 23:13, 31:23, 32:1, 35:17, 35:18, 42:11, 42:20, 48:16, 50:22, 61:20, 64:20, 64:21, 103:22, 117:11, 117:13, 124:19, 126:15
**done** [5] - 80:14, 98:7, 108:23, 120:1, 128:15
**door** [1] - 58:7
**double** [1] - 107:16
**double-spaced** [1] - 107:16
**doubt** [1] - 99:22
**down** [28] - 11:9, 11:20, 11:22, 11:25, 12:1, 12:2, 12:3, 13:14, 15:13, 26:3, 41:25, 52:5, 55:5, 63:23, 64:17, 66:18, 67:22, 68:2, 68:4, 68:23, 71:25, 80:8, 95:22, 111:12, 122:25
**draft** [3] - 84:19, 88:11, 111:3
**dragged** [1] - 42:23
**drive** [2] - 128:11, 128:13
**Drug** [1] - 91:20
**drug** [8] - 9:19, 26:20, 65:16, 90:4, 96:9, 97:6, 97:20, 125:23
**drugs** [27] - 25:4, 33:16, 33:18, 33:21, 33:23, 34:7, 34:12, 34:15, 34:24, 34:25, 37:7, 65:19, 66:22, 66:23, 67:2, 67:6, 67:8, 70:20, 71:8, 73:13, 73:23, 90:2, 90:22, 92:2, 95:18, 97:10
**duly** [1] - 6:9
**during** [11] - 7:2, 18:11, 25:10, 50:19, 53:15, 56:16, 102:14, 103:20, 122:4, 122:17, 127:19
**duties** [1] - 54:1
**duty** [2] - 107:14, 108:5

## E

**e-Pharm/alert** [1] - 71:12
**ear** [1] - 79:19
**early** [2] - 53:2, 67:1

**East** [1] - 129:20
**easy** [1] - 111:7
**Eberspacher** [1] - 65:9
**effective** [1] - 9:25
**effort** [3] - 26:19, 42:24, 119:16
**efforts** [1] - 42:9
**eight** [2] - 75:9, 89:23
**either** [9] - 16:7, 17:21, 45:7, 73:20, 74:5, 92:1, 104:25, 105:21, 105:23
**elaborate** [3] - 42:15, 53:20, 119:22
**electronic** [2] - 127:22, 127:25
**element** [2] - 75:13, 106:13
**Eleventh** [7] - 94:21, 96:18, 97:3, 97:15, 97:23, 101:14, 101:24
**email** [30] - 11:2, 14:3, 21:20, 22:8, 22:14, 23:21, 26:4, 26:8, 28:22, 28:24, 29:23, 34:25, 35:3, 35:6, 35:20, 35:21, 51:9, 62:2, 65:4, 65:9, 65:24, 66:14, 67:1, 67:12, 68:7, 68:19, 99:6, 121:7, 126:13
**emailed** [2] - 54:8, 105:11
**emails** [20] - 13:11, 19:2, 19:16, 22:17, 30:9, 35:12, 35:22, 36:19, 36:21, 43:11, 44:5, 54:9, 54:12, 56:1, 61:3, 61:21, 67:4, 67:15, 107:19, 128:4
**employee** [2] - 32:2, 49:2
**employees** [2] - 17:2, 32:3
**encouraged** [1] - 8:15
**end** [6] - 12:4, 12:6, 54:9, 54:12, 98:5, 118:18
**ended** [1] - 103:21
**ends** [1] - 14:3
**energy** [1] - 39:10
**enforcement** [1] - 58:8
**enter** [1] - 78:21
**entered** [5] - 73:18, 74:9, 74:17, 96:7, 96:10
**enters** [5] - 5:16, 5:21, 59:6, 59:11, 86:20
**Entin** [1] - 129:17
**ENTIN** [2] - 2:3, 129:18
**entire** [3] - 113:9, 113:11, 113:13
**entirety** [1] - 117:8
**entitled** [1] - 129:15
**entries** [4] - 118:16, 119:7, 119:14, 119:17
**equally** [2] - 42:17, 99:25
**error** [2] - 22:17, 23:12
**especially** [4] - 96:6, 103:7, 106:16, 119:7
**Esquire** [5] - 1:13, 1:14, 1:18, 1:18, 1:22
**essential** [1] - 75:13
**essentially** [3] - 98:9, 102:22, 103:1
**establish** [3] - 73:7, 73:24, 75:8
**established** [1] - 96:21
**establishing** [1] - 73:18
**evaluate** [1] - 17:5
**evaluated** [1] - 10:4
**evaluations** [1] - 17:6
**events** [2] - 23:19, 33:4
**Evidence** [37] - 70:16, 73:1, 81:12, 111:16, 111:19, 112:3, 112:7, 112:11, 112:15, 112:19, 112:23, 113:2, 113:24, 114:7, 114:11, 114:15, 114:19, 114:23, 115:2, 115:6, 115:10, 115:14, 115:18, 116:19, 116:23, 117:2, 120:10, 121:24, 122:11, 122:22, 123:22, 124:5, 124:14, 125:4, 126:6, 126:23, 127:14
**evidence** [50] - 30:19, 33:25, 34:18, 34:20, 34:21, 39:15, 42:11, 43:23, 44:1, 44:25, 45:1, 57:21, 62:9, 62:25, 63:23, 65:1, 65:2, 66:4, 67:18, 68:10, 70:5, 70:12, 71:1, 72:8, 72:11, 72:19, 73:17, 74:5, 74:9, 74:13, 74:16, 74:22, 75:12, 75:14, 75:17, 81:8, 95:11, 95:16, 95:19, 96:7, 96:10, 96:12, 96:21, 97:14, 98:4, 98:9, 98:16, 118:9, 122:8, 128:17
**exact** [3] - 11:8, 27:5, 41:11
**exactly** [3] - 76:6, 98:13, 104:24
**examination** [7] - 35:8, 36:14, 64:19, 118:6, 122:18, 126:1, 126:11
**EXAMINATION** [4] - 3:3, 3:4, 6:11, 30:4
**examined** [1] - 6:9
**example** [7] - 32:23, 43:4, 44:10, 54:7, 83:14, 118:21, 119:2
**except** [2] - 86:3, 93:24
**exception** [1] - 120:22
**excuse** [3] - 13:2, 85:1, 86:6
**excused** [1] - 71:25
**Exhibit** [42] - 7:19, 10:16, 10:24, 13:7, 15:12, 22:11, 26:2, 28:19, 30:19, 39:15, 41:2, 45:12, 45:23, 46:20, 47:22, 48:6, 51:6, 52:19, 55:4, 55:5, 55:24, 60:11, 61:24, 62:13, 62:25, 63:23, 64:25, 66:4, 67:18, 68:10, 70:6, 70:12, 71:1, 81:9, 111:11, 116:11, 116:16, 116:20, 116:24, 117:5, 120:18
**exhibit** [19] - 7:21, 12:9, 13:10, 46:6, 70:4, 80:7, 80:17, 107:20, 113:7, 113:15, 113:21, 115:21, 117:18, 118:10, 123:7, 123:9, 126:8, 128:21
**exhibits** [32] - 30:8, 78:4, 78:17, 78:25, 84:11, 84:24, 84:25, 85:17, 85:24, 86:1, 86:4, 86:7, 86:15, 87:10, 99:7, 104:5, 108:14, 111:4, 113:6, 114:2, 115:20, 116:4, 116:5, 117:17, 120:13, 126:25, 127:17, 127:19, 127:24, 128:6, 128:8
**existed** [2] - 7:25, 10:3
**existence** [1] - 10:12
**exits** [5] - 56:15, 56:21, 72:6, 82:2, 87:22
**expand** [2] - 6:16, 9:9
**expanded** [1] - 10:11
**expansion** [1] - 9:12
**expected** [1] - 49:17
**experience** [7] - 40:17, 41:5, 41:7, 41:9, 41:15, 41:20, 62:21
**explain** [2] - 40:6, 119:19
**explaining** [1] - 118:15
**exposure** [2] - 60:6, 60:22
**extent** [1] - 106:7

**F**

**face** [2] - 119:7, 119:24
**facia** [1] - 73:7
**facie** [2] - 75:8, 75:23
**fact** [15] - 8:18, 22:2, 23:4, 23:15, 26:15, 27:23, 34:17, 42:19, 73:25, 88:5, 95:25, 103:15, 105:17, 105:21
**factored** [1] - 37:9
**facts** [6] - 33:24, 37:9, 43:22, 44:25, 96:18, 97:13
**failed** [5] - 73:7, 73:24, 74:8, 74:15, 75:8
**failures** [1] - 96:2
**fair** [4] - 50:25, 58:12, 61:11, 102:14
**fairness** [1] - 58:12
**faith** [37] - 28:2, 28:4, 28:6, 75:15, 75:16, 101:19, 102:4, 102:19, 103:18, 103:23, 104:10, 104:12, 104:16, 104:18, 104:20, 105:4, 105:7, 105:14, 105:17, 105:19, 105:22, 105:24, 106:1, 106:4, 106:6, 106:9, 106:13, 106:16, 106:18, 106:20, 106:24, 107:18, 108:2, 108:7, 119:16
**fall** [1] - 116:8
**false** [4] - 36:1, 54:12, 90:23, 97:17
**falsely** [1] - 74:11
**falsified** [8] - 36:20, 54:8, 54:24, 60:7, 60:18, 61:9, 65:19, 74:2
**familiar** [4] - 6:21, 7:11, 7:12, 7:14
**familiarity** [1] - 118:14
**far** [7] - 12:10, 18:14, 50:19, 60:17, 64:9, 71:16, 78:11
**fashion** [1] - 48:4
**favorable** [2] - 89:4, 118:23
**FBI** [1] - 58:13
**FDA** [3] - 41:18, 71:14, 73:16
**February** [8] - 19:5, 19:7, 25:7, 25:10, 25:21, 26:3, 30:9, 74:4
**federal** [4] - 37:18, 41:6, 41:17, 61:1
**Federal** [3] - 1:22, 75:6, 129:20
**felony** [1] - 89:10
**felt** [7] - 42:21, 42:22, 42:25, 53:18, 53:21, 54:1, 54:18
**few** [5] - 27:10, 40:2, 54:8, 72:4, 76:1
**figure** [2] - 109:15, 109:19
**figuring** [1] - 79:13
**filed** [2] - 72:7, 99:3
**files** [6] - 7:24, 8:2, 8:3, 8:6, 14:18, 123:13
**final** [3] - 63:10, 107:23, 111:3
**finally** [2] - 40:6, 81:13
**fine** [3] - 86:8, 100:10, 129:3
**firm** [6] - 13:23, 117:15, 118:14, 119:4, 119:5, 120:4
**firm's** [2] - 117:7, 118:14
**first** [9] - 6:9, 54:8, 73:3, 88:14, 94:16, 100:21, 100:23,

109:25, 110:7
**five** [7] - 17:4, 30:22, 42:25, 46:1, 54:6, 56:13, 110:5
**five-minute** [1] - 46:1
**fix** [1] - 29:5
**fixing** [1] - 29:5
**Fl** [1] - 1:22
**Flores** [1] - 1:19
**FLORIDA** [1] - 1:2
**Florida** [7] - 1:4, 1:16, 1:20, 1:23, 126:2, 129:19, 129:21
**Flowers** [3] - 64:9, 64:14, 126:10
**focus** [1] - 15:15
**follow** [7] - 6:2, 35:20, 59:17, 81:2, 83:2, 87:1, 96:3
**follow-up** [1] - 35:20
**followed** [2] - 35:6, 104:22
**following** [5] - 58:21, 76:21, 85:9, 110:25, 125:13
**follows** [1] - 6:10
**Food** [1] - 91:20
**foolishness** [1] - 98:19
**FOR** [3] - 1:13, 1:18, 1:22
**foregoing** [1] - 129:13
**forge** [1] - 74:11
**form** [7] - 9:2, 9:21, 10:2, 10:11, 39:18, 108:9
**formally** [1] - 77:22
**forms** [2] - 8:25, 108:10
**FORT** [1] - 1:2
**Fort** [3] - 1:4, 1:23, 129:21
**forth** [3] - 25:8, 25:11, 75:23
**forward** [1] - 77:6
**forwarded** [1] - 65:25
**foundation** [2] - 117:8, 118:1
**four** [1] - 108:22
**FPR** [2] - 2:3, 129:18
**fraud** [11] - 74:15, 74:18, 74:21, 74:23, 90:7, 90:9, 90:24, 93:9, 93:14, 103:20
**fraudulently** [1] - 96:23
**free** [2] - 101:11, 126:25
**frequently** [1] - 32:3
**Frier** [9] - 13:1, 13:12, 13:23, 55:8, 55:16, 60:15, 61:3, 104:6, 117:6
**front** [6] - 77:17, 77:23, 102:18, 117:22, 118:5, 119:1
**frustrated** [3] - 23:3, 23:11, 24:7
**frustration** [3] - 23:15, 23:25, 24:2
**fulsome** [1] - 104:3
**functions** [1] - 73:16
**funds** [1] - 96:23

## G

**general** [3] - 41:19, 55:14, 91:11
**generally** [1] - 109:3
**generic** [2] - 68:17, 106:1
**Gentek** [1] - 53:15
**Gilead** [35] - 10:19, 12:23, 14:14, 21:23, 22:3, 22:18, 23:5, 23:6, 23:16, 24:4, 25:6, 25:23, 25:24, 26:18, 27:23, 28:17, 29:3, 29:5, 29:12, 66:21, 67:1, 67:4, 67:5, 68:16, 69:1, 69:4, 69:17, 69:19, 71:11, 71:16, 117:14, 121:15, 123:11, 124:25
**Gilead's** [2] - 21:20, 24:4
**given** [7] - 19:25, 20:4, 76:9, 89:24, 97:17, 104:22
**googled** [1] - 51:18
**Gould** [1] - 76:5
**government** [1] - 117:23
**Government** [45] - 3:11, 3:12, 28:2, 28:8, 43:24, 56:25, 57:3, 57:4, 57:11, 62:24, 70:11, 72:1, 72:2, 72:25, 73:7, 73:17, 73:24, 74:8, 74:15, 75:8, 75:23, 77:1, 77:8, 78:6, 78:18, 78:21, 79:14, 81:11, 81:17, 85:16, 85:19, 88:9, 88:23, 95:4, 95:9, 98:1, 98:25, 109:9, 109:22, 113:6, 116:1, 127:23, 128:24, 129:4, 129:7
**GOVERNMENT** [1] - 1:13
**Government's** [62] - 3:11, 3:11, 3:13, 3:14, 3:15, 3:16, 3:17, 3:18, 3:19, 3:20, 3:21, 3:22, 30:18, 39:14, 41:1, 45:12, 45:22, 46:19, 47:21, 48:5, 51:5, 52:19, 55:4, 55:24, 60:11, 61:23, 62:13, 62:25, 63:23, 64:24, 66:3, 67:17, 68:10, 70:6, 70:12, 70:16, 71:1, 72:25, 75:15, 76:4, 81:9, 81:11, 84:20, 89:22, 100:1, 102:2, 111:10, 111:11, 111:15, 111:18, 111:23, 112:2, 112:6, 112:10, 112:14, 112:18, 112:22, 113:1, 116:11, 117:5, 117:17
**grant** [1] - 100:24
**great** [4] - 20:8, 27:4, 27:17, 110:12
**ground** [1] - 106:17
**grounds** [2] - 7:8, 123:25
**Group** [4] - 44:24, 45:5, 70:8, 71:4
**guess** [7] - 38:1, 38:21, 54:14, 76:6, 76:10, 79:12, 105:16
**guidance** [2] - 8:14, 54:16
**guide** [1] - 20:6
**guilty** [3] - 83:22, 94:16, 104:8
**guy** [1] - 40:6
**guys** [4] - 27:5, 51:16, 79:25, 109:2

## H

**habits** [1] - 64:9
**half** [5] - 20:18, 99:4, 109:6, 109:10, 109:14
**Hammett** [2] - 20:13, 63:6
**hand** [2] - 83:21, 84:19
**handed** [1] - 111:3
**handlings** [1] - 18:15
**hard** [1] - 43:2
**harm** [1] - 115:22
**Harvoni** [1] - 43:9
**hats** [1] - 39:8
**head** [1] - 98:10
**healthy** [1] - 87:19
**hear** [4] - 21:4, 63:4, 95:9, 103:10
**heard** [2] - 83:23, 103:15
**hearing** [1] - 103:21
**hearsay** [10] - 63:1, 117:9, 117:24, 120:15, 121:4, 122:8, 124:1, 124:18, 125:22
**held** [1] - 121:12
**help** [2] - 20:23, 48:3
**helpful** [1] - 12:23
**hereby** [1] - 129:13
**hesitant** [2] - 38:22, 116:13
**high** [2] - 29:8, 96:22
**high-level** [1] - 29:8
**Highway** [1] - 1:22
**himself** [1] - 43:24
**hire** [2] - 38:25, 102:16
**hired** [1] - 119:11
**HIV** [27] - 18:4, 18:5, 30:22, 30:23, 31:17, 32:6, 32:16, 33:16, 33:21, 34:7, 34:15, 34:24, 36:7, 37:7, 46:12, 47:25, 50:20, 50:23, 51:1, 51:16, 53:15, 53:22, 57:12, 66:7, 70:19, 71:8, 97:2
**hold** [1] - 113:22
**home** [1] - 79:1
**Honor** [108] - 5:5, 5:9, 5:11, 5:13, 5:24, 6:1, 32:10, 32:17, 33:25, 44:14, 44:25, 58:17, 58:18, 59:1, 59:3, 59:14, 59:16, 59:21, 65:20, 71:21, 72:2, 72:9, 72:18, 73:5, 75:2, 75:4, 75:19, 76:18, 80:6, 80:10, 80:24, 81:1, 81:7, 81:18, 82:9, 82:11, 82:15, 82:17, 82:21, 82:23, 83:4, 83:6, 83:11, 83:13, 83:18, 83:20, 84:1, 84:3, 84:6, 84:8, 84:12, 84:14, 84:18, 85:4, 85:5, 86:23, 86:25, 87:5, 87:24, 89:7, 89:13, 91:9, 92:20, 93:25, 94:22, 95:10, 96:16, 98:14, 99:1, 99:8, 99:10, 100:10, 100:15, 101:8, 101:9, 102:7, 102:10, 103:19, 104:24, 105:11, 106:5, 107:5, 107:8, 108:15, 109:13, 110:14, 110:21, 111:5, 117:6, 117:13, 117:20, 118:11, 118:25, 120:2, 120:11, 120:19, 122:2, 122:14, 122:24, 123:25, 124:17, 125:6, 125:21, 126:7, 126:9, 127:23, 128:7
**Honorable** [1] - 2:4
**HONORABLE** [1] - 1:10
**hope** [4] - 20:22, 38:20, 57:4, 89:3
**hopefully** [3] - 32:4, 76:16, 84:20
**hoping** [1] - 12:20
**hostile** [1] - 69:19
**hour** [10] - 79:13, 79:21, 79:23, 99:4, 109:6, 109:10, 109:14, 109:22, 110:3, 110:5
**hours** [3] - 79:14, 85:24, 108:22
**house** [2] - 38:3, 58:14
**hundreds** [1] - 60:7

## I

**idea** [5] - 25:23, 26:15, 30:10, 55:18, 99:23
**identification** [15] - 7:19, 10:17, 10:25, 12:9, 13:8, 13:10, 14:7, 14:8, 15:13, 18:23, 19:20, 22:12, 26:3, 28:20
**Identification** [1] - 111:24
**identified** [2] - 66:11, 77:2
**ignorance** [9] - 95:4, 95:13, 96:6, 96:17, 97:5, 97:15, 97:20, 98:8, 98:16
**II** [5] - 73:22, 74:3,

90:3, 90:16, 91:25
**III** [6] - 73:22, 74:3, 90:3, 90:16, 91:25, 92:18
**illicit** [2] - 95:17, 97:10
**immediately** [1] - 53:23
**immunity** [1] - 89:3
**impact** [1] - 86:16
**impairing** [1] - 73:14
**impeding** [1] - 73:14
**implement** [1] - 7:14
**implemented** [2] - 6:24, 9:25
**importance** [1] - 61:14
**important** [1] - 99:25
**importantly** [1] - 118:3
**improper** [3] - 44:14, 44:16, 118:20
**improved** [1] - 51:18
**improvements** [2] - 9:8, 9:9
**incident** [3] - 21:19, 22:25, 23:3
**inclined** [3] - 105:24, 106:24, 107:3
**include** [4] - 13:21, 19:24, 20:19, 106:25
**included** [1] - 9:12
**includes** [1] - 111:10
**including** [4] - 41:18, 104:21, 113:18, 121:2
**independent** [2] - 27:13, 30:14
**indicate** [1] - 88:10
**indicating)** [1] - 26:6
**indicia** [1] - 97:9
**indicted** [6] - 48:20, 48:24, 49:22, 50:4, 51:19, 51:25
**indictment** [7] - 49:1, 49:11, 50:8, 50:15, 75:9, 89:23, 89:25
**individuals** [3] - 60:5, 66:11, 119:4
**industry** [5] - 20:5, 29:8, 29:12, 40:17, 41:8
**info** [3] - 29:2, 29:11, 67:25
**informants** [1] - 89:2
**information** [16] - 10:6, 23:16, 24:5, 33:17, 33:22, 34:9, 34:15, 34:18, 34:24, 35:15, 37:13, 61:5, 95:21, 98:11, 104:3, 128:5
**informed** [2] - 43:17, 66:21
**initial** [3] - 13:14, 13:18, 35:21
**initials** [1] - 24:8
**input** [2] - 8:9, 20:23
**inquire** [1] - 118:8
**inquiries** [1] - 96:11
**inquiring** [1] - 118:3
**inquiry** [3] - 84:15, 95:23, 97:18
**inserts** [1] - 57:22
**inside** [2] - 67:23, 97:11
**insight** [1] - 29:9
**insofar** [1] - 96:19
**inspect** [1] - 17:9
**instance** [3] - 17:19, 66:6, 68:17
**instances** [1] - 25:5
**instead** [2] - 90:12, 113:8
**instruct** [1] - 108:25
**instructed** [2] - 57:5, 58:1
**instructing** [1] - 94:19
**Instruction** [9] - 88:14, 88:20, 88:21, 88:22, 88:24, 89:21, 90:10, 91:6, 105:4
**instruction** [40] - 88:16, 89:5, 89:6, 89:9, 89:11, 89:12, 89:14, 91:21, 93:19, 94:21, 94:24, 95:13, 96:17, 97:5, 97:16, 97:20, 98:8, 98:18, 99:24, 101:3, 101:15, 101:16, 102:2, 102:3, 102:20, 102:24, 103:7, 103:10, 103:25, 105:7, 105:8, 105:25, 106:6, 106:11, 107:1, 107:9, 107:22, 107:23, 107:24, 107:25
**instructions** [25] - 79:7, 79:16, 80:13, 84:20, 84:21, 84:22, 86:16, 87:18, 88:8, 88:9, 98:23, 98:24, 99:13, 99:18, 100:2, 100:4, 100:12, 101:18, 101:22, 101:24, 107:4, 109:3, 109:5, 109:16, 111:4
**intake** [4] - 8:25, 9:2, 9:21, 39:18
**integrity** [1] - 26:20
**intent** [11] - 73:8, 73:10, 73:25, 74:23, 75:10, 75:13, 101:19, 106:10, 106:12, 106:21, 106:25
**intentionally** [2] - 42:22, 95:20
**interact** [1] - 29:18
**interacting** [1] - 50:5
**interest** [1] - 38:18
**interesting** [1] - 29:10
**internally** [1] - 128:23
**interrupt** [1] - 113:4
**interstate** [2] - 73:12, 73:23
**introduce** [14] - 72:11, 74:9, 74:16, 77:9, 78:5, 78:6, 78:18, 78:25, 84:25, 85:17, 85:22, 90:1, 90:22, 104:6
**introduced** [2] - 113:9, 128:22
**introducing** [4] - 73:11, 84:10, 113:7, 113:8
**introduction** [5] - 73:11, 73:12, 73:23, 86:1, 90:4
**investigation** [4] - 52:13, 53:1, 53:6, 53:9
**investigations** [4] - 52:8, 53:5, 63:19, 66:11
**Invicta** [1] - 53:16
**involved** [12] - 9:14, 17:18, 18:7, 18:10, 18:15, 25:18, 32:21, 38:22, 46:25, 66:23, 74:5, 126:13
**involvement** [6] - 21:18, 48:12, 48:14, 49:11, 51:1, 105:18
**involves** [1] - 57:19
**involving** [4] - 30:9, 57:18, 71:4, 125:23
**irrelevant** [1] - 125:22
**Ishbay** [1] - 33:10
**issue** [14] - 13:3, 17:16, 17:23, 21:21, 28:17, 36:6, 40:8, 57:9, 57:10, 57:17, 74:1, 78:14, 125:24
**issues** [13] - 18:12, 25:7, 25:19, 29:12, 38:2, 42:18, 43:14, 43:16, 57:8, 68:15, 80:13, 116:9
**itself** [1] - 122:7
**IV** [8] - 74:7, 90:5, 90:15, 90:16, 90:19, 90:20, 90:24, 92:19
**Ivlis** [1] - 1:18

## J

**Jacqueline** [1] - 1:14
**Janssen** [2] - 43:12, 68:4
**January** [2] - 13:1, 74:4
**Jesse** [3] - 20:13, 21:3, 63:6
**job** [10] - 17:5, 17:12, 20:14, 31:12, 40:20, 41:12, 53:12, 53:18, 54:1, 63:16
**John** [2] - 14:12, 122:25
**join** [2] - 93:22, 98:14
**joined** [1] - 41:4
**joining** [1] - 40:24
**joint** [1] - 129:1
**Jones** [3] - 50:14, 52:12, 52:22
**JUDGE** [1] - 1:11
**judge** [4] - 46:2, 76:1, 98:1, 103:17
**Judge** [57] - 5:8, 6:6, 34:17, 35:7, 37:11, 38:4, 38:8, 49:19, 49:24, 50:11, 56:23, 58:16, 63:1, 63:3, 69:8, 70:13, 72:10, 72:20, 79:4, 79:21, 80:12, 83:23, 84:17, 85:14, 86:8, 88:2, 89:17, 90:12, 91:8, 91:14, 91:19, 91:24, 92:5, 92:10, 92:14, 92:25, 93:6, 93:12, 93:16, 93:21, 94:8, 95:1, 104:14, 105:5, 106:9, 107:2, 107:7, 108:12, 108:17, 110:9, 110:17, 113:4, 123:6, 124:22, 127:17, 128:11, 128:23
**judges** [1] - 109:4
**judgment** [6] - 73:5, 73:21, 74:7, 74:14, 74:20, 75:7
**July** [7] - 31:1, 48:24, 51:8, 51:23, 67:12, 121:17
**June** [3] - 13:2, 13:4, 13:18
**jurors** [2] - 59:4, 115:24
**JURY** [1] - 1:10
**Jury** [9] - 5:21, 56:15, 59:11, 72:6, 80:21, 82:2, 86:20, 87:22, 129:11
**jury** [63] - 5:4, 5:23, 56:13, 58:1, 59:13, 62:9, 72:3, 72:4, 75:12, 75:18, 77:8, 77:17, 77:23, 78:20, 78:24, 79:1, 79:2, 79:16, 80:5, 80:23, 81:19, 83:22, 83:23, 85:1, 85:13, 86:6, 86:16, 86:18, 86:22, 87:11, 87:18, 88:6, 94:14, 94:19, 98:17, 100:4, 100:12, 101:22, 101:23, 101:24, 102:1, 103:2, 103:3, 103:9, 105:21, 106:3, 106:6, 107:22, 107:23, 107:25, 111:3, 116:5, 119:8, 119:14, 119:21, 120:5, 120:7, 127:18, 128:5, 128:9, 128:19, 128:20, 128:21

## K

**Katie** [2] - 65:9, 65:10
**keep** [2] - 29:12, 123:13
**keeping** [2] - 41:16, 48:17
**Kelsey** [4] - 49:9, 50:14, 52:12, 52:22
**Kenzie** [3] - 39:18, 39:23, 40:4
**kept** [2] - 47:18, 126:14
**Khaim** [3] - 10:2, 95:21, 95:25
**Khaim's** [1] - 10:3
**Kimchi** [9] - 35:25, 36:3, 36:20, 44:10, 44:13, 44:21, 46:8, 53:9, 54:21
**kind** [12] - 9:12, 10:5, 32:2, 40:20, 42:21, 42:22, 62:2, 93:23, 95:20, 116:9, 121:8
**King** [9] - 35:25, 36:3, 36:20, 44:10, 44:13,

44:21, 46:8, 53:9, 54:21
**knowingly** [4] - 73:8, 74:11, 90:21, 107:10
**knowledge** [6] - 74:1, 95:5, 95:14, 95:15, 96:5, 98:20
**known** [3] - 6:21, 7:15, 98:2
**knows** [3] - 24:23, 43:24, 44:13

## L

**labeling** [1] - 74:12
**labels** [1] - 96:8
**lack** [1] - 40:17
**lacking** [1] - 75:14
**laid** [2] - 73:9, 117:8
**laptop** [2] - 127:25, 128:4
**last** [9] - 20:5, 26:8, 29:6, 30:8, 31:3, 33:12, 53:6, 72:7, 126:7
**late** [1] - 81:24
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:23, 129:21
**law** [13] - 13:23, 58:8, 82:24, 96:13, 97:4, 117:7, 117:15, 118:13, 118:14, 119:4, 119:16, 120:4
**lawful** [1] - 73:15
**lawsuit** [2] - 126:2, 126:3
**lawsuits** [1] - 125:23
**lawyer** [22] - 27:16, 30:8, 36:13, 37:1, 37:17, 38:11, 38:16, 39:6, 45:11, 52:7, 54:19, 66:20, 70:2, 70:9, 70:18, 84:5, 104:15, 104:17, 104:22, 104:23, 105:1
**lawyer's** [1] - 60:23
**lawyers** [26] - 31:4, 34:20, 43:25, 45:1, 55:8, 60:1, 60:4, 61:6, 61:8, 61:13, 69:4, 69:19, 82:24, 87:17, 102:16, 103:5, 103:8, 103:11, 103:13, 103:24, 104:2, 104:4, 104:8, 105:2, 119:11, 120:4
**lay** [1] - 118:1
**lays** [1] - 35:3
**lead** [1] - 49:10
**leading** [2] - 32:10, 69:8
**learn** [2] - 20:5, 95:17
**learned** [3] - 34:14, 34:23, 42:12
**learning** [2] - 40:20, 42:19
**least** [17] - 7:2, 9:13, 12:12, 27:16, 29:11, 30:25, 40:23, 44:4, 47:10, 48:16, 50:22, 60:4, 60:21, 68:19, 69:19, 102:13, 109:6
**leave** [4] - 91:4, 98:16, 99:18, 100:16
**leaves** [1] - 79:2
**leaving** [2] - 66:13, 100:11
**left** [8] - 64:21, 67:15, 67:25, 68:7, 71:9, 71:11, 100:5, 120:13
**legal** [16] - 13:2, 14:5, 38:1, 38:19, 38:23, 39:5, 55:13, 55:21, 57:8, 57:9, 57:17, 83:1, 102:16, 103:14, 104:5
**length** [1] - 108:19
**letter** [20] - 10:18, 10:21, 11:6, 12:23, 19:7, 19:11, 19:18, 19:22, 19:24, 27:6, 27:25, 28:24, 70:8, 70:20, 70:23, 71:9, 71:11, 122:7, 124:8
**Letter** [2] - 3:11, 70:16
**letters** [4] - 18:18, 67:4, 67:9, 67:11
**level** [1] - 29:8
**levels** [1] - 39:10
**Levitt** [7] - 13:1, 13:23, 55:8, 55:16, 61:3, 104:6, 117:7
**license** [2] - 36:6, 54:4
**licensing** [4] - 13:12, 41:6, 41:17
**lie** [3] - 98:4, 98:5
**lied** [2] - 47:14, 98:3
**life** [1] - 83:1
**line** [3] - 60:8, 61:15, 69:2
**lines** [1] - 39:11
**list** [8] - 80:17, 107:20, 111:6, 115:19, 115:20, 117:18, 120:24, 120:25
**listed** [2] - 95:25, 117:17
**litigation** [2] - 71:12, 103:22
**location** [2] - 37:2, 37:6
**logistics** [1] - 69:7
**look** [16] - 8:21, 10:24, 13:7, 18:22, 22:11, 26:2, 28:19, 48:11, 50:5, 63:19, 66:7, 97:11, 99:8, 101:4, 119:10, 127:1
**looked** [15] - 9:10, 10:16, 22:1, 35:3, 37:6, 42:11, 43:11, 44:5, 50:23, 56:1, 60:14, 61:3, 61:20, 68:20, 96:8
**looking** [13] - 9:8, 9:24, 30:11, 40:2, 45:14, 46:6, 54:16, 66:9, 70:8, 76:5, 95:19, 101:20, 121:10
**looks** [12] - 88:14, 88:17, 88:20, 88:21, 88:22, 89:20, 107:10, 107:11, 107:13, 108:5, 108:6, 109:16
**looped** [1] - 39:5
**lost** [2] - 44:3, 64:5
**lousy** [1] - 83:15
**low** [1] - 29:10
**luck** [1] - 21:3
**lunch** [5] - 78:24, 80:15, 81:20, 81:23, 85:2

## M

**ma'am** [3] - 30:1, 30:6, 71:24
**macro** [1] - 77:5
**mail** [1] - 68:12
**mailing** [1] - 54:4
**main** [2] - 46:17, 116:8
**major** [1] - 15:7
**management** [7] - 15:2, 15:5, 15:7, 15:21, 50:7, 50:16, 121:19
**manager** [3] - 40:12, 40:14, 121:13
**manager's** [3] - 120:24, 120:25, 121:11
**managers** [1] - 121:14
**managing** [1] - 41:5
**Mantilla** [1] - 1:18
**manufacturer** [2] - 22:22, 125:23
**manufacturers** [4] - 7:1, 24:13, 24:16, 25:4
**March** [5] - 11:2, 11:5, 11:6, 25:7, 25:10
**marijuana** [1] - 97:21
**mark** [1] - 80:6
**marked** [5] - 52:19, 55:4, 62:13, 70:5, 111:23
**market** [2] - 66:22, 66:23
**Marrone** [4] - 14:6, 14:12, 122:25, 123:10
**Martha** [19] - 8:5, 8:18, 8:19, 8:24, 21:19, 22:8, 22:16, 23:4, 24:3, 24:6, 25:22, 26:4, 26:16, 26:23, 27:25, 56:2, 68:12, 117:23, 125:21
**Maryland** [1] - 13:3
**matched** [1] - 17:6
**matches** [1] - 16:10
**matter** [3] - 54:1, 121:6, 129:15
**matters** [3] - 57:6, 119:3, 119:9
**max** [1] - 56:9
**mean** [8] - 7:17, 8:1, 28:3, 32:24, 50:4, 97:19, 118:9, 126:15
**meaning** [1] - 26:18
**means** [1] - 73:15
**meant** [1] - 118:19
**Med** [1] - 22:20
**media** [1] - 66:9
**medical** [3] - 90:5, 90:23, 93:4
**medications** [1] - 68:16
**Medicine** [1] - 21:21
**meet** [5] - 25:2, 29:3, 38:12, 38:16, 129:3
**meeting** [6] - 15:21, 69:4, 69:6, 69:10, 121:12, 121:13
**meetings** [3] - 15:2, 121:15, 121:21
**meld** [1] - 84:22
**members** [3] - 72:3, 81:19, 87:11
**memo** [1] - 126:1
**memorialization** [2] - 14:4, 14:12
**memory** [1] - 118:7
**mention** [1] - 58:13
**mentioned** [1] - 97:22
**message** [5] - 49:10, 50:7, 50:14, 50:15, 64:12
**messages** [6] - 13:4, 29:20, 43:5, 43:8, 47:3, 62:15
**met** [2] - 29:8, 77:1
**method** [1] - 61:14
**Miami** [2] - 1:16, 1:20
**mid** [1] - 31:1
**mid-July** [1] - 31:1
**middle** [1] - 106:17
**might** [1] - 127:4
**million** [2] - 30:22, 37:7
**minded** [1] - 75:12
**minute** [2] - 46:1, 110:11
**minutes** [17] - 27:10, 31:10, 56:9, 56:13, 56:19, 58:19, 72:4, 76:1, 108:22, 108:24, 109:2, 109:6, 109:21, 109:22, 110:8
**misbranded** [9] - 67:8, 73:13, 73:23, 90:2, 90:4, 90:22, 92:2, 92:12, 100:8
**mislead** [2] - 73:11, 73:25
**misleading** [1] - 119:21
**mispronouncing** [2] - 9:17, 96:15
**missed** [2] - 12:21, 89:22
**missing** [1] - 96:8
**misspoke** [2] - 11:5, 22:17
**mistake** [4] - 22:2, 23:5, 23:21, 124:9
**mistrial** [2] - 57:24, 58:14
**modification** [1] - 106:10
**modified** [1] - 106:18
**modify** [1] - 6:16
**Mohammed** [2] - 9:16, 48:20
**moment** [3] - 71:21, 76:13, 99:8
**Monday** [8] - 79:1, 79:5, 79:13, 79:15, 85:22, 87:15, 87:20, 129:9
**money** [1] - 119:12
**month** [3] - 39:20, 71:9, 71:19

**months** [1] - 64:11
**morning** [5] - 22:16, 30:6, 79:16, 109:1, 109:7
**motion** [8] - 38:5, 38:7, 38:8, 56:22, 58:14, 73:2, 75:5, 88:6
**motions** [5] - 77:21, 78:13, 87:23, 87:25, 88:3
**move** [9] - 62:24, 70:12, 72:18, 73:5, 73:21, 74:7, 74:14, 74:20, 81:8
**moving** [3] - 72:8, 72:17, 77:6
**MR** [380] - 3:3, 3:4, 5:5, 5:8, 5:9, 5:11, 5:24, 5:25, 6:1, 6:6, 6:12, 7:5, 7:9, 7:18, 7:22, 8:21, 8:23, 10:7, 10:10, 10:24, 11:1, 11:9, 11:11, 13:7, 13:9, 14:7, 14:10, 15:12, 15:14, 18:22, 18:25, 19:19, 19:21, 22:4, 22:7, 22:11, 22:13, 23:8, 23:14, 24:21, 24:24, 25:13, 25:17, 26:2, 26:5, 27:18, 27:22, 28:9, 28:12, 28:19, 28:21, 30:1, 30:5, 30:15, 30:16, 30:18, 30:20, 32:9, 32:12, 32:13, 32:17, 32:19, 33:24, 34:2, 34:4, 34:17, 34:22, 35:7, 35:11, 37:11, 37:15, 38:4, 38:7, 38:10, 39:14, 39:16, 41:1, 41:3, 41:25, 42:1, 43:22, 44:2, 44:12, 44:19, 44:25, 45:3, 45:10, 45:13, 45:22, 45:24, 46:2, 46:5, 46:19, 46:21, 47:16, 47:17, 47:21, 47:23, 48:5, 48:7, 49:4, 49:7, 49:19, 49:21, 49:24, 50:2, 50:11, 50:13, 51:5, 51:7, 52:5, 52:6, 52:18, 52:21, 55:3, 55:6, 55:23, 55:25, 56:9, 56:23, 57:4, 57:16, 58:5, 58:16, 58:17, 58:18, 59:1, 59:2, 59:3, 59:14, 59:15, 59:16, 59:21, 59:22, 60:10, 60:12, 61:23, 61:25, 62:8, 62:11, 62:14, 62:24, 63:1, 63:2, 63:3, 63:5, 63:7, 63:10, 63:13, 63:14, 63:22, 63:25, 64:17, 64:18, 64:24, 65:2, 65:3, 65:12, 65:14, 65:20, 65:23, 66:3, 66:5, 66:18, 66:19, 67:17, 67:19, 68:9, 68:11, 68:23, 68:24, 69:8, 69:14, 70:4, 70:7, 70:11, 70:13, 70:14, 70:17, 70:25, 71:2, 71:21, 71:23, 72:2, 72:9, 72:10, 72:13, 72:18, 72:20, 72:22, 73:3, 73:5, 75:4, 75:19, 76:1, 76:5, 76:8, 76:10, 76:11, 76:12, 76:17, 76:18, 77:1, 77:5, 77:11, 77:13, 77:16, 77:19, 77:25, 78:2, 78:4, 78:10, 78:13, 78:19, 79:4, 79:7, 79:12, 79:20, 79:23, 80:2, 80:4, 80:6, 80:10, 80:12, 80:18, 80:24, 80:25, 81:1, 81:7, 81:13, 81:17, 82:5, 82:6, 84:17, 84:18, 85:3, 85:4, 85:5, 85:14, 85:16, 86:8, 86:17, 86:23, 86:24, 86:25, 87:5, 87:8, 87:24, 88:2, 89:6, 89:12, 89:17, 89:18, 90:11, 90:12, 91:3, 91:8, 91:9, 91:13, 91:14, 91:18, 91:19, 91:23, 91:24, 92:4, 92:5, 92:9, 92:10, 92:14, 92:15, 92:20, 92:25, 93:1, 93:6, 93:7, 93:11, 93:12, 93:16, 93:17, 93:21, 93:22, 93:25, 94:8, 94:11, 94:22, 95:1, 95:2, 95:7, 95:8, 95:10, 98:1, 98:13, 99:1, 99:5, 99:6, 99:7, 99:10, 99:12, 99:15, 99:19, 100:3, 100:10, 100:15, 100:18, 100:20, 100:23, 101:1, 101:4, 101:8, 101:9, 101:17, 102:7, 102:10, 102:13, 102:22, 103:1, 103:5, 103:12, 103:17, 103:19, 104:11, 104:14, 104:24, 105:5, 105:11, 105:15, 106:5, 106:8, 106:15, 107:1, 107:5, 107:7, 107:8, 108:11, 108:12, 108:15, 108:17, 108:19, 108:25, 109:3, 109:7, 109:11, 109:13, 109:15, 109:19, 109:24, 110:2, 110:5, 110:9, 110:11, 110:14, 110:17, 110:20, 110:21, 111:21, 113:4, 113:11, 113:16, 121:11, 121:20, 122:19, 123:6, 123:8, 123:10, 124:10, 124:22, 124:24, 125:12, 125:16, 125:25, 126:19, 127:1, 127:6, 127:7, 127:11, 127:17, 128:10, 128:23, 129:3, 129:8
**MS** [60] - 86:10, 86:14, 111:5, 111:10, 111:13, 111:25, 112:4, 112:8, 112:12, 112:16, 112:20, 112:24, 113:17, 113:20, 114:1, 114:8, 114:12, 114:16, 114:20, 114:24, 115:3, 115:7, 115:11, 115:15, 115:19, 115:23, 116:7, 116:15, 116:20, 116:24, 117:4, 117:12, 117:20, 118:11, 118:25, 120:2, 120:11, 120:17, 120:24, 121:1, 121:5, 121:9, 122:1, 122:5, 122:13, 122:24, 123:18, 123:24, 124:7, 124:15, 124:17, 125:5, 125:20, 126:7, 126:20, 126:24, 127:3, 127:23, 128:7, 129:7
**muddy** [1] - 101:22
**multiple** [3] - 91:16, 107:12
**must** [2] - 89:1, 105:13

**N**

**Nalley** [3] - 39:18, 39:24, 40:4
**name** [5] - 9:17, 33:10, 33:11, 33:13, 53:6
**named** [1] - 120:21
**names** [3] - 20:20, 51:13, 101:7
**nature** [2] - 97:10, 101:20
**NE** [1] - 1:16
**necessarily** [2] - 18:6, 18:9
**necessary** [2] - 9:9, 123:12
**need** [9] - 11:21, 14:13, 29:5, 51:13, 78:5, 78:17, 108:7, 123:2, 129:6
**needed** [2] - 9:8, 35:15
**neglected** [1] - 80:8
**negligence** [1] - 98:19
**never** [6] - 13:22, 21:23, 22:18, 23:4, 28:7, 38:20
**new** [8] - 9:21, 15:9, 15:23, 20:14, 24:5, 32:3, 32:4, 64:2
**newsletter** [3] - 65:13, 65:15, 65:17
**next** [44] - 52:20, 64:2, 64:4, 64:7, 65:13, 72:1, 80:9, 88:16, 89:9, 89:15, 89:20, 89:21, 91:6, 91:11, 91:16, 91:20, 91:25, 92:7, 92:12, 92:18, 93:3, 93:19, 94:7, 94:24, 95:3, 98:22, 102:4, 107:9, 107:11, 107:12, 107:14, 117:3, 121:25, 122:1, 122:12, 122:23, 123:23, 123:24, 124:6, 124:7, 124:15, 125:5, 125:19
**nice** [2] - 81:23, 87:19
**night** [1] - 72:7
**NO** [1] - 1:3
**none** [6] - 91:14, 91:24, 92:5, 92:10, 92:25, 108:12
**nonetheless** [1] - 71:18
**note** [2] - 27:12, 89:20
**note-taking** [1] - 89:20
**noted** [1] - 114:3
**nothing** [3] - 5:8, 92:17, 129:7
**nothing's** [1] - 128:18
**notified** [2] - 18:12, 23:7
**noting** [1] - 30:13
**notion** [1] - 104:7
**November** [1] - 67:20
**NP** [1] - 21:6
**Number** [4] - 3:10, 74:7, 89:21, 90:10
**number** [4] - 7:21, 80:9, 89:24, 115:21
**numerous** [1] - 47:14
**NW** [1] - 1:19

**O**

**oath** [2] - 5:18, 59:8
**object** [13] - 72:22, 90:18, 92:21, 92:22, 93:21, 95:6, 95:8, 100:6, 101:9, 114:4, 117:4, 117:18, 120:19
**objected** [4] - 118:7, 118:22, 119:1, 120:6
**objection** [75] - 7:5, 10:7, 22:4, 23:8, 24:21, 25:13, 27:18, 28:9, 32:9, 33:24, 34:17, 35:7, 37:11, 38:4, 43:22, 44:1, 44:12, 44:15, 49:4, 49:19, 49:24, 50:11, 58:2, 58:9, 58:10, 63:7, 63:12, 65:20, 69:8, 70:13, 70:14, 72:10, 72:20, 72:23, 82:3, 82:5, 82:6, 89:15, 89:18, 90:10, 91:6, 91:12, 91:13, 91:17, 91:18, 91:22, 91:23, 92:3, 92:4, 92:8, 92:9, 92:13, 92:15, 92:24, 93:1, 93:5, 93:7, 93:10, 93:11, 93:15, 93:17, 93:20, 93:22, 94:6, 94:9, 94:25, 95:2, 98:21, 102:3, 102:6,

108:9, 108:11, 111:7, 124:1, 125:18
**objectionable** [1] - 44:18
**objections** [6] - 85:21, 88:12, 91:2, 98:24, 120:15
**objects** [2] - 73:9, 91:16
**obligated** [1] - 14:14
**observation** [1] - 29:22
**obstructing** [1] - 73:14
**obtainable** [1] - 128:5
**obtained** [2] - 96:23, 117:13
**obviously** [6] - 10:2, 57:18, 78:14, 86:9, 96:4, 109:17
**occasions** [1] - 47:14
**occurred** [1] - 15:20
**October** [8] - 1:5, 14:1, 16:18, 45:17, 55:7, 55:15, 67:1, 74:25
**odd** [1] - 26:17
**OF** [3] - 1:2, 1:4, 1:10
**offense** [1] - 73:10
**offenses** [3] - 90:3, 90:8, 92:1
**offer** [1] - 38:25
**offered** [1] - 121:6
**OFFICER** [10] - 5:20, 56:14, 72:5, 76:19, 80:20, 82:1, 85:7, 87:21, 110:23, 129:10
**officer** [1] - 41:22
**Official** [2] - 2:3, 129:18
**Omom** [1] - 53:16
**onboarding** [1] - 32:2
**once** [1] - 23:13
**one** [91] - 9:16, 9:18, 13:25, 19:5, 25:21, 25:25, 26:6, 27:23, 30:8, 40:6, 48:14, 48:20, 49:10, 53:22, 53:23, 56:2, 57:24, 60:4, 61:13, 67:11, 71:21, 79:21, 79:23, 80:18, 88:14, 89:1, 89:8, 89:9, 89:15, 89:20, 89:21, 91:6, 91:11, 91:16, 91:20, 91:25, 92:7, 92:12, 92:18, 93:3, 93:19, 94:7, 94:8, 94:24, 95:3, 95:12, 95:24, 95:25, 97:17, 98:22, 99:8, 99:23, 100:13, 102:4, 103:8, 103:14, 104:5, 105:13, 105:14, 106:7, 107:9, 107:11, 107:12, 107:14, 107:15, 107:18, 108:7, 113:4, 114:3, 116:8, 116:9, 117:3, 119:5, 121:25, 122:1, 122:12, 122:14, 122:23, 123:23, 123:24, 124:6, 124:7, 124:15, 125:5, 125:6, 125:19, 126:14, 127:1, 128:10
**one-hour** [2] - 79:21, 79:23
**ones** [6] - 100:3, 100:6, 100:11, 111:7, 116:13, 125:16
**ongoing** [1] - 38:1
**open** [2] - 27:2, 43:8
**opened** [1] - 58:7
**opening** [3] - 102:14, 110:6, 119:12
**opinion** [2] - 13:2, 29:6
**opportunity** [4] - 15:8, 19:25, 20:4, 26:18
**opposed** [1] - 106:21
**Order** [1] - 5:1
**ordered** [1] - 72:15
**ordering** [1] - 31:19
**origin** [1] - 95:18
**original** [2] - 113:6, 113:7
**out-of-court** [6] - 120:20, 120:21, 121:5, 122:15, 125:6, 126:12
**outs** [1] - 25:1
**outside** [1] - 95:20
**overall** [1] - 41:12
**overruled** [16] - 7:8, 23:10, 25:15, 27:20, 34:1, 34:3, 35:9, 37:12, 44:1, 45:2, 46:3, 49:5, 49:25, 50:12, 69:9, 72:23
**overwhelmed** [1] - 32:7
**own** [6] - 29:5, 38:18, 54:15, 75:15, 89:4, 128:13
**owner** [5] - 33:13, 49:15, 49:22, 50:6, 65:6

## P

**p.m** [1] - 26:4
**packer** [1] - 97:11
**PAGE** [1] - 3:2
**page** [16] - 39:15, 46:20, 51:6, 52:20, 64:2, 64:4, 64:7, 65:13, 71:1, 92:16, 99:15, 99:19, 100:9, 100:17
**Page** [1] - 3:10
**Pages** [1] - 1:8
**pages** [1] - 113:9
**paid** [2] - 89:2, 119:11
**paper** [4] - 127:21, 127:24, 129:1, 129:5
**paperwork** [3] - 31:18, 36:4, 48:1
**paragraph** [4] - 10:19, 26:8, 100:20
**paragraph-by-paragraph** [1] - 10:19
**paragraphs** [2] - 11:13, 11:21
**part** [23] - 7:24, 8:3, 8:24, 9:12, 9:21, 15:5, 15:7, 16:20, 16:21, 17:2, 17:15, 17:19, 27:1, 28:13, 49:14, 50:6, 60:21, 60:25, 94:8, 103:23, 119:15, 121:17
**partial** [1] - 95:21
**participants** [1] - 56:2
**particular** [2] - 65:17, 74:3
**particularly** [1] - 97:16
**parties** [1] - 81:8
**parts** [2] - 21:18, 118:8
**party** [1] - 117:10
**pass** [1] - 30:2
**past** [1] - 29:3
**Pat** [1] - 64:1
**PATRICIA** [2] - 2:3, 129:18
**patrick** [1] - 94:3
**Patrick** [63] - 31:4, 36:11, 36:13, 36:16, 36:19, 37:17, 43:21, 43:23, 44:4, 44:23, 45:4, 45:7, 47:24, 48:2, 48:9, 48:10, 48:16, 51:1, 51:12, 51:15, 51:22, 62:1, 62:6, 62:15, 64:4, 64:8, 64:11, 64:21, 65:4, 65:10, 65:25, 66:13, 67:15, 67:21, 68:12, 68:20, 73:6, 73:8, 73:18, 73:22, 73:24, 74:5, 74:8, 74:9, 74:16, 74:22, 75:20, 82:4, 82:8, 82:14, 82:20, 83:3, 83:10, 83:17, 83:25, 84:5, 84:11, 87:5, 87:25, 89:6, 89:12, 90:11, 101:4
**PATRICK** [11] - 1:7, 1:18, 82:9, 82:15, 82:21, 83:4, 83:11, 83:18, 84:1, 84:6, 84:12
**pattern** [10] - 100:4, 100:12, 101:18, 101:22, 101:24, 102:1, 103:15, 105:17, 106:6, 106:15
**Pause** [3] - 5:15, 59:10, 86:19
**payment** [1] - 47:10
**pedigree** [2] - 41:6, 71:7
**pedigrees** [3] - 14:14, 41:10, 54:13
**people** [11] - 17:1, 24:11, 25:4, 29:8, 40:11, 42:25, 51:25, 52:13, 94:2, 118:16, 121:1
**perhaps** [1] - 116:2
**period** [2] - 25:10, 53:15
**permission** [1] - 75:19
**permitted** [1] - 104:25
**person** [10] - 32:4, 50:6, 79:21, 79:24, 89:10, 118:12, 118:13, 121:2
**perspective** [3] - 42:13, 49:2
**Peter** [12] - 10:2, 10:3, 33:12, 43:5, 44:10, 44:13, 46:1, 46:7, 46:17, 46:23, 53:6, 95:21
**Ph** [1] - 1:19
**Pharm/alert** [1] - 71:12
**pharmaceutical** [4] - 20:5, 40:17, 41:8, 41:19
**pharmaceuticals** [1] - 24:16
**pharmacies** [4] - 27:13, 30:14, 33:22, 95:22
**pharmacist** [1] - 22:20
**pharmacy** [12] - 17:20, 18:3, 30:21, 31:20, 31:22, 31:24, 34:8, 67:22, 71:4, 95:24, 95:25
**phone** [5] - 45:25, 46:1, 46:7, 62:3, 69:6
**phonetically** [1] - 96:15
**photo** [1] - 37:1
**photos** [1] - 96:7
**piece** [1] - 118:21
**pill** [1] - 21:21
**pills** [2] - 43:6, 43:12
**Pinkerton** [2] - 93:19, 94:13
**pipe** [1] - 88:18
**place** [2] - 42:21, 44:3
**placed** [1] - 20:6
**plan** [1] - 6:24
**planted** [1] - 20:9
**play** [4] - 77:10, 78:22, 79:19, 81:13
**played** [2] - 77:2, 77:3
**PM** [5] - 1:6, 85:8, 110:24, 129:11
**POGOZELSKI** [155] - 3:4, 5:5, 5:11, 5:24, 7:5, 10:7, 22:4, 23:8, 24:21, 25:13, 27:18, 28:9, 30:5, 30:16, 30:18, 30:20, 32:13, 32:19, 34:4, 34:22, 35:11, 37:15, 38:10, 39:14, 39:16, 41:1, 41:3, 41:25, 42:1, 44:2, 44:19, 45:3, 45:10, 45:13, 45:22, 45:24, 46:5, 46:19, 46:21, 47:16, 47:17, 47:21, 47:23, 48:5, 48:7, 49:7, 49:21, 50:2, 50:13, 51:5, 51:7, 52:5, 52:6, 52:18, 52:21, 55:3, 55:6, 55:23, 55:25, 56:9, 58:17, 59:1, 59:14, 59:21, 59:22, 60:10, 60:12, 61:23, 61:25, 62:8, 62:11, 62:14, 62:24, 63:2, 63:10, 63:13, 63:14, 63:22, 63:25, 64:17, 64:18, 64:24, 65:2,

65:3, 65:12, 65:14, 65:23, 66:3, 66:5, 66:18, 66:19, 67:17, 67:19, 68:9, 68:11, 68:23, 68:24, 69:14, 70:4, 70:7, 70:11, 70:17, 70:25, 71:2, 71:21, 71:23, 72:2, 72:9, 72:18, 76:5, 76:10, 76:12, 76:18, 80:6, 80:10, 80:24, 81:7, 81:13, 81:17, 85:4, 86:23, 92:20, 93:25, 94:22, 95:10, 99:1, 99:5, 99:7, 100:3, 100:10, 101:1, 101:4, 101:9, 101:17, 102:10, 102:13, 102:22, 103:1, 103:5, 103:12, 103:19, 104:24, 105:15, 106:5, 106:15, 107:5, 108:15, 109:13, 109:24, 110:2, 110:5, 110:9, 110:11, 111:21, 127:7
**Pogozelski** [7] - 1:13, 30:3, 56:7, 59:20, 81:5, 109:12, 109:23
**point** [18] - 16:16, 21:9, 25:21, 27:15, 27:23, 35:14, 41:21, 46:17, 53:17, 57:8, 57:9, 58:11, 65:6, 75:18, 75:25, 77:19, 78:14, 87:16
**points** [1] - 118:5
**policy** [1] - 14:23
**polling** [4] - 5:23, 59:13, 80:23, 86:22
**portion** [1] - 113:13
**position** [8] - 29:4, 29:23, 38:20, 76:4, 100:1, 124:25, 128:24, 128:25
**possible** [6] - 64:9, 88:8, 99:15, 99:22, 100:14, 100:16
**possibly** [2] - 8:4, 36:15
**potential** [2] - 8:6, 115:24
**potentially** [1] - 79:13
**practice** [1] - 14:22
**prejudicial** [2] - 57:23, 58:11
**preparation** [1] - 28:1
**prescription** [1] - 65:16
**presence** [13] - 5:22, 6:4, 56:12, 59:12, 59:19, 66:9, 66:16, 80:22, 81:4, 81:22, 86:21, 87:3, 87:14
**present** [13] - 5:3, 58:23, 75:14, 76:24, 85:11, 85:20, 111:2, 121:14
**presented** [4] - 12:10, 95:11, 95:15, 97:14
**presenting** [3] - 13:11, 29:17, 54:4
**preserve** [2] - 14:17, 26:20
**pretty** [7] - 50:4, 51:16, 79:14, 83:8, 106:23, 119:9, 119:17
**previous** [4] - 41:7, 122:15, 124:1, 124:19
**previously** [4] - 56:25, 57:3, 88:3
**Prezcobix** [1] - 67:23
**priced** [1] - 29:10
**prima** [3] - 73:7, 75:8, 75:23
**primarily** [1] - 117:7
**principals** [1] - 9:13
**print** [2] - 11:13, 105:14
**printed** [1] - 8:2
**privately** [1] - 48:11
**privileged** [1] - 103:21
**probability** [1] - 96:22
**problem** [11] - 21:6, 57:17, 86:9, 86:10, 86:14, 88:18, 99:24, 116:3, 118:11, 124:25, 125:1
**problems** [4] - 28:16, 29:5, 29:11, 40:11
**Procedure** [1] - 75:6
**proceed** [2] - 6:5, 54:10
**proceedings** [8] - 5:15, 58:21, 59:10, 76:21, 85:9, 86:19, 110:25, 129:14
**proceeds** [2] - 74:19, 74:24
**process** [7] - 15:24, 17:18, 17:19, 18:4, 31:25, 32:21, 37:14
**produced** [2] - 72:14, 76:4
**producing** [1] - 12:13
**product** [12] - 14:24, 16:8, 16:10, 16:20, 29:10, 31:17, 43:14, 46:23, 68:2, 68:5, 71:18
**products** [9] - 6:25, 15:24, 26:20, 30:22, 68:16, 74:12, 90:6, 90:23, 93:4
**program** [1] - 7:3
**prohibit** [1] - 118:17
**prohibited** [2] - 118:3, 118:15
**promised** [1] - 89:3
**pronouncer** [1] - 9:17
**proof** [6] - 95:5, 95:14, 96:4, 96:5
**proposal** [1] - 105:6
**propose** [1] - 88:10
**proposed** [8] - 27:23, 80:13, 84:20, 85:20, 88:9, 107:22, 107:23, 107:25
**prove** [2] - 98:19, 121:6
**provide** [6] - 14:14, 31:23, 32:1, 35:17, 35:18, 61:5
**provided** [3] - 12:25, 85:16, 104:2
**providing** [1] - 36:1
**public** [1] - 29:6
**publish** [2] - 62:8, 85:23
**published** [1] - 81:16
**pull** [17] - 30:18, 39:14, 41:1, 45:10, 45:22, 46:19, 47:16, 47:21, 51:5, 60:10, 61:23, 63:22, 64:24, 67:17, 68:9, 120:16, 127:22
**pulled** [1] - 120:14
**pulling** [1] - 59:24
**purchase** [1] - 24:16
**purple** [2] - 11:14, 11:18
**purport** [1] - 118:2
**purpose** [2] - 74:18, 118:6
**pursuant** [2] - 75:5, 117:13
**purview** [1] - 18:1
**pushed** [1] - 29:4
**pushing** [1] - 29:6
**put** [13] - 12:22, 42:24, 62:19, 73:17, 95:3, 95:4, 98:9, 98:22, 117:22, 118:5, 128:10, 128:13
**puts** [1] - 97:13
**putting** [4] - 64:12, 90:17, 115:22, 116:3

**Q**

**questionable** [1] - 67:25
**questioning** [9] - 26:11, 37:17, 60:8, 61:15, 69:2, 95:24, 102:14, 102:15, 102:17
**questions** [43] - 6:15, 14:25, 21:24, 31:5, 31:9, 36:14, 36:17, 38:12, 38:14, 39:7, 39:10, 39:11, 40:16, 40:18, 42:2, 42:4, 42:6, 42:8, 46:11, 46:14, 47:18, 48:4, 48:19, 48:22, 51:1, 51:3, 51:18, 52:8, 52:10, 53:4, 53:11, 53:13, 55:7, 55:10, 61:12, 63:15, 66:10, 66:20, 66:24, 68:25, 71:14, 71:23, 119:18
**quick** [1] - 53:25
**quickly** [1] - 62:20
**quite** [3] - 52:3, 96:18, 97:5
**quote** [1] - 119:1

**R**

**raise** [2] - 36:22, 99:10
**raised** [2] - 13:3, 28:7
**Rapid's** [1] - 53:16
**rather** [3] - 20:18, 24:12, 100:23
**re** [3] - 81:17, 94:11, 97:11
**re-argue** [1] - 94:11
**re-packer** [1] - 97:11
**re-rests** [1] - 81:17
**reach** [1] - 18:13
**read** [10] - 11:20, 15:15, 23:18, 23:24, 26:10, 62:20, 79:7, 79:9, 79:10, 94:20
**ready** [3] - 77:3, 84:24, 87:16
**real** [1] - 95:22
**reality** [1] - 119:16
**realized** [1] - 23:12
**really** [5] - 39:4, 42:16, 43:2, 119:24, 127:8
**reason** [5] - 60:21, 60:25, 61:8, 105:10, 117:20
**reasonable** [2] - 80:3, 99:22
**reasonably** [1] - 75:12
**reasoning** [1] - 124:18
**reasons** [4] - 38:24, 74:19, 82:18, 117:5
**rebuttal** [1] - 110:6
**receipt** [2] - 16:9, 74:18
**receive** [2] - 35:21, 69:15
**received** [55] - 18:18, 19:15, 30:21, 31:21, 31:24, 70:15, 70:16, 73:1, 81:10, 81:12, 99:6, 111:6, 111:15, 111:18, 112:2, 112:6, 112:10, 112:14, 112:18, 112:22, 113:1, 113:23, 114:6, 114:10, 114:14, 114:18, 114:22, 115:1, 115:5, 115:9, 115:13, 115:17, 116:18, 116:22, 117:1, 119:5, 120:8, 120:9, 121:22, 121:23, 122:7, 122:10, 122:21, 123:20, 123:21, 124:3, 124:4, 124:12, 124:13, 125:3, 126:5, 126:21, 126:22, 127:12, 127:13
**receiving** [3] - 14:24, 96:22, 97:8
**recess** [9] - 56:10, 58:19, 76:15, 78:24, 81:19, 85:6, 87:12, 108:18, 110:18
**recitation** [1] - 55:20
**recognize** [1] - 28:22
**recollection** [7] - 23:19, 26:13, 52:15, 52:25, 58:7, 123:4, 126:16
**record** [19] - 5:2, 7:24, 48:3, 58:20, 58:22, 62:3, 72:16, 74:13, 76:20, 76:22, 76:23, 85:8, 85:10, 110:24, 111:1, 113:11, 113:13, 117:8, 121:11
**records** [13] - 104:6, 113:8, 113:9, 117:7, 117:15, 117:22, 118:4, 118:8,

118:15, 118:19, 119:11, 121:16, 121:17
**redact** [1] - 100:17
**redacting** [1] - 100:2
**redirect** [2] - 30:3, 56:8
**REDIRECT** [2] - 3:4, 30:4
**redundancy** [1] - 115:23
**redundant** [2] - 116:4, 116:14
**references** [1] - 103:5
**referred** [1] - 126:16
**referring** [3] - 22:25, 26:7, 47:11
**reflect** [2] - 15:20, 19:2
**reflection** [1] - 9:24
**refresh** [4] - 26:13, 52:15, 52:25, 126:16
**refreshed** [1] - 123:4
**refreshing** [1] - 118:6
**regarding** [3] - 72:19, 97:1, 97:2
**regardless** [1] - 48:4
**regularly** [1] - 121:12
**regulations** [1] - 41:17
**rejected** [1] - 17:20
**relate** [3] - 106:13, 118:16, 119:8
**related** [5] - 23:15, 24:2, 41:10, 51:10, 75:16
**relates** [4] - 8:25, 106:9, 106:12, 125:23
**relating** [8] - 15:24, 21:21, 24:2, 24:3, 57:5, 72:15, 119:19
**relationship** [3] - 14:24, 24:15, 26:19
**relationships** [2] - 24:12, 24:20
**relative** [1] - 40:17
**relatively** [1] - 94:1
**relay** [2] - 36:9, 36:11
**relayed** [1] - 36:15
**relaying** [1] - 45:19
**release** [2] - 29:4, 103:21
**relevance** [1] - 63:7
**relevant** [2] - 49:23, 95:14
**reliance** [8] - 102:4, 102:19, 103:18, 104:12, 104:18, 105:19, 106:1, 106:4
**reluctantly** [1] - 79:11
**rely** [1] - 104:17
**relying** [3] - 55:20, 101:24, 106:4
**remember** [12] - 13:5, 14:25, 36:17, 52:3, 56:11, 81:21, 87:13, 100:17, 108:7, 120:3, 123:3, 125:15
**removed** [1] - 99:21
**removing** [1] - 100:11
**renew** [3] - 78:13, 87:23, 87:25
**renewed** [1] - 77:21
**reopen** [6] - 72:12, 72:13, 72:17, 77:9, 78:21, 81:6
**replace** [1] - 53:23
**reply** [1] - 24:5
**report** [1] - 48:4
**REPORTED** [1] - 2:2
**Reporter** [2] - 2:3, 129:18
**reporting** [1] - 22:21
**representing** [1] - 54:19
**request** [5] - 13:2, 13:14, 13:18, 102:24, 106:5
**requested** [1] - 107:1
**requests** [4] - 13:21, 57:24, 89:6, 89:12
**required** [4] - 14:24, 20:19, 32:1, 35:17
**requirements** [3] - 13:12, 25:2, 41:6
**requires** [2] - 106:20, 106:21
**reserve** [1] - 38:7
**resignation** [2] - 19:18, 122:6
**resigned** [1] - 38:25
**resolve** [1] - 86:4
**respond** [6] - 19:5, 19:7, 19:11, 21:5, 64:1, 102:10
**responded** [9] - 13:22, 21:14, 21:23, 23:17, 26:23, 26:25, 27:8, 27:25, 36:14
**responding** [1] - 13:10
**responds** [1] - 21:3
**response** [13] - 12:23, 13:24, 14:2, 19:12, 21:9, 21:11, 23:18, 24:4, 30:13, 35:21, 40:1, 47:2, 51:15
**responses** [2] - 19:2, 23:22
**responsibilities** [2] - 31:13, 31:15
**rest** [9] - 77:17, 77:23, 78:22, 79:1, 84:25, 85:25, 86:5, 114:1
**rested** [1] - 72:10
**resting** [1] - 84:10
**restroom** [2] - 5:6, 5:13
**rests** [5] - 72:2, 81:17, 85:25, 87:6, 87:9
**result** [1] - 10:5
**resumé** [1] - 41:20
**retail** [2] - 27:13, 30:14
**retrospectively** [2] - 98:6, 101:20
**review** [7] - 8:7, 8:25, 10:19, 12:19, 12:20, 17:5, 85:19
**reviewed** [1] - 9:10
**reviewing** [2] - 22:17, 99:7
**Richardson** [3] - 51:12, 51:22, 52:2
**rise** [10] - 5:20, 56:14, 72:5, 76:19, 80:20, 82:1, 85:7, 87:21, 110:23, 129:10
**role** [1] - 32:7
**roles** [1] - 94:2
**room** [2] - 56:13, 72:4
**Rosiello** [3] - 120:21, 121:3, 125:7
**rough** [3] - 84:19, 88:11
**router** [1] - 6:22
**RPR** [2] - 2:3, 129:18
**Rule** [7] - 73:2, 75:6, 77:21, 78:13, 87:23, 87:25, 88:6
**rule** [3] - 85:21, 88:4, 88:12
**Rules** [1] - 75:6
**ruling** [1] - 77:21
**Rumore** [7] - 8:19, 21:20, 56:2, 68:13, 117:23, 118:22, 125:21
**run** [1] - 42:23
**rushed** [1] - 32:14

**S**

**Safe** [48] - 6:24, 7:1, 7:15, 7:24, 8:3, 8:11, 14:13, 14:18, 15:2, 15:8, 17:2, 20:8, 20:13, 21:18, 21:22, 25:6, 27:16, 28:16, 29:12, 29:17, 29:23, 30:10, 31:23, 38:1, 38:22, 39:8, 40:21, 40:23, 41:4, 41:22, 43:2, 46:12, 49:15, 56:25, 57:7, 61:12, 61:17, 62:21, 65:6, 66:21, 66:22, 67:5, 71:4, 71:7, 121:12, 121:16, 123:13, 124:25
**sake** [1] - 119:23
**sale** [1] - 71:18
**Salemi** [3] - 9:16, 48:21, 51:19
**sales** [4] - 32:6, 35:16, 94:3
**salesperson** [1] - 52:3
**sand** [1] - 98:10
**satisfied** [1] - 128:3
**saw** [3] - 9:16, 43:4, 127:3
**scared** [4] - 37:18, 37:22, 48:1, 60:25
**scary** [1] - 52:1
**school** [1] - 82:24
**scientific** [1] - 61:14
**scope** [1] - 35:7
**screen** [1] - 120:14
**scroll** [12] - 11:9, 11:20, 11:22, 11:25, 12:1, 12:2, 12:3, 13:14, 26:3, 85:24
**scuffed** [1] - 96:8
**sealed** [1] - 67:23
**second** [4] - 5:6, 57:25, 113:4, 128:10
**secret** [1] - 128:4
**section** [3] - 15:13, 15:16, 16:24
**SECURITY** [10] - 5:20, 56:14, 72:5, 76:19, 80:20, 82:1, 85:7, 87:21, 110:23, 129:10
**see** [46] - 12:20, 13:14, 14:11, 15:18, 23:18, 27:1, 39:17, 39:23, 42:23, 46:22, 51:8, 51:12, 56:12, 56:19, 62:1, 62:15, 64:1, 64:4, 64:8, 65:4, 65:18, 67:22, 68:2, 68:12, 68:15, 71:3, 72:7, 77:24, 79:18, 80:3, 81:23, 81:24, 87:20, 89:22, 99:1, 99:5, 100:19, 100:22, 105:9, 107:14, 108:2, 110:22, 125:10, 127:18, 128:9, 129:9
**seed** [1] - 20:9
**seeing** [5] - 33:10, 42:19, 65:15, 88:11, 125:15
**seek** [2] - 95:20, 102:16
**seeking** [2] - 103:14, 119:15
**seem** [3] - 38:18, 97:3, 120:3
**seized** [1] - 121:15
**seizure** [4] - 71:16, 117:14, 121:16, 121:17
**select** [1] - 118:6
**self** [1] - 124:1
**self-serving** [1] - 124:1
**sell** [2] - 25:4, 33:21
**selling** [3] - 34:24, 70:19, 71:8
**send** [13] - 8:5, 17:12, 31:22, 34:25, 35:12, 35:20, 36:19, 47:5, 67:1, 79:1, 80:15, 128:18, 128:20
**sending** [6] - 16:4, 17:15, 46:23, 67:4, 120:23, 123:10
**sends** [1] - 21:6
**sense** [4] - 79:4, 96:3, 97:17, 109:8
**sent** [17] - 17:20, 17:21, 18:3, 18:5, 19:2, 19:15, 20:13, 21:20, 23:16, 50:7, 51:9, 61:21, 64:11, 67:12, 68:12, 71:11, 74:22
**sentence** [1] - 100:21
**separate** [5] - 16:24, 89:23, 104:14, 104:19, 115:25
**separately** [2] - 114:4, 116:10
**September** [2] - 47:9, 71:3
**serious** [1] - 57:19
**serve** [2] - 120:24, 120:25
**servers** [1] - 72:19
**services** [1] - 104:5
**serving** [1] - 124:1
**set** [2] - 75:23, 117:12
**setting** [1] - 105:17
**several** [4] - 32:3, 113:17, 116:8, 117:5
**shared** [1] - 54:24
**ship** [1] - 97:12

**shipment** [1] - 71:3
**shipments** [2] - 74:4, 97:8
**shipped** [1] - 16:9
**shipping** [1] - 16:5
**shocked** [1] - 42:17
**Shoppe** [2] - 21:21, 22:20
**short** [2] - 81:13, 115:19
**show** [9] - 7:18, 52:18, 55:3, 55:23, 62:12, 70:25, 71:7, 76:13, 95:24
**showed** [4] - 19:12, 30:9, 37:1, 45:11
**showing** [1] - 52:15
**shown** [7] - 38:3, 64:20, 70:3, 122:4, 122:5, 122:17, 123:14
**shows** [1] - 71:18
**Shukurov** [1] - 33:10
**side** [6] - 42:20, 70:25, 79:14, 83:24, 109:21
**side-by-side** [1] - 70:25
**similar** [4] - 40:8, 69:22, 96:18, 97:6
**simpler** [1] - 90:25
**simply** [1] - 96:10
**situations** [1] - 76:16
**six** [2] - 17:4, 54:6
**sketchy** [1] - 39:24
**slow** [2] - 111:12
**slower** [1] - 109:4
**small** [1] - 94:1
**smeared** [1] - 18:5
**so..** [1] - 77:25
**social** [2] - 66:9, 66:16
**sold** [1] - 34:7
**solution** [2] - 129:1, 129:4
**someone** [2] - 25:2, 53:6
**sometimes** [2] - 18:13, 25:20
**somewhere** [1] - 47:8
**soon** [1] - 53:22
**SOP** [3] - 8:2, 8:6, 8:12
**SOPs** [12] - 7:12, 7:14, 7:17, 7:23, 8:7, 8:24, 41:13, 125:8, 125:12, 125:14, 125:17
**sorry** [14] - 12:5, 12:15, 13:16, 14:8, 19:6, 21:13, 30:16, 46:24, 79:22, 103:7, 111:13, 113:20, 121:9, 123:8
**sort** [3] - 28:13, 42:17, 42:22
**sound** [2] - 79:20, 79:23
**sounds** [1] - 21:6
**sourced** [1] - 34:8
**sources** [1] - 34:25
**sourcing** [2] - 33:17, 33:23
**Southern** [1] - 129:19
**SOUTHERN** [1] - 1:2
**spaced** [1] - 107:16
**speaking** [2] - 44:15, 104:21
**special** [3] - 24:12, 24:15, 105:7
**Special** [1] - 105:3
**specific** [5] - 36:15, 69:10, 119:1, 125:9, 125:16
**specifically** [5] - 28:5, 41:9, 41:14, 74:24, 118:15
**speculation** [5] - 10:8, 23:9, 24:22, 27:19, 118:19
**speed** [1] - 32:4
**spinning** [1] - 53:21
**spoken** [2] - 57:11, 69:11
**squarely** [2] - 97:3, 97:13
**stamp** [2] - 115:25, 116:1
**stamps** [2] - 76:6, 76:7
**standard** [5] - 94:20, 99:18, 101:18, 106:12, 106:14
**standpoint** [1] - 79:5
**start** [8] - 37:14, 60:17, 76:14, 85:22, 90:15, 108:23, 111:6, 120:17
**started** [3] - 16:15, 47:9, 58:25
**State** [1] - 13:3
**statement** [8] - 54:13, 119:12, 120:20, 124:19, 125:6, 125:21, 126:9, 126:12
**statements** [5] - 102:15, 120:22, 121:6, 122:15, 122:25
**STATES** [3] - 1:1, 1:4, 1:11
**States** [6] - 1:15, 2:4, 73:10, 73:14, 96:14, 129:19
**statin** [1] - 43:6
**status** [1] - 76:25
**statutes** [1] - 67:12
**stay** [1] - 87:19
**STENOGRAPHICALLY** [1] - 2:2
**step** [1] - 71:25
**stepped** [1] - 5:6
**stepping** [2] - 50:9, 50:16
**sticking** [1] - 106:15
**still** [5] - 5:17, 16:12, 59:8, 64:2, 72:14
**stipulate** [2] - 77:20
**stipulation** [13] - 3:11, 3:12, 72:7, 72:8, 72:19, 72:24, 72:25, 77:9, 78:22, 80:7, 80:11, 81:8, 81:11
**stop** [1] - 76:14
**stopped** [1] - 70:19
**story** [2] - 83:24, 97:17
**strategy** [2] - 82:18, 84:9
**Street** [2] - 1:16, 1:19
**stressing** [1] - 99:23
**stricken** [3] - 58:1, 58:3, 58:6
**stuck** [1] - 83:8
**stuff** [2] - 47:5, 51:24
**subject** [4] - 85:25, 117:16, 120:22, 124:18
**submitted** [2] - 88:9, 105:5
**submitting** [3] - 8:24, 87:10, 125:8
**subpoena** [3] - 69:15, 119:5, 119:19
**subpoenaed** [1] - 69:22
**subpoenas** [1] - 31:24
**subsequent** [3] - 23:22, 33:4, 103:22
**substance** [1] - 31:19
**substances** [1] - 57:19
**substantive** [5] - 90:3, 90:8, 90:13, 90:14, 92:1
**succession** [1] - 53:25
**sufficient** [1] - 75:11
**suggest** [6] - 21:10, 50:9, 50:16, 90:17, 116:1, 119:14
**suggested** [3] - 26:16, 69:8, 91:5
**suggesting** [1] - 57:18
**suggestion** [1] - 90:12
**suggestions** [1] - 8:18
**summaries** [1] - 89:15
**summary** [2] - 12:25
**super** [1] - 29:10
**Super** [1] - 29:10
**super-low-priced** [1] - 29:10
**suppliers** [1] - 46:12
**supports** [3] - 96:13, 104:7, 105:22
**suppose** [1] - 115:23
**supposed** [3] - 127:8, 128:17, 128:18
**supposedly** [1] - 47:14
**surprised** [6] - 37:23, 37:25, 42:18, 43:4, 43:8, 43:11
**surprising** [1] - 38:2
**surrounding** [2] - 96:24, 97:1
**suspicious** [4] - 96:19, 96:23, 96:25, 97:7
**sustain** [2] - 63:12, 125:18
**sustained** [10] - 10:9, 22:6, 28:11, 32:11, 32:18, 38:6, 49:20, 58:2, 58:10, 65:22
**sustaining** [1] - 58:9
**sworn** [1] - 6:9
**Symtuza** [2] - 67:23, 68:4
**Synergy** [11] - 33:7, 44:24, 45:5, 53:16, 54:7, 61:4, 70:8, 70:20, 71:4, 71:8, 71:18
**system** [2] - 6:21, 6:22

## T

**T3** [7] - 16:5, 16:10, 36:4, 47:5, 71:7, 71:18
**T3s** [26] - 14:14, 14:23, 16:12, 16:15, 17:7, 32:2, 34:25, 35:15, 36:1, 36:20, 47:7, 47:9, 54:8, 54:12, 54:21, 55:13, 59:25, 60:7, 60:18, 61:4, 61:9, 65:19, 74:1, 95:24, 123:11
**talks** [3] - 65:18, 89:2, 101:18
**team** [6] - 15:5, 15:7, 38:23, 39:5, 50:7, 50:16
**Teams** [3] - 47:2, 52:22, 60:13
**ten** [3] - 35:6, 110:11, 120:12
**ten-minute** [1] - 110:11
**term** [2] - 11:14, 28:6
**terminology** [1] - 60:23
**terms** [3] - 61:13, 101:21, 101:25
**terrible** [1] - 50:4
**testified** [13] - 6:10, 37:22, 65:20, 103:8, 121:12, 121:21, 123:6, 125:8, 125:9, 125:12, 125:25, 126:1, 126:17
**testify** [11] - 28:1, 69:23, 82:8, 82:13, 83:14, 83:16, 83:22, 88:17, 123:7, 123:9, 124:21
**testifying** [4] - 78:8, 78:11, 82:19, 84:10
**testimony** [14] - 18:20, 28:8, 28:13, 56:17, 63:11, 75:11, 75:15, 89:1, 95:12, 96:3, 120:3, 122:4, 123:14
**Tex** [1] - 53:16
**text** [4] - 20:12, 43:4, 43:8, 62:15
**THE** [318] - 1:10, 1:13, 5:2, 5:7, 5:10, 5:14, 5:17, 5:19, 5:20, 5:22, 6:2, 7:7, 10:9, 22:6, 23:10, 24:23, 25:15, 27:20, 28:11, 30:3, 32:11, 32:18, 34:1, 34:3, 34:20, 35:9, 37:12, 38:6, 38:9, 43:25, 44:15, 45:1, 46:3, 49:5, 49:20, 49:25, 50:12, 56:7, 56:10, 56:14, 56:16, 56:20, 56:22, 57:1, 57:15, 58:2, 58:6, 58:19, 58:22, 59:4, 59:7, 59:9, 59:12, 59:17, 62:10, 63:4, 63:9, 63:12, 65:1, 65:22, 69:9, 70:15, 71:22, 71:24, 72:3, 72:5, 72:7, 72:12, 72:17, 72:21,

72:23, 73:2, 73:4, 75:3, 75:21, 76:3, 76:15, 76:19, 76:22, 77:4, 77:7, 77:12, 77:14, 77:18, 77:23, 78:1, 78:3, 78:9, 78:12, 78:17, 78:20, 79:6, 79:9, 79:18, 79:22, 79:25, 80:3, 80:5, 80:9, 80:15, 80:19, 80:20, 80:22, 81:2, 81:10, 81:15, 81:19, 82:1, 82:3, 82:7, 82:10, 82:12, 82:16, 82:18, 82:22, 82:24, 83:5, 83:7, 83:12, 83:14, 83:19, 83:21, 84:2, 84:4, 84:7, 84:9, 84:13, 84:15, 84:19, 85:6, 85:7, 85:10, 85:15, 86:3, 86:13, 86:15, 86:18, 86:21, 87:1, 87:7, 87:11, 87:21, 87:23, 88:1, 88:5, 89:8, 89:14, 89:19, 90:18, 91:4, 91:10, 91:15, 91:20, 91:25, 92:6, 92:11, 92:16, 92:22, 93:2, 93:8, 93:13, 93:18, 93:23, 94:5, 94:10, 94:20, 94:23, 95:3, 95:9, 97:19, 98:12, 98:15, 99:3, 99:9, 99:11, 99:14, 99:17, 100:1, 100:8, 100:13, 100:16, 100:19, 100:22, 100:24, 101:2, 101:6, 101:14, 102:1, 102:9, 102:12, 102:21, 102:23, 103:3, 103:9, 104:10, 104:12, 105:3, 105:9, 105:12, 105:24, 106:19, 107:3, 107:6, 107:9, 107:19, 107:25, 108:1, 108:2, 108:3, 108:5, 108:13, 108:16, 108:18, 108:21, 109:2, 109:5, 109:9, 109:12, 109:18, 109:20, 109:25, 110:4, 110:7, 110:10, 110:13, 110:16, 110:18, 110:22, 110:23, 111:1, 111:9, 111:12, 111:14, 111:17, 111:20, 111:22, 112:1, 112:5, 112:9, 112:13, 112:17, 112:21, 112:25, 113:3, 113:10, 113:15, 113:19, 113:22, 113:25, 114:5, 114:9, 114:13, 114:17, 114:21, 114:25, 115:4, 115:8, 115:12, 115:16, 115:22, 116:3, 116:12, 116:17, 116:21, 116:25, 117:3, 117:10, 117:17, 118:9, 118:21, 120:1, 120:3, 120:16, 120:23, 120:25, 121:4, 121:8, 121:19, 121:22, 121:25, 122:4, 122:9, 122:12, 122:17, 122:20, 122:23, 123:2, 123:7, 123:9, 123:16, 123:20, 123:23, 124:2, 124:6, 124:8, 124:11, 124:16, 124:21, 124:23, 125:2, 125:10, 125:15, 125:18, 126:4, 126:15, 126:21, 127:10, 127:12, 127:15, 127:18, 128:2, 128:8, 128:15, 129:1, 129:6, 129:9, 129:10

**theme** [1] - 32:16
**themselves** [2] - 17:9, 85:18
**theories** [1] - 29:11
**theory** [11] - 98:22, 101:2, 101:5, 101:12, 101:15, 102:2, 102:3, 105:13, 107:17, 107:22, 107:24
**Thereupon** [1] - 6:7
**they've** [1] - 82:25
**thinking** [1] - 27:4
**third** [5] - 54:20, 55:12, 92:20, 92:22
**thorough** [1] - 12:17
**thoughts** [1] - 12:22
**thousands** [1] - 60:7
**thread** [2] - 13:11, 63:2
**threats** [1] - 71:12
**three** [6] - 20:5, 40:5, 51:9, 64:11, 90:14, 116:15
**throughout** [5] - 20:9, 32:2, 42:12, 46:6, 101:12
**timeline** [1] - 10:15
**timing** [1] - 79:5
**today** [6] - 38:14, 72:8, 81:24, 86:4, 123:14, 123:15
**together** [4] - 12:22, 78:5, 84:22, 128:14
**tone** [1] - 55:14
**Tony** [1] - 63:6
**took** [2] - 31:15, 124:24
**top** [1] - 123:2
**totally** [1] - 16:24
**towards** [1] - 69:19
**traditionally** [1] - 121:14
**traffic** [3] - 90:5, 90:23, 93:3
**trafficking** [1] - 9:19
**training** [3] - 32:2, 32:4, 64:3
**transactions** [3] - 75:16, 96:19, 104:21
**transcript** [1] - 118:25
**TRANSCRIPT** [1] - 1:10
**transcription** [1] - 129:14
**treatment** [1] - 89:4
**trial** [6] - 38:17, 42:12, 58:12, 58:13, 95:15, 101:12
**Trial** [1] - 129:11
**TRIAL** [1] - 1:10
**tried** [6] - 43:3, 53:1, 82:25, 98:4, 98:10, 107:15
**Triumeq** [1] - 67:25
**true** [2] - 50:19, 95:17
**truly** [2] - 19:24, 20:4
**trust** [1] - 20:6
**truth** [1] - 121:6
**truthful** [1] - 36:4
**try** [8] - 30:6, 52:12, 84:21, 96:3, 100:17, 100:24, 104:15, 107:25
**trying** [8] - 9:12, 42:24, 66:6, 94:11, 95:20, 98:2, 98:6, 104:5
**Tuesday** [3] - 79:16, 108:25, 109:7
**turn** [3] - 77:14, 83:15, 128:16
**twice** [1] - 115:22
**two** [20] - 44:7, 47:19, 54:24, 57:24, 60:5, 61:21, 73:19, 73:20, 74:6, 79:14, 85:24, 88:24, 100:2, 104:14, 104:19, 106:16, 107:19, 108:9, 109:14, 115:24
**type** [3] - 36:4, 40:8, 97:4
**types** [1] - 43:16
**typically** [1] - 18:12
**typing** [1] - 11:18

## U

**U.S** [1] - 129:20
**under** [3] - 5:18, 59:8, 97:7
**underlined** [6] - 65:9, 99:16, 99:20, 100:4, 100:11, 100:16
**underlines** [1] - 99:21
**underlining** [4] - 99:12, 99:14, 99:22, 100:2
**underneath** [1] - 11:13
**understood** [4] - 18:17, 39:6, 107:5, 116:7
**unfamiliar** [1] - 65:21
**UNITED** [3] - 1:1, 1:4, 1:11
**United** [6] - 1:15, 2:4, 73:10, 73:14, 96:14, 129:19
**unknown** [2] - 33:13, 53:7
**unless** [6] - 29:3, 57:12, 79:9, 105:19, 109:2, 128:14
**unrelated** [1] - 119:9
**unrest** [1] - 72:11
**up** [40] - 16:15, 18:4, 30:18, 31:15, 32:4, 35:6, 35:20, 38:3, 39:14, 41:1, 45:10, 45:22, 46:19, 47:16, 47:21, 51:5, 51:17, 59:24, 60:10, 61:23, 63:22, 64:24, 67:17, 68:7, 68:9, 76:5, 86:11, 88:19, 96:8, 98:16, 103:21, 108:4, 109:9, 116:10, 120:14, 120:16, 123:2, 127:22, 129:1, 129:4
**up-to-date** [1] - 16:15
**update** [2] - 8:8, 85:14
**updated** [1] - 13:21
**upheld** [3] - 96:17, 97:4, 97:16

## V

**valid** [1] - 54:4
**valuable** [1] - 8:11
**Value** [1] - 53:16
**values** [1] - 20:8
**variety** [2] - 38:1, 121:1
**various** [6] - 44:8, 50:23, 52:8, 63:20, 118:5, 120:21
**Vega** [2] - 44:24, 45:5
**vendor** [15] - 8:25, 9:2, 10:11, 17:13, 17:16, 17:22, 35:13, 36:7, 37:10, 39:17, 39:21, 47:25, 53:4, 53:22, 66:7
**vendors** [15] - 13:12, 30:23, 31:17, 44:8, 48:20, 50:23, 51:2, 52:9, 53:17, 54:9, 63:20, 66:12, 68:16, 96:4, 97:2
**venture** [1] - 26:19
**verdict** [3] - 108:6, 108:9, 108:10
**verification** [6] - 6:22, 6:25, 7:4, 10:11, 15:23
**verify** [2] - 16:7, 96:3
**version** [4] - 54:21, 106:18, 115:25, 116:1
**versions** [2] - 54:25, 128:1
**VI** [4] - 74:20, 74:24, 90:8, 93:14
**via** [1] - 73:13
**video** [4] - 72:14, 77:11, 77:12, 81:16
**view** [2] - 77:5, 127:25
**VII** [3] - 74:25, 90:8, 93:14
**VIII** [4] - 74:21, 74:25, 90:8, 93:14
**ViiV** [2] - 43:14, 68:2

**vitiates** [1] - 58:12
**Volume** [1] - 1:7
**volunteered** [1] - 56:24
**volunteers** [1] - 57:16
**VRS** [1] - 6:21
**vs** [1] - 1:6
**vulnerable** [1] - 29:4

## W

**WAC** [1] - 76:9
**waiting** [1] - 16:12
**waive** [4] - 5:23, 59:13, 80:23, 86:22
**walked** [1] - 5:12
**wants** [5] - 76:7, 77:5, 85:19, 125:14, 127:18
**warehouse** [8] - 16:9, 16:20, 16:21, 17:2, 17:21, 18:6, 18:14
**warning** [5] - 110:7, 110:11, 110:13, 110:15, 110:16
**warrants** [1] - 95:12
**wasted** [1] - 42:24
**waters** [1] - 101:22
**week** [1] - 29:8
**weekend** [2] - 87:12, 87:19
**whatsoever** [5] - 57:22, 74:1, 74:5, 74:9, 74:16
**wheels** [1] - 53:21
**whole** [2] - 80:1, 113:15
**Wholesale** [1] - 53:16
**wholesalers** [1] - 65:19
**Wholesalers** [4] - 44:24, 45:5, 70:9, 71:5
**wilfulness** [5] - 101:20, 106:9, 106:13, 106:21, 106:25
**willfully** [4] - 73:8, 74:11, 90:21, 107:10
**willfulness** [1] - 108:8
**WILLIAM** [1] - 1:10
**William** [2] - 1:18, 2:4
**wire** [11] - 74:15, 74:17, 74:21, 74:24, 74:25, 75:1, 90:7, 90:9, 90:24, 93:9, 93:14
**wires** [1] - 74:22
**wish** [1] - 54:10
**withdrawing** [1] - 102:23
**Witness** [3] - 5:16, 56:21, 59:6
**witness** [26] - 7:19, 7:20, 8:22, 10:25, 11:10, 18:23, 19:19, 28:20, 30:2, 52:18, 55:3, 55:24, 56:24, 60:11, 62:12, 69:1, 70:6, 72:1, 75:15, 83:15, 95:12, 101:13, 117:23, 118:17, 119:18
**WITNESS** [4] - 3:2, 5:19, 56:20, 59:9
**witnesses** [5] - 78:7, 84:11, 89:3, 96:13
**witnesses'** [1] - 89:1
**wonderful** [1] - 110:9
**word** [3] - 99:15, 99:23, 100:18
**words** [10] - 20:10, 21:1, 86:5, 90:15, 94:15, 99:19, 99:23, 99:24, 105:6, 105:9
**wore** [1] - 39:7
**works** [3] - 86:2, 86:3, 108:15
**worries** [1] - 51:24
**worry** [1] - 66:15
**worth** [2] - 30:22, 37:7
**write** [8] - 20:22, 40:1, 40:4, 48:2, 48:10, 51:15, 51:22, 66:13
**writes** [7] - 46:24, 51:12, 62:1, 64:1, 64:4, 64:8, 68:15
**writing** [4] - 36:23, 46:23, 62:19, 64:12
**written** [3] - 12:25, 94:12, 94:14
**wrote** [4] - 27:1, 40:2, 47:4, 48:1

## X

**XIV** [1] - 1:7

## Y

**year** [2] - 20:16, 20:18
**years** [2] - 20:5, 40:23
**yesterday** [19] - 6:15, 6:17, 9:16, 10:15, 14:4, 14:22, 18:18, 19:18, 20:12, 21:17, 21:19, 22:5, 22:25, 28:7, 38:14, 42:2, 45:11, 45:14, 70:9
**yourself** [1] - 11:21

## Z

**Zimet** [13] - 1:22, 6:5, 56:22, 73:2, 75:3, 76:6, 76:13, 87:7, 88:1, 97:25, 110:16, 125:11, 127:10
**ZIMET** [163] - 3:3, 5:8, 5:25, 6:6, 6:12, 7:9, 7:18, 7:22, 8:21, 8:23, 10:10, 10:24, 11:1, 11:9, 11:11, 13:7, 13:9, 14:7, 14:10, 15:12, 15:14, 18:22, 18:25, 19:19, 19:21, 22:7, 22:11, 22:13, 23:14, 24:24, 25:17, 26:2, 26:5, 27:22, 28:12, 28:19, 28:21, 30:1, 30:15, 34:17, 35:7, 37:11, 38:4, 38:7, 46:2, 49:19, 49:24, 50:11, 56:23, 57:4, 57:16, 58:5, 58:16, 59:2, 59:15, 63:1, 63:3, 63:5, 69:8, 70:13, 72:10, 72:13, 72:20, 73:3, 75:4, 76:1, 76:8, 76:11, 76:17, 77:1, 77:5, 77:11, 77:13, 77:16, 77:19, 77:25, 78:2, 78:4, 78:10, 78:13, 78:19, 79:4, 79:7, 79:12, 79:20, 79:23, 80:2, 80:4, 80:12, 80:18, 80:25, 82:5, 84:17, 85:3, 85:14, 85:16, 86:8, 86:17, 86:24, 87:8, 88:2, 89:17, 90:12, 91:3, 91:8, 91:14, 91:19, 91:24, 92:5, 92:10, 92:14, 92:25, 93:6, 93:12, 93:16, 93:21, 94:8, 94:11, 95:1, 95:7, 98:1, 102:7, 103:17, 104:11, 104:14, 105:5, 106:8, 107:1, 107:7, 108:12, 108:17, 108:19, 108:25, 109:3, 109:7, 109:11, 109:15, 109:19, 110:17, 110:20, 113:4, 113:11, 113:16, 121:11, 121:20, 122:19, 123:6, 123:8, 123:10, 124:10, 124:22, 124:24, 125:12, 125:16, 125:25, 126:19, 127:1, 127:6, 127:11, 127:17, 128:10, 128:23, 129:3
**Zimet's** [1] - 98:13
**zoom** [1] - 39:23