UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-20255-Dimitrouleas/Hunt

UNITED STATES OF AMERICA,

vs.

PATRICK BOYD and CHARLES BOYD,

Defendants.

Fort Lauderdale, Florida
October 27, 2025
1:00 PM - 5:00 PM
Volume XV
Pages 1 to 163

---

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: Alexander Pogozelski, Esquire
Jacqueline DerOvanesian, Esquire
Assistant United States Attorneys
99 NE 4th Street
Miami, Florida 33132

FOR DEFENDANT PATRICK BOYD: William Barzee, Esquire
Ivlis Mantilla, Esquire
Barzee Flores
40 NW 3rd Street Ph 1
Miami, Florida 33128

FOR DEFENDANT CHARLES BOYD: Bruce Zimet, Esquire
633 S. Federal Highway Fl 6
Fort Lauderdale, Florida 33301

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

(Call to the Order of the Court.)

THE COURT: We are back on the record. Counsel are present. Both defendants are present.

Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: I think there were a couple of things, Your Honor.

One, there was a question about whether we were sending just paper or just electronic exhibits back with the jury.

THE COURT: Right.

MR. POGOZELSKI: What's the Court's -- does the Court have a preference? We've got both paper and electronic.

THE COURT: If you all agree on the electronic part, then we can send back the electronic. If you don't agree, we can send back paper.

Do you want to do a hybrid?

We can do a hybrid.

MR. POGOZELSKI: We would prefer a hybrid.

There are some that are only accessible electronically, and then we have a paper binder of one of the exhibits; so we would prefer a hybrid version.

THE COURT: That's something that you should have worked out before now, but we'll work it out tomorrow morning.

MR. POGOZELSKI: And then the only other question

was -- we conferred with Mr. Zimet about demonstratives. We started conferring with Mr. Barzee about demonstratives that he might use during opening. He showed some of them but didn't show the rest of them, but we would just be --

THE COURT: If you don't like his demonstrative, object, and I'll rule.

MR. POGOZELSKI: All right, Your Honor.

THE COURT: How about the corrections to the jury instructions on page 10?

I can't find page 10.

Oh, there's page 10.

MR. POGOZELSKI: Yeah, it was just that --

THE COURT: So there's a couple of page 10s. So what page are we changing?

MR. POGOZELSKI: It is the -- what appears to be the offense instructions that begin, "The indictment charges eight separate crimes called counts," and then the second paragraph states, "Count I charges that the defendants knowingly and willfully conspired to introduce adulterated and misbranded drugs," and it just leaves out the "and to defraud the FDA." It leaves out the third object there. That's all.

THE COURT: Any objection to adding that to that page?

MR. ZIMET: No, Judge.

MR. BARZEE: No, Your Honor.

THE COURT: Okay. So I'll substitute that page in.

Anything else before we bring in the jury?

MR. POGOZELSKI: Nothing from the Government, Your Honor.

MR. ZIMET: No, sir.

MR. BARZEE: No, Your Honor.

THE COURT: All right. If we have all the jurors, let's bring them in.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

Both sides have now rested their cases. The attorneys will now present their closing arguments. What the attorneys say is not evidence, but their arguments are intended to aid you in understanding the case.

Each side will have equal time, but Mr. Pogozelski is entitled to divide that time between an opening argument and a rebuttal argument.

Mr. Pogozelski, you may proceed.

MR. POGOZELSKI: Thank you, Your Honor.

Good afternoon, ladies and gentlemen of the jury.

I want to start the closing argument the same way that we began this trial, which was by thanking you for your service for being here.

It's been a long trial. We appreciate your patience. We appreciate how much you've paid attention to the witnesses who have testified and how much attention you've paid to the evidence that we presented.

And I have seen a lot of you taking notes, and that's just one indicator of your attentiveness during this trial.

Back at the very beginning, during opening statements, you heard two very different versions of what the evidence in this case would show. And now that you've seen the evidence -- all the emails, all the Teams messages, all the text messages, and you've heard from the witnesses -- you know the truth here.

You know that Charles Boyd and Patrick Boyd, who ran Safe Chain Solutions, who distributed over $90 million worth of these black market HIV drugs, did so knowingly and intentionally. And you also know from the evidence that there were a lot of witnesses, a lot of employees, who raised their hands and said, "This doesn't seem right."

People who didn't have a lot of former pharmaceutical experience, like these two defendants, people who used their common sense and saw Boulevard and saw the condition of the drugs and saw the boxes and the way they were shipped -- they

were wondering, "What the heck is going on? This doesn't make any sense."

And this case is not just about one fact or red flag in isolation. It's not just about how cheap they got the drugs. It's not just about the appearance of the drugs which, obviously, you've seen a lot of photos, and we're going to walk through those. It's not just about what Peter testified to. He's a career criminal. We acknowledge that.

And as I go through my presentation, what I want to do is focus you on the parts of his testimony that are supported by the documents and the evidence in this case.

So I'll start by walking through the indictment, which it has been a while now, but there are eight counts charged: Conspiracy to introduce adulterated and misbranded drugs and to defraud the FDA. Introduction of misbranded drugs. Basically, two shipments of these misbranded HIV drugs by the defendants. Conspiracy to traffic in medical products with false documentation. Conspiracy to commit wire fraud and wire fraud.

And I'll explain a little more in detail, these charges, as we proceed, but they all boil down to a few simple facts, and they all involve deception. And that is what you have seen throughout this case.

You have seen lies to customers. You've seen lies or misleading withholding of information from the employees, the compliance department that you heard from. You've heard about

lies to the FDA. You even heard about lies to these two defendants' own lawyers.

Now, I think in opening statement, there was some suggestion that criminals don't hire lawyers and they don't have a compliance department.

Well, when you lie to your lawyers, when you don't tell your compliance director everything and hide information from your compliance director and she testifies essentially that she felt whatever she said didn't matter and she felt taken advantage of, then that is what criminals do -- they lie to lawyers and they use a compliance defendant as a facade.

And I will show you how all of these charges are based on much of the same conduct but involve some slightly different elements.

Now, obviously, by now you know that the two defendants here on trial are Charles Boyd and Patrick Boyd. They're both sitting over here, and you've seen them here for a while. And you know that they occupy different roles within their company.

And Safe Chain Solutions -- I think at the beginning of the trial, my colleague, Ms. DerOvanesian, told you that you will learn Safe Chain, the drugs they distributed were anything but safe.

And it is a sad but ironic fact that they named their company "Safe Chain," when they went on to distribute all of these black market, dirty, diverted, adulterated, misbranded,

lifesaving HIV drugs to thousands of pharmacies all over the country. That is a sad irony.

And I think there are a few things that might not be in dispute between us, the Government, and the lawyers defending Charles and Patrick Boyd.

I think we can all agree at the end of the day, these were all black market drugs. And you can see here, you heard from Peter, "King Kimchi." You heard from him himself about how he got these drugs. Terrible what he did to get these drugs. Terrible.

But at the end of the day, without Safe Chain, without these two defendants, he couldn't have gotten those drugs from the street into the pharmacies.

And I think one of the lawyers suggested to him during questioning, "You were just laundering these drugs through Safe Chain."

Well, that is an interesting way to put it, but he was laundering it with his coconspirators, Charles and Patrick Boyd. They knew these were not legitimate drugs.

And then again, at the beginning of trial, we told you -- you're not going to hear, and we're not alleging that these two defendants went in there and opened the bottles and put the wrong drugs in there. We're not saying that.

And we also told you that Peter never told them, "Hey, I'm getting all these drugs so cheap from the street, can you

help me sell them?" We told you that in opening statement, and that is consistent with what Peter Boulevard testified to.

But they don't have to know exactly where those drugs came from, which patients. They just have to know that they were illegitimate drugs. And that's what they were. And Peter, "King Kimchi," other than saying he got it from closed-down pharmacies, which as we'll go through makes absolutely zero sense when you look at the T3s, other than that, he really didn't do much to hide the fact.

You heard him talk about the boxes, the diaper boxes and the boxes from the street. You saw this bottle that he shipped to them, that a customer had to complain about, that looks like it was previously dispensed.

You saw albuterol sulfate inhalation on another bottle that they distributed that customers complained about. And these were very, very early on in the conspiracy.

You saw this box. You saw it multiple times. You also saw these messages in September 29th of 2020, about that article that the defendants had read about this exact type of buyback scheme that Peter engaged in and that is alleged in the indictment.

And you even -- you see here Charles Boyd telling Patrick Boyd, "Yeah, we're going to talk to Peter this afternoon." And you also saw, I think when they were questioning the agent, "We may need to cut off Boulevard

again."

Well, if you look at those dates -- 9/29, 10/1, 10/6 -- that's a lot of money going to Boulevard for a lot of drugs. A lot of these black market HIV drugs. And it wasn't just about Boulevard. It was one after the other. And this doesn't even include all of them.

You heard Ms. Divilio testify about, you know, one would disappear and another would pop up. You heard about Invicta. You heard about Cintex, Value Wholesale -- just a constant stream of all these HIV vendors and their magically cheap prices, prices that were too good to be true, as stated in these defendants' own standard operating procedures.

You also heard a lot of testimony and saw a lot of documents about how they bought these cheap HIV drugs from Boulevard without any T3s, without any information about where the drugs came from, for months, and resold them to pharmacies for months.

(Exhibit published via playback.)

MR. POGOZELSKI: So you heard there, that also goes to knowledge. They knew about these pedigree T3 requirements for a long time.

(Exhibit published via playback.)

MR. POGOZELSKI: And then just to support that, you heard from Abbie Divilio over the course of a month or so, three or so months without any information about where the

drugs came from.

You heard that from Mr. King Kimchi, "Peter Boulevard." No T3s, no pedigrees, at all. And you also heard this only became a problem when customers started complaining.

You heard testimony it wasn't Charles Boyd who said "Hey, this is a problem." It was customers who started complaining, and then Ms. Divilio had to field some of those complaints, and she had no control over the situation, no control over the business decisions.

And you saw that July 10th email, where she sends the email about the criminal consequences of doing so, which we just saw at least Mr. Patrick Boyd knew about it. And that is one of the allegations in the indictment -- is buying and selling of these HIV drugs without any T3s or pedigrees at all.

You also heard during opening statement from the defense lawyers, and I believe through some of the questions, some suggestion that these T3s, pedigrees -- they're not important. They're like shipping labels.

Well, that's not what the witnesses said. Ms. Eberspacher -- it's basically a birth certificate of a drug. And mind you, she was only 24 when she was hired at this company. No experience in the pharmaceutical industry, and she knew that it was to ensure patient safety.

And you've seen exactly why the requirement exists. It's not just a paper documentary requirement. You've seen the

consequences where you have no or false T3s hiding where the drugs came from.

You heard from a patient who suffered adverse consequences from this exact crime that these two defendants committed, and you saw documents about numerous other instances.

You heard from a sales rep, who, again, no pharmaceutical experience before. He compared it to when someone gets contaminated and you go to a grocery store, you want to be able to trace back and figure out where is the contamination; right?

Well, with these falsified T3s pedigrees that these two defendants both helped create and trafficked in, there wasn't a way to track those drugs back to their actual source because all the information was false.

And then again, you heard from Ms. Divilio. And you heard about why it's particularly important in the context of lifesaving HIV drugs.

(Exhibit published by being played back.)

MR. POGOZELSKI: So there you hear Patrick Boyd explaining the purpose to identify diversion. And again, that is what this case is about: Diverted HIV drugs. Drugs that were diverted from a legitimate supply chain, resold at dirt cheap prices in whatever condition Peter could find them so that these defendants could use their company to then get those

same HIV drugs over to pharmacies. And that's the reason they got them so cheap.

And again, the witnesses you heard from, former employees -- you heard from Ms. Divilio. You heard from her at some length.

You heard about the toll this job took on her. You heard how she felt, basically, that her role was meaningless by the end. No matter what she said, no matter how many emails she sends about the first Boulevard T3, the second falsified Boulevard T3 -- it doesn't matter. Synergy. She sends emails about all three of them. It doesn't matter.

You heard her say, "Business decisions, sales always took precedent." And maybe they paid a little bit of lip service, but what they wanted was to pursue these sales of these cheap HIV drugs. It basically helped keep their business afloat, as you saw from the finances, as you saw from the document.

Ms. Eberspacher -- you heard from her that she was instructed not to put things in writing. You saw documents similarly where Patrick Boyd was sending a message to Charles Boyd about what Abbie was putting in writing.

That is not something you should be particularly concerned about -- what your compliance director is putting in writing if you are doing things legitimately on the up-and-up.

And you heard from Jonathan Nicholls. The drugs at the

prices that these defendants offered them -- they sold themselves. Again, too good to be true.

You heard from Ms. Rumore, who represented these defendants during the course of the conspiracy. You heard how many times she said no when asked: Did you know about this? Did they tell you about this? It was something like ninety-plus times she said "No" to that. She was not kept informed.

You heard from the patient, Mr. Borjas, who suffered. It never had this happen to him in Ecuador, he testified to. Unfortunately, it happened here, where we're supposed to have the safest drug supply chain in the world.

You heard from Vipul Parekh. He was the owner of Legend Drugs, where one of his patients got a bottle of Seroquel. And when he was being cross-examined, he said, "Yeah, I did think the pricing was too good to be true." He said that. He's a pharmacy owner, and he had a patient who suffered consequences.

You heard from Ms. Trissell, who turned down the defendant's business. It was a Facebook message you saw from Charles Boyd to Ms. Trissell. She owns a pharmacy in the same town as Safe Chain. She was approached. No, that the pricing didn't make sense to her.

You heard from Nicole Wolfe with ViiV Healthcare. You saw lots of documents where there were problems with ViiV HIV

drugs -- sometimes the wrong drugs in them. Sometimes the bottle looked like it was dispensed before. Safe Chain never reported anything to ViiV.

And you heard from Daniel Conger, who went through the payments, which I'll show as we go through.

So there's three conspiracy counts. So I want to talk to you a little bit about the conspiracy counts. And I expect the judge will instruct you, at least similarly to this; but you know, for Count I, two or more persons in some way agreed to try to accomplish a shared and unlawful plan.

That's pretty much universal in a lot of conspiracy counts. And the defendant knew about the plan's unlawful purpose and wilfully joined in it. And then we'll talk about some of these overt acts that are alleged in the indictment.

And these terms "adulterated" and "misbranded drugs," obviously, us lawyers always try to overcomplicate things, but when you look at the definitions: "Adulterated," if any substance has been substituted in whole or in part for the drug.

Well, we know that happened on many occasions here. And you heard from a witness who took one of those other substances that was in his bottle of Biktarvy.

Misbranded: If a drug's label or labeling is false or misleading. And as the judge will instruct you, these T3s, pedigrees, documents that had information about the origin and

the history of the drug and that accompanied the drugs that the defendants sold, that they can constitute labeling.

Now, intent to defraud -- I will just walk you quickly through this -- a specific intent to deceive or cheat. "Intent to mislead" means to act with the specific intent to create a false impression by misstating, omitting, or concealing facts.

And then in the context of this count, when we're talking about who are the people or the entities who are being mislead, we're talking about pharmacies and patients.

And there has certainly been overwhelming evidence that both of these defendants were intentionally omitting, concealing, and misstating facts about the drugs and their nature and where they came from. That is in all the documents. You see it in the lies to the customers. You see it in a lie to the FDA. You see it in the cover-up after they get caught by Gilead.

And you heard it from one pharmacy customer. "I walked through every single complaint in August, September, October, November.

"Did you hear about it?

"No, no.

"Would you have wanted to?

"Yes.

"Would it have impacted your decision?

"Yes."

And then a conspiracy, generally -- all it is really, in layman's terms, is a partnership for criminal purposes. And some of the key language here is that every member of a conspiracy becomes the agent partner of every other member.

So you heard a lot of names here.

These two defendants are on trial. They worked with the co-owner, Adam Brosius. They worked -- they chose Peter from Boulevard. They chose to do business with him and all the other individuals behind these black market HIV suppliers.

And then another key point I want to focus your attention on is that a person may be a coconspirator even without knowing all of the details of the unlawful plan and the names and identities of all the other alleged conspirators.

And that's important because in a lot of these white collar crimes, things are siloed, and not everyone knows what everyone else is doing, but they all -- they are all working towards a shared plan. And here that shared plan was: "These HIV drugs are cheap. We can sell them to you, Charles and Patrick Boyd, cheap, very cheap. You can then sell them on to pharmacies. And we can do that with falsified paperwork so that pharmacies don't know where the drugs came from."

They think it came from AmerisourceBergen or Drogueria Betances.

We talked about King Kimchi a bit.

Adam Brosius -- you heard his name a lot throughout the

trial, a co-owner of Safe Chain. You saw some financials back in 2018 when he started. He brought a lot of money to the company before any of this HIV businesses started. And when Charles Boyd was asking him, "I need a description of what you do," "I make it rain."

That's what he did. He brought in, both before and during the HIV business -- he brought a lot of that business in, and they knew that. They signed a contract with him that laid out his commission percentage. He's not hiding that from them.

And then you also heard a lot about Adam Brosius was lying to these two guys, these two guys with no experience. He was telling them it was just a Gilead problem.

Well, July 30th, when they're all discussing some potential settlement with Gilead, what does he say there?

"We don't want Gilead calling ViiV or Pfizer," et cetera.

Pat Boyd: "Right."

Charles Boyd: "Yep."

Why wouldn't they want Gilead going to these manufacturers? Because they had the same problems with those drugs. That's why. And they never reported them.

They got caught by Gilead, but they hadn't gotten caught by these other ones yet.

Is this Adam Brosius lying to these two defendants?

No.

You even see a lot of documents where Adam Brosius is the one saying, "Hey, we got a problem. It looks like there's some Alzheimer's pills in this bottle of ViiV product." This is in May of 2021.

You got Prezcobix inside a sealed Symtuza bottle. This is one of Adam Brosius's employees sending that. That's a Janssen drug. That's in November.

Again, we don't want Gilead telling anybody else.

And then Synergy, Carlos Vega -- you saw all these emails. Abbie: "Trying to verify March 10th."

No, they put a fake name with a fake email address on there, and DMS said they're going to report it to the FDA. That was March 10th.

What do you see April 7th?

Synergy asking if we're conducting a PO.

Charles Boyd: "The T3 didn't go back to an AD but a ghetto PR distributor."

Charles Boyd: "Between that and lying the first time, we just need to be careful."

Patrick Boyd: "Okay. Got it."

The next day he tells Abbie: "Hey, I got to call Carlos in a few. Do you want me to tell him we need authorized distributors T3s before sending a PO?

"Just put an authorized distributor on there, and we're

good to go."

Edel Reyes, Gentek -- you heard a little bit about Gentek. There were lot of problems with Gentek, and you can see this email chain here, the "Pesident" of Gentek.

So you've seen a lot of these coconspirators -- Peter, Brosius, these two defendants. They all got in this together. They were all making money. Some more than others, but they got into this HIV business. They worked together. Adam Brosius worked with Peter. Charles Boyd worked with Peter. They had a group text thread. They were working with Peter after Abbie had already said, "There are criminal consequences to having no T3s." And the solution to that was let's get with Peter, and let's make some phony T3s.

And you heard Peter testify we were doing this behind Ms. Divilio's back before we would send it to her.

And that's exactly what they were doing.

So, in Count I, there's these two unlawful plans we discussed. We haven't talked about defraud the FDA yet. But I think one of the most important things, when you go back to deliberate in this case, is to just use your common sense.

Does this all make sense? The dirty drugs? The boxes? All the customer complaints? The 584-page exhibits in the binder we looked at where Peter says, "Hey, I'm getting all these drugs from closed-down pharmacies during COVID. That's what I'm doing"?

And if you use your common sense and you try and think -- and you remember those T3s that all listed Amsterdam Wellness Pharmacy. I think it was over 8,000 bottles, when you calculated in one of the exhibits, all from one pharmacy based on one page of one invoice.

I don't know any mom-and-pop pharmacy that can hold 8,000 bottles of these.

And then also, if you're holding them, sell them slowly over time when it's a fast-moving product. That doesn't make any sense. And if you look at those T3s closely, you also see Amsterdam Wellness Pharmacy closed not in COVID. It was in 2019. That's not COVID.

So using your common sense, that explanation makes zero sense. Zero sense.

And if you just look at those T3s and hear "This is what I was told. I was tricked," it doesn't add up. That just simply doesn't make any sense.

I think you also heard about the two guys from Maryland. No experience. Didn't really know what they were doing. They're just new to this. Mistakes were made.

Well, you saw Charles Boyd's resume, and it certainly suggests otherwise. Managed all state and federal licensing and pedigree compliance requirements. That's prior to Safe Chain. In charge of keeping company compliant with all state and federal licensing regulations, including the FDA and DEA.

His resume suggests otherwise. It suggests he had a lot of compliance experience and knew about these laws having to do with T3s and pedigrees.

(Exhibit published via playback.)

MR. POGOZELSKI: And then another way in white collar cases is, you know, why do people lie? Often it's consciousness of guilt. Why is he saying in that clip, "I had no idea what WAC was until we got in the brand space"?

But you've seen documents dated way, way behind that where he's talking about "specialty products that I can get under WAC."

Guess what those were?

HIV drugs. A lot of same drugs that are at issue here.

But in that clip, "Nah, I didn't know anything about WAC."

You also saw in July of 2018, this young compliance manager for Safe Chain sends that article to Charles and Patrick Boyd. And you saw Patrick Boyd forward that on to Anthony Berger. And that article is interesting because it describes in 2018, when it was sent to these two defendants, it describes exactly what happened here.

The defendants in those cases supplied diverted drugs to chain and independent pharmacies all over the country. None of them sold -- none of these diverters sold originated from authorized distributors as was claimed on the pedigrees.

Pharmacies received drugs of unknown quality and origin, whose false pedigrees made it practically impossible to trace or determine the true source of the drugs.

Ladies and gentlemen, compare that to this indictment, compare that to the evidence in this case, and it is on point. And they received this article about two years -- two years before.

And Patrick Boyd even forwards it on. And the Queens Eagle article that they're reading -- you saw it also describes buyback schemes.

They know this stuff is going on.

And then we talk about Boulevard. You're probably sick of hearing about Boulevard, but obviously, that's the location. She testified she shared it with Charles Boyd and shared her concerns.

She testified that when she approved Boulevard, she had no idea this would be the location of $38 million worth of these HIV drugs.

Ms. Rumore, the same thing: "This would have raised red flags for me."

They knew the way the bottles were shipped. And I know we have Mr. Peter Boulevard testified, at least on one of those trash days, about a diaper box like this.

Sturdy; right? It is sturdy, and it's got to hold a lot of these bottles that Boulevard and Peter are sending to

these defendants.

Is that something that a legitimate supplier would ship HIV drugs in?

I mean, just the way the bottles looked. I mean, the customers had to complain about this.

Look, this is May 29th of 2020. We're talking -- what? -- a month into Boulevard business and we already got albuterol sulfate on the foil? That's a diverted drug.

And this, again, not Gilead.

"Peter, is this an example of one of the drugs that you sold to them?"

And I guess he was nice enough to send a free bottle after that complaint.

And you see the distributor is asking, he testified, "Yeah, the distributor with Adam Brosius was Safe Chain." That's who was asking about this.

And, you know, I just discovered this recently. When I was looking at the dates here, May 29th -- Adam Brosius: "Distributor is asking" -- that happened to be the same exact day that Charles Boyd was asking Kenzie Nalley about Boulevard and the intake form.

And she asked, "Something sketchy with them, Boulevard.

"Yeah. There was something sketchy with them. They're sending us bottles like this."

I'm just looking at a few things."

And she says something similar to Ms. Divilio, "Because I know they have three contacts there, and I finally called the guy and made him explain to me who he was."

Same day that Adam Brosius is saying, "Distributor is asking about this bottle with the albuterol foil, not Gilead bottle." Your testimony, "Never reported it."

And you see here Charles Boyd asking for the Boulevard vendor intake application.

Ms. Divilio -- she didn't know about it. Kept that from her. You've seen a lot of this bottle. This bottle is pretty fricking bad.

You heard testimony that it looks like it's been previously dispensed before. That makes sense. What else is covering all of this important information on this bottle?

You heard from someone from ViiV. "Very worn. Maybe a sticker on top. Information is illegible, used, damaged."

Yeah, that's because it was used. That's how Peter got his drugs. That's how he shipped them to Safe Chain to these two defendants. He wasn't hiding it at that point.

And they knew. Kept buying from them for another 10 -- 9, 10 months.

Again, Peter just explaining why it looks that way after having been dispensed and all the information that's covered.

Ms. Rumore: "Yeah, indicates it's a supplier problem,

not a Gilead problem. A supplier problem. A Safe Chain problem," and its suppliers that it knew were not getting these drugs legitimately.

And then August, you've seen these texts about a patient opening a bottle of bipolar medication. I believe that Patrick Boyd says, "Are we having problems with both of these suppliers? Gentek and Boulevard or just Boulevard?"

"Both and worse than we could have thought," and then he has to ask, "Gentek, has to be okay. They were legit sealed."

Shouldn't all of these HIV drugs that you're getting be "legit sealed?" That's an odd question to ask.

And there's another document where I think a sales rep says, "Hey, does Boulevard -- do they come in sealed bottles?"

Why is a sales rep asking? Why do they have to ask that simple question when you're selling lifesaving drugs: "Do these come in sealed bottles, by the way?"

And then you heard about, again, the boxes. This is not, obviously, a diaper box, as far as we can tell, but it's a dirty cardboard box, and it is an example of a box that Peter Boulevard testified he got on trash day, saved some money. Just pick up whatever you find. Take a bottles and toss those dirty bottles in.

A lot of them scuffed-up, dirty, no instructions. That is not the work of a legitimate supplier.

And, again, he was looking for sturdy boxes, and you're going to see exactly why he needed a sturdy box because you can see on August 27th, "Sending package," to Charles Boyd.

"Thanks. Just one box?" Almost, like, surprised because that wire amount is for half a million dollars.

One box?

"Yes, it's all in there."

August 28th, that's when Adam Brosius sends that photo. Half a million dollars' worth of drugs in one box like that. That's why you need them sturdy.

And then again, corroborated by the photo, "I just dumped them in there. I didn't package them carefully. I didn't do much. I just threw them in there," and that's exactly what you see here.

That's what these defendants accepted from Boulevard. That's the supplier they continued selling from May to the end of March, 11 months, $38 million worth of drugs, when you had May, June, August -- all of these indicators.

You had compliance starting to raise red flags. No T3s, no information where the drugs came from. And then you also had Peter testify, "Did you ever ask to have these boxes of street HIV drugs, you know, delivered directly to Charles Boyd?"

He said, "Yes."

And you do see in the text messages, "Please meet him.

"Good morning.

"Yes, I'm here.

"He's there.

It's done."

Again, I know you're probably tired of SOPs. I think they were described by one of the defenses lawyers as a bible for our company.

They were not followed here, and you heard that over and over and over again.

Appearance of the bottles -- you look here. Look for signs that it has been compromised.

Well, you saw a lot of pictures of things that are compromised -- boxes and bottles. Product inserts are missing.

Well, almost all of them were missing, Peter testified to, and you saw a lot missing there.

An appearance of product -- that was not something within Ms. Divilio's purview. But the people in the warehouse and the evidence that you've seen, that we presented that's in evidence, exhibits about Patrick Boyd saying, "This 'S' is a mess," going through all this in July.

If you just look at this timeline, it's wild. They didn't cut them off there, with no information on where the drugs were coming from until the customers complained. Zero information. Zero information about where the drugs came from.

Again, SOPs -- didn't follow. I think Ms. Eberspacher

testified that these two defendants reviewed and approved those same SOPs that they went on to not follow.

"Notify your manager right away if product cannot be verified."

Well, you saw time and time again, Ms. Divilio notifying her manager, her direct manager, Charles Boyd, but also on a lot of those emails Patrick Boyd. She couldn't verify a Boulevard IPC T3, forward it to the two defendants.

What happens?

There's some background work. Magically, Rochester Drugs shows up.

She confirms that was false.

What does she do? Forwards that over to the two defendants. And then magically, it's AmerisourceBergen, and the lies to the lawyer, and Charles Boyd telling Ms. Divilio -- she just testified -- "Yeah, we're covered by legal." That's why she testified she approved all those totally bogus Amsterdam Wellness and Amerisource T3s.

She notified her manager every time in those documents, and you saw that, and as they said multiple times, "Actions speak louder than words."

Well, she notified them, and what were their actions? They kept buying. They kept buying, over, over, over again.

We've covered this. This is -- she is following up July.

She's going so far as to email her employer a statute that includes criminal penalties when other -- I think at least Ms. Eberspacher testified she was intimidated by them. Ms. Divilio was not intimidated. She put this in writing, even though she had been -- you know, you saw the document, I think in April, she shouldn't be putting these things in writing.

Well, she didn't follow that directive. She did document her concerns. There she is writing that. And it is rare, ladies and gentlemen -- she had to follow up on it, and no one answered her.

But it is rare, ladies and gentlemen, where you actually can see a compliance director sending an email citing the same statutes that are alleged in the indictment.

I have not had a case like that.

Again, SOPs -- I mean, this all applied to Boulevard. This all applied to Synergy. They never verified Gentek. They were never able to verify Gentek.

They had a customer try to do their due diligence on Gentek. What happened? The customer says, "We're not doing business with you anymore."

And again, no T3s, no information where the drugs are coming from. No questions asked, not till there was a problem. Customers complaining.

And then, again, going back to Adam Brosius. He was the face of Boulevard. He was the one who was doing all these

things behind their back.

Well, here you see, "Sorry to get you so involved.

"All good. He and I have been talking a lot because of the T3 stuff, and we just sent over $500,000 this morning."

Yeah, that's same day we saw those texts about the one box and then the picture of the box the next day.

And you heard a lot about all these phone calls between Charles Boyd and Patrick -- sorry, Peter Khaim.

You see the timeline there.

And then Peter testified about those calls. "Highlights. Instructions. Ah, you got McKesson."

"No, I don't have any McKesson bills. Can you send some money."

"What did you discuss on that call?

"Yeah, it's got to be the manufacturer, and then LMP is on there."

"LMP wrong." Charles Boyd said, "LMP is wrong. You can't put that there."

And you recall this here is an image of a T3 that Peter sent to Charles Boyd during that phone call, right, where Peter testified, "No, that's not right. That's facially false. We can't do that."

After the phone call, magically, Independent Pharmacy Cooperative appears. Again, business, business, business, business.

He needs the product name and lots, and then I give you the T3. "Tell me what I sold you so I can create these T3s." That also makes no sense.

Use your common sense. What legitimate wholesaler has to say, "I don't have any information like the lot number and the product name and the quantity of all those HIV drugs that I sold you. Can you send me a spreadsheet so I can make the required regulatory paperwork?"

That is not something that happens with a legitimate wholesaler.

Again, "Can I have all lot numbers?"

And here again, King Kimchi, being introduced as Peter. We have Charles Boyd emailing with compliance.

Peter puts the Utah facility on there. Same day, you know, this is Kimchi, and then, "I'll tell him," Kimchi, "to fix it."

"Hey, Peter, all of the T3s have our Utah address on them. Can you fix that?" Ask for his email.

( Exhibit published via playback.)

MR. POGOZELSKI: You've seen this. He says, "No, I don't know King Kimchi. I thought he was somebody else."

Those documents suggest otherwise.

September 29th, we keep moving along. Divilio is trying to do her work. And these were two other complaints: "Open bottles, broken pills, below sounds pretty bad." Divilio

is not on that chain.

Those are the same type of complaints that Charles Boyd is texting to Peter that same day, "broken pills of statin. Harvoni already opened."

And then you can just see all the money that continues flowing there. IPC confirms it's false. Peter tells you about those phone calls. Also talks about how after all these customer complaints, "Yeah, okay, I'll start cleaning the bottles. I'll make them look better."

Abbie would make a phone call to IPC, and the lady would say, "We never sold a drug to the pharmacy."

What happens next?

Well, Charlie Boyd and Adam Brosius have a phone call with Peter. And then what happens? Magically, Rochester Drug shows up.

And you see the phone call logs there. And he testified about those calls. And then you see the next day, the Rochester Drug T3 shows up.

You also see that same day Adam Brosius writing, "Fill in whatever info you want."

Again, instructions -- you can see what was changed after that phone call.

And then tellingly, Ms. Divilio: "Hey, are they going to be sending over accurate information for previous shipments?"

No answer.

"Did you get T3s?"

"Yeah, I've got them."

Oh, this one has InstaCare Pharmacy on it.

Yeah, interesting. She had no success getting there.

Has a phone call with Peter, "He doesn't get any T3 information. Thanks. Thanks for letting me know that."

Oh, yeah, this is another exhibit. Charles Boyd said, "he had nothing more to tell them since he had not provided any legit documents."

Same day, there's a five-minute call.

Pharmacy customers rejecting this product because of the Drug Supply Chain Security Act, the T3 pedigree requirement and their moral obligation to ensure the health and safety of their customers.

What is that? October 2nd.

October 2nd, Charles Boyd: "We know the T3 is not what it needs to be from Boulevard." And I think you heard questions, "Well, they refunded the customer."

"Well, we don't need them going to the California Board of Pharmacy."

And all those T3s -- I'll show this a little bit later, but they all contained promises to the pharmacies they're shipped to. And one of those is t not knowingly ship a suspect or illegitimate product.

I think by this point -- September, October, certainly by March -- there was abundant evidence that Boulevard's product was not only suspect, certainly illegitimate, but the sales kept flowing.

And those are promises they made to pharmacies. Those are lies on those documents.

Again, pharmacy: Suspicious packaging. They found it suspicious.

We looked at the box earlier, "not usable." And this is how the defendant shipped it. I mean, it's not that much different than the way Peter shipped it to them: Scuffed-up bottles, rubber bands, missing patient information.

Again, and then the problems just continue. All right.

You put InstaCare on there. That doesn't make any sense. All right. Now you're backdating it. All right. Now we have another phone call.

Then we get this one page of one invoice that lists Amsterdam Wellness Pharmacy. Great. Guess what? They purchased it for the actual price, not 2,400.

And then we get to the text messages between Charles Boyd, Peter, and Adam Brosius. And I think defense counsel spent a lot of time on the top ones here, on October 7th, where Charles Boyd says, "This is not about doing your best. It's a requirement by law."

And mind you, this is five months into the relationship

with Boulevard, months without T3s, after violating that legal requirement, but then six days later, he asks the same question when it's just him and Peter Boulevard: "Can you get us the invoices?

"Hopefully, we can move forward tomorrow, but having the invoices would really help.

"I know, but I don't have. They closed the place.

"Gotcha."

Those are different -- those are different text messages than the ones above, and they're later in time, and that's the one page of an invoice.

We talked about this a lot: Gilead also confirms counterfeit drugs from Boulevard, falsified T3s.

What happens?

$23 million more.

Charles, Patrick Boyd paid Boulevard after that.

Again, this continues. Compliance: "Do you have any additional information or documents to support these purchases, invoices or pedigrees from AmerisourceBergen or Amsterdam Wellness Pharmacy?"

Charles Boyd is on this.

"No, I do not, but it's 100 percent no problem."

Guess what? It was 100 percent no problem for these two defendants to keep buying and selling those cheap HIV drugs from Boulevard and putting them in the hands of pharmacies and,

ultimately, the patients.

It's the patients who are the victims here. And I expect that you will see a theory of defense instruction to suggest that these two defendants are victims of these unscrupulous HIV suppliers.

All this evidence shows otherwise, and the victims in this case are the patients and also the pharmacies.

"You'll have no problems. It's all accurate. I only have what I have, except one page of invoice to Charles."

And then, of course, follows up with his lawyer, leaves Divilio off of this. Just like he leaves Divilio off of this, he leaves out a lot of relevant information. And what did Divilio testify about that?

"Yeah, there's nothing about Gilead confirming. They couldn't verify nothing about IPC saying this transaction never took place. Nothing about buying and selling HIV drugs from Boulevard without any T3s at all."

Point 2, Divilio: Not a fully accurate description of the Gilead email that she had forwarded to the defendants.

And again, why did she approve those? Why did she think she had no exposure? Because Charles Boyd said, "We're covered by legal," on a call that she testified she was not on.

The same kind of email with Synergy. Left out all of the two falsified T3s. Charles Boyd acknowledged in those messages lying the first time, and then putting some other

weird company. " We got to be careful," just like they need to be careful about what they put in writing.

Martha Rumore: "Did you advise them it is okay to continue buying from Boulevard?

"No."

But that's what he told Abbie. He lied to Abbie about that, just like he lied to Martha Rumore about a lot of things.

Again, Synergy: Company says, "Hey, Jeffrey Anderson doesn't work here. He's got a Gmail. We'll report this to the FDA. Hmm, this is a possible problem."

And they put a new company on there. This one, wholesalers Group.

And, again, after that, April 7th, between that line and the first time, "We just need to be careful."

Patrick Boyd: "Okay, got it."

The next day, one of the sales reps, "Any good news?

"No, I'm making progress with the paperwork. I'm on a rampage with compliance to get some stuff rolling."

And he also talks about the financial incentive here. "Ten million this month easy, compared to four million the prior year."

Patrick Boyd, again, the same day he's making progress and going on a rampage, "Hey, do you want me to call Carlos and say we need AD T3s." Basically, put an authorized distributor on here, and we're good to go, just like what happened with

Peter when he put the Amerisource on there that was false.

Even still, Ms. Divilio is questioning them, talking about the email address doesn't match the web page, just like that JeffreyAndersonDMS@gmail didn't match the actual company's email. It's the same things happening over and over and over again. No one is being tricked here.

Criticizing her for her language. And then again, another lie to the lawyers. "Hey, we got three million backorders of Synergy. We want to move forward."

Not complete information in there.

THE COURT: Ten minutes, Mr. Pogozelski.

MR. POGOZELSKI: Thank you, Your Honor.

Omom -- didn't hear much about Omom except at the very beginning, but Omom -- this is in June of 2021.

Divilio: "Omom, which arrived to Utah in a beat-up minivan."

She wants to see video. Like, What the heck? What is happening here?

Charles Boyd: "I'm not worried what it showed up in."

Just like he wasn't worried about the way Peter sent his drugs, at least initially in those boxes.

Yeah, Peter did testify. He said, "Hey, got to clean some of these up," and they did return some product labeled illegible. "These are not clean enough for us."

Again, look at all these incidents: May, June, August,

September, October, November, February, March, April, May.

And there's an instruction that I expect the judge will give you in here. The defendants knew what they were doing. They were both helping separate HIV vendors make these false T3s, but the equivalent of knowledge under the law is also what you see on your screen here, which is if the defendant was aware of a high probability that a fact existed, and deliberate avoidance occurs if a defendant receives a package containing drugs that were acquired illegally but deliberately avoids learning that it contains illicit drugs so he or she can deny the actual origin, I mean, at a minimum.

So here we have adulterated drugs. Well, you've seen all of the examples and documents where there was a different substance substituted in part for that, and those were different drugs.

Misbranded drugs: We talked about that one mislabeled drug with the albuterol foil. That's not what the bottle said. And then the key is Boulevard -- over 8,000 bottles, all with these falsified T3s pedigrees listing one pharmacy, one pharmacy.

Use your common sense. That makes zero sense. Those false T3s, when they accompany these drugs, make those drugs misbranded. The same applies to Synergy.

And then overt acts -- you will see a bunch of overt acts in the indictment. There's one for you: The 9/29 email

to Adam Brosius, who resided in Florida. And you've got another overt act, which is also a count, where they're shipping this Biktarvy to Modern Pharmacy in Florida with a clearly false T3.

Conspiracy to defraud the FDA: Deceit, craft, or trickery. Right.

Here we've got that form that Abbie first filled out. Charles Boyd said, "No, legal says we don't have to file it."

And then there's a form that's almost the same found in the shred bin listing Ms. Divilio.

You also heard Ms. Divilio testify about a false statement in a filed FDA form here.

For each complaint, Safe Chain declined the specific lots from any vendors, quarantined the specific lot, and contacted the manufacturer.

Well, she said that was not a true statement. And certainly, when she didn't even know about all these different complaints -- and these were not quarantined, and she testified in substance to that effect.

Patrick Boyd: "We wouldn't report them any fact regardless."

Abbie Divilio: "That's consistent with my experience there."

ViiV product never reported.

Janssen product never reported.

"We don't want to report it. We don't want the manufacturers to know."

Even their lawyers were wondering, "Hey, these don't seem like te right answers."

Charles Boyd, February: "I don't want to open a can of worms here. If we contact the FDA now, won't that be a big problem?"

Yeah, they did not -- you heard from Divilio herself, didn't report those broken statin pills, didn't report those other product complaints.

They only starting reporting when they got caught. Gilead, e-Pharm/alert, March 23rd is when, I think there was a threatening demand letter. That's when they start filing things with the FDA.

These are specific instances. You will see the T3s. Look at those T3s. They were shipped from Safe Chain to Florida. Look at those T3s. You know they're false. We all know they're false. That makes them misbranded.

We know that one is false. Again, Amsterdam Wellness. Pharmacy -- it's not even a date there.

Guilty. Guilty on those first three counts.

And then this: Conspiracy to traffic in medical product with false documentation, we talked about --

(Reporter requests clarification.)

MR. POGOZELSKI: I apologize.

And this one -- we talked a lot of the evidence already -- they conspired with Brosius, Peter Khaim to falsely make and alter those Boulevard T3s. They conspired with each other -- Brosius and Carlos Vega -- to make and alter those Synergy HIV T3s that accompany those drugs.

And then they, of course, conspired with each other to transport and traffic in these medical products, involving false or altered labeling or documentation -- documentation relating to origination or shipping.

They knew. They had all these pedigree programs in place.

Wire fraud: I think the most important part you need to see here is: "Deceiving another into paying for one thing and then delivering something materially different."

That's what they did with all these pharmacies. That's what you heard from Vipul Parekh. And a statement is false or fraudulent even when it's a half-truth or effectively conceals a material fact. Certainly, where these drugs came from is a material fact. And you heard his testimony.

"Did they tell you about this?

"No.

"Did they tell you about this?

"No.

"Did they tell you about this?

"No.

"Would you have bought drugs from Safe Chain if they had told you all that?

"No."

One of the patients got the wrong drug in the bottle. They wouldn't have dispensed them. He wouldn't have billed insurers.

That is what wire fraud is -- defrauding pharmacy customers, health insurers, and patients, with all this phony paperwork and with all these lies on this phony paperwork. Guilty of conspiracy to commit wire fraud.

And then Count VI through VIII -- these are just acts in execution of that wire fraud.

For example, a payment to Gentek to get more of these diverted, misbranded, adulterated HIV drugs.

Guilty.

A message Adam Brosius sent to Pat and Charles Boyd. Brosius lived in Florida. There's an exhibit that the servers in Safe Chain were in Virginia; so that's interstate commerce.

He sends this message: "With Boulevard back in play, hopefully we can continue the momentum."

Guilty.

That's a lot of false T3s sent to Modern Pharmacy here in Florida, and those false T3s contained a lot of lies that we just looked at.

Guilty.

We talked about a lot of the coverup.

Motive. There's been a lot about "follow the money." Well, even if they didn't make the most money from the scheme, they had a motive.

July: Historic revenue for the company, 14 million.

Below that, "HIV has saved us from having some dreadful months." And I think you saw that when we were with Dan Conger and we saw the red, the negative, the losses in 2019 preceding HIV, and then they become positives.

So even if they didn't make the most money, they had a motive, and you see it in these documents: Historic revenue. "It's 75 percent of our business."

I think you heard in opening statement it was only 20 percent. Well, that's not in the documents. That's not in the evidence.

And you heard about the consequences from a patient himself, who had never had this happen to him in Ecuador, but unfortunately, it happened here. And there's been a lot of blame cast around throughout this trial: Gilead. Patients Divilio testified these defendants described as junkies.

Gilead, patients, FDA collusion, Big Pharma -- blame cast everywhere, except for where it should be cast, on Charles Boyd and Patrick Boyd because they're the ones who got these diverted, misbranded HIV drugs into pharmacies' and into patients' hands.

And all this evidence certainly is enough to convict these two defendants beyond a reasonable doubt and hold them accountable for their conduct.

They are the ones who did this with Peter, with Carlos Vega, with Brosius, with their coconspirators.

Am I out of time?

THE COURT: You have a minute.

MR. POGOZELSKI: Let's see. Is there anything I missed?

I might have skipped over something. Let's see what I can do.

Delivering something materially different -- this guy even on cross, "Pricing, too good to be true."

September of 2020: "I'll tell you no."

"Would you want to know?

"Yes.

"Why is that?

"Because" -- and the main thing with his testimony was he had a patient who got Seroquel in the bottle, and there were numerous incidents before that. Of course you would want to know about that, but they never told him.

Just like they had lies in the letters to customers that we covered. Lies to lawyers. They're hiding things from their employees. You see all the "Let's chat privately. Don't put this in writing. Why is Abbie researching social media

presence?"

THE COURT: Time up, Mr. Pogozelski. If you want to use part of your rebuttal, you can.

MR. POGOZELSKI: I will wrap up there. Thank you, Your Honor.

And thank you again, ladies and gentlemen, for your patience and for your attentiveness.

THE COURT: Mr. Barzee.

MR. BARZEE: Thank you, Your Honor.

You just heard a lot. It was a lot to take in. It was very fast.

I'm going to try to talk to you in a slow way about what happened in this case, about what the evidence showed, and about why Patrick Boyd is not guilty of these offenses.

And the place to begin are ten things that Patrick Boyd never, ever did.

Let's go through that together. The first thing that Patrick Boyd never, ever did was approve any of these vendors.

You remember the testimony in the trial is everyone had a different role at the company, and Patrick Boyd's role was in sales.

All of these vendors were approved by Abbie Divilio. Patrick Boyd never approved any of these vendors.

Patrick Boyd never set, negotiated, or agreed to the cost of any of these medications.

You heard the Government talking over and over again about this make-believe thing called WAC, which Patrick Boyd apparently was aware of back in 2016.

Safe Chain wasn't dealing with branded medications; so it was never an issue. It was something that he didn't give any thought to. It's something that no one in the business really gives a lot of thought to because it's a made-up number. It's something that Gilead says this is what we're going to sell our medications for. There's no requirement that anybody matches their prices to what Gilead wants.

But regardless of all of that, where is the evidence that Patrick Boyd had anything to do with setting the price of these medications?

There isn't any because he had nothing to do with that.

Patrick Boyd never sent a wire.

What evidence did you hear in this trial that Patrick Boyd was involved in sending wires to anybody or receiving wires or having anything to do with the money in the case? Absolutely nothing.

Patrick Boyd never, ever created a T3. We kept hearing about the T3s over and over again. And mind you, let's just take a second to talk about these T3s.

Do you remember how the system works? It's really a computer program, where someone is supposed to download some information into the computer so that if compliance wants to

look at it, it's there, or if a pharmacy wants it, they're able to go online and see what's inside the computer program.

Do the T3s go to Patrick Boyd's desk? You heard that Patrick Boyd wasn't even in the Safe Chain building. His office was in a different building.

Is there any evidence that he even reviewed any T3s or his job had anything to do with T3s?

Absolutely not.

Patrick Boyd never, ever sent a T3 to anyone. He's charged with sending these false T3s. Who did Patrick Boyd ever send a T3 to? He never even touched a T3.

And the Government says, "Well, it's obvious that these were fake because the same pharmacy is on all of them and how could the same pharmacy send out 8,000 bottles?"

Well, yeah, that's true, but where is the evidence that Patrick Boyd knew that? That he knew the same pharmacy was on 8,000 of these T3s that Peter Khaim sent in binders to Safe Chain? There's just no evidence of it because he had nothing to do with T3s, and yet that's what he's accused of?

Patrick Boyd never, ever pressured or coerced anyone to do any of those top five.

Do you remember Abbie Divilio taking the stand, and when the prosecutor is asking her questions, what did she say? She said, "Patrick Boyd. Patrick Boyd pressured me. He pressured me to approve these vendors."

Do you remember that testimony?

That's devastating testimony.

But when I got up, and I asked her, "Well, how did Patrick Boyd pressure you? Was he standing over you?

"No.

"Did he do anything other than ask you if something had been approved?

"No.

"Are you sure about him pressuring you?

"Not really. Possibly. Maybe. I'm not sure."

Patrick Boyd never pressured anyone.

Is there proof in this case beyond a reasonable doubt that Patrick Boyd pressured Abbie Divilio to do anything?

Patrick Boyd never decided when or whether to file a 3911.

Listen, the 3911 is a form you file when you have the wrong pills in a bottle. Let's just talk about that for a second. And that is absolutely horrible. And I can tell you Patrick Boyd and Charles Boyd have lost sleep over the idea that some of the bottles that went through Safe Chain contained the wrong medication.

They went to their attorneys, and they spoke to their attorneys about what to do in those situations. They followed the advice of somebody who knew a lot more about FDA regulations than they did.

Do you remember all the letters after Martha Rumore's name? She has a doctorate in pharmaceutical information. She's an attorney. She teaches at the university. Who knows the most about when and whether to file a 3911?

Obviously, she does.

And what did they do when they heard there was a problem with the medications? The evidence in this case shows that they went to their lawyers, and they said, "What do we do?"

In fact, if you remember, Martha Rumore said that Abbie Divilio was incompetent. And when Bruce Zimet got up there up and said, "Why would you say that the compliance director at Safe Chain was incompetent?

Martha's answer was, "because every time there was a problem, she would call me and ask me what to do, and I would always tell her how to file a 3911."

Do you remember that?

Well, of course, Martha knows how to do it. She's the one who writes the rules and regulations. She's the one who studies it and teaches it at the university.

Meanwhile, this company is trying to act in good faith. Abbie Divilio is trying to act in good faith, and when she has a question, what did she do? She calls an attorney.

Patrick Boyd never, ever spoke to Peter Khaim. I mean, they're saying that he's involved in a conspiracy with Peter,

and yet the evidence shows that he never had one single conversation with the man. Never exchanged a text message. No email. No meetings in alleyways late at night.

How can the Government come in here and ask you to convict this man when he's never even spoken to the person that he supposedly conspiring with?

Patrick Boyd never, ever concealed any money. You're going to read the instructions. You're going to read about the concealment of funds. You're going to read about wire transfers -- crimes that the Government has accused of Patrick Boyd of, knowing that he had nothing to do with it.

In fact, Patrick Boyd never, ever overrode any decisions made by compliance.

So if Patrick Boyd never did any of these things, how can the Government possibly ask you to return a verdict of guilty against him?

Let's talk about Abbie Divilio. And I just want to raise five points with you about Abbie Divilio's testimony, and the first was that Patrick Boyd's role at Safe Chain was in sales.

Give me one second.

The second, that Patrick Boyd never pressured anyone in compliance.

The third is that Patrick Boyd asked compliance to verify the T3s. Now, do you remember that evidence in the case

where Patrick Boyd says, "Check up the line on Boulevard," and she said on the stand that he asked her to check the T3s to verify the T3s with Gentek?

Think about what the Government is saying. They're saying that Patrick Boyd is involved in this conspiracy to buy these black market drugs off the street and to falsify T3s; right? I mean, that's the Government's theory of their case.

If that's what Patrick Boyd was doing, why would he be telling his compliance officer to call up and verify the T3s? Why would a criminal be going to someone in compliance and say, "I want you to do the very single thing that will get me caught and send me to prison for 20 years"?

It defies common sense. It doesn't make any sense whatsoever, and yet that's the testimony that the Government brought to you.

Patrick Boyd said, "We can do no business if a T3 is invalid." Now, why would Patrick Boyd be telling Abbie Divilio we can't do business with a company if the T3 is invalid if, as the Government claims, he's involved in this conspiracy to traffic in adulterated drugs and fake T3s?

Why would he be telling compliance, "We can't do it if the T3 is invalid"? That's something that an innocent person would do. That's what Patrick Boyd said. That's what the evidence shows.

And finally, when I asked Abbie Divilio on the stand,

"Did you ever advise Patrick Boyd to stop HIV sales," and her answer was, "I guess not."

So they have someone in compliance whose job is to what? Is to verify the license and, Number 2, to check the T3s.

It's not Patrick Boyd's job, and the person in compliance didn't do those two things. It's not her fault that she didn't do it. She got tricked. She got duped.

Getting duped -- if there was one thing that's important in this entire case, it's this idea about getting duped, the idea of being deceived, of being lied to.

And I want to talk to you about ten ways that Peter deceived Charlie, deceived Abbie, deceived Safe Chain, deceived the Government, and then tried to deceive you.

And we're going to talk about why he did those things, but let's take it step-by-step.

The first one is he deceives them with the Boulevard license; right?

Now, what is the Government's theory?

The Government's theory of the case is that Pat and Charlie entered into a conspiracy with Peter Khaim to sell these medications through Safe Chain; right?

So if that were true, if Patrick Boyd conspired with Peter Khaim, with Adam Brosius, knowing that these medications were coming off the street, why would Peter Khaim send Safe

Chain a fake vendor application with a fake license?

I mean, you saw Peter Khaim. You knew the type of man he was. If they were in a conspiracy with him, they were all dealers together, and they said, "Hey, Peter, we want you to fake a license and send it to us so we have coverage," Peter would say, "Do it yourself. Why are you asking me?"

That's not what criminals do. They don't do favors for each other.

Peter Khaim did that license because he wanted to trick Safe Chain. He wanted to trick Safe Chain into believing that he was a wholesaler. And you know what? What did we learn from Abbie Divilio? It worked. She got tricked.

Now, should she have spent more time verifying the license?

Yes, of course.

Should she have approved them in 15 minutes from home during COVID?

No.

But you know what? Life happens. People make mistakes.

Abbie Divilio isn't a criminal. She didn't intend to commit a crime. She made a simple mistake, and it wasn't her fault. She was being deceived by Peter Khaim.

What about the source of the medicines? What did Peter Khaim tell Abbie Divilio about the source of the

medicines?

He said -- this is Abbie letting Charlie know what Peter said -- "Hey, Charlie, just letting you know I spoke to Peter. Conversation didn't last long. He explained to me that he buys the drugs from pharmacies that are closing."

Why is Peter Khaim making up lies to Abbie Divilio?

I mean, you saw Peter. You saw what kind of person he was. If he didn't have to lie to them, he would have just said, "Go ask Charlie. Don't bother me," but that's not what he's doing. He's making up a lie and telling her, "Oh, it's from pharmacies that are going out of business, that are closed."

What about not having the T3s? Abbie is trying to figure out where the T3s are, and what does King Kimchi say? "Pharmacy closed for business. Can't get any paperwork. I'm sorry."

This reminds me of a story. Many, many years ago, I was driving through North Florida with my father, and we're on a long trip, and we drive by this great big, huge, red barn. And there's a little boy standing outside, and he's got like a BB gun or something in his hands, and he's taking shots at the barn. And there's targets all over the barn, and each one is a bull's-eye.

And my father pulls over because my father says, "This kid is amazing. I have never seen anyone shoot so many

bull's-eyes in a row. We got to find out what's happening."

And we get out of the car, and my father goes up, and he says, "Son, how long have you been shooting? Where did you learn how to do this? You're amazing. You should be in the Olympics. Can we watch you do it?"

And the kid says, "Yes." And he goes over, and he picks up his BB gun and points at the big red barn, and he shoots, and the BB goes flying through the air, and it just goes into the side of the barn. And then he walks up, pulls out a white piece of chalk, and draws a circle about it.

That's what the Government is doing in this case. They're coming -- everything with hindsight is 20/20. They're saying, "Oh, look at this fact. This proves this, this, and this," but they're not looking at it in the time that it occurred.

What did Abbie Divilio say on the stand? She said, "At the time, I believed him. I believed what Peter Khaim was saying. I believed that the pharmacies had gone out of business. It was in the middle of COVID. It made certain sense."

What about Peter cleaning the bottles with lighter fluid? Do you remember that story? He said that he heard from Mike Zangari that he had to clean the bottles before he sold them.

Now, think about this for a second. Why is Peter Khaim

cleaning the bottles that he sells to Safe Chain? Because he wants to pretend that these bottles are legit. He doesn't want Safe Chain to know that they're coming off the street.

If they were coconspirators, do you really think that Peter Khaim, who billed the pharmacies in New York over $40 million -- you heard about his former crimes, right? All of the houses, the Mercedes Benz, the Rolex watch, the money in the kitchen -- do you really think he's going to be sitting there on his couch, cleaning each one of those bottles one by one with his lighter fluid?

No. He would say to Patrick Boyd and Charles Boyd, "Go clean the bottles yourself. I'm not cleaning the bottles. You want them, here. Here they are."

But instead, he says he's cleaning off all the labels with lighter fluid. Why? In order to continue the deception of Charlie and Patrick, to trick them into believing that this was legitimate.

What's the next thing he does? He claims to hire somebody named King Kimchi.

Why does he do that? Like, think about the fraud that Peter did on Patrick and on Charlie. He pretended to hire somebody to handle the T3s.

Would a criminal coconspirator have to tell Charlie and Pat, "I'm hiring somebody to fix the T3s"? Of course not. He would just say, "Deal with it. Go do it yourself," but

instead, he hires somebody pretending to be legitimate.

Why does he send binders full of fake T3s? Once Abbie -- remember, Abbie doesn't realize there are no T3s in her computer system because they're supposed to be going directly in the computer. They don't even go into people's hands.

She doesn't even know they're not there for about two and a half, three months. That's when she realizes that Boulevard hasn't been sending the T3s. It was when someone from a pharmacy was asking for it.

When they go to Peter, and they say, "Hey, where are the T3s?" Peter starts making up the excuses, "Oh, the pharmacy's closed. I don't have this. Blah-blah-blah. I'm going to hire King Kimchi."

Remember, at one point, he claimed that he didn't know anything about T3s, even though we've established that he had been in the pharmacy business for about 50 years scamming and stealing.

So, obviously, Peter Khaim is involved in this crime. Obviously, he's at the tip of a criminal syndicate, and it's equally obvious that he's doing everything in his power to pull the wool over the eyes of Charlie Boyd and Patrick Boyd.

And you know what? It's not a crime to be naive. It's not a crime to be foolish. I mean, we need to have some grace with each other. We need to be able to forgive each other for mistakes. It's not a crime to not understand when you're being

duped.

What about lying to Charlie? This is a document that Alex -- that the prosecutor just brought up.

Charlie is saying to Peter, "Hey, Peter, I'm on a call today until 4:00 PM, but Adam mentioned you got ADs, authorized distributor info, which is great. So the only thing we need now added to your spreadsheet is the McKesson billed to and shipped to addresses and reference number invoice or PO number."

So clearly, Peter has lied to Charlie and told him that he was getting medicine from McKesson. Why else would Charlie be sending this text? I mean, this is all the evidence you need to see that Peter is a liar. It's not true. He wasn't getting it from McKesson, but if he's a coconspirator of Charlie, Charlie would have known that.

And if Charlie did know it, why was Peter sending a text pretending that he had a distributor for McKesson? That doesn't make any sense.

What about requesting a report of sales and the lot numbers? You remember that? When Peter Boulevard said, "Send me a list of everything that I sold to you and the lot numbers so that I can create these T3s, so I can put it together again?"

And what did Abbie say on the stand? I mean, you can go back and ask the judge to have you reread the testimony, but

what she said was, "At the time, it didn't -- that didn't -- it seemed okay to me. It seemed reasonable to me."

But why is he doing it?

Again, he's doing it to trick Patrick and to trick Charlie.

Let's talk about the Pampers box. Let's talk about Peter Khaim and the Pampers box.

Now, I want you to imagine how this came up. First of all, let's talk about the fact that it's obviously a lie. It's obviously not true.

How do we know it's not true? We know -- you know what? When he waves this Pampers box around, it made me so angry in the middle of the trial because the Government knows that Patrick Boyd and Charlie Boyd were never down there at the warehouse when the medicine came in. So they would have never known that medicine came in a Pampers box, if it had, which it didn't -- and we'll talk about that. But they would have never known that. That's why I got so angry when he was waving around this Pampers box.

Peter Khaim claims that he was using Pampers boxes. So I was thinking to myself, "Well, what really happened here?" We have a million documents in this case. Forty or fifty employees at Safe Chain -- you saw all the text messages, all the emails, all the chats, all the Teams messages.

You saw Abbie and Katie. You know that they were

employees there that would be happy to talk with the Government. Did anybody in this case ever tell you that they saw a Pampers box?

No.

That testimony about his Pampers box came from one person, and that was from Peter Khaim. And it was never corroborated. Not one other person claims to have ever seen anything in a Pampers box.

And, obviously, if a Pampers box had come into the warehouse, there would be a text message, the Government would have had a picture of it from the surveillance. Someone would have sent an email. Abbie would have said, "What's going on? Why are we getting medicine in a Pampers box?"

It simply never happened.

So why is it here? Why is that Pampers box here with Peter Khaim and King Kimchi? And the reason it's here is because Prosecutor Alex and Prosecutor Jackie went to visit Peter in a jail cell somewhere. And when they're sitting in the jail cell with Peter, they're asking him about the case. And Peter wants to get out of prison, and he knows that his best chance of getting out of prison is to cooperate against Patrick and Charlie and to get on the good side of Alex and Jackie.

So when they're asking him about, "Oh, so tell us how you did this," he said, "I just go out, and I look around for

recycled boxes, and I grab something, like a diaper box, whatever." That's where it came from.

And as soon as he said "diaper box," these two excellent litigators knew this would have an impact with the jury. They knew they could wave it around and get everyone's emotions going, but the truth of the matter is it was a lie. How do we know it's a lie? Forget about the fact that there's no evidence of it. We know it's a lie because of Q.

Do you remember the mysterious Q? Q was the person that Peter Khaim wouldn't tell us what his real name was. He refused to tell the Government who he was because the truth is Peter Khaim was buying all of this medicine that was shipped to Peter Khaim in great big boxes because Q was the one who was handling all the runners. Q was the one from the criminal syndicate that Peter Khaim was working with. And the criminal syndicate is delivering these bottles in huge boxes, like the bottle you saw, like the box you saw that Patrick Boyd complained about.

They never came in Pampers boxes. So what started out off as being angry at Alex for waving this around is no longer anger. Now it's pity because I can see that they fell for him the same way Patrick fell for him and the same way Charlie fell for him.

You believed him. How could you believe someone like that?

MR. POGOZELSKI: Objection, Your Honor.

THE COURT: Sustained.

30 minutes, Mr. Barzee.

MR. BARZEE: Thank you, Your Honor.

How could anyone believe Peter Khaim? You guys saw him on the stand. You heard him.

And this is who the Government is relying on to put two brothers in prison?

The final piece of deceit, Number 10, "I'm here to tell the truth."

Does anyone here think that's what Peter Khaim wanted to do? To come in here and unburden himself so everybody knew what a good guy he was?

No. He's trying to get out of prison, and he's going to do anything and say anything that he can to convince these two that he's being honest, and they fell for it.

And it's not a crime because we're all human beings, and we all have a tendency to fall for fraudsters, and that's what happened with the Government, that's what happened to Patrick, that's what happened to Charlie, and I'm begging you, I'm begging you, don't let it happen to you. Don't fall for it.

I want to talk to you a little bit about good faith and about the instruction that the judge is going to read, but before I do that, I want to go over some testimony from Abbie

talking about Patrick Boyd in this case.

The first thing I'm going to show you is her testimony from October 21st, which, I guess, was about a week ago. It seems like years ago at this point.

"QUESTION: And we said that everyone at Safe Chain had sort of their own role; is that fair to say?

"ANSWER: Yes.

"QUESTION: And Patrick Boyd's role was primarily dealing with the sales teams; correct?

"ANSWER: Yes.

"QUESTION: In fact, you really didn't really interact with Pat on a daily basis, did you?

"ANSWER: No, not daily.

"QUESTION: Well, fair to say you only spoke to him infrequently?

"ANSWER: Well, at least weekly. We had managers' meetings and things where everyone participated.

"QUESTION: So he would be at managers' meetings, but outside of that, you weren't typically talking to him day in and day out; correct?

"ANSWER: No, not typically.

"QUESTION: In fact, he wasn't really even in the office other than for those manager meetings; right?

"ANSWER: No, he worked out of a different office sometimes.

"QUESTION: Over in Easton; right?
"ANSWER: Yes.
"QUESTION: And sometimes he worked from home; right?
"ANSWER: I guess.
"QUESTION: He wasn't there at Safe Chain?
"ANSWER: Right. I had one office location."

So there she is admitting that Patrick Boyd is not even in the same room with them.

And what did she say about Patrick pressuring her? This is what she told the Government: Alex is asking her questions, and says, "At that time, did you feel pressured in your job to approve the vendors?"

And Abbie said, "Yes. There were certainly a lot of pressures." She talks about all of it.

"Did at least some of that pressure come from Patrick Boyd?"

And her answer was, "Yes."

Devastating. Devastating testimony to suggest that Patrick Boyd pressured her to approve Boulevard or Gentek or Rapid's or any of these other ones.

But what's the truth? When I get up on the stand and I talk to her -- when I get up and talk to her, it's different.

"You answered questions from the prosecutors. You said on more than one occasion you felt pressured by Patrick Boyd to approve the vendors. Patrick Boyd wasn't standing over you

saying, 'Abbie, you have to approve this vendor,' was he?"

What was her answer? "No, but I could still feel pressure by the circumstances.

"Well, you could feel pressure, right? But what really happened was Patrick would just ask you a question: 'Has Gentek been approved or was Boulevard approved yet'; right?

"Yes.""other than that inquiry, he wasn't forcing you to do something against your will, was he?"

"I mean, I guess no."

I mean, come on. She answered -- she says to the Government, "I was pressured by Patrick Boyd." I mean, if that was true, then go ahead and put him in prison, but then when I get up and ask her, she says, "No, I wasn't pressured"?

I mean, the judge is going to give you an instruction on reasonable doubt. This is it. Here's your instruction right here. When a witness says one thing to the Government and another thing to the defense, says something that would completely inculpate your client, send him off to prison, and then she says, "Oh, no. I guess he didn't," that's what the Government is relying on in this case.

"Patrick Boyd, the defendant, is the one asking you, the compliance director, to check the Boulevard T3s; correct?

"Answer: Yes."

What criminal goes to compliance and says, "Look at everything so you can discover that I've committed this crime"?

I mean, does that make any sense whatsoever?

And what does Patrick tell her? Patrick Boyd confirmed that "You should not do business if the T3 came back invalid; correct?

"Yes."

So that's Abbie Divilio's testimony.

And give me one second. I want to talk to you about the good faith instruction. I have papers all over here and I'm lost. Here we go.

You're going to read the instruction. The judge is going to give it to you. Take it back and take a look at it, but basically, "good faith" in a nutshell is this: If you believe that Patrick Boyd was acting in good faith, that he was trying to make things work, that he was trying to do things correctly, that he was telling compliance to check the T3s, if you believe that Patrick Boyd was telling compliance we can't do business if they don't have a valid T3 -- that's all evidence of good faith.

And if Patrick Boyd was acting in good faith, you must find him not guilty. You absolutely must because that means he was doing his best, he was trying to make it work. He was trying to comply with the law.

Now, let's ask ourselves some questions. What is the evidence that Patrick Boyd and Charlie Boyd, for that matter, acted in good faith?

The first is, I think the overwhelming evidence, is this compliance hold.

Now, you remember she said they got a new computer system in that would trace all the T3s, and everything would go through it and it would also check all the licenses, and she talked about all the DEA licenses, and she talked about how it had an automatic hold and a manual hold. And those were both called "compliance holds."

And she said that Safe Chain asked the company to put these holds into the computer system, which gives compliance the right to shut everything down when they think it's appropriate to do so.

Compliance says, "Stop. You can't do business anymore because a T3 is fake. The license is fake."

Remember when they found out that the Boulevard license was fake, they stopped doing business immediately.

So what criminal enterprise hands the keys to everything over to a compliance officer? But that's what Patrick and Charlie did when they had this compliance hold put in.

And what about -- so look as this: Do you remember this document? The Government showed this to you during the trial. This is something that they did at their monthly meetings or their weekly manager meetings, and it shows the different strengths and weaknesses at the company.

Look at this. Look at the weaknesses. Look at Number 5, where Charlie Boyd is telling the rest of the company one of the weaknesses for Safe Chain Solutions was that we failed to follow the SOPs, and it caused costly errors for not following processes and vetting processes and opportunities.

What criminals report to the entire company, "Hey, we're committing crimes by not following our own SOPs"?

No, that's something that an innocent person, an innocent business person does. Somebody who is trying to make work, saying, "Look, we made mistakes." Boulevard was clearly a mistake that Abbie made.

And Charlie saying, "We've made mistakes. We didn't follow the SOPs. Things weren't done the way they were supposed to be done," if he's trying to hide a criminal enterprise behind lies and deceit, why is he so vocal about the mistakes they made? That's evidence of good faith.

What about -- the prosecutor mentioned Value Wholesalers; they didn't do business with Value Wholesalers.

Value Wholesalers was one where they found out that the guy, Salemi, had been convicted of something. There was some indictment, and so Charlie and Pat said, "No, we don't want to do business with them."

Well, criminals don't care. Criminals would have done it, but they said, "No, we're not interested."

Pat Boyd asking compliance to verify Boulevard and

Gentek T3s -- that's evidence of good faith.

And what about Adam Brosius? We heard about Adam Brosius and how at some point, everyone finds out that he had been indicted. You remember in opening statement we talked about Adam Brosius a lot, and I explained to you that Adam Brosius had, in fact, been indicted while he was at Safe Chain.

Now, think for a second. If Charlie and Pat were in a criminal enterprise with Adam Brosius and he gets indicted in the middle of the criminal enterprise, what would criminals do? They would immediately cut ties with him. They would delete all the emails. They would delete all the text messages. They would say, "Don't do business with us. Don't talk to us. Get away from us"; right? He would become absolutely, 100 percent, radioactive. And their fear, a criminal's fear, a criminal mindset would be, "Adam got indicted. He's in trouble with the feds. He's going to want to cooperate in order to get out of the prison early" -- right? -- like Peter is doing. The criminals know that's the game; right?

So if Pat and Charlie really were criminals and they were conspiring with Adam Brosius and he gets indicted, they would have dropped him like a hot potato.

Instead, what did they do? They went to the lawyers. They had meetings. They sent out memorandums and emails informing the rest of the company that his indictment had nothing to do with the work he was doing at Safe Chain.

That's proof of good faith. That's proof of what they're doing. They didn't delete emails.

Did you ever hear any evidence that Patrick Boyd and Charles Boyd deleted anything? Deleted emails? Deleted text messages? Slammed phones with hammers. Threw them in the water? Had drop phones? Used encrypted messaging systems?

No, none of that, because they are legitimate businessmen trying to do their best.

What about refunding Olympia over $300,000? Olympia was a pharmacy that complained about the appearance of the bottles. If these two guys are criminals -- 300,000 is a lot of money. Why not say to Olympia, "Hey, you bought it. You keep it. We don't do returns"; right? Isn't that what a criminal would say? But that's not what Patrick and Charlie did. I mean, they didn't like it. You saw the emails. Patrick was like, "Oh, my goodness. That's a lot of money." But ultimately, they refunded it because they're a legitimate business. They have 47 valid state licenses. You heard they had valid DEA licenses. They had attorneys. They had consultants. They had a compliance department. I mean, these guys are doing their best.

What about contacting Gilead? You heard testimony that Abbie Divilio, at the request of Patrick Boyd, contacted Gilead to check on a T3.

Why would Patrick be telling her to go to Gilead to

check a T3 if he knew that Gilead would immediately say, "No, that's not ours and you guys are committing a crime by selling it"?

I mean, it's absurd if you think about it, but that's the story that the Government is asking you to accept.

And finally, you saw that quote that the Government brought up again. And that is Charles Boyd saying, not once but at least twice to Peter Khaim, "Look, it's the law. It's not about doing your best. We've got to have these T3s."

So if he's in a conspiracy with Peter Khaim, wouldn't Peter's response be, "What the eff are you talking about? You know I don't have any T3s"; right?

But instead Peter is like, "Yeah, yeah. We'll do our best. No problem," because Peter is deceiving them, the same way he deceived them about the Pampers box. The same way that he was able to pull off a $40 million fraud in New York with his previous pharmacies.

The last thing that I want to talk to you about are the instructions that the judge is going to give you. And one of those instructions is an instruction on reasonable doubt.

THE COURT: Ten minutes, Mr. Barzee.

MR. BARZEE: Thank you, sir.

This is the instruction on reasonable doubt: "The Government's burden of proof is heavy, but it doesn't have to prove a defendant's guilt beyond all possible doubt. The

Government's proof only has to exclude any reasonable doubt concerning a defendant's guilt. A reasonable doubt is a real doubt based on your reason and common sense --" and when I keep saying, "would they ever do something like this?" That's an appeal to your common sense -- "after you have carefully and impartially considered all evidence in the case."

And here's the most important sentence, in my opinion: "Proof beyond a reasonable doubt is proof so convincing that you would be willing to rely and act on it without hesitation, -- without hesitation, in the most important of your affairs."

Now, what's the most important thing that you have ever done in your life? For some people, it's buy a house. For some people, it's gotten married. For somebody else, it may be surgery for a child or a parent.

These are the most important things in our lives, and "proof beyond a reasonable doubt" means you have made your decision without hesitation -- "We're going to get the surgery. I have given it all the thought, and I have no worries. I have no doubt. We're going to do it."

Are you that convinced that Patrick Boyd was involved in some huge criminal enterprise with these guys, when the Government has failed to prove it? Failed to bring you evidence of it? And all they have done is make allegations?

I want you to consider these ten final points when considering "proof beyond a reasonable doubt" and the "burden

of proof."

Now, both sides can subpoena witnesses to come in and testify. All right? Both sides can do that, but if you remember, we talked about in voir dire, the Government has the burden of proof. They're the ones that have to prove their case. We don't have to prove something didn't happen. They have to prove that it did. It's their burden.

And I told you we could sit here and do nothing. Remember? We got up. We cross-examined witnesses. We're arguing to you, but the defense has no burden of proof.

So let's talk about reasonable doubt.

Are you convinced in a way that you wouldn't hesitate? How can you be convinced if the Government didn't bother to bring you Adam Brosius so we could hear from Adam Brosius and we could ask Adam Brosius about the involvement of Pat and Charlie? Why didn't the Government bring him? Alex should answer that question.

What about Mike Zangari? The guy who supposedly tells Peter Khaim how to wipe off the bottles and how to clean them, how to deceive Patrick and Charlie -- why wasn't he brought as a witness?

Alex should answer that question.

What about Dhruv Ralhan? Garrett Mellott? Those are the people that said Peter Khaim said he was working with. Those were the coconspirators.

The Government is aware of four different coconspirators who were supposedly involved in this and don't bother to bring them to you? That's reasonable doubt. That should cause you to hesitate. What are they hiding?

And when you ask yourselves, "What are they hiding," go to Number 5, when we said, "Follow the money."

The Government put on a forensic accountant from the FBI, somebody who reviewed all of the paperwork, all of the financials, all of the bank records.

And when we asked him, "Where did the money go?" Do you remember his answer? "Alex didn't ask me to look into that. He just wanted me to find out how much money was sent out."

I mean, how is that possible? How is it possible that you bring two people to trial and you claim that hundreds of million dollars changed hands but your forensic accountant doesn't know where the money went? It's in here.

Look at the documents that we're going to give, you're going to have back with you in the evidence. You can go through the forms, and you will see that Patrick Boyd and Charlie Boyd probably made 100-, maybe $200,000 at the end of the year and a half or two years of this, whereas Adam Brosius walks away with 11- to 19 million, according to the forensic accountant?

Follow the money.

This idea of the medicine, the wrong medicine in the bottles is horrible, absolutely horrible. It never should have happened.

Obviously, Safe Chain had nothing do with it. You heard the witness saying that when he opened the bottle, the seal was in tact; right? So how can the Government come and claim that Safe Chain is responsible for wrong pills in these bottles?

Did they prove to you beyond a reasonable doubt that that's Safe Chain's fault? What did the witnesses say?

Martha Rumore said that she was familiar with Gilead having problems with wrong medicine in bottles.

Abbie Divilio said she heard that it was a manufacturing problem and she was aware of the fact that Gilead had wrong pills in bottles.

Even the pharmacist, Parekh, who the Government called -- three different Government witnesses all testified that Gilead had a problem with the wrong medicine in bottles. And their one witness who said he took medicine that was incorrect, testified that the bottle cap was new and that the foil was on it and it hadn't been tampered with.

So where is the evidence that Patrick Boyd or Charlie Boyd is switching medicines? There simply isn't any because it never happened.

Abbie's access to consultants and attorneys: Abbie

said she was able to call consultants -- not a consultant, multiple consultants -- for advice and for help.

She also said she was able to call attorneys at Frier Levitt whenever she wanted. And mind you, Martha was one attorney at Frier Levitt.

There were a lot of attorneys at Frier Levitt. John Marrone and Jesse Dresser are two of them that you've heard about. The Government didn't bring them as witnesses. Why? That's reasonable doubt. That's missing evidence.

Look at the Government's agent Eddie Colanes and Daniel Conger. Do you think that those two witnesses -- and you can remember their testimony. Did they come in here and try to figure out the truth?

Was their investigation about uncovering the truth and figuring out who was responsible here, or was it just drawing one of those white circles around a BB that had already gone into the wall so that they could blame Charlie and Pat?

Because that's what they did. You heard their testimony. And they were acting under strict instructions from Alex only to look at one narrow issue for both of them.

That's not the way trials are supposed to happen in the United States of America. That's not what the FBI or the Department of Justice is supposed to be doing. They're supposed to be looking for the truth.

That's not what happened here.

And the final point for reasonable doubt is the absolute lack of evidence that Patrick Boyd, who I represent, did anything wrong. It's just not there.

My time is up. I would love to go through each and every document with you. I wish I could go back in the jury room and answer questions. I wish I could go through the binders and show you everything, but I can't. I can thank you for your service.

Sitting on a jury, being here over a month, is absolutely incredible, and from the bottom of my own heart, I want to thank each and every one of you for your attention. And I want to plead with you. And I want to plead with you to follow the judge's instructions as carefully as you can.

Read over that good faith instruction. Read over that reasonable doubt instruction.

If your feelings about this case vacillated between when the Government was asking a witness questions and when we were asking questions, if it sounded good on their side but then bad on our side, if you went back and forth, that means you have a reasonable doubt.

If you would hesitate in the most important of your own personal affairs, that's a reasonable doubt.

And I beg you to give that reasonable doubt, the benefit of that doubt to Patrick Boyd, to Charlie Boyd. Let them go back home to their families. Let them take their

children trick or treating this weekend. Thank you.

THE COURT: Members of the jury, we're going to take a 15-minute recess.

Remember my admonition not to discuss the case or allow it to be discussed in your presence, and we'll see you back in the jury room in about 15 minutes.

THE COURT SECURITY OFFICER: All rise.

(Jury exits.)

THE COURT: If there's nothing else to come before the Court, we will be in recess for 15 minutes.

THE COURT SECURITY OFFICER: All rise.

(Off the record from: 3:05 PM to 3:17 PM, after which the following proceedings were had:).

THE COURT: We are back on the record. Counsel are present. Both defendants are present.

Anything to come before the Court before we bring the jury in?

MR. POGOZELSKI: No, Your Honor.

MR. ZIMET: No, sir.

MR. BARZEE: No, Your Honor.

THE COURT: All right. If we have all the jurors, let's bring them in.

(Jury enters.)

THE COURT: Does counsel concede the presence of the jury and waive its polling?

MR. POGOZELSKI: Yes, Your Honor.

MR. ZIMET: Yes, sir.

MR. BARZEE: Yes, Your Honor.

THE COURT: And did everyone follow my admonition not to discuss the case or allow it to be discussed in your presence?

All right. Mr. Zimet, you may proceed.

MR. ZIMET: May it please the Court.

Good afternoon. As the saying goes for you jurors, I have some good news and I have some news that might not be as good.

The good news is you people for five weeks have endured and have been able to sit as vigilant jurors and absorb some very, very difficult facts, some very, very difficult concepts, some areas that probably most of us never even heard of previously.

I have the ability to sit at home and read, go back and read again, go back and read again.

You guys sit here and you have to absorb. Some of you take notes, and it's very, very difficult to understand all the concepts, all the things that are being presented to you. That's just the way the system works.

The good news is you have been incredible so far. The news which isn't maybe as quite at good is that the hard work hasn't even begun yet for you, and the hard work is going to

begin tomorrow, once Judge Dimitrouleas gives you jury instructions as to what law to apply to this case.

Understand that so far you have heard witnesses' testimony, closing arguments from the Government, one from Patrick Boyd's attorney.

Now I'm going to try to have a discussion with you as far as what has taken place so far.

Listening to the Government's closing argument, it sort of brought home to me what happens in our house a lot. We have a lot of mystery shows -- Law and Order, police kind of cases where you know, at the beginning of the show, the way it's set up, something is shown that happens, and you see it, and you say, "Well, I guess I know what happened. I guess I know who done it. I guess I know. Maybe there's not any reason to keep watching this show."

And the Government's closing argument today reminded me of that. It sounded good. It created a picture for everyone in their mind.

Some of you are nodding your head; some of you had your arms folded. You had your own reactions to it. All of you had certain things going through your mind.

The problem is is that what was presented to you was not the entire picture. It was not the entire picture.

And you jurors are going to be fact-finders, applying the facts that you find to the law that Judge Dimitrouleas

gives to you.

In doing that, you people are going to understand what you need to do to reach a fair and impartial verdict.

Judge Dimitrouleas is going to give some basic rules. The basic rules are going to include, number one, the indictment is not evidence of guilt.

Charlie Boyd is presumed to be not guilty. Charlie Boyd does not need to prove his innocence. Charlie Boyd does not need to testify. Charlie Boyd's decision not to testify cannot be considered during your deliberations. The Government must prove guilt beyond a reasonable doubt.

And the failure of the Government to prove Charlie Boyd guilty beyond a reasonable doubt would require you to return a verdict of not guilty.

Concepts sound good. I'm sure we all agree that's what our country should be all about. That's what jurors are all about.

You are, basically, the gatekeepers of whether or not someone is going to be convicted or not convicted in a case. And you need to apply those rules and all the other instructions that Judge Dimitrouleas gives to you.

One of the instructions, or some of the instructions that you're going to hear from Judge Dimitrouleas includes certain things that were noticeably absent when the prosecution gave you their closing argument.

They all are present in these two concepts in every one of the eight crimes charged in this case in one form or another.

They are essential elements of this case. They are essential elements of each count in this case. They are something that the Government must prove beyond a reasonable doubt before you can convict Charlie or Pat Boyd of anything.

And if it's not satisfied beyond a reasonable doubt, your verdict must be that of not proved, not proved.

What are these two concepts?

And you will see them in each of the counts one way or the other in this indictment.

There must be an intent to defraud. That means -- to act with intent to defraud means to act with the specific intent to deceive or to fraud, commit fraud.

Willfully: "Willfully" means that the act was committed voluntarily and purposely with the intent to do something that the law forbids, that is with bad purpose to disobey or disregard the law.

Each count of this -- each count of this indictment includes one of those two requirements that relate to the intent, the intent of Charlie Boyd and Pat Boyd.

So, for instance, you've heard over and over and over again they were sending T3s without -- excuse me, they were sending prescriptions, they were sending pills, they were

sending pharmaceuticals without pedigrees, without T3s. That's a crime.

Well, that's not the crime that's charged in this case. The crime that's charged in this case is sending those T3s or receiving -- excuse me, sending those drugs or receiving those drugs without T3s with the intent to defraud.

It's not just enough that they were sent without a T3 -- and we'll show actually there were T3s -- but, in fact, there has to be an intent to defraud accompanying that, accompanying that, as part of that.

And when we get to the real facts, the actual facts in this case, you're going to find that that crime was not committed. There is not proof beyond a reasonable doubt of that crime whatsoever.

Mr. Barzee talked about reasonable doubt, and I don't want to be redundant, but this is so important. So important. It's the backbone of our system, that I think it's worthwhile going over it again.

The last paragraph: Proof beyond a reasonable doubt is proof so convincing that you will be willing to rely and act on it without hesitation in the most important of your own affairs.

If you are convinced that the defendant has been proved guilty beyond a reasonable doubt, say so. If you're not convinced, say so.

Mr. Barzee sort of went over a few examples of that. I'll be a little more specific and spend a couple of more minutes on it.

For those of us who have been blessed with children and/or grandchildren, medical issues are the most important thing in our lives. With our spouse also, significant other -- whatever it might be.

Let's assume -- and you guys all have your own things that you know are the most important things in your life, so try to isolate on that, as I try to find analogy, describe what the circumstances should be.

Let's assume there's a medical decision that needs to be made and the medical decision relates something that is potentially life-threatening, if it works or doesn't work, whatever it might be, and let's assume that the doctor who comes in and recommends that your child, grandchild, significant other is Peter Khaim. It's Peter Khaim, a person with multiple convictions --

MR. POGOZELSKI: Objection, Your Honor.

THE COURT: Overruled.

MR. ZIMET: A person who has a motive to say that you need to have an operation or you need to have -- an operation should take place. A person who has invested in it, for their own good, if you follow that advice and recommendation.

Would anyone, anyone, knowing about Peter Khaim and

what he's all about, go forward with that, ever? The most you would do is try to get somebody else that could come in and corroborate what Peter Khaim is saying and also find out the basis for why Peter Khaim is saying what he's recommending to say.

That's credibility of a person. That relates to whether or not you're going to accept what someone is saying.

And in this case, we've heard over and over and over again what Peter Khaim is all about and the statements that he's saying and represented.

The one thing we know for sure is that Peter Khaim never, ever, ever said to Patrick Boyd or to Charlie Boyd, "These drugs are coming from the black market." Never said it.

No evidence of it. He even admitted he didn't say it, and he gave probably the most honest answer in his testimony: "I don't want to say it because they might find out where I'm getting it from. They might find out where I'm getting this from."

And if they found out where he was getting it from, they would realize it was coming from the black market, and there's no evidence whatsoever that once they found it out to be true, if they ever did find out to be true, that they would pull the plug. They would stop. They would absolutely remove Peter Khaim as a source of any kind of medication.

Those are the real facts of this case. Those are the

accurate facts of this case.

And so when you think about witnesses -- Judge Dimitrouleas is going to give you an instruction concerning credibility of witnesses.

You see it's not just, "Oh, Peter Khaim said it. It must be true."

I mean, just imagine if that's the way the system worked. If someone comes in and said something, you got to believe them and got to convict somebody. That ain't the way it is. And Judge Dimitrouleas, I anticipate, is going to give you this instruction concerning credibility of witnesses:

"When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You are probably reading this instruction as the Peter Khaim's instruction. "You should decide whether you believe what each witness had to say and how important that testimony was. In making that decision, you may believe or disbelieve any witness in whole or in part.

"The number of witnesses testifying at any particular point doesn't necessarily matter."

And then it provides certain things to look at as jurors, suggestions. Excuse me.

"Decide whether you believe any witness, I suggest that you ask yourself a few questions: Did the witness impress you as one who of telling the truth?"

Really? Peter Khaim? I mean, if you have, you know, they have those little buzzers that you can watch somebody testify and watch somebody who is saying something, and you press "believe" or "disbelieve," my guess is most of you would disbelieve it, especially Peter Khaim, knowing what his background was.

Did the witness have any particular reason not to tell the truth? Well, he had 16 years in prison. He's trying to get out early. He's also trying to talk his way out of getting indicted in this case, which by the way, he hasn't been charged with anything. And he convinced the prosecutors he's going to be a good witness for them? Not only is he hoping, as he testified, to get his sentence reduced, he's also hoping he doesn't get prosecuted in this case.

He's the source of 90 million -- excuse me, of $35 million of illegal drugs. Not prosecuted.

Why would that happen if the Government didn't need -- need his testimony?

How strong is the Government's case if they don't have it? Why would you make a deal like that with the Peter Khaims of the world? A man of a decade of fraud, not a legitimate minute of real work, and give away the courthouse to him just to get what they wanted to hear?

And Peter Khaim isn't stupid. He's not dumb. He knows he can evaluate exactly what the Government wants. He's been

involved with the Government long enough to know how the system works. Pay to play, present testimony that they like, you're going to get a benefit.

That's what he's all about.

And so he knows, just because he's being interviewed, and, in fact, prosecutors fly up to Fort Dix, New Jersey, to talk to him.

They do house calls in prison to see him, and he right away knows what he wants to tell him.

Charlie Boyd this, Charlie Boyd that.

Think about it for a second. Think about that for a second. If he tells them, "I was involved in the black market, I wanted to keep it a secret. Adam Brosius was my contact person. I told him that I loved him when we exchanged greetings on New Year's Eve and New Year's Day. I really don't have anything to say about Charlie Boyd knowing that these were black market drugs because I wanted to be insulated."

What chances in the world would Peter Khaim have to get his sentence reduced? In fact, he would be walking himself into an indictment.

So Peter Khaim might have been born at night, but he wasn't born last night. He knows exactly what to say; but to show you the influence, show him how he had control of the situation -- and you all saw, if you look up "control freak" in the dictionary, Peter Khaim's picture pops up right away.

He tells the Government, "My source is a guy named Q but I don't want you to ask me about Q." And guess what? The Government doesn't do that.

Q is the source to Peter Khaim. The way it should work, we think, if you're doing a real investigation, you want to find out where things came from. Who is the ultimate source?

But this guy, Peter Khaim, says, "I'll give you the Boyds, but I don't want to give you the name of my source other than Q, and please don't ask me about it."

And they say, "Okay."

How does that sound? How does that sound to you, as jurors, in considering whether or not you are being given the full picture, or whether this is a mission to try to find any facts that could look bad for the Boyds as opposed to a real investigation of what happened, especially what was in Charlie Boyd's mind at the time.

Not in retrospect; not in hindsight. We all know the expression, "Monday morning quarterback." We all know that when we look at something in hindsight, the vision is 20/20. All of us have experienced that one way or the other. We all have been judged in retrospect.

We need to look at what Charlie Boyd was thinking and knowing at the time.

Credibility of witnesses: It goes on, did the witness

have any particular reason not to tell the truth?

Peter Khaim again.

Did the witness have a personal interest in the outcome of the case?

Peter Khaim again.

Did the witness seem to have a good memory?

Well, selective, okay.

Did the witness have the opportunity and ability to accurately observe the things he/or she testified about?

Again, Peter Khaim.

Did the witness appear to understand the questions closely and answer them directly?

You all saw what he did. When he didn't want to answer, you know, what was the tack that he took?

He didn't understand, and they said, "Well, English isn't your first language, is it?"

He understood exactly what the question was. He was buying time not to answer, hoping he could evade the answer, and not give the truthful testimony over and over and over again. That's their star witness.

And he's their star witness because they didn't call Adam Brosius, who we all know is right in the middle of this case. Right in the middle of bringing the Boyds in. Right in the middle of sweet-talking the Boyds as to what he thought could make money. Telling the Boyds it was legitimate.

Telling the Boyds he knew how things worked, and the vendors he was bringing in were real, quality, and honest.

But they decided not to call him. And so they go to their bench, right? And who do they get from their bench? Peter Khaim.

Does that tell you something about Peter Khaim? Does it tell you something about how slick the presentation was to you in this case?

All the facts? No way at all. Facts that were inconsistent with their theory? No way at all.

Facts that would want you -- or lead you to think, "Ah, this is bad. This is guilty. We must convict."

And finally, did the witnesses' testimony differ from other testimony or other evidence?

So that's Peter Khaim, and Peter Khaim came in and told a whole bunch of different things.

Believable? No. Credible? No. Consistent with what really happened? No.

Because Peter Khaim is a manipulator. Peter Khaim directed what he called "the girl," to create the false certification for Boulevard sent to Safe Chain.

He started the process with a lie. He never had spoken to Charlie or to Patrick before he made that submission.

Who was his contact person? Adam Brosius.

Who was the intermediary that set it up? Adam Brosius.

Safe Chain was a convenient vehicle for companies like Boulevard to try to make money, allow themselves to avoid exposure and keep their criminal conduct going.

Why was Safe Chain so exciting to them? Why did it make so much sense to them to go to Safe Chain?

Well, Number 1, Safe Chain had distribution licenses in 47 states around the country. 47 states. That meant there was a vehicle for them to get rid of and make a profit on the drugs that had been obtained in the black market.

That's why they were attractive.

And Adam Brosius was the shield that could convince Safe Chain it was legal to go forward and do it. He's the connection.

Now, how did Adam Brosius get involved with Safe Chain? Well, he got involved, you heard testimony, for a couple of years. He brought a lot of business to Safe Chain, and he made himself important to Safe Chain. He made himself invaluable to Safe Chain. Exactly what a con man does.

He made himself so valuable -- and you saw the document. It was introduced into evidence -- that Adam Brosius's company, Worldwide, got 75 percent of the gross monies before anything else was divided up in the case.

So if Safe Chain received, let's say, $100,000 gross, he gets $75,000 of it right away. The remainder goes to Safe Chain, and then Safe Chain has to pay expenses. Has to pay for

transportation. Has to pay for whatever, whatever there was, for the HIV drugs.

75 percent of every transaction? How in the world could someone achieve that unless they made themselves so invaluable, made themselves so important, and was able to convince, convince someone it was a worthwhile deal.

And these two guys think that, "Wow, this guy is really helping our business." And then buys an interest in Safe Chain himself, and like "Wow, there's no way in the world he would ever direct us or have anything illegal because he's a part owner of the business himself."

Those are the facts that Charlie Boyd and Patrick Boyd were aware of. You see, you can't look at what they did and eliminate the Adam Brosius factor.

You can't do it.

They tried to do it. It sounded great. It sounded wonderful. But that's not reality, and you're here to decide a verdict based on real facts and reality, not what sounds good. Not what's manufactured. Not what was presented to you in a Pampers box and kept out because, "Oh, it would have such a strong influence on you."

Let's talk about this. Think about it. A Pampers box, according to Peter Khaim, gets delivered to Safe Chain.

What do we know happened at Safe Chain? There's a warehouse, and we know -- what do we do at the warehouse.

I asked this question of Abbie Divilio at the end. It sounds like a stupid question. It sounds like, why are they wasting our time with a question like this.

I asked her, "How many people worked -- how many people worked in the warehouse?"

I forget the exact number. "Four or five, at least," she said.

If you're doing a real investigation and you want to find out whether Peter Khaim is telling the truth about this box, you go to the warehouse.

We know they're up there multiple times. They had so many field trips up to Maryland and New Jersey.

MR. POGOZELSKI: Objection, Your Honor.

MR. ZIMET: You go to --

THE COURT: Overruled. I allow a wide latitude during closing argument.

You have 30 minutes left, Mr. Zimet.

MR. ZIMET: Thank you, Judge.

You go to the warehouse and interview people and say, "Was there ever a delivery from Boulevard in a Pampers box?" That's how you prove a case.

Not taking the Peter Khaims of the world and just accepting anything that he says without reservation.

And then we know Adam Brosius got indicted. So if Charlie Boyd and Patrick Boyd say, "Okay, that's no big deal.

We'll cut him loose or whatever," what do they do?

They go to their attorneys, Frier Levitt, and they get advice from Frier Levitt whether Adam Brosius can continue and what way he can continue, and is it legal?

So if you're trying to look at it and evaluate whether Charlie Boyd and Patrick Boyd do things according to the law and want to do things according to the law, you start out with the Adam Brosius and the records from Frier Levitt -- and you can have all these when you're back there. We introduced them into evidence because we wanted you to see them. See all the activities that took place with Safe Chain going to Frier Levitt for legal opinions.

That's their good faith. That's the good faith that they were entering into because they wanted to get opinions concerning whether or not something could be done or not done.

Of course, we sort of didn't bring that out in the closing of the Government.

We also know that wasn't the first time they went to Frier Levitt. One of the things that I think was so symbolic in this case, remember, four or five witnesses were shown Teams messages between Charlie Boyd and Abbie Divilio.

June 1st, 2020. Charlie asked for the Boulevard license. She sends it to him. Well, first, she says she didn't remember it, and remember, we're talking about a witness whose memory the Government is relying upon.

She didn't remember something that happened six-weeks ago, back in 2020 at the time, and then there's no Maryland license.

So Abbie says, "Well, do you want me to call the Maryland Board of Pharmacy?"

And Charlie says, "No."

And that's where they stopped. That's Teams message.

How can you sit there as a juror and say, "Oh, my gosh. How sleazy is this guy? He doesn't want to go to the Bureau of Pharmacy to get the answer."

And that's where it was left. This started creating that image in your mind that he was not acting in good faith. He was doing something that was wrong.

Well, guess what? It didn't stop there.

What actually happened was that Charlie Boyd said to Abbie Divilio, "Let's call our attorneys to get a legal answer to it, to this question."

Total, total mischaracterization of what occurred. Only for the purpose of creating a negative image of Charlie Boyd because that's what they wanted to carry through the entire case. It wasn't accidental. It was planned, and it was deliberate, and it was phony.

And you will see from the records and you will see from documents that we have presented and you will see in the jury room, that Abbie Divilio repeatedly made requests of Frier

Levitt to get an answer to her question and even provided updates to Charles Boyd about that question.

So this whole concept that, "Oh, he didn't care. Oh, he's acting illegally. Oh, he doesn't want to follow the law," is totally, totally, totally inaccurate.

You see the good faith defense relates to Charlie Boyd. It's a complete defense to each of the charges in the indictment, since each count alleges an offense requiring wilfulness and/or intent to defraud and/or wilfulness.

A defendant isn't required to prove good faith. The Government must prove intent to defraud and/or wilfulness beyond a reasonable doubt.

An honestly held opinion or honestly formed belief cannot be fraudulent intent or wilfulness, even if the opinion or belief is a mistake.

Similarly, evidence of a mistake in judgment or error in management or carelessness can establish fraudulent intent or wilfulness, but an honest belief that a business venture would ultimately succeed does not constitute good faith that the defendant intended to deceive others by making representations that the defendant knew to be false or fraudulent.

And that leads us to the T3s. We know that the T3 issue arose because salesmen were saying "customers want to see where these drugs are coming from," and Abbie Divilio says, "We

haven't gotten any T3s From Boulevard."

Abbie Divilio then reaches out, to who? To Adam Brosius's company. Why? Because she knows that Adam Brosius is the one who brought in Boulevard.

She also knows, and later on we learned that she knew that Adam Brosius brought every single one of the vendors who provided false information to Safe Chain.

We also know that Abbie Divilio did not monitor the T3s. I asked her a question. "Well, how did the system work? How is it set up? Did you look at it every day?"

"No."

"How often?"

"Well, maybe once a month. Twice a month maybe."

We learned that what happened with the T3s that Boulevard wasn't sending them. Abbie Divilio tried to reach out through Adam Brosius to people, Mike Zangari, remember those emails?

He said he was just a consultant. He would send an email to Boulevard to try to get it. T3s didn't come.

Abbie wrote that email about the law. She sent it to Charlie as well as to Adam Brosius.

Adam Brosius was the contact person, obviously, with Peter Boulevard.

Adam Brosius, okay, was not the one who himself was going to get the T3s, but he had the connections to get it

done.

And we know what happened at that point is that Peter Boulevard refused to give T3s. Refused to do it. And Abbie Divilio at that point asked, again, ten days later, "What's the story?"

And we know from Teams messages that Charlie Boyd, on July 21st, went to Abbie Divilio and said, "Listen, Adam told me that Peter will have the T3s to you shortly." That's the real evidence.

The Government didn't bring it up. They had the same Teams messages. They didn't show it to you. They wanted to suggest that nothing was being done, and Charlie Boyd didn't; care about it, and Charlie Boyd wasn't doing anything.

Totally, totally, totally, totally false. Totally misleading. The same way they tried to characterize him as agreed to defraud with contacting Frier Levitt or the Maryland Board of Pharmacy concerning the issue of the Maryland licensing.

We also know that the system at Safe Chain sent out T3s on Boulevard products, even if Boulevard did not submit a T3 to Safe Chain.

It wasn't until cross-examination, the next to last day of trial, that you learned the true story of the T3s at Boulevard -- excuse me, at Safe Chain.

It wasn't until that time that you learned that the

system worked, that once something came in from Boulevard, a T3 was sent out to the pharmacy, which said "received from Boulevard to Safe Chain. Safe Chain to the pharmacy."

It was incomplete, but it was correct. It wasn't false. It was accurate as to what had occurred.

Safe Chain did not have all the information from Boulevard. And at that point, Charlie gets involved. Gets involved and says "listen" -- and we have all sorts of quotations, I can read them off to you.

There's probably five or six of them, which says, basically, "T3s are the law. We are not going to do business with you unless you provide T3s." Absolutely.

Now, of course -- of course, that's not evidence of good faith, that he tells Peter Khaim, "You got to be truthful. It's got to be complete for every transaction."

And you heard from Abbie Divilio that the plan was, even though they haven't provided T3s up to the point, Peter Khaim needed to update and make them all whole, and the goal was once they got them all whole to Safe Chain, Safe Chain would complete the incomplete T3s that had been sent to pharmacies.

Totally, totally different picture than presented by the Government.

How many times did they say, "Well, Charlie Boyd sent these T3s, these false T3s over and over and over again."

The truth is Charlie Boyd didn't send any T3s from Safe Chain to anybody. It was automatic.

What Charlie Boyd did was try to make sure that the T3s were updated and corrected and made right.

And we heard he stopped Boulevard business until that was done. We saw the Catch-22 email from Adam Brosius saying, "Safe Chain, okay, is saying we're not going to pay you anything, Boulevard, until you update or provide us T3s," and Boulevard said, "We're not going to do that."

Well, that didn't pass was corrected, at least and they started supposedly to do it and what they did was incomplete, it was inaccurate, and Charlie Boyd, if he really, really was involved in intent to defraud, what would he have done?

"That's okay. Put down whatever you want to, and that's fine. All we need is something on paper and that's okay."

What we saw and heard was what Charlie Boyd did, was he said, "Listen, my compliance department needs to see every proposed T3, and nothing is going to happen until they say it's approved."

And when they said it wasn't approved, the product wasn't going to happen.

Now what did occur is that Boulevard came back with a second T3, sometimes a third T3; and I asked, Abbie Divilio on the witness stand says, "Listen, you knew there were two false

T3s that came in, two inaccurate T3s, and then there was one that you passed that you said was okay. Was there any reason or rule that you couldn't do that?"

And she said, "No." She thought it was okay to do it that way.

Was she right? Was she wrong? I don't know. You might think that's the wrong thing to do, but Abbie Divilio was acting in good faith, and Charlie Boyd and Pat Boyd were relying on her as the compliance director to do things in that way.

I don't have a lot of time left. I'm going to jump forward to October.

You saw the email of Charlie Boyd said asking several questions of John Morrone.

John Morrone, by the way, told Charlie Boyd that if Gilead, who's asking for T3s, okay, if Gilead is asking for T3s, you don't want to give it to Gilead because of business reasons? That's okay. That's my advice.

That's documented. And that's an exhibit that you're going to see as part of what we presented to you.

And you will be able to see that in the jury room.

You will see from the Frier Levitt billing records, there was a telephone call, a conference call concerning the issues in Charlie's memo.

Now, Martha says, "Well, certain things weren't said in

that call."

Do you remember we asked Martha, "Do you have any records? Do you have a file?"

There's no file. Look at the Frier Levitt records that you see when you start your deliberations tomorrow. There's references to reviewing the file all over the place.

There was a Safe Chain file.

Of course, Martha didn't want to acknowledge that because she knew if she did, it would show that, in fact, what she was saying was inaccurate; and we know that Martha was here because she was afraid of what? The M word. Malpractice.

Now they say every time you go to trial, there's always something new that happens. You saw it with this woman. Martha.

She didn't want to continue her testimony until she was assured by the prosecutors that they weren't going to charge her, in the middle of her testimony.

So she's blaming other people because they didn't tell her something. Remember, I asked her, "Did you ask questions? Did you want to find out facts?"

"That's not my job."

An attorney is trying to give advice, trying to find out what to do, and her testimony is, or her statement is that wasn't her job to find out facts. Yet that's who they relied upon.

And then we find out later on, when John Morrone dies and Gilead goes forward and starts making accusations, Abbie starts responding and getting information. Excuse me, Martha starts responding and she gets information from Abbie, and part of the information she gets from Abbie are in memos.

I asked, "Well, did you give the Government those documents?"

"I did."

Did they introduce those into evidence?

We are also going to find out that Abbie, later on, told Martha there was another incident that Gilead was complaining about, where Gilead was saying that Safe Chain never provided information.

Abbie said, "Yes, I did," but Gilead never responded.

And the testimony in the documents show that Gilead immediately comes back and said, "Wait a second. You never sent us anything."

What Abbie does at that point is she goes back to her records and realizes that she had made a mistake. You're going to see that email also. The Government didn't produce it. We did, and you're going to see it.

It shows that her memory wasn't wonderful. She had a lot of things going on at the time. But the testimony that you supposedly relied upon is that, "Well, Charlie didn't tell me this."

Can you rely upon that, in the most important of your own affairs, when she thinks she sent something to Gilead which is important concerning wrong drugs, and she ends up being wrong about it?

Can you really rely upon that beyond a reasonable doubt?

And we will see that Martha decided she didn't want to send that to Gilead's attorneys.

And you will see and, excuse me, Abbie testified that part of what Gilead was saying was, that, "Listen, you're not responding. We're asking you to talk to us, to speak to us, maybe work this out."

Martha dropped the ball.

You also heard that Martha got fired. She claims she got fired because of some kind of age discrimination matter. She also admitted that's not what Frier Levitt was saying.

Basically, she wasn't paying attention to her clients.

Guess what? That's happening in this case. That's what happened to them.

Yet Gilead interprets that as them not wanting to work together.

You also see the email where Abbie says, you know, "Something, with all the stuff going on, why don't we become an AD, an authorized distributor for Gilead?"

And Martha says, "That's a good idea."

And Charlie says, "Let's do it."

What fraudster, what person with the intent to defraud, what person who is willfully acting, wants to be an AD to the company that supposedly they're defrauding.

We also know from Abbie that in March of 2021, Gilead writes a demand letter, and in response to that demand letter, Abbie writes and drafts an answer.

You're going to see Boyd Exhibit 289, which has a different type and shows all the answers, Abbie's response.

And she said, "On 10/13, I filled out the FDA form 3911, in case we were going to report the product.

"In conversation with legal counsel, it was advised that we were not going to report the files" -- excuse me, "that we were not responsible the party that should be reporting the FDA form."

That's Abbie's recollection of what occurred.

Yet Martha said, "That was never part of the conversation."

But Martha got this information and never questioned it because that's what really happened.

That was the advice John Morrone gave was that they did not have to report it.

But, again, in an attempt to make Charlie Boyd sound like he's some scoundrel, the agent who really didn't do anything except read some Pat Boyd text messages but was;

presented to you, as a pseudo case agent who said, "Oh, by the way, when the search was done in Safe Chain in July of 2021, they found this form 3911 that Abbie had prepared in the fall in the shredder."

Well, guess what? It wasn't filed.

And guess what, the 3911 that was introduced into evidence from that point was preserved. It wasn't trying to get rid of something so one would think it never existed.

Abbie even memorialized it in the document, which the Government had, Gilead seized when they did their seizure, yet it wasn't presented to you.

Why is that the case? Is that the case because the Government only wants to show you the picture that they want you to see?

And I would suggest to you, as jurors, that's not the test in a criminal case. The test in a criminal case is not a picture that the Government wants to see. The issue is: Does the jury want to see all the facts so they can make an informed decision which affects people's lives?

THE COURT: Ten minutes, Mr. Zimet.

MR. ZIMET: Thank you, Judge.

That's the test. That's what needs to be the test.

And that's what in this case hasn't been what was presented to you.

You're going to see just a handful of documents that we

want you to see, that show how incomplete the picture was.

Remember we asked questions about Charlie Boyd changing the procedure at Safe Chain relating to Boulevard products? Remember that?

Asked Abbie that, "Really didn't happen."

Well, guess what? There's minutes that were prepared, Boyd Exhibit 160, October 12, 2020. Go down to "Compliance 1B, Boulevard, "After talking to compliance, we're starting a new verification process. There will be -- they'll be sending compliance the T3 prior to shipping. Compliance will verify and either approve or deny. If approved, product will ship and the warehouse will have to make sure that we received matches. Still waiting on T3s from Boulevard."

Charlie Boyd said, "Wait a second. We're not going to get caught in what Boulevard is trying to pull. They tried to send us product. Our people wanted to sell it to their customers, therefore, the T3s don't get done. No way that's going to continue.

"What has to happen is Boulevard has to send us the T3s first, they have to be approved. Until they're approved, nothing else can happen."

That's an example of good faith. That's an example of someone who doesn't want to be part of a conspiracy. That's the person, Charlie Boyd, who did not know -- did not know that these drugs were coming from the black market because he was

being lied to. Being lied to by Peter Khaim. Being lied to by Adam Brosius and all of the other vendors who signed up with Safe Chain.

You see, what the Government is really trying to do is to have you make a determination that Charlie Boyd knew these were black market drugs. But they don't have proof of that.

So instead of that, they're trying to suggest to you that Charlie Boyd should have known. Should have known.

Well, there's a big difference between "knowing" and "should have known."

Should have known they're trying to look at everything in retrospect, in hindsight; and the real danger that each of you have, and the biggest concern, biggest fear that I have in representing Charlie Boyd, is that you look at it, "Well, if that was me, I wouldn't have done what he did."

You wouldn't feel that tension, that urge to do that.

That's not fair to Charlie Boyd.

Because we know what actually happened. So it's like knowing the end of the book, how the story ends, how Law and Order ends, okay, and it's, like, well, this is what I would have done.

Of course, you wouldn't have done what he did, but he was acting in real time in the moment of what was occurring. He was making judgment calls.

He was using the money of his company to purchase these

drugs. The profit margin was very small, maybe 10 percent actual profit margin.

The chart that you saw, the summary, was absolutely bogus.

They tried to suggest because the revenues, the Safe Chain revenues that were used to purchase the drugs, that indicated how much money they made.

They didn't make $90 million. They made a portion of that.

It costs money to purchase the drugs, and guess where the money came from? The perfect, perfect scenario for a con man like Adam Brosius.

It came from a line of credit at Safe Chain. They were exposed. They were borrowing money so they can purchase drugs so Adam Brosius could make 75 percent of the gross profit.

That's not a deal that any of us would sign up with. But only a deal that people that were patsies for Adam Brosius, patsies for Peter Khaim, and patsies for the other people involved in this industry.

These are good guys. The truth of the matter is they were way over their head in dealing with con men like this. Way over their head.

And the Government wants to brand them as criminals because of that? When they made their judgments that they believed was in good faith, when they made their judgments that

they believed were appropriate? Did they make mistakes? Of course, they're human.

They say certain things that probably they shouldn't have said. Of course, but did they have an intent to defraud? Were they acting willfully?

And my suggestion to you if you look at all the evidence -- not just the evidence that picked out, plucked out, cherry-picked and thrown at you -- you will find out that the Government has failed to prove beyond a reasonable doubt any of the eight charges in this indictment, any of the eight charges.

And we would suggest that, based upon that, you return a verdict of not guilty, which is actually the verdict of not proved.

I'm not saying that you want to find them innocent. The issue is are they proved or not proved? And to be proved, it has to be proved beyond a reasonable doubt, and we would submit to you that the Government has failed to do that, that each and every count should be a verdict of not guilty or not proved, and that when you're done with your deliberations, whenever that might be, we're able to end the nightmare, the nightmare that Charlie Boyd and Patrick Boyd have been living for the last 1,556 days, when Gilead decided to raid their building, raid their business, and try to take them down.

Because as we all know, they are competitors of Big Pharma, and the best way to remove a competitor is to have them

destroyed.

They did that civilly. They ran to the Government. You saw what kind of investigation was done in this case. It wasn't to find out real facts. It was to try to find out what we can mount in addition to what Gilead was accusing them of.

That's not the way justice works in this country. Not in 2025, not anytime.

That's why I would suggest, and I would hope that after this jury fully considers all the facts and gets down to the really hard work that you guys are going to have to be doing, that you find Charlie and Pat not guilty and not proved.

On behalf of the Boyds, thank you. Thank you for your deliberation. Thank you for your attention, and God bless you all.

THE COURT: Mr. Pogozelski.

MR. POGOZELSKI: Yes, Your Honor.

All right, ladies and gentlemen of the jury. You have been here a while and I'm going to do my best to not use the full amount of my time despite a lot of things that these defense lawyers threw at you today.

I think one of the most interesting things that I heard Charlie Boyd's lawyer talk about was trusting Peter Khaim to do some sort of surgery or medical, an important medical procedure.

Now, of course, when we call Peter Khaim -- and when I

stood up here before they made their closing arguments -- I said, "I want to focus only on what was corroborated and focus on his emails, his text messages, his call logs, all of those things."

I told you he's a career criminal. I told you he's a liar. I wouldn't trust him to do a medical procedure on me. I would not go into business with someone like Peter Khaim, but that's exactly what Charles and Patrick Boyd did.

We called him as a witness because he had text messages with Charles Boyd and Adam Brosius. He had a lot of phone calls. He had a lot of emails. You saw all those King Kimchi emails, "100 percent, no problem. No paperwork. Sorry, pharmacy closed for business. Can't get it."

You saw all those emails. Those were documents that were relevant. They corroborated him. And I want you to focus on those documents and what he said.

But at the end of the day, Boulevard, Peter, King Kimchi, it was Patrick Boyd and Charles Boyd that went into business with Boulevard.

And they went into business with him, and they received all sorts of crazy complaints of bottles that looked previously dispensed and dirty boxes, and he testified they told him, "Come on. You have to clean some of this up. Customers are complaining. It looks bad," and that is after the T3 situation.

But not only did they choose to go into business with Peter, they stayed in business with him. May until the end of March of 2021, March 31st of 2021, which is ironically right around the time that Gilead starts threatening them and threatening to sue them.

We're not saying he's a good guy. We're saying he ran a dirty business, and Charles and Patrick Boyd helped him launder, get those drugs from the street into all those pharmacies, and you also heard Peter testify about, you know, they asked "you're the ultimate gatekeeper. You created the false T3s. You made those decisions," and then when I was asking him questions on redirect, he testified he was working with Charles Boyd to do that. And that is corroborated by the document.

Why do you think you see version after version after version of all these T3s and him saying, what's he hiding when he said, "I don't have paperwork. I can't do this. You need to tell me what I sold to you. You need to tell me what goes in where," and IPC confirms it's false. Phone call.

IPC confirms it's false. I got to put something else. Rochester Drug, Rochester confirms it's false.

"Do you have any invoices?"

"I have got this one page."

Charles Boyd takes that and goes to his lawyer, lies to his lawyer. Lies to Abbie Divilio. Says, "Hey, now we're good

to go," and off to the races, with those 8,000 or so bottles with the same bogus T3s pedigrees from one closed-down pharmacy during COVID-2019.

But the other part, when the lawyer defending Charles Boyd was talking about trusting Peter Khaim with your life, ultimately, at the end of the day, what these two defendants did is they trusted Peter, King Kimchi, Boulevard, with other people's lives: The people who got those HIV drugs. The people who were infected, who ended up with these bottles from the street and God only knows when they expired, but certainly there were bottles that were opened and bottles that were dirty and bottles with the wrong pills.

They trusted Peter enough to buy $38 million worth of cheap HIV drugs that they then sold to pharmacies, that ended up in the ultimate victims' hands, and that's the patients.

And that is why this case is so important, and that's why it is important that you carefully consider the evidence, the exhibits, the text messages of Patrick Boyd talking about "I wouldn't report them regardless."

And the text message of Charles Boyd, where they're going back and forth with these falsified T3s and pedigrees.

Look at the evidence. Look at the text messages.

You know, and there was one point where the lawyer defending Patrick Boyd was going on about "they never deleted any messages," and "they didn't use encrypted WhatsApp

messages" -- well, that's not true, according to the witnesses that you heard.

Peter Khaim testified when he was shown a WhatsApp message with Patrick Boyd, they had a timer on it that disappeared.

You've seen the documents where Patrick Boyd is complaining about, "Abbie wrote something that looked really criminal. That should have been a phone call."

These are not acts, again, of people who want compliance to do their job, document problems and take corrective action.

They don't tell you not to put things in writing. They don't disregard you continuously, which Abbie testified. And you can see here, "I felt like I was sort of intentionally sort of being dragged around and run around all the time, and I can see what wasted effort I put into trying to do the right thing when I felt like I had five people working against me all the time."

She didn't know the half of what was going on, and that's why, obviously, when the questions are phrased "at the time, at the time, at the time," she believed Charles Boyd at the time.

I mean, that makes sense. It's a small community, but she didn't know about all the evidence that we presented to you. She didn't know about those complaints with the Statin

pills and the text messages directly with Peter, and she didn't know about the exchanging of the T3s beforehand, before they got to her.

She didn't know about, at least a fair amount, a lot of these other wrong drugs, you know, Symtuza in November of 2020. She testified she didn't know much about the appearance of the drugs when they arrived in the warehouse, and she worked really hard.

And you saw that she was a credible witness. She was consistent with the documents.

She broke her testimony up over a month, but, you know, when they -- the defense keeps claiming, "Brosius was our star witness, and Peter was our star witness," our star witness was the compliance director because she did such a good job documenting everything that she found along the way.

And she testified her in front of you, both a month ago and more recently, that she would flag these concerns, ask "let me know how to proceed," and there would be some new excuse or she would be disregarded, be dragged and run around all the time; and she was very surprised when she saw a lot of the evidence that we presented to her in this trial.

A director of compliance is supposed to keep you in compliance with the law. If you don't tell that director of compliance what's happening at the company, and you have all sorts of backroom dealings, it's not really a director of

compliance.

It's a facade. The same way they used the lawyers as a facade to try and tell Abbie, "You're covered. You can approve all the T3s. Legal says we are covered."

Well, that's not what Martha Rumore said, and that's certainly not what you see in the emails to the lawyers.

You don't see full facts disclosed, and you see then Charles Boyd asking for a compliance call, leaving out his director of compliance.

And then telling her, "We're good to go."

Now we also talked about reasonable doubt, or at least the defense did, and that's the burden. It's a heavy burden. We bear it.

And what you need to focus on, or should focus on and, you know, when you came in here, you came in here with your common sense, and when you go back there and look over the evidence and you're discussing it, your common sense is the most important thing that you have.

Because you heard from a lot of former employees who were young at the time, still young, no background; but with their common sense, they saw something was wrong. Like couldn't put their finger on it. "Something is wrong," and you remember Abbie Divilio testifying about that Queens Eagle article drug buyback scheme she read on October 1st, right around the time of the first confirmed falsified Boulevard T3s.

She was shocked, and it sounded like it was out of a movie. Why are you even googling things like that? It's because you're dealing with Boulevard, and you're dealing with King Kimchi, and you're getting responses, no paperwork -- all this.

I mean, if he was really sophisticated in this scheme and really did a good job duping these two defendants, surely he wouldn't just say, "I have no paperwork. I can't get any paperwork."

You know, what do we do? It's just so obvious.

These two defendants, their lawyers want you to believe they were duped and they were tricked by Peter Boulevard; but you saw him on the stand, and you saw all of his documents.

It's clear what he is, and it's clear that he has no ability to create a truthful, legitimate T3, and that is why he worked with Charles Boyd and Adam Brosius to get there, to get to a point where compliance would eventually approve it after compliance had raised their concerns in a couple of emails.

Now, I think one other point that the lawyer defending Patrick Boyd had made was Patrick Boyd didn't direct these wires, but you're going to see in the instructions, the conspiracy instructions, aiding and abetting, you know, not -- everyone had a different role to play. Not everyone can do everything.

These wires -- they were on behalf of Safe Chain. One

of them was for HIV drugs from Gentek.

Another one is the Teams message or electronic message from Adam Brosius to both of the defendants, and then the third one is the transmission of, I don't know, thirty, fifty falsified T3s by the customer's service email at Safe Chain.

A defendant doesn't have to directly send the email to be liable under the law, and you will see that in the instructions. They don't have to know all the details, as the conspiracy instructions will show you.

As good faith defense, I keep hearing good faith.

Is it good faith -- I know I sound like I'm repeating myself. Is it good faith to hide things from your director of compliance. Is it good faith to lie to your lawyers?

These are not things that are done in good faith. Lies are not good faith.

Is it good faith to lie to your customers? These are not acts of people who are acting in good faith.

They're acting with knowledge and full intent of what they're doing.

And even if they don't know the exact sourcing of drugs, there was every indication, all the evidence over months and months, that these were not legitimate drugs.

And when faced with that, the decision was, "Abbie, we're covered by legal," and then bam. Keep buying. Twenty-two plus million bought after Gilead accused them of

distributing counterfeit drugs, which it turns out they actually did distribute these diverted black market, counterfeit drugs. Gilead was right.

And then we talk about Count I. The language that's important in there for Count I is, when you're misleading consumers of a product, it includes about the nature of the product being purchased, or some significant fact or aspect.

That, obviously, is the nature of the drugs and the false T3s pedigrees that are used to conceal that.

The only reason to falsify those documents is to hide where they're coming from.

And you will also see in the instructions there that a defendant's state of mind can be proven indirectly from surrounding circumstances, such as what the defendant said, what they did, how they acted, and any other facts or circumstances in evidence that bear on their intent, and there's a lot of that in there. A lot of emails. Lot of text messages.

And when Ms. Divilio, you know, there was also a lot of talk by one of these defense lawyers about consulting a lot of lawyers and we submitted, we brought into evidence, we brought into Frier Levitt, legal bills.

And when you heard Abbie Divilio testify when she was being cross-examined, that she wasn't surprised that she was approached by federal agents, the defense said, "All right."

She said, "Given the circumstances and all the legal issues that they have been having, I was more aggravated."

So she's aggravated. She was annoyed. She has a new job, and she has to keep talking about Safe Chain and everything that was happening there.

Those legal bills do not support a good faith defense. They talk about all sorts of other things, as you will see.

They talk about subpoenas. They talk about all -- a lot of things that are totally irrelevant to this case.

And the main lawyer who was relevant to this case, you heard from on the stand, which is Martha Rumore, who was lied to repeatedly, repeatedly, repeatedly, over and over again.

Now, there was also some suggestion, I believe, that Patrick Boyd was not really involved in T3s and not pressuring compliance. Well, at least this text message suggests otherwise.

Also, you know, trying to suggest his lack of involvement with the T3s. "Well, we probably shouldn't have shipped it without the T3. That was out of the question."

And then he basically says, "It's fine. We just can't tell the client that." Basically, we have to lie to our pharmacy customers, under these circumstances, ratifying a lie. Is that good faith? No.

Customer wants to talk about the Drug Supply Chain Security Act. Patrick Boyd, Charles Boyd, "This doesn't sound

great."

And then the Teams message that we did show Abbie, and the defense just showed you about Patrick Boyd suggesting calling up the chain.

If you read it closely, he's talking about a customer who's complaining that two of the bottles look different than how they normally look.

He didn't call the manufacturer or anything. He was really cool about it, but his pharmacist did call up the T3, and one of the vendors he said was closed for COVID.

So the customer is like, "What's going on here? The T3 is closed. What are you doing?"

So we should take a look.

After his pharmacist left, he was like, "Look, guys, I'm good with this stuff. We need to have transactions to be cleaner because the pharmacist get worried."

Well, that pharmacist is worried because of the sourcing of the drugs because that pharmacy was Olympia Pharmacy, and they were getting Boulevard drugs; and that's the photo that we saw with all the scuff marks and missing patient labels.

Of course, the pharmacist is worried. They're the ones giving to the patients. And these are not just any patients. They're HIV patients. They're vulnerable.

And, again, Adam Brosius, Adam Brosius. You know, this

was right around the time of the raid.

Patrick Boyd, "If you get them," Peter at Cintex, "let them know it's Gilead only and civil. No feds."

"Civil action is the key to all this. One company doesn't like what another company is doing. There may be underlying issues, but this is civil."

These are honest and frank conversations that you have seen between Adam Brosius and Charles Boyd and Patrick Boyd.

And then, again, this idea that there were a lot of seemingly personal attacks on me about which witnesses I put up.

And this box here, Abbie wasn't in the warehouse. She testified to that. Eberspacher wasn't there.

You saw other boxes that looked pretty darn bad with drugs just strewn about them, and there are text messages, which, as you see on your screen, where Peter is saying, "Please meet my courier, my driver," who he testified was driving some sedan with a box of HIV drugs in his trunk.

Is that normal? Is this legitimate wholesalers?

It's the same way Jonathan Nicholls, the sales rep, had testified about another person named Caitlin, who had driven some hours to meet with somebody. I think it had to do with Synergy, to pick up a bunch of HIV drugs.

These are just completely outside the norm of what a legitimate wholesaler does. And it's not just Boulevard, it's

Gentek, $42 million.

It's Synergy, $7 million.

Rapid's four.

Omom, something like seven.

It's just a continuing pattern. Continuing pattern. They just tripped over and over and over and over again, or were they drawn to the cheap prices that these drugs were offered at?

And this was an exhibit that the defense, I believe, introduced. It has to do with the Synergy letter that they showed Ms. Divilio.

And Safe Chain fears that "despite its extensive due diligence efforts, it's been duped by Synergy and provided with falsified documents."

Right. They were duped, even though Charles and Patrick Boyd knew that they lied the first time, put some phony, quote-unquote, "ghetto PR distributor" on the second false T3, and then finally got to a third version that Ms. Divilio was like, "these emails don't match."

But according to that letter, they were duped.

And then you even see this T3, Synergy, Safe Chain, about a month after that letter.

And so Count IV is also an important count here, and I point to that fourth element. The defendant knew -- and again, this is a conspiracy between these two brothers and all the

names that you have heard about -- "a conspiracy to traffic in medical product with false documentation where the defendant knew the labeling or documentation, including documentation relating to origination or shipping, was falsely made or altered."

You have seen so much evidence that they knew these T3s, both defendants knew these T3s and pedigrees were false from Boulevard and from Synergy; and Ms. Divilio said she wasn't able to verify a single HIV vendor's T3, which, under their SOPs, means "notify your manager, report to the FDA." Didn't happen.

These are the bills that I'm talking about, and you will have a chance to look at them but, you know, a lot of them just discuss completely unrelated things that have nothing to do with this case.

The things that have to do with this case is the 10/14, October 14, 2020, call on there where it says Martha Rumore and Charles Boyd, because that's the call Charles Boyd claimed to Abbie was "good to go with Boulevard," contrary to her testimony and contrary to anything she knew about Boulevard at that time because she testified she didn't learn about it until much later.

I mean, these are -- you see some of the no's about what they didn't tell her.

I don't know how long this will go on, but it's a lot

of no's.

If you're hiring attorneys in good faith, you're seeking their legal advice. You should be telling them all the relevant facts, that's how you get appropriate legal advice.

But criminals hire attorneys to try and conceal their crimes, and they lie to their attorneys, and that's what happened here.

They lied to Frier Levitt, and they used that to manipulate Abbie, the same way Martha said, and testified that she felt manipulated. The master manipulators here are Charles and Patrick Boyd, the way they manipulated their employees, hid things from their employees, hid things from their lawyers, lied to customers, hid things from their customers, anybody and everybody to try to keep this train of cheap HIV drugs going.

And this is one of the instructions that I expect that you will see: That if someone is going to say that they consulted lawyers, and that's evidence of their good faith, that they have to have made a full and complete, good faith report of all material facts to an attorney he or she considered competent.

MR. ZIMET: Judge, I'm going to object and reserve.

THE COURT: Overruled.

MR. POGOZELSKI: Received the attorney's advice and reasonably relied upon their advice.

I won't go through this entire thing again, but that --

it's not what happened here.

Again, lying to customers. We brought this out through multiple witnesses. They kept buying from Gentek and selling from Gentek. But they had gotten caught. They had gotten caught.

Because all those Gentek T3s were false. Just like every other HIV supplier.

And this idea that, again, they were duped, that the text messages and the emails, they all speak for themselves. They don't seem to trick -- they're not tricky to me.

If someone says they have no paperwork, says they don't know what they do. Says they have no experience with this, aren't providing it, it's pretty clear there's no way this person can actually create a truthful T3 and needs assistance to make something look legitimate, and that's where the text messages and the calls come in; and that's where he got the assistance, Charles Boyd and Adam Brosius.

And, you know, one other important thing to keep in mind as you deliberate in this case is that you have seen and heard a lot of evidence about the lies that these two defendants, these Boyd brothers, told to their employees, their director of compliance, their lawyers. It's a Gilead issue. It's the patients that are doing this. It's the junkies that are doing it.

Blaming everybody. Maybe it's the pharmacy.

I think there was one point where the lawyer defending Patrick Boyd had a little sheet and just started marking out everybody on the piece of paper, just casting blame everywhere.

All these lies that they told their lawyers and compliance department employees, those are the same lies and stories that you are hearing today; but you have all the information, you have all the evidence. You can see through it when you look at those exhibits. When you sift through those King Kimchi emails, and you look at those text messages, and you see those misleading emails to the lawyers, you have information that all of those people didn't have.

And you have information to make the only decision that is consistent with the evidence in this case, which is guilty beyond a reasonable doubt on all counts in this indictment.

And now, these defense lawyers were also I think trying to make it -- I'll try to be more cordial here, obviously, because of who I represent, but, you know -- they were trying to make it appear as if I personally am hiding something from you, the jury, by not calling Adam Brosius, or not calling these different witnesses.

We have been here for a long time, and we've presented a lot of evidence. And there is more than sufficient evidence for you all to rely upon and review and consider in conjunction with these ten witnesses' testimony, to reach that guilty verdict.

And, again, claiming we're hiding Adam Brosius from you guys, which is ironic because in the opening statement, I believe this defense lawyer's statement was "at this point, no one would rely upon Adam Brosius. No one in the world, but there's one entity, these people."

Well, we didn't call Adam Brosius. We feel that with the witnesses we presented, the former employees, two compliance employees, a former sales rep, Peter, Lisa Trissell, a pharmacy owner who was in the same town who immediately turned them down, turned Safe Chain down.

A patient victim. A pharmacy owner who got the wrong drugs in the bottle, told you the pricing was too good to be true. Told you he questioned those T3s himself and didn't understand why, we go from Puerto Rico and then back, and didn't make sense to him.

And when I hear some of these defenses of "we were duped, we were victims of these unscrupulous HIV vendors, these five, six, seven of them," it brings me back to this childish emoji where these lawyers want to you think that Charles and Patrick Boyd, these unsophisticated, supposedly, owners of a small company were just living on this island of purity at Safe Chain, and they just were surrounded by a sea of corrupt HIV vendors that all tricked them; and they were all duped, and they didn't see anything. They didn't hear anything. That they were just innocent victims of these people.

It's just not credible. It's just not credible. And, again, they knew exactly what they were doing.

Even if you look at this, the equivalence of knowledge. If you receive a package containing drugs that were acquired illegally but deliberately avoid learning that that package contains illicit drugs, so you can deny knowledge of the actual origin of the drugs, that's the same thing as positive knowledge.

And Peter testified when he was not getting any T3s or pedigrees, did they ask about the sourcing of the drugs? No.

When he had one pharmacy listed and one invoice supporting 8,000 bottles, do we see any more questioning? This doesn't make sense. This doesn't add up. Where is this coming from? It says closed-down pharmacies.

The dates on here are pre-COVID. There are meeting dates on some of these.

No questions. None at all. Just "give me the drugs. Give me the drugs, cheap and clean some of this crap up because we're getting a lot of customer complaints."

THE COURT: Five minutes, Mr. Pogozelski.

MR. POGOZELSKI: Thank you, Your Honor.

Then here you can see another example of a lie to a lawyer, Patrick Boyd, April 21st, 2021.

Martha Rumore, copying his brother, as well as others. "We have only had issues with Gilead products from these

vendors, and no other medications in any instance, branded or generic."

Well, we have all seen the evidence that that is not true, that was a lie, that was part of the story. This is a Gilead issue. This is a Gilead issue. And that's why the lawyer thought, "Okay, that sounds plausible. If it's only Gilead, it's only Gilead."

She didn't know about all these other manufacturer problems, and you heard from Nicole Wolfe, from ViiV. They never reported it to ViiV. They made some suggestion, "Ah, who in good faith goes to Gilead, if they're committing a crime."

Well, there are documents. You will see that the pharmacy sent the drug to Gilead first. And if you're acting in good faith, wouldn't you go to ViiV and Janssen, and these other manufacturers and say, "We're having these problems."

It's not the manufacturer's fault. It's not the patient's fault. It's not the pharmacy's fault.

The problem is with where these two defendants were knowingly getting their drugs, and that is from black market suppliers for prices that were too cheap, that they knew were too cheap, that their SOPs flagged as too cheap.

The appearance of the product was in there. Their own bible, their own SOPs.

The FDA guidance was in their own SOPs.

They didn't follow any of that. Why? "Because the HIV

business saved us from some dreadful months as a business."

And, again, trying to avoid the FDA. Try not to open a can of worms with the FDA. Lawyers are concerned about it.

I mean, the documents are just so strong in this case, and there's a lot of them; and I know there's a lot of them, but they're worth reviewing a few of the key ones with Abbie Divilio where she says, "This is false. Let me know how to proceed," and then compare that to the text messages.

And she says, "Gilead says this is a counterfeit drug. Let me know how to proceed."

"Don't file it. Lawyers say we're covered," and you heard from her on the stand over the course of four or five days, probably longer than any other witness. That's because she was our star witness. Not Adam Brosius. Not Peter Khaim.

She was also corroborated by Katie Eberspacher, who worked there before her, 24 years old.

Pat Boyd told her, "We don't need pedigrees, Katie. Just fix it. Go figure it the eff out." Told her, "Don't put things in writing."

And that was her testimony but now you have seen all the documents to corroborate that.

And then I just want to show you one other document before I run out of time here because the lawyer representing Patrick Boyd suggested something that is just -- I will just

wait until the document just comes up. All right.

He suggested that we, the Government, got up here with this diaper box, knowing full well that Mr. Patrick Boyd was never in the warehouse.

Well, this is in evidence, and I believe this is one of the overt acts, and that was just -- that was not true. This document establishes that.

Two hours counting HIV with the crew. "That 'S' is a mess." It was a mess.

We have seen all the photos of that mess.

I'm sorry for going so far. I thought I would be a lot more efficient with this. It was a lot to cover.

Thank you, again, for your time. All I ask is that you use your common sense when you're reviewing the evidence, thinking about the witness's testimony.

These defendants are guilty beyond a reasonable doubt of all the crimes charged in the indictment.

Read the instructions closely, and you will see that, with those instructions that the judge will give you and all the evidence and all the witnesses, that they knew what they were doing. They hid it, and they continued it for about 16 months, eleven of which was just with Boulevard, with that guy who you heard on the stand. That was their business partner.

Thank you.

THE COURT: All right.

Members of the jury, we're going to recess for the evening. Remember my admonition not to discuss the case or allow it to be discussed in your presence.

I'm going to ask you to come in at 9:15. So have a nice evening, and we will see you back at 9:15.

COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: Okay. As I alluded to earlier, I'll send back the exhibits tomorrow, but we're going to have to agree that all the exhibits are there that are supposed to be there and nothing is there that's not supposed to be there, and there's a lot of exhibits to go over.

Am I correct that the defense exhibits are all paper?

MR. ZIMET: Yes, sir.

THE COURT: So we could go through them and agree on that.

MR. ZIMET: We have already provided those to the Government, Judge.

THE COURT: Has the Government had a chance to go through the binder, and agree that everything that's there is supposed to be there, and nothing is there that's not supposed to be there?

MR. POGOZELSKI: Yes, Your Honor.

THE COURT: So we'll send the binder back, and we'll do

the same for the Government's exhibits.

MR. ZIMET: Judge, the only real issue with the Government right now is there's some exhibits that have both electronic and in paper.

And our position is it should be one or the other, okay, for a particular exhibit. That same exhibit shouldn't go in twice, as in paper and electronic.

THE COURT: I tend to agree with that. So you want -- what's easier to eliminate? The paper exhibits or the electronic exhibits?

MS. DEROVANESIAN: Your Honor, we can proceed with just the electronic exhibits with the exception, of course, of the physical exhibit.

THE COURT: So it's all electronic and the Pampers box? The Pampers is the demonstrative. That's right.

MS. DEROVANESIAN: That's a demonstrative.

MR. BARZEE: Alex is taking that home with him.

MR. POGOZELSKI: Again, I think you need it more, Bill.

MS. DEROVANESIAN: We just wanted to clarify one other thing about the exhibits.

We initially admitted some of the Government 700 series exhibits in a shorter form, and then separately, the defense admitted the larger version of those exhibits. So we just wanted to clarify --

THE COURT: I don't have any problem with there being

defense exhibits and the Government having repetitive portions of those exhibits.

I'm just not excited about one party having multiple copies of the same exhibit.

So I guess my question to you is, are we in agreement that the Government has a laptop that's a clean laptop that is just going to have the exhibits on them and that's it?

MR. ZIMET: Yes, Judge.

MR. POGOZELSKI: I suspect the request will be denied, but I'll just ask if just that one binder, that is a physical copy of a large electronic exhibit, could be an exception to this. That would be the only paper exhibit.

THE COURT: You can introduce that in lieu of the electronics. I mean, the jury may not be able to figure out viewing the electronics. So it's up to you whether you want them to come in electronically or on paper.

MR. POGOZELSKI: Okay. That's a fair point.

We'll produce one copy, whether it's electronic or paper. We'll make sure they line up exactly because it's a lot of pages.

THE COURT: What I need you to do is you got all of the defense exhibits, and they're okay.

I need the defense to go over your exhibits and be able to say the same thing: That everything that's there is what's supposed to be there, and nothing there that's not supposed to

be there.

That's the reason I've got the jury coming back at 9:15 instead of 9:00 so if there's questions about Exhibit 500 coming into evidence, I can look at my list and we can figure it out.

MR. POGOZELSKI: Understood, Your Honor.

MS. DEROVANESIAN: Your Honor, I'll confer with the defense.

I think probably the easiest thing to do is for us to just produce electronically just the exhibits that we do not have in paper copy, so there's either a paper copy or an electronic copy for each exhibit, and we can show that to defense counsel to make sure that that's acceptable to them.

THE COURT: Should we do that now, tonight in open court, or do you guys want to do that between now and 9:00 tomorrow morning?

MS. DEROVANESIAN: I think it would probably be our preference to do it between --

MR. POGOZELSKI: Whenever defense is available.

MR. ZIMET: We'll be available at 8:30 tomorrow.

THE COURT: Will that be enough time to be able to do everything?

MS. DEROVANESIAN: I suspect it should be.

MR. ZIMET: 8:15.

MS. DEROVANESIAN: We're up early. It works for us.

THE COURT: Well, you guys can meet at 8:15 wherever you want to meet, and we'll be in recess until 9:00 tomorrow morning.

MR. POGOZELSKI: Thank you, Your Honor.

MR. BARZEE: Thank you, Your Honor.

(Jury trial was adjourned.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 10/28/2025

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN RPR, FCR
Official Court Reporter
United States District Court
Southern District of Florida

## $

**$100,000** [1] - 95:23
**$200,000** [1] - 77:21
**$23** [1] - 37:15
**$300,000** [1] - 73:9
**$35** [1] - 90:16
**$38** [3] - 24:17, 28:17, 118:13
**$40** [2] - 59:6, 74:16
**$42** [1] - 128:1
**$500,000** [1] - 32:4
**$75,000** [1] - 95:24
**$90** [2] - 6:17, 113:8

## '

**'Abbie** [1] - 68:1
**'has** [1] - 68:5
**'S'** [2] - 29:19, 137:8

## /

**/s/Patricia** [1] - 142:14

## 1

**1** [3] - 1:8, 1:19, 95:6
**1,556** [1] - 114:22
**10** [7] - 4:9, 4:10, 4:11, 26:20, 26:21, 65:9, 113:1
**10/1** [1] - 11:2
**10/13** [1] - 109:10
**10/14** [1] - 129:16
**10/28/2025** [1] - 142:14
**10/6** [1] - 11:2
**100** [5] - 37:22, 37:23, 72:13, 77:21, 116:12
**10s** [1] - 4:13
**10th** [3] - 12:10, 20:11, 20:14
**11** [2] - 28:17, 77:23
**12** [1] - 111:7
**14** [2] - 46:5, 129:17
**15** [3] - 56:16, 81:6, 81:10
**15-minute** [1] - 81:3
**16** [2] - 90:8, 137:22
**160** [1] - 111:7
**19** [1] - 77:23
**1:00** [1] - 1:6
**1B** [1] - 111:7
**1st** [2] - 98:22, 121:24

## 2

**2** [2] - 38:18, 55:4
**2,400** [1] - 36:19
**20** [2] - 46:14, 54:12
**20/20** [2] - 58:12, 92:20
**2016** [1] - 49:3
**2018** [3] - 19:2, 23:16, 23:20
**2019** [2] - 22:12, 46:8
**2020** [8] - 10:18, 25:6, 47:14, 98:22, 99:2, 111:7, 120:5, 129:17
**2021** [7] - 20:5, 40:14, 109:5, 110:2, 117:3, 134:23
**2025** [2] - 1:5, 115:7
**21st** [3] - 66:3, 102:7, 134:23
**23rd** [1] - 43:12
**24** [2] - 12:21, 136:17
**24-cr-20255-Dimitrouleas/Hunt** [1] - 1:2
**27** [1] - 1:5
**27th** [1] - 28:3
**289** [1] - 109:8
**28th** [1] - 28:8
**29th** [4] - 10:18, 25:6, 25:18, 33:23
**2nd** [2] - 35:16, 35:17

## 3

**30** [2] - 65:3, 97:17
**300,000** [1] - 73:11
**30th** [1] - 19:14
**31st** [1] - 117:3
**33128** [1] - 1:19
**33132** [1] - 1:16
**33301** [1] - 1:22
**3911** [7] - 51:15, 51:16, 52:4, 52:16, 109:11, 110:3, 110:6
**3:05** [1] - 81:12
**3:17** [1] - 81:12
**3rd** [1] - 1:19

## 4

**40** [1] - 1:19
**47** [3] - 73:18, 95:7
**4:00** [1] - 61:5
**4th** [1] - 1:15

## 5

**5** [2] - 71:2, 77:6
**50** [1] - 60:16
**500** [1] - 141:3
**584-page** [1] - 21:22
**5:00** [1] - 1:6

## 6

**6** [1] - 1:22
**633** [1] - 1:22

## 7

**7** [1] - 128:2
**700** [1] - 139:21
**75** [4] - 46:12, 95:21, 96:3, 113:15
**7th** [3] - 20:15, 36:23, 39:13

## 8

**8,000** [7] - 22:3, 22:7, 41:18, 50:14, 50:17, 118:1, 134:12
**8:15** [2] - 141:24, 142:1
**8:30** [1] - 141:20

## 9

**9** [1] - 26:21
**9/29** [2] - 11:2, 41:25
**90** [1] - 90:15
**99** [1] - 1:15
**9:00** [3] - 141:3, 141:15, 142:2
**9:15** [3] - 138:5, 138:6, 141:2

## A

**Abbie** [80] - 11:24, 14:21, 20:11, 20:22, 21:11, 34:10, 39:6, 42:7, 42:22, 47:25, 48:22, 50:22, 51:13, 52:11, 52:22, 53:17, 53:18, 54:17, 54:25, 55:13, 56:12, 56:21, 56:25, 57:2, 57:6, 57:13, 58:16, 60:2, 60:3, 61:24, 62:25, 63:12, 65:25, 67:13, 69:6, 71:11, 73:23, 78:13, 78:25, 97:1, 98:21, 99:4, 99:16, 99:25, 100:25, 101:2, 101:8, 101:15, 101:20, 102:3, 102:7, 103:16, 104:24, 105:7, 107:2, 107:4, 107:5, 107:10, 107:14, 107:18, 108:9, 108:22, 109:5, 109:7, 110:3, 110:9, 111:5, 117:25, 119:7, 119:13, 121:3, 121:23, 123:23, 124:23, 126:2, 127:12, 129:19, 130:9, 136:6
**Abbie's** [3] - 78:25, 109:9, 109:16
**abetting** [1] - 122:22
**ability** [3] - 82:17, 93:8, 122:15
**able** [15] - 13:10, 31:17, 50:1, 60:24, 74:16, 79:1, 79:3, 82:13, 96:5, 105:21, 114:20, 129:9, 140:14, 140:23, 141:21
**above-entitled** [1] - 142:12
**absent** [1] - 84:24
**absolute** [1] - 80:2
**absolutely** [11] - 10:8, 49:19, 50:8, 51:18, 69:20, 72:13, 78:2, 80:10, 88:23, 103:12, 113:3
**absorb** [2] - 82:13, 82:19
**absurd** [1] - 74:4
**abundant** [1] - 36:2
**accept** [3] - 74:5, 88:7, 89:13
**acceptable** [1] - 141:13
**accepted** [1] - 28:15
**accepting** [1] - 97:23
**access** [1] - 78:25
**accessible** [1] - 3:20
**accidental** [1] - 99:21
**accompanied** [1] - 17:1
**accompany** [2] - 41:22, 44:5
**accompanying** [2] - 86:9, 86:10
**accomplish** [1] - 16:10
**according** [6] - 77:23, 96:23, 98:6, 98:7, 119:1, 128:20
**accountable** [1] - 47:3
**accountant** [3] - 77:7, 77:16, 77:24
**accurate** [7] - 34:24, 38:8, 38:18, 89:1, 89:13, 103:5, 142:11
**accurately** [1] - 93:9
**accusations** [1] - 107:2
**accused** [3] - 50:19, 53:10, 123:25
**accusing** [1] - 115:5
**achieve** [1] - 96:4
**acknowledge** [2] - 7:8, 106:8
**acknowledged** [1] - 38:24
**acquired** [2] - 41:9, 134:4
**act** [9] - 17:5, 42:2, 52:21, 52:22, 75:9, 85:14, 85:16, 86:20
**Act** [2] - 35:13, 125:25
**acted** [2] - 69:25, 124:15
**acting** [12] - 69:13, 69:19, 79:19, 99:12, 100:4, 105:8, 109:3, 112:23, 114:5, 123:17, 123:18, 135:13
**action** [2] - 119:11, 127:4
**Actions** [1] - 30:20
**actions** [1] - 30:22
**activities** [1] - 98:11
**acts** [7] - 16:14, 41:24, 41:25, 45:11, 119:9, 123:17, 137:6
**actual** [7] - 13:14, 36:19, 40:4, 41:11, 86:11, 113:2, 134:6
**AD** [4] - 20:17, 39:24, 108:24, 109:3
**Adam** [66] - 18:7, 18:25, 19:11, 19:25, 20:2, 20:7, 21:9, 25:15, 25:18, 26:4, 28:8, 31:24, 34:13, 34:19, 36:21, 42:1, 45:16, 55:24, 61:5, 72:2, 72:5, 72:8, 72:15, 72:20, 76:14, 76:15, 77:22, 91:13, 93:22, 94:24, 94:25, 95:11, 95:14, 95:20, 96:14, 97:24, 98:3, 98:8, 101:3, 101:6, 101:16, 101:21, 101:22, 101:24, 102:7, 104:6, 112:2, 113:12, 113:15, 113:17, 116:10, 122:16, 123:3, 126:25, 127:8, 131:17, 132:19, 133:1, 133:4, 133:6,

136:14
**add** [2] - 22:16, 134:13
**added** [1] - 61:7
**adding** [1] - 4:22
**addition** [1] - 115:5
**additional** [1] - 37:18
**address** [3] - 20:12, 33:17, 40:3
**addresses** [1] - 61:8
**adjourned** [1] - 142:6
**admitted** [4] - 88:14, 108:16, 139:21, 139:23
**admitting** [1] - 67:7
**admonition** [4] - 5:14, 81:4, 82:4, 138:3
**ADs** [1] - 61:5
**adulterated** [8] - 4:19, 7:14, 8:25, 16:15, 16:17, 41:12, 45:14, 54:20
**advantage** [1] - 8:10
**adverse** [1] - 13:3
**advice** [11] - 51:24, 79:2, 87:24, 98:3, 105:18, 106:22, 109:21, 130:3, 130:4, 130:23, 130:24
**advise** [2] - 39:3, 55:1
**advised** [1] - 109:12
**affairs** [4] - 75:10, 80:22, 86:22, 108:2
**affects** [1] - 110:19
**afloat** [1] - 14:16
**afraid** [1] - 106:11
**afternoon** [3] - 6:1, 10:24, 82:9
**age** [1] - 108:15
**agent** [5] - 10:25, 18:4, 79:10, 109:24, 110:1
**agents** [1] - 124:25
**aggravated** [2] - 125:2, 125:3
**ago** [5] - 57:17, 66:3, 66:4, 99:2, 120:16
**agree** [8] - 3:14, 3:15, 9:6, 84:15, 138:10, 138:16, 138:21, 139:8
**agreed** [3] - 16:9, 48:24, 102:16
**agreement** [1] - 140:5
**ahead** [1] - 68:12
**aid** [1] - 5:19
**aiding** [1] - 122:22
**ain't** [1] - 89:9
**air** [1] - 58:8
**albuterol** [4] - 10:14, 25:8, 26:5, 41:17
**Alex** [10] - 61:3, 63:17, 63:22, 64:20, 67:10, 76:16, 76:22, 77:11, 79:20, 139:17
**Alexander** [1] - 1:13
**allegations** [2] - 12:13, 75:23
**alleged** [4] - 10:20, 16:14, 18:13, 31:13
**alleges** [1] - 100:8
**alleging** [1] - 9:21
**alleyways** [1] - 53:3
**allow** [6] - 5:15, 81:4, 82:5, 95:2, 97:15, 138:4
**alluded** [1] - 138:9
**almost** [3] - 28:4, 29:14, 42:9
**alter** [2] - 44:3, 44:4
**altered** [2] - 44:8, 129:5
**Alzheimer's** [1] - 20:4
**amazing** [2] - 57:25, 58:4
**AMERICA** [1] - 1:4
**America** [1] - 79:22
**Amerisource** [2] - 30:18, 40:1
**AmerisourceBergen** [3] - 18:22, 30:14, 37:19
**amount** [3] - 28:5, 115:19, 120:4
**Amsterdam** [6] - 22:2, 22:11, 30:18, 36:18, 37:19, 43:19
**analogy** [1] - 87:10
**Anderson** [1] - 39:8
**anger** [1] - 64:21
**angry** [3] - 62:13, 62:18, 64:20
**annoyed** [1] - 125:3
**ANSWER** [9] - 66:7, 66:10, 66:13, 66:16, 66:21, 66:24, 67:2, 67:4, 67:6
**answer** [19] - 35:1, 52:14, 55:2, 67:17, 68:2, 68:23, 76:17, 76:22, 77:11, 80:6, 88:15, 93:12, 93:14, 93:18, 99:10, 99:16, 100:1, 109:7
**answered** [3] - 31:10, 67:23, 68:10
**answers** [2] - 43:4, 109:9
**Anthony** [1] - 23:19
**anticipate** [1] - 89:10
**anytime** [1] - 115:7
**apologize** [1] - 43:25
**appeal** [1] - 75:5
**appear** [2] - 93:11, 132:18
**appearance** [6] - 7:5, 29:10, 29:16, 73:10, 120:6, 135:22
**APPEARANCES** [1] - 1:11
**application** [2] - 26:8, 56:1
**applied** [2] - 31:15, 31:16
**applies** [1] - 41:23
**apply** [2] - 83:2, 84:20
**applying** [1] - 83:24
**appreciate** [2] - 6:5, 6:6
**approached** [2] - 15:22, 124:25
**appropriate** [3] - 70:12, 114:1, 130:4
**approve** [10] - 38:20, 48:18, 50:25, 67:12, 67:19, 67:25, 68:1, 111:11, 121:3, 122:17
**approved** [14] - 24:16, 30:1, 30:17, 48:22, 48:23, 51:7, 56:16, 68:6, 104:20, 104:21, 111:11, 111:20
**April** [5] - 20:15, 31:6, 39:13, 41:1, 134:23
**areas** [1] - 82:15
**arguing** [1] - 76:10
**argument** [7] - 5:22, 5:23, 6:2, 83:8, 83:16, 84:25, 97:16
**arguments** [4] - 5:18, 5:19, 83:4, 116:1
**arms** [1] - 83:20
**arose** [1] - 100:24
**arrived** [2] - 40:15, 120:7
**article** [6] - 10:19, 23:17, 23:19, 24:6, 24:9, 121:24
**aspect** [1] - 124:7
**assistance** [2] - 131:14, 131:17
**Assistant** [1] - 1:14
**assume** [3] - 87:8, 87:12, 87:15
**assured** [1] - 106:16
**attacks** [1] - 127:10
**attempt** [1] - 109:23
**attention** [6] - 6:6, 6:7, 18:11, 80:11, 108:17, 115:13
**attentiveness** [2] - 6:10, 48:7
**attorney** [6] - 52:3, 52:23, 79:5, 83:5, 106:22, 130:19
**attorney's** [1] - 130:23
**attorneys** [14] - 5:17, 5:18, 51:22, 51:23, 73:19, 78:25, 79:3, 79:6, 98:2, 99:16, 108:8, 130:2, 130:5, 130:6
**Attorneys** [1] - 1:15
**attractive** [1] - 95:10
**August** [6] - 17:18, 27:4, 28:3, 28:8, 28:18, 40:25
**authorized** [6] - 20:23, 20:25, 23:25, 39:24, 61:5, 108:24
**automatic** [2] - 70:7, 104:2
**available** [2] - 141:19, 141:20
**avoid** [3] - 95:2, 134:5, 136:2
**avoidance** [1] - 41:8
**avoids** [1] - 41:9
**aware** [5] - 41:7, 49:3, 77:1, 78:14, 96:13

## B

**backbone** [1] - 86:17
**backdating** [1] - 36:15
**background** [3] - 30:10, 90:6, 121:20
**backorders** [1] - 40:9
**backroom** [1] - 120:25
**bad** [8] - 26:11, 33:25, 80:19, 85:18, 92:15, 94:12, 116:24, 127:14
**BAILEY** [2] - 2:2, 142:15
**Bailey** [1] - 142:14
**BAILEY-ENTIN** [2] - 2:2, 142:15
**Bailey-Entin** [1] - 142:14
**ball** [1] - 108:13
**bam** [1] - 123:24
**bands** [1] - 36:12
**bank** [1] - 77:9
**barn** [5] - 57:19, 57:22, 58:7, 58:9
**Barzee** [8] - 1:17, 1:18, 4:2, 48:8, 65:3, 74:21, 86:15, 87:1
**BARZEE** [10] - 4:24, 5:5, 5:13, 48:9, 65:4, 74:22, 81:20, 82:3, 139:17, 142:5
**based** [5] - 8:12, 22:4, 75:3, 96:18, 114:11
**basic** [2] - 84:4, 84:5
**basis** [2] - 66:12, 88:4
**BB** [4] - 57:21, 58:7, 58:8, 79:16
**bear** [2] - 121:13, 124:16
**beat** [1] - 40:15
**beat-up** [1] - 40:15
**became** [1] - 12:4
**become** [3] - 46:9, 72:13, 108:23
**becomes** [1] - 18:4
**BEFORE** [1] - 1:10
**beforehand** [1] - 120:2
**beg** [1] - 80:23
**began** [1] - 6:3
**begging** [2] - 65:20, 65:21
**begin** [3] - 4:16, 48:15, 83:1
**beginning** [5] - 6:11, 8:19, 9:20, 40:14, 83:11
**begun** [1] - 82:25
**behalf** [2] - 115:12, 122:25
**behind** [5] - 18:9, 21:14, 23:9, 32:1, 71:15
**beings** [1] - 65:17
**belief** [3] - 100:13, 100:15, 100:18
**believable** [1] - 94:17
**below** [2] - 33:25, 46:6
**bench** [2] - 94:4
**benefit** [2] - 80:24, 91:3
**Benz** [1] - 59:7
**Berger** [1] - 23:19
**best** [9] - 36:24, 63:21, 69:21, 73:8, 73:21, 74:9, 74:14, 114:25, 115:18
**Betances** [1] - 18:23
**better** [1] - 34:9
**between** [13] - 5:22, 9:4, 20:19, 32:7, 36:20, 39:13, 80:16, 98:21, 112:9, 127:8, 128:25, 141:15, 141:18
**beyond** [20] - 47:2,

51:12, 74:25, 75:8, 75:16, 75:25, 78:9, 84:11, 84:13, 85:6, 85:8, 86:13, 86:19, 86:24, 100:12, 108:5, 114:9, 114:16, 132:14, 137:16
**bible** [2] - 29:6, 135:23
**Big** [2] - 46:21, 114:24
**big** [6] - 43:6, 57:19, 58:7, 64:13, 97:25, 112:9
**biggest** [2] - 112:13
**Biktarvy** [2] - 16:22, 42:3
**Bill** [1] - 139:18
**billed** [3] - 45:5, 59:5, 61:7
**billing** [1] - 105:22
**bills** [4] - 32:12, 124:22, 125:6, 129:12
**bin** [1] - 42:10
**binder** [5] - 3:21, 21:23, 138:21, 138:25, 140:10
**binders** [3] - 50:17, 60:2, 80:7
**bipolar** [1] - 27:5
**birth** [1] - 12:20
**bit** [6] - 14:13, 16:7, 18:24, 21:2, 35:22, 65:23
**black** [15] - 6:18, 8:25, 9:7, 11:4, 18:9, 54:6, 88:13, 88:20, 91:12, 91:17, 95:9, 111:25, 112:6, 124:2, 135:19
**blah** [3] - 60:12
**blah-blah-blah** [1] - 60:12
**blame** [4] - 46:19, 46:21, 79:17, 132:3
**blaming** [2] - 106:18, 131:25
**bless** [1] - 115:13
**blessed** [1] - 87:4
**Board** [3] - 35:20, 99:5, 102:17
**bogus** [3] - 30:17, 113:4, 118:2
**boil** [1] - 7:20
**book** [1] - 112:19
**Borjas** [1] - 15:9
**born** [2] - 91:21, 91:22
**borrowing** [1] - 113:14
**bother** [3] - 57:9, 76:13, 77:3
**bottle** [22] - 10:11, 10:14, 15:14, 16:2, 16:22, 20:4, 20:6, 25:12, 26:5, 26:6, 26:10, 26:14, 27:5, 41:17, 45:4, 47:19, 51:17, 64:17, 78:5, 78:20, 133:12
**bottles** [42] - 9:22, 22:3, 22:7, 24:21, 24:25, 25:4, 25:24, 27:14, 27:17, 27:22, 27:23, 29:10, 29:13, 33:25, 34:9, 36:12, 41:18, 50:14, 51:20, 58:21, 58:23, 59:1, 59:2, 59:9, 59:12, 64:16, 73:11, 76:19, 78:2, 78:8, 78:12, 78:15, 78:18, 116:21, 118:1, 118:9, 118:11, 118:12, 126:6, 134:12
**bottom** [1] - 80:10
**bought** [4] - 11:14, 45:1, 73:12, 123:25
**Boulevard** [85] - 6:24, 10:2, 10:25, 11:3, 11:5, 11:15, 12:2, 14:9, 14:10, 18:8, 24:12, 24:13, 24:16, 24:22, 24:25, 25:7, 25:20, 25:22, 26:7, 27:7, 27:14, 27:21, 28:15, 30:8, 31:15, 31:25, 35:18, 37:1, 37:3, 37:13, 37:16, 37:25, 38:17, 39:4, 41:18, 44:3, 45:19, 54:1, 55:17, 60:8, 61:20, 67:19, 68:6, 68:22, 70:15, 71:10, 71:25, 94:21, 95:2, 97:20, 98:22, 101:1, 101:4, 101:15, 101:19, 101:23, 102:3, 102:20, 102:24, 103:1, 103:3, 103:7, 104:5, 104:8, 104:9, 104:23, 111:3, 111:8, 111:13, 111:15, 111:19, 116:17, 116:19, 118:7, 121:25, 122:3, 122:12, 126:19, 127:25, 129:8, 129:19, 129:20, 137:22
**Boulevard's** [1] - 36:2
**box** [35] - 10:17, 24:23, 27:19, 27:20, 28:2, 28:4, 28:6, 28:9, 32:6, 36:9, 62:6, 62:7, 62:12, 62:16, 62:19, 63:3, 63:5, 63:8, 63:9, 63:13, 63:15, 64:1, 64:3, 64:17, 74:15, 96:20, 96:22, 97:10, 97:20, 127:12, 127:18, 137:3, 139:14
**boxes** [17] - 6:25, 10:10, 10:11, 21:21, 27:18, 28:1, 28:21, 29:13, 40:21, 62:20, 64:1, 64:13, 64:16, 64:19, 116:22, 127:14
**boy** [1] - 57:20
**BOYD** [4] - 1:7, 1:17, 1:21
**Boyd** [217] - 6:16, 8:16, 9:5, 9:19, 10:22, 10:23, 12:5, 12:12, 13:20, 14:20, 14:21, 15:21, 18:19, 19:4, 19:18, 19:19, 20:17, 20:19, 20:21, 21:9, 23:18, 24:8, 24:14, 25:20, 26:7, 27:6, 28:3, 28:23, 29:19, 30:6, 30:7, 30:15, 32:8, 32:17, 32:20, 33:13, 34:2, 34:13, 35:8, 35:17, 36:21, 36:23, 37:16, 37:21, 38:21, 38:24, 39:15, 39:22, 40:19, 42:8, 42:20, 43:5, 45:16, 46:23, 48:14, 48:15, 48:18, 48:23, 48:24, 49:2, 49:12, 49:15, 49:17, 49:20, 50:4, 50:9, 50:10, 50:16, 50:20, 50:24, 51:4, 51:11, 51:13, 51:14, 51:19, 52:24, 53:7, 53:11, 53:12, 53:14, 53:22, 53:24, 54:1, 54:5, 54:8, 54:16, 54:17, 54:23, 55:1, 55:23, 59:11, 60:21, 62:14, 64:17, 66:1, 67:7, 67:16, 67:19, 67:24, 67:25, 68:11, 68:21, 69:2, 69:13, 69:16, 69:19, 69:24, 71:2, 71:25, 73:3, 73:4, 73:23, 74:7, 75:20, 77:20, 77:21, 78:22, 78:23, 80:2, 80:24, 84:7, 84:8, 84:12, 85:7, 85:22, 88:12, 91:10, 91:16, 92:23, 96:12, 97:25, 98:6, 98:21, 99:15, 99:20, 100:2, 100:6, 102:6, 102:12, 102:13, 103:24, 104:1, 104:3, 104:12, 104:17, 105:8, 105:13, 105:15, 109:8, 109:23, 109:25, 111:2, 111:7, 111:14, 111:24, 112:5, 112:8, 112:14, 112:17, 114:21, 116:8, 116:10, 116:18, 117:7, 117:13, 117:24, 118:5, 118:18, 118:20, 118:24, 119:4, 119:6, 119:21, 121:8, 122:16, 122:20, 125:14, 125:25, 126:3, 127:2, 127:8, 128:16, 129:18, 130:11, 131:17, 131:21, 132:2, 133:20, 134:23, 136:18, 136:25, 137:3
**Boyd's** [10] - 22:21, 48:20, 50:3, 53:19, 55:6, 66:8, 83:5, 84:9, 92:17, 115:22
**Boyds** [7] - 92:9, 92:15, 93:23, 93:24, 93:25, 94:1, 115:12
**brand** [2] - 23:8, 113:23
**branded** [2] - 49:4, 135:1
**bring** [13] - 3:5, 5:1, 5:7, 75:22, 76:14, 76:16, 77:3, 77:15, 79:8, 81:16, 81:22, 98:16, 102:10
**bringing** [2] - 93:23, 94:2
**brings** [1] - 133:18
**broke** [1] - 120:11
**broken** [3] - 33:25, 34:3, 43:9
**Brosius** [66] - 18:7, 18:25, 19:11, 19:25, 20:2, 21:6, 21:9, 25:15, 25:18, 26:4, 28:8, 31:24, 34:13, 34:19, 36:21, 42:1, 44:2, 44:4, 45:16, 45:17, 47:5, 55:24, 72:2, 72:3, 72:5, 72:6, 72:8, 72:20, 76:14, 76:15, 77:22, 91:13, 93:22, 94:24, 94:25, 95:11, 95:14, 96:14, 97:24, 98:3, 98:8, 101:4, 101:6, 101:16, 101:21, 101:22, 101:24, 104:6, 112:2, 113:12, 113:15, 113:17, 116:10, 120:12, 122:16, 123:3, 126:25, 127:8, 131:17, 132:19, 133:1, 133:4, 133:6, 136:14
**Brosius's** [3] - 20:7, 95:21, 101:3
**brother** [1] - 134:24
**brothers** [3] - 65:8, 128:25, 131:21
**brought** [14] - 19:2, 19:6, 19:7, 54:15, 61:3, 74:7, 76:20, 83:9, 95:16, 101:4, 101:6, 124:21, 131:2
**Bruce** [2] - 1:21, 52:11
**building** [3] - 50:4, 50:5, 114:23
**bull's** [2] - 57:23, 58:1
**bull's-eye** [1] - 57:23
**bull's-eyes** [1] - 58:1
**bunch** [3] - 41:24, 94:16, 127:23
**burden** [7] - 74:24, 75:25, 76:5, 76:7, 76:10, 121:12
**Bureau** [1] - 99:9
**Business** [1] - 14:12
**business** [48] - 12:9, 14:15, 15:20, 18:8, 19:7, 21:8, 25:7, 31:20, 32:24, 32:25, 46:12, 49:6, 54:16, 54:18, 57:11, 57:15, 58:19, 60:16, 69:3, 69:17, 70:13, 70:16, 71:9, 71:18, 71:22, 72:12, 73:18, 95:16, 96:8, 96:11, 100:18, 103:11, 104:5,

105:17, 114:23, 116:7, 116:13, 116:19, 116:20, 117:1, 117:2, 117:7, 136:1, 137:23
**businesses** [1] - 19:3
**businessmen** [1] - 73:8
**buy** [3] - 54:5, 75:12, 118:13
**buyback** [3] - 10:20, 24:10, 121:24
**buying** [11] - 12:13, 26:20, 30:23, 37:24, 38:16, 39:4, 64:12, 93:18, 123:24, 131:3
**buys** [2] - 57:5, 96:8
**buzzers** [1] - 90:2
**BY** [1] - 2:1

## C

**Caitlin** [1] - 127:21
**calculated** [1] - 22:4
**California** [1] - 35:20
**cannot** [3] - 30:3, 84:10, 100:14
**cap** [1] - 78:20
**car** [1] - 58:2
**cardboard** [1] - 27:20
**care** [3] - 71:23, 100:3, 102:13
**career** [2] - 7:8, 116:5
**careful** [4] - 20:20, 39:1, 39:2, 39:14
**carefully** [4] - 28:12, 75:5, 80:13, 118:17
**carelessness** [1] - 100:17
**Carlos** [5] - 20:10, 20:23, 39:23, 44:4, 47:4
**carry** [1] - 99:20
**case** [69] - 5:15, 5:20, 6:13, 7:3, 7:11, 7:22, 13:22, 21:20, 24:5, 31:14, 38:7, 48:13, 49:18, 51:12, 52:7, 53:25, 54:7, 55:10, 55:20, 58:11, 62:22, 63:2, 63:19, 66:1, 68:20, 75:6, 76:6, 80:16, 81:4, 82:5, 83:2, 84:19, 85:2, 85:4, 85:5, 86:3, 86:4, 86:12, 88:8, 88:25, 89:1, 90:10, 90:14, 90:19, 93:4, 93:23, 94:8, 95:22, 97:21, 98:20, 99:21, 108:18, 109:11, 110:1, 110:12, 110:16, 110:23, 115:3, 118:16, 125:9, 125:10, 129:15, 129:16, 131:19, 132:13, 136:4, 138:3
**CASE** [1] - 1:2
**cases** [4] - 5:17, 23:6, 23:22, 83:10
**cast** [3] - 46:19, 46:22
**casting** [1] - 132:3
**Catch-22** [1] - 104:6
**caught** [8] - 17:15, 19:23, 19:24, 43:11, 54:11, 111:15, 131:4, 131:5
**caused** [1] - 71:4
**cell** [2] - 63:18, 63:19
**certain** [6] - 58:19, 83:21, 84:24, 89:21, 105:25, 114:3
**certainly** [10] - 17:10, 22:21, 36:1, 36:3, 42:17, 44:18, 47:1, 67:13, 118:11, 121:6
**certificate** [1] - 12:20
**certification** [1] - 94:21
**certify** [1] - 142:10
**cetera** [1] - 19:17
**chain** [6] - 13:23, 15:12, 21:4, 23:23, 34:1, 126:4
**Chain** [84] - 6:17, 8:19, 8:21, 8:24, 9:11, 9:16, 15:22, 16:2, 19:1, 22:24, 23:17, 25:15, 26:18, 27:1, 35:13, 42:13, 43:16, 45:1, 45:18, 49:4, 50:4, 50:18, 51:20, 52:13, 53:19, 55:13, 55:22, 56:1, 56:10, 59:1, 59:3, 62:23, 66:5, 67:5, 70:9, 71:3, 72:6, 72:25, 78:4, 78:7, 94:21, 95:1, 95:4, 95:5, 95:6, 95:12, 95:14, 95:16, 95:17, 95:18, 95:23, 95:25, 96:8, 96:23, 96:24, 98:11, 101:7, 102:19, 102:21, 102:24, 103:3, 103:6, 103:19, 104:2, 104:7, 106:7, 107:12, 110:2, 111:3, 112:3, 113:6, 113:13, 122:25, 123:5, 125:4, 125:24, 128:12, 128:21, 133:10, 133:22
**Chain's** [1] - 78:10
**chalk** [1] - 58:10
**chance** [3] - 63:21, 129:13, 138:20
**chances** [1] - 91:18
**changed** [2] - 34:21, 77:16
**changing** [2] - 4:14, 111:2
**characterize** [1] - 102:15
**charge** [2] - 22:24, 106:16
**charged** [7] - 7:13, 50:10, 85:2, 86:3, 86:4, 90:10, 137:17
**charges** [7] - 4:16, 4:18, 7:20, 8:12, 100:7, 114:10
**CHARLES** [2] - 1:7, 1:21
**Charles** [66] - 6:16, 8:16, 9:5, 9:18, 10:22, 12:5, 14:21, 15:21, 18:18, 19:4, 19:19, 20:17, 20:19, 21:9, 22:21, 23:17, 24:14, 25:20, 26:7, 28:3, 28:23, 30:6, 30:15, 32:8, 32:17, 32:20, 33:13, 34:2, 35:8, 35:17, 36:21, 36:23, 37:16, 37:21, 38:9, 38:21, 38:24, 40:19, 42:8, 43:5, 45:16, 46:23, 51:19, 59:11, 73:4, 74:7, 100:2, 116:8, 116:10, 116:18, 117:7, 117:13, 117:24, 118:5, 118:20, 119:21, 121:8, 122:16, 125:25, 127:8, 128:15, 129:18, 130:10, 131:17, 133:19
**Charlie** [85] - 34:13, 55:13, 55:21, 57:2, 57:3, 57:9, 59:16, 59:21, 59:23, 60:21, 61:2, 61:4, 61:10, 61:11, 61:15, 61:16, 62:5, 62:14, 63:22, 64:22, 65:20, 69:24, 70:19, 71:2, 71:12, 71:21, 72:7, 72:19, 73:14, 76:16, 76:20, 77:21, 78:23, 79:17, 80:24, 84:7, 84:8, 84:9, 84:12, 85:7, 85:22, 88:12, 91:10, 91:16, 92:16, 92:23, 94:23, 96:12, 97:25, 98:6, 98:21, 98:22, 99:6, 99:15, 99:20, 100:6, 101:21, 102:6, 102:12, 102:13, 103:7, 103:24, 104:1, 104:3, 104:12, 104:17, 105:8, 105:13, 105:15, 107:24, 109:1, 109:23, 111:2, 111:14, 111:24, 112:5, 112:8, 112:14, 112:17, 114:21, 115:11, 115:22
**Charlie's** [1] - 105:24
**chart** [1] - 113:3
**chat** [1] - 47:24
**chats** [1] - 62:24
**cheap** [18] - 7:4, 9:25, 11:11, 11:14, 13:24, 14:2, 14:15, 18:18, 18:19, 37:24, 118:14, 128:7, 130:14, 134:18, 135:20, 135:21
**cheat** [1] - 17:4
**Check** [1] - 54:1
**check** [7] - 54:2, 55:4, 68:22, 69:15, 70:5, 73:24, 74:1
**cherry** [1] - 114:8
**cherry-picked** [1] - 114:8
**child** [2] - 75:14, 87:16
**childish** [1] - 133:18
**children** [2] - 81:1, 87:4
**choose** [1] - 117:1
**chose** [2] - 18:7, 18:8
**Cintex** [2] - 11:9, 127:2
**circle** [1] - 58:10
**circles** [1] - 79:16
**circumstances** [6] - 68:3, 87:11, 124:14, 124:16, 125:1, 125:22
**citing** [1] - 31:12
**civil** [3] - 127:3, 127:4, 127:6
**civilly** [1] - 115:2
**claim** [2] - 77:15, 78:7
**claimed** [3] - 23:25, 60:14, 129:18
**claiming** [2] - 120:12, 133:1
**claims** [5] - 54:19, 59:18, 62:20, 63:7, 108:14
**clarification** [1] - 43:24
**clarify** [2] - 139:19, 139:24
**clean** [8] - 40:22, 40:24, 58:23, 59:12, 76:19, 116:23, 134:18, 140:6
**cleaner** [1] - 126:16
**cleaning** [6] - 34:8, 58:21, 59:1, 59:9, 59:12, 59:14
**clear** [3] - 122:14, 131:13
**clearly** [3] - 42:4, 61:10, 71:10
**client** [2] - 68:18, 125:21
**clients** [1] - 108:17
**clip** [2] - 23:7, 23:14
**closed** [12] - 10:7, 21:24, 22:11, 37:7, 57:12, 57:15, 60:12, 116:13, 118:2, 126:10, 126:12, 134:14
**closed-down** [4] - 10:7, 21:24, 118:2, 134:14
**closely** [4] - 22:10, 93:12, 126:5, 137:18
**closing** [10] - 5:18, 6:2, 57:5, 83:4, 83:8, 83:16, 84:25, 97:16, 98:17, 116:1
**co** [2] - 18:7, 19:1
**co-owner** [2] - 18:7, 19:1
**coconspirator** [3] - 18:11, 59:23, 61:14
**coconspirators** [6] - 9:18, 21:5, 47:5, 59:4, 76:25, 77:2
**coerced** [1] - 50:20
**Colanes** [1] - 79:10
**collar** [2] - 18:15, 23:5
**colleague** [1] - 8:20
**collusion** [1] - 46:21
**coming** [13] - 29:23,

31:22, 55:25, 58:12, 59:3, 88:13, 88:20, 100:25, 111:25, 124:11, 134:13, 141:2, 141:4
**commerce** [1] - 45:18
**commission** [1] - 19:9
**commit** [4] - 7:18, 45:10, 56:22, 85:15
**committed** [4] - 13:5, 68:25, 85:17, 86:13
**committing** [3] - 71:7, 74:2, 135:11
**common** [13] - 6:24, 21:20, 22:1, 22:13, 33:4, 41:21, 54:13, 75:3, 75:5, 121:16, 121:17, 121:21, 137:14
**community** [1] - 119:23
**companies** [1] - 95:1
**company** [27] - 8:18, 8:24, 12:22, 13:25, 19:3, 22:24, 29:7, 39:1, 39:8, 39:11, 46:5, 48:20, 52:21, 54:18, 70:9, 70:25, 71:2, 71:6, 72:24, 95:21, 101:3, 109:4, 112:25, 120:24, 127:4, 127:5, 133:21
**company's** [1] - 40:4
**compare** [3] - 24:4, 24:5, 136:8
**compared** [2] - 13:8, 39:20
**competent** [1] - 130:20
**competitor** [1] - 114:25
**competitors** [1] - 114:24
**complain** [2] - 10:12, 25:5
**complained** [4] - 10:15, 29:23, 64:18, 73:10
**complaining** [7] - 12:4, 12:7, 31:23, 107:12, 116:24, 119:7, 126:6
**complaint** [3] - 17:18, 25:13, 42:13
**complaints** [10] - 12:8, 21:22, 33:24, 34:2, 34:8, 42:18, 43:10, 116:21, 119:25, 134:19
**complete** [5] - 40:10, 100:7, 103:15, 103:20, 130:18
**completely** [3] - 68:18, 127:24, 129:14
**compliance** [56] - 7:25, 8:5, 8:7, 8:8, 8:11, 14:23, 22:23, 23:2, 23:16, 28:19, 31:12, 33:13, 37:17, 39:18, 49:25, 52:12, 53:13, 53:23, 53:24, 54:9, 54:10, 54:21, 55:3, 55:7, 68:22, 68:24, 69:15, 69:16, 70:2, 70:8, 70:10, 70:13, 70:18, 70:19, 71:25, 73:20, 104:18, 105:9, 111:8, 111:10, 119:10, 120:14, 120:22, 120:23, 120:24, 121:1, 121:8, 121:9, 122:17, 122:18, 123:13, 125:15, 131:22, 132:5, 133:8
**Compliance** [1] - 111:7
**compliant** [1] - 22:24
**comply** [1] - 69:22
**compromised** [2] - 29:11, 29:13
**computer** [7] - 49:24, 49:25, 50:2, 60:4, 60:5, 70:3, 70:10
**con** [3] - 95:18, 113:11, 113:21
**conceal** [2] - 124:9, 130:5
**concealed** [1] - 53:7
**concealing** [2] - 17:6, 17:12
**concealment** [1] - 53:9
**conceals** [1] - 44:17
**concede** [2] - 5:9, 81:24
**concept** [1] - 100:3
**concepts** [5] - 82:14, 82:21, 84:15, 85:1, 85:10
**concern** [1] - 112:13
**concerned** [2] - 14:23, 136:3
**concerning** [7] - 75:2, 89:4, 89:11, 98:15, 102:17, 105:23, 108:3
**concerns** [4] - 24:15, 31:8, 120:17, 122:18
**condition** [2] - 6:24, 13:24
**conduct** [3] - 8:13, 47:3, 95:3
**conducting** [1] - 20:16
**confer** [1] - 141:7
**conference** [1] - 105:23
**conferred** [1] - 4:1
**conferring** [1] - 4:2
**confirmed** [2] - 69:2, 121:25
**confirming** [1] - 38:14
**confirms** [6] - 30:12, 34:6, 37:12, 117:19, 117:20, 117:21
**Conger** [3] - 16:4, 46:7, 79:11
**conjunction** [1] - 132:23
**connection** [1] - 95:13
**connections** [1] - 101:25
**consciousness** [1] - 23:7
**consequences** [6] - 12:11, 13:1, 13:4, 15:18, 21:12, 46:16
**consider** [4] - 75:24, 89:12, 118:17, 132:23
**considered** [3] - 75:6, 84:10, 130:20
**considering** [2] - 75:25, 92:13
**considers** [1] - 115:9
**consistent** [5] - 10:2, 42:22, 94:17, 120:10, 132:13
**conspiracy** [24] - 7:14, 7:17, 7:18, 10:16, 15:4, 16:6, 16:7, 16:11, 18:1, 18:4, 42:5, 43:22, 45:10, 52:25, 54:5, 54:19, 55:21, 56:3, 74:10, 111:23, 122:22, 123:9, 128:25, 129:1
**conspirators** [1] - 18:13
**conspired** [5] - 4:19, 44:2, 44:3, 44:6, 55:23
**conspiring** [2] - 53:6, 72:20
**constant** [1] - 11:10
**constitute** [2] - 17:2, 100:19
**consultant** [2] - 79:1, 101:18
**consultants** [4] - 73:20, 78:25, 79:1, 79:2
**consulted** [1] - 130:17
**consulting** [1] - 124:20
**consumers** [1] - 124:6
**contact** [4] - 43:6, 91:13, 94:24, 101:22
**contacted** [2] - 42:15, 73:23
**contacting** [2] - 73:22, 102:16
**contacts** [1] - 26:2
**contained** [3] - 35:23, 45:23, 51:20
**containing** [2] - 41:8, 134:4
**contains** [2] - 41:10, 134:6
**contaminated** [1] - 13:9
**contamination** [1] - 13:11
**context** [2] - 13:17, 17:7
**continue** [8] - 36:13, 39:4, 45:20, 59:15, 98:3, 98:4, 106:15, 111:18
**continued** [2] - 28:16, 137:21
**continues** [2] - 34:5, 37:17
**continuing** [2] - 128:5
**continuously** [1] - 119:13
**contract** [1] - 19:8
**contrary** [2] - 129:19, 129:20
**control** [4] - 12:8, 12:9, 91:23, 91:24
**convenient** [1] - 95:1
**conversation** [4] - 53:2, 57:4, 109:12, 109:18
**conversations** [1] - 127:7
**convict** [5] - 47:1, 53:5, 85:7, 89:9, 94:12
**convicted** [3] - 71:20, 84:19
**convictions** [1] - 87:18
**convince** [4] - 65:15, 95:11, 96:6
**convinced** [6] - 75:20, 76:12, 76:13, 86:23, 86:25, 90:11
**convincing** [2] - 75:8, 86:20
**cool** [1] - 126:9
**cooperate** [2] - 63:21, 72:16
**Cooperative** [1] - 32:24
**copies** [1] - 140:4
**copy** [5] - 140:11, 140:18, 141:11, 141:12
**copying** [1] - 134:24
**cordial** [1] - 132:16
**correct** [6] - 66:9, 66:20, 68:22, 69:4, 103:4, 138:14
**corrected** [2] - 104:4, 104:10
**corrections** [1] - 4:8
**corrective** [1] - 119:11
**correctly** [1] - 69:15
**corroborate** [2] - 88:3, 136:22
**corroborated** [6] - 28:11, 63:7, 116:2, 116:15, 117:13, 136:16
**corrupt** [1] - 133:22
**cost** [1] - 48:25
**costly** [1] - 71:4
**costs** [1] - 113:10
**couch** [1] - 59:9
**counsel** [7] - 3:3, 5:9, 36:22, 81:14, 81:24, 109:12, 141:13
**Count** [7] - 4:18, 16:9, 21:17, 45:11, 124:4, 124:5, 128:23
**count** [8] - 17:7, 42:2, 85:5, 85:20, 100:8, 114:18, 128:23
**counterfeit** [4] - 37:13, 124:1, 124:3, 136:9
**counting** [1] - 137:8
**country** [5] - 9:2, 23:23, 84:16, 95:7, 115:6
**counts** [8] - 4:17, 7:13, 16:6, 16:7, 16:12, 43:21, 85:11, 132:14
**couple** [5] - 3:7, 4:13, 87:2, 95:15, 122:18
**courier** [1] - 127:17
**course** [19] - 11:24, 15:4, 38:10, 44:6, 47:20, 52:18, 56:15, 59:24, 98:16,

103:13, 106:8, 112:22, 114:2, 114:4, 115:25, 126:22, 136:12, 139:12
**court** [1] - 141:15
**COURT** [46] - 1:1, 3:3, 3:11, 3:14, 3:23, 4:5, 4:8, 4:13, 4:22, 4:25, 5:6, 5:9, 5:14, 40:11, 47:7, 48:2, 48:8, 65:2, 74:21, 81:2, 81:7, 81:9, 81:11, 81:14, 81:21, 81:24, 82:4, 87:20, 97:15, 110:20, 115:15, 130:22, 134:20, 138:1, 138:9, 138:16, 138:20, 138:25, 139:8, 139:14, 139:25, 140:13, 140:21, 141:14, 141:21, 142:1
**Court** [10] - 2:3, 2:4, 3:1, 3:5, 3:12, 81:10, 81:16, 82:8, 142:15, 142:16
**Court's** [1] - 3:12
**courthouse** [1] - 90:22
**COURTROOM** [1] - 138:7
**cover** [2] - 17:15, 137:12
**cover-up** [1] - 17:15
**coverage** [1] - 56:5
**covered** [9] - 26:24, 30:16, 30:24, 38:22, 47:23, 121:3, 121:4, 123:24, 136:11
**covering** [1] - 26:14
**coverup** [1] - 46:1
**COVID** [7] - 21:24, 22:11, 22:12, 56:17, 58:19, 126:10, 134:15
**COVID-2019** [1] - 118:3
**craft** [1] - 42:5
**crap** [1] - 134:18
**crazy** [1] - 116:21
**create** [7] - 13:13, 17:5, 33:2, 61:22, 94:20, 122:15, 131:14
**created** [3] - 49:20, 83:17, 117:10
**creating** [2] - 99:11, 99:19
**credibility** [4] - 88:6, 89:4, 89:11, 92:25
**credible** [4] - 94:17, 120:9, 134:1
**credit** [1] - 113:13
**crew** [1] - 137:8
**crime** [15] - 13:4, 56:22, 60:18, 60:22, 60:23, 60:25, 65:17, 68:25, 74:2, 86:2, 86:3, 86:4, 86:12, 86:14, 135:11
**crimes** [8] - 4:17, 18:15, 53:10, 59:6, 71:7, 85:2, 130:6, 137:17
**criminal** [24] - 7:8, 12:11, 18:2, 21:11, 31:2, 54:10, 56:21, 59:23, 60:19, 64:14, 64:15, 68:24, 70:17, 71:14, 72:8, 72:9, 72:14, 73:14, 75:21, 95:3, 110:16, 116:5, 119:8
**criminal's** [1] - 72:14
**criminals** [12] - 8:4, 8:10, 56:7, 71:6, 71:23, 72:9, 72:18, 72:19, 73:11, 113:23, 130:5
**criticizing** [1] - 40:7
**cross** [5] - 15:15, 47:13, 76:9, 102:22, 124:24
**cross-examination** [1] - 102:22
**cross-examined** [3] - 15:15, 76:9, 124:24
**customer** [11] - 10:12, 17:17, 21:22, 31:18, 31:19, 34:8, 35:19, 125:24, 126:5, 126:11, 134:19
**customer's** [1] - 123:5
**customers** [20] - 7:23, 10:15, 12:4, 12:6, 17:14, 25:5, 29:23, 31:23, 35:12, 35:15, 45:8, 47:22, 100:24, 111:17, 116:23, 123:16, 125:22, 130:13, 131:2
**cut** [4] - 10:25, 29:22, 72:10, 98:1

**D**

**daily** [2] - 66:12, 66:13
**damaged** [1] - 26:16
**Dan** [1] - 46:7
**danger** [1] - 112:12
**Daniel** [2] - 16:4, 79:10
**darn** [1] - 127:14
**DATE** [1] - 142:14
**date** [1] - 43:20
**dated** [1] - 23:9
**dates** [4] - 11:2, 25:18, 134:15, 134:16
**days** [5] - 24:23, 37:2, 102:4, 114:22, 136:13
**DEA** [3] - 22:25, 70:6, 73:19
**deal** [5] - 90:20, 96:6, 97:25, 113:16, 113:17
**Deal** [1] - 59:25
**dealers** [1] - 56:4
**dealing** [5] - 49:4, 66:9, 113:21, 122:3
**dealings** [1] - 120:25
**decade** [1] - 90:21
**deceit** [3] - 42:5, 65:9, 71:15
**deceive** [5] - 17:4, 55:14, 76:20, 85:15, 100:20
**deceived** [7] - 55:11, 55:13, 56:23, 74:15
**deceives** [1] - 55:17
**Deceiving** [1] - 44:13
**deceiving** [1] - 74:14
**deception** [2] - 7:21, 59:15
**decide** [3] - 89:15, 89:23, 96:17
**decided** [4] - 51:14, 94:3, 108:7, 114:22
**decision** [9] - 17:24, 75:17, 84:9, 87:12, 87:13, 89:17, 110:19, 123:23, 132:12
**decisions** [4] - 12:9, 14:12, 53:13, 117:11
**declined** [1] - 42:13
**defendant** [14] - 8:11, 16:12, 36:10, 41:6, 41:8, 68:21, 86:23, 100:10, 100:20, 100:21, 123:6, 124:14, 128:24, 129:2
**DEFENDANT** [2] - 1:17, 1:21
**defendant's** [4] - 15:20, 74:25, 75:2, 124:13
**defendants** [41] - 3:4, 4:18, 6:23, 7:16, 8:15, 9:12, 9:22, 10:19, 13:4, 13:13, 13:25, 15:1, 15:4, 17:2, 17:11, 18:6, 19:25, 21:6, 23:20, 23:22, 25:1, 26:19, 28:15, 30:1, 30:8, 30:14, 37:24, 38:4, 38:19, 41:3, 46:20, 47:2, 81:15, 118:7, 122:7, 122:11, 123:3, 129:7, 131:21, 135:18, 137:16
**Defendants** [1] - 1:8
**defendants'** [2] - 8:2, 11:12
**defending** [5] - 9:4, 118:4, 118:24, 122:19, 132:1
**defense** [26] - 12:16, 36:21, 38:3, 68:17, 76:10, 100:6, 100:7, 115:20, 120:12, 121:12, 123:10, 124:20, 124:25, 125:6, 126:3, 128:9, 132:15, 133:3, 138:14, 139:22, 140:1, 140:22, 140:23, 141:8, 141:13, 141:19
**defenses** [2] - 29:6, 133:16
**defies** [1] - 54:13
**definitions** [1] - 16:17
**defraud** [15] - 4:20, 7:15, 17:3, 21:18, 42:5, 85:13, 85:14, 86:6, 86:9, 100:9, 100:11, 102:16, 104:13, 109:2, 114:4
**defrauding** [2] - 45:7, 109:4
**delete** [3] - 72:10, 72:11, 73:2
**deleted** [4] - 73:4, 118:24
**deliberate** [4] - 21:20, 41:7, 99:22, 131:19
**deliberately** [2] - 41:9, 134:5
**deliberation** [1] - 115:13
**deliberations** [3] - 84:10, 106:5, 114:19
**delivered** [2] - 28:22, 96:23
**delivering** [3] - 44:14, 47:12, 64:16
**delivery** [1] - 97:20
**demand** [3] - 43:13, 109:6
**demonstrative** [3] - 4:5, 139:15, 139:16
**demonstratives** [2] - 4:1, 4:2
**denied** [1] - 140:9
**deny** [3] - 41:10, 111:11, 134:6
**Department** [1] - 79:23
**department** [5] - 7:25, 8:5, 73:20, 104:18, 132:5
**DEPUTY** [1] - 138:7
**DerOvanesian** [2] - 1:13, 8:20
**DEROVANESIAN** [7] - 139:11, 139:16, 139:19, 141:7, 141:17, 141:23, 141:25
**describe** [1] - 87:10
**described** [2] - 29:6, 46:20
**describes** [3] - 23:20, 23:21, 24:9
**description** [2] - 19:4, 38:18
**desk** [1] - 50:3
**despite** [2] - 115:19, 128:12
**destroyed** [1] - 115:1
**detail** [1] - 7:19
**details** [2] - 18:12, 123:8
**determination** [1] - 112:5
**determine** [1] - 24:3
**devastating** [3] - 51:2, 67:18
**Dhruv** [1] - 76:23
**diaper** [6] - 10:10, 24:23, 27:19, 64:1, 64:3, 137:3
**dictionary** [1] - 91:25
**dies** [1] - 107:1
**differ** [1] - 94:13
**difference** [1] - 112:9
**different** [24] - 6:12, 8:13, 8:18, 36:11, 37:9, 41:13, 41:15, 42:17, 44:14, 47:12, 48:20, 50:5, 66:24, 67:22, 70:25, 77:1, 78:17, 94:16, 103:22, 109:9,

122:23, 126:6, 132:20
**difficult** [3] - 82:14, 82:20
**diligence** [2] - 31:18, 128:13
**DIMITROULEAS** [1] - 1:10
**Dimitrouleas** [8] - 2:3, 83:1, 83:25, 84:4, 84:21, 84:23, 89:3, 89:10
**dire** [1] - 76:4
**direct** [3] - 30:6, 96:10, 122:20
**directed** [1] - 94:20
**directive** [1] - 31:7
**directly** [5] - 28:22, 60:4, 93:12, 120:1, 123:6
**director** [14] - 8:7, 8:8, 14:23, 31:12, 52:13, 68:22, 105:9, 120:14, 120:22, 120:23, 120:25, 121:9, 123:12, 131:22
**dirt** [1] - 13:23
**dirty** [8] - 8:25, 21:21, 27:20, 27:23, 27:24, 116:22, 117:7, 118:12
**disappear** [1] - 11:8
**disappeared** [1] - 119:5
**disbelieve** [3] - 89:17, 90:4, 90:5
**disclosed** [1] - 121:7
**discover** [1] - 68:25
**discovered** [1] - 25:17
**discrimination** [1] - 108:15
**discuss** [6] - 5:15, 32:14, 81:4, 82:5, 129:14, 138:3
**discussed** [5] - 5:15, 21:18, 81:5, 82:5, 138:4
**discussing** [2] - 19:14, 121:17
**discussion** [1] - 83:6
**disobey** [1] - 85:19
**dispensed** [6] - 10:13, 16:2, 26:13, 26:23, 45:5, 116:22
**dispute** [1] - 9:4
**disregard** [2] - 85:19, 119:13
**disregarded** [1] - 120:19
**distribute** [2] - 8:24, 124:2
**distributed** [3] - 6:17, 8:21, 10:15
**distributing** [1] - 124:1
**distribution** [1] - 95:6
**distributor** [10] - 20:18, 20:25, 25:14, 25:15, 25:19, 39:24, 61:6, 61:17, 108:24, 128:17
**Distributor** [1] - 26:4
**distributors** [2] - 20:24, 23:25
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [3] - 2:4, 142:16, 142:16
**diversion** [1] - 13:21
**diverted** [8] - 8:25, 13:22, 13:23, 23:22, 25:8, 45:14, 46:24, 124:2
**diverters** [1] - 23:24
**divide** [1] - 5:22
**divided** [1] - 95:22
**Divilio** [60] - 11:7, 11:24, 12:7, 13:16, 14:4, 26:1, 26:9, 30:5, 30:15, 31:4, 33:23, 33:25, 34:23, 38:11, 38:13, 38:18, 40:2, 40:15, 42:10, 42:11, 42:22, 43:8, 46:20, 48:22, 50:22, 51:13, 52:11, 52:22, 53:17, 54:17, 54:25, 56:12, 56:21, 56:25, 57:6, 58:16, 73:23, 78:13, 97:1, 98:21, 99:16, 99:25, 100:25, 101:2, 101:8, 101:15, 102:4, 102:7, 103:16, 104:24, 105:7, 117:25, 121:23, 124:19, 124:23, 128:11, 128:19, 129:8, 136:7
**Divilio's** [4] - 21:15, 29:17, 53:18, 69:6
**DIVISION** [1] - 1:2
**Dix** [1] - 91:6
**DMS** [1] - 20:13
**doctor** [1] - 87:15
**doctorate** [1] - 52:2
**document** [14] - 14:17, 27:13, 31:5, 31:8, 61:2, 70:22, 80:5, 95:20, 110:9, 117:14, 119:10, 136:23, 137:1, 137:7
**documentary** [1] - 12:25
**documentation** [7] - 7:18, 43:23, 44:8, 129:2, 129:3
**documented** [1] - 105:19
**documenting** [1] - 120:15
**documents** [33] - 7:11, 11:14, 13:5, 14:19, 15:25, 16:25, 17:13, 20:2, 23:9, 30:19, 33:22, 35:10, 36:6, 37:18, 41:13, 46:11, 46:14, 62:22, 77:18, 99:24, 107:7, 107:15, 110:25, 116:14, 116:16, 119:6, 120:10, 122:13, 124:10, 128:14, 135:12, 136:4, 136:22
**dollars** [2] - 28:5, 77:16
**dollars'** [1] - 28:9
**done** [21] - 29:4, 71:13, 71:14, 71:23, 75:12, 75:23, 83:14, 98:15, 102:1, 102:12, 104:6, 104:13, 110:2, 111:17, 112:15, 112:21, 112:22, 114:19, 115:3, 123:14
**doubt** [38] - 47:2, 51:12, 68:15, 74:20, 74:23, 74:25, 75:1, 75:2, 75:3, 75:8, 75:16, 75:19, 75:25, 76:11, 77:3, 78:9, 79:9, 80:1, 80:15, 80:20, 80:22, 80:23, 80:24, 84:11, 84:13, 85:7, 85:8, 86:13, 86:15, 86:19, 86:24, 100:12, 108:6, 114:9, 114:16, 121:11, 132:14, 137:16
**down** [14] - 7:20, 10:7, 15:19, 21:24, 62:14, 70:11, 104:14, 111:7, 114:23, 115:9, 118:2, 133:10, 134:14
**download** [1] - 49:24
**drafts** [1] - 109:7
**dragged** [2] - 119:15, 120:19
**drawing** [1] - 79:15
**drawn** [1] - 128:7
**draws** [1] - 58:10
**dreadful** [2] - 46:6, 136:1
**Dresser** [1] - 79:7
**drive** [1] - 57:19
**driven** [1] - 127:21
**driver** [1] - 127:17
**driving** [2] - 57:18, 127:18
**Drogueria** [1] - 18:22
**drop** [1] - 73:6
**dropped** [2] - 72:21, 108:13
**Drug** [5] - 34:14, 34:18, 35:13, 117:21, 125:24
**drug** [12] - 12:20, 15:12, 16:19, 17:1, 20:8, 25:8, 34:11, 41:17, 45:4, 121:24, 135:13, 136:9
**drug's** [1] - 16:23
**Drugs** [2] - 15:14, 30:11
**drugs** [124] - 4:20, 6:18, 6:25, 7:4, 7:5, 7:14, 7:15, 7:16, 8:21, 9:1, 9:7, 9:9, 9:10, 9:12, 9:15, 9:19, 9:23, 9:25, 10:3, 10:5, 11:3, 11:4, 11:14, 11:16, 12:1, 12:14, 13:2, 13:14, 13:18, 13:22, 14:1, 14:15, 14:25, 16:1, 16:15, 17:1, 17:12, 18:18, 18:21, 19:22, 21:21, 21:24, 23:13, 23:22, 24:1, 24:3, 24:18, 25:3, 25:10, 26:18, 27:3, 27:11, 27:16, 28:9, 28:17, 28:20, 28:22, 29:23, 29:24, 31:21, 33:6, 37:13, 37:24, 38:16, 40:21, 41:9, 41:10, 41:12, 41:15, 41:16, 41:22, 44:5, 44:18, 45:1, 45:14, 46:24, 54:6, 54:20, 57:5, 86:5, 86:6, 88:13, 90:16, 91:17, 95:8, 96:2, 100:25, 108:3, 111:25, 112:6, 113:1, 113:6, 113:10, 113:14, 117:8, 118:8, 118:14, 120:5, 120:7, 123:1, 123:21, 123:22, 124:1, 124:3, 124:8, 126:18, 126:19, 127:15, 127:18, 127:23, 128:7, 130:14, 133:12, 134:4, 134:6, 134:7, 134:10, 134:17, 134:18, 135:19
**due** [2] - 31:18, 128:12
**dumb** [1] - 90:24
**dumped** [1] - 28:12
**duped** [11] - 55:8, 55:9, 55:11, 61:1, 122:12, 128:13, 128:15, 128:20, 131:8, 133:17, 133:23
**duping** [1] - 122:7
**during** [14] - 4:3, 6:10, 6:11, 9:14, 12:15, 15:4, 19:7, 21:24, 32:20, 56:17, 70:22, 84:10, 97:15, 118:3

## E

**e-Pharm/alert** [1] - 43:12
**Eagle** [2] - 24:9, 121:23
**early** [4] - 10:16, 72:17, 90:9, 141:25
**easier** [1] - 139:9
**easiest** [1] - 141:9
**Easton** [1] - 67:1
**easy** [1] - 39:20
**Eberspacher** [6] - 12:20, 14:18, 29:25, 31:3, 127:13, 136:16
**Ecuador** [2] - 15:10, 46:17
**Eddie** [1] - 79:10
**Edel** [1] - 21:2
**eff** [2] - 74:11, 136:19
**effect** [1] - 42:19
**effectively** [1] - 44:17
**efficient** [1] - 137:12
**effort** [1] - 119:16
**efforts** [1] - 128:13
**eight** [5] - 4:16, 7:13, 85:2, 114:10
**either** [2] - 111:11, 141:11
**electronic** [13] - 3:10,

3:13, 3:14, 3:15, 123:2, 139:4, 139:7, 139:10, 139:12, 139:14, 140:11, 140:18, 141:12
**electronically** [3] - 3:20, 140:16, 141:10
**electronics** [2] - 140:14, 140:15
**element** [1] - 128:24
**elements** [3] - 8:14, 85:4, 85:5
**eleven** [1] - 137:22
**eliminate** [2] - 96:14, 139:9
**email** [22] - 12:10, 12:11, 20:12, 21:4, 31:1, 31:12, 33:18, 38:19, 38:23, 40:3, 40:5, 41:25, 53:3, 63:12, 101:19, 101:20, 104:6, 105:13, 107:20, 108:22, 123:5, 123:6
**emailing** [1] - 33:13
**emails** [23] - 6:14, 14:8, 14:10, 20:11, 30:7, 62:24, 72:11, 72:23, 73:2, 73:4, 73:15, 101:17, 116:3, 116:11, 116:12, 116:14, 121:6, 122:18, 124:17, 128:19, 131:9, 132:9, 132:10
**emoji** [1] - 133:19
**emotions** [1] - 64:6
**employees** [14] - 6:20, 7:24, 14:4, 20:7, 47:24, 62:23, 63:1, 121:19, 130:11, 130:12, 131:21, 132:5, 133:7, 133:8
**employer** [1] - 31:1
**encrypted** [2] - 73:6, 118:25
**end** [11] - 9:6, 9:11, 14:8, 28:16, 77:21, 97:1, 112:19, 114:20, 116:17, 117:2, 118:6
**ended** [2] - 118:9, 118:14
**ends** [3] - 108:3, 112:19, 112:20
**endured** [1] - 82:12
**engaged** [1] - 10:20
**English** [1] - 93:15
**ensure** [2] - 12:23, 35:14
**entered** [1] - 55:21
**entering** [1] - 98:14
**enterprise** [5] - 70:17, 71:15, 72:8, 72:9, 75:21
**enters** [2] - 5:8, 81:23
**Entin** [1] - 142:14
**ENTIN** [2] - 2:2, 142:15
**entire** [6] - 55:10, 71:6, 83:23, 99:21, 130:25
**entities** [1] - 17:8
**entitled** [2] - 5:22, 142:12
**entity** [1] - 133:5
**equal** [1] - 5:21
**equally** [1] - 60:20
**equivalence** [1] - 134:3
**equivalent** [1] - 41:5
**error** [1] - 100:16
**errors** [1] - 71:4
**especially** [2] - 90:5, 92:16
**Esquire** [5] - 1:13, 1:14, 1:17, 1:18, 1:21
**essential** [2] - 85:4, 85:5
**essentially** [1] - 8:8
**establish** [1] - 100:17
**established** [1] - 60:15
**establishes** [1] - 137:7
**et** [1] - 19:16
**evade** [1] - 93:18
**evaluate** [2] - 90:25, 98:5
**Eve** [1] - 91:15
**evening** [2] - 138:3, 138:6
**eventually** [1] - 122:17
**everywhere** [2] - 46:22, 132:3
**evidence** [74] - 5:19, 6:8, 6:12, 6:13, 6:19, 7:11, 17:10, 24:5, 29:18, 29:19, 36:2, 38:6, 44:1, 46:15, 47:1, 48:13, 49:11, 49:16, 50:6, 50:15, 50:18, 52:7, 53:1, 53:25, 54:24, 61:12, 64:8, 69:18, 69:24, 70:1, 71:16, 72:1, 73:3, 75:6, 75:23, 77:19, 78:22, 79:9, 80:2, 84:6, 88:14, 88:21, 89:12, 89:13, 94:14, 95:20, 98:10, 100:16, 102:9, 103:13, 107:9, 110:7, 114:7, 118:17, 118:22, 119:24, 120:21, 121:17, 123:21, 124:16, 124:21, 129:6, 130:17, 131:20, 132:7, 132:13, 132:22, 135:3, 137:5, 137:14, 137:20, 141:4
**exact** [5] - 10:19, 13:4, 25:19, 97:6, 123:20
**exactly** [13] - 10:3, 12:24, 21:16, 23:21, 28:2, 28:14, 90:25, 91:22, 93:17, 95:18, 116:8, 134:2, 140:19
**examination** [1] - 102:22
**examined** [3] - 15:15, 76:9, 124:24
**example** [6] - 25:10, 27:20, 45:13, 111:22, 134:22
**examples** [2] - 41:13, 87:1
**excellent** [1] - 64:4
**except** [4] - 38:9, 40:13, 46:22, 109:25
**exception** [2] - 139:12, 140:11
**exchanged** [2] - 53:2, 91:14
**exchanging** [1] - 120:2
**excited** [1] - 140:3
**exciting** [1] - 95:4
**exclude** [1] - 75:1
**excuse** [9] - 85:24, 86:5, 89:22, 90:15, 102:24, 107:3, 108:9, 109:13, 120:18
**excuses** [1] - 60:11
**execution** [1] - 45:12
**Exhibit** [4] - 23:4, 109:8, 111:7, 141:3
**exhibit** [15] - 11:18, 11:22, 13:19, 33:19, 35:8, 45:17, 105:19, 128:9, 139:6, 139:13, 140:4, 140:11, 140:12, 141:12
**exhibits** [25] - 3:10, 3:21, 21:22, 22:4, 29:19, 118:18, 132:8, 138:10, 138:11, 138:13, 138:14, 139:1, 139:3, 139:9, 139:10, 139:12, 139:20, 139:22, 139:23, 140:1, 140:2, 140:7, 140:22, 140:23, 141:10
**existed** [2] - 41:7, 110:8
**exists** [1] - 12:24
**exits** [2] - 81:8, 138:8
**expect** [4] - 16:7, 38:3, 41:2, 130:15
**expenses** [1] - 95:25
**experience** [8] - 6:23, 12:22, 13:8, 19:12, 22:19, 23:2, 42:22, 131:12
**experienced** [1] - 92:21
**expired** [1] - 118:10
**explain** [2] - 7:19, 26:3
**explained** [2] - 57:4, 72:5
**explaining** [2] - 13:21, 26:22
**explanation** [1] - 22:13
**exposed** [1] - 113:14
**exposure** [2] - 38:21, 95:3
**expression** [1] - 92:19
**extensive** [1] - 128:12
**eye** [1] - 57:23
**eyes** [2] - 58:1, 60:21

## F

**facade** [3] - 8:11, 121:2, 121:3
**face** [1] - 31:25
**Facebook** [1] - 15:20
**faced** [1] - 123:23
**facially** [1] - 32:21
**facility** [1] - 33:14
**fact** [22] - 7:3, 8:23, 10:9, 41:7, 42:20, 44:18, 44:19, 52:10, 53:12, 58:13, 62:9, 64:7, 66:11, 66:22, 72:6, 78:14, 83:24, 86:8, 91:6, 91:19, 106:9, 124:7
**fact-finders** [1] - 83:24
**factor** [1] - 96:14
**facts** [24] - 7:21, 17:6, 17:12, 82:14, 83:25, 86:11, 88:25, 89:1, 92:15, 94:9, 94:11, 96:12, 96:18, 106:20, 106:24, 110:18, 115:4, 115:9, 121:7, 124:15, 130:4, 130:19
**failed** [5] - 71:3, 75:22, 114:9, 114:17
**failure** [1] - 84:12
**fair** [6] - 66:6, 66:14, 84:3, 112:17, 120:4, 140:17
**faith** [39] - 52:21, 52:22, 65:23, 69:8, 69:12, 69:13, 69:18, 69:19, 69:25, 71:16, 72:1, 73:1, 80:14, 98:13, 99:12, 100:6, 100:10, 100:19, 103:14, 105:8, 111:22, 113:25, 123:10, 123:11, 123:12, 123:13, 123:14, 123:15, 123:16, 123:17, 125:6, 125:23, 130:2, 130:17, 130:18, 135:11, 135:14
**fake** [11] - 20:12, 50:13, 54:20, 56:1, 56:5, 60:2, 70:14, 70:16
**fall** [3] - 65:18, 65:21, 110:3
**false** [40] - 7:17, 13:1, 13:15, 16:23, 17:6, 24:2, 30:12, 32:21, 34:6, 40:1, 41:4, 41:22, 42:4, 42:11, 43:17, 43:18, 43:19, 43:23, 44:8, 44:16, 45:22, 45:23, 50:10, 94:20, 100:21, 101:7, 102:14, 103:5, 103:25, 104:25, 117:11, 117:19, 117:20, 117:21, 124:9, 128:18, 129:2, 129:7, 131:6, 136:7
**falsely** [2] - 44:2, 129:4
**falsified** [10] - 13:12, 14:9, 18:20, 37:13, 38:24, 41:19,

118:21, 121:25, 123:5, 128:14
**falsify** [2] - 54:6, 124:10
**familiar** [1] - 78:11
**families** [1] - 80:25
**far** [7] - 27:19, 31:1, 82:23, 83:3, 83:7, 137:11
**fast** [2] - 22:9, 48:11
**fast-moving** [1] - 22:9
**father** [4] - 57:18, 57:24, 58:2
**fault** [6] - 55:7, 56:23, 78:10, 135:16, 135:17
**favors** [1] - 56:7
**FBI** [2] - 77:8, 79:22
**FCR** [1] - 142:15
**FDA** [20] - 4:20, 7:15, 8:1, 17:15, 20:13, 21:18, 22:25, 39:10, 42:5, 42:12, 43:6, 43:14, 46:21, 51:24, 109:10, 109:15, 129:10, 135:24, 136:2, 136:3
**fear** [3] - 72:14, 112:13
**fears** [1] - 128:12
**February** [2] - 41:1, 43:5
**Federal** [1] - 1:22
**federal** [3] - 22:22, 22:25, 124:25
**feds** [2] - 72:16, 127:3
**feelings** [1] - 80:16
**fell** [4] - 64:21, 64:22, 65:16
**felt** [7] - 8:9, 14:7, 67:24, 119:14, 119:17, 130:10
**few** [7] - 7:20, 9:3, 20:23, 25:25, 87:1, 89:24, 136:6
**field** [2] - 12:7, 97:12
**fifty** [2] - 62:22, 123:4
**figure** [6] - 13:10, 57:14, 79:13, 136:19, 140:14, 141:4
**figuring** [1] - 79:15
**file** [10] - 42:8, 51:14, 51:16, 52:4, 52:16, 106:3, 106:4, 106:6, 106:7, 136:11
**filed** [2] - 42:12, 110:5
**files** [1] - 109:13
**filing** [1] - 43:13
**Fill** [1] - 34:19
**filled** [2] - 42:7, 109:10
**final** [3] - 65:9, 75:24, 80:1
**finally** [5] - 26:2, 54:25, 74:6, 94:13, 128:18
**finances** [1] - 14:16
**financial** [1] - 39:19
**financials** [2] - 19:1, 77:9
**finders** [1] - 83:24
**fine** [2] - 104:15, 125:20
**finger** [1] - 121:22
**fired** [2] - 108:14, 108:15
**first** [19] - 14:9, 20:19, 38:25, 39:14, 42:7, 43:21, 48:17, 53:19, 55:17, 62:8, 66:2, 70:1, 93:16, 98:18, 98:23, 111:20, 121:25, 128:16, 135:13
**five** [12] - 35:11, 36:25, 50:21, 53:18, 82:12, 97:6, 98:20, 103:10, 119:17, 133:18, 134:20, 136:13
**five-minute** [1] - 35:11
**fix** [4] - 33:16, 33:18, 59:24, 136:19
**Fl** [1] - 1:22
**flag** [2] - 7:3, 120:17
**flagged** [1] - 135:21
**flags** [2] - 24:20, 28:19
**Flores** [1] - 1:18
**FLORIDA** [1] - 1:1
**Florida** [11] - 1:4, 1:16, 1:19, 1:22, 42:1, 42:3, 43:17, 45:17, 45:23, 57:18, 142:16
**flowing** [2] - 34:6, 36:4
**fluid** [3] - 58:22, 59:10, 59:15
**fly** [1] - 91:6
**flying** [1] - 58:8
**focus** [7] - 7:10, 18:10, 116:2, 116:15, 121:14
**foil** [4] - 25:8, 26:5, 41:17, 78:21
**folded** [1] - 83:20
**follow** [14] - 5:14, 29:25, 30:2, 31:7, 31:9, 46:2, 71:4, 71:13, 77:25, 80:13, 82:4, 87:24, 100:4, 135:25
**Follow** [1] - 77:6
**followed** [2] - 29:8, 51:23
**following** [4] - 30:24, 71:4, 71:7, 81:13
**follows** [1] - 38:10
**foolish** [1] - 60:23
**FOR** [3] - 1:13, 1:17, 1:21
**forbids** [1] - 85:18
**forcing** [1] - 68:7
**foregoing** [1] - 142:10
**forensic** [3] - 77:7, 77:16, 77:23
**forget** [2] - 64:7, 97:6
**forgive** [1] - 60:24
**form** [10] - 25:21, 42:7, 42:9, 42:12, 51:16, 85:2, 109:10, 109:15, 110:3, 139:22
**formed** [1] - 100:13
**former** [6] - 6:22, 14:3, 59:6, 121:19, 133:7, 133:8
**forms** [1] - 77:20
**FORT** [1] - 1:2
**Fort** [3] - 1:4, 1:22, 91:6
**forth** [2] - 80:19, 118:21
**forty** [1] - 62:22
**forward** [8] - 23:18, 30:8, 37:5, 40:9, 88:1, 95:12, 105:12, 107:2
**forwarded** [1] - 38:19
**forwards** [2] - 24:8, 30:13
**four** [6] - 39:20, 77:1, 97:6, 98:20, 128:3, 136:12
**fourth** [1] - 128:24
**FPR** [1] - 2:2
**frank** [1] - 127:7
**fraud** [11] - 7:18, 44:12, 45:7, 45:10, 45:12, 59:20, 74:16, 85:15, 90:21
**fraudster** [1] - 109:2
**fraudsters** [1] - 65:18
**fraudulent** [4] - 44:17, 100:14, 100:17, 100:22
**freak** [1] - 91:24
**free** [1] - 25:12
**fricking** [1] - 26:11
**Frier** [15] - 79:3, 79:5, 79:6, 98:2, 98:3, 98:8, 98:11, 98:19, 99:25, 102:16, 105:22, 106:4, 108:16, 124:22, 130:8
**front** [1] - 120:16
**full** [7] - 60:2, 92:14, 115:19, 121:7, 123:18, 130:18, 137:3
**fully** [2] - 38:18, 115:9
**funds** [1] - 53:9

## G

**game** [1] - 72:18
**Garrett** [1] - 76:23
**gatekeeper** [1] - 117:10
**gatekeepers** [1] - 84:18
**generally** [1] - 18:1
**generic** [1] - 135:2
**Gentek** [19] - 21:2, 21:3, 21:4, 27:7, 27:9, 31:16, 31:17, 31:19, 45:13, 54:3, 67:19, 68:6, 72:1, 123:1, 128:1, 131:3, 131:4, 131:6
**gentlemen** [6] - 6:1, 24:4, 31:9, 31:11, 48:6, 115:17
**ghetto** [2] - 20:18, 128:17
**Gilead** [54] - 17:16, 19:13, 19:15, 19:16, 19:20, 19:23, 20:9, 25:9, 26:5, 27:1, 37:12, 38:14, 38:19, 43:12, 46:19, 46:21, 49:8, 49:10, 73:22, 73:23, 73:25, 74:1, 78:11, 78:14, 78:18, 105:16, 105:17, 107:2, 107:11, 107:12, 107:14, 107:15, 108:2, 108:10, 108:20, 108:24, 109:5, 110:10, 114:22, 115:5, 117:4, 123:25, 124:3, 127:3, 131:22, 134:25, 135:5, 135:7, 135:11, 135:13, 136:9
**Gilead's** [1] - 108:8
**girl** [1] - 94:20
**given** [2] - 75:18, 92:13
**Given** [1] - 125:1
**Gmail** [1] - 39:9
**goal** [1] - 103:18
**God** [2] - 115:13, 118:10
**goodness** [1] - 73:16
**googling** [1] - 122:2
**gosh** [1] - 99:8
**Gotcha** [1] - 37:8
**GOVERNMENT** [1] - 1:13
**Government** [67] - 5:2, 9:4, 49:1, 50:12, 53:4, 53:10, 53:15, 54:4, 54:14, 54:19, 55:14, 58:11, 62:13, 63:2, 63:10, 64:11, 65:7, 65:19, 67:10, 68:11, 68:16, 68:20, 70:22, 74:5, 74:6, 75:22, 76:4, 76:13, 76:16, 77:1, 77:7, 78:6, 78:16, 78:17, 79:8, 80:17, 83:4, 84:10, 84:12, 85:6, 90:17, 90:25, 91:1, 92:1, 92:3, 98:17, 98:25, 100:11, 102:10, 103:23, 107:6, 107:20, 110:10, 110:13, 110:17, 112:4, 113:23, 114:9, 114:17, 115:2, 137:2, 138:19, 138:20, 139:3, 139:21, 140:1, 140:6
**Government's** [10] - 54:7, 55:19, 55:20, 74:24, 75:1, 79:10, 83:8, 83:16, 90:19, 139:1
**grab** [1] - 64:1
**grace** [1] - 60:23
**grandchild** [1] - 87:16
**grandchildren** [1] - 87:5
**great** [6] - 36:18, 57:19, 61:6, 64:13, 96:16, 126:1
**greetings** [1] - 91:15
**grocery** [1] - 13:9
**gross** [3] - 95:21, 95:23, 113:15
**Group** [1] - 39:12
**group** [1] - 21:10
**guess** [21] - 23:12, 25:12, 36:18, 37:23, 55:2, 66:3, 67:4,

68:9, 68:19, 83:13, 83:14, 90:4, 92:2, 99:14, 108:18, 110:5, 110:6, 111:6, 113:10, 140:5
**guidance** [1] - 135:24
**guilt** [5] - 23:7, 74:25, 75:2, 84:6, 84:11
**guilty** [20] - 43:21, 45:10, 45:15, 45:21, 45:25, 48:14, 53:16, 69:20, 84:7, 84:13, 84:14, 86:24, 94:12, 114:12, 114:18, 115:11, 132:13, 132:24, 137:16
**gun** [2] - 57:21, 58:7
**guy** [11] - 26:3, 47:12, 65:13, 71:20, 76:18, 92:1, 92:8, 96:7, 99:9, 117:6, 137:23
**guys** [17] - 19:12, 22:18, 65:5, 73:11, 73:21, 74:2, 75:21, 82:19, 87:8, 96:7, 113:20, 115:10, 126:14, 133:2, 141:15, 142:1

## H

**had:)** [1] - 81:13
**half** [6] - 28:5, 28:9, 44:17, 60:7, 77:22, 119:19
**half-truth** [1] - 44:17
**hammers** [1] - 73:5
**handful** [1] - 110:25
**handle** [1] - 59:22
**handling** [1] - 64:14
**hands** [8] - 6:21, 37:25, 46:25, 57:21, 60:5, 70:17, 77:16, 118:15
**happy** [1] - 63:1
**hard** [4] - 82:24, 82:25, 115:10, 120:8
**Harvoni** [1] - 34:4
**he/or** [1] - 93:9
**head** [3] - 83:19, 113:21, 113:22
**health** [2] - 35:14, 45:8
**Healthcare** [1] - 15:24
**hear** [12] - 9:21, 13:20, 17:20, 22:15, 40:13, 49:16, 73:3, 76:14, 84:23, 90:23, 133:16, 133:24
**heard** [91] - 6:12, 6:15, 7:25, 8:1, 9:7, 9:8, 10:10, 11:7, 11:8, 11:9, 11:13, 11:19, 11:24, 12:2, 12:3, 12:5, 12:15, 13:3, 13:7, 13:16, 13:17, 14:3, 14:4, 14:6, 14:7, 14:12, 14:18, 14:25, 15:3, 15:4, 15:9, 15:13, 15:19, 15:24, 16:4, 16:21, 17:17, 18:5, 18:25, 19:11, 21:2, 21:14, 22:18, 26:12, 26:15, 27:18, 29:8, 32:7, 35:18, 42:11, 43:8, 44:16, 44:19, 46:13, 46:16, 48:10, 49:1, 50:3, 52:6, 58:22, 59:6, 65:6, 72:2, 73:18, 73:22, 78:5, 78:13, 79:7, 79:18, 82:15, 83:3, 85:23, 88:8, 95:15, 103:16, 104:5, 104:17, 108:14, 115:21, 117:9, 119:2, 121:19, 124:23, 125:11, 129:1, 131:20, 135:9, 136:12, 137:23
**hearing** [4] - 24:13, 49:20, 123:10, 132:6
**heart** [1] - 80:10
**heavy** [2] - 74:24, 121:12
**heck** [2] - 7:1, 40:17
**held** [1] - 100:13
**help** [3] - 10:1, 37:6, 79:2
**helped** [3] - 13:13, 14:15, 117:7
**helping** [2] - 41:4, 96:8
**hereby** [1] - 142:10
**herself** [1] - 43:8
**hesitate** [3] - 76:12, 77:4, 80:21
**hesitation** [4] - 75:9, 75:10, 75:17, 86:21
**hid** [4] - 130:11, 130:12, 130:13, 137:21
**hide** [5] - 8:7, 10:9, 71:14, 123:12, 124:10
**hiding** [9] - 13:1, 19:9, 26:19, 47:23, 77:4, 77:5, 117:16, 132:18, 133:1
**high** [1] - 41:7
**highlights** [1] - 32:11
**Highway** [1] - 1:22
**himself** [11] - 9:8, 46:17, 65:12, 91:19, 95:17, 95:19, 96:9, 96:11, 101:24, 133:13
**hindsight** [4] - 58:12, 92:18, 92:20, 112:12
**hire** [5] - 8:4, 59:18, 59:21, 60:13, 130:5
**hired** [1] - 12:21
**hires** [1] - 60:1
**hiring** [2] - 59:24, 130:2
**historic** [2] - 46:5, 46:11
**history** [1] - 17:1
**HIV** [47] - 6:18, 7:16, 9:1, 11:4, 11:10, 11:14, 12:14, 13:18, 13:22, 14:1, 14:15, 15:25, 18:9, 18:18, 19:3, 19:7, 21:8, 23:13, 24:18, 25:3, 27:11, 28:22, 33:6, 37:24, 38:5, 38:16, 41:4, 44:5, 45:14, 46:6, 46:9, 46:24, 55:1, 96:2, 118:8, 118:14, 123:1, 126:24, 127:18, 127:23, 129:9, 130:14, 131:7, 133:17, 133:22, 135:25, 137:8
**hmm** [1] - 39:10
**hold** [7] - 22:6, 24:24, 47:2, 70:2, 70:7, 70:19
**holding** [1] - 22:8
**holds** [2] - 70:8, 70:10
**home** [6] - 56:16, 67:3, 80:25, 82:17, 83:9, 139:17
**honest** [5] - 65:16, 88:15, 94:2, 100:18, 127:7
**honestly** [2] - 100:13
**Honor** [27] - 3:8, 4:7, 4:24, 5:3, 5:5, 5:11, 5:13, 5:25, 40:12, 48:5, 48:9, 65:1, 65:4, 81:18, 81:20, 82:1, 82:3, 87:19, 97:13, 115:16, 134:21, 138:24, 139:11, 141:6, 141:7, 142:4, 142:5
**HONORABLE** [1] - 1:10
**Honorable** [1] - 2:3
**hope** [1] - 115:8
**hopefully** [2] - 37:5, 45:20
**hoping** [3] - 90:12, 90:13, 93:18
**horrible** [3] - 51:18, 78:2
**hot** [1] - 72:21
**hours** [2] - 127:22, 137:8
**house** [3] - 75:12, 83:9, 91:8
**houses** [1] - 59:7
**huge** [3] - 57:19, 64:16, 75:21
**human** [2] - 65:17, 114:2
**hundreds** [1] - 77:15
**hybrid** [4] - 3:17, 3:18, 3:19, 3:22

## I

**idea** [9] - 23:8, 24:17, 51:19, 55:10, 55:11, 78:1, 108:25, 127:9, 131:8
**identify** [1] - 13:21
**identities** [1] - 18:13
**illegal** [2] - 90:16, 96:10
**illegally** [3] - 41:9, 100:4, 134:5
**illegible** [2] - 26:16, 40:24
**illegitimate** [3] - 10:5, 35:25, 36:3
**illicit** [2] - 41:10, 134:6
**image** [3] - 32:19, 99:12, 99:19
**imagine** [2] - 62:8, 89:7
**immediately** [5] - 70:16, 72:10, 74:1, 107:16, 133:9
**impact** [1] - 64:4
**impacted** [1] - 17:24
**impartial** [1] - 84:3
**impartially** [1] - 75:6
**important** [29] - 12:18, 13:17, 18:14, 21:19, 26:14, 44:12, 55:10, 75:7, 75:10, 75:11, 75:15, 80:21, 86:16, 86:21, 87:5, 87:9, 89:16, 95:17, 96:5, 108:1, 108:3, 115:23, 118:16, 118:17, 121:18, 124:5, 128:23, 131:18
**impossible** [1] - 24:2
**impress** [1] - 89:24
**impression** [1] - 17:6
**inaccurate** [4] - 100:5, 104:12, 105:1, 106:10
**incentive** [1] - 39:19
**incident** [1] - 107:11
**incidents** [2] - 40:25, 47:20
**include** [2] - 11:6, 84:5
**includes** [4] - 31:2, 84:23, 85:21, 124:6
**including** [2] - 22:25, 129:3
**incompetent** [2] - 52:11, 52:13
**incomplete** [4] - 103:4, 103:20, 104:11, 111:1
**inconsistent** [1] - 94:10
**incorrect** [1] - 78:20
**incredible** [2] - 80:10, 82:23
**inculpate** [1] - 68:18
**independent** [1] - 23:23
**Independent** [1] - 32:23
**indicated** [1] - 113:7
**indicates** [1] - 26:25
**indication** [1] - 123:21
**indicator** [1] - 6:10
**indicators** [1] - 28:18
**indicted** [7] - 72:4, 72:6, 72:8, 72:15, 72:20, 90:10, 97:24
**indictment** [18] - 4:16, 7:12, 10:21, 12:13, 16:14, 24:4, 31:13, 41:25, 71:21, 72:24, 84:6, 85:12, 85:20, 91:20, 100:8, 114:10, 132:14, 137:17
**indirectly** [1] - 124:13
**individuals** [1] - 18:9
**industry** [2] - 12:22, 113:19
**infected** [1] - 118:9
**influence** [2] - 91:23, 96:21
**info** [2] - 34:20, 61:6
**information** [33] -

7:24, 8:7, 11:15, 11:25, 13:15, 16:25, 26:14, 26:16, 26:23, 28:20, 29:22, 29:24, 31:21, 33:5, 34:24, 35:7, 36:12, 37:18, 38:12, 40:10, 49:25, 52:2, 101:7, 103:6, 107:3, 107:4, 107:5, 107:13, 109:19, 132:7, 132:11, 132:12
**informed** [2] - 15:8, 110:18
**informing** [1] - 72:24
**infrequently** [1] - 66:15
**inhalation** [1] - 10:14
**innocence** [1] - 84:8
**innocent** [5] - 54:22, 71:8, 71:9, 114:14, 133:25
**inquiry** [1] - 68:7
**inserts** [1] - 29:13
**inside** [2] - 20:6, 50:2
**InstaCare** [2] - 35:4, 36:14
**instance** [2] - 85:23, 135:1
**instances** [2] - 13:6, 43:15
**instead** [6] - 59:14, 60:1, 72:22, 74:13, 112:7, 141:3
**instruct** [2] - 16:8, 16:24
**instructed** [1] - 14:19
**instruction** [15] - 38:3, 41:2, 65:24, 68:14, 68:15, 69:8, 69:10, 74:20, 74:23, 80:14, 80:15, 89:3, 89:11, 89:14, 89:15
**instructions** [22] - 4:9, 4:16, 27:24, 32:11, 34:21, 53:8, 74:19, 74:20, 79:19, 80:13, 83:2, 84:21, 84:22, 122:21, 122:22, 123:8, 123:9, 124:12, 130:15, 137:18, 137:19
**insulated** [1] - 91:17
**insurers** [2] - 45:6, 45:8
**intake** [2] - 25:21, 26:8
**intend** [1] - 56:21
**intended** [2] - 5:19, 100:20
**intent** [21] - 17:3, 17:4, 17:5, 85:13, 85:14, 85:15, 85:17, 85:22, 86:6, 86:9, 100:9, 100:11, 100:14, 100:17, 104:13, 109:2, 114:4, 123:18, 124:16
**intentionally** [3] - 6:19, 17:11, 119:14
**interact** [1] - 66:11
**interest** [2] - 93:3, 96:8
**interested** [1] - 71:24
**interesting** [4] - 9:17, 23:19, 35:5, 115:21
**intermediary** [1] - 94:25
**interprets** [1] - 108:20
**interstate** [1] - 45:18
**interview** [1] - 97:19
**interviewed** [1] - 91:5
**intimidated** [2] - 31:3, 31:4
**introduce** [4] - 4:19, 7:14, 107:9, 140:13
**introduced** [5] - 33:12, 95:20, 98:9, 110:6, 128:10
**introduction** [1] - 7:15
**invalid** [4] - 54:17, 54:18, 54:22, 69:3
**invaluable** [2] - 95:17, 96:5
**invested** [1] - 87:23
**investigation** [5] - 79:14, 92:5, 92:16, 97:8, 115:3
**Invicta** [1] - 11:9
**invoice** [6] - 22:5, 36:17, 37:11, 38:9, 61:8, 134:11
**invoices** [4] - 37:4, 37:6, 37:19, 117:22
**involve** [2] - 7:21, 8:13
**involved** [17] - 32:2, 49:17, 52:25, 54:5, 54:19, 60:18, 75:20, 77:2, 91:1, 91:12, 95:14, 95:15, 103:7, 103:8, 104:13, 113:19, 125:14
**involvement** [2] - 76:15, 125:18
**involving** [1] - 44:7
**IPC** [6] - 30:8, 34:6, 34:10, 38:15, 117:19, 117:20
**ironic** [2] - 8:23, 133:2
**ironically** [1] - 117:3
**irony** [1] - 9:2
**irrelevant** [1] - 125:9
**island** [1] - 133:21
**isolate** [1] - 87:10
**isolation** [1] - 7:4
**issue** [11] - 23:13, 49:5, 79:20, 100:24, 102:17, 110:17, 114:15, 131:22, 135:5, 139:2
**issues** [5] - 87:5, 105:24, 125:2, 127:6, 134:25
**IV** [1] - 128:23
**Ivlis** [1] - 1:18

## J

**Jackie** [2] - 63:17, 63:23
**Jacqueline** [1] - 1:13
**jail** [2] - 63:18, 63:19
**Janssen** [3] - 20:8, 42:25, 135:14
**Jeffrey** [1] - 39:8
**JeffreyAndersonDMS@gmail** [1] - 40:4
**Jersey** [2] - 91:6, 97:12
**Jesse** [1] - 79:7
**job** [11] - 14:6, 50:7, 55:3, 55:6, 67:12, 106:21, 106:24, 119:10, 120:14, 122:7, 125:4
**John** [5] - 79:6, 105:14, 105:15, 107:1, 109:21
**joined** [1] - 16:13
**Jonathan** [2] - 14:25, 127:20
**Judge** [12] - 4:23, 83:1, 83:25, 84:4, 84:21, 84:23, 89:3, 89:10, 97:18, 110:21, 138:19, 140:8
**judge** [11] - 16:8, 16:24, 41:2, 61:25, 65:24, 68:14, 69:10, 74:19, 130:21, 137:19, 139:2
**JUDGE** [1] - 1:10
**judge's** [1] - 80:13
**judged** [1] - 92:22
**judgment** [2] - 100:16, 112:24
**judgments** [2] - 113:24, 113:25
**July** [8] - 12:10, 19:14, 23:16, 29:20, 30:25, 46:5, 102:7, 110:2
**jump** [1] - 105:11
**June** [4] - 28:18, 40:14, 40:25, 98:22
**junkies** [2] - 46:20, 131:23
**juror** [1] - 99:8
**jurors** [9] - 5:6, 81:21, 82:9, 82:13, 83:24, 84:16, 89:22, 92:13, 110:15
**JURY** [1] - 1:9
**Jury** [5] - 5:8, 81:8, 81:23, 138:8, 142:6
**jury** [23] - 3:6, 3:10, 4:8, 5:1, 5:10, 6:1, 64:5, 80:5, 80:9, 81:2, 81:6, 81:17, 81:25, 83:1, 99:24, 105:21, 110:18, 115:9, 115:17, 132:19, 138:2, 140:14, 141:2
**justice** [1] - 115:6
**Justice** [1] - 79:23

## K

**Katie** [3] - 62:25, 136:16, 136:18
**keep** [14] - 14:15, 33:23, 37:24, 73:13, 75:3, 83:14, 91:13, 95:3, 120:22, 123:10, 123:24, 125:4, 130:14, 131:18
**keeping** [1] - 22:24
**keeps** [1] - 120:12
**Kenzie** [1] - 25:20
**kept** [9] - 15:7, 26:9, 26:20, 30:23, 36:4, 49:20, 96:20, 131:3
**key** [5] - 18:3, 18:10, 41:18, 127:4, 136:6
**keys** [1] - 70:17
**Khaim** [67] - 32:8, 44:2, 50:17, 52:24, 55:21, 55:24, 55:25, 56:2, 56:9, 56:23, 56:25, 57:6, 58:17, 58:25, 59:5, 60:18, 62:7, 62:20, 63:6, 63:16, 64:10, 64:12, 64:13, 64:15, 65:5, 65:11, 74:8, 74:10, 76:19, 76:24, 87:17, 87:25, 88:3, 88:4, 88:9, 88:11, 88:24, 89:5, 90:1, 90:5, 90:24, 91:18, 91:21, 92:4, 92:8, 93:2, 93:5, 93:10, 94:5, 94:6, 94:15, 94:19, 96:23, 97:9, 103:14, 103:18, 112:1, 113:18, 115:22, 115:25, 116:7, 118:5, 119:3, 136:15
**Khaim's** [2] - 89:14, 91:25
**Khaims** [2] - 90:20, 97:22
**kid** [2] - 57:25, 58:6
**Kimchi** [17] - 9:8, 10:6, 12:2, 18:24, 33:12, 33:15, 33:21, 57:14, 59:19, 60:13, 63:16, 116:11, 116:18, 118:7, 122:4, 132:9
**kind** [6] - 38:23, 57:7, 83:10, 88:24, 108:15, 115:3
**King** [15] - 9:8, 10:6, 12:2, 18:24, 33:12, 33:21, 57:14, 59:19, 60:13, 63:16, 116:11, 116:17, 118:7, 122:4, 132:9
**kitchen** [1] - 59:8
**knowing** [10] - 18:12, 53:11, 55:24, 87:25, 90:5, 91:16, 92:24, 112:9, 112:19, 137:3
**knowingly** [4] - 4:18, 6:18, 35:24, 135:19
**knowledge** [6] - 11:20, 41:5, 123:18, 134:3, 134:6, 134:8
**known** [7] - 61:15, 62:16, 62:18, 112:8, 112:10, 112:11
**knows** [12] - 18:15, 52:3, 52:18, 62:13, 63:20, 90:24, 91:5, 91:9, 91:22, 101:3, 101:5, 118:10

## L

**label** [1] - 16:23
**labeled** [1] - 40:23
**labeling** [4] - 16:23, 17:2, 44:8, 129:3
**labels** [3] - 12:18, 59:14, 126:21
**lack** [2] - 80:2, 125:17
**ladies** [6] - 6:1, 24:4, 31:9, 31:11, 48:6, 115:17

**lady** [1] - 34:10
**laid** [1] - 19:9
**language** [4] - 18:3, 40:7, 93:16, 124:4
**laptop** [2] - 140:6
**large** [1] - 140:11
**larger** [1] - 139:23
**last** [6] - 57:4, 74:18, 86:19, 91:22, 102:22, 114:22
**late** [1] - 53:3
**latitude** [1] - 97:15
**LAUDERDALE** [1] - 1:2
**Lauderdale** [2] - 1:4, 1:22
**launder** [1] - 117:8
**laundering** [2] - 9:15, 9:18
**law** [15] - 36:24, 41:5, 69:22, 74:8, 83:2, 83:25, 85:18, 85:19, 98:6, 98:7, 100:4, 101:20, 103:11, 120:23, 123:7
**Law** [2] - 83:10, 112:19
**laws** [1] - 23:2
**lawyer** [13] - 30:15, 38:10, 115:22, 117:24, 117:25, 118:4, 118:23, 122:19, 125:10, 132:1, 134:23, 135:6, 136:24
**lawyer's** [1] - 133:3
**lawyers** [30] - 8:2, 8:4, 8:6, 8:11, 9:4, 9:14, 12:16, 16:16, 29:6, 40:8, 43:3, 47:23, 52:8, 72:22, 115:20, 121:2, 121:6, 122:11, 123:13, 124:20, 124:21, 130:12, 130:17, 131:22, 132:4, 132:10, 132:15, 133:19, 136:3, 136:11
**layman's** [1] - 18:2
**lead** [1] - 94:11
**leads** [1] - 100:23
**learn** [4] - 8:21, 56:11, 58:4, 129:21
**learned** [4] - 101:5, 101:14, 102:23, 102:25
**learning** [2] - 41:10, 134:5
**least** [13] - 12:12, 16:8, 24:22, 31:2, 40:21, 66:16, 67:15, 74:8, 97:6, 104:10, 120:4, 121:11, 125:15
**leaves** [5] - 4:20, 4:21, 38:10, 38:11, 38:12
**leaving** [1] - 121:8
**left** [5] - 38:23, 97:17, 99:11, 105:11, 126:14
**legal** [16] - 30:16, 37:1, 38:22, 42:8, 95:12, 98:4, 98:12, 99:16, 109:12, 121:4, 123:24, 124:22, 125:1, 125:6, 130:3, 130:4
**Legend** [1] - 15:14
**legit** [4] - 27:9, 27:12, 35:10, 59:2
**legitimate** [17] - 9:19, 13:23, 25:2, 27:25, 33:4, 33:9, 59:17, 60:1, 73:7, 73:17, 90:21, 93:25, 122:15, 123:22, 127:19, 127:25, 131:15
**legitimately** [2] - 14:24, 27:3
**length** [1] - 14:5
**letter** [6] - 43:13, 109:6, 128:10, 128:20, 128:22
**letters** [2] - 47:22, 52:1
**letting** [3] - 35:7, 57:2, 57:3
**Levitt** [15] - 79:4, 79:5, 79:6, 98:2, 98:3, 98:8, 98:12, 98:19, 100:1, 102:16, 105:22, 106:4, 108:16, 124:22, 130:8
**liable** [1] - 123:7
**liar** [2] - 61:13, 116:6
**license** [10] - 55:4, 55:18, 56:1, 56:5, 56:9, 56:14, 70:14, 70:15, 98:23, 99:3
**licenses** [5] - 70:5, 70:6, 73:18, 73:19, 95:6
**licensing** [3] - 22:22, 22:25, 102:18
**lie** [19] - 8:6, 8:10, 17:14, 23:6, 40:8, 57:8, 57:10, 62:9, 64:6, 64:7, 64:8, 94:22, 123:13, 123:16, 125:21, 125:22, 130:6, 134:22, 135:4
**lied** [11] - 39:6, 39:7, 55:11, 61:10, 112:1, 125:11, 128:16, 130:8, 130:13
**lies** [19] - 7:23, 8:1, 17:14, 30:15, 36:6, 45:9, 45:23, 47:22, 47:23, 57:6, 71:15, 117:24, 117:25, 123:14, 131:20, 132:4, 132:5
**lieu** [1] - 140:13
**life** [5] - 56:19, 75:12, 87:9, 87:14, 118:6
**life-threatening** [1] - 87:14
**lifesaving** [3] - 9:1, 13:18, 27:16
**lighter** [3] - 58:21, 59:10, 59:15
**line** [4] - 39:13, 54:1, 113:13, 140:19
**lip** [1] - 14:13
**Lisa** [1] - 133:8
**list** [2] - 61:21, 141:4
**listed** [2] - 22:2, 134:11
**listen** [2] - 51:16, 103:8
**Listen** [4] - 102:7, 104:18, 104:25, 108:10
**listening** [1] - 83:8
**listing** [2] - 41:19, 42:10
**lists** [1] - 36:17
**litigators** [1] - 64:4
**lived** [1] - 45:17
**lives** [4] - 75:15, 87:6, 110:19, 118:8
**living** [2] - 114:21, 133:21
**LMP** [3] - 32:15, 32:17
**location** [3] - 24:13, 24:17, 67:6
**logs** [2] - 34:16, 116:3
**Look** [4] - 68:24, 71:10, 74:8, 126:14
**look** [49] - 10:8, 11:2, 16:17, 22:10, 22:15, 25:6, 29:10, 29:21, 34:9, 40:25, 43:16, 43:17, 50:1, 58:13, 63:25, 69:11, 70:21, 71:1, 77:11, 77:18, 79:10, 79:20, 89:21, 91:24, 92:15, 92:20, 92:23, 96:13, 98:5, 101:10, 106:4, 112:11, 112:14, 114:6, 118:22, 121:16, 126:6, 126:7, 126:13, 129:13, 131:15, 132:8, 132:9, 134:3, 141:4
**looked** [8] - 16:2, 21:23, 25:4, 36:9, 45:24, 116:21, 119:7, 127:14
**looking** [5] - 25:18, 25:25, 28:1, 58:14, 79:24
**looks** [5] - 10:13, 20:3, 26:12, 26:22, 116:24
**loose** [1] - 98:1
**losses** [1] - 46:8
**lost** [2] - 51:19, 69:9
**louder** [1] - 30:21
**love** [1] - 80:4
**loved** [1] - 91:14
**lying** [6] - 19:12, 19:25, 20:19, 38:25, 61:2, 131:2

## M

**made-up** [1] - 49:7
**magically** [5] - 11:10, 30:10, 30:14, 32:23, 34:14
**main** [2] - 47:18, 125:10
**make-believe** [1] - 49:2
**malpractice** [1] - 106:11
**man** [6] - 53:2, 53:5, 56:2, 90:21, 95:18, 113:12
**managed** [1] - 22:22
**management** [1] - 100:17
**manager** [8] - 23:17, 30:3, 30:6, 30:19, 66:23, 70:24, 129:10
**managers'** [2] - 66:16, 66:18
**manipulate** [1] - 130:9
**manipulated** [2] - 130:10, 130:11
**manipulator** [1] - 94:19
**manipulators** [1] - 130:10
**Mantilla** [1] - 1:18
**manual** [1] - 70:7
**manufactured** [1] - 96:19
**manufacturer** [4] - 32:15, 42:15, 126:8, 135:8
**manufacturer's** [1] - 135:16
**manufacturers** [3] - 19:21, 43:2, 135:15
**manufacturing** [1] - 78:14
**March** [9] - 20:11, 20:14, 28:17, 36:2, 41:1, 43:12, 109:5, 117:3
**margin** [2] - 113:1, 113:2
**market** [15] - 6:18, 8:25, 9:7, 11:4, 18:9, 54:6, 88:13, 88:20, 91:12, 91:17, 95:9, 111:25, 112:6, 124:2, 135:19
**marking** [1] - 132:2
**marks** [1] - 126:20
**married** [1] - 75:13
**Marrone** [1] - 79:7
**Martha** [25] - 39:3, 39:7, 52:1, 52:10, 52:18, 78:11, 79:4, 105:25, 106:2, 106:8, 106:10, 106:14, 107:3, 107:11, 108:7, 108:13, 108:14, 108:25, 109:17, 109:19, 121:5, 125:11, 129:17, 130:9, 134:24
**Martha's** [1] - 52:14
**Maryland** [6] - 22:19, 97:12, 99:2, 99:5, 102:16, 102:17
**master** [1] - 130:10
**match** [3] - 40:3, 40:4, 128:19
**matches** [2] - 49:10, 111:12
**material** [3] - 44:18, 44:19, 130:19
**materially** [2] - 44:14, 47:12
**matter** [11] - 8:9, 14:8, 14:10, 14:11, 64:6, 69:24, 89:20, 108:15, 113:20, 142:12
**McKesson** [6] - 32:11,

32:12, 61:7, 61:11, 61:14, 61:17
**mean** [29] - 25:4, 31:15, 36:10, 41:11, 52:24, 54:7, 56:2, 57:7, 60:23, 61:12, 61:24, 68:9, 68:10, 68:11, 68:14, 69:1, 73:15, 73:20, 74:4, 77:14, 89:7, 89:13, 90:1, 119:23, 122:6, 129:23, 136:4, 140:14
**meaningless** [1] - 14:7
**means** [8] - 17:5, 69:20, 75:16, 80:19, 85:13, 85:14, 85:16, 129:10
**meant** [1] - 95:7
**meanwhile** [1] - 52:21
**media** [1] - 47:25
**medical** [10] - 7:17, 43:22, 44:7, 87:5, 87:12, 87:13, 115:23, 116:6, 129:2
**medication** [3] - 27:5, 51:21, 88:24
**medications** [8] - 48:25, 49:4, 49:9, 49:13, 52:7, 55:22, 55:24, 135:1
**medicine** [10] - 61:11, 62:15, 62:16, 63:13, 64:12, 78:1, 78:12, 78:18, 78:19
**medicines** [3] - 56:24, 57:1, 78:23
**meet** [5] - 28:25, 127:17, 127:22, 142:1, 142:2
**meeting** [1] - 134:15
**meetings** [7] - 53:3, 66:17, 66:18, 66:23, 70:24, 72:23
**Mellott** [1] - 76:23
**member** [2] - 18:3, 18:4
**members** [2] - 81:2, 138:2
**memo** [1] - 105:24
**memorandums** [1] - 72:23
**memorialized** [1] - 110:9
**memory** [3] - 93:6, 98:25, 107:22
**memos** [1] - 107:5
**men** [1] - 113:21
**mentioned** [2] - 61:5, 71:17
**Mercedes** [1] - 59:7
**mess** [4] - 29:20, 137:9, 137:10
**message** [13] - 14:20, 15:20, 45:16, 45:19, 53:2, 63:10, 99:7, 118:20, 119:4, 123:2, 125:15, 126:2
**messages** [28] - 6:14, 10:18, 28:25, 36:20, 37:10, 38:25, 62:23, 62:24, 72:11, 73:5, 98:21, 102:6, 102:11, 109:25, 116:3, 116:9, 118:18, 118:22, 118:25, 119:1, 120:1, 124:18, 127:15, 131:9, 131:16, 132:9, 136:8
**messaging** [1] - 73:6
**Miami** [2] - 1:16, 1:19
**middle** [7] - 58:19, 62:13, 72:9, 93:22, 93:23, 93:24, 106:17
**might** [11] - 4:3, 9:3, 47:10, 82:10, 87:7, 87:15, 88:16, 88:17, 91:21, 105:7, 114:20
**Mike** [3] - 58:23, 76:18, 101:16
**million** [22] - 6:17, 24:17, 28:5, 28:9, 28:17, 37:15, 39:20, 40:8, 46:5, 59:6, 62:22, 74:16, 77:16, 77:23, 90:15, 90:16, 113:8, 118:13, 123:25, 128:1, 128:2
**mind** [10] - 12:21, 36:25, 49:21, 79:4, 83:18, 83:21, 92:17, 99:12, 124:13, 131:19
**mindset** [1] - 72:15
**minimum** [1] - 41:11
**minivan** [1] - 40:16
**minute** [3] - 35:11, 47:7, 90:22
**minutes** [11] - 40:11, 56:16, 65:3, 74:21, 81:6, 81:10, 87:3, 97:17, 110:20, 111:6, 134:20
**misbranded** [12] - 4:19, 7:14, 7:15, 7:16, 8:25, 16:15, 16:23, 41:16, 41:23, 43:18, 45:14, 46:24
**mischaracterization** [1] - 99:18
**mislabeled** [1] - 41:16
**mislead** [2] - 17:5, 17:9
**misleading** [5] - 7:24, 16:24, 102:15, 124:5, 132:10
**missed** [1] - 47:9
**missing** [6] - 29:13, 29:14, 29:15, 36:12, 79:9, 126:20
**mission** [1] - 92:14
**misstating** [2] - 17:6, 17:12
**mistake** [5] - 56:22, 71:11, 100:15, 100:16, 107:19
**mistakes** [7] - 22:20, 56:20, 60:25, 71:10, 71:12, 71:16, 114:1
**Modern** [2] - 42:3, 45:22
**mom** [1] - 22:6
**mom-and-pop** [1] - 22:6
**moment** [1] - 112:23
**momentum** [1] - 45:20
**Monday** [1] - 92:19
**money** [26] - 11:3, 19:2, 21:7, 27:21, 32:13, 34:5, 46:2, 46:3, 46:10, 49:18, 53:7, 59:7, 73:12, 73:16, 77:6, 77:10, 77:12, 77:17, 77:25, 93:25, 95:2, 112:25, 113:7, 113:10, 113:11, 113:14
**monies** [1] - 95:22
**monitor** [1] - 101:8
**month** [9] - 11:24, 25:7, 39:20, 80:9, 101:13, 120:11, 120:16, 128:22
**monthly** [1] - 70:23
**months** [13] - 11:16, 11:17, 11:25, 26:21, 28:17, 36:25, 37:1, 46:7, 60:7, 123:21, 123:22, 136:1, 137:22
**moral** [1] - 35:14
**morning** [6] - 3:24, 29:1, 32:4, 92:19, 141:16, 142:3
**Morrone** [4] - 105:14, 105:15, 107:1, 109:21
**most** [20] - 21:19, 44:12, 46:3, 46:10, 52:4, 75:7, 75:10, 75:11, 75:15, 80:21, 82:15, 86:21, 87:5, 87:9, 88:1, 88:15, 90:4, 108:1, 115:21, 121:18
**motive** [4] - 46:2, 46:4, 46:11, 87:21
**mount** [1] - 115:5
**move** [2] - 37:5, 40:9
**movie** [1] - 122:2
**moving** [2] - 22:9, 33:23
**MR** [61] - 3:7, 3:12, 3:19, 3:25, 4:7, 4:12, 4:15, 4:23, 4:24, 5:2, 5:4, 5:5, 5:11, 5:12, 5:13, 5:25, 11:19, 11:23, 13:20, 23:5, 33:20, 40:12, 43:25, 47:8, 48:4, 48:9, 65:1, 65:4, 74:22, 81:18, 81:19, 81:20, 82:1, 82:2, 82:3, 82:8, 87:19, 87:21, 97:13, 97:14, 97:18, 110:21, 115:16, 130:21, 130:23, 134:21, 138:15, 138:18, 138:24, 139:2, 139:17, 139:18, 140:8, 140:9, 140:17, 141:6, 141:19, 141:20, 141:24, 142:4, 142:5
**MS** [7] - 139:11, 139:16, 139:19, 141:7, 141:17, 141:23, 141:25
**multiple** [7] - 10:17, 30:20, 79:2, 87:18, 97:11, 131:3, 140:3
**must** [11] - 69:19, 69:20, 84:11, 85:6, 85:9, 85:13, 89:6, 89:12, 89:13, 94:12, 100:11
**mysterious** [1] - 64:9
**mystery** [1] - 83:10

## N

**Nah** [1] - 23:14
**naive** [1] - 60:22
**Nalley** [1] - 25:20
**name** [7] - 18:25, 20:12, 33:1, 33:6, 52:2, 64:10, 92:9
**named** [4] - 8:23, 59:19, 92:1, 127:21
**names** [3] - 18:5, 18:13, 129:1
**narrow** [1] - 79:20
**nature** [3] - 17:13, 124:6, 124:8
**NE** [1] - 1:15
**necessarily** [1] - 89:20
**need** [32] - 10:25, 19:4, 20:20, 20:23, 28:10, 35:20, 39:1, 39:14, 39:24, 44:12, 60:23, 60:24, 61:6, 61:13, 84:3, 84:8, 84:9, 84:20, 87:22, 90:17, 90:18, 92:23, 104:15, 117:17, 117:18, 121:14, 126:15, 136:18, 139:18, 140:21, 140:23
**needed** [2] - 28:2, 103:18
**needs** [6] - 33:1, 35:18, 87:12, 104:18, 110:22, 131:14
**negative** [2] - 46:8, 99:19
**negotiated** [1] - 48:24
**Never** [1] - 26:6
**never** [54] - 9:24, 15:10, 16:2, 19:22, 31:16, 31:17, 34:11, 38:15, 42:24, 42:25, 46:17, 47:21, 48:16, 48:18, 48:23, 48:24, 49:5, 49:15, 49:20, 50:9, 50:11, 50:20, 51:11, 51:14, 52:24, 53:1, 53:2, 53:5, 53:7, 53:12, 53:14, 53:22, 57:25, 62:14, 62:15, 62:17, 63:6, 63:14, 64:19, 78:2, 78:24, 82:15, 88:12, 88:13, 94:22, 107:13, 107:14, 107:16, 109:17, 109:19, 110:8, 118:24, 135:10, 137:4
**New** [6] - 59:5, 74:16, 91:6, 91:15, 97:12
**new** [8] - 22:20, 39:11, 70:3, 78:20, 106:13, 111:8, 120:18, 125:3
**news** [6] - 39:16, 82:10, 82:12, 82:23,

82:24
**next** [7] - 20:22, 32:6, 34:12, 34:17, 39:16, 59:18, 102:22
**nice** [2] - 25:12, 138:6
**Nicholls** [2] - 14:25, 127:20
**Nicole** [2] - 15:24, 135:9
**night** [3] - 53:3, 91:21, 91:22
**nightmare** [2] - 114:20, 114:21
**ninety** [1] - 15:7
**ninety-plus** [1] - 15:7
**NO** [1] - 1:2
**no's** [2] - 129:23, 130:1
**none** [4] - 23:23, 23:24, 73:7, 134:17
**norm** [1] - 127:24
**normal** [1] - 127:19
**normally** [1] - 126:7
**North** [1] - 57:18
**notes** [2] - 6:9, 82:20
**nothing** [20] - 5:2, 35:9, 38:14, 38:15, 38:16, 49:14, 49:19, 50:18, 53:11, 72:25, 76:8, 78:4, 81:9, 102:12, 104:19, 111:21, 129:14, 138:12, 138:22, 140:25
**noticeably** [1] - 84:24
**notified** [2] - 30:19, 30:22
**notify** [2] - 30:3, 129:10
**notifying** [1] - 30:6
**November** [4] - 17:19, 20:8, 41:1, 120:5
**number** [7] - 33:5, 49:7, 61:8, 61:9, 84:5, 89:19, 97:6
**Number** [5] - 55:4, 65:9, 71:1, 77:6, 95:6
**numbers** [3] - 33:11, 61:20, 61:21
**numerous** [2] - 13:5, 47:20
**nutshell** [1] - 69:12
**NW** [1] - 1:19

**O**

**object** [3] - 4:6, 4:21, 130:21
**objection** [4] - 4:22, 65:1, 87:19, 97:13
**obligation** [1] - 35:14
**observe** [1] - 93:9
**obtained** [1] - 95:9
**obvious** [3] - 50:12, 60:20, 122:10
**obviously** [16] - 7:6, 8:15, 16:16, 24:13, 27:19, 52:5, 60:18, 60:19, 62:9, 62:10, 63:9, 78:4, 101:22, 119:20, 124:8, 132:16
**occasion** [1] - 67:24
**occasions** [1] - 16:20
**occupy** [1] - 8:18
**occur** [1] - 104:23
**occurred** [4] - 58:15, 99:18, 103:5, 109:16
**occurring** [1] - 112:23
**occurs** [1] - 41:8
**October** [12] - 1:5, 17:18, 35:16, 35:17, 36:1, 36:23, 41:1, 66:3, 105:12, 111:7, 121:24, 129:17
**odd** [1] - 27:12
**OF** [3] - 1:1, 1:4, 1:9
**offense** [2] - 4:16, 100:8
**offenses** [1] - 48:14
**offered** [2] - 15:1, 128:8
**office** [4] - 50:5, 66:23, 66:24, 67:6
**OFFICER** [2] - 81:7, 81:11
**officer** [2] - 54:9, 70:18
**Official** [2] - 2:3, 142:15
**often** [2] - 23:6, 101:12
**old** [1] - 136:17
**Olympia** [4] - 73:9, 73:12, 126:18
**Olympics** [1] - 58:5
**omitting** [2] - 17:6, 17:11
**Omom** [5] - 40:13, 40:14, 40:15, 128:4
**once** [7] - 60:2, 74:7, 83:1, 88:21, 101:13, 103:1, 103:19
**one** [115] - 3:9, 3:21, 6:10, 7:3, 9:14, 11:5, 11:7, 12:13, 15:14, 16:21, 17:17, 20:3, 20:7, 21:19, 22:4, 22:5, 24:22, 25:10, 28:4, 28:6, 28:9, 29:6, 31:10, 31:25, 32:5, 35:4, 35:24, 36:17, 37:11, 38:9, 39:11, 39:16, 40:6, 41:16, 41:19, 41:25, 43:19, 44:1, 44:13, 45:4, 49:6, 52:19, 53:1, 53:21, 55:9, 55:17, 57:22, 59:9, 59:10, 60:14, 63:5, 63:7, 64:13, 64:14, 67:6, 67:24, 68:16, 68:21, 69:7, 71:2, 71:19, 74:19, 78:19, 79:4, 79:16, 79:20, 80:11, 83:4, 84:5, 84:22, 85:1, 85:2, 85:11, 85:21, 88:11, 89:25, 92:21, 98:19, 101:4, 101:6, 101:24, 105:1, 110:8, 115:21, 117:23, 118:2, 118:23, 122:19, 122:25, 123:2, 123:4, 124:20, 126:10, 127:4, 130:15, 131:18, 132:1, 133:4, 133:5, 134:11, 136:23, 137:5, 139:5, 139:19, 140:3, 140:10, 140:18
**ones** [9] - 19:24, 36:22, 37:10, 46:23, 47:4, 67:20, 76:5, 126:22, 136:6
**online** [1] - 50:2
**open** [4] - 33:25, 43:5, 136:2, 141:14
**opened** [4] - 9:22, 34:4, 78:5, 118:11
**opening** [10] - 4:3, 5:22, 6:11, 8:3, 10:1, 12:15, 27:5, 46:13, 72:4, 133:2
**operating** [1] - 11:12
**operation** [2] - 87:22
**opinion** [3] - 75:7, 100:13, 100:14
**opinions** [2] - 98:12, 98:14
**opportunities** [1] - 71:5
**opportunity** [1] - 93:8
**opposed** [1] - 92:15
**order** [2] - 59:15, 72:16
**Order** [3] - 3:1, 83:10, 112:20
**origin** [4] - 16:25, 24:1, 41:11, 134:7
**originated** [1] - 23:24
**origination** [2] - 44:9, 129:4
**otherwise** [5] - 22:22, 23:1, 33:22, 38:6, 125:16
**ourselves** [1] - 69:23
**outcome** [1] - 93:3
**outside** [3] - 57:20, 66:19, 127:24
**overcomplicate** [1] - 16:16
**overrode** [1] - 53:12
**overruled** [3] - 87:20, 97:15, 130:22
**overt** [5] - 16:14, 41:24, 42:2, 137:6
**overwhelming** [2] - 17:10, 70:1
**own** [14] - 8:2, 11:12, 66:6, 71:7, 80:10, 80:21, 83:20, 86:21, 87:8, 87:24, 108:2, 135:22, 135:23, 135:24
**owner** [7] - 15:13, 15:17, 18:7, 19:1, 96:11, 133:9, 133:11
**owners** [1] - 133:20
**owns** [1] - 15:21

**P**

**package** [5] - 28:3, 28:12, 41:8, 134:4, 134:5
**packaging** [1] - 36:7
**page** [13] - 4:9, 4:10, 4:11, 4:13, 4:14, 4:22, 4:25, 22:5, 36:17, 37:11, 38:9, 40:3, 117:23
**Pages** [1] - 1:8
**pages** [1] - 140:20
**paid** [4] - 6:6, 6:7, 14:13, 37:16
**Pampers** [19] - 62:6, 62:7, 62:12, 62:16, 62:19, 62:20, 63:3, 63:5, 63:8, 63:9, 63:13, 63:15, 64:19, 74:15, 96:20, 96:22, 97:20, 139:14, 139:15
**paper** [16] - 3:10, 3:13, 3:16, 3:21, 12:25, 104:15, 132:3, 138:14, 139:4, 139:7, 139:9, 140:12, 140:16, 140:19, 141:11
**papers** [1] - 69:8
**paperwork** [13] - 18:20, 33:8, 39:17, 45:9, 57:15, 77:8, 116:12, 117:17, 122:4, 122:8, 122:9, 131:11
**paragraph** [2] - 4:17, 86:19
**Parekh** [3] - 15:13, 44:16, 78:16
**parent** [1] - 75:14
**part** [15] - 3:14, 16:18, 41:14, 44:12, 48:3, 86:10, 89:18, 96:10, 105:20, 107:4, 108:10, 109:17, 111:23, 118:4, 135:4
**participated** [1] - 66:17
**particular** [4] - 89:19, 90:7, 93:1, 139:6
**particularly** [2] - 13:17, 14:22
**partner** [2] - 18:4, 137:24
**partnership** [1] - 18:2
**parts** [1] - 7:10
**party** [2] - 109:14, 140:3
**pass** [1] - 104:10
**passed** [1] - 105:2
**Pat** [17] - 19:18, 45:16, 55:20, 59:24, 66:12, 71:21, 71:25, 72:7, 72:19, 76:15, 79:17, 85:7, 85:22, 105:8, 109:25, 115:11, 136:18
**patience** [2] - 6:5, 48:7
**patient** [10] - 12:23, 13:3, 15:9, 15:17, 27:5, 36:12, 46:16, 47:19, 126:20, 133:11
**patient's** [1] - 135:17
**patients** [15] - 10:4, 15:14, 17:9, 38:1, 38:2, 38:7, 45:4, 45:8, 46:19, 46:21, 118:15, 126:23, 126:24, 131:23
**patients'** [1] - 46:25
**PATRICIA** [2] - 2:2, 142:15

**PATRICK** [2] - 1:7, 1:17
**Patrick** [130] - 6:16, 8:16, 9:5, 9:18, 10:23, 12:12, 13:20, 14:20, 18:19, 20:21, 23:18, 24:8, 27:6, 29:19, 30:7, 32:8, 37:16, 39:15, 39:22, 42:20, 46:23, 48:14, 48:15, 48:18, 48:20, 48:23, 48:24, 49:2, 49:12, 49:15, 49:16, 49:20, 50:3, 50:4, 50:9, 50:10, 50:16, 50:20, 50:24, 51:4, 51:11, 51:13, 51:14, 51:19, 52:24, 53:7, 53:11, 53:12, 53:14, 53:19, 53:22, 53:24, 54:1, 54:5, 54:8, 54:16, 54:17, 54:23, 55:1, 55:6, 55:23, 59:11, 59:16, 59:21, 60:21, 62:4, 62:14, 63:22, 64:17, 64:22, 65:20, 66:1, 66:8, 67:7, 67:9, 67:15, 67:19, 67:24, 67:25, 68:5, 68:11, 68:21, 69:2, 69:13, 69:16, 69:19, 69:24, 70:19, 73:3, 73:14, 73:16, 73:23, 73:25, 75:20, 76:20, 77:20, 78:22, 80:2, 80:24, 83:5, 88:12, 94:23, 96:12, 97:25, 98:6, 114:21, 116:8, 116:18, 117:7, 118:18, 118:24, 119:4, 119:6, 122:20, 125:14, 125:25, 126:3, 127:2, 127:8, 128:16, 130:11, 132:2, 133:20, 134:23, 136:25, 137:3
**patsies** [3] - 113:17, 113:18
**pattern** [2] - 128:5
**pay** [5] - 91:2, 95:25, 96:1, 104:7
**paying** [2] - 44:13, 108:17
**payment** [1] - 45:13
**payments** [1] - 16:5
**pedigree** [4] - 11:20, 22:23, 35:13, 44:10
**pedigrees** [17] - 12:3, 12:14, 12:17, 13:12, 16:25, 23:3, 23:25, 24:2, 37:19, 41:19, 86:1, 118:2, 118:21, 124:9, 129:7, 134:10, 136:18
**penalties** [1] - 31:2
**people** [28] - 6:22, 6:23, 17:8, 23:6, 29:17, 56:19, 75:12, 75:13, 76:24, 77:15, 82:12, 84:2, 97:4, 97:19, 101:16, 106:18, 111:16, 113:17, 113:18, 118:8, 118:9, 119:9, 119:17, 123:17, 132:11, 133:5, 133:25
**people's** [3] - 60:5, 110:19, 118:8
**percent** [10] - 37:22, 37:23, 46:12, 46:14, 72:13, 95:21, 96:3, 113:1, 113:15, 116:12
**percentage** [1] - 19:9
**perfect** [2] - 113:11
**person** [22] - 18:11, 53:5, 54:22, 55:6, 57:7, 63:6, 63:7, 64:9, 71:8, 71:9, 87:17, 87:21, 87:23, 88:6, 91:14, 94:24, 101:22, 109:2, 109:3, 111:24, 127:21, 131:14
**personal** [3] - 80:22, 93:3, 127:10
**personally** [1] - 132:18
**persons** [1] - 16:9
**Pesident** [1] - 21:4
**Peter** [151] - 7:7, 9:8, 9:24, 10:2, 10:6, 10:20, 10:23, 12:2, 13:24, 18:7, 21:5, 21:9, 21:10, 21:11, 21:13, 21:14, 21:23, 24:22, 24:25, 25:10, 26:17, 26:22, 27:20, 28:21, 29:14, 32:8, 32:10, 32:19, 32:20, 33:12, 33:14, 33:17, 34:3, 34:6, 34:14, 35:6, 36:11, 36:21, 37:3, 40:1, 40:20, 40:22, 44:2, 47:4, 50:17, 52:24, 52:25, 55:12, 55:21, 55:24, 55:25, 56:2, 56:4, 56:5, 56:9, 56:23, 56:25, 57:3, 57:4, 57:6, 57:7, 58:17, 58:21, 58:25, 59:5, 59:21, 60:10, 60:11, 60:18, 61:4, 61:10, 61:13, 61:16, 61:20, 62:7, 62:20, 63:6, 63:16, 63:18, 63:19, 63:20, 64:10, 64:12, 64:13, 64:15, 65:5, 65:11, 72:17, 74:8, 74:10, 74:13, 74:14, 76:19, 76:24, 87:17, 87:25, 88:3, 88:4, 88:9, 88:11, 88:24, 89:5, 89:14, 90:1, 90:5, 90:20, 90:24, 91:18, 91:21, 91:25, 92:4, 92:8, 93:2, 93:5, 93:10, 94:5, 94:6, 94:15, 94:19, 96:23, 97:9, 97:22, 101:23, 102:2, 102:8, 103:14, 103:17, 112:1, 113:18, 115:22, 115:25, 116:7, 116:17, 117:2, 117:9, 118:5, 118:7, 118:13, 119:3, 120:1, 120:13, 122:12, 127:2, 127:16, 133:8, 134:9, 136:14
**Peter's** [1] - 74:11
**Pfizer** [1] - 19:16
**Ph** [1] - 1:19
**Pharm/alert** [1] - 43:12
**Pharma** [2] - 46:21, 114:25
**pharmaceutical** [4] - 6:22, 12:22, 13:8, 52:2
**pharmaceuticals** [1] - 86:1
**pharmacies** [25] - 9:1, 9:13, 10:7, 11:16, 14:1, 17:9, 18:20, 18:21, 21:24, 23:23, 24:1, 35:23, 36:5, 37:25, 38:7, 44:15, 57:5, 57:11, 58:18, 59:5, 74:17, 103:21, 117:9, 118:14, 134:14
**pharmacies'** [1] - 46:24
**pharmacist** [6] - 78:16, 126:9, 126:14, 126:16, 126:17, 126:22
**pharmacy** [30] - 15:17, 15:21, 17:17, 22:4, 22:6, 34:11, 35:12, 36:7, 41:19, 41:20, 45:7, 50:1, 50:13, 50:14, 50:16, 57:15, 60:9, 60:16, 73:10, 103:2, 103:3, 116:13, 118:2, 125:22, 126:18, 131:25, 133:9, 133:11, 134:11, 135:13
**Pharmacy** [14] - 22:3, 22:11, 32:23, 35:4, 35:21, 36:18, 37:20, 42:3, 43:20, 45:22, 99:5, 99:10, 102:17, 126:19
**pharmacy's** [2] - 60:12, 135:17
**phone** [13] - 32:7, 32:20, 32:23, 34:7, 34:10, 34:13, 34:16, 34:22, 35:6, 36:16, 116:10, 117:19, 119:8
**phones** [2] - 73:5, 73:6
**phony** [5] - 21:13, 45:8, 45:9, 99:22, 128:17
**photo** [3] - 28:8, 28:11, 126:20
**photos** [2] - 7:6, 137:10
**phrased** [1] - 119:20
**physical** [2] - 139:13, 140:10
**pick** [2] - 27:22, 127:23
**picked** [2] - 114:7, 114:8
**picks** [1] - 58:7
**picture** [11] - 32:6, 63:11, 83:17, 83:23, 91:25, 92:14, 103:22, 110:13, 110:17, 111:1
**pictures** [1] - 29:12
**piece** [3] - 58:10, 65:9, 132:3
**pills** [10] - 20:4, 33:25, 34:3, 43:9, 51:17, 78:7, 78:15, 85:25, 118:12, 120:1
**pity** [1] - 64:21
**place** [8] - 37:7, 38:16, 44:11, 48:15, 83:7, 87:23, 98:11, 106:6
**plan** [5] - 16:10, 18:12, 18:17, 103:16
**plan's** [1] - 16:12
**planned** [1] - 99:21
**plans** [1] - 21:17
**plausible** [1] - 135:6
**play** [3] - 45:19, 91:2, 122:23
**playback** [4] - 11:18, 11:22, 23:4, 33:19
**played** [1] - 13:19
**plead** [2] - 80:12
**plucked** [1] - 114:7
**plug** [1] - 88:23
**plus** [2] - 15:7, 123:25
**PM** [5] - 1:6, 61:5, 81:12
**PO** [3] - 20:16, 20:24, 61:8
**Pogozelski** [7] - 1:13, 5:21, 5:24, 40:11, 48:2, 115:15, 134:20
**POGOZELSKI** [34] - 3:7, 3:12, 3:19, 3:25, 4:7, 4:12, 4:15, 5:2, 5:11, 5:25, 11:19, 11:23, 13:20, 23:5, 33:20, 40:12, 43:25, 47:8, 48:4, 65:1, 81:18, 82:1, 87:19, 97:13, 115:16, 130:23, 134:21, 138:24, 139:18, 140:9, 140:17, 141:6, 141:19, 142:4
**point** [22] - 18:10, 24:5, 26:19, 36:1, 60:14, 66:4, 72:3, 80:1, 89:20, 102:2, 102:4, 103:7, 103:17, 107:18, 110:7, 118:23, 122:17, 122:19, 128:24, 132:1, 133:3, 140:17
**Point** [1] - 38:18
**points** [3] - 53:18, 58:7, 75:24
**police** [1] - 83:10
**polling** [2] - 5:10, 81:25
**pop** [2] - 11:8, 22:6
**pops** [1] - 91:25
**portion** [1] - 113:8
**portions** [1] - 140:1
**position** [1] - 139:5

**positive** [1] - 134:7
**positives** [1] - 46:9
**possible** [4] - 39:10, 74:25, 77:14
**possibly** [2] - 51:10, 53:15
**potato** [1] - 72:21
**potential** [1] - 19:15
**potentially** [1] - 87:14
**power** [1] - 60:20
**PR** [2] - 20:18, 128:17
**practically** [1] - 24:2
**pre** [1] - 134:15
**pre-COVID** [1] - 134:15
**precedent** [1] - 14:13
**preceding** [1] - 46:8
**prefer** [2] - 3:19, 3:22
**preference** [2] - 3:13, 141:18
**prepared** [2] - 110:3, 111:6
**prescriptions** [1] - 85:25
**presence** [7] - 5:9, 5:16, 48:1, 81:5, 81:24, 82:6, 138:4
**present** [7] - 3:4, 5:18, 81:15, 85:1, 91:2
**presentation** [2] - 7:9, 94:7
**presented** [15] - 6:8, 29:18, 82:21, 83:22, 96:19, 99:24, 103:22, 105:20, 110:1, 110:11, 110:24, 119:24, 120:21, 132:21, 133:7
**preserved** [1] - 110:7
**press** [1] - 90:4
**pressure** [4] - 51:4, 67:15, 68:3, 68:4
**pressured** [11] - 50:20, 50:24, 50:25, 51:11, 51:13, 53:22, 67:11, 67:19, 67:24, 68:11, 68:13
**pressures** [1] - 67:14
**pressuring** [3] - 51:9, 67:9, 125:14
**presumed** [1] - 84:7
**pretend** [1] - 59:2
**pretended** [1] - 59:21
**pretending** [2] - 60:1, 61:17
**pretty** [5] - 16:11, 26:11, 33:25, 127:14, 131:13
**previous** [2] - 34:24, 74:17
**previously** [4] - 10:13, 26:13, 82:16, 116:21
**Prezcobix** [1] - 20:6
**price** [2] - 36:19, 49:12
**prices** [7] - 11:11, 13:24, 15:1, 49:10, 128:7, 135:20
**pricing** [3] - 15:16, 15:22, 133:12
**Pricing** [1] - 47:13
**primarily** [1] - 66:8
**prison** [10] - 54:12, 63:20, 63:21, 65:8, 65:14, 68:12, 68:18, 72:17, 90:8, 91:8
**privately** [1] - 47:24
**probability** [1] - 41:7
**problem** [22] - 12:4, 12:6, 19:13, 20:3, 26:25, 27:1, 27:2, 31:22, 37:22, 37:23, 39:10, 43:7, 52:7, 52:15, 74:14, 78:14, 78:18, 83:22, 116:12, 135:18, 139:25
**problems** [10] - 15:25, 19:21, 21:3, 27:6, 36:13, 38:8, 78:12, 119:10, 135:9, 135:15
**procedure** [3] - 111:3, 115:24, 116:6
**procedures** [1] - 11:12
**proceed** [7] - 5:24, 7:20, 82:7, 120:18, 136:8, 136:10, 139:11
**proceedings** [2] - 81:13, 142:11
**process** [2] - 94:22, 111:9
**processes** [2] - 71:5
**produce** [3] - 107:20, 140:18, 141:10
**product** [23] - 20:4, 22:9, 29:13, 29:16, 30:3, 33:1, 33:6, 35:12, 35:25, 36:3, 40:23, 42:24, 42:25, 43:10, 43:23, 104:21, 109:11, 111:11, 111:16, 124:6, 124:7, 129:2, 135:22
**products** [6] - 7:17, 23:10, 44:7, 102:20, 111:3, 134:25
**profit** [4] - 95:8, 113:1, 113:2, 113:15
**program** [2] - 49:24, 50:2
**programs** [1] - 44:10
**progress** [2] - 39:17, 39:22
**promises** [2] - 35:23, 36:5
**proof** [15] - 51:12, 73:1, 74:24, 75:1, 75:8, 75:16, 75:25, 76:1, 76:5, 76:10, 86:13, 86:19, 86:20, 112:6
**Proof** [1] - 75:8
**proposed** [1] - 104:19
**prosecuted** [2] - 90:14, 90:16
**prosecution** [1] - 84:24
**prosecutor** [3] - 50:23, 61:3, 71:17
**Prosecutor** [2] - 63:17
**prosecutors** [4] - 67:23, 90:11, 91:6, 106:16
**prove** [14] - 74:25, 75:22, 76:5, 76:6, 76:7, 78:9, 84:8, 84:11, 84:12, 85:6, 97:21, 100:10, 100:11, 114:9
**proved** [10] - 85:9, 86:23, 114:13, 114:15, 114:16, 114:19, 115:11
**proven** [1] - 124:13
**proves** [1] - 58:13
**provide** [2] - 103:12, 104:8
**provided** [7] - 35:9, 100:1, 101:7, 103:17, 107:13, 128:13, 138:18
**provides** [1] - 89:21
**providing** [1] - 131:13
**pseudo** [1] - 110:1
**published** [5] - 11:18, 11:22, 13:19, 23:4, 33:19
**Puerto** [1] - 133:14
**pull** [4] - 60:20, 74:16, 88:23, 111:15
**pulls** [2] - 57:24, 58:9
**purchase** [4] - 112:25, 113:6, 113:10, 113:14
**purchased** [2] - 36:19, 124:7
**purchases** [1] - 37:18
**purity** [1] - 133:21
**purpose** [4] - 13:21, 16:13, 85:18, 99:19
**purposely** [1] - 85:17
**purposes** [1] - 18:2
**pursue** [1] - 14:14
**purview** [1] - 29:17
**put** [27] - 9:17, 9:23, 14:19, 20:12, 20:25, 31:4, 32:18, 36:14, 39:2, 39:11, 39:24, 40:1, 47:25, 61:22, 65:7, 68:12, 70:9, 70:19, 77:7, 104:14, 117:20, 119:12, 119:16, 121:22, 127:10, 128:16, 136:19
**puts** [1] - 33:14
**putting** [5] - 14:21, 14:23, 31:6, 37:25, 38:25

**Q**

**quality** [2] - 24:1, 94:2
**quantity** [1] - 33:6
**quarantined** [2] - 42:14, 42:18
**quarterback** [1] - 92:19
**Queens** [2] - 24:8, 121:23
**QUESTION** [9] - 66:5, 66:8, 66:11, 66:14, 66:18, 66:22, 67:1, 67:3, 67:5
**questioned** [2] - 109:19, 133:13
**questioning** [4] - 9:15, 10:25, 40:2, 134:12
**questions** [19] - 12:16, 31:22, 35:19, 50:23, 67:11, 67:23, 69:23, 80:6, 80:17, 80:18, 89:24, 93:11, 105:14, 106:19, 111:2, 117:12, 119:20, 134:17, 141:3
**quickly** [1] - 17:3
**quite** [1] - 82:24
**quotations** [1] - 103:9
**quote** [2] - 74:6, 128:17
**quote-unquote** [1] - 128:17

**R**

**races** [1] - 118:1
**radioactive** [1] - 72:14
**raid** [3] - 114:22, 114:23, 127:1
**rain** [1] - 19:5
**raise** [2] - 28:19, 53:18
**raised** [3] - 6:20, 24:19, 122:18
**Ralhan** [1] - 76:23
**rampage** [2] - 39:18, 39:23
**ran** [3] - 6:16, 115:2, 117:6
**Rapid's** [2] - 67:20, 128:3
**rare** [2] - 31:9, 31:11
**ratifying** [1] - 125:22
**reach** [3] - 84:3, 101:15, 132:24
**reaches** [1] - 101:2
**reactions** [1] - 83:20
**read** [16] - 10:19, 53:8, 53:9, 65:24, 69:10, 80:14, 82:17, 82:18, 103:9, 109:25, 121:24, 126:5, 137:18
**reading** [2] - 24:9, 89:14
**real** [15] - 64:10, 75:2, 86:11, 88:25, 90:22, 92:5, 92:15, 94:2, 96:18, 97:8, 102:9, 112:12, 112:23, 115:4, 139:2
**reality** [2] - 96:17, 96:18
**realize** [2] - 60:3, 88:20
**realizes** [2] - 60:7, 107:19
**Really** [1] - 111:5
**really** [33] - 10:9, 18:1, 22:19, 37:6, 49:7, 49:23, 51:10, 59:4, 59:8, 62:21, 66:11, 66:22, 68:4, 72:19, 90:1, 91:15, 94:18, 96:7, 104:12, 108:5, 109:20, 109:24, 112:4, 115:10, 119:7, 120:7, 120:25, 122:6, 122:7, 125:14, 126:9
**reason** [9] - 14:1, 63:16, 75:3, 83:14, 90:7, 93:1, 105:2, 124:10, 141:2

**reasonable** [35] - 47:2, 51:12, 62:2, 68:15, 74:20, 74:23, 75:1, 75:2, 75:8, 75:16, 75:25, 76:11, 77:3, 78:9, 79:9, 80:1, 80:15, 80:20, 80:22, 80:23, 84:11, 84:13, 85:6, 85:8, 86:13, 86:15, 86:19, 86:24, 100:12, 108:5, 114:9, 114:16, 121:11, 132:14, 137:16
**reasonably** [1] - 130:24
**reasons** [1] - 105:18
**rebuttal** [2] - 5:23, 48:3
**receive** [1] - 134:4
**received** [7] - 24:1, 24:6, 95:23, 103:2, 111:12, 116:20, 130:23
**receives** [1] - 41:8
**receiving** [3] - 49:17, 86:5
**recently** [2] - 25:17, 120:17
**recess** [4] - 81:3, 81:10, 138:2, 142:2
**recollection** [1] - 109:16
**recommendation** [1] - 87:24
**recommending** [1] - 88:4
**recommends** [1] - 87:16
**record** [3] - 3:3, 81:12, 81:14
**records** [7] - 77:9, 98:8, 99:23, 105:22, 106:3, 106:4, 107:19
**recycled** [1] - 64:1
**red** [6] - 7:3, 24:20, 28:19, 46:8, 57:19, 58:7
**redirect** [1] - 117:12
**reduced** [2] - 90:13, 91:19
**redundant** [1] - 86:16
**reference** [1] - 61:8
**references** [1] - 106:6
**refunded** [2] - 35:19, 73:17
**refunding** [1] - 73:9
**refused** [3] - 64:11, 102:3
**regardless** [3] - 42:21, 49:11, 118:19
**regulations** [3] - 22:25, 51:25, 52:19
**regulatory** [1] - 33:8
**rejecting** [1] - 35:12
**relate** [1] - 85:21
**relates** [3] - 87:13, 88:6, 100:6
**relating** [3] - 44:9, 111:3, 129:4
**relationship** [1] - 36:25
**relevant** [4] - 38:12, 116:15, 125:10, 130:4
**relied** [3] - 106:24, 107:24, 130:24
**rely** [6] - 75:9, 86:20, 108:1, 108:5, 132:23, 133:4
**relying** [4] - 65:7, 68:20, 98:25, 105:9
**remainder** [1] - 95:24
**remember** [34] - 22:2, 48:19, 49:23, 50:22, 51:1, 52:1, 52:10, 52:17, 53:25, 58:22, 60:3, 60:14, 61:20, 64:9, 70:3, 70:15, 70:21, 72:4, 76:4, 76:9, 77:11, 79:12, 81:4, 98:20, 98:24, 99:1, 101:16, 106:2, 106:19, 111:2, 111:4, 121:23, 138:3
**reminded** [1] - 83:16
**reminds** [1] - 57:17
**remove** [2] - 88:23, 114:25
**rep** [5] - 13:7, 27:13, 27:15, 127:20, 133:8
**repeatedly** [4] - 99:25, 125:12
**repeating** [1] - 123:11
**repetitive** [1] - 140:1
**report** [14] - 20:13, 39:9, 42:20, 43:1, 43:9, 61:19, 71:6, 109:11, 109:13, 109:22, 118:19, 129:10, 130:19
**REPORTED** [1] - 2:1
**reported** [6] - 16:3, 19:22, 26:6, 42:24, 42:25, 135:10
**reporter** [1] - 43:24
**Reporter** [2] - 2:3, 142:15
**reporting** [2] - 43:11, 109:14
**represent** [2] - 80:2, 132:17
**representations** [1] - 100:21
**represented** [2] - 15:3, 88:10
**representing** [2] - 112:14, 136:24
**reps** [1] - 39:16
**request** [2] - 73:23, 140:9
**requesting** [1] - 61:19
**requests** [2] - 43:24, 99:25
**require** [1] - 84:13
**required** [2] - 33:8, 100:10
**requirement** [6] - 12:24, 12:25, 35:13, 36:24, 37:2, 49:9
**requirements** [3] - 11:20, 22:23, 85:21
**requiring** [1] - 100:8
**reread** [1] - 61:25
**researching** [1] - 47:25
**reservation** [1] - 97:23
**reserve** [1] - 130:21
**resided** [1] - 42:1
**resold** [2] - 11:16, 13:23
**responded** [1] - 107:14
**responding** [3] - 107:3, 107:4, 108:11
**response** [3] - 74:11, 109:6, 109:9
**responses** [1] - 122:4
**responsible** [3] - 78:7, 79:15, 109:14
**rest** [3] - 4:4, 71:2, 72:24
**rested** [1] - 5:17
**resume** [2] - 22:21, 23:1
**retrospect** [3] - 92:18, 92:22, 112:12
**return** [4] - 40:23, 53:15, 84:13, 114:11
**returns** [1] - 73:13
**revenue** [2] - 46:5, 46:11
**revenues** [2] - 113:5, 113:6
**review** [1] - 132:23
**reviewed** [3] - 30:1, 50:6, 77:8
**reviewing** [3] - 106:6, 136:6, 137:14
**Reyes** [1] - 21:2
**Rico** [1] - 133:14
**rid** [2] - 95:8, 110:8
**rise** [3] - 81:7, 81:11, 138:7
**Rochester** [5] - 30:10, 34:14, 34:18, 117:21
**role** [7] - 14:7, 48:20, 53:19, 66:6, 66:8, 122:23
**roles** [1] - 8:18
**Rolex** [1] - 59:7
**rolling** [1] - 39:18
**room** [5] - 67:8, 80:6, 81:6, 99:25, 105:21
**row** [1] - 58:1
**RPR** [2] - 2:2, 142:15
**rubber** [1] - 36:12
**rule** [2] - 4:6, 105:3
**rules** [4] - 52:19, 84:4, 84:5, 84:20
**Rumore** [11] - 15:3, 24:19, 26:25, 39:3, 39:7, 52:10, 78:11, 121:5, 125:11, 129:17, 134:24
**Rumore's** [1] - 52:1
**run** [3] - 119:15, 120:19, 136:24
**runners** [1] - 64:14

**S**

**sad** [2] - 8:23, 9:2
**Safe** [83] - 6:17, 8:19, 8:21, 8:24, 9:11, 9:15, 15:22, 16:2, 19:1, 22:23, 23:17, 25:15, 26:18, 27:1, 42:13, 43:16, 45:1, 45:18, 49:4, 50:4, 50:17, 51:20, 52:13, 53:19, 55:13, 55:22, 55:25, 56:10, 59:1, 59:3, 62:23, 66:5, 67:5, 70:9, 71:3, 72:6, 72:25, 78:4, 78:7, 78:10, 94:21, 95:1, 95:4, 95:5, 95:6, 95:12, 95:14, 95:16, 95:17, 95:18, 95:23, 95:24, 95:25, 96:8, 96:23, 96:24, 98:11, 101:7, 102:19, 102:21, 102:24, 103:3, 103:6, 103:19, 104:1, 104:7, 106:7, 107:12, 110:2, 111:3, 112:3, 113:5, 113:13, 122:25, 123:5, 125:4, 128:12, 128:21, 133:10, 133:21
**safe** [1] - 8:22
**safest** [1] - 15:12
**safety** [2] - 12:23, 35:14
**Salemi** [1] - 71:20
**sales** [14] - 13:7, 14:12, 14:14, 27:13, 27:15, 36:4, 39:16, 48:21, 53:20, 55:1, 61:19, 66:9, 127:20, 133:8
**salesmen** [1] - 100:24
**satisfied** [1] - 85:8
**saved** [3] - 27:21, 46:6, 136:1
**saw** [61] - 6:24, 6:25, 10:11, 10:14, 10:17, 10:18, 10:24, 11:13, 12:10, 12:12, 13:5, 14:16, 14:19, 15:20, 15:25, 19:1, 20:10, 22:21, 23:16, 23:18, 24:9, 29:12, 29:15, 30:5, 30:20, 31:5, 32:5, 46:7, 46:8, 56:2, 57:7, 62:23, 62:25, 63:3, 64:17, 65:5, 73:15, 74:6, 91:24, 93:13, 95:19, 104:6, 104:17, 105:13, 106:13, 113:3, 115:3, 116:11, 116:14, 120:9, 120:20, 121:21, 122:13, 126:20, 127:14
**scamming** [1] - 60:16
**scenario** [1] - 113:11
**scheme** [4] - 10:20, 46:3, 121:24, 122:6
**schemes** [1] - 24:10
**scoundrel** [1] - 109:24
**screen** [2] - 41:6, 127:16
**scuff** [1] - 126:20
**scuffed** [2] - 27:24, 36:11
**scuffed-up** [2] - 27:24, 36:11
**sea** [1] - 133:22
**seal** [1] - 78:6
**sealed** [5] - 20:6, 27:10, 27:12, 27:14, 27:17
**search** [1] - 110:2
**second** [15] - 4:17, 14:9, 49:22, 51:18,

53:21, 53:22, 58:25, 69:7, 72:7, 91:11, 91:12, 104:24, 107:16, 111:14, 128:17
**secret** [1] - 91:13
**Security** [2] - 35:13, 125:25
**SECURITY** [2] - 81:7, 81:11
**sedan** [1] - 127:18
**see** [89] - 9:7, 10:22, 17:14, 17:15, 20:2, 20:15, 21:4, 22:10, 25:14, 26:7, 28:2, 28:3, 28:14, 28:25, 31:12, 32:2, 32:9, 34:5, 34:16, 34:17, 34:19, 34:21, 38:3, 40:17, 41:6, 41:24, 43:15, 44:13, 46:11, 47:8, 47:10, 47:24, 50:2, 61:13, 64:21, 77:20, 81:5, 83:12, 85:11, 89:5, 91:8, 96:13, 98:10, 99:23, 99:24, 100:6, 100:24, 104:18, 105:20, 105:21, 105:22, 106:5, 107:20, 107:21, 108:7, 108:9, 108:22, 109:8, 110:14, 110:17, 110:18, 110:25, 111:1, 112:4, 117:15, 119:14, 119:16, 121:6, 121:7, 122:21, 123:7, 124:12, 125:7, 127:16, 128:21, 129:23, 130:16, 132:7, 132:10, 133:24, 134:12, 134:22, 135:12, 137:18, 138:6
**seeking** [1] - 130:3
**seem** [4] - 6:21, 43:4, 93:6, 131:10
**seemingly** [1] - 127:10
**seized** [1] - 110:10
**seizure** [1] - 110:10
**selective** [1] - 93:7
**sell** [7] - 10:1, 18:18, 18:19, 22:8, 49:9, 55:21, 111:16
**selling** [7] - 12:14, 27:16, 28:16, 37:24, 38:16, 74:2, 131:3
**sells** [1] - 59:1
**Send** [1] - 61:20
**send** [21] - 3:15, 3:16, 21:15, 25:12, 32:12, 33:7, 50:11, 50:14, 54:12, 55:25, 56:5, 60:2, 68:18, 101:18, 104:1, 108:8, 111:16, 111:19, 123:6, 138:9, 138:25
**Sending** [1] - 28:3
**sending** [21] - 3:9, 14:20, 20:7, 20:24, 24:25, 25:24, 31:12, 34:24, 49:17, 50:10, 60:8, 61:12, 61:16, 85:24, 85:25, 86:1, 86:4, 86:5, 101:15, 111:9
**sends** [7] - 12:10, 14:9, 14:10, 23:17, 28:8, 45:19, 98:23
**sense** [33] - 6:24, 7:2, 10:8, 15:23, 21:20, 21:21, 22:1, 22:10, 22:13, 22:14, 22:17, 26:13, 33:3, 33:4, 36:15, 41:21, 54:13, 58:20, 61:18, 69:1, 75:3, 75:5, 95:5, 119:23, 121:16, 121:17, 121:21, 133:15, 134:13, 137:14
**sent** [22] - 23:20, 32:4, 32:20, 40:20, 45:16, 45:22, 49:15, 50:9, 50:17, 63:12, 72:23, 77:12, 86:7, 94:21, 101:20, 102:19, 103:2, 103:20, 103:24, 107:17, 108:2, 135:13
**sentence** [3] - 75:7, 90:13, 91:19
**separate** [2] - 4:17, 41:4
**separately** [1] - 139:22
**September** [6] - 10:18, 17:18, 33:23, 36:1, 41:1, 47:14
**series** [1] - 139:21
**Seroquel** [2] - 15:15, 47:19
**servers** [1] - 45:17
**service** [4] - 6:3, 14:14, 80:8, 123:5
**set** [4] - 48:24, 83:11, 94:25, 101:10
**setting** [1] - 49:12
**settlement** [1] - 19:15
**seven** [2] - 128:4, 133:18
**several** [1] - 105:13
**shared** [5] - 16:10, 18:17, 24:14
**sheet** [1] - 132:2
**shield** [1] - 95:11
**ship** [3] - 25:2, 35:24, 111:11
**shipments** [2] - 7:16, 34:25
**shipped** [11] - 6:25, 10:12, 24:21, 26:18, 35:24, 36:10, 36:11, 43:16, 61:8, 64:12, 125:19
**shipping** [5] - 12:18, 42:3, 44:9, 111:10, 129:4
**shocked** [1] - 122:1
**shoot** [1] - 57:25
**shooting** [1] - 58:3
**shoots** [1] - 58:8
**shorter** [1] - 139:22
**shortly** [1] - 102:8
**shots** [1] - 57:21
**show** [21] - 4:4, 6:13, 8:12, 16:5, 35:22, 66:2, 80:7, 83:11, 83:15, 86:8, 91:23, 102:11, 106:9, 107:15, 110:13, 111:1, 123:9, 126:2, 136:23, 141:12
**showed** [6] - 4:3, 40:19, 48:13, 70:22, 126:3, 128:11
**shown** [3] - 83:12, 98:20, 119:3
**shows** [11] - 30:11, 34:15, 34:18, 38:6, 52:7, 53:1, 54:24, 70:24, 83:10, 107:22, 109:9
**shred** [1] - 42:10
**shredder** [1] - 110:4
**shut** [1] - 70:11
**sick** [1] - 24:12
**side** [5] - 5:21, 58:9, 63:22, 80:18, 80:19
**sides** [3] - 5:17, 76:2, 76:3
**sift** [1] - 132:8
**sign** [1] - 113:16
**signed** [2] - 19:8, 112:2
**significant** [3] - 87:6, 87:17, 124:7
**signs** [1] - 29:11
**siloed** [1] - 18:15
**similar** [1] - 26:1
**similarly** [3] - 14:20, 16:8, 100:16
**simple** [3] - 7:20, 27:16, 56:22
**simply** [3] - 22:17, 63:14, 78:23
**single** [5] - 17:18, 53:1, 54:11, 101:6, 129:9
**sit** [5] - 76:8, 82:13, 82:17, 82:19, 99:8
**sitting** [4] - 8:17, 59:8, 63:18, 80:9
**situation** [3] - 12:8, 91:24, 116:25
**situations** [1] - 51:23
**six** [4] - 37:2, 99:1, 103:10, 133:18
**six-weeks** [1] - 99:1
**sketchy** [2] - 25:22, 25:23
**skipped** [1] - 47:10
**slammed** [1] - 73:5
**sleazy** [1] - 99:9
**sleep** [1] - 51:19
**slick** [1] - 94:7
**slightly** [1] - 8:13
**slow** [1] - 48:12
**slowly** [1] - 22:8
**small** [3] - 113:1, 119:23, 133:21
**social** [1] - 47:25
**sold** [12] - 15:1, 17:2, 23:24, 25:11, 33:2, 33:7, 34:11, 58:23, 61:21, 117:18, 118:14
**solution** [1] - 21:12
**Solutions** [3] - 6:17, 8:19, 71:3
**someone** [17] - 13:9, 26:15, 49:24, 54:10, 55:3, 60:8, 63:11, 64:24, 84:19, 88:7, 89:8, 96:4, 96:6, 111:23, 116:7, 130:16, 131:11
**sometimes** [5] - 16:1, 66:25, 67:3, 104:24
**somewhere** [1] - 63:18
**Son** [1] - 58:3
**soon** [1] - 64:3
**sophisticated** [1] - 122:6
**SOPs** [11] - 29:5, 29:25, 30:2, 31:15, 71:4, 71:7, 71:13, 129:10, 135:21, 135:23, 135:24
**Sorry** [1] - 32:2
**sorry** [4] - 32:8, 57:16, 116:12, 137:11
**sort** [7] - 66:6, 83:8, 87:1, 98:16, 115:23, 119:14
**sorts** [4] - 103:8, 116:21, 120:25, 125:7
**sound** [6] - 84:15, 92:12, 109:23, 123:11, 125:25
**sounded** [5] - 80:18, 83:17, 96:16, 122:1
**sounds** [5] - 33:25, 96:18, 97:2, 135:6
**source** [10] - 13:14, 24:3, 56:24, 56:25, 88:24, 90:15, 92:1, 92:4, 92:7, 92:9
**sourcing** [3] - 123:20, 126:18, 134:10
**Southern** [1] - 142:16
**SOUTHERN** [1] - 1:1
**space** [1] - 23:8
**specialty** [1] - 23:10
**specific** [7] - 17:4, 17:5, 42:13, 42:14, 43:15, 85:14, 87:2
**spend** [1] - 87:2
**spent** [2] - 36:22, 56:13
**spoken** [2] - 53:5, 94:22
**spouse** [1] - 87:6
**spreadsheet** [2] - 33:7, 61:7
**stand** [12] - 50:22, 54:2, 54:25, 58:16, 61:24, 65:6, 67:21, 104:25, 122:13, 125:11, 136:12, 137:23
**standard** [1] - 11:12
**standing** [3] - 51:4, 57:20, 67:25
**star** [6] - 93:20, 93:21, 120:12, 120:13, 136:14
**start** [6] - 6:2, 7:12, 34:8, 43:13, 98:7, 106:5
**started** [10] - 4:2, 12:4, 12:6, 19:2, 19:3, 64:19, 94:22, 99:11, 104:11, 132:2
**starting** [3] - 28:19,

43:11, 111:8
**starts** [5] - 60:11, 107:2, 107:3, 107:4, 117:4
**state** [4] - 22:22, 22:24, 73:18, 124:13
**statement** [11] - 8:3, 10:1, 12:15, 42:12, 42:16, 44:16, 46:13, 72:4, 106:23, 133:2, 133:3
**statements** [2] - 6:11, 88:9
**states** [3] - 4:18, 95:7
**STATES** [3] - 1:1, 1:4, 1:10
**States** [4] - 1:14, 2:4, 79:22, 142:16
**Statin** [1] - 119:25
**statin** [2] - 34:3, 43:9
**statute** [1] - 31:1
**statutes** [1] - 31:13
**stayed** [1] - 117:2
**stealing** [1] - 60:17
**STENOGRAPHICALLY** [1] - 2:1
**step** [2] - 55:16
**step-by-step** [1] - 55:16
**sticker** [1] - 26:16
**still** [4] - 40:2, 68:2, 111:13, 121:20
**stood** [1] - 116:1
**Stop** [1] - 70:13
**stop** [3] - 55:1, 88:23, 99:14
**stopped** [3] - 70:16, 99:7, 104:5
**store** [1] - 13:9
**stories** [1] - 132:6
**story** [7] - 57:17, 58:22, 74:5, 102:5, 102:23, 112:19, 135:4
**stream** [1] - 11:10
**Street** [2] - 1:15, 1:19
**street** [9] - 9:13, 9:25, 10:11, 28:22, 54:6, 55:25, 59:3, 117:8, 118:10
**strengths** [1] - 70:25
**strewn** [1] - 127:15
**strict** [1] - 79:19
**strong** [3] - 90:19, 96:21, 136:4
**studies** [1] - 52:20
**stuff** [5] - 24:11, 32:4, 39:18, 108:23, 126:15
**stupid** [2] - 90:24, 97:2
**sturdy** [5] - 24:24, 28:1, 28:2, 28:10
**submission** [1] - 94:23
**submit** [2] - 102:20, 114:17
**submitted** [1] - 124:21
**subpoena** [1] - 76:2
**subpoenas** [1] - 125:8
**substance** [3] - 16:18, 41:14, 42:19
**substances** [1] - 16:22
**substitute** [1] - 4:25
**substituted** [2] - 16:18, 41:14
**succeed** [1] - 100:19
**success** [1] - 35:5
**sue** [1] - 117:5
**suffered** [3] - 13:3, 15:9, 15:18
**sufficient** [1] - 132:22
**suggest** [11] - 33:22, 38:4, 67:18, 89:23, 102:12, 110:15, 112:7, 113:5, 114:11, 115:8, 125:17
**suggested** [3] - 9:14, 136:25, 137:2
**suggesting** [1] - 126:3
**suggestion** [5] - 8:4, 12:17, 114:6, 125:13, 135:10
**suggestions** [1] - 89:22
**suggests** [4] - 22:22, 23:1, 125:15
**sulfate** [2] - 10:14, 25:8
**summary** [1] - 113:3
**supplied** [1] - 23:22
**supplier** [6] - 25:2, 26:25, 27:1, 27:25, 28:16, 131:7
**suppliers** [5] - 18:9, 27:2, 27:7, 38:5, 135:20
**supply** [2] - 13:23, 15:12
**Supply** [2] - 35:13, 125:24
**support** [3] - 11:23, 37:18, 125:6
**supported** [1] - 7:10
**supporting** [1] - 134:12
**supposed** [14] - 15:11, 49:24, 60:4, 71:14, 79:21, 79:23, 79:24, 120:22, 138:11, 138:12, 138:22, 140:25
**supposedly** [7] - 53:6, 76:18, 77:2, 104:11, 107:24, 109:4, 133:20
**surely** [1] - 122:7
**surgery** [3] - 75:14, 75:17, 115:23
**surprised** [3] - 28:4, 120:20, 124:24
**surrounded** [1] - 133:22
**surrounding** [1] - 124:14
**surveillance** [1] - 63:11
**suspect** [4] - 35:24, 36:3, 140:9, 141:23
**suspicious** [2] - 36:7, 36:8
**sustained** [1] - 65:2
**sweet** [1] - 93:24
**sweet-talking** [1] - 93:24
**switching** [1] - 78:23
**symbolic** [1] - 98:19
**Symtuza** [2] - 20:6, 120:5
**syndicate** [3] - 60:19, 64:15, 64:16
**Synergy** [15] - 14:10, 20:10, 20:16, 31:16, 38:23, 39:8, 40:9, 41:23, 44:5, 127:23, 128:2, 128:10, 128:13, 128:21, 129:8
**system** [11] - 49:23, 60:4, 70:4, 70:10, 82:22, 86:17, 89:7, 91:1, 101:9, 102:19, 103:1
**systems** [1] - 73:6

## T

**T3** [42] - 11:20, 14:9, 14:10, 20:17, 30:8, 32:4, 32:19, 33:2, 34:18, 35:6, 35:13, 35:17, 42:4, 49:20, 50:9, 50:11, 54:16, 54:18, 54:22, 69:3, 69:17, 70:14, 73:24, 74:1, 86:8, 100:23, 102:20, 103:1, 104:19, 104:24, 111:10, 116:24, 122:15, 125:19, 126:9, 126:11, 128:18, 128:21, 129:9, 131:14
**T3s** [115] - 10:8, 11:15, 12:3, 12:14, 12:17, 13:1, 13:12, 16:24, 20:24, 21:12, 21:13, 22:2, 22:10, 22:15, 23:3, 28:20, 30:18, 31:21, 33:2, 33:17, 35:2, 35:22, 37:1, 37:13, 38:17, 38:24, 39:24, 41:5, 41:19, 41:22, 43:15, 43:16, 43:17, 44:3, 44:5, 45:22, 45:23, 49:21, 49:22, 50:3, 50:6, 50:7, 50:10, 50:17, 50:19, 53:25, 54:2, 54:3, 54:6, 54:9, 54:20, 55:5, 57:13, 57:14, 59:22, 59:24, 60:2, 60:3, 60:8, 60:11, 60:15, 61:22, 68:22, 69:15, 70:4, 72:1, 74:9, 74:12, 85:24, 86:1, 86:4, 86:6, 86:8, 100:23, 101:1, 101:9, 101:14, 101:19, 101:25, 102:3, 102:8, 102:19, 102:23, 103:11, 103:12, 103:17, 103:20, 103:25, 104:1, 104:3, 104:8, 105:1, 105:16, 105:17, 111:13, 111:17, 111:19, 117:11, 117:16, 118:2, 118:21, 120:2, 121:4, 121:25, 123:5, 124:9, 125:14, 125:18, 129:7, 131:6, 133:13, 134:9
**tack** [1] - 93:14
**tact** [1] - 78:6
**talks** [3] - 34:7, 39:19, 67:14
**tampered** [1] - 78:21
**targets** [1] - 57:22
**teaches** [2] - 52:3, 52:20
**teams** [1] - 66:9
**Teams** [8] - 6:14, 62:24, 98:20, 99:7, 102:6, 102:11, 123:2, 126:2
**telephone** [1] - 105:23
**tellingly** [1] - 34:23
**ten** [9] - 39:20, 40:11, 48:15, 55:12, 74:21, 75:24, 102:4, 110:20, 132:24
**tend** [1] - 139:8
**tendency** [1] - 65:18
**tension** [1] - 112:16
**terms** [2] - 16:15, 18:2
**terrible** [2] - 9:9, 9:10
**test** [4] - 110:16, 110:22
**testified** [37] - 6:7, 7:7, 10:2, 15:10, 24:14, 24:16, 24:22, 25:14, 27:21, 29:14, 30:1, 30:16, 30:17, 31:3, 32:10, 32:21, 34:17, 38:22, 42:18, 46:20, 78:17, 78:20, 90:13, 93:9, 108:9, 116:22, 117:12, 119:3, 119:13, 120:6, 120:16, 127:13, 127:17, 127:21, 129:21, 130:9, 134:9
**testifies** [1] - 8:8
**testify** [12] - 11:7, 21:14, 28:21, 38:13, 40:22, 42:11, 76:3, 84:9, 90:3, 117:9, 124:23
**testifying** [2] - 89:19, 121:23
**testimony** [40] - 7:10, 11:13, 12:5, 26:6, 26:12, 44:19, 47:18, 48:19, 51:1, 51:2, 53:18, 54:14, 61:25, 63:5, 65:25, 66:2, 67:18, 69:6, 73:22, 79:12, 79:19, 83:4, 88:15, 89:16, 90:18, 91:2, 93:19, 94:13, 94:14, 95:15, 106:15, 106:17, 106:23, 107:15, 107:23, 120:11, 129:20, 132:24, 136:21, 137:15
**text** [26] - 6:14, 21:10, 28:25, 36:20, 37:9, 53:2, 61:12, 61:17, 62:23, 63:10, 72:11, 73:4, 109:25, 116:3, 116:9, 118:18, 118:20, 118:22, 120:1, 124:17,

125:15, 127:15, 131:9, 131:15, 132:9, 136:8
**texting** [1] - 34:3
**texts** [2] - 27:4, 32:5
**thanking** [1] - 6:3
**THE** [47] - 1:10, 1:13, 3:3, 3:11, 3:14, 3:23, 4:5, 4:8, 4:13, 4:22, 4:25, 5:6, 5:9, 5:14, 40:11, 47:7, 48:2, 48:8, 65:2, 74:21, 81:2, 81:7, 81:9, 81:11, 81:14, 81:21, 81:24, 82:4, 87:20, 97:15, 110:20, 115:15, 130:22, 134:20, 138:1, 138:9, 138:16, 138:20, 138:25, 139:8, 139:14, 139:25, 140:13, 140:21, 141:14, 141:21, 142:1
**themselves** [5] - 15:2, 95:2, 96:4, 96:5, 131:9
**theory** [5] - 38:3, 54:7, 55:19, 55:20, 94:10
**therefore** [1] - 111:17
**thinking** [3] - 62:21, 92:23, 137:15
**thinks** [1] - 108:2
**third** [5] - 4:21, 53:24, 104:24, 123:3, 128:18
**thirty** [1] - 123:4
**thousands** [1] - 9:1
**thread** [1] - 21:10
**threatening** [4] - 43:13, 87:14, 117:4, 117:5
**three** [8] - 11:25, 14:11, 16:6, 26:2, 40:8, 43:21, 60:7, 78:17
**threw** [3] - 28:13, 73:5, 115:20
**throughout** [3] - 7:22, 18:25, 46:19
**thrown** [1] - 114:8
**ties** [1] - 72:10
**timeline** [2] - 29:21, 32:9
**timer** [1] - 119:4
**tip** [1] - 60:19
**tired** [1] - 29:5
**today** [4] - 61:5, 83:16, 115:20, 132:6
**together** [6] - 21:6, 21:8, 48:17, 56:4, 61:22, 108:21
**toll** [1] - 14:6
**tomorrow** [8] - 3:24, 37:5, 83:1, 106:5, 138:10, 141:16, 141:20, 142:2
**tonight** [1] - 141:14
**took** [7] - 14:6, 14:13, 16:21, 38:16, 78:19, 93:14, 98:11
**top** [3] - 26:16, 36:22, 50:21
**toss** [1] - 27:22
**total** [2] - 99:18
**totally** [12] - 30:17, 100:5, 102:14, 103:22, 125:9
**touched** [1] - 50:11
**towards** [1] - 18:17
**town** [2] - 15:22, 133:9
**trace** [3] - 13:10, 24:2, 70:4
**track** [1] - 13:14
**traffic** [5] - 7:17, 43:22, 44:7, 54:20, 129:1
**trafficked** [1] - 13:13
**train** [1] - 130:14
**transaction** [3] - 38:15, 96:3, 103:15
**transactions** [1] - 126:15
**TRANSCRIPT** [1] - 1:9
**transcription** [1] - 142:11
**transfers** [1] - 53:10
**transmission** [1] - 123:4
**transport** [1] - 44:7
**transportation** [1] - 96:1
**trash** [2] - 24:23, 27:21
**treating** [1] - 81:1
**TRIAL** [1] - 1:9
**trial** [18] - 6:3, 6:5, 6:10, 8:16, 8:20, 9:20, 18:6, 19:1, 46:19, 48:19, 49:16, 62:13, 70:23, 77:15, 102:23, 106:12, 120:21, 142:6
**trials** [1] - 79:21
**trick** [7] - 56:9, 56:10, 59:16, 62:4, 81:1, 131:10
**tricked** [6] - 22:16, 40:6, 55:8, 56:12, 122:12, 133:23
**trickery** [1] - 42:6
**tricky** [1] - 131:10
**tried** [6] - 55:14, 96:16, 101:15, 102:15, 111:15, 113:5
**trip** [1] - 57:19
**tripped** [1] - 128:6
**trips** [1] - 97:12
**Trissell** [3] - 15:19, 15:21, 133:8
**trouble** [1] - 72:15
**true** [21] - 11:11, 15:2, 15:16, 24:3, 42:16, 47:13, 50:15, 55:23, 61:13, 62:10, 62:11, 68:12, 88:22, 89:6, 89:13, 102:23, 119:1, 133:13, 135:4, 137:6
**trunk** [1] - 127:18
**trust** [1] - 116:6
**trusted** [2] - 118:7, 118:13
**trusting** [2] - 115:22, 118:5
**truth** [15] - 6:15, 44:17, 64:6, 64:11, 65:10, 67:21, 79:13, 79:14, 79:24, 89:25, 90:8, 93:1, 97:9, 104:1, 113:20
**truthful** [4] - 93:19, 103:14, 122:15, 131:14
**try** [21] - 16:10, 16:16, 22:1, 31:18, 48:12, 79:12, 83:6, 87:10, 88:2, 92:14, 95:2, 101:19, 104:3, 114:23, 115:4, 121:3, 130:5, 130:14, 132:16, 136:2
**trying** [28] - 20:11, 33:24, 52:21, 52:22, 57:13, 65:14, 69:14, 69:21, 69:22, 71:9, 71:14, 73:8, 90:8, 90:9, 98:5, 106:22, 110:7, 111:15, 112:4, 112:7, 112:11, 119:16, 125:17, 132:15, 132:17, 136:2
**turned** [3] - 15:19, 133:10
**turns** [1] - 124:1
**twenty** [1] - 123:25
**twenty-two** [1] - 123:25
**twice** [3] - 74:8, 101:13, 139:7
**two** [55] - 6:12, 6:23, 7:16, 8:1, 8:15, 9:12, 9:22, 13:4, 13:12, 16:9, 18:6, 19:12, 19:25, 21:6, 21:17, 22:18, 23:20, 24:6, 26:19, 30:1, 30:8, 30:13, 33:24, 37:24, 38:4, 38:24, 47:2, 55:7, 60:6, 64:3, 65:7, 65:16, 73:11, 77:15, 77:22, 79:7, 79:11, 85:1, 85:10, 85:21, 96:7, 104:25, 105:1, 118:6, 122:7, 122:11, 123:25, 126:6, 128:25, 131:20, 133:7, 135:18, 137:8
**type** [4] - 10:19, 34:2, 56:2, 109:9
**typically** [2] - 66:19, 66:21

## U

**ultimate** [3] - 92:6, 117:10, 118:15
**ultimately** [4] - 38:1, 73:17, 100:19, 118:6
**unburden** [1] - 65:12
**uncovering** [1] - 79:14
**under** [6] - 23:11, 41:5, 79:19, 123:7, 125:22, 129:9
**underlying** [1] - 127:6
**understood** [2] - 93:17, 141:6
**unfortunately** [2] - 15:11, 46:18
**UNITED** [3] - 1:1, 1:4, 1:10
**United** [4] - 1:14, 2:4, 79:22, 142:16
**universal** [1] - 16:11
**university** [2] - 52:3, 52:20
**unknown** [1] - 24:1
**unlawful** [4] - 16:10, 16:12, 18:12, 21:17
**unless** [2] - 96:4, 103:12
**unquote** [1] - 128:17
**unrelated** [1] - 129:14
**unscrupulous** [2] - 38:5, 133:17
**unsophisticated** [1] - 133:20
**up** [69] - 11:8, 14:24, 17:15, 22:16, 27:22, 27:24, 30:11, 30:24, 31:9, 34:15, 34:18, 36:11, 38:10, 40:15, 40:19, 40:23, 48:2, 48:4, 49:7, 51:3, 52:11, 52:12, 54:1, 54:9, 57:6, 57:10, 58:2, 58:7, 58:9, 60:11, 61:3, 62:8, 67:21, 67:22, 68:13, 74:7, 76:9, 80:4, 83:12, 91:6, 91:24, 91:25, 94:25, 95:22, 97:11, 97:12, 101:10, 102:10, 103:17, 108:3, 112:2, 113:16, 116:1, 116:23, 118:9, 118:15, 120:11, 126:4, 126:9, 127:11, 127:23, 134:13, 134:18, 137:1, 137:2, 140:15, 140:19, 141:25
**up-and-up** [1] - 14:24
**update** [2] - 103:18, 104:8
**updated** [1] - 104:4
**updates** [1] - 100:2
**urge** [1] - 112:16
**usable** [1] - 36:9
**Utah** [3] - 33:14, 33:17, 40:15

## V

**vacillated** [1] - 80:16
**valid** [3] - 69:17, 73:18, 73:19
**valuable** [1] - 95:19
**Value** [4] - 11:9, 71:17, 71:18, 71:19
**Vega** [3] - 20:10, 44:4, 47:5
**vehicle** [2] - 95:1, 95:8
**vendor** [3] - 26:8, 56:1, 68:1
**vendor's** [1] - 129:9
**vendors** [16] - 11:10, 41:4, 42:14, 48:18, 48:22, 48:23, 50:25, 67:12, 67:25, 94:1, 101:6, 112:2, 126:10, 133:17, 133:23, 135:1
**venture** [1] - 100:18

**verdict** [9] - 53:15, 84:3, 84:14, 85:9, 96:18, 114:12, 114:18, 132:25
**verification** [1] - 111:9
**verified** [2] - 30:4, 31:16
**verify** [11] - 20:11, 30:8, 31:17, 38:15, 53:25, 54:3, 54:9, 55:4, 71:25, 111:10, 129:9
**verifying** [1] - 56:13
**version** [6] - 3:22, 117:15, 117:16, 128:18, 139:23
**versions** [1] - 6:12
**vetting** [1] - 71:5
**VI** [1] - 45:11
**via** [4] - 11:18, 11:22, 23:4, 33:19
**victim** [1] - 133:11
**victims** [5] - 38:2, 38:4, 38:6, 133:17, 133:25
**victims'** [1] - 118:15
**video** [1] - 40:17
**viewing** [1] - 140:15
**vigilant** [1] - 82:13
**VIII** [1] - 45:11
**ViiV** [10] - 15:24, 15:25, 16:3, 19:16, 20:4, 26:15, 42:24, 135:9, 135:10, 135:14
**violating** [1] - 37:1
**Vipul** [2] - 15:13, 44:16
**Virginia** [1] - 45:18
**vision** [1] - 92:20
**visit** [1] - 63:17
**vocal** [1] - 71:15
**voir** [1] - 76:4
**Volume** [1] - 1:7
**voluntarily** [1] - 85:17
**vs** [1] - 1:5
**vulnerable** [1] - 126:24

**W**

**WAC** [4] - 23:8, 23:11, 23:15, 49:2
**Wait** [2] - 107:16, 111:14
**wait** [1] - 137:1
**waiting** [1] - 111:13
**waive** [2] - 5:10, 81:25
**walk** [2] - 7:6, 17:3
**walked** [1] - 17:17
**walking** [2] - 7:12, 91:19
**walks** [2] - 58:9, 77:23
**wall** [1] - 79:17
**wants** [13] - 40:17, 49:10, 49:25, 50:1, 59:2, 63:20, 90:25, 91:9, 109:3, 110:13, 110:17, 113:23, 125:24
**warehouse** [12] - 29:17, 62:15, 63:10, 96:25, 97:5, 97:10, 97:19, 111:12, 120:7, 127:12, 137:4
**wasted** [1] - 119:16
**wasting** [1] - 97:3
**watch** [4] - 58:5, 59:7, 90:2, 90:3
**watching** [1] - 83:15
**water** [1] - 73:6
**wave** [1] - 64:5
**waves** [1] - 62:12
**waving** [2] - 62:18, 64:20
**ways** [1] - 55:12
**weaknesses** [3] - 70:25, 71:1, 71:3
**web** [1] - 40:3
**week** [1] - 66:3
**weekend** [1] - 81:1
**weekly** [2] - 66:16, 70:24
**weeks** [2] - 82:12, 99:1
**weird** [1] - 39:1
**Wellness** [6] - 22:3, 22:11, 30:18, 36:18, 37:20, 43:19
**WhatsApp** [2] - 118:25, 119:3
**whatsoever** [4] - 54:14, 69:1, 86:14, 88:21
**whereas** [1] - 77:22
**white** [4] - 18:14, 23:5, 58:10, 79:16
**whole** [6] - 16:18, 89:18, 94:16, 100:3, 103:18, 103:19
**Wholesale** [1] - 11:9
**wholesaler** [4] - 33:4, 33:10, 56:11, 127:25
**wholesalers** [2] - 39:12, 127:19
**Wholesalers** [3] - 71:18, 71:19
**wide** [1] - 97:15
**wild** [1] - 29:21
**wilfully** [1] - 16:13
**wilfulness** [5] - 100:9, 100:11, 100:14, 100:18
**willfully** [5] - 4:19, 85:16, 109:3, 114:5
**WILLIAM** [1] - 1:10
**William** [2] - 1:17, 2:3
**willing** [2] - 75:9, 86:20
**wipe** [1] - 76:19
**wire** [9] - 7:18, 28:5, 44:12, 45:7, 45:10, 45:12, 49:15, 53:9
**wires** [4] - 49:17, 49:18, 122:21, 122:25
**wish** [2] - 80:5, 80:6
**withholding** [1] - 7:24
**witness** [28] - 16:21, 68:16, 76:21, 78:5, 78:19, 80:17, 89:16, 89:17, 89:23, 89:24, 90:7, 90:12, 92:25, 93:3, 93:6, 93:8, 93:11, 93:20, 93:21, 98:24, 104:25, 116:9, 120:9, 120:13, 136:13, 136:14
**witness's** [1] - 137:15
**witnesses** [23] - 6:6, 6:15, 6:20, 12:19, 14:3, 76:2, 76:9, 78:10, 78:17, 79:8, 79:11, 89:2, 89:4, 89:11, 89:19, 92:25, 98:20, 119:1, 127:10, 131:3, 132:20, 133:7, 137:20
**witnesses'** [3] - 83:3, 94:13, 132:24
**Wolfe** [2] - 15:24, 135:9
**woman** [1] - 106:13
**wonderful** [2] - 96:17, 107:22
**wondering** [2] - 7:1, 43:3
**wool** [1] - 60:21
**word** [1] - 106:11
**words** [1] - 30:21
**works** [6] - 49:23, 82:22, 87:14, 91:2, 115:6, 141:25
**world** [7] - 15:12, 90:21, 91:18, 96:3, 96:9, 97:22, 133:4
**Worldwide** [1] - 95:21
**worms** [2] - 43:6, 136:3
**worn** [1] - 26:15
**worried** [5] - 40:19, 40:20, 126:16, 126:17, 126:22
**worries** [1] - 75:18
**worse** [1] - 27:8
**worth** [6] - 6:17, 24:17, 28:9, 28:17, 118:13, 136:6
**worthwhile** [2] - 86:17, 96:6
**Wow** [2] - 96:7, 96:9
**wrap** [1] - 48:4
**writes** [3] - 52:19, 109:6, 109:7
**writing** [11] - 14:19, 14:21, 14:24, 31:4, 31:6, 31:8, 34:19, 39:2, 47:25, 119:12, 136:20
**wrote** [2] - 101:20, 119:7

**X**

**XIV** [1] - 1:7

**Y**

**year** [2] - 39:21, 77:22
**Year's** [2] - 91:15
**years** [10] - 24:6, 54:12, 57:17, 60:16, 66:4, 77:22, 90:8, 95:16, 136:17
**yes.""other** [1] - 68:7
**yet'** [1] - 68:6
**York** [2] - 59:5, 74:16
**young** [3] - 23:16, 121:20
**yourself** [4] - 56:6, 59:12, 59:25, 89:24
**yourselves** [1] - 77:5

**Z**

**Zangari** [3] - 58:23, 76:18, 101:16
**zero** [6] - 10:8, 22:13, 22:14, 29:23, 29:24, 41:21
**Zimet** [6] - 1:21, 4:1, 52:11, 82:7, 97:17, 110:20
**ZIMET** [17] - 4:23, 5:4, 5:12, 81:19, 82:2, 82:8, 87:21, 97:14, 97:18, 110:21, 130:21, 138:15, 138:18, 139:2, 140:8, 141:20, 141:24