UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 24-cr-20255-Dimitrouleas/Hunt

UNITED STATES OF AMERICA, Fort Lauderdale, Florida

March 13, 2026

vs.

PATRICK BOYD,

Defendant. Pages 1 to 82

---

# TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
Alexander Pogozelski, Esquire
Jacqueline DerOvanesian, Esquire
Nicole Grosnoff, Esquire
Assistant United States Attorneys
99 NE 4th Street
Miami, Florida 33132

FOR DEFENDANT PATRICK BOYD:
William Barzee, Esquire
Ivlis Mantilla, Esquire
Barzee Flores
40 NW 3rd Street Ph 1
Miami, Florida 33128

FOR DEFENDANT CHARLES BOYD:
Bruce Zimet, Esquire
633 S. Federal Highway Fl 6
Fort Lauderdale, Florida 33301

STENOGRAPHICALLY REPORTED BY:

PATRICIA BAILEY-ENTIN, RPR, FPR
Official Court Reporter before:
The Honorable William P. Dimitrouleas
United States District Court

(Call to the Order of Court.)

THE COURT: United States v. Patrick Boyd and Charles Boyd, if counsel will announce their appearances for the record.

MR. POGOZELSKI: Alex Pogozelski and Jacqueline DerOvanesian as well as Nicole Grosnoff on behalf of the United States.

MR. BARZEE: Good afternoon, Your Honor. William Barzee and Ivlis Mantilla on behalf of Patrick Boyd. He's present in court.

MR. ZIMET: Good afternoon, Your Honor. May it please the Court, Bruce Zimet on behalf of Charles Boyd, who is present.

THE COURT: All right. If we could speak into the microphone, that would help the court reporter.

There was some indication that you guys wanted to bifurcate the sentencings; is that correct?

MR. ZIMET: Yes, sir.

THE COURT: And who wants to go first?

MR. BARZEE: I'm happy to go first on behalf of Patrick Boyd, Your Honor.

THE COURT: So is Charles Boyd going to sit here during Patrick Boyd's sentencing?

MR. ZIMET: I have no problem with that, Judge.

THE COURT: Is that okay with the Government?

MR. POGOZELSKI: Yes, Your Honor.

THE COURT: So let's go forward with Patrick Boyd first.

Patrick Boyd is before the Court, having been found guilty of conspiracy to introduce misbranded drugs, introduction of the misbranded drugs, two counts; conspiracy to possess medical products with false labeling; conspiracy to commit wire fraud; and two counts of wire fraud.

I adjudicated him guilty, deferred sentencing, ordered a presentence investigation report that I have received and reviewed.

Have counsel had an opportunity to review the presentence investigation report?

Mr. Pogozelski?

MR. POGOZELSKI: Yes, Your Honor.

THE COURT: Mr. Barzee?

MR. BARZEE: Yes, Your Honor.

THE COURT: Patrick Boyd, have you read the presentence investigation report and discussed it with your lawyer?

DEFENDANT PATRICK BOYD: Yes, Your Honor.

THE COURT: Any objection to the presentence investigation report from the Government?

MR. POGOZELSKI: No, Your Honor.

THE COURT: Mr. Barzee?

MR. BARZEE: Yes, Your Honor.

We have objections listed in Docket Entry 269. Our objections to the presentence investigative report begins with objection to paragraph 1, which failed to include the special verdicts that the jury returned as to Count I and to Count IV.

THE COURT: Any objection to correcting that, Mr. Pogozelski?

MR. POGOZELSKI: No, Your Honor.

THE COURT: All right. So I'll sustain that objection.

MR. BARZEE: Objection to paragraph 20, clarification that Patrick Boyd never met or communicated with Lazaro Roberto Hernandez.

THE COURT: I don't remember that.

What's your position on that, Mr. Pogozelski?

MR. POGOZELSKI: It's true. No, I don't object to that, no.

THE COURT: All right. I'll sustain that objection.

MR. BARZEE: Objection to paragraph 23, which misstates Patrick Boyd's involvement in the case.

Paragraph 23 says that Patrick Boyd orchestrated a complex prescription drug scheme and that he recruited over five participants to facilitate the purchase and sale of diverted medications.

Neither one of those facts are correct.

THE COURT: Mr. Pogozelski.

MR. POGOZELSKI: Yes, Your Honor, the trial evidence demonstrated that he was a leader. He led the internal sales team, although the sales team were unwitting -- quote-unquote, they're not criminal participants, but they were unwittingly acting at his direction when they were pushing all of these black market drugs from the streets into pharmacies.

There was also evidence introduced that Patrick Boyd dealt with Carlos Vega of Synergy. The evidence of that is cited in the Government's sentencing memo. There was a Teams message. After two falsified T3s, Patrick Boyd asked Ms. Divilio, "Do you want me to call Carlos? I've got to talk to him "-- something to that nature -- "I'll tell him we need AD T3," basically one that would pass muster with compliance. And so we certainly think the trial evidence supports that paragraph of the PSR, Your Honor.

THE COURT: Well, let me ask you -- I mean, there's clearly more than five people that he supervised on the sales team, but for the enhancement to apply, do they have to have been complicit, or could they have unwittingly furthered the benefit of the scheme?

MR. POGOZELSKI: Unwittingly participated in the scheme. And we cite a case in our sentencing memo to that effect.

And while I'm looking for that, I would just also bring up the fact that there were five black market suppliers --

Boulevard, Gentek, Synergy, Omom, Rapid's Tex.

Patrick Boyd was involved in selling and instructing the sales reps to sell drugs from those black market suppliers. That's five participants right there.

And then if you also look at "otherwise extensive," this was nationwide. It was more than $92 million worth of drugs. Hundreds of pharmacies. Many, many thousands and thousands of pills. So -- and he was with his brother, Charles Boyd, the cofounder and the leader of the sales team.

So there were -- and it was certainly foreseeable. To the extent he did not -- Patrick Boyd did not deal with every black market supplier, the evidence introduced during trial where he's emailing the sales reps with, you know, "This is the new pricing," it's certainly foreseeable for him and falls into relevant conduct that there were -- you know, that they were dealing with five of these black market suppliers. So those would be five participants.

And then the case that talks about the unwitting sales reps that were under his watch is -- I'm sorry. One moment, Your Honor -- that would be United States v. Copeland. 2026 WL 73208 at Star 5, Footnote 2. Quote, "A fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."

So that goes to the "otherwise extensive" nature of the fraud, which the evidence -- the trial evidence undisputedly

proved how extensive it was. And that Eleventh Circuit case certainly supports the sales reps being included for purposes of applying the role enhancement.

THE COURT: I don't know that it necessarily applies to the five or more. It may apply to the "extensive."

MR. POGOZELSKI: Sure, Your Honor. We're arguing both, that both apply, but undisputedly, the "otherwise extensive" applies.

And the idea -- the fact that he orchestrated it, the evidence showed how closely he worked with his brother. There were text messages in August 2020 where they were talking about bottles with the wrong drugs early in the conspiracy, trying to figure out what they should do.

There were a lot -- there were other text messages between him -- Patrick Boyd and Adam Brosius about other black market suppliers. So his role was significant, and the trial evidence certainly supported that.

And that was also in the testimony of Jonathan Nichols, a sales rep under his watch. Abigail Divilio, who interacted with him and did testify about his role. And so we think that that objection should be overruled.

THE COURT: Mr. Barzee.

MR. BARZEE: Your Honor, this objection that we're dealing with right now is objection to paragraph 23, which says that Patrick Boyd recruited over five participants to

facilitate the purchase and sale of diverted medications. That's just factually incorrect. He didn't recruit anybody to do anything, number one.

Number two, he managed their internal sales force, which was in existence prior to the commission of the conspiracy, prior to the beginning of the conspiracy. He managed them, selling legitimate pharmaceutical products that Safe Chain had been dealing with for many years prior to Adam Brosius introducing the scheme. And he continued doing that in his role in Safe Chain.

The idea that he went out and recruited participants in order to complete this conspiracy or scheme is simply not in the facts.

The other thing that's not in the factual record is the number of sales force individuals that he was supervising. There's nothing in the record that suggests that he was supervising more than five people at any time, regardless of the recruitment issue.

THE COURT: I'm going to overrule the objection. I think the four-level enhancement is appropriate.

The next objection?

MR. BARZEE: The objection to paragraph 24 is that the PSI misstates Patrick Boyd's involvement in the case. It's suggesting that he caused Safe Chain to make payments to Boulevard, and that is factually incorrect.

Patrick Boyd never caused Safe Chain to make any transfers of any monies whatsoever.

THE COURT: Mr. Pogozelski.

MR. POGOZELSKI: Well, Patrick Boyd, obviously, as an owner of the company, along with Charles Boyd, controlled and/or are involved in payments to the black market suppliers, causing them, along with his coconspirators. It certainly was at least foreseeable to Patrick Boyd, and so we do not think that that factual objection should be sustained.

THE COURT: This is paragraph 24?

MR. BARZEE: Yes, Your Honor.

THE COURT: And we're talking about the PSI on February 13th?

MR. BARZEE: Yes, Your Honor.

THE COURT: I'm going to overrule the objection to paragraph 24.

MR. BARZEE: The objection to paragraph 25 misstates Patrick Boyd's involvement in the case.

Again, not personally being involved in making payments of approximately 1.2 million to Gentek.

THE COURT: I'm going to overrule that objection.

MR. BARZEE: Objection to paragraph 28: Patrick Boyd never knowingly sold or distributed, quote, "bottles purporting to contain a specific HIV drug but which actually contained a different drug entirely."

Your Honor, there's a very, very, very small percentage of the bottles at issue in this case that had the wrong medications in them -- less than ten, I believe it is. The addendum might say ten, which is a mistake. It's actually under ten, the number of bottles that had the wrong prescription in them.

We heard the trial testimony in court that that is something that happens as a regular part of this industry. The FDA that regulates all of this understands and permits a certain number, a certain percentage of these things that get into the stream. That happens at Walgreens, according to the testimony at trial.

And I would suggest that since there was no intention to do that, it shouldn't be read as though he knowingly sold or distributed bottles purporting to contain a specific prescription HIV drug, which contained a different drug entirely.

THE COURT: Paragraph 28 doesn't say anything about "knowingly." It just says that Brosius, Patrick Boyd and Charles Boyd sold or distributed bottles purporting to contain a specific HIV drug and contained something else entirely.

I think that's true; so I'll overrule the objection on 28.

MR. BARZEE: Objection to paragraph 34 -- again, the language overstating Patrick Boyd's role in the offense.

Nothing was ever shipped to Patrick Boyd. Medications were shipped to a warehouse owned by Safe Chain.

THE COURT: So you want to change before shipping them to instead of Patrick Boyd and Charles Boyd to a warehouse owned by Safe Chain?

MR. BARZEE: Yes, Your Honor.

THE COURT: Any objection to that?

MR. POGOZELSKI: Well, Your Honor, they are the owners of the company. There was evidence introduced -- actually, one of the Government's exhibits is Patrick Boyd sending a message to Adam, Brosius, how he's in the warehouse dealing with the S-word, the mess of HIV drugs.

It's probably a distinction without a difference, but certainly, these drugs were shipped to Patrick and Charles Boyd at their company.

THE COURT: Okay. Well, I'm going to sustain the objection. And we'll change paragraph 34, the fifth line to read, "Before shipping them to --" we'll delete "Patrick Boyd" and "Charles Boyd," and include "a warehouse owned by Safe Chain."

Next objection.

MR. BARZEE: Objection to paragraph 35, Your Honor, which states that, quote, "On at least ten occasions, pharmacies reported bottles labeled as HIV medications that instead contained an entirely different drug," there were not

at least ten occasions.

The addendum, I believe, misstates again ten occasions. And I believe that the facts introduced at trial and in the record indicates that it was less than ten.

THE COURT: Mr. Pogozelski?

MR. POGOZELSKI: Your Honor, I do think that the evidence at trial was probably around eight. I would have to dig back through there. So that could be amended to say -- I could get a more accurate count right now. So I have four, five, six -- I think seven or eight.

If we could just go with seven.

THE COURT: All right. So we'll change paragraph 35. In the first line, we'll change ten to seven.

Next objection?

MR. BARZEE: Objection to paragraph 38, Patrick Boyd did not take any steps, deliberate or otherwise, to conceal his criminal conduct.

In fact, the evidence suggests the opposite of that. This was done in an open way. They weren't hiding the sales. They weren't hiding the transfers of money. They weren't hiding assets. Nothing was hidden.

THE COURT: I think maybe Charles Boyd was.

Mr. Pogozelski, tell me about Patrick Boyd's involvement here.

MR. POGOZELSKI: Yes, Your Honor.

With Synergy, he helped the owner there manufacture a falsified T3. Those falsified T3s concealed the true origin of the drugs. That's one example.

Jonathan Nichols, one of his subordinate sales reps, testified at trial something along the lines of "He would have wanted to know about various complaints regarding wrong drugs in the bottles distributed," because he's out there selling the drugs. So he concealed that type of information from his sales force.

He also, as we pointed out in our sentencing memo, cited an email that's in evidence, where Patrick Boyd lied to the attorneys by saying, "We never had any issues with any products other than Gilead products." And we cite the exhibits that demonstrate that was a lie. So those are a few examples of concealment.

THE COURT: I think the last one is good enough; so I'll overrule the objection to paragraph 38.

MR. BARZEE: Your Honor, that same ruling would apply to objection to paragraph 40, where the defense argues that Patrick Boyd did not lie to or mislead Safe Chain attorneys.

THE COURT: Okay. So same ruling. I'll overrule the objection to 40.

MR. BARZEE: Objection to paragraph 42 has to do with the obstruction enhancement. There's no evidence that Patrick Boyd took any steps to obstruct a DOJ investigation.

THE COURT: So tell me why testimony in a civil deposition should be obstruction of justice in a criminal case later?

MR. POGOZELSKI: For a few reasons, Your Honor.

First, the deposition -- the lie during the deposition was in June of 2023, which was quite a bit after we initiated our investigation.

The Wall Street Journal, which I have copies of and I think you could take judicial notice of -- and I can show it to you, the Wall Street Journal reported on DOJ's investigation into the pharmaceutical diversion scheme approximately a year or a little bit over a year before he lied during his deposition.

They contacted Safe Chain. Safe Chain declined to comment. So at the time of his deposition, when he lied, he knew -- there's evidence that he knew about the criminal investigation into his company.

THE COURT: And the way he knew that is because a newspaper reporter called him up and asked him some questions and he didn't answer them?

MR. POGOZELSKI: Asking questions about an article regarding a Justice Department investigation into Safe Chain.

THE COURT: So what's the evidence that a New York newspaper talked to Patrick Boyd about a Department of Justice investigation into drug companies and that Mr. Boyd said, "No

comment"?

I mean, there wasn't testimony to that during the trial.

What was the evidence of that?

MR. POGOZELSKI: Your Honor, I would be happy to introduce as an exhibit the Wall Street Journal article where they state they contacted Safe Chain. He owns -- he's one of the owners of the company.

I think it's a very, very logical and common-sense inference that Patrick Boyd, as an owner, would be informed about the article, especially when the Wall Street Journal is reaching out to his company for comment on the article.

THE COURT: I think that's too attenuated; so I'll sustain the objection to paragraph 42.

MR. BARZEE: Objection to paragraph 45, Your Honor, is involving language. There was no evidence introduced in trial that Patrick Boyd was involved in the purchase of any diverted medications.

THE COURT: Mr. Pogozelski.

MR. POGOZELSKI: Involved in the sale of -- oh, in the purchase.

Again, going back to Synergy, the evidence -- the exhibits about Synergy show that Patrick Boyd was the one contacting Carlos Vega to manufacture a falsified a T3 so that Ms. Divilio would have, after having been worn down by these

two defendants, to finally say, "Go ahead."

And they went on to purchase more than 6.7 million worth of these black market drugs from Synergy. So he was working with that black market supplier. And there was evidence in the record about that.

So he was certainly involved with the purchase because they wouldn't have purchased it if he hadn't been able to work with the coconspirator to manufacture this false TD.

THE COURT: I think there's enough circumstantial evidence that would support paragraph 45; so I'll overrule the objection to 45.

MR. BARZEE: Objection to paragraph 49 involves role, Your Honor. And, Your Honor, the entire PSI and the Government's argument as far as Patrick Boyd's role is concerned is based on a false premise.

And that is that his role was the same as the other codefendants; that he was involved in all aspects of this conspiracy; and that is just factually untrue.

As the Government has repeated numerous times, there's at least five different vendors. The evidence that they introduced to the Court that he's involved with the purchase of these medications from these vendors is one email to one vendor discussing a need to receive some paperwork.

Other than that, what was Patrick Boyd's involvement in the case?

THE COURT: Well, paragraph 49 says that they were one of the leaders of the scheme, and I think there's circumstantial evidence of that; so I'll overrule the objection to 49.

MR. BARZEE: Objections to paragraphs 54 to 57 relate to the obstruction enhancement, and I believe that the Court has previously ruled.

THE COURT: Right.

So I'm going to sustain that objection; so there won't be the two-level enhancement.

MR. BARZEE: The second, Your Honor, is specific offense characteristics. Objection to paragraph 65, ten or more victims.

THE COURT: Were there ten victims, Mr. Pogozelski?

MR. POGOZELSKI: Yes, Your Honor.

So beginning with Gustavo Borja, he was a patient/victim who unknowingly ingested the Seroquel that was in his bottle and passed out.

Raj Parekh, Legend Drugs, testified that he would have never purchased from Safe Chain and these defendants had he known about all of the complaints month after month with all the problems with the drugs; so he was certainly a victim.

Adadie Acambi (phonetic), another patient victim -- his victim impact system, he took the wrong pills that were in his prescribed bottle and had some effects from that. That's in

the victim impact statement I filed under seal yesterday.

Andy's Pharmacy would be Number 4, another pharmacy that stated they never would have purchased from Safe Chain had it known about the falsified T3s, black market drugs, et cetera.

THE COURT: I mean, every pharmacy is going to say that, aren't they?

I mean, what pharmacy is going to say that they would purchase black market drugs if they knew about ir? Everyone is going to say that.

MR. POGOZELSKI: Right. But that's the whole point of the scheme -- because they concealed it from their customers by giving them falsified T3s. That's how these drugs got into the pharmacies and patients' hands in the first place.

THE COURT: Unless the argument is that the pharmacies were "wink-wink, you know, these prices are too good; so we're not going to ask any questions," and they're not victims. They were accomplices to it.

MR. POGOZELSKI: Well, that's not evidence that's in the record.

And just to be clear: The defendants were convicted of wire fraud in connection with a pharmacy, Modern Pharmacy, in I believe that was Count VIII.

So certainly, the jury agreed for that pharmacy they were a victim. And the theory of the case was that their

concealment and lies to customers on the falsified T3s, which is required by registration and law to be provided.

Lies in letters to customers. We show that through Raj Parekh, where there was a letter sent to customers about ceasing the relationship with Gentek, but yet he had received Gentek drugs in January 2021.

There were a litany of falsehoods and lies to these pharmacy customers, one, to hide the nature of the drugs; two, to hopefully try to appease them and convince them this was a one-off or this is a Gilead problem or whoever they wanted to blame -- patients.

So there certainly is evidence in the record that as least some of the hundreds of pharmacies were victims and Raj Parekh was them and Andy's Pharmacy on --

THE COURT: I agree some of them were victims, but do you have ten? Do you have ten pharmacies and/or you know, patients?

MR. POGOZELSKI: So I'll continue.

We have Modern Pharmacy, which is in Count II and Count VIII as Pharmacy 1. We have PharmaQuick, LLC, which was Count III. That was the intent to defraud and mislead and ship misbranded drugs to that pharmacy. And then we have the pharmacies that received all these wrong drugs in the bottles that were introduced in various documents.

You have Bellevue Pharmacy, where they were pain pills

in a bottle of Descovy. I believe that was discovered during some sort of a state inspection. White Cross Pharmacy, Palm Springs. White Cross Pharmacy, Brawley. Those are bipolar meds and Excedrin in the bottles that the defendants distributed. Total Remedy -- that was Government's Exhibit 278 -- wrong pills in the bottle.

There were text messages between Charles Boyd, Peter Khaim and Brosius about broken statin pills in a bottle that a pharmacy had complained about. Evidence that Patrick Boyd knew about that because there's an email in evidence between Patrick Boyd and Adam Brosius talking about these broken pills.

And then we also have as victims, Raj Parekh testified that patients, who he dispensed these drugs to, were covered by Medicare, Medicaid, and commercial insurers; so I would add those as victims.

I would add Gilead as a victim, pursuant to their victim impact statement. There was a representative of ViiV, whose drugs were also -- the defendants distributed black market versions of ViiV's drugs as well.

Fred Hopkins was unable to testify at trial. He received the wrong pills in a bottle. We have a case agent here ready, who interviewed him, who could testify to that.

And then we have another pharmacy, Kalorama Pharmacy that was interviewed by that same case agent, who made the same statements that she would have never purchased these drugs had

she known the T3s were falsified.

By my count, I'm up to 18 there. And that's just very, very specific evidence.

THE COURT: I think you got ten; so I'm going to overrule the objection.

MR. BARZEE: Objection to paragraph 66 deals with loss.

THE COURT: What do you think the loss is, Mr. Barzee?

MR. BARZEE: I don't know, Your Honor. It's really unascertainable on the record that we have before us.

So the Government is going to ask you to speculate, and they're going to ask you to find some other way of determining a loss even though it's really not a loss.

And this probably goes to the fundamental -- one of the fundamental problems with the guideline calculation and how it overstates the criminal conduct here.

The ascertainable loss would be the amount of monies that pharmacists lost returning bottles. It would be what patients lost paying deductibles.

If we're looking at profit, Patrick Boyd profited maybe $200,000 from this scheme.

So I can't answer the Court, when you ask me what the correct loss amount is, because that number, based on the record before us, is unascertainable.

THE COURT: So let me ask Mr. Pogozelski, how did you come up with 92 million?

MR. POGOZELSKI: Your Honor, the evidence at trial -- that's a definitive number. We know that number.

We also introduced evidence -- and this only -- this comports with common sense that the defendants sold those $92.8 million of black market worthless drugs to pharmacies at a profit.

There were plenty of documents about the pricing discounts to pharmacies between 5 and 10 percent, whereas they were getting the drugs between 15 and 25 percent. So certainly, the whole purpose of this fraudulent scheme was to make money.

So by using the amount they paid their black market suppliers, it is a conservative calculation. Gross sales would be higher. That's certainly the case. And reimbursements to pharmacies for these worthless black market drugs would also be higher.

So the amount paid to these black market suppliers actually understates the loss. And I would also just look at United States v. Campbell, 765 F.3d 1291. This is an Eleventh Circuit 2014 case, which the defense relies on.

And that case is interesting because it does talk about cases where actual loss can be difficult to ascertain, and it discusses a Ponzi scheme as one example. And it says that -- the quotes in there, I believe -- hold on one second.

"In cases like Campbell, the requirement does not

demand that the Government and the court sift through years of bank records and receipts to ascertain itemized proof of every single transaction."

And that would take a long, long, long time here to figure out the reimbursements that were given for those worthless drugs. There's no dispute that there were black market drugs. And there were 92.8 million that they bought, which they sold for profit, which were reimbursed for more.

So that's why this is a conservative calculation. It is supported by First and Fourth Circuit rulings in similar cases involving consumer products.

And particularly telling is -- I believe it was United States v. Marcus, that we cite in our sentencing memorandum, where it talks about the safety, efficacy, and bioequivalency of drugs.

And where you have a case like this one, where these are black market drugs obtained off the street, those are worthless drugs, and so they shouldn't have been paid anything for those drugs, and certainly, no pharmacy should have been reimbursed.

So that's why rather than trying to go through an exercise with every single insurer with hundreds and hundreds of pharmacies, we are being conservative and saying the loss amount is 92.8 million, what they paid, which is also consistent with the methodology used for Adam Brosius, just

using a different time range.

THE COURT: What did we determine the loss was for Mr. Brosius's case?

MR. POGOZELSKI: It was approximately 60.6 million, which would be a two-point difference between Mr. Brosius and losses in this case.

But I would just add as a final note on that, the reason Brosius's loss was lower was, one, at the time that he pled guilty, we were basing it on a date, September 29th or 30th of 2020, when him and his codefendants get an email from Abbie Divilio about falsified T3s in connection with Boulevard.

The trial evidence certainly showed these defendants knew about various problems and worked directly, at least Charles Boyd worked directly with Peter Khaim, with many phone calls.

And so the loss amount here, based on the trial evidence, should be higher than Adam Brosius's, but again, it's only a two-point swing and in the grand scheme of this PSR, it's probably again a distinction without a difference.

But we do believe 92.8 million understates the actual losses and intended losses.

THE COURT: So how much over that 92.8 million that they paid for the black market drugs were they going to get? What percentage above that were they going to get from the pharmacies?

MR. POGOZELSKI: We've done some consecutive calculations. When you look at emails, the delta between the sales, 5 to 10 percent versus 15 to 25, I think we came out around 105 million. So if you did gross sales, you would still be in around the same loss band.

THE COURT: I'm not articulating my question very well.

If they paid 92 million to the black market sellers, how much were they expecting to get from the pharmacies?

MR. BARZEE: A profit of 13 million.

MR. POGOZELSKI: That would be profit. And gross sales would be appropriate here because these are worthless drugs.

MR. BARZEE: But to answer the Court's question, it would be $13 million. That's what Safe Chain's profit would be, and that's the most ascertainable loss.

THE COURT: So it would be a 20-level enhancement rather than a 24-level enhancement?

MR. BARZEE: Correct, Your Honor.

THE COURT: All right. I'm going to be consecutive and sustain the objection and rule a 20-level enhancement for loss instead of 24.

Next objection?

MR. BARZEE: Objection to paragraph 67, Your Honor, involves the employee breach of trust enhancement.

THE COURT: I mean, it's their company. Who are they breaching trust with, with their company, Mr. Pogozelski?

MR. POGOZELSKI: So this enhancement has to do with -- it has two prongs. One prong is if the offense conduct involved conduct described in 18, USC, 670, which was a count for which they were convicted, Count IV.

And then the second prong for an additional two points is for employees or agents of an organization in the supply chain for pre-retail medical products.

Certainly, a company cannot act without humans and as the -- as an owner in charge of the sales division, it seems pretty clear that Patrick Boyd was an agent of Safe Chain, and so the additional two points there would apply. He's an agent of Safe Chain. He was authorized to act on behalf Safe Chain.

The purpose of that enhancement is to punish more severely people, individuals in the supply chain before these prescription drugs arrived to pharmacies and ultimately patients. And that's precisely where both Patrick and Charles Boyd stood, as the owners of a licensed pharmaceutical wholesale distributor. They were agents of that company.

THE COURT: I was confused. I thought the argument was abuse of position of trust as opposed to he was involved in a supply chain and he was employed by the company. So paragraph 67, the four-level enhancement, I think, is okay because there was a supply chain and he was employed by Safe Chain. He was one of the co-owners or vice president or whatever his title was. So I'll overrule the objection to 67.

MR. BARZEE: Your Honor, just to let the Court know, the other part of that objection was the fact that there was no special jury verdict, which we believe would have been necessary as to Count V in order to seek this type of enhancement, a finding that he was acting as an agent of Safe Chain.

THE COURT: We're not exceeding the statutory maximum. There's no minimum in this case. So why would I have to have had a special verdict form?

For the guidelines I have to have a special verdict form?

MR. BARZEE: No.

THE COURT: Maybe I missed that Supreme Court case.

MR. BARZEE: I'm just relying on what's --

THE COURT: All right. So I'll overrule the objection to 67.

MR. BARZEE: The next objection is to paragraph 68, sophisticated means.

Your Honor, this enhancement should apply to an individual's actions in the conspiracy. And I'll note that Adam Brosius was not given a sophisticated means enhancement. In fact, many of other similarly situated defendants have not received this enhancement.

The truth of the matter is this wasn't sophisticated at all. This was simply buying in bulk and then reselling. They

weren't changing labels. They weren't changing the pills into the bottles.

And Patrick Boyd certainly was not involved in any type of sophisticated doings as part of this conspiracy. He was a cheerleader for his sales team, and that did not require a high degree of sophistication.

THE COURT: Mr. Pogozelski.

MR. POGOZELSKI: Your Honor, my colleague, Ms. DerOvanesian, is going to handle this argument.

THE COURT: Okay.

MS. DEROVANESIAN: Your Honor, this enhancement actually is a great example to highlight the true difference and the distinction between the Boyds and Mr. Brosius. That's because one of the factors that made this scheme so sophisticated and so complex was the fact that what the Boyds had, being a license to distribute pharmaceuticals through their wholesale business, is what made all of these pharmacies purchase the drugs.

Without that license, without operating that licensed company that they both owned and operated, none of those drugs would have been able to get into the pharmacies or into the hands of the patients. People like Adam Brosius or the other people at the street level of these crimes would not be able to get those drugs into the pharmacies.

So Patrick Boyd and Charles Boyd both had to use that

license in order to conceal the true origin of those drugs and to pass them off as if they were legitimate, knowing they weren't.

In addition, as Mr. Pogozelski already explained, Patrick Boyd was specifically involved in falsifying and assisting with creating falsified T3s with respect to that Synergy company, again, to conceal the illicit nature of those drugs.

Now, that certainly is sophisticated in this case because those are -- that is paperwork, as the Court heard countless witnesses testifying to, that paperwork is what tells pharmacies that the drugs are legitimate and where they came from.

By concealing the true origin on that paperwork, that also allowed them to pass it off to the pharmacies.

Now, additionally, with respect to Patrick Boyd, there was evidence that he hid all of these facts from compliance as well. Again, allowing the compliance department to believe that these drugs were acquired legitimately; that this T3 paperwork was legitimate, knowing it wasn't.

Additionally, all of the evidence about Patrick Boyd's lies to the attorneys to get the attorneys to approve things or to help them conceal also was sophisticated on his part.

Additionally, I think we've already mentioned lies to the sales team, concealing things from the sales team about the

problems that they were having was sophisticated because that allowed the sales team to continue selling these drugs to customers without knowing what was really going on.

And then on top of that, there were also the lies to the customers. There was a letter crafted that was placed into evidence that was specifically drafted containing many lies, according to the testimony of multiple people, including the attorney who represented the Boyds as well as their compliance director.

And that letter was specifically crafted to mislead the consumers as to why they were receiving bottles that had the wrong pills inside. So by strategizing in that way and crafting a letter to shift the blame and by using all of these falsified documents, there were certainly ample evidence that Patrick Boyd's participation in this scheme was sophisticated as well as Charles Boyd's.

MR. BARZEE: Your Honor, not telling on yourself isn't a mark of sophistication. It's a mark of anyone who's committing a crime.

THE COURT: I kind of agree with Mr. Barzee. I think what you're arguing is, is anytime someone lies or commits fraud it's sophisticated. I think it's got to be much more than that; so I'm going to sustain the objection to paragraph 68.

Next one?

MR. BARZEE: Objection to paragraph 69, death or serious bodily injury.

THE COURT: So what's the serious bodily injury that they were anticipating in this case, Mr. Pogozelski?

MR. POGOZELSKI: Your Honor, they were distributing black market drugs. They worked with Boulevard and Peter Khaim. They learned of all -- of at least two complaints where bottles they distributed had the wrong pills in them as early as August of 2020.

There's the article that they share between each other that discussed the serious risks posed by exactly these types of schemes. And in that article and in the deposition -- or sorry, the Teams message where Charles Boyd sends it to Patrick Boyd, some time passes, and Patrick Boyd replies, "Oof."

But that article identifies all sorts of risks. The safety of these drugs come from the street. No one knows when they expire, what their efficacy is. And there were at least seven complaints of wrong drugs in the wrong bottle.

And after they learned of those complaints is when Gustavo Borja, who testified at trial, got his Seroquel and what he thought was his prescribed HIV medication and passed out and was unconscious for 24 hours.

And this enhancement is not only about actually causing that type of harm. It's also about the risk and the conscious and reckless disregard of that risk. And the trial was --

throughout the trial, there was a litany of witnesses and documents discussing these risks, discussing these dirty bottles, tampered bottles.

And so these defendants both -- and Patrick Boyd -- knew about these risks early on and nevertheless, continued for another year selling black market drugs to HIV patients.

THE COURT: I don't think the Boyds were deliberating sending out HIV drugs that were not HIV drugs or they were not viable drugs. I think they thought that the drugs that they were getting from the homeless people in New York were HIV drugs.

So I don't necessarily believe that it was conscious on their part, but why wasn't it reckless when you're sending out these drugs and some people are getting sick from them and some people are getting drugs that aren't supposed to be in the bottle, Mr. Barzee?

MR. BARZEE: I think that the Court can reasonably say that some of the behavior here was reckless. I think the question is, is it a reckless risk of death or serious bodily injury.

THE COURT: Didn't we have a patient that testified that if he doesn't take his correct medicine religiously, it's very, very serious?

MR. BARZEE: Yeah. But there's nothing in the record, Your Honor. These arguments are speculative. There's nothing

in the record that indicates anyone suffered any serious bodily injury. In fact, the opposite is true.

There's evidence in the record that someone did take a medication that wasn't the HIV medication that they were supposed to get and they fell asleep for 24 hours. That is not a serious bodily injury.

THE COURT: I don't think they have to prove that someone died or someone had serious bodily injury. They just have to prove that they were reckless, running the risk that that would happen.

MR. BARZEE: But what I'm saying is there is no risk of serious bodily injury. There's a risk that someone's going to sleep for a long time.

THE COURT: I think there's a risk; so I'll overrule the objection to paragraph 69.

MR. BARZEE: Objection to paragraph 70, vulnerable victims -- you know, the Government has offered various theories as to who the victims are in this case.

I would suggest to the Court that the pharmacies that were purchasing these medications at 10, 20 30 percent below WAC were nothing more than unindicted coconspirators. Certainly not vulnerable.

THE COURT: How about the patients that got the HIV medicine from the pharmacies?

MR. BARZEE: There's nothing in the record that suggest

any particular vulnerability of any of those patients, Your Honor.

THE COURT: Well, they got HIV. I would think --

MR. BARZEE: Having HIV is not the equivalent of being a vulnerable victim, Your Honor.

THE COURT: I think having HIV and maybe not getting your medicine makes you vulnerable; so I'm going to overrule the objection to paragraph 70.

MR. BARZEE: Objection to paragraph 27 is the objection to the enhancement for leader/organizer.

MR. POGOZELSKI: And I believe the Court already ruled on this.

MR. BARZEE: Well, the Court ruled on some of the language that was used in another paragraph, but the Court hasn't ruled on whether or not a four-level enhancement should be given to Patrick Boyd for being a cheerleader of the internal sales force, Your Honor.

Remember that most of these medications were being sold by Adam Brosius's sales team. I think he collected somewhere around $7 million in commissions for his sales team selling those medications.

Patrick Boyd's job was to be a cheerleader for a sales team that had already been in operation, had already been working there, and already been selling medications.

Other than the sales team, he did not direct or lead or

organize anything or anyone, and he certainly didn't recruit anyone into the conspiracy.

THE COURT: I think --

MR. BARZEE: The conspiracy itself might have been extensive, but Patrick Boyd's involvement was minuscule compared to the conspiracy. Minuscule.

THE COURT: I think he was a leader. I think there were five or more participants, salespeople, and I think it was otherwise extensive; so I'm going to overrule the objection to paragraph 72.

Did we skip over 71?

MR. POGOZELSKI: That was the vulnerable victims, Your Honor.

THE COURT: I thought that was 70.

MR. POGOZELSKI: I apologize. That was 70.

71 is role for leader /organizer plus 4.

THE COURT: See, that's 72 in my PSI. Do I have the wrong PSI?

MR. BARZEE: I'm not sure, Your Honor.

MR. POGOZELSKI: I'm using the one that was issued last night, but I also think I have a copy of --

THE COURT: Yeah. I'm using the one that was issued February 13th. So I have a different -- although I got the March 13th one for Charles Boyd. On Patrick Boyd, I have the February 13th one.

MR. POGOZELSKI: And, Your Honor, I have an additional copy.

THE COURT: I mean, really, it doesn't matter as long as we're on the same page as to what the rulings are.

MR. BARZEE: I believe we are, Your Honor.

THE COURT: So are you objecting to the special skill two-level enhancement?

MR. BARZEE: Yes, Your Honor.

THE COURT: So, Mr. Pogozelski, what's the response to him having abuse of public or private trust or use a special skill?

MR. POGOZELSKI: Yeah, that was taken out of the revised PSR.

THE COURT: Okay.

MR. POGOZELSKI: We acknowledge you can't apply that one if you also apply the 671.

THE COURT: Very good. That's why there's no 71 in the new PSR. Or that's why the 71 in the new PSR is the role for the offense.

MR. BARZEE: Yes.

THE COURT: I think we're on the same page here. The next one was the obstruction of justice.

Didn't I already say I wasn't going to score that?

MR. ZIMET: Yes, Your Honor.

MR. POGOZELSKI: You did, Your Honor.

THE COURT: So let's go back over the guidelines and see if we can add up what we've come up.

The seven-level base offense level, we're in agreement on that; right?

MR. BARZEE: Yes, Your Honor.

MR. POGOZELSKI: Yes, Your Honor.

THE COURT: I think I ruled there were ten or more victims; is that correct?

MR. POGOZELSKI: Yes, Your Honor.

THE COURT: So that moves it up to 9.

On the loss amount, I said 20; so that moves it up to 29.

On the 670 enhancement, I said 4; so that moves it up to 33.

Sophisticated means, I said no.

Risk of death or serious bodily injury, I said yes. That moves it up to 35.

Vulnerable victims, I said yes; so that moves it up to 39.

Special skill, I said no.

Role in the offense, I said yes; so that moves it up to 43.

And the obstruction, I said no.

So does that mean that the offense level is 43, the way I have calculated it?

MR. POGOZELSKI: Yes, Your Honor.

MR. BARZEE: That seems to be the math.

THE COURT: Okay.

Any other objections to the presentence investigation report?

MR. BARZEE: Your Honor, minor objections to content. Objection to paragraph 95 involves medical care.

THE COURT: Was that 2022 instead of 2024?

MR. BARZEE: Exactly.

THE COURT: So we'll change it to March of 2022 in paragraph 95.

MR. BARZEE: Objection to paragraph 113. Just a correction, the amount should be 7,500 per month.

THE COURT: Any objection to changing 7,000 to 7,500?

MR. POGOZELSKI: No, Your Honor.

THE COURT: Okay. I'll change that.

MR. BARZEE: And the final objection is whether or not there are grounds for a variance.

THE COURT: Okay.

So the guidelines are life, but the maximum penalties are -- none of them are life. The maximum penalties are -- I don't know. I didn't add them all up.

240, 240, 240, 180, 36, 36, 60 -- however many months that comes up to.

MR. POGOZELSKI: I believe probation has the answer.

PROBATION OFFICER: Yes, Your Honor. Because the 108 is a 36-month offense, based on the corrections, so it's 888 months.

THE COURT: Well, let's see. I'm not following.

The conspiracy to possess medical products and false label is a three-year maximum, not a fifteen? Is that what you're saying?

PROBATION OFFICER: Yes, as to Count IV?

THE COURT: Right.

PROBATION OFFICER: Correct.

THE COURT: So I had that down as a 15-year max, but it's a three-year max.

PROBATION OFFICER: Yes.

THE COURT: So we have 60 months as to Count I, 108 months as to Counts II, III and IV, 720 months as to Counts V, VII and VIII, and that comes out to 888.

Any legal cause to show why sentence should not to be imposed?

MR. BARZEE: No, Your Honor, but we do have argument for variance.

THE COURT: Go ahead.

MR. BARZEE: Your Honor, I first want to make clear that in requesting a variance from the Court on behalf of Patrick Boyd, we're not asking for mercy.

What I'm asking the Court to do is fashion a sentence

that takes into account the need to avoid unwarranted sentencing disparity between similarly situated defendants.

The language in 3553, calling that a "need" is significant. A "need" is something that's required. It's required for the system.

We "need" food, water, and air for these bodies to continue operating.

Cars "need" gasoline.

AI "needs" energy.

The "need" here is the "need" for fairness for the entire system, for the judicial system because it would be absurd to the system if two individuals who committed essentially the same crime received two wildly different sentences. And that is exactly what the Government is asking the Court to do in this case.

If you look at some of the similarity situated defendants and the sentences they received, you can see how courts have routinely dealt with these types of cases. The most significant similarly situated defendant is Lazaro Hernandez.

According to the PSI, Lazaro Hernandez is related to this conspiracy. In fact, we know that Lazaro Hernandez -- we know from Gilead and their production that Lazaro Hernandez is considered the kingpin of this entire conspiracy, and that's a conspiracy that begins with someone purchasing these

medications from patients outside of pharmacies.

It may begin with doctors writing false prescriptions in order to get them filled and resold. It moves on to different people doing different things at different stages of the conspiracy.

Lazaro Hernandez was in charge of all of it from the beginning to the end. He was held responsible for $232 million in loss. $232 million was his loss amount, and his sentence was 180 months. This is someone who probation has identified as being related to this case.

Lazaro Hernandez also had an extensive criminal history. The sentence that he received 180 months on wasn't his only healthcare fraud sentence. In fact, he had another sentence a few months before that for an entirely separate part of this huge conspiracy. So you have someone like Lazaro Hernandez with a loss amount of $232 million receiving the sentence of 180 months with an extensive criminal history, two healthcare fraud convictions, a prior conviction for trafficking in cocaine, a prior case that wasn't counted where he was convicted of armed robbery, that's the kingpin defendant, and he received a sentence of 180 months.

THE COURT: Maybe Judge Singhal is a more lenient sentencer than me. I don't know.

MR. BARZEE: That's possible, Your Honor, but Congress has dictated that courts need to avoid. That's an obligation.

THE COURT: Well, I understand that, but I don't think it automatically falls to the lowest common denominator. If someone gets a lenient sentence, I don't know that everybody gets a windfall and gets the same or similar sentence.

MR. BARZEE: You're right. And if this sentence was an absolute anomaly, given by a very lenient liberal judge against the wishes of the Government, that might be a valid point, but that's not the case.

It's number one, it's not an anomaly. Other judges have handed down similar sentences, which I'll go into, which I've made as part of my sentencing memorandum, number one.

Number two, putting aside any issues of leniency, the Government came in and asked for these sentences. The Government wasn't asking for a sentence of 2000 years for Lazaro Hernandez. They were asking for a sentence of 180 months. They were asking for the sentences to run concurrent to his other sentences.

And the prosecutor here in the courtroom was the prosecutor on that case, and I'm sure he's going to get up and tell you that Mr. Hernandez's case was entirely different and he cooperated with us and he did A, B, and C; but, Your Honor, he was held responsible for double or triple the loss amount in this case. He was the mastermind of the entire conspiracy, earning the name "Kingpin" from Gilead, and he has this extensive criminal history.

I mean, it's not just a small criminal history. He's been to prison for healthcare fraud, for trafficking in cocaine. He's been convicted of armed robbery.

Patrick Boyd has never been in trouble before this case. He has no criminal history. So when you're looking at similarly situated defendants, when you're looking at the fact that Lazaro Hernandez was convicted of essentially the same counts, pled guilty essentially to the same counts as here, and you have somebody with an incredible criminal history, who made over $200 million, who was driving around in Miami, as the Government pointed out at his sentencing hearing in Lamborghinis and $250,000 Mercedes -- you have Patrick Boyd whose profit here was probably about $250,000.

There's no Lamborghini in his garage. There was no $250,000 Mercedes. He wasn't living the high life in Miami. He was living a very humble life up in Maryland. So, yeah, maybe Lazaro Hernandez came in and sweet-talked Alex and convinced him he was cooperating, but how much do you get off for cooperating?

800 months? Is that his reduction for his cooperation?

The Court has to consider that, and the fact that that lenient sentence, as the Court described it for Lazaro Hernandez --

THE COURT: I'm not saying --

MR. BARZEE: I'm sorry?

THE COURT: I'm not saying it was lenient. I'm just saying it could be perceived to be lenient.

MR. BARZEE: No, I understand. It's not an anomaly. Look at the next one I mention, Stephen Costa.

Stephen Costa is sitting in prison. He's in prison convicted of a healthcare fraud, and he is teaching other prisoners how to commit this offense with diverted medications. He's telling them that since he can't do it anymore, they're going to have to deal directly with Lazaro Hernandez.

For his case, he's sentenced to 168 months with a loss amount of $77 million. And this is a guy who is serving a prison sentence when he originates his new case.

Again, Patrick Boyd's never been in trouble in his life. He's running a completely legitimate company, living the American dream, until Adam Brosius shows up and introduces this virus that infects the entire company, but there's no criminal history here.

These guys like Lazaro Hernandez and Stephen Costa, Mohammed Salami, Adam Brosius -- these guys are all career criminals. They were in the business to commit crimes. That was not the case for Patrick Boyd. He was in the business to do legitimate business as he was doing before another similarly situated defendant, Adam Brosius, shows up.

Adam Brosius is the one that introduced each and every single vendor in this case. The big five vendors all came from

Adam Brosius. Adam Brosius sold a vast, vast majority, at least two-thirds of the medication, through his sales force, earning him a $7 million commission.

He arranged for the purchase for all the medications and the prices, earning him an additional $3 million in brokerage fees. And Adam Brosius, just like Lazaro Hernandez, just like Stephen Costa, was a career criminal. He had a prior -- he was committing this offense while he was under indictment in another healthcare fraud case.

And the Government steps up and asks the Court to give Lazaro Hernandez -- I'm sorry. The Government asked for 188 months. Correct what I said before.

The Court gave him 180, but I believe the Government may have asked for eight more than that.

The Government asked for 168 months in Stephen Costa. They asked for 103 months in Mohammed Salami, and they asked for 97 months for Adam Brosius.

There's a reason why Congress said there was a need, an obligation, a commitment to avoid sentencing disparities between similarly situated defendants, and there is no defendant that is more similarity situated than Adam Brosius.

So the Government's going to stress the differences between Adam Brosius and Patrick Boyd, and those differences boil down to two things: Number one, he came in early and pled guilty. Conceded.

Number two: He, quote-unquote, "cooperated." "Conceded."

So the Government recommends a sentence of 97 months for Adam Brosius.

Well, if you take away the reduction for his guilty plea, if we say, "Okay. Well, that's different. How much of a difference does that make?"

It's three levels for pleading guilty. And so you go 97 up three levels, and you're what? At like 112 or something.

What's the other difference?

The other difference is "Oh, well, Adam Brosius cooperated with us."

Well, you know what? Maybe Adam Brosius will get credit for that cooperation someday in the future. He wasn't sentenced based on his cooperation. He was sentenced based on his wrongdoing, and the Government believed that the appropriate sentence for Adam Brosius, who was the true leader, the true organizer of this entire scheme, the one who introduced all this to Patrick Boyd and Charlie Boyd -- they asked for a sentence of 97 months.

Now, granted, maybe he will get a reduction in the future, but for his wrongdoing, the recommendation was 97 months.

And what's the biggest difference between Patrick Boyd and Adam Brosius? The biggest difference isn't that Patrick

Boyd decided to exercise his right to go to trial. The biggest difference is Patrick Boyd had never been in trouble before in his life. He was operating a legitimate business, whereas Adam Brosius was in the field in order to commit crimes.

His -- he had a healthcare fraud prior, much more culpable than Patrick Boyd in this case, and the Government is recommending a sentence of 97 months.

Your Honor, I would suggest to the Court that it's appropriate to not give Patrick Boyd a reduction for acceptance of responsibility. That's fine. He exercised his right to go to trial, but should we really give him 800 more months because he exercised his constitutional right to go to trial?

And even if we did, what about the fact that Adam Brosius has a criminal history and he doesn't? This is the first time he was involved.

And what about the fact that he was recruited into this conspiracy by Adam Brosius?

Your Honor, I would suggest that it would be an absurd result, an absolutely absurd result for Patrick Boyd to receive a sentence higher than Adam Brosius.

It should offend everyone to consider even a possibility that he would receive a higher sentence than someone like Lazaro Hernandez, who originated all of this and trained everybody and probably brought dozens and dozens and dozens of people into his conspiracies and was driving around

town in Lamborghinis.

And the Court heard about all of the money that people like Peter Khaim was making. There was no money here that Patrick Boyd made. He probably made about $250,000 in profit when all was said and done. And he already has forfeited $75,000, I believe, to Gilead as part of the $2 million settlement.

And the fact of the matter is -- and this is a separate issue, I guess, but I think it's important for the Court to know that he's destroyed. He's already destroyed. He's already destroyed.

The company is gone. It's gone bankrupt. He's lost his company. He's lost all -- he has no money. He has no assets. He owns a house and a car. That's about it.

Lazaro Hernandez gained probably over $100 million in profits, whereas Patrick Boyd gained $250,000 maybe, maybe.

Your Honor, I would suggest that a sentence in line with what Adam Brosius has received would be the only possible just sentence in this case. It has to be a sentence lower than Lazaro Hernandez. There's no way he's anywhere near as culpable as him.

And even the other ones that received sentences of -- Stephen Costa with a loss of $77 million, receiving a sentence of 168 months with an extensive criminal history, hatching his crime from behind bars, recruiting other people into the crime

from behind bars. Mohammed Salami receiving a sentence of 103 months with a $78 million loss amount. And then finally, Adam Brosius.

So, Your Honor, I'm not asking for mercy. I'm asking for the Court to exercise reason and logic in complying with Congress's admonition to avoid these types of disparities, because disparities like these are a cancer on the system.

People will lose faith in the system if one defendant commits a crime and receives is a sentence of 97 months and another defendant commits the same crime and receives a sentence ten times that amount or double that amount. That would be a miscarriage of justice.

So we're asking the Court to take into account Patrick's limited role when compared to someone like Lazaro Hernandez or Adam Brosius. The fact that these similarly situated defendants have received substantially lower sentences and take into account the fact that Patrick Boyd has already lost absolutely everything after getting sucked into this scheme with Adam Brosius and profiting maybe $250,000.

Your Honor, there's several individuals here that are here in support of Patrick Boyd, one of which would like to address the Court.

THE COURT: Okay.

MR. POGOZELSKI: I can wait to respond, but I do want to respond.

THE COURT: I'll give you a chance.

MR. POGOZELSKI: Okay.

MR. BARZEE: Please introduce yourself to the Court.

MR. BARCH: Good afternoon, Your Honor. I appreciate the time to present to the Court and to yourself my experiences with Pat Boyd and Charlie to some degree but Pat to a greater degree.

My background is health care. I ran GW Medical Center for 20 years. I then was associate dean of the school of medicine at Hopkins and assistant vice president of medicine there. I then left there and built Medicaid HMOs for five years, largely around community health centers. I then came back and ran the public health system in D.C.

And you say, "Why does all this matter?"

Well, I have a good deal of experience in health care and I have known Patrick Boyd since he was a little tyke. He's my son's best friend. I've watched him grow up, and I've worked with him on numerous occasions.

I can't even imagine that he was involved in a conspiracy. I can certainly imagine some bad judgment in who he did business with. I can definitely imagine that, and I certainly appreciate the seriousness of this crime.

But let me give you a little bit about what Pat has done over the years. One of the things that I created in D.C. when I was CEO of GW Medical Center was health care for the

homeless, which ultimately became Unity Health Care.

Pat spent two of his Thanksgivings feeding the homeless. He took away his own time to basically do a community service. He also -- another example of his community service is his coaching of football teams for his son, where he currently lives.

I also worked with him -- I owned or was chairman of the board of GPS, a global pharmaceutical sourcing company, which was not dissimilar from the business that Pat was in. It was a secondary distributor; so I have great experience with pedigrees and the complications associated with getting pedigrees that are perfect.

Pat one day, when we were walking to lunch at that organization, found a wallet. And in that wallet was a fair amount of money.

And I said, "Pat, turn it into the police department."

He said, "No, no, no. It may never get back to him. I'm going to run the guy down."

And so he spent the afternoon finding him, contacting the guy, and gave back the wallet, which had a considerable amount of money in it, and refused to take any sort of reward. That's the sort of person that he is.

What this sentence -- what has already happened to him, we heard from his lawyer, he's destroyed. But you're about to destroy much more than just Pat Boyd.

His parents, who are elderly and who are not here today -- his father's on dialysis. His mother had a faulty back operation. They can't get here. They're dependant on their sons for support.

He's got two teenage kids who the grandparents -- and I'm a grandparent -- probably won't see much of. This is all stressed out so much beyond just the businesses. He's going through a divorce. I mean, the impact is unbelievable.

And at the risk of being a little presumptuous, another poor decision on his part -- and I hope there isn't a chauvinistic reaction to this -- but is doing business in Southern Florida. It is well known that medical fraud in this part of the country is rampant, and we've got to stamp it out.

What else worries me is what we heard about the sentencing. I was getting educated in this process. And health care and law remind me of the same thing today. Health care has evolved to where it's a two-tier system. The haves get very good care in this country. The have-nots suffer. And our health indices indicate that.

I believe it the same thing with the law today, and it's built around money. They spent all their money on the civil defense. And not that they didn't get good defense, but they didn't have the resources to raise the sort of defense that may have had a difference on the outcome.

And certainly, I think today with what is happening

with law concerns me. It really does. And fairness really needs to be considered. I mean, I'm sure Hamilton and Jefferson are rolling over in their graves with what is going on with law today.

And I appreciate the time to speak to the Court, and thank you for your consideration.

THE COURT: I'm sure Mr. Boyd appreciates your support.

(Reporter requests clarification.)

THE COURT: Mr. Barzee --

MR. BARZEE: Yes, Judge.

THE COURT: -- he didn't state his name.

MR. BARZEE: It's Michael Barch, B-A-R-C-H.

Thank you.

THE COURT: Anything Mr. Patrick Boyd wants to say before I impose sentence?

MR. BARZEE: Your Honor, can I make one very brief comment --

THE COURT: Sure.

MR. BARZEE: -- that I didn't talk about and I wanted to do it very, very briefly.

The fact is Patrick Boyd is a father. He has two teenage children. I want the Court to consider the significance of the fact that even a sentence in the range of Adam Brosius is likely to take him away from his teenagers' lives in a very, very significant way.

THE COURT: It's something I hear in almost every sentencing, Mr. Barzee.

MR. BARZEE: I understand. I understand, Your Honor.

Your Honor, I had a couple of requests procedural as far as location.

THE COURT: Okay.

MR. BARZEE: Your Honor, we're asking that he be designated to a facilitate as close to Eastern Maryland as possible. Mr. Boyd would also like to participant in the RDAP program if it was available to him, and he would like an opportunity to address the Court briefly.

THE COURT: All right.

Mr. Patrick Boyd, you may proceed.

DEFENDANT PATRICK BOYD: Thank you.

I have been in the pharmaceutical wholesale business since 2003 and not once had any criminal issue in business or in a personal level.

While the trial painted a period of May 2020 through July of 2021, a time filled with constant problems of wrong products, the truth is that there were less than total issues with the wrong medications during that period.

We sold over 50,000 bottles of branded medications, making that a rate of .02 percent and also found out that McKesson had the exact same issues, including ones with Seroquel in their bottles.

While in our industry, we feel that one issue is too many, it translates to you having a better chance of being struck by lightning twice than getting the wrong medications by Safe Chain.

Our net profitability was about 1 percent, and that part of our business made up a small percentage of the company's total profits while vendors deceiving us were making eight figures.

Despite being called over and over an unsafe company, our goal and intention was always to make a positive impact in our industry and in the community.

We helped hundreds of mom-and-pop pharmacies stay in business with all their needs when the big guys were forcing minimums on them that they couldn't afford. We sold life-saving medications on a daily basis in our emergency hospital wholesale market. We helped VAs, surgery centers and other facilities get what they needed when they needed it.

We created dozens of jobs in a distressed county and helped multiple employees become first-time homeowners. This was a mindset not just for our workplace but also how we approached our personal lives.

My children have always been the most important part of my life since they came into this world. In the last five months, I have seen them for a total of two hours being that it's been so expensive for them to visit.

I missed the holidays this year, my daughter's 16th birthday, my son's entire basketball season, where I previously never missed one of their sporting events. There's nothing I want more than to be back in their daily lives.

I've always tried to set an example -- the best example for them possible and support them in all of their efforts, just as my parents have supported me and still are today, to the best of their ability.

I'm so thankful that through this process with all the inaccurate media and rumors that my loved ones, especially my girlfriend Caroline, had provided endless encouragement and support while I can't be there in my normal role of supporting them.

With family always coming first, another aspect of my life that's been extremely important to me has been the time I have been able to give in our small-town community.

I've raised money for and participated physically for countless charities like Habitat for Humanity, Casa, University of Maryland Health and local mentorship programs.

I've served on boards for youth sports and maybe had my biggest impact in mentoring hundreds of kids while coaching over the last ten years.

I'm not a career criminal. Like I've been compared to in sentencing reports, trial, or the people that the Government put on the stand to testify. My brother and I made a mistake

by putting too much trust in people that we shouldn't have.

Even the FDA, our governing body, acknowledge that these issues during that time period of branded drug sales were mistakes that needed to be corrected.

After their long investigation, multiday inspection and viewing the same PowerPoint presentation from Gilead that the DOJ saw, they didn't suspend our license, they didn't shut us down, and they certainly didn't recommend prison.

They issued a warning letter asking that we update our SOPs to be more effective against offenders that are potentially scamming us and to be more efficient in our recordkeeping.

As of 2021, all of the recommendations that have already been put into place and continue to be followed until the company was forced to close during our trial in the fall of 2025.

Thank you.

THE COURT: What's the Government's position?

MR. POGOZELSKI: Your Honor, just to clarify one thing that Mr. Barzee repeated over and over again, we are not recommending 800 months.

Okay?

We are recommending a significant downward variance from life. And what we're recommending we believe is reasonable, and I'll explain why.

We're recommending that Patrick Boyd be sentenced to 18 years or 216 months, and that is based primarily on two factors.

One, throughout trial, throughout the sentencing memoranda and his own words right now, I didn't hear a single apology or sentence that referenced any of the vulnerable patients who were harmed and the ones we don't know about.

No remorse for his crimes. He's sad about not seeing his family, but as the Court will recall, Ms. Divilio testified that these two defendants refer to these vulnerable patients as, quote, "junkies." They expressed disdain for these victims of their crimes.

And apparently, that is the same sentiment that he continues to hold.

And that is also what distinguishes him very significantly from Adam Brosius and Lazaro Hernandez. At least they expressed remorse, at least they pleaded guilty.

Lazaro Hernandez -- I was there. I recommended 180 months. He was scored at a Criminal History Category 1. I cited the transcript in the sentencing memo.

If he had not pled guilty, he would have been at a 39, which would be 262 to 327 months. That's significantly more than what the Government is recommending here.

And the witness who spoke on behalf of Mr. Patrick Boyd mentioned the haves and the have-nots.

These two defendants are the haves. And I'm not trying to minimize what people like Lazaro Hernandez and Peter Khaim did, but they were the have-nots.

Lazaro Hernandez came over on the Mariel Cuba Boatlift. Peter Khaim was born poor, facing anti-Semitism in Uzbekistan. They pleaded guilty. They expressed remorse. They cooperated.

Lazaro Hernandez -- his cooperation was included in this case. He was the first person I prosecuted in this investigation, and then we worked up the chain, as most criminal investigations do, and we indicted these defendants.

They were much harder to charge, to obtain the evidence. Your Honor was here for the trial. You heard about all the lies. What they hid. They had this Safe Chain that was a facade. It was not a legitimate company. It was a way to launder and peddle these drugs from the street into patients' hands. Lie to the lawyers. Lie to the compliance director.

You even saw how emotional the lawyer and the compliance director got when they were on the stand. This is not a case that is similarly situated to Adam Brosius or Lazaro Hernandez.

The Eleventh Circuit has repeatedly held that there are no unwarranted sentencing disparities when you compare someone who pleaded guilty, accepted responsibility, expressed remorse, and has cooperated.

Lazaro Hernandez cooperated in this case. We didn't call him, but at least ten other people have been charged based on what his cooperation has entailed.

He mentioned Costa as well. Again, every single person that they compared to is someone who actually accepted responsibility and expressed remorse. And I think the remorse part is the most significant one because again, I'm not hearing any acceptance of responsibility.

What I'm hearing are the same defenses presented at trial and rejected by the jury -- We were deceived. We were tricked. This was all Adam Brosius. This was Gilead hiding it from us.

Anywhere they could point the finger, anywhere Patrick Boyd and Charles Boyd could point the finger, they would point it. It hasn't changed, and I'm kind of shocked by that.

So a sentence of 18 years appropriately reflects the sentence here. And the final important part that I just want to emphasize here -- well, two.

One is without a Safe Chain with licenses, a Lazaro Hernandez and a Peter Khaim can't get their drugs into pharmacies. They need people like these two defendants to operate their Safe Chain company.

And there were a lot of references to running a legitimate business before Adam Brosius came along. Well, as the Court will recall, some testimony came out that the DEA

agent showed up at Abbie Divilio doorstep, and of course, the Court did not allow this evidence in, but when we're thinking about a downward variance, we were prepared to present evidence of the illicit, illegal distribution of opioids.

We even have a document where Patrick Boyd talks about how they sell these oxy and hydro at very high prices because the pharmacies, quote, "oversupply them."

This was not a legitimate business before the HIV scheme, and it wasn't, obviously, a legitimate business during the conspiracy in this case. He is not similarly situated to Adam Brosius. Adam Brosius was a salesman. He was out there pushing drugs. They had the licenses. They had the company. They were on-site.

Patrick Boyd was in the warehouse. They were the kingpins here because without them, these drugs don't end up in the pharmacies and don't end up in vulnerable patients' hands.

And, Your Honor, I guess I'll just finish with this continual minimization of conduct, this continual denial of the role -- clearly, these defendants' attitudes haven't changed.

They went to trial. They had the right to do so. This is not the Government asking for a trial tax. These are different in kind defendants as opposed to the Lazaro Hernandez or Peter Khaim or Costa, who all pleaded guilty.

As far as I know, this is the only prescription drug

diversion scheme that went to trial in this district. And again, when someone pleads and accepts responsibility, they are not similarly situated.

So we are asking for a sentence that's slightly above what Lazaro would have gotten -- or quite a bit below what Lazaro would have gotten had he proceeded to trial. And we do think it's a reasonable sentence, and it's a significant, significant downward variance from the 800 months that his counsel continually repeated, as if that was actually a sentence that we were going to recommend.

Thank you, Your Honor.

THE COURT: Mr. Barzee, what's your position on the forfeiture?

MR. BARZEE: Your Honor, I rely on what we previously filed with the Court.

THE COURT: Well, unless there's an agreement on the amount of forfeiture, I think I have to have a hearing.

[!EZ SPEAKER 06]: That's correct, Your Honor. My understanding from speaking to defense counsel is they're not making factual objections to our calculations, merely legal argument.

THE COURT: Well, let me hear the legal argument.

Mr. Barzee?

MR. BARZEE: Your Honor, I'm relying on what I had previously filed with the Court.

THE COURT: Anything further before I impose sentence?

MR. POGOZELSKI: Nothing from the Government, Your Honor.

THE COURT: All right. Having considered the sentencing guidelines, having considered the factors in 18, United States Code, Section 3553(a), it's up to the Court to determine what a reasonable and sufficient sentence is.

And I'm always interested in what other judges do in similarly situated situations, but it's not controlling on me, and it's not going to be a situation where if I thought someone got an unusually lenient sentence, that I'm going to drop everything down to what I described earlier as the lowest common denominator.

I don't think people get a windfall because somebody else got a low sentence. Maybe there was a reason they got a low sentence.

Maybe the prosecutor didn't have a good case, or maybe the judge was having a bad day. Maybe there were other mitigating circumstances; so I take it into account.

So when I weigh the aggravating and mitigating circumstances, it's up to the Court to determine what a fair and just sentence is.

And before Mr. Pogozelski spoke, it was going to be 240 months, but I'm going to defer to Mr. Pogozelski. He knows more about this case than I do, and I'm going to reluctantly go

along with his recommendation.

So it will be the judgment of Court and sentence of law that Mr. Patrick Boyd be sentenced to 216 months in prison. 60 months in prison on Count I; 36 months in prison on Count II; 36 months in prison on Count III; 36 months in prison on Count IV; 216 months in prison on Count V; 216 months in prison on Count VII; 216 months on Count VIII, all to run concurrent.

Upon his release from imprisonment, I place him on three years of supervised release as to Counts V, VII, VIII and I. One year of supervised release as to Counts II, III, and IV, all to run concurrent.

While on supervised release, he shall not commit any crimes. He shall be prohibited from possessing a firearm or other dangerous device. He shall not possess any controlled substances. He shall comply with the standard conditions of supervised release, including the special condition that he not associate with Adam Brosius or Lazaro Hernandez.

I also order that he obtain prior written approval from the Court before entering into any self-employment. I order that he provide complete access to his financial information to his probation officer. I order that he not apply for or solicit or incur any further debt without first obtaining written permission from his probation officer.

I order that he submit to a reasonable search of his person or property conducted in a reasonable time and manner by

his probation officer.

I order that he not own directly or indirectly or be employed directly or indirectly in any healthcare business or service which submits claims to private or government insurance companies without the Court's prior approval.

I find that he's not able to pay a fine. I waive the fine and impose a $700 special assessment, and order that any unpaid special assessment be paid during the period of the supervised release.

Was the Government seeking any restitution in this case?

MR. POGOZELSKI: Not today, Your Honor.

THE COURT: Today is the day.

MR. POGOZELSKI: Then no.

THE COURT: Okay.

I'll recommend an Eastern Maryland facility, realizing that recommendation is persuasive, not controlling on the Bureau of Prisons.

I don't see any reason for the RDAP program, given the paragraph in the presentence investigation report on Mr. Boyd.

Mr. Boyd, it's my duty to inform you that you have 14 days within which to appeal the judgment and sentence of this Court.

Should you desire to appeal and be without funds with which to prosecute an appeal, an attorney will be appointed to

represent you in connection with that appeal.

Should you fail to appeal within that 14-day period, it will constitute a waiver of your right to appeal.

Also, it's my duty to elicit from counsel for all parties fully articulated objections to the Court's findings of fact and conclusions of law, as announced at the sentencing hearing, and to further elicit any objection which any party may have to the manner in which the sentence was imposed in this case.

Are there any objections from the Government?

MR. POGOZELSKI: No, Your Honor. Next time I won't speak.

[!EZ SPEAKER 06]: Your Honor, just to make sure that the forfeiture order is incorporated in the judgment.

THE COURT: Right.

I'll order forfeiture in the amount of $21,850,000.

I also incorporate and adopt the mandatory and standard conditions of supervised release that are contained in paragraphs 129 through 147 of the presentence investigation report.

Do I need to read them into the record, Mr. Barzee?

MR. BARZEE: Yes, Your Honor, I apologize. We do have argument related to the forfeiture, if the Court is willing to hear it at this point.

THE COURT: No. I've already ruled. You had a chance

to argue it.

MR. BARZEE: All right.

THE COURT: Do you want me to read the general conditions and standard conditions of supervised release into the record?

MR. BARZEE: Yes. I apologize, Your Honor.

THE COURT: Well, that's the first time I've had --

MR. BARZEE: No, no, no. I'm sorry, Your Honor. I'm not requesting that. It's not necessary.

Thank you, Your Honor.

THE COURT: Any other objections to the manner in which the sentence was imposed, Mr. Barzee?

MR. BARZEE: Your Honor, we'll just renew all of our previously filed objections, including what was previously filed regarding the forfeiture and the preliminary order of forfeiture that was requested by the Government.

THE COURT: Okay. The rulings are the same.

The marshal will execute the sentence of the Court.

Good luck to you, Patrick Boyd.

And we'll take a recess for the court reporter.

THE COURT SECURITY OFFICER: All rise.

(Sentencing was concluded at 3:05 PM.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 3/14/2026

/s/Patricia Bailey-Entin
PATRICIA BAILEY-ENTIN, FPR, RPR
Official Court Reporter
United States District Court
Southern District of Florida
U.S. Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

## $

**$100** [1] - 49:15
**$13** [1] - 26:13
**$200** [1] - 44:10
**$200,000** [1] - 22:20
**$21,850,000** [1] - 67:16
**$232** [3] - 42:7, 42:8, 42:16
**$250,000** [6] - 44:12, 44:13, 44:15, 49:4, 49:16, 50:19
**$700** [1] - 66:7
**$75,000** [1] - 49:6
**$77** [2] - 45:11, 49:23
**$78** [1] - 50:2
**$92** [1] - 7:6

## /

**/organizer** [1] - 36:16
**/s/Patricia** [1] - 69:8

## 0

**02** [1] - 55:23
**06** [2] - 63:18, 67:13

## 1

**1** [6] - 1:8, 1:20, 5:4, 20:20, 56:5, 59:19
**1.2** [1] - 10:20
**10** [3] - 23:8, 26:3, 34:20
**103** [2] - 46:16, 50:2
**105** [1] - 26:4
**108** [2] - 40:1, 40:15
**112** [1] - 47:9
**113** [1] - 39:12
**129** [1] - 67:19
**1291** [1] - 23:19
**13** [2] - 1:5, 26:9
**13th** [4] - 10:13, 36:23, 36:24, 36:25
**14** [1] - 66:22
**14-day** [1] - 67:2
**147** [1] - 67:19
**15** [2] - 23:9, 26:3
**15-year** [1] - 40:11
**168** [3] - 45:10, 46:15, 49:24
**16th** [1] - 57:1
**18** [5] - 22:2, 27:3, 59:2, 61:16, 64:5
**180** [8] - 39:23, 42:9, 42:12, 42:17, 42:21, 43:16, 46:13, 59:19
**188** [1] - 46:12

## 2

**2** [2] - 7:21, 49:6
**20** [4] - 5:10, 34:20, 38:11, 51:9
**20-level** [2] - 26:15, 26:19
**2000** [1] - 43:14
**2003** [1] - 55:16
**2014** [1] - 23:20
**2020** [4] - 8:11, 25:10, 32:9, 55:18
**2021** [3] - 20:6, 55:19, 58:13
**2022** [2] - 39:8, 39:10
**2023** [1] - 15:6
**2024** [1] - 39:8
**2025** [1] - 58:16
**2026** [2] - 1:5, 7:20
**216** [5] - 59:2, 65:3, 65:6, 65:7
**23** [3] - 5:18, 5:20, 8:24
**24** [6] - 9:22, 10:10, 10:16, 26:20, 32:22, 34:5
**24-cr-20255-Dimitrouleas/Hunt** [1] - 1:3
**24-level** [1] - 26:16
**240** [4] - 39:23, 64:24
**25** [3] - 10:17, 23:9, 26:3
**262** [1] - 59:22
**269** [1] - 5:2
**27** [1] - 35:9
**278** [1] - 21:6
**28** [3] - 10:22, 11:18, 11:23
**29** [1] - 38:12
**299** [1] - 69:11
**29th** [1] - 25:9

## 3

**3** [1] - 46:5
**3/14/2026** [1] - 69:8
**30** [1] - 34:20
**30th** [1] - 25:10
**327** [1] - 59:22
**33** [1] - 38:14
**33128** [1] - 1:20
**33132** [1] - 1:17
**33301** [2] - 1:23, 69:12
**34** [2] - 11:24, 12:17
**35** [3] - 12:22, 13:12, 38:17
**3553** [1] - 41:3
**3553(a** [1] - 64:6
**36** [5] - 39:23, 65:4, 65:5
**36-month** [1] - 40:2
**38** [2] - 13:15, 14:17
**39** [2] - 38:19, 59:21
**3:05** [1] - 68:22
**3rd** [1] - 1:20

## 4

**4** [3] - 19:2, 36:16, 38:13
**40** [3] - 1:20, 14:19, 14:22
**42** [2] - 14:23, 16:14
**43** [2] - 38:22, 38:24
**45** [3] - 16:15, 17:10, 17:11
**49** [3] - 17:12, 18:1, 18:4
**4th** [1] - 1:16

## 5

**5** [3] - 7:21, 23:8, 26:3
**50,000** [1] - 55:22
**54** [1] - 18:5
**57** [1] - 18:5

## 6

**6** [1] - 1:23
**6.7** [1] - 17:2
**60** [3] - 39:23, 40:14, 65:4
**60.6** [1] - 25:4
**633** [1] - 1:23
**65** [1] - 18:12
**66** [1] - 22:6
**67** [4] - 26:22, 27:22, 27:25, 28:16
**670** [2] - 27:3, 38:13
**671** [1] - 37:16
**68** [2] - 28:17, 31:24
**69** [2] - 32:1, 34:15

## 7

**7** [2] - 35:20, 46:3
**7,000** [1] - 39:14
**7,500** [2] - 39:13, 39:14
**70** [4] - 34:16, 35:8, 36:14, 36:15
**71** [4] - 36:11, 36:16, 37:17, 37:18
**72** [2] - 36:10, 36:17
**720** [1] - 40:15
**73208** [1] - 7:21
**765** [1] - 23:19

## 8

**800** [4] - 44:20, 48:11, 58:21, 63:8
**888** [2] - 40:3, 40:16

## 9

**9** [1] - 38:10
**92** [2] - 22:25, 26:7
**92.8** [5] - 23:5, 24:7, 24:24, 25:20, 25:22
**95** [2] - 39:7, 39:11
**97** [7] - 46:17, 47:3, 47:9, 47:20, 47:22, 48:7, 50:9
**99** [1] - 1:16

## A

**Abbie** [2] - 25:11, 62:1
**Abigail** [1] - 8:19
**ability** [1] - 57:8
**able** [5] - 17:7, 29:21, 29:23, 57:16, 66:6
**above-entitled** [1] - 69:6
**absolute** [1] - 43:6
**absolutely** [2] - 48:19, 50:18
**absurd** [3] - 41:12, 48:18, 48:19
**abuse** [2] - 27:20, 37:10
**Acambi** [1] - 18:23
**acceptance** [2] - 48:9, 61:8
**accepted** [2] - 60:24, 61:5
**accepts** [1] - 63:2
**access** [1] - 65:20
**accomplices** [1] - 19:18
**according** [3] - 11:11, 31:7, 41:21
**account** [4] - 41:1, 50:13, 50:17, 64:19
**accurate** [2] - 13:9, 69:5
**acknowledge** [2] - 37:15, 58:2
**acquired** [1] - 30:19
**act** [2] - 27:8, 27:12
**acting** [2] - 6:5, 28:5
**actions** [1] - 28:20
**actual** [2] - 23:22, 25:20
**AD** [1] - 6:12
**Adadie** [1] - 18:23
**Adam** [40] - 8:15, 9:8, 12:11, 21:11, 24:25, 25:17, 28:21, 29:22, 35:19, 45:15, 45:19, 45:23, 45:24, 46:1, 46:6, 46:17, 46:21, 46:23, 47:4, 47:11, 47:13, 47:17, 47:25, 48:3, 48:13, 48:17, 48:20, 49:18, 50:3, 50:15, 50:19, 54:24, 59:16, 60:20, 61:11, 61:24, 62:11, 65:17
**add** [5] - 21:14, 21:16, 25:7, 38:2, 39:22
**addendum** [2] - 11:4, 13:2
**addition** [1] - 30:4
**additional** [4] - 27:5, 27:11, 37:1, 46:5
**additionally** [3] - 30:16, 30:21, 30:24
**address** [2] - 50:22, 55:11
**adjudicated** [1] - 4:10
**admonition** [1] - 50:6
**adopt** [1] - 67:17
**afford** [1] - 56:14
**afternoon** [4] - 3:9, 3:12, 51:4, 52:19
**agent** [6] - 21:21, 21:24, 27:10, 27:11, 28:5, 62:1
**agents** [2] - 27:6, 27:18
**aggravating** [1] - 64:20
**agree** [2] - 20:15, 31:20
**agreed** [1] - 19:24
**agreement** [2] - 38:3, 63:16
**ahead** [2] - 17:1, 40:21
**AI** [1] - 41:9
**air** [1] - 41:6
**Alex** [2] - 3:6, 44:17
**Alexander** [1] - 1:13
**allow** [1] - 62:2
**allowed** [2] - 30:15, 31:2
**allowing** [1] - 30:18
**almost** [1] - 55:1
**amended** [1] - 13:8
**AMERICA** [1] - 1:4
**American** [1] - 45:15
**amount** [19] - 22:16, 22:22, 23:12, 23:17, 24:24, 25:16, 38:11, 39:13, 42:8, 42:16, 43:22, 45:11, 50:2, 50:11, 52:15, 52:21,

63:17, 67:16
**ample** [1] - 31:14
**Andy's** [2] - 19:2, 20:14
**announce** [1] - 3:4
**announced** [1] - 67:6
**anomaly** [3] - 43:6, 43:9, 45:3
**answer** [4] - 15:20, 22:21, 26:12, 39:25
**anti** [1] - 60:5
**anti-Semitism** [1] - 60:5
**anticipating** [1] - 32:4
**anytime** [1] - 31:21
**apologize** [3] - 36:15, 67:22, 68:6
**apology** [1] - 59:6
**appeal** [6] - 66:22, 66:24, 66:25, 67:1, 67:2, 67:3
**appearances** [1] - 3:4
**APPEARANCES** [1] - 1:12
**appease** [1] - 20:9
**applies** [2] - 8:4, 8:8
**apply** [9] - 6:18, 8:5, 8:7, 14:18, 27:11, 28:19, 37:15, 37:16, 65:21
**applying** [1] - 8:3
**appointed** [1] - 66:25
**appreciate** [3] - 51:4, 51:22, 54:5
**appreciates** [1] - 54:7
**approached** [1] - 56:21
**appropriate** [4] - 9:20, 26:11, 47:17, 48:9
**appropriately** [1] - 61:16
**approval** [2] - 65:18, 66:5
**approve** [1] - 30:22
**argue** [1] - 68:1
**argues** [1] - 14:19
**arguing** [2] - 8:6, 31:21
**argument** [8] - 17:14, 19:15, 27:19, 29:9, 40:19, 63:21, 63:22, 67:23
**arguments** [1] - 33:25
**armed** [2] - 42:20, 44:3
**arranged** [1] - 46:4
**arrived** [1] - 27:15
**article** [7] - 15:21, 16:6, 16:11, 16:12, 32:10, 32:12, 32:15
**articulated** [1] - 67:5
**articulating** [1] - 26:6
**ascertain** [2] - 23:22, 24:2
**ascertainable** [2] - 22:16, 26:14
**aside** [1] - 43:12
**asleep** [1] - 34:5
**aspect** [1] - 57:14
**aspects** [1] - 17:17
**assessment** [2] - 66:7, 66:8
**assets** [2] - 13:21, 49:14
**Assistant** [1] - 1:15
**assistant** [1] - 51:10
**assisting** [1] - 30:6
**associate** [2] - 51:9, 65:17
**associated** [1] - 52:11
**attenuated** [1] - 16:13
**attitudes** [1] - 62:19
**attorney** [2] - 31:8, 66:25
**attorneys** [4] - 14:12, 14:20, 30:22
**Attorneys** [1] - 1:16
**August** [2] - 8:11, 32:9
**authorized** [1] - 27:12
**automatically** [1] - 43:2
**available** [1] - 55:10
**avoid** [4] - 41:1, 42:25, 46:19, 50:6

## B

**B-A-R-C-H** [1] - 54:12
**background** [1] - 51:8
**bad** [2] - 51:20, 64:18
**Bailey** [1] - 69:8
**BAILEY** [2] - 2:3, 69:9
**Bailey-Entin** [1] - 69:8
**BAILEY-ENTIN** [2] - 2:3, 69:9
**band** [1] - 26:5
**bank** [1] - 24:2
**bankrupt** [1] - 49:12
**Barch** [1] - 54:12
**BARCH** [1] - 51:4
**bars** [2] - 49:25, 50:1
**Barzee** [16] - 1:18, 1:19, 3:10, 4:17, 4:25, 8:22, 22:7, 31:20, 33:16, 54:9, 55:2, 58:20, 63:12, 63:23, 67:21, 68:12
**BARZEE** [73] - 3:9, 3:21, 4:18, 5:1, 5:10, 5:18, 8:23, 9:22, 10:11, 10:14, 10:17, 10:22, 11:24, 12:6, 12:22, 13:15, 14:18, 14:23, 16:15, 17:12, 18:5, 18:11, 22:6, 22:8, 26:9, 26:12, 26:17, 26:22, 28:1, 28:12, 28:14, 28:17, 31:17, 32:1, 33:17, 33:24, 34:11, 34:16, 34:25, 35:4, 35:9, 35:13, 36:4, 36:19, 37:5, 37:8, 37:20, 38:5, 39:2, 39:6, 39:9, 39:12, 39:17, 40:19, 40:22, 42:24, 43:5, 44:25, 45:3, 51:3, 54:10, 54:12, 54:16, 54:19, 55:3, 55:7, 63:14, 63:24, 67:22, 68:2, 68:6, 68:8, 68:13
**base** [1] - 38:3
**based** [8] - 17:15, 22:22, 25:16, 40:2, 47:15, 59:2, 61:2
**basing** [1] - 25:9
**basis** [1] - 56:15
**basketball** [1] - 57:2
**became** [1] - 52:1
**become** [1] - 56:19
**BEFORE** [1] - 1:10
**begin** [1] - 42:2
**beginning** [3] - 9:6, 18:16, 42:7
**begins** [2] - 5:3, 41:25
**behalf** [7] - 3:7, 3:10, 3:13, 3:21, 27:12, 40:23, 59:24
**behavior** [1] - 33:18
**behind** [2] - 49:25, 50:1
**Bellevue** [1] - 20:25
**below** [2] - 34:20, 63:5
**benefit** [1] - 6:20
**best** [3] - 51:17, 57:5, 57:8
**better** [1] - 56:2
**between** [13] - 8:15, 21:7, 21:10, 23:8, 23:9, 25:5, 26:2, 29:13, 32:10, 41:2, 46:20, 46:23, 47:24
**beyond** [1] - 53:7
**bifurcate** [1] - 3:18
**big** [2] - 45:25, 56:13
**biggest** [4] - 47:24, 47:25, 48:1, 57:21
**bioequivalency** [1] - 24:14
**bipolar** [1] - 21:3
**birthday** [1] - 57:2
**bit** [4] - 15:6, 15:12, 51:23, 63:5
**black** [22] - 6:6, 6:25, 7:3, 7:12, 7:16, 8:15, 10:6, 17:3, 17:4, 19:4, 19:9, 21:18, 23:5, 23:12, 23:15, 23:17, 24:6, 24:17, 25:23, 26:7, 32:6, 33:6
**blame** [2] - 20:11, 31:13
**board** [1] - 52:8
**boards** [1] - 57:20
**Boatlift** [1] - 60:4
**bodies** [1] - 41:6
**bodily** [8] - 32:2, 32:3, 33:19, 34:1, 34:6, 34:8, 34:12, 38:16
**body** [1] - 58:2
**boil** [1] - 46:24
**Borja** [2] - 18:16, 32:20
**born** [1] - 60:5
**bottle** [8] - 18:18, 18:25, 21:1, 21:6, 21:8, 21:21, 32:18, 33:16
**bottles** [18] - 8:12, 10:23, 11:2, 11:5, 11:15, 11:20, 12:24, 14:7, 20:23, 21:4, 22:17, 29:2, 31:11, 32:8, 33:3, 55:22, 55:25
**bought** [1] - 24:7
**Boulevard** [5] - 7:1, 9:25, 25:11, 32:6, 69:11
**Boyd** [96] - 3:3, 3:4, 3:10, 3:13, 3:22, 3:23, 4:3, 4:5, 4:19, 5:11, 5:20, 6:7, 6:10, 7:2, 7:9, 7:11, 8:15, 8:25, 10:1, 10:4, 10:5, 10:8, 10:22, 11:19, 11:20, 12:1, 12:4, 12:10, 12:14, 12:18, 12:19, 13:15, 13:22, 14:11, 14:20, 14:25, 15:24, 15:25, 16:10, 16:17, 16:23, 21:7, 21:9, 21:11, 22:19, 25:14, 27:10, 27:17, 29:3, 29:25, 30:5, 30:16, 32:13, 32:14, 33:4, 35:16, 36:24, 40:24, 44:4, 44:12, 45:21, 46:23, 47:19, 47:24, 48:1, 48:2, 48:6, 48:9, 48:19, 49:4, 49:16, 50:17, 50:21, 51:6, 51:16, 52:25, 54:7, 54:14, 54:21, 55:9, 55:13, 59:1, 59:24, 61:14, 62:5, 62:14, 65:3, 66:20, 66:21, 68:19
**BOYD** [5] - 1:7, 1:18, 1:22, 4:21, 55:14
**Boyd's** [14] - 3:24, 5:19, 9:23, 10:18, 11:25, 13:23, 17:14, 17:24, 30:21, 31:15, 31:16, 35:22, 36:5, 45:13
**Boyds** [4] - 29:13, 29:15, 31:8, 33:7
**branded** [2] - 55:22, 58:3
**Brawley** [1] - 21:3
**breach** [1] - 26:23
**breaching** [1] - 26:25
**brief** [1] - 54:16
**briefly** [2] - 54:20, 55:11
**bring** [1] - 6:24
**broken** [2] - 21:8, 21:11
**brokerage** [1] - 46:6
**Brosius** [42] - 8:15, 9:9, 11:19, 12:11, 21:8, 21:11, 24:25, 25:5, 28:21, 29:13, 29:22, 45:15, 45:19, 45:23, 45:24, 46:1, 46:6, 46:17, 46:21, 46:23, 47:4, 47:11, 47:13, 47:17, 47:25, 48:4, 48:14, 48:17, 48:20, 49:18, 50:3, 50:15, 50:19, 54:24, 59:16, 60:20, 61:11, 61:24, 62:11, 65:17
**Brosius's** [4] - 25:3, 25:8, 25:17, 35:19
**brother** [3] - 7:8, 8:10, 57:25
**brought** [1] - 48:24
**Broward** [1] - 69:11
**Bruce** [2] - 1:22, 3:13
**built** [2] - 51:11, 53:21
**bulk** [1] - 28:25
**Bureau** [1] - 66:18
**business** [16] - 29:17, 45:20, 45:21, 45:22, 48:3, 51:21, 52:9,

53:11, 55:15, 55:16, 56:6, 56:13, 61:24, 62:8, 62:9, 66:3
**businesses** [1] - 53:7
**buying** [1] - 28:25
**BY** [1] - 2:2

## C

**calculated** [1] - 38:25
**calculation** [3] - 22:14, 23:13, 24:9
**calculations** [2] - 26:2, 63:20
**Campbell** [2] - 23:19, 23:25
**cancer** [1] - 50:7
**cannot** [1] - 27:8
**car** [1] - 49:14
**care** [7] - 39:7, 51:8, 51:15, 51:25, 53:16, 53:17, 53:18
**Care** [1] - 52:1
**career** [3] - 45:19, 46:7, 57:23
**Carlos** [3] - 6:8, 6:11, 16:24
**Caroline** [1] - 57:11
**cars** [1] - 41:8
**Casa** [1] - 57:18
**case** [46] - 5:19, 6:22, 7:18, 8:1, 9:23, 10:18, 11:2, 15:2, 17:25, 19:25, 21:21, 21:24, 23:14, 23:20, 23:21, 24:16, 25:3, 25:6, 28:8, 28:13, 30:9, 32:4, 34:18, 41:15, 42:10, 42:19, 43:8, 43:19, 43:20, 43:23, 44:5, 45:10, 45:12, 45:21, 45:25, 46:9, 48:6, 49:19, 60:8, 60:20, 61:1, 62:10, 64:17, 64:25, 66:11, 67:9
**CASE** [1] - 1:3
**cases** [4] - 23:22, 23:25, 24:11, 41:18
**Category** [1] - 59:19
**caused** [2] - 9:24, 10:1
**causing** [2] - 10:7, 32:23
**ceasing** [1] - 20:5
**Center** [2] - 51:8, 51:25
**centers** [2] - 51:12, 56:16
**CEO** [1] - 51:25
**certain** [2] - 11:10
**certainly** [25] - 6:14, 7:10, 7:14, 8:2, 8:17, 10:7, 12:14, 17:6, 18:22, 19:24, 20:12, 23:10, 23:14, 24:19, 25:12, 27:8, 29:3, 30:9, 31:14, 34:22, 36:1, 51:20, 51:22, 53:25, 58:8
**certify** [1] - 69:4
**cetera** [1] - 19:5
**Chain** [23] - 9:8, 9:10, 9:24, 10:1, 12:2, 12:5, 12:20, 14:20, 15:14, 15:22, 16:7, 18:20, 19:3, 27:10, 27:12, 27:24, 28:6, 56:4, 60:13, 61:19, 61:22
**chain** [5] - 27:7, 27:14, 27:21, 27:23, 60:9
**Chain's** [1] - 26:13
**chairman** [1] - 52:7
**chance** [3] - 51:1, 56:2, 67:25
**change** [6] - 12:3, 12:17, 13:12, 13:13, 39:10, 39:16
**changed** [2] - 61:15, 62:20
**changing** [3] - 29:1, 39:14
**characteristics** [1] - 18:12
**charge** [3] - 27:9, 42:6, 60:11
**charged** [1] - 61:2
**charities** [1] - 57:18
**CHARLES** [1] - 1:22
**Charles** [18] - 3:3, 3:13, 3:23, 7:8, 10:5, 11:20, 12:4, 12:14, 12:19, 13:22, 21:7, 25:14, 27:16, 29:25, 31:16, 32:13, 36:24, 61:14
**Charlie** [2] - 47:19, 51:6
**chauvinistic** [1] - 53:11
**cheerleader** [3] - 29:5, 35:16, 35:22
**children** [2] - 54:22, 56:22
**Circuit** [4] - 8:1, 23:20, 24:10, 60:22
**circumstances** [2] - 64:19, 64:21
**circumstantial** [2] - 17:9, 18:3
**cite** [3] - 6:22, 14:13, 24:13
**cited** [3] - 6:9, 14:11, 59:20
**civil** [2] - 15:1, 53:22
**claims** [1] - 66:4
**clarification** [2] - 5:10, 54:8
**clarify** [1] - 58:19
**clear** [3] - 19:21, 27:10, 40:22
**clearly** [2] - 6:17, 62:19
**close** [2] - 55:8, 58:15
**closely** [1] - 8:10
**co** [1] - 27:24
**co-owners** [1] - 27:24
**coaching** [2] - 52:5, 57:21
**cocaine** [2] - 42:19, 44:3
**coconspirator** [1] - 17:8
**coconspirators** [2] - 10:7, 34:21
**Code** [1] - 64:6
**codefendants** [2] - 17:17, 25:10
**cofounder** [1] - 7:9
**colleague** [1] - 29:8
**collected** [1] - 35:19
**coming** [1] - 57:14
**comment** [4] - 15:15, 16:1, 16:12, 54:17
**commercial** [1] - 21:14
**commission** [2] - 9:5, 46:3
**commissions** [1] - 35:20
**commit** [5] - 4:9, 45:7, 45:20, 48:4, 65:12
**commitment** [1] - 46:19
**commits** [3] - 31:21, 50:9, 50:10
**committed** [1] - 41:12
**committing** [2] - 31:19, 46:8
**common** [4] - 16:9, 23:4, 43:2, 64:13
**common-sense** [1] - 16:9
**communicated** [1] - 5:11
**community** [5] - 51:12, 52:4, 56:11, 57:16
**companies** [2] - 15:25, 66:5
**company** [23] - 10:5, 12:9, 12:15, 15:17, 16:8, 16:12, 26:24, 26:25, 27:8, 27:18, 27:21, 29:20, 30:7, 45:14, 45:16, 49:12, 49:13, 52:8, 56:9, 58:15, 60:14, 61:22, 62:12
**company's** [1] - 56:7
**compare** [1] - 60:23
**compared** [4] - 36:6, 50:14, 57:23, 61:5
**complained** [1] - 21:9
**complaints** [5] - 14:6, 18:21, 32:7, 32:18, 32:19
**complete** [2] - 9:12, 65:20
**completely** [1] - 45:14
**complex** [2] - 5:21, 29:15
**compliance** [6] - 6:13, 30:17, 30:18, 31:8, 60:16, 60:19
**complications** [1] - 52:11
**complicit** [1] - 6:19
**comply** [1] - 65:15
**complying** [1] - 50:5
**comports** [1] - 23:4
**conceal** [4] - 13:16, 30:1, 30:7, 30:23
**concealed** [3] - 14:2, 14:8, 19:12
**concealing** [2] - 30:14, 30:25
**concealment** [2] - 14:15, 20:1
**conceded** [2] - 46:25, 47:2
**concerned** [1] - 17:15
**concerns** [1] - 54:1
**concluded** [1] - 68:22
**conclusions** [1] - 67:6
**concurrent** [3] - 43:17, 65:7, 65:11
**condition** [1] - 65:16
**conditions** [4] - 65:15, 67:18, 68:4
**conduct** [6] - 7:15, 13:17, 22:15, 27:2, 27:3, 62:18
**conducted** [1] - 65:25
**confused** [1] - 27:19
**Congress** [2] - 42:24, 46:18
**Congress's** [1] - 50:6
**connection** [3] - 19:22, 25:11, 67:1
**conscious** [2] - 32:24, 33:12
**consecutive** [2] - 26:1, 26:18
**conservative** [3] - 23:13, 24:9, 24:23
**consider** [3] - 44:21, 48:21, 54:22
**considerable** [1] - 52:20
**consideration** [1] - 54:6
**considered** [5] - 7:23, 41:24, 54:2, 64:4, 64:5
**consistent** [1] - 24:25
**conspiracies** [1] - 48:25
**conspiracy** [23] - 4:6, 4:7, 4:8, 8:12, 9:6, 9:12, 17:18, 28:20, 29:4, 36:2, 36:4, 36:6, 40:5, 41:22, 41:24, 41:25, 42:5, 42:15, 43:23, 48:17, 51:20, 62:10
**constant** [1] - 55:19
**constitute** [1] - 67:3
**constitutional** [1] - 48:12
**consumer** [1] - 24:11
**consumers** [1] - 31:11
**contacted** [2] - 15:14, 16:7
**contacting** [2] - 16:24, 52:19
**contain** [3] - 10:24, 11:15, 11:20
**contained** [5] - 10:24, 11:16, 11:21, 12:25, 67:18
**containing** [1] - 31:6
**content** [1] - 39:6
**continual** [2] - 62:18
**continually** [1] - 63:9
**continue** [4] - 20:18, 31:2, 41:7, 58:14
**continued** [2] - 9:9, 33:5
**continues** [1] - 59:14
**controlled** [2] - 10:5, 65:14
**controlling** [2] - 64:9, 66:17
**convicted** [6] - 19:21, 27:4, 42:20, 44:3, 44:7, 45:6
**conviction** [1] - 42:18
**convictions** [1] - 42:18

**convince** [1] - 20:9
**convinced** [1] - 44:18
**cooperated** [6] - 43:21, 47:1, 47:12, 60:6, 60:25, 61:1
**cooperating** [2] - 44:18, 44:19
**cooperation** [5] - 44:20, 47:14, 47:15, 60:7, 61:3
**Copeland** [1] - 7:20
**copies** [1] - 15:8
**copy** [2] - 36:21, 37:2
**correct** [9] - 3:18, 5:24, 22:22, 26:17, 33:22, 38:8, 40:10, 46:12, 63:18
**corrected** [1] - 58:4
**correcting** [1] - 5:6
**correction** [1] - 39:13
**corrections** [1] - 40:2
**Costa** [8] - 45:4, 45:5, 45:18, 46:7, 46:15, 49:23, 61:4, 62:24
**counsel** [5] - 3:4, 4:13, 63:9, 63:19, 67:4
**count** [3] - 13:9, 22:2, 27:3
**Count** [17] - 5:5, 19:23, 20:19, 20:20, 27:4, 28:4, 40:8, 40:14, 65:4, 65:5, 65:6, 65:7
**counted** [1] - 42:19
**countless** [2] - 30:11, 57:18
**country** [2] - 53:13, 53:18
**counts** [4] - 4:7, 4:9, 44:8
**Counts** [4] - 40:15, 65:9, 65:10
**county** [1] - 56:18
**couple** [1] - 55:4
**course** [1] - 62:1
**COURT** [124] - 1:1, 3:3, 3:15, 3:20, 3:23, 4:1, 4:3, 4:17, 4:19, 4:22, 4:25, 5:6, 5:9, 5:13, 5:17, 5:25, 6:16, 8:4, 8:22, 9:19, 10:3, 10:10, 10:12, 10:15, 10:21, 11:18, 12:3, 12:7, 12:16, 13:5, 13:12, 13:22, 14:16, 14:21, 15:1, 15:18, 15:23, 16:13, 16:19, 17:9, 18:1, 18:8, 18:14, 19:6, 19:15, 20:15, 22:4, 22:7, 22:24, 25:2, 25:22, 26:6, 26:15, 26:18, 26:24, 27:19, 28:7, 28:13, 28:15, 29:7, 29:10, 31:20, 32:3, 33:7, 33:21, 34:7, 34:14, 34:23, 35:3, 35:6, 36:3, 36:7, 36:14, 36:17, 36:22, 37:3, 37:6, 37:9, 37:14, 37:17, 37:21, 38:1, 38:7, 38:10, 39:3, 39:8, 39:10, 39:14, 39:16, 39:19, 40:4, 40:9, 40:11, 40:14, 40:21, 42:22, 43:1, 44:24, 45:1, 50:23, 51:1, 54:7, 54:9, 54:11, 54:14, 54:18, 55:1, 55:6, 55:12, 58:18, 63:12, 63:16, 63:22, 64:1, 64:4, 66:13, 66:15, 67:15, 67:25, 68:3, 68:7, 68:11, 68:17, 68:21
**Court** [48] - 2:4, 2:5, 3:1, 3:13, 4:5, 17:21, 18:6, 22:21, 28:1, 28:13, 30:10, 33:17, 34:19, 35:11, 35:13, 35:14, 40:23, 40:25, 41:15, 44:21, 44:22, 46:10, 46:13, 48:8, 49:2, 49:9, 50:5, 50:13, 50:22, 51:3, 51:5, 54:5, 54:22, 55:11, 59:9, 61:25, 62:2, 63:15, 63:25, 64:6, 64:21, 65:2, 65:19, 66:23, 67:23, 68:18, 69:9, 69:10
**court** [5] - 3:11, 3:16, 11:7, 24:1, 68:20
**Court's** [3] - 26:12, 66:5, 67:5
**Courthouse** [1] - 69:11
**courtroom** [1] - 43:18
**courts** [2] - 41:18, 42:25
**covered** [1] - 21:13
**crafted** [2] - 31:5, 31:10
**crafting** [1] - 31:13
**created** [2] - 51:24, 56:18
**creating** [1] - 30:6
**credit** [1] - 47:14
**crime** [7] - 31:19, 41:13, 49:25, 50:9, 50:10, 51:22
**crimes** [6] - 29:23, 45:20, 48:4, 59:8, 59:12, 65:13
**Criminal** [1] - 59:19
**criminal** [18] - 6:4, 13:17, 15:2, 15:16, 22:15, 42:11, 42:17, 43:25, 44:1, 44:5, 44:9, 45:16, 46:7, 48:14, 49:24, 55:16, 57:23, 60:10
**criminals** [1] - 45:20
**Cross** [2] - 21:2, 21:3
**Cuba** [1] - 60:4
**culpable** [2] - 48:6, 49:21
**customers** [7] - 19:12, 20:1, 20:3, 20:4, 20:8, 31:3, 31:5

## D

**D.C** [2] - 51:13, 51:24
**daily** [2] - 56:15, 57:4
**dangerous** [1] - 65:14
**date** [1] - 25:9
**DATE** [1] - 69:8
**daughter's** [1] - 57:1
**days** [1] - 66:22
**DEA** [1] - 61:25
**deal** [3] - 7:11, 45:9, 51:15
**dealing** [4] - 7:16, 8:24, 9:8, 12:11
**deals** [1] - 22:6
**dealt** [2] - 6:8, 41:18
**dean** [1] - 51:9
**death** [3] - 32:1, 33:19, 38:16
**debt** [1] - 65:22
**deceived** [1] - 61:10
**deceiving** [1] - 56:7
**decided** [1] - 48:1
**decision** [1] - 53:10
**declined** [1] - 15:14
**deductibles** [1] - 22:18
**Defendant** [1] - 1:8
**defendant** [6] - 41:19, 42:21, 45:23, 46:21, 50:8, 50:10
**DEFENDANT** [4] - 1:18, 1:22, 4:21, 55:14
**defendants** [19] - 17:1, 18:20, 19:21, 21:4, 21:18, 23:4, 25:12, 28:22, 33:4, 41:2, 41:17, 44:6, 46:20, 50:16, 59:10, 60:1, 60:10, 61:21, 62:23
**defendants'** [1] - 62:19
**defense** [6] - 14:19, 23:20, 53:22, 53:23, 63:19
**defenses** [1] - 61:9
**defer** [1] - 64:24
**deferred** [1] - 4:10
**definitely** [1] - 51:21
**definitive** [1] - 23:2
**defraud** [1] - 20:21
**degree** [3] - 29:6, 51:6, 51:7
**delete** [1] - 12:18
**deliberate** [1] - 13:16
**deliberating** [1] - 33:7
**delta** [1] - 26:2
**demand** [1] - 24:1
**demonstrate** [1] - 14:14
**demonstrated** [1] - 6:2
**denial** [1] - 62:18
**denominator** [2] - 43:2, 64:13
**department** [2] - 30:18, 52:16
**Department** [2] - 15:22, 15:24
**dependant** [1] - 53:3
**deposition** [6] - 15:2, 15:5, 15:13, 15:15, 32:12
**DerOvanesian** [3] - 1:14, 3:7, 29:9
**DEROVANESIAN** [1] - 29:11
**Descovy** [1] - 21:1
**described** [3] - 27:3, 44:22, 64:12
**designated** [1] - 55:8
**desire** [1] - 66:24
**despite** [1] - 56:9
**destroy** [1] - 52:25
**destroyed** [4] - 49:10, 49:11, 52:24
**determine** [3] - 25:2, 64:7, 64:21
**determining** [1] - 22:11
**device** [1] - 65:14
**dialysis** [1] - 53:2
**dictated** [1] - 42:25
**died** [1] - 34:8
**difference** [11] - 12:13, 25:5, 25:19, 29:12, 47:7, 47:10, 47:11, 47:24, 47:25, 48:2, 53:24
**differences** [2] - 46:22, 46:23
**different** [13] - 10:25, 11:16, 12:25, 17:20, 25:1, 36:23, 41:13, 42:4, 43:20, 47:6, 62:23
**difficult** [1] - 23:22
**dig** [1] - 13:8
**Dimitrouleas** [1] - 2:4
**DIMITROULEAS** [1] - 1:10
**direct** [1] - 35:25
**direction** [1] - 6:5
**directly** [5] - 25:13, 25:14, 45:9, 66:2, 66:3
**director** [3] - 31:9, 60:17, 60:19
**dirty** [1] - 33:2
**discounts** [1] - 23:8
**discovered** [1] - 21:1
**discussed** [2] - 4:20, 32:11
**discusses** [1] - 23:23
**discussing** [3] - 17:23, 33:2
**disdain** [1] - 59:11
**disparities** [4] - 46:19, 50:6, 50:7, 60:23
**disparity** [1] - 41:2
**dispensed** [1] - 21:13
**dispute** [1] - 24:6
**disregard** [1] - 32:25
**dissimilar** [1] - 52:9
**distinction** [3] - 12:13, 25:19, 29:13
**distinguishes** [1] - 59:15
**distressed** [1] - 56:18
**distribute** [1] - 29:16
**distributed** [7] - 10:23, 11:15, 11:20, 14:7, 21:5, 21:18, 32:8
**distributing** [1] - 32:5
**distribution** [1] - 62:4
**distributor** [2] - 27:18, 52:10
**DISTRICT** [3] - 1:1, 1:2, 1:11
**district** [1] - 63:1
**District** [3] - 2:5, 69:10, 69:10
**diversion** [2] - 15:11, 63:1

**diverted** [4] - 5:23, 9:1, 16:17, 45:7
**Divilio** [6] - 6:11, 8:19, 16:25, 25:11, 59:9, 62:1
**division** [1] - 27:9
**DIVISION** [1] - 1:2
**divorce** [1] - 53:8
**Docket** [1] - 5:2
**doctors** [1] - 42:2
**document** [1] - 62:5
**documents** [4] - 20:24, 23:7, 31:14, 33:2
**doings** [1] - 29:4
**DOJ** [2] - 14:25, 58:7
**DOJ's** [1] - 15:10
**done** [4] - 13:19, 26:1, 49:5, 51:24
**doorstep** [1] - 62:1
**double** [2] - 43:22, 50:11
**down** [7] - 16:25, 40:11, 43:10, 46:24, 52:18, 58:8, 64:12
**downward** [3] - 58:23, 62:3, 63:8
**dozens** [4] - 48:24, 48:25, 56:18
**drafted** [1] - 31:6
**dream** [1] - 45:15
**driving** [2] - 44:10, 48:25
**drop** [1] - 64:11
**drug** [10] - 5:21, 10:24, 10:25, 11:16, 11:21, 12:25, 15:25, 58:3, 62:25
**Drugs** [1] - 18:19
**drugs** [59] - 4:6, 4:7, 6:6, 7:3, 7:7, 8:12, 12:12, 12:14, 14:3, 14:6, 14:8, 17:3, 18:22, 19:4, 19:9, 19:13, 20:6, 20:8, 20:22, 20:23, 21:13, 21:18, 21:19, 21:25, 23:5, 23:9, 23:15, 24:6, 24:7, 24:15, 24:17, 24:18, 24:19, 25:23, 26:11, 27:15, 29:18, 29:20, 29:24, 30:1, 30:8, 30:12, 30:19, 31:2, 32:6, 32:16, 32:18, 33:6, 33:8, 33:9, 33:11, 33:14, 33:15, 60:15, 61:20, 62:12, 62:15
**during** [11] - 3:23, 7:12, 15:5, 15:12, 16:2, 21:1, 55:21, 58:3, 58:15, 62:9, 66:8
**duty** [2] - 66:21, 67:4

## E

**early** [4] - 8:12, 32:8, 33:5, 46:24
**earning** [3] - 43:24, 46:3, 46:5
**East** [1] - 69:11
**Eastern** [2] - 55:8, 66:16
**educated** [1] - 53:15
**effect** [1] - 6:23
**effective** [1] - 58:10
**effects** [1] - 18:25
**efficacy** [2] - 24:14, 32:17
**efficient** [1] - 58:11
**efforts** [1] - 57:6
**eight** [4] - 13:7, 13:10, 46:14, 56:8
**elderly** [1] - 53:1
**Eleventh** [3] - 8:1, 23:19, 60:22
**elicit** [2] - 67:4, 67:7
**email** [4] - 14:11, 17:22, 21:10, 25:10
**emailing** [1] - 7:13
**emails** [1] - 26:2
**emergency** [1] - 56:15
**emotional** [1] - 60:18
**emphasize** [1] - 61:18
**employed** [3] - 27:21, 27:23, 66:3
**employee** [1] - 26:23
**employees** [2] - 27:6, 56:19
**employment** [1] - 65:19
**encouragement** [1] - 57:11
**end** [3] - 42:7, 62:15, 62:16
**endless** [1] - 57:11
**energy** [1] - 41:9
**enhancement** [23] - 6:18, 8:3, 9:20, 14:24, 18:6, 18:10, 26:15, 26:16, 26:19, 26:23, 27:1, 27:13, 27:22, 28:5, 28:19, 28:21, 28:23, 29:11, 32:23, 35:10, 35:15, 37:7, 38:13
**entailed** [1] - 61:3
**entering** [1] - 65:19
**Entin** [1] - 69:8
**ENTIN** [2] - 2:3, 69:9
**entire** [7] - 17:13, 41:11, 41:24, 43:23, 45:16, 47:18, 57:2
**entirely** [6] - 10:25, 11:17, 11:21, 12:25, 42:14, 43:20
**entitled** [1] - 69:6
**Entry** [1] - 5:2
**equivalent** [1] - 35:4
**especially** [2] - 16:11, 57:10
**Esquire** [6] - 1:13, 1:14, 1:15, 1:18, 1:19, 1:22
**essentially** [3] - 41:13, 44:7, 44:8
**et** [1] - 19:4
**events** [1] - 57:3
**evidence** [40] - 6:1, 6:7, 6:8, 6:14, 7:12, 7:25, 8:10, 8:17, 12:9, 13:7, 13:18, 14:11, 14:24, 15:16, 15:23, 16:4, 16:16, 16:22, 17:5, 17:10, 17:20, 18:3, 19:19, 20:12, 21:9, 21:10, 22:3, 23:1, 23:3, 25:12, 25:17, 30:17, 30:21, 31:6, 31:14, 34:3, 60:12, 62:2, 62:3
**evolved** [1] - 53:17
**exact** [1] - 55:24
**exactly** [3] - 32:11, 39:9, 41:14
**example** [6] - 14:3, 23:23, 29:12, 52:4, 57:5
**examples** [1] - 14:14
**Excedrin** [1] - 21:4
**exceeding** [1] - 28:7
**execute** [1] - 68:18
**exercise** [3] - 24:22, 48:1, 50:5
**exercised** [2] - 48:10, 48:12
**Exhibit** [1] - 21:5
**exhibit** [1] - 16:6
**exhibits** [3] - 12:10, 14:13, 16:23
**existence** [1] - 9:5
**expecting** [1] - 26:8
**expensive** [1] - 56:25
**experience** [2] - 51:15, 52:10
**experiences** [1] - 51:5
**expire** [1] - 32:17
**explain** [1] - 58:25
**explained** [1] - 30:4
**expressed** [5] - 59:11, 59:17, 60:6, 60:24, 61:6
**extensive** [12] - 7:5, 7:23, 7:24, 8:1, 8:5, 8:7, 36:5, 36:9, 42:11, 42:17, 43:25, 49:24
**extent** [1] - 7:11
**extremely** [1] - 57:15
**EZ** [2] - 63:18, 67:13

## F

**F.3d** [1] - 23:19
**facade** [1] - 60:14
**facilitate** [3] - 5:22, 9:1, 55:8
**facilities** [1] - 56:17
**facility** [1] - 66:16
**facing** [1] - 60:5
**fact** [19] - 6:25, 8:9, 13:18, 28:2, 28:22, 29:15, 34:2, 41:22, 42:13, 44:6, 44:21, 48:13, 48:16, 49:8, 50:15, 50:17, 54:21, 54:23, 67:6
**factors** [3] - 29:14, 59:3, 64:5
**facts** [4] - 5:24, 9:13, 13:3, 30:17
**factual** [3] - 9:14, 10:9, 63:20
**factually** [3] - 9:2, 9:25, 17:18
**fail** [1] - 67:2
**failed** [1] - 5:4
**fair** [2] - 52:14, 64:21
**fairness** [2] - 41:10, 54:1
**faith** [1] - 50:8
**fall** [1] - 58:15
**falls** [2] - 7:14, 43:2
**false** [5] - 4:8, 17:8, 17:15, 40:5, 42:2
**falsehoods** [1] - 20:7
**falsified** [11] - 6:10, 14:2, 16:24, 19:4, 19:13, 20:1, 22:1, 25:11, 30:6, 31:14
**falsifying** [1] - 30:5
**family** [2] - 57:14, 59:9
**far** [3] - 17:14, 55:5, 62:25
**fashion** [1] - 40:25
**father** [1] - 54:21
**father's** [1] - 53:2
**faulty** [1] - 53:2
**FDA** [2] - 11:9, 58:2
**February** [3] - 10:13, 36:23, 36:25
**Federal** [2] - 1:23, 69:11
**feeding** [1] - 52:2
**fees** [1] - 46:6
**fell** [1] - 34:5
**few** [3] - 14:14, 15:4, 42:14
**field** [1] - 48:4
**fifteen** [1] - 40:6
**fifth** [1] - 12:17
**figure** [2] - 8:13, 24:5
**figures** [1] - 56:8
**filed** [5] - 19:1, 63:15, 63:25, 68:14, 68:15
**filled** [2] - 42:3, 55:19
**final** [3] - 25:7, 39:17, 61:17
**finally** [2] - 17:1, 50:2
**financial** [1] - 65:20
**findings** [1] - 67:5
**fine** [3] - 48:10, 66:6, 66:7
**finger** [2] - 61:13, 61:14
**finish** [1] - 62:17
**firearm** [1] - 65:13
**first** [13] - 3:20, 3:21, 4:4, 13:13, 15:5, 19:14, 40:22, 48:15, 56:19, 57:14, 60:8, 65:22, 68:7
**First** [1] - 24:10
**first-time** [1] - 56:19
**five** [15] - 5:22, 6:17, 6:25, 7:4, 7:16, 7:17, 8:5, 8:25, 9:17, 13:10, 17:20, 36:8, 45:25, 51:11, 56:23
**Fl** [1] - 1:23
**Flores** [1] - 1:19
**FLORIDA** [1] - 1:2
**Florida** [7] - 1:4, 1:17, 1:20, 1:23, 53:12, 69:10, 69:12
**followed** [1] - 58:14
**following** [1] - 40:4
**food** [1] - 41:6
**football** [1] - 52:5
**Footnote** [1] - 7:21
**FOR** [3] - 1:13, 1:18, 1:22
**force** [5] - 9:4, 9:15, 14:9, 35:17, 46:2
**forced** [1] - 58:15
**forcing** [1] - 56:13
**foregoing** [1] - 69:4

**foreseeable** [3] - 7:10, 7:14, 10:8
**forfeited** [1] - 49:5
**forfeiture** [7] - 63:13, 63:17, 67:14, 67:16, 67:23, 68:15, 68:16
**form** [2] - 28:9, 28:11
**FORT** [1] - 1:2
**Fort** [3] - 1:4, 1:23, 69:12
**forward** [1] - 4:3
**four** [4] - 9:20, 13:9, 27:22, 35:15
**four-level** [3] - 9:20, 27:22, 35:15
**Fourth** [1] - 24:10
**FPR** [2] - 2:3, 69:9
**fraud** [13] - 4:9, 7:21, 7:25, 19:22, 31:22, 42:13, 42:18, 44:2, 45:6, 46:9, 48:5, 53:12
**fraudulent** [1] - 23:10
**Fred** [1] - 21:20
**friend** [1] - 51:17
**fully** [1] - 67:5
**fundamental** [2] - 22:13, 22:14
**funds** [1] - 66:24
**furthered** [1] - 6:19
**future** [2] - 47:14, 47:22

**G**

**gained** [2] - 49:15, 49:16
**garage** [1] - 44:14
**gasoline** [1] - 41:8
**general** [1] - 68:3
**Gentek** [4] - 7:1, 10:20, 20:5, 20:6
**Gilead** [8] - 14:13, 20:10, 21:16, 41:23, 43:24, 49:6, 58:6, 61:11
**girlfriend** [1] - 57:11
**given** [5] - 24:5, 28:21, 35:16, 43:6, 66:19
**global** [1] - 52:8
**goal** [1] - 56:10
**governing** [1] - 58:2
**government** [1] - 66:4
**Government** [25] - 4:1, 4:23, 17:19, 22:10, 24:1, 34:17, 41:14, 43:7, 43:13, 43:14, 44:11, 46:10, 46:11, 46:13, 46:15, 47:3, 47:16, 48:6, 57:24, 59:23, 62:22, 64:2, 66:10, 67:10, 68:16
**GOVERNMENT** [1] - 1:13
**Government's** [6] - 6:9, 12:10, 17:14, 21:5, 46:22, 58:18
**GPS** [1] - 52:8
**grand** [1] - 25:18
**grandparent** [1] - 53:6
**grandparents** [1] - 53:5
**granted** [1] - 47:21
**graves** [1] - 54:3
**great** [2] - 29:12, 52:10
**greater** [1] - 51:6
**Grosnoff** [2] - 1:15, 3:7
**gross** [3] - 23:13, 26:4, 26:10
**grounds** [1] - 39:18
**grow** [1] - 51:17
**guess** [2] - 49:9, 62:17
**guideline** [1] - 22:14
**guidelines** [4] - 28:10, 38:1, 39:20, 64:5
**guilty** [12] - 4:6, 4:10, 25:9, 44:8, 46:25, 47:5, 47:8, 59:17, 59:21, 60:6, 60:24, 62:24
**Gustavo** [2] - 18:16, 32:20
**guy** [3] - 45:11, 52:18, 52:20
**guys** [4] - 3:17, 45:18, 45:19, 56:13
**GW** [2] - 51:8, 51:25

**H**

**Habitat** [1] - 57:18
**Hamilton** [1] - 54:2
**handed** [1] - 43:10
**handle** [1] - 29:9
**hands** [4] - 19:14, 29:22, 60:16, 62:16
**happy** [2] - 3:21, 16:5
**harder** [1] - 60:11
**harm** [1] - 32:24
**harmed** [1] - 59:7
**hatching** [1] - 49:24
**have-nots** [3] - 53:18, 59:25, 60:3
**haves** [3] - 53:17, 59:25, 60:1
**health** [8] - 51:8, 51:12, 51:13, 51:15, 51:25, 53:16, 53:19
**Health** [2] - 52:1, 57:19
**healthcare** [7] - 42:13, 42:18, 44:2, 45:6, 46:9, 48:5, 66:3
**hear** [4] - 55:1, 59:5, 63:22, 67:24
**heard** [6] - 11:7, 30:10, 49:2, 52:24, 53:14, 60:12
**hearing** [5] - 44:11, 61:7, 61:9, 63:17, 67:7
**held** [3] - 42:7, 43:22, 60:22
**help** [2] - 3:16, 30:23
**helped** [4] - 14:1, 56:12, 56:16, 56:19
**hereby** [1] - 69:4
**Hernandez** [30] - 5:12, 41:20, 41:21, 41:22, 41:23, 42:6, 42:11, 42:16, 43:15, 44:7, 44:17, 44:23, 45:9, 45:18, 46:6, 46:11, 48:23, 49:15, 49:20, 50:15, 59:16, 59:18, 60:2, 60:4, 60:7, 60:21, 61:1, 61:20, 62:23, 65:17
**Hernandez's** [1] - 43:20
**hid** [2] - 30:17, 60:13
**hidden** [1] - 13:21
**hide** [1] - 20:8
**hiding** [4] - 13:19, 13:20, 13:21, 61:11
**high** [3] - 29:5, 44:15, 62:6
**higher** [5] - 23:14, 23:16, 25:17, 48:20, 48:22
**highlight** [1] - 29:12
**Highway** [1] - 1:23
**History** [1] - 59:19
**history** [9] - 42:12, 42:17, 43:25, 44:1, 44:5, 44:9, 45:17, 48:14, 49:24
**HIV** [16] - 10:24, 11:16, 11:21, 12:12, 12:24, 32:21, 33:6, 33:8, 33:10, 34:4, 34:23, 35:3, 35:4, 35:6, 62:8
**HMOs** [1] - 51:11
**hold** [2] - 23:24, 59:14
**holidays** [1] - 57:1
**homeless** [3] - 33:10, 52:1, 52:3
**homeowners** [1] - 56:19
**Honor** [89] - 3:9, 3:12, 3:22, 4:2, 4:16, 4:18, 4:21, 4:24, 5:1, 5:8, 6:1, 6:15, 7:20, 8:6, 8:23, 10:11, 10:14, 11:1, 12:6, 12:8, 12:22, 13:6, 13:25, 14:18, 15:4, 16:5, 16:15, 17:13, 18:11, 18:15, 22:8, 23:1, 26:17, 26:22, 28:1, 28:19, 29:8, 29:11, 31:17, 32:5, 33:25, 35:2, 35:5, 35:17, 36:13, 36:19, 37:1, 37:5, 37:8, 37:24, 37:25, 38:5, 38:6, 38:9, 39:1, 39:6, 39:15, 40:1, 40:19, 40:22, 42:24, 43:21, 48:8, 48:18, 49:17, 50:4, 50:20, 51:4, 54:16, 55:3, 55:4, 55:7, 58:19, 60:12, 62:17, 63:11, 63:14, 63:18, 63:24, 64:3, 66:12, 67:11, 67:13, 67:22, 68:6, 68:8, 68:10, 68:13
**HONORABLE** [1] - 1:10
**Honorable** [1] - 2:4
**hope** [1] - 53:10
**hopefully** [1] - 20:9
**Hopkins** [2] - 21:20, 51:10
**hospital** [1] - 56:16
**hours** [3] - 32:22, 34:5, 56:24
**house** [1] - 49:14
**huge** [1] - 42:15
**Humanity** [1] - 57:18
**humans** [1] - 27:8
**humble** [1] - 44:16
**hundreds** [6] - 7:7, 20:13, 24:22, 56:12, 57:21
**hydro** [1] - 62:6

**I**

**idea** [2] - 8:9, 9:11
**identified** [1] - 42:9
**identifies** [1] - 32:15
**II** [4] - 20:19, 40:15, 65:5, 65:10
**III** [4] - 20:21, 40:15, 65:5, 65:10
**illegal** [1] - 62:4
**illicit** [2] - 30:7, 62:4
**imagine** [3] - 51:19, 51:20, 51:21
**impact** [6] - 18:24, 19:1, 21:17, 53:8, 56:10, 57:21
**important** [4] - 49:9, 56:22, 57:15, 61:17
**impose** [3] - 54:15, 64:1, 66:7
**imposed** [3] - 40:18, 67:8, 68:12
**imprisonment** [1] - 65:8
**inaccurate** [1] - 57:10
**include** [2] - 5:4, 12:19
**included** [2] - 8:2, 60:7
**including** [4] - 31:7, 55:24, 65:16, 68:14
**incorporate** [1] - 67:17
**incorporated** [1] - 67:14
**incorrect** [2] - 9:2, 9:25
**incredible** [1] - 44:9
**incur** [1] - 65:22
**indicate** [1] - 53:19
**indicates** [2] - 13:4, 34:1
**indication** [1] - 3:17
**indices** [1] - 53:19
**indicted** [1] - 60:10
**indictment** [1] - 46:8
**indirectly** [2] - 66:2, 66:3
**individual's** [1] - 28:20
**individuals** [4] - 9:15, 27:14, 41:12, 50:20
**industry** [3] - 11:8, 56:1, 56:11
**infects** [1] - 45:16
**inference** [1] - 16:10
**inform** [1] - 66:21
**information** [2] - 14:8, 65:20
**informed** [1] - 16:10
**ingested** [1] - 18:17
**initiated** [1] - 15:6
**injury** [8] - 32:2, 32:3, 33:20, 34:2, 34:6, 34:8, 34:12, 38:16
**inside** [1] - 31:12
**inspection** [2] - 21:2, 58:5

**instead** [4] - 12:4, 12:25, 26:20, 39:8
**instructing** [1] - 7:2
**insurance** [1] - 66:4
**insurer** [1] - 24:22
**insurers** [1] - 21:14
**intended** [1] - 25:21
**intent** [1] - 20:21
**intention** [2] - 11:13, 56:10
**interacted** [1] - 8:19
**interested** [1] - 64:8
**interesting** [1] - 23:21
**internal** [3] - 6:2, 9:4, 35:17
**interviewed** [2] - 21:22, 21:24
**introduce** [3] - 4:6, 16:6, 51:3
**introduced** [10] - 6:7, 7:12, 12:9, 13:3, 16:16, 17:21, 20:24, 23:3, 45:24, 47:19
**introduces** [1] - 45:15
**introducing** [1] - 9:9
**introduction** [1] - 4:7
**investigation** [15] - 4:11, 4:14, 4:20, 4:23, 14:25, 15:7, 15:10, 15:17, 15:22, 15:25, 39:4, 58:5, 60:9, 66:20, 67:19
**investigations** [1] - 60:10
**investigative** [1] - 5:3
**involved** [15] - 7:2, 7:21, 10:6, 10:19, 16:17, 16:20, 17:6, 17:17, 17:21, 27:3, 27:20, 29:3, 30:5, 48:15, 51:19
**involvement** [6] - 5:19, 9:23, 10:18, 13:24, 17:24, 36:5
**involves** [3] - 17:12, 26:23, 39:7
**involving** [2] - 16:16, 24:11
**ir** [1] - 19:9
**issue** [5] - 9:18, 11:2, 49:9, 55:16, 56:1
**issued** [3] - 36:20, 36:22, 58:9
**issues** [5] - 14:12, 43:12, 55:20, 55:24, 58:3
**itemized** [1] - 24:2
**itself** [1] - 36:4
**IV** [6] - 5:5, 27:4, 40:8, 40:15, 65:6, 65:11
**Ivlis** [2] - 1:19, 3:10

**J**

**Jacqueline** [2] - 1:14, 3:6
**January** [1] - 20:6
**Jefferson** [1] - 54:3
**job** [1] - 35:22
**jobs** [1] - 56:18
**Jonathan** [2] - 8:18, 14:4
**Journal** [4] - 15:8, 15:10, 16:6, 16:11
**Judge** [3] - 3:25, 42:22, 54:10
**judge** [2] - 43:6, 64:18
**JUDGE** [1] - 1:11
**judges** [2] - 43:9, 64:8
**judgment** [4] - 51:20, 65:2, 66:22, 67:14
**judicial** [2] - 15:9, 41:11
**July** [1] - 55:19
**June** [1] - 15:6
**junkies** [1] - 59:11
**jury** [4] - 5:5, 19:24, 28:3, 61:10
**justice** [3] - 15:2, 37:22, 50:12
**Justice** [2] - 15:22, 15:24

**K**

**Kalorama** [1] - 21:23
**Khaim** [8] - 21:8, 25:14, 32:7, 49:3, 60:2, 60:5, 61:20, 62:24
**kids** [2] - 53:5, 57:21
**kind** [3] - 31:20, 61:15, 62:23
**kingpin** [2] - 41:24, 42:20
**Kingpin** [1] - 43:24
**kingpins** [1] - 62:15
**knowing** [3] - 30:2, 30:20, 31:3
**knowingly** [3] - 10:23, 11:14, 11:19
**known** [5] - 18:21, 19:4, 22:1, 51:16, 53:12
**knows** [2] - 32:16, 64:24

**L**

**label** [1] - 40:6
**labeled** [1] - 12:24
**labeling** [1] - 4:8
**labels** [1] - 29:1
**Lamborghini** [1] - 44:14
**Lamborghinis** [2] - 44:12, 49:1
**language** [4] - 11:25, 16:16, 35:14, 41:3
**largely** [1] - 51:12
**last** [4] - 14:16, 36:20, 56:23, 57:22
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:23, 69:12
**launder** [1] - 60:15
**law** [7] - 20:2, 53:16, 53:20, 54:1, 54:4, 65:2, 67:6
**lawyer** [3] - 4:20, 52:24, 60:18
**lawyers** [1] - 60:16
**Lazaro** [32] - 5:11, 41:19, 41:21, 41:22, 41:23, 42:6, 42:11, 42:15, 43:15, 44:7, 44:17, 44:22, 45:9, 45:18, 46:6, 46:11, 48:23, 49:15, 49:20, 50:14, 59:16, 59:18, 60:2, 60:4, 60:7, 60:20, 61:1, 61:19, 62:23, 63:5, 63:6, 65:17
**lead** [1] - 35:25
**leader** [5] - 6:2, 7:9, 36:7, 36:16, 47:17
**leader/organizer** [1] - 35:10
**leaders** [1] - 18:2
**learned** [2] - 32:7, 32:19
**least** [12] - 10:8, 12:23, 13:1, 17:20, 20:13, 25:13, 32:7, 32:17, 46:2, 59:16, 59:17, 61:2
**led** [1] - 6:2
**left** [1] - 51:11
**legal** [3] - 40:17, 63:20, 63:22
**Legend** [1] - 18:19
**legitimate** [11] - 9:7, 30:2, 30:12, 30:20, 45:14, 45:22, 48:3, 60:14, 61:24, 62:8, 62:9
**legitimately** [1] - 30:19
**leniency** [1] - 43:12
**lenient** [7] - 42:22, 43:3, 43:6, 44:22, 45:1, 45:2, 64:11
**less** [3] - 11:3, 13:4, 55:20
**letter** [5] - 20:4, 31:5, 31:10, 31:13, 58:9
**letters** [1] - 20:3
**level** [10] - 9:20, 18:10, 27:22, 29:23, 35:15, 37:7, 38:3, 38:24, 55:17
**levels** [2] - 47:8, 47:9
**liberal** [1] - 43:6
**license** [4] - 29:16, 29:19, 30:1, 58:7
**licensed** [2] - 27:17, 29:19
**licenses** [2] - 61:19, 62:12
**lie** [5] - 14:14, 14:20, 15:5, 60:16
**lied** [3] - 14:11, 15:12, 15:15
**lies** [9] - 20:1, 20:3, 20:7, 30:22, 30:24, 31:4, 31:6, 31:21, 60:13
**life** [10] - 39:20, 39:21, 44:15, 44:16, 45:14, 48:3, 56:15, 56:23, 57:15, 58:24
**life-saving** [1] - 56:15
**lightning** [1] - 56:3
**likely** [1] - 54:24
**limited** [1] - 50:14
**line** [3] - 12:17, 13:13, 49:17
**lines** [1] - 14:5
**listed** [1] - 5:2
**litany** [2] - 20:7, 33:1
**lives** [4] - 52:6, 54:25, 56:21, 57:4
**living** [3] - 44:15, 44:16, 45:14
**LLC** [1] - 20:20
**local** [1] - 57:19
**location** [1] - 55:5
**logic** [1] - 50:5
**logical** [1] - 16:9
**look** [5] - 7:5, 23:18, 26:2, 41:16, 45:4
**looking** [4] - 6:24, 22:19, 44:5, 44:6
**lose** [1] - 50:8
**loss** [23] - 22:6, 22:7, 22:12, 22:16, 22:22, 23:18, 23:22, 24:23, 25:2, 25:8, 25:16, 26:5, 26:14, 26:19, 38:11, 42:8, 42:16, 43:22, 45:10, 49:23, 50:2
**losses** [3] - 25:6, 25:21
**lost** [5] - 22:17, 22:18, 49:12, 49:13, 50:18
**loved** [1] - 57:10
**low** [2] - 64:15, 64:16
**lower** [3] - 25:8, 49:19, 50:16
**lowest** [2] - 43:2, 64:12
**luck** [1] - 68:19
**lunch** [1] - 52:13

**M**

**majority** [1] - 46:1
**managed** [2] - 9:4, 9:7
**mandatory** [1] - 67:17
**manner** [3] - 65:25, 67:8, 68:11
**Mantilla** [2] - 1:19, 3:10
**manufacture** [3] - 14:1, 16:24, 17:8
**March** [2] - 36:24, 39:10
**Marcus** [1] - 24:13
**Mariel** [1] - 60:4
**mark** [2] - 31:18
**market** [23] - 6:6, 6:25, 7:3, 7:12, 7:16, 8:16, 10:6, 17:3, 17:4, 19:4, 19:9, 21:19, 23:5, 23:12, 23:15, 23:17, 24:7, 24:17, 25:23, 26:7, 32:6, 33:6, 56:16
**marshal** [1] - 68:18
**Maryland** [4] - 44:16, 55:8, 57:19, 66:16
**mastermind** [1] - 43:23
**math** [1] - 39:2
**matter** [5] - 28:24, 37:3, 49:8, 51:14, 69:6
**max** [2] - 40:11, 40:12
**maximum** [4] - 28:7, 39:20, 39:21, 40:6
**McKesson** [1] - 55:24
**mean** [10] - 6:16, 16:2, 19:6, 19:8, 26:24, 37:3, 38:24, 44:1, 53:8, 54:2
**means** [3] - 28:18, 28:21, 38:15

**media** [1] - 57:10
**Medicaid** [2] - 21:14, 51:11
**medical** [5] - 4:8, 27:7, 39:7, 40:5, 53:12
**Medical** [2] - 51:8, 51:25
**Medicare** [1] - 21:14
**medication** [4] - 32:21, 34:4, 46:2
**medications** [18] - 5:23, 9:1, 11:3, 12:1, 12:24, 16:18, 17:22, 34:20, 35:18, 35:21, 35:24, 42:1, 45:7, 46:4, 55:21, 55:22, 56:3, 56:15
**medicine** [5] - 33:22, 34:24, 35:7, 51:10
**meds** [1] - 21:4
**memo** [4] - 6:9, 6:22, 14:10, 59:20
**memoranda** [1] - 59:5
**memorandum** [2] - 24:13, 43:11
**mention** [1] - 45:4
**mentioned** [3] - 30:24, 59:25, 61:4
**mentoring** [1] - 57:21
**mentorship** [1] - 57:19
**Mercedes** [2] - 44:12, 44:15
**mercy** [2] - 40:24, 50:4
**merely** [1] - 63:20
**mess** [1] - 12:12
**message** [3] - 6:10, 12:10, 32:13
**messages** [3] - 8:11, 8:14, 21:7
**met** [1] - 5:11
**methodology** [1] - 24:25
**Miami** [4] - 1:17, 1:20, 44:10, 44:15
**Michael** [1] - 54:12
**microphone** [1] - 3:16
**might** [3] - 11:4, 36:4, 43:7
**million** [26] - 7:6, 10:20, 17:2, 22:25, 23:5, 24:7, 24:24, 25:4, 25:20, 25:22, 26:4, 26:7, 26:9, 26:13, 35:20, 42:7, 42:8, 42:16, 44:10, 45:11, 46:3, 46:5, 49:6, 49:15, 49:23, 50:2
**mindset** [1] - 56:20
**minimization** [1] - 62:18
**minimize** [1] - 60:2
**minimum** [1] - 28:8
**minimums** [1] - 56:14
**minor** [1] - 39:6
**minuscule** [2] - 36:5, 36:6
**misbranded** [3] - 4:6, 4:7, 20:22
**miscarriage** [1] - 50:12
**mislead** [3] - 14:20, 20:21, 31:10
**missed** [3] - 28:13, 57:1, 57:3
**misstates** [4] - 5:18, 9:23, 10:17, 13:2
**mistake** [2] - 11:4, 57:25
**mistakes** [1] - 58:4
**mitigating** [2] - 64:19, 64:20
**Modern** [2] - 19:22, 20:19
**Mohammed** [3] - 45:19, 46:16, 50:1
**mom** [1] - 56:12
**mom-and-pop** [1] - 56:12
**moment** [1] - 7:19
**money** [10] - 13:20, 23:11, 49:2, 49:3, 49:13, 52:15, 52:21, 53:21, 57:17
**monies** [2] - 10:2, 22:16
**month** [3] - 18:21, 39:13
**months** [40] - 39:23, 40:3, 40:14, 40:15, 42:9, 42:12, 42:14, 42:17, 42:21, 43:16, 44:20, 45:10, 46:12, 46:15, 46:16, 46:17, 47:3, 47:20, 47:23, 48:7, 48:11, 49:24, 50:2, 50:9, 56:24, 58:21, 59:2, 59:19, 59:22, 63:8, 64:24, 65:3, 65:4, 65:5, 65:6, 65:7
**most** [6] - 26:14, 35:18, 41:19, 56:22, 60:9, 61:7
**mother** [1] - 53:2
**moves** [7] - 38:10, 38:11, 38:13, 38:17, 38:18, 38:21, 42:3
**MR** [126] - 3:6, 3:9, 3:12, 3:19, 3:21, 3:25, 4:2, 4:16, 4:18, 4:24, 5:1, 5:8, 5:10, 5:15, 5:18, 6:1, 6:21, 8:6, 8:23, 9:22, 10:4, 10:11, 10:14, 10:17, 10:22, 11:24, 12:6, 12:8, 12:22, 13:6, 13:15, 13:25, 14:18, 14:23, 15:4, 15:21, 16:5, 16:15, 16:20, 17:12, 18:5, 18:11, 18:15, 19:11, 19:19, 20:18, 22:6, 22:8, 23:1, 25:4, 26:1, 26:9, 26:10, 26:12, 26:17, 26:22, 27:1, 28:1, 28:12, 28:14, 28:17, 29:8, 31:17, 32:1, 32:5, 33:17, 33:24, 34:11, 34:16, 34:25, 35:4, 35:9, 35:11, 35:13, 36:4, 36:12, 36:15, 36:19, 36:20, 37:1, 37:5, 37:8, 37:12, 37:15, 37:20, 37:24, 37:25, 38:5, 38:6, 38:9, 39:1, 39:2, 39:6, 39:9, 39:12, 39:15, 39:17, 39:25, 40:19, 40:22, 42:24, 43:5, 44:25, 45:3, 50:24, 51:2, 51:3, 51:4, 54:10, 54:12, 54:16, 54:19, 55:3, 55:7, 58:19, 63:14, 63:24, 64:2, 66:12, 66:14, 67:11, 67:22, 68:2, 68:6, 68:8, 68:13
**MS** [1] - 29:11
**multiday** [1] - 58:5
**multiple** [2] - 31:7, 56:19
**muster** [1] - 6:13

**N**

**name** [2] - 43:24, 54:11
**nationwide** [1] - 7:6
**nature** [4] - 6:12, 7:24, 20:8, 30:7
**NE** [1] - 1:16
**near** [1] - 49:20
**necessarily** [2] - 8:4, 33:12
**necessary** [2] - 28:4, 68:9
**need** [13] - 6:12, 17:23, 41:1, 41:3, 41:4, 41:6, 41:8, 41:10, 42:25, 46:18, 61:21, 67:21
**needed** [3] - 56:17, 58:4
**needs** [3] - 41:9, 54:2, 56:13
**net** [1] - 56:5
**never** [12] - 5:11, 10:1, 10:23, 14:12, 18:20, 19:3, 21:25, 44:4, 45:13, 48:2, 52:17, 57:3
**nevertheless** [1] - 33:5
**new** [4] - 7:14, 37:18, 45:12
**New** [2] - 15:23, 33:10
**newspaper** [2] - 15:19, 15:24
**next** [9] - 9:21, 12:21, 13:14, 26:21, 28:17, 31:25, 37:22, 45:4, 67:11
**Nichols** [2] - 8:18, 14:4
**Nicole** [2] - 1:15, 3:7
**night** [1] - 36:21
**NO** [1] - 1:3
**none** [2] - 29:20, 39:21
**normal** [1] - 57:12
**note** [2] - 25:7, 28:20
**nothing** [9] - 9:16, 12:1, 13:21, 33:24, 33:25, 34:21, 34:25, 57:3, 64:2
**notice** [1] - 15:9
**nots** [3] - 53:18, 59:25, 60:3
**number** [13] - 9:3, 9:4, 9:15, 11:5, 11:10, 22:22, 23:2, 43:9, 43:11, 43:12, 46:24, 47:1
**Number** [1] - 19:2
**numerous** [2] - 17:19, 51:18
**NW** [1] - 1:20

**O**

**object** [1] - 5:15
**objecting** [1] - 37:6
**objection** [59] - 4:22, 5:4, 5:6, 5:9, 5:10, 5:17, 5:18, 8:21, 8:23, 8:24, 9:19, 9:21, 9:22, 10:9, 10:15, 10:17, 10:21, 10:22, 11:22, 11:24, 12:7, 12:17, 12:21, 12:22, 13:14, 13:15, 14:17, 14:19, 14:22, 14:23, 16:14, 16:15, 17:11, 17:12, 18:3, 18:9, 18:12, 22:5, 22:6, 26:19, 26:21, 26:22, 27:25, 28:2, 28:15, 28:17, 31:23, 32:1, 34:15, 34:16, 35:8, 35:9, 36:9, 39:7, 39:12, 39:14, 39:17, 67:7
**objections** [10] - 5:2, 5:3, 18:5, 39:4, 39:6, 63:20, 67:5, 67:10, 68:11, 68:14
**obligation** [2] - 42:25, 46:19
**obstruct** [1] - 14:25
**obstruction** [5] - 14:24, 15:2, 18:6, 37:22, 38:23
**obtain** [2] - 60:11, 65:18
**obtained** [1] - 24:17
**obtaining** [1] - 65:22
**obviously** [2] - 10:4, 62:9
**occasions** [4] - 12:23, 13:1, 13:2, 51:18
**OF** [3] - 1:2, 1:4, 1:10
**offend** [1] - 48:21
**offenders** [1] - 58:10
**offense** [10] - 11:25, 18:12, 27:2, 37:19, 38:3, 38:21, 38:24, 40:2, 45:7, 46:8
**offered** [1] - 34:17
**officer** [3] - 65:21, 65:23, 66:1
**OFFICER** [5] - 40:1, 40:8, 40:10, 40:13, 68:21
**Official** [2] - 2:4, 69:9
**Omom** [1] - 7:1
**on-site** [1] - 62:13
**once** [1] - 55:16
**one** [49] - 5:24, 6:13, 7:19, 9:3, 12:9, 14:3, 14:4, 14:16, 16:7, 16:23, 17:22, 18:1, 20:8, 20:10, 22:13, 23:23, 23:24, 24:16, 25:8, 27:2, 27:24, 29:14, 31:25, 32:16, 36:20, 36:22, 36:24, 36:25, 37:16, 37:22,

43:9, 43:11, 45:4, 45:24, 46:24, 47:18, 50:8, 50:21, 51:24, 52:13, 54:16, 56:1, 57:3, 58:19, 59:4, 61:7, 61:19, 65:10
**one-off** [1] - 20:10
**ones** [4] - 49:22, 55:24, 57:10, 59:7
**Oof** [1] - 32:14
**open** [1] - 13:19
**operate** [1] - 61:22
**operated** [1] - 29:20
**operating** [3] - 29:19, 41:7, 48:3
**operation** [2] - 35:23, 53:3
**opioids** [1] - 62:4
**opportunity** [2] - 4:13, 55:11
**opposed** [2] - 27:20, 62:23
**opposite** [2] - 13:18, 34:2
**orchestrated** [2] - 5:20, 8:9
**order** [14] - 9:12, 28:4, 30:1, 42:3, 48:4, 65:18, 65:19, 65:21, 65:24, 66:2, 66:7, 67:14, 67:16, 68:15
**Order** [1] - 3:1
**ordered** [1] - 4:10
**organization** [2] - 27:6, 52:14
**organize** [1] - 36:1
**organizer** [1] - 47:18
**origin** [3] - 14:2, 30:1, 30:14
**originated** [1] - 48:23
**originates** [1] - 45:12
**otherwise** [5] - 7:5, 7:24, 8:7, 13:16, 36:9
**outcome** [1] - 53:24
**outside** [1] - 42:1
**outsiders** [1] - 7:23
**overrule** [14] - 9:19, 10:15, 10:21, 11:22, 14:17, 14:21, 17:10, 18:3, 22:5, 27:25, 28:15, 34:14, 35:7, 36:9
**overruled** [1] - 8:21
**overstates** [1] - 22:15
**overstating** [1] - 11:25
**oversupply** [1] - 62:7
**own** [3] - 52:3, 59:5, 66:2
**owned** [5] - 12:2, 12:5, 12:19, 29:20, 52:7
**owner** [4] - 10:5, 14:1, 16:10, 27:9
**owners** [4] - 12:8, 16:8, 27:17, 27:24
**owns** [2] - 16:7, 49:14
**oxy** [1] - 62:6

## P

**page** [2] - 37:4, 37:21
**Pages** [1] - 1:8
**paid** [7] - 23:12, 23:17, 24:18, 24:24, 25:23, 26:7, 66:8
**pain** [1] - 20:25
**painted** [1] - 55:18
**Palm** [1] - 21:2
**paperwork** [5] - 17:23, 30:10, 30:11, 30:14, 30:20
**paragraph** [42] - 5:4, 5:10, 5:18, 5:20, 6:15, 8:24, 9:22, 10:10, 10:16, 10:17, 10:22, 11:18, 11:24, 12:17, 12:22, 13:12, 13:15, 14:17, 14:19, 14:23, 16:14, 16:15, 17:10, 17:12, 18:1, 18:12, 22:6, 26:22, 27:22, 28:17, 31:24, 32:1, 34:15, 34:16, 35:8, 35:9, 35:14, 36:10, 39:7, 39:11, 39:12, 66:20
**paragraphs** [2] - 18:5, 67:19
**Parekh** [4] - 18:19, 20:4, 20:14, 21:12
**parents** [2] - 53:1, 57:7
**part** [14] - 11:8, 28:2, 29:4, 30:23, 33:13, 42:14, 43:11, 49:6, 53:10, 53:13, 56:6, 56:22, 61:7, 61:17
**participant** [1] - 55:9
**participants** [8] - 5:22, 6:4, 7:4, 7:17, 7:22, 8:25, 9:11, 36:8
**participated** [2] - 6:21, 57:17
**participation** [1] - 31:15
**particular** [1] - 35:1
**particularly** [1] - 24:12
**parties** [1] - 67:5
**party** [1] - 67:7
**pass** [3] - 6:13, 30:2, 30:15
**passed** [2] - 18:18, 32:21
**passes** [1] - 32:14
**Pat** [8] - 51:6, 51:23, 52:2, 52:9, 52:13, 52:16, 52:25
**patient** [2] - 18:23, 33:21
**patient/victim** [1] - 18:17
**patients** [12] - 20:11, 20:17, 21:13, 22:18, 27:16, 29:22, 33:6, 34:23, 35:1, 42:1, 59:7, 59:10
**patients'** [3] - 19:14, 60:16, 62:16
**PATRICIA** [2] - 2:3, 69:9
**PATRICK** [4] - 1:7, 1:18, 4:21, 55:14
**Patrick** [86] - 3:3, 3:10, 3:21, 3:24, 4:3, 4:5, 4:19, 5:11, 5:19, 5:20, 6:7, 6:10, 7:2, 7:11, 8:15, 8:25, 9:23, 10:1, 10:4, 10:8, 10:18, 10:22, 11:19, 11:25, 12:1, 12:4, 12:10, 12:14, 12:18, 13:15, 13:23, 14:11, 14:20, 14:24, 15:24, 16:10, 16:17, 16:23, 17:14, 17:24, 21:9, 21:10, 22:19, 27:10, 27:16, 29:3, 29:25, 30:5, 30:16, 30:21, 31:15, 32:13, 32:14, 33:4, 35:16, 35:22, 36:5, 36:24, 40:24, 44:4, 44:12, 45:13, 45:21, 46:23, 47:19, 47:24, 47:25, 48:2, 48:6, 48:9, 48:19, 49:4, 49:16, 50:17, 50:21, 51:16, 54:14, 54:21, 55:13, 59:1, 59:24, 61:13, 62:5, 62:14, 65:3, 68:19
**Patrick's** [1] - 50:14
**pay** [1] - 66:6
**paying** [1] - 22:18
**payments** [3] - 9:24, 10:6, 10:19
**peddle** [1] - 60:15
**pedigrees** [2] - 52:11, 52:12
**penalties** [2] - 39:20, 39:21
**people** [20] - 6:17, 9:17, 27:14, 29:22, 29:23, 31:7, 33:10, 33:14, 33:15, 42:4, 48:25, 49:2, 49:25, 50:8, 57:24, 58:1, 60:2, 61:2, 61:21, 64:14
**per** [1] - 39:13
**perceived** [1] - 45:2
**percent** [6] - 23:8, 23:9, 26:3, 34:20, 55:23, 56:5
**percentage** [4] - 11:1, 11:10, 25:24, 56:6
**perfect** [1] - 52:12
**period** [5] - 55:18, 55:21, 58:3, 66:8, 67:2
**permission** [1] - 65:23
**permits** [1] - 11:9
**person** [4] - 52:22, 60:8, 61:4, 65:25
**personal** [2] - 55:17, 56:21
**personally** [1] - 10:19
**persuasive** [1] - 66:17
**Peter** [8] - 21:7, 25:14, 32:6, 49:3, 60:2, 60:5, 61:20, 62:24
**Ph** [1] - 1:20
**pharmaceutical** [5] - 9:7, 15:11, 27:17, 52:8, 55:15
**pharmaceuticals** [1] - 29:16
**pharmacies** [27] - 6:6, 7:7, 12:24, 19:14, 19:15, 20:13, 20:16, 20:23, 23:5, 23:8, 23:15, 24:23, 25:25, 26:8, 27:15, 29:17, 29:21, 29:24, 30:12, 30:15, 34:19, 34:24, 42:1, 56:12, 61:21, 62:7, 62:16
**pharmacists** [1] - 22:17
**Pharmacy** [9] - 19:2, 19:22, 20:14, 20:19, 20:20, 20:25, 21:2, 21:3, 21:23
**pharmacy** [10] - 19:2, 19:6, 19:8, 19:22, 19:24, 20:8, 20:22, 21:9, 21:23, 24:19
**PharmaQuick** [1] - 20:20
**phone** [1] - 25:14
**phonetic** [1] - 18:23
**physically** [1] - 57:17
**pills** [10] - 7:8, 18:24, 20:25, 21:6, 21:8, 21:11, 21:21, 29:1, 31:12, 32:8
**place** [3] - 19:14, 58:14, 65:8
**placed** [1] - 31:5
**plea** [1] - 47:6
**pleaded** [4] - 59:17, 60:6, 60:24, 62:24
**pleading** [1] - 47:8
**pleads** [1] - 63:2
**pled** [4] - 25:9, 44:8, 46:24, 59:21
**plenty** [1] - 23:7
**plus** [1] - 36:16
**PM** [1] - 68:22
**POGOZELSKI** [48] - 3:6, 4:2, 4:16, 4:24, 5:8, 5:15, 6:1, 6:21, 8:6, 10:4, 12:8, 13:6, 13:25, 15:4, 15:21, 16:5, 16:20, 18:15, 19:11, 19:19, 20:18, 23:1, 25:4, 26:1, 26:10, 27:1, 29:8, 32:5, 35:11, 36:12, 36:15, 36:20, 37:1, 37:12, 37:15, 37:25, 38:6, 38:9, 39:1, 39:15, 39:25, 50:24, 51:2, 58:19, 64:2, 66:12, 66:14, 67:11
**Pogozelski** [19] - 1:13, 3:6, 4:15, 5:7, 5:14, 5:25, 10:3, 13:5, 13:23, 16:19, 18:14, 22:24, 26:25, 29:7, 30:4, 32:4, 37:9, 64:23, 64:24
**point** [8] - 19:11, 25:5, 25:18, 43:7, 61:13, 61:14, 67:24
**pointed** [2] - 14:10, 44:11
**points** [2] - 27:5, 27:11
**police** [1] - 52:16
**Ponzi** [1] - 23:23
**poor** [2] - 53:10, 60:5
**pop** [1] - 56:12
**posed** [1] - 32:11
**position** [4] - 5:14, 27:20, 58:18, 63:12
**positive** [1] - 56:10
**possess** [3] - 4:8, 40:5, 65:14
**possessing** [1] -

65:13
**possibility** [1] - 48:22
**possible** [4] - 42:24, 49:18, 55:9, 57:6
**potentially** [1] - 58:11
**PowerPoint** [1] - 58:6
**pre** [1] - 27:7
**pre-retail** [1] - 27:7
**precisely** [1] - 27:16
**preliminary** [1] - 68:15
**premise** [1] - 17:15
**prepared** [1] - 62:3
**prescribed** [2] - 18:25, 32:21
**prescription** [5] - 5:21, 11:6, 11:16, 27:15, 62:25
**prescriptions** [1] - 42:2
**present** [4] - 3:11, 3:14, 51:5, 62:3
**presentation** [1] - 58:6
**presented** [1] - 61:9
**presentence** [8] - 4:11, 4:14, 4:19, 4:22, 5:3, 39:4, 66:20, 67:19
**president** [2] - 27:24, 51:10
**presumptuous** [1] - 53:9
**pretty** [1] - 27:10
**previously** [6] - 18:7, 57:2, 63:14, 63:25, 68:14
**prices** [3] - 19:16, 46:5, 62:6
**pricing** [2] - 7:14, 23:7
**primarily** [1] - 59:2
**prison** [12] - 44:2, 45:5, 45:12, 58:8, 65:3, 65:4, 65:5, 65:6
**prisoners** [1] - 45:7
**Prisons** [1] - 66:18
**private** [2] - 37:10, 66:4
**probation** [5] - 39:25, 42:9, 65:21, 65:23, 66:1
**PROBATION** [4] - 40:1, 40:8, 40:10, 40:13
**problem** [2] - 3:25, 20:10
**problems** [5] - 18:22, 22:14, 25:13, 31:1, 55:19
**procedural** [1] - 55:4
**proceed** [1] - 55:13
**proceeded** [1] - 63:6
**proceedings** [1] - 69:5
**process** [2] - 53:15, 57:9
**production** [1] - 41:23
**products** [8] - 4:8, 9:7, 14:13, 24:11, 27:7, 40:5, 55:20
**profit** [8] - 22:19, 23:6, 24:8, 26:9, 26:10, 26:13, 44:13, 49:4
**profitability** [1] - 56:5
**profited** [1] - 22:19
**profiting** [1] - 50:19
**profits** [2] - 49:16, 56:7
**program** [2] - 55:10, 66:19
**programs** [1] - 57:19
**prohibited** [1] - 65:13
**prong** [2] - 27:2, 27:5
**prongs** [1] - 27:2
**proof** [1] - 24:2
**property** [1] - 65:25
**prosecute** [1] - 66:25
**prosecuted** [1] - 60:8
**prosecutor** [3] - 43:18, 43:19, 64:17
**prove** [2] - 34:7, 34:9
**proved** [1] - 8:1
**provide** [1] - 65:20
**provided** [2] - 20:2, 57:11
**PSI** [6] - 9:23, 10:12, 17:13, 36:17, 36:18, 41:21
**PSR** [5] - 6:15, 25:18, 37:13, 37:18
**public** [2] - 37:10, 51:13
**punish** [1] - 27:13
**purchase** [10] - 5:22, 9:1, 16:17, 16:21, 17:2, 17:6, 17:21, 19:9, 29:18, 46:4
**purchased** [4] - 17:7, 18:20, 19:3, 21:25
**purchasing** [2] - 34:20, 41:25
**purporting** [3] - 10:23, 11:15, 11:20
**purpose** [2] - 23:10, 27:13
**purposes** [1] - 8:2
**pursuant** [1] - 21:16
**pushing** [2] - 6:5, 62:12
**put** [2] - 57:25, 58:14
**putting** [2] - 43:12, 58:1

## Q

**questions** [3] - 15:19, 15:21, 19:17
**quite** [2] - 15:6, 63:5
**quote** [7] - 6:3, 7:21, 10:23, 12:23, 47:1, 59:11, 62:7
**quote-unquote** [2] - 6:3, 47:1
**quotes** [1] - 23:24

## R

**raise** [1] - 53:23
**raised** [1] - 57:17
**Raj** [4] - 18:19, 20:3, 20:13, 21:12
**rampant** [1] - 53:13
**ran** [2] - 51:8, 51:13
**range** [2] - 25:1, 54:23
**Rapid's** [1] - 7:1
**rate** [1] - 55:23
**rather** [2] - 24:21, 26:16
**RDAP** [2] - 55:9, 66:19
**reaching** [1] - 16:12
**reaction** [1] - 53:11
**read** [5] - 4:19, 11:14, 12:18, 67:21, 68:3
**ready** [1] - 21:22
**realizing** [1] - 66:16
**really** [7] - 22:8, 22:12, 31:3, 37:3, 48:11, 54:1
**reason** [5] - 25:8, 46:18, 50:5, 64:15, 66:19
**reasonable** [5] - 58:25, 63:7, 64:7, 65:24, 65:25
**reasonably** [1] - 33:17
**reasons** [1] - 15:4
**receipts** [1] - 24:2
**receive** [3] - 17:23, 48:19, 48:22
**received** [12] - 4:11, 20:5, 20:23, 21:21, 28:23, 41:13, 41:17, 42:12, 42:21, 49:18, 49:22, 50:16
**receives** [2] - 50:9, 50:10
**receiving** [4] - 31:11, 42:16, 49:23, 50:1
**recess** [1] - 68:20
**reckless** [5] - 32:25, 33:13, 33:18, 33:19, 34:9
**recommend** [3] - 58:8, 63:10, 66:16
**recommendation** [3] - 47:22, 65:1, 66:17
**recommendations** [1] - 58:13
**recommended** [1] - 59:18
**recommending** [6] - 48:7, 58:21, 58:23, 58:24, 59:1, 59:23
**recommends** [1] - 47:3
**record** [15] - 3:5, 9:14, 9:16, 13:4, 17:5, 19:20, 20:12, 22:9, 22:23, 33:24, 34:1, 34:3, 34:25, 67:21, 68:5
**recordkeeping** [1] - 58:12
**records** [1] - 24:2
**recruit** [2] - 9:2, 36:1
**recruited** [4] - 5:21, 8:25, 9:11, 48:16
**recruiting** [1] - 49:25
**recruitment** [1] - 9:18
**reduction** [4] - 44:20, 47:5, 47:21, 48:9
**refer** [1] - 59:10
**referenced** [1] - 59:6
**references** [1] - 61:23
**reflects** [1] - 61:16
**refused** [1] - 52:21
**regarding** [3] - 14:6, 15:22, 68:15
**regardless** [1] - 9:17
**registration** [1] - 20:2
**regular** [1] - 11:8
**regulates** [1] - 11:9
**reimbursed** [2] - 24:8, 24:20
**reimbursements** [2] - 23:14, 24:5
**rejected** [1] - 61:10
**relate** [1] - 18:5
**related** [3] - 41:21, 42:10, 67:23
**relationship** [1] - 20:5
**release** [8] - 65:8, 65:9, 65:10, 65:12, 65:16, 66:9, 67:18, 68:4
**relevant** [1] - 7:15
**relies** [1] - 23:20
**religiously** [1] - 33:22
**reluctantly** [1] - 64:25
**rely** [1] - 63:14
**relying** [2] - 28:14, 63:24
**Remedy** [1] - 21:5
**remember** [2] - 5:13, 35:18
**remind** [1] - 53:16
**remorse** [6] - 59:8, 59:17, 60:6, 60:24, 61:6
**renew** [1] - 68:13
**rep** [1] - 8:19
**repeated** [3] - 17:19, 58:20, 63:9
**repeatedly** [1] - 60:22
**replies** [1] - 32:14
**report** [8] - 4:11, 4:14, 4:20, 4:23, 5:3, 39:5, 66:20, 67:20
**reported** [2] - 12:24, 15:10
**REPORTED** [1] - 2:2
**Reporter** [3] - 2:4, 54:8, 69:9
**reporter** [3] - 3:16, 15:19, 68:20
**reports** [1] - 57:24
**represent** [1] - 67:1
**representative** [1] - 21:17
**represented** [1] - 31:8
**reps** [5] - 7:3, 7:13, 7:19, 8:2, 14:4
**requested** [1] - 68:16
**requesting** [2] - 40:23, 68:9
**requests** [2] - 54:8, 55:4
**require** [1] - 29:5
**required** [3] - 20:2, 41:4, 41:5
**requirement** [1] - 23:25
**reselling** [1] - 28:25
**resold** [1] - 42:3
**resources** [1] - 53:23
**respect** [2] - 30:6, 30:16
**respond** [2] - 50:24, 50:25
**response** [1] - 37:9
**responsibility** [5] - 48:10, 60:24, 61:6, 61:8, 63:2
**responsible** [2] - 42:7, 43:22
**restitution** [1] - 66:10
**result** [2] - 48:19
**retail** [1] - 27:7
**returned** [1] - 5:5
**returning** [1] - 22:17
**review** [1] - 4:13

**reviewed** [1] - 4:12
**revised** [1] - 37:13
**reward** [1] - 52:21
**rise** [1] - 68:21
**risk** [9] - 32:24, 32:25, 33:19, 34:9, 34:11, 34:12, 34:14, 38:16, 53:9
**risks** [4] - 32:11, 32:15, 33:2, 33:5
**robbery** [2] - 42:20, 44:3
**Roberto** [1] - 5:11
**role** [14] - 8:3, 8:16, 8:20, 9:10, 11:25, 17:12, 17:14, 17:16, 36:16, 37:18, 38:21, 50:14, 57:12, 62:19
**rolling** [1] - 54:3
**routinely** [1] - 41:18
**RPR** [2] - 2:3, 69:9
**rule** [1] - 26:19
**ruled** [6] - 18:7, 35:11, 35:13, 35:15, 38:7, 67:25
**ruling** [2] - 14:18, 14:21
**rulings** [3] - 24:10, 37:4, 68:17
**rumors** [1] - 57:10
**run** [4] - 43:16, 52:18, 65:7, 65:11
**running** [3] - 34:9, 45:14, 61:23

## S

**S-word** [1] - 12:12
**sad** [1] - 59:8
**Safe** [24] - 9:8, 9:10, 9:24, 10:1, 12:2, 12:5, 12:19, 14:20, 15:14, 15:22, 16:7, 18:20, 19:3, 26:13, 27:10, 27:12, 27:23, 28:5, 56:4, 60:13, 61:19, 61:22
**safety** [2] - 24:14, 32:16
**Salami** [3] - 45:19, 46:16, 50:1
**sale** [3] - 5:22, 9:1, 16:20
**sales** [30] - 6:2, 6:3, 6:17, 7:3, 7:9, 7:13, 7:18, 8:2, 8:19, 9:4, 9:15, 13:19, 14:4, 14:8, 23:13, 26:3, 26:4, 26:10, 27:9, 29:5, 30:25, 31:2, 35:17, 35:19, 35:20, 35:22, 35:25, 46:2, 58:3
**salesman** [1] - 62:11
**salespeople** [1] - 36:8
**saving** [1] - 56:15
**saw** [2] - 58:7, 60:18
**scamming** [1] - 58:11
**scheme** [18] - 5:21, 6:20, 6:22, 9:9, 9:12, 15:11, 18:2, 19:12, 22:20, 23:10, 23:23, 25:18, 29:14, 31:15, 47:18, 50:19, 62:9, 63:1
**schemes** [1] - 32:12
**school** [1] - 51:9
**score** [1] - 37:23
**scored** [1] - 59:19
**seal** [1] - 19:1
**search** [1] - 65:24
**season** [1] - 57:2
**second** [3] - 18:11, 23:24, 27:5
**secondary** [1] - 52:10
**Section** [1] - 64:6
**SECURITY** [1] - 68:21
**see** [6] - 36:17, 38:2, 40:4, 41:17, 53:6, 66:19
**seeing** [1] - 59:8
**seek** [1] - 28:4
**seeking** [1] - 66:10
**self** [1] - 65:19
**self-employment** [1] - 65:19
**sell** [2] - 7:3, 62:6
**sellers** [1] - 26:7
**selling** [7] - 7:2, 9:7, 14:7, 31:2, 33:6, 35:20, 35:24
**Semitism** [1] - 60:5
**sending** [3] - 12:10, 33:8, 33:13
**sends** [1] - 32:13
**sense** [2] - 16:9, 23:4
**sent** [1] - 20:4
**sentence** [48] - 40:17, 40:25, 42:8, 42:12, 42:13, 42:14, 42:17, 42:21, 43:3, 43:4, 43:5, 43:14, 43:15, 44:22, 45:12, 47:3, 47:17, 47:20, 48:7, 48:20, 48:22, 49:17, 49:19, 49:23, 50:1, 50:9, 50:11, 52:23, 54:15, 54:23, 59:6, 61:16, 61:17, 63:4, 63:7, 63:10, 64:1, 64:7, 64:11, 64:15, 64:16, 64:22, 65:2, 66:22, 67:8, 68:12, 68:18
**sentenced** [5] - 45:10, 47:15, 59:1, 65:3
**sentencer** [1] - 42:23
**sentences** [8] - 41:14, 41:17, 43:10, 43:13, 43:16, 43:17, 49:22, 50:16
**Sentencing** [1] - 68:22
**sentencing** [18] - 3:24, 4:10, 6:9, 6:22, 14:10, 24:13, 41:2, 43:11, 44:11, 46:19, 53:15, 55:2, 57:24, 59:4, 59:20, 60:23, 64:5, 67:6
**SENTENCING** [1] - 1:10
**sentencings** [1] - 3:18
**sentiment** [1] - 59:13
**separate** [2] - 42:14, 49:8
**September** [1] - 25:9
**serious** [10] - 32:2, 32:3, 32:11, 33:19, 33:23, 34:1, 34:6, 34:8, 34:12, 38:16
**seriousness** [1] - 51:22
**Seroquel** [3] - 18:17, 32:20, 55:25
**served** [1] - 57:20
**service** [3] - 52:4, 52:5, 66:4
**services** [1] - 7:22
**serving** [1] - 45:11
**set** [1] - 57:5
**settlement** [1] - 49:7
**seven** [5] - 13:10, 13:11, 13:13, 32:18, 38:3
**seven-level** [1] - 38:3
**several** [1] - 50:20
**severely** [1] - 27:14
**shall** [4] - 65:12, 65:13, 65:14, 65:15
**share** [1] - 32:10
**shift** [1] - 31:13
**ship** [1] - 20:21
**shipped** [3] - 12:1, 12:2, 12:14
**shipping** [2] - 12:3, 12:18
**shocked** [1] - 61:15
**show** [4] - 15:9, 16:23, 20:3, 40:17
**showed** [3] - 8:10, 25:12, 62:1
**shows** [2] - 45:15, 45:23
**shut** [1] - 58:7
**sick** [1] - 33:14
**sift** [1] - 24:1
**significance** [1] - 54:23
**significant** [8] - 8:16, 41:4, 41:19, 54:25, 58:23, 61:7, 63:7, 63:8
**significantly** [2] - 59:16, 59:22
**similar** [3] - 24:10, 43:4, 43:10
**similarity** [2] - 41:16, 46:21
**similarly** [11] - 28:22, 41:2, 41:19, 44:6, 45:22, 46:20, 50:15, 60:20, 62:10, 63:3, 64:9
**simply** [2] - 9:12, 28:25
**Singhal** [1] - 42:22
**single** [5] - 24:3, 24:22, 45:25, 59:5, 61:4
**sit** [1] - 3:23
**site** [1] - 62:13
**sitting** [1] - 45:5
**situated** [13] - 28:22, 41:2, 41:16, 41:19, 44:6, 45:23, 46:20, 46:21, 50:16, 60:20, 62:10, 63:3, 64:9
**situation** [1] - 64:10
**situations** [1] - 64:9
**six** [1] - 13:10
**skill** [3] - 37:6, 37:11, 38:20
**skip** [1] - 36:11
**sleep** [1] - 34:13
**slightly** [1] - 63:4
**small** [4] - 11:1, 44:1, 56:6, 57:16
**small-town** [1] - 57:16
**sold** [9] - 10:23, 11:14, 11:20, 23:4, 24:8, 35:18, 46:1, 55:22, 56:14
**solicit** [1] - 65:22
**someday** [1] - 47:14
**someone** [14] - 31:21, 34:3, 34:8, 41:25, 42:9, 42:15, 43:3, 48:23, 50:14, 60:23, 61:5, 63:2, 64:10
**somewhere** [1] - 35:19
**son** [1] - 52:5
**son's** [2] - 51:17, 57:2
**sons** [1] - 53:4
**sophisticated** [11] - 28:18, 28:21, 28:24, 29:4, 29:15, 30:9, 30:23, 31:1, 31:15, 31:22, 38:15
**sophistication** [2] - 29:6, 31:18
**SOPs** [1] - 58:10
**sorry** [5] - 7:19, 32:13, 44:25, 46:11, 68:8
**sort** [4] - 21:2, 52:21, 52:22, 53:23
**sorts** [1] - 32:15
**sourcing** [1] - 52:8
**SOUTHERN** [1] - 1:2
**Southern** [2] - 53:12, 69:10
**SPEAKER** [2] - 63:18, 67:13
**speaking** [1] - 63:19
**special** [10] - 5:4, 28:3, 28:9, 28:10, 37:6, 37:10, 38:20, 65:16, 66:7, 66:8
**specific** [5] - 10:24, 11:15, 11:21, 18:11, 22:3
**specifically** [3] - 30:5, 31:6, 31:10
**speculate** [1] - 22:10
**speculative** [1] - 33:25
**spent** [3] - 52:2, 52:19, 53:21
**sporting** [1] - 57:3
**sports** [1] - 57:20
**Springs** [1] - 21:3
**stages** [1] - 42:4
**stamp** [1] - 53:13
**stand** [2] - 57:25, 60:19
**standard** [3] - 65:15, 67:17, 68:4
**Star** [1] - 7:21
**state** [3] - 16:7, 21:2, 54:11
**statement** [2] - 19:1, 21:17
**statements** [1] - 21:25
**STATES** [3] - 1:1, 1:4, 1:11
**states** [1] - 12:23
**States** [9] - 1:15, 2:5, 3:3, 3:8, 7:20, 23:19, 24:13, 64:6, 69:10
**statin** [1] - 21:8
**statutory** [1] - 28:7

**stay** [1] - 56:12
**STENOGRAPHICALLY** [1] - 2:2
**Stephen** [6] - 45:4, 45:5, 45:18, 46:7, 46:15, 49:23
**steps** [3] - 13:16, 14:25, 46:10
**still** [2] - 26:4, 57:7
**stood** [1] - 27:17
**strategizing** [1] - 31:12
**stream** [1] - 11:11
**Street** [6] - 1:16, 1:20, 15:8, 15:10, 16:6, 16:11
**street** [4] - 24:17, 29:23, 32:16, 60:15
**streets** [1] - 6:6
**stress** [1] - 46:22
**stressed** [1] - 53:7
**struck** [1] - 56:3
**submit** [1] - 65:24
**submits** [1] - 66:4
**subordinate** [1] - 14:4
**substances** [1] - 65:15
**substantially** [1] - 50:16
**sucked** [1] - 50:18
**suffer** [1] - 53:18
**suffered** [1] - 34:1
**sufficient** [1] - 64:7
**suggest** [6] - 11:13, 34:19, 34:25, 48:8, 48:18, 49:17
**suggesting** [1] - 9:24
**suggests** [2] - 9:16, 13:18
**supervised** [8] - 6:17, 65:9, 65:10, 65:12, 65:16, 66:9, 67:18, 68:4
**supervising** [2] - 9:15, 9:17
**supplier** [2] - 7:12, 17:4
**suppliers** [7] - 6:25, 7:3, 7:16, 8:16, 10:6, 23:13, 23:17
**supply** [4] - 27:6, 27:14, 27:21, 27:23
**support** [6] - 17:10, 50:21, 53:4, 54:7, 57:6, 57:12
**supported** [3] - 8:17, 24:10, 57:7
**supporting** [1] - 57:12
**supports** [2] - 6:14, 8:2
**supposed** [2] - 33:15, 34:5
**Supreme** [1] - 28:13
**surgery** [1] - 56:16
**suspend** [1] - 58:7
**sustain** [7] - 5:9, 5:17, 12:16, 16:14, 18:9, 26:19, 31:23
**sustained** [1] - 10:9
**sweet** [1] - 44:17
**sweet-talked** [1] - 44:17
**swing** [1] - 25:18
**Synergy** [7] - 6:8, 7:1, 14:1, 16:22, 16:23, 17:3, 30:7
**system** [9] - 18:24, 41:5, 41:11, 41:12, 50:7, 50:8, 51:13, 53:17

**T**

**T3** [4] - 6:13, 14:2, 16:24, 30:19
**T3s** [8] - 6:10, 14:2, 19:4, 19:13, 20:1, 22:1, 25:11, 30:6
**talks** [3] - 7:18, 24:14, 62:5
**tampered** [1] - 33:3
**tax** [1] - 62:22
**TD** [1] - 17:8
**teaching** [1] - 45:6
**team** [12] - 6:3, 6:18, 7:9, 29:5, 30:25, 31:2, 35:19, 35:20, 35:23, 35:25
**teams** [1] - 52:5
**Teams** [2] - 6:9, 32:13
**teenage** [2] - 53:5, 54:22
**teenagers'** [1] - 54:24
**ten** [17] - 11:3, 11:4, 11:5, 12:23, 13:1, 13:2, 13:4, 13:13, 18:12, 18:14, 20:16, 22:4, 38:7, 50:11, 57:22, 61:2
**testified** [6] - 14:5, 18:19, 21:12, 32:20, 33:21, 59:9
**testify** [4] - 8:20, 21:20, 21:22, 57:25
**testifying** [1] - 30:11
**testimony** [7] - 8:18, 11:7, 11:12, 15:1, 16:2, 31:7, 61:25
**Tex** [1] - 7:1
**text** [3] - 8:11, 8:14, 21:7
**thankful** [1] - 57:9
**Thanksgivings** [1] - 52:2
**THE** [125] - 1:10, 1:13, 3:3, 3:15, 3:20, 3:23, 4:1, 4:3, 4:17, 4:19, 4:22, 4:25, 5:6, 5:9, 5:13, 5:17, 5:25, 6:16, 8:4, 8:22, 9:19, 10:3, 10:10, 10:12, 10:15, 10:21, 11:18, 12:3, 12:7, 12:16, 13:5, 13:12, 13:22, 14:16, 14:21, 15:1, 15:18, 15:23, 16:13, 16:19, 17:9, 18:1, 18:8, 18:14, 19:6, 19:15, 20:15, 22:4, 22:7, 22:24, 25:2, 25:22, 26:6, 26:15, 26:18, 26:24, 27:19, 28:7, 28:13, 28:15, 29:7, 29:10, 31:20, 32:3, 33:7, 33:21, 34:7, 34:14, 34:23, 35:3, 35:6, 36:3, 36:7, 36:14, 36:17, 36:22, 37:3, 37:6, 37:9, 37:14, 37:17, 37:21, 38:1, 38:7, 38:10, 39:3, 39:8, 39:10, 39:14, 39:16, 39:19, 40:4, 40:9, 40:11, 40:14, 40:21, 42:22, 43:1, 44:24, 45:1, 50:23, 51:1, 54:7, 54:9, 54:11, 54:14, 54:18, 55:1, 55:6, 55:12, 58:18, 63:12, 63:16, 63:22, 64:1, 64:4, 66:13, 66:15, 67:15, 67:25, 68:3, 68:7, 68:11, 68:17, 68:21
**theories** [1] - 34:18
**theory** [1] - 19:25
**thinking** [1] - 62:2
**thirds** [1] - 46:2
**thousands** [2] - 7:7, 7:8
**three** [6] - 7:22, 40:6, 40:12, 47:8, 47:9, 65:9
**three-year** [2] - 40:6, 40:12
**throughout** [3] - 33:1, 59:4
**tier** [1] - 53:17
**title** [1] - 27:25
**today** [8] - 53:2, 53:16, 53:20, 53:25, 54:4, 57:7, 66:12, 66:13
**took** [3] - 14:25, 18:24, 52:3
**top** [1] - 31:4
**total** [4] - 21:5, 55:20, 56:7, 56:24
**town** [2] - 49:1, 57:16
**trafficking** [2] - 42:19, 44:2
**trained** [1] - 48:24
**transaction** [1] - 24:3
**transcript** [1] - 59:20
**TRANSCRIPT** [1] - 1:10
**transcription** [1] - 69:5
**transfers** [2] - 10:2, 13:20
**translates** [1] - 56:2
**trial** [32] - 6:1, 6:14, 7:12, 7:25, 8:16, 11:7, 11:12, 13:3, 13:7, 14:5, 16:3, 16:16, 21:20, 23:1, 25:12, 25:16, 32:20, 32:25, 33:1, 48:1, 48:11, 48:12, 55:18, 57:24, 58:15, 59:4, 60:12, 61:10, 62:21, 62:22, 63:1, 63:6
**tricked** [1] - 61:11
**tried** [1] - 57:5
**triple** [1] - 43:22
**trouble** [3] - 44:4, 45:13, 48:2
**true** [9] - 5:15, 11:22, 14:2, 29:12, 30:1, 30:14, 34:2, 47:17, 47:18
**trust** [5] - 26:23, 26:25, 27:20, 37:10, 58:1
**truth** [2] - 28:24, 55:20
**try** [1] - 20:9
**trying** [3] - 8:12, 24:21, 60:1
**turn** [1] - 52:16
**twice** [1] - 56:3
**two** [31] - 4:7, 4:9, 6:10, 9:4, 17:1, 18:10, 20:8, 25:5, 25:18, 27:2, 27:5, 27:11, 32:7, 37:7, 41:12, 41:13, 42:17, 43:12, 46:2, 46:24, 47:1, 52:2, 53:5, 53:17, 54:21, 56:24, 59:2, 59:10, 60:1, 61:18, 61:21
**two-level** [2] - 18:10, 37:7
**two-point** [2] - 25:5, 25:18
**two-thirds** [1] - 46:2
**two-tier** [1] - 53:17
**tyke** [1] - 51:16
**type** [4] - 14:8, 28:4, 29:3, 32:24
**types** [3] - 32:11, 41:18, 50:6

**U**

**U.S** [1] - 69:11
**ultimately** [2] - 27:15, 52:1
**unable** [1] - 21:20
**unascertainable** [2] - 22:9, 22:23
**unbelievable** [1] - 53:8
**unconscious** [1] - 32:22
**under** [5] - 7:19, 8:19, 11:5, 19:1, 46:8
**understates** [2] - 23:18, 25:20
**undisputedly** [2] - 7:25, 8:7
**unindicted** [1] - 34:21
**UNITED** [3] - 1:1, 1:4, 1:11
**United** [9] - 1:15, 2:5, 3:3, 3:7, 7:20, 23:19, 24:12, 64:6, 69:10
**Unity** [1] - 52:1
**University** [1] - 57:18
**unknowing** [1] - 7:22
**unknowingly** [1] - 18:17
**unless** [2] - 19:15, 63:16
**unpaid** [1] - 66:8
**unquote** [2] - 6:3, 47:1
**unsafe** [1] - 56:9
**untrue** [1] - 17:18
**unusually** [1] - 64:11
**unwarranted** [2] - 41:1, 60:23
**unwitting** [2] - 6:3, 7:18
**unwittingly** [3] - 6:4, 6:19, 6:21
**up** [28] - 6:25, 15:19, 22:2, 22:25, 38:2, 38:10, 38:11, 38:13, 38:17, 38:18, 38:21, 39:22, 39:24, 43:19,

44:16, 45:15, 45:23, 46:10, 47:9, 51:17, 56:6, 60:9, 62:1, 62:15, 62:16, 64:6, 64:21
**update** [1] - 58:9
**USC** [1] - 27:3
**Uzbekistan** [1] - 60:5

## V

**valid** [1] - 43:7
**variance** [6] - 39:18, 40:20, 40:23, 58:23, 62:3, 63:8
**various** [4] - 14:6, 20:24, 25:13, 34:17
**VAs** [1] - 56:16
**vast** [2] - 46:1
**Vega** [2] - 6:8, 16:24
**vendor** [2] - 17:22, 45:25
**vendors** [4] - 17:20, 17:22, 45:25, 56:7
**verdict** [3] - 28:3, 28:9, 28:10
**verdicts** [1] - 5:5
**versions** [1] - 21:19
**versus** [1] - 26:3
**viable** [1] - 33:9
**vice** [2] - 27:24, 51:10
**victim** [8] - 18:22, 18:23, 18:24, 19:1, 19:25, 21:16, 21:17, 35:5
**victims** [13] - 18:13, 18:14, 19:17, 20:13, 20:15, 21:12, 21:15, 34:17, 34:18, 36:12, 38:8, 38:18, 59:11
**viewing** [1] - 58:6
**VII** [3] - 40:16, 65:7, 65:9
**VIII** [5] - 19:23, 20:20, 40:16, 65:7, 65:9
**ViiV** [1] - 21:17
**ViiV's** [1] - 21:19
**virus** [1] - 45:16
**visit** [1] - 56:25
**vs** [1] - 1:6
**vulnerability** [1] - 35:1
**vulnerable** [9] - 34:16, 34:22, 35:5, 35:7, 36:12, 38:18, 59:6, 59:10, 62:16

## W

**WAC** [1] - 34:21
**wait** [1] - 50:24
**waive** [1] - 66:6
**waiver** [1] - 67:3
**Walgreens** [1] - 11:11
**walking** [1] - 52:13
**Wall** [4] - 15:8, 15:10, 16:6, 16:11
**wallet** [3] - 52:14, 52:20
**wants** [2] - 3:20, 54:14
**warehouse** [5] - 12:2, 12:4, 12:11, 12:19, 62:14
**warning** [1] - 58:9
**watch** [2] - 7:19, 8:19
**watched** [1] - 51:17
**water** [1] - 41:6
**weigh** [1] - 64:20
**whatsoever** [1] - 10:2
**whereas** [3] - 23:8, 48:3, 49:16
**white** [1] - 21:2
**White** [1] - 21:3
**whole** [2] - 19:11, 23:10
**wholesale** [4] - 27:18, 29:17, 55:15, 56:16
**wildly** [1] - 41:13
**WILLIAM** [1] - 1:10
**William** [3] - 1:18, 2:4, 3:9
**willing** [1] - 67:23
**windfall** [2] - 43:4, 64:14
**wink** [2] - 19:16
**wink-wink** [1] - 19:16
**wire** [3] - 4:9, 19:22
**wishes** [1] - 43:7
**witness** [1] - 59:24
**witnesses** [2] - 30:11, 33:1
**WL** [1] - 7:20
**word** [1] - 12:12
**words** [1] - 59:5
**workplace** [1] - 56:20
**world** [1] - 56:23
**worn** [1] - 16:25
**worries** [1] - 53:14
**worth** [2] - 7:6, 17:3
**worthless** [5] - 23:5, 23:15, 24:6, 24:18, 26:11
**writing** [1] - 42:2
**written** [2] - 65:18, 65:23
**wrongdoing** [2] - 47:16, 47:22

## Y

**year** [7] - 15:11, 15:12, 33:6, 40:6, 40:12, 57:1, 65:10
**years** [10] - 9:8, 24:1, 43:14, 51:9, 51:12, 51:24, 57:22, 59:2, 61:16, 65:9
**yesterday** [1] - 19:1
**York** [2] - 15:23, 33:10
**yourself** [3] - 31:17, 51:3, 51:5
**youth** [1] - 57:20

## Z

**Zimet** [2] - 1:22, 3:13
**ZIMET** [4] - 3:12, 3:19, 3:25, 37:24